# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE PAYMENT OF CERTAIN PREPETITION AND POSTPETITION TAXES AND FEES AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:[2]

### Relief Requested

1.       The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order"), (a) authorizing, but not directing, the Debtors to remit and pay (or use tax credits to offset) certain prepetition obligations accrued in the ordinary course on account of undisputed Taxes and Fees (as defined herein); and (b) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately twenty-one days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]     A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.  Capitalized terms used but not immediately defined in this motion have the meanings ascribed to them later in this motion or in the First Day Declaration, as applicable.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363(b), and 507(a)(8) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

## Background

5.      The Debtors were a leading provider of transportation services with a 100-year history.  With its family of trucking brands—Yellow Logistics, Holland, Reddaway, New Penn, and YRC—the Debtors provided their customers with one of the most comprehensive less-than-truckload ("LTL") networks in North America.

6.      The Debtors commenced these chapter 11 cases to implement a timely and efficient process to maximize the value of the Debtors' estates for the benefit of all stakeholders.  Through these chapter 11 cases, the Debtors will immediately commence an orderly and value-maximizing

wind-down of their businesses.  The Debtors will use their time in chapter 11 to market a sale or sales of all or substantially all of their assets.

7.     On August 6, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are managing their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no official committees have been appointed or designated.

**The Taxes and Fees**

8.     The Debtors (a) collect, withhold, and incur sales taxes from their customers and incur taxes, including, but not limited to, sales, use, weight-distance, highway use, fuel, franchise, gross receipts, commercial activity, business, real and personal property, and other taxes arising from the operation of their businesses (collectively, the "Taxes") and (b) pay customs duties, franchise fees, license costs, vehicle licensing fees, registrations, permitting costs, and any similar charges, duties, bills, invoices, and assessments (collectively, the "Fees" together with the Taxes, the "Taxes and Fees").[3]  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing authorities (collectively, the "Authorities"), identified in the

---

[3]    For the avoidance of doubt, the Taxes and Fees include Income Taxes, Sales and Use Taxes, Weight-Distance and Highway Use Taxes, Federal Heavy Highway Vehicle Use Tax, Fuel Taxes, Franchise Taxes, Ohio Commercial Activity Tax, TGRT, Property Taxes, Regulatory and Other Taxes and Fees, and Customs Duties, Custom Brokers' fees, and Penalty Fees (each term as defined below).  Other than with respect to potential Audits or Assessments (as defined below), this motion does not seek relief with respect to the Debtors' collection and remittance of employee-related taxes and withholdings, which are instead addressed in the *Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (II) Continue Employee Benefits Programs, and (III) Granting Related Relief* (the "Wages Motion"), filed contemporaneously herewith.

schedule attached hereto as **Exhibit C**.[4]  Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.   From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes and Fees.  The Debtors generally use these credits to offset against future Taxes and Fees or request the amount of such credits refunded to the Debtors. The Debtors estimate that approximately $25.4 million in Taxes and Fees are outstanding as of the Petition Date, of which approximately $5.04 million is currently payable or will become due and owing to the Authorities within the first twenty-one days of these chapter 11 cases in the ordinary course.

9.      Additionally, the Debtors may become subject to routine audit investigations on account of tax returns and/or tax obligations in respect of prior years ("Audits") during these chapter 11 cases, including as a result of any voluntary disclosure agreements or similar procedural mechanisms (if applicable).  Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors (such additional Taxes and Fees, "Assessments").[5]  Accordingly, the Debtors seek authority, but not direction, to pay or remit tax obligations on account of the Assessments as they arise, including as a result of any resolutions of issues addressed in an Audit and with respect to kinds of Taxes and Fees otherwise addressed in the Wages Motion.

10.      The Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, quarterly, semi-annually, or annually depending on the nature and incurrence of the

---

[4]   Although **Exhibit C** is intended to be comprehensive, the Debtors may have inadvertently omitted Authorities from **Exhibit C**.  By this motion, the Debtors request relief with respect to Taxes and Fees payable to all Authorities, regardless of whether such Authority is specifically identified on **Exhibit C**.

[5]   Nothing in this motion or any related order constitutes, or should be construed, as an admission of liability by the Debtors with respect to any Audit or Assessment.  The Debtors expressly reserve all rights with respect to any Audit and the right to contest any Assessments claimed to be due as a result of any Audit.

particular category of Taxes and Fees, each of which is further discussed below. Although the Debtors believe that they are substantially current with respect to their payment of Taxes and Fees, the Debtors seek authority pursuant to this motion to make such payments where: (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition or were paid in an amount less than actually owed; (c) Taxes and Fees paid prepetition by the Debtors were lost or otherwise not received in full by any of the Authorities; or (d) Taxes and Fees incurred for prepetition periods may become due after the commencement of these chapter 11 cases. In addition, for the avoidance of doubt, the Debtors seek authority, but not direction, to pay Taxes and Fees for so-called "straddle" periods (*i.e.*, periods that include the Petition Date).[6]

11.     In addition, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

12.     The Taxes and Fees are summarized as follows:

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date | Approximate Amount Due During the First Twenty-One Days |
|---|---|---|---|
| Income Taxes | The Debtors incur various state, local, and federal income taxes. The Debtors pay state, local, and federal income on a periodic basis. | $6,476,000 | $152,000 |
| Sales and Use Taxes | The Debtors pay taxes on goods and services sold or used, assessed based on the value of such goods and services, which are generally payable on a monthly basis. | $432,000 | $432,000 |

---

[6]     The Debtors reserve their rights with respect to the proper characterization of any "straddle" Taxes and Fees and to seek reimbursement of any portion of any payment made that ultimately is not entitled to administrative or priority treatment.

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date | Approximate Amount Due During the First Twenty-One Days |
|---|---|---|---|
| Weight-Distances, Highway Use, and Federal Heavy Highway Vehicle Use Taxes | Taxes imposed on the use of highways and other roadways in various jurisdictions. | $420,000 | $420,000 |
| Fuel Taxes | Taxes imposed in connection with the purchase of fuel. | $890,000 | $678,000 |
| Franchise Taxes, Ohio Commercial Activity Tax, and Texas Gross Receipts Tax | Taxes and related fees assessed as part of the Debtors' operations in the ordinary course. | $1,724,000 | $382,000 |
| Property Taxes | The Debtors pay taxes related to real and personal property holdings, which are generally payable on an annual basis. | $14,180,000 | $1,698,000 |
| Customs Duties, Custom Brokers' fees, and Penalty Fees | Customs duties, import and export-related taxes, and other incidental import and export expenses. | $230,000 | $230,000 |
| Regulatory and Other Taxes and Fees | Taxes, fees, tolls, fines, and other charges required to conduct business in the ordinary course in certain jurisdictions. | $1,056,000 | $1,045,000 |
| **Total** | | $25,408,000 | $5,037,000 |

## I.    Income Taxes.

13.    The Debtors incur and are required to pay various state, local, and federal income taxes (collectively, the "Income Taxes") in the jurisdictions where they conduct business.  In some jurisdictions, the Debtors remit to the relevant Authorities estimated amounts with respect to Income Taxes, resulting in tax credits or overpayments, which may be set off against future Income Taxes, or in certain circumstances may be refunded to the Debtors.  The Debtors generally remit Income Taxes to the relevant Authorities in accordance with the statutory requirements of each applicable jurisdiction (e.g., on an annual basis).  As of the Petition Date, the Debtors estimate that they owe approximately $6,476,000 in aggregate Income Taxes to the applicable Authorities on account of prepetition Income Taxes, approximately $152,000 of which will become payable

during the first twenty-one days following the Petition Date.  The Debtors request authority, but not direction, to satisfy any amounts owed on account of such Income Taxes, including any Income Taxes that are due and owing as of the Petition Date, and to satisfy any Income Taxes that may become due and owing in the ordinary course of business during their chapter 11 cases.

II.     **Sales and Use Taxes.**

14.     Certain Debtors collect and remit sales and excise taxes directly to the Authorities (the "Sales Taxes").[7]  Generally, the Debtors remit Sales Taxes to the Authorities in the month following acquisition and disposition of their corresponding goods.

15.     In addition to Sales Taxes and in connection with their business operations, including operating their transportation vehicles, trailers, and other machinery in various jurisdictions across the United States and Canada, the Debtors incur various state and local or provincial use taxes levied on the use of machinery and repair components in the applicable taxing jurisdiction (the "Use Taxes").  In 2022, the Debtors paid approximately $1.4 million in total Sales and Use Taxes.

16.     As of the Petition Date, the Debtors estimate that approximately $432,000 in Sales and Use Taxes and other charges will have accrued and remain unpaid to the relevant Authorities, approximately all of which will become payable during the first twenty-one days following the Petition Date. The Debtors request authority, but not direction, to satisfy any amounts owed on account of such Sales and Use Taxes, including any Sales and Use Taxes that are due and owing as of the Petition Date, and to satisfy any Sales and Use Taxes that may become due and owing in the ordinary course of business during their chapter 11 cases.

---

[7]     The Debtors' revenue-generating services are not subject to sales tax in most U.S. jurisdictions, but are subject to sales taxes in Canadian jurisdictions.

### III.     Weight-Distance and Highway Use and Federal Heavy Highway Vehicle Use Tax.

17.     The Debtors must pay weight-distance and highway use taxes to certain states in which the Debtors' carriers operate vehicles (collectively, the "Weight-Distance and Highway Use Taxes"). The tax payments are due with the returns and are due on a monthly basis, depending on the state. The Debtors' aggregate amount of Weight-Distance and Highway Use Taxes varies based on the mileage driven and the weight of the Debtors' vehicles and freight transported on highways in the relevant jurisdiction.

18.     In addition to the state-imposed Weight-Distance and Highway Use Taxes, the Debtors also incur and are required to pay an annual federal heavy highway vehicle use tax (the "FHHVUT"). The Internal Revenue Service assesses the FHHVUT after the first mile driven and the total amount is based on an estimate of the Debtors' expected United States fleet activity for the coming year. The FHHVUT is due and paid annually in August, subject to the federal government's adjustments due for any newly-active units.   In 2022, the Debtors prepaid approximately $4.96 million in FHHVUT for the period of August 2022 through July 2023.

19.     As of the Petition Date, the Debtors estimate that approximately $420,000 in Weight-Distance and Highway Use Taxes and FHHVUT and other charges will have accrued and remain unpaid to the relevant Authorities, approximately $420,000 of which will become payable during the first twenty-one days following the Petition Date.[8]  The Debtors request authority, but not direction, to satisfy any amounts owed on account of such Weight-Distance and Highway Use

---

[8]     As set forth herein, the Debtors have historically paid the FHHVUT in August when due, which covers the per-unit fee for the fiscal year, July through June.  When units are sold or otherwise disposed of, a prorated refund of the annual fee previously paid is available.  To balance the need to maximize the value of the estate with the need to effectuate a successful wind-down of operations, the Debtors seek authority, but not direction, to pay the full amount of the FHHVUT when due, with the intent to capture any refund available once proof of disposition is obtained.

Taxes and FHHVUT, including any Weight-Distance and Highway Use Taxes and FHHVUT that are due and owing as of the Petition Date, and to satisfy any Weight-Distance and Highway Use Taxes and FHHVUT that may become due and owing in the ordinary course of business during their chapter 11 cases.

**IV.    Fuel Taxes.**

20.    The Debtors pay certain federal fuel taxes ("Federal Fuel Taxes") directly to the vendor of such fuel. The applicable fuel vendors bear the responsibility for remitting the Federal Fuel Tax due to the taxing authority.

21.    The Debtors also incur certain state and provincial fuel taxes ("State and Provincial Fuel Taxes," and together with Federal Fuel Taxes, "Fuel Taxes") in connection with the purchase of diesel fuel or liquefied gas for use on state and federal highways.  The Debtors pay these State and Provincial Fuel Taxes in the states or provinces where the fuel is purchased, but the State and Provincial Fuel Tax liability is due to the state or province where the fuel is actually used. To simplify matters regarding payment and collection of State and Provincial Fuel Taxes, the 48 contiguous states and the ten Canadian provinces bordering the United States, which includes each of the states and provinces in which the Debtors operate, have adopted the International Fuel Tax Agreement ("IFTA") for the payment of the vast majority of State and Provincial Fuel Taxes.[9]

22.    Pursuant to IFTA, each of the Debtors operating qualified motor vehicles, as defined under IFTA, files quarterly reports with its base jurisdiction (the "Quarterly IFTA Reports").  Each Debtor's Quarterly IFTA Report lists all distances traveled and all fuel purchased

---

[9]    IFTA provides for the consolidated reporting of state and provincial Fuel Taxes for qualified commercial motor vehicles. Thus, IFTA simplifies the reporting of fuel used by commercial motor carriers operating in more than one jurisdiction. Under IFTA, an operator of vehicles traveling in multiple jurisdictions select one of the member jurisdictions as its base jurisdiction. *See generally* IFTA, Inc., http://www.iftach.org/index.php (last visited July 21, 2023). The base jurisdiction will issue to each vehicle one set of IFTA fuel decals that is valid in all member jurisdictions. *See id.*

by jurisdiction during that quarter. The Quarterly IFTA Reports calculate the amount of fuel consumed in each jurisdiction and compare that figure to tax-paid fuel in each jurisdiction. The net amount is multiplied by the respective jurisdictions' tax rates to determine the incremental amount due or overpayment. Amounts for all jurisdictions are totaled, resulting in an overall balance due or overpaid amount.  The Debtors remit any additional State and Provincial Fuel Tax due to the base jurisdiction, or a credit or refund is issued.  Pursuant to IFTA, the base jurisdiction then distributes the appropriate amount of State and Provincial Fuel Taxes to the other member jurisdictions in which the Debtors operate qualified motor vehicles.

23.    The Debtors file Quarterly IFTA Reports in several states because certain of the Debtors have different base jurisdictions. The Debtors determined their relevant base jurisdictions based on the following factors:  (a) where operational control and operational records are maintained or can be made available; and (b) where their qualified motor vehicles travel.  In 2022, the Debtors paid approximately $1.2 million in IFTA taxes alone.

24.    A core requirement of the Debtors' business and a key element of clearing its network on a postpetition basis is both intrastate and interstate travel.  The Debtors' failure to pay the Weight-Distance and Highway Use Taxes, FHHVUT, Federal Fuel Taxes, and State and Provincial Fuel Taxes, along with any related or similar charges, may cause the Authorities to take certain actions related to the Debtors' right to do business in certain states, thereby disrupting their orderly, cost-efficient wind-down efforts. Without the right to operate their vehicles on interstate and intrastate highways, the Debtors would suffer significant disruption to its limited postpetition operations necessary to clear its network and effectuate an orderly wind-down of its businesses.

25.    As of the Petition Date, the Debtors estimate that approximately $890,000 in Fuel Taxes and other charges will have accrued and remain unpaid to the relevant Authorities,

approximately $678,000 of which will become payable during the first twenty-one days following the Petition Date.  The Debtors request authority, but not direction, to satisfy any amounts owed on account of such Fuel Taxes and other charges, including any Fuel Taxes and other charges that are due and owing as of the Petition Date, and to satisfy any Fuel Taxes and other charges that may become due and owing in the ordinary course of business during their chapter 11 cases.

**V.    Franchise Taxes, Ohio Commercial Activity Tax, and Texas Gross Receipts Tax.**

26.    The Debtors pay certain franchise taxes to the Authorities (the "Franchise Taxes"). The calculations for the Franchise Taxes vary and can derive from several sources, including a flat fee, net operating income, or capital employed.  Certain jurisdictions assess both Franchise Taxes and income taxes, while others assess either Franchise Taxes or income taxes depending on which yields a higher tax. Moreover, certain jurisdictions require estimated payments in respect of Franchise Taxes to be remitted on a quarterly basis if the estimated Franchise Taxes exceed a certain threshold.  The Debtors pay the majority of the Franchise Taxes owed annually.  In 2022, the Debtors paid approximately $516,000 on account of Franchise Taxes.

27.    In addition, in lieu of assessing a franchise tax, the state of Ohio assesses the Ohio Commercial Activities Tax ("CAT"), which is based on the previous quarter's gross receipts apportioned to Ohio and paid in arrears.  Similarly, in lieu of assessing a franchise tax, the state of Texas assesses the Texas Gross Receipt Tax ("TGRT"), which is based on the previous year's gross receipts apportioned to Texas and paid in arrears.

28.    If the Debtors do not pay any of the Franchise Taxes, CAT, or TGRT, the applicable Authority may seek to suspend or revoke the Debtors' right to do business in certain states, which would cause significant disruption to the Debtors' wind-down operations.

29.    As of the Petition Date, the Debtors estimate that approximately $1.72 million in Franchise Taxes, CAT, and TGRT will have accrued and remain unpaid to the relevant Authorities,

approximately $382,000 of which will become payable during the first twenty-one days following the Petition Date.  The Debtors request authority, but not direction, to satisfy any amounts owed on account of such Franchise Taxes, CAT, and TGRT, including any Franchise Taxes, CAT, and TGRT that are due and owing as of the Petition Date, and to satisfy any Franchise Taxes, CAT, and TGRT that may become due and owing in the ordinary course of business during their chapter 11 cases.

**VI.    Property Taxes.**

30.    Under applicable law, state and local governments in jurisdictions where the Debtors' operations are located may levy property taxes against the Debtors' real and personal property (the "Property Taxes").  Generally, the Debtors' real Property Taxes owed are assessed in advance and fixed as of the lien date, which may be January 1 or other date of each year (depending on the jurisdiction), but come due for payment all at once or in installments throughout the year and, in some cases, into the following year.  The Debtors typically pay the personal Property Taxes in arrears in the ordinary course of business as such taxes are invoiced. In 2022, the Debtors paid approximately $22.2 million in Property Taxes.

31.    As of the Petition Date, the Debtors estimate that approximately $14.2 million in Property Taxes will have accrued and remain unpaid to the relevant Authorities, approximately $1.7 million of which will become payable during the first twenty-one days following the Petition Date.  The Debtors request authority, but not direction, to satisfy any amounts owed on account of such Property Taxes including any Property Taxes that are due and owing as of the Petition Date, and to satisfy any Property Taxes that may become due and owing in the ordinary course of business during their chapter 11 cases.

**VII.    Customs Duties, Customs Brokers' Fees, and Penalty Fees.**

32.    The Debtors also seek authority for the Debtors and their customs brokers, as the Debtors' agents, to continue to make necessary payments of customs duties, import and export-related taxes (including the Canadian Value Added Tax and other taxes), and other incidental import expenses, including fees, penalties, and fines assessed during the ordinary course of business (collectively, the "Customs Duties") to the U.S. Customs and Border Protection Agency (the "U.S. Customs Service") and to non-U.S. customs Authorities,[10] even if the Debtors incurred the relevant liability prior to the Petition Date.  The Customs Duties include without limitation, the following customs duties, import and export-related taxes, and other incidental import and export expenses:   U.S. Customs duties, merchandise processing fees, harbor maintenance fees, Canadian Value-Added Taxes, fees for duty, and fee processing paid to third-party processors, and other similar fees.  In the ordinary course of their businesses, the Debtors transport raw materials, parts, components, certain finished goods, tooling, machinery, and equipment for their customers' businesses to and from non-United States jurisdictions, and then import or export (as applicable) such goods into the United States and other jurisdictions (collectively, the "Imported and Exported Goods").  In addition, certain of the Debtors remit the Customs Duties on behalf of their customers through third-party processors of Customs Duties (collectively, the "Customs Brokers").

33.    If the Debtors do not timely pay the Customs Duties, the U.S. Customs Service and non-U.S. customs Authorities may demand liquidated damages, assess interest, or impose other sanctions.  Contesting these measures would require substantial time, effort, and expense and

---

[10]    In the vast majority of cases, these customs payments are made on behalf of the Debtors' customers whose goods or materials are being transported by the Debtors across international borders, and the Debtors are subsequently reimbursed by their customers for these payments. In addition, certain of the Debtors may act from time to time as Customs Brokers (as defined below) for certain of the other Debtors.

would needlessly distract the Debtors from their wind-down efforts.  In addition, absent payment the Debtors' Customs Brokers (as defined herein) may, in some instances, assert shipper's and warehousemen's liens against the Imported and Exported Goods, the U.S. Customs Service may assert a lien against such goods under 19 C.F.R. § 141.1 (2008) and non-US. customs authorities may assert similar liens or take other action against the Debtors in their respective jurisdictions. Any such actions would impair the Debtors' ability to conduct business across the borders of the United States and Canada resulting in immediate and irreparable harm to the Debtors' estates.

34.     Accordingly, the Debtors submit that it is in the best interests of the Debtors' estates and creditors that the Debtors be authorized to pay such Customs Duties on their customers' behalf as they become due, even if such payments were assessed prepetition, to ensure an expedient and cost-effective implementation of their wind-down efforts.

35.     In addition, in order to qualify under customs regulations to operate in the import and export sector as international bonded carriers and bonded facilities for shipping and receiving the Imported and Exported Goods, the Debtors maintain surety bonds.  Due to the exigencies of their business in the ordinary course of business, the Debtors frequently made deliveries of bonded imported goods and released imported goods from their bonded facilities before the applicable customs Authority responded to the Debtors' request for the release of the bond to which the good is subject.  To the extent that any bonded imported good was delivered or released from a bonded facility prior to the Debtors' obtaining the consent of the applicable Customs authority, the Debtors are liable to such Authority for a penalty fee (the "Penalty Fees").  However, in the ordinary course, in each instance of such Penalty Fees being assessed, the Debtors routinely appeal such assessed Penalty Fees and are granted a reassessment of such penalty, often at a fraction of the original amount assessed.

36.     As of the Petition Date, the Debtors estimate that approximately $230,000 in Customs Duties, Customs Brokers' fees, and Penalty Fees will have accrued and remain unpaid to the relevant Authorities, approximately all of which will become payable during the first twenty-one days following the Petition Date.   The Debtors request authority, but not direction, to satisfy any amounts owed on account of such Customs Duties, Customs Brokers' fees, and Penalty Fees including any Customs Duties, Customs Brokers' fees, and Penalty Fees that are due and owing as of the Petition Date, and to satisfy any Customs Duties, Customs Brokers' fees, and Penalty Fees that may become due and owing in the ordinary course of business during their chapter 11 cases.

## VIII.   Regulatory and Other Taxes and Fees.

37.     The Debtors also are required to obtain various business licenses, permits (including permits for permission to carry overweight loads on certain highways), vehicle registration certificates, and pay state mileage taxes, tolls, and other fees and charges (together, "Regulatory and Other Taxes and Fees") in many jurisdictions in which they operate. The criteria to obtain these licenses, certificates, and permits as well as the the methods of calculating the payments and their deadlines vary significantly by jurisdiction.   Some state governments require the Debtors to pay annual reporting fees to remain in good standing for purposes of conducting business within the state.   In 2022, the Debtors paid approximately $4.4 million on account of Regulatory and Other Taxes and Fees.

38.     The Debtors own or lease facilities in all fifty states and market their services to commercial, industrial, and governmental customers throughout the United States and Canada. Any disputes that could impact the Debtors' ability to conduct business in a particular jurisdiction would have a sweeping and adverse effect on the Debtors' operations as a whole.   Specifically, the Debtors' failure to pay the Regulatory and Other Taxes and Fees could materially disrupt the

Debtors' business operations in several ways: (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the wind-down process; (b) the Authorities may attempt to file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates; and (c) certain directors and officers could be subject to claims of personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring. In addition, the Debtors have collected and hold certain outstanding tax liabilities in trust for the benefit of the Authorities. These funds may not constitute property of the Debtors' estates. Moreover, unpaid Taxes and Fees may result in penalties, the accrual of interest or both. The Debtors believe that payment of such Taxes and Fees related to business licenses, permits, certificates, annual reports, and state mileage taxes is necessary to ensure the efficient wind-down of the Debtors' businesses during the pendency of the chapter 11 cases.

39.     As of the Petition Date, the Debtors estimate that approximately $1,056,000 in Regulatory and Other Taxes and Fees will have accrued and remain unpaid to the relevant Authorities, approximately $1,045,000 of which will become payable during the first twenty-one days following the Petition Date. The Debtors request authority, but not direction, to satisfy any amounts owed on account of such Regulatory and Other Taxes and Fees, including any Regulatory and Other Taxes and Fees that are due and owing as of the Petition Date, and to satisfy any Regulatory and Other Taxes and Fees that may become due and owing in the ordinary course of business during their chapter 11 cases.

**Basis for Relief**

40.     The Debtors believe that any failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways: (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the wind-down process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the

automatic stay, and pursue other remedies that will harm the estates; and (c) certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key employees from their duties related to the Debtors' wind-down efforts.  In addition, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates; as such, there is a strong legal basis for allowing the Debtors to remit these funds to the applicable Authorities on a postpetition basis.  Moreover, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both.

**I.      Certain of the Taxes and Fees May Not Be Property of the Debtors' Estates.**

41.      Many of the Taxes and Fees are collected or withheld by the Debtors on behalf of the applicable Authorities and are held in trust by the Debtors.  *See*, *e.g.*, I.R.C. § 7501 (stating that certain taxes and fees are held in trust).  As such, these Taxes and Fees are not property of the Debtors' estates under section 541 of the Bankruptcy Code.  *See, e.g., Begier v. Internal Revenue Serv.*, 496 U.S. 53, 57–60 (1990) (holding that any prepetition payment of trust fund taxes is not a transfer subject to avoidance because such funds are not the debtor's property); *In re First Pay, Inc.*, 773 F.3d 583, 590 (4th Cir. 2014) (same); *DuCharmes & Co. v. Mich.* (*In re DuCharmes & Co.*), 852 F.2d 194 (6th Cir. 1988) (per curiam) (same); *In re Shank*, 792 F.2d 829, 833 (9th Cir. 1986) (sales tax required by state law to be collected by sellers from their customers is a "trust fund" tax and not released by bankruptcy discharge); *DeChiaro v. N.Y. State Tax Comm'n*, 760 F.2d 432, 435–36 (2d Cir. 1985) (same); *Rosenow v. Ill. Dept. of Revenue* (*In re Rosenow*), 715 F.2d 277, 279–82 (7th Cir. 1983) (same); *W. Surety Co. v. Waite* (*In re Waite*), 698 F.2d 1177, 1179 (11th Cir. 1983) (same).  The Debtors, therefore, generally do

not have an equitable interest in such funds, and they should be permitted to pay those funds to the Authorities as they become due.[11]

## II.    Certain of the Taxes and Fees May Be Secured or Priority Claims Entitled to Special Treatment Under the Bankruptcy Code.

42.    Claims for certain of the Taxes and Fees are or may be priority claims entitled to payment before general unsecured claims.  *See* 11 U.S.C. § 507(a)(8) (describing taxes entitled to priority treatment).  Moreover, to the extent that such amounts are entitled to priority treatment under the Bankruptcy Code, the respective Authorities may attempt to assess interest and penalties if such amounts are not paid.  *See* 11 U.S.C. § 507(a)(8)(G) (granting eighth priority status to "a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss").  Claims entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code must be paid in full under a confirmable plan pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  Therefore, payment of certain of the Taxes and Fees at this time only affects the timing of the payment for the amounts at issue and will not unduly prejudice the rights and recoveries of junior creditors.  Paying such Taxes and Fees likely will give Authorities no more than they otherwise would be entitled to under a chapter 11 plan and will save the Debtors the potential interest expense, legal expense, and penalties that might otherwise accrue on the Taxes and Fees during these chapter 11 cases.  For the avoidance of doubt, the Debtors are not seeking to make any payments pursuant to this Motion for tax periods that would be older than those entitled to priority treatment.

43.    Some of the Taxes and Fees may be entitled to secured status with respect to property owned by the Debtors.  As secured claims, these Taxes and Fees would be entitled to

---

[11]    For the avoidance of doubt, the Debtors hereby request authority to pay the Taxes and Fees as provided herein regardless of whether such Taxes and Fees constitute trust fund obligations.

priority treatment if the Debtors sell the property to which Taxes and Fees relate when the Debtors

confirm a Chapter 11 plan. *See* 11 U.S.C. §§ 506(a), 1129(a)(9)(C); 1129(b)(2)(A) (requiring that

any plan of reorganization "crammed down" over a class of secured creditors pay those creditors

in full or allow those creditors to retain their liens).  Moreover, such secured claims could accrue

interest if not timely paid.  Thus, paying such secured Taxes and Fees only affects the timing of

the payments, may reduce the ultimate amount owed with respect to such Taxes and Fees, and

does not prejudice the rights of other creditors of the Debtors.

**III.    Paying the Taxes and Fees Is a Sound Exercise of the Debtors' Business Judgment.**

44.    Courts have recognized that it is appropriate to authorize the payment of prepetition

obligations where necessary to protect and preserve the estate.  *See, e.g., In re Just for Feet, Inc.*,

242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497

(Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y.

1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, 29 B.R. 391, 398 (S.D.N.Y. 1983).

In doing so, these courts acknowledge that several legal theories rooted in sections 105(a) and

363(b) of the Bankruptcy Code support the payment of prepetition claims.

45.    Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and

a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  Under this section, a court may authorize a debtor

to pay certain prepetition claims.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (affirming lower

court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy

Code); *see also  In re Lehigh  &  New  England  Ry.  Co.*, 657  F.2d  570,  581  (3d Cir. 1981)

(recognizing the doctrine of necessity and authorizing the debtor to pay prepetition claims if such

payment was essential to the continued operation of the debtor); *In re Orion Refining Corp.*, 372

B.R. 688, 703 (Bankr. D. Del. 2007) (authorizing payment of prepetition claim of critical vendor

pursuant to section 363(b) of the Bankruptcy Code).  To do so under section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose" justifies the proposed use of property.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring the debtor to show a "good business reason" to approve a sale pursuant to section 363(b)).  Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").  Thus, if a transaction satisfies the business judgment rule, it should be approved under section 363(b) of the Bankruptcy Code.

46.     Furthermore, section 105(a) of the Bankruptcy Code provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity."    11 U.S.C.  § 105(a). The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein.  *See  Lehigh*, 657 F.2d at 581  (holding that a court may authorize payment of prepetition claims if such payment is essential to the debtor's continued operation); *see also Just for Feet*, 242 B.R. 821 at 824–25 (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189,

191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

47.     Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *See Ionosphere Clubs*, 98 B.R. at 176; *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

48.     The Debtors' ability to pay the Taxes and Fees is critical to avoid interruptions to wind-down operations.  If certain Taxes and Fees remain unpaid, the Authorities may seek to recover such amounts directly from the Debtors' directors, officers, or employees, thereby distracting these key personnel from wind-down efforts.  *See, e.g.*, *In re Am. Motor Club, Inc.*, 139 B.R. 578, 581–83 (Bankr. E.D.N.Y. 1992) (stating "[i]f the employer fails to pay over the trust fund taxes, the IRS may collect an equivalent amount directly from officers or employees of the employer who are responsible for collecting the tax" and finding director personally liable for

unpaid taxes) (citing *United States v. Energy Res. Co.*, 495 U.S. 545, 547 (1990)).  Any collection action on account of such claims, and any potential ensuing liability, would distract the Debtors and their personnel to the detriment of all parties in interest.  The dedicated and active participation of the Debtors' officers and employees is integral to the Debtors' orderly and value-maximizing wind-down of their business.

49.     Furthermore, the Debtors' liability to pay the Taxes and Fees may ultimately result in increased tax liability for the Debtors if interest and penalties accrue on the claims for Taxes and Fees, which amounts may also be entitled to priority treatment.  Such a result would be contrary to the best interests of the Debtors' estates and all stakeholders.  As noted above, many of the Taxes and Fees may be entitled to priority status pursuant to section 507(a)(8)(C) of the Bankruptcy Code.  As priority claims, these obligations must be paid in full before any general unsecured obligations of the Debtors may be satisfied.  To the extent that the Debtors are not able to timely pay the prepetition Taxes and Fees, they may ultimately be required to pay those amounts with additional interest and penalties.  The Debtors' failure to pay the prepetition Taxes and Fees as they come due may, thus, ultimately increase the amount of priority claims held by the Authorities against the Debtors' estates, to the detriment of the Debtors' general unsecured creditors and other non-priority creditors.  *See* 11 U.S.C. §§ 507(a)(8)(C) and 507(a)(8)(G). Accordingly, the Court should grant the Debtors authority to pay the prepetition Taxes and Fees as provided herein.

50.     Courts in this jurisdiction have often authorized payment of prepetition taxes under sections 105(a) and 363(b) of the Bankruptcy Code.  *See, e.g.*, *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. July 19, 2023) (authorizing debtors to pay prepetition taxes and fees in the ordinary course of business); *In re Lannett Company, Inc.*, No. 23-10559 (JKS) (Bankr. D.

Del. June 5, 2023) (same); *In re SIO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 24, 2023) (same); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Sept. 22, 2022) (same); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Nov. 18, 2021) (same).[12]

## Processing of Checks and Electronic Fund Transfers Should Be Authorized

51.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of access to cash on hand and anticipated access to debtor-in-possession financing.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority, but not direction, to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

## The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

52.     Bankruptcy Rule 6003 empowers a court to grant certain relief within the first twenty-one days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical, and the failure to receive the requested relief during the first twenty-one days of these chapter 11 cases could impact the Debtors' operations at this important juncture.  The requested relief is necessary for  the Debtors to ensure

---

[12]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

successful implementation of wind-down operations, preserve the ongoing value of their operations, and maximize value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

### Reservation of Rights

53.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount of, basis for, priority, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

54.     To the extent that any aspect of the relief sought herein constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

55.     The Debtors will provide notice of this motion to:  (a) the United States Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the DIP Agent and counsel thereto; (i) Milbank LLP, as counsel to certain investment funds and accounts managed by affiliates of Apollo Capital Management, L.P.; (j) the administrative and collateral agents under the B-2 Term Loan and counsel thereto; (k) the ABL Agent and counsel thereto; (l) White & Case LLP, as counsel to Beal Bank USA; (m) the administrative and collateral agents under the UST Credit Agreements and counsel thereto; (n) the United States Department of Justice and Arnold & Porter Kaye Scholer LLP as counsel to the United States Department of the Treasury; (o) the Taxing Authorities; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

56.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  August 7, 2023
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (*pro hac vice* pending) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (*pro hac vice* pending) |
| Peter J. Keane (DE Bar No. 5503) | Whitney Fogelberg (*pro hac vice* pending) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |
| Wilmington, Delaware 19801 | Telephone:     (312) 862-2000 |
| Telephone:     (302) 652-4100 | Facsimile:     (312) 862-2200 |
| Facsimile:     (302) 652-4400 | Email:          patrick.nash@kirkland.com |
| Email:          ljones@pszjlaw.com | david.seligman@kirkland.com |
| tcairns@pszjlaw.com | whitney.fogelberg@kirkland.com |
| pkeane@pszjlaw.com | |
| ecorma@pszjlaw.com | -and- |

Allyson B. Smith (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:          allyson.smith@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*