## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## MOTION OF DEBTORS
## FOR ENTRY OF INTERIM AND FINAL
## ORDERS (I) AUTHORIZING THE DEBTORS TO
## (A) MAINTAIN INSURANCE COVERAGE ENTERED
## INTO PREPETITION AND PAY RELATED PREPETITION
## OBLIGATIONS AND (B) RENEW, SUPPLEMENT, MODIFY, OR
## PURCHASE INSURANCE COVERAGE, (II) APPROVING CONTINUATION
## OF THE SURETY BOND PROGRAM, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

as follows in support of this motion:[2]

### Relief Requested

1.      The Debtors seek entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"),

(a) authorizing, but not directing, the Debtors to (i) maintain coverage under the Insurance Policies

and the Surety Bonds (each as defined herein) and pay any related prepetition or postpetition

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of Debtors'
principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street,
Suite 400, Overland Park, Kansas 66211.

[2]     A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to
the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer
of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions*
(the "First Day Declaration"), filed contemporaneously herewith.  Capitalized terms used but not immediately
defined in this motion have the meanings ascribed to them later in this motion or in the First Day Declaration, as
applicable.

amounts or obligations related hereto and (ii) renew, supplement, modify, or purchase Insurance Policies or Surety Bonds in the ordinary course, and (c) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately twenty-one days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

## Background

5.      The Debtors were a leading provider of transportation services with a 100-year history.  With its family of trucking brands—Yellow Logistics, Holland, Reddaway, New Penn, and YRC—the Debtors provided their customers with one of the most comprehensive less-than-truckload ("LTL") networks in North America.

6.      The Debtors commenced these chapter 11 cases to implement a timely and efficient process to maximize the value of the Debtors' estates for the benefit of all stakeholders.  Through these chapter 11 cases, the Debtors will immediately commence an orderly and value-maximizing wind-down of their businesses.  The Debtors will use their time in chapter 11 to market a sale or sales of all or substantially all of their assets.

7.      On August 6, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are managing their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no official committees have been appointed or designated.

**The Debtors' Insurance Policies**

8.      The Debtors maintain 82 insurance policies (collectively, the "Insurance Policies") administered by multiple third-party insurance carriers (collectively, the "Insurance Carriers"). The Insurance Policies provide coverage for, among other things, automobile liability, general liability, workers' compensation, commercial umbrella and excess liability, property (including Canadian property), excess flood, shipper's interest, legal liability, errors and omissions, consumer-generated cargo liability, cargo legal liability, international casualty DIC, directors' and officers' liability, cyber liability, fiduciary liability, employment practices liability,

employed-lawyers professional liability, and employee dishonesty liability.[3]  A schedule of the Insurance Policies is attached hereto as **Exhibit C**.  The annual premiums for the Insurance Policies total approximately $38.9 million in the aggregate, of which 68 percent is financed through a third-party premium financing company. The Debtors estimate that, as of the Petition Date, there are no outstanding premiums due to Insurance Carriers on account of the Insurance Policies.

9.     The Debtors' ability to maintain the Insurance Policies, to renew, supplement, and modify the same as needed, and to enter into new insurance policies as needed consistent with prepetition practices, is essential to preserving the value of the Debtors' estates.  Moreover, in many instances, insurance coverage is required by statutes, rules, regulations, and contracts that govern the Debtors' commercial activities, including the requirement of the United States Trustee for the Distract of Delaware (the "United States Trustee") that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.  Accordingly, the Debtors seek authority, but not direction, to maintain the Insurance Policies, to pay related prepetition obligations, to renew, supplement, or modify the Insurance Policies, and to enter into new insurance policies as needed.

10.    To the extent not already prepaid, the Debtors will need to continue to:  (a) make premium payments when due and post collateral, including surety bonds and letters of credit, required in order to preserve the coverage provided under the Insurance Policies; (b) make payments in respect of (i) any prepetition workers' compensation benefits incurred but not yet

---

[3]     The descriptions of the Insurance Policies set forth in this motion constitute a summary only.  The actual terms of the Insurance Policies and related agreements will govern in the event of any inconsistency with the descriptions set forth in this motion.

reported or paid, (ii) any prepetition claims that were filed but have yet to be resolved, and (iii) newly reported claims as they arise; and (c) continue to make payments to Sedgwick Claims Management Services, Inc. ("Sedgwick") and Broadspire Management Services, Inc. ("Broadspire," together with Sedgwick, the "Third-Party Claims Administrators") with respect to the administration of both prepetition and postpetition workers' compensation bodily injury and property damage claims, in each case to the extent outstanding.

**Liability, Property, and Other Insurance Programs**

11.    The Debtors maintain various liability and property-related Insurance Policies (collectively, the "Property and Casualty Insurance Programs"). The Debtors are required to pay premiums under the Property and Casualty Insurance Programs based upon fixed rates established by the applicable Insurance Carrier. The aggregate amount of annual premiums for the Property and Casualty Insurance Programs currently in effect is approximately $32.8 million. The Debtors pay these premiums directly to the Insurance Carriers, premium finance companies, or to any of the various applicable insurance brokers that aid the Debtors in procuring their insurance.

12.    In addition, the Debtors maintain their current automobile and general liability ("AL/GL") insurance coverage (the "AL/GL Policies") through several layers of third-party insurance. Old Republic General Insurance Corporation ("ORIC") and Old Republic Insurance Company of Canada (together with ORIC, the "ORIC Companies") are, respectively, the Debtors' primary carriers on Insurance Policies for the United States and Canada, with a combined annual premium amount of approximately $5.54 million for the current year. The Debtors and the ORIC Companies operate a loss sensitive insurance arrangement, with Insurance Policies issued on a quarterly basis, pursuant to which the Debtors' pay losses for amounts up to the $6 million deductible per AL/GL occurrence and $5 million deductible per occurrence under the Debtors'

Insured Workers' Compensation Program (as defined herein).  In connection therewith, the Debtors are required to post certain collateral through letters of credit for the ORIC Companies calculated by an actuarial assessment of projected losses within the retentions for which such ORIC Company is liable.  The Debtors' inability to pay pre-petition claims related to their AL/GL and Workers' Compensation Programs could trigger a draw by the ORIC Companies against the Debtors' letter of credit.

13.     The AL/GL Policy period runs through May 31, 2024. The Debtors' AL/GL Policies are extensive given the size of the Debtors' U.S. and Canadian operations, and to facilitate the Company's AL/GL Policies programs, the Debtors maintain a service agreement with Sedgwick to efficiently administer processing and payment by the Debtors of all AL/GL and non-litigated liability claims, and the Debtors pay Sedgwick a monthly service fee for administering this process.  The Debtors estimate that there are approximately $211,000 in prepetition amounts outstanding to Sedgwick on account of such services.  As such, the Debtors seeks the authority, but not direction, to pay any prepetition amounts that might be accrued and unpaid on account of the AL/GL Policies.

14.     The Debtors currently maintain liability insurance coverage for their directors and officers (the "D&O Liability Insurance") with Federal Insurance Company for primary coverage. The Debtors also currently maintain fiduciary liability insurance (the "Fiduciary Liability Insurance") that helps protect companies from claims of mismanagement and the legal liability related to serving as a fiduciary.  Due to the claims-made-and-notified structure of the D&O Liability Insurance and Fiduciary Liability Insurance, an insured party must make a claim and notify the insurer during the active period of the policy for coverage to apply.  The Debtors' D&O Liability Insurance and Fiduciary Liability Insurance expires on October 14, 2023.  As such, the

Debtors have negotiated and procured run-off coverage to provide against unnecessary distraction and safeguard the Debtors' directors' and officers' conscientious decision-making during the Debtors' wind-down process.  The Debtors do not believe that there are any prepetition amounts outstanding with respect to run-off coverage for the D&O Liability Insurance and Fiduciary Liability Insurance at this time, however, out of an abundance of caution, the Debtors request the authority to pay any prepetition amounts that might be accrued and unpaid on account of such run-off coverage.

15.     The Debtors currently maintain cyber liability insurance coverage (the "Cyber Liability Insurance") for losses relating to the damage to, or loss of information from, information technology ("IT") systems and networks.  Due to the claims-made-and-notified structure of Cyber Liability Insurance, an insured party must make a claim and notify the insurer during the active period of the policy for coverage to apply.  The Debtors maintain Cyber Liability Insurance currently, but such coverage will lapse when the policy expires on August 31, 2023.  As such, the Debtors seek the authority, to negotiate, renew, and procure such run-off coverage to provide against unforeseen issues.

**Insurance Brokers**

16.     The Debtors employ various insurance brokers (the "Brokers") to assist them with the procurement and negotiation of the Insurance Policies, the processing of claims, and, in certain circumstances, to remit payment to the Insurance Carriers on behalf of the Debtors.  The preservation of the agreements and arrangements in place with such Brokers is essential to the maintenance of the Insurance Policies and necessary for the efficient operation of the Debtors' business.  In addition to brokering the renewal of the Debtors' various Insurance Policies on favorable terms, the Brokers fulfill a necessary gateway function between the Debtors and their

various insurance providers, providing information and assistance related to the Insurance Policies.

17.     In exchange for the Brokers' services, the Debtors and the Debtors' Insurance Carriers pay fees to the Brokers (the "Brokers' Fees").  The Debtors' inability to pay the Brokers' Fees would immediately and irreparably jeopardize the Debtors' relationships with their Brokers and their insurance companies, and a search for new Brokers and insurance coverage would incur substantial costs and consume valuable time.  As stated above, such a disruption in insurance coverage and administration of the Insurance Policies would severely impair the Debtors' ability to maximize the value of their estates.  As of the Petition Date, the Debtors estimate that they owe prepetition Brokers' Fees in the aggregate amount of approximately $610,000, which Brokers' Fees are on account of recently procured Insurance Policies as well as currently ongoing negotiations for the renewal of other Insurance Policies.[4]

### The Debtors' Workers' Compensation Programs

18.     The Debtors' self-insured workers' compensation programs (the "Self-Insured Workers' Compensation Program") require the Debtors to pay a self-insured retention ("SIR") obligation of up to $5 million per occurrence, and the Debtors' insured workers' compensation program (the "Insured Workers' Compensation Program," together with the Self-Insured Workers' Compensation Program, the "Workers' Compensation Programs") requires the Debtors to pay a combined deductible and reimbursement of up to $5 million per occurrence.  The Debtors secure their obligations in respect of the certain of their Insurance Policies, including the Workers' Compensation Program, with an aggregate total of approximately $354.5 million in collateral

---

[4]     In addition, the Debtors anticipate that they will be obligated to pay Brokers' Fees associated with potential future renewals as part of the premiums associated with such renewals.

(letters of credit and cash in support of certain Surety Bonds) posted with the Debtors' insurance companies, as well as directly with certain states in which the Debtors maintain operations. The Debtors have posted a total of nearly $148.9 million in Surety Bonds with respect to their self-insurance obligations under their Workers' Compensation Programs in the states in which they operated as self-insured employers.

19.     The Debtors believe that absent the immediate relief requested herein, the Insurance Policies, Workers' Compensation Programs, and their administration would likely experience substantial disruption.  The Debtors' inability to pay prepetition claims related to their Self-Insured Workers' Compensation Programs would trigger payment on the Debtors' Surety Bonds to the states in which the Debtor is a self-insurer, resulting in the Debtors' sureties drawing on the currently-issued letters of credit and potentially cancelling the associated bond. Accordingly, the Debtors submit that a failure to receive the relief requested herein would substantially jeopardize the Debtors' wind-down efforts.

20.     The Debtors maintain their Workers' Compensation Programs through three types of programs, briefly described in turn herein.  For the avoidance of doubt, the Debtors seek the authority, but not direction, to continue the Workers' Compensation Programs in the ordinary course.

**A.     State-Funded Programs.**

21.     The Debtors are required by law in the various states where they operate to maintain workers' compensation and to provide employees with Workers' Compensation Programs for claims arising from or related to workplace illnesses or injuries arising during their employment with the Debtors.  Therefore, and in accordance with applicable requirements of local law, the Debtors maintain the Workers' Compensation Programs in all 50 states, as well as in Puerto Rico and Canada.  Absent compliance with these laws, the Debtors would either be prohibited from

operating in the relevant state or be placed into state-run insurance pools, which are generally prohibitively expensive, thereby causing immediate and irreparable harm to the Debtors' insurance program.

22.     In certain states and provinces, the Debtors Workers' Compensation Programs are administered through such state's or province's "monopolistic" workers' compensation insurance fund (collectively, the "State-Funded Programs").  As of the Petition Date, approximately 164 of the Debtors' employees and former employees receive workers' compensation benefits through the State-Funded Programs.  The Debtors expect to pay the applicable state and provincial agencies charged with administering the State-Funded Programs approximately $113,000 in aggregate annual premiums for the 2023 calendar year.

**B.   Self-Insured Programs.**

23.     The Debtors provide their workers with insurance through the Self-Insured Workers' Compensation Program in many of the states where they operate.  Pursuant to the Self-Insured Workers' Compensation Program, the Debtors pay applicable workers' compensation claims as they arise.  The various states that permit the Debtors to operate the Self-Insured Workers' Compensation Programs also require the Debtors to pay periodic assessments directly to certain of such states' agencies throughout the year (the "Self-Insured Assessments").  If the Debtors are not authorized to pay certain prepetition claims related to their Self-Insured Workers' Compensation Programs and potentially post additional collateral, certain states would likely revoke the Debtors' qualified self-insured employer status.  A revocation of self-insured status would force the Debtors to seek alternative arrangements,

which in turn would result in the Debtors' estates incurring unnecessary costs, including higher premiums and collateral requirements.

24.     In 2022, the Debtors paid an approximate aggregate amount of $1.85 million in Self-Insured Assessments.  The Debtors estimate that as of the Petition Date, approximately $1.02 million in prepetition Self-Insured Assessments have accrued but remain unpaid.

25.     The Debtors also have contracted with Chubb Global Casualty (Ace American Insurance Company) ("Chubb") to provide excess coverage for the Self-Insured Workers' Compensation Programs.  The Debtors make payments to workers for claims covered by the Self-Insured Workers' Compensation Programs for the full value on any given claim and Chubb is responsible for reimbursing the Debtors for such amounts in excess of any state's applicable claim limit.  Chubb provides coverage for workers' compensation claims greater than $5 million through premium-funded insurance managed through the Debtors' premium financing agreements (the "PFAs").  To secure the Debtors' obligations under the Chubb arrangement, Chubb requires the Debtors to post collateral in the form of irrevocable letters of credit in the amount of $10 million.

### C.     Insured Programs.

26.     The Debtors also ensure their workers' compensation liabilities through a series of jurisdiction-specific Insured Workers' Compensation Programs,[5] under which ORIC is the Debtors' primary carrier.  The ORIC workers' compensation policy constitutes a loss sensitive insurance arrangement, which requires the Debtors to reimburse ORIC up to $5 million per

---

[5]     In the ordinary course of business, certain of the Debtors may decide to transition from insured to self-insured in certain states.  Out of an abundance of caution, the Debtors seek approval herein to transition from insured to self-insured (or vice versa) in any particular state in their business judgment.

workers' compensation occurrence.  ORIC provides coverage for workers' compensation claims greater than $5 million through premium funded insurance.  The ORIC policies renew on a quarterly basis, providing ORIC a non-renewal option if premiums are not paid or collateral is not secured.  Pursuant to the terms of the ORIC workers' compensation arrangement, the Debtors must pay an aggregate annual premium of approximately $5.04 million, paid in quarterly installments.

### Third-Party Claims Administrators

27.     As discussed above, the Debtors' Workers' Compensation Programs are extensive given the size of the Debtors' U.S. and Canadian operations.  To facilitate the Debtors' Workers' Compensation Programs, the Debtors maintain a service agreement with Sedgwick to efficiently administer processing and payment by the Debtors of all workers' compensation claims and non-litigated liability claims.  The Debtors pay Sedgwick a monthly service fee for administering this process.  Additionally, the Debtors remain party to reimbursement agreements with Broadspire pursuant to which they must occasionally reimburse Broadspire for older claims that arose several years ago.  The Debtors do not believe that there are any prepetition amounts outstanding to the Third-Party Claims Administrators at this time on account of such services.  Out of an abundance of caution, however, the Debtors hereby request the authority to pay any prepetition amounts that may be accrued and unpaid on account of the Third-Party Claims Administrators' services.

### Premium Financing Agreements

28.     In the ordinary course, the Debtors finance the premium payments for their Insurance Policies (collectively, the "Financed Policies") pursuant to PFAs with third-party premium finance companies.  Specifically, the Debtors are currently party to two PFAs through

AFCO Premium Credit LLC ("AFCO"), one effective as of March 1, 2023 totaling approximately

$2.3 million and another effective June 1, 2023 totaling approximately $23.2 million.  As of the

Petition Date, the Debtors owe approximately $2.4 million in outstanding obligations under the

PFAs.  The Debtors expect that approximately $18.4 million owed in connection with the PFAs

will come due postpetition in the ordinary course.  For the avoidance of doubt, the Debtors seek

the authority, but not direction, to pay related prepetition obligations under the PFAs and any

related postpetition obligations due in the ordinary course.

### The Surety Bond Program

29.    The Debtors are required to provide surety bonds or other forms of credit support

(collectively, the "Surety Bonds") to certain third parties, often governmental units or other public

agencies, to secure the payment or performance of certain obligations (the "Surety Bond

Program").  A schedule of the Surety Bonds is attached hereto as **Exhibit D**.  The Surety Bond

Program covers, among other things, (a) workers' compensation obligations; (b) obligations

relating to obtaining and maintaining permits or licenses; and (c) obligations related to Canadian

and U.S. customs.  The Surety Bonds are either obtained directly by the Debtors or indirectly on

the Debtors' behalf by certain non-Debtor affiliates.

30.    The Debtors are party to several indemnity agreements that set forth the sureties'

rights to recover from the Debtors (collectively, the "Surety Indemnity Agreements").  Pursuant

to the Surety Indemnity Agreements, the Debtors agree to indemnify each surety from any loss,

cost, or expense which the surety may incur on account of the issuance of any bonds on behalf of

the Debtors.

31.    As of the Petition Date, the Debtors have approximately $153.9 million in

outstanding Surety Bonds, collateralized by approximately $82 million in letters of credit.  These

outstanding Surety Bonds secure their performance and obligations in the following general categories and for the following approximate amounts:

| Number of Bonds | Nature of Bond | Approximate Aggregate Bond Amount |
|---|---|---|
| 99 | Workers' compensation | $148,884,600 |
| 27 | Performance, property broker, and related toll, licensing, and permitting requirements | $2,877,000 |
| 17 | Canadian/US customs | $1,635,000 |
| 1 | Municipal obligations | $100,000 |
| 2 | Utility obligations | $205,920 |
| 2 | Excise tax | $175,080 |
| 11 | Notary | $101,000 |
| **Total** | | $153,978,600 |

32.     To effectuate the wind-down process, the Debtors must be able to provide financial assurances to local and national governments, regulatory agencies, and other third parties.  This in turn requires the Debtors to maintain the existing Surety Bond Program, including the existing cash collateral arrangements with the sureties, and potentially to acquire additional surety bond capacity as needed in the ordinary course.

## Basis for Relief

33.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983).  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

34. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also Armstrong World*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b)).

35. Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See Just for Feet*, 242 B.R. at 825−26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when

there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business).   A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)).   Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *See CoServ*, 273 B.R. at 497.

36.    The relief requested herein is necessary to allow the Debtors to maintain appropriate insurance coverage and surety bonds to maximize the value of their estates during these chapter 11 cases.  Failure to maintain appropriate insurance coverage could, among other things, expose the Debtors to significant economic risk and also violate applicable legal requirements (including the United States Trustee's operating guidelines).

37.    Courts in this district have granted relief similar to the relief requested herein under sections 105(a) and 363(b) of the Bankruptcy Code.  *See, e.g.*, *In re PGX Holdings, Inc., et al.*, No. 23-10718 (CTG) (Bankr. D. Del. July 21, 2023) (authorizing debtors on final basis to continue their current insurance policies and surety coverage, pay related prepetition obligations, renew, supplement, modify, or purchase insurance and surety coverage); *In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 5, 2023) (same);  *In re SiO2 Med. Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 24, 2023) (authorizing debtors on a final basis to continue their current insurance policies, pay related prepetition obligations, renew, supplement, modify, or purchase insurance coverage); *In re Carestream Health, Inc.*, No. 22-10778 (JKS)

(Bankr. D. Del. Sept. 22, 2022) (same); *In re Ector Cty. Energy Ctr. LLC*, No. 22-10320 (JTD)

(Bankr. D. Del. May 26, 2022) (same).[6]

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

38.     The Debtors have sufficient funds to pay the amounts described in this motion in

the ordinary course by virtue of access to cash on hand and anticipated access to

debtor-in-possession financing.  In addition, under the Debtors' existing cash management system,

the Debtors can readily identify checks or wire transfer requests as relating to any authorized

payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that

checks or wire transfer requests, other than those relating to authorized payments, will be

inadvertently honored.  Therefore, the Debtors request authority, but not direction, to authorize all

applicable financial institutions, when requested by the Debtors, to receive, process, honor, and

pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

39.     Bankruptcy Rule 6003 empowers a court to grant certain relief within the first

twenty-one days after the petition date only "to the extent that relief is necessary to avoid

immediate and irreparable harm."  For the reasons discussed above, the Debtors believe an

immediate and orderly transition into chapter 11 is critical, and the failure to receive the requested

relief during the first twenty-one days of these chapter 11 cases could impact the Debtors'

operations at this important juncture.  The requested relief is necessary for the Debtors to operate

their businesses in the ordinary course, preserve the ongoing value of their operations, and

maximize value of their estates for the benefit of all stakeholders.  The Debtors have demonstrated

---

[6]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

## Reservation of Rights

40.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount of, basis for, priority, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

41.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

42.     The Debtors will provide notice of this motion to:  (a) the United States Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the DIP Agent and counsel thereto; (i) Milbank LLP, as counsel to certain investment funds and accounts managed by affiliates of Apollo Capital Management, L.P.; (j) the administrative and collateral agents under the B-2 Term Loan and counsel thereto; (k) the ABL Agent and counsel thereto; (l) White & Case LLP, as counsel to Beal Bank USA; (m) the administrative and collateral agents under the UST Credit Agreements and counsel thereto; (n) t the United States Department of Justice and Arnold & Porter Kaye Scholer LLP as counsel to the United States Department of the Treasury; (o) the Insurance Carriers; (p) the Brokers; (q) the sureties under the Surety Bonds; (r) Broadspire; (s) Sedgwick; (t) AFCO; and (u) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, no other or further notice need be given.

**<u>No Prior Request</u>**

43.     No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  August 7, 2023
Wilmington, Delaware

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:           ljones@pszjlaw.com
                  tcairns@pszjlaw.com
                  pkeane@pszjlaw.com
                  ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (*pro hac vice* pending)
David Seligman, P.C. (*pro hac vice* pending)
Whitney Fogelberg (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                  david.seligman@kirkland.com
                  whitney.fogelberg@kirkland.com

-and-

Allyson B. Smith (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           allyson.smith@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*