## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) PERFORM INTERCOMPANY TRANSACTIONS AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:[2]

### Relief Requested

1.     The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"), (a) authorizing the Debtors to (i) continue to operate their Cash Management Systems and maintain their existing Bank Accounts (each as defined herein), (ii) honor certain prepetition or postpetition obligations related thereto, (iii) maintain existing Business Forms (as defined herein), and (iv) continue to perform the Intercompany Transactions (as defined herein) consistent with

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation.   The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]    A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.   Capitalized terms used but not immediately defined in this motion have the meanings ascribed to them later in this motion or in the First Day Declaration, as applicable.

past practice and (b) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately twenty-one days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105, 345, 363, 364, and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 2015-2, and 9013-1.

## Background

5.      The Debtors were a leading provider of transportation services with a 100-year history.  With its family of trucking brands—Yellow Logistics, Holland, Reddaway, New Penn, and YRC—the Debtors provided their customers with one of the most comprehensive less-than-truckload ("LTL") networks in North America.

6.      The Debtors commenced these chapter 11 cases to implement a timely and efficient process to maximize the value of the Debtors' estates for the benefit of all stakeholders.  Through these chapter 11 cases, the Debtors will immediately commence an orderly and value-maximizing wind-down of their businesses.  The Debtors will use their time in chapter 11 to market a sale or sales of all or substantially all of their assets.

7.      On August 6, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are managing their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no official committees have been appointed or designated.

**The Cash Management Systems**

8.      The Debtors generally maintain two distinct cash management systems (the "USA Cash Management System" and the "Canada Cash Management System," collectively, the "Cash Management Systems"), a schematic of which is attached as Exhibit 1 to the Interim Order and Final Order, respectively (the "Proposed Orders").  The Debtors use the Cash Management System to collect, transfer, and disburse funds and to facilitate cash monitoring, forecasting, and reporting.[3]  The Debtors' treasury department maintains daily oversight of the Cash Management Systems and implements cash management controls for accepting, processing, and releasing funds, including in connection with Intercompany Transactions.  The Debtors'

---

[3]    In the ordinary course of business, the Debtors may close existing accounts or open new accounts to facilitate their cash management needs.

accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

9.      The Cash Management Systems are similar to those commonly employed by businesses comparable in size and scale to the Debtors to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities.

10.      Because access to the Cash Management Systems is imperative to meet immediate-term obligations and to allow the Debtors, with the assistance of their advisors, to conduct a marketing process for their extensive asset portfolio and an orderly wind-down of their operations, any disruption to the Cash Management Systems could have an immediate and significant value-destructive effect on the Debtors' estates to the detriment of all stakeholders. Accordingly, the Debtors request authority, but not direction, to continue using their existing Cash Management Systems during the pendency of these chapter 11 cases, subject to the terms described herein.

**I.      The Bank Accounts and Flow of Funds.**

11.      As of the Petition Date, the Debtors' Cash Management Systems are collectively comprised of fifty-nine bank accounts (each, a "Bank Account" and, collectively, the "Bank Accounts"), each of which is identified on Exhibit 2 to the Interim Order and Final Order.[4]  Of those Bank Accounts, fifty-one are owned and controlled by the Debtors (the "Debtor Bank Accounts") and eight are owned and controlled by non-Debtor entities (the "Non-Debtor Bank Accounts").

---

[4]      The Debtors believe that Exhibit 2 is a complete list of the Debtors' relevant Bank Accounts.  To the extent that any Bank Account has been inadvertently omitted from that list, the Debtors request that the order granting the relief sought herein apply to such Bank Account.

A.    **The USA Cash Management System.**

12.    The USA Cash Management System is comprised of merchant services provided by PNC Merchant Services Company and thirty bank accounts that handle the primary collection and distribution of funds throughout the USA Cash Management System (the "USA Primary Bank Accounts") and seven bank accounts that the Debtors do not utilize on a frequent basis (the "USA Secondary Bank Accounts," and together with the USA Primary Bank Accounts, the "USA Bank Accounts").[5]

13.    The USA Bank Accounts consist of the following:

- Seventeen (17) Bank Accounts at JPMorgan Chase & Co. ("JP Morgan");

- Seven (7) Bank Accounts at Citizens Bank ("Citizens");

- Five (5) Bank Accounts at BNY Mellon ("BNY");

- Three (3) Bank Accounts at PNC Bank and PNC Brokerage / Investment ("PNC");

- Two (2) Bank Accounts at Wells Fargo Bank, N.A. ("Wells Fargo");

- One (1) Bank Account at U.S. Bank National Association ("US Bank");

- One (1) Bank Account at Bank of America, N.A. ("BoA");

- One (1) Bank Account at UMB Bank N.A. ("UMB" and, together with the above banks, the "USA Cash Management Banks").

14.    The USA Cash Management System is based around the USA Concentration Account (as defined herein), the Debtors' primary operating account.  Cash generated by the Debtors' operating revenues flow into the USA Cash Management System by way of checks, ACH, and wire transfers from the USA Concentration Collection Account to the USA Concentration Account.  On a periodic basis, funds from the USA Concentration Collection

---

[5]    While as of the Petition Date, the USA Cash Management System includes the thirty-seven USA Bank Accounts, during these chapter 11 cases, the Debtors may close existing accounts or open new accounts in accordance with prepetition practices.

Account are electronically transferred to other USA Bank Accounts directly by the Debtors' treasury department for the purpose of disbursements from, among others, the USA O&M Accounts and USA Payroll Accounts.

15.    The USA Bank Accounts and the USA Cash Management System are further described in the following table:

| USA PRIMARY BANK ACCOUNTS | |
|---|---|
| **Category** | **Description** |
| **USA Concentration Account**<br><br>JP Morgan ***0830 | This account serves as the Debtors' main bank account for operations. Disbursed funds across the USA Cash Management System mainly originate from the USA Concentration Account.<br><br>The primary Bank Accounts that receive funds from the USA Concentration Account are the USA O&M Accounts, the USA Payroll Accounts, the USA Investment Accounts, the USA Liability Accounts and the ABL Receivables Debt Service Account.[6]<br><br>Funding of this account is comprised of:  (a) revenue collections from the Debtors' operating companies; and (b) periodic draws from the ABL Receivables Debt Service Account pursuant to the ABL Credit Facility.<br><br>This account is subject to a Deposit Account Control Agreement ("DACA"). |
| **ABL Receivables Accounts**<br><br>JP Morgan *****9583<br>JP Morgan *****9567<br>JP Morgan *****3310<br>JP Morgan *****5497<br>JP Morgan ***2227<br>JP Morgan *****1713<br>PNC ******7094 | These seven (7) accounts serve as the Debtors' revenue collections accounts.<br><br>(1) ****9583 is a zero-balance lockbox account.  The Debtors receive electronic payments from customers related to the operations of USF Holland LLC ("USF Holland Lockbox Account");<br>(2) ****9567 is a zero-balance lockbox account. The Debtors receive electronic payments from customers related to the operations of USF Reddaway Inc ("USF Reddaway Lockbox Account");<br>(3) *****3310 is a zero-balance collections account.  The Debtors receive electronic payments from customers related to the operations of New Penn's operations (both directly from customers and also indirectly from the New Penn Collection Account);<br><br>With respect to the three (3) ABL Receivables Accounts above, the funds in these accounts are automatically swept daily into the USA Concentration Account. |

---

[6]    The USA Concentration Account also occasionally funds the Canada Bank Accounts and certain Non-Debtor Bank Accounts for the purpose of, among other things, foreign operations.

| USA PRIMARY BANK ACCOUNTS | |
|---|---|
| | (4) *****5497 is a collections account. The Debtors receive electronic payments from customers related to the operations of YRC Inc. ("YRC Freight Collection Account"); <br>(5) ***2227 is a lockbox account. The Debtors receive check payments from customers related to the operations of YRC Freight ("YRC Freight Lockbox Account"); <br><br> With respect to the YRC Freight Collection Account, the funds in the account flow via SOFTI[7] into the YRC Freight Lockbox Account and then to the legacy concentration YRC Freight account (the "YRC Freight Concentration Account").[8] <br><br> (6) *****1713 is a zero-balance collections account. The Debtors receive electronic payments from legacy customers related to the operations of Yellow Logistics, Inc. ("Logistics Account"); <br>(7) ******7094 is a zero-balance collections account. The Debtors receive electronic payments from customers related to the operations of Yellow Logistics, Inc. ("Yellow Logistics Account"). <br><br> With respect to the Logistics Account, funds within that account flow daily via SOFTI to the USA Concentration Account. For the Yellow Logistics Account, funds are swept daily into the PNC Master Concentration Account.[9] However, when the account balance exceed $500,000, the excess is wired to the USA Concentration Account. <br><br> Each account is subject to a DACA. |
| **USA Concentration Collection Account** <br><br> BoA ******2291 | This account serves as the Debtors' lockbox account for non-receivable collections (*i.e.*, returned overpayments, rebates, etc.). <br><br> Funding of this account originates from third parties. When the account balance exceeds $300,000, the Debtors' treasury department manually transfers excess funds to the USA Concentration Account. <br><br> This account is subject to a DACA. |
| **ABL Cash Collateral Accounts** <br><br> Citizens ******9308 <br> Citizens ******8700 | These accounts serve as accounts for (a) funding of restricted cash and (b) directly applying cash deposits to repay outstanding loans. <br><br> Both accounts are subject to a blocked DACA that is under the sole dominion and control of Citizens Business Capital, a division of Citizens Asset Finance, Inc. (a subsidiary of Citizens Bank, N.A.) (the "ABL Agent"). |

---

[7]    "SOFTI" stands for "Standing Order Funds Transfer Initiation," which is a regularly scheduled movement of funds by ACH or wire transfer from one bank to another bank.

[8]    The YRC Freight Concentration Account is maintained at JP Morgan by YRC Freight and has the account number *****7613 and is subject to a DACA.

[9]    The PNC Concentration Account in maintained at PNC by Yellow Corporation and has the account number ******2947 and is subject to a DACA.

| USA PRIMARY BANK ACCOUNTS | |
|---|---|
| | Citizens ******8700 shall be used during the chapter 11 cases in accordance with the DIP Orders.[10] |
| **USA O&M Accounts**<br><br>JP Morgan *****4201<br>JP Morgan *****4250<br>JP Morgan *****4599<br>JP Morgan *****4623<br>JP Morgan *****4268 | These accounts serve as the Debtors' disbursement accounts for operations. The primary recipients of funds from these accounts are third-party vendors, suppliers, and service providers.<br><br>These accounts are funded via a zero-balance transfers for the exact amount required to fund the applicable payments to payees. This occurs through a separate payables concentration account[11] maintained by the Debtors at JP Morgan (the "<u>USA Disbursement Concentration Account</u>"). |
| **USA Payroll Account**<br><br>US Bank ********5676 | This account serves as the Debtors' disbursement accounts for payroll. Payroll is automatically swept via a reverse wire by the Debtors' payroll provider.<br><br>The Debtors' treasury department funds this account as needed from the USA Concentration Account and maintains a minimum cash balance of $2 million. |
| **USA Liability Accounts**<br><br>Citizens ******8689<br>Citizens ******8417 | These accounts serve as the Debtors' disbursement accounts for workers' compensation and bodily injury and property damage claims.<br><br>(1) Account ******8689 is used to reimburse Sedgwick Claims Management Services, Inc. ("<u>Sedgwick</u>") the Debtors' third-party employee claims administrator, for workers' compensation claims.<br>(2) Account ******8417 is used to reimburse Sedgwick for bodily injury and property damage claims.<br><br>These accounts are funded from the Citizens Concentration Account daily for the exact amount required to reimburse Sedgwick on account of claims. |
| **USA Government Account**<br><br>JP Morgan *****4219 | This account serves as the Debtors' disbursement account for payments to governmental agencies. The Debtors are obligated by certain governmental agencies to maintain this account to fund, among other things, taxes and licenses.<br><br>Disbursements from this account are limited to government and licensing agencies and have specified debit filters and amount limits in place.<br><br>This account is funded from the USA O&M Accounts on an as-needed basis and maintains a balance of between $10,000 and $175,000 at all times. |

---

[10] "<u>DIP Orders</u>" has the meaning set forth in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "<u>DIP Motion</u>").

[11] The USA O&M Accounts are funded from the USA Disbursement Concentration Account ****4193, which is funded from the USA Concentration Account daily to make payments. This occurs via zero-balance funding.

| USA PRIMARY BANK ACCOUNTS | |
|---|---|
| **USA Investment Accounts**<br>Citizens ******8727<br>Citizens ******8638 | These accounts serve as the Debtors' investment accounts for fees/charges and interest income under the ABL Facility.<br><br>(1) Account ******8727 is an investment sweep account used to pay fees and letter of credit charges to the lenders under the ABL Facility as required by the ABL Credit Facility Agreement.<br>(2) Account ******8638 is a money market account used to earn higher interest income on cash available.  The Debtors are permitted to add funds to the money market account at any time during the month, but it is limited to a maximum of six withdrawals in one month.<br><br>The Debtors' treasury department electronically funds these accounts from the USA Concentration Account.<br><br>Each account is subject to a DACA. |
| **USA    Equipment    Proceeds Accounts**<br><br>BNY Mellon*****6671<br>BNY Mellon ******6698<br>JP Morgan*****2835 | These accounts serve as the Debtors' equipment related accounts to collect proceeds from sales of rolling stock and disbursements for reinvestment/purchase of rolling stock of up to $5 million per year.<br><br>Activity within each of these accounts represents a specific lienholder(s) collateral.  The proceeds and reinvestment are deposited and funded into the various accounts based on the related equipment lienholder(s).<br><br>Each account is subject to a DACA. |
| **USA  BNY  Mellon  Operating Account**<br><br>BNY Mellon******6663 | These accounts serve as the Debtors' disbursement accounts for payment of bank maintenance fees. |

| SECONDARY USA BANK ACCOUNTS | |
|---|---|
| **Other Obligations Accounts**<br><br>JP Morgan account number unknown<br>Wells Fargo ******6130<br>Wells Fargo ******9838<br>UMB **1046 | These accounts serve as the Debtors' disbursement accounts for payment of court-ordered, state, utility, or employee agreement obligations.<br><br>(1) The JP Morgan account is a workers' compensation trust account maintained by USF Holland ("USF Holland W/C Trust Account"). The USF Holland W/C Trust Account is inactive and dormant.<br>(2) Account ******6130 is a certificate of deposit account maintained by YRC Freight to secure certain municipal obligations owed to the city of San Francisco ("San Francisco CD Account").<br>(3) Account ******9838 is a savings account maintained by Yellow to hold funds arising from a draw on a letter of credit issued on behalf of the state of California relating to environmental obligations ("California Environmental L/C Account").<br>(4) Account **1045 is a standalone trust account maintained by Yellow to hold funds arising from a draw on a letter of credit ("UMB L/C"). The account has zero balance and the UMB L/C has not been drawn upon. |
| **USA Brokerage Account**<br><br>PNC *****0640 | This account serves as the Debtors' investment account. Historically the Debtors used the USA Brokerage Account for various investment purposes.<br><br>This account is currently dormant, and the Debtors do not intend to continue this practice. |
| **USA Government Controlled Accounts**<br><br>BNY Mellon*****58400<br>BNY Mellon*****68400 | These accounts serve as the Debtors' government funding accounts. The accounts have no activity and are zero-balance.<br><br>These accounts were utilized exclusively for funding of the UST Tranche A and UST Tranche B facilities. |

**B.      The Canada Cash Management System.**

16.      The Canada Cash Management System is comprised of fourteen bank accounts that handle the primary collection and distribution of funds throughout the Canada Cash Management System (the "Canada Bank Accounts").[12]

17.      The Canada Bank Accounts consist of the following:

- Eight (8) Bank Accounts at the Bank of Nova Scotia ("BNS");

- Four (4) Bank Accounts at JPMorgan Chase & Co. ("JP Morgan");

---

[12]   The USA Concentration Account also occasionally funds the Canada bank accounts owned by the Debtors for the purpose of, among other things, the foreign operations.

- One (1) Bank Account at Wells Fargo Bank ("Wells Fargo"); and

- One (1) Bank Account at Toronto-Dominion Bank ("TD Bank," together with the above banks, the "Canada Cash Management Banks," and collectively with the USA Cash Management Banks, the "Cash Management Banks").

18.     The Canada Cash Management System is based around the YRCF Canada Concentration Account and the Yellow Canada Disbursement Account, the primary operating accounts for the Debtors' Canadian operating company, YRC Freight Canada Company ("YRCF Canada").

19.     Cash generated by revenues from YRCF Canada's operations is generally funded in two ways:  (a) if YRCF Canada or YRC Freight receives customer receipts denominated in Canadian currency, into the Canada CAD Collection Account (as defined below) and (b) if YRCF Canada or YRC Freight receives customer receipts denominated in U.S. currency, into the Canada USD Collection Account (as defined below).  Cash collected in the Canada CAD Collection Account is automatically transferred to the YRCF Canada Concentration Account and then subsequently wired by the Debtors' treasury department to the Yellow Canada Disbursement Account.

20.     Cash collected in the Canada USD Collection Account (as defined in the chart below) is wired by the Debtors' treasury department into the USA Concentration Account as needed.  On a monthly basis, the Debtors' treasury department funds the YRCF Canada O&M Accounts and YRCF Canada Concentration Account in an amount determined under the service agreement between YRC Freight and YRCF Canada for operations.  Balances in the YRCF Canada Concentration Account, Canada Payroll Accounts, and YRCF Canada O&M accounts are adjusted as needed by the Debtors' treasury department electronically.

21.     The following table describes the Canada Bank Accounts in further detail:

| CANADA BANK ACCOUNTS | |
|---|---|
| **Bank Accounts Category** | **Description** |
| **YRCF Canada Concentration Account**<br><br>BNS ***4510 | This account serves as the Debtors' main bank account for Canada operations. The YRCF Canada Concentration Account is funded by revenues from YRCF Canada and YRC Freight's operations via the Canada Collection Accounts, which are denominated in Canadian currency.<br><br>The Debtors' treasury department makes daily transfer from this account into the Yellow Canada Disbursement Account.<br><br>Additionally, this account is funded an amount required under the service agreement between YRC Freight and YRCF Canada on a monthly basis. The monthly funding is then disbursed from this account to the YRCF Canada O&M Accounts and YRCF Canada Payroll Account for operating and payroll disbursements.<br><br>This account is subject to a DACA. |
| **Yellow Canada Disbursement Account**<br><br>BNS ********5214 | This account serves as the Debtors' disbursement account for payments of operating expenses. The primary recipients of funds from this account are third-party vendors, suppliers, and service providers on behalf of the Debtors.<br><br>This account is funded by revenues from the YRCF Canada Concentration Account or the USA Concentration Account.<br><br>This account is subject to a DACA. |
| **Canada Collection Accounts**<br><br>JP Morgan ******1210<br>JP Morgan ******1101 | These accounts serve as the Debtors' collection accounts for customer receipts.<br><br>(1) Account ******1210 is funded electronically by customer receipts from YRCF Canada and YRC Freight's operations that are denominated in Canadian currency (the "Canada CAD Collection Account").<br>(2) Account ******1101 is funded electronically by customer receipts from YRCF Canada and YRC Freight's operations that are denominated in U.S. currency (the "Canada USD Collection Account").<br><br>The Debtors maintain a standing transfer order with JP Morgan to automatically sweep cash from the Canada CAD Collection Account into the YRCF Canada Concentration Account on a daily basis. The Canada USD Collection Account is manually swept by the Debtors' treasury department.<br><br>These accounts are subject to a DACA. |
| **Canada Payroll Accounts**<br><br>BNS ********5311<br>BNS *********2910 | These accounts serve as the Debtors' disbursement accounts for employee payroll.<br><br>(1) Account ********5311 has minimal activity.<br>(2) Account *********2910 is funded by the YRCF Canada Concentration Account and funds are used to pay employee payroll obligations. |

| CANADA BANK ACCOUNTS | |
|---|---|
| **Bank Accounts Category** | **Description** |
|  | BNS ********5311 is subject to a DACA. |
| **Canada O&M Accounts**<br><br>BNS ********5117<br>TD Bank ***0714 | These accounts serve as the Debtors' disbursement accounts for operating expenses.  These accounts maintain a minimum cash balance of $20,000 at all times.<br><br>(1) Account ********5117 is manually funded by the Debtors' treasury department for payments to third party vendors, suppliers, and service providers on behalf of the Debtors.<br>(2) Account ***0714 is manually funded by the Debtors' treasury department for cargo claims related to shipments.<br><br>The Canada O&M Accounts maintain cash balances at all times.<br><br>BNS ********5117 is subject to a DACA. |
| **YRCF Canada O&M Accounts**<br><br>BNS *********7914<br>BNS********3512<br>BNS ********8114 | These accounts serve as the Debtors' disbursement accounts for operating expenses. The primary recipients of funds from the YRCF Canada O&M Accounts are third-party vendors, suppliers, and service providers on behalf of YRCF Canada.<br><br>(1) Account ********3512 is funded monthly via the service agreement between YRC Freight and YRCF Canada by the Debtors' treasury department.<br>(2) Account ********8114 is funded monthly via the service agreement between YRC Freight and YRCF Canada by the Debtors' treasury department.<br>(3) Account *********7914 is a zero-balance account used for payment of cargo claims.<br><br>The Debtors' treasury department funds each of these accounts for operating expense disbursements.<br><br>BNS********3512 and BNS ********8114 are each subject to a DACA. |
| **YRC Freight Canadian Lockboxes**<br><br>JPM Canada ******8704<br>JPM Canada ******8705 | These accounts serve as the Debtors' lockbox accounts for receipt of customer payments from operations in CAD or USD denomination.<br><br>These accounts are subject to a DACA. |
| **Canada Brokerage Account**<br><br>Account number unknown | This account serves as the Debtors' brokerage account for investment purposes.<br><br>This account is currently inactive and dormant, and the Debtors do not intend to continue this practice. |

II.     **Compliance with the Bankruptcy Code and Guidelines.**

 A.     **Compliance with U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code.**

 22.     Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  To comply with section 345 of the Bankruptcy Code, the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines") for the United States Trustee for the District of Delaware (the "U.S. Trustee") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with certain requirements set by the U.S. Trustee.  For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the court "for cause" orders otherwise.  11 U.S.C. § 345(a)–(b).  The majority of the Bank Accounts are held at authorized depositories under the U.S. Trustee Guidelines, however, certain of Cash Management Banks are not authorized depositories.  All of these Bank Accounts are part of the Canada Cash Management System or are Non-Debtor Bank Accounts.  Given the Debtors' global operations and cash management requirements, it is not feasible to consolidate all cash activities to the narrow group of financial institutions approved in the U.S. Trustee Guidelines.

23.     Eight of the Cash Management Banks where the Debtors maintain thirty-seven of their fifty-nine Bank Accounts are authorized depositories under the U.S. Trustee Guidelines, including the Debtors main operating accounts.  All of the Bank Accounts that are not held with an authorized depository are maintained at highly-rated, global financial institutions that are widely recognized as well-capitalized and financially stable.  The principal basis for the exclusion of certain of these financial institutions from the U.S. Trustee Guidelines is location—not financial soundness or stability.  Indeed, all of these institutions are based outside of the United States and thus less likely to be identified by the U.S. Trustee as an authorized depository.  These financial institutions are well-positioned to continue performing depository and cash management functions during these chapter 11 cases.  Cause exists to allow the Debtors to continue utilizing the existing Bank Accounts consistent with historical practices.

24.     The Cash Management Systems are complex and critical to the ongoing stability of the Debtors' businesses.  Relocating the Cash Management Systems to U.S.-only accounts and/or an authorized depository (a) would impose an excessive administrative burden on the Debtors and (b) could have tax or regulatory impacts which would require extensive diligence and analysis to ensure that no unwanted or detrimental effects would stem from such a transition.  The Debtors will continue to work in good faith with the U.S. Trustee to address any concerns regarding the use of these accounts on a postpetition basis.

25.     Out of an abundance of caution, to the extent the Court determines that the requirements of section 345(b) of the Bankruptcy Code are not satisfied, the Debtors request a 30-day suspension of such requirements, subject to the Debtors' rights to seek further extensions.

**B.     Compliance with U.S. Trustee Guidelines as to Business Forms.**

26.     As part of the Cash Management Systems, the Debtors utilize a number of preprinted business forms (the "Business Forms"), including, but not limited to, letterhead,

purchase orders, invoices, and preprinted and future checks.  The U.S. Trustee Guidelines require that the Cash Management Banks print "Debtor in Possession" and the bankruptcy case number on checks issued after the Petition Date.  To minimize expenses to their estates, the Debtors request that the Court authorize, but not direct, their continued use of all Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  Once the Debtors exhaust their existing supply of checks during these chapter 11 cases, the Debtors will, when reordering (or with respect to checks the Debtors or their agents print themselves), require or print the "Debtor in Possession" legend and corresponding bankruptcy case number on all such items.

### III.    Corporate Credit Card Program.

27.    As part of the Cash Management Systems, the Debtors provide a limited number of employees and departments with access to travel and expense credit cards (the "Credit Cards"). The Debtors maintain the Credit Cards with Citizens Bank (the "Corporate Credit Card Program"). The Credit Cards with Citizens Bank are reimbursed by the Debtors.  The Credit Cards issued under the Corporate Credit Card Program are used by the Debtors' employees to cover certain payments for travel expenses, such as meals and other necessary and approved company expenditures including facilities upkeep, office supplies, and utilities.  As of the date of filing there was an approximately $3,800,000 cash security deposit (the "Corporate Credit Card Cash Collateral") with Citizens Bank securing the Corporate Credit Card Program.

28.    The Corporate Credit Card Program is an integral part of the Debtors' Cash Management Systems to enable the Debtors to reimburse their employees for certain expenses that might be incurred in connection with the Debtors limited operations on a postpetition basis. Accordingly, the Debtors seek authority, but not direction, to pay any amount due and owing thereunder in the ordinary course of business on a postpetition basis, including, without limitation,

16

making payments, and permitting Citizens Bank to apply the Corporate Credit Card Cash Collateral, in each case on account of charges that were made under the Corporate Credit Card Program both prior to and after the Petition Date.

## IV.   Bank Fees.

29.     The Debtors incur periodic service charges and other fees related to the Cash Management Systems (collectively, the "Bank Fees"). As of the Petition Date, the Debtors estimate that they owe approximately $60,000 in prepetition Bank Fees. The Debtors request authority, but not direction, to pay any prepetition Bank Fees for prepetition transactions that are charged postpetition and to continue to pay the Bank Fees in the ordinary course.

## V.   Intercompany Transactions.

30.     The Debtors maintain and engage in routine business relationships with each other and non-Debtor affiliates (such transactions, the "Intercompany Transactions"), resulting in intercompany receivables and payables (the "Intercompany Balances"). The Debtors engage in various Intercompany Transactions, including funding of various expenses, such as operating expenses, legal entity maintenance fees, taxes, among other fees between the Debtors and certain non-Debtor affiliates. Furthermore, the Debtors anticipate the need to directly fund costs incurred by their non-Debtor affiliates associated with the facilitation of an orderly wind-down process.

31.     The Debtors generally account for and record all Intercompany Transactions and Intercompany Balances in their centralized accounting system, the results of which are recorded on the Debtors' balance sheets and regularly reconciled. Specifically, in the ordinary course of business, the Debtors provide monthly funding to certain of their non-Debtor affiliates located in Mexico. These non-Debtor entities maintain their own non-U.S. bank accounts and the Debtors have historically provided approximately $250,000 per month in the aggregate to such non-Debtor affiliates to cover the various expenses described above. The Debtors anticipate they will continue

to fund their non-Debtor affiliates as described herein on a postpetition basis pursuant to the budget approved for any debtor-in-possession financing.

32.     Accordingly, the Debtors seek authority, but not direction, to continue to engage in Intercompany Transactions and grant administrative expense status under section 364 of the Bankruptcy Code to Intercompany Balances as a result of postpetition Intercompany Transactions.

## Basis for Relief

**I.      The Court Should Authorize the Debtors to Continue to Use the Cash Management Systems.**

33.     The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) close all existing bank accounts and open new debtor-in-possession accounts; (b) establish one debtor-in-possession bank account for all estate monies required for the payment of taxes, including payroll taxes; and (c) maintain a separate debtor-in-possession account for cash collateral.  These requirements are intended to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims.  Considering the complexity of the Debtors' business and financial affairs and the need to collect, disburse, and move funds throughout the Cash Management Systems, enforcing these provisions of the U.S. Trustee Guidelines during these chapter 11 cases would severely disrupt the Debtors' business.  Accordingly, the Debtors request that the Court allow them to operate each of the Bank Accounts listed on <u>Exhibit 2</u> attached to the Interim Order and Final Order, respectively, as they were maintained in the ordinary course of business prior to the Petition Date.

34.     Maintaining the Cash Management Systems is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).

Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter[.]" *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039, 1061 (3d Cir. 1993). The requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Id.*; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (stating that a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

35. Requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive. Importantly, the Cash Management Systems provide the Debtors with the ability to quickly track and report the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds. Disrupting the Cash Management Systems could negatively affect the Debtors' efforts to maintain certain limited business operations while the Debtors and their advisors undertake a comprehensive marketing process for some or all of their assets and effectuate an orderly and cost-effective wind-down of their business affairs. Requiring the Debtors to adopt a new, segmented cash management system would be unduly burdensome and cause needless disruption under the circumstances. By contrast, maintaining the current Cash Management Systems will facilitate the Debtors' transition into chapter 11 and enable

the Debtors to maximize value of their estates by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.

36.     Parties in interest will not be harmed by the Debtors maintaining the Cash Management Systems, including maintaining the Bank Accounts and the Intercompany Transactions, because the Debtors implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations.  Specifically, with the assistance of their advisors, the Debtors implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' treasury department.  In light of such protective measures, maintaining the Cash Management Systems are in the best interests of the Debtors' estates and creditors.

37.     Courts in this and other districts have regularly allowed debtors in large chapter 11 cases to maintain their existing cash management systems and such relief generally is non-controversial.  *See, e.g.*, *In re PGX Holdings, Inc.*, Case No. 23-10718 (CTG) (Bankr. D. Del. Jun. 4, 2023) (authorizing the debtors to continue using the cash management system maintained by the debtors prepetition); *In re Lannett Co., Inc.*, Case No. 23-10559 (JKS) (Bankr. D. Del. May 2, 2023) (same); *In re SiO2 Medical Prods. Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. Mar. 29, 2023); *In re FB Debt Fin. Guar., LLC*, No. 23-10025 (KBO) (Bankr. D. Del. Feb. 6, 2023) (same); *In re AIG Fin. Prods. Corp. LLC*, No. 23-11309 (MFW) (Bankr. D. Del. Jan. 30, 2023) (same).[13]

38.     Accordingly, the Debtors request authority, but not direction, to continue using the Cash Management Systems, including maintaining, servicing, and administering the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the

---

[13]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

ordinary course of business.  Notwithstanding the foregoing, any check, draft, or other notification that the Debtors advise the Cash Management Banks to have drawn, issued, or otherwise presented before the Petition Date may be honored by the Cash Management Banks only to the extent authorized by order of the Court.  If the Debtors' ability to conduct transactions by these methods is impaired, the Debtors may be unable to perform under certain contracts necessary to effectuate their wind-down activities, resulting in unnecessary disruption to their business operations and additional costs to their estates.

## II.    Authorizing the Debtors to Continue Using Debit, Wire, Credit Card, and ACH Payments Is Warranted.

39.    The Debtors request relief from the U.S. Trustee Guidelines to the extent such guidelines require the Debtors to make all disbursements by check.  Implementing the U.S. Trustee Guidelines would needlessly impair the Debtors' efforts to preserve the value of their estates.  Thus, the Debtors request authority, but not direction, to continue using the Cash Management Systems, including receiving, processing, honoring, and paying any and all checks, ACH transfers and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto.  Notwithstanding the foregoing, any check, draft, or other notification that the Debtors advise the Cash Management Banks to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the Cash Management Banks only to the extent authorized by order of the Court.

40.    The Debtors also request authority, but not direction, to authorize the Cash Management Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors and debtors in possession, including by accepting and honoring all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be

honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date.  The Debtors also request that, to the extent a Cash Management Bank honors a prepetition check or other item drawn on any account either (a) at the direction of the Debtors or (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Cash Management Bank will not be deemed to be liable to the Debtors or their estates on account of such prepetition check or other item honored postpetition.  This relief is reasonable and appropriate because the Cash Management Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

41.     Moreover, the Debtors request authority, but not direction, to authorize the Cash Management Banks to (a) continue to charge the Debtors the Bank Fees, as applicable, and (b) charge back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course of business and only to the extent consistent with historical practices.

42.     In complex chapter 11 cases such as these, courts in this and other districts often waive the U.S. Trustee Guidelines' requirement that debtors establish new postpetition bank accounts, recognizing that they may harm a debtor's restructuring efforts to an extent that is out of proportion to the benefit, if any, the requirements afford the debtor's estate or parties in interest. *See, e.g.*, *In re PGX Holdings Inc.*, Case No. 23-10718 (CTG) (Bankr. D. Del. Jun. 4, 2023) (authorizing the debtors' continued use of existing bank accounts); *In re Lannett Co., Inc.*, Case No. 23-10559 (JKS) (Bankr. D. Del. May 2, 2023) (same); *In re SiO2 Medical Prods. Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. Mar. 29, 2023); *In re Carestream Health, Inc.*, No. 22-10778

(JKS) (Bankr. D. Del. Aug. 24, 2022) (same); *In re Riverbed Tech. Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Nov. 18, 2021) (same).[14]

### III.     The Court Should Authorize Payment of Fees and Prepetition Obligations Related to the Bank Accounts.

43.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983).  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

44.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."  *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also Armstrong World*, 29 B.R. at 397 (relying on section 363 of the Bankruptcy Code to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36

---

[14]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

(Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b)).

45.     Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business.  *See Just for Feet*, 242 B.R. at 825–26.  Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business).  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)).  Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim."  *See CoServ*, 273 B.R. at 497.

46.     These standards are satisfied here because paying fees, including the Bank Fees, and related prepetition obligations are necessary to maintain the Cash Management Systems and

avoid any disruption in the administration of the Bank Accounts while the pursue one or more value maximizing sale transactions for their assets. The Debtors request authority, but not direction, to continue to pay the Bank Fees, including any prepetition Bank Fees, in light of the material benefit of maintaining the Cash Management Systems. The relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003.

## IV.     Waiving of the Requirements of Section 345(b) of the Bankruptcy Code Is Warranted.

47.     The Debtors further seek a waiver of the deposit and investment requirements set forth in section 345 of the Bankruptcy Code. Section 345(a) of the Bankruptcy Code authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." For deposits that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise."

48.     Courts may waive compliance with section 345 of the Bankruptcy Code for "cause." In evaluating whether "cause" exists, courts have considered a number of factors such as:

      a.     the sophistication of the debtor's business;

      b.     the size of the debtor's business operations;

      c.     the amount of the investments involved;

| | | |
|---|---|---|
| d. | the bank ratings (Moody's and Standard & Poor) of the financial institutions where the debtor-in-possession funds are held; | |
| e. | the complexity of the case; | |
| f. | the safeguards in place within the debtor's own business for ensuring the safety of the funds; | |
| g. | the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions; | |
| h. | the benefit to the debtor; | |
| i. | the harm, if any, to the debtor; | |
| j. | the harm, if any, to the estate; and | |
| k. | the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case. | |

*See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

49. Because the Bank Accounts are vital to the Cash Management Systems, requiring the Debtors to transfer funds to other banks would be unduly burdensome to the administration of these chapter 11 cases and potentially cause severe tax consequences to the detriment of the Debtors' estates. The Bank Accounts are maintained at well-capitalized, highly rated banks, hold cash under the FDIC limits, and/or are otherwise necessary for the Debtors to transact in certain jurisdictions. Therefore, cause exists to waive the requirements of section 345(b) of the Bankruptcy Code and allow the Debtors to continue to maintain the Bank Accounts in the ordinary course of business

## V. The Court Should Authorize the Debtors to Continue Using the Business Forms.

50. To avoid disrupting the Cash Management Systems and incurring unnecessary expenses, the Debtors request authority, but not direction, to continue to use the Business Forms substantially in the form existing immediately before the Petition Date, without reference to their

status as debtors in possession.  Parties in interest will not be prejudiced by this relief and undoubtedly will be aware of their status as debtors in possession.  Thus, changing the Business Forms is unnecessary and would be unduly burdensome.  Once the Debtors have exhausted their existing stock of Business Forms, the Debtors will ensure that any new Business Forms are clearly labeled "Debtor in Possession" as soon as it is reasonably practicable to do so.

51.     Courts in this district have allowed debtors to use their prepetition business forms without the "debtor in possession" label in other large chapter 11 cases.  *See, e.g.*, *In re PGX Holdings Inc.*, Case No. 23-10718 (CTG) (Bankr. D. Del. Jun. 4, 2023) (authorizing debtors' continued use of preprinted check stock without a "Debtor in Possession" marking); *In re Lannett Co., Inc.*, Case No. 23-10559 (JKS) (Bankr. D. Del. May 2, 2023) (same); *In re SiO2 Medical Prods. Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. Mar. 29, 2023); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (same); *In re Riverbed Tech. Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Nov. 18, 2021) (same).[15]

## VI.    The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Priority Status to Postpetition Intercompany Claims.

52.     At any given time, there may be claims arising from Intercompany Balances (the "Intercompany Claims").  Intercompany Transactions are made between and among the Debtors and their non-Debtor affiliates in the ordinary course as part of the Cash Management Systems.  Furthermore, the Debtors anticipate making Intercompany Transactions between the Debtors and non-Debtor affiliates for purposes of providing cash support to non-Debtor affiliates so that they can fund their applicable wind-down procedure in accordance with applicable law.

---

[15] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

53.     The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions previously described.   The Debtors, moreover, will continue to maintain records of such Intercompany Transactions.   If the Intercompany Transactions were to be discontinued, the Cash Management Systems and related administrative controls could be disrupted to the detriment of the Debtors and their estates. Accordingly, the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such performance.

54.     Because certain of the Intercompany Transactions represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management Systems, the Debtors request the authority, but not direction, to continue conducting Intercompany Transactions postpetition in the ordinary course of business without further Court order.   The Debtors further request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all postpetition payments on account of postpetition Intercompany Transactions between or among the Debtors or their non-Debtor affiliates that give rise to an Intercompany Claim be accorded administrative expense status, which would result in an administrative expense claim in favor of the applicable Debtor payer.   This relief will ensure that each entity receiving payments from a Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.   For the avoidance of doubt, the relief requested herein with respect to the postpetition Intercompany Transactions and the Intercompany Balances resulting therefrom shall not constitute an admission of the Debtors or any other party as to the validity, priority, or status of any prepetition

Intercompany Balance or the Intercompany Transaction(s) from which such Intercompany Balance may have arisen.

55.     Similar relief has been granted in comparable chapter 11 cases in this district and others. *See, e.g.*, *In re PGX Holdings*, Case No. 23-10718 (CTG) (Bankr. D. Del. Jun. 4, 2023) (authorizing postpetition intercompany transactions and granting administrative expense status to intercompany claims); *In re Lannett Co., Inc.*, Case No. 23-10559 (JKS) (Bankr. D. Del. May 2, 2023) (same); *In re SiO2 Medical Prods. Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. Mar. 29, 2023); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (same); *In re Riverbed Tech. Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Nov. 18, 2021) (same).[16]

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

56.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of access to cash on hand and anticipated access to debtor-in-possession financing.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority, but not direction, to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

### The Requirements of Bankruptcy Rule 6003(b) Are Satisfied

57.     Bankruptcy Rule 6003 empowers a court to grant certain relief within the first twenty-one days after the petition date only "to the extent that relief is necessary to avoid

---

[16]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

immediate and irreparable harm." For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical, and the failure to receive the requested relief during the first twenty-one days of these chapter 11 cases could impact the Debtors' operations at this important juncture. The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

### **Reservation of Rights**

58. Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, priority, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the

Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

59.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

60.     The Debtors will provide notice of this motion to:  (a) the United States Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the DIP Agent and counsel thereto; (i) Milbank LLP, as counsel to certain investment funds and accounts managed by affiliates of Apollo Capital Management, L.P.; (j) the administrative and collateral agents under the B-2 Term Loan and counsel thereto; (k) the ABL Agent and counsel thereto; (l) White & Case LLP, as counsel to Beal Bank USA; (m) the administrative and collateral agents under the UST Credit Agreements and counsel thereto; (n) the United States Department of Justice and Arnold & Porter Kaye Scholer LLP as counsel to the United States Department of the Treasury; (o) the Cash Management Banks; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

61.     No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  August 7, 2023
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (*pro hac vice* pending) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (*pro hac vice* pending) |
| Peter J. Keane (DE Bar No. 5503) | Whitney Fogelberg (*pro hac vice* pending) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:       (302) 652-4100
Facsimile:       (302) 652-4400
Email:            ljones@pszjlaw.com
                  tcairns@pszjlaw.com
                  pkeane@pszjlaw.com
                  ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (*pro hac vice* pending)
David Seligman, P.C. (*pro hac vice* pending)
Whitney Fogelberg (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200
Email:            patrick.nash@kirkland.com
                  david.seligman@kirkland.com
                  whitney.fogelberg@kirkland.com

-and-

Allyson B. Smith (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:            allyson.smith@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*