**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTORS FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING**
**DEBTORS TO PAY PREPETITION CLAIMS OF CERTAIN**
**CRITICAL VENDORS, 503(b)(9) CLAIMANTS, LIEN CLAIMANTS,**
**AND FOREIGN VENDORS (II) CONFIRMING ADMINISTRATIVE EXPENSE**
**PRIORITY OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:[2]

**Relief Requested**

1.     The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"):  (a) authorizing, but not directing, the Debtors to pay prepetition amounts owing on account of (i) Critical Vendor Claims, (ii) 503(b)(9) Claims, (iii) Lien Claims, and (iv) Foreign Vendor Claims (each as defined herein); (b) granting administrative expense priority to all undisputed obligations on account of goods ordered by the Debtors prior to the date hereof that

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]     A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.  Capitalized terms used but not immediately defined in this motion have the meanings ascribed to them later in this motion or in the First Day Declaration, as applicable.

will not be delivered until after the Petition Date and authorizing the Debtors to satisfy such obligations; and (c) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately twenty-one days after the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363, 503, 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1.

## Background

5.      The Debtors were a leading provider of transportation services with a 100-year history.  With its family of trucking brands—Yellow Logistics, Holland, Reddaway, New Penn, and YRC—the Debtors provided their customers with one of the most comprehensive less-than-truckload ("LTL") networks in North America.

6.      The Debtors commenced these chapter 11 cases to implement a timely and efficient process to maximize the value of the Debtors' estates for the benefit of all stakeholders.  Through these chapter 11 cases, the Debtors will immediately commence an orderly and value-maximizing wind-down of their businesses.  The Debtors will use their time in chapter 11 to market a sale or sales of all or substantially all of their assets.

7.      On August 6, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are managing their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no official committees have been appointed or designated.

**Overview of the Debtors' Prepetition Claims**

| Relief Requested | | |
| --- | --- | --- |
| *Prepetition Claim Type* | *Interim* | *Final* |
| Critical Vendor Claims | $3,300,000 | $15,300,000 |
| 503(b)(9) Claims[3] | - | - |
| Lien Claims | $1,800,000 | $2,400,000 |
| Foreign Vendor Claims | $100,000 | $800,000 |
| **Total** | **$5,200,000** | **$18,500,000** |

**I.      Critical Vendors**.

8.      In the ordinary course of business and continuing during the wind-down process, the Debtors engage a number of providers of essential products or services, which the Debtors

---

[3]    The 503(b)(9) Claims are also Critical Vendor Claims, Lien Claims, Foreign Vendor Claims, and amounts owed on account of such claims are captured in the other categories of claims in this motion.

historically required to run their operations and service their businesses.  In order to effectuate necessary wind-down activities, the Debtors will rely on a small subset of specialized providers of products and services (the "Critical Vendors") to assist with such wind-down.  The Critical Vendors include, among others, suppliers who provide the Debtors with goods—such as fuel, tires, and certain specialized parts—and services, such as terminal security (to protect property of the estates), technology subscriptions (to track and value property of the estates), collections (to recover accounts receivable and effectively clear the Debtors' freight network), and transportation (to deliver freight necessary to collect certain accounts receivable).  These goods and services are essential for maintaining the marketable value of the Debtors' real property and rolling stock assets.  To that end, failure to pay prepetition claims held by certain Critical Vendors and accrued in the ordinary course of business (collectively, the "Critical Vendor Claims") could cause such Critical Vendors to refuse to provide the goods and services necessary for the Debtors' postpetition activities, including limited operations related to clearing their transportation network and winding down their businesses.

9.     The Debtors only intend to make payments contemplated herein to the extent that the Debtors believe a Critical Vendor's failure to do business with the Debtors would materially harm the Debtors' ability to effectuate an orderly wind-down.  Prior to filing these chapter 11 cases, the Debtors reviewed their accounts payable and vendor lists and consulted with the Debtors' purchasing and facility managers to identify those vendors most essential to the Debtors' postpetition activities that will be critical to maximizing the value of their estates in light of the following criteria:

(a)     whether a vendor is critical to maximizing property of the estates during the sale process;

(b)     whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' limited business operations;

4

(c)     whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to transition business thereto;

(d)     the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

(e)     whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

(f)     whether, if a vendor is not a sole source supplier, the Debtors have sufficient product in inventory to continue their operations while a replacement vendor is put in place;

(g)     whether the business relationship between the Debtors and the supplier is governed by a contract that will remain enforceable during these chapter 11 cases; and

(h)     whether a vendor meeting the foregoing criteria is able or likely to refuse to ship product to, or perform services for, the Debtors postpetition if the Debtors fail to pay their prepetition claims.

10.     Following the Debtors' analysis of these vendors, the Debtors identified a limited number of Critical Vendor candidates who constitute less than 1% of the total prepetition vendor population for purposes of the relief requested herein.  The Debtors believe that their relationships with these Critical Vendors may materially deteriorate without such payments, thereby causing disruption to the Debtors' limited operations and wind-down process if the Debtors are unable to pay Critical Vendor Claims as provided herein.[4]  The Debtors seek authority to pay prepetition Critical Vendor Claims solely to the extent that such payments are needed to ensure that a

---

[4]     The Debtors' calculation of the Critical Vendor Claims is based upon the Debtors' review of invoices received and invoices billed but not yet received by the Debtors' accounts payable department during the twelve months prior to the Petition Date, together with historical and forecasted annual purchase volumes for, or related to, Critical Vendors.  As a result, certain adjustments and reconciliations may be necessary to account for variances in these calculations due to actual volumes and payment terms related to Critical Vendors.  Accordingly, the Debtors reserve their right to request an increase in each of these caps (on proper notice).

particular vendor continues to provide goods and services to the Debtors that are critical to the Debtors' postpetition asset sale and wind-down efforts.

11.     As of the Petition Date, the Debtors estimate that approximately $15.3 million is due and owing to the Critical Vendors, $3.3 million of which is due prior to the final hearing.

## II.     503(b)(9) Claimants.

12.     The Debtors may have received certain goods from various vendors (collectively, the "503(b)(9) Claimants") within the 20-day period immediately preceding the Petition Date, thereby giving rise to prepetition claims to the 503(b)(9) Claimants (the "503(b)(9) Claims"). Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.

13.     The Debtors' believe that all of the 503(b)(9) Claims are also Critical Vendor Claims, Foreign Claims, or Lien Claims and have been characterized as such for purposes of this motion.  As such, the Debtors are not requesting relief for any amounts due and owing on account of 503(b)(9) Claims that are separate and distinct from the Critical Vendor Claims, Foreign Claims, or Lien Claims.  However, out of abundance of caution, to the extent a 503(b)(9) Claim is not otherwise classified as a Critical Vendor Claim, Foreign Claim, or Lien Claim, the Debtors seek authority to pay any undisputed Claims 503(b)(9) Claims.  The Debtors do not seek to accelerate or modify existing payment terms with respect to 503(b)(9) Claims (if any).  Rather, the Debtors will pay the applicable 503(b)(9) Claims (if any) as they come due and in the ordinary course of business.

## III.     Lien Claimants.

14.     The Debtors also rely on services from a number of third parties, including carriers (collectively, the "Lien Claimants"), who may hold, or claim to hold, a variety of statutory,

common law, or possessory liens (collectively, the "Lien Claims") that, if asserted, could materially impair the Debtors' postpetition asset sale and wind-down efforts.

15.     Unless the Lien Claimants are paid for outstanding prepetition amounts, the Debtors believe the Lien Claimants may refuse to continue performing obligations to the Debtors—including refusal to release from their possession customer freight, or property of the Debtors—causing immediate harm to the Debtors, their creditors, and their estates. Moreover, the value of the materials in the possession of the Lien Claimants generally exceeds the value of their respective prepetition claims.

16.     The Debtors intend to pay prepetition Lien Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs, including the expenses and delay of contesting asserted liens, to their estates. The Debtors have determined, in their business judgment, that paying approximately $2.4 million on account of total prepetition Lien Claims will benefit the estates, with approximately $1.8 million coming due prior to the final hearing.

**IV.     Foreign Vendors**.

17.     Certain of the Debtors' vendors are foreign entities (the "Foreign Vendors" and together with the Critical Vendors, 503(b)(9) Claimants, and Lien Claimants the "Specified Trade Claimants") with prepetition claims (the "Foreign Vendor Claims" and together with the with the Critical Vendor Claims, 503(b)(9) Claims, and Lien Claims the "Specified Trade Claims") against the Debtors. As of the Petition Date, the Debtors estimate that there is approximately $800,000 in aggregate amount due and owing on account of prepetition goods or services provided by the Debtors' Foreign Vendors, with approximately $100,000 coming due prior to the final hearing.

18.     Based on the reactions of foreign suppliers in other chapter 11 cases, the Debtors believe there is a significant and material risk that the nonpayment of even a single invoice could

cause a Foreign Vendor to stop shipping goods or providing supplies to the Debtors on a timely basis and/or completely sever its business relationship with the Debtors.  Suppliers and vendors located in foreign countries are often unfamiliar with the chapter 11 process and react skeptically to its debtor protections.  Short of severing their relations with the Debtors, nonpayment of certain Foreign Vendor Claims may also cause Foreign Vendors to take other harmful actions.  Timely shipment of supplies, including freight, is critical to the Debtors' business and postpetition wind-down operations, and the Debtors can ill-afford any delays or interruptions of this nature. Accordingly, the Debtors seek authority, in their sole discretion and business judgment, to make payments on account of such Foreign Vendor Claims.

## V.       The Debtors' Conditions on Payment to Prepetition Claimants.

19.       In return for paying the Specified Trade Claims, the Debtors will seek to require the applicable Specified Trade Claimants to continue supplying services to the Debtors on customary or other reasonable trade terms (the "Customary Trade Terms") in addition to promptly releasing any existing liens.  The Debtors may request, in their sole discretion, that each individual Specified Trade Claimant provide written acknowledgment of its obligation to continue supplying services to the Debtors on the Customary Trade Terms, in addition to promptly releasing any existing liens, as a condition to receiving any payment made pursuant to an order granting the relief requested in this motion.

## VI.      The Outstanding Orders.

20.       Prior to the Petition Date, and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue

substitute purchase orders postpetition.  To prevent any disruption to the Debtors' wind-down and sale process, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek entry of an order:  (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the acceptance of goods subject to Outstanding Orders; and (b) authorizing the Debtors to satisfy such obligations in accordance with their historic practices.

**Basis for Relief**

## I.      The Court Should Authorize the Payment of Foreign and Critical Vendor Claims.

21.      Allowing the Debtors to pay the Critical Vendor Claims and the Foreign Vendor Claims pursuant to all or some of the above-referenced Bankruptcy Code provisions is especially appropriate where, as here, doing so is consistent with the policies of chapter 11 of the Bankruptcy Code, including maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999). Indeed, recognizing that payment of prepetition claims of certain essential suppliers and vendors is, in fact, critical to a debtor's ability to maximize creditor recovery, and courts in this district regularly grant relief consistent with that which the Debtors are seeking in this motion.  *See, e.g.*, *In re PGX Holdings, Inc.*, No. 23-20728 (CTG) (Bankr. D. Del. Jul. 20, 2023) (authorizing the debtors to pay critical vendor claims); *In re KDC Agribusiness LLC*, No. 23-10786 (CTG) (Bankr. D. Del. Jul. 18, 2023) (same); *In re The Rockport Company, LLC*, No. 23-10774 (BLS) (Bankr. D. Del. July 10, 2023) (same); *In re Decurtis Holdings LLC*, No. 23-10548 (JKS) (Bankr. D. Del.

June 5, 2023) (same); *In re Boxed, Inc.*, No. 23-10397 (BLS) (Bankr. D. Del. Apr. 25, 2023) (same).[5]

22.    Additionally, if the Debtors do not pay certain of the Foreign Vendor Claims, certain Foreign Vendors may refuse to do business with the Debtors unless and until they receive payment on account of their prepetition claims.  The Foreign Vendors may take other actions against the Debtors based on the incorrect belief that they are not bound by the automatic stay.  As a result, the Debtors would be unable to procure related products and services, potentially causing the Debtors to fail or delay their wind-down and asset sale processes.  Courts in this jurisdiction routinely grant authorization for debtors to pay claims owing to foreign entities against which the automatic stay cannot be enforced readily in the United States and as to which it would be unduly time-consuming and expensive to seek enforcement of an order of the bankruptcy court in the creditor's home country.  *See, e.g.*, *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 24, 2023) (authorizing payment of certain foreign vendor claims); *In re Standyne LLC*, No. 23-10207 (JTD) (Bankr. D. Del. Apr. 14, 2023) (same); *In re Starry Group Holdings, Inc.*, No. 23-10219 (KBO) (Bankr. D. Del. Mar. 21, 2023) (same); *In re In re DCL Holdings USA Inc.*, No. 23-11319 (JKS) (Bankr. D. Del. Feb. 14, 2023) (same); *In re FTX Trading Ltd.*, No 22-11068 (JTD) (Bankr. D. Del. Jan. 9, 2023) (same).[6]

23.    The Debtors depend on the goods and services by the Critical Vendors and the Foreign Vendors and will continue to do so in connection with their wind-down activities. Ensuring these Critical Vendors and Foreign Vendors continue to supply certain goods and provide

---

[5]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

[6]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

services is therefore vital to the ability of the Debtors to maximize the value of their estates. Accordingly, for the reasons set forth herein, it is appropriate for the Court to authorize the Debtors to satisfy the Foreign Vendor Claims and Critical Vendor Claims.

**II.     The Court Should Authorize the Payment of 503(b)(9) Claims.**

24.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for "the value of any goods received by the debtor within twenty days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."  The 503(b)(9) Claims must be paid in full for the Debtors to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Consequently, paying such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan. Moreover, the timing of such payments lies squarely within the Court's discretion.  *See In re Glob. Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr.  D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").  Absent this relief, the Debtors could be denied access to goods necessary to maximize the value of their estates.

25.     Moreover, the Bankruptcy Code does not prohibit a debtor from paying such claims prior to pursuit of confirmation of a plan.  As administrative claims incurred in the ordinary course of business, the Debtors believe they may pay such claims in an exercise of their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code.  *See, e.g.*, October 31, 2006 Hr'g Tr. at 49, *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Nov. 6, 2006) ("THE COURT: I think arguably the debtor could pay its 503(b)(9) claimants without court approval.").

26.     For these reasons, courts in this district have regularly authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business. *See, e.g.*, *In re Boxed, Inc.*, No. 23-10397 (BLS) (Bankr. D. Del. Apr. 25, 2023) (authorizing

payment to parties with section 503(b)(9) claims); *In re FTX Trading Ltd.*, No 22-11068 (JTD) (Bankr. D. Del. Jan. 9, 2023) (same); *In re Alex and Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. July 14, 2021) (same); *In re Extraction Oil and Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. July 13, 2020) (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. June 11, 2020) (same).[7]    Accordingly, it is appropriate for the Court to authorize the Debtors to satisfy the 503(b)(9) Claims.

### III.    The Court Should Authorize the Debtors to Pay the Lien Claims Pursuant to Sections 1107(a), 1108, 363(b), and 105(a) of the Bankruptcy Code.

27.    Courts have authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so.  *See, e.g.*, *In re Murray Metallurgical Coal Holdings, LLC*, 613 B.R. 442, 450 (Bankr. S.D. Ohio 2020) ("[T]here can be little doubt that [section 363(b)(1)] also provides a mechanism for debtors to obtain court authority to pay prepetition claims before confirmation if a sound business purpose supports the payment."); *In re Windstream Holdings Inc.*, 614 B.R. 441, 456 (S.D.N.Y. 2020) (finding authority to authorize the payment of prepetition claims where the debtor can "articulate some business justification, other than mere appeasement of major creditors . . . ."); *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005) ("Bankruptcy courts recognize that section 363 is a source of authority to make critical vendor payments, and section 105 is used to fill in the blanks."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397–98 (S.D.N.Y. 1983) (allowing contractor to pay prepetition claims of suppliers who were potential lien claimants under section 363 because the payments were necessary for general contractors to release funds owed to debtors); *see also In re CoServ L.L.C.*, 273 B.R. 487, 497

---

[7]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

(Bankr. N.D. Tex. 2002). In so doing, these courts have found that sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

28. Further, courts generally acknowledge that, under appropriate circumstances, they may authorize a debtor to pay (or provide special treatment for) certain prepetition obligations. *See, e.g.*, *In re Just For Feet, Inc.*, 242 B.R. 821, 824–25 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the debtor's business); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting the debtor the authority to pay prepetition wages). When authorizing payments of certain prepetition obligations, courts have relied upon several legal theories rooted in sections 1107(a), 1108, 363(b), and 105(a) of the Bankruptcy Code.

29. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, a debtor in possession is a fiduciary charged with "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *CoServ*, 273 B.R. at 497. Inherent in a debtor in possession's fiduciary duties is the obligation to "protect and preserve the estate, including an operating business's going-concern value," which, in certain instances, can be fulfilled only "by the preplan satisfaction of a prepetition claim." *Id.* Indeed, the *CoServ* court specifically noted several examples, including "the foreign creditor beyond the bankruptcy court's reach that enforces its prepetition claim against foreign assets of the estate or refuses, absent payment, to supply an unique piece of equipment or manufacturing component" or when "payment of a prepetition unsecured claim is the only means to effect a substantial enhancement of the estate." *Id.*

30. Consistent with a debtor's fiduciary duties, where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business

justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such payments under section 363(b) of the Bankruptcy Code. *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to pay prepetition wages); *In re James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).

31.     Courts have also authorized payment of prepetition claims in appropriate circumstances pursuant to section 105(a) of the Bankruptcy Code.    Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a), courts may permit preplan payments of prepetition obligations when such payments are essential to the operation of the debtor's business.  *See Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt).

32.     The flexible approaches developed by bankruptcy courts are particularly applicable where a prepetition creditor—here, the Lien Claimants—provides vital goods or services to a debtor that would be otherwise unavailable if the debtor were unable to satisfy its prepetition obligations.  As set forth above, the Debtors have determined, in the exercise of their sound business judgment, that payment of Lien Claims is essential to continue the uninterrupted supply of goods and services that directly affect the viability of the Debtors' to wind-down and asset sale process.  The relief requested herein is crafted to minimize the number and amount of prepetition claims that are paid and at the same time maximize the value that the Debtors receive in return for such payments.  Thus, the Debtors submit that the relief requested herein is narrowly-tailored to facilitate the Debtors' chapter 11 liquidation process.

33.    Under most state laws, a carrier may have a lien on the goods in its possession,[8] which lien secures the charges or expenses incurred in connection with the transportation or storage of such goods.[9]  As a result, certain carriers may refuse to deliver or release customer freight or other property of the estates in their possession or control, as applicable, before the prepetition amounts owed to them by the Debtors are satisfied and their liens redeemed.

34.    Lien Claimants also may possess a state-law lien on certain equipment or property for which prepetition services or improvements were provided.  Unless the Debtors are authorized to pay the Lien Claims, the Debtors may fall victim to "self-help" remedies, thereby disrupting the Debtors' wind-down process and dramatically reducing the value of the Debtors' estates to the detriment of the Debtors' creditors and all parties in interest.

35.    Further, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of a valid possessory lien to the extent that the Debtors use or sell the estate property against which a Lien Claim is asserted.  Given that the value of such property will generally far exceed the value of the related Lien Claim, creditors will not be harmed—and, in fact, will be benefited—by the satisfaction of certain amounts owed to the Lien

---

[8]    For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law."  *See* U.C.C. § 7-307(a) (2005).

*See* U.C.C. § 7-209(a) ("A *warehouse* has a lien against the bailor on the *goods* covered by a warehouse receipt or storage agreement or on the proceeds thereof in its possession for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.") (emphasis added).

[9]    By this motion, the Debtors do not concede that any liens (contractual, common law, statutory, or otherwise) described in this motion are valid, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of any and all such liens, and to seek avoidance thereof.

Claimants.  Those payments will facilitate the sale of estate property against which liens may otherwise be asserted, helping to preserve the going-concern value of the Debtors' business.

36.     Payment of the Lien Claims is not only important to the winding down of the Debtors' operations, but also critical to preserving the value of the Debtors' estates.  Payment of the Lien Claims will save the Debtors the considerable time and expense of having to negotiate or litigate for the return of or right to use property of the estate that may be subject to these lien claims.

37.     In addition, the relief requested herein should not impair unsecured creditor recoveries in these chapter 11 cases.  Given that the value of the product in the possession of the Lien Claimants generally will far exceed the value of their respective claims, most such parties may be fully secured creditors of the Debtors' estates.  Likewise, payments to the Lien Claimants will not prejudice unsecured creditors since the Debtors will pay only those claimants that they believe in their business judgment (a) to be secured by valid liens or that they believe (b) are capable of perfecting liens in the Debtors' property.  Payment now provides such parties only with what they might be entitled to receive under a chapter 11 plan, only without any interest costs that might otherwise accrue during these chapter 11 cases.  Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.

38.     Additionally, it is not uncommon for courts in this district and others to authorize payments to prepetition creditors, and in particular to lien claimants.  *See, e.g.*, *In re AearoFarms, Inc.*, No. 23-10737 (MFW) (Bankr. D. Del. Jun. 29, 2023) (authorizing payments to prepetition lien claimants); *In re Virgin Orbit Holdings, Inc.*, No. 23-10405 (KBO) (Bankr. D. Del. Apr. 26, 2023) (same); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 24, 2023) (same); *In re Starry Group Holdings, Inc.*, No. 23-10219 (KBO) (Bankr. D. Del. Mar. 21,

2023) (same); *In re FB Debt Financing Guarantor, LLC*, No. 23-10025 (KBO) (Bankr. D. Del. Feb. 8, 2023) (same).[10]

39.     Based on the foregoing, the Debtors respectfully submit that honoring the prepetition claims of the Lien Claimants is justified under the circumstances.

**IV.     The Court Should Confirm that Outstanding Orders Are Administrative Expenses and that Payment of Such Claims is Authorized.**

40.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expenses because they benefit the estate postpetition. *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority).  Thus, granting the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other party in interest.

41.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders.  The attendant disruption and delay to the continuous and timely flow of critical materials and other goods to the Debtors could require the Debtors to delay the wind-down of operations and slow the sale process.

---

[10]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

**V.   The Court Should Grant the Relief Requested in this Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code.**

42.     Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also  In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983).  In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

43.     Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions."  *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also Armstrong World*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b) of the Bankruptcy Code).

44.     Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code, courts may authorize pre plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses.  *See Just for Feet*, 242 B.R. at 825−26.  Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  *See, e.g.*, *Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business).  A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  *Ionosphere Clubs*, 98 B.R. at 175–76 (*citing Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)).  Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim."  *CoServ*, 273 B.R. at 497.

45.     As discussed above, it is imperative that the Debtors have the authority to pay Specified Trade Claimants if determined necessary to preserve the Debtors' limited operations, which will in turn, facilitate the orderly wind-down of the business and liquidation of the Debtors' assets.  The relief requested herein represents a sound exercise of the Debtors' business judgment,

is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is there justified under sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.

### Processing of Checks and Electronic Fund Transfers Should be Authorized

46.     The Debtors have sufficient funds to pay the amounts described in this motion by virtue of access to cash on hand and anticipated access to debtor-in-possession financing.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority, but not direction, to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

### The Requirements of Bankruptcy Rule 6003(b) are Satisfied

47.     Bankruptcy Rule 6003 empowers a court to grant certain relief within the first twenty-one days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical, and the failure to receive the requested relief during the first twenty-one days of these chapter 11 cases could impact the Debtors' operations at this important juncture.  The requested relief is necessary for the Debtors to operate their businesses in a value-maximizing manner for the benefit of all stakeholders.  The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

## Reservation of Rights

48.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount of, basis for, priority, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

49.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

50.     The Debtors will provide notice of this motion to:  (a) the United States Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the DIP Agent and counsel thereto; (i) Milbank LLP, as counsel to certain investment funds and accounts managed by affiliates of Apollo Capital Management, L.P.; (j) the administrative and collateral agents under the B-2 Term Loan and counsel thereto; (k) the ABL Agent and counsel thereto; (l) White & Case LLP, as counsel to Beal Bank USA; (m) the administrative and collateral agents under the UST Credit Agreements and counsel thereto; (n)  the United States Department of Justice and Arnold & Porter Kaye Scholer LLP as counsel to the United States Department of the Treasury; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

51.     No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (a) granting the relief requested herein, and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  August 7, 2023
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (*pro hac vice* pending) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (*pro hac vice* pending) |
| Peter J. Keane (DE Bar No. 5503) | Whitney Fogelberg (*pro hac vice* pending) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |

Wilmington, Delaware 19801
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:      ljones@pszjlaw.com
　　　　　tcairns@pszjlaw.com
　　　　　pkeane@pszjlaw.com
　　　　　ecorma@pszjlaw.com

Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      patrick.nash@kirkland.com
　　　　　david.seligman@kirkland.com
　　　　　whitney.fogelberg@kirkland.com

-and-

Allyson B. Smith (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      allyson.smith@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*