**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SEARLES VALLEY MINERALS INC., *et al.*,[1] | ) | Case No. 26-10966 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |

**DECLARATION OF ADRIAN FRANKUM**
**IN SUPPORT OF MOTION OF DEBTORS FOR**
**ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING**
**THE DEBTORS TO ASSUME SODA ASH SUPPLY AND LIQUIDITY**
**AGREEMENT AND OBTAIN FINANCING THEREUNDER**

I, Adrian Frankum, hereby declare under penalty of perjury:

40.     I am a Senior Managing Director at Ankura Consulting Group, LLC ("**Ankura**"), an interim management and financial services advisory firm, with numerous offices throughout the world. Ankura is the proposed restructuring advisor for the Debtors in the Chapter 11 Cases.

41.     I submit this declaration (this "**Declaration**") in support of the Debtors' *Motion of Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Assume Soda Ash Supply and Liquidity Agreement and Obtain Financing Thereunder* (the "**Motion**").[2] I am familiar with the Supply Agreement and the material terms thereof.

42.     Except as otherwise indicated, all statements set forth in this Declaration are based upon the following: (a) my personal knowledge, belief, or opinion; (b) information learned from

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Searles Valley Minerals Inc. (9263), Trona Railway Company LLC (3177), and Searles Domestic Water Company LLC (N/A). The location of Searles Valley Mineral Inc.'s corporate headquarters and the Debtors' service address is 9401 Indian Creek Parkway, Suite 1000, Overland Park, KS 66210.

[2]     Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the Motion, filed contemporaneously herewith.

my review of the Debtors' books and records and materials filed in the Chapter 11 Cases; (c) information supplied to me or verified by the Debtors' employees or advisors and/or employees of Ankura working directly under my supervision and direction; and (d) my professional experience, knowledge, skill, education, and/or training concerning financial restructurings, sale and capital raise transactions. If called as a witness, I could and would testify competently to the statements set forth in this Declaration on that basis. I am not being specifically compensated for this testimony other than through payments received by Ankura as a professional proposed to be retained by the Debtors. I am over the age of eighteen years and am authorized to submit this Declaration on behalf of the Debtors.

### Background and Qualifications

43.    Since 2014, Ankura has been a global provider of turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas. Ankura's debtor advisory services include a wide range of activities targeted at stabilizing and improving a company's financial position. Ankura's expertise relevant to the Chapter 11 Cases includes: (a) turnaround and restructuring consulting; (b) interim management, including serving in executive and management roles; (c) managing communications with lenders, board members, employees, investors, and creditor constituencies; (d) cash management and liquidity enhancement; (e) financial modeling and forecasting; (f) operational improvement; (g) strategic business plan development; (h) customer and vendor management; and (i) bankruptcy services, including contingency planning, preparing schedules and statements, preference analysis, claims resolution, and executory contract analysis.

44.    In addition, Ankura and its professionals have assisted and advised numerous financially troubled companies from a variety of industries in complex financial restructurings and liquidations, both out of court and in chapter 11 cases. Ankura professionals have been retained in

2

numerous large, complex chapter cases, including, among others: *In re Hardinge Inc.*, No. 24-11605 (JKS) (Bankr. D. Del. Aug. 23, 2024); *In re LaVie Care Centers, LLC*, et al., No. 24-55507 (PMB) (Bankr. N.D. Ga. 2024); I*n re Anagram Holdings, LLC, et al.*, No. 23-90901 (MI) (Bankr. S.D. Tx. 2023); *Pipeline Health System, LLC.*, No. 22-90291 (MI) (Bankr. S.D. Tx. 2022); *In re Black News Channel, LLC*, No. 4:22-bk-40087-KKS, (Bankr. N.D. Fla. 2022); *In re GBG USA Inc.*, No. 21-11368 (MEW) (Bankr. S.D.N.Y. 2021); *In re BJ Serv's., LLC*, No. 20-33627 (MI) (Bankr. S.D. Tex. 2020); *In re Brooks Brothers Group, Inc.*, et al., No. 20-11785 (CSS) (Bankr. D. Del. 2020); *In re Payless Holdings LLC*, No. 19-40883 (KAS) (Bankr. E.D. Mo. 2019); *In re 4 West Holdings, Inc.*, No. 18-30777 (HDH) (Bankr. N.D. Tex. 2018); *In re Westinghouse Electric Co.*, No. 17-10751 (MEW) (Bankr. S.D.N.Y. 2017); *In re Foundation Healthcare, Inc.*, No. 17-42571 (ELM) (Bankr. N.D. Tex. 2017); *In re ModelReorg Acquisition, LLC*, Case No. 17-11794 (CSS) (Bankr. D. Del. 2017).

45.     I am a Senior Managing Director of Ankura, with whom I have worked since 2017. Prior to joining Ankura, I worked for FTI Consulting, Inc. from 2004 until 2017. I have more than 26 years of experience as a financial professional and have held a variety of roles related to restructurings, liquidations, negotiated sales, and interim management positions in and across various jurisdictions. During my time as a restructuring professional, I have advised and assisted distressed companies across various complex financial, operational, and strategic situations, including, as set forth below, serving in a variety of interim management positions. Areas of my experience include operations management, financial statement analysis, financial projection development, liquidity and cash management, M&A support, stakeholder negotiations, balance sheet recapitalization and restructuring, postpetition financing and sourcing, and bankruptcy preparation and administration. My interim management experience includes serving as: the

3

interim CEO of a distressed private equity backed direct-to-consumer business; the Chief Restructuring Officer at Hardinge, Inc.; the Chief Restructuring Officer at Anagram Holdings, LLC; the Restructuring Officer at Brooks Brothers Group, Inc.; the Restructuring Officer at Payless ShoeSource; the Senior Vice President of Finance of Vertis Communications; the chief restructuring officer for a $600 million government contractor; and a member of the interim management team of the RadioShack Corporation. I have also served as a financial advisor in connection with restructuring activities and/or bankruptcy proceedings involving Sports Authority, the Puerto Rico Electric Power Authority, Revstone Industries, Jackson Hewitt Tax Service, Inc., Visteon Corporation, and Delphi Corporation, among others. I hold an MBA from NYU Stern School of Business and a BBA from the University of Georgia. I am also a certified public accountant (inactive).

## Ankura's Retention by the Debtors

46.     Ankura has been engaged as restructuring advisor for the Debtors, and members of my team and I have been working closely with the Debtors since April 2026. Since being engaged, Ankura has rendered financial advisory services to the Debtors which have included, among other things, advising on liquidity management and cash flow forecasting, developing a debtor in possession financing budget, updating the Debtors' business plan, and providing assistance in connection with various "first day" pleadings. Ankura has worked closely with the Debtors' management and other professionals retained by the Debtors with respect to the Debtors' restructuring efforts and has become acquainted with the Debtors' capital structure, liquidity needs, and business operations.

## The Debtors' Need for Liquidity

47.     Based on my familiarity with the Debtors' financial condition, I understand that the Debtors require immediate access to liquidity in addition to the liquidity to be provided by the

DIP Facility to ensure that they are able to continue to operate during the Chapter 11 Cases and preserve the value of their estates for the benefit of all parties in interest. Leading up to the filing of the Chapter 11 Cases, the Debtors' available liquidity was extremely limited. Specifically, the Debtors experienced significant financial distress and faced severe liquidity constraints, losing approximately $3-4 million per month in operating costs. Based on the Debtors' cash flow forecasts, which I have reviewed, the Debtors determined, and I agree, that the best path forward was to obtain liquidity under the Supply Agreement and DIP Facility and pursue a sale process in chapter 11. I believe that absent the liquidity provided by the Liquidity Advances and the DIP Facility, the Company will exhaust its remaining cash resources as soon as next week and will be unable to continue operations. In other words, without access to the Liquidity Advances and the liquidity provided by the DIP Facility, the Debtors would be unable to fund operations or the cost of administering the Chapter 11 Cases, and would instead be forced into an immediate liquidation that would be value destructive for the Debtors, their estates, creditors, and all parties in interest.

### Overview of the Supply Agreement and Reimbursement Agreement

48.     Based on my familiarity with the negotiation of the Supply Agreement, my review of the Supply Agreement, and my discussions with the Debtors and their counsel, I understand that, under the Supply Agreement, the Supplier will fulfill all of the Company's soda ash supply obligations to the Company's customers under existing customer contracts. I understand that the Debtors would be unable to satisfy their obligations to customers under existing soda ash contracts without the Supplier agreeing to do so under the Supply Agreement. Further, under the Supply Agreement, the Supplier will make liquidity advances to the Company in an aggregate amount of $20 million, $7 million of which will be provided upon entry of the Interim Order and the remaining portion of which will be funded upon entry of the Final Order. I understand that the Liquidity Advances, if approved, will constitute superpriority administrative expense claims under

section 364(c)(1) of the Bankruptcy Code. A portion of each payment made by the Debtors to the Supplier under the Supply Agreement will be deemed to repay the outstanding Liquidity Advances on a dollar-for-dollar basis until the Liquidity Advances are repaid in full, with all outstanding amounts due on the Maturity Date. Notably, the Supply Agreement does not grant the Supplier any liens on the Debtors' assets and does not impose milestones or cross-collateralization.  I understand that neither the Supplier nor any other party was willing to provide a comparable unsecured liquidity package allowable as an administrative expense under sections 503(b)(1) and 364(b).

49.    Nirma has agreed to enter into the Corporate Guarantee with the Supplier, guaranteeing SVM's obligations under the Supply Agreement, subject to the protections provided by the Reimbursement Agreement and the Interim Order.  Subject to entry of the Interim Order, the Debtors will enter into the Reimbursement Agreement with Nirma whereby they have agreed to indemnify Nirma, and provide Nirma with non-priming, postpetition liens under sections 364(c)(2) and (c)(3) of the Bankruptcy Code and superpriority administrative expense claims under section 364(c)(1), for any obligations Nirma incurs under the Corporate Guarantee.

50.    Based on my review of the Supply Agreement and Reimbursement Agreement and my discussions with the Debtors' counsel, I understand that the Supplier was not willing to provide the Debtors with the Liquidity Advances without obtaining superpriority administrative expense claims in return in addition to the Corporate Guarantee from Nirma. I further understand the Reimbursement Agreement, including the non-priming postpetition liens and superpriority claims provided to Nirma thereunder, was a necessary predicate to Nirma's willingness to supply the Corporate Guarantee.

51.     Additionally, based on my review of the Supply Agreement and Reimbursement Agreement, I understand that the Supplier's obligation to fund the Initial Advance is conditioned on, among other things, entry of the Interim Order within five (5) days of the Petition Date. Further, I understand that the Supplier's obligation to fund the Final Advance is conditioned upon, among others, entry of the Final Order within forty-five (45) days of entry of the Interim Order and that such Final Order authorizes SVM to assume the Supply Agreement.

52.     I believe the Debtors' agreement to the terms of the Supply Agreement and Reimbursement Agreement was necessary to obtain the liquidity provided by the Liquidity Advances. Should the Debtors find a superior form of liquidity prior to the Final Hearing, they may terminate the Supply Agreement pursuant to its terms if they repay all outstanding Liquidity Advances and pay a modest termination fee of 2.5% of such outstanding amounts.

53.     The following table summarizes the proposed material terms of the Supply Agreement, Reimbursement Agreement, and Orders:[3]

| Bankruptcy Rule | Summary of Material Terms |
| --- | --- |
| **Parties**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Company**:<br>Searles Valley Minerals Inc.<br><br>**Supplier**:<br>TATA Chemicals North America Inc.<br><br>**Guarantor**:<br>Nirma Limited<br><br>*See* Supply Agreement, Preamble. |
| **Borrowing Limits** | Subject to the terms and conditions set forth in the Supply Agreement, the Supplier shall make Liquidity Advances in an aggregate amount |

---

[3]     The summaries contained in this Declaration are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Declaration is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings given to them in the Supply Agreement or the Interim Order, as applicable.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B); Local Bankruptcy Rule 4001 -2(a)(i)(A)* | not greater than the Maximum Liquidity Advance Amount ($20 million) as follows: (i) upon entry of the Interim Order, the Supplier will advance up to $7 million and (ii) upon entry of the Final Order, the Supplier will advance the remaining $13 million.<br><br>*See* Supply Agreement § 4. |
| **Maturity Date**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | SVM shall repay to Supplier the outstanding amount of the Liquidity Advances in full on the Maturity Date.  The Maturity Date is the earliest of (i) thirty (30) days after Supplier's issuance of its final invoice for Material supplied following the end of the Supply Contract Term, (ii) the date on which all or substantially all of the Customer Contracts are sold, and (iii) the occurrence of a Company Termination Event.<br><br>*See* Supply Agreement §§ 1, 4(d). |
| **Interest Rates**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(B)* | The Liquidity Advances shall not bear interest; *provided, however*, that upon the occurrence and during the continuance of a Company Termination Event, the outstanding principal amount of the Liquidity Advances shall bear interest at a rate per annum equal to the prime rate as published in the *Wall Street Journal* on the date of such Company Termination Event plus two percent (2%), calculated on the basis of a 360-day year for the actual number of days elapsed, payable on demand.  In addition, any amount of Purchase Price not paid when due shall bear interest from the due date until paid at a rate per annum equal to the lesser of (x) the prime rate as published in the *Wall Street Journal* on the date such payment was due plus three percent (3%) and (y) the maximum rate permitted by applicable law.<br><br>*See* Supply Agreement §§ 2(b), 4(b).<br><br>If Indemnitor does not reimburse Nirma for all of such Reimbursable Amounts on or prior to the Payment Deadline, then interest shall accrue on the unpaid portion of such Reimbursable Amounts from and after the Payment Deadline at a rate equal to the lesser of equal to the interest rate in effect from time to time with respect to the DIP Obligations (as defined in the DIP Credit Agreement), as set forth, and in effect from time to time, in <u>Section 2.5(a)</u> of the DIP Credit Agreement and the maximum rate permitted by law.<br><br>*See* Reimbursement Agreement § 3(a). |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Conditions Precedent to Closing and Lending**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(E)* | The Supplier's obligation under the Supply Agreement to make a Liquidity Advance is subject to the satisfaction or waiver of the following conditions precedent:<br><br>• on the Closing Date, each of the Parties shall have duly executed and delivered the Supply Agreement;<br><br>• the guarantee from Nirma shall have been duly executed, delivered to Supplier, and be in full force and effect;<br><br>• on or prior to the Closing Date, Supplier shall have received evidence in form and substance reasonably satisfactory to it that the Customer Contracts provide for the supply of Soda Ash in the amount specified in the Supply Agreement, which Customer Contracts are in full force and effect;<br><br>• with respect to the Initial Liquidity Advance, the Interim Approval Order shall have been entered by the Bankruptcy Court;<br><br>• with respect to the Final Liquidity Advance, (x) the Final Approval Order shall have been entered by the Bankruptcy Court on or prior to the Final Approval Order Date and (y) the Supply Agreement shall have been assumed under section 365 of the Bankruptcy Code pursuant to and as a part of the Final Approval Order, and in connection with such assumption Company must have cured any defaults thereunder and provided Supplier with adequate assurance of future performance (in accordance with applicable law) reasonably acceptable to Supplier;;<br><br>• with respect to the Initial Liquidity Advance, Supplier's receipt of rolling thirteen (13) week cash flow budgets, in form and detail reasonably satisfactory to Supplier, and containing information customary in chapter 11 cases;<br><br>• SVM is not in default of its obligations to pay Purchase Price under the Supply Agreement as and when required;<br><br>• no Company Termination Event shall have occurred and be continuing;<br><br>• no Company Termination Event would result from the making of such Liquidity Advance; |

9

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | • the representations and warranties of Company shall be true and correct in all material respects as of the date of such Liquidity Advance (except to the extent such representations specifically relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date); and<br><br>• as of the Closing Date, no Material Adverse Change shall have occurred.<br><br>*See* Supply Agreement § 5. |
| **Repayment Features**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(O)* | A portion of each payment of Purchase Price made by SVM to the Supplier under the Supply Agreement shall be deemed to repay the outstanding Liquidity Advances on a dollar for dollar basis until the Liquidity Advances are paid in full. SVM shall repay to the Supplier the outstanding amount of the Liquidity Advances in full on the Maturity Date.<br><br>*See* Supply Agreement § 4.<br><br>If, at any time or from time to time, Nirma incurs any Loss, then Indemnitor shall reimburse Nirma for one hundred percent (100%) of such Losses (any and all such amounts payable by Indemnitor pursuant to the Guarantee "<u>Reimbursable Amounts</u>"), in each instance on or prior to the date that is fifteen (15) days after Nirma's written request therefor is delivered to Indemnitor (the "<u>Payment Deadline</u>").<br><br>*See* Reimbursement Agreement § 3(a). |
| **Termination**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(M)* | The following give rise to a Company Termination Event:<br><br>• the failure of SVM to repay the Liquidity Advances in full on or prior to the Maturity Date;<br><br>• SVM shall fail to make a payment of Purchase Price in an amount in excess of $7,500,000 at any time, and which is not remedied within ten (10) days after written notice from Supplier to Company, or (B) the aggregate outstanding Purchase Price equaling or exceeding $3,000,000 for a period of more than thirty (30) consecutive days, measured from the earliest applicable due date of any component thereof; |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | • any representation, statement or warranty made or deemed made by SVM, shall not be true and correct in all material respects (except to the extent already qualified by materiality, in which case it shall not be true and correct in all respects) on the date when made, and the foregoing shall remain unremedied for ten (10) days from the earlier of actual knowledge of, or written notice to, SVM; <br><br> • SVM shall be in violation, breach or default of, or shall fail to perform, observe or comply in any material respect with, any covenant, obligation or agreement set forth in the Supply Agreement, and the foregoing continues unremedied for a period of ten (10) calendar days from the earlier of actual knowledge of, or written notice to, SVM; or <br><br> • SVM's chapter 11 bankruptcy case is converted to a case under chapter 7 of the Bankruptcy Code or a trustee in the chapter 11 case is appointed, provided, such chapter 11 trustee provides Supplier with evidence reasonably satisfactory to Supplier of the bankruptcy estate's ability to perform SVM's obligations under the Supply Agreement within ten (10) days of appointment; <br><br> • the Corporate Guarantee ceases to be in full force and effect; <br><br> • the Interim Approval Order is not entered on or prior to the Interim Approval Order Date; <br><br> • the Final Approval Order is not entered on or prior to the Final Approval Order Date; <br><br> • the Supply Agreement shall not have been assumed under section 365 of the Bankruptcy Code pursuant to and as a part of the Final Approval Order; <br><br> • the occurrence of a Material Adverse Change; <br><br> • an examiner with expanded powers is appointed in the Chapter 11 Cases; <br><br> • the filing of a plan of reorganization or any motion seeking approval of a sale or disposition of all or substantially all of Company's assets that does not provide for payment in full of |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | all obligations owing to Supplier or that has not been agreed to in writing by Supplier;<br><br>• termination or breach of the Corporate Guarantee<br><br>The following give rise to a Supplier Termination Event:<br><br>• the Supplier shall be in material violation, breach or default of, or shall fail to perform, observe or comply in any material respect with, any covenant, obligation or agreement set forth in the Supply Agreement with an aggregate value in excess of $5 million, and the foregoing continues unremedied for a period of thirty (30) calendar days (or ninety (90) calendar days in the case of non-performance due to force majeure) from the earlier of actual knowledge of, or written notice to, the Supplier; provided, however, that if Supplier undertakes to remedy such breach within the applicable cure period and is diligently pursuing such remedy, the foregoing thirty (30) or ninety (90) days cure periods, as applicable, shall be extended for an additional thirty (30) days; or<br><br>• the Liquidity Advances shall have been repaid to Supplier in full Supplier shall have concurrently received the Termination Fee.<br><br>*See* Supply Agreement §§ 1,8. |
| **Carve Out**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(F)* | N/A |
| **Priority of Liens and Claims; Collateral**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(i)* | Pursuant to section 364(c)(1) of the Bankruptcy Code, all obligations owed by SVM to the Supplier under the Supply Agreement shall constitute allowed superpriority administrative expense claims of the Supplier against SVM and its estate (without the need to file any proof of claim) (the "**Supplier Superpriority Claims**"). The Supplier Superpriority Claims shall have priority of all other administrative expense claims in the Chapter 11 Cases except for any superpriority administrative expense claims of HSBC, Karnavati Holdings, Inc., and the Nirma Superpriority Claims. |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | Pursuant to section 364(c)(1) of the Bankruptcy Code, SVM is authorized to grant Nirma superpriority administrative expense claims against SVM and its estate (without the need to file any proof of claim) (the "**Nirma Superpriority Claims**"). The Nirma Superpriority Claims shall have priority over the Supplier Superpriority Claims and shall be *pari passu* with any superpriority administrative expense claims granted in connection with the DIP Credit Agreement in favor of Karnavati Holdings, Inc. or any such claims granted to any other party providing the Debtors with debtor-in-possession financing in lieu of Karnavati Holdings, Inc., except to the extent that Nirma agrees otherwise in writing. For the avoidance of doubt, the Supplier's Superpriority Claim shall be junior to superpriority administrative expense claims of HSBC or its affiliates, Nirma, and Karnavati Holdings, Inc.<br><br>The liens granted in favor of Nirma under the Reimbursement Agreement shall be automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code on all DIP Collateral having the priorities specified in the Lien and Claim Priorities Chart attached as Exhibit 3 to the Interim DIP Order; *provided*, that such liens shall be *pari passu* with liens securing the debtor-in-possession financing provided by Karnavati Holdings, Inc. as DIP Lender under the DIP Credit Agreement or any liens granted to any other party providing the Debtors with debtor-in-possession financing in lieu of Karnavati Holdings, Inc., except to the extent that Nirma agrees otherwise in writing.[4]<br><br>*See* Supply Agreement § 2(d); Reimbursement Agreement §§ 5, 6; and Interim Order ¶ 3. |
| **Adequate Protection**<br><br>*Bankruptcy Rule 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii)* | N/A |
| **Marshalling**<br><br>*Local Bankruptcy Rule 4001-2(a)(i)(X)* | N/A |
| **Debtors' Stipulations**<br><br>*Bankruptcy Rule* | N/A |

---

[4]    Capitalized terms in this sentence shall have the meaning ascribed to them in Interim DIP Order.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| *4001(c)(1)(B)(iii); Local Bankruptcy Rule 4001-2(a)(i)(Q)* | |
| **Waiver or Modification of Automatic Stay**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | Upon the occurrence of a Company Termination Event, (x) Supplier may, by written notice to Company, elect to terminate the Supply Agreement and/or declare the outstanding amount of the Liquidity Advances immediately due and payable, (y) Supplier shall automatically have relief from the automatic stay to exercise its remedies under the Supply Agreement without the necessity of obtaining such relief from the Bankruptcy Court, upon five (5) days' written notice to Company; provided however Company will have the right to contest that a Company Termination Event has actually occurred within such five (5) day period, and (z) Supplier may exercise any and all rights and remedies available to it under the Supply Agreement, at law or in equity, including bringing suit to collect all amounts due thereunder, together with all accrued and unpaid interest thereon and all other amounts owing thereunder.<br><br>*See* Supply Agreement § 8(a); Interim Order ¶ 5. |
| **Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(i)(H)* | N/A |
| **Indemnification**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | SVM shall indemnify, defend and hold harmless Supplier and its affiliates, and their respective directors, officers, employees, agents and advisors (each, a "Supplier Indemnified Party") from and against any and all Losses arising out of Claims based upon<br><br>(x)     any breach by SVM of any representation, warranty, covenant or obligation under the Supply Agreement,<br><br>(xi)    any gross negligence or willful misconduct of SVM relating to the Liquidity Advances or the use or proposed use of proceeds thereof,<br><br>(xii)   any claim relating to any Customer Contract to the extent arising from SVM' breach thereof,<br><br>(xiii)  all Losses resulting from Supplier's use of SVM-provided intellectual property or specifications, |

14

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
|  | (xiv)   all regulatory fines, penalties, and attorneys' fees incurred because SVM' instructions violated applicable laws or trade sanctions, <br><br> (xv)   any Losses or Claims arising from SVM's mishandling of shared data or breach of data privacy laws, <br><br> (xvi)   death, personal injury, or property damage Claims caused by SVM's negligence or mishandling of Material, <br><br> (xvii)   any Claims or Losses for which Company is indemnified by Customer under the Customer Contracts or applicable law, or <br><br> (xviii)  SVM's willful, unauthorized disclosure of Supplier's confidential information to a direct competitor of Supplier, subject to Supplier demonstrating actual competitive harm.  SVM's aggregate liability for indemnification shall not exceed an amount equal to the Purchase Price paid (or payable) for the volume of Material supplied under the applicable Customer Contract that is directly related to the event giving rise to indemnification. <br><br> Supplier shall indemnify, defend and hold harmless Company and its affiliates, and their respective directors, officers, employees, agents and advisors (each, a "Company Indemnified Party") from and against any and all Losses arising out of Claims based upon <br><br> (i) any breach by Supplier of any representation, warranty, covenant or obligation under the Supply Agreement, <br><br> (ii) any gross negligence or willful misconduct of Supplier relating to the Material supplied, <br><br> (iii) any claim relating to any Customer Contract to the extent arising from Supplier's material breach of its obligations, or <br><br> (iv) Supplier's willful, unauthorized disclosure of Company's confidential information to a direct competitor of Company, subject to Company demonstrating actual competitive harm; *provided* Supplier shall have no liability where (A) Material was modified, altered, combined with other products, or used contrary to specifications after delivery, (B) a recipient of Material failed to conduct incoming inspection in accordance with good industry practice, (C) a recipient of the Material failed to follow |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| | Supplier's written handling, storage, or use instructions, (D) the Claim relates to Material supplied more than six (6) months before the Claim is first asserted, or (E) Company failed to notify Supplier in writing within thirty (30) days of becoming aware of any Claim.  Supplier's aggregate liability for indemnification shall not exceed an amount equal to the Purchase Price paid (or payable) for the volume of Material supplied under the applicable Customer Contract that is directly related to the event giving rise to indemnification.<br><br>*See* Supply Agreement § 16.<br><br>(b)     If, at any time or from time to time, Nirma incurs any Loss, then Indemnitor shall reimburse Nirma for one hundred percent (100%) of such Losses (any and all such amounts payable by Indemnitor pursuant to the Guarantee "Reimbursable Amounts"), in each instance on or prior to the date that is fifteen (15) days after Nirma's written request therefor is delivered to Indemnitor (the "Payment Deadline"). If Indemnitor does not reimburse Nirma for all of such Reimbursable Amounts on or prior to the Payment Deadline, then interest shall accrue on the unpaid portion of such Reimbursable Amounts from and after the Payment Deadline at a rate equal to the lesser of equal to the interest rate in effect from time to time with respect to the DIP Obligations (as defined in the DIP Credit Agreement), as set forth, and in effect from time to time, in Section 2.5(a) of the DIP Credit Agreement and the maximum rate permitted by law.<br><br>*See* Reimbursement Agreement § 3. |
| **Section 506(c) Waiver**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(x); Local Bankruptcy Rule 4001-2(a)(i)(V)* | N/A |
| **Liens on Avoidance Actions**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi); Local Bankruptcy Rule 4001-2(a)(i)(U)* | N/A |

16

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Fees**<br><br>*Bankruptcy Rule 4001(c)(1); Local Bankruptcy Rule 4001-2(a)(i)(B)* | **Termination Fee:** A fee equal to 2.5% of the Liquidity Advances ever outstanding, payable to Supplier in connection with Company's termination of the Supply Agreement pursuant to Section 8 of the Supply Agreement and concurrently with repayment of the Liquidity Advances.<br><br>*See* Supply Agreement § 1. |

**Good Faith and at Arm's Length Negotiations**

54. Ankura assisted the Debtors, together with their other advisors, with the evaluation of the terms and provisions of the Supply Agreement and Reimbursement Agreement. Based on my involvement in the process and discussions with the Debtors and their counsel, I understand that the Supply Agreement and Reimbursement Agreement were negotiated between the Debtors, Nirma, and the Supplier, each of whom was represented by independent counsel. All negotiations were, in my view, conducted in good faith and on an arm's length basis. The Supply Agreement and Reimbursement Agreement have been independently reviewed and approved by the Debtors' independent director, John S. Dubel—whose approval is required pursuant to the resolutions appointing him as an independent director, dated June 1, 2026—and approved by the Debtors' board of directors through the affirmative vote of those directors that are not affiliated with Nirma.

**The Liquidity Provided by the Supply Agreement is the Best Available**

55. Based on my experience and involvement in the evaluation of the Supply Agreement and Reimbursement Agreement, I believe that the Liquidity Advances are the best option presently available to the Debtors to provide them with the liquidity they need in addition to that which is provided by the DIP Facility. Not only will the Liquidity Advances give the Debtors near-term access to $20 million of liquidity, but the cost to the Debtors of obtaining such liquidity is generally neutral, depending on soda ash customer mix and volumes. This near-term

17

liquidity, along with the liquidity to be provided to the Debtors' under the DIP Facility, will provide the Debtors with access to the liquidity necessary to effectively and efficiently administer the Chapter 11 Cases, fund ongoing operations, and effectuate a postpetition marketing process for the sale of their assets.  Based on my review of the Debtors' cash flow forecasts and my familiarity with the Debtors' business, I believe that the Liquidity Advances are essential for the Debtors to maintain their operations and preserve value during the pendency of these cases.

56.    As described in greater detail in Tempke Declaration, Lazard has conducted an extensive marketing process seeking postpetition liquidity for the Debtors, and no other party has expressed a willingness to provide liquidity on more favorable terms.  Indeed, although another party offered to provide the Debtors with access to incremental liquidity through a supply agreement, such party required a guarantee of a nature that was not viable or even comparable to the terms of the Supply Agreement and Reimbursement Agreement.  Simply put, the Debtors require more liquidity than is provided by the DIP Facility and alternative sources of liquidity with better, or even as favorable, terms as those of the Liquidity Advances on the terms set forth in the Supply Agreement and Reimbursement Agreement are not available to the Debtors to allow them to obtain such liquidity.  Accordingly, I understand that the Liquidity Advances represent the only actionable form of postpetition liquidity presently available to provide the Debtors with the liquidity they need beyond that which is contemplated to be provided by the DIP Facility to fund the Chapter 11 Cases.

57.    Based on my discussions with the Debtors' counsel, I understand that, in connection with the Liquidity Advances, the relief requested in the Motion contemplates a modification of the automatic stay (if applicable) to, among other things, (i) permit the Debtors to grant the superpriority claims described above, (ii) permit the Debtors to grant Nirma the liens described

18

above, and (iii) permit the Supplier and Nirma to exercise rights and remedies under certain circumstances.  Based on my review of the Supply Agreement and the Reimbursement Agreement, these provisions, together with the release of the Supplier provided in the Interim and Final Orders and effective upon entry of the Final Order, were part of the *quid pro quo* for the Debtors' ability to obtain the Liquidity Advances.

58.     Moreover, in my view, SVM's decision to assume the Supply Agreement is a sound exercise of business judgment.  Section 5 of the Supply Agreement makes assumption through the Final Order a prerequisite to the Supplier's obligation to fund the Final Liquidity Advance.  Thus, if the Supply Agreement is not assumed as required by its express terms, including by forms of Interim and Final Orders containing customary terms and conditions, the Debtors would not have access to the liquidity they need to operate during the pendency of these cases and maximize the value of their assets through a postpetition sales process.

59.     In my view, without access to the Liquidity Advances and the liquidity provided under the DIP Facility, the Debtors would not be able to effectuate a value-maximizing sale and would instead need to immediately cease operations and liquidate.

**Conclusion**

60.     In light of the foregoing and based on my experience as a restructuring professional, involvement in similar transactions, and evaluation of the Supply Agreement and Reimbursement Agreement, I believe that the relief requested in the Motion should be granted.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

I, Adrian Frankum, pursuant to section 1746 of title 28 of the United States code hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 15, 2026

/s/ *Adrian Frankum*
Adrian Frankum
Senior Managing Director
Ankura Consulting Group, LLC

4937-5675-9989.1 78006.00001