**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | ) ) ) | Case No. 23-11069 (___) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**MOTION OF
DEBTORS FOR ENTRY OF
INTERIM AND FINAL ORDERS (A)
(I) APPROVING THE DEBTORS' PROPOSED
ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE
UTILITY SERVICES, (II) PROHIBITING UTILITY PROVIDERS
FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES,
(III) APPROVING THE DEBTORS' PROPOSED PROCEDURES FOR RESOLVING
ADEQUATE ASSURANCE REQUESTS, AND (B) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:[2]

**Relief Requested**

1.   The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"), (a) (i) approving the Debtors' proposed adequate assurance of payment for future utility services, (ii) prohibiting utility providers from altering, refusing, or discontinuing services, (iii) approving

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]   A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not immediately defined in this motion have the meanings ascribed to them later in this motion or in the First Day Declaration, as applicable.

the debtors' proposed procedures for resolving adequate assurance requests, and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within approximately twenty-one days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a) and 366 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

## Background

5. The Debtors were a leading provider of transportation services with a 100-year history. With its family of trucking brands—Yellow Logistics, Holland, Reddaway, New Penn, and YRC—the Debtors provided their customers with one of the most comprehensive less-than-truckload ("LTL") networks in North America.

2

6. The Debtors commenced these chapter 11 cases to implement a timely and efficient process to maximize the value of the Debtors' estates for the benefit of all stakeholders. Through these chapter 11 cases, the Debtors will immediately commence an orderly and value-maximizing wind-down of their businesses. The Debtors will use their time in chapter 11 to market a sale or sales of all or substantially all of their assets.

7. On August 6, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are managing their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no official committees have been appointed or designated.

**The Debtors' Utility Providers**

8. As of the Petition Date, the Debtors maintain 311 transportation service centers located in 50 states, Puerto Rico, and Canada. Of this total, 169 transportation service centers are owned and 142 are leased. The Debtors also lease office buildings in (a) Overland Park, Kansas, (b) Topeka, Kansas, (c) Sioux Falls, South Dakota, (d) Holland, Michigan, (e) Tualatin, Oregon, (f) Des Moines, Iowa, (g) Buffalo, New York, (h) Toledo, Ohio, (i) Nashville, Tenesse, (j) Sarnia, Ontario, and (k) St. Catherines, Ontario. The Debtors incur utility expenses for water, electricity, telecommunications, internet, trash removal, waste and sewer water, and natural gas in connection with the maintenance of their owned and leased terminals, transportation centers, and office spaces. These utility services are provided by approximately 524 different utility providers—both under direct relationships with the Debtors and through the Debtors' landlords (collectively, the "Utility Providers")—through approximately 2,194 different accounts, as listed on **Exhibit C**

attached hereto (the "Utility Service List").[3] On average, the Debtors spend approximately $3.2 million in the aggregate each month on utility costs at the facilities where the Debtors operate. In addition, the Debtors currently have approximately $69,692 on deposit with various Utility Providers and approximately $205,920 of utility payments covered by surety bonds under which the Debtors are the principal.

9. Beginning on September 13, 2010, certain of the Debtors started to utilize the services of two utilities management firms—Cost Control Associates, Inc. and Cass Information Systems, Inc. (together, the "Utilities Management Firms"). The Utilities Management Firms audit the Debtors' utility rates, pay the Utility Providers, and compare utility vendors to ensure that the Debtors receive the highest quality utility services at the most competitive rates. In light of the circumstances of these chapter 11 cases, the Debtors intend to utilize the assistance of the Utilities Management Firms in evaluating and ultimately reducing their utility spend at the outset of these chapter 11 cases. The Debtors pay the Utilities Management Firms approximately $10,000 per month for their services, an amount which the Debtors request authority to continue to pay in accordance with prepetition practices.

10. In order to effectuate an orderly, cost-effective wind-down, it is necessary for the Debtors to provide their Utility Providers with an Adequate Assurance Deposit (as defined herein) to ensure that they can maintain the condition of their transportation centers and office spaces during these chapter 11 cases. The Debtors will continue to use certain transportation centers, terminals, and office space locations to facilitate the cost-effective wind-down of their operations

---

[3] To the extent that the Debtors subsequently identify additional providers of utility services, the Debtors seek authority, in their sole discretion, to amend the Utility Service List attached hereto to add or remove any Utility Provider. Additionally, the listing of an entity on the Utility Service List is not an admission that such entity is a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve the right to contest any such characterization in the future.

and administer these chapter 11 cases. In addition, the Debtors will actively pursue one or more sale processes of certain of these real property assets. As such, ensuring continued utility service will enhance the marketability of the Debtors' real property assets, protect such assets from deterioration and vandalism, and safeguard such assets from otherwise diminution of value during the pendency of these chapter 11 cases. For the avoidance of doubt, the Debtors will continue to evaluate their utility obligations during these chapter 11 cases with an eye towards reducing their obligations associated with the utilities.

11.  While the Debtors believe they generally were current on utility payments as of the Petition Date, should any Utility Provider refuse to provide services to even a small number of the Debtors' facilities after the Petition Date, the resulting disruption could harm the Debtors ability to wind-down their business affairs in an orderly fashion. Uninterrupted utility services are necessary to maximizing the value of the Debtors' estates. Indeed, any interruption of utility services, even for a brief period of time, would negatively impact the Debtors' efforts to maximize value during their time in chapter 11 which could ultimately negatively effect creditor recoveries. It is therefore critical that utility services continue uninterrupted during these chapter 11 cases.

**I.    The Proposed Adequate Assurance.**

12.  The Debtors intend to pay postpetition obligations owed to the Utility Providers in a timely manner. However, to provide additional assurance of payment, the Debtors propose to deposit $1,515,409 (the "<u>Adequate Assurance Deposit</u>") into an existing segregated account (the "<u>Utility Deposit Account</u>") for the benefit of the Utility Providers within twenty days of the Petition Date.[4]  This amount represents a sum equal to approximately two weeks of the Debtors'

---

[4] The Utility Deposit Account will be maintained with a minimum balance equal to two weeks of the Debtors' estimated aggregate monthly cost of utility services, which may be adjusted by the Debtors from time to time if the Debtors' estimated cost of utility services materially increases or decreases.

estimated aggregate monthly costs of utility services for all Utility Providers listed on **Exhibit C** attached hereto. Such Adequate Assurance Deposit will be held in escrow, pending further order of the Court, including any order approving the sale of substantially all of the Debtors' assets under section 363 of the Bankruptcy Code.

13.     The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' demonstrated ability to pay for utility services in the ordinary course of business and the outstanding deposits and surety bonds covering some Utility Providers (the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers. If any Utility Provider believes additional adequate assurance is required, it may request such assurance pursuant to the procedures described below.

## II.     The Proposed Adequate Assurance Procedures.

14.     The Debtors request that the Court approve the procedures for requesting different or additional adequate assurance of future payment (each, an "Adequate Assurance Request") set forth in the Interim and Final Orders (the "Adequate Assurance Procedures"). Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make an Adequate Assurance Request pursuant to the Adequate Assurance Procedures.

15.     The Adequate Assurance Procedures provide a streamlined process for a Utility Provider to address potential concerns with respect to the Proposed Adequate Assurance. Specifically, the Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Adequate Assurance Request upon certain notice parties.

16.     The Debtors may, in their discretion, resolve any Adequate Assurance Request by mutual agreement with the applicable Utility Provider and without further order of the Court. If the Debtors determine that the Adequate Assurance Request cannot be resolved by mutual

agreement, the Debtors may seek Court resolution of the Adequate Assurance Request. Unless and until a Utility Provider timely files an objection or serves an Adequate Assurance Request, such Utility Provider shall be (a) deemed to have received adequate assurance of payment "satisfactory" to such Utility Provider in compliance with section 366 of the Bankruptcy Code and (b) forbidden from discontinuing, altering, or refusing services to, or discriminating against, the Debtors on account of any unpaid prepetition charges, or require additional assurance of payment other than the Proposed Adequate Assurance.

### III.     Subsequent Modifications.

17.     The Debtors have made an extensive and good-faith effort to identify all Utility Providers and include them on the Utility Services List. Additionally, in light of the circumstances of these chapter 11 cases and the Debtors wind-down efforts, the Debtors have endeavored to limit the relief sought herein to only that relief which is necessary to avoid irreparable harm to the Debtors' estates at this critical juncture where the Debtors look towards marketing their assets in one or more sale processes, including their real property assets and unexpired lease portfolio. To the extent the Debtors identify new or additional Utility Providers or discontinue services from existing Utility Providers, the Debtors seek authority, in their sole discretion, to add or remove parties from the Utility Services List. For any Utility Provider that is subsequently added to the Utility Services List, the Debtors will serve such Utility Provider a copy of the Court's Interim or Final Order, as applicable, including the Adequate Assurance Procedures. The Debtors request that the terms of the Interim or Final Order, as applicable, and the Adequate Assurance Procedures apply to any subsequently identified Utility Provider. For any Utility Provider that is subsequently removed from the Utility Services List, the Debtors request the authority to decrease the Adequate Assurance Deposit by withdrawing from the Utility Deposit Account the amount deposited with respect to such Utility Provider upon either (a) obtaining the affected Utility Provider's consent to

do so or (b) filing with this Court and serving upon the affected Utility Provider a notice of the Debtors' intent to reduce the Utility Deposit within fourteen days thereof and receiving no response thereto.

### Basis for Relief

**III.    The Court Should Authorize, but Not Direct, the Debtors to Establish Adequate Assurance Procedures.**

18. Section 366 of the Bankruptcy Code, which protects a debtor against the immediate termination or alteration of utility services after the petition date, provides the debtor thirty days following the petition date to provide "adequate assurance" of payment for postpetition services in a form "satisfactory" to the utility provider before the utility provider may alter, refuse, or discontinue service. 11 U.S.C. § 366(c)(2). For purposes of section 366 of the Bankruptcy Code, "assurance of payment" can be provided in the form of a cash deposit, letter of credit, certificate of deposit, surety bond, prepayment, or other mutually agreed form of security. 11 U.S.C. § 366(c)(1). "Adequate assurance of payment" need not constitute an absolute guarantee of the debtors' ability to pay. *See, e.g.*, *In re Great Atl. & Pac. Tea Co.*, 2011 WL 5546954, at *5 (Bankr. S.D.N.Y. Nov. 14, 2011) (finding that "[c]ourts will approve an amount that is adequate enough to insure against unreasonable risk of nonpayment, but are not required to give the equivalent of a guaranty of payment in full"); *In re Caldor, Inc.*, 199 B.R. 1, 3 (S.D.N.Y. 1996) ("Section 366(b) requires . . . 'adequate assurance' of payment. The statute does not require an absolute guarantee of payment." (citation omitted)), *aff'd sub nom. Va. Elec. & Power Co. v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997).

19. When considering whether a given assurance of payment is "adequate," courts examine the totality of the circumstances to make an informed decision as to whether the utility provider will be subject to an unreasonable risk of nonpayment. *See In re Keydata Corp.*,

12 B.R. 156, 158 (B.A.P. 1st Cir. 1981) (citing *In re Cunha*, 1 B.R. 330 (Bankr. E.D. Va. 1979)); *In re Adelphia Bus. Sols., Inc.*, 280 B.R. 63, 82–83 (Bankr. S.D.N.Y. 2002). In determining the level of adequate assurance, however, "a bankruptcy court must focus upon the need of the utility for assurance, and . . . require that the debtor supply no more than that, since the debtor almost perforce has a conflicting need to conserve scarce financial resources." *In re Penn Jersey Corp.*, 72 B.R. 981, 985 (Bankr. E.D. Pa. 1987); *see also In re Penn. Cent. Transp. Co.*, 467 F.2d 100, 103–04 (3d Cir. 1972) (affirming the bankruptcy court's ruling that no utility deposits were necessary where such deposits likely would "jeopardize the continuing operation of the [debtor] merely to give further security to suppliers who already are reasonably protected").

20. The Utility Providers are adequately assured against any risk of nonpayment for future services. The Adequate Assurance Deposit and the Debtors' ongoing ability to meet obligations as they come due in the ordinary course provide assurance that the Debtors will pay their future obligations to the Utility Providers. In contrast, terminating the utility services could render the Debtors' unable to wind-down their business in an orderly fashion and negatively impact the value of the Debtors' estates to the detriment of all stakeholders. *See In re Monroe Well Serv., Inc.*, 83 B.R. 317, 321–22 (Bankr. E.D. Pa. 1988) (noting that without utility service the debtors "would have to cease operations" and that section 366 of the Bankruptcy Code "was intended to limit the leverage held by utility companies, not increase it").

21. Courts are permitted to fashion reasonable procedures, such as the Adequate Assurance Procedures proposed herein, to implement the protections afforded under section 366 of the Bankruptcy Code. *See, e.g.*, *In re Circuit City Stores Inc.*, No. 08-35653, 2009 WL 484553, at *5 (Bankr. E.D. Va. Jan. 14, 2009) (stating that "the plain language of § 366 of the Bankruptcy Code allows the court to adopt the Procedures set forth in the Utility Order").

Such procedures are important because, without them, the Debtors "could be forced to address numerous requests by utility companies in an unorganized manner at a critical period in their efforts to reorganize." *Id*. Moreover, any rights the Utility Providers believe they have under sections 366(b) and (c)(2) of the Bankruptcy Code are fully preserved under the Adequate Assurance Procedures because the Utility Providers may choose to request modification of the Proposed Adequate Assurance. *See id.* at *5–6. The Adequate Assurance Procedures avoid a haphazard and chaotic process whereby each Utility Provider could make an extortionate last-minute demand for adequate assurance that would force the Debtors to pay under the threat of losing critical utility services. *See id.* at *5.

22. The Adequate Assurance Procedures are reasonable and consistent with the purposes of section 366 of the Bankruptcy Code. Similar procedures have been approved by courts in this district. *See, e.g., In re Lannett Co., Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. May 5, 2023) (approving adequate assurance procedures); *In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Mar. 30, 2023) (same); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Sept. 22, 2022) (same); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Nov. 18, 2021) (same); *In re Alex & Ani, LLC*, No. 21 10918 (CTG) (Bankr. D. Del. July 14, 2021) (same).[5]

23. Furthermore, the Court possesses the power, under section 105(a) of the Bankruptcy Code, to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Adequate Assurance Procedures and the Proposed Adequate Assurance are necessary and appropriate to carry out the provisions of the Bankruptcy

---

[5] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Code, particularly section 366 thereof. Accordingly, the Court should exercise its powers under sections 105(a) and 366 and of the Bankruptcy Code and approve both the Adequate Assurance Procedures and the Proposed Adequate Assurance.

### **Processing of Checks and Electronic Fund Transfers Should Be Authorized**

24. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of access to cash on hand and anticipated access to debtor-in-possession financing. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored. Therefore, the Debtors request authority, but not direction, to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

### **The Requirements of Bankruptcy Rule 6003(b) Are Satisfied**

25. Bankruptcy Rule 6003 empowers a court to grant certain relief within the first twenty-one days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical, and the failure to receive the requested relief during the first twenty-one days of these chapter 11 cases could impact the Debtors' operations at this important juncture. The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

**Reservation of Rights**

26.    Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount of, basis for, priority, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

27.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Notice**

28. The Debtors will provide notice of this motion to: (a) the United States Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the DIP Agent and counsel thereto; (i) Milbank LLP, as counsel to certain investment funds and accounts managed by affiliates of Apollo Capital Management, L.P.; (j) the administrative and collateral agents under the B-2 Term Loan and counsel thereto; (k) the ABL Agent and counsel thereto; (l) White & Case LLP, as counsel to Beal Bank USA; (m) the administrative and collateral agents under the UST Credit Agreements and counsel thereto; (n) the United States Department of Justice and Arnold & Porter Kaye Scholer LLP as counsel to the United States Department of the Treasury; (o) the Utilities Providers; (p) the Utilities Management Firms; and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties"). As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m). In light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

29. No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated: August 7, 2023
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (*pro hac vice* pending) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (*pro hac vice* pending) |
| Peter J. Keane (DE Bar No. 5503) | Whitney Fogelberg (*pro hac vice* pending) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |
| Wilmington, Delaware 19801 | Telephone: (312) 862-2000 |
| Telephone: (302) 652-4100 | Facsimile: (312) 862-2200 |
| Facsimile: (302) 652-4400 | Email: patrick.nash@kirkland.com |
| Email: ljones@pszjlaw.com | david.seligman@kirkland.com |
| tcairns@pszjlaw.com | whitney.fogelberg@kirkland.com |
| pkeane@pszjlaw.com | |
| ecorma@pszjlaw.com | -and- |
| | Allyson B. Smith (*pro hac vice* pending) |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone: (212) 446-4800 |
| | Facsimile: (212) 446-4900 |
| | Email: allyson.smith@kirkland.com |

*Proposed Co-Counsel for the Debtors and Debtors in Possession*