## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DECLARATION OF MATTHEW A. DOHENY, CHIEF RESTRUCTURING OFFICER OF YELLOW CORPORATION, IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Matthew A. Doheny, declare under penalty of perjury:

1.     As a storied American icon for approximately 100 years, Yellow has been a leading trucking and logistics company, boasting one of the largest less-than-truckload ("LTL") networks in North America that enabled Yellow to provide customers with regional, national, and international shipping services of transportation logistics and LTL services.  Entering 2023, Yellow was the largest unionized LTL carrier in the United States, in addition to being the third largest LTL freight carrier and the fifth largest transportation company in North America.

2.     In recent months, however, Yellow has faced a severe liquidity crisis orchestrated by the International Brotherhood of Teamsters (the "IBT" or the "Union") General-President Sean O'Brien and carried out by Union leadership who acted at all times at his behest and direction. For more than nine months leading up to today, Mr. O'Brien and other senior Union leadership caused the Union to engage in a series of egregious breaches of Yellow's collective bargaining agreement designed to block Yellow from completing One Yellow, which was a vital strategic

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

initiative that Mr. O'Brien and other Union senior leadership knew and understood was absolutely critical to Yellow's survival and future success.

3.      The One Yellow restructuring initiative was developed by Yellow in 2019 and was intended to modernize Yellow's business and upgrade the efficiency of its operations so that it could compete successfully against non-unionized LTL carriers.   One Yellow involved, in carefully planned phases, the merger of four operating subsidiaries into a freight carrier that would have eliminated inefficiencies and created a super-regional carrier.  All of Yellow's stakeholders, including its employees, customers, creditors, and shareholders knew and understood the criticality of Yellow's successful and timely implementation of its One Yellow network transformation.

4.      Indeed, long before Mr. O'Brien interjected himself into Yellow's change of operations negotiations with the Union that were and should have been a routine part of the approvals Yellow needed to implement One Yellow, the Union, through Freight Division Director John Murphy, had worked together with Yellow on the One Yellow initiative.  Thus, during the first phase of One Yellow ("Phase 1"), and prior to Mr. O'Brien's direct intervention, the Union worked with Yellow to resolve the seniority and other issues associated with Phase 1, and the Union in the ordinary course approved the implementation of Phase 1 in August 2022.  The result of the successful implementation of Phase 1, and as proof of the success of One Yellow, was a far more efficient and successful operation in Yellow's western network.

5.      But beginning in December 2022, the Union, at the direction of Mr. O'Brien, pulled its support for the implementation of phase 2 ("Phase 2") of One Yellow, which covered approximately 70% of Yellow's network, mainly in the mid-west, southeast and eastern parts of the United States.   Thereafter, the Union steadfastly refused to comply with its contractual obligations and to resolve the seniority issues arising from Phase 2, even though the Union and

Mr. O'Brien were repeatedly warned and knew full well that obstructing One Yellow would financially destroy Yellow and put 30,000 employees out of work.  Indeed, to ensure that the Union understood full well the gravity of Yellow's precarious financial condition, Yellow provided the Union's economists with access to Yellow's detailed financial records and had its own financial advisors meet with them to walk them through the material.

6.      While the Union refused to move forward with Yellow's proposals for Phase 2 under the contractual procedures, and instead made serial extra-contractual demands on Yellow, Yellow tried to accommodate the Union's demands each time, with the hope and expectation that such accommodations would result in implementation of the long overdue and critically important Phase 2.  But each time Yellow agreed to a Union demand, the Union demanded more.

7.      Notwithstanding Yellow's repeated approaches to the Union and Mr. O'Brien to meet and negotiate and Yellow's repeated offers to accommodate the Union's demands, Mr. O'Brien refused to permit any cooperation or negotiations.  At the same time, Mr. O'Brien engaged in a very public dressing down of Yellow, via social media and through other public communications, that was intended to weaken Yellow, scare off Yellow's customers, inhibit Yellow's ability to refinance its debt, and to generally erode market confidence in Yellow's ability to continue as a going concern.



8.      Against the backdrop of the Union's then on-going negotiations with UPS, where Mr. O'Brien was taking a hard and self-described "militant" line, he used Yellow as a sacrificial

lamb in an apparent attempt to gain leverage.  Beginning this year, as concerns over Yellow's liquidity worsened, Mr. O'Brien in his public comments repeatedly fell back on his empty slogan that "the concession stand was closed," despite the fact that Yellow asked for no concessions in connection with seeking One Yellow approval, while continuously spewing a steady stream of public criticism at Yellow and its executives.  Mr. O'Brien's messaging was clear:  he would rather see Yellow destroyed than be perceived as weak in negotiations, even if that meant the sacrifice of more than 22,000 of his own rank-and-file members' jobs.

9.     By stonewalling Yellow's implementation of Phase 2, Mr. O'Brien and the Union knowingly and intentionally triggered a death spiral for Yellow.  Every month the Union breached its contractual obligations, Yellow lost the savings and increased revenues that One Yellow's implementation would have provided.  Each day the Union blocked the successful completion of One Yellow, Yellow got closer to running out of cash, further impairing its ability to refinance its $1.2 billion in debt that matures in 2024 or 2026, as applicable.

10.    Pushed to the brink by the Union's breaches of the collective bargaining agreement, and with Mr. O'Brien refusing to allow the Union to participate in the contractually mandated change of operations process for Phase 2, Yellow was forced to take immediate steps to try to save itself.  On June 27, 2023, Yellow sued the IBT, its negotiating committee, and several local unions in the U.S. District Court for the District of Kansas, alleging that the parties had breached the collective bargaining agreement.  The lawsuit seeks $137 million in damages for the Union's obstruction of Phase 2, as well as the loss of Yellow's enterprise value which it estimates at approximately $1.5 billion.

11.    As Mr. O'Brien's on-going blockade of One Yellow continued to starve Yellow of desperately needed liquidity, the Union-caused liquidity crisis becoming more acute by the day,

*and* hopeful that, with the benefit of more time, the IBT might finally come to the negotiating table, Yellow undertook numerous liquidity-preservation measures necessary to extend its runway, including deferring payment of certain contractual contributions (the "Contributions") in the amount of approximately $22.5 million to both the Central States Health and Welfare Fund and Central States Pension Fund ("Central States").

12.    Instead of using this borrowed time to engage with Yellow on an agreed path forward on the One Yellow initiative, on Monday, July 17, 2023, Mr. O'Brien, who weeks earlier had pre-ordered Yellow's tombstone and publicly gloated about it, decided to put the final nail in Yellow's coffin.  Rather than simply call Central States and work with them to extend employee benefits for thirty days to provide Yellow and the Union time to negotiate, he instead decided to punish Yellow by causing the IBT to issue a 72-hour strike notice to Yellow that was set to take effect on July 24, 2023.  News of the strike threat spread like wildfire, garnering national attention in major news outlets.[2]  Yellow warned the Union *in no uncertain terms*, that the triggering event for the strike—the deferral of payment to Central States—was caused by the Union's months' long failure to agree to the change of operations necessary to implement Phase 2 thus making the strike unlawful and that, whatever the Union's view, such a strike would irreparably harm Yellow.  Yellow's warnings to Mr. O'Brien and other senior Union leadership fell on deaf ears.

---

[2]    *See* Paul Berger, Trucker Yellow Is Losing Customers as Teamsters Strike Looms, WSJ (July 20, 2023 7:19 pm ET), https://www.wsj.com/articles/trucker-yellow-is-losing-customers-as-teamsters-strike-looms-2c47bcdc; Thomas Black, Teamsters Plan 22,000-Worker Strike at Trucking Firm Yellow, Bloomberg (July 18, 2023 at 2:05 PM EDT), https://www.bloomberg.com/news/articles/2023-07-18/teamsters-plan-22-000-worker-strike-at-trucking-firm-yellow?in_source=embedded-checkout-banner;  Todd Maiden, Teamsters issue strike notice at Yellow, FreightWaves (Tuesday, July 18, 2023), https://www.freightwaves.com/news/teamsters-issue-strike-notice-at-yellow;  Lisa Baertlein et. al., Strike at trucking firm Yellow averted after deal, Reuters (July 24, 20235:52 AM CDT), https://www.reuters.com/business/autos-transportation/strike-trucking-firm-yellow-averted-after-deal-2023-07-23/ Brian Kaberline, Deal averts strike against Yellow on Monday, Yahoo!finance (Jul 23, 2023 8:18pm CDT), https://www.bizjournals.com/kansascity/news/2023/07/23/deal-averts-strike-against-yellow-on-monday.html?utm_source=sy&utm_medium=nsyp&utm_campaign=yh.

13.     Unfortunately, Yellow's prediction came true.  The consequences of the Union's public strike threat, coupled with the corrosive effect of its months'-long negative messaging that Yellow would soon fail, were nothing short of devastating.  On the Monday the strike was announced, Yellow's individual shipments totaled approximately 40,000.  The next day, Yellow's shipments declined to approximately 30,000.  By Wednesday: approximately 20,000.  By Thursday: approximately 10,000.  By Friday: ***near zero***.  Over the course of just four days, Yellow's business had evaporated.  Yellow's most loyal customers, facing the uncertainty of the threatened strike, dropped Yellow as a carrier.  Competitors absorbed Yellow's shipments.  Any realistic prospect of obtaining out-of-court financing dried up.

14.     It was not until ***10 hours*** before the threatened strike on July 23, 2023—six full days ***after*** the IBT threatened to strike—that the IBT came to the negotiating table and met with Yellow.  After months of stonewalling Yellow, Mr. O'Brien repeatedly called Yellow CEO Darren Hawkins and told him that he would try to get a 30-day deferral of the Contributions.  Importantly, Mr. O'Brien could have just as easily sought a deferral before issuing the strike notice that was clearly done in an effort to kill Yellow.

15.     Mr. O'Brien then did just that—he persuaded Central States to defer the Contributions for 30 days.  That agreement with Central States led to the cancellation of the threatened strike, but, even though Yellow tried to see if a deal could somehow be salvaged from the wreckage Mr. O'Brien had caused, it was too little, too late.  The Union's threat of a strike was the final straw that sealed Yellow's fate.  At bottom, after the catastrophic harm he had already deliberately caused Yellow, after his belligerence, after his months long refusal to engage Yellow's management in a good faith effort to save the jobs of Yellow's 30,000 employees, including its 22,000 Teamsters, Mr. O'Brien's last second outreach amounted to little more than meaningless

showmanship, and was an insult to all of Yellow's employees who have now lost their jobs and to all who fought so hard for so long to save Yellow.

16.     After months of blocking One Yellow, continuing a steady stream of public vitriol about Yellow, and suggesting in public that Yellow did not deserve to continue under its current structure, Mr. O'Brien's gratuitous threat of a strike at the end of July forced Yellow's arrival at this avoidable juncture.  Yellow's customers are gone.  Approximately 30,000 jobs nationwide have been lost.  As a consequence, Yellow and its advisors have determined that Yellow is unlikely to obtain financing for the IBT's proposal, let alone for the future of Yellow to continue operating as a going-concern. ***This is not an outcome that anyone at Yellow desired.***

17.     Prior to the Petition Date, Yellow took the first steps towards implementing a full scale winddown of their business operations.  On July 28, 2023, the Company terminated approximately 3,500 employees who executed release agreements in consideration for severance payments from the Company.  On July 30, 2023, the Company sent notice to the IBT, IAM, OPEIU, and ILA unions that it was laying-off approximately 22,000 union employees.  In connection with that notice, on July 31, 2023, the Company sent WARN notices to affected employees.  Yellow discontinued accepting additional shipments during the week of July 24, 2023.

18.     To be clear: Yellow's funded debt obligations did not cause Yellow to commence these chapter 11 cases.  As described herein, the implementation of Phase 1 of One Yellow was a tremendous success, leading to bolstered financial performance.  Indeed, Yellow anticipated that One Yellow would grow EBITDA starting next year at $450 million to over $700 million ***within three years of implementation***.  Yellow further anticipated that One Yellow would create a financial opportunity to capture upwards of $675 million in additional annual revenue at operating margins of 13.5%.  In fact, before Mr. O'Brien unilaterally stopped the One Yellow integration in

its tracks, Yellow was on the precipice of refinancing its funded debt obligations—a clear signal that the market was willing to extend Yellow significant liquidity.  In connection with this refinancing, Yellow retained Ducera Partners LLC to facilitate these negotiations.  Indeed, while renegotiating Yellow's ABL Facility, the ABL Lenders had agreed to give Yellow additional liquidity and better pricing.  And, as the Debtors believe that these chapter 11 cases will demonstrate, the value of their rolling stock and other assets will exceed Yellow's secured debt obligations.

19.     Yellow and its subsidiary Debtors commenced these chapter 11 cases to accomplish one broad objective:  to effectuate an orderly, value-maximizing winddown of their businesses for the benefit of all parties in interest.  To that end, Yellow will spend its time in chapter 11 marketing substantially all of its assets to one or more buyers and conducting certain postpetition activities in connection with preserving the value of their assets and clearing freight from their network.

## **Background**

20.     I am the Chief Restructuring Officer of Yellow Corporation (together with its direct and indirect subsidiaries, "Yellow", and together with its affiliated debtors and debtors in possession, the "Debtors").  I submit this declaration in support of the chapter 11 petitions and first-day motions filed by the debtors and debtors in possession (collectively, the "Debtors").

21.     Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my experience, knowledge, and familiarity with the Debtors' business and operations.

22.     On July 19, 2023, I was appointed Chief Restructuring Officer by the Board of Directors of Yellow Corporation.  As Chief Restructuring Officer, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

23.     Prior to becoming Chief Restructuring Officer, I was a member of the Board of Directors of Yellow Corporation (the "Board") beginning in 2011 and served as Chairman of the Board from 2019 until July 31, 2023.  Effective July 31, 2023, I resigned from the board of directors of Yellow Corporation.  I have approximately 25 years of experience in board advisory assignments, alternative investments, and operational turnarounds.  I hold an undergraduate degree from Allegheny College and a law degree from Cornell Law School.

24.     Prior to joining Yellow, I was (a) managing director and investor in special situations at Deutsche Bank Securities Inc, where I also helped run the investment committee; (b) a portfolio manager at hedge fund Fintech Advisory, Inc.; (c) managing director and co-head of special  situation trading at HSBC Securities Inc.; (d) an attorney at Orrick, Herrington & Sutcliffe LLP, as well as at Kelly Drye & Warren LLP; and (e) the founder of North Country Capital LLC, an alternative investment and advisory firm.  In addition, I've also served in numerous roles throughout the chapter 11 process, including (a) acting as the CRO of MatlinPatterson; (b) serving as an independent director in FTX, Fronterra, and Eastman Kodak, among others; and (c) being on the board of liquidations of ResCap Liquidating Trust, Arcapita, and Elk Petroleum.

25.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  To minimize the adverse effects on their business and facilitate a "smooth landing" in the Chapter 11 Cases, the Debtors also filed motions seeking certain "first day" relief (the "First Day Motions").

26.    I am over 18 and authorized to submit this declaration on behalf of the Debtors.  If called, I would testify competently as set forth herein.  This Declaration is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history and business operations;

- **Part II** describes the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to the filing of these chapter 11 cases and the Debtors' path forward;

- **Part IV** describes the Debtors' proposed debtor-in-possession financing, use of cash collateral, and wind-down process; and

- **Part V** provides a description of the relief requested and the facts supporting each of the First Day Motions.

In addition, attached to declaration as <u>**Exhibit A**</u> is a structure chart for the Debtors.

## I.    The Debtors' Corporate History and Business Operations.

### A.    Corporate History.

27.    In 1906, Grover Cleveland Harrell started a horse-drawn cab service in Oklahoma City.  In the years that followed, automobiles were pushed to the forefront of the global economy.    After purchasing a Model T. Ford, G.C. Harrell recognized that



people were willing to pay more to ride in an automobile than a horse-drawn cab.  As demonstrated in World War I, cars and trucks were able to efficiently move large quantities of goods and people.  G.C. Harrell then purchased two additional cars and painted them yellow.  The Yellow Cab company was born.[3]

---

[3]    For the avoidance of doubt, the Yellow Cab company that is today called "Yellow" is a separate company than the taxicab company called Yellow Cab Company, which was founded in 1907 by John D Hertz.

28.     G.C. Harrell solicited extra help and capital from his family, and together, they started a bus line connecting Oklahoma City and Tulsa.  When oil was discovered in Oklahoma City, the Harrell family pivoted, purchased mules, and in 1929 established Yellow Transit Freight Lines to assist companies in digging slush pits.

29.     Shortly after the founding of Yellow Transit Freight Lines, A.J. Harrell, G.C. Harrell's older brother, set out to find a color that would make Yellow's trucks more visible on the road.  A.J. Harrell enlisted the help of chemical company E.I. DuPont's paint division for a recommended color that would be more visible on the road, regardless of weather conditions or the time of day.  The winning color was one that DuPont coined "Swamp Holly Orange."  Soon, Yellow's entire fleet of cabs and trailers bore the eye-catching color.

30.     In 1951, Yellow filed for bankruptcy and in 1952, A.J. Harrell sold the struggling company to a group led by investment banker George E. Powell.  A few years later, Yellow had become a national force.  By the late 1950s, the trucking industry had matured in America.  The post-World War II era led to a revitalization of the American economy with a concurrent increase in demand for goods and need to transport those goods.  Powell built Yellow into a long-haul operator that captured value from the construction of the Interstate Highway System.  Indeed, Yellow was the original LTL expert with comprehensive North American coverage and a broad portfolio of expedited and specialized LTL freight shipping services.

31.     Taking advantage of this spike in the market cycle, in 1965, Yellow purchased a large competitor, Watson-Wilson Transportation System, opening the door for a new period of growth.  The acquisition expanded Yellow's national reach and doubled its size.  A few short years after, Yellow made further acquisitions of the Norwalk Truck Lines, as well as others throughout the North and Southeast, officially creating a coast-to-coast operation.  Yellow changed its name

to "Yellow Freight System" in 1968 in connection with the new additions, all while becoming one of the nation's largest trucking companies.

32.     Yellow continued to innovate the industry, breaking new grounds in technology, routes, depots, and break-bulk centers, all while strengthening its network across the United States. To further its growth, in 1992, Yellow expanded its international footprint in Mexico, Puerto Rico, and Canada.  Starting in the 2000's, taking note of industry consolidation, Yellow continued to pursue additional strategic acquisitions to improve synergies.

33.     In 2000, Yellow launched Transportation.com, an online transportation management company that provided logistics services to small and medium-sized businesses.  In 2003, Yellow announced its plan to buy another company, Roadway Corp.  A new holding company, Yellow Roadway Corporation, was formed based at Yellow's headquarters in Overland Park.

34.     In 2005, Yellow Roadway added competitor USF Corporation to its family of trucking brands.  Reddaway (f/k/a USF Reddaway) was acquired as part of Yellow Roadway's acquisition of USF Corporation.  Prior to integration with Yellow, Reddaway's employee base was half-unionized, half non-unionized.  In connection with the acquisition, Reddaway's non-union membership was converted to union membership.  Around the same time, on the international side, Yellow began making investments in China, further increasing its international presence, through Reimer.

35.     In 2006 Yellow Roadway adopted the YRC Worldwide Inc. moniker to reflect its growing international presence.   It also restructured certain

businesses and formed YRC National Transportation to oversee the operations of Yellow and Roadway along with Canadian-based Reimer Express.

36.    However, that same year, Yellow faced a series of financial and operational headwinds.  After months of hard-fought, good faith negotiations, Yellow reached a consensual agreement with its stakeholders to place the company on stronger financial footing.  In 2009, Yellow merged with Roadway to create YRC.



37.    In 2019, Yellow formally changed its name to "Yellow Corporation" as part of a larger restructuring effort to refocus on its North American LTL operations.  Returning to the Yellow name was just the first step in a continuing transformation from four trucking brands (YRC Freight, Reddaway, Holland and New Penn) into one super-regional LTL carrier.



**B.    Yellow's Business Operations.**

**1.    Business Overview.**

38.    When it was serving customers prior to the Petition Date, Yellow offered its customers a full range of services for the transportation of industrial, commercial and retail goods in national, regional and international markets, primarily through the operation of owned or leased equipment in its North American ground distribution network.  Yellow provided its customers with both LTL services, which combine shipments from multiple customers on a single trailer, and truckload ("TL") services, whereby the quantity of freight



shipped by customers filled the entire trailer. While Yellow offered both LTL and TL services, deliveries were predominately LTL shipments, with truckload services offered to maximize equipment utilization and reduce empty miles (the distance empty or partially full trailers travel to balance the network).

39.    In addition to LTL and TL transportation services, Yellow also provided higher-margin specialized services, including guaranteed expedited services, time-specific deliveries, cross-border services, exhibit services, product returns, and government material shipments.

40.    Yellow was a transportation provider to the United States federal government and provider of logistics solutions for customer-specific needs with custom projects, consolidation and distribution, reverse logistics, and residential white glove service offerings. A substantial majority of Yellow's services were provided wholly within the United States.

41.    Yellow was the largest unionized LTL carrier in the United States, transporting approximately 10% of the nation's LTL freight. As of July 27, 2023, Yellow employed nearly 30,000 people, approximately two thirds of whom are members of the IBT, who primarily comprised the Company's drivers and dock, maintenance, and clerical  workers. Yellow operated service terminals in 300 communities, with employees in all fifty states. In 2022, Yellow transported approximately 14.2 million shipments, for approximately 250,000 customers, including the U.S. Government, generating more than $5.2 billion in operating revenue.

On an average workday, Yellow's approximately 30,000 employees handled approximately 50,000 freight shipments.

42.     Yellow's fleet is comprised of approximately 12,700 tractors, including approximately 11,700 owned tractors and approximately 1,000 leased tractors, and approximately 42,000 trailers, including approximately 34,800 owned trailers and 7,200 leased trailers. Yellow's network includes 308 strategically located service facilities, including 169 owned facilities with approximately 10,000 doors and 140 leased facilities with approximately 9,100 doors, in addition to six warehouses managed by Yellow's logistics solution provider, Yellow Logistics.

43.     Yellow operated in a highly competitive environment. Overall, when Yellow was still operating, the LTL market was increasingly dominated by non-union trucking companies who carried approximately 80% of all LTL freight. Key competitors included global, integrated freight transportation services providers, global freight forwarders, national freight services providers (including intermodal providers), regional and interregional carriers, third-party logistics providers, and small, intraregional transportation companies. Yellow also had competitors within several different modes of transportation including: LTL, truckload, air and ocean cargo, intermodal rail, parcel and package companies, transportation consolidators, reverse logistics firms, and privately-owned fleets. Ground-based transportation includes private fleets and "for-hire" provider groups.

### 2.     Yellow's Family of Trucking Brands.

44.     With its family of trucking brands, including Holland, New Penn, YRC Freight, Reddaway, and Yellow Logistics, Yellow provided transportation services for various categories of goods, which included (among others) apparel, appliances, automotive parts, chemicals, food, furniture, glass, machinery, metal, metal products, non-bulk petroleum products, rubber, textiles, wood and other manufactured products or components. Each of Yellow's trucking brands

provided different transportation and logistics services to its customers, as summarized in the following chart:

| Brand | Description |
|-------|-------------|
| Holland | Offered the most next-day service lanes in its territory and consistently recorded one of the lowest claim ratios in the industry. |
| NEW PENN | Provided next-day regional LTL shipping services through the northeastern United States, Canada and Puerto Rico. |
| YRC FREIGHT | Transported industrial, commercial and retail goods, specializing in shipping solutions with an expansive network across North America. |
| Reddaway | Offered next-day and two-day service, with a footprint that encompassed all of the Western United States, including Alaska and Hawaii. |
| YELLOW LOGISTICS | Coast-to-coast 3PL brokerage combined trucks, technology and talented people to create customized logistics solutions. |

### 3.    One Yellow.

45.    In 2019, Yellow announced the "One Yellow" enterprise initiative.  One Yellow was intended to combine the vast national network of the YRC Freight brand with the speed and consistency of Yellow's regional brands to create one "super-regional carrier."

46.    In addition, One Yellow, once implemented, was set to address operational inefficiencies that hampered the Company's ability to compete in the LTL sector of the trucking

market and gain market share that had been lost to non-unionized competitors that do not have the same burdensome operational cost structure.

47.    Prior to the One Yellow initiative, numerous operating companies within Yellow's corporate structure were competing for the same business.  For instance, on any given day, multiple trucks from competing companies that



The One Yellow super-regional network would streamline operations and reduce duplication in pickup and delivery operations.  Customer benefit is one driver can pickup and deliver both regional and long-haul shipments.

were under Yellow's corporate umbrella could be dispatched to the same location to pick up and deliver shipments of freight, resulting in a massive amount of redundancy, higher costs, and general waste of resources.  Yellow could not reasonably compete with other LTL carriers while its own brands were competing with one another.  One Yellow was therefore a commonsense integration initiative that would eliminate unnecessary duplication, prevent Yellow's trucking brands from competing with one another for, quite literally, the exact same business, and ultimately transform Yellow from a disparate set of operating companies into a single unified national platform.  Once completed, One Yellow would have resulted in the following benefits:

- network optimization of all zip codes in pickup and delivery zones, thereby eliminating redundancy where multiple terminals serve the same zip codes;

- brand enhancement through superior service and customer satisfaction;

- volume accretion attributable to Yellow's ability to provide a structurally higher level of service and increase its LTL market share, especially its next-day/same-day delivery market share;

- increased yield; and

- enhanced pricing abilities, due to greater competitiveness and higher service levels.

48.    One Yellow was Yellow's most vital strategic initiative, and the very survival of Yellow depended on completing One Yellow as soon as possible.  Yellow anticipated that One Yellow would enable Yellow to dramatically improve its financial performance, including by growing EBITDA to $450 million within one full year of implementation.  Yellow further anticipated that One Yellow would create a financial opportunity to capture upwards of $675 million in additional annual revenue at operating margins of 13.5%.  One Yellow not only made sense financially as a method to improve synergies, but also as a practical matter to position Yellow for long-term success.  Both the pre-Sean O'Brien Union and the management team at Yellow were aligned in achieving these objectives.

49.    Indeed, in the ten months prior to these chapter 11 cases, Yellow *was performing well*.  In the Fourth Quarter of 2022, Yellow had reported its best operating  income and operating ratio in 16 years.  By all accounts, Phase 1 of the One Yellow initiative was a tremendous success.

II.     **Corporate and Capital Structure.**

       1.     **Corporate Structure.**

50.     As set forth on the structure chart attached as **Exhibit A**, Debtor Yellow Corporation directly or indirectly owns thirty-two subsidiaries, twenty-four of which are Debtors in these chapter 11 cases.

       2.     **Capital Structure.**

51.     The Debtors have approximately $1.2 billion in total funded debt obligations.  This consists of a $485.4 million senior secured term loan, and approximately $737 million in US Treasury term loans, and $0.9 million in borrowings under the ABL Facility.[4]

| ($ in millions) | Maturity | Outstanding Principal |
|---|---|---|
| UST Tranche A | September 30, 2024 | $337,042,758 |
| UST Tranche B | September 30, 2024 | $399,999,770 |
| B-2 Term Loan Facility | June 30, 2024 | $485,372,693 |
| ABL Facility | January 9, 2026 | $858,520 |
| **Total Funded Debt** | | $1,223,273,741 |

    **B.**     **The UST Credit Agreements.**

52.     Beginning the last two weeks of March 2020, the transportation industry and the economy at large experienced an unexpected and significant decline in economic activity due to the impact of the 2019 coronavirus disease ("COVID-19") and the resulting business shutdown and shelter-in-place orders made across North America by various governmental entities and private enterprises.  As a result, Yellow pursued a loan with the UST pursuant to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").

---

[4]     Yellow also has approximately $359 million of undrawn letters of credit issued and outstanding under the ABL Facility supporting workers compensation insurance among other obligations.

53.    Accordingly, on July 7, 2020, Yellow and certain of its subsidiaries, as guarantors (the "Term Guarantors"), entered into the UST Tranche A Term Loan Credit Agreement (as amended, restated, amended and restated, modified or otherwise supplemented from time to time, the "Tranche A UST Credit Agreement") with The Bank of New York Mellon, as administrative agent and collateral agent and the UST Tranche B Term Loan Credit Agreement (as amended, restated, amended and restated, modified or otherwise supplemented from time to time, the "Tranche B UST Credit Agreement" and, together with the Tranche A UST Credit Agreement, the "UST Credit Agreements") with The Bank of New York Mellon, as administrative agent and collateral agent, pursuant to which the United States Treasury ("UST") committed an aggregate principal amount of $700.0 million to the Company pursuant to the CARES Act. The obligations of the Company under the UST Credit Agreements are guaranteed by the Term Guarantors.

54.    The UST Credit Agreements have maturity dates of September 30, 2024, with a single payment at maturity of the outstanding balance.  The Tranche A UST Credit Agreement consists of a $300.0 million term loan and bears interest at a rate of the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 3.5% per annum, consisting of 1.50% in cash and the remainder paid-in-kind.  Proceeds from the Tranche A UST Credit Agreement were used to meet Yellow's contractual obligations, maintain working capital and finance technology and infrastructure development.  The Tranche B UST Credit Agreement consists of a $400.0 million term loan and bears interest at a rate of the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 3.5% per annum, paid in cash.  Proceeds from the Tranche B UST Credit Agreement were used predominantly for the acquisition of tractors and trailers.

55.    Obligations under the UST Credit Agreements are secured by a perfected first-priority security interest in the escrow or controlled account supporting the respective UST Credit

Facility, certain tractors and trailers (solely in the case of the Tranche B UST Credit Agreement) and a perfected junior priority security interest (subject in each case to permitted liens) in substantially all other assets of the Company and the Term Guarantors, subject to certain exceptions.

56.     On July 7, 2023, the Company and certain of its subsidiaries entered into a waiver agreement (the "UST Credit Agreement Waiver") under the UST Credit Agreements.  The UST Credit Agreement Waiver provides for a waiver of the minimum Consolidated EBITDA financial covenant of $200.0 million LTM set forth in the UST Credit Agreements for the covenant testing period that ended on June 30, 2023.  LTM Consolidated EBITDA for fourth quarter 2022 was $343.1 million.

57.     As of the Petition Date, approximately $337 million in borrowings remain outstanding under the Tranche A UST Credit Agreement, and approximately $400 million in borrowings remain outstanding under the Tranche B UST Credit Agreement.

### C.     B-2 Term Loan.

58.     On September 11, 2019, Yellow and certain of its subsidiaries, as guarantors (the "B-2 Term Guarantors"), amended and restated the existing credit facilities under the credit agreement dated February 13, 2014 (the "Prior Term Loan Agreement") and entered into a $600.0 million term loan agreement (the "B-2 Term Loan") with funds managed by Apollo Global Management, LLC acting collectively as lead lender ("Apollo"), and Alter Domus, as administrative agent and collateral agent.  The obligations of the Company under the governing agreement (the "B-2 Term Loan Agreement") are guaranteed by the B-2 Term Guarantors.

59.     The B-2 Term Loan has a maturity date of June 30, 2024, with a single payment due at maturity of the outstanding balance.  The B-2 Term Loan initially bore interest at the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 7.5% per annum, payable at least

quarterly in cash, subject to a 1.0% margin step down in the event the Company achieves greater than $400.0 million in trailing-twelve-month Adjusted EBITDA.  Obligations under the B-2 Term Loan are secured by a perfected first-priority security interest in (subject to permitted liens) assets of the Company and the B-2 Term Guarantors, including but not limited to all of the Company's wholly owned terminals, tractors and trailers other than the tractors and trailers funded by the UST Tranche B loan, subject to certain limited exceptions.

60.    On April 7, 2020, the Company and certain of its subsidiaries entered into Amendment No. 1 (the "First Term Loan Amendment") to the B-2 Term Loan as a result of expected future covenant and liquidity tightening due to unprecedented economic deterioration. The First Term Loan Amendment principally provided additional liquidity allowing the Company to defer quarterly interest payments for the quarter ending March 31, 2020 and the quarter ending June 30, 2020 with almost all of such interest to be paid-in-kind.  The First Term Loan Amendment also provided for a waiver with respect to the Adjusted EBITDA financial covenant during each fiscal quarter during the fiscal year ending December 31, 2020.  The interest rate was retroactively reset to a fixed 14% during the first six months of 2020.

61.    On July 7, 2020, the Company and the B-2 Term Guarantors entered into Amendment No. 2 (the "Second Term Loan Amendment") to the B-2 Term Loan Agreement.  The material terms of the Second Term Loan Amendment include, among other things, a consent to the refinancing and conforming changes to the description of collateral set forth in the UST Credit Agreements, permanently capitalizing previously paid-in-kind interest on borrowings under the  B-2 Term Loan Agreement, and that all future interest shall accrue at Adjusted LIBO rate plus a margin of 7.5% per annum and 6.5% per annum in the case of alternative base rate borrowings

paid in cash.  Additionally, the Company is subject to certain financial covenant requirements identical to those of the UST credit agreements.

62.     On July 7, 2023, but effective as of June 30, 2023, the Company and certain of its subsidiaries entered Amendment No. 3 (the "Third Term Loan Amendment") to the B-2 Term Loan.  The Third Term Loan Amendment requires, among other things, that the Debtors provide a weekly liquidity report and that the Debtors do not permit liquidity to fall below $35 million at any time.  The Third Term Loan Amendment also provided for a change from the Adjusted LIBO rate to the Secured Overnight Financing Rate ("SOFR") plus the ARRC recommended credit spread adjustment.

63.     In July 2023, the Company announced that it closed on the sale of an obsolete terminal property in Compton, California with a third-party purchaser for a sale price of $80 million.  In accordance with the terms and conditions of the Third Term Loan Amendment, the net proceeds of the sale, totaling approximately $79.5 million, were applied to the outstanding principal balance of the B-2 Term Loan.

64.     As of the Petition Date, approximately $485.3 million in borrowings remain outstanding under the B-2 Term Loan.

### D.     ABL Facility.

65.     On February 13, 2014, Yellow entered into a $450 million asset-based loan facility (the "ABL Facility") from a syndicate of banks arranged by Citizens Business Capital (the "ABL Agent"), Merrill Lynch, Pierce, Fenner & Smith and CIT Finance LLC.  Yellow and its subsidiaries YRC Freight, Reddaway, Holland and New Penn are borrowers under the ABL Facility, and certain of the Company's domestic subsidiaries are guarantors thereunder. Availability under the ABL Facility is derived by reducing the amount that may be advanced against eligible receivables plus eligible borrowing base cash by certain reserves imposed by the

ABL Agent and the Company's outstanding letters of credit and revolving loans.   Eligible borrowing base cash is cash that is deposited from time to time into a segregated restricted account and is included in "Restricted amounts held in escrow" in the accompanying consolidated balance sheet.

66.     At Yellow's option, borrowings under the ABL Facility bear interest at either: (i) the applicable USD LIBOR rate plus 2.25%, as amended, or (ii) the base rate (as defined in the ABL Facility) plus 1.25%, as amended.  Letter of credit fees equal to the applicable USD LIBOR margin in effect, 2.25% as amended, are charged quarterly in arrears on the average daily stated amount of all letters of credit outstanding during the quarter.   Unused line fees are charged quarterly in arrears (such unused line fee percentage is equal to 0.375% per annum if the average revolver usage is less than 50% or 0.25% per annum if the average revolver usage is greater than 50%).   The ABL Facility is secured by a perfected first-priority security interest (subject to permitted liens) in accounts receivable, cash, deposit accounts and other assets related to accounts receivable of Yellow and the other loan parties and an additional second-priority security interest (subject to permitted liens) in substantially all remaining assets of the borrowers and the guarantors.

67.     On October 31, 2022, the Company and certain of its subsidiaries entered into Amendment No. 7 (the "ABL Treasury Amendment") in which the maturity date of the ABL Facility was extended to January 9, 2026 and included a springing maturity commencing thirty days prior to the maturity of any of the Term Debt, the UST Tranche A Facility Indebtedness, or the UST Tranche B Facility Indebtedness.  Further, as part of the ABL Treasury Amendment, the approximately $359 million in outstanding and undrawn Letters of Credit fees under the ABL Facility became the applicable margin for SOFR Loans.  The amended facility has an increased

capacity of $50 million up to $500 million and an interest rate of SOFR plus 1.75% plus a credit spread adjustment of .10%.

68.     As of the Petition Date, $0.9 million in borrowings remain outstanding under the ABL Facility as well as approximately $359 million of undrawn letters of credit issued and outstanding under the ABL Facility supporting workers compensation insurance, among other obligations.

## III.    Circumstances Leading to Chapter 11 Filing.

### A.    COVID-19.

69.     During 2019, the freight industry experienced a recession.  This recession appeared to have stabilized in the first quarter of 2020.  However, beginning the last two weeks of March, the freight industry and the economy at large experienced a precipitous and significant decline in economic activity due to the impact of the COVID-19.

70.     The COVID-19 pandemic and related economic repercussions created significant uncertainty and resulted in a material decrease in the volume that was expected during 2020 by both Yellow and the industry as a whole.  This market downcycle forced Yellow into a liquidity crunch.  In order to maintain adequate liquidity to fund operations, Yellow took preservation actions in late March and early April 2020, including layoffs, furloughs, further eliminations of short-term incentive compensation and reductions in capital expenditures, and deferment of payments to various parties.

71.     In addition, Yellow benefited from the support afforded to it under the CARES Act, which provided temporary relief related to the payment of employer payroll taxes and non-union pension payments.  Specifically, the UST Credit Agreements, which provided Yellow $700 million, were entered into pursuant to the CARES Act.  The CARES Act loan saved Yellow and allowed it to move forward on solid economic footing.

### B.      One Yellow.

72.      In 2019, Yellow announced the multi-year One Yellow initiative to transform Yellow's legacy businesses into a unified national platform that operates as "one company, one network, under one Yellow brand."   As described above, One Yellow was a critical strategic initiative designed to, among other things, enable the Company to operate efficiently, enhance customer service, increase productivity, strengthen financial results, and importantly, operate without internal competition among its affiliated subsidiary companies.   Ultimately, the implementation of One Yellow would ensure that Yellow could compete successfully with the non-union LTL carriers that dominate the market, and allow Yellow to provide a competitive, viable, "ready to go to the market" product, *i.e.* super-regional service—just like FedEx or Old Dominion Freight Line.

73.      In fact, when Yellow received its CARES Act loan, it was widely understood, including by the UST, that the timely and successful completion of One Yellow would be critical to ensuring that Yellow had a modern and efficient network that is vital for carriers to be successful in the highly competitive LTL market.

74.      The One Yellow process contained three phases, with full implementation expected to be completed by early 2023.  The three phases of the One Yellow initiative can be summarized as follows:

- Phase 1 (20% of network):   to consolidate YRC Freight's operations with Reddaway's operations in the West;

- Phase 2 (70% of network):  to consolidate YRC Freight's operations with Holland's and New Penn's operations in the Northeast, Midwest, and Southeast; and

- Phase 3 (10% of network):  to consolidate YRC Freight's operations with Holland's remaining operations in the Central and Southern regions.

75.     When Yellow decides on an operational change, the Union must resolve with Yellow the seniority of affected Union members.  YRCW National Master Freight Agreement ("NMFA") Art. 5 § 2, Art. 8 § 6.  The change of operations process is usually routine and easily dealt with through the contractual mechanisms set forth in the collective bargaining agreement. *See, e.g.*, *id*. at Art. 8 § 6.  When Yellow decides to make a change of operations ("CHOPS") proposal, it meets with affected local unions and then participate in a CHOPS Committee hearing where any remaining issues are worked out.  *Id.*

76.     Last year, Yellow proposed CHOPS for Phase 1 of One Yellow, the Union approved the Phase 1 CHOPS by following mandatory procedures incorporated within the NMFA, the collective bargaining agreement, and Yellow successfully implemented Phase 1.

77.     In September 2022, Phase 1 was launched, with Union support and Union approval of the change of operations Yellow needed to implement Phase 1.  As a result, the linehaul networks of YRC Freight and Reddaway in the Western region were integrated to support both regional and long-haul services.  This was one of the first major steps Yellow took to improve operational performance, and the preliminary results of Phase 1 were very positive.

78.     As described above, the implementation of Phase 1 was a success, and Yellow's financial position was strong when Yellow began preparations to implement Phase 2.  In fact, Yellow was seeking to refinance its funded debt obligations and simplify its capital structure in order to further capture value associated with the full implementation of One Yellow.  But for O'Brien and the Union halting One Yellow integration in its tracks, the ABL Facility would have been refinanced without any issues.

**C.     The Union's Obstruction of Phase 2 Causes Yellow Irreparable Damage.**

79.     Even before Yellow's successful implementation of Phase 1, Yellow was preparing for Phase 2 of One Yellow to address operations in the East, Central, and portions of the Southern

region—covering 70% of Yellow's network.   In addition to consolidating YRC Freight's operations with Holland's and New Penn's in the East, Central, and portions of the Southern regions, Phase 2 would:  (a) establish one dispatch system across all three operating companies; (b) create 35 new velocity distribution centers; and (c) combine terminals in near proximity with one another in the YRC Freight-Holland-New Penn network.   To be sure, the majority of employees were to be offered the opportunity to work at terminals within the same city (in some cases to a new terminal right across the street).  Yellow planned to implement and complete Phase 2 by the end of 2022 and to begin and complete the final Phase 3 implementation in early 2023. Unfortunately, these efforts never bore fruit.

80.   For a time, the Union appeared to work with Yellow on the Phase 2 CHOPS, but it soon became evident that the Union had disregarded the NMFA, as it governs the CHOPS process, and was instead misusing the CHOPS process to stall these vital operational changes.  By late December 2022/early January 2023, it was evident that Mr. O'Brien had usurped Mr. Murphy's role in leading the negotiations with Yellow over Phase 2.  After that, Phase 2 was met with heavy resistance by the Union, and each proposal Yellow made for its implementation was ultimately rejected.  Rather than work out a consensual solution, as the collective bargaining agreement required, the Union, at the instruction of Mr. O'Brien, refused to bargain in good faith at all and instead rebuffed every effort to resolve their issues with Phase 2, doubling down on its position that it would not approve any operational changes at Yellow.

81.   As described above, One Yellow was designed, among other things, to unify Yellow's disparate operating companies into a single company and brand, modernize Yellow's LTL network, address certain operational inefficiencies, improve Yellow's operating footprint and create a super-regional carrier, enhance the Yellow brand, increase the number of shipments

Yellow transports, and expand Yellow's market share. Looking to the future, One Yellow was designed to better position Yellow to take market share from both non-unionized competitors, which have lower operational costs than unionized companies, and from the remaining union competitors. The Union's obstruction of Phase 2 of One Yellow meant that Yellow could not implement these changes or achieve these improvements for the 80% of Yellow's network that Phase 2 and Phase 3 were intended to address. Reduced to dollars and cents, the inability to proceed with One Yellow cost Yellow the operational savings of approximately $22.85 million per month that, without Union obstruction, Yellow should have been able to achieve.

82. When trying to work directly with the Union yielded no results—and with Yellow's financial position growing more precarious as a result—Yellow simultaneously pursued another angle to try to save itself. Yellow reached out to key political figures, including Senator Bernie Sanders, and former United States Secretary of Labor Marty Walsh for assistance in bringing the Union back to the negotiating table.

83. Yellow apprised members of President Biden's administration of the loss of tens of thousands of jobs, the damage to America's already fragile supply chains, and the anticompetitive impact that would result from Yellow's closure. President Biden's administration was specifically informed that the loss of Yellow would have significant negative economic impact, beyond just the loss of its $5 billion in annual revenue and 30,000 jobs; given Yellow's size and criticality to the LTL freight shipping sector, the loss of its capacity in the system would be unprecedented and send shock waves through numerous critical supply chains; and the loss of Yellow's freight handling capacity would dilute competition in the LTL freight sector and have the anticompetitive effect of enabling other LTL carriers to immediately increase their prices.

84.     Yellow asked President Biden's administration for assistance in convincing the Union to negotiate with Yellow.  I understand that President Biden's administration encouraged the Union to return to the negotiating table, but the Union would not do so.  While Yellow reached out to other high-level, pro-Union government officials for assistance in convincing the Union to return to the negotiating table, these efforts did not prove to be fruitful.

85.     Most recently, on July 12, 2023, Yellow went a step further in attempting to get the Union to negotiate in good faith.  After reports that the Union reached a new collective bargaining agreement with Yellow competitor ABF Freight that included an $11.00/hour wage and benefit increase, Yellow offered to match the $11.00/hour wage and benefit increase.  In spite of this, the proposal was once again met with opposition.  Despite the Union's duty to present Yellow's proposal to the Yellow employee Union members that it represents, it did not do so.

86.     It continued to be abundantly clear:  Mr. O'Brien had no intention of allowing Yellow to take the steps necessary to save itself.  Mr. O'Brien told Yellow's 22,000 Union workers that they will find other jobs, gloated about putting Yellow in the grave, and goaded:  "[T]here comes a point where you have to cut your losses. Yellow has shown that it doesn't deserve and cannot be expected to continue under its current structure."[5]

87.     The Union's obstruction of Phase 2 cost Yellow at least $137 million in adjusted EBITDA, and created a liquidity crisis, as a direct result of which Yellow was forced to take cash-conservation measures, including deferring the Contributions, as described above.

---

[5]     This quote is part of a larger statement from Mr. O'Brien's video message posted on Facebook on June 12, 2023. https://www.facebook.com/teamsters/videos/obrien-sets-the-record-straight-on-yellowthe-teamsters-have-learned-that-yellow-/931798261232894/

88.     On June 27, 2023, Yellow filed a lawsuit against the IBT, TNFINC, and several local unions for their breaches of the NMFA.  In that lawsuit, Yellow seeks to hold the IBT accountable for its deliberate destruction of Yellow's enterprise value.

**D.     Yellow's Near-Term Liquidity Issues.**

89.     Yellow anticipated that, as the phases of One Yellow were implemented, operational efficiencies would be achieved, and EBITDA would increase.  However, because the Union stopped One Yellow in its tracks after only 20% of the initiative was implemented, Yellow has not realized the projected savings or increased revenues from implementation of Phases 2 or 3. As a result, Yellow has been operating at a loss and rapidly exhausting its liquidity.

90.     Furthermore, the overall LTL industry has been experiencing challenging business conditions.  Last year, as the manufacturing sector's strength began to waver, demand for LTL capacity decreased.  Into this year, the first quarter of 2023 was characterized by soft demand, and Yellow did not experience the typical seasonal uplift in demand during the second half of the first quarter.

91.     This combination of economic headwinds and a liquidity crisis brought on by the Union's obstruction of Phase 2 created a perfect storm.  Each day Mr. O'Brien caused the Union to block the successful completion of One Yellow, Yellow continued to get closer to running out of cash.  Accordingly, Yellow retained the services of Alvarez & Marsal North America, LLC and Kirkland & Ellis LLP to consider potential alternatives to address Yellow's liquidity issues. This liquidity crisis was sufficiently acute that it necessitated Yellow obtaining waivers of certain covenants under its current credit agreements, including waiver of a minimum EBITDA financial covenant, which it obtained on July 7, 2023.  The credit agreement amendment required, among other things, that Yellow provide lenders with a weekly liquidity report and that Yellow's liquidity

not fall below $35 million.  Further, as part of efforts to pay off the more than $1.2 billion in loans, Yellow sold a terminal in Compton, California, for $80 million.

92.     With liquidity deteriorating, Yellow was forced to take cash-conservation measures—Yellow had to stop paying some of its bills in the ordinary course in an effort to save itself and ultimately save 30,000 American jobs, including 22,000 union jobs.  Had the Union not blocked the implementation of One Yellow, thus depriving Yellow of over $137 million in EBITDA, Yellow almost certainly would have had sufficient funds available to pay the Contributions when they became due without putting the business at risk.

93.     Indeed, and as discussed in greater detail above, as of June 30, 2023, Yellow has a $485 million Term Loan that matures in June 2024 and a $737.0 million US Treasury Loan that matures in September 2024.  Yellow must refinance its $1.2 billion in debt before it matures.  The financial markets and credit rating agencies took notice of the Union's obstruction of One Yellow.

94.     As a result of the steady drum beat of Mr. O'Brien's persistent negative public comments about Yellow, its leadership and its uncertain future, Yellow's stock price has sharply declined over the course of the last ten months.  At the same time, the credit-rating agencies have steadily downgraded Yellow.  On February 27, 2023, S&P downgraded Yellow's issuer credit rating from B- to CCC+ and its issue-level rating on Yellow's Term Loan from B- to CCC+ because of uncertainty regarding Yellow's ability to refinance the Term Loan and US Treasury Loan.  Further, S&P indicated it could lower Yellow's ratings again if it did not believe Yellow's refinancing plans would address its upcoming maturities before they became current.

95.     On May 15, 2023, Moody's downgraded Yellow's ratings—the corporate family rating, the probability of default rating, the senior secured rating, and the speculative grade liquidity rating—citing delays in implementing Phase 2 and weaker sector fundamentals.  On

July 6, 2023, S&P further downgraded Yellow's issuer credit rating from CCC+ to CCC- and its issue-level rating on Yellow's Term Loan from CCC+ to CCC-, citing contentious labor contract negotiations and Yellow's need to address looming maturities. On August 1, 2023, in the wake of the value destruction caused by the IBT strike threat, and in light of the fact that Yellow was forced to take initial steps to wind-down its operations, S&P once again downgraded Yellow's issuer credit rating from a CCC- to a CC.

96.     Mr. O'Brien's and the Union's public statements about the Company and statements suggesting an intention to put Yellow out of business also reduced customer confidence, which caused shippers to switch from Yellow to its competitors. Further, the Union's obstruction of Phase 2 delayed Yellow's ability to improve its service performance, affecting the Company's ability maintain or increase its market share. Ultimately, this negative-feedback loop from investors, analysts, credit-rating agencies, and customers, caused shareholders and customers to abandon Yellow, which made it increasingly more difficult for Yellow to find light at the end of the tunnel.

### E.     IBT Threatens to Strike and Seals Yellow's Fate.

97.     In retaliation for Yellow's decision to defer the Contributions, which Yellow could not pay because of the Union's obstruction of One Yellow and the resulting liquidity crisis, on July 17, 2023, Mr. Murphy, on behalf of all local unions affected by the deferred Contributions, gave a 72-hour notice that the affected local unions were authorized and intended to strike on or after July 24, 2023. Mr. O'Brien's decision to issue and publicize a strike notice while knowing that instead he could have just as easily asked Central States to extend his member's coverage for thirty days to allow the parties time to negotiate a resolution, was intended to put Yellow out of business.

98.     On July 19, 2023, recognizing that an IBT strike would all but guarantee the permanent, immediate, and value-destructive shutdown of Yellow, Yellow sought a temporary restraining order and preliminary injunction to, among other things, enjoin the Union from engaging in a strike work stoppage, slow down, or interruption of work (the "<u>TRO Motion</u>").  On July 20, 2023, the Union opposed Yellow's request for a temporary restraining order and preliminary injunction, and, on July 21, 2023, U.S. District Judge Julie A. Robinson of the District of Kansas denied the TRO Motion on the basis that the court lacked jurisdiction to do so.  In issuing its decision, the court admonished the Union that while it might have won that day's battle, by forcing a strike on Yellow it stood to lose the war.[6]

99.     On July 23, 2023, Mr. O'Brien finally ended his month's long stone-walling and reached out to Yellow's senior management—***just ten hours before the strike deadline***.  It was not until then, hours before that strike deadline, that Yellow and the Union could finally engage in negotiations to avert the threatened IBT strike.  As a result of these discussions, and the Union's direct request, Central States agreed to extend benefits for workers at Yellow operating companies Holland and YRC Freight for 30 days, thus averting a strike that could have begun Monday, July 24.

100.    However, as described above, the threat of the IBT strike was enough to seal Yellow's fate, causing Yellow's customers to flee to Yellow's competitors and irreparably harm

---

[6]     Transcript of Motion for Temporary Restraining Order Before the Honorable Julie A. Robinson Senior United States District Court Judge at 54:14-17, *Yellow Corp., et. al., v. Intnl. Brotherhood of Teamsers, et. al.*, Case No. 23- CV-1131-JAR (D. Kan. 21, 2003) ("I will say that I understand the grave consequences that may flow from this.  I hope the union understands that perhaps 22,000 or 30,000 jobs will be lost.  It could be a situation where you win a battle and lose a war, I don't know.  I don't know a whole lot about bankruptcy.  I used to.  But if a bankruptcy is filed, there would be an automatic stay in place, which is going to affect some things right away.  And it does sound like an orderly liquidation, if that's the outcome, is not going to -- is not going to be in the best interest of anybody that's representing -- or anybody that's being represented in the courtroom today, so that is unfortunate").

Yellow as a going-concern business.  Moreover, the IBT's threatened strike caused Yellow's banking partners to exercise certain protective remedies.  Specifically, on July 19, 2023, Citizens Business Capital ("Citizens") sent Yellow a notice of establishment of availability reserve in the amount of $25 million, which came due July 21, 2023.  On July 25, 2023, Citizens again sent a notice of establishment of availability reserve in the amount of $25 million, exacerbating Yellow's rapidly deteriorating liquidity, which came due on July 27, 2023.

## IV.   Restructuring Actions.

### A.   DIP Financing.

101.    Pursuant to the DIP Facility,[7] the Debtors will obtain access to (in addition to Available ABL Cash Collateral) of up to $142.5 million of new money over four draws as follows: (a) an initial $60 million draw made immediately available to the Debtors upon the Court's entry of the Interim Order; (b) $37.5 million upon the entry of a final, non-appealable order approving the Bidding Procedures; (c) $20 million upon the Debtors' receipt, pursuant to the Bidding Procedures Order, of unique, non-duplicative binding bids for the DIP Priority Collateral that would, in the aggregate, generate net cash proceeds equal to at least $250 million; and (d) $25 million upon the Debtors' receipt, pursuant to the Bidding Procedures Order, of unique, non-duplicative binding bids for the DIP Priority Collateral that would, in the aggregate, generate net cash proceeds equal to at least $450 million.

---

[7]    Capitalized terms used herein, but not otherwise defined have the meaning set forth in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion").

102.    As set forth in greater detail in the DIP Motion, the Kaldenberg Declaration,[8] and the Whittman Declaration,[9] the Debtors, with the assistance of their advisors, filed these chapter 11 cases to conduct an orderly wind-down of operations and execute a sale process for all of their assets in a manner that maximizes value for all stakeholders.  As of the Petition Date, the Debtors have only approximately $39 million of unrestricted cash on their balance sheet.  The Debtors, with the assistance of their advisors, including A&M, have determined that they must obtain incremental liquidity to address these postpetition financing needs.  Access to the incremental liquidity provided by the proposed DIP Facility, including access to Cash Collateral in accordance with the Interim Order and DIP Budget, will provide the Debtors with the means to maintain limited operations and to effectuate the orderly wind-down of operations and sale of the Debtors' extensive assets, which include a substantial real estate portfolio and thousands of operational trucks and trailers.

103.    As described in the Kaldenberg Declaration and the DIP Motion, the Debtors, with the assistance of their advisors, conducted an extensive marketing process designed to identify the parties that may be interested in providing postpetition financing to the Debtors, both from within and outside the Debtors' existing capital structure.  Following extensive canvassing of the market and several days of around-the-clock and arm's-length negotiations, the Debtors and the DIP

---

[8]    *Declaration of Cody Leung Kaldenberg, Founding Member and Partner at Ducera Partners LLC in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Projection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Kaldenberg Declaration").

[9]    *Declaration of Brian Whittman, Managing Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, and (V) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Whittman Declaration").

Lenders agreed to the DIP Facility, which, as presented to the Court today, represents the best possible debtor-in-possession financing facility that the Debtors could realistically obtain. The DIP Facility, together with the consensual use of cash collateral, provides significant additional liquidity, minimizes the size of the DIP Facility, and provides adequate assurance to the DIP Lenders by avoiding unnecessary and costly litigation.

### B.    Value Maximizing Wind-down.

104.    Facing a dire liquidity shortfall and no prospects for the significant additional financing required to complete a turnaround of the business, immediately prior to the Petition Date, the Debtors' management team and advisors determined that it was appropriate to clear the Debtors' freight network, close their facilities and commence layoffs of their workforce. The Debtors intend to pursue an orderly wind-down of their estates in these chapter 11 cases in order to maximize value and minimize the impact of the shutdown for all stakeholders. As part of the Company's wind-down efforts, the Debtors may incur costs associated with the layoffs of its workforce, including under state wage payment laws or under state law equivalents of the federal WARN Act.

105.    Further, as described above, Ducera has been engaged by Yellow to assist it in conducting a comprehensive marketing process for all of their assets. As further described above, Ducera was originally engaged in connection with Yellow's efforts to refinance the UST Credit Agreement facility and the B-2 Term Loan Facility. As one of the first steps in connection with these refinancing efforts, the Debtors had their extensive portfolio of real estate, equipment, and other assets professionally appraised at an aggregate value that, if fully monetized at such apparently appraised valuation, would exceed the aggregate amount of Yellow's prepetition secured debt and the DIP Facility. It is my understanding that Ducera has begun to, and will continue to, work diligently with Yellow's management to achieve a value-maximizing sale

Yellow's assets with the goal of achieving the highest possible recoveries to creditors. Even factoring in the costs and Fees of the proposed DIP Facility, I believe that the continuation of this sale-and-marketing process will serve to maximize value of the estates.

106.     Several individuals on Yellow's management team possess key expertise in Yellow's sophisticated and industry-specific assets as well as critical relationships with the likely and prospective purchasers of these assets (*i.e.*, Yellow's industry competitors). Furthermore, Yellow has an extensive tangible asset base, including hundreds of owned and leased properties and tens of thousands of units of rolling stock across the United States and Canada. Yellow's specific knowledge and expertise of its real estate, asset management, and other personnel is critical to supporting the informational and logistical requirements of a value-maximizing sale process in light of the breadth and complexity of the Yellow's assets.

107.     Accordingly, I believe that conducting the sale process through these chapter 11 cases, harnessing the New Money DIP Term Loans provided by the DIP Facility along with the continued efforts of Yellow's advisors in consultation with these individuals from management most familiar with Yellow's assets, as opposed to liquidating Yellow's assets through a potentially disorderly chapter 7 process, will ultimately yield incremental value to the estates above the costs and fees of the DIP Facility.

**V.     Evidence in Support of First Day Motions.**

108.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet. On August 7, 2023, Yellow filed the following First Day Motions:

- **Cash Management Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Relating Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief.*

- **Wages Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief.*

- **Vendors Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Claims of Certain Critical Vendors, 503(b)(9) Claimants, Lien Claimants, and Foreign Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief.*

- **Utilities Motion.** *Motion of Debtors for Entry of Interim and Final Orders (A)(I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (B) Granting Related Relief.*

- **Insurance and Surety Bond Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance Coverage Entered Into Prepetition and Pay Related Prepetition Obligations and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, (II) Approving Continuation of the Surety Bond Program, and (III) Granting Related Relief.*

- **Taxes Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief.*

- **Equity Trading Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and (II) Granting Related Relief.*

- **Customer Collections Motion.** *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Consent to Limited Relief From the Automatic Stay to Permit Setoff of Certain Customer Claims Against the Debtors, and (II) Granting Related Relief.*

- **Foreign Representative Motion.** *Motion of Debtors for Entry of an Order (I) Authorizing Yellow Corporation to Act as Foreign Representative Pursuant to 11 U.S.C. § 1505, and (II) Granting Related Relief.*

- **Creditor Matrix Motion.** *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (C) Serve Certain Parties in Interest by Email, (D) Approve the Form and Manner of Service of the Notice of Commencement, and (E) Redact Certain Personally Identifiable Information of Natural Persons, (II) Waiving the Requirement to File a List of Equity Security Holders, and (III) Granting Related Relief.*

- **Joint Administration Motion.** *Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief.*

- **Epiq 156(c) Retention Application.** *Application of Debtors for Entry of an Order (I) Authorizing and Approving the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent and (II) Granting Related Relief.*

109.    The First Day Motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

110.    I am familiar with the information contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to undertake certain postpetition activities in connection with their wind-down efforts, including effectuating one or more asset sales in order to maximize value for the benefit of all stakeholders, (b) constitutes a critical element for the Debtors to successfully implement the foregoing chapter 11 objectives, and (c) best serves the Debtors' estates and creditors' interests.

*[Remainder of Page Intentionally Left Blank]*

111.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: August 7, 2023                        /s/ *Matthew A. Doheny*
                                        Name:  Matthew A. Doheny
                                        Title:   Chief Restructuring Officer,
                                                Yellow Corporation.