## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| YELLOW CORPORATION, et al.,[1] | ) | Case No. 23-11069 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) MODIFYING THE AUTOMATIC STAY, (IV) AUTHORIZING THE DEBTORS
TO USE UST CASH COLLATERAL, (V) GRANTING ADEQUATE PROTECTION,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:[2]

### Preliminary Statement

1.     The Debtors filed these chapter 11 cases to conduct a comprehensive and value-maximizing liquidation of their assets and an efficient and orderly wind-down of their operations.  The Debtors enter these chapter 11 cases with only approximately $39 million of liquidity on their balance sheet—an amount insufficient to fund the Debtors' wind-down efforts,

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]    A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith.  Capitalized terms used but not immediately defined in this motion have the meanings ascribed to them later in this motion, in the First Day Declaration, the interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), or the interim order governing the Treasury's interests in Cash Collateral, attached hereto as **Exhibit B** (the "Interim UST Cash Collateral Order"), as applicable.

sale process, and the limited operations the Debtors must maintain to maximize the value of their estates. Accordingly, entry into that certain senior secured super-priority debtor-in-possession credit agreement (the "DIP Credit Agreement" and the facility set forth therein, the "DIP Facility") and access to the Prepetition Secured Parties' (and the Prepetition UST Secured Parties') cash collateral on the terms set forth in the Interim Order and the Interim UST Cash Collateral Order (the "Cash Collateral," and specifically, as set forth in the Interim Order, the "Available ABL Cash Collateral") is necessary to ensure that the Debtors will have ample liquidity to administer a value-maximizing chapter 11 process.

2.      The Debtors anticipate filing a bidding procedures motion (the "Bidding Procedures Motion," and the bidding procedures sought for entry thereunder, the "Bidding Procedures") in the near term. Through the Bidding Procedures, the Debtors will market all of their assets to interested purchasers, including the Debtors' former industry competitors as well as other strategic and financial buyers and investors, over an approximately three-month process led by the Debtors' proposed investment banker, Ducera Partners LLC ("Ducera"). Concurrent with marketing their extensive portfolio of assets, the Debtors will complete an orderly wind-down of their operations, which was commenced prior to the Petition Date. Operations will remain limited and solely to support sale and wind-down efforts, including clearing remaining customer freight and collection of associated accounts receivable, over an expedited period. Access to Cash Collateral and the DIP Facility proceeds is essential to fund the Debtors' sale process, an efficient wind-down, and these limited operations.

3.      Over the course of several intensive weeks, Ducera, on behalf of the Debtors, led an extensive marketing process designed to identify parties with interest in providing postpetition financing to the Debtors. These parties included institutions both from within and outside the

Debtors' existing capital structure. Ducera contacted approximately 35 third-party financial institutions, of which 10 executed confidentiality agreements and received access to a private data room containing detailed materials related to the Debtors' financials, operations, assets, organizational structure, and the opportunity to provide debtor-in-possession financing. The Prepetition Secured Parties, including the Prepetition B-2 Lenders, as well as the Prepetition UST Secured Parties, indicated that they would not consent to having their prepetition liens primed by a third-party lender. Further, as explained in the *Declaration of Cody Leung Kaldenberg, Founding Member of and Partner at Ducera Partners LLC, In Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Kaldenberg Declaration"), no party other than the Prepetition B-2 Lenders offered the Debtors an actionable post-petition financing facility. *See* Kaldenberg Decl. ¶ 19. Further the Prepetition ABL Lenders (defined below), who have a first lien on the Debtors' cash and accounts receivable, were unwilling to consent to the Debtors' use of a sufficient portion of those collections to fund the Debtors' wind-down, the sale process, and these chapter 11 cases. Thus, the incremental liquidity provided by the New Money DIP Term Loans of the DIP Facility is required to achieve the Debtors' objectives in these cases.

4.      Once the Debtors and Ducera determined that a debtor-in-possession financing facility would likely and realistically only be made available from the Prepetition B-2 Lenders, the Debtors and their advisors commenced hard-fought negotiations with the Prepetition B-2 Lenders and their advisors on the terms of the DIP Facility in order to obtain the best possible terms under

the circumstances.  As part of these intensive discussions, the Debtors and their advisors sought significant concessions and adjustments relative to the DIP Lenders' original offer for post-petition financing.  Specifically, the Debtors pursued a reduced Roll-Up Amount and reduced Fees, including an overhaul of the Prepetition B-2 Lenders' originally proposed fee structure (which would have tied the Fees to the "asset monetization" of the Debtors' sale process).  As further explained in the Kaldenberg Declaration, the Debtors succeeded in reducing the Fees (among other concessions) but were unable to negotiate (despite their best efforts) a reduced Roll-Up Amount. *See* Kaldenberg Decl. ¶ 20–21.  As negotiations with the Prepetition B-2 Lenders progressed, Ducera, on behalf of the Debtors, continued to canvass the debtor-in-possession financing market for any and all available or possible alternatives.  These efforts included reaching out to several of the parties originally contacted, as well as certain additional parties, to solicit interest on the basis of providing postpetition financing containing a new money component competitive with the sizing of the DIP Facility (*i.e.*, in the range of $142.5 million of new money loans, including with approximately $60 million on an immediately needed basis).   Notwithstanding these continuous efforts by the Debtors and Ducera, no actionable offers for alternative postpetition financing materialized.  Following several days of around-the-clock and arm's length negotiations, the Debtors and the Prepetition B-2 Lenders agreed to the DIP Facility, which, as presented to the Court today, represents the best possible debtor-in-possession financing facility that the Debtors were able to obtain.  Furthermore, the terms of the DIP Facility leave open the possibility for third parties, if they have not yet come forward but wish to, to present competing offers for replacement postpetition financing.

5.     The DIP Facility is a $142.5 million new-money senior secured super-priority debtor-in-possession facility (or approximately $644 million factoring in the Roll-Up Amount)

provided by certain of the Debtors' prepetition term lenders (in their capacity as lenders under the Prepetition B-2 Term Loan Credit Agreement, the "Prepetition B-2 Lenders" or, as lenders under the DIP Facility, the "DIP Lenders"), under that certain Amended and Restated Credit Agreement, dated as of September 11, 2019, and amended and restated on April 7, 2020, July 7, 2020, and July 7, 2023 (but effective as of June 30, 2023) (the "Prepetition B-2 Credit Agreement"), among Yellow Corporation and certain of its subsidiaries, as guarantors, and Alter Domus Products Corp. (f/k/a Cortland Products Corp.), as administrative agent and collateral agent ("Alter Domus" or the "Prepetition B-2 Agent," along with the Prepetition B-2 Lenders, the "Prepetition B-2 Secured Parties").

6.      Through the DIP Facility, the Debtors will obtain access to (in addition to Available ABL Cash Collateral) up to $142.5 million of new money over four draws as follows:  (a) an initial $60 million draw (the "Initial Draw") made immediately available to the Debtors upon the Court's entry of the Interim Order; (b) $37.5 million upon the Court's entry of a final, non-appealable order approving the Bidding Procedures (the "Second Draw"); (c) $20 million upon the Debtors' receipt, pursuant to the Bidding Procedures Order, of unique, non-duplicative binding bids for the DIP Priority Collateral (as defined in the Interim Order) that would, in the aggregate, generate net cash proceeds equal to at least $250 million (the "Third Draw"); and (d) $25 million upon the Debtors' receipt, pursuant to the Bidding Procedures Order, of unique, non-duplicative binding bids for the DIP Priority Collateral that would, in the aggregate, generate net cash proceeds equal to at least $450 million (the "Final Draw").  The DIP Facility contains milestones that provide for an efficient and value-maximizing chapter 11 sale and wind-down process (as further described below and as set forth in the DIP Credit Agreement, the "Milestones").[3]

---

[3]     The Interim UST Cash Collateral Order contains certain of the same Milestones, as well as certain additional milestones (the 'UST Milestones") for the benefit of the Prepetition UST Secured Parties.

7.     Further, as described, the DIP Facility provides that the DIP Lenders' Prepetition B-2 Term Loans will be fully "rolled up" into the DIP Facility (*i.e.*, into DIP Obligations) upon the Court's entry of the Interim Order (the "Roll-Up").  The proposed Roll-Up would convert into DIP Obligations, immediately upon entry of the Interim Order, all outstanding obligations under the Prepetition B-2 Credit Agreement held by the DIP Lenders or their affiliates or their respective managed or related funds (including accrued interest and unpaid fees and expenses) (the "Roll-Up Amount").  The Roll-Up Amount is $501,584,152.30.  The Roll-Up constitutes a key component of the DIP Facility.  The DIP Lenders indicated to the Debtors that they would not agree to provide the DIP Facility absent the Roll-Up and its being effectuated upon entry of the Interim Order.  The Roll-Up Amount represents an approximately 3.5-to-1 conversion of the DIP Lenders' Prepetition B-2 Obligations into DIP Obligations when accounting for the $142.5 million of New Money DIP Term Loans under the DIP Facility (assuming all four draws).

8.     Critically, the Roll-Up will not prejudice other parties in interest.  All other secured creditors have consented to the Roll-Up, and, in light of the DIP Lenders' oversecured status, the Roll-Up only affects the timing—and not the recovery—on account of such prepetition secured claims.  As described in the First Day Declaration and the Kaldenberg Declaration, the Debtors have had their extensive portfolio of real estate, equipment, and other assets professionally appraised at an aggregate value that, if and once monetized at such appraised aggregate value, would exceed the aggregate amount of the Debtors' prepetition secured debt and the DIP Facility.  *See* First Day Decl. ¶ 105; Kaldenberg Decl. ¶ 22.  Under the circumstances described herein and as set forth in the Kaldenberg Declaration, the Debtors submit that the Roll-Up is appropriate and reasonable.  Kaldenberg Decl. ¶ 20.

9.      In addition to the New Money DIP Term Loans (up to $142.5 million), the Prepetition ABL Agent has consented to the Debtors' use of the Available ABL Cash Collateral,[4] and the Prepetition ABL Secured Parties have agreed to the Debtors' use of their cash on hand as of the Petition Date less $16.5 million (which amount will be used to pay down (or cash collateralize, as applicable) the Prepetition ABL Secured Parties at the outset of these cases following entry of the Interim Order).  As set forth in the *Declaration of Brian Whittman, Managing Director of Alvarez & Marsal North America, LLC, In Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Whittman Declaration"), Available ABL Cash Collateral is expected to be approximately $80 million over the first twelve weeks of these chapter 11 cases. *See* Whittman Decl. ¶ 9.  The Debtors would be unable to finance their sale efforts and orderly wind-down process, while maintaining certain limited and necessary wind-down and sale-related operations, with Available ABL Cash Collateral alone.  Accordingly, accessing the New Money DIP Term Loans provided by the DIP Lenders is critical to maximize the value of the Debtors' estates.

10.     Pursuant to the DIP Facility, the Debtors will provide adequate protection to the Prepetition Secured Parties and the Prepetition UST Secured Parties (as set forth in the Interim Order and the Interim UST Cash Collateral Order, respectively), consisting of replacement liens, payment of professional fees, interest and fees payments, and information and reporting rights (as

---

[4]    "Available ABL Cash Collateral" has the meaning ascribed to it in paragraph 11(c)(i) of the Interim Order.

further described below and in the DIP Credit Agreement (as applicable to the Prepetition Secured Parties) and the Interim UST Cash Collateral Order (as applicable to the Prepetition UST Secured Parties), the "Adequate Protection").[5]  Specifically, as security for the DIP Obligations, the Debtors will grant the DIP Agent, for the benefit of the DIP Lenders, a first lien on all previously unencumbered assets of the Debtors and a priming lien on certain Prepetition Collateral, subject to the Prepetition Secured Parties' collateral priority scheme as set forth in the Prepetition Intercreditor Agreement.  Further, the Approved Budget (as defined in the Interim Order) shall be subject to the consultation rights of the Prepetition ABL Secured Parties and consent rights of the Prepetition UST Secured Parties.

11.     The DIP Facility (including each of the terms thereunder, as also set forth in the Interim Order) and access to Cash Collateral (pursuant to the terms of the Interim Order and the Interim UST Cash Collateral Order) has been consented to by each of the Prepetition B-2 Agent, the Prepetition ABL Agent, and the Prepetition UST Agent.  The DIP Facility is the culmination of hard-fought, arms-length, good faith negotiations between the DIP Lenders, the Prepetition Secured Parties, the Prepetition UST Secured Parties, and the Debtors.

12.     As further described in the Kaldenberg Declaration, the terms and provisions of the DIP Facility are fair and reasonable under the circumstances.  *See* Kaldenberg Decl. ¶ 20. The proposed DIP Facility, following Ducera's thorough canvassing of the debtor-in-possession financing market for available postpetition financing alternatives, represents the Debtors' only

---

[5]   The UST Adequate Protection Obligations (as defined in the Interim UST Cash Collateral Order) for the benefit of the Prepetition UST Secured Parties are set forth in the contemporaneously filed UST Cash Collateral Order. The Prepetition UST Secured Parties requested that the Debtors provide the UST Adequate Protection Obligations pursuant to a standalone order separate from the Interim Order.

available option to acquire postpetition funding apart from simply accessing Available ABL Cash Collateral.

13.     As further described in the Whittman Declaration, the Debtors enter these cases in a compromised liquidity position and require access to Available ABL Cash Collateral and the proceeds of the DIP Facility (including, in the immediate term, the $60 million Initial Draw) to fund their wind-down and sale efforts and their limited remaining operations.  *See* Whittman Decl. ¶ 6.  Specifically, access to the Initial Draw will permit the Debtors to meet near-term obligations relating to payroll, preparing the Debtors' assets for value-maximizing sales, and allowing customers to obtain their freight remaining in the Debtors network.  These funds will also allow the Debtors, with the assistance of their advisors, to conduct a thorough marketing process for their extensive asset portfolio and an orderly wind-down of their operations.

14.     The DIP Facility is necessary to fund these chapter 11 cases, the wind-down of the Debtors' operations, and a value-maximizing sale process pursuant to section 363 of the Bankruptcy Code and the anticipated Bidding Procedures.  The proposed DIP Facility is therefore in the best interests of the Debtors, is necessary to avoid irreparable harm to the Debtors and their estates, and should be approved.

## Relief Requested

15.     The Debtors seek entry of the Interim Order and the Interim UST Cash Collateral Order and a final debtor-in-possession financing order (the "Final Order") and a final order governing the Treasury's interest in Cash Collateral (the "Final UST Cash Collateral Order," and together with the Final Order, the "Final Orders" and collectively with the Interim Order and the Interim UST Cash Collateral Order, the "Orders"):[6]

---

[6]     The Debtors will file the form of Final Orders prior to the Final Hearing (as defined herein).

- authorizing the Borrower (as defined below) to obtain postpetition financing ("DIP Financing") pursuant to a secured, superpriority, priming debtor in possession multi-draw term loan facility (the "DIP Facility") subject to the terms and conditions set forth in the Interim Order and that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement attached to the Interim Order as Exhibit 1 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement") by and among Yellow Corporation ("Yellow" or the "Company"), as borrower (in such capacity, the "Borrower"), the DIP Guarantors (as defined below), the financial institutions or other entities from time to time party thereto as "Lenders" (the "DIP Lenders"), and Alter Domus Products Corp., as administrative agent and collateral agent (in such capacity, together with its successors and permitted assigns, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties"), consisting of (i) new money term loans (the "New Money DIP Term Loans") in an aggregate principal amount of $142.5 million, of which $60 million will be made available to be drawn upon entry of the Interim Order (the "Interim Draw") and the remainder will be made available to be drawn in three subsequent draws as set forth in the DIP Credit Agreement, and (ii) DIP Roll-Up Loans (as defined below) in an amount equal to (x) the Prepetition B-2 Obligations held by the DIP Lenders (or their affiliates) (including, without limitation, accrued interest, exit fee, and accrued and unpaid reasonable and documented fees and out-of-pocket expenses of the Prepetition B-2 Lenders (which are DIP Lenders) and their respective counsels) and (y) any accrued and unpaid reasonable and documented out-of-pocket expenses of the Prepetition B-2 Agent (as defined below) (including reasonable and documented counsel fees and out-of-pocket expenses) (the "Roll-Up Amount"), which will be deemed rolled up and converted into DIP Obligations (as defined below) upon entry of the Interim Order (the loans to be made available under the foregoing clauses (i) and (ii), the "DIP Loans" and the commitments therefor, the "DIP Commitments");

- authorizing the Borrower to incur, and the other Debtors to jointly and severally guarantee (such Debtors, in this capacity, the "DIP Guarantors" and, together with the Borrower, the "DIP Loan Parties") the DIP Loans and all extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, commitment fees or premiums and administrative agency fees), costs, expenses and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) earned, due and payable under the DIP Documents (as defined below) (collectively, the "DIP Obligations"), in each case subject to the Carve Out and the Canadian Priority Charges (as defined in the DIP Credit Agreement) and in accordance with the terms of the Interim Order and the DIP Documents;

- authorizing the DIP Loan Parties to execute, deliver and perform under the DIP Credit Agreement and all other documents and instruments that may be reasonably requested by the DIP Secured Parties in connection with the DIP Facility (in each case, as amended, restated, supplemented, waived or otherwise

modified from time to time in accordance with the terms thereof and under the Interim Order, together with the DIP Credit Agreement, the "DIP Documents");

- subject to the Carve-Out (as defined below) and the Canadian Priority Charges (as defined in the DIP Credit Agreement) and otherwise solely to the extent set forth in the Interim Order, granting to the DIP Agent, for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code;

- granting to the DIP Agent, for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the DIP Collateral (as defined below), on the terms set forth in the Interim Order;

- authorizing the DIP Agent to take all commercially reasonable actions to implement the terms of the Interim Order;

- waiving (a) the Debtors' right to surcharge the DIP Collateral, Prepetition B-2 Collateral, or Prepetition ABL Collateral (each as defined below) pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

- waiving the equitable doctrine of "marshaling" and other similar doctrines for the benefit of the DIP Secured Parties, the Prepetition Secured Parties, and the Prepetition UST Secured Parties with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Obligations (each as defined below), as applicable, in each case subject to the Carve Out and the Canadian Priority Charges (as defined in the DIP Credit Agreement);

- authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral solely in accordance with the Orders, the DIP Documents (including the Approved Budget, subject to Permitted Variances), and the Interim UST Cash Collateral Order (as defined below);

- authorizing the Debtors to pay the DIP Obligations as they become due and payable in accordance with the DIP Documents;

- authorizing the Debtors to remit ABL Cash Collateral (as defined below) to the Prepetition ABL Agent as set forth in the Interim Order and for the Prepetition ABL Agent to apply such ABL Cash Collateral to permanently reduce or cash collateralize, as applicable, Prepetition ABL Obligations as set forth in the Interim Order and pursuant to the procedures thereof;

- subject to the restrictions set forth in the DIP Documents and the Orders, authorizing the Debtors to use Prepetition Collateral and provide adequate protection to the Prepetition Secured Parties and the Prepetition UST Secured Parties for any diminution in value of their respective interests in the applicable

Prepetition Collateral (including Cash Collateral), for any reason provided for in the Bankruptcy Code (collectively, the "Diminution in Value");

- vacating and modifying the automatic stay to the extent necessary to permit the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and the Prepetition UST Secured Parties to implement and effectuate the terms and provisions of the Orders and the DIP Documents;

- waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order, the Interim UST Cash Collateral Order, and, upon entry, the Final Orders; and

- scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facility and use of Cash Collateral (including UST Cash Collateral) on the terms of the Final Orders to be posted to the docket prior to the Final Hearing.

## **Jurisdiction and Venue**

16.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

17.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

18.    The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b), 4001-2, and 9013-1(m).

**Concise Statements Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2[7]**

19.    The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.

| Bankruptcy Code | Summary of Material Terms |
| --- | --- |
| Borrower<br><br>Bankruptcy Rule 4001(c)(1)(B) | Yellow Corporation, a Delaware corporation (the "Borrower")<br><br>*See* DIP Credit Agreement, Introduction |
| Guarantors<br><br>Bankruptcy Rule 4001(c)(1)(B) | Each Subsidiary of the Borrower as of the Petition Date that is incorporated, formed or otherwise organized under the Laws of the United States of America or Canada (collectively, the "Guarantors")<br><br>*See* DIP Credit Agreement, "Guarantors," Section 1.01 |
| DIP Lenders<br><br>Bankruptcy Rule 4001(c)(1)(B) | Each lender from time to time party to the DIP Credit Agreement.  As of the Closing Date, Appendices A and B set forth the name of each Lender with a commitment for New Money Term Loans and Appendix C sets forth the name of each Lender who shall be deemed to make Rolled Term Loans in accordance with Section 2.01(b).<br><br>*See* DIP Credit Agreement, "Lender," Section 1.01; Appendices A–C |
| Term<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The date that is the earliest to occur of the following (i) 90 days following the Closing Date (the "Initial Maturity Date"); provided that, if (x) on or prior to the Initial Maturity Date the Borrower shall have received unique, non-duplicative binding cash bids pursuant to the Bidding Procedures Order for DIP Priority Collateral equal to at least 100% of the sum of the aggregate amount of Obligations outstanding as of such date but shall not have consummated such sale of DIP Priority Collateral and (y) not later than 12:00 p.m. New York City time one (1) Business Day prior to the Initial Maturity Date, the Lenders and the Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower certifying that the circumstances described in the foregoing clause (x) above have occurred, the date in this clause (i) shall be extended to 105 days after the Closing Date; (ii) the effective date or the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court; (iii) the date the Bankruptcy Court orders the conversion of the Chapter 11 Case of any of the Loan Parties to a liquidation under Chapter 7 of the Bankruptcy Code; (iv) the date of consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code or otherwise; (v) the date the Bankruptcy Court orders the dismissal of the Chapter 11 Case of any of the Loan Parties; (vi) the date of acceleration of the Term Loans or early termination of the Commitments hereunder, including as a result of the occurrence and continuance of an Event of Default; and (vii) the date that is 30 calendar |

---

[7]    The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Credit Agreement, the Interim Order, and the Interim UST Cash Collateral Order. To the extent any description, summary, or term in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Orders, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | days after the Petition Date if the Final Order Entry Date shall not have occurred by such date. <br><br> *See* DIP Credit Agreement, "Maturity Date," Section 1.01 |
| Commitment <br><br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(ii) | The New Money Term Loans will be available in four draws in an aggregate principal amount equal to $142.5 million.  Upon entry of the Interim Order, an initial draw of $60 million will be available.  The DIP Loans consists of $501,584,152.30 of Rolled Term Loans. <br><br> *See* DIP Credit Agreement, "Commitment," Section 1.01; Interim Order at 2 |
| Conditions of Borrowing <br><br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(ii) | The obligation of each Lender to honor any Request for Credit Extension is subject to satisfaction (or waiver by the Required Lenders) of the following conditions precedent: <br><br> (a)     The representations and warranties set forth in Article 5 and in each other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided*, that any such representation and warranty that is qualified by "materiality", "material adverse effect" or similar language shall be true and correct in all respects (after giving effect to such qualification therein) on and as of the date of such Credit Extension with the same effect as though made on and as of such date or such earlier date, as applicable. <br><br> (b)     No Default shall exist or would result from such proposed Credit Extension or from the application of the proceeds therefrom. <br><br> (c)     The following shall each be true as the date of such Credit Extension: <br><br> (i)     All Chapter 11 Orders and the orders granted in the Canadian Recognition Proceedings filed or to be filed with, and submitted to, the Bankruptcy Court or the Canadian Court shall be in form and substance acceptable to the Agents and the Required Lenders. <br><br> (ii)     Each Chapter 11 Order and the orders granted in the Canadian Recognition Proceedings that has been entered as of such date shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the Agents and the Required Lenders. <br><br> (iii)     No appeal of the DIP Order and the Canadian Orders shall have been filed or remain pending as of the date of such Credit Extension. <br><br> (iv)     The Loan Parties shall be in compliance in all material respects with the DIP Order and each other Chapter 11 Order and the orders granted in the Canadian Recognition Proceedings. <br><br> (d)     The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof. <br><br> (e)     The FTI Engagement Letter shall be in full force and effect. <br><br> (f)     All engagement letters or other agreements providing for the payment of the fees and expenses of the proposed Debtors' professional advisors shall be in form and substance reasonably satisfactory to the Required Lenders. <br><br> Each Request for Credit Extension submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in <u>Sections</u> |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | 4.01(a) and (b) have been satisfied or waived on and as of the date of the applicable Credit Extension.<br><br>The effectiveness of this Agreement and the obligation of each Lender to fund the Initial Loans on the Closing Date, shall be subject to satisfaction (or waiver) of the following conditions precedent:<br><br>(a)    The Administrative Agent and the Lenders shall have received the following, each properly executed by a Responsible Officer of the signing Loan Party, each dated as of the Closing Date:<br><br>(i)    executed counterparts of this Agreement duly executed by the Borrower and each Guarantor;<br><br>(ii)    a Term Note executed by the Borrower in favor of each Lender that has requested a Term Note at least one Business Day in advance of the Closing Date;<br><br>(iii)    the Security Agreement duly executed by the parties thereto; and<br><br>(iv)    the Fee Letter and the Agency Letter duly executed by the respective parties thereto.<br><br>(b)    The Administrative Agent and the Lenders shall have received, on behalf of themselves, the Agents and the Lenders, an opinion of Kirkland & Ellis LLP, special counsel for the Loan Parties, dated the Closing Date and addressed to the Administrative Agent, the Collateral Agent and the Lenders and in customary form and substance, and the Borrower hereby requests such counsel to deliver such opinions.<br><br>(c)    The Administrative Agent and the Lenders shall have received (i) a copy of the certificate or articles of incorporation or organization or certificate of formation, including all amendments thereto, of each Loan Party, certified, if applicable, as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing (to the extent applicable) of each Loan Party as of a recent date, from such Secretary of State or similar Governmental Authority; (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws or operating (or limited liability company) agreement of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or equivalent governing body) of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Loan Party is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation or organization or certificate of formation of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party on the Closing Date, and (E) as to the absence of any proceeding for the dissolution or liquidation of such Loan Party; and (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above.<br><br>(d)    (i) The Administrative Agent and the Lenders shall have received the results of (x) searches of the Uniform Commercial Code filings (or equivalent filings) and (y) judgment and tax lien searches, made with respect to each Loan Party in the states or |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | other jurisdictions of formation of such Loan Party and with respect to such other locations and names reasonably requested by the Required Lenders, together with copies of the financing statements (or similar documents) disclosed by such search, (ii) such results shall evidence the absence of any other Liens or mortgages on the Collateral, except the Liens securing each Prepetition Indebtedness and other Permitted Liens and (iii) the Security Agreement shall have been duly executed and delivered by each Loan Party that is to be a party thereto, together with (x) certificates, if any, representing the Equity Interests pledged by the Borrower and the Guarantors accompanied by undated stock powers executed in blank and (y) documents and instruments to be recorded or filed that the Administrative Agent may deem, subject to <u>Section 6.13</u> reasonably necessary to satisfy the Collateral and Guarantee Requirement. <br><br> (e) Subject to Section 6.13(a), the Collateral and Guarantee Requirement shall have been satisfied. <br><br> (f) The Administrative Agent and the Required Lenders shall have received all documentation and other information about the Borrower and the Guarantors required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, including without limitation, a duly executed W-9 tax form (or such other applicable IRS tax form) of each Loan Party, that has been reasonably requested in writing prior to the Closing Date. <br><br> (g) The Administrative Agent and the Lenders shall have received a certificate from an officer of the Borrower certifying as to compliance with the conditions set forth in Sections 4.01(a) and (b). <br><br> (h) All reimbursable reasonable and documented unpaid expenses (including Attorney Costs) of the Prepetition B-2 Agent and Prepetition B-2 Lenders under the Prepetition B-2 Loan Documents shall have been paid by the Borrower. The Administrative Agent and the Required Lenders shall have received all applicable fees and other amounts earned, due and payable on or prior to the Closing Date, including, to the extent invoiced prior to the Closing Date (except as otherwise reasonably agreed by the Borrower), reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document on or prior to the Closing Date. <br><br> (i) The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the First Day Orders and all related pleadings to be filed at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Agents, Required Lenders, Prepetition UST Tranche A Secured Parties and the Prepetition UST Tranche B Secured Parties and shall be in form and substance acceptable to the Required Lenders, the Prepetition UST Tranche A Secured Parties and the Prepetition UST Tranche B Secured Parties. <br><br> (j) The Canadian Recognition Proceedings shall have been commenced in the Canadian Court and all of the Canadian Orders and all related filings, motions, pleadings, other papers or material notices to be filed at the time of commencement of the Canadian Recognition Proceedings or shortly thereafter shall have been reviewed in advance by the Required Lenders and shall be in form and substance acceptable to the Required Lenders. <br><br> (k) The Interim Order (i) shall have been entered by the Bankruptcy Court and the Borrower shall have delivered to the Administrative Agent and the Required Lenders a true and complete copy of such order, and (ii) shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, appealed or vacated, or subject to stay pending appeal, or otherwise challenged or subject to any challenge, |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | absent prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent). The Closing Date shall have occurred on or prior to the third (3rd) Business Day after the Interim Order Entry Date. |

(l)     [Reserved];

(m)     All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Agents and Required Lenders.

(n)     (i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtors or their business, properties or assets and no motion shall be pending seeking any such relief, and (ii) no motion shall be pending seeking any other relief in the Bankruptcy Court to exercise control over Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions; provided that this clause (ii) shall not apply to any motion that is being contested in good faith by the Debtors and which contest the Debtors reasonably believe will be successful.

(o)     The Administrative Agent and the Lenders shall have received the Initial Budget and such other information (financial or otherwise) as the Lenders or the Administrative Agent may reasonably request.

(p)     All engagement letters or other agreements providing for the payment of the fees and expenses of the Debtors' proposed professional advisors shall be in form and substance reasonably satisfactory to the Required Lenders, the Prepetition UST Tranche A Lenders and the Prepetition UST Tranche B Lenders.

(q)     The Cash Collateral Account shall have been established and shall constitute Term Priority Collateral and not Prepetition ABL Priority Collateral.

(r)     [reserved].

(s)     Since July 7, 2023, none of the Loan Parties have transferred assets or incurred any debt or obligations outside the ordinary course of business, except as disclosed to the Lenders in writing (which may be by email) prior to the Closing Date.

(t)     Subject to Bankruptcy Court approval, (i) each Loan Party shall have the corporate power and authority to make, deliver and perform its obligations under the Loan Documents and the Interim Order and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any third party or any Governmental Authority) shall be required in connection with the execution, delivery and performance by each Loan Party of the Loan Documents, or for the validity or enforceability in accordance with its terms against such Loan Party of the Interim Order, except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect.

(u)     The Administrative Agent and the Required Lenders shall be satisfied that the Loan Parties have obtained any material third party and governmental consents necessary in connection with the Facility, the financing hereunder and any related transactions.

(v)     The Loan Parties and the transactions contemplated by the Loan Documents and the Interim Order shall be in compliance with all applicable laws and regulations.

(w)     The Loan Parties shall have executed an engagement letter to pay the fees and expenses of Houlihan Lokey, as financial advisor to the Prepetition UST Tranche A

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Lenders and the Prepetition UST Tranche B Lenders, in form and substance satisfactory to such Prepetition UST Tranche A Lenders and the Prepetition UST Tranche B Lenders.<br><br>Solely for purposes of determining whether the conditions set forth in Section 4.01 or 4.02 have been satisfied in respect of any Credit Extension, the Agents and each Lender party hereto shall be deemed to have consented to, approved, accepted or be reasonably satisfied with any document delivered prior to such Credit Extension or other matter (in each case, for which such consent, approval, acceptance or satisfaction is expressly required by Section 4.01 or 4.02, as applicable) by releasing its signature page to this Agreement or to an Assignment and Acceptance, as the case may be.<br><br>The obligation of each Lender to fund Final Loans on any Final Loan Borrowing Date, shall be subject to satisfaction (or waiver) of the following conditions precedent:<br><br>(a)     Subject to Section 6.13(a), the Collateral and Guarantee Requirement shall have been satisfied.<br><br>(b)     The Administrative Agent and the Required Lenders shall have received a certificate from an officer of the Borrower certifying compliance with the conditions set forth in clauses (a) and (b) of Section 4.01.<br><br>(c)     The Administrative Agent and the Required Lenders shall have received all applicable fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced prior to the Closing Date (except as otherwise reasonably agreed by the Borrower), reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document on or prior to the Closing Date.<br><br>(d)     The Final Order (i) shall be in form and substance satisfactory to the Agents and the Required Lenders, (ii) shall have been entered by the Bankruptcy Court within a date which is 30 days following the Petition Date, and the Borrower shall have delivered to the Administrative Agent and the Required Lenders a true and complete copy of such order and (iii) shall be in full force and effect and shall not have been modified or amended absent prior written consent of the Administrative Agent and the Required Lenders or reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge in any respect absent the prior written consent of the Administrative Agent and the Required Lenders.<br><br>(e)     The Loan Parties shall be in compliance with each order entered in the Chapter 11 Cases and the Canadian Recognition Proceedings, including the DIP Order and the Canadian Orders.<br><br>(f)     The Loan Parties shall be in compliance with the Approved Budget (subject to Permitted Variances).<br><br>(g)     The Interim Order shall have been entered by the Bankruptcy Court and the Borrower shall have delivered to the Administrative Agent and the Required Lenders a true and complete copy of such order, and such order shall and shall be in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent) , be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or appealed or subject to pending appeal or otherwise challenged or subject to any challenge in any respect absent prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent).<br><br>(h)     All orders entered by the Bankruptcy Court pertaining to cash management |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Agents and  Required Lenders .<br><br>(i)    (i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtors or their business, properties or assets and no motion shall be pending seeking any such relief, and (ii) no motion shall be pending seeking any other relief in the Bankruptcy Court to exercise control over Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions; provided that this clause (ii) shall not apply to any motion that is being contested in good faith by the Debtors and which contest the Debtors reasonably believe will be successful.<br><br>(j)    Administrative Agent and the Lenders shall have received the Initial Budget, each Updated Budget required under Section 6.02(l) and such other information (financial or otherwise) as the Lenders or the Administrative Agent may reasonably request.<br><br>(k)    (i) With respect to any Borrowing which would result in the aggregate principal amount of New Money Term Loans borrowed hereunder exceeding $97,500,000, the First Bid Milestone Date shall have occurred and (ii) with respect to any Borrowing which would result in the aggregate principal amount of New Money Term Loans borrowed hereunder exceeding $117,500,000, the Second Bid Milestone Date shall have occurred.<br><br>(l)    To the extent required by Section 6.07, the Administrative Agent shall have received evidence that the insurance required by Section 6.07 is in effect, together with endorsements naming the Administrative Agent, for the benefit of the Secured Parties, as additional insured and loss payee thereunder.<br><br>(m)    The Canadian Final DIP Recognition Order shall have been entered by the Canadian Court and the Borrower, in its capacity as "foreign representative" on behalf of the Debtors, shall have delivered to the Administrative Agent and the Required Lenders a true and complete copy of such order, and such order shall and shall be in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent), be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent).<br><br>Solely for purposes of determining whether the conditions set forth in Section 4.01 or 4.03 have been satisfied in respect of any Credit Extension after the Closing Date, the Agents and each Lender party hereto shall be deemed to have consented to, approved, accepted or be reasonably satisfied with any document delivered prior to such Credit Extension or other matter (in each case, for which such consent, approval, acceptance or satisfaction is expressly required by Section 4.01 or 4.03, as applicable) by releasing its signature page to this Agreement or to an Assignment and Acceptance, as the case may be.<br><br>*See* DIP Credit Agreement, Section 4.01, 4.02, 4.03 |
| Interest Rates | The expected interest rate is 17.0% comprised of the current Prime Rate of 8.5% plus the Applicable Margin.[8] |

---

[8]    The interest rate is consistent with the interest rate under the Prepetition B-2 Credit Agreement, as adjusted for

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | "Applicable Margin" shall mean, with respect to any Loan, a percentage per annum equal to, 8.50%.<br><br>*See* DIP Credit Agreement, "Applicable Margin," Section 1.01 |
| Use of DIP Facility and Cash Collateral<br><br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | The proceeds of the New Money Term Loans shall be applied strictly in accordance with the Approved Budget (subject to Permitted Variances).   Proceeds of the Initial Loans, to the extent authorized by the Bankruptcy Court, to pay the pre-petition accrued wages specified in the Initial Budget (subject to Permitted Variances).  No part of the proceeds of any Loan will be used, whether directly or indirectly in any manner that causes such Loan or the application of such proceeds to violate the Regulations of the Board, including Regulation T, Regulation U and Regulation X, or any other regulation thereof, or to violate the Exchange Act.<br><br>No part part of the proceeds of any Loan, the Debtors' Cash Collateral, or the Collateral will be used:<br><br>(i)       for any purpose that is prohibited under the Bankruptcy Code or the DIP Order;<br><br>(ii)       to investigate, commence, prosecute, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of any or all of the Agents, the Lenders, the Prepetition B-2 Agent or the Prepetition B-2 Lenders with respect to or related to: (A) the claims, liens or security interest of the Agents, the Lenders, the Prepetition B-2 Agent or the Prepetition B-2 Lenders or their respective rights and remedies under this Agreement, the other Loan Documents, the DIP Order or the Prepetition B-2 Loan Documents, as the case may be, including to commence or prosecute or join in any action against any or all of the Agents, the Lenders, the Prepetition B-2 Agent or the Prepetition B-2 Lenders seeking (x) to avoid, subordinate or recharacterize the Obligations or the Prepetition B-2 Obligations or any of the Collateral Agent's or the Prepetition B-2 Agent's Liens, (y) any monetary, injunctive or other affirmative relief against any or all of the Agents, the Lenders the Prepetition B-2 Agent or the Prepetition B-2 Lenders or their Collateral or "Collateral" under (and as defined in) the Prepetition B-2 Loan Documents) in connection with the Loan Documents or the Prepetition B-2 Loans Documents or (z) to prevent or restrict the exercise by any or all of the Agents, the Lenders, the Prepetition B-2 Agent or the Prepetition B-2 Lenders of any of their respective rights or remedies under the Loan Documents or the Prepetition B-2 Loan Documents, (B) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of the release set forth in Section 10.23 against the Agents, the Lenders, Prepetition B-2 Lenders and the Prepetition B-2 Agent, (C) certain stipulations to be made by the Loan Parties and approved by the DIP Order; or (D) any other action which with the giving of notice or passing of time would result in an Event of Default hereunder;<br><br>(iii)       other than in respect to UST Adequate Protection Payments or as otherwise permitted pursuant to the Orders, for the payment of fees, expenses, interest or principal or any other payment with respect to any Prepetition ABL Facility Indebtedness, Prepetition UST Tranche A Facility Indebtedness or Prepetition UST Tranche B Facility Indebtedness;<br><br>(iv)       to make any distribution under a Plan of Reorganization that is not an |

application of the default rate thereunder, and in recognition of the Debtors' inability to borrow pursuant to SOFR.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Acceptable Plan; |
| |     (v)    except as contemplated by the Approved Budget, to make any payment to (x) any board member of any Loan Party or any Affiliate thereof outside of the ordinary course of business or (y) any equityholder of any Loan Party or any controlled Affiliate thereof in any capacity (other than UST Adequate Protection Payments or as otherwise permitted pursuant to the Orders); or |
| |     (vi)    except as permitted by the Approved Budget (subject to Permitted Variances) or the Loan Documents to make any payment in settlement of any claim, action or proceeding (before any court, arbitrator or other governmental body) without the prior written consent of the Required Lenders. |
| | Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications). |
| | *See* DIP Credit Agreement, Section 6.16 |
| "Roll-Up" Provisions<br><br>Local Rule 4001-2(a)(i)(E) | Upon entry of the Interim Order, the DIP Roll-Up Loans shall be rolled up, and converted into DIP Obligations in an amount equal to (x) the Prepetition B-2 Obligations held by the DIP Lenders (or their affiliates) (including, without limitation, accrued interest, exit fee, and accrued and unpaid reasonable and documented fees and out-of-pocket expenses of the Prepetition B-2 Lenders (which are DIP Lenders) and their respective counsels) and (y) any accrued and unpaid reasonable and documented out-of-pocket expenses of the Prepetition B-2 Agent (as defined below) (including reasonable and documented counsel fees and out-of-pocket expenses) (the "Roll-Up Amount"). <br><br>*See* Interim Order, Introduction |
| Adequate Protection<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral) for the aggregate Diminution in Value and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and the use of their Cash Collateral, the Prepetition Secured Parties are granted the following Adequate Protection (collectively, the "Adequate Protection Obligations"): <br><br>    (a)    *Adequate Protection of Prepetition ABL Secured Parties.* <br><br>       (i)    *ABL Adequate Protection Liens.* The Prepetition ABL Agent is hereby granted, for the benefit of the Prepetition ABL Secured Parties, effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition ABL Secured Parties' Diminution in Value upon all of the DIP Collateral (the "ABL Adequate Protection Liens"), (i) in the case of the Prepetition ABL Priority Collateral, senior to all other liens, subject solely to the Carve-Out and the Prepetition Permitted Senior Liens, (ii) in the case of the Prepetition B-2 Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Prepetition Permitted Senior Liens, (B) the DIP Liens, (C) the B-2 Adequate Protection Liens (as defined below), and |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (D) the Prepetition B-2 Liens, (iii) in the case of the Prepetition Joint Collateral and Prepetition UST Tranche B Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Prepetition Permitted Senior Liens, (B) the UST Tranche B Adequate Protection Liens (as defined below), (C) the Prepetition UST Tranche B Liens, (D) the DIP Liens, (E) the B-2 Adequate Protection Liens, and (F) the Prepetition B-2 Liens, and (iv) in the case of the Unencumbered Property, subject and subordinate to, in the following order, (A) the Carve-Out and (B) the DIP Unencumbered Property Liens.<br><br>   (ii)  *ABL Section 507(b) Claims.* The Prepetition ABL Secured Parties are hereby granted allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition ABL Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "<u>ABL 507(b) Claims</u>"), which ABL 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, Avoidance Proceeds). Except as otherwise provided herein, the ABL 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; *provided, however*, that (i) the ABL 507(b) Claims shall be junior to the Carve-Out; (ii) the ABL 507(b) Claims shall be junior to the DIP Superpriority Claims other than as set forth in clause (iii); (iii) with respect to the Prepetition ABL Priority Collateral, the ABL 507(b) Claims shall be senior to, in the following order, (A) the DIP Superpriority Claims, (B) the B-2 507(b) Claims (as defined below), and (C) the UST Tranche B 507(b) Claims and the UST Tranche A 507(b) Claims (as defined below); (iv) with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, the ABL 507(b) Claims shall be junior to, in the following order, (A) the UST Tranche B 507(b) Claims, (B) the DIP Superpriority Claims, and (C) the B-2 507(b) Claims; and (v) with respect to the Prepetition B-2 Priority Collateral, the ABL 507(b) Claims shall be junior to, in the following order, (A) the DIP Superpriority Claims and (B) the B-2 507(b) Claims.<br><br>   (iii)  *Prepetition ABL Secured Parties' Interest, Fees, and Expenses.* As further adequate protection, subject to the Carve Out, the DIP Loan Parties shall make current cash payments of (x) interest at the Default Rate (as defined in the Prepetition ABL Credit Agreement), (y) fees with respect to Letters of Credit pursuant to Section 3.2.2 of the Prepetition ABL Credit Agreement (including any such fees that accrue at the default rate as set forth therein), and (z) other fees, in each case pursuant to, due, and payable under the terms of the Prepetition ABL Loan Documents, and shall currently pay in cash, subject to the review procedures set forth in paragraph 16 of the Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition ABL Secured Parties' legal and financial advisors, including, without limitation, those of Choate, Hall & Stewart LLP, Richards, Layton & Finger, PA, AlixPartners, LLP, and any local legal counsel or other advisors, consultants, and other professionals reimbursable under the Prepetition ABL Loan Documents (collectively, the "<u>ABL Adequate Protection Fees and Expenses</u>" and, together with the ABL Adequate Protection Liens and ABL 507(b) Claims, the "<u>ABL Adequate Protection Obligations</u>"). |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | (iv)    *Additional Rights and Protections*. The Debtors shall deliver to the Prepetition ABL Agent (substantially concurrent with delivery to the DIP Agent) all financial statements, reports, certificates and related items that are required to be delivered to the DIP Agent pursuant to the DIP Credit Agreement. On the third (3rd) business day of each week, the Debtors shall deliver to the Prepetition ABL Agent a Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement) as required pursuant to Section 8.1(ii) of the Prepetition ABL Credit Agreement, which shall be accompanied by customary backup reporting in form and detail reasonably acceptable to the Prepetition ABL Agent, including, without limitation, Account agings, and a roll-forward of Prepetition ABL Priority Collateral; *provided* that the first Borrowing Base Certificate of each month following entry of the Interim Order shall further include a line item for Ineligible Accounts and a breakdown of Ineligible Accounts as part of the customary backup reporting provided. The Debtors shall make the members of their senior management and its professional advisors available for update calls at least one time per calendar week with the prepetition ABL Agent and its respective professional advisors, at times reasonably acceptable to the Prepetition ABL Agent to discuss the cases, the then-current Approved Budget, the Budget Variance Reports, the Liquidity Reports (each as defined in the DIP Credit Agreement), other reporting delivered pursuant to Section 6.02 of the DIP Credit Agreement, union matters, the status of any monetization strategies being pursued by the Debtors, including pursuant to the Bidding Procedures Order (as defined in the DIP Credit Agreement), and any other matters (including business, operational and due diligence matters) reasonably requested by the Prepetition ABL Agent. <br><br> (b)    *Adequate Protection of Prepetition B-2 Secured Parties.* <br><br> (i)    *B-2 Adequate Protection Liens*. The Prepetition B-2 Agent is hereby granted, for the benefit of the Prepetition B-2 Secured Parties, effective and perfected upon the date of the Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition B-2 Secured Parties' Diminution in Value upon all of the DIP Collateral (the "B-2 Adequate Protection Liens"), (i) in the case of the Prepetition B-2 Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Prepetition Permitted Senior Liens and (B) the DIP Liens, (ii) in the case of the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Prepetition Permitted Senior Liens, (B) the UST Tranche B Adequate Protection Liens, (C) the Prepetition UST Tranche B Liens, and (D) the DIP Liens; (iii) in the case of the Prepetition ABL Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Prepetition Permitted Senior Liens, (B) the ABL Adequate Protection Liens, (C) the Prepetition ABL Liens, and (D) the DIP Liens, and (iv) in the case of the Unencumbered Property, subject and subordinate to, in the following order, (A) the Carve-Out and (B) the DIP Unencumbered Property Liens. <br><br> (ii)    *B-2 Section 507(b) Claims*. The Prepetition B-2 Secured Parties are hereby granted allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition B-2 Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "B-2 507(b) Claims," and together with the ABL 507(b) Claims, the "507(b) Claims")), which B-2 507(b) Claims shall be |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, Avoidance Proceeds).  Except as otherwise provided herein, the B-2 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; *provided*, *however*, that (i) the B-2 507(b) Claims shall be junior to the Carve-Out; (ii) the B-2 507(b) Claims shall be junior to the DIP Superpriority Claims; (iii) with respect to the Prepetition ABL Priority Collateral, the B-2 507(b) Claims shall be junior to, in the following order, (A) the ABL 507(b) Claims and (B) the DIP Superpriority Claims; (iv) with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, the B-2 507(b) Claims shall be junior to, in the following order, (A) the UST Tranche B 507(b) Claims and (B) the DIP Superpriority Claims; and (v) with respect to the Prepetition B-2 Priority Collateral, the B-2 507(b) Claims shall be senior to, in the following order, (A) the ABL 507(b) Claims and (B) the UST Tranche B 507(b) Claims and UST Tranche A 507(b) Claims. <br><br> (iii)    *Prepetition B-2 Secured Parties' Fees and Expenses.*  As further adequate protection, the DIP Loan Parties shall currently pay in cash, subject to the review procedures set forth in paragraph 16 of the Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition B-2 Secured Parties' legal and financial advisors, including, without limitation, those of (i) Milbank LLP, FTI Consulting, Inc., Cousins Law LLC, and any local legal counsel or other advisors in any foreign jurisdiction and (ii) White & Case LLP, as counsel to Beal Bank USA and any local legal counsel or other advisors in any foreign jurisdiction (provided, with respect to each (i) and (ii), respectively, no more than one local legal counsel or other advisor in any foreign jurisdiction) (collectively, the "<u>B-2 Adequate Protection Fees and Expenses</u>" and, together with the B-2 Adequate Protection Liens and B-2 507(b) Claims, the "<u>B-2 Adequate Protection Obligations</u>"). <br><br> (c)    *Adequate Protection of Prepetition UST Tranche A Secured Parties and Adequate Protection of Prepetition UST Tranche B Secured Parties.*  The Adequate Protection in favor of the Prepetition UST Secured Parties is set forth in the Interim UST Cash Collateral Order. <br><br> *See* Interim Order ¶ 12 |
| Repayment Features <br><br> Local Rule 4001-2(a)(i)(E) | The Borrower shall repay to the Administrative Agent, for the ratable account of the Term Lenders on the Maturity Date, the aggregate principal amount of all Term Loans outstanding on such date, together with all accrued and unpaid interest on the principal amount (to be paid to but excluding the date of such payment) and all fees and expenses payable under the Loan Documents hereunder and other outstanding Obligations. <br><br> *See* DIP Credit Agreement, Section 2.11 |
| Fees <br><br> Bankruptcy Rule 4001(c)(1)(B) | The Borrower agrees to pay to (i) the Agents, for their own account, the administrative agent and collateral agents fees applicable to the Facilities payable in the amounts and at the times agreed upon between the Borrower and the Administrative Agent as set forth in the Agency Fee Letter and (ii) the Administrative Agent, for the account of the Lenders, |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(ii) | the fees applicable to the Facilities in the amounts, in the manner and at the times set forth in the Fee Letter (the "<u>Fees</u>").<br><br>All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent.  Once paid, none of the Fees shall be refundable under any circumstances.<br><br>*See* DIP Credit Agreement, Section 2.05; *see also* Fee Letter, providing:<br><br>As consideration for the Lenders providing the DIP Facility, the Company hereby agrees to pay (or cause to be paid) to the Administrative Agent, for the ratable account of the Lenders, a closing fee (the "<u>DIP Closing Fee</u>") in an aggregate amount equal to:<br><br>(a)    $7,125,000 (the "<u>Fixed Amount</u>"); and<br><br>(b)    an amount (the "<u>Variable Amount</u>") equal to:<br><br>(i)    the product of (A) the DIP Facility Amount <u>multiplied</u> by (B) a percentage representing the sum of (x) if any Obligations under the Credit Agreement are outstanding on September 8, 2023, 2.50%, plus (y) if any Obligations under the Credit Agreement are outstanding on September 29, 2023, 2.50%, plus (z) if any Obligations under the Credit Agreement are outstanding on the second day after the scheduled Maturity Date pursuant to clause (i) of the definition of the term "Maturity Date" under the Credit Agreement, 2.50%; <u>minus</u><br><br>(ii)    the Fixed Amount. |
| Budget<br><br>Bankruptcy Rule 4001 (c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Following delivery of the Budget on the Petition Date, not later than 5:00 p.m. New York time on the third Business Day of the last full calendar week of each month (commencing with August 30, 2023) occurring after the Closing Date (the "<u>Updated Budget Deadline</u>"), a supplement to, for the first such supplement, the Initial Budget, and for each supplement thereafter, the most-recently delivered Updated Budget (each such supplement which is approved in accordance with the terms of this clause (l), an "<u>Updated Budget</u>"), prepared by management of the Borrower in consultation with the Borrower's Operational Advisor covering the 13-week period that commences with the Saturday of the calendar week that includes such Updated Budget Deadline, consistent with the form and level of details set forth in the Initial Budget.  Each Updated Budget shall be, in each case, subject to the written approval of the Required Lenders (in their sole discretion); <u>provided</u> that, if the Required Lenders shall have not provided written approval of any proposed budget supplement prior to 5:00 (New York City time) on the third Business Day after receipt thereof (the "<u>Budget Review Time</u>"), the Required Lenders shall be deemed to have accepted such proposed budget supplement; <u>provided</u> further that, (i) if the Required Lenders object in writing to any proposed budget supplement prior to the Budget Review Time, no  proposed budget supplement covering the 13-week period covered by such rejected budget supplement shall become an Updated Budget until and unless the Required Lenders approve thereof in writing (in their sole and absolute discretion), and (ii) the prior Approved Budget shall remain in effect until such time as the Required Lenders so approve a revised budget supplement in accordance with the foregoing sub-clause (i).  As used herein, the "<u>Approved Budget</u>" shall mean (i) initially, the Initial Budget and (ii) thereafter, upon (and subject to) the approval (or deemed approval) of any Updated Budget by the Required Lenders in accordance with the foregoing procedures, such Updated Budget.<br><br>*See* DIP Credit Agreement, Section 6.02(k). |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Variance Covenant Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | Commencing with the Budget Variance Test Date occurring on Friday, August 18, 2023, and on each Budget Variance Test Date occurring thereafter, the Borrower shall not, nor shall it permit any of its Subsidiaries to, permit:<br><br>(a)    the sum of the actual aggregate cash receipts of the Borrower and its Subsidiaries (excluding proceeds of the Term Loans) for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be less than the Permitted Variance Percentage of the aggregate amount set forth for the line item in the Approved Budget entitled "Total Receipts" for such Budget Variance Test Period; or<br><br>(b)    the sum of the actual aggregate operating disbursements of the Borrower and its Subsidiaries for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be greater than Permitted Variance Percentage of the aggregate amount set forth for the line item in the Approved Budget entitled "Total Operating Disbursements" for such Budget Variance Test Period; or<br><br>(c)    the sum of the actual aggregate amounts paid by the Borrower and its Subsidiaries with respect to severance and accrued pre-petition wages for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be greater than Permitted Variance Percentage of the aggregate amount set forth for the line items in the Approved Budget entitled "Severance" and "Accrued Pre-Petition Wages" for such Budget Variance Test Period; or<br><br>(d)    the sum of the actual aggregate disbursements of the Borrower and its Subsidiaries with respect to lienholders and on account of taxes and other restructuring costs for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be greater than Permitted Variance Percentage of the aggregate amount set forth for the line items in the Approved Budget entitled "Prepetition Vendors & Taxes" for such Budget Variance Test Period; or<br><br>(e)    the sum of the actual amount of fees incurred by professionals of any unsecured creditors committee in the Chapter 11 Cases and of the Borrower and its Subsidiaries ending immediately prior to such Budget Variance Test Date to be greater than Permitted Variance Percentage of the amount set forth for the line item in the Approved Budget entitled "Professional Fees Reserve" for such Budget Variance Test Period.<br><br>To the extent that any Budget Variance Test Period encompasses a period that is covered in more than one Approved Budget, the applicable weeks from each applicable Approved Budget shall be utilized in making the calculations pursuant to this Section 7.11.<br><br>"Permitted Variance Percentage" shall mean:<br><br>(a)    with respect to Section 7.11(a), (i) with respect to the Budget Variance Test Period ending on August 11, 2023, 80%, (b) with respect to the Budget Variance Period ending on August 18, 2023, 85%, and (c) with respect to each Budget Variance Period ending thereafter, 90%;<br><br>(b)    with respect to Sections 7.11(b) through (d), (i) with respect to the Budget Variance Test Period ending on August 11, 2023, 120%, (ii) with respect to the Budget Variance Period ending on August 18, 2023, 115%, and (iii) with respect to each Budget Variance Period ending thereafter, 110%; and<br><br>(c)    with respect to Section 7.11(e), 120%.<br><br>*See* DIP Credit Agreement, "Permitted Variance Percentage," Sections 1.01, 7.11. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Events of Default<br><br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(ii) | Any of the following from and after the Closing Date shall constitute an event of default (each, an "<u>Event of Default</u>"):<br><br>(a)    *Non-Payment*.  Any Loan Party fails to pay (i) when and as required to be paid herein or in any other Loan Document, any amount of principal of any Loan, (ii) within three (3) Business Days after the same becomes due, any interest on any Loan or (iii) within five (5) Business Days after the same becomes due, any other amount payable hereunder or with respect to any other Loan Document; or<br><br>(b)    *Specific Covenants*.  The Borrower fails to perform or observe any term, covenant or agreement contained in any of (i) <u>Sections 6.03(a)</u> (*provided* that the delivery of a notice of Default or Event of Default at any time will cure an Event of Default under <u>Section 6.03(a)</u> arising from the failure of the Borrower to timely deliver such notice of Default or Event of Default), <u>6.05(a)</u> (solely with respect to the Borrower), <u>6.13(c)</u>, <u>6.14</u>, <u>6.16</u>, <u>6.17</u> or <u>Article 7</u> or (ii) Section <u>6.01</u> or <u>6.02</u> and, in the case solely of this clause (ii), such failure continues for two Business Days after the earlier of (A) a Responsible Officer of the Borrower becoming aware of such default and (B) receipt by the Borrower of written notice thereof from the Administrative Agent or the Required Lenders; or<br><br>(c)    *Other Defaults*.  Any Loan Party fails to perform or observe any other term, covenant or agreement (not specified in <u>Section 8.01(a)</u> or (<u>b</u>) above) contained in any Loan Document on its part to be performed or observed and such failure continues for fifteen (15) days after receipt by the Borrower of written notice thereof from the Administrative Agent or the Required Lenders; or<br><br>(d)    *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any Compliance Certificate or other document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or<br><br>(e)    *Cross-Default*.  Except as a result of the events leading up to or resulting from the commencement of the Chapter 11 Cases, the ceasing of operations, the commencement of the Chapter 11 Cases, the Canadian Recognition Proceedings or entry into this Agreement and unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court or the Canadian Court, any Loan Party or any Subsidiary (i) fails to make any payment after the applicable grace period with respect thereto, if any, (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any other prepetition Indebtedness (other than Indebtedness hereunder and, for the avoidance of doubt, excluding Prepetition Indebtedness) having an outstanding aggregate principal amount of not less than the Threshold Amount or (ii) fails to observe or perform any other agreement or condition relating to any such prepetition Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any other default thereunder by any Loan Party), after all grace periods having expired and all required notices having been given, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, after all grace periods having expired and all required notices having been given, such prepetition Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | (f)     *[Reserved]; or* |
|  | (g)     *[Reserved]*; or |
|  | (h)     *Judgments*.  Except as a result of the events leading up to or resulting from the commencement of the Chapter 11 Cases or the Canadian Recognition Proceedings, the commencement of the Chapter 11 Cases or the Canadian Recognition Proceedings or entry into this Agreement and unless any such judgment is stayed by the Bankruptcy Court or the Canadian Court, there is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance or indemnity as to which the insurer or third party indemnitor has been notified of such judgment or order and has not denied coverage) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or |
|  | (i)     *Invalidity of Loan Documents*.  Any material provision of the Loan Documents, at any time after their execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under <u>Section 7.04</u> or <u>7.05</u>) or as a result of acts or omissions by the Administrative Agent or Collateral Agent or any Lender or the satisfaction in full of all the Obligations (other than other than contingent obligations), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations), or purports in writing to revoke or rescind any Loan Document; or |
|  | (j)     *Change of Control*.  There occurs any Change of Control; or |
|  | (k)     *Collateral Documents*.  The Orders (and, in the case of the Canadian Collateral, the Canadian DIP Recognition Order) and the Collateral Documents after delivery thereof pursuant to Sections <u>4.02</u> or <u>6.13</u> shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under <u>Section 7.04</u> or <u>7.05</u>) cease to create, or shall be asserted by any Loan Party not to create, a valid and perfected Lien, on and security interest in the Collateral, with the priority required herein and in the DIP Order, subject to Liens permitted under <u>Section 7.01</u>; or |
|  | (l)     *ERISA*.  The occurrence of an ERISA Event pursuant to clause (r) of the definition of such term that has resulted or could reasonably be expected to result in a Material Adverse Effect; |
|  | (m)     *[Reserved]*; or |
|  | (n)     *[Reserved]*; or |
|  | (o)     *The Chapter 11 Cases*. |
|  | (i)     A Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 30 days after the entry of the Interim Order, which Final Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated, appealed or subject to pending appeal or otherwise challenged or subject to any challenge in any respect without prior consent of the Required Lenders; or |
|  | (ii)     Any Chapter 11 Cases or Canadian Recognition Proceedings shall be dismissed (or the Bankruptcy Court or Canadian Court, as applicable, shall make a ruling requiring the dismissal of any Chapter 11 Case or Canadian |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | Recognition Proceedings), suspended or converted to a case under chapter 7 of the Bankruptcy Code, or any Loan Party shall file any pleading requesting any such relief; or a motion shall be filed by any Loan Party for the approval of, or there shall arise, (x) any other Claim having priority senior to or pari passu with the claims of the Administrative Agent and Lenders under the Loan Documents or any other claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN$1,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders) or (y) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except as expressly provided herein and in the DIP Order and in the Canadian Orders; or<br><br>(iii)    Any Loan Party shall file motion in the Chapter 11 Cases to obtain additional or replacement financing from a party other than Lenders under Section 364(d) of the Bankruptcy Code or to use Cash Collateral of a Lender under Section 363(c) of the Bankruptcy Code, except to the extent any such financing shall provide for the payment in full in cash of the Obligations and all Prepetition B-2 Obligations outstanding or with the prior written consent of the Required Lenders; or<br><br>(iv)    Any Loan Party shall file a motion seeking, or the Bankruptcy Court or the Canadian Court shall enter, an order (A) approving payment of any pre-petition claim (or the Loan Party shall otherwise make a payment on any prepetition claim) other than (x) as provided for in (i)  the First Day Orders or Second Day Orders or the Canadian Orders or (ii) the Approved Budget (subject to Permitted Variances) or (y) otherwise consented to by the Required Lenders in writing, (B) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets with a fair market value in excess of $250,000; or (C) except with respect to the Prepetition B-2 Term Loan Credit Agreement as provided in the Orders, and the other adequate protections set forth in the Orders and the UST Cash Collateral Orders, approving any settlement or other stipulation not approved by the Required Lenders and not included in the Approved Budget with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor; or<br><br>(v)    (A) Any Chapter 11 Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Loan Party shall apply for authority to do so), in each case, in a manner adverse to the Required Lenders, without the written consent of the Required Lenders (or any Loan Party shall file, or otherwise support, any pleading seeking such relief described in this clause (v)) or (B) any Chapter 11 Order shall cease to be in full force and effect; or<br><br>(vi)    An order with respect to any of the Chapter 11 Cases or Canadian Recognition Proceedings shall be entered by the Bankruptcy Court or Canadian Court, as applicable, without the express prior written consent of the Required Lenders  (and, with respect to any provisions that adversely affect the rights or duties of any Agent, such Agent) (i) to revoke, reverse, stay, modify, supplement, vacate or amend any of the DIP Order or Canadian Orders  in a manner inconsistent with this Agreement, in a manner adverse to the Lenders, or that is not otherwise consented to by the Required Lenders (and with respect to amendments, |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | modifications, or supplements that adversely affect the rights or duties of any Agent, such Agent); (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Loans (other than the Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN$1,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders)) or the adequate protection Claims (other than the Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN$1,700,000, on the Canadian Collateral) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders or the administrative expense claims on account of the DIP Facility); or (iii) to grant or permit the grant of a Lien on the Collateral; or<br><br>(vii)    An application for any of the orders described in subclauses (ii), (iv), (vi), (x), (xvii) and (xviii) of this clause (o) shall be made by a Person other than the Loan Parties, and such application is not contested by the Loan Parties in good faith or any Person obtains a non-appealable final order charging any of the Collateral under section 506(c) of the Bankruptcy Code against any Agent or the Lenders or obtains a final order adverse to any Agent or the Lenders; or<br><br>(viii)    The Bankruptcy Court enters a Bidding Procedures Order that permits the sale of less than all of the Debtors' assets; provided, assets may be sold across various transactions and to various purchasers(x) if all such transactions are actually consummated and generate Net Proceeds in an aggregate amount sufficient to repay the Obligations in full or (y) with the prior written consent of the Required Lenders; or<br><br>(ix)    Any of the Loan Parties shall fail to comply with the terms and conditions of any Chapter 11 Order in any material respect, and such failure is not cured within two (2) Business Days of knowledge thereof; or<br><br>(x)    The Bankruptcy Court shall enter an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of Section 1106 of the Bankruptcy Code) under clause (b) of Section 1106 of the Bankruptcy Code in the Chapter 11 Cases (or any Loan Party or any of its Subsidiaries or Affiliates shall file, or otherwise support, any pleading seeking such relief described in this clause (x)); or<br><br>(xi)    The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders; or<br><br>(xii)    The Loan Parties or any of their controlled Affiliates shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries) any other Person's opposition of any motion made in the Bankruptcy Court by the Lenders seeking confirmation of the amount of the Lenders' claim or the validity and enforceability of the Liens in favor of the Collateral Agent; or<br><br>(xiii)    (A) The Loan Parties or any of their Affiliates shall seek to, or |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of the Collateral Agent or contest any material provision of any Loan Document, (B) any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Collateral Agent or the Lenders or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code, (C) any Liens on the Collateral and/or super-priority claims shall otherwise, for any reason, cease to be valid, perfected and enforceable in all respects, (D) any action is commenced by the Loan Parties that contests the validity, perfection or enforceability of any of the Liens and security interests of the Collateral Agent or the Lenders created by the DIP Order or the Loan Documents, or (E) any material provision of any Loan Document shall cease to be effective; or<br><br>(xiv)     Any judgments which are in the aggregate in excess of $2,500,000 as to any postpetition obligation shall be rendered against any of the Loan Parties and the enforcement thereof shall not be stayed; or<br><br>(xv)     (A) The Loan Parties or any of their Affiliates shall file any pleading or proceeding results in a material impairment of the rights or interests of the Lenders or (B) entry of an order of the Bankruptcy Court with respect to any pleading or proceeding brought by any other Person which results in such a material impairment of the rights or interests of the Lenders; or<br><br>(xvi)     Any Loan Party or any of their Affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court or Canadian Court shall have entered, an order approving a payment to any Person (whether in cash or other property or whether as adequate protection, settlement of a dispute, or otherwise) that would be materially inconsistent with the treatment of any such Person under the Approved Budget or First Day Orders or Second Day Orders, without the prior written consent of the Required Lenders; or<br><br>(xvii)     Any Loan Party files or publicly announces its intention to file a Plan of Reorganization that is not an Acceptable Plan, without the prior written consent of the Required Lenders;<br><br>(xviii)     An order shall be entered by the Bankruptcy Court transferring the Chapter 11 Cases to any other court; or<br><br>(xix)     [Reserved]; or<br><br>(xx)     The Bankruptcy Court shall enter an order approving any sale of the Debtors' assets (the "Sale Order") that (A) is not final and non-appealable, (B) approves a sale other than (x) a sale of all assets pursuant to a credit bid of the DIP Facility or (y) a sale that generates Net Proceeds in respect of the Term Priority Collateral sufficient to repay all outstanding Obligations, or (C) does not provide for all cash proceeds in respect of the Term Priority Collateral from a sale pursuant to clause (B)(y) to be used first to promptly fund, subject to the Carve-Out and the Canadian Priority Charges, the repayment of all outstanding Obligations (including, in each case, fees); or<br><br>(xxi)     To the extent the Bankruptcy Court enters the Sale Order, the Canadian Court refuses to grant an order of the Canadian Court in the Canadian |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Recognition Proceedings, which order shall recognize the Sale Order under Part IV of the CCAA; or |
| | (xxii) The Bidding Procedures Order or the Sale Order is amended, supplemented, or otherwise modified in a manner adverse in any material respect without the prior written consent of the Required Lenders; or |
| | (xxiii) The occurrence of a "Cash Collateral Termination Event" (or similar event) under the UST Adequate Protection Order or the DIP Order; or |
| | (xxiv) Any Loan Party or any of their Affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court or Canadian Court shall have entered, an order approving a payment to any person that would be inconsistent with the Approved Budget (subject to Permitted Variances); or the proceeds of any Loan shall have been expended in a manner that is not in accordance with the Approved Budget (subject to Permitted Variances); or |
| | (xxv) The filing of any Plan of Reorganization that does not propose to repay the Obligations in full in cash; or |
| | (xxvi) The withdrawal or termination of any binding bid received by the Debtors pursuant to the Bidding Procedures Order, without the consent of the Required Lenders (to the extent such withdrawal would have created a breach under the Milestones); or |
| | (xxvii) Failure to meet a Chapter 11 Milestone when required, unless extended or waived in writing (which may be via email) by the Required Lenders; or |
| | (xxviii) The Loan Parties terminate the FTI Letter without the prior written consent of the Prepetition B-2 Lenders and the Lenders that are advised by FTI under the FTI Letter. |
| | *See* DIP Credit Agreement, Section 8.01 |
| Indemnification<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Borrower agrees (i) promptly following (and in any event within thirty (30) days of) written demand (including documentation reasonably supporting such request) therefor, to pay or reimburse the Prepetition B-2 Agent and Prepetition B-2 Lenders for all unpaid reasonable and documented out-of-pocket costs and expenses (including Attorney Costs) incurred under the Prepetition B-2 Loan Documents (which, for the avoidance of doubt, shall be limited to the documented fees and expenses of Milbank LLP, FTI Consulting Inc., Cousins Law LLC and White & Case LLP), (ii) promptly following (and in any event within thirty (30) days of) written demand (including documentation reasonably supporting such request) therefor, to pay or reimburse the Administrative Agent, the Collateral Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses (which, for the avoidance of doubt, shall be limited to the documented fees and expenses of Milbank LLP, FTI Consulting Inc., Cousins Law LLC and White & Case LLP) incurred in connection with the preparation, negotiation and execution of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby (including Attorney Costs which in the case of the Agents, shall be limited to Attorney Costs of one counsel to the Agents) and (iii) from and after the Closing Date, promptly following (and in any event within thirty (30) days of) written demand (including documentation reasonably supporting such |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | request) therefor, to pay or reimburse the Administrative Agent, the Collateral Agent, Apollo and each Lender promptly following written demand for all reasonable and documented out-of-pocket costs and expenses (which, for the avoidance of doubt, shall be limited to the documented fees and expenses of Milbank LLP, FTI Consulting Inc., Cousins Law LLC and White & Case LLP) incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Loan Documents (including all such out-of-pocket costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs (which in the case of the Agents, shall be limited to Attorney Costs of one counsel to the Agents). To the extent otherwise reimbursable by the foregoing sentence of this section, the foregoing costs and expenses shall include all reasonable search, filing, recording, title insurance, survey, environmental, property condition report and zoning report charges and fees related thereto, and other reasonable and documented out of pocket expenses incurred by any Agent. The foregoing costs and expenses shall also include all mortgage recording, recording and filing fees charged by governmental authorities to record and/or file Collateral Documents.<br><br>Whether or not the transactions contemplated hereby are consummated, the Loan Parties shall, jointly and severally, indemnify and hold harmless the Administrative Agent, the Collateral Agent and their respective Affiliates, successors and permitted assigns (or the directors, officers, employees, agents, advisors and members of each of the foregoing) (each an "<u>Agent Indemnitee</u>" and collectively, the "<u>Agent Indemnitees</u>") and each Lender and their respective Affiliates, successors and permitted assigns (or the directors, officers, employees, agents, advisors and members of each of the foregoing) (each a "<u>Lender Indemnitee</u>" and collectively, the "<u>Lender Indemnitees</u>"; together with, the Agent Indemnitees, collectively the "<u>Indemnitees</u>") from and against any and all actual losses, damages, claims, liabilities and reasonable documented out-of-pocket costs and expenses (including Attorney Costs which shall be limited to Attorney Costs of one outside counsel for the Agent Indemnitees and Attorney Costs of one outside counsel for the Lender Indemnitees (and, if necessary, one local counsel in each applicable jurisdiction and, in the event of any actual or reasonably perceived conflict of interest, one additional counsel for each type of similarly situated affected Indemnitees)) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any Agent Indemnitee or Lender Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the Transactions or the other transactions contemplated thereby, (ii) any Commitment or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials at, on, under or from any property, vehicle or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any other Environmental Liability related in any way to any Loan Parties or any Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Agent Indemnitee or Lender Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its Affiliates or equityholders in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of any such Agent Indemnitee or Lender Indemnitee; *provided* that, notwithstanding the foregoing, |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, damages, claims, liabilities and expenses resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee, as determined by the final non-appealable judgment of a court of competent jurisdiction or (y) any dispute solely among the Indemnitees other than (1) any claim against an Indemnitee in its capacity or in fulfilling its role as Administrative Agent, Collateral Agent or similar role and (2) any claim arising out of any act or omission of the Borrower or any of its Affiliates.  No Indemnitee or any other party hereto shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement except to the extent that such damages resulted from the (A) gross negligence, bad faith or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee, as determined by the final non-appealable judgment of a court of competent jurisdiction or (B) the material breach by such Indemnitee of its or any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee's obligations under the Loan Documents, as determined by the final non-appealable judgment of a court of competent jurisdiction.  In the case of a claim, investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such claim, investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, any Loan Party's directors, stockholders or creditors or other Affiliates or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated.  For the avoidance of doubt, this paragraph shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.<br><br>To the extent the Agent Indemnitees are not reimbursed and indemnified by the Loan Parties, and without limiting the obligation of the Loan Parties to do so, the Lenders shall indemnify and hold harmless the Agent Indemnities, based on and to the extent of such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), from and against any and all losses, claims, damages, liabilities and related expenses (including Attorney Costs which shall be limited to Attorney Costs of one counsel to the Agent Indemnitees and one local counsel in each applicable jurisdiction for the Agent Indemnitees) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any Agent Indemnitee in any way relating to or arising out of or in connection with this Agreement or any other Loan Document or in the performance by the Agents in its duties under the Loan Documents; provided that no Lender shall be liable for any portion of such losses, claims, damages, liabilities and related expenses resulting from any Agent Indemnitees gross negligence, bad faith or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  For purposes hereof, if the Term Loans have been paid in full prior to such determination pursuant to the immediately preceding sentence, then each such Lender's "pro rata share" shall be determined as of the last date the Term Loans were in effect immediately prior to such payment in full.<br><br>To the extent permitted by applicable Law, (i) no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee and (ii) no Indemnitee shall assert, and each hereby waives, any claim against any Loan Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions or any Loan or the use of the proceeds thereof (whether before or after the Closing Date); *provided* that the foregoing shall in no event limit the Borrower's indemnification obligations under clause (b) above.<br><br>The provisions of this <u>Section 10.05</u> shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.  All amounts due under this <u>Section 10.05</u> shall be payable within 30 days after written demand therefor (including documentation reasonably supporting such request).<br><br>*See* DIP Credit Agreement, Section 10.05 |
| Milestones<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The Debtors shall ensure that each of the following milestones is achieved by the dates set forth below (or such later dates as approved in writing by the Required Lenders) (the "<u>Milestones</u>")[9]:<br><br>1)  By no later than August 6, 2023, the Borrower and each Guarantor shall have commenced the Chapter 11 Cases (the date of such commencement, the "<u>Petition Date</u>").<br><br>2)  By no later than the Petition Date, the Debtors shall have filed the motion seeking entry of the DIP Order and the UST Adequate Protection Order, in each case, in form and substance satisfactory to the Required Lenders and the Agents.<br><br>3)  By no later than three (3) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to the Required Lenders and the Agents.<br><br>4)  By no later than ten (10) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order, in form and substance reasonably satisfactory to the Required Lenders and the Agents.<br><br>5)  By no later than ten (10) calendar days after the Petition Date, Borrower, in its capacity as foreign representative on behalf of the Debtors that are Canadian Subsidiaries, shall have filed an application with the Canadian Court to commence the Canadian Recognition Proceedings and the Canadian Court shall have issued the Canadian Initial Recognition Order, the Canadian Supplemental Order and the Canadian Interim DIP Recognition Order.<br><br>6)  By no later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, in form and substance satisfactory to the Required Lenders and the Agents.<br><br>7)  By no later than forty (40) calendar days after the Petition Date, the Borrower, in its capacity as foreign representative on behalf of the Debtors, shall have filed a motion with the Canadian Court for the recognition of, and the Canadian Court shall have issued, the Canadian Final DIP Recognition Order. |

---

[9]  The Interim UST Cash Collateral Order sets forth certain of the same Milestones, as well as certain additional UST Milestones (as defined therein) for the benefit of the Prepetition UST Secured Parties.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | 8) By no later than fifty-five (55) calendar days after the Petition Date, the Debtors shall have received unique, non-duplicative binding cash bids for DIP Priority Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, Net Proceeds at least equal to $250,000,000.<br><br>9) By no later than seventy (70) calendar days after the Petition Date, the Debtors shall have received unique, non-duplicative binding cash bids pursuant to the Bidding Procedures Order which are not subject to any financing contingencies (but, for the avoidance of doubt, may be subject to receipt of environmental reports and/or title contingencies reasonably acceptable to buyer(s)) for the DIP Priority Collateral) for DIP Priority Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, Net Proceeds at least equal to $450,000,000.<br><br>10) By no later than ninety (90) calendar days after the Petition Date, the Debtors shall have consummated Dispositions in accordance with the Bidding Procedures Order that either (i) generated Net Proceeds of DIP Priority Collateral equal to at least 100% of the sum of the aggregate amount of Obligations outstanding as of such date or (ii) is consummated through a credit bid of the outstanding Obligations (and any other applicable obligations) in connection with sales of DIP Priority Collateral.<br><br>*See* DIP Credit Agreement, Section 6.17(e); Appendix D |
| Entities with Interests in Cash Collateral<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The following secured parties have an interest in Cash Collateral:<br><br>The Prepetition Secured Parties, the Prepetition UST Secured Parties, and the DIP Secured Parties<br><br>*See* Interim Order ¶ F; Interim UST Cash Collateral Order ¶ F |
| Carve Out<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(f) | "<u>Carve-Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve-Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, lead counsel to the Prepetition ABL Agent, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | *See* Interim Order ¶ 4(a) |
| Liens and Priorities<br>Bankruptcy Rule<br>4001(c)(l)(B)(i)<br><br>Local Rule<br>4001-2(a)(i)(D) and<br>(G), 4001-2(a)(ii) | As security for the DIP Obligations, effective and automatically properly perfected on the date the Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Secured Parties, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "DIP Liens") are hereby granted to the DIP Agent for the benefit of the DIP Secured Parties (all property identified in clauses (a) through (e) below being collectively referred to as the "DIP Collateral," and, together with the Prepetition Collateral, the "Collateral"):<br><br>(a)    *Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out) all tangible and intangible prepetition and postpetition property of the DIP Loan Parties, other than "Excluded Property" (as defined in the DIP Credit Agreement) whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than the Avoidance Actions and the Carve-Out Reserves (and any amounts held therein), but including, upon and subject to entry of the Interim Order, the Avoidance Proceeds (collectively, the "Unencumbered Property," and such liens, the "DIP Unencumbered Property Liens")).<br><br>(b)    *Liens Priming Certain Prepetition Secured Parties' Liens*.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest (subject and subordinate to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition B-2 Priority Collateral, regardless of where located (the "DIP Priming Liens"). Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (A) senior in all respects to the other Prepetition Liens on the Prepetition B-2 Priority Collateral, (B) senior to any Adequate Protection Liens on the Prepetition B-2 Priority Collateral, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens with respect to the Prepetition B-2 Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens.<br><br>(c)    *Junior Liens Priming Certain Prepetition Secured Parties' Liens on Prepetition ABL Priority Collateral*.  Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior (subject only to (1) the Carve-Out, (2) the ABL Adequate Protection Liens (as defined below), and (3) the Prepetition ABL Liens) priority priming security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition ABL Priority Collateral, regardless of where located, which security interest and lien shall prime the Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition UST Tranche B Liens on the Prepetition ABL Priority Collateral (the "DIP Priming ABL Third Liens").  Notwithstanding anything herein to the contrary, the DIP Priming ABL Third Liens shall be (A) senior in all respects to the Prepetition Liens and Adequate Protection Liens on the Prepetition ABL Priority Collateral other than the Prepetition ABL Liens and ABL Adequate Protection Liens, and (B) not subordinate to any lien, security interest or mortgage that is avoided and preserved |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code. The Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition UST Tranche B Liens with respect to the Prepetition ABL Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming ABL Third Liens. |

(d)    *Junior Liens Priming Certain Prepetition Secured Parties' Liens on Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral*.  Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior (subject only to (1) the Carve-Out, (2) the UST Tranche B Adequate Protection Liens (as defined below), and (3) the Prepetition UST Tranche B Liens) priority priming security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, regardless of where located, which security interest and lien shall prime the Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition ABL Liens on the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral (the "DIP Priming UST Tranche B Third Liens").  Notwithstanding anything herein to the contrary, the DIP Priming UST Tranche B Third Liens shall be (A) senior in all respects to the Prepetition Liens and Adequate Protection Liens on the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral other than the Prepetition UST Tranche B Liens and UST Tranche B Adequate Protection Liens, and (B) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition ABL Liens with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming UST Tranche B Third Liens.

(e)    *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that, on or as of the Petition Date, is subject to Prepetition Permitted Senior Liens, which shall be (A) with respect to the Prepetition B-2 Priority Collateral, immediately junior and subordinate to the Prepetition B-2 Permitted Senior Liens, (B) with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, immediately junior and subordinate to the Prepetition UST Tranche B Permitted Senior Liens, and (C) with respect to the Prepetition ABL Priority Collateral, immediately junior and subordinate to the Prepetition ABL Permitted Senior Liens, but (1) senior to the Prepetition Liens and Adequate Protections Liens on all Prepetition B-2 Priority Collateral subject to such Prepetition Permitted Senior Liens, (2) junior to the UST Tranche B Adequate Protection Liens and Prepetition UST Tranche B Liens but senior to the Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition ABL Liens on all Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral subject to such Prepetition Permitted Senior Liens, and (3) junior to the ABL Adequate Protection Liens and Prepetition ABL Liens but senior to the Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition UST Tranche B Liens on all Prepetition ABL Priority Collateral subject to such Prepetition Permitted Senior Liens.

(f)    *No Senior Liens*.  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in the Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (C) any intercompany liens; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code unless otherwise provided for in the DIP Documents or in the Interim Order. *See* Interim Order ¶ 6 |
| 506(c) Waiver; Section 552(b) Bankruptcy Rule 4001(c)(l)(B)(x); 4001(c)(1)(B) Local Rule 4001-2(a)(i)(C); 4001-2(a)(i)(h) | Except to the extent of the Carve Out, no costs or expenses of administration of these cases or any Successor Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, Prepetition B-2 Collateral, or Prepetition ABL Collateral (in each case, including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Prepetition B-2 Agent, or the Prepetition ABL Agent, as applicable, and no consent shall be implied from any action, inaction or acquiescence by any of the DIP Secured Parties, Prepetition B-2 Secured Parties, or Prepetition ABL Secured Parties, and nothing contained in the Interim Order shall be deemed to be a consent by the DIP Secured Parties, Prepetition B-2 Secured Parties, or Prepetition ABL Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.  Further, effective upon entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the DIP Secured Parties or Prepetition Secured Parties. *See* Interim Order ¶ 8 |
| Stipulations to Prepetition Liens and Claims Bankruptcy Rule 4001(c)(1)(B)(iii) Local Rule 4001-2(a)(i)(B) | Prior to the Petition Date the Debtors admit, stipulate and agree that:  (a)    *Prepetition B-2 Term Loan.*  Pursuant to that certain Amended and Restated Credit Agreement, dated as of September 11, 2019 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition B-2 Credit Agreement" and, collectively with all other agreements (including all Loan Documents (as defined therein)), documents, and instruments executed or delivered in connection therewith, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and fee letters, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition B-2 Loan Documents"), by and among (a) Yellow Corp., as borrower (in such capacity, the "Prepetition B-2 Borrower"), (b) the guarantors party thereto (the "Prepetition B-2 Guarantors" and, together with the Prepetition B-2 Borrower, the "Prepetition B-2 Loan Parties"), (c) Alter Domus Products Corp., as administrative and collateral agent (the "Prepetition B-2 Agent"), and (d) the lenders party thereto from time to time (the "Prepetition B-2 Lenders" and, together with the Prepetition B-2 Agent, the "Prepetition B-2 Secured Parties"), Prepetition B-2 Loan Parties incurred "Obligations" (as defined in the Prepetition B-2 Credit Agreement, the "Prepetition B-2 Obligations") to the Prepetition B-2 Secured Parties on a joint and several basis;  (b)    *Prepetition ABL Facility.*  Pursuant to that certain Loan and Security Agreement, dated as of February 13, 2014 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition ABL Credit Agreement", collectively with all other agreements (including all Loan Documents (as defined therein)), documents, and instruments executed or delivered in connection therewith, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and fee letters, each as may be amended, restated, |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "<u>Prepetition ABL Loan Documents</u>", and the credit facilities evidenced thereby, collectively, the "<u>Prepetition ABL Facility</u>") among (a) Yellow Corp, as administrative borrower (together with the other borrowers party thereto, the "<u>Prepetition ABL Borrowers</u>"), (b) the guarantors party thereto (the "<u>Prepetition ABL Guarantors</u>" and, together with the Prepetition ABL Borrowers, the "<u>Prepetition ABL Loan Parties</u>" and, together with the Prepetition B-2 Loan Parties, the "<u>Prepetition Loan Parties</u>"), (c) Citizens Business Capital, a division of Citizens Asset Finance, Inc. (a subsidiary of Citizens Bank, N.A.), as agent (the "<u>Prepetition ABL Agent</u>" and, together with the Prepetition B-2 Agent, the "<u>Prepetition Agents</u>"), (d) the lenders from time to time party thereto (the "<u>Prepetition ABL Lenders</u>" and, together with the Prepetition B-2 Lenders, the "<u>Prepetition Lenders</u>"), and (e) the issuing banks from time to time party thereto (together with the Prepetition ABL Agent and the Prepetition ABL Lenders, the "<u>Prepetition ABL Secured Parties</u>" and, together with the Prepetition Agents, the Prepetition Lenders, and the Bank Product Providers (as defined in the Prepetition ABL Credit Agreement), the "<u>Prepetition Secured Parties</u>"), the Prepetition ABL Loan Parties incurred "Obligations" (as defined in the Prepetition ABL Credit Agreement, the "<u>Prepetition ABL Obligations</u>" and, together with the Prepetition B-2 Obligations, the "<u>Prepetition Secured Obligations</u>") to the Prepetition ABL Secured Parties on a joint and several basis; and<br><br>(c)     *Prepetition Intercreditor Agreement*.  Pursuant to (and to the extent set forth in) that certain Amended and Restated Intercreditor Agreement, dated as of July 7, 2020 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, the "<u>Prepetition Intercreditor Agreement</u>" and, together with the Prepetition B-2 Loan Documents, the Prepetition ABL Loan Documents, and the "<u>Prepetition Loan Documents</u>") by and among the Prepetition ABL Agent, the Prepetition B-2 Agent, the Prepetition UST Tranche A Agent, and the Prepetition UST Tranche B Agent, the parties thereto agreed, among other things, to the relative priority of such parties' respective security interests in the Prepetition Collateral (as defined below), which relative priorities are governed by and set forth in the Prepetition Intercreditor Agreement.  The Prepetition Loan Documents, including the Prepetition Intercreditor Agreement, are, in each case, binding and enforceable against the parties thereto.<br><br>(d)     *Prepetition B-2 Obligations*.  As of the Petition Date, the Prepetition B-2 Loan Parties were validly, justly, and lawfully indebted and liable to the Prepetition B-2 Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, for Loans (as defined in the Prepetition B-2 Credit Agreement) in the aggregate principal amount of not less than $485,372,693.29 plus accrued and unpaid interest thereon and any fees, exit fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees, and fees of other consultants and professionals), costs, charges, indemnities, and other Prepetition B-2 Obligations in each case incurred under (or reimbursable pursuant to) or secured by the Prepetition B-2 Loan Documents;<br><br>(e)     *Prepetition ABL Obligations*.  As of the Petition Date, the Prepetition ABL Loan Parties were validly, justly and lawfully indebted and liable to the Prepetition ABL Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, for (x) not less than $858,520.35 in outstanding principal amount of Loans (as defined in the Prepetition ABL Credit Agreement) plus accrued and unpaid interest thereon, (y) not less than $359,288,388.60 in outstanding and undrawn Letters of Credit (as defined in the Prepetition ABL Credit Agreement) plus accrued and unpaid fees with respect thereto, and (z) any fees, expenses and disbursements (including any attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, financial advisors' fees, and fees of |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | other consultants and professionals), costs, charges, indemnities, and other Prepetition ABL Obligations (including, without limitation, Bank Product Debt, as defined in the Prepetition ABL Credit Agreement) in each case incurred under (or reimbursable pursuant to) or secured by the Prepetition ABL Loan Documents.  As of the Petition Date, (1) ABL Cash Collateral (as defined below) in an amount equal to $91,449,240.35 is being held on deposit in the Borrowing Base Cash Account (as defined in the Prepetition ABL Credit Agreement) and (2) ABL Cash Collateral (as defined below) in an amount equal to $3,800,000 has been pledged to the Prepetition ABL Agent as security for certain Bank Product Debt owed to Citizens Bank, N.A. and/or its affiliates (such amounts described in this sentence, collectively, the "<u>Existing ABL Cash Collateral Deposits</u>").<br><br>*See* Interim Order ¶ G (i)–(v) |
| Waiver/Modification of Applicability of Non-bankruptcy Law Relating to Perfection or Enforceability of Liens<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Parties, as applicable, enforceable in accordance with the respective terms of the relevant documents, and no portion of the Prepetition Secured Obligations or any payment made to the Prepetition Secured Parties or applied to or paid on account of the Prepetition Secured Obligations prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action (including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law.<br><br>As of the Petition Date, pursuant to the Prepetition B-2 Loan Documents, the Prepetition B-2 Loan Parties granted to the Prepetition B-2 Agent, for the benefit of the Prepetition B-2 Secured Parties, a security interest in and continuing lien on (the "<u>Prepetition B-2 Liens</u>") substantially all of their respective assets and property (other than Excluded Assets (as defined in the Prepetition B-2 Loan Documents), collectively, the "<u>Prepetition B-2 Collateral</u>"), including: (i) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Non-UST Tranche B Term Priority Collateral (as defined in the Prepetition Intercreditor Agreement), which, for the avoidance of doubt, includes all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "<u>Prepetition B-2 Priority Collateral</u>"), subject only to any liens permitted by the Prepetition B-2 Loan Documents to be senior to the Prepetition B-2 Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "<u>Prepetition B-2 Permitted Senior Liens</u>"); (ii) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the UST Tranche B Joint Collateral (as defined in the Prepetition Intercreditor Agreement), which, for the avoidance of doubt, includes all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "<u>Prepetition Joint Collateral</u>"), subject only to the *pari passu* liens of the Prepetition UST Tranche B Agent and the Prepetition B-2 Permitted Senior Liens on the Prepetition Joint Collateral; (iii) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition UST Tranche B Priority Collateral, subject and subordinate only to the liens of the Prepetition UST Tranche B Agent and the Prepetition B-2 Permitted Senior Liens on the Prepetition UST Tranche B Priority Collateral; and (iv) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject and subordinate only to the liens of the Prepetition ABL Agent and the Prepetition B-2 Permitted Senior Liens on the Prepetition ABL Priority Collateral. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | As of the Petition Date, pursuant to the Prepetition ABL Loan Documents, the Prepetition ABL Loan Parties granted to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, a security interest in and continuing lien on (the "Prepetition ABL Liens" and, together with the Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition UST Tranche B Liens, the "Prepetition Liens") substantially all of their respective assets and property (collectively, the "Prepetition ABL Collateral" and, collectively with the Prepetition B-2 Collateral, Prepetition UST Tranche A Collateral, and Prepetition UST Tranche B Collateral, the "Prepetition Collateral"), including: (i) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement), which, for the avoidance of doubt, includes all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral"), subject only to any liens permitted by the Prepetition ABL Loan Documents to be senior to the Prepetition ABL Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "Prepetition ABL Permitted Senior Liens" and, collectively with the Prepetition B-2 Permitted Senior Liens, Prepetition UST Tranche A Permitted Senior Liens, and Prepetition UST Tranche B Permitted Senior Liens, the "Prepetition Permitted Senior Liens");[10] (ii) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition B-2 Priority Collateral, subject and subordinate only to the liens of the Prepetition B-2 Agent and the Prepetition ABL Permitted Senior Liens on the Prepetition B-2 Priority Collateral; (iii) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition Joint Collateral, subject and subordinate only to the liens of the Prepetition B-2 Agent and Prepetition UST Tranche B Agent and the Prepetition ABL Permitted Senior Liens on the Prepetition Joint Collateral; and (iv) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition UST Tranche B Priority Collateral, subject and subordinate only to the liens of the Prepetition B-2 Agent and Prepetition UST Tranche B Agent and the Prepetition ABL Permitted Senior Liens on the Prepetition UST Tranche B Priority Collateral. <br><br> None of the Prepetition Liens are subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, subordination, recharacterization, avoidance or other cause of action (including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law. <br><br> *See* Interim Order ¶ G (vi)–(ix) |
| Challenge Period Bankruptcy Rule 4001(c)(l)(B) <br><br> Local Rule 4001-2(a)(i)(B) | The Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon the Debtors in all circumstances and for all purposes. The Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in these cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (a) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter |

---

[10] For the avoidance of doubt, no reference to the "Prepetition Permitted Senior Liens" shall refer to or include the Prepetition Liens.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | (subject to the limitations contained herein) by no later than (i) the earlier of (w) one business day before the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan of reorganization, whichever occurs first, (x) as to the Creditors' Committee only, 75 calendar days after entry of the Interim Order, (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 75 calendar days after entry of the Interim Order, or (B) the date that is 30 calendar days after their appointment, and (z) for all other parties in interest, 75 calendar days after entry of the Interim Order; and (ii) any such later date as (v) has been agreed to in writing (which may be by email) by the Prepetition ABL Agent with respect to the Prepetition ABL Obligations or the Prepetition ABL Liens, (w) has been agreed to in writing (which may be by email) by the Prepetition B-2 Agent with respect to the Prepetition B-2 Obligations or the Prepetition B-2  Liens, or (x) has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)-(ii), the "<u>Challenge Period</u>"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations or the Prepetition Liens, or (B) asserting or prosecuting any Avoidance Action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "<u>Challenges</u>") against any Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (collectively, the "<u>Representatives</u>") in connection with or related to the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; *provided, however*, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred.  If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge, then: (1) the Debtors' stipulations, admissions, agreements and releases contained in the Interim Order shall be binding on all parties in interest; (2) the obligations of the Prepetition Loan Parties under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise, except as provided in the Prepetition Intercreditor Agreement), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in these cases and any Successor Case(s); (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than as provided in the Prepetition Intercreditor Agreement), or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in these cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in these cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives shall be deemed forever waived, released and barred.  If any Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in the Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in the Interim Order vests or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Secured Obligations or Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization in these cases. <br><br>*See* Interim Order ¶ 17 |
| Waiver/Modification of the Automatic Stay Bankruptcy Rule 4001(c)(1)(B)(iv) | The Interim Order includes a customary waiver/modification of the automatic stay to permit the Debtors and non-Debtor affiliates to take all actions as are necessary or appropriate to implement the terms of the Interim Order.  The automatic stay shall be modified to the extent necessary to permit the DIP Secured Parties and each Prepetition Secured Parties to take any Perfection Action. <br><br>*See* Interim Order ¶ 14(a); 31 |
| UST Adequate Protection Obligations <br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition UST Collateral (including UST Cash Collateral) for the aggregate Diminution in Value and as an inducement to the Prepetition UST Secured Parties to consent to priming of the Prepetition UST Tranche A Liens and the use of their Prepetition UST Collateral (including UST Cash Collateral), the Prepetition UST Secured Parties are granted the following adequate protection (collectively, the "UST Adequate Protection"): <br><br>(a)    *Milestone Adequate Protection of the Prepetition UST Secured Parties*. As adequation protection for the Debtors' use of UST Cash Collateral, the Debtors shall meet timely the following milestones (the "Milestones"): <br><br>(i)    No later than the Petition Date, the Debtors shall have filed the Motion, seeking, among other things, entry of the DIP Orders and the UST Cash Collateral Orders, each in form and substance reasonably satisfactory to the Prepetition UST Secured Parties; <br><br>(ii)    No later than three (3) calendar days after the Petition Date, the Court shall have entered the Interim DIP Order and the Interim UST Cash Collateral Order, each in form and substance satisfactory to the Prepetition UST Secured Parties; <br><br>(iii)    No later than ten (10) calendar days after the Petition Date, the Court shall have entered the Bidding Procedures Order, in form and substance reasonably satisfactory to the Prepetition UST Secured Parties; <br><br>(iv)    No later than ten (10) calendar days after the Petition Date, Borrower, in its capacity as proposed foreign representative on behalf of the Debtors that are Canadian Subsidiaries, shall have filed an application with the Canadian Court, in form and substance reasonably satisfactory to the Prepetition UST Secured Parties, to commence the Canadian Recognition Proceedings and obtained an |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | interim stay of proceedings, and by no later than ten (10) calendar days after the granting of the Interim DIP Order and the Interim UST Cash Collateral Order by the Court, the Canadian Court shall have issued the Canadian Initial Recognition Order, the Canadian Supplemental Order, and the Canadian Interim DIP Recognition Order, each in form and substance reasonably satisfactory to the Prepetition UST Secured Parties.[11]<br><br>(v)　　No later than thirty (30) calendar days after the Petition Date, the Court shall have entered the Final DIP Order and the Final UST Cash Collateral Order, each in form and substance satisfactory to the Prepetition UST Secured Parties;<br><br>(vi)　　No later than forty (40) calendar days after the Petition Date, the Borrower, in its capacity as foreign representative on behalf of the Debtors, shall have filed a motion with the Canadian Court for the recognition of, and the Canadian Court shall have issued, the Canadian Final DIP Recognition Order (capitalized terms used but not otherwise defined in this sub-paragraph (vi) shall have the meanings given to those terms in the DIP Credit Agreement), each in form and substance reasonably satisfactory to the Prepetition UST Secured Parties;<br><br>(vii)　　Unless otherwise waived or extended by the Required DIP Lenders pursuant to the Interim DIP Order, no later than fifty-five (55) calendar days after the Petition Date, the Debtors shall have received unique, non-duplicative binding cash bids for the DIP Priority Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, Net Proceeds at least equal to $250 million (capitalized terms used but not otherwise defined in this sub-paragraph (vii) shall have the meanings given to those terms in the DIP Credit Agreement);<br><br>(viii)　　Unless otherwise waived or extended by the Required DIP Lenders pursuant to the Interim DIP Order, no later than seventy (70) calendar days after the Petition Date, the Debtors shall have received unique, non-duplicative binding cash bids pursuant to the Bidding Procedures Order which are not subject to any financing contingencies (but, for the avoidance of doubt, may be subject to receipt of environmental reports and/or title contingencies reasonably acceptable to buyer(s)) for the DIP Priority Collateral) for DIP Priority Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, Net Proceeds at least equal to $450 million (capitalized terms used but not otherwise defined in this sub-paragraph (viii) shall have the meanings given to those terms in the DIP Credit Agreement);<br><br>(ix)　　Unless otherwise waived or extended by the Required DIP Lenders pursuant to the Interim DIP Order, no later than ninety (90) calendar days after the Petition Date, the Debtors shall have consummated Dispositions in accordance with the Bidding Procedures Order that either (i) generated Net Proceeds of DIP Priority Collateral equal to at least 100% of the sum of the aggregate amount of Obligations outstanding as of such date or (ii) is consummated through a credit bid of the outstanding Obligations (and any other applicable obligations) in connection with sales of DIP Priority Collateral (capitalized terms used but not otherwise defined in this sub-paragraph (ix) shall have the meanings |

---

[11]　Capitalized terms used but not otherwise defined in this sub-paragraph (iv) shall have the meanings given to those terms in the DIP Credit Agreement.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | given to those terms in the DIP Credit Agreement); |

(x)     No later than fifty-five (55) calendar days after the Petition Date, the Debtors shall have received unique, non-duplicative binding cash bids for the Prepetition UST Tranche B Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, net cash proceeds at least equal to $200 million;

(xi)     No later than seventy (70) calendar days after the Petition Date, the Debtors shall have received unique, non-duplicative binding cash bids pursuant to the Bidding Procedures Order which are not subject to any financing contingencies (but, for the avoidance of doubt, may be subject to receipt of environmental reports and/or title contingencies reasonably acceptable to buyer(s)) for the Prepetition UST Tranche B Collateral) for the Prepetition UST Tranche B Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, net cash proceeds at least equal to $300 million;

(xii)     No later than ninety (90) calendar days after the Petition Date, the Debtors shall have consummated dispositions in accordance with the Bidding Procedures Order that either (i) generated net proceeds of Prepetition UST Tranche B Collateral equal to at least 100% of the sum of the aggregate amount of the Prepetition UST Tranche B Obligations outstanding as of such date or (ii) is consummated through a credit bid of the outstanding Prepetition UST Tranche B Obligations.

(b)     *Reporting to the Prepetition UST Secured Parties*.  The Debtors shall deliver to the Prepetition UST Secured Parties (substantially concurrent with delivery to the DIP Agent and the Prepetition ABL Agent) all financial statements, certificates, reports, certificates and related items that are required to be delivered to the DIP Agent or the Prepetition ABL Agent pursuant to the DIP Credit Agreement and/or the Interim DIP Order (collectively, the "Reporting Requirements"); *provided*, that, to the extent it would violate applicable securities laws, the Prepetition UST Secured Parties shall refrain, and are prohibited, from trading in the Debtors' stock upon receipt of any information, materials, or reporting whatsoever constituting material non-public information provided to the Prepetition UST Secured Parties and their counsel and advisors pursuant to the Reporting Requirements and this paragraph.  Additionally, the Debtors shall make the members of their senior management and its professional advisors available for update calls at least one time per calendar week with the Prepetition UST Secured Parties and their respective professional advisors, at times reasonably acceptable to the Prepetition UST Secured Parties to discuss the cases, the then-current Approved Budget, the Budget Variance Reports, the Liquidity Reports (each as defined in the DIP Credit Agreement), other reporting delivered pursuant to Section 6.02 of the DIP Credit Agreement, union matters, the status of any monetization strategies being pursued by the Debtors, including pursuant to the Bidding Procedures Order (as defined in the DIP Credit Agreement), and any other matters (including business, operational and due diligence matters) reasonably requested by the Prepetition UST Secured Parties.

(c)     *Adequate Protection of Prepetition UST Tranche B Secured Parties*.

(i)     *UST Tranche B Adequate Protection Liens*.  The Prepetition UST Tranche B Agent is hereby granted, for the benefit of the Prepetition UST Tranche B Secured Parties, effective and perfected upon the date of the Interim UST Cash Collateral Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements,

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | a valid, perfected replacement security interest in and lien on account of the Prepetition UST Tranche B Secured Parties' Diminution in Value upon all of the DIP Collateral (the "UST Tranche B Adequate Protection Liens"), (i) in the case of the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, subject solely to the Carve-Out and the Prepetition Permitted Senior Liens, (ii) in the case of the Prepetition B-2 Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Prepetition Permitted Senior Liens, (B) the DIP Liens, (C) the B-2 Adequate Protection Liens, (D) the Prepetition B-2 Liens, (E) the ABL Adequate Protection Liens, and (F) the Prepetition ABL Liens, and *pari passu* with the UST Tranche A Adequate Protection Liens (as defined below), and (iii) in the case of the Prepetition ABL Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Prepetition Permitted Senior Liens, (B) the ABL Adequate Protection Liens, (C) the Prepetition ABL Liens, (D) the DIP Liens, (E) the B-2 Adequate Protection Liens, and (F) the Prepetition B-2 Liens, and *pari passu* with the UST Tranche A Adequate Protection Liens. <br><br> (ii) *Prepetition and Postpetition UST Tranche B Secured Parties' Fees and Expenses.* As further adequate protection, the DIP Loan Parties shall currently pay monthly in cash, subject to the procedures set forth in paragraph 11 of the Interim UST Cash Collateral Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition UST Agent itself and the Prepetition UST Tranche B Secured Parties' legal and financial advisors, including, without limitation, those of Arnold & Porter Kaye Scholer LLP, Houlihan Lokey Capital, Inc., Hogan Lovells US LLP, and a local and a foreign counsel in each relevant jurisdiction retained by each of the Prepetition UST Tranche B Secured Parties (collectively, the "UST Tranche B Adequate Protection Fees and Expenses"). <br><br> (iii) *UST Tranche B Adequate Protection Payments.* As further adequate protection, the DIP Loan Parties shall pay monthly interest payments under the UST Tranche B Credit Agreement on or before the tenth (10th) calendar day of each month, beginning August 2023 and continuing thereafter through the effective date of the Debtors' chapter 11 plan, payable to the Prepetition UST Secured Parties at the Default Rate (as defined in the Prepetition UST Tranche B Credit Agreement) in cash (the "UST Tranche B Adequate Protection Payment" and, together with the Debtors' obligations to meet the Milestones, the Reporting Requirements, UST Tranche B Adequate Protection Liens and UST Tranche B 507(b) Claims, and the UST Tranche B Adequate Protection Fees and Expenses, the "UST Tranche B Adequate Protection Obligations"). <br><br> (d) *Adequate Protection of Prepetition UST Tranche A Secured Parties.* <br><br> (i) *UST Tranche A Adequate Protection Liens.* The Prepetition UST Tranche A Agent is hereby granted, for the benefit of the Prepetition UST Tranche A Secured Parties, effective and perfected upon the date of the Interim UST Cash Collateral Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest and lien on account of the Prepetition UST Tranche A Secured Parties' Diminution in Value upon all of the DIP Collateral (the "UST Tranche A Adequate Protection Liens" and together with the UST Tranche B Adequate Protection Liens, the "UST Adequate Protection Liens"), (i) in the case of the Prepetition ABL Collateral, subject and subordinate |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | to, in the following order, (A) the Carve-Out and the Prepetition Permitted Senior Liens, (B) the ABL Adequate Protection Liens, (C) the Prepetition ABL Liens, (D) the DIP Liens, (E) the B-2 Adequate Protection Liens, (F) the Prepetition B-2 Liens, and *pari passu* with the UST Tranche B Adequate Protection Liens, (ii) in the case of the Prepetition B-2 Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Prepetition Permitted Senior Liens, (B) the DIP Liens, (C) the B-2 Adequate Protection Liens, (D) the Prepetition B-2 Liens, (E) the ABL Adequate Protection Liens, and (F) the Prepetition ABL Liens, and *pari passu* with the UST Tranche B Adequate Protection Liens, and (iii) in the case of the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Prepetition Permitted Senior Liens, (B) the UST Tranche B Adequate Protection Liens, (C) the Prepetition UST Tranche B Liens, (D) the DIP Liens, (E) the B-2 Adequate Protection Liens, (F) the Prepetition B-2 Liens, (G) the ABL Adequate Protection Liens, and (H) the Prepetition ABL Liens. <br><br> (ii) *Prepetition and Postpetition UST Tranche A Secured Parties' Fees and Expenses.*  As further adequate protection, the DIP Loan Parties shall currently pay monthly in cash, subject to the procedures set forth in paragraph 11 of the Interim UST Cash Collateral Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition UST Tranche A Agent itself and the Prepetition UST Tranche A Secured Parties' legal and financial advisors, including, without limitation, those of Arnold & Porter Kaye Scholer LLP, Houlihan Lokey Capital, Inc., Hogan Lovells US LLP, and a local and a foreign counsel in each relevant jurisdiction retained by each of the Prepetition UST Tranche A Secured Parties (collectively, the "<u>UST Tranche A Adequate Protection Fees and Expenses</u>," and together with the UST Tranche B Adequate Protection Fees and Expenses, the "<u>UST Adequate Protection Fees and Expenses</u>"). <br><br> (iii) *UST Tranche A Adequate Protection Payments.*  As further adequate protection, the DIP Loan Parties shall pay monthly interest payments under the Prepetition UST Tranche A Credit Agreement on or before the tenth (10th) calendar day of each month, beginning August 2023 and continuing thereafter through the effective date of the Debtors' chapter 11 plan, payable to the Prepetition UST Secured Parties at the Default Rate (as defined in the Prepetition UST Tranche A Credit Agreement) in cash (the "<u>UST Tranche A Adequate Protection Payment</u>" and, together with the Debtors' obligations to meet the Milestones, the Reporting Requirements, UST Tranche A Adequate Protection Liens, UST Tranche A 507(b) Claims, the UST Tranche A Adequate Protection Fees and Expenses, the "<u>UST Tranche A Adequate Protection Obligations</u>" and together with the UST Tranche B Adequate Protection Obligations, the "<u>UST Adequate Protection Obligations</u>"). <br><br> *See* Interim UST Cash Collateral Order ¶ 7 |
| UST 507(b) Claim | *UST Tranche B Section 507(b) Claims.*  The Prepetition UST Tranche B Secured Parties are hereby granted allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition UST Tranche B Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "<u>UST Tranche B 507(b) Claims</u>"), which UST Tranche B 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, Avoidance Proceeds).  Except as and to the extent otherwise provided in the Interim UST Cash |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
|  | Collateral Order, the UST Tranche B 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; *provided*, *however*, that (i) the UST Tranche B 507(b) Claims shall be junior to the Carve-Out; (ii) the UST Tranche B 507(b) Claims shall be junior to the DIP Superpriority Claims other than as set forth in clause (iv); (iii) with respect to the Prepetition ABL Priority Collateral, the UST Tranche B 507(b) Claims shall be *pari passu* with the UST Tranche A 507(b) claims and junior to, in the following order, (A) the ABL 507(b) Claims, (B) the DIP Superpriority Claims, and (C) the B-2 507(b) Claims; (iv) with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, the UST Tranche B 507(b) Claims shall be senior to, in the following order, (A) the DIP Superpriority Claims, (B) the B-2 507(b) Claims, (C) the ABL 507(b) Claims, and (D) the UST Tranche A 507(b) Claims (as defined below); and (v) with respect to the Prepetition B-2 Priority Collateral, the UST Tranche B 507(b) Claims shall be shall be *pari passu* with the UST Tranche A 507(b) claims and junior to, in the following order, (A) the DIP Superpriority Claims, (B) the B-2 507(b) Claims, and (C) the ABL 507(b) Claims.<br><br>*UST Tranche A Section 507(b) Claims*. The Prepetition UST Tranche A Secured Parties are hereby granted allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition UST Tranche A Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "UST Tranche A 507(b) Claims," and together with the UST Tranche B 507(b) Claims, the "UST 507(b) Claims"), which UST Tranche A 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, Avoidance Proceeds). Except as otherwise provided in the Interim UST Cash Collateral Order, the UST Tranche A 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; *provided*, *however*, that (i) the UST Tranche A 507(b) Claims shall be junior to the Carve-Out; (ii) the UST Tranche A 507(b) Claims shall be junior to the DIP Superpriority Claims; (iii) with respect to the Prepetition ABL Priority Collateral, the UST Tranche A 507(b) Claims shall be *pari passu* with the UST Tranche B 507(b) claims and junior to, in the following order, (A) the ABL 507(b) Claims, (B) the DIP Superpriority Claims, and (C) the B-2 507(b) Claims; (iv) with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, the UST Tranche A 507(b) Claims shall be junior to, in the following order, (A) the UST Tranche B 507(b) Claims, (B) the DIP Superpriority Claims, (C) the B-2 507(b) Claims, and (D) the ABL 507(b) Claims; and (v) with respect to the Prepetition B-2 Priority Collateral, the UST Tranche A 507(b) Claims shall be shall be *pari passu* with the UST Tranche B 507(b) claims and junior to, in the following order, (A) the DIP Superpriority Claims, (B) the B-2 507(b) Claims, and (C) the ABL 507(b) Claims.<br><br>*See* Interim UST Cash Collateral Order ¶ 7 |

**The Debtors' Prepetition Capital Structure and Need for the DIP Facility**

**I.**     **Prepetition Capital Structure.**

20.     The Debtors have approximately $1.2 billion in total funded debt obligations.  This amount consists of a $485.3 million senior secured term loan, and approximately $737 million in US Treasury term loans, and $0.9 million in borrowings under the ABL Facility.  In addition, the Debtors have approximately $359.3 million of undrawn letters of credit issued under the ABL Facility.

| ($ in millions) | Maturity | Outstanding Principal |
|---|---|---|
| UST Tranche A | September 30, 2024 | $337,042,758 |
| UST Tranche B | September 30, 2024 | $399,999,770 |
| B-2 Term Loan | June 30, 2024 | $485,372,693 |
| ABL Facility | January 9, 2026 | $858,520 |
| **Total Funded Debt** | | $1,223,273,741 |

**A.**     **The UST Credit Agreements.**

21.     On July 7, 2020, Yellow and certain of its subsidiaries, as guarantors (the "Term Guarantors"), entered into the UST Tranche A Term Loan Credit Agreement (as amended, restated, amended and restated, modified or otherwise supplemented from time to time, the "Tranche A UST Credit Agreement") with The Bank of New York Mellon, as administrative agent and collateral agent and the UST Tranche B Term Loan Credit Agreement (as amended, restated, amended and restated, modified or otherwise supplemented from time to time, the "Tranche B UST Credit Agreement" and, together with the Tranche A UST Credit Agreement, the "UST Credit Agreements") with The Bank of New York Mellon, as administrative agent and collateral agent, through which the United States Treasury ("UST") committed an aggregate principal amount of $700.0 million to the Company pursuant to the CARES Act. The obligations of the Company under the UST Credit Agreements are guaranteed by the Term Guarantors.

22.    The UST Credit Agreements have maturity dates of September 30, 2024, with a single payment at maturity of the outstanding balance.  The Tranche A UST Credit Agreement consists of a $300.0 million term loan and bears interest at a rate of the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 3.5% per annum, consisting of 1.50% in cash and the remainder paid-in-kind.  Proceeds from the Tranche A UST Credit Agreement were used to meet Yellow's contractual obligations, maintain working capital and finance technology and infrastructure development.  The Tranche B UST Credit Agreement consists of a $400.0 million term loan and bears interest at a rate of the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 3.5% per annum, paid in cash.  Proceeds from the Tranche B UST Credit Agreement were used predominantly for the acquisition of tractors and trailers.

23.    Obligations under the UST Credit Agreements are secured by a perfected first-priority security interest in the escrow or controlled account supporting the respective UST Credit Facility, certain tractors and trailers (solely in the case of the Tranche B UST Credit Agreement) and a perfected junior priority security interest (subject in each case to permitted liens) in substantially all other assets of the Company and the Term Guarantors, subject to certain exceptions.

24.    On July 7, 2023, but effective as of June 30, 2023, the Company and certain of its subsidiaries entered into a waiver agreement (the "UST Credit Agreement Waiver") under the UST Credit Agreements.  The UST Credit Agreement Waiver provides for a waiver of the minimum Consolidated EBITDA financial covenant of $200.0 million LTM set forth in the UST Credit Agreements for the covenant testing period that ended on June 30, 2023.

25.    As of the Petition Date, approximately $337 million in borrowings remain outstanding under the Tranche A UST Credit Agreement, and approximately $400 million in borrowings remain outstanding under the Tranche B UST Credit Agreement.

**B.    Prepetition B-2 Term Loans.**

26.    On September 11, 2019, Yellow and certain of its subsidiaries, as guarantors (the "Prepetition B-2 Guarantors"), amended and restated the existing credit facilities under the credit agreement dated February 13, 2014 (the "Prior Term Loan Agreement") and entered into a $600.0 million term loan agreement (the "Prepetition B-2 Term Loan") with the Prepetition B-2 Lenders, and Alter Domus, as administrative agent and collateral agent.  The obligations of the Company under the Prepetition B-2 Credit Agreement are guaranteed by the Term Guarantors.

27.    The Prepetition B-2 Term Loan has a maturity date of June 30, 2024, with a single payment due at maturity of the outstanding balance.  The Prepetition B-2 Term Loan initially bore interest at the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 7.5% per annum, payable at least quarterly in cash, subject to a 1.0% margin step down in the event the Company achieves greater than $400.0 million in trailing-twelve-month Adjusted EBITDA.  Obligations under the Prepetition B-2 Term Loan are secured by a perfected first-priority security interest in (subject to permitted liens) assets of the Company and the Term Guarantors, including but not limited to all of the Company's wholly owned terminals, tractors and trailers other than the tractors and trailers funded by the UST Tranche B loan, subject to certain limited exceptions.

28.    On April 7, 2020, the Company and certain of its subsidiaries entered into Amendment No. 1 (the "First Term Loan Amendment") to the Prepetition B-2 Term Loan as a result of expected future covenant and liquidity tightening due to unprecedented economic deterioration.  The First Term Loan Amendment principally provided additional liquidity allowing the Company to defer quarterly interest payments for the quarter ended March 31, 2020 and the

quarter ending June 30, 2020 with almost all of such interest to be paid-in-kind.  The First Term Loan Amendment also provided for a waiver with respect to the Adjusted EBITDA financial covenant during each fiscal quarter during the fiscal year ending December 31, 2020.  The interest rate was retroactively reset to a fixed 14% during the first six months of 2020.

29.     On July 7, 2020, the Company and the Term Guarantors entered into Amendment No. 2 (the "Second Term Loan Amendment") to the Term Loan Agreement.  The material terms of the Second Term Loan Amendment include, among other things, a consent to the refinancing and conforming changes to the description of collateral set forth in the UST Credit Agreements, permanently capitalizing previously paid-in-kind interest on borrowings under the Term Loan Agreement, and that all future interest shall accrue at Adjusted LIBO rate plus a margin of 7.5% per annum and 6.5% per annum in the case of alternative base rate borrowings paid in cash. Additionally, the Company is subject to certain financial covenant requirements identical to those of the UST credit agreements.

30.     On July 7, 2023, but effective as of June 30, 2023, the Company and certain of its subsidiaries entered Amendment No. 3 (the "Third Term Loan Amendment") to the Prepetition B-2 Term Loan.  The Third Term Loan Amendment requires, among other things, that the Debtors provide a weekly liquidity report and that the Debtors do not permit liquidity to fall below $35 million at any time.  The Third Term Loan Amendment also provided for a change from the Adjusted LIBO rate to the Secured Overnight Financing Rate ("SOFR") plus the ARRC recommended credit spread adjustment.

31.     In July 2023, the Company announced that it closed on the sale of an obsolete terminal property in Compton, California with a third-party purchaser for a sale price of $80 million.  In accordance with the terms and conditions of the Third Term Loan Amendment, the net

proceeds of the sale, totaling approximately $79.5 million, were applied to the outstanding principal balance of the Prepetition B-2 Term Loan.

32.     As of the Petition Date, approximately $485.3 million in borrowings remain outstanding under the Prepetition B-2 Term Loan.

### C.     ABL Facility.

33.     On February 13, 2014, Yellow entered into a $450 million asset-based loan facility (the "ABL Facility") from a syndicate of banks arranged by Citizens Business Capital (the "ABL Agent"), Merrill Lynch, Pierce, Fenner & Smith and CIT Finance LLC.   Yellow and its subsidiaries, YRC Freight, Reddaway, Holland and New Penn are borrowers under the ABL Facility, and certain of the Company's domestic subsidiaries are guarantors thereunder. Availability under the ABL Facility is derived by reducing the amount that may be advanced against eligible receivables plus eligible borrowing base cash by certain reserves imposed by the ABL Agent and the Company's outstanding letters of credit and revolving loans.   Eligible borrowing base cash is cash that is deposited from time to time into a segregated restricted account and is included in "Restricted amounts held in escrow" in the accompanying consolidated balance sheet.

34.     At Yellow's option, borrowings under the ABL Facility bear interest at either: (i) the applicable USD LIBOR rate plus 2.25%, as amended, or (ii) the base rate (as defined in the ABL Facility) plus 1.25%, as amended.  Letter of credit fees equal to the applicable USD LIBOR margin in effect, 2.25% as amended, are charged quarterly in arrears on the average daily stated amount of all letters of credit outstanding during the quarter.   Unused line fees are charged quarterly in arrears (such unused line fee percentage is equal to 0.375% per annum if the average revolver usage is less than 50% or 0.25% per annum if the average revolver usage is greater than 50%).   The ABL Facility is secured by a perfected first-priority security interest (subject to

permitted liens) in accounts receivable, cash, deposit accounts and other assets related to accounts receivable of Yellow and the other loan parties and an additional second priority security interest (subject to permitted liens) in substantially all remaining assets of the borrowers and the guarantors.

35.    On October 31, 2022, the Company and certain of its subsidiaries entered into Amendment No. 7 (the "ABL Treasury Amendment") in which the maturity date of the ABL Facility was extended to January 9, 2026 and included a springing maturity commencing thirty days prior to the maturity of any of the Term Debt, the UST Tranche A Facility Indebtedness, or the UST Tranche B Facility Indebtedness. The amended facility has an increased capacity of $50 million up to $500 million and an interest rate of SOFR plus 1.75% plus a credit spread adjustment of .10%.

36.    As of the Petition Date, $900,000 in borrowings remain outstanding under the ABL Facility in addition to approximately $359,288,000 of undrawn letters of credit.  The relative lien priorities of each credit facility are set forth as follows:

| Debt Facility | 1st Lienholder Position | 2nd Lienholder Position | 3rd Lienholder Position | 4th Lienholder Position |
|---|---|---|---|---|
| **Prepetition ABL Facility** | Cash | Category 2 Rolling Stock | Category 1 Rolling Stock | |
| | Accounts Receivable | Category 3 Rolling Stock | | |
| | Accounts | Certain Real Estate Properties | | |
| **Prepetition UST Tranche A Facility** | | | Category 2 Rolling Stock | Category 1 Rolling Stock |
| | | | Category 3 Rolling Stock (*pari passu with UST Tranche B*) | |
| | | | Certain Real Estate Properties (*pari passu with UST Tranche B*) | |
| | | | Cash (*pari passu with UST Tranche B*) | |

| Debt Facility | 1st Lienholder Position | 2nd Lienholder Position | 3rd Lienholder Position | 4th Lienholder Position |
|---|---|---|---|---|
| | | | Accounts Receivable (*pari passu with UST Tranche B*) | |
| | | | Accounts (*pari passu with UST Tranche B*) | |
| **Prepetition UST Tranche B Facility** | Category 1 Rolling Stock | Certain Real Estate Properties | Category 3 Rolling Stock (*pari passu with UST Tranche A*) | |
| | Category 2 Rolling Stock *split: 67% to UST / 33% to Alter Domus* | | Certain Real Estate Properties | |
| | | | Cash (*pari passu with UST Tranche A*) | |
| | | | Accounts Receivable (*pari passu with UST Tranche A*) | |
| | | | Accounts (*pari passu with UST Tranche A*) | |
| **Prepetition B-2 Term Loan** | All Real Estate Properties | Category 1 Rolling Stock | | |
| | Category 2 Rolling Stock *split: 67% to UST / 33% to Alter Domus* | Cash | | |
| | | Accounts Receivable | | |
| | Category 3 Rolling Stock | Accounts | | |

## II.    Alternative Sources of Financing Are Not Readily Available.

37.    As further described in the Kaldenberg Declaration, other than the proposed DIP Facility offered by the Prepetition B-2 Lenders, the Debtors do not have any actionable financing alternative available from sources either within or outside their capital structure.  *See* Kaldenberg Decl. ¶ 18.  The Debtors and their advisors engaged with numerous parties regarding soliciting funding for these chapter 11 cases.  Specifically, Ducera contacted approximately 35 third-party financial institutions with particular industry experience in providing debtor-in-possession financing to determine whether any of these parties would be willing to provide postpetition financing to the Debtors.  These marketing efforts continued in earnest in parallel with the Debtors'

negotiations of the DIP Facility with the DIP Lenders.  *See id.* ¶ 16.  Of those parties contacted by Ducera, ten entered into confidentiality agreements and received access to a private data room containing extensive materials related to the Debtors' financials, operations, assets, organizational structure, and the opportunity to provide debtor-in-possession financing.  *See id.* ¶ 16.  Other than the offer for the DIP Facility from the Prepetition B-2 Lenders, the Debtors received only one third-party indication of interest to provide post-petition financing, which inbound of interest was was labeled "for discussion purposes only," based on public information only, and was premised upon needing several additional weeks of diligence to determine if such a financing would be feasible on any terms.  Accordingly, with time being of the essence, the Debtors determined that they lacked sufficient time for multiple more weeks of negotiations with this party, leaving the DIP Lenders' proposed DIP Facility as the Debtors' only available option to reach an expeditious deal.  *See id.* ¶ 17.

38.    The terms of the DIP Facility are fair and reasonable under the circumstances.  The DIP Facility is the product of good-faith, robust, and arm's-length negotiations with the DIP Lenders.  The New Money DIP Term Loans are necessary for the Debtors to maximize value of their estates pursuant to an orderly, but efficient, sale process and to avoid an unwieldy fire sale liquidation.  *See id.* ¶ 22.  Accordingly, approval of and the Debtors' entry into the DIP Facility is in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' reasonable business judgment.  *See Id.* ¶ 21.  Further, access to both the proceeds of the DIP Facility and the use of Available ABL Cash Collateral is integral because neither is sufficient alone to fund these chapter 11 cases without the other.

**Basis for Relief**

I.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

    A.    **Entry into the DIP Documents Is a Sound Exercise of the Debtors' Business Judgment.**

39.    The Court should authorize the Debtors, as a sound exercise of the Debtors' business judgment, to execute, deliver, and perform under the DIP Documents, including the DIP Credit Agreement, and to obtain access to the New Money DIP Term Loans provided by the DIP Facility.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.   Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g., In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

40.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also*

*In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

41.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) ("Viewed in isolation, several of the terms of the [postpetition financing] might appear to be extreme or even unreasonable.  Certainly, many of them favor the DIP Lenders.  But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable."); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  Courts may also appropriately take into consideration noneconomic benefits to a debtor offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.   Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

2009 WL 2902568, at *4 (Bankr.  S.D.N.Y. July 6, 2009) (emphasis added).

42.    The Debtors' decision to enter into the DIP Facility represents a sound exercise of the Debtors' business judgment following hard-fought and arm's-length negotiation with the DIP Lenders and an extensive canvassing of the debtor-in-possession financing market for any available and actionable postpetition financing alternatives.  The postpetition financing offered by the DIP Facility will provide the Debtors with adequate liquidity to smoothly transition into chapter 11, conduct an orderly wind-down of their operations and businesses, and execute a comprehensive sale process for their vast assets, which includes a substantial real estate portfolio and many thousands of tractor-trailers, among other key industry assets.  *See* Whittman Decl. ¶ 8.  The Debtors and their advisors negotiated the DIP Facility with the DIP Lenders in good faith, at arm's length, and around-the-clock over several intensive days, and the Debtors believe that they have obtained the best possible post-petition financing solution available under the circumstances.  *See* Kaldenberg Decl. ¶ 23.  Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a sound exercise of the Debtors' business judgment.

## B.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.

43.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) and section 364(d) of the Bankruptcy Code.  More specifically, the Debtors propose to provide to the DIP Lenders, subject to the Carve-Out, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in, and liens upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition B-2 Priority Collateral, regardless of where located.  The Prepetition Liens with respect to the Prepetition B-2 Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens.

44.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

A.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code—*i.e.*, by allowing a lender only an administrative claim;

B.     the credit transaction is necessary to preserve the assets of the estate; and

C.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also L.A. Dodgers LLC*, 457 B.R. at 312–13 (Bankr. D. Del. 2011); *Ames Dep't Stores*, 115 B.R. at 37–40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

45.     As described above and in the Kaldenberg Declaration, the Debtors recognized that it would be difficult, if not impossible, to secure unsecured or junior postpetition financing given that time to access incremental liquidity was limited and the Prepetition Secured Parties (as well as the Prepetition UST Secured Parties) indicated that they would not consent to a "priming" DIP financing provided by a third party.  *See* Kaldenberg Decl. at ¶ 19.  In light of these circumstances and the realities imposed by the Debtors' existing capital structure, any third-party DIP financing would almost certainly have required the Debtors to engage in a protracted and costly priming fight at the very outset of these chapter 11 cases.  *Id.*  Regardless of the prospects of success, the expense and disruption associated with complex priming litigation (or non-consensual use of cash

collateral litigation) at the outset of these cases would jeopardize the Debtors' ability to immediately hit the ground running with their monumental sale efforts. Such litigation would divert critical resources from accomplishing the Debtors' goals of maximizing estate value and creditor recoveries to instead litigating a potentially bitter and costly priming dispute. Further, the Debtors' already strained liquidity would be required to fund such a fight. *Id.*

46. Absent the DIP Facility, which will provide sufficient liquidity to administer these chapter 11 cases and execute the Debtors' sale process and wind-down, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders. Given the Debtors' unique circumstances, the Debtors believe that the terms of the DIP Facility, including the Roll-Up and other economic provisions of the DIP Facility (including the Fees), as set forth in the DIP Credit Agreement and other DIP Documents, are fair and reasonable. For these reasons, the Debtors have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

47. In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court may:

> authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c). As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

48. Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after

notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility to the extent such DIP Collateral is subject to prepetition liens that secure the Prepetition B-2 Obligations of the Prepetition B-2 Secured Parties. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) their Prepetition B-2 Secured Parties have consented or (b) the Prepetition B-2 Secured Parties' interests in collateral are adequately protected.

49.     Here, the Prepetition Secured Parties, including the Prepetition ABL Secured Parties, as well as the Prepetition UST Secured Parties, have each affirmatively consented to the DIP Facility and actively participated in facilitating the proposed DIP Facility. Moreover, as set forth more fully in the Interim Order, the Debtors propose to provide an extensive adequate protection package to protect the interests of the Prepetition Secured Parties and (pursuant to the Interim UST Cash Collateral Order) the Prepetition UST Secured Parties. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.**

50.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987). Moreover, in circumstances where only a few lenders

likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (finding that the debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

51.     The Debtors do not believe that alternative sources of financing are reasonably or readily available given the Debtors' extensive (and unsuccessful) solicitation of alternative financing proposals. *See* Kaldenberg Decl. ¶ 17–18. The Debtors and their advisors have thoroughly canvassed the distressed financing market for alternative postpetition financing proposals. Despite these efforts, no parties other than the DIP Lenders came forward with a viable debtor-in-possession financing proposal to infuse the Debtors with sufficient liquidity to fund these cases. Other than the proposed DIP Facility, the Debtors received only one third-party indication of interest to provide a DIP financing proposal, but this inbound was labeled "for discussion purposes only" and was explicitly premised upon the need for several further weeks of diligence before this party's indication of interest might possibly advance to an actual offer for financing. Thus, the DIP Facility offered by the DIP Lenders represents the Debtors' only available option to meet the Debtors' urgent liquidity needs and to successfully finance these cases. *See Id.* The DIP

Facility will allow the Debtors to smoothly transition into chapter 11, wherein they and their advisors will conduct an orderly wind-down of operations and execute a comprehensive sale process for the Debtors' assets.  *See* Whittman Decl. ¶ 6.  Financed by the New Money DIP Term Loans and Available ABL Cash Collateral, the Debtors intend to efficiently, proactively, and professionally market and monetize their substantial portfolio of real estate and other valuable industry-specific assets, with the goal of maximizing creditor recoveries on the basis of these sale proceeds.  No alternative other than the proposed DIP Facility is available to fund this process.  Therefore, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

### D.    The Roll-Up is Appropriate.

52.    The proposed DIP Orders provide that upon entry of the Interim Order $501,584,152.30 of outstanding Prepetition B-2 Obligations will be rolled up into the DIP Facility. The proposed Roll-Up is an exercise of the Debtors' sound business judgment.

53.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).    The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

54.     Repaying prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.  The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Jul. 31, 2023) (authorizing an approximately $63 million DIP Facility, including an approximately $43 million roll-up); *In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (authorizing an approximately $120 million DIP facility, including a $60 million roll-up of the prepetition term loan); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jul. 20, 2020) (authorizing an approximately $50 million DIP facility including a $22 million roll-up); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Jul. 23, 2019) (authorizing an approximately $240 million DIP facility, including a $100 million roll-up of the prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim order); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and an additional $250 million in additional liquidity, pursuant to interim order).[12]

55.     Where, as here, the Prepetition B-2 Lenders are likely oversecured, repaying creditors that stand to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors.  Rather, the proposed Roll-Up feature merely affects the timing, not the amount, of the Prepetition B-2 Lenders' recovery.  Further, the Roll-Up is a material component of the consideration required by the DIP Lenders as part of their commitment to

---

[12]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

provide postpetition financing. Without continued access to the incremental liquidity provided under the DIP Facility necessary to fund the administration of these chapter 11 cases and the sale process, the Debtors will be unable to maximize estate value. Accordingly, the proposed Roll-Up should be approved as a sound exercise of the Debtors' business judgment.

56. As discussed herein and in the Kaldenberg Declaration, the Roll-Up was the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, is an integral component of the overall terms of the DIP Facility and was required by the DIP Lenders as consideration for their extension of postpetition financing. *See* Kaldenberg Decl. ¶ 20. Given the Prepetition B-2 Lenders' likely oversecured status, the potential volatility in the Debtors' collections, their inability to access Cash Collateral outside of the DIP Facility, and the fact that no other party has put forward an actionable financing proposal, the Roll-Up pursuant to the Interim Order is reasonable, appropriate, a sound exercise of the Debtors' business judgment, and ultimately in the best interest of all stakeholders given the alternatives.

### E. The Debtors Should Be Authorized to Use the Cash Collateral (Including Available ABL Cash Collateral).

57. Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the DIP Lenders and the Prepetition Secured Parties (including the Prepetition UST Secured Parties pursuant to the Interim UST Cash Collateral Order) have consented to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order and the Interim UST Cash Collateral Order.

58.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case-by-case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) (holding that "the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

59.     As set forth in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with certain forms of adequate protection to protect against the postpetition diminution in value of their Prepetition Collateral (collectively, the "Adequate Protection Obligations").  The Debtors will likewise provide the Prepetition UST Secured Parties with the adequate protection package under the Interim UST Cash Collateral Order.  These protections are

set forth in the Interim Order (and, as applicable, in the Interim UST Cash Collateral Order) and summarized herein:

    a.    payment of reasonable fees, costs and expenses of the Prepetition Secured Parties and their professionals (as well as the Prepetition UST Secured Parties and their professionals);

    b.    replacement liens;

    c.    superpriority administrative expense claims to the extent of any postpetition diminution in value of the Prepetition Secured Parties' (and the Prepetition UST Secured Parties') interest in the Prepetition Collateral;

    d.    reporting and information requirements;

    e.    segregation of 80% of ABL Cash Collateral (*i.e.*, accounts receivable) to pay down, or cash collateralize (as applicable), the Prepetition ABL Obligations; and

    f.    cash interest payments to the Prepetition Secured Parties and the Prepetition UST Secured Parties (including certain fees payments to the Prepetition ABL Secured Parties).

60.    The Debtors submit that the proposed Adequate Protection Obligations (including, under the Interim UST Cash Collateral Order, the UST Adequate Protection Obligations) are sufficient to protect the Prepetition Secured Parties and the Prepetition UST Secured Parties from any potential diminution in value to their respective Prepetition Collateral (including Cash Collateral).  In light of the foregoing, the Debtors submit, and the Prepetition Secured Parties and the Prepetition UST Secured Parties agree, that the proposed Adequate Protection Obligations (and UST Adequate Protection Obligations) to be provided for the benefit of the Prepetition Secured Parties and the Prepetition UST Secured Parties are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations and the UST Adequate Protection Obligations are fair and appropriate under the circumstances of these chapter 11 cases to ensure that the Debtors are able to continue using Prepetition Collateral, including Available ABL Cash Collateral, subject to the

terms and limitations set forth in the Interim Order and the Interim UST Cash Collateral Order, for the benefit of all parties in interest and the Debtors' estates.

## II.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders Under the DIP Documents.

61.     Under the DIP Credit Agreement, the Debtors will, subject to Court approval, pay certain fees (as defined in the DIP Credit Agreement, the "Fees") to the DIP Secured Parties.  The Fees are reasonable under the circumstances and for the same reasons as set forth above with respect to the Roll-Up: the DIP Lenders, representing the Debtors' only available source of postpetition financing, would not have extended the DIP Facility but for the economics (including the Fees) contained therein.  These economics and Fees were the subject of hard-fought negotiations between the Debtors and the DIP Lenders.  Thus, the Fees should not be viewed separately but rather as a part of the overall, substantial benefits provided under the DIP Facility.

62.     The proposed Fees are as follows:  (a) the DIP Lenders will earn the DIP Closing Fee (as defined in the Fee Letter) on the Closing Date with the Fixed Amount portion thereof to be payable on the Closing Date and the Variable Amount portion thereof to be payable on the earliest to occur of July 31, 2025, the date on which the Chapter 11 Cases (as defined in the DIP Credit Agreement) are converted to a chapter 7 and the effective date of any plan of reorganization; and (b) the Admin Fee (as defined in the Agency Fee Letter (as defined in the DIP Credit Agreement)) will be due and payable to the DIP Agent annually, commencing on the Closing Date.

63.     The DIP Closing Fee is an aggregate amount equal to: (a) $7,125,000 (the "Fixed Amount"); and (b) an amount (the "Variable Amount") equal to: the product of (A) the DIP Facility Amount multiplied by (B) a percentage representing the sum of (x) if any obligations under the DIP Credit Agreement are outstanding on September 8, 2023, 2.50%, plus (y) if any obligations under the DIP Credit Agreement are outstanding on September 29, 2023, 2.50%, plus (z) if any

obligations under the DIP Credit Agreement are outstanding on the second day after the scheduled

Maturity Date pursuant to clause (i) of the definition of the term "Maturity Date" under the Credit

Agreement, 2.50%; minus the Fixed Amount.

### III.   The Interim UST Cash Collateral Order Should Be Entered as an Exercise of the Debtors' Sound Business Judgment.

64.     The Debtors also seek the Court's approval of the Interim UST Cash Collateral

Order.  Following extensive discussions regarding the DIP Facility between the Debtors and their

Prepetition Secured Parties, the Prepetition UST Secured Parties and their counsel indicated their

preference for this Court's entry of a standalone order (separate and apart from the Interim Order),

among other things, (a) documenting the Prepetition UST Secured Parties' consent for the Debtors

to use UST Cash Collateral (as defined in the Interim UST Cash Collateral Order) and (b) granting

certain adequate protections to the Prepetition UST Secured Parties (*i.e.*, the UST Adequate

Protection Obligations (as defined in the Interim UST Cash Collateral Order)), including, among

other protections, cash interest payments, reporting requirements to the Prepetition UST Secured

Parties, and reimbursement of professional fees.[13]   The Prepetition UST Secured Parties also

insisted upon, and the Interim UST Cash Collateral Order provides for, the UST Milestones.  The

UST Adequate Protection Obligations are critical to secure the Prepetition UST Secured Parties'

consent to the Debtors' use of UST Cash Collateral and the Treasury's support for the Debtors'

sale and wind-down efforts in these cases.  Accordingly, the Debtors respectfully request that the

---

[13]    The Houlihan Restructuring Fee is set forth in the Financial Agency Agreement (as defined in the Interim UST Cash Collateral Order) with the Prepetition UST Secured Lenders as follows: "If [Houlihan Lokey Capital, Inc.] receives written notice from Treasury to engage with an issuer on a financial restructuring of [the Debtors'] obligation to the Treasury, then upon the completion of the financial restructuring [Houlihan Lokey Capital, Inc.] will receive a fee equal to seventy-five basis points (0.75%) of the principal amount of the claim held by Treasury of the [Debtors] capped at $7,500,000."  As set forth in the Interim UST Cash Collateral Order, the Houlihan Restructuring Fee (as defined in the Interim UST Cash Collateral Order) is subject to entry of the Final UST Cash Collateral Order.

Interim UST Cash Collateral Order, including authority to provide the UST Adequate Protections, be entered.

**IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e) of the Bankruptcy Code.**

65.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

66.    As explained herein and in the Kaldenberg Declaration, the proposed DIP Facility is the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable (and only available) terms on which to obtain vital postpetition financing.  The DIP Facility is the culmination of hard-fought, arm's-length, good-faith negotiations between the Debtors and the DIP Lenders.  The DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, the Orders (including the Approved Budget), and the DIP Documents.  Furthermore, no consideration is being provided to any party to the DIP Documents other than as described herein.

67.    Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded therein.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

68.      The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to the extent necessary to permit the DIP Agent to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, deposit account control agreements or to take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder, including, without limitation, with respect to the DIP Liens and the Adequate Protection Liens.

69.      Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g., In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (same); *In re Town Sports Int'l, LLC*, No. 12-12168 (CTG) (Bankr. D. Del. Oct. 2, 2020) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jun. 15, 2020) (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (same).[14]

**VI.     Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm.**

70.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a

---

[14]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

71.     For the reasons noted above and in the Whittman Declaration, the Debtors have a critical and near-term need for the liquidity provided by the DIP Facility and access to Available ABL Cash Collateral.  *See* Whittman Decl. ¶ 6–7.  The New Money DIP Term Loans and Available ABL Cash Collateral will provide the Debtors with the funds necessary to conduct an orderly wind-down of their operations and execute a value-maximizing sale process for all of their assets. *See Id.*  Available ABL Cash Collateral will supplement the New Money DIP Term Loans to ensure that these chapter 11 cases are sufficiently funded and that estate value is maximized.  The Debtors will also maintain certain limited operations and functions during these wind-down and sale efforts, all in compliance with the Approved Budget and for the singular purpose of maximizing estate value for the benefit of creditor recoveries.  *Id.*

72.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive initial funding under the DIP Facility.  The Debtors also request approval of the Interim UST Cash Collateral Order, as described above.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### Request for Final Hearing

73.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after twenty-one days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## Notice

74.     The Debtors will provide notice of this motion to:  (a) the United States Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the DIP Agent and counsel thereto; (i) Milbank LLP, as counsel to certain investment funds and accounts managed by affiliates of Apollo Capital Management, L.P.; (j) the administrative and collateral agents under the B-2 Term Loan and counsel thereto; (k) the ABL Agent and counsel thereto; (l) White & Case LLP, as counsel to Beal Bank USA; (m) the administrative and collateral agents under the UST Credit Agreements and counsel thereto; (n) the United States Department of Justice and Arnold & Porter Kaye Scholer LLP, as counsel to the United States Department of the Treasury; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  In light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

75.     No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors request that the Court enter the Orders, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  August 7, 2023
Wilmington, Delaware

/s/ Laura Davis Jones

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (*pro hac vice* pending) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (*pro hac vice* pending) |
| Peter J. Keane (DE Bar No. 5503) | Whitney Fogelberg (*pro hac vice* pending) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |
| Wilmington, Delaware 19801 | Telephone:    (312) 862-2000 |
| Telephone:    (302) 652-4100 | Facsimile:    (312) 862-2200 |
| Facsimile:    (302) 652-4400 | Email:    patrick.nash@kirkland.com |
| Email:    ljones@pszjlaw.com | david.seligman@kirkland.com |
| tcairns@pszjlaw.com | whitney.fogelberg@kirkland.com |
| pkeane@pszjlaw.com | |
| ecorma@pszjlaw.com | -and- |
| | |
| | Allyson B. Smith (*pro hac vice* pending) |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone:    (212) 446-4800 |
| | Facsimile:    (212) 446-4900 |
| | Email:    allyson.smith@kirkland.com |
| | |
| | *Proposed Co-Counsel for the Debtors and Debtors in Possession* |