**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | ) ) ) | Case No. 23-11069 (___) |
| Debtors. | ) ) | (Joint Administration Requested) |

**DECLARATION OF BRIAN WHITTMAN,
MANAGING DIRECTOR OF ALVAREZ & MARSAL
NORTH AMERICA, LLC, IN SUPPORT OF THE MOTION
OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) MODIFYING THE AUTOMATIC STAY, (IV) AUTHORIZING THE DEBTORS
TO USE UST CASH COLLATERAL, (V) GRANTING ADEQUATE PROTECTION,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Brian Whittman, hereby declare under penalty of perjury as follows:

1. I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a limited liability corporation, which has served as financial and restructuring advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I have more than twenty-five (25) years of experience serving as a financial advisor in distressed situations and providing restructuring and performance improvement services to corporations, various creditor classes, equity owners, and directors of financially distressed companies. For the past twenty-five years, I have advised companies requiring performance improvement or financial restructuring across a wide range of industries, including automotive, communications, distribution,

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

manufacturing, media, mining, and retail. I have also led complex engagements for companies, secured lenders, and creditors, serving in both interim management and advisory roles. I am a Certified Insolvency and Restructuring Advisor and a Certified Public Accountant.

2.     I have served as a Managing Director in A&M's Restructuring & Turnaround group since 2008 and as the group's co-head of the Midwest region since 2019.  During my tenure at A&M, among other engagements, I have served as interim chief financial officer of Horizon Global in 2018–19, chief restructuring officer of UCI International in 2016, and interim chief financial officer of PSAV, Inc. in 2014.  In addition, my recent company-side restructuring engagements include, among others, Virgin Orbit Holdings, Fast Radius, Boy Scouts of America, and Paddock Enterprises.  Prior to joining A&M in 2002, I spent seven years working as a director in the restructuring practice at a former "Big Five" accounting firm.

3.     A&M's practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic assistance, typically in distressed business and restructuring settings and situations.  A&M serves distressed companies, debtors, secured and unsecured creditors, equity holders, and other parties in both in-court and out-of-court restructuring engagements.  Prior to August 6, 2023 (the "Petition Date"), A&M was engaged by the Debtors to help manage their liquidity, forecasting, and budgeting, and to generally assist in financial planning and analysis, including by developing cash flow forecasts (including the DIP Budget)[2] and preparing for these chapter 11 cases.[3]

---

[2]    The DIP Budget, as such term is used herein, shall mean the Initial Budget (as defined in the Interim Order).

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

4.      I submit this declaration (the "Declaration") in support of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion").

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' employees, operations, and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and their advisors (including A&M employees working under my supervision), or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations, financial affairs, and restructuring and liquidity-management initiatives. I am over the age of eighteen (18) and am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

**Background**

6.      The Debtors require immediate incremental liquidity to smoothly transition into chapter 11, conduct an orderly wind-down of operations, and execute a sale process for all of their assets. As described in the First Day Declaration (and as set forth in the DIP Budget), the Debtors require the funds under the DIP Facility (particularly, the up to $142.5 million of New Money DIP Term Loans) to preserve the value of their assets, including accounts receivable, execute a comprehensive and efficient sale process, wind-down their affairs, and pay remaining employees for their work during this period. The Debtors' liquidity position has rapidly deteriorated in the weeks leading up to the Petition Date. In fact, as of the Petition Date, the Debtors have only

approximately $39 million of unrestricted cash on hand. The Debtors, with the assistance of their advisors, including A&M, have determined that they must obtain incremental liquidity to address these postpetition financing needs. Access to the incremental liquidity provided by the proposed DIP Facility, including access to Cash Collateral (particularly, to Available ABL Cash Collateral) in accordance with the Interim Order and DIP Budget, will provide the Debtors with the means to (i) effectuate the orderly wind-down of operations, including allowing customers to pick-up the remaining freight in the Debtors' network and collecting accounts receivable, and (ii) conduct a value-maximizing sale process for the Debtors' extensive assets, which includes a substantial real estate portfolio and many thousands of operational trucks and trailers, among other industry-specific equipment.

7.      Access to liquidity in the form of the postpetition debtor-in-possession financing under the DIP Facility (the "DIP Financing"), as well as access to Cash Collateral in the manner prescribed by the DIP Documents and the Interim Order, will be vital to preserving and maximizing the value of the Debtors' estates for all creditors during these cases. In fact, as of the filing of this Declaration, the Debtors require immediate access to the DIP Financing (particularly, the $60 million Initial Draw of the New Money DIP Terms Loans) in order to, among other things, meet near-term payroll obligations to the Debtors' remaining workforce, who will be integral to the Debtors' preservation of asset value during the sale process, as well as to pay the final unpaid wages for former employees whose services and cooperation were essential to the orderly and recent shutdown of the Debtors' operations. The New Money DIP Term Loans and Available ABL Cash Collateral will also be necessary to conduct and efficiently complete the Debtors' sale process. Accordingly, following hard fought, good faith, and arms-length negotiations, the Debtors reached an agreement with the DIP Lenders regarding the terms of the DIP Financing,

including agreement with their Prepetition Secured Parties regarding the consensual use of Cash Collateral in accordance with the Interim Order.[4]  In my opinion, approval of the DIP Financing and the Interim Order will provide the Debtors with sufficient liquidity to achieve the aforementioned goals of these cases.

8. Pursuant to the Interim Order, the DIP Lenders have agreed to provide the Debtors with up to $644 million of postpetition financing under the DIP Credit Agreement, including up to $142.5 million in New Money DIP Term Loans and approximately $501.5 million of DIP Roll-Up Loans (collectively, the "DIP Commitments").  Critically, $60 million of the New Money DIP Term Loans will become immediately available to be drawn following the Court's entry of the Interim Order.  Based on current projections and estimates prepared by my team and I at A&M, I believe that the New Money DIP Term Loans, along with the Debtors' ability to access Available ABL Cash Collateral, on the terms and pursuant to the procedures agreed under the Interim Order, will provide sufficient liquidity to fund these chapter 11 cases (*i.e.*, to maintain limited operations (including making payroll for remaining employees) while the Debtors, with the assistance of their advisors, conduct a robust marketing process for their extensive asset portfolio and orderly wind-down their operations).  In my opinion, these funds are necessary to ultimately generate sufficient proceeds from the asset sales to repay the DIP Lenders, provide the maximum possible recovery to the Debtors' other creditors, and to fund the remainder of these chapter 11 cases.

## The DIP Motion

9. Pursuant to the DIP Motion, the Debtors seek entry of the Interim Order authorizing the Debtors to obtain the DIP Financing, access and use Cash Collateral on the terms set forth in

---

[4] The Debtors have separately agreed to provide the UST Adequate Protection, to the Prepetition UST Secured Parties pursuant to the Interim UST Cash Collateral Order.

the Interim Order, and provide adequate protection to the Prepetition Secured Parties (as set forth in the Interim Order) and the Prepetition UST Secured Parties (as set forth in the Interim UST Cash Collateral Order). Importantly, in addition to the New Money DIP Term Loans to be provided under the DIP Facility, the Prepetition ABL Secured Parties have consented to the Debtors' use of Available ABL Cash Collateral on the terms and conditions set forth in the Interim Order and in accordance with the DIP Budget. I forecast that Available ABL Cash Collateral will be approximately $80 million during the first twelve weeks of these cases.

10.     I believe that the Debtors' use of the new-money proceeds of the DIP Facility and access to Cash Collateral on the agreed terms will preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders. Among other things, access to the DIP Financing and Cash Collateral is essential to allow the Debtors to commence and conduct an orderly and value-maximizing wind-down of their business and to market a sale of all of their assets. Lacking such access to the incremental liquidity provided by the DIP Facility, the Debtors risk being unable to maximize the value of these assets and to run an orderly wind-down, a result which would be detrimental to all stakeholders. As such, I believe failure to obtain access to the DIP Financing and access to Cash Collateral would result in immediate and irreparable harm to the Debtors and their stakeholders and would diminish the value of the Debtors' estates.

11.     The Debtors, with the assistance of their advisors, developed the DIP Budget governing their use of proceeds from the DIP Facility and Cash Collateral during the period for which the DIP Budget was prepared. As reflected in the DIP Budget, prepared at the direction of the Debtors, as of the Petition Date, the Debtors have approximately $39 million in cash on hand, which, as shown in the DIP Budget, is insufficient to support the Debtors' limited operations, wind-down, sale-and-marketing process for their assets, and the administration of these chapter 11

cases. The DIP Budget contains line items for each category of cash flow anticipated to be received or disbursed during the identified period. I believe that the DIP Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the wind-down of the Debtors' businesses and operations and marketing and sales of their assets for the period set forth in the DIP Budget. Further, I believe that the DIP Budget establishes that the Debtors will have access to adequate liquidity during the identified period to execute upon the foregoing goals of these cases and to administer these cases. Both the DIP Budget and the terms of the Interim Order are the product of extensive, hard fought, arms-length negotiations conducted in good faith between the Debtors, the DIP Lenders, the Prepetition Secured Parties, and the Prepetition UST Secured Parties. In light of the circumstances and the Debtors' urgent need for postpetition funding and access to Cash Collateral to fund these chapter 11 cases and to ultimately maximize estate value for all stakeholders, and based upon the lack of alternatives from the *Declaration of Cody Leung Kaldenberg, Managing Director of Ducera Partners LLC, In Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Kaldenberg Declaration"), I believe that the terms of the DIP Documents and the Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and should be approved.

12. The Debtors' immediate access to the DIP Financing and Cash Collateral (particularly, as set forth in the DIP Budget, the New Money DIP Term Loans and Available ABL Cash Collateral) under the terms of the DIP Documents and the Interim Order is, in my opinion,

critical to the Debtors' ability to maximize estate value and administer these chapter 11 cases. Therefore, I believe that the relief requested in the Interim Order is necessary and appropriate to avoid immediate and irreparable harm to the Debtors' estates, and should be approved by this Court.

[*Remainder of page intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  August 7, 2023                              */s/ Brian Whittman*
                                                                           Brian Whittman
                                                                           Managing Director
                                                                           Alvarez & Marsal, LLC