**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF CODY LEUNG KALDENBERG,
FOUNDING MEMBER AND PARTNER AT
DUCERA PARTNERS LLC IN SUPPORT OF THE MOTION
OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) MODIFYING THE AUTOMATIC STAY, (IV) AUTHORIZING THE DEBTORS
TO USE UST CASH COLLATERAL, (V) GRANTING ADEQUATE PROTECTION,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Cody Leung Kaldenberg, hereby declare under penalty of perjury as follows:

1.      I am a founding member of and partner at Ducera Partners LLC ("Ducera"), which maintains its principal office at 11 Times Square, 36th Floor, New York, New York 10036.  Ducera is the proposed investment banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2.      I submit this declaration (the "Declaration") in support of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST*

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is:  11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

*Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion").[2]

3.      The DIP Motion seeks authorization for the Debtors to enter into the proposed super-priority, multiple draw debtor-in-possession term loan, consisting of:  (a) up to $142.5 million in New Money DIP Term Loans, of which (i) an initial $60 million draw will be made available upon entry of the Interim Order, followed by (ii) $37.5 million available upon entry of a final, non-appealable order approving the Bidding Procedures, (iii) $20 million available upon the Debtors' receipt, pursuant to the Bidding Procedures Order, of unique, non-duplicative binding bids for the DIP Priority Collateral that would, in the aggregate, generate net cash proceeds of at least $250 million, and (iv) $25 million available upon the Debtors' receipt, pursuant to the Bidding Procedures Order, of unique, non-duplicative binding bids (which shall not be subject to any financing contingencies) for the DIP Priority Collateral that would, in the aggregate, generate net cash proceeds of at least $450 million; and (b) approximately $501.5 million in DIP Roll-Up Loans.  In addition, the DIP Motion seeks authorization for the consensual use of Cash Collateral (including Available ABL Cash Collateral) in accordance with the DIP Documents (including the Approved Budget) and the terms and provisions of the Interim Order and the Interim UST Cash Collateral Order.

4.      Unless otherwise stated herein, all statements set forth in this Declaration are based upon:  (a) my personal knowledge; (b) information provided to me by the Debtors' management team, other members of the Ducera team working at my direction, the Debtors' other advisors, and certain creditors' advisors; (c) my review of relevant documents; (d) my

---

[2]   The significant terms of the DIP Facility are set forth in greater detail in the DIP Motion.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Motion or the Interim Order, as applicable.

experience in chapter 11 cases, including with debtor-in-possession financing facilities; (e) the DIP Motion; (f) the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith; and (g) the *Declaration of Brian Whittman, Managing Director of Alvarez & Marsal North America, LLC, In Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Whittman Declaration"), filed contemporaneously herewith.

5.      I am over the age of eighteen (18) years and authorized to submit this Declaration on behalf of the Debtors.  I am not being compensated separately for this Declaration or testimony, other than through payments received by Ducera as the Debtors' proposed investment banker.  If I were called upon to testify, I could and would competently testify to the facts and opinions set forth herein.

### Professional Background and Qualifications

6.      Founded in 2015, Ducera is an independent investment banking advisory firm, which has extensive experience in, among other areas, providing leading-edge capital structure and restructuring advice in both in-court and out-of-court situations.  In addition to numerous out-of-court restructuring and sale assignments, Ducera professionals have served as investment bankers to debtors, creditor groups, asset purchasers, committees, boards of directors, and trustees in a number of bankruptcy matters.  Ducera provides a broad range of corporate and financial services to its clients, including general corporate advice; mergers, acquisitions, and

3

divestitures; corporate restructurings; and private placements.  Ducera provides its services worldwide from three offices located in the United States.

7.    Ducera employs more than fifty professionals and is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties in interest involved with financially troubled companies requiring complex financial restructurings, both in and outside of bankruptcy. Ducera has represented debtors, creditors, and other constituents in some of the largest restructuring cases in the United States, including (a) *In re Diebold Holding Co., LLC*, Case No. 23-90602 (DRJ) (Bankr. S.D. Tex. July 18, 2023) [Docket No. 266]; (b) *In re Virgin Orbit Holdings, Inc.*, Case No. 23-10405 (KBO) (Bankr. D. Del. May 15, 2023) [Docket No. 261]; (c) *In re Altera Infrastructure L.P.*, Case No. 22-90130 (MI) (d) *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 22, 2021) [Docket No. 230]; (e) *In re Superior Energy Servs., Inc.*, Case No. 20-35812 (DRJ) (Bankr. S.D. Tex. Feb. 2, 2021) [Docket No. 316]; (f) *In re Hornbeck Offshore Services, Inc.*, Case No. 20-32679 (DRJ); (g) *In re iHeartMedia, Inc.*, Case No. 18-31274 (MI); (h) *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. Jan. 26, 2018).

8.    I have nearly twenty years of restructuring-related investment banking experience and have worked on a broad range of restructuring advisory assignments across a variety of industry sectors.  Since joining Ducera in 2015, I have provided investment banking expertise and financing advice, including with respect to marketing for and obtaining postpetition debtor-in-possession financing, to financially distressed companies as well as lenders and strategic investors in distressed and special situations engagements.  Prior to joining Ducera, I worked as a Director at Perella Weinberg Partners for over six years, advising companies and other stakeholders on special situation restructuring engagements, prior to which I worked as an

associate at Goldman Sachs for over four years.  I earned a Bachelor of Science in Economics from the Massachusetts Institute of Technology in 2004.

## Ducera's Retention

9.      The Debtors retained Ducera in February 2023 to act as their investment banker in connection with the Debtors' efforts to consider potential alternatives to address liquidity needs. During the engagement, Ducera has rendered investment banking services to the Debtors in connection with the evaluation of various strategic and financial alternatives, including the prospect of the Debtors soliciting and ultimately entering into debtor-in-possession financing. Among other things, Ducera has been engaged to assist the Debtors in evaluating and negotiating postpetition financing alternatives and to conduct a marketing process to obtain debtor-in-possession financing to fund a potential chapter 11 process.

10.     Ducera's engagement also involves assisting the Debtors in marketing their assets, which process is described in further detail in the First Day Declaration.  I understand this sale process is intended to be the cornerstone of the Debtors' efforts to maximize estate value during these chapter 11 cases.  Given the Debtors' constrained liquidity position as described in the Whittman Declaration, I understand that the proceeds of the DIP Facility are required to fund the sale process.

11.     I have worked closely with the Debtors' management and other professionals retained by the Debtors with respect to preparing for these chapter 11 cases and have become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

## The Debtors' Efforts to Obtain Postpetition Financing

12.     At the onset of Ducera's engagement, the Debtors had just generated over $340 million Adjusted EBITDA for fiscal year 2022 and expected performance to strengthen upon the anticipated implementation of Phase 2 of its One Yellow initiative (as described in the First Day

Declaration).  Throughout early 2023, I along with other members of the Ducera team worked with the Debtors to explore various potential alternatives to refinance the Debtors' existing debt, reduce their cost of capital, and enhance their liquidity profile.  These alternatives were generally premised on the Debtors (a) continuing to operate as a going concern enterprise and (b) implementing Phase 2 of One Yellow, which I understood to be critical and foundational to the Debtors' future financial performance.

13.    As described in the First Day Declaration, the Debtors' liquidity position became significantly challenged during the second quarter of 2023.  I understand that the Debtors initially expected to have sufficient liquidity to fund operations through the pendency of a refinancing process; however, as described in the First Day Declaration, the Debtors' inability to implement One Yellow severely frustrated their business plan objectives and resulted in the rapid and unexpected deterioration of the Debtors' liquidity profile.  In an effort to secure incremental liquidity on an out-of-court basis to preserve going concern operations, I, along with members of the Ducera team working at my direction, assisted the Debtors in exploring various potential financial alternatives to enhance the Debtors' liquidity profile, including seeking to arrange an alternative ABL facility, seeking private equity investment, and deferring interest payments on existing debt.  These efforts were ultimately unfruitful as both third-party and existing investors were unwilling to extend credit without a clear "line of sight" to the implementation of One Yellow.  With no immediate financing solution available to shore up liquidity, I understand that the Debtors took various "self-help" actions to extend runway, including deferring payment of Central States Contributions (as defined in the First Day Declaration).  Shortly thereafter, the IBT issued a 72-hour strike notice to Yellow that was set to take effect on July 24, 2023.  As more fully described in the First Day Declaration, while the IBT ultimately lifted the threat of a

strike on July 23, 2023, the devasting impact of the strike notice on the Debtors' business, compounded by the breakdown of One Yellow, diminished both the Debtors' ability to continue operating as a going concern and the prospects of obtaining financing on an out-of-court basis.

14.     In light of the impact of the strike notice on the Debtors' business, the Debtors and their advisors rapidly began contingency planning.  Given the Debtors' diminished prospects as a going concern operating business, the Debtors and their advisors determined that an orderly wind-down and sale of their assets in chapter 11 would likely provide the best pathway to maximizing value for their estates.  As part of this contingency planning process, the Debtors and their advisors determined that postpetition financing would be required to provide the Debtors the runway needed to maximize value pursuant to a chapter 11 sale process for their extensive portfolio of assets.

15.     My team and I worked diligently with the Debtors and their advisors to develop a process to expeditiously seek debtor-in-possession financing on the most advantageous available terms for the Debtors' estates.  The principal objectives of this process were to (a) obtain runway necessary to fund a robust, competitive sale process to best position the Company to maximize the value of its assets for the benefit of all stakeholders, (b) secure sufficient liquidity to fund steps to preserve the value of the Debtors' assets (*e.g.*, securing the Debtors' facilities, costs associated with collecting accounts receivable and allowing customers to retrieve any freight remaining in the Debtors' network), as well as an orderly wind-down of the estate, and (c) work toward consensus among the Debtors' prepetition capital structure constituents to (i) avoid the cost and distraction of a contested postpetition financing process and (ii) implement a thorough and efficient sale and wind-down process supported by the Debtors' entire capital structure.

16.     With limited time available to secure debtor-in-possession financing following the rapid deterioration of the Debtor's liquidity position, my team and I, working on the Debtors' behalf, initiated discussions with the Debtors' existing capital structure constituents, including the Prepetition B-2 Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition UST Secured Parties.  In these discussions, the Prepetition B-2 Secured Parties were the only existing capital structure constituent that indicated a willingness to provide the Debtors with new money debtor-in-possession financing (beyond the use of cash collateral).  In parallel, I and my team launched a comprehensive third-party marketing process consisting of outreach to approximately 35 third-party financial institutions with particular industry experience in providing debtor-in-possession financing.  Ten of these parties executed confidentiality agreements and received access to a private data room containing extensive materials related to the Debtors' financials, operations, assets, organizational structure, and the opportunity to provide debtor-in-possession financing.

17.     Recognizing the Company's urgent liquidity constraints and immediate-term restructuring needs (which circumstances are described in detail in the First Day Declaration and the Whittman Declaration), we instructed all solicited and interested parties to provide proposals for postpetition financing on an expedited basis.  The Debtors received only one third-party indication of interest to provide a debtor-in-possession financing proposal, which proposal was based on public information only.  The inbound proposal was labeled "for discussion purposes only" and was premised upon having several additional weeks of diligence to determine if such a financing would be feasible on any terms.  It is my understanding that the Debtors could not wait several weeks to determine whether this highly uncertain financing would be available to the Debtors.  Further, despite my requesting this party to reconsider engagement with the Debtors—

provided such a process would need to progress over the course of days rather than weeks—this party, in no uncertain terms, indicated that weeks of diligence would be required to advance their potential interest.   Accordingly, with time being of the essence, I believe that this party's indication of interest could not realistically materialize into a viable or actionable alternative.

18.     As discussions regarding the DIP Facility progressed in earnest with the DIP Lenders, we continued to actively canvass the debtor-in-possession financing market for any and all available or possible alternatives.  These efforts included reaching out to several of the parties originally contacted as well as eight additional parties and soliciting interest on the basis of providing postpetition financing containing a new money component competitive with the DIP Facility (*i.e.*, in the range of $142.5 million of new money with approximately $60 million to be made available on an immediate basis).  In addition, the Debtors' advisors engaged with the Debtors' Prepetition ABL Secured Parties, which I understand have a first priority lien on the Debtors' cash and accounts receivable, regarding the possibility of the Debtors obtaining full access to their Cash Collateral (rather than only Available ABL Cash Collateral (as defined in the Interim Order)) in exchange for fees and certain other incremental economics.   The Prepetition ABL Secured Parties, however, indicated that they were not interested in pursuing any such arrangement with the Debtors and were only willing to consent to the use of Available ABL Cash Collateral pursuant to the terms of the Interim Order.  Notwithstanding these efforts, no alternatives to the proposed DIP Facility for postpetition financing materialized.  Thus, the Debtors pursued the DIP Facility as it represented the only actionable and available alternative to address their critical funding needs.

19.     In light of the Debtors' exigent liquidity needs and lack of actionable third-party alternatives on the expedited timeline required, I do not believe that viable alternative sources of

financing, other than the proposed DIP Facility, are readily available to the Debtors.  In addition, I am advised that substantially all the Debtors' assets (subject to customary exceptions) are encumbered by liens arising under the Debtors' prepetition funded debt facilities.  Thus, I do not believe that third-party debtor-in-possession financing is or would be reasonably available on a junior-lien basis, nor do I believe it would be advisable for the Debtors to engage in a costly and potentially drawn-out priming fight at the outset of these chapter 11 cases.  I likewise do not believe the Debtors should engage in a similarly costly and contested dispute regarding the non-consensual use of cash collateral with the Prepetition ABL Secured Parties at the outset of these cases.  I believe that any such outside financing could expose the Debtors to the execution risk associated with a new lender transaction, including material timing and due diligence constraints.  Further, several parties representing potential sources of financing indicated to me that the Debtors entanglement with the IBT (which circumstances are discussed in detail in the First Day Declaration) foreclosed any interest they might have otherwise had in offering debtor-in-possession financing to the Debtors.

20.    Based upon the foregoing, it is my belief that the DIP Facility represents the best and only postpetition financing option presently available to address the Debtors' immediate liquidity needs and to fund the Debtors' chapter 11 cases.  Further, I believe that the terms and conditions of the DIP Documents are reasonable and appropriate under these circumstances.  The Roll-Up provision was a material requirement for the DIP Lenders to provide the DIP Facility, and the DIP Lenders consistently indicated to the Debtors and their advisors that the DIP Facility would not be extended without the Roll-Up provision contained therein.  Moreover, the economics and Fees under the DIP Facility were heavily negotiated at arms' length and represent, in my opinion, the only available terms under the unique circumstances the Debtors

face.  The DIP Lenders' fee arrangement under the proposed DIP Facility provides that the DIP Lenders will earn the DIP Closing Fee (as defined in the Fee Letter (as defined in the DIP Credit Agreement)) on the Closing Date with the Fixed Amount portion thereof to be payable on the Closing Date and the Variable Amount portion thereof to be payable on the earliest to occur of July 31, 2025, the date on which the Chapter 11 Cases are converted to a chapter 7 and the effective date of any plan of reorganization.  Per my calculations, the DIP Closing Fee (inclusive of the Fixed Amount and Variable Amount) could reach as high as $32 million prior to maturity of the DIP Facility, representing 22.6% of the New Money DIP Term Loans.  However, the Variable Amount (representing $25 million of the $32 million total potential Fee) will not be payable until such time as the Prepetition UST Secured Parties are paid in full.  The Admin Fee (as defined in the Agency Fee Letter (as defined in the DIP Credit Agreement)), in the amount of $35,000, will be due and payable to the DIP Agent annually, commencing on the Closing Date. The Debtors engaged in extensive, hard-fought negotiations with the DIP Lenders regarding the DIP Facility that achieved meaningful improvements including:  (a) a significant reduction in the cost of the DIP Facility relative to initial proposals; (b) flexibility to repay or refinance the DIP Facility early without incurring a substantial portion of the Fees; and (c) extended maturity and milestones to meet the Debtors' objectives for a value-maximizing sale process, among other enhancements.  Critically, these negotiations yielded flexibility in the fee structure to refinance the DIP Facility early and avoid a significant portion of the Fees if a more cost-effective debtor-in-possession financing alternative becomes available.  If such an alternative becomes available and the Debtors are able to fully repay the DIP Facility through a refinancing or otherwise by September 8, 2023, the Fees under the DIP Facility would be reduced to approximately $7 million (5% of New Money DIP Term Loans).

21.     Ultimately, the DIP Lenders indicated that the Fees contemplated by the DIP Facility were requirements for their commitment to provide the DIP Facility.  Lacking any available alternatives, agreeing to the Fees became necessary to secure the proposed DIP Facility from the DIP Lenders.  Accordingly, in my opinion, the DIP Facility (including the Fees) should be approved as a sound and reasonable exercise of the Debtors' business judgment to obtain critical funding and preserve estate value.  The DIP Facility is the product of good faith, arm's length negotiations between the Debtors and the DIP Lenders and is an essential component of the Debtors' wind-down and sale efforts and ability to maximize estate value for the benefit of all stakeholders.

22.     As mentioned above, Ducera has also been engaged by the Debtors to assist the Debtors in conducting a comprehensive marketing process for all of their assets.   My understanding is that the Debtors have had their extensive portfolio of real estate, equipment, and other assets professionally appraised at an aggregate value that, if fully monetized at such apparently appraised valuation, would exceed the aggregate amount of the Debtors' prepetition secured debt and the DIP Facility.  Ducera has begun to, and will continue to, work diligently with the Debtors' management to achieve a value-maximizing sale of the Debtors' assets with the goal of achieving the highest possible recoveries to creditors.  Even factoring in the costs and Fees of the proposed DIP Facility, I believe that the continuation and ultimate completion of this sale-and-marketing process will serve to maximize value of the estates.  On the other hand, I am advised that a chapter 7 liquidation would involve shutting down operations entirely, including losing the entirety of the Debtors' management team and potentially the ability to maintain the Debtors' assets in advance of their sales (with such maintenance costs contemplated by the Agreed Budget).  Several individuals on the Debtors' management team possess key expertise in

the Debtors' sophisticated and industry-specific assets as well as have critical relationships with the likely and prospective purchasers of these assets (*i.e.*, the Debtors' industry competitors). Furthermore, the Debtors have an extensive tangible asset base, including hundreds of owned and leased properties and tens of thousands of units of rolling stock across the United States and Canada. The company-specific knowledge and expertise of the Debtors' real estate, asset management, and other personnel is critical to supporting the informational and logistical requirements of a value-maximizing sale process in light of the breadth and complexity of the Debtors' assets. Accordingly, I believe that conducting the sale process through these chapter 11 cases, harnessing the New Money DIP Term Loans provided by the DIP Facility along with the continued efforts of the Debtors' advisors in consultation with these individuals from management most familiar with the Debtors' assets, as opposed to liquidating the Debtors' assets through a potentially disorderly chapter 7 process, will ultimately yield incremental value to the estates above the costs and fees of the DIP Facility.

23.    The proposed DIP Facility will provide the Debtors with immediate access to liquidity that will fund these cases and the Debtors' value-maximizing objectives. No financing alternative to the proposed DIP Facility is readily available following a thorough canvassing of the debtor-in-possession financing market. The DIP Facility, in my opinion, contains the best possible terms available under the circumstances following hard-fought and around-the-clock negotiations with the DIP Lenders conducted in good faith. Accordingly, I believe that the DIP Facility should be approved on the terms and conditions described in the DIP Motion and as set forth in the DIP Documents.

## Conclusion

24.    I believe that the Debtors lack any viable or available postpetition financing alternatives to the proposed DIP Facility. Based upon my understanding of the Debtors'

13

projections and liquidity position (as described in the Whittman Declaration and set forth in the Initial DIP Budget), the Debtors urgently require access to the New Money Term Loans under the DIP Facility (and to Available ABL Cash Collateral) to effectively run their chapter 11 process, including to conduct an orderly wind-down of their operations and a robust, competitive, and value-maximizing sale process with the goal of maximizing the value of their assets for the benefit of all stakeholders.  I believe that the DIP Facility reflects the best possible (and only) financing currently available to the Debtors and that the terms thereof, taken as a whole, are reasonable and appropriate under the facts and circumstances of these chapter 11 cases.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  August 7, 2023                  */s/ Cody Leung Kaldenberg*
_____
                                        Cody Leung Kaldenberg
                                        Partner
                                        Ducera Partners LLC