**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | ) ) ) | Case No. 23-11069 (___) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO CONSENT TO LIMITED RELIEF FROM
THE AUTOMATIC STAY TO PERMIT SETOFF OF CERTAIN CUSTOMER
CLAIMS AGAINST THE DEBTORS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion:[2]

**Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order"): (a) authorizing the Debtors to consent, in their sole discretion, to limited relief from the automatic stay solely to permit modifying the automatic stay in order to setoff certain customer claims against the Debtors and (b) granting related relief. In addition, the Debtors request that the

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2] A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not immediately defined in this motion have the meanings ascribed to them later in this motion or in the First Day Declaration as applicable.

Court schedule a final hearing within approximately twenty-one days of the commencement of these chapter 11 cases to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a), 362, and 553 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

## Background

5. The Debtors were a leading provider of transportation services with a 100-year history. With its family of trucking brands—Yellow Logistics, Holland, Reddaway, New Penn, and YRC—the Debtors provided their customers with one of the most comprehensive less-than-truckload ("LTL") networks in North America.

6. The Debtors commenced these chapter 11 cases to implement a timely and efficient process to maximize the value of the Debtors' estates for the benefit of all stakeholders. Through

these chapter 11 cases, the Debtors will immediately commence an orderly and value-maximizing wind-down of their businesses. The Debtors will use their time in chapter 11 to market a sale or sales of all or substantially all of their assets.

7. On August 6, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are managing their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no official committees have been appointed or designated.

### Description of Customer Programs

8. When operating, the Debtors historically offered volume discounts, rebates, allowances, and other reimbursements to their customers (the "Customer Programs"). In connection therewith, the Debtors also paid certain claims to customers related to the Customer Programs in the ordinary course. The Debtors' Customer Programs are each described in turn.

**I. Pricing Programs.**

9. The Debtors historically offered their customers certain pricing programs, including Volume Discounts, Customer Allowances, Accounts Receivable Credits, Deposits, Overpayment Credits, and Rerating (each as defined herein, and collectively, the "Pricing Programs"). Such Pricing Programs are commonly utilized in the transportation

industry. As of the Petition Date, the Debtors estimate that their aggregate Pricing Program obligations are approximately $60.6 million.[3]

### A. Volume Discounts and Customer Allowances.

10. The Debtors previously offered certain volume rebates to their customers in the ordinary course and as agreed upon in individual pricing programs (the "Volume Discounts"). The Debtors offered the Volume Discounts to customers whose shipment activity or revenue levels reached a certain threshold and such thresholds were based on the individual pricing programs agreed to by the Debtors with their customers. At any given time, the accrued amount of the Volume Discounts varied based on the number and type of customer shipments and the individual programs agreed to with their customers. The Debtors determined and paid the Volume Discounts in arrears on a monthly basis based on the actual shipments that had been made and pursuant to past business levels with each applicable customer. Payments were either made automatically or upon a written request by a customer. Thus, the Debtors' obligations with respect to Volume Discounts varied from month-to-month.

11. The Debtors also offered certain rebates to their customers based on certain services performed by customers that would otherwise be performed by the Debtors as a part of their standard service offering (collectively, the "Customer Allowances"). Specifically, the Debtors provided Customer Allowances to customers (a) where the customer loaded and unloaded goods on or off the Debtors' trailers themselves rather than relying on the Debtors to provide this service, (b) for using pallets for their goods that were being transported on outbound freight; or (c) for reduced costs for certain customers who picked up goods directly from one of the Debtors'

---

[3] Importantly, the precision of the Debtors' estimates for the amounts owed pursuant to the Customer Programs is dependent on the time of the month such measurement is made, and all such estimates are subject to adjustment.

terminals and hauled their own goods to their final destination. Because the amount the Debtors invoiced to their customers was calculated based on the mileage from the pick-up point of origin to the zip code for the final destination, the applicable Customer (as defined herein) would receive a reimbursement for partially delivering the goods.

12.     As of the Petition Date, the Debtors estimate that the aggregate Volume Discounts and Customer Allowances available to the Debtors' customers was approximately $3.3 million.

     B.     **Accounts Receivable Credits, Deposits, and Overpayment Credits.**

13.     The Debtors incurred credits in their accounts receivable in the ordinary course arising from duplicate customer payments, payments from customers that were not related to a specific charge or invoice, and other miscellaneous customer credits appearing in the Debtors' books and records (collectively, the "<u>Accounts Receivable Credits</u>"). The Debtors may therefore owe their customers a credit or reimbursement for the amount of the applicable Accounts Receivable Credit.

14.     The Debtors routinely incurred credits through their accounts receivable reconciliation process in the ordinary course where customers had inadvertently overpaid for the Debtors' services (collectively, "<u>Overpayment Credits</u>"). As a result, the Debtors may be legally obligated to reimburse their customers upon the receipt of a filed written claim from a customer for an Overpayment Credit under federal regulations that govern overpayments to common motor carriers, such as the Debtors, that are set forth in 49 C.F.R. 378. Once a customer has provided the Debtors with written notice of a claim for an Overpayment Credit under 49 C.F.R. 378, the Debtors typically investigate the potential Overpayment Credit and generally settle on an agreed reimbursement amount within approximately sixty days of receipt of the written notice. Due to the length of time of this reconciliation process, it is difficult to accurately estimate the amounts owed to customers for the Overpayment Credits. In addition, many of the Customer Contracts (as

defined herein) provide Customers with an offset right in connection with Overpayment Credits. The Debtors estimate that, as of the Petition Date, the sum of the Accounts Receivable Credits and the Overpayment Credits is approximately $20 million.

15. The Debtors also routinely required deposits (collectively, the "Deposits") in the ordinary course of business from certain customers, based on each such customer's creditworthiness, to secure each such customer's obligations to the Debtors. The Debtors hold the Deposits until the Debtors have rendered all services, at which time the customer will request the return of its Deposit. As of the Petition Date, the Debtors estimate they currently hold approximately $500,000 on account of Deposits owed to Customers.

### C. Rerating and Revenue Claims.

16. The Debtors assigned pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination, and individual customer discounts, which is a process called rating. Following the initial rating, the Debtors (or their customers) may have identified errors based on many factors, including weight verifications, corrected bills of lading submitted by the customer, updated customer discounts, and a variety of other factors. Customer invoices were corrected in the ordinary course through a rerating process ("Rerating"). In addition, customers may file a revenue claim where the Customer believes certain services were overcharged on the invoice ("Revenue Claims"). Many of the Customer Contracts provide customers with an offset right in connection with Rerating obligations. As of the Petition Date, the Debtors estimate that they have aggregate Rerating and Revenue Claims obligations of approximately $25.6 million.

## II. Customer Cargo Claims.

17. Pursuant to 49 U.S.C. § 14706, the Debtors' motor carrier subsidiaries may have been liable for the loss or damage of goods in transit (collectively, the "Cargo Claims"). The

Cargo Claims arose in the ordinary course of the Debtors' business. Customers filed written claims with the Debtors evidencing the loss or damage and requested payment on account of the Cargo Claims. The Debtors evaluated the amount owed for such Cargo Claim based on several factors, including shipment documentation (bill of lading and delivery receipt), applicable tariff or contract limits, documented purchase value, mitigated repair costs, and any excess coverage options selected by the customer at the time of the shipment. Cargo Claims were generally filed by customers within nine months after shipment of the customer's goods. Most Cargo Claims were paid, declined, or compromised within three months of the filing of a Cargo Claim, and, once the Debtors declined payment for a Cargo Claim, customers generally had two years to file a lawsuit contesting such declined payment. In addition, many of the Customer Contracts provide Customers with an offset right in connection with Cargo Claims. As of the Petition Date, the Debtors estimate that their accrued obligations on account of Cargo Claims are approximately $11.2 million.

### III. Customer Contracts.

18. Pursuant to many of the contracts (the "Customer Contracts") between the Debtors and their customers (the "Customers"), the Debtors and/or certain of their Customers possess certain rights to offset or set off amounts owed to the Customers or Debtors, as applicable. The Debtors submit that authority to allow certain of these Customers to set off amounts owed to Customers on account of the Customer Programs is essential to preserving the Debtors' accounts receivable portfolio and maximizing the value of the Debtors' estates.

19. In the event a Customer Contract does not provide for the right to offset amounts owed to the Debtors or Customers, the Debtors propose that they be authorized to enter into a form agreement that provides for an offset right in exchange for the Customer promptly remitting the applicable receivables to the Debtors. Accordingly, the Debtors seek the authority, but not

direction, to enter into a form agreement setting forth limited setoff rights, substantially in the form attached hereto as **Exhibit C** (each, a "Setoff Agreement"), solely for the purpose of conducting a setoff of amounts owed to the Debtors or the applicable Customer, for the purpose of inducing the Customer to remit accounts receivable owed to the Debtors. As of the Petition Date, the Debtors estimate that they are owed approximately $485 million in prepetition accounts receivable. Accordingly, the Debtors submit that it is imperative to be able to setoff amounts as provided in certain Customer Contracts and to the extent such Customer Contracts do not provide for the right to offset amounts, enter into the Setoff Agreements, in the Debtors' sole discretion, in order to maximize the value of the estates for all stakeholders during these chapter 11 cases.

## Basis for Relief

**I.    Cause Exists to Lift the Automatic Stay to Permit Payment Offsets.**

20.    Section 362(a)(7) of the Bankruptcy Code provides that filing a petition stays "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor." The Court, however, may lift the automatic stay for "cause." 11 U.S.C. § 362(d)(1). "Section 362(d)(1) does not define 'cause,' leaving courts to consider what constitutes cause based on the totality of the circumstances in each particular case." *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997). Provided that a court lifts the stay, section 553(a) of the Bankruptcy Code protects in bankruptcy the "right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case." *See In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 896 F.2d 54, 57 (3d Cir. 1990) ("The rule allows parties that owe mutual debts to state the accounts between them, subtract one from the other and pay only the balance."); *United States v. Norton*, 717 F.2d 767, 772 (3d Cir. 1983)

("[Section 553] is generally understood as a legislative attempt to preserve the common-law right of setoff arising out of non-bankruptcy law.").

21.   As discussed above, the Debtors owe prepetition amounts to certain Customers on account of the Customer Programs. Certain of these Customers also, however, owe the Debtors prepetition amounts. Many of the Customer Contracts provide the Debtors and/or the Customers with the right to offset certain mutual debts. Effecting an offset of these amounts as permitted under applicable Customer Contracts and applicable law is necessary to ensure that Customers do not withhold receivables from the Debtors that substantially outweigh the amounts that the Debtors owe such Customers. Accordingly, granting the related relief will enable the Debtors to collect on outstanding accounts receivable from Customers, which will benefit the Debtors estates and all stakeholders. Additionally, modifying the automatic stay solely for the limited purpose of allowing certain Customers to offset prepetition debts will reduce the administrative burdens on the Court by eliminating the need for the Court to adjudicate the setoff. Accordingly, cause exists to modify the automatic stay solely for the limited and exclusive purpose allowing the Customers and/or Debtors, as applicable, to permit setoffs and collect valuable receivables. *See*, *e.g.*, *In re Lannett Company, Inc.*, No. 23-10559 (JKS) (Bankr. D. Del. June 5, 2023) (granting request to allow for setoff of mutual debts); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 28, 2019) (allowing for payment of debts via setoff); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Mar. 19, 2013) (granting request to modify the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code to allow debtors to effect setoffs); *In re SuperMedia Inc.*, No. 13-10545 (KG) (Bankr. D. Del. Mar. 19, 2013) (same); *In re Local Insight Media Holdings, Inc.*, No. 10-13677 (KG) (Bankr. D. Del. Nov. 19, 2010) (same).

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

22. Under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored. Therefore, the Debtors request authority, but not direction, to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**The Requirements of Bankruptcy Rule 6003(b) Are Satisfied**

23. Bankruptcy Rule 6003 empowers a court to grant certain relief within the first twenty-one days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical, and the failure to receive the requested relief during the first twenty-one days of these chapter 11 cases could impact the Debtors' operations at this important juncture. The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

24. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Reservation of Rights**

25. Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, priority, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

26. The Debtors will provide notice of this motion to: (a) the United States Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the

United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the DIP Agent and counsel thereto; (i) Milbank LLP, as counsel to certain investment funds and accounts managed by affiliates of Apollo Capital Management, L.P.; (j) the administrative and collateral agents under the B-2 Term Loan and counsel thereto; (k) the ABL Agent and counsel thereto; (l) White & Case LLP, as counsel to Beal Bank USA; (m) the administrative and collateral agents under the UST Credit Agreements and counsel thereto; (n) the United States Department of Justice and Arnold & Porter Kaye Scholer LLP as counsel to the United States Department of the Treasury; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties"). As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m). In light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

27. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated: August 7, 2023
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (*pro hac vice* pending) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (*pro hac vice* pending) |
| Peter J. Keane (DE Bar No. 5503) | Whitney Fogelberg (*pro hac vice* pending) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |
| Wilmington, Delaware 19801 | Telephone: (312) 862-2000 |
| Telephone: (302) 652-4100 | Facsimile: (312) 862-2200 |
| Facsimile: (302) 652-4400 | Email: patrick.nash@kirkland.com |
| Email: ljones@pszjlaw.com | david.seligman@kirkland.com |
| tcairns@pszjlaw.com | whitney.fogelberg@kirkland.com |
| pkeane@pszjlaw.com | |
| ecorma@pszjlaw.com | -and- |
| | Allyson B. Smith (*pro hac vice* pending) |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone: (212) 446-4800 |
| | Facsimile: (212) 446-4900 |
| | Email: allyson.smith@kirkland.com |

*Proposed Co-Counsel for the Debtors and Debtors in Possession*