**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF AN
ORDER (I)(A) APPROVING BIDDING PROCEDURES FOR THE
SALE OR SALES OF THE DEBTORS' ASSETS; (B) SCHEDULING
AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE
THEREOF; (C) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES,
(D) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER
OF NOTICE THEREOF; (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES
AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

as follows in support of this motion:[2]

**Preliminary Statement**

1.    As discussed in the First Day Declaration, the Debtors filed these chapter 11 cases

to effectuate a sale or sales of some or all of the Debtors' assets and, in parallel, commence an

orderly wind-down of the Debtors' businesses to maximize value for all stakeholders.  Through

this motion, the Debtors seek the Court's approval of bidding procedures pursuant to which they

will seek bids for the sale or sales of their assets, which include a significant portfolio of owned

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of Debtors'
principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street,
Suite 400, Overland Park, Kansas 66211.

[2]    A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to
the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer
of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions*
(the "First Day Declaration"), filed contemporaneously herewith.

real property across numerous states as well as thousands of trucks, trailers, and other forms of operational equipment. To preserve the value of the Debtors' estates—and to offer the Debtors a chance to increase the ultimate value provided by the monetization and disposition of their assets—the Debtors propose the expedited timeline set forth herein. The Debtors will consider all viable options in accordance with the Bidding Procedures before determining if selling assets will, in their business judgment, maximize value for the estate.

2.     The proposed sale process is the product of substantial discussion and planning by the Debtors. As more fully described in the First Day Declaration and the Kaldenberg Declaration,[3] in the face of increasing operational inefficiencies and union disputes, the Debtors were forced to take the first steps towards implementing a full-scale wind-down of their business operations. Pursuant to this motion, the Debtors seek to formalize bidding procedures designed to maximize value for all stakeholders and minimize disruptions to the Debtors' wind-down efforts. The bidding procedures attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures")[4] provide the Debtors with significant flexibility to market substantially all of the Debtors' assets (collectively, the "Assets") in one or multiple transaction(s) (each, a "Sale Transaction"). If approved, the proposed Bidding Procedures will enable the Debtors to

---

[3]   The Debtors intend to file in support of this motion the *Declaration of Cody Kaldenberg In Support of the Debtors Motion for Entry of an Order (I)(A) Approving the Bidding Procedures For the Sale or Sales of the Debtors' Assets, (B) Scheduling an Auction and Approving the Form and Manner of Notice Thereof; (C) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (VI) Granting Related Relief* in advance of the hearing to approve this motion.

[4]   Capitalized terms used but not defined in this motion have the meanings ascribed to them in the Bidding Procedures and the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion"). All references to the Bidding Procedures herein are qualified in their entirety to the Bidding Procedures themselves.

expeditiously sell their Assets free and clear of all liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, encumbrances, and other interests (collectively, the "Encumbrances") and completely and successfully wind down all operations thereafter.

3.     The Bidding Procedures provide sufficient time for the Debtors to market the Assets, receive and evaluate bids, execute a Stalking Horse Agreement (as defined in the Bidding Procedures), if applicable, and hold an auction for the Debtors' Assets (the "Auction"), as necessary, to determine the highest or otherwise best bid for the Assets.

4.     The Debtors commenced these chapter 11 cases with committed postpetition financing in the form of a DIP Facility, granting the Debtors with runway to pursue a sale or sales of the Debtors' Assets.  Pursuant to the DIP Credit Agreement, the Debtors must satisfy certain milestones (the "DIP Milestones") for the sale of their Assets, including:

- any Stalking Horse Agreement must be executed not later than 55 days after the Petition Date;

- any Bid Deadline must be not later than 70 days after the Petition Date; and

- any Sale Transactions must be consummated not later than 90 days after the Petition Date.

5.     A thorough yet expedited bidding process and consummating Sale Transactions are vitally important to the Debtors' efforts to maximize value by selling the Assets.  The expeditious timeline set forth in the Bidding Procedures is necessary to comply with the milestones in the DIP Facility but is also reasonable under the circumstances of this chapter 11 case.

6.     The Bidding Procedures and the related relief requested in this motion are in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors respectfully request that the Court grant this motion.

## Relief Requested

7.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Bidding Procedures Order"):[5]

     (a)      authorizing and approving the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order;

     (b)      authorizing the Debtors to enter into a Stalking Horse Agreement with and provide certain Bid Protections to one or more Stalking Horse Bidders (each as defined below);

     (c)      approving the form and manner of notice of the auction, attached Bidding Procedures Order as Exhibit 2 (the "Auction Notice"), the notice of Winning Bidder, attached to the Bidding Procedures Order as Exhibit 3, and the notice of designation of the Stalking Horse Bidder (the "Stalking Horse Notice");

     (d)      approving procedures for the assumption and assignment of the Assigned Contracts in connection with any Sale (the "Assumption and Assignment Procedures"), and approving the form and manner of the notice thereof, attached as Exhibit 4 to the Bidding Procedures Order (the "Cure Notice");

     (e)      scheduling certain dates with respect thereto; and

     (f)      granting related relief.

## Jurisdiction and Venue

8.      The United States Bankruptcy Court for the District of Delaware (the "Court") has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

*Order of Reference* from the United States District Court for the District of Delaware, dated

February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the

Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection

with this motion to the extent that it is later determined that the Court, absent consent of the parties,

---

[5]    For the avoidance of doubt, the Debtors will file proposed sale orders in advance of any Sale Hearing.

cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.        Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.        The statutory bases for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6004, 6006, and 6007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, and 9013-1.

## The Proposed Sale Process

### I.        The Prepetition Marketing Process.

11.        Prior to the Petition Date, Ducera Partners LLC ("Ducera"), the Debtors' proposed investment banker, commenced a robust marketing process for the sale or sales of all or a subset of the Debtors' Assets with the goal of maximizing the value of the Debtors' estates in the event of a chapter 11 filing.  As part of this prepetition process, Ducera contacted over 200 interested parties, including various financial institutions and other strategic buyers, that were considered likely participants in a sale process of the Debtors' assets, and provided such parties with marketing materials.  In addition to identifying potential bidders, prior to the Petition Date, Ducera began collecting and organizing diligence materials for inclusion in a virtual data room, access to which was provided to 63 interested parties that executed confidentiality agreements with the Debtors. The Debtors expect that additional parties will become aware of the potential sale through the chapter 11 process, thus driving even more interest in the Debtors' Assets.

12.        Contemporaneous with Ducera's asset marketing process, on the Petition Date, after extensive arm's-length negotiations with their prepetition secured lenders, the Debtors were able to secure the proposed DIP Facility of approximately $142.5 million in new money, as further

described in the DIP Motion.  The liquidity provided by the DIP Facility will facilitate the Debtors'

implementation of a fulsome and value-maximizing asset marketing process pursuant to the

Bidding Procedures.

## II.     The Proposed Schedule.

13.     Pursuant to the Bidding Procedures, the Debtors will solicit the highest or otherwise

best proposals according to the following proposed schedule, subject to Court approval and

availability:

| Date and Time (all times in Eastern Time) | Event or Deadline |
| --- | --- |
| August 18, 2023 | Deadline for Indications of Interest |
| September 30, 2023 | Deadline to execute a Stalking Horse Agreement |
| October 15, 2023 | Bid Deadline |
| October 18, 2023 | Auction (if required) |
| October 20, 2023 | Notice of Winning Bidder |
| October 23, 2023 | Sale Objection Deadline for Bids |
| October 26, 2023 | Sale Hearing as to Winning Bid(s) (or Back-Up Bid(s), as applicable) |

14.     The Debtors believe that this timeline balances a thorough marketing process to

maximize value with the need to proceed expeditiously, as required under the Debtors' postpetition

financing.  In addition to the Debtors' marketing efforts thus far, the Debtors will utilize the time

prior to, and after, entry of the Bidding Procedures Order to actively market the Assets to expedite

the solicitation of bids for the Debtors' Assets in advance of the applicable bid deadline

(the "Bid Deadline").  In light of the foregoing, the Debtors have determined that the proposed

schedule is in the best interests of the Debtors' estates, will assist in establishing whether and to

what extent a market exists for the Assets, and provides interested parties with sufficient

opportunity to participate in any sale transaction(s) and ultimately, will result in the highest and best bid for the underlying Assets under the circumstances.

### III.    The Bidding Procedures.

15.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order.[6]  The proposed Bidding Procedures are designed to permit a fair, efficient, competitive, and value-maximizing auction process for the Debtors' assets, consistent with the Debtors' goal of implementing a cost-effective wind-down.

16.    The Bidding Procedures will provide potential bidders with ample notice and time to conduct thorough due diligence to submit binding bids in advance of the sale hearing as to any Winning Bid(s) (or Back-Up Bid(s), as applicable) (if required) for the Debtors' Assets (the "Sale Hearing").  The Debtors and their advisors have already commenced a marketing and sale process to confirm the market value of the Debtors' assets.  The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward, effectuate an expeditious wind-down process with minimal disruption, and create a path towards entry of the sale order (the "Sale Order") that embodies the highest or otherwise best available recoveries for the Debtors' stakeholders. The proposed Bidding Procedures is in the best interests of all stakeholders, complies with the Milestones set forth in the Interim DIP Order, and should be approved.

---

[6]    This summary is qualified in its entirety by the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings given to such terms in the Bidding Procedures.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

17.     The Debtors also request authority, as set forth in the Bidding Procedures Order, to (a) select one or more Stalking Horse Bidders and enter into Stalking Horse Agreements, and (b) in connection with any Stalking Horse Agreement with a Stalking Horse Bidder, provide Bid Protections to the extent the Debtors determine that provision of such Bid Protections would be an actual and necessary cost of preserving the value of the Debtors' estates.  Importantly, with respect to any Stalking Horse Agreement, the aggregate of the Cash Breakup Fee and the total Expense Reimbursements shall in no event exceed 3 percent of the applicable Purchase Price.

18.     Having the flexibility to designate one or more Stalking Horse Bidders and provide Bid Protections will provide the Debtors with the ability to maximize the value of the Assets. Given the Debtors' need to maximize value for creditors and other stakeholders through a timely and efficient marketing process, the ability to designate Stalking Horse Bidders and offer Bid Protections to each such bidder (although the Debtors ultimately may, in the exercise of their reasonable business judgment, not designate a Stalking Horse Bidder at all) is a reasonable and sound exercise of the Debtors' business judgment and provides an actual benefit to the Debtors' estates.

19.     The following describes the salient points of the Bidding Procedures and discloses certain information required pursuant to Local Rule 6004-1:[7]

| Requirement | Description |
| --- | --- |
| **Potential Bidders & Acceptable Bidders** | To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale Transaction (a "Potential Bidder") must deliver or have previously delivered to the Debtors and each of their advisors the following documents and information (unless the Debtors, in their reasonable business judgment after |

---

[7]     The following summary is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects.  Capitalized terms used in this summary but not defined herein shall have the meanings ascribed to them in the Bidding Procedures.

| Requirement | Description |
|---|---|
| | consultation with the Consultation Parties, choose to waive any of the requirements set forth in this Section 3 for any Potential Bidder): |
| | A. a statement and other factual support demonstrating, to the Debtors' satisfaction, that the Potential Bidder has a *bona fide* interest in purchasing any or all of the Assets and is likely to be able to submit a Qualified Bid (as defined below) by the Bid Deadline (as defined below), and has the financial ability to consummate its proposed Sale Transaction; |
| | B. a description of any connections the Potential Bidder, its affiliates, and related persons have to the Debtors, any current or former directors and officers of the Debtors, their non-Debtor affiliates, and their primary creditors as identified by the Debtors; |
| | C. an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"); |
| | D. the identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on such Potential Bidder's behalf for all purposes regarding the contemplated Sale Transaction(s); and |
| | E. an optional non-binding written indication of interest specifying, among other things, with respect to any proposed Sale Transaction, the identity of the Assets to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such Potential Bidder. |
| | The Debtors will provide copies of materials delivered by any Potential Bidder prior to the date of these Bidding Procedures upon reasonable request by the Consultation Parties and/or their counsel. |
| | The Debtors, in their reasonable business judgment, following consultation with the Consultation Parties, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a Bid (as defined herein) (such Potential Bidder, an "Acceptable Bidder"). |
| | The Debtors may, in their reasonable business judgment, conduct a process for the sale of unsold Assets that are not included in any Winning Bid(s), subject to the terms of the DIP Credit Agreement. |
| **Due Diligence** | The Debtors, with their advisors, have established an electronic data room or rooms (the "Data Room") that provide standard and customary diligence |

| Requirement | Description |
|---|---|
| | materials, including information to allow Acceptable Bidders to submit a Qualified Bid (as defined below) and to seek and obtain financing commitments.<br><br>Only Acceptable Bidders shall be eligible to receive due diligence information and access to the Data Room and to additional non public information regarding the Debtors.  Subject to the other terms herein, the Debtors may provide to each Acceptable Bidder reasonable due diligence information, as requested by such Acceptable Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall use commercially reasonable efforts to post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' Data Room.  The due diligence period for any Stalking Horse Bidder (as defined herein) will end prior to execution of the applicable Stalking Horse Agreement, unless otherwise agreed pursuant to the applicable Stalking Horse Agreement.  For all Acceptable Bidders other than any Stalking Horse Bidder, the due diligence period will end on the Bid Deadline.  The Debtors may, in their reasonable business judgment after consultation with the Consultation Parties, but shall have no obligation to, furnish any additional due diligence information to any person following execution of a Stalking Horse Agreement or the Bid Deadline, as applicable.<br><br>The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or the Sale(s) to any person except to an Acceptable Bidder or to such Acceptable Bidder's duly authorized representatives subject to the applicable Confidentiality Agreement.  The Debtors and their advisors shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment and after consultation with the Consultation Parties, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate the applicable Sale Transaction.<br><br>Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets (a) to any person or entity who is not an Acceptable Bidder or (b) if and to the extent doing so would (1) violate any law to which the Debtors are subject, including any privacy law, (2) result in the disclosure of any trade secrets of third parties in breach of any contract with such third party, (3) violate any legally-binding obligation of any Debtor with respect to confidentiality, non-disclosure or privacy or (4) jeopardize protections afforded to any Debtor under the attorney-client privilege or the attorney work product doctrine (provided, that, in case of each of clauses (1) through (4), the Debtors shall use commercially reasonable efforts to (x) provide such access as can be provided (or otherwise convey such information regarding the applicable matter as can be conveyed) without violating such privilege, doctrine, contract, obligation or law and (y) provide such information |

| Requirement | Description |
|---|---|
|  | in a manner without violating such privilege, doctrine, contract, obligation, or law). |
|  | The Debtors also reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure, including to an Acceptable Bidder whom the Debtors determine in consultation with the Consultation Parties is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be an Acceptable Bidder. |
|  | **All due diligence requests directed to the Debtors must be directed to yellow@ducerapartners.com.** |
|  | **Each Potential Bidder or Acceptable Bidder (as defined below) shall comply with all reasonable requests with respect to information and due diligence access by the Debtors or their advisors regarding such Potential Bidder or Acceptable Bidder, as applicable, and its contemplated Sale Transaction.** |
| **Bid Requirements** | Any proposal, solicitation, or offer to consummate a Sale Transaction (each, a "<u>Bid</u>") must be submitted in writing and must satisfy the following requirements (collectively, the "<u>Bid Requirements</u>"): |
|  | A. **<u>Proposed Sale Transaction.</u>** Each Bid must clearly propose a Sale Transaction as to the Assets. Each Bid must specify (1) which of such Assets are to be included in the proposed Sale Transaction (the "<u>Acquired Assets</u>") and (2) to the extent such Bid is for substantially all of the Assets, which Assets are to be excluded from the proposed Sale Transaction (the "<u>Excluded Assets</u>"), in each case, as well as the disposition of any liabilities or obligations of the Debtors. For the avoidance of doubt, all Assets held by non-Debtor subsidiaries primarily related to the non-U.S. businesses of the Debtors shall be presumed to be Excluded Assets. |
|  | B. **<u>Purchase Price.</u>** Each Bid must clearly specify a purchase price, including and identifying separately any Cash and non-Cash components in US dollars (the "<u>Purchase Price</u>"). A Bid that encompasses less than all of the Assets but includes multiple businesses, segments, or groups of assets must contain sufficient information as to allow the Debtors to determine an allocation of value among each business, segment, or group of assets. If the Debtors select a Stalking Horse Bidder (as defined below) for such assets, then such Purchase Price shall exceed such Stalking Horse Bid (as defined below) by at least the aggregate sum of (1) the Bid Protections (as defined below) for such assets, and (2) such |

| Requirement | Description |
|---|---|
| | additional amount as determined by the Debtors in their reasonable business judgment after consultation with the Consultation Parties. |

C. **Deposit.** Each Bid other than a credit bid must be accompanied by a Cash deposit equal to ten percent (10%) of the applicable aggregate Purchase Price (the "Deposit"), to be held in one or more escrow accounts on terms acceptable to the Debtors and the Consultation Parties; *provided*, *however*, that the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, may elect to waive or modify the requirement of a Deposit on a case-by-case basis. For the avoidance of doubt, to the extent the Purchase Price of a Bid is increased, at any time or from time to time, whether prior to commencement of the Auction or during the Auction, the amount of the Deposit shall automatically increase accordingly (to be equal to 10% of any increased Purchased Price) and the corresponding bidder will pay into escrow the amount of such increase, as promptly as practicable, and in any event within one business day, following such increase. Without limiting the foregoing, if a Purchase Price is increased in order to make a bid into a Qualified Bid, the Debtors may condition participation of the applicable bidder at the Auction on such bidder paying the then full amount of the Deposit into escrow prior to commencement of the Auction or such participation.

D. **Transaction Documents.** Each Bid must be accompanied by an executed purchase agreement with respect to the proposed Sale Transaction, including the exhibits, schedules, and ancillary agreements related thereto and any other related material documents integral to such Bid. In addition, (1) the executed purchase agreement accompanying such bidder's Bid must be further accompanied by a redline copy marked to reflect any amendments or modifications to the form purchase agreement provided by the Debtors and (2) if one or more Stalking Horse Bidders have been designated for the applicable Assets, the executed purchase agreement accompanying such bidder's Bid must be further accompanied by a redline copy marked against each applicable Stalking Horse Agreement.

E. **Back-Up Bidder Commitment.** Each Bid must include a written commitment by the applicable Potential Bidder to serve as a Back-Up Bidder in the event that such Potential Bidder's Bid is not selected as the Winning Bid; *provided* that the foregoing shall not apply to any Potential Bidder that (1) is the DIP Agent (on behalf of the DIP Lenders); (2) both (a) qualifies as a Secured Party (as defined herein) and (b) submits a Bid that contemplates providing consideration pursuant to section 363(k) of the Bankruptcy Code; or (3) is expressly exempted from such

| Requirement | Description |
|---|---|
| | requirement pursuant to an applicable Stalking Horse Agreement (as defined herein). |

F. **Proof of Financial Ability to Perform.** Each Bid must include written evidence that the Debtors reasonably conclude, in consultation with the Consultation Parties, demonstrates that the bidder has the necessary financial ability to close the proposed Sale Transaction. Such information must include the following:

1. contact names and telephone numbers for verification of financing sources;

2. evidence of the bidder's internal resources and, if applicable, proof of fully executed and effective financing commitments with limited conditionality customary for transactions of this type from one or more reputable sources in an aggregate amount equal to the Cash portion of such Bid (including, if applicable, the payment of cure amounts), in each case, as are needed to close the Sale Transaction;

3. a description of the bidder's pro forma capital structure; and

4. any other financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtors demonstrating that such bidder has the ability to close the proposed Sale Transaction.

G. **Contingencies; No Financing or Diligence Outs.** Each Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence.

H. **Identity.** Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid—including each equity holder or other financial backer of the bidder if such bidder is an entity formed for the purpose of consummating the proposed Sale Transaction contemplated by such Bid—and the complete terms of any such participation. Each Bid should also include contact information for the specific person(s) and counsel whom the Debtors (and their advisors) should contact regarding such Bid.

I. **Authorization.** Each Bid must contain evidence acceptable to the Debtors that the bidder has obtained authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the Sale Transaction contemplated by such Bid.

| Requirement | Description |
|---|---|
| | J. **Contracts and Leases.** Each Bid must identify each and every executory contract and unexpired lease to be assumed and assigned in connection with the proposed Sale Transaction (collectively, the "Assigned Contracts"). Each Bid must be accompanied by adequate assurance of future performance under all Assigned Contracts, which shall include audited and unaudited financial statements, tax returns, bank account statements, and a description of the business to be conducted at the premises, and such other documentation as the Debtors may request (the "Adequate Assurance Package"). The Adequate Assurance Package should be submitted in its own compiled PDF document. |
| | K. **As-Is, Where-Is.** Each Bid must include a written acknowledgement and representation that: (1) the bidder has had an opportunity to conduct any and all due diligence regarding the Sale Transaction prior to making its offer; (2) the bidder has relied solely upon its own independent review, investigation, or inspection of any documents in making its Bid; (3) except as may be set forth in Definitive Sale Documents (as defined below) concerning such Bid, the bidder did not rely, and is not relying upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or their advisors or other representatives regarding the Sale Transaction, the completeness of any information provided in connection therewith or the Auction, if any, or otherwise; and (4) the bidder did not engage in any collusive conduct and acted in good faith in submitting its Bid. |
| | L. **No Break-Up Fee.** Each Bid must expressly state and acknowledge that such bidder shall not be entitled to, and shall not seek, any transaction break-up fee, termination fee, expense reimbursement, working fee, or similar type of payment; *provided*, that the Debtors are authorized in their discretion, subject to Section 6 of these Bidding Procedures, to offer Bid Protections (as defined below) to one or more Stalking Horse Bidders in accordance with the Bidding Procedures and the Bidding Procedures Order. Provided further, each Bid must expressly waive any claim or or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code or the payment of any broker fees or costs in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the sale process. |
| | M. **Transition Services.** Each Bid must state or otherwise estimate the types of transition services, if any, the Potential Bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, |

| Requirement | Description |
|---|---|
| | if the Potential Bidder's Bid were selected as the Winning Bid for the applicable Assets. |
| | N. **Indication of Interest.**  To the extent a bidder provided a non-binding indication of interest pursuant to Section 3.5 of these Bidding Procedures, each Bid submitted by such a bidder must describe any material deviations of the Bid from the indication of interest. |
| | O. **Commitment to Close.**  Each Bid must include a commitment to close as soon as practicable, and state the expected date of closing of the Sale Transaction. |
| | P. **Irrevocable Bid.**  Each Bid must contain a statement by the applicable bidder acknowledging and agreeing that such Bid and each of its provisions is binding upon the bidder and irrevocable in all respects. |
| | Q. **Compliance with Bidding Procedures.**  Each Bid must contain a covenant that the applicable bidder will comply with the terms of these Bidding Procedures and the Bidding Procedures Order. |
| | R. **Combination Bids**.  For Bids that contemplate a purchase of multiple categories of Assets, each Bid must specify: (i) allocation of the Purchase Price across categories of Assets (e.g., between Rolling Stock, real estate, etc.); (ii) for Bids that include real estate and sale-leaseback equity specifically, the Purchase Price must be allocated across each individual property included in the Bid; and (iii)Bids must indicate whether the offer is on an "all or none" basis in the event that the Potential Bidder is outbid for certain Assets contemplated in the Bid. |
| | By submitting a Bid, each bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of these Bidding Procedures and to refrain from (A) submitting a Bid after conclusion of the Auction (if any) or (B) seeking to reopen the Auction (if any) once closed.  **The submission of a Bid shall constitute a binding and irrevocable offer (a) for the Winning Bidder, until consummation of the Sale Transaction, (b) for the Back-Up Bidder (if any), as provided in these Bidding Procedures, including Section 11 hereof, and (c) for any bidder other than the Winning Bidder and Back-Up Bidder, until two business days after entry of the Sale Order approving the Winning Bid and (if applicable) the Back-Up Bid for the applicable Assets, and each Bid must include a written acknowledgment and representation to such effect.** |
| **Stalking Horse Bidder** | The Debtors are and shall be authorized, but not obligated, in an exercise of their reasonable business judgment, and upon consent of the Consultation Parties, to: (A) select one or more Acceptable Bidders to act as stalking horse bidders in connection with a Sale Transaction (each, a "Stalking Horse Bidder," and such |

| Requirement | Description |
|---|---|
| | Acceptable Bidder's Bid, a "<u>Stalking Horse Bid</u>") and enter into a purchase agreement with respect to such Sale Transaction with such Stalking Horse Bidder (each such agreement, a "<u>Stalking Horse Agreement</u>"); and (B) in connection with any Stalking Horse Agreement and in recognition of such Stalking Horse Bidder's expenditure of time, energy, and resources, the Debtors may, with the consent of the Consultation Parties, determine to (i) provide a breakup fee (other than with respect to a Stalking Horse Bidder that is a Secured Party (as defined herein)) (the "<u>Breakup Fee</u>") and/or (ii) reimburse such Stalking Horse Bidder's reasonable and documented out-of-pocket fees and expenses (including attorney's fees and expenses) actually incurred in connection with preparation and negotiation of the Stalking Horse Agreement (the "<u>Expense Reimbursement</u>," and together with the Breakup Fee, the "<u>Bid Protections</u>"); *provided* that, with respect to any Stalking Horse Agreement, the aggregate of the Breakup Fee and the total Expense Reimbursements shall in no event exceed three percent (3%) of the applicable Purchase Price.  To the extent the Bid Protections do not otherwise comply with these Bidding Procedures, the Debtors reserve the right to seek Court approval of such Bid Protections.  The applicable Debtors' entry into a Stalking Horse Agreement and/or provision of Bid Protections to a Stalking Horse Bidder shall be in compliance with the DIP Orders, the DIP Documents (as defined in the DIP Motion), and the Debtors' obligations thereunder.<br><br>No later than one business day after selecting a Stalking Horse Bidder, the Debtors shall file with the Court and serve a notice that (A) identifies the Stalking Horse Bidder and the material terms of the applicable Stalking Horse Bid, including the Purchase Price and the Assets to which such Stalking Horse Bid relates; and (B) attaches a copy of the corresponding Stalking Horse Agreement. |
| **Bid Deadline** | Any Bid must be transmitted via email (in .pdf or similar format) to each of the parties specified in Section 2 hereof so as to be **actually received by such parties** on or before **October 15, 2023 by 5:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>"). |
| **Qualified Bids & Qualified Bidders** | A Bid is a "<u>Qualified Bid</u>" if the Debtors, in the Debtors' reasonable business judgment and in consultation with the Consultation Parties, determine that such Bid (A) satisfies the Bid Requirements set forth above; (B) is for an amount equal to or greater than $1,000,000.00 in the aggregate; and (C)  is reasonably likely to be consummated if selected as the Winning Bid (or Back-Up Bid, as applicable) (as defined below) for the applicable Assets, no later than the Applicable Outside Date (as defined herein); *provided* that any Stalking Horse Bid shall constitute and be deemed a Qualified Bid.<br><br>An Acceptable Bidder that submits a Qualified Bid is a "<u>Qualified Bidder</u>" with respect to the Assets to which such Qualified Bid relates. |

| Requirement | Description |
|---|---|
| | As soon as reasonably practicable after the applicable Bid Deadline, the Debtors will notify each Acceptable Bidder whether such party is a Qualified Bidder and shall provide the Consultation Parties' counsel with a copy of each Qualified Bid. If an Acceptable Bidder's Bid is determined not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit (if any) on the date that is three business days after the applicable Bid Deadline. <br><br> Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the date set for the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors following consultation with the Consultation Parties, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in the Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction (if any) as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures. <br><br> Notwithstanding anything herein to the contrary, the Debtors, in consultation with the Consultation Parties, reserve the right to work with (A) Potential Bidders and Acceptable Bidders to aggregate two or more Bids into a single consolidated Bid prior to the applicable Bid Deadline and (B) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction (if any). The Debtors, in consultation with the Consultation Parties, reserve the right to cooperate with any Acceptable Bidder to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors, in consultation with the Consultation Parties, may accept a single Qualified Bid or multiple Bids that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders shall be treated as a single Qualified Bidder and their Bid a single Qualified Bid for purposes of the Auction (if any)). |
| **Right To Credit Bid** | Any Qualified Bidder that has a valid and perfected lien on any Assets of the Debtors' estates (a "<u>Secured Party</u>") shall be entitled to credit bid all or a portion of the face value of such Secured Party's claims against the Debtors toward the Purchase Price specified in such Qualified Bidder's Bid; *provided* that a Secured Party shall be entitled to credit bid its claim(s) only with respect to Assets that are subject to a valid and perfected first priority lien in favor of such Secured Party as to such claim(s). Notwithstanding anything to the contrary herein, each of the Prepetition Agents, the Prepetition UST Agent, subject to section 363(k) of the Bankruptcy Code, and the DIP Agents may submit a credit bid of all or any portion of the aggregate amount of their respective secured claims, including, with respect to the DIP Agent, any postpetition financing claims. Any credit bid submitted by any Prepetition Agent, subject to section 363(k) of the Bankruptcy |

| Requirement | Description |
|---|---|
| | Code, or the DIP Agent shall be deemed a Qualified Bid regardless of whether it meets the requirements set forth herein. |
| | In the event that the DIP Agent, on behalf of the DIP Lenders, or the Prepetition B-2 Agent, on behalf of the Prepetition B-2 Lenders, submits a credit bid comprised of any of their DIP Obligations (as defined in the DIP Motion) or Prepetition B-2 Obligations (as defined in the DIP Motion), respectively, on any assets securing such respective obligations, and without limiting any other requirements for approval of any other bid as a higher or better offer or a Winning Bid, any further bid for the purchase of some or all of the assets and any sale of such assets to a Winning Bidder (other than the DIP Agent, on behalf of the DIP Lenders, or the Prepetition B-2 Agent, on behalf of the Prepetition B-2 Lenders) that is approved by the Court must provide for, at the closing of such Sale Transaction, indefeasible cash payments of the DIP Obligations and the Prepetition B-2 Obligations to the DIP Agent, on behalf of the DIP Lenders, or the Prepetition B-2 Agent, on behalf of the Prepetition B-2 Lenders, respectively, in greater than the dollar amount equivalent of the credit bid submitted by the DIP Agent, on behalf of the DIP Lenders, or the Prepetition B-2 Agent, on behalf of the Prepetition B-2 Lenders, as applicable, in order for the Bid of such Winning Bidder to be considered as a potentially higher or better bid and/or to be approved by the Court as a Winning Bid, unless otherwise agreed to by the DIP Agent, on behalf of the DIP Lenders, or the Prepetition B-2 Agent, on behalf of the Prepetition B-2 Lenders, as applicable. |
| | Notwithstanding the foregoing, following the submission of a credit bid by the DIP Agent or any Prepetition Agent, the Debtors may sell a portion of the Assets that are subject to such credit bid with the prior written consent of the DIP Agent or such Prepetition Agent, as applicable, and the amount of such credit bid shall be adjusted accordingly. |
| | The rights and defenses of the Debtors and any other party in interest with respect to whether any assertion that any liens, claims, encumbrances, or interests, if any, will attach to the proceeds of the Sale Transaction(s) are expressly preserved. |
| **Auction** | If the Debtors receive two or more Qualified Bids with respect to the same Assets by the applicable Bid Deadline, the Debtors may, in consultation with the Consultation Parties, conduct an auction (the "Auction") to determine the Winning Bidder (or Back-Up Bidder, as applicable) with respect to such Assets. In such event, the Debtors will (A) notify all Qualified Bidders of the highest or otherwise best Qualified Bid with respect to the applicable Assets, as determined by the Debtors in their reasonable business judgment and in consultation with the Consultation Parties (each such Qualified Bid, a "Baseline Bid") and (B) provide copies of the documents setting forth the terms of the Baseline Bid(s) to all Qualified Bidders, in each case, as soon as reasonably practicable after the Bid Deadline and in any event no later than prior to the commencement of the |

| Requirement | Description |
|---|---|
| | Auction. The Debtors' determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, deem relevant to the value of the Qualified Bid to the Debtors' estates and the Debtors' patient care mandate and related regulatory requirements.<br><br>If the Debtors, in consultation with the Consultation Parties, determine that they have received no Qualified Bids other than any Stalking Horse Bid(s) or they have received only a single Qualified Bid, then the Auction will not occur, and the Stalking Horse Bid(s) or the Qualified Bid will be deemed to be the Winning Bid(s) for the Assets to which such Stalking Horse Bid(s) or Qualified Bid relates. If the Debtors make such a determination, the Debtors shall file a notice with the Court within one business day of making such determination.<br><br>If the Debtors receive two or more Qualified Bids, the Auction shall take place on **October 18, 2023** at a time to be announced by the Debtors in consultation with the Consultation Parties, via remote video and/or in person at the Debtors' election, and shall be conducted in a timely fashion according to the procedures set forth in Section 10(i)-(vii) of these Bidding Procedures (the "Auction Procedures").<br><br> AUCTION PROCEDURES <br>A.    **The Debtors Shall Conduct the Auction; General Provisions.** The Debtors, with the assistance of their advisors, shall direct and preside over any Auction and shall consult with the Consultation Parties throughout the Auction process. At the commencement of the Auction, the Debtors (1) may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit any successive Bid(s); and (2) shall describe the terms of the Baseline Bid. Only incremental Bids that comply with the terms set forth in Section 10(ii) of these Bidding Procedures shall be considered "Overbids." Overbids shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders. The Debtors, in consultation with the Consultation Parties, shall determine in their reasonable business judgment whether an incremental Bid is an Overbid. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Winning Bid (or Back-Up Bid, as applicable) (as defined below).<br><br>Only Qualified Bidders, the Debtors, the Consultation Parties and each of their respective legal and financial advisors, and any other parties specifically invited or permitted to attend by the Debtors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the |

| Requirement | Description |
|---|---|
| | Auction in person and may speak or bid themselves or through duly authorized representatives.  Except as otherwise permitted by the Debtors in consultation with the Consultation Parties, only Qualified Bidders shall be entitled to bid at the Auction.<br><br>The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction.<br><br>The Debtors may, subject to Section 15 of these Bidding Procedures, announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures.<br><br>B.   **Terms of Overbids**.  Each Overbid must comply with the following terms:<br><br>1.   <u>Minimum Overbid Increment</u>.  At the commencement of the initial solicitation of Overbids, the Debtors, in consultation with the Consultation Parties, shall announce the minimum increment by which any Overbid must exceed the applicable Baseline Bid.  At the commencement of each subsequent round of solicitation of Overbids, the Debtors shall announce the minimum increment by which any Overbid must exceed the Prevailing Highest Bid (as defined below) at such time.  The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties, announce increases or reductions to the applicable minimum Overbid increment at any time during the Auction.  Any Overbid made by a Stalking Horse Bidder shall be deemed to have been made in an amount equal to the Overbid plus, if applicable, the Expense Reimbursement and the Breakup Fee, to the extent provided in the applicable Stalking Horse Agreement.<br><br>2.   <u>Conclusion of Each Overbid Round</u>.  Upon the solicitation of each round of Overbids, the Debtors may announce a deadline by which time any Overbids must be submitted to the Debtors (an "<u>Overbid Round Deadline</u>"); *provided* that the Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, may extend any Overbid Round Deadline. |

| Requirement | Description |
|---|---|
| | 3.     <u>Overbid Alterations</u>.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' reasonable business judgment and after consultation with the Consultation Parties, but shall otherwise comply with the terms of these Bidding Procedures. <br><br> 4.     <u>Announcing Highest Bid</u>.  Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Consultation Parties, have identified an Overbid as being higher or otherwise better than, in the initial Overbid round, the Baseline Bid or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Debtors shall describe to all applicable Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid, as well as the value attributable by the Debtors to such Prevailing Highest Bid. <br><br> C.     **Consideration of Overbids.**  The Debtors reserve the right, in their reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times, to, among other things (1) facilitate discussions between the Debtors and Qualified Bidders, (2) allow Qualified Bidders the opportunity to consider how they wish to proceed, and (3) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient and sufficiently unconditional financing commitments to consummate the proposed Sale Transaction at the prevailing Overbid amount. <br><br> D.     <u>**No Round-Skipping**</u>.  To remain eligible to participate in the Auction, in each round of bidding, each Qualified Bidder, except the Qualified Bidder that submitted the Prevailing Highest Bid, must submit an Overbid with respect to such round of bidding.  To the extent a Qualified Bidder that did not submit the Prevailing Highest Bid fails to submit an Overbid with respect to such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction; *provided* the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, may permit a bidder that has been disqualified to take part in the Auction solely to the extent a Qualified Bidder that has not been disqualified has agreed (after receiving express permission from the Debtors upon consultation with the Consultation Parties) to permit |

| Requirement | Description |
|---|---|
| | such disqualified bidder to join such Qualified Bidder in its next-round Bid as an additional purchaser party or debt or equity financing source. |
| | E. **Closing the Auction.**  The Auction shall continue until there is only one Qualified Bid for a particular group of assets that the Debtors determine, in their reasonable business judgment and in consultation with the Consultation Parties, to be the highest or otherwise best Qualified Bid for the applicable Assets.  Such Qualified Bid shall be designated the "<u>Winning Bid</u>" (or Back-Up Bid, as applicable, and the Qualified Bidder who submitted the Winning Bid, the "<u>Winning Bidder</u>") with respect to its proposed Acquired Assets, at which time the Auction with respect to such Assets shall be closed; *provided* that (1) such Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid; and (2) the Debtors' designation of a Qualified Bid as a Winning Bid (or Back-Up Bid, as applicable) shall be subject to and conditioned on finalization of definitive documentation and the Court's approval of such Winning Bid (or Back-Up Bid, as applicable), applicable regulatory and third-party approvals, and the consummation of the Sale Transaction contemplated thereby.  As soon as reasonably practicable after the designation of a Winning Bid (or Back-Up Bid, as applicable), the Debtors, in consultation with the Consultation Parties, shall finalize definitive documentation to implement the terms of such Winning Bid (or Back-Up Bid, as applicable) and cause such definitive documentation to be filed with the Court. |
| | F. **No Collusion; Good Faith Offer.**  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (1) such Qualified Bidder has not engaged in any collusion with respect to the bidding process (2) such Qualified Bidders' Qualified Bid is a good faith and irrevocable offer and such Qualified Bidder intends to consummate the Sale Transaction contemplated by its Qualified Bid if such Qualified Bid is the Winning Bid (or Back-Up Bid, as applicable) with respect to the applicable Acquired Assets, and (3) will serve as Back-Up Bid. |
| | G. **Rejection of Bids.**  The Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Winning Bid (or Back-Up Bid, as applicable), any Bid that the Debtors determine, after consultation with the Consultation Parties, is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code and/or these Bidding Procedures, or (3) contrary to the |

| Requirement | Description |
|---|---|
| | best interests of the Debtors, their estates, their creditors, and other stakeholders. |
| **Designation of a Back-Up Bidder** | If for any reason the Winning Bidder fails to consummate the Qualified Bid within the time permitted after the entry of the Sale Order approving the Sale to the Winning Bidder, then the Qualified Bidder or Qualified Bidders with the next-highest or otherwise second-best Bid (each, a "Back-Up Bidder"), as determined by the Debtors after consultation with the Consultation Parties, at the conclusion of the Auction and announced at that time to all the Qualified Bidders participating therein and as set forth in the Sale Order, will automatically be deemed to have submitted the highest or otherwise best Bid or Bids (each, a "Back-Up Bid"), and the Debtors will be authorized, but not required, to consummate the transaction pursuant to the Back-Up Bid as soon as is commercially reasonable without further order of the Bankruptcy Court upon at least twenty-four hours advance notice, which notice will be filed with the Court; *provided* that the forgoing shall not apply to any Potential Bidder that (1) both (a) qualifies as a Secured Party and (b) submits a Bid that contemplates providing consideration pursuant to section 363(k) of the Bankruptcy Code; or (2) is expressly exempted from such requirement pursuant to an applicable Stalking Horse Agreement. <br><br> Upon designation of the Back-Up Bidder at the Auction, the Back-Up Bid must remain open and irrevocable until the earlier of (1) the closing of the transactions contemplated by the Winning Bid notwithstanding any outside date set forth in such Back-Up Bidder's proposed purchase agreement or the chapter 11 plan and (2) the date that is four months following the conclusion of the Auction. |
| **Fiduciary Out** | Notwithstanding anything to the contrary in these Bidding Procedures or any document filed with or entered by the Court, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or its board of directors, board of managers, or similar governing body to take any action or to refrain from taking any action with respect to any Sale Transaction or these Bidding Procedures solely to the extent such Debtor or governing body determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.. <br><br> Further, notwithstanding anything to the contrary in these Bidding Procedures or any document filed with or entered by the Court, until the entry of the applicable Sale Order, the Debtors and their respective directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:  (A) consider, respond to, and facilitate alternate proposals for sales or other transactions involving any or all of the Assets (each, an "Alternate Proposal"); (B) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality |

| Requirement | Description |
|---|---|
| | agreements or nondisclosure agreements with any entity; (C) maintain or continue discussions or negotiations with respect to Alternate Proposals; (D) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (E) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposal. |
| "As Is, Where Is" | Consummation of any Sale Transaction will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors or their estates, except as specifically accepted and agreed to by the Debtors in the executed definitive written documentation for the Sale Transaction (the "Definitive Sale Documents").  Unless otherwise specifically accepted and agreed to by the Debtors in Definitive Sale Documents, all of the Debtors' right, title, and interest in and to the Assets disposed of in a Sale Transaction will be transferred to the Winning Bidder (or Back-Up Bidder, as applicable) free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests in accordance with sections 363(f) of the Bankruptcy Code. <br><br> By submitting a Bid, each bidder will be deemed to acknowledge and represent that it (A) has had an opportunity to conduct adequate due diligence regarding the Debtors and the proposed Sale Transaction prior to making its Bid, (B) has relied solely on its own independent review, investigation, and inspection of any document, including executory contracts and unexpired leases, in making its Bid, and (C) did not rely on or receive from any person or entity (including any of the Debtors or their advisors or other representatives) any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, with respect to the Sale Transaction or the completeness of any information provided in connection with the Sale Transaction or the Auction (if any), except as may be set forth in Definitive Sale Documents. |
| Commissions | The Debtors shall be under no obligation to pay any commissions, fees, or expenses to any bidder's agent, advisor, or broker.  All commissions, fees, or expenses for any such agents, advisors, or brokers shall be paid by the applicable bidder at such bidder's discretion.  In no case shall any commissions, fees, or expenses for any bidder's agent, advisor, or broker be deducted from any proceeds derived from any Sale of the Assets.  This Section 14 shall not apply to any Bid Protections that become payable pursuant to the terms of a Stalking Horse Agreement. |

| Requirement | Description |
|---|---|
| **Reservation of Rights** | The Debtors shall be entitled to modify these Bidding Procedures in their reasonable business judgment in consultation with the Consultation Parties in any manner that will best promote the goals of these Bidding Procedures, or impose, at or prior to the Auction (if any), additional customary terms and conditions on a Sale Transaction, including:  (A) extending the deadlines set forth in these Bidding Procedures; (B) adjourning the Auction at the Auction; (C) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (if any); (D) canceling the Auction; and (E) rejecting any or all Bids or Qualified Bids;  provided, however, that the Debtors may not amend these Bidding Procedures or the bidding process to (i) reduce or otherwise modify their obligations to consult with any Consultation Party without the consent of such Consultation Party or further order of the Court, (ii) reduce or otherwise modify their obligations to obtain consent from any Consultation Party pursuant to these Bidding Procedures, the DIP Orders or the DIP Documents, as applicable, or (iii) provide for any extensions of deadlines, other modifications of the Bidding Procedures or acceptance of any bid which limit the rights set out in or the protections provided to the DIP Agent, the DIP Lenders, the Prepetition B-2 Agent, and the Prepetition B-2 Lenders as set forth in the DIP Orders or the DIP Documents (each as defined in the DIP Motion), or are inconsistent with the Debtors' agreements and obligations thereunder, in each case, without the prior written consent of the Required Lenders (as defined in the DIP Motion).  All such modifications and additional rules will be communicated to each of the Consultation Parties, Potential Bidders, and Qualified Bidders; provided that, to the extent such modifications occur at the Auction, disclosure of such modifications is limited to those in attendance at the Auction. |
| **Consent to Jurisdiction** | All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of these Bidding Procedures. |
| **Sale Hearing** | The Court shall hold a hearing to consider approval of the Winning Bid(s) (and Back-Up Bid(s), as applicable) and the Sale Transaction(s) contemplated thereby (the "Sale Hearing").  **The Sale Hearing shall be held on October 26, 2023, subject to the availability of the Court.  The Sale Hearing may be continued to a later date by the Debtors' sending written notice to all Qualified Bidders and Consultation Parties prior to, or by making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any bidder or other party.** |

| Requirement | Description |
|---|---|
| **Return of Deposit** | Any Deposits provided by Qualified Bidders shall be held in one or more escrow accounts on terms acceptable to the Debtors.  Any such Deposits will be returned to Qualified Bidders that are not Winning Bidders (or Back-Up Bidders, as applicable) on the date that is three business days after the Auction (if any).  Any Deposit provided by a Winning Bidder (or Back-Up Bidder, as applicable) shall be applied to the Purchase Price of the applicable Sale Transaction at closing.<br><br>If a Winning Bidder (or Back-Up Bidder, as applicable) fails to consummate the Sale Transaction contemplated by its Winning Bid (or Back-Up Bid, as applicable) because of a breach by such Winning Bidder (or Back-Up Bidder, as applicable), the Debtors will not have any obligation to return any Deposit provided by such Winning Bidder (or Back-Up Bidder, as applicable), which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors and their estates. |

20.     Importantly, the Bidding Procedures recognize and comply with the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

**A.      Form and Manner of Auction Notice.**

21.     The Debtors intend the deadline by which Indications of Interest for the Assets must be received is **5:00 p.m. (prevailing Eastern Time) on August 18, 2023, 2023**.     The Bid Deadline by which Bids must be actually received by the Debtors and their advisors is **5:00 p.m. (prevailing Eastern Time) on October 15, 2023**.

22.     The Debtors intend to conduct the Auction, if required, on **October 18, 2023**, at the time to be announced by the Debtors in consultation with the Consultation Parties, in person or by videoconference or such other form of remote communication established by the Debtors.

23.     As soon as reasonably practicable after entry of the Bidding Procedures, the Debtors will cause the Auction Notice, substantially in the forms attached as <u>Exhibit 4</u> to the

Bidding Procedures Order, to be served on the following parties or their respective counsel, if known:  (a) the Notice Parties; (b) counsel to the Stalking Horse Bidder (if any); (c) all parties to executory contracts and leases to be assumed and assigned as part of a proposed Sale Transaction; (d) all parties who have expressed a written interest in some or all of the Debtors' assets; (e) all known holders of liens, encumbrances, and other claims secured by the Debtors' assets; (f) the Internal Revenue Service;  (g) all applicable state and local taxing authorities;  (h)  each governmental agency that is an interested party with respect to a Sale Transaction; and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

24.    In addition, as soon as reasonably practicable after entry of the Bidding Procedures Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will provide notice of the Sale Hearings through the publication of the Auction Notice on the website of the Debtors' proposed noticing and claims agent to be retained in the chapter 11 cases, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/YellowCorporation and publish the Auction Notice, with any modifications necessary for ease of publication, once in *The New York Times* (national edition), to provide notice to any other potential interested parties.

25.    The Debtors respectfully submit that the Auction Notice is reasonably calculated to provide interested parties with notice of the Sale Transaction(s) and Sale Hearings and an opportunity to respond accordingly.

**B.    Summary of the Assumption and Assignment Procedures.**

26.    The Debtors seek entry of the Assumption and Assignment Procedures to facilitate the fair and orderly assumption and assignment of the Assigned Contracts in connection with the Sale Transactions.  Because the Cure Notice, attached as Exhibit 3 to the Bidding Procedures Order, sets forth the Assumption and Assignment Procedures in detail, they are not restated herein.

Generally, however, the Assumption and Assignment Procedures:  (a) outline the process by which the Debtors will serve notice to all counterparties to the Assigned Contracts regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right and the procedures to object thereto and (b) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assigned Contracts to the extent necessary.

<u>**Basis for Relief**</u>

I.    **The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.**

27.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.  If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999));  *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (quoting *In re Schipper*); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992) (noting that bidding procedures that have been negotiated by a trustee are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

28.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, No. 17-10866 (KG),

2017 WL 5484017, at *3 (Bankr. D. Del. Sept. 20, 2017) ("The relief requested in the Sale Motion . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate and its creditors."); *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (debtor-in-possession "had a fiduciary duty to protect and maximize the estate's assets"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand"); *Integrated Res.*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

29.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Dura Auto, Sys.*, No. 06-11202(KJC), 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (bidding procedures "enhance[ing] competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales"); *Integrated Res.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

30.     The Debtors believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will elicit the highest or otherwise best offers available for the Debtors' assets.  The proposed Bidding Procedures will allow the Debtors to conduct the Sale Transactions in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Debtors' Assets and who can demonstrate the ability to close a transaction.  Specifically, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

31.     At the same time, the Bidding Procedures provide the Debtors with a robust opportunity to consider competing bids and select the highest or otherwise best offer for the completion of the Sale Transactions.  In addition, potential entry into a Stalking Horse Agreement with a Stalking Horse Bidder would further ensure that the Debtors obtain fair market value by setting a minimum purchase price for the Debtors' assets that will be tested in the marketplace. As such, creditors of the Debtors' estates can be assured that the consideration obtained will be fair and reasonable and at or above market.  Additionally, no later than three business days after entry into a Stalking Horse Agreement, or as soon as reasonably practicable thereafter, the Debtors shall file a notice with the Court to provide interested parties notice of the Debtors' entry into a Stalking Horse Agreement.

32.     The Debtors submit that the proposed Bidding Procedures will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with other procedures previously approved by this Court.  *See, e.g.*, *In re SIO2 Medical Products, Inc.*, No. 23—10366

(JTD) (Bankr. D. Del. Apr. 25, 2023); *In re Lucira Health, Inc.*, No. 23-10242 (MFW) (Bankr. D. Del. Mar. 27, 2023); *In re Performance Powersports Group Holdings, Inc.*, No. 23-10047 (LSS) (Bankr. D. Del. Feb. 27, 2023); *In re Alex & Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. Jul. 16, 2021); *In re Bluestem Brands, Inc.*, No. 20-10566 (MFW) (Bankr. D. Del. Jun. 3, 2020).[8]

A. **The Form and Manner of Service of the Sale Hearing Notice Should Be Approved.**

33.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with twenty-one days' notice of the Sale Hearings. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the relevant Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

34.     As noted above, within three business days of entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Auction Notice upon the following parties or their respective counsel, if known: (a) the Notice Parties; (b) counsel to the Stalking Horse Bidder (if any); (c) all parties to executory contracts and leases to be assumed and assigned as part of a proposed Sale Transaction; (d) all parties who have expressed a written interest in some or all of the Debtors' assets; (e) all known holders of liens, encumbrances, and other claims secured by the Debtors' assets; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; (h) each governmental agency that is an interested party with respect to a Sale Transaction; and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

35.     In addition, within three business days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors will provide notice of the Sale Hearings through the publication of the Auction Notice on the website of the Debtors' proposed noticing and claims agent to be retained in the chapter 11 cases, Epiq Corporate Restructuring, LLC, at https://dm.epiq11.com/YellowCorporation and publish the Auction Notice, with any modifications necessary for ease of publication, once in *The New York Times* (national edition), to provide notice to any other potential interested parties

36.     The Debtors submit that notice of this motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Auction Notice and the Cure Notice as provided for herein, constitutes good and adequate notice of the Sale Transactions and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, the Debtors request that this Court approve the form and manner of the Auction Notice and Cure Notice.

**B.      The Bid Protections Have a Sound Business Purpose and Should be Approved.**

37.     To the extent the Debtors designate one or more Stalking Horse Bidders at a later date, the Debtors request approval to offer certain bid protections (the "Bid Protections") to such a Stalking Horse Bidder, namely in the form of an expense reimbursement (the "Expense Reimbursement") and/or a breakup fee (the "Breakup Fee").

38.     Generally, stalking horse expense reimbursements and breakup fees are a normal, and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code.  For example, courts have found that because a "corporation [has] a duty to encourage bidding, [bid protections] can be ***necessary*** to discharge [such] duties to maximize value. . . . [Bid protections] may 'be legitimately necessary to convince a white knight to enter the

bidding by providing some form of compensation for the risks it is undertaking.'" *In re Integrated Res., Inc.*, 147 B.R. at 660–61 (emphasis added). As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298 (3d Cir. 2018) (holding that "[T]he allowability of [bid protections] . . . depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate.") (internal quotations omitted) (alterations in original); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (same); *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999) (same); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121–23 (Bankr. D. Del. 2005) (same). The Debtors believe that the allowance of an Expense Reimbursement or Breakup Fee is in the best interests of their estates and their creditors, as the Stalking Horse Bidder, if designated, will establish a floor for further bidding that may increase the consideration given in exchange for the applicable assets for the benefit of the Debtors' estates.

39. In the Third Circuit, bidding protections, such as those proposed here, are subject to the general standard used for administrative expenses under section 503 of the Bankruptcy Code. *Energy Future*, 904 F.3d at 313 ("[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503."); *Women First Healthcare, Inc.*, 332 B.R. at 121–23 (holding that the general standard used for all administrative expenses applies to expense reimbursements). Thus, the allowability of expense reimbursements, "like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Reliant Energy*, 594 F.3d at 206 (internal quotations omitted) (quoting *O'Brien*, 181 F.3d at 535).

40.     Similar types of bid protections have been approved by this Court.  *See, e.g., In re Things Remembered, Inc.*, Case No 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (authorizing stalking horse break-up fee and expense reimbursement); *In re Haggen Holdings, LLC*, No. 15-11874 (KG) (Bankr. D. Del. Oct. 19, 2015) (same); *In re AgFeed USA, LLC*, No. 13-11761 (BLS) (Bankr. D. Del. Aug. 1, 2013) (authorizing breakup fee of 3% and expense reimbursement of 1%); *In re Solyndra LLC*, No. 11-12799 (MFW) (Bankr. D. Del. Sept. 28, 2012) (authorizing break-up fee of 2.6%); *In re AES Thames, L.L.C.*, No. 11-10334 (KJC) (Bankr. D. Del. Nov. 16, 2011) (authorizing a break-up fee of $300,000 in the event the debtor entered into a stalking horse purchase agreement with a purchase price of at least $10 million); *In re Magic Brands, LLC*, No. 10-11310 (BLS) (Bankr. D. Del. May 18, 2010) (authorizing stalking horse expense reimbursement).

41.     Accordingly, for the reasons set forth above, the Debtors respectfully request that the Court grant the Debtors the authority, but not direction, to incur and pay the Expense Reimbursement and/or Breakup Fee to the extent such Bid Protections are necessary to preserve the value of the Debtors' estates.

**C.     The Assumption and Assignment Procedures Are Appropriate and Should Be Approved.**

42.     As set forth above, the Sale Transactions may contemplate the assumption and assignment of contracts to the Winning Bidders arising from the Auctions, if any.  In connection with this process, the Debtors believe it is necessary to establish the Assumption and Assignment Procedures by which:  (a) the Debtors and contract counterparties can reconcile cure obligations, if any, in accordance with section 365 of the Bankruptcy Code; and (b) such counterparties can object to the assumption and assignment of contracts and/or related cure amounts.

43.    As set forth in the Bidding Procedures Order, the Debtors also request that any party that fails to object to the proposed assumption and assignment of any contract be deemed to consent to the assumption and assignment of the applicable contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the sale order, along with the cure amounts identified in the contract notice. *See, e.g.*, *In re Boy Scouts of Am.*, 642 BR 504, 569 (Bankr. D. Del. 2022) ("The lack of objection of a [creditor] is also consensual for purposes of § 363 and, again, permissible under § 363(f)(2)."); *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (same); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

44.    The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice to parties to the executory contracts and leases, and provide certainty to all parties in interest regarding their obligations and rights in respect thereof. Accordingly, the Debtors request that the Court approve the Assumption and Assignment Procedures set forth in the Bidding Procedures Order.

### D.    The Sale Should Be Approved as an Exercise of Sound Business Judgment.

45.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g.*, *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) (same); *Comm. of*

*Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (same); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999) (same).

46.     Once the Debtors articulate a valid business justification, the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions.").

### 1.     A Sound Business Purpose Exists for the Sale.

47.     As set forth herein, the Debtors have a sound business justification for selling their assets.  *First*, and most significantly, the Company has ceased all revenue generating operations. Accordingly, the only way to generate value to maximize stakeholder recovery is to proceed with the asset sales as contemplated by the Bidding Procedures.

48.     *Second*, the Debtors' assets are a comprehensive network of trucking terminals and related Rolling Stock and intellectual property, among others.  In particular, the terminals and related Rolling Stock were used by the Debtors to facilitate the transit of goods representing a significant portion of the less-than-truckload shipping market in the U.S. for the last 100 years. For the appropriate purchaser, the Debtors' Assets could represent a lucrative opportunity to expand or enter the market, without the overhang of the Debtors' union disputes or other operational difficulties.  The Bidding Procedures allow the Debtors the flexibility to sell a national

network of Assets to the value-maximizing buyer, or portions of their Assets to several buyers if those Bids represent the highest or otherwise best group of Bids in order to maximize the value of their estates.

49.     ***Third***, the sale or sales of the Debtors' assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for such assets. Consequently, the ultimately successful bids, after being subject to a "market check" in the form of the relevant Auction (if any), will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offers for the assets and will provide a greater recovery for their estates than any known or practicably available alternatives. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

50.     Thus, the Debtors submit that the Winning Bidders' purchase agreements will constitute the highest or otherwise best offer for the assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternatives. As such, the Debtors' determination to sell the assets through an Auction process and subsequently to enter into the Winning Bidders' purchase agreements will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearings to support these conclusions. Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

### 2.     Adequate and Reasonable Notice of the Sale Will Be Provided.

51.     The Auction Notice: (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the applicable Auction and Sale Hearing; (b) informs

parties in interest of the deadlines for objecting to the Sale Transactions or the assumption and assignment of contracts; and (c) otherwise includes all information relevant to parties interested in or affected by the Sale Transactions. Significantly, the form and manner of the Auction Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

52.     Additionally, the Debtors will file the Stalking Horse Notice to be filed within three business days of the Stalking Horse Deadline or as soon as reasonably practicable thereafter. The Stalking Horse Notice will include, among other things, including the identity of the Stalking Horse Bidder, key terms of the Stalking Horse Bidder's bid, any Bid Protections, and the proposed Stalking Horse Agreement attached thereto in its entirety as an exhibit.

### 3.     The Sale Transactions and Purchase Price Reflects a Fair Value Transaction.

53.     It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

54.     As described herein, prior to the Bid Deadline, Ducera will continue to market the Debtors' Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting presumably interested parties as well as previously solicited parties, continuing to provide acceptable bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with

all efforts to increase transaction value.  In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized.

> **4.    The Sale Transactions Have Been Proposed in Good Faith and Without Collusion, and the Stalking Horse Bidders or Successful Bidders Are "Good-Faith Purchasers."**

55.    The Debtors request that the Court find the Stalking Horse Bidders and/or other Successful Bidders arising from the Auction(s), if any, are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the assets.

56.    Section 363(m) of the Bankruptcy Code provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

57.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made.  *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143 (3d Cir. 1986) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy*

*Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

58.     Accordingly, the Debtors believe that the Stalking Horse Bidders and/or other Successful Bidders arising from the Auction, if any, should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

### 5.     The Sale Transactions Should be Approved "Free and Clear" Under Section 363(f).

59.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

60.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Debtors' sale of the assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances), except with respect to any interests that may constitute an assumed liability under the applicable purchase agreement. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

61.     The Debtors submit that any interest that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such interest will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale Transactions, subject to any claims and defenses

the Debtors may possess with respect thereto.  The Debtors accordingly request authority to convey the assets to the Winning Bidders arising from the Auction, if any, free and clear of all liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances, with any such liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, or encumbrances to attach to the proceeds of the Sale Transactions.

> **6.     Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.**

62.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district court and bankruptcy courts that creditors can bid the full face value of their secured claims under section 363(k)").

63.     In this district, absent cause for restricting credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim. *See, e.g.*, *In re Performance Powersports Group Holdings, Inc.*, No. 23-10047 (LSS) (Bankr. D. Del. Feb. 27, 2023); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Nov. 14, 2019) (order approving bid procedures which authorized parties with secured claims to credit bid);

*In re Z Gallerie, Inc.*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 11, 2019) (same); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (same).

64.     Accordingly, the Debtors prepetition secured lenders should be entitled to credit bid some or all of the claims secured by their collateral, pursuant to section 363(k) of the Bankruptcy Code.

### 7.     The Assumption and Assignment of Contracts Reflects the Debtors' Reasonable Business Judgment.

65.     To facilitate and effectuate the sale of the assets, the Debtors are seeking authority to assign or transfer executory contracts to the Winning Bidders arising from the Auction(s), if any, to the extent required by such bidders.

66.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign their executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.  *See, e.g.*, *Grp. of Inst'l Invrs. v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankr. Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor of whether rejection is within debtor's business judgment); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the [Bankruptcy] Code."); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); *In re Network Access Sols.,*

*Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule").

67.     Here, the Court should approve the decision to assume and assign the Assigned Contracts in connection with the Sale Transactions as a sound exercise of the Debtors' business judgment: *First*, the Assigned Contracts may be necessary to operate certain assets and, as such, they are essential to inducing the best offer for those assets. *Second*, it is unlikely that any purchaser would want to acquire certain assets unless a significant number of the contracts and leases needed to operate such assets, if applicable, were included in the transaction. *Finally*, the Assigned Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in the chapter 11 cases.

68.     Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

**8.     Defaults Under the Assigned Contracts Will Be Cured Through the Sale Transactions.**

69.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting

non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

70.     The Debtors submit that the statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be promptly satisfied.     Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over cure amounts or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-debtor parties.

### 9.     Non-Debtor Parties Will Be Adequately Assured of Future Performance.

71.     Similarly, the Debtors submit that the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.   "The phrase 'adequate assurance of future performance' was adopted from Uniform Commercial Code section 2-609" and is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982).  Although no single solution will satisfy every case, "the degree of assurance necessary falls considerably short of an absolute guaranty." *In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *8 (D. Del. May 20, 2002) (citing *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994)).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See Dura Auto.*, 2007 WL 7728109, at *97 (adequate assurance of future performance present where a prospective assignee has financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding); *In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (same).

72.     The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assigned Contracts to the Winning Bidders arising from the Auction(s), if any, will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Assigned Contracts) and will demonstrate such financial wherewithal, willingness, and ability to perform under the Assigned Contracts assigned to the Winning Bidders arising from the Auction(s).  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Winning Bidders arising from the Auction(s) to provide adequate assurance of future performance and object to the assumption of the Assigned Contracts or proposed cure amounts.  The Court therefore should have a sufficient basis to authorize the Debtors to reject or assume and assign the Assigned Contracts.

**E.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

73.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtors request that any sale order entered in connection with a Sale Transaction be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

74.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."   10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

75.     To maximize the value received for the assets, the Debtors seek to close the Sale Transactions as soon as possible after the Sale Hearings.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

76.     The Debtors will provide notice of this motion to:  (a) the United States Trustee; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Department of Justice; (h) the DIP Agent and counsel thereto; (i) Milbank LLP, as counsel to certain investment funds and accounts managed by affiliates of Apollo Capital Management, L.P.; (j) the administrative and collateral agents under the B-2 Term Loan and counsel thereto; (k) the ABL Agent and counsel thereto; (l) White & Case LLP, as counsel to Beal Bank USA; (m) the United States Department

of Justice and Arnold & Porter Kaye Scholer LLP as counsel to the United States Department of the Treasury; (n) the United States Department of the Treasury and counsel thereto; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").   In light of the nature of the relief requested, no other or further notice need be given.

### **No Prior Request**

77.     No prior request for the relief sought in this motion has been made to this or any other court.


*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request entry of the Order, substantially in the form attached

hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as

the Court deems appropriate under the circumstances.

Dated:  August 7, 2023
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (*pro hac vice* pending) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (*pro hac vice* pending) |
| Peter J. Keane (DE Bar No. 5503) | Whitney Fogelberg (*pro hac vice* pending) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |
| Wilmington, Delaware 19801 | Telephone:      (312) 862-2000 |
| Telephone:      (302) 652-4100 | Facsimile:      (312) 862-2200 |
| Facsimile:      (302) 652-4400 | Email:      patrick.nash@kirkland.com |
| Email:      ljones@pszjlaw.com |             david.seligman@kirkland.com |
|             tcairns@pszjlaw.com |             whitney.fogelberg@kirkland.com |
|             pkeane@pszjlaw.com | |
|             ecorma@pszjlaw.com | -and- |

Allyson B. Smith (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      allyson.smith@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*