**<u>Exhibit A</u>**

**Proposed Interim DIP Order**

DOCS_DE:244043.1 96859/001

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (    ) |
| | ) |
| Debtors. | ) (Joint Administration Pending) |
| | ) |

### INTERIM ORDER (I) AUTHORIZING
### THE DEBTORS TO (A) OBTAIN POSTPETITION
### FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT
### LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
### CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN
### PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
### (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "DIP Motion")[2] of Yellow Corporation ("Yellow Corp") and each

of its above-captioned affiliates (collectively, the "Debtors"), pursuant to sections 105, 361, 362,

363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507

of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy

Code"), rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and rules 2002-1, 4001-1, 4001-2, and 9013-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Bankruptcy Local Rules"), seeking entry of this interim order (this "Interim

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Motion or DIP Credit Agreement (as defined herein), as applicable.

Order") and the Final Order (as defined herein and, together with this Interim Order, the "DIP

Orders") among other things:

- authorizing the Borrower (as defined below) to obtain postpetition financing ("DIP Financing") pursuant to a secured, superpriority, priming debtor in possession multi-draw term loan facility (the "DIP Facility") subject to the terms and conditions set forth in this Interim Order and that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement attached hereto as **Exhibit 1** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement") by among Yellow Corp, as borrower (in such capacity, the "Borrower"), the DIP Guarantors (as defined below), the financial institutions or other entities from time to time party thereto as "Lenders" (the "DIP Lenders"), and Alter Domus Products Corp., as administrative agent and collateral agent (in such capacity, together with its successors and permitted assigns, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties"), consisting of (i) new money term loans (the "New Money DIP Term Loans") in an aggregate principal amount of $142.5 million, of which $60 million will be made available to be drawn upon entry of this Interim Order (the "Interim Draw") and the remainder will be made available to be drawn following entry of the Final Order (subject to certain conditions as set forth in the DIP Credit Agreement), and (ii) DIP Roll-Up Loans (as defined below) in an amount equal to (x) the Prepetition B-2 Obligations held by the DIP Lenders (or their affiliates) (including, without limitation, accrued interest, exit fee, and accrued and unpaid reasonable and documented fees and out-of-pocket expenses of the Prepetition B-2 Lenders (which are DIP Lenders) and their respective counsels) and (y) any accrued and unpaid reasonable and documented out-of-pocket expenses of the Prepetition B-2 Agent (as defined below) (including reasonable and documented counsel fees and out-of-pocket expenses) (the "Roll-Up Amount"), which will be deemed rolled up and converted into DIP Obligations (as defined below) upon entry of this Interim Order (the loans to be made available under the foregoing clauses (i) and (ii), the "DIP Loans" and the commitments therefor, the "DIP Commitments");

- authorizing the Borrower to incur, and the other Debtors to jointly and severally guarantee (such Debtors, in this capacity, the "DIP Guarantors" and, together with the Borrower, the "DIP Loan Parties") the DIP Loans and all extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, commitment fees or premiums and administrative agency fees), costs, expenses and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) earned, due and payable under the DIP Documents (as defined below) (collectively, the "DIP Obligations"), in each case subject to the Carve Out and the Canadian Priority Charges and in accordance with the terms hereof;

- authorizing the DIP Loan Parties to execute, deliver and perform under the DIP Credit Agreement and all other documents and instruments that may be reasonably requested by the DIP Secured Parties in connection with the DIP Facility (in each case, as

2

amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof, together with the DIP Credit Agreement, the "<u>DIP Documents</u>");

- subject to the Carve-Out (as defined below) and the Canadian Priority Charges and otherwise solely to the extent set forth herein, granting to the DIP Agent, for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code;

- granting to the DIP Agent, for the benefit of the DIP Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the DIP Collateral (as defined below), on the terms described herein;

- authorizing the DIP Agent to take all commercially reasonable actions to implement the terms of this Interim Order;

- waiving (a) the Debtors' right to surcharge the DIP Collateral, Prepetition B-2 Collateral, or Prepetition ABL Collateral (each as defined below) pursuant to section 506(c) of the Bankruptcy Code and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

- waiving the equitable doctrine of "marshaling" and other similar doctrines for the benefit of the DIP Secured Parties and the Prepetition Secured Parties with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, and the Prepetition Obligations (each as defined below), as applicable, in each case subject to the Carve Out and Canadian Priority Charges;

- authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral solely in accordance with the DIP Orders, the DIP Documents (including the Approved Budget, subject to Permitted Variances), the Interim UST Cash Collateral Order (as defined below), and the Final UST Cash Collateral Order (as defined below);

- authorizing the Debtors to pay the DIP Obligations as they become due and payable in accordance with the DIP Documents;

- authorizing the Debtors to remit ABL Cash Collateral (as defined below) to the Prepetition ABL Agent as set forth herein and for the Prepetition ABL Agent to apply such ABL Cash Collateral to permanently reduce or cash collateralize, as applicable, Prepetition ABL Obligations as set forth herein;

- subject to the restrictions set forth in the DIP Documents and the DIP Orders, authorizing the Debtors to use Prepetition Collateral and provide adequate protection to the Prepetition Secured Parties (as defined below) for any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash

Collateral), for any reason provided for in the Bankruptcy Code (collectively, the "Diminution in Value");[3]

- vacating and modifying the automatic stay to the extent necessary to permit the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents;

- waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

- scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facility and use of Cash Collateral on the terms of a proposed order (the "Final Order") to be posted to the docket prior to the Final Hearing.

The Court having considered the interim relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Cody Leung Kaldenberg, Founding Member of and Partner at Ducera Partners In Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate*

---

[3]    The adequate protection and certain other rights and protections to be provided to the Prepetition UST Secured Parties (as defined below) is set forth in a separate Court order being entered contemporaneously with this Interim Order (the "Interim UST Cash Collateral Order" and the final order approving such relief, the "Final UST Cash Collateral Order").  As used in this Interim Order, UST Cash Collateral, Prepetition UST Tranche A Credit Agreement, Prepetition UST Tranche A Loan Documents, Prepetition UST Tranche A Borrower, Prepetition UST Tranche A Guarantors, Prepetition UST Tranche A Loan Parties, BNY, Prepetition UST Tranche A Agent, Prepetition UST Tranche A Lenders, Prepetition UST Tranche A Secured Parties, Prepetition UST Tranche A Obligations, Prepetition UST Tranche B Credit Agreement, Prepetition UST Tranche B Loan Documents, Prepetition UST Loan Documents, Prepetition UST Tranche B Borrower, Prepetition UST Tranche B Guarantors, Prepetition UST Tranche B Loan Parties, Prepetition UST Tranche B Agent, Prepetition UST Tranche B Lenders, Prepetition UST Lenders, Prepetition UST Tranche B Secured Parties, Prepetition UST Tranche B Obligations, Prepetition UST Secured Obligations, Prepetition UST Tranche A Liens, Prepetition UST Tranche A Permitted Senior Liens, Prepetition UST Tranche A Collateral, Prepetition UST Tranche B Liens, Prepetition UST Liens, Prepetition UST Tranche B Term Priority Collateral, Prepetition UST Tranche B Permitted Senior Liens, Prepetition UST Tranche B Priority Collateral, Prepetition UST Tranche B Collateral, Prepetition UST Secured Parties, UST Tranche B Adequate Protection Liens, UST Tranche A Adequate Protection Liens, UST Adequate Protection Liens, UST Tranche B 507(b) Claims, UST Tranche A 507(b) Claims, UST 507(b) Claims, UST Tranche B Adequate Protection Fees and Expenses, UST Tranche A Adequate Protection Fees and Expenses, UST Adequate Protection Fees and Expenses, UST Tranche B Adequate Protection Obligations, UST Tranche A Adequate Protection Obligations, UST Adequate Protection Obligations, UST Adequate Protection Payments, and UST Adequate Protection shall have the meanings given to those terms in the Interim UST Cash Collateral Order.

*Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Kaldenberg Declaration"), the *Declaration of Brian Whittman, Managing Director of Alvarez & Marsal North America, LLC, In Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Whittman Declaration"), and the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), the available DIP Documents, and the evidence submitted and arguments made at the interim hearing held on August [●], 2023 (the "Interim Hearing"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Bankruptcy Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable, in the best interests of the Debtors and their estates, and essential for the preservation of the value of the Debtors' assets; and it appearing that the DIP Loan Parties' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

A.    *Petition Date*.  On August 6, 2023 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

B.    *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    *Jurisdiction and Venue*.  This Court has core jurisdiction over these cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order approving the relief sought in the DIP Motion consistent with Article III of the United States Constitution.  Venue for these cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9013, and 9014, and Bankruptcy Local Rules 2002-1, 4001-2, and 9013-1.

D.    *Committee Formation*.  As of the date hereof, the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") has not appointed an official committee of unsecured creditors in these cases (a "<u>Creditors' Committee</u>") or any other statutory committee.

---

[4]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.      *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the DIP Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, Bankruptcy Rules and Bankruptcy Local Rules, and no other or further notice was or shall be required under the circumstances.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

F.      *Cash Collateral*.  As used herein, the term "Cash Collateral" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties or DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

G.      *Debtors' Stipulations*.  Subject to the provisions and limitations contained in paragraph 17 hereof, and after consultation with their attorneys, the Debtors admit, stipulate and agree that:

(i)      *Prepetition B-2 Term Loan*.  Pursuant to that certain Amended and Restated Credit Agreement, dated as of September 11, 2019 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition B-2 Credit Agreement" and, collectively with all other agreements (including all Loan Documents (as defined therein)), documents, and instruments executed or delivered in connection therewith, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and fee letters, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition B-2 Loan Documents"), by and among (a) Yellow Corp., as borrower (in such capacity, the "Prepetition B-2 Borrower"), (b) the guarantors party thereto (the "Prepetition B-2 Guarantors" and, together with

7

the Prepetition B-2 Borrower, the "Prepetition B-2 Loan Parties"), (c) Alter Domus Products Corp., as administrative and collateral agent (the "Prepetition B-2 Agent"), and (d) the lenders party thereto from time to time (the "Prepetition B-2 Lenders" and, together with the Prepetition B-2 Agent, the "Prepetition B-2 Secured Parties"), Prepetition B-2 Loan Parties incurred "Obligations" (as defined in the Prepetition B-2 Credit Agreement, the "Prepetition B-2 Obligations") to the Prepetition B-2 Secured Parties on a joint and several basis;

(ii)     *Prepetition ABL Facility*.  Pursuant to that certain Loan and Security Agreement, dated as of February 13, 2014 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition ABL Credit Agreement", collectively with all other agreements (including all Loan Documents (as defined therein)), documents, and instruments executed or delivered in connection therewith, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and fee letters, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition ABL Loan Documents", and the credit facilities evidenced thereby, collectively, the "Prepetition ABL Facility") among (a) Yellow Corp, as administrative borrower (together with the other borrowers party thereto, the "Prepetition ABL Borrowers"), (b) the guarantors party thereto (the "Prepetition ABL Guarantors" and, together with the Prepetition ABL Borrowers, the "Prepetition ABL Loan Parties" and, together with the Prepetition B-2 Loan Parties, the "Prepetition Loan Parties"), (c) Citizens Business Capital, a division of Citizens Asset Finance, Inc. (a subsidiary of Citizens Bank, N.A.), as agent (the "Prepetition ABL Agent" and, together with the Prepetition B-2 Agent, the "Prepetition Agents"), (d) the lenders from time to time party thereto (the "Prepetition ABL Lenders" and, together with the Prepetition B-2 Lenders, the "Prepetition Lenders"), and (e) the issuing banks

from time to time party thereto (together with the Prepetition ABL Agent and the Prepetition ABL Lenders, the "Prepetition ABL Secured Parties" and, together with the Prepetition Agents, the Prepetition Lenders, and the Bank Product Providers (as defined in the Prepetition ABL Credit Agreement), the "Prepetition Secured Parties"), the Prepetition ABL Loan Parties incurred "Obligations" (as defined in the Prepetition ABL Credit Agreement, the "Prepetition ABL Obligations" and, together with the Prepetition B-2 Obligations, the "Prepetition Secured Obligations") to the Prepetition ABL Secured Parties on a joint and several basis;

(iii)     *Prepetition Intercreditor Agreement*.  Pursuant to (and to the extent set forth in) that certain Amended and Restated Intercreditor Agreement, dated as of July 7, 2020 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Intercreditor Agreement" and, together with the Prepetition B-2 Loan Documents and the Prepetition ABL Loan Documents, the "Prepetition Loan Documents") by and among the Prepetition ABL Agent, the Prepetition B-2 Agent, the Prepetition UST Tranche A Agent, and the Prepetition UST Tranche B Agent, the parties thereto agreed, among other things, to the relative priority of such parties' respective security interests in the Prepetition Collateral (as defined below), which relative priorities are governed by and set forth in the Prepetition Intercreditor Agreement.  The Prepetition Loan Documents and the Prepetition UST Loan Documents, including the Prepetition Intercreditor Agreement, are, in each case, binding and enforceable against the parties thereto,

(iv)     *Prepetition B-2 Obligations*.  As of the Petition Date, the Prepetition B-2 Loan Parties were validly, justly, and lawfully indebted and liable to the Prepetition B-2 Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, for Loans (as defined in the Prepetition B-2 Credit Agreement) in the aggregate principal amount of not less

than $485,372,693.29, plus accrued and unpaid interest thereon and any fees, exit fees, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees and fees of other consultants and professionals), costs, charges, indemnities, and other Prepetition B-2 Obligations in each case incurred under (or reimbursable pursuant to) or secured by the Prepetition B-2 Loan Documents;

(v)     *Prepetition ABL Obligations*.  As of the Petition Date, the Prepetition ABL Loan Parties were validly, justly and lawfully indebted and liable to the Prepetition ABL Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, for (x) not less than $858,520.35 in outstanding principal amount of Loans (as defined in the Prepetition ABL Credit Agreement) plus accrued and unpaid interest thereon, (y) not less than $359,288,388.60 in outstanding and undrawn Letters of Credit (as defined in the Prepetition ABL Credit Agreement) plus accrued and unpaid fees with respect thereto, and (z) any fees, expenses and disbursements (including any attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, financial advisors' fees, and fees of other consultants and professionals), costs, charges, indemnities, and other Prepetition ABL Obligations (including, without limitation, Bank Product Debt, as defined in the Prepetition ABL Credit Agreement) in each case incurred under (or reimbursable pursuant to) or secured by the Prepetition ABL Loan Documents.  As of the Petition Date, (1) ABL Cash Collateral (as defined below) in an amount equal to $91,449,240.35 is being held on deposit in the Borrowing Base Cash Account (as defined in the Prepetition ABL Credit Agreement) and (2) ABL Cash Collateral (as defined below) in an amount equal to $3,800,000 has been pledged to the Prepetition ABL Agent as security for certain Bank Product Debt owed to Citizens Bank, N.A. and/or its affiliates (such amounts described in this sentence, collectively, the "Existing ABL Cash Collateral Deposits");

(vi)    *Validity of Prepetition Secured Obligations*.    The Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Parties, as applicable, enforceable in accordance with the respective terms of the relevant documents, and no portion of the Prepetition Secured Obligations or any payment made to the Prepetition Secured Parties or applied to or paid on account of the Prepetition Secured Obligations prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action (including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(vii)    *Validity, Perfection and Priority of Prepetition B-2 Liens*.    As of the Petition Date, pursuant to the Prepetition B-2 Loan Documents, the Prepetition B-2 Loan Parties granted to the Prepetition B-2 Agent, for the benefit of the Prepetition B-2 Secured Parties, a security interest in and continuing lien on (the "Prepetition B-2 Liens") substantially all of their respective assets and property (other than Excluded Assets (as defined in the Prepetition B-2 Loan Documents), collectively, the "Prepetition B-2 Collateral"), including: (i) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Non-UST Tranche B Term Priority Collateral (as defined in the Prepetition Intercreditor Agreement), which, for the avoidance of doubt, includes all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition B-2 Priority Collateral"), subject only to any liens permitted by the Prepetition B-2 Loan Documents to be senior to the Prepetition B-2 Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid

11

liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "Prepetition B-2 Permitted Senior Liens"); (ii) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the UST Tranche B Joint Collateral (as defined in the Prepetition Intercreditor Agreement), which, for the avoidance of doubt, includes all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Joint Collateral"), subject only to the *pari passu* liens of the Prepetition UST Tranche B Agent and the Prepetition B-2 Permitted Senior Liens on the Prepetition Joint Collateral; (iii) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition UST Tranche B Priority Collateral, subject and subordinate only to the liens of the Prepetition UST Tranche B Agent and the Prepetition B-2 Permitted Senior Liens on the Prepetition UST Tranche B Priority Collateral; and (iv) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition ABL Priority Collateral, subject and subordinate only to the liens of the Prepetition ABL Agent and the Prepetition B-2 Permitted Senior Liens on the Prepetition ABL Priority Collateral;

(viii)   *Validity, Perfection and Priority of Prepetition ABL Liens.*  As of the Petition Date, pursuant to the Prepetition ABL Loan Documents, the Prepetition ABL Loan Parties granted to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, a security interest in and continuing lien on (the "Prepetition ABL Liens" and, collectively with the Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition UST Tranche B Liens, the "Prepetition Liens") substantially all of their respective assets and property (collectively, the "Prepetition ABL Collateral" and, collectively with the Prepetition B-2 Collateral, Prepetition

UST Tranche A Collateral, and Prepetition UST Tranche B Collateral, the "Prepetition Collateral"), including: (i) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement), which, for the avoidance of doubt, includes all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral"), subject only to any liens permitted by the Prepetition ABL Loan Documents to be senior to the Prepetition ABL Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "Prepetition ABL Permitted Senior Liens" and, collectively with the Prepetition B-2 Permitted Senior Liens, Prepetition UST Tranche A Permitted Senior Liens, and Prepetition UST Tranche B Permitted Senior Liens, the "Prepetition Permitted Senior Liens");[5] (ii) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition B-2 Priority Collateral, subject and subordinate only to the liens of the Prepetition B-2 Agent and the Prepetition ABL Permitted Senior Liens on the Prepetition B-2 Priority Collateral; (iii) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition Joint Collateral, subject and subordinate only to the liens of the Prepetition B-2 Agent and Prepetition UST Tranche B Agent and the Prepetition ABL Permitted Senior Liens on the Prepetition Joint Collateral; and (iv) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition UST Tranche B Priority

---

[5] For the avoidance of doubt, no reference to the "Prepetition Permitted Senior Liens" shall refer to or include the Prepetition Liens.

Collateral, subject and subordinate only to the liens of the Prepetition B-2 Agent and Prepetition UST Tranche B Agent and the Prepetition ABL Permitted Senior Liens on the Prepetition UST Tranche B Priority Collateral;

(ix) *Waiver of Challenge*. None of the Prepetition Liens are subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, subordination, recharacterization, avoidance or other cause of action (including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(x) *No Control*. None of the Prepetition Secured Parties control (or have in the past controlled) any of the Debtors or their respective properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of any Debtor by virtue of any actions taken with respect to, in connection with, related to or arising from any Prepetition Loan Documents;

(xi) *No Claims or Causes of Action*. No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties and each of their respective Representatives (as defined below), in each case, in their capacity as such, under or relating to any agreements by and among the Debtors and any Prepetition Secured Party that is in existence as of the Petition Date; and

(xii) *Release*. Effective as of the date of entry of this Interim Order, each of the Debtors and each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties, the DIP Secured Parties, and each of their respective Representatives

14

(solely in their capacities as such) (collectively, the "Released Parties"), from any and all liability

to the Debtors (and their successors and assigns) and from any and all claims, counterclaims,

demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of

any kind, nature and description, whether matured or unmatured, known or unknown, asserted or

unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or

unliquidated, pending or threatened, arising in law or equity, in contract or tort, in each case arising

out of or related to the Prepetition Loan Documents, the DIP Facility, the DIP Documents, the

New Money DIP Term Loans, the DIP Roll-Up Loans, the negotiation thereof, and the transactions

and agreements reflected thereby, that the Debtors at any time had, now have or may have, or that

their predecessors, successors or assigns at any time had or hereafter may have against any of the

Released Parties for or by reason of any act, omission, matter, or cause arising at any time on or

prior to the date of this Interim Order; *provided* that the release set forth in this section shall not

release (i) any claims against or liabilities of a Released Party that a court of competent jurisdiction

determines has resulted from such Released Party's bad faith, fraud, gross negligence, or willful

misconduct, or (ii) any DIP Secured Party(ies) from honoring its/their obligations to the Debtors

under the DIP Documents.

H.    *Findings Regarding DIP Financing and Use of Cash Collateral.*

(i)    Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the DIP Loan Parties to obtain financing pursuant to the DIP Documents.

(ii)    The Debtors have demonstrated an immediate and critical need to obtain the DIP Financing and to use Prepetition Collateral (including Cash Collateral) in order to, among other things, maintain, administer, and preserve certain limited operations and maximize the value of their estates through an orderly winddown process of their businesses and comprehensive sale effort of their assets.  Without the ability of the Debtors to obtain sufficient working capital and liquidity through the proposed DIP Financing and the use of Cash Collateral as set forth in this Interim Order, the Debtors, their estates, and parties-in-interest would be immediately and irreparably harmed.  Accordingly the Debtors have an immediate need to obtain the DIP Financing and to use Cash Collateral as set forth in this Interim Order to, among other things, maximize the value of the assets of the Debtors' estates to maximize the recovery to all creditors of the estates.

(iii)    The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents.  The Debtors are also unable to obtain secured credit without granting to the DIP Secured Parties the DIP Liens and the DIP Superpriority Claims (each as defined below) and incurring the Adequate Protection Obligations (as defined below) on the terms and subject to the conditions set forth in this Interim Order and in the DIP Documents.

(iv)    Based on the DIP Motion, the First Day Declaration, the Kaldenberg Declaration, the Whittman Declaration, and the record and argument presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the adequate protection granted to

the Prepetition Secured Parties as provided in paragraphs 12–14 of this Interim Order and with respect to the Prepetition UST Secured Parties as provided in the Interim UST Cash Collateral Order (collectively, the "Adequate Protection"), and the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are consistent with the Bankruptcy Code, including section 506(b) thereof, are fair and reasonable, and reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties under the circumstances.

(v)     This Interim Order, the DIP Financing, the Adequate Protection, and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, the DIP Secured Parties, and the Prepetition Secured Parties (each of whom acted in good faith in negotiating such documents), and all of the loans and other financial accommodations extended by the DIP Secured Parties and the Prepetition Secured Parties (as applicable) to the DIP Loan Parties under, in respect of, or in connection with, the DIP Financing and the DIP Documents (including the granting of the Adequate Protection Liens (as defined below) and other adequate protections provided herein), shall be deemed to have been extended by the DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and their respective successors and assigns) and such Prepetition Secured Parties (and their respective successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(vi)     The Prepetition B-2 Lenders (or their affiliates) have agreed to provide the New Money DIP Term Loans for the benefit of the Debtors' estates, the other Prepetition Secured

Parties, all holders of administrative expense claims against the Debtors, and all other creditors in lieu of exercising their rights to immediately seek relief from the automatic stay under section 362(d) of the Bankruptcy Code with respect to the Prepetition B-2 Priority Collateral (as defined below).

(vii)    The Prepetition Secured Parties and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of this Interim Order, the DIP Facilities and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facilities or the use of Cash Collateral, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing.  Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and the DIP Secured Parties shall be and hereby are indemnified (as applicable) as provided in the Prepetition Loan Documents and the DIP Documents, as applicable, including, without limitation, Section 10.05 of the DIP Credit Agreement, Section 10.05 of the Prepetition B-2 Credit Agreement, and Section 15.2 of the Prepetition ABL Credit Agreement.

(viii)    The Prepetition Secured Parties are entitled to the Adequate Protection as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the DIP Motion and on the record presented to the Court, the terms of the proposed Adequate Protection are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral, including Cash Collateral.

(ix)     To the extent that their consent is required, the requisite Prepetition Secured Parties have consented or are deemed to have consented to the use of Prepetition Collateral, including Cash Collateral, and the priming of the Prepetition Liens on the Prepetition Collateral by the DIP Liens, in each case on the terms set forth in this Interim Order; *provided* that nothing in this Interim Order or the DIP Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Interim Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering Prepetition Collateral or Prepetition UST Collateral (whether senior or junior) other than as contemplated by this Interim Order, or (z) prejudice, limit or otherwise impair the rights of any Prepetition Secured Party or Prepetition UST Secured Party to seek new, different or additional adequate protection or assert any other right, and the rights of any other party in interest, including the DIP Loan Parties to object to such relief, are hereby preserved, subject to the terms and conditions of the Prepetition Intercreditor Agreement.

(x)     The Debtors have prepared and delivered to the advisors to the DIP Secured Parties an initial budget (the "Initial DIP Budget"), attached hereto as Schedule 1.  The Initial DIP Budget reflects, among other things, the Debtors' anticipated operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each calendar week covered thereby.  The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement and in consultation with the Prepetition ABL Agent.  Each subsequent budget, once otherwise approved in accordance with the DIP Credit Agreement and in consultation with the Prepetition ABL Agent, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget, an "Approved Budget").

(xi)      Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

I.      *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  Absent the relief granted in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Financing and continued use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Documents, are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.  The DIP Motion and this Interim Order comply with the requirements of Bankruptcy Local Rule 4001-2.

J.      *Prepetition Permitted Senior Liens; Continuation of Prepetition Liens*.  Nothing herein constitutes a finding or ruling by this Court that any alleged Prepetition Permitted Senior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Secured Parties, or the other Prepetition Secured Parties, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Senior Lien.  For the avoidance of doubt, the right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code does not constitute a Prepetition Permitted Senior Lien, and such right is expressly subject to the DIP Liens and the Prepetition Liens (each as defined herein).  The Prepetition Liens and the DIP Liens are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens.

K.     *Intercreditor Agreement.*   Pursuant to section 510 of the Bankruptcy Code, the Prepetition Intercreditor Agreement shall (i) remain in full force and effect, (ii) continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties and Prepetition UST Secured Parties (including the relative priorities, rights and remedies of such parties with respect to replacement liens, administrative expense claims and superpriority administrative expense claims or amounts payable in respect thereof), and (iii) not be deemed to be amended, altered or modified by the terms of this Interim Order, the Interim UST Cash Collateral Order, or the DIP Documents, unless expressly set forth therein or herein, as applicable.

L.     *DIP Roll-Up Loans.* Upon entry of this Interim Order, the Roll-Up Amount shall be rolled up and converted into DIP Obligations (the "DIP Roll-Up Loans").  The Prepetition B-2 Lenders that are also DIP Lenders (or affiliates thereof) would not have consented to extend the DIP Financing or other financial accommodations to the Debtors without the inclusion of the DIP Roll-Up Loans in the DIP Obligations.  Thus, the roll-up is consideration for, and solely on account of, the agreement of the DIP Lenders (or affiliates thereof) to extend the New Money DIP Term Loans.

M.     Contemporaneous with the entry of this Interim Order, the Court is entering the Interim UST Cash Collateral Order granting Adequate Protection to the Prepetition UST Secured Parties.

Based upon the DIP Motion, the foregoing findings and conclusions, and the overall record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      *Motion Granted*.  The DIP Motion is granted on an interim basis on the terms and conditions set forth in this Interim Order.  All objections to the Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby overruled on the merits.

2.      *Authorization of the DIP Financing and the DIP Documents.*

(a)      The DIP Loan Parties are hereby authorized to execute, deliver, enter into and perform all of their obligations under the DIP Documents and perform such other acts as may be necessary, appropriate or desirable in connection therewith.  The Borrower is hereby authorized upon entry of this Interim Order to borrow up to and draw $60 million pursuant to the DIP Credit Agreement, and the DIP Guarantors are hereby authorized to guarantee the Borrower's obligations on account of this Interim Draw, subject to any limitations set forth in the DIP Documents.  The proceeds of the DIP Loans shall be used for all purposes permitted under the DIP Documents and the Interim Order, in each case subject to and in accordance with the Approved Budget (subject to any Permitted Variances (as defined in the DIP Credit Agreement)).

(b)      Upon entry of this Interim Order, the Roll-Up Amount shall be deemed rolled up and constitute DIP Obligations.  The Debtors are authorized to take such acts as shall be necessary or desirable to effect the roll-up and conversion of the Prepetition B-2 Obligations beneficially owned by the DIP Lenders (or their affiliates) in the Roll-Up Amount.

(c)      In furtherance of the foregoing and without further approval of this Court, each DIP Loan Party is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents, execute or record pledge and security agreements, mortgages, financing statements and other similar documents, if any, and

22

to pay all fees, expenses and indemnities in connection with or that may be reasonably required, necessary, or desirable in connection with for the DIP Financing, including, without limitation:

(i)  the execution and delivery of, and performance under, each of the DIP Documents;

(ii)  the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the DIP Secured Parties may accept, it being understood that no further approval of this Court shall be required for any such amendments, waivers, consents or other modifications or the payment of any fees, including attorneys', accountants', appraisers' and financial advisors' fees, and other expenses, charges, costs, indemnities and other like obligations in connection therewith) that do not shorten the scheduled maturity of the DIP Facility, increase the aggregate DIP Commitments, increase the rate of interest or fees payable thereunder, or release any DIP Liens.  Updates, modifications, and supplements to the Approved Budget in accordance with this Interim Order and the DIP Credit Agreement shall not require any further approval of this Court, but, for the avoidance of doubt, shall be made in consultation with the Prepetition ABL Agent;

(iii)  the non-refundable payment to any of the DIP Secured Parties of any fees in connection with the DIP Facility, including any amendment fees, premiums, servicing fees, audit fees, liquidator fees, structuring fees, arrangement fees, administrative agent's, collateral agent's or security trustee's fees, upfront fees, closing fees, commitment premiums, exit fees, closing date fees, prepayment fees or agency fees, and any amounts due in respect of any indemnification and expense reimbursement obligations, including, without limitation, reasonable and documented fees and out-of-pocket expenses of professionals retained by, or on behalf of, any

23

of the DIP Secured Parties (including, without limitation, those of Milbank LLP, White & Case LLP, FTI Consulting, Inc., Cousins Law LLC, any local legal counsel or other advisors in any foreign jurisdiction (provided no more than one local legal counsel or other advisor in any foreign jurisdiction), and any other advisors as permitted under the DIP Documents), in each case, as provided in the DIP Documents (collectively, the "DIP Fees and Expenses"), without the need to file retention or fee applications; the payment of the foregoing amounts shall be irrevocable, and shall be deemed to have been approved upon entry of this Interim Order, whether any such obligations arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law.

3.      *DIP Obligations*.   Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party and their estates in accordance with their respective terms and this Interim Order, and any successors thereto, including any trustee appointed in these chapter 11 cases (the "Chapter 11 Cases"), or in any case under chapter 7 of the Bankruptcy Code upon conversion of any of these cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").   Upon execution and delivery of the DIP Documents, the DIP Obligations shall include all loans and any other indebtedness or obligations, contingent or absolute, which may from time to time be owing by any of the DIP Loan Parties to any of the DIP Secured Parties, in such capacities, in each case, under the DIP Documents and this Interim Order, including all principal, interest, costs, fees, expenses,

premiums, indemnities and other amounts.  The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations.  Except as (and solely to the extent) expressly provided herein, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Agent and/or the other DIP Secured Parties shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.    *Carve-Out.*

(a)    As used herein, the "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee

Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap").  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, lead counsel to the Prepetition ABL Agent, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement) and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)     Delivery of Weekly Fee Statements. Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided, that, within one business day of the

occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the DIP Agent and Prepetition Agent). If any Professional Person fails to deliver a Weekly Statement within three (3) calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person.

(c)    Carve-Out Reserves.

(i)    Commencing with the week ended August 11, 2023, and on or before the Thursday of each week thereafter, the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of (a) the greater of (i) the aggregate unpaid amount of all Estimated Fees and Expenses reflected in the Weekly Statement delivered on the immediately prior Wednesday to the Debtors and the DIP Agent, and (ii) the aggregate amount of unpaid Allowed Professional Fees contemplated to be incurred in the Approved Budget during such week, *plus* (b) an amount equal to the amount of Allowed Professional Fees set forth in the Budget for the week occurring after the most recent Calculation Date.  The Debtors shall deposit and hold such amounts in a segregated account at the

DIP Agent in trust (the "Funded Reserve Account") to pay such Allowed Professional Fees (the "Funded Reserves") prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Termination Declaration Date shall be paid first from such Funded Reserve Account.

(ii)     On the day on which a Carve-Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date, including cash in the Funded Reserve Account, and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve-Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve-Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve-Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap.  The Debtors shall deposit and hold such amounts in a segregated account at the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve-Out Trigger Notice Cap (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above (the "Pre-Carve-Out Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice

Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties and the Prepetition UST Secured Parties in accordance with their rights and priorities as set forth in this Interim Order and the Interim UST Cash Collateral Order.  All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "Post-Carve-Out Amounts"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties and the Prepetition UST Secured Parties in accordance with their rights and priorities as set forth in this Interim Order and the Interim UST Cash Collateral Order.  Notwithstanding anything to the contrary in the DIP Documents, or this Interim Order, if either of the Carve-Out Reserves is not funded in full in the amounts set forth in this paragraph 4, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in this paragraph 4, prior to making any payments to the DIP Agent or the Prepetition Secured Parties and the Prepetition UST Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent, the Prepetition UST Agent, and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a security interest in any residual

interest in the Carve-Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents, this Interim Order, and the Interim UST Cash Collateral Order.  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the DIP Credit Agreement) or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Loan Document, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the ABL 507(b) Claims, B-2 507(b) Claims, UST Tranche A 507(b) Claims, UST Tranche B 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(d)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(e)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with these Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse

expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)    <u>Payment of Carve-Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(a)    <u>Reservation of Rights</u>.  Nothing in this Interim Order shall be construed as a waiver of any right of the DIP Secured Parties or any of the Prepetition Secured Parties to object to any fee statement, interim application, or monthly application issued or filed by any Professional Persons.

5.    *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations, including the DIP Roll-Up Loans, shall constitute allowed superpriority administrative expense claims (the "<u>DIP Superpriority Claims</u>") against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties (but for the avoidance of doubt, junior to the Carve-Out and the Canadian Priority Charges), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien,

levy or attachment.  The DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (excluding (x) the Carve-Out Reserves and amounts held therein other than the DIP Secured Parties' reversionary interest therein and (y) claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, the "Avoidance Actions"), but including any proceeds or property recovered as a result of any Avoidance Actions (but not the Avoidance Actions themselves), whether by judgment, settlement or otherwise (the "Avoidance Proceeds")), subject only to the Carve-Out and the Canadian Priority Charges and (i) solely in respect of any assets that constitute Prepetition ABL Priority Collateral, the ABL 507(b) Claims (as defined below) and the Prepetition ABL Obligations, and (ii) solely in respect of any assets that constitute Prepetition Joint Collateral or Prepetition UST Tranche B Priority Collateral, the UST Tranche B 507(b) Claims (as defined below) and the Prepetition UST Tranche B Obligations.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

6.     *DIP Liens*.  As security for the DIP Obligations, effective and automatically properly perfected on the date this Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Agent of, or over, any Collateral, without any further action by the DIP Secured Parties, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "DIP Liens") are hereby granted to the DIP Agent for the benefit of the DIP Secured Parties (all property identified in clauses (a) through (e) below being collectively referred to as the "DIP Collateral," and, together with the Prepetition Collateral, the "Collateral"):

(a)    *Liens on Unencumbered Property.*  Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject only to the Carve-Out and the Canadian Priority Charges) all tangible and intangible prepetition and postpetition property of the DIP Loan Parties, other than "Excluded Property" (as defined in the DIP Credit Agreement) whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than the Avoidance Actions and the Carve-Out Reserves (and any amounts held therein), but including, upon and subject to entry of the Interim Order, the Avoidance Proceeds (collectively, the "Unencumbered Property," and such liens, the "DIP Unencumbered Property Liens")).

(b)    *Liens Priming Certain Prepetition Secured Parties' Liens.*  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest (subject and subordinate to the Carve-Out and Canadian Priority Charges`) in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition B-2 Priority Collateral, regardless of where located (the "DIP Priming Liens").  Notwithstanding anything herein to the contrary, the DIP Priming Liens shall be (A) senior in all respects to the other Prepetition Liens on the Prepetition B-2 Priority Collateral, (B) senior to any Adequate Protection Liens on the Prepetition B-2 Priority Collateral, and (C) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens with respect to the

Prepetition B-2 Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming Liens.

(c)    *Junior Liens Priming Certain Prepetition Secured Parties' Liens on Prepetition ABL Priority Collateral*.    Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior (subject only to (1) the Carve-Out, (2) the Canadian Priority Charges, (3) the ABL Adequate Protection Liens (as defined below), and (4) the Prepetition ABL Liens) priority priming security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition ABL Priority Collateral, regardless of where located, which security interest and lien shall prime the Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition UST Tranche B Liens on the Prepetition ABL Priority Collateral (the "<u>DIP Priming ABL Third Liens</u>").    Notwithstanding anything herein to the contrary, the DIP Priming ABL Third Liens shall be (A) senior in all respects to the Prepetition Liens and Adequate Protection Liens on the Prepetition ABL Priority Collateral other than the Prepetition ABL Liens and ABL Adequate Protection Liens, and (B) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.    The Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition UST Tranche B Liens with respect to the Prepetition ABL Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming ABL Third Liens.

(d)    *Junior Liens Priming Certain Prepetition Secured Parties' Liens on Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral*.    Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior (subject only to (1) the Carve-Out, (2) the Canadian Priority

34

Charges, (3) the UST Tranche B Adequate Protection Liens (as defined below), and (4) the Prepetition UST Tranche B Liens) priority priming security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, regardless of where located, which security interest and lien shall prime the Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition ABL Liens on the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral (the "DIP Priming UST Tranche B Third Liens").  Notwithstanding anything herein to the contrary, the DIP Priming UST Tranche B Third Liens shall be (A) senior in all respects to the Prepetition Liens and Adequate Protection Liens on the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral other than the Prepetition UST Tranche B Liens and UST Tranche B Adequate Protection Liens, and (B) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition ABL Liens with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral shall be primed by and made subject and subordinate to the DIP Priming UST Tranche B Third Liens.

(e)    *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected security interest in and lien upon all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that, on or as of the Petition Date, is subject to Prepetition Permitted Senior Liens, which shall be (A) with respect to the Prepetition B-2 Priority Collateral, immediately junior and subordinate to the Prepetition B-2 Permitted Senior Liens, (B) with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, immediately junior and subordinate to the

Prepetition UST Tranche B Permitted Senior Liens, and (C) with respect to the Prepetition ABL Priority Collateral, immediately junior and subordinate to the Prepetition ABL Permitted Senior Liens, but (1) senior to the Prepetition Liens and Adequate Protections Liens on all Prepetition B-2 Priority Collateral subject to such Prepetition Permitted Senior Liens, (2) junior to the UST Tranche B Adequate Protection Liens and Prepetition UST Tranche B Liens but senior to the Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition ABL Liens on all Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral subject to such Prepetition Permitted Senior Liens, and (3) junior to the ABL Adequate Protection Liens and Prepetition ABL Liens but senior to the Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition UST Tranche B Liens on all Prepetition ABL Priority Collateral subject to such Prepetition Permitted Senior Liens.

(f) *No Senior Liens.* The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, or (C) any intercompany liens; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code unless otherwise provided for in the DIP Documents or in this Interim Order.

7. *Protection of DIP Lenders' and Prepetition Secured Parties' Rights.*

(a)      Except as and to the extent set forth in clauses (b) and (c) immediately below, to the extent any Prepetition Secured Party has possession of, or control over, any Prepetition Collateral or DIP Collateral, or has been listed as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, such Prepetition Secured Party shall be deemed to have such possession or be so listed or have such possession or control as a gratuitous bailee and/or gratuitous agent for the benefit of the DIP Secured Parties, and such Prepetition Secured Party shall comply with the instructions of the DIP Agent with respect to any of the foregoing.

(b)      So long as there are any Prepetition ABL Obligations or ABL 507(b) Claims outstanding and until all Prepetition ABL Obligations and ABL 507(b) Claims have been, solely with respect to the Prepetition ABL Priority Collateral, paid in full, the enforcement rights of the DIP Secured Parties or Prepetition Secured Parties other than the Prepetition ABL Secured Parties with respect to the Prepetition ABL Priority Collateral shall be subject to the terms of the Prepetition Intercreditor Agreement as if the DIP Agent was party thereto as a Tranche B-2 Term Agent (as defined in the Prepetition Intercreditor Agreement).

(c)      So long as there are any Prepetition UST Tranche B Obligations or UST Tranche B 507(b) Claims outstanding and until all Prepetition UST Tranche B Obligations and UST Tranche B 507(b) Claims have been, solely with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, paid in full, the enforcement rights of the DIP Secured Parties or Prepetition Secured Parties other than the Prepetition UST Tranche B Secured Parties with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral shall be subject to the terms of the Prepetition Intercreditor Agreement as if the DIP Agent was party thereto as a Tranche B-2 Term Agent.

37

(d)     Except as set forth in clauses (b) and (c) immediately above or as otherwise set forth in this Interim Order (including paragraph 11) with respect to the Prepetition ABL Priority Collateral, Prepetition Joint Collateral, and Prepetition UST Tranche B Priority Collateral, any proceeds of Prepetition Collateral received by any Prepetition Secured Party, whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise, shall be segregated and held in trust for the benefit of, and forthwith paid over to, the DIP Agent for the benefit of the DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct. The DIP Agent is hereby authorized to make any such endorsements as agent for the applicable Prepetition Secured Parties.  This authorization is coupled with an interest and is irrevocable.

(e)     The DIP Loan Parties shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents or, (i) in the case of any DIP Collateral other than DIP Priority Collateral (as defined in the DIP Credit Agreement) or Prepetition B-2 Priority Collateral, an order of the Court or (ii) in the case of the UST Tranche B Priority Collateral and the UST Tranche B Joint Collateral, except with an order of the Court.

(f)     Upon the occurrence and during the continuation of an Event of Default that has not been waived by the Required Lenders under the DIP Credit Agreement and following delivery of written notice (a "Termination Notice") (which may be by e-mail) on not less than three (3) business days' notice (such three (3) business day period, the "DIP Agent Remedies Notice Period") to lead restructuring counsel to the Debtors, lead restructuring counsel to each of the Prepetition Agents, lead counsel to the Creditors' Committee, counsel to the Prepetition UST Secured Parties, and the U.S. Trustee (the "Remedies Notice Parties"), the DIP Agent may (and

any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order (including this paragraph) is hereby modified), without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agent to, unless the Court orders otherwise (provided that during the DIP Agent Remedies Notice Period (as defined below), the Debtors, the Creditors' Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing with the Court for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing or to obtain non-consensual use of Cash Collateral (and the rights of the DIP Secured Parties and the Prepetition Secured Parties are fully preserved), and provided further that if a request for such hearing is made prior to the end of the DIP Agent Remedies Notice Period, then the DIP Agent Remedies Notice Period shall be continued until the Court hears at its earliest availability and rules with respect thereto) take any or all of the following actions, at the same time or different times: (a) immediately terminate and/or revoke the Debtors' right under this Interim Order and any other DIP Documents to use any Cash Collateral (subject to the Carve-Out and related provisions and the Canadian Priority Charges), (b) terminate the DIP Facility and any DIP Document as to any future liability or obligation of the DIP Secured Parties but without affecting any of the DIP Obligations or the DIP Liens securing such DIP Obligations; (c) declare all DIP Obligations to be immediately due and payable; (d) deliver a Carve Out Trigger Notice; and (e) invoke the right to charge interest at the default rate under the DIP Documents. Upon delivery of such Termination Notice by the DIP Agent, without further notice or order of the Court, subject only to the last sentence of paragraph 7(g), the DIP Secured Parties' and the Prepetition Secured Parties' consent to use Cash Collateral and the Debtors' ability to incur additional DIP Obligations hereunder will automatically terminate and the DIP Secured Parties

will have no obligation to provide any DIP Loans or other financial accommodations. As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of same on the docket.

(g)     Immediately following the occurrence of an Event of Default and the delivery of the Termination Notice, subject to the DIP Agent Remedies Notice Period, the DIP Secured Parties shall be authorized to, subject to the Prepetition Intercreditor Agreement and the Carve-Out and related provisions and the Canadian Priority Charges: (a) freeze monies or balances in the Debtors' accounts (unless such monies constitute Prepetition ABL Priority Collateral, Joint Priority Collateral, or Prepetition UST Tranche B Priority Collateral); (b) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Secured Parties against the DIP Obligations (unless such amounts constitute Prepetition ABL Priority Collateral, Joint Priority Collateral, or Prepetition UST Tranche B Priority Collateral), (c) enforce any and all rights against the DIP Collateral (other than Prepetition ABL Priority Collateral, Joint Priority Collateral, or Prepetition UST Tranche B Priority Collateral), including, without limitation, foreclosure on all or any portion of the DIP Collateral (other than Prepetition ABL Priority Collateral, Joint Priority Collateral, or Prepetition UST Tranche B Priority Collateral), occupying the Debtors' premises, sale or disposition of the DIP Collateral (other than Prepetition ABL Priority Collateral, Joint Priority Collateral, or Prepetition UST Tranche B Priority Collateral); and (d) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Documents or applicable law (other than with respect to Prepetition ABL Priority Collateral, Joint Priority Collateral, or Prepetition UST Tranche B Priority Collateral). If the DIP Secured Parties are not prohibited by the Court from taking any enforcement action with respect to the DIP Collateral (other than Prepetition ABL Priority Collateral, Joint

40

Priority Collateral, or Prepetition UST Tranche B Priority Collateral), the Debtors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral (other than Prepetition ABL Priority Collateral, Joint Priority Collateral, or Prepetition UST Tranche B Priority Collateral), and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security interests in the DIP Collateral.  During the DIP Agent Remedies Notice Period, the Debtors may use the proceeds of the DIP Facility to the extent drawn prior to the occurrence of an Event of Default and Cash Collateral to make payments, in each case, solely in accordance with the Approved Budget and the terms of the DIP Documents and to the extent necessary to avoid immediate and irreparable harm to the Collateral and protection and preservation thereof.

(h)     Upon the occurrence and continuance of any of the below events (each, a "Cash Collateral Termination Event"), any such event being deemed an Event of Default, the Prepetition ABL Agent, on not less than three (3) business days' notice to the Remedies Notice Parties (such three (3) business day period, the "ABL Remedies Notice Period"), and unless the Court orders otherwise (*provided* that during the ABL Remedies Notice Period, the Debtors, the Creditors' Committee (if appointed), and/or any party in interest shall be entitled to seek an emergency hearing with the Court for the purpose of contesting whether, in fact, a Cash Collateral Termination Event has occurred and is continuing or to obtain non-consensual use of Cash Collateral), may terminate its and the Prepetition ABL Secured Parties' consent to the Debtors' use of Cash Collateral constituting Prepetition ABL Priority Collateral (the date of such termination, the "Cash Collateral Termination Date"): (i) the DIP Obligations have been accelerated in accordance with the terms of the DIP Credit Agreement; (ii) the filing of any motion or pleading by the Debtors, or the entry of an order on account of a motion filed by any other party,

41

to stay, vacate, reverse, amend or modify the Interim Order or Final Order in a manner adverse to the Prepetition ABL Secured Parties without the consent of the Prepetition ABL Secured Parties; (iii) the entry of an order appointing a trustee, receiver or examiner with expanded powers with respect to any of the Debtors; (iv) the Debtors shall attempt to invalidate, reduce or otherwise impair the Prepetition ABL Obligations; (v) the dismissal of any of the Chapter 11 Cases; (vi) the effective date of any plan of reorganization; (vii) the conversion of any of the Chapter 11 Cases to a case under chapter 7; (viii) the delivery of a Carve-Out Trigger Notice as provided in this Interim Order; or (ix) the failure of the Debtors to make any payments as and when required under paragraph 11(c) and paragraph 12(a)(iii) of this Interim Order; (x) the Final Order (in form and substance reasonably acceptable to the Prepetition ABL Agent) shall not have been entered by the Court within thirty (30) days of the Petition Date; (xi) the Prepetition ABL Obligations shall not have been fully repaid or cash collateralized, as applicable, in accordance with the Prepetition ABL Loan Documents by the date that is four (4) months after the Petition Date; (xii) the Debtors shall materially breach any of the other provisions of paragraph 11 of this Interim Order; (xiii) any Approved Budget shall be updated, supplemented, replaced, or otherwise modified without prior consultation with the Prepetition ABL Agent; or (xiv) at any time on or after the date that is four (4) weeks after the Petition Date, the Debtors shall breach the receipts variance covenant set forth on Exhibit 2 attached hereto.

(i)      Immediately upon the occurrence of the Cash Collateral Termination Date, the Prepetition ABL Secured Parties shall be authorized, subject to the Prepetition Intercreditor Agreement and the Carve-Out and the Canadian Priority Charges, to: (a) freeze monies or balances in the Debtors' accounts which constitute proceeds of ABL Priority Collateral; (b) immediately set-off any and all amounts in accounts maintained by the Debtors to the extent such amounts

constitute proceeds of ABL Priority Collateral; (c) enforce any and all rights against the DIP Collateral that constitutes proceeds of ABL Priority Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral constituting ABL Priority Collateral and occupying the Debtors' premises; and (d) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the Prepetition ABL Loan Documents or applicable law, subject to the Prepetition Intercreditor Agreement.  If the Prepetition ABL Secured Parties are permitted by the Court to take any enforcement action with respect to the ABL Priority Collateral, the Debtors shall cooperate with the Prepetition ABL Secured Parties in their efforts to enforce their security interest in the ABL Priority Collateral, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such Prepetition ABL Secured Parties from enforcing their security interests in the ABL Priority Collateral.

(j)      No rights, protections or remedies of the DIP Secured Parties, the Prepetition Secured Parties, or the Prepetition UST Secured Parties granted by this Interim Order, the Interim UST Cash Collateral Order, or the DIP Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

8.      *Limitation on Charging Expenses Against Collateral.*  Except to the extent of the Carve Out, no costs or expenses of administration of these cases or any Successor Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the DIP

Collateral, Prepetition B-2 Collateral, or Prepetition ABL Collateral (in each case, including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Prepetition B-2 Agent, or the Prepetition ABL Agent, as applicable, and no consent shall be implied from any action, inaction or acquiescence by any of the DIP Secured Parties, Prepetition B-2 Secured Parties, or Prepetition ABL Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties, Prepetition B-2 Secured Parties, or Prepetition ABL Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.  Further, effective upon entry of this Interim Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the DIP Secured Parties or Prepetition Secured Parties

9.      *No Marshaling*.  Effective upon entry of this Interim Order, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Collateral, or the Prepetition Obligations, as applicable.

10.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Secured Parties or Prepetition Secured Parties pursuant to the provisions of this Interim Order, the DIP Documents or any subsequent order of the Court shall, subject to the reservation of rights set out in paragraph 21 of this Interim Order with respect to the Prepetition Secured Parties, be irrevocable, received free and clear of any claim, charge, assessment or other liability.

11.     *Use of Cash Collateral*.

(a)     *Authorization to Use Cash Collateral*. The Debtors are hereby authorized, solely on the terms and conditions of this Interim Order and the Interim UST Cash Collateral

Order, to use all Cash Collateral in accordance with the DIP Documents and Approved Budget (subject to Permitted Variances).

(b)     *Proceeds of New Money DIP Term Loans*.  All proceeds of the New Money DIP Term Loans shall be funded and held in the Cash Collateral Account (as defined in the DIP Credit Agreement) in accordance with the terms of the DIP Credit Agreement, which Cash Collateral Account shall be maintained as a segregated account by the Borrower as set forth in the DIP Credit Agreement.  For the avoidance of doubt, none of the Cash Collateral Account, any funds therein constituting New Money DIP Term Loans, or any proceeds of the New Money DIP Term Loans (exclusive, for the avoidance of doubt, of any proceeds constituting Prepetition ABL Priority Collateral) shall constitute Prepetition ABL Priority Collateral or be subject to any terms or provisions in this Interim Order governing ABL Cash Collateral.

(c)     *Procedures for Use of ABL Cash Collateral*.

(i)     *Delivery of ABL Cash Collateral to Prepetition ABL Agent*.  No later than the first business day after the date that this Interim Order is entered, the Debtors shall remit to the Prepetition ABL Agent cash equal to $16,500,000 in respect of Cash Collateral constituting Prepetition ABL Priority Collateral ("ABL Cash Collateral") that was collected on or before August 2, 2023.  Beginning on the first business day after the date that this Interim Order is entered, and on each business day thereafter following receipt of any ABL Cash Collateral, the Debtors shall (x) wire 80% of the amount of ABL Cash Collateral received on or after August 3, 2023 into the applicable Debtor's blocked account ending *8700 maintained at Citizens Bank on the first business day following receipt of the funds to the extent not already remitted (or such other account as the Prepetition ABL Agent and Yellow Corp may agree in writing from time to time), to the extent not wired prior to the Petition Date (it being acknowledged that the Prepetition ABL Agent

received two such wires prior to the Petition Date in respect of such percentage of the ABL Cash Collateral received on August 3, 2023 and a portion of the ABL Cash Collateral received on August 4, 2023), or (y) otherwise deliver 80% of the ABL Cash Collateral received on or after August 3, 2023 to the Prepetition ABL Agent in a manner satisfactory to the Prepetition ABL Agent (such remittance, deposit, or delivery, each a "Daily Delivery Event").  Commencing on the third business day of the week following entry of this Interim Order (and on the third business day of each week thereafter) (each, an "Eligibility Reporting Date"), the Debtors shall deliver to the Prepetition ABL Agent information on collections from the prior week (as well as, if applicable, information regarding postpetition collections from prior thereto if either (a) such information has yet to be reported or (b) such information reflects a change from prior reporting (each of (a) and (b), as applicable, the "Supplemental Reporting")) in form and detail reasonably acceptable to the Prepetition ABL Agent.  On the business day after each Eligibility Reporting Date, the Debtors shall (x) to the extent the cumulative Daily Delivery Events since August 3, 2023 (taking Supplemental Reporting into account, if applicable) resulted in delivery of less than 80% of the amount of ABL Cash Collateral received, remit to the Prepetition ABL Agent ABL Cash Collateral in an amount necessary to equal 80% of the amount of ABL Cash Collateral received on or after August 3, 2023 or (y) to the extent the cumulative Daily Delivery Events since August 3, 2023 (taking Supplemental Reporting into account, if applicable) resulted in delivery in excess of 80% of the amount of ABL Cash Collateral received, deduct from that day's Daily Delivery Event ABL Cash Collateral in an amount necessary to equal 80% of the amount of ABL Cash Collateral received on or after August 3, 2023.  The portion of such ABL Cash Collateral to remain with the Debtors in accordance with this paragraph 11(c)(i) is referred to herein as the "Available ABL Cash Collateral".  The Debtors shall be permitted to access and utilize all Available ABL Cash

Collateral in accordance with the Approved Budget and the terms and provisions of this Interim Order. For the avoidance of doubt, no portion of the Existing ABL Cash Collateral Deposits shall be required to be remitted to the Debtors pursuant to this paragraph 11(c)(i), nor shall any portion of the Existing ABL Cash Collateral Deposits constitute Available ABL Cash Collateral.

(ii)     *ABL Cash Collateral in Prepetition ABL Agent's Possession.* The Prepetition ABL Agent is authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its or any other Prepetition ABL Secured Party's possession or control which constitute Prepetition ABL Priority Collateral or proceeds thereof.

(d)     *Application of Cash Collateral to Prepetition ABL Obligations*. Notwithstanding anything to the contrary in this Interim Order, except with respect to the Available ABL Cash Collateral as set forth in paragraph 11(c)(i), the Prepetition ABL Agent is authorized at any time, and from time to time, to apply all or any portion of the ABL Cash Collateral (including, without limitation, the Existing ABL Cash Collateral Deposits) now or hereafter in the Prepetition ABL Agent's or any other Prepetition ABL Secured Party's possession or control to the payment or cash collateralization, as applicable, of Prepetition ABL Obligations (including, without limitation, any accrued and unpaid ABL Adequate Protection Fees and Expenses in accordance with paragraph 16, without limiting the obligation of the DIP Loan Parties under paragraph 16 to pay such amounts directly) in accordance with the Prepetition ABL Loan Documents, and no other party in interest shall have any right to use or direct the use of such ABL Cash Collateral, except that the Debtors shall have the right to use and direct the use of Available ABL Cash Collateral. All such applications to Prepetition ABL Obligations shall be final, subject only to the right of parties in interest, including the Debtors, to seek a determination in accordance with paragraph 17

of this Interim Order that such applications resulted in the payment of any unsecured prepetition claim of the Prepetition ABL Secured Parties.

(e)    *Accounts Collection Practices.*  The Debtors shall maintain at all times reasonably appropriate staffing, staffing levels, and other resources with respect to Accounts billing and collections in order to maximize the Debtors' recovery of proceeds with respect to such Accounts.  The Debtors shall also provide the Prepetition ABL Agent with reasonable access to all Accounts billing and collections systems and associated staff members.

12.    *Adequate Protection of Prepetition Secured Parties*.  Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral) for the aggregate Diminution in Value and as an inducement to the Prepetition Secured Parties to consent to the priming of the Prepetition Liens and the use of their Cash Collateral, the Prepetition Secured Parties are granted the following Adequate Protection (collectively, the "Adequate Protection Obligations"):

(a)    *Adequate Protection of Prepetition ABL Secured Parties.*

(i)    *ABL Adequate Protection Liens*.  The Prepetition ABL Agent is hereby granted, for the benefit of the Prepetition ABL Secured Parties, effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition ABL Secured Parties' Diminution in Value upon all of the DIP Collateral (the "ABL Adequate Protection Liens"), (i) in the case of the Prepetition ABL Priority Collateral, senior to all other liens, subject solely to the Carve-Out, the Canadian Priority Charges, and the Prepetition Permitted Senior Liens, (ii) in the case of the Prepetition B-2 Priority Collateral, subject and subordinate to, in the

48

following order, (A) the Carve-Out, the Canadian Priority Charges, and the Prepetition Permitted Senior Liens, (A) the DIP Liens, (B) the B-2 Adequate Protection Liens (as defined below), and (C) the Prepetition B-2 Liens, (iii) in the case of the Prepetition Joint Collateral and Prepetition UST Tranche B Collateral, subject and subordinate to, in the following order, (A) the Carve-Out, the Canadian Priority Charges, and the Prepetition Permitted Senior Liens, (B) the UST Tranche B Adequate Protection Liens (as defined below), (C) the Prepetition UST Tranche B Liens, (D) the DIP Liens, (E) the B-2 Adequate Protection Liens, and (F) the Prepetition B-2 Liens, and (iv) in the case of the Unencumbered Property, subject and subordinate to, in the following order, (A) the Carve-Out and the Canadian Priority Charges and (B) the DIP Unencumbered Property Liens.

(ii)     *ABL Section 507(b) Claims*.   The Prepetition ABL Secured Parties are hereby granted allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition ABL Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "ABL 507(b) Claims"), which ABL 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, Avoidance Proceeds).   Except as otherwise provided herein, the ABL 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; *provided*, *however*, that (i) the ABL 507(b) Claims shall be junior to the Carve-Out and the Canadian Priority Charges; (ii) the ABL 507(b) Claims shall be junior to the DIP Superpriority Claims other than as set forth in clause (iii); (iii) with respect to the Prepetition

ABL Priority Collateral, the ABL 507(b) Claims shall be senior to, in the following order, (A) the DIP Superpriority Claims, (B) the B-2 507(b) Claims (as defined below), and (C) the UST Tranche B 507(b) Claims and the UST Tranche A 507(b) Claims (as defined below); (iv) with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, the ABL 507(b) Claims shall be junior to, in the following order, (A) the UST Tranche B 507(b) Claims, (B) the DIP Superpriority Claims, and (C) the B-2 507(b) Claims; and (v) with respect to the Prepetition B-2 Priority Collateral, the ABL 507(b) Claims shall be junior to, in the following order, (A) the DIP Superpriority Claims and (B) the B-2 507(b) Claims.

(iii)    *Prepetition ABL Secured Parties' Interest, Fees and Expenses*.  As further adequate protection, subject to the Carve Out and Canadian Priority Charges, the DIP Loan Parties shall make current cash payments of (x) interest at the Default Rate (as defined in the Prepetition ABL Credit Agreement), (y) fees with respect to Letters of Credit pursuant to Section 3.2.2 of the Prepetition ABL Credit Agreement (including any such fees that accrue at the default rate as set forth therein), and (z) other fees, in each case pursuant to, due, and payable under the terms of the Prepetition ABL Loan Documents, and shall currently pay in cash, subject to the review procedures set forth in paragraph 16 of this Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition ABL Secured Parties' legal and financial advisors, including, without limitation, those of Choate, Hall & Stewart LLP, Richards, Layton & Finger, PA, AlixPartners, LLP, and any local legal counsel or other advisors, consultants, and other professionals reimbursable under the Prepetition ABL Loan Documents (collectively, the "ABL Adequate Protection Fees and Expenses" and, together with the ABL Adequate Protection Liens and ABL 507(b) Claims, the "ABL Adequate Protection Obligations").

(iv)    *Additional Rights and Protections*.  The Debtors shall deliver to the Prepetition ABL Agent (substantially concurrent with delivery to the DIP Agent) all financial statements, reports, certificates and related items that are required to be delivered to the DIP Agent pursuant to the DIP Credit Agreement.  On the third (3rd) business day of each week, the Debtors shall deliver to the Prepetition ABL Agent a Borrowing Base Certificate (as defined in the Prepetition ABL Credit Agreement) as required pursuant to Section 8.1(ii) of the Prepetition ABL Credit Agreement, which shall be accompanied by customary backup reporting in form and detail reasonably acceptable to the Prepetition ABL Agent, including, without limitation, Account agings, and a roll-forward of Prepetition ABL Priority Collateral; *provided* that the first Borrowing Base Certificate of each month following entry of this Interim Order shall further include a line item for Ineligible Accounts and a breakdown of Ineligible Accounts as part of the customary backup reporting provided.  The Debtors shall make the members of their senior management and its professional advisors available for update calls at least one time per calendar week with the prepetition ABL Agent and its respective professional advisors, at times reasonably acceptable to the Prepetition ABL Agent to discuss the cases, the then-current Approved Budget, the Budget Variance Reports, the Liquidity Reports (each as defined in the DIP Credit Agreement), other reporting delivered pursuant to Section 6.02 of the DIP Credit Agreement, union matters, the status of any monetization strategies being pursued by the Debtors, including pursuant to the Bidding Procedures Order (as defined in the DIP Credit Agreement), and any other matters (including business, operational and due diligence matters) reasonably requested by the Prepetition ABL Agent.

(b)    *Adequate Protection of Prepetition B-2 Secured Parties.*

51

(i)      *B-2 Adequate Protection Liens*.  The Prepetition B-2 Agent is hereby granted, for the benefit of the Prepetition B-2 Secured Parties, effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition B-2 Secured Parties' Diminution in Value upon all of the DIP Collateral (the "<u>B-2 Adequate Protection Liens</u>"), (i) in the case of the Prepetition B-2 Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Canadian Priority Charges and the Prepetition Permitted Senior Liens and (B) the DIP Liens, (ii) in the case of the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Canadian Priority Charges and the Prepetition Permitted Senior Liens, (B) the UST Tranche B Adequate Protection Liens, (C) the Prepetition UST Tranche B Liens, and (D) the DIP Liens; (iii) in the case of the Prepetition ABL Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and the Canadian Priority Charges and the Prepetition Permitted Senior Liens, (B) the ABL Adequate Protection Liens, (C) the Prepetition ABL Liens, and (D) the DIP Liens, and (iv) in the case of the Unencumbered Property, subject and subordinate to, in the following order, (A) the Carve-Out and the Canadian Priority Charges and (B) the DIP Unencumbered Property Liens.

(ii)     *B-2 Section 507(b) Claims*.  The Prepetition B-2 Secured Parties are hereby granted allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition B-2 Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "<u>B-2 507(b) Claims</u>," and together with the ABL 507(b) Claims, the "<u>507(b) Claims</u>"), which B-2

507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, Avoidance Proceeds). Except as otherwise provided herein, the B-2 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; *provided*, *however*, that (i) the B-2 507(b) Claims shall be junior to the Carve-Out and the Canadian Priority Charges; (ii) the B-2 507(b) Claims shall be junior to the DIP Superpriority Claims; (iii) with respect to the Prepetition ABL Priority Collateral, the B-2 507(b) Claims shall be junior to, in the following order, (A) the ABL 507(b) Claims and (B) the DIP Superpriority Claims; (iv) with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, the B-2 507(b) Claims shall be junior to, in the following order, (A) the UST Tranche B 507(b) Claims and (B) the DIP Superpriority Claims; and (v) with respect to the Prepetition B-2 Priority Collateral, the B-2 507(b) Claims shall be senior to, in the following order, (A) the ABL 507(b) Claims and (B) the UST Tranche B 507(b) Claims and UST Tranche A 507(b) Claims.

(iii)    *Prepetition B-2 Secured Parties' Fees and Expenses*.  As further adequate protection, the DIP Loan Parties shall currently pay in cash, subject to the review procedures set forth in paragraph 16 of this Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition B-2 Secured Parties' legal and financial advisors, including, without limitation, those of (i) Milbank LLP, FTI Consulting, Inc., Cousins Law LLC, and any local legal counsel or other advisors in any foreign jurisdiction and (ii) White & Case LLP, as counsel to Beal Bank USA and any local legal counsel

or other advisors in any foreign jurisdiction (provided, with respect to each (i) and (ii), respectively, no more than one local legal counsel or other advisor in any foreign jurisdiction) (collectively, the "B-2 Adequate Protection Fees and Expenses" and, together with the B-2 Adequate Protection Liens and B-2 507(b) Claims, the "B-2 Adequate Protection Obligations").

(c)     *Adequate Protection of Prepetition UST Secured Parties.*  The Adequate Protection in favor of the Prepetition UST Secured Parties is set forth in the Interim UST Cash Collateral Order.

13.    *Maintenance of Collateral*.  The DIP Loan Parties shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Loan Documents and the DIP Documents, as applicable.

14.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     Without in any way limiting the validity of the automatic perfection of the DIP Liens and the Adequate Protection Liens under the terms of this Interim Order and the Interim UST Cash Collateral Order, the DIP Secured Parties and the Prepetition Secured Parties are hereby authorized, but not required, to execute in the name of the DIP Loan Parties or the Prepetition Loan Parties (as applicable), as their true and lawful attorneys (with full power of substitution, to the maximum extent permitted by law) and to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar perfection instruments in any jurisdiction, or take possession of certificated securities, or take any other similar action in a manner not inconsistent herewith to document, validate or perfect the liens and security interests granted to them hereunder (the "Perfection Actions").  All such Perfection Actions shall be deemed to have been taken on the date of entry of this Interim Order.  The automatic stay shall be modified to the extent necessary to permit the DIP Secured Parties and each Prepetition Secured Parties to take

any Perfection Action. For the avoidance of doubt, the DIP Liens and the Adequate Protection

Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to

challenge, dispute or subordination, at the time and on the date of entry of this Interim Order,

whether or not the DIP Secured Parties or the Prepetition Secured Parties take such Perfection

Actions.

(b)      A certified copy of this Interim Order may, in the discretion of the DIP

Agent and each Prepetition Agent, be filed or recorded in the filing or recording offices in addition

to or in lieu of any financing statements, mortgages, notices of lien or similar instruments, and all

filing and recording offices are hereby authorized and directed to accept a certified copy of this

Interim Order for filing and/or recording, as applicable.

15.   *Preservation of Rights Granted Under this Interim Order.*

(a)      Other than the claims and liens expressly granted or permitted by this

Interim Order, including the Carve-Out and the Canadian Priority Charges, no claim or lien having

a priority superior to or *pari passu* with those granted by this Interim Order shall be permitted

while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and,

except as otherwise expressly provided in or permitted under this Interim Order, the DIP Liens

and the Adequate Protection Liens shall not be: (i) junior to any lien or security interest that is

avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy

Code; (ii) subordinated to or made *pari passu* with any other lien or security interest, whether

under section 364(d) of the Bankruptcy Code or otherwise; (iii) subordinated to or made *pari passu*

with any liens arising after the Petition Date including, without limitation, any liens or security

interests granted in favor of any federal, state, municipal or other domestic or foreign governmental

unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (iv) junior to any intercompany liens or security interests of the DIP Loan Parties.

(b)      The occurrence and continuance of any Event of Default shall, after written notice by the DIP Agent (acting at the direction of Required Lenders under the DIP Credit Agreement) to the Borrower, counsel to the Borrower, the U.S. Trustee, and lead counsel to the Creditors' Committee (if any), constitute an event of default under this Interim Order and, upon such notice, interest, including, where applicable, default interest, shall accrue and be payable as set forth in the DIP Credit Agreement.  Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting these cases to cases to a Successor Case: (A) the DIP Superpriority Claims, the DIP Liens, the Adequate Protection Liens, the 507(b) Claims, and the Prepetition Liens shall continue in full force and effect, shall maintain their priorities as provided in this Interim Order and the Interim UST Cash Collateral Order, and shall remain binding on all parties in interest until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full; (B) the other rights granted by this Interim Order, including with respect to the Carve-Out and the Canadian Priority Charges, shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)      If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect (i) the validity, priority, or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur, or stay; or (ii) the validity,

priority, and enforceability of the DIP Liens, the Prepetition Liens, the Adequate Protection Liens, and the Carve-Out and the Canadian Priority Charges.  Notwithstanding any such reversal, modification, vacatur or stay, the DIP Obligations, DIP Liens, Adequate Protection Obligations, Adequate Protection Liens, DIP Superpriority Claims, and 507(b) Claims incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under sections 364(e) and 363(m) of the Bankruptcy Code.

(d)    Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the 507(b) Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by this Interim Order and the DIP Documents, as well as the Carve-Out and the Canadian Priority Charges, shall survive, and shall not be modified, impaired or discharged by the entry of an order (i) converting or dismissing any of these cases, or terminating the joint administration of these cases; (ii) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) confirming a chapter 11 plan in any of the cases.  The terms and provisions of this Interim Order and the DIP Documents shall continue in full force and effect in these cases and in any Successor Cases until all DIP Obligations, Prepetition Obligations, and Adequate Protection Obligations are indefeasibly paid in full in cash and the DIP Commitments have been terminated.  Any confirmation order entered in these cases shall not discharge or otherwise affect in any way the joint and several obligations of the DIP Loan Parties to the DIP Secured Parties under the DIP Facility and the DIP

Loan Documents, other than after (x) the payment in full and in cash of all DIP Obligations and the termination of the DIP Commitments or (y) the occurrence of the effective date of such confirmed plan (solely in accordance with the terms of such plan).

16.      *Payment of Fees and Expenses*.  The DIP Loan Parties are authorized and directed to pay the DIP Fees and Expenses and Adequate Protection Fees and Expenses.  Subject to the review procedures set forth in this paragraph 16, payment of the DIP Fees and Expenses and Adequate Protection Fees and Expenses shall not be subject to allowance or review by the Court. Professionals for the DIP Secured Parties and the Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines, however, any time that such professionals seek payment of fees and expenses from the Debtors prior to confirmation of a chapter 11 plan, each such professional shall provide summary copies of its invoices (including aggregate amounts of fees and expenses and total amount of time on a per-professional basis), which are not required to contain time detail and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, to the DIP Loan Parties, counsel to any statutory committee, and the U.S. Trustee (together, the "Review Parties"); *provided, however*, that (i) the provision of such invoices shall not constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law.  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) calendar days after receipt (the "Review Period").  If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the last date of the Review Period, the Debtors shall pay such invoices within five (5) business days.  If an objection

to a professional's invoice is received within the Review Period, the Debtors shall promptly pay the undisputed amount of the invoice without the necessity of filing formal fee applications, regardless of whether the invoiced amount arose or was incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay, on or prior to the Closing Date (as defined in the DIP Credit Agreement): (i) any accrued and unpaid ABL Adequate Protection Fees and Expenses, invoices of which have been provided to lead counsel of the Debtors at least one (1) business day prior to the Closing Date and (ii) any costs, fees, expenses (including reasonable and documented legal fees and expenses) and other compensation contemplated by this Interim Order or the DIP Loan Documents, with respect to items (i) and (ii) above, whether arising before or after the Petition Date, which costs, fees and expenses shall not be subject to the Review Period.  No attorney or advisor to any DIP Secured Party or any Prepetition Secured Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to (i) the DIP Secured Parties in connection with the DIP Facility and (ii) Prepetition Secured Parties in connection with these cases are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

17.    *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon all other parties in interest, including,

without limitation, any statutory or non-statutory committees appointed or formed in these cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (a) such committee or other party in interest with requisite standing has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein) by no later than (i) the earlier of (w) one business day before the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan of reorganization, whichever occurs first, (x) as to the Creditors' Committee only, 75 calendar days after entry of this Interim Order, (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 75 calendar days after entry of this Interim Order, or (B) the date that is 30 calendar days after their appointment, and (z) for all other parties in interest, 75 calendar days after entry of this Interim Order; and (ii) any such later date as (v) has been agreed to in writing (which may be by email) by the Prepetition ABL Agent with respect to the Prepetition ABL Obligations or the Prepetition ABL Liens, (w) has been agreed to in writing (which may be by email) by the Prepetition B-2 Agent with respect to the Prepetition B-2 Obligations or the Prepetition B-2 Liens, or (x) has been ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)-(ii), the "Challenge Period"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations or the Prepetition Liens, or (B) asserting or prosecuting any Avoidance Action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against any Prepetition Secured Parties or their respective

subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (collectively, the "Representatives") in connection with or related to the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; *provided*, *however*, that any pleadings filed in connection with a Challenge shall set forth with specificity the basis for such Challenge and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred. If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge, then: (1) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest; (2) the obligations of the Prepetition Loan Parties under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise, except as provided in the Prepetition Intercreditor Agreement), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in these cases and any Successor Case(s); (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than as provided in the Prepetition Intercreditor Agreement), or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable

61

law or regulation by any person or entity, including any statutory or non-statutory committees appointed or formed in these cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in these cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives shall be deemed forever waived, released and barred.  If any Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Secured Obligations or Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization in these cases.

18.    *Limitation on Use of DIP Financing Proceeds and Collateral.*  Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out or the Canadian Priority Charges, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party, in connection with (a) the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective Representatives (in their capacities as such), or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Obligations, Adequate Protection Liens, or 507(b) Claims or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Obligations and/or liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under the DIP Orders, the DIP Documents or the Prepetition Loan Documents in respect of the Prepetition Secured Obligations, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to sections 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and DIP Collateral (including Cash Collateral) may be used by the Creditors' Committee to investigate, but not to prosecute, (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $50,000 (the "Investigation Cap"), (b) attempts to prevent, hinder, or otherwise delay or interfere with the Prepetition Secured Parties' or the DIP Secured Parties', as applicable, enforcement or realization

63

on the Prepetition Secured Obligations, Prepetition Collateral, DIP Obligations, DIP Collateral, as applicable, and the liens, claims and rights granted to such parties under the DIP Orders; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties or the DIP Secured Parties under this Interim Order, the Interim UST Cash Collateral Order, the Prepetition Loan Documents or the DIP Documents, as applicable, other than in accordance with this Interim Order; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims permitted by the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and 507(b) Claims; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are authorized by the Court, agreed to in writing by the DIP Lenders, and expressly permitted under this Interim Order or under the DIP Documents (including the Approved Budget, subject to Permitted Variances), in each case unless all DIP Obligations, Prepetition Secured Obligations, Adequate Protection Obligations, and claims granted to the DIP Secured Parties and Prepetition Secured Parties under this Interim Order, have been paid in full in cash or otherwise agreed to in writing by the DIP Secured Parties.

19.     *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any statutory or non-statutory committees appointed or formed in these cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of

64

the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties, the Debtors, and their respective successors and assigns; *provided* that the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee or chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

20.     Nothing in this Interim Order, the DIP Documents, the Prepetition Loan Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  The DIP Secured Parties and Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors.

21.     *Limitation of Liability.*  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or Prepetition Loan Documents, as applicable, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty

to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective Representatives.

22.    *Master Proofs of Claim*.    Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of these Chapter 11 Cases or any Successor Cases, neither the Prepetition Agents, nor any other Prepetition Secured Parties shall be required to file proofs of claim in these cases or any Successor Cases in order to assert claims for payment of any of the Prepetition Secured Obligations, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts payable under the Prepetition Loan Documents or this Interim Order. The Debtors' stipulations, admissions and acknowledgments of the claim and liens in respect of the Prepetition Secured Obligations set forth in this Interim Order is deemed to constitute timely proofs of claim in respect of all indebtedness, secured status and claims arising under the Prepetition Credit Documents and this Interim Order. Nonetheless, in order to facilitate the processing of claims, each Prepetition Agent is authorized, but not directed or required, to file a master proof of claim in the Debtors' lead case *In re Yellow Corporation, et al.*, Case No. 23-11069 ([    ]), on behalf of the applicable Prepetition Secured Parties (each, a "<u>Master Proof of Claim</u>"), which shall be deemed to have been filed against each Debtor. The provisions of this

paragraph 22 and the filing of Master Proofs of Claim, if any, are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan filed in these cases. Any Master Proof of Claim shall not be required to include any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Agent. The DIP Secured Parties shall not be required to file proofs of claim with respect to the DIP Obligations.

23.    *Insurance.*  To the extent that any Prepetition Agent is listed as a loss payee under the insurance policies of any of the DIP Loan Parties, the DIP Agent shall also be deemed to be a loss payee under such insurance policies until the indefeasible payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitment and, except with respect to the Prepetition ABL Priority Collateral prior to the Prepetition ABL Obligations being paid in full and with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral prior to the Prepetition UST Tranche B Obligations being paid in full, shall act in that capacity and distribute any proceeds recovered or received in respect of such insurance policies.

24.    *Credit Bidding.*  In each case to the extent permitted by the Prepetition Intercreditor Agreement, (i) the DIP Agent, or any assignee or designee of the DIP Agent, acting at the direction of the Required Lenders under the DIP Credit Agreement, shall have the unqualified and unconditional right to credit bid up to the full amount of any obligations arising in connection with the DIP Loans in any sale of any of the Debtors' assets, including pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or a plan of liquidation under section 1129 of

the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any Debtor under
section 725 of the Bankruptcy Code, (ii) the Prepetition ABL Agent (on behalf, and at the
direction, of the requisite Prepetition ABL Lenders pursuant to the Prepetition ABL Credit
Agreement) shall have the unqualified and unconditional right to credit bid, subject to section
363(k) of the Bankruptcy Code, (x) up to the full amount of the Prepetition ABL Obligations and
(y) the ABL Adequate Protection Obligations in the sale or other disposition of any assets of the
Debtors, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy
Code, in each case, pursuant to a plan of reorganization or liquidation or by a chapter 7 trustee in
a chapter 7 proceeding, (iii) the Prepetition B-2 Agent (on behalf, and at the direction, of the
requisite Prepetition B-2 Lenders pursuant to the Prepetition B-2 Credit Agreement) shall have the
unqualified and unconditional right to credit bid, subject to section 363(k) of the Bankruptcy Code,
(x) up to the full amount of the Prepetition B-2 Obligations and (y) the B-2 Adequate Protection
Obligations in the sale or other disposition of any assets of the Debtors, including, without
limitation, sales occurring pursuant to section 363 of the Bankruptcy Code, in each case, pursuant
to a plan of reorganization or liquidation or by a chapter 7 trustee in a chapter 7 proceeding, and
each DIP Secured Party shall automatically be deemed a "qualified bidder" with respect to any
disposition of assets by the Debtors under or pursuant to (a) section 363 of the Bankruptcy Code,
(b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or
(c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the
Bankruptcy Code.  (i) The DIP Agent, at the direction of the Required Lenders under the DIP
Credit Agreement and on behalf of the DIP Lenders, (ii) the Prepetition ABL Agent at the direction
of the requisite Prepetition ABL Lenders pursuant to the Prepetition ABL Credit Agreements and
on behalf of the Prepetition ABL Lenders, and (iii) the Prepetition B-2 Agent at the direction of

the requisite Prepetition B-2 Lenders pursuant to the Prepetition B-2 Credit Agreements and on behalf of the Prepetition B-2 Lenders, shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Secured Parties, Prepetition ABL Secured Parties, Prepetition B-2 Secured Parties, Prepetition UST Tranche B Secured Parties, or Prepetition UST Tranche A Secured Parties, as applicable, to any acquisition entity or joint venture formed in connection with such bid.

25.     *Proceeds of Subsequent Financing.*  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Case shall obtain credit or incur debt pursuant to section 364(d) of the Bankruptcy Code in violation of the DIP Credit Agreement or this Interim Order at any time, then all of the cash proceeds derived from such credit or debt shall immediately be applied to satisfy the DIP Obligations in accordance with this Interim Order, the DIP Loan Documents, or the Prepetition Intercreditor Agreement.

26.     *Effectiveness.*  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

27.     *Governing Order.*  Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Interim Order, including compliance with the Approved Budget (subject to Permitted Variances) and all other terms and conditions hereof, and (ii) to the extent there is any inconsistency between the terms of the DIP Documents and this Interim Order, this Interim Order shall control.

28.     *Headings*.  Paragraph headings used herein are for convenience only and shall not affect the construction of, or to be taken into consideration in interpreting, this Interim Order.

29.     *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Documents and except with respect to the DIP Loan Parties, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral (other than Prepetition ABL Priority Collateral, Prepetition Joint Collateral, or Prepetition UST Tranche B Priority Collateral), receives any DIP Collateral (other than Prepetition ABL Priority Collateral, Prepetition Joint Collateral, or Prepetition UST Tranche B Priority Collateral) or any proceeds of the DIP Collateral (other than Prepetition ABL Priority Collateral, Prepetition Joint Collateral, or Prepetition UST Tranche B Priority Collateral) or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments, such person or entity shall be deemed to have received, and shall hold, any such DIP Collateral or any payment on account or proceeds thereof (other than Prepetition ABL Priority Collateral, Prepetition Joint Collateral, or Prepetition UST Tranche B Priority Collateral) in trust for the benefit of the DIP Secured Parties and shall immediately turn over such collateral or its proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

30.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

31.     *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

32.     *Necessary Action*.   The Debtors, the DIP Secured Parties and the Prepetition Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Interim Order.  The automatic stay is modified to permit affiliates of the Debtors who are not debtors in these cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

33.     *Retention of Jurisdiction*.   This Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

34.     *Final Hearing*.   A final hearing to consider the relief requested in the DIP Motion on a final basis shall be held on [_____], 2023 at [__:__] [a.m.] [p.m.] (Prevailing Eastern Time).

35.     *Objections*.   Any objections or responses to the DIP Motion shall be filed on or prior to [_____], 2023 at 4:00 p.m. (Prevailing Eastern Time).  Any party objecting to the relief sought at the Final Hearing shall file and serve (via mail and e-mail) written objections, which objections shall be served upon (a) the Debtors, 10990 Roe Avenue, Overland Park, Kansas 66211 (Attn: Matthew A. Doheny and Leah Dawson); (b) counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, IL 60654, Attn.: Patrick J. Nash, Jr., P.C. and Whitney C. Fogelberg; 601 Lexington Avenue, New York, New York 10022, Attn.: Allyson B. Smith and Aaron Metviner; (b) the DIP Agent; (c) counsel to certain investment funds and accounts managed by affiliates of Apollo Capital Management, L.P., Milbank LLP, 55 Hudson Yards, New York, New York 10001, Attn: Dennis F. Dunne and Matthew L. Brod; (d) counsel to Beal Bank USA, White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020 Attn: Scott

Greissman, Elizabeth Feld, and Andrew Zatz; (e) the Office of the United States Trustee for the District of Delaware; (f) counsel to the Creditors' Committee, if appointed; (g) the Prepetition ABL Agent, and counsel thereto, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: Kevin Simard and Seth Mennillo; (h) the Prepetition B-2 Agent, and counsel thereto; (i) the Prepetition UST Tranche A Agent, and counsel thereto, Hogan Lovells US LLP, 390 Madison Avenue, New York, New York 10017, Attn: Ronald J. Silverman and Christopher R. Bryant; (j) the Prepetition UST Tranche B Agent, and counsel thereto, Hogan Lovells US LLP, 390 Madison Avenue, New York, New York 10017, Attn: Ronald J. Silverman and Christopher R. Bryant; and (k) the United States Department of Justice and Arnold & Porter Kaye Scholer LLP as counsel to the United States Department of the Treasury, 70 West Madison Street, Suite 4200, Chicago, Illinois 60602, Attn: Michael Messersmith, 250 West 55th Street, New York, New York 10019, Attn: Benjamin Mintz, and 601 Massachusetts Ave., N.W., Washington, DC 20001, Attn: Rosa Evergreen, and the U.S. Department of Justice, 1100 L St NW Rm 7102, Washington, DC 20005-4035, Attn: I-Heng.Hsu and Crystal Geise.

36.    The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) on the parties having been given notice of the Interim Hearing and to any party that has filed with this Court a request for notices in these cases.

## Exhibit 1

**DIP Credit Agreement**

**Milbank Draft 8/06/23**

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION

CREDIT AGREEMENT

dated as of

August [__], 2023

among

YELLOW CORPORATION

THE OTHER GUARANTORS PARTY HERETO FROM TIME TO TIME
THE LENDERS PARTY HERETO

and

ALTER DOMUS PRODUCTS CORP.,

as Administrative Agent and Collateral Agent

_____

**TABLE OF CONTENTS**[1]

## ARTICLE 1
### DEFINITIONS

*Section 1.01. Defined Terms* ................................................................................................ *1*
*Section 1.02. Other Interpretive Provisions* ......................................................................... *53*
*Section 1.03. Certifications* ................................................................................................... *54*
*Section 1.04. Accounting Terms* ........................................................................................... *54*
*Section 1.05. Rounding* ......................................................................................................... *55*
*Section 1.06. References to Agreements, Laws, Etc.* ............................................................ *55*
*Section 1.07. Times of Day* ................................................................................................... *55*
*Section 1.08. Timing of Payment or Performance* ............................................................... *55*
*Section 1.09. Cumulative Credit Transactions* ..................................................................... *55*
*Section 1.10. Pro Forma Calculations* ................................................................................. *55*
*Section 1.11. Certain Accounting Matters* ........................................................................... *57*
*Section 1.12. Classification of Loans and Borrowings* ........................................................ *57*
*Section 1.13. Currency Equivalents Generally* ..................................................................... *57*
*Section 1.14. Effect of Amendment and Restatement* ........................................................... *58*

## ARTICLE 2
### THE CREDITS

*Section 2.01. Tranche B-2 Term Loan Commitments* ............................................................ *58*
*Section 2.02. Loans* .............................................................................................................. *58*
*Section 2.03. Borrowing Procedure* ..................................................................................... *59*
*Section 2.04. Evidence of Debt; Repayment of Loans* .......................................................... *60*
*Section 2.05. Fees* ................................................................................................................. *61*
*Section 2.06. Interest on Loans* ............................................................................................ *61*
*Section 2.07. Default Interest* ............................................................................................... *62*
*Section 2.08. Alternate Rate of Interest* ............................................................................... *62*
*Section 2.09. Termination and Reduction of Commitments* .................................................. *63*
*Section 2.10. Conversion and Continuation of Borrowings* ................................................. *63*
*Section 2.11. Repayment of Term Borrowings* ..................................................................... *64*
*Section 2.12. Voluntary Prepayment* .................................................................................... *65*
*Section 2.13. Mandatory Prepayments* ................................................................................. *66*
*Section 2.14. Pro Rata Treatment* ........................................................................................ *69*
*Section 2.15. Sharing of Setoffs* ........................................................................................... *70*
*Section 2.16. Payments* ......................................................................................................... *70*
*Section 2.17. [Reserved]* ...................................................................................................... *71*
*Section 2.18. Refinancing Amendments* ............................................................................... *71*
*Section 2.19. Extensions of Term Loans* .............................................................................. *72*

## ARTICLE 3
### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

*Section 3.01. Taxes* .............................................................................................................. *74*
*Section 3.02. Illegality* ......................................................................................................... *78*
*Section 3.03. Increased Cost and Reduced Return; Capital Adequacy; Reserves on SOFR Loans* ........... *78*

_____

[1] TOC to be updated prior to signing.

i

Section 3.04. [Reserved] .............................................................................................. 80
Section 3.05. Matters Applicable to all Requests for Compensation ........................... 80
Section 3.06. Replacement of Lenders under Certain Circumstances .......................... 81
Section 3.07. Survival ................................................................................................ 83

### ARTICLE 4
#### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01. All Credit Extensions ............................................................................. 83
Section 4.02. First Credit Extension ........................................................................... 84

### ARTICLE 5
#### REPRESENTATIONS AND WARRANTIES

Section 5.01. Existence, Qualification and Power; Compliance with Laws .................. 86
Section 5.02. Authorization; No Contravention ........................................................... 87
Section 5.03. Governmental Authorization; Other Consents ....................................... 87
Section 5.04. Binding Effect ....................................................................................... 87
Section 5.05. Financial Statements; No Material Adverse Effect ................................ 87
Section 5.06. Compliance With Laws .......................................................................... 88
Section 5.07. Ownership of Property; Liens ............................................................... 88
Section 5.08. Environmental Matters .......................................................................... 89
Section 5.09. Taxes .................................................................................................... 90
Section 5.10. ERISA Compliance ............................................................................... 90
Section 5.11. Subsidiaries .......................................................................................... 90
Section 5.12. Margin Regulations; Investment Company Act ..................................... 90
Section 5.13. Disclosure ............................................................................................ 91
Section 5.14. Labor Matters ....................................................................................... 91
Section 5.15. Insurance ............................................................................................... 91
Section 5.16. Solvency ............................................................................................... 92
Section 5.17. No Other Borrowed Money Indebtedness ............................................. 92
Section 5.18. Collateral Documents ........................................................................... 92
Section 5.19. Compliance with Anti-Terrorism and Corruption Laws ........................ 94

### ARTICLE 6
#### AFFIRMATIVE COVENANTS

Section 6.01. Financial Statements, Reports, Etc ....................................................... 95
Section 6.02. Certificates; Other Information ............................................................. 96
Section 6.03. Notices .................................................................................................. 98
Section 6.04. Payment of Taxes ................................................................................. 99
Section 6.05. Preservation of Existence, Etc. ............................................................. 99
Section 6.06. Maintenance of Properties .................................................................... 99
Section 6.07. Maintenance of Insurance ..................................................................... 99
Section 6.08. Compliance with Laws ........................................................................ 101
Section 6.09. Books and Records ............................................................................. 101
Section 6.10. Inspection Rights ................................................................................ 101
Section 6.11. Additional Collateral; Additional Guarantors ..................................... 101
Section 6.12. Compliance with Environmental Laws ................................................ 103
Section 6.13. Further Assurances and Post-Closing Conditions ............................... 103
Section 6.14. [Reserved] .......................................................................................... 104
Section 6.15. Maintenance of Ratings ...................................................................... 104
Section 6.16. Use of Proceeds .................................................................................. 104

*Section 6.17. 2020 Financial Plan*.................................................................................................. *104*

## ARTICLE 7
### NEGATIVE COVENANTS

*Section 7.01. Liens* ........................................................................................................................ *104*
*Section 7.02. Investments*............................................................................................................... *108*
*Section 7.03. Indebtedness* ............................................................................................................. *112*
*Section 7.04. Fundamental Changes*.............................................................................................. *115*
*Section 7.05. Dispositions* .............................................................................................................. *117*
*Section 7.06. Restricted Payments* ................................................................................................ *120*
*Section 7.07. Change in Nature of Business; Organization Documents*........................................ *121*
*Section 7.08. Transactions with Affiliates*..................................................................................... *122*
*Section 7.09. Burdensome Agreements* .......................................................................................... *122*
*Section 7.10. Financial Covenant* .................................................................................................. *123*
*Section 7.11. [Reserved]*................................................................................................................. *123*
*Section 7.12. Fiscal Year* ............................................................................................................... *123*
*Section 7.13. Prepayments, Etc. of Indebtedness*.......................................................................... *124*

## ARTICLE 8
### EVENTS OF DEFAULT AND REMEDIES

*Section 8.01. Events of Default* ...................................................................................................... *125*
*Section 8.02. Remedies Upon Event of Default*.............................................................................. *128*
*Section 8.03. [Reserved]* ................................................................................................................ *129*
*Section 8.04. Application of Funds* ................................................................................................ *129*

## ARTICLE 9
### THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

## ARTICLE 10
### MISCELLANEOUS

*Section 10.01. Notices; Electronic Communications*....................................................................... *133*
*Section 10.02. Survival of Agreement* ............................................................................................ *137*
*Section 10.03. Binding Effect*......................................................................................................... *137*
*Section 10.04. Successors and Assigns* .......................................................................................... *137*
*Section 10.05. Expenses; Indemnity*............................................................................................... *142*
*Section 10.06. Right of Setoff* ........................................................................................................ *145*
*Section 10.07. Applicable Law*....................................................................................................... *145*
*Section 10.08. Waivers; Amendment*.............................................................................................. *146*
*Section 10.09. Interest Rate Limitation* .......................................................................................... *148*
*Section 10.10. Entire Agreement*.................................................................................................... *148*
*Section 10.11. WAIVER OF JURY TRIAL* ...................................................................................... *148*
*Section 10.12. Severability*............................................................................................................. *149*
*Section 10.13. Counterparts* ........................................................................................................... *149*
*Section 10.14. Headings* ................................................................................................................. *149*
*Section 10.15. Jurisdiction; Consent to Service of Process*............................................................ *149*
*Section 10.16. Confidentiality*........................................................................................................ *150*
*Section 10.17. Lender Action* ......................................................................................................... *150*
*Section 10.18. USA PATRIOT Act Notice* ...................................................................................... *151*
*Section 10.19. Collateral And Guaranty Matters* .......................................................................... *151*
*Section 10.20. Limitation on Liability*............................................................................................ *152*
*Section 10.21. Payments Set Aside*................................................................................................. *152*

*Section 10.22. No Advisory or Fiduciary Responsibility* ........................................................................ 152
*Section 10.23. Intercreditor Agreements* ........................................................................................... 153

## ARTICLE 11
### GUARANTEE

*Section 11.01. The Guarantee* ........................................................................................................ 155
*Section 11.02. Obligations Unconditional* ......................................................................................... 155
*Section 11.03. Certain Waivers* ...................................................................................................... 156
*Section 11.04. Reinstatement* ......................................................................................................... 156
*Section 11.05. Subrogation; Subordination* ....................................................................................... 157
*Section 11.06. Remedies* ............................................................................................................... 157
*Section 11.07. Instrument for the Payment of Money* ........................................................................... 157
*Section 11.08. Continuing Guarantee* .............................................................................................. 157
*Section 11.09. General Limitation on Guarantee Obligations* ................................................................. 157
*Section 11.10. Release of Guarantors* .............................................................................................. 157
*Section 11.11. Right of Contribution* ............................................................................................... 158
*Section 11.12. Additional Guarantor Waivers and Agreements* ............................................................... 158

APPENDICES
A       Initial Commitments
B       Final Commitments
C       Rolled Term Loan Allocation
D       Chapter 11 Milestones

SCHEDULES

| | |
|---|---|
| 1.01(a) | [Reserved] |
| 1.01(b) | Excluded Subsidiaries |
| 1.01(c) | Real Property |
| 1.01(d) | Pension Fund Entities |
| 5.10 | Litigation |
| 5.11 | Subsidiaries and Capitalization |
| 5.14 | Labor Matters |
| 5.22 | Prepetition UST Priority and Joint Collateral |
| 6.13(a) | Post Closing Schedule |
| 7.01(b) | Existing Liens |
| 7.02(e) | Existing Investments |
| 7.03(b) | Existing Indebtedness |
| 7.08 | Transactions with Affiliates |
| 7.09 | Certain Contractual Obligations |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Request for Credit Extension |
| Exhibit D | [Reserved] |
| Exhibit E | Form of Intercompany Note |
| Exhibit F | Form of Compliance Certificate |
| Exhibit G-1 | Form of United States Tax Compliance Certificate (For Non-U.S. Lenders that are not Partnerships) |
| Exhibit G-2 | Form of United States Tax Compliance Certificate (For Non-U.S. Lenders that are Partnerships) |
| Exhibit G-3 | Form of United States Tax Compliance Certificate (For Non-U.S. Participants that are not Partnerships) |
| Exhibit G-4 | Form of United States Tax Compliance Certificate (For Non-U.S. Participants that are Partnerships) |
| Exhibit H | [Reserved] |
| Exhibit I | [Reserved] |
| Exhibit J | Form of Term Note |

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of August [__], 2023 (this "**Agreement**"), among YELLOW CORPORATION, a Delaware corporation (the "**Borrower**"), the Guarantors party hereto from time to time, the Lenders (such term and each other capitalized term used but not defined in this introductory statement having the meaning given it in Article 1), and ALTER DOMUS PRODUCTS CORP., as administrative agent (in such capacity, including any permitted successor or assign thereto, the "**Administrative Agent**") and as collateral agent (in such capacity, including any permitted successor or assign thereto, the "**Collateral Agent**") for the Lenders.

WHEREAS, on August 6, 2023, (the "Petition Date"), the Borrower and its Subsidiaries (together with the Borrower, collectively, the "Debtors") commenced voluntary cases under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), and the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code in order to effect a wind down of their businesses and sale of their properties to repay existing Indebtedness (including the Obligations hereunder and the Prepetition B-2 Obligations) with the net proceeds thereof.

WHEREAS, the Borrower, in its capacity as "foreign representative" on behalf of the Debtors, will file an application with the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "**Canadian Court**") under Part IV of the Companies' Creditors Arrangement Act (Canada), R.S.C. 1985, c. C-36, as amended (the "**CCAA**") to recognize the Chapter 11 Cases as "foreign main proceedings" and grant certain customary related relief (the "**Canadian Recognition Proceedings**").

WHEREAS, the Borrower has requested and the Lenders have agreed to provide a senior secured super-priority debtor-in-possession term loan facility to the Borrower (the "**DIP Facility**") consisting of (i) New Money Term Loans in an aggregate committed amount of $142,500,000 and (ii) the Rolled Term Loans specified herein in an aggregate principal amount of $501,584,152.30.

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder and the Borrower and the Guarantors have agreed to secure their respective Obligations by granting to Administrative Collateral Agent, for the benefit of Secured Parties, a lien on substantially all of their respective assets, in accordance with the priorities provided in the DIP Order.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto covenant and agree as follows:

## ARTICLE 1
### Definitions

Section 1.01.  *Defined Terms.*  As used in this Agreement, the following terms shall have the meanings specified below:

"**ABR**", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"**Acceptable Plan**" shall mean a Plan of Reorganization that, upon the consummation thereof, provides for the termination of all unused Commitments and the indefeasible payment in full of all Obligations in cash.

"**Administrative Agent's Office**" means the Administrative Agent's office or account as it may from time to time designate, in writing, to the Borrower and each Lender.

"**Administrative Agent**" shall have the meaning assigned to such term in the introductory statement to this Agreement, together with its successors and any replacement designated pursuant to Article 9 of this Agreement.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

"**Affiliate**" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, that, with respect to the Borrower and its Subsidiaries, in no case shall any Governmental Authority constitute an "Affiliate". "**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Agency Fee Letter**" means that certain fee letter dated as of the date hereof, by and between Borrower and Agents, as amended, amended and restated, supplemented, waived, replaced or otherwise modified from time to time.

"**Agent Indemnitees**" shall have the meaning assigned to such term in Section 10.05(b).

"**Agents**" shall have the meaning assigned to such term in Article 9.

"**Agreement**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Alternate Base Rate**" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%; provided that in no event shall the Alternate Base Rate be less than 2.00% per annum. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, as the case may be.

"**Apollo**" means, collectively, Apollo Capital Management, L.P. and one or more funds and/or accounts managed by its affiliates.

"**Applicable Margin**" shall mean, with respect to any Loan, a percentage per annum equal to, 8.50%.

"**Approved Budget**" has the meaning assigned to such term in Section 6.02(l).

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Lender and an Eligible Assignee, and accepted by the Administrative Agent, in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"**Attorney Costs**" shall mean and shall include all reasonable and documented fees, expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" shall mean, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Audited Financial Statements**" shall mean the audited consolidated balance sheets of the Borrower and its consolidated subsidiaries for the fiscal years ending December 31, 2021 and December 31, 2022 and the related consolidated statements of operations, changes in shareholders' equity and cash flows of the Borrower and its consolidated subsidiaries.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as applicable to the Chapter 11 Cases (unless the context requires otherwise), now and hereafter in effect or any successors to such statute.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Bidding Procedures Order Entry Date**" means the date on which the Bidding Procedures Order shall have been entered on the docket of the Bankruptcy Court.

"**Bidding Procedures Order**" means a final, non-appealable order approving procedures for the sale of all or substantially all of the Debtors' assets and permitting the Lenders (or the Administrative Agent on behalf of the Lenders) to credit bid the full amount of the Obligations (and, to the extent any Prepetition B-2 Obligations are outstanding, the Prepetition B-2 Lenders to credit of the full amount of the Prepetition B-2 Obligations) in form and substance satisfactory to the Agents and the Required Lenders.

"**Blocked Person**" shall mean any Person that is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**").

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"**Borrower Materials**" shall have the meaning assigned to such term in <u>Section 10.01</u>.

"**Borrower**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Borrowing**" shall mean Loans of the same Class made on the same date.

"**Budget Variance Report**" shall mean a weekly variance report prepared by management of the Borrower (in consultation with the Borrower's Operational Advisor), in form and detail reasonably satisfactory to the Required Lenders, comparing for each applicable Budget Variance Test Period the actual receipts and disbursements against anticipated receipts and disbursements under the applicable Approved Budget, on a line by line and aggregate basis and in the same level of detail set forth in the Approved Budget, together with a written explanation for all material variances in any given Budget Variance Test Period and such other related information as the Required Lenders may reasonably request.

"**Budget Variance Test Date**" shall mean each of (a) Friday August 18, 2023, (b) Friday August 25, 2023, (c) Wednesday August 30, 2023 and (d) each Wednesday thereafter.

"**Budget Variance Test Period**" means, as of any date of determination, (a) with respect to the first Budget Variance Report delivered after the Closing Date pursuant to Section 6.02(n)(i) and the first Budget Variance Test Date occurring on Friday August 18, 2023, the one-calendar week period ending on August 11, 2023, (b) with respect to the second Budget Variance Report delivered after the Closing Date pursuant to Section 6.02(n)(i) and the Budget Variance Test Date occurring on Friday August 25, 2023, the two-week period ending on August 18, 2023, (c) with respect to the third Budget Variance Report delivered after the Closing Date pursuant to Section 6.02(n)(i) and the Budget Variance Test Date occurring on Wednesday August 30, 2023, the three-week period ending on August 25, 2023 and (c) with respect to each Budget Variance Report delivered pursuant to Section 6.02(n)(i) thereafter and each the Budget Variance Test Date occurring thereafter, the four-week period ending on the Friday of the week immediately preceding the applicable Budget Variance Test Date.

"**Business Day**" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close.

"**Canadian Administrative Charge**" shall mean a super priority charge granted by the Canadian Court over the Canadian Collateral to secure payment of the professional fees and disbursements of the Debtors' Canadian counsel, the Information Officer and counsel to the Information Officer (in a maximum amount not to exceed CDN$700,000).

"**Canadian Collateral**" shall mean the Collateral of the Debtors located in Canada.

"**Canadian Court**" shall have the meaning assigned to the term in the recitals hereto.

"**Canadian Debtors**" shall mean YRC Freight Canada Company, YRC Logistics Inc., USF Holland International Sales Corporation and 1105481 Ontario Inc.

"**Canadian DIP Charge**" shall mean the super priority charge granted by the Canadian Court pursuant to the Canadian DIP Recognition Order in favor of the Lenders on the Canadian Collateral.

"**Canadian DIP Recognition Order**" shall mean the Canadian Interim DIP Recognition Order, unless the Canadian Final DIP Recognition Order shall have been issued by the Canadian Court, in which case it means the Canadian Final DIP Recognition Order.

"**Canadian Directors' Charge**" shall mean the Canadian Priority Directors' Charge and the Canadian Subordinate Directors' Charge.

"**Canadian Dollar**" and "**CDN$**" means lawful money of Canada.

"**Canadian Final DIP Recognition Order**" shall mean an order of the Canadian Court in the Canadian Recognition Proceedings, which order shall, among other things, recognize the Final Order and provide for a super priority charge over the Canadian Collateral in respect of the Collateral Agent's Liens consistent with the liens and charges created by or set forth in the Final Order subject to the Canadian Priority Charges (in a maximum amount not to exceed CDN$1,700,000) and shall be in form and substance satisfactory to the Required Lenders, and as the same shall be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders. For the avoidance of doubt, the super priority charge granted pursuant to the Canadian Final DIP Recognition Order shall rank senior in priority to the Canadian Subordinate Directors' Charge

"**Canadian Initial Recognition Order**" shall mean an order of the Canadian Court, which order shall, among other things, recognize Chapter 11 Cases as "foreign main proceedings" under Part IV of the CCAA, and grant a stay of proceedings in Canada, which such order shall be in form and substance satisfactory to the Required Lenders, and as the same shall be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders.

"**Canadian Interim DIP Recognition Order**" shall mean an order of the Canadian Court in the Canadian Recognition Proceedings, which order shall, among other things, recognize the Interim Order and provide for a super priority charge over the Canadian Collateral in respect of the Collateral Agent's Liens consistent with the liens and charges created by or set forth in the Interim DIP Order subject to the Canadian Priority Charges (in a maximum amount not to exceed CDN$1,700,000) and shall be in form and substance satisfactory to the Required Lenders, and as the same shall be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders. For the avoidance of doubt, (i) the Canadian Interim DIP Recognition Order may be part of the Canadian Supplemental Order, and (ii) the super priority charged granted pursuant to the Canadian Interim DIP Recognition Order shall rank senior in priority to the Canadian Subordinate Directors' Charge.

"**Canadian Orders**" means, as applicable and as the context may require, the Canadian Initial Recognition Order, the Canadian DIP Recognition Order and/or the Canadian Supplemental Order, whichever is then applicable or collectively.

"**Canadian Priority Charges**" shall mean the Canadian Administrative Charge (in a maximum amount not to exceed CDN$700,000) and the Canadian Priority Directors' Charge (in a maximum amount not to exceed CDN$1,000,000).

"**Canadian Priority Directors' Charge**" shall mean a charge granted by the Canadian Court on the Canadian Collateral (in a maximum amount not to exceed CDN$1,000,000), securing an indemnity in favor of the Canadian Debtor's directors and officers against any obligations or liabilities that they may incur as directors and officers of the Canadian Debtor on or after the commencement of the Canadian Recognition Proceedings.

"**Canadian Recognition Proceedings**" shall have the meaning assigned to the term in the recitals hereto.

"**Canadian Subordinate Directors' Charge**" shall mean a charge granted by the Canadian Court on the Canadian Collateral (in a maximum amount not to exceed CDN$2,500,000), securing an indemnity in favour of the Canadian Debtor's directors and officers against any obligations or liabilities that they may incur as directors and officers of the Canadian Debtor on or after the commencement of the Canadian Recognition Proceedings.

"**Canadian Supplemental Order**" shall mean an order of the Canadian Court in the Canadian Recognition Proceedings, which order shall grant such additional relief as is customary in the proceedings under Part IV of the CCAA and shall be in form and substance satisfactory to the Required Lenders, and as the same shall be amended, supplemented, or modified from time to time after entry thereof with the consent of the Required Lenders.

"**Canadian Subsidiary**" shall mean any Subsidiary that is organized under the Laws of Canada or any province thereof.

"**Capital Expenditures**" shall mean, for any period, the aggregate of (a) all amounts that would be reflected as additions to property, plant or equipment on a consolidated statement of cash flows of the

Borrower and its Subsidiaries in accordance with GAAP and (b) the value of all assets under Capitalized Leases incurred by the Borrower and its Subsidiaries during such period.

"**Capitalized Leases**" shall mean all leases that have been or are required to be, in accordance with GAAP, recorded as capitalized leases; *provided* that, subject to Section 1.11, for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Carve-Out**" shall have the meaning assigned to such term in the Interim Order (and which Carve-Out shall include an amount up to CDN$700,000 (or such other amount as agreed by the Required Lenders) for the benefit of the beneficiaries of the Canadian Administrative Charge, provided that such amount shall not be duplicative of the Canadian Administrative Charge).

"**Cash Collateral**" shall have the meaning assigned to such term in the Interim Order.

"**Cash Collateral Account**" shall mean a deposit account in the name of, and for the account of, USF Holland, LLC maintained at JP Morgan, as account number ending with x4623, which shall constitute Collateral but not Prepetition ABL Priority Collateral, and into which proceeds of the New Money Term Loans shall be funded and held in accordance with this Agreement

"**Cash Equivalents**" shall mean any of the following types of Investments, to the extent owned by the Borrower or any Subsidiary:

(a)     Dollars and, to the extent consistent with past practice, Canadian Dollars;

(b)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of issuance thereof;

(c)     investments in commercial paper maturing within 270 days from the date of issuance thereof and having, at such date of acquisition, rated at least A-2 or P-2 by S&P or Moody's;

(d)     investments in demand deposits, certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent, the Prepetition ABL Agent, the Prepetition UST Tranche A Agent, the Prepetition UST Tranche B Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000 and that issues (or the parent of which issues) commercial paper rated at least "Prime 1" (or the then equivalent grade) by Moody's or "A 1" (or the then equivalent grade) by S&P;

(e)     fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (b) above and entered into with a financial institution satisfying the criteria of clause (d) above;

(f)     investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (e) above; and

(g)      other short-term investments entered into in accordance with normal investment policies and practices of any Foreign Subsidiary consistent with past practices for cash management and constituting investments in governmental obligations and investment funds analogous to and having a credit risk not greater than investments of the type described in clauses (a) through (f) above.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than set forth in clause (a) above; *provided* that such amounts are converted into currencies listed in clause (a) within ten Business Days following the receipt of such amounts.

"**Casualty Event**" shall mean any event that gives rise to the receipt by the Borrower or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or Real Property (including any improvements thereon) to replace or repair such equipment, fixed assets or Real Property or as compensation for such condemnation event.

"**CCAA**" shall have the meaning assigned to the term in the recitals hereto.

"**CCAA Charges**" shall mean the Canadian Administration Charge (in a maximum amount not to exceed CDN$700,000), the Canadian Directors' Charge (in a maximum amount not to exceed CDN$3,500,000), and the Canadian DIP Charge, as granted by the Canadian Court.

"**Change of Control**" shall mean:

(a)      the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), in each case, other than the United States federal government or any other Governmental Authority on behalf thereof (or, in each case, any agent, trustee or other Person on behalf thereof, including, for the avoidance of doubt, any voting trust and the trustee thereof created to hold the Equity Interests for the benefit of the United States federal government or any other Governmental Authority), of Equity Interests representing more than 66.67% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Borrower;

(b)      occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were neither (i) nominated or approved by the board of directors of the Borrower nor (ii) appointed by directors so nominated or approved; or

(c)      a "**change of control**" (or similar event) shall occur under (i) any Prepetition Indebtedness or (ii) any other Indebtedness for borrowed money, with an aggregate principal amount (in the case of this clause (ii)) in excess of the Threshold Amount.

"**Chapter 11 Cases**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Chapter 11 Milestones**" shall have the meaning assigned to such term in <u>Section 6.17(f)</u>.

"**Chapter 11 Orders**" means, collectively, each order entered by the Bankruptcy Court, including the DIP Orders and any cash management order, cash collateral order and adequate protection order, in each case, which shall have been reviewed in advance by the Required Lenders and shall be in form and substance acceptable to the Agents and the Required Lenders.

"**Charges**" shall have the meaning assigned to such term in <u>Section 10.09</u>.

"**Claim**" has the meaning assigned to such term in Section 101(5) of the Bankruptcy Code.

"**Class**" when used in reference to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are "Initial Loans", "Final Loans", "New Money Term Loans" or "Rolled Term Loans", (b) any Commitment, refers to whether such Commitment is an "Initial Commitment" or a "Final Commitment" and (c) any Lender, refers to whether such Lender has a Loan or Commitment with respect to a particular Class of Loans or Commitments.

"**Closing Date**" means the date on which the conditions specified in Section 4.02 are satisfied (or waived in accordance with Section 10.08), which date is August [__], 2023.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean (a) all of the assets, property, rights and interests of the Loan Parties that are or are intended to be subject to the Liens created by or pursuant to the Collateral Documents and (b) the "Collateral" referred to in the DIP Order, in each case, except for Excluded Property.

For the avoidance of doubt, and without limiting the generality of the foregoing, "Collateral" shall include (i) all property or assets of any Canadian Subsidiary of the Borrower, (ii) all claims and causes of action in connection with the any commercial tort and breach of contract claims, (iii) the proceeds of all claims and causes of action (excluding the claims and causes of actions themselves) arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable federal and/or state-law equivalents, (iv) all leasehold interests of each Loan Party, and (v) the proceeds of each of the foregoing.

"**Collateral Agent**" shall have the meaning assigned to such term in the introductory statement to this Agreement.

"**Collateral and Guarantee Requirement**" shall mean, at any time, the requirement that:

(a)     on the Closing Date, the Administrative Agent and the Collateral Agent shall have received each Collateral Document to the extent required to be delivered on the Closing Date pursuant to Section 4.02 duly executed by each Loan Party that is a party thereto;

(b)     in each case subject to the limitations and exceptions set forth in this Agreement, the Collateral Documents and the DIP Order, and to any action required to be taken by the Collateral Agent or the Administrative Agent to effectuate the same, the Obligations shall have been secured by a perfected security interest in all assets and property of the Loan Parties (other than Excluded Property) with the priority set forth herein and in the DIP Order;

(c)     after the Closing Date, (x) each Subsidiary of the Borrower that is an Excluded Subsidiary on the Closing Date and that ceases to constitute an Excluded Subsidiary pursuant to the definition thereof shall, at the request of the Required Lenders (or the Administrative Agent on behalf of the Required Lenders) become a Guarantor and signatory to this Agreement pursuant to a joinder agreement in connection with Section 6.11 or Section 6.13 and (y) each Subsidiary of the Borrower shall deliver such collateral documents and take such perfection steps as reasonably requested by the Collateral Agent or the Required Lenders, including, without limitation, as specified in Schedule 6.13(a); and

(d)     notwithstanding that all of the security interests described herein with respect to the Collateral shall be effective and perfected by the DIP Orders and without the necessity of the execution of mortgages, security agreements, pledge agreements or other agreements, the Loan Parties shall take all action that may be necessary or desirable, or that the Required Lenders or the Collateral Agent may reasonably request, to maintain the validity, perfection, enforceability and priority of the security interest

and Liens of the Collateral Agent in the Collateral, or to enable the Collateral Agent to protect, exercise or enforce its rights hereunder, under the DIP Order and in the Collateral.

"**Collateral Documents**" shall mean, collectively, the Security Agreement, each of the Mortgages, collateral assignments, security agreements, pledge agreements, intellectual property security agreements, control agreements or other similar agreements delivered to the Administrative Agent or the Collateral Agent pursuant to Section 4.02, Section 6.11 or Section 6.13, each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Commitment**" shall mean, with respect to any Lender, such Lender's Initial Commitment and Final Commitment.  The aggregate amount of the Commitments as of the Closing Date is $142,500,000.

"**Communications**" shall have the meaning assigned to such term in Section 10.01.

"**Compliance Certificate**" shall mean a certificate substantially in the form of Exhibit F.

"**Contractual Obligation**" shall mean, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" shall have the meaning specified in the definition of "Affiliate".

"**Control Agreement**" means an agreement, in form and substance reasonably satisfactory to the Required Lenders, which provides for the Collateral Agent to have "control" (for purposes of this definition, as defined in Section 9 104 of the UCC of the State of New York or Section 8-106 of the UCC of the State of New York, as applicable) of the Cash Collateral Account, Deposit Accounts or Securities Accounts, as applicable.

"**Credit Extension**" shall mean a Borrowing.

"**Debtor Relief Laws**" shall mean (i) the Bankruptcy Code of the United States; (ii) the CCAA and the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, as amended; and (iii) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, arrangement, rearrangement, receivership, insolvency, reorganization or similar debtor relief Laws of the United States, Canada or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" shall mean any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of any grace period, or both, without cure or waiver hereunder, would be an Event of Default.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Debtors**" shall have the meaning assigned to the term in the recitals hereto.

"**DIP Facility**" shall have the meaning assigned to the term in the recitals hereto.

"**DIP Order**" shall mean the Interim Order or, upon entry thereof by the Bankruptcy Court, the Final Order.

"**DIP Priority Collateral**" means all Collateral securing the DIP Facility on a first priority basis. For the avoidance of doubt, the DIP Priority Collateral shall not include the Prepetition ABL Priority Collateral, the Prepetition UST Tranche A Priority Collateral or the Prepetition UST Tranche B Priority Collateral.

"**Discharge of ABL Obligations**" shall have the meaning assigned to such term in the Prepetition ABL Intercreditor Agreement.

"**Discharge of UST Tranche A Obligations**" shall have the meaning assigned to such term in the Prepetition ABL Intercreditor Agreement.

"**Discharge of UST Tranche B Obligations**" shall have the meaning assigned to such term in the Prepetition ABL Intercreditor Agreement.

"**Disposition**" or "**Dispose**" shall mean the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale or issuance of Equity Interests in a Subsidiary) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"**Disqualified Equity Interests**" shall mean any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (c) provides for scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date; *provided* that if such Equity Interests are issued pursuant to, or in accordance with a plan for the benefit of employees of the Borrower or the Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"**Dollars**" or "**$**" shall mean lawful money of the United States of America.

"**Domestic Subsidiary**" shall mean any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**Eligible Assignee**" shall mean (i) a Lender, (ii) an Affiliate of a Lender, (iii) a Related Fund of a Lender, and (iv) any other Person (other than a natural person) approved by the Administrative Agent; *provided* that, notwithstanding the foregoing, "**Eligible Assignee**" shall not include the Borrower or any other Controlled Affiliate of the Borrower.

"**Environmental Laws**" shall mean all federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including

consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety (with respect to exposure to hazardous or toxic substances or wastes) or the presence, Release of, or exposure to, hazardous or toxic substances or wastes, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, hazardous or toxic substances or wastes.

"**Environmental Liability**" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, capital and operating costs, injunctive relief, costs associated with financial assurance, permitting or closure requirements, natural resource damages and investigation or remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" shall mean, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities) but excluding in each case any debt security that is convertible into, or exchanged for, Equity Interests.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" shall mean any Person, any trade or business (whether or not incorporated) that, together with a Loan Party or any Subsidiary, is or, within the six year period immediately preceding the Closing Date, was treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) a Reportable Event; (b) the failure to satisfy the minimum funding standard with respect to a Pension Plan within the meaning of Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA, whether or not waived (unless such failure is corrected by the final due date for the plan year for which such failure occurred), (c) a determination that a Pension Plan is, or is expected to be, in "at risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (d) the receipt by a Loan Party, any Subsidiary or any of their respective ERISA Affiliates of notice pursuant to Section 305(b)(3)(D) of ERISA that a Multiemployer Plan is or will be in "endangered status" or "critical status" (as defined in Section 305(b) of ERISA), or is, or is expected to be, "insolvent" (within the meaning of Section 4245 of ERISA); (e) the filing pursuant to Section 431 of the Code or Section 304 of ERISA of an application for the extension of any amortization period; (f) the failure to timely make a contribution required to be made with respect to any Pension Plan or Multiemployer Plan; (g) the filing of a notice to terminate any Pension Plan if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA; (h) the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Pension Plan or the termination of any Pension Plan under Section 4041(c) of ERISA; (i) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (j) the incurrence by a Loan Party, any Subsidiary or any of their respective ERISA

Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan; (k) the receipt by a Loan Party, any Subsidiary or any of their respective ERISA Affiliates from the PBGC or a plan administrator of any notice of an intention to terminate any Pension Plan or Pension Plans or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (l) the receipt by a Loan Party, any Subsidiary or any of their respective ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from a Loan Party, any Subsidiary or any of their respective ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability; (m) the occurrence of any event or condition that would reasonably be expected to result in the termination of a Pension Plan or the appointment of a trustee to administer a Pension Plan; (o) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) with respect to any Plan which could result in liability to a Loan Party or any Subsidiary or with respect to which a Loan Party or any Subsidiary is a "disqualified person" (as defined in Section 4975 of the Code) or a "party in interest" (as defined in Section 3(14) of ERISA); (p) the incurrence of any liability with respect to any Pension Plan or Multiemployer Plan under Title IV of ERISA (other than premiums due and not delinquent under Section 4007 of ERISA); (q) engagement in any transaction that could be subject to Sections 4069 or 4212(c) of ERISA or (r) the PBGC or any Multiemployer Plan indicates its intention to file an action, suit, litigation or proceeding (including in the Chapter 11 Orders) (x) contesting the Transactions, this Agreement or any of the other Loan Documents or the sale of the Collateral in accordance with the Chapter 11 Orders, (y) that materially impairs the value of any Collateral constituting real property interests and Rolling Stock of the Loan Parties or (z) that would reasonably be expected to prevent or materially delay the sale of the Collateral in accordance with the Chapter 11 Orders.

"**Event of Default**" shall have the meaning assigned to such term in Article 8.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Excluded Property**" shall mean (a) any lease, license or agreement or any property to the extent a grant of a security interest therein would violate or invalidate such lease, license or agreement or similar arrangement or create a right of termination in favor of any other party thereto after giving effect to the applicable anti-assignment provisions of the UCC, PPSA, Bankruptcy Code or other applicable law, other than proceeds and receivables thereof, the assignment of which is deemed effective under the UCC, PPSA, Bankruptcy Code or other applicable law, notwithstanding such prohibition and (b) "intent to use" trademark applications.

"**Excluded Subsidiary**" shall mean each Subsidiary of the Borrower listed on Schedule 1.01(b); provided that, if as of the end of any calendar month, (x) any such Subsidiary, individually, comprises more than 1.0% of the Borrower and its Subsidiaries' total assets or liquidity as of the end of such calendar month, such Subsidiaries shall no longer constitute Excluded Subsidiaries, and shall be required to become a Loan Party pursuant to Section 6.11 or (y) such Subsidiaries, in the aggregate, comprise more than 3.0% of the Borrower and its Subsidiaries' total assets or liquidity as of the end of such calendar month, the Borrower shall designate one or more such Subsidiaries as not being Excluded Subsidiaries as may be necessary such that the foregoing aggregate percentage limit shall not be exceeded, and any such Subsidiaries so designated shall be required to become Loan Parties pursuant to Section 6.11.

"**Facility**" shall mean the Initial Loans, the Final Loans or the Rolled Term Loans, as the context may require.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as in effect on the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices

adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities entered into in connection with the implementation of the foregoing.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"**Fee Letter**" shall mean the Fee Letter dated as of the Closing Date by and between the Borrower and Administrative Agent.

"**Fees**" shall have the meaning assigned to such term in <u>Section 2.05</u>.

"**Final Commitment**" means, as to each Lender, its obligations to make Final Loans to the Borrower pursuant to Section 2.01(a) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Appendix B under the caption "Final Commitment". The aggregate amount of the Final Commitments on the Closing Date is $82,500,000.

"**Final Loan Borrowing Date**" means each of the First Final Loan Borrowing Date, the Second Final Loan Borrowing Date and the Third Final Loan Borrowing Date.

"**Final Loan**" means a term loan made on any Final Loan Borrowing Date pursuant to Section 2.01(a).

"**Final Order Entry Date**" means the date on which the Final Order shall have been entered on the docket of the Bankruptcy Court.

"**Final Order**" means the final order of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code approving the Agreement and the other Loan Documents with respect to the Loan Parties, in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent), as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of any Agent, such Agent).

"**First Bid Milestone Date**" shall have the meaning assigned to such term in the definition of Second Final Loan Borrowing Date.

"**First Day Orders**" shall mean all "first day orders" with respect of the Chapter 11 Cases, including the cash management orders, in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent), as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of any Agent, such Agent).

"**First Final Loan Borrowing Date**" means a date that is (a) on or after the Bidding Procedures Order Entry Date and (b) on or prior to the Second Final Loan Borrowing Date.

"**Foreign Subsidiary**" shall mean any direct or indirect Subsidiary of the Borrower which is not a Domestic Subsidiary.

"**FTI Engagement Letter**" means an engagement letter to pay the fees and expenses of FTI, as financial advisor to certain Lenders and Prepetition B-2 Lenders, in form and substance satisfactory to such Prepetition B-2 Lenders and Lenders.

"**FTI**" means FTI Consulting, Inc.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time, subject to Section 1.11; *provided, however*, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" shall mean any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including, without limitation, the U.S. Treasury).

"**Granting Lender**" shall have the meaning assigned to such term in Section 10.04(i).

"**Guarantee**" shall mean, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment or performance of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include (i) endorsements for collection or deposit, in either case in the ordinary course of business, (ii) customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness) or (iii) product warranties. The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "**Guarantee**" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" shall have the meaning specified in Section 11.01.

"**Guarantors**" shall mean each Subsidiary of the Borrower as of the Petition Date (other than an Excluded Subsidiary).

"**Guaranty**" shall mean, collectively, the guaranty of the Obligations by the Guarantors pursuant to this Agreement.

"**Hazardous Materials**" shall mean (a) any petroleum products, distillates or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances and (b) any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any Environmental Law.

"**Indebtedness**" shall mean, as to any Person at a particular time, without duplication and without reference to what constitutes indebtedness or a liability in accordance with GAAP, all of the following:

(a)        all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)        the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all outstanding letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)        net obligations of such Person under any Swap Contract;

(d)        all obligations of such Person to pay the deferred purchase price of property or services;

(e)        indebtedness (excluding prepaid interest thereon) described in clauses (a) through (d) and (f) through (h) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)        all Attributable Indebtedness;

(g)        all obligations of such Person to purchase, redeem, retire or otherwise acquire for value any Disqualified Equity Interests (but solely to the extent required to occur on or prior to the Maturity Date (other than as a result of a change of control, asset sale or similar event)); and

(h)        to the extent not otherwise included above, all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person (i) shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise expressly contractually limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt and (ii) shall exclude (A) trade accounts payable in the ordinary course of business, (B) any earn-out obligation until such earn-out obligation has become due and payable, (C) any pension contributions or health and welfare contributions due from such Person and/or its applicable Subsidiaries to any Pension Fund Entity, (D) liabilities accrued in the ordinary course, (E) deferred revenues, liabilities associated with customer prepayments and deposits and any such obligations incurred under ERISA, and other accrued obligations (including transfer pricing), in each case incurred in the ordinary course of business, (F) operating leases, (G) customary obligations under employment agreements and deferred compensation and (H) deferred tax liabilities. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value

thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) that is limited in recourse to the property encumbered thereby shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Taxes**" shall have the meaning assigned to such term in <u>Section 3.01(a)</u>.

"**Indemnitee**" shall have the meaning assigned to such term in <u>Section 10.05(b)</u>.

"**Information**" shall have the meaning assigned to such term in <u>Section 10.16</u>.

"**Information Officer**" shall mean the information officer appointed by the Canadian Court in the Canadian Recognition Proceedings.

"**Initial Anti-Cash Hoarding Threshold Amount**" shall mean, as of any date of determination, the sum of:

(a)        $50,000,000; <u>plus</u>

(b)        prior to the Discharge of ABL Obligations, to the extent a positive amount, an amount (such amount under this clause (b) as of any date of determination, the "**Excess A/R Collection Amount**") equal to the product of (i) the excess of (A) the aggregate amount of actual cash receipts from accounts receivable collections of the Debtors from the Petition Date through such date of determination over (B) the sum of forecast cash receipts from accounts receivables collections of the Debtors in the Approved Budget for the same period <u>multiplied</u> by (ii) 20%; <u>plus</u>

(c)        prior to the Discharge of ABL Obligations, to the extent a positive amount, an amount (such amount under this clause (c) as of any date of determination, the "**Expenses Underspend Amount**") equal to an amount equal to the excess of (i) the sum of forecast operating expenses of the Debtors in the Approved Budget from the Petition Date through such date of determination over (ii) the aggregate amount of actual operating expenses paid in cash by the Debtors from the Petition Date for the same period.

"**Initial Budget**" shall mean the initial 13-week consolidated weekly operating budget of the Borrower and its Subsidiaries setting forth projected operating receipts, operating disbursements, professional fees, net operating cash flow and Liquidity for the periods described therein prepared by management of the Borrower (and in consultation with the Borrower's Operational Advisor), covering the period commencing on or about the Closing Date and attached to the Interim Order.

"**Initial Commitment**" means, as to each Lender, its obligations to make Initial Loans to the Borrower on the Closing Date pursuant to Section 2.01(a) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Appendix A under the caption "Initial Commitment". The aggregate amount of the Initial Commitments on the Closing Date is $60,000,000.

"**Initial Loan**" means a term loan made on the Closing Date pursuant to Section 2.01(a).

"**Interim Order**" means the interim order of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code approving this Agreement and the other Loan Documents with respect to the Loan Parties, in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights and duties of any Agent, such Agent), as the same may be amended, modified or supplemented

from time to time with the express written joinder or consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of any Agent, such Agent).

"**Interim Order Entry Date**" means the date on which the Interim Order shall have been entered on the docket of the Bankruptcy Court.

"**Intercompany Note**" shall mean a promissory note substantially in the form of <u>Exhibit E</u>.

"**Interest Payment Date**" shall mean the last Business Day of each calendar month (commencing with Thursday, August 31, 2023).

"**Investment**" shall mean, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person, or (c) the purchase or other acquisition (in one transaction or a series of related transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, (i) the amount of any Investment shall equal (A) the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment <u>minus</u>, except for purposes of calculating the Cumulative Credit, (B) the aggregate amount of dividends, distributions or other payments received in cash in respect of such Investment (including by way of a sale or other disposition of such Investment) but not in excess of the original amount invested and (ii) the fair market value of any and all Investments (which for the avoidance of doubt shall include all debt, equity and other items described in the foregoing provisions of this definition) held by any Loan Party in any Guarantor that becomes an Excluded Subsidiary pursuant to clause (a) of the definition of "Excluded Subsidiary" shall be deemed to be an Investment incurred on the date such Guarantor becomes an Excluded Subsidiary pursuant to clause (a) of the definition of "Excluded Subsidiary".

"**Laws**" shall mean, collectively, all international, foreign, federal, state and local laws (including common law), statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, requirements, and agreements with, any Governmental Authority.

"**Lender**" shall mean each lender from time to time party hereto.  As of the Closing Date, Appendices A and B set forth the name of each Lender with a commitment for New Money Term Loans and Appendix C sets forth the name of each Lender who shall be deemed to make Rolled Term Loans in accordance with <u>Section 2.01(b)</u>.

"**Lender Indemnitees**" shall have the meaning assigned to such term in <u>Section 10.05(b)</u>.

"**Lien**" shall mean any mortgage, deed of trust, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any Capitalized Lease or financing lease having substantially the same economic effect as any of the foregoing).

"**Liquidity**" shall mean, as of any date of determination, the sum of unrestricted cash and Cash Equivalents of the Loan Parties as of such date.

"**Liquidity Report**" shall have the meaning assigned to such term in <u>Section 6.02(m)</u>.

"**Loan**" shall mean any Term Loan.

"**Loan Documents**" shall mean this Agreement (including, without limitation, any amendments to and consents and waivers under this Agreement), the Collateral Documents, the Fee Letter, the Agency Fee Letter and the Term Notes, if any, executed and delivered pursuant to <u>Section 2.04(e)</u> and each amendment, restatement, supplement or other modification of any Loan Document.

"**Loan Parties**" shall mean, collectively, the Borrower and each Guarantor.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Master Agreement**" shall have the meaning specified in the definition of "**Swap Contract**".

"**Material Adverse Effect**" shall mean a (a) material adverse effect on the business, operations, assets, liabilities (actual or contingent), operating results or financial condition, profits or prospects of the Borrower and its Subsidiaries, taken as a whole; (b) material adverse effect on the ability of the Loan Parties (taken as a whole) to fully and timely perform their payment obligations under the Loan Documents to which the Borrower or any of the Loan Parties is a party; or (c) material adverse effect on the rights and remedies available to the Lenders, the Administrative Agent or the Collateral Agent under any Loan Document (other than due to the action or inaction of any Agent or any Lender); *provided*, that "Material Adverse Effect" shall expressly exclude the effect of the filing of the Chapter 11 Cases, the events and conditions resulting from or leading up thereto, the ceasing of operations, the commencement of the Canadian Recognition Proceedings and any action required to be taken under the Loan Documents, the Chapter 11 Orders or the Canadian Orders.

"**Material Real Property**" shall mean each Real Property that is owned in fee by a Loan Party.

"**Maturity Date**" shall mean the earliest to occur of the following (i) [____], 2023[2] (the "**Initial Maturity Date**"); <u>provided</u> that, if (x) on or prior to the Initial Maturity Date the Borrower shall have received unique, non-duplicative binding cash bids pursuant to the Bidding Procedures Order for DIP Priority Collateral equal to at least 100% of the sum of the aggregate amount of Obligations outstanding as of such date but shall not have consummated such sale of DIP Priority Collateral and (y) not later than 12:00 p.m. New York City time one (1) Business Day prior to the Initial Maturity Date, the Lenders and the Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower certifying that the circumstances described in the foregoing clause (x) above have occurred, the date in this clause (i) shall be extended to [____], 2023[3] in order to permit the completion of documentation for, and the consummation of such sale of, DIP Priority Collateral; (ii) the effective date or the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court; (iii) the date the Bankruptcy Court orders the conversion of the Chapter 11 Case of any of the Loan Parties to a liquidation under Chapter 7 of the Bankruptcy Code; (iv) the date of consummation of a sale or other disposition of all or substantially all of

---

[2] To be 90 days after the Closing Date

[3] To be 105 days after the Closing Date

the assets of the Debtors under section 363 of the Bankruptcy Code or otherwise; (v) the date the Bankruptcy Court orders the dismissal of the Chapter 11 Case of any of the Loan Parties; (vi) the date of acceleration of the Term Loans or early termination of the Commitments hereunder, including as a result of the occurrence of an Event of Default; and (vii) the date that is 30 calendar days after the Petition Date if the Final Order Entry Date shall not have occurred by such date.

"**Maximum Rate**" shall have the meaning assigned to such term in <u>Section 10.09</u>.

"**MNPI**" shall mean material information concerning the Borrower, Subsidiary or Controlled Affiliate of any of the foregoing or their securities that has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Securities Act and the Exchange Act.  For purposes of this definition, "material information" means information concerning the Borrower, the Subsidiaries or any Controlled Affiliate of any of the foregoing or any of their securities that could reasonably be expected to be material for purposes of the United States Federal and State securities laws and, where applicable, foreign securities laws.

"**Moody's**" shall mean Moody's Investors Service, Inc., or any successor thereto.

"**Mortgages**" shall mean, collectively, the mortgages, deeds of trust, trust deeds, hypothecs deeds to secure debt and similar instruments by the Loan Parties in favor or for the benefit of the Collateral Agent on behalf of the Secured Parties creating and evidencing a Lien on a Mortgaged Property in form and substance reasonably satisfactory to the Required Lenders, Collateral Agent and the Borrower.

"**Multiemployer Plan**" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA subject to the provisions of Title IV of ERISA to which a Loan Party, any Subsidiary or any of their respective ERISA Affiliates is an "employer" as defined in Section 3(5) of ERISA.

"**Net Equity Proceeds**" shall mean 100% of the cash proceeds from the issuance or sale by the Borrower (or contributions in respect of) any Equity Interests issued after the Closing Date, net of all taxes paid or reasonably estimated to be payable as a result thereof and reasonable and documented costs and other expenses, in each case incurred in connection with such issuance or sale; provided, that, if the amount of any estimated taxes exceeds the amount of taxes actually required to be paid in cash, the aggregate amount of such excess shall constitute Net Proceeds at the time such taxes are actually paid

"**Net Proceeds**" shall mean:

(a)       100% of the cash proceeds actually received by the Borrower or any Subsidiaries (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation and similar awards, but in each case only as and when received) from any Disposition or Casualty Event, net of the following:

(i)       attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes,

(ii)       required debt payments and required payments (including principal amount, premium or penalty, if any, interest, fees and expenses and other amounts) of other obligations that are secured by the applicable asset or property (other than pursuant to the Loan Documents, the Prepetition ABL Facility Documentation (other than, prior to the Discharge of ABL Obligations, in respect of ABL Priority Collateral), the Prepetition UST Tranche A Facility Documentation

(other than, prior to the Discharge of UST Tranche A Obligations, in respect of the Prepetition UST Tranche A Only Collateral) and the Prepetition UST Tranche B Facility Documentation (other than, prior to the Discharge of UST Tranche B Obligations, in respect of the Prepetition UST Tranche B Priority Collateral and the Prepetition UST Tranche B Only Collateral)),

(iii)    [reserved],

(iv)    [reserved],

(v)    taxes paid or reasonably estimated to be payable as a result thereof (provided, that if the amount of any such estimated taxes exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition or Casualty Event, the aggregate amount of such excess shall constitute Net Proceeds at the time such taxes are actually paid),

(vi)    the amount of any reasonable reserve established in accordance with GAAP against any adjustment to the sale price or any liabilities (other than any taxes deducted pursuant to clause (i) or (v) above) (x) related to any of the applicable assets and (y) retained by the Borrower or any of the Subsidiaries with respect to the assets subject to the Disposition or Casualty Event including, without limitation, liabilities related to environmental matters or against any indemnification obligations (however, the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Proceeds of such Disposition or Casualty Event occurring on the date of such reduction), and

(vii)    any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition; and

(b)    100% of the cash proceeds from the incurrence, issuance or sale by the Borrower or any of the Subsidiaries of any Indebtedness, net of all taxes paid or reasonably estimated to be payable as a result thereof and fees (including investment banking fees and discounts), commissions, costs and other expenses, in each case incurred in connection with such issuance or sale, *provided*, that if the amount of any estimated taxes exceeds the amount of taxes actually required to be paid in cash, the aggregate amount of such excess shall constitute Net Proceeds at the time such taxes are actually paid.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to the Borrower or the Subsidiaries shall be disregarded.

"**New Money Term Loans**" shall mean the Initial Loans and the Final Loans (which, for the avoidance of doubt, excludes Rolled Term Loans).

"**Non-Consenting Lender**" has the meaning set forth in Section 3.06(b).

"**Obligations**" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding (or would accrue but for the operation of applicable Debtor Relief Laws), regardless of whether such interest and fees are allowed or allowable claims in such proceeding. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges,

expenses, fees (including under the Fee Letter, no matter when earned in accordance with the terms thereof), Attorney Costs, indemnities and other amounts payable by any Loan Party under any Loan Document and (b) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Agent or Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party.

"**OFAC**" shall have the meaning assigned to such term in the definition of "Blocked Person".

"**Official Committee**" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code, if any.

"**Operational Advisor**" means Alvarez and Marsal or another nationally-recognized, reputable financial planning and analysis firm reasonably acceptable to the Required Lenders and engaged by the Borrower pursuant to an engagement letter meeting the requirements set forth in Section 6.13(c). The term "Operational Advisor" shall include any replacement nationally-recognized, reputable financial planning and analysis firm selected by the Borrower and reasonably acceptable to the Required Lenders so long as the Borrower has provided to the Required Lenders a replacement engagement letter meeting the requirements set forth in Section 6.13(c) for such engagement letter prior to retaining such replacement Operational Advisor.

"**Organization Documents**" shall mean (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" shall have the meaning assigned to such term in Section 3.01(b).

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(f).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Pension Fund Entities**" shall mean those entities identified on Schedule 1.01(d) hereto.

"**Pension Plan**" shall mean any employee pension benefit plan within the meaning of Section 3(2) of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Sections 412 and 430 of the Code or Sections 302 and 303 of ERISA and in respect of which a Loan Party, any Subsidiary or any of their respective ERISA Affiliates is, or if such plan were terminated would under Section 4069 of ERISA be deemed to be, or within the six year period immediately preceding the date hereof was, a "contributing sponsor" as defined in Section 4001(a)(13) of ERISA or an "employer" as defined in Section 3(5) of ERISA.

"**Petition Date**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Permits**" shall mean all necessary certificates, licenses, permits, franchises, trade names, certificates of occupancy, consents and other approvals required under applicable Laws for the operation of any Real Property.

"**Permitted Variances**" shall mean any variance from the Approved Budget which would not result in a breach of Section 7.11.

"**Permitted Variance Percentage**" shall mean:

(a)     with respect to <u>Section 7.11(a)</u>, (i) with respect to the Budget Variance Test Period ending on August 11, 2023, 80%, (b) with respect to the Budget Variance Period ending on August 18, 2023, 85%, and (c) with respect to each Budget Variance Period ending thereafter, 90%;

(b)     with respect to <u>Sections 7.11(b)</u> through <u>(d)</u>, (i) with respect to the Budget Variance Test Period ending on August 11, 2023, 120%, (ii) with respect to the Budget Variance Period ending on August 18, 2023, 115%, and (iii) with respect to each Budget Variance Period ending thereafter, 110%; and

(c)     with respect to <u>Sections 7.11(e)</u>, 120%.

"**Person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plan of Reorganization**" shall mean a plan of reorganization in the Chapter 11 Cases.

"**Platform**" shall have the meaning assigned to such term in <u>Section 10.01</u>.

"**PPSA**" means the *Personal Property Security Act*, R.S.O 1990, c. P.10; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Canadian Collateral is governed by (i) a Personal Property Security Act as in effect in a Canadian jurisdiction other than Ontario or (ii) the *Civil Code of Québec*, then "PPSA" means the Personal Property Security Act as in effect from time to time in such other jurisdiction or the *Civil Code of Québec*, as applicable, for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority in such Canadian Collateral.

"**Prepetition ABL Agent**" shall mean, as the context may require, Citizens Business Capital (a division of Citizens Asset Finance, Inc., a subsidiary of Citizens, N.A.), in its capacity as administrative agent under the Prepetition ABL Facility Documentation, Citizens Business Capital (a division of Citizens Asset Finance, Inc., a subsidiary of Citizens, N.A.), in its capacity as collateral agent under the Prepetition ABL Facility Documentation.

"**Prepetition ABL Credit Agreement**" shall mean that certain asset-based revolving credit agreement dated as of the February 13, 2014, among the Borrower, YRC Inc., a Delaware corporation, USF Reddaway Inc., an Oregon corporation, USF Holland LLC, a Delaware limited liability company (as successor to USF Holland, Inc., a Michigan corporation) and New Penn Motor Express, LLC, a Delaware limited liability company (as successor to New Penn Motor Express, Inc., a Pennsylvania corporation), the other subsidiaries of the Borrower party thereto, the lenders party thereto and the Prepetition ABL Agent, as amended prior to the Petition Date, provided by lenders who are third party commercial banks or other financial institutions that customarily provide asset based lending credit facilities and other financial institutions consented to by the Administrative Agent (such consent not to be unreasonably withheld or delayed).

"**Prepetition ABL Facility Documentation**" shall mean the Prepetition ABL Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith and including all "Loan Documents" (as defined in the Prepetition ABL Credit Agreement) or similar term.

"**Prepetition ABL Facility Indebtedness**" shall mean Indebtedness of the Borrower or any Subsidiary outstanding under the ABL Facility Documentation, including Bank Product Debt (as defined in the Prepetition ABL Credit Agreement).

"**Prepetition ABL Facility**" shall mean the asset-based revolving credit facility made available to the Borrower and certain of its Subsidiaries pursuant to the Prepetition ABL Credit Agreement.

"**Prepetition ABL Intercreditor Agreement**" shall mean the Amended and Restated Intercreditor Agreement dated as of July 7, 2020, among the Administrative Agent and/or Collateral Agent, the Prepetition ABL Agent, the Prepetition UST Tranche A Agent, the Prepetition UST Tranche B Agent and the Loan Parties, and as the same may be further amended, restated, modified, supplemented, extended, renewed, restructured, waived or replaced from time to time.

"**Prepetition ABL Priority Collateral**" shall have the meaning assigned to the term "ABL Priority Collateral" in the Prepetition ABL Intercreditor Agreement.

"**Prepetition ABL Secured Parties**" shall have the meaning assigned to the term "ABL Secured Parties" in the Prepetition ABL Intercreditor Agreement.

"**Prepetition Agents**" shall mean, collectively, the (a) Prepetition B-2 Agent, (b) Prepetition ABL Agent, (c) Prepetition UST Tranche A Agent and (d) Prepetition UST Tranche B Agent.

"**Prepetition B-2 Agent**" means Alter Domus Products Corp., as administrative agent and collateral agent for the Prepetition B-2 Lenders.

"**Prepetition B-2 Lenders**" means the lenders party to the Prepetition B-2 Term Loan Credit Agreement, from time to time, under and as defined in the Prepetition B-2 Term Loan Credit Agreement.

"**Prepetition B-2 Facility Indebtedness**" shall mean Indebtedness of the Borrower or any Subsidiary outstanding under or secured by the Prepetition B-2 Loan Documents.

"**Prepetition B-2 Loan Documents**" means the Prepetition B-2 Term Loan Credit Agreement and all instruments and documents executed at any time in connection therewith.

"**Prepetition B-2 Loans**" means the Prepetition B-2 Obligations in respect of principal of "Loans" under, and as defined in, the Prepetition B-2 Term Loan Credit Agreement and interest, expenses, fees, premium and other sums payable in respect thereof under the Pre Prepetition B-2 Loan Documents.

"**Prepetition B-2 Obligations**" means the "Obligations" as defined in the Prepetition B-2 Term Loan Credit Agreement.

"**Prepetition B-2 Term Loan Credit Agreement**" means that Amended and Restated Credit Agreement, dated as of September 11, 2019, by and among Borrower, as borrower, the guarantors from time to time party thereto, the Prepetition B-2 Lenders and the Prepetition B-2 Agent**,** as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

"**Prepetition Facility Documentation**" shall mean, collectively, the (i) Prepetition B-2 Loan Documents, (ii) Prepetition ABL Facility Documentation, (iii) Prepetition UST Tranche A Facility Documentation and (iv) Prepetition UST Tranche B Facility Documentation.

"**Prepetition Indebtedness**" shall mean, collectively, the (i) Prepetition B-2 Indebtedness, (ii) Prepetition ABL Facility Indebtedness, (iii) Prepetition UST Tranche A Facility Indebtedness and (iv) Prepetition UST Tranche B Facility Indebtedness.

"**Prepetition Lenders**" shall mean, collectively, the (a) Prepetition B-2 Lenders, (b) Prepetition ABL Lenders, (c) Prepetition UST Tranche A Lenders and (d) Prepetition UST Tranche B Lenders.

"**Prepetition Perfection Certificate**" shall mean the Perfection Certificate as of July 7, 2023 delivered by the Borrower pursuant to the Prepetition B-2 Credit Agreement.

"**Prepetition Secured Parties**" shall mean, collectively, the (a) Prepetition Agents and (b) the Prepetition Lenders.

"**Prepetition UST Tranche A Agent**" shall mean, as the context may require, The Bank of New York Mellon, in its capacity as administrative agent and as collateral agent under the Prepetition UST Tranche A Facility Documentation, such agents collectively or any permitted successor or assignee administrative agent or collateral agent under the Prepetition UST Tranche A Facility Documentation.

"**Prepetition UST Tranche A Controlled Account**" shall have the meaning assigned to the term "UST Tranche A Controlled Account" in the Prepetition UST Tranche A Credit Agreement (as in effect as of the date hereof).

"**Prepetition UST Tranche A Credit Agreement**" shall mean that certain Prepetition UST Tranche A Term Loan Credit Agreement dated as of the July 7, 2020, among the Borrower, the other subsidiaries of the Borrower party thereto, the lenders party thereto and the Prepetition UST Tranche A Agent, and as the same may be further amended, restated, modified, supplemented, extended, renewed, restructured, refunded, replaced or refinanced from time to time prior to the Petition Date.

"**Prepetition UST Tranche A Facility Documentation**" shall mean the Prepetition UST Tranche A Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith and including all "Loan Documents" (as defined in the Prepetition UST Tranche A Credit Agreement) or similar term.

"**Prepetition UST Tranche A Facility Indebtedness**" shall mean Indebtedness of the Borrower or any Subsidiary outstanding under or secured by the Prepetition UST Tranche A Facility Documentation.

"**Prepetition UST Tranche A Facility**" shall mean the credit facility made available to the Borrower pursuant to the Prepetition UST Tranche A Credit Agreement.

"**Prepetition UST Tranche A Only Collateral**" shall mean the Prepetition UST Tranche A Controlled Account and all Money (as defined in the UCC) and all cash, checks, other negotiable instruments, funds and other evidences of loan proceeds properly held therein.  As of the Closing Date, the aggregate amount held in the Prepetition UST Tranche A Controlled Account is $0.

"**Prepetition UST Tranche A Secured Parties**" shall have the meaning assigned to the term "UST Tranche A Secured Parties" in the Prepetition ABL Intercreditor Agreement.

"**Prepetition UST Tranche B Agent**" shall mean, as the context may require, The Bank of New York Mellon, in its capacity as administrative agent and as collateral agent under the Prepetition UST Tranche B Facility Documentation, such agents collectively or any permitted successor or assignee administrative agent or collateral agent under the Prepetition UST Tranche B Facility Documentation.

"**Prepetition UST Tranche B Controlled Account**" shall have the meaning assigned to the term "UST Tranche B Controlled Account" in the Prepetition UST Tranche B Credit Agreement (as in effect as of the date hereof).

"**Prepetition UST Tranche B Credit Agreement**" shall mean that certain Prepetition UST Tranche B Term Loan Credit Agreement dated as of the July 7, 2020, among the Borrower, the other subsidiaries of the Borrower party thereto, the lenders party thereto and the Prepetition UST B Agent, and as the same may be further amended, restated, modified, supplemented, extended, renewed, restructured, refunded, replaced or refinanced from time to time prior to the Petition Date.

"**Prepetition UST Tranche B Facility Documentation**" shall mean the Prepetition UST Tranche B Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith and including all "Loan Documents" (as defined in the Prepetition UST Tranche B Credit Agreement) or similar term.

"**Prepetition UST Tranche B Facility Indebtedness**" shall mean Indebtedness of the Borrower or any Subsidiary outstanding under or secured by the Prepetition UST Tranche B Facility Documentation.

"**Prepetition UST Tranche B Facility**" shall mean the credit facility made available to the Borrower pursuant to the Prepetition UST Tranche B Credit Agreement.

"**Prepetition UST Tranche B Joint Account**" shall have the meaning assigned to the term "UST Tranche B Joint Account" in the Prepetition ABL Intercreditor Agreement.

"**Prepetition UST Tranche B Joint Collateral**" shall have the meaning assigned to the term "UST Tranche B Joint Collateral" in the Prepetition ABL Intercreditor Agreement.

"**Prepetition UST Tranche B Only Collateral**" shall mean the Prepetition UST Tranche B Controlled Account and all Money (as defined in the UCC) and all cash, checks, other negotiable instruments, funds and other evidences of loan proceeds properly held therein.  s of the Closing Date, the aggregate amount held in the Prepetition UST Tranche A Controlled Account is $0.

"**Prepetition UST Tranche B Priority Collateral**" shall have the meaning assigned to the term "UST Tranche B Priority Collateral" in the Prepetition ABL Intercreditor Agreement.

"**Prepetition UST Tranche B Secured Parties**" shall have the meaning assigned to the term "UST Tranche B Secured Parties" the Prepetition ABL Intercreditor Agreement.

"**Prime Rate**" shall mean, as of any day, the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as reasonably determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as reasonably determined by the Administrative Agent).

"**Pro Rata Share**" shall mean, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments (or, if Commitments have been terminated, the principal amount of the Loans) under the applicable Facility or Facilities of such Lender at such time and the denominator of which is the amount of the aggregate Commitments (or, if the Commitments have been terminated, the principal amount of the Loans) under the applicable Facility or Facilities at such time.

"**Public Lender**" shall have the meaning assigned to such term in <u>Section 10.01</u>.

"**Qualified Equity Interests**" shall mean any Equity Interests that are not Disqualified Equity Interests.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned or leased by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Real Property Disposition Proceeds**" shall mean any Net Proceeds realized from a Disposition of any Real Property.

"**Register**" shall have the meaning assigned to such term in <u>Section 10.04(d)</u>.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Fund**" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in loans, any other fund that invests in loans and is managed or advised by the same investment advisor/manager as such Lender or by an Affiliate of such investment advisor/manager.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" shall mean any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or from, within or upon any vessel, vehicle, building, structure, facility or fixture.

"**Reportable Event**" shall mean any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived with respect to a Pension Plan.

"**Request for Credit Extension**" shall mean a request by the Borrower in accordance with the terms of <u>Section 2.03</u> and substantially in the form of <u>Exhibit C</u>, or such other form as shall be approved by the Administrative Agent.

"**Required Class Lenders**" shall mean, as of any date of determination, Lenders of a Class having more than 50% of the sum of the outstanding Loans and unused Commitments of the applicable Class.

"**Required Lenders**" shall mean, at any time, Lenders having Loans and unused Term Loan Commitments representing more than 50% of the sum of all Loans outstanding and unused Term Loan Commitments at such time.

"**Responsible Officer**" shall mean the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, director of treasury or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of such Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed by the recipient of such document to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed by the recipient of such document to have acted on behalf of such Loan Party.

"**Restricted Payment**" shall mean (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest of the Borrower or any Subsidiary, or on account of any return of capital to the Borrower's or a Subsidiary's stockholders, partners or members (or the equivalent Persons thereof) and (ii) any payment to any board member of any Loan Party or any Subsidiary thereof.

"**Rolled Term Loan Allocation**" means, as to any Lender, its allocation of Rolled Term Loans constituting converted principal, Exit Fees (as defined in the Prepetition B-2 Term Loan Agreement) and interest outstanding under the Prepetition B-2 Term Loan Agreement to be made on the Interim Order Entry Date pursuant to Section 2.01(b) in the aggregate principal amount set forth opposite such Lender's name on Appendix C under the caption "Rolled Term Loan Allocation", or in the Assignment and Acceptance pursuant to which such Lender becomes a party hereto.  The initial aggregate principal amount of the Initial Rolled Term Loan Allocation is $501,584,152.30.

"**Rolled Term Loans**" shall mean the term loans deemed made pursuant to Section 2.01(b).

"**Rolling Stock**" shall mean any vehicles, tractors, trucks, trailers, tank trailer and other trailers, or similar vehicles and trailers, railroad cars, locomotives, stacktrains and other rolling stock and accessories used on such railroad cars, locomotives or other rolling stock (including superstructures and racks).

"**S&P**" shall mean Standard & Poor's Ratings Service, or any successor thereto.

"**SEC**" shall mean the Securities and Exchange Commission or any Governmental Authority that is the successor thereto.

"**Second Bid Milestone Date**" shall have the meaning assigned to such term in the definition of Third Final Loan Borrowing Date.

"**Second Day Orders**" shall mean all "second day orders" with respect of the Chapter 11 Cases in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent), as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of any Agent, such Agent).

"**Second Final Loan Borrowing Date**" means a date occurring after the First Final Loan Borrowing Date that is (a) on or after the date (the "**First Bid Milestone Date**")  that the Lenders and the Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower (i) certifying that the Debtors have received unique, non-duplicative binding cash bids complying with the requirements set forth in the Bidding Procedures Order for the DIP Priority Collateral that would, in the aggregate, generate Net Proceeds at least equal to $250,000,000 and (ii) attaching copies of documentation

and calculations evidencing the foregoing, in each case, in form and substance satisfactory to the Required Lenders and (b) on or prior to the Third Final Loan Borrowing Date.

"**Secured Parties**" shall have the meaning assigned to such term in Section 13.04.

"**Securities Account**" as defined in the UCC or the PPSA, as applicable.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Security Agreement**" shall mean the Senior Secured Super-Priority Debtor-in-Possession Security Agreement dated as of the Closing Date among the Borrower, the Guarantors party thereto and the Collateral Agent as the same may be amended, restated, modified, supplemented, extended, renewed, restructured or replaced.

"**Security Agreement Supplement**" shall have the meaning specified in the Security Agreement.

"**Senior Financial Officer**" of any Person shall mean the chief financial officer, principal accounting officer, treasurer, controller or other similar officer of such Person.

"**Single-Employer Plans**" shall mean the Roadway LLC Pension Plan, the Yellow Corporation Pension Plan and the YRC Retiree Pension Plan or any other Pension Plans sponsored or maintained by the Borrower or any Subsidiary.

"**Specified Rolling Stock**" shall mean all Rolling Stock that does not constitute Prepetition UST Tranche B Priority Collateral.   For the avoidance of doubt, Prepetition UST Tranche B Joint Collateral shall be Specified Rolling Stock.

"**SPV**" shall have the meaning assigned to such term in Section 10.04(i).

"**Subsidiary**" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity of which (i) a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned or (ii) the management of which is otherwise Controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "**Subsidiary**" or to "**Subsidiaries**" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Subsequent Anti-Cash Hoarding Threshold Amount**" shall mean, as of any date of determination, the sum of:

(a)        $35,000,000; plus

(b)        prior to the Discharge of ABL Obligations, to the extent a positive amount, an amount (such amount under this clause (b) as of any date of determination, the "**Excess A/R Collection Amount**") equal to the product of (i) the excess of (A) the aggregate amount of actual cash receipts from accounts receivable collections of the Debtors from the Petition Date through such date of determination over (B) the sum of forecast cash receipts from accounts receivables collections of the Debtors in the Approved Budget for the same period multiplied by (ii) 20%; plus

(c)        prior to the Discharge of ABL Obligations, to the extent a positive amount, an amount (such amount under this clause (c) as of any date of determination, the "**Expenses Underspend Amount**")

equal to an amount equal to the excess of (i) the sum of forecast operating expenses of the Debtors in the Approved Budget from the Petition Date through such date of determination over (ii) the aggregate amount of actual operating expenses paid in cash by the Debtors from the Petition Date for the same period.

"**Swap Contract**" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" shall mean, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Taxes**" shall have the meaning assigned to such term in Section 3.01(a).

"**Term Borrowing**" shall mean a Borrowing comprised of Term Loans.

"**Term Lender**" shall mean a Lender with a Term Loan Commitment or an outstanding Term Loan.

"**Term Loans**" shall mean the New Money Term Loans and the Rolled Term Loans.

"**Term Note**" shall mean a promissory note of the Borrower payable to any Term Lender or its registered assigns, in substantially the form of Exhibit J hereto, evidencing the aggregate Indebtedness of the Borrower to such Term Lender resulting from the Term Loans made by such Term Lender.

"**Term Priority Collateral**" shall have the meaning assigned to the term "Non-UST Tranche B Term Priority Collateral" in the Prepetition ABL Intercreditor Agreement.

"**Third Final Loan Borrowing Date**" means a date occurring after the First Final Loan Borrowing Date and the Second Final Loan Borrowing Date that is (a) on or after the date (the "**Second Bid Milestone Date**") that the Lenders and the Administrative Agent shall have received a certificate signed by a Responsible Officer of the Borrower (i) certifying that the Debtors have received unique, non-duplicative binding cash bids which are not subject to any financing contingencies (but, for the avoidance of doubt, may be subject to receipt of environmental reports and/or title contingencies reasonably acceptable to buyer(s)) for the DIP Priority Collateral and the Administrative and that comply with the requirements set forth in the Bidding Procedures Order for the DIP Priority Collateral that would, in the aggregate, generate Net Proceeds at least equal to $450,000,000 and (ii) attaching copies of documentation and calculations evidencing the foregoing,

in each case, in form and substance satisfactory to the Required Lenders and (b) on or prior to the fifth (5th) Business Day prior to the Maturity Date.

"**Threshold Amount**" shall mean $10,000,000.

"**Transaction Expenses**" shall mean any costs, fees or expenses incurred or paid by the Borrower or any of its Subsidiaries in connection with the Transactions described in clause (a) of the definition of such term.

"**Transactions**" shall mean, collectively, (a) the execution and delivery by the Loan Parties of the Loan Documents to which they are a party and the making of the Borrowings hereunder and the consummation of any other transaction in connection with the foregoing and (b) the payment of the Transaction Expenses.

"**Transferred Guarantor**" shall have the meaning specified in the Section 11.10.

"**Treasury**" means the United States Department of the Treasury.

"**Treasury Only Collateral**" shall mean, collectively, the Prepetition UST Tranche A Only Collateral and the Prepetition UST Tranche B Only Collateral.

"**Unaudited Financial Statements**" shall mean the unaudited consolidated balance sheets and related statements of operations and cash flows of the Borrower and its consolidated Subsidiaries as at the end of and for the fiscal quarter ended March 31, 2023.

"**Uniform Commercial Code**" or "**UCC**" shall mean the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**United States Tax Compliance Certificate**" shall have the meaning assigned to such term in Section 3.01(d).

"**U.S. Government Securities Business Day**" shall mean any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**USA PATRIOT Act**" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"**UST Adequate Protection Order**" shall mean in a final, non-appealable order approving adequate protection payments on account of the Prepetition UST Tranche A Facility Indebtedness and the Prepetition UST Tranche B Facility Indebtedness, in form and substance satisfactory to the Required Lenders and the Agents.

"**UST Adequate Protection Payments**" shall mean adequate protection payments expressly set forth in the UST Adequate Protection Order.

"**wholly owned**" shall mean, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02. *Other Interpretive Provisions.* With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    (i) The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation.

(c)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(d)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(e)    The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(f)    All references to "knowledge" or "awareness" of any Loan Party or a Subsidiary thereof means the actual knowledge of a Responsible Officer of a Loan Party or such Subsidiary.

(g)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(h)    The word "or" is not exclusive.

(i)    The usage of the term "written" includes electronic messages, including e-mail.

(j)    Any reference herein or in any other Loan Document to (i) a transfer, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company, as if it were a transfer, assignment, sale or transfer, or similar term, as applicable, to a separate Person, and (ii) a merger, consolidation, amalgamation or consolidation, or similar term, shall be deemed to apply to the unwinding

of such a division or allocation, as if it were a merger, consolidation, amalgamation or consolidation or similar term, as applicable, with a separate Person.

Section 1.03.  *Certifications.*  All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such a Person in his or her capacity solely as an officer or representative of such Loan Party, on such Loan Party's behalf and not in such Person's individual capacity.

Section 1.04.  *Accounting Terms.*  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein or therein.

Section 1.05.  *Rounding.*  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.06.  *References to Agreements, Laws, Etc.*  Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements, replacements, extensions, renewals, refinancings, restructurings and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements, replacements, extensions, renewals, refinancings, restructurings and other modifications are not prohibited by hereby; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.07.  *Times of Day.*  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.08.  *Timing of Payment or Performance.*  Except as otherwise expressly provided herein, when the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

Section 1.09.  *Certain Accounting Matters.*  Notwithstanding any other provision contained herein or in any other Loan Document, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, (a) without giving effect to any election under Statement of Financial Accounting Standards 159 or Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any of its Subsidiaries at "fair value", as defined therein; and (b) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 and/or Statement of Financial Accounting Standards 150 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof. Furthermore, unless the Borrower elects otherwise, notwithstanding any other provision contained herein or in any other Loan Document, for all purposes under this Agreement and the other Loan Documents, including negative covenants, financials covenants and component definitions, operating leases and Capitalized Leases will be deemed to be treated in a manner consistent with their current treatment under GAAP as in effect on December 31, 2018, notwithstanding

any modifications or interpretive changes thereto that may occur thereafter.  For the avoidance of doubt, the principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP, except as expressly set forth in clauses (a) and (b) of this <u>Section 1.11</u>.

Section 1.10.  *Classification of Loans and Borrowings.*  For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "New Money Term Loan").  Borrowings also may be classified and referred to by Class (e.g., a "New Money Term Borrowing").

Section 1.11. *Currency Equivalents Generally.*  For purposes of determining compliance with <u>Sections 7.01</u>, <u>7.02</u>, <u>7.03</u>, <u>7.05</u>, <u>7.06</u>, <u>7.08</u>, <u>7.09</u> and <u>7.13</u> with respect to any amount of Indebtedness, Lien, Asset Sale, Restricted Payment, Capital Expenditure, affiliate transaction, Contractual Obligation, prepayment of Indebtedness or Investment in a currency other than Dollars, no Default or Event of Default shall be deemed to have occurred solely as a result of changes in rates of currency exchange occurring after the time such Indebtedness or Investment is incurred (so long as such Indebtedness or Investment, at the time incurred, made or acquired, was permitted hereunder) and once incurred or made, the amount of such Indebtedness, Lien, Asset Sale, Restricted Payment, Capital Expenditure, affiliate transaction, Contractual Obligation, prepayment of Indebtedness or Investment, shall be always deemed to be at the Dollar amount on such date, regardless of later changes in currency exchange rates.

# ARTICLE 2
## THE CREDITS

Section 2.01.  *Term Loan Commitments.*

(a)    Subject to the terms and conditions set forth herein and in the DIP Order, each Lender severally and not jointly agrees to make, on the applicable borrowing date, a Loan to the Borrower in an aggregate amount not to exceed such Lender's Commitment.  The Borrower may make only four (4) Borrowings under the Commitments (not including, for the avoidance of doubt, the deemed borrowing of Rolled Term Loans pursuant to Section 2.01(b) below) that shall be, in the case of the Initial Commitments, one Borrowing on the Closing Date in an aggregate principal amount equal to $60,000,000 and, in the case of the Final Commitments, on any Final Loan Borrowing Date, in each case, as set forth in Section 2.02(b). The Initial Commitments shall terminate automatically immediately after the making of the Initial Loans on the Closing Date and the Final Commitments shall reduce automatically on a dollar for dollar basis immediately after the making of the Final Loans on each Final Loan Borrowing Date.

(b)    Subject to the terms and conditions set forth herein and in the DIP Order, all of the outstanding Prepetition B-2 Obligations held by the Lenders or their respective Affiliates or managed or related funds and separately managed accounts that are Prepetition B-2 Lenders immediately prior to the Interim Order Entry Date, shall be rolled up and converted into Obligations hereunder on the Interim Order Entry Date as follows: (i) the outstanding principal balance of the Prepetition B-2 Loans, together with all accrued and unpaid interest thereon and exit fees with respect thereto, shall be rolled up and converted, effected by means of a "cashless" roll, into term loans hereunder (such term loans, the "**Rolled Term Loans**") into an aggregate principal amount for each Lender equal to its Rolled Term Loan Allocation and (ii) all other accrued and unpaid fees and expenses of such Prepetition B-2 Lenders and their respective counsels shall be rolled up and converted, effected by means of a "cashless" roll, into Obligations hereunder of the same type.   For the avoidance of doubt, the consummation of the "cashless roll" described in subclause (i) above shall be deemed a borrowing of Rolled Term Loans hereunder and all Rolled Term

Loans shall, upon entry of the Interim Order, cease to be Prepetition B-2 Obligations governed by the terms of the Prepetition B-2 Loan Documents.

(c)    The New Money Term Loans and the Rolled Term Loans are sometimes referred to individually as a "Term Loan" and together as the "Term Loans".

(d)    Initial Loans, Final Loans and Rolled Term Loans which are repaid or prepaid may not be reborrowed.  All Term Loans and all other amounts owed hereunder and under any of Loan Document (other than the Variable Amount, as such term is defined in and under the Fee Letter, which shall be payable in accordance with the terms of the Fee Letter) with respect to the Term Loans shall be paid in full in cash not later than the Maturity Date.

Section 2.02.  *Loans*.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments*; provided, however*, that the failure of any Lender to make any Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).

(b)    The Borrower may only request Final Loans as follows:

(i)    for a borrowing on the First Final Loan Borrowing, in an aggregate principal amount not the exceed $37,500,000;

(ii)    for a borrowing on the Second Final Loan Borrowing, in an aggregate principal amount not the exceed $20,000,000; and

(iii)    for a borrowing on the Third Final Loan Borrowing Date, in an aggregate principal amount not to exceed $25,000,000.

(c)    Each Borrowing shall be comprised entirely of ABR Loans.

(d)    Each Lender shall make each New Money Term Loan to be made by it hereunder on the Closing Date and/or each Final Loan Borrowing Date by wire transfer of immediately available funds to the Administrative Agent's Office not later than 1:00 p.m., New York City time, and upon receipt of all requested funds the Administrative Agent shall promptly credit the amounts so received to an account designated by the Borrower in the applicable Request for Credit Extension.

(e)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph I above and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable at the time to the Loans comprising such Borrowing, and (ii) in the case of such Lender, a rate determined by the Administrative

Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error).  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

Section 2.03.  *Borrowing Procedure.*  In order to request a Borrowing, the Borrower shall notify the Administrative Agent of such request in writing not later than 1:00 p.m., New York City time, (i) in the case of the Borrowing on the Closing Date, two (2) Business Days before the proposed Borrowing and (ii) in the case of any Borrower after the Closing Date, three (3) Business Days before such proposed Borrowing.  Each such Request for Credit Extension shall be irrevocable (but may be conditioned upon the prepayment of indebtedness or the consummation of a specified transaction) and shall specify the following information:  (i) the Class of Loans to be borrowed; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the wire instructions for the Cash Collateral Account to which such funds shall be delivered and (iv) the amount of such Borrowing; *provided, however*, that, notwithstanding any contrary specification in any Request for Credit Extension, each requested Borrowing shall comply with the requirements set forth in Section 2.02 and shall be subject to satisfaction(or waiver) of the conditions precedent set forth in Section 4.01 and Section 4.02 or 4.03, as applicable.  The Administrative Agent shall promptly advise the applicable Lenders of any notice given pursuant to this Section 2.03 (and the contents thereof), and of each Lender's portion of the requested Borrowing.

Section 2.04.  *Evidence of Debt; Repayment of Loans*.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the principal amount of each Term Loan of such Lender as provided in Section 2.11.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder and the Class thereof, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraphs (b) and (c) above shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided, however*, that (i) the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans in accordance with their terms and (ii) in the event of any conflict between the accounts set forth in paragraphs (b) and (c) above, the amounts set forth in the accounts maintained pursuant to paragraph (c) shall prevail.

(e)    Any Lender may request that Loans made by it hereunder be evidenced by a Term Note. In such event, the Borrower shall promptly execute and deliver to such Lender a Term Note payable to such Lender and its registered assigns in accordance with Section 10.04.  Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive a Term Note, the interests represented by such Term Note shall at all times (including after any assignment of all or part of such interests pursuant to Section 10.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns, unless such Term Note is duly cancelled.

(f)    This <u>Section 2.04</u> shall at all times be interpreted and administered in such a way that the Term Notes will be issued in "registered form" within the meaning of Treasury Regulation Section 5f.163-1(a).

Section 2.05.  *Fees*.

(a)    The Borrower agrees to pay to (i) the Agents, for their own account, the administrative agent and collateral agents fees applicable to the Facilities payable in the amounts and at the times agreed upon between the Borrower and the Administrative Agent as set forth in the Agency Fee Letter and (ii) the Administrative Agent,  for the account of the Lenders, the fees applicable to the Facilities in the amounts, in the manner and at the times set forth in the Fee Letter (the fees pursuant to the foregoing subclauses (i) and (ii) of this clause (a), the  "**Fees**").

(b)    All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent.  Once paid, none of the Fees shall be refundable under any circumstances.

Section 2.06.  *Interest on Loans*.

(a)    Subject to the provisions of <u>Section 2.07</u>, the Loans shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin.  For the avoidance of doubt, no date of payment shall be included in the calculation of fees or interest.

(b)    [Reserved].

(c)    Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement.  The applicable Alternate Base Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.07.  *Default Interest*.  Automatically from and after the occurrence and during the continuance of an Event of Default, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder, shall thereafter, after as well as before judgment, bear interest (including post-petition interest in any proceeding under Debtor Relief Laws) payable on written demand at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2.0% per annum in excess of the interest rate otherwise payable hereunder).

Section 2.08.  *[Reserved]*.

Section 2.09.  *[Reserved]*.

Section 2.10.  *[Reserved]*.

Section 2.11.  *Repayment of Term Borrowings*.  The Borrower shall repay to the Administrative Agent, for the ratable account of the Term Lenders on the Maturity Date, the aggregate principal amount of all Term Loans outstanding on such date, together with all accrued and unpaid interest on the principal amount to be paid (to, but excluding, the date of such payment) and all fees and expenses payable under the Loan Documents and other outstanding Obligations.

(a)      All repayments pursuant to this <u>Section 2.11</u> shall be without premium or penalty.

Section 2.12.   *Voluntary Prepayment*.

(a)      The Borrower shall have the right at any time to prepay the Term Loans in full or in part, upon written (email) notice to the Administrative Agent at least one Business Day prior to the date of prepayment, before 1:00 p.m., New York City time.

(b)      Such notice of prepayment shall specify the prepayment date, shall be irrevocable and shall specify the principal amount of the Term Loans (or portion thereof) to be prepaid on the date stated therein; provided, however, that a notice of prepayment delivered by the Borrower may state that such notice is conditioned upon the consummation of a sale transaction or any other specified event, in which case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  All prepayments under this Section 2.12 shall be without premium or penalty.  All prepayments under this Section 2.12 shall be accompanied by all accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment and all fees, expenses and other outstanding Obligations.

Section 2.13.   *Mandatory Prepayments*.

(a) (i)  If the Borrower or any Subsidiary Disposes of any property or assets pursuant to <u>Section 7.05(b)</u> or under any transaction that would be prohibited by <u>Section 7.05</u>, or (2) any Casualty Event occurs, which results in the realization or receipt by the Borrower or a Subsidiary of Net Proceeds, in each case, the Borrower shall cause to be prepaid not later than two (2) Business Days after the date of the realization or receipt by the Borrower or a Subsidiary of Net Proceeds an aggregate principal amount of Term Loans in an amount equal to 100% of all Net Proceeds realized or received; provided, that the foregoing mandatory prepayment shall be subject to the DIP Order. Notwithstanding the foregoing or anything to the contrary in the definition of "Net Proceeds", solely with respect to Dispositions of Prepetition UST Tranche B Joint Collateral, Net Proceeds of Dispositions of Prepetition UST Tranche B Joint Collateral shall be applied as follows: (A) an amount equal to 33% of such Net Proceeds shall be applied to the prepayment of the Term Loans (and applied ratably to each Class of Term Loans then outstanding) in accordance with this Section 2.13(a)(i) and (B) an amount equal to 67% of such Net Proceeds shall be applied to the prepayment of the Prepetition UST Tranche B Facility Indebtedness.

(ii)      If the Borrower or any Subsidiary incurs or issues any Indebtedness after the Petition Date (other than Indebtedness permitted under <u>Section 7.03</u>), the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans in an amount equal to 100% of all Net Proceeds received therefrom on or prior to the date which is one (1) Business Day after the receipt by the Borrower or such Subsidiary of such Net Proceeds.

(iii)      If the Borrower issues any Equity Interests, the Borrower shall cause to be prepaid an aggregate principal amount of Term Loans in an amount equal to 100% of all Net Equity Proceeds received therefrom on or prior to the date which is one (1) Business Day after the receipt by the Borrower of such Net Equity Proceeds.

(iv)      If, on each Monday or Friday of each calendar week (each, an "**Anti-Cash Hoarding Test Date**") during the period commencing with Monday August 14, 2023 and ending on and including Friday September 8, 2023 , the amount of Liquidity exceeds the Initial Anti-Cash Hoarding Threshold Amount as of such Anti-Cash Hoarding Test Date, then the Borrower shall promptly (but in any event not later than two (2) Business Days thereafter) prepay the Term Loans in an amount equal to 100% of such excess; *provided*, the amount required to prepay the Term Loans pursuant to this clause (iv) shall

not include any cash representing proceeds of accounts receivables that is required to be paid to the Prepetition ABL Secured Parties pursuant to the DIP Order.

(v)     If, on an Anti-Cash Hoarding Test Date that falls after Friday September 8, 2023, the amount of Liquidity exceeds the Subsequent Anti-Cash Hoarding Threshold Amount as of such Anti-Cash Hoarding Test Date, then the Borrower shall promptly (but in any event not later than two (2) Business Days thereafter) prepay the Term Loans in an amount equal to 100% of such excess; *provided*, the amount required to prepay the Term Loans pursuant to this clause (v) shall not include any cash representing proceeds of accounts receivables that is required to be paid to the Prepetition ABL Secured Parties pursuant to the DIP Order.

(b)     The Borrower shall notify the Administrative Agent in writing (which may be by email) of any mandatory prepayment of the Loans required to be made pursuant to Section 2.13 by 3:00 p.m., New York City time, at least one (1) Business Day prior to the date of such prepayment. Each prepayment of Term Loans pursuant to Section 2.13(a) shall be applied ratably to each Class of Term Loans then outstanding. With respect to each Class of Term Loans and each prepayment pursuant to Section 2.13(a) shall be paid to the Lenders in accordance with their respective Pro Rata Shares. All prepayments under this Section 2.13 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

Section 2.14. *Pro Rata Treatment.* Except as required under Section 3.02, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each reduction of the Term Loan Commitments shall be allocated pro rata among the Lenders of the applicable Class in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans); *provided* that the provisions of this Section 2.14 shall not be construed to apply to any payment made by the Borrower required to be made on a non pro rata basis pursuant to and in accordance with the express terms of this Agreement as in effect as of the date of this Agreement. Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

Section 2.15. *Sharing of Setoffs.* Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans as a result of which the unpaid principal portion of its Loans shall be proportionately less than the unpaid principal portion of the Loans of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans of such other Lender, so that the aggregate unpaid principal amount of the Loans and participations in Loans held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans then outstanding as the principal amount of its Loans prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; *provided, however,* that (i) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.15 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (ii) the provisions of this Section 2.15 shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or

sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower as to which the provisions of this <u>Section 2.15</u> shall apply (*provided*, that if the applicable payment, assignment, sale or participation to the Borrower is expressly permitted under <u>Section 10.04</u>, the provisions of this <u>Section 2.15</u> shall not be construed to apply).  The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

Section 2.16.  *Payments*.

(a)    The Borrower shall make each payment (including principal of or interest on any Borrowing or any Fees or other amounts due and payable) hereunder and under any other Loan Document not later than 2:00 p.m., New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  Each such payment shall be made to the Administrative Agent at the Administrative Agent's Office.  The Administrative Agent shall promptly distribute to each Lender any payments received by the Administrative Agent on behalf of such Lender.

(b)    Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

# ARTICLE 3
### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

Section 3.01.  *Taxes*.

(a)    Except as provided in this <u>Section 3.01</u>, any and all payments made by or on account of the Borrower or any Guarantor under any Loan Document to any Lender or Agent shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, assessments, withholdings (including backup withholding), fees or similar charges imposed by any Governmental Authority including interest, penalties and additions to tax (collectively "**Taxes**"), excluding (i) Taxes imposed on or measured by net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, (ii) Taxes attributable to the failure by the relevant Lender or Agent to deliver the documentation required to be delivered pursuant to clause (d) of this <u>Section 3.01</u>, (iii) Taxes imposed by a jurisdiction as a result of any connection between such Lender or Agent and such jurisdiction other than any connection arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, or enforcing any Loan Document, (iv) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which the Borrower or any Guarantor (as appropriate) is located, (v) any U.S. federal withholding tax imposed on amounts payable hereunder pursuant to a law in effect at such time the Lender or Agent becomes a party to this Agreement (other than pursuant to an assignment request by the Borrower under <u>Section 3.06</u>), or designates a new lending office, except in each case to the extent such Lender (or its assignor, if any) was entitled at the time of designation of a new lending office (or assignment) to receive additional amounts with respect to such withholding tax pursuant to this <u>Section 3.01(a)</u> and (vi) any withholding Tax imposed under FATCA (all such non-excluded Taxes imposed on such payments, being hereinafter referred to as "**Indemnified Taxes**").  If the Borrower, any Guarantor or other applicable withholding agent shall be

required by any Laws to deduct or withhold any Indemnified Taxes or Other Taxes (as defined below) from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) the sum payable by the Borrower or Guarantor shall be increased as necessary so that after making all required deductions or withholding (including deductions and withholdings applicable to additional sums payable under this Section 3.01), such Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent shall make such deductions or withholdings, (iii) the applicable withholding agent shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), if the Borrower or any Guarantor is the applicable withholding agent, the applicable withholding agent shall furnish to such Agent or Lender (as the case may be) the original or a copy of a receipt evidencing payment thereof or other evidence acceptable to such Agent or Lender.

(b)      In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other intangible or mortgage recording taxes, or charges or levies of the same character, imposed by any Governmental Authority, which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (including additions to tax, penalties and interest related thereto) excluding, in each case, such amounts that result from an Agent or Lender's Assignment and Acceptance, grant of a Participation, transfer or assignment to or designation of a new applicable lending office or other office for receiving payments under any Loan Document (collectively, "**Assignment Taxes**") except for Assignment Taxes resulting from assignment or participation that is requested or required in writing by the Borrower (all such non-excluded taxes described in this Section 3.01(b) being hereinafter referred to as "**Other Taxes**").

(c)      Without duplication of Section 3.01(a) or (b), the Borrower and each Guarantor agree to indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes and Other Taxes paid by such Agent or Lender (including Indemnified Taxes and Other Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01(c)) and (ii) any reasonable expenses arising therefrom or with respect thereto, *provided* such Agent or Lender, as the case may be, provides Borrower or Guarantor with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts.

(d)      Each Lender and Agent shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by Law or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender or Agent to an exemption from, or reduction in, withholding tax with respect to any payments to be made to such Lender under the Loan Documents.  Each such Lender and Agent shall, whenever a lapse in time or change in circumstances renders such documentation obsolete or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify the Borrower and the Administrative Agent of its inability to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any Loan Document to or for a Lender are not subject to withholding tax or are subject to such Tax at a rate reduced by an applicable tax treaty, the Borrower, the Administrative Agent or other applicable withholding agent shall withhold amounts required to be withheld by applicable Law from such payments at the applicable statutory rate.  Notwithstanding the foregoing, a Lender shall not be required to deliver any form pursuant to this clause (d) (other than such documentation set forth in Sections 3.01(d)(i), 3.01(d)(ii) and 3.01(g)) that such Lender is not legally able to deliver.  In addition, each Lender and Agent shall deliver to the Borrower and the Administrative Agent such other tax forms or other documents as shall

be prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender or Agent is subject to backup withholding or information reporting requirements.  Without limiting the foregoing:

(i)     Each Lender and Agent that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) two properly completed and duly signed executed copies of Internal Revenue Service Form W-9 certifying that such Lender or Agent (as the case may be) is exempt from federal backup withholding.

(ii)     Each Lender and Agent that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) whichever of the following is applicable:

(A)     two properly completed and duly signed executed copies of Internal Revenue Service Form W-8BEN or Internal Revenue Service Form W-8BEN-E (or any successor forms) claiming eligibility for the benefits of an income tax treaty to which the United States is a party, and such other documentation as required under the Code,

(B)     two properly completed and duly signed executed copies of Internal Revenue Service Form W-8ECI (or any successor forms) and, in the case of an Agent, a withholding certificate that satisfies the requirements of Treasury Regulation Sections 1.1441-1(b)(2)(iv) and 1.1441-1(e)(3)(v) as applicable to a U.S. branch that has agreed to be treated as a U.S. person for withholding tax purposes(C) in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit G-1, G-2, G-3 or G-4, as applicable (any such certificate a "**United States Tax Compliance Certificate**") and (B) two properly completed and duly signed executed copies of Internal Revenue Service Form W-8BEN or Internal Revenue Service Form W-8BEN-E, or

(D)     to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a participant holding a participation granted by a participating Lender), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (*provided* that, if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such beneficial owner).  Each Lender and Agent shall deliver to the Borrower and the Administrative Agent two further executed copies of any previously delivered form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete or inaccurate and promptly after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower or the Administrative Agent, or promptly notify the Borrower and the Administrative Agent that it is unable to do so.  Each Lender and Agent shall promptly notify the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered form or certification to the Borrower or the Administrative Agent.

(e)     Any Lender or Agent claiming any additional amounts payable pursuant to this Section 3.01 shall use its reasonable efforts to change the jurisdiction of its lending office (or take any other measures reasonably requested by the Borrower) if such a change or other measures would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the reasonable, good faith

determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

(f)        If any Lender or Agent determines, in its reasonable, good faith discretion, that it has received a refund in respect of any Taxes as to which indemnification or additional amounts have been paid to it by the Borrower pursuant to this Section 3.01 (including by payment of additional amounts pursuant to this Section 3.01) it shall promptly remit such refund to the Borrower or Guarantor, net of all out-of-pocket expenses of the Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund net of any Taxes payable by any Agent or Lender on such interest); *provided* that the Borrower and Guarantors, upon the request of the Lender or Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant Governmental Authority.  This section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to the Borrower or any other person.

(g)        If a payment made to a Lender or Agent under any Loan Document would be subject to withholding Tax imposed by FATCA if such Lender or Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender or Agent has complied with such Lender's or Agent's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this Section 3.01(g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)        Each party's obligations under this Section 3.01 shall survive any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)        Each Lender shall indemnify each Agent, within 10 days following written demand therefor, for (i) the full amount of any Indemnified Taxes and Other Taxes attributable to such Lender (but only to the extent that such Agent has not already been indemnified by the Borrower and each Guarantor for such Indemnified Taxes and Other Taxes and without limiting the obligation of the Borrower and each Guarantor to do so), and (ii) any Taxes attributable to such Lender's failure to comply with the provision of Section 10.04(f) relating to the maintenance of a Participant Register, in each case, that are payable or paid by such Agent in connection with any Loan Documents, and any expenses arising therefrom or with respect thereto; *provided* that such Agent provides such lender with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts.

Section 3.02.  *[Reserved]*.

Section 3.03.  *Increased Cost and Reduced Return; Capital Adequacy*.

(a)        If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the Closing Date, or such Lender's compliance therewith, there shall be any material  increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Loans, or a material reduction in the amount received or receivable by such

Lender in connection with any of the foregoing (excluding for purposes of this Section 3.03(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Other Taxes for which additional amounts are payable pursuant to Section 3.01, or any Taxes excluded from the definition of Indemnified Taxes under exception (iii) thereof to the extent such Taxes are imposed on or measured by net income or profits or are franchise taxes (imposed in lieu of the foregoing taxes) and any Taxes excluded from the definition of Indemnified Taxes under exceptions (i), (ii), (iv), (v) and (vi) thereof or (ii) reserve requirements contemplated by Section 3.03(c)) and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining its obligations to make any Loan, or to reduce the amount of any sum received or receivable by such Lender, then from time to time within fifteen (15) days after written demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such written demand to the Administrative Agent given in accordance with Section 3.05), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)        If any Lender determines that the introduction of any Law regarding capital adequacy or liquidity or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its lending office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any entity controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and liquidity and such Lender's desired return on capital), then from time to time upon written demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such written demand to the Administrative Agent given in accordance with Section 3.05), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender or controlling entity for such reduction within fifteen (15) days after receipt of such written demand.

(c)        The Borrower shall pay to each Lender, as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, *provided* the Borrower shall have received at least fifteen (15) days' prior written notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender.  If a Lender fails to give written notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days from receipt of such written notice.

(d)        Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.03 shall not constitute a waiver of such Lender's right to demand such compensation.

(e)        If any Lender requests compensation under this Section 3.03, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another lending office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no material economic, legal or regulatory disadvantage, and *provided further* that nothing in this Section 3.03(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.03(a), (b), (c) or (d).

Section 3.04.  *[Reserved].*

Section 3.05.  *Matters Applicable to all Requests for Compensation.*

(a)        Any Agent or any Lender claiming compensation under this Article 3 shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, such Agent or such Lender may use any reasonable and customary averaging and attribution methods.

(b)        With respect to any Lender's claim for compensation under Section 3.02 or 3.03, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(c)        [Reserved].

(d)        [Reserved].

(e)        Notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall be deemed to have been adopted or made after the Closing Date, regardless of the date enacted or adopted.

Section 3.06.  *Replacement of Lenders under Certain Circumstances*.

(a)        If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.03 as a result of any condition described in such Sections or (ii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on prior written notice to the Administrative Agent and such Lender, (x) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.04(b) (unless otherwise agreed, with the assignment fee to be paid by the Borrower in such instance) (it being understood that any such assignment shall become effective only in accordance with Section 10.04(e)), all of its rights and obligations under this Agreement (in respect of any applicable Facility only in the case of clause (i) or, with respect to a Class vote, clause (ii)) to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; and *provided further* that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.03 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to, and shall be sufficient (together with all other consenting Lenders) to cause the adoption of, the applicable departure, waiver or amendment of the Loan Documents; or (y) terminate the Commitment of such Lender and repay all Obligations of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date; *provided* that in the case of any such termination of a Non-Consenting Lender, such termination shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents and such termination shall be in respect of any applicable Facility only in the case of clause (i) or, with respect to a Class vote, clause (ii).

(b)        In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of each Lender, each directly and adversely affected Lender, each Lender with respect to a certain Class of Loans

or each directly and adversely affected Lender with respect to a certain Class of Loans, in each case in accordance with Section 10.08, and (iii) the Required Lenders (or, in the case of a consent, waiver or amendment involving all Lenders or all directly and adversely affected Lenders of a certain Class, the Required Class Lenders) have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

(c)    Any Lender being replaced pursuant to Section 3.06(a) above shall (i) execute and deliver an Assignment and Acceptance with respect to such Lender's applicable Commitment and outstanding Loans, and (ii) deliver any Term Notes evidencing such Loans to the Borrower or Administrative Agent. Pursuant to such Assignment and Acceptance, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans and participations so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such Assignment and Acceptance and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Term Note executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender. In connection with any such replacement, if any such Non-Consenting Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Acceptance reflecting such replacement within five (5) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Acceptance to such Non-Consenting Lender, then such Non-Consenting Lender shall be deemed to have executed and delivered such Assignment and Acceptance without any action on the part of the Non-Consenting Lender.

(d)    Notwithstanding anything to the contrary contained above, the Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with Article 9.

Section 3.07. *Survival.*  All of the Borrower's obligations under this Article 3 shall survive termination of the Commitments and repayment of all other Obligations hereunder.

# ARTICLE 4
CONDITIONS PRECEDENT TO EFFECTIVENESS AND EACH CREDIT EXTENSION

Section 4.01. *All Credit Extensions.*  The obligation of each Lender to honor any Request for Credit Extension is subject to satisfaction (or waiver by the Required Lenders) of the following conditions precedent:

(a)    The representations and warranties set forth in Article 5 and in each other Loan Document shall be true and correct in all material respects on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided*, that any such representation and warranty that is qualified by "materiality", "material adverse effect" or similar language shall be true and correct in all respects (after giving effect to such qualification therein) on and as of the date of such Credit Extension with the same effect as though made on and as of such date or such earlier date, as applicable.

(b)    No Default or Event of Default shall exist or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

(c)    The following shall each be true as the date of such Credit Extension:

(i)    All Chapter 11 Orders and the orders granted in the Canadian Recognition Proceedings filed or to be filed with, and submitted to, the Bankruptcy Court or the Canadian Court shall be in form and substance acceptable to the Agents and the Required Lenders.

(ii)    Each Chapter 11 Order and the orders granted in the Canadian Recognition Proceedings that has been entered as of such date shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the Agents and the Required Lenders.

(iii)    No appeal of the DIP Order and the Canadian Orders shall have been filed or remain pending as of the date of such Credit Extension.

(iv)    The Loan Parties shall be in compliance in all respects with the DIP Order and each other Chapter 11 Order and the orders granted in the Canadian Recognition Proceedings.

(d)    The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

(e)    [Reserved].

(f)    The FTI Engagement Letter shall be in full force and effect.

(g)    All engagement letters or other agreements providing for the payment of the fees and expenses of the proposed Debtors' professional advisors shall be in form and substance reasonably satisfactory to the Required Lenders.

Each Request for Credit Extension submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Sections 4.01 (a) and (b) have been satisfied or waived on and as of the date of the applicable Credit Extension.

Section 4.02.  *Initial Credit Extension.*  The effectiveness of this Agreement and the obligation of each Lender to fund the Initial Loans on the Closing Date, shall be subject to satisfaction (or waiver) of the following conditions precedent:

(a)    The Administrative Agent and the Lenders shall have received the following, each properly executed by a Responsible Officer of the signing Loan Party, each dated as of the Closing Date:

(i)    executed counterparts of this Agreement duly executed by the Borrower and each Guarantor;

(ii)    a Term Note executed by the Borrower in favor of each Lender that has requested a Term Note at least one Business Day in advance of the Closing Date;

(iii)    the Security Agreement duly executed by the parties thereto; and

(iv)    the Fee Letter and the Agency Letter duly executed by the respective parties thereto.

(b)    The Administrative Agent and the Lenders shall have received, on behalf of themselves, the Agents and the Lenders, an opinion of Kirkland & Ellis LLP, special counsel for the Loan Parties, dated

46

the Closing Date and addressed to the Administrative Agent, the Collateral Agent and the Lenders and in customary form and substance, and the Borrower hereby requests such counsel to deliver such opinions.

(c)      The Administrative Agent and the Lenders shall have received (i) a copy of the certificate or articles of incorporation or organization or certificate of formation, including all amendments thereto, of each Loan Party, certified, if applicable, as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing (to the extent applicable) of each Loan Party as of a recent date, from such Secretary of State or similar Governmental Authority; (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws or operating (or limited liability company) agreement of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or equivalent governing body) of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Loan Party is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation or organization or certificate of formation of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above, (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party on the Closing Date, and (E) as to the absence of any proceeding for the dissolution or liquidation of such Loan Party; and (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above.

(d)      (i) The Administrative Agent and the Lenders shall have received the results of (x) searches of the Uniform Commercial Code filings (or equivalent filings) and (y) judgment and tax lien searches, made with respect to each Loan Party in the states or other jurisdictions of formation of such Loan Party and with respect to such other locations and names reasonably requested by the Required Lenders, together with copies of the financing statements (or similar documents) disclosed by such search, (ii) such results shall evidence the absence of any other Liens or mortgages on the Collateral, except the Liens securing each Prepetition Indebtedness and other Permitted Liens and (iii) the Security Agreement shall have been duly executed and delivered by each Loan Party that is to be a party thereto, together with (x) certificates, if any, representing the Equity Interests pledged by the Borrower and the Guarantors accompanied by undated stock powers executed in blank and (y) documents and instruments to be recorded or filed that the Administrative Agent may deem, subject to Section 6.13 reasonably necessary to satisfy the Collateral and Guarantee Requirement.

(e)      Subject to Section 6.13(a), the Collateral and Guarantee Requirement shall have been satisfied.

(f)      The Administrative Agent and the Required Lenders shall have received all documentation and other information about the Borrower and the Guarantors required under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, including without limitation, a duly executed W-9 tax form (or such other applicable IRS tax form) of each Loan Party, that has been reasonably requested in writing prior to the Closing Date.

(g)      The Administrative Agent and the Lenders shall have received a certificate from an officer of the Borrower certifying as to compliance with the conditions set forth in Sections 4.01(a) and (b).

(h)      All reimbursable reasonable and documented unpaid expenses (including Attorney Costs) of the Prepetition B-2 Agent and Prepetition B-2 Lenders under the Prepetition B-2 Loan Documents shall

have been paid by the Borrower. The Administrative Agent and the Required Lenders shall have received all applicable fees and other amounts, earned, due and payable on or prior to the Closing Date, including, to the extent invoiced prior to the Closing Date (except as otherwise reasonably agreed by the Borrower), reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document on or prior to the Closing Date.

(i)        The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the First Day Orders and all related pleadings to be filed at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Agents, Required Lenders, Prepetition UST Tranche A Secured Parties and the Prepetition UST Tranche B Secured Parties  and shall be in form and substance acceptable to the Required Lenders, the Prepetition UST Tranche A Secured Parties and the Prepetition UST Tranche B Secured Parties.

(j)        The Canadian Recognition Proceedings shall have been commenced in the Canadian Court and all of the applicable Canadian Orders and all related filings, motions, pleadings, other papers or material notices to be filed at the time of commencement of the Canadian Recognition Proceedings or shortly thereafter shall have been reviewed in advance by the Required Lenders and shall be in form and substance acceptable to the Required Lenders.

(k)        The Interim Order (i) shall have been entered by the Bankruptcy Court and the Borrower shall have delivered to the Administrative Agent and the Required Lenders a true and complete copy of such order, and (ii) shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, appealed or vacated, or subject to stay pending appeal, or otherwise challenged or subject to any challenge, absent prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent).  The Closing Date shall have occurred on or prior to the third (3rd) Business Day after the Interim Order Entry Date.

(l)        [Reserved];

(m)        All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Agents and Required Lenders.

(n)        (i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtors or their business, properties or assets and no motion shall be pending seeking any such relief, and (ii) no motion shall be pending seeking any other relief in the Bankruptcy Court to exercise control over Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions; provided that this clause (ii) shall not apply to any motion that is being contested in good faith by the Debtors and which contest the Debtors reasonably believe will be successful.

(o)        The Administrative Agent and the Lenders shall have received the Initial Budget and such other information (financial or otherwise) as the Lenders or the Administrative Agent may reasonably request.

(p)        All engagement letters or other agreements providing for the payment of the fees and expenses of the Debtors' proposed professional advisors shall be in form and substance reasonably satisfactory to the Required Lenders, the Prepetition UST Tranche A Lenders and the Prepetition UST Tranche B Lenders.

(q)        The Cash Collateral Account shall have been established and shall constitute Term Priority Collateral and not Prepetition ABL Priority Collateral.

(r)        [reserved].

(s)        Since July 7, 2023, none of the Loan Parties have transferred assets or incurred any debt or obligations outside the ordinary course of business, except as disclosed to the Lenders in writing (which may be by email) prior to the Closing Date.

(t)        Subject to Bankruptcy Court approval, (i) each Loan Party shall have the corporate power and authority to make, deliver and perform its obligations under the Loan Documents and the Interim Order and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any third party or any Governmental Authority) shall be required in connection with the execution, delivery and performance by each Loan Party of the Loan Documents, or for the validity or enforceability in accordance with its terms against such Loan Party of the Interim Order, except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect.

(u)        The Administrative Agent and the Required Lenders shall be satisfied that the Loan Parties have obtained any material third party and governmental consents necessary in connection with the Facility, the financing hereunder and any related transactions.

(v)        The Loan Parties and the transactions contemplated by the Loan Documents and the Interim Order shall be in compliance with all applicable laws and regulations.

(w)        The Loan Parties shall have executed an engagement letter to pay the fees and expenses of Houlihan Lokey, as financial advisor to the Prepetition UST Tranche A Lenders and the Prepetition UST Tranche B Lenders, in form and substance satisfactory to such Prepetition UST Tranche A Lenders and the Prepetition UST Tranche B Lenders.

Solely for purposes of determining whether the conditions set forth in <u>Section 4.01</u> or <u>4.02</u> have been satisfied in respect of any Credit Extension, the Agents and each Lender party hereto shall be deemed to have consented to, approved, accepted or be reasonably satisfied with any document delivered prior to such Credit Extension or other matter (in each case, for which such consent, approval, acceptance or satisfaction is expressly required by <u>Section 4.01</u> or <u>4.02</u>, as applicable) by releasing its signature page to this Agreement or to an Assignment and Acceptance, as the case may be.

Section 4.03.   <u>Final Credit Extensions</u>.  The obligation of each Lender to fund Final Loans on any Final Loan Borrowing Date, shall be subject to satisfaction (or waiver) of the following conditions precedent:

(a)        Subject to Section 6.13(a), the Collateral and Guarantee Requirement shall have been satisfied.

(b)        The Administrative Agent and the Required Lenders shall have received a certificate from an officer of the Borrower certifying compliance with the conditions set forth in clauses (a) and (b) of Section 4.01.

(c)        The Administrative Agent and the Required Lenders shall have received all applicable fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced prior to the Closing Date (except as otherwise reasonably agreed by the Borrower), reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document on or prior to the Closing Date.

49

(d)      The Final Order (i) shall be in form and substance satisfactory to the Agents and the Required Lenders, (ii) shall have been entered by the Bankruptcy Court within a date which is 30 days following the Petition Date, and the Borrower shall have delivered to the Administrative Agent and the Required Lenders a true and complete copy of such order and (iii) shall be in full force and effect and shall not have been modified or amended absent prior written consent of the Administrative Agent and the Required Lenders or reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge in any respect absent the prior written consent of the Administrative Agent and the Required Lenders.

(e)      The Loan Parties shall be in compliance with each order entered in the Chapter 11 Cases and the Canadian Recognition Proceedings, including the DIP Order and the Canadian Orders.

(f)      The Loan Parties shall be in compliance with the Approved Budget (subject to Permitted Variances).

(g)      The Interim Order shall have been entered by the Bankruptcy Court and the Borrower shall have delivered to the Administrative Agent and the Required Lenders a true and complete copy of such order, and such order shall and shall be in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent) , be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or appealed or subject to pending appeal or otherwise challenged or subject to any challenge in any respect absent prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent).

(h)      All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Agents and Required Lenders .

(i)      (i) No trustee, examiner or receiver shall have been appointed or designated with respect to the Debtors or their business, properties or assets and no motion shall be pending seeking any such relief, and (ii) no motion shall be pending seeking any other relief in the Bankruptcy Court to exercise control over Collateral with an aggregate fair market value in excess of $100,000 with respect to all such motions; provided that this clause (ii) shall not apply to any motion that is being contested in good faith by the Debtors and which contest the Debtors reasonably believe will be successful.

(j)      Administrative Agent and the Lenders shall have received the Initial Budget, each Updated Budget required under Section 6.02(l) and such other information (financial or otherwise) as the Lenders or the Administrative Agent may reasonably request.

(k)      (i) With respect to any Borrowing which would result in the aggregate principal amount of New Money Term Loans borrowed hereunder exceeding $97,500,000, the First Bid Milestone Date shall have occurred and (ii) with respect to any Borrowing which would result in the aggregate principal amount of New Money Term Loans borrowed hereunder exceeding $117,500,000, the Second Bid Milestone Date shall have occurred.

(l)      To the extent required by Section 6.07, the Administrative Agent shall have received evidence that the insurance required by Section 6.07 is in effect, together with endorsements naming the Administrative Agent, for the benefit of the Secured Parties, as additional insured and loss payee thereunder.

(m)      The Canadian Final DIP Recognition Order shall have been entered by the Canadian Court and the Borrower, in its capacity as "foreign representative" on behalf of the Debtors, shall have delivered to the Administrative Agent and the Required Lenders a true and complete copy of such order, and such order shall and shall be in form and substance satisfactory to the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent) , be in full force and effect, and shall not have been reversed, modified, amended, stayed or vacated absent prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of any Agent, such Agent).

Solely for purposes of determining whether the conditions set forth in Section 4.01 or 4.03 have been satisfied in respect of any Credit Extension after the Closing Date, the Agents and each Lender party hereto shall be deemed to have consented to, approved, accepted or be reasonably satisfied with any document delivered prior to such Credit Extension or other matter (in each case, for which such consent, approval, acceptance or satisfaction is expressly required by Section 4.01 or 4.03, as applicable) by releasing its signature page to this Agreement or to an Assignment and Acceptance, as the case may be.

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

Each of the Borrower and each of the Guarantors party hereto represents and warrants to the Administrative Agent, the Collateral Agent and each of the Lenders that:

Section 5.01. *Existence, Qualification and Power; Compliance with Laws.* Each Loan Party and each Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing (where relevant) under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite organizational power and authority to execute, deliver and perform its obligations under the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder, (c) is duly qualified and in good standing (where relevant) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions, and (e) has all requisite franchises, licenses, authorizations, qualifications, consents and approvals to operate its business as currently conducted; except in each case, referred to in clause (a) (other than with respect to any Loan Party), (c), (d) or (e), to the extent that failure to do so, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

Section 5.02. *Authorization; No Contravention.*  Subject to the entry by (and terms of) the Bankruptcy Court of the DIP Order, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, (a) are within such Loan Party's organizational powers, (b) have been duly authorized by all necessary corporate or other organizational action, and (c) do not (i) contravene the terms of any of such Person's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of (or the requirement to create) any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (x) any post-petition Indebtedness of such Person (y) any post-petition material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any material Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (c)(ii)(x), to the extent that such violation, conflict, breach, contravention or payment, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.03. *Governmental Authorization; Other Consents.* Subject to the entry by (and terms of) the Bankruptcy Court of the DIP Order, and, in the case of the Canadian Collateral, the Canadian Orders, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, or for the consummation of the Transactions, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) to the extent required thereunder or (d) the exercise by the Administrative Agent, the Collateral Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) approvals, consents, exemptions, authorizations or other actions by, or notices to, or filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties (or release existing Liens), (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect (except to the extent not required to be obtained, taken, given or made or to be in full force and effect pursuant to the Collateral and Guarantee Requirement) and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.04. *Binding Effect.* This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is a party thereto. Upon entry of the DIP Order (and in the case of the Canadian Collateral, the Canadian Orders), this Agreement and each other Loan Document constitutes a legal, valid and binding obligation of each such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

Section 5.05. *Financial Statements.*

(a)       (i) The Audited Financial Statements fairly present in all material respects the financial condition of the Borrower and its consolidated Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein.

(ii)       The Unaudited Financial Statements fairly present in all material respects the financial condition of the Borrower and its consolidated Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein and the absence of footnotes.

(b)       The forecasts of income statements of the Borrower and its Subsidiaries which have been furnished to the Administrative Agent and the Required Lenders prior to the Closing Date have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such forecasts it being understood by the Agents and the Lenders that such projections as to future events (i) are not to be viewed as facts, (ii)(A) are subject to significant uncertainties and contingencies, which may be beyond the control of the Borrower and its Subsidiaries, (B) no assurance is given by the Borrower and its Subsidiaries that the results or forecast in any such projections will be realized and (C) the actual results may differ from the forecast results set forth in such projections and such differences may be material and (iii) are not a guarantee of performance and that actual results during the period or periods covered by any such projections may vary significantly from the projected results and such differences may be material.

Section 5.06. *Compliance With Laws.* Subject to the entry by (and terms of) the Bankruptcy Court of the DIP Order, neither the Borrower nor any of the Subsidiaries or any of their respective properties or assets is in violation of, nor will the continued operation of their properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any real property interest of the Borrower or any of its Subsidiaries, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where in each case such violation or default, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

Section 5.07. *Ownership of Property; Liens.*

(a)     Schedule 1.01(c) sets forth a true, complete and correct list of all Real Property owned (whether in fee or through a leasehold estate under any ground lease) by Borrower and the Subsidiaries as of the Closing Date.

(b)     Each of the Borrower and the Subsidiaries has good record title to, or valid leasehold interests in, or easements or other limited property interests in, all its properties and assets, free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and except where the failure to have such title or interest would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.08. *Environmental Matters.* Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)     Each Loan Party and each Subsidiary is and has been in compliance with all Environmental Laws, which includes obtaining and maintaining all Environmental Permits required under such Environmental Laws to carry on the business of the Loan Parties and the Subsidiaries;

(b)     the Loan Parties and the Subsidiaries have not received notice alleging any Environmental Liability or proposing or seeking to revoke, modify or deny the renewal of any Environmental Permit required to be held by the Loan Parties or the Subsidiaries, and neither the Loan Parties nor the Subsidiaries have become subject to any Environmental Liability;

(c)     there has been no Release, discharge or disposal of Hazardous Materials (i) on, to, at, under or from any Real Property or any vehicles or facilities owned or leased by any of the Loan Parties or the Subsidiaries, or, to the knowledge of the Borrower, formerly owned, operated or leased by any Loan Party or any Subsidiary, or (ii) arising out of the conduct of the Loan Parties or the Subsidiaries that, in the case of (i) or (ii), could reasonably be expected to require investigation, remedial activity or corrective action or cleanup by or on behalf of any Loan Party or any Subsidiary or for which any Loan Party or Subsidiary reasonably could be expected to otherwise incur any Environmental Liability; and

(d)     there are no facts, circumstances or conditions arising out of or relating to, and there are no pending or reasonably anticipated requirements under Environmental Law associated with, the operations of the Loan Parties or the Subsidiaries or any Real Property, vehicles or facilities currently or, to the knowledge of the Borrower, previously owned or leased by the Loan Parties or any Subsidiary that, in such case, are known to or would reasonably be likely to require investigation, remedial activity or corrective action or cleanup by or on behalf of any Loan Party or any Subsidiary or that are known to or would reasonably be likely to result in the Borrower or any other Loan Party or Subsidiary incurring any Environmental Liability or capital expenditures to achieve or maintain compliance with Environmental Laws.

Section 5.09. *Taxes.* Except as would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect: each of the Loan Parties and their Subsidiaries have timely filed all tax returns required to be filed (taking into account any extensions), and have paid all Taxes levied or imposed upon them or their properties, that are due and payable (including in their capacity as a withholding agent), except those which are being contested in good faith by appropriate proceedings diligently conducted if such contest shall have the effect of suspending enforcement or collection of such Taxes and for which adequate reserves have been provided in accordance with GAAP.  There is no proposed Tax deficiency or assessment known to any Loan Party against any Loan Party or any Subsidiary that would, if made, individually or in the aggregate, have a Material Adverse Effect.

Section 5.10. *Litigation*. Except for claims, actions, suits, investigations, litigation or proceedings stayed by Section 362 of the Bankruptcy Code and set forth on Schedule 5.10, there shall not exist any action, suit, investigation, litigation or proceeding, pending or to the knowledge of the Loan Parties, threatened in writing in any court or before any arbitrator or Governmental Authority that, (x) either individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect with respect to the assets or property of the Loans Parties or (y) is in respect of the Loans or the Loan Documents and either individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

Section 5.11. *Subsidiaries.*  As of the Closing Date (after giving effect to the Transactions), no Loan Party has any direct or indirect Subsidiaries other than those specifically disclosed in Schedule 5.11, and all of the outstanding Equity Interests owned by the Loan Parties (or a Subsidiary of any Loan Party) in such Subsidiaries have been validly issued and are fully paid and (if applicable) non-assessable and all Equity Interests owned by a Loan Party (or a Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (a) those created under the Collateral Documents or under the Prepetition ABL Facility Documentation, the Prepetition UST Tranche A Facility Documentation and the Prepetition UST Tranche B Facility Documentation (which Liens shall be subject to the Prepetition ABL Intercreditor Agreement) and (b) any other Lien that is permitted under the DIP Order or Section 7.01.  As of the Closing Date, Schedule 5.11 sets forth (i) the name and jurisdiction of each Loan Party and (ii)  the direct ownership interest of the Borrower and any Loan Party thereof in each such Subsidiary, including the percentage of such ownership.

Section 5.12. *Margin Regulations; Investment Company Act*.

(a)     No Loan Party or Subsidiary is engaged nor will it engage, principally, or as one of its important activities in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no proceeds of any Borrowings will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of the provisions of the Regulations of the Board, including Regulation T, U or X.

(b)     Neither the Borrower, nor any of the Subsidiaries is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.13. *Disclosure.*  No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, pro forma financial information, budgets, estimates  and information of a general economic or industry nature) to any Agent or any Lender about the Borrower and its Subsidiaries in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains or will contain any material misstatement of fact or omits or will omit to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were or will

be made, not materially misleading.  With respect to projected financial information and pro forma financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood and agreed by the Agents and the Lenders that such projections as to future events (i) are not to be viewed as facts, (ii) are subject to significant uncertainties and contingencies, which may be beyond the control of the Borrower and its Subsidiaries and (iii) are not a guarantee of performance and that actual results during the period or periods covered by any such projections may vary significantly from the projected results and such differences may be material.

Section 5.14.  *[Reserved]*.

Section 5.15.  *Insurance.*  Upon entry of the Chapter 11 Orders (and in the case of the Canadian Collateral, the Canadian Orders), each of the Borrower and its Subsidiaries maintains, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations; *provided*, that each of the Borrower and its Subsidiaries may self-insure to the same extent as other companies engaged in similar businesses and owning similar properties in the same general areas in which the Borrower or each such Subsidiary, as applicable, operates.

Section 5.16.  *[Reserved]*.

Section 5.17.  *No Other Borrowed Money Indebtedness.*  Immediately after giving effect to the consummation of the Transactions to occur on the Closing Date the Borrower and its Subsidiaries shall have outstanding no Indebtedness for borrowed money other than (a) Indebtedness outstanding under this Agreement and the Prepetition Indebtedness and (b) Indebtedness permitted pursuant to Section 7.03.

Section 5.18.  *Collateral Documents*. The DIP Order (and in the case of the Canadian Collateral, the Canadian DIP Recognition Order) and the Collateral Documents, on execution and delivery thereof by the parties thereto, are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Collateral described therein to the extent intended to be created thereby, and the Liens created by the DIP Order and the Collateral Documents shall constitute fully perfected Liens on, and security interests in, in each case, to the extent available under the Chapter 11 Cases, all right, title and interest of the Loan Parties in such Collateral with the priority set forth herein and otherwise subject in all respects to the terms of the DIP Order.

Section 5.19.  *Compliance with Anti-Terrorism and Corruption Laws*.

(a)      To the extent applicable, the Borrower and the Subsidiaries are in compliance, in all material respects, with (i) the Trading with the Enemy Act and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V) and any other enabling legislation or executive order relating thereto, and (ii) the USA PATRIOT Act.

(b)      None of the Borrower or any Subsidiary nor, to the knowledge of the Borrower, any director, officer, agent, employee or controlled Affiliate of the Borrower or any Subsidiary, (i) is a Blocked Person or (ii) is currently subject to any U.S. sanctions administered by OFAC that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and none of the Borrower or any Subsidiary will use the proceeds of the Loans for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

No part of the proceeds of the Loans will be used by the Borrower or any of the Subsidiaries, directly or indirectly, for any payments to any governmental official or employee, political party, official

of a political party, candidate for political office or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

Section 5.20. *Real Property Permits.* Borrower has all Permits, all of which are in full force and effect as of the date hereof required by the applicable Governmental Authorities in connection with the ownership and operation of any Material Real Property, except to the extent that the failure to have any such Permits would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.21. *Secured, Super-Priority Obligations.* On and after the Closing Date (and with respect to the Canadian Orders, solely after the Closing Date):

(a) The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof for (x) the motions seeking approval of the Loan Documents, the DIP Order and the Canadian Orders and (y) the hearings for the approval of the DIP Order and the Canadian Orders was given in each case. The Borrower has given, on a timely basis as specified in the DIP Order and the Canadian Orders, all notices required to be given to all parties specified in the DIP Order and the Canadian Orders.

(b) The provisions of the Loan Documents and the DIP Order (and, in the case of the Canadian Collateral, the Canadian Orders), are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral (the "**DIP Liens**"), having the priority provided for herein and in the DIP Order and the Canadian Orders, and enforceable against the Loan Parties, in each case, subject to the terms and conditions of the DIP Order.

(c) Pursuant to Section 364(c)(1) of the Bankruptcy Code and the DIP Order (and, in the case of the Canadian Collateral, the Canadian Orders), all Obligations and all other obligations of the Loan Parties under the Loan Documents at all times shall constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, and shall at all times be senior to the rights of Loan Parties, the estates of Loan Parties, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN$1,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders.

(d) Pursuant to Section 364(c)(2) of the Bankruptcy Code and DIP Order (and, in the case of the Canadian Collateral, the Canadian Orders), all Obligations are secured by a first priority perfected Lien on all unencumbered assets of the Loan Parties (now existing or hereafter acquired) and all proceeds thereof that were not subject to a perfected, non-avoidable Lien as of the Petition Date, subject only to the Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN$1,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders.

(e) Pursuant to Section 364(d)(1) of the Bankruptcy Code and the DIP Order (and, in the case of the Canadian Collateral, the Canadian Orders), all Obligations are secured by a first priority perfected Lien on all Term Priority Collateral of the Loan Parties (now existing or hereafter acquired) and all proceeds thereof that were subject to valid, perfected and unavoidable Liens in existence as of the Petition Date, subject only to the Carve-Out and the and the Canadian Priority Charges (in a maximum amount not to

exceed CDN$1,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders.

(f)        Pursuant to Section 364(c)(3) of the Bankruptcy Code and the DIP Order, and, in the case of the Canadian Collateral, the Canadian Orders, the DIP Liens shall be subject and junior to (i) the Prepetition ABL Facility Indebtedness (prior to the Discharge of ABL Obligations), in the case of Prepetition ABL Priority Collateral, (ii) the Prepetition UST Tranche B Facility Indebtedness (prior to the Discharge of UST Tranche B Obligations), in the case of Prepetition UST Tranche B Priority Collateral and Prepetition UST Tranche B Joint Collateral, (iii) the Carve-Out, (iv) the Canadian Priority Charges (in a maximum amount not to exceed CDN$1 ,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders, and (v) any valid, perfected and unavoidable Liens in existence on the Closing Date on such assets of the Loan Parties that pursuant to the terms of the DIP Order are senior in priority the DIP Liens.

(g)        The DIP Order is in full force and effect and has not been vacated, reversed, modified, amended or stayed without the prior written consent of Required Lenders.

(h)        The Initial Budget and each Updated Budget were prepared in good faith by the management of the Borrower (and in consultation with the Borrower's Operational Advisor), based on assumptions believed by the management of the Borrower to be reasonable at the time made and upon information believed by the management of the Borrower to have been accurate based upon the information available to the management of Borrower at the time such Initial Budget or Updated Budget was furnished.

Section 5.22.  *Prepetition UST Joint and Priority Collateral.* As of the Closing Date, Schedule 5.22(a) lists all Rolling Stock that constitutes Prepetition UST Tranche B Joint Collateral and Schedule 5.22(b) lists all Rolling Stock that constitutes Prepetition UST Tranche B Priority Collateral.

# ARTICLE 6

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation (other than contingent indemnification or reimbursement obligations) hereunder which is accrued or payable shall remain unpaid or unsatisfied, then from and after the Closing Date, the Borrower shall and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.15) cause each of the Subsidiaries to:

Section 6.01. *Financial Statements, Reports, Etc.*  In the case of the Borrower, deliver to the Administrative Agent for prompt further distribution to each Lender, within 45 days after the end of each fiscal quarter of each fiscal year of the Borrower (commencing with the fiscal quarter ended June 30, 2023), a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (x) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (y) consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and accompanied by customary management discussion and analysis.

Notwithstanding the foregoing, the obligations in this Section 6.01 or Section 6.02(b) may be satisfied with respect to information of the Borrower and the Subsidiaries by furnishing within the time period specified in the applicable paragraph (A) the applicable financial statements of the Borrower or (B) the Borrower's Form 10-K or 10-Q, as applicable, filed with the SEC.

Documents required to be delivered pursuant to Section 6.01 or Section 6.02(b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the earliest date on which (i) Borrower posts such documents, or provides a link thereto on Borrower's website on the Internet and provides notice thereof to the Administrative Agent; (ii) such documents are posted on Borrower's behalf on IntraLinks/IntraAgency or another website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent), or (iii) such financial statements and/or other documents are posted on the SEC's website on the internet at www.sec.gov; *provided* that: (i) promptly following written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

Section 6.02.  *Certificates; Other Information.*  Deliver to the Administrative Agent for prompt further distribution to each Lender (or, with respect to clauses (k) through (p), deliver directly to the Lenders and their advisors):

(a)        concurrently with the delivery of the financial statements referred to in Sections 6.01 (or the date on which such delivery is required), commencing with the first fiscal quarter ended after the Closing Date, a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower; it being understood that, if applicable for such period of delivery, such Compliance Certificate shall include information about Net Proceeds received in the period (other than Net Proceeds not exceeding $150,000 in the aggregate after the Closing Date) and the application thereof (and for the avoidance of doubt, not including accounts receivable information);

(b)        promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which the Borrower or any Subsidiary files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)        promptly after the furnishing thereof, copies of any material notices received by any Loan Party or Subsidiary (other than in the ordinary course of business) or furnished to any holder of Indebtedness or debt securities of any Loan Party or of any of its Subsidiaries (including pursuant to the terms of any Prepetition Indebtedness) (and solely in the case of Indebtedness or debt securities incurred or issued prior to the Petition Date, to the extent the principal amount thereof exceeds the Threshold Amount);

(d)        together with the delivery of each Compliance Certificate pursuant to Section 6.02(a), (i) a report setting forth the information required by sections of the Prepetition Perfection Certificate describing the legal name and the jurisdiction of organization or formation of each Loan Party and the location of the chief executive office of each Loan Party or confirming that there has been no change in such information since the Closing Date or the date of the last such report, (ii) a description of each (x) event, condition or

circumstance during the last fiscal quarter covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.12(a) and (y) Disposition of owned Real Property and (iii) a list of each Subsidiary of the Borrower as of the date of delivery of such Compliance Certificate;

(e)       [reserved];

(f)       promptly after the written request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act;

(g)       promptly after the receipt thereof by the Borrower or any of the Subsidiaries, a copy of any final "management letter" received by any such Person from its certified public accountants and the management's response thereto;

(h)       [reserved];

(i)       promptly after the furnishing thereof (and in no event later than three Business Days after the delivery thereof), a copy of each borrowing base certificate delivered under the Prepetition ABL Credit Agreement;

(j)       at least two days in advance of such filing or as promptly as practicable, (i) drafts of all material pleadings, motions, applications, judicial information, financial information and other documents intended to be filed by or on behalf of the Borrower or any other Loan Party with the Bankruptcy Court in the Chapter 11 Cases, including all First Day Orders and Second Day Orders, or distributed by or on behalf of the Borrower or any other Loan Party to any Official Committee and (ii) drafts of all filings, motions, pleadings, other papers or material notices filed by or on behalf of the Borrower, in its capacity as "foreign representative" of the Debtors, or any other Loan Party with the Canadian Court in the Canadian Recognition Proceedings, including all motions for the Canadian Orders;

(k)       promptly after the occurrence thereof (and in no event later than one Business Day thereafter (or such longer period as agreed by the Required Lenders)), notice of any Loan Party entering into any new material agreement or incurring any new material obligation, together with copies of such agreement or other material documentation with respect thereto;

(l)       not later than 5:00 p.m. New York time on the third Business Day of the last full calendar week of each month (commencing with August 30, 2023) occurring after the Closing Date (the "**Updated Budget Deadline**"), a supplement to, for the first such supplement, the Initial Budget, and for each supplement thereafter, the most-recently delivered Updated Budget (each such supplement which is approved in accordance with the terms of this clause (l), an "**Updated Budget**"), prepared by management of the Borrower in consultation with the Borrower's Operational Advisor covering the 13-week period that commences with the Saturday of the calendar week that includes such Updated Budget Deadline, consistent with the form and level of details set forth in the Initial Budget. Each Updated Budget shall be, in each case, subject to the written approval of the Required Lenders (in their sole discretion); provided that, if the Required Lenders shall have not provided written approval of any proposed budget supplement prior to 5:00 (New York City time) on the third Business Day after receipt thereof (the "**Budget Review Time**"), the Required Lenders shall be deemed to have accepted such proposed budget supplement; provided further that, (i) if the Required Lenders object in writing to any proposed budget supplement prior to the Budget Review Time, no  proposed budget supplement covering the 13-week period covered by such rejected budget supplement shall become an Updated Budget until and unless the Required Lenders approve thereof in writing (in their sole and absolute discretion), and (ii) the prior Approved Budget shall remain in effect until such time as the Required Lenders so approve a revised budget supplement in accordance with the

foregoing sub-clause (i). As used herein, the "**Approved Budget**" shall mean (i) initially, the Initial Budget and (ii) thereafter, upon (and subject to) the approval (or deemed approval) of any Updated Budget by the Required Lenders in accordance with the foregoing procedures, such Updated Budget.

(m)     not later than 5:00 p.m. New York time, on each Business Day (commencing with the second Business Day following the Closing Date), liquidity update (each, a "**Liquidity Report**"), which may be sent by email, specifying the aggregate amount of Liquidity of the Loan Parties and their Subsidiaries as of the end of business of the immediately preceding Business Day;

(n)     not later than 5:00 p.m. New York time on each Budget Variance Test Date, the following:

(i)     a Budget Variance Report for the most recently ended Budget Variance Test Period; and

(ii)     an updated budget prepared by management of the Borrower (in consultation with the Borrower's Operational Advisor) covering the 13-week period that commences with the calendar week that includes such Wednesday (provided that this clause (n)(ii) may be satisfied, for each week on which an Updated Budget Deadline occurs, by delivery of the Updated Budget);

(o)     not later than 5:00 p.m. New York time on the Friday of each calendar week, with information for the immediately preceding calendar week ending on a Friday (commencing on Friday, August 18, 2023) the following, each in form and substance satisfactory to the Required Lenders:

(i)     a written report (each, a "**Disbursement Report**") of disbursements made during the period since delivery of the last Disbursement Report (or, for the first Disbursement Report delivered hereunder, since the Petition Date), including payroll payments made by department, payments to directors, and payments to professionals;

(ii)     a written report (each, a "**Sale Report**") setting out updates in the monetization strategy of the Borrower, including an update on the status of the sale of each Real Property and other assets of the Loan Parties contemplated by the Bidding Procedures Order, a description of inbound interests and outbound solicitations, and updates on the status of diligence and bids since delivery of the last Sale Report (or, for the first Sale Report delivered hereunder, since the Petition Date); and

(iii)     a list of (A) current information with respect to all accounts receivable owed to the Loan Parties, including all collections, sales, reconciliations and payments in respect thereof, and (B) current information with respect to all accounts payable owed by the Loan Parties.

Notwithstanding anything to the contrary, neither the Borrower nor any Subsidiary will be required to disclose or permit the inspection of any document, information or other matter pursuant to this Section 6.02 (i) that is subject to attorney client or similar privilege or constitutes attorney work product. or (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their representative or contractors) is prohibited by law or any binding agreement (to the extent not created in contemplation of such Loan Party's obligations under this Agreement).

Section 6.03. *Notices.* Promptly after the Borrower or any Guarantor has obtained knowledge thereof, notify the Administrative Agent (which shall provide notice to the Lenders):

(a)     of the occurrence of any Default or an Event of Default;

(b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)     of the filing or commencement of, or any written threat or written notice of intention of any person to file or commence any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, against the Borrower or any of its Subsidiaries that has a reasonable likelihood of adverse determination and such determination could reasonably be expected to result in a Material Adverse Effect and any material developments in any of the foregoing;

(d)     of any material developments in any material action, suit, litigation or proceeding, whether at law or in equity, commenced by the Borrower or any of its Subsidiaries; and

(e)     of the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect.

(f)     Each notice pursuant to this Section shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to Section 6.03(a), (b), (c), (d)  or (e) (as applicable) and (y) setting forth details of the occurrence referred to in Section 6.03(a), (b), (c), (d) or (e), as applicable, and stating what action the Borrower has taken and proposes to take with respect thereto.

Notwithstanding anything to the contrary, neither the Borrower nor any Subsidiary will be required to disclose or permit the inspection of any document, information or other matter pursuant to this Section 6.03 (i) that is subject to attorney client or similar privilege or constitutes attorney work product. or (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their representative or contractors) is prohibited by law or any binding agreement (to the extent not created in contemplation of such Loan Party's obligations under this Agreement).

Section 6.04.  *Payment of Taxes.*  Promptly pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, to the extent any such Tax is being contested in good faith and by appropriate proceedings for which appropriate reserves have been established in accordance with GAAP if such contest shall have the effect of suspending enforcement or collection of such Taxes or, where the failure to pay, discharge or otherwise satisfy the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.05.  *Preservation of Existence, Etc.*  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or Section 7.05 and (b) obtain, maintain, renew, extend and keep in full force and effect all rights, privileges (including its good standing where applicable in the relevant jurisdiction), permits, licenses and franchises necessary in the normal conduct of its business, except, in the case of clause (a) (other than with respect to the Borrower) or (b), to the extent that failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.06.  *Maintenance of Properties.*  Except if the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in satisfactory working order, repair and condition, ordinary wear and tear excepted and fire, casualty or condemnation excepted, and (b) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice and in the normal conduct of its business.

Section 6.07.  *Maintenance of Insurance.*

(a)      *Generally.*  Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business consistent in all material respects with the insurance maintained by Borrower and/or such Subsidiaries (as applicable) as of the Closing Date, which insurance shall insure against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, and which insurance shall be of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Subsidiaries) as are customarily carried under similar circumstances by such other Persons in such similar or same locations.

(b)      *Requirements of Insurance.*      Including as required by the Chapter 11 Orders, (A) use commercially reasonable efforts to cause, not later than 30 days after the Closing Date (or such longer period as the Required Lenders may agree in writing in their reasonable discretion), all insurance required pursuant to Section 6.07(a) and (d) (x) to provide (and to continue to provide at all times thereafter) that it shall not be canceled, materially modified or not renewed (i) by reason of nonpayment of premium upon not less than 10 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent or (ii) for any other reason upon not less than 20 days' prior written notice thereof by the insurer to the Administrative Agent and the Collateral Agent and (y) to name the Collateral Agent as additional insured on behalf of the Secured Parties (in the case of liability insurance) or loss payee (in the case of property insurance), as applicable (and to continue to so name the Collateral Agent at all times thereafter), (B) use commercially reasonable efforts to deliver, not later than 30 days after the Closing Date (or such longer period as the Administrative Agent, with the consent of the Required Lenders, may agree in writing in its reasonable discretion), a copy of the policy (and to the extent any such policy is cancelled or not renewed, a renewal or replacement policy) or other evidence thereof to the Administrative Agent and the Collateral Agent, or insurance certificate with respect thereto, and (C) in the case of all property insurance policies located in the United States, not later than 30 days after the Closing Date (or such longer period as the Administrative Agent may agree in writing in its reasonable discretion) cause such policies to be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable endorsement, in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent, which endorsement shall provide that, from and after such date, if the insurance carrier shall have received written notice from the Administrative Agent or the Collateral Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to the Borrower or the Loan Parties under such policies directly to the Collateral Agent during the continuance of such Event of Default.

(c)      *Flood Insurance.*  Following the Closing Date, the Borrower shall deliver to the Collateral Agent and the Required Lenders annual renewals of the flood insurance policy under the property policy or annual renewals of a force-placed flood insurance policy.

(d)      *Environmental Insurance.*  Maintain with financially sound and reputable insurance companies, a premises pollution  liability portfolio insurance and storage tank third-party liability, corrective and clean-up insurance policy with respect to its properties and business for an initial three year policy period commencing on the date hereof and with limits not less than, and with terms and conditions comparable to, the limits, terms and conditions in such policies that are in effect as of the date hereof, and subject to annual renewals after such initial three year policy period, which insurance shall be reasonably satisfactory to the Required Lenders.  The Borrower shall purchase such insurance required under this Section 6.07(d) within 30 days following the Closing Date and provide evidence thereof to the Administrative Agent.

(e)      Notify the Administrative Agent and the Collateral Agent (for distribution to the Lenders) promptly whenever any separate insurance concurrent in form or contributing in the event of material loss

with that required to be maintained under this Section 6.07 is taken out by the Borrower or another Loan Party; and promptly deliver to the Administrative Agent and the Collateral Agent a duplicate original copy of such policy or policies, or an insurance certificate with respect thereto once available.

Section 6.08. *Compliance with Laws.*  Subject to the terms of the Orders, comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.09. *Books and Records.*  Maintain proper books of record and account, in which entries are made that are full, true and correct in all material respects and are in conformity with GAAP (except as noted therein) and which reflect all material financial transactions and matters involving the assets and business of the Borrower or a Subsidiary, as the case may be.

Section 6.10. *Inspection Rights.*  Permit representatives and independent contractors of the Administrative Agent or any Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants (subject to such accountants' customary policies and procedures), all at the reasonable expense of the Borrower and subject to *bona fide* confidentiality obligations, limitations imposed by law and attorney-client privilege and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower and at the expense of the Borrower at any time during normal business hours.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

Section 6.11. *Additional Collateral; Additional Guarantors.*  At the Borrower's expense, take all reasonable actions which are necessary or reasonably requested by the Administrative Agent or the Collateral Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including: upon any Subsidiary that constitutes an Excluded Subsidiary of the Closing Date ceasing to be an Excluded Subsidiary, within ten (10) Business Days thereafter, or such longer period as the administrative Agent, with the consent of the Required Lenders (in their sole discretion), may agree, causing such Subsidiary to duly execute and deliver to the Administrative Agent or the Collateral Agent (as appropriate) joinders to this Agreement as Guarantors, a supplement to the Security Agreement in the form attached thereto,  a counterpart of the Intercompany Note and other security agreements and documents, in each case granting Liens required by the Collateral and Guarantee Requirement, and to take such action (including the filing of UCC financing statements), in each case, as may be reasonably requested by the Collateral Agent or the Required Lenders from time to time to maintain the validity, perfection, enforceability and priority of the security interest and Liens of the Collateral Agent in the Collateral, or to enable the Collateral Agent to protect, exercise or enforce its rights hereunder, under the DIP Order and in the Collateral;

Section 6.12. *Compliance with Environmental Laws.*  Subject to the terms of the Orders, except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) comply, and take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; (b) obtain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent the Loan Parties or the Subsidiaries are required to do so by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws.

Section 6.13.  *Further Assurances and Post-Closing Conditions*.

(a)      Within the time periods after the Closing Date set forth in Schedule 6.13(a), deliver each Collateral Document set forth on Schedule 6.13(a), duly executed by each Loan Party thereto, together with all documents and instruments required to perfect the security interest of the Collateral Agent in the Collateral free of any other pledges, security interests or mortgages, except Liens expressly permitted hereunder, to the extent required pursuant to the Collateral and Guarantee Requirement.

(b)      Promptly upon reasonable request by the Required Lenders, Administrative Agent or the Collateral Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral (including, without limitation, any defect or error related to certificates of title for vehicles and other rolling stock) as to which the Borrower reasonably agrees is a defect or error, (ii) notwithstanding that all of the security interests described herein with respect to the Collateral shall be effective and perfected by the DIP Orders (and, in the case of Canadian Collateral, the Canadian DIP Recognition Order) and without the necessity of the execution of mortgages, security agreements, pledge agreements or other agreements, take all action that may be necessary or desirable to maintain the validity, perfection, enforceability and priority of the security interest and Liens of the Collateral Agent in the Collateral, or to enable the Collateral Agent to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the Collateral and (iii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Loan Documents and to cause the Collateral and Guarantee Requirement to be and remain satisfied.  If the Required Lenders, Administrative Agent or the Collateral Agent reasonably determines that it is required by applicable Law to have appraisals prepared in respect of any Material Real Property of any Loan Party subject to a Mortgage, the Borrower shall cooperate with the Required Lenders, Administrative Agent and/or Collateral Agent, as applicable, in obtaining such appraisals and shall pay all reasonable out-of-pocket costs and expenses relating thereto.

(c)      At all times engage, at the cost of the Borrower, the Operational Advisor for financial planning and analysis services, including assistance in preparation of cash flow forecasting and budget variance reporting under this Agreement pursuant to an engagement letter in form and substance reasonably satisfactory to the Required Lenders (it being agreed that the engagement letter in effect on the Closing Date is reasonably satisfactory); provided that, if for any reason the Operational Advisor becomes unavailable or unable to perform its duties under this Agreement, the Borrower shall have five (5) days (or such longer timeframe as the Required Lenders may agree in its sole discretion) to replace the Operational Advisor in accordance with the terms of this Agreement.

Section 6.14.  *Lender Calls; Access; Diligence Requests*.

(a)      The Borrower shall, and shall cause the other Loan Parties to, make the members of its senior management and its professional advisors (including the Operational Advisor) available for update calls at least once per calendar week (unless the Required Lenders request a lesser frequency) with the Lenders and  the Lenders' respective professional advisors, at times reasonably acceptable to the Required Lenders to discuss the Chapter 11 Cases and the Canadian Recognition Proceedings, the then-current Approved Budget, the Budget Variance Reports, the Liquidity Reports, Sale Reports, other reporting delivered hereunder, union matters, the status of any monetization strategies being pursued by the Borrower and its Subsidiaries, including pursuant to the Bidding Procedures Order, and any other matters (including business, operational and due diligence matters) reasonably requested by the Lenders.

(b)      The Borrower shall, and shall cause the other Loan Parties to,  make the members of its senior management and its professional advisors (including the Operational Advisor) available from time to time, at reasonable times, and during normal business hours, upon the reasonable request of the Required Lenders to provide, discuss, inform and/or confer on (i) the matters described in clause (a) above, strategic planning, cash and Liquidity management, operational and restructuring activities and other matters reasonably related thereto and (ii) if reasonably necessary, any reasonable diligence requests, which may include access to books and records (including historical information) and real property assets of the Borrower and its Subsidiaries.

(c)      The Borrower shall, and shall cause the members of its senior management and its professional advisors (including the Operational Advisor) to promptly provide such additional information regarding any of the matters described in clauses (a) and (b) above, and the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Subsidiaries, including the business performance and tax and collateral due diligence of the Borrower and its Subsidiaries, as the Administrative Agent or any Lender may from time to time reasonably request.

Notwithstanding anything to the contrary, neither the Borrower nor any Subsidiary will be required to disclose any matter pursuant to this Section 6.14 (i) that is subject to attorney client or similar privilege or constitutes attorney work product. or (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their representative or contractors) is prohibited by law or any binding agreement (to the extent not created in contemplation of such Loan Party's obligations under this Agreement).

Section 6.15.  *[Reserved].*

Section 6.16.  *Use of Proceeds and Collateral.*

(a)      The proceeds of the New Money Term Loans shall be applied in accordance with the Approved Budget (subject to Permitted Variances).  No part of the proceeds of any Loan will be used, whether directly or indirectly in any manner that causes such Loan or the application of such proceeds to violate the Regulations of the Board, including Regulation T, Regulation U and Regulation X, or any other regulation thereof, or to violate the Exchange Act;

(b)      No part of the proceeds of any Loan, the Debtors' Cash Collateral, the Collateral or the Carve-Out will be used, whether directly or indirectly:

(i)      for any purpose that is prohibited under the Bankruptcy Code, the DIP Order or the Canadian Orders and not in accordance with the Approved Budget (subject to Permitted Variances);

(ii)      to investigate, commence, prosecute, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of any or all of the Agents, the Lenders or the Prepetition Secured Parties respect to or related to: (A) the claims, liens or security interest of the Prepetition Secured Parties (including the Agents, the Lenders, the Prepetition B-2 Agent or the Prepetition B-2 Lenders)  or their respective rights and remedies under this Agreement, the other Loan Documents, the DIP Order, or the Canadian Orders or the Prepetition Facility  Documentation, as the case may be, including to commence or prosecute or join in any action against any or all of the Agents, the Lenders, or the Prepetition Secured Parties seeking (x) to avoid, subordinate or recharacterize the Obligations or any Prepetition Indebtedness or any of the Collateral Agent's or any of the Prepetition Agent's Liens, (y) any monetary, injunctive or other affirmative relief against any or all of the Agents, the Lenders or any Prepetition

Secured Parties or, in the case of the Agents and the Lenders,   their Collateral or in the case of any Prepetition Secured Party, "Collateral" under (and as defined in) the applicable Prepetition Facility Documentation) in connection with the Loan Documents or any of the Prepetition Facility Documentation or (z) to prevent or restrict the exercise by any or all of the Agents, the Lenders, or the Prepetition Secured Parties of any of their respective rights or remedies under the Loan Documents or the applicable Prepetition Facility Documentation, (B) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are subjects of the release set forth in Section 10.23 against the Agents, the Lenders, Prepetition B-2 Lenders and the Prepetition B-2 Agent or any other release provided to any Prepetition Secured Party on or after the Petition Date, (C) certain stipulations to be made by the Loan Parties and approved by the DIP Order; or (D) any other action which with the giving of notice or passing of time would result in an Event of Default hereunder;

(iii)    other than in respect to UST Adequate Protection Payments or as otherwise permitted pursuant to the DIP Orders, for the payment of fees, expenses, interest or principal or any other payment with respect to any Prepetition ABL Facility Indebtedness, Prepetition UST Tranche A Facility Indebtedness or Prepetition UST Tranche B Facility Indebtedness;

(iv)    to make any distribution under a Plan of Reorganization that is not an Acceptable Plan;

(v)    except as contemplated by the Approved Budget, to make any payment to (x) any board member of any Loan Party or any Affiliate thereof outside of the ordinary course of business or (y) any equityholder of any Loan Party or any Affiliate thereof in any capacity (other than UST Adequate Protection Payments or as otherwise permitted pursuant to the DIP Orders); or

(vi)    except as permitted by the Approved Budget (subject to Permitted Variances) or the Loan Documents to make any payment in settlement of any claim, action or proceeding (before any court, arbitrator or other governmental body) without the prior written consent of the Required Lenders.

Nothing herein shall in any way prejudice or prevent the Administrative Agent or the Lenders from objecting, for any reason, to any requests, motions, or applications made in the Bankruptcy Court, including any application of final allowances of compensation for services rendered or reimbursement of expenses incurred under Sections 105(a), 330 or 331 of the Bankruptcy Code, by any party in interest (and each such order shall preserve the Administrative Agent's and the Lenders' right to review and object to any such requests, motions or applications).

Section 6.17.  *Chapter 11 Cases.*

(a)    Comply with each Chapter 11 Order and the orders of the Canadian Court in the Canadian Recognition Proceedings.

(b)    Promptly provide to and discuss with the Administrative Agent and each Lender any and all information and developments in connection with (i) any proposed conveyance, sale, assignment, transfer or other disposition of all or any part of the assets of the  Loan Parties or their Subsidiaries, (ii) the sale or other disposition or issuance of any Equity Interests of the Loan Parties or (iii) any Change of Control, including, without limitation, any letters of intent, commitment letters or engagement letters received by the Loan Parties, and any other event or condition which is reasonably likely to have a material effect on the Loan Parties, the Loans, the Chapter 11 Cases or the Canadian Recognition Proceedings, including, without limitation, the progress of any proposed or confirmed Plan of Reorganization.

(c)      In consultation with the Lenders, as provided under the Bidding Procedures Order, shall take such action as shall be reasonably necessary to consummate a sale of the Loan Parties' assets in accordance with the Bidding Procedures Order that either (i) generates Net Proceeds in respect of the DIP Priority Collateral of at least 100% of the outstanding Obligations or (ii) is consummated through a credit bid of the Obligations.

(d)      Timely pay all material obligations arising after the Petition Date in accordance with their terms after giving effect to any applicable grace and cure periods (including all reasonable and documented fees and out of pocket expenses of estate professionals when due in accordance with the interim compensation procedures approved in the Chapter 11 Cases) and timely pay and discharge promptly all material taxes, assessments and governmental charges or levies imposed upon any Loan Party or upon its income or profits or in respect of its property arising after the Petition Date, as well as all material lawful claims for labor, materials and supplies or otherwise arising after the Petition Date which, if unpaid, would become a Lien or charge upon such properties or any part thereof, before the same shall become in default; provided that the Borrower and each of its Subsidiaries shall not be required to pay and discharge or to cause to be paid and discharged any such obligation, tax, assessment, charge, levy or claim so long as (i) the validity or amount thereof shall be contested in good faith by appropriate proceedings (if the Borrower or its Subsidiaries shall have set aside on their books adequate reserves therefor) or (ii) non-payment and discharge thereof is permitted or required under the Bankruptcy Code, the CCAA,  or order of the Bankruptcy Court or order of the Canadian Court.

(e)      Ensure that each of the milestones set forth on Appendix D hereto (the "**Chapter 11 Milestones**") is achieved in accordance with the applicable timing referred to therein (or such later dates as approved in writing by the Required Lenders ).

# ARTICLE 7
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation (other than contingent indemnification or reimbursement obligations) hereunder which is accrued or payable shall remain unpaid or unsatisfied, then from and after the Closing Date:

Section 7.01. *Liens.*  The Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)      Liens (i) created pursuant to any Loan Document and (ii) securing any Prepetition Indebtedness;

(b)      Liens existing immediately prior to the Prepetition Date and listed on Schedule 7.01(b); *provided* that the Lien does not extend to any additional property other than any replacements of such property or assets and additions and accessions thereto, after-acquired property subjected to a Lien securing Indebtedness and other obligations incurred prior to such time and which Indebtedness and other obligations are permitted hereunder that require, pursuant to their terms at such time, a pledge of after-acquired property (it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition, or asset of the Borrower or any Subsidiary and the proceeds and the products thereof and customary security deposits in respect thereof and in the case of multiple financings of equipment provided by any lender, other equipment financed by such lender);

(c)      Liens for unpaid utilities, taxes, assessments or governmental charges that are (i) not overdue for a period of more than thirty (30) days and are not otherwise delinquent, securing obligations in

an amount not to exceed $500,000, or that are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP or (ii) otherwise not required to be paid pursuant to Section 6.04;

(d)        statutory, lease or common law Liens of landlords, sublandlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens, or other customary Liens (other than in respect of Indebtedness) in favor of landlords, in each case arising in the ordinary course of business that secure amounts not overdue for a period of more than thirty (30) days or if more than thirty (30) days overdue, that either secure obligations in an amount not to exceed $100,000, are being contested in good faith and by appropriate actions, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP or stayed by the Chapter 11 Cases;

(e)        (i) Liens in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) Liens in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Subsidiaries; *provided* that this Section 7.01(e) shall not permit liens securing letters of credit;

(f)        Liens to secure the performance of bids, trade contracts, governmental contracts and leases (in the case of each of the foregoing, other than for Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations), in each case incurred in the ordinary course of business; *provided* that this Section 7.01(f) shall not permit liens securing letters of credit;

(g)        (i) easements, rights-of-way, restrictions (including zoning restrictions and other land use regulations), encroachments, protrusions, reservations and other similar encumbrances and minor title defects affecting Real Property that do not in the aggregate materially interfere with the ordinary conduct of the business of the Borrower and the Subsidiaries, taken as a whole and (ii) ground leases in respect of Real Property on which facilities owned or leased by the Borrower or any of the Subsidiaries are located; *provided* in the case of this clause (ii) that such ground leases do not confer rights on the counter-party(ies) thereto superior to those of the Collateral Agent in the relevant property;

(h)        Liens securing judgments not constituting an Event of Default under Section 8.01(h);

(i)        leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrower and the Subsidiaries, taken as a whole, or (ii) secure any Indebtedness*;*

(j)        Liens (i) in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business or (ii) on specific items of inventory or other goods and proceeds thereof of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such person to facilitate the purchase, shipment or storage of such inventory or such other goods in the ordinary course of business;

(k)        Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (ii) arising in the ordinary course of business in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution (including the right of set-off)

and that are within the general parameters customary in the banking industry or arising pursuant to the general terms and conditions of such banking institutions;

(l)        Liens consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(m)       Liens (i) in favor of the Borrower or a Subsidiary on assets of a Subsidiary that is not a Loan Party securing Indebtedness permitted under Section 7.03 and (ii) in favor of the Borrower or any Guarantor;

(n)        any interest or title (and all encumbrances and other matters affecting such interest or title) of a lessor, sublessor, licensor or sublicensor under leases, subleases, licenses or sublicenses entered into by the Borrower or any of the Subsidiaries in the ordinary course of business; *provided*, that no such lease or sublease shall constitute a Capitalized Lease;

(o)        junior Liens relating to any Multiemployer Plan or Pension Plan;

(p)        [reserved];

(q)        [reserved];

(r)        [reserved];

(s)        [reserved]

(t)        [reserved];

(u)        Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto in the ordinary course of business;

(v)        [reserved];

(w)       [reserved];

(x)        [reserved];

(y)        [reserved];

(z)        [reserved];

(aa)       [reserved];

(bb)       Liens expressly permitted to be granted pursuant to (i) the First Day Orders or Second Day Orders or (ii) pursuant to the DIP Order;

(cc)       utility and similar deposits in the ordinary course of business; and

(dd)       other Liens with respect to property or assets securing obligations other than for borrowed money of the Borrower or any Subsidiary in an aggregate principal amount not to exceed, together with all Investments made pursuant to Section 7.02(p) and Indebtedness incurred pursuant to Section 7.03(cc), $350,000 in the aggregate during the term of this Agreement; and

(ee)    the CCAA Charges.

Section 7.02.  *Investments.*  The Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, make or hold any Investments, except:

(a)    Investments by the Borrower or any of the Subsidiaries in cash or Cash Equivalents in accordance with the Approved Budget (subject to Permitted Variances);

(b)    [reserved];

(c)    Investments (i) by and among Loan Parties and (ii) by any Loan Party in a Subsidiary that is not a Loan Party; *provided* that the aggregate amount of Investments under this clause (ii) shall not exceed $350,000 during the term of this Agreement;

(d)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit or other credits to suppliers in the ordinary course of business;

(e)    Investments existing on the Petition Date and set forth on Schedule 7.02(e);

(f)    Investments in Swap Contracts as in effect immediately prior to the Petition Date.

(g)    [reserved];

(h)    [reserved];

(i)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers consistent with past practices;

(j)    Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers;

(k)    advances of payroll payments to employees (other than senior management) in the ordinary course of business;

(l)    [reserved];

(m)    [reserved];

(n)    [reserved];

(o)    Guarantees by the Borrower or any Subsidiary of operating leases (other than Capitalized Leases) or of other obligations that do not constitute Indebtedness, in each case, which leases or other obligations are entered into by the Borrower or any Guarantor in the ordinary course of business;

(p)    other Investments in an aggregate amount not to exceed, together with all Liens incurred pursuant to Section 7.01(dd) and Indebtedness incurred pursuant to Section 7.03(cc), $350,000 in the aggregate during the term of this Agreement;

(q)      make lease, utility and other similar deposits or any other advance or deposit permitted by this Agreement, in the ordinary course of business and in accordance with the Approved Budget (subject to Permitted Variances);

(r)      [reserved];

(s)      Investments in deposit accounts or securities accounts opened in the ordinary course of business;

(t)      [reserved];

(u)      [reserved]; and

(v)      Investments consisting of or resulting from (i) Indebtedness permitted under Section 7.03, (ii) Liens permitted under Section 7.01, (iii) Restricted Payments permitted under Section 7.06, (iv) Dispositions permitted by Section 7.05 and (v) fundamental changes permitted by Section 7.04; and

(w)      Investments expressly permitted to be made pursuant to (i) the First Day Orders or Second Day Orders, or (ii) the DIP Order.

Section 7.03.  *Indebtedness.*  The Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Indebtedness, except the following:

(a)      Indebtedness of any Loan Party under the Loan Documents;

(b)      (i) Indebtedness existing immediately prior to the Petition Date and listed on Schedule 7.03(b) and (ii) intercompany Indebtedness outstanding on the Petition Date;

(c)      Prepetition Indebtedness; provided that, for the avoidance of doubt, the Borrower shall not redraw or reborrow any amounts under the Prepetition ABL Facility after the Petition Date;

(d)      [reserved];

(e)      [reserved];

(f)      Indebtedness in respect of Swap Contracts that were designed to hedge against the Borrower's or any Subsidiary's exposure to interest rates, foreign exchange rates or commodities (including fuel) pricing risks incurred not for speculative purposes;

(g)      [reserved];

(h)      Indebtedness representing deferred compensation to employees of the Borrower or any of its Subsidiaries incurred in the ordinary course of business and other obligations and liabilities arising under employee benefit plans in the ordinary course of business;

(i)      [reserved];

(j)      [reserved];

(k)      Indebtedness in respect of treasury, depository, credit card, debit card and cash management services or automated clearinghouse transfer of funds, overdraft or any similar services

incurred in the ordinary course of business and in accordance with the DIP Order or any cash management order filed in connection with the Chapter 11 Cases and acceptable to the Required Lenders;

(l)      Indebtedness consisting of the financing of insurance premiums or take-or-pay obligations contained in supply arrangements that do not constitute Guarantees, in each case, in the ordinary course of business and in accordance with the DIP Order and the Approved Budget (subject to Permitted Variances);

(m)      [reserved];

(n)      indebtedness of the Borrower or any of its Subsidiaries to the extent outstanding immediately prior to the Petition Date in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business and not in connection with the borrowing of money, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness incurred in the ordinary course of business with respect to reimbursement-type obligations regarding workers compensation claims;

(o)      obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice, not in connection with the borrowing of money or Swap Contracts and as in effect immediately prior to the Petition Date;

(p)      [reserved]

(q)      [reserved];

(r)      [reserved];

(s)      [reserved];

(t)      all premiums (if any), interest (including post-petition interest and interest paid in kind), fees, expenses, charges and additional or contingent interest on obligations described in the other clauses under this Section 7.03;

(u)      [reserved];

(v)      [reserved];

(w)      [reserved];

(x)      Indebtedness in respect of taxes, assessments or governmental charges to the extent that payment thereof shall not at the time be required to be made hereunder;

(y)      [reserved];

(z)      [reserved];

(aa)      [reserved];

(bb)    Indebtedness expressly permitted to be incurred pursuant to (i) the First Day Orders or Second Day Orders, (ii) the Approved Budget (subject to Permitted Variances) or (iii) pursuant to the DIP Order;

(cc)    other Indebtedness (other than for borrowed money) of the Borrower or any of its Subsidiaries, in an aggregate principal amount not to exceed, together with all Liens incurred pursuant to Section 7.01(dd) and Investments made pursuant to Section 7.02(p), $350,000 in the aggregate during the term of this Agreement; and

(dd)    Indebtedness incurred in respect of credit cards, credit card processing services" debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the ordinary course of business.

Without limiting the foregoing, in no event shall any Loan Party incur any Indebtedness, other than the Carve-Out, that (x) ranks pari passu with or senior to the Loans or (y) benefits from a first priority Lien under Section 364 of the Bankruptcy Code.

Section 7.04.  *Fundamental Changes.*  The Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of related transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except (i) with the prior written consent of the Required Lenders (ii) as permitted by Section 7.05 and (iii) pursuant to (A) the First Day Orders or Second Day Orders, (B) the Bidding Procedures Order or (C) the DIP Orders.

Section 7.05.  *Dispositions.*  The Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, make any Disposition (including, without limitation, abandoning any assets), except:

(a)    Dispositions of cash and Cash Equivalents in accordance with the Approved Budget (subject to Permitted Variances);

(b)    Dispositions of property to the extent (i) such Disposition is for no less than the fair market value of such property, (ii) except pursuant to a credit bid by the Lenders (or the Administrative Agent on behalf of the Lenders), 100% of the proceeds thereof are in the form of cash or Cash Equivalents, (iii) at the time of such Disposition, 100% of the Net Proceeds of each Disposition shall be applied to the prepayment of the Term Loans in accordance with Section 2.13(a)(i) and (iv) such Disposition is in accordance with the Bidding Procedures Order;

(c)    Dispositions of property to and among Loan Parties or from a non-Loan Party to a Loan Party; *provided* that any transfer of any property by the Borrower or any Domestic Subsidiary of the Borrower to a Foreign Subsidiary of the Borrower after the Petition Date shall require the prior written consent of the Required Lenders;

(d)    Dispositions (including write-offs, discounts, and compromises) or discounts without recourse of accounts receivable and related assets in connection with the compromise or collection thereof in the ordinary course of business;

(e)    the unwinding of any Swap Contract or cash management agreement, in each case, in effect on the Petition Date;

(f)    the Disposition of any account receivable in connection with the collection or compromise thereof in the ordinary course of business and consistent with past practice;

(g)        the incurrence of Liens or making of Investments permitted hereunder;

(h)        transfers of property subject to Casualty Events upon the receipt (where practical) of the Net Proceeds of such Casualty Event;

(i)        Dispositions (including the abandonment thereof) of immaterial assets (i) in an aggregate amount not exceeding $250,000 during the term or (ii) subject to Chapter 11 Orders satisfactory to the Required Lenders; and

(j)        Dispositions (i) made in connection with the First Day Orders or Second Day Orders, (ii) the DIP Order or (iii) other Dispositions consented to by the Required Lenders.

Section 7.06.  *Restricted Payments.*  The Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, declare or make, directly or indirectly, any Restricted Payment, except (a) each Subsidiary may make Restricted Payments to (i) the Borrower or any other Domestic Subsidiary or Canadian Subsidiary and (ii) any other Subsidiary (and, in the case of a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests of the relevant class of Equity Interests), in the case of this clause (ii),  solely if required to comply with this Agreement and (b) payments to board members of any Loan Party or any Affiliate thereof, in each case, in the ordinary course of business and in accordance with the Approved Budget.

Section 7.07.  *Organization Documents*.  Except as required by the Bankruptcy Code, the Borrower shall not, nor shall the Borrower permit any of the Subsidiaries to, amend, restate, supplement or otherwise modify, or waive any of its rights under, its Organization Documents to the extent adverse in any material respect to the Lenders (in their capacities as such).

Section 7.08.  *Transactions with Affiliates.*  The Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, enter into any transaction of any kind with any of its Affiliates, whether or not in the ordinary course of business, other than (a) transactions between or among Loan Parties or any entity that becomes a Loan Party as a result of such transaction and transactions between or among Subsidiaries that are not Loan Parties, (b) to the extent pursuant to the Approved Budget (subject to Permitted Variances), (i) Investments made pursuant to Section 7.02 and Restricted Payments permitted under Section 7.06, (ii) customary employment, consulting and severance arrangements between the Borrower and the Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant employee benefit plans and similar arrangements in the ordinary course of business to the extent permitted under the DIP Order, (iii) the payment of customary fees and reasonable out of pocket costs to, and customary indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and the Subsidiaries in the ordinary course of business, (iv) transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 7.08, (v) transactions made in connection with the First Day Orders or Second Day Orders, (vi) pursuant to the Approved Budget (subject to Permitted Variances), and (vii) transactions made pursuant to the DIP Orders.

Section 7.09.  *Burdensome Agreements.*  The Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, enter into or permit to exist any Contractual Obligation after the Closing Date (other than the Loan Documents, pursuant to the Prepetition Indebtedness, or agreements  entered into as permitted by the First Day Orders or Second Day Orders, the DIP Orders or the Bidding Procedures Order, in each case, to the extent such orders are acceptable to the Required Lenders) that limits the ability of (a) any Subsidiary that is not a Guarantor to make Restricted Payments to the Borrower or any Guarantor or to make or repay loans or advances to or otherwise transfer assets to or make Investments in the Borrower or any Subsidiary that is a Guarantor or (b) any Loan Party to create, incur, assume or suffer to exist Liens on

property of such Person to secure the Obligations; provided that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations which exist on the Petition Date and are listed on Schedule 7.09 hereto.

Section 7.10.  *[Reserved].*

Section 7.11.  *Budget Variance Covenants.*  Commencing with the Budget Variance Test Date occurring on Friday, August 18 2023, and on each Budget Variance Test Date occurring thereafter, the Borrower shall not, nor shall it permit any of its Subsidiaries to, permit:

(a)     the sum of the actual aggregate cash receipts of the Borrower and its Subsidiaries (excluding proceeds of the Term Loans) for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be less than the Permitted Variance Percentage of the aggregate amount set forth for the line item in the Approved Budget entitled "Total Receipts" for such Budget Variance Test Period; or

(b)     the sum of the actual aggregate operating disbursements of the Borrower and its Subsidiaries for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be greater than Permitted Variance Percentage of the aggregate amount set forth for the line item in the Approved Budget entitled "Total Operating Disbursements" for such Budget Variance Test Period; or

(c)     the sum of the actual aggregate amounts paid by the Borrower and its Subsidiaries with respect to severance and accrued pre-petition wages for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be greater than Permitted Variance Percentage of the aggregate amount set forth for the line items in the Approved Budget entitled "Severance" and "Accrued Pre-Petition Wages" for such Budget Variance Test Period; or

(d)     the sum of the actual aggregate disbursements of the Borrower and its Subsidiaries with respect to lienholders and on account of taxes and other restructuring costs for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be greater than Permitted Variance Percentage of the aggregate amount set forth for the line item in the Approved Budget entitled "Prepetition Vendors & Taxes" for such Budget Variance Test Period; or

(e)     the sum of the actual amount of fees incurred by professionals of any unsecured creditors committee in the Chapter 11 Cases and of the Borrower and its Subsidiaries ending immediately prior to such Budget Variance Test Date to be greater than Permitted Variance Percentage of the amount set forth for the line item in the Approved Budget entitled "Professional Fees Reserve" for such Budget Variance Test Period.

To the extent that any Budget Variance Test Period encompasses a period that is covered in more than one Approved Budget, the applicable weeks from each applicable Approved Budget shall be utilized in making the calculations pursuant to this Section 7.11.

Section 7.12.  *Fiscal Year.*  The Borrower shall not make any change in its fiscal year or fiscal quarters (it being understood that the Borrower's fiscal year ends on December 31 of each year, and that each of the first three fiscal quarters of each fiscal year of the Borrower ends on the March 31, June 30 and September 30, respectively); *provided, however*, that the Borrower may, upon written notice to the Administrative Agent and the Required Lenders, change its fiscal year and fiscal quarters to any other fiscal year (and any other fiscal quarters) reasonably acceptable to the Administrative Agent and the Required Lenders, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such changes.

Section 7.13.  *Prepayments, Etc. of Indebtedness.*

(a)       Except as set forth in the Approved Budget, the DIP Order or the Bidding Procedures Order, the Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, voluntarily pay, prepay, redeem, purchase, defease or otherwise satisfy any principal, interest or other amounts, in any manner, with respect to any Prepetition ABL Facility Indebtedness, Prepetition UST Tranche A Facility Indebtedness or Prepetition UST Tranche B Facility Indebtedness or any other Indebtedness, other than (i) payments set forth in the Approved Budget, (ii) UST Adequate Protection Payments,  (iii) payments in the First Day Orders or Second Day Orders expressly set forth in the Approved Budget and (iv) other payments agreed in writing by the Required Lenders and authorized by the Bankruptcy Court or the Canadian Court.

(b)       Except as permitted by the DIP Order, the Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, amend, modify, change, terminate or release in any manner materially adverse to the interests of the Lenders any term or condition of any Prepetition ABL Facility Documentation, Prepetition UST Tranche A Facility Documentation or Prepetition UST Tranche B Documentation without the prior written consent of the Required Lenders.

Section 7.14.  *[Reserved].*

Section 7.15.  *Leases and Other Executory Contracts; Exclusivity Period.*  The Borrower shall provide at least five (5) Business Days' (or as promptly as reasonably practicable) prior notice (such notice period, the "**Review Period**") to the Administrative Agent and the Required Lenders prior to (i) any modification of, or waiver under, any real property leases, (ii) any modification of, or waiver under, any critical vendor arrangements or other material contracts, (iii) the termination of any real property leases, critical vendor arrangements or other material executory contracts, (iv) the entry into new real property leases, critical vendor arrangements or other material contracts,  (v) the filing of any material motion or notice (including pursuant to any procedures governing the rejection, assumption, and/or assumption and assignment of executory contracts and unexpired leases) to reject, assume and/or assume and assign any real property leases, critical vendor arrangements or other material contracts or (vi) the filing of any motion or notice to terminate or reduce the exclusivity period to file and solicit a Plan of Reorganization. The Required Lenders shall have the right to object to or approve any such modification, waiver, termination, entry into, motion, or notice in accordance with formal or informal procedures that are acceptable to the Required Lenders.

Section 7.16.  *Cash Collateral Account; Use of Cash.*  The Borrower shall maintain the Cash Collateral Account at all times and ensure that only proceeds of New Money Term Loans are deposited in the Cash Collateral Account.  The Borrower (i) shall not, nor permit any Subsidiary who holds such Cash Collateral Account, to withdraw any cash in the Cash Collateral Account, or otherwise make any other payments during the pendency of the Chapter 11 Cases (notwithstanding the source of case), except consistent with the Approved Budget (subject to Permitted Variances) and (ii) for the avoidance of doubt, shall not permit any cash in such Cash Collateral Account to be subject to any zero-balance or other similar automatic sweep.  For the avoidance of doubt, none of the Cash Collateral Account, any funds therein, or any proceeds of New Money Term Loans shall be subject to any terms or provisions in the DIP Order governing cash that constitutes Prepetition ABL Priority Collateral.

# ARTICLE 8
### EVENTS OF DEFAULT AND REMEDIES

Section 8.01.  *Events of Default.*  Any of the following from and after the Closing Date shall constitute an event of default (an "**Event of Default**"):

(a)        *Non-Payment*.  Any Loan Party fails to pay (i) when and as required to be paid herein or in any other Loan Document, any amount of principal of any Loan, (ii) within three (3) Business Days after the same becomes due, any interest on any Loan or (iii) within five (5) Business Days after the same becomes due, any other amount payable hereunder or with respect to any other Loan Document; or

(b)        *Specific Covenants*.  The Borrower fails to perform or observe any term, covenant or agreement contained in any of (i) Sections 6.03(a) (*provided* that the delivery of a notice of Default or Event of Default at any time will cure an Event of Default under Section 6.03(a) arising from the failure of the Borrower to timely deliver such notice of Default or Event of Default), 6.05(a) (solely with respect to the Borrower), 6.13(c), 6.14, 6.16, 6.17 or Article 7 or (ii) Section 6.01 or 6.02 and, in the case solely of this clause (ii), such failure continues for two Business Days after the earlier of (A) a Responsible Officer of the Borrower becoming aware of such default and (B) receipt by the Borrower of written notice thereof from the Administrative Agent or the Required Lenders; or

(c)        *Other Defaults*.  Any Loan Party fails to perform or observe any other term, covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for fifteen (15) days after receipt by the Borrower of written notice thereof from the Administrative Agent or the Required Lenders; or

(d)        *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any Compliance Certificate or other document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)        *Cross-Default*.  Except as a result of the events leading up to or resulting from the commencement of the Chapter 11 Cases, the ceasing of operations, the commencement of the Chapter 11 Cases, the Canadian Recognition Proceedings or entry into this Agreement and unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Bankruptcy Court or the Canadian Court, any Loan Party or any Subsidiary (i) fails to make any payment after the applicable grace period with respect thereto, if any, (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any other prepetition Indebtedness (other than Indebtedness hereunder and, for the avoidance of doubt, excluding Prepetition Indebtedness) having an outstanding aggregate principal amount of not less than the Threshold Amount or (ii) fails to observe or perform any other agreement or condition relating to any such prepetition Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts and not as a result of any other default thereunder by any Loan Party), after all grace periods having expired and all required notices having been given, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, after all grace periods having expired and all required notices having been given, such prepetition Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or

(f)        *[Reserved]*; or

(g)        *[Reserved]*; or

(h)        *Judgments*.  Except as a result of the events leading up to or resulting from the commencement of the Chapter 11 Cases or the Canadian Recognition Proceedings, the commencement of

the Chapter 11 Cases or the Canadian Recognition Proceedings or entry into this Agreement and unless any such judgment is stayed by the Bankruptcy Court or the Canadian Court, there is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance or indemnity as to which the insurer or third party indemnitor has been notified of such judgment or order and has not denied coverage) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(i)  *Invalidity of Loan Documents*.  Any material provision of the Loan Documents, at any time after their execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or Collateral Agent or any Lender or the satisfaction in full of all the Obligations (other than other than contingent obligations), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the Obligations), or purports in writing to revoke or rescind any Loan Document; or

(j)  *Change of Control*.  There occurs any Change of Control; or

(k)  *Collateral Documents*.  The DIP Order, the Canadian Orders and the Collateral Documents after delivery thereof pursuant to Sections 4.02, 6.11 or 6.13 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 7.04 or 7.05) cease to create, or shall be asserted by any Loan Party not to create, a valid and perfected Lien, on and security interest in the Collateral, with the priority required herein and in the DIP Order, subject to Liens permitted under Section 7.01; or

(l)  *ERISA*. The occurrence of an ERISA Event pursuant to clause (r) of the definition of such term that has resulted or could reasonably be expected to result in a Material Adverse Effect; or

(m)  *[Reserved]*; or

(n)  *[Reserved]*; or

(o)  *The Chapter 11 Cases*.

(i)  A Final Order and Canadian Final DIP Recognition Order shall not have been entered by the Bankruptcy Court or the Canadian Court, as applicable, on or before the date that is 30 days after the entry of the Interim Order or Canadian Interim DIP Recognition Order, as applicable, which Final Order and Canadian Final DIP Recognition Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated, appealed or subject to pending appeal or otherwise challenged or subject to any challenge in any respect without prior consent of the Required Lenders; or

(ii)  Any Chapter 11 Cases or Canadian Recognition Proceedings shall be dismissed (or the Bankruptcy Court or Canadian Court, as applicable, shall make a ruling requiring the dismissal of any Chapter 11 Case or Canadian Recognition Proceedings), suspended or converted to a case under chapter 7 of the Bankruptcy Code, or any Loan Party shall file any pleading requesting any such relief; or a motion shall be filed by any Loan Party for the approval of, or there shall arise, (x) any other Claim having priority senior to or pari passu with the claims of the Administrative Agent and Lenders under the Loan Documents or any other claim having priority

over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN\$1,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders) or (y) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except as expressly provided herein and in the DIP Order and in the Canadian Orders; or

(iii)    Any Loan Party shall file a motion in the Chapter 11 Cases or the Canadian Recognition Proceedings to obtain additional or replacement financing from a party other than Lenders under Section 364(d) of the Bankruptcy Code or the CCAA or to use Cash Collateral of a Lender under Section 363(c) of the Bankruptcy Code, except to the extent any such financing shall provide for the payment in full in cash of the Obligations or with the prior written consent of the Required Lenders; or

(iv)    Any Loan Party shall file a motion seeking, or the Bankruptcy Court or the Canadian Court shall enter, an order (A) approving payment of any pre-petition claim (or the Loan Party shall otherwise make a payment on any prepetition claim) other than (x) as provided for in (i) the First Day Orders or Second Day Orders or the Canadian Orders or (ii) the Approved Budget (subject to Permitted Variances) or (y) otherwise consented to by the Required Lenders in writing, (B) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets with a fair market value in excess of \$250,000; or (C) except with respect to the Prepetition B-2 Term Loan Credit Agreement as provided in the DIP Order, and the other adequate protections set forth in the DIP Orders and the UST Cash Collateral Order, approving any settlement or other stipulation not approved by the Required Lenders and not included in the Approved Budget with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor; or

(v)    (A) Any Chapter 11 Order or order granted in the Canadian Recognition Proceedings shall be amended, supplemented, stayed, reversed, vacated or otherwise modified (or any Loan Party shall apply for authority to do so), in each case, in a manner adverse to the Lenders, without the written consent of the Required Lenders (or any Loan Party shall file, or otherwise support, any pleading seeking such relief described in this clause (v)) or (B) any Chapter 11 Order or order granted in the Canadian Recognition Proceedings shall cease to be in full force and effect; or

(vi)    An order with respect to any of the Chapter 11 Cases or Canadian Recognition Proceedings shall be entered by the Bankruptcy Court or Canadian Court, as applicable, without the express prior written consent of the Required Lenders  (and, with respect to any provisions that adversely affect the rights or duties of any Agent, such Agent) (i) to revoke, reverse, stay, modify, supplement, vacate or amend any of the DIP Order or Canadian Orders  in a manner inconsistent with this Agreement, in a manner adverse to the Lenders, or that is not otherwise consented to by the Required Lenders (and with respect to amendments, modifications, or supplements that adversely affect the rights or duties of any Agent, such Agent); (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Loans (other than the Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN\$1,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders)) or the adequate protection Claims (other than the Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN\$1 ,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition

Order and the Canadian Orders or the administrative expense claims on account of the DIP Facility); or (iii) to grant or permit the grant of a Lien on the Collateral; or

(vii)    An application for any of the orders described in subclauses (ii), (iv), (vi), (x), (xvii) and (xviii) of this clause (o) shall be made by a Person other than the Loan Parties, and such application is not contested by the Loan Parties in good faith or any Person obtains a non-appealable final order charging any of the Collateral under section 506(c) of the Bankruptcy Code against any Agent or the Lenders or obtains a final order adverse to any Agent or the Lenders; or

(viii)    The Bankruptcy Court enters a Bidding Procedures Order that permits the sale of less than all of the Debtors' assets; provided, assets may be sold across various transactions and to various purchasers (x) if all such transactions are actually consummated and generate Net Proceeds in an aggregate amount sufficient to repay the Obligations in full or (y) with the prior written consent of the Required Lenders; or

(ix)    Any of the Loan Parties shall fail to comply with the terms and conditions of any Chapter 11 Order or order granted in the Canadian Recognition Proceedings in any material respect and such failure is not cured within two (2) Business Days of the earlier of the Borrower having knowledge thereof any notice by the Administrative Agent (at the direction of the Required Lenders); or

(x)    The Bankruptcy Court shall enter an order appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of clause (a) of Section 1106 of the Bankruptcy Code) under clause (b) of Section 1106 of the Bankruptcy Code in the Chapter 11 Cases (or any Loan Party or any of its Subsidiaries or Affiliates shall file, or otherwise support, any pleading seeking such relief described in this clause (x)); or

(xi)    The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders; or

(xii)    The Loan Parties or any of their controlled Affiliates shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or Canadian Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries) any other Person's opposition of any motion made in the Bankruptcy Court or Canadian Court by the Lenders seeking confirmation of the amount of the Lenders' claim or the validity and enforceability of the Liens in favor of the Collateral Agent; or

(xiii)    (A) The Loan Parties or any of their Affiliates shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or Canadian Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties or any of their Subsidiaries) any other Person's motion to, disallow in whole or in part the Lenders' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of the Collateral Agent or contest any material provision of any Loan Document, (B) any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Collateral Agent or the Lenders or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code, (C) any Liens on the Collateral and/or super-priority claims shall otherwise, for any reason, cease to be valid, perfected and enforceable in all respects, (D) any action is commenced by the Loan Parties that contests the validity, perfection or enforceability of any of the Liens and security interests of the Collateral Agent or the Lenders created by the DIP Order or

80

the Loan Documents, or (E) any material provision of any Loan Document shall cease to be effective; or

(xiv)    Any judgments which are in the aggregate in excess of $2,500,000 as to any postpetition obligation shall be rendered against any of the Loan Parties and the enforcement thereof shall not be stayed; or

(xv)    (A) The Loan Parties or any of their Affiliates shall file any pleading or proceeding which results in a material impairment of the rights or interests of the Lenders or (B) entry of an order of the Bankruptcy Court or Canadian Court with respect to any pleading or proceeding brought by any other Person which results in such a material impairment of the rights or interests of the Lenders; or

(xvi)    Any Loan Party or any of their Affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court or Canadian Court shall have entered, an order approving a payment to any Person (whether in cash or other property or whether as adequate protection, settlement of a dispute, or otherwise) that would be materially inconsistent with the treatment of any such Person under the Approved Budget or First Day Orders or Second Day Orders, without the prior written consent of the Required Lenders; or

(xvii)    Any Loan Party files or publicly announces its intention to file a Plan of Reorganization that is not an Acceptable Plan, without the prior written consent of the Required Lenders; or

(xviii)    An order shall be entered by the Bankruptcy Court transferring the Chapter 11 Cases to any other court; or

(xix)    [Reserved]; or

(xx)    The Bankruptcy Court shall enter an order approving any sale of the Debtors' assets (the "**Sale Order**") that (A) is not final and non-appealable, (B) approves a sale other than (x) a sale of all assets pursuant to a credit bid of the DIP Facility or (y) a sale that generates Net Proceeds in respect of the Term Priority Collateral sufficient to repay all outstanding Obligations, or (C) does not provide for all cash proceeds in respect of the Term Priority Collateral from a sale pursuant to clause (B)(y) to be used first to promptly fund, subject to the Carve-Out and the Canadian Priority Charges, the repayment of all outstanding Obligations (including, in each case, fees); or

(xxi)    To the extent the Bankruptcy Court enters the Sale Order, the Canadian Court refuses to grant an order of the Canadian Court in the Canadian Recognition Proceedings, which order shall recognize the Sale Order under Part IV of the CCAA; or

(xxii)    The Bidding Procedures Order or the Sale Order is amended, supplemented, or otherwise modified without the prior written consent of the Required Lenders; or

(xxiii)    The occurrence of a "Cash Collateral Termination Event" (or similar event) under the UST Adequate Protection Order or the DIP Order; or

(xxiv)    Any Loan Party or any of their Affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court or Canadian Court shall have entered, an order approving a payment to any person that would be inconsistent with the Approved Budget (subject to Permitted

Variances); or the proceeds of any Loan shall have been expended in a manner that is not in accordance with the Approved Budget (subject to Permitted Variances); or

(xxv)    The filing of any Plan of Reorganization that does not propose to indefeasibly repay the Obligations in full in cash; or

(xxvi)   The withdrawal or termination of any binding bid received by the Debtors pursuant to the Bidding Procedures Order, without the consent of the Required Lenders (to the extent such withdrawal would have created a breach under the Chapter 11 Milestones); or

(xxvii)  Failure to meet a Chapter 11 Milestone when required, unless extended or waived in writing (which may be via email) by the Required Lenders ; or

(xxviii) The Loan Parties terminate the FTI Letter without the prior written consent of the Prepetition B-2 Lenders and the Lenders that are advised by FTI under the FTI Letter.

Section 8.02.  *Remedies Upon Event of Default.*  Subject to the terms and conditions of the DIP Orders, if any Event of Default occurs and is continuing the Administrative Agent may, at the request of the Required Lenders, take any or all of the following actions:

(i)      declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments shall be terminated;

(ii)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, premium and all other amounts owing or payable or accrued hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived (to the extent permitted by applicable law) by the Borrower and each other Loan Party; and

(iii)    subject to the terms, conditions and provisions of the Prepetition ABL Intercreditor Agreement, the DIP Order, and solely in the case of Canadian Loan Parties, the Canadian Orders, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

In addition, subject solely to the giving of three (3) Business Days' written notice as set forth below, (i) the use by the Borrower and its Subsidiaries of Cash Collateral shall terminate and (ii) the automatic stay provided in Section 362 of the Bankruptcy Code, the CCAA or an order of the Canadian Court shall be deemed automatically vacated without further action or order of the Bankruptcy Court or Canadian Court and the Administrative Agent and the Lenders shall be entitled to exercise all of their respective rights and remedies under the Loan Documents and the DIP Order, including all rights and remedies with respect to the Collateral and the Guarantors. In addition to the remedies set forth above, the Administrative Agent may exercise any other remedies provided for by this Agreement and the other Loan Documents in accordance with the terms hereof and thereof or any other remedies provided by the DIP Order or applicable law, subject to the Prepetition ABL Intercreditor Agreement. Notwithstanding the foregoing, any exercise of remedies is subject to the requirement of the giving of three (3) Business Days' prior written notice (which may be via e-mail) to counsel for the Loan Parties, the Office of the U.S. Trustee and counsel for the Official Committee, if any, in accordance with the terms of the DIP Order and solely in the case of the Canadian Collateral, the Canadian Orders.

Section 8.03.  *[Reserved].*

Section 8.04.  *Application of Funds*.  Subject to the terms, conditions and provisions of the DIP Order, the Canadian Orders (solely in the case of Canadian Collateral) and the Prepetition ABL Intercreditor Agreement, after the exercise of remedies provided for in <u>Section 8.02</u> any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order (to the fullest extent permitted by mandatory provisions of applicable Law):

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under <u>Section 10.05</u> and amounts payable under <u>Article 3</u>) payable to the Administrative Agent or the Collateral Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities, premium and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under <u>Section 10.05</u> and amounts payable under <u>Article 3</u>), ratably among them in proportion to the amounts described in this clause *Second* payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause *Third* payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause *Fourth* held by them;

*Fifth*, to the payment of all other Obligations of the Borrower that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Obligations (other than contingent obligations) have been paid in full, to the Borrower or as otherwise required by Law.

# ARTICLE 9
## THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

Each Lender hereby irrevocably appoints the Administrative Agent and the Collateral Agent (for purposes of this Article 9, the Administrative Agent and the Collateral Agent are referred to collectively as the "**Agents**") its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental or related thereto.  Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Collateral Documents and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.  The institution serving as the Administrative Agent and/or the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not an Agent hereunder. The Agents shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or

any Loan Party that is communicated or obtained by the Person serving as Administrative Agent or Collateral Agent, as applicable, or any of their Affiliates in any capacity.

Neither Agent shall have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.08), and (c) except as expressly set forth in the Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent and/or Collateral Agent or any of its Affiliates in any capacity. Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.08) or in the absence of its own gross negligence or willful misconduct as determined by the final non-appealable judgment of a court of competent jurisdiction. Notwithstanding the foregoing, no action nor any omission to act, taken by either Agent at the direction of the Required Lenders (or such other number of percentage of Lenders as shall be expressly provided for herein or in the other Loan Documents) shall constitute gross negligence or willful misconduct. Neither Agent shall be deemed to have knowledge of any Default unless and until written notice thereof, conspicuously labeled as a "notice of default" and specifically describing such Default, is given to such Agent by the Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it in good faith to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the arrangement of the Facilities as well as activities as Agent.

Either Agent may resign at any time by notifying the Lenders and the Borrower in writing, and either Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to the Borrower and such Agent and signed by the Required Lenders. Upon any such resignation or removal, the Required Lenders shall have the right, with the consent of the Borrower (which

consent shall not be required during the continuance of an Event of Default under Sections 8.01(a), (f) or (g)), to appoint a successor.  If no successor shall have been so appointed by the Required Lenders (with the consent of the Borrower (which consent shall not be required during the continuance of an Event of Default under Sections 8.01(a), (f) or (g))) and shall have accepted such appointment within 30 days after (i) the retiring Agent gives notice of its resignation or (ii) the Required Lenders delivers removal instructions, then the retiring or removed Agent may, on behalf of the Lenders (with the consent of the Borrower (which consent shall not be required during the continuance of an Event of Default under Sections 8.01(a), (f) or (g))), appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  If no successor Agent has been appointed pursuant to the immediately preceding, such Agent's resignation or removal shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders (with the consent of the Borrower (which consent shall not be required during the continuance of an Event of Default under Sections 8.01(a), (f) or (g))) appoint a successor Administrative Agent and/or Collateral Agent, as the case may be.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of its predecessor Agent, and its predecessor Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After an Agent's resignation hereunder, the provisions of this Article and Section 10.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

Each Lender acknowledges and agrees that Alter Domus Products Corp. or one or more of its Affiliates may (but is not obligated to) act as collateral agent or representative for the holders of Prepetition B-2 Indebtedness and/or under the collateral agreements with respect thereto.  Each Lender waives any conflict of interest, now contemplated or arising hereafter, in connection therewith and agrees not to assert against Alter Domus Products Corp. or any of its Affiliates any claims, causes of action, damages or liabilities of whatever kind or nature relating thereto.

In case of the pendency of any case or proceeding under any insolvency or other similar law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise: (a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Agents under Section 2.05, Section 3.01, and Section 10.05) allowed in such judicial proceeding; and (b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the

Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agents any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due to the Agents under Section 2.05 and Section 10.05.  Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The Lenders hereby irrevocably authorize the Administrative Agent (or its designee), at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, the CCAA,  or any similar laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any amounts owed to the Agents shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the stock or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided, that, any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or stock thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement, (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any stock and/or debt instruments issued by such acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for the Administrative Agent or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the each Lenders pro rata and the stock and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for the Administrative Agent or any acquisition vehicle to take any further action.

## ARTICLE 10
### MISCELLANEOUS

Section 10.01.  *Notices; Electronic Communications.*  Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email or fax, as follows:

(a)    if to the Borrower or any other Loan Party, to it at:

Yellow Corporation

Attention of Chief Financial Officer and General Counsel
10990 Roe Avenue
Overland Park, Kansas 66211
Fax No. 913-696-6116
Tel. No. 913-696-6529 or 913-696-6132
Email: Dan.Olivier@myYellow.com and Leah.Dawson@myYellow.com

With copy to:

Kirkland & Ellis LLP
Attention of Michelle Kilkenney, Esq. and Patrick Nash, Esq.
300 North LaSalle
Chicago, Illinois 60654
Fax No. 312-862-2200
Tel. No. 312-862-2487
Email: michelle.kilkenney@kirkland.com; Patrick.nash@kirkland.com

and to:

Goodmans LLP
Attention of Robert J. Chadwick and Caroline Descours
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7
Email: rchadwick@goodmans.ca; cdescours@goodmans.ca

(b)      if to the Administrative Agent, to:

Alter Domus Products Corp.
225 W. Washington Street, 9th Floor
Chicago, Illinois 60606
Attention: Legal Department – Agency, Emily Ergang Pappas and Chris Capezuti
Fax No.: 312-376-0751
Tel. No.: 312-564-5100
Email: legal_agency@alterdomus.com, emily.ergangpappas@alterdomus.com and cpcagency@alterdomus.com

With a copy to:

Holland & Knight LLP
150 N. Riverside Plaza, Suite 2700
Chicago, Illinois 60606
Fax No.: 312-578-6666
Tel. No.: 312-263-3600
Attention: Joshua M. Spencer
Email: joshua.spencer@hklaw.com and alterdomus@hklaw.com

(c)      if to a Lender, to it at its address (email address or fax number) set forth on Appendices A and B or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date three Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 10.01. As agreed to among the Borrower, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

The Borrower hereby agrees, unless directed otherwise by the Required Lenders or Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent and/or the Required Lenders all information, documents and other materials that it is obligated to furnish to the Administrative Agent and/or the Required Lenders pursuant to the Loan Documents or to the Lenders under Article 6, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Request for Credit Extension or a notice pursuant to Section 2.10, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, or (iii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document, (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format reasonably acceptable to the Administrative Agent and/or the Required Lenders to an electronic mail address as directed by the Administrative Agent and/or the Required Lenders. In addition, the Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent, the Required Lenders or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on Intralinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may be "public‑side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower, its Subsidiaries or any of their respective securities) (each, a "**Public Lender**"). The Borrower hereby agrees (w) to use commercially reasonable effort to make all Borrower Materials that are to be made available to Public Lenders clearly and conspicuously "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or any of its securities for purposes of United States federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.16); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC", unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (1) the Loan Documents, (2) financial statements and related documentation, in each case, provided pursuant to Section 6.01 and (3) notification of changes in the terms of the Facilities.

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities laws, to make references to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower, its Subsidiaries or any of their respective securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL NON-APPEALABLE RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S OR ITS RELATED PARTIES' GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR BAD FAITH, IN EACH CASE, AS DETERMINED BY THE FINAL NON-APPEALABLE JUDGMENT OF A COURT OF COMPETENT JURISDICTION.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 10.02.  *Survival of Agreement.*  All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the Lenders or on their behalf or that any Agent or Lender may have had notice of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable

under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated.  The provisions of Section 3.01, Section 3.03 Article 9 and Section 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.

Section 10.03.  *Binding Effect.*  This Agreement shall become effective when it shall have been executed and delivered by the Borrower, each other Loan Party hereto on the Closing Date and the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

Section 10.04.  *Successors and Assigns*.

(a)    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, the Administrative Agent, the Collateral Agent or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective permitted successors and assigns.

(b)    Each Lender may assign to one or more Eligible Assignees all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it), with the prior written consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed); *provided, however*, (i) the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall be in an integral multiple of, and not less than, $1,000,000 (or, if less, the entire remaining amount of such Lender's Commitment or Loans of the relevant Class) unless the Administrative Agent otherwise agrees; *provided* that simultaneous assignments by two or more Related Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (ii) the parties to each assignment shall (A) execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance, and, in each case, shall pay to the Administrative Agent a processing and recordation fee of $3,500; *provided* that (x) simultaneous assignments by two or more Related Funds shall require the payment of a single processing and recordation fee of $3,500 and (y) such processing and recordation fee may be waived or reduced in the sole discretion of the Administrative Agent and (iii) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire (in which the assignee shall designate one or more credit contacts to whom all Lender-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable Laws, including Federal and state securities laws), all documentation and other information reasonably determined by the Administrative Agent to be required by applicable regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, and all applicable tax forms (including such documentation required under Section 3.01(d)).  Upon acceptance and recording pursuant to paragraph (e) of this Section 10.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B)  the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an

Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.03 and 10.05). Upon request and the surrender by the assigning Lender of its Term Note (if any), the Borrower (at its expense) shall execute and deliver a Term Note to the assignee Lender.

(c)      By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and the outstanding balances of its Term Loans without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance; (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrower or any Subsidiary or the performance or observance by the Borrower or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is an Eligible Assignee legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with copies of the most recent financial statements referred to in Section 5.05 or delivered pursuant to Section 6.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Administrative Agent and the Collateral Agent, respectively, by the terms hereof or thereof, together with such powers as are reasonably incidental or related thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)      The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of and the interest on the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error and the Borrower, the Administrative Agent, the Collateral Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Collateral Agent and, as to entries pertaining to it, any Lender, at any reasonable time and from time to time upon reasonable prior written notice. This Section 10.04(d) shall be construed so that all Loans are at all times maintained in "registered form" within the meaning of Section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury regulations (or any other relevant or successor provisions of the Code or of such Treasury regulations).

(e)      Upon its receipt of, and consent to, a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee

referred to in paragraph (b) above, if applicable, and the written consent of the Administrative Agent and, if required, the Borrower, to such assignment, and "know your customer" information requested by the Administrative Agent, and any applicable tax forms (including such documentation required under Section 3.01(d)), the Administrative Agent shall promptly (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)        Each Lender may without the consent of the Borrower or the Administrative Agent sell participations to one or more banks or other Persons in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided, however*, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other Persons shall be entitled to the benefit of the cost protection provisions contained in Sections 3.01 and 3.03 (subject to the requirements and limitations therein, including the requirements under Section 3.01(d) (it being understood that the documentation required under Section 3.01(d) shall be delivered to the participating Lender)) to the same extent as if they were Lenders (but with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant and only if such participant has complied with the requirements of such provisions as if it were a Lender) and (iv) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of (or consent under) any provision of this Agreement or any other Loan Document (*provided* that the agreement or instrument pursuant to which such Lender has sold a participation may provide that such Lender shall not agree to the following amendments without the consent of such participating bank or Person hereunder: amendments, modifications or waivers decreasing any fees payable to such participating bank or Person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participating bank has an interest; extending any scheduled principal payment date or scheduled date fixed for the payment of interest on the Loans in which such participating bank or Person has an interest; increasing or extending the Commitments in which such participating bank or Person has an interest; releasing all or substantially all of the Guarantors (other than in connection with the sale of any such Guarantor in a transaction permitted by Section 7.05) releasing all or substantially all of the Collateral or the Term Priority Collateral or reductions in the voting thresholds; or modifying the pro rata requirements of Section 2.13(b), Section 2.13(c) or Section 2.14, in each case, which directly and adversely affects such participants; *provided, further*, that, notwithstanding the foregoing, only the consent of the Required Lenders shall be required in respect of any amendment, modification or waiver of (i) the payment of default interest, (ii) the occurrence of a default or an Event of Default or (iii) the mandatory prepayment requirements of Section 2.13.  To the extent permitted by law, each participating bank or other Person also shall be entitled to the benefits of Section 10.06 as though it were a Lender, *provided* such participating bank or other Person agrees to be subject to Section 2.15 as though it were a Lender.  Each Lender that sells a participation or exercises its option under section 10.04(i) with respect to an SPV shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and SPV (other than any SPV that is treated as a disregarded entity of the Granting Lender for U.S. federal income tax purposes) and the principal amounts (and interest thereon) of each participant's interest in the Loans or other Obligations under this Agreement (the "**Participant Register**"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or SPV or any information relating to a Participant's or a SPV's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary in connection with a Tax audit or other proceeding to establish that such commitment, loan, letter of credit or other obligation is in registered form under United States Treasury Regulations Section 5f.103-1(c) and proposed United States Treasury Regulations Section

1.163-5(b) (or any amended or successor version).  The entries in the Participant Register shall be conclusive absent manifest error, and the Borrower, the Lenders and each Agent shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding notice to the contrary.

(g)     Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 10.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided* that (except during the arrangement by the Required Lenders when customary confidentiality arrangements shall apply), prior to any such disclosure of Information, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree to preserve the confidentiality of such confidential information on terms no less restrictive in any material respect than those applicable to the Lenders pursuant to Section 10.16 for the benefit of (and enforceable by) the Borrower.

(h)     Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; *provided* that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)     Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (an "**SPV**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Loan, (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof, and (iii) the Granting Lender shall for all purposes remain the Lender hereunder.  The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 10.04, any SPV may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans, and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.

(j)     The Borrower (except as expressly permitted by clause (ii) of Section 7.04(d)) shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

Section 10.05.  *Expenses; Indemnity.*

(a)      The Borrower agrees (i) promptly following (and in any event within thirty (30) days of) written demand (including documentation reasonably supporting such request) therefor, to pay or reimburse the Prepetition B-2 Agent and Prepetition B-2 Lenders for all unpaid reasonable and documented out-of-pocket costs and expenses (including Attorney Costs) incurred under the Prepetition B-2 Loan Documents (including the documented fees and expenses of Holland & Knight LLP, Milbank LLP, FTI Consulting Inc., Cousins Law LLC and White & Case LLP), (ii) promptly following (and in any event within thirty (30) days of) written demand (including documentation reasonably supporting such request) therefor, to pay or reimburse the Administrative Agent, the Collateral Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses (including the documented fees and expenses of Holland & Knight LLP, Milbank LLP, FTI Consulting Inc., Cousins Law LLC and White & Case LLP) incurred in connection with the preparation, negotiation and execution of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby (including Attorney Costs which in the case of the Agents, shall be limited to Attorney Costs of one counsel to the Agents and one local counsel in each applicable jurisdiction for the Agents) and (iii) from and after the Closing Date, promptly following (and in any event within thirty (30) days of) written demand (including documentation reasonably supporting such request) therefor, to pay or reimburse the Administrative Agent, the Collateral Agent, Apollo and each Lender promptly following written demand for all reasonable and documented out-of-pocket costs and expenses (including the documented fees and expenses of Holland & Knight LLP, Milbank LLP, FTI Consulting Inc., Cousins Law LLC and White & Case LLP) incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Loan Documents (including all such out-of-pocket costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs (which in the case of the Agents, shall be limited to Attorney Costs of one counsel to the Agents and one local counsel in each applicable jurisdiction for the Agents).  To the extent otherwise reimbursable by the foregoing sentence of this section, the foregoing costs and expenses shall include all reasonable search, filing, recording, title insurance, survey, environmental, property condition report and zoning report charges and fees related thereto, and other reasonable and documented out of pocket expenses incurred by any Agent. The foregoing costs and expenses shall also include all mortgage recording, recording and filing fees charged by governmental authorities to record and/or file Collateral Documents.

(b)      Whether or not the transactions contemplated hereby are consummated, the Loan Parties shall, jointly and severally, indemnify and hold harmless the Administrative Agent, the Collateral Agent and their respective Affiliates, successors and permitted assigns (or the directors, officers, employees, agents, advisors and members of each of the foregoing) (each an "**Agent Indemnitee**" and collectively, the "**Agent Indemnitees**") and each Lender and their respective Affiliates, successors and permitted assigns (or the directors, officers, employees, agents, advisors and members of each of the foregoing) (each a "**Lender Indemnitee**" and collectively, the "**Lender Indemnitees**"; together with, the Agent Indemnitees, collectively the "**Indemnitees**") from and against any and all actual losses, damages, claims, liabilities and reasonable documented out-of-pocket costs and expenses (including Attorney Costs which shall be limited to Attorney Costs of one outside counsel for the Agent Indemnitees and Attorney Costs of one outside counsel for the Lender Indemnitees (and, if necessary, one local counsel in each applicable jurisdiction and, in the event of any actual or reasonably perceived conflict of interest, one additional counsel for each type of similarly situated affected Indemnitees)) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any Agent Indemnitee or Lender Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the Transactions or the other transactions contemplated thereby, (ii) any Commitment or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials at, on, under or from any

property, vehicle or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any other Environmental Liability related in any way to any Loan Parties or any Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Agent Indemnitee or Lender Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its Affiliates or equityholders in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of any such Agent Indemnitee or Lender Indemnitee; *provided* that, notwithstanding the foregoing, such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, damages, claims, liabilities and expenses resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee, as determined by the final non-appealable judgment of a court of competent jurisdiction or (y) any dispute solely among the Indemnitees other than (1) any claim against an Indemnitee in its capacity or in fulfilling its role as Administrative Agent, Collateral Agent or similar role and (2) any claim arising out of any act or omission of the Borrower or any of its Affiliates. No Indemnitee or any other party hereto shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement except to the extent that such damages resulted from the (A) gross negligence, bad faith or willful misconduct of such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee, as determined by the final non-appealable judgment of a court of competent jurisdiction or (B) the material breach by such Indemnitee of its or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee's obligations under the Loan Documents, as determined by the final non-appealable judgment of a court of competent jurisdiction.  In the case of a claim, investigation, litigation or other proceeding to which the indemnity in this <u>Section 10.05</u> applies, such indemnity shall be effective whether or not such claim, investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, any Loan Party's directors, stockholders or creditors or other Affiliates or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated.  For the avoidance of doubt, this paragraph shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    To the extent the Agent Indemnitees are not reimbursed and indemnified by the Loan Parties, and without limiting the obligation of the Loan Parties to do so, the Lenders shall indemnify and hold harmless the Agent Indemnities, based on and to the extent of such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), from and against any and all losses, claims, damages, liabilities and related expenses (including Attorney Costs which shall be limited to Attorney Costs of one counsel to the Agent Indemnitees and one local counsel in each applicable jurisdiction for the Agent Indemnitees) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any Agent Indemnitee in any way relating to or arising out of or in connection with this Agreement or any other Loan Document or in the performance by the Agents in its duties under the Loan Documents; provided that no Lender shall be liable for any portion of such losses, claims, damages, liabilities and related expenses resulting from any Agent Indemnitees gross negligence, bad faith or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). Without limiting the foregoing, to the extent not paid or reimbursed by the Loan Parties, each Lender shall pay or reimburse the Agent Indemnitees based on and to the extent of such Lender's pro rata share of all reasonable and documented out-of-pocket costs and expenses reimbursable pursuant to Section 10.05, incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Loan Documents (including all such out-of-pocket costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all Attorney Costs which shall be limited to

Attorney Costs of one counsel to the Agent Indemnitees and one local counsel in each applicable jurisdiction for the Agent Indemnitees). For purposes hereof, if the Term Loans have been paid in full prior to such determination pursuant to the immediately preceding sentence, then each such Lender's "pro rata share" shall be determined as of the last date the Term Loans were in effect immediately prior to such payment in full.

(d)     To the extent permitted by applicable Law, (i) no Loan Party shall assert, and each hereby waives, any claim against any Indemnitee and (ii) no Indemnitee shall assert, and each hereby waives, any claim against any Loan Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions or any Loan or the use of the proceeds thereof (whether before or after the Closing Date); *provided* that the foregoing shall in no event limit the Borrower's indemnification obligations under clause (b) above.

(e)     The provisions of this <u>Section 10.05</u> shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent or any Lender.  All amounts due under this <u>Section 10.05</u> shall be payable within 30 days after written demand therefor (including documentation reasonably supporting such request).

Section 10.06.  *Right of Setoff.*  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates (and the Agents, in respect of any unpaid fees, costs and expenses payable hereunder) is authorized at any time and from time to time (with the prior consent of the Administrative Agent), without prior notice to any Loan Party, any such notice being waived by each Loan Party (on its own behalf and on behalf of each of its Subsidiaries), to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than payroll accounts, trust and tax accounts, escrow accounts, employee benefits accounts or petty cash accounts) at any time held by, and other indebtedness at any time owing by, such Lender and its Affiliates or the Collateral Agent to or for the credit or the account of the respective Loan Parties against any and all matured Obligations owing to such Lender and its Affiliates or the Collateral Agent hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be denominated in a currency different from that of the applicable deposit or Indebtedness. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender; *provided*, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent, the Collateral Agent and each Lender under this <u>Section 10.06</u> are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent, the Collateral Agent and such Lender may have at Law.

Section 10.07.  *Applicable Law.*  This Agreement and the other Loan Documents shall be governed by, and construed in accordance with, the law of the State of New York, except to the extent New York law is superseded by the Bankruptcy Code.

Section 10.08.  *Waivers; Amendment.*

(a)     No failure or delay of the Administrative Agent, the Collateral Agent or any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver

thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)        Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders and (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by each party thereto with the consent of the Required Lenders  (*provided*, that amendments to the Prepetition ABL Intercreditor Agreement shall require the agreement of the Loan Parties (or any of them) only to the extent required pursuant to the terms thereof); *provided, however*, that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any fee or any interest on any Loan, or waive or excuse any such payment or any part thereof (other than with respect to any default interest), or decrease the amount of any fee or the rate of interest on any Loan (other than with respect to any default interest), without the prior written consent of each Lender directly and adversely affected thereby (it being understood that (x) the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest, (y) any change to the definition of "Consolidated EBITDA" or in the component definitions thereof shall not constitute a reduction or forgiveness in any rate of interest pursuant to this clause (i), (ii) increase or extend the Commitment of any Lender without the prior written consent of such Lender (it being understood that a waiver of any condition precedent or of any Default or Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender), (iii) (A) amend or modify any of the definition of "Pro Rata Share", the pro rata requirements of Section 2.13(b),Section 2.14, Section 2.15, Section 8.04 or any other provision of this Agreement or the Loan Documents in a manner that would have the effect of altering the ratable reduction of Commitments or the pro rata sharing of payments otherwise required hereunder, the provisions of Section 10.04(j) or any provision of this Section, 10.08(b), (1) subordinate, or have the effect of subordinating, the Obligations hereunder to any other Indebtedness, or (2) subordinate, or have the effect of subordinating, the Liens securing the Obligations to Liens securing any other Indebtedness, or (C) or release all or substantially all of the Guarantors (other than in connection with the sale of such Guarantors in a transaction permitted by Sections 7.04 or 7.05) or all or substantially all of the Collateral (other than as permitted hereby), without the prior written consent of each Lender directly and adversely affected thereby (or, in the case of Section 10.04(j), each Lender), (iv) change the provisions of any Loan Document in a manner that by its terms materially and adversely affects the rights of Lenders holding Loans of one Class differently from the rights of Lenders holding Loans of any other Class without the prior written consent of the Required Class Lenders with respect to each materially and adversely affected Class, (v) modify the protections afforded to an SPV pursuant to the provisions of Section 10.04(i) without the written consent of such SPV (vi) amend or modify, including to reduce the percentage contained in the definition of the term "Required Lenders" without the prior written consent of each Lender (it being understood that, with the consent of the Required Lenders (if such consent is otherwise required), additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Term Loan Commitments on the Closing Date) or (vii) modify the definition of "Required Class Lenders" without the consent of the Required Class Lenders with

respect to each Class of Loans or Commitments; *provided further* that no Lender consent is required to effect any amendment expressly contemplated by Section 7.12.

Notwithstanding any other language to the contrary contained herein, with respect to any amendment, waiver or modification to which the Administrative Agent's consent is not required, the parties agree to deliver to the Administrative Agent a copy of each such amendment, waiver or modification; provided that, (i) no party shall be liable for its failure to comply with this sentence and (ii) the Administrative Agent shall not be bound by any such amendment unless and until it has received a copy thereof.

(c)    Notwithstanding the foregoing, this Agreement and any other Loan Document may be amended solely with the consent of the Administrative Agent, the Required Lenders and the Borrower without the need to obtain the consent of any other Lender if such amendment is delivered in order to if such amendment is delivered in order to correct or cure (x) ambiguities, errors, omissions, defects, (y) to effect administrative changes of a technical or immaterial nature or (z) incorrect cross references or similar inaccuracies in this Agreement or the applicable Loan Document. This Agreement, guarantees, collateral documents, security documents, intercreditor agreements,  and related documents executed in connection with this Agreement may be in a form reasonably determined by the Administrative Agent or Collateral Agent, as applicable, and may be amended, modified, terminated or waived, and consent to any departure therefrom may be given, without the consent of any Lender if such amendment, modification, waiver or consent is given in order to (x) comply with local law or advice of counsel or (y) cause such guarantee, collateral document, security document or related document to be consistent with this Agreement and the other Loan Documents.  The Borrower, the Required Lenders and the Administrative Agent may, without the consent of any other Lender, effect amendments to this Agreement and the other Loan Documents as may be necessary in the reasonable opinion of the Borrower, the Required Lenders and the Administrative Agent to effect the provisions of Section 2.05.  Notwithstanding anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Loan Document.

Section 10.09.  *Interest Rate Limitation.*  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Law (collectively the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable Law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 10.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.10.  *Entire Agreement.*  This Agreement, the Fee Letter and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Required Lenders, Administrative Agent, the Collateral Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

Section 10.11. *WAIVER OF JURY TRIAL.* EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.11</u>.

Section 10.12. *Severability.* In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 10.13. *Counterparts.* This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in <u>Section 10.03</u>. Delivery of an executed signature page to this Agreement by facsimile or other electronic imaging transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 10.14. *Headings.* Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 10.15. *Jurisdiction; Consent to Service of Process.*

(a) Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, such New York State or, to the extent permitted by law, such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b) Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in the Bankruptcy Court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)        Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 10.01.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Provided that, notwithstanding anything to the contrary herein, the Canadian Recognition Proceedings and the orders of the Canadian Court granted therein shall be subject to the exclusive jurisdiction of the Canadian Court.

Section 10.16.  *Confidentiality.*  Each of the Administrative Agent, the Collateral Agent, and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, financing sources, legal counsel and other advisors involved in the Transaction on a "need to know" basis (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process (and in such case, such Person shall promptly notify the Borrower of such disclosure), (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 10.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents  or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower or any Subsidiary or of their respective obligations, (f) with the prior written consent of the Borrower, (g) on a confidential basis to (x) any rating agency in connection with rating the Borrower or its Subsidiaries or the Facility or (y) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Facility, or (h) to the extent such Information becomes publicly available other than as a result of a material breach of this Section 10.16 or other confidentiality obligation owed to the Borrower or any of its Subsidiaries.  For the purposes of this Article, "**Information**" shall mean all information received from the Borrower and related to the Borrower, its business, other than any such information that was available to the Administrative Agent, the Collateral Agent or any Lender on a nonconfidential basis prior to its disclosure by the Borrower not in violation of any confidentiality or obligation owed to the Borrower and the Subsidiaries.  In addition, each Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to market data collectors, similar services providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement and the other Loan Documents.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.  None of the Borrower and its Subsidiaries or their respective Affiliates or their and their Affiliates' respective representatives shall make any public announcement or filing, whether or not relating to this Agreement, which names any Lender or the investment advisor or manager of any Lender without the prior written approval such Lender except solely to the extent including such name in such announcement or filing is required by applicable Law.

Section 10.17.  *Lender Action.*  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any

such Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent (which shall be given at the direction of the Required Lender).

Section 10.18. *USA PATRIOT Act Notice.*  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the USA PATRIOT Act.

Section 10.19. *Collateral And Guaranty Matters.*  The Lenders irrevocably agree:

(a)       that any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document shall be automatically released (i) upon termination of all Commitments hereunder and payment in full of all Obligations (other than contingent obligations not yet accrued or payable), (ii) at the time the property subject to such Lien is disposed as part of or in connection with any disposition permitted hereunder or under any other Loan Document to any Person other than a Person required to grant a Lien to the Administrative Agent or the Collateral Agent under the Loan Documents, (iii) subject to Section 10.08, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to Section 11.10, (v) any such property constitutes Excluded Property or (vi) in accordance with the Prepetition ABL Intercreditor Agreement or any Chapter 11 Order;

(b)       [reserved]; and

(c)       that any Guarantor shall be automatically released from its obligations under the Guaranty as provided in Section 11.10.

Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's or the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 10.19.  In each case as specified in this Section 10.19, the Administrative Agent or the Collateral Agent will (and each Lender irrevocably authorizes the Administrative Agent and the Collateral Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as the Borrower may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 10.19.

Section 10.20. Limitation on Liability. TO THE EXTENT PERMITTED BY APPLICABLE LAW, AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS: (A) NO INDEMNITEE SHALL BE LIABLE TO ANY PARTY FOR ANY INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH THEIR RESPECTIVE ACTIVITIES RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE TRANSACTIONS CONTEMPLATED THEREBY, THE TERM LOANS, OR OTHERWISE IN CONNECTION WITH THE FOREGOING; (B) WITHOUT LIMITING THE FOREGOING, NO INDEMNITEE SHALL BE SUBJECT TO ANY EQUITABLE REMEDY OR RELIEF, INCLUDING SPECIFIC PERFORMANCE OR INJUNCTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED THEREBY; (C) NO INDEMNITEE SHALL HAVE ANY LIABILITY TO THE

LOAN PARTIES, FOR DAMAGES OR OTHERWISE, ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED THEREBY UNTIL THE AMENDMENT NO. 1 EFFECTIVE DATE HAS OCCURRED; AND (D) IN NO EVENT SHALL ANY INDEMNITEE'S LIABILITY TO THE LOAN PARTIES ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED THEREBY EXCEED ACTUAL DIRECT DAMAGES INCURRED BY THE LOAN PARTIES OF UP TO $10,000,000 IN THE AGGREGATE; PROVIDED THAT THE FOREGOING SHALL IN NO EVENT LIMIT THE LENDERS' INDEMNIFICATION OBLIGATIONS TO THE AGENT INDEMNITEES UNDER SECTION 10.05 OF THIS AGREEMENT; PROVIDED FURTHER THAT SUCH LIMITATION OF LIABILITY SHALL NOT APPLY TO LIABILITY RESULTING FROM FRAUD BY THE INDEMNITEES

Section 10.21.  *Payments Set Aside.*  To the extent that any payment by or on behalf of the Borrower or any other Loan Party is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall, to the fullest extent possible under provisions of applicable Law, be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Federal Funds Effective Rate from time to time in effect.

Section 10.22. *No Advisory or Fiduciary Responsibility*.

(a)    In connection with all aspects of each transaction contemplated hereby, each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that (i) the facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower and its Subsidiaries, on the one hand, and the Agents and the Lenders, on the other hand, and the Borrower and its Subsidiaries are capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof), (ii) the Agents, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from, and may conflict with, those of the Borrower and its Affiliates, and none of the Agents or the Lenders has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship, and (iii) the Agents and the Lenders have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate.

(b)    Each Loan Party acknowledges and agrees that each Lender and any of its affiliates may lend money to, invest in, and generally engage in any kind of business with, the Borrower, any of its Affiliates or any other person or entity that may do business with or own securities of any of the foregoing, all as if such Lender or Affiliate thereof were not a Lender (or an agent or any other person with any similar role under the Facilities) and without any duty to account therefor to any other Lender, the Borrower or any Affiliate of the foregoing. Each Lender and any of its Affiliates may accept fees and other consideration from the Borrower or any of its Affiliates for services in connection with this Agreement, the Facilities, the

commitment letter or otherwise without having to account for the same to any other Lender, the Borrower or any Affiliate of the foregoing.

Section 10.23. *Release*. Each Loan Party, on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, shall absolutely, unconditionally, and irrevocably release and discharge and acquit the Lenders, the Agents, the Prepetition B-2 Lenders and the Prepetition B-2 Agent and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, in their capacities as such (the "**Released Parties**"), from any and all obligations and liabilities to the Loan Parties (and their successors and assigns) and from any and all claims counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising prior to the Petition Date of any kind, nature, or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort, or under any state or federal law or otherwise, arising out of or related to the Borrower and its direct and indirect Subsidiaries, the Loan Documents or the Prepetition B-2 Loan Documents, the obligations owing and the financial obligations made thereunder, the negotiation of any of the foregoing and the agreement reflected thereby, in each case that the Loan Parties at any time had, now have, or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the Bankruptcy Court's entry of each DIP Order; provided that nothing herein shall relieve the Released Parties from fulfilling their obligations under the Loan Documents and DIP Order; provided, further, that such release shall not be available to the extent that any of the above resulted from the gross negligence, bad faith or willful misconduct of such Released Party, as determined by the final non-appealable judgment of a court of competent jurisdiction.

Section 10.24. *Process Agent*. Each Guarantor irrevocably appoints Borrower, and Borrower hereby accepts such irrevocable appointment, as its agent and true and lawful attorney-in-fact in its name, place and stead to accept on behalf of such Guarantor and its Property and revenues service of copies of the summons and complaint and any other process which may be served in any such suit, action or proceeding brought in the Bankruptcy Court and/or the State of New York, and such Guarantor agrees that the failure of Borrower to give any notice of any such service of process to such Guarantor shall not impair or affect the validity of such service or, to the extent permitted by applicable law, the enforcement of any judgment based thereon.

Section 10.25. *Waiver of Immunity.* To the extent that any Guarantor may be or become entitled to claim for itself or its property or revenues any immunity on the ground of sovereignty or the like from suit, court jurisdiction, attachment prior to judgment, attachment in aid of execution of a judgment or execution of a judgment, and to the extent that in any such jurisdiction there may be attributed such an immunity (whether or not claimed), such Guarantor hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity with respect to its obligations under this Agreement and the other Loan Documents to which it is a party.

Section 10.26. *DIP Order Controls.* To the fullest extent possible, the terms and provisions of this Agreement and the other Loan Documents shall be read together with the terms and provisions of the DIP Order so that the terms and provisions of this Agreement and the Loan Documents do not conflict with the terms and provisions of the DIP Order; provided that, notwithstanding the foregoing or anything herein to the contrary in this Agreement or the Loan Documents, in the event of any conflict or inconsistency between the terms and provisions of this Agreement or any other Loan Document (on the one hand) and the DIP Order (on the other hand), the terms and provisions of the applicable DIP Order shall govern and control to

the extent of such conflict or inconsistency; it being expressly understood and agreed that the inclusion in any Loan Document of terms and provisions or supplemental rights or remedies in favor of the Administrative Agent, Collateral Agent or Lenders not addressed in the DIP Order shall not be deemed to be in conflict with the DIP Order and all such additional terms, provisions, supplemental rights or remedies contained herein shall be given full force and effect.

# ARTICLE 11
### GUARANTEE

Section 11.01. *The Guarantee.*  Each Guarantor hereby jointly and severally with the other Guarantors guarantees, as a primary obligor and not as a surety to each Secured Party and their respective permitted successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of (i) Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code and (ii) any other Debtor Relief Laws, whether or not such items are allowed or allowable as a claim in any applicable proceeding) on the Loans made by the Lenders to, and the Term Notes (if any) issued hereunder and held by each Lender of, the Borrower, and all other Obligations  from time to time owing to the Secured Parties by any other Loan Party under any Loan Document strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**").  The Guarantors hereby jointly and severally agree that if the Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Section 11.02. *Obligations Unconditional.*  The obligations of the Guarantors under Section 11.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrower or any other Guarantor under this Agreement, any Term Notes issued under this Agreement, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment).  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a)     at any time or from time to time, without notice to the Guarantors, to the extent permitted by Law, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b)     any of the acts mentioned in any of the provisions of this Agreement or the Term Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c)     the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d)      any Lien or security interest granted to, or in favor of, any Secured Party or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e)      the release of any other Guarantor pursuant to <u>Section 11.10</u>.

Section 11.03.  *Certain Waivers. Etc.*  The Guarantors hereby expressly waive (to the extent permitted by applicable Law) diligence, presentment, demand of payment, protest and, to the extent permitted by Law, all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against the Borrower under this Agreement or the Term Notes issued hereunder, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations.  The Guarantors waive, to the extent permitted by Law, any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Borrower and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee.  This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other Person at any time of any right or remedy against the Borrower or against any other Person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto.  This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and permitted assigns thereof, and shall inure to the benefit of the Secured Parties, and their respective successors and permitted assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.  Each Guarantor waives (to the extent permitted by Law) any rights and defenses that are or may become available to it by reason of §§ 2787 to 2855, inclusive, and §§ 2899 and 3433 of the California Civil Code.  As provided in <u>Section 10.07</u>, the provisions of this <u>Article 11</u> shall be governed by, and construed in accordance with, the laws of the State of New York.  The foregoing waivers and the provisions hereinafter set forth in this <u>Article 11</u> which pertain to California law are included solely out of an abundance of caution, and shall not be construed to mean that any of the above-referenced provisions of California law are in any way applicable to this <u>Article 11</u>, to any other provision of this Agreement or to the Obligations.

Section 11.04.  *Reinstatement.*  The obligations of the Guarantors under this <u>Article 11</u> shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

Section 11.05.  *Subrogation; Subordination.*   Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations (other than contingent obligations) and the expiration and termination of the Commitments of the Lenders under this Agreement, it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in <u>Section 11.01</u>, whether by subrogation, contribution or otherwise, against the Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.  Any Indebtedness of any Loan Party to any Person that is not a Loan Party permitted pursuant to <u>Section 7.03(b)</u> or <u>7.03(d)</u> shall be subordinated to such Loan Party's Obligations in a manner reasonably acceptable to the Required Lenders.

Section 11.06.  *Remedies.*    The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of the Borrower under this Agreement and the Term Notes issued hereunder, if any, may be declared to be forthwith due and payable as provided in Section 8.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.02) for purposes of Section 11.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 11.01.

Section 11.07.  *Instrument for the Payment of Money.*    Each Guarantor hereby acknowledges that the guarantee in this Article 11 constitutes an instrument for the payment of money, and consents and agrees that any Secured Party or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

Section 11.08.  *Continuing Guarantee.*    The guarantee in this Article 11 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

Section 11.09.  *General Limitation on Guarantee Obligations.*    In any action or proceeding involving any state corporate, limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other Law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 11.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 11.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other Person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 11.11) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 11.10.  *Release of Guarantors.*    If, in compliance with the terms and provisions of the Loan Documents, (all or substantially all of the Equity Interests or property of any Guarantor are sold or otherwise transferred to a Person or Persons none of which is a Loan Party (any such Guarantor, a "**Transferred Guarantor**"), such Transferred Guarantor shall, upon the consummation of such sale or transfer or other transaction, be automatically released from its obligations under this Agreement (including under Section 10.05 hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to any Collateral Document and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor, the pledge of such Equity Interests to the Collateral Agent pursuant to the Collateral Documents shall be automatically released, and, the Collateral Agent shall take such actions as are necessary to effect each release described in this Section 11.10 in accordance with the relevant provisions of the Collateral Documents; *provided*, that no Guarantor shall be released as provided in this paragraph if such Guarantor continues to be a guarantor in respect of any Prepetition Indebtedness.

When all Commitments hereunder have terminated, and all Loans or other Obligations hereunder which are accrued and payable have been paid or satisfied, this Agreement and the Guarantees made herein shall automatically terminate with respect to all Obligations, except with respect to Obligations that expressly survive such repayment pursuant to the terms of this Agreement.

Section 11.11.  *Right of Contribution.*    Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder

which has not paid its proportionate share of such payment.  Each Guarantor's right of contribution shall be subject to the terms and conditions of <u>Section 11.05</u>.  The provisions of this <u>Section 11.11</u> shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Secured Parties, and each Guarantor shall remain liable to the Administrative Agent and the Secured Parties for the full amount guaranteed by such Guarantor hereunder.

Section 11.12.  *Additional Guarantor Waivers and Agreements*.

(a)    Each Guarantor understands and acknowledges that if the Collateral Agent or any other Secured Party forecloses judicially or nonjudicially against any real property security for the Obligations, that foreclosure could impair or destroy any ability that such Guarantor may have to seek reimbursement, contribution, or indemnification from the Borrower or others based on any right such Guarantor may have of subrogation, reimbursement, contribution, or indemnification for any amounts paid by such Guarantor under the Guaranty.  Each Guarantor further understands and acknowledges that in the absence of this paragraph, such potential impairment or destruction of such Guarantor's rights, if any, may entitle such Guarantor to assert a defense to this Guaranty based on Section 580d of the California Code of Civil Procedure as interpreted in <u>Union Bank v. Gradsky</u>, 265 Cal. App. 2d 40 (1968).  By executing this Guaranty, each Guarantor freely, irrevocably, and unconditionally:  (i) waives (to the extent permitted by Law) and relinquishes that defense and agrees that such Guarantor will be fully liable under this Guaranty even though the Collateral Agent or any other Secured Party may foreclose, either by judicial foreclosure or by exercise of power of sale, any deed of trust securing the Obligations; (ii) agrees that such Guarantor will not assert that defense in any action or proceeding which the Administrative Agent, the Collateral Agent or any other Secured Party may commence to enforce this Guaranty; (iii) acknowledges and agrees that the rights and defenses waived by such Guarantor in this Guaranty include any right or defense that such Guarantor may have or be entitled to assert based upon or arising out of any one or more of §§ 580a, 580b, 580d, or 726 of the California Code of Civil Procedure or § 2848 of the California Civil Code; and (iv) acknowledges and agrees that the Secured Parties are relying on this waiver in creating the Obligations, and that this waiver is a material part of the consideration which the Secured Parties are receiving for creating the Obligations.

(b)    Each Guarantor waives (to the extent permitted by Law) all rights and defenses that such Guarantor may have because any of the Obligations is secured by real property.  This means, among other things:  (i) the Administrative Agent, the Collateral Agent and the other Secured Parties may collect from such Guarantor without first foreclosing on any real or personal property Collateral pledged by the other Loan Parties; and (ii) if the Collateral Agent or any other Secured Party forecloses on any real property Collateral pledged by the other Loan Parties: (A) the amount of the Obligations may be reduced only by the price for which that Collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price, and (B) the Administrative Agent, the Collateral Agent and the other Secured Parties may collect from such Guarantor even if the Secured Parties, by foreclosing on the real property Collateral, have destroyed any right such Guarantor may have to collect from the Borrower.  This is an unconditional and irrevocable waiver of any rights and defenses such Guarantor may have because any of the Obligations is secured by real property.  These rights and defenses include, but are not limited to, any rights or defenses based upon § 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(c)    Each Guarantor waives (to the extent permitted by Law) any right or defense it may have at law or equity, including California Code of Civil Procedure § 580a, to a fair market value hearing or action to determine a deficiency judgment after a foreclosure.

# ARTICLE 12
*RESERVED*

# ARTICLE 13
SECURITY AND ADMINISTRATIVE PRIORITY

Section 13.01.  *Prepetition B-2 Obligations.*  Each of the Loan Parties hereby acknowledges, confirms and agrees that each of them are each indebted to the Prepetition B-2 Agent and the Prepetition B-2 Lenders for the Prepetition B-2 Obligations, as of the Petition Date, in an aggregate principal amount of not less than $485,372,693.29 plus accrued and unpaid interest of at least $6,504,005.15, in respect of Prepetition B-2 Obligations under the Prepetition B-2 Term Loan Agreement plus fees, costs, expenses, charges and disbursements incurred in connection therewith (including attorneys' fees), indemnities, reimbursement obligations and other charges now or hereafter owed by the Borrower and its Subsidiaries (including the Loan Parties) to the Prepetition B-2 Agent and the Prepetition B-2 Lenders pursuant to the terms of the Prepetition B-2 Term Loan Agreement, all of which are unconditionally owing by the Borrower and its Subsidiaries (including the Loan Parties) to the Prepetition B-2 Agent and the Prepetition B-2 Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

Section 13.02.  *Acknowledgement of Security Interests.*  As of Petition Date, each of the Loan Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that (i) the Prepetition B-2 Agent and the Prepetition B-2 Lenders have valid, enforceable and perfected first priority and senior liens (subject only to "Permitted Liens" (as defined in the Prepetition B-2 Loan Documents) upon and security interests in all of the Collateral (as defined in the Prepetition B-2 Loan Documents) granted pursuant to the Prepetition B-2 Loan Documents and the other "Collateral Documents" (as defined in the Prepetition B-2 Loan Documents) as in effect on the Petition Date to secure all of the Prepetition B-2 Obligations and (ii) such Liens are not subject to avoidance, set off, counterclaim, recharacterization, reduction, disallowance, impairment or subordination (whether contractual, equitable or otherwise) or other challenge pursuant to Debtor Relief Law or applicable non-bankruptcy law.

Section 13.03.  *Binding Effect of Documents.*

Each of the Loan Parties hereby acknowledges, confirms and agrees (and hereby agrees that it will not dispute, challenge or otherwise contest) that (i) each of the Prepetition B-2 Loan Documents and the other "Collateral Documents" (as defined in the Prepetition B-2 Loan Documents) to which it is a party is in full force and effect as of the date hereof, (ii) the agreements and obligations of the Borrower and each of its Subsidiaries contained in the Prepetition B-2 Loan Documents and the other "Collateral Documents" (as defined in the Prepetition B-2 Loan Documents) constitute the legal, valid and binding obligations of each of the Borrower and its Subsidiaries enforceable against each of them in accordance with their respective terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity, and neither the Borrower nor any of its Subsidiaries has any valid defense, offset or counterclaim to the enforcement of such obligations and (iii) the Prepetition B-2 Agent and the Prepetition B-2 Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in the Prepetition B-2 Loan Documents and the other "Collateral Documents" (as defined in the Prepetition B-2 Loan Documents), except to the extent clauses (ii) and (iii) above are subject to the automatic stay under the Bankruptcy Code upon commencement of the Chapter 11 Cases.

Section 13.04.  *Collateral; Grant of Lien and Security Interest.*

(i)        Pursuant to the DIP Order and in accordance with the terms thereof, and, in the case of the Canadian Collateral, the Canadian Orders, as security for the full and timely payment and performance of all of the Obligations, each of the Loan Parties hereby collaterally assigns, pledges and grants to the Collateral Agent, for the benefit of itself, the Administrative Agent, the Lenders, the Indemnitees and any other holders of the Obligations (collectively, the "**Secured Parties**"), a security interest in, and Lien on, the Collateral, which is hereby acknowledged to include all of the property, assets or interests in property or assets of such Person, of any kind or nature whatsoever, real or personal, tangible and intangible now existing or hereafter acquired or created, including all property of the "estate" (within the meaning of the Bankruptcy Code) of the Loan Parties, and all accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas.  Reg. Section 1.956-2(c)(2)) and all of the issued and outstanding Equity Interests not entitled to vote (within the meaning of Treas.  Reg. Section 1.956-2(c)(2)) of each Subsidiary of the Borrower, all of the Equity Interests of all other Persons that are not Subsidiaries directly owned by the Borrower, money, investment property, deposit accounts, all commercial tort claims and other causes of action other than Avoidance Actions, the proceeds of all Avoidance Actions (excluding for the avoidance of doubt, any claims and the causes of actions themselves), all Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions and profits of any of Collateral described above, in each case, other than Excluded Property, but including the proceeds thereof.

(ii)        The security interests and Liens in favor of the Collateral Agent in the Collateral shall be effective immediately upon the entry of the Interim Order and subject and subordinate only to (i) the Carve-Out, (ii) solely with respect to the Canadian Collateral, the Canadian Priority Charges (in a maximum amount not to exceed CDN$1,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Order and the Canadian Orders, and (iii) with respect to any Prepetition ABL Priority Collateral, Prepetition UST Tranche B Priority Collateral or Prepetition UST Tranche B Joint Collateral, the terms (including subordination terms) and conditions set forth in the Interim Order and the Prepetition ABL Intercreditor Agreement.  Such Liens and security interests and their priority shall remain in effect until the Commitments shall have been terminated and all Obligations (other than contingent obligations not claimed) shall have been paid in full.

(iii)        Notwithstanding anything herein to the contrary (A) all proceeds received by the Administrative Agent and the Lenders from the Collateral (other Prepetition ABL Priority Collateral, Prepetition UST Tranche B Priority Collateral or Prepetition UST Tranche B Joint Collateral) subject to the Liens granted in this Section 13.04 and in each other Loan Document shall be, upon the occurrence and during the continuation of an Event of Default or a default under the DIP Order and, in the case of the Canadian Collateral, the Canadian Orders, subject and subordinate to the prior payment of the Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN$1,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders, (B) all proceeds received by the Administrative Agent and the Lenders from Prepetition ABL Priority Collateral, Prepetition UST Tranche B Priority Collateral or Prepetition UST Tranche B Joint Collateral) subject to the Liens granted in this Section 13.04 and in each other Loan Document shall be, upon the occurrence and during the continuation of an Event of Default or a default under the DIP Order, subject to the terms (including subordination terms) and conditions set forth in the Interim Order and no Person entitled to the Carve-Out shall be entitled to sell or otherwise dispose of any Collateral, and without limiting such Person's right to receive proceeds of a sale up to the amount of the Carve-Out, owed to such Person, such Person shall not seek or object to the sale or other disposition of any Collateral.

(iv)        Subject only to prior payment of Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN$1,700,000) pursuant to the Canadian Orders to the extent set forth

in the Canadian DIP Recognition Order and the Canadian Orders, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or Canadian Recognition Proceedings or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of any Lender or the Administrative Agent against any Loan Party in respect of any Obligation.

Section 13.05. *Administrative Priority.*    Each Loan Party agrees that its Obligations shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to prior payment of the Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN$1,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders and the terms and conditions of the DIP Order and the Canadian Orders.

Section 13.06. *Grants, Rights and Remedies.*  The Liens and security interests granted pursuant to clause (i) of Section 13.04 and the administrative priority granted pursuant to Section 13.05 may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into.  This Agreement, the DIP Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder and thereunder are cumulative.

Section 13.07. *No Filings Required.*  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Interim Order or the Final Order, as the case may be and, in the case of the Canadian Collateral, the Canadian Orders.  The Collateral Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, take possession or control of any Collateral, or take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, the DIP Order, the Canadian Orders, or any other Loan Document.

Section 13.08. *Survival.*  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Administrative Agent and the Lenders pursuant to this Agreement, the DIP Order, the Canadian Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Loan Parties (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Chapter 11 Cases or the Canadian Recognition Proceedings, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    except to the extent of the Carve-Out and the Canadian Priority Charges (in a maximum amount not to exceed CDN$1 ,700,000) pursuant to the Canadian Orders to the extent set forth in the Canadian DIP Recognition Order and the Canadian Orders, no fees, charges, disbursements, costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or the Canadian Recognition Proceedings or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Administrative Agent and the Lenders against the Loan Parties in respect of any Obligation;

(ii)    the Liens in favor of the Collateral Agent and the Lenders set forth in Section 13.04 shall constitute valid and perfected first priority Liens and security interests, and shall be prior to all other Liens

and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(iii)     Subject to the DIP Order, the Liens in favor of the Collateral Agent and the Lenders set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Administrative Agent file financing statements or mortgages, take possession or control of any Collateral, or otherwise perfect its Lien under applicable non-bankruptcy law.

[Signature Pages Follow]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

YELLOW CORPORATION, as Borrower

By:  _____
Name:
Title:

[_____], as Guarantor

By:  _____
Name:
Title:

ALTER DOMUS PRODUCTS CORP.,
as Administrative Agent and Collateral Agent


By: _____
Name:
Title:

[_____],
as a Lender


By:    _____
Name:
Title:

**APPENDIX A**
**TO SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION**
**CREDIT AGREEMENT**

**Initial Commitments**

| Lender | Initial Commitment |
|---|---|
| [_____] | $[____] |
| **Total** | $60,000,000 |

**APPENDIX B**
**TO SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION**
**CREDIT AGREEMENT**

**Final Commitments**

| Lender | Final Commitment |
|---|---|
| [_____] | $[____] |
| **Total** | $82,500,000 |

**APPENDIX C**
**TO SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION**
**CREDIT AGREEMENT**

**Rolled Term Loan Allocation**

| Lender | Rolled Term Loan Allocation |
|---|---|
| [_____] | $[____] |
| **Total** | $501,584,152.30 |

**APPENDIX D**
**TO SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION**
**CREDIT AGREEMENT**

### Chapter 11 Milestones

1) By no later than August 6, 2023, the Borrower and each Guarantor shall have commenced the Chapter 11 Cases (the date of such commencement, the "**Petition Date**").

2) By no later than the Petition Date, the Debtors shall have filed the motion seeking entry of the DIP Order and the UST Adequate Protection Order, in each case, in form and substance satisfactory to the Required Lenders and the Agents.

3) By no later than three (3) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to the Required Lenders and the Agents.

4) By no later than ten (10) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order, in form and substance satisfactory to the Required Lenders and the Agents.

5) By no later than ten (10) calendar days after the Petition Date, Borrower, in its  capacity as foreign representative on behalf of the Debtors that are Canadian Subsidiaries, shall have filed an application with the Canadian Court to commence the Canadian Recognition Proceedings and the Canadian Court shall have issued the Canadian Initial Recognition Order, the Canadian Supplemental Order and the Canadian Interim DIP Recognition Order.

6) By no later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, in form and substance satisfactory to the Required Lenders and the Agents.

7) By no later than forty (40) calendar days after the Petition Date, the Borrower, in its capacity as foreign representative on behalf of the Debtors, shall have filed a motion with the Canadian Court for the recognition of, and the Canadian Court shall have issued, the Canadian Final DIP Recognition Order.

8) By no later than fifty-five (55) calendar days after the Petition Date, the Debtors shall have received unique, non-duplicative binding cash bids for DIP Priority Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, Net Proceeds at least equal to $250,000,000.

9) By no later than seventy (70) calendar days after the Petition Date, the Debtors shall have received unique, non-duplicative binding cash bids pursuant to the Bidding Procedures Order which are not subject to any financing contingencies (but, for the avoidance of doubt, may be subject to receipt of environmental reports and/or title contingencies reasonably acceptable to buyer(s)) for the DIP Priority Collateral) for DIP Priority Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, Net Proceeds at least equal to $450,000,000.

10) By no later than ninety (90) calendar days after the Petition Date, the Debtors shall have consummated Dispositions in accordance with the Bidding Procedures Order that either (i) generated Net Proceeds of DIP Priority Collateral equal to at least 100% of the sum of the aggregate amount of Obligations outstanding as of such date or (ii) is consummated through a credit bid of the outstanding Obligations (and any other applicable obligations) in connection with sales of DIP Priority Collateral.

**Exhibit 2**

**Receipts Covenant**

1.  Commencing with the first Receipts Variance Test Date, and on each Receipts Variance Test Date occurring thereafter, Yellow Corp shall not, nor shall it permit any of its subsidiaries to, permit the sum of the actual aggregate cash receipts of Yellow Corp and its subsidiaries (excluding proceeds of the Term Loans (as defined in the DIP Credit Agreement)) for the Receipts Variance Test Period ending immediately prior to such Receipts Variance Test Date to be less than the Permitted Variance Percentage of the aggregate amount set forth for the line item in the Approved Budget entitled "Total Receipts" for such Receipts Variance Test Period (the "Receipts Variance Covenant").

    To the extent that any Receipts Variance Test Period encompasses a period that is covered in more than one Approved Budget, the applicable weeks from each applicable Approved Budget shall be utilized in making the calculations pursuant to the Receipts Variance Covenant.

2.  Not later than 5:00 p.m. New York time on each Receipts Variance Test Date, Yellow Corp shall deliver to the Prepetition ABL Agent (i) a Receipts Variance Report for the most recently ended Receipts Variance Test Period, and (ii) an updated budget prepared by management of Yellow Corp (in consultation with Yellow Corp's Operational Advisor) covering the 13-week period that commences with the calendar week that includes such Wednesday (or Friday, as applicable).

    For purposes of the foregoing provisions:

    "Closing Date" shall have the meaning set forth in the DIP Credit Agreement.

    "Operational Advisor" shall have the meaning set forth in the DIP Credit Agreement.

    "Permitted Variance Percentage" shall mean (a) with respect to the Receipts Variance Test Period ending on August 11, 2023, 80%, (b) with respect to the Receipts Variance Test Period ending on August 18, 2023, 85%, and (c) with respect to each Receipts Variance Test Period ending thereafter, 90%.

    "Receipts Variance Report" shall mean a weekly variance report prepared by management of Yellow Corp (in consultation with Yellow Corp's Operational Advisor), in form and detail reasonably satisfactory to the Prepetition ABL Agent, comparing for each applicable Receipts Variance Test Period the actual receipts and disbursements against anticipated receipts and disbursements under the applicable Approved Budget, on a line by line and aggregate basis and in the same level of detail set forth in the Approved Budget, together with a written explanation for all material variances in any given Receipts Variance Test Period and such other related information as the Required Lenders may reasonably request.

    "Receipts Variance Test Date" shall mean each of (a) Friday, August 18, 2023, (b) Friday, August 25, 2023, (c) Wednesday, August 30, 2023 and (d) each Wednesday thereafter.

    "Receipts Variance Test Period" shall mean, as of any date of determination, (a) with respect to the first Receipts Variance Report delivered after the Closing Date pursuant to paragraph 2 above and the first Receipts Variance Test Date occurring on Friday, August 18, 2023, the one-calendar week period ending on August 11, 2023, (b) with respect to the second Receipts Variance Report delivered after the Closing Date pursuant to paragraph 2 above and the Receipts Variance Test Date occurring on Friday, August 25, 2023, the two-week period ending on August 18, 2023, (c) with respect to the third Receipts Variance Report delivered after the Closing Date pursuant to paragraph 2 above and the Receipts Variance Test Date occurring on Wednesday, August 30, 2023, the three-week period ending on August 25, 2023 and (d) with respect to each Receipts Variance Report

delivered pursuant to paragraph 2 above thereafter and each the Receipts Variance Test Date occurring thereafter, the four-week period ending on the Friday of the week immediately preceding the applicable Receipts Variance Test Date.

## <u>Schedule 1</u>

**Initial DIP Budget**

# Yellow Corp and Subsidiaries
**DIP Cash Flow Forecast**
*For Weeks Ending 8/4/23 through 10/27/23*
($ 000s)

| Filing Status: | Pre | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | Post | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 8/4/2023 | 8/11/2023 | 8/18/2023 | 8/25/2023 | 9/1/2023 | 9/8/2023 | 9/15/2023 | 9/22/2023 | 9/29/2023 | 10/6/2023 | 10/13/2023 | 10/20/2023 | 10/27/2023 | Weeks 1-13 |
| Week No. | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | |
| Ad./Fct. | Fct. | Fct. | Fct. | Fct. | Fct. | Fct. | Fct. | Fct. | Fct. | Fct. | Fct. | Fct. | Fct. | Fct. |
| **Total Receipts** | 57,366 | 47,407 | 48,888 | 44,767 | 38,803 | 30,237 | 21,794 | 19,788 | 17,230 | 10,050 | 6,645 | 4,990 | 4,218 | 352,184 |
| *Operating Disbursements* | | | | | | | | | | | | | | |
| Payroll & Related | 34,884 | 7,615 | 1,422 | 1,401 | 6,158 | 1,047 | 5,171 | 1,051 | 6,438 | 632 | 3,443 | 538 | 639 | 70,438 |
| Other Opex | 10,553 | 7,580 | 4,914 | 4,684 | 12,492 | 4,731 | 1,894 | 2,861 | 6,128 | 7,452 | 1,034 | 1,135 | 1,063 | 66,622 |
| **Total Operating Disbursements** | 45,437 | 15,196 | 6,336 | 6,085 | 18,650 | 5,778 | 7,065 | 3,911 | 12,566 | 8,084 | 4,477 | 1,673 | 1,702 | 136,960 |
| Severance | - | - | - | - | 2,481 | - | - | - | - | 4,568 | - | - | - | 7,049 |
| Professional Fees Reserve[1] | 2,905 | 6,694 | 2,995 | 3,353 | 3,353 | 2,889 | 3,089 | 2,889 | 4,139 | 2,015 | 2,015 | 2,215 | 2,015 | 40,566 |
| Accrued Prepetition Wages[2] | - | 8,450 | 500 | - | - | - | - | - | - | - | - | - | - | 8,950 |
| Adequate Assurance Utility Deposit | - | 1,600 | - | - | - | - | - | - | - | - | - | - | - | 1,600 |
| Prepetition Vendors & Taxes | - | 4,273 | 4,273 | 4,273 | 4,273 | - | 1 | - | - | - | - | 1 | 136 | 17,229 |
| **Total Restructuring** | 2,905 | 21,017 | 7,768 | 7,625 | 10,106 | 2,889 | 3,090 | 2,889 | 4,139 | 6,584 | 2,015 | 2,216 | 2,151 | 75,394 |
| *Interest* | | | | | | | | | | | | | | |
| ABL Interest | - | 1,132 | - | - | 847 | - | - | - | 949 | - | - | - | - | 2,927 |
| DIP TL New Money Interest | - | - | - | - | 709 | - | - | - | 1,272 | - | - | - | - | 1,981 |
| DIP TL Roll-Up Interest | - | - | - | - | 8,218 | - | - | - | 6,574 | - | - | - | - | 14,792 |
| UST Interest | - | 9,160 | - | - | 4,580 | - | - | - | 6,106 | - | - | - | - | 19,846 |
| **Total Interest** | - | 10,291 | - | - | 14,353 | - | - | - | 14,901 | - | - | - | - | 39,545 |
| **Total Disbursements** | 48,342 | 46,504 | 14,104 | 13,710 | 43,109 | 8,667 | 10,155 | 6,800 | 31,606 | 14,668 | 6,492 | 3,889 | 3,853 | 251,899 |
| **Total Net Cash Flow** | 9,024 | 903 | 34,783 | 31,057 | (4,306) | 21,570 | 11,640 | 12,988 | (14,376) | (4,618) | 153 | 1,100 | 366 | 100,285 |
| (+/-) ABL Paydown (80% of receipts) | - | (37,926) | (39,110) | (35,814) | (31,043) | (24,190) | (17,436) | (15,831) | (13,784) | (8,040) | (5,316) | (3,992) | (3,375) | (235,854) |
| **Total Net Cash Flow Including ABL Paydown** | 9,024 | (37,023) | (4,327) | (4,756) | (35,349) | (2,620) | (6,796) | (2,843) | (28,160) | (12,658) | (5,163) | (2,891) | (3,009) | (135,569) |
| **Unrestricted US and Canada Cash Rollforward[3]** | | | | | | | | | | | | | | |
| Beginning Cash Balance | 42,760 | 38,855 | 45,332 | 41,006 | 73,749 | 38,401 | 35,781 | 29,985 | 27,142 | 18,982 | 6,324 | 26,161 | 23,270 | 42,760 |
| (-) ABL Paydown (80% of receipts) | - | (37,926) | (39,110) | (35,814) | (31,043) | (24,190) | (17,436) | (15,831) | (13,784) | (8,040) | (5,316) | (3,992) | (3,375) | (235,854) |
| (-) ABL Paydown (One-Time) | (12,949) | (16,500) | - | - | - | - | - | - | - | - | - | - | - | (29,449) |
| (+/-) Net Cash Flow | 9,024 | 903 | 34,783 | 31,057 | (4,306) | 21,570 | 11,640 | 12,988 | (14,376) | (4,618) | 153 | 1,100 | 366 | 100,285 |
| (+) DIP TL Proceeds | - | 60,000 | - | 37,500 | - | - | - | - | 20,000 | - | 25,000 | - | - | 142,500 |
| Ending Cash Balance | 38,855 | 45,332 | 41,006 | 73,749 | 38,401 | 35,781 | 29,985 | 27,142 | 18,982 | 6,324 | 26,161 | 23,270 | 20,261 | 20,261 |
| Net ABL Exposure[4] | 275,883 | 221,457 | 181,739 | 145,926 | 114,883 | 90,693 | 73,258 | 57,427 | 43,643 | 35,603 | 30,187 | 26,196 | 22,821 | 22,821 |
| Restricted Cash | 91,449 | 145,875 | 184,985 | 220,799 | 220,985 | 244,775 | 262,211 | 278,042 | 286,825 | 294,865 | 300,181 | 304,173 | 307,548 | 307,548 |

*Notes:*
*(1) Assumes all professional fees are funded into a reserve as incurred*
*(2) Prepetition salaries for ongoing employees and other benefits are included in operating disbursements*
*(3) Includes approximately CAD $1.9 million (translated at $0.749) and USD $0.4 million held by the Canadian debtors*
*(4) Ending ABL Exposure equal to 102% of outstanding letters of credit net of restricted cash*