IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| _____ ) | |
| In re: | ) Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*, | ) Case No. 23-11069 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) Re: Docket Nos. 13, 277 |
| | ) |
| | ) Obj. Deadline: 8/31/23, 4:00 p.m. |
| | ) Hearing Date: 9/18/23, 2:00 p.m. |
| _____ ) | |

**OBJECTION OF CERTAIN UTILITY COMPANIES TO THE MOTION
OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(A)(I) APPROVING THE DEBTORS' PROPOSED ADEQUATE ASSURANCE OF
PAYMENT FOR FUTURE UTILITY SERVICES, (II) PROHIBITING UTILITY
PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING SERVICES,
(III) APPROVING THE DEBTORS' PROPOSED PROCEDURES FOR RESOLVING
ADEQUATE ASSURANCE REQUESTS, AND (B) GRANTING RELATED RELIEF**

American Electric Power ("AEP"), Constellation NewEnergy,

Inc. ("CNE"), Constellation NewEnergy – Gas Division, LLC

("CNEG"), Georgia Power Company ("Georgia Power"), Salt River

Project ("SRP"), Southern California Edison Company ("SCE"), The

Cleveland Electric Illuminating Company ("CEI"), Toledo Edison

Company ("TE"), Ohio Edison Company ("Ohio Edison"), Monongahela

Power Company ("Mon Power"), Potomac Edison Company ("PE"),

Pennsylvania Electric Company ("Penelec"), Metropolitan Edison

Company ("Met-Ed"), The Connecticut Light & Power Company

("CL&P"), Yankee Gas Service Company ("Yankee Gas"), Public

Service Company of New Hampshire ("PSNH"), Eversource Gas of

Massachusetts ("Eversource Gas"), NStar Electric Company, Western

Massachusetts ("NStar West"), Tucson Electric Power Company

("TEP"), UNS Electric, Inc. ("UNS Electric"), UNS Gas, Inc. ("UNS

Gas"), CenterPoint Energy Resources Corp. ("CERC"), Consolidated

Edison Company of New York, Inc. ("Con Ed"), Rochester Gas &

Electric Corporation ("RG&E"), New York State Electric and Gas

Corporation ("NYSEG"), Virginia Electric and Power Company d/b/a

Dominion Energy Virginia ("DEV"), Dominion Energy South Carolina,

Inc. ("DESC"), Public Service Company of North Carolina

Incorporated, d/b/a Dominion Energy North Carolina ("DENC"),

Florida Power & Light Company ("FPL"), Colonial Gas Cape Cod

("Colonial Gas"), KeySpan Energy Delivery Long Island ("Kedli"),

KeySpan Energy Delivery New York ("Kedny"), Massachusetts

Electric Company ("MEC"), Narragansett Electric Company ("NEC"),

Niagara Mohawk Power Corporation ("NIMO"), San Diego Gas and

Electric Company ("SDG&E"), Southern California Gas Company

("SoCalGas") and DTE Energy Company ("DTE") (collectively, the

"Utilities"), by counsel, hereby object to the *Motion of Debtors*

*For Entry of Interim and Final Orders (A)(I) Approving the*

*Debtors' Proposed Adequate Assurance of Payment For Future*

*Utility Services, (II) Prohibiting Utility Providers From*

*Altering, Refusing, or Discontinuing Services, (III) Approving*

*the Debtors' Proposed Procedures For Resolving Adequate Assurance*

2

*Requests, and (B) Granting Related Relief* (the "Utility Motion")

(Docket No. 13), and respectfully set forth the following:

### Introduction

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. This Court should not permit the Debtors to shift their statutory burden.

The Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account containing $1,515,409 that supposedly reflects approximately two weeks of the Debtors' estimated monthly utility charges (the "Bank Account"). Although not requested in the Utility Motion, the Utility Services List attached as Exhibit "C" to the Utility Motion reflects that the Debtors are not offering any adequate assurance of payment to SCE, Con Ed or SDG&E because those Utilities supposedly held prepetition security. The Debtors' apparent proposal that the monies contained in the Bank Account should be net of any prepetition security does not make sense because the Debtors do not know if any of the prepetition security will remain after the Utilities recoup prepetition deposits against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.

4

The Court should reject the Debtors' proposed Bank Account because:  (1) The Utilities bill the Debtors on a monthly basis and provide the Debtors with generous payment terms pursuant to applicable state-law tariffs, rules, regulations or contracts, and a two-week account is not sufficient in amount or in form to provide the Utilities with adequate assurance of payment even if that account contained two-weeks of charges on behalf of the Utilities; (2) Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated bank account; and (3) even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment for the Utilities, the Court should reject it as an insufficient form of adequate assurance of payment for the reasons set forth in Section A.1. of this Objection.

The Utilities are seeking the following cash deposits from the Debtors, which are amounts that they are authorized to obtain pursuant to applicable state law or contracts:  (a) AEP – $69,665 (2-month); (b) CNE – $67,336 (2-month); (c) CNEG – $36,456 (2-month); (d) Georgia Power – $28,635 (2-month); (e) SRP – $11,500 (2-month); (f) SCE – $203,537 (2-month); (g) CEI – $6,200 (2-month); (h) TE – $8,240 (2-month); (i) Ohio Edison – $18,536 (2-

5

month); (j) Mon Power – $810 (2-month); (k) PE – $5,776 (2-month); (l) Penelec – $1,128 (2-month); (m) Met-Ed – $1,740 (2-month); (n) CL&P – $2,535 (1.5-month); (o) Yankee Gas – $4,375 (1.5-month); (p) PSNH – $2,945 (2-month); (q) Eversource Gas – $1,630 (2-month); (r) NStar West – $2,750 (2-month); (s) TEP – $4,183 (2.5-month); (t) UNS Electric – $1,955 (2.5-month); (u) UNS Gas – $1,675 (2.5-month); (v) CERC – $116,927 (2-month); (w) Con Ed – $11,340 (2-month); (x) RG&E – $5,170 (2-month); (y) NYSEG – $11,780 (2-month); (z) DEV – $4,722 (2-month); (aa) DESC – $7,850 (2-month); (bb) DENC – $530 (2-month); (cc) FPL – $13,955 (2-month); (dd) Colonial Gas – $4,010 (2-month); (ee) Kedli – $1,790 (2-month); (ff) Kedny – $2,280 (2-month); (gg) MEC – $3,504 (2-month); (hh) NEC – $12,332 (2-month); (ii) NIMO – $14,194 (2-month); (jj) SDG&E – $9,674 (2-month); (kk) SoCalGas – $6,200 (2-month); and (ll) DTE – $54,722 (2-month).  Based on the foregoing, this Court should deny the Utility Motion as to the Utilities because the amounts of the Utilities' post-petition deposit requests are reasonable under the circumstances and should not be modified.

## **Facts**

### **Procedural Facts**

1.    On August 6, 2023 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of Title 11 of the United

States Code (the "Bankruptcy Code") that are now pending with this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

2.    The Debtors' chapter 11 bankruptcy cases are being jointly administered.

### The Utility Motion

3.    On August 7, 2023, the Debtors filed the Utility Motion.

4.    On August 17, 2023, the Court entered the *Interim Order (A)(I) Approving the Debtors' Proposed Adequate Assurance of Payment For Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures For Resolving Adequate Assurance Requests, and (B) Granting Related Relief* (the "Interim Utility Order")(Docket No. 277).  The Interim Utility Order set (i) an objection deadline of August 31, 2023 at 4:00 p.m., and (ii) the final hearing on the Utility Motion to take place on September 18, 2023 at 20:00 p.m.  Interim Utility Order at ¶ 2.

5.    Through the Utility Motion, the Debtors seek to avoid the applicable legal standards under Sections 366(c)(2) and (3) by seeking Court approval for their own form of adequate

7

assurance of payment, which is the Bank Account containing
$1,515,409 that supposedly reflects approximately two weeks of
the Debtors' estimated monthly utility charges.  Utility Motion
at ¶ 12.

6.    The Debtors refer to the proposed Bank Account as the
"Adequate Assurance Deposit."  Utility Motion at ¶ 12.  Monies
contained in an escrow account controlled by a customer of a
utility such as the proposed Bank Account are not recognized as
a "cash deposit" provided by a customer to a utility by any
public utility commission.  Additionally, Section 366(c) of the
Bankruptcy Code specifically defines the forms of adequate
assurance of payment in Section 366(c)(1), none of which include
a segregated utility bank account.  Simply put, the Debtors are
not proposing to provide the Utilities with cash deposits as
adequate assurance of payment pursuant to Section 366(c) of the
Bankruptcy Code.

7.    Although not requested in the Utility Motion, the
Utility Services List attached as Exhibit "C" to the Utility
Motion reflects that the Debtors are not offering any adequate
assurance of payment to SCE, Con Ed or SDG&E because those
Utilities supposedly held prepetition security.  The Debtors'
proposal that monies contained in the Bank Account would be net
of any prepetition security does not make sense because the

8

Debtors do not know if any of the prepetition security will remain after the Utilities recoup prepetition deposits against prepetition debt pursuant to Section 366(c)(4) of the Bankruptcy Code.

8.    The proposed Bank Account is not acceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).

9.    The Debtors claim that they generally were current paying their prepetition utility charges.  Utility Motion at ¶ 11.  However, Section 366(c)(3)(B)(ii) expressly provides that in making an adequate assurance of payment determination, a court may not consider a debtor's timely payment of prepetition utility charges.

10.    The Interim Utility Order provides that any payments made or authorized to be made pursuant to the Interim Utility Order shall be subject to the "Approved Budget" as defined in the order approving debtor-in-possession ("DIP") financing. Interim Utility Order at ¶ 11.  It is not clear if the Debtors and the secured lenders are trying to subordinate all of the

9

post-petition payments made to the Utilities to the secured
lenders' liens.  At a minimum, all post-petition payments made
by the Debtors to the Utilities, including any post-petition
security, should not be subordinated to the lenders' liens or
subject to subsequent disgorgement by the secured lenders.  If
the Debtors want the Utilities to provide post-petition utility
goods/services, then any and all post-petition payments made to
the Utilities should be free and clear of any and all liens.
Otherwise, all of the relief sought in the Utility Motion is
effectively nothing more than a subterfuge.

11.    The Utility Motion does not address why the Bank
Account would be underfunded with supposedly two-weeks of
utility charges when the Debtors know that the Utilities are
required by state-law tariffs, rules, regulations and/or
contracts to bill the Debtors monthly.  Moreover, presumably the
Debtors want the Utilities to continue to bill them monthly and
provide them with the same generous payment terms that they
received prepetition.  Accordingly, if the Bank Account is
relevant, which the Utilities dispute, the Debtors need to
explain: (A) why they are only proposing to deposit supposed
two-week amounts into the Bank Account for the Utilities; and
(B) how such insufficient amounts could even begin to constitute
adequate assurance of payment for the Utilities' monthly bills.

ME1 45846556v.1

12.    Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance request pursuant to Section 366(c)(2).  Rather, without providing any specifics, the Utility Motion merely states that the Bank Account, "in conjunction with the Debtors' demonstrated ability to pay for utility services in the ordinary course of business and the outstanding deposits and surety bonds cover some Utility Providers," constitutes sufficient adequate assurance of payment to the Debtors' utility providers.  Utility Motion at ¶ 13.  Moreover, the Debtors' contention that prepetition utility deposits held by some of the Debtors' utility providers may provide additional adequate assurance to such utility companies should be rejected because Section 366(c)(4) of the Bankruptcy Code expressly provides that utilities can recoup prepetition deposits against prepetition debt without notice or court order.

### The Debtors' Financing Motion

13.    On August 7, 2023, the Debtors filed the *Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors To Use UST Cash Collateral,*

11

*(V) Granting Adequate Protection, (VI) Scheduling a Final*
*Hearing, and (VII) Granting Related Relief* (the "Financing
Motion") (Docket No. 16).

14.   Through the Financing Motion, the Debtors seek
authority to enter into a $142.5 million new-money senior
secured super-priority DIP facility (approximately $644 million
factoring in the Roll-Up Amount).   Financing Motion at ¶ 5.

15.   Through the Financing Motion, the Debtors also seek a
carve-out for payments to the Debtors' professionals incurred
prior to delivery of a Carve-Out Trigger Notice, plus an
additional $2.5 million after delivery of a Carve-Out Trigger
Notice (the "Carve-Out").   Financing Motion at page 36.

16.   The Debtors have the following milestones:   (i) no
later than 30 days after the Petition Date – entry of final
Financing Order; (ii) no later than 55 days after the Petition
Date – the Debtors shall have received unique, non-duplicative
binding cash bids for the DIP Priority Collateral pursuant to
the Bidding Procedures Order that would generate, in the
aggregate, net proceeds at least equal to $250 million.
Financing Motion at pages 35-36.

17.   On August 18, 2023, the Court entered the *Interim UST*
*Cash Collateral and Adequate Protection Order (I) Authorizing*
*the Debtors To (A) Use UST Cash Collateral and all Other*

12

*Prepetition UST Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Interim Cash Collateral Order")(Docket No. 303).

18.   The Interim Cash Collateral Order authorized the Debtors to use "UST Cash Collateral" on an interim basis.  The term "UST Cash Collateral" is defined as "all of the Debtors' cash, wherever located and held, including cash **in deposit accounts.**" (emphasis added)) Interim Cash Collateral Order at page 6.  It is unclear if the monies contained in the Debtors' proposed Bank Account would be considered UST Cash Collateral of any of the Prepetition UST Secured Parties.

19.   On August 18, 2023, the Court entered the *Interim Order (I) Authorizing the Debtors To (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection To Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Interim Financing Order")(Docket No. 302).

20.   The Interim Financing Order approved the Carve-Out. Interim Financing Order at pages 27-28.

21.   Attached at "Annex 5" to the DIP Term Sheet that is attached as Exhibit "1" to the Interim Financing Order is a 13-week budget through the week ending October 27, 2023 (the "Budget").  Although the Budget includes monies to fund the Bank Account, the Budget does not include any line-item for the payment of post-petition utility charges.  As such, it is not apparent from the Budget whether sufficient funds have in fact been budgeted for the timely (and full) payment of the Debtors' post-petition utility charges.

14

### The Debtors' Critical Vendor Motion

22.  On August 7, 2023, the Debtors filed the *Motion of Debtors For Entry of Interim and Final Orders (I) Authorizing Debtors To Pay Prepetition Claims of Certain Critical Vendors, 503(b)(9) Claimants, Lien Claimants, and Foreign Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "Critical Vendor Motion")(Docket No. 162).  Through the Critical Vendor Motion, the Debtors sought authority to pay "Critical Vendor Claims" of up to $3.3 million on an interim basis and $15.3 million on a final basis.  Critical Vendor Motion at ¶ 7.

23.  On August 9, 2023, the Court entered the *Interim Order (I) Authorizing Debtors To Pay Prepetition Claims of Certain Critical Vendors, 503(b)(9) Claimants, Lien Claimants, and Foreign Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "Interim Critical Vendor Order")(Docket No. 176).  The Interim Critical Vendor Order authorized the Debtors to pay supposed critical vendor claims in an aggregate amount not to exceed $1 million on an interim basis.  Interim Critical Vendor Order at ¶ 3.

24.  On August 21, 2023, the Court entered the *Second Interim Order (I) Authorizing Debtors To Pay Prepetition Claims*

ME1 45846556v.1

*of Certain Critical Vendors, 503(b)(9) Claimants, Lien Claimants, and Foreign Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "Second Interim Critical Vendor Order")(Docket No. 310). The Second Interim Critical Vendor Order authorized the Debtors to pay supposed critical vendor claims in an aggregate amount not to exceed $4.3 million on an interim basis.  Interim Critical Vendor Order at ¶ 3.

25.   The Critical Vendor Motion does not reflect that the Debtors sought Court authority to pay prepetition utility charges.

## The Debtors' Sale Motion

26.   On August 7, 2023, the Debtors filed the *Motion of the Debtors For Entry of An Order (I)(A) Approving Bidding Procedures For the Sale or Sales of the Debtors' Assets; (B) Scheduling An Auction and Approving the Form and Manner of Notice Thereof; (C) Approving Assumption and Assignment Procedures, (D) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Sale Motion")(Docket No. 22).

ME1 45846556v.1

27.  The Sale Motion reflects that pursuant to the DIP Credit Agreement, the Debtors must satisfy certain milestones for the sale of their assets, including:  (i) any Stalking Horse Agreement must be executed no later than 55 days after the Petition Date; (ii) any Bid Deadline must be no later than 70 days after the Petition Date; and (iii) any Sale Transactions must be consummated no later than 90 days after the Petition Date.  Sale Motion at ¶ 4.

28.  The Bidding Procedures include the following deadlines: (i) September 30, 2023 – deadline to execute a Stalking Horse Agreement; (ii) October 15, 2023 – bid deadline; (iii) October 18, 2023 – auction (if required); (iv) October 20, 2023 – notice of winning bidder; (v) October 23, 2023 – sale objection deadline for bids; and (vi) October 26, 2023 – sale hearing as to winning bid(s)(or back-up bid(s), as applicable).  Sale Motion at ¶ 13.

### Facts Regarding CNE

29.  CNE provides electricity and related services to the Debtors pursuant to an Electricity Supply Agreement – Fixed Price Solutions (the "Electricity Agreement") that sets forth the terms and conditions concerning CNE's provision of electricity and related services to the Debtors' accounts in Texas.  CNE has continued to provide the Debtors with electricity and related services pursuant to the Electricity Agreement since the Petition

17

Date.

30.    Pursuant to the Electricity Agreement, the Debtors receive approximately one month of electricity and related services before CNE issues a bill.  Once a bill is issued, the Debtors have approximately 20 days to pay the applicable bill. If the Debtors fail to timely pay the bill, a late fee may be subsequently imposed on the account. Accordingly, the Debtors could receive more than two months of electricity and related services before CNE could terminate the Electricity Agreement after a post-petition payment default.

31.    The estimated pre-petition debt owed by the Debtors to CNE related to the Debtors' Texas accounts is approximately $37,969.  CNE is requesting a two-month cash deposit of $63,336 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and conditions of the Electricity Agreement.

## Facts Regarding CNEG

32.    CNEG provides natural gas and related services to the Debtors' accounts in Kansas pursuant to a Master Retail Natural Gas Supply Agreement and two related Transaction Confirmations, and CNEG provides natural gas and related services to the Debtors' accounts in Illinois under other contracts (collectively, the "Gas Agreements") that set forth the terms and

18

conditions concerning CNEG's provision of natural gas and related services to the Debtors.  CNEG has continued to provide the Debtors with natural gas and related services pursuant to the Gas Agreements since the Petition Date.

33.   Pursuant to the Gas Agreements, the Debtors receive approximately one month of natural gas and related services before CNEG issues a bill.  Once a bill is issued, the Debtors have 10 days to pay the applicable bill.  If the Debtors fail to timely pay a bill, a late fee may be subsequently imposed on the account.  Accordingly, the Debtors could receive approximately two months of natural gas and related services before CNEG could terminate the Gas Agreements after a post-petition payment default.

34.   The estimated pre-petition debt owed by the Debtors to CNEG is approximately $2,727.  CNEG is requesting a two-month cash deposit of $36,456 as adequate assurance of payment from the Debtors, which is an amount it can obtain from the Debtors pursuant to the terms and conditions of the Gas Agreements.

**Facts Regarding the Utilities Other Than CNE and CNEG**

35.   The Utilities provided the Debtors with prepetition utility goods and/or services and have continued to provide the Debtors with utility goods and/or services since the Petition Date.

19

36.    Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utilities issue a bill for such charges.  Once a bill is issued, the Debtors have approximately 20 to 30 days to pay the applicable bill before a late charge may be subsequently imposed on the account.  If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or their service will be disconnected.  Accordingly, under the Utilities' billing cycles, the Debtors could receive at least two months of unpaid charges before the Utilities could cease the supply of goods and/or services for a post-petition payment default.

37.    To avoid the need to bring witnesses and have lengthy testimony regarding the Utilities' regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles.  Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities' links to their tariffs, state laws, and regulations are set forth in Exhibit "A" attached hereto.

38.    Subject to a reservation of the Utilities' right to supplement their post-petition deposit requests if additional

accounts belonging to the Debtors are subsequently identified, the Utilities' post-petition deposit requests are as follows:

| Utility | No. Accts. | Est. Pre. Debt | Dep. Request |
|---|---|---|---|
| AEP | 33 | $46,621.07 | $69,665 (2-month) |
| Georgia Power | 8 | n/a | $28,635 (2-month) |
| SRP | 4 | $22,914.10 | $11,550 (2-month) |

| Utility | No. Accts. | Est. Pre. Debt | Dep. Request |
|---|---|---|---|
| SCE | 16 | $173,303 | $203,537 (2-month) |
| CEI | 2 | To be supplemented | $6,200 (2-month) |
| TE | 4 | $11,860.90 | $8,240 (2-month) |
| Ohio Edison | 6 | $24,988.55 | $18,536 (2-month) |
| Mon Power | 2 | $721.79 | $810 (2-month) |
| PE | 1 | $6,596.52 | $6,776 (2-month) |
| Penelec | 3 | $1,573.65 | $1,128 (2-month) |
| Met-Ed | 1 | $1,984.15 | $1,740 (2-month) |
| CL&P | 1 | $2,646.44 | $2,535 (1.5-month) |
| Yankee Gas | 1 | $1,180.99 | $4,375 (1.5-month) |
| PSNH | 1 | $1,797.20 | $2,945 (2-month) |
| Eversource Gas | 1 | n/a | $1,610 (2-month) |
| NStar West | 1 | $3,906.56 | $2,750 (2-month) |
| TEP | 4 | $2,248.48 | $4,183 (2.5-month) |
| UNS Electric | 2 | $873.68 | $1,955 (2.5-month) |
| UNS Gas | 1 | $22.34 | $1,675 (2.5-month) |

ME1 45846556v.1

| Utility | No. Accts. | Est. Pre. Debt | Dep. Request |
|---|---|---|---|
| CERC | 7 | $6,531.60 | $116,927 (2-month) |
| Con Ed | 5 | $6,916.09 | $11,340 (2-month) |
| RG&E | 2 | To be supplemented | $5,170 (2-month) |
| NYSEG | 9 | To be supplemented | $11,780 (2-month) |
| DEV | 7 | $6,538.94 | $4,722 (2-month) |
| DESC | 6 | $4,329.41 | $7,850 (2-month) |
| DENC | 3 | n/a | $530 (2-month) |
| **Utility** | **No. Accts.** | **Est. Pre. Debt** | **Dep. Request** |
| FPL | 6 | $11,437.94 | $13,955 (2-month) |
| Colonial Gas | 4 | n/a | $4,010 (2-month) |
| Kedli | 2 | $90.68 | $1,790 (2-month) |
| Kedny | 2 | $66.19 | $2,280 (2-month) |
| MEC | 1 | $3,494.41 | $3,504 (2-month) |
| NEC | 3 | $9,970.19 | $12,332 (2-month) |
| NIMO | 10 | $15,692.71 | $14,194 (2-month) |
| SDG&E | 2 | $6,106.70 | $9,674 (2-month) |
| SoCalGas | 7 | $352.11 | $6,200 (2-month) |
| DTE | 10 | n/a | $54,722 (2-month) |

39.  SCE holds a surety bond in the amount of $185,000 that it will make a claim upon for payment of the prepetition debt that the Debtors owe to SCE.

40.  Con Ed held prepetition deposits totaling $11,525 that it will recoup against the prepetition debt owing to Con Ed from

22

the Debtors pursuant to Section 366(c)(4) of the Bankruptcy Code.
Any prepetition deposit amount remaining after recoupment can be
applied to Con Ed's post-petition deposit request.

41.   RG&E held prepetition deposits totaling $1,890 that it
will recoup against the prepetition debt owing to RG&E from the
Debtors pursuant to Section 366(c)(4) of the Bankruptcy Code.   No
prepetition deposit amount will remain after recoupment.

42.   DEV held a prepetition deposit in the amount of $2,434
that it recouped against the prepetition debt owing to DEV from
the Debtors pursuant to Section 366(c)(4) of the Bankruptcy Code.
No prepetition deposit amount remains after recoupment.

43.   MEC held a prepetition deposit in the amount of $2,966
that it recouped against the prepetition debt owing to MEC from
the Debtors pursuant to Section 366(c)(4) of the Bankruptcy Code.
No prepetition deposit amount remains after recoupment.

## Discussion

### A.   THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a
> case filed under chapter 11, a utility referred to in
> subsection (a) may alter, refuse, or discontinue utility
> service, if during the 30-day period beginning on the
> date of the filing of the petition, the utility does not
> receive from the debtor or the trustee adequate assurance
> of payment for utility service that is satisfactory to
> the utility;

ME1 45846556v.1

(3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. *In re* Lucre, 333 B.R. 151, 154 (Bankr. W.D. Mich. 2005). If a debtor believes that the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section

24

366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors.  Accordingly, this Court should not reward the Debtors for their failure to comply with the plain requirements of Section 366(c) and deny the Utility Motion as to the Utilities.

ME1 45846556v.1

**1.    The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide The Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A). Moreover, even if the Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

1. Unlike the statutory approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities.  Accordingly, the Utilities would have no control over how long the Bank Account will remain in place.

2. To access the Bank Account, the Utilities would have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a disbursement request.

3. It is underfunded from the outset because the Utilities issue monthly bills and by the time a default notice is issued the Debtors will have received approximately 60 days of utility service.

4. The Debtors may close the Bank Account before all post-petition utility charges are paid in full.

Accordingly, the Court should not approve the Bank Account

ME1 45846556v.1

as adequate assurance as to the Utilities because the Bank Account is: (a) not the **form** of adequate assurance requested by the Utilities; (b) not a form recognized by Section 366(c)(1)(A); and (c) an otherwise unreliable form of adequate assurance.

>   **2.    The Utility Motion Should Be Denied As To The Utilities Because the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.**

In the Utility Motion, the Debtors fail to address why this Court should modify the amounts of the Utilities' requests for adequate assurance of payment.  Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified.  *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof).  However, the Debtors have not provided this Court with any evidence or factually supported documentation to explain why the amounts of the Utilities' adequate assurance requests should be modified.  Accordingly, this Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the plain requirements of Section 366(c) with respect to the Utilities.

27

**B. THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), which held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases.  Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

> (i) a cash deposit;
> (ii) a letter of credit;
> (iii) a certificate of deposit;
> (iv) a surety bond;
> (v) a prepayment of utility consumption; or
> (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate-payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990).  The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor."  *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court

to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

The Utilities bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior month.  The Utilities then provide the Debtors with 20 to 30 days to pay the bill, the timing of which is set forth in applicable state laws, tariffs, regulations or contracts.  Based on the foregoing state-mandated, or contract-mandated, billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months.  Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of approximately 60 days or more based on their billing cycles.  Furthermore, the forms and amounts of the Utilities' adequate assurance requests are the forms and amounts that the applicable public service commission, which is a neutral third-party entity, or contract, permit the Utilities to request from their customers.  The Utilities are not taking the position that the cash deposits that they are entitled to obtain under applicable state law or contract are binding on this Court, but instead are introducing those forms and amounts as evidence of the forms and amounts that the applicable

regulatory entity or contract permit the Utilities to request from their customers.

In contrast, the Debtors failed to address in the Utility Motion why this Court should modify, if at all, the amounts of the Utilities' adequate assurance of payment requests, which is the Debtors' statutory burden.  Instead, the Debtors merely asked this Court to approve the Adequate Assurance Account supposedly containing approximately two-weeks of the Debtors' utility charges. The Debtors did not provide an objective, much less an evidentiary, basis for their proposed adequate assurance in the form of the Bank Account.  Moreover, in contrast to the improper treatment proposed to the Debtors' Utilities, the Debtors have made certain that supposed "critical vendors" and post-petition professionals are favored creditors over the Utilities by ensuring (i) the payment of critical vendors claims of up to $4.3 million on an interim basis and $15.3 million on a final basis, and (ii) the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition default on the use of DIP financing and cash collateral, by obtaining a $2.5 million professionals' carve-out for the payment of their fees/expenses after a default and a guarantee of payment for fees incurred up to a default. Despite the fact that the Utilities continue to provide the Debtors with admittedly crucial post-petition utility goods/services on the same generous

30

terms that were provided prepetition, with the possibility of non-payment, the Debtors are seeking to deprive the Utilities of any adequate assurance of payment for which they are entitled to for continuing to provide the Debtors with post-petition utility goods/services. Against this factual background, it is reasonable for the Utilities to seek and be awarded the full security they have requested herein.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1.   Denying the Utility Motion as to the Utilities;

2.   Awarding the Utilities the post-petition adequate assurance of payment pursuant to Section 366 in the amounts and form satisfactory to the Utilities, which is the form and amounts requested herein; and

3.   Providing such other and further relief as this Court deems just and appropriate.

Dated: August 25, 2023   McCARTER & ENGLISH, LLP

/s/ William F. Taylor, Jr.
William F. Taylor, Jr. (DE#2936)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE  19801
wtaylor@mccarter.com

and

LAW FIRM OF RUSSELL R. JOHNSON III, PLC
Russell R. Johnson III (VSB No. 31468)
John M. Craig (VSB No. 32977)

31

2258 Wheatlands Drive
Manakin-Sabot, Virginia  23103
Telephone: (804) 749-8861
russell@russelljohnsonlawfirm.com
john@russelljohnsonlawfirm.com

*Counsel for American Electric Power, Constellation NewEnergy, Inc., Constellation NewEnergy – Gas Division, LLC, Georgia Power Company, Salt River Project, Southern California Edison Company, The Cleveland Electric Illuminating Company, Toledo Edison Company, Ohio Edison Company, Monongahela Power Company, Potomac Edison Company, Pennsylvania Electric Company, Metropolitan Edison Company, The Connecticut Light & Power Company, Yankee Gas Service Company, Public Service Company of New Hampshire, Eversource Gas of Massachusetts, NStar Electric Company, Western Massachusetts, Tucson Electric Power Company, UNS Electric, Inc., UNS Gas, Inc., CenterPoint Energy Resources Corp., Consolidated Edison Company of New York, Inc., Rochester Gas & Electric Corporation, New York State Electric and Gas Corporation, Virginia Electric and Power Company d/b/a Dominion Energy Virginia, Dominion Energy South Carolina, Inc., Public Service Company of North Carolina Incorporated, d/b/a Dominion Energy North Carolina, Florida Power & Light Company, Colonial Gas Cape Cod, KeySpan Energy Delivery Long Island, KeySpan Energy Delivery New York, Massachusetts Electric Company, Narragansett Electric Company, Niagara Mohawk Power Corporation, San Diego Gas and Electric Company, Southern California Gas Company and DTE Energy Company*

ME1 45846556v.1