**<u>Exhibit 1</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**INTERIM ORDER (I) AUTHORIZING
THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING, (B) USE CASH COLLATERAL, AND (C) GRANT
LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN
PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "DIP Motion")[2] of Yellow Corporation ("Yellow Corp") and each

of its above-captioned affiliates (collectively, the "Debtors"), pursuant to sections 105, 361, 362,

363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c) and 507

of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy

Code"), rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and rules 2002-1, 4001-1, 4001-2, and 9013-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Bankruptcy Local Rules"), seeking entry of this interim order (this "Interim

Order")[3] and the Final Order (as defined herein and, together with this Interim Order, the "DIP

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the DIP Motion or DIP Term Sheet (as defined herein), as applicable.

[3]   The Debtors filed a prior version of this Interim Order at Docket No. 16-1.

Orders") among other things:

- authorizing the Borrower (as defined below) to obtain postpetition financing (the "DIP Financing") pursuant to a $142.5 million postpetition credit facility (the "DIP Facility") subject to the terms and conditions set forth in this Interim Order and that certain Debtor-In-Possession Credit Facility Term Sheet attached hereto as **Exhibit 1** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Term Sheet") consisting of:

    (A) a junior secured, superpriority debtor in possession multi-draw term loan facility (the "Junior DIP Facility") by and among Yellow Corp, as borrower (in such capacity, the "Borrower"), the DIP Guarantors (as defined in the DIP Term Sheet), MFN Partners, L.P. (together with any assigns, the "Junior DIP Lender"), and Alter Domus Products Corp., as administrative agent and collateral agent in such capacity, together with its successors and permitted assigns, the "Junior DIP Agent" and, together with the Junior DIP Lender, the "Junior DIP Secured Parties"), consisting of new money term loans (together with any drawn Junior DIP Commitments (as defined below), the "Junior DIP Loans") in an aggregate principal amount of $42.5 million, of which: (i) $17.9 million will be made available to be drawn upon entry of this Interim Order and (ii) $24.6 million will be made available to be drawn (including (a) $11.2 million on the Second Draw (as defined below) and (b) $13.4 million on the Third Draw (as defined below)) subject to certain conditions set forth in the DIP Term Sheet and, when applicable, a credit agreement governing the Junior DIP Facility on the terms set forth in the DIP Term Sheet (including the Documentation Principals (as defined therein)) (the "DIP Credit Agreement"), including the filing by the Debtors of a form of order approving bid procedures (the "Proposed Bid Procedures Order") in form and substance acceptable to the Junior DIP Lender and the B-2 Lenders;

    (B) an incremental postpetition tranche of the B-2 Facility (as defined below) constituting a senior secured, superpriority debtor in possession multi-draw term loan facility (the "Postpetition B-2 Facility"), subject to the terms herein, the DIP Term Sheet and the Prepetition B-2 Credit Agreement (as defined below), as modified by this Interim Order and the DIP Term Sheet, which will be superseded by the DIP Credit Agreement (if the Postpetition B-2 Lenders and the Debtors agree) or an amendment to the B-2 Credit Agreement (the "B-2 Amendment" and the Prepetition B-2 Credit Agreement as so modified and superseded, the "Postpetition B-2 Credit Agreement"), subject to the Documentation Principles set forth (and as defined) in the DIP Term Sheet, consisting of new money term loans (the "Postpetition B-2 Term Loans" and, together with the Junior DIP Loans, the "DIP Loans")[4] provided by Citadel Credit Master LLC (together with any permitted assignee thereof, the "Postpetition B-2 Lenders" and, together with the

---

[4] The commitments under the Junior DIP Facility shall be referred to herein as the "Junior DIP Commitments" and the commitments under the Postpetition B-2 Facility shall be referred to herein as the "Postpetition B-2 Commitments." The Junior DIP Commitments and the Postpetition B-2 Commitments, together, shall be referred to herein as the "DIP Commitments."

Postpetition B-Agent (as defined below), the "<u>Postpetition B-2 Secured Parties</u>") in an aggregate principal amount of $100.0 million of which: (i) $42.1 million will be made available upon entry of the Interim Order (together with the Junior DIP Loans described in subclause (A)(i) above, the "<u>Interim Draw</u>"); (ii) $26.3 million will be made available to be drawn subject to certain conditions set forth in the B-2 Amendment or DIP Credit Agreement, as applicable, including the filing by the Debtors of the Proposed Bid Procedures Order (together with the Junior DIP Loans discussed in subclause (A)(ii)(a) above, the "<u>Second Draw</u>"); and (iii) $31.6 million will be made available to be drawn upon the Court's entry of the Final Order (together with the Junior DIP Loans discussed in subclause (A)(ii)(b) above, the "<u>Third Draw</u>"); and

(C) up to $70.0 million (the "<u>Additional Junior DIP Commitments</u>")[5] shall be made available by the Junior DIP Lender, at the Debtors' request following the Third Draw, which amount may be drawn in one or multiple draws at the Debtors' discretion.[6]

- authorizing the Borrower to incur, and the DIP Guarantors (as defined in the DIP Term Sheet and, together with the Borrower, the "<u>DIP Loan Parties</u>") to jointly and severally guarantee the DIP Loans and all extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, commitment fees or premiums and administrative agency fees, costs, expenses and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) earned, due and payable under the DIP Loan Documents (as defined below) (collectively, the "<u>Junior DIP Obligations</u>"), in each case subject to the Carve-Out and the Canadian Priority Charges and in accordance with the terms hereof;

- authorizing the DIP Loan Parties to jointly and severally guarantee the Postpetition B-2 Loans and all extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, commitment fees or premiums and administrative agency fees, costs, expenses and other liabilities and obligations (including indemnities and similar obligations, whether contingent or absolute) earned, due and payable under the DIP Loan Documents (as defined below) to the Postpetition B-2 Secured Parties (collectively, the "<u>Postpetition B-2 Obligations</u>" and, together with the Junior DIP Obligations, the "<u>DIP Obligations</u>"), in each case subject to the Carve-Out and the Canadian Priority Charges and in accordance with the terms hereof;

---

[5]  The Additional Junior DIP Commitments (if drawn) shall be junior and subordinate (including in right of payment) in all respects to the Prepetition Liens and Adequate Protection Liens of the Prepetition B-2 Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition UST Secured Parties.

[6]  The Junior DIP Lender and the Postpetition B-2 Lenders, together, shall be referred to herein as the "<u>DIP Lenders</u>." The Junior DIP Secured Parties and the Postpetition B-2 Secured Parties, together, shall be referred to herein as the "<u>DIP Secured Parties</u>."

- authorizing the DIP Loan Parties to execute, deliver and perform, as applicable, under the DIP Loan Parties to execute, deliver and perform, as applicable, under the DIP Term Sheet, the Postpetition B-2 Credit Agreement, the DIP Credit Agreement, the Postpetition B-2 Amendment (if any), the Amended and Restated Fee Letter, the Fee Letter, and all other documents and instruments that may be reasonably requested by the Junior DIP Secured Parties or Postpetition B-2 Secured Parties in connection with the DIP Facility (in each case, as amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof, the "<u>DIP Loan Documents</u>");

- subject to the Carve-Out (as defined below) and the Canadian Priority Charges and otherwise solely to the extent set forth herein, granting to the Junior DIP Agent, for the benefit of the Junior DIP Secured Parties, and the Postpetition B-2 Agent, for the benefit of the Postpetition B-2 Secured Parties, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code;

- granting to the Junior DIP Agent, for the benefit of the Junior DIP Secured Parties, and the Postpetition B-2 Agent, for the benefit of the Postpetition B-2 Secured Parties, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on the DIP Collateral, on the terms described herein;[7]

- authorizing the Junior DIP Agent and the Postpetition B-2 Agent to take all commercially reasonable actions to implement the terms of this Interim Order;

- (a) waiving the Debtors' right to surcharge the DIP Collateral, (b) upon entry of a final order providing for such relief, waiving the Debtors' right to surcharge the B-2 Collateral or Prepetition ABL Collateral (each as defined below) pursuant to section 506(c) of the Bankruptcy Code and (c) upon entry of a final order providing for such relief any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

- (a) waiving the equitable doctrine of "marshaling" and other similar doctrines for the benefit of the DIP Secured Parties with respect to the DIP Collateral and the DIP Obligations, and (b) upon entry of a final order providing for such relief, waiving the equitable doctrine of "marshaling" and other similar doctrines for the benefit of the Prepetition Secured Parties with respect to the Prepetition Collateral and the Prepetition

---

[7] "<u>DIP Collateral</u>" shall mean all tangible and intangible prepetition and postpetition property of the DIP Loan Parties (other than: (a) any lease, license or agreement or any property to the extent a grant of a security interest therein would violate or invalidate such lease, license or agreement or similar arrangement or create a right of termination in favor of any other party thereto after giving effect to the applicable anti-assignment provisions of the UCC, PPSA, Bankruptcy Code or other applicable law, other than proceeds and receivables thereof, the assignment of which is deemed effective under the UCC, PPSA, Bankruptcy Code or other applicable law, notwithstanding such prohibition; and (b) "intent to use" trademark applications, (a) and (b), collectively, "<u>Excluded Property</u>") whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, other than the Avoidance Actions and the Carve-Out Reserves (and any amounts held therein), but including, upon and subject to entry of the Final Order, the Avoidance Proceeds (collectively, the "<u>Unencumbered Property</u>," and such liens, the "<u>DIP Unencumbered Property Liens</u>")).

Secured Obligations (each as defined below), as applicable, in each case subject to the Carve-Out and Canadian Priority Charges;

- authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral solely in accordance with the DIP Orders, the DIP Loan Documents (including the Approved Budget, subject to Permitted Variances (as defined in the DIP Term Sheet)), the Interim UST Cash Collateral Order (as defined below), and the Final UST Cash Collateral Order (as defined below);

- authorizing the Debtors to pay the DIP Obligations as they become due and payable in accordance with the DIP Loan Documents;

- authorizing the Debtors to remit ABL Cash Collateral (as defined below) to the Prepetition ABL Agent as set forth herein and for the Prepetition ABL Agent to apply such ABL Cash Collateral to permanently reduce or cash collateralize, as applicable, Prepetition ABL Obligations as set forth herein;

- subject to the restrictions set forth in the DIP Loan Documents and the DIP Orders, authorizing the Debtors to use Prepetition Collateral (including Cash Collateral) and provide adequate protection to the Prepetition Secured Parties (as defined below) for any diminution in value of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), for any reason provided for in the Bankruptcy Code (collectively, the "Diminution in Value");[8]

- vacating and modifying the automatic stay to the extent necessary to permit the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties to implement and

---

[8] The adequate protection and certain other rights and protections to be provided to the Prepetition UST Secured Parties (as defined below) is set forth in a separate Court order being entered contemporaneously with this Interim Order (the "Interim UST Cash Collateral Order" and the final order approving such relief, the "Final UST Cash Collateral Order"). As used in this Interim Order, UST Cash Collateral, Prepetition UST Tranche A Credit Agreement, Prepetition UST Tranche A Loan Documents, Prepetition UST Tranche A Borrower, Prepetition UST Tranche A Guarantors, Prepetition UST Tranche A Loan Parties, BNY, Prepetition UST Tranche A Agent, Prepetition UST Tranche A Lenders, Prepetition UST Tranche A Secured Parties, Prepetition UST Tranche A Obligations, Prepetition UST Tranche B Credit Agreement, Prepetition UST Tranche B Loan Documents, Prepetition UST Loan Documents, Prepetition UST Tranche B Borrower, Prepetition UST Tranche B Guarantors, Prepetition UST Tranche B Loan Parties, Prepetition UST Tranche B Agent, Prepetition UST Agent, Prepetition UST Tranche B Lenders, Prepetition UST Lenders, Prepetition UST Tranche B Secured Parties, Prepetition UST Tranche B Obligations, Prepetition UST Secured Obligations, Prepetition UST Tranche A Liens, Prepetition UST Tranche A Permitted Senior Liens, Prepetition UST Tranche A Collateral, Prepetition UST Tranche B Liens, Prepetition UST Liens, Prepetition UST Tranche B Term Priority Collateral, Prepetition UST Tranche B Permitted Senior Liens, Prepetition UST Tranche B Priority Collateral, Prepetition UST Tranche B Collateral, Prepetition UST Secured Parties, UST Tranche B Adequate Protection Liens, UST Tranche A Adequate Protection Liens, UST Adequate Protection Liens, UST Tranche B 507(b) Claims, UST Tranche A 507(b) Claims, UST 507(b) Claims, UST Tranche B Adequate Protection Fees and Expenses, UST Tranche A Adequate Protection Fees and Expenses, UST Adequate Protection Fees and Expenses, UST Tranche B Adequate Protection Obligations, UST Tranche A Adequate Protection Obligations, UST Adequate Protection Obligations, UST Adequate Protection Payments, and UST Adequate Protection shall have the meanings given to those terms in the Interim UST Cash Collateral Order.

effectuate the terms and provisions of the DIP Orders and the DIP Loan Documents;

- waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

- scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Facility and use of Cash Collateral on the terms of a proposed order (the "Final Order") to be posted to the docket prior to the Final Hearing.

The Court having considered the interim relief requested in the DIP Motion [Docket No. 16], the exhibits attached thereto, the *Declaration of Cody Leung Kaldenberg, Founding Member of and Partner at Ducera Partners In Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 18] (the "Kaldenberg Declaration"), the *Declaration of Brian Whittman, Managing Director of Alvarez & Marsal North America, LLC, In Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 17] (the "Whittman Declaration"), and the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 14] (the "First Day Declaration"), the available DIP Loan Documents, including the DIP Term Sheet, and the evidence submitted to the Court, including arguments made at the interim hearing held on August 9, 2023 (the "Interim Hearing"); and due and sufficient notice of the Interim Hearing, including continuations thereof,

and subsequent status conferences having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Bankruptcy Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable, in the best interests of the Debtors and their estates, and essential for the preservation of the value of the Debtors' assets; and it appearing that the DIP Loan Parties' entry into the DIP Loan Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[9]**

A.    *Petition Date*.  On August 6, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").

B.    *Debtors in Possession*.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    *Jurisdiction and Venue*.  This Court has core jurisdiction over these cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the*

---

[9]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

*District of Delaware*, dated February 29, 2012.  Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order approving the relief sought in the DIP Motion consistent with Article III of the United States Constitution.  Venue for these cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9013, and 9014, and Bankruptcy Local Rules 2002-1, 4001-2, and 9013-1.

D.     *Committee Formation*.  On August 16, 2023, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") in these chapter 11 cases (the "Chapter 11 Cases") pursuant to section 1102 of the Bankruptcy Code [Docket No. 269].  As of the date hereof, the U.S. Trustee has not appointed any other statutory committee.

E.     *Notice*.  The Interim Hearing was held pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  Proper, timely, adequate and sufficient notice of the DIP Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, Bankruptcy Rules and Bankruptcy Local Rules, and no other or further notice was or shall be required under the circumstances.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

F.     *Cash Collateral*.  As used herein, the term "Cash Collateral" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the Prepetition Secured Parties (and the Prepetition UST Secured Parties) or DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

8

G.    *Debtors' Stipulations*.  Without prejudice to the rights of any other party in interest and subject to the provisions and limitations contained in paragraph 19 hereof, after consultation with their attorneys, the Debtors admit, stipulate and agree that:

(i)    *Prepetition B-2 Term Loan*.  Pursuant to that certain Amended and Restated Credit Agreement, dated as of September 11, 2019 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition B-2 Credit Agreement" and, collectively with all other agreements (including all Loan Documents (as defined therein)), documents, and instruments executed or delivered in connection therewith, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and fee letters, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition B-2 Loan Documents"), by and among (a) Yellow Corp., as borrower (in such capacity, the "Prepetition B-2 Borrower"), (b) the guarantors party thereto (the "Prepetition B-2 Guarantors" and, together with the Prepetition B-2 Borrower, the "Prepetition B-2 Loan Parties"), (c) Alter Domus Products Corp., as administrative and collateral agent (the "Prepetition B-2 Agent"),[10] and (d) the lenders party thereto from time to time (the "Prepetition B-2 Lenders" and, together with the Prepetition B-2 Agent, the "Prepetition B-2 Secured Parties"),[11] Prepetition B-2 Loan Parties incurred "Obligations" under (and as defined in) the Prepetition B-2 Credit Agreement (the "Prepetition B-2 Obligations" and, together with the Postpetition B-2 Obligations, the "B-2 Obligations") to the

---

[10]    Alter Domus Product Corp. also serves as administrative agent and collateral agent with respect to the Postpetition B-2 Facility (in such capacity, the "Postpetition B-2 Agent" and, together with the Prepetition B-2 Agent, the "B-2 Agent").

[11]    The Prepetition B-2 Lenders and the Postpetition B-2 Lenders shall be referred to herein as the "B-2 Lenders." The Prepetition B-2 Secured Parties and the Postpetition B-2 Secured Parties shall be referred to herein as the "B-2 Secured Parties."

Prepetition B-2 Secured Parties on a joint and several basis;

(ii)     *Prepetition ABL Facility*.   Pursuant to that certain Loan and Security Agreement, dated as of February 13, 2014 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Prepetition ABL Credit Agreement", collectively with all other agreements (including all Loan Documents (as defined therein)), documents, and instruments executed or delivered in connection therewith, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and fee letters, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "Prepetition ABL Loan Documents", and the credit facilities evidenced thereby, collectively, the "Prepetition ABL Facility") among (a) Yellow Corp, as administrative borrower (together with the other borrowers party thereto, the "Prepetition ABL Borrowers"), (b) the guarantors party thereto (the "Prepetition ABL Guarantors" and, together with the Prepetition ABL Borrowers, the "Prepetition ABL Loan Parties" and, together with the Prepetition B-2 Loan Parties, the "Prepetition Loan Parties"), (c) Citizens Business Capital, a division of Citizens Asset Finance, Inc. (a subsidiary of Citizens Bank, N.A.), as agent (the "Prepetition ABL Agent" and, together with the Prepetition B-2 Agent, the "Prepetition Agents"), (d) the lenders from time to time party thereto (the "Prepetition ABL Lenders" and, together with the Prepetition B-2 Lenders, the "Prepetition Lenders"), and (e) the issuing banks from time to time party thereto (together with the Prepetition ABL Agent and the Prepetition ABL Lenders, the "Prepetition ABL Secured Parties" and, together with the Prepetition Agents, the Prepetition Lenders, and the Bank Product Providers (as defined in the Prepetition ABL Credit Agreement), the "Prepetition Secured Parties"), the Prepetition ABL Loan Parties incurred "Obligations" (as defined in the Prepetition ABL Credit Agreement, the "Prepetition ABL

10

Obligations" and, together with the Prepetition B-2 Obligations, the "Prepetition Secured Obligations") to the Prepetition ABL Secured Parties on a joint and several basis;

(iii)     *Prepetition Intercreditor Agreement.*  Pursuant to (and to the extent set forth in) that certain Amended and Restated Intercreditor Agreement, dated as of July 7, 2020 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time, the "Prepetition Intercreditor Agreement" and, together with the Prepetition B-2 Loan Documents and the Prepetition ABL Loan Documents, the "Prepetition Loan Documents") by and among the Prepetition ABL Agent, the Prepetition B-2 Agent, the Prepetition UST Tranche A Agent, and the Prepetition UST Tranche B Agent, the parties thereto agreed, among other things, to the relative priority of such parties' respective security interests in the Prepetition Collateral (as defined below), which relative priorities are governed by and set forth in the Prepetition Intercreditor Agreement.  The Prepetition Loan Documents and the Prepetition UST Loan Documents, including the Prepetition Intercreditor Agreement, are, in each case, binding and enforceable against the parties thereto;

(iv)     *Prepetition B-2 Obligations.*  As of the Petition Date, the Prepetition B-2 Loan Parties were validly, justly, and lawfully indebted and liable to the Prepetition B-2 Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, for Loans (as defined in the Prepetition B-2 Credit Agreement) in the aggregate principal amount of not less than $485,372,693.29, plus accrued and unpaid interest thereon and any fees, exit fees (including the exit fee arising pursuant to Section 2.05(c) of the Prepetition B-2 Credit Agreement), expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees and fees of other consultants and professionals), costs, charges, indemnities, and other Prepetition B-2 Obligations in each case incurred under (or reimbursable

11

pursuant to) or secured by the Prepetition B-2 Loan Documents;

(v)    *Prepetition ABL Obligations*.  As of the Petition Date, the Prepetition ABL Loan Parties were validly, justly and lawfully indebted and liable to the Prepetition ABL Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, for (x) not less than $858,520.35 in outstanding principal amount of Loans (as defined in the Prepetition ABL Credit Agreement) plus accrued and unpaid interest thereon, (y) not less than $359,288,388.60 in outstanding and undrawn Letters of Credit (as defined in the Prepetition ABL Credit Agreement) plus accrued and unpaid fees with respect thereto, and (z) any fees, expenses and disbursements (including any attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, financial advisors' fees, and fees of other consultants and professionals), costs, charges, indemnities, and other Prepetition ABL Obligations (including, without limitation, Bank Product Debt, as defined in the Prepetition ABL Credit Agreement) in each case incurred under (or reimbursable pursuant to) or secured by the Prepetition ABL Loan Documents.  As of the Petition Date, (1) ABL Cash Collateral (as defined below) in an amount equal to $91,449,240.35 was being held on deposit in the Borrowing Base Cash Account (as defined in the Prepetition ABL Credit Agreement) and (2) ABL Cash Collateral (as defined below) in an amount equal to $3,800,000 had been pledged to the Prepetition ABL Agent as security for certain Bank Product Debt owed to Citizens Bank, N.A. and/or its affiliates (such amounts described in this sentence, collectively, the "Existing ABL Cash Collateral Deposits");

(vi)    *Validity of Prepetition Secured Obligations*.  The Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Loan Parties, as applicable, enforceable in accordance with the respective terms of the relevant documents, and no portion of the Prepetition Secured Obligations or any payment made to the

Prepetition Secured Parties or applied to or paid on account of the Prepetition Secured Obligations prior to the Petition Date is subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim (as such term is defined in the Bankruptcy Code), cause of action (including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(vii)    *Validity, Perfection and Priority of Prepetition B-2 Liens*.  As of the Petition Date, pursuant to the Prepetition B-2 Loan Documents, the Prepetition B-2 Loan Parties granted to the Prepetition B-2 Agent, for the benefit of the Prepetition B-2 Secured Parties, a security interest in and continuing lien on (the "Prepetition B-2 Liens") substantially all of their respective assets and property (other than Excluded Assets (as defined in the Prepetition B-2 Loan Documents), collectively, the "Prepetition B-2 Collateral"), including: (i) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the Non-UST Tranche B Term Priority Collateral (as defined in the Prepetition Intercreditor Agreement), which, for the avoidance of doubt, includes all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition B-2 Priority Collateral"), subject only to any liens permitted by the Prepetition B-2 Loan Documents to be senior to the Prepetition B-2 Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "Prepetition B-2 Permitted Senior Liens"); (ii) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the UST Tranche B Joint Collateral (as defined

13

in the Prepetition Intercreditor Agreement), which, for the avoidance of doubt, includes all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition Joint Collateral"), subject only to the *pari passu* liens of the Prepetition UST Tranche B Agent and the Prepetition B-2 Permitted Senior Liens on the Prepetition Joint Collateral; (iii) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition UST Tranche B Priority Collateral, subject and subordinate only to the liens of the Prepetition UST Tranche B Agent and the Prepetition B-2 Permitted Senior Liens on the Prepetition UST Tranche B Priority Collateral; and (iv) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition ABL Priority Collateral (as defined below), subject and subordinate only to the liens of the Prepetition ABL Agent and the Prepetition B-2 Permitted Senior Liens on the Prepetition ABL Priority Collateral;

(viii)  *Validity, Perfection and Priority of Prepetition ABL Liens.*  As of the Petition Date, pursuant to the Prepetition ABL Loan Documents, the Prepetition ABL Loan Parties granted to the Prepetition ABL Agent, for the benefit of the Prepetition ABL Secured Parties, a security interest in and continuing lien on (the "Prepetition ABL Liens" and, collectively with the Prepetition B-2 Liens, Prepetition UST Tranche A Liens, and Prepetition UST Tranche B Liens, the "Prepetition Liens") substantially all of their respective assets and property (other than Excluded Assets (as defined therein)) (collectively, the "Prepetition ABL Collateral" and, collectively with the Prepetition B-2 Collateral, Prepetition UST Tranche A Collateral, and Prepetition UST Tranche B Collateral, the "Prepetition Collateral"), including: (i) a valid, binding, properly perfected, enforceable, non-avoidable first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the Prepetition Intercreditor Agreement), which, for

14

the avoidance of doubt, includes all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Prepetition ABL Priority Collateral"), subject only to any liens permitted by the Prepetition ABL Loan Documents to be senior to the Prepetition ABL Liens, solely to the extent that such permitted liens are (a) valid, perfected, and non-avoidable on the Petition Date or (b) valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date in accordance with section 546(b) of the Bankruptcy Code (collectively, the "Prepetition ABL Permitted Senior Liens" and, collectively with the Prepetition B-2 Permitted Senior Liens, Prepetition UST Tranche A Permitted Senior Liens, and Prepetition UST Tranche B Permitted Senior Liens, the "Prepetition Permitted Senior Liens");[12] (ii) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition B-2 Priority Collateral, subject and subordinate only to the liens of the Prepetition B-2 Agent and the Prepetition ABL Permitted Senior Liens on the Prepetition B-2 Priority Collateral; (iii) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition Joint Collateral, subject and subordinate only to the liens of the Prepetition B-2 Agent and Prepetition UST Tranche B Agent and the Prepetition ABL Permitted Senior Liens on the Prepetition Joint Collateral; and (iv) a valid, binding, properly perfected, enforceable, non-avoidable security interest in and continuing lien on the Prepetition UST Tranche B Priority Collateral, subject and subordinate only to the liens of the Prepetition B-2 Agent and Prepetition UST Tranche B Agent and the Prepetition ABL Permitted Senior Liens on the Prepetition UST Tranche B Priority Collateral;

---

[12] For the avoidance of doubt, no reference to the "Prepetition Permitted Senior Liens" shall refer to or include the Prepetition Liens.

(ix)     *Waiver of Challenge*.  None of the Prepetition Liens are subject to any contest, attack, rejection, recovery, reduction, defense, counterclaim, subordination, recharacterization, avoidance or other cause of action (including any avoidance actions under chapter 5 of the Bankruptcy Code), choses in action or other challenge of any nature under the Bankruptcy Code or any applicable non-bankruptcy law;

(x)     *No Control*.  None of the Prepetition Secured Parties or the DIP Secured Parties control (or have in the past controlled) any of the Debtors or their respective properties or operations, have authority to determine the manner in which any Debtor's operations are conducted or are control persons or insiders of any Debtor by virtue of any actions taken with respect to, in connection with, related to or arising from any Prepetition Loan Documents;

(xi)     *No Claims or Causes of Action*.  No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties and each of their respective Representatives (as defined below), in each case, in their capacity as such, under or relating to any agreements by and among the Debtors and any Prepetition Secured Party that is in existence as of the Petition Date; and

(xii)     *Release*.  Effective as of the date of entry of this Interim Order and subject in all respects to paragraph 19 hereof, each of the Debtors and each of their estates, on its own behalf and on behalf of its and their respective predecessors, successors, heirs, and past, present and future subsidiaries and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties, the DIP Secured Parties, and each of their respective Representatives (solely in their capacities as such) (collectively, the "Released Parties"), from any and all liability to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts,

liabilities, actions and causes of action of any kind, nature and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, in contract or tort, in each case arising out of or related to the Prepetition Loan Documents, the DIP Facility, the DIP Loan Documents (including the DIP Term Sheet), the DIP Loans, the negotiation thereof, and the transactions and agreements reflected thereby, that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter may have against any of the Released Parties for or by reason of any act, omission, matter, or cause arising at any time on or prior to the date of this Interim Order; *provided* that the release set forth in this section shall not release (i) any claims against or liabilities of a Released Party that a court of competent jurisdiction determines by a final non-appealable order to have directly and primarily resulted from such Released Party's bad faith, fraud, gross negligence, or willful misconduct, or (ii) any DIP Secured Party(ies) from honoring its/their obligations to the Debtors under the DIP Loan Documents.

        H.     *Findings Regarding DIP Financing and Use of Cash Collateral.*

        (i)     Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the DIP Loan Parties to obtain financing pursuant to the DIP Loan Documents, including the DIP Term Sheet.

        (ii)     The Debtors have demonstrated an immediate and critical need to obtain the DIP Loans and to use Prepetition Collateral (including Cash Collateral) in order to, among other things, maintain, administer, and preserve certain limited operations and maximize the value of their estates through an orderly winddown process of their businesses and comprehensive sale process for their assets.  Without the ability of the Debtors to obtain sufficient working capital and

liquidity through the proposed DIP Facility and the use of Cash Collateral as set forth in this Interim Order, the Debtors, their estates, and parties-in-interest would be immediately and irreparably harmed.  Accordingly the Debtors have an immediate need to obtain the DIP Loans provided under the DIP Facility and to use Cash Collateral as set forth in this Interim Order to, among other things, maximize the value of the assets of the Debtors' estates to maximize the recovery to all creditors of the estates.

(iii)    The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured financing on more favorable terms from sources other than the DIP Lenders under the DIP Loan Documents, including financing secured solely by lien on property of the Debtors and their estates that is not otherwise subject to a lien or secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  The Debtors are also unable to obtain secured credit without granting to the DIP Secured Parties the DIP Liens and the DIP Superpriority Claims (each as defined below) and incurring the Adequate Protection Obligations (as defined below) on the terms and subject to the conditions set forth in this Interim Order and in the DIP Loan Documents, including the DIP Term Sheet.

(iv)    Based on the DIP Motion, the First Day Declaration, the Kaldenberg Declaration, the Whittman Declaration, and the record and argument presented to the Court at the Interim Hearing, the terms of the DIP Facility, the terms of the adequate protection granted to the Prepetition Secured Parties as provided in paragraph 14 of this Interim Order and with respect to the Prepetition UST Secured Parties as provided in the Interim UST Cash Collateral Order (collectively, the "Adequate Protection"), and the terms on which the Debtors may continue to use Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Loan

Documents are consistent with the Bankruptcy Code, including section 506(b) thereof, are fair and reasonable, and reflect the DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties under the circumstances.

(v)     This Interim Order, the DIP Facility, the Adequate Protection, and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the DIP Loan Parties, the DIP Secured Parties, and the Prepetition Secured Parties (each of whom acted in good faith in negotiating such documents), and all of the loans and other financial accommodations extended by the DIP Secured Parties and the Prepetition Secured Parties (as applicable) to the DIP Loan Parties under, in respect of, or in connection with, the DIP Facility and the DIP Loan Documents (including the granting of the Adequate Protection Liens (as defined below) and other adequate protections provided herein), shall be deemed to have been extended by the DIP Secured Parties in good faith, as that term is used in section 364(c) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and their respective successors and assigns) and such Prepetition Secured Parties (and their respective successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(vi)     The Postpetition B-2 Lenders have agreed to provide the Postpetition B-2 Loans for the benefit of the Debtors' estates, the other Prepetition Secured Parties, all holders of administrative expense claims against the Debtors, and all other creditors in lieu of exercising their rights to immediately seek relief from the automatic stay under section 362(d) of the Bankruptcy Code with respect to the Prepetition B-2 Priority Collateral (as defined below).

(vii)     The Prepetition Secured Parties and the DIP Secured Parties have acted in

19

good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of this Interim Order, the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens, any challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Loan Documents (including the DIP Term Sheet), and all other documents related to and all transactions contemplated by the foregoing. Accordingly, without limitation to any other right to indemnification, the Prepetition Secured Parties and the DIP Secured Parties shall maintain their right of indemnification (as applicable) as provided in the Prepetition Loan Documents and the DIP Loan Documents, as applicable, including, without limitation, Section 10.05 of the Prepetition B-2 Credit Agreement and Section 15.2 of the Prepetition ABL Credit Agreement.

(viii)    The Prepetition Secured Parties are entitled to the Adequate Protection as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code. Based on the DIP Motion and on the record presented to the Court, the terms of the proposed Adequate Protection are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral, including Cash Collateral.

(ix)    To the extent that their consent is required, the requisite Prepetition Secured Parties have consented or are deemed to have consented to the use of Prepetition Collateral, including Cash Collateral, and the priming of certain of the Prepetition Liens on the Prepetition Collateral by the DIP Liens, in each case on the terms set forth in the DIP Term Sheet and this Interim Order; *provided*, that, nothing in this Interim Order or the DIP Loan Documents shall (x) be construed as the affirmative consent by any of the Prepetition Secured Parties for the use of

Cash Collateral other than on the terms set forth in this Interim Order, (y) be construed as a consent by any party to the terms of any other financing or any other lien encumbering Prepetition Collateral or Prepetition UST Collateral (whether senior or junior) other than as contemplated by this Interim Order (or, as applicable, the Interim UST Cash Collateral Order), or (z) prejudice, limit or otherwise impair the rights of any Prepetition Secured Party or Prepetition UST Secured Party to seek new, different or additional adequate protection or assert any other right, and the rights of any other party in interest, including the DIP Loan Parties to object to such relief, are hereby preserved, subject to the terms and conditions of the Prepetition Intercreditor Agreement.

(x)    The Debtors have prepared and delivered to the advisors to the Junior DIP Secured Parties, the Prepetition ABL Secured Parties, the B-2 Secured Parties, and the Prepetition UST Secured Parties an initial budget (the "Initial DIP Budget"), attached hereto as **Schedule 1**. The Initial DIP Budget reflects, among other things, the Debtors' anticipated operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each calendar week covered thereby.  The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Loan Documents and with the approval of the Junior DIP Secured Parties, the B-2 Lenders, the Prepetition ABL Agent and the Prepetition UST Secured Parties (such approval not to be unreasonably withheld).  Each subsequent budget, once otherwise approved in accordance with the DIP Loan Documents and this Interim Order and subject to review and approval of the Junior DIP Lender, the B-2 Lenders, the Prepetition ABL Agent, and the Prepetition UST Secured Parties (such approval of the Prepetition UST Secured Parties not to be unreasonably withheld) shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget, an "Approved Budget").

(xi)    Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and, upon entry of a final order providing for such relief, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

(xii)    The intercreditor and subordination provisions herein and in the other DIP Loan Documents are essential elements of the DIP Facility and the protections granted to the parties as consideration therefor and are immediately and irrevocably binding and enforceable.

I.    *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  Absent the relief granted in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and continued use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Loan Documents (including the DIP Term Sheet), are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.  The DIP Motion and this Interim Order comply with the requirements of Bankruptcy Local Rule 4001-2.

J.    *Prepetition Permitted Senior Liens; Continuation of Prepetition Liens*.  Nothing herein constitutes a finding or ruling by this Court that any alleged Prepetition Permitted Senior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, the DIP Secured Parties, or the Prepetition Secured Parties, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Senior Lien.  For the avoidance of doubt, the right of a seller of goods to reclaim goods under

22

section 546(c) of the Bankruptcy Code does not constitute a Prepetition Permitted Senior Lien, and such right is expressly subject to the DIP Liens and the Prepetition Liens (each as defined herein). The Prepetition Liens and the DIP Liens are continuing liens and the DIP Collateral is and will continue to be encumbered by such liens.

K.      *Intercreditor Agreement.*  Pursuant to section 510 of the Bankruptcy Code, the Prepetition Intercreditor Agreement shall: (i) remain in full force and effect, (ii) continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties and Prepetition UST Secured Parties (including the relative priorities, rights and remedies of such parties with respect to replacement liens, administrative expense claims and superpriority administrative expense claims or amounts payable in respect thereof), and (iii) not be deemed to be amended, altered or modified by the terms of this Interim Order, the Interim UST Cash Collateral Order, or the DIP Loan Documents (including the DIP Term Sheet), unless expressly set forth therein or herein, as applicable.

L.      Contemporaneous with the entry of this Interim Order, the Court is entering the Interim UST Cash Collateral Order granting the UST Adequate Protection (as defined in the Interim UST Cash Collateral Order) to the Prepetition UST Secured Parties.

Based upon the DIP Motion, the foregoing findings and conclusions, and the overall record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      *Motion Granted.*  The DIP Motion is granted on an interim basis on the terms and conditions set forth in this Interim Order. All objections to the Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby overruled on the merits.

2.      *Authorization of the DIP Financing and the DIP Loan Documents.*

(a)     The DIP Loan Parties are hereby authorized to execute, deliver, enter into and perform all of their obligations under the DIP Loan Documents, including the DIP Term Sheet, and perform such other acts as may be necessary, appropriate or desirable in connection therewith. Once executed, the DIP Credit Agreement and the B-2 Amendment (if any) shall be deemed effective as of the Closing Date (as defined in the DIP Term Sheet).  The Borrower is hereby authorized upon entry of this Interim Order to borrow up to and draw $60 million (the "Initial Draw") pursuant to the terms and conditions of the DIP Term Sheet and the Postpetition B-2 Credit Agreement, as modified by this Interim Order and the DIP Term Sheet (including the Documentation Principles) (and, without further order or approval of this Court, the Second Draw on such date that the Second Draw becomes available pursuant to the terms and provisions of the DIP Term Sheet), and the DIP Guarantors are hereby authorized to guarantee the Borrower's obligations on account of the Initial Draw (and, if applicable, without further order or approval of this Court, the Second Draw), subject to any limitations set forth in the DIP Loan Documents, including the DIP Term Sheet.  The proceeds of the DIP Loans shall be used for all purposes permitted under the DIP Loan Documents and the Interim Order, in each case subject to and in accordance with the Approved Budget (subject to any Permitted Variances).

(b)     In furtherance of the foregoing and without further approval of this Court, each DIP Loan Party is authorized and directed to perform all acts, to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents, execute or record pledge and security agreements, mortgages, financing statements and other similar documents, if any, and, subject to the provisions of this Interim Order (or the Interim UST Cash Collateral Order, as applicable) to pay all DIP Obligations as and when such amounts become due and payable, including fees, expenses and indemnities in connection with or that may be reasonably required,

24

necessary, or desirable in connection with the DIP Financing, including, without limitation:

(i)    the execution and delivery of, and performance under, each of the DIP Loan Documents, including the DIP Term Sheet;

(ii)    the execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Loan Documents, in each case, in such form as the DIP Secured Parties may accept and with any such other approvals as required by the DIP Loan Documents, it being understood that no further approval of this Court, unless expressly set forth herein, shall be required for any such amendments, waivers, consents or other modifications or the payment of any fees, including attorneys', accountants', appraisers' and financial advisors' fees, and other expenses, charges, costs, indemnities and other like obligations in connection therewith) that do not shorten the scheduled maturity of the DIP Facility, increase the aggregate DIP Commitments, increase the rate of interest or fees payable thereunder, or release any DIP Liens. Updates, modifications, and supplements to the Approved Budget in accordance with this Interim Order and the DIP Loan Documents shall not require any further approval of this Court, but, for the avoidance of doubt, shall be subject to review and approval by the DIP Secured Parties, the B-2 Lenders, the Prepetition ABL Agent, and the Prepetition UST Secured Parties (such approval of the Prepetition UST Secured Parties not to be unreasonably withheld);

(iii)    the non-refundable payment to any of the DIP Secured Parties of all principal, interest, and fees in connection with the DIP Facility, including any amendment fees, premiums, servicing fees, audit fees, liquidator fees, structuring fees, arrangement fees, administrative agent's, collateral agent's or security trustee's fees, upfront fees, closing fees, commitment premiums, exit fees, closing date fees, prepayment premium or fees, or agency fees, and any amounts due in respect of any indemnification and expense reimbursement obligations,

including, without limitation, reasonable and documented fees and out-of-pocket expenses of professionals retained by, or on behalf of, any of the DIP Secured Parties (including, without limitation, those of Quinn Emanuel Urquhart & Sullivan, LLP, Ropes & Gray LLP, Province, LLC, White & Case LLP, GrayRobinson, P.A., Holland & Knight LLP, and any local legal counsel or other advisors in any foreign jurisdiction (provided no more than one local legal counsel or other advisor in any foreign jurisdiction for each of the Junior DIP Lender and the Postpetition B-2 Lenders), and any other advisors of the DIP Secured Parties as permitted under the DIP Loan Documents), in each case, as provided in the DIP Loan Documents (collectively, the "DIP Fees and Expenses"), without the need to file retention or fee applications; the payment of the foregoing amounts shall be irrevocable, and shall be deemed to have been approved upon entry of this Interim Order, whether any such obligations arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and upon payment thereof, shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance, disallowance, impairment, or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or applicable non-bankruptcy law.

3.      *DIP Obligations*.  Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents, including the DIP Term Sheet, shall constitute legal, valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party and their estates in accordance with their respective terms and this Interim Order, and any successors thereto, including any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon conversion of any of these cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  Upon

execution and delivery of the DIP Term Sheet, the DIP Obligations shall include all loans and any other indebtedness or obligations, contingent or absolute, which may from time to time be owing by any of the DIP Loan Parties to any of the DIP Secured Parties, in such capacities, in each case, under the DIP Loan Documents (including the DIP Term Sheet) and this Interim Order, including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts.  The DIP Loan Parties shall be jointly and severally liable for the DIP Obligations.  Except as (and solely to the extent) expressly provided herein, no obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents to the Junior DIP Agent, the Postpetition B-2 Agent, and/or the other DIP Secured Parties shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.      *Carve-Out.*

(a)      As used herein, the "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without

regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the Junior DIP Agent or the Postpetition B-2 Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first business day following delivery by the Junior DIP Agent or the Postpetition B-2 Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve-Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the Junior DIP Agent or the Postpetition B-2 Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, the Prepetition ABL Agent and counsel thereto, counsel to the Junior DIP Agent or the Postpetition B-2 Agent (whichever did not deliver the Carve-Out Trigger Notice), and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Term Sheet) and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)    <u>Delivery of Weekly Fee Statements</u>. Not later than 7:00 p.m. New York time on the third business day of each week starting with the first full calendar week following

28

entry of this Interim Order, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); *provided*, that, within one business day of the occurrence of the Termination Declaration Date (as defined below), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the Junior DIP Agent and the B-2 Agent). If any Professional Person fails to deliver a Weekly Statement within three (3) calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Pre-Carve-Out Trigger Notice Reserve (as defined below) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person.

(c)     Carve-Out Reserves.

(i)     Commencing with the week ended August 18, 2023, and on or before the Thursday of each week thereafter, the Debtors shall utilize all cash on hand as of such date and

any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the sum of (a) the greater of (i) the aggregate unpaid amount of all Estimated Fees and Expenses reflected in the Weekly Statement delivered on the immediately prior Wednesday to the Debtors, the Junior DIP Agent, and the B-2 Agent, and (ii) the aggregate amount of unpaid Allowed Professional Fees contemplated to be incurred in the Approved Budget during such week, *plus* (b) an amount equal to the amount of Allowed Professional Fees set forth in the Approved Budget for the week occurring after the most recent Calculation Date.  The Debtors shall deposit and hold such amounts in a segregated account designated by and subject to the control of the Junior DIP Agent and the Postpetition B-2 Agent in trust (the "<u>Funded Reserve Account</u>") to pay such Allowed Professional Fees prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Termination Declaration Date shall be paid first from such Funded Reserve Account.

(ii)    On the day on which a Carve-Out Trigger Notice is given by the Junior DIP Agent or the Postpetition B-2 Agent to the Debtors with a copy to counsel to the Creditors' Committee and counsel to the Prepetition ABL Agent (the "<u>Termination Declaration Date</u>"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date, including cash in the Funded Reserve Account, and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated designated by and subject to the control of the Junior DIP Agent and the Postpetition B-2 Agent in trust to pay such then unpaid Allowed Professional Fees (the "<u>Pre-Carve-Out Trigger Notice Reserve</u>") prior to any and all other claims.  On the Termination Declaration Date, the Carve-Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, after funding the Pre-Carve-Out Trigger Notice

Reserve, to fund a reserve in an amount equal to the Post-Carve-Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account designated by and subject to the control of the Junior DIP Agent and the Postpetition B-2 Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve-Out Trigger Notice Cap (the "Post-Carve-Out Trigger Notice Reserve" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "Carve-Out Reserves") prior to any and all other claims. All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve-Out set forth above (the "Pre-Carve-Out Amounts"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the Junior DIP Agent and the Postpetition B-2 Agent for the benefit of the applicable DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full in cash and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties and the Prepetition UST Secured Parties in accordance with their rights and priorities as set forth in this Interim Order and the Interim UST Cash Collateral Order. All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve-Out set forth above (the "Post-Carve-Out Amounts"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the Junior DIP Agent and the Postpetition B-2 Agent for the benefit of the applicable DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full in cash and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties and the Prepetition UST Secured Parties in accordance with their rights and priorities as set forth in this Interim Order and the Interim UST Cash Collateral Order. Notwithstanding anything to the contrary in the DIP

Loan Documents, or this Interim Order, if either of the Carve-Out Reserves is not funded in full in the amounts set forth in this paragraph 4, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth in this paragraph 4, prior to making any payments to the Junior DIP Agent, the Postpetition B-2 Agent, or the Prepetition Secured Parties and the Prepetition UST Secured Parties, as applicable. Notwithstanding anything to the contrary in the DIP Loan Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the Junior DIP Agent, the Postpetition B-2 Agent, the Prepetition UST Agent, and the Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the Junior DIP Agent and the Postpetition B-2 Agent for application in accordance with the DIP Loan Documents, this Interim Order, and the Interim UST Cash Collateral Order. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve-Out Reserves shall not constitute Loans (as defined in the DIP Loan Documents) or increase or reduce the DIP Obligations, (ii) the failure of the Carve-Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, and (iii) in no way shall the Initial Budget, any subsequent Approved Budget, Carve-Out, Post-Carve-Out Trigger Notice Cap, Carve-Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or in any Prepetition Loan Document, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, the

Adequate Protection Liens, the ABL 507(b) Claims (as defined below), B-2 507(b) Claims (as defined below), UST Tranche A 507(b) Claims, UST Tranche B 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(d)      <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(e)      <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the Junior DIP Agent, the Junior DIP Lender, the Postpetition B-2 Secured Parties, or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with these Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the Junior DIP Agent, the Junior DIP Lender, the Postpetition Secured Parties, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)      <u>Payment of Carve-Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

(g)    _Reservation of Rights_.  Nothing in this Interim Order shall be construed as a waiver of any right of the DIP Secured Parties or any of the Prepetition Secured Parties to object to any fee statement, interim application, or monthly application issued or filed by any Professional Persons.

5.    _Junior DIP Superpriority Claims_.  Pursuant to section 364(c)(1) of the Bankruptcy Code, and except as provided for herein or in the DIP Loan Documents, all of the Junior DIP Obligations shall constitute allowed superpriority administrative expense claims (the "Junior DIP Superpriority Claims") against the DIP Loan Parties on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the DIP Loan Parties (but shall be: (i) with respect to the Prepetition UST Tranche B Priority Collateral, the Prepetition UST Tranche B Joint Collateral, and the Prepetition ABL Priority Collateral, junior to, in the following order, (A) the Carve-Out, (B) the Canadian Priority Charges, (C) the Prepetition Liens of the Prepetition UST Secured Parties (_i.e._, the Prepetition UST Liens), the Prepetition ABL Secured Parties and the Prepetition B-2 Secured Parties in respect thereof of (in such order of priority as set forth herein and in the Prepetition Intercreditor Agreement), the Adequate Protection Liens of the Prepetition UST Secured Parties (_i.e._, the UST Adequate Protection Liens), the Prepetition ABL Secured Parties and the Prepetition B-2 Secured Parties in respect thereof, and the 507(b) Claims of the Prepetition UST Secured Parties (_i.e._, the UST 507(b) Claims), the Prepetition ABL Secured Parties and the Prepetition B-2 Secured Parties in respect thereof, and (D) the Postpetition B-2 Liens (as defined below); and (ii) with respect to the Prepetition B-2 Priority Collateral, shall be junior only to, in the following order, (A) the Carve-Out, (B) the Canadian Priority Charges, (C) the Prepetition B-2 Liens, (D) the Postpetition B-2 Liens, and (E) the B-2 Adequate Protection Liens, and otherwise shall be senior in all respects to the Prepetition ABL Secured Parties' and the

Prepetition UST Secured Parties' Prepetition Liens, Adequate Protection Liens, and 507(b) Claims with respect thereto), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. The DIP Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (excluding (x) the Carve-Out Reserves and amounts held therein other than the DIP Secured Parties' reversionary interest therein and (y) claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, the "Avoidance Actions"), but including (upon entry of the Final Order) any proceeds or property recovered as a result of any Avoidance Actions (but not the Avoidance Actions themselves), whether by judgment, settlement or otherwise (the "Avoidance Proceeds")), subject only to the Carve-Out and the Canadian Priority Charges.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

6.    *Postpetition B-2 Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, and except as provided for herein or in the DIP Loan Documents, all of the Postpetition B-2 Obligations shall constitute allowed superpriority administrative expense claims (the "Postpetition B-2 Superpriority Claims," and, together with the Junior DIP Superpriority Claims, the "DIP Superpriority Claims") against the DIP Loan Parties on a joint and several basis

35

(without the need to file any proof of claim) with priority over any and all claims against the DIP

Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without

limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the

Bankruptcy Code and any and all administrative expenses or other claims arising under sections

105, 326, 327, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the

Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses

or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment;

*provided* that: (i) with respect to the Prepetition UST Tranche B Priority Collateral, the Prepetition

UST Tranche B Joint Collateral, and the Prepetition ABL Priority Collateral, the Postpetition B-2

Superpriority Claims shall be junior, in the following order, to (A) the Carve-Out, (B) the Canadian

Priority Charges, and (C) the Prepetition Liens of the Prepetition UST Secured Parties (*i.e.*, the

Prepetition UST Liens), the Prepetition ABL Secured Parties, and the Prepetition B-2 Secured

Parties in respect thereof of (in such order of priority as set forth herein and in the Prepetition

Intercreditor Agreement), the Adequate Protection Liens of the Prepetition UST Secured Parties

(*i.e.*, the UST Adequate Protection Liens), the Prepetition ABL Secured Parties, and the Prepetition

B-2 Secured Parties in respect thereof, and the 507(b) Claims of the Prepetition UST Secured

Parties (*i.e.*, the UST 507(b) Claims), the Prepetition ABL Secured Parties, and the Prepetition B-

2 Secured Parties in respect thereof; and (ii) with respect to the Prepetition B-2 Priority Collateral,

the Postpetition B-2 Superpriority Claims shall be junior only, in the following order, to (A) the

Carve-Out, (B) the Canadian Priority Charges, (C) the Prepetition B-2 Liens, (D) the Postpetition

B-2 Liens, and (E) the B-2 Adequate Protection Liens, and otherwise shall be senior in all respects

to the Prepetition ABL Secured Parties' and the Prepetition UST Secured Parties' Prepetition

Liens, Adequate Protection Liens, and 507(b) Claims with respect thereto).  The Postpetition B-2

Superpriority Claims shall be payable from, and have recourse to, all prepetition and postpetition property of the DIP Loan Parties and all proceeds thereof (excluding (x) the Carve-Out Reserves and amounts held therein other than the DIP Secured Parties' reversionary interest therein and (y) Avoidance Actions, but including (upon entry of the Final Order) the Avoidance Proceeds), subject only to the Carve-Out and the Canadian Priority Charges.   The Postpetition B-2 Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

7.     *Junior DIP Liens*.   As security for the Junior DIP Obligations, effective and automatically properly perfected on the date this Interim Order is entered, and without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the Junior DIP Agent of, or over, any Collateral, without any further action by the Junior DIP Secured Parties, the following valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens (the "Junior DIP Liens") are hereby granted to the Junior DIP Agent for the benefit of the Junior DIP Secured Parties (all property identified in clauses (a) through (f) below being collectively referred to as the "Junior DIP Collateral," and, together with the Prepetition Collateral, the "Collateral"):

(a)     *Liens on Unencumbered Property*.   Pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in (subject and subordinate only to, in the following order, (A) the Carve-Out and (B) the Canadian Priority Charges) all tangible and intangible prepetition and postpetition property of the DIP Loan Parties, other than Excluded Property, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, was not subject to (i) a valid, perfected

and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date

that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy

Code, and also excluding the Avoidance Actions and the Carve-Out Reserves (and any amounts

held therein), but including (upon entry of the Final Order) Avoidance Proceeds (collectively, the

"Unencumbered Property," and such liens, the "DIP Unencumbered Property Liens")).

(b)     *Liens on DIP Proceeds Account*.   Pursuant to section 364(c)(2) of the

Bankruptcy Code, a first priority lien on and security interest in the proceeds of the Junior DIP

Facility in the DIP Proceeds Account.

(c)     *Junior Liens Priming Certain Prepetition Secured Parties' Liens on*

*Prepetition B-2 Priority Collateral*.   Pursuant to sections 364(c)(3) and 364(d)(1) of the

Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior priority priming

security interest and lien (subject and subordinate only to, in the following order, (1) the Carve-

Out, (2) the Canadian Priority Charges, (3) the Prepetition B-2 Liens, (4) the B-2 Adequate

Protection Liens, and (5) the Postpetition B-2 Liens) on the Prepetition B-2 Priority Collateral) all

tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same

nature, scope, and type as the Prepetition B-2 Priority Collateral, regardless of where located,

which security interest and lien on the Prepetition B-2 Priority Collateral shall prime and be senior

to the Prepetition ABL Liens, the ABL Adequate Protection Liens, the Prepetition UST Tranche

B Liens, the Prepetition UST Tranche A Liens, the UST Tranche B Adequate Protection Liens and

the UST Tranche A Adequate Protection Liens (the "Junior DIP Priming B-2 Second Liens").  For

the avoidance of doubt, notwithstanding anything herein to the contrary, the Junior DIP Priming

B-2 Second Liens shall be (A) priming and senior in all respects to the Prepetition Liens and the

Adequate Protection Liens of the Prepetition ABL Secured Parties and the Prepetition UST

Secured Parties with respect to the Prepetition B-2 Priority Collateral, and (B) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.

(d)     *Junior Liens on Prepetition ABL Priority Collateral*.  Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior priority security interest in, and lien upon (subject and subordinate in all respects to, in the following order, (1) the Carve-Out, (2) the Canadian Priority Charges, and (3) the Prepetition Liens and the Adequate Protection Liens of the Prepetition ABL Secured Parties, the Prepetition B-2 Secured Parties, and the Prepetition UST Secured Parties (in such order of priority as set forth in the Prepetition Intercreditor Agreement)), all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition ABL Priority Collateral, regardless of where located, which security interest and lien, for the avoidance of doubt, shall be junior to (with respect to the Prepetition ABL Priority Collateral) the Prepetition ABL Liens, the ABL Adequate Protection Liens, the Prepetition B-2 Liens, the B-2 Adequate Protection Liens, the Postpetition B-2 Liens, the Prepetition UST Tranche B Liens, the UST Tranche B Adequate Protection Liens, the Prepetition UST Tranche A Liens, and the UST Tranche A Adequate Protection Liens (the "DIP ABL Junior Liens").  Notwithstanding anything herein to the contrary, the DIP ABL Junior Liens shall be (A) junior in all respects to the Prepetition Liens (as set forth in the Prepetition Intercreditor Agreement) and Adequate Protection Liens of the Prepetition ABL Secured Parties, the Prepetition B-2 Secured Parties, and the Prepetition UST Secured Parties, and junior to the Postpetition B-2 Liens, in each case on the Prepetition ABL Priority Collateral, and (B) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section

39

551 of the Bankruptcy Code.

(e)    *Junior Liens on Prepetition UST Tranche B Priority Collateral*.  Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior security interest in, and lien upon, (subject only to, in the following order, (1) the Carve-Out, (2) the Canadian Priority Charges, and (3) the Prepetition Liens and the Adequate Protection Liens of the Prepetition UST Tranche B Secured Parties, the Prepetition B-2 Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition UST Tranche A Secured Parties (in such order of priority as set forth in the Prepetition Intercreditor Agreement with respect to the Prepetition UST Tranche B Priority Collateral and the Postpetition B-2 Liens) all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the Prepetition UST Tranche B Priority Collateral, regardless of where located, which security interest and lien, for the avoidance of doubt, shall be junior to (with respect to the Prepetition UST Tranche B Priority Collateral) the Prepetition Liens and the Adequate Protection Liens of the Prepetition UST Tranche B Secured Parties, the Prepetition B-2 Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition UST Tranche A Secured Parties, and to the Postpetition B-2 Liens (the "Junior DIP UST Tranche B Priority Collateral Junior Liens").  Notwithstanding anything herein to the contrary, the Junior DIP UST Tranche B Priority Collateral Junior Liens shall be (A) junior in all respects to the Prepetition Liens (as set forth in the Prepetition Intercreditor Agreement) and Adequate Protection Liens of the Prepetition ABL Secured Parties, the Prepetition B-2 Secured Parties, and the Prepetition UST Secured Parties, and also junior to the Postpetition B-2 Liens, in each case on the Prepetition UST Tranche B Priority Collateral, and (B) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the

Bankruptcy Code.

(f)    *Junior Liens on UST Tranche B Joint Collateral*.  Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior security interest in, and lien upon, (subject only to, in the following order, (1) the Carve-Out, (2) the Canadian Priority Charges, and (3) the Prepetition Liens and the Adequate Protection Liens of the Prepetition UST Tranche B Secured Parties, the Prepetition B-2 Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition UST Tranche A Secured Parties (in such order of priority as set forth in the Prepetition Intercreditor Agreement with respect to the UST Tranche B Joint Collateral)) all tangible and intangible prepetition and postpetition property of the DIP Loan Parties of the same nature, scope, and type as the UST Tranche B Joint Collateral, regardless of where located, which security interest and lien, for the avoidance of doubt, shall be junior to (with respect to the UST Tranche B Joint Collateral), the Prepetition Liens and the Adequate Protection Liens of the Prepetition UST Tranche B Secured Parties, the Prepetition B-2 Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition UST Tranche A Secured Parties, and to the Postpetition B-2 Liens (the "DIP UST Tranche B Joint Collateral Junior Liens"). Notwithstanding anything herein to the contrary, the DIP UST Tranche B Joint Collateral Junior Liens shall be (A) junior in all respects to the Prepetition Liens (as set forth in the Prepetition Intercreditor Agreement) and Adequate Protection Liens of the Prepetition ABL Secured Parties, the Prepetition B-2 Secured Parties, and the Prepetition UST Secured Parties, and junior to the Postpetition B-2 Liens, in each case on the Prepetition UST Tranche B Joint Collateral, and (B) not subordinate to any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.

(g)    *Liens Junior to Certain Other Liens*.  Pursuant to section 364(c)(3) of the

41

Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected junior security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the DIP Loan Parties that, on or as of the Petition Date, is subject to Prepetition Permitted Senior Liens, which shall be, except with respect to the Junior DIP Priming B-2 Second Liens and the DIP Unencumbered Property Liens, junior and subordinate to the liens of the Prepetition ABL Secured Parties and the Prepetition UST Secured Parties in such order of priority as set forth in the Prepetition Intercreditor Agreement with respect to the Prepetition Collateral.  For the avoidance of doubt, the Junior DIP Liens shall prime the Prepetition ABL Liens, the Prepetition UST Tranche B Liens, and the Prepetition UST Tranche A Liens with respect to the Prepetition B-2 Priority Collateral (and, for the avoidance of doubt, the Junior DIP Liens with respect to the Prepetition B-2 Priority Collateral shall only be junior to, in the following order, (1) the Carve-Out, (2) the Canadian Priority Charges, (3) the Postpetition B-2 Liens, (4) the Prepetition B-2  Liens, and (5) the B-2 Adequate Protection Liens), and shall otherwise, with respect to each of the Prepetition ABL Priority Collateral, the Prepetition UST Tranche B Priority Collateral, and the Prepetition UST Tranche B Joint Collateral, be junior in lien priority to the Prepetition Secured Parties (including the Prepetition UST Secured Parties) (which lien priority(ies), as applicable, shall remain governed by the Prepetition Intercreditor Agreement) and, unless otherwise set forth herein, *pari passu* with the Postpetition B-2 Liens.

(h)     *No Senior Liens.*  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code unless otherwise provided in the DIP Loan Documents or this Interim Order, and (B) unless otherwise provided for in the DIP Loan Documents or in this Interim Order, any liens or security interests arising after the

Petition Date, (other than the Postpetition B-2 Liens as set forth herein), including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code unless otherwise provided for in the DIP Loan Documents or in this Interim Order; *provided*, that, for the avoidance of doubt, the Junior DIP Liens, unless otherwise provided herein, shall be subject and subordinate to the Prepetition Liens and the Adequate Protection Liens of the Prepetition B-2 Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition UST Secured Parties, as applicable, and the Postpetition B-2 Liens, in each case as set forth in the foregoing paragraphs and the DIP Loan Documents; *provided*, *further*, that, for the avoidance of doubt, under the DIP Facility and this Interim Order, the DIP Liens shall prime all other liens on the DIP Proceeds Account, and be senior to the Prepetition Liens and Adequate Protection Liens of the Prepetition ABL Secured Parties, the Prepetition UST Tranche B Secured Parties, and the Prepetition UST Tranche A Secured Parties (but shall be junior and subordinate to the Carve-Out, the Canadian Priority Charges, the Postpetition B-2 Liens, the Prepetition B-2 Liens, and the B-2 Adequate Protection Liens) with respect to the Prepetition B-2 Priority Collateral, as set forth herein and in the DIP Loan Documents.

(i)     *Additional Junior DIP Commitment*.  Notwithstanding anything to the contrary contained herein, or in the Interim UST Cash Collateral Order or the DIP Loan Documents to the contrary, the claims and liens in respect of the Additional Junior DIP Commitment (if any) shall not prime any prepetition or postpetition claims or liens of the Prepetition Secured Parties or the Prepetition UST Secured Parties, and shall be junior and subordinated (including in right of

payment) in all respects to the prepetition and postpetition claims and liens of the Prepetition

Secured Parties and the Prepetition UST Secured Parties, including in respect of any adequate

protection claims and liens granted under this Interim Order and the Interim UST Cash Collateral

Order, including the Adequate Protection Liens, the UST Adequate Protection Liens, the Adequate

Protection Obligations, the UST Adequate Protection Obligations, the 507(b) Claims, and the UST

507(b) Claims, including, for the avoidance of doubt, to the payment and enforcement rights of

each of the B-2 Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition UST

Secured Parties, which rights with respect to the B-2 Secured Parties shall be consistent with and

no less favorable than those set forth in this Interim Order and the other DIP Loan Documents.

8.      *Postpetition B-2 Liens*.  As security for the Postpetition B-2 Obligations, effective

and automatically properly perfected on the date this Interim Order is entered, and without the

necessity of execution, recordation or filing of any perfection document or instrument, or the

possession or control by the B-2 Agent of, or over, any Collateral, without any further action by

the Postpetition B-2 Secured Parties, the following valid, binding, continuing, fully perfected,

enforceable and non-avoidable security interests and liens (the "Postpetition B-2 Liens" and,

together with the Junior DIP Liens, the "DIP Liens") are hereby granted to the Postpetition B-2

Agent for the benefit of the Postpetition B-2 Secured Parties:

(a)      *Liens on DIP Proceeds Account*.  Pursuant to section 364(c)(2) of the

Bankruptcy Code, a first priority lien on and security interest in the proceeds of the Postpetition

B-2 Facility in the DIP Proceeds Account.

(b)      *Liens on Prepetition Collateral*.  Pursuant to sections 364(c)(3) and

364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected senior

priority priming security interest and lien (subject and subordinate only to, in the following order,

(1) the Carve-Out and (2) the Canadian Priority Charges) on the Prepetition Collateral with the same priority as the Prepetition B-2 Liens on such Prepetition Collateral (as set forth in the Prepetition Intercreditor Agreement and herein), including, for the avoidance of doubt, first priority liens on all Prepetition B-2 Priority Collateral, *pari passu* with the Prepetition B-2 Liens on such Prepetition Collateral, and senior to the Junior DIP Liens on such Prepetition Collateral, and to the Prepetition Liens and Adequate Protection Liens of the Prepetition ABL Secured Parties and the Prepetition UST Secured Parties on such Prepetition B-2 Priority Collateral.

(c)     *No Senior Liens.*   The Postpetition B-2 Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code unless otherwise provided in the DIP Loan Documents or this Interim Order, and (B) unless otherwise provided for in the DIP Loan Documents or in this Interim Order, any liens or security interests arising after the Petition Date (other than the Junior DIP Liens as and to the extent set forth herein), including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code unless otherwise provided for in the DIP Loan Documents or in this Interim Order; *provided*, that, for the avoidance of doubt, the Prepetition B-2 Liens, unless otherwise provided herein, shall be subject and subordinate to the Prepetition Liens and the Adequate Protection Liens of the Prepetition ABL Secured Parties and the Prepetition UST Secured Parties with respect to the Prepetition ABL Priority Collateral and the Prepetition UST Tranche B Collateral, as applicable, to the extent set forth in the foregoing paragraphs and the DIP Loan Documents; *provided*, *further*, that, for the

avoidance of doubt, under the Postpetition B-2 Facility and this Interim Order, the Postpetition B-2 Liens shall prime and be senior to the Prepetition Liens and Adequate Protection Liens of the Prepetition ABL Secured Parties, the Prepetition UST Tranche B Secured Parties, the Prepetition UST Tranche A Secured Parties, and shall be senior to the Junior DIP Liens (but shall be junior and subordinate to the Carve-Out and the Canadian Priority Charges), in each case with respect to the Prepetition B-2 Priority Collateral, as set forth herein and in the DIP Loan Documents.

9.      *Protection of DIP Secured Parties' Rights.*

(a)      Except as and to the extent set forth in clauses (b)-(d) immediately below, to the extent any Prepetition Secured Party (or any Prepetition UST Secured Party) has possession of, or control over, any Prepetition Collateral or DIP Collateral, or has been listed as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, such Prepetition Secured Party (and any Prepetition UST Secured Party) shall be deemed to have such possession or be so listed or have such possession or control as a gratuitous bailee and/or gratuitous agent for the benefit of the Junior DIP Secured Parties, and such Prepetition Secured Party (including any such Prepetition UST Secured Party) shall comply with the instructions of the Junior DIP Agent with respect to any of the foregoing.

(b)      So long as there are any B-2 Obligations, Postpetition B-2 Superpriority Claims or B-2 507(b) Claims outstanding and until all B-2 Obligations, Postpetition B-2 Superpriority Claims and B-2 507(b) Claims have been indefeasibly paid in full in cash, the B-2 Secured Parties shall have the exclusive right to exercise remedies with respect to the Prepetition B-2 Priority Collateral and the Junior DIP Secured Parties shall not exercise any remedies with respect to the Prepetition B-2 Priority Collateral, and, as among the Prepetition Facilities, the enforcement rights of the Prepetition Secured Parties (including the Prepetition UST Secured

Parties) with respect to the Prepetition B-2 Priority Collateral shall be subject to the terms of the Prepetition Intercreditor Agreement as if (following payment in full in cash of all B-2 Obligations, Postpetition B-2 Superpriority Claims and B-2 507(b) Claims but prior to the DIP Obligations being satisfied in full) the Junior DIP Agent was party thereto as a Tranche B-2 Term Agent (as defined in the Prepetition Intercreditor Agreement); *provided* that, notwithstanding the foregoing (and these clauses (b)-(d)), nothing contained herein (including these clauses (b)-(d)) shall be construed to prevent the Junior DIP Lender or the Junior DIP Agent from (i) filing a claim or statement of interest with respect to the outstanding obligations owed to it in the Chapter 11 Cases, (ii) taking any action (not adverse to the priority status of any other Prepetition Agent or any Prepetition Secured Party (including any Prepetition UST Secured Party), in order to create, perfect, preserve or protect (but not enforce) its lien, or (iii) filing any necessary or responsive pleadings in opposition to any motion, adversary proceeding, or other pleading filed by any person objecting to or otherwise seeking disallowance of the claim or lien of any DIP Lender or the DIP Agent (such actions in clauses (i) through (iii), the "Permitted Actions").

(c)      So long as there are any Prepetition ABL Obligations or ABL 507(b) Claims outstanding and until all Prepetition ABL Obligations and ABL 507(b) Claims have been, solely with respect to the Prepetition ABL Priority Collateral, indefeasibly paid in full in cash, including the cash collateralization of all issued and outstanding letters of credit, the Prepetition ABL Secured Parties shall have the exclusive right to exercise remedies with respect to the Prepetition ABL Priority Collateral and the DIP Secured Parties shall not exercise any remedies (*provided*, they shall be permitted to take Permitted Actions) with respect to the Prepetition ABL Priority Collateral until the Prepetition Facilities have been indefeasibly paid in full in cash (including the cash collateralization of all issued and outstanding letters of credit of the Prepetition ABL Secured

Parties), and, as among the Prepetition Facilities, the enforcement rights of the Prepetition Secured Parties (including the Prepetition UST Secured Parties) with respect to the Prepetition ABL Priority Collateral shall be subject to the terms of the Prepetition Intercreditor Agreement.

(d)     So long as there are any Prepetition UST Tranche B Obligations or UST Tranche B 507(b) Claims outstanding and until all Prepetition UST Tranche B Obligations and UST Tranche B 507(b) Claims have been, solely with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral, indefeasibly paid in full in cash, the Prepetition UST Tranche B Secured Parties shall have the exclusive right to exercise remedies with respect to the Prepetition UST Tranche B Priority Collateral and the Prepetition Joint Collateral (*provided*, that, with respect to the Prepetition Joint Collateral, the Prepetition B-2 Secured Parties, if any Prepetition B-2 Obligations or B-2 507(b) Claims remain outstanding, shall maintain their enforcement rights as set forth in the Prepetition Intercreditor Agreement) and the DIP Secured Parties shall not exercise any remedies (*provided*, they shall be permitted to take Permitted Actions) with respect to the Prepetition UST Tranche B Priority Collateral and the Prepetition Joint Collateral until the Prepetition Facilities have been indefeasibly paid in full in cash, and, as among the Prepetition Facilities, the enforcement rights of the Prepetition Secured Parties (including the Prepetition UST Tranche B Secured Parties) with respect to the Prepetition Joint Collateral and the Prepetition UST Tranche B Priority Collateral shall be subject to the terms of the Prepetition Intercreditor Agreement.

(e)     Except as set forth in clauses (b)-(d) immediately above or as otherwise set forth in this Interim Order (including paragraph 13) with respect to the Prepetition B-2 Collateral, Prepetition ABL Priority Collateral, Prepetition Joint Collateral, and Prepetition UST Tranche B Priority Collateral, any proceeds of Prepetition Collateral received by any Prepetition Secured

Party (including any Prepetition UST Secured Party), whether in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise, shall be segregated and held in trust for the benefit of, and forthwith paid over to, the Junior DIP Agent for the benefit of the Junior DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The Junior DIP Agent is hereby authorized to make any such endorsements as agent for the applicable Prepetition Secured Parties (including the appliable Prepetition UST Secured Parties).  This authorization is coupled with an interest and is irrevocable.

(f)      The DIP Loan Parties shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except (i) as otherwise permitted by the DIP Loan Documents (including the DIP Term Sheet) or (ii) in the case of any Prepetition ABL Priority Collateral, UST Tranche B Priority Collateral, and UST Tranche B Joint Collateral, pursuant to an order of the Court.

(g)      Upon the occurrence and during the continuation of an Event of Default that has not been waived by the Junior DIP Lender under the DIP Term Sheet (or applicable DIP Loan Documents) and following delivery of written notice (a "Termination Notice") (which may be by e-mail) on not less than five (5) calendar days' notice (such five (5) calendar day period, the "Junior DIP Agent Remedies Notice Period") to lead restructuring counsel to the Debtors, lead restructuring counsel to the Postpetition B-2 Agent, lead restructuring counsel to each of the Prepetition Agents, lead counsel to the Creditors' Committee, counsel to the Prepetition UST Secured Parties, and the U.S. Trustee (the "Remedies Notice Parties"), the Junior DIP Agent may (and any automatic stay otherwise applicable to the Junior DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the terms of this

Interim Order (including this paragraph) is hereby modified), without further notice to, hearing of, or order from this Court, to the extent necessary to permit the Junior DIP Agent to take any or all of the following actions, at the same time or different times, unless the Court orders otherwise (*provided*, that, during the Junior DIP Agent Remedies Notice Period, the Debtors, the Creditors' Committee and/or any party in interest shall be entitled to seek an emergency hearing with the Court and the rights of the Junior DIP Secured Parties, the Postpetition B-2 Secured Parties and the Prepetition Secured Parties (including the Prepetition UST Secured Parties) are fully preserved) (*provided*, *further*, that, if a request for such hearing is made prior to the end of the Junior DIP Agent Remedies Notice Period, then the Junior DIP Agent Remedies Notice Period shall be continued until the Court hears at its earliest availability and rules with respect thereto): (a) immediately terminate and/or revoke the Debtors' right under this Interim Order and any other DIP Loan Documents to use any Cash Collateral (subject to the Carve-Out and related provisions and the Canadian Priority Charges), (b) terminate the Junior DIP Facility and any DIP Loan Document as to any future liability or obligation of the Junior DIP Secured Parties but without affecting any of the Junior DIP Obligations or the Junior DIP Liens securing such Junior DIP Obligations; (c) declare all Junior DIP Obligations to be immediately due and payable; (d) deliver a Carve-Out Trigger Notice; and (e) invoke the right to charge interest at the default rate under the DIP Loan Documents. Upon delivery of such Termination Notice by the Junior DIP Agent, without further notice or order of the Court, subject only to the last sentence of paragraph 9(g), the Junior DIP Secured Parties', the Postpetition B-2 Secured Parties' and the Prepetition Secured Parties' consent to use Cash Collateral and the Debtors' ability to incur Additional Junior DIP Obligations hereunder will automatically terminate and the Junior DIP Secured Parties will have no obligation to provide any Junior DIP Loans or other financial accommodations. As soon as

reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of same on the docket.

(h)     Immediately following the occurrence of an Event of Default and the delivery of the Termination Notice, subject to the Junior DIP Agent Remedies Notice Period, the Junior DIP Secured Parties shall be authorized to, subject to the Prepetition Intercreditor Agreement, the terms and provisions set forth in this Interim Order, and the Carve-Out and related provisions and the Canadian Priority Charges: (a) freeze monies or balances in the Debtors' accounts (unless such monies constitute Prepetition B-2 Priority Collateral, Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral); (b) immediately set-off any and all amounts in accounts maintained by the Debtors with, or subject to the control of, the Junior DIP Agent or the Junior DIP Secured Parties against the Junior DIP Obligations (unless such amounts constitute Prepetition B-2 Priority Collateral, Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral), (c) enforce any and all rights against the Junior DIP Collateral (other than Prepetition B-2 Priority Collateral, Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral), including, without limitation, foreclosure on all or any portion of the Junior DIP Collateral (other than Prepetition B-2 Priority Collateral, Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral), occupying the Debtors' premises, sale or disposition of the Junior DIP Collateral (other than Prepetition B-2 Priority Collateral, Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral); and (d) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents (including the DIP Term Sheet) or applicable law (other than

with respect to Prepetition B-2 Priority Collateral, Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral). If the Junior DIP Secured Parties are not prohibited by the Court from taking any enforcement action with respect to the Junior DIP Collateral (other than Prepetition B-2 Priority Collateral, Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral), the Debtors shall cooperate with the Junior DIP Secured Parties in their efforts to enforce their security interest in the Junior DIP Collateral (other than Prepetition B-2 Priority Collateral, Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral), and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such Junior DIP Secured Parties from enforcing their security interests in the Junior DIP Collateral. During the Junior DIP Agent Remedies Notice Period, the Debtors may use the proceeds of the Junior DIP Facility to the extent drawn prior to the occurrence of an Event of Default and Cash Collateral to make payments, in each case, solely in accordance with the Approved Budget and the terms of the DIP Loan Documents and to the extent necessary to avoid immediate and irreparable harm to the Collateral and protection and preservation thereof.

(i)     Upon the occurrence and during the continuation of an Event of Default that has not been waived by the B-2 Lenders under the DIP Term Sheet (or applicable DIP Loan Documents) and following delivery of a Termination Notice (which may be by e-mail) on not less than five (5) calendar days' notice (such five (5) calendar day period, the "B-2 Agent Remedies Notice Period") to the Remedies Notice Parties, the Junior DIP Agent, and counsel thereto, the B-2 Agent may (and any automatic stay otherwise applicable to the Junior DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, but subject to the

terms of this Interim Order (including this paragraph) is hereby modified), without further notice to, hearing of, or order from this Court, to the extent necessary to permit the B-2 Agent to take any or all of the following actions, at the same time or different times, unless the Court orders otherwise (*provided*, that, during the B-2 Agent Remedies Notice Period, the Debtors, the Creditors' Committee, and/or any party in interest shall be entitled to seek an emergency hearing with the Court and the rights of the Junior DIP Secured Parties, the Postpetition B-2 Secured Parties and the Prepetition Secured Parties (including the Prepetition UST Secured Parties) are fully preserved) (*provided*, *further*, that, if a request for such hearing is made prior to the end of the B-2 Agent Remedies Notice Period, then the B-2 Agent Remedies Notice Period shall be continued until the Court hears at its earliest availability and rules with respect thereto): (a) immediately terminate and/or revoke the Debtors' right under this Interim Order and any other DIP Loan Documents to use any Cash Collateral (subject to the Carve-Out and related provisions and the Canadian Priority Charges), (b) terminate the Postpetition B-2 Facility and any DIP Loan Document as to any future liability or obligation of the Postpetition B-2 Secured Parties but without affecting any of the Postpetition B-2 Obligations or the Postpetition B-2 Liens securing such B-2 Obligations; (c) declare all Postpetition B-2 Obligations to be immediately due and payable; (d) deliver a Carve-Out Trigger Notice; and (e) invoke the right to charge interest at the default rate under the DIP Loan Documents.  Upon delivery of such Termination Notice by the B-2 Agent, without further notice or order of the Court, subject only to the last sentence of paragraph 9(j), the Junior DIP Secured Parties', the Postpetition B-2 Secured Parties' and the Prepetition Secured Parties' consent to use Cash Collateral and the Debtors' ability to incur additional Postpetition B-2 Obligations hereunder will automatically terminate and the B-2 Secured Parties will have no obligation to provide any Postpetition B-2 Loans or other financial accommodations.

As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy of same on the docket.

(j)     Immediately following the occurrence of an Event of Default and the delivery of the Termination Notice, subject to the B-2 Agent Remedies Notice Period, the B-2 Secured Parties shall be authorized to, subject to the Prepetition Intercreditor Agreement, the terms and provisions set forth in this Interim Order, and the Carve-Out and related provisions and the Canadian Priority Charges: (a) freeze monies or balances in the Debtors' accounts (unless such monies constitute Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral); (b) immediately set-off any and all amounts in accounts maintained by the Debtors with, or subject to the control of, the B-2 Agent or the B-2 Secured Parties against the B-2 Obligations (unless such amounts constitute Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral), (c) enforce any and all rights against the Prepetition Collateral (other than Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral), including, without limitation, foreclosure on all or any portion of the Prepetition Collateral (other than Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral), occupying the Debtors' premises, sale or disposition of the Prepetition Collateral (other than Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral); and (d) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents (including the DIP Term Sheet) or applicable law (other than with respect to Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral).  If the B-2 Secured Parties are not prohibited by the Court from taking any

enforcement action with respect to the Prepetition Collateral (other than Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral), the Debtors shall cooperate with the B-2 Secured Parties in their efforts to enforce their security interest in the Prepetition Collateral (other than Prepetition ABL Priority Collateral, UST Tranche B Joint Collateral, or Prepetition UST Tranche B Priority Collateral), and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such B-2 Secured Parties from enforcing their security interests in the Prepetition Collateral.  During the Junior DIP Agent Remedies Notice Period, the Debtors may use the proceeds of the Junior DIP Facility to the extent drawn prior to the occurrence of an Event of Default and Cash Collateral to make payments, in each case, solely in accordance with the Approved Budget and the terms of the DIP Loan Documents and to the extent necessary to avoid immediate and irreparable harm to the Prepetition Collateral and protection and preservation thereof.

(k)     Upon the occurrence and continuance of any of the below events, any such event being deemed an Event of Default, the Prepetition ABL Agent, on not less than five (5) calendar days' notice to the Junior DIP Secured Parties (and their counsel), the Postpetition B-2 Secured Parties (and their counsel), and the Remedies Notice Parties (such five (5) calendar day period, the "ABL Remedies Notice Period") and unless the Court orders otherwise (*provided*, that, during the ABL Remedies Notice Period, the Debtors, the Creditors' Committee, and/or any party in interest shall be entitled to seek an emergency hearing with the Court), may terminate its and the Prepetition ABL Secured Parties' consent to the Debtors' use of Cash Collateral constituting Prepetition ABL Priority Collateral (the date of such termination, the "Cash Collateral Termination Date"): (i) the DIP Obligations have been accelerated in accordance with the terms of the DIP Loan Documents; (ii) the filing of any motion or pleading by the Debtors, or the entry of an order

55

on account of a motion filed by any other party, to stay, vacate, reverse, amend or modify the Interim Order or Final Order in a manner adverse to the Prepetition ABL Secured Parties without the consent of the Prepetition ABL Secured Parties; (iii) the entry of an order appointing a trustee, receiver or examiner with expanded powers with respect to any of the Debtors; (iv) the Debtors shall attempt to invalidate, reduce or otherwise impair the Prepetition ABL Obligations; (v) the dismissal of any of the Chapter 11 Cases; (vi) the effective date of any plan of reorganization; (vii) the conversion of any of the Chapter 11 Cases to a case under chapter 7; (viii) the delivery of a Carve-Out Trigger Notice as provided in this Interim Order; or (ix) the failure of the Debtors to make any payments as and when required under paragraph 13(c) and paragraph 14(a)(iii) of this Interim Order; (x) the Final Order (in form and substance reasonably acceptable to the Prepetition ABL Agent) shall not have been entered by the Court within forty-five (45) days of the Petition Date; (xi) the Prepetition ABL Obligations shall not have been fully repaid or cash collateralized, as applicable, in accordance with the Prepetition ABL Loan Documents by the date that is four (4) months after entry of the Interim Order; (xii) the Debtors shall materially breach any of the other provisions of paragraph 13 of this Interim Order; (xiii) any Approved Budget shall be updated, supplemented, replaced, or otherwise modified without the prior consent of the Prepetition ABL Agent; or (xiv) at any time on or after the date that is four (4) weeks after the entry of this Interim Order, the Debtors shall breach the receipts variance covenant set forth on <u>Exhibit 2</u> attached hereto.

(l)     Immediately upon the occurrence of the Cash Collateral Termination Date, the Prepetition ABL Secured Parties shall be authorized, subject to the Prepetition Intercreditor Agreement and the Carve-Out and the Canadian Priority Charges, to: (a) freeze monies or balances in the Debtors' accounts which constitute proceeds of ABL Priority Collateral; (b) immediately

set-off any and all amounts in accounts maintained by the Debtors to the extent such amounts constitute proceeds of ABL Priority Collateral; (c) enforce any and all rights against the DIP Collateral that constitutes proceeds of ABL Priority Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral constituting ABL Priority Collateral and occupying the Debtors' premises; and (d) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the Prepetition ABL Loan Documents or applicable law, subject to the Prepetition Intercreditor Agreement.  If the Prepetition ABL Secured Parties are permitted by the Court to take any enforcement action with respect to the ABL Priority Collateral, the Debtors shall cooperate with the Prepetition ABL Secured Parties in their efforts to enforce their security interest in the ABL Priority Collateral, and shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such Prepetition ABL Secured Parties from enforcing their security interests in the ABL Priority Collateral.

(m)     No rights, protections or remedies of the Junior DIP Secured Parties, the Prepetition Secured Parties, or the Prepetition UST Secured Parties granted by this Interim Order, the Interim UST Cash Collateral Order, or the DIP Loan Documents shall be limited, modified or impaired in any way by: (i) any actual or purported withdrawal of the consent to the Debtors' authority to continue to use Cash Collateral; (ii) any actual or purported termination of the Debtors' authority to continue to use Cash Collateral; or (iii) the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

10.     *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve-Out and Canadian Priority Charges, no costs or expenses of administration of these cases or any Successor Case or any future proceeding that may result therefrom, including liquidation in

bankruptcy or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral and, upon entry of a final order providing for such relief, Prepetition B-2 Collateral or Prepetition ABL Collateral (in each case, including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the B-2 Agent, or the Prepetition ABL Agent, as applicable, and no consent shall be implied from any action, inaction or acquiescence by any of the DIP Secured Parties, the B-2 Secured Parties, or Prepetition ABL Secured Parties, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties, the B-2 Secured Parties, or Prepetition ABL Secured Parties to any charge, lien, assessment or claims against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.  Further, effective upon entry of a final order providing for such relief, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the DIP Secured Parties or Prepetition Secured Parties.

11. *No Marshaling*.  In no event shall the DIP Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations.  Effective upon entry of a final order providing for such relief, in no event shall the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral or the Prepetition Secured Obligations.

12. *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Secured Parties or Prepetition Secured Parties pursuant to the provisions of this Interim Order, the DIP Loan Documents or any subsequent order of the Court shall, subject to the reservation of rights set out in paragraph 23 of this Interim Order with respect to the Prepetition Secured Parties, be irrevocable, received free and clear of any claim, charge, assessment or other liability.

13. *Use of Cash Collateral*.

(a)  *Authorization to Use Cash Collateral.* The Debtors are hereby authorized, solely on the terms and conditions of this Interim Order and the Interim UST Cash Collateral Order, to use all Cash Collateral in accordance with the DIP Loan Documents and Approved Budget (subject to Permitted Variances).

(b)  *Proceeds of DIP Loans.* All proceeds of the DIP Loans shall be funded and held in the DIP Proceeds Account (as defined in the DIP Loan Documents) in accordance with the terms of the DIP Loan Documents, which DIP Proceeds Account shall be maintained as a segregated account by the Borrower as set forth in the DIP Loan Documents. For the avoidance of doubt, none of the DIP Proceeds Account, any funds therein constituting DIP Loans, or any proceeds of the DIP Loans (exclusive, for the avoidance of doubt, of any proceeds constituting Prepetition ABL Priority Collateral) shall constitute Prepetition ABL Priority Collateral or be subject to any terms or provisions in this Interim Order governing ABL Cash Collateral.

(c)  *Procedures for Use of ABL Cash Collateral.*

(i)  *Delivery of ABL Cash Collateral to Prepetition ABL Agent.* Beginning on the first business day after the date that this Interim Order is entered, and on each business day thereafter following receipt of any Cash Collateral constituting Prepetition ABL Priority Collateral ("ABL Cash Collateral"), the Debtors shall, unless previously paid, (x) wire 80% of the amount of ABL Cash Collateral received on or after August 3, 2023 into the applicable Debtor's blocked account ending *8700 maintained at Citizens Bank on the first business day following receipt of the funds to the extent not already remitted (or such other account as the Prepetition ABL Agent and the Debtors may agree in writing from time to time), to the extent not wired prior to the Petition Date (it being acknowledged that the Prepetition ABL Agent received two such wires prior to the Petition Date in respect of such percentage of the ABL Cash Collateral

received on August 3, 2023 and a portion of the ABL Cash Collateral received on August 4, 2023, as well as received an additional wire of $16.5 million constituting ABL Cash Collateral following the Court's entry of the interim cash collateral order entered at Docket No. 181) (which such prior payments, for the avoidance of doubt, are approved and shall not be invalidated by this Interim Order), or (y) otherwise deliver 80% of the ABL Cash Collateral received on or after August 3, 2023 to the Prepetition ABL Agent in a manner satisfactory to the Prepetition ABL Agent (such remittance, deposit, or delivery, each a "<u>Daily Delivery Event</u>").   Commencing on the third business day of the week following entry of this Interim Order (and on the third business day of each week thereafter) (each, an "<u>Eligibility Reporting Date</u>"), the Debtors shall deliver to the Prepetition ABL Agent information on collections from the prior week (as well as, if applicable, information regarding postpetition collections from prior thereto if either (a) such information has yet to be reported or (b) such information reflects a change from prior reporting (each of (a) and (b), as applicable, the "<u>Supplemental Reporting</u>")) in form and detail reasonably acceptable to the Prepetition ABL Agent.   On the business day after each Eligibility Reporting Date, the Debtors shall (x) to the extent the cumulative Daily Delivery Events since August 3, 2023 (taking Supplemental Reporting into account, if applicable) resulted in delivery of less than 80% of the amount of ABL Cash Collateral received, remit to the Prepetition ABL Agent ABL Cash Collateral in an amount necessary to equal 80% of the amount of ABL Cash Collateral received on or after August 3, 2023 or (y) to the extent the cumulative Daily Delivery Events since August 3, 2023 (taking Supplemental Reporting into account, if applicable) resulted in delivery in excess of 80% of the amount of ABL Cash Collateral received, deduct from that day's Daily Delivery Event ABL Cash Collateral in an amount necessary to equal 80% of the amount of ABL Cash Collateral received on or after August 3, 2023.   The portion of such ABL Cash Collateral to remain with the

Debtors in accordance with this paragraph 13(c)(i) is referred to herein as the "Available ABL Cash Collateral." The Debtors shall be permitted to access and utilize all Available ABL Cash Collateral in accordance with the Approved Budget and the terms and provisions of this Interim Order. For the avoidance of doubt, no portion of the Existing ABL Cash Collateral Deposits shall be required to be remitted to the Debtors pursuant to this paragraph 13(c)(i), nor shall any portion of the Existing ABL Cash Collateral Deposits constitute Available ABL Cash Collateral.

(ii)    *ABL Cash Collateral in Prepetition ABL Agent's Possession.* The Prepetition ABL Agent is authorized to collect upon, convert to cash and enforce checks, drafts, instruments and other forms of payment now or hereafter coming into its or any other Prepetition ABL Secured Party's possession or control which constitute Prepetition ABL Priority Collateral or proceeds thereof.

(d)    *Application of Cash Collateral to Prepetition ABL Obligations.* Notwithstanding anything to the contrary in this Interim Order, except with respect to the Available ABL Cash Collateral as set forth in paragraph 13(c)(i), the Prepetition ABL Agent is authorized at any time, and from time to time, to apply all or any portion of the ABL Cash Collateral (including, without limitation, the Existing ABL Cash Collateral Deposits) now or hereafter in the Prepetition ABL Agent's or any other Prepetition ABL Secured Party's possession or control to the payment or cash collateralization, as applicable, of Prepetition ABL Obligations (including, without limitation, any accrued and unpaid ABL Adequate Protection Fees and Expenses in accordance with paragraph 18, without limiting the obligation of the DIP Loan Parties under paragraph 18 to pay such amounts directly) in accordance with the Prepetition ABL Loan Documents, and no other party in interest shall have any right to use or direct the use of such ABL Cash Collateral, except that the Debtors shall have the right to use and direct the use of Available ABL Cash Collateral.

All such applications to Prepetition ABL Obligations shall be final, subject only to the right of parties in interest, including the Debtors, to seek a determination in accordance with paragraph 19 of this Interim Order that such applications resulted in the payment of any unsecured prepetition claim of the Prepetition ABL Secured Parties.

(e)    *Accounts Collection Practices.*    The Debtors shall maintain at all times reasonably appropriate staffing, staffing levels, and other resources with respect to Accounts billing and collections in order to maximize the Debtors' recovery of proceeds with respect to such Accounts.    The Debtors shall also provide the Prepetition ABL Agent with reasonable access to all Accounts billing and collections systems and associated staff members.

14.    *Adequate Protection of Prepetition Secured Parties.*    Pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, as adequate protection of their respective interests in the Prepetition Collateral (including Cash Collateral) for the aggregate Diminution in Value and as an inducement to the Prepetition Secured Parties to consent to the priming of certain of the Prepetition Liens and the use of their Cash Collateral, the Prepetition Secured Parties are granted the following Adequate Protection (collectively, the "Adequate Protection Obligations"):

(a)    *Adequate Protection of Prepetition ABL Secured Parties.*

(i)    *ABL Adequate Protection Liens.*    The Prepetition ABL Agent is hereby granted, for the benefit of the Prepetition ABL Secured Parties, effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements, a valid, perfected replacement security interest in and lien on account of the Prepetition ABL Secured Parties' Diminution in Value upon all of the Prepetition Collateral (the "ABL Adequate Protection Liens"): (i) in the case of the Prepetition ABL Priority Collateral, senior to all other liens, subject

62

and subordinate to, in the following order, (A) the Carve-Out and (B) the Canadian Priority Charges; (ii) in the case of the Prepetition B-2 Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out, (B) the Canadian Priority Charges, (C) the Prepetition B-2 Liens, (D) the B-2 Adequate Protection Liens, and (E) the DIP Liens; (iii) in the case of the Prepetition UST Tranche B Collateral, subject and subordinate to, in the following order, (A) the Carve-Out, (B) the Canadian Priority Charges, (C) the Prepetition UST Tranche B Liens, (D) the UST Tranche B Adequate Protection Liens, (E) the Prepetition B-2 Liens, and (F) the B-2 Adequate Protection Liens; (iv) in the case of the UST Tranche B Joint Collateral, subject and subordinate to, in the following order, (A) the Carve-Out, (B) the Canadian Priority Charges, and (C) the Prepetition UST Tranche B Liens, the Prepetition B-2 Liens, the UST Tranche B Adequate Protection Liens, and the B-2 Adequate Protection Liens; and (iv) in the case of the Unencumbered Property, subject and subordinate to, in the following order, (A) the Carve-Out, (B) the Canadian Priority Charges, and (C) the DIP Unencumbered Property Liens.

(ii)     *ABL Section 507(b) Claims.*  The Prepetition ABL Secured Parties are hereby granted allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition ABL Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "ABL 507(b) Claims"), which ABL 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions but including, without limitation, Avoidance Proceeds).  Except as otherwise provided herein, the ABL 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy

Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; *provided*, *however*, that the ABL 507(b) Claims shall be junior in all respects to (i) the Carve-Out, (ii) the Canadian Priority Charges, and (iii) the applicable senior Prepetition Liens and Adequate Protection Liens (as set forth in this Interim Order).

(iii)     *Prepetition ABL Secured Parties' Interest, Fees and Expenses*.  As further adequate protection, subject to the Carve-Out and the Canadian Priority Charges, the DIP Loan Parties shall make current cash payments on the first calendar day of each month of (x) interest at the Default Rate (as defined in the Prepetition ABL Credit Agreement), (y) fees with respect to Letters of Credit pursuant to Section 3.2.2 of the Prepetition ABL Credit Agreement (including any such fees that accrue at the default rate as set forth therein), and (z) other fees, in each case pursuant to, due, and payable under the terms of the Prepetition ABL Loan Documents, and shall currently pay in cash, subject to the review procedures set forth in paragraph 18 of this Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition ABL Secured Parties' legal and financial advisors, including, without limitation, those of Choate, Hall & Stewart LLP, Richards, Layton & Finger, PA, AlixPartners, LLP, and any local legal counsel or other advisors, consultants, and other professionals reimbursable under the Prepetition ABL Loan Documents (collectively, the "<u>ABL Adequate Protection Fees and Expenses</u>" and, together with the ABL Adequate Protection Liens and ABL 507(b) Claims, the "<u>ABL Adequate Protection Obligations</u>").

(iv)     *Additional Rights and Protections*.  The Debtors shall deliver to the Prepetition ABL Agent (substantially concurrent with delivery to the DIP Agent) all financial statements, reports, certificates and related items that are required to be delivered to the DIP Agent pursuant to the DIP Term Sheet and other applicable DIP Loan Documents.  On the third (3rd)

business day of each week (commencing on the first full calendar week after entry of this Interim

Order), the Debtors shall deliver to the Prepetition ABL Agent a Borrowing Base Certificate (as

defined in the Prepetition ABL Credit Agreement) as required pursuant to Section 8.1(ii) of the

Prepetition ABL Credit Agreement, which shall be accompanied by customary backup reporting

in form and detail reasonably acceptable to the Prepetition ABL Agent, including, without

limitation, Account agings, and a roll-forward of Prepetition ABL Priority Collateral; *provided*

that the first Borrowing Base Certificate of each month following entry of this Interim Order shall

further include a line item for Ineligible Accounts and a breakdown of Ineligible Accounts as part

of the customary backup reporting provided.  The Debtors shall make the members of their senior

management and its professional advisors available for update calls at least one time per calendar

week with the prepetition ABL Agent and its respective professional advisors, at times reasonably

acceptable to the Prepetition ABL Agent to discuss the cases, the then-current Approved Budget,

the Budget Variance Reports, the Liquidity Reports (each as defined in the DIP Term Sheet), other

reporting delivered pursuant to the DIP Loan Documents, union matters, the status of any

monetization strategies being pursued by the Debtors, including pursuant to the Bidding

Procedures Order (as defined in the DIP Term Sheet), and any other matters (including business,

operational and due diligence matters) reasonably requested by the Prepetition ABL Agent.

    (b)    *Adequate Protection of Prepetition B-2 Secured Parties.*

    (i)    *B-2 Adequate Protection Liens*.  The Prepetition B-2 Agent is

hereby granted, for the benefit of the Prepetition B-2 Secured Parties, effective and perfected upon

the date of this Interim Order and without the necessity of the execution of any mortgages, security

agreements, pledge agreements, financing statements or other agreements, a valid, perfected

replacement security interest in and lien on account of the Prepetition B-2 Secured Parties'

Diminution in Value upon all of the Prepetition Collateral (the "B-2 Adequate Protection Liens" and, together with the ABL Adequate Protection Liens, the "Adequate Protection Liens"):[13] (i) in the case of the Prepetition B-2 Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out and (B) the Canadian Priority Charges; (ii) in the case of the Prepetition UST Tranche B Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out, (B) the Canadian Priority Charges, (C) the Prepetition UST Tranche B Liens, and (D) the UST Tranche B Adequate Protection Liens; (iii) in the case of the Prepetition Joint Collateral, subject and subordinate to, in the following order, (A) the Carve-Out, (B) the Canadian Priority Charges, and (C) the Prepetition UST Tranche B Liens and the Prepetition B-2 Liens; (iv) in the case of the Prepetition ABL Priority Collateral, subject and subordinate to, in the following order, (A) the Carve-Out, (B) the Canadian Priority Charges, (C) the Prepetition ABL Liens, and (D) the ABL Adequate Protection Liens; and (v) in the case of the Unencumbered Property, subject and subordinate to, in the following order, (A) the Carve-Out, (B) the Canadian Priority Charges and (C) the DIP Unencumbered Property Liens.

(ii)        *B-2 Section 507(b) Claims*.  The Prepetition B-2 Secured Parties are hereby granted allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) on account of the Prepetition B-2 Secured Parties' Diminution in Value under section 507(b) of the Bankruptcy Code (the "B-2 507(b) Claims" and, together with the ABL 507(b) Claims, the "507(b) Claims"), which B-2 507(b) Claims shall be payable from and have recourse to all DIP Collateral and all proceeds thereof (excluding Avoidance Actions, but including, without limitation, Avoidance Proceeds).

---

[13]    For the avoidance of doubt, any reference herein to the "Adequate Protection Liens of the Prepetition UST Secured Parties" shall refer to the UST Adequate Protection Liens (as defined and set forth in the contemporaneously entered Interim UST Cash Collateral Order).

Except as otherwise provided herein, the B-2 507(b) Claims shall have priority over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, whether or not such claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; *provided*, *however*, that the B-2 507(b) Claims shall be junior to (i) the Carve-Out, (ii) the Canadian Priority Charges, and (iii) the applicable senior Prepetition Liens and Adequate Protection Liens (as set forth in this Interim Order).

(iii)     *Prepetition B-2 Secured Parties' Interest, Fees and Expenses.*  As further adequate protection, the DIP Loan Parties shall make current cash payments of (x) interest on the last business day of each month at the rate accruing since the Petition Date (which is and shall be deemed for all purposes to be the default rate set forth in Section 2.07 of the Prepetition B-2 Credit Agreement) with respect to ABR Loans (as defined in the Prepetition B-2 Credit Agreement)) and (y) other fees, in each case pursuant to, due, and payable under the terms of the Prepetition B-2 Loan Documents, and shall currently pay in cash, subject to the review procedures set forth in paragraph 18 of this Interim Order, all reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the current and former Prepetition B-2 Secured Parties' legal and financial advisors, including, without limitation, those of (i) White & Case LLP and GrayRobinson, P.A., as counsel to the B-2 Lenders (ii) Holland & Knight LLP, as counsel to the Prepetition B-2 Agent), and (iii) Cousins Law, Milbank LLP and FTI Consulting (as Canadian counsel, lead restructuring counsel and financial advisor, respectively, to certain former Prepetition B-2 Lenders) (*provided*, that, the fees and expenses of the professionals set forth in this clause (iii) shall be reimbursed only as incurred through August 15, 2023), and with respect to

67

clauses (i) and (ii), any local legal counsel or other advisors in any foreign jurisdiction (*provided*, no more than one local legal counsel or other advisor in any foreign jurisdiction) (collectively, the "B-2 Adequate Protection Fees and Expenses" and, together with the B-2 Adequate Protection Liens and B-2 507(b) Claims, the "B-2 Adequate Protection Obligations").

(c)     *Adequate Protection of Prepetition UST Secured Parties.*  The Adequate Protection in favor of the Prepetition UST Secured Parties is set forth in the Interim UST Cash Collateral Order.

15.     *Maintenance of Collateral*.  The DIP Loan Parties shall continue to maintain and insure the Prepetition Collateral and DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Loan Documents and the DIP Loan Documents, as applicable.

16.    *Authorization to Record DIP Liens and Adequate Protection Liens.*

(a)    Without in any way limiting the validity of the automatic perfection of the DIP Liens and the Adequate Protection Liens under the terms of this Interim Order and the Interim UST Cash Collateral Order, the DIP Secured Parties and the Prepetition Secured Parties are hereby authorized, but not required, to execute in the name of the DIP Loan Parties or the Prepetition Loan Parties (as applicable), as their true and lawful attorneys (with full power of substitution, to the maximum extent permitted by law) and to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar perfection instruments in any jurisdiction, or take possession of certificated securities, or take any other similar action in a manner not inconsistent herewith to document, validate or perfect the liens and security interests granted to them hereunder (the "Perfection Actions").  All such Perfection Actions shall be deemed to have been taken on the date of entry of this Interim Order.  The automatic stay shall be modified to the extent necessary to permit the DIP Secured Parties and each Prepetition Secured Parties to take any Perfection Action.  For the avoidance of doubt, the DIP Liens and the Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order, whether or not the Junior DIP Secured Parties, the Postpetition B-2 Secured Parties, or the Prepetition Secured Parties take such Perfection Actions.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agent and each Prepetition Agent, be filed or recorded in the filing or recording offices in addition to or in lieu of any financing statements, mortgages, notices of lien or similar instruments, and all filing and recording offices are hereby authorized to accept a certified copy of this Interim Order for filing and/or recording, as applicable.

69

17.    *Preservation of Rights Granted Under this Interim Order.*

(a)    Other than the claims and liens expressly granted or permitted by this Interim Order, including the Carve-Out and the Canadian Priority Charges, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order shall be permitted while any of the DIP Obligations or the Adequate Protection Obligations remain outstanding, and, except as otherwise expressly provided in or permitted under this Interim Order, including the provisions of paragraph 19, the DIP Liens and the Adequate Protection Liens shall not be: (i) junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (ii) except as provided in this Interim Order or the DIP Loan Documents, subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (iii) except as provided in this Interim Order or the DIP Loan Documents, subordinated to or made *pari passu* with any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties; or (iv) except as provided in this Interim Order or the DIP Loan Documents, junior to any intercompany liens or security interests of the DIP Loan Parties.

(b)    The occurrence and continuance of any Event of Default shall, after written notice by the DIP Agent to the Borrower, counsel to the Borrower, the U.S. Trustee, and lead counsel to the Creditors' Committee (if any), constitute an event of default under this Interim Order and, upon such notice, interest, including, where applicable, default interest, shall accrue and be payable as set forth in the DIP Term Sheet.  Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting

these cases to cases to a Successor Case: (A) the DIP Superpriority Claims, the DIP Liens, the Adequate Protection Liens, the 507(b) Claims, and the Prepetition Liens shall continue in full force and effect, shall maintain their priorities as provided in this Interim Order and the Interim UST Cash Collateral Order, and shall remain binding on all parties in interest until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash; (B) the other rights granted by this Interim Order, including with respect to the Carve-Out and the Canadian Priority Charges, shall not be affected; and (C) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, modification, vacatur, or stay shall not affect (i) the validity, priority, or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur, or stay; or (ii) the validity, priority, and enforceability of the DIP Liens, the Prepetition Liens, the Adequate Protection Liens, and the Carve-Out and the Canadian Priority Charges.  Notwithstanding any such reversal, modification, vacatur or stay, the DIP Obligations, DIP Liens, Adequate Protection Obligations, Adequate Protection Liens, DIP Superpriority Claims, and 507(b) Claims incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges and benefits arising under sections 364(e) and 363(m) of the Bankruptcy Code.

(d)     Except as expressly provided in this Interim Order or in the DIP Loan Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the 507(b) Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by this Interim Order and the DIP Loan Documents, as well as the Carve-Out and the Canadian Priority Charges, shall survive, and shall not be modified, impaired or discharged by the entry of an order (i) converting or dismissing any of these cases, or terminating the joint administration of these cases; (ii) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents); or (iii) confirming a chapter 11 plan in any of the cases.  The terms and provisions of this Interim Order and the DIP Loan Documents shall continue in full force and effect in these cases and in any Successor Cases until all DIP Obligations, Prepetition Secured Obligations, and Adequate Protection Obligations are indefeasibly paid in full in cash and the DIP Commitments have been terminated.  Any confirmation order entered in these cases shall not discharge or otherwise affect in any way the joint and several obligations of the DIP Loan Parties to the DIP Secured Parties under the DIP Facility and the DIP Loan Documents, other than after (x) the payment in full and in cash of all DIP Obligations and the termination of the DIP Commitments or (y) the occurrence of the effective date of such confirmed plan (solely in accordance with the terms of such plan).

(e)     Nothing in this Interim Order or in the other DIP Loan Documents shall, nor shall the extension of Postpetition B-2 Loans or the exercise of any rights thereunder, in any way impair or otherwise effect the validity, perfection, extent or priority of the Prepetition B-2 Liens.

18.     *Payment of Fees and Expenses*.  The DIP Loan Parties are authorized and directed

to pay the DIP Fees and Expenses and Adequate Protection Fees and Expenses.  DIP Fees and Expenses and Adequate Protection Fees and Expenses that constitute professional fees and expenses shall not be subject to allowance or review by the Court but shall be subject to the review procedures set forth in this paragraph 18.  Professionals for the Junior DIP Secured Parties, the Postpetition B-2 Secured Parties, and the Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines, however, any time that such professionals seek payment of fees and expenses from the Debtors prior to confirmation of a chapter 11 plan, each such professional shall provide summary copies of its invoices (including aggregate amounts of fees and expenses and total amount of time on a per-professional basis), which are not required to contain time detail and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, to the DIP Loan Parties, counsel to any statutory committee, and the U.S. Trustee (together, the "Review Parties"); *provided, however*, that (i) the provision of such invoices shall not constitute a waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law; *provided*, *further*, that, the Review Parties reserve the right to seek reasonable, additional information regarding such invoices and time entries of any such professional and/or to challenge any assertion of privilege with respect to the same.  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) calendar days after receipt (the "Review Period").  If no written objection is received by 12:00 a.m. (midnight), prevailing Eastern Time, on the last date of the Review Period, the Debtors shall pay such invoices within five (5) business days.  If an objection to a professional's invoice is

received within the Review Period, the Debtors shall promptly pay the undisputed amount of the invoice without the necessity of filing formal fee applications, regardless of whether the invoiced amount arose or was incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay, on or prior to the Closing Date (as defined in the DIP Term Sheet): (i) any accrued and unpaid ABL Adequate Protection Fees and Expenses, invoices of which have been provided to lead counsel of the Debtors at least one (1) business day prior to the Closing Date and (ii) any costs, fees, expenses (including reasonable and documented legal fees and expenses) and other compensation contemplated by this Interim Order or the DIP Loan Documents, with respect to items (i) and (ii) above, whether arising before or after the Petition Date, which costs, fees and expenses shall not be subject to the Review Period.  No attorney or advisor to any Junior DIP Secured Party, Postpetition B-2 Secured Party, or any Prepetition Secured Party shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

19.    *Effect of Stipulations on Third Parties*.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon the Debtors in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in these cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes unless: (a) such committee or other party in interest with

requisite standing has timely and properly filed an adversary proceeding or initiated a contested matter (subject to the limitations contained herein, a "<u>Challenge Motion</u>") (*provided*, no interested party shall be permitted to raise a defense to standing on the basis that the applicable Debtor is a Delaware limited liability company) by no later than (i) the earlier of (w) one business day before the hearing approving a sale of substantially all of the Debtors' assets or confirming a plan of reorganization, whichever occurs first, (x) as to the Creditors' Committee only, 75 calendar days after entry of this Interim Order, (y) if a chapter 7 or a chapter 11 trustee is appointed or elected prior to the end of the Challenge Period (as defined below), the Challenge Period solely for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (A) 75 calendar days after entry of this Interim Order, or (B) the date that is 30 calendar days after their appointment, and (z) for all other parties in interest, 75 calendar days after entry of this Interim Order; and (ii) any such later date as (v) has been agreed to in writing (which may be by email) by the Prepetition ABL Agent with respect to the Prepetition ABL Obligations or the Prepetition ABL Liens, (w) has been agreed to in writing (which may be by email) by the Prepetition B-2 Agent with respect to the Prepetition B-2 Obligations or the Prepetition B-2 Liens, or (x) has been ordered by the Court for cause upon a motion filed and served within any applicable period or (y) has been ordered by the Court after disposition or resolution of a Challenge Motion (the time period established by the foregoing clauses (i)-(ii), the "<u>Challenge Period</u>"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations or the Prepetition Liens, or (B) asserting or prosecuting any Avoidance Action or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "<u>Challenges</u>") against any Prepetition Secured Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial

75

advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (collectively, the "Representatives") in connection with or related to the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge; *provided*, *however*, that any pleadings filed in connection with a Challenge shall comply with the Federal Rules of Bankruptcy Procedure and set forth with specificity the basis for such Challenge, and any Challenges not so raised prior to the expiration of the Challenge Period shall be deemed forever waived, released and barred.  If no Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such Challenge, then: (1) the Debtors' stipulations, admissions, agreements and releases contained in this Interim Order shall be binding on all parties in interest; (2) the obligations of the Prepetition Loan Parties under the Prepetition Loan Documents shall constitute allowed claims not subject to defense avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise, except as provided in the Prepetition Intercreditor Agreement), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in these cases and any Successor Case(s); (3) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual (other than as provided in the Prepetition Intercreditor Agreement), or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any

statutory or non-statutory committees appointed or formed in these cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, and any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in these cases or any other party acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any chapter 7 or chapter 11 trustee or examiner, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives shall be deemed forever waived, released and barred.  If any Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on each person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any person or entity (each as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges with respect to the Prepetition Loan Documents, Prepetition Secured Obligations or Prepetition Liens, and any ruling on standing, if appealed, shall not stay or otherwise delay confirmation of any plan of reorganization in these cases.  For the avoidance of doubt, any trustee shall, until the expiration of the Challenge Period, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this

paragraph (whether commenced by the trustee or any other party in interest on behalf of the Debtors' estates), be deemed to be a party (other than the Debtors) in such adversary proceeding or contested matter and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgements, admissions, confirmations, and stipulations made by the Debtors in this Interim Order.

20.     *Limitation on Use of DIP Financing Proceeds and Collateral*.  Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out or the Canadian Priority Charges, may be used directly or indirectly, including without limitation through reimbursement of professional fees of any non-Debtor party, in connection with (a) the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the DIP Secured Parties, or the Prepetition Secured Parties, or their respective Representatives (in their capacities as such), or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, DIP Superpriority Claims, Prepetition Secured Obligations, Adequate Protection Liens, or 507(b) Claims or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to the DIP Obligations, the Prepetition Secured Obligations and/or liens, claims, rights, or security interests securing or supporting the DIP Obligations granted under the DIP Orders, the DIP Loan Documents or the Prepetition Loan Documents in respect of the Prepetition Secured Obligations, including, in the case of each (i) and (ii), without limitation, for lender liability or pursuant to sections 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and DIP Collateral (including Cash Collateral) may

be used by the Creditors' Committee to investigate, but not to prosecute, (A) the claims and liens of the Prepetition Secured Parties and (B) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, up to an aggregate cap of no more than $50,000 (the "Investigation Cap"), (b) attempts to prevent, hinder, or otherwise delay or interfere with the Prepetition Secured Parties' or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Obligations, Prepetition Collateral, DIP Obligations, DIP Collateral, as applicable, and the liens, claims and rights granted to such parties under the DIP Orders; (c) attempts to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties or the DIP Secured Parties under this Interim Order, the Interim UST Cash Collateral Order, the Prepetition Loan Documents or the DIP Loan Documents, as applicable, other than in accordance with this Interim Order; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens and claims permitted by the DIP Loan Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and 507(b) Claims; or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are authorized by the Court, agreed to in writing by the DIP Lenders, and expressly permitted under this Interim Order or under the DIP Loan Documents (including the Approved Budget, subject to Permitted Variances), in each case unless all DIP Obligations, Prepetition Secured Obligations, Adequate Protection Obligations, and claims, obligations and liens granted to the DIP Secured Parties, Prepetition Secured Parties, and Prepetition UST Secured Parties under this Interim Order and the Interim UST Cash Collateral Order (inclusive of the UST Adequate Protection Obligations and the Prepetition UST Secured Obligations)), have been indefeasibly paid in full in cash or otherwise agreed to in writing by the DIP Secured Parties (and, for the avoidance

of doubt, no accrued paid time off obligations on account of employees terminated prior to the Petition Date shall be paid until all DIP Obligations, Prepetition Secured Obligations, Adequate Protection Obligations, and claims, obligations and liens granted to the DIP Secured Parties, the Prepetition Secured Parties, and the Prepetition UST Secured Parties under this Interim Order and the Interim UST Cash Collateral Order (inclusive of the UST Adequate Protection Obligations and the Prepetition UST Secured Obligations), have been indefeasibly paid in full in cash).

21.     *Binding Effect; Successors and Assigns.*  The DIP Loan Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, the Prepetition UST Secured Parties, any statutory or non-statutory committees appointed or formed in these cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties, the Debtors, and their respective successors and assigns; *provided*, that the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee or chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

22.     Nothing in this Interim Order, the DIP Loan Documents, the Prepetition Loan Documents or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Secured Party or

Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  The DIP Secured Parties and Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral or Prepetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors.

      23.    *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Loan Documents, to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents or Prepetition Loan Documents, as applicable, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code).  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective Representatives.

24.     *Master Proofs of Claim*.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of these Chapter 11 Cases or any Successor Cases, neither the Prepetition Agents, nor any other Prepetition Secured Parties shall be required to file proofs of claim in these cases or any Successor Cases in order to assert claims for payment of any of the Prepetition Secured Obligations, including, without limitation, any principal, unpaid interest, fees, expenses and other amounts payable under the Prepetition Loan Documents or this Interim Order.  The Debtors' stipulations, admissions and acknowledgments of the claim and liens in respect of the Prepetition Secured Obligations set forth in this Interim Order is deemed to constitute timely proofs of claim in respect of all indebtedness, secured status and claims arising under the Prepetition Credit Documents and this Interim Order.  Nonetheless, in order to facilitate the processing of claims, each Prepetition Agent is authorized, but not directed or required, to file a master proof of claim in the Debtors' lead case *In re Yellow Corporation, et al.*, Case No. 23-11069 (CTG), on behalf of the applicable Prepetition Secured Parties (each, a "Master Proof of Claim"), which shall be deemed to have been filed against each Debtor.  The provisions of this paragraph 24 and the filing of Master Proofs of Claim, if any, are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan filed in these cases.  Any Master Proof of Claim shall not be required to include any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the applicable Prepetition Agent.  The DIP Secured Parties shall not be required to file proofs of claim with respect to the DIP Obligations.

25.     *Insurance*.  To the extent that any Prepetition Agent is listed as a loss payee under

the insurance policies of any of the DIP Loan Parties, the DIP Agent shall also be deemed to be a loss payee under such insurance policies until the indefeasible payment in full of the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and termination of the DIP Commitment and, except with respect to the Prepetition ABL Priority Collateral prior to the Prepetition ABL Obligations being indefeasibly paid in full in cash (or, as applicable, cash collateralized) and with respect to the Prepetition Joint Collateral and Prepetition UST Tranche B Priority Collateral prior to the Prepetition UST Tranche B Obligations being indefeasibly paid in full in cash, shall act in that capacity and distribute any proceeds recovered or received in respect of such insurance policies; *provided*, that the liens granted herein shall not interfere with any rights held by a landlord to insurance proceeds for damage to a landlord's property.

26.     *Credit Bidding*.  The Junior DIP Agent and the Junior DIP Lender have expressly waived any right to credit bid the Junior DIP Obligations.  In each case to the extent permitted by the Prepetition Intercreditor Agreement, (i) the Prepetition ABL Agent (on behalf, and at the direction, of the requisite Prepetition ABL Lenders pursuant to the Prepetition ABL Credit Agreement) shall have the unqualified and unconditional right to credit bid, subject to section 363(k) of the Bankruptcy Code, (x) up to the full amount of the Prepetition ABL Obligations and (y) the ABL Adequate Protection Obligations in the sale or other disposition of any assets of the Debtors, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code, in each case, pursuant to a plan of reorganization or liquidation or by a chapter 7 trustee in a chapter 7 proceeding of ABL Priority Collateral, and (ii) the B-2 Agent (on behalf, and at the direction, of the B-2 Lenders pursuant to the Postpetition B-2 Credit Agreement) shall have the unqualified and unconditional right to credit bid, subject to section 363(k) of the Bankruptcy Code,

(x) up to the full amount of the B-2 Obligations and (y) the B-2 Adequate Protection Obligations in the sale or other disposition of any assets of the Debtors, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code, in each case, pursuant to a plan of reorganization or liquidation or by a chapter 7 trustee in a chapter 7 proceeding of Prepetition B-2 Priority Collateral, and each Prepetition ABL Secured Party and B-2 Secured Party complying with the foregoing shall automatically be deemed a "qualified bidder" with respect to any disposition of assets by the Debtors under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code; *provided*, that, no party shall be permitted to credit bid for Prepetition ABL Priority Collateral until such time that the Prepetition ABL Parties have been indefeasibly paid in full in cash and all issued and outstanding letters of credit cash collateralized. The Prepetition ABL Agent at the direction of the requisite Prepetition ABL Lenders pursuant to the Prepetition ABL Credit Agreement and on behalf of the Prepetition ABL Lenders, and the B-2 Agent at the direction of the B-2 Lenders and on behalf of the B-2 Lenders, shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid to any acquisition entity or joint venture formed in connection with such bid.

27.      *Proceeds of Subsequent Financing.*  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Case shall obtain credit or incur debt pursuant to section 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents or this Interim Order at any time, then all of the cash proceeds derived from such credit or debt shall immediately be applied to satisfy the DIP Obligations in accordance with this Interim Order, the DIP Loan Documents, and the Prepetition

Intercreditor Agreement.

28.     *Rights Preserved*.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the DIP Secured Parties' and the Prepetition Secured Parties', as applicable, respective rights to seek any other or supplemental relief in respect of the Debtors (including, the right to seek additional or different adequate protection); (b) the rights of any of the DIP Secured Parties to seek the payment by the Debtors of post-petition interest or fees pursuant to section 506(b) of the Bankruptcy Code; or (c) any of the rights of the DIP Secured Parties and the Prepetition Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, (iii) seek an injunction, (iv) oppose any request for use of Cash Collateral, (v) object to any sale of assets, or (vi) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; provided that the rights of the DIP Secured Parties and the Prepetition Secured Parties, respectively, with respect to sections (a)–(c) of this paragraph 26 shall be subject to the Prepetition Intercreditor Agreement, as applicable. Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties are preserved.

29.     *No Waiver by Failure to Seek Relief*.  The failure or delay on the part of any of the DIP Secured Parties or any of the Prepetition Secured Parties to seek relief or otherwise exercise their respective rights and remedies under this Interim Order, the DIP Loan Documents, the respective Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute

a waiver of any of their respective rights hereunder, thereunder, or otherwise. No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy. None of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the party against whom such amendment, modification, suspension, or waiver is sought. No consents required hereunder by any of the DIP Secured Parties or any of the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or any of the Prepetition Secured Parties, respectively.

30. *Chubb Reservation of Rights.* For the avoidance of doubt, (i) to the extent ACE American Insurance Company and/or any of its U.S.-based affiliates (collectively, and together with each of their successors, "Chubb") had valid, enforceable, perfected, and non-avoidable liens and/or security interests on property of the Debtors as of the Petition Date, which liens and/or security interests were senior to the liens and/or security interests of each of the Prepetition Secured Parties (collectively, the "Chubb Liens"), the DIP Liens shall not prime the Chubb Liens; (ii) this Interim Order does not grant the Debtors any right to use any property (or the proceeds thereof) held by Chubb as collateral to secure obligations under insurance policies and related agreements; (iii) without altering or limiting any of the foregoing, none of the insurance policies issued by Chubb to or providing coverage to any of the Debtors and any rights and claims thereunder shall be nor shall constitute DIP Collateral nor shall be subject to any liens granted pursuant to this Interim Order, and, further, the proceeds of any insurance policy issued by Chubb shall only be considered to be DIP Collateral to the extent such proceeds are payable to the Debtors (as opposed to a third party claimant) pursuant to the terms of any such applicable insurance policy; and (iv)

86

nothing, including the DIP Loan Documents and/or this Interim Order, alters or modifies the terms and conditions of any insurance policies issued by Chubb and/or any agreements related thereto.

31.     *Provision Regarding TSC Equipment Finance*.  Notwithstanding anything to the contrary set forth in this Order, to the extent that the leases held by TSC Equipment Finance LLC ("TSC") (as successor by assignment to PNC Equipment Finance, LLC) are subsequently found to be financing arrangements rather than true leases (which TSC disputes), nothing contained in this Order shall (x) result in the granting of any priming or pari passu liens on the equipment subject to such leases or (y) otherwise alter or impair the rights or claims of TSC with respect to such equipment or leases.

32.     *Effectiveness*.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

33.     *Governing Order*.  Notwithstanding the relief granted in any other order by this Court, (i) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be subject to this Interim Order, including compliance with the Approved Budget (subject to Permitted Variances) and all other terms and conditions hereof, and (ii) to the extent there is any inconsistency between the terms of the DIP Loan Documents and this Interim Order, this Interim Order shall control.  For the avoidance of doubt, upon entry of this Interim Order, this Interim Order shall supersede and replace the interim cash collateral order entered at Docket No. 181, provided that any adequate protection granted therein to the respective Prepetition Secured Parties for the period from the Petition Date until the entry of this Interim Order shall survive and is hereby reaffirmed and ratified.

34.     *Headings*.  Paragraph headings used herein are for convenience only and shall not affect the construction of, or to be taken into consideration in interpreting, this Interim Order.

35.     *Payments Held in Trust*.  Except as expressly permitted in this Interim Order or the DIP Loan Documents and except with respect to the DIP Loan Parties, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral (other than Prepetition B-2 Collateral, Prepetition ABL Priority Collateral, Prepetition Joint Collateral, or Prepetition UST Tranche B Priority Collateral), receives any DIP Collateral (other than Prepetition B-2 Collateral, Prepetition ABL Priority Collateral, Prepetition Joint Collateral, or Prepetition UST Tranche B Priority Collateral) or any proceeds of the DIP Collateral (other than Prepetition B-2 Collateral, Prepetition ABL Priority Collateral, Prepetition Joint Collateral, or Prepetition UST Tranche B Priority Collateral) or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments, such person or entity shall be deemed to have received, and shall hold, any such DIP Collateral or any payment on account or proceeds thereof (other than Prepetition B-2 Collateral, Prepetition ABL Priority Collateral, Prepetition Joint Collateral, or Prepetition UST Tranche B Priority Collateral) in trust for the benefit of the Junior DIP Secured Parties and shall immediately turn over such collateral or its proceeds to the Junior DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Loan Documents and this Interim Order.

36.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

37.     *No Third Party Rights*.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct,

indirect or incidental beneficiary.

38.    *Necessary Action*.  The Debtors, the DIP Secured Parties, and the Prepetition Secured Parties are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Interim Order.  The automatic stay is modified to permit affiliates of the Debtors who are not debtors in these cases to take all actions as are necessary or appropriate to implement the terms of this Interim Order.

39.    *Retention of Jurisdiction*.  This Court shall retain jurisdiction to enforce the provisions of this Interim Order.

40.    *Final Hearing*.  A final hearing to consider the relief requested in the DIP Motion on a final basis shall be held on September 18, 2023 at 2:00 p.m. (Prevailing Eastern Time).

41.    *Objections*.  Any objections or responses to the DIP Motion shall be filed on or prior to September 11, 2023 at 4:00 p.m. (Prevailing Eastern Time).  Any party objecting to the relief sought at the Final Hearing shall file and serve (via mail and e-mail) written objections, which objections shall be served upon (a) the Debtors, 10990 Roe Avenue, Overland Park, Kansas 66211, Attn: Matthew A. Doheny and Leah Dawson; (b) counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, IL 60654, Attn.: Patrick J. Nash, Jr., P.C. and Whitney C. Fogelberg; 601 Lexington Avenue, New York, New York 10022, Attn.: Allyson B. Smith and Aaron Metviner; (b) counsel to the Junior DIP Lender, Quinn Emmanuel Urquhart & Sullivan, LLP, 865 S. Figueroa St., 10th Floor, Los Angeles, CA 90017, Attn: Eric Winston; 51 Madison Avenue, 22nd Floor, New York, NY 10010, Attn: Susheel Kirplani; Ropes & Gray LLP, 191 North Wacker Drive, 32nd Floor, Chicago, IL 60606, Attn: Lucas S. Smith; 1211 Avenue of the Americas, New York, NY 10036, Attn: Natasha S. Hwangpo; (c) counsel to the B-2 Lenders, White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020 Attn: Scott

Greissman, Elizabeth Feld, and Andrew Zatz; (d) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Jane M. Leamy and Richard Schepacarter; (e) counsel to the Creditors' Committee; (f) the Prepetition ABL Agent, and counsel thereto, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: Kevin Simard and Hampton Foushee; (g) the B-2 Agent and Junior DIP Agent, and counsel thereto, Holland & Knight LLP, 150 N. Riverside Plaza, Suite 2700, Chicago IL 60606, Attn. Joshua M. Spencer and Phillip W. Nelson; (h) the Prepetition UST Tranche A Agent, and counsel thereto, Hogan Lovells US LLP, 390 Madison Avenue, New York, New York 10017, Attn: Ronald J. Silverman and Christopher R. Bryant; (i) the Prepetition UST Tranche B Agent, and counsel thereto, Hogan Lovells US LLP, 390 Madison Avenue, New York, New York 10017, Attn: Ronald J. Silverman and Christopher R. Bryant; (j) the United States Department of Justice and Arnold & Porter Kaye Scholer LLP as counsel to the United States Department of the Treasury, 70 West Madison Street, Suite 4200, Chicago, Illinois 60602, Attn: Michael Messersmith; 250 West 55th Street, New York, New York 10019, Attn: Benjamin Mintz, and 601 Massachusetts Ave., N.W., Washington, DC 20001, Attn: Rosa Evergreen, and the U.S. Department of Justice, 1100 L St NW Rm 7102, Washington, DC 20005-4035, Attn: I-Heng.Hsu and Crystal Geise; and (k) counsel to the proposed Stalking Horse Purchaser, BakerHostetler LLP, 200 S. Orange Avenue, Suite 2300, Orlando, Florida 32801, Attn: Elizabeth Green.

42.     The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) on the parties having been given notice of the Interim Hearing and to any party that has filed with this Court a request for notices in these cases.

90

**Dated: August 18th, 2023**
**Wilmington, Delaware**

**CRAIG T. GOLDBLATT**
**UNITED STATES BANKRUPTCY JUDGE**

**<u>Exhibit 1</u>**

**DIP Term Sheet**

EXECUTION VERSION

**YELLOW CORPORATION**
**DEBTOR-IN-POSSESSION CREDIT FACILITY**
**TERM SHEET**

The following is a summary of the principal terms and conditions of a $142.5 million debtor-in-possession financing facility for the Debtors (as defined below) (the "DIP Term Sheet").

This DIP Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Interim Order (as defined below) with respect to the DIP Loans (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the Junior DIP Facility (as defined below) and the Postpetition B-2 Facility (as defined below), which will be set forth in the DIP Loan Documents (as defined below). The obligations of the Junior DIP Lender (as defined below) and the B-2 Lenders (as defined below), respectively, to provide financing pursuant to this DIP Term Sheet is conditioned upon the execution and delivery of signature pages to this DIP Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein.  In the event of any conflict between this DIP Term Sheet and the terms of the DIP Order (as defined below), the terms of the DIP Order shall govern.

| Parties | **Debtors**: Yellow Corporation, a Delaware corporation ("Yellow" or the "Company") and all of its direct and indirect domestic and Canadian subsidiaries, each as debtors-in-possession (collectively, the "Debtors") in the chapter 11 cases (the "Chapter 11 Cases") commenced August 6, 2023 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). |
|---|---|
| | **Borrower**: Yellow (the "Borrower"). |
| | **Guarantors**: All obligations under the DIP Facility (as defined below), this DIP Term Sheet and the other DIP Loan Documents (each as defined below) will be unconditionally guaranteed, jointly and severally, (x) with respect to the Junior DIP Facility, on a junior priority secured basis and (y) with respect to the Postpetition B-2 Facility, on a *pari passu* secured basis with the Prepetition B-2 Obligations (as defined below), in each case by each direct or indirect subsidiary of the Borrower formed in the United States and Canada which is a "Loan Party" under the B-2 Term Loan Credit Agreement (as defined below) (collectively, the "Guarantors"). |
| | The Borrower and the Guarantors are collectively referred to herein as the "Loan Parties." |
| | **Junior DIP Lender**: MFN Partners, L.P. (the "Junior DIP Lender"). |
| | **Junior DIP Agent**: Alter Domus Products Corp. or another entity designated by the Junior DIP Lender will serve as the administrative agent and collateral agent under the Junior DIP Facility (in such capacity, including any successors, the "Junior DIP Agent") and will perform duties customarily associated with such capacities.  The Junior DIP Lender together with the Junior DIP Agent shall be referred to as the "Junior DIP Secured Parties." |

| | |
|---|---|
| | **Postpetition B-2 Lender**:  Citadel Credit Master Fund LLC and any assignee thereof (the "Postpetition B-2 Lender" and, together with the Prepetition B-2 Lender (as defined below), the "B-2 Lenders"). |
| | **Postpetition B-2 Agent**: Alter Domus Products Corp. will serve as the administrative agent and collateral agent under the Postpetition B-2 Facility (in such capacity, including any successors, the "B-2 Agent") and will perform duties customarily associated with such capacities. The B-2 Lenders together with the B-2 Agent shall be referred to as the "B-2 Secured Parties." |
| **Prepetition Facilities** | **Prepetition Facilities**: The Company is party to each of: |
| | 1.  the Loan and Security Agreement, dated as of February 13, 2014 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "ABL Facility"), by and among Yellow, YRC Inc., USF Reddaway Inc., USF Holland LLC, and New Penn Motor Express LLC, as borrowers (the "ABL Borrowers"), the guarantors from time to time party thereto (together with the ABL Borrowers, the "ABL Obligors"), the lenders from time to time party thereto (the "ABL Lenders"), the issuing banks from time to time party thereto, and Citizens Business Capital, as agent (in such capacity, the "ABL Agent" and, together with the Prepetition ABL Lenders, Bank Providers and Issuing Banks (each as defined in the ABL Facility), the "Prepetition ABL Secured Parties") and any and all Obligations as defined in the ABL Facility, the "Prepetition ABL Obligations"; |
| | 2.  the Amended and Restated Credit Agreement, dated as of September 11, 2019 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "B-2 Term Loan Credit Agreement", the loans thereunder, the "Prepetition B-2 Loans", and any and all Obligations under and as defined in the B-2 Term Loan Credit Agreement (including, without limitation, the exit fee arising pursuant to Section 2.05(c) of the B-2 Term Loan Credit Agreement), the "Prepetition B-2 Obligations" and together with all obligations under the Postpetition B-2 Facility, including, without limitation, all principal, interest, fees and other amounts arising in respect thereof, the "B-2 Obligations"), by and among Yellow, as borrower (the "B-2 Borrower"), the guarantors from time to time party thereto (together with the B-2 Borrower, the "B-2 Obligors"), the lenders from time to time party thereto (the "Prepetition B-2 Lenders"), and the B-2 Agent; |
| | 3.  the UST Tranche A Term Loan Credit Agreement, dated as of July 7, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "UST Tranche A Credit Agreement"), by and among Yellow, as borrower (the "UST Tranche A Borrower"), the guarantors from time to time party thereto (together with the UST Tranche A Borrower, the "UST Tranche A Obligors"), the lenders from time to time party thereto (the "UST Tranche A Lenders"), and The Bank of New York Mellon ("BNYM"), as administrative agent and collateral agent (in such capacities, and BNYM, in its capacities as a party to all other agreements, documents, or instruments with any or all of the Prepetition UST Tranche A Obligors entered into in connection with the transactions relating to the entry of the Prepetition UST Tranche A Credit Agreement and all related loan and security documents and/or the incurrence of the UST Tranche A Obligations (as defined in the UST Adequate Protection Order), including, without limitation, any banking arrangements in connection therewith with BNYM and/or its affiliates, the "UST Tranche A Agent," and, together with the UST Tranche A Lenders, the "Prepetition UST |

Tranche A Secured Parties") and any and all Obligations as defined in the UST Tranche A Credit Agreement, the "Prepetition UST Tranche A Obligations"); and

4.      the UST Tranche B Term Loan Credit Agreement, dated as of July 7, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "UST Tranche B Credit Agreement" and, together with the ABL Facility, B-2 Term Loan Credit Agreement, and UST Tranche A Credit Agreement, the "Prepetition Facilities"), by and among Yellow, as borrower (the "UST Tranche B Borrower"), the guarantors from time to time party thereto (together with the UST Tranche B Borrower, the "UST Tranche B Obligors" and, together with the ABL Obligors,  B-2 Obligors, and UST Tranche A Obligors, the "Prepetition Obligors"), the lenders from time to time party thereto (the "UST Tranche B Lenders" and, together with the ABL Lenders, Prepetition B-2 Lenders, and UST Tranche A Lenders, the "Prepetition Lenders"), and BNYM, as administrative agent and collateral agent (in such capacities, and BNYM, in its capacities as a party to all other agreements, documents, or instruments with any or all of the Prepetition UST Tranche B Obligors entered into in connection with the transactions relating to the entry of the Prepetition UST Tranche B Credit Agreement and all related loan and security documents and/or the incurrence of the UST Tranche B Obligations (as defined in the UST Adequate Protection Order), including, without limitation, any banking arrangements in connection therewith with BNYM and/or its affiliates, the "UST Tranche B Agent", together with the UST Tranche B Lenders, the "Prepetition UST Tranche B Secured Parties", and the UST Tranche B Agent together with the ABL Agent, B-2 Agent, and UST Tranche A Agent, the "Prepetition Agents") and any and all Obligations as defined in the UST Tranche B Credit Agreement, the "Prepetition UST Tranche B Obligations").

The Prepetition Lenders and the Prepetition Agents are collectively referred to herein as the "Prepetition Secured Parties".  The Prepetition Agents are parties to the Amended and Restated Intercreditor Agreement, dated as of July 7, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Intercreditor Agreement"), by and among the Prepetition Agents and acknowledged by the Prepetition Obligors.

All instruments and documents executed at any time in connection with the ABL Facility shall be referred to collectively as the "ABL Documents", all instruments and documents executed at any time in connection with the B-2 Term Loan Credit Agreement shall be referred to collectively as the "B-2 Documents", all instruments and documents executed at any time in connection with the UST Tranche A Credit Agreement shall be referred to collectively as the "UST Tranche A Documents", and all instruments and documents executed at any time in connection with the UST Tranche B Credit Agreement shall be referred to collectively as the "UST Tranche B Documents" and, together with the ABL Documents, B-2 Documents, and UST Tranche A Documents, the "Prepetition Debt Documents."

The Prepetition UST Tranche A Secured Parties and the Prepetition UST Tranche B Secured Parties are collectively referred to herein as the "UST Secured Parties".  The UST Tranche A Documents and UST Tranche B Documents are collectively referred to herein as the "UST Debt Documents."

| DIP Facility | **Junior DIP Facility**: A superpriority junior secured multi-draw term loan facility (the "Junior DIP Facility," and the loans thereunder, the "Junior DIP Loans")[1] in an aggregate principal amount of up to $42.5 million, to be made available as provided below in the section entitled "Commitments." |
|---|---|
| | **Postpetition B-2 Facility**: A superpriority senior secured multi-draw term loan facility (the "Postpetition B-2 Facility," and the loans thereunder, the "Postpetition B-2 Loans"[2]; and the Postpetition B-2 Loans together with the Prepetition B-2 Loans, the "B-2 Loans") in an aggregate principal amount of up to $100.0 million, to be made available below in the section entitled "Commitments." The Postpetition B-2 Facility shall be governed by the B-2 Term Loan Credit Agreement as in effect on the Petition Date, as superseded, supplemented and modified by the terms of this DIP Term Sheet and the Interim Order, and all agreements, instruments and documents executed at any time in connection therewith, including either the DIP Credit Agreement (as defined below) or an amendment to the B-2 Term Loan Credit Agreement (a "Postpetition B-2 Credit Agreement Amendment," the terms of which shall be effective as of the date of the Closing Date) (in either case as may be agreed to by the B-2 Lenders, the B-2 Agent, and the Debtors), which such instruments and documents shall be referred to collectively as the "Postpetition B-2 Loan Documents." |
| | **DIP Loan Documents**: This DIP Term Sheet, the DIP Credit Agreement, the Postpetition B-2 Credit Agreement Amendment (if any), the other Postpetition B-2 Loan Documents, the DIP Orders, the Amended and Restated Fee Letter (as defined below), the Fee Letter (as defined below), and all instruments and documents executed at any time in connection therewith, shall be referred to collectively as the "DIP Loan Documents." |
| | **DIP Loans**: Subject to the terms and conditions herein, including the restrictions on Use of Proceeds set forth below, the proceeds of the DIP Facility will be used in accordance with the terms of the Budget (subject to Permitted Variances) (as such terms are defined below), including to pay (a) (i) Professional Fees (as defined below) and other restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the United States Trustee and allowed professional fees and expenses of a Committee (as defined herein) and (ii) the Carve-Out (as defined below) and the Canadian Priority Charges,[3] (b) all professional fees and expenses |

---

[1] For the avoidance of doubt, proceeds of the DIP Facility will be funded into a controlled segregated bank account (the "DIP Proceeds Account"), which DIP Proceeds Account (and the funds therein) shall be subject to first-priority senior security interests (x) in favor of the Junior DIP Agent with respect to proceeds of the Junior DIP Facility and (y) in favor of the B-2 Agent with respect to proceeds of the Postpetition B-2 Facility, which respective security interests shall be senior in all respects to any other liens or security interests, including any Adequate Protection Liens of the Prepetition Lenders, in such proceeds. For the further avoidance of doubt, none of the DIP Proceeds Account, any funds therein constituting Junior DIP Loans or Postpetition B-2 Loans (as defined below), or any proceeds of the Junior DIP Loans or Postpetition B-2 Loans (exclusive of any proceeds constituting Prepetition ABL Priority Collateral) shall constitute Prepetition ABL Priority Collateral or be subject to any terms or provisions in the Interim Order governing ABL Cash Collateral.

[2] The Junior DIP Loans and the Postpetition B-2 Loans, together, shall be referred to herein as the "DIP Loans." The Junior DIP Facility and the Postpetition B-2 Facility, together, shall be referred to herein as the "DIP Facility."

[3] "Canadian Priority Charges" shall mean, collectively, (i) a super priority charge granted by the Canadian Court over the Canadian Debtors' Collateral to secure payment of the professional fees and disbursements of the Debtors' Canadian counsel, the Information Officer and counsel to the Information Officer (in a maximum

| | |
|---|---|
| | (including legal, financial advisor, appraisal, and valuation-related fees and expenses) incurred by (x) the Junior DIP Agent and/or the Junior DIP Lender as provided under the DIP Loan Documents and (y) the B-2 Agent and/or B-2 Secured Parties as provided under the DIP Loan Documents, including those incurred in connection with the preparation, negotiation, documentation, and court approval of the DIP Facility and (c) payments as set forth in the "Adequate Protection" section below.<br><br>"Professional Fees" shall mean, to the extent allowed at any time, whether by interim or final compensation order entered by the Bankruptcy Court, all unpaid fees and expenses incurred relating to services rendered by persons or firms retained by the Loan Parties pursuant to and in accordance with sections 327, 328, 329, 330, 331, 363, or 503(b)(4) of the Bankruptcy Code (collectively, the "Debtors' Professionals"); provided that to the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by a Final Order by the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees. |
| **Commitments; Funding** | The Junior DIP Loans in an aggregate principal amount of $42.5 million and the Postpetition B-2 Loans in an aggregate principal amount of $100.0 million will be made available as follows (collectively, the "Commitments"), in the case of each of 1-3 below, allocated ratably between the Junior DIP Loans and the Postpetition B-2 Loans:<br><br>1. $60.0 million ($17.9 million of which shall be funded under the Junior DIP Facility and $42.1 million of which shall be funded under the Postpetition B-2 Facility) upon the Bankruptcy Court's entry of an interim order approving the DIP Facility and adequate protection for the Prepetition Secured Parties[4] on an interim basis (the "Interim Order") in form and substance acceptable to the Junior DIP Lender, the B-2 Lenders, the Junior DIP Agent, the B-2 Agent, and the ABL Agent, but prior to the entry of a final order approving the DIP Facility and adequate protection for the Prepetition Secured Parties on a final basis (the "Final Order" and, together with the Interim Order, the "DIP Order", as applicable).<br><br>2. $37.5 million ($11.2 million of which shall be funded under the Junior DIP Facility and $26.3 million of which shall be funded under the Postpetition B-2 Facility) which is permitted to be borrowed on a date that is on or after (x) the date that the Debtors file a revised form of order approving revised bidding procedures for one or more sales of all or substantially all of the Debtors' assets, which shall be in form and substance reasonably |

---

amount not to exceed CDN$700,000) (the "Canadian Administrative Charge"); (ii) a charge granted by the Canadian Court on the Canadian Debtors' Collateral (in a maximum amount not to exceed CDN$3,500,000), securing an indemnity in favor of the Canadian Debtor's directors and officers against any obligations or liabilities that they may incur as directors and officers of the Canadian Debtor on or after the commencement of the Canadian Recognition Proceedings (the "Canadian Directors' Charge"); and (iii) the super priority charge granted by the Canadian Court pursuant to the Canadian DIP Recognition Order in favor of the Junior DIP Lender and B-2 Lenders on the Canadian Debtors' Collateral, other than the UST Tranche B Priority Collateral (the "Canadian DIP Charge").

[4]   For the avoidance of doubt, the interim and final UST Adequate Protection Order shall be entered by the Bankruptcy Court simultaneously with the Interim Order and the Final Order, as applicable, and shall provide for the adequate protection of the UST Secured Parties.

<table>
<tr><td></td><td>

acceptable to the Junior DIP Lender and permitting the B-2 Lenders to credit bid the full amount of the B-2 Obligations (the "<u>Bidding Procedures Motion</u>"), and (y) the parties have entered into final DIP Loan Documents in accordance with the applicable Documentation Principles.

3. $45.0 million ($13.4 million of which shall be funded under the Junior DIP Facility and $31.6 million of which shall be funded under the Postpetition B-2 Facility) which is permitted to be borrowed on a date that is on or after the date that the Court has entered the Final Order.

4. Up to $70.0 million shall be made available by the Junior DIP Lender, at the Debtors' request (the "<u>Additional Junior DIP Commitment</u>").  To the extent drawn, Additional Junior DIP Commitment shall accrue (i) interest at ABR plus 10.0% (paid once-monthly in cash) and (ii) an exit fee of 7.50% of the amount drawn shall be earned, due, and payable upon exit (such amounts to be paid in cash).  The Additional Junior DIP Commitment (x) shall be fully junior and subordinated (including in right and payment) to the claims and liens of the Prepetition B-2 Lenders and B-2 Agent, the Prepetition ABL Secured Parties, and the UST Secured Parties, including their respective adequate protection claims and liens, and to the liens and claims of the Postpetition B-2 Lenders and B-2 Agent under the Postpetition B-2 Facility, including for the avoidance of doubt, to the payment and enforcement rights of each of the B-2 Secured Parties, the Prepetition ABL Secured Parties, and the UST Secured Parties, which rights with respect to the B-2 Secured Parties shall be consistent with and no less favorable than those set forth in this DIP Term Sheet and the DIP Order, and (y) shall be made available to be drawn provided that prepetition senior secured claims outstanding shall not exceed at the time of such draw, in the aggregate, $1.435 billion.

Amounts paid or prepaid under the Junior DIP Facility or in respect of the Additional Junior DIP Commitment, and under the Postpetition B-2 Facility may not be reborrowed.

The Junior DIP Lender shall make each Junior DIP Loan to be made by it hereunder on the respective borrowing date by wire transfer of immediately available funds to the Junior DIP Agent not later than 1:00 p.m., New York City time, and upon receipt of all requested funds the Junior DIP Agent shall promptly wire the amounts so received to the DIP Proceeds Account.

The Postpetition B-2 Lender shall make each Postpetition B-2 Loan to be made by it hereunder on the respective borrowing date by wire transfer of immediately available funds to the B-2 Agent not later than 1:00 p.m., New York City time, and upon receipt of all requested funds the B-2 DIP Agent shall promptly wire the amounts so received to the DIP Proceeds Account.

</td></tr>
<tr><td>

**Use of Proceeds**

</td><td>

No portion of the Debtors' "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) (the "<u>Cash Collateral</u>"), the proceeds of the DIP Facility, the Carve-Out, or the Collateral (as defined below) may be used, whether directly or indirectly:

1. for any purpose that is prohibited under the Bankruptcy Code, the DIP Orders and not in accordance with the Budget (subject to Permitted Variances (as defined below));

2. to finance or reimburse for expenses incurred or to be incurred, in both instances, in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the Junior DIP Secured Parties, the B-2 Secured Parties, the Prepetition Secured Parties, or their respective rights

</td></tr>
</table>

|  | and remedies under DIP Loan Documents, the DIP Order, or the Prepetition Debt Documents; or (ii) any other action, which with the giving of notice or passing of time, would result in an Event of Default under the DIP Loan Documents; |
|  | 3.    other than in respect to UST Adequate Protection Payments[5] or Prepetition ABL Secured Parties as set forth herein, for the payment of fees, expenses, interest or principal or any other payment with respect to the ABL Facility, UST Tranche A Credit Agreement, or UST Tranche B Credit Agreement; and |
|  | 4.    other than for payments for director fees included in and permitted by the Approved Budget, subject to the Debtors' ability to make UST Adequate Protection Payments pursuant to the UST Adequate Protection Order, to make any payment to any board member or shareholder of any Loan Party in their capacity as such. |
|  | except as permitted by the Budget (subject to Permitted Variances (as defined below)), to make any payment in settlement of any claim, action or proceeding without the prior written consent of the Junior DIP Lender and the B-2 Lenders. |
| **Budget** | The 13-week statement of the Loan Parties' anticipated cash receipts and disbursements for the first 13 weeks the Chapter 11 Cases, set forth on a weekly basis, including the anticipated uses of the DIP Facility for such period (the "Budget"), attached hereto as Annex 5.  The Budget will be attached as an exhibit to the Interim Order and shall be in all respects satisfactory to the Junior DIP Lender, the B-2 Lenders and the Prepetition Secured Parties (including the UST Secured Parties).  For the avoidance of doubt, no accrued vacation payment obligations on account of employees terminated prior to the Petition Date shall be paid until all prepetition secured debt has been indefeasibly paid in full in cash. |
| **Documentation Principles** | A credit agreement governing the terms of the Junior DIP Facility (and, if the B-2 Lenders and the Debtors agree, the Postpetition B-2 Facility) (the "DIP Credit Agreement") shall (i) be based on and consistent with the credit agreement attached as Exhibit 1 to the Filed Proposed DIP Order (as defined below) (the "Filed DIP Credit Agreement") except as otherwise set forth in this DIP Term Sheet or in the DIP Order, (ii) be subject to the Senior ICA Provisions (as defined below), (iii) reflect the junior lien on the Collateral with respect to the Junior DIP Facility (and, if applicable, the pari passu secured status of the Postpetition B-2 Facility vis-à-vis the Prepetition B-2 Obligations), (iv) be subject to negotiation in good faith within a reasonable (consistent with the term of this DIP Term Sheet) time period, (v) be reasonably satisfactory to the B-2 Lenders, the UST Secured Parties, and the ABL Agent, and (vi) be satisfactory to the Junior DIP Agent and Junior DIP Lender.  The terms in this paragraph are collectively referred to herein as the "Junior DIP Documentation Principles." |

---

[5]   "UST Adequate Protection Payments" means and includes the UST Tranche A Adequate Protection Payment, the UST Tranche B Adequate Protection Payment, and the UST Adequate Protections Fees and Expenses (each as defined in the UST Adequate Protection Order).  "UST Adequate Protection Order" means, with respect to the adequate protection to be provided to the UST Secured Parties, the separate order substantially in the form included with the Debtors' DIP motion at ECF No. 16-2 (and the motion at ECF No. 16 that attaches the UST Adequate Protection Order, the "Initial DIP Motion"), subject to modifications acceptable to the UST Secured Parties.

The Postpetition B-2 Credit Agreement Amendment (if any) shall (i) be based on and consistent with the B-2 Term Loan Credit Agreement as in effect on the Petition Date, except as otherwise set forth in and superseded, supplemented and modified by (x) the terms set forth in the Filed DIP Credit Agreement, (y) this DIP Term Sheet, and (z) the DIP Order (it being understood that, to the extent of any conflict between the Filed DIP Credit Agreement, this DIP Term Sheet, the DIP Credit Agreement or the DIP Order, then the DIP Term Sheet and the DIP Order shall control), (*provided* that, if the B-2 Lenders and the Debtors agree to enter into a Postpetition B-2 Credit Agreement Amendment and such Postpetition B-2 Credit Agreement Amendment is substantially consistent with the terms and provisions set forth in this DIP Term Sheet, the Filed DIP Credit Agreement, and the DIP Order, it may be entered into by the B-2 Secured Parties and the Debtors without further Court authorization), (ii) be subject to the Senior ICA Provisions (as defined below) and the Intercreditor Agreement, (iii) reflect liens on the Collateral consistent with the priorities set forth herein, including the Senior ICA Provisions, and the Intercreditor Agreement, including first priority liens on the B-2 Priority Collateral (as defined below), (iv) be subject to negotiation in good faith within a reasonable (consistent with the term of this DIP Term Sheet) time period, (v) be reasonably satisfactory to the Junior DIP Lender, the UST Secured Parties, and the ABL Agent, and (vi) be satisfactory to the B-2 Agent and the B-2 Lenders.  The terms in this paragraph, together with the Junior DIP Documentation Principles, the "Documentation Principles."

| | |
|---|---|
| **Collateral; Priority** | **Collateral**:  All property, causes of action, rights, or claims of the Loan Parties (now or hereafter acquired and all proceeds thereof) (subject to limited customary exceptions set forth in the DIP Orders (the "Excluded Property")), including (i) all property or assets of any non-U.S. Loan Parties located in Canada, (ii) all claims and causes of action in connection with any commercial tort and breach of contract claims, (iii) the proceeds of all claims and causes of action (excluding the claims and causes of action themselves) arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code or applicable federal and/or state-law equivalents, (iv) all leasehold interests of any Loan Party, and (v) the proceeds of each of the foregoing (collectively, the "Collateral").

"B-2 Priority Collateral" refers to all Non-UST Tranche B Term Priority Collateral (as defined in the Intercreditor Agreement).

**Junior DIP Facility Priority**:  All obligations of the Loan Parties to the Junior DIP Lender and the Junior DIP Agent under the DIP Loan Documents, including all loans made under the Junior DIP Facility, shall, subject in all respects to the Carve-Out and the Canadian Priority Charge, at all times:

1.  pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status against each Debtor in the Chapter 11 Cases, which claims in respect of the Junior DIP Facility shall be superior to all other claims except as otherwise set forth herein;

2.  pursuant to section 364(c)(2) of the Bankruptcy Code, have first priority and be secured by liens on (i) the Cash Collateral Account and (ii) all unencumbered assets of the Loan Parties (other than Excluded Property) (now or hereafter acquired and all proceeds thereof) that are senior to the adequate protection liens of the Prepetition Secured Parties on such unencumbered assets; |

3. pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, be secured by a lien on the B-2 Priority Collateral that is junior to the B-2 Secured Parties' lien on such collateral, but senior to the Prepetition ABL Secured Parties' and UST Secured Parties' lien on such collateral; and

4. pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by (i) junior liens on the Collateral securing the obligations of the Prepetition Secured Parties (other than as expressly set forth above with respect to the B-2 Priority Collateral) and (ii) a lien on any assets and properties of Canadian Debtors (with respect to the UST Tranche B Priority Collateral any such lien shall be junior to the UST Secured Parties' liens on such collateral) securing the indemnity obligations of the Canadian Debtors to their directors and officers in respect of obligations and liabilities that such directors and officers may incur during or prior to the Canadian Proceedings in their capacities as directors and officers (relating to the restructuring, winddown, and/or related chapter 11 proceedings, including with respect to any amount for wages or termination pay whether arising prior to or following the filing of the Canadian Proceedings) that is junior to any court-ordered charge over such assets and properties as issued or anticipated to be issued by the Canadian Court.

5. Notwithstanding anything above or herein to the contrary or in the DIP Loan Document or the DIP Orders to the contrary, it is expressly understood and agreed that the liens and claims in respect of the Additional Junior DIP Commitment shall be junior and subordinated (including in right of payment) in all respects to the liens and claims (including any adequate protection liens and claims) of the Prepetition Secured Parties and to the liens and claims of the B-2 Secured Parties under the Postpetition B-2 Facility, including, for the avoidance of doubt, to the payment and enforcement rights of each of the B-2 Secured Parties, the Prepetition ABL Secured Parties, and the UST Secured Parties, which rights with respect to the B-2 Secured Parties shall be consistent with and no less favorable than those set forth in this DIP Term Sheet and the DIP Order.

**Postpetition B-2 Facility Priority**: All obligations of the Loan Parties to the B-2 Lender and the B-2 Agent under the Postpetition B-2 Loan Documents (in respect of the Postpetition B-2 Facility), including all loans made under the Postpetition B-2 Facility, shall, subject in all respects to the Carve-Out and the Canadian Priority Charge, at all times:

1. pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status against each Debtor in the Chapter 11 Cases, which claims in respect of the Postpetition B-2 Facility shall be superior to all other claims except as otherwise set forth herein; and

2. pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, in each case have the same priority as the B-2 Secured Parties' prepetition liens on all Collateral, as set forth in the Intercreditor Agreement and herein, including, for the avoidance of doubt, first priority liens on all B-2 Priority Collateral, pari passu with the B-2 Secured Parties' existing liens on the B-2 Priority Collateral, and senior to the Junior DIP Liens, and the liens of the Prepetition ABL Secured Parties and UST Secured Parties, on the B-2 Priority Collateral.

All of the liens described herein with respect to the assets of the Loan Parties shall be effective and perfected as of the entry date of the Interim Order (the "Interim Order Entry Date") and such other mortgages, security agreements, pledge agreements, financing statements, or other

9

agreements as may be reasonably required by the Junior DIP Agent, the Junior DIP Lender, the B-2 Agent and the B-2 Lenders; provided, that the Junior DIP Lender and the Postpetition B-2 Lender agree that they shall not seek real property mortgages after the date hereof.  For the avoidance of doubt, the DIP Orders shall provide that the existing liens of the B-2 Secured Parties with respect to the Prepetition B-2 Obligations shall automatically extend to and be perfected with respect to the Postpetition B-2 Obligations and shall otherwise be granted, and be effective and perfected, as of the Interim Order Entry Date.  Nothing in this DIP Term Sheet, the DIP Orders or the other Postpetition B-2 Loan Documents shall, nor shall the extension of any Postpetition B-2 Loans or the exercise of any rights hereunder or under any Postpetition B-2 Loan Documents, in any way impair or otherwise affect the validity, perfection, extent or priority of the prepetition liens of the B-2 Secured Parties on the B-2 Priority Collateral.

Except to the extent expressly set forth in this DIP Term Sheet and/or the DIP Loan Documents (including with respect to the Postpetition B-2 Obligations), each DIP Order shall contain provisions prohibiting each Loan Party from incurring any additional indebtedness (other than the Carve-Out and the Canadian Priority Charges) which (x) ranks *pari passu* with or senior to the DIP Loans or (y) benefits from a first priority lien under section 364 of the Bankruptcy Code.

The DIP Order and the DIP Loan Documents shall provide intercreditor provisions (the "Senior ICA Provisions") requiring the Junior DIP Agent and the Junior DIP Lender to be silent with respect to the exercise of remedies on Collateral, including the following:

(i) Until the B-2 Obligations have been indefeasibly paid in full in cash, the B-2 Secured Parties shall have the exclusive right to exercise remedies with respect to the B-2 Priority Collateral and the Junior DIP Agent and Junior DIP Lender shall not exercise any remedies with respect to the B-2 Priority Collateral.

(ii) Until the Prepetition ABL Obligations have been paid in full in cash, including the cash collateralization of all issued and outstanding letters of credit, the Prepetition ABL Secured Parties shall have the exclusive right to exercise remedies with respect to the ABL Priority Collateral and the B-2 Agent, the B-2 Lenders, the Junior DIP Agent, and the Junior DIP Lender shall not exercise any remedies with respect to the ABL Priority Collateral until the B-2 Obligations and the Prepetition Facilities shall have been paid in full in cash, including the cash collateralization of all issued and outstanding letters of credit.

(iii) Until the UST Tranche B Obligations (as defined in the UST Adequate Protection Order) have been paid in full in cash, the Prepetition UST Tranche B Secured Parties shall have the exclusive right to exercise remedies with respect to the UST Tranche B Priority Collateral (as defined in the Prepetition Intercreditor Agreement) and the UST Tranche B Joint Collateral (as defined in the Prepetition Intercreditor Agreement) (in the case of the UST Tranche B Joint Collateral, subject to the application of proceeds provision set forth in section 4.1(e) of the Intercreditor Agreement, and the Junior  DIP Lender shall not exercise any remedies with respect to the UST Tranche B Priority Collateral and the UST Tranche B Joint Collateral until the B-2 Obligations and the Prepetition UST Tranche B Obligations shall have been paid in full in cash.

For the avoidance of doubt, (A) the Senior ICA Provisions shall govern the relative rights of the Junior DIP Facility, on the one hand, and the Postpetition B-2 Facility and the Prepetition Facilities, on the other hand, with respect to the exercise remedies on Collateral and (B) as among Prepetition Facilities (and the Postpetition B-2 Facility), the Senior ICA Provisions shall not override the Intercreditor Agreement.

| | |
|---|---|
| | The intercreditor and subordination provisions set forth in this DIP Term Sheet and the other DIP Loan Documents, including the Senior ICA Provisions, and the Intercreditor Agreement are essential elements of the DIP Facility and the protections granted to the parties as consideration therefor and are immediately and irrevocably binding and enforceable. |
| | Notwithstanding the foregoing or elsewhere herein, nothing contained herein shall be construed to prevent any Prepetition Agent, any Prepetition Secured Party, any B-2 Secured Party, any Junior DIP Lender or the Junior DIP Agent from (i) filing a claim or statement of interest with respect to the outstanding obligations owed to it in the Chapter 11 Cases, (ii) submitting a notice of default pursuant to the Prepetition Debt Documents or the DIP Loan Documents and accruing any applicable default interest that may be permitted thereunder, (iii) taking any action (not adverse to the priority status of any other Prepetition Agent, any Prepetition Secured Party, any B-2 Secured Party, any Junior DIP Lender or the Junior DIP Agent) in order to create, perfect, preserve or protect (but not enforce its lien), or (iv) filing any necessary or responsive pleadings in opposition to any motion, adversary proceeding or other pleading filed by any person objecting to or otherwise seeking disallowance of the claim or lien of such Prepetition Agent, any Prepetition Secured Party, any B-2 Secured Party, any Junior DIP Lender or the Junior DIP Agent. |
| **Carve-Out** | Carve-Out as set forth in the DIP Orders and consistent in size with the Carve-Out in the Filed Proposed DIP Order; *provided* that, the Carve-Out post-trigger notice professional fees cap may be increased by up to $1 million to include amounts for an official committee of equityholders in the event one is appointed. |
| **Adequate Protection** | As adequate protection, the Prepetition Secured Parties shall receive customary adequate protection liens and claims consistent with the Intercreditor Agreement, in each case junior to the Carve-Out and the Canadian Priority Charges.  All adequate protection liens and claims of the Prepetition Secured Parties shall (x) be senior to the liens and claims securing the Junior DIP Facility and (y) have the same relative priorities with respect to the liens and claims securing the B-2 Postpetition Facility with respect to the liens and claims securing the Prepetition B-2 Loans pursuant to the Intercreditor Agreement and as provided herein; <u>provided</u>, <u>however</u>, that with respect to the B-2 Priority Collateral, the adequate protection liens and claims of the Prepetition ABL Secured Parties and Prepetition UST Tranche B Secured Parties shall be junior to the liens and claims securing the Junior DIP Facility. |
| | Other than as modified herein, the adequate protection to be provided to the Prepetition ABL Secured Parties shall be as set forth in the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* filed at docket number 16-1 in the Chapter 11 Cases (the "<u>Filed Proposed DIP Order</u>"); *provided* that the Approved Budget, and any subsequent updates, modifications, and supplements shall be subject to review and approval by the ABL Agent. |
| | Other than as set forth below with respect to the sale milestones for the Prepetition B-2 Priority Collateral, the adequate protection to be provided to the UST Secured Parties shall be as set forth in the separate UST Adequate Protection Order, which Order shall be in form and substance acceptable in all material respects to the UST Secured Parties and the DIP Lender.  The Budget, and any subsequent updates, modifications, and supplements shall be subject to review and approval by the UST Secured Parties. |

For the avoidance of doubt, the Interim Order shall also include provisions set forth in the Final Proposed DIP Order regarding (i) the use of and application of ABL Cash Collateral (as defined in the Proposed Interim Order) in accordance with paragraph 11 of the Filed Proposed DIP Order; (ii) reporting and access rights as set forth in paragraph 12(a)(iv) of the Filed Proposed DIP Order; and (iii) compliance with paragraph 11(e) of the Filed Proposed DIP Order.

The adequate protection to be provided to the B-2 Secured Parties shall include, without limitation; (i) adequate protection liens and claims as set forth herein; (ii) interest payments in cash paid on the last Business Day of each month at the rate accruing since the Petition Date (which is and shall be deemed for all purposes to be the default rate set forth in Section 2.07 of the B-2 Term Loan Credit Agreement with respect to ABR Loans (as defined in the B-2 Term Loan Credit Agreement)); (iii) payment of all reasonable and documented prepetition and postpetition fees and expenses of the B-2 Secured Parties' legal and financial advisors as set forth in paragraph 12(b)(iii) of the Filed Proposed DIP Order, including, for the avoidance of doubt, any fees and expenses of White & Case LLP, as counsel to Citadel Credit Master Fund LLC and its affiliates; (iv) delivery by the Debtors to the B-2 Secured Parties (substantially concurrent with delivery to the Junior DIP Agent) of all Chapter 11 Cases filings, financial statements, reports, certificates, notifications, updates, and related items that are required to be delivered to the Junior DIP Agent pursuant to the Reporting Covenants attached hereto as Annex 2, including all items described in the "Additional Information Covenants" herein; (v) the Debtors shall schedule a weekly teleconference between their financial advisors and management team and the B-2 Lenders and their respective advisors (unless the B-2 Lenders request a lesser frequency); (vi) the B-2 Lenders shall have reasonable access to the Debtors' financial advisors, management team and books and records (subject to customary exceptions); (vii) the Debtors shall deliver to the B-2 Agent and the B-2 Lenders and their advisors by 5:00 pm EST on Friday of each week (commencing the first full week after the Interim Order Entry Date) with information for the immediately preceding calendar week ending on a Friday, a status update regarding the sale process contemplated by the Bankruptcy Court's final order approving procedures for one or more sales of all or substantially all of the Debtors' assets in form and substance in all material respects acceptable to the Junior DIP Lender and permitting the B-2 Lenders (or the B-2 Agent on behalf of the B-2 Lenders) to credit bid the full amount of the B-2 Obligations (the "<u>Bidding Procedures Order</u>"), including reports of inbound interest, outbound solicitation, and status of diligence and bids; *provided* that the Borrower shall be entitled to restrict and/or redact commercially sensitive information to protect the competitive sales process as determined in its good faith judgment; *provided, further,* that, solely if the B-2 Lenders become a potential bidder, the Loan Parties shall not be required to provide information to the B-2 Lenders regarding the sale process that is not available to all potential bidders; (viii) the Budget shall be satisfactory to the B-2 Lenders; (ix) the Debtors shall comply with the Approved Budget (subject to Permitted Variances) as set forth in the Filed Proposed DIP Order; and (x) except as permitted by the Budget (subject to Permitted Variances), the Debtors shall not make any payment in settlement of any claim, action or proceeding without the prior written consent of the B-2 Lenders.

| | |
|---|---|
| **Cash Collateral Termination** | The cash collateral termination events and remedies of the Prepetition ABL Secured Parties and UST Secured Parties shall be as set forth in the Filed Proposed DIP Order and the UST Adequate Protection Order, respectively. |
| **DIP Orders** | The DIP Orders shall: |
| | 1. provide that, so long as there are any B-2 Obligations outstanding and until all B-2 Obligations have been indefeasibly paid in full in cash, the Junior DIP Agent and the Junior DIP Lender shall not exercise any enforcement rights with respect to the Collateral, |

12

<table>
<tr><td></td><td>and the enforcement rights with respect to the Collateral shall otherwise be consistent with the priorities for liens and claims securing the DIP Facility as set forth herein and the Senior ICA Provisions;</td></tr>
</table>

|  | and the enforcement rights with respect to the Collateral shall otherwise be consistent with the priorities for liens and claims securing the DIP Facility as set forth herein and the Senior ICA Provisions; |
|---|---|
|  | 2.  provide that, so long as there are (i) any Prepetition UST Tranche B Obligations outstanding or (ii) any Prepetition ABL Obligations (as defined in the Filed Proposed DIP Order) outstanding which have not been fully cash collateralized and until (x) all Prepetition UST Tranche B Obligations have been paid in full in cash and (y) all Prepetition ABL Obligations have been paid in full in cash or fully cash-collateralized, as applicable, the Junior DIP Secured Parties shall not exercise any enforcement rights with respect to the Collateral (other than with respect to the B-2 Collateral, subject to the foregoing paragraph), and the enforcement rights with respect to the Collateral (other than with respect to the B-2 Collateral, subject to the foregoing paragraph) shall otherwise be consistent with the priorities for liens and claims securing the DIP Facility as set forth herein and the Senior ICA Provisions; |
|  | 3.  provide that in no event shall the Junior DIP Agent, Junior DIP Lender, B-2 Secured Parties or Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral; |
|  | 4.  with respect to the Junior DIP Facility, ABL Facility, the Postpetition B-2 Facility and the B-2 Term Loan Credit Agreement, the UST Tranche A Credit Agreement and the UST Tranche B Credit Agreement, approve the Debtors' waiver of all section 506(c) claims and any "equities of the case" exception under section 552(b) of the Bankruptcy Code; and |
|  | 5.  otherwise be in form and substance satisfactory to the Junior DIP Lender, the B-2 Lenders, the ABL Agent, and the UST Secured Parties. |
| **Closing Date** | The closing date of the DIP Facility (the "Closing Date") shall occur within three (3) Business Days (as defined below) of the Interim Order Entry Date and shall be the first Business Day on which the conditions precedent set forth in this DIP Term Sheet have been satisfied or waived by the Junior DIP Lender and the B-2 Lenders. "Business Day" shall mean any day other than a Saturday, Sunday, or day on which banks in New York City are authorized or required by law to close. |
| **Maturity** | Borrowings shall be repaid in full and in cash, and the commitments shall terminate, on the earliest to occur (the "Maturity Date") of the following:  (i) February [__], 2024 (the "Scheduled Maturity Date"); provided, that the Scheduled Maturity Date may be extended by the Junior DIP Lender to May [__], 2024,[6] with the Debtors' consent; provided, however, that the Scheduled Maturity Date may not be extended unless and until all Prepetition UST Tranche A Obligations and Prepetition UST Tranche B Obligations have been paid in full in cash); (ii) the effective date or the date of the substantial consummation (as defined in section 1102(2) of the Bankruptcy Code) of a chapter 11 plan in the Chapter 11 Cases (a "Chapter 11 Plan") that has been confirmed by an order of the Bankruptcy Court (the "Plan Effective Date"); (iii) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Loan Parties to a liquidation under Chapter 7; (iv) the date the Bankruptcy Court orders the dismissal of the bankruptcy case of any of the Loan |

---

[6]    270 days from Closing Date.

<table>
<tr><td></td><td>Parties; (v) the acceleration of the loans or termination of the commitments under the DIP Facility, including as a result of the occurrence of an Event of Default; and (vi) the date that is 45 calendar days after the Petition Date if the Final Order Entry Date shall not have occurred by such date; <em>provided</em> that no prepayment, repayment, repurchase, or exchange of borrowings under the Junior DIP Facility shall occur until the B-2 Obligations have first been indefeasibly paid in full in cash and any such prepayment, repayment, repurchase, or exchange shall otherwise be consistent with the priorities for liens and claims securing the DIP Facility as set forth herein.<br><br>Any order confirming a Chapter 11 Plan shall not discharge or otherwise affect in any way the joint and several obligations of the Loan Parties to the Junior DIP Lender or the B-2 Secured Parties under the DIP Facility and the DIP Loan Documents, other than after the indefeasible payment in full and in cash to the Junior DIP Lender and the B-2 Secured Parties (subject to the priorities set forth herein) of all respective obligations under the DIP Facility and the DIP Loan Documents on or before the Plan Effective Date and the termination of the Commitments.</td></tr>
<tr><td><strong>Interest; Fees</strong></td><td>The interest rate, default rate, and fees (x) under the Junior DIP Facility are set forth in <u>Annex 1-A</u> hereto and that certain Fee Letter dated on or about the date hereof (the "<u>Fee Letter</u>") by and between the Borrower and Alter Domus Products Corp. and (y) under the Postpetition B-2 Facility are set forth in Annex 1-B hereto and that certain Amended and Restated Fee Letter dated on or about the date hereof (the "<u>Amended and Restated Fee Letter</u>") by and between the Borrower and Alter Domus Products Corp.</td></tr>
<tr><td><strong>Conditions Precedent</strong></td><td>The obligations of the Junior DIP Lender and the B-2 Lenders to make any DIP Loans shall be conditioned solely on the satisfaction or waiver of the following:<br><br><u>Interim Order/Bankruptcy Matters</u>.<br><br>1.    The Bankruptcy Court shall have entered an Interim Order that shall be in form and substance acceptable in all material respects to the Junior DIP Agent, Junior DIP Lender, B-2 Lenders, the B-2 Agent, the ABL Agent, and the UST Secured Parties, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal or otherwise challenged or subject to any challenge.  The Loan Parties shall be in compliance in all material respects with the Interim Order.<br><br>2.    Entry of the UST Adequate Protection Order.<br><br>3.    All orders entered by the Bankruptcy Court pertaining to cash management and adequate protection and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the Junior DIP Lender, the B-2 Lenders, and the ABL Agent.<br><br><u>Budgets and Financial Information</u>.<br><br>1.    The Junior DIP Agent, the Junior DIP Lender, the B-2 Agent, the B-2 Lenders and the Prepetition Secured Parties shall have received the Budget as of the Closing Date, which Budget shall be in form and substance satisfactory to the Junior DIP Agent, the Junior DIP Lender, the B-2 Lenders, the ABL Agent, and the UST Secured Parties; <em>provided</em>, that the Budget filed in connection with the Initial DIP Motion shall be acceptable to each of the Junior DIP Lender, the B-2 Lenders, the ABL Agent, and the UST Secured Parties. Any amendments, modifications, updates, or extensions to the Approved Budget shall</td></tr>
</table>

14

require the express written consent of the Junior DIP Lender, the B-2 Lenders, the ABL Agent, and the UST Secured Parties.

<u>Customary Closing Documents</u>.

1.   All reasonable invoiced costs, fees, expenses (including reasonable and documented legal fees and expenses) of the Junior DIP Agent and Junior DIP Lender and the B-2 Secured Parties and other compensation required by the DIP Loan Documents and this DIP Term Sheet shall have been paid or reimbursed on or prior to the Closing Date (solely to the extent invoiced in advance thereof).

2.   The Junior DIP Lender shall be satisfied that the Loan Parties have complied with the following customary closing conditions:  (i) the delivery of corporate records and documents from public officials, secretary's certificates, and officer's certificates; and (ii) evidence of authority.  The Loan Parties and the transactions contemplated by this DIP Term Sheet shall be in compliance in all material with all applicable laws and regulations.

3.   The Loan Parties have not transferred assets or incurred any debt or obligations outside the ordinary course of business since July 7, 2023, except as disclosed to the Junior DIP Lender and B-2 Lenders in writing (which may be by email) prior to the Closing Date.

4.   The Junior DIP Agent and the B-2 Agent shall have received all documentation and other information that the Junior DIP Agent and/or the B-2 Agent reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

**<u>Conditions to All Loans and all Withdrawals from the DIP Proceeds Account</u>**:

With respect to all borrowings under the DIP Facility and all withdrawals from the DIP Proceeds Account:

1.   With respect to borrowings under the DIP Facility and withdrawals from the DIP Proceeds Account that occur on or after the date that is 45 days following the date on which the Chapter 11 Cases are commenced (the "<u>Petition Date</u>"), the Final Order shall be in full force and effect and shall not (in whole or in part) have been modified or amended absent written consent of the Junior DIP Lender and the B-2 Lenders or reversed, stayed, vacated, appealed, or subject to a stay pending appeal or otherwise challenged or subject to any challenge absent written consent of the Junior DIP Lender or the B-2 Lenders.

2.   The Loan Parties shall be in compliance in all material respects with each order entered in the Chapter 11 Cases, including the DIP Orders and the Cash Management Order.

3.   The Loan Parties shall be in compliance with the Budget (subject to Permitted Variances).

4.   The following statements shall be true and correct:  (i) the representations and warranties contained in the DIP Loan Documents are true and correct in all material respects (including on and as of each date the Loan Parties request to borrow DIP Loans and Postpetition B-2 Loans) as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects on and as

15

<table>
<tr><td></td><td>5.</td><td>of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on such date.</td></tr>
</table>

| | | |
|---|---|---|
| | 5. | If reasonably requested, execution and delivery by the Loan Parties of the DIP Loan Documents and promissory notes (if requested by the Junior DIP Lender or any B-2 Lender) evidencing the loans made and to be made under the Junior DIP Facility or the Postpetition B-2 Facility, as applicable. |
| | 6. | The Junior DIP Agent and the B-2 Agent shall have received a borrowing notice not later than 1:00 p.m., New York City time at least one (1) Business Day prior to the borrowing. |
| **Covenants** | | The covenants under the DIP Loan Documents shall be subject to the respective Documentation Principles and subject to, and based on the terms and conditions of, the DIP Orders, as applicable. Neither the DIP Credit Agreement nor the Postpetition B-2 Loan Documents shall include any "anti-hoarding" covenant or mandatory prepayment provisions.  The covenants shall include: |
| | | **Additional Information Covenants**:   Additional information covenants shall apply for the benefit of the Junior DIP Lender and the B-2 Secured Parties as follows: |
| | 1. | Chapter 11 Cases Filings.  Delivery by the Loan Parties to the Junior DIP Agent and the B-2 Lenders of copies of all pleadings, motions, applications, judicial information, financial information, and other documents filed by or on behalf of any other Loan Party with the Bankruptcy Court in the Chapter 11 Cases, or distributed by or on behalf of any Loan Party to any official committee appointed in the Chapter 11 Cases, including all motions for "first day" and "second day" relief. |
| | 2. | Conference Call.  The Loan Parties shall schedule a weekly teleconference between their financial advisors and management team and the Junior DIP Agent and Junior DIP Lender and the B-2 Secured Parties and their respective advisors (unless the Junior DIP Lender requests a lesser frequency). |
| | 3. | Access.  The Junior DIP Agent, the Junior DIP Lender and the B-2 Secured Parties shall have reasonable access to the Company's financial advisors, management team and books and records (subject to customary exceptions); provided that the Borrower shall be entitled to restrict and/or redact information to protect the competitive sales process as determined in its good faith judgment. |
| | 4. | Sale Process Reporting.  Delivery by the Loan Parties to the Junior DIP Agent, Junior DIP Lender, B-2 Agent, and the B-2 Lenders and their respective advisors by 5:00 pm EST on Friday of each week (commencing the first full week after the Closing Date) with information for the immediately preceding calendar week ending on a Friday, a status update regarding the sale process contemplated by the Bidding Procedures Order, including reports of inbound interest, outbound solicitation, and status of diligence and bids, *provided* that the Borrower shall be entitled to restrict and/or redact commercially sensitive information to protect the competitive sales process as determined in its good faith judgment; *provided*, *however*, if the Junior DIP Lender and/or the B-2 Lenders is / are / become(s) a potential bidder, the Loan Parties shall not be required under the DIP Loan Documents to provide information to the Junior DIP Lender and/or B-2 Lenders, as applicable, regarding the sale process that is not available to all potential bidders. |
| | 5. | Reporting Frequency.  Delivery by the Loan Parties to the Junior DIP Agent, Junior DIP Lender, the B-2 Agent and the B-2 Lenders and their respective advisors of a daily |

16

liquidity report (which may be sent by email) (to commence with the second Business Day following the Closing Date).

6.      <u>Disbursements Reporting.</u>  Delivery by the Loan Parties to the Junior DIP Agent, Junior DIP Lender, the B-2 Agent, and the B-2 Lenders and their respective advisors by 5:00 pm EST on Friday of each week with information for the immediately preceding calendar week ending on a Friday (commencing the first full week after the Closing Date) an itemized list of disbursements.

7.      <u>Receivables Reporting.</u>  Delivery by the Loan Parties to the Junior DIP Agent, Junior DIP Lender, B-2 Agent, and the B-2 Lenders and their respective advisors by 5:00 pm EST on Friday of each week with information for the immediately preceding calendar week ending on a Friday (commencing the first full week after the Closing Date) a list of receivables and payables.

8.      <u>Agreements.</u>  Notification by the Loan Parties to the Junior DIP Lender and the B-2 Lenders and their respective advisors, within one (1) Business Day (or such longer timeframe as agreed by the Junior DIP Lender and B-2 Lenders), of any new material agreement entered into or material obligation incurred by any Loan Party.

**Affirmative Covenants**: Affirmative covenants in favor of the Junior DIP Lender and, where indicated, the B-2 Secured Parties, as follows:

1.      Comply in all material respects with (x) with respect to the Junior DIP Lender and the B-2 Secured Parties, the DIP Order and (y) each other order entered by the Bankruptcy Court in the Chapter 11 Cases .

2.      Upon the reasonable request of the Junior DIP Agent, Junior DIP Lender, B-2 Agent, or B-2 Lenders, access to information (including historical information) and personnel regarding strategic planning, cash, and liquidity management, and operational and restructuring activities (subject to customary exceptions); *provided* that the Borrower shall be entitled to restrict and/or redact information in order to protect the competitive sales process  as determined in its good faith judgment; *provided*, *further*, if the Junior DIP Lender and/ or the B-2 Lenders is / are / become(s) a potential bidder, the Loan Parties shall not be required under the DIP Loan Documents to provide information to the Junior DIP Lender and/or the B-2 Lenders, as applicable, regarding the sale process that is not available to all potential bidders.

3.      With respect to the Junior DIP Lender, comply with the Budget as set forth on Annex 3.

4.      Pay all fees and expenses of estate professionals when due in accordance with the interim compensation procedures approved in the Chapter 11 Cases.

**Negative Covenants**: Negative covenants in favor of the Junior DIP Lender and, where indicated, the B-2 Secured Parties, as follows:

1.      Absent the consent of the Junior DIP Lender and, to the extent constituting or impacting any B-2 Priority Collateral, the B-2 Lenders, (a) assume or reject any executory contract or unexpired lease or (b) consent to termination or reduction of the exclusivity period to

<table>
<tr><td></td><td></td><td>file and solicit a chapter 11 plan or fail to object to any motion seeking to terminate or reduce such exclusivity period.</td></tr>
<tr><td></td><td>2.</td><td>For the benefit of the Junior DIP Lender and the B-2 Secured Parties, modify or alter organizational documents in any material manner, except as required by the Bankruptcy Code.</td></tr>
<tr><td></td><td>3.</td><td>Assert any right of subrogation or contribution against any other Loan Party until all borrowings under the DIP Facility are indefeasibly paid in full and in cash as provided herein and the commitments are terminated.</td></tr>
<tr><td></td><td>4.</td><td>Except as set forth in the Approved Budget (subject to Permitted Variances), the DIP Orders, or the "first day" or "second day" orders, make any payment of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than UST Adequate Protection Payments, the payment of ABL Adequate Protection Fees and Expenses (as defined in the Filed Proposed DIP Order), adequate protection payments for the B-2 Lenders, any other payments contemplated by the DIP Order (including repayments of the B-2 Obligations as set forth herein), and other payments agreed in writing by the Junior DIP Lender and B-2 Lenders and authorized by the Bankruptcy Court.</td></tr>
<tr><td></td><td>5.</td><td>Incur any new debt, including redrawing, and/or reborrowing the ABL Facility.</td></tr>
<tr><td></td><td>6.</td><td>For the benefit of the Junior DIP Lender and the B-2 Secured Parties, incur any new consensual liens on any assets of any Loan Party.</td></tr>
<tr><td></td><td>7.</td><td>Other than for director fees included in and as permitted by the Approved Budget (subject to Permitted Variances), subject to the Debtors' ability to make UST Adequate Protection Payments pursuant to the UST Adequate Protection Order, make any payment to any board member or shareholder of any Loan Party in their respective capacities as such.</td></tr>
<tr><td></td><td>8.</td><td>For the benefit of the Junior DIP Lender and, to the extent involving B-2 Priority Collateral, the B-2 Secured Parties, no asset sales other than (i) immaterial assets in an aggregate amount not exceeding $250,000 during the term, and (ii) in accordance with the Bidding Procedures Order, the DIP Order and other applicable "first day" or "second day" orders.</td></tr>
<tr><td></td><td>9.</td><td>Abandonment of any material assets or any similar action absent written approval of the Junior DIP Lender and the B-2 Lenders, and with respect to the Prepetition UST Tranche B Priority Collateral, the UST Secured Parties.</td></tr>
<tr><td><strong>Milestones</strong></td><td colspan="2">The Junior DIP Facility and DIP Orders shall contain the following milestones (which will not limit or modify the milestones set forth in the UST Adequate Protection Order for the UST Tranche B Priority Collateral, except as modified in Annex 4), such milestones may be extended or waived in writing (which may be via email) by the Junior DIP Lender:[7]</td></tr>
</table>

---

[7]   The failure by the Debtors to meet any milestone set forth in this DIP Term Sheet, unless otherwise waived by the Junior DIP Lender, will be an Event of Default under the Junior DIP Facility and under the Postpetition B-2 Credit Agreement.  The failure by the Debtors to meet any milestone set forth in this DIP Term Sheet that is also

1. No later than fifteen (15) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order and the UST Adequate Protection Order, each in form and substance satisfactory to the Junior DIP Lender, the Junior DIP Agent, the B-2 Agent, and the B-2 Lenders;

2. By no later than fifteen (15) calendar days entry of the Interim Order, the Canadian Court shall have issued the Canadian Initial Recognition Order, the Canadian Supplemental Order and the Canadian Interim DIP Recognition Order;

3. No later than thirty (30) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order, in form and substance reasonably satisfactory to the Junior DIP Lender;

4. By no later than fifteen (15) calendar days after entry of the Final Order, the Borrower, in its capacity as foreign representative on behalf of the Debtors, shall have filed a motion with the Canadian Court for the recognition of, and the Canadian Court shall have issued, the Canadian Final DIP Recognition Order;

5. No later than forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, in form and substance satisfactory in all material respects to the Junior DIP Lender, the Junior DIP Agent, the B-2 Agent, and the B-2 Lenders;

6. No later than ninety (90) calendar days after the Petition Date, the Debtors shall have received unique, non-duplicative binding cash bids for the B-2 Priority Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, net cash proceeds of at least $250 million; and

7. No earlier than one-hundred twenty (120) calendar days after the Petition Date (which may be extended to one-hundred fifty (150) calendar days after the Petition Date with (i) the consent of the Prepetition ABL Agent, the B-2 Agent, and the UST Secured Parties (in each case such consent not to be unreasonably withheld), and (ii) the consent of the Junior DIP Lender in its sole discretion) and no later than one-hundred and fifty (150) calendar days after the Petition Date (which may be extended to one-hundred and eighty (180) calendar days after the Petition Date with (i) the consent of the Prepetition ABL Agent, the Prepetition B-2 Agent, and the UST Secured Parties (in each case such consent not to be unreasonably withheld), and (ii) the consent of the Junior DIP Lender in its sole discretion), the Debtors shall have consummated one or more sales of all or substantially all of their assets in accordance with the Bidding Procedures Order that generates net cash proceeds in respect of the B-2 Priority Collateral of at least 100% of outstanding obligations under the Junior DIP Facility and the B-2 Obligations and shall have indefeasibly repaid the B-2 Obligations and outstanding obligations under the Junior DIP Facility in full in cash.

---

a milestone under the UST Adequate Protection Order, unless otherwise waived by the UST Secured Parties, will be a cash collateral termination event for the UST Secured Parties under the UST Adequate Protection Order..

| | |
|---|---|
| **Representations and Warranties** | The representations and warranties of the DIP Loan Parties under the DIP Loan Documents shall be subject to the Documentation Principles and subject to, and based on the terms and conditions of, the DIP Order, as applicable. |
| **Payments; Prepayments** | The Borrower shall make each payment (including principal of or interest on any borrowing or any fees or other amounts due and payable) hereunder and under any other DIP Loan Document not later than 2:00 p.m., New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim. Any amounts received after such time on any date may, in the discretion of the Junior DIP Agent or the B-2 Agent, as applicable, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. Each such payment shall be made to the Junior DIP Agent or the B-2 Agent. The Junior DIP Agent or the B-2 Agent shall promptly distribute to the Junior DIP Lender or each B-2 Lender any payments received by it on behalf of such Junior DIP Lender or such B-2 Lender.

At any time after the B-2 Obligations have been indefeasibly paid in full in cash, the Loan Parties may, at any time, without premium or penalty, (i) repay the loans under the Junior DIP Facility and/or (ii) reduce the Junior DIP Facility commitments, in each case in full or in part; *provided*, *however*, that no repayment or prepayment of borrowings under the Junior DIP Facility shall occur until the B-2 Obligations have been indefeasibly paid in full in cash and any such repayment or prepayment shall otherwise be consistent with the priorities for liens and claims securing the Junior DIP Facility and the B-2 Obligations as set forth herein. The Loan Parties shall notify the Junior DIP Agent in writing (which may be by email) of any mandatory prepayment of the loans under the Junior DIP facility not later than 1:00 p.m., New York City time, at least one (1) Business Day prior to the date of such prepayment.

The B-2 Obligations shall be non-call for 120 days from the Closing Date and par thereafter. A Make-Whole Amount (as defined below) shall be payable upon acceleration, termination, prepayment or repayment during the non-call period.

"Make-Whole Amount" means, as of any date of determination, an amount equal to the aggregate amount of interest which would have otherwise been payable on the principal amount of the B-2 Obligations repaid or prepaid (or deemed repaid or prepaid in the case of an acceleration or termination of the B-2 Obligations) on such date from the date of repayment or prepayment until the date falling 120 days after the Closing Date discounted at the Treasury Rate (as defined below) plus 0.50%.

"Treasury Rate" means, with respect to any repayment or prepayment of B-2 Obligations, a rate per annum (computed on the basis of actual days elapsed over a year of 360 days) equal to the rate determined by the B-2 Agent on the date falling three Business Days prior to the date of such repayment or prepayment, to be the yield expressed as a rate listed in The Wall Street Journal for United States Treasury securities most nearly equal to the period from the date of such prepayment or repayment to and including the date falling 120 days after the Closing Date. |
| **Events of Default** | The Events of Default under the DIP Loan Documents shall be subject to the Documentation Principles and subject to, and based on the terms and conditions of, the DIP Orders, subject to the following modifications with respect to the Junior DIP Facility and, where indicated, the Postpetition B-2 Facility: |

| | |
|---|---|
| | 1. **Budget**. The proceeds of any DIP Loans shall have been expended in a manner that is not in accordance with the Budget (subject to permitted variances set forth on Annex 3 ("Permitted Variances") with respect to disbursements). |
| | 2. **Entry of Final Order**. For the benefit of the Junior DIP Lender and the B-2 Secured Parties, the entry of the Final Order shall not have occurred within 45 calendar days after the Petition Date. |
| | 3. **Prepetition Claims**. For the benefit of the Junior DIP Lender and, with respect to (A)(iii) and (B), the B-2 Secured Parties), any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (A) approving payment of any pre-petition claim (or the Loan Party shall otherwise make a payment on any prepetition claim) other than (x) as provided for in (i) the first day orders or second day orders, (ii) the Budget (subject to Permitted Variances), or (iii) the DIP Order (including repayments of the B-2 Obligations as set forth herein) or (y) otherwise consented to by the Junior DIP Agent and Junior DIP Lender in writing, (B) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets with a fair market value in excess of $250,000; or (C) except as provided in the DIP Order, and the other adequate protections set forth in the DIP Orders and the UST Cash Collateral Order, approving any settlement or other stipulation not approved by the Junior DIP Lender and not included in the Budget with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor. |
| | 4. **Bidding Procedures Order**. Reserved. |
| | 5. **Sale Order**. Reserved. |
| | 6. **Plan**. For the benefit of the Junior DIP Lender and the B-2 Secured Parties, the filing of any plan that does not propose to indefeasibly repay the B-2 Obligations and the obligations under the Junior DIP Facility in full in cash. |
| **Junior DIP Agent and B-2 Agent** | The Junior DIP Lender and the Junior DIP Agent and the B-2 Lenders and the B-2 Agent hereby agree to the agency provisions set forth in Annex 6 hereto, which are incorporated herein by reference. |
| **Indemnity; Expenses** | The Loan Parties shall, jointly and severally, be obligated to indemnify and hold harmless the Junior DIP Agent, the Junior DIP Lender, the B-2 Agent and the B-2 Lenders, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys, and representatives (collectively, the "Related Parties") from and against all losses, claims, liabilities, damages, and expenses (including out-of-pocket fees and disbursements of counsels) in connection with any investigation, litigation, or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility, the DIP Loan Documents or the transactions contemplated in this DIP Term Sheet; provided that, notwithstanding the foregoing, such indemnity shall not, as to any indemnitee, be available to the extent that such losses, damages, claims, liabilities and expenses resulted from the gross negligence, bad faith or willful misconduct of such indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such indemnitee, as determined by the final non-appealable judgment of a court of competent jurisdiction. The Loan Parties shall, jointly and severally, be obligated to pay or reimburse the Junior DIP Agent, the Junior DIP Lender, the B-2 Agent and the B-2 Lenders, and each of their respective affiliates, officers, directors, fiduciaries, |

21

| | employees, agents, advisors, attorneys, and representatives incurred in connection with (i) the preparation, negotiation and execution of this DIP Term Sheet and the other DIP Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby (including out-of-pocket fees and disbursements of counsels) and (ii) the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this DIP Term Sheet or the other DIP Loan Documents (including out-of-pocket fees and disbursements of counsels). |
|---|---|
| | To the extent permitted by applicable law, no Loan Party shall assert, and each hereby waives, any claim against the Junior DIP Agent, the Junior DIP Lender, the B-2 Agent, the B-2 Lenders and their Related Parties, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this DIP Term Sheet, any other DIP Loan Document or any agreement or instrument contemplated hereby or thereby. |
| | The provisions of this section entitled "Indemnity; Expenses" shall survive the resignation or replacement of the Junior DIP Agent or the B-2 Agent, as applicable, the termination of the DIP Loan Documents, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any DIP Loan Document. |
| **Credit Bidding** | The Junior DIP Lender and Junior DIP Agent expressly waive any rights to credit bid the obligations outstanding under the Junior DIP Facility.  For the avoidance of doubt, the Prepetition Agents will have the rights to credit bid as set forth in the Filed Proposed DIP Order and the UST Adequate Protection Order.  The B-2 Agent, upon the instruction of the B-2 Lenders, shall have the right and authority to credit bid up to the full amount of the B-2 Obligations.  Any credit bid with respect to all or any portion of the ABL Priority Collateral shall require all Prepetition ABL Obligations to be paid in full in cash or cash collateralized, as applicable, upon the consummation of such credit bid. |
| **Bid Procedures / Stalking Horse Purchaser** | In connection with the DIP Facility and Bidding Procedures Order, the Debtors shall enter into an Asset Purchase Agreement (the "Stalking Horse Purchase Agreement") pursuant to which Old Dominion Freight Line, Inc., as buyer (the "Stalking Horse Purchaser"), shall purchase some or all of the Real Property constituting Non-UST Tranche B Term Priority Collateral (as defined in the Intercreditor Agreement) (the "Stalking Horse Purchase Properties") for no less than $1.5 billion (the "Stalking Horse Purchase Amount").<br><br>The Stalking Horse Purchase Agreement shall:<br>(i)  provide that the Stalking Horse Purchaser's obligation to purchase the Stalking Horse Purchase Properties pursuant to the Stalking Horse Purchase Agreement shall not be conditioned on any contingency other than title;<br>(ii)  provide that any breakup fee shall not exceed $26 million and expense reimbursement payable to the Stalking Horse Purchaser shall not exceed $2 million;<br>(iii)  include a deposit equal to 5% of the Stalking Horse Purchase Amount;<br>(iv)  a representation that the Stalking Horse Purchaser is a credit worthy entity with cash and/or financing commitments for the entire Stalking Horse Purchase Amount;<br>(v)  not include any limitation on Stalking Horse Purchaser damages;<br>(vi)  provide that the Stalking Horse Purchaser will act as a backup bidder, if applicable;<br>(vii)  provide that the Stalking Horse Purchaser shall pay any and all transfer taxes and real estate closing costs; |

|  | (viii) | be acceptable to the Junior DIP Lender, the B-2 Lenders, and the UST Secured Parties, with such acceptance not to be unreasonably withheld; |
|  | (ix) | provide that, provided it is consistent with, and not contrary to, the Debtors' fiduciary duties, closing shall occur no later than one-hundred fifty (150) calendar days after the Petition Date (which may be extended to one-hundred eighty (180) calendar days with (i) the written consent of the Prepetition ABL Agent, the B-2 Agent, and the UST Secured Parties (in each case such consent not to be unreasonably withheld), and (ii) the written consent of the Junior DIP Lender in its sole discretion); and |
|  | (x) | provide that the Stalking Horse Bid shall remain effective for no less than one hundred and eighty (180) days. |
| **No Assignments or Participations** | | The DIP Loan Documents shall not include rights of assignment or participation rights other than with respect to the B-2 Obligations.<br><br>The B-2 Obligations shall be freely transferable by the B-2 Lenders. |
| **Amendment and Waiver** | | No provision of this DIP Term Sheet may be amended other than by an instrument in writing signed by the Borrower, Junior DIP Agent, Junior DIP Lender, B-2 Agent and the B-2 Lenders. |
| **Governing Law** | | The DIP Loan Documents will provide that the Loan Parties will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county, and city of New York, borough of Manhattan, and shall waive any right to trial by jury. New York law shall govern the DIP Loan Documents (other than security documents to be governed by local law, to be determined by the Junior DIP Agent or the B-2 Agent, as applicable). |
| **Release** | | Releases as set forth in the Filed Proposed DIP Order and UST Adequate Protection Order. For the avoidance of doubt, the Junior DIP Lender and Junior DIP Agent and the B-2 Secured Parties shall receive releases no less favorable than those contained in the Filed Proposed DIP Order and Filed Proposed UST Cash Collateral Order. |
| **Remedies** | | Subject to the Senior ICA Provisions and the Intercreditor Agreement, remedies as set forth in the Filed Proposed DIP Order and UST Adequate Protection Order; *provided* that the Prepetition Secured Parties shall have remedies consistent with, and no less favorable than, the remedies of the ABL Agent as set forth in the Filed Proposed DIP Order; *provided*, *further*, that the B-2 Secured Parties shall have remedies and the rights thereof (including, without limitation, the right to enforce against Collateral) consistent with, and no less favorable than, the remedies of the "DIP Agent" and the "DIP Secured Parties" (as defined in the Filed Proposed DIP Order) and the B-2 Agent and B-2 Secured Parties as set forth in the Filed Proposed DIP Order; and *provided, further,* that neither the Junior DIP Agent nor the Junior DIP Lender shall be permitted to exercise any remedies with respect to the B-2 Priority Collateral unless the B-2 Obligations, the Prepetition ABL Obligations, and the Prepetition UST Tranche B Obligations (as defined in the UST Adequate Protection Order) have been indefeasibly paid in full in cash (or cash collateralized, as applicable) and otherwise subject to the priorities of the liens and claims securing the DIP Facility as set forth herein. |

**[Signature Pages to Follow]**

**IN WITNESS WHEREOF,** the parties below have caused this DIP Term Sheet to be executed as of the date first above written.

YELLOW CORPORATION

By: _Daniel L. Olivier_ _____
Name:  Daniel L. Oliver
Title:  Chief Financial Officer

EXPRESS LANE SERVICE, INC.,
YELLOW LOGISTICS, INC.,
NEW PENN MOTOR EXPRESS LLC,
ROADWAY EXPRESS INTERNATIONAL, INC.,
ROADWAY LLC,
ROADWAY NEXT DAY CORPORATION,
USF BESTWAY INC.
USF DUGAN INC.,
USF HOLLAND LLC,
USF REDDAWAY INC.,
USF REDSTAR LLC,
YRC ASSOCIATION SOLUTIONS, INC.,
YRC ENTERPRISE SERVICES, INC.,
YRC INC.,
YRC INTERNATIONAL INVESTMENTS, INC. ,
YRC LOGISTICS SERVICES, INC.,
YRC MORTGAGES, LLC,
YRC REGIONAL TRANSPORTATION, INC.,
1105481 ONTARIO, INC.,
USF HOLLAND INTERNATIONAL SALES CORPORATION,
YRC LOGISTICS INC.,
YELLOW FREIGHT CORPORATION,
YRC FREIGHT CANADA COMPANY

By: _Steve Frontczak_ _____
Name:  Steven Frontczak
Title:  Secretary

[Signature Page to DIP Term Sheet]

**JUNIOR DIP LENDER**

MFN Partners, LP

By: _____

Name: Jon Reisman

Title: Authorized Person

**JUNIOR DIP AGENT**
Alter Domus Products Corp.

By: _____

Name:   Winnalynn N. Kantaris
Title:   Associate General Counsel

**B-2 AGENT**

Alter Domus Products Corp.

By: _____

Name:    Winnalynn N. Kantaris
Title:     Associate General Counsel

**POSTPETITION B-2 LENDER**
Citadel Credit Master Fund LLC,
by its Manager, Citadel Advisors LLC

By: _____
Name   Christopher Ramsay:
Title:   Authorized Signatory

OLD DOMINION FREIGHT LINE, INC.,
solely in its capacity as Stalking Horse
Purchaser

By: _Kevin Marty Freeman_
Name: KEVIN MARTY FREEMAN
Title: PRESIDENT & CEO

### Annex 1-A[8]

### Junior DIP Facility

### Interest, Premiums, Fees

**Interest Rate**:

All amounts outstanding under the Junior DIP Facility will bear interest 15.00% *per annum* and shall be paid in cash on the last Business Day of each month.

**Default Interest**:

During the continuance of an Event of Default, the Junior DIP Loans and all other outstanding obligations under the Junior DIP Facility will bear interest at an additional 2.0% *per annum* above the interest rate otherwise applicable.

**DIP Fee**:

As consideration for the Junior DIP Lender providing the Junior DIP Facility, the Borrower hereby agrees to pay (or cause to be paid) to the Junior DIP Agent, for the account of the Junior DIP Lender, a closing fee (the "DIP Closing Fee") in an aggregate amount equal to 4.0% of the Junior DIP Facility.  The DIP Closing Fee will be earned on the date of execution of the Junior DIP Facility. The DIP Closing Fee will be payable on the Maturity Date, only if the B-2 Obligations have first been indefeasibly paid in full in cash.

**Agency Fees:**

As set forth in the Fee Letter.

**Nature of Interest and Fees**:

Payable in cash and non-refundable under all circumstances.

---

[8] For the avoidance of doubt, the Additional Junior DIP Commitment's interest rate and exit fee are not reflected this Annex 1-A and are otherwise reflected in the DIP Term Sheet.

<u>**Annex 1-B**</u>

**Postpetition B-2 Facility**

**Interest, Premiums, Fees**

| | |
|---|---|
| **Interest Rate**: | All amounts outstanding under the Postpetition B-2 Facility will bear interest at the Alternate Base Rate (as defined in the B-2 Term Loan Credit Agreement) plus 8.50% *per annum* and shall be paid in cash on the last Business Day of each month. |
| **Default Interest**: | During the continuance of an Event of Default, the Postpetition B-2 Loans and all other outstanding obligations under the Postpetition B-2 Facility will bear interest at an additional 2.0% *per annum* above the interest rate otherwise applicable. |
| **Upfront Fee**: | An amount (the "<u>Upfront Fee</u>") equal to 4.0% of the aggregate amount of the Postpetition B-2 Facility as of the date of this DIP Term Sheet (i.e., $4.0 million).  For the avoidance of doubt, the Upfront Fee will be paid-in-kind in full on the Closing Date. |
| **Agency Fees:** | As set forth in the Amended and Restated Fee Letter. |
| **Nature of Interest and Fees**: | Payable in cash (other than the Upfront Fee, which shall be paid-in-kind) and non-refundable under all circumstances. |

**Annex 2**

**Reporting Covenants[9]**

So long as the Junior DIP Lender shall have any commitment under the DIP Facility or any loan or other obligation (other than contingent indemnification or reimbursement obligations) under the DIP Loan Documents that is accrued or payable shall remain unpaid or unsatisfied, then from and after the date specified below, the Borrower shall deliver to the Junior DIP Agent for prompt further distribution to the Junior DIP Lender and its advisors:

(a)      not later than 5:00 p.m. New York time on the third business day of the last full calendar week of each month (commencing with August 30, 2023) occurring after the Closing Date (the "**Updated Budget Deadline**"), a supplement to, for the first such supplement, the Initial Budget, and for each supplement thereafter, the most-recently delivered Updated Budget (each such supplement which is approved in accordance with the terms of this clause (l), an "**Updated Budget**"), prepared by management of the Borrower in consultation with the Borrower's Operational Advisor covering the 13-week period that commences with the Saturday of the calendar week that includes such Updated Budget Deadline, consistent with the form and level of details set forth in the Initial Budget.  Each Updated Budget shall be, in each case, subject to the written approval of the Junior DIP Lender, the B-2 Lenders, the ABL Agent, and the UST Secured Parties (the "**Required Budget Approval Parties**"); provided that, if the Required Budget Approval Parties shall have not provided written approval of any proposed budget supplement prior to 5:00 (New York City time) on the third business day after receipt thereof (the "**Budget Review Time**"), the Required Budget Approval Parties shall be deemed to have accepted such proposed budget supplement; provided further that, (i) if a Required Budget Approval Party object in writing to any proposed budget supplement prior to the Budget Review Time, no proposed budget supplement covering the 13-week period covered by such rejected budget supplement shall become an Updated Budget until and unless the Required Budget Approval Parties approve thereof in writing (in their sole and absolute discretion), and (ii) the prior Approved Budget shall remain in effect until such time as the Required Budget Approval Parties so approve a revised budget supplement in accordance with the foregoing sub-clause (i).  As used herein, the "**Approved Budget**" shall mean (i) initially, the Initial Budget and (ii) thereafter, upon (and subject to) the approval (or deemed approval) of any Updated Budget by the Required Budget Approval Parties in accordance with the foregoing procedures, such Updated Budget.

(b)      not later than 5:00 p.m. New York time, on each business day (commencing with the second business day following the Closing Date), liquidity update (each, a "**Liquidity Report**"), which may be sent by email, specifying the aggregate amount of Liquidity of the Loan Parties and their Subsidiaries as of the end of business of the immediately preceding business day;

---

[9] Copies of all reporting and information provided (or required to be provided but for the Junior DIP Lender becoming a potential bidder) to the Junior DIP Agent or the Junior DIP Lender and its advisors pursuant to this Annex 2 shall also be provided concurrently to the B-2 Secured Parties, the UST Secured Parties, and each of their respective advisors.

(c)    not later than 5:00 p.m. New York time on each Budget Variance Test Date, the following:

    (i)    a Budget Variance Report for the most recently ended Budget Variance Test Period; and

    (ii)    an updated budget prepared by management of the Borrower (in consultation with the Borrower's Operational Advisor) covering the 13-week period that commences with the calendar week that includes such Wednesday (provided that this clause (c)(ii) may be satisfied, for each week on which an Updated Budget Deadline occurs, by delivery of the Updated Budget);

(d)    not later than 5:00 p.m. New York time on the Friday of each calendar week, with information for the immediately preceding calendar week ending on a Friday (commencing on Friday, August 25, 2023) the following, each in form and substance satisfactory to the Required Budget Approval Parties:

    (i)    a written report (each, a "**Disbursement Report**") of disbursements made during the period since delivery of the last Disbursement Report (or, for the first Disbursement Report delivered hereunder, since the Petition Date), including payroll payments made by department, payments to directors, and payments to professionals;

    (ii)    a written report (each, a "**Sale Report**") setting out updates in the monetization strategy of the Borrower, including an update on the status of the sale of each Real Property and other assets of the Loan Parties contemplated by the Bidding Procedures Order, a description of inbound interests and outbound solicitations, and updates on the status of diligence and bids since delivery of the last Sale Report (or, for the first Sale Report delivered hereunder, since the Petition Date); *provided, however,* if the Junior DIP Lender is / becomes a potential bidder, the Loan Parties shall not be required under the DIP Loan Documents to provide information to the Junior DIP Lender regarding the sale process that is not available to all potential bidders; and

    (iii)    a list of (A) current information with respect to all accounts receivable owed to the Loan Parties, including all collections, sales, reconciliations and payments in respect thereof, and (B) current information with respect to all accounts payable owed by the Loan Parties.

**Annex 3**

**Budget Variance Covenants**

Commencing with the Budget Variance Test Date occurring on Friday, August 25, 2023, and on each Budget Variance Test Date occurring thereafter, the Borrower shall not, nor shall it permit any of its Subsidiaries to, permit:

(a)        the sum of the actual aggregate cash receipts of the Borrower and its Subsidiaries (excluding proceeds of the Term Loans) for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be less than the Permitted Variance Percentage of the aggregate amount set forth for the line item in the Approved Budget entitled "Total Receipts" for such Budget Variance Test Period; or

(b)        the sum of the actual aggregate operating disbursements of the Borrower and its Subsidiaries for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be greater than Permitted Variance Percentage of the aggregate amount set forth for the line item in the Approved Budget entitled "Total Operating Disbursements" for such Budget Variance Test Period; or

(c)        the sum of the actual aggregate amounts paid by the Borrower and its Subsidiaries with respect to severance and accrued pre-petition wages for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be greater than Permitted Variance Percentage of the aggregate amount set forth for the line items in the Approved Budget entitled "Severance" and "Accrued Pre-Petition Wages" for such Budget Variance Test Period; or

(d)        the sum of the actual aggregate disbursements of the Borrower and its Subsidiaries with respect to lienholders and on account of taxes and other restructuring costs for the Budget Variance Test Period ending immediately prior to such Budget Variance Test Date to be greater than Permitted Variance Percentage of the aggregate amount set forth for the line item in the Approved Budget entitled "Prepetition Vendors & Taxes" for such Budget Variance Test Period.

To the extent that any Budget Variance Test Period encompasses a period that is covered in more than one Approved Budget, the applicable weeks from each applicable Approved Budget shall be utilized in making the calculations set forth herein.

The capitalized terms used in this DIP Term Sheet but not defined shall have the following meanings:

"<u>Budget Variance Report</u>" shall mean a weekly variance report prepared by management of the Borrower (in consultation with the Borrower's Operational Advisor), in form and detail reasonably satisfactory to the Junior DIP Lender and the B-2 Lenders, comparing for each applicable Budget Variance Test Period the actual receipts and disbursements against anticipated receipts and disbursements under the applicable Approved Budget, on a line by line and aggregate basis and in the same level of detail set forth in the Approved Budget, together with a written explanation for all material variances in any given Budget Variance Test Period and such other related information as the Required Lenders may reasonably request.

"<u>Budget Variance Test Date</u>" shall mean each of (a) Friday August 25, 2023, (b) Friday September 1, 2023, (c) Wednesday September 6, 2023 and (d) each Wednesday thereafter.

"Budget Variance Test Period" means, as of any date of determination, (a) with respect to the first Budget Variance Report delivered after the Closing Date and the first Budget Variance Test Date occurring on Friday August 25, 2023, the period starting on the Petition Date and ending on August 18, 2023, (b) with respect to the second Budget Variance Report delivered after the Closing Date and the Budget Variance Test Date occurring on Friday September 1, 2023, the period starting on the Petition Date and ending on August 25, 2023, (c) with respect to the third Budget Variance Report delivered after the Closing Date and the Budget Variance Test Date occurring on Wednesday September 6, 2023, the period starting on the Petition Date and ending on September 1, 2023 and (c) with respect to each Budget Variance Report delivered thereafter and each the Budget Variance Test Date occurring thereafter, the four-week period ending on the Friday of the week immediately preceding the applicable Budget Variance Test Date.

"Permitted Variance Percentage" shall mean:

(a)    with respect to clause (a) above, (i) with respect to the Budget Variance Test Period ending on August 18, 2023, 80%, (b) with respect to the Budget Variance Period ending on August 25, 2023, 85%, and (c) with respect to each Budget Variance Period ending thereafter, 90%;

(b)    with respect to clauses (b) through (d), (i) with respect to the Budget Variance Test Period ending on August 18, 2023, 120%, (ii) with respect to the Budget Variance Period ending on August 25, 2023, 115%, and (iii) with respect to each Budget Variance Period ending thereafter, 110%; and

(c)    with respect to clause(e), 120%.

**Annex 4**

**UST Milestones**

| Milestone | Date Listed in UST Adequate Protection Order [Docket No. 16-2] | New Date |
|---|---|---|
| 7(a)(ii):  Court shall have entered the Interim DIP Order and the Interim UST Cash Collateral Order, each in form and substance reasonably satisfactory to the UST Secured Parties | No later than three (3) calendar days after the Petition Date | No later than fifteen (15) calendar days after the Petition Date |
| 7(a)(iii):  The Court shall have entered the Bidding Procedures Order, in form and substance reasonably satisfactory to the UST Secured Parties | No later than ten (10) calendar days after the Petition Date | No later than thirty (30) calendar days after the Petition Date |
| 7(a)(iv):  By no later than fifteen (15) calendar days after the granting of the Interim DIP Order and the Interim UST Cash Collateral Order by the Court, the Canadian Court shall have issued the Canadian Initial Recognition Order, the Canadian Supplemental Order, and the Canadian Interim DIP Recognition Order, each in form and substance reasonably satisfactory to the UST Secured Parties | No later than ten (10) calendar days after the Petition Date | Deleted portion already satisfied |
| 7(a)(v):  The Court shall have entered the Final DIP Order and the Final UST Cash Collateral Order, each in form and substance satisfactory to the UST Secured Parties | No later than thirty (30) calendar days after the Petition Date | No later than forty-five (45) calendar days after the Petition Date |
| 7(a)(vi):  The Borrower, in its capacity as foreign representative on behalf of the Debtors, shall have filed a motion with the Canadian Court for the recognition of, and the Canadian Court shall have issued, the Canadian Final DIP Recognition Order (capitalized terms used but not otherwise defined in this sub-paragraph (vi) shall have the meanings given to those terms in the DIP Credit Agreement), each in form and substance reasonably satisfactory to the UST Secured Parties | No later than forty (40) calendar days after the Petition Date | No later than fifteen (15) calendar days after the granting of the Final DIP Order. |
| 7(a)(vii):  The Debtors shall have received unique, non-duplicative binding cash bids for the B-2 Priority Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, Net Proceeds at least equal to $250 million (capitalized terms used but not otherwise defined in this sub-paragraph (vii) shall have the meanings | Unless otherwise waived or extended by the Required DIP Lenders pursuant to the Interim DIP Order, no later than fifty-five (55) calendar days after the Petition Date | No later than ninety (90) calendar days after the Petition Date |

| Milestone | Date Listed in UST Adequate Protection Order [Docket No. 16-2] | New Date |
|---|---|---|
| given to those terms in the DIP Credit Agreement) | | |
| 7(a)(ix):  The Debtors shall have consummated Dispositions in accordance with the Bidding Procedures Order that either (i) generated Net Proceeds of B-2 Priority Collateral equal to at least 100% of the sum of the aggregate amount of Obligations outstanding as of such date or (ii) is consummated through a credit bid of the outstanding Obligations (and any other applicable obligations) in connection with sales of B-2 Priority Collateral (capitalized terms used but not otherwise defined in this sub-paragraph (ix) shall have the meanings given to those terms in the DIP Credit Agreement) | Unless otherwise waived or extended by the Required DIP Lenders pursuant to the Interim DIP Order, no later than ninety (90) calendar days after the Petition Date | No later than one-hundred and fifty (150) calendar days after the Petition Date (which may be extended to one-hundred and eighty (180) calendar days after the Petition Date with (i) the consent of the Prepetition ABL Agent, the Prepetition B-2 Agent, and the UST Secured Parties (in each case such consent not to be unreasonably withheld), and (ii) the consent of the Junior DIP Lender in its sole discretion). |
| 7(a)(x):  The Debtors shall have received unique, non-duplicative binding cash bids for the Prepetition UST Tranche B Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, net cash proceeds at least equal to $200 million | No later than fifty-five (55) calendar days after the Petition Date | No change. |
| 7(a)(xi):  the Debtors shall have received unique, non-duplicative binding cash bids pursuant to the Bidding Procedures Order which are not subject to any financing contingencies (but, for the avoidance of doubt, may be subject to receipt of environmental reports and/or title contingencies reasonably acceptable to buyer(s)) for the Prepetition UST Tranche B Collateral) for the Prepetition UST Tranche B Collateral pursuant to the Bidding Procedures Order that would generate, in the aggregate, net cash proceeds at least equal to $300 million | No later than seventy (70) calendar days after the Petition Date | No change. |
| 7(a)(xii):  The Debtors shall have consummated dispositions in accordance with the Bidding Procedures Order that either (i) generated net proceeds of Prepetition UST Tranche B Collateral equal to at least 100% of the sum of the aggregate amount of the Prepetition UST Tranche B Obligations outstanding as of such date or (ii) is consummated through a credit bid of the outstanding Prepetition UST Tranche B Obligations | No later than ninety (90) calendar days after the Petition Date | No change. |

* * * * *

**Annex 5**

**Budget**

**Yellow Corp and Subsidiaries**
*DIP Cash Flow Forecast*
*For Weeks Ending 8/4/23 through 10/27/23*

($ 000s)

| Filing Status: | Pre 8/4/2023 Week 1 Fct. | Post 8/11/2023 Week 2 Fct. | Post 8/18/2023 Week 3 Fct. | Post 8/25/2023 Week 4 Fct. | Post 9/1/2023 Week 5 Fct. | Post 9/8/2023 Week 6 Fct. | Post 9/15/2023 Week 7 Fct. | Post 9/22/2023 Week 8 Fct. | Post 9/29/2023 Week 9 Fct. | Post 10/6/2023 Week 10 Fct. | Post 10/13/2023 Week 11 Fct. | Post 10/20/2023 Week 12 Fct. | Post 10/27/2023 Week 13 Fct. | Total Weeks 1-13 Fct. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Receipts** | $ 57,366 | $ 30,000 | $ 30,000 | $ 40,000 | $ 38,803 | $ 30,237 | $ 26,000 | $ 25,583 | $ 25,000 | $ 17,279 | $ 13,645 | $ 9,990 | $ 8,280 | $ 352,184 |
| *Operating Disbursements* | | | | | | | | | | | | | | |
| Payroll & Related | $ 10,553 | $ 3,129 | $ 1,449 | $ 7,600 | $ 12,492 | $ 4,731 | $ 4,394 | $ 5,361 | $ 6,128 | $ 7,452 | $ 1,034 | $ 1,135 | $ 1,063 | $ 66,522 |
| Other Opex | 34,884 | 7,615 | 1,422 | 1,401 | 6,158 | 1,047 | 5,171 | 1,051 | 6,438 | 632 | 3,443 | 538 | 639 | 70,438 |
| **Total Operating Disbursements** | $ 45,437 | $ 10,744 | $ 2,872 | $ 9,001 | $ 18,650 | $ 5,778 | $ 9,565 | $ 6,411 | $ 12,566 | $ 8,084 | $ 4,477 | $ 1,673 | $ 1,702 | $ 136,960 |
| *Restructuring* | | | | | | | | | | | | | | |
| Severance | - | - | - | - | 2,481 | - | - | - | - | 4,568 | - | - | - | 7,049 |
| Professional Fees Reserve[1] | 2,905 | - | - | 15,776 | 3,353 | 2,889 | 3,089 | 2,889 | 4,139 | 2,015 | 2,015 | 2,215 | 2,015 | 43,301 |
| Accrued Pre-Petition Wages[2] | - | 8,450 | 500 | - | - | - | - | - | - | - | - | - | - | 8,950 |
| Adequate Assurance Utility Deposit | - | - | - | 1,600 | - | - | - | - | - | - | - | - | - | 1,600 |
| Prepetition Vendors & Taxes | - | 500 | 750 | 6,368 | 4,273 | 2,600 | 2,601 | - | - | - | - | 1 | 136 | 17,229 |
| **Total Restructuring** | $ 2,905 | $ 8,950 | $ 1,250 | $ 23,744 | $ 10,106 | $ 5,489 | $ 5,690 | $ 2,889 | $ 4,139 | $ 6,584 | $ 2,015 | $ 2,216 | $ 2,151 | $ 78,128 |
| *Interest and Adequate Protection* | | | | | | | | | | | | | | |
| ABL Interest | - | - | - | - | 2,206 | - | - | - | 469 | - | - | - | - | 2,674 |
| DIP TL New Money Interest (MFN) | - | - | - | - | 51 | - | - | - | 412 | - | - | - | - | 463 |
| DIP TL New Money Interest (Citadel) | - | - | - | - | 150 | - | - | - | 1,150 | - | - | - | - | 1,301 |
| DIP TL New Money Interest (MFN Junior) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| TLB Interest | - | - | - | 10,938 | 1,624 | - | - | - | 6,495 | - | - | - | - | 19,057 |
| UST Interest | - | - | - | 12,213 | - | - | 4,580 | - | - | - | 6,106 | - | - | 22,899 |
| **Total Interest and Adequate Protection** | $ - | $ - | $ - | $ 23,151 | $ 4,031 | $ - | $ 4,580 | $ - | $ 8,526 | $ - | $ 6,106 | $ - | $ - | $ 46,394 |
| **Total Disbursements** | $ 48,342 | $ 19,694 | $ 4,122 | $ 55,896 | $ 32,787 | $ 11,267 | $ 19,835 | $ 9,300 | $ 25,231 | $ 14,668 | $ 12,598 | $ 3,889 | $ 3,853 | $ 261,482 |
| **Total Net Cash Flow** | $ 9,024 | $ 10,306 | $ 25,878 | $ (15,896) | $ 6,016 | $ 18,970 | $ 6,165 | $ 16,282 | $ (231) | $ 2,611 | $ 1,047 | $ 6,100 | $ 4,428 | $ 90,702 |
| (+/-) ABL Paydown (80% of receipts) | - | (24,000) | (24,000) | (32,000) | (31,043) | (24,190) | (20,800) | (20,466) | (20,000) | (13,824) | (10,916) | (7,992) | (6,624) | (235,854) |
| **Total Net Cash Flow Including ABL Paydown** | $ 9,024 | $ (13,694) | $ 1,878 | $ (47,896) | $ (25,026) | $ (5,220) | $ (14,635) | $ (4,184) | $ (20,231) | $ (11,212) | $ (9,869) | $ (1,891) | $ (2,197) | $ (145,152) |
| *Unrestricted US and Canada Cash Rollforward[3]* | | | | | | | | | | | | | | |
| Beginning Cash Balance | $ 42,780 | $ 38,855 | $ 8,661 | $ 10,539 | $ 22,643 | $ 35,117 | $ 29,897 | $ 60,262 | $ 56,078 | $ 35,847 | $ 24,635 | $ 14,766 | $ 12,875 | $ 42,780 |
| (-) ABL Paydown (80% of receipts) | - | (24,000) | (24,000) | (32,000) | (31,043) | (24,190) | (20,800) | (20,466) | (20,000) | (13,824) | (10,916) | (7,992) | (6,624) | (235,854) |
| (-) ABL Paydown (One-Time) | (12,949) | (16,500) | - | - | - | - | - | - | - | - | - | - | - | (29,449) |
| (+/-) Net Cash Flow | 9,024 | 10,306 | 25,878 | (15,896) | 6,016 | 18,970 | 6,165 | 16,282 | (231) | 2,611 | 1,047 | 6,100 | 4,428 | 90,702 |
| (+) DIP TL Proceeds[4] | - | - | - | 60,000 | 37,500 | - | - | 45,000 | - | - | - | - | - | 142,500 |
| **Ending Cash Balance** | $ 38,855 | $ 8,661 | $ 10,539 | $ 22,643 | $ 35,117 | $ 29,897 | $ 60,262 | $ 56,078 | $ 35,847 | $ 24,635 | $ 14,766 | $ 12,875 | $ 10,678 | $ 10,678 |
| *Net ABL Exposure[5]* | $ 275,883 | $ 234,775 | $ 207,361 | $ 175,361 | $ 144,318 | $ 120,128 | $ 99,328 | $ 78,862 | $ 58,762 | $ 44,938 | $ 34,022 | $ 26,031 | $ 19,406 | |
| *Restricted Cash* | 90,591 | 100,693 | - | 16,992 | 41,182 | 61,982 | 82,448 | 97,448 | 111,272 | 122,188 | 130,179 | 136,804 | | |

*Notes:*
*(1) Assumes all professional fees are funded into a reserve as incurred*
*(2) Pre-petition salaries for ongoing employees and other benefits are included in operating disbursements*
*(3) Includes approximately CAD $1.9 million (translated at $0.749) and USD $0.4 million held by the Canadian debtors*
*(4) Assumes DIP is approved the week-ending 8/18 but funds on Monday 8/21*
*(5) Net ABL Exposure equal to 102% of outstanding letters of credit net of restricted cash, plus outstanding ABL borrowings*

**Annex 6**

**THE ADMINISTRATIVE AGENT AND COLLATERAL AGENT/TAX PROVISIONS**

Any reference to (i) the "Administrative Agent" or "Collateral Agent" shall refer to the Junior DIP Agent or the B-2 Agent, as applicable, (ii) "Lender" shall refer to the Junior DIP Lender or the B-2 Lenders, as applicable, (iii) "Secured Parties" shall refer to the Junior DIP Secured Parties or the B-2 Secured Parties, as applicable and (iv) "Required Lenders" shall refer to Junior DIP Lender or the B-2 Lenders, as applicable. Capitalized terms used herein without definition shall have the meaning in the Debtor-in-Possession Credit Facility Term Sheet.

1. <u>Agency Provisions</u>

   a. Each Lender hereby irrevocably appoints the Administrative Agent and the Collateral Agent (for purposes of this <u>Section 1</u>, the Administrative Agent and the Collateral Agent are referred to collectively as the "<u>Agents</u>") its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the DIP Loan Documents, together with such actions and powers as are reasonably incidental or related thereto. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of the DIP Term Sheet and the other DIP Loan Documents and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender. The institution serving as the Administrative Agent and/or the Collateral Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other affiliate thereof as if it were not an Agent hereunder. The Agents shall not, except as expressly set forth herein and in the other DIP Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any Loan Party that is communicated or obtained by the person serving as Administrative Agent or Collateral Agent, as applicable, or any of their affiliates in any capacity.

   b. Neither Agent shall have any duties or obligations except those expressly set forth in the DIP Loan Documents. Without limiting the generality of the foregoing, (a) neither Agent shall be subject to any fiduciary or other implied duties, regardless of whether an Event of Default or default has occurred and is continuing, (b) neither Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances), and (c) except as expressly set forth in the DIP Loan Documents, neither Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent and/or Collateral Agent or any of its affiliates in any capacity. Neither Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances) or in the absence of its own gross negligence or willful

misconduct as determined by the final non-appealable judgment of a court of competent jurisdiction. Notwithstanding the foregoing, no action nor any omission to act, taken by either Agent at the direction of the Required Lenders (or such other number of percentage of Lenders as shall be expressly provided for herein or in the other DIP Loan Documents) shall constitute gross negligence or willful misconduct. Neither Agent shall be deemed to have knowledge of any Event of Default or default unless and until written notice thereof, conspicuously labeled as a "notice of default" and specifically describing such Event of Default or default, is given to such Agent by the Borrower or a Lender, and neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any DIP Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any DIP Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any DIP Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in the DIP Term Sheet or elsewhere in any DIP Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

c.   Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it in good faith to be genuine and to have been signed or sent by the proper person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

d.   Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the arrangement of the facilities as well as activities as Agent.

e.   Either Agent may resign at any time by notifying the Lenders and the Borrower in writing, and either Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to the Borrower and such Agent and signed by the Required Lenders. Upon any such resignation or removal, the Required Lenders shall have the right, without the consent of the Borrower, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after (i) the retiring Agent gives notice of its resignation or (ii) the Required Lenders delivers removal instructions, then the retiring or removed Agent may, on behalf of the Lenders, appoint a successor Agent which shall be a bank with an office in New York, New York, or an affiliate of any such bank. If no successor Agent has been appointed pursuant to the immediately preceding, such Agent's resignation or removal shall become effective and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other DIP Loan Document until such time, if any, as the Required Lenders appoint a successor Administrative Agent and/or Collateral Agent, as the case may be. Upon the acceptance of its appointment as Agent

hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of its predecessor Agent, and its predecessor Agent shall be discharged from its duties and obligations hereunder.  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After an Agent's resignation hereunder, the provisions of this <u>Section 1</u> and the section entitled "<u>Indemnity; Expenses</u>" in the DIP Term Sheet shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

f.  Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this DIP Term Sheet and the other DIP Loan Documents.  Each Lender also acknowledges that it will, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other DIP Loan Document, any related agreement or any document furnished hereunder or thereunder.

g.  Each Lender acknowledges and agrees that Alter Domus Products Corp. or one or more of its affiliates may (but is not obligated to) act as collateral agent or representative for the Lenders and/or under the collateral agreements with respect thereto.  Each Lender waives any conflict of interest, now contemplated or arising hereafter, in connection therewith and agrees not to assert against Alter Domus Products Corp. or any of its affiliates any claims, causes of action, damages or liabilities of whatever kind or nature relating thereto.

h.  In case of the pendency of any case or proceeding under any insolvency or other similar law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise: (a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the DIP Loans and all other obligations under the Junior DIP Facility or the B-2 Facility, as applicable, that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Agents under <u>Section 1</u> and the section entitled "<u>Indemnity; Expenses</u>" in the DIP Term Sheet ) allowed in such judicial proceeding; and (b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agents any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due to the Agents under <u>Section 1</u> and the section entitled "<u>Indemnity; Expenses</u>" in the DIP Term Sheet.  Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or

consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Junior DIP Facility or the B-2 Facility, as applicable, or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

i.  To the extent the Administrative Agent, Collateral Agent and their Related Parties (the "Agent Indemnitees") are not reimbursed and indemnified by the Loan Parties, and without limiting the obligation of the Loan Parties to do so, the Lenders shall indemnify and hold harmless the Agent Indemnitees, based on and to the extent of such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), from and against any and all losses, claims, damages, liabilities and related expenses (including out-of-pocket fees and disbursements of counsels) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any Agent Indemnitee in any way relating to or arising out of or in connection with this DIP Term Sheet or any other DIP Loan Document or in the performance by the Agents in its duties under the DIP Loan Documents; provided that no Lender shall be liable for any portion of such losses, claims, damages, liabilities and related expenses resulting from any Agent Indemnitees gross negligence, bad faith or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). Without limiting the foregoing, to the extent not paid or reimbursed by the Loan Parties, each Lender shall pay or reimburse the Agent Indemnitees based on and to the extent of such Lender's pro rata share of all reasonable and documented out-of-pocket costs and expenses, incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this DIP Term Sheet or the other DIP Loan Documents (including all such out-of-pocket costs and expenses incurred during any legal proceeding, including any proceeding under any debtor relief law, and including out-of-pocket fees and disbursements of counsels). For purposes hereof, if the Loans have been paid in full and the Commitments have been terminated prior to such determination pursuant to the immediately preceding sentence, then each such Lender's "pro rata share" shall be determined as of the last date the Loans and the Commitments were in effect immediately prior to such payment in full.

j.  The provisions of this Section 1 shall survive the resignation or replacement of the Administrative Agent or Collateral Agent, the termination of the DIP Loan Documents, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any DIP Loan Document.

2.  Taxes

a.  Except as provided in this Section 2, any and all payments made by or on account of the Borrower or any Guarantor under any DIP Loan Document to any Lender or Agent shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, assessments, withholdings (including backup withholding), fees or similar charges imposed by any governmental authority including interest, penalties and additions to tax (collectively "Taxes"), excluding (i) Taxes imposed on or measured by net income, however denominated, and franchise (and similar) Taxes imposed on it in lieu of net income Taxes, (ii) Taxes attributable to the failure by the relevant Lender or Agent to deliver the documentation required to be delivered pursuant to clause (d) of this Section 2, (iii) Taxes imposed by a jurisdiction as a result of any connection between such Lender or Agent and such jurisdiction other than any connection arising from executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under,

or enforcing any DIP Loan Document, (iv) any branch profits Taxes imposed by the United States or any similar Tax imposed by any other jurisdiction in which the Borrower or any Guarantor (as appropriate) is located, (v) any U.S. federal withholding tax imposed on amounts payable hereunder pursuant to a law in effect at such time the Lender or Agent becomes a party to this DIP Term Sheet and the other DIP Loan Documents, or designates a new lending office, except in each case to the extent such Lender (or its assignor, if any) was entitled at the time of designation of a new lending office (or assignment) to receive additional amounts with respect to such withholding tax pursuant to this Section 2(a) and (vi) any withholding Tax imposed under Sections 1471 through 1474 of the Internal Revenue Code of 1986 (as amended from time to time) (the "Code"), as in effect on the date hereof (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities entered into in connection with the implementation of the foregoing (the "FATCA") (all such non-excluded Taxes imposed on such payments, being hereinafter referred to as "Indemnified Taxes").  If the Borrower, any Guarantor or other applicable withholding agent shall be required by any laws to deduct or withhold any Indemnified Taxes or Other Taxes (as defined below) from or in respect of any sum payable under any DIP Loan Document to any Agent or any Lender, (i) the sum payable by the Borrower or Guarantor shall be increased as necessary so that after making all required deductions or withholding, such Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent shall make such deductions or withholdings, (iii) the applicable withholding agent shall pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable laws, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), if the Borrower or any Guarantor is the applicable withholding agent, the applicable withholding agent shall furnish to such Agent or Lender (as the case may be) the original or a copy of a receipt evidencing payment thereof or other evidence acceptable to such Agent or Lender.

b.   In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other intangible or mortgage recording taxes, or charges or levies of the same character, imposed by any governmental authority, which arise from any payment made under any DIP Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any DIP Loan Document (including additions to tax, penalties and interest related thereto) [excluding, in each case, such amounts that result from an Agent or Lender's Assignment and Acceptance, grant of a Participation, transfer or assignment to or designation of a new applicable lending office or other office for receiving payments under any DIP Loan Document (collectively, "Assignment Taxes") except for Assignment Taxes resulting from assignment or participation that is requested or required in writing by the Borrower (all such non-excluded taxes described in this Section 2(b) being hereinafter referred to as "Other Taxes")].

c.   Without duplication of Section 2(a) or (b), the Borrower and each Guarantor agree to indemnify each Agent and each Lender for (i) the full amount of Indemnified Taxes and Other Taxes paid by such Agent or Lender (including Indemnified Taxes and Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2(c)) and (ii)

any reasonable expenses arising therefrom or with respect thereto, *provided* such Agent or Lender, as the case may be, provides Borrower or Guarantor with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts.

d.  Each Lender and Agent shall, at such times as are reasonably requested by the Borrower or the Administrative Agent, provide the Borrower and the Administrative Agent with any documentation prescribed by law or reasonably requested by the Borrower or the Administrative Agent certifying as to any entitlement of such Lender or Agent to an exemption from, or reduction in, withholding tax with respect to any payments to be made to such Lender under the DIP Loan Documents. Each such Lender and Agent shall, whenever a lapse in time or change in circumstances renders such documentation obsolete or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify the Borrower and the Administrative Agent of its inability to do so. Unless the applicable withholding agent has received forms or other documents satisfactory to it indicating that payments under any DIP Loan Document to or for a Lender are not subject to withholding tax or are subject to such Tax at a rate reduced by an applicable tax treaty, the Borrower, the Administrative Agent or other applicable withholding agent shall withhold amounts required to be withheld by applicable law from such payments at the applicable statutory rate. Notwithstanding the foregoing, a Lender shall not be required to deliver any form pursuant to this clause (d) (other than such documentation set forth in Sections 2(d)(i), 3(d)(ii) and 3(g)) that such Lender is not legally able to deliver. In addition, each Lender and Agent shall deliver to the Borrower and the Administrative Agent such other tax forms or other documents as shall be prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender or Agent is subject to backup withholding or information reporting requirements. Without limiting the foregoing:

  i.  Each Lender and Agent that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this DIP Term Sheet and the other DIP Loan Documents (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) two properly completed and duly signed executed copies of Internal Revenue Service Form W-9 certifying that such Lender or Agent (as the case may be) is exempt from federal backup withholding.

  ii.  Each Lender and Agent that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to the Borrower and the Administrative Agent on or before the date on which it becomes a party to this DIP Term Sheet and the other DIP Loan Documents (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent) whichever of the following is applicable:

    1.  two properly completed and duly signed executed copies of Internal Revenue Service Form W-8BEN or Internal Revenue Service Form W-8BEN-E (or any successor form) claiming eligibility for the benefits of an income tax treaty to which the United States is a party, and such other documentation as required under the Code,

2.  two properly completed and duly signed executed copies of Internal Revenue Service Form W-8ECI (or any successor forms) and, in the case of an Agent, a withholding certificate that satisfies the requirements of Treasury Regulation Sections 1.1441-1(b)(2)(iv) and 1.1441-1(e)(3)(v) as applicable to a U.S. branch that has agreed to be treated as a U.S. person for withholding tax purposes,

3.  in the case of a Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate substantially in the form of Exhibit G-1, G-2, G-3 or G-4, as applicable (any such certificate a "United States Tax Compliance Certificate") and (B) two properly completed and duly signed executed copies of Internal Revenue Service Form W-8BEN or Internal Revenue Service Form W-8BEN-E, or

4.  to the extent a Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a participant holding a participation granted by a participating Lender), Internal Revenue Service Form W-8IMY (or any successor forms) of the Lender, accompanied by a Form W-8ECI, W-8BEN, W-8BEN-E, United States Tax Compliance Certificate, Form W-9, Form W-8IMY or any other required information from each beneficial owner, as applicable (*provided* that, if one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such beneficial owner).  Each Lender and Agent shall deliver to the Borrower and the Administrative Agent two further executed copies of any previously delivered form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete or inaccurate and promptly after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower or the Administrative Agent, or promptly notify the Borrower and the Administrative Agent that it is unable to do so.  Each Lender and Agent shall promptly notify the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered form or certification to the Borrower or the Administrative Agent.

5.  Any Lender or Agent claiming any additional amounts payable pursuant to this Section 2 shall use its reasonable efforts to change the jurisdiction of its lending office (or take any other measures reasonably requested by the Borrower) if such a change or other measures would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the reasonable, good faith determination of such Lender, result in any unreimbursed cost or expense or be otherwise materially disadvantageous to such Lender.

e.  If any Lender or Agent determines, in its reasonable, good faith discretion, that it has received a refund in respect of any Taxes as to which indemnification or additional amounts have been paid to it by the Borrower pursuant to this Section 2 (including by payment of additional amounts pursuant to this Section 2) it shall promptly remit such refund to the Borrower or Guarantor, net of all out-of-pocket expenses of the Lender or Agent, as the

case may be and without interest (other than any interest paid by the relevant governmental authority with respect to such refund net of any Taxes payable by any Agent or Lender on such interest); *provided* that the Borrower and Guarantors, upon the request of the Lender or Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant governmental authority) to such party in the event such party is required to repay such refund to the relevant governmental authority. This section shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to Taxes that it deems confidential) to the Borrower or any other person.

f.    If a payment made to a Lender or Agent under any DIP Loan Document would be subject to withholding Tax imposed by FATCA if such Lender or Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender or Agent has complied with such Lender's or Agent's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this Section 2), "FATCA" shall include any amendments made to FATCA after the date of this DIP Term Sheet and the other DIP Loan Documents.

g.    Each party's obligations under this Section 2 shall survive the resignation or replacement of the Administrative Agent or Collateral Agent, the termination of the DIP Loan Documents, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any DIP Loan Document.

h.    Each Lender shall indemnify each Agent, within 10 days following written demand therefor, for (i) the full amount of any Indemnified Taxes and Other Taxes attributable to such Lender (but only to the extent that such Agent has not already been indemnified by the Borrower and each Guarantor for such Indemnified Taxes and Other Taxes and without limiting the obligation of the Borrower and each Guarantor to do so), [and (ii) any Taxes attributable to such Lender's failure to comply with the provision of Section [____] relating to the maintenance of a Participant Register], in each case, that are payable or paid by such Agent in connection with any DIP Loan Documents, and any expenses arising therefrom or with respect thereto; *provided* that such Agent provides such lender with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts.