**EXHIBIT 1**

# FUEL SUPPLY AGREEMENT
# GENERAL TERMS AND CONDITIONS

## BY AND BETWEEN
## World Fuel Services

### AND

## YRC Enterprise Services, Inc.

**June 1, 2019**

**Table of Contents**

**Page**

ARTICLE 1.    DEFINITIONS ................................................................................................1

ARTICLE 2.    SALE AND DELIVERY................................................................................2

ARTICLE 3.    CONTRACT PRICE AND TERM................................................................22

ARTICLE 4.    BILLING, PAYMENT AND CREDIT.........................................................22

ARTICLE 5.    QUALITY....................................................................................................33

ARTICLE 6.    POSSESSION AND TITLE.........................................................................33

ARTICLE 7.    NOTICES ....................................................................................................4

ARTICLE 8.    TRADE IDENTITIES .................................................................................44

ARTICLE 9.    INSURANCE, PERSONNEL AND WARRANTY......................................44

ARTICLE 10.   FORCE MAJEURE.....................................................................................55

ARTICLE 11.   TAXES .......................................................................................................55

ARTICLE 12.   CLAIMS AND DISPUTES.........................................................................55

ARTICLE 13.   MISCELLANEOUS....................................................................................6

# FUEL SUPPLY AGREEMENT

This **FUEL SUPPLY AGREEMENT** (this "Agreement") is made and entered into as of June 1, 2019 (the "Effective Date") by and between **YRC Enterprise Services, Inc.,** a Delaware corporation, with its principal offices at 10990 Roe Avenue, Overland Park, KS 66211, as agent for its participating Affiliates ("Buyer"), and **World Fuel Services**, a(n) _____ corporation, with principal offices at _____, _____, _____ _____ ("Seller" and collectively with Buyer, the "Parties").

**WHEREAS,** This Agreement includes and incorporates by this reference the following general terms and conditions, as well as those Exhibits referencing this Agreement which Company and Customer, on behalf of its Affiliates, may execute from time to time for the purchase or provision of Products or Services;

**WHEREAS,** The terms and conditions set forth in this Agreement shall control in the event that there are different or additional terms set forth in any other acceptance form, document, or invoice issued by Seller; and

**WHEREAS,** the Parties desire to enter into this Agreement under which Seller agrees to sell and Buyer agrees to purchase certain petroleum products identified in Exhibit A - Specific Product Terms ("Exhibit A").

**NOW, THEREFORE**, in consideration of the mutual agreements, covenants, and conditions herein contained, Seller and Buyer agree as follows:

## ARTICLE 1.    DEFINITIONS

1.1 "Affiliate(s)" shall mean (1) all business units and divisions of a Buyer or Seller or its parents and (2) any entity controlled by, controlling, or under common control with such party. Such entity shall be deemed to be an "Affiliate" only so long as such control exists. Upon request, the parties agree to confirm the Affiliate status of a particular entity.

1.2 "Agreement" means this Fuel Supply Agreement, including all amendments, modifications or supplements hereto.

1.3 "Argus" means Argus Media Ltd.

1.4 "Buyer" means the purchaser of products as identified in the introductory paragraph of this Agreement.

1.5 "Contract Price" means the price at which Product will be transferred from Seller to Buyer as defined in Exhibit A.

1.6 "Delivery Point" means the location where Product is transferred from Seller to Buyer.

1.7 "NYMEX" means the New York Mercantile Exchange.

1.8 "OPIS" means the Oil Price Information Service.

1.9 "Platts Index" means the Platt's Oilgram Price Report U.S.

1.10 "Product" means refined petroleum products including the various grades of distillates identified in Exhibit A.

1.11 "Seller" means World Fuel Services, and its affiliates.

1.12 "Service" means delivery, handling, or other service related to the sale of Product.

1.13 "Schedule – Specific Product Terms" means those deal terms contained on Exhibit A (product, quantity, dates, locations).

**ARTICLE 2.    SALE AND DELIVERY**

2.1  Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller the quantities of Products as defined in Exhibit A.

2.2  All quantities of products sold hereunder are either net volume or gross volume (depending on geographic location and will set forth in Exhibit A) and use a basis of the temperature hereof at 60 degrees Fahrenheit in accordance with API specifications listed in the Manual of Petroleum Measurement standards unless specified otherwise in Exhibit A.

**ARTICLE 3.    CONTRACT PRICE AND TERM**

3.1  The Contract Price for all Product sold and purchased under this Agreement at the Delivery Point(s) shall be as defined in Exhibit A.

3.2  The pricing index will be designated in Exhibit A.

3.3  If the index used for pricing ceases to be published, then a new basis for calculation shall be negotiated in good faith between the parties.  If no agreement on a substitute index can be reached, this Agreement shall automatically terminate on the earlier of 90 days after the cessation of the index or 30 days after Buyer notifies Seller.

3.4  This Agreement shall commence on the Effective date and continue for a term of __1__ year.  The term of this Agreement shall automatically renew for successive __1__ year terms, unless (a) Seller gives Buyer written notice of termination thereof at least 90 days prior to the expiration of the then current term, or (b) Buyer gives Seller written notice of termination thereof at least 30 days prior to the expiration of the then current term.

3.5  It is agreed that either party may terminate this Agreement immediately upon written notice to the other party in the event that such other party (a) becomes insolvent or makes assignment for the benefit of creditors; (b) files or has filed against it any petition under any Title of the United States Code or under any applicable bankruptcy, insolvency, reorganization or similar debtor relief law which is not discharged within thirty (30) days of said filing, or (c) requests or suffers the appointment of a trustee or receiver, or the entry of an attachment or execution as to a substantial part of its business or assets.  Either party may terminate this Agreement in the event the other party materially breaches any of its other obligations under any provision of this Agreement, which breach is not remedied within thirty (30) days after notice thereof by the other party. Notwithstanding anything contained herein to the contrary, Buyer may terminate this Agreement or any Schedule at any time for convenience upon giving Seller thirty (30) days prior written notice. The Termination Date will be as set forth in buyer's termination notice.

3.6  Termination of this Agreement shall not limit either party from pursuing other remedies available to it, including injunctive relief. All provisions of this Agreement which by their nature must survive termination in order to achieve the fundamental purposes of this Agreement shall survive any termination of this Agreement.

**ARTICLE 4.    BILLING, PAYMENT AND CREDIT**

4.1  Billing will be based on the quantities identified on the Bill of Lading at the time of delivery/lift.  All payments will be due under the terms set forth herein.

4.2  Invoices. All payments hereunder shall, unless otherwise set forth in the applicable Schedule, be payable via ACH, Net 10 days following Buyer's receipt of Seller's invoice into FuelQuest (Buyer's invoicing system), or as otherwise directed by Buyer. Seller will invoice Buyer for Services after delivery thereof to Buyer.  If Seller does not invoice Buyer within sixty (60) days after delivery of Services, the invoice will be discounted by 25%.  If Seller does not invoice Buyer within one hundred twenty (120) days after delivery of Services, the invoice will be waived.  Buyer must notify Seller of any dispute as to the amount of any invoice within 24 months from the

date of the receipt or the invoice will be deemed undisputed and accepted by Seller. If applicable, any amount in dispute shall not be payable until resolution of such dispute.

4.3  If Buyer fails to make timely payment under Section 4.2 and such failure is not remedied within 10 Business Days after Seller gives Buyer written notice of such failure, Seller, in addition to any other remedy it may have, may suspend further sale and delivery of Product until such amount is paid; provided, if Buyer, in good faith, shall dispute the amount of any such billing or part thereof and shall pay to Seller such amounts as Buyer concedes to be correct, Seller shall continue to sell and deliver Product as provided hereunder. Within 180 days from the date of delivery of Services, Seller shall promptly investigate the matter and submit an adjusted invoice, if necessary, to Buyer. If Buyer has overpaid amounts actually due, Seller shall remit to Buyer any necessary refund within thirty (30) days after determination of such overpayment. All invoice corrections, adjustments, or refunds shall be processed through FuelQuest.

4.4  Any dispute not resolved pursuant to the terms of this Article 4 shall be without recourse, unless litigation has been commenced within twenty-four (24) months after the event causing the dispute is discovered or reasonably should have been discovered

4.5  Seller will be responsible for any wait time charges incurred by Buyer as a result of seller's failure to deliver Product to the Delivery Point as specified in Exhibit A.

## ARTICLE 5.    QUALITY

5.1  Product shall conform to the requirements of all applicable environmental laws, regulations, and ASTM industry standards for petroleum products. In the event Seller seeks to deliver to Buyer or its designee under this Agreement shall fail to conform to such quality standards and specifications, Buyer may, at its option and in addition to all other available remedies, either (1) refuse to accept delivery of such nonconforming product, or (2) accept such product and cure the nonconformity, provided such cure shall be at Seller's expense through a payment reduction or otherwise, at Buyer's option.

5.2  If regulatory changes require or allow the sale of a different formulation of Product then Seller may offer for sale to Buyer the new product. Seller shall provide buyer a minimum 30 day written notice of the change and the applicable pricing. Buyer in turn has the right to re-bid the specific location(s) for which the different product formulation applies.

## ARTICLE 6.    POSSESSION AND TITLE

6.1  As between the Parties, Seller shall be deemed to be in exclusive control and possession of all Product to be delivered under this Agreement prior to its delivery to Buyer, and Seller shall bear the risk of loss and be responsible for any damage or injury caused by such Product prior to its delivery to Buyer.

6.2  As between the Parties, Buyer shall be deemed to be in exclusive control and possession of all Product to be delivered under this Agreement after its delivery, and Buyer shall bear the risk of loss.

6.3  Title to all product sold and purchased hereunder shall pass from Seller to Buyer or Buyer's Affiliate as specified herein, at the Delivery Point applicable to the sale and purchase of such Product. Delivery occurs when product exits the transport vehicle provided by Seller or when Buyer picks up product with its vehicle. Specific delivery points are as follows:

a.      If via rack: coupler, at the loading rack;

b.      If via pipeline, at the pipeline meter into Buyer's terminal facility;

c.      If into storage: when it enters the tank; or

d.      Other: _____.

6.4 Seller warrants title to all Product sold and all Product delivered under this Agreement, free and clear of all liens, encumbrances, production burdens and other adverse claims whatsoever.

## ARTICLE 7.    NOTICES

7.1 All written notices or other communications under this Agreement shall be deemed duly given when delivered in hand, or upon receipt when properly addressed return-receipt requested and delivered by United States Postal Service or other delivery service to the following addresses:

Buyer:              YRC Worldwide Inc.
                    Attn: Fuel Procurement
                    10990 Roe Avenue
                    Overland Park, KS 66211

With a copy to:     YRC Worldwide Inc.
                    10990 Roe Avenue
                    Overland Park, KS 66211
                    Attn:  Legal Department

Seller:             World Fuel Services
                    9800 N.W. 41 Street
                    Miami, FL 33178

## ARTICLE 8.    TRADE IDENTITIES

8.1 Neither party shall advertise, market or otherwise make known to others any information relating to the services performed under this Agreement, including mentioning or implying the name of the other party, or any of its personnel, without first obtaining the prior written consent of such other party.  The parties recognize that they have no right, title or interest, propriety or otherwise, in or to the name or any logo, copyright, service mark or trademark owned or licensed by the other party.

## ARTICLE 9.    INSURANCE, PERSONNEL AND WARRANTY

9.1 During the term of this Agreement, Seller shall procure and maintain Commercial General Liability insurance including products & completed operations, blanket contractual liability, with a minimum limit of $5,000,000 and, if the use of automobiles is required, Automobile Liability insurance with a minimum limit of $5,000,000 including coverage for sudden and accidental pollution cost and clean up.  The automobile liability policy shall include the MCS-90 endorsement.  To the extent applicable to any personnel supplied by Seller, Seller shall procure and maintain Employer's Liability Insurance with a minimum limit of $1,000,000 and shall also maintain Workers' Compensation coverage in accordance with statutory requirements of the jurisdiction where the Services are to be performed.  Coverage shall be placed with a financially responsible insurance company that are qualified to do business in the state where work is performed and shall have an A.M. Best rating of at least A-VII.  Commercial general liability and automobile liability shall include Buyer, its parent and its parent's subsidiaries as Additional Insureds.  Coverage shall be primary and receive no contribution from any insurance available to the additional insureds.  All policies shall provide a waiver of subrogation in favor of Buyer, its parent and its parent's subsidiaries.  If Seller utilizes subcontractors in performance of this Agreement, Seller shall require and warrant that said subcontractors have the requisite type and amounts of insurance as required within Article 9.  Upon request, Seller shall supply Buyer with a certificate of insurance evidencing required coverage and shall provide Buyer with thirty (30) days' advance notice in the event of a material change or a cancellation of coverage.  The coverage limits required herein may be satisfied by any combination of primary and excess coverage.  It is specifically agreed that the types and amounts of insurance required herein shall not limit or otherwise affect Seller's liability or obligation to indemnify and hold Buyer harmless as provided by the indemnification provision of this Agreement.

9.2  All personnel supplied or used by Seller shall be deemed employees or subcontractors of Seller and will not be considered employees, agents or subcontractors of Buyer for any purpose whatsoever.  Seller assumes full responsibility for the actions of all such personnel while performing services under this Agreement and for the payment of their compensation (including, if applicable, withholding of income taxes, and the payment and withholding of social security and other payroll taxes), workers' compensation, disability benefits and the like to the extent applicable to the personnel involved.  Notwithstanding and without in any way limiting any terms and conditions set forth in this Agreement, all subcontractors of Seller shall be deemed to have made all of the representations and warranties of Seller set forth herein and shall be subject to any obligations of Seller hereunder, and, if requested by Buyer, Seller shall obtain from each subcontractor its written consent to and acknowledgment of the terms of this Agreement.  Seller shall be responsible for any breach by any subcontractor of any representations, warranties or obligations set forth in this Agreement.  No part of the Services to be provided pursuant to this Agreement may be subcontracted without the written consent by Buyer, which such consent shall be in Buyer's sole discretion.

9.3  Seller warrants to Buyer that the necessary licenses and bonds have been secured by Seller for performance of the Services covered by this Agreement.  Seller further warrants that the Services performed hereunder will be performed in a manner in accord with any statutes, regulations, ordinances or contracts applicable to the Services covered hereunder, and will be performed in a manner in accord with ordinary business custom and usage.

Seller warrants that neither the performance of its duties under this Agreement, nor any deliverable or the use thereof, will infringe any patent, copyright, trade secret or other proprietary right of any third party.  Seller warrants that no deliverable shall contain any material owned by any third party, except as disclosed to Buyer in writing prior to Seller's incorporating such material into any deliverable, and that as to any such material, Seller shall have all rights necessary to provide to Buyer the full, unrestricted benefits to such material as incorporated into the deliverable, including without limitation the right to use, market, distribute and copy, and to provide such rights to others.

## ARTICLE 10.    FORCE MAJEURE

10.1 Each party will be excused from performance for any period during which, and to the extent that, it or its subcontractor(s) is prevented from performing any obligation or service, in whole or in part, as a result of causes beyond its reasonable control, and without its fault or negligence including without limitation, acts of God, strikes, lockouts, riots, acts of war, epidemics, communication line failures, and power failures, etc.

## ARTICLE 11.    TAXES

11.1 All current or future Federal, State and/or Local taxes and fees imposed on petroleum products and the sale/purchase thereunder, shall be invoiced as a separate line item at the rates in effect as of the date of product delivery, except where Buyer holds a valid exemption and provides proof thereof to Seller.

## ARTICLE 12.    CLAIMS AND DISPUTES

12.1  **Effect of Waiver or Consent**.  Failure by a Party to complain of any act of the other Party or to declare the other Party in default with respect to this Agreement, irrespective of how long that failure continues, does not constitute a waiver by that Party of its rights with respect to that default until the applicable statute of limitations period has run.

12.2  **Indemnification**.  Each Party (an "Indemnitor") shall defend and indemnify the other Party and its employees, officers, directors and agents (the "Indemnitee") against all damages for bodily injury, death, or damage to real or tangible personal property proximately caused by the Indemnitor in the course of performing this Agreement; provided that (i) the Indemnitor receives prompt written notice of the claim from the Indemnitee under this Section, (ii) the Indemnitor has the right to control the defense of such claim and any related settlement negotiations, and (iii) the Indemnitee provides to the Indemnitor, at the Indemnitor's request and expense, with the assistance, information and authority necessary to perform the Indemnitor's obligations under this Section.

12.3 **Limitation of Damages**. IN NO EVENT SHALL BUYER OR SELLER BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF PROFITS, DATA OR USE, INCURRED BY EITHER PARTY OR ANY THIRD PARTY, WHETHER IN AN ACTION IN CONTRACT OR TORT.

12.4 **Injunctive Relief**. Each party acknowledges and agrees that in the event of a material breach of this Agreement, the non-breaching party shall be entitled to seek immediate injunctive relief, in addition to whatever remedies it might have at law or under this Agreement.

12.5 **Severability**. In the event any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement will remain in full force.

12.6 **Governing Law/Jurisdiction**. This Agreement and all matters arising out of or relating to this Agreement shall be governed by the laws of the State of Kansas, excluding its conflict of law provisions. Any dispute regarding this Agreement shall be subject to the exclusive jurisdiction of the applicable court in Johnson County, Kansas and each party submits to the jurisdiction of such courts. The parties agree that the United Nations Convention on Contracts for the International Sale of Goods is specifically excluded from application to this Agreement.

**ARTICLE 13.   MISCELLANEOUS**

13.1 **Waiver**. The waiver by either party of any default or breach of this Agreement shall not constitute a waiver of any other or subsequent default or breach. Except for actions for breach of confidentiality and non-payments of amounts owed hereunder, no action, regardless of form, arising out of this Agreement may be brought by either party more than one year after the cause of action has accrued.

13.2 **Successors and Assigns**. All provisions of the Agreement and any exhibits, attachments or schedules shall be binding upon, inure to the benefit of and be enforceable by and against the respective successors and permitted assigns of the parties.

13.3 **Delivery**. All Services provided hereunder shall be delivered pursuant to this Agreement. Nothing in this Section shall be deemed to transfer title to, or provide a party with any rights in, the Services, except as specifically provided in this Agreement.

13.4 **Export Controls**. The parties agree to comply fully with all relevant export laws and regulations of the United States, including but not limited to the U.S. Export Administration Regulations (collectively, "U.S. Export Controls"). Without limiting the generality of the foregoing, each party expressly agrees that it shall not, and shall cause its representatives to agree not to, export, directly or indirectly, re-export, divert, or transfer Services provided hereunder or any direct product thereof to any destination, company or person restricted or prohibited by U.S. Export Controls.

13.5 **Non-Exclusivity/Volume Commitments**. There are no commitments by Buyer to Seller of exclusivity in dealing, preferred vendor status, revenue generation or otherwise under this Agreement or any exhibit or schedule unless explicitly stated as such on an exhibit or schedule.

13.6 **Equal Employment Opportunity**. To the extent required by law and during the performance of this Agreement, the Seller agrees to comply with Executive Order 11246 and agrees that it will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin.

13.7 **Employee Notice Clause**. Where applicable, the Seller agrees to comply with the provisions of 29 CFR part 470 and agrees that it will inform its employees of certain rights related to union membership and the use of union dues and fees under federal law.

13.8 **Assignment**. Neither this Agreement nor any rights granted hereunder may be sold, leased, assigned, or otherwise transferred, in whole or in part, by either party, and any such attempted assignment shall be void and

of no effect without the advance written consent of the other party, such consent not to be unreasonably withheld or delayed; provided, however, that such consent shall not be required if (i) Buyer assigns this Agreement, in whole or in part, to an Affiliate or in connection with a merger, acquisition, or sale of assets.

13.9 [**Nondisclosure**.   Each party may have access to information that is confidential to the other party ("Confidential Information"). Confidential Information shall include any information that is clearly identified in writing at the time of disclosure as confidential as well as any information that, based on the circumstances under which it was disclosed, a reasonable person would believe to be confidential. Confidential Information shall include, but not be limited to, formulas, methods, know how, processes, designs, new products, developmental work, marketing requirements, marketing plans, customer names, prospective customer names, and the terms and pricing under this Agreement, regardless of whether such information is identified as confidential.  Confidential Information includes all information received from third parties that either party is obligated to treat as confidential and oral information that is identified by either party as confidential.

A party's Confidential Information shall not include information that (i) is or becomes a part of the public domain through no act or omission of the other party; (ii) was in the other party's lawful possession prior to the disclosure and had not been obtained by the other party either directly or indirectly from the disclosing party; (iii) is lawfully disclosed to the other party by a third party without restriction on disclosure; or (iv) is independently developed by the other party without use of or reference to the other party's Confidential Information.  In addition, this Section will not be construed to prohibit disclosure of Confidential Information to the extent that such disclosure is required to by law or valid order of a court or other governmental authority; provided, however, that the responding party shall first have given notice to the other party and shall have made a reasonable effort to obtain a protective order requiring that the Confidential Information so disclosed be used only for the purposes for which the order was issued.

The parties agree, unless required by law, not to make each other's Confidential Information available in any form to any third party (except to a party's directors, officers, employees, agents, or representatives, including, without limitation, its attorneys, accountants, consultants and financial advisors) or to use each other's Confidential Information for any purpose other than in the performance of this Agreement. Each party agrees to take all reasonable steps to ensure that Confidential Information is not disclosed or distributed by its employees or agents in breach of this Agreement. The parties agree to hold each other's Confidential Information in confidence during the term of this Agreement and for a period of three (3) years thereafter. Each party acknowledges and agrees that, due to the unique nature of Confidential Information, there can be no adequate remedy at law for breach of this Section and that such breach would cause irreparable harm to the non-breaching party; therefore, the non-breaching party shall be entitled to seek immediate injunctive relief, in addition to whatever remedies it might have at law or under this Agreement.

This Section constitutes the entire understanding of the parties and supersedes all prior or contemporaneous agreements, representations or negotiations, whether oral or written, with respect to Confidential Information.]

13.10     **Audit Rights**.  Buyer or any third party representative of Buyer shall have the right, upon reasonable notice and at reasonable times, to examine the books and records of Seller to the extent reasonably necessary to verify the accuracy of any billing statement, payment demand, charge, payment or computation made under this Agreement.

13.11     **Buyer Affiliate Usage**.  For the purposes of this Agreement, Buyer Affiliates may utilize the services provided by Seller hereunder.  Seller agrees that all such usage of the services by Buyer Affiliates will be separate dealings between Seller and such Buyer Affiliate pursuant to the terms and conditions of this Agreement and that such dealings will not be a sale by and between Seller and such Buyer Affiliates, and that Buyer does not guarantee the performance of its Affiliates. Seller further agrees that all usage of the services by Buyer Affiliates will contribute toward any minimum commitments, usage guarantees, etc. as may be set forth in this Agreement or Exhibit A.

13.12     **Construction and Headings**.  The section titles and subtitles in this Agreement are for ease of reference only.  They do not modify, restrict or expand upon the meaning of any provision.

13.13    **Execution.** This Agreement will not be binding upon Seller or Buyer unless and until it is signed by Seller's and Buyer's authorized representatives.

13.14    **Entire Agreement.** This Agreement, together with the attached exhibits which are incorporated by reference, constitutes the complete agreement between the parties and supersedes all prior or contemporaneous agreements or representations, written or oral, concerning the subject matter of this Agreement and such exhibits. This Agreement may not be modified or amended except in writing signed by a duly authorized representative of each party; No other act, document, usage or custom shall be deemed to amend or modify this Agreement.

13.15    **Counterparts and Exchanges by Fax.** This Agreement may be executed simultaneously in two (2) or more counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by fax shall be sufficient to bind the parties to the terms and conditions of this Agreement.

13.16    **Security.** Where Seller is granted access to information systems, as part of their contract(s), Seller agrees to comply with the Buyer's security policies and procedures. This includes full and unconditional compliance with legal and regulatory requirements of the country in which the organization is performing services. Seller agrees to be bound by Buyer's current "Information Security Requirements" as may be, and will be, amended unilaterally by Buyer from time to time throughout the duration of this agreement. A current version (as of time of execution of this agreement hereto) of the Information Security Requirements is attached hereto as "information only" and will not, and does not, change the legal obligation of Seller to be subject to the most current version in effect by Buyer at any particular time. A current version is available at anytime upon request by Seller.

**IN WITNESS WHEREOF**, the Parties have entered into this Agreement, effective as of the date first above written.

"BUYER"

**YRC Enterprise Services, Inc.**

By: _J Ringgenberg_
Name: _Jason Ringgenberg_
Title: _CIO_

"SELLER"

**World Fuel Services**

By: _Scott_
Name: _Scott Effinger_
Title: _National Account Sales Manager_

# Fuel Supply Agreement
## Schedule - Specific Product Terms
### Exhibit A

THIS EXHIBIT A ("Exhibit") hereby incorporates the terms of the Agreement between Seller and Buyer. To the extent that the terms of the Agreement between the parties are in conflict with the terms and conditions of this Exhibit, the terms and conditions of this Exhibit shall control. Where applicable, the defined terms in the Agreement shall have the same meaning in this Exhibit. All monetary denominations shall be in United States dollars.

**Seller Name:** WFS-Carter

**Buyer Name:** YRC Enterprise Services, Inc., a Delaware Corporation

**Effective Date of Fuel Supply Agreement:** 6/1/2019

**Commencement Date of this Exhibit:** 6/1/2019

**Termination Date of this Exhibit:** 5/31/2020

| Fuel Supplier | Fleet | Term Code | Location Name | Street Address | City | State | ZIP Code | Product Type | Gross/ Net Gallons | Index | OPIS City or Platts Group | Offset | Diff to Platts/ OPIS (+/-) | Freight per Gallon | Fuel Surcharge % on 3/1/18 | Pump Rerd | Pump Fee | Minimum Load Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WFS-Carter | YRC | REX-555 | San Antonio | 111 Gembler Rd | San Antonio | TX | 78219 | TXLED | Net | Platts | USGC Pipe | Prior Day Avg | $ 0.0510 | $ 0.0196 | 29.000% | No | N/A | 7,500 |

'Exhibit A' Accepted and Acknowledged:

**Seller:** WFS-Carter

Signature:

Name: _Tim Crowe_

Title: VP Commercial Bon

Date: 5/21/19

**Buyer:** YRC Enterprise Services, Inc.

Signature:

Name: Jason Ringgenberg

Title: SVP & CIO

Date: 12/19/19

YRC Freight Confidential

## Schedule – Specific Product Terms
### Exhibit A

THIS EXHIBIT A ("Exhibit") hereby incorporates the terms of the Agreement between Seller and Buyer. To the extent that the terms of the Agreement between the parties are in conflict with the terms and conditions of this Exhibit, the terms and conditions of this Exhibit shall control. Where applicable, the defined terms in the Agreement shall have the same meaning in this Exhibit. All monetary denominations shall be in United States dollars.

Seller Name: **WFS-Associated Petroleum**

Buyer Name: **YRC Enterprise Services, Inc., a Delaware Corporation**

Effective Date of Fuel Supply Agreement: 6/1/2019

Commencement Date of this Exhibit: 6/1/2019

Termination Date of this Exhibit: 5/31/2020

| Fuel Supplier | Fleet | Term Code | Location Name | Street Address | City | State | ZIP Code | Product Type | Gross/Net Gallons | Index | OPIS City or Plats Group | Offset | Diff to Plats/OPIS (+/-) | Freight per Gallon | Fuel Surcharge % on 3/1/18 | Pump Req'd | Pump Fee | Minimum Load Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WFS-Associated Petroleum | YRC | REX-873 | Tacoma2 | 2807 70th Ave. East | Tacoma | WA | 98424 | ULSD2 | Gross | OPIS | Tacoma | Low same Day 10am | $ (0.0400) | $ 0.0175 | 0.000% | No | N/A | 9,800 |
| WFS-Associated Petroleum | YRC | REX-R91 | Portland2 | 6845 North Cutter Circle | Portland | OR | 97217 | BS | Gross | OPIS | Portland | Low same Day 10am | $ (0.0400) | $ 0.0175 | 0.000% | Yes | $ 25.00 | 9,800 |
| WFS-Associated Petroleum | URD | URD-501 | Portland2 | 10510 N Vancouver Way | Portland | OR | 97217 | BS | Gross | OPIS | Portland | Low same Day 10am | $ (0.0400) | $ 0.0175 | 0.000% | Yes | $ 25.00 | 9,800 |
| WFS-Associated Petroleum | URD | URD-504 | Tacoma2 | 802 East 11th St | Tacoma | WA | 98421 | ULSD2 | Gross | OPIS | Tacoma | Low same Day 10am | $ (0.0400) | $ 0.0175 | 0.000% | Yes | $ 25.00 | 9,800 |
| WFS-Associated Petroleum | URD | URD-508 | Medford | 4000 Hamrick Rd | Central Point | OR | 97502 | BS | Gross | OPIS | Portland | Low same Day 10am | $ (0.0400) | $ 0.1155 | 0.000% | Yes | $ 25.00 | 9,800 |

'Exhibit A' Accepted and Acknowledged:

Seller: WFS-Associated Petroleum

Signature: _____

Name: _OP COMMERCIAL DEV_

Title: VP COMMERCIAL DEV

Date: 5/24/19

Buyer: YRC Enterprise Services, Inc.

Signature: J Ringgenberg

Name: Jason Ringgenberg

Title: SVP & CIO

Date: 12/19/19

# Fuel Supply Agreement

## Schedule - Specific Product Terms

### Exhibit A

THIS EXHIBIT A ("Exhibit") hereby incorporates the terms of the Agreement between Seller and Buyer. To the extent that the terms of the Agreement between the parties are in conflict with the terms and conditions of this Exhibit, the terms and conditions of this Exhibit shall control. Where applicable, the defined terms in the Agreement shall have the same meaning in this Exhibit. All monetary denominations shall be in United States dollars.

**Seller Name:** WFS-Papco

**Buyer Name:** YRC Enterprise Services, Inc., a Delaware Corporation

**Effective Date of Fuel Supply Agreement:** 6/1/2019

**Commencement Date of this Exhibit:** 6/1/2019

**Termination Date of this Exhibit:** 5/31/2020

| Fuel Supplier | Fleet | Term Code | Location Name | Street Address | City | State | ZIP Code | Product Type | Gross/ Net Gallons | Index | OPIS City or Platts Group | Offset | Diff1 to Platts/ OPIS (+/-) | Freight per Gallon | Fuel Surcharge % on 3/1/18 | Pump Req'd | Pump Fee | Minimum Load Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WFS-Papco | YRC | REX-617 | Roanoke | 1665 Seibel Dr NE | Roanoke | VA | 24012 | ULSD2 | Net | OPIS | Norfolk | Same Day GCA | $ (0.0140) | $ 0.0198 | 19.0006% | No | N/A | 7,500 |

'Exhibit A' Accepted and Acknowledged:

**Seller:** WFS-Papco

Signature: _[signature]_

Name: JIM CROWE

Title: VP COMMERCIAL DEV

Date: 5/21/19

**Buyer:** YRC Enterprise Services, Inc.

Signature: _[signature]_

Name: Jason Ringgenberg

Title: SVP & CIO

Date: 12/19/19

YRC Freight Confidential