## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | Case No. 23-11069 (CTG) |
| Debtors. | (Jointly Administered) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## (I) APPROVING THE DEBTORS' SELECTION OF A
## REAL ESTATE STALKING HORSE BIDDER, (II) APPROVING BID PROTECTIONS
## IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (the "Motion"):[2]

### Relief Requested

1.     The Debtors seek entry of an order (the "Order"): (a) approving Estes Express Lines ("Estes") as the Real Estate Stalking Horse Bidder for all of the Debtors' Owned Properties and certain other Assets related to the Owned Properties (as further described in the Real Estate Stalking Horse APA and as defined therein, the "Acquired Assets"), (b) authorizing the Bid Protections to Estes (the "Estes Bid Protections") in connection therewith, and (c) granting related relief.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]    A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 14] (the "First Day Declaration").  Capitalized terms used but not immediately defined in this Motion have the meanings ascribed to them in the Bidding Procedures, the Bidding Procedures Order, or in the First Day Declaration, as applicable.

2.     In support of the Motion, the Debtors submit the *Declaration of Cody Leung Kaldenberg, Founding Member and Partner at Ducera Partners LLC*, *in Support of the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Selection of a Stalking Horse Bidder, (II) Approving Bid Protections in Connection Therewith, and (III) Granting Related Relief*, filed contemporaneously herewith (the "Stalking Horse Declaration").

## Jurisdiction and Venue

3.     The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, and 6006(a), and Bankruptcy Local Rules 2002-1, 6004-1, and 9006-1.

## Background

6.     On August 6, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. These chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 169].

7.      The Debtors are managing their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On August 16, 2023, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 269] (the "Committee").  No trustee or examiner has been appointed in these chapter 11 cases.

8.      On August 7, 2023, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I)(A) Approving Bidding Procedures for the Sale or Sales of the Debtors' Assets; (B) Scheduling an Auction and Approving the Form and Manner of Notice Thereof; (C) Approving Assumption and Assignment Procedures, (D) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Therefore; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 22] (the "Sale Motion").

9.      On September 11, 2023, the Debtors filed the amended proposed *Order (I)(A) Approving Bidding Procedures for the Sale or Sales of the Debtors' Assets; (B) Scheduling Auctions and Approving the Form and Manner of Notice Thereof; (C) Approving Assumption and Assignment Procedures, (D) Scheduling Sale Hearings and Approving the Form and Manner of Notice Therefore; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 444] (the "Bidding Procedures Order"), including the Debtors' proposed Bidding Procedures attached

3

as <u>Exhibit A</u> to the Bidding Procedures Order. Substantially contemporaneously herewith, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Shortening the Notice and Objection Period for the Debtors' Real Estate Stalking Horse Motion and (II) Granting Related Relief* (the "<u>Motion to Shorten</u>"), seeking expedited approval of the relief sought herein.

10.    At the hearing on the sale of the Non-Rolling Stock Assets (including the Acquired Assets under the Real Estate Stalking Horse APA), scheduled under the Bidding Procedures for December 12, 2023, subject to the Court's availability (the "<u>Sale Hearing</u>"), the Debtors will seek Court approval to consummate either the Transactions contemplated herein or an otherwise higher or better Bid (or combination of Bids) for the Acquired Assets and any other applicable Non-Rolling Stock Assets.

<u>**Preliminary Statement**</u>

**I.    The Debtors' Marketing and Sale Process for the Owned Properties.**

11.    Pursuant to the Debtors' proposed Bidding Procedures, the Debtors seek to maximize the value of their Assets (including but not limited to their Owned Properties) for the benefit of all of their stakeholders. The Bidding Procedures contemplate separate Auction(s), in each case if required, for (i) the Rolling Stock and (ii) the Debtors' Non-Rolling Stock Assets (*i.e.*, the Real Property Assets (which includes the Owned Properties and the Leased Properties), the Intellectual Property, and the Other Assets (each as defined in the Bidding Procedures)), to commence on October 18, 2023 at 10:00 a.m. (prevailing Eastern Time) and November 27, 2023 at 2:30 p.m. (prevailing Eastern Time), respectively.

12.    Prior to such Auction(s), the Debtors and their advisors, including Ducera, will have already spent several months actively marketing the Assets, including the Debtors' Owned Properties and certain other Assets related to the Owned Properties that are the subject of the Real Estate Stalking Horse APA. As detailed in the First Day Declaration and the Kaldenberg

4

Declaration,[3] the Debtors' proposed investment banker, Ducera Partners LLC ("Ducera"), launched a robust marketing process for the Debtors' Assets prior to the Petition Date, which process remains ongoing.  To date, approximately 540 prospective purchasers of the Assets, including the Rolling Stock and the Real Property Assets, have been in contact with the Debtors and Ducera, and approximately 307 parties have executed confidentiality agreements with the Debtors and gained access to the Data Room.  Extensive information relating to the Assets has been made available to these prospective purchasers in the Data Room.

13.    Prior to and following entry of the Interim DIP Order,[4] the Debtors and their advisors engaged in hard-fought negotiations with both Old Dominion (as defined below) and Estes regarding the terms of a value-maximizing Stalking Horse APA for the Owned Properties. As counsel to the Debtors stated on the record at the status conference held before the Court on August 17, 2023, Estes was the Debtors' originally contemplated Real Estate Stalking Horse Bidder (under the DIP Facility) for the Acquired Assets, providing a stalking horse bid for the Acquired Assets in the amount of $1.3 billion (the "Original Estes Bid").  Immediately thereafter, Old Dominion Freight Line, Inc. ("Old Dominion") submitted a stalking horse bid to the Debtors for the Acquired Assets in the amount of $1.5 billion (the "Old Dominion Bid").  The Debtors filed that certain *Debtor-in-Possession Credit Facility Term Sheet* [Docket No. 297-1] (the "DIP

---

[3]    The *Declaration of Cody Leung Kaldenberg, Founding Member and Partner at Ducera Partners LLC, in Support of the Debtors' Motion Seeking Entry of an Order (I)(A) Approving Bidding Procedures for the Sale or Sales of the Debtors' Assets; (B) Scheduling an Auction and Approving the Form and Manner of Notice Thereof; (C) Approving Assumption and Assignment Procedures, (D) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Therefore; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief*, filed contemporaneously herewith.

[4]    The *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 302] (the "Interim DIP Order," and together with the final order approving such relief, the "DIP Orders").

5

Term Sheet") on August 18, 2023, incorporating the Old Dominion Bid (in lieu of the Original Estes Bid) therein.  Indeed, one of the key aspects of the Interim DIP Order and the DIP Term Sheet, consented to by each of the Junior DIP Secured Parties, the B-2 Secured Parties, the Prepetition ABL Secured Parties, and the Prepetition UST Secured Parties, was the requirement of a Stalking Horse APA for the Owned Properties as part of the DIP Facility.  Since then, the Debtors engaged in weeks of extensive and hard-fought negotiations with both Estes and Old Dominion.  Ultimately, Estes offered the Real Estate Stalking Horse APA (as defined below) to purchase all of the Owned Properties for $1.525 billion (the "Estes Stalking Horse Bid").  The Estes Stalking Horse Bid is an improvement over the Old Dominion Bid because it offers more money for the Acquired Assets and less fees in terms of bid protections.  The Debtors, in consultation with their advisors, believe that the Real Estate Stalking Horse APA offered by Estes represents the best available stalking horse alternative with respect to the Acquired Assets and is reasonable and necessary considering that the Interim DIP Order and the DIP Term Sheet require the Debtors' entry into a Stalking Horse APA.  This Motion seeks approval of the Real Estate Stalking Horse APA provided by Estes.

14.    The Debtors' proposed Bidding Procedures (filed substantially contemporaneously herewith as Exhibit A to the Bidding Procedures Order) establish a clear and open bidding process for the solicitation, receipt, and evaluation of third-party Bids for the Assets, including the Acquired Assets.  Such Bids may be for all, packages of, or single Assets (including the Owned Properties that are the subject of the Real Estate Stalking Horse APA).  The Bidding Procedures will enable the Debtors to maximize the proceeds generated by the Sale or Sales of their Assets, including the Owned Properties.

DOCS_DE:244781.1 96859/001

15.     The Debtors believe that the Real Estate Stalking Horse APA represents the highest and otherwise best value-maximizing stalking horse arrangement for the Owned Properties.  The Real Estate Stalking Horse APA sets a meaningful price floor ($1.525 billion) for the Owned Properties in the aggregate, while the Bidding Procedures maintain flexibility for the Debtors to pursue the highest value achievable for proceeds of the Acquired Assets, by clearly establishing that Bids for the Assets may be be submitted on an all-, packaged-, or individualized- basis. Further, the Real Estate Stalking Horse APA provides assurance to the Debtors and their stakeholders that the Sale (or Sales) of the Owned Properties will at least exceed $1.525 billion, an amount sufficient to pay off the Debtors' entire remaining prepetition secured capital structure in full, with remaining proceeds available for distribution to general unsecured creditors.

16.     Moreover, the Estes Bid Protections are substantially below market.  For example, had the parties agreed to a 3% breakup fee and 1% expense reimbursement, amounts routinely approved by bankruptcy courts in this and other districts, the requested bid protections for the proposed $1.525 billion transaction under the Real Estate Stalking Horse APA could have been $61 million.  The Estes Bid Protections, in contrast, total only a maximum amount of $9.1 million, comprising (a) a $7,500,000 Breakup Fee and (b) an Expense Reimbursement of up to $1,600,000. Last, the Real Estate Stalking Horse APA provides for 30 days of rent-free storage of Rolling Stock and other equipment that the Real Estate Stalking Horse Bidder estimates could have a value to the Debtors' estates in excess of $10 million.   Accordingly, by this Motion (and the accompanying Motion to Shorten), the Debtors seek expedited approval of (a) entry into the Real Estate Stalking Horse APA with Estes and (b) the Estes Bid Protections.

## II.     The Real Estate Stalking Horse Bidder.

17.     On September 12, 2023, the Debtors and Estes (the "Real Estate Stalking Horse Bidder"), entered into that certain stalking horse asset purchase agreement (including all exhibits

7

and schedules related thereto, the "Real Estate Stalking Horse APA") attached hereto as **Exhibit A**, whereby the Real Estate Stalking Horse Bidder commits to purchasing all of the Debtors' Owned Properties and certain other Assets related to the Owned Properties (as further described in the Real Estate Stalking Horse APA, and as defined therein, the "Acquired Assets") for cash consideration of $1.525 billion, subject to certain adjustments as set forth in the Real Estate Stalking Horse APA (the "Purchase Price").

18.     Pursuant to the Bidding Procedures, the Debtors will continue to solicit higher or otherwise better proposals for the Owned Properties (including pursuant to combinations of Bids, as applicable).  Under the Bidding Procedures, Bids from third-party Acceptable Bidders may, but need not, be for all of the Owned Properties.  The Debtors, in consultation with the Consultation Parties, will evaluate all Bids received and pursue the Sale Transaction, or a combination of Sale Transactions, that delivers the highest proceeds for the Assets and recoveries to the Debtors' stakeholders.

19.     The Debtors submit that the process set forth in the proposed Bidding Procedures will yield the highest or otherwise best value for the Assets and, in turn, maximize recoveries for the Debtors' stakeholders.  The Real Estate Stalking Horse APA, if consummated, will generate proceeds in excess of the amount of the Debtors' entire remaining prepetition secured capital structure.  At the same time, the proposed Bidding Procedures provide flexibility for the Debtors, in consultation with the Consultation Parties, to seek higher or otherwise better Bids (including value-maximizing combinations of Bids) for the Owned Properties that are the subject of the Real Estate Stalking Horse APA.  Accordingly, entry into the Real Estate Stalking Horse APA and approval of the Estes Bid Protections should be approved.

### III.    Material Terms of the Real Estate Stalking Horse APA.

20.    The following chart summarizes the terms and conditions of the Real Estate Stalking Horse APA and discloses certain information required pursuant to Local Rule 6004-1:[5]

| Real Estate Stalking Horse APA Provision | Summary Description |
| --- | --- |
| **Real Estate Stalking Horse APA Parties** | <u>Seller</u>:  Yellow Corporation<br><u>Purchaser</u>: Estes Express Lines<br><br>*See* Real Estate Stalking Horse APA, Preamble. |
| **Purchase Price** | <u>Cash Purchase Price</u>:   $1.525 billion, subject to certain potential adjustments.<br><br>*See* Real Estate Stalking Horse APA § 2.1. |
| **Estes Bid Protections**<br>**Local Bankr. R.**<br>**6004-1(c)(i)(C)** | <u>Breakup Fee</u>: $7,500,000.<br><u>Expense Reimbursement</u>: up to $1,600,000.<br><br>*See* Real Estate Stalking Horse APA §§ 8.2(b)-(c). |
| **Acquired Assets** | Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein, in the Sale Order, and in the Canadian Sale Recognition Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser or a Designated Purchaser, and Purchaser or a Designated Purchaser shall purchase, acquire, and accept from Sellers, all of Sellers' right, title and interest in and to, as of the Closing, the Acquired Assets, free and clear of all Encumbrances other than Permitted Encumbrances. For the avoidance of doubt, the Acquired Assets shall be free and clear of any and all Employment Liabilities, pension liabilities, and successor liabilities of any kind. "Acquired Assets" means all of the Sellers' right, title and interest, as of the Closing, in and to:<br><br>(a)    the Owned Real Property of the Sellers set forth on Schedule 1.1(a) (the "Acquired Real Property"); |

---

[5]    This summary is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between this summary and the Real Estate Stalking Horse APA, the Real Estate Stalking Horse APA shall govern in all respects.  Capitalized terms used in the following summary shall have the meanings ascribed to them in the Real Estate Stalking Horse APA.  All references to schedules or sections in the following summary shall refer to schedules or sections of the Real Estate Stalking Horse APA.

|  | (b) | the Contracts set forth on Schedule 1.1(b) (collectively, the "Assigned Contracts"); |
|---|---|---|
|  | (c) | to the extent transferable under applicable Law, all of the rights, interests and benefits (if any) accruing under all Permits and Governmental Authorizations related to the Acquired Real Property, and all pending applications therefor; |
|  | (d) | all Documents relating solely to the Acquired Real Property included in the Acquired Assets, but excluding any information to the extent prohibited by Law; |
|  | (e) | all rights against third parties (including customers, suppliers, vendors, merchants, manufacturers and counterparties to any Assigned Contract), including causes of action, claims, counterclaims, defenses, credits, rebates (including any vendor or supplier rebates), demands, allowances, refunds (other than Tax refunds or Tax attributes), causes of action, rights of set off, rights of recovery, rights of recoupment or rights under or with respect to express or implied guarantees, warranties, representations, covenants or indemnities made by such third parties, with respect to any of the Acquired Real Property, or the Assumed Liabilities, in each case, other than (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (ii) all claims that any Seller or any of its Affiliates may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities, and (iii) claims against any Seller or its Affiliates. |
|  |  | *See* Real Estate Stalking Horse APA § 1.1. |
| **Assumed Liabilities** |  | On the terms and subject to the conditions set forth herein, in the Sale Order, and in the Canadian Sale Recognition Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with Section 2.1, Purchaser or a Designated Purchaser shall irrevocably assume from each Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably transfer, assign, convey, and deliver to Purchaser or a Designated Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "Assumed Liabilities"): |

DOCS_DE:244781.1 96859/001

|  | (a) | all Liabilities and obligations of any Seller under the Assigned Contracts that become due from and after the Closing;

(b) all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts (the "Cure Costs");

(c) all Liabilities (including, for the avoidance of doubt, Taxes other than income Taxes of Sellers) relating to amounts required to be paid, or actions required to be taken or not to be taken, by Purchaser under this Agreement and all Transfer Taxes;

(d) all Liabilities agreed to be assumed by Purchaser or for which Purchaser has agreed to be responsible in accordance with this Agreement; and

(e) all Liabilities arising out of or relating to any environmental, health or safety matter, including those arising under or relating to Environmental Laws or Hazardous Materials, in connection with ownership, operation, use or maintenance of the Acquired Assets, whenever arising or occurring (the "Environmental Liabilities") other than those Environmental Liabilities (i) that are dischargeable, or capable of being sold free and clear, pursuant to Section 363 of the Bankruptcy Code, the CCAA, the Sale Order or the Canadian Sale Recognition Order, (ii) that are otherwise dischargeable pursuant to Section 1141 of the Bankruptcy Code, the CCAA, the Sale Order or the Canadian Sale Recognition Order, or (iii) from which the Acquired Assets are otherwise released as of the Closing pursuant to an Order of the Bankruptcy Court or Canadian Court, including the Sale Order and Canadian Sale Recognition Order, respectively.

*See* Real Estate Stalking Horse APA § 1.3. |

11

| Excluded Assets | Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under any of the other properties, rights, interests and assets of Sellers other than the Acquired Assets (collectively, the "Excluded Assets"). Further notwithstanding anything to the contrary in this Agreement, and without limiting any rights of Purchaser set forth in this Agreement, to the extent that any specific Acquired Asset located in Canada cannot be sold free and clear of any and all Employment Liabilities, pension liabilities, and successor liabilities of any kind (or such liabilities cannot be removed or released by operation of the Sale Order), Purchaser may, at its sole and absolute discretion, remove such asset from the Acquired Assets prior to Closing with no corresponding reduction in the Purchase Price. For the avoidance of doubt, Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and Purchaser shall not acquire, (i) any assets other than the Acquired Assets, (ii) any relationships, obligations, or liabilities in respect of any employees, suppliers, or customers of Sellers, (iii) any products or services in respect of Sellers' business and (iv) any goodwill or intellectual property in respect to Sellers' business. <br><br>*See* Real Estate Stalking Horse APA § 1.2. |
|---|---|
| Excluded Liabilities | Purchaser and the Designated Purchaser(s) (if any) shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Closing, other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"). For the avoidance of doubt, all Liabilities under, associated with or with respect to any employee claim, former employee claim or claims from or related to any collective bargaining agreement, or corresponding or related pension plan obligation, under United States or Canadian Law are expressly excluded. <br><br>*See* Real Estate Stalking Horse APA § 1.4. |
| Representations and Warranties | Customary representations and warranties by Purchaser and Seller, including but not limited to a representation by Estes that it is a credit worthy entity with cash and/or financing commitments for the entire Purchase Price. |

| | *See* Real Estate Stalking Horse APA, Art. III, IV. |
|---|---|
| **Sale to Insider**<br>**Local Bankr. R.**<br>**6004-1(b)(iv)(A)** | N/A. |
| **Agreements with Management**<br>**Local Bankr. R.**<br>**6004-1(b)(iv)(B)** | N/A. |
| **Releases**<br>**Local Bankr. R.**<br>**6004-1(b)(iv)(C)** | N/A. |
| **Private Sale/No Competitive Bidding**<br>**Local Bankr. R. 6004-1(b)(iv)(D)** | N/A.  The Debtors have proposed an open Auction and sale process. |
| **Closing and Other Deadlines**<br>**Local Bankr. R.**<br>**6004-1(b)(iv)(E)** | Closing:  The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities in accordance with this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing), or at such other place and time as the Parties may agree in writing; provided that the Closing will occur no earlier than 120 calendar days after the Petition Date (i.e., December 4, 2023), which may be extended to 150 days with the written consent of Purchaser (such consent not to be unreasonably withheld) and the Persons whose consent is required under any debtor-in-possession financing agreement(s) of Sellers. The date on which the Closing actually occurs is referred to herein as the "Closing Date."  In anticipation of and following the Closing Date, Sellers and Purchaser shall make all commercially reasonable efforts to accomplish the recording of all documents and instruments necessary to transfer title to the Acquired Real Property within fourteen (14) days of Closing.<br><br>Estes shall pay any and all transfer taxes and real estate closing costs in connection with its purchase of the Acquired Assets. |

13

| | |
|---|---|
| | *See* Real Estate Stalking Horse APA §§ 2.3(a), 2.7(b), 9.1. |
| **Good Faith Deposit**<br>**Local Bankr. R. 6004-(b)(iv)(F)** | Deposit:  5% of the Cash Payment portion of the Purchase Price.<br><br>*See* Real Estate Stalking Horse APA § 2.2. |
| **Interim Arrangements with Proposed Buyer**<br>**Local Bankr. R. 6004-(b)(iv)(G)** | N/A. |
| **Use of Proceeds**<br>**Local Bankr. R. 6004-1(b)(iv)(H)** | N/A. |
| **Tax Exemption**<br>**Local Bankr. R. 6004-1(b)(iv)(I)** | None. |
| **Records Retention**<br>**Local Bankr. R. 6004-(b)(iv)(J)** | For a period of three years post-Closing, books and records will be maintained as set forth in Section 6.2 of the Stalking Horse APA. |
| **Sale of Avoidance Actions**<br>**Local Bankr. R. 6004-(b)(iv)(K)** | None. |
| **Requested Findings as to Successor Liability**<br>**Local Bankr. R. 6004-1(b)(iv)(L)** | From and after the Closing, if any Seller or any of its Affiliates is subject to a Liability that should belong to Purchaser or its Affiliates pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Purchaser, and Purchaser shall assume and accept such Liability. From and after the Closing, if Purchaser or any of its Affiliates is subject to a Liability that should belong to a Seller or its Affiliates pursuant to the terms of this Agreement, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller or its Affiliates, and such Seller or its Affiliates shall assume and accept such Liability.<br><br>*See* Real Estate Stalking Horse APA § 6.11(b). |
| **Sale of Unexpired Leases Free and Clear** | One lease (ground lease) will be sold as part of the purchase and sale of the Acquired Assets pursuant to Section 1.1 of the Real Estate Stalking Horse APA. |

14

| Local Bankr. R. 6004-1(b)(iv)(M) | |
|---|---|
| **Credit Bid**<br>**Local Bankr. R. 6004-1(b)(iv)(N)** | None. |
| **Relief from Bankruptcy Rule 6004(h)**<br>**Local Bankr. R. 6004-1(b)(iv)(O)** | The Debtors have requested a waiver of the fourteen day stay under Bankruptcy Rule 6004(h). |

**IV.    The Estes Bid Protections.**

21.    The Debtors seek approval of the Estes Bid Protections.  As set forth above, the Real Estate Stalking Horse APA contemplates Bid Protections in the form of: (i) a breakup fee in the amount of $7,500,000, which is equal to approximately 0.5% of the Purchase Price (the "Breakup Fee"), payable in the event the Debtors consummate an alternative Transaction (or Transactions) with respect to the Acquired Assets; and (ii) a provision for reimbursement of reasonable and documented fees and expenses not to exceed $1,600,000, which is equal to approximately 0.1% of the Purchase Price (the "Expense Reimbursement").

22.    The Estes Bid Protections were a necessary component of the Estes Stalking Horse Bid.  The Real Estate Stalking Horse Bidder was unlikely to submit the Real Estate Stalking Horse APA, let alone permit the Real Estate Stalking Horse APA to be subject to higher or otherwise better offers (which may take the form of several combined Bids aggregating into a superior alternative for the Debtors), without the Estes Bid Protections.

23.    The Estes Bid Protections promote competitive bidding for the Acquired Assets by inducing the Real Estate Stalking Horse Bidder to hold the Real Estate Stalking Horse APA open as a minimum bid for all of the Owned Properties on which the Debtors (and other Acceptable Bidders for all of the Owned Properties) can rely.  The Real Estate Stalking Horse APA, if

15

consummated, would generate proceeds to the estate *at least* exceeding the aggregate amount of the Debtors' outstanding prepetition secured debt.  Thus, Estes, through its Real Estate Stalking Horse APA, (a) has provided a meaningful floor for bidding on the Owned Properties in the aggregate, (b) will serve as a catalyst for other Qualified Bids, and (c) provides critical assurance to the Debtors and their stakeholders regarding the minimum—and significant—value to ultimately be generated on account of the Sale (or Sales, as applicable) of the Owned Properties.

24.     Executing the Real Estate Stalking Horse APA contemporaneous with approval of the Bidding Procedures will put the Debtors in a comfortable position to solicit competing Bids for the Owned Properties that may be materially higher or otherwise better than the Estes Stalking Horse Bid.  As mentioned, such Winning Bid (or Winning Bids) may take the form of either a single Bid or the combination of multiple Bids for different packages of or individual Owned Properties.  The Real Estate Stalking Horse APA is subject to higher or otherwise better alternatives and provides a meaningful floor of value for the Owned Properties in the aggregate.  The Estes Bid Protections are reasonable and substantially below market for bid protections in similar transactions routinely approved by courts in this and other jurisdictions.  The Estes Bid Protections are also appropriate in light of the extensive benefits to be provided to the Debtors, their estates, and their stakeholders by the Real Estate Stalking Horse APA.  Accordingly, the Real Estate Stalking Horse APA, including the Estes Bidding Protections, should be approved.

### Basis for Relief

**I.     The Selection of Estes as Real Estate Stalking Horse Bidder Should Be Approved as an Exercise of Sound Business Judgment.**

25.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to

section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction.  *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

26.    Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company.'"  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *Integrated Res.*, 147 B.R. at 656; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

27.    As set forth above, the Debtors have a sound business justification for selecting Estes as the Real Estate Stalking Horse Bidder for the Owned Properties.

28.    *First*, the Debtors conducted a thorough marketing process for the Owned Properties, including for a stalking horse specifically, and engaged in extensive, arm's-length negotiations with both Estes and Old Dominion before selecting Estes as the Real Estate Stalking Horse Bidder.  Ultimately, the Debtors and their advisors, including Ducera, determined that the Real Estate Stalking Horse APA provided by Estes offered the highest or otherwise best stalking

17

horse bid for the Acquired Assets.  The Real Estate Stalking Horse APA will (a) generate $1.525 billion in proceeds for the Acquired Assets if consummated, and (b) establish a meaningful "floor" for the Acquired Assets.

29.     *Second*, the Real Estate Stalking Horse APA will not chill bidding, but rather, will foster a competitive process.  The Real Estate Stalking Horse APA is subject to competing Bids, which may be for all, packages of, or individual Assets (including the Owned Properties).  The proposed Bidding Procedures provide significant flexibility to the Debtors to maximize the proceeds of the Sale(s) of their Owned Properties.  At the same time, the Real Estate Stalking Horse APA signals to the market (and guarantees to the Debtors' estates) a significant price floor of $1.525 billion for the Owned Properties in the aggregate.

30.     *Third*, the Debtors and Ducera will continue to market all of the Assets (including the Acquired Assets subject to the Real Estate Stalking Horse APA) and solicit any and all other Bids consistent with the Bidding Procedures.  As described in the Real Estate Stalking Horse Declaration, hundreds of parties have already gained access to the Data Room.  Further, all interested parties are eligible to become Acceptable Bidders and gain access to the Data Room. Under the Bidding Procedures, Bids for the Owned Properties are not required to be submitted until November 9, 2023 at 5:00 p.m. (prevailing Eastern Time).  The Bidding Procedures will provide interested bidders ample time to prepare and submit Bids as well as enable the Debtors, in consultation with the Consultation Parties, to pursue the highest or otherwise best alternative(s) for monetizing the Assets (including for the Owned Properties).  The Bidding Procedures and the Real Estate Stalking Horse APA, taken together, provide both (a) flexibility to the Debtors, in consultation with the Consultation Parties, to pursue and ultimately consummate the best value-

maximizing alternative for the Owned Properties and (b) assurance to the Debtors and their stakeholders that the proceeds of the Owned Properties will be at least $1.525 billion.

31.     Accordingly, the Debtors respectfully request that the Court make a finding that the selection of Estes as the Real Estate Stalking Horse Bidder for the Acquired Assets is for the highest and otherwise best stalking horse offer currently available for the Acquired Assets and that the Debtors' entry into the Real Estate Stalking Horse APA reflects a proper exercise of the Debtors' business judgment and rightly authorized.

## II.    The Estes Bid Protections Have a Sound Business Purpose and Should Be Approved.

32.     The Debtors seek authority to provide the Estes Bid Protections to the Real Estate Stalking Horse Bidder.  The Debtors have agreed to pay the Expense Reimbursement and the Breakup Fee (if triggered) to Estes as an allowed administrative expense priority claim.  The Estes Bid Protections are customary and appropriate for stalking horse agreements of this type and purpose.

33.     The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."  *Official Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).  As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bid protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement."  *Id*. (internal citations omitted).  Thus, the use of bid protections has become an established practice in chapter 11 cases.

DOCS_DE:244781.1 96859/001

34.     Indeed, break-up fees and other forms of bid protections are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . .  In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be *necessary* to discharge [such] duties to maximize value." *Integrated Res.*, 147 B.R. at 659–60 (emphasis added).   Specifically, bid protections "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *995 Fifth Ave.*, 96 B.R. at 28 (quotations omitted); *see also Integrated Resources*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

35.     As a result, courts routinely approve such bid protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).   The Debtors believe that in connection with designating a Real Estate Stalking Horse Bidder, the Bid Protections are necessary and, together with the Bid, provide the Debtors' estates a floor for further bidding that may increase the consideration given in exchange for the Assets.

36.     The Estes Bid Protections were necessary to attract and retain Estes as the Real Estate Stalking Horse Bidder.   Indeed, although the Estes Bid Protections are substantially below market relative to bid protections routinely approved as part of similarly sized transactions by courts in this and other jurisdictions, they were a material inducement for Estes to provide the Real

Estate Stalking Horse APA.  The Debtors and Estes negotiated the Real Estate Stalking Horse

APA at arms' length and in good faith over the course of several hard-fought weeks.  Without the

Estes Bid Protections, Estes likely would have withdrawn the Real Estate Stalking Horse APA

altogether.  Accordingly, the Debtors would have been left without a $1.525 billion assurance of

proceeds for their Owned Properties.  At the same time, the Bidding Procedures provide significant

flexibility for the Debtors, in consultation with the Consultation Parties, to pursue alternative Sale

Transactions for the Owned Properties.  As such, the Bid Protections will enable the Debtors to

maximize the value of their estates for the benefit of all stakeholders.

37.    Furthermore, the Debtors believe that the Estes Bid Protections are significantly

below market, and fair and reasonable in amount in light of the size and nature of the proposed

Sale Transaction to Estes under the Real Estate Stalking Horse APA and the significant efforts

expended by Estes in connection with negotiating and entering into the Real Estate Stalking Horse

APA.  In addition, given that the Breakup Fee (if triggered) will be paid out of the proceeds of any

competing Sale Transaction(s), such payment will not diminish the Debtors' estates.  Finally, the

Real Estate Stalking Horse Bidder is not an "insider" of the Debtors, as that term is defined in

section 101(31) of the Bankruptcy Code.

38.    As mentioned, the Estes Bid Protections are significantly below the range of bid

protections typically approved by bankruptcy courts in the Third Circuit.  When considered

together, the combined total Breakup Fee and Expense Reimbursement in the maximum amount

of $9.1 million represents approximately only 0.6% of the Purchase Price, a cost the Debtors

respectfully submit is well worth the significant benefits of the Real Estate Stalking Horse APA.

In contrast, bankruptcy courts in this district routinely approve bid protections of 4%-5% of a

stalking horse's purchase price.  *See, e.g.*, Exhibit A to Stalking Horse Declaration; *see also In re*

*Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (approving break-up fee and expense reimbursement equal to 4.4% of the purchase price); *In re The Weinstein Company Holdings LLC*, 18-10601 (MFW) (Bankr. D. Del. Apr. 6, 2018) (approving break-up fee and expense reimbursement equal to 5% of the purchase price); *In re ATopTech, Inc.*, No. 17-10111 (MFW) (Bankr. D. Del. Apr. 21, 2017) (approving break-up fee and expense reimbursement equal to 5% of the purchase price); *In re Phoenix Brands LLC*, No. 16-11242 (BLS) (Bankr. D. Del. June 8, 2016) (approving break-up fee and expense reimbursement equal to 5.3% of the purchase price); *In re American Hospice Management Holdings, LLC*, No. 16-10670 (LSS) (Bankr. D. Del. Apr. 7, 2016) (approving break-up fee and expense reimbursement equal to 5% of the purchase price).  Had the Debtors sought bid protections totaling 4% of the Real Estate Stalking Horse Bidder's proposed Purchase Price, such bid protections for the $1.525 billion transaction here would have totaled $61 million.  The Estes Bid Protections (up to $9.1 million) thus represent $51.9 million in potential costs averted by the Debtors' estates relative to hypothetical bid protections of 4% of the Purchase Price.

39.     For the foregoing reasons, the Debtors respectfully request that the Court authorize the Estes Bid Protections.

## III.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.

40.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

DOCS_DE:244781.1 96859/001

41.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."  10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006).

42.     Here, the waiver of the stays under Bankruptcy Rules 6004(h) and 6006(d) is necessary to the Real Estate Stalking Horse APA.  To maximize the value received for the Acquired Assets, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## Notice

43.     The Debtors will provide notice of this motion to: (a) the U.S. Trustee; (b) the Committee and Akin Gump Strauss Hauer & Feld LLP as proposed counsel to the Committee; (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the Junior DIP Lender and counsel thereto; (h) the Junior DIP Agent and counsel thereto;(i) White & Case LLP, as counsel to the B-2 Lenders; (j) the Prepetition ABL Agent and counsel thereto; (k) the B-2 Agent and counsel thereto; (l) the Prepetition UST Tranche A Agent and counsel thereto; (m) the Prepetition UST Tranche B Agent, and counsel thereto; (n) the United States Department of Justice and Arnold & Porter Kaye Scholer LLP as counsel to the United States Department of the Treasury; (o)  the Real Estate Stalking Horse Bidder and counsel thereto; and (p) any party that has requested notice

pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  In light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

44.    No prior request for the relief sought in this Motion has been made to this or any other court.

DOCS_DE:244781.1 96859/001

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting

the relief requested in this Motion and granting such other and further relief as is appropriate under

the circumstances.


Dated:  September 13, 2023
Wilmington, Delaware

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:      ljones@pszjlaw.com
                tcairns@pszjlaw.com
                pkeane@pszjlaw.com
                ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Whitney Fogelberg (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      patrick.nash@kirkland.com
                david.seligman@kirkland.com
                whitney.fogelberg@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      allyson.smith@kirkland.com

*Proposed Co-Counsel for the Debtors and Debtors in
Possession*