## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DECLARATION OF CODY LEUNG KALDENBERG
## IN SUPPORT OF THE DEBTORS' MOTION FOR
## ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' SELECTION
## OF A STALKING HORSE BIDDER, (II) APPROVING BID PROTECTIONS
## IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

I, Cody Leung Kaldenberg, declare under penalty of perjury:

### Introduction[2]

1.      I am a founding member of and partner at Ducera Partners LLC ("Ducera"), which maintains its principal office at 11 Times Square, 36th Floor, New York, New York 10036. Ducera is the proposed investment banker to the above captioned debtors and debtors in possession (collectively, the "Debtors").

2.      I submit this declaration (the "Declaration") in support of the *Debtors' Motion For Entry of an Order (I) Approving the Debtors' Selection of a Stalking Horse Bidder, (II) Approving*

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]      Capitalized terms used but not otherwise defined shall have the meaning ascribed to them in the Motion or in the Debtors' amended proposed bidding procedures attached as Exhibit 1 to the *Order (I)(A) Approving Bidding Procedures for the Sale or Sales of the Debtors' Assets; (B) Scheduling Auctions and Approving the Form and Manner of Notice Thereof; (C) Approving Assumption and Assignment Procedures, (D) Scheduling Sale Hearings and Approving the Form and Manner of Notice Therefore; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 444] (the "Bidding Procedures," and the proposed order, the "Bidding Procedures Order").

*Bid Protections in Connection therewith, and (III) Granting Related Relief* (the "Motion"), filed contemporaneously herewith.

### Professional Background and Qualifications

3.      Founded in 2015, Ducera is an independent investment banking advisory firm, which has extensive experience in, among other areas, providing leading-edge capital structure and restructuring advice in both in-court and out-of-court situations.  In addition to numerous out-of-court restructurings and sales, Ducera professionals have served as investment bankers to debtors, creditor groups, asset purchasers, committees, boards of directors, and trustees in a number of bankruptcy matters.  Ducera provides a broad range of corporate and financial services to its clients, including:  general corporate advice; mergers, acquisitions, and divestitures; corporate restructurings; and private placements.  Ducera provides its services worldwide from three offices located in the United States.

4.      Ducera has more than fifty professionals and is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers, and other parties in interest involved with financially troubled companies requiring complex financial restructurings, both in and outside of bankruptcy. Ducera has represented debtors, creditors, and other constituents in some of the largest restructuring cases in the United States, including: (a) *In re Diebold Holding Co., LLC*, Case No. 23-90602 (DRJ) (Bankr. S.D. Tex. July 18, 2023) [Docket No. 266]; (b) *In re Virgin Orbit Holdings, Inc.*, Case No. 23-10405 (KBO) (Bankr. D. Del. May 15, 2023) [Docket No. 261]; (c) *In re Altera Infrastructure L.P.*, Case No. 22-90130 (MI) (d) *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 22, 2021) [Docket No. 230]; (e) *In re Superior Energy Servs., Inc.*, Case No. 20-35812 (DRJ) (Bankr. S.D. Tex. Feb. 2, 2021) [Docket No. 316]; (f) *In re Hornbeck Offshore Services, Inc.*, Case No. 20-32679 (DRJ);

(g) *In re iHeartMedia, Inc.*, Case No. 18-31274 (MI); (h) *In re Toys "R" Us, Inc.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. Jan. 26, 2018).

5.      I have nearly twenty years of restructuring-related investment banking experience and have worked on a broad range of restructuring advisory assignments across a variety of industry sectors.  Since joining Ducera in 2015, I have provided investment banking expertise and financing advice, including with respect to marketing for and obtaining postpetition debtor-in-possession financing, to financially distressed companies as well as lenders and strategic investors in distressed and special situations engagements.  Prior to joining Ducera, I worked as a Director at Perella Weinberg Partners for over six years, advising companies and other stakeholders on special situation restructuring engagements, prior to which I worked as an associate at Goldman Sachs for over four years.  I earned a Bachelor of Science in Economics from the Massachusetts Institute of Technology in 2004.

6.      I have worked closely with the Debtors' management and other professionals retained by the Debtors with respect to preparing for these chapter 11 cases and have become well acquainted with the Debtors' capital structure, liquidity needs, and business operations.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Ducera team, the Debtors' management team, and the Debtors' other advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.  I am authorized to submit this Declaration on behalf of the Debtors.  I am not being specifically compensated for this testimony other than through payments received by Ducera as a professional proposed to be retained by the Debtors,

subject to approval by this Court. I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.

**The Real Estate Stalking Horse APA Is In the Best Interests of the Estates**

7.      As more fully described in the First Day Declaration and the Kaldenberg Declaration filed in support of the Bidding Procedures, the Debtors entered these chapter 11 cases in order to pursue a value maximizing sale of their assets and have submitted proposed Bidding Procedures contemporaneously herewith to fulfill that goal.

8.      Since the Petition Date, the Debtors have negotiated with two primary parties (Old Dominion and Estes) regarding potential Stalking Horse Bids for all of the Debtors' Owned Properties. The Debtors had substantial engagement with a third party that expressed interest in providing a Stalking Horse Bid, but such party was unable to deliver on the timelines that Estes and Old Dominion contemplated. The Debtors received written proposals for a Stalking Horse Bid for the Owned Properties from each of Old Dominion and Estes. Ducera and the Debtors negotiated with both parties regarding value of the Owned Properties and key business terms, including purchase price, deposit, assumed liabilities, excluded assets, deal contingencies, bid protections, and timing of closing a transaction.

9.      After extensive negotiations and due diligence efforts with both parties, Estes ultimately delivered what the Debtors view, in consultation with their advisors, including Ducera, as the only actionable Stalking Horse Bid for the Acquired Assets, providing the best stalking horse economic terms available to the Debtors for the Acquired Assets. Accordingly, the Debtors, in consultation with their advisors (including Ducera), selected Estes's proposal as the Real Estate Stalking Horse Bid for the Owned Properties. On September 12, 2023, the Debtors and the Real Estate Stalking Horse Bidder (*i.e.*, Estes) entered into that certain Asset Purchase Agreement (including all exhibits and schedules related thereto, the "Real Estate Stalking Horse APA"),

whereby the Real Estate Stalking Horse Bidder has committed to purchase all of the Debtors' Owned Properties (including certain related assets (as further described in the Stalking Horse APA), the "Acquired Assets") for cash consideration of $1.525 billion, subject to certain adjustments as set forth in the Stalking Horse APA (the "Purchase Price").

10.     Based on my knowledge of and experience with the Debtors' marketing process and the extensive, arm's-length, and good-faith negotiations between the parties, I believe that the Stalking Horse Bid proposal from Estes was superior to the proposal of Old Dominion, and I believe entry into the Real Estate Stalking Horse APA is in the best interests of the Debtors' estates and best positions the Debtors to achieve the best outcome from their sale process with respect to their Owned Properties.   Under the proposed Bidding Procedures, the Real Estate Stalking Horse APA will be subject to higher or otherwise better Bids (including combinations of Bids, as applicable).

11.     The Real Estate Stalking Horse APA merely provides a floor for other Acceptable Bidders on all of the Owned Properties.  Ducera will continue to market the Assets, including the Owned Properties, pursuant to the proposed Bidding Procedures and, if necessary, conduct an Auction for the Owned Properties.  Hundreds of Potential Bidders have already gained access to the Data Room and have indicated interest in bidding on the Owned Properties.  Even if a Stalking Horse Bid is approved, the Debtors and Ducera will continue to engage with and facilitate the provision of information to Acceptable Bidders, who will have the opportunity to submit Qualified Bids pursuant to the Bidding Procedures.  After engaging in this diligence, Acceptable Bidders may submit Bids for individual Owned Properties or packages of a subset of the Owned Properties. The Debtors, in consultation with the Consultation Parties, will then select the Bid (or Bids) that maximize the value of the proceeds of Sales of the Owned Properties.  The Real Estate Stalking

Horse APA provides assurance that such proceeds will equal at least $1.525 billion, an amount sufficient to pay off the Debtors' entire remaining prepetition secured capital structure in full, with remaining proceeds available for distribution to general unsecured creditors.  Further, pursuant to the Real Estate Stalking Horse APA, the Stalking Horse Bidder is prepared to close the Transaction on a timeline consistent with the milestones set forth in the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 302].

12.     I believe that the $1.525 billion consideration (subject to post-closing adjustments) in the Real Estate Stalking Horse APA provides significant value to the Debtors' estates and will be used (if the binding Real Estate Stalking Horse APA ultimately becomes the Winning Bid for the Acquired Assets) to repay obligations of the Debtors as approved by the Court.  The Real Estate Stalking Horse Bid provides an opportunity to maximize the value of the Acquired Assets by allowing the Debtors, under the Bidding Procedures, to continue marketing efforts and to conduct an Auction (if necessary) to secure higher or better Bids (including combinations thereof) for the Acquired Assets.

13.     To my knowledge, there was no fraud or collusion between the Real Estate Stalking Horse Bidder and the Debtors or between the Real Estate Stalking Horse Bidder and other bidders, nor any attempt to take unfair advantage of other Potential Bidders, during the marketing process. Moreover, I understand that all parties were represented by competent counsel and were in arm's-length bargaining positions.

**There Is a Sound Business Purpose for the Estes Bid Protections**

14.     In exchange for the value that the Real Estate Stalking Horse Bidder is guaranteeing to provide to the sale process and to the Debtors' estates, the Debtors ultimately agreed to grant the Real Estate Stalking Horse Bidder the Estes Bid Protections.  I and my team at Ducera were personally involved in the negotiations of the Estes Bid Protections, and I believe that the Estes Bid Protections were the product of good faith, arm's-length negotiations amongst the parties, with the Debtors at all times acting in the interest of their estates and consistent with their fiduciary duties.  The Estes Bid Protections were heavily negotiated and scrutinized by the Debtors' and their professionals.

15.     Specifically, the Debtors agreed to a $7.5 million breakup fee ("Break-up Fee"), and to reimburse up to $1.6 million in reasonable and documented costs and out-of-pocket expenses ("Expense Reimbursement") incurred by the Real Estate Stalking Horse Bidder, payable upon certain termination events set forth in the Real Estate Stalking Horse APA.  Together, the Break-up Fee and the maximum Expense Reimbursement equal approximately 0.6% of the Purchase Price.

16.     In my experience and based upon my analysis of comparable deals, the Estes Bid Protections are more favorable to the Debtors than the bid protections provided to stalking horse bidders in comparable transactions of this type and purpose.  In negotiating the Estes Bid Protections, Ducera evaluated stalking horse arrangements with bid protections for (i) cases that filed in 2021 through present and (ii) with stalking horse bids providing for a purchase price above $10 million.  On average, break-up fees for these cases ranged from 2.5% to 3.0%.  Within this group, Ducera identified four cases where the stalking horse bid price exceeded $100 million, whereby the break-up fees ranged from 2.2% to 3.3% of the purchase price.

17.     Moreover, I understand that the Estes Bid Protections are a critical component of the Real Estate Stalking Horse Bidder's commitment.  I understand that the Real Estate Stalking Horse Bidder has expended, and will continue to expend, time and resources related to the proposed Transaction, despite its Bid remaining subject not only to Court approval, but also to overbidding by third parties in a competitive bidding process contemplated by the proposed Bidding Procedures.

18.     I believe that the Estes Bid Protections are necessary to induce the Real Estate Stalking Horse Bidder's Bid.  Further, if the Court does not approve the Estes Bid Protections, I believe there is significant risk that the Real Estate Stalking Horse Bidder will elect not to serve as the "stalking horse" for the Owned Properties, to the detriment of the Debtors' estates.  In my experience, stalking horse bidders almost always insist upon similar protections in exchange for the value of acting as the stalking horse.  Here, based upon my professional experience and personal knowledge of the Debtors' circumstances, I believe that the Estes Bid Protections are a reasonable cost in exchange for securing a $1.525 billion commitment from the Real Estate Stalking Horse Bidder.  I believe that the Estes Bid Protections will maximize the value of the Acquired Assets, and thus the Debtors' estates, and are a valid and sound exercise of the Debtors' business judgment.

## Conclusion

19.     Based upon my professional experience and my personal knowledge of the Debtors' commercial circumstances and the marketing process of the Assets, including the Acquired Assets subject of the Real Estate Stalking Horse APA, I believe that designating Estes as the Stalking Horse Bidder for the Acquired Assets is in the best interests of the estates, and that the Estes Bid Protections were necessary to induce Estes's stalking horse bid for the Acquired

Assets.  The Real Estate Stalking Horse APA provides assurance to the Debtors and their stakeholders regarding the minimum value of proceeds to be generated by a Sale (or Sales) of the Owned Properties, establishes a competitive price floor for subsequent bidding by third-parties on all of the Owned Properties, and will, in my opinion, ultimately maximize value to the Debtors' estates.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  September 13, 2023

/s/ Cody Leung Kaldenberg

Cody Leung Kaldenberg
Partner
Ducera Partners, LLC

*Proposed Investment Banker to the Debtors*