UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANTHONY MARTINO, an Illinois citizen;   )
                                             )

**Case No: 20-CV-2893**

Plaintiff                                )

Judge John Tharp Jr.

vs.                                    )

Magistrate Judge Susan Cox

YRC, INC., a Delaware corporation; YRC   )
WORLDWIDE, INC., a Delaware corporation

Defendant

---

## PLAINTIFF'S SECOND AMENDED COMPLAINT AT LAW

Pursuant to Fed. R. Civ. P. 15(a)(2), Plaintiff, ANTHONY MARTINO, hereby brings this Second Amended Complaint and jury demand against Defendant YRC, INC and Defendant YRC WORLDWIDE, INC. This suit arises out of Defendants' blatant violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/), the negligent supervision of their respective employees, and defamation based on the libelous and slanderous statements published about Plaintiff by Defendant's employees during the scope of their employment of which Defendants as their employer are vicariously liable under the *respondeat superior* doctrine. All of the claims for relief alleged herein by Plaintiff are based on new events and actions taken by Defendants immediately following the settlement and voluntary dismissal (with prejudice) of a prior small-claim lawsuit between the parties on March 9th of 2020 as referenced herein.

## PARTIES

1. Plaintiff, Anthony Martino is an individual and resident of the state of Illinois.

Plaintiff is self-employed, and amongst other things, is the sole owner and member of an

incorporated business entity of which is involved in the acquisition, re-distribution and direct sales of liquidated consumer goods and other industrial machinery to the general public of the United States, and of which such endeavors sometimes requires LTL ("less than truckload") freight shipping/delivery. Plaintiff has also in the past dually-worked as a fraud investigator (civil & criminal related matters) and possesses the following professional designations and educational credentials: CFE (#763085), FCLS, PCLS, HCAFA & MBA.

2.      Defendant, YRC, INC., d/b/a "YRC Freight" (hereafter "YRC"), is a full-service freight transportation provider (i.e. motor carrier/freight forwarder) incorporated in the state of Delaware, and with its principal place of business in Overland Park, Kansas.   It is a subsidiary of YRC Worldwide, Inc., and per its website (yrc.com/about), it is the leading transporter of industrial, commercial, and retail goods, specializing in solutions for businesses across North America through a full-service network, advanced information technologies, and proactive customer service.

3.      Defendant, YRC WORLDWIDE, Inc., (hereafter "YRCW") is a publicly traded holding company with a portfolio of motor carrier brands including Holland, New Penn, Reddaway, HNRY Logistics, and (Defendant) YRC, INC. D/B/A YRC Freight.    Upon information and belief, it receives a direct financial benefit on a year to year basis from its ownership of Defendant YRC. Inc, and said yearly financial benefit is directly contingent by the overall financial performance of Defendant YRC, Inc.    Upon information and belief, it is the joint employer of many of the employees of Defendant YRC, Inc., and it exerts day-to-day control and/or ultimate authority and oversight of YRC Inc's managers (including terminal managers), supervisors, operations, claims

handling and customer relations policies and decisions, and electronic payment systems. YRCW is incorporated in the state of Delaware and shares its principal place of business and many of its upper-level and senior executives with Defendant YRC, Inc. in Overland Park, Kansas.

## JURISDICTION AND VENUE

4.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332(a), because the Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds $75,000.

5.     Venue is proper under 28 U.S.C. §1391(a)(2)(b)(1)(2) because all of the acts and omissions alleged herein by the Plaintiff occurred within the Northern District of Illinois, because the Defendants are duly authorized to and actually are continuously "doing business" and "transacting business" in this judicial district, and because the Defendants have committed torts against Plaintiff in this judicial district through their Illinois-based agents (employees) of which were explicitly aimed at Illinois, thus constituting both general and specific jurisdiction.

## FACTS CONCERNING PLAINTIFF'S SHIPMENT HISTORY WITH DEFENDANT YRC, INC.

6.     Between January 1st of 2018 and March 23rd, 2020, Plaintiff scheduled and prepaid for approximately 35 different LTL ("less than truckload") freight shipments of which YRC accepted and successfully delivered to Plaintiff's business customers or other non-business consignees located across the United States in direct connection with Plaintiff's business or his personal e-commerce sales—the majority (if not all) of which were residential deliveries containing only 1 pallet each.

7.     For nearly every one of the approximate 35 different shipments that Plaintiff

shipped through YRC between January 1st of 2018 and March 23rd, 2020, Plaintiff (as the consignor) personally dropped off each one at YRC's local freight terminal located in Wheeling, Illinois using his own personal vehicles.    Plaintiff did this as a cost saving measure so as to avoid incurring additional "pick-up" fees of which are generated when YRC sends out its own truck to pick up a shipment at one of Plaintiff's locations.

8.        Of the approximate 35 freight shipments that YRC accepted and delivered for Plaintiff between January 1st, 2018 and March 23rd, 2020, only 1 of Plaintiff's shipments ever resulted in a reported damage claim to YRC, thus, equating to an overall shipment to damage-claim ratio of less than 3% during that time span.

9.        Notably, on January 27th, 2020 Plaintiff shipped 1 pallet (through YRC) to a commercial business (Reyco Foods) located in Pittsburgh, PA of which had contained a brand-new high-end commercial steam oven, and of which the contact person (the receiver) for the business (Mr. Nicola Dicio) had purchased directly from Plaintiff on the website EBAY for $3,650.    As such, Plaintiff declared the value (i.e. release rate of liability) of this shipment as $3,650 on the shipment's bill of lading ("BOL").

10.        Prior to its transit, Plaintiff had wrapped the steam oven in extensive protective padding and plastic Saranwrap.    After doing so, Plaintiff personally dropped off the pallet containing the steam oven at YRC's local freight terminal located in Wheeling, Illinois.

11.        At the immediate time that Plaintiff dropped off the pallet containing the steam oven at YRC's terminal in Wheeling, Illinois, YRC inspected the contents thereon the pallet, accepted the pallet for transit, and its own terminal employee signed the BOL under the lines attesting that the shipment was received in apparent good order with no

exceptions noted thereon.   A copy of the BOL signed on 1/27/20 by Defendant's own

terminal employee evidencing Defendant's acceptance of the steam oven shipment in

apparent good order without exceptions is attached hereto as **EXHIBIT A.**

12.      The steam oven was delivered by YRC in Pittsburg, PA on January 29th, 2020, but

was left with an unknown individual (last name "Crosey") at the delivery address of

whom was not the intended receiver explicitly listed on the BOL (Mr. Nicola Dicio).

The unknown individual ("Crosey") did not unbundle the protective padding and

Saranwrap from the steam oven at the immediate time of delivery, and as such, no

notations of any damage were made on YRC's delivery receipt.

13.      However, within only a few hours after the delivery of the steam oven by YRC on

January 29th, 2020, Mr. Dicio (the actual intended receiver per the BOL) personally

contacted Plaintiff directly through EBAY and advised that when he had personally

unbundled the steam oven from all of its protective wrapping and Saranwrap, that he

discovered concealed damage to the oven's front door of which contained shattered

shards of glass and door-frame damage.   According to Mr. Dicio, it appeared obvious to

him that something very heavy (i.e. a forklift or pallet jack) likely hit the front of the door

of the steam oven sometime during its transit.

14.      Based on the damage being limited to only the front door of the steam oven, Mr.

Dicio agreed to accept a partial refund of $670 from Plaintiff—equivalent to the actual

replacement cost of a new OEM ("original equipment manufacturer") front door from its

manufacturer (Miele).

15.      On that very same day (January 29th, 2020) that Plaintiff was informed by Mr.

Dicio of the partial damage to the steam oven—*which was only a few hours after its*

*delivery by YRC*—Plaintiff immediately notified YRC and submitted a written "partial damage" claim in the amount of only $670 (out of a declared value of $3,650) solely so as to cover the cost of the refund issued back to Mr. Dicio for the replacement front door for the steam oven **(hereafter "Subject Damage Claim").**   As part of the Subject Damage Claim to YRC, Plaintiff also included photographs depicting the broken glass, as well as the written communication between Plaintiff and Mr. Dicio establishing that Mr. Dicio only discovered the concealed broken glass after personally unwrapping all of the extensive protective padding and Saranwrap from the steam oven shortly after its delivery by YRC.

16.       At all times, YRC's delivery driver could have insisted that the unknown recipient ("Crosey") at the delivery address remove the extensive wrapping and Saranwrap from the steam oven at the immediate time of its delivery so as to verify any damage, but voluntarily declined to do so.   As such, at all times, YRC knew that the steam oven had not actually been unbundled from its protective wrappings and inspected at the immediate time of its delivery, and therefore, could not conclusively determine whether or not there was any concealed damage.

17.       At all times after being alerted of the Subject Damage Claim by Plaintiff, YRC could have also voluntarily inspected the concealed damage on the steam oven by coordinating an inspection time either with the consignee (Mr. Dicio) directly, or through Plaintiff.   YRC again declined to do so.

18.       On or about January 30th, 2020, YRC's Sr. Claims Resolution Specialist (Liz Hadermann) formally denied Plaintiff's Subject Damage Claim in writing, leaving Plaintiff with no other choice but to file a small claims lawsuit against YRC pursuant to

49 U.S.C. §14706(a)(1) (The Carmack Amendment) in order to recoup the $670 loss of revenue for having refunded Mr. Dicio the actual cost of the OEM replacement door. A copy of Ms. Hadermann's 1/30/20 claim denial letter to Plaintiff is attached hereto as **EXHIBIT B.**

19.    49 CFR § 370.7(a) states in part that each "claim filed against a carrier…be promptly and thoroughly investigated if investigation has not already been made prior to receipt of the claim."

20.    Ms. Hadermann's claim denial letter of 1/30/20 (Exhibit B hereto) explicitly states in part…: "*This shipment was signed for as having been in good condition at the time of delivery…The damage you are claiming was reported after our clear delivery. In reviewing the supporting documents and photos, this was visible damage not noted. Due to the nature and extent of the shattered glass, we feel that this would be easily noticed and should have been noted on the delivery receipt.*"

21.    Ms. Hadermann's claim denial letter of 1/30/20 explicitly notes (at the top) that the shipment containing the steam oven was dropped off at 1000 CHADDICK DR.-YRC TERMINAL, WHEELING IL 60090, but deceptively omits the material fact that its own terminal/dock employee in Wheeling, Illinois inspected and signed the BOL (Exhibit A hereto) at the immediate time of Plaintiff's drop-off under the lines attesting that the shipment was received in apparent good order.

22.    Ms. Hadermann's statement within her denial letter, "*Due to the nature and extent of the shattered glass, we feel that this would be easily noticed and should have been noted on the delivery receipt,*" is an unequivocal admission that the shattered glass—if it had hypothetically already existed at the immediate time it was dropped off by Plaintiff at

YRC's dock terminal in Wheeling, Illinois—would have also been "easily noticed" at the time it was personally dropped off and actually wrapped by Plaintiff at YRC's terminal, and should have been noted by YRC itself at the time its own employee inspected the shipment and signed the BOL attesting to the shipment's apparent good order (Exhibit A hereto).

23.     Moreover, the content of Ms. Hadermann's claim denial letter did not in any way address or mention any alleged limitation of liability for damages on the $670 cargo claim submitted by Plaintiff.

24.     Neither Ms. Hadermann or any other employee of YRC ever contacted the named consignee or any other employee at the business address listed on the BOL during the course of its alleged investigation of the Subject Damage Claim.

25.     As such, per the explicit content of Ms. Hadermann's letter explaining the reason for YRC's denial of Plaintiff's claim, Defendant did not have a valid basis to deny Plaintiff's $670 cargo claim for the damaged steam oven, and its denial was imposed only so as to evade payment on a legitimate cargo claim, and was otherwise deceitful, fraudulent and/or entirely frivolous.

**FACTS CONCERNING PLAINTIFF'S SMALL CLAIMS LAWSUIT AGAINST
DEFENDANT YRC, INC.**

26.     On February 11th, 2020, Plaintiff filed a small claims lawsuit in the Circuit Court of Cook County Third Municipal District (case no: 2020-M3-000922) pursuant to 49 U.S.C. §14706(a)(1) (The Carmack Amendment) specifically relating to the Subject Damage Claim as referenced in paragraphs 14-25 herein.   In the filed complaint, Plaintiff sought damages including $670 per the refund he'd issued to Mr. Dicio for a replacement door for the damaged steam oven he'd shipped, freight charges for the shipment, and related

costs of suit and service of process fees, for a total of $1231.52—an amount that was not greater than his consequential actual out of pocket losses as a proximate result of the damaged shipment and YRC's denial of the Subject Damage Claim.   A copy of Plaintiff's filed Complaint in case no: 2020-M3-000922 is attached hereto as **EXHIBIT C.**

27.      Pursuant to Fed. R. Civ. P. 54(d)(1), in the small claims complaint, Plaintiff sought costs of suit (for example court filing fees) as part of the total damages claimed in his small claim lawsuit against YRC of which was brought pursuant to 49 U.S.C. §14706(a)(1), since no costs of suit would have been incurred by Plaintiff had YRC approved the Subject Damage Claim prior to the suit being filed.

28.      On February 26th, 2020, Plaintiff received an email from YRC Sr. Legal Analyst, Kathy Jones, who informed Plaintiff that she'd received Plaintiff's filed Complaint and offered to settle the claim for the reduced amount of $492.

29.      While not raised in YRC's claim denial letter as sent to Plaintiff by its claim's examiner Liz Hadermann (as referenced in paragraphs 18-23 herein), Ms. Jones alleged in her emails that based on YRC's limitations of liability for the Subject Damage Claim, her offer of $492 including the freight charges was proper.

30.      As a means of compromise and so as to avoid the necessity of court appearances, on February 28th, 2020 Plaintiff emailed Kathy Jones back and offered to settle and dismiss his small claims lawsuit against YRC for the reduced amount of $971, stating therein his email: *"While I disagree with the applicability of the terms you've presented as it concerns the filed claim under the Carmack Amendment, as a means of comprise and so as to avoid the time/expense of unnecessary court appearances, I'd be willing to*

*settle/dismiss the complaint for no less than $971, which includes the damage and freight charges **using your calculations of $492.54**, plus the costs of suit and service of process fees incurred in filing the matter."*

31.     Later in the day on February 28th, 2020, Kathy Jones responded to Plaintiff's email and agreed to settle the small claims lawsuit for the amount of $971.

32.     Per the parties' settlement of the small claim lawsuit regarding the Subject Damage Claim for the amount of $971, Plaintiff did not obtain an amount in excess of actual out of pocket losses, as the actual out of pocket losses as proximately caused by the damage to the steam oven ($670) and YRC's denial of the Subject Damage Claim were actually in excess of $971 when including, inter alia, the costs of suit and service of process fees necessarily incurred to file the small claim lawsuit (so as to recover the $670).

33.     Furthermore, that Plaintiff took into consideration Ms. Jones' assertion of YRC's alleged limitation of liability and agreed to settle the small claims lawsuit for an amount less than actual out of pocket losses, establishes that Plaintiff's intent was to (and Plaintiff did) operate in good faith in settling the claim and had no intention of seeking any alleged "windfall" from the Subject Damage Claim.

34.     Additionally, YRC does not have any legitimate basis to support its allegation (or even a mathematical basis for hypothesizing) that Plaintiff was seeking a "windfall" in the settlement of the Subject Damage Claim for $971.

35.     On March 2nd, 2020, Kathy Jones emailed Plaintiff and informed Plaintiff that the settlement check had been mailed out, and also stated therein: **"We regret that it was necessary for you to file this claim"**—essentially a statement that Plaintiff reasonably construed as an admission that the Subject Damage Claim should have been paid by YRC

10

without Plaintiff having had to have first filed a lawsuit.

36.    On March 4th, 2020, Plaintiff received the settlement check from YRCW in the amount of $971.

37.    Pursuant to the settlement between the parties, on (Friday) March 6th, 2020 Plaintiff e-filed his Notice of Voluntary Dismissal With Prejudice in the Circuit Court of Cook County Third Municipal District, and therein alerted the Court that the parties had settled the matter.

38.    YRC voluntarily never made any appearance to defend the lawsuit, and the case was already settled between the parties prior to YRC's required initial appearance date.

39.    On March 9th, 2020, Plaintiff emailed Kathy Jones and provided her with a copy of the Clerk-stamped Notice of Voluntary Dismissal With Prejudice as filed with the court. Later that same day, Ms. Jones emailed Plaintiff back acknowledging her receipt of the filing and thanking him for providing a copy.    Copies of Plaintiff's emails with Kathy Jones between 2/28/20 and 3/9/20 are attached hereto collectively as **EXHIBIT D.**

40.    YRC admits at paragraph 37 of its Amended Answer to Plaintiff's First Amended Complaint (filed 8/3/20) that at no time between the filing date of Plaintiff's small claims lawsuit in the Circuit Court of Cook County Third Municipal District and the voluntary dismissal of the lawsuit pursuant to the party's settlement, did Kathy Jones or any other employee of YRC ever indicate to Plaintiff that it was YRC and YRCW's intent to cease doing business with Plaintiff thereafter the settlement of the small claim lawsuit.

41.    As such, because Plaintiff was never informed by anyone at YRC or YRCW that he was now banned as a customer as a consequence of having filed the small claim lawsuit, was never served with a no-trespass notice from YRC (or YRCW), and also

because YRC had voluntarily accepted a credit card payment from Plaintiff for the scheduling of a *new* shipment on March 7th, 2020 through its website, accepted an in-person drop-off of this new shipment from Plaintiff (personally) on March 9th, 2020 at its Wheeling, Illinois freight terminal (as set forth in paragraph 44 herein), delivered this new shipment to Plaintiff's consignee in Jacksonville, Florida on March 18th, 2020 (as set forth in paragraph 44 herein), as well as per Ms. Jones' prior email (from March 2nd, 2020) conveying that "[YRC] regret[ted] that it was necessary for [Plaintiff] to have [had to] file" the small claim lawsuit (as set forth in paragraph 35 herein), Plaintiff reasonably assumed that the parties were continuing their ongoing business relationship in good faith following the settlement and voluntary dismissal of the small claims lawsuit from the Circuit Court of Cook County Third Municipal District on March 9th, 2020.

42.     Other than YRC's payment to Plaintiff of the $971 and the voluntary dismissal with prejudice, the parties' settlement of Plaintiff's small claims lawsuit on March 9th, 2020, contained no other terms or provisions.

### FACTS CONCERNING PLAINTIFF'S BUSINESS DEALINGS WITH DEFENDANT YRC, INC. AFTER THE FILING OF HIS SMALL CLAIMS LAWSUIT BUT *PRIOR* TO ITS FORMAL DISMISSAL FROM THE CIRCUIT COURT OF COOK COUNTY-THIRD MUNIICPAL DISTRICT

43.     On Saturday, March 7th, 2020—while still awaiting to receive a stamped-copy of Plaintiff's Notice of voluntary Dismissal back from the Clerk of the Circuit Court of Cook County Third Municipal District as was e-filed on Friday, March 6th, 2020 (as referenced in paragraph 37 herein)—Plaintiff proceeded to schedule another freight shipment (PRO # 357-149804-5) through YRC's website in connection with an e-commerce sale.   Notably, on this date, Plaintiff prepaid the freight charges of $264.96 to YRC through YRC's website payment portal with a credit card so as to ship 1 pallet

containing a new dishwasher to a residential consignee located in Jacksonville, Florida who purchased the dishwasher from Plaintiff on EBAY.

44.     On Monday, March 9th, 2020—the very same day that Plaintiff emailed Kathy Jones and provider her with a copy of the clerk-stamped Notice Of Voluntary Dismissal as e-filed by Plaintiff on Friday, March 6th, 2020 (as referenced in paragraph 37 herein)— Plaintiff personally entered YRC's freight terminal in Wheeling, IL, had the bill of lading signed by a YRC employee, and dropped off the 1-pallet containing the dishwasher of which YRC accepted and later delivered to the intended consignee in Jacksonville, Florida on March 18th, 2020.    However, this would be the last shipment that YRC would accept and deliver for Plaintiff.    A copy of the March 9th, 2020 BOL as signed and accepted by YRC is attached hereto as **EXHIBIT E.**

### **FACTS CONCERNING PLAINTIFF'S BUSINESS DEALINGS WITH DEFENDANT YRC, INC. IMMEDIATELY *FOLLOWING* THE FORMAL DISMISSAL OF HIS SMALL CLAIMS LAWSUIT FROM THE CIRCUIT COURT OF COOK COUNTY-THIRD MUNIICPAL DISTRICT**

45.     On March 24th, 2020, Plaintiff again scheduled and prepaid the freight charges to YRC for another freight shipment in the amount of $244.00 through its public website (www.yrc.com) to be personally dropped off at YRC's Wheeling, IL terminal. This was the *next chronological shipment* (PRO #: 397-225762-2) that Plaintiff scheduled with YRC after the shipment specifically referenced in paragraphs 43 and 44 herein.

46.      The shipment consisted of 1 pallet containing a new-condition commercial rangehood that was to be delivered to a consignee in Williamsburg, Virginia in direct connection with the consignee's purchase from Plaintiff on the e-commerce website, EBAY **(hereafter "Refused Shipment")**.

47.     Immediately upon scheduling and prepaying the freight charges of $244 with a

13

credit card through YRC's website payment portal on March 24th, 2020, Plaintiff received an email from YRC's payment portal processor (PayConnexion, a product of JP Morgan Chase Bank, N.A) confirming and thanking him for the payment to YRC. Plaintiff also separately received an email from YRC containing YRC's BOL for the Refused Shipment, and of which stated: **"Please take your provided Bill of Lading and shipment to the terminal whose address is below: YRC Terminal 303, 1000 CHADDICK DR Wheeling, IL 60090 USA."** Additionally, Plaintiff submitted a request through YRC's website for shipping/tracking labels so as to attach to the outside of the Refused Shipment, of which YRC also immediately emailed to Plaintiff on this same date. True and accurate copies of YRC's payment portal confirmation email to Plaintiff, YRC's email to Plaintiff containing the BOL for the Refused Shipment, and YRC's email to Plaintiff containing the shipping labels for the Refused Shipment, are attached hereto collectively as **<u>EXHIBIT F.</u>**

48.     On the evening of March 24th, 2020, Plaintiff and his father drove to Plaintiff's third-party storage facility and picked up the pallet and the sealed box containing the rangehood (i.e. the "Refused Shipment"), loaded them into Plaintiff's vehicle (an SUV owned by Plaintiff's father), then subsequently drove these items to YRC's local freight terminal in Wheeling, Illinois so as to drop off the Refused Shipment with YRC for its scheduled transit.

49.     Upon arriving at YRC's freight terminal in Wheeling, Illinois, Plaintiff and his father parked near the terminal's loading dock, unloaded the pallet and the sealed box containing the rangehood from Plaintiff's vehicle, and then proceeded prepare and tie the box containing the rangehood to the pallet using shipping rope.

50.     Once the box was thoroughly prepared and tied to the pallet (an approximate 15-20 minute process) and YRC's shipping/tracking labels taped to the box, Plaintiff then entered YRC's terminal office with a copy of the BOL so as to have it signed for drop-off acceptance by a YRC receptionist, have the shipment inspected, and also so that a dock employee would then be paged to bring the assembled pallet up the terminal's loading ramp and into the dock with a forklift.

51.     The sequential steps taken by Plaintiff as specifically referenced in paragraphs 45 through 50 accurately represents the usual process, in general, that had commenced for nearly every single shipment that Plaintiff had ever shipped through YRC dating back to January of 2018, and in fact, many of the employees working within YRC's freight terminal in Wheeling, Illinois had/have personally waited on Plaintiff during that time span to sign BOL's, and instantly recognized/recognize him in the office from his frequent drop-off shipments.   This is particularly so because each shipment required Plaintiff to physically enter YRC's terminal office to have the associated BOL formally signed/accepted by a YRC employee and the shipment inspected before the shipment can be left for transit at the terminal.

52.     However, upon entering YRC's terminal office on the evening of March 24th, 2020 to have the BOL for the Refused Shipment signed by a YRC receptionist, Plaintiff handed over the BOL to the attending receptionist, YRC employee Monica Cepauskas. Ms. Cepauskas signed the BOL and handed it back to Plaintiff, but then told Plaintiff to wait a moment near her desk while she disappeared to the far back of the office to retrieve a document.   A copy of the BOL signed by Ms. Cepauskas (as handed back to Plaintiff) on 3/24/20 is attached hereto as **EXHIBIT G.**

15

53.     When Ms. Cepauskas eventually returned with the document, she approached Plaintiff and stated that her terminal could not accept Plaintiff's drop-off of the Refused Shipment.

54.     Taken by surprise, Plaintiff inquired with Ms. Cepauskas as to the reason why his drop-off of could not be accepted.    In response, Ms. Cepauskas asked Plaintiff whether or not he was involved in a damage claim with YRC.

55.     Plaintiff responded that he had in fact been involved in a "relatively minor" partial damage claim with YRC that had settled multiple weeks prior in small claims court in Cook County (i.e. the "Subject Damage Claim" as referenced in paragraphs 8 through 42 herein), but was unaware of any reason why he would not be permitted to continue shipping through YRC since the individual that he'd directly settled the Subject Damage Claim with (Kathy Jones) had never mentioned anything of the sort in the settlement of the claim.

56.     Ms. Cepauskas then stated to Plaintiff that she was just "following orders" and proceeded to hand Plaintiff a copy of an internal memo/email she told Plaintiff she'd received and of which had been circulated around the office. The memo/email was dated March 11th, 2020 and written by Karry Wallin—the manager of YRC's Wheeling, Illinois freight terminal—and of which was specifically addressed to and shared with a number of YRC and/or YRCW employees (including, Monica Cepauskas, Mike Walker, James Donley, Douglas Candre, Michael Smith, April Fleming, Cindy Grady, Alice Hobbs, Lisa Thompson-McCarthy, Marge Prochaska, Pat Reisser, and Alex Terrones) and also physically circulated around the Wheeling, Illinois freight terminal office to additional individuals, including but not limited to Dan Trueman.    Ms. Cepauskas asked that

Plaintiff read the memo for himself. *See* March 11th, 2020 memo from Karry Wallin to YRC Employees hereto as **EXHIBIT H.**

57.     The internal email/memo had the subject line "drop off", included information specific to the shipment of which was the subject of the Subject Damage Claim, and its body states: *"WE will not accept any more frt ["freight"] from this customer. Anthony Martino. It is a drop off on the dock. But just in case he calls in for a pickup. Or tries this with a different name we should make sure the frt ["freight"] is packaged properly. I'm not sure what this looked like as it wasn't signed for damaged at the destination. No exceptions in our system. This frt ["freight"] delivered clear and we denied his claim and now we have a lawsuit. The claim is for $1200.00 for a stainless steel steam oven. Claims dept has requested that we do not accept anymore frt ["freight"] from this customer."*

58.     After personally reading the memo, Plaintiff then asked Ms. Cepauskas what he was supposed to do with the Refused Shipment that he'd already prepaid for through YRC's website earlier in the day (as referenced in paragraph 43 herein) and of which was still sitting outside in the back of the freight terminal waiting to be taken up the loading ramp. Ms. Cepauskas stated, "I'm not sure" and indicated that she then would get someone from the back of the office to address Plaintiff.

59.     Shortly thereafter, the Ms. Cepauskas returned from the back of the office with a male supervisor she referred to as "Marty" (upon information and belief, YRC and/or YRCW employee Dan Trueman) of whom approached Plaintiff, and deliberately stated in a loud and hostile tone with the obvious intention that numerous other known and unknown individuals present in the office (including Ms. Cepauskas who had retrieved

him) could hear him: "You need to leave the premises immediately, we cannot accept your shipment."

60.      Plaintiff informed the male supervisor [Mr. Trueman] that nobody at YRC had ever notified him that he was banned from shipping with YRC and asked who specifically at YRC made the decision to suddenly ban Plaintiff from sending any further shipments. The supervisor [Mr. Trueman] responded again in a deliberately loud and hostile tone, "Our claims department determined that you submitted a fraudulent claim. That's all I know. You can call Karry Wallin when she returns to the office tomorrow to discuss this issue, but right now you need to leave the premises."

61.      Finally, Plaintiff then asked the male supervisor [Mr. Trueman] what he was supposed to do with the Refused Shipment to which he'd already prepaid the freight charges and had just spent the time assembling right the outside terminal office with his father.   The male supervisor [Mr. Trueman] responded: "That's not my problem, but you need to take it off of our premises and leave.   We can't accept it."

62.      Based on the direct instruction of the male supervisor [Mr. Trueman], Plaintiff then left the terminal office and went back outside where his father was waiting next to the Refused Shipment.

63.      Plaintiff had no choice but to explain to his father that the YRC and/or YRCW employees inside the terminal office were not permitting Plaintiff to drop off the Refused Shipment because he'd been banned, and that they needed to immediately cut off all of the rope from the pallet of which they'd used to tie down the box (containing the rangehood) and reload Plaintiff's vehicle so as to leave YRC's premises with it.   In disassembling the box from the pallet so as to reload the vehicle, Plaintiff was essentially

forced to waste approximately $25 (which Plaintiff had directly paid to his father) in shipping rope after cutting it all apart.

64.     Immediately upon returning home later that same evening, Plaintiff sent an email to YRC/YRCW Sr. Legal Analyst Kathy Jones—the same individual of whom Plaintiff had dealt directly with in settling the small claims lawsuit regarding the Subject Damage Claim as referenced in paragraphs 28-42 herein.    Also cc'd on the email were YRC employees Karry Wallin (the manager of YRC's Wheeling, IL freight terminal), and T.J O'Connor (a Chief Operating Officer of YRCW).

65.     In his email, Plaintiff advised Kathy Jones of how embarrassed and humiliated he felt during the events that transpired earlier that same evening while at the YRC freight terminal in Wheeling, Illinois as referenced in paragraphs 52-63 herein, particularly because the male supervisor [Mr. Trueman] publicly implied in front of numerous individuals present that YRC had determined that Plaintiff had committed some sort of claim fraud in regards to the prior Subject Damage Claim.    Additionally, Plaintiff reminded Ms. Jones that he'd been a customer of YRC for a few years and had only ever filed one damage claim out of numerous shipments—and a claim of which she herself had previously implied in writing should have been paid without the necessity of Plaintiff having to file a lawsuit (as referenced in paragraph 35 herein).    Finally, in his email, Plaintiff advised that he'd already prepaid for the Refused Shipment and was now unnecessarily delayed in sending it to the consignee.    As such, Plaintiff requested an immediate solution as to whether YRC would accept the Refused Shipment.

66.     On the morning of March 25th, 2020, Plaintiff called Karry Wallin (the YRC terminal manager in Wheeling, Illinois) on his cellular phone so as to discuss the events

that had transpired the previous evening as referenced in paragraphs 52-63 herein, but she was allegedly not available.

67.    After attempting to call Ms. Wallin without success as referenced in paragraph 66 herein, Plaintiff then immediately called YRC Sr. Legal Analyst Kathy Jones on his cellular phone, of whom upon information and belief, is based in Overland Park, KS.

68.    When Kathy Jones answered Plaintiff's call, Plaintiff identified himself and then asked her if she'd received the email that he'd sent to her attention the previous night as referenced in paragraphs 64 and 65 herein.    Ms. Jones stated that she had received it.

69.    Plaintiff then immediately advised Ms. Jones that he was putting his cellular phone on the speakerphone setting so that his father (who was sitting next to Plaintiff) could also listen in to their phone call, since he too was present with Plaintiff the prior night at the YRC terminal in Wheeling, Illinois during the events referenced in paragraphs 48-63 herein.    Ms. Jones acknowledged that Plaintiff was putting the call on speakerphone, by stating "OK."

70.    Plaintiff asked Ms. Jones why nobody had told him that as part of the settlement of the small claims lawsuit (regarding the Subject Damage Claim) that he would be banned from continuing to do business with YRC.    Ms. Jones stated that she "didn't know."

71.    Plaintiff asked Ms. Jones whether or not it was her that had made the decision to ban Plaintiff from continuing to do business with YRC.    Ms. Jones stated, "No, I didn't personally make that decision.    Our claims department investigated your claim and determined it contained elements of fraud.    Based on their determination, it went up to our legal department and they made the decision."    When Plaintiff inquired as to what "elements" she was referring to, she indicated that she didn't have any more information.

72.     Finally, Plaintiff again advised Ms. Jones that he still was obligated to immediately

ship out the Refused Shipment to its consignee who was waiting for its delivery, and had

already prepaid the freight charges to YRC.    Plaintiff asked Ms. Jones if she had a

resolution as to whether or not YRC would accept the Refused Shipment, or if YRC was

instead going to issue him an immediate refund of $244.    Ms. Jones stated, "I'm not

sure, I don't have an answer at the moment.    I know that our legal department is

reviewing the email you sent us yesterday, and someone will be in touch with you right

away."

73.     Several hours later—after still not hearing from anyone at YRC regarding a

resolution as to whether or not YRC would accept the Refused Shipment—Plaintiff again

sent an email to Kathy Jones, advising her that he had not yet heard back from anyone

from YRC and questioned whether or not YRC intended to immediately refund him the

prepaid shipping charges.

74.     Within only a few minutes of sending the email to Kathy Jones as referenced in

paragraph 73 herein, Plaintiff received a phone call from Karry Wallin—the manager of

YRC's Wheeling, Illinois freight terminal.

75.     In her phone call to Plaintiff, Ms. Wallin immediately advised Plaintiff that she

was just informed by Kathy Jones that YRC was electing not to accept any further freight

shipments from Plaintiff, including the prepaid Refused Shipment.    Ms. Wallin also

apologized concerning the internal memo that Plaintiff had received from Ms. Cepauskas

the prior night as referenced in paragraphs 56 and 57 herein, and stated "You weren't

supposed to get that."

76.     Plaintiff asked Ms. Wallin if she had been made aware as to the reason why he was

being banned from conducting any further shipping through YRC, and Ms. Wallin stated

that all she was told is that YRC's legal department had made the decision based on the

Subject Damage Claim that Plaintiff previously submitted, and that she had nothing to do

with the decision.   Ms. Wallin stated, "All I am is the messenger of the bad news."

77.     Plaintiff informed Ms. Wallin that he'd shipped numerous shipments through YRC

over the past two years and that the Subject Damage Claim was the only claim he'd ever

submitted to YRC.   He then asked Ms. Wallin if she'd ever heard of such a situation

where a customer was banned after submitted a damage claim.

78.     Ms. Wallin stated to Plaintiff that she'd heard of clients being banned from

shipping with YRC that had a very high shipment to damage claim ratio, but in all of her

many years of employment with YRC, she had never heard of a situation such as

Plaintiff's where he's been banned after only submitting *one* damage claim out of many

total shipments.

79.     Plaintiff again explained to Ms. Wallin that he was humiliated by the male

supervisor's [Mr. Trueman's] deliberately loud and defaming comments made the

previous evening in front of numerous employees and other unknown individuals while at

the freight terminal (as referenced in paragraphs 48 through 63 herein).   Plaintiff asked

Ms. Wallin if the supervisor's name [Mr. Trueman] is in fact "Marty" and she stated that

it is.   Ms. Wallin stated that she would talk to him ["Marty"] about it.

80.     Finally, Plaintiff asked Ms. Wallin if YRC was going to refund the prepaid freight

charges for the Refused Shipment.   Ms. Wallin stated that she "didn't know."

81.     Because YRC would not accept the Refused Shipment, Plaintiff immediately

scheduled the Refused Shipment to be delivered to its consignee by FedEx Freight at a

cost of $413.87—an increased cost of $169.87 from what Plaintiff had already prepaid to YRC for the Refused Shipment, but the lowest rate of which Plaintiff could find on short notice, and Plaintiff had no choice but to personally re-transport/re-palletize the Refused shipment to FedEx Freight in Des Plaines, Illinois on or about the following day (March 25th, 2020) in order to timely ship it to its intended consignee.

82.      Despite multiple inquiries to both Kathy Jones and Karry Wallin as previously referenced herein, and at all other times preceding Plaintiff filing the instant lawsuit, YRC opted not to refund Plaintiff his prepaid shipping charges of $244 for the Refused Shipment as paid through YRC's website on March 24th, 2020, nor reimburse the $25 wasted in shipping rope as a result of being told to leave the premises on the date he attempted to drop off the Refused Shipment (as referenced in paragraph 63 herein).

83.       In response to the instant lawsuit of which YRC was served with via process server on June 4th, 2020, YRC retroactively submitted a credit card refund to Plaintiff on June 26th, 2020 in the amount of $244 (the amount of his prepaid shipping charges for the Refused Shipment on March 24th, 2020), and of which then cleared on June 29th, 2020.

84.      On June 29th, 2020, YRC then filed its late Answer to this lawsuit—as the Answer was due on or about June 25th, 2020—21 days after it was served.

85.      As such, Defendant deliberately filed a late Answer so as to use the extra days between June 25th, and June 29th, 2020 to retroactively submit the credit card refund to Plaintiff and wait for it to clear—and only submitted said refund in response to Plaintiff having filed this lawsuit and so as to assert therein in its untimely Answer that the prepaid funds had already been refunded.

86.      YRC's retroactive refund of the $244 to Plaintiff between June 26th and June 29th,

2020, of which was only issued to Plaintiff in direct response to this litigation, is in and
of itself a continuation of its deceptive and unfair acts as set forth herein and does not
negate any of the numbered allegations within Plaintiff's initial complaint of which
specifically addressed Plaintiff's prior attempts at recovering the $244 from YRC over
the approximate 3-month period immediately preceding this lawsuit, as well as the
necessity of Plaintiff having to first file this lawsuit so as to finally recover it—said
amount being the money paid for services that were deliberately not rendered by YRC on
March 24th, 2020 (and of which it already knew as early as March 9th, 2020 that it had no
intention of rendering).

87.  Moreover, YRC made no attempt to issue back the $244 refund to Plaintiff prior to
Plaintiff filing the instant lawsuit against it despite his multiple requests, and also despite
numerous YRC and YRCW employees (including Trevor Blaylock, Tim McKinstry,
Karry Wallin, and Kathy Jones) *having actually identified* in their internal emails
composed and exchanged on March 25th, 2020 that a refund was immediately due back to
Plaintiff for the transportation services it refused to provide for the Refused Shipment on
March 24th, 2020 (and knew as early as March 9th, 2020 that it had no intention of
rendering).

## FIRST CLAIM FOR RELIEF – VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/2) AGAINST DEFENDANT YRC, INC.

88.  Plaintiff re-alleges and incorporates by reference each and every allegation and
statement contained in the preceding paragraphs with the same force and effect as if fully
set forth at length herein.

89.  At all times between February 26th, 2020 and March 9th, 2020—the time span

24

specifically encompassing the parties' exchanged email dialogue concerning the settlement of the small claims lawsuit regarding the Subject Damage Claim (case no: 2020-M3-000922) and Plaintiff's e-filed Notice of Voluntary Dismissal of said lawsuit from the Circuit Court of Cook County Third Municipal District per the parties' mutual settlement (as explicitly referenced in paragraphs 26-39 herein) — YRC and YRCW, through their claims department employees and supervisors, including but not limited to Kathy Jones (Sr. Legal Analyst-Claim Prevention & Resolution) and Trevor Blaylock (Manager Claim Prevention and Resolution), intentionally concealed from Plaintiff the fact that YRC and YRCW intended to ban Plaintiff from conducting any further shipping through YRC beginning immediately after his small claims lawsuit was formally dismissed (on March 9th, 2020).

90. At all times between March 9th, 2020 and March 24th, 2020—the time span specifically encompassing the date of Plaintiff's e-filed Notice of Voluntary Dismissal of his small claims lawsuit (March 9th, 2020) and the date of Plaintiff's next chronological shipment (i.e. the Refused Shipment) as prepaid by Plaintiff through YRC's public website (March 24th, 2020) — YRC and YRCW, through their respective claims department employees and supervisors, including but not limited to Kathy Jones (Sr. Legal Analyst-Claim Prevention & Resolution) and Trevor Blaylock (Manager Claim Prevention and Resolution), *continued* to intentionally conceal from Plaintiff that they had in fact already internally made the corporate decision (in writing on or about March 11th, 2020) to ban Plaintiff from conducting any further shipping through YRC.

91. As such, because YRC and YRCW intentionally concealed from Plaintiff their intention to ban him as a customer immediately following the settlement and dismissal of

25

his small claims lawsuit (and that they actually *had* internally banned him in writing on or about March 11th, 2020), at no time prior to Plaintiff scheduling and prepaying the freight charges for the Refused Shipment through YRC's public website on March 24th, 2020, his receiving the bill of lading and shipping/tracking labels for the Refused Shipment from YRC by email on March 24th, 2020, and his physically bringing the Refused Shipment to YRC's Wheeling, Illinois freight terminal for drop-off on that same date, did Plaintiff have any knowledge whatsoever that he had been banned from continuing to ship through YRC.

92.     Moreover, YRC and YRCW's Sr. Legal Analyst Kathy Jones, intentionally waited until only after receiving an email from Plaintiff containing his e-filed Notice of Voluntary Dismissal of his small claims lawsuit (on March 9th, 2020) before then subsequently instructing Ms. Wallin by email on March 11th, 2020 that her terminal should not accept any further shipments from customer "Anthony Martino/Tony Martino" (Plaintiff).

93.     At all times between February 26th, 2020 and March 24th, 2020, YRC owed Plaintiff a duty of good faith and fair dealing in the settlement agreement of the parties' prior small claims lawsuit, as well as a statutory duty pursuant to 815 ILCS 505/2, to disclose its material and exclusive knowledge to Plaintiff (a long-known business invitee/shipping customer) that it had no intention of accepting any further shipments from Plaintiff after the dismissal of the small claims suit on March 9th, 2020, including the Refused Shipment that Plaintiff scheduled and prepaid freight charges for on March 24th, 2020 through YRC's public website, because it had already internally banned him as a customer (as of or about March 11th, 2020) as a direct result of filing the small claims lawsuit against it.

94.     At all times, YRC and YRCW intended for Plaintiff to rely on the expressed content

of the emails written and sent to him by their employee Kathy Jones between February

26th, 2020 and March 9th, 2020 as it concerned the full scope of the parties' settlement of

the small claims lawsuit regarding the Subject Damage Claim (as referenced in

paragraphs 26 through 39 herein) and the status of the parties' business relationship

thereafter, and particularly Ms. Jones' email on March 2nd, 2020 of which stated: **"[YRC]**

**regret[s] that it was necessary for you to file this claim,"** of which deliberately omitted

the material and exclusive knowledge that YRC was banning Plaintiff as a customer

immediately following Plaintiff's dismissal of the small claims lawsuit, and instead,

reasonably conveyed to Plaintiff that YRC was conceding that it should have paid his

valid Subject Damage Claim without the necessity of having to file a small claims

lawsuit.

95.      Had YRC and YRCW not intended for Plaintiff to rely on the expressed content of

Ms. Jones' written emails as it concerned the parties' settlement of the prior small claim

lawsuit and the status of the business relationship between the parties thereafter its

dismissal, they could (and would) have directly notified Plaintiff or otherwise ensured

that Ms. Jones directly notified Plaintiff either at the time she was engaging in settlement

discussions with him (beginning on February 26th, 2020) or immediately thereafter the

voluntary dismissal of the small claims lawsuit (on March 9th, 2020), that Plaintiff was

banned as continued customer of YRC so that he would have known that he was not

welcome to schedule and prepay for any further shipments through YRC's public website

(as he did on March 24th, 2020) or attempt to personally drop off any further shipments at

YRC's Wheeling, IL freight terminal (as he did on March 24th, 2020).

96.     As explicitly set forth in paragraph 45-47 herein, at all times immediately following the parties' settlement and dismissal of the small claim lawsuit on March 9th, 2020, YRC (and upon information and belief, YRCW) also deceptively intended for Plaintiff to rely on YRC's public business website (www.yrc.com) for the purpose of booking and paying for further freight shipments, its payment confirmation email for the Refused Shipment on March 24th, 2020, and the bill of lading and shipping labels it emailed to Plaintiff for the Refused Shipment on March 24th, 2020.

97.     If YRC (and upon information and belief YRCW) had *not* deceptively intended for Plaintiff to rely on its public business website, its payment confirmation email for the Refused Shipment on March 24th, 2020, and the bill of lading and shipping labels it emailed to Plaintiff for the Refused Shipment on March 24th, 2020, it could (and would) have either directly notified Plaintiff prior to March 24th, 2020 that he was banned as a customer of YRC, served Plaintiff with a no-trespass order, and/or instructed JP Morgan Chase Bank, N.A (the administrator of YRC's website's PayConnexion payment portal account) to block Plaintiff's IP address, credit card, name, and/or billing address from its payment system immediately after March 9th, 2020 so that no further shipments could be scheduled and prepaid for by Plaintiff through its website.

98.     By scheduling and prepaying the freight charges by credit card in the amount of $244 for transportation of the Refused Shipment on March 24th, 2020 through YRC's website payment portal (PayConnexion), and then personally transporting it to YRC's freight terminal in Wheeling, Illinois on that same date, Plaintiff actually demonstrated his reliance on the written statements and omissions by Ms. Jones per her emails, as well as his reliance on his access to YRC's website payment portal, YRC's payment

confirmation email of March 24, 2020 for the Refused Shipment, YRC's March 24th, 2020 email containing the bill of lading for the Refused Shipment of which explicitly stated, "**Please take your provided Bill of Lading and shipment to the terminal whose address is below: YRC Terminal 303, 1000 CHADDICK DR Wheeling, IL 60090 USA,**" and YRC's March 24th, 2020 email containing the shipping labels to be attached to the Refused Shipment (collectively Exhibit F hereto).

99.     At all times during the parties' settlement negotiations of the small-claim lawsuit and immediately thereafter its voluntary dismissal with prejudice on March 9th, 2020, YRC and YRCW *could have* notified Plaintiff that they had banned him as a customer of YRC so that he would have known prior to scheduling and prepaying the freight charges for the transportation of the Refused Shipment through YRC's website on March 24, 2020, and prior to physically attempting to drop off the Refused Shipment at YRC's Wheeling, IL freight terminal on that same date, but deliberately failed to do so in retaliation for Plaintiff having filed the small claims lawsuit against it arising out of the Subject Damage Claim.

100.     YRC and YRCW, through its claims supervisors, operations managers and in-house attorneys, including but not limited to Trevor Blaylock and Kevin Oakleaf, deliberately instructed Ms. Jones to omit from all of her emails to Plaintiff between February 26th, 2020 and March 9th, 2020 that they'd made the corporate decision to ban him as a customer of YRC, and so as to instead allow Plaintiff to continue believing that he remained welcome to schedule and prepay for further transportation services thereafter through YRC's website, and with the premeditated intention of then recouping some of the funds it had paid to Plaintiff in the settlement of the small claim lawsuit and/or

29

otherwise cause emotional distress, thus constituting a deceptive and unfair act under 815 ILCS 505/2.

101.    In an email written on March 11th, 2020, YRC's (and upon information and belief YRCW's) Senior Legal Analyst, Kathy Jones, instructed YRC's Wheeling, IL terminal manager, Karry Wallin, that her terminal should no longer "pick up or accept" any further shipments from Plaintiff.

102.    Upon information and belief, after Ms. Jones notified Ms. Wallin (on March 11th, 2020) that her terminal was not to pick up or accept any further shipments from Plaintiff, YRC and YRCW, through their claims supervisors, legal analysts, operations managers and/or in-house attorney, including but not limited to Ms. Jones, Trevor Blaylock, Kevin Oakleaf, and Tim Mckinstry, also deliberately instructed Ms. Wallin to withhold from Plaintiff that he'd been banned as a customer of YRC and instead allow him to continue believing that he was still welcome to schedule and prepay for further transportation services through YRC's website, and with the premeditated intention that YRC would effectively recoup some of the funds it had paid to Plaintiff in the settlement of the small claim lawsuit and/or otherwise cause emotional distress to Plaintiff when he showed up to drop-off a newly scheduled shipment entirely unaware that it would not be accepted, thus constituting a deceptive and unfair act under 815 ILCS 505/2.

103.    YRC and YRCW had actual and constructive knowledge that Plaintiff always prepaid for nearly each and every one of his outbound freight shipments through YRC's public website with a credit card dating all the way back to January of 2018, and as such, could reasonably foresee that Plaintiff would likely continue to schedule and prepay for further shipments through YRC's website after March 9th, 2020 as a direct result of not

30

disclosing to him that they'd made the corporate decision (on or about March 11th, 2020) to ban him as a customer of YRC.

104.    As such, by failing to disclose to Plaintiff that he'd been banned as a customer and also failing to ever serve Plaintiff with a no-trespass notice, YRC and YRCW intentionally allowed Plaintiff to schedule and prepay the $244 in freight charges for the Refused Shipment through its website via credit card on March 24th, 2020, and then actually physically bring the Refused Shipment to its freight terminal in Wheeling, Illinois for drop-off that very same day, before only then advising Plaintiff in person (through its local employees Monica Cepauskas and Dan Trueman at its Wheeling, Illinois freight terminal) in a publicly humiliating manner that he'd been banned from further shipping due to his having submitted an allegedly "fraudulent claim" (i.e. the "Subject Damage Claim" as referenced herein), that the Refused Shipment would not be accepted, and that he needed to immediately leave YRC's premises and take the Refused Shipment with him.

105.    Thereafter, at all times preceding Plaintiff filing the instant lawsuit, YRC deliberately opted not to refund Plaintiff his prepaid funds of $244 for the "Refused Shipment" as a means of retroactively recouping a portion of the funds ($971) it had previously paid to Plaintiff in its voluntary settlement of the prior small claims lawsuit concerning the "Subject Damage Claim and to otherwise cause Plaintiff undue aggravation and emotional distress.

106.     As directly set forth in paragraphs 82 through 87 herein, retroactively refunded the $244 only *after* Plaintiff was compelled to file the instant lawsuit to recoup said funds.

107.     Furthermore, despite Plaintiff's multiple inquires to Kathy Jones and Karry

Wallin regarding a refund for the prepaid Refused Shipment, neither Ms. Jones, Ms.

Wallin, or any other employee of YRC and YRCW ever informed Plaintiff that he would

(allegedly) need to first fill out the paperwork explicitly attached as Exhibit A to YRC's

Amended Answer to Plaintiff's First Amended Complaint in order to receive a refund of

the $244 credit card payment that he'd made as the prepayment for the Refused Shipment

that YRC cancelled and refused to accept on March 24th, 2020.

108.     The document attached as Exhibit A of YRC's Amended Answer to Plaintiff's

First Amended Complaint is dated April 25th, 2020 and states as its heading, "Notice of

Duplicate or Overpayment. This is not a bill."

109.     The document attached as Exhibit A of YRC's Amended Answer to Plaintiff's

First Amended Complaint states in part in its body, "Our records indicate you **may** be

due a refund. If you agree with the information shown, please complete the attached form

and return via mail or fax.    Should you request a refund, a refund check will be issued to

your company upon receipt of the completed form."

110.     Even if YRC had hypothetically "communicated" and intended for Plaintiff to

rely on the document attached as Exhibit A to its Amended Answer to Plaintiff's First

Amended Complaint in order to obtain a refund of his prepayment ($244) for the Refused

Shipment, said document is deceptive in content in that YRC and YRCW, through their

employees Trevor Blaylock, Kathy Jones, Karry Wallin, and Tim Mckinstry, already had

actual knowledge and had explicitly identified in an internal email on March 25th, 2020

that Plaintiff *was for fact* due a refund on the Refused Shipment because it had

deliberately cancelled said shipment and rejected its acceptance from Plaintiff on March

24th, 2020—and not that Plaintiff *may* have been due a refund as the document states. Further, the letter is deceptive in content because YRC and YRCW also had actual knowledge (since March 24th and March 25th, 2020) that Plaintiff had *already inquired* multiple times about receiving a refund of his prepayment for the Refused Shipment, and as such, that there was no legal or other reasonable basis for Plaintiff to have to fill out "paperwork" in order to again confirm that.

111.     Even if YRC had hypothetically "communicated" and intended for Plaintiff to rely on the document attached as Exhibit A to its Amended Answer to Plaintiff's First Amended Complaint as it alleges it did at paragraph 78 therein, said document was not delivered in a reasonably timely manner since it is dated April 25th, 2020—over a month after the date that YRC refused to accept the Refused Shipment (March 24th, 2020, the same day that Plaintiff prepaid for the Refused Shipment through YRC's website payment portal), and a month after Plaintiff had already inquired in writing to Kathy Jones about obtaining a refund for the Refused Shipment (as set forth in paragraph 73 herein).

112.     The document attached as Exhibit A of YRC's Amended Answer to Plaintiff's First Amended Complaint further specifies that in order to obtain a refund, Plaintiff would have had to first mail and/or fax a completed form for YRC to review, and if eventually approved, then wait for YRC to issue a refund check by mail delivery. Thus, even if Plaintiff had hypothetically received this document on or around April 25th, 2020 (the date stated on its heading), YRC's delayed delivery and its unreasonable requirements for obtaining a credit card refund would have constituted both an unfair delay and unfair retainment of Plaintiff's prepaid funds for services that YRC deliberately

failed to render over a month prior (and knew at least as early as March 11ᵗʰ, 2020 that it had no intention of rendering).

113.     Moreover, despite the fact that the document attached as Exhibit A of YRC's Amended Answer to Plaintiff's First Amended Complaint states as its heading, "Notice of Duplicate or Overpayment," YRC had and has actual knowledge that Plaintiff's pre-payment for the Refused Shipment was not a "duplicate" or "overpayment" as those two terms are explicitly defined in YRC's Tariff 100, Item 179 (Exhibit I hereto), but rather, that it was a pre-payment (by credit card) for a shipment that YRC itself admits (at paragraph 78 of its Amended Answer to Plaintiff's First Amended Complaint) to identifying as a "cancelled shipment" (i.e. the Refused Shipment that it refused to accept for drop-off from Plaintiff on March 24ᵗʰ, 2020).

114.     As such, even if Plaintiff had hypothetically ever received the document attached as Exhibit A of YRC's Amended Answer to Plaintiff's First Amended Complaint, the language of the document specifying that it was a "notice of duplicate or overpayment" was misrepresented in content and otherwise wholly inapplicable to the circumstances of which warranted a refund, and therefore, YRC's alleged intention that Plaintiff rely on the language of said document, and particularly that Plaintiff would have first needed to complete and mail/fax the document to YRC's attention in order for Plaintiff to obtain the credit card refund that it had already identified and had actual knowledge (as of March 25ᵗʰ, 2020) was due back to Plaintiff for the services it intentionally failed to render on March 24ᵗʰ, 2020, is both an unfair act and a deceptive act under 815 ILCS 505/2.

115.     In any regard, YRC's intentional retainment of Plaintiff's $244 in prepaid funds between March 24ᵗʰ, 2020 and June 29ᵗʰ, 2020 for services it deliberately failed to render

34

on the Refused Shipment (on March 24th, 2020), and already knew that it had no intention

of rendering because it had banned Plaintiff as a customer (as early as or about March

11th, 2020), constitutes both an unfair and deceptive act pursuant to 815 ILCS 505/2.

116.     As a proximate result of Plaintiff's reliance on YRC's and YRCW's deceptive

and unfair acts and omissions as specified in paragraphs 89 through 115 herein, including

those acts committed by their employees, all of which violate 815 ILCS 505/2, Plaintiff

incurred actual economic losses in the amount of $488.87, including $244 in prepaid

freight charges for the Refused Shipment of which YRC deliberately retained starting on

March 24th, 2020 and then retroactively electronically-refunded on June 26th, 2020

(clearing on June 29th, 2020) only after necessitating that Plaintiff file the instant lawsuit

to recover said amount as set forth in paragraphs 82 through 87 herein; $169.87 for the

increased difference in cost paid ($413.87) by Plaintiff to ship the Refused Shipment

through FedEx Freight on short notice instead of the original amount ($244) that he'd

prepaid to YRC via credit card on March 24th, 2020; and $75 as paid by Plaintiff directly

to his father (Frank Martino, a general contractor) on March 24th, 2020 for the shipping

rope used to prepare the Refused Shipment for transit of which Plaintiff was forced to

destroy in order to remove the Refused Shipment from YRC's Wheeling, IL freight

terminal on March 24th, 2020 as instructed by YRC's employee (as explicitly referenced

in paragraphs 61-63 herein), as well as for borrowing his father's SUV to transport the

Refused Shipment to YRC's freight terminal in Wheeling, Illinois and his father's

time/assistance in preparing the Refused Shipment for transit on that date (and again on

the following date in re-preparing/re-transporting the Refused Shipment to FedEx Freight

in Des Plaines, IL)—all of which YRC and YRCW are directly and/or vicariously liable

35

to reimburse.

117.     Additionally, Plaintiff incurred aggravation, inconvenience, and public
humiliation of which manifested in physical symptoms of emotional distress on March
24th, 2020, including, inter alia, an exacerbation of preexisting asthma, all as a proximate
result of YRC and YRCW's unfair and deceptive acts as explicitly referenced in
paragraphs 52 through 87 herein.

118.     Furthermore, YRC and YRCW intend for all YRC customers, including Plaintiff,
to rely on the expressed language of YRC's Tariff 100, Item 179 ("Filing of Claims) of
which itemizes/defines its claims and litigation processes, but deceptively omits from
said language of Tariff 100, Item 179, the material fact that YRC and YRCW's (unfair)
business practice is to ban (as customers) individual shippers such as Plaintiff (as
opposed to incorporated business entity shippers) that file a single lawsuit against YRC
as arising out of one of YRC's claim denials—regardless of the merits of the claim and
YRC's denial, and regardless of an individual shipper's [including Plaintiff's] low
shipment to damage-claim ratio and long-established track record of shipping with YRC
without historical incident of submitted damage claims.    A copy of Defendant's Tariff
100, Item 179 is attached hereto as **EXHIBIT I.**

118(A).     Additionally, as part of its unfair and deceptive business practice as set forth in
paragraph 118, YRC and YRCW also intentionally conceal from those individual
shippers/customers they've internally banned (including from Plaintiff), the actual
material knowledge that they've been banned, and do not reveal such material knowledge
until only *after* such time the banned individual shippers/customers (including Plaintiff)
schedule and/or electronically prepay (via credit card) for *further* transportation services

through YRC's public website (not knowing that such further transportation services will actually be refused at the immediate time of drop-off a scheduled shipment at one of YRC's freight terminals due to the ban). YRC then intentionally and indefinitely retains these banned shippers/individuals' (including Plaintiff's) electronically-prepaid funds without issuing an immediate refund, and does so under the false pretense that such electronically-prepaid funds fall into one of the categories of payments enumerated under 49 CFR § 378.2 (e.g. "overcharge", "duplicate" payments, or "unidentified" payments) of which requires claimants to first complete and return paperwork to YRC over a period of weeks or months in order to obtain the owed refund, or otherwise retains such prepaid funds until the banned individual shipper/customer is otherwise compelled to file a lawsuit in order to obtain the owed refund for the transportation services YRC never rendered.

119.      As such, because YRC and YRCW also had/have no legitimate basis of any kind to assert that Plaintiff's Subject Damage Claim was fraudulent and/or otherwise illegitimate, YRC and YRCW only retroactively fabricated such allegations so as to justify their ban of Plaintiff as a customer in direct retaliation for Plaintiff having filed his prior small claims action against YRC concerning the Subject Damage Claim, and also so as to avoid taking professional accountability as a motor carrier due to the fact that YRC and YRCW have actual knowledge (per Plaintiff's previous *pro se* small claims lawsuit) that Plaintiff might again file a *pro se* lawsuit against YRC in the future in the hypothetical event that YRC were to again negligently cause damage to one of his freight shipments and then again deny his respective damage claim without a valid basis or a thorough investigation—including filing a *pro se* lawsuit arising out of damage claims of

even relatively low value that would be subject to small claims court-jurisdiction (such as the Subject Damage Claim).

120.     Because Plaintiff sustained actual pecuniary losses as specified in paragraph 116 herein as proximately resulting from Defendant's intentionally unfair and deceptive acts and practices, Plaintiff is also entitled to compensatory damages for aggravation, inconvenience, public humiliation, and physical manifestations of emotional distress, as well as punitive damages, as pursuant to 815 ILCS 505/10a.

## SECOND CLAIM FOR RELIEF – DEFAMATION *PER SE* AGAINST BOTH DEFENDANTS

121.     Plaintiff re-alleges and incorporates by reference each and every allegation and statement contained in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

122.     In its full context and entirety, the memo/email directive (Exhibit H hereto) composed on March 11th, 2020 by YRC and/or YRCW's Wheeling, Illinois freight terminal manager, Karry Wallin, and of which was published to numerous YRC and/or YRCW employees (and potentially other unknown parties) as specifically referenced in paragraphs 56-57 herein, contains false statements of fact, false and misleading implications, and deliberate omissions of material exculpatory facts which if included would've directly negated the implied defamatory meaning and false impressions, and instead would've conveyed a fair account.    As a proximate result, the published memo/email prejudices Plaintiff in his business, imputes a lack of integrity in Plaintiff's performance of his employment duties, and also imputes that Plaintiff defrauded YRC through the submission of his prior damage claim (i.e. the Subject Damage Claim) and small claim lawsuit, thus justifying YRC and YRCW's ban of Plaintiff as a customer.

123.     The lines of Ms. Wallin's email directive that specifically state, "*I'm not sure what this looked like as it wasn't signed for damaged at the destination.   No exceptions in our system. This frt ["freight"] delivered clear and we denied his claim and now we have a lawsuit. The claim is for $1200 for a stainless steel steam oven,"* contains false statements of material fact because Ms. Wallin personally had actual and constructive knowledge at the immediate time she published the statement that the shipment referenced within the Subject Damage Claim factually did not deliver "clear", but in reality, was delivered by YRC with concealed damage to a different receiver ("Crosey" as referenced in paragraph 11 herein) than the one explicitly named in the BOL (Mr. Nicola Dicio) and was never actually inspected at the immediate time of delivery either by the unknown receiver that signed for receipt ("Crosey"), the intended receiver named on the BOL (Mr. Dicio), or by YRC's delivery driver.

124.     Additionally, Ms. Wallin's statement that she wasn't "*sure what this looked like as it wasn't signed for damaged at the destination"* is a false statement of fact because Ms. Wallin had both actual and constructive knowledge at the immediate time that she published the statement that her own co-employees at the Wheeling, Illinois freight terminal (of which she manages) verifiably inspected, accepted, and signed the BOL attesting that YRC received the shipment in "apparent good order" at the immediate time that Plaintiff had personally dropped it off at her terminal on 1/27/20 (Exhibit A hereto)—an exculpatory fact of which was already known to Ms. Wallin and YRC's entire claims department on March 11th, 2020, and of which if included in her published memo/email to her co-employees would have negated the implication that Plaintiff's submitted claim for damage and subsequent lawsuit was improper and fraudulent.

125.     Further, on the exact date that Ms. Wallin published her memo/email (March 11, 2020), both she and YRC/YRCW knew or should have known that the lawsuit she was referencing therein had already been mutually settled and dismissed; that the amount sought by Plaintiff in his submitted damage claim to YRC for the steam oven (prior to its denial) was not $1200 but only $670 (the *actual cost* for replacement parts—as opposed to an unjustified windfall of $1200); that the amount ($1,231.52) that Plaintiff sought in his filed small claims lawsuit against YRC consisted of nothing more than his actual losses as a direct result of YRC's baseless claim denial (including costs of suit that Plaintiff was compelled to incur); that YRC voluntarily failed to appear and/or defend the lawsuit; that during the settlement of the lawsuit YRC and/or YRCW's Senior Sr. Legal Analyst (Kathy Jones) stated to Plaintiff in an email that YRC "regretted that it was necessary" for Plaintiff to had to have filed the small claims lawsuit against it regarding the Subject Damage Claim; that YRC never legitimately investigated Plaintiff's damage claim; and that YRC and/or YRCW's own claims examiner (Liz Hadermann) had stated in YRC's claim denial letter to Plaintiff regarding the steam oven on 1/30/20 that "*Due to the nature and extent of the shattered glass, we feel that this would be easily noticed and should have been noted on the delivery receipt,"* and as such, had unequivocally admitted that the shattered glass—if it had hypothetically already existed at the immediate time it was dropped off by Plaintiff at YRC's dock terminal in Wheeling, Illinois—would have also been "easily noticed" at the time it was personally dropped off at its terminal by Plaintiff and should have been noted by YRC itself at the immediate time Ms. Wallin's own co-employee inspected/accepted the shipment and signed the BOL attesting to YRC's receipt of the shipment in apparent good order prior to its transit (Exhibit A

hereto).

126.     The lines of Ms. Wallin's memo/email as referenced in paragraphs 123-124
herein of which were deliberately published to numerous YRC and/or YRCW employees
without the inclusion of the material exculpatory facts referenced in paragraphs 123-125,
and when construed within the full context of the memo/email, creates the false and
misleading implication that Plaintiff is of such unscrupulous business integrity that he
had knowingly submitted an illegitimate damage claim to YRC and/or knowingly
shipped pre-damaged goods with the intent of then collecting unwarranted monetary
sums from YRC through the illegitimate damage claim (i.e. committed a fraud);
intentionally sued YRC for an unwarranted monetary sum after his illegitimate damage
claim was denied by YRC's claims department; and that YRC's claims department
therefore had instructed her to personally inform the employees of the Wheeling, Illinois
freight terminal not to accept any further shipments from Plaintiff when he attempts
another drop off due to the risk that Plaintiff would repeat such actions.

127.     The line of Ms. Wallin's memo directive that specifically state, *"But just in case
he calls in for a pickup or tries this with a different name we should make sure the frt
[freight] is packaged properly,"* falsely implies in the full context and intent of the
memo/email that YRC and YRCW determined as fact that Plaintiff has such
unscrupulous business integrity that he'd deliberately fabricate a different name solely so
as to deceive YRC into accepting one of his shipments against its intent, and thus why
she was instructed by YRC and YRCW's claims department employees (Trevor Blaylock
and Kathy Jones) to notify her fellow terminal employees at the Wheeling, Illinois
terminal not to accept any further shipments from Plaintiff as a business customer.

128.    The words within Ms. Wallin's that specifically state, "*or tries this…*" also falsely insinuates as fact in the full context of her memo/email that Plaintiff had already committed a deceptive business act against YRC through the submission of his damage claim, and is thus the reason why YRC and YRCW's claims department employees (Trevor Blaylock and Kathy Jones) had instructed her/her terminal not to accept any further shipments from Plaintiff as a business customer.

129.    The line of Ms. Wallin's memo directive that specifically state*, "…and now we have a lawsuit…"* contains a false statement of fact in that on the exact date Ms. Wallin composed and distributed the memo to YRC employees, Plaintiff's lawsuit had already been mutually settled with YRC, and in fact, the lawsuit had already been verifiably voluntarily dismissed from the Circuit Court of Cook County Third Municipal District as of March 9th, 2020.    As such, the timing of Ms. Wallin's memo directive (March 11th, 2020) establishes that YRC and YRCW deliberately waited to notify Ms. Wallin of their decision to ban Plaintiff as a business customer until only after said lawsuit had first been verifiably settled and dismissed, and also intentionally concealed such decision from Plaintiff at all times during the settlement of said lawsuit.

130.    The fact that the subject line of Ms. Wallin's 3/11/20 memo/email states, "*drop off,*" and that the body states, "*It is a drop off on the dock. But just in case he calls in for a pickup*…," establishes Defendants' (and Ms. Wallin personally) actual and constructive knowledge that Plaintiff was a longstanding established business customer of YRC's of whom regularly dropped off all of his shipments at YRC's Wheeling, Illinois freight terminal in person (as opposed to Plaintiff requesting that YRC pickup his shipments from his own various locations).

131.    As such, instead of ever notifying Plaintiff himself that he'd been banned (as of March 11th, 2020) as a customer of YRC so that he'd have known he was not welcome to schedule/prepay and/or drop off any further shipments, Ms. Wallin (at the direct instruction of YRC and YRCW claims department employees and managers including but not limited to Trevor Blaylock and Kathy Jones) consciously disregarded Plaintiff's rights and reputation and published her March 11th, 2020 memo/email to numerous YRC and/or YRCW employees, including many that are employed at YRC's Wheeling, IL terminal.   In fact, Plaintiff wasn't finally notified that he'd been banned as a customer of YRC until March 24th, 2020 while actually attempting to drop off another shipment that he'd prepaid for on that same date through YRC's public website (the Refused Shipment) as previously set forth at paragraphs 53-57 herein.

132.    The fact that the subject line of Ms. Wallin's 3/11/20 memo/email states, "*drop off,*" and that the body therein states, "*It is a drop off on the dock. But just in case he calls in for a pickup…,*" plainly indicates that Defendants intended for Ms. Wallin to conceal their ban of Plaintiff as a customer until after such time that Plaintiff had already scheduled and prepaid for a future shipment through YRC's public website and attempted to drop it off at YRC's Wheeling, IL terminal (i.e. the "Refused Shipment"), since between March 11th, 2020 and March 24th, 2020 neither Ms. Wallin nor any other employee of YRC and/or YRCW ever disclosed to Plaintiff that he'd been banned as a customer, nor ever served Plaintiff with a no-trespass order.

133.    None of the libelous statements published about Plaintiff by Ms. Wallin to YRC employees as referenced on Exhibit H hereto were/are protected by privilege.

134.    To the extent that any of Ms. Wallin's statements about Plaintiff as published to

her employees as referenced on Exhibit H hereto could be considered as protected by privilege, such privilege was deliberately abused by Ms. Wallin based directly upon her deliberate and/or reckless disregard for Plaintiff's rights in her failure to investigate the truth of her statements and the unnecessary scope of content that she published of which creates a false impression about Plaintiff.    Notably, even setting aside Ms. Wallin's failure to first notify Plaintiff himself of YRC's ban, Ms. Wallin could have still conveyed to her employees YRC and YRCW's instruction of not accepting any further shipments from Plaintiff by simply publishing a memo/email of which stated only that fact alone while leaving out all of her false statements of fact, or alternatively, publish a memo/email of which included the material exculpatory facts of which she deliberately omitted as set forth in paragraphs 123-125 herein, and of which she knew or should have known on March 11th, 2020

135.     None of Ms. Wallin's statements published about Plaintiff in Exhibit H hereto can be reasonably construed as having an innocent construction when interpreted in its full context, particularly the lines *"WE will not except any more frt [freight] from this customer. Anthony Martino",* and *"Claims dept has requested that we do not except [accept] any more frt [freight] from this customer,"* of which clearly conveyed that Plaintiff was being banned as a customer for the reasons specifically referenced and implied in her email/memo.

136.     To the extent that Ms. Wallin was specifically directed by individual(s) employed by YRC and/or YRCW to publish the statements made about Plaintiff thereon Exhibit H hereto without including the known exculpatory facts that of which if included would've directly negated the false meaning conveyed about Plaintiff, such individual(s) is/are

44

jointly culpable for permitting, participating, and or encouraging her publication of false statements of fact and libelous implications of which prejudices Plaintiff in his business, that imputes a lack integrity in Plaintiff's performance of his employment duties, and also that imputes that Plaintiff committed fraud against YRC through his prior damage claim (i.e. the Subject Damage Claim) and small claim lawsuit.

137.    Additionally, during the phone call with Plaintiff on March 25th, 2020, YRC and/or YRCW's Senior Sr. Legal Analyst, Kathy Jones, published a slanderous statement about Plaintiff to Plaintiff's father of whom she was made aware was listening into the phone call via Plaintiff's amplified speakerphone setting (as referenced in paragraph 69 herein).   Notably, Ms. Jones' statement (in part): "… *Our claims department investigated your damage claim and determined it contained elements of fraud.   Based on their determination, it went up to our legal department and they made the decision…*" reasonably implies that Plaintiff had committed a fraud through his submission of the Subject Damage Claim, and thus the reason that Plaintiff was banned as a customer.

138.    Furthermore, Ms. Jones' statement as referenced in paragraph 137 herein is both a false statement of material fact and a false implication about Plaintiff in that Plaintiff's damage claim (the Subject Damage Claim) did not contain any elements of fraud, was not fraudulent, and as such, YRC and/or YRCW's claims department couldn't have legitimately contended that Plaintiff committed fraud against YRC to justify its decision to ban Plaintiff as a customer.

139.    Moreover, Plaintiff's Subject Damage Claim for $670 was an entirely valid claim for partial damage to a shipment of which was reported to YRC by Plaintiff only a couple of hours after it was delivered to the consignee's address, and of which after receipt of

the claim from Plaintiff, YRC and/or YRCW's claims department never contacted the consignee or inspected the shipment as part of its alleged investigation prior to denying it.

140.    Ms. Jones' slanderous statement published about Plaintiff as referenced in paragraph 137 was not protected by any privilege.

141.    To the extent that Ms. Jones' statement about Plaintiff as published to Plaintiff's father as referenced in paragraph 137 herein could be considered as protected by privilege, such privilege was deliberately abused by Ms. Jones based directly upon her reckless disregard for Plaintiff's rights and reputation in the unnecessary scope of her statement.    Specifically, Ms. Jones could have conveyed to Plaintiff (and his father) that she didn't personally make the decision to ban Plaintiff as a shipping customer and that the decision had been made by YRC and/or YRCW's legal department, while specifically refraining to include the defaming statement, "*Our claims department investigated your damage claim and determined it contained elements of fraud.*"

142.     Ms. Jones' slanderous statement as published about Plaintiff as referenced in paragraph 137 also cannot reasonably be construed as having an innocent construction, particularly when interpreted in context with YRC and YRCW's action of actually banning Plaintiff as a customer and having their employees demand he leave its Wheeling, Illinois freight terminal with the Refused Shipment on March 24th, 2020.

143.    Because all of the libelous and slanderous statements published about Plaintiff to third-parties by Karry Wallin and Kathy Jones as referenced herein this Complaint were made during the scope of their employment with YRC and/or YRCW, in furtherance of their employment-related activities, and at the direct instruction of YRC and/or YRCW, YRC and YRCW are vicariously liable as their employer under the *respondeat superior*

doctrine.

144.    Moreover, YRC and/or YRCW's employees (Ms. Wallin and Ms. Jones) had actual and constructive knowledge that the libelous and slanderous statements published about Plaintiff were false and imputed a false impression at the immediate time of their publication, and also that such publication deliberately omitted material exculpatory facts of which if included would've directly negated its implied defamatory meaning and false impressions about Plaintiff, and instead would've conveyed a fair account about Plaintiff's professional reputation, business integrity, and actions.

145.    As a proximate result of the libelous and slanderous statements published about him, Plaintiff has sustained significant emotional distress, including anxiety, embarrassment and humiliation.    Furthermore, it is reasonably presumed that Plaintiff's personal reputation has been tarnished, and that he also has been and will be further personally prejudiced in his business based on the grossly false implications made about him and his prior Subject Damage Claim by YRC and YRCW employees as previously referenced herein this complaint.

## THIRD CLAIM FOR RELIEF – DEFAMATION PER QUOD AGAINST ALL DEFENDANTS

146.    Plaintiff re-alleges and incorporates by reference each and every allegation, statement, and extrinsic fact contained in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

147.    The false statements and implications written about Plaintiff and published to numerous individuals on March 11th, 2020 by YRC and/or YRCW employee, Karry Wallin, as set forth in paragraphs 56-57 and paragraphs 121-145 herein, proximately caused Plaintiff special damages in the amount of $488.87, in that the publication itself

(i.e. the email/memo) served as the *actual* basis for YRC and/or YRCW employees Monica Cepauskas and Dan Trueman to refuse to accept Plaintiff's prepaid shipment on March 24th, 2020 when he attempted to drop if off at YRC's Wheeling, Illinois freight terminal (as set forth in paragraphs 52-63 herein).

148.     Because Ms. Wallin's publication was made during the scope of her employment with YRC and/or YRCW, in furtherance of her employment-related activities, and at the direct instruction other of YRC and/or YRCW employees (including Kathy Jones), YRC and YRCW are vicariously liable as her employer under the *respondeat superior* doctrine.

149.     Because Plaintiff incurred actual pecuniary loss as a direct result of Ms. Wallin's publication, Plaintiff is entitled to compensatory damages for emotional distress, including anxiety, embarrassment, humiliation, and damage to personal reputation.

## FOURTH CLAIM FOR RELIEF – NEGLIGENT SUPERVISION AGAINST ALL DEFENDANTS

150.     Plaintiff re-alleges and incorporates by reference each and every allegation and statement contained in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

151.     At all times, Defendants YRC and YRCW, as direct and/or joint-employers, owed Plaintiff—a known and established customer and business invitee of YRC—a duty of reasonable care to monitor, supervise, and/or control the conduct, interactions, and any extraordinary customer-relation decisions implemented by their employees of which could foreseeably cause direct harm or injury to its customers, including to Plaintiff.

152.     At all times, Defendants YRC and YRCW, as direct and/or joint-employers, had a right to control, monitor, and supervise their employees' conduct, interactions, and

implemented customer-relations policies and decisions during the scope of their employment pursuant to the doctrine of *respondeat superior*.

153.    Furthermore, on March 24th, 2020, Defendant YRC and Plaintiff were in a special relationship defined as business invitor/invitee as set forth in paragraph 98 herein, and as such, Defendant YRC, Inc. as the owner and operator of its Wheeling, Illinois freight terminal owed a duty of care to, inter alia, protect Plaintiff from an unreasonable risk of foreseeable physical harm pursuant to §314A (1965) Restatement (Second) of Torts.

154.    On or about March 9th, 2020, following the settlement and dismissal of Plaintiff's small claims lawsuit against YRC, YRCW employee Trevor Blaylock (Manager of Claims Prevention and Resolution) and YRC and/or YRCW employee Kathy Jones (Senior Legal Analyst-Claims Resolution), in consultation and concert with YRCW employee Kevin Oakleaf (In-house Counsel), and potentially other employees, made the ultimate decision to ban Plaintiff as a customer of YRC, but deliberately opted not to serve Plaintiff with a no-trespass order or otherwise notify him in any other manner that he'd been banned and was no longer welcome to continue scheduling/prepaying (through YRC's public website) and dropping off any further shipments at YRC's terminals.

155.    On March 11th, 2020, YRC and/or YRCW employee Kathy Jones sent an email with the subject line "Anthony Martino/Tony Martino" to YRC's and/or YRCW's Wheeling, IL freight Terminal Manager, Karry Wallin, and instructed Ms. Wallin that her terminal was no longer permitted to accept any future freight shipments from Plaintiff due to his having submitted the prior Subject Damage Claim and having filed the small claims lawsuit against YRC (of which was dismissed from the Cook County Circuit Court-Third Municipal District on March 9th, 2020).

156.    However, at no time did Ms. Jones, Mr. Blaylock, Mr. Oakleaf, nor any of their direct superiors or any other employee of YRC or YRCW, including Ms. Wallin's direct superior, YRC/YRCW Chicago-Area Vice President Tim McKintsry, ever instruct Ms. Wallin to notify Plaintiff that he was no longer welcome to continue scheduling/prepaying for new shipments through YRC's public website or dropping off further shipments at any of YRC's freight terminals as a result of his being banned as a customer.

157.    On March 11th 2020, Ms. Wallin composed and distributed her email/memo regarding Plaintiff (Exhibit H hereto) with the subject line **"drop off"** to numerous employees of YRC and/or YRCW, including to several that were/are employed at her Wheeling, Illinois freight terminal as set forth in paragraphs 56-57 herein (such as Monica Cepauskas and Dan Trueman), but never notified Plaintiff himself that he was no longer welcome to continue scheduling, prepaying and/or dropping off further shipments at her YRC terminal.

158.    At all times between February 26th, 2020 and March 24th, 2020, YRC and/or YRCW employees Kathy Jones, Karry Wallin, Trevor Blaylock, Kevin Oakleaf, and Tim McKinistry, and their direct superiors or supervisors, knew or should have known that by failing to inform Plaintiff at any point during the settlement discussions of the small claims lawsuit that he was no longer welcome as a customer of YRC; that by stating in an email to Plaintiff on March 2nd, 2020 that **"[YRC] regret[s] that it was necessary for [Plaintiff] to file this claim"** (paragraph 35 herein); that by never serving Plaintiff with a no-trespass order; that by accepting a new drop-off shipment from Plaintiff (personally) on March 9th, 2020 (paragraph 43 herein)—the same date that the small claims lawsuit

was dismissed; that by delivering Plaintiff's March 9th drop-off shipment to a consignee in Jacksonville, Florida on March 18th, 2020 (paragraph 44 herein); that by voluntarily accepting a credit card payment from Plaintiff through its website's payment portal on March 24th, 2020 for the scheduling of his next chronological shipment (the "Refused Shipment"); and by transmitting emails to Plaintiff on March 24th, 2020 that contained a bill of lading and shipping labels for the Refused Shipment and of which also explicitly stated therein: **"Please take your provided Bill of Lading and shipment to the terminal whose address is below: YRC Terminal 303, 1000 CHADDICK DR Wheeling, IL 60090 USA";** it was reasonably foreseeable that Plaintiff would assume that he was still a welcome customer of YRC and continue to schedule/prepay for further shipments through YRC's public website, and/or personally drop-off further prepaid shipments at YRC's Wheeling, Illinois terminal (including on March 24th, 2020), just as he had done on a regular basis since January of 2018 (paragraph 6-7 & 51 herein).

159.    At all times between and including March 9th, 2020 and March 24th, 2020, YRC and/or YRCW employees Kathy Jones, Trevor Blaylock, and Kevin Oakleaf, and their direct superiors or supervisors, knew or should have known that by allowing and/or instructing Karry Wallin to publish/disseminate an email on March 11th, 2020 (Exhibit H hereto) to the employees of her Wheeling, Illinois freight terminal of which falsely implied, inter alia, that YRC/YRCW's claims department was mandating that Plaintiff's drop-off shipments no longer be accepted by her terminal due to Plaintiff's prior damage claim/lawsuit allegedly being fraudulent, but without ever instructing or assuring that Ms. Wallin immediately notify Plaintiff himself of YRC's mandate, it was reasonably foreseeable that an event of which could cause significant emotional distress to Plaintiff

would occur the next time that he would enter YRC's Wheeling, Illinois freight terminal reasonably expecting to drop off a scheduled/prepaid shipment for transportation (i.e. the Refused Shipment on March 24th, 2020) and be taken completely by surprise when informed for the first time by the attending employees that he'd been banned as a customer due to his prior damage claim/lawsuit and that he'd need to immediately leave the premises with his shipment.

160.     At all times prior to March 24th, 2020, YRC and/or YRCW's Chicago-Area Vice President, Tim McKintsry, and potentially other direct supervisors of Wheeling, Illinois terminal manager, Karry Wallin, failed to properly control, monitor and/or otherwise supervise Ms. Wallin, by allowing her the unrestricted ability to publish and disseminate an email (Exhibit H hereto) on March 11th, 2020 to numerous employees at her terminal with the subject line **"drop off",** and of which explicitly referenced Plaintiff, Plaintiff's prior damage claim/small claim lawsuit, and YRC/YRCW's mandate that her terminal was no longer permitted to accept any further shipments from Plaintiff should he again enter the premises expecting to drop one off—but without requiring that Ms. Wallin ever notify Plaintiff *himself* that he'd been banned as a customer prior to him scheduling/prepaying for further shipments through YRC's public website and personally appearing at the Wheeling, IL freight terminal on March 24th, 2020 attempting to drop-off a scheduled and prepaid shipment for transportation (i.e. the "Refused Shipment").

161.     At all times between March 11th, 2020 and March 24th, 2020, YRC and/or YRCW's Wheeling, Illinois terminal manager, Karry Wallin, failed to monitor, supervise and/or otherwise control the scope and accuracy of the information that would be publicly conveyed about Plaintiff by the local employees at her terminal (including Dan

Trueman as set forth in paragraphs 56-62 herein) of whom had received her published

email, and most particularly at the precise time she had actual knowledge that Plaintiff

would be entering the Wheeling, Illinois freight terminal (on March 24th, 2020) to drop

off the prepaid Refused Shipment, so as to ensure that a publicly humiliating event for

Plaintiff would not occur when he entered (as it did on that date).

162.     At all times between March 24th, 2020 and the filing date of this lawsuit, YRC

and YRCW failed to supervise and/or monitor each of the employees that had actual

knowledge that Plaintiff was due a refund in the amount of $244 of which he'd explicitly

prepaid on that date for the transportation of the Refused Shipment, including but not

limited to Trevor Blaylock, Kathy Jones, T.J O'Connor, Karry Wallin, Tim McKinistry,

Bob Shockley, and Melissa Tomlen, so as to ensure that said employees conveyed to

YRC's billing department that a refund was immediately due to Plaintiff as a result of

YRC refusing to accept the Refused Shipment on March 24th, 2020.    As a proximate

result, YRC willfully retained Plaintiff's prepaid funds until on or about June 26th, 2020.

163.     At all times whatsoever, YRC and YRCW knew or should have known that by

failing to control, supervise, and/or monitor their claims and legal department employees'

(including but not limited to Trevor Blaylock, Kathy Jones and Kevin Oakleaf) ability to

independently make the decision to internally ban an established and regular customer

(including Plaintiff) in such a manner that at all times deliberately and/or negligently

conceals such decision from that same customer (including Plaintiff), an emotionally-

distressing altercation of which could cause physical harm would likely occur where that

same customer (including Plaintiff) schedules & prepays (via credit card) for the

transportation of a further freight shipment through YRC's publicly accessible website,

53

prepares and attempts to personally drop-off the respective prepaid shipment at one of YRC's freight terminals, but is then taken completely by surprise when only informed for the very first time *in person* by the local employees at a given YRC freight terminal that the scheduled/prepaid shipment cannot be accepted because the customer (including Plaintiff) has already been banned by YRC and YRCW's claims department.

164.     As set forth in paragraphs 154-163 herein, YRC and YRCW breached its duty to protect Plaintiff from an unreasonable risk of physical harm as a business invitee, and also breached its duty to properly monitor, supervise, and control their employees' conduct, interactions, and implementation of the extraordinary decision to ban Plaintiff as a customer/business invitee of YRC on March 11th, 2020 without ever informing him of same, in that Plaintiff subsequently scheduled and prepaid for a shipment (the Refused Shipment) through YRC's public website on March 24th, 2020, entered YRC's Wheeling, Illinois freight terminal on March 24th, 2020 expecting to personally drop off the prepaid shipment, but was instead publicly humiliated by YRC employees Dan Trueman and Monica Cepauskas as set forth in paragraphs 52-65 herein.

165.     As a proximate result of YRC and YRCW's breach of duties, Plaintiff incurred substantial aggravation and embarrassment, manifesting in physical symptoms of emotional distress, including but not limited to an exacerbation of preexisting asthma, of which YRC and YRCW are liable as direct and/or joint employers.

## FIFTH CLAIM FOR RELIEF – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

166.     Plaintiff re-alleges and incorporates by reference each and every allegation and statement contained in the preceding paragraphs with the same force and effect as if fully set forth at length herein.

167.     As a proximate result of YRC and YRCW breaching the duties it owed to Plaintiff as set forth in paragraphs 151 and 153 herein, Plaintiff directly incurred substantial aggravation, humiliation and embarrassment, manifesting in physical symptoms of emotional distress, including but not limited to an exacerbation of preexisting asthma, of which YRC and YRCW are liable.

**WHEREFORE**, having stated his causes of action, Plaintiff prays for judgment as follows:

A.     Compensatory damages against YRC, Inc. in the amount of $244.87 (after applying YRC Inc.'s retroactive refund of the $244 as set forth in paragraphs 80-87 for violation of 815 ILCS 505/2 (Illinois Consumer Fraud and Deceptive Business Practices Act);

B.     Compensatory damages against YRC, Inc. in the amount of $25,000 for emotional distress, aggravation, and inconvenience for violation of 815 ILCS 505/2 (Illinois Consumer Fraud and Deceptive Business Practices Act), or in the alternative, for emotional distress, aggravation, and inconvenience arising out of negligent supervision or negligent infliction of emotional distress;

C.     Compensatory damages against YRC, Worldwide, Inc. in the amount of $25,000 for emotional distress, aggravation, and inconvenience arising out of negligent supervision or negligent infliction of emotional distress;

D.     Punitive damages in the amount of $75,000 against Defendant YRC Inc., for violation of 815 ILCS 505/2 (Illinois Consumer Fraud and Deceptive Business Practices Act), or in the alternative, for the grossly negligent supervision of its employees in willful disregard of Plaintiff's rights;

E.     Punitive damages in the amount of $75,000 against YRC, Worldwide, Inc. for the grossly negligent supervision of its employees in willful disregard of Plaintiff's rights;

F.     Compensatory damages against both Defendants in the total amount of $300,000 for defamation per se, or in the alternative, defamation per quod;

G.     Punitive damages in the total amount of $900,000 against both Defendants for defamation per se or in the alternative defamation per quod;

H.     Plaintiff s costs in this action;

I. Plaintiff s reasonable attorney's fees if incurred in this action pursuant to 815 ILCS 505/10a;

J. Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

By: /s/Anthony Martino
Anthony Martino
P.O Box 5558
Buffalo Grove, IL 60089
tony@tonymartinomusic.com
847-977-4128

## JURY DEMAND

Plaintiff, Anthony Martino, hereby demands a trial by jury on all claims in this action so triable.

Respectfully submitted,

By: /s/Anthony Martino
Anthony Martino
Plaintiff
P.O Box 5558
Buffalo Grove, IL 60089
tony@tonymartinomusic.com
847-977-4128

# EXHIBIT A

**Web straight bill of lading—original—not negotiable**

**YRC FREIGHT**

SCAC: RDWY

For shipment information or charges call 1-800-610-6500

**349-045518-0**

Date: **01/27/2020**

B/L number:

Shipper number:

Trailer number:

Shipper name: **ANTHONY MARTINO % YRC TERMINAL 303**

Address: **1000 CHADDICK DR**

| City: **WHEELING** | State: **IL** | ZIP code: **60090** |

Origin city (if different than before):

Invoice: **ANTHONY MARTINO**

Address: **580 VERNON LN**

Attn: **ANTHONY MARTINO**

| City: **BUFFALO GROVE** | State: **IL** | ZIP code: **60089** |

PRO Number:

Consignee name and address:
**REYNA FOODS INC.**

Attn: **NICOLA DICIO**

**2031 PENN AVE**

| Destination City: **PITTSBURGH** | State: **PA** | ZIP Code: **15222** |

Phone Number: **(412) 287-9721**

Customer number: | Store number: | Department:

P.O. Number:

Special instructions:
**DECLARED VALUE: $3650 FOR TOTAL GROSS WEIGHT**

Contact Name: | Contact Phone:

- [X] Standard
- [ ] Guaranteed Standard Service by 5 p.m. or end of business day
- [ ] Guaranteed Multiday Window Between: ___/___/___ & ___/___/___

- [ ] Accelerated
- [ ] Time-Critical Deliver by: ___/___/___ [ ] By noon [ ] By 5 p.m. or end of business day
- [ ] Time-Critical Hour Window Deliver on: ___/___/___ Between: ___ & ___
- [ ] Time-Critical (fastest ground delivery – no delivery date required)

*guarantee only applies to direct service points

Quote I.D.: **40689434**

All shipments are subject to individual pricing programs as published by YRC or by written transportation contracts.

| Cod fee: Prepaid [ ] Collect [ ] | | COD amount: $ | Customer check OK for COD amount? Yes [ ] No [ ] |

| No. shipping units | Kind of package | No. pieces | Unit of measure | HM | Description of articles, special marks and exceptions | NMFC item number | Class | Weight (lb) Subject to correction | Length | Width | Height |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PLT | 1 | BOX | | 1 BRAND NEW MIELE DGC 6805-1 | | | 150 | 48 | 40 | 32 |
| | | | | | STAINLESS STEEL COMBINATION | | | | | | |
| | | | | | STEAM OVEN | | | | | | |
| | | | | | Liftgate Service at Delivery:Prepaid | | | | | | |
| 1 | | 1 | | | **GRAND TOTAL** | | | 150 | | | |

Shipment charges are prepaid unless marked collect: Collect [ ]

Total charges: $

EMERGENCY CONTACT
Phone: 847-477-4128 Anthony Martino

NOTE (1) Where the rate depends on value, shippers must state specifically in writing the agreed or declared value of the property as follows:
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding 3650.00 per Total Gross Weight

Note (2) Liability limitation for loss or damage on this shipment may be applicable. See 49 U.S.C. §14706 (c)(1)(A) and (B).

Note (3) Products requiring special or additional care or attention in handling or stowing must be so marked and packaged as to ensure safe transportation with ordinary care. See Sec. 2(e) of NMFC item 360.
If this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.
Signature of consignor

Received subject to individually determined rates or written contracts that have been agreed on in writing between the carrier and shipper, if applicable, otherwise to rates, classifications and rules that have been established by the carrier and are available to the shipper on request.
The property described above is in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined, as indicated above which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry its usual place of delivery of said destination, if on its route, otherwise to deliver to another carrier on the route to said destination.
I hereby declare that the contents of this consignment are fully and accurately described above by the proper shipping name and are classified, packaged, marked and labeled/placarded and are in all respects in proper condition for transport according to applicable international and national governmental regulations.

It is mutually agreed as to each carrier of all or any of said property over all or any portion of said route to destination and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

| Shipper company name: **ANTHONY MARTINO** | Carrier: **YRC FREIGHT** | Trailer #: **DOCK** | Date: **1/27/20** | Trailer loaded by: [ ] Shipper [ ] Driver |
| | | | | Freight counted by: [ ] Driver: pallets said to contain |
| Shipper signature: | YRC Freight employee signature: | | | [ ] Shipper [ ] Driver: pallets containing [ ] Driver: Loose pieces |

Mark "X" in "HM" column for hazardous materials.

Single shipment pickup: [ ]

Printed in U.S.A.

page 1 of 1

# EXHIBIT B



**Cargo Claims Department**
PO Box 7903
Overland Park, KS 66207
Phone: 913-344-5174

JANUARY 30, 2020


ANTHONY MARTINO
ANTHONY MARTINO
1000 CHADDICK DRYRC TERMINAL
WHEELING IL 60090


Your Claim Number:
Our Claim Number:          36-775857
Claim Amount:              $670.82
Our Pro Number:            349-045518-0  01/27/2020

This letter refers to your claim involving the above freight bill number.

This shipment was signed for as having been in good condition at the time of delivery.  The damage you are claiming was reported after our clear delivery.

In reviewing the supporting documents and photos, this was visible damage not noted.  Due to the nature and extent of the shattered glass, we feel that this would be easily noticed and should have been noted on the delivery receipt.  It is the duty of the consignee, regardless of authority or experience, to notate any damage on the delivery receipt at the time of delivery.

When visible damage is reported after a clear delivery, documented evidence must be submitted to show that the damage was caused by the carrier.  At present, your file does not contain documented evidence showing the damage occurred while the goods were in our possession.

In the absence of evidence that the damage was carrier caused, we have no alternative at this time but to decline your claim as filed. Please know that your claim was carefully reviewed - our goal is always a fair and legal outcome.

LIZ HADERMANN
Sr. Claim Resolution Specialist
CARGO CLAIMS DEPARTMENT
(913)344-5173
Liz.Hadermann@yrcfreight.com

Claim Status information is available on-line at www.yrc.com > Manage > Cargo Claims > Cargo Claims Status.

# EXHIBIT C

FILED
2/11/2020 5:05 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
20203000922

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**THIRD MUNICIPAL DISTRICT**

ANTHONY MARTINO, an Illinois citizen;  )
                                            )  Case No: **20203000922**
                                            )
                                            )
                     Plaintiff        )  **PLAINTIFF'S COMPLAINT AND JURY**
                                              )  **DEMAND**
vs.                                         )
                                         )
                                         )
YRC, INC., a Delaware corporation;    )  Return Date: 3/18/2020
                                           Courtroom Number: 0204

                      Defendant

---

## COMPLAINT AT LAW

NOW COMES, the Plaintiff, ANTHONY MARTINO, and complaining of Defendant, YRC, INC., a Delaware corporation, states and alleges as follows:

### PARTIES TO SUIT

1.    Plaintiff, Anthony Martino, was at all times relevant herein a resident and citizen of the state of Illinois.

2.    Defendant, YRC, INC., (hereafter "YRC"), is a full-service freight transportation provider (i.e. motor carrier/freight forwarder) incorporated in the state of Delaware, and with its principal place of business in Overland Park, Kansas.  It is a subsidiary or YRC Worldwide, Inc., and per its website (yrc.com/about), it is the leading transporter of industrial, commercial, and retail goods, specializing in solutions for businesses across North America through a full-service network, advanced information technologies, and proactive customer service.

FILED DATE: 2/11/2020 5:05 PM    20203000922

FILED DATE: 2/11/2020 5:05 PM   20203000922

## JURISDICTION AND VENUE

3.  All acts and omissions alleged herein occurred within Cook County in the State of Illinois.

4.  This Court has jurisdiction over this action under The Carmack Amendment (49 U.S.C. §14706(d)(3)) and 28 U.S.C. § 1337(a) because the amount in controversy is under $10,000.

## COUNT ONE - VIOLATION OF 49 U.S.C. §14706(a)(1) (The Carmack Amendment)

5.  At all relevant times herein, Plaintiff and YRC were in a contractual relationship in which YRC provided motor transportation for Plaintiff's commercial goods pursuant to a bill of lading (hereafter "BOL"). *See* BOL as **EXHIBIT A** hereto.

6.  Plaintiff was and is at all times relevant herein the holder of the BOL.

7.  Per the BOL, Plaintiff shipped his goods to a consignee named Nicola Dicio, an employee at a business called Reyna Foods, Inc., located in Pittsburgh, Pennsylvania.

8.  Plaintiff's goods consisted of 1 pallet containing a brand-new-condition steam oven (Miele model # DGC 6805-1) with a total weight of approximately 150 pounds (hereafter "Shipment"). The Shipment was sold by Plaintiff directly to the consignee for $3650 in connection with an EBAY transaction.

9.  On 1/24/20, Plaintiff prepaid the freight charges to YRC in the amount of 192.54 through YRC's website.

10. Prior to Plaintiff personally dropping off the Shipment at YRC's freight terminal in Wheeling, Illinois on 1/27/20, Plaintiff thoroughly protected the Shipment with extensive padded bubble-wrap and shrink-wrap, and also thoroughly

FILED DATE: 2/11/2020 5:05 PM    20203000922

strapped down the Shipment to its pallet with rope so as to prevent any movement during transit.

11.   On or about 1/27/20, Plaintiff personally dropped off the Shipment at YRC's freight terminal dock in Wheeling, Illinois, and YRC's receiving agent signed the BOL explicitly declaring that the contents of the Shipment were personally accepted by YRC in good order, with no damage or other exceptions otherwise noted on the BOL by YRC.  *See* YRC signature on BOL.

12.   On the morning of 1/29/20, YRC delivered the Shipment to the consignee's business address in Pittsburg, PA, but left the shipment with a different individual ("Crosey") other than the consignee explicitly named on the BOL. This other individual at the delivery location, signed for delivery receipt of the shipment, but without removing any of the protective wrap to inspect for damage.

13.   Shortly after delivery on 1/29/20, the consignee notified Plaintiff that he'd gotten the opportunity to personally inspect the Shipment and found concealed damage (shattered glass on the front door and a broken door frame) that he could only possibly discover after unwrapping all of the protective packaging from around the item.  The consignee indicated to Plaintiff that the damage was limited to the front door of the item, and that the item was likely hit by a heavy object during transit of which damaged the door.

14.   Upon being notified of the damaged by the consignee, Plaintiff mitigated his damages and immediately submitted a damage claim (1/29/20) to YRC seeking $670.82—the amount necessary for solely replacing the damaged front door of

the Shipment. As part of his written claim, Plaintiff also included photographs of the damage, as well as an electronic communication between Plaintiff and the consignee indicating consignee's discovery of the concealed damage only after unwrapping the extensive protective wrappings.

15. On 1/30/20, YRC formally denied Plaintiff's damage claim.

16. Per YRC' acceptance of Plaintiff's prepaid monetary consideration in the amount of $192.54 for transportation charges under the BOL, and actual acceptance of the Shipment itself as personally dropped off at its terminal by Plaintiff on 1/27/20, YRC (including but not limited to its package handlers, drivers or other third party employees tasked with handling YRC' freight shipments) owed Plaintiff a reasonable duty of care as an interstate motor carrier in its handling of Plaintiff's Shipment during transit under the BOL so as to not cause damage to its contents prior to its delivery to the consignee in Pittsburg, PA.

17. YRC breached its duty of care owed to Plaintiff when it negligently damaged Plaintiff's Shipment during its transit.

18. As a proximate result of YRC's breach of duty of care as a motor carrier, Plaintiff is entitled to reimbursement for the following amounts: prepaid freight charges for the damaged Shipment in the amount of $192.54; mitigated repair costs for the damaged portion of the Shipment of $670.82; service of process fees totaling $60; and the costs of a new complaint w/jury demand filing fee of $308.16; for a total collective loss to date of $1231.52, of which YRC as a motor carrier is liable to reimburse to Plaintiff as pursuant to The Carmack

FILED DATE: 2/11/2020 5:05 PM 2020300 0922

Amendment, 49 U.S.C. §14706.

**WHEREFORE**, having stated his causes of action, Plaintiff, Anthony Martino, prays

for judgment against Defendant YRC, in the total amount of $1231.52, including costs of

suit, to be proven at jury trial, and for any such other and further relief which the Court

deems to be fair, equitable and just.

By: _____
       Anthony Martino

Anthony Martino
Plaintiff
P.O. Box 5558
Buffalo Grove, IL 60089
847-977-4128
hemitman@aol.com

DATED 2/11/20

FILED DATE: 2/11/2020 5:05 PM   20203000922

FILED DATE: 2/11/2020 5:05 PM   20203000922

# EXHIBIT A

OP-097 01.16

**Web straight bill of lading—original—not negotiable**

**YRC FREIGHT**

SCAC: RDWY

For shipment information, visit yrcfreight
call 1-800-610-6500

**349-045518-0**

FILED DATE: 2/11/2020 5:05 PM    20203000922

| | |
|---|---|
| Date: **01/27/2020** | B/L number: |

PRO Number:

Shipper number: | Trailer number:

Consignee name and address:
**REYNA FOODS INC.**

Shipper name:
**ANTHONY MARTINO % YRC TERMINAL 303**

Attn: **NICOLA DICIO**

Address:
**1000 CHADDICK DR**

**2031 PENN AVE**

| City: **WHEELING** | State: **IL** | ZIP code: **60090** |

| Destination City **PITTSBURGH** | State: **PA** | ZIP Code: **15222** |

| Origin city (if different than before): | State: | ZIP code: |

Phone Number:
**(412) 287-9721**

Invoicee:
**ANTHONY MARTINO**

| Customer number: | Store number: | Department: |

Address:
**580 VERNON LN**

P.O. Number:

Attn: **ANTHONY MARTINO**

Special instructions:
**DECLARED VALUE: $3650 FOR TOTAL GROSS WEIGHT**

| City: **BUFFALO GROVE** | State: **IL** | ZIP code: **60089** |

Contact Name: | Contact Phone:

☒ Standard

☐ Accelerated

☐ Guaranteed Standard Service by 5 p.m. or end of business day

☐ Time-Critical    Deliver by: / /    ☐ By noon    ☐ By 5 p.m. or end of

☐ Guaranteed Multiday Window    Between:___/___/___ & ___/___/___

☐ Time-Critical Hour Window    Deliver on: / /    Between: ___ & ___

☐ Time-Critical (fastest ground delivery – no delivery date required)

Quote I.D.: **40689434**

*guarantee only applies to dir

All shipments are subject to individual pricing programs as published by YRC or by written transporta

| Cod fee: Prepaid ☐ Collect ☐ | | | | | COD amount: $ | Customer check OK for COD amount? | | Yes ☐ No | | |

| No. shipping units | Kind of package | No. pieces | Unit of measure | H/I | Description of articles, special marks and exceptions | NMFC item number | Class | Weight (lb) Subject to correction | Length | Wid |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PLT | 1 | BOX | | 1 BRAND NEW MIELE DGC 6805-1 | | | 150 | 48 | 40 |
| | | | | | STAINLESS STEEL COMBINATION | | | | | |
| | | | | | STEAM OVEN | | | | | |
| | | | | | Liftgate Service at Delivery:Prepaid | | | | | |
| 1 | | 1 | | | **GRAND TOTAL** | | | 150 | | |

EMERGENCY CONTACT
Phone: 242-477-4128 Anthony Martino

Shipment charges are prepaid unless marked collect: Collect ☐

Total charges: $

NOTE (1) Where the rate depends on value, shippers must state specifically in writing the agreed or declared value of the property as follows:
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding
$ 3650.00 per Total Gross Weight

NOTE (2) Liability limitation for loss or damage on this shipment may be applicable. See 49 U.S.C. §14706 (c)(1)(A) and (B).

Note (3) Products requiring special or additional care or attention in handling or stowing must be so packaged as to ensure safe transportation with ordinary care. See Sec. 2(e) of NMFC item 360.

If this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.

Signature of consignor

The property described above is in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined, as indicated above which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry its usual place of delivery of said destination, if on its route, otherwise to deliver to another carrier on the route to said destination.
I hereby declare that the contents of this consignment are fully and accurately described above by the proper shipping name and are classified, packaged, marked and labeled/placarded and are in all respects in prope for transport according to applicable international and national governmental regulations.

It is mutually agreed as to each carrier of all or any of said property over all or any portion of said route to de as to each party at any time interested in all or any of said property, that every service to be performed here subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

| Shipper company name: **ANTHONY MARTINO** | Carrier: **YRC FREIGHT** | Trailer # **DOCK** | Date: **1/29/20** | Trailer loaded by: ☐ Shipper ☐ Driver: pallets sai |
| Shipper signature: | YRC Freight employee signature: | | H/U received | Freight counted by: ☐ Shipper ☐ Driver: Loose pieces |

# EXHIBIT D



**HERESTHEDEAL HERESTHEDEAL <heresthedealllc@gmail.com>**

---

## YRC Cargo Claim #775857/PRO #3490455180

**Jones, Kathy** <Kathy.Jones@yrcfreight.com>                              Mon, Mar 9, 2020 at 1:25 PM
To: HERESTHEDEAL HERESTHEDEAL <heresthedealllc@gmail.com>

Thank you Anthony.


**From:** HERESTHEDEAL HERESTHEDEAL <heresthedealllc@gmail.com>
**Sent:** Monday, March 09, 2020 12:14 PM
**To:** Jones, Kathy <Kathy.Jones@YRCFreight.com>
**Subject:** Re: YRC Cargo Claim #775857/PRO #3490455180



Kathy,


Per the settlement, attached for your reference, please find the notice of dismissal with prejudice as filed with the Court.


Thank you,

Anthony Martino

847-977-4128


On Mon, Mar 2, 2020 at 1:18 PM HERESTHEDEAL HERESTHEDEAL <heresthedealllc@gmail.com> wrote:

> Thank you.  Once it arrives, I will file the voluntary dismissal/notice of settlement with the court this week and email you a copy.
>
>
> Best,
>
> Anthony
>
>
> On Mon, Mar 2, 2020 at 1:15 PM Jones, Kathy <Kathy.Jones@yrcfreight.com> wrote:
>
>> Hi Anthony,
>>
>>    I just received the check and tracking information.  The check is being sent via UPS 2nd day service—you should receive it soon.
>>
>>
>> CK #1148666        Tracking # is 1Z 692 011 02 9707 5256

We regret that it was necessary for you to file this claim.

Kathy

**From:** HERESTHEDEAL HERESTHEDEAL <heresthedealllc@gmail.com>
**Sent:** Friday, February 28, 2020 5:33 PM
**To:** Jones, Kathy <Kathy.Jones@YRCFreight.com>
**Subject:** Re: YRC Cargo Claim #775857/PRO #3490455180

OK, thank you.

Once you email it to me, I will dismiss the case and send you a copy of the notice of dismissal filed with the court.

Best,

Anthony

On Fri, Feb 28, 2020 at 5:03 PM Jones, Kathy <Kathy.Jones@yrcfreight.com> wrote:

> Hello,
>
>   I agree with the amount of $971.00. I will provide the check number and tracking number early next week. Thank you for your assistance in resolving this matter.
>
> **From:** HERESTHEDEAL HERESTHEDEAL <heresthedealllc@gmail.com>
> **Sent:** Friday, February 28, 2020 11:12 AM
> **To:** Jones, Kathy <Kathy.Jones@YRCFreight.com>
> **Subject:** Re: YRC Cargo Claim #775857/PRO #3490455180
>
> Hi,
>
> While I disagree with the applicability of the terms you've presented as it concerns the filed claim under the Carmack Amendment, as a means of comprise and so as to avoid the time/expense of unnecessary court appearances, I'd be willing to settle/dismiss the complaint for no less than $971, which includes the damage and freight charges using your calculations of $492.54, plus the costs of suit and service of process fees incurred in filing the matter.   If this is acceptable, please let me know by the end of the day next Tuesday and I will voluntarily dismiss the case.
>
> Sincerely,

Anthony Martino

847-977-4128

On Wed, Feb 26, 2020 at 4:24 PM Jones, Kathy <Kathy.Jones@yrcfreight.com> wrote:

Good Afternoon Mr. Martino,

I have reviewed the Complaint and cargo claim file in reference to this matter. This shipment moved under a Dimensional Quote – attached is a copy of the confirmation. Based on the rate paid and the liability provisions, the maximum amount recoverable for loss or damage is $2.00 per pound, per package. Since the shipment weighed 150 pounds, the amount recoverable is $492.54. This amount includes freight charges of $192.54.

Although the shipment was delivered without exception, we are offering this maximum, contractual liability. Upon receipt of your acceptance to $492.54, our check will be promptly issued and sent via UPS. We look forward to reaching an amicable conclusion on this matter.

**Kathy Jones**

Sr. Legal Analyst-Claim Prevention & Resolution

kathy.jones@YRCFreight.com

YRC Freight – Overland Park, KS

Office: **913.344.3189** I Fax: **913.982.0110** I Customer Service: **800.610.6500**



# EXHIBIT E

For shipment information, visit yrcfreight.com or call 1-800-610-6500

OP-097 01/16

**Web straight bill of lading—original—not negotiable**

**YRC FREIGHT**

SCAC: RDWY

**357-149804-5**

| | | |
|---|---|---|
| Date: **03/09/2020** | B/L number: | |
| Shipper number: | | Trailer number: |

Shipper name:
**ANTHONY MARTINO % YRC TERMINAL 303**

Address:
**1000 CHADDICK DR**

| City: | State: | ZIP code: |
|---|---|---|
| **WHEELING** | **IL** | **60090** |

| Origin city (if different than before): | State: | ZIP code: |
|---|---|---|

Invoicee:
**ANTHONY MARTINO**

Address:
**580 VERNON LN**

Attn: **ANTHONY MARTINO**

| City: | State: | ZIP code: |
|---|---|---|
| **BUFFALO GROVE** | **IL** | **60089** |

PRO Number:

Consignee name and address:
**JENNY GARMON**

Attn: **JENNY GARMON**

**11620 MCALLISTER BLVD**

| Destination City | State: | ZIP Code: |
|---|---|---|
| **JACKSONVILLE** | **FL** | **32218** |

Phone Number:
**(904) 265-5676**

| Customer number: | Store number: | Department: |
|---|---|---|

P.O. Number:

Special instructions: **PLEASE CALL CONSIGNEE AT 904-265-5676. IF SHE DOES NOT ANSWER, PLEASE LEAVE HER A VOICE MESSAGE WITH A DIRECT** (

Contact Name:

Contact Phone:

☒ Standard
☐ Accelerated

☐ Guaranteed Standard Service by 5 p.m. or end of business day
☐ Guaranteed Multiday Window   Between __/__/__ & __/__/__

☐ Time-Critical   Deliver by: __/__/__   ☐ By noon   ☐ By 5 p.m. or end of business day
☐ Time-Critical Hour Window   Deliver on: __/__/__   Between ___ & ___
☐ Time-Critical (fastest ground delivery – no delivery date required)

*guarantee only applies to direct service points

Quote I.D.: **55172277**

All shipments are subject to individual pricing programs as published by YRC or by written transportation contracts.

| Cod fee: Prepaid ☐ Collect ☐ | | | COD amount: $ | | Customer check OK for COD amount?   Yes ☐ No ☐ | | | | |
|---|---|---|---|---|---|---|---|---|---|

| No. shipping units | Kind of package | No. pieces | Unit of measure | HM | Description of articles, special marks and exceptions | NMFC item number | Class | Weight (lb) Subject to correction | Length | Width | Height |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PLT | 1 | BDL | | **1 BRAND NEW SHP865ZD2N** | | | **140** | 48 | 40 | 40 |
| | | | | | **DISHWASHER** | | | | | | |
| | | | | | **Residential Delivery:Prepaid** | | | | | | |
| | | | | | **Liftgate Service at Delivery:Prepaid** | | | | | | |
| | | | | | **Delivery Appointment:Prepaid** | | | | | | |
| 1 | | 1 | | | **GRAND TOTAL** | | | **140** | | | |

EMERGENCY CONTACT
Phone: 847-977-4128   Name: Anthony Martino   Contract #:

Shipment charges are prepaid unless marked collect: Collect ☐   Total charges: $

NOTE (1) Where the rate depends on value, shippers must state specifically in writing the agreed or declared value of the property is as follows:
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding
$ 785.00   per Total gross weight

Note: (2) Liability limitation for loss or damage on this shipment may be applicable. See 49 U.S.C. §14706 (c)(1)(A) and (B).

NOTE (3) Products requiring special or additional care or attention in handling or stowing must be so marked and packaged as to ensure safe transportation with ordinary care. See Sec. 2(e) of NMFC item 360.
If this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges.
Signature of consignor

Received subject to individually determined rates or written contracts that have been agreed on in writing between the carrier and shipper, if applicable, otherwise to rates, classifications and rules that have been established by the carrier and are available to the shipper on request.

The property described above is in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined, as indicated above which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry its usual place of delivery of said destination, if on its route, otherwise to deliver to another carrier on the route to said destination.

It is mutually agreed as to each carrier of all or any of said property over all or any portion of said route to destination and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

I hereby declare that the contents of this consignment are fully and accurately described above by the proper shipping name and are classified, packaged, marked and labeled/placarded and are in all respects in proper condition for transport according to applicable international and national governmental regulations.

| Shipper company name: **ANTHONY MARTINO** | Carrier: **YRC FREIGHT** | Trailer # | Date: | Trailer loaded by: ☐ Shipper ☐ Driver |
|---|---|---|---|---|
| | | | | Freight counted by: ☐ Driver: pallets said to contain |

Shipper signature: *Anthony Martino*

YRC Freight employee signature:

N/U received:
☐ Shipper
☐ Driver: Loose pieces

☐ Driver: pallets containing

*Mark "X" in "HM" column for hazardous materials.*

Single shipment pickup: ☐

Printed in U.S.A.

Page 1 of 2

**Date:** 03/09/2020

# SUPPLEMENT TO THE WEB BILL OF LADING

**Pro Number:** 357-149804-5

**Bill of Lading Number:**

## CUSTOMER ORDER INFORMATION

| CUSTOMER ORDER NUMBER | STORE # | DEPT # | # PKGS | WEIGHT (lbs) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## CARRIER INSTRUCTIONS

BACK NUMBER. HER ALTERNATE # IS 904-718-5096. NEEDS APPOINTMENT

## CARRIER INFORMATION

| HANDLING UNIT | | PACKAGE | | | | COMMODITY DESCRIPTION | LTL ONLY | |
|---|---|---|---|---|---|---|---|---|
| QTY | TYPE | QTY | TYPE | WEIGHT (lbs) | HM (X) | Commodities requiring special or additional care or attention in handling or stowing must be so marked and packaged as to ensure safe transportation with ordinary care. See Section 2(e) of NMFC Item 360 | NMFC # | CLASS |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

# EXHIBIT F

 **HERESTHEDEAL HERESTHEDEAL <heresthedealllc@gmail.com>**

---

## Payment Confirmation for YRC Freight
1 message

---

**noreply@payconnexion.com** <noreply@payconnexion.com>  Tue, Mar 24, 2020 at 12:10 AM
To: heresthedealllc@gmail.com

*** PLEASE DO NOT RESPOND TO THIS EMAIL ***

Thank you for submitting your payment for YRC Freight. This email is to confirm that on Mar-24-2020, you authorized YRC Freight to charge the credit card listed below on the scheduled payment date.

| | |
|---|---|
| **Confirmation Number:** | YRCTWQ000859893 |
| **Confirmation Date (ET):** | Mar-24-2020 01:08:48 AM |
| **Payer Name:** | Anthony Martino |
| **Amount Due:** | $244.00 |

| | |
|---|---|
| **Payment Amount Debited:** | $244.00 |
| **Scheduled Payment Date:** | Mar-24-2020 |

| | |
|---|---|
| **Cardholder Name:** | Anthony Martino |
| **Card Number:** | XXXXXXXXXXXX0078 |
| **Card Type:** | Visa Debit |

If you have questions about this payment or need assistance, please call Customer Service at (800) 610-6500.

Thank you for using the YRC Freight electronic payment system.

 **HERESTHEDEAL HERESTHEDEAL <heresthedealllc@gmail.com>**

---

## Your YRC Freight Transactional Bill of Lading, PRO# 397-225762-2
1 message

---

**my.yrcfreight.com** <AutomatedEmail@yrcfreight.com>                    Tue, Mar 24, 2020 at 12:09 AM
To: heresthedealllc@gmail.com

Dear Anthony Martino,

A quote has been created through YRC Freight's Dimensional Freight Quote tool by Anthony Martino. Please take your provided Bill of Lading and shipment to the terminal whose address is below.

Anthony Martino % YRC Terminal 303
1000 CHADDICK DR
Wheeling, IL 60090 USA

Click here to create shipping labels.

Click here to receive Shipment Notifications (tracking updates and shipping documents).

If you have questions or need to cancel the pickup, please call YRC Freight Customer Service 800-610-6500

Thank you for your business!

 YRC Freight

---

 **397-225762-2_bol.pdf**
496K

 **HERESTHEDEAL HERESTHEDEAL <heresthedealllc@gmail.com>**

---

## YRC Freight - Requested Documents for PRO# 397-225762-2
1 message

**my.yrcfreight.com** <AutomatedEmail@yrcfreight.com>                    Tue, Mar 24, 2020 at 12:09 AM
To: heresthedealllc@gmail.com

The attached document is for the shipment with PRO Number 397-225762-2.

---

 **3972257622_ShippingLabels.pdf**
36K

EXHIBIT G

OP-097 01/18



**Web straight bill of lading—original—not negotiable**

SCAC: RDWY

For shipment information, visit yrcfreight.com or call 1-800-610-6500

## 397-225762-2

**PRO Number:**

| Date: 03/24/2020 | B/L number: |
|---|---|

Shipper number: | Trailer number:

**Consignee name and address:**
AVERY WATERMAN

Shipper name:
ANTHONY MARTINO % YRC TERMINAL 303

Attn: AVERY WATERMAN

Address:
1000 CHADDICK DR

322 E LANDING

| City: WHEELING | State: IL | ZIP code: 60090 |
|---|---|---|

| Destination City: WILLIAMSBURG | State: VA | ZIP Code: 23185 |
|---|---|---|

| Origin city (if different than before): | State: | ZIP code: |
|---|---|---|

Phone Number:
(757) 570-8484

Invoicee:
ANTHONY MARTINO

| Customer number: | Store number: | Department: |
|---|---|---|

Address:
580 VERNON LN

P.O. Number:

Attn: ANTHONY MARTINO

**Special instructions:**
DECLARED VALUE: $ 1750 FOR TOTAL GROSS WEIGHT

| City: BUFFALO GROVE | State: IL | ZIP code: 60089 |
|---|---|---|

Contact Name: | Contact Phone:

**Standard**
☒ Standard

**Faster Standard**
☐ Accelerated

**Standard Guaranteed**
☐ Guaranteed Standard Service by 5 p.m. or end of business day
☐ Guaranteed Multiday Window Between: ___/___/___ & ___/___/___

**Expedited Guaranteed**
☐ Time-Critical  Deliver by: ___/___/___  ☐ By noon  ☐ By 5 p.m. or end of business day
☐ Time-Critical Hour Window  Deliver on: ___/___/___  Between: ___ & ___
☐ Time-Critical (fastest ground delivery – no delivery date required)

*guarantee only applies to direct service points

Quote I.D.: 59639874

All shipments are subject to individual pricing programs as published by YRC or by written transportation contracts.

| Cod fee: Prepaid ☐ Collect ☐ | | | | COD amount: $ | Customer check OK for COD amount? Yes ☐ No ☐ | | | Shipment dimensions | | |

| No. shipping units | Kind of package | No. pieces | Unit of measure | HM | Description of articles, special marks and exceptions | NMFC item number | Class | Weight (lb) Subject to correction | Length | Width | Height |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PLT | 1 | BOX | | 1 BRAND NEW THERMADOR | | 115 | | 60 | 37 | 35 |
| | | | | | HMCB36WS WALL-HOOD | | | | | | |
| | | | | | Residential Delivery:Prepaid | | | | | | |
| | | | | | Liftgate Service at Delivery:Prepaid | | | | | | |
| | | | | | Delivery Appointment:Prepaid | | | | | | |
| 1 | | 1 | | | **GRAND TOTAL** | | | 115 | | | |

EMERGENCY CONTACT
Phone: 847-477-4128  Name: Anthony Martino  Contract #:

Shipment charges are prepaid unless marked collect: Collect ☐ | Total charges: $

NOTE (1) Where the rate depends on value, shippers must state specifically in writing the agreed or declared value of the property as follows:
The agreed or declared value of the property is hereby specifically stated by the shipper to be not exceeding
$1750.00 per Total Gross Weight
**Note: (2) Liability limitation for loss or damage on this shipment may be applicable. See 49 U.S.C. §14706 (c)(1)(A) and (B).**

Note (3) Products requiring special or additional care or attention in handling or stowing must be so marked and packaged as to ensure safe transportation with ordinary care. See Sec. 2(e) of NMFC item 360.
If this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement:
The carrier may decline to make delivery of this shipment without payment of freight and all other lawful charges.
Signature of consignor

Received subject to individually determined rates or written contracts that have been agreed on in writing between the carrier and shipper, if applicable, otherwise to rates, classifications and rules that have been established by the carrier and are available to the shipper on request.

The property described above is in apparent good order, except as noted (contents and condition of contents of packages unknown), marked, consigned, and destined, as indicated above which said carrier (the word carrier being understood throughout this contract as meaning any person or corporation in possession of the property under the contract) agrees to carry its usual place of delivery of said destination, if on its route, otherwise to deliver to another carrier on the route to said destination.

It is mutually agreed as to each carrier of all or any of said property over all or any portion of said route to destination and as to each party at any time interested in all or any of said property, that every service to be performed hereunder shall be subject to all the conditions not prohibited by law, whether printed or written, herein contained, including the conditions on the back hereof, which are hereby agreed to by the shipper and accepted for himself and his assigns.

I hereby declare that the contents of this consignment are fully and accurately described above by the proper shipping name and are classified, packaged, marked and labeled/placarded and are in all respects in proper condition for transport according to applicable international and national governmental regulations.

| Shipper company name: ANTHONY MARTINO | Carrier: YRC FREIGHT | Trailer # | Date: 3/24/20 | Trailer loaded by: ☐ Shipper  ☐ Driver |
|---|---|---|---|---|

| Shipper signature | YRC Freight employee signature: | Pro received: | Freight counted by: ☐ Shipper  ☐ Driver: Loose pieces | ☐ Driver: pallets said to contain ☐ Driver: pallets containing |

Mark "X" in "HM" column for hazardous materials.

Single shipment pickup: ☐

Printed in U.S.A

EXHIBIT H

**Cepauskas, Monica**

| | |
|---|---|
| **From:** | Wallin, Karry |
| **Sent:** | Wednesday, March 11, 2020 1:17 PM |
| **To:** | 303.Clerical; Walker, Mike; Donley, James; Candre, Douglas; Smith, Michael |
| **Subject:** | drop off |

*KARRY WALLIN*

WE will not except any more frt from this customer.   Anthony Martino.
It is a drop off on the dock   But just in case he calls in for a pickup.
Or tries this with a different name   we should make sure the frt is packaged properly.
I'm not sure what this looked like   as it wasn't signed for damaged at the destination
No exceptions in our system.

This frt delivered clear  and we denied his claim and now we have a law suit.
The claim is for $1200.00  for a Stainless steel Steam oven.

Claims dept has requested that we do not except any more frt from this customer.

```
                      SHIPMENT ID: 349 045518 0
   PURPOSE: GR    ORIG: 303     P/U DATE: 01 27 20    GAT
BILL STA: B00   DEST: 213 1   DEL DATE: 01 29 20    APP
SERVICES: ** VELO **
BUS ID: 77136079079                   BUS ID: 80027
S/ ANTHONY MARTINO % YRC TERMINAL 30  C/ REYNA FOOD
1000 CHADDICK DR                      NICOLA DICIO
WHEELING IL 60090                     2031 PENN AVE
                                      PITTSBURGH PA

BUS ID: 79099609030 CHARGES: 192.54
ANTHONY MARTINO
ANTHONY MARTINO
580 VERNON LN
BUFFALO GROVE IL 60089


PAGE  1 OF 1                                      DIM: D
                      SHIPMENT ID: 349 045518 0                     Y
SHIPPER: ANTHONY MARTINO % YRC TERMI   CONSIGNEE: REYNA FOODS INC.
        DELIVERY INFORMATION    ORIGIN: 303       PLANNED TRANSFERS
** VELO **               ORIG DEST/Z: 213  1   TERM DOOR/TERM DOOR/TERM DOOR
                         REVS DEST/Z:         211          211
DUE DATE: 01 29 DUE DEST: 01 29
DELIVERY DATE: 01 29 20        TRANSFER HISTORY       NO EXCEPTIONS
TYP FROM              TO             DATE   TIME EXCEPTION W&I CHKR
PU  SHIPPER           TRLR DOCK      01 27 20
UL  UNKNOWN           TERM 303       01 27 20 19:08         * 3434
LO                    TRLR 129762    01 27 20 19:10           719
UL                    TERM 211       01 28 20 11:01         * 18
LO                    TRLR 140871    01 28 20 11:01           18
UL                    TERM 213       01 29 20 05:11
LO                    82705          01 29 20 07:41
DL                    CONSIGNEE'S LOCAL TIME 01 29 20 10:21
```

# EXHIBIT I

**Tariff 100 Item 179 (U.S. Domestic and Cross Border)**

**RULES, CHARGES AND ACCESSORIAL SERVICES**

**FILING OF CLAIMS**

Inquiry Date: JULY 06 2020
Effective date: OCTOBER 28 2017

UNIDENTIFIED PAYMENTS
  Definition - Payment which a carrier has received but which the carrier
  is unable to match with its open accounts receivable or otherwise
  identify as being due for the performance of transportation services.

  APPLICATION - U.S. Motor Carrier regulations allow carriers to
  conditionally retain these payments as revenue in the absence of a
  timely response by the payer.  After 90 days from the date of notice of
  unidentified funds, regular overcharge claims procedures will apply.

DUPLICATE AND OVERPAYMENTS
  Definition - Two or more payments for transporting the same shipment
  and payments made in excess of the stated amount resulting in an
  overpayment.

  APPLICATION - Claims for a refund of an overpayment or a refund of a
  duplicate payment of freight charges must be made in writing and
  received by the carrier within 180 days from date of the carrier's
  original freight bill.

OVERCHARGE CLAIMS
  Overcharge claims must be filed within 180 days from the date of the
  carrier's original freight bill.  You may file claims by using the form
  found in the YRC Forms Library at:

    http://www.yrc.com/shippers/shipformlib.html

  YRC will acknowledge claims within 30 days of receipt.
  Please include YRC Pro numbers in all correspondence.

CARGO LOSS AND DAMAGE CLAIMS
  Cargo Loss and Damage Claims must be filed within nine (9) months after
  the delivery of the property (or, in the case of export traffic, within
  nine (9) months after delivery to the port of export); except that
  claims for failure to make delivery must be filed within nine (9)
  months.  Any action at law or proceeding to recover for freight loss or
  damage shall be instituted against YRC no later than two (2) years from
  the date the claimant receives written disallowance of a claim. To the
  extent permitted by applicable law, the expiration of the time
  limitations noted above shall be a complete and absolute defense to any
  such action or proceeding, without regard to any mitigating or
  extenuating circumstances or excuse whatsoever.  You may file claims by
  using the form found in the YRC Forms Library at:

    http://www.yrc.com/shippers/shipformlib.html

  YRC will acknowledge claims within 30 days of receipt.
  Please include YRC Pro numbers in all correspondence.

ALLOWANCE AND INCENTIVE
  Defined as performing a service or tendering a volume of freight over a
  stated period of time. Unless otherwise provided, customer filed claims
  for allowance or incentives must be made in writing and received by the
  carrier within 60 days of shipment.

DEDUCTION OR OFFSETTING OF CLAIMS
  Pending or un-filed claims against the carrier for loss, damage, over
  collection, duplicate, overpayment, stating errors, or overcharge
  dollar amounts may not be deducted from freight charges billed to the
  claimant (the party who filed or will file the claim or claims).

TERMS OF PAYMENT CLAIMS
  As a result of the customer paying for freight charges due to errors
  made by the carrier when stating the Terms of  Payment; claims for an
  adjustment must be made in writing and received by the carrier within
  180 days from the date of the carrier's original freight bill.
      Terms of Payment include:
          Prepaid to Collect
          Collect to Prepaid
          Adding or Deleting Third Parties

CLASS ACTION WAIVER
  All claims shall be brought solely in a customer's individual
  capacity.  Customer agrees it will not bring an action against carrier
  as a class plaintiff or class representative, join a class as a
  member, or participate in any way as an adverse party in a class
  action lawsuit against carrier.  Claims may not be joined or
  consolidated unless agreed to in writing by all parties.

SETTLEMENT OF CLAIMS

  When Carrier settles any claims for cargo loss or damage, payment by
  Carrier to the party making the claim for cargo loss or damage
  (hereinafter "Claimant") is in full and complete satisfaction of any

and all claims, known or unknown, arising out of or relating to the claim submitted by Claimant.

Claimant on its own behalf and on behalf of its subrogors agrees and understands that in exchange for and in consideration of the payment by Carrier, which Claimant acknowledges receipt, Claimant and its respective subrogors, successors, heirs, assigns, agents, attorneys, representatives, insurers, any trustees or conservators appointed on their behalf, and all related business entities, including their parent, subsidiary, affiliated and related companies, together with its respective past, present and future predecessors, successors, assigns, officers, directors, shareholders, agents, attorneys, employees, insurers, and their respective heirs and legal representatives releases, discharges and acquits all claims, actions and causes of action which Claimant has against Carrier and its insurers, affiliates, agents, attorneys, servants, employees, successors or assigns and all related business entities, including their parent, subsidiary, affiliated and related companies, arising from any and all liability or claims of liability, whether known or unknown, for property damage or any other damage arising out of or relating to the claim submitted by Claimant.

Claimant agrees that it will not in the future pursue or agree to allow itself to be named as a pursuing party in any lawsuit of any kind against Carrier and its insurers, affiliates, agents, attorneys, servants, employees, successors or assigns and all related business entities, including their parent, subsidiary, affiliated and related companies, arising from any and all liability or claims of liability, whether known or unknown, for property damage or any other damage arising out of or relating to the claim submitted by Claimant. Claimant further agrees that in the event suit is pursued against Carrier or its insurers, affiliates, agents, attorneys, servants, employees, successors or assigns and all related business entities including their parent, subsidiary, affiliated and related companies, for all claims, costs, expenses, attorneys' fees, damages or amounts paid of any kind, arising out of or relating to the claim submitted by Claimant regardless of any alleged fault or negligence on behalf of Carrier.

Claimant warrants and represents that it has the right to payment for the claim; that Claimant has not assigned this claim to any other party; and that Claimant has not filed an insurance claim for the cargo loss or damage.

ISSUED BY
Vice President, Finance
10990 Roe Avenue, Overland Park, KS 66211