## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Proposed Objection Deadline**: |
| | ) | **October 23, 2023 at 8:00 a.m. (ET)** |
| | ) | |
| | ) | **Proposed Hearing Date**: |
| | ) | **October 23, 2023 at 10:00 a.m. (ET)** |
| | ) | |
| | ) | |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING
AGENCY AGREEMENT WITH NATIONS CAPITAL, LLC, RITCHIE
BROS. AUCTIONEERS (AMERICA) INC., IRONPLANET, INC., RITCHIE
BROS. AUCTIONEERS (CANADA) LTD., AND IRONPLANET CANADA
LTD. EFFECTIVE AS OF OCTOBER 16, 2023; (II) AUTHORIZING THE
SALE OF ROLLING STOCK ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors")

respectfully move (the "Motion") as follows[2]:

### RELIEF REQUESTED

1.      The Debtors seek entry of an order, substantially in the form attached as

**Exhibit A** (the "Order"), (i) approving the agency agreement (the "Agency Agreement") dated

as of October 16, 2023 by and between the Debtors and Nations Capital, LLC, Ritchie Bros.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]     Capitalized terms used but not immediately defined in this Motion have the meanings ascribed to them in the Agency Agreement or the Bidding Procedures Order and its related exhibits, as applicable.

Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bros. Auctioneers (Canada) Ltd,. and IronPlanet Canada Ltd. (collectively, the "Agent"), attached to the Order as **Exhibit 1**, (ii) authorizing and approving the sales by the Agent (acting on behalf of the Debtors) of Rolling Stock Assets free and clear of any liens, claims, interests and encumbrances, and (iii) granting related relief (effective upon the sale thereof).

## JURISDICTION AND VENUE

2.      The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105, 327, 328 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 2014 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2014-1 and 6004-1.

## BACKGROUND

5.      On August 6, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  These chapter 11 cases

have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 169].  The Debtors are managing their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On August 16, 2023, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 269] (the "Committee").  No trustee or examiner has been appointed in these chapter 11 cases.

7.      On September 15, 2023, the Court entered the *Order (I)(A) Approving Bidding Procedures for the Sale or Sales of the Debtors' Assets; (B) Scheduling Auctions and Approving the Form and Manner of Notice Thereof; (C) Approving Assumption and Assignment Procedures, (D) Scheduling Sale Hearings and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale or Sales of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 575] (the "Bidding Procedures Order").

8.      On September 21, 2023, the Court entered the *Order (I) Approving the Debtors' Selection of a Stalking Horse Bidder, (II) Approving Bid Protections in Connection Therewith, (III) and Granting Related Relief* [Docket No. 624].

9.      On October 16, 2023, the Debtors and the Agent entered into the Agency Agreement.  The Agency Agreement provides, as further described below and subject in all respects to the terms of the Agency Agreement, that the Debtors will engage the Agent to ready the Debtors' Rolling Stock Assets for sale and to dispose of the Rolling Stock Assets through private treaty, online, webcast, or unreserved public auctions to maximize the value of the

Rolling Stock Assets. The Agency Agreement also provides that the Agent may sell the Rolling Stock Assets from Company Properties, and will remove the remaining Rolling Stock Assets from Company Properties by no later than six (6) months from the entry of the Order (the "Removal Date") and transport the Rolling Stock Assets to Agent Properties, at which locations the Agent may conduct further sales of the Rolling Stock Assets.

10. Substantially contemporaneously herewith, the Debtors filed: (i) the *Motion of Debtors for Entry of an Order Shortening Notice of Motion of Debtors' for Entry of an Order (I) Approving Agency Agreement with Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bros. Auctioneers (Canada) Ltd. and IronPlanet Canada Ltd. Effective as of October 16, 2023; (II) Authorizing the Sale of Rolling Stock Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (III) Granting Related Relief* (the "Motion to Shorten"); (ii) the *Notice of Cancellation of Rolling Stock Auction* (the "Auction Cancellation Notice")[3]; (iii) the *Declaration of Cody Leung Kaldenberg in Support of Motion of Debtors for Entry of an Order (i) Approving Agency Agreement with Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bros. Auctioneers (Canada) Ltd. and IronPlanet Canada Ltd. Effective as of October 16, 2023; (II) Authorizing the Sale of Rolling Stock Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (III) Granting Related Relief* (the "Kaldenberg Declaration"); and (iv) the *Declaration of Disinterestedness of Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bros. Auctioneers (Canada) Ltd., and IronPlanet Canada Ltd.* (the "Agent Declaration," and together with the Kaldenberg Declaration, the "Declarations").

---

[3]    The Bidding Procedures Order sets Auction Dates for the Rolling Stock Assets (October 18, 2023) and the Real Property Assets and all other Assets (November 28, 2023).

11.     The Debtors have determined, in an exercise of their business judgment in consultation with their advisors and the Consultation Parties, to pursue sales of the Rolling Stock Assets under the Agency Agreement rather than as originally intended by the Debtors and their advisors pursuant to the Bidding Procedures Order.   The Agent possesses significant storage capacity for all of the Debtors' Rolling Stock Assets, which it intends to remove from Company Properties (and thereafter store at Agent Properties) within approximately six (6) months following entry of the Order.   This arrangement will reduce the Debtors' rent obligations and permit the Rolling Stock Assets to be sold over a more extended period of time than if the Debtors did not enter into the Agency Agreement.   For these and other reasons (as described herein and in the Kaldenberg Declaration), the Debtors determined that the Agency Agreement presented the most value-maximizing option for dispositions and sales of the Rolling Stock Assets.

## The Agency Agreement

12.     The Debtors filed these chapter 11 cases to conduct an orderly and value-maximizing liquidation of their extensive portfolio of real estate and trucking Assets.   To that end, the Debtors and their advisors have engaged with hundreds of prospective purchasers of the Assets, including under the terms and conditions of the Bidding Procedures Order.   To maximize the value of the Rolling Stock Assets, the Debtors, with the support of their key creditor constituents, including those with priority liens on the Rolling Stock Assets, respectfully submit that the relief requested herein—*i.e.*, to retain the Agent as the Debtors' exclusive broker and auctioneer of the Rolling Stock Assets—will best position the estates to maximize the value of the Rolling Stock Assets.

13. As described in further detail below, the relief requested herein should be authorized for several reasons. *First*, the Agent possesses unparalleled and market-leading expertise, experience, and relationships for marketing and selling the Rolling Stock Assets in a value-maximizing manner. *Second*, the Agent has the capability (including sufficient manpower and storage space) to remove the Rolling Stock Assets from the Company Properties no later than the Removal Date. *Third*, the Agent will reasonably refurbish the Rolling Stock Assets, if needed, to best position them for value-maximizing sales. *Fourth*, the Agent will execute the foregoing as promptly as commercially practicable, including by "clearing" the Company Properties of the Rolling Stock Assets by the Removal Date (a capability the Debtors lack) so that the Debtors' Real Property Assets purchaser(s) may enter and utilize those premises. *Fifth*, as described in the Kaldenberg Declaration, the Agency Agreement sets forth terms and conditions that are commercially reasonable, were executed at arms'-length and in good faith, and reflect an exercise of the Debtors' sound business judgment. *Sixth*, the relief contained herein has the support of the Debtors' key creditor constituents, including the Creditors' Committee, the Prepetition UST Secured Parties (which hold a significant number of first-priority liens on the Rolling Stock Assets), the B-2 Parties, and the Junior DIP Secured Parties.

14. The Debtors believe that the Agency Agreement will provide the best overall solution for a value-maximizing liquidation of the Rolling Stock Assets (including their removal from the Company Properties). Under the Agency Agreement, the Agent has offered competitive and commercially reasonable economic terms. These terms and conditions were negotiated at arms'-length and in good faith with the Debtors. Under the Agency Agreement, the Agent may conduct any combination of commercial sales, public unreserved auctions, and online sales—pursuant to strategies approved by the Debtors in consultation with the Consultation

Parties—to maximize liquidation values of the Rolling Stock Assets for the benefit of creditor recoveries.[45]

15.    In sum, the Agent's industry-leading marketing and auction platforms, extensive experience in conducting value-maximizing liquidations of this magnitude, and proven capabilities to market, sell, transport, and store the Rolling Stock Assets will best position the Rolling Stock Assets to achieve the highest possible liquidation values.  Accordingly, the relief requested herein should be approved.

16.    A summary of the material terms of the Agency Agreement is set forth below:[6]

| Term | Agency Agreement |
| --- | --- |
| **The Agent's Services** | In connection with the marketing, disposition and sale (including removal, transportation, and storage of, as applicable) of the Rolling Stock Assets (the "<u>Rolling Stock Services</u>"), Agent will:<br><br>(i)    develop an advertising, removal, transportation, storage, disposition and marketing plan (including the timing, sale modality and location) for the marketing, removal, transportation, storage, and sale of the Rolling Stock Assets (the "<u>Disposition Plan</u>") within forty-five (45) days of the entry of the Retention Order designed to maximize the net recovery on the Rolling Stock Assets and consult with Company (in consultation with the |

---

[4]    Currently, Rolling Stock Assets only includes the assets listed in <u>Exhibit A</u> to the Agency Agreement.  The Debtors request the authority to modify <u>Exhibit A</u> to the Agency Agreement in the future without further order of the Court.

[5]    Pursuant to the Agency Agreement, the Agent will market and sell the Rolling Stock Assets both in live and online formats, in multiple phases as needed through both private sales and public auctions.  Such auctions are customarily held in the trucking industry with no reserving, meaning that there are no minimum bid requirements.  Unreserved auctions are designed to maximize value by eliminating barriers to entry and creating a global marketplace where competition for the goods can flourish.  The Agent's private sale process is generally based on the prevailing market rates set at recent auctions, but are effectuated outside of the auction process because the applicable parties were able to facilitate ethe sale through private channels.  These private sales can reduce transaction costs and the duration of the sale process.

[6]    This summary is provided for convenience purposes only.  To the extent any of the terms described below are inconsistent with the Agency Agreement, the Agency Agreement shall control in all respects.

Consultation Parties) with respect to the foregoing plan;

(ii)    implement the advertising, removal, transportation, storage, disposition and marketing plan as deemed necessary or appropriate by Agent and provide the Company (which shall, in turn, provide the Consultation Parties) with weekly updates on the implementation of such plan;

(iii)   prepare for the sale of the Rolling Stock Assets, including gathering specifications and photographs for pictorial brochures or other advertising means and arranging (including removing and transporting to Agent Properties (as applicable) and refurbishing (as applicable)) the Rolling Stock Assets in a manner, which in Agent's commercially reasonable judgment is designed to enhance the net recovery on the Rolling Stock Assets;

(iv)   provide fully qualified and experienced personnel who will advertise, market, prepare for sale and sell the Rolling Stock Assets and promptly account for the proceeds thereof in accordance with the terms of this Agreement;

(v)    provide additional staffing to handle all auction-related accounting tasks, including a complete auction crew to handle computerized accounting functions necessary to provide auction buyers with invoices and the Company with a complete accounting of all Rolling Stock Assets sold at any auction or otherwise;

(vi)   (A) organize, oversee, staff, and facilitate all aspects of purchasers' removal of Rolling Stock Assets from the Company Properties and (B) organize and provide fully qualified and experienced drivers, towing services, and other necessary and specialized personnel and services necessary on a commercially best efforts basis to remove (by either (a) on-site sale and removal by buyer or (b) removal and transportation by Agent) from Company Properties any and all Rolling Stock Assets within six (6) months of entry of the Retention Order (the "Removal Date") and to transport any such Rolling Stock Assets to commercially appropriate facilities owned or possessed by the entities comprising the Agent or their affiliates ("Agent Properties"), where Agent will store such Rolling Stock Assets in a commercially reasonable manner; *provided* that the Company agrees to coordinate with Agent to provide the minimum level of Company staffing (but not less than one) necessary to ensure Agent's access to Company Properties and ability to execute its obligations hereunder; *provided further* that Agent acknowledges and agrees it will provide substantially all staffing related to and necessary for the marketing, sale, removal, transportation, and storage of the Rolling Stock Assets during the Term as contemplated by this Agreement; *provided further* that Agent agrees to use commercially best efforts to remove all Rolling Stock Assets from all Company Properties by

the Removal Date, including its commercially best efforts to remove all Rolling Stock Assets from Priority Company Properties (defined below)[7] within three (3) months after the date of the entry of the Retention Order; *provided further* that Agent acknowledges and agrees that the Removal Date (*i.e.*, the date that is six (6) months from the date of entry of the Retention Order) shall not be extended except in Company's sole, exclusive, and reasonable discretion (in consultation with the Consultation Parties); *provided further*, however, if Company determines to not extend the Removal Date, Agent shall have the right to cure by continuing to use commercially best efforts to remove and transport remaining Rolling Stock Assets from Company Properties during the three (3) months following the Removal Date (the "Cure Period"), with any occupancy costs incurred by the Company during such Cure Period added to the Gross Proceeds tiered ranges set forth below; and *provided further* that Agent's failure to remove all Rolling Stock Assets (without Company's consent in consultation with the Consultation Parties) from Company Properties by the Removal Date (as may be extended or during any Cure Period) shall result only in a Gross Proceeds range upward adjustment as provided in Section III.B.(i) below, and Agent shall, following any cure period, unless agreed otherwise with the Company (in consultation with the Consultation Parties), use commercially best efforts to dispose of any remaining Rolling Stock Assets (y) at Company Properties "AS IS" "WHERE IS" and (z) at Agent Properties in Agent's commercially reasonable discretion either (1) "AS IS" "WHERE IS" or (2) if any Rolling Stock Services Expenses budget remains, refurbished in an effort to maximize the Gross Proceeds of such Rolling Stock Assets at Agent Properties, as promptly as commercially practicable, with any additional occupancy costs incurred by the Company adjusting the Gross Proceeds tiers upwards by such costs incurred following the Removal Date.  For the avoidance of doubt, (m) the Company's sole and exclusive remedy for the Agent's failure to remove all Rolling Stock Assets from Company Properties by the Removal Date, as may be extended by agreement or by the expiration of the Cure Period, or by the expiration of the Term, shall be an increase in the Gross Proceeds range upward adjustment as provided in Section III.B.(i) below and (n) Agent shall not be liable for any actual, special, consequential or punitive damages; *provided* that nothing in this Section III(A)(vi) shall remove or otherwise limit the Company's termination rights under this Agreement, including but not limited to, for cause.

(vii)    as part of the Disposition Plan, recommend (and consult with the Company

---

[7]    "Priority Company Properties" shall mean those Company Properties provided in a list by the Company to Agent within two (2) business days following entry of the Retention Order which (a) Agent shall use its commercially best efforts to clear of Rolling Stock Assets within three (3) months after the date of the entry of the Retention Order and (b) amount to no more than fifty (50%) of the Company Properties.  Company and Agent may adjust the list of Priority Company Properties thereafter to the extent agreed and commercially practicable.

(in consultation with the Consultation Parties)) and manage refurbishment (including, *e.g.*, cleaning, topping off fluids, replacement of tires and batteries, etc.) of certain of the Rolling Stock Assets to prepare for sales, in each case where appropriate and value-maximizing, and arrange for, oversee, and execute all other tasks in connection with same;

(viii)    sell the Rolling Stock Assets for cash or other immediately available funds at live, internet or internet-assisted auctions or by private treaty to the highest bidder(s) pursuant to standard buyer terms and conditions and on an "AS IS," "WHERE IS" and "all sales are final" bases. Only sales by private treaty and Strategic Bulk Sales (as defined below) shall be subject to approval by the Company (not to be unreasonably withheld or delayed) in consultation with and following notice to the Consultation Parties and their advisors).  Sales of Rolling Stock Assets at live, internet, or internet-assisted auctions shall not be subject to the Company's consent; *provided*, however, for the avoidance of doubt, the approximate timing of such auctions and the scope of Rolling Stock Assets included therein shall be subject to the Company's consent (not to be unreasonably withheld or delayed) in consultation with the Consultation Parties;

(ix)    charge and collect on behalf of Company from all purchasers any purchase price together with all applicable taxes in connection therewith and manage and administer the processing of all Company certificates of title associated with titled Rolling Stock Assets;

(x)    assist the Company and/or its advisors as necessary to obtain all required approvals and authorizations from the Bankruptcy Court or the Canadian Court (as defined in the Bidding Procedures Order) with respect to any sale of Rolling Stock Assets contemplated herein, which assistance may include, without limitation, testimony at hearings before the Bankruptcy Court or the Canadian Court, attendance at depositions and/or the provision of declarations or affidavits in support of Rolling Stock Asset sales (provided that Agent shall not be responsible for the costs of such assistance); provided, however, time spent preparing to deliver testimony (whether in court or for purposes of a deposition), attending court proceedings, and delivering any testimony in court or during a deposition will be charged on a time and materials basis based on Agent's then prevailing hourly rates ("Testimony Fees"), which Testimony Fees are not otherwise included in Agent's compensation set forth herein, and Agent shall be reimbursed for reasonable attorney's fees and expenses incurred in connection therewith; *provided*, however, Agent's legal fees in connection with the foregoing (which shall be limited to those of one law firm) and Testimony Fees shall not be subject to the limitation on expenses in Section III.B.(i);

(xi)    work with the Company and/or its advisors to prepare reports, statements, affidavits or similar documents required under Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") or any applicable

|  | local rule (including, if necessary, as part of the Canadian Recognition Proceeding (as defined in the Bidding Procedures Order)); |
|--|--|
|  | (xii)    collect Gross Proceeds generated by the sale of the Rolling Stock Assets and account and remit net proceeds (Gross Proceeds less any amounts due to Agent hereunder, the "<u>Net Proceeds</u>") to the Company by transferring the Net Proceeds to an account as directed by the Company (the "<u>Client Account</u>"), provided that the Agent shall remit all collected Net Proceeds to the Client Account together with a settlement statement (a) with respect to any sale to a single purchaser generating Gross Proceeds in excess of $10,000,000, within five (5) business days following Agent's receipt of good funds on account of such Gross Proceeds from any such purchaser and (b) with respect to all other sales, on a rolling basis in each case as promptly as commercially practicable (and at least every fourteen (14) calendar days following the commencement of the Rolling Stock Assets sales), subject to a periodic true up and audit procedures to be agreed between the Agent and the Company (in consultation with the Consultation Parties) to reflect the actual calculation of the Rolling Stock Services Fees (defined below) earned by the Agent during such period (if such amounts have not already been earned and withheld by Agent) and reimbursement of Rolling Stock Services Expenses (defined below) and Transportation Fees (defined below). The Company shall provide a copy of each settlement statement to the Consultation Parties.  In connection with any true up and/or audit of the Net Proceeds, Rolling Stock Services Fees, Rolling Stock Services Expenses and Transportation Fees, the Company shall be granted access to all accounting and information necessary to complete the audit/true up (and the Consultation Parties shall have access to such accounting and information from the Company, once provided to the Company).  "Gross Proceeds" shall be defined as cumulative collected gross receipts from the sale of the Rolling Stock Assets, exclusive of sales taxes and Transaction Fees (defined below) charged to purchasers; |
|  | (xiii)    only if and to the extent required and requested by the Company, procure or provide insurance coverage on the Company's behalf at rates lower (if available) than the rates paid by the Company for Rolling Stock Assets only once such assets are delivered to certain of the Agent Properties; |
|  | (xiv)    submit to the Company and its advisors (which shall provide the same, upon receipt, to the Consultation Parties and their advisors) (a) bi-weekly sales reports and (b) a final and complete sales report no later than fourteen (14) calendar days after the end of the Term. |
| **Term of Agency Agreement** | Eighteen (18) months following from the Effective Date. |
| **Sale Format** | For purposes of marketing and selling the Rolling Stock Assets, Agent shall market and sell the Rolling Stock Assets during the Term (defined below) of this Agreement |

|  | substantially consistent with the Disposition Plan (defined below) utilizing private treaty, online, webcast, or unreserved public auctions, and such other sale strategies as the Company (in consultation with the Consultation Parties (as defined in the Bidding Procedures Order) (as defined below)) and Agent mutually agree.[8] |
|---|---|

---

[8] For the avoidance of doubt, any reference herein to the consultation rights of the Consultation Parties shall mean the Company's (not Agent's) obligation to consult with the Consultation Parties in each applicable case.

| **Compensation** | (i) | In consideration of its performance of the Rolling Stock Services, the Rolling Stock Services Fee shall be a percentage of the Gross Proceeds collected and payable on sales of owned Rolling Stock Assets, in accordance with the table below: |
|---|---|---|

| Tier | Start | End | Fee |
|---|---|---|---|
| 1 | $0 | $475,000,000 | ███ |
| 2 | $475,000,001 | $600,000,000 | ███ |
| 3 | $600,000,001 | $800,000,000 | ███ |
| 4 | $800,000,001 | Above $800,000,001 | ███ |

With respect to Rolling Stock Assets that are missing or are in unsalable condition only (as reasonably determined by Agent, "Unsaleable Assets"), the Gross Proceeds ranges shown above will be adjusted downward based on existing orderly liquidation values provided to and accepted by the Agent. Agent acknowledges it has reviewed and accepted such orderly liquidation values of the Rolling Stock Assets provided by the Company to Agent in the Company's data room in advance of entering this Agreement. In the event adjustment(s) are required pursuant to this provision, each tier of Gross Proceeds shown above will be adjusted downward ratably based on the contribution of the Unsalable Assets to the total orderly liquidation values provided to and accepted by the Agent. The Gross Proceeds ranges shown above will be adjusted downward based on Strategic Bulk Sales.

Pursuant to Section III.C of this Agreement, Agent will work with Company to mutually agree upon budgeted amounts for Rolling Stock Services Expenses and Transportation Fees (each as defined herein). In the event total budgeted amounts of Rolling Stock Services Expenses (excluding title transfer fees) and Transportation Fees exceeds $38.4 million, each of the Gross Proceeds ranges shown above will be adjusted upward by the dollar amount that the total budgeted amounts exceed $38.4 million. Further, in the event the Company incurs occupancy costs after the Removal Date solely on account of Rolling Stock Assets remaining on such properties, each of the Gross Proceeds ranges shown above will be adjusted upward by the dollar amount of such occupancy costs pursuant to Section III.A(vi); *provided*, however, if the Company (in consultation with the Consultation Parties) and Agent agree to extend the Removal Date (including by amendment to the Disposition Plan) in order to maximize the Gross Proceeds, then the Gross Proceeds ranges shown above will not be adjusted upwards unless additional costs are incurred beyond such extended Removal Date; *provided further*

|  | | that Agent acknowledges and agrees that the Removal Date (*i.e.*, the date that is six (6) months from the date of entry of the Retention Order) shall not be extended except in the Company's sole and exclusive discretion.<br><br>For the avoidance of doubt, the above ranges apply marginally, *i.e.*, the next fee tier only applies to each dollar of Gross Proceeds in excess of the cutoff for the prior tier.<br><br>With respect to leased Rolling Stock Assets, the Rolling Stock Services Fee shall be ▮ for any amount of Gross Proceeds therefrom. |
|  | (ii) | The Company has indicated that it will share with Agent a list of potential buyers who have each expressed an interest in purchasing a sub-set of the Rolling Stock Assets.  Any lists provided must be from specific buyers on a specific list of the Rolling Stock Assets. Agent and the Company's representatives (in consultation with the Consultation Parties, to the extent required under the Bidding Procedures Order) will assess these expressions of interest and mutually determine whether or not to negotiate and execute any such sales. In the event that binding transaction documentation for any such sales is executed within sixty (60) days of the entry of the Retention Order (such sales, "<u>Strategic Bulk Sales</u>"), which such transaction documentation shall set forth the purchase price for each Rolling Stock Asset and across categories of Rolling Stock Assets, Agent will reduce its commission rate to ▮ for those applicable Rolling Stock Assets sold pursuant to Strategic Bulk Sales; *provided*, however, Agent shall be entitled to the full commission rate for any portion of the Gross Proceeds of such Strategic Bulk Sales for Rolling Stock Assets that were not initially included in the specific list provided by the Company and that are directly attributable to Agent's services and efforts that resulted in  increased Gross Proceeds generated on account of such increase in units sold or pricing.   For the avoidance of doubt, any Strategic Bulk Sales at the reduced commission rate shall cause a downward adjustment of the Gross Proceeds tiers described in Section III.B(i) above based on existing orderly liquidation values provided to and accepted by the Agent. |
| **Expenses** | | Agent shall market and sell the Rolling Stock Assets in a commercially practical and prompt manner, including in various phases if commercially reasonable to do so, consistent with the Disposition Plan and this Agreement.  Agent shall advance (up to the agreed Rolling Stock Services Expenses budget)[9], and shall be entitled to reimbursement by the Company for all Rolling Stock Services Expenses on a cost basis, regardless of whether or not any Rolling Stock Assets are sold, and which expenses shall be recovered from the collected Gross Proceeds of the sale of Rolling Stock Assets only.  "Rolling Stock Services Expenses" mean the Agent's commercially reasonable and documented |

---

[9]    The Parties will discuss and agree to the Rolling Stock Expenses budget as promptly as practicable following the Effective Date.

out-of-pocket expenses for repair and refurbishment costs to be incurred solely to maximize the Net Proceeds to the Company and title transfer fees equal to or less than (if applicable) $50.00 per title. Agent will not charge the Company for storage of any Rolling Stock Assets following their removal of such Rolling Stock Assets from the Company Properties. Notwithstanding anything to the contrary provided herein, Agent shall not be obligated to advance payment of Rolling Stock Services Expenses or Transportation Fees in excess of the Rolling Stock Services Expenses budget or the Transportation Fees budget, respectively, and shall thereafter use commercially best efforts, unless agreed otherwise with the Company, to dispose of the remaining Rolling Stock Assets "AS IS" "WHERE IS" during the duration of the Term, with any additional costs incurred by the Company for occupancy adjusting the Gross Proceeds tiers upwards by such costs incurred following the Removal Date; *provided* that if the aggregate of Rolling Stock Services Expenses and Transportation Fees incurred exceed $38.4 million (not to be exceeded without Company's prior written consent in consultation with the Consultation Parties), then the Gross Proceeds ranges in Section III.B.(i) above shall be adjusted upwards by such amount in excess of $38.4 million.

Agent shall advance (up to the agreed Transportation Fees budget)[10] and shall be entitled to reimbursement of its expenses on a cost basis for (a) removing all Rolling Stock Assets from off the Company Properties' premises consistent with the Disposition Plan and this Agreement and (b) transporting such Rolling Stock Assets to Agent Locations in a commercially practicable and economical manner (such fees and costs, the "Transportation Fees"). In addition to the Rolling Stock Services Fees, the Company shall be responsible for Transportation Fees, both of which shall be recovered from the collected Gross Proceeds derived from the sale of Rolling Stock Assets only. Notwithstanding anything to the contrary provided herein, Agent shall not be obligated to advance payment of Rolling Stock Services Expenses or Transportation Fees in excess of the Rolling Stock Services Expenses budget or the Transportation Fees budget, respectively, and shall thereafter use commercially best efforts, unless agreed otherwise with the Company, to dispose of the remaining Rolling Stock Assets "AS IS" "WHERE IS" during the duration of the Term, with any additional costs incurred by the Company for occupancy adjusting the Gross Proceeds tiers upwards by such costs incurred; *provided* that if the aggregate of Rolling Stock Services Expenses and Transportation Fees incurred exceed $38.4 million (not to be exceeded without Company's prior written consent in consultation with the Consultation Parties), then the Gross Proceeds ranges in Section III.B.(i) above shall be adjusted upwards by such amount in excess of $38.4 million.

Agent shall provide the Company (which shall in turn provide to the Consultation Parties) an updated Rolling Stock Services Expenses budget and an updated Transportation Fees budget as promptly as practicable (and no event later than fourteen (14) days) following Agent's incurrence of eighty (80) percent, or $30.7 million, of the abovementioned $38.4 million budget for Rolling Stock Services Expenses and

---

[10] The Parties will discuss and agree to the Transportation Fees budget as promptly as practicable following the Effective Date.

|  | Transportation Fees. |
|---|---|
|  | Agent is authorized to charge purchasers a transaction fee (the "<u>Transaction Fee</u>"). With respect to Rolling Stock Assets sold at a public auction run by Ritchie Bros. Auctioneers (America) Inc. or its affiliates, any Transaction Fee collected shall not exceed the following: (a) ████ on all lots selling for USD 12,000 or less, with a minimum fee of USD ██ per lot,[11] (b) ████ on all lots selling for over USD 12,000 up to USD 75,000, with a minimum fee of USD ██ per lot or, (c) USD ██ on all lots selling for over USD 75,000. For the avoidance of doubt, any Rolling Stock Assets sold through a private treaty or other mutually agreeable sales platforms that are not sold via public unreserved auction shall not be subject to the Transaction Fee. The Transaction Fee shall not be considered Gross Proceeds for the purpose of calculating the Rolling Stock Services Fees hereunder. Agent agrees that ████ percent of each Transaction Fee shall be credited against the Rolling Stock Service Fee earned and owing to Agent in connection with the applicable sale. |
| **Indemnification** | Agent understands that the Rolling Stock Assets will be sold AS IS and WHERE IS, without representation or warranty of any nature of kind whatsoever, and the Company does not make any representations or warranties with respect to the Rolling Stock Assets, except for specifically stated under Section VI of this Agreement (provided, however, any existing or remaining manufacturer's warranty shall remain and be transferred to the extent permissible and practicable to any buyer). The Company hereby agrees to indemnify and hold Agent harmless from any and all claims, causes of actions, damages, losses, or liabilities (including, without limitation, reasonable and documented attorney's fees) of any kind arising from or related to (i) the Company's material breach of any of its obligations, representations and warranties hereunder, (ii) its performance or failure to perform hereunder, (iii) the Company's failure to pay any personal property taxes associated with the Rolling Stock Assets, and (iv) the fraud, negligence, gross negligence (including omissions) or willful misconduct of the Company, its officers, directors, employees, agents or representatives. The Company further agrees to indemnify and hold Agent harmless from any and all claims, causes of actions, damages, losses, or liabilities (including, without limitation, reasonable attorney's fees) of any kind arising from any misrepresentations concerning the Rolling Stock Assets made by the Company to Agent. Notwithstanding the foregoing, the Company shall not in any circumstances indemnify Agent from any claims or causes of action arising from any fraud, negligence, gross negligence (including omissions) or willful misconduct of Agent or its respective officers, directors, employees, agents, contractors, consultants or representatives. |
|  | Agent hereby agrees to indemnify and hold the Company and its affiliates and their officers, directors, principals, shareholders, affiliates, members, consultants, attorneys, advisors, and employees (collectively, "<u>Company Indemnified Parties</u>") harmless from any and all claims, causes of actions, damages, losses, or liabilities (including, without limitation, reasonable attorney's fees), including those asserted by any buyer or |

---

[11] For purposes of this Agreement, a "lot" shall be defined as a single Rolling Stock Asset.

<table>
<tr><td></td><td>prospective buyer, arising from or related to (i) Agent's material breach of any of its obligations, representations and warranties hereunder, (ii) its performance or failure to perform hereunder, (iii) the fraud, negligence, gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents, Third Parties, affiliates, contractors or representatives, or (iv) any liability or other claims asserted by Agent's consultants, members, employees, representatives, affiliates, contractors and principals (excluding Company Indemnified Parties) against a Company Indemnified Party arising out of or related to Agent's conduct of the sale of the Rolling Stock Assets, except claims arising from the Company's gross negligence, willful misconduct or unlawful behavior.  Notwithstanding the foregoing, Agent shall not in any circumstances indemnify Company from any claims or causes of action arising from any fraud, negligence, gross negligence (including omissions) or willful misconduct of the Company or its respective officers, directors, employees, agents, contractors, consultants or representatives.</td></tr>
</table>

## **BASIS FOR RELIEF**

17.    For the reasons explained herein and in the Kaldenberg Declaration, the Debtors believe that approval of the Agency Agreement, retention of the Agent as the Debtors' exclusive marketer, broker, and auctioneer for the Rolling Stock Assets, and the Agent's sale (on the Debtors' behalf) of the Rolling Stock Assets free and clear of liens, interests, and encumbrances (effective upon the sale thereof) is in the best interests of the Debtors, their creditors, and their estates.

**I.    The Court Should Authorize the Retention of the Agent as the Debtors' Exclusive Broker and Auctioneer for the Rolling Stock Assets.**

18.    Section 327(a) of the Bankruptcy Code provides that a debtor, subject to court approval:

> [M]ay employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor's] duties under this title.

11 U.S.C. § 327(a).  To the best of the Debtors' knowledge, information, and belief, which are based upon and in reliance upon the representations of disinterestedness set forth in the Agent

Declaration filed contemporaneously herewith, the Agent (i) does not hold any interest materially adverse to the Debtors' estates; (ii) has no material connection with the Debtors, the creditors, any other party in interest or related parties herein outside of these chapter 11 cases; and (iii) is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code. Given that the Agent is a national auctioneer specializing in the sale of truck tractors, trailers, and other personal property, the Agent has served as auctioneer to sell assets for, or has other relationships with, one or more of the Debtors' creditors. Nonetheless, based upon the Agent Declaration, the Agent is not working for or on behalf of any of the Debtors' creditors in connection with this matter and no such relationship is material to the Agent. Accordingly, the Debtors respectfully submit that the Agent satisfies the requirements of section 327(a) of the Bankruptcy Code and can act as the Debtors' exclusive marketer, broker, and auctioneer for the Rolling Stock Assets pursuant to the Agency Agreement.[12]

19.     Additionally, the Debtors seek approval of the terms of the Agency Agreement, including the proposed compensation to be paid to the Agent, pursuant to section 328(a) of the Bankruptcy Code. Section 328(a) of the Bankruptcy Code provides, in relevant part, that debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327. . . on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis . . ." 11 U.S.C. § 328(a). Accordingly, section 328 permits the

---

[12]   To the extent that any new relevant facts or relationships bearing on the matters described herein during the period of the Agent's retention are discovered or arise, the Agent will use reasonable efforts to promptly disclose such facts or relationships.

compensation of professionals on flexible terms that reflect the nature of their services and market conditions.

20.     The Debtors respectfully submit that the terms and conditions of the Agency Agreement are fair, reasonable, and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.  In accordance with the Agency Agreement, the Agent shall receive a commission based on the gross sale price of the Rolling Stock Assets as follows (subject to the adjustments as set forth in the Agency Agreement): (a) ████ for sales of Rolling Stock Assets realizing up to $475 million; (b) ███ for a sale realizing between $475,000,001 and $600 million; ████ for a sale realizing between $600,000,001 and $800 million; and ███ for a sale realizing more than $800,000,001.  For the reasons previously stated and described further below, the Debtors submit that entry into the Agency Agreement is necessary and in the best interests of the Debtors and their estates.

21.     Accordingly, the retention and employment of the Agent pursuant to the terms of the Agency Agreement is reasonable under the circumstances and is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

## II.     Entry into the Agency Agreement for the Agent's Marketing and Selling of the Rolling Stock Assets Reflects a Sound Exercise of the Debtors' Business Judgment.

22.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). This Court's power under section 363 is supplemented by section 105(a), which provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title…." § 105(a).

23.    A debtor should be authorized to sell assets out of the ordinary course of business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan of reorganization if it demonstrates a sound business purpose for doing so. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (finding that the sale of substantially all of debtor's assets outside of a plan of reorganization is appropriate when a sound business reason justifies such a sale); *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 394–95 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070–71 (2d Cir. 1983).

24.    Here, the Debtors submit that the Agent's marketing and selling the Rolling Stock Assets on the Debtors' behalf pursuant to the Agency Agreement is an exercise of sound business judgment.  The Agent possesses the unparalleled ability to maximize the amounts realized from the sales of the Rolling Stock Assets, given its specialized and widespread access to the freight markets and its extensive experience with assets of this nature.  Further, the Agent can and will immediately take steps to reasonably refurbish the Rolling Stock Assets if needed to maximize sale values.  The Agent has conducted liquidation processes in various high-profile assignments in the Debtors' industry for the benefit of creditor recoveries.  Thus, the Agent is uniquely qualified to execute its obligations under the Agency Agreement and to assist the Debtors in maximizing the value of the Rolling Stock.

25.    Given the vast numbers of tractors and trailers comprising the Debtors' geographically dispersed Rolling Stock Assets and the Agent's access to Agent Properties, as well as the specialized market for the Rolling Stock Assets and the Debtors' present lack of manpower and transportation resources, the Debtors determined that the most efficient method for disposing of the Rolling Stock Assets in a value-maximizing manner would be with the

assistance of an auctioneer experienced with and well-known in the trailer and tractor markets, including with the resources and capabilities necessary to remove from Company Properties, transport, and store the Rolling Stock Assets. Any attempt by the Debtors to liquidate the Rolling Stock Assets (including to refurbish Rolling Stock Assets and to transport the Rolling Stock Assets off of Company Properties) would require the Debtors, which terminated nearly all of their workforce at the outset of these chapter 11 cases, to significantly increase their existing operational capabilities and personnel.

26. The Agent is the only auctioneer available to the Debtors that has the capability to remove and transport the Rolling Stock Assets off of the Company Properties by the Removal Date (*i.e.*, six (6) months from entry of the Order). Removing the Rolling Stock Assets off the Company Properties by the Removal Date (and thereafter storing and selling the Rolling Stock Assets at the Agent Properties) is critical to ensuring that the Company Properties can be sold in a value maximizing manner and utilized by the eventual purchaser(s) without the hindrance of the Rolling Stock Assets still on premises.

27. Further, by utilizing the Agent's services to remove the Rolling Stock Assets from Company Properties, the Debtors will be able to minimize rent and other expenses at the Company Properties (which will continue to accrue with each additional month the Company Properties are not cleared of the Rolling Stock Asserts). Sale closings relating to the Company Properties are expected to occur in or around the first two months of 2024. Lacking the resources and personnel to clear the Company Properties, the Debtors require the services and expertise of the Agent to efficiently and expeditiously accomplish this task. Doing so will maximize the value of the Real Property Assets pursuant to the ongoing Sale Process under the

Bidding Procedures Order, save significant costs for the estates, and ultimately maximize stakeholder recoveries.

28.     As mentioned, the Agent is an industry-leading marketer, auctioneer, and broker of assets of this type with vast industry connections and experience.  The Agent possesses the expertise and the resources to efficiently and expeditiously market, sell, transport, and store the Rolling Stock Assets in a value-maximizing manner.  The Agent is best positioned to market the Rolling Stock Assets extensively and to ensure that the Debtors receive the highest or otherwise best offers and Net Proceeds achievable for the Rolling Stock Assets.

29.     The Agent has been in the business of, among other things, refurbishing and selling heavy equipment and trucks since 1958. With a global network that includes over forty permanent auction sites around the world and operations in more than fifteen countries, the Agent sells billions of dollars of heavy equipment and trucks and trailers each year and helps thousands of people and companies around the world appraise, sell, inspect, buy, refurbish, ship and finance heavy equipment, trucks, and other assets every month.

30.     Accordingly, the Debtors believe that the entry into the Agency Agreement and retention of the Agent will provide the best method for selling the Rolling Stock Assets in a manner that will maximize creditor recoveries.  The Debtors respectfully submit that they have satisfied the requirements of sections 105 and 363 as those sections have been construed by courts in the Third Circuit and that the sale of the Rolling Stock Assets by the Agent, whether by auction or private sale, meets the standard set forth in section 363(b) for sales outside of the ordinary course of a debtor's business.

III.     **The Court Should Authorize Entry into the Agency Agreement Effective as of October 16, 2023.**

31.     The Debtors request approval of the Agency Agreement with the Agent effective as of October 16, 2023.  The Third Circuit has identified "time pressure to begin service" and absence of prejudice as factors favoring *nunc pro tunc* retention.  *See Matter of Arkansas Co.*, 798 F.2d 645, 650 (3d Cir. 1986); *see also In re Indian River Homes, Inc.*, 108 B.R. 46, 52 (D. Del. 1989).  Given the exigencies of these cases, the Debtors require the Agent to commence work immediately.  Under these circumstances, no party will be prejudiced, and *nunc pro tunc* relief should be approved.  Accordingly, the Debtors believe that approval of the Agency Agreement effective as of October 16, 2023, on the terms and conditions proposed herein and in the Agency Agreement, is appropriate.

IV.     **Sales of the Rolling Stock Assets Free and Clear of All Encumbrances Is Authorized under Section 363(f) of the Bankruptcy Code.**

32.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

33.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfying any one of its five requirements will suffice to permit the sale of the assets "free and clear" of liens and interests.  *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); *see also*

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132,

1147 n.24 (6th Cir. 1991) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y.

1986) (same).  Furthermore, a debtor possesses broad authority to sell assets free and clear of

liens.  *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3d Cir. 2003).

34.     The Debtors submit that, in the interest of attracting the best offers and

highest Net Proceeds for the Rolling Stock Assets, it is appropriate to sell the Rolling Stock

Assets free and clear of any and all encumbrances in accordance with section 363(f) of the

Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to

such Sale.  In particular, the Debtors submit that section 363(f)(2) of the Bankruptcy Code will

be met as to their Secured Parties (defined below).

35.     The Debtors stipulate that the Rolling Stock Assets are subject to the liens

of the Prepetition Secured Parties, the Prepetition UST Secured Parties, and the Junior DIP

Secured Parties (collectively, the "Secured Parties") as set forth in the DIP Orders, the UST Cash

Collateral Orders, and the Prepetition Intercreditor Agreement, as applicable.  Such liens will

attach to the Net Proceeds of each sale of the Rolling Stock Assets, including on the Client

Account where the Net Proceeds will be deposited, for the benefit of the Secured Parties, in

accordance with the Final DIP Order and the Final UST Cash Collateral Order, as applicable,

and each of the foregoing parties has consented to or is expected to consent to the sales of the

Rolling Stock Assets by the Agent, on behalf of the Debtors, pursuant to the Agency Agreement.

Therefore, the Rolling Stock Assets may be sold free and clear under section 363(f)(2).

36.     Moreover, with respect to any other party asserting a lien, claim, or

encumbrance against the Rolling Stock Assets, the Debtors anticipate that they will be able to

satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In

particular, known lienholders, if any, will receive notice of this Motion and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the relief requested in this Motion should be deemed to have consented.  *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).  Consistent with the foregoing, the notice of this Motion provides that the absence of a timely objection to the sale of the assets in accordance therewith shall be "consent" to such sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

37.     A sale of the Rolling Stock Assets other than one "free and clear" of all interests would yield substantially less value for the Debtors' estates.  The Debtors submit that potential purchasers are unlikely to consummate a sale absent the ability to purchase the Rolling Stock Asset(s) free and clear of all liens, claims, encumbrances, and interests.  Accordingly, the Debtors request that the Rolling Stock Assets be authorized to be sold free and clear with any such liens, claims, encumbrances, and interests attaching to the Net Proceeds of the sale, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto.

38.     In approving the sales by the Agent (acting on the Debtors' behalf) of the Rolling Stock Assets free and clear of liens, claims, interests, or encumbrances, the Debtors request that the Court find that those who purchase the Rolling Stock Assets through the Agent's

sale process are entitled to the protections afforded by section 363(m) of the Bankruptcy Code. This relief is appropriate in light of the opportunity for review and objection provided herein.

## **WAIVER OF BANKRUPTCY RULE 6004**

39.  To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **NOTICE**

40.  The Debtors will provide notice of this motion to: (a) the U.S. Trustee; (b) Akin Gump Strauss Hauer & Feld LLP, as counsel to the Committee; (c) Arnold & Porter Kaye Scholer LLP and the U.S. Department of Justice, as counsel to the Prepetition UST Secured Lenders; (d) White & Case LLP, as counsel to the B-2 Lenders; (e) Quinn Emmanuel Urquhart & Sullivan, LLP, as co-counsel to the Junior DIP Lender; (f) Ropes & Gray LLP, as co-counsel to the Junior DIP Lender; (f) Choate, Hall & Stewart LLP, as counsel to the Prepetition ABL Agent; (g) Holland & Knight LLP, as counsel to the Junior DIP Agent and the B-2 Agent; (h) Hogan Lovells US LLP, as counsel to the Prepetition UST Tranche A Agent and the Prepetition UST Tranche B Agent; (i) Whiteford, Taylor & Preston LLP, as counsel to the Real Estate Stalking Horse Purchaser; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  In light of the nature of the relief requested, no other or further notice need be given.

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form of the Proposed Order attached hereto as **<u>Exhibit A</u>** and grant such other relief as is just and proper under the circumstances.

Dated:  October 16, 2023
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | Whitney Fogelberg (admitted *pro hac vice*) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |
| Wilmington, Delaware 19801 | Telephone:    (312) 862-2000 |
| Telephone:    (302) 652-4100 | Facsimile:    (312) 862-2200 |
| Facsimile:    (302) 652-4400 | Email:    patrick.nash@kirkland.com |
| Email:    ljones@pszjlaw.com | david.seligman@kirkland.com |
| tcairns@pszjlaw.com | whitney.fogelberg@kirkland.com |
| pkeane@pszjlaw.com | |
| ecorma@pszjlaw.com | -and- |

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    allyson.smith@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*