**Exhibit A**

# COMMERCIAL LEASE RE: Fishersville Terminal
## 53 Expo Road, Fishersville, Virginia
## TABLE OF CONTENTS

| CLAUSE | | PAGE |
|---|---|---|
| 1. | PARTIES. | 3 |
| 2. | PREMISES. | 3 |
| 3. | TERM. | 3 |
| 4. | USE. | 3 |
| 5. | RENT. | 3 |
| 6. | NO RIGHT TO TERMINATE OR ABATE RENT. | 4 |
| 7. | ALL OTHER COSTS. | 4 |
| 8. | QUIET ENJOYMENT. | 5 |
| 9. | CARE OF THE PREMISES. | 5 |
| 10. | UTILITIES AND SERVICES. | 6 |
| 11. | COMPLIANCE WITH LAW AND INSURANCE REQUIREMENTS. | 6 |
| 12. | INSURANCE. | 6 |
| 13. | ABANDONED PROPERTY. | 8 |
| 14. | DAMAGE TO THE BUILDING. | 8 |
| 15. | ALTERATIONS AND IMPROVEMENTS. | 9 |
| 16. | CONDEMNATION. | 11 |
| 17. | SECURITY DEPOSIT. | 12 |
| 18. | MECHANIC'S LIENS. | 12 |
| 19. | MUTUAL INDEMNIFICATION. | 12 |
| 20. | DEFAULTS AND REMEDIES. | 13 |
| 21. | LANDLORD MAY CURE TENANT'S DEFAULT. | 14 |
| 22. | SURRENDER OF THE PREMISES. | 15 |
| 23. | ASSIGNMENT AND SUBLET. | 15 |
| 24. | LANDLORD'S DEFAULT. | 15 |
| 25. | LANDLORD'S RIGHT TO INSPECT PREMISES. | 16 |
| 26. | FINANCING PROVISIONS. | 16 |
| 27. | SUBORDINATION TO MORTGAGES. | 16 |
| 28. | ESTOPPEL CERTIFICATES. | 16 |
| 29. | SALE BY LANDLORD. | 17 |
| 30. | BROKER. | 17 |
| 31. | LIMITED LIABILITY. | 17 |
| 32. | "AS-IS". | 18 |
| 33. | ENVIRONMENTAL LIABILITY. | 18 |
| 34. | NOTICES. | 19 |
| 35. | WAIVER OF PERFORMANCE. | 19 |
| 36. | WAIVER OF JURY TRIAL. | 19 |
| 37. | FORCE MAJEURE. | 19 |
| 38. | SUBMISSION. | 20 |
| 39. | FINAL UNDERSTANDING; CAPTIONS. | 20 |
| 40. | NO RECORDING. | 20 |
| 41. | SEVERABILITY CLAUSE. | 20 |
| 42. | TIMELINESS. | 20 |
| 43. | CONTROLLING LAW. | 20 |
| 44. | SUCCESSORS AND ASSIGNS. | 20 |
| 45. | NO JOINT VENTURE. | 21 |
| 46. | AUTHORITY. | 21 |
| 47. | COUNTERPART COPIES. | 21 |
| 48. | CONFIDENTIALITY. | 21 |
| 49. | SUBMISSION NOT AN OFFER. | 21 |
| 50. | SIGNAGE. | 21 |

LEGAL DESCRIPTION .................................................................................................................. 24

1. PARTIES.

        THIS COMMERCIAL LEASE (this "Lease") is made as of the 1<sup>st</sup>day of July, 2012, between MG FISHERSVILLE I, LLC, a Virginia limited liability company ("Landlord"), having an office at 5607 Grove Avenue, Richmond, Virginia 23226, and YRC Inc., a Delaware corporation, d/b/a YRC Freight ("Tenant"), having an office at 557 East Tallmadge Avenue, Akron, Ohio 44310.

2. PREMISES.

        The premises hereby leased by Landlord to Tenant is known generally as the Fishersville Terminal located in Augusta County, Virginia at 53 Expo Road, Fishersville, Virginia 22939, as more specifically described in Exhibit "A", which is attached hereto and made a part hereof (the "Premises").Landlord represents and warrants to Tenant that Landlord is the fee simple owner of the Premises with full authority to execute, deliver, and perform this Lease, that, as of the date of this Lease, no third party has any leasehold right, title, or interest adverse to Tenant's leasehold right, title and interest hereunder in the Premises.

3. TERM.

        The initial term of this Lease is for a period of five (5) years, commencing on July 1, 2012 (the "Commencement Date"), and ending on June 30, 2017 ("Term"). Thereafter, Tenant shall have the option to extend the Term of this Lease for an additional period of five (5) years (the "Renewal Option") provided that Tenant shall give Landlord written notice of Tenant's intention to exercise such Renewal Option on or before March 31, 2017. Tenant's right to exercise the Renewal Option shall be null and void in the event Tenant fails to deliver written notice of Tenant's intention to exercise such Renewal Option on or before March 31, 2017. In the event that Tenant timely exercises the Renewal Option, the word "Term" hereby shall be deemed to include the Renewal Option and the terms of this Lease shall continue to be of full force and effect.

4. USE.

        Tenant covenants and agrees that it shall use the Premises solely as a commercial trucking terminal and for ancillary office space and other ancillary uses related thereto, and for no other purpose whatsoever without the written consent of Landlord, which shall not be unreasonably withheld, conditioned, or delayed.

5. RENT.

        The annual rent ("Annual Rent") for the Premises for the initial twelve (12) calendar months of the Term shall be Seventy-Eight Thousand and 00/100 Dollars ($78,000.00); thereafter, the Annual Rent will increase at a rate of two and one half percent (2.5%) per year, as described in Exhibit "B", attached hereto and made a part of this Lease. Beginning on the Commencement Date, the Annual Rent shall be paid in advance, in twelve (12) equal monthly installments on the first day of each calendar month. Simultaneously with the execution of this Lease, Tenant shall deposit Six Thousand Five Hundred and No/100 Dollars ($6,500.00) with Landlord, which such

deposit shall be applied to the payment of the first installment of monthly Annual Rent due hereunder. Rent will be paid and delivered to Landlord at 5607 Grove Avenue, Richmond, Virginia 23226, Attn: John L. Crowley, or such address as Landlord may designate in writing. Any monthly installment received more than ten (10) days after thedue date shall be subject to a five percent (5%) late fee. Landlord and Tenant may establish automated Rent payments hereunder through ACH or other reputable automated payment system. The term "Rent" as used herein shall refer to Annual Rent, All Other Costs (hereinafter defined), additional rent and all other payments, fees, charges or expenses due hereunder from Tenant to Landlord. Rent for any partial calendar month or year shall be prorated on a daily basis.

6.  NO RIGHT TO TERMINATE OR ABATE RENT.

Except as expressly provided for in this Lease, no occurrence during the Term, (a) will entitle Tenant to quit or surrender the Premises or to terminate or surrender this Lease, or (b) will relieve Tenant from its obligation to pay, in full, the Rent, and other charges payable by Tenant under this Lease, or relieve Tenant from any of its other obligations under this Lease.

7.  ALL OTHER COSTS.

a.    PROMISE TO PAY. Except as expressly provided for herein, this Lease is a "triple net lease", so that it will yield the Annual Rent net to Landlord. During the Term, Tenant will pay all costs, expenses, and charges of every kind and nature relating to its occupancy and use of the Premises. Tenant covenants to pay, among other things, all real estate and similar taxes and assessments (including assessments for local or municipal improvements), personal property taxes and assessments, sales, use and occupancy taxes, business license taxes, water and sewer, rents, charges for public and private utilities, fees for governmental approvals, and all other governmental charges and fees (general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever) that may, during the Term, be imposed on, payable with respect to, or become a lien on the Premises, any building, its appurtenances, or the roads, streets, sidewalks, or other areas adjacent to the Premises ("All Other Costs"). Notwithstanding the foregoing, Tenant shall not be liable for any liens, fines, interest, or other charges imposed upon the Premises as a result of the actions or inactions of Landlord.

b.    PAYMENT. Tenant agrees that as additional rent for the Premises, it will, during each calendar year the Lease is in effect, reimburse Landlord for the cost of all real estate taxes, charges or assessments levied or assessed for that year upon and against the Premises; provided, however, that for the first and final Lease year, Tenant shall be liable for the reimbursement of such cost only for the proportionate part of such year that it is in possession of the Premises. The amount of such additional rent shall be due and payable thirty (30) days after receipt of an invoice from Landlord showing the amount due. Tenant shall have the right to contest, at its own cost, the validity or amount of any real estate tax or charge or the assessed value on which it is based provided that Tenant's right to contest shall be dependent upon Tenant providing a bond or other security as reasonably required by Landlord to prevent the imposition of liens, fines, or late penalties

4

against Landlord or the Premises. Tenant must give Landlord notice of intent to pursue any such contest. During the Term of the Lease, Landlord shall pay, as the same become due and payable and before any fine, penalty, interest, or other charge may be added for nonpayment, all real estate taxes, charges, and assessments against the Premises.

8. QUIET ENJOYMENT.
Landlord covenants that Tenant, on compliance with all of the terms of this Lease, will quietly enjoy the Premises without hindrance or interference by Landlord, subject, however, to the provisions of this Lease.

9. CARE OF THE PREMISES.
Landlord shall repair, maintain, and replace as necessary the following structural portions of the Premises: roof and roof membrane, foundation and other structural elements of the building making up a portion of the Premises, the structural portion of the loading dock flooring and the parking lot/yard (including all periodic repaving as determined as necessary in Landlord's reasonable discretionand any patching/pothole maintenance), together with curbs and walkways,the heating and air conditioning system (provided that Tenant maintains the HVAC Maintenance Contract, as defined below) and all other mechanical and utility systems serving the Premises that are unexposed, including, without limitation, all unexposed electrical, gas, plumbing, piping and sewage systems. Landlord shall not be liable for any failure to make such repairs or to perform any maintenance unless such failure shall persist for an unreasonable time after written notice of the need of such repairs or maintenance is given to Landlord by Tenant. There shall be no abatement of Rent and no liability of Landlord by reason of any injury to or interference with Tenant's business arising from the making of any repairs, alterations or improvements in or to any portion of the Premises provided that Landlord shall use reasonable efforts to minimize any interference with Tenant's operations. Notwithstanding the foregoing, any repairs or maintenance that are the Landlord's responsibility hereunder shall be done at Tenant's expense to the extent such repairs or maintenance are attributable, in whole or in part, to the act, neglect, fault or omission of any duty of Tenant, its agents, servants, employees, invitees or to breaking and entering by third parties.

Except for those obligations expressly assumed by Landlord above, Tenant, at its sole cost and expense, during the Term of this Lease, shall keep the Premises in asgood a condition as existed on the Commencement Date (such condition shall include any repairs made by the Con-Way Transportation Services, Inc. or its subtenants as part of the termination of the lease for the Premises existing immediately prior to this Lease), clean and orderly condition, including all exposed mechanical and utility systems serving the Premises. Without limitation, Tenant shall also bear the cost to replace light bulbs, ballasts, furnace filters, belts, A/C refrigerant, fuses, circuit breakers, broken glass, window and door hardware and shall perform similar tasks of routine maintenance and repair (collectively referred to as "Routine Maintenance"). Except as otherwise provided herein, Landlord will not be required to make any repairs, alterations, replacements, changes, additions, or improvements in or to the Premises or any improvements thereon at any time during the Term. The Premises and improvements thereon will be maintained

5

in a good, orderly and safe condition. Tenant is obligated to make all repairs and replacements required – interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, and whether or not necessitated by wear, tear, obsolescence, or defects, latent or otherwise – that are the direct result of Tenant's actions or negligence, or the actions or negligence of an employee, agent, or invitee of Tenant. Tenant will also, at its own cost and expense, maintain the sidewalks, curbs and other areas part of or adjacent to the Premises, in an orderly and safe condition and free of dirt, rubbish, snow, ice and obstructions. At Tenant's sole expense, Tenant agrees to put into effect and keep current an annual maintenance agreement for a heating, ventilation, and air conditioning system ("HVAC") for the Premises with a contractor reasonably acceptable to Landlord (the "HVAC Maintenance Contract"). If Landlord at any time gives notice to Tenant that Tenant has failed to comply in any respect with the provisions of this Clause 9, Tenant will promptly perform all repairs and other work specified in such notice.

10. UTILITIES AND SERVICES.

Landlord is not required to provide heat, electricity, air conditioning, telephone access, water/sewer, natural gas or any other facilities, utilities, or services, of any kind whatsoever, to or at the Premises or its improvements during the Term. Tenant will provide and pay for all of the same as and when they are required for Tenant's use.

11. COMPLIANCE WITH LAW AND INSURANCE REQUIREMENTS.

From and after the Commencement Date, Tenant, at its own cost and expense, will promptly comply with, and pay all amounts imposed by, all laws and other governmental requirements (including all notices of violation of law or state or municipal ordinances, orders or requirements issued by any state or municipal agency having jurisdiction), all governmental approvals, all requirements of fire underwriters, and all insurance policies in force with respect to Tenant's use of the Premises or improvements installed by or for Tenant. Tenant will perform and comply with, and pay all amounts payable by reason of, all covenants, agreements, conditions, restrictions, easements, and rights of way (whether or not Tenant is a party) that currently effect the Premises, the sidewalks, curbs, streets, and roads adjoining the Premises, or to the use of the Premises. Landlord shall not enter into any new covenants, agreements, conditions, restrictions, easements, or rights of way related to or otherwise affecting the Premises that would result in a "Material Impact"on Tenant's use of the Premises without first obtaining Tenant's prior consent thereto (such consent not be unreasonably withheld, conditioned or delayed). For the purposes of the foregoing, the term "Material Impact" shall mean a financial undertaking on Tenant's part or an adverse effect on Tenant's access to the Premises or Tenant's use of the Premises as described in Clause 4.

12. INSURANCE.

a.    TYPES OF INSURANCE.  Tenant will, at its own cost and expense, for the mutual benefit of Landlord and Tenant, maintain:

i.    Commercial general public liability insurance against claims for bodily

injury, death, or property damage occurring on, in, or about the Premises or its improvements and on or about the adjoining streets and sidewalks, which insurance will provide minimum protection in single limit of not less than $1,000,000.00 for bodily injury or death in any one occurrence, and not less than $1,000,000.00 for property damage (or in such increased limits from time to time to reflect inflation, as Landlord will reasonably determine); and

ii.    Insurance, in the amount of $1,000,000.00, against loss or damage from leakage of sprinkler systems and from explosion or rupture of boilers, pressure vessels, air tanks, compressors, air conditioning equipment, motors, and similar apparatus at any time installed in or at the demised Premises; and

iii.    Tenant agrees to maintain casualty and fire insurance with extended coverage endorsement in an amount not less than one hundred percent (100%) of the insurable value of all equipment and trade fixtures installed by Tenant. In the event of loss and/or damage to such equipment by fire or other casualty, Tenant agrees to repair or replace the same promptly and to this end shall apply all insurance proceeds and such additional sums as may be necessary, except when repair or construction shall not be required under Clause 14 of this Lease. Tenant will deliver to Landlord a certificate showing the insurance required hereby to be in force and effect.

b.    TYPE OF CARRIER. All insurance provided for in this Clause 12 will be effected under valid and enforceable policies in standard form and issued by insurers of recognized responsibility that are well rated by a national rating organization, are licensed or authorized to do business in the Commonwealth of Virginia, and have been approved by Landlord (which approval will not be unreasonably withheld).

c.    PROOF OF COVERAGE. On the execution of this Lease and on or before July 1 of each calendar year throughout the Term, Tenant shall provide Landlord with adequate evidence of the continued existence of applicable insurance coverage by certificate(s) of insurance. Prior to taking effect, Tenant shall provide to Landlord notice of cancellation or material change in accordance with policy terms and conditions.

d.    TERMS. All policies for the insurance provided for in this Clause 12 will provide that the loss thereunder will be adjusted and paid in accordance with this Lease and/or in accordance with policy terms and conditions. To the extent reasonably obtainable, each such policy will contain agreements by the insurers substantially to the effect thatLandlord will not be liable for any premiums.Tenant and Landlord each hereby waive any and all rights of recovery against the other or against the officers, employees, agents and representatives of the other, for loss of or damage to such waiving party or its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damages. Tenant and Landlord each, on behalf of their respective insurance companies insuring the property of either Tenant or Landlord against such loss or damage, hereby waive any right of subrogation that any insurance company may have against Landlord or Tenant, as

7

the case may be. The insuring party shall give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Lease. Notwithstanding, the waiver of subrogation would not be effective if its inclusion would cancel an insurance policy of any party.

e.   INSUREDS.  All policies for the insurance provided for in this Clause 12 will name Landlord as additional insured to the extent of the Tenant's negligence and the indemnity obligations herein.

f.   ADJUSTMENT AND PAYMENT OF CLAIMS.  Tenant will adjust the loss under all policies with the insurers.  The loss under the above referenced policies for insurance will be payable to Landlord and/or Tenant as appropriate.  Any such loss payment paid to Landlord and Tenant will be held in trust by Landlord for application to the cost of repairing, altering, restoring, replacing, or rebuilding any building or improvements located on the Premises if and to the extent required under the terms of Clause 14 of this Lease.

g.   PREMISES INSURANCE COSTS.  Tenant shall annually reimburse Landlord, as additional rent, for all Insurance Costs paid by the Landlord for the Premises.  "Insurance Costs" means all insurance premiums and other charges payable by Landlord in order to procure and maintain in force fire and extended coverage insurance which may include vandalism, malicious mischief, earthquake and sprinkler damage endorsements, liability insurance, rent loss insurance, plate glass insurance, boiler insurance and such other insurance as may be required pursuant to the foregoing provisions, or deemed advisable by Landlord in connection with its ownership of the building or land of which the Premises are a part, all with such reasonable limits of coverage as Landlord may deem advisable.  Tenant agrees to pay such Insurance Costs within thirty (30) days of its receipt of the annual bill from Landlord.  Such Insurance Costs shall be adjusted annually to reflect any change in the total amount of Insurance Costs from year to year.

13. ABANDONED PROPERTY.
All of Tenant's personal property remaining on the Premises after this Lease terminates will be deemed abandoned and may be removed or stored by Landlord at Tenant's risk and expense.

14. DAMAGE TO THE BUILDING.

a.   OBLIGATION TO REPAIR OR REBUILD.  All repairs and restorations will be accomplished in compliance with the conditions set forth in Clause 14 of this Lease (except for the conditions not relevant to a total restoration of any building).

b.   DAMAGE OR DESTRUCTION OF PREMISES.  In the event that all or any part of any building or the Premises shall be damaged or destroyed as a result of fire or other casualty, regardless of cause, Landlord shall be entitled to receive all legally entitled insurance proceeds payable in connection therewith, and, unless this Lease is terminated as provided for herein, Landlord shall diligently thereafter restore, rebuild, and replace any building and/or Premises to an equivalent condition as existed

8

immediately prior to such casualty. Notwithstanding anything contained herein to the contrary, Landlord's obligation to restore the Premises following a fire or other casualty shall be subject to Landlord's actual receipt of insurance proceeds and Landlord shall not be under any obligation to incur costs over the amount of such insurance proceeds actually received by Landlord.

c.  In the event that all or any part of any building or the Premises shall be damaged or destroyed as a result of fire or other casualty during Tenant's occupancy, Landlord shall diligently repair the same, and provided that such repairs can be made within ninety (90) days under existing governmental laws and regulations, such damage or destruction shall not terminate this Lease. Tenant shall be entitled to a proportionate reduction of Annual Rent while such repairs are being made, based upon the extent to which the making of such repairs shall interfere with the business of Tenant on the Premises. If any building and/or Premises shall be so damaged that a contractor or architect selected by Landlord shall determine that any building and/or Premises are incapable of being restored for the use permitted hereunder within ninety (90) days of the occurrence of such casualty, then Landlord or Tenant may terminate this Lease. This option may be exercised by either party giving the other party written notice of such cancellation within thirty (30) days from the date the determination is made that any building and/or Premises are incapable of being so restored, or sixty (60) days from the date of the casualty or destruction, whichever is earlier. Upon termination pursuant to this Clause 14, this Lease shall be null and void and of no further force and effect (except that such cancellation shall not affect the rights or remedies of Landlord or Tenant which accrued prior to the date of such cancellation).

d.  In the event that all or any part of any building or the Premises shall be damaged or destroyed as a result of fire or other casualty during Tenant's last full year of occupancy, the Landlord or Tenant may elect to terminate this Lease by delivering written notice to the other party within thirty (30) days of such casualty. Rent will be apportioned as of the date of the surrender, and any Rent paid for any period beyond that date will be repaid to Tenant.

e.  In the event of restoration of the Premises in accordance with the terms of this Clause 14, Tenant shall promptly restore all improvements and betterments it has made to the Premises to a condition existing immediately prior to the casualty and shall replace all of its personal property at the Premises.

f.  Notwithstanding the foregoing, and any other clauses, subsections or provisions within this Lease, if any damage or destruction, either partial or complete, during Tenant's occupancy or use results from the negligence, misconduct, or willful acts of Tenant, its employees, agents, or invitees, then Tenant shall have no right to terminate this Lease and Rent due under this Lease shall not abate during the period between such casualty and the completion of the restoration, rebuilding or replacement of any building and/or Premises.

15. ALTERATIONS AND IMPROVEMENTS.

Tenant may, during the Term of this Lease make any alterations, additions, and improvements to the Premises, including to the building(s) and any fixtures and equipment, which it deems desirable, at its sole cost and expense, provided that any alterations to the roof, foundation or other structural elements, modifications to the exterior of the Premises or the parking lot shall require Landlord's prior written approval, which shall not be unreasonably withheld, conditioned, or delayed.   Regardless of whether Landlord's prior written approval is necessary or not, Tenant must comply with the following conditions with respect to any alteration, addition, or improvements to the Premises (collectively referred to as "Alterations"):

a.       Alterations must be performed in a good and workmanlike manner, and in compliance with legal, insurance, and other applicable requirements, as stipulated in Clause 11 of this Lease.

b.       Alterations made must be made in a good and workmanlike manner and consistent with Tenant's obligation to maintain the Premises in as good a condition as existed on the Commencement Date (such condition shall include any repairs made by the Con-Way Transportation Services, Inc. or its subtenants as part of the termination of the lease for the Premises existing immediately prior to this Lease), and in an orderly and safe condition, as well as all other provisions of this Lease.

c.       Tenant will deliver to Landlord a copy of all plans and specifications for any Alterations, as well as proof of approval of the plans by the appropriate municipal agency and any other government agency whose approval is necessary.

d.       No Alteration may be made that would lessen the rental value of the Premises unless Tenant agrees, in writing, that prior to expiration of the Term, it will restore the Premises to its condition before such alteration was made.

e.       Any Alterations to the exterior of any building located on the Premises must be consistent with the original architecture.

f.       Before commencing any Alterations, Tenant must provide to Landlord reasonable proof that (1) Tenant shall effect and maintain Builder's Risk Insurance covering Landlord, Tenant, Tenant's contractors and Tenant's subcontractors, as their interest may appear against loss or damage by fire, vandalism and malicious mischief and such other risks as are customarily covered by a standard "All Risk" policy of insurance protecting against all risk of physical loss or damage to all Alterations in place and all materials stored at the site of, and all materials, equipment, supplies and temporary structures of all kinds incidental to such Alterations, and equipment, all while forming a part of or contained in such improvements or temporary structures, or while on the Premises, all to the actual replacement cost thereof at all times on a completed value basis; (2) all insurance policies required under this Lease will remain in full force during such Alterations and that they will cover, by endorsement or otherwise, the risks arising during completion of the Alterations; and (3) Tenant (or its contractors or subcontractors, as appropriate) has secured workmen's compensation insurance, in an amount at least equal to the minimum amount required by law, covering all persons employed to complete any

10

Alterations.

g.      All costs incurred for any Alterations will be paid when due, such that the Premises, and any part of the Premises, remains at all times free of any liens, encumbrances, chattel mortgages, conditional bills of sale, financing statements, and other claims for labor or materials supplied to the Premises.

h.      Any dispute between Landlord and Tenant concerning Tenant's compliance with the conditions enumerated in Clauses 15(a) through 15(g) above will be determined by an independent licensed architect or engineer selected by Tenant and approved by Landlord. The determination of such architect or engineer will be binding on the parties and the cost of such architect or engineer shall be shared equally by Landlord and Tenant.

i.      Except as specifically required under the terms of this Lease, Tenant has no obligation to restore the Premises at the end of the Term to the state or condition existing prior to the making of any Alterations in compliance with this Clause 15.

16. CONDEMNATION.
    a.      Total Condemnation.  If a competent public authority such as a town, city, county or state government, for an express public purpose (not associated with damage or destruction as a result of fire or other casualty as in Clause 14), condemns the whole of the Premises, this Lease shall terminate as of the date the condemning authority takes possession, and Rent for the then current period shall be apportioned as of the date of termination.

    b.      Partial Condemnation.   If a substantial portion of the Premises is taken or condemned by a competent public authority such as a town, city, county or state government, for an express public purpose (not associated with damage or destruction as a result of fire or other casualty as in Clause 14), so that the remaining portion cannot reasonably be operated for the purposes herein set forth, as determined by Tenant in the exercise of its reasonable judgment, Tenant may at its option terminate this Lease by giving written notice to Landlord within thirty (30) days after such taking deprives Tenant of possession of any such substantial portion of the Premises; or Tenant may at its option continue this Lease as to the remaining portion on the same terms hereof, and Tenant's liability for Rent shall continue but shall be equitably apportioned according to the space so taken and disruption to Tenant's business.  Subject to Landlord's actual receipt of condemnation proceeds, Landlord, at its sole cost and expense provided that Landlord shall not be required to expend any amounts over the condemnation proceeds actually received by Landlord, shall restore the remaining portion of the leased Premises making it reasonably suitable for the purposes for which it was leased.

    c.      Condemnation Proceeds.  Any award for the land and building and for damages to the Premises shall be the property of Landlord.  Tenant shall be entitled to claim, prove and receive in a condemnation proceeding such awards as may be allowed for loss of business, cost of removals, and/or for fixtures and other equipment and property installed by it at the Premises provided such awards shall be made by the condemning court in

11

addition to and shall not reduce the award made for the Premises.

e.     Landlord's Option to Terminate. If more than one-third (1/3) of the Premises is taken or condemned, Landlord may terminate this Lease by giving Tenant fifteen (15) days written notice of its election to do so, which notice shall be given within thirty (30) days after possession of such property is taken by the condemning agency. Rent shall be adjusted as of the date of termination.

17. SECURITY DEPOSIT.
          Concurrent with its execution of this Lease, Tenant shall deposit with Landlord an amount equal to Six Thousand Five Hundred and No/100ths Dollars ($6,500.00) as security for Tenant's failure to pay sums due hereunder or otherwise perform any of its obligations described herein (the "Security Deposit"). Landlord shall not be required to pay interest on the Security Deposit or to maintain it in a separate account. Within five (5) business days after written notice of Landlord's application of the Security Deposit, Tenant shall deposit with Landlord in cash or by wire transfer an amount sufficient to restore the Security Deposit to its original amount.   The Security Deposit (or any remaining portion thereof) shall be returned to Tenant no later than thirty (30) days after the expiration or earlier termination of this Lease.

18. MECHANIC'S LIENS.
          Tenant will not create, permit, or suffer, and will discharge and satisfy, any mechanic's or other lien or encumbrance on or affecting the Premises or improvements on the Premises.  If any such lien or encumbrance is, at any time, filed or imposed, Tenant, within thirty (30) days the filing or imposition, will cause it to be discharged of record (by payment, deposit, bond, order of a court of competent jurisdiction, or as is otherwise permitted by law).  If Tenant fails to cause such lien or encumbrance to be discharged within such period, then, in addition to any other right or remedy of Landlord, Landlord may (but will not be obligated to) discharge the same.  All amounts so paid by Landlord and all costs and expenses in connection with such discharge, if any (including court costs and reasonable attorneys' fees), plus interest at the rate of eighteen percent (18%) per annum, will be deemed to be additional rental under this Lease and will be paid by Tenant to Landlord, immediately on demand by Landlord.

19. MUTUAL INDEMNIFICATION.

          Each party (the "Indemnitor") agrees to indemnify, defend and hold the other party (the "Indemnitee") harmless from and against any and all losses, damages, claims, suits, actions, judgments, liabilities and expenses, including, without limitation, environmental damages and remediation expenses, reasonable attorneys' fees (collectively, "Losses"), arising out of, or with respect to:   (A) any breach of any warranty or representation or any covenant or agreement of the Indemnitor under this Lease (including, without limitation, any warranty, representation, covenant or agreement contained in Clause 33); or (B) any injury to, or death of, persons and/or any damage to, or destruction of, property, on or about the Premises and attributable to the negligence or misconduct of the Indemnitor, or its officers, employees, agents, contractors or invitees,

except to the extent any such breach, any injury or death or any damage or destruction is attributable to the negligence or misconduct of the Indemnitee, or any of its officers, employees, agents, contractors or invitees, or as otherwise specifically provided in this Lease.Each partyagrees to give prompt notice to the other party of any event giving rise to such indemnification obligation.

## 20. DEFAULTS AND REMEDIES.

a.    ELEMENTS OF DEFAULT.  Each of the following shall constitute an "Event of Default" under this Lease:

i.    A default in the payment of the Rent or other charges payable by Tenant under this Lease when they are due and payable and such default continues for a period of ten (10) days after written notice of default from Landlord to Tenant.

ii.    A default by Tenant in the performance of, or failure to be in compliance with, any of the covenants, agreements, or conditions contained in this Lease (other than those referred to in Clause 20(a)(i) above) where:  (1) in the case of a default or a contingency that can with due diligence be cured within thirty (30) days, such default is not cured within thirty (30) days of written notice from Landlord to Tenant (subject to unavoidable delays), or (2) in the case of a default or a contingency that cannot with due diligence be cured within thirty (30) days, Tenant's failure after written notice from Landlord to proceed promptly and with all due diligence to cure and to prosecute the curing of such default with all due diligence (subject to unavoidable delays) but not to exceed sixty (60) in any case.

iii.    An abandonment of the Premises by Tenant.

iv.    It shall not be an Event of Default hereunder in the event Tenant ceases its business operations at the Premises provided that Tenant continues to pay Rent and Tenant continues to maintain and insure the Premises as provided herein (including, without limitation, maintaining utility service at the Premises).  It shall be an Event of Default hereunder in the event Tenant ceases its business operations at the Premises and fails to pay Rent or fails to maintain and insure the Premises as required herein (including, without limitation, failing to maintain utility service at the Premises).

b.    RIGHT TO TERMINATE.  Following an Event of a Default under this Lease, Landlord may terminate this Lease by giving written notice ("Notice") to Tenant specifying the Event of Default and stating that this Lease and the Term will expire on the date specified in the Notice (which will be at least ten (10) days after the giving of the Notice).  On the date specified in the Notice, this Lease and the Term and all rights of Tenant under this Lease, including any right to extend the Term, whether or not exercised, will expire.  The Notice shall be in addition to, not in lieu of, the written Notice to which Tenant is entitled under Subclauses 20(a)(i) and 20(a)(ii).  Tenant remains liable to Landlord under those obligations that are specifically stated in this

Lease to survive expiration or termination of this Lease.

c.     RIGHT TO RECOVER RENTS AND CHARGES.   Notwithstanding Clause 20(b), Landlord may at any time after the occurrence of any Event of Default, institute an action for the recovery of the charges as to which Event of Default has occurred and is continuing.  Neither the commencement of any such action nor its prosecution will be deemed a waiver of Landlord's right to give a Notice for any such Event of Default. Landlord may, notwithstanding the commencement and prosecution of any such action, give a Notice and terminate this Lease at any time during the continuance of the Event of Default.

d.     REPOSSESSION OF THE PREMISES.   If this Lease is terminated as provided in this Clause 20, Landlord may, immediately or at any time thereafter, (without further notice and without being liable for any damages) enter upon the Premises and repossess it, by summary proceedings, ejectment, or otherwise, and may dispossess Tenant and its property from the Premises.  No reentry by Landlord pursuant to this Clause 20(d) will be deemed an acceptance of a surrender of this Lease or will absolve or discharge Tenant from any liability under this Lease.

e.     DAMAGES RECOVERABLE.   If this Lease is terminated pursuant to this Clause 20, whether or not the Premises has been relet by Landlord: (1) Landlord is entitled to retain all monies, if any, paid by Tenant to Landlord whether as advance rent or otherwise (but such monies will be credited against any rent due at the time of such termination, or at Landlord's option, against any damages payable to Tenant); (2) Landlord is entitled to recover from Tenant all Rent to the date on which this Lease is terminated and all Rent that would have been due through the remainder of the Term but only as such Rent would have become due and payable hereunder; and (3) Landlord is entitled to recover from Tenant all actual and reasonable expenses paid by Landlord in recovering possession of the Premises (including summary proceedings), in restoring the Premises to good order and condition, in maintaining the Premises in good order and condition while vacant, in altering or otherwise preparing the Premises for reletting, and in reletting the Premises (including actual and reasonable brokerage commissions).

21. LANDLORD MAY CURE TENANT'S DEFAULT.

a.  If Tenant defaults in the performance of any covenant or condition of this Lease, Landlord may, on reasonable notice to Tenant (which shall be at least ten (10) days written notice, except that no notice need be given in case of emergency), cure the default at Tenant's expense, and the reasonable amount of all expenses, including attorneys' fees, incurred by Landlord (whether paid by Landlord or not) will be deemed additional rent payable on demand.

b.  If Landlord at any time, by reason of any such nonperformance by Tenant, is compelled to pay or elects to pay any sum of money, including court costs and reasonable attorneys' fees in instituting, prosecuting, or defending any action or proceeding, or suffers any loss, then all such costs will be deemed to be additional rent under this Lease, and Tenant will pay such amount to Landlord immediately on demand, including the sum

paid by Landlord with interest at the rate of eighteen percent (18%) per year (or such lower rate as will be the maximum lawful rate of interest payable by Tenant), and all costs and damages. Landlord will not be limited, in the proof of any damages that Landlord may claim against Tenant due to Tenant's failure to provide and keep in force any insurance required under this Lease, to the amount of the insurance premium or premiums not paid or incurred by Tenant. Landlord may recover as damages for such breach the amount of any uninsured liability, loss, or damage and all costs and expenses suffered or incurred by Landlord by reason of any damage to, or destruction of, the Premises or its improvements or any other occurrence during any period when Tenant has failed to provide any such insurance.

## 22. SURRENDER OF THE PREMISES.

On the expiration or termination of this Lease for any reason whatsoever, Tenant will surrender to Landlord the Premises and all buildings, structures, fixtures, and building equipment on the Premises (together with all alterations and replacements made by Tenant, unless such alterations or replacements are required to be removed by other provisions of this Lease), in good order, condition (broom clean with all of Tenant's personal property removed), and repair except for reasonable wear and tear and damage by casualty or condemnation.

## 23. ASSIGNMENT AND SUBLET.

a.     Tenant may not assign this Lease, nor the estate created under this Lease, either voluntarily or involuntarily, by operation of law or otherwise, without the Landlord's written consent, which consent shall  not be unreasonably withheld, conditioned, or delayed; provided, however, that Tenant shall have the right, without the consent of Landlord, to assign this Lease to any entity controlling, controlled by or under common control with Tenant or to any successor by merger, consolidation or purchase of assets. Absent the written agreement of Landlord, no assignment of this Lease shall relieve Tenant of any of the terms, conditions, covenants and obligations of this Lease on the part of Tenant to be performed.

b.     Tenant may not sublet or license all or any portion of the Premises during any part of the Term of this Lease (including any renewal term) without the written consent of Landlord, which consent may not be unreasonably withheld, conditioned, or delayed; provided, however, that Tenant shall have the right, without the consent of Landlord, to sublet any portion of the Premises to any entity controlling, controlled by or under common control with Tenant or to any successor by merger, consolidation or purchase of assets. Absent the written agreement of Landlord, no subletting of all or any portion of the Premises shall relieve Tenant of any of the terms, conditions, covenants and obligations of this Lease on the part of Tenant to be performed.

## 24. LANDLORD'S DEFAULT.

Landlord shall be deemed to be in default under this Lease if Landlord shall fail to comply with any term, provision or covenant of this Lease and shall not cure such failure within thirty (30) days after written notice of such failure; provided, however, that such failure shall not be an event of default if such failure could not reasonably be cured

15

during such thirty (30) day period, Landlord has commenced the cure within such thirty (30) day period and thereafter is diligently pursuing such cure to completion. If Landlord shall default beyond applicable grace and notice periods, in the performance of any term, covenant, condition or agreement on Landlord's part to be performed hereunder, Tenant may perform the same for the account and at the sole cost and expense of Landlord, without notice if an emergency exists, or, if no emergency exists, on thirty (30) days prior written notice to Landlord, and all costs and expenses paid or incurred by Tenant in curing such default shall be paid by Landlord to Tenant upon demand. If Landlord fails to pay such amounts to Tenant within thirty (30) days of written notice and reasonably sufficient invoices/back-up documentation, Tenant may offset such amounts against Annual Rent due hereunder.

## 25. LANDLORD'S RIGHT TO INSPECT PREMISES.

Landlord may enter the Premises at any reasonable time on reasonable notice to Tenant (except that no notice is needed in case of emergency) to inspect the Premises or take such action as is authorized by this Lease and, provided that Landlord is acting in good faith and takes reasonable steps to mitigate any impacts on Tenant's business operations at Premises, Tenant will have no claim or cause of action against Landlord for entering the Premises in accordance with this Clause 25.

## 26. FINANCING PROVISIONS.

Tenant may not mortgage its leasehold estate and Landlord expressly reserves its right to unreasonably withhold its consent to any such subordination requested by Tenant's prospective mortgagee.

## 27. SUBORDINATION TO MORTGAGES.

This Lease is and shall be subordinate to all deed of trust or mortgages now or hereafter existing and to any modification, extension, consolidation and replacement thereof which may now or hereafter encumber the Premises or any portion thereof after commencement of the Term or otherwise; provided, however, that as long as Tenant is not in default of this Lease there shall be no interference with Tenant's quiet possession hereunder. Tenant shall execute any documents to indicate such subordination that Landlord may reasonably require.Landlord represents to Tenant that there are no lenders with a security interest in the Premises as of the date of this Lease.

## 28. ESTOPPEL CERTIFICATES.

Tenant or Landlord will as requested, but on not less than ten (10) business days after written request by the other, execute, acknowledge, and deliver a written statement certifying (1) that this Lease is unmodified and in full force and effect (or that this Lease is in full force and effect as modified, listing the instruments of modification), (2) the dates to which the Rent and other charges have been paid, (3) whether to the best of its knowledge the other is in default (and if so, specifying the nature of the default), and (4) any other information with respect to this Lease and the Premises that Landlord (or Tenant) may reasonably require. It is intended that any statement delivered pursuant to this Clause 28 may be relied on by a prospective assignee, purchaser, or mortgagee of Landlord's interest in the Premises or prospective assignee of any mortgage on

Landlord's interest in the Premises or by a prospective mortgagee of Tenant's estate and interest in the Premises under this Lease.

29. SALE BY LANDLORD.

In the event of a sale or conveyance by Landlord of all or part of the Premises, the same shall operate to release Landlord from any future liability upon any of the covenants or conditions, express or implied, herein contained in favor of Tenant, and in such event Tenant agrees to look solely to the responsibility of the successor in interest of Landlord in and to this Lease. This Lease shall not be affected by any such sale, and Tenant agrees to attorn to the purchaser or assignee. Tenant agrees to permit Landlord, at any time within sixty (60) days prior to the expiration of this Lease, to place upon or in the window of the Premises any usual or ordinary "For Rent" or similar sign and, after reasonable prior notice to Tenant, to allow prospective tenants, applicants or agents of Landlord to enter and examine the Premises during the last sixty (60) days of the Term hereof, and, after reasonable prior notice to Tenant, to permit Landlord or Landlord's agents, at any time during the Term hereof, to conduct prospective purchasers through the Premises during reasonable business hours. The provisions of this Section are subject to the provisions of Section 31 below.

30. BROKER.

Tenant warrants and represents that it has not engaged, hired or otherwise dealt with a broker in connection with this transaction. Tenant agrees to indemnify Landlord and hold Landlord harmless from any and all claims, losses, damages, and expenses arising out of any inaccuracy or alleged inaccuracy of the above warranty and representation, (including court costs and attorneys' fees).

31. LIMITED LIABILITY.

a.     NO PERSONAL LIABILITY. If Tenant at any time recovers a judgment against Landlord, Tenant's rights with respect to the collection, enforcement, or satisfaction of that judgment are limited to the Premises and Landlord's interest in it. Tenant is not entitled, and Tenant waives and releases all rights, to collect, enforce or satisfy any such judgment out of or against any other assets or properties of Landlord.

b.     NO LIABILITY AFTER TRANSFER. The term "Landlord" as used in this Lease means only the owner or owners, at the time in question, of Landlord's interest in this Lease (or any lease given in substitution pursuant to the terms of this Lease). In the event of any transfer (by operation of law or otherwise) of Landlord's interest in this Lease and the title to such leasehold estate, the Landlord named in this Lease (and in case of any subsequent transfers or conveyances, the then transferor) is automatically freed and relieved, from and after the date of such transfer, of all liability with respect to the performance of any covenants or obligations of Landlord contained in this Lease, that is thereafter to be performed. However: (1) any funds in which Tenant has an interest, in the hands of such landlord or the then transferor at the time of such transfer, must be turned over to the transferee; (2) any amount then due and payable to Tenant by Landlord or the then transferor under any provision of this Lease must be paid to Tenant; and (3)

the transferee will be deemed to have assumed and agreed to perform (subject to the limitations of this <u>Clause 31</u>) without further agreement between or among the parties or their successors in interest, and/or the transferee all of the terms, covenants, and conditions in this Lease to be performed by Landlord. It is intended that the terms, covenants, and conditions contained in this Lease will be binding on Landlord, its successors, and assigns, only during and in respect of their respective successive periods of ownership.

32. <u>"AS-IS"</u>.

Except as otherwise provided herein and except to the extent provided in the joint inspection report contemplated below, Tenant acknowledges that it will let the Premises, as-is, where-is, without representation or warranty, and based solely on Tenant's own investigation. No person acting on behalf of Landlord is authorized to make, and by execution hereof Tenant acknowledges that, except as provided in this Lease, no person has made, any representation, agreement, statement, warranty, guarantee, or promise regarding the Property or the transaction contemplated herein or the zoning, construction, physical condition or other status of the Premises. No representation, warranty, agreement, statement, guarantee, or promise, if any, made by any person acting on behalf of Landlord which is not contained in this Lease will be valid or binding on Landlord. As soon as practicable after Lease commencement, representatives of Landlord and Tenant shall make a joint inspection of the Premises, and the results of such inspection shall be reduced to a written memorandum, which memorandum shall be approved and executed on behalf of each party and then shall constitute a part of this Lease and be conclusive with respect to the condition of the Premises on such date, except with respect to latent defects of which Tenant delivers notice to Landlord from time to time.

33. <u>ENVIRONMENTAL LIABILITY</u>.

Tenant shall be permitted to use and store those Hazardous Materials, as defined hereinafter, that are used in the normal course of Tenant's business in the Premises so long as such Hazardous Materials are used and stored in compliance with applicable Environmental Laws, as defined hereinafter. Subject to the exception contained in the preceding sentence, Tenant shall not, without the prior written consent of Landlord, cause or permit, knowingly or unknowingly, any Hazardous Material to be brought or remain upon, kept, used, discharged, leaked, or emitted in or about, or treated at the Premises. As used in this Lease, "Hazardous Material(s)" shall mean any hazardous, toxic or radioactive substance, material, matter or waste which is or becomes regulated by any federal, state or local law, ordinance, order, rule, regulation, code or any other governmental restriction or requirement, and shall include, but not be limited to, asbestos, petroleum products and the terms "Hazardous Substance" and "Hazardous Waste" as defined in the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. Sec. 9601 et seq. ("CERCLA"), and the Resource Conservation and Recovery Act, as amended, 42 U.S.C. Sec. 6901 et seq. ("RCRA") and the term "Hazardous Chemical" as defined in OSHA (the "Environmental Laws"). Immediately prior to termination of this Lease or within ninety (90) days thereafter Landlord, at Landlord's option, may cause a Phase I Environmental Assessment to be conducted on the Premises. Should any violation be noted and should such violation be shown by

conclusive evidence to have been caused by Tenant, Tenant agrees to pay for the assessment and all related costs of remediation. Landlord hereby represents and warrants to Tenant that it has received no written notice that the Premises are in violation of Environmental Lawsthat remains uncured as of the Commencement Date. Further, Landlord hereby represents and warrants to Tenant that, to the best of Landlord's knowledge, there are no aboveground or underground storage tanks located on the Premises and that, if any tanks do exist at the Premises, then Tenant shall have no right to use such tanks and Landlord shall be solely responsible for the maintenance of any such tanks in compliance with all applicable federal, state, and municipal environmental regulations.

## 34. NOTICES.

Any notice by either party to the other will be in writing, and will be deemed to be properly given only if delivered personally or mailed by national overnight delivery carrier or registered or certified United States mail, return receipt requested, addressed (1) if to Tenant: YRC Inc., ATTN: Real Estate, 557 East Tallmadge Avenue, Akron, Ohio 44310; (2) if to Landlord: MG Fishersville I, LLC, ATTN: John L. Crowley, 5607 Grove Avenue, Richmond, Virginia 23226; or (3) at those addresses as Tenant or Landlord may from time to time designate in writing. Notice will be deemed to have been given on delivery if delivered personally or by national overnight delivery carrier, and if by certified United States mail, on the third day after the date of mailing.

## 35. WAIVER OF PERFORMANCE.

Either party's failure to insist on strict performance of any part of this Lease, or to exercise any option, will not be construed as a waiver of the performance in any other instance. The rights and remedies of the parties under this Lease shall be cumulative and in addition to any and all other rights and remedies which the parties have or may have elsewhere under this Lease or at law or equity.

## 36. WAIVER OF JURY TRIAL.

To the extent waiver is permitted by law, Tenant waives trial by jury in any action or proceeding brought in connection with this Lease or the Premises.

## 37. FORCE MAJEURE.

In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, labor troubles, inability to procure labor or materials, failure of power, restrictive governmental laws or regulations, riots, terrorism, insurrection, war, acts of God, fire or other casualty or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for the period of the delay and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this section shall not operate to excuse Tenant from the prompt payment of Rent and shall not operate to extend the Term. Delays or failures to perform resulting from lack of funds shall not be deemed delays beyond the reasonable control of a party.

38. <u>SUBMISSION</u>.

This Lease does not constitute an offer to lease and Landlord shall not be bound by this Lease until it is executed and unconditionally delivered by both parties.

39. <u>FINAL UNDERSTANDING; CAPTIONS</u>.

This Lease represents the final understanding between Landlord and Tenant. This Lease cannot be modified except by writing signed by the party against whom the modification is to be enforced. The captions in this Lease are for purposes of reference only and shall not limit or define the meaning of the provisions of this Lease. Although the printed provisions of this Lease were drawn by Landlord, the parties hereto agree that this circumstance alone shall not create any presumption, canon of construction or implication favoring the position of either Landlord or Tenant. The parties agree that any deletion of language from this Lease prior to its mutual execution by Landlord and Tenant shall not be construed to have any particular meaning or to raise any presumption, canon of construction or implication, including, without limitation, any implication that the parties intended thereby to state the converse, obverse or opposite of the deleted language.

40. <u>NO RECORDING</u>.

This Lease shall not be recorded and neither shall a memorandum hereof without the written consent of the Landlord.

41. <u>SEVERABILITY CLAUSE</u>.

If any term, covenant, condition, or provision of this Lease is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

42. <u>TIMELINESS</u>.

The reference to and the counting of "days" in this Lease shall mean calendar days unless stated to the contrary. *E.g.*, "business days" shall mean Monday through Friday unless one of such days is a national holiday. Time is of the essence in this Lease, especially with regard to payment of Rent.

43. <u>CONTROLLING LAW</u>.

This Lease shall be construed according to the laws of the Commonwealth of Virginia. All parties agree that the proper venue and jurisdiction for any matter arising out of this transaction shall be the Circuit Court of the County of Augusta, Virginia. Should a federal question or diversity of jurisdiction question arise, all parties agree that the proper venue and jurisdiction for any matter arising out of this transaction shall be the United States District Court for the Western District of Virginia located in Charlottesville, Virginia.

44. <u>SUCCESSORS AND ASSIGNS</u>.

The covenants and conditions herein contained, subject to the provisions as to

assignment, shall apply to and bind the heirs, successors, executors, administrators and assigns of the parties hereto.

45. NO JOINT VENTURE.
Landlord does not hereunder, in any way or for any purpose, become a partner, employer, principal, master, agent or joint venturer of or with Tenant.

46. AUTHORITY.
If Tenant is or will be a corporation, the persons executing this Lease on behalf of Tenant hereby covenant and warrant that Tenant is a duly qualified corporation authorized to do business in the State where the Premises is located, that all franchise and corporate taxes have been paid to date and all future forms, reports, fees and other documents necessary to comply with applicable laws will be filed when due, and the person signing this Lease on behalf of the corporation is an officer of Tenant, and is duly authorized to sign and execute this Lease. The persons executing this Lease on behalf of Landlord hereby covenant and warrant that Landlord is authorized to do business in the State where the Premises is located, and that the person signing this Lease on behalf of Landlord is duly authorized to sign and execute this Lease.

47. COUNTERPART COPIES.
This Lease may be executed in counterpart copies, all of which counterparts shall have the same force and effect as if all parties hereto had executed a single copy of this Lease.

48. CONFIDENTIALITY.
Any and all information contained in this Lease or provided to or by Tenant and/or Landlord by reason of the covenants and conditions of this Lease, economic or otherwise, shall remain confidential between Landlord and Tenant and shall not be divulged to third parties; provided, however Landlord and Tenant shall be permitted to divulge the contents hereof in connection with any contemplated sales, transfers, assignments, encumbrances or financing arrangements of their respective interests in the Premises or in connection with any administrative or judicial proceedings in which such party is involved where disclosure is required by law.

49. SUBMISSION NOT AN OFFER.
Neither the submission of this Lease by either party, nor the reliance by either party on the terms hereof, shall constitute an agreement or give either party a right to rely on the terms hereof. This Lease shall have no force or effect until it has been executed by all parties hereto.

50. SIGNAGE.
Tenant shall have exclusive sign rights for the Premises, exterior and interior, and shall have the right to erect and display signs on the Premises and on such other areas of the Premises as Tenant reasonably may request, subject only to compliance with applicable laws, ordinances and requirements of governmental authorities with competent

jurisdiction.

[*Signatures to follow*]

IN WITNESS WHEREOF, Landlord and Tenant have set their signatures and seals as of the date first above written.

**LANDLORD**:

MG FISHERSVILLE I, LLC,
a Virginia limited liability company

By:     John L. Crowley
Its:     Manager

**TENANT**:

YRC INC., d/b/a YRC FREIGHT,
a Delaware corporation

By:     Brad Schroeder
Its:     Authorized Officer

Taxpayer ID No.: 34-0492670

Exhibit "A"

**Legal Description**
**and**
**Diagram of Premises, Non-Exclusive Areas**

All that certain lot or parcel of land situate, lying and being in Beverly Manor District of Augusta County, Virginia, (formerly in South River District of Augusta County, Virginia, prior to recent redistricting of Augusta County, Virginia), containing 5.228 acres as shown on that certain plat entitled "Plat For Thurston Motor Lines, Inc., " dated June 23, 1989, by Brenneman Engineering, a copy of which said plat is of recorded in the Clerk's Office of the Circuit Court of Augusta County, Virginia in Deed Book 999, Page 130.

Exhibit "B"

Annual Rent

| Year | Lease Year | Rent |
|------|------------|------|
| 1 | July 1, 2012 – June 30, 2013 | $78,000.00 |
| 2 | July 1, 2013 – June 30, 2014 | $79,950.00 |
| 3 | July 1, 2014 – June 30, 2015 | $81,948.75 |
| 4 | July 1, 2015 – June 30, 2016 | $83,997.47 |
| 5 | July 1, 2016 – June 30, 2017 | $86,097.41 |
| If Renewal Option Exercised: | | |
| 6 | July 1, 2017 – June 30, 2018 | $88,249.84 |
| 7 | July 1, 2018 – June 30, 2019 | $90,456.09 |
| 8 | July 1, 2019 – June 30, 2020 | $92,717.49 |
| 9 | July 1, 2020 – June 30, 2021 | $95,035.43 |
| 10 | July 1, 2021 – June 30, 2022 | $97,411.31 |

25

04/12/2017    14:43                                    (FAX)                              P.002

## AMENDMENT NO. 1 TO COMMERCIAL LEASE AGREEMENT

THIS AMENDMENT NO. 1 TO COMMERCIAL LEASE AGREEMENT ("Amendment") is made effective and entered into as of the 21st day of April, 2017, by and between MG Fishersville I, LLC, a Virginia limited liability company (hereinafter referred to as "Landlord") and YRC Inc., d/b/a YRC Freight, a Delaware corporation (hereinafter referred to as "Tenant").

### WITNESSETH:

WHEREAS, Landlord and Tenant entered into a certain Lease on July 1, 2012 (the "Lease") under which Landlord leased to Tenant certain premises described in the Lease located at 53 Expo Road, Fishersville, Virginia ("Premises").

WHEREAS, Landlord and Tenant desire to amend the Lease for the purpose of extending the term, adjusting the monthly rent, and modify certain other provisions.

NOW THEREFORE, in consideration of the mutual promises, covenants and agreements hereinafter contained, the Lease is hereby amended as follows:

1. Extension Term: The term of the Lease is extended for five (5) years, commencing on July 1, 2017 and continuing through June 30, 2022 ("Extension Term").

2. Rent: During the Extension Term the monthly rent payable under the Lease will be the following:

| Period | Annual Rent | Monthly Rent |
|---|---|---|
| 7/1/2017 – 12/31/2017 | 43,048.00 | $7,174.78 |
| 1/1/2018 – 6/30/2018 | 43,584 | $7,264.00 |
| 7/1/2018 – 6/30/2019 | $88,692.00 | $7,391.00 |
| 7/1/2019 – 6/30/2020 | $90,240.00 | $7,520.00 |
| 7/1/2020 – 6/30/2021 | $91,824.00 | $7,652.00 |
| 7/1/2021 – 6/30/2022 | $93,432.00 | $7,786.00 |

$450,820.68

3. Notice Address: All notices to be given to Tenant in accordance with the Lease should be directed to the address shown below, or as changed in writing from time to time:

    Tenant:       YRC Freight
                  Attn: Properties
                  10990 Roe Avenue
                  Mail Stop: A-650
                  Overland Park, KS  66211
                  Fax: (913) 234-9238

4. Miscellaneous:
    a. All capitalized terms used in this Amendment, unless otherwise defined herein, will have the same meaning as the terms contained in the Lease.
    b. In case of any inconsistencies between the terms and conditions contained in the Lease and the terms and conditions contained in this Amendment, the terms and conditions of this Amendment will control.
    c. This Amendment may be executed in duplicate counterparts, each of which will be deemed an original. Facsimile and electronic (PDF) signatures are acceptable to effectuate the terms of this Amendment.
    d. Each of the parties represents and warrants that it has the right, power, legal capacity and authority to enter into and perform its respective obligations under this Amendment.

04/12/2017    14:43                                    (FAX)                        P.003

Except as set forth in this Amendment, all of the terms, covenants, conditions and agreements of the Lease shall remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the undersigned have hereunto set their hands as of the day and year first above written.

LANDLORD:

MG Fishersville 1, LLC,
a Virginia limited liability company

BY: _____
     John L. Crowley, Manager

TENANT:
YRC INC., d/b/a YRC FREIGHT,
a Delaware corporation

BY: _____
     Lance Collins, Director-Properties

## SECOND AMENDMENT TO COMMERCIAL LEASE

**THIS SECOND AMENDMENT TO COMMERCIAL LEASE** (this "**Second Amendment**") is made this 21st day of March, 2022 (the "**Effective Date**") by and between **MG FISHERSVILLE I, LLC**, a Virginia limited liability company ("**Landlord**"), and **YRC INC.**, a Delaware corporation, d/b/a YRC Freight ("**Tenant**").

A.      Landlord and Tenant are parties to that certain Commercial Lease dated July 1, 2012, as amended by that certain Amendment #1 to Commercial Lease Agreement dated April 21, 2017 (collectively, the "**Lease**"), whereby Tenant leased from Landlord a certain premises known generally as the Fishersville Terminal located in Augusta County, Virginia at 53 Expo Road, Fishersville, Virginia 22939, as more particularly described in said Lease (the "**Premises**").

B.      The current Term of the Lease (which includes a previously exercised Renewal Term) is set to expire on June 30, 2022.

C.      Landlord and Tenant wish to extend the Term of the Lease and make certain amendments to the Lease as further described in this Second Amendment.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants, conditions and agreements herein contained, and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and received, the parties hereto agree as follows:

1.  **Recitals; Capitalized Terms.**  The parties acknowledge that the above recitals to this Second Amendment are true and correct, and agree that the same are incorporated by reference into the body of this Second Amendment.  Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Lease.

2.  **Extension of Term; Additional Renewal Option.**  Landlord and Tenant agree that the Term of the Lease is hereby extended until June 30, 2025 and that Annual Rent for such extended portion for the Term shall be: (i) $108,000.00 for July 1, 2022 through June 30, 2023, (ii) $110,160.00 for July 1, 2023 through June 30, 2024, and (iii) $112,363.20 for July 1, 2024 through June 30, 2025.  Thereafter, Tenant shall have the option to further extend the Term of this Lease for an additional period of three (3) years (the "**Additional Renewal Option**") provided that Tenant shall give Landlord written notice of Tenant's intention to exercise such Renewal Option on or before January 1, 2025 (time being of the essence).  Tenant's right to exercise the Additional Renewal Option shall be null and void in the event Tenant fails to deliver written notice of Tenant's intention to exercise such Additional Renewal Option on or before January 1, 2025.  In the event that Tenant timely exercises the Additional Renewal Option, the word "Term" shall be deemed to include the Additional Renewal Option and the terms of this Lease shall continue to be of full force and effect through the Additional Renewal Option except that Annual Rent shall be: (i) $114,610.20 for July 1, 2025 through June 30, 2026, (ii) $116,902.68 for July 1, 2026 through June 30, 2027, and (iii) $119,240.76 for July 1, 2027 through June 30, 2028.

3. **Estoppel**. Tenant represents and warrants to Landlord that (a) the Lease is in full force and effect, and is the legal, valid and binding obligation of Tenant, enforceable in accordance with its terms, and (b) there are no defaults under the Lease by Landlord, nor claims against Landlord, nor any state of facts which, with the giving of notice or the passage of time, might constitute a default under the Lease or a claim against Landlord under the Lease.

4. **Miscellaneous**. Except as otherwise set forth herein, the Lease shall remain unchanged and in full force and effect. The Lease as amended hereby shall inure to the benefit of and be binding upon Landlord and Tenant and their respective successors and assigns. In the event of any inconsistency between the provisions of the Lease and the provisions of this Second Amendment, the provisions of this Second Amendment will control. No representations, understandings or agreements have been made or relied upon in entering into this Second Amendment other than those specifically set forth herein. This Second Amendment shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Virginia.

5. **Counterparts**. This Second Amendment may be executed in counterparts, each of which shall be deemed an original and all of which shall be one document. A signature received by electronic mail in "portable document format" (".pdf") or facsimile shall be deemed an original.

[signature page(s) to follow]

**IN WITNESS WHEREOF**, the parties hereto have each executed this Second Amendment to be effective for all purposes as of the date first written above.

LANDLORD:

**MG FISHERSVILLE I, LLC,**
a Virginia limited liability company

By: _____
Name: John E. Crowley
Title: Manager

TENANT:

**YRC INC.,**
a Delaware corporation, d/b/a YRC Freight

By: _____
Name: Jeffrey H. Coltrin
Title: Vice President – Finance & Properties

3