# **EXHIBIT A**

**(Lease)**

LEASE AGREEMENT

Between

# CHESHIRE DISTRIBUTION CENTER, L.L.C.,
as Landlord

- and -

# ROADWAY EXPRESS, INC.,
as Tenant

# LEASE AGREEMENT

**INDENTURE** made this _28_ day of July, 2005, by and between **CHESHIRE DISTRIBUTION CENTER, L.L.C.**, a Delaware limited liability company, with offices c/o Oaktree Capital Management, LLC, 1301 Avenue of the Americas, 34th Floor, New York, New York 10019 hereinafter referred to as "Landlord", and **ROADWAY EXPRESS, INC.** a Delaware corporation, with offices at 1077 Gorge Boulevard, Akron, Ohio 44309.

## WITNESSETH:

## ARTICLE 1. DEFINITIONS

**Section 1.1.**    Additional Rent.  In addition to the Minimum Rent, all other payments to be made by Tenant to Landlord, shall be deemed to be and shall become additional rent hereunder whether or not the same be designated as such; and shall be due and payable on demand or together with the next succeeding installment of rent, whichever shall first occur together with interest thereon after ten (10) days written notice. Landlord shall have the same remedies for failure to pay Additional Rent as for a nonpayment of Minimum Rent. Landlord, at its election, shall have the right to pay or do any act which requires the expenditure of any sums of money by reason of the failure or neglect of Tenant to pay any sums due under or perform any of the provisions of this Lease, and in the event Landlord shall, at its election, pay such sums or do such acts requiring the expenditure of monies, Tenant agrees to pay Landlord, upon demand, all such sums, and the sum so paid by Landlord, together with interest thereon after ten (10) days written notice, shall be deemed additional rent and be payable as such. All payments required to be made by Tenant to Landlord pursuant to this Lease shall be delivered to the office of the Landlord at the address set forth on the first page of this Lease or at such place or places as Landlord may from time to time designate by notice to Tenant, all without prior demand for same.

**Section 1.2.**    Commencement Date.  As used herein shall mean August 1, 2005.

**Section 1.3.**    Common Facilities.  As used herein shall mean all facilities furnished in the Industrial Center and designated for the general use, in common, of all occupants of the Industrial Center, including the Tenant hereunder, its officers, agents,

employees and customers.   Common Facilities shall include, but are not limited to, parking areas, streets, sidewalks, canopies, roadways, washrooms, shelter, ramps, landscaped areas and other similar facilities.

**Section 1.4.**   Demised Premises.  Approximately Seventy-Four Thousand Five Hundred Fifty-Four (74,554) aggregate square feet of Floor Area located on the ground floor of the building commonly known as 181 West Johnson Avenue, Cheshire, Connecticut (the "Building"), designated by cross-hatching on Exhibit A attached hereto and made a part hereof.  The Demised Premises do not include any exterior of the Building, or any space above the bottom of the structural framework supporting the roof or below the finished floor level of the area demised.

**Section 1.5.**   Industrial Center.  As used herein, the Industrial Center shall mean the land described on Exhibit A attached hereto and by this reference incorporated herein and the Building and all related common areas and common facilities located thereon, less any deletion by Landlord pursuant hereto, plus such additions and extensions as Landlord may from time to time designate as included with the Industrial Center pursuant hereto.  Exhibit A embodies the proposed outline of the Industrial Center of which the Demised Premises will be a part.  Landlord may amend Exhibit A at any time and make such departures therefrom as Landlord in its sole discretion may from time to time deem proper, including the minor relocation of the Demised Premises as a result of construction.  The Industrial Center may sometimes be hereinafter referred to as the Cheshire Distribution Center.

**Section 1.6.**   Lease Term.  **The Lease Term shall be Five (5) full Lease Years,** commencing on the Commencement Date, and ending, unless sooner terminated or extended as hereinafter provided, at midnight on the last day of the sixtieth (60th) calendar month following the Commencement Date.

**Section 1.7.**   Lease Year.  shall mean each period of twelve (12) consecutive months during the Lease Term commencing on the Commencement Date, except that the first Lease Year shall be extended by the number of days, if any, required for said first Lease Year to end on the last day of a calendar month.  For example, if the Commencement Date is August 15, 2005, the first Lease Year shall commence upon such date, the second Lease Year shall commence upon September 1, 2006 and so on.

**Section 1.8.**   Minimum Rent.

A.   The   annual   Minimum   Rent   shall   commence   upon   the Commencement Date and for and during the first Lease Year shall be Four Hundred

00205868.5                                    2

Thirty Two Thousand Dollars and No Cents ($432,000.00) or Thirty Six Thousand Dollars and No Cents ($36,000.00) monthly.

      **B.**    Commencing upon the first day of each of the second, third, fourth and fifth Lease Years during the Lease Term hereof, the Minimum Rent for each such Lease Year shall be an amount equal to the Minimum Rent for the immediately preceding Lease Year increased by the greater of (i) three (3%) percent or (ii) the percentage change in the "Consumer Price Index" for the preceding Lease Year measured from the first month of the prior Lease Year to the twelfth (12th) month of the prior Lease Year. The Minimum Rent, determined in accordance with this Section 1.8 shall be payable in equal monthly installments, in advance, on the first day of each month during the Lease Year then in effect. As used herein, "Consumer Price Index" shall mean the Consumer Price Index For All Urban Consumers All Items, United States (CPI-U) (1985-87 = 100) seasonally adjusted as published by the United States Department of Labor, Bureau of Labor Statistics, or any replacement thereof. If the manner in which the Consumer Price Index is determined by the Department of Labor shall be substantially revised, an adjustment shall be made in such revised index which would have obtained if the Consumer Price Index had not been so revised. If the current yearly average shall no longer be used as an index of 100, such change shall constitute a substantial revision. If the Consumer Price Index shall become unavailable to the public because publication is discontinued, or otherwise, Landlord will substitute therefor a comparable index based upon changes in the cost of living or purchasing power of the consumer dollar published by any other governmental agency or, if no such index shall then be available, a comparable index published by a major bank or other financial institution or by a university or a recognized financial publication shall be substituted.

      **Section 1.9.**    <u>Permitted Use</u>. Tenant shall use the Demised Premises solely for the purpose of a warehouse and distribution facility for Tenant's business with incidental office space related to the foregoing and for no other purposes whatsoever.

      **Section 1.10.**    <u>Real Estate Taxes</u>. As used herein shall mean all real estate taxes, assessments, water and sewer rents or charges and other governmental impositions and charges of every kind and nature whatsoever, extraordinary as well as ordinary, foreseen and unforeseen, and each and every installment thereof, which shall or may during the Lease Term be assessed, imposed, become due and payable or be levied by the lawful taxing authorities against the land, buildings and all other improvements in the Industrial Center, or liens upon or arising in connection with the use or occupancy or possession of, or becoming due or payable out of or for, the Industrial Center or any part thereof or any land, buildings or other improvements therein, including all commercially

reasonable costs and fees incurred by Landlord in contesting same or in negotiating with the appropriate governmental authorities as to same.

Except as otherwise set forth in the immediately succeeding paragraph of this Section l.10, nothing herein contained shall be construed to include as a Real Estate Tax any inheritance, estate, succession, transfer, gift, franchise, corporation, income or profit tax that is or may be imposed upon Landlord; provided, however, that, if at any time during the Lease Term the methods of taxation prevailing at the commencement of the Lease Term shall be altered so that in lieu of or as a substitute for the whole or any part of the taxes now levied, assessed or imposed, there shall be levied, assessed or imposed an income or other tax of whatever nature, then the same shall be included in the computation of Real Estate Taxes hereunder. As used in this Lease, the term "Common Facilities Charges" shall include any excise, transaction, sales or privilege tax hereafter imposed by any government or governmental agency upon Landlord on account of, attributed to, or measured by rent or other charges payable by Tenant, or levied by reason of the public parking made available by Landlord in the Industrial Center. Tenant shall not have the right to contest the amount or application of any Real Estate Taxes with any governmental authority.

**Section 1.11.**    Tenant's Pro-rata Share. As used herein shall mean a fraction, the numerator of which shall be the gross rentable area of the Demised Premises and the denominator of which shall be the gross rentable area of all buildings in the Industrial Center. As of the Commencement Date, **Tenant's Pro-rata Share shall be 14 and 15 one hundredths (14.15%) percent.**

## ARTICLE 2. GRANTING CLAUSE

**Section 2.1.**    Lease of Demised Premises. In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants and conditions hereof, Landlord hereby leases and rents to Tenant, and Tenant hereby leases and rents from Landlord, the Demised Premises. TO HAVE AND TO HOLD said Demised Premises for the Lease Term.

## ARTICLE 3. POSSESSION AND CONSTRUCTION

**Section 3.1.**    Demise Includes Use of Common Facilities.    The demise to Tenant shall include, in addition to the Demised Premises, the right to the nonexclusive

00205868.5                        4

use in common with others of the Common Facilities, subject, however, to the terms and conditions of this Lease and to the rules and regulations set forth in Exhibit B which is attached hereto and made a part hereof.

**Section 3.2.**    Quiet Enjoyment.    Tenant, upon paying the rent and performing Tenant's obligations in this Lease, shall peacefully and quietly have, hold and enjoy the Demised Premises and the appurtenances thereunto appertaining throughout the Lease Term, subject, however, to the provisions of this Lease, to all other agreements, conditions, restrictions and encumbrances and mortgages to which this Lease is or may become subject and subordinate.

**Section 3.3.**    Industrial Center.    Tenant acknowledges that Exhibit A attached hereto is a site plan which generally depicts the layout of the Industrial Center.

**Section 3.4.**    No Preparation of Demised Premises by Landlord.

A.    Tenant shall take possession of the Demised Premises on the Commencement Date in a strictly "as is", "where is" condition, and Landlord shall have no obligation to alter, improve, decorate or otherwise prepare the Demised Premises for Tenant's occupancy except that on or prior to the Commencement Date, Landlord shall deliver the dock and surrounding parking areas in so-called "broom clean" condition ("Landlord's Work"). The taking of possession of the Demised Premises by Tenant shall be deemed a delivery of the Demised Premises by Landlord and an absolute and unconditional acceptance of same by Tenant. Without limiting the generality of the foregoing, Tenant (and not Landlord) shall be fully responsible at Tenant's own cost and expense for repairing and maintaining all mechanical, electrical, lighting and plumbing systems ("Building Systems") in good operating order and condition throughout the Lease Term. The Building Systems shall be delivered in working order on the Commencement Date.

B.    The parties agree that Tenant shall be solely responsible for performing any alteration or other work necessary or desired by Tenant for its occupancy of the Demised Premises. Tenant agrees that it will promptly upon the Commencement Date with due diligence proceed and shall install such fixtures and equipment and perform such other work, including the Initial Tenant Work described below, as shall be necessary and appropriate in order to prepare the Demised Premises for the commencement of its business operations.

C.    Landlord has made no representations, warranties or promises with respect to this Lease, to the Demised Premises, to any fixtures, equipment or other property therein or to any matter related thereto, whether express or implied and Tenant acknowledges that it has not relied upon any representations, warranties or promises, whether from Landlord or from any of Landlord's employees, agents or representatives. ALL IMPLIED WARRANTIES ARE EXCLUDED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS, IF ANY.  Tenant waives any right to rescind this Lease under the laws of the State of Connecticut and further waives any damages which may result from any lack of completion of the Demised Premises.

**Section 3.5.**    Initial Tenant's Work.

Tenant shall, promptly upon the Commencement Date, perform all work necessary to prepare the Demised Premises for Tenant's occupancy (the "Initial Tenant's Work") at its sole cost, expense and risk in accordance with the design, materials and standards that Landlord shall determine are standard or appropriate for the Building and Industrial Center; provided, however, that Tenant shall make any changes in Tenant's Initial Work required by any governmental department or bureau having jurisdiction of the Center. The Initial Tenant's Work shall be performed by Tenant in full compliance with the terms, provisions of conditions set forth below in Article V.

## ARTICLE 4. TENANT PAYMENTS

**Section 4.1.**    Tenant's Obligations To Pay Minimum Rent and Other Charges. During the Lease Term, Tenant shall pay to Landlord without any prior demand and without any deduction or set-off whatsoever, Minimum Rent in the manner hereinafter set forth.  In addition to Tenant's obligation to pay. Minimum Rent, Tenant shall pay any tax, whether a sales tax or otherwise, which is or shall be imposed on Tenant's payment of rent hereunder.    Tenant further covenants and agrees to pay, as set forth hereinbelow, maintenance, taxes and insurance charges, all of which are included within the term "Additional Rent".

**Section 4.2.**    Additional Rent Adjustment. Should Tenant's obligations for the payment of Additional Rent cover less than a full calendar year, Tenant's liability for Additional Rent, excluding Real Estate Taxes, shall be subject to a pro rata adjustment based upon a fraction, the numerator of which is the number of days for which Tenant's obligation to pay Additional Rent, excluding Real Estate Taxes, is in effect, and the denominator of which is the number of days in the calendar year.

00205868.5                                   6

**Section 4.3.**   Minimum Rent.  Tenant shall pay to Landlord the Minimum Rent in the amounts set forth in this Lease.  Tenant covenants and agrees to pay to Landlord the Minimum Rent in advance on the first day of each calendar month during the Lease Term, in equal monthly installments, without deduction or set-off.  The Minimum Rent shall commence to accrue on the Commencement Date, on which date Tenant shall pay to Landlord the pro-rata amount applicable to the period from the Commencement Date to the first day of the calendar month immediately following the Commencement Date, together with the payment of the Minimum Rent for the first full calendar month.

**Section 4.4.**   Common   Facilities   Charge.     Commencing   with   the Commencement Date, and continuing thereafter during the Lease Term, Tenant will pay to Landlord, Tenant's Pro-rata Share of Landlord's operating cost of the Common Facilities (the "Common Facilities Charge").  Tenant's Common Facilities Charge shall be a monthly charge to be paid in advance, on the first day of each month, without deduction or set-off. Tenant's initial Common Facilities Charge shall be estimated by Landlord and the amount of such estimate shall be furnished to Tenant on or around to the Commencement Date.  **Within ninety (90) days after the end of each** Lease Year of the Lease Term, Landlord will furnish to Tenant a statement of the amount of Landlord's operating cost of the Common Facilities for the immediately preceding Lease Year, Landlord's estimate of Landlord's cost of operating the Common Facilities for the then Lease Year and Tenant's Common Facilities Charge for the then Lease Year.  Tenant shall pay any deficiency in Tenant's Common Facilities Charge with respect to both the preceding Lease Year and the then Lease Year (as a result of any delay in adjusting the monthly Common Facilities Charge for the then Lease Year) contemporaneously with the next regular installment of Tenant's Common Facilities Charge, which shall be adjusted to reflect Landlord's estimate of the cost of operating the Common Facilities for the then Lease Year. Landlord may increase the monthly payment of Common Facilities Charge to compensate for increased expenses for snow removal during periods of unusual snow fall.  **In addition, Tenant shall** be solely responsible for **the cost of maintenance and repair and snow and ice removal from all areas where Tenant is granted exclusive parking rights herein.**  Landlord shall credit any **excess payments made by** Tenant against the next regular installment of Tenant's Common Facilities Charge.

Tenant's Common Facilities Charge shall be based on the cost and expense of operating, maintaining and managing the Common Facilities in a manner deemed by Landlord reasonable and appropriate and for the best interest of the Industrial Center, including without limitation:

(a)     All costs and expenses, including capital expenses (the cost of each capital expense, plus interest charges paid thereon, shall be amortized on a straight-line basis over its estimated useful life and only the annual amortization cost of such capital expense shall be included in Tenant's Common Facilities Charge for each Lease Year until the cost of such capital expense is fully amortized), of operating, repairing, lighting, cleaning, painting, striping, securing (including cost of uniforms, equipment and all employment taxes) and insuring (including liability insurance for personal injury, death and property damage, insurance and extended coverage against fire, theft or other casualty, worker's compensation insurance covering personnel, fidelity bonds for personnel, insurance against liability for defamation and claims of false arrest occurring in or about the Common Facilities, and plate glass insurance for glass exclusively serving the Common Facilities) the Common Facilities;

(b)     All costs and expenses incurred by Landlord in making the Landlord's Repairs as set forth in Section 10.01 hereof.

(c)     All costs and expenses of paying all personnel employed on a full or part-time basis in the operation, maintenance or repair of the Common Facilities;

(d)     All costs and expenses of removal of rubbish and debris;

(e)     All costs and expenses of regulating traffic;

(f)     All costs and expenses of inspecting and depreciation on (straight-line) machinery and equipment used in the operation and maintenance of the Common Facilities and personal property taxes and other charges incurred in connection with such equipment;

(g)     All costs and expenses of the maintenance and replacement of paving, curbs, walkways, drainage and lighting facilities in the Common Facilities;

(h)     All costs and expenses of planting, replanting and replacing flowers, shrubbery and planters in the Common Facilities and the supplies required therefor;

(i)     All costs and expenses in the maintenance and replacement of the built-up roof system and all items in connection therewith, including but not limited to, flashing, expansion joints, pitch boxes, curbs, gutters, leaders and skylights;

00205868.5

8

(j)    The cost of all utilities, including the cost of standby water for fire protection, used in connection with the operation of the Common Facilities;

(k)    The cost of snow and ice removal from the Common Facilities; and

(l)    The cost of property management services which shall not exceed commercially reasonable rates. Tenant acknowledges and agrees that 20 cents per square foot for property management services is a commercially reasonable rate.

**Section 4.5.**    Net Lease.    It is the intention of the parties that the rent payable hereunder shall be absolutely net to Landlord, so that this Lease shall yield to Landlord the net annual basic minimum rent specified herein during the term of this Lease, and that all costs, expenses and obligations of every kind and nature whatsoever relating to the Demised Premises shall be paid by Tenant and shall be deemed to be and shall become Additional Rent hereunder whether or not the same be designated as such and Landlord shall have the same remedies for failure to pay same as for a non-payment of rent.

**Section 4.6.**    Utility Service Charges.    The electricity and gas servicing the Demised Premises will be separately metered to the Demised Premises and Tenant will be responsible for the utility charges incurred in connection with such use and shall make timely payments to the appropriate companies as billed by any said company.

**Section 4.7.**    Taxes.    Commencing with the Commencement Date and continuing thereafter during the term of this Lease, Tenant agrees to pay to Landlord on the first day of each month, in advance, and without deduction or set-off, Tenant's Pro-rata Share of Real Estate Taxes.  Tenant's initial monthly charge for Real Estate Taxes shall be based on Landlord's estimate of Real Estate Taxes, written notice of which charge for the initial tax year (as that term is hereinafter defined) shall be furnished to Tenant at or around the Commencement Date. · Such monthly charge may be periodically adjusted by Landlord to more accurately reflect Tenant's share of Real Estate Taxes.

Within ninety (90) days of receipt of the tax bills for each tax year, Landlord shall mail to Tenant a statement setting forth the Real Estate Taxes and the amount of Tenant's pro-rata share of Real Estate Taxes. Tenant's Pro-rata Share of Real Estate Taxes paid or payable for each tax year during the Lease Term shall be adjusted between Landlord and Tenant, each party hereby agreeing to pay to the other, within thirty (30) days of the mailing of the aforesaid statement to Tenant, such amount as may be necessary to effect Tenant's proportionate share of Real Estate Taxes based upon actual amounts due.  The term "tax year" as used herein shall mean the twelve-month

period established as the real estate tax year by the taxing authorities having jurisdiction over the Industrial Center.

Should Tenant's obligation for the payment of Real Estate Taxes pursuant to this Lease originate or terminate for less than a full tax year, Tenant's liability for Real Estate Taxes shall be subject to a pro rata adjustment based on the number of months of said tax year for which Tenant's obligation to pay Real Estate Taxes is in effect.

Tenant shall pay promptly when due all taxes directly or indirectly imposed or assessed on Tenant's business operations, machinery, equipment, improvements, inventory and other personal property or assets, whether such taxes are assessed against Tenant, Landlord or the Industrial Center as a single entity. In the event that such taxes are imposed or assessed against Landlord or the Industrial Center, Landlord, upon request, shall furnish Tenant with all applicable tax bills, public charges and other assessments or impositions.

Notwithstanding the foregoing, Tenant shall pay during the Lease Term its pro-rata share of water and sewer charges for the Industrial Center. These charges shall be billed in a manner similar to that set forth above for Real Estate Taxes.

**Section 4.8.**    Insurance Premiums. Tenant agrees to pay, within thirty (30) days after demand, any increase in premiums that may be charged on insurance carried by Landlord resulting from Tenant's use or occupancy of the Demised Premises or the Industrial Center (the "Insurance Premium Charge"). In determining whether increased premiums are the result of Tenant's use or occupancy of the Demised Premises, a schedule or "make-up" rate of the organization issuing the fire insurance, extended coverage, vandalism and malicious mischief, special extended coverage or any all-risk insurance rates for the Demised Premises or Industrial Center or any rule books issued by the rating organization or similar bodies or rating procedures or rules of Landlord's insurance companies shall be conclusive evidence of the several items and charges which make up the insurance rates and premiums on the Demised Premises and the Industrial Center. If due to the Tenant's failure to occupy the Demised Premises, as herein provided, any such insurance shall be canceled by the insurance carrier, then Tenant shall indemnify and hold Landlord harmless against any loss which would have been covered by such insurance. Tenant also shall pay any increase in premiums on rent insurance as may be carried by Landlord for its protection against rent loss through fire or other casualty, if such increase shall result from Tenant's occupancy or failure to occupy.

Commencing with the Commencement Date, Tenant further agrees to pay Tenant's pro rata share of the premiums charged for fire and extended coverage and liability insurance with all its endorsements carried by Landlord for those portions of the Industrial Center, other than the Common Facilities. Said sum shall be paid on the first day of each month, in advance and without deduction or set-off.

Within ninety (90) days after receipt by Landlord of the statement for payment of premium, Landlord shall mail to Tenant a statement setting forth: the amount of said insurance premium, and the amount of Tenant's Pro-rata share of the insurance premium. Tenant's pro rata share of insurance premiums paid or payable for each year during the Lease Term shall be adjusted between Landlord and Tenant, each party hereby agreeing to pay to the other, within thirty (30) days of mailing the aforesaid statement to Tenant, such amount as may be necessary to effect Tenant's pro-rata share of insurance premiums based upon actual amounts due and appropriate adjustment shall be made in Tenant's monthly payment for insurance premiums.

During any part of the Lease Term which shall be less than a full calendar year, any insurance premium shall be prorated on a daily basis between the parties to the end that Tenant only shall pay the insurance premium attributable to the portion of the calendar year within the Lease Term.

## ARTICLE 5. TENANT'S WORK

**Section 5.1.**    Except as expressly set forth herein, Tenant shall not, without Landlord's prior written approval, make (i) structural changes or alterations in or to the Demised Premises of any nature, (ii) changes or alterations which affect the Building's systems, which term shall include the Building's utility, plumbing, ventilating, electrical, air conditioning or heating systems or (iii) non-structural changes or alterations costing more than $10,000 in the aggregate. Prior to Tenant's commencing the Initial Tenant's Work described in Section 3.5 above, or any other work in the Demised Premises for which Landlord's prior approval is required, Tenant shall submit to Landlord for Landlord's written approval (which approval shall not be unreasonably withheld for non-structural work which does not affect any building systems), complete drawings, plans and specifications (herein collectively referred to as "Tenant's Plan") for the improvements and installations to be made by Tenant (said Initial Tenant's Work, together with all other work contemplated in this Article V is herein collectively referred to as "Tenant's Work"). Tenant shall also submit to Landlord for Landlord's written approval the proposed budget (updated as any work progresses) for all Tenant's Work to be made by Tenant and a list of contractors and subcontractors for Tenant's Work. Upon

request, Tenant agrees to employ Landlord's contractor to perform any part of Tenant's Work with respect to the Building's systems or the exterior of the Demised Premises and/or any structural aspect of Tenant's Work. Tenant acknowledges that said Landlord's contractor may be a related party to Landlord and Tenant has no objection thereto. Tenant's Plan shall be fully detailed, shall show complete dimensions, shall not require any changes in the structure of the Building (except as expressly permitted pursuant hereto) and shall not be in violation of any laws, order, rules or regulations of any governmental department or bureau having jurisdiction of the premises. Tenant shall pay all out-of-pocket expenses paid or incurred by Landlord in reviewing and approving Tenant's Plan and Tenant's Work.

**Section 5.2.**    Within ten (10) days after submission to Landlord of Tenant's Plan, Landlord shall either approve same or shall set forth in writing the particulars in which Landlord does not approve same, in which latter case Tenant shall, within ten (10) days after Landlord's notification, return to Landlord appropriate corrections thereto. Such corrections shall be subject to Landlord's approval not to be unreasonably withheld. Tenant shall pay to Landlord, promptly upon being billed, any reasonable charges or expenses of Landlord's architects and engineers in reviewing Tenant's Plan and/or insuring compliance therewith.

**Section 5.3.**    Tenant further agrees that Tenant shall not make any changes in Tenant's Plan subsequent to approval by Landlord unless Landlord consents to such changes. Tenant shall pay to Landlord all costs and expenses caused by such change which Landlord may incur or sustain in the performance by Landlord of any construction or work in the building. Landlord shall have the right to refuse to consent to any such changes if in the reasonable judgment of Landlord or Landlord's architect such changes materially deviate from Tenant's Plan theretofore approved by Landlord or otherwise violate the terms of this lease. Any charges payable under this subparagraph 5.3 shall be paid by Tenant from time to time upon demand as additional rent, whether or not the lease term shall have commenced.

**Section 5.4.**    Following compliance by Tenant with its obligations under the foregoing subparagraphs and approval of Tenant's Plan by Landlord, Tenant shall commence Tenant's Work and it shall proceed diligently with same in a good and workmanlike manner using first-class materials in order to complete same within a reasonable period of time.

**Section 5.5.**    Tenant agrees that in the performance of Tenant's Work (i) neither Tenant nor its agents or employees shall interfere with the work being done at the

00205868.5                                12

Industrial Center by Landlord and its contractors, agents and employees, (ii) that Tenant shall provide Landlord with adequate security (in the form of completion bond, letter of credit or other form, as determined by Landlord) to secure Tenant's full and timely performance and completion of Tenant's Work ("Security"), (iii) that Tenant shall comply with any reasonable rules and regulations proposed by Landlord, its agents, contractors or employees, (iv) that all personnel employed by Tenant shall be harmonious and compatible with the labor employed by Landlord in the building, it being agreed that if in Landlord's judgment the labor is incompatible with the labor employed by Landlord or construction labor employed by other tenants in the Industrial Center, Tenant shall immediately resolve such incompatibility, or upon Landlord's demand immediately withdraw such labor from the premises, (v) that prior to commencing Tenant's Work, Tenant shall procure and deliver to Landlord worker's compensation, public liability, property damage and such other insurance policies, in such amounts as shall be reasonably acceptable to Landlord in connection with Tenant's Work, and shall upon Landlord's request cause Landlord, any mortgagee of the Industrial Center and such other entities as Landlord shall designate to be named as an insured thereunder, (vi) that Tenant shall hold Landlord, any mortgagee of the Industrial Center and such other entities as Landlord shall designate harmless from and against any and all claims arising from or in connection with any act or omission of Tenant or its agents, contractors and employees, (viii) that Tenant's Work shall be performed in accordance with the approved Tenant's Plan and in compliance with the laws, orders, rules and regulations of any governmental department or bureau having jurisdiction of the demised premises and Tenant shall immediately correct any non-conforming work, and (vii) that Tenant shall promptly pay for Tenant's Work in full and shall not permit any lien to attach to the Demised Premises or the land and/or Industrial Center.

**Section 5.6.**    In the event that Tenant shall not diligently perform and fully pay for Tenant's Work and/or causes or permits any liens to attach to the Demised Premises or the building containing the Demised Premises, as determined by Landlord, then, in addition to any other remedies of Landlord in this lease contained, by law or otherwise, Landlord shall, to the extent Landlord deems necessary, be entitled to restore and/or protect the Demised Premises or the Industrial Center, and to pay or satisfy any costs, damages or expenses in connection with the foregoing and/or Tenant's obligations under the lease.

**Section 5.7.**    All trade fixtures and equipment installed or used by Tenant in the Demised Premises shall be fully paid for by Tenant in cash and shall not be subject to conditional bills of sale, chattel mortgage or other title retention agreements, unless the lender under such conditional bill of sale, chattel mortgage or other title retention interest

shall in substance expressly acknowledge that its interest does not affect Landlord's interest in the Demised Premises or the Industrial Center.

**Section 5.8.**    Notice is hereby given that the Landlord shall not be liable for any labor or materials furnished or to be furnished to the Tenant upon credit, and that no mechanic's or other lien for any such labor or materials shall attach to or affect the reversion or other estate or interest of the Landlord in and to the Demised Premises or the Industrial Center.

**Section 5.9.**    Notwithstanding anything to the contrary contained herein, Landlord shall not be obligated to give its consent or approval regarding Tenant's Work in the event that such consent or approval is required of, and not given by, Landlord's mortgagee.  Tenant's Work shall in all respects conform to the requirements, if any, imposed by any mortgage on the Industrial Center with respect to such alterations and improvements.

**Section 5.10.**    Landlord may, at any time and from time to time, in addition to any other right of access given to Landlord pursuant to the terms of this lease, enter upon the Demised Premises with one or more engineers and/or architects of Landlord's selection to determine the course and degree of completion of Tenant's Work and its compliance with Tenant's Plan and the terms and conditions of this lease.  In addition, Tenant agrees to allow other tenants of the Building and their guests and invitees, with appropriate reasonable identification and/or authorization, to pass through Tenant's outdoor gated areas at all times.

## ARTICLE 6.  USE OF THE PREMISES

**Section 6.1.**    Permitted Use.  During the Lease Term the Demised Premises shall be used and occupied solely for the purposes set forth in Section 1.9 and for no other purposes without the written consent of Landlord.  Upon the Commencement Date, Tenant shall commence the conduct of its business and shall continuously, actively and diligently thereafter operate its business at the Demised Premises in a high-grade and reputable manner and in accordance with the terms, provisions and conditions of this Lease.

**Section 6.2.**    Operation of Demised Premises.

A.    If any governmental license or permit shall be required for the proper and lawful conduct of Tenant's business in the Demised Premises or any part thereof,

00205868.5                                                    14

Tenant, at its expense, shall duly procure and thereafter maintain such license or permit and submit the same to Landlord for inspection. Tenant shall at all times comply with the terms and conditions of each such license or permit. Without limiting the generality of the forgoing, Tenant (and not Landlord) shall be responsible at its own cost, expense and risk to obtain a certificate of occupancy for Tenant's use and occupancy of the Demised Premises, it being agreed, however, that Landlord shall reasonably cooperate with Tenant's obtaining any local permitting relating to Tenant's use of the Demised Premises as herein contemplated, and Tenant shall pay Landlord's out-of-pocket expenses paid or incurred in connection therewith.

B.    Tenant shall not at any time use or occupy the Demised Premises, or suffer or permit anyone to use or occupy the Demised Premises, or do anything to be done in, brought into or kept on the Demised Premises, which in any manner in the sole discretion of Landlord (a) violates the Certificate of Occupancy for the Demised Premises; (b) causes or is liable to cause injury to the Demised Premises or the Industrial Center or any equipment, facilities or systems therein; (c) constitutes a violation of the laws and requirements of any public authorities or the requirements of insurance bodies; (d) constitutes a nuisance, public or private; (e) makes unobtainable from reputable insurance companies authorized to do business in the State of Connecticut any fire insurance with extended coverage, or liability, elevator, boiler or other insurance at standard rates required to be furnished by Landlord under the terms of any mortgages covering the Demised Premises; (f) discharges objectionable fumes, vapors or odors into the Demised Premises and/or Industrial Center's flues or vents or otherwise in such manner as may offend other tenants or occupants of the Industrial Center; or (g) is in violation of laws or any regulation of any governmental authority.

C.    Tenant, at Tenant's expense, shall at all times cause all portions of the Demised Premises to be kept in a clean and safe condition, including, without limitation, the windows, doors and loading docks thereof, in a manner reasonably satisfactory to Landlord and in compliance with the requirements of all governmental authorities having jurisdiction therein.

D.    Tenant covenants and agrees at all times during the term of this Lease, except when and to the extent that the Demised Premises may be untenantable by reason of damage by fire or other casualty, to continuously and uninterruptedly use, occupy and operate for the Permitted Use all of the Demised Premises.

00205868.5                              15

E.    Tenant covenants and agrees that no part of the loading docks, drives, sidewalks or walkways abutting or leading to the Demised Premises, nor the Demised Premises itself, has been leased to Tenant for retail, commercial or sale purposes and that Tenant shall use no part thereof for such purposes.

F.    Tenant covenants at all times to exterminate and keep the Demised Premises in a clean, sanitary and wholesome condition at its own cost and expense.

G.    Tenant shall store all of Tenant's refuse and rubbish in the Demised Premises enclosed areas and in sanitary containers and arrange for it to be removed from the Demised Premises at Tenant's sole cost and expense.  Landlord shall not be required to furnish any services or equipment for the removal of such refuse and rubbish.  Tenant further agrees that the refuse and rubbish to be collected or disposed of from the Demised Premises shall be removed only in accordance with the present or future regulations established by Landlord.  If the use of plastic bags for external refuse storage and disposal is unsatisfactory due to vandalism or other cause, Tenant will place refuse, at Landlord's request, in metal containers.

H.    Tenant shall not place any item, merchandise, inventory, fixture or equipment within the Demised Premises which will have a weight in excess of the floor load of the Demised Premises.

I.    Tenant agrees that the tenant occupying the space to the north of the Demised Premises (currently H&M) shall have the right to use the doorway connecting the Demised Premises to such space for emergency egress if necessary.

**Section 6.3.**    Rules and Regulations.  The rules and regulations set forth in Exhibit B are made a part of this Lease, and Tenant agrees to comply with and observe the same.  Tenant's failure to keep and observe the rules and regulations shall constitute a breach of the terms of this Lease in the manner as if the same were contained herein as covenants.  Landlord reserves the right from time to time to reasonably amend or supplement said rules and regulations and to adopt and promulgate additional reasonable rules and regulations applicable to the Demised Premises and the Industrial Center.  Notice of such additional rules and regulations, and amendments and supplements, if any, shall be given to Tenant, and Tenant agrees to comply with and observe all such amendments and supplements from and after the date of such notice.

**Section 6.4.**    Parking.  Tenant shall have the right to use in accordance with other tenants at the Building, the parking areas on the north and east sides of the Building

00205868.5                                        16

where designated on Exhibit A.  In addition, Tenant shall have the right to exclusive use of the parking areas designated on Exhibit A for the parking of Tenant's trucks, subject however to the rights of the existing tenants of the Industrial Center to unobstructed access and passage over and through such areas.  Tenant shall not have the right to park its cars or trucks in any other areas of the Industrial Center except as set forth in the preceding two (2) sentences and in Article XXXI.

## ARTICLE 7.VII.  COMMON FACILITIES.

**Section 7.1.**     Common Facilities Under Control of Landlord.  The Common Facilities shall at all times be subject to the exclusive control and management of Landlord, and Landlord shall have the right from time to time, and providing the visibility of and the access to the Demised Premises are not materially and adversely affected, to do any of the following:  add, alter or construct upon any portion of the Industrial Center; change the area, level, location and arrangement of such parking areas and other facilities comprising the Common Facilities; restrict parking by Tenant and its employees to employee parking areas; do such things as in Landlord's reasonable discretion may be necessary regarding said facilities; and make all rules and regulations pertaining to and necessary for the proper operation and maintenance of the Common Facilities.  Except as in this Lease specifically provided, Tenant shall have no right or interest in the Common Facilities.  If the Common Facilities shall be changed or diminished in accordance with the terms hereof, Landlord shall not be subject to any liability to Tenant and Tenant shall not be entitled to any compensation or abatement of rent nor shall any change or diminution of such areas be deemed constructive or actual eviction. Tenant agrees not to hinder, block or deny access of vehicular ingress and egress of any other tenant to and from the Building.

**Section 7.2.**     Industrial Center as Private Property.  In order to establish that the Industrial Center, and any portion thereof is and will continue to remain private property, the Landlord shall have the unrestricted right in the Landlord's sole discretion, with respect to the entire Industrial Center and/or any portion thereof owned or controlled by the Landlord, to close the same to the general public for one (1) non-business day in each calendar year and, in connection therewith, to seal off all entrances to the Industrial Center or any portion thereof.

00205868.5                          17

## ARTICLE 8.VIII.  UTILITIES

**Section 8.1.**    Obtaining Utilities.  Tenant shall make application for, arrange for and pay or cause to be paid and shall be solely responsible for all charges for utility services and shall indemnify Landlord and save it harmless against any liability or charges on account thereof.  In the event any such utility charges are not paid by Tenant when due, Landlord may pay the same to the utility company or department furnishing the same and any amount so paid by Landlord shall be paid by Tenant as additional rent for the month next following such payment by Landlord.

**Section 8.2.**    Installation of Equipment by Tenant.  Tenant further agrees that it will not install any equipment which will exceed or overload the capacity of any utility facilities and that if any equipment installed by Tenant shall require additional utility facilities, the same shall be installed at Tenant's expense in accordance with plans and specifications to be approved in writing by Landlord.

**Section 8.3.**    Cessation of Utilities.  Landlord shall not be liable to Tenant for any damages should the furnishing of any utilities by any utility company be interrupted or required to be terminated because of necessary repairs or improvements or any cause beyond the control of Landlord.  Nor shall any such interruption or cessation relieve Tenant from the performance of any of Tenant's covenants, conditions and agreements under this Lease.

**Section 8.4.**    Demised Premises Heating and Air-Conditioning.  Tenant agrees to operate the heating and air-conditioning servicing the Demised Premises in such a manner so as to maintain an adequate temperature within the Demised Premises during Tenant's business hours and at such temperatures during non-business hours to prevent the freezing of any pipes or plumbing facilities.  Tenant agrees to keep in force a standard maintenance agreement, at the sole expense of Tenant, and to furnish a copy of such agreement to Landlord upon request.  If Tenant does not provide such maintenance agreement, Landlord shall have the right to enter into such agreement on behalf of Tenant at Tenant's sole cost and expense.

**Section 8.5.**    **A.** Prior to the Commencement Date, Landlord, at Landlord's expense, shall have installed a submeter or submeters in the Demised Premises to measure Tenant's actual consumption of electricity in the entire Demised Premises. Tenant shall pay to Landlord, from time to time, upon demand, for the electricity consumed in the Demised Premises, as determined by such submeter or submeters, the

actual cost to Landlord of purchasing electricity for the Demised Premises (as such actual cost is hereinafter defined) plus all applicable taxes thereon. In addition to the payment required to be made by Tenant to Landlord for the electricity consumed in the Demised Premises as aforesaid, Tenant shall also pay to Landlord as an administrative fee a sum equal to five (5%) percent of such actual cost to Landlord of purchasing electricity for the remises. Landlord's actual cost for Tenant's KW and KWH shall be determined by the application of the Building's electric rate schedule per month from the corporation(s) and/or other entity(ies) selected by Landlord to supply electrical service to the Building to Tenant's usage. With respect to any period when any such submeter is not in good working order, Tenant shall pay Landlord for electricity consumed in the portion of the Premises served by such submeter at the rate paid by Tenant to Landlord during the most recent comparable period when such submeter was in good working order plus such five (5%) percent administrative fee. Tenant shall take good care of any such submeter and all submetering installation equipment, at Tenant's sole cost and expense, and make all repairs thereto occasioned by any acts, omissions or negligence of Tenant or any person claiming through or under Tenant as and when necessary to insure that any such submeter is, at all times during the Term, in good working order.

   **B.** Landlord may, at any time, elect to discontinue the redistribution or furnishing of electrical energy. In the event of any such election by Landlord, (i) Landlord agrees to give reasonable advance notice of any such discontinuance to Tenant, (ii) Landlord agrees to permit Tenant to receive electrical service directly from the corporation(s) and/or other entity(ies) Landlord selects to supply electrical service to the Building and to permit the existing feeders, risers, wiring and other electrical facilities serving the Demised Premises to be used by Tenant for such purpose to the extent they are suitable and safely capable, (iii) the provisions of Subsection A of this Section 8.5 shall be deemed deleted from this Lease, and (iv) this Lease shall remain in full force and effect and such discontinuance shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of rent, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business, or otherwise. Notwithstanding anything to the contrary contained in this Section 8.05B., Landlord agrees that Landlord shall not voluntarily discontinue the redistribution or furnishing of electrical energy until Landlord shall have made or paid for all installations required to provide Tenant with electrical service similar to the electrical service which Tenant had in the Demised Premises immediately prior to such discontinuance so that Tenant shall, upon such discontinuance, be able to receive electrical service directly from the public utility corporation supplying electrical service to the Building.

00205868.5

19

## ARTICLE 9.  LIENS

**Section 9.1.**    <u>Discharge of Lien</u>.  Tenant shall, prior to the commencement of any work upon the Demised Premises, do all things necessary to prevent the filing of any mechanics' or other liens against the Industrial Center, the Demised Premises or any part thereof by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Demised Premises, or any part thereof, through or under Tenant.  If any such lien or notice thereof shall at any time be filed against the Demised Premises, then Tenant shall either cause the same to be discharged of record within twenty (20) days after the date of filing of the same or, if Tenant, in Tenant's discretion and in good faith, determines that such lien should be contested, furnish such security as may be necessary or required to prevent any enforcement or foreclosure proceedings against the Demised Premises during the pendency of such contest.  If Tenant shall fail to discharge such lien within such period or fail to furnish such security, then, in addition to any other right or remedy of Landlord resulting from such default, Landlord may, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien in such manner as is, or may be, prescribed by law.  Tenant shall repay to Landlord, as additional rent, all sums disbursed or deposited by Landlord pursuant to the foregoing provisions of this Section 9.1, including interest and the costs, expenses and reasonable attorneys' fees incurred by Landlord in connection therewith.

## ARTICLE 10.    MAINTENANCE, REPAIR AND ALTERATIONS

**Section 10.1.**    <u>Landlord and Tenant Repair</u>.  Landlord will make necessary structural repairs to the Building's roof, foundation and exterior walls, excepting any work done by Tenant or by Landlord for Tenant; provided, however, that in each case Tenant shall have given Landlord prior written notice of the necessity of such repairs ("Landlord's Repairs").  The cost of all repairs made by Landlord shall be included in the Common Facilities Charge pursuant to Paragraph 4.4 of this Lease.  If any such repair is required by reason of Tenant's negligence or the negligence of any of its contractors, agents, invitees, delivery trucks, vendors, distributors, employees or other person using the Demised Premises with Tenant's consent, express or implied, or Tenant's failure to perform any of its obligations under this Lease, then Landlord may, at its option, make such repair and add the cost thereof to the first installment of Minimum Rent which shall thereupon become due.  Except as hereinbefore provided, Tenant covenants and agrees to keep and maintain in good working order, condition and repair the Demised Premises and

00205868.5                                    20

every part thereof, including fixtures and equipment therein, the exterior and interior portions of all loading docks, drives leading to same, doors, door checks, security gates, windows, glass, all Building systems, including plumbing and sewage facilities within the Demised Premises (and the free flow of sewer lines therein) and all sprinkler, heating, air-conditioning, ventilation, mechanical, electrical and lighting systems and all fixtures, interior walls, floors and ceilings.    Tenant shall accomplish any and all repairs, alterations, replacements and modifications at its own expense, using materials and labor of kind and quality equal to the original work.  As a material inducement to Landlord to enter into this Lease and to accept Tenant's use of the Demised Premises as herein permitted, Tenant covenants and agrees to and with Landlord that Tenant shall, at its sole cost and expense, surrender the Demised Premises and all areas of the Industrial Center subjected to Tenant's use (including without limitation, all drives and other paved surfaces) at the expiration or earlier termination of this Lease in as good condition as when received, excepting only deterioration caused by ordinary wear and tear or fire and other casualty resulting in termination by Landlord as provided in Article XIV hereof.

If any repairs required to be made by Tenant hereunder are not made within twenty (20) days after written notice delivered to Tenant by Landlord, or if such repairs are of a nature that they cannot be completed within twenty (20) days, then if Tenant, within such twenty (20) day period has not commenced such repair or having commenced such repairs, thereafter fails to diligently complete such repairs, then Landlord may, at its option, make such repairs without liability to Tenant for any loss or damage which may result to its inventory or business by reason of such repairs, and Tenant shall pay to Landlord, as additional rent, upon demand, the reasonable cost of such repairs plus interest from the date of payment by Landlord until repaid by Tenant.

Except as provided herein, Landlord shall have no obligation to repair or maintain the Demised Premises, or any part thereof, or any Building system therein, including the plumbing, heating, electrical, air-conditioning or other mechanical installations therein.

**Section 10.2.**    Alteration of Demised Premises.  Except for the installation of unattached moveable trade fixtures, which may only be installed without drilling, cutting or otherwise defacing the Demised Premises, Tenant shall not make any alterations, additions or improvements to the Demised Premises without the prior written consent of Landlord.

**Section 10.3.**    Fixtures and Signs.  Tenant shall not install or fix any sign, device, fixture or attachment on or to the exterior or interior of the Demised Premises or Building, nor place any vents, structure, building, improvement, sign or advertising device or obstruction of any type or kind upon the Common Facilities or on or to the exterior or interior of the Demised Premises, without first obtaining Landlord's written consent. If Tenant shall do any of the foregoing acts in contravention of this provision, then Landlord shall have the right to remove any such decoration, paint, alteration, sign, device, fixture or attachment, etc., and restore the Demised Premises and/or the Common Facilities to the condition thereof prior to such act, and the cost of such removal and restoration shall be paid by Tenant as an additional charge.  Any signage approved for Tenant shall be installed, maintained and at the termination or expiration of this Lease removed by Tenant at Tenant's sole cost, expense and risk.

Throughout the term of this Lease, Landlord reserves the right to remodel or renovate the Building facade and to require Tenant to replace, at its sole expense, its existing signage once during the original term of this Lease to conform to Landlord's common signage scheme for the Building as to sign size, location and material, but using Tenant's standard logo and sign colors.

**Section 10.4.**    Construction Standards.  All construction work done by Tenant within the Demised Premises shall be performed in compliance with Article V hereof. Tenant shall, at Tenant's sole cost and expense, erect and install a temporary enclosure, subject to Landlord's reasonable approval, which structure shall enclose all of the Demised Premises during construction therein, and which enclosure shall meet all state and local fire codes and Landlord's insurance standards.

## ARTICLE 11.    ENTRY, INSPECTION, POSTING AND DISPLAY

**Section 11.1.**    Posting Notices.    Tenant shall permit Landlord and any authorized representative of Landlord to enter the Demised Premises at all reasonable times during business hours for any of the following purposes:  serving or posting or keeping posted thereon notices required by any law or which Landlord may reasonably deem necessary or appropriate for the protection of Landlord or its interest; inspecting the Demised Premises; inspecting the heating and air-conditioning service facilities and sprinkler facilities; any other reason that may be necessary to comply with any laws, ordinances, rules, regulations or requirements of any public authority or any applicable standards that may from time to time be established by all carriers of insurance on the Demised Premises, any Board of Underwriters, Rating Bureau or similar bodies or that

00205868.5                          22

Landlord may deem necessary to prevent waste, loss, damage, or deterioration to or in connection with the Demised Premises. Nothing herein shall imply any duty upon the part of Landlord to do any work which, under any provision of this Lease, Tenant may be required to perform, and the performance thereof by Landlord shall not constitute a waiver of Tenant's default in failing to perform the same. Landlord may, during the progress of any work on the Demised Premises, keep and store upon the Demised Premises all necessary materials, tools and equipment without the same constituting a constructive eviction of Tenant in whole or in part, and the rents reserved shall not abate while said work is in progress by reason of loss or interruption of Tenant's business or otherwise. Landlord shall not in any event be liable for inconvenience, annoyance, disturbance, loss of business or other damage of Tenant by reason of the performance of any work on the Demised Premises, or on account of bringing materials, supplies and equipment into or through the Demised Premises during the course of work on or in or under the Demised Premises, and the obligations of the Tenant under this Lease shall not thereby be affected in any manner whatsoever. However, Landlord, in connection with the doing of any such work, shall cause as little inconvenience, annoyance, disturbance, loss of business or other damage to Tenant as may reasonably be possible under the circumstances and shall use all reasonable efforts to preserve vehicular and personnel access to the Demised Premises.

**Section 11.2.**    Entry to Demised Premises.    Landlord and any authorized representative of Landlord may enter the Demised Premises at all reasonable times during business hours for the purpose of exhibiting the same to prospective purchasers, mortgagees, lessees and tenants and, during the final six (6) months of the Lease Term, may exhibit the Demised Premises for hire.

**Section 11.3.**    Landlord's Easement.    Tenant hereby grants to Landlord such licenses and easements in, over or under the Demised Premises or any portion or portions thereof as shall be reasonably required for the installation or maintenance of mains, conduits, pipes, ducts or other facilities to serve the Industrial Center, or any part thereof, including, but not by way of limitation, the premises of any other tenant or occupant; provided, however, that no exercise, occupancy under or enjoyment of any such license or easement shall result in the permanent unreasonable interference with Tenant's use of the Demised Premises as contemplated by this Lease.

## ARTICLE 12.        XII. LAWS AND INSURANCE STANDARDS

**Section 12.1.**     Tenant's Compliance With Laws and Insurance Standards.  Tenant shall, during the Lease Term and at Tenant's sole cost and expense, promptly comply in every respect with the following: all codes, laws, ordinances, rules and regulations of all federal, state, county and municipal governments, including without limitation, all Environmental Laws (hereinafter defined) now in force or that may be enacted hereafter; all requirements of the American with Disabilities Act of 1990, as the same may be hereafter modified from time to time; all directions, rules and regulations of the fire marshal, health officer, building inspector, zoning official and/or other proper officers of the governmental agencies having jurisdiction over the Demised Premises; all carriers of insurance on the Demised Premises, any Board of Underwriters, Rating Bureau and any similar bodies, which are applicable to Tenant's use and occupancy of the Demised Premises. Tenant shall, at Tenant's sole cost and expense, make all changes to the Demised Premises which are or hereafter may be required in order to comply with the foregoing.   Tenant expressly covenants and agrees to indemnify and save Landlord harmless from any penalties, damages or charges imposed for any violation of any and all laws, ordinances, rules or regulations or violations of the covenants herein expressed, whether occasioned by Tenant or any person upon the Demised Premises.

**Section 12.2.**     Tenant's Use of Demised Premises Impaired.  Tenant shall have no claim against Landlord for any damages should Tenant's use and occupancy of the Demised Premises for the purpose set forth in this Lease be prohibited or substantially impaired by reason of any law, ordinance or regulation of federal, state, county or municipal governments or by reason of any act of any legal or governmental or other public authority.

**ARTICLE 13.**     **INDEMNIFICATION OF LANDLORD AND LIABILITY INSURANCE**

**Section 13.1.**     Tenant Indemnity.  Tenant hereby indemnifies and agrees to defend and hold Landlord and its managing agents and its and their respective members, partners, affiliates, principals, shareholders, officers, directors, members, trustees, fiduciaries, servants, agents and employees free and harmless from and against all suits, causes, actions, damages, liabilities, penalties, costs, charges, fees and expenses, including without limitation, attorneys' fees and disbursements, in connection with a breach by Tenant under this Lease or with loss of life, personal injury or property damage arising from or out of any occurrence in, upon, at or from the Demised Premises or the occupancy or use by Tenant of the Demised Premises or occasioned wholly or in part by any act or omission by Tenant, its agents, contractors, employees, servants, invitees,

00205868.5                                    24

licensees or concessionaires, whether or not occurring or resulting in damage or injury within the Demised Premises or upon the Common Facilities and whether or not any such act or omission constitutes a violation of law or this Lease; Tenant shall store its property in and shall occupy the Demised Premises and all other portions of the Industrial Center at its own risk; Landlord shall not be responsible or liable at any time for any loss or damage to Tenant's merchandise, equipment, fixtures or other personal property of Tenant or to Tenant's business; Landlord shall not be responsible or liable to Tenant, or to those claiming by, through or under Tenant, for any loss or damage to either the person or property of Tenant, or of those claiming by, through or under Tenant, that may be occasioned by or through the acts or omissions of persons occupying adjacent, connecting or adjoining premises; Landlord shall not be responsible or liable for any defect, latent or otherwise, in any building in the Industrial Center or in any of the equipment, machinery, utilities, appliances or apparatus therein; Landlord shall not be responsible or liable for any injury, loss or damage to any person or to any property of Tenant or other person caused by or resulting from bursting, breakage or leakage, steam or snow or ice, running, backing up, seepage, or the overflow of water or sewage in any part of the Industrial Center or for any injury or damage caused by or resulting from any defect or negligence in the occupancy, construction or use of any building in the Industrial Center, or machinery, apparatus or equipment therein or thereon; or by or from the acts of negligence of any occupant of the Industrial Center building.  Providing Tenant has knowledge of same, Tenant shall give prompt notice to Landlord in case of fire or accidents in the Demised Premises or in the building of which the Demised Premises are a part and of defects therein or in any fixtures or equipment.  Landlord shall in no event be liable for any damages arising from any act, omission or negligence of any other tenant at the Industrial Center. In case Landlord shall be made a party to any litigation commenced by or against Tenant, Tenant shall protect and hold Landlord harmless and shall pay all reasonable costs, expenses and attorney's fees in connection therewith.  The obligations of Tenant under this Section shall survive the termination of this Lease.

**Section 13.2.**   Tenant Liability Insurance.  Tenant shall at all times during the Lease Term maintain in full force and effect the following insurance in standard form generally in use in the state in which the Industrial Center is located with insurance companies with an AM Best rating of A or better (or a comparable rating in the event that the AM Best rating is no longer published) and authorized to do business in said state:

(a)   Commercial general liability insurance in the amount of at least Five Million Dollars ($5,000,000) per any occurrence resulting in bodily injury, personal injury or property damage.  The pollution exclusion in the liability policy has been amended and shall not apply if the discharge, release or escape of pollutants is the direct result of a

00205868.5

25

sudden and accidental occurrence involving the operation or use of a covered vehicle; or if the pollutants are goods of others which are legally in transit and physically in the possession of Tenant at the time of the discharge, dispersal, release or escape but only if they have not been in Tenant's physical possession for more than 30 days prior to the discharge, dispersal, release or escape.

(b)    Commercial Automobile Insurance covering all owned, non-owned and hired automobiles of Tenant including the loading and unloading of any automobile, truck or other vehicle with limits of liability not less than $5,000,000 combined single limit for bodily injury liability and property damage liability.

(c)    Tenant further agrees that any contractor Tenant hires to perform any alterations to the Demised Premises shall furnish Tenant with certificates showing evidence of comprehensive public liability and damage insurance in the amount of at least ~~$3,000,000~~ plus required workmen's compensation and employer's liability insurance coverage to the extent required by law.

*[handwritten margin note: $1,000,000]*

The insurance and certificates required in subsections (a) through (c) above shall name Landlord, as an additional insured for the full amount of the insurance herein required. With respect to each and every policy of such insurance and each renewal thereof, Tenant, at the beginning of the Lease Term and thereafter not less than thirty (30) days prior to the expiration of any such policy, shall furnish Landlord with a certificate of insurance executed by the insurer involved which shall contain, in addition to matters customarily set forth in such a certificate under standard insurance industry practices, an undertaking by the broker to give Landlord ten (10) days' prior written notice of cancellations, nonrenewal or change in scope or amount of coverage of such policy. Tenant shall, at all times, maintain worker's compensation insurance to comply with the applicable laws of the state in which the Industrial Center is located.

**Section 13.3.**    Landlord Indemnity.    Landlord hereby indemnifies and agrees to defend and hold Tenant and its and their members, partners, affiliates, principals, shareholders, officers, directors, members, trustees, fiduciaries, servants, agents and employees free and harmless from and against all suits, causes, actions, damages, liabilities, penalties, costs, charges, fees and expenses, including without limitation, attorneys' fees and disbursements, in connection with a breach by Landlord under this Lease or with loss of life, personal injury or property damage arising from or out of all acts, failures, omissions or negligence of Landlord, its agents, employees or contractors in, upon, at or from the Common Facilities. The obligations of Landlord under this Section shall survive the termination of this Lease.

00205868.5                    26

**Section 13.4.** Landlord Liability Insurance. During the term of the lease, Landlord, at its own expense, shall maintain comprehensive general public liability insurance against any claims upon Landlord arising from the ownership, operation or control of the Industrial Center with respect to bodily injury, death, property damage or other risks of similar nature with combined limits as Landlord deems appropriate, but in no event less than FIVE MILLION and 00/100 ($5,000,000) DOLLARS per occurrence.

## ARTICLE 14.    XIV. FIRE INSURANCE, DAMAGE AND DESTRUCTION

**Section 14.1.** Landlord Insurance. At all times during the Lease Term, Landlord shall maintain in effect with a responsible insurance company or companies with an AM Best rating of A or better (or a comparable rating in the event that the AM Best rating is no longer published), policies of insurance covering the building of which the Demised Premises constitute a part, providing protection to the extent of not less than the full replacement cost of the building against all casualties included under standard insurance industry practices within the classification "All Risk". Nothing in this Section shall prevent the taking out of policies of blanket insurance, which may cover real and/or personal property and improvements in addition to the building of which the Demised Premises constitutes a part; provided, however, that in all other respects each such policy shall comply with the other provisions of this Section 14.1. Upon the termination of Tenant's insurance provided for in Section 14.2(c), Tenant's Work shall be included in Landlord's insurance as provided for in Section 14.1.

**Section 14.2.** Tenant Insurance. At all times during the Lease Term, Tenant shall pay all premiums for and maintain in effect, with a responsible insurance company or companies with an AM Best rating of A or better (or a comparable rating in the event that the AM Best rating is no longer published) licensed to do business within the state in which the Industrial Center is located, policies of insurance for the benefit of Tenant, as follows:

(a)    Insurance covering Tenant's trade fixtures, furniture, furnishings, equipment and other installations of Tenant not otherwise covered under Landlord's insurance coverage as described in Section 14.1 above, providing protection to the extent of not less than the full replacement cost thereof against all casualties included under standard insurance industry practices within the classification "All Risk" and insurance covering sprinkler leakage, unless Tenant's insurance otherwise includes sprinkler leakage coverage.

00205868.5                           27

(b)    Plate glass insurance covering the plate glass in the Demised Premises; provided, however, Tenant may satisfy this requirement by self-insuring and in the event of damage or destruction to said plate glass immediately replacing same.

(c)    Insurance covering the full replacement cost of any Tenant's Work against all casualties included under standard insurance industry practices within the classification "All Risk" which insurance shall be maintained, and under no circumstances terminated by Tenant, until Landlord has included such Tenant's Work under Landlord's insurance as provided for in Section 14.1 and has given Tenant notice thereof.

Tenant will furnish to Landlord, within five (5) days after Tenant receives notice of Landlord's intention to deliver possession of the Demised Premises and prior to Tenant entering on the Demised Premises, certificates of insurance evidencing coverages required by this Lease. All policies required hereunder shall contain an endorsement providing that the insurer will not cancel, fail to renew or materially change the coverage of said policy or policies without first giving ten (10) days' prior written notice thereof to the Landlord.

Landlord and Tenant hereby grant to each other on behalf of any insurer providing the insurance to either of them described in Sections 14.1 and 14.2 covering the Demised Premises, improvements therein or contents thereof a waiver of any right of subrogation any such insurer of one party may acquire against the other by virtue of payment of any loss under such insurance. Such waivers shall stand mutually terminated as of the date either Landlord or Tenant ceases to be so empowered to grant such subrogation on behalf of any such insurer.

**Section 14.3.**    Landlord Repair. If the Demised Premises shall be partially damaged by any fire or casualty covered under the Landlord's insurance policy pursuant to Section 14.1, Landlord shall, upon receipt of the insurance proceeds, repair the same; provided, however, the obligation of Landlord to restore the Demised Premises as herein provided shall be limited to such restoration as can be financed by such insurance proceeds as shall actually be received by Landlord, free and clear from collection by any mortgagees and after deducting the cost and expense, if any, including attorneys' fees of settling with the insurer.

**Section 14.4.**    Lease Termination. If the Demised Premises (a) by reason of a loss are rendered untenantable or (b) should be damaged as a result of a risk which is not covered by Landlord's insurance or (c) should be damaged in whole or in part during the

00205868.5                                    28

last three (3) years of the Lease Term or any renewal term thereof or (d) if any or all of the buildings or Common Facilities of the Industrial Center are damaged, whether or not the Demised Premises are damaged, to such an extent that the Industrial Center cannot, in the reasonable judgment of Landlord, be operated as an integral unit, then, or in any such event, Landlord may either elect to repair the damage or may cancel this Lease. Landlord shall give the Tenant written notice of its election to terminate or to continue the Lease within ninety (90) days after such event. In the event of termination, this Lease shall expire at the end of the calendar month in which such notice of termination is given and Tenant shall vacate and surrender the Demised Premises to the Landlord. In the event of notice by Landlord that Landlord has elected to continue this Lease, Landlord and Tenant shall commence their respective obligations for repair as soon as is reasonably possible and prosecute the same to completion with all due diligence.

**Section 14.5.**     **Rent Abatement.**     The Minimum Rent shall be abated proportionately with the degree in which Tenant's use of the Demised Premises is impaired during the period of any damage, repair or restoration provided for in this Article XIV; provided that in the event Landlord elects to repair the damage insurable under Landlord's policies, any abatement of rent shall end five (5) days after notice by Landlord to Tenant that the Demised Premises have been repaired. Tenant shall continue the operation of its business on the Demised Premises during any such period to the extent reasonably practicable from the standpoint of prudent business management. Except for the abatement of Minimum Rent hereinabove provided, Tenant shall not be entitled to any compensation or damage for loss in the use of the whole or any part of the Demised Premises and/or any inconvenience or annoyance occasioned by any damage, destruction, repair or restoration.

**Section 14.6.**     **Tenant Repairs.**     Unless this Lease is terminated by Landlord, Tenant shall repair, restore and refixture all parts of the Demised Premises not insured under Landlord's insurance policy in a manner and to a condition equal to that existing prior to its destruction or casualty, including, but not by way of limitation, all exterior signs, trade fixtures, equipment, display cases, furniture, furnishings and other installations of personalty of Tenant. The proceeds of all insurance carried by Tenant on its property and improvements shall be held in trust by Tenant for the purpose of said repair and replacement.

## ARTICLE 15.    EMINENT DOMAIN

**Section 15.1.**    Entire Taking.    In the event that the whole of the Demised Premises shall be taken under the power of eminent domain, this Lease shall thereupon terminate as of the date possession shall be so taken.

**Section 15.2.**    Partial Taking Other than Demised Premises.    If more than ten percent (10%) of the floor area of the Building in which the Demised Premises is located, whether or not any portion of the Demised Premises is included therein, is taken as aforesaid, then Landlord may, by written notice to Tenant, terminate this Lease, such termination to be effective as of the date possession shall be so taken.

**Section 15.3.**    Partial Taking Demised Premises.    In the event that a portion of the Floor Area shall be taken under the power of eminent domain and the portion not so taken will not, in the reasonable business judgment of both Landlord and Tenant, be suitable for the operation of Tenant's business notwithstanding Landlord's performance of restoration as hereinafter set out in this Section, this Lease shall thereupon terminate as of the date possession of said portion is taken. In the event of any taking under the power of eminent domain which is not sufficiently extensive to render the Demised Premises unsuitable for the business of the Tenant, the provisions of this Lease shall remain in full force and effect, except that the Minimum Rent shall be reduced in the same proportion that the amount of Floor Area taken bears to the original total Floor Area immediately prior to such taking, and Landlord shall, upon receipt of the award in condemnation, make all necessary repairs or alterations to the building in which the Demised Premises are located so as to constitute the portion of the building not taken a complete architectural unit, but Landlord shall not be required to spend for such work an amount in excess of the amount received by Landlord as damages for the part of the Demised Premises so taken. "Amount received by Landlord" shall mean that part of the award in condemnation which is free and clear to Landlord of any collection by mortgagees for the value of the diminished fee, and after payment of all costs involved in collection including but not limited to attorneys fees. Tenant, at its own cost and expense, shall, with respect to all exterior signs, trade fixtures, equipment, display cases, furniture, furnishings and other installations of personality of Tenant, restore such part of the Demised Premises as is not taken to as near its former condition as the circumstances will permit.

**Section 15.4.**    Condemnation Award.    In the event the Demised Premises or any part thereof shall be taken or condemned either permanently or temporarily for any public or quasipublic use or purpose by any competent authority in appropriate proceedings or by any right of eminent domain, the entire compensation award for both leasehold and

reversion shall belong to the Landlord without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby expressly waives any claim and assigns to Landlord all its right, title and interest to any such award. However, Tenant shall be entitled to claim in such condemnation proceedings such award as may be allowed for relocation costs, fixtures and other equipment installed by it, but only to the extent that the same shall not reduce Landlord's award and only if such award shall be in addition to the award for the land and building (or portion thereof) containing the Demised Premises. To the extent that the Tenant has a claim in condemnation proceedings, as aforesaid, Tenant may claim for condemnors, but not from Landlord, such compensation as may be recoverable by Tenant.

**Section 15.5.**   Rent Proration.   If the Lease is terminated as provided in this Article XV, all rent and other charges shall be paid up to the date that possession is taken by public authority, and Landlord shall make refund of any rent and other charges paid by Tenant in advance and not yet earned.

**Section 15.6.**   Temporary Taking.   Notwithstanding anything to the contrary in the foregoing provisions of this Article XV, the requisitioning of the Demised Premises or any part thereof by military or other public authority for purposes arising out of a temporary emergency or other temporary situation shall constitute a taking of the Demised Premises by eminent domain only when the use and occupancy by the requisitioning authority has continued for one hundred eighty (180) consecutive days. During such one hundred eighty (180) day period, and if this Lease is not terminated under the foregoing provisions of this Article XV, then for the duration of the use and occupancy of the Demised Premises by the requisitioning authority, any obligation of Tenant under this Lease to pay rent based on a Percentage Rent and all of the other provisions of this Lease shall remain in full force and effect, except that the Minimum Rent shall be reduced in the same proportion that the amount of the Floor Area requisitioned bears to the total Floor Area, and Landlord shall be entitled to whatever compensation may be payable from the requisitioning authority.

**ARTICLE 16.        FINANCIAL INFORMATION; STATEMENT OF TENANT;AMENDMENT TO LEASE**

**Section 16.1.**   Delivery of Information.   Tenant shall, at any time and from time to time within twenty (20) days of written request by Landlord, deliver to Landlord any and all of the following:

(a)    Such financial information concerning Tenant and Tenant's business operations as may reasonably be requested by a mortgagee or prospective mortgagee or purchaser of the Industrial Center or any part thereof.

(b)    An executed and acknowledged written declaration in recordable form, prepared by Landlord:  (1) ratifying this Lease; (2) expressing the commencement and termination dates hereof; (3) certifying that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writings as shall be stated and attached); (4) certifying that, to the extent of Tenant's knowledge, and if the same be true, that all conditions under this Lease to be performed by Landlord have been satisfied; (5) certifying that there are no known defenses or offsets against the enforcement of this Lease by the Landlord, or stating those claimed by Tenant; (6) stating the amount of advance rental if any (or none if such is the case), paid by Tenant; and (7) stating the date to which rental has been paid.

(c)    An executed and acknowledged instrument, prepared by Landlord, amending this Lease in such respects as may be required by any mortgagee or prospective mortgagee, provided that any such amendment shall not materially alter or impair any of the rights and remedies of Tenant under this Lease or increase Tenant's financial obligations under this Lease.

(d)    Use of Information.  Any financial information delivered pursuant to Section 16.1(a) and any statement delivered pursuant to Section 16.1(b) may be relied upon by any mortgagee or prospective mortgagee or purchaser; provided, however, that any such financial information and any such statement shall be utilized only for bona fide business reasons related to such mortgage or purchase.

## ARTICLE 17.    ASSIGNMENT, SUBLETTING AND HYPOTHECATION OF LEASE

**Section 17.1.**    Assignment and Subletting.  Except as herein provided, Tenant shall not, and shall not have the power to, transfer, assign, sublet, enter into license or concession agreements, change ownership, mortgage or hypothecate this Lease or Tenant's interest in and to the Demised Premises without first procuring the written consent of Landlord, which consent shall not be unreasonably withheld.  Any attempted or purported transfer, assignment, subletting, license or concession agreement, change of ownership, mortgage or hypothecation without Landlord's written consent pursuant to this Section 17.1 or Section 17.2 shall be void and confer no rights upon any third person.

00205868.5                           32

The consent by Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. If this Lease be assigned or if the Demised Premises or any part thereof be occupied by anybody other than Tenant, Landlord may collect rent from the assignee, or occupant and apply the net amount collected to the rent reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of this provision or the acceptance of the assignee, undertenant or occupant as Tenant. Nothing herein contained shall relieve Tenant or any Guarantor from its covenants and obligations for the term of this Lease. Tenant agrees to reimburse Landlord for Landlord's reasonable attorney's fees incurred in conjunction with the processing and documentation of any such requested transfer, assignment, subletting, license or concession agreement, change of ownership, mortgage or hypothecation of this Lease or Tenant's interest in and to the Demised Premises.

**Section 17.2.** Documentation Required. Each transfer, assignment, subletting, license, concession agreement, mortgage or hypothecation to which there has been consent shall be by an instrument in writing in form reasonably satisfactory to Landlord, and shall be executed by the transferor, assignor, sublessor, licensor, concessionaire, hypothecator or mortgagor and the transferee, assignee, sublessee, licensee, concessionaire or mortgagee in each instance, as the case may be; and each transferee, assignee, sublessee, licensee, concessionaire or mortgagee shall agree in writing for the benefit of Landlord herein to assume, to be bound by, and to perform the terms, covenants and conditions of this Lease to be done, kept and performed by Tenant, including the payment of all amounts due or to become due under this Lease directly to Landlord. Failure to first obtain in writing Landlord's consent or failure to comply with the provisions of this Section shall operate to prevent any such transfer, assignment, subletting, license, concession agreement or hypothecation from becoming effective.

**Section 17.3.** Voting Control. In the event the Tenant is a corporation, any dissolution, merger, consolidation or other reorganization of such corporation or the sale or other transfer of a controlling percentage of the corporate stock of Tenant shall constitute an assignment of this Lease for all purposes of this Article XVII; provided, however, that any transfer by inheritance or by any transaction in Tenant's stock or the stock of a corporation owning or controlling a majority of Tenant's stock which occurs on a major security exchange shall not be considered an assignment hereunder. If an assignment is made as aforesaid, then Tenant shall so notify Landlord and Landlord shall have the right, at its option, to terminate this Lease upon ten (10) days' notice to Tenant. The term "controlling percentage", for the purpose of this Article XVII, means the ownership of stock possessing, and of the right to exercise voting power of all classes of stock of such corporation issued, outstanding and entitled to vote for the election of direc-

00205868.5                                    33

tors, whether such ownership be direct or indirect ownership through ownership of stock possessing, and of the right to exercise, at least fifty-one percent (51%) of the total combined voting power of all classes of stock of another corporation or corporations.

In the event Tenant is a partnership or entity other than a corporation, any dissolution, merger, consolidation or other reorganization of such partnership or entity or the sale or transfer of a controlling percentage of such partnership or entity shall constitute an assignment of this Lease for all purposes of this Article XVII; provided, however, that any transfer by inheritance shall not be considered an assignment hereunder. If an assignment is made as aforesaid, then Tenant shall notify Landlord and Landlord shall have the right, at its option, to terminate this Lease upon ten (10) days' notice to Tenant. The term "controlling percentage," for the purpose of this Article XVII means the ownership of, and the right to exercise, at least fifty-one percent (51%) of the total combined voting rights of said partnership or entity, whether such ownership be direct or indirect.

**Section 17.4.**    Tenant Includes Approved Assignees and Subtenants.    In the event that Landlord shall agree to any transfer of Tenant's interest in this Lease, then the term "Tenant" shall thereafter be deemed to include, without further reference, the party to whom such interest is transferred, which is, for example, but without limiting the generality thereof, any subtenant, assignee, concessionaire or licensee. If the Lease be assigned or if the Demised Premises or any part thereof be occupied by anybody other than Tenant, then Landlord may collect rent from the assignee or occupant and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of this provision or the acceptance of the assignee, subtenant or occupant as Tenant or as a release of Tenant from the further performance of the provisions on its part to be observed or performed herein. Notwithstanding any assignment or sublease, Tenant shall remain fully liable and shall not be released from performing any of the terms of this Lease.

**Section 17.5.**    Tenant Include Successors.    All rights, obligations and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several and respective heirs, executors, administrators, successors, subtenants, licensees, concessionaires and assigns of the named Tenant herein, except as expressly provided in this Article; and if there shall be more than one Tenant they shall all be bound jointly and severally by the terms, covenants, conditions and agreements herein and the word "Tenant" shall be deemed and taken to mean each and every person or party mentioned as a Tenant herein, be the same one or more; and if there shall be more than

00205868.5                                34

one Tenant, any notice required or permitted by the terms of this Lease may be given by or to any one thereof. No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Landlord in writing as aforesaid. The use of the neuter singular pronoun to refer to Landlord or Tenant shall be deemed a proper reference even though Landlord or Tenant may be an individual, a partnership, a corporation, a group of two or more individuals or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Landlord or Tenant and to either corporations, associations, partnerships, or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

**Section 17.6.**   Recapture.  Notwithstanding anything to the contrary contained in this Article XVII, if Tenant wishes to assign this Lease or to sublease all or any part of the Demised Premises, Tenant shall give Landlord written notice of its intention as aforesaid, and Landlord shall have the right upon receipt of such notice to terminate this Lease within ninety (90) days after Landlord's receipt of Tenant's notice. Landlord shall give notice to Tenant of Landlord's election to terminate this Lease which termination shall become effective sixty (60) days after the date the termination notice is forwarded to Tenant; and, upon such termination, all of the liabilities of the parties each to the other shall cease and terminate except such covenants of Tenant which survive the termination of this Lease. If Landlord does not terminate this Lease, as aforesaid, Landlord's consent to the proposed transaction shall not be unreasonably withheld.

**Section 17.7.**   Successor to Landlord Interest.  The term "Landlord," as used in this Lease, so far as covenants, conditions and agreements on the part of the said Landlord are concerned, shall be limited to mean the party executing this Lease as Landlord, its successors and assigns, and in the event of any transfer or transfers of the interest of Landlord in the Industrial Center, the said Landlord (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer or conveyance of all liability as respects the performance of any covenants, conditions and agreements on the part of said Landlord contained in this Lease thereafter to be performed, provided that any amount then due and payable to Tenant by Landlord, or the then grantor, under any provisions of this Lease, shall be paid to Tenant. It being intended by Landlord and Tenant that the covenants, conditions and agreements contained in this Lease on the part of the Landlord shall, subject as aforesaid, be binding on Landlord, its successors and assigns, only during and in respect of their respective successive periods of ownership. Further, Landlord's liability under this Lease shall be limited to and include only the interest of Landlord in the Industrial Center.

00205868.5

35

**Section 17.8.**    Transfer Premium.  If Landlord consents to any assignment of this Lease, or subletting of the Demised Premises or parts thereof (a "Transfer") then, as a condition thereto which the parties hereby agree is reasonable, Tenant shall pay Landlord fifty percent (50%) of any Transfer Premium to be received by Tenant from such Transfer.  "Transfer Premium" shall mean all rent, additional rent or other consideration payable by any transferee in excess of the Minimum Rent and Insurance Premium and Common Facility Charges payable by Tenant under this Lease (on a monthly basis during the Term, and prorated on a per rentable square foot basis, if less than all of the Demised Premises is transferred), after amortizing in equal monthly installments of the period of the Transfer the reasonable expenses incurred by Tenant for any brokerage commissions in connection with the Transfer.  If part of the consideration for such Transfer shall be payable other than in cash, Landlord's share of such non-cash consideration shall be in the form as is reasonably satisfactory to Landlord.  Such percentage of the Transfer Premium shall be paid promptly by Tenant upon Tenant's receipt from time to time of periodic payments from such transferee or such other time as Tenant shall realize a Transfer Premium from such transferee.  In lieu of accepting such percentage of the Transfer Premium, Landlord may elect in writing within ninety (90) days after Tenant's notice, to increase the monthly Minimum Rent hereunder during the Term of the Transfer by an amount equal to Landlord's share of such Transfer Premium.

## ARTICLE 18.     INTENTIONALLY DELETED

## ARTICLE 19.     OWNERSHIP OF CERTAIN PROPERTY AND SURRENDER OF PREMISES

**Section 19.1.**    Ownership Of Property.  Upon termination of this Lease, Tenant shall surrender to Landlord the Demised Premises, including, without limitation, all buildings, carpeting, additions, alterations, improvements, apparatus and fixtures, except unattached moveable fixtures and furniture installed by Tenant, in good condition and repair, as aforesaid in Section 10.1 hereof; provided, however, that Tenant, upon written approval by Landlord, which approval shall not be unreasonably withheld, may be permitted to remove such other alterations, additions, improvements and fixtures installed by Tenant and restore the Demised Premises to their original condition at Tenant's expense.

00205868.5                          36

## ARTICLE 20.    HOLDOVER BY TENANT

**Section 20.1.**    Rent In The Event Of Holdover.    In the event that Tenant shall hold the Demised Premises after the expiration of the Lease Term without the express written consent of the Landlord, such holding shall be deemed to have created a tenancy from month to month terminable on thirty (30) days' written notice by either party to the other, upon a monthly rental basis, and otherwise subject to all terms and provisions of this Article XX.  Such monthly rental shall be computed on the basis of one-sixth (1/6th) of the total rental payable by Tenant to Landlord during the last twelve (12) month period of the Lease Term, including, but not limited to Minimum Rent and all other additional charges provided by this Lease.

**Section 20.2.**    Liability In The Event Of Holdover.    If the Tenant fails to surrender the Demised Premises upon the termination of this Lease, then Tenant shall, in addition to any other liabilities to Landlord accruing therefrom, indemnify and hold Landlord harmless from loss or liability resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant founded on such failure.

## ARTICLE 21.    ADDITIONAL CONSTRUCTION

**Section 21.1.**    Construction By Landlord.  Landlord hereby reserves the right, at any time and from time to time, providing reasonable access to the Demised Premises is not materially and adversely affected, to make alterations or additions to the Industrial Center, to build additional stories on the building in which the Demised Premises are contained and to build adjoining same and to construct other or add to other buildings or improvements in the Industrial Center; provided, however, that such construction or additions shall not unreasonably interfere with Tenant's use of the Demised Premises as permitted hereunder, except when such work is necessitated by emergency or required by structural need.

**Section 21.2.**    Excavation.  If an excavation shall be made upon land adjacent to the Demised Premises, then, Tenant shall permit the person authorized to cause such excavation license to enter upon the Demised Premises for the purpose of doing such work as such person deems necessary to preserve the wall or the building of which the Demised Premises form a part from damage and to support the same by proper foundations and Tenant shall not be entitled to any claim for damages or indemnification

against Landlord nor shall Tenant be entitled to an abatement of rent. All reasonable efforts shall be taken to preserve vehicular and personnel access during any such work.

## ARTICLE 22.    XXII. DEFAULT

**Section 22.1.**    Notice; Remedies. If after ten (10) days' written notice, Tenant fails to pay any Minimum or Additional Rent ("Rent") or make any other payment due hereunder when due or fails to cure any breach of this Lease which is monetary in nature, or if Tenant vacates or abandons the Demised Premises, or if Tenant creates a hazardous condition at the Demised Premises which is not immediately cured upon Tenant's becoming aware thereof, or if after thirty (30) days' written notice, Tenant fails to perform any other of the terms, conditions or provisions of this Lease to be observed or performed by Tenant (provided that if such other term, condition or provision is non-monetary in nature and cannot be reasonably performed within thirty (30) days, Tenant shall have ninety (90) days following Landlord's initial written notice of default to effect the cure if Tenant immediately commences such cure and diligently pursues the same to completion) then, in any one or more of such events (sometimes hereinafter referred to as an "event of default"), this Lease shall, at the option of Landlord, terminate and come to an end on the date specified in a notice of cancellation from Landlord to Tenant, and Tenant shall quit and surrender the Demised Premises to the Landlord as if the term hereunder ended by the expiration of the time fixed herein, but Tenant shall remain liable for all sums accruing prior to the termination of this Lease. Tenant shall not be entitled to any written notice of default from Landlord regarding any default by Tenant repeated more than twice in any given Lease Year.

If an event of default occurs and Landlord elects not to terminate this Lease, then (a) Landlord shall have the immediate right, pursuant to legal process, if any be applicable, to either pay any sums or do any act on behalf of Tenant, in order to cure a default by Tenant, and any sums expended by Landlord, together with interest thereon at the highest rate permitted by the laws of the state in which the Industrial Center is located (and if there is no such rate, then interest shall be at the rate equal to three percent (3%) in excess of the prime rate of JP Morgan Chase Bank or any successor thereto) shall be immediately due and payable by Tenant to Landlord, or (b) Landlord may, pursuant to legal process, if any be applicable, re-enter the Demised Premises and Landlord may remove all persons and property from the Demised Premises and such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of, Tenant without Landlord being deemed guilty of trespass or becoming liable for any

00205868.5                                         38

loss or damage which may be occasioned thereby.

Should Landlord elect to re-enter or should it take possession pursuant to legal proceedings or pursuant to any notice provided for by law, it may make such alterations and repairs as may be necessary in order to relet the Demised Premises or any part thereof, for such term or terms (which may be for a term extending beyond the Lease Term) and at such rentals and upon such other terms and conditions as Landlord in its sole discretion may deem advisable and upon each such reletting all rentals received by Landlord from such reletting shall be applied first, to the payment of any indebtedness other than Rent due hereunder from Tenant to Landlord, second, to the payment of the cost of any such alterations and repairs, third, to the payment of Rent due and unpaid hereunder, and any amount remaining shall be held by Landlord and applied in payment of future Rent as the same may become due and payable hereunder. If such rentals received from such reletting during any month be less than the Rent to be paid during that month by Tenant hereunder, then Tenant shall pay any such deficiency to Landlord. Such deficiency shall be calculated and paid monthly. Landlord may recover from Tenant, from time to time, all damages it may incur by reason of Tenant's default, including the cost of recovering the Demised Premises, reasonable attorneys' fees and the worth, at the time of such termination, of the excess, if any, of the amount of Rent and charges equivalent to rent reserved in this Lease for the remainder of the Lease Term over the then reasonable rental value of the Demised Premises for the remainder of the stated term, all of which amount shall be immediately due and payable from Tenant to Landlord.

The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Demised Premises and/or any claim of injury or damage. In the event Landlord commences any proceedings for nonpayment of Minimum Rent or any other charge due hereunder, Tenant will not interpose any counterclaim, except compulsory counterclaims, of whatever nature or description in any such proceedings. This shall not, however, be construed as a waiver of Tenant's right to assert such claims in any separate action brought by Tenant.

Tenant hereby expressly waives any and all rights of redemption granted by or under present or future laws in the event of Tenant being evicted or dispossessed for any cause or in the event of Landlord obtaining possession of the Demised Premises by reason of the violation by Tenant of any of the provisions of this Lease or otherwise.

In the event of a breach or threatened breach by Tenant of any provision of this Lease, Landlord shall have the right of injunction as if other remedies were not provided for herein.

The rights and remedies given to Landlord in this Lease are distinct, separate and cumulative remedies, and the exercise of any of them shall not be deemed to exclude Landlord's right to exercise any or all of the others or those which may be permitted by law.

Tenant expressly waives any right of defense which it may have to claim a merger and neither the commencement of any action or proceeding nor the settlement thereof or entering of judgment therein shall bar Landlord from bringing subsequent actions or proceedings from time to time.

In the event of any action taken by Landlord to enforce or interpret, or to pursue its rights or remedies under, this Lease against Tenant, whether or not suit be brought, Tenant shall be responsible for and shall pay upon demand by Landlord all of Landlord's costs and expenses paid or incurred in connection therewith, including without limitation, Landlord's attorneys' fees and disbursements.

**Section 22.2.**    Notice to Landlord.  Landlord shall in no event be in default in the performance of any of its obligations in this Lease contained unless and until Landlord shall have failed to perform such obligation within thirty (30) days, or such additional time as is reasonably required to correct any such default, after notice by Tenant to Landlord properly specifying wherein Landlord has failed to perform any such obligation.

**Section 22.3.**    Force Majeure.  Landlord and/or Tenant shall be excused for the period of any delay and shall not be deemed in default with respect to the performance of any of the terms, covenants and conditions of this Lease, except for the payment of monetary obligations, when prevented from so doing by cause or causes beyond the Landlord's control or Tenant's control, as the case may be, which shall include, without limitation, all labor disputes, governmental regulations or controls, fire or other casualty, inability to obtain any material or services, or reasonable substitute for said materials or services, acts of God or any other cause, whether similar or dissimilar to the foregoing, not within the reasonable control of the Landlord and/or Tenant.

**Section 22.4.**    Bankruptcy.  To the full extent permissible under the Bankruptcy Reform Act of 1978, specifically Section 365 thereof (11 U.S.C. 365) or any successor

thereto, if Tenant shall file a voluntary petition in bankruptcy or take the benefit of any insolvency act or be dissolved or adjudicated a bankrupt, or if a receiver shall be appointed for its business or its assets and the appointment of such receiver is not vacated within sixty (60) days after such appointment, or if it shall make an assignment for the benefit of its creditors, then and forthwith thereafter Landlord shall have all of the rights provided in Section 22.l, in the event of nonpayment of rent.

## ARTICLE 23.    XXIII. NO WAIVER

**Section 23.1.**    No Waiver Except In Writing.    Failure of Landlord or Tenant to insist upon the strict performance of any provisions hereof or of any rules and regulations promulgated hereunder or to exercise any option shall not be construed as a waiver for the future of any such provision or rule or option.  The receipt by Landlord of any rent or other charge due hereunder with knowledge of the breach of any provision of this Lease shall not be deemed a waiver of such breach.  No provision of this Lease shall be deemed to have been waived unless such waiver be in writing signed by the Landlord.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent shall be deemed to be other than on account of the earliest rent then unpaid nor shall any endorsement or statement or any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease, and no waiver by Landlord in respect to one tenant shall constitute a waiver in favor of any other tenant in the Industrial Center.

## ARTICLE 24.    XXIV. NOTICES

**Section 24.1.**    Addresses.    Except as otherwise provided for herein, any notice, demand, request, consent, approval or other communication which either party hereto is required or desires to give, make, or communicate to the other shall be in writing and shall be given, made, or communicated by United States certified mail, addressed, in the case of Landlord:

00205868.5                                41

CHESHIRE DISTRIBUTION CENTER, L.L.C.
c/o Oaktree Capital Management, LLC
1301 Avenue of the Americas, 34th floor
New York, New York 10019
Attention: Phil Hofmann, Managing Director

with copies to:


MARC POROSOFF, ESQUIRE
Oaktree Capital Management, LLC
1301 Avenue of the Americas, 34th floor
New York, New York 10019


- and -

MARC J. BECKER, ESQUIRE
Goldfarb and Fleece
345 Park Avenue, 33rd Floor
New York, New York 10154


and addressed, in the case of Tenant, to Tenant's address contained in the preamble of this Lease, Attn: Real Estate and Properties, subject to the right of either party to designate a different address by notice similarly given, made or communicated, as the case may be, any such notice to be effective on the date the same was deposited in the United States mail as certified matter, with postage thereon fully prepaid.

### ARTICLE 25.        SUBORDINATION AND ATTORNMENT

**Section 25.1.**    Subordination.  This Lease and the rights of Tenant hereunder are and shall be automatically subordinate to the lien of any mortgage now or hereafter in force against the land and/or buildings of which the Demised Premises are a part against any buildings hereafter placed upon the land of which the Demised Premises are a part and to all advances made or hereafter to be made upon the security thereof, and to any and all extensions, renewals, modifications or replacements thereof, and to any ground or underlying lease of the land or buildings.  Within ten (10) days of Landlord's written request, Tenant shall execute any agreement reasonably required by any mortgagee or landlord, confirming the foregoing subordination of this Lease.  In the event Tenant fails

to execute and furnish such agreement to Landlord within said ten (10) day period, Landlord may thereafter terminate this Lease upon ten (10) days prior written notice to Tenant.

**Section 25.2.**    Attornment.  Tenant shall, in the event of the sale or assignment of Landlord's interest in the Building of which the Demised Premises form a part or in the event of any proceedings brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Landlord covering the Demised Premises, attorn to the purchaser and recognize such purchaser as Landlord under this Lease.

**Section 25.3.**    Mortgagee Protection Clause.    Tenant agrees to give any mortgagee and/or trustees under any deed of trust or land under any ground lease, by Registered Mail, a copy of any notice of default served upon Landlord under this Lease, provided that prior to such notice Tenant has been notified, in writing, of the address of such mortgagees and/or trust deed holders and/or landlords.  Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then the mortgagees and/or trust deed holders and/or landlords shall have an additional thirty (30) days within which to cure such default or if such default cannot be cured within that time, then such additional time as may be necessary if within such thirty (30) days, any mortgagee and/or trust deed holder and/or landlord has commenced and is diligently pursuing the remedies necessary to cure such default, (including but not limited to commencement of foreclosure proceedings, if necessary to effect such cure) in which event this Lease shall not be terminated while such remedies are being so diligently pursued.

## ARTICLE 26.    HAZARDOUS MATERIALS

**Section 26.1.**    Tenant shall not cause or permit any Hazardous Materials, as herein defined, to be brought upon, stored, treated, used, produced, generated, emitted, disposed, discharged, or released (collectively known as "handled" or "handle") upon, about, above or beneath the Demised Premises or the Industrial Center.  Notwithstanding the foregoing, (i) normal quantities of those Hazardous Materials customarily used in the conduct of general administrative and executive office activities (e.g., copier fluids and cleaning supplies) may be used and stored at the Premises without Landlord's prior written consent, and (ii) in connection with the Permitted Use of the Demised Premises, Tenant shall be allowed to receive and send shipments of Hazardous Materials, but only in compliance with all applicable Environmental Laws, as defined herein and with the highest prevailing industry standards.    These Hazardous Materials referred to in

00205868.5                          43

subdivisions (i) and (ii) of the preceding sentence shall be known as "Tenant's Hazardous Materials" and shall be handled in accordance with all applicable federal, state and local laws, statutes, ordinances, regulations, codes, rulings, policies, requirements, orders and decrees including, but not limited to, the Resource Conservation Recovery Act of 1976 (42 U.S.C.. 6901 et seq.), as amended, and the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C.. 9601 et seq.), as amended (collectively known as "Environmental Laws") relating to the industrial hygiene, environmental protection or the handling, use, analysis, generation, manufacture, storage, presence, disposal or transportation of Hazardous Materials, defined below.  Tenant hereby agrees to pay the costs of all remediation and corrective measures made necessary or desirable in the event that Tenant shall breach the provisions of this Article.   Tenant hereby indemnifies and agrees to defend and hold harmless, Landlord and its managing agent and its or their respective affiliates, principals, shareholders, officers, directors, partners, members, trustees, fiduciaries, servants, agents and employees from and against any and all liabilities, damages, suits, causes, actions, penalties, costs, charges, fees and expenses, including, without limitation, attorneys' fees and disbursements, for death or injury to any person or damage to any property whatsoever (including water tables and atmosphere) or otherwise resulting from Tenant's failure to comply with its obligations, duties and responsibilities under this Article.  For purposes of this indemnity, Tenant shall have the burden of proof to establish any pre-existing environmental conditions affecting the Demised Premises by conducting an environmental audit of the property.  Any acts or omissions of Tenant or its employees, agents, customers, invitees, sub-lessees, assignees, contractors or sub-contractors (whether or not they are negligent, intentional, willful or unlawful) shall be strictly attributable to Tenant hereunder.  Tenant agrees to execute affidavits, representations and the like from time to time at Landlord's request conveying Tenant's best knowledge and belief regarding the presence of Hazardous Materials in the Demised Premises.

Tenant shall at its own expense procure, maintain in effect and comply with all conditions of any and all permits, licenses and other governmental and regulatory approvals required for Tenant's use of the Demised Premises, including, without limitation, discharge of (appropriately treated) materials or waste into or through any sanitary sewer system serving the Demised Premises.  Except as discharged in strict accordance and conformity with all applicable Environmental Laws, Tenant shall cause any and all Hazardous Materials to be removed from the Demised Premises and transported solely by duly licensed facilities for final disposal of such Hazardous Materials.  Tenant shall in all respects handle any and all Hazardous Materials in, on, under or about the Demised Premises in complete conformity with all applicable

Environmental Laws and prudent industry practice regarding the management of such Hazardous Materials. All reporting obligations to the extent imposed upon Tenant by Environmental Laws are solely the responsibility of Tenant. Upon expiration or termination of this Lease, Tenant shall cause all Tenant's Hazardous Materials to be removed from the Demised Premises and transported for use, storage or disposal in accordance and in compliance with all applicable Environmental Laws. Tenant shall not take any remedial action in response to the presence of Hazardous Materials in, on or about the Demised Premises or in the Industrial Center, nor enter into any settlement agreement, consent, decree or other compromise in respect to any claims relating to or in any way connected with the Demised Premises or the Industrial Center without first notifying Landlord of Tenant's intention to do so and affording Landlord thirty (30) days to appear, intervene or otherwise appropriately assert and protect Landlord's interest with respect thereto. In addition, at Landlord's request, at the expiration of the Lease Term, Tenant shall remove all tanks or fixtures which were placed on the Demised Premises during the Lease Term and which contain, have contained or are contaminated with, Hazardous Materials.

Tenant shall immediately notify Landlord in writing of (a) any enforcement, clean-up, removal or other governmental or regulatory action instituted, completed or threatened pursuant to any Environmental Laws; (b) any claim made or threatened by any person against Landlord or the Demised Premises relating to damage, contribution, cost recovery, compensation, loss or injury resulting from or claimed to result from any Hazardous Materials; and (c) any reports made to any environmental agency arising out of or in, on or about the Demised Premises or in connection with any Hazardous Materials removed from the Demised Premises, including any complaints, notices, warnings, reports or asserted violations in connection therewith. Tenant shall also provide to Landlord, as promptly a possible, and in any event within five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings or asserted violations relating in any way to the Demised Premises or Tenant's use thereof. Upon written request of Landlord (to enable Landlord to defend itself from any claim or charge related to any Environmental Law), Tenant shall promptly deliver to Landlord lists of Hazardous Materials removed or to be removed from the Demised Premises. All such lists shall list the Tenant or its agent as a responsible party and in no way shall attribute responsibility for any such Hazardous Materials to Landlord.

"Hazardous Materials" means: (a) any material or substance; (i) which is defined or becomes defined as a "hazardous substance," "hazardous waste," "infectious waste," "chemical mixture or substance," or "air pollutant" under Environmental Laws;

(ii) containing asbestos, urea formaldehyde or polychlorinated biphenyls, (iii) which is oil or petroleum product, (iv) which is radioactive; or (b) any other material or substance displaying toxic, reactive ignitable or corrosive characteristics, as all such terms are used in their broadest sense, and are defined or become defined by Environmental Laws; or (c) materials which cause a nuisance upon or waste to the Demised Premises or any portion of the Industrial Center.

If any lender or governmental agency requires Landlord to test for a release of Hazardous Materials on the Demised Premises, or if Landlord reasonable believes that Tenant may have violated an Environmental Law or the terms of this Article, Tenant shall, within thirty (30) days following Landlord's demand, supply to Landlord at Tenant's sole cost and expense an environmental report of the Demised Premises and the use of the Demised Premises addressing Landlord's concerns and demonstrating whether Tenant's use of the Demised Premises has violated or is violating any Environmental Laws, prepared by a reputable independent licensed environmental contracting firm, in form, substance and detail reasonably satisfactory to Landlord.  Such report shall be delivered to Landlord and shall be kept strictly confidential by Tenant.

Tenant agrees to clean its trucks in compliance with Environmental Laws such that any run off from the cleaning of Tenant's trucks shall not spill into landscaped areas or drains.

Tenant acknowledges that Landlord has made no representations to Tenant with respect to the compliance of the Demised Premises with Environmental Laws.

The obligations of Tenant under this Article shall survive the termination of this Lease.

## ARTICLE 27.        MISCELLANEOUS PROVISIONS

**Section 27.1.**    Headings. The captions of the Articles and Sections of this Lease are for convenience only and shall not be considered or referred to in resolving questions of interpretation or construction.

**Section 27.2.**    Time of Essence.  Time is of the essence with respect to the performance of each of the covenants and agreements under this Lease.

**Section 27.3.**    Construction of Lease.  Parts of this Lease which are written or typed hereon control parts which are pretyped, but pretyped parts of this Lease which are

superseded by written or typewritten parts may be utilized in the interpretation of such pretyped parts. Tenant declares that Tenant has read and understands all parts of this Lease, including all pretyped parts hereof. It is agreed that in the construction and interpretation of the terms of this Lease any rule of construction that a document is to be construed most strictly against the party who prepared the same shall not be applied, it being agreed that both parties hereto have participated in the preparation of the final form of this Lease.

**Section 27.4.**    Governing Law. This Lease and the enforcement hereof shall be governed by the laws of the state in which the Industrial Center is located.

**Section 27.5.**    Severability. If any provision of this Lease or any paragraph, sentence, clause, phrase or word appearing herein be judicially or administratively held invalid or unenforceable for any reason whatsoever, such holding shall not be deemed to affect, alter, modify or impair in any manner whatsoever any other term, provision, paragraph, sentence, clause, phrase or word appearing therein.

**Section 27.6.**    Interest Rate. Where under the terms of this Lease interest shall be provided for, such interest, unless a specific interest rate is set forth, shall be at a rate equal to the prime rate of JP Morgan Chase Manhattan Bank, or any successor thereto, plus three percent (3%), but in no event greater than the highest lawful rate of interest per annum permissible under the law of the state in which the Industrial Center is located, and shall accrue from the date when the same becomes due and payable by the terms and provisions hereof until paid and shall continue after any judgment until fully satisfied, to which shall be added reasonable attorneys' fees and costs.

**Section 27.7.**    Consent of Landlord. Where, under the terms of this Lease, the consent of Landlord shall be required, such consent, unless otherwise provided for herein, may be arbitrarily withheld. If Tenant shall request Landlord's consent and Landlord shall fail or refuse to give such consent, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent, it being intended that Tenant's sole remedy shall be an action for specific performance or injunction, and that such remedy shall be available only in those cases where Landlord has expressly agreed in writing not to unreasonably withhold its consent or where as a matter of law Landlord may not unreasonably withhold its consent.

**Section 27.8.**    Entire Agreement. This Lease and the exhibits, riders and/or addenda, if any, attached hereto contain all covenants and agreements between Landlord and Tenant relating in any manner to the rental, use and occupancy of the Demised

00205868.5                                47

Premises and the other matters set forth in this Lease. No prior agreement or understanding pertaining to the same shall be valid or of any force or effect, and the covenants and agreements of this Lease cannot be altered, changed, modified or added to, except in writing signed by Landlord and Tenant. No representation, inducement, understanding or anything of any nature whatsoever, made, stated or represented on Landlord's behalf, either orally or in writing (except this Lease), has induced Tenant to enter into this Lease. The submission of this document for examination does not constitute an offer to lease, or a reservation of an option for the Demised Premises, and becomes effective only upon execution and delivery thereof by Landlord and Tenant.

**Section 27.9.**   Default Under Other Agreements.   Any default by Tenant under any instrument, undertaking or agreement executed by Tenant in favor of or with Landlord relating to this Lease, or the tenancy created hereby, shall constitute a breach of this Lease and entitle Landlord to pursue each and all of its rights and remedies hereunder and at law.

**Section 27.10.**   Objection to Statements.   Tenant's failure to object to any statement, invoice or billing rendered by Landlord within a period of thirty (30) days after receipt thereof shall constitute Tenant's acquiescence with respect thereto and shall render such statement, invoice or billing an account stated between Landlord and Tenant.

**Section 27.11.**   Brokerage Commission.   Tenant and Landlord represent and warrant to the other that there are no claims for brokerage commissions or finder's fees incurred by them, respectively, in connection with the execution of this Lease except for Landlord's broker, Cushman & Wakefield of Connecticut, Inc. (the "Broker") and each party agrees to indemnify the other against and hold it harmless from all liabilities arising from any such claims other than that of the Broker, including the cost of counsel.

**Section 27.12.**   Relationship of Parties.   Anything in this Lease to the contrary notwithstanding, it is agreed that Landlord shall in no event be deemed to be a partner or engaged in a joint venture with or any associate of Tenant, or any party associated with Tenant in the conduct of its business or otherwise, nor shall Landlord be liable for any debts incurred by Tenant in the conduct of its business. The relationship of Landlord and Tenant as established by this Lease is that of Landlord and Tenant. None of the language or terminology of this Lease shall be construed to create any other form of relationship between Landlord and Tenant.

**Section 27.13.**   Memorandum of Lease.   Tenant represents that it shall not record this Lease and acknowledges that such representation is a material term of this Lease.

00205868.5

However, on and after the occurrence of the Commencement Date, and at the request of either party, Landlord and Tenant shall execute a memorandum of lease and starting date agreement in form reasonably acceptable to Landlord. Either party may then record such memorandum with the party so recording paying all costs and expenses in connection with such recording.

**Section 27.14.**  Past Due Rent. If Landlord shall fail to receive, when the same is due and payable, any Minimum Rent, Additional Rent or other amounts or charges to be paid to Landlord by Tenant, as provided in this Lease, Tenant shall pay as Additional Rent interest thereon until fully paid, which shall continue after any judgment until fully satisfied, and if same is not paid within fifteen (15) days of its due date Tenant shall pay as Additional Rent, a late charge equal to five percent (5%) of each installment past due to cover the administrative costs and expenses involved in administering delinquent accounts.

**Section 27.15.**  Limitation of Liability. Anything in this Lease to the contrary notwithstanding, Tenant agrees that it shall look solely to the estate and property of the Landlord in the land and buildings comprising the Industrial Center of which the Demised Premises are a part, and subject to the prior rights of any mortgagee of the Industrial Center and subject to Landlord's rights under a leasehold interest of the Industrial Center or part thereof, if any, for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and/or performed by Landlord, and no other assets of the Landlord or its managing agent, and its or their respective affiliates, principals, shareholders, officers, directors, partners, members, trustees, fiduciaries, servants, agents and employees, shall be subject to levy, execution or other procedures for the satisfaction of Tenant's remedies.

**Section 27.16.**  OFAC List Representation. Tenant represents and warrants that it is not listed, nor is it owned or controlled by, or acting for or on behalf of any person or entity, on the list of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Assets Control of the United States Department of the Treasury, or any other list of persons or entities with whom Landlord is restricted from doing business with ("OFAC List"). Notwithstanding anything to the contrary herein contained, Tenant shall not permit the Demised Premises or any portion thereof to be used, occupied or operated by or for the benefit of any person or entity that is on the OFAC List. Tenant shall provide documentary and other evidence of Tenant's identity and ownership as may be reasonably requested by Landlord at any time to enable Landlord to verify Tenant's identity or to comply with any Legal request. Tenant shall indemnify and hold Landlord

harmless from and against all losses, damages, liabilities, cost and expenses (including, without limitation, reasonable attorneys' fees and expenses) that are incurred by Landlord and/or its affiliate that derive from a claim made by a third party against Landlord and/or its affiliates arising or alleged to arise from a misrepresentation made by Tenant hereunder or a breach of any covenant to be performed by Tenant hereunder.

**Section 27.17.**   Landlord and Tenant acknowledge and agree that in no event shall any of the partners, members, shareholders, officers, directors, employees, agents or investment managers (collectively, "Representatives") of Oaktree Capital Management, LLC , have any personal obligation or liability whatsoever with respect to this Lease, the transactions contemplated hereby, or otherwise (such obligation and liability being the sole responsibility of Landlord).   Landlord and Tenant further acknowledge and agree that all obligations and liabilities of Landlord under this Lease or in connection herewith are enforceable solely against Landlord and not against the assets of Oaktree Capital Management, LLC.

## ARTICLE 28.   SECURITY DEPOSIT

**Section 28.1.**   Tenant has deposited the sum of $111,000.00 with Landlord as a "Security Deposit" which shall be held by Landlord as security for the punctual performance by Tenant of each and every obligation of it under this Lease.  In the event of any default by Tenant, Landlord may apply or retain all or any part of the Security Deposit to cure the default or to reimburse Landlord for any sum which Landlord may spend by reason of the default.  In the case of every such application or retention Tenant shall on demand, pay to Landlord the sum so applied or retained which shall be added to the Security Deposit so that the same shall be restored to $36,000.00.  If at the end of the Term of this Lease, Tenant shall not be in default under this Lease, but not otherwise, the Security Deposit shall be returned to Tenant within thirty (30) days to the extent same has not been retained or applied by Landlord in accordance with the provisions of Section 28.01.

**Section 28.2.**   Notwithstanding anything to the contrary contained herein, Landlord shall have the right to use a portion of the Security Deposit to pay certain initial expenses of Landlord in entering into this Lease, including, but not limited to, the cost of Landlord's Work and the Tenant Allowance ("Initial Landlord Costs").  To the extent that Tenant is not in default under any of the terms, covenants and conditions of this Lease, such Initial Landlord Costs, to the extent paid by Landlord, shall be applied against the next accruing Minimum Rent payable by Tenant hereunder.  In the event that by virtue of the payment of the Initial Landlord Costs, the Security Deposit is reduced below

$36,000.00, Tenant shall on demand, pay to Landlord the sum required to restore the Security Deposit to $36,000.00.

## ARTICLE 29.   TENANT ALLOWANCE

**Section 29.1.**   (a) Landlord agrees to pay to Tenant a one-time construction allowance (the "Construction Allowance"), as Landlord's sole obligation and contribution for Tenant to repair or install the following components of Tenant's Initial Work; dock equipment, parking expansion (subject to the provisions hereof), overhead doors, swing area style lamps, dock seals, edge of dock levelers and adding or replacing dock equipment as necessary, in an amount equal to SIXTY FIVE THOUSAND and 00/100 ($65,000.00) DOLLARS. Once all unfinished doors are suitably equipped, Tenant may use the remaining Construction Allowance, if any, for expanded parking as provided in Article XXXI or other improvements to be mutually agreed upon by Landlord and Tenant.

(b)   Provided Tenant is not then in default under any of the terms, covenants or conditions of this Lease on Tenant's part to be observed or performed, the Construction Allowance shall be paid to Tenant within thirty (30) days after the latest of the following to occur:

(i)   Tenant shall have submitted to Landlord a written certification from Tenant's general contractor stating that the Initial Tenant's Work is complete;

(ii)   Tenant shall have submitted to Landlord an executed and acknowledged final waiver and release of mechanics' liens, in form required by Landlord, with respect to the Demised Premises executed by Tenant's general contractor and by every subcontractor and supplier of labor and/or materials engaged in Initial Tenant's Work;

(iii)   Tenant shall have submitted to Landlord a final Certificate of Occupancy for the Demised Premises (or other similar final permit from the appropriate Governmental Authority stating that Tenant can legally occupy the Demised Premises);

(iv)   Tenant shall have paid to Landlord the first (1st) installment of Minimum Rent hereunder; and

(vi)    Tenant shall have submitted to Landlord paid receipts or other evidence of payment, in form reasonably acceptable to Landlord, for the cost and expense of the Initial Tenant's Work, in an amount equal to or in excess of the Construction Allowance.

(c)    All appurtenances, fixtures, improvements, additions and other property (including personal property) acquired with proceeds of the Construction Allowance which are attached to or installed or located in the Demised Premises, whether by Landlord or Tenant or others (the "Construction Allowance Property"), shall be and remain at all times the property of Landlord.  Any replacements of any Construction Allowance Property, whether made at Tenant's expense or otherwise, shall be and remain the property of Landlord.

## ARTICLE 30.    RENEWAL TERM

**Section 30.1.**    (a) Provided that Tenant is not then in Default under the terms of this Lease and provided further that this Lease has not theretofore been terminated pursuant to the provisions hereof Tenant shall have the option to renew this Lease for one additional period of three (3) years (the "Renewal Term").  The option to renew shall expire and be of no force or effect unless exercised by Tenant giving written notice thereof to Landlord twenty-four (24) months prior to the expiration of the original Term.

(b)    All of the terms, conditions and provisions of this Lease shall remain in full force and effect during the Renewal Term, except that the Minimum Rent shall be as follows:

(i)    During the first Lease Year of the Renewal Term, at an annual rate equal to the greater of (x) the fair market rental value of the Demised Premises determined as provided in subsection (c) of this Section 30.01 and (y) the Minimum Rent payable for the fifth Lease Year of the Lease Term increased by the greater of (i) three (3%) percent or (ii) the percentage change in the "Consumer Price Index" for the fifth Lease Year measured from the first month of the fifth Lease Year to the twelfth (12th) month of the fifth Lease Year.  Landlord and Tenant agree that the Minimum Rent for the second and third Lease Years of the Renewal Term shall increase in the same manner as the Minimum Rent is increased during the original term in accordance with the provisions of Section 1.08B.

(c)     If Tenant shall exercise its option to renew the Term of this Lease, then the fair market rental value of the Demised Premises for the first year of the Renewal Term shall be determined as follows:

(i)     If the parties cannot agree upon a fair market rental value, then each shall select an appraiser to make an individual judgment as to the fair market rental value. If the two appraisers cannot agree upon the fair market rental value, they shall select a third appraiser, whose judgment as to fair market rental value shall be binding upon the parties. In the event of the failure of Landlord or Tenant to designate an appraiser within thirty (30) days after Tenant exercises any such option, or in the event of the failure of the two appraisers designated to select a third appraiser, either party shall have the right to apply to the County Court of the county in which the Demised Premises is located to designate an appraiser or appraisers.

(ii)     All appraisers designated under this subsection (c) shall be members of the American Institute of Real Estate Appraisers.

(iii)     In determining the fair market rental value of the Demised Premises, the appraisers, in arriving at their decision, shall be bound by the provisions of this Lease, and shall not add to, subtract from, or otherwise modify such provisions.

(iv)     The determination of the appraisers shall be final and binding on the parties and shall be retroactive to the first day of the Renewal Term. Until said Minimum Rent has been determined, as provided in this subsection (c), Tenant shall continue to pay the Minimum Rent stipulated during the original Term.

(d)     No option granted to Tenant to renew this Lease, nor the exercise of any such option by Tenant, shall prevent Landlord from exercising any right granted or reserved to Landlord in this Lease or which Landlord may have by virtue of any law to terminate this Lease, either during the original Term or during the Renewal Term. Any termination of this Lease shall serve to terminate any renewal option whether or not Tenant shall have exercised same. Any right on the part of Landlord to terminate this Lease shall continue during the Renewal Term, and no option granted to Tenant to renew this Lease shall be deemed to give Tenant any further option to renew beyond the Renewal Term.

## ARTICLE 31.    ADDITIONAL PARKING

**Section 31.1.**    Subject to the terms and provisions of this Article, Tenant shall have the right, at Tenant's sole cost and expense, without any increase in the Minimum Rent payable by Tenant to Landlord hereunder, to construct a parking lot up to 26,000 square feet in size where indicated by outlining on the site plan annexed hereto and made a part hereof as Exhibit A (such area is referred to herein as the "Optional Parking Area") and use the Optional Parking Area for Tenant's exclusive use as a parking area for Tenant's trucks. Prior to performing such work, Tenant agrees to submit to Landlord, for Landlord's approval, a detailed set of plans and specifications for the Optional Parking Area (the "Parking Plans").   In the event that Landlord approves the Parking Plans, Tenant shall, at Tenant's sole cost and expense, procure, maintain and exhibit to Landlord, so far as the same may be required from time to time, all permits, certifications, authorizations and approvals of all municipal departments and governmental subdivisions, required in connection with Tenant's construction use of the Optional Parking Area.   Notwithstanding the foregoing provisions of this Section 31.01 and Landlord's consent to the Parking Plans, Tenant's construction and use of the Optional Parking Area, as set forth herein, shall be in full compliance with (i) all applicable laws, orders and regulations of Federal, State County and Municipal authorities, (ii) the Building Rules and Regulations, (iii) all of the provisions of this Lease including, but not limited to Article V, and (iv) any reasonable rules and regulations adopted by Landlord from time to time.

**Section 31.2.**    Notwithstanding anything to the contrary set forth in Section 31.01, (i) Tenant acknowledges that Landlord makes no representation to Tenant as to whether or not Tenant shall be entitled to use the Optional Parking Area as set forth in said Section and (ii) in the event that Tenant is prohibited from the use of the Optional Parking Area for any reason, including, but not limited to, the refusal of either Landlord or any applicable governmental entity to approve the Parking Plans, then in either event, Tenant shall not be entitled to any abatement or diminution of rent or be relieved from any of its obligations under the Lease, and Landlord shall not incur any liability or obligation to Tenant.

**Section 31.3.**    Tenant agrees that from and after the date that Tenant commences construction of the Optional Parking Area, Tenant shall be responsible for cleaning, maintaining, repaving and insuring the Optional Parking Area. Tenant agrees that all work performed by Tenant in constructing the Optional Parking Area shall be performed in a manner which shall minimize interference or disturbance to other tenants of the Building.

**Section 31.4.**     Tenant agrees to indemnify and save Landlord and Landlord's agents harmless of and from all loss, cost, liability, damage and expense including, but not limited to, reasonable counsel fees, penalties and fines, incurred in connection with or arising from the use or occupancy or manner of use or occupancy of the Optional Parking Area by Tenant or any person claiming through or under Tenant, notwithstanding that the Optional Parking Area is not contained within the Demised Premises nor shall any provision of this Lease vest in Tenant any rights in or to the Optional Parking Area.

**Section 31.5.**     In the event that Landlord desires to expand the Building such that Landlord shall require the use of all or any portion of the Optional Parking Area, in Landlord's sole and absolute discretion, Landlord may give to Tenant a notice terminating Tenant's right to use the Optional Parking Area in which event Tenant shall have no further right to use the Optional Parking Area for any purpose. However, in lieu thereof, Tenant shall have the right to construct and use another parking area where designated on the site plan as the "Alternative Parking Area" and should Tenant elect to do so, all of the terms and provisions of this Article 31 applicable to the Optional Parking Area shall be fully applicable to the Alternative Parking Area.

          IN WITNESS WHEREOF, the parties hereto have set their hands and seals on this _28_ day of July, 2005.

LANDLORD:                                    TENANT:

**CHESHIRE DISTRIBUTION CENTER, L.L.C.**     **ROADWAY EXPRESS, INC.**
By:     Oaktree Capital Management, LLC,
          Its manager

By: _____          By: _____
                                                            Name:  Jerry C. Bowlin
                                                            Title:   Vice President

By: _____

00205868.5                              55

# EXHIBIT A





EXHIBIT B
(Rules and Regulations)

1.     Tenant shall advise and cause its vendors and distributors to deliver all merchandise in a manner that does not interfere with Landlord's and other tenant's use and enjoyment of the Industrial Center.

2.     All deliveries and pick ups are to be made to designated service or receiving areas and Tenant shall request delivery trucks to approach their service or receiving areas by designated service routes and drives.

3.     Tractor trailers which must be unhooked or parked must use steel plates under dolly wheels to prevent damage to the asphalt paving surface.  In addition, wheel blocking must be available for use.  Tractor trailers are to be removed from the loading areas after unloading.

4     Automobiles and other vehicles of Tenant and its employees and agents shall be parked only in areas designated by Landlord from time to time as "employee parking."  There shall be absolutely no overnight parking of any kind by Tenant or its employees or agents at the Industrial Center.  Landlord shall have the right to remove or cause to be removed any automobile or other vehicle of Tenant, its employees or agents that may be parked in any other area not designated for employee parking or which may be parked overnight. Any such removal shall be without liability of any kind to Landlord, its agents and employees and Tenant hereby indemnifies and agrees to hold Landlord free and harmless against all such liability pursuant to the indemnity provisions contained in this Lease. Tenant shall, from time to time, upon request of Landlord, supply Landlord with a list of all automobile models and license plate numbers owned by its employees and agents.

5.     Tenant is responsible for storage and removal of its trash, refuse and garbage.   Tenant shall not dispose of the following items in sinks or commodes: Hazardous Waste; plastic products (plastic bags, straws, boxes); sanitary napkins; tea bags; cooking fats, cooking oils; any meat scraps or cutting residue; petroleum products (gasoline, naphtha, kerosene, lubricating oils); paint products (thinner, brushes); or any other items which the same are not designed to receive.  All floor area of the Demised Premises, including vestibules, entrances and returns, loading docks, doors, fixtures, windows and plate glass, shall be maintained in a safe, neat and clean condition.

6     Tenant shall not permit or suffer any advertising medium to be placed on

the Building's walls, on the Demised Premises' exterior walls or windows, on the sidewalks or on the parking lot areas or light poles. No permission, expressed or implied, is granted to expressed or implied, is granted to exhibit or display any banner, pennant, sign and trade or seasonal decoration of any size, style or material within the Industrial Center, or outside the Demised Premises.

7    Tenant shall not permit or suffer the use of any advertising medium which can be heard or experienced outside of the Demised Premises, including, without limiting the generality of the foregoing, flashing lights, searchlights, loud speakers, phonographs, radios or television. No radio, television or other communication antenna equipment or device is to be mounted, attached, or secured to any part of the roof, exterior surface, or anywhere outside the Demised Premises, unless Landlord has previously given its written consent, which may be arbitrarily withheld.

8.    Tenant shall not permit or suffer merchandise of any kind at any time to be placed, exhibited or displayed outside the Demised Premises, nor shall Tenant use the exterior sidewalks, loading docks or exterior walkways of the Demised Premises to display, store or place any merchandise. No sale of merchandise by tent sale, truck load sale or the like, shall be permitted on the Industrial Center's drives, parking lot or other Common Facilities.

9.    Tenant shall not permit or suffer any portion of the Demised Premises to be used for retail residential, lodging purposes, sleeping, manufacturing, or any immoral or illegal, purpose.

10.    Tenant shall not, in or on any part of the Common Facilities or to other tenants at the Industrial Center:

(a)    Create a nuisance.

(b)    Throw, discard or deposit any paper, glass or extraneous matter of any kind except in designated receptacles, or create litter or hazards of any kind.

(c)    Deface, damage, or demolish any sign, light standard or fixture, landscaping materials or other improvements within the Industrial Center, or the property of other tenants, business invitees or employees situated within the Industrial Center.

11.    No additional locks or bolts of any kind shall be placed upon any of the

00205868.5                                          2

entrances, doors or windows by Tenant, nor shall any changes be made in existing locks or the mechanism thereof. Each Tenant must, upon the termination of its tenancy, restore to Landlord all keys of entrances, doors, offices, and toilet rooms, either furnished to, or otherwise procured by, such Tenant, and in the event of the loss of any keys so furnished, such Tenant shall pay to Landlord the cost thereof and the cost of any locksmith or other service required by Landlord to obtain access to the Demised Premises, and in the event safes, closets of other lockable fixtures were installed in the Demised Premises, Tenant shall give all keys or combinations thereto to Landlord.

12    Landlord shall have the right to prohibit any advertising, signage or other display by any Tenant which, in Landlord's opinion, tends to impair the reputation of the Industrial Center or its desirability as an industrial center, and upon written notice from Landlord, the Tenant shall refrain from or discontinue such advertising, signage or display.

ARTICLE 1. DEFINITIONS ........................................1
        Section 1.1.Additional Rent.  ........................1
        Section 1.2.Commencement Date.........................1
        Section 1.3.Common Facilities.........................1
        Section 1.4.Demised Premises..........................2
        Section 1.5.Industrial Center.........................2
        Section 1.6.Lease Term................................2
        Section 1.7.Lease Year................................2
        Section 1.8.Minimum Rent..............................2
        Section 1.9.Permitted Use.............................3
        Section 1.10.Real Estate Taxes........................3
        Section 1.11.Tenant's Pro-rata Share..................4


ARTICLE 2.GRANTING CLAUSE .....................................4
        Section 2.1.Lease of Demised Premises. ...............4


ARTICLE 3.POSSESSION AND CONSTRUCTION ........................4
        Section 3.1.Demise Includes Use of Common Facilities.....4
        Section 3.2.Quiet Enjoyment...........................5
        Section 3.3.Industrial Center.........................5
        Section 3.4.No Preparation of Demised Premises by
             Landlord. .......................................5
        Section 3.5.Initial Tenant's Work. ...................6


ARTICLE 4.TENANT PAYMENTS .....................................6
        Section 4.1.Tenant's Obligations To Pay Minimum Rent
             and Other Charges...............................6
        Section 4.2.Additional Rent Adjustment. ..............6
        Section 4.3.Minimum Rent..............................7
        Section 4.4.Common Facilities Charge..................7
        Section 4.5.Net Lease.................................9
        Section 4.6.Utility Service Charges...................9
        Section 4.7.Taxes.....................................9
        Section 4.8.Insurance Premiums.......................10


ARTICLE 5.TENANT'S WORK ......................................11
        Section 5.1.........................................11
        Section 5.2.........................................12

Section 5.3...................................................12
Section 5.4...................................................12
Section 5.5...................................................12
Section 5.6...................................................13
Section 5.7...................................................13
Section 5.8...................................................14
Section 5.9...................................................14
Section 5.10..................................................14


ARTICLE 6.USE OF THE PREMISES ................................14
    Section 6.1.Permitted Use.................................14
    Section 6.2.Operation of Demised Premises.................14
    Section 6.3.Rules and Regulations.   .....................16
    Section 6.4.Parking.......................................16


ARTICLE 7.   COMMON FACILITIES................................17
    Section 7.1.Common Facilities Under Control of
        Landlord..............................................17
    Section 7.2.Industrial Center as Private Property........17


ARTICLE 8.UTILITIES .........................................18
    Section 8.1.Obtaining Utilities..........................18
    Section 8.2.Installation of Equipment by Tenant.   ......18
    Section 8.3.Cessation of Utilities.......................18
    Section 8.4.Demised Premises Heating and Air-
        Conditioning..........................................18
    Section 8.5...............................................18


ARTICLE 9.LIENS .............................................20
    Section 9.1.Discharge of Lien............................20


ARTICLE 10.MAINTENANCE, REPAIR AND ALTERATIONS ..............20
    Section 10.1.Landlord and Tenant Repair..................20
    Section 10.2.Alteration of Demised Premises..............21
    Section 10.3.Fixtures and Signs..........................22
    Section 10.4.Construction Standards......................22


ARTICLE 11.ENTRY, INSPECTION, POSTING AND DISPLAY ...........22
    Section 11.1.Posting Notices.............................22

Section 11.2. Entry to Demised Premises...................23
Section 11.3. Landlord's Easement.........................23

ARTICLE 12. LAWS AND INSURANCE STANDARDS .....................23
   Section 12.1. Tenant's Compliance With Laws and
      Insurance Standards...................................24
   Section 12.2. Tenant's Use of Demised Premises
      Impaired..............................................24

ARTICLE 13. INDEMNIFICATION OF LANDLORD AND LIABILITY .........24
      INSURANCE
   Section 13.1. Tenant Indemnity............................24
   Section 13.2. Tenant Liability Insurance..................25
   Section 13.3. Landlord Indemnity..........................26
   Section 13.4. Landlord Liability Insurance................27

ARTICLE 14. FIRE INSURANCE, DAMAGE AND DESTRUCTION ...........27
   Section 14.1. Landlord Insurance..........................27
   Section 14.2. Tenant Insurance............................27
   Section 14.3. Landlord Repair.............................28
   Section 14.4. Lease Termination...........................28
   Section 14.5. Rent Abatement..............................29
   Section 14.6. Tenant Repairs..............................29

ARTICLE 15. EMINENT DOMAIN ...................................30
   Section 15.1. Entire Taking...............................30
   Section 15.2. Partial Taking Other than Demised Premises
     ...................................................30
   Section 15.3. Partial Taking Demised Premises.............30
   Section 15.4. Condemnation Award..........................30
   Section 15.5. Rent Proration..............................31
   Section 15.6. Temporary Taking.   .........................31

ARTICLE 16. FINANCIAL INFORMATION; STATEMENT OF
   TENANT; AMENDMENT TO LEASE ................................31
   Section 16.1. Delivery of Information.....................31

ARTICLE 17. ASSIGNMENT, SUBLETTING AND HYPOTHECATION OF LEASE
   Section 17.1. Assignment and Subletting...................32
   Section 17.2. Documentation Required......................33

Section 17.3.Voting Control.............................33
Section 17.4.Tenant Includes Approved Assignees and......34
   Subtenants
Section 17.5.Tenant Include Successors...................34
Section 17.6.Recapture..................................35
Section 17.7.Successor to Landlord Interest.............35
Section 17.8.Transfer Premium...........................36

ARTICLE 18.INTENTIONALLY DELETED ..............................36

ARTICLE 19.OWNERSHIP OF CERTAIN PROPERTY AND SURRENDER OF
   PREMISES ...............................................36
Section 19.1.Ownership Of Property......................36

ARTICLE 20.HOLDOVER BY TENANT .................................37
Section 20.1.Rent In The Event Of Holdover..............37
Section 20.2.Liability In The Event Of Holdover.........37

ARTICLE 21.ADDITIONAL CONSTRUCTION ...........................37
Section 21.1.Construction By Landlord...................37
Section 21.2.Excavation.................................37

ARTICLE 22. DEFAULT ..........................................38
Section 22.1.Notice; Remedies...........................38
Section 22.2.Notice to Landlord.........................40
Section 22.3.Force Majeure..............................40
Section 22.4.Bankruptcy.................................40

ARTICLE 23.NO WAIVER .........................................41
Section 23.1.No Waiver Except In Writing................41

ARTICLE 24. NOTICES ..........................................41
Section 24.1.Addresses..................................41

ARTICLE 25.SUBORDINATION AND ATTORNMENT ......................42
Section 25.1.Subordination..............................42
Section 25.2.Attornment.................................43
Section 25.3.Mortgagee Protection Clause................43

00205868.5                          7

ARTICLE 26.HAZARDOUS MATERIALS ...............................43
    Section 26.1. ..............................................43


ARTICLE 27.MISCELLANEOUS PROVISIONS ..........................46
    Section 27.1.Headings. ....................................46
    Section 27.2.Time of Essence. .............................46
    Section 27.3.Construction of Lease. .......................46
    Section 27.4.Governing Law. ...............................47
    Section 27.5.Severability. ................................47
    Section 27.6.Interest Rate. ...............................47
    Section 27.7.Consent of Landlord. .........................47
    Section 27.8.Entire Agreement. ............................47
    Section 27.9.Default Under Other Agreements. ..............48
    Section 27.10.Objection to Statements. ....................48
    Section 27.11.Brokerage Commission. .......................48
    Section 27.12.Relationship of Parties. ....................48
    Section 27.13.Memorandum of Lease. ........................48
    Section 27.14.Past Due Rent. ..............................49
    Section 27.15.Limitation of Liability. ....................49
    Section 27.16.OFAC List Representation. ...................49
    Section 27.17. .............................................50


ARTICLE 28.SECURITY DEPOSIT ..................................50
    Section 28.1. ..............................................50
    Section 28.2. ..............................................50


ARTICLE 29.TENANT ALLOWANCE ..................................51
    Section 29.1. ..............................................51


ARTICLE 30.RENEWAL TERM ......................................52
    Section 30.1. ..............................................52


ARTICLE 31.ADDITIONAL PARKING ................................54
    Section 31.1. ..............................................54
    Section 31.2. ..............................................54
    Section 31.3. ..............................................54
    Section 31.4. ..............................................55
    Section 31.5. ..............................................55

EXHIBITS

Exhibit "A"   Site Plan
Exhibit "B"   Rules and Regulations
Exhibit "C"   Initial Tenant's Work (general)

00205868.5

## AMENDMENT TO LEASE AGREEMENT

**THIS AMENDMENT TO LEASE AGREEMENT** (this "Amendment") is made as of July 21, 2013, by and between **CT INDY CH TT, LLC**, a New York limited liability company, having an office at 280 Park Avenue, 36W, New York, New York 10017 ("Landlord"), and **YRC INC.**, a Delaware corporation, having an office at 10990 Roe Avenue, Overland Park, Kansas 66211 ("Tenant").

## RECITALS

**WHEREAS**, Cheshire Distribution Center, L.L.C., as landlord, and Tenant, as tenant, entered into that certain Lease Agreement, dated July 28, 2005 ("Original Lease"), whereby Landlord leased to Tenant approximately 74,554 square feet of space on the ground floor in the building commonly known as 181 West Johnson Avenue, Cheshire, Connecticut, as such space is more particularly described in the Original Lease ("Premises");

**WHEREAS**, Landlord has succeeded to the interests of Cheshire Distribution Center, L.L.C. and Tenant succeeded to the interests of Roadway Express, Inc., under the Original Lease;

**WHEREAS,** Tenant and Landlord extended the Original Lease pursuant to that certain letter dated July 30, 2008 ("First Amendment"; and the Original Lease and the First Amendment shall collectively be referred to as the "Lease"); and

**WHEREAS**, Landlord and Tenant desire to enter into this Amendment to further extend the Lease.

**NOW, THEREFORE,** in consideration of Ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the parties hereto, Landlord and Tenant agree as follows:

1.      **Undefined Capitalized Terms**.  Unless otherwise defined herein, all capitalized terms used in this Amendment shall have the definitions ascribed to them in the Lease.

2.      **Renewal Term**.  The Lease Term shall expire on July 31, 2018, unless sooner terminated in accordance with the provisions of the Lease.

3.      **Renewal Term Rent**.  Article 30 of the Lease is hereby deleted and the following is substituted therefor:

"(i)      During the first (1st) Lease Year of the renewal term (August 1, 2013 – July 31, 2014), Tenant shall pay Minimum Rent at an annual rate equal to Five Hundred Fifty-Nine Thousand One Hundred Fifty-Five and 00/100 Dollars ($559,155.00), paid monthly in the amount of Forty-Six Thousand Five Hundred Ninety-Six and 25/100 Dollars ($46,596.25) for each Lease Year. Thereafter, the annual Minimum Rent shall increase by three (3%) percent above the annual Minimum Rent for the previous Lease Year.

4. **Place of Payment**.  All payments required to be made by Tenant to Landlord pursuant to the Lease shall be made to CT INDY CH TT, LLC, c/o Investcorp International, Inc., 280 Park Avenue, 36W, New York, New York 10017.

5. **No Landlord Obligations**.  Tenant acknowledges and agrees that (i) Cheshire Distribution Center, L.L.C. delivered the Premises to Tenant on the Commencement Date in the condition required by the Lease, including, without limitation, Section 3.4(A); (ii) Cheshire Distribution Center, L.L.C. paid the Construction Allowance in full to Tenant; and (iii) Tenant is not entitled to any free rent, tenant improvement allowances or any other financial concessions.

6. **Notices**.  Article 24 of the Lease is hereby deleted and the following is substituted therefor: "Any notice, demand, consent, approval, direction, agreement or other communication required or permitted hereunder or under any other documents in connection herewith shall be in writing and shall be directed as follows:

| | |
|---|---|
| If to Landlord: | CT INDY CH TT, LLC<br>c/o Investcorp International, Inc.<br>280 Park Avenue, 36W<br>New York, New York 10017<br>Attn: F. Jonathan Dracos |
| | with a copy to: |
| | Robinson & Cole LLP<br>1055 Washington Boulevard<br>Stamford, Connecticut  06901<br>Attn:  Steven L. Elbaum, Esq. |
| If to Tenant: | YRC Inc.<br>10990 Roe Avenue<br>Overland Park, Kansas  66211<br>Attn:  Real Estate (A650) |

or to such changed address as a party hereto shall designate to the other parties hereto from time to time in writing.  Notices shall be hand delivered, sent by reputable guaranteed overnight courier service with computerized tracking capabilities, or by time stamped facsimile transmission, followed the next business day by delivery from a reputable guaranteed overnight courier service with computerized tracking capabilities.  Notices shall be deemed received upon receipt in the case of hand delivery, and facsimile transmission (but only if confirmed by delivery the next business day from a reputable guaranteed overnight courier service with computerized tracking capabilities), and the next business day if sent by a reputable guaranteed overnight courier."

7. **No Further Right to Renew**.  Tenant shall have no further option to renew or extend the Lease Term.

8.    **Broker**.  Landlord and Tenant each represent to the other that neither party has had any dealings, negotiations or consultations with any broker, representative, employee, agent or other intermediary in connection with this Amendment other than CBRE New England.  Each party hereto agrees that it shall indemnify, defend and hold the other party harmless from and against any liability arising as a result of its breach of the foregoing representation.

9.    **Authority**.  Tenant represents and warrants to Landlord that it has the right, power and authority to execute and deliver this Amendment and to perform its obligations hereunder, and this Amendment has been duly authorized, executed and delivered by it and is a valid and binding obligation of it enforceable against it in accordance with the terms hereof.

10.    **Ratify/Conflict**.  Except as amended herein, the Lease shall remain in full force and effect and the parties hereto ratify and reconfirm the Lease.  In the event of any conflicts or inconsistencies between the provisions of the Lease and the provisions of this Amendment, the provisions of this Amendment shall control.

11.    **Counterparts**.    This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and all such counterparts shall constitute one agreement.

12.    **Entire Agreement**.  This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein.  There have been no additional oral or written representations or agreements.

13.    **Binding**.  The provisions hereof shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.

14.    **Captions**.  The captions of the various sections of this Amendment are solely for the purpose of convenience.  Such captions are not a part hereof and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Amendment.

**[SIGNATURE PAGE FOLLOWS]**

Landlord and Tenant have executed this Amendment as of the day and year first above written.

**LANDLORD:**

**CT INDY CH TT, LLC**

By:_____
Name:     F. Jonathan Dracos
Its:        President

**TENANT:**

**YRC INC.**

By:_____
Name:     Steven R. Shippers
Its:        Director- Properties

## THIRD AMENDMENT TO LEASE AGREEMENT

**THIS THIRD AMENDMENT TO LEASE AGREEMENT** (this "Amendment") is made as of __ June 21 ___, 2018, by and between **CT INDY CH TT, LLC**, a New York limited liability company, having an office at 280 Park Avenue, 36W, New York, New York 10017 ("Landlord"), and **YRC INC.** (formerly known as Roadway Express, Inc.**), a Delaware corporation, having an office at 10990 Roe Avenue, Overland Park, Kansas 66211 ("Tenant").

## RECITALS

**WHEREAS**, Cheshire Distribution Center, L.L.C., as landlord, and Tenant, as tenant, entered into that certain Lease Agreement, dated July 28, 2005 ("Original Lease"), whereby Landlord leased to Tenant approximately 74,554 square feet of space on the ground floor in the building commonly known as 181 West Johnson Avenue, Cheshire, Connecticut, as such space is more particularly described in the Original Lease ("Premises");

**WHEREAS**, Landlord has succeeded to the interests of Cheshire Distribution Center, L.L.C., under the Original Lease;

**WHEREAS**, Tenant and Landlord extended the Original Lease pursuant to that certain letter dated July 30, 2008 ("First Amendment") and Tenant and Landlord further extended the Original Lease pursuant to that certain Amendment to Lease Agreement dated July 31, 2013 ("Second Amendment"; and the Original Lease, the First Amendment and the Second Amendment shall collectively be referred to as the "Lease"); and

**WHEREAS**, Landlord and Tenant desire to enter into this Amendment to further extend the term, adjust the monthly rent, and modify certain other provisions.

**NOW, THEREFORE,** in consideration of Ten ($10.00) Dollars and other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the parties hereto, Landlord and Tenant agree as follows:

1.     **Undefined Capitalized Terms**.  Unless otherwise defined herein, all capitalized terms used in this Amendment shall have the definitions ascribed to them in the Lease.

2.      **Renewal Term**.  The Lease Term shall expire on July 31, 2025, unless sooner terminated in accordance with the provisions of the Lease.

3.     **Renewal Term Rent**.  During the first (1st) Lease Year of the second renewal term (August 1, 2018 – July 31, 2019), Tenant shall pay Minimum Rent at an annual rate equal to Six Hundred Twenty-Nine Thousand Three Hundred Thirty-Three and 88/100 Dollars ($629,333.88), paid monthly in the amount of Fifty-Two Thousand Four Hundred Forty-Four and 49/100 Dollars ($52,444.49) for such Lease Year.  Thereafter, the annual Minimum Rent for each Lease Year shall increase by two and one quarter (2.25%) percent above the annual Minimum Rent for the previous Lease Year.

17872940-v6

4.    **No Landlord Obligations**.  Tenant acknowledges and agrees that (i) Cheshire Distribution Center, L.L.C. delivered the Premises to Tenant on the Commencement Date in the condition required by the Lease, including, without limitation, Section 3.4(A); (ii) Cheshire Distribution Center, L.L.C. paid the Construction Allowance in full to Tenant; (iii) Tenant is not entitled to any free rent, tenant improvement allowances (other than the Tenant Allowance (as hereinafter defined)) or any other financial concessions; and (iv) Tenant accepts the Premises in its "as-is" condition.

5.    **Tenant Allowance**.  Landlord shall pay to Tenant a one-time unconditional allowance (the "Tenant Allowance"), as Landlord's sole obligation and contribution for Tenant to repair or install Tenant's work in the Premises, the amount of $157,333.47.  Provided Tenant is not then in default of any of the terms, covenants or conditions of the Lease on Tenant's part to be observed or performed, the Tenant Allowance shall be paid to Tenant within thirty (30) days after the date on which Tenant shall have submitted a written request to Landlord for the payment of such Tenant Allowance.

6.    **No Further Right to Renew**. Tenant shall have no further option to renew or extend the Lease Term.

7.    **Broker**.  Landlord and Tenant each represent to the other that neither party has had any dealings, negotiations or consultations with any broker, representative, employee, agent or other intermediary in connection with this Amendment other than CBRE New England.  Each party hereto agrees that it shall indemnify, defend and hold the other party harmless from and against any liability arising as a result of its breach of the foregoing representation.

8.    **Authority**.  Tenant represents and warrants to Landlord that it has the right, power and authority to execute and deliver this Amendment and to perform its obligations hereunder, and this Amendment has been duly authorized, executed and delivered by it and is a valid and binding obligation of it enforceable against it in accordance with the terms hereof.

9.    **Ratify/Conflict**.  Except as amended herein, the Lease shall remain in full force and effect and the parties hereto ratify and reconfirm the Lease.  In the event of any conflicts or inconsistencies between the provisions of the Lease and the provisions of this Amendment, the provisions of this Amendment shall control.

10.    **Counterparts**.   This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, and all such counterparts shall constitute one agreement.

11.    **Entire Agreement**. This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein.  There have been no additional oral or written representations or agreements.

12.    **Binding**. The provisions hereof shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, legal representatives, successors and permitted assigns.

13.    **Captions**.  The captions of the various sections of this Amendment are solely for the purpose of convenience.  Such captions are not a part hereof and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Amendment.

Landlord and Tenant have executed this Amendment as of the day and year first above written.

**LANDLORD:**

**CT INDY CH TT, LLC**

By: _____

Name:   Michael O'Brien

Its:   Managing Director

**TENANT:**

**YRC INC.**

By: _____

Name:    Lance Collins

Its:     Director - Properties

3

## FOURTH AMENDMENT TO LEASE AGREEMENT

This Fourth Amendment to Lease Agreement (this "**Amendment**") is executed as of June <u>30</u>, 2020 (the "**Effective Date**"), between G&I IX CHESHIRE LLC, a Delaware limited liability company ("**Landlord**"), and YRC INC., a Delaware corporation ("**Tenant**"), for the purpose of amending the Lease Agreement between Landlord's predecessor-in-interest and Tenant dated July 28, 2005 (as amended, the "**Lease**"). Capitalized terms used herein but not defined shall be given the meanings assigned to them in the Lease.

### RECITALS:

Pursuant to the terms of the Lease, Tenant is currently leasing approximately 74,554 square feet of space on the ground floor in the building commonly known as 181 West Johnson Avenue, Cheshire, Connecticut (the "**Premises**"). The Lease has been amended pursuant to (i) that certain letter dated July 30, 2008; (ii) that certain Amendment to Lease Agreement dated July 31, 2013; and (iii) that certain Third Amendment to Lease Agreement dated June 21, 2018. Tenant has requested that Landlord allow Tenant to defer payment of the Minimum Rent payable for the months of May, June and July 2020, and Landlord has agreed to such deferral on the terms and conditions contained herein.

### AGREEMENTS:

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.    **Recitals**.  The recitals set forth above are true and correct and are hereby incorporated in their entirety.

2.    **Definitions**.  Capitalized terms used but otherwise not defined in this Amendment shall have the meaning ascribed to such terms in the Lease.

3.    **Deferral of Minimum Rent**.    Subject to the terms and conditions of this <u>Section 3</u>, Landlord hereby agrees to conditionally defer payment of the Minimum Rent payable for the months of May, June and July, 2020 in the aggregate amount of $160,888.81 (collectively, the "**Deferred Rent**", and such period being referred to as the "**Deferment Period**"). Notwithstanding such deferral of the Deferred Rent, all other sums due under the Lease, including specifically but without limitation Tenant's Common Facilities Charge and all other Additional Rent, shall be payable as provided in the Lease. Commencing August 1, 2020, and continuing thereafter on the first (1st) day of each calendar month through and including the month of January, 2021 (the "**Repayment Period**"), in addition to the monthly installment of Minimum Rent, the monthly installment of Tenant's Common Facilities Charge and all other Additional Rent and other sums due under the Lease, Tenant shall pay to Landlord the Deferred Rent in six (6) equal monthly installments of $26,814.81. Landlord agrees that it shall not charge any late fees or interest to Tenant with respect to the Deferred Rent otherwise payable during the Deferment Period, provided, that Landlord hereby expressly reserves the right to charge any and all late fees and interest as permitted under the Lease in the event that Tenant fails to timely pay any other sums payable under the Lease as amended hereby, including without limitation the Deferred Rent during the Repayment Period. In the event Tenant defaults under the Lease and fails to cure such default within any applicable notice or cure period, Tenant shall not be entitled to any further deferment of Deferred Rent and any Deferred Rent previously deferred shall be paid by Tenant to Landlord together with Tenant's next ensuing monthly rent payment. Tenant's continued failure or refusal to pay the Deferred Rent when due shall constitute an event of default under the Lease.

4. **Insurance and Governmental Rent Relief**. Upon Tenant's receipt (at any time prior to Tenant's repayment in full of the Deferred Rent) of insurance proceeds, or other funds or loan proceeds from any governmental agency or SBA lender in connection with the COVID-19 pandemic, including business interruption insurance proceeds and any loans under the Paycheck Protection Program, which proceeds, funds or loan proceeds are provided, in whole or in part, to pay Tenant's rental obligations under the Lease (e.g., insurance proceeds that were allocated by the insurer and paid out specifically for Tenant's damages arising from the Premises, or the 25% of PPP funds allocated for rent, or a pro rata allocation of such sums if paid to Tenant for multiple leased locations) (collectively, "**Rent Relief Funds**"), Tenant shall immediately provide written thereof to Landlord; provided, however, Landlord acknowledges that Landlord may be required to execute a confidentiality and/or non-disclosure agreement in form mutually agreeable between Landlord and Tenant prior to Landlord's receipt of details regarding the Rent Relief Funds. Notwithstanding anything to the contrary, Landlord and Tenant agree that Rent Relief Funds shall not include any funds conditioned on certain payment, repayment, application and/or similar obligations that are in fact prior to or superior to Landlord's rights to such funds. In the event Tenant receives any Rent Relief Funds during the Deferment Period, the Deferred Rent shall automatically be reduced to the extent of such Rent Relief Funds, and any such Deferred Rent so reduced shall be immediately due and payable by Tenant to Landlord, and shall constitute Rent payable under the Lease. If the Tenant receives any Rent Relief Funds after the Deferment Period but during the Repayment Period, Tenant shall promptly pay such Rent Relief Funds to Landlord, and any such payments shall reduce any remaining payments of Deferred Rent proportionately (e.g.,  if Tenant receives $10,000 of Rent Relief Funds and pays such amount to Landlord at a time when five payments of $20,000 of Deferred Rent remain outstanding, then each of the remaining five payments shall be reduced by $2,000.00). Tenant's failure to provide written notice to Landlord of its receipt of Rent Relief Funds, or Tenant's subsequent failure to pay to Landlord the Rent Relief Funds as set forth above, shall be deemed an event of default under the Lease.

5. **Confidentiality.** It is agreed and understood that Tenant may acknowledge only the existence of an agreement between Landlord and Tenant pertaining to the Lease, as amended, and that Tenant may not disclose any of the terms and provisions contained in this Amendment to any tenant or other occupant in the Building or to any agent, employee, subtenant or assignee of such tenant or occupant. It is agreed and understood that Landlord may acknowledge only the existence of an agreement between Landlord and Tenant pertaining to the Lease, as amended, and that Landlord may not disclose any of the terms and provisions contained in this Amendment or any of the information furnished by Tenant to Landlord in furtherance of this Amendment, including, but not limited to, the existence and terms of any Rent Relief Funds, to any other party except for Landlord's accountants, advisors, attorneys and professional consultants on a need-to-know basis.

6. **Limitation of Liability.** The parties agree and acknowledge that the Lease (including this Amendment) remains subject to Sections 27.12 and 27.15 of the Lease.

7. **Brokerage.** Landlord and Tenant each warrant to the other that it has not dealt with any broker or agent in connection with the negotiation or execution of this Amendment. Tenant and Landlord shall each indemnify the other against all costs, expenses, attorneys' fees, and other liability for commissions or other compensation claimed by any other brokers or agents claiming the same by, through, or under the indemnifying party.

8. **Prohibited Persons and Transactions.** Tenant and Landlord represent and warrant to each other that they are currently in compliance with and shall at all times during the Term (including any extension thereof) remain in compliance with the regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List) and any statute, executive order (including the September 24, 2001,

Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto.

9.    **Representations and Warranties**.  Landlord and Tenant represent and warrant to each other respectively that they have the requisite power and authority to enter into this Amendment; and that all necessary and appropriate approvals, authorizations and other steps have been taken to effect the legality of this Amendment that the signatories executing this Amendment on behalf of Landlord and Tenant have been duly authorized and empowered to execute this Amendment on behalf of Landlord and Tenant, respectively.

10.    **Ratification.**

(a)    Tenant hereby ratifies and confirms its obligations under the Lease, and represents and warrants to Landlord that it has no defenses thereto.  Additionally, Tenant further confirms and ratifies that, as of the date hereof, (a) the Lease is and remains in good standing and in full force and effect, (b) Tenant has no claims, counterclaims, set-offs or defenses against Landlord arising out of the Lease or in any way relating thereto or arising out of any other transaction between Landlord and Tenant, and (c) all tenant finish-work allowances provided to Tenant under the Lease or otherwise, if any, have been paid in full by Landlord to Tenant, and Landlord has no further obligations with respect thereto.

(b)    Landlord hereby ratifies and confirms its obligations under the Lease, and that, as of the date hereof, the Lease, as amended hereby, remains in full force and effect. Landlord acknowledges and agrees that all of Tenant's preferential rights and options under the Lease that were in effect as of March 1, 2020, did not terminate due to Tenant's failure to timely pay the Deferred Rent.

11.    **Binding Effect; Governing Law.**  Except as modified hereby, the Lease shall remain in full effect and this Amendment shall be binding upon Landlord and Tenant and their respective successors and assigns.  If any inconsistency exists or arises between the terms of this Amendment and the terms of the Lease, the terms of this Amendment shall prevail.  This Amendment shall be governed by the laws of the State where the Premises is located.

12.    **Counterparts; Electronic Signatures**.  This Amendment may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document. This Amendment may be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. For these purposes, "electronic signature" shall mean electronically scanned and transmitted versions (e.g., via pdf file) of an original signature, signatures electronically inserted and verified by software such as Adobe Sign, or faxed versions of an original signature.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

    This Amendment is executed on the respective dates set forth below, but for reference purposes this Amendment shall be dated as of the Effective Date.  If the execution date is left blank by Tenant, this Amendment shall be deemed executed by Tenant as of the Effective Date.

**LANDLORD:**

    **G&I IX Cheshire LLC,**
    a Delaware limited liability company

    By: *Valla Brown*
    Name: Valla Brown
    Title: Vice President

    Execution Date: Effective Date

**TENANT:**

    **YRC INC.,**
    a Delaware corporation

    By: _____
    Name: Jeffry H Cottrin
    Title: VP Pinonect Properties

    Execution Date: June ___, 2020

## FIFTH AMENDMENT TO LEASE AGREEMENT

This Fifth Amendment to Lease Agreement (this "**Amendment**") is executed as of _October 13_, 2021 (the "**Effective Date**"), between G&I IX CHESHIRE LLC, a Delaware limited liability company ("**Landlord**"), and YRC INC., a Delaware corporation ("**Tenant**"), for the purpose of amending the Lease Agreement between Landlord's predecessor-in-interest and Tenant dated July 28, 2005 (as amended, the "**Lease**"). Capitalized terms used herein but not defined shall be given the meanings assigned to them in the Lease.

## RECITALS:

A.      Pursuant to the terms of the Lease, Tenant is currently leasing approximately 74,554 square feet of space on the ground floor in the building commonly known as 181 West Johnson Avenue, Cheshire, Connecticut (the "**Premises**"). The Lease has been amended pursuant to (i) that certain letter dated July 30, 2008; (ii) that certain Amendment to Lease Agreement dated July 31, 2013; (iii) that certain Third Amendment to Lease Agreement dated June 21, 2018; and (iv) that certain Fourth Amendment to Lease Agreement dated June 30, 2020.

B.      Tenant desires to utilize certain trailer parking spaces on a surface lot owned by Landlord and currently under development, and Landlord and Tenant desire to extend the term of the Lease, all subject to the terms and conditions set forth herein .

## AGREEMENTS:

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      **Recitals**. The recitals set forth above are true and correct and are hereby incorporated in their entirety.

2.      **Trailer Parking**.

(a)      Landlord and Tenant acknowledge and agree that, as of the Effective Date, Landlord has commenced the process of design and permitting with respect to the construction of a paved parking area situated within the Industrial Center (the "**New Trailer Parking Area**"). Landlord anticipates that it will commence construction of the New Trailer Parking Area in October, 2021 and that it will complete construction in December, 2021. Upon completion of the New Trailer Parking Area, Tenant shall be granted a license to utilize up to forty (40) trailer parking spaces in the New Trailer Parking Area, in addition to those spaces already utilized by Tenant in the "Existing Trailer Parking Area". Both such areas are approximately shown on Exhibit A attached hereto.

(b)      In consideration for the foregoing license, Tenant shall pay to Landlord a monthly license fee (on a "must-take, must-pay" basis) equal to $185 per space within the New Trailer Parking Area throughout the Term and Extension Term of the Lease as set forth in Section 3 herein. All payments of the fee for such spaces shall be made in advance at the same time as monthly Base Rent is due under the Lease. Tenant shall at all times comply with all applicable laws and restrictions respecting the use of the New Trailer Parking Area. Landlord reserves the right to adopt, modify, and enforce reasonable rules and regulations governing the use of the New Trailer Parking Area, from time to time, including any security, key-card, sticker, or other identification or entrance systems.

(c)     Unless specified to the contrary above, the parking spaces for the parking rights provided hereunder shall be provided on an unreserved, "first-come, first-served" basis. Landlord shall have no liability whatsoever for any damage to vehicles or any other items located in or about the New Trailer Parking Area, and in all events, Tenant agrees to seek recovery from its insurance carrier. Landlord also reserves the right to close all or any portion of the New Trailer Parking Area if required by casualty, strike, condemnation, repair, alteration, act of God, Laws, or other reason beyond Landlord's reasonable control; provided, however, that except for matters beyond Landlord's reasonable control, any such closure shall be temporary in nature, and Landlord shall make diligent efforts to reopen the New Trailer Parking Area as soon as reasonably possible. If Tenant's use of any parking space is precluded for any reason, Tenant's sole remedy for any period during which Tenant's use of any parking space is precluded shall be abatement of parking charges for such precluded space. Tenant shall not assign its rights under this Section 2. Tenant's failure to pay for any of the above-referenced parking spaces or to otherwise comply with any provision of this <u>Section 2</u> or applicable provision of the Lease shall constitute an event of default under the Lease. In addition to any rights or remedies available to Landlord in the event of a default which continues uncured for ten (10) business days following written notice to Tenant, Landlord shall have the right to cancel the license granted to Tenant hereunder and/or remove any vehicles from the New Trailer Parking Area.

3.     **Extension of Term**. The term of the Lease ("**Term**") currently expires on July 31, 2025. The Term is hereby extended for a period of twelve (12) months, from August 1, 2025 through July 31, 2026 (the "**Extension Term**").

4.     **Minimum Rent**.   During the Extension Term, Tenant shall pay Minimum Rent equal to $61,283.43 per month, $735,401.20 per year.

5.     **Ingress / Egress**.  The parties acknowledge and agree that, as of the Effective Date, Tenant is using and has access to use the circulation driveway and entrance/exit to the West of the Premises as a primary means if ingress to and egress from the Premises and the public right of way.  Tenant hereby agrees that, following Landlord's completion of a new driveway and entrance/exit to the East of the Premises, Tenant shall utilize such new driveway as its primary means of ingress to and egress from the Premises and shall not utilize the Western driveway except in cases of emergency or closures of the new Eastern driveway.

6.     **Brokerage.** Landlord and Tenant each warrant to the other that it has not dealt with any broker or agent in connection with the negotiation or execution of this Amendment other than CBRE, representing Landlord, whose commission shall be paid by Landlord pursuant to a separate written agreement. Tenant and Landlord shall each indemnify the other against all costs, expenses, attorneys' fees, and other liability for commissions or other compensation claimed by any other brokers or agents claiming the same by, through, or under the indemnifying party.

7.     **Prohibited Persons and Transactions**. Tenant and Landlord represent and warrant to each other that they are currently in compliance with and shall at all times during the Term (including any extension thereof) remain in compliance with the regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List) and any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto.

8.     **Ratification.** Tenant hereby ratifies and confirms its obligations under the Lease, and represents and warrants to Landlord that it has no defenses thereto. Additionally, Tenant further confirms and ratifies that, as of the date hereof, (a) the Lease is and remains in good standing and in full force and effect, (b) Tenant has no claims, counterclaims, set-offs or defenses against Landlord arising out of the Lease or in any way relating thereto or arising out of any other transaction between Landlord and Tenant, and (c) all

tenant finish-work allowances provided to Tenant under the Lease or otherwise, if any, have been paid in full by Landlord to Tenant, and Landlord has no further obligations with respect thereto.

9.      **Binding Effect; Governing Law.** Except as modified hereby, the Lease shall remain in full effect and this Amendment shall be binding upon Landlord and Tenant and their respective successors and assigns. If any inconsistency exists or arises between the terms of this Amendment and the terms of the Lease, the terms of this Amendment shall prevail. This Amendment shall be governed by the laws of the State where the Premises is located.

10.      **Counterparts; Electronic Signatures**. This Amendment may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document. This Amendment may be executed by electronic signature, which shall be considered as an original signature for all purposes and shall have the same force and effect as an original signature. For these purposes, "electronic signature" shall mean electronically scanned and transmitted versions (e.g., via pdf file) of an original signature, signatures electronically inserted and verified by software such as Adobe Sign, or faxed versions of an original signature.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

This Amendment is executed on the respective dates set forth below, but for reference purposes this Amendment shall be dated as of the Effective Date. If the execution date is left blank by Tenant, this Amendment shall be deemed executed by Tenant as of the Effective Date.

**LANDLORD:**

**G&I IX Cheshire LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____

Execution Date: Effective Date  Oct 13, 21

**TENANT:**

**YRC INC.,**
a Delaware corporation

By: _____
Name:  Jeffrey H. Coltrin
Title:   Vice President – Finance & Properties

Execution Date: October 13, 2021

Exhibit A – New Trailer Parking Area & Existing Trailer Parking Area



New Trailer Parking Area

Existing Trailer Parking Area