# EXHBIT A



# MASTER DATA CENTER SERVICES AGREEMENT
## STANDARD TERMS AND CONDITIONS

## CLIENT INFORMATION:

Name:   YRC Enterprise Services, Inc.                Suite Number/Rack:_____

Billing Address:_____10990 Roe Ave._____

City:   Overland Park                      State:             Zip:
                                           KS                 66211

Contact Name:   Jeff Wright                 Title:   Director, Technologies

Telephone:_█████████_____           E-mail:_█████████_____

Nature of Client:

☐ Individual/sole proprietorship   ☒ Corporation   ☐ Limited Liability Company   ☐ Partnership

## AGREEMENT:

This Master Data Center Services Agreement is made July 30, 2021 ("Effective Date") between YRC Enterprise Services, Inc., a Delaware Corporation having its principal place of business at 10990 Roe Ave., Overland Park, KS 66211, ("Client") on behalf of its and as agent for its Affiliates, and  Continuity of Operation Planning, LLC, a Kansas limited liability company doing business as Cavern Technologies ("**Cavern**"), having its principal place of business at 17501 W. 98th Street, Pillar 1833, Lenexa, KS 66219, who is the owner of a leasehold interest in properties at the Meritex/Lenexa Executive Park, to provide certain data center services as identified herein and in particular Statements of Work executed between the parties pursuant to the Standard Terms and Conditions attached hereto. This agreement, including any Statements of Work or Service Level Agreements executed hereunder or attached hereto (collectively, the "**Agreement**"), constitutes the entire agreement between Client and Cavern relating to the particular Statements of Work and Service Level Agreements, and replaces all prior oral or written communications between the parties.

## SIGNATURES:

*By signing below, the undersigned certify that they have read and understand, and agree to be legally bound by, the terms and conditions of this Agreement, including the terms and conditions contained in any Statements of Work.*

| *YRC Enterprise Services, Inc.* ("Client") | **Continuity of Operation Planning, LLC ("Cavern")** |
|---|---|
| By: *Jason T. Ringgenberg* _____ | By: *Sean Khurana* _____ |
| 5CA0A3ED5BA64F0...  (Authorized Signature) | 81704FFB50184A7...  (Authorized Signature) |
| Name: Jason T. Ringgenberg | Name: Sean Khurana |
| (Print) | (Print) |
| Title: Senior Vice President | Title: President and Chief Growth Officer |
| Date: 8/5/2021 | Date: 8/5/2021 |

# MASTER DATA CENTER SERVICES AGREEMENT
## STANDARD TERMS AND CONDITIONS

## Section 1. DEFINITIONS

**"Affiliate(s)"** means (1) all business units and divisions of a party or its parents and (2) any entity controlled by, controlling, or under common control with such party.

**"Cavern Equipment"** means any equipment, hardware or other property (including, without limitation, wires, lines, circuits, ports, routers, switches, channel service units, cabinets and racks) used by Cavern to provide Services to Client or provided by Cavern to Client in conjunction with the Services.

**"Client Information Systems"** means any equipment, hardware or other property (including, without limitation, computers, databases, applications, laptops and network connected devices owned by Client.

"**Cavern Systems"** shall mean the equipment, hardware and software controlled by Cavern and collectively used by Cavern to provide Client with access to the Data Center Services, namely (a) Cavern data center environmental and infrastructure systems; (b) connectivity channels and networks, if any, provided directly by Cavern; (c) Cavern equipment or hardware that Cavern has agreed to support and maintain; (d) Cavern-owned software or third-party software that Cavern has agreed to support and maintain; and (e) any other equipment, hardware and software under Cavern's reasonable control used to provide Client with access to the Data Center Services.

**"Common Areas"** means those portions of the Facility (excluding Client's Data Center) in which Cavern's clients have joint and non-exclusive access, including, without limitation, hallways, restroom facilities, entrances, and lobbies.

**"Data Center"** means that portion of the Facility in which equipment storage space will be allocated to Client for installation and use of Client or Cavern Equipment. The specifications of the Data Center shall be set forth in a Statement of Work.

**"Facility"** means those premises leased by Cavern at the Meritex/Lenexa Executive Park located 17501 West 98th Street, Lenexa, Kansas.

**"Meritex"** means Meritex Enterprises, Inc., a Minnesota corporation.

**"Services"** means those data center services to be provided by Cavern and its lessors, subcontractors or agents as identified in a Statement of Work.

**"Statement of Work"** means each written statement of work executed by the parties during the term of this Agreement whereby Cavern agrees to provide Services to Client. Statements of Work may only be submitted during the term of this Agreement and shall be subject to the terms and conditions set forth in this Agreement. In the event any provisions contained in a Statement of Work expressly conflict with any terms, conditions or clauses contained in this Agreement, the provisions of the applicable Statement of Work shall govern to the extent of such conflict.

## Section 2. STATEMENTS OF WORK

2.1    **Engagement.** Client engages Cavern to perform the Services as set forth in this Agreement and any Statements of Work. Cavern is an independent contractor and nothing in this Agreement shall operate to create any employment or other relationship between Cavern and Client. As an independent contractor, Cavern shall have the right to determine the method, details and means of performing the Services. Cavern shall have the sole right to designate the appropriate personnel necessary to accomplish the Services to be performed under this Agreement.

2.2    **Statement of Work Changes.**  Client may from time to time make changes in scope from those set forth in this Agreement or Statement of Work. Variations to scope, to the Data Center, to the Services or to the specifications or delivery dates thereof may incur additional costs. Such changes must be in writing and accepted by both parties to be effective. If any such change causes an increase or decrease in the estimated charges or causes a schedule change from that originally

agreed upon, Cavern will provide written notice to Client of the change in charges or scheduling. A new Statement of Work or modification, acceptable to both parties using the Customer Contract Change Addendum, will be promptly initiated and executed by the Parties.

2.3    **Client Obligations.** Client shall perform those obligations ("**Client Obligations**") set forth in this Agreement and any Statement of Work in a timely manner. Unless otherwise provided in a Statement of Work, Client shall be solely responsible for providing, maintaining and ensuring the compatibility of any hardware, software, electrical, telecommunications, network or other physical, technical or service requirements necessary to utilize the Data Center or any Services.

2.4    **Delivery and Acceptance.** Cavern will use commercially reasonable efforts to perform the Services by the dates set forth in this Agreement or the applicable Statement of Work, if any. In the event Client fails to meet a Client Obligation by the date set forth in this Agreement or the applicable Statement of Work, the delivery dates set forth in the applicable Statement of Work impacted by such failure, parties shall agree to revise, amend, or extend the Statement of Work.

2.5    **Utilities — Third Party Services.** Customer shall pay for all utilities consumed in its use of the Data Center (except water and sewer). Electrical power will be provided by Evergy through Cavern's service and will be billed through to Client on a monthly basis. Client's maximum electrical load available for the Data Center is specified in the Data Center Services Statement of Work. Unless otherwise set forth in a Statement of Work, Client shall be responsible for securing and paying for any other utilities or third-party services consumed by Client or necessary or useful for Client's use of the Data Center (including, without limitation, telephone, internet, and data communications). Cavern reserves the right to increase/decrease utility charges based on rate adjustments as outlined by Evergy and the State Corporation Commission of Kansas.

2.6    **No Lease.** This Agreement is not intended to and does not constitute a lease for any real property. Nothing herein creates or vests in Client any leasehold estate, easement, ownership interest or other property right or interest of any nature in the Facility. Client acknowledges and agrees that (i) it has been granted only a license to use the Data Center and Cavern Equipment in accordance with this Agreement, (ii) Client has not been granted any real property interest in the Data Center and (iii) Client has no rights as a tenant or otherwise under any real property or landlord/tenant laws, regulations or ordinances. Equipment located in the Data Center or the Facility are not fixtures and shall be reported by Client as personal property for all purposes.

## Section 3. DATA CENTER — SERVICES

3.1    **Compliance with Law, Cavern Rules and Regulations and Acceptable Use Policy**. Client agrees that it will use the Data Center and the Services only for lawful purposes and in accordance with this Agreement. Client will comply at all times with all applicable laws, rules, regulations and ordinances (collectively, the "**Laws**"), Cavern's general rules and regulations relating to Client's use of the Data Center, as updated by Cavern from time to time (the "**Rules and Regulations**") and Cavern's Acceptable Use Policy relating to Client's use of the Data Center Services, as updated by Cavern from time to time (the "**AUP**"). Both the Rules and Regulations and the AUP are attached as Exhibits A and B respectively, and made a part of this Agreement by this reference. Client agrees that it has read and understands the current version of the Rules and Regulations and the AUP, copies of which are attached hereto. Cavern may change the Rules and Regulations and/or the AUP upon thirty (30) days-notice to Client, which notice may be provided by forwarding such new versions to the Client Contact via email. Client acknowledges that Cavern exercises no control whatsoever over the content of the information passing through the Data Center, and that it is the sole responsibility of Client to ensure that the information it transmits and receives complies with the Laws, the Rules and Regulations and the AUP. Notwithstanding anything to the contrary contained herein, Client acknowledges that upon reasonable notice to Client (except for in cases of emergency, when notice shall not be required) Cavern may immediately take corrective action, including, without limitation, and without liability to Client or its customers, suspension or termination of the Services and removal of any offending data, information or content, in the event Cavern receives notice of possible violations by Client of the Laws, the Rules and Regulations or the AUP. Client will cooperate with Cavern's investigation of any potential violations of any Laws,

the Rules and Regulations or the AUP.

**3.2** **Contents of Communications.** Cavern does not undertake any duty to monitor or exert editorial control over, and shall have no liability or responsibility for, the content of any communications transmitted by or to Client via the Services, Data Center or Cavern Equipment, or for any data, content or information exchanged by Client via the Services, Data Center or Cavern Equipment. Client assumes sole responsibility for such communications and their underlying data, content and information and for ensuring its compliance with all applicable laws and third-party rights. In the event it comes to the attention of Cavern and that Client communications, underlying data, content, or information may violate or infringe any Laws, the Rules and Regulations, the AUP, third party rights or may expose Cavern to civil or criminal liability (an "Alleged Incident"), Cavern will provide Client with notice of any such Alleged Incident within 24 hours and the parties will work together to resolve the situation, as appropriate.   In the event Cavern receives instructions from law enforcement or a court order to remove from the Services, Data Center or Cavern Equipment any Client communications, underlying data, content, or information, Cavern may do so without liability to Client or its customers.

**3.3** **Access, Physical Security and Availability of Services**. Cavern and Client represent and warrant to each other that they have conducted background investigations on their respective employees performing this Agreement.    Except with the advanced written consent of Cavern, Client's access to the Data Center will be limited solely to its employees and agents identified and authorized by Client to have access to the Data Center ("**Client Representatives**") in accordance with this Agreement and as identified on a Data Center Physical Access Authorization form. Client and its Representatives will be permitted reasonable access to the Data Center twenty-four (24) hours per day, seven (7) days per week, three-hundred and sixty-five (365) days per year subject to the terms of this Agreement, any life-threatening, dangerous or other emergency situation and any other reasonable security measures put in place by Cavern to secure the Data Center. Cavern may refuse entry to, or require the immediate departure of, Client, its Representatives and any individual who (i) is disorderly, (ii) has failed to comply with or agree to the terms of this Agreement, the then current version of the Rules and Regulations and/or the AUP, or (iii) has failed to comply with the Laws or agree to any of Cavern's other procedures and requirements. Client assumes sole responsibility to ensure that all user identification, login and password information and any other access information used in connection with Client's access to the Data Center remains confidential. Client shall immediately notify Cavern if it becomes aware of any disclosure to, or use of, access information by anyone other than Client's authorized employees as set forth above. Client is solely responsible for all use of the Data Center and the Data Center Services by Client Representatives or other authorized parties on Client's behalf. Cavern will retain all security camera recordings for not less than 30 days and all physical access logs for not less than twelve months.

   a.    **Physical Security.**  Cavern will conform with all security protocols described in Cavern's most recently completed Service Organization Control 2 (SOC 2) audit report, and during the Term, Cavern shall not materially diminish the protections provided by the controls set forth in Cavern's then-current SOC 2 audit report.   Cavern shall maintain a physical security program that includes appropriate administrative, technical and physical safeguards reasonably designed to: 1) ensure the physical security of the Data Center containing the Client Information Systems; 2) protect against any anticipated threats or hazards to the physical security of the Data Center containing the Client Information Systems; and 3) protect against unauthorized physical access to the Data Center containing the Client Information Systems that could result in substantial harm or inconvenience to Client.

   To comply with the safeguard obligations generally described above, Cavern has (a) designated an employee to coordinate its physical security program, (b) identified reasonably foreseeable internal and external risks to the physical security of the Data Center containing the Client Information Systems that could result in the unauthorized disclosure, misuse, alteration, destruction, or other compromise of such Client Information Systems, and assessed the sufficiency of any physical safeguards in place to control these risks, and (c) designed and implemented physical safeguards to control the risks identified through the risk assessment, and regularly tests or otherwise monitors the effectiveness of the physical

safeguards' key controls, systems and procedures.

Cavern shall notify Client in writing as soon as possible and without unreasonable delay, but in no event later than 24 hours after Cavern has either actual or constructive knowledge of an act or omission that may compromise the physical security of the Data Center containing the Client Information Systems or the physical, technical, administrative or organizational safeguards put in place by Cavern (an "Incident").  Notification may be delayed as required by law enforcement to prevent any impediment(s) to its investigation of the Incident. Cavern shall have actual or constructive knowledge of an Incident if Cavern actually knows there has been an Incident or if Cavern has reasonable basis in facts or circumstances, whether acts or omissions, for its belief that an Incident has occurred. Cavern shall cooperate with law enforcement in accordance with applicable law provided however, that such cooperation shall not result in or cause an undue delay to remediation of the Incident within Cavern's control. Cavern shall promptly take appropriate action to mitigate such physical risk or potential problem and, to the extent that the Incident was the result of a breach of Cavern's obligations herein, such mitigation shall be at Cavern's expense.  In the event of an Incident, Cavern shall, at its sole cost and expense, fully restore the physical security of the Data Center and take appropriate measures to prevent any recurrence of the problem as soon as is commercially practicable.

b.   **Availability of Services**.  Cavern shall provide and shall make available to Client the Services outlined in this Agreement, the Service Level Agreement and the applicable Statement of Work; provided that, the Client has established sufficient connectivity to the Cavern Systems as set forth in this Agreement (the "Service Levels").

**3.4   Restrictions on Use of Data Center.** Client shall not at any time, without Cavern's prior written consent, (i) permit the Data Center to be utilized for purposes other than as a data center or for the provision of any services that compete directly or indirectly with any Cavern services, (ii) resell the Services to any third parties or otherwise allow third parties to use the Data Center or the Services, (iii) connect Cavern Equipment (defined below) to anything other than the Cavern network, equipment or facilities, (iv) attempt to grant access or otherwise allow any individual not identified and authorized pursuant to Section 3.3 above into the Data Center; (v) access, alter, tamper with, adjust or repair any equipment, property, data, information or systems not belonging to Client; (vi) make any alterations, installations, additions or improvements to the Data Center, or install any signs or other advertisements in the Data Center, Facilities or Common Areas, or (vii) store in or permit any hazardous materials into the Data Center.

**3.5   Damage Prevention.** Client will refrain from using any equipment, tools, materials, apparatuses or methods that, in Cavern's sole judgment, might cause damage to the Data Center or otherwise interfere with Cavern Equipment or operations or the equipment or operations of any other Cavern client. Cavern reserves the right, in its sole discretion, to take any action to prevent harm to the services, personnel or property of Cavern (and its affiliates, vendors or clients).

**3.6   Inspection.** Cavern and its designees may enter the Data Center at any time upon reasonable notice to Client (except in cases of emergency, when notice shall not be required) for the purposes of inspecting and examining the foregoing, to make repairs, alterations, improvements, installations, additions to or removals from the Facility as Cavern may deem necessary or desirable. All Client equipment shall fit within the Data Center. During the three (3) months prior to the expiration of the Term or any renewal thereof, and upon Client approval, Cavern may advertise and show the Data Center to potential clients with prior notice to Client.

**3.7   Cavern Equipment.** In some instances, Client may wish for Cavern to use Cavern Equipment in providing Services to Client as set forth in a Statement of Work. Additionally, Cavern may need to place Cavern Equipment inside the Data Center to provide the Services to Client. Client shall have the right to use the Cavern Equipment for the Term of any such applicable Statement of Work. Under no circumstances will Client remove any Cavern Equipment from the Data Center without the prior written consent of Cavern. Client shall be responsible for keeping the Cavern Equipment in the Data Center in good working condition and in a proper environment for such equipment and will under no circumstances alter, modify, sublet, rent, dispose of, relocate or move the Cavern

DocuSign Envelope ID: 61D4FDB1-EE42-4EC0-804A-6A0C159E3F74

Equipment without the prior written approval of Cavern. Cavern Equipment shall always remain the personal property of Cavern. Client shall have no right, title or interest in or to the Cavern Equipment except as provided in this Agreement, and Client shall hold the Cavern Equipment subject and subordinate to the rights of Cavern. Client will not remove, alter or destroy any labels on the Cavern Equipment. Client shall keep any Cavern Equipment free from all liens, levies and encumbrances.

**3.8    Maintenance.** Unless otherwise set forth herein, Client is solely responsible for all service, maintenance and cleaning necessary to ensure the adequate operation of the Client equipment located within Client's Data Center. Client will maintain its Data Center in an orderly, clean and safe condition, and Client will return such space to Cavern in the same condition (reasonable wear and tear excepted) as when it was made available to Client upon termination or expiration of this Agreement or the applicable Statement of Work. Client will perform, and is solely responsible for, all janitorial services, maintenance of client-owned infrastructure, and other actions as are reasonably necessary to maintain the Data Center in a condition which is generally suitable for the placement of telecommunications, electrical and computer equipment. Client shall comply with all applicable Laws set forth by the fire marshal, health officer, building inspector and other governmental agents and agencies exercising jurisdiction over the Facility and those standards established by the National Board of Fire Underwriters. Cavern will keep in good condition and repair, ordinary wear and tear excepted, (i) the structural components of the Facility, Common Areas and all routes of ingress or egress thereto, and (ii) nonstructural damage to the Facility caused by structural failures in or to the Facility.

**3.9    Removal of Equipment and Data.** Upon termination of this Agreement or the applicable Statement of Work, Client is responsible for arranging the removal of its equipment, data and information from the Data Center and/or from any Cavern Equipment. Such removal will be at Client's sole risk and expense and shall occur within ninety (90) days after the effective date of termination of this Agreement or the applicable Statement of Work; provided that Client pays the per diem rate until Client has removed all equipment from the Data Room; and provided further that, Cavern reserves the right to retain any such equipment, data and information until any fees due to Cavern are paid and exercise its rights under Section 4.4 of this Agreement. In the event Client fails to remove its equipment, data and information as set forth herein, Cavern may, in addition to any other remedies set forth in this Agreement, dispose of such equipment, data and information as it sees fit and without any liability to Client or its customers.

**3.10   Access Provided by Client**. Client shall cooperate with Cavern as necessary to complete any and all Services set forth in this Agreement or any Statement of Work.

## Section 4. FEES, EXPENSES & PAYMENT

**4.1    Fees.** Client shall pay to Cavern the fees for all Services at the times and in the amounts set forth in the applicable Statement of Work. Any additional fees for services not contemplated or outside the scope of this Agreement or any Statement of Work shall be at Cavern's then-current rates for such services. Cavern reserves the right to increase its standard rates on an annual basis during the term of this Agreement as set forth in the Statement of Work. If not specified in a Statement of Work, Cavern shall issue invoices monthly. Invoices will list all expenses, charges, costs, Services descriptions and all state, federal, sales or other applicable taxes separately, if any. All invoice amounts shall be paid when due as set forth in the applicable Statement of Work. Client shall pay a late charge of one percent (1.0%) per month, or the maximum rate permitted by applicable law, whichever is less, on any unpaid amount for each calendar month or fraction thereof that any payments are in arrears. Cavern shall be entitled to any reasonable expenses incurred in collecting any amounts due pursuant to this Agreement or in addressing any violations by Client of the terms and conditions of this Agreement, including, without limitation, reasonable attorneys' fees.

**4.2    Reimbursement of Expenses.** Unless otherwise noted in a Statement of Work, Client shall be obligated to reimburse Cavern for all reasonable out-of-pocket expenses, incurred by Cavern and pre-approved in writing by Customer, in performing its obligations hereunder.

**4.3    Taxes.** Fees are exclusive of any and all sales, use, value added, excise, transfer, privilege and

DocuSign Envelope ID: 61D4FDB1-EE42-4E60-8949-640C9469E3774

other taxes or duties, whether international, national, state or local, however designated or assessed with respect to the Services provided under this Agreement, excluding income taxes on Cavern's profits. Client shall be responsible for any increase in real property taxes . Client shall pay such amounts within sixty (60) days of invoice from Cavern. Cavern will provide tax bills evidencing the increase in taxes along with the invoice. Client shall be responsible for any and all personal property taxes on property stored in the Data Center.

**4.4**   **Security Deposit.** Client shall provide Cavern with a security deposit in the amount set forth in the applicable Statement of Work in order to secure Client's obligations under this Agreement. Cavern may charge against this security deposit any damages incurred by Cavern due to Client's breach of this Agreement. Client shall replenish the security deposit within thirty (30) days of demand by Cavern in the event Cavern makes any charges against the security deposit. Cavern shall refund the amount of such security deposit, without interest, within ten (10) days of the expiration or termination of this Agreement in the event Client is not in breach of this Agreement and all amounts due to Cavern have been paid in full. Cavern will not refund security deposit for Clients who terminate an Agreement early.

## Section 5. TERM, TERMINATION

**5.1**   **Term.** This Agreement will begin on the Start Date (as set forth in the applicable Statement of Work) and shall continue for the Term set forth in the applicable Statement of Work unless otherwise earlier terminated as set forth herein. This Agreement shall renew as set forth in such Statement of Work.

**5.2**   **Termination upon Breach.** Either party may terminate this Agreement immediately upon written notice to the other party, in the event that the other party: (i) materially violates any provision of this Agreement and fails to cure such violation within thirty (30) days after receiving written notice of such violation; (ii) becomes insolvent or makes assignment for the benefit of creditors; (iii) files or has filed against it any petition under any Title of the United States Code or under any applicable bankruptcy, insolvency, reorganization or similar debtor relief law which is not discharged within thirty (30) days of said filing,  (iv) requests or suffers the appointment of a trustee or receiver, or the entry of an attachment or execution as to a substantial part of its business or assets, (v) is the subject of a voluntary or involuntary bankruptcy, reorganization or liquidation proceeding, is insolvent, makes an assignment for the benefit of creditors or admits in writing its inability to pay debts when due, or (vi) dissolves or otherwise ceases operation of its business.

**5.3**   **Termination or Suspension by Cavern.** Notwithstanding Section 5.2, Cavern may terminate or suspend its performance of this Agreement, any accepted but uncompleted Statements of Work and/or Client's access to the Data Center, without liability to Client or its customers, at any time upon written notice to Client if Client fails to make any payment when due and such failure continues for twenty (20) business days after written notice from Cavern. Additionally, Cavern may immediately suspend Client's access to the Data Center and Cavern's provision of the Services, without liability to Client or its customers, in the event (i) Client breaches any Laws, Rules and Regulations or the AUP, or (ii) Client engages in any actions that, in Cavern's reasonable business judgment, would harm or disrupt the Facilities, the Data Center, Cavern's other clients or Cavern's ability to provide services to its other clients.

**5.4**   **Rights and Remedies upon Termination.** In the event this Agreement expires pursuant to Section 5.1 or either party terminates the Agreement pursuant to Sections 5.2 or 5.3, Cavern shall be entitled to receive payment for all Services performed and expenses incurred through the effective date of termination. In addition, if Cavern terminates this Agreement for Client's breach pursuant to Sections 5.2 or 5.3, Cavern will suffer damages that will be difficult to ascertain. Cavern shall be entitled to all remaining fees and amounts for Services under all Statements of Work to compensate Cavern for lost opportunities, in addition to any amounts already received or owed to Cavern for Services previously performed or expenses previously incurred, as liquidated damages and not a penalty, in addition to all other rights and remedies available to Cavern in law and in equity which may be granted by a court of competent jurisdiction. Client shall immediately return any Cavern Equipment in its possession upon termination of this Agreement.

**5.5**   **Termination or Suspension by Client.** Notwithstanding Section 5.2, Client may terminate or suspend its performance of this Agreement, any accepted but uncompleted Statements of Work, without liability to Cavern, at any time upon ten (10) business days' written notice to Cavern if Cavern revokes Client access in violation of this Agreement or makes unauthorized changes to Client's equipment, intentionally tampers with Client data, is the sole cause of a physical security breach to the Data Center, grants unauthorized access to the Data Center, or is the sole cause of material loss of Client's data and/or equipment.

## Section 6. CONFIDENTIALITY & OWNERSHIP

**6.1**   **Confidentiality**. Either party (the "**Disclosing Party**") may from time to time disclose Confidential Information (as defined below) to the other party (the "**Recipient**"), including Recipient's directors, officers, employees, agents, or representatives, including, without limitation, its attorneys, accountants, consultants, advisors, auditors, banks and financial advisors being bound to a similar duty of confidentiality. As used herein, "**Confidential Information**" shall mean: (i) all nonpublic information concerning the business, technology, products, services and strategies of the Disclosing Party, intellectual property, concepts, methodologies, inventions, developments or procedures provided by Cavern to Client, (ii) all such information clearly labeled by the Disclosing Party in writing as "confidential" prior to its disclosure, and (iii) all such information that, by its nature, a reasonable party would consider to be confidential or proprietary. Recipient shall keep in confidence and trust and will not disclose, disseminate or use, or permit any employee, agent or other person working under Recipient's direction to disclose, disseminate or use, the existence, source, content or substance of any Confidential Information to any other person or for any purpose other than those set forth in this Agreement. The following information will not be considered Confidential Information: (a) information which was in the public domain prior to its disclosure; (b) information which becomes part of the public domain by any means other than through violation of this Agreement; or (c) information which was known to the Recipient prior to disclosure as evidenced by written records existing prior to such disclosure. (d) information independently developed by a party without reference to the Disclosing Party's Confidential Information. In addition, this Section will not be construed to prohibit disclosure of Confidential Information to the extent that such disclosure is required to by law or valid order of a court or other governmental authority; provided, however, that the Recipient gives the Disclosing Party reasonable notice that such Confidential Information is being sought by a third party as permitted by law, so as to afford the Disclosing Party the opportunity to limit or prevent such disclosure.

**6.2**   **Ownership of Work Product.** All Work Product (defined below) related to a particular Statement of Work shall be owned by Cavern, unless otherwise expressly set forth in a Statement of Work. Conditioned upon full payment of all fees and expenses due pursuant to this Agreement, Cavern grants to Client a limited, non-exclusive, non-transferable license to use copies of the Work Product solely in conjunction with the Work Product and solely for Client's internal purposes. As used herein, "**Work Product**" shall mean all forms, publications, data, documentation, instructions, software, original works of authorship, trade secrets, concepts, ideas, specifications, know-how, methods, methodologies, processes, formulae, and proprietary, intellectual or similar intangible rights, including goodwill associated thereto, or information of any kind or nature developed or provided by Cavern to Client as a result of any Statement of Work.

## Section 7. WARRANTY DISCLAIMER; LIMITATION ON LIABILITY & INDEMNITY

**7.1**   **Warranty; Disclaimer.** Except as is specifically set forth in the Agreement, to the extent allowed by law CAVERN EXPRESSLY DISCLAIMS ALL WARRANTIES OF ANY KIND RELATING TO THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR USE OR PURPOSE, AND TITLE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, CAVERN MAKES NO WARRANTY THAT THE SERVICES WILL MEET CLIENT'S REQUIREMENTS, THAT THE RESULTS OBTAINED FROM THE USE OF THE FOREGOING WILL BE SATISFACTORY, ACCURATE OR RELIABLE, OR THAT THE FOREGOING WILL MEET CLIENT'S EXPECTATIONS.

**7.2. LIMITATION ON LIABILITY.  IN NO EVENT SHALL CAVERN (AND MERITEX) OR CLIENT BE LIABLE TO OTHER PARTY OR TO ANY THIRD PARTY FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR NON-CONTRACTUAL DAMAGES, INTERRUPTION OF OR LOSS OF BUSINESS, LOSS OF DATA, REFUNDS OF ANY KIND, LOSS OF INCOME, LOST PROFITS, OR COSTS OF REPLACEMENT SERVICES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY STATEMENT OF WORK, WHETHER IN AN ACTION IN CONTRACT OR TORT, EVEN IF CAVERN OR CLIENT HAS BEEN ADVISED OF THE POSSIBILITY THEREOF. CAVERN'S OR CLIENT'S LIABILITY, IF ANY, TO THE OTHER PARTY OR ANY THIRD PARTY SHALL NOT EXCEED THE TOTAL MONTHLY FEES PAID BY CLIENT UNDER THE STATEMENT OF WORK, NOT TO EXCEED A TOTAL OF 12 MONTHS.  <u>This limitation of liability will not apply to, indemnified claims, instances of bodily injury, property damage and third-party claims.</u>**

**7.3   Indemnity.**

<u>General Indemnity</u>**.**

Each party (an "Indemnitor") agrees to indemnify, defend and hold the other party and its directors, officers, employees, members, agents, parents, subsidiaries and Affiliates (each, an "Indemnified Party") harmless from and against all claims, actions, liabilities, losses, expenses, damages and costs (including reasonable attorneys' fees) ("Losses") that may at any time be incurred by such parties and that arise out of or relate to (i) any breach of the party's representations, warranties, covenants or obligations pursuant to this Agreement, (ii) violation of the Laws, the Rules and Regulations, the AUP or third party rights, (iii) injury to persons or loss of life, any damage or destruction to the Facility, Common Areas, Data Center or the property of an Indemnified Party or any other occupant of the Facility, Common Areas, Data Center by Indemnitor, its agents, employees, representatives, contractors, customers, invitees, licensees, and guests, including but not limited to any third party claim for said acts or omissions, or (iv) any negligence or willful misconduct of Indemnitor, its agents, employees, representatives, contractors, customers, invitees, licensees and guests.

<u>Intellectual Property Indemnity</u>. An Indemnitor shall defend, indemnify, release and hold harmless an Indemnified Party from and against any loss, damage, injury, liability, demands and claims, and pay any settlements and judgments against the Indemnified Party, to the extent arising out of the actual infringement of patent rights, trademark, copyrights or alleged misuse of trade secret information, by the Indemnitor.

Sections 7.2 and 7.3 state the Indemnitor's sole liability to, and the Indemnified Party's exclusive remedy against the other party for any claim described in these Sections7.2 and 7.3.

## Section 8. GENERAL PROVISIONS

**8.1   Status; Due Authorization; Validity of Agreement.** Each party hereby represents and warrants that it (i) is duly organized, validly existing and in good standing under the laws of its state of domicile; (ii) has the power and authority to execute and perform under this Agreement; and (iii) this Agreement constitutes a valid and binding obligation enforceable in accordance with its terms.

**8.2   Binding Nature of Agreement; Assignment.** Except as otherwise provided herein, all the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns, except that Client may not assign or transfer its rights or obligations under or interest in this Agreement (whether by sale of assets, merger, consolidation, or sale of more than twenty percent (20%) of the aggregate equity interests of Client) without the prior written consent of Cavern.  Such consent shall not be required if Client assigns this Agreement to an Affiliate or in connection with a merger, acquisition, or sale of all or substantially all of its assets, unless the Affiliate or surviving entity is a direct competitor of Cavern; provided that written notice is provided to Cavern and the assignee assumes the obligations of the Client pursuant to this Agreement. Cavern may, in its sole discretion, assign this Agreement or subcontract its obligations under any Statement of Work, <u>provided that</u> Cavern will remain responsible for the completion of any Services.  Notwithstanding the foregoing, a collateral assignment of the MSA and borrower's rights thereunder to a financial institution in connection with a credit or similar facility directly or indirectly affecting Cavern (and/or its subsidiaries) shall not be deemed an assignment under the MSA or

otherwise require Client's consent.

**8.3  Severability; Survival.** If any term or provision of this Agreement is found to be invalid under any applicable statute or rule of law, then that provision notwithstanding, the terms and conditions of this Agreement will remain in full force and effect, and, in such event, such provision will be changed and interpreted so as to best accomplish the objectives of the unenforceable or invalid provision within the limits of applicable law or applicable court decisions. Sections 3.9, 4.1, 4.4, 5.4 and 6 - 8 shall survive the termination of this Agreement.

**8.4  Beneficiaries.** The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors and permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other person or entity.  Should either Meritex or Cavern initiate a claim, it shall prevent the other from making a claim based upon the same cause of action.

**8.5  No Publicity.** Neither party shall advertise, market or otherwise make known to others any information relating to the services performed under this Agreement, including mentioning or implying the name of the other party, or any of its personnel, without first obtaining the prior written consent of such other party.  The parties recognize that they have no right, title or interest, propriety or otherwise, in or to the name or any logo, copyright, service mark or trademark owned or licensed by the other party.

**8.6  Governing Law.** This Agreement shall be governed by and shall be construed, interpreted and enforced in accordance with the laws of the State of Kansas, without reference to its internal principles of conflicts of law.

**8.7  Venue and Jurisdiction.** Any claim or dispute that arises under or is in any way related to i) the parties' relationship, ii) this Agreement, or iii) the services provided hereunder, the parties agree that the sole and exclusive jurisdiction and venue for such claim or dispute shall be in the Johnson County, Kansas District Court. The parties hereby consent to personal jurisdiction in Johnson County Kansas for any claims or disputes arising between the parties.

**8.8  Attorney Fees.** In the event of any litigation between the parties hereto arising from or related to a party's performance or breach of this Agreement, the prevailing party shall be entitled to and shall receive, in addition to any relief granted by a court of law, its reasonable attorneys' fees and other costs and expenses incurred in prosecuting or opposing the prosecution of such action.

**8.9  Jury Trial Waiver.** <u>**THE PARTIES HEREBY IRREVOCABLY WAIVE THEIR RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF, OR THAT IS IN ANY WAY RELATED TO, THE PARTIES' RELATIONSHIP, THIS AGREEMENT, OR THE SERVICES PROVIDED HEREUNDER.**</u>

**8.10  Notices; Counterparts.** All notices, demands or other communications given under or required by the following sections of this Agreement: 3.2, all of Sections 5, 6 and 7, 8.2, 8.14, 8.15, 8.16, 8.17, and 8.22, shall be in writing and shall be deemed to have been duly given if delivered personally, mailed via registered mail, postage prepaid, to the attention of the persons who executed this Agreement.  Other forms of communication by and among the parties, including, but not limited to invoicing, may occur via facsimile, email, or other electronic means of communication. This Agreement and any Statement of Work may be executed in any number of counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. The parties agree that this Agreement and any Statement of Work may be delivered by facsimile signature, or electronic document or email attachment containing a party's signature, electronic or otherwise.

**8.11  Entire Agreement.** This Agreement, including any Statements of Work executed between the parties and all documents expressly referenced herein, shall be the entire agreement among the parties with respect to the transactions contemplated among them and supersedes all previous negotiations, commitments and writings. Except as otherwise expressly set forth herein, no alteration, modification or change of this Agreement or any Statement of Work shall be valid unless made in writing and executed by the parties hereto.

**8.12  No Waiver.** No failure or delay by any party hereto in exercising any right, power, or privilege

DocuSign Envelope ID: 61D4F8B1-FE42-45C0-981A-619C469E3774

hereunder (and no course of dealing between or among any of the parties) shall operate as a waiver of any right, power or privilege hereunder. No waiver of any default on any one occasion shall constitute a waiver of any subsequent or other default. No partial exercise of any right, power or privilege shall preclude the further or full exercise thereof.

**8.13 Force Majeure.** Each party to this Agreement shall be excused from any delay or failure in its performance hereunder, other than for payment of money, caused by any disruption or slow speed of the Internet, break-downs of security or introduction of computer viruses (and the like) by third parties, any labor dispute, government requirement, act of God, or any other cause beyond its reasonable control. Such party shall use its best efforts to cure any such failure or delay in performance arising from a force majeure condition, and shall timely advise the other party of such efforts. In the event Cavern claims a Force Majeure event that lasts beyond thirty (30) days ("Extended Force Majeure Event"), Client's payment obligations under this Agreement (except for any prior balances owed) or any affected Statement of Work shall be suspended until Cavern is able to resume providing Services.  For avoidance of doubt, once Services resume, Client is only liable for payment for Services moving forward (and any balances owed for periods prior to the Extended Force Majeure Event) and has no liability for payment during the Extended Force Majeure Event or any backpay related thereto.  In the event the Extended Force Majeure Event lasts 180 days or more, Client may terminate this Agreement or any Statement of Work with no further liability to Cavern under this Agreement.

**8.14 Reporting.** If, in the course of providing Services pursuant to this Agreement or any Statement of Work, Cavern personnel discover any videos, images, audio and/or visual recordings or other materials or content that in Cavern's sole discretion constitute pornographic, obscene, sexually abusive, exploitive or similar content involving minors or children, or constitute or involve terrorism or a threat to national security, Cavern will immediately notify and turn such content over to the appropriate authorities and fully cooperate with any investigation conducted by such authorities. Upon any discovery of such content by Cavern personnel, Cavern may notify Client of such discovery so that Client may have the opportunity to participate in Cavern's notification of the authorities; provided that, Cavern reserves the right to contact the appropriate authorities directly and cooperate with such authorities without notification to or participation by Client if, in Cavern's sole discretion, Cavern determines that notifying Client or delaying notification to the authorities is contrary to law or may expose Cavern to potential civil or criminal liability or public ridicule. Client acknowledges and agrees that any notification pursuant to this provision shall not violate any confidentiality or other contractual obligation pursuant to this Agreement, any Statement of Work or any other agreement between Cavern and Client.

**8.15 Insurance.**

　　a.　Client shall maintain, at all times during the term of this Agreement, (i) fire and extended coverage insurance for all personal property, equipment of Client that is contained within the Data Center; (ii) commercial general liability insurance in an amount not less than Six Million Dollars ($6,000,000) arising out of any one (1) occurrence; (iii) commercial automobile liability covering all owned, hired, and non-owned vehicles in an amount not less than Six Million Dollars ($6,000,000) combined single limit per occurrence; (iv) workers' compensation with statutory limits and employers' liability in an amount not less than Five Hundred Thousand Dollars ($500,000) each accident, disease each employee and policy limit.

　　　　1.　Commercial General Liability and Commercial Automobile Liability shall include Cavern as additional insured but only to the extent of the indemnity obligations herein.

　　　　2.　All policies required herein shall provide a waiver of subrogation to the extent of Client's negligence.

　　　　3.　Limits required herein can be met through any combination of primary and excess and/or umbrella coverage.

　　　　4.　The policies for such insurance shall contain a provision that it will not be

canceled or materially changed without at least ten (10) days' advanced written notice. Client shall provide written notice to Cavern immediately upon receipt of such notice from its insurers.

5.  Policies shall be issued by insurance companies that are qualified to do business in the state where work is performed and shall have an A.M. Best rating of at least A-VII.

6.  Client shall provide certificates of insurance to Cavern evidencing required insurance.

7.  It is specifically agreed that the types and amounts of insurance required herein shall not limit or otherwise affect Client's liability or obligation to indemnify and hold Cavern harmless as provided by the indemnification provision of this agreement.

b.  Cavern shall maintain, at all times during the term of this Agreement, (i) all-risk property insurance at replacement cost insurance on the Facility for damages caused by fire and hazards customarily included within an extended coverage endorsement covering loss or damage to Cavern's property to include vandalism and malicious mischief and rental interruption; and (ii) commercial general liability insurance with limits in an amount not less than Six Million Dollars ($6,000,000) arising out of any one (1) occurrence; (iii) commercial automobile liability covering all owned, hired, and non-owned vehicles in an amount not less than Six Million Dollars ($6,000,000) combined single limit per occurrence; (iv) workers' compensation with statutory limits and employers' liability in an amount not less than Five Hundred Thousand Dollars ($500,000) each accident, disease each employee and policy limit; (v) errors and omissions coverage in an amount not less than Five Million Dollars ($5,000,000) per claim; (vi) crime insurance in an amount not less than Two Million Dollars ($2,000,000) per claim.

1.  Commercial General Liability and Commercial Automobile Liability shall include Client as additional insured but only to the extent of the indemnity obligations herein.

2.  Policies required in items (i) through (iv) above shall provide a waiver of subrogation except to the extent of Client's negligence.

3.  Limits required herein can be met through any combination of primary and excess and/or umbrella coverage.

4.  The policies for such insurance shall contain a provision that it will not be canceled or materially changed without at least ten (10) days' advanced written notice. Cavern shall provide written notice to Client immediately upon receipt of such notice from its insurers.

5.  Policies shall be issued by insurance companies that are qualified to do business in the state where work is performed and shall have an A.M. Best rating of at least A-VII.

6.  Cavern shall provide certificates of insurance to Client evidencing required insurance.

7.  It is specifically agreed that the types and amounts of insurance required herein shall not limit or otherwise affect Cavern's liability or obligation to indemnify and hold Client harmless as provided by the indemnification provision of this agreement.

**8.16  Estoppel Certificates.** Client shall execute and deliver to Cavern any estoppel certificate requested by Cavern stating that this Agreement is in full force and effect, the date to which Services have been paid, that Cavern is not in default hereunder (or specifying any default of Cavern), the termination date of this Agreement, and such other matters relating to this Agreement requested by Cavern within fifteen (15) business days of request by Cavern. In the event Client fails to execute and deliver such estoppel certificate as provided herein, Cavern may immediately terminate this Agreement for Client's breach.

8.17 **Section 889 of the 2019 National Defense Authorization Act.** As of the "Start Date" as set forth in the initial Statement of Work, in accordance Section 889 of the 2019 National Defense Authorization Act (the "Act"), Company represents that it (1) has reviewed manufacturers of the telecommunications or video surveillance equipment or services it will use or provide under this contract, (2) it will not provide any Covered Telecommunications Equipment or Services (as defined in the Act) to Customer in the performance of this contract; (3) the equipment, systems, and/or services it will provide to Customer under this contract do not contain or use Covered Telecommunications Equipment or Services, or any equipment, system, or service that contains or uses Covered Telecommunications Equipment, and (4) in the event Company identifies Covered Telecommunications Equipment or Services used as a substantial or essential component of any system, or as critical technology as part of any system, during contract performance, or is notified of such by a subcontractor at any tier or by any other source, it shall report the information in FAR 52.204-25(d)(2) to Customer within the time frames established therein.

8.18 **Intentionally Deleted.**

8.19 **Intentionally Deleted.**

8.20 **Cavern Personnel.** All personnel supplied or used by Cavern shall be deemed employees or subcontractors of Cavern and will not be considered employees, agents or subcontractors of Client for any purpose whatsoever. Cavern assumes full responsibility for the actions of all such personnel while performing services under this Agreement and for the payment of their compensation (including, if applicable, withholding of income taxes, and the payment and withholding of social security and other payroll taxes), workers' compensation, disability benefits and the like to the extent applicable to the personnel involved. Notwithstanding and without in any way limiting any terms and conditions set forth in this Agreement, all subcontractors of Cavern shall be deemed to have made all of the representations and warranties of Cavern set forth herein and shall be subject to any obligations of Cavern hereunder. Cavern shall be responsible for any breach by any subcontractor of any representations, warranties or obligations set forth in this Agreement.

8.21 **Non-Exclusivity/Volume Commitments.** There are no commitments by Client to Cavern of exclusivity in dealing, preferred vendor status, revenue generation, volume usage, purchase quantities or otherwise under this Agreement or any Statement of Work unless explicitly stated as such on a Statement of Work.

8.22 **Right to Audit.** Client shall have the right to audit all books and records pertaining to this Agreement, including any and all documents which support or underlie those books and records, kept by or under the Cavern, its employees, agents, assigns, successors, and subcontractors provided, however, that the audit shall be limited to only those services provided herein. Except as provided herein, Cavern shall maintain such books and records, together with such supporting or underlying documents and materials, for the duration of this Agreement and for at least 1 year following the completion of this Agreement, including any and all renewals thereof. The books and records, together with any supporting or underlying documents and materials shall be made available, upon request, to Client, its employees, agents, representatives, contractors or other designees, at a mutually agreed time and location.

8.23 **Injunctive Relief.** Each party acknowledges and agrees that in the event of a material breach of this Agreement, the non-breaching party shall be entitled to seek immediate injunctive relief, in addition to whatever remedies it might have at law or under this Agreement.

8.24 **Relationship Between the Parties.** The parties are independent contractors; nothing in this Agreement shall be construed to create a partnership, joint venture or agency relationship between the parties.



Exhibit A – Cavern Rules & Regulations

**Last Updated:  September 2017**

*Cavern provides Data Center or Hosted Services to Clients subject to the following Rules and Regulations, which may be updated by Cavern from time to time without notice to clients.*

**RESPONSIBILITIES OF CAVERN AND CLIENT**

1. All Cavern's Clients and their representatives, employees, contractors, agents and users of Cavern's facilities are subject to these Rules and Regulations in connection with their use of the Data Center.
2. All equipment installation activities must be approved by Cavern.
3. Client's use of the Data Center and the building in which it is located shall at all times comply with the rules and regulations promulgated by the owner of such building from time to time, a copy of which may be obtained from Cavern.
4. Client representatives shall not disclose the identity of any other Cavern client.
5. The Data Center shall be kept neat and orderly at all times. Client representatives shall remove all trash and debris upon departure from the Data Center. Cavern strictly enforces keeping all corrugated cardboard material from being brought into the facility. Common storage rooms provide space for Client to unpack equipment prior to move into data center suites.  Cavern shall have the right to remove and discard any trash and debris left in the Data Center in violation of the foregoing.
6. At conclusion of work being done in the Data Center, Client shall ensure all cables are routed and dressed neatly in cabinets and all doors are closed and locked.
7. Dollies and carts are available for use on a first come basis.
8. Client Equipment must be configured and run at all times in compliance with the manufacturer's specifications, including power outlet, power consumption and clearance requirements. All Cavern Data Center designs are engineered with use of blanking panels as a fundamental airflow control strategy to improve airflow through the equipment.  Calculations used to figure both cooling capacity and power used in the cooling process depend on the customer using best practices.  Any equipment found not using blanking panels to cover unused rack space in the front of the racks may be assessed an additional charge each month.
9. No sign, advertisement, notice or object shall be displayed by a Client in or on the exterior of the Data Center walls, doors, ceilings, or racks without Cavern's prior approval.
10. No Client, nor any of Client's Representatives or visitors, shall at any time bring into or keep upon the Data Center premises any hazardous, inflammable, combustible, explosive or otherwise dangerous fluid, chemical or substance at any time.
11. No acids, vapors or other materials shall be discharged or permitted to be discharged into the waste lines, vents or flues of the Data Center.

12. Client may not bring, or make use of, any of the following into the facility: food, drink, tobacco products, explosives, weapons, chemicals, illegal drugs, alcohol or other intoxicants, electro-magnetic devices, radioactive materials, photographic or recording equipment of any kind (other than tape back-up equipment).

13. Cavern reserves the right to inspect all objects to be brought into or taken out of the Data Center and to exclude from the Data Center all objects which violate any of these Rules and Regulations. Cavern may require any persons entering or leaving the Data Center with any package to document the contents of said package.

14. All connections to and from Client's Equipment must be clearly labeled. Client may use Cavern's labeling code or choose to use its own code. All Client labeling codes must be provided to Cavern for purposes of configuration control.

15. Client representatives shall not approach, handle, use, inspect or examine in any way any other equipment but their own.

16. Client agrees to cooperate with Cavern during any scheduled maintenance.

## ACCESS AND SECURITY

1. Only those individuals specifically identified by Client, and whose access has not been revoked by Cavern, may access the Data Center.

2. Client will notify Cavern in writing of any change in Client's Representatives.

3. Client Representatives shall stay in the vicinity of their own equipment when in the Cavern facility.

4. Client shall not access the building roof, electrical or communications closets, the Data Center ceiling or floor without prior consent of Cavern.

## CONDUCT GUIDELINES

1. Client and its Representatives may not misuse or abuse any Cavern Equipment or property.

2. Client and its Representatives may not engage in any activity that is in violation of the law or aid in criminal activity while on Cavern property or in connection with the Data Center Services. Client and its Representatives may not assist or permit any persons in engaging in any of the activities described above. If Client becomes aware of any such activities, Client will use its best efforts to stop such activities immediately, including, if necessary, terminating Client's users' access to Client's online facilities.

3. Client and its Representatives may not infringe or misappropriate the intellectual property rights of others. This includes posting copyrighted materials without appropriate permission, using trademarks of others without appropriate permission or attribution, and posting or distributing trade secret information of others in violation of a duty of confidentiality.

4. Client and its Representatives may not violate the personal privacy rights of others. This includes collecting and distributing information about users without their permission, except as permitted by applicable law.

5. Client and its Representatives may not send, post or host harassing, abusive, libelous or obscene materials or take any similar actions.

DocuSign Envelope ID: 61D4FDB1-EE42-45C0-8819-649C469E3774

6. Client and its Representatives may not intentionally omit, delete, forge or misrepresent transmission information, including headers, return addressing information and IP addresses or take any other actions intended to cloak Client's or its users' identity or contact information.

7. If Client becomes aware of any such activities, Client will use its best efforts to stop such activities immediately, including, if necessary, terminating Client's users' access to Client's online facilities.

**MODIFICATION OF RULES AND REGULATIONS**

1. Cavern reserves the right to change these Rules and Regulations at any time. Client is responsible for regularly reviewing these Rules and Regulations.

2. Continued use of the Data Center Services following any such changes shall constitute Client's acceptance of such changes.

**Exhibit B**

**CONTINUITY OF OPERATIONS PLANNING, LLC
d/b/a CAVERN TECHNOLOGIES**



**DATA CENTER**

**ACCEPTABLE USE POLICY**

1.  **Introduction**

This Acceptable Use Policy ("AUP") applies to all clients of Continuity of Operations Planning, LLC, doing business as Cavern Technologies ("Cavern"), and is intended to provide a general understanding of Cavern's policy on the Acceptable Use of Cavern's Data Center and other Hosted Services. It is designed to help protect our service, our clients and the Internet community from irresponsible or illegal activities. Cavern expects that common sense and good judgment will guide all of our clients' activities on the Internet. Information available on Cavern's network is the property of Cavern, its information providers or other clients. Cavern does not accept responsibility for the content of the materials and information published by others which are accessible through the Cavern connection and does not accept responsibility for the violation of any laws resulting from such publication.

All users of Cavern's Data Center or Hosted Services are expected to abide by the laws of the state and country in which they reside, including, without limitation, all copyright laws and regulations, tariff regulations, export controls, treaties and international law.

Use of Cavern's Data Center or Hosted Services is contingent on user acceptance of and agreement to abide by all of the rules and regulations and policies of Cavern, including this AUP, as such policies may be modified by Cavern at any time and from time to time, and to use such Data Center or Hosted Services for lawful purposes in compliance with all applicable laws. Use of Cavern's Data Center or Hosted Services is at the risk of the client.

Electronic Communications Privacy Act Notice (18 USC § 2701-2711). CAVERN MAKES NO GUARANTEE OF CONFIDENTIALITY OR PRIVACY OF ANY COMMUNICATION OR INFORMATION TRANSMITTED ON ITS NETWORK OR ANY NETWORK ATTACHED TO ITS NETWORK. CAVERN SHALL NOT BE LIABLE FOR THE PRIVACY OF E-MAIL ADDRESSES, REGISTRATION AND IDENTIFICATION, DISK SPACE, COMMUNICATIONS, CONFIDENTIAL OR TRADE-SECRET INFORMATION OR ANY OTHER CONTENT STORED ON CAVERN EQUIPMENT, TRANSMITTED OVER NETWORKS ACCESSED BY CLIENT OR OTHERWISE CONNECTED WITH USE OF THE CAVERN NETWORK.

2.  **Policies**

a.  Cavern accounts may be used only by the authorized owners of the accounts, except where specifically authorized by Cavern system administrators. Allowing use of your account by others is prohibited. At no time can there be simultaneous use of the same account username and password combination.

b.  Resale, trade or transfer of any account without express written consent from Cavern is prohibited. Attempting to obtain access beyond that for which a client is authorized will be grounds for immediate termination of such client's account.

c.  Attempting to defeat identification procedures, gain passwords or encryption codes, penetrate security measures, circumvent user authentication, use of the Cavern network to gain unlawful or unauthorized entry to another machine on the Internet, use of or any attempt to use a Cavern account to alter or

DocuSign Envelope ID: 61D4F0B1-FE42-45C0-8B1A-618C469E3774

destroy data belonging to Cavern or another user on any computer network and use of the Cavern system as a staging ground to "crack" other systems will be grounds for immediate termination of suchclient's account.

**d.** Transmission, redistribution, reproduction or commercial exploitation of information available on Cavern's network without the permission of its owner or in violation of applicable law will be grounds for immediate termination of such client's account.

**e.** Abusive or inappropriate use of any Cavern service, including, without limitation, any behavior which disrupts the normal use of the system or Internet services of others, inhibits any user from accessing the Internet, interferes with the proper operation of Cavern's network or impairs the availability, reliability or quality of Cavern's services for other clients is prohibited.

**f.** It is contrary to the specific policies of Cavern for any user to effect or participate in any of the following activities:

    **(i)** exporting software or technical information in violation of any applicable export control laws;

    **(ii)** making fraudulent offers of items, products or services originating from a client's account;

    **(iii)** using non-authorized relays through any third party systems;

    **(iv)** "flooding" or overburdening recipient computer systems by sending a high volume of spurious data which impedes functionality or disables the recipient system or any other methods of denial of service of another;

    **(v)** storing or distributing on Cavern servers illegally-acquired information or programs containing malicious code, including, without limitation, viruses, Trojan horses, worms or tools to comprise the security of other sites; or

    **(vi)** using programs such as packet sniffers, host and/or service monitoring or other similar programs.

**g. Email and Internet Relay Chat**

    **(i)** Email is a person-to-person medium and not a broadcast medium. Harassing others by "mail-bombing" or "spamming," which constitutes sending the same or substantially similar unsolicited electronic mail messages to a large number of recipients, or an unreasonable number of similar mail messages to the same email address, may be grounds for termination of a client's account. Threatening bodily harm or property damage to individuals or groups is also strictly prohibited and is grounds for termination.

    **(ii)** The following activities are specifically prohibited by Cavern in connection with the use of email or IRC services:

        **(a)** distributing malicious software which contributes to or assists in "mail-bombing" or "spamming";

        **(b)** sending unsolicited, junk or chain letter email for the purpose of advertising or soliciting, or using Cavern's email address to collect responses from unsolicited email;

        **(c)** attempting to impersonate any person or using forged email or other identifying information;

**(d)** using an email box exclusively as a storage space for data, which includes a mailbox exceeding the size limits established by Cavern;

**(e)** installing "auto-responders," "cancel-bots" or similar automated or manual routines which generate excessive amounts of net traffic; and

**(f)** using IRC bots in violation of any accepted policies on IRC servers.

**h.  Content**

Users of Cavern's Data Center and Hosted Services, and <u>not</u> Cavern (under any circumstances whatsoever), are responsible for the content of their sites and obtaining all required legal permissions for the use of such content. Each such user must accept responsibility for the publication of any defamatory, pornographic, confidential, secret or proprietary material. Cavern reserves the right to remove any material from any site without notice.

**3.  <u>Client's Responsibilities</u>**

**a.** All Cavern clients who publish materials and information which are accessible through the Cavern connection are solely responsible for the content of such materials and information and are solely responsible for compliance with all laws applicable to the publication of such materials and information, including, without limitation, intellectual property laws.

**b.** Each account holder is responsible for charges incurred by others to whom the account holder has given its username and/or password and for charges incurred by a person who has obtained such account holder's username and/or password prior to such account holder's notification to Cavern of such fact.

**c.** Users are responsible for the files residing in their accounts, including the back-up of such files, unless otherwise agreed between Client and Cavern.

**d.** Any permitted customers of Cavern's clients are bound by same restrictions as Cavern's clients, including this AUP.

**e.** All Cavern Data Center designs are engineered with hot isle/ cold isle engineering methodologies. Calculations used to figure both cooling capacity and power used in the cooling process depend on the customer using best practices. Any equipment exhausting hot air through the front of the rack into the "cold-isle" will be assessed a charge of $20.00 per "U" per month.

**4.  <u>Actions by Cavern for Noncompliance or Violation</u>**

**a.** Certain activities set forth above cause alarms that could require Cavern to take action. Account holders should be aware, however, that normal use and software will not set off such alarms.

**b.** Use of a Cavern account or service in an illegal manner is grounds for immediate termination of such account. Users should be aware that Cavern views such activities very seriously, and Cavern reserves the right to disclose prohibited activities to law enforcement agencies, including, without limitation, the Federal Bureau of Investigation, with whom Cavern will fully cooperate. Cavern will cooperate with appropriate law enforcement agencies involved in investigating instances that may be reported to such authorities by clients or other users.

**c.** Cavern reserves the right to conduct its own investigation of suspected violations of this AUP.

**d.** In addition to the other actions described herein, Cavern may take one or more of the following specificactions without liability to Client or any third party:

    **(i)** log instances of abuse;

    **(ii)** disable and cancel the client's account (noncompliance or violation of this AUP is a material breach of the applicable Data Center or Hosted Services Statement of Work and the Master DataCenter Services Agreement Standard Terms and Conditions and may be grounds for terminationby Cavern); and

**e.** In the event that an account is temporarily deactivated as a result of any prohibited activities, the account may be subject to reactivation charges and/or deposit requirements to be determined solely byCavern.

**f.** Each account holder understands and acknowledges that Cavern has the right to terminate any accountfor any reason that Cavern interprets as an abuse of the account, and such account holder will be liablefor any and all costs incurred by Cavern as result of such abuse.

**g.** Cavern will review alleged violations of this AUP on a case-by-case basis. Violations that are not promptly remedied may result in disciplinary action, including, without limitation, referral to appropriate authorities for civil or criminal prosecution. Cavern's decisions in all such matters are final. Cavern does not assume any liability to any account holders, users or others for its failure to enforce this AUP.

**h.** Nothing herein is to be construed to limit Cavern's remedies in any way to recover costs, identify andremove offenders, levy cancellation charges or pursue any other remedies at law or in equity.

**i.** No failure by Cavern to enforce any provision of this AUP on a single occasion or multiple occasions shall be construed as a waiver of any right, power or privilege under this AUP and no partial exercise of any right, power or privilege shall preclude the further or full exercise of that right, power or privilege.

**5.** <u>**Contacts**</u>

**a.** Each account holder must immediately notify Cavern of any unauthorized use of such account holder'saccount, of any breach or attempted breach of security if it is believed that such account holder's password has been compromised or of any other violations of this AUP.

If you have any questions with respect to this AUP, please contact Cavern Technology at
17501 W 98th St.
Pillar Number: #18-33
Lenexa, Kansas 66219
Attention: Sean Khurana
or by telephone at ███████████ .

**CAVERN RESERVES THE RIGHT TO MODIFY THIS POLICY AT ANY TIME AND FROM TIME TO TIME.**