# **<u>EXHIBIT 1</u>**

## INDUSTRIAL LEASE AGREEMENT
### (MULTI-TENANT)

THIS LEASE AGREEMENT (this "Lease") is entered into as of the  10  day of July, 2020, between BREIT INDUSTRIAL CANYON GA1B01 LLC, a Delaware limited liability company ("Landlord"), and the Tenant named below.

### BASIC PROVISIONS AND CERTAIN DEFINED TERMS

| | |
|---|---|
| **Tenant:** | YRC Inc., a Delaware corporation d/b/a HNRY Logistics, Inc. |
| **Tenant's Representative:** | Jeffrey H. Coltrin, Vice President – Properties |
| **Address, and Telephone:** | YRC Inc.<br>c/o YRC Worldwide Inc.<br>Real Estate and Properties – Mail Stop A650<br>10990 Roe Avenue<br>Overland Park, KS 66211<br>Attention:  Jeffrey H. Coltrin<br>(913) 696-6192 |
| **Premises:** | That portion of the Building known as Suite 200, containing approximately 141,600 square feet, as determined by Landlord, as shown on Exhibit A. |
| **Project:** | The Building and the parcel of land on which it is located, which land is described in Exhibit E, and any other improvements located on such land. |
| **Building:** | 1250 Terminus Drive, Lithia Springs, Georgia 30122, and containing approximately 330,000 square feet. |
| **Permitted Use:** | General industrial/warehouse use for the purpose of receiving, storing, shipping and selling (but limited to wholesale sales) products, materials and merchandise made and/or distributed by Tenant, and for such other lawful purposes as may be incidental thereto. |
| **Tenant's Proportionate Share:** | 42.91% |
| **Lease Term:** | Beginning on the Commencement Date and ending on the last day of the sixty-third (63rd) full calendar month thereafter. |
| **Commencement Date:** | August 1, 2020 |

| | | |
|---|---|---|
| **Initial Monthly Base Rent:** | | $49,560.00* |
| **Initial Estimated Monthly Operating Expense Payments:** (estimates only and subject to adjustment to actual costs and expenses according to the provisions of this Lease) | 1.  Common Area Charges: | $4,838.00 |
| | 2.  Taxes: | $8,968.00 |
| | 3.  Insurance: | $590.00 |
| **Initial Estimated Monthly Operating Expense Payments:** | | $14,396.00* |

- 1 -

| | |
|---|---|
| **Initial Monthly Base Rent and Operating Expense Payments:** | $63,956.00* |
| | *Provided that Tenant is not required to pay Base Rent during the period from August 1, 2020, through October 31, 2020, but Tenant shall pay Tenant's Proportionate Share of Operating Expenses during such period. |
| **Rent Payment Address:** | BREIT INDUSTRIAL CANYON GA1B01 LLC<br>BU #: BT42584<br>PO Box 208022<br>Dallas, TX 75320-8022 |
| | If by wire: |
| | Wells Fargo Bank, N.A.<br>Beneficiary Account #: 4245834114<br>ACH/Wire ABA: 121000248<br>Account Name: BREIT INDUSTRIAL CANYON GA1B01 LLC |
| **Security Deposit:** | $70,446.00 |
| **Guarantor:** | YRC WORLDWIDE INC., a Delaware corporation.  Concurrent with Tenant's execution and delivery of this Lease, Tenant shall cause Guarantor to execute and deliver a guaranty in favor of Landlord in the form attached hereto as Exhibit F. |
| **Brokers:** | Seefried Industrial Properties, Inc., representing Landlord, and Burr & Temkin, representing Tenant |
| **Addenda:** | 1. Intentionally Omitted, 2. HVAC Maintenance Contract, 3. Move Out Conditions, 4. Base Rent Adjustments, 5. Initial Improvements, 6. Renewal Option |
| **Exhibits:** | A. Depiction of Premises, B. Rules and Regulations, C. Summary of Insurance Requirements, D. Tenant Operations Inquiry Form, E. Legal Description, F. Continuing Lease Guaranty |

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

511977.001238 23710491.1

1.       **Granting Clause**.  In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of this Lease.  In addition, Tenant shall have the non-exclusive right to use, in common with others, any areas designated by Landlord from time to time as common areas for the use and enjoyment of all tenants and occupants of the Project (the "Common Areas"), subject to such reasonable rules and regulations as Landlord may promulgate from time to time in accordance with Paragraph 31 of this Lease.  Landlord or such other person(s) as Landlord may appoint shall have the exclusive control and management of the Common Areas subject to the terms and conditions set forth in this Lease.

2.       **Commencement Date; Acceptance of Premises**.   (a) Subject to and upon the terms and conditions set forth in this Lease, this Lease shall continue in force for the Lease Term.

(b)       Subject to Landlord's Work (as defined in Addendum 5 attached hereto), Tenant shall upon taking possession of the Premises accept the Premises in its condition as of the Commencement Date, subject to all applicable laws, ordinances, regulations, covenants and restrictions; provided, however, Landlord shall perform the Landlord's Work described in Addendum 5.  Except with respect to Landlord's obligation to perform the Landlord's Work and as otherwise expressly set forth in this Lease, Landlord has made no representation or warranty as to the suitability of the Premises for the conduct of Tenant's business, and Tenant waives any implied warranty that the Premises are suitable for Tenant's intended purposes.  **EXCEPT WITH RESPECT TO LANDLORD'S OBLIGATION TO PERFORM THE LANDLORD'S WORK AND AS OTHERWISE EXPRESSLY SET FORTH IN THIS LEASE, TENANT ACKNOWLEDGES THAT (1) IT HAS INSPECTED AND ACCEPTS THE PREMISES IN AN "AS IS, WHERE IS" CONDITION, (2) THE BUILDINGS AND IMPROVEMENTS COMPRISING THE SAME ARE SUITABLE FOR THE PURPOSE FOR WHICH THE PREMISES ARE LEASED AND LANDLORD HAS MADE NO WARRANTY, REPRESENTATION, COVENANT, OR AGREEMENT WITH RESPECT TO THE MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PREMISES, (3) THE PREMISES ARE IN GOOD AND SATISFACTORY CONDITION, (4) NO REPRESENTATIONS AS TO THE REPAIR OF THE PREMISES, NOR PROMISES TO ALTER, REMODEL OR IMPROVE THE PREMISES HAVE BEEN MADE BY LANDLORD, (5) THERE ARE NO REPRESENTATIONS OR WARRANTIES, EXPRESSED, IMPLIED OR STATUTORY, THAT EXTEND BEYOND THE DESCRIPTION OF THE PREMISES, AND (6) TENANT HAS NOT RELIED ON ANY REPRESENTATIONS OR WARRANTIES OF LANDLORD EXCEPT AS EXPRESSLY SET FORTH HEREIN.**  Except as provided below and in Paragraph 10 and except for any latent defects in the Landlord's Work reported to Landlord within nine (9) months after the Commencement Date, in no event shall Landlord have any obligation for any defects in the Premises or any limitation on its use.  Notwithstanding the foregoing, if the HVAC unit(s) serving the office portion of the Premises require repairs or replacements during the first six (6) months of the initial Lease Term, excluding any repairs or replacements necessitated by any action or inaction of Tenant or its agents, contractors, employees, invitees, licensees, or visitors, Landlord shall promptly make such required repairs or replacements to such items during such period, at no additional cost to Tenant.

(c)       Following the full execution and delivery of this Lease, Tenant's payment of the Security Deposit and prepaid rent payable upon the execution of this Lease, Tenant's compliance with the insurance requirements set forth in Paragraph 9 below, and Tenant's receipt of the government approvals necessary to occupy the Premises, Tenant may enter upon the Premises prior to the Commencement Date, provided such occupancy does not unreasonably interfere with the performance of the Landlord's Work.  Such early occupancy shall be subject to all of the terms and conditions of the Lease, including but not limited to Tenant's right to conduct business operations within the Premises, except that Tenant shall not be required to pay Base Rent or Operating Expenses with respect to the period of time prior to the Commencement Date during which Tenant has such early occupancy.  Tenant shall, however, be liable for the cost of any services (including utilities) that are provided to Tenant or the Premises during the period of Tenant's possession prior to the Commencement Date.

511977.001238 23710491.1

3.   **Use**. (a)  The Premises shall be used only for the Permitted Use, and no other use or purpose.  The Premises shall not be used for any illegal purposes or any Drug-Related Activities (hereinafter defined).  Tenant shall not conduct or give notice of any auction, liquidation, or going out of business sale on the Premises.  Tenant will use the Premises in a careful, safe and proper manner and will not commit waste or overload the floor or structure of the Premises.  Tenant shall not permit any unreasonable levels of objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Premises, or take any other action that would constitute a nuisance or would unreasonably disturb, interfere with, or endanger Landlord or any tenants of the Project.  Outside storage, including without limitation, storage of pallets, inventory, personal property, trucks and other vehicles, is expressly prohibited without Landlord's prior written consent; provided, however, Tenant may park its trucks, trailers and other vehicles overnight against the dock doors of the Premises and in the Tenant's trailer parking spaces, so long as the same remain in reasonably good and operable condition and do not unreasonably interfere with the ingress and egress of other tenants of Project.  Tenant, at its sole expense, shall comply with all laws, including, without limitation, the Americans With Disabilities Act of 1990 (49 U.S.C. Section 12101 et seq.) and regulations and guidelines promulgated thereunder, as all of the same may be amended from time to time (collectively, the "ADA"), orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions with reference to the use, condition, configuration or occupancy of the Premises (collectively, with the ADA, "Legal Requirements").  Tenant will not use or permit the Premises to be used for any purpose or in any manner that would violate any Environmental Requirements (as defined and more particularly described in Paragraph 30 below) or void Tenant's or Landlord's insurance.  If any increase in the cost of Landlord's insurance on the Premises is directly caused by Tenant's use or occupation of the Premises, or because Tenant vacates the Premises, then Tenant shall pay the reasonable amount of such increase to Landlord within thirty (30) days after Tenant's receipt of an invoice and supporting documentation therefor.  On or prior to the date hereof, Tenant has completed and delivered for the benefit of Landlord a "Tenant Operations Inquiry Form" in the form attached hereto as Exhibit D describing the nature of Tenant's proposed business operations at the Premises, which form is intended to, and shall be, relied upon by Landlord.  From time to time during the Term (but no more often than once in any twelve month period unless Tenant is in default hereunder beyond any applicable notice and cure period or unless Tenant assigns this Lease or subleases all or any portion of the Premises, whether or not in accordance with Paragraph 17), Tenant shall provide an updated and current Tenant Operations Inquiry Form within twenty (20) days after Landlord's written request.

(b)   Tenant shall not engage in any Drug-Related Activities and shall prohibit any use or occupancy of the Premises for Drug-Related Activities.  Without limiting the generality of the foregoing, Tenant shall not enter into, consent to or permit any assignment, sublease, license or other use of the Premises which allows Drug-Related Activities at the Premises.  To the extent Tenant should nonetheless become aware of any Drug-Related Activities occurring at the Premises, Tenant shall promptly provide notice of such information to Landlord. Tenant shall not make any payments to Landlord from funds derived from Drug-Related Activities.  The provisions of this Paragraph 3(b) are intended and shall apply notwithstanding any state or local law permitting the Controlled Substances Uses (hereinafter defined) or Drug-Related Activities.  As used herein, (i) "Drug-Related Activities" means any Controlled Substances Uses, any violation of any Controlled Substances Law or any business, communications, financial transactions or other activities related to Controlled Substances or Controlled Substances Uses, (ii) "Controlled Substances Uses" means any cultivation, growth, creation, production, manufacture, sale, distribution, storage, handling, possession or other use of a Controlled Substance, (iii) "Controlled Substance" means any drug or chemical whose manufacture, possession, or use is regulated by any Governmental Authority, such as illicitly used drugs or prescription medications that are designated a controlled substance by the US Drug Enforcement Agency, (iv) "Controlled Substances Law" means The Federal Controlled Substances Act (21 U.S.C. § 801 et seq.) or any other similar or related federal, state or local law, ordinance, code, rule, regulation or order, and (v) "Governmental Authority" means any governmental and quasi-governmental bodies, regulatory bodies and authorities, local, state or federal, having jurisdiction over Tenant, Landlord or the Project or any part thereof.

4.   **Base Rent**.  Tenant shall pay Base Rent in the amounts set forth on Addendum 4 attached hereto. The installment of monthly Base Rent payable for the period from November 1, 2020, through November 30, 2020, pursuant to Addendum 4 attached hereto, the Security Deposit, and the first monthly installment of estimated Operating Expenses (as hereafter defined) shall be due and payable on the date hereof, and Tenant promises to pay to Landlord in advance, without demand, deduction or set-off, monthly installments of Base Rent on or before the

first business day of each calendar month succeeding November 30, 2020. Payments of Base Rent for any fractional calendar month shall be prorated. All payments required to be made by Tenant to Landlord hereunder (or to such other party as Landlord may from time to time specify in writing) shall be made at the Rent Payment Address, or at such place, within the continental United States, as Landlord may from time to time designate to Tenant in writing. The obligation of Tenant to pay Base Rent and other sums to Landlord and the obligations of Landlord under this Lease are independent obligations. Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except as may be expressly provided in this Lease. If Tenant is delinquent in any monthly installment of Base Rent or of estimated Operating Expenses for more than 5 business days, Tenant shall pay to Landlord on demand a late charge equal to 5 percent of such delinquent sum. The provision for such late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as a penalty. No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the correct installment of rent due under this Lease shall be deemed to be other than a payment on account of the earliest rent due hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other available remedy. The acceptance by Landlord of an installment of rent on a date after the due date of such payment shall not be construed to be a waiver of Landlord's right to declare a default for any other late payment. If Tenant's payment by check is returned for non-sufficient funds or for any other reason, Landlord at its sole option may require all future payments to be made by cashier's or certified check, money order, or wire transfer, and the delivery of Tenant's personal or corporate check shall no longer constitute payment thereof.

5.    **Security Deposit**. The Security Deposit shall be held by Landlord as security for the performance of Tenant's obligations under this Lease. The Security Deposit is not an advance rental deposit or a measure of Landlord's damages in case of Tenant's default. Upon each occurrence of an Event of Default (hereinafter defined), Landlord may use all or part of the Security Deposit to pay delinquent payments due under this Lease, and the cost of any damage, injury, expense or liability caused by such Event of Default, without prejudice to any other remedy provided herein or provided by law. Tenant shall pay Landlord on demand the amount that will restore the Security Deposit to its original amount. Landlord's obligation respecting the Security Deposit is that of a debtor, not a trustee; no interest shall accrue thereon. The Security Deposit shall be the property of Landlord, but shall be paid to Tenant when Tenant's obligations under this Lease have been completely fulfilled. Landlord shall be released from any obligation with respect to the Security Deposit upon transfer of this Lease and the Premises to a person or entity assuming Landlord's obligations under this Paragraph 5.

6.    **Operating Expense Payments**. (a) During each month of the Lease Term (including during the period from August 1, 2020, through October 31, 2020), on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to 1/12 of the annual cost, as estimated by Landlord from time to time, of Tenant's Proportionate Share of Operating Expenses for the Project. Payments thereof for any fractional calendar month shall be prorated. The term "Operating Expenses" means all costs and expenses incurred by Landlord with respect to the ownership, maintenance, and operation of the Project including, but not limited to costs of: Taxes (hereinafter defined) and fees payable to tax consultants and attorneys for consultation and contesting taxes (but not to exceed the reduction or savings in any particular year); premiums for the insurance policies maintained by Landlord; any deductible portion of an insured loss; utilities (excluding utilities that are separately metered to or separately and directly paid by any particular tenant of the Project); maintenance, repair and (subject to the exclusions set forth below) replacement of all portions of the Project, including without limitation, paving and parking areas, roads, roofs (including the roof membrane), alleys, and driveways, mowing, landscaping, snow removal, exterior painting, utility lines, heating, ventilation and air conditioning systems, lighting, electrical systems and other mechanical and building systems; amounts paid to contractors and subcontractors for work or services performed in connection with any of the foregoing; charges or assessments of any association or under any recorded declarations or restrictive covenants to which the Project is subject; property management fees (not to exceed 5 percent of the gross rentals received from the Project) payable to a property manager, including any affiliate of Landlord, or if there is no property manager and Landlord is actually self-managing the Project, an administration fee not to exceed 4 percent of the gross rentals received from the Project payable to Landlord (as applicable, the "Management Fee"); security services, if any; trash collection, sweeping and removal; and additions or alterations made by Landlord to the Project or the Building in order to comply with Legal Requirements (other than those expressly required herein to be made

- 5 -

by Tenant) or that are reasonably appropriate to the continued operation of the Project or the Building as a bulk warehouse facility in the market area, provided that the cost of additions or alterations that are required to be capitalized for federal income tax purposes shall be amortized on a straight line basis over a period equal to the lesser of the useful life thereof for federal income tax purposes or 10 years. All such Operating Expenses shall be determined in accordance with sound real estate accounting principles, consistently applied. Notwithstanding the foregoing, in no event shall Operating Expenses include any of the following: (i) costs, expenses, depreciation or amortization for capital repairs and capital replacements required to be made by Landlord under Paragraph 10 of this Lease; (ii) debt service under mortgages or ground rent under ground leases; (iii) interest, amortization or other payments on loans made to Landlord or any ground lessor of Landlord, whether secured or unsecured, costs of acquiring or negotiating equity contributions, and costs and charges incurred in obtaining any public or private financing, refinancing or loan modifications; (iv) rental payments pursuant to any ground, underlying or superior leases of the real property underlying all or any portion of the Project; (v) the costs of correcting any violation of Legal Requirements to the extent such violation existed prior to the Commencement Date; (vi) costs incurred in connection with the original design, construction and landscaping of the Project or the Building and any correction of defects in the original design or construction, or both, of the Project or the Building, including but not limited to replacement of defective equipment; (vii) costs or expenses for the monitoring, testing, removal, cleaning, abatement or remediation of any Hazardous Material in or about the Project or the Building, and including without limitation, Hazardous Material in the ground water or soil to the extent present on, before or after the Commencement Date, provided that the costs of removing materials in the ordinary course of maintenance and repairs shall be included, even if such materials contain some level of Hazardous Materials (e.g., removing asphalt in connection with repairs to the driveways); (viii) fines, costs, late charges, liquidated damages, penalties, tax penalties or related interest charges imposed on Landlord or Landlord's property manager; (ix) fees for (1) disputes with tenants, prospective tenants or other occupants of the Project or the Building, including but not limited to lease takeover or lease take back costs, (2) disputes between Landlord and members, partners, employees, parents, subsidiaries or affiliates of Landlord, (3) disputes with purchasers, prospective purchasers, mortgagees, ground lessors or prospective mortgagees of the Project or the Building or any part of either, or (4) negotiations of leases, mortgages, ground leases, security instruments, contracts of sales or transfers of all or any portion of the Project or the Building or any interest therein by any person or entity of any tier owning an interest therein; (x) reserves of any kind; (xi) expenses for services or other benefits which are provided directly and exclusively to another tenant or occupant of the Project or the Building and that are not offered or available to Tenant without additional, separate charge; (xii) expenses for repair, replacements and maintenance of portions of the Project or the Building to the extent paid by proceeds of insurance or by Tenant or other third parties; (xiii) additions or alterations attributable solely to a particular tenant or occupant of the Project or the Building; (xiv) costs of marketing, solicitation, negotiation, and execution of leases or subleases of space in the Project or the Building, including without limitation, promotional and advertising expenses, commissions, finders' fees, referral fees, legal fees and expenses for the negotiation and preparation of any lease, sublease, or other occupancy document, tenant improvement costs for tenant or other occupant space, the amount of any allowances or credits paid or granted to tenants or other occupants of any such design or construction, and other costs of tenant-specific alterations of space in the Project or the Building leased to or occupied by particular tenants or occupants; (xv) costs, fees, dues, or contributions for political, charitable or industry association, as well as the cost of any newspaper, magazine, trade or other subscriptions; (xvi) advertising and promotional costs, including but not limited to any form of entertainment expenses, dining expenses, costs of a tenant or vendor relation programs including flowers, gifts, luncheons, parties, and other social events, but excluding any cost associated with life safety information services and other like property management events; (xvii) except for the Management Fee, wages, salaries, fees, benefits and any other forms of compensation paid to any executive employee of Landlord and/or Landlord's members, partners, parents, subsidiaries or affiliates above the level of property manager; (xviii) the cost of any utilities furnished directly to Tenant and other tenants or occupants of the Project or the Building; and (xix) costs incurred by Landlord directly as a result of Landlord's breach of this Lease, Landlord's gross negligence or willful misconduct, or Landlord's indemnification of any other tenant or occupant of the Project or the Building.

(b)    Within one hundred twenty (120) days after the end of each calendar year (or as soon as reasonably practicable thereafter if all amounts are not fully known), Landlord shall determine the actual amount of Tenant's Proportionate Share of Operating Expenses for the prior calendar year and deliver to Tenant a reasonably detailed written statement of such amount (the "Operating Expense Statement"). If Tenant's total payments of

- 6 -

DocuSign Envelope ID: 43621777-0E2C-4515-9692-40F6B4AB4CEA

Tenant's Proportionate Share of Operating Expenses for any year are less than Tenant's Proportionate Share of actual Operating Expenses for such year, then Tenant shall pay the difference to Landlord within 30 days after Tenant's receipt of the Operating Expense Statement, and if more, then Landlord shall refund such excess to Tenant, after first deducting any amounts then due and payable by Tenant under this Lease. For purposes of calculating Tenant's Proportionate Share of Operating Expenses, a year shall mean a calendar year except the first year, which shall begin on the Commencement Date, and the last year, which shall end on the expiration of this Lease. Tenant's "Proportionate Share" shall be the percentage set forth on the first page of this Lease as Tenant's Proportionate Share as reasonably adjusted by Landlord in the future for changes in the physical size of the Premises or the Building. Landlord may equitably increase Tenant's Proportionate Share for any item of expense or cost reimbursable by Tenant that relates to a repair, replacement, or service that benefits only the Premises or only a portion of the Project or Building that includes the Premises or that varies with occupancy or use. The estimated Operating Expenses for the Premises set forth on the first page of this Lease are only estimates, and Landlord makes no guaranty or warranty that such estimates will be accurate.

(c)     For purposes of calculating Tenant's Proportionate Share of Operating Expenses, commencing on the first day of the second full calendar year of the Lease Term, the Controllable Operating Expenses (hereinafter defined) shall not increase by more than 7% per calendar year on a compounding and cumulative basis over the course of the Lease Term. In other words, Controllable Operating Expenses for the second full calendar year of the Lease Term shall not exceed 107% of the Controllable Operating Expenses for the first full calendar year of the Lease Term, and Controllable Operating Expenses for the third full calendar year of the Lease Term shall not exceed 107% of the limit on Controllable Operating Expenses for the second full calendar year of the Lease Term, etc. By way of illustration, if Controllable Operating Expenses were $1.00 per square foot for the first full calendar year of the Lease Term, then Controllable Operating Expenses for the second full calendar year of the Lease Term shall not exceed $1.07 per square foot, and Controllable Operating Expenses for the third full calendar year of the Lease Term shall not exceed $1.1449 per square foot. "Controllable Operating Expenses" shall mean all Operating Expenses exclusive of the following to the extent the following are part of Operating Expenses: (i) the cost of utilities, (ii) the cost of insurance, (iii) Taxes and governmental charges, (iv) fees for management services (subject to the 5% cap set forth in Paragraph 6(a) above), (v) the cost of snow and ice removal, and (vi) costs to comply with Legal Requirements (excluding the correction of any violations existing as of the Commencement Date).

(d)     During the one hundred eighty (180) day period following the delivery of the Operating Expense Statement, Tenant shall have the right to inspect, at reasonable times, in a reasonable manner and with at least ten (10) days prior written notice to Landlord, such of Landlord's books of account and records as pertain to and contain information concerning such costs and expenses in order to verify the amounts thereof. Tenant agrees that any information obtained during an inspection by Tenant of Landlord's books of account and records shall be kept in confidence by Tenant and its agents and employees and shall not be disclosed to any other parties, except to Tenant's attorneys, accountants and other consultants. Any parties retained by Tenant to inspect Landlord's books of account and records shall not be compensated on a contingency fee basis. If Landlord and Tenant determine that Operating Expenses for the year in question are less than reported, Landlord shall refund such excess to Tenant within thirty (30) days after such determination, after first deducting any amounts then due and payable by Tenant hereunder. Likewise, if Landlord and Tenant determine that Operating Expenses for the year in questions are greater than reported, Tenant shall pay Landlord the amount of any underpayment within thirty (30) days. Further, if Landlord and Tenant determine that Operating Expenses for the year in question were less than stated by more than five percent (5%), Landlord, within thirty (30) days after its receipt of paid invoices therefor from Tenant, shall reimburse Tenant for the reasonable amounts paid by Tenant to third parties in connection with such review by Tenant, not to exceed $2,000.00. If Tenant fails to dispute any item or items included in the determination of Operating Expenses for a particular calendar year by delivering a written notice to Landlord generally describing in reasonable detail the basis of such dispute within two hundred ten (210) days after delivery of the Operating Expense Statement for such year, Tenant shall be deemed to have approved such statement. During the pendency of any dispute over Operating Expenses, Tenant shall pay, under protest and without prejudice, Tenant's Proportionate Share of Operating Expenses as calculated by Landlord.

- 7 -

     7.    **Utilities and Other Services**.  Tenant shall pay for all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, refuse and trash collection, and other utilities and services used on the Premises, all maintenance charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like pertaining to Tenant's use of the Premises.  As of the date of this Lease, electric and gas service to the Premises are separately metered, and water and sewer service to the Premises are jointly metered with the other premises of the Building.  All separately metered utilities will be charged directly to Tenant by the applicable provider.  Tenant shall pay its share of all charges for jointly metered utilities ("Shared Utilities") based upon consumption, as reasonably determined by Landlord; provided, however, if the consumption of Shared Utilities by other tenants or occupants of the Project is over and above the normal and customary amount of consumption of such Shared Utilities by typical operators for the Permitted Use ("High Volume Consumption"), then Landlord shall make such reasonably equitable adjustments to the charges for Shared Utilities as are needed such that Tenant's share of all charges for such Shared Utilities does not include amounts applicable to High Volume Consumption.  No interruption or failure of utilities shall result in the termination of this Lease or, except as hereinafter provided, the abatement of rent. Notwithstanding the foregoing, if: (i) Landlord is the sole and direct cause of an interruption in the utilities to the Premises for a period in excess of three (3) consecutive days after Tenant notifies Landlord of such cessation (the "Interruption Notice"); (ii) such cessation is not caused by a fire or other casualty (in which case Paragraph 15 shall control); and (iii) as a result of such cessation, the Premises, or a portion thereof, is rendered untenantable and Tenant in fact ceases to use the Premises, or portion thereof, then Tenant, as its sole remedy, shall be entitled to receive an abatement of rent payable hereunder during the period beginning on the fourth (4th) consecutive day following Landlord's receipt of the Interruption Notice and ending on the day when the utility in question has been restored.  In the event the entire Premises has not been rendered untenantable by the cessation in utility service, the amount of abatement that Tenant is entitled to receive shall be prorated based upon the percentage of the Premises so rendered untenantable and not used by Tenant.

     8.    **Taxes**.  Landlord shall pay all real estate taxes, assessments and governmental charges (collectively referred to as "Taxes") that accrue against the Project during the Lease Term, which shall be included as part of the Operating Expenses charged to Tenant.  Landlord may contest by appropriate legal proceedings the amount, validity, or application of any Taxes or liens thereof.  Tenant hereby waives all rights to protest the appraised value of the Project or appeal the same.  However, Landlord agrees to take such steps as a reasonably prudent landlord would take with respect to protesting the appraised value of the Project.  Notwithstanding the foregoing, in no event shall Taxes include any transfer, gains, inheritance, estate, succession, gift, corporation, unincorporated business, gross receipts, income, franchise, excise, transaction, sales or privilege tax imposed on Landlord upon the rents payable to Landlord under this Lease or any penalty or interest incurred as a result of Landlord's failure to timely pay Taxes; unless the same are in substitution for any Taxes payable hereunder.  If any such tax or excise is levied or assessed directly against Tenant, then Tenant shall be responsible for and shall pay the same at such times and in such manner as the taxing authority shall require.  Tenant shall be liable for all taxes levied or assessed against any personal property or fixtures placed in the Premises, whether levied or assessed against Landlord or Tenant, and if any such taxes are levied or assessed against Landlord or Landlord's property and (a) Landlord pays them or (b) the assessed value of Landlord's property is increased thereby and Landlord pays the increased taxes, then Tenant shall pay to Landlord such taxes within 10 days after Landlord's written request therefor with supporting documentation.  If any assessments may be paid in installments by Landlord over a period of years, then only the installments or portions thereof coming due or accruing during the Lease Term will be included in Taxes.  If a betterment or improvement assessment is payable in installments, then regardless of whether Landlord elects to pay the assessment in installments, Taxes shall be computed as though Landlord had elected to pay the same in the maximum number of installments permitted by law without payment of additional costs, penalties, or interests being assessed by reason of such installments.  In no event shall Tenant have any liability with respect to such installments (except to the extent of that portion of any installment coming due or accruing during the Lease Term) which accrue or become due either before the Commencement Date or after the expiration of the Lease Term.

     9.    **Insurance**.  (a)  Landlord shall maintain causes of loss – special form property insurance covering the full replacement cost of the Building and commercial general liability insurance for a limit not less than One Million Dollars ($1,000,000) per occurrence.  Landlord may, but is not obligated to, maintain such other insurance and additional coverages as it may deem necessary, including, but not limited to, rent loss insurance.  All such

- 8 -

insurance and deductibles payable thereunder shall be included as part of the Operating Expenses charged to Tenant; provided that Tenant shall not be charged for the excess cost of any insurance coverage maintained by Landlord that is not customarily maintained by similar landlords of similar projects.  The Project or Building may be included in a blanket policy (in which case the cost of such insurance allocable to the Project or Building will be determined by Landlord based upon the insurer's cost calculations).

(b)	Effective as of the earlier of: (1) the date Tenant enters or occupies the Premises; or (2) the Commencement Date, and continuing during the Lease Term, Tenant, at its expense, shall maintain during the Lease Term the following insurance:

(i)	Causes of Loss – Special Form Property Insurance covering leasehold improvements paid for by Tenant or required by the terms of this Lease to be maintained by Tenant and Tenant's personal property and fixtures from time to time in, on, or at the Premises, in an amount not less than 100% of the full replacement cost, without deduction for depreciation, providing protection against events protected under "Special Risk Coverage," as well as against sprinkler damage, vandalism, and malicious mischief. Any proceeds from the Causes of Loss – Special Form Property Insurance shall be used for the repair or replacement of the property damaged or destroyed, unless this Lease is terminated under an applicable provision herein.  If the Premises are not repaired or restored following damage or destruction in accordance with other provisions herein, Landlord shall receive any proceeds from the Causes of Loss – Special Form Property Insurance allocable to Tenant's leasehold improvements.

(ii)	Business Interruption Insurance, providing in the event of damage or destruction of the Premises an amount sufficient to sustain Tenant for a period of not less than 1 year for:  (i) the net income that would have been realized had Tenant's business continued; and (ii) such operating expenses as must necessarily continue during a total or partial suspension of business to the extent to which they would have been incurred had no business interruption occurred, including, but not limited to, interest on indebtedness of Tenant, foremen, and other employees under contract, charges under noncancelable contracts, charges for advertising, legal or other professional services, taxes and rents that may still continue, trade association dues, insurance premiums, and depreciation.

(iii)	Commercial General Liability insurance insuring Tenant against liability for bodily injury, property damage, including contractual liability insuring the indemnification provisions contained in this Lease.  Such insurance shall name Landlord, Landlord's mortgagee, if any, any property management company of Landlord for the Premises, and any other parties reasonably designated by Landlord (including those listed on Exhibit C), as additional insureds on a form that does not limit the coverage provided under such policy to any additional insured (i) by reason of  such additional insured's negligence, when jointly or concurrently negligent with the named insured (excluding Landlord's sole negligence, (ii) by reason of other insurance available to such additional insured, or (iii) to claims for which a primary insured has agreed to indemnify the additional insured, subject to policy terms and conditions.  Such insurance shall be for a limit of not less than Six Million Dollars ($6,000,000) per occurrence and Six Million Dollars ($6,000,000) annual aggregate. Coverage shall also be included for fire damage (damage to rented premises) for a limit of $300,000 any one fire.

(iv)	Worker's Compensation Insurance in the statutory amount covering all employees of Tenant employed or performing services at the Premises required by the laws of the state in which the Premises are located, or non-subscriber's insurance providing coverage for claims that would have been covered by worker's compensation insurance, and Employer's Liability Insurance in the amount of $6,000,000 each accident/$6,000,000 disease-policy limit/$1,000,000 disease-each employee.

(v)	Automobile Liability Insurance on all owned, non-owned, and hired vehicles used in connection with the Premises, with a combined single limit per occurrence of not less than Six Million Dollars ($6,000,000) for Bodily Injury and Property Damage.

DocuSign Envelope ID: 43621777-0E2C-4F15-9682-40F6D4AB4CEA

The commercial liability policies shall insure on an occurrence and not a claims-made basis and be issued by insurance companies which are reasonably acceptable to Landlord, not be cancelable unless 30 days' prior written notice shall have been given to Tenant. Tenant shall provide notice to Landlord upon receipt of such notice from its insurer. Further, the liability insurance obtained by Tenant under Paragraph 9(b)(iii) shall (i) be primary and (ii) insure Tenant's obligations to Landlord under Paragraph 18. The amount and coverage of such insurance shall not limit Tenant's liability nor relieve Tenant of any other obligation under this Lease. Landlord may also obtain commercial general liability insurance in an amount and with coverage determined by Landlord insuring Landlord against liability with respect to the Premises and the Project. The policy obtained by Landlord shall not provide primary insurance, shall not be contributory and shall be excess over any insurance maintained by Tenant.

The Tenant's insurers issuing the above described policies shall have a Best's Insurance Reports rating of A- VII or better. Such certificates thereof shall be delivered to Landlord by Tenant upon the earlier of (i) Tenant's entry into the Premises and (ii) commencement of the Lease Term and upon each renewal of said insurance. If Tenant fails to comply with the foregoing insurance requirements or to deliver to Landlord certificates evidencing the coverage required herein, Landlord shall have any remedy available pursuant to this Lease or otherwise, excluding the purchase of insurance on Tenant's behalf.

(c)    The causes of loss – special form property insurance obtained by Landlord and Tenant shall include a waiver of subrogation by the insurers and all rights based upon an assignment from its insured, against Landlord or Tenant, their officers, directors, employees, managers, agents, invitees and contractors, in connection with any loss or damage thereby insured against, even if the same is caused by the negligence of the other party. Notwithstanding anything to the contrary set forth herein, neither party nor its officers, directors, employees, managers, agents, invitees or contractors shall be liable to the other for loss or damage caused by any risk coverable by causes of loss – special form property insurance, and each party waives any claims against the other party, and its officers, directors, employees, managers, agents, invitees and contractors for such loss or damage, even if the same is caused by the negligence of the released party. The failure of a party to insure its property shall not void this waiver. To the extent not expressly prohibited by applicable law, Landlord and its agents, employees and contractors shall not be liable for, and Tenant hereby waives all claims against such parties for, business interruption and losses occasioned thereby sustained by Tenant or any person claiming through Tenant resulting from any accident or occurrence in or upon the Premises or the Project from any cause whatsoever.

10.    **Landlord's Repairs**. Landlord shall maintain the structure of the Building, consisting of the roof and roof membrane, foundation, floor slab (but excluding floor covering) and exterior walls of the Building all in good repair, reasonable wear and tear and damages caused by Tenant, its agents and contractors excluded. The term "walls" as used in this Paragraph 10 shall not include windows, glass or plate glass, doors or overhead doors, special store fronts, dock bumpers, dock plates or levelers, or office entries. Tenant shall promptly give Landlord written notice of any repair required by Landlord pursuant to this Paragraph 10, after which Landlord shall have a reasonable opportunity to repair. Landlord, at Tenant's expense as provided in Paragraph 6, shall maintain in good repair and condition the parking areas, the Building's exterior drains and downspouts, the Common Areas, and other exterior areas not exclusively serving the Premises or the premises of other tenants, including, but not limited to driveways, alleys, landscape and grounds surrounding the Premises, and common utility lines from the point of common connection to the point of connection to the applicable utility provider. If Landlord fails to perform its maintenance and repair obligations hereunder and if (i) the lack of such maintenance and repair by Landlord materially impairs Tenant's ability to use and occupy the Premises, and (ii) Landlord fails to make any required repairs within three (3) business days after the receipt of Tenant's written notice in the event of an emergency (i.e., threat of bodily injury or death or material and adverse effects to health and safety), or otherwise thirty (30) days after the receipt of Tenant's written notice or, in the event the nature of Landlord's obligation is such that more than thirty (30) days (or 3 business days if an emergency) are required for its performance and Landlord fails to commence performance within the thirty (30) (or 3 business) day period and thereafter diligently pursue the completion of same using commercially reasonable efforts, Tenant may, at its option, perform such maintenance, repair or replacement on Landlord's behalf and Landlord shall reimburse Tenant for Tenant's reasonable out-of-pocket costs and expenses in connection with the exercise of such right, together with an administration charge in an amount equal to 5% of the cost of such work, within thirty (30) days after receipt of an invoice therefor (which invoice shall include documentation evidencing such costs); provided that if the repair or replacement affects any

- 10 -

portion of the Building which is the subject of any warranty or maintenance/service agreement (such as, without limitation, the roof), Tenant shall use Landlord's designated contractor for such repair and/or replacement so as not to impair or invalidate the warranty or maintenance/service agreement. In the case of any damage to such components or systems caused by Tenant or Tenant's agents, employees, contractors, customers, licensees or invitees, the cost to repair the same shall be paid for by Tenant.

11. **Tenant's Repairs**. (a) Subject to Landlord's obligation in Paragraph 10 and subject to Paragraphs 9 and 15, Tenant, at its expense, shall repair, replace and maintain in good condition, reasonable wear and tear and damages caused by Landlord, its agents and contractors excluded, all portions of the Premises and all areas, improvements and systems exclusively serving the Premises including, without limitation, dock and loading areas, man doors, truck doors, dock levelers, shelters, seals and bumpers (if any), lighting, plumbing, restrooms, water and sewer lines up to points of common connection, fire sprinklers and fire protection systems, entries, doors, ceilings, windows, interior walls, and the interior side of demising walls, electrical systems, air rotation equipment, and heating, ventilation and air conditioning systems. Such repair and replacements include capital expenditures and repairs whose benefit may extend beyond the Term.

(b) Hot water equipment and heating, ventilation and air conditioning systems serving the Premises shall be maintained at Tenant's expense pursuant to maintenance service contracts entered into by Tenant or, at Landlord's election, by Landlord (but at Tenant's reasonable expense). The scope of services and contractors under such maintenance contracts shall be subject to Landlord's prior written approval, which shall not be unreasonably withheld. The current scope of services under such maintenance contract is set forth on Addendum 2 attached hereto. Provided that Tenant maintains the required maintenance service contract for the heating, ventilation and air conditioning systems serving the Premises as required above, and except for any repairs or replacements necessitated by any negligent or willful action or inaction of Tenant or its agents, contractors, employees, invitees, licensees, or visitors, Landlord and Tenant agree that Tenant's obligations for repairs or replacements to the heating, ventilation and air conditioning units serving the Premises shall not exceed $1,500.00 per unit per occurrence or $2,500.00 per unit per calendar year during the initial Lease Term, provided that the cost of the maintenance service contract and the cost of routine preventative maintenance shall be excluded from such caps. In the event such repair or replacement cost for a particular unit exceeds $1,500.00 per any one occurrence or $2,500.00 for any one calendar year during the initial Lease Term, Landlord shall either, at its sole but reasonable discretion, repair or replace such unit(s), and Landlord shall pay the cost thereof exceeding the applicable cost cap. If Tenant fails to maintain the required maintenance service contract in effect for more than thirty (30) consecutive days at any time during the Lease Term, Landlord's obligation to pay for any repair or replacement of any heating, ventilation and air conditioning unit shall terminate and be of no force or effect. Upon request by Landlord, Tenant shall provide Landlord with copies of invoices and evidence of payment of all repair costs for the heating, ventilation and air conditioning systems serving the Premises.

(c) Except in the event of an emergency, in no event shall Tenant allow any of its agents, employees or contractors access to the roof of the Building for maintenance or repairs to the heating, ventilation and air conditioning systems or for any other reason without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, and each request from Tenant for roof access shall include the identities of all persons needing access to the roof. The provisions of Paragraph 12 below shall apply with respect to any alterations, additions or repairs on or about the roof of the Building. Without limitation of any other provision of this Lease, Tenant shall indemnify, defend and hold Landlord harmless from claims for personal injury, death and/or property damage arising in connection with Tenant or its agents, employees or contractors accessing the roof.

(d) If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may perform such work and be reimbursed by Tenant for the reasonable cost of such work within 10 days after written demand therefor with supporting documentation, together with an administration charge in an amount equal to 5% of the cost of the repairs. Subject to Paragraphs 9 and 15, Tenant shall bear the full cost of any repair or replacement to any part of the Building or Project that results from damage caused by Tenant, its agents, contractors, or employees. Subject to Paragraph 10, Tenant shall bear the full cost of any repair that benefits only the Premises.

- 11 -

12.    **Tenant-Made Alterations and Trade Fixtures.**  (a)  Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") shall be subject to Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed with respect to any Tenant-Made Alterations that will not affect the structure of the Building or adversely affect the Building mechanical, electrical or plumbing systems and will not affect the exterior of the Premises or Building.  However, Landlord's consent shall not be required for any proposed Tenant-Made Alterations that satisfy all of the following criteria (a "Cosmetic Alteration"):  (1) is not visible from the exterior of the Premises or Building; (2) will not affect the systems or structure of the Building; (3) does not require a building permit; and (4) will not cost more than $50,000.00 in the aggregate.  Except for the requirement of obtaining Landlord's prior written consent and the requirement of delivering plans to the Landlord, Cosmetic Alterations shall otherwise be subject to all the other provisions of this Paragraph 12.  Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with Tenant's insurance requirements under this Lease and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations.  All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only good grades of materials shall be used.  All plans and specifications for any Tenant-Made Alterations (other than Cosmetic Alterations) shall be submitted to Landlord for its approval, which approval shall not be unreasonably withheld, conditioned or delayed.  Landlord may monitor construction of the Tenant-Made Alterations.  Tenant shall reimburse Landlord for its reasonable, third party costs in reviewing plans and specifications and in monitoring construction of any Tenant-Made Alterations that affect the systems or structure of the Building, provided that such monitoring costs shall not exceed 5% of the cost of the Tenant-Made Alteration.  Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit, and Landlord shall have no duty to see that such plans and specifications or construction comply with Legal Requirements.  Tenant shall provide Landlord with the identity and mailing address of Tenant's general contractor for any Tenant-Made Alterations, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to Legal Requirements.  Tenant shall provide certificates of insurance for worker's compensation and other coverage in reasonable amounts and from an insurance company reasonably satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction of Tenant-Made Alterations.  In no event shall Tenant perform any roof penetrations without Landlord's prior written consent, and Landlord shall have the right to designate any roofing contractor having a warranty or maintenance service agreement on the roof to perform such work, or otherwise approve of the contractor performing such work.  Upon completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord sworn statements setting forth the names of all contractors and subcontractors who did work on the Tenant-Made Alterations and final lien waivers from all such contractors and subcontractors who furnished more than $10,000 in work or materials as part of such Tenant-Made Alterations.  Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations.  Tenant shall repair any damage caused by such removal.  Notwithstanding the foregoing, Landlord shall not be entitled to require Tenant to remove Tenant-Made Alterations that were approved by Landlord if Landlord notified Tenant in writing at the time of such approval that Landlord would not require the same to be removed upon the expiration or termination of this Lease.

(b)    Tenant, at its own cost and expense and without Landlord's approval, may erect such shelves, bins, machinery and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business, provided Tenant and such Trade Fixtures are otherwise in compliance with this Lease.  At the expiration or earlier termination of this Lease, Tenant shall remove its Trade Fixtures and shall repair any damage caused by such removal.

13.    **Signs**.  (a) Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, decorations, balloons, flags, pennants, banners, or painting, or erect or install any signs, windows or door lettering, placards, decorations, or advertising media of any type which can be viewed from the exterior of the Premises, without Landlord's prior written consent, which consent with respect to signage shall not be unreasonably withheld, conditioned or delayed.  Upon surrender or vacation of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building fascia surface to which its signs are attached.  Tenant shall obtain all

- 12 -

applicable governmental permits and approvals for sign and exterior treatments. All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Premises shall be subject to Landlord's approval, which approval with respect to signage shall not be unreasonably withheld, conditioned or delayed, and conform in all respects to Landlord's reasonable requirements.

(b) So long as (i) Tenant is not in default under the terms of the Lease beyond the expiration of any applicable notice and cure periods and (ii) Tenant is in occupancy of the Premises, Tenant shall have the right, at Tenant's expense, to install a corporate identification sign on the Building above the entry to the Premises or at such other location subject to Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed (the "Building Sign"); provided that (i) Tenant obtains all necessary approvals from any governmental authorities having jurisdiction over Tenant, the Project, or the Building Sign), (ii) the Building Sign conforms to all applicable laws, rules and regulations of any governmental authorities having jurisdiction over the Building Sign or the Project and all restrictive covenants applicable to the Project, and (iii) the Building Sign conforms to the signage specifications for the Project, and (iv) Tenant obtains Landlord's written consent, which consent shall not be unreasonably withheld, conditioned or delayed, to any proposed signage and lettering prior to its fabrication and installation. To obtain Landlord's reasonable consent, Tenant shall submit design drawings to Landlord showing the type and sizes of all lettering; the colors, finishes and types of materials used. Tenant shall pay all costs associated with the Building Sign, including without limitation, installation expenses, maintenance and repair costs, utilities and insurance. Tenant agrees that, subject to inclusion in Operating Expenses, Landlord shall have the right, after notice to Tenant, to temporarily remove and replace the Building Sign in connection with and during the course of any repairs, changes, alterations, modifications, renovations or additions to the Building. Tenant shall maintain the Building Sign in good condition. Upon expiration or earlier termination of the Lease, Tenant shall, at its sole cost and expense, remove the Building Sign and repair all damage caused by such removal.

14.     **Parking**. Tenant shall be entitled to use Tenant's pro rata share of parking spaces in common with other tenants of the Project in those areas designated for nonreserved parking. Landlord may allocate parking spaces among Tenant and other tenants in the Project if Landlord determines that such parking facilities are becoming crowded; provided that, so long as the Premises consists of not less than the Premises initially leased hereunder (and subject to Paragraphs 15 and 16 below), Tenant will not be allocated less than 32 trailer parking spaces at the Project for Tenant's use. Landlord shall not be responsible for enforcing Tenant's parking rights against any third parties. Vehicle parking shall be at Tenant's risk and Landlord shall not be responsible for any damage or theft to vehicles parking at the Project. Landlord shall not be responsible for policing the parking areas.

15.     **Restoration.** If at any time during the Lease Term the Building or the Project should be totally destroyed by fire or other casualty or in the event the Building or the Project (or any portion thereof) should be so damaged that rebuilding or repairs cannot be completed, in Landlord's reasonable opinion, within 6 months after the date of the casualty, Landlord may, at its option, terminate this Lease, in which event Base Rent and Tenant's Proportionate Share of Operating Expenses shall be abated during the unexpired portion of this Lease effective with the date of such damage. Landlord shall exercise the termination right pursuant to the preceding sentence, if at all, by delivering written notice of termination to Tenant within 60 days after the date of such damage, and if Landlord exercises such termination right, Landlord must also terminate the leases of all other similarly situated tenants of the Project so long as Landlord has the right to so terminate such other leases under the terms of such other leases. If at any time during the Lease Term the Premises, or any portion of the Building or the Project necessary for Tenant's use of or access to the Premises, are damaged by a fire or other casualty, Landlord shall notify Tenant in writing (the "Repair Estimate") within 60 days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises, or such portion of the Building or the Project, whichever the case may be. If the restoration time is estimated to exceed 6 months, either Landlord or Tenant may elect to terminate this Lease upon written notice to the other party given no later than 30 days after Landlord's written notice that the restoration is estimated to exceed such 6 month period, in which event Base Rent and Tenant's Proportionate Share of Operating Expenses shall be abated during the unexpired portion of this Lease effective with the date of such damage. If neither party elects to terminate this Lease within the time required by this Paragraph or if Landlord estimates that restoration will take 6 months or less, then, subject to receipt of sufficient insurance proceeds, Landlord shall promptly restore the Premises or such portion of the Building or the Project, whichever the case may be, excluding the improvements installed by Tenant or by Landlord and paid by Tenant, subject to delays arising from Force

Majeure events; provided that if Landlord does not receive sufficient insurance proceeds to substantially complete the required restoration and Landlord elects not to fund any shortfall, Landlord shall so notify Tenant and Tenant, within thirty (30) days thereafter, shall have the right to terminate this Lease by the giving of written notice to Landlord. Tenant at Tenant's expense shall promptly perform, subject to delays arising from Force Majeure events, all repairs or restoration to Tenant's improvements not required to be done by Landlord and shall promptly re-enter the Premises upon completion of such repairs or restoration and commence doing business in accordance with this Lease. If neither party elects to (or is entitled to) terminate this Lease, but Landlord does not substantially complete the required repair and restoration within sixty (60) days after the expiration of the estimated period of time set forth in the Repair Estimate, which period shall be extended to the extent of any Reconstruction Delays (hereinafter defined), then Tenant may terminate this Lease by written notice to Landlord within ten (10) days after the expiration of such sixty (60) day period, as the same may be extended, but in any event prior to Landlord's substantial completion of the required repair and restoration. For purposes of this Lease, the term "Reconstruction Delays" shall mean: (i) any delays caused by Tenant; and (ii) any delays caused by events of Force Majeure. Notwithstanding the foregoing, either party may terminate this Lease if the Premises are damaged during the last year of the Lease Term and Landlord reasonably estimates that it will take more than one month to repair such damage, in which event Base Rent and Tenant's Proportionate Share of Operating Expenses shall be abated during the unexpired portion of this Lease effective with the date of such damage. Base Rent and Tenant's Proportionate Share of Operating Expenses shall be abated for the period of repair and restoration in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises; provided, that if such casualty was caused by Tenant, its agents or employees, Base Rent and Tenant's Proportionate Share of Operating Expenses shall be abated only to the extent Landlord is compensated for the same by loss of rents insurance, if any. Such abatement and termination rights set forth in this Paragraph 15 shall be the sole remedy of Tenant, and except as provided herein, Tenant waives any other right to terminate the Lease by reason of damage or casualty loss. Any insurance which may be carried by Landlord or Tenant against loss or damage to the Building or to the Premises shall be for the sole benefit of the party carrying such insurance and under its sole control.

16.    **Condemnation**. If any part of the Premises or the Project should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would prevent or materially interfere with Tenant's use of the Premises or the Project for the conduct of its business operations in Tenant's reasonable judgment or in Landlord's reasonable judgment would materially interfere with or impair its ownership or operation of the Project, then either party may terminate this Lease upon written notice to the other party, and this Lease shall terminate and Base Rent and Tenant's Proportionate Share of Operating Expenses shall be apportioned as of the date of the Taking. If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent and Tenant's Proportionate Share of Operating Expenses payable hereunder during the unexpired Lease Term shall be reduced to such extent as may be fair and reasonable under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for moving expenses and damage to Tenant's Trade Fixtures, if a separate award for such items is made to Tenant.

17.    **Assignment and Subletting**. (a) Without Landlord's prior written consent, which consent to an assignment (other than a collateral assignment) or sublease shall not be unreasonably withheld, conditioned or delayed, Tenant shall not assign this Lease or sublease the Premises or any part thereof or mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect. Without limitation, it is agreed that Landlord's consent shall not be considered unreasonably withheld, conditioned or delayed if: (1) the proposed transferee's financial condition is not reasonably adequate in Landlord's reasonable judgment for the obligations such transferee is assuming in connection with the proposed assignment or sublease; (2) the transferee's business or reputation is not suitable for the Project in Landlord's reasonable judgment considering the business and reputation of the other tenants and the Project's prestige, or would result in a violation of another tenant's rights under its lease at the Project; (3) the transferee is a governmental agency or occupant of the Project; (4) Tenant is in default beyond any applicable notice and cure period; (5) any portion of the Project or the Premises would likely become subject to additional or different Legal

- 14 -

Requirements as a consequence of the proposed assignment or sublease; or (6) Landlord or its leasing agent has received a proposal from or made a proposal to the proposed transferee to lease space in the Project within 3 months prior to Tenant's delivery of written notice of the proposed assignment or sublease to Landlord.  For purposes of this paragraph, a transfer of the ownership interests controlling Tenant shall be deemed an assignment of this Lease unless such ownership interests are publicly traded or are transferred pursuant to a Permitted Transfer (as defined below).  Notwithstanding the above, Tenant may assign this Lease or sublet the Premises, or any part thereof, (i) to any entity controlling Tenant, controlled by Tenant or under common control with Tenant (an "Affiliate"), or (ii) to any successor to Tenant by purchase, merger, consolidation or reorganization (collectively, a "Permitted Transfer"), without the prior written consent of Landlord, provided (A) Tenant is not in default under this Lease beyond any applicable notice and cure period; (B) such proposed transferee operates the business in the Premises for the use permitted under Paragraph 3 above and no other purpose; (C) if such proposed transferee is a successor to Tenant by purchase, said proposed transferee shall acquire all or substantially all of the stock or assets of Tenant's business or, if such proposed transferee is a successor to Tenant by merger, consolidation or reorganization, the continuing or surviving entity shall own all or substantially all of the assets of Tenant; (D) with respect to a Permitted Transfer to a proposed transferee described in clause (ii) when such proposed transferee is not an Affiliate, such proposed transferee shall have a tangible net worth which is at least equal to the greater of Tenant's tangible net worth at the date of this Lease or Tenant's tangible net worth as of the day prior to the proposed purchase, merger, consolidation or reorganization as evidenced to Landlord's reasonable satisfaction; and (E) Tenant shall give Landlord written notice not less than 30 days after the effective date of the proposed assignment or sublease.  Tenant shall reimburse Landlord for all of Landlord's reasonable out-of-pocket expenses in connection with any proposed assignment or sublease; provided that, so long as Tenant does not request any changes to this Lease or to Landlord's standard form of consent, such reimbursement shall not exceed $2,000.00 for any one requested transfer.  Upon Landlord's receipt of Tenant's written notice of a desire to assign this Lease or sublet all or substantially all the Premises for all or substantially all the then remaining Lease Term (other than pursuant to a Permitted Transfer), Landlord may, by giving written notice to Tenant within 30 days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease.  Notwithstanding the foregoing, Tenant shall have the right, exercisable within 5 days after receipt of Landlord's intent to terminate this Lease pursuant to this Paragraph 17(a), to withdraw its request for consent to the proposed transfer, in which case Landlord's notice of termination shall be null and void and this Lease shall continue in full force and effect.

(b)    Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or sublettings); provided that, except as set forth in Addendum 6 to this Lease, Tenant and any guarantor or surety shall not be responsible for any increased obligations resulting from any amendments to this Lease entered into between a non-Affiliate assignee or subtenant and Landlord without Tenant's written consent.  In the event that the rent due and payable by a sublessee or assignee (or a combination of the rental payable under such sublease or assignment plus any bonus or other consideration therefor or incident thereto) exceeds the rental payable under this Lease, then Tenant shall be bound and obligated to pay Landlord as additional rent hereunder all such excess rental and other excess consideration within 30 days following receipt thereof by Tenant.

(c)    If this Lease be assigned or if the Premises be subleased (whether in whole or in part) or in the event of the mortgage, pledge, or hypothecation of Tenant's leasehold interest or grant of any concession or license within the Premises or if the Premises be occupied in whole or in part by anyone other than Tenant, then upon a default by Tenant hereunder beyond any applicable notice and cure period, Landlord may collect rent from the assignee, sublessee, mortgagee, pledgee, party to whom the leasehold interest was hypothecated, concessionee or licensee or other occupant and, except to the extent set forth in the preceding paragraph and except as otherwise agreed between Landlord and any mortgagee or pledgee, apply the amount collected to the next rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord.  No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder.

- 15 -

18.    **Indemnification**.  Subject to the provisions of Paragraph 9(c) above, Tenant agrees to indemnify, defend (with counsel reasonably acceptable to Landlord) and hold harmless Landlord, and Landlord's agents, employees and contractors, from and against any and all claims, demands, losses, liabilities, cause of action, suits, judgments, damages, costs and expenses (including reasonable attorney's fees) arising from any occurrence on the Premises, the use and occupancy of the Premises, or from any activity, work, or thing done, permitted or suffered by Tenant in or about the Premises or due to any other act or omission of Tenant, its subtenants, assignees, invitees, employees, contractors and agents (other than any loss arising from the negligence or willful misconduct of Landlord or its employees, agents or contractors).  Subject to the provisions of Paragraph 9(c) above, Landlord agrees to indemnify, defend (with counsel reasonably acceptable to Tenant) and hold harmless Tenant, and Tenant's agents, employees and contractors, from and against any and all claims, demands, losses, liabilities, cause of action, suits, judgments, damages, costs and expenses (including reasonable attorney's fees) arising out of any occurrence on the Project to the extent caused by the negligence or willful misconduct of Landlord, or Landlord's employees, contractors and agents (other than any loss arising from the negligence or willful misconduct of Tenant or its employees, agents or contractors).  This indemnity provision shall survive termination or expiration of this Lease. The furnishing of insurance required hereunder shall not be deemed to limit Tenant's or Landlord's obligations under this Paragraph 18.

19.    **Inspection and Access**.  Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time to inspect the Premises and to make such repairs as may be required or permitted pursuant to this Lease.  After 48 hours' prior notice to Tenant, Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to prospective purchasers and, during the last year of the Lease Term, to prospective tenants.  Landlord may erect a suitable sign at the Project stating that the Project is available for sale and, during the last year of the Lease Term, that the Premises are available to let. Landlord may grant easements, make public dedications, reconfigure the Common Areas and create restrictions on or about the Premises, provided that no such easement, dedication, reconfiguration or restriction materially interferes with Tenant's use or occupancy of the Premises.  At Landlord's request, Tenant shall execute such instruments as may be reasonably necessary for such easements, dedications or restrictions.  Landlord shall have the right to temporarily close the Premises or the Building to perform repairs, alterations or additions in the Premises or the Building, provided that Landlord shall use reasonable efforts to perform all such work on weekends and after Tenant's business hours.  In the event Tenant's ability to operate within the Premises, or portion thereof, is materially and adversely affected for more than three (3) consecutive days solely as a result of such repairs, alterations or additions performed by Landlord, and provided that (i) the need for such repairs, alterations or additions was not caused by a fire or other casualty (in which case Paragraph 15 shall control) or by condemnation (in which case Paragraph 16 shall control) or by Tenant or its agents, contractors, employees, invitees, licensees, or visitors, and (ii) Tenant had not previously vacated the Premises (without re-occupying same), then rent shall be abated for each day after such three (3) consecutive day period that Tenant's ability to operate within the Premises, or portion thereof, is materially and adversely affected as a result of such repairs, alterations or additions performed by Landlord.  In the event Tenant is unable to operate within only a portion of the Premises under the circumstances described above, the amount of abatement that Tenant is entitled to receive shall be prorated based upon the percentage of the Premises in which Tenant is unable to operate.  Entry by Landlord hereunder shall not constitute a constructive eviction or, except as otherwise set forth in this Paragraph, entitle Tenant to any abatement or reduction of rent by reason thereof.

20.    **Quiet Enjoyment**.  If Tenant shall perform all of the covenants and agreements herein required to be performed by Tenant, Tenant shall, subject to the terms of this Lease, at all times during the Lease Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

21.    **Surrender**.  Upon termination of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, broom clean, and in compliance with Addendum 3 attached hereto, ordinary wear and tear and casualty loss and condemnation covered by Paragraphs 15 and 16 excepted.  Any Trade Fixtures and Tenant-Made Alterations not removed by Tenant as permitted or required herein, and any inventory, goods, equipment or other personal property remaining in the Premises following the termination of the Lease Term or earlier termination of Tenant's right of possession, shall be

- 16 -

deemed abandoned and may be stored, removed, sold and disposed of by Landlord at Tenant's expense.  Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and/or disposition of such property deemed abandoned.  All obligations of Landlord and Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including without limitation, indemnity obligations, payment obligations with respect to Tenant's Proportionate Share of Operating Expenses and obligations concerning the condition and repair of the Premises.

22.    **Holding Over**.  If Tenant retains possession of the Premises after the termination of the Lease Term, unless otherwise agreed in writing, such possession shall be subject to immediate termination by Landlord at any time, and all of the other terms and provisions of this Lease (excluding any expansion or renewal option or other similar right or option) shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period on a per month basis without reduction for any partial months during any such holdover, an amount equal to 150% of the Base Rent in effect on the termination date. All other payments shall continue under the terms of this Lease.  In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over; provided Tenant shall not be liable to Landlord for consequential damages arising from Tenant's holdover unless (i) Landlord gives written notice (the "Vacancy Notice") to Tenant stating (x) that Landlord has entered into a letter of intent, letter or memorandum of understanding or another similar instrument with a proposed tenant or a third party has accepted a proposal made by Landlord to lease all or part of the Premises and (y) the date Landlord requires Tenant to vacate the Premises (the "Vacancy Date"), which date shall be the later of the expiration date of this Lease and thirty (30) days after Tenant's receipt of the Vacancy Notice, and (ii) Tenant fails to vacate the Premises on or before the Vacancy Date.  No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided, and this Paragraph 22 shall not be construed as consent for Tenant to retain possession of the Premises.  For purposes of this Paragraph 22, "possession of the Premises" shall continue until Tenant has delivered all keys to the Premises to Landlord and Landlord has complete and total dominion and control over the Premises.

23.    **Events of Default**.  Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(i)    Tenant shall fail to pay any installment of Base Rent or any other payment required herein when due, and such failure shall continue for a period of 5 business days after Tenant's receipt of written notice of such failure.

(ii)    Tenant or any guarantor or surety of Tenant's obligations hereunder shall (A) make a general assignment for the benefit of creditors; (B) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (C) become the subject of any proceeding for relief which is not dismissed within 90 days of its filing or entry; or (D) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

(iii)    Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced to below what is required under this Lease, except, in each case, as permitted in this Lease, and such failure is not cured within 5 business days after Tenant's receipt of written notice thereof.

(iv)    Tenant shall vacate or abandon the Premises, whether or not Tenant is in monetary or other default under this Lease, casualty and condemnation in Paragraphs 15 and 16 excepted, and Tenant does not re-occupy the Premises within 3 business days after Landlord's written demand.

(v)     Tenant shall attempt or there shall occur any assignment, subleasing or other transfer of Tenant's interest in or with respect to this Lease except as otherwise permitted in this Lease, and such failure is not cured within 3 business days after Tenant's receipt of written notice thereof.

(vi)    Tenant shall fail to discharge any lien placed upon the Premises in violation of this Lease within 30 days after Tenant receives notice that such lien or encumbrance was filed against the Premises.

(vii)   Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Paragraph 23, and except as otherwise expressly provided herein, such default shall continue for more than 30 days after Landlord shall have given Tenant written notice of such default (unless such compliance will, due to the nature of the obligation, require a period of time in excess of 30 days, then after such period of time as is reasonably necessary, so long as Tenant commences the cure within such 30 day period and thereafter diligently pursues the cure to completion).

24.     **Landlord's Remedies**.  (a)  Upon each occurrence of an Event of Default and so long as such Event of Default shall be continuing, Landlord may at any time thereafter at its election: terminate this Lease or Tenant's right of possession, (but Tenant shall remain liable as hereinafter provided) and/or pursue any other remedies at law or in equity.  Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom.  If Landlord re-enters the Premises, Landlord shall have the right to keep in place and use, or remove and store, all of the furniture, fixtures and equipment at the Premises.

(b)     If Landlord terminates this Lease, Landlord may recover from Tenant the sum of:  all Base Rent and all other amounts accrued hereunder to the date of such termination; the reasonable cost of reletting the whole or any part of the Premises, including without limitation brokerage fees and/or leasing commissions incurred by Landlord, and costs of removing and storing Tenant's or any other occupant's property, repairing, altering, remodeling, or otherwise putting the Premises into condition reasonably acceptable to a new tenant or tenants, and all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs; and the excess of the then present value of the Base Rent and other amounts payable by Tenant under this Lease as would otherwise have been required to be paid by Tenant to Landlord during the period following the termination of this Lease measured from the date of such termination to the expiration date stated in this Lease, over the present value of any net amounts which Tenant establishes Landlord can reasonably expect to recover by reletting the Premises for such period, taking into consideration the availability of acceptable tenants and other market conditions affecting leasing.  Such present values shall be calculated at a discount rate equal to the 90-day U.S. Treasury bill rate at the date of such termination.

(c)     Notwithstanding anything contained herein to the contrary, Landlord agrees to use commercially reasonable efforts in order to mitigate its damages following any Event of Default by Tenant under the Lease; provided, however, notwithstanding anything to the contrary provided herein and notwithstanding any duty to mitigate damages which at any time now or hereafter may be imposed under or by virtue of any statute or law, it is understood and agreed that Landlord shall not be obligated to pay any sums or incur any obligations or liabilities which are not paid or reimbursed in advance by Tenant in order to relet the Premises or to mitigate its damages, and that Landlord shall not be obligated to relet the Premises or any part or parts thereof (a) during any period in which any other comparable or suitable space in the Project is vacant or is reasonably expected to become vacant, (b) to any tenant who is not satisfactory to Landlord in its reasonable judgment and discretion, or (c) for any rental or upon any terms or conditions which are not satisfactory to Landlord in its reasonable judgment and discretion (including without limitation a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, lease of less than the entire Premises to any tenant and leasing any or all other portions of the Project before reletting the Premises).  Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting.

(d)     If Landlord terminates Tenant's right of possession (but not this Lease), Landlord agrees to use commercially reasonable efforts to mitigate its damages and to relet the Premises (as provided in Paragraph

- 18 -

24(c)) for the account of Tenant for such rent and upon such terms as shall be reasonably satisfactory to Landlord without thereby releasing Tenant from any liability hereunder and without demand or notice of any kind to Tenant. For the purpose of such reletting Landlord is authorized to make any repairs, changes, alterations, or additions in or to the Premises as Landlord deems reasonably necessary or desirable. If the Premises are not relet, then Tenant shall pay to Landlord as damages a sum equal to the amount of the rental reserved in this Lease for such period or periods, plus the cost of recovering possession of the Premises (including reasonable attorneys' fees and costs of suit), the unpaid Base Rent and other amounts accrued hereunder at the time Landlord terminates Tenant's right of possession (but not this Lease), and the costs incurred in any attempt by Landlord to relet the Premises. If the Premises are relet and a sufficient sum shall not be realized from such reletting [after first deducting therefrom, for retention by Landlord, the unpaid Base Rent and other amounts accrued hereunder at the time of reletting, the cost of recovering possession (including reasonable attorneys' fees and costs of suit), all of the costs and expense of repairs, changes, alterations, and additions, the reasonable expense of such reletting (including without limitation brokerage fees and leasing commissions) and the cost of collection of the rent accruing therefrom] to satisfy the rent provided for in this Lease to be paid, then Tenant shall satisfy and pay any such deficiency within thirty (30) days after receipt of Landlord's written demand therefor, and Tenant agrees that Landlord may file suit to recover any sums falling due from time to time. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.

(e)    Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, whether by agreement or by operation of law, it being understood that such surrender and/or termination can be effected only by the written agreement of Landlord and Tenant. Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same. Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce its rights pursuant to this Lease or at law or in equity, shall not be a waiver of Landlord's right to enforce one or more of its rights in connection with any subsequent default. A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. To the greatest extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter as provided for in any statute, or to institute legal proceedings to that end, and also waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge. The terms "enter," "re-enter," "entry" or "re-entry," as used in this Lease, are not restricted to their technical legal meanings.

25.    **Tenant's Remedies/Limitation of Liability**. Landlord shall not be in default hereunder unless Landlord fails to perform any of its obligations hereunder within 30 days after written notice from Tenant specifying such failure (unless such performance will, due to the nature of the obligation, require a period of time in excess of 30 days, then after such period of time as is reasonably necessary, so long as Landlord commences the cure within such 30 day period and thereafter diligently pursues the cure to completion). All obligations of Landlord hereunder shall be construed as covenants, not conditions; and, except as may be otherwise expressly provided in this Lease, Tenant may not terminate this Lease for breach of Landlord's obligations hereunder. All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter. The term "Landlord" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Lease Term upon each new owner for the duration of such owner's ownership. Any liability of Landlord under this Lease shall be limited solely to its interest in the Project and the stream of rent received by Landlord therefrom to the extent such stream of rent has not been otherwise obligated or allocated to a holder of a mortgage encumbering the Premises, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord. In no event shall Landlord be liable for any consequential, special or punitive damages.

- 19 -

DocuSign Envelope ID: 43621777-0E2C-4F15-9682-40F8D4AB4CEA

26.     **Waiver of Jury Trial**.  TENANT AND LANDLORD KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LAWSUIT BROUGHT BY EITHER LANDLORD OR TENANT, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, TO RESOLVE ANY DISPUTE ARISING OUT OF THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS LEASE OR THE TRANSACTIONS RELATED THERETO.    LANDLORD AND TENANT ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THE FOREGOING WAIVER.

27.     **Subordination**.  This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any first mortgage, now existing or hereafter created on or against the Project or the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant; provided that the foregoing subordination in respect of any mortgage placed on the Premises after the date hereof shall not become effective until and unless the holder of such mortgage delivers to Tenant a subordination, non-disturbance and attornment agreement in form and substance reasonably acceptable to Tenant permitting Tenant, if Tenant is not then in default under this Lease beyond the expiration of any applicable notice and cure period, to remain in occupancy of the Premises in the event of a foreclosure of such mortgage.  Tenant agrees, at the election of the holder of any such mortgage, to attorn to any such holder.  Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination and such instruments of attornment as shall be requested by any such holder.  Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such holder shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such holder.  The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust.  Landlord agrees to use good faith and diligent efforts to obtain a subordination, non-disturbance and attornment agreement from the current holder of a mortgage on the Building.  "Good faith and diligent efforts" of Landlord shall not require Landlord to incur any cost, expense or liability to obtain such agreement, it being agreed that Tenant shall be responsible for any fee or review costs charged by the mortgagee.

28.     **Mechanic's Liens**.  Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Premises or under this Lease.  Tenant shall give Landlord prompt written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged of record (by payment or bond) within 30 days after Tenant's receipt of written notice thereof.

29.     **Estoppel Certificates**.  Tenant agrees, from time to time (but in no event more than twice in a calendar year, except in connection with a sale, financing or refinancing of Landlord's interest in the Premises), within 20 days after written request of Landlord, to execute and deliver to Landlord, or Landlord's designee, an estoppel certificate in commercially reasonable form, stating that this Lease is in full force and effect, the date to which rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the expiration date of the then current Lease Term and such other matters pertaining to this Lease as may be reasonably requested by Landlord.

30.     **Environmental Requirements**.  (a)  Except for Hazardous Material (i) contained in products used by Tenant in de minimis quantities for ordinary cleaning and office purposes, and (ii) contained in packages in containers received, stored and transported in the ordinary course of Tenant's business operations for the Permitted

Use; Tenant shall not permit or cause any party to bring Hazardous Material upon the Premises or transport, store, use, generate, manufacture, dispose, or release any Hazardous Material on or from the Premises without Landlord's prior written consent. Tenant, at its sole cost and expense, shall operate its business in the Premises in compliance with all Environmental Requirements and all requirements of this Lease. Tenant shall complete and certify to disclosure statements as reasonably requested by Landlord from time to time (but in no event more than twice per calendar year) relating to Tenant's transportation, storage, use, generation, manufacture, or release of Hazardous Materials on the Premises, and Tenant shall promptly deliver to Landlord a copy of any notice of violation relating to the Premises or Project of any Environmental Requirement.

(b) The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders, authorizations, orders, policies or other similar requirements of any governmental authority, agency or court regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; the Clean Air Act; the Clean Water Act; the Toxic Substances Control Act and all state and local counterparts thereto, and any common or civil law obligations including, without limitation, nuisance or trespass, and any other requirements of Paragraphs 3 and 31 of this Lease. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant or contaminant that is or could be regulated under any Environmental Requirement or that may adversely affect human health or the environment, including, without limitation, any solid or hazardous waste, hazardous substance, asbestos, petroleum (including crude oil or any fraction thereof, natural gas, synthetic gas, polychlorinated biphenyls (PCBs), and radioactive material). For purposes of Environmental Requirements, to the extent authorized by law, Tenant is and shall be deemed to be the responsible party, including without limitation, the "owner" and "operator" of Tenant's "facility" and the "owner" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

(c) Tenant, at its sole cost and expense, shall before Tenant's right to possession terminates or expires or as required by applicable Environmental Requirements (whichever is earliest) remove all Hazardous Materials stored, disposed of or otherwise released by Tenant, its assignees, subtenants, agents, employees, contractors or invitees onto or from the Premises, in a manner and to a level satisfactory to Landlord in its reasonable discretion, but in no event to a level and in a manner less than that which complies with all Environmental Requirements. If Tenant fails to perform such work before Tenant's right to possession terminates or expires (whichever is earlier), Landlord may at its discretion, and without waiving any other remedy available under this Lease or at law or equity (including without limitation an action to compel Tenant to perform such work), perform such work at Tenant's cost. Tenant shall pay all reasonable costs incurred by Landlord in performing such work within 30 days after Landlord's written request with supporting documentation therefor. Such work performed by Landlord on behalf of Tenant and, for purposes of Environmental Requirements, Tenant remains the owner, generator, operator, transporter, and/or arranger of the Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom. Tenant agrees not to enter into any agreement with any person, including without limitation any governmental authority, regarding the removal of Hazardous Materials that have been disposed of or otherwise released onto or from the Premises without the written approval of the Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

(d) Except to the extent arising from Landlord's gross negligence or willful misconduct, Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises or the Project and loss of rental income from the Project), claims, demands, actions, suits, damages (including, without limitation, third party punitive damages), expenses (including without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including without limitation, reasonable attorneys' fees, consultant fees or expert fees) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials by or any breach of the requirements under this Paragraph 30 by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance. Tenant shall have no liability for any Hazardous Materials located on the Project which existed in the Premises or the Project prior to the date of Tenant's possession thereof

511977.001238 23710491.1

(unless the same were introduced by Tenant or its agents, employees, contractors, subtenants, assignees or invitees), and Landlord agrees that Landlord will not claim Tenant to be the owner, generator, operator, transporter, and/or arranger of such pre-existing Hazardous Materials for purposes of Environmental Requirements (unless the same were introduced by Tenant or its agents, employees, contractors, subtenants, assignees or invitees). Landlord shall indemnify, defend, and hold Tenant harmless from and against any and all losses, claims, demands, actions, suits, damages (including, without limitation, third party punitive damages), expenses, and costs (including without limitation, reasonable attorneys' fees, consultant fees or expert fees) which are brought or recoverable against, or suffered or incurred by Tenant to the extent caused by any release of Hazardous Materials by Landlord, its agents, employees or contractors, regardless of whether Landlord had knowledge of such noncompliance. The obligations of Landlord and Tenant under this Paragraph 30 shall survive any termination of this Lease.

(e)     Landlord shall have access to, and a right to perform reasonable inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Paragraph 30, or the environmental condition of the Premises. Access shall be granted to Landlord upon Landlord's 48-hour prior written notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations. Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement or this Paragraph 30, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests. Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant. Tenant shall promptly notify Landlord of any communication or report that Tenant makes to any governmental authority regarding any possible violation of Environmental Requirements or release of any Hazardous Materials onto or from the Premises. Tenant shall, within 5 days of receipt thereof, provide Landlord with a copy of any documents or correspondence received from any governmental agency or other party relating to a possible violation of Environmental Requirements or claim or liability associated with the release of any Hazardous Material onto or from the Premises.

(f)     In addition to all other rights and remedies available to Landlord under this Lease or otherwise, Landlord may, in the event of a breach of the requirements of this Paragraph 30 that is not cured within 150 days following notice of such breach by Landlord, require Tenant to provide financial assurance (such as insurance, escrow of funds or third party guarantee) in an amount and form satisfactory to Landlord. The requirements of this Paragraph 30 are in addition to and not in lieu of any other provision in the Lease.

31.     **Rules and Regulations**.     Tenant shall, at all times during the Lease Term and any extension thereof, comply with all reasonable rules and regulations at any time or from time to time established by Landlord covering use of the Premises and the Project, provided that Tenant shall not be subject to any rules and regulations other than those set forth on Exhibit B unless Tenant has been provided written notice of such subsequent rules and regulations and such subsequent rules and regulations do not increase Tenant's obligations under this Lease or reduce Tenant's rights under this Lease in any material respect. In the event of any conflict between said rules and regulations and other provisions of this Lease, the other terms and provisions of this Lease shall control. Landlord shall not have any liability or obligation for the breach of any rules or regulations by other tenants in the Project. However, Landlord agrees to use commercially reasonable efforts to enforce the rules and regulations against all tenants of the Project in a uniform and nondiscriminatory manner. The current rules and regulations applicable to the Project are attached hereto as Exhibit B.

32.     **Security Service**.     Tenant acknowledges and agrees that, while Landlord may patrol the Project, Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

33.     **Force Majeure**.     Except with respect to the payment of rent or other sums payable under this Lease, neither Landlord nor Tenant shall be held responsible for delays in the performance of its respective obligations hereunder when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental orders or regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or

other casualty, epidemics or pandemics, and other causes beyond the reasonable control of such party ("Force Majeure").

34.  **Entire Agreement**.  This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof.  No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease.  This Lease may not be amended except by an instrument in writing signed by both parties hereto.

35.  **Severability**.  If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby.  It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

36.  **Brokers**.  Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the Brokers (as defined on the second page of this Lease), and Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.  Landlord represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the Brokers, and Landlord agrees to indemnify and hold Tenant harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Landlord with regard to this leasing transaction.

37.  **Miscellaneous**.        (a)        Any payments or charges due from Tenant to Landlord hereunder shall be considered rent for all purposes of this Lease.

(b)        If and when included within the term "Tenant" as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(c)        All notices required or permitted to be given under this Lease shall be in writing and shall be sent by registered or certified mail, return receipt requested, or by a reputable national overnight courier service, postage prepaid, or by hand delivery addressed to the parties at their addresses set forth below their respective signatures.  Either party may by notice given aforesaid change its address for all subsequent notices.  Except where otherwise expressly provided to the contrary, notice sent by hand delivery shall be deemed given upon delivery and notice sent by mail or national overnight courier service shall be deemed given as of the date of first attempted delivery at the address and in the manner provided herein.

(d)        Intentionally Deleted.

(e)        Except as otherwise expressly provided or limited by this Lease, Tenant shall pay Landlord's reasonable, third party, out-of-pocket fees and expenses, including legal, engineering and other consultants' fees and expenses, incurred in connection with Tenant's request for Landlord's consent or approval under this Lease.  In connection with any such request by Tenant, Tenant may also request that Landlord first provide its estimate of the fees and expenses Landlord reasonably expects to incur in connection therewith, in which case Landlord shall promptly provide such estimate.

(f)        At Landlord's request from time to time Tenant shall furnish or cause Guarantor to furnish Landlord with true and complete copies of Tenant's or Guarantor's most recent annual and quarterly financial statements prepared by Tenant or Guarantor, or Tenant's or Guarantor's accountants, as applicable, and any other financial information or summaries that Tenant or Guarantor typically provides to its lenders or shareholders.

- 23 -

Notwithstanding the foregoing, so long as either Tenant's or Guarantor's financial statements are publically available (and Guarantor's guaranty of this Lease remains in effect), neither Tenant nor Guarantor shall be required to provide financial statements.

(g)     Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record.  Landlord may prepare and file, and upon request by Landlord Tenant will execute, a memorandum of lease.

(h)     The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

(i)     The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

(j)     Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.  The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(k)     Any amount not paid by Tenant within 30 days after its due date in accordance with the terms of this Lease shall bear interest from such due date until paid in full at the lesser of the highest rate permitted by applicable law or 10 percent per year.  It is expressly the intent of Landlord and Tenant at all times to comply with applicable law governing the maximum rate or amount of any interest payable on or in connection with this Lease.  If applicable law is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected by Landlord be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to Tenant), and the provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

(l)     Construction and interpretation of this Lease shall be governed by the laws of the state in which the Project is located, excluding any principles of conflicts of laws.

(m)     Time is of the essence as to the performance of Tenant's and Landlord's obligations under this Lease.

(n)     All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof.  In the event of any conflict between such exhibits or addenda (other than the rules and regulations) and the terms of this Lease, such exhibits or addenda shall control.  In the event of a conflict between the rules and regulations attached hereto and the terms of this Lease, the terms of this Lease shall control.

(o)     If either party shall prevail in any litigation instituted by or against the other related to this Lease, the prevailing party, as determined by the court, shall receive from the non-prevailing party all costs and reasonable attorneys' fee (payable at standard hourly rates) incurred in such litigation, including costs on appeal, as determined by the court.  Tenant shall pay to Landlord all costs and expenses, including reasonable attorneys' fees, incurred by Landlord in enforcing this Lease.

(p)     This Lease shall create the relationship of landlord and tenant between the parties hereto; no estate shall pass out of Landlord.  Tenant only has a usufruct, not subject to levy and sale and not assignable by Tenant except by Landlord's consent as otherwise permitted in this Lease.

(q)    Tenant hereby represents to Landlord and Landlord hereby represents to Tenant that (i) neither such entity, nor any person or entity that directly owns a 10% or greater equity interest in it nor any of its officers, directors or managing members is or will be a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury including those parties named on the OFAC's Specially Designated and Blocked Persons List and those covered pursuant to the Executive Order 13224 signed on September 24, 2001, entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action; and (ii) that such entity's activities do not and will not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or USA Patriot Act, or the regulations or orders promulgated thereunder.

(r)    This Lease may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document.  Notwithstanding any law or presumption to the contrary, this Lease may be executed electronically or by facsimile or pdf and each party has the right to rely upon an electronic, facsimile or pdf counterpart of this Lease signed by the other party to the same extent as if such party had received an original counterpart, and such counterpart of this Lease shall be deemed valid and binding and admissible by either party against the other as if same were an original ink signature.

38.    **Landlord's Lien/Security Interest**.  Intentionally omitted.

39.    **Limitation of Landlord's Liability**.  The obligations of this Lease shall run with the land, and this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  No owner of the Project shall be liable under this Lease except for breaches of Landlord's obligations occurring while owner of the Project.  The obligations of Landlord shall be binding upon the assets of Landlord which comprise the Project but not upon other assets of Landlord.  No individual partner, trustee, stockholder, officer, member, director, employee, advisors or beneficiary of Landlord or any partner, trustee, stockholder, officer, member, director, employee, advisor or beneficiary of any of the foregoing, shall be personally liable under this Lease and Tenant shall look solely to Landlord's interest in the Project in pursuit of its remedies upon an event of default hereunder, and the general assets of Landlord, its partners, trustees, stockholders, members, officers, employees, advisors or beneficiaries of Landlord, and the partners, trustees, stockholders, members, officers, employees, advisors or beneficiary of any of the foregoing, shall not be subject to levy, execution or other enforcement procedure for the satisfaction of the remedies of Tenant.

40.    **Substitution of Premises**.  Intentionally omitted.

41.    **Reserved Rights.**  Landlord reserves the following rights, exercisable without notice, except as provided herein, and without liability to Tenant for damage or injury to property, person or business and without affecting an eviction or disturbance of Tenant's use or possession or giving rise to any claim for setoff or abatement of rent or affecting any of Tenant's obligations under this Lease: (1) upon 30 days prior notice to change the name or street address of the Building, provided that Landlord will not change the street address of the Building unless required by a governmental authority; (2) to install and maintain signs on the exterior and interior of the Building; (3) to designate and approve window coverings to present a uniform exterior appearance; (4) to make any decorations, alterations, additions, improvements to the Building or Project, or any part thereof (including, with reasonable prior written notice, the Premises) which Landlord shall desire, or deem reasonably necessary for the safety, protection, preservation or improvement of the Building or Project, or as Landlord may be required to do by Legal Requirements, provided that, except to the extent required by Legal Requirements, Landlord shall not make any such changes that unreasonably interfere with the conduct of Tenant's business at the Project; (5) to retain at all times and to use in reasonably appropriate instances, pass keys to all locks within and to the Premises; (6) to change the arrangement and/or location of the Common Areas of the Project, provided that Landlord shall not make any such changes that unreasonably interfere with the conduct of Tenant's business at the Project; (7) to regulate access to telephone, electrical and other utility closets in the Building and to require use of designated contractors for any work involving access to the same; and (8) if Tenant has vacated the Premises during the last 6 months of the Lease Term, to perform additions, alterations and improvements to the Premises in connection with a reletting or

- 25 -

anticipated reletting thereof without being responsible or liable for the value or preservation of any then existing improvements to the Premises.

43.    **Landlord Representations**.  Landlord represents to Tenant that, as of the date of this Lease, it has the right and authority to execute this Lease and perform its obligations under this Lease.

[Signature page follows.]

- 26 -

DocuSign Envelope ID: 43621777-0E2C-4F15-9683-40F8D4AB4CFA

    IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the day and year first above written.

TENANT:

YRC INC.,
a Delaware corporation

By: _____
Name: Jeffrey H. Coltrin
Title: Vice President – Properties

Address:

YRC Inc.
c/o YRC Worldwide Inc.
Real Estate and Properties – Mail Stop A650
10990 Roe Avenue
Overland Park, KS 66211
Attention: Jeffrey H. Coltrin

with a copy to:

YRC Worldwide Inc.
Legal Department – Mail Stop A305
10990 Roe Avenue
Overland Park, KS 66211
Attention: Assistant General Counsel

with a copy to:

Husch Blackwell LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Attention: William M. Hof, Esq.

LANDLORD:

BREIT INDUSTRIAL CANYON GA1B01 LLC,
a Delaware limited liability company

By: _____
Name: Benjamin Harris
Title: Authorized Signatory

Address:

BREIT INDUSTRIAL CANYON GA1B01 LLC
c/o Link Industrial Management LLC
602 W. Office Center Drive, Suite 200
Fort Washington, PA 19034
Attention: Lease Administration

with a copy to:

BREIT INDUSTRIAL CANYON GA1B01 LLC
c/o Link Industrial Management LLC
90 Park Avenue, 32nd Floor
New York, NY 10016
Attention: General Counsel

- 27 -

511977.001238 23710491.1

DocuSign Envelope ID: 43621777-0E2C-4F15-9692-40F6D4AB4CFA

ADDENDUM 1

INTENTIONALLY OMITTED

511977.001238 23710491.1

ADDENDUM 2

HVAC MAINTENANCE CONTRACT

The service contract Tenant is required to maintain under Paragraph 11 of the Lease must become effective within 30 days after occupancy, and a copy of the service contract must be provided to Landlord during the same period of time.  Service visits should be performed on at least a quarterly basis.  The HVAC contractor that is used to service the equipment is required to provide a copy of all work performed to the Landlord within 24 hours after work is completed.  If the service provider cannot provide the Landlord with copies within 24 hours, then Tenant will be required to contract with a service provider who can meet the requirement.  The following items must be included in the maintenance contract:

1.     Adjust belt tension;
2.     Lubricate all moving parts, as necessary;
3.     Inspect and adjust all temperature and safety controls;
4.     Check refrigeration system for leaks and operation;
5.     Check refrigeration system for moisture;
6.     Inspect compressor oil level and crank case heaters;
7.     Check head pressure, suction pressure and oil pressure;
8.     Inspect air filters and replace when necessary;
9.     Check space conditions;
10.    Check condensate drains and drain pans and clean, if necessary;
11.    Inspect and adjust all valves;
12.    Check and adjust dampers; and
13.    Run machine through complete cycle.

DocuSign Envelope ID: 43621777-9E2C-4F15-9603-40F8D4AB4CEA

ADDENDUM 3

MOVE-OUT CONDITIONS

Tenant is obligated to check and address prior to move-out of the Premises the following items.  The following list is designed to assist Tenant in the move-out procedures but is not intended to be all inclusive.

1.    All lighting is to be placed into good working order. This includes replacement of bulbs, ballasts, and lenses as needed.

2.    All truck doors, dock levelers, and dock bumpers and shelters shall be in good operating order.

3.    All structural steel columns in the warehouse and office should be inspected for damage.  Repairs of this nature must be pre-approved by the Landlord prior to implementation.

4.    Heating/air-conditioning systems and air rotation equipment shall be placed in good working order, including the necessary replacement of any parts to return the same to a well maintained condition.  This includes warehouse heaters and exhaust fans. Upon move-out, Landlord will have an exit inspection performed by a certified mechanical contractor to determine the condition.

5.    All holes in the sheet rock walls shall be repaired prior to move-out.

6.    The carpets and vinyl tiles shall be in a clean condition.  Landlord will accept normal wear on these items provided they appear to be in a maintained condition.

7.    The Premises should be returned in a clean condition which shall include cleaning of the coffee bar, restroom areas, windows, and other portions of the space.

8.    The warehouse shall be in broom clean condition with all inventory and racking removed.  There shall be no protrusion of anchors from the warehouse floor and all holes shall be appropriately patched.  If machinery/equipment is removed, the electrical lines shall be properly terminated at the nearest junction box.

9.    All exterior windows with cracks or breakage shall be replaced.

10.   The Tenant shall provide keys for all locks on the Premises, including front doors, rear doors, and interior doors.

11.   Items that have been added by the Tenant and affixed to the building will remain the property of Landlord, unless agreed otherwise.  This shall include but is not limited to mini-blinds, air conditioners, electrical, water heaters, cabinets, flooring, etc. If modifications have been made to the space, such as the addition of office areas, Landlord retains the right to have the Tenant remove these modifications at Tenant's expense.

12.   All phone and data cabling exclusively serving the Premises (whether such cabling is located within or outside of the Premises) shall be removed to the originating panel, unless otherwise instructed by Landlord.

13.   All electrical systems shall be left in a safe condition that conforms to code. Bare wires and dangerous installations should be corrected prior to move-out.

14.   All plumbing fixtures shall be in good working order, including the water heater. Faucets and toilets shall not leak.

511977.001238 23710491.1

ADDENDUM 4

BASE RENT ADJUSTMENTS

Base Rent shall equal the following amounts for the respective periods set forth below:

| Period | Annual Rate PSF | Monthly Base Rent |
|--------|-----------------|-------------------|
| 8/1/20 – 10/31/20 | $0.00 | $0.00 |
| 11/1/20 – 7/31/21 | $4.20 | $49,560.00 |
| 8/1/21 – 7/31/22 | $4.31 | $50,858.00 |
| 8/1/22 – 7/31/23 | $4.41 | $52,038.00 |
| 8/1/23 – 7/31/24 | $4.52 | $53,336.00 |
| 8/1/24 – 7/31/25 | $4.64 | $54,752.00 |
| 8/1/25 – 10/31/25 | $4.75 | $56,050.00 |

511977.001238 23710491.1

ADDENDUM 5

INITIAL IMPROVEMENTS

Landlord shall perform the following work in the Premises, at no additional cost to Tenant, using Building standard methods, materials and finishes (collectively, the "Landlord's Work"): (i) install twelve (12) Edge of Dock Levelers on the dock doors serving the Premises that are currently unequipped with a pit leveler, (ii) professionally clean the office portion of the Premises, (iii) remove all trash and debris and sweep the warehouse portion of the Premises, and (iv) perform the work necessary to place all mechanical, electrical and plumbing systems serving the Premises, as well as the overhead doors and dock levelers serving the Premises, in good working order.  Tenant acknowledges that the Landlord's Work may be performed by Landlord in the Premises during normal business hours both prior and subsequent to the Commencement Date.  Landlord and Tenant agree to reasonably cooperate with each other in order to enable the Landlord's Work to be performed in a timely manner and with as little inconvenience to the operation of Tenant's business as is reasonably possible.  Tenant acknowledges and agrees that it will be responsible, at its sole cost, for moving and protecting its furniture, fixtures, equipment and other personal property as may be reasonably necessary in connection with the performance of the Landlord's Work, and Tenant shall coordinate the same with the contractor performing the Landlord's Work.  Notwithstanding anything contained herein or in the Lease to the contrary, Landlord shall not be obligated to perform the Landlord's Work during the continuance of an uncured default by Tenant under the Lease, and any delay in the completion of the Landlord's Work or inconvenience suffered by Tenant during the performance of the Landlord's Work shall not delay the Commencement Date nor shall it subject Landlord to any liability for any loss or damage resulting therefrom or entitle Tenant to any credit, abatement or adjustment of rent or other sums payable under the Lease.

ADDENDUM 6

RENEWAL OPTION

1.      Tenant shall have the right to extend the Lease Term (the "Renewal Option") for one additional period of five (5) years (the "Renewal Term") commencing on the day following the expiration date of the initial Lease Term, provided that each of the following occurs:

    (a)      Landlord receives notice of exercise of the Renewal Option ("Initial Renewal Notice") not less than six (6), and not more than twelve (12), full calendar months prior to the expiration of the initial Lease Term; and

    (b)      No Event of Default exists at the time that Tenant delivers its Initial Renewal Notice or at the time Tenant delivers its Binding Renewal Notice (hereinafter defined); and

    (c)      Not more than 25% of the Premises is sublet (other than pursuant to a Permitted Transfer) at the time that Tenant delivers its Initial Renewal Notice or at the time Tenant delivers its Binding Renewal Notice; and

    (d)      The Lease has not been assigned by Tenant (other than pursuant to a Permitted Transfer) prior to the date that Tenant delivers its Initial Renewal Notice or prior to the date Tenant delivers its Binding Renewal Notice.

2.      The initial Base Rent rate per square foot for the Premises during the Renewal Term shall equal the Prevailing Market (hereinafter defined) rate per square foot for the Premises.  The Base Rent during the Renewal Term shall increase, if at all, in accordance with the increases assumed in the determination of the Prevailing Market rate.

3.      Tenant shall pay Tenant's Proportionate Share of Operating Expenses for the Premises during the Renewal Term in accordance with the terms of the Lease; provided that the cap on Controllable Operating Expenses may be adjusted in connection with the determination of the Prevailing Market rate.

4.      (a)      Within thirty (30) days after receipt of Tenant's Initial Renewal Notice, Landlord shall advise Tenant of the Base Rent rate for the Premises for the Renewal Term.  Tenant, within fifteen (15) days after the date on which Landlord advises Tenant of the Base Rent rate for the Renewal Term, shall either (i) give Landlord final binding written notice ("Binding Renewal Notice") of Tenant's exercise of its option, or (ii) if Tenant disagrees with Landlord's determination, provide Landlord with written notice of rejection (the "Rejection Notice").

    (b)      If Tenant fails to provide Landlord with either a Binding Renewal Notice or Rejection Notice within such fifteen (15) day period, Tenant's Renewal Option shall be null and void and of no further force or effect.  If Tenant provides Landlord with a Binding Renewal Notice, Landlord and Tenant shall enter into the Renewal Amendment (hereinafter defined) upon the terms and conditions set forth herein.  If Tenant provides Landlord with a Rejection Notice, Landlord and Tenant shall work together in good faith to agree upon the Prevailing Market rate for the Premises during the Renewal Term.  Upon agreement Tenant shall provide Landlord with the Binding Renewal Notice and Landlord and Tenant shall enter into the Renewal Amendment in accordance with the terms and conditions hereof.

    (c)      Notwithstanding the foregoing, if Landlord and Tenant are unable to agree upon the Prevailing Market rate for the Premises within thirty (30) days after the date Tenant provides Landlord with a

- A6-1 -

Rejection Notice, Tenant, by written notice to Landlord (the "Arbitration Notice") within ten (10) days after the expiration of such thirty (30) day period, shall have the right to have the Prevailing Market rate determined in accordance with the arbitration procedures described in Paragraph 5 below.  If Landlord and Tenant are unable to agree upon the Prevailing Market rate for the Premises within the thirty (30) day period described and Tenant fails to timely exercise its right to arbitrate, Tenant's Renewal Option shall be null and void and of no further force or effect.

5.    If Tenant provides Landlord with an Arbitration Notice, Landlord and Tenant, within ten (10) days after the date of the Arbitration Notice, shall each simultaneously submit to the other its good faith estimate of the Prevailing Market rate for the Premises during the Renewal Term (collectively referred to as the "Estimates") and each select a broker (hereinafter, a "broker") to determine which of the two Estimates most closely reflects the Prevailing Market rate for the Premises during the Renewal Term.  Each broker so selected shall (i) be a licensed commercial real estate broker and (ii) have not less than 10 years' experience in the field of commercial brokerage in connection with buildings comparable to the Building in area in which the Project is located.  Upon selection, Landlord's and Tenant's brokers shall work together in good faith to agree upon which of the two Estimates most closely reflects the Prevailing Market rate for the Premises during the Renewal Term.  The Estimate chosen by such brokers shall be binding on both Landlord and Tenant as the Base Rent rate for the Premises during the Renewal Term.  If either Landlord or Tenant fails to appoint a broker within the ten (10) day period referred to above, the broker appointed by the other party shall be the sole broker for the purposes hereof.  If the two brokers cannot agree upon which of the two Estimates most closely reflects the Prevailing Market rate within thirty (30) days after their appointment, then, within ten (10) days after the expiration of such thirty (30) day period, the two brokers shall select a third broker meeting the aforementioned criteria.  Once the third broker (i.e. arbitrator) has been selected as provided for above, then, as soon thereafter as practicable but in any case within fourteen (14) days, the arbitrator shall make his determination of which of the two Estimates most closely reflects the Prevailing Market rate and such Estimate shall be binding on both Landlord and Tenant as the Base Rent rate for the Premises during the Renewal Term.  The parties shall share equally in the costs of the arbitrator.  Any fees of any broker, counsel or experts engaged directly by Landlord or Tenant shall be borne by the party retaining such broker, counsel or expert.

6.    If Tenant is entitled to and properly exercises its Renewal Option, Landlord and Tenant shall execute an amendment (the "Renewal Amendment") to reflect changes in the Base Rent, Lease Term, expiration date and other appropriate terms; provided that an otherwise valid exercise of the Renewal Option shall be fully effective whether or not the Renewal Amendment is executed.

7.    For purpose hereof, "Prevailing Market" rate shall mean the arm's length fair market annual rental rate per square foot under renewal leases and amendments entered into on or about the date on which the Prevailing Market is being determined hereunder for space comparable to the Premises in the Project and in buildings comparable to the Building in the submarket in which the Building is included.  The determination of Prevailing Market shall take into account any material economic differences between the terms of this Lease and any comparison lease, such as rent abatements, construction costs and other concessions and the manner, if any, in which the landlord under any such lease is reimbursed for operating expenses and taxes.  The determination of Prevailing Market rate shall also take into consideration any reasonably anticipated changes in the Prevailing Market rate from the time such Prevailing Market rate is being determined and the time such Prevailing Market rate will become effective under this Lease.

8.    The renewal rights of Tenant hereunder shall not be severable from the Lease, nor may such rights be assigned or otherwise conveyed in connection with any permitted assignment of the Lease, except in connection with a Permitted Transfer.  Landlord's consent to any assignment of the Lease shall not be construed as allowing an assignment of such rights to any assignee, except in connection with a Permitted Transfer.  If Tenant assigns the Renewal Option to an assignee pursuant to a Permitted Transfer and such assignee exercises the Renewal Option set forth herein, Tenant shall remain liable under the Lease for all of the obligations of the tenant hereunder during such Renewal Term, whether or not Tenant has consented to

- A6-2 -

DocuSign Envelope ID: 43621777-0E2C-4F15-9692-40F6D4AB4CEA

or is notified of such renewal and Landlord shall have no obligation to obtain the consent of Tenant or to notify Tenant of such renewal.

EXHIBIT A

DEPICTION OF PREMISES



**Premises**

EXHIBIT B

RULES AND REGULATIONS

1.     The sidewalk, entries, and driveways of the Project shall not be obstructed by Tenant, or its agents, or used by them for any purpose other than ingress and egress to and from the Premises.

2.     Tenant shall not place any objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises, or on the roof of the Project, except with Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

3.     Except for service animals required to be permitted by applicable Legal Requirements, no animals shall be allowed in the offices, halls, or corridors in the Project.

4.     Tenant shall not disturb the occupants of the Project or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises.

5.     If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced; and, without such direction, no boring or cutting of wires will be permitted.  Any such installation or connection shall be made at Tenant's expense.

6.     Tenant shall not install or operate any steam or gas engine or boiler, or other mechanical apparatus in the Premises, except as specifically approved in the Lease.  The use of oil, gas or inflammable liquids for heating, lighting or any other purpose is expressly prohibited.  Explosives or other articles deemed extra hazardous shall not be brought into the Project.

7.     Parking any type of recreational vehicles is specifically prohibited on or about the Project.  Further, parking any type of trucks, trailers or other vehicles in the Premises is specifically prohibited.  Except for the overnight parking of operative vehicles, no vehicle of any type shall be stored in the parking areas at any time.  In the event that a vehicle is disabled, it shall be removed within 48 hours.  There shall be no "For Sale" or other advertising signs on or about any parked vehicle.  All vehicles shall be parked in the designated parking areas in conformity with all signs and other markings.  All parking will be open parking, and no reserved parking, numbering or lettering of individual spaces will be permitted except as specified by Landlord.

8.     Tenant shall maintain the Premises free from rodents, insects and other pests.

9.     Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project.

10.    Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness.  Landlord shall not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitors or any other employee or person.

11.    Tenant shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus, or any other service equipment affecting the Premises.

12.     Except as otherwise provided in the Lease, Tenant shall not permit storage outside the Premises, including without limitation, outside storage of trucks and other vehicles, or dumping of waste or refuse or permit any harmful materials to be placed in any drainage system or sanitary system in or about the Premises.

13.     All moveable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure areas, if any, provided for that purpose.

14.     No auction, public or private, will be permitted on the Premises or the Project.

15.     No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

16.     The Premises shall not be used for lodging, sleeping or cooking or for any immoral or illegal purposes or for any purpose other than that specified in the Lease.  No gaming devices shall be operated in the Premises.

17.     Tenant shall ascertain from Landlord the maximum amount of electrical current which can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Project and the Premises and the needs of other tenants, and shall not use more than such safe capacity.  Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

18.     Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

19.     Tenant shall not install or operate on the Premises any machinery or mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises and shall keep all such machinery free of vibration, noise and air waves which may be transmitted beyond the Premises.

511977.001238 23710491.1

EXHIBIT C

SUMMARY OF INSURANCE REQUIREMENTS

**Location:**                          1250 Terminus Drive, Suite 200
                                       Lithia Springs, GA 30122

**Certificate Holder:**

                                       BREIT Industrial Canyon GA1B01 LLC
                                       c/o Link Industrial Management LLC
                                       602 W. Office Center Drive, Suite 200
                                       Fort Washington, PA 19034

**Additional Insureds:**

                                       BREIT Industrial Canyon GA1B01 LLC        **Landlord Entity**

                                       Stream Realty Partners                    **Property Manager**

                                       Link Industrial Management LLC            **Other**
                                       Link Industrial Properties, LLC
                                       Revantage Corporate Services
                                       Cabot Properties LP

                                       The Prudential Insurance Company of America,   *Mortgagee*
                                       and New York State Teachers' Retirement System

| <u>Coverage</u> | <u>$ Limits</u> |
|---|---|
| **Commercial General Liability** | $6,000,000  each occurrence<br>$6,000,000  annual aggregate |
| <u>Worker's Compensation Insurance</u> | Statutory Amount |
| <u>Employers' Liability Insurance</u> | $6,000,000 each accident/ $1,000,000 each employee – disease/ $6,000,000 policy limit - disease |
| <u>Automobile Liability Insurance</u> | $6,000,000  combined single limit |
| **Causes of Loss – Special Form Property Insurance** | 100% of Replacement Cost; Coverage extends to additions, improvements & alterations |
| **Business Interruption Insurance** | 1 year of net income plus operating expenses |
| <u>Notice of Cancellation</u> | 30 Days |

511977.001238 23710491.1

**Tenant Contact for Insurance Matters:** *(After Lease Commencement Date)*

Street
City, State, Zip Code
Attn:
Tel. No.

511977.001238 23710491.1

EXHIBIT D

TENANT OPERATIONS INQUIRY FORM

1.     Name of Company/Contact *Chad Tauscher*

2.     Address/Phone *10990 Roe Ave., Overland Park, KS 66211*
                *913-344-3884*

3.     Provide a brief description of your business and operations: *HNRV Logistics is a logistics company in that they plan, implement, and control the movement and storage of goods. In this case this warehouse, within a supply chain and between the points of origin and consumption.*

4.     Will you be required to make filings and notices or obtain permits as required by Federal and/or State regulations for the operations at the proposed facility? Specifically:

        a. SARA Title III Section 312 (Tier II) reports         YES   (NO)

            (> 10,000lbs. of hazardous materials STORED at any one time)

        b. SARA Title III Section 313 (Tier III) Form R reports     YES   (NO)

            (> 10,000lbs. of hazardous materials USED per year)

        c. NPDES or SPDES Stormwater Discharge permit      YES   (NO)

            (answer "No" if "No-Exposure Certification" filed)

        d. EPA Hazardous Waste Generator ID Number       YES   (NO)

5.     Provide a list of chemicals and wastes that will be used and/or generated at the proposed location. Routine office and cleaning supplies are not included. Make additional copies if required.

| Chemical/Waste | Approximate Annual Quantity Used or Generated | Storage Container(s) (i.e. Drums, Cartons, Totes, Bags, ASTs, USTs, etc) |
|---|---|---|
| Non-Hazardous (Non-RCRA) oil, oil dry, dirt, sand | 110 Gallons | Drums |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Completed By:

Name: *Ruben Byerley*

Title: *Manager - Environmental*

Date: *07/08/2020*

511977.001238 23710491.1

EXHIBIT E

LEGAL DESCRIPTION

All that tract or parcel of land lying in and being part of Land Lots 674, 675, 710, 711, 712, 767 and 768, 18th District, 2nd Section, City of Douglasville, Douglas County, Georgia and being more particularly described as follows:

To find the TRUE POINT OF BEGINNING commence at a 1" pipe found lying on the intersection of the Land Lot line common to Land Lots 618 and 675 and the Southerly right of way of Blairs Bridge Road (50' R/W). THENCE South 43 degrees 55 minutes 12 seconds East for a distance of 174.92 feet to a 2" pipe found; THENCE South 18 degrees 43 minutes 21 seconds East for a distance of 75.82 feet to an iron pin set, said point being the TRUE POINT OF BEGINNING.

From the TRUE POINT OF BEGINNING as thus established South 18 degrees 43 minutes 21 seconds East for a distance of 359.10 feet to an iron pin set; THENCE North 70 degrees 09 minutes 21 seconds East for a distance of 355.47 feet to a 1" open-top pipe iron pin found; THENCE South 02 degrees 02 minutes 56 seconds West for a distance of 921.02 feet to a point found on the land lot line between Land Lots 675 and 711; THENCE along the land lot line between Land Lots 675 and 711 and the land lot line between Land Lots 676 and 710 South 88 degrees 00 minutes 37 seconds East for a distance of 1040.23 feet to a 5/8" rebar iron pin found on the northern top of bank of Sweetwater Creek; THENCE leaving said land lot line along said northern top of bank of Sweetwater Creek, the following courses and distances: South 39 degrees 27 minutes 06 seconds West 140.46 feet; South 38 degrees 36 minutes 33 seconds West 752.57 feet; South 70 degrees 02 minutes 05 seconds West 384.59 feet; South 59 degrees 35 minutes 56 seconds West 243.46 feet; South 44 degrees 56 minutes 22 seconds West 125.28 feet; South 30 degrees 08 minutes 36 seconds West 118.10 feet; South 05 degrees 33 minutes 26 seconds West 106.06 feet; South 07 degrees 47 minutes 17 seconds East 83.83 feet; South 24 degrees 57 minutes 49 seconds East 143.53 feet; South 34 degrees 20 minutes 39 seconds East 306.90 feet to a 5/8" rebar iron pin found; THENCE leaving said northern top bank of Sweetwater Creek South 80 degrees 28 minutes 12 seconds West for a distance of 208.76 feet; THENCE South 09 degrees 31 minutes 48 seconds East for a distance of 37.86 feet; THENCE South 46 degrees 11 minutes 35 seconds West for a distance of 13.82 feet to a point; THENCE South 69 degrees 25 minutes 57 seconds West for a distance of 188.39 feet to a point; THENCE South 82 degrees 14 minutes 19 seconds West for a distance of 185.70 feet to a point; THENCE North 86 degrees 33 minutes 01 seconds West for a distance of 184.79 feet to a point; THENCE North 79 degrees 13 minutes 17 seconds West for a distance of 187.00 feet to a point; THENCE North 42 degrees 39 minutes 08 seconds West for a distance of 233.12 feet to a point; THENCE North 60 degrees 17 minutes 18 seconds West for a distance of 203.29 feet to a point; THENCE North 70 degrees 51 minutes 40 seconds West for a distance of 168.99 feet to a point; THENCE North 72 degrees 54 minutes 11 seconds West for a distance of 196.33 feet to a point; THENCE North 53 degrees 26 minutes 26 seconds West for a distance of 108.97 feet to a point; THENCE North 00 degrees 06 minutes 43 seconds West for a distance of 85.43 feet to a point; THENCE North 01 degrees 21 minutes 51 seconds East for a distance of 41.70 feet to a point; THENCE North 00 degrees 02 minutes 02 seconds West for a distance of 160.03 feet to a point; THENCE South 88 degrees 16 minutes 46 seconds East for a distance of 417.62 feet to an iron pin found; THENCE South 20 degrees 16 minutes 09 seconds East for a distance of 186.06 feet to an iron pin found; THENCE South 88 degrees 04 minutes 21

- E-1 -

seconds East for a distance of 292.98 feet to an iron pin found; THENCE North 00 degrees 32 minutes 20 seconds East for a distance of 622.72 feet to an iron pin set; THENCE North 25 degrees 49 minutes 41 seconds East for a distance of 171.44 feet to an iron pin set; THENCE North 20 degrees 24 minutes 03 seconds East for a distance of 173.29 feet to an iron pin set; THENCE North 51 degrees 10 minutes 16 seconds East for a distance of 150.04 feet to an iron pin set; THENCE North 81 degrees 12 minutes 22 seconds East for a distance of 115.11 feet to an iron pin set; THENCE North 77 degrees 51 minutes 21 seconds East for a distance of 17.20 feet to an iron pin set; THENCE North 23 degrees 57 minutes 26 seconds West for a distance of 897.33 feet to an iron pin set; THENCE along a curve to the left having a radius of 73.50 feet and an arc length of 131.12 feet, being subtended by a chord of North 18 degrees 02 minutes 03 seconds West for a distance of 114.41 feet to an iron pin set; THENCE along a curve to the right having a radius of 40.00 feet and an arc length of 31.54 feet, being subtended by a chord of North 46 degrees 32 minutes 57 seconds West for a distance of 30.73 feet to an iron pin set; THENCE North 23 degrees 57 minutes 26 seconds West for a distance of 396.56 feet to an iron pin set; THENCE North 16 degrees 04 minutes 19 seconds East for a distance of 61.09 feet to an iron pin set; THENCE North 64 degrees 46 minutes 21 seconds East for a distance of 66.01 feet to a 1" rebar found; THENCE North 65 degrees 52 minutes 49 seconds East for a distance of 360.55 feet to an iron pin set; THENCE South 23 degrees 19 minutes 15 seconds East for a distance of 86.47 feet to an iron pin set; THENCE South 61 degrees 32 minutes 55 seconds East for a distance of 122.74 feet to an iron pin set; THENCE South 85 degrees 08 minutes 46 seconds East for a distance of 102.87 feet to an iron pin set; THENCE North 71 degrees 16 minutes 39 seconds East for a distance of 66.94 feet to an iron pin set, said point being the TRUE POINT OF BEGINNING.

511977.001238 23710491.1

EXHIBIT F

CONTINUING LEASE GUARANTY

In consideration of the making of that certain Industrial Lease Agreement by and between BREIT INDUSTRIAL CANYON GA1B01 LLC, a Delaware limited liability company ("Landlord") and YRC INC., a Delaware corporation ("Tenant") covering space in the building located at 1250 Terminus Drive, Lithia Springs, Douglas County, Georgia 30122 (the "Lease"), and for the purpose of inducing Landlord to enter into and make the Lease, the undersigned hereby unconditionally guarantees the full and prompt payment of rent and all other sums required to be paid by Tenant under the Lease (including without limitation all rent payable with respect to the initial Premises and all expansion space) (the "Guaranteed Payments") and the full and faithful performance of all terms, conditions, covenants, obligations and agreements contained in the Lease on the Tenant's part to be performed (the "Guaranteed Obligations") and the undersigned further promises to pay all of Landlord's costs and expenses (including reasonable attorneys' fees) incurred in endeavoring to collect the Guaranteed Payments or to enforce the Guaranteed Obligations or incurred in enforcing this Guaranty.  All capitalized terms not defined herein shall have the meaning assigned to them in the Lease.

1.      Landlord may at any time and from time to time, without notice to or consent by the undersigned, take any or all of the following actions without affecting or impairing the liability and obligations of the undersigned on this Guaranty:

      (a)      grant an extension or extensions of time for payment of any Guaranteed Payment or time for performance of any Guaranteed Obligation;

      (b)      grant an indulgence or indulgences in any Guaranteed Payment or in the performance of any Guaranteed Obligation;

      (c)      modify or amend the Lease or any term thereof or any obligation of Tenant arising thereunder;

      (d)      consent to any assignment or assignments, sublease or subleases and successive assignments or subleases by Tenant;

      (e)      consent to an extension or extensions of the term of the Lease;

      (f)      accept other guarantors; and/or

      (g)      release any person primarily or secondarily liable hereunder or under the Lease or under any other guaranty of the Lease.

The liability of the undersigned under this Guaranty shall not be affected or impaired by any failure or delay by Landlord in enforcing any Guaranteed Payment or Guaranteed Obligation or this Guaranty or any security therefor or in exercising any right or power in respect thereto, or by any compromise, waiver, settlement, change, subordination, modification or disposition of any Guaranteed Payment or Guaranteed Obligation or of any security therefor.  In order to hold the undersigned liable hereunder, there shall be no obligation on the part of Landlord, at any time, to resort for payment to Tenant or to any other guaranty or to any security or other rights and remedies, and Landlord shall have the right to enforce this Guaranty irrespective of whether or not other proceedings or actions are pending or being taken seeking resort to or realization upon or from any of the foregoing.

The Guaranteed Obligations of the undersigned shall be irrevocable and unconditional, irrespective of the genuineness, validity, regularity or enforceability of the Lease or any security given for the Guaranteed Obligations or any circumstances which might otherwise constitute a legal or equitable discharge of a surety or the undersigned.  The undersigned waives the benefit of all principles or provisions of law,

- G-1 -

DocuSign Envelope ID: 43621777-9E2G-4F15-9602-40F6D4AB4GFA

statutory or otherwise, which are or might be in conflict with the terms of this Guaranty, and agrees that the Guaranteed Obligations of the undersigned shall not be affected by any circumstances, whether or not referred to in this Guaranty, which might otherwise constitute a legal or equitable discharge of a surety or the undersigned, except for payment and performance in full of the Guaranteed Obligations. Specifically, the undersigned waives the benefits of any right of discharge under any statute applicable to sureties and any other rights of sureties and the undersigned thereunder. Without limiting the generality of the foregoing, the undersigned agrees that the occurrence of any of the following events, whether they occur with or without notice or consent by the undersigned, will in no way release or impair any liability or obligation of the undersigned hereunder: (i) Landlord transfers Landlord's interest in the premises covered by the Lease or Landlord's rights under this Guaranty; (ii) the Lease or the premises described therein or the property within which the same are located are transferred in any foreclosure proceeding or deed in lieu of foreclosure; (iii) Tenant is released or discharged in any creditor's proceeding, receivership, bankruptcy or other proceeding; (iv) the liability of Tenant or Landlord's claim against the estate of Tenant in bankruptcy is impaired, limited or modified or any remedy for the enforcement of Tenant's said liability under the Lease, resulting from the operation of any present or future provision of the federal Bankruptcy Reform Act of 1978, as amended, or other statute or from the decision in any court, is impaired, limited, or modified; or (v) the Lease is rejected or disaffirmed in any such proceeding, or the Lease is assumed or assumed and assigned in any such bankruptcy proceeding. If, as a result of such proceedings, Landlord is forced to refund any payment made by Tenant to Landlord because it is found to be a preference or for any other reason, the undersigned hereby covenants to pay such amount on demand.

2.    The undersigned waives all diligence in collection or in protection of any security, presentment, protest, demand, notice of dishonor or default, notice of acceptance of this Guaranty, notice of any extensions granted or other action taken in reliance hereon and all demands and notices of any kind in connection with this Guaranty or any Guaranteed Payment or Guaranteed Obligation.

3.    The undersigned hereby acknowledges full and complete notice and knowledge of all the terms, conditions, covenants, obligations and agreements of the Lease.

4.    The payment by the undersigned of any amount pursuant to this Guaranty shall not in any way entitle the undersigned to any right, title or interest (whether by subrogation or otherwise) of Tenant under the Lease or to any security being held for any Guaranteed Payment or Guaranteed Obligation.

5.    This Guaranty shall be continuing, absolute and unconditional and remain in full force and effect until all Guaranteed Payments are made, all Guaranteed Obligations are performed and all obligations of the undersigned under this Guaranty are fulfilled.

6.    This Guaranty also shall bind the heirs, personal representatives, successors and assigns of the undersigned and shall inure to the benefit of Landlord, its successors and assigns, including any successor in connection with any foreclosure affecting the building in which the premises under the Lease are located.

7.    This Guaranty shall be construed according to the laws of the State of Georgia and shall be performed in the county in the first paragraph of this Guaranty. The situs for the resolutions (including any judicial proceedings) of any disputes arising under or relating to this Guaranty shall be the county referenced in the first paragraph of this Guaranty.

8.    If this Guaranty is executed by more than one (1) person or entity, all singular nouns and verbs herein relating to the undersigned shall include the plural number, the obligations of the several guarantors shall be joint and several and Landlord may enforce this Guaranty against any one (1) or more guarantors without joinder of any other guarantor hereunder.

511977.001238 23710491.1

9.  Landlord and the undersigned intend and believe that each provision of this Guaranty comports with all applicable law. However, if any provision of this Guaranty is found by a court to be invalid for any reason, the remainder of this Guaranty shall continue in full force and effect and the invalid provision shall be construed as if it were not contained herein.

10.  The undersigned hereby warrants and represents unto Landlord that: (a) this Guaranty is a legal, valid and binding obligation of the undersigned, enforceable against the undersigned in accordance with its terms; (b) the execution, delivery and performance by the undersigned of this Guaranty do not and will not violate any authority having the force of law or any indenture, agreement, or other instrument to which the undersigned is a party or by which the undersigned or any of the properties or assets of the undersigned are or may be bound; (c) all balance sheets, net worth statements, financial statements and reports, and other financial data which have heretofore been given to Landlord with respect to the undersigned and Tenant fairly and accurately present the financial condition of the undersigned and Tenant as of the date thereof, and, since the date thereof, there has been no material adverse change in the financial condition of the undersigned or Tenant; (d) there are no legal or arbitration proceedings, material adverse claims, or demands pending against, or to the knowledge of the undersigned threatened against the undersigned or Tenant or against any of the assets or properties of the undersigned or Tenant; (e) no event (including, specifically, the undersigned's execution and delivery of this Guaranty) has occurred which, with the lapse of time or action by a third party (or both), could result in the undersigned's breach or default under any agreement binding upon the undersigned.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Guaranty to Landlord as of the date of the Lease.

Address:

YRC Worldwide Inc.
Real Estate and Properties – Mail Stop A650
10990 Roe Avenue
Overland Park, KS 66211
Attention: Jeffrey H. Coltrin

with a copy to:

YRC Worldwide Inc.
Legal Department – Mail Stop A305
10990 Roe Avenue
Overland Park, KS 66211
Attention: Assistant General Counsel

with a copy to:

Husch Blackwell LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Attention: William M. Hof, Esq.

YRC WORLDWIDE INC.,
a Delaware corporation

By: _____
Name: JEFFREY H. COLTRIN
Title: V.P. Properties

511977.001238 23710491.1