# **EXHIBIT A**

Application for Resolution of a Claim – Injury
February 2020 Edition

Filed:
via LMS - 4/5/2023

# KENTUCKY DEPARTMENT OF WORKERS' CLAIMS

## Application for Resolution of a Claim - Injury

**Claim No.** _____

| Plaintiff | | Defendant |
|---|---|---|
| Steven Hensley | vs. | USF Holland |
| Plaintiff | | Defendant/Employer (Business Name) |
| *******6227 | | 219 Transport Court |
| Social Security Number/ Green Card | | Defendant/ Employer Mailing Address |
| 12/4/1971      M | | LEXINGTON KY 40511 |
| Birth Date     Gender | | City/State/Postal Code |
| 370 Persimmon Way | | Sedgwick |
| Plaintiff Mailing Address | | Insurance Carrier |
| HARRODSBURG KY 40330 | | PO Box 14434 |
| City/State/Postal Code | | Insurance Carrier Mailing Address |
| ☐ Outside United States | | LEXINGTON, KY 40512 |
| UNITED STATES | | City/State/Postal Code |
| Country | | |
| (859) 659-4287 | | |
| Plaintiff's Phone Number | | |
| | | |
| Email Address | | |
| Truck driver  ns | | |
| Occupation | | |

## Additional Parties

| Additional Party | Additional Party |
|---|---|
| Mailing Address | Mailing Address |
| City/State/Postal Code | City/State/Postal Code |
| Reason for Joinder: | Reason for Joinder: |

I. Nature of Injury

1. Date and location of accident/injury:

   | 4/6/2020 | LEXINGTON, KY 40511 |
   |---|---|
   | Date of Injury | Location of Injury (City/State/Postal Code) |

   [X] Plaintiff states that he/she was injured within the scope and course of employment with defendant employer on the above date at the above location.

2. Describe how the accident/injury occurred:
   Plaintiff was injured when as he was helping to unload a truck with a pallet jack when one of the pins broke and he was pinned against the wall of the truck injuring his right shoulder, arm, and hand

   Cause of Injury: CAUGHT IN, UNDER OR BETWEEN MACHINE OR MACHINERY

3. Body part injured: MULTIPLE UPPER EXTREMITIES

4. When and by what means did the plaintiff give notice of injury to the employer?
   verbally

5. Describe medical treatment, if any:
   Urgent care, physical therapy, orthopedic consult with follow ups, arthroscopic repair of the supraspinatus and infraspinatus tears with subacromial decompression of the superior labrum, and radiology testing.

6. Name and address (city/state/postal code) of physician whose report will be provided:
   Dr. Mark Barrett, 811 S 2nd Street, Suite 100, Louisville, KY 40203

7. Will an interpreter be needed for the formal hearing? (Yes / No)   No
   If yes, in which language?

8. Dependents

   Injured worker is deceased? (Yes / No)   No

   If deceased, dependent information is required for a deceased worker. If work injury resulted in the death of claimant, attach/provide/upload Form F in addition to the application for Resolution of Claim.

9. Have you previously filed for or received workers' compensation benefits in Kentucky? (Yes / No)   No
   If yes, please provide the following information:

   | Claim Number | Date of Injury | Nature of Injury/Disease | Awards/Benefits |
   |---|---|---|---|
   |  |  |  |  |
   |  |  |  |  |
   |  |  |  |  |

   If not a Kentucky claim, please provide the state in which you were awarded benefits:

10. Was there concurrent employment at the time of injury? (Yes / No)  No

11. Name and address of concurrent employer:

    Concurrent Employer Name  _____
    Concurrent Employer City  _____
    Concurrent Employer State  _____   Postal Code  _____

12. Has the plaintiff worked since the injury? (Yes / No)  No

13. Name and address of current employer and description of job currently being performed:

    Current Employer Name  _____
    Current Employer City  _____
    Current Employer State  _____   Postal Code  _____
    Description of Job Performed:

14. Highest grade completed in school?  _____

15. G.E.D. Awarded?    ☐ Yes    ☒ No

16. Professional or Vocational Degrees, Certificates, or Licenses:

17. Are you alleging a violation of a safety rule/regulation pursuant to KRS 342.165? (Yes / No)  No
    If yes, submit form SVC with the Application for Resolution of Claim.

**NOTICE**

Any person who knowingly and with intent to defraud any insurance company or other person files a statement or claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

By entering your name below, you are confirming the accuracy of this form to the best of your knowledge.

| /s/ James R. Martin | Attorney |
|---|---|
| This form prepared and submitted by | Relationship to injured worker |
| (859) 899-8116 | jmartin@forthepeople.com |
| Submitter Phone Number | Submitter Email Address |

_____
Plaintiff Signature

FORM 104
October 2016 Edition

# KENTUCKY DEPARTMENT OF WORKERS' CLAIMS
# PLAINTIFF'S EMPLOYMENT HISTORY

| Name: Steven Hensley | | Social Security Number / Green Card: ▮▮▮▮ 6227 | | | |
|---|---|---|---|---|---|
| Name and Address of Employer (Begin with most recent) | Type of Industry | Occupation | Period of Employment (Begin date / End date) | Exposure to substance causing occupational disease (specify substance) | Was an injury sustained while working for this employer? |
| USF Holland<br>219 Transport Court<br>Lexington, KY 40511 | Delivery | CDL Driver | 07/2011 – 04/2020 | No | Yes |
| UPS<br>1702 Mercer Road<br>Lexington, KY 40511 | Delivery | CDL Driver | 08/2010 – 10/2010 | No | No |
| ABF Freight<br>1057 Nandino Blvd.<br>Lexington, KY 40511 | Delivery | CDL Driver | 06/2010 – 08/2010 | No | No |
| IMI<br>Lexington, KY | Concrete company | CDL Driver | 06/2003 – 04/2010 | No | No |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

I hereby certify that the above information is true and correct to the best of my knowledge and belief.

_____

Plaintiff's Signature                                         Date

FORM 105
October 2016 Edition

# KENTUCKY DEPARTMENT OF WORKERS' CLAIMS
# PLAINTIFF'S CHRONOLOGICAL MEDICAL HISTORY

| Plaintiff Name: Steven Hensley | Claim Number: |
|---|---|

*Include all treatment for work injury as well as all prior treatment.*
(Begin with most recent treatment)

| Name & Address of Physician or Hospital | Date Treatment Received | Nature of Injury or Disease and Part of body affected? | Still under a doctor's care? |
|---|---|---|---|
| **Danville Family Medicine**<br>**109 Daniel Drive**<br>**Danville, KY 40422** | **02/2023** | **Diabetes** | **Yes** |
| **Dr. Mark Barrett**<br>**Barrett & Associates Medicals**<br>**811 S 2nd Street, Suite 100**<br>**Louisville, KY 40203** | **01/19/2023** | **Independent medical examination, right shoulder, right arm, right hand** | **No** |
| **Ephraim McDowell James B Haggin Hospital**<br>**464 Linden Avenue**<br>**Harrodsburg, KY 40330** | **09/2022** | **Diabetes** | **No** |
| **Kleinert Kutz & Associates Hand Care**<br>**230 Fountain Court, Suite 375**<br>**Lexington, KY 40509** | **07/2022 – 08/2022** | **Right hand** | **No** |
| **Dr. Gary T Bray**<br>**Kentucky Bone & Joint Surgeons**<br>**216 Fountain Court, Suite 250**<br>**Lexington, KY 40509** | **06/2021; 05/2022** | **Independent medical examination** | **No** |
| **McDowell Wellness Center**<br>**1107 Ben Ali Drive**<br>**Danville, KY 40422** | **12/2020 – 08/2022** | **Right shoulder** | **No** |
| **Baptist Physicians Surgery Center**<br>**1720 Nicholasville Road, Suite 101**<br>**Lexington, KY 40503** | **08/14/2020; 10/08/2021** | **Right shoulder arthroscopy** | **no** |
| **Baptist Health Lexington – Alysheba Way**<br>**1740 Nicholasville Road**<br>**Lexington, KY 40503** | **07/2020 - 10/2021** | **Pre-Admission Testing, Right shoulder MRI,** | **No** |
| **Baptist Health Orthopedics & Sports Medicine**<br>**1760 Nicholasville Road, Suite 101**<br>**Lexington, KY 40503** | **07/2020 – 10/2022** | **Right shoulder** | **No** |
| **Bluegrass Regional Imaging**<br>**1401 Harrodsburg Road, Suite C-45**<br>**Lexington, KY 40504** | **04/2020** | **CT of Right shoulder** | **No** |
| **Danville Surgical Associates**<br>**210 W Main Street**<br>**Danville, KY 40422** | **08/2015** | **Hernia repair** | **No** |
| **Dr. Talwalker**<br>**Baptist Health Orthopedics** | **07/2013** | **Left knee** | **No** |

| **1760 Nicholasville Road, Suite 101** <br> **Lexington, KY 40503** | | | |
|---|---|---|---|

I hereby certify that the above information is true and correct to the best of my knowledge and belief.

_____
Plaintiff's Signature                                                                         Date

FORM 106
ADOPTED JULY 2003

COMMONWEALTH OF KENTUCKY
DEPARTMENT OF WORKERS' CLAIMS
CLAIM NO:_____

MEDICAL WAIVER AND CONSENT

I, _____ having filed a claim for workers' compensation benefits, do hereby waive any physician-patient, psychiatrist-patient, or chiropractor-patient privilege I may have and hereby authorize any health care provider to furnish to myself, my attorney, my employer, its workers' compensation carrier or its agent, the Division of Workers' Compensation Funds, the Uninsured Employers' Fund, or Administrative Law Judge any information or written material reasonably related to my work-related injury occurring on or about _____ any medical information relevant to the claim including past history of complaints of, or treatment of, a condition similar to that presented in this claim or other conditions related to the same body part.

Such information is being disclosed to the purpose of facilitating my claim for Kentucky workers' compensation benefits.

I understand I have the right to revoke this authorization in writing at any time, by sending written notification to each individual health care provider, but such revocation will not have any affect on actions taken prior to revocation. Moreover, inasmuch as KRS 342.020(8) requires a medical waiver to be executed, revocation may result in suspension or delay of the workers' compensation claim.

I understand that no medical provider may condition treatment or payment on whether I sign this medical waiver; however, I further understand that failure to sign this medical waiver may result in suspension or delay of the workers' compensation claim.

I understand that the information used or disclosed pursuant to this medical waiver may be subject to re-disclosure by the recipient.

This authorization shall remain valid for 180 days following its execution. A photocopy of the authorization may be accepted in lieu of the original.

The authorization includes, but is not restricted to, a right to review and obtain all copies of all records, x-rays, x-ray reports, medical charts, prescriptions, diagnoses, opinions and courses of treatment.

Signed at _____, Kentucky, this _____ day of _____, 20_____.

*Steven Henry Hensley*
_____
Signature of Patient Or Personal Representative

Social Security Number: _____

*Tuesday L Knolle*
_____
Witness Signature

_____
Description Of Personal Representative's Authority

## KENTUCKY WORKERS' COMPENSATION AND HIPAA

On April 14, 2003, the federal Health Insurance Portability and Accountability Act [HIPAA] privacy regulation will take effect. This regulation limits the situations in which medical providers may release patient information, unless the information is necessary for the purpose of treatment, payment, or health care operations. <u>Moreover, it is important to note that disclosures for workers' compensation are in most instances exempt from HIPAA privacy requirements</u>. The exact wording is as follows: "A covered entity may disclose protected health information as authorized by and to the extent necessary to comply with laws relating to workers' compensation…"

Since HIPAA defers to state law regarding disclosures relating to workers' compensation, it is important for claimants and medical providers to know what Kentucky law requires for disclosure of patient information. An employee who reports a work injury or who files for workers compensation benefits must "execute a waiver and consent of any physician-patient, psychiatrist-patient, or chiropractor-patient privilege with respect to any condition or complaint reasonably related to the condition for which the employee claims compensation." KRS 342.020 (8). Kentucky law further states that once this Form 106 is signed, any health care provider "shall, <u>within a reasonable time</u> after written request by the employee, employer, workers' compensation insurer [or its agent or assignee], special fund, uninsured employers' fund, or the administrative law judge, provide the **requesting party** with any information or written material reasonably related to any injury or disease for which the employee claims compensation."

Once the Form 106 is signed, health care providers may disclose information as set out in Kentucky law. Another section of the regulation allows release of information pursuant to an administrative or judicial order or subpoena, provided that there has been a reasonable effort to notify the injured worker [or his attorney] that such a request has been made. Should there be questions regarding disclosures pursuant to this form, appropriate legal counsel should be consulted or you can contact the Department of Workers' Claims at 1-800 554-8601.

January 27, 2023

Barrett and Associates Medical
811 S 2nd Street, Suite 100
Louisville, KY  40203

James Martin
Morgan & Morgan
1507 US-23
Prestonsburg, KY 41653

RE:  Steven Hensley
DOB:  12-4-71
DOI:  4-6-20

Dear Mr. Martin,

Thank you for asking me to do an independent medical examination on your client Mr. Steven Hensley.  On 1-19-23 I saw him in my offices at 811 S 2nd Street in Louisville, KY, at which time I took his history and did a physical exam.  I have also reviewed records concerning his case which you have sent to me from Baptist Health Orthopedics & Sports Medicine, Kleinert Kutz Hand Center, McDowell Wellness Center, Baptist Health Lexington, and an IME done by Dr. Gary Bray.  Mr. Hensley understands that I am seeing him as an independent examiner and not as a treating physician.

**RIGHT SHOULDER**

According to the patient's history and the medical record, on 4-6-20 while working as a truck driver he was helping unload the back of the semi with a pallet jack.  One of the pins on the pallet jack broke and the load (about 2800 pounds) began to slip forward toward the edge of the trailer.  This caused him to be pinned against the wall of the truck at his right shoulder/arm/hand.  He was seen at Concentra and did some physical therapy with no improvement (records not included).  He was referred to orthopedist Dr. Janak Talwalkar 7-2-20 with the history given of onset of right shoulder pain after the work accident.  On exam he had tenderness on rotator cuff testing.  An MRI had been done 6-17-20 which

Hensley, S. 1

showed partial thickness supraspinatus and infraspinatus tears.  Dr. Talwalkar believed the supraspinatus tear was near complete.  He agreed that this was a traumatic tear of the right rotator cuff from a work related injury.  He recommended arthroscopic repair.

On 8-14-20 Dr. Talwalkar did arthroscopic repair of the supraspinatus and infraspinatus tears with subacromial decompression and debridement of the superior labrum without complication.  His pre-op diagnosis was work related right rotator cuff injury with rotator cuff tear; post-op was partial thickness supra and infraspinatus tear with degenerative superior labral tear.

Mr. Hensley was seen 9-1-20 in follow up with moderate pain but wounds looking good and had sutures removed.  He was to continue wearing the operative sling.  He returned 9-22-20 with more severe pain.  Work comp had not yet approved his post-op therapy.  He denied any new injury but had burning pain with movement.  He had not begun therapy and it was thought that the stiffness and inflammation may have been the source of his increased pain.  He was started on gabapentin for pain (possible brachial neuritis) and plans were to begin PT.

He was seen next 10-8-20 with no relief on the gabapentin, but he did get pain relief with hydrocodone.  Therapy had still not begun, but he had been doing home exercises.  Dr. Talwalkar wrote that "plan will be to appeal to his Worker's Comp to try and get physical therapy approved ASAP.  Patient is falling behind by not starting range of motion exercises and runs a high risk of getting stiff postoperatively."  Gabapentin was stopped and he was kept on the hydrocodone.

On 11-5-20 he was still having pain and had not had therapy.  Dr. Talwalkar wrote "the patient has developed adhesive capsulitis secondary to his lack of consistent physical therapy.  None of this is his fault."  It was noted that his DOT license had expired.  On 1-14-21 his symptoms were worsening and new MRI was ordered with concerns that he would have to have adhesolysis done.  On 2-18-21 he had an MRI arthrogram which demonstrated his rotator cuff repair and no evidence of reinjury but positive tendinopathy, moderate fluid in the joint and severe inferior capsular thickening of adhesive capsulitis.  There was evidence of a SLAP tear of the anterior glenoid labrum, but no periosteal stripping.

Mr. Hensley was seen 2-25-21 with persistent pain and stiffness.  Dr. Talwalkar recommended manipulation under anesthesia and arthroscopic lysis of adhesions.

Mr. Hensley was sent for an IME by work comp and on 4-15-21 was seen by orthopedist Dr. Gary Bray.  In addition to the shoulder complaints beginning with the work incident, Dr. Bray makes note of onset of right hand complaints as well where he had a prior ORIF of the hand and now complained of pain and decreased grip.  He wrote that "lack of treatment contributed to the development of adhesive capsulitis.  This is not a reinjury but a recognized postoperative complication leading to loss of joint motion."

On 7-27-21 he saw Dr. Talwalkar who noted Dr. Bray's opinion that adhesolysis should be done.  He was very firm in his note that post-op therapy would need to be guaranteed, or else surgery could actually make him worse.

On 10-8-21 Dr. Talwalkar did right shoulder arthroscopy with arthroscopic lysis of adhesions and manipulation under anesthesia without complication.

Mr. Hensley was seen back in clinic 10-26-21 and reported two physical therapy sessions, 10-22-21 and 10-26-21.  Sutures were removed and he was encouraged to be aggressive with range of motion and stretching.  On 11-30-21 he was doing some better but still needed more therapy.  On 1-27-22 he saw Dr. Talwalkar and it was noted that he had worsening of his diabetes and had begun insulin, but that it had kept him from being consistent with therapy, but also there were still problems apparently with therapy approval.

Dr. Talwalkar wrote a letter 2-15-22 stating "it is my medical opinion that it's imperative that Steven Hensley attends Physical Therapy to help recover from surgery.   Steve is also diabetic and returning to work at this time is slowing down his progression rate."

On 3-10-22 he saw Dr. Talwalkar again and the clinic note states that "physical therapy has not been approved.  Predictably, the patient is stiff and sore and complaining of anterior lateral pain."  Dr. Talwalkar further writes "we were vigilant about trying to get postoperative PT arranged ahead of time and we were assured by his case manager that this was the case.  After his surgery, therapy

was for some reason not [approved] and as a result the patient now has recurrent stiffness and chronic pain. . . pain management may be something he needs down the road."

On 4-19-22 he was still having pain and therapy had not been approved. Dr. Talwalkar wrote "he will need physical therapy 3 times a week for the next 6 weeks and hopefully this will be a gradual improvement over the next 6 to 12 weeks realistically."

Mr. Hensley saw Dr. Bray for another IME 5-17-22. Dr. Bray wrote that "immediate physical therapy after manipulation under anesthesia is essential" and that Dr. Talwalkar had requested further physical therapy which had not been approved. He further wrote that he had ongoing significant limitation of range of motion and that there was an "inordinate delay in starting his physical therapy." He then opined that "it would be my opinion he would benefit from a third procedure including arthroscopy and manipulation under anesthesia with immediate daily physical therapy for two weeks and then three times a week for another month in order to minimize the recurrence of his capsulitis. If Dr. Talwalkar opts not to recommend that surgical procedure, then I think intense physical therapy for one month and the continued home exercise program monitored by physical therapy once a week would bring him to maximum medical improvement. HE cannot return to his previous level of work at this time."

Mr. Hensley saw Dr. Talwalkar 5-31-22 and noted that he had improving strength but still limited range of motion. Dr. Talwalkar wrote "patient has again developed postop stiffness due to lack of physical therapy. Patient will be given a prescription to try 1 last time to get into physical therapy and if this will not be approved or cannot be facilitated, I will see him back and put him at MMI. . . patient not a candidate for a glenohumeral injection with steroid because of his diabetes."

On 8-2-22 he saw Dr. Talwalkar and reported that 6 PT visits had been approved. Dr. Talwalkar did not want to risk another operation, not trusting that he would get adequate postop therapy. On 9-1-22 he was getting "some" therapy and had also been trying cupping for pain control.

Mr. Hensley saw Dr. Talwalkar 10-25-22 with some improvement in physical and aquatic therapy. Dr. Talwalkar put him at MMI but did recommend he do as much therapy as would be allowed still. He recommended that Mr. Hensley have an impairment rating done for his loss of motion.

**RIGHT HAND**

Mr. Hensley does relate that his right hand was crushed in the 4-6-20 work incident. He had a prior history of ORIF for a fracture of the right 5th metacarpal but there are no records with details of this.

On 7-20-22 Mr. Hensley saw hand surgeon Dr. Margaret Napolitano at Kleinert Kutz. History states that he had right hand pain and swelling following a crush injury at work and had persistent difficulty since then using his right (dominant) hand, specifically with decreased range of motion especially in the small, ring, and long fingers. X-rays were done showing a prior fifth CMC joint arthrodesis that appeared to be nonunion. The compression screw was intact but with slight bowing. On exam he had tenderness to palpation over the proximal metacarpal region of the small, ring, long, and index fingers, along with minimal tenderness at the fifth CMC joint, but had significant edema there. He had full wrist range of motion. There was no intrinsic atrophy. She was concerned about carpal tunnel syndrome and EMG/NCV was ordered. This was done on 8-4-22 but I do not have the official report. Dr. Napolitano saw him again and says that the study shows "pervasive upper and lower extremity [i.e., upper arm and forearm] sensorimotor neuropathy all 3 nerves." She then writes "I don't think his pain is nerve mediated. We cannot image him with an MRI because of the screw. I strongly recommend he return to Dr. Burgess [surgeon who did the operation 2 years prior to injury?]. The screw is bending and there is a non-union at the right 5th CMC joint.

**PAST HISTORY**

Past history is positive for a 2019 right hand fracture requiring open reduction and internal fixation. He has had a right inguinal hernia repair and a large umbilical hernia repair with mesh. He has had left knee operations twice. In 2004 he had left shoulder surgery for a torn labrum. He has insulin dependent diabetes.

**PRESENT ILLNESS**

Mr. Hensley tells me that he has ongoing pain and decreased range of motion and function in the right upper extremity.  It is his belief that he would not be able to return to CDL driving since the loading/unloading and backing process requires vigorous use of the right shoulder and hand to maneuver the truck into proper position.  He relates that he had an exam to renew his CDL license but failed it because of his shoulder pain and decreased range of motion.  One of the things that bothers him most on a personal level is that he can no longer play the guitar because of his right hand pain, which used to be a prominent part of his activities of daily living.  He is on gabapentin, but his understanding is that it is for his chronic foot pain/tingling from the diabetes.

**PHYSICAL EXAM**

This is a pleasant and cooperative gentleman who reports being 5 feet 9 inches tall and weighing 207 pounds.  Salient positives on exam:  There is tenderness to palpation in the right shoulder at the glenohumeral joint and AC joint.  He has a positive Neer, Hawkins, and empty can sign.  Active ROM in the right shoulder is flexion 90 degrees, abduction 90, internal rotation 30, external rotation 32, adduction 0, and extension 10.  Left shoulder exam shows full active ROM and strength.

There is tenderness in the right hand at the dorsal 5th CMC joint with a slight dorsal deformity.  Left hand is nontender with intact intrinsic musculature.

He has grossly reduced grip in the right hand as compared to the left, but full ROM against gravity.  Jamar dynamometer is used to assess grip strength with findings on the right at position 1 of 15, 20, 25; at 2 of 35, 40,45; at 3 of 35, 40, 40; at 4 of 35,35,35; at 5 of 35, 30, 35.  On the left he has results at position 1 of 95,95,95; at 2 of 115,120,125; at 3 of 100,105,100; at 4 of 100,100,95; at 5 of 85, 85, 85.  These average to right 20,40,38,35,33; on the left 95,120,102,98,85.

Neurological exam is grossly intact with no demonstrable deficits.

**IMPRESSION**

1) Right rotator cuff tear treated with arthroscopic repair and subsequent adhesive capsulitis secondary to inadequate physical therapy.
2) Chronic right hand pain and decreased grip.

**DISCUSSION**

Mr. Hensley did not have right shoulder complaints until the 4-6-20 work accident and it is my opinion that was the cause of his injury and subsequent clinical course as outlined above. I believe that his treatment has been reasonable and necessary. I agree with his treating physician Dr. Talwalkar and the IME physician Dr. Bray that inadequate physical therapy led to developing adhesive capsulitis, sadly twice, and that his current active range of motion is permanently decreased. I do not believe that further therapy at this point would make a difference.

The hand complaints are a bit more problematic since he had a prior injury 2 years before the work accident of 4-6-20 and by X-ray this surgery resulted in a non-union. There is no objective documentation of pre-injury hand strength other than the patient's description and volunteered history that he had full or near-full use of his right hand before 4-6-20; at minimum he was able to drive his truck and play the guitar, so this sounds reasonable. I can't say with certainty that the crush injury caused the screw to become bent since there are no pre-injury records or X-rays to document this, but Mr. Hensley avows that he did not have the dorsal hand bump and tenderness until the crush injury. That being the case I would say that his right hand injury at least had a 25% pre-existing component because of the non-union, which was not related to the 4-6-20 injury. I do believe he would do well to have a hand surgeon assess him for possible further treatment of the non-union (Dr. Napolitano recommended he see his prior hand surgeon), but let me be clear personally I doubt that further surgery would be advisable with his current level of decreased use.

I would place him at MMI as of his last visit with Dr. Talwalkar 10-25-22.

According to the *5th Edition AMA Guides to the Evaluation of Permanent Impairment* 16-40/43/46 pages 476-9 he would have upper extremity impairments from loss of active ROM in flexion of 6%, abduction 4%, internal

rotation 4%, eternal rotation 1%, adduction 2%, extension 2% for a total 19% upper extremity impairment for the shoulder.

Grip strength testing at the strongest position (#2) to compute loss of strength index per the formula page 509 gives 120 – 40/120 = 67%.  Per Table 16-34 this would be an upper extremity impairment of 30% for the hand and I have assigned this as 25% pre-existing, which would be a total then of current 22% upper extremity impairment for the hand.

These values are combined 19 + 22 = 37% total upper extremity impairment per the Combined Values Chart page 604, which is a 22% whole person impairment.

From his description of the actions necessary to drive his truck I do not believe he could return to his former work as a CDL driver.

Please note that the above opinions are given within a reasonable degree of medical probability.  If I can provide any further help, please let me know.

Sincerely,

Mark D. Barrett, M.D.