### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*, | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 575, 968, 1268** |

### OBJECTION OF 1313 GRAND STREET REALTY, LLC TO (A) THE PROPOSED SALE ORDER AND ASSUMPTION AND ASSIGNMENT LEASE; (B) CURE COSTS PROPOSED IN CONNECTION WITH THE ASSIGNMENT OF LEASE; AND (C) PROPOSED ADEQUATE ASSURANCES OF FUTURE PERFORMANCE

1313 Grand Street Realty, LLC ("Landlord"), by its undersigned attorneys, respectfully submits this objection to: (a) the proposed sale order and assumption and assignment of the Landlord's lease; (b) the cure costs proposed in connection with the assignment of the lease; and (c) the proposed adequate assurances of future performance, and respectfully states as follows:

### Background

1.      On August 6 and 7, 2023 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States District Court for the District of Delaware (the "Court").

2.      As of the Petition Date, Landlord and YRC Inc., d/b/a YRC Freight, one of the Debtors, were parties to that certain Lease Agreement dated as of January 30, 2009 concerning real property located at 1313 Grand Street, Brooklyn, New York 11211, as amended (the "Lease").[1]

---

[1]      The Lease was originally entered into between NATMI Truck Terminals, LLC ("NATMI") and, by Assignment of Lease dated January 24, 2013, NATMI assigned its rights under the Lease to Landlord.

3.      On September 15, 2023, the Court entered the *Order (I)(A) Approving the Bidding Procedures for the Sale or Sales of the Debtors' Assets; (B) Scheduling Auctions and Approving the Form and Manner of Notice Thereof; (C) Scheduling Sale Hearings and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 575] (the "Bidding Procedures Order"), which approved, among other things, the procedures by which the Debtors may solicit and pursue one or more sales of the Debtors' assets pursuant to 11 U.S.C. § 363.

4.      On October 26, 2023, the Debtors filed the *Notice of Potential Assumption or Assumption and Assignment of Certain Contracts or Leases Associated with the Non-Rolling Stock Assets* [Docket No. 968] (the "Cure Notice").  Pursuant to the Cure Notice, the Debtors listed the cure amount for the Lease as $95,202.00, which represents the unpaid rent for the month of August 2023.

5.      On November 8, 2023, Landlord filed its Objection the Cure Notice [Docket No. 1072] (the "Cure Objection"), objecting to the cure amount identified in the Cure Notice and reserving all rights to any proposed assumption and assignment of the Lease.  Pursuant to the Cure Objection, Landlord asserted that, as of November 8, 2023, cure costs to assume and assign the Lease were at least $300,846.40.

6.      After submitting its opening bid, Landlord was deemed a "qualified bidder" and participated in the auction for the Lease held on November 28, 2023.  After the auction the Debtors filed their *Notice of Winning Bidders And, If Applicable, Back-up Bidders With Respect to Certain of the Debtors' Real Property Assets* [Docket No. 1268] (the "Winning Bidder

2

Notice"). Pursuant to an exhibit attached to the Winning Bidder Notice, the Debtors gave notice

that they (a) select XPO, Inc. ("XPO") as the bidder with the highest and best bid for the Lease

and (b) intend to seek this Court's approval of the assumption and assignment of the Lease to

XPO.

7.      On December 6, 20223, the Debtors filed their *Notice of Filing of Proposed*

*Order (i) Approving Certain Asset Purchase Agreements; (ii) Authorizing and Approving Sales*

*of Certain Real Property Assets of the Debtors, Free and Clear of Liens, Claims, Interests, and*

*Encumbrances, in Each Case Pursuant to the Applicable Asset Purchase Agreement; (iii)*

*Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired*

*Leases in Connection Therewith, in Each Case as Applicable Pursuant to the Applicable Asset*

*Purchase Agreement; and (iv) Granting Related Relief* [Docket No. 1285], which included a

copy of the proposed sale order attached as Exhibit 1 thereto (the "Sale Order").

8.      Also on December 6, 2023, the Debtors filed their *Notice of Filing of Asset*

*Purchase Agreement Dated as of December 4, 2023 Between the Debtors and XPO, Inc.* [Docket

No. 1286] (the "APA Notice"). The APA Notice included a copy of the *Asset Purchase*

*Agreement Dated as of December 4, 2023 Between XPO, Inc., as Purchaser, and Yellow*

*Corporation and its Subsidiaries Named Therein, as Sellers (as may be amended, modified, or*

*supplemented from time to time, including all exhibits and schedules thereto)* (the "XPO Asset

Purchase Agreement").

**Objection**

A.  The Debtors Failed to Satisfy Their Burden on the Sale and Assignment of the Lease

9.      Approval of a sale of assets or assumption and assignment of executory contracts

or leases under the Bankruptcy Code requires a debtor to establish that the proposed sale is fair

and equitable, in the best interests of the estate and proposed in good faith.  *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).  The Debtors are unable to uphold their burden for the assignment of the Lease to XPO.

10.    In accordance with the Bid Procedures Order, Landlord submitted a bid for the Lease on November 2, 2023, one week before the November 9, 2023 bid deadline.  Landlord was not informed until early in the morning on Saturday, November 25, 2023 that it was deemed a qualified bidder and could participate in the virtual auction for the Lease, to commence less than three days later on November 28, 2023.

11.    Notwithstanding its qualified bidder status, Landlord was not informed of the opening bid requirements until the evening of November 27, 2023, less than 24 hours prior to the auction.  At that time, Landlord was informed that if it wished to participate in the auction, it would have to submit an opening bid of at least $2.92 million by 9:00 a.m. on November 28, 2023.  Landlord was also informed that a bidder had submitted a "package" bid for the Lease and certain other properties, but no other information was provided regarding the package of properties, the amount of the package bid or the identity of the package bidder.

12.    At 8:00 a.m. (EST) on November 28, Landlord submitted its opening bid for the Lease in the amount of $2.92 million cash, plus the waiver of all cure amounts (which, according to the Cure Objection, are in excess of $300,000).  For the next several hours, Landlord was provided with sporadic email notices that if it wished to continue with the auction and bid on the Lease, it would have to raise its bid.  The email notices informed Landlord that it was the highest single bidder for the Lease and it was bidding against a "package" bidder for the Lease and other properties, but again provided no other information about the package bidder, the other properties included in the package and how the Debtors were allocating the package bidder offer.

13.     For the next several hours, Landlord submitted several higher bids and remained a participant in the auction.  At approximately 1:00 p.m. (EST), Landlord submitted an increased cash bid of $5.1 million plus the waiver of cure amounts (the "Landlord Offer").

14.     At approximately 4:35 p.m. (EST), Landlord was informed by email that the highest bid for the Lease was $7.5 million, which had been submitted by the "package" bidder, and that if Landlord wanted to continue with the auction, it would have to raise its bid to at least $8.65 million.  Again, no information was provided regarding the identity of the package bidder, the aggregate amount of the package bid and how the Debtors were allocating the package bid to the various properties, including the Lease.  Given the lack of information about the other bids and bidders for the Lease, Landlord held firm with the Landlord Offer.

15.     Late in the evening on November 28, 2023, Landlord was informed that it was not the winning bidder for the Lease.  No other information was provided at that time about the winning bidder and the consideration for the Lease.  Pursuant to the Bid Procedures Order, the Debtors were obligated to provide Landlord with notice of the winning bidder for the Lease on or before December 1, 2023.  *See* Procedures Order at ¶¶ 25, 28.  Notwithstanding the requirements of the Procedures Order, the Debtors did not provide the Winning Bidder Notice until late in the evening on December 4, 2023, more than three days after it was due.

16.     Pursuant to the Winning Bidder Notice, the Debtors informed the Court and all parties in interest that they had selected certain bidders as the winning bidders for certain of their owned and leased properties.  The Winning Bidder Notice indicated that XPO was the winning bidder for 28 of the Debtors' owned properties, including one of the Debtors' most prized owned

terminals in Carlisle, Pennsylvania,[2] and two leased properties, including the Lease, for an aggregate purchase price of $870 million.  Continuing with the lack of transparency, the Winning Bidder Notice provides no additional information on how the XPO purchase price was allocated among the various properties, including the Lease.

17.    Nothing in the recently filed XPO Asset Purchase Agreement sheds light on, or provides additional insight into, how the Debtors allocated the $870 million XPO purchase price among the 28 properties to be purchased and the two leases to be assigned, including the Lease. Indeed, allocation of the purchase price is slated to occur only after approval of the transaction by the Court.  *See* XPO Asset Purchase Agreement, Section 9.2.

18.    Simply put, and notwithstanding the requirements of the Bid Procedures Order, the auction process run by the Debtors lacked the transparency necessary for the Court to approve the assumption and assignment of the Lease to XPO.  *See In re Las Cruces Country Club, Inc.*, 585 B.R. 239, 248 (Bankr. D.N.M. 2018) (holding that integrity of sale process required trustee to conduct public auction process for sale of estate assets); *In re Landscape Properties, Inc.*, 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988) ("interested parties in bankruptcy proceedings are entitled to full disclosure of the proposed terms of sale and agreements and should not be denied access.")

19.    Given the lack of information on the XPO sale price, including the price paid for the Lease, Landlord submits that the Landlord Offer was the highest and best bid for the Lease. Even the XPO Asset Purchase Agreement supports a finding that the Landlord Offer was in

---

[2]    Paul Berger, *Yellow Rivals Scoop Up Truck Terminals in Bankruptcy Auction*, The Wall Street Journal (Dec. 4, 2023), https://www.wsj.com/articles/yellow-rivals-scoop-up-truck-terminals-in-bankruptcy-auction-945b9425.

excess of any bids for the Lease.  Pursuant to the XPO Asset Purchase Agreement, the "Backup

Bid Amount" for the Lease is listed at $2,541,536, less than half of the Landlord Offer.[3]  *See*

XPO Asset Purchase Agreement, Section 11.1(g) and Schedule 7.2(b)(i).

20.     The lack of transparency regarding the bidding for the Lease and allocation of

XPO's purchase price makes it impossible to determine whether the assignment of the Lease to

XPO is in the best interest of the Debtors' estates.  Accordingly, Landlord requests that the Court

deny the Debtors request to assume and assign the Lease to XPO and find that the Landlord

Offer represents the highest and best offer for the Lease.

B. Failure to Satisfy Landlord's Cure Amounts and Provide Adequate Assurances

21.     In addition to the failure to comply with the Bankruptcy Code mandate for a fair

and open auction process, section 365(b) of the Bankruptcy Code requires a debtor to fully cure

all defaults existing at the time of assumption before assuming an executory contract and provide

adequate assurance of future performance under the contract. 11 U.S.C. §365(b)(1); *In re*

*Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("In order for a debtor to assume a

contract under § 365(b)(1), it must: (1) cure existing default or provide adequate assurance that

cure will promptly occur, 365(b)(1)(A); (2) compensate any party to the agreement that has

suffered actual pecuniary loss as a result of default, or provide adequate assurance of prompt

compensation to the injured party, § 365(b)(1)(B); and (3) provide adequate assurance of future

performance under the agreement before assumption will be permitted, § 365(b)(1)(c).")

22.     Cure is a critical component of assumption and assignment of executory contracts

and leases.  *In re Thane International, Inc.*, 586 B.R. 540, 549 (Bankr. D. Del. 2018).  This

includes both prepetition and post-petition defaults. *See In re Network Access Solutions, Corp.*,

---

[3]      Landlord has been provided no information on any "Backup Bidder".

330 B.R. 67, 76 (Bankr. D. Del. 2005).  The Bankruptcy Code thus unequivocally requires that before a lease can be assigned, any defaults must either be cured or adequate assurance that a prompt cure will be provided must be given.

23.     Assuming the Court finds that the XPO bid for the Lease is in the best interest of the estates and was proposed in good faith, Landlord objects to any proposed assumption and assignment of the Lease unless the Debtors and/or XPO comply with all of the cure and adequate assurances requirements of section 365 of the Bankruptcy Code.  Absent the ability, or willingness, of the Debtors and XPO to satisfy such requirements, any proposed assumption and assignment must be denied.

24.     Pursuant to the XPO Asset Purchase Agreement, XPO has agreed to cure and pay only $95,202 in alleged cure costs.  *See* XPO Asset Purchase Agreement, Schedule 11.1(s).  As noted in the Cure Objection, the amount necessary to cure defaults under the Lease as of November 8, 2023 was at least $300,846.40.  In addition to this amount, additional charges continue to accrue under the Lease, including, but not limited to, attorneys' fees and real property taxes recently billed and due for payment on or before January 2, 2024 in the amount of $272,197.08.  At a minimum, the Cure Costs payable before Lease may be assumed and assigned to XPO are $573,043.48, plus Landlord's attorneys' fees incurred since November 8, 2023.

25.     In addition to these costs, some charges for which the Debtors bear responsibility under the Lease may have not yet been reconciled and/or adjusted from pre-petition (or even post-petition) periods.  The Debtors remain responsible for all accrued or accruing charges under the Lease and must pay such charges when they come due.  XPO assumes the Lease subject to its terms, and must assume all obligations owing under the Lease, including obligations that have accrued but may not yet have been billed.  Any final assumption or sale order should clearly state

8

that XPO will assume these lease obligations and pay them when due, regardless of whether they relate to the period prior to, or after, the closing of the assignment.

26.      Moreover, any provision in the Sale Order that purports to release the Debtors or XPO of further liability based upon a payment of cure amounts (*e.g.*, Sale Order ¶ 4.10), should be modified to specify that such release does not apply to obligations to pay accrued or accruing, but unbilled, charges that come due under the Lease.

27.      The Lease also requires the Debtors to indemnify Landlord for certain existing claims as well as claims that may arise post-assumption and assignment.  Any order approving assignment of the Lease must obligate XPO (or any other assignee) to assume all indemnification liabilities, or Debtors must be required to evidence, or obtain adequate insurance to guaranty that their indemnity responsibilities will be met.  Claims for indemnity may include, but are not limited to, claims for personal injuries that occur at the premises, when either the Landlord is joined as a party defendant, damage, and destruction to the premises by the Debtors or their agents, claims for environmental damage or environmental clean-up, etc.  Any assumption or assumption and assignment of the Lease must be subject to the terms of the Lease, including the continuation of all indemnification obligations, regardless of when they arose.  Nothing in the Sale Order should preclude the Landlord from pursuing the Debtors or XPO, their insurance, or any other party that may be liable under the Lease, and the Landlord requests that any order specifically preserve their right to pursue such rights irrespective of any resolution of cure amounts herein.

28.      Pursuant to section 365(f)(2)(B) of the Bankruptcy Code, the Debtors may only assume and assign the Lease if "adequate assurance of future performance by the assignee of

such . . . lease is provided, . . . ."  The burden of proof on adequate assurance issues is with the

Debtors.  *See In re Lafayette Radio Elecs. Corp.*, 12 B.R. 302, 312 (Bankr. E.D.N.Y. 1991).

29.    Other than a rudimentary balance sheet, Landlord has not received any other

adequate assurances information relating to XPO (or the XPO entity to which the Lease will be

assigned), and the Debtors or XPO should provide such adequate assurance information to the

Landlord prior to the assumption and assignment of the Lease.  Landlord notes that, as part of

XPO's bid for the Debtors' properties, XPO is seeking additional financing, in the form of a

$870 million Bridge Facility, an amount equal to 100% of its bid.  *See* XPO Asset Purchase

Agreement Section 4.4; *see also* XPO, Inc. Form 8-K filed December 5, 2023 (available at:

https://investors.xpo.com/node/20076/html).  The new Bridge Facility is scheduled to mature one

year after the closing on the XPO Asset Purchase Agreement.  No information has been provided

on whether the Bridge Facility will be used by XPO to pay the continuing obligations under the

Lease or how XPO intends to satisfy such obligations once the Bridge Facility matures.

30.    Landlord reserves its rights to supplement this Objection and to object to any

potential assignment based on the failure to provide adequate assurance.

C.  Any Assignment of the Lease Must be
    Subject to all Terms of the Lease and Applicable Restrictive Covenants

31.    The Debtors should not be permitted to unilaterally modify the Lease, through the

assumption and assignment process, but must assign the Lease in its totality.  *See In re Buffets*

*Holdings, Inc.*, 387 B.R. 115, 119 (Bankr. D. Del. 2008) ("If the debtor decides to assume a

lease, however, it must generally assume all the terms of the lease and may not pick and choose

only favorable terms to be assumed. "The [debtor] may not blow hot and cold. If he accepts the

contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot

accept one and reject the other."); *In re Jamesway Corp.*, 201 B.R. 73, 76 (Bankr. S.D.N.Y.

1996); *Rockland Center Assoc. v. TSW Stores of Nanuet, Inc. (In re TSA Stores of Nanuet, Inc.)*, 34 B.R. 299, 304 (Bankr. S.D.N.Y. 1985).

32.     Thus, any modifications to the Lease must be approved in writing by Landlord before they can be effective and any order assuming and assigning the Lease should state that the Lease is unmodified, except with signed written consent of the Landlord.

33.     The *cum onere* principle and requirements of section 365 of the Bankruptcy Code also mandate that restrictive covenants in the Lease be respected in connection with any lease assignment.  *See In re MF Glob. Holdings Ltd.*, 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012). Accordingly, assumption and assignment of the Lease requires compliance with, and is subject to, the reciprocal easement agreements and other restrictive covenants related to the property and Landlord objects to the assignment of the Lease to the extent such assignment is not subject to all applicable reciprocal easement agreements and other restrictive covenants.  The Sale Order should expressly state that the assignment of the Lease is subject to all easement agreements and restrictive covenants, including but not limited to, the easement dated as of November 22, 2022 with the Environmental Protection Agency.

34.     Landlord requests that, as a condition to any order approving assumption and assignment of the Lease, XPO (or any other the assignee) shall be required to enter into a short form Assumption and Amendment Agreement whereby the assignee shall become directly obligated to Landlord and the provisions of the Leases regarding notice addresses will be modified.

35.     Landlord reserves the right to raise other and further objections to the proposed Sale Order or transaction documents once any of those proposed documents are submitted or filed of record.

### Reservation of Rights

36.     Landlord reserves its right to amend, supplement, and/or otherwise modify this Objection and its Cure Amount, and to raise other and further objections to the assumption and assignment or cure claims for the Lease.

**WHEREFORE**, Landlord requests that the Court (i) deny the assumption and the assignment of the Lease to XPO and (ii) grant Landlord such other and further relief as is just and equitable.

Dated: December 8, 2023                    **ARCHER & GREINER, P.C.**


/s/ Peter L. Frattarelli
Peter L. Frattarelli (DE Bar No. 2871)
300 Delaware Avenue, Suite 1100
Wilmington, DE 19801
Tel: (302) 777-4350
Fax: (302) 777-4352
E-mail: pfrattarelli@archerlaw.com

        -and-

Gerard DiConza (Admitted Pro hac Vice)
1211 Avenue of the Americas
New York, NY 10036
Tel: (212) 682-4940
Email:  gdiconza@archerlaw.com

*Counsel for 1313 Grand Street Realty, LLC*