**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |

---

**DEBTORS' OBJECTION TO THE PROOFS OF CLAIM FILED BY**
**THE CENTRAL STATES PENSION FUND**

---

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:          ljones@pszjlaw.com
                  tcairns@pszjlaw.com
                  pkeane@pszjlaw.com
                  ecorma@pszjlaw.com

*Co-Counsel for the Debtors and Debtors in Possession*

Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
Whitney Fogelberg (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          patrick.nash@kirkland.com
                  david.seligman@kirkland.com
                  michael.slade@kirkland.com
                  whitney.fogelberg@kirkland.com

Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:     (415) 439-1400
Facsimile:     (415) 439-1500
Email:          michael.esser@kirkland.com
                  john.christian@kirkland.com

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ........................................................................................................ 8

RELIEF REQUESTED............................................................................................... 11

JURISDICTION & VENUE....................................................................................... 11

BACKGROUND ........................................................................................................ 12

A.    Congress Has Established Multiple Safeguards for Multiemployer Pension Plans. ........ 12

    1.    Federal law insures multiemployer pension plans and imposes liability on employers who withdraw from the funds. ............................................................. 12

    2.    Congress provided pension funds with tools to address short-term funding issues. ................................................................................................................ 14

B.    The Debtors Contributed to CSPF For Nearly 20 Years. ................................................. 15

C.    CSPF Struggled to Manage Plan Assets For Decades ...................................................... 16

D.    Congress Enacts ARPA To Solve MEPPs' Problems And Save CSPF. ........................... 17

E.    CSPF Submits an SFA Application and Claims It Would Not Recover Withdrawal Liability Payments from Yellow...................................................................... 18

F.    The Debtors Commence These Chapter 11 Cases, and CSPF Files 45 Proofs of Claim Seeking Nearly $6 billion........................................................................................ 20

LEGAL STANDARD................................................................................................. 21

ARGUMENT .............................................................................................................. 22

A.    CSPF Cannot File a Duplicative Claim or Seek Double Recovery. ................................. 22

    1.    CSPF is wrongfully seeking double recovery through withdrawal liability claims. ................................................................................................................ 22

    2.    CSPF's "guarantee" claims are inappropriate attempts to impose withdrawal liability or penalties on the Debtors. ................................................. 25

B.    CSPF Should Be Estopped from Seeking Withdrawal Liability Payments, However Characterized.................................................................................................... 27

C.    The Proofs of Claim Must Be Reduced Or Eliminated .................................................... 29

1.      CSPF's effort to ignore the $36 billion in SFA funding to calculate
        withdrawal liability cannot succeed ....................................................................... 29

2.      CSPF failed to apply ERISA's cap for withdrawal liability payments ................. 31

3.      The Proofs of Claim must be discounted to net present value .............................. 33

D.      CSPF's Other Proofs Of Claims Should Be Rejected As Unidentifiable ......................... 34

CONCLUSION .................................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2336 North Clark, LLC v. Hair Fairies, Inc.*,
  2022 WL 17249039 (Ill. App. Ct. Nov. 28, 2022).....................................................22

*Camp Street Crossing, LLC v. Ad In, Inc.*,
  2021 WL 5298062 (Ill. App. Ct. Nov. 15, 2021).....................................................21

*Chicago Regional Council of Carpenters Pension Fund v. Drive Constr., Inc.*,
  2023 WL 4760586 (N.D. Ill. July 26, 2023)............................................................21

*Combs v. Classic Coal Corp.*,
  931 F.2d 96 (D.C. Cir. 1991)...................................................................................27

*Connolly v. Pension Ben. Guar. Corp.*,
  475 U.S. 211 (1986)...................................................................................................7

*Cott Corp. v. New England Teamsters & Trucking Indus. Pension Fund (In re Cott Corp.*),
  26 B.R. 332 (Bankr. D. Conn. 1982) .......................................................................28

*In re Affiliated Foods, Inc.*,
  249 B.R. 770 (Bankr. W.D. Mo. 2000)....................................................................28

*In re Allegheny Int'l, Inc.*,
  954 F.2d 167 (3d Cir. 1992)......................................................................................16

*In re Amatex Corp.*,
  755 F.2d 1034 (3d Cir. 1985)....................................................................................15

*In re Anson*,
  457 B.R. 130 (Bankr. M.D. Fla. 2011) ....................................................................18

*In re Cont'l Airlines Corp.*,
  57 B.R. 845 (Bankr. S.D. Tex. Oct. 1, 1985)...........................................................18

*In re F.W.D.C., Inc.*,
  158 B.R. 523 (Bankr. S.D. Fla. 1993) .....................................................................19

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
  160 B.R. 882 (Bankr. S.D.N.Y. 1993)......................................................................17

*In re Holm*,
  931 F.2d 620 (9th Cir. 1991) ....................................................................................16

*In re Mallinckrodt Plc*,
   2022 WL 3545583 (D. Del. Aug. 18, 2022) ................................................28, 29

*In re Marcal Paper Mills, Inc.*,
   650 F.3d 311 (3d Cir. 2011).................................................................................25

*In re Minbatiwalla*
   *424 B.R. 104* (Bankr. S.D.N.Y. 2010) ..............................................................28, 29

*In re Pierport Dev. & Realty, Inc.*,
   491 B.R. 544 (Bank. N.D. Ill. 2013)...................................................................17

*In re Sacred Heart Hosp. of Norristown*,
   182 B.R. 413 (Bankr. E.D. Pa. 1995) ..................................................................18

*In re Stone & Webster, Inc.*,
   279 B.R. 748 (Bankr. D. Del. 2002)....................................................................27

*In re U.S. Airways Grp., Inc.*,
   303 B.R. 784 (Bankr. E.D. Va. 2003)..................................................................27

*In re Vanguard Nat. Res., LLC*,
   2021 WL 220697 (Bankr. S.D. Tex. Jan. 21, 2021) ............................................18

*In re Vebeliunas*,
   332 F.3d 85 (2d Cir. 2003)...................................................................................23

*In re Webb*,
   99 B.R. 283 (Bankr. E.D. Pa. 1989) ....................................................................23

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
   274 F.3d 706 (2d Cir. 2001).................................................................................23

*Matter of Baldwin-United Corp.*,
   55 B.R. 885 (Bankr. S.D. Ohio 1985)..................................................................18

*Pension Benefit Guar. Corp. v. R.A. Gray Co.*,
   467 U.S. 717 (1984).......................................................................................11, 25

*Sofco Erectors, Inc. v. Trustees of Ohio Operating Engineers Pension Fund*,
   15 F.4th 407 (6th Cir. 2021) ........................................................................7, 25, 27

*Trustees of the Leather Goods, Plastics, Handbags & Novelty Workers Union
   Local 1 Joint Retirement Fund v. Key Handling Systems Inc. et al.*,
   692 F.3d 127 (2d Cir. 2012).................................................................................26

**Statutes**

11 U.S.C. § 502.......................................................................................................1, 6

11 U.S.C. § 502(a) ...........................................................................................................15

11 U.S.C. § 502(b) ........................................................................................................5, 28

11 U.S.C. § 502(b)(1) ....................................................................................................15

28 U.S.C. § 157 ...............................................................................................................6

28 U.S.C. § 1334 .............................................................................................................6

28 U.S.C. § 1408 .............................................................................................................6

28 U.S.C. § 1409 .............................................................................................................6

29 U.S.C. § 1085(b)(1) ....................................................................................................9

29 U.S.C. § 1085(b)(2) ....................................................................................................9

29 U.S.C. § 1085(b)(6) ....................................................................................................9

29 U.S.C. § 1085(e)(9)(B)(i) .........................................................................................10

29 U.S.C. § 1085(e)(9)(C) .............................................................................................10

29 U.S.C. § 1132 ...........................................................................................................19

29 U.S.C. § 1145 ...........................................................................................................19

29 U.S.C. § 1381(a) .......................................................................................................25

29 U.S.C. § 1381(b) .......................................................................................................20

29 U.S.C. § 1382 .............................................................................................................8

29 U.S.C. § 1391 ...........................................................................................................20

29 U.S.C. § 1392 ...........................................................................................................21

29 U.S.C. § 1399 .............................................................................................................8

29 U.S.C. § 1399(a)(1) ....................................................................................................8

29 U.S.C. § 1399(b) .........................................................................................................2

29 U.S.C. § 1399(b)(2)(A) ..............................................................................................8

29 U.S.C. § 1399(c)(1)(B) .............................................................................................26

29 U.S.C. § 1405(b) .......................................................................................................28

**Rules**

Fed. R. Bankr. P. 3001(f) ............................................................................................16

Fed. R. Bankr. P. 3007 ...................................................................................1, 5, 6, 28

Fed. R. Bankr. P. 7033 ................................................................................................28

Fed. R. Bankr. P. 7034 ................................................................................................28

Fed. R. Bankr. P. 9014(c) ...........................................................................................28

Local Bankruptcy Rule 3007-1 .....................................................................................6

Local Bankruptcy Rule 9013-1(f) .................................................................................6

**Other Authorities**

29 C.F.R. § 4211.4(a)(1) .............................................................................................26

29 C.F.R. § 4211.4(a)(2) .............................................................................................26

29 C.F.R. § 4219(c) .....................................................................................................26

29 C.F.R. § 4219(c)(1)(B) ...........................................................................................26

29 C.F.R. § 4225(b) .....................................................................................................28

29 C.F.R. § 4262 ..........................................................................................................22

29 C.F.R. § 4262.15 (2022) .........................................................................................12

29 C.F.R. § 4262.16(g)(2) ...........................................................................................23

American Rescue Plan Act of 2021, H.R. 1319, 117th Cong. § 4262(j)(1) .................12

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby object, pursuant to Section 502 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to each proof of claim (individually, a "Proof of Claim," and together with other proofs of claim, the "Proofs of Claim") filed by the Central States Pension Fund ("CSPF").

CSPF is a multi-employer pension fund that filed dozens of Proofs of Claim against the estates, seeking nearly $5 billion for withdrawal liability and nearly $6 billion total.[2] But these Proofs of Claim are demonstrably, massively, and improperly overstated. As of the Petition Date, CSPF had a negligible shortfall on its balance sheet and stated publicly that it is secure "long into the future" and can pay all benefits owed for "the lifetime of our active participants, retirees, and beneficiaries."[3] The reason is simple: CSPF applied for and received $35.8 billion from the U.S. Treasury that makes it impossible for the Debtors to have any meaningful withdrawal liability.

If allowed in any material part, CSPF would receive an improper windfall. As the Court, creditors, equity security holders, and CSPF should know based on filings earlier this week, the Debtors successfully auctioned just a portion of their real estate portfolio for nearly $1.9 billion, more than double the appraised value.[4] When added to remaining assets still to be sold, there should be significant value not only for unsecured creditors, but also for prepetition shareholders.

---

[2] CSPF has filed at least 45 Proofs of Claim, generally falling in three categories: (1) 24 Proofs of Claim asserting withdrawal liability of $4,827,470,743.87, *see, e.g.,* Proofs of Claim No. 4312- 4335, (2) 17 Proofs of Claim claiming breach of an alleged "contributions guarantee" and seeking $917,028,151.83, *see, e.g.,* Proofs of Claim No. 4336- 4352; and (3) assorted other claims, ranging from $3-$77 million, that provide only haphazard names of people and theories such as "vacation pay" or "WARN" without any rationale for why the CSPF is owed anything, *see, e.g.,* Proofs of Claim No. 4303-06. For the avoidance of doubt, the Debtors object to each of CSPF's filed Proofs of Claim.

[3] https://mycentralstatespension.org/-/media/Pension/PDFs/Pension-Crisis/SFA-FAQ.pdf?la=en&hash=29D68C68E854D8A7C4FFB45F17D56F477343DCB9 (at FAQ Answer No. 6).

[4] *See* Dkt. 1268, Notice of Winning Bidders (noting total purchase prices for only some of the Debtors' assets aggregating to nearly $1.9 billion).

In other words, these chapter 11 cases should result in the truly rare circumstance of allowed claims being paid in full and equity holders obtaining a material recovery, even in the face of the destruction the Debtors' business. The key impediment is CSPF's inflated Proofs of Claim which, if allowed, would provide CSPF a windfall at the expense of shareholders—including the U.S. Treasury—and unsecured creditors, who would be left with fractional recoveries. As the Debtors will establish following fact and expert discovery and trial, CSPF's Proofs of Claim should be disallowed in full or in overwhelming part.[5]

### **INTRODUCTION**

1.      CSPF is one of the largest multiemployer pension funds in the country. It has operated for nearly 70 years and has thousands of beneficiaries from a variety of industries, including trucking, warehouse, construction, food processing, and dairy and grocery trucking.[6] The Debtors contributed hundreds of millions of dollars to CSPF over a period of many years.

2.      For many years, CSPF was poorly managed and highly troubled, struggling to manage its assets responsibly and maintain sufficient funding to cover benefits for participants.[7] But that is not the case today. Last year, at a time when it faced near-term insolvency, CSPF was bailed out by the United States government, receiving a "historic" commitment of $35.8 billion,[8]

---

[5]    This Objection is intended to, among other things, satisfy any obligation to request review by CSPF of its alleged withdrawal liability assessment, as set forth under ERISA § 4219(b), 29 U.S.C. § 1399(b), to the extent, if any, that making such a request is required of any Debtor.

[6]    *See* https://mycentralstatespension.org/about-your-fund.

[7]    *See* https://www.forbes.com/sites/ebauer/2018/12/03/understanding-the-central-states-pension-plans-tale-of-woe/?sh=4d9735a26c10 ("Had the plan been well-run and properly funded, and had principles of multi-employer plan design and the relevant legislation been designed to ensure long-term solvency rather than relying on new generations of contributors to make up for losses, Central States would have weathered these storms. But Central States was missing all this. . . . they were neither well-run nor properly funded."); *see generally* James Cook, *The Most Abused, Misused Pension Fund in America*, FORBES, Nov. 10, 1980.

[8]    https://www.whitehouse.gov/briefing-room/statements-releases/2022/12/08/fact-sheet-president-biden-announces-historic-relief-to-protect-hard-earned-pensions-of-hundreds-of-thousands-of-union-workers-and-retirees/#:~:text=The%20Central%20States%20Pension%20Fund%20estimates%20that%20it%20will%20now, Michigan%20%E2%80%93%2040%2C000%20workers%20and%20retirees

funds it now has in its possession and were listed on its balance sheet as an asset at year-end 2022. The effect of the bailout means that CSPF is virtually assured to be fully funded forever even if it receives zero from the Debtors—something that CSPF has touted in public statements.

3.    CSPF's assertion of nearly $6 billion in claims against these chapter 11 estates completely ignores this funding.  Instead, while the amounts in CSPF's Proofs of Claim are hard to discern, it appears that CSPF assumes that it is as underfunded today as it was before it was bailed out last year.  CSPF's Proofs of Claim thus belie the reality of its situation and the Debtors' situation as of the Petition Date and seek an inequitable result fundamentally inconsistent with the Bankruptcy Code.

4.    More specifically, the CSPF's Proofs of Claim ignore the fact that, in March 2021, Congress enacted the American Rescue Plan Act ("ARPA") to salvage failing multi-employer pension funds like CSPF with special financial assistance ("SFA").  SFA funding under ARPA involves "loans" that do not have to be repaid to cover a pension fund's liabilities, thereby reducing or—as here—eliminating a pension fund's unfunded vested benefits (vested liabilities less assets) ("UVBs") to ensure there are sufficient funds to pay all benefits owed by the plan to its retirees, beneficiaries and active participants.  The opportunity to secure this funding was a lifeline to CSPF, which promptly submitted an application seeking such assistance.

5.    As part of its application for SFA, CSPF made representations to the government regarding its financial status and prospects.  Among other things, CSPF represented that the Debtors—the largest contributing employer to CSPF for the past 20 years—faced a probability of bankruptcy, in which case CSPF did not stand to recover *anything*, including withdrawal liability. Ex. A at 23.  Based on these and other representations in CSPF's application, the government awarded CSPF *$35.8 billion*—the largest award under ARPA to date.

6.      CSPF possessed every dollar of that $35.8 billion in SFA funding as of the Petition Date, and CSPF included that funding as an asset on its balance sheet as of December 31, 2022. The Debtors believe and will prove that such SFA funding, together with CSPF's other assets, investment returns and contributions, is sufficient to cover any and all benefits and expenses owed to CSPF retirees, beneficiaries, and active participants.  And CSPF is not a for-profit entity that does anything other than pay out benefits that have been promised.  Indeed, celebrating its success, CSPF stated publicly that the funding secured per the ARPA allows it to "make a full recovery" and that CSPF "benefits are secure both now, and long into the future."[9]  According to CSPF, "[t]hanks to this development, Central States pension benefits are secure and can be relied upon throughout the lifetime of our active participants, retirees, and beneficiaries."[10]  Stated succinctly, CSPF is fully funded and there should be no withdrawal liability because there are no UVBs.

7.      CSPF nevertheless filed 45 Proofs of Claim, alleging withdrawal liability, participation guarantees, and other matters that together seek nearly *$6 billion*.  But CSPF seeks an improper windfall and double recovery.  CSPF cannot ignore the SFA or feign a need to allocate to the Debtors an attributable share of UVBs that do not exist, at the expense of the Debtors' unsecured creditors and equity holders.  Similarly, CSPF cannot seek more than $900 million based on a "participation guarantee" when, in truth, the Debtors' withdrawal benefitted CSPF by reducing future benefit accruals.  The bankruptcy process cannot, and principles of equity do not, countenance such an inequitable result.

8.      Moreover, even if CSPF's Proofs of Claim were (following discovery and trial) to be allowed in any amount, they must be significantly reduced.  As described above, CSPF's Proof

---

[9]    https://mycentralstatespension.org/helpful-resources/pension-crisis

[10]   https://mycentralstatespension.org/-/media/Pension/PDFs/Pension-Crisis/SFA-FAQ.pdf?la=en&hash=29D68C68E854D8A7C4FFB45F17D56F477343DCB9 (at FAQ Answer No. 6).

of Claim ignores $35.8 billion in funding that was on its balance sheet and in its possession long before the Petition Date.  That funding eliminates any purpose of, or basis for, an assessment of "withdrawal liability."   In addition, while CSPF's calculations are not entirely clear and the Debtors will need discovery to fully understand the claims, it appears that CSPF failed to account for required liability caps, and its claims (if allowed at all) must be discounted to present value.

9.      Further, CSPF's request for a "contributions guarantee" suffers from the same fact that CSPF was already made whole and is, at best, an effort to invoke an unenforceable liquidated damages clause despite the reality that CSPF is suffering zero damages from the Debtors' ceased participation in the fund.  At a minimum, these errors must be corrected and the Proofs of Claim reduced by billions of dollars.

10.      Based on these and other arguments set forth more fully below, and that will be further demonstrated at trial, the Court should sustain the Debtors' objection to CSPF's Proofs of Claim.

## RELIEF REQUESTED

11.      The Debtors request entry of an order pursuant to Section 502(b) of the Bankruptcy Code and Rule 3007 of the Bankruptcy Rules disallowing CSPF's Proofs of Claim in their entirety. Alternatively, the Debtors request entry of an order reducing CSPF's Proofs of Claim by, among other things, eliminating the double counting, applying relevant caps, and discounting the claims to present value—any of which would reduce any allowed claim(s) by billions of dollars.

## JURISDICTION & VENUE

12.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  CSPF has waived any objection to this Court's adjudication of its Proofs of Claim by voluntarily filing 45 (or more) Proofs of Claim in this Court and seeking allowance

of such claims here.  But in any event, the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Practice and Procedure of the U.S. Bankruptcy Court for the District of Delaware, to this Court entering a final order in connection with the Proofs of Claim and this Objection to the extent that it is later found that the Court, absent consent, cannot enter final orders or judgments in connection herewith consistent with Article III of the U.S. Constitution.

13.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.    The statutory bases for the relief requested herein are sections 502 of the Bankruptcy Code, Rule 3007 of the Bankruptcy Rules, and Rule 3007-1 of the Local Rules.

## **BACKGROUND**

**A.    Congress Has Established Multiple Safeguards for Multiemployer Pension Plans.**

**1.    Federal law insures multiemployer pension plans and imposes liability on employers who withdraw from the funds.**

15.    Most multiemployer pension plans ("MEPPs") were established in the decade following the passage of the Taft-Hartley Act of 1947.  The Taft-Hartley Act set forth procedural and substantive standards for unions and employers regarding the provision of pension benefits.  At the time, participating employers negotiated a contribution rate to the plan, and the plan's board of trustees set pension benefits consistent with the expected contributions.

16.    Rules governing the contributions-benefits process changed with the passage of the Employee Retirement Income Security Act of 1974 ("ERISA"), which set forth a comprehensive scheme to regulate private pension plans.  ERISA established reporting and disclosure requirements; minimum funding standards; fiduciary duties; and plan termination insurance.  It also established the Pension Benefit Guaranty Corporation ("PBGC"), an administrative agency under the Department of Labor that manages the plan termination insurance program.  This effectively put the federal government in the position of guaranteeing benefits under MEPPs.

17.     In the late 1970s, Congress directed PBGC to report on the challenges of insuring MEPPs and to propose legislative solutions.  *See Sofco Erectors, Inc. v. Trustees of Ohio Operating Engineers Pension Fund*, 15 F.4th 407, 415 (6th Cir. 2021).  PBGC, in turn, found that ERISA did not adequately protect multiemployer plans from individual employer withdrawals.  *Id*.  The problem was that "[e]mployer withdrawals reduce[d] a plan's contribution base," which would "push[] the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan." *Id*. (quoting *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 216 (1986)).  Such increased rates would encourage further withdrawals, "thereby increasing the inherited liabilities to be funded by an ever decreasing contribution base," and creating a "vicious downward spiral". *Id*.  PBGC thus recommended imposing withdrawal liability on employers leaving MEPPs, "requiring them to pay for their fair share of the plan's unfunded liabilities." *Id*. at 416. Congress later incorporated these recommendations into the Multiemployer Pension Plan Amendments Act ("MPPAA"), which became law in 1980.

18.     Through ERISA and the MPPAA, "Congress established a comprehensive scheme for assessing and challenging assessed withdrawal liability.  When an employer withdraws from a multiemployer plan, the plan sponsor is responsible for assessing withdrawal lability and sending the employer a demand for payment." *Id*. (citing 29 U.S.C. §§ 1382, 1399).  Plan sponsors typically conduct these assessments in accordance with the requirements of ERISA and MPPAA: professional actuaries calculate withdrawal liability by using "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1399(a)(1).

13

19.     It is the responsibility of the pension fund (here CSPF) to perform an initial formal assessment of withdrawal liability.  A current or former employer (such as the Debtors) that participated in the fund can then challenge any such assessment by, among other things, showing "that the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable . . . or the plan's actuary made a significant error in applying the actuarial assumptions or methods." *Id.* §§ 1399(b)(2)(A), 1401(a)(3)(B).  Here, while it is unclear how exactly CSPF calculated its Proofs of Claim seeking withdrawal liability, it appears it did not do so in a manner that reflects the actual status of CSPF's current assets and liabilities.

### 2.     Congress provided pension funds with tools to address short-term funding issues.

20.     During the 1990s, many MEPPs experienced investment returns significantly higher than anticipated by actuarial assumptions, and increased their benefit levels accordingly. But following the stock market crash in 2000, some MEPPs were left with unfunded liabilities.[11]

21.     Concerns about addressing these liabilities were among the driving forces behind the multiemployer provision of the Pension Protection Act of 2006 (the "PPA").  The PPA provided plans with tools to address short-term funding issues without cutting benefits or requiring additional contributions.  For instance, the PPA allowed for an automatic five-year extension of the amortization period required to amortize liabilities for minimum funding purposes, and for automatic approval of the "shortfall" funding method.[12]  The PPA also created categories of "troubled plans" based on 3 measures: the plan's funded percentage (the smoothed actuarial value of assets divided by the present value of accrued benefits using the plan's assumptions)[13]; the

---

[11]    Multiemployer Pension Plans: Report to Congress Required by the Pension Protection Act of 2006 at 2.

[12]    *Id.* at 2-4, 30-34.

[13]    *Id.* at n.47.

number of years before the plan is projected to have a minimum funding deficiency under ERISA; and the number of years before the plan projects to become insolvent.[14]  Based on these measures, a troubled plan could be categorized as in the (1) Yellow Zone, or "endangered" if the funded percentage is less than 80% or a minimum funding deficiency is projected in the next seven years; (2) Orange Zone, or "seriously endangered" if the funded percentage is less than 80% and a minimum funding deficiency is projected in the next seven years; or (3) Red Zone, or "critical" if a funding deficiency is projected at any time in the next four years, or five years if the funded percentage is less than 65%.[15]

22.    The Multiemployer Pension Reform Act of 2014 ("MPRA") made other modifications to ERISA rules for MEPPs.  For instance, a plan in "critical and declining" status could apply for an exception to reduce otherwise protected accrued benefits to a level as low as 110% of the PBGC guaranteed level.  However, reductions would only be permitted by the U.S. Treasury if the plan actuary certified that, accounting for the proposed suspension and certain other factors, the plan would be projected to avoid insolvency.[16]

**B.    The Debtors Contributed to CSPF For Nearly 20 Years.**

23.    As described earlier, CSPF is one of the nation's largest MEPPs with more than 1,000 contributing employers representing approximately 45,000 active participants in a variety of industries.[17]  Like other MEPPs, CSPF is a prefunded plan that pools contributions into a trust fund for investment purposes and pays out benefits to participating employers' retirees.

---

[14]    *See* 29 U.S.C. § 1085(b)(6).

[15]    *See* 29 U.S.C. § 1085(b)(1-2); Cong. Rsch. Serv., R43305, Multiemployer Defined Benefit (DB) Pension Plans: A Primer 18 (Apr. 3, 2020).  When the PPA provisions were modified in 2014 by MPRA, a new category was added to the list, and if a plan in the Red Zone was projected to become insolvent in the next 20 years, it would be categorized as "critical and declining."  *See* 29 U.S.C. § 1085(b)(6).

[16]    29 U.S.C. § 1085(e)(9)(B)(i) & (e)(9)(C).

[17]    *See* https://mycentralstatespension.org/about-your-fund

24.     The Debtors contributed billions of dollars to CSPF, beginning in the early 2000s. For years, the Debtors were the largest contributor to CSPF.[18]

**C.      CSPF Struggled to Manage Plan Assets For Decades.**

25.     CSPF was first established in 1955 to provide pension benefits to IBT members in the trucking industry.  By 1982, CSPF had less than half the funds needed to cover plan liabilities.[19] This problem did not get better: until recently CSPF never exceeded a 75% funding level, and since 1984, paid benefits have consistently exceeded contributions.[20]  Indeed, by 2015, for each full-time active employee contributing to CSPF, there were five retirees receiving benefits.

26.     On September 25, 2015, CSPF, in critical and declining status, submitted an application to reduce pension benefits.  Although CSPF was publicly recognized as "the largest multiemployer [defined benefit] pension in critical and declining status," U.S. Treasury denied CSPF's application.[21]  At the time, "[b]ecause of the size of its benefit obligations, and absent any federal financial assistance, the insolvency of Central States would likely lead to the insolvency of [the PBGC]."[22]  The U.S. Treasury ultimately denied the CSPF benefit suspension relief under the MPRA, citing: (1) the unreasonableness of CSPF's rate of return assumption, (2) the inequitable distribution of benefit suspensions across the plans' populations, and (3) the technical nature of the participant notice, which would not be understood by the average plan participant.[23]

---

[18]   A. Ramsey, *Yellow's Demise Won't Sink Central States Due to US Bailout*, BLOOMBERG L. (Aug. 3, 2023), https://news.bloomberglaw.com/daily-labor-report/yellows-demise-wont-sink-central-states-thanks-to-us-bailout.

[19]   U.S. GOV'T ACCOUNTABILITY OFF., GAO-18-106, CENT. STATES PENSION FUND: INV. POL'Y DECISIONS & CHALLENGES FACING THE PLAN (2018) at 9.

[20]   *Id.* at 12, 24.

[21]   *See* Jim MacKinnon, *Retired Teamsters Get Reprieve as Federal Government Rejects Central States Pension Cuts*, Beacon Journal (May 6, 2016).

[22]   *Id.*; *See* CONG. RSCH. SERV., R95-118, PENSION BENEFIT GUAR. CORP. (PBGC): PRIMER 12 (Feb. 7, 2023).

[23]   National Coordinating Committee for Multiemployer Plans, "Treasury Dep't Rejects Central States' Application to Suspend Benefits Under MPRA," NCCMP: MULTI-ELERT 16(3) (May 12, 2016).

27.     In 2017, following this denial, CSPF announced that it could no longer avoid a projected insolvency,[24] which was estimated to occur on January 1, 2025.[25] The U.S. Government observed that, in addition to placing hundreds of thousands of retirees at risk of severe benefit cuts, any such insolvency could have dire consequences for the PBGC program more generally:

> [CSPF's] projected insolvency is also likely to coincide with the projected insolvency of the multiemployer insurance program managed by the Pension Benefit Guaranty Corporation (PBGC). The insolvency of PBGC's multiemployer program would significantly impact the level of PBGC-guaranteed benefits to current and future beneficiaries in all multiemployer plans receiving PBGC assistance.[26]

**D.     Congress Enacts ARPA To Solve MEPPs' Problems And Save CSPF.**

28.     On March 11, 2021, Congress passed ARPA, which established an SFA program to save and secure what were then severely underfunded MEPPs in critical status. Under ARPA, eligible MEPPs can receive special financial assistance in the amount needed to pay participants' full plan benefits through at least 2051.[27] As CSPF described, the program provides "an up-front single payment from the [PBGC] to financially distressed multiemployer pension plans that qualify and apply for SFA funding, including Central States."[28]

29.     There is no cap on the amount of financial assistance that may be granted by the PBGC to an eligible MEPP.[29] In fact, the very purpose of the legislation was to save failing MEPPs and to ensure that all promised benefits were and are paid.

---

[24]  *Id.* at 14.

[25]  *Id.* at 14 n.30.

[26]  *See* U.S. Gov't Accountability Off., GAO-18-106, Cent. States Pension Fund: Inv. Pol'y Decisions & Challenges Facing the Plan 1 (2018).

[27]  American Rescue Plan Act of 2021, H.R. 1319, 117th Cong. § 4262(j)(1).

[28]  https://mycentralstatespension.org/-/media/Pension/PDFs/Pension-Crisis/SFA-FAQ.pdf?la=en&hash=29D68C68E854D8A7C4FFB45F17D56F477343DCB9 (at response to FAQ No. 1)

[29]  American Rescue Plan Act of 2021, H.R. 1319, 117th Cong. § 4262(i)(2).

30.     Section 9704 of ARPA appropriated funds in "such amounts as are necessary" to provide special financial assistance to eligible MEPPs.  Unlike past financial assistance programs run by the PBGC, any SFA paid under ARPA **does not have to be repaid**.  29 C.F.R. § 4262.15 (2022) ("A plan receiving special financial assistance pursuant to this section shall not be subject to repayment obligations with respect to such special financial assistance.").

31.     To qualify for the SFA program, a MEPP must submit an application to the PBGC and demonstrate either that it (1) is in critical and declining status in any plan year from 2020 through 2022; (2) had an application to suspend benefits under the MPRA approved prior to the enactment of ARPA; (3) has a modified funded percentage of less than 40% and a ratio of active to inactive participants in the plan is less than 2:3; or (4) became insolvent after December 14, 2014 but was not terminated by the date ARPA was enacted.[30]  CSPF satisfied the first such condition based on its Form 5500 filing with the U.S. Department of Labor,[31] and needed to prove the remainder by formally filing its SPA application.

**E.      CSPF Submits an SFA Application and Claims It Would Not Recover Withdrawal Liability Payments from Yellow.**

32.     On April 28, 2022, CSPF submitted an SFA application, which CSPF later revised and resubmitted on August 12, 2022.  Ex. A.  CSPF sought a total of $34,965,401,436.  *See id*.

33.     To justify the amount of SFA funding for which it was applying, CSPF had to show how much it expected to receive on a go-forward basis from employer contributions and withdrawal liability payments, relative to its estimated liabilities.  To project future employer contributions, CSPF made certain assumptions regarding employers' contribution base units and

---

[30]   CONG. RSCH. SERV., R46803, MULTIEMPLOYER DEFINED BENEFIT PENSION PLANS POTENTIALLY ELIGIBLE FOR SPECIAL FIN. ASSISTANCE UNDER THE AM. RESCUE PLAN ACT  1 (May 28, 2021) at 3.

[31]   *Id*.

contribution rates.  CSPF also had to make assumptions about the amount of withdrawal liability payments it would receive from employers that withdrew from the fund prior to March 31, 2022, and those that may withdraw in the future.

34.    In making these projections, CSPF accounted for Debtors' potential insolvency and inability to make withdrawal liability payments.  CSPF assumed, in estimating contribution base units, that the Debtors may withdraw from the plan due to bankruptcy.  Ex. A.  Critically, CSPF also assumed that, in the event of such withdrawal or bankruptcy, there would be "*[z]ero future withdrawal liability payments . . . for Yellow*," such that "**any withdrawal liability collection would be de minimis**."  *Id.* at 23 (emphasis added).

35.    On December 8, 2022, and based on the information in CSPF's application, PBGC granted CSPF approximately $35.8 billion, representing the single largest SFA grant to date.  In announcing this unprecedented award, the White House stated that "[t]he Central States Pension Fund estimates that it will now be able to pay full benefits to workers and retirees through 2051" and CSPF proclaimed the payment would allow it to make a "full recovery."[32]  As CSPF told participants, "[t]hanks to this development, Central States pension benefits are secure and can be relied upon throughout the lifetime of our active participants, retirees and beneficiaries."[33]

36.    On January 12, 2023, CSPF received $35.8 billion from the U.S. Treasury's general fund.[34]  Those funds were listed as assets on CSPF's balance sheet as of December 31, 2022.[35]

---

[32]    *Fact Sheet: President Biden Announces Historic Relief to Protect Hard-Earned Pensions of Hundreds of Thousands of Union Workers and Retirees*, THE WHITE HOUSE (Dec. 8, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/12/08/fact-sheet-president-biden-announces-historic-relief-to-protect-hard-earned-pensions-of-hundreds-of-thousands-of-union-workers-and-retirees/.

[33]    https://mycentralstatespension.org/-/media/Pension/PDFs/Pension-Crisis/SFA-FAQ.pdf?la=en&hash=29D68C68E854D8A7C4FFB45F17D56F477343DCB9 (Response to FAQ 6)

[34]    *American Rescue Plan Act: Pension Benefit Guaranty Corporation Approves Central Stats' Application For Special Financial Assistance*, https://mycentralstatespension.org/helpful-resources/pension-crisis

[35]    *See* Ex. B, CSPF's Form 5500 for fiscal year ending December 31, 2022, at 174.

**F.      The Debtors Commence These Chapter 11 Cases, and CSPF Files 45 Proofs of Claim Seeking Nearly $6 billion.**

37.      By July 2023, and because of rapidly falling demand, threatened strikes, and the IBT's flagrant violations of federal labor law, the Debtors could no longer afford the required contributions to CSPF.[36]  CSPF thus terminated the Debtors' participation in the plan on July 17, 2023.  All benefit accruals for CSPF participants affiliated with the Debtors stopped on that date.[37]

38.      Several weeks later, as a result of unconscionable conduct by Teamsters leadership that is detailed in the Debtors' First-Day Declaration,[38] the Debtors commenced a permanent reduction of their workforce, began clearing their freight network, and ceased substantially all operations.[39]  Ultimately, on August 6 and 7, 2023, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

39.      Shortly before the claims bar date, and despite CSPF's representation to the PBGC that it would at best recover a "de minimis" sum from the Debtors in the event of their bankruptcy, CSPF filed 45 Proofs of Claim, seeking a total of nearly $6 billion.[40]  Some of CSPF's claims are for alleged "withdrawal liability," some are on account of an alleged "guarantee," and some are not described in sufficient detail for the Debtors to determine their origin.  All should be disallowed or severely reduced.

---

[36]  *See* Emma Bowman, *The Yellow Trucking Company Meltdown, Explained*, National Public Radio (August 3, 2023, 1:57 PM), https://www.npr.org/2023/07/30/1190960948/yellow-trucking-shutdown-explained

[37]  YRC Inc. & USF Holland LLC FAQs, Central States Pension Fund, https://mycentralstatespension.org/yrc-inc-and-usf-holland-llc-faqs ("As notified previously, Yellow's participation in the Central States Pension Fund remains terminated effective July 23, 2023.  As of July 23, 2023, active members stopped earning additional pension benefit accruals on that date.").

[38]  *See* Docket No. 14, *Declaration of Matt Doheny, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (filed August 7, 2023).

[39]  *See* Alan Rappeport, *After $700 Million U.S. Bailout, Trucking Firm is Shutting Down, N.Y. Times* (July 28, 2023), https://www.nytimes.com/2023/07/28/business/bailout-trucking-firm-yellow-yrc-shutdown.html

[40]  *See infra* at p.1 n.3.

**LEGAL STANDARD**

40.     Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of this title is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a); *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985) (defining party in interest "as one who has a sufficient stake in the proceeding so as to require representation") (internal quotations omitted).   Upon receiving any objection to a claim under section 502(a), the court must then "determine the amount of such claim . . . and allow such claim in such amount," unless the claim "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . . ." 11 U.S.C. § 502(b)(1).

41.     As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes prima facie evidence of the validity and amount of the claim under section 402(a) of the Bankruptcy Code. *See* Fed. R. Bankr. P. 3001(f).   But a proof of claim loses the presumption of prima facie validity under Bankruptcy Rule 3001(f) where, as here, an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).   Once such an allegation is refuted, "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *Id.* at 174.   Despite this shifting burden during the claim objection process, "[t]he burden of persuasion is always on the claimant." *Id.* (citing *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991)).

## ARGUMENT

42.    CSPF's Proofs of Claim seek a total of nearly $6 billion.  For the following reasons and others that will be demonstrated following discovery and trial, the Court should disallow the Proofs of Claim in their entirety or significantly reduce them.[41]

### A.    CSPF Cannot File a Duplicative Claim or Seek Double Recovery.

#### 1.    CSPF is wrongfully seeking double recovery through withdrawal liability claims.

43.    CSPF's withdrawal liability Proofs of Claim (which collectively seek nearly $5 billion) are naked attempts to make the Debtors cover a shortfall—UVBs—that no longer exists. This shortfall, supposedly representing the difference between CSPF's assets and vested benefits, was the subject of CSPF's application for SFA benefits—an application that PBGC approved in December 2022, and which precipitated CSPF's receipt of $35.8 billion in taxpayer-subsidized funding.  The purpose of that funding was to ensure that CSPF would be able to make benefit payments and satisfy plan expenses through 2051, the same purpose that CSPF is allegedly seeking to fulfill through its Proofs of Claim.  And CSPF has announced to the world that the SFA funding already permitted it to make a "full recovery" despite decades of poor management, ensuring that participants' benefits are "secure" and can be relied upon by participants "throughout the lifetime of our active participants, retirees and beneficiaries."[42]

44.    While CSPF's withdrawal liability calculation is unclear to date, the face of its Proofs of Claim appears to concede that it has either zero UVBs, or an extremely small amount of UVBs, to justify the assessment of withdrawal liability *at all*.  Indeed, CSPF's Proofs of Claim

---

[41]    For the avoidance of doubt, the Debtors reserve their rights to modify or add to their bases for objection to the CSPF's Proofs of Claim once the actual allegations made by CSPF are clarified in the discovery process.

[42]    https://mycentralstatespension.org/-/media/Pension/PDFs/Pension-Crisis/SFA-FAQ.pdf?la=en&hash=29D68C68E854D8A7C4FFB45F17D56F477343DCB9 (Response to FAQ No. 6).

assert that CSPF has UVBs of approximately $36 billion *when the SFA is ignored*.  But CSPF already received $35.8 billion from the government, plan assets that CSPF's withdrawal liability calculation ignores.  Using reasonable rate of return assumptions on this $35.8 billion in federal funding, CSPF is in fact fully funded and has *zero* UVBs to allocate to withdrawing employers.[43]

45.      CSPF is asking to be paid twice on the same obligations when it has already been satisfied in full.  This is clearly not permissible under the Bankruptcy Code, whether for pension withdrawal liability or otherwise.  *See, e.g.*, *In re Pierport Dev. & Realty, Inc.*, 491 B.R. 544, 547 (Bank. N.D. Ill. 2013) ("A claim that seeks duplicative recovery for the same debt is partially unenforceable to the extent of the duplication.") (holding that a portion of the $334,876 claim was unenforceable because "[t]he union would not be able to recover the same debt from both Debtor and a separate bond procured by Debtor"); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993) (disallowing a pension trustee's deficiency claim for minimum funding contributions that debtor allegedly owed to its ERISA pension plan because it was duplicative of PBGC's unfunded benefits claim, and, offsetting PBGC's claim by the allowed amount of the pension trustee's minimum funding claim); *In re Vanguard Nat. Res., LLC*, 2021 WL 220697, at *27 (Bankr. S.D. Tex. Jan. 21, 2021) (ordering "no further payment" on the claim since allowing the claim would constitute an impermissible double-recovery on a satisfied claim); *In re Cont'l Airlines Corp.*, 57 B.R. 845, 853 (Bankr. S.D. Tex. Oct. 1, 1985) ("[T]he Bankruptcy Code does not permit the presentation of two claims and the recovery of double damages for what is essentially one legally compensable claim.").

---

[43]     At worst, CSPF's Proof of Claim concedes that its vested liabilities only exceed its assets by $200 million, and not the $5 billion sought.  In this regard, it is important to note that MEPPs are not for-profit entities intended to generate income for shareholders.  Their only purpose is to invest contributions and ensure that benefits promised to participants are paid.  The purpose of the withdrawal liability rules is to ensure that occurs even if participating employers have withdrawn.  No purpose is served by assessing penalties to withdrawing employers where a MEPP is already fully funded and all beneficiaries' promised benefits are in fact "secure," as CSPF has confirmed.

46.     Stated differently, where (as here) a claimant seeks payment on a debt that a third-party has already satisfied, in whole or in part, the debt must be reduced, dollar-for-dollar, to the extent of such satisfaction.  *See, e.g.*, *See Matter of Baldwin-United Corp.*, 55 B.R. 885, 910-11 (Bankr. S.D. Ohio 1985) (finding that equity required disallowance of claims for contribution and indemnity by brokers who marketed deferred annuities issued by insurance companies owned by debtor-corporations where annuity holders would be made whole or nearly so by payments from the insurance companies' rehabilitation fund); *see also In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 421 (Bankr. E.D. Pa. 1995) ("There is no mistake that, if an insured claim had been liquidated in whole or in part by an insurance payment prior to the effective date of confirmation of the Plan, the claim of the creditor receiving the insurance payment would have had to have been reduced dollar-for-dollar by the amount of the insurance proceeds received."); *see also In re Anson*, 457 B.R. 130, 138 (Bankr. M.D. Fla. 2011) ("It is fundamental that a creditor is not entitled to recover more than the full amount of the debt."); *see also In re F.W.D.C., Inc.*, 158 B.R. 523, 528 (Bankr. S.D. Fla. 1993) ("Finally, it must be emphasized that although the Court is herein allowing a creditor to prove the total amount of an indebtedness against a guarantor-debtor without deducting the amount of collateral received from a third party, that such creditor may not collect more than the total amount of the indebtedness.").

47.     In sum, CSPF already sought and obtained the funds necessary to eliminate all or virtually all UVBs, covering all, or almost all, of the Debtors' withdrawal liability (which is a withdrawing employer's allocable share of a plan's UVBs).  The Court should disallow the Proofs of Claim seeking to assess "withdrawal liability" in the face of admitted full funding and receipt of $35.8 billion in funds explicitly intended by both CSPF and the federal government to cover CSPF's previously existing UVBs as duplicative of CSPF's earlier claim and recovery.

2.      **CSPF's "guarantee" claims are inappropriate attempts to impose withdrawal liability or penalties on the Debtors.**

48.     CSPF's remaining Proofs of Claim fare no better.  CSPF apparently asserts that it has a right to future contributions, based on a 2014 letter, *even after complete withdrawal and termination*, and despite the fact that CSPF in fact has no (or, at most, *de minimis*) shortfalls whatsoever.  Though disguised as requests for "delinquent" contributions, these claims are actually based on amounts the Debtors purportedly would have owed had CSPF *not* terminated the Debtors as contributing employers and the Debtors continued operations.  This is nothing more than an attempted end run around the statutory requirements for calculating withdrawal liability, and another means by which CSPF seeks double/triple recovery.

49.     CSPF's Proofs of Claim and the exhibits attached thereto demonstrate as much.  Per these Proofs of Claim, CSPF is seeking nearly $1 billion "for pension contributions pursuant to 29 U.S.C. §§ 1132 and 1145," *see, e.g.*, Proof of Claim No. 4336 at 4, which permit plan fiduciaries to recover unpaid and delinquent contributions owed under a collective bargaining agreement.  But these Proofs of Claim are not seeking to recover delinquent contributions.  Indeed, the Proofs of Claim and attached exhibits clearly acknowledge that the Debtors had paid all outstanding contributions to CSPF in full on January 3, 2023 and were not delinquent at all.  *Id.* (noting there was a "January 3, 2023 payoff of the [contribution] balance").

50.     Rather, these Proofs of Claim seek prospective damages based on the Debtors' alleged breach of a Guarantee of Continued Participation Letter ("Guarantee Letter"), dated January 29, 2014.  *Id.*  The Guarantee Letter stated that the Debtors would "continue to participate in and pay contributions to the Pension Fund pursuant to the collective bargaining agreements for a period of not less than 10 (ten) full years after all balances (including all principal, interest and any applicable expenses or fees) owed to the Pension Fund . . . are completely and fully paid and

25

satisfied . . . ." *Id.* at 39.  According to CSPF, and based on this language, the Debtors must continue participating in and contributing to the pension plan for ten years following their repayment of outstanding contributions – in this case, through January 3, 2033.  It is these future payments that CSPF is attempting to recoup through its Proofs of Claim.

51.    These claims are not cognizable.  For one thing, CSPF itself terminated the Debtors' status as a participating employer in July and announced as much on the CSPF website.[44] But at best, the claims represent an attempt to recover withdrawal liability without abiding by the requirements for calculating such liability under ERISA.  *See* 29 U.S.C. §§ 1381(b), 1391.  This is impermissible.  ERISA clearly distinguishes between liability for unpaid and overdue contributions, on the one hand, and liability for allocated vested benefits, not otherwise covered by the plan's existing assets, on the other.  *See, e.g.*, 29 U.S.C. § 1392 (distinguishing between obligatory contributions under a collective bargaining agreement and withdrawal liability); *Chicago Regional Council of Carpenters Pension Fund v. Drive Constr., Inc.*, 2023 WL 4760586, at *9 (N.D. Ill. July 26, 2023) ("Withdrawal liability assessed against an employer under the MPPAA is distinct from contributions obligated by CBAs.").  CSPF cannot characterize as "delinquent" payments extending as far as ten years into the future, and in so doing, avoid the distinction between contributions and withdrawal liability under ERISA.

52.    At worst, these claims represent an attempt to penalize the Debtors—to the tune of $1 billion—for being evicted from the plan, notwithstanding the absence of any harm to CSPF from such withdrawal.  As set forth in more detail above, earlier this year, the Debtors were forced to permanently lay off all union employees, after which any plan benefits for those employees

---

[44]    https://mycentralstatespension.org/yrc-inc-and-usf-holland-llc-faqs#:~:text=As%20notified%20previously%2C%20Yellow's%20participation,for%20maintaining%20future%20pension%20coverage

stopped accruing. Any amount that the Debtors pay towards CSPF's "guarantee" claims would thus not be based on any Debtor employee's work or be otherwise attributable to such employee's benefit calculation under ERISA; it would simply constitute "free money" that CSPF would be at liberty to use for any other purpose.

53. This is "free money" that CSPF does not need. CSPF's receipt of $35.8 billion in SFA funding has, by CSPF's admission, ensured the fund has sufficient assets to cover all plan benefits already accrued for all plan participants and beneficiaries. Under these circumstances, CSPF cannot attempt to penalize the Debtors and recover hundreds of millions of dollars in damages it has not sustained, through the Guarantee Letter. Even if the Guarantee Letter purported to provide such relief, as CSPF contends, the Guarantee Letter would constitute nothing more than an unenforceable liquidated damages clause. *See, e.g.*, *Camp Street Crossing, LLC v. Ad In, Inc.*, 2021 WL 5298062, at *7-8 (Ill. App. Ct. Nov. 15, 2021) ("Courts will invalidate liquidated damages clauses that amount to a windfall for one party. Courts will also invalidate a liquidated damages clause based on public policy where its purpose is not to estimate damages but to punish nonperformance or secure performance."); *2336 North Clark, LLC v. Hair Fairies, Inc.*, 2022 WL 17249039, at *6 (Ill. App. Ct. Nov. 28, 2022) (liquidated damages clause unenforceable where it entitled nonbreaching party to recover five years' worth of payments for any defaults, where there was no evidence that such amounts corresponded to actual damages). In either case, and for these reasons, CSPF's "guarantee" Proofs of Claims should also be disallowed.

**B.      CSPF Should Be Estopped from Seeking Withdrawal Liability Payments, However Characterized.**

54. Even if the Proofs of Claim did not seek double recovery, CSPF should be estopped from seeking recovery thereon. Less than a year ago, PBGC granted CSPF nearly $36 billion in funding based in part on CSPF's representation that any recovery of withdrawal liability from the

Debtors (if any) would be "de minimis." Ex. A at 23. Had CSPF instead represented that it expected to obtain nearly $5 billion in withdrawal liability from the Debtors—the amount sought in CSPF's Proofs of Claim—CSPF would not have been eligible for, and PBGC would not have granted, the SFA funding as requested. *See* 29 C.F.R. 4262 ("To the extent that a plan has other means available to pay benefits, it does not require or need SFA for that purpose.").

55. That CSPF is now wholly disregarding representations it made less than a year ago. If anything, the Debtors' ability to make withdrawal liability payments has only ***decreased*** since CSPF submitted its SFA application, yet CSPF has ostensibly ***increased*** the amount it expects to recover from "de minimis" to nearly $6 billion.

56. Any recovery on these Proofs of Claim would only come at the expense of unsecured creditors and equity holders—including the United States government,[45] which relied upon CSPF's representations in granting CSPF an unprecedented amount of bailout funding. The equitable doctrine of estoppel is designed to avoid precisely this type of injustice, and should apply here. *See, e.g.*, *In re Webb*, 99 B.R. 283, 290 (Bankr. E.D. Pa. 1989) (estoppel is appropriate where a party makes "a false representation… calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which [CSPF] subsequently attempts to assert"); *In re Vebeliunas*, 332 F.3d 85, 93 (2d Cir. 2003) ("Equitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result."); *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001) ("The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct.").

---

[45]    The U.S. Treasury is the Debtors' second largest shareholder, holding more than 30% of Yellow's common stock.

C.    **The Proofs of Claim Must Be Reduced Or Eliminated.**

1.    **CSPF's effort to ignore the $36 billion in SFA funding to calculate withdrawal liability cannot succeed.**

57.    Should the Proofs of Claim be allowed in any amount, they must still be reduced such that they comply with the logic underlying the calculation of withdrawal liability.  And in that regard, the first problem with CSPF's claim is that it calculates withdrawal liability for Yellow based on the assumption that CSPF does not have access to $36 billion in SFA funding—even though CSPF's balance sheet represented such funds to be fund assets as of December 31, 2022. That position is illogical and cannot comply with the Bankruptcy Code.

58.    In fact, in its 2022 annual funding notice sent to plan participants a year ago, CSPF conceded that with the benefit of the $35.8 billion in SFA funding, even using CSPF's extremely conservative assumptions regarding asset growth relative to benefits projected to be paid, CSPF was 97.5% funded, would "no longer become insolvent," and was funded "well into the future"[46]:

**Events Having a Material Effect on Assets or Liabilities**

As allowed by law, this notice contains a written explanation of new events that have a material effect on plan assets or liabilities. This is because such events can significantly impact the funding condition of a plan. The Plan expects the following event that occurred after December 31, 2022, to have such an effect:

The Plan's application for Special Financial Assistance (SFA) under the American Rescue Plan Act of 2021 (ARPA), was approved by the Pension Benefit Guaranty Corporation (PBGC) in December 2022 and on January 12, 2023, the Plan received $35,764,910,109.99 in SFA. With the receipt of the SFA, the Plan projects that its Funded Percentage as of January 1, 2023, counting the SFA asset receivable would be approximately 97.5%. Further, the Plan projects that it will no longer become insolvent, but instead will be funded well into the future.

In fact, the Debtors believe, and will be prepared to prove at trial, that based on a rational set of economic assumptions, CSPF actually had *zero* UVBs as of the Petition Date, was fully funded as of the Petition Date, and did not need to assess a single dollar of withdrawal liability to ensure its ability to meet the Debtors' allocable share of vested benefits promised.

---

[46]    https://mycentralstatespension.org/-/media/Pension/PDFs/Legal/Central-States-Pension-Fund-Annual-Funding-Notice-2021.pdf?la=en&hash=BCA6A56593848EF05F8424C6D840AA800F1AFF10

59.     CSPF may rely on 29 C.F.R. § 4262.16(g)(2), which purports to provide for phasing in SFA funding when calculating alleged withdrawal liability.  But CSPF conveniently ignores several other regulations, including those described below regarding the calculation of contribution rates and imposing a 20-year cap.  In any event, the Debtors will demonstrate at trial that 29 C.F.R. § 4262.16(g)(2), which purports to advise MEPPs to ignore reality, including CSPF's actual physical possession of $35.8 billion in SFA funding which sits on its balance sheet as an asset, cannot be enforced, as it is inconsistent with ERISA and federal law more generally.  Under ERISA, withdrawal liability is an employer's allocable share of UVBs, after certain adjustments that reduce an employer's withdrawal liability.  UVBs, as defined under ERISA § 4213, consist of a plan's assets less its vested liabilities.  29 C.F.R. § 4262.16(g)(2) purports to alter the statutory definition of UVBs by excluding billions of dollars of assets that the MEPP actually possesses to pay benefits and expenses and to invest, *increasing* an employer's withdrawal liability contrary to ERISA § 4201.  By doing so, PBGC has purported to change the statutory definition of UVBs such that it is completely untethered to the MEPP's underfunding or to ERISA.  In short, PBGC's regulation purports to permit plans to assess an employer for an allocable share of unfunded vested liabilities when there are no unfunded vested liabilities to allocate.

60.     This is a case in point for the absurdity of the regulation.  If every CSPF employer withdrew today, PBGC's purported regulation would lead to assessing $36 billion in withdrawal liability against such employers—even though CSPF admits that, at most, it needs only $200 million (in reality, it needs zero additional payments) to pay the pension of every single participant and beneficiary in the plan.  PBGC's regulation, therefore, is not consistent with the statute.[47]

---

[47]   CSPF's calculation method as applied here is also flatly unreasonable, as PBGC has recognized it is improper in prior regulations.  *See* 29 C.F.R. § 4211.21(c) (a MEPP may not use a UVB allocation method "that results in a systematic and substantial overallocation of the plan's unfunded vested benefits").

61.     In sum, withdrawal liability is supposed to assess a withdrawing employer's allocable share of a multi-employer plan's UVBs.  *See, e.g., Sofco Erectors*, 15 F.4th at 416-19 (withdrawal liability intends to assess withdrawing employers their "fair share of the plan's unfunded liabilities.").  As the Sixth Circuit recently described in rejecting a MEPP's assessment of withdrawal liability, UVBs are calculated by actuaries who "compare the present value of future liabilities (how much money do we need?) to the current assets in the fund (how much money do we have?) . . . If the fund has less money than it needs, then there is an unfunded liability." *Id*. Where (as here) the CSPF has ***more*** money than it needs as a result of the SFA funding, it makes no sense to assess withdrawal liability, and asserting a claim assuming the *absence* of such funding is precisely the artificial sort of claims-creation that Bankruptcy Courts frequently reject.

### 2.      CSPF failed to apply ERISA's cap for withdrawal liability payments.

62.     Should the Proofs of Claim be allowed at all, they must still be reduced such that they comply with the actual statutory requirements for calculating withdrawal liability and the Bankruptcy Code's requirements for properly calculating claims as of the Petition Date.

63.     Section 4201 of the MPPAA provides that a withdrawing employer is liable for its proportionate share of the plan's unfunded vested benefits. 29 U.S.C. § 1381(a).  Unfunded vested benefits are "calculated as the difference between the present value of vested benefits and the current present value of the plan's assets." *Pension Benefit Guar. Corp. v. R.A. Gray Co.*, 467 U.S. 717, 725 (1984).  "Put differently, withdrawal liability is intended to make up for any deficiency in the [plan]'s assets—any such deficiency [that] would prevent the employer from fulfilling its promise to provide a specific retirement benefit, a promise which is made in exchange for the employees' work." *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 318 (3d Cir. 2011).

64.     Three factors are typically relevant to the calculation of withdrawal liability for a withdrawing employer where assessing such liability is appropriate.  First, the difference between the value of benefits promised to plan participants and the value of the plan's assets.  29 C.F.R. § 4211.4(a)(1).  Second, the withdrawing employer's contribution history.  *Id*. § 4211.4(a)(2).  And third, whether factors one and two entail an initial allocation of unfunded benefits that would require more than 20 payment years to satisfy. *Id*. § 4219(c)(1)(B); 29 U.S.C. § 1399(c)(1)(B).

65.     As described above, on the Petition Date, CSPF had no UVBs, and thus there should be no withdrawal liability.  But even under CSPF's calculation, where (as under its assumptions) a calculation would impose a total withdrawal liability requiring more than 20 payment years, an employer's liability is capped at the amount to be paid over such 20 years, and the amounts are spread over, and required to be paid over, that 20-year period.  *See Trustees of the Leather Goods, Plastics, Handbags & Novelty Workers Union Local 1 Joint Retirement Fund v. Key Handling Systems Inc. et al.,* 692 F.3d 127, 130 (2d Cir. 2012) ("[ERISA] limits the employer's obligation to make these payments to 20 years, even if it would take more than 20 [annual] payments for the employer to pay its full withdrawal liability.") (citing 29 C.F.R. § 4219(c)(1)(B); 29 U.S.C. § 1399(c)(1)(B)).  Put differently, 29 C.F.R. § 4219(c) requires that withdrawing employers make annual payments to the MEPP *for the lesser of* (1) the number of years it would take to satisfy its initial allocation of unfunded benefits, or (2) 20 years.  *See* 29 C.F.R. § 4219(c)(1)(B); 29 U.S.C. § 1399(c)(1)(B)).

66.     These annual withdrawal liability payments are calculated independently of the withdrawal liability itself. ERISA specifically provides that the annual withdrawal liability payment is capped at (a) the highest contribution rate in effect during the ten-year period ending with the year in which the employer withdraws multiplied by (b) the highest average annual

contribution base units during three consecutive plan years during the ten-year period ending with the plan year prior to the plan year in which the employer withdrew.  *See* 29 C.F.R. § 4219(c).

67.     Here, CSPF is seeking nearly $5 billion in total withdrawal liability from the Debtors, but it has not even attempted to calculate the Debtors' annual withdrawal liability.  Had CSPF performed such calculations using the framework set forth above, CSPF would have been forced to concede that it would take the Debtors far more than 20 years of payments to satisfy its claim.  Indeed, under such framework, the Debtors' annual withdrawal liability would take the Debtors *100 years* to satisfy CSPF's claim.  That violates ERISA.  Accordingly, and even *if* it were appropriate to assess withdrawal liability at all, CSPF would need to apply the 20-year cap, and reduce its claim massively, to the present value of what would be (*even before discounting*) 20 annual payments of approximately $50 million.

### 3.     The Proofs of Claim must be discounted to net present value.

68.     CSPF's withdrawal liability claim must be further reduced to net present value. That is, after applying the 20-year cap and reducing CSPF's claim to a nominal sum paid annually for 20 years, a discount rate must then be applied to that sum to arrive at a present value of the claim as of the Petition Date.  *See Sofco*, 15 F.4th at 420; *In re U.S. Airways Grp., Inc.*, 303 B.R. 784, 793 (Bankr. E.D. Va. 2003) ("In fixing the amount of a claim 'as of the date of the filing of the petition,' there is no dispute that the court must discount future damages to present value."); *In re Stone & Webster, Inc.*, 279 B.R. 748, 806 (Bankr. D. Del. 2002) (finding that all damages estimates based on a future payment stream must be reduced by use of a present value adjustment); *Combs v. Classic Coal Corp.*, 931 F.2d 96, 101 (D.C. Cir. 1991) (explaining that an "erroneously low" discount rate, without appropriate offsetting assumptions, might "destroy the validity of the entire calculation" of unfunded vested benefits).

33

69.     Many economic factors should be considered in choosing the right discount rate, which should account for both the time value of money (as a 20-year stream of payments is being reduced to a single lump-sum which is assumed, under the Bankruptcy Code, to be paid on the Petition Date), and the risks of the underlying cash flows not being paid.  Expert testimony will establish that appropriate discount rate will be material even *if* it were appropriate to assess withdrawal liability here at all.  Indeed, applying such discount rate to CSPF's Proofs of Claim, as modified by the 20-year cap, would reduce such claims to a present value *far* below \$1 billion, *even if* there is withdrawal liability at all.[48]

### D.      CSPF's Other Proofs Of Claims Should Be Rejected As Unidentifiable.

70.     Finally, the asserted basis for CSPF's remaining Proofs of Claim is not apparent from the claims filed.  Specifically, Proofs of Claim 4303-6, which contain lists of former employees and vague assertions such as "WARN" or "vacation pay", do not articulate why *CSPF* believes *it* is entitled to seek money from the Debtors on account of such individuals and claims.

71.     The Debtors will seek discovery from CSPF to understand the alleged basis for these Proofs of Claim.[49]  If CSPF can justify them, the Debtors will negotiate in good faith with CSPF on an appropriate claim and propose it for allowance.  But in the interim, "claims can be disallowed for failure to support the claim with sufficient evidence … under 11 U.S.C. § 502(b), because absent adequate documentation, the proof of claim is not sufficient for the objector to concede the validity of a claim." *In re Minbatiwalla 424 B.R. 104*, 119 (Bankr. S.D.N.Y. 2010);

---

[48]    Finally, and again even *if* CSPF were entitled to assess *any* withdrawal liability against the Debtors, some portion would nevertheless have to be subordinated under 29 U.S.C. § 1405(b) and 29 C.F.R. § 4225(b), such that the subordinated amount would only be recoverable if all other creditor claims were satisfied in full.  *See, e.g.*, *In re Affiliated Foods, Inc.*, 249 B.R. 770, 785 (Bankr. W.D. Mo. 2000) (citing *Cott Corp. v. New England Teamsters & Trucking Indus. Pension Fund* (*In re Cott Corp.*), 26 B.R. 332, 335 (Bankr. D. Conn. 1982).

[49]    The Debtors are serving Interrogatories and Requests for Production along with this objection to begin the discovery process.  *See* Fed. R. Bankr. P. 3007, 9014(c), 7033, 7034.

*see also In re Mallinckrodt Plc*, 2022 WL 3545583 at \*4. (D. Del. Aug. 18, 2022) (upholding a bankruptcy court's ruling to disallow claims a creditor failed to support with evidence). Here, as in *Minbatiwalla* and *Mallinckrodt*, creditors filed proofs of claim that summarily asserted liability without alleging substantive facts conducive to liability. *Id.* The *Minbatiwalla* and *Mallinckrodt* creditors had their claims rejected for insufficiency *despite* identifying discernible liabilities arising from contract and common law. *Id.* Here, Proofs of Claim 4303-06 fail to meet that lower bar: they fail to identify any contractual, statutory, or common law grounds for such claims, and (absent detail to substantiate them) they should be disallowed.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that this Court enter an order disallowing or modifying CSPF's Proofs of Claim.

| | |
|---|---|
| Dated:  December 8, 2023<br>Wilmington, Delaware | */s/ Laura Davis Jones* |
| | Laura Davis Jones (DE Bar No. 2436)<br>Timothy P. Cairns (DE Bar No. 4228)<br>Peter J. Keane (DE Bar No. 5503)<br>Edward Corma (DE Bar No. 6718)<br>**PACHULSKI STANG ZIEHL & JONES LLP**<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19899-8705 (Courier 19801)<br>Telephone:    (302) 652-4100<br>Facsimile:    (302) 652-4400<br>Email:    ljones@pszjlaw.com<br>            tcairns@pszjlaw.com<br>            pkeane@pszjlaw.com<br>            ecorma@pszjlaw.com |
| | Patrick J. Nash, P.C. (admitted *pro hac vice*)<br>David Seligman, P.C. (admitted *pro hac vice*)<br>Michael B. Slade (admitted *pro hac vice*)<br>Whitney Fogelberg (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654 |

Telephone:       (312) 862-2000
Facsimile:        (312) 862-2200
Email:            patrick.nash@kirkland.com
                  david.seligman@kirkland.com
                  michael.slade@kirkland.com
                  whitney.fogelberg@kirkland.com

-and-
Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:       (415) 439-1400
Facsimile:        (415) 439-1500
Email:            michael.esser@kirkland.com
                  john.christian@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*