**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | ) ) | Case No. 23-11069 (CTG) |
| Debtors. | ) ) ) ) | (Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF CODY LEUNG KALDENBERG
IN SUPPORT OF ENTRY OF ORDER (I) APPROVING
CERTAIN ASSET PURCHASE AGREEMENTS; (II) AUTHORIZING AND
APPROVING SALES OF CERTAIN REAL PROPERTY ASSETS OF THE DEBTORS
FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, IN
EACH CASE PURSUANT TO THE APPLICABLE ASSET PURCHASE AGREEMENT;
(III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION
THEREWITH, IN EACH CASE AS APPLICABLE PURSUANT TO THE APPLICABLE
ASSET PURCHASE AGREEMENT; AND (IV) GRANTING RELATED RELIEF**

I, Cody Leung Kaldenberg, hereby declare under penalty of perjury as follows:

1. On December 8, 2023, I submitted the *Declaration of Cody Leung Kaldenberg in Support of Entry of Order (I) Approving Certain Asset Purchase Agreements; (II) Authorizing and Approving Sales of Certain Real Property Assets of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, in Each Case Pursuant to the Applicable Asset Purchase Agreement; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, in Each Case as Applicable Pursuant to the*

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

*Applicable Asset Purchase Agreement; and (IV) Granting Related Relief* [Docket No. 1303] (the "Original Declaration").

2. I hereby submit this supplement to the Original Declaration (this "Supplemental Declaration") to provide additional detail relating to the Real Estate Auction for the Initial Properties and certain related matters.[2] The entirety of the Original Declaration, including, without limitation, the description of my professional background, is incorporated herein by reference as if fully set forth herein. If called as a witness, I could and would testify competently to the facts set forth in this Supplemental Declaration (and the Original Declaration). I am not being specifically compensated for this testimony other than through payments received by Ducera as a professional retained by the Debtors, subject to approval by this Court. I am over the age of 18 years and authorized to submit this Supplemental Declaration on behalf of the Debtors.

**The Auction Procedures for Bidding on the Initial Properties Were Designed In Consultation with the Consultation Parties to Maximize Value, and Did Maximize Value**

3. The Real Estate Auction for the Initial Properties (*i.e.*, one hundred and twenty eight (128) Owned Properties and two (2) Leased Properties) commenced on November 28, 2023, at 9:00 a.m. E.T. In accordance with the Bidding Procedures Order, the Debtors, in close consultation with the Consultation Parties—including the Committee—designed the procedures governing bidding for the Initial Properties (the "Auction Procedures") to create a format that the Debtors and the Consultation Parties agreed would best maximize estate value.

4. The goal of the Auction Procedures was to prevent and mitigate any collusion while maximizing the value of the Debtors' real estate portfolio. As discussed in the Original Declaration, the Debtors received over seventy (70) bids for Real Property Assets as of the Bid

---

[2] Capitalized terms used but not defined in this Supplemental Declaration shall have the meanings ascribed to such terms in the Original Declaration.

Deadline for the Real Property Assets. The majority of bids (*i.e.*, as submitted by over seventy percent (70%) of Qualified Bidders for the Real Property Assets) were to acquire five or fewer properties. The Debtors decided to design an auction process, in consultation with the Consultation Parties, where there would be competitive bidding for each individual Initial Property and where all Qualified Bidders would be able to bid on and compete for each such property for which they expressed bidding interest.

5.   Accordingly, the Debtors, with the support of and in consultation with the Consultation Parties, proceeded with bidding for the Initial Properties on a property-by-property basis. As further described below, the Debtors, in consultation with the Consultation Parties, (a) determined which bidders were Qualified Bidders with respect to each individual property, (b) conducted individual auctions for each Initial Property (*i.e.*, property-by-property bidding over the course of four competitive days of bidding), and (c) selected the Winning Bidder for each individual property on the sole basis that such Qualified Bidder presented the highest bid for such property relative to the other Qualified Bidders for that particular property.

6.   Appraisal values prior to the Petition Date of the Debtors' entire owned real estate portfolio totaled nearly $1.1 billion. Further, as discussed in the Original Declaration, the Stalking Horse Bid of Estes Express Lines, approved by this Court in September, totaled $1.525 billion for all of the Debtors' Owned Properties. The Winning Bids for just the Initial Properties (*i.e.*, approximately 75% of the Owned Properties and two of the Leased Properties) total just under $1.9 billion. The Winning Bids for the Initial Properties represent an approximately forty percent (40%) improvement relative to the "starting" bids for the Initial Properties, which totaled approximately $1.35 billion. There is no question that the Auction Procedures fostered four days of competitive property-by-property bidding for the Initial Properties and maximized their value.

7.  The Bidding Procedures Order provides that the Debtors, in consultation with the Consultation Parties, may modify and implement additional Auction Procedures to promote the goals of the Bidding Procedures and maximize value. Accordingly, the Debtors, in consultation and with the support of the Consultation Parties, implemented the below process for bidding on the Initial Properties. To the extent any aspect of the below protocol was not already set forth in the Bidding Procedures, the Debtors consulted with and received the support of the Consultation Parties before implementing the same, and clearly communicated the same to all Qualified Bidders in advance of bidding.

8.  Specifically, the Auction Procedures included the following aspects:

**(a)  Open Access to All Qualified Bidders.** As described in the Original Declaration, Ducera canvassed hundreds of potentially interested parties, including the Debtors' industry competitors and real estate investors, in the approximately three months preceding the commencement of the Real Estate Auction. In accordance with the Bidding Procedures Order, any Potential Bidder was able to become an Acceptable Bidder (and, ultimately, upon satisfying the criteria applicable to all Acceptable Bidders as set forth in the Bidding Procedures, a Qualified Bidder) for any Initial Property for which such bidder expressed bidding interest. In addition to our outreach, these are highly public chapter 11 cases that are being actively covered by the financial and restructuring press, and the fact that the Debtors' entire real estate portfolio was being auctioned to the highest bidder was not anywhere close to a secret. Indeed, interest in the Initial Properties was robust, and each and every Qualified Bidder was invited to attend the Real Estate Auction and bid. Accordingly, bidding on the Initial Properties included a broad composition of Qualified Bidders, ranging from Fortune 50 companies and major global investment managers to individual bidders seeking to acquire a single Initial Property.

**(b)  Anonymized Email Bidding.** The Debtors, in their business judgment and in close consultation with the Consultation Parties, determined that bidding on the Initial Properties would proceed anonymously and over email. We implemented this format both to eliminate the possibility of any collusion or communications among bidders whatsoever and to facilitate bidding by making it easy to bid. Based upon my discussions with the Debtors' senior management team as well as with bidders, I understand that the senior officers of the Debtors' industry competitors (*i.e.*, the approximately one-to-two dozen leading less-than-truckload (LTL) carriers in the United States) know each other both professionally and personally. The Debtors took seriously the risk—however remote—of any "side bar" discussions occurring among bidders which might have had the effect of altering bidding outcomes. Thus, the Debtors, in consultation and with the support of the Consultation Parties, determined that the Real Estate Auction for the Initial Properties would be conducted by email and anonymously, with Qualified Bidders learning neither the identities nor the number of competing Qualified Bidders.

**(c)** **Property-by-Property Bidding.** Each Initial Property was auctioned, property-by-property, to the applicable group of Qualified Bidders over the course of four competitive days of bidding. Between twenty-eight (28) and thirty-seven (37) Initial Properties were auctioned each day, with bidding for each day's group of Initial Properties both beginning and ending on the same day of bidding. As set forth in the Bidding Procedures, and based upon bidding activity and interest with respect to each individual Initial Property, the Debtors conducted successive Incremental Rounds, "Knock-Out" Rounds, and Best and Final Offer Rounds before arriving, in each case, at the applicable Winning Bid. Bidding instructions were prepared in consultation with the Consultation Parties and communicated in advance of bidding to all applicable Qualified Bidders.

**(i)** **Bidding Process and Communications**. For bidding on each Initial Property, and applicable to each round thereof:

**(1)** *first*, all applicable Qualified Bidders received from the Debtors a personalized spreadsheet containing (a) the property(ies) for which they were qualified to bid, (b) the current highest bid for such property(ies), (c) the minimum overbid requirements for such property(ies), and (d) requirements for submitting bids. Each such spreadsheet included language stating, and in submitting its bid each bidder attested, that in preparing and submitting its bid the bidder had proceeded in good faith and without collusion or communication with any other bidder of any type or kind whatsoever. Each spreadsheet was accompanied by a cover email from the Debtors to the applicable Qualified Bidder restating the procedures as well as stating the submission deadline for bids.

**(2)** *second*, upon receipt of completed and executed spreadsheets, and at each round of bidding, the Debtors and the Consultation Parties reviewed the submissions received and determined the bids qualified to proceed into the next round of bidding based on the specific qualification requirements of that round which were communicated to bidders in advance of each round. This process continued until the Debtors, in consultation with the Consultation Parties, determined a Winning Bidder with respect to each Initial Property, with Qualified Bidders notified at the end of each day of bidding the Initial Property(ies) they had won or not won.

**(ii)** **Types of Rounds.** In their discretion and in consultation with the Consultation Parties, the Debtors employed three types of bidding "rounds": Incremental Rounds, Knock-Out Rounds, and Best & Final Rounds, each as described below. The type of round was communicated to each applicable Qualified Bidder in advance of the start of bidding on that round.

**(1)** **Incremental Rounds**. In an Incremental Round, bids were required to match or exceed the "Minimum Bid" communicated in advance to all applicable Qualified Bidders as part of their personalized spreadsheet. All bidders matching or exceeding the applicable Minimum Bid advanced to the next round of bidding.

5

    **(2)**   **Knock-Out Rounds**. In a Knock-Out Round, the lowest bidder in that round (provided that three or more active bidders remained bidding on the applicable property) was eliminated from the subsequent round of bidding.

    **(3)**   **Best & Final Rounds**. In a Best & Final Round, all remaining Qualified Bidders were invited to submit a final bid for the applicable property, with the highest bid in such round provisionally declared the Winning Bidder for that property.

   **(iii)**   **Package Bid.** My discussion in the Original Declaration of the Package Bid (defined below) is incorporated herein by reference. Each Initial Property, including those contained within the Package Bid, was auctioned on a property-by-property basis to all applicable Qualified Bidders. XPO was invited to participate in, and did participate in, the individual auctions for such properties upon its initial Package Bid being outbid by the aggregate of the otherwise highest bidders for each such property, which forced it to increase its Package Bid materially. Ultimately, in consultation with the Consultation Parties, the Debtors determined in their business judgment that the Package Bid—which (a) increased substantially over the course of the bidding process as a result of the competitive property-by-property bidding by other Qualified Bidders and (b) presents considerable more value to the estates relative to the aggregate of the Non-Package Bids for the Package Properties (each defined below)—represented the highest (and considerably more) value to the estates for the Package Properties relative to the aggregate of the highest Non-Package Bids for such properties.

  **(d)**   **Extensive Consultation with Consultation Parties.** The Debtors and their advisors consulted closely with the Consultation Parties with respect to devising and implementing the Bidding Procedures and the Auction Procedures. Not one aspect of the Bidding Procedures or the Auction Procedures lacked or lacks the support of the Consultation Parties, which were each afforded an active role in developing the Auction Procedures and were invited to the offices of Kirkland & Ellis LLP, the Debtors' lead restructuring counsel, to consult real-time during the course of the Real Estate Auction. Indeed, representatives of the Committee, among other Consultation Parties, did attend (in-person at Kirkland's offices) and consult in real-time and round-by-round regarding the bidding process during the entire week of bidding on the Initial Properties, all with a goal of maximizing value for stakeholders.

  **(e)**   **Communications with Qualified Bidders.** All Auction Procedures and other bidding instructions and rules were communicated in advance of bidding to all applicable Qualified Bidders and in consultation with the Consultation Parties.

   **(i)**   **Initial Communications.** On November 21, 2023 (one week prior to commencement of the Real Estate Auction for the Initial Properties), Ducera distributed a document to all Qualified Bidders for the Initial Properties (attached hereto as **Exhibit A**) which provided an overview of the Auction Procedures, including: (i) a description of the anonymized email bidding process; (ii) instructions for participation; (iii) the basis on which Winning Bids would be determined by the Debtors; (iv) a description of the types of bidding rounds that would be utilized during bidding; and (v) a timeline for further communications

and instructions, including when "opening bids" for each Initial Property would be distributed to applicable Qualified Bidders. Attached to this document was a "Designated Auction Representative Form" pursuant to which bidders were required to identify representatives duly authorized to both send and receive bid information during the Real Estate Auction. Qualified Bidders were required to complete and sign the Designated Auction Representative Form prior to being able to bid in the Real Estate Auction.

**(ii)** **Pre-Bidding Communications.** Each day in advance of bidding on the Initial Properties—beginning November 27, 2023 and continuing each day through November 30, 2023—Ducera distributed to each applicable Qualified Bidder by email (i) the "opening bids" for each Initial Property to be auctioned the following day and (ii) further instructions for the following day of bidding.[3]

**(iii)** **Live Communications.** During the Real Estate Auction for the Initial Properties, Ducera provided each applicable Qualified Bidder with a personalized spreadsheet and email prior to the commencement of each round of bidding, (i) restating the procedures for the subsequent round of bidding and (ii) setting forth the specific bid requirements for each applicable Initial Property being auctioned in such round.

**(f)** **Live Record Maintained of All Bidding.** Notwithstanding the anonymized, email format of the Real Estate Auction for the Initial Properties and the lack of a traditional "transcriber," the Debtors, in accordance with the Bidding Procedures, maintained a full record real-time during the bidding process. All communications to and from Qualified Bidders, including bidding instructions and bids received, were recorded in the form of the emails sent and received by and among the Debtors and the applicable participating Qualified Bidders. Thus, the Debtors kept, and there is, a robust record of the Real Estate Auction for the Initial Properties.

9. In my opinion and based upon my professional experience, the Auction Procedures were fair to all bidders, were developed and implemented in close consultation with the Consultation Parties, and were designed to maximize—and did maximize—the property-by-property values of the Initial Properties.

---

[3] A sample of such communication (with the Objecting Landlord (defined below)) is shown at **Exhibit B**.

7

### 1313 Grand Street Realty, LLC Failed to Submit the Highest or Best Bid for the 1313 Grand Street, Brooklyn, NY Leased Property

10.     As described above, the Auction Procedures abided fully with the Bidding Procedures Order and were fair to all Qualified Bidders, including the one party objecting to the Debtors' proposed Sale Order: 1313 Grand Street Realty, LLC (the "Objecting Landlord"), which filed that certain objection to the Sale Order at Docket No. 1304 (the "Objection"). The Objecting Landlord is the lessor of the Debtors' Leased Property at 1313 Grand Street, Brooklyn, New York 11211 (the "Lease").

11.     The Objecting Landlord asserts that it submitted the "highest and best bid for the Lease." *See* Objection, ¶19. That is not correct. The Debtors, in their business judgment and in consultation with the Consultation Parties, determined that XPO was the Winning Bidder of the Lease—one of the twenty-eight (28) Initial Properties won by XPO pursuant to its $870 million package bid (the "Package Bid")—because the Package Bid presented the highest and best offer for the Lease. In fact, XPO separately bid $7.5 million for the Lease, and the Objecting Landlord was offered the opportunity to top that bid but declined to do so.

12.     More specifically, despite the fact that it initially bid only $100, the Objecting Landlord was invited to participate in the Real Estate Auction and bid further on the Lease. See **Exhibits B** and **C**. The Objecting Landlord did, in fact, bid for the Lease. *Id*. However, not one time did the Objecting Landlord raise to me or any member of my team any of the issues raised by it in its Objection, including alleged concerns about Auction Procedures, bidding instructions, or communications. Further, like all other Qualified Bidders bidding for the properties contained within the Package Bid (collectively, the "Package Properties"), the Objecting Landlord was notified by my team in writing, in advance of each round of bidding for the Lease, that a certain

8

package bidder stood to win all of the Package Properties if the aggregate of the otherwise highest bids for each individual Package Property failed to exceed the Package Bid. Id.

13. Specifically, Qualified Bidders for the Package Properties, including the Lease, were notified in writing, in advance of each round of bidding for each Package Property, that bidding on each Package Property would proceed on a property-by-property basis until the aggregate of the highest bids for the Package Properties submitted by Qualified Bidders not the package bidder (collectively, the "Non-Package Bids") exceeded the Package Bid. Indeed, in the opening round of bidding for the Package Properties, the Non-Package Bids aggregated to a value significantly below the then-submitted Package Bid. Subsequently, in advance of each successive round of bidding for Package Properties, each applicable Qualified Bidder, including the Objecting Landlord, was provided guidance as to how far the Non-Package Bids were from matching the Package Bid to provide them with a means of benchmarking for the preparation of their bids for the Package Properties.

14. Once the aggregate value of the Non-Package Bids met the value of the Package Bid, the Debtors required XPO to bid on a property-by-property basis and/or increase its Package Bid in order to attempt to outbid the Non-Package Bids for the Package Properties. In response, XPO increased its bid on certain individual properties, including the Lease, as well as increased its Package Bid. My team informed the Objecting Landlord in writing that a bid for $7.5 million (which was XPO's bid, although no other bidder was provided the identity of the highest bidder) was the current highest bid for the Lease and invited the Objecting Landlord to submit a "best and final" offer for the Lease as part of a "Best & Final Round" for the Lease. See **Exhibit B**. Further, the Objecting Landlord was invited to submit a new bid as part of the prior "Incremental Round," and in response, the Objecting Landlord communicated to Ducera that it had "determined not to

submit any further bids." See **Exhibit B**. Still, as mentioned above and despite this feedback, the Objecting Landlord was provided an opportunity to submit a "best and final bid" in spite of its failure to submit a bid at all as part of the prior Incremental Round for the Lease. The Objecting Landlord, required to outbid $7.5 million for the Lease, did not bid further. See **Exhibits B** and **C**. Thus, the Objecting Landlord did not win the Lease and the assertion in its Objection that it submitted the highest and best bid for the Lease is simply incorrect.

15. In my opinion, based upon my professional judgment and review of all bids submitted for the Lease, the Package Bid provides the highest value to the estates for the sale of the Lease and was submitted by XPO in good faith. The Auction Procedures, including with respect to bidding on the Package Properties, were fair to all Qualified Bidders and devised and implemented with the full support of the Consultation Parties. Thus, the Debtors' sale of the Lease to XPO as part of the Package Bid is in the best interests of the estates and should be authorized pursuant to the proposed Sale Order.

### XPO Has Provided Adequate Assurance of Future Performance Under the Lease

16. The Objecting Landlord calls into question XPO's ability to adequately perform under the Lease. See Objection, Sec. B. XPO is a publicly-traded Fortune 500 company with a market capitalization of over $9.5 billion and last twelve months' revenue of over $7.6 billion. The annual rent under the Lease is approximately $1.1 million. Shortly after the Debtors filed the Notice of Winning Bidders, the Debtors sent the Objecting Landlord XPO's adequate assurance package, including XPO's audited balance sheet, and upon the Objecting Landlord filing its Objection—the first time the Debtors and their advisors learned of any such issues—the Debtors put the Objecting Landlord and representatives of XPO immediately in contact to discuss resolving the same. Further, as reflected in the proposed Sale Order, the Debtors have agreed to escrow in

full any disputed Cure Costs under the Lease pending resolution between the Debtors and the Objecting Landlord or further order of the Court. We do not believe there are legitimate grounds for concern over XPO's ability to adequately perform under the Lease, as it is a well-capitalized entity that is clearly capable of doing so. Accordingly, I believe that the Court should enter the proposed Sale Order authorizing, among other things, the proposed assignment of the Lease to XPO.

## **Conclusion**

17. Accordingly, based upon the foregoing, my Original Declaration, and my professional experience and judgment, and with the support of the Consultation Parties, I respectfully submit that the Court should approve the proposed Sale Order.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  December 11, 2023                    /s/ Cody Leung Kaldenberg

Cody Leung Kaldenberg
Partner
Ducera Partners, LLC

*Investment Banker to the Debtors*