**<u>Exhibit B</u>**

**Reply**

DE:4879-6123-4581.1 96859.001

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket Nos. 1285, 1304** |
| | ) | |

**REPLY IN FURTHER SUPPORT OF ENTRY OF THE DEBTORS' PROPOSED ORDER (I) APPROVING CERTAIN ASSET PURCHASE AGREEMENTS; (II) AUTHORIZING AND APPROVING SALES OF CERTAIN REAL PROPERTY ASSETS OF THE DEBTORS, FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, IN EACH CASE PURSUANT TO THE APPLICABLE ASSET PURCHASE AGREEMENT; (III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH, IN EACH CASE AS APPLICABLE PURSUANT TO THE APPLICABLE ASSET PURCHASE AGREEMENT; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") file this reply in further support of entry of the Debtors' proposed *Order (I) Approving Certain Asset Purchase Agreements; (II) Authorizing and Approving Sales of Certain Real Property Assets of the Debtors, Free and Clear of Liens, Claims, Interests, and Encumbrances, in Each Case Pursuant to the Applicable Asset Purchase Agreement; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, in Each Case as Applicable Pursuant to the Applicable Asset Purchase Agreement; and (IV) Granting Related Relief* (the "Sale Order"), and in response to 1313 Grand Street Realty, LLC's objection thereto [Docket No. 1304]

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

(the "Objection" and 1313 Grand Street Realty, LLC, the "Objector"). In support of this reply and in further support of entry of the Sale Order, the Debtors respectfully state as follows:

**Preliminary Statement[2]**

1. Following the operational shutdown of their businesses, on August 6, 2023, the Debtors commenced these chapter 11 cases to effectuate the orderly winddown of their estates, with the goal of maximizing value. Prior to the Petition Date, the Debtors' owned real estate portfolio was appraised at nearly $1.1 billion. Supplemental Kaldenberg Declaration ¶ 6.[3] Shortly after the Petition Date, and after a competitive bidding process, the Debtors entered into the stalking horse agreement with Estes Express Lines for the Debtors' 174 owned properties for a purchase price of $1.525 billion. Now, the Debtors with the support of their key stakeholders, including the Committee, stand before this Court seeking approval of approximately 21 sale transactions, for 128 owned properties and two leased properties, for an aggregate purchase price of $1.88 billion—a value that not only far exceeds the stalking horse bid and will lead to the payoff of all prepetition secured debt in full, but also leaves 46 owned properties and substantially all of the Debtors' leased properties and rolling stock assets still to be sold.

---

[2] Capitalized terms used but not defined in this Preliminary Statement shall have the meaning ascribed to them elsewhere in this reply, the Objection, the Bidding Procedures, or the Sale Order, as applicable.

[3] "Supplemental Kaldenberg Declaration" means the *Supplemental Declaration of Cody Leung Kaldenberg in Support of Order (I) Approving Certain Asset Purchase Agreements; (II) Authorizing and Approving Sales of Certain Real Property Assets of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, in Each Case Pursuant to the Applicable Asset Purchase Agreement; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, in Each Case as Applicable Pursuant to the Applicable Asset Purchase Agreement; (IV) and Granting Related Relief* [Docket No. 1330].

2.     Included in these proposed sales is the assignment of the 1313 Grand Street Lease to XPO, Inc. ("XPO"),[4] for $7.5 million, as part of XPO's overall $870 million winning bid. Even though the Debtors have many thousands of creditors, four secured lenders, the Creditors' Committee, 21 proposed purchasers, and numerous other interested parties, *only one party*, the landlord of 1313 Grand Street, has objected to any of the sales.[5] But the Objector lost the auction fair and square. It actively participated in the bidding and auction process,[6] never once raising a concern to the Debtors or their advisors prior to, during, or after the auction. And the Objector's best and final bid was materially lower than the highest individual bid for the 1313 Grand Street Lease, which *still* did not exceed the winning $870 million "package" bid when aggregated with the other highest individual bids. In fact, after the Objector declined to submit any further bid, the Debtors still went back to the Objector to offer the opportunity to participate in the "best and final" round. The Objector declined. The first time the Debtors were made aware the Objector had any issue at all was upon receipt of the Objection.

3.     Contrary to the assertions made in the Objection, the Debtors conducted a robust and successful auction process that, at all times, complied with the Bidding Procedures, including step by step consultation with the Committee and other Consultation Parties—all of which support the relief requested. The Debtors and their advisors, in consultation with the Consultation Parties, advanced a comprehensive process to protect against collusion and promote competitive bidding,

---

[4]   XPO informed the Debtors that, in accordance with section 10.4(b) of the XPO asset purchase agreement [Docket No. 1298] that XPO designates XPO LTL Properties, LLC as the designated purchaser (the "XPO Designated Purchaser").

[5]   One other party, Mid-American Constructors, LLC, filed a limited objection at Docket No. 1323. The Debtors have since resolved this objection with the inclusion of certain language in the Sale Order.

[6]   The Objector submitted an initial bid of $100 plus any cure amounts and was deemed a Qualified Landlord Bidder by virtue of its property interest in the Lease.

with confidential, virtual, and anonymous auction rounds on a property-by-property basis, as described in more detail in the Supplemental Kaldenberg Declaration. The Objector offers zero evidence to the contrary because there is none.

4. Despite the Objector's allegations that bidders had a "lack of information" and that the process was unclear, Objector never raised these concerns in any of its ongoing discussions with the Debtors, instead continuing to submit bids in each round. And none of the other hundreds of bidders has complained. The reason is simple: the Debtors and their advisors were clear in all communications to Qualified Bidders that the auction would proceed anonymously—meaning the Objector would not know who it was bidding against just as other bidders would not know the Objector was bidding—and would proceed on a property-by-property basis until the individual bids, whose aggregate opening bids were significantly below the value of the "package" bid, met or exceeded the "package" bid.[7] In light of the auction's anonymous nature, each round's opening communication included guidance on how far the aggregate individual bids were from meeting the "package" bid to provide a means of benchmarking to individual bidders. Once the individual bids did successfully meet the "package" bid, the "package" bidder submitted additional bids on a property-by-property basis and increased its "package" bid in order to bid again, resulting in both the $7.5 million bid provided to the Objector as the then current highest bid for the 1313 Grand Street Lease, as well as the $870 million "package" bid that was ultimately designated as XPO's winning bid. Ultimately, the aggregate of the individual bids was an amount less than XPO's $870 million "package" bid, but even if the aggregate of the individual bids had exceeded XPO's

---

[7] *See* Supplemental Kaldenberg Declaration ¶ 13.

4

"package" price, the Objector would have still lost since its last bid was $5.1 million[8], which is less than the $7.5 million high bid for the 1313 Grand Street Lease.[9]

5.  On December 4, 2023,[10] the Debtors declared XPO the successful bidder with respect to 26 owned terminals and two leases, one of which was the 1313 Grand Street Lease, for which XPO's last bid on a property-by-property basis was $7.5 million.[11]  Despite assenting to the Debtors' bidding procedures and then actively participating in the auction, and despite being provided the opportunity to "top" the $7.5 million winning price but electing not to,[12] the Objector now—only after losing the auction—seeks to cast aspersions on the integrity of the process to prevent the Debtors from closing on the highest offer.  But there is no basis for the objection, and the proof is in the pudding.  The Debtors' auction process yielded an aggregate purchase price of nearly $1.9 billion for the properties at issue—approximately 2.4 times the originally appraised value.  Supplemental Kaldenberg Declaration ¶ 6.  The process worked.  Accordingly, the Court should overrule the Objection and approve the proposed sale transactions, including assignment of the Lease to XPO.

## General Background

6.  On August 7, 2023, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I)(A) Approving Bidding Procedures for the Sale or Sales of the Debtors' Assets;*

---

[8]  Such last bid was in addition to a proposed waiver of cure amounts totaling at least $300,846.40.

[9]  *See* Supplemental Kaldenberg Declaration, Exhibit C.

[10] The Objection states the notice of winning bidder was due to be filed on December 1, 2023.  Not so.  As permitted by the Bidding Procedures, the Debtors extended such date to December 5, 2023.  Notice of the extended deadline was filed and served on counsel to the Objector.  *See* Docket Nos. 1267, 1307.

[11] While $7.5 million is the value allocated to this property under the XPO bid, the $870 million bid also includes a premium price on top of the individual property allocations.

[12] *See* Supplemental Kaldenberg Declaration ¶ 14.

5

*(B) Scheduling an Auction and Approving the Form and Manner of Notice Thereof; (C) Approving Assumption and Assignment Procedures, (D) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Therefore; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 22] (the "<u>Bidding Procedures Motion</u>").

7.	On September 11, 2023, the Debtors filed the amended proposed *Order (I)(A) Approving Bidding Procedures for the Sale or Sales of the Debtors' Assets; (B) Scheduling Auctions and Approving the Form and Manner of Notice Thereof; (C) Approving Assumption and Assignment Procedures, (D) Scheduling Sale Hearings and Approving the Form and Manner of Notice Therefore; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 444] (the "<u>Bidding Procedures Order</u>").

8.	On September 12, 2023, the Debtors and Estes Express Lines (the "<u>Real Estate Stalking Horse Bidder</u>"), entered into that certain stalking horse asset purchase agreement for all of the Debtors' owned properties for a purchase price of $1.525 billion.  On September 13, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Selection of a Real Estate Stalking Horse Bidder, (II) Approving Bid Procedures in Connection Therewith, and (III) Granting Related Relief* [Docket No. 518], which order was entered on September 21, 2023 [Docket No. 624].

9. The Court entered the Bidding Procedures Order on September 15, 2023 [Docket No. 575], setting the cure deadline as November 9, 2023, the sale objection deadline as December 8, 2023, and the initial sale hearing for December 12, 2023 at 10:00 a.m. prevailing Eastern Time.

10. On October 26, 2023, the Debtors filed the *Notice of Potential Assumption or Assumption and Assignment of Certain Contracts or Leases Associated with the Non-Rolling Stock Assets* [Docket No. 968] (the "Cure Notice"), which listed the cure amount for the 1313 Grand Street Lease as $95,202.00.

11. On November 8, 2023, the Objector file an objection to the Cure Notice [Docket No. 1072], asserting cure costs of at least $300,846.40.

12. On November 9, 2023, the Objector submitted a bid for the 1313 Grand Street Lease in the amount of $100 plus any and all cure costs. By virtue of its property interest in the 1313 Grand Street Lease, the Objector was deemed a Qualified Landlord Bidder. Supplemental Kaldenberg Declaration ¶ 10.

13. The Debtors' auction for Real Property Assets commenced on November 28, 2023. As described in the Kaldenberg Declaration, the auction was extremely competitive, with many participants submitting many topping bids for individual assets and packages of assets. The 1313 Grand Street Lease was auctioned on November 28, 2023, and the Objector actively participated through six rounds of bidding. Supplemental Kaldenberg Declaration ¶ 12.

14. Ultimately, XPO bid $7.5 million for the 1313 Grand Street Lease individually, and also separately included it within its global bid for $870 million. The Objector was given the opportunity to try to top the $7.5 million bid for the 1313 Grand Street Lease alone, but it declined to do so. *See* Supplemental Kaldenberg Declaration ¶ 14.

15. On December 4, 2023, the Debtors filed the *Notice of Winning Bidders and, if Applicable, Back-Up Bidders With Respect to Certain of the Debtors' Real Property Assets* [Docket No. 1268], publicly announcing XPO as the winning bidder for the 1313 Grand Street Lease.

16. On December 8, 2023, the Objector filed the Objection.

### Argument

**A. The Parties Complied with the Bidding Procedures Order in Conducting a Fair Auction Process That Resulted in the Proposed Sale of the 1313 Grand Street Lease to XPO.**

17. "[A]n unsuccessful bidder may have standing to challenge the actions of a successful bidder that destroyed the 'intrinsic fairness' of the sale transaction so that it was not a good faith purchaser. To challenge the intrinsic fairness of a sale, the disappointed bidder must allege that the sale was tainted by fraud, bad faith, collusion, deceit, mistake or unfairness." *Macquarie Rotorcraft Leasing Holdings Ltd. v. LCI Helicopters (Ir.) Ltd. (In re Waypoint Leasing Holdings Ltd.)*, 607 B.R. 143, 156 (Bankr. S.D.N.Y. 2019). Here, the Objector offers no evidence of any of the above, because none exists. The Objector does not even allege facts suggesting that the Bidding Procedures or the auction itself, each of which it consented to via its active participation over six rounds, were "deeply flawed." *See, e.g.*, *Kravitz v. Samson Energy Co. (In re Samson Res. Corp.)*, 15-11934 (BLS), 2023 WL 4003815, at *1 (Bankr. D. Del. June 14, 2023) ("As a practical matter, it is incumbent on a party challenging the value of a sold asset to demonstrate that the marketing and sale process was irretrievably tainted or deeply flawed.").

18. The Objector's sole avenue of attack, accordingly, is to attempt to demonstrate that the winning $7.5 million price, a price that the Objector was given the opportunity to beat but declined (and even if the Objector **had** beat it, the package bid was still higher), was a number pulled out of the Debtors' hat rather than submitted by XPO pursuant to their own bid submissions.

8

The Objector also references what was merely nomenclature on XPO's original APA submission, and which was subsequently clarified, to suggest as much.[13]

19. The reality is that XPO actually bid $7.5 million for the lease (excluding any premium reflected in its package bid) in question and the Objector refused to come even close. Supplemental Kaldenberg Declaration ¶ 14. Thus, the auction process worked as intended—XPO and the Objector engaged in robust, competitive bidding for an asset they both desired. *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 136 (3d Cir. 2017) ("As to value, we have said that, '[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt' . . . a competitive auction strongly indicates that a purchaser has paid appropriate value for estate assets." (internal citations omitted)). Ultimately, the Objector "failed to win at the auction not because of" the Debtors' or XPO's "conduct, but because of" the Objector's "own decisions during the bidding process"—namely, declining to submit a higher bid. *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 136 (3d Cir. 2017).

### B. The Debtors Have Provided Adequate Assurance of Future Performance.

20. Section 365(b)(1)(C) of the Bankruptcy Code provides that a debtor seeking to assume a contract or unexpired lease must provide "adequate assurance of future performance under such contract or lease." 11 U.S.C. § 365(b)(1)(C). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988). Adequate assurance does not mean that a debtor has to guarantee the success of the

---

[13] In accordance with the Bidding Procedures, XPO was required to bid on a property-by-property basis. It did so but also submitted a "package" bid which included a premium price on top of the individual bids. The "Backup Bid Amount" referenced by the Objector was clarified to "Opening Bid Amount" on December 7, 2023 [Docket No. 1298] prior to the filing of the Objection.

9

proposed assignee. *See In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Adequate assurance may be established by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business to give it strong likelihood of succeeding). Further, when evaluating a potential assignee, "the chief determinant of adequate assurance of future performance is whether the rent will be paid." *Id.* at 605 (*citing In re Natco Indus., Inc.*, 54 B.R. 436, 440-441 (Bankr. S.D.N.Y. 1985)).

21. Objector references a "rudimentary balance sheet" regarding the adequate assurance provided. Objection ¶ 29. XPO is a public company with a market cap of approximately $9.5 billion. Supplemental Kaldenberg Declaration ¶ 16. Its financial information is publicly available, and the provided ***audited*** balanced sheet was taken from such publicly available filings. *Id.* Following provision of the adequate assurance package, the Debtors did not receive any further questions or requests for additional adequate assurance. Again, it was only upon receipt of the Objection that the Debtors became aware of any issue at all. At that time, the Debtors immediately put the Objector directly in contact with XPO's counsel to facilitate a resolution.

22. As evidenced by its public filings and the adequate assurance information provided, XPO will be well-capitalized and will have the requisite corporate backing to perform under the 1313 Grand Street Lease. Moreover, section 365(b) of the Bankruptcy Code does not require that a purchaser guarantee future performance under an assigned contract; rather, it must only

demonstrate adequate assurance of future performance. *See Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001) ("What constitutes 'adequate assurance' is to be determined by factual conditions; the seller must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary and capricious. [. . .] The phrase 'adequate assurance of future performance' … is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.") (citations omitted); *In re Fleming Co.*, 499 F.3d 300, 305 (3d Cir. 2007) (discussing *Cinicola*'s definition of adequate assurance of future performance and subsequently noting that "[i]t is clear that adequate assurances need not be given for every term of an executory contract"); *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (explaining that to fulfill the requirements for adequate assurance of future performance, "[e]very single detail need not be hammered out") (citations committed).

23.    Additionally, as reflected in Section 7.10 of the Sale Order, the Debtors will escrow in full any cure costs in dispute pending resolution between the Debtors and the applicable counterparty or a further order of this Court.  Thus, the Objector is not harmed by permitting the assignment to proceed while parties continue to reconcile and resolve cure costs.

24.    The Debtors believe that, on the basis of the financial sources cited above, the content of the adequate assurance packages provided, and the Debtors' escrowing of dispute cure amounts, adequate assurance of future performance has been demonstrated, and any objections related to adequate assurance or cure costs should be overruled.

**C.      The 1313 Grand Street Lease is Being Assumed and Assigned in Its Entirety.**

25.     Finally, the Objector implies that parts of the 1313 Grand Street Lease will be "cherry-picked" in its assumption and assignment to XPO. That is patently false and at no point in these cases have the Debtors ever represented that they would seek to assume and assign only a portion of any lease. XPO is acquiring the entire 1313 Grand Street Lease, warts and all, full stop. The Objectors' conditioning entry of the Sale Order upon execution of a separate, standalone Assumption and Assignment Agreement is unwarranted and unnecessary.

## Conclusion

26.     For the reasons set forth herein, the Debtors respectfully request the Court overrule the Objection and enter the Sale Order.

Dated: December 11, 2023
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | Whitney Fogelberg (admitted *pro hac vice*) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |
| Wilmington, Delaware 19801 | Telephone: (312) 862-2000 |
| Telephone: (302) 652-4100 | Facsimile: (312) 862-2200 |
| Facsimile: (302) 652-4400 | Email: patrick.nash@kirkland.com |
| Email: ljones@pszjlaw.com | david.seligman@kirkland.com |
| tcairns@pszjlaw.com | whitney.fogelberg@kirkland.com |
| pkeane@pszjlaw.com | |
| ecorma@pszjlaw.com | -and- |

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*