# Exhibit B

**Changed Pages to the Estes Asset Purchase Agreement**

Closing, Seller's right, title and interest in and to such Acquired Asset shall promptly be transferred and assigned to Purchaser or a Designated Purchaser in accordance with the terms of this Agreement and the Sale Order. Notwithstanding anything herein to the contrary, (x) the provisions of this Section 1.5(b) shall not apply to any Consent or approval required under the HSR Act, if required, and any Antitrust Laws, which Consent or approval shall be governed by Section 6.3 and (y) no Seller will be obligated to pay any consideration therefor to any third party from whom Consent or Governmental Authorization is requested or to initiate any litigation to obtain any such Consent or Governmental Authorization.

## ARTICLE II
### CONSIDERATION; PAYMENT; CLOSING

2.1  Consideration; Payment.

(a)  The aggregate consideration (collectively, the "Purchase Price") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) a cash payment of TWO HUNDRED FORTY-EIGHT MILLION SEVEN HUNDRED TWENTY THOUSAND FIVE HUNDRED AND FIVE DOLLARS ($248,720,505.00), subject to adjustments as specified in Section 2.7 (the "Cash Payment"), (ii) the assumption of Assumed Liabilities, ~~provided that, notwithstanding the foregoing,~~ (iii) the storage of the Rolling Stock on Purchaser's property pursuant to Section 6.13 hereof, and (iv) such other consideration under law provided to Sellers pursuant to this Agreement.

(b)  At the Closing, Purchaser shall deliver, or cause to be delivered, to Sellers the Cash Payment, as adjusted pursuant to Section 2.7, less the Deposit, (the "Closing Date Payment"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two Business Days prior to the date such payment is to be made.

(c)  The Purchaser shall be liable for and shall pay all Transfer Taxes in addition to the Purchase Price.

2.2  Deposit.

(a)  Purchaser, Yellow and Acquiom Clearinghouse LLC (the "Escrow Agent") have entered into the Escrow Agreement, pursuant to which, Purchaser has previously made an earnest money deposit with the Escrow Agent in the amount equal to or greater than 5% of the Cash Payment portion of the Purchase Price (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate segregated, interest bearing escrow account maintained by the Escrow Agent in accordance with the Bidding Procedures Order and Escrow Agreement. Interest will be applied to the Purchase Price if Purchaser is the Successful Bidder and returned to Purchaser in accordance with Section 2.2(c) if Purchaser is not the Successful Bidder. The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any Seller or Purchaser and shall be applied against

(a) <u>Closing</u>. The closing of the purchase and sale of the Acquired Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities in accordance with this Agreement (the "<u>Closing</u>") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022) at 10:00 a.m. Eastern Time on the second Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in <u>Article VII</u> (other than conditions that by their terms or nature are to be satisfied at the Closing), or at such other place and time as the Parties may agree in writing; <u>provided</u> that the Closing will occur no earlier than 120 calendar days after the Petition Date (*i.e.*, December 4, 2023), which may be extended to 150 days with the written consent of Purchaser (such consent not to be unreasonably withheld) and the Persons whose consent is required under any debtor-in-possession financing agreement(s) of Sellers. The date on which the Closing actually occurs is referred to herein as the "<u>Closing Date</u>." In anticipation of and following the Closing Date, Sellers and Purchaser shall make all commercially reasonable efforts to accomplish the recording of all documents and instruments necessary to transfer title to the Acquired Real Property within fourteen (14) days of Closing.

(b) <u>Closing Escrow</u>. The Closing shall take place pursuant to a money escrow at Newmark Title Services, One Penn Plaza, Suite 3406, New York, NY 10119, Ph: (301) 347-4886, Attn: Douglas M. Atkins, Senior Commercial Counsel (douglas.atkins@nmrk.com) (the "<u>Title Company</u>") in accordance with the standard document and money escrow agreement utilized by the Title Company ("<u>Closing Escrow</u>") to be opened with the Title Company on or before the Closing Date, with such special provisions inserted in the Closing Escrow as may be required to conform to this Agreement; <u>provided</u> that, in the event of a conflict between the terms of this Agreement and the Closing Escrow, the terms of this Agreement shall control. All of the documents required to be delivered pursuant to <u>Section 2.4</u> and <u>Section 2.5</u>, and otherwise appropriate to consummate the Transactions shall be delivered to the Title Company, as closing agent, on or before Closing. Notwithstanding the foregoing, the Parties agree that the Closing may take place remotely or in a manner so that the Parties and their respective attorneys, or any of them, need not be physically present and may deliver all necessary documents by overnight mail or other means, in which event the Parties agree to complete all arrangements for Closing not later than the Closing Date so that all requirements, with the exception of the Purchase Price, for Closing are in place by the scheduled time for the Closing.

(c) [Intentionally omitted].

2.4 <u>Closing Deliveries by Sellers</u>. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a) an assignment and assumption agreement substantially in the form of <u>Exhibit A</u> (the "<u>Assignment and Assumption Agreement</u>") duly executed by the applicable Sellers;

(b) ~~[intentionally omitted]~~<u>a quit claim deed with respect to each parcel of Acquired Real Property located outside of Canada, duly executed by the applicable Sellers</u>;

7

8.2     Effect of Termination.

(a)     In the event of termination of this Agreement in accordance with Article VIII, this Agreement shall forthwith become null and void and no Party or any of its partners, officers, directors, managers or equityholders will have any Liability under this Agreement; provided that Section 2.2, Section 6.2(b), Section 6.6(e), Section 6.12, this Section 8.2 and Article X shall survive any such termination; provided further that no termination will relieve Purchaser from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not be limited to reimbursement of expenses or out-of-pocket costs, and would include the benefits of the Transactions lost by Sellers (taking into consideration all relevant matters, including other combination opportunities and the time value of money), which shall be deemed in such event to be damages of Sellers) resulting from any Willful Breach of this Agreement prior to the date of such termination (which, for the avoidance of doubt, will be deemed to include any failure by Purchaser to consummate the Closing if and when it is obligated to do so hereunder). Subject to Section 10.12, nothing in this Section 8.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

(b)     [Intentionally Omitted].

(c)     [Intentionally Omitted].

(d)     Subject in all cases to Section 10.12, prior to the Closing, in the event of any breach by any Seller of this Agreement, the sole and exclusive remedy of Purchaser shall be to terminate this Agreement in accordance with Section 8.1.

(e)     [Intentionally Omitted].

## ARTICLE IX
### TAXES

9.1     Transfer Taxes. Any U.S. ~~federal, Canadian~~ federal, state, provincial, local, municipal, and non-U.S. sales, consumption sales, goods and services, harmonized sales, use, excise, value added, registration, real property, deed, land transfer, retail sales, mutations, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, duties on the transfer of immovables or other Taxes and recording charges (including all related interest, penalties, and additions to any of the foregoing) payable by reason of the purchase or sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the Transactions (the "Transfer Taxes") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes with the appropriate Taxing Authority. Purchaser or Designated Purchaser shall pay any Transfer Taxes to the Sellers or directly to the relevant Governmental Body as and when required under applicable Law.

9.2     Allocation of Purchase Price. For U.S. federal and applicable state and local and foreign income Tax purposes, Purchaser, Sellers, and their respective Affiliates shall allocate the Purchase Price (and any Assumed Liabilities or other amounts treated as part of the purchase price for U.S. federal income Tax purposes) among the Acquired Assets in accordance with the

10.10   Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules, and any disclosure in the Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course. In addition, matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11   Complete Agreement. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the Transactions. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties. Notwithstanding anything in this Section 10.11 or elsewhere in this Agreement to the contrary, the parties hereby agree and confirm that the Stalking Horse Asset Purchase Agreement between Yellow and the Purchaser dated as of September 11, 2023, shall remain in full force and effect following the execution of this Agreement and that nothing herein is intended to, nor shall be construed to, restrict, limit or alter any of the Purchaser's rights thereunder, including but not limited to, the right of the Purchaser

to receive the Breakup Fee, the Expense Reimbursement and the Deposit (to the extent not applied to the Purchase Price payable hereunder), as such terms are defined therein.

10.12    Specific Performance. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions. It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither Sellers nor Purchaser would have entered into this Agreement. The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 10.12 will not be required to provide any bond or other security in connection with any such Order. The remedies available to Sellers pursuant to this Section 10.12 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 10.13, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus ten Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be. In no event will this Section 10.12 be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty made by any Seller herein.

10.13    Jurisdiction and Exclusive Venue. Each of the Parties irrevocably agrees that any Action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the Transactions and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "Agreement Dispute") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Court of Chancery of the State of Delaware (or if such court lacks jurisdiction, any other state or federal court sitting in the State of Delaware) (the "Chosen Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any

authorizations, and exemptions pending with or issued by Governmental Bodies, in each case, that is material to Seller and its Subsidiaries, taken as a whole.

(xx) "Permitted Encumbrances" means (i) Encumbrances for utilities and Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) easements, servitudes, rights of way, conditions, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Acquired Assets which do not, individually or in the aggregate, adversely affect the operation in the ordinary course of the Acquired Assets, (iii) applicable zoning Laws, building codes, land use restrictions or Laws, Environmental Laws and other similar restrictions imposed by Law or by any Governmental Body having jurisdiction over such Acquired Real Property which are not violated by the current use or occupancy of such Acquired Real Property, as applicable, (iv) customary liens, rights and remedies of lessors, lessees, sublessors, sublessees, licensors or licensees arising under Assigned Contracts, (v) non-monetary Encumbrances in respect of all matters set forth on title insurance policies, opinions or surveys made available to Purchaser Group as of the date of this Agreement; (vi) [Intentionally Omitted]; (vii) any Encumbrances set forth on Schedule 11.1(xx), and (viii) solely prior to Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

(yy) "Permitted Exception" means each of the following: (i) as contemplated by this Agreement (including the Schedules) or the Bidding Procedures Order (including the Auction), (ii) as set forth on Schedule 6.1, (iii) to the extent related to the Bankruptcy Cases, (iv) as required by applicable Law, Order or a Governmental Body (v) for limitations imposed by the Debtors' debtor-in-possession financing or use of cash collateral, (vi) as Sellers determine, in their reasonable judgment, may be necessary or desirable in light of COVID-19 (including to comply with or as a response to any COVID-19 Measures) or (vii) as consented to in writing by Purchaser (such consent not to be unreasonably withheld, delayed or conditioned, and failure to respond within five (5) Business Days of a request for consent shall be deemed to be consent).

(zz) "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, organization, estate, third party, Governmental Body or other entity or group.

(aaa) "Purchaser Group" means, with respect to Purchaser, Purchaser, any Designated Purchaser, any Affiliate of Purchaser or a Designated Purchaser, and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(bbb) ~~"QST" means the Quebec sales tax imposed under *An Act respecting the Québec sales tax* (Quebec)~~[intentionally omitted].

(ccc) "Sale Order" means an Order of the Bankruptcy Court approving the Transactions, in form and substance reasonably acceptable to each of the Parties.

(ddd) "Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.