# EXHIBIT C

# Central States, Southeast and Southwest Areas Pension Plan



RESTATED PLAN EFFECTIVE JANUARY 1, 1985
AS AMENDED THROUGH APRIL 3, 2023

**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND**, a jointly administered, defined benefit employee benefit plan

### ADDRESS OF ADMINISTRATIVE OFFICE
8647 West Higgins Road
Chicago, Illinois 60631

### TELEPHONE NUMBER
(847) 518-9800
1-800-323-5000 (Toll-Free)

### EMPLOYER IDENTIFICATION NUMBER
36-6044243

### PLAN NUMBER
001

### BOARD OF TRUSTEES

| UNION | EMPLOYER |
|-------|----------|
| Charles A. Whobrey | Gary F. Caldwell |
| Gary Dunham | Robert Whitaker |
| Trevor Lawrence | Mark Angerame |
| | Richard K. Ellis |

### EXECUTIVE DIRECTOR
(also Agent for Service of Legal Process)
Thomas C. Nyhan

TM:619767 / 01096280 / 04/03/2023

**TABLE OF CONTENTS**

**PAGE**

ARTICLE I      DEFINITIONS ................................................................................. 1

    1.01   ACCRUED BENEFIT ................................................................. 1
    1.02   ACTIVE PARTICIPANT ............................................................. 2
    1.03   BARGAINING UNIT ................................................................... 2
    1.04   BOARD OF TRUSTEES ........................................................... 2
    1.05   BREAK-IN-SERVICE ................................................................ 2
    1.06   COLLECTIVE BARGAINING AGREEMENT ............................. 3
    1.07   CONTRIBUTING EMPLOYER ................................................. 3
    1.08   CONTRIBUTIONS ................................................................... 3
    1.09   CONTRIBUTORY SERVICE ................................................... 5
    1.10   CONTRIBUTORY SERVICE CREDIT ...................................... 7
    1.11   COVERED SERVICE ............................................................... 8
    1.12   DEFERRED RETIREMENT DATE ........................................... 8
    1.13   DISABLED PARTICIPANT ....................................................... 8
    1.14   EMPLOYEE .............................................................................. 9
    1.15   EMPLOYEE GROUP ............................................................... 9
    1.16   GENDER .................................................................................. 9
    1.17   HOUR OF SERVICE ................................................................ 9
    1.18   INACTIVE PARTICIPANT ...................................................... 10
    1.19   LOSS OF NON-CONTRIBUTORY SERVICE ........................ 10
    1.20   MINIMUM CONTRIBUTION REQUIREMENT ........................ 10
    1.21   NON-CONTRIBUTORY SERVICE ......................................... 11
    1.22   NON-CONTRIBUTORY SERVICE CREDIT ........................... 12
    1.23   ONE-YEAR BREAK-IN-SERVICE .......................................... 13
    1.24   PARTICIPANT ....................................................................... 14
    1.25   PENSIONER .......................................................................... 14
    1.26   PENSION FUND .................................................................... 14
    1.27   PENSION PLAN .................................................................... 14
    1.28   RECOVERY OF LOST SERVICE CREDIT ............................ 14
    1.29   RETIREMENT DATE .............................................................. 15
    1.30   SERVICE CREDIT ................................................................. 15
    1.31   TEAMSTER CONTRACT ....................................................... 15
    1.32   TRUST AGREEMENT ............................................................ 15
    1.33   UNION ................................................................................... 15
    1.34   VESTED PARTICIPANT ........................................................ 15
    1.35   VESTED PENSION RETIREMENT DATE (NORMAL RETIREMENT DATE) .......... 16
    1.36   VESTING SERVICE ............................................................... 16
    1.37   VESTING SERVICE YEAR .................................................... 17
    1.38   WITHDRAWAL OF AN EMPLOYEE GROUP ......................... 17
    1.39   YEAR OF EMPLOYMENT ..................................................... 18
    1.40   YEAR OF PARTICIPATION ................................................... 18

ARTICLE II     EFFECTIVE DATE .................................................................... 19

ARTICLE III    BENEFIT CLASS ...................................................................... 20

    3.01   BENEFIT CLASS OF A COLLECTIVE BARGAINING AGREEMENT ...................... 20
    3.02   CONTINUOUS CONTRIBUTIONS .......................................... 25

**TABLE OF CONTENTS**

**PAGE**

| | | |
|---|---|---|
| 3.03 | BENEFIT CLASS OF A PARTICIPANT | 26 |
| 3.04 | BENEFIT CLASS MAINTENANCE | 28 |

| ARTICLE IV | RETIREMENT PENSION BENEFITS | 29 |
|---|---|---|

| | | |
|---|---|---|
| 4.01 | TWENTY-YEAR SERVICE PENSION | 29 |
| 4.02 | EARLY RETIREMENT PENSION | 30 |
| 4.03 | CONTRIBUTION-BASED PENSION | 30 |
| 4.04 | CONTRIBUTORY CREDIT PENSION | 31 |
| 4.05 | 25-AND-OUT PENSION - BENEFIT CLASS 17a, 18 and 18+ ONLY | 41 |
| 4.06 | 30-AND-OUT PENSION - SCHEDULE B BENEFIT ONLY | 43 |
| 4.07 | VESTED PENSION | 45 |
| 4.08 | DEFERRED PENSION | 46 |
| 4.09 | TWENTY-YEAR DEFERRED PENSION - SCHEDULE B BENEFIT ONLY | 46 |
| 4.10 | FORMS OF PAYMENT | 47 |
| 4.11 | BENEFITS UNDER ANOTHER PLAN | 54 |
| 4.12 | CHOICE OF BENEFITS | 54 |
| 4.13 | RULES AND PROCEDURES FOR SUSPENSION OF BENEFITS | 54 |
| 4.14 | CONTRIBUTORY SERVICE AFTER RETIREMENT DATE OR AFTER DISABILITY | 59 |
| 4.15 | PERIOD OF BENEFIT DISTRIBUTION | 60 |

| ARTICLE V | DISABILITY BENEFITS | 61 |
|---|---|---|

| | | |
|---|---|---|
| 5.01 | DEFINITION OF DISABILITY | 61 |
| 5.02 | MONTHLY DISABILITY BENEFITS | 61 |
| 5.03 | LUMP SUM DISABILITY BENEFITS | 62 |
| 5.04 | 50% SURVIVING SPOUSE BENEFIT | 63 |
| 5.05 | CHOICE OF DISABILITY BENEFITS | 63 |

| ARTICLE VI | BEFORE RETIREMENT DEATH BENEFITS | 65 |
|---|---|---|

| | | |
|---|---|---|
| 6.01 | 50% SURVIVING SPOUSE BENEFIT | 65 |
| 6.02 | 60 MONTH SURVIVOR BENEFIT | 65 |
| 6.03 | DISABILITY DEATH BENEFIT | 66 |
| 6.04 | LUMP SUM DEATH BENEFIT | 67 |
| 6.05 | BENEFIT CLASS 18/18+ DEATH BENEFIT | 67 |
| 6.06 | CHOICE OF SURVIVOR BENEFITS OR DEATH BENEFITS | 68 |
| 6.07 | SPECIAL RULES FOR DEATH OCCURRING DURING QUALIFIED MILITARY SERVICE | 68 |

| ARTICLE VII | ADMINISTRATION | 70 |
|---|---|---|

| | | |
|---|---|---|
| 7.01 | ADMINISTRATION AUTHORITY | 70 |
| 7.02 | AMENDMENT OF THE PENSION PLAN | 70 |
| 7.03 | DECISIONS OF BOARD OF TRUSTEES | 70 |
| 7.04 | BENEFITS CLAIM AND APPELLATE PROCEDURES | 70 |
| 7.05 | RECOVERY OF OVERPAYMENTS | 70 |

TM:619767 / 01096280 / 04/03/2023

**TABLE OF CONTENTS**

**PAGE**

| | | |
|---|---|---|
| 7.06 | PAYMENT OF BENEFITS FOR INDIVIDUALS UNDER LEGAL DISABILITY OR IN SIMILAR MENTAL OR PHYSICAL CONDITION | 71 |
| 7.07 | SPENDTHRIFT CLAUSE | 71 |
| 7.08 | ELIGIBILITY VERIFICATION | 71 |
| 7.09 | TERMINATION OF THE PENSION PLAN | 71 |
| 7.10 | MERGERS | 71 |
| 7.11 | CONSTRUCTION | 72 |
| 7.12 | SAVINGS CLAUSE | 72 |
| 7.13 | CHANGE OF ADDRESS | 72 |
| 7.14 | BENEFITS CLAIM FILING PROCEDURES | 72 |
| 7.15 | MAXIMUM BENEFIT LIMITATIONS | 72 |
| 7.16 | DIRECT ROLLOVER PAYMENTS TO ELIGIBLE RETIREMENT PLANS | 73 |
| 7.17 | ASSET-TRANSFER RULES UNDER SECTION 4234 OF ERISA | 75 |
| 7.18 | VALIDITY OF ELECTIONS AND CONSENTS MADE WITH RESPECT TO THE UPS-IBT FULL-TIME PENSION PLAN | 75 |
| 7.19 | REHABILITATION PLAN:  PENSION PROTECTION ACT OF 2006 | 75 |
| APPENDIX A-1. | ADJUSTMENT FACTORS FOR THE JOINT AND 50% SURVIVING SPOUSE OPTION | 76 |
| APPENDIX A-2. | ADJUSTMENT FACTORS FOR THE JOINT AND 75% SURVIVING SPOUSE OPTION | 85 |
| APPENDIX B. | BENEFIT CLAIMS AND APPEALS PROCEDURES | 92 |
| APPENDIX C. | SCHEDULE A - EARLY RETIREMENT PENSION AMOUNTS | 98 |
| APPENDIX D. | PARTIAL PENSIONS | 100 |
| APPENDIX E. | RULES AND REGULATIONS PERTAINING TO EMPLOYER WITHDRAWAL LIABILITY | 103 |
| APPENDIX F. | RULES PERTAINING TO HOURLY RATES FOR CONSTRUCTION INDUSTRY PARTICIPANTS | 115 |
| APPENDIX G. | ACCEPTANCE POLICIES FOR BARGAINING UNITS | 118 |
| APPENDIX H. | THE SPECIAL ELIGIBILITY APPENDIX | 122 |
| APPENDIX I. | MEDICAL BENEFITS ACCOUNTS | 125 |
| APPENDIX J-1. | GROCERY WAREHOUSE PLAN A | 128 |
| APPENDIX J-2. | GROCERY WAREHOUSE PLAN B | 131 |
| APPENDIX K-1. | MINIMUM EMPLOYER CONTRIBUTION REQUIREMENTS | 134 |
| APPENDIX K-2. | MINIMUM EMPLOYER CONTRIBUTION REQUIREMENTS (NOVEMBER 8, 2006 UPDATE) | 139 |
| APPENDIX L. | TRANSFER OF LIABILITIES TO THE UPS TRANSFER PLAN | 143 |

# TABLE OF CONTENTS

**PAGE**

APPENDIX M-1.   REHABILITATION PLAN ........................................................................ 146

APPENDIX M-2.   REHABILITATION PLAN (INCLUDING 2010 UPDATE) ......................... 158

APPENDIX M-3.   REHABILITATION PLAN (INCLUDING 2011 UPDATE) ......................... 172

APPENDIX M-4.   REHABILITATION PLAN (INCLUDING 2012 UPDATE) ......................... 187

APPENDIX M-5.   REHABILITATION PLAN (INCLUDING 2013 UPDATE) ......................... 203

APPENDIX M-6.   REHABILITATION PLAN (INCLUDING 2014 UPDATE) ......................... 219

APPENDIX M-7.   REHABILITATION PLAN (INCLUDING 2015 UPDATE) ......................... 235

APPENDIX M-8.   REHABILITATION PLAN (INCLUDING 2016 UPDATE) ......................... 251

APPENDIX M-9.   REHABILITATION PLAN (INCLUDING 2017 UPDATE) ......................... 268

APPENDIX M-10. REHABILITATION PLAN (INCLUDING 2018 UPDATE) ......................... 286

APPENDIX M-11. REHABILITATION PLAN (INCLUDING 2019 UPDATE) ......................... 304

APPENDIX M-12. REHABILITATION PLAN (INCLUDING 2020 UPDATE) ......................... 322

APPENDIX M-13. REHABILITATION PLAN (INCLUDING 2021 UPDATE) ......................... 340

APPENDIX M-14. REHABILITATION PLAN (INCLUDING 2022 UPDATE) ......................... 358

APPENDIX M-15. REHABILITATION PLAN (INCLUDING 2023 UPDATE) ......................... 376

APPENDIX N.     PUERTO RICO PROVISIONS ................................................................. 396

APPENDIX O.     SPECIAL FINANCIAL ASSISTANCE FROM THE PBGC ...................... 399

TM:619767 / 01096280 / 04/03/2023

# ARTICLE I          DEFINITIONS

## Section 1.01    ACCRUED BENEFIT

(a)  The Accrued Benefit of a Participant who is eligible for a Vested Pension (as defined in Section 4.07) is the greater of either the maximum Twenty-Year Service Pension or 30-and-Out Pension payable from his Benefit Class multiplied by the sum of the following:

   (1)  1½% of the Contributory Service Credit earned by the Participant before January 1, 1976,

   (2)  3% of the Contributory Service Credit earned by the Participant on and after January 1, 1976,

   (3)  the product of (1) and (2), above.

(b)  The Accrued Benefit of a Participant who is eligible for a Contribution-Based Pension (as defined in Section 4.03) is:

   (1)  The greater of either the Twenty-Year Service Pension or 30-And-Out Pension payable from his Benefit Class, as of December 31, 1985, multiplied by the sum of the following:

      (A)  1½% of the Contributory Service Credit he earned before January 1, 1976,

      (B)  3% of the Contributory Service Credit he earned from January 1, 1976 through December 31, 1985,

      (C)  the product of (A) and (B), above, <u>plus</u>

   (2)  For each calendar year from 1986 through 2003, inclusive, the greater of:

      (A)  2% of all Contributions made on his behalf during the calendar year or, if he is at Benefit Class 15(C) or 16,

      (B)  the minimum benefit below, corresponding to his Benefit Class as of the date of the last Contribution made on his behalf during the calendar year, multiplied by the Contributory Service Credit he earned during the calendar year:

| Benefit Class | | Minimum Benefit |
|---|---|---|
| 15 | | |
| | (C) | $66 |
| 16 | | |
| | (A) | 77 |
| | (B) | 81 |
| | (C) | 83, <u>plus</u> |

   (3)  For calendar year 2004 and for each subsequent calendar year, 1% of all Contributions made on his behalf during the calendar year.

(c)  The Accrued Benefit calculated in (a) or (b)(1), above, shall not exceed the 30-And-Out Pension amount for the Benefit Class of the Participant.

- 1 -

(d)    The Accrued Benefit calculated in (a) or (b), above, shall never be less than the Accrued Benefit determined at the end of any preceding calendar year.

(e)    All Non-Contributory Service Credit and any calendar year for which no Contributory Service Credit is earned shall be excluded in determining a Participant's Accrued Benefit in (a) and (b)(1), above.

**Section 1.02    ACTIVE PARTICIPANT**

(a)    A Participant becomes an Active Participant if:

    (1)    he has a Year of Participation; or

    (2)    he has not had a One-Year Break-in-Service during any calendar year since he last became an Active Participant.

(b)    A Disabled Participant becomes an Active Participant during the calendar year in which he recovers from his disability.

(c)    A Participant becomes an Active Participant immediately upon having a Year of Participation.

**Section 1.03    BARGAINING UNIT** means, all Employees who are covered by and whose terms and conditions of employment are specified in a particular Collective Bargaining Agreement.

**Section 1.04    BOARD OF TRUSTEES** means, the Union Trustees and the Employer Trustees collectively as appointed according to the Trust Agreement to administer the Pension Fund and the Pension Plan.

**Section 1.05    BREAK-IN-SERVICE**

(a)    A Break-in-Service is sustained when consecutive One-Year Breaks-in-Service accumulate as follows:

    (1)    If the Participant stopped working in Covered Service between February 1, 1955 and March 31, 1969, inclusive, he shall sustain a Break-in-Service if he has at least 5 consecutive One-Year Breaks-in-Service.

    (2)    If the Participant stopped working in Covered Service between April 1, 1969 and December 31, 1975, inclusive, he shall sustain a Break-in-Service if he has at least 3 consecutive One-Year Breaks-in-Service.

    (3)    If the Participant stopped working in Covered Service after December 31, 1975, he shall sustain a Break-in-Service if he has the greater of:

        (A)    5 consecutive One-Year Breaks-in-Service; or

        (B)    a number of consecutive One-Year Breaks in Service equaling or exceeding the number of years of Vesting Service he earned prior to the first of his consecutive One-Year Breaks-in-Service.

(b)    A Vested Participant cannot sustain a Break-in-Service.

TM:619767 / 01096280 / 04/03/2023

(c)    An individual who sustains a Break-in-Service is no longer a Participant, and he shall lose all right and claim to any benefit from the Pension Plan, except that he shall never lose any Self-Contributions he may have made to the Pension Fund.

**Section 1.06**    **COLLECTIVE BARGAINING AGREEMENT** means, a written agreement between a Union and a Contributing Employer requiring Employer Contributions to the Pension Fund on behalf of all Employees whose classification of work is covered by the Collective Bargaining Agreement. A Collective Bargaining Agreement also means a written agreement between the Board of Trustees and a Contributing Employer requiring Employer Contributions on behalf of all Employees whose classification of work is covered by the agreement.

**Section 1.07**    **CONTRIBUTING EMPLOYER** means, any association or individual employer which has agreed or shall agree, in writing, to be bound by the Trust Agreement and to make Employer Contributions to the Pension Fund according to a Collective Bargaining Agreement, and which has been accepted by the Board of Trustees as a Contributing Employer. Contributing Employer also means a Union with regard to its Employees, the Pension Fund with regard to its Employees, and Central States, Southeast and Southwest Areas Health and Welfare Fund with regard to its Employees. A Contributing Employer, upon acceptance, must continue to meet the conditions stated above as well as any additional conditions established by the Board of Trustees for Contributing Employers.

**Section 1.08**    **CONTRIBUTIONS** means, either or both of the following:

(a)    Employer Contributions are Contributions which a Contributing Employer is required to make to the Pension Fund pursuant to a Collective Bargaining Agreement or applicable law, provided that the Contributing Employer shall be required to make such Employer Contributions to the Pension Fund at Contribution rates at least equal to minimum Employer Contribution requirements adopted by the Board of Trustees and applicable to the Collective Bargaining Agreement, including the requirements stated in Appendix K-1 and Appendix K-2 of this Pension Plan. Any Contributing Employer which, based upon the Uniformed Services Employment and Reemployment Rights Act of 1994, is required to make Employer Contributions to the Pension Fund, shall make those Employer Contributions at the rates and in the amounts of Employer Contributions which that Contributing Employer would have been obligated to pay to the Pension Fund, relative to the Participant, _if_ his employment by that Contributing Employer had continued throughout (and had not been interrupted by) such service in the Uniformed Services (plus interest, to the extent such Employer Contributions are not paid at the time of such absence from employment as a result of service in the Uniformed Services, in accordance with the Trust Agreement of the Pension Fund).

(b)    **<u>Self-Contributions cannot be made and are not acceptable for any period after December 31, 2003, unless the period of the layoff, sick leave, other leave of absence or approved strike, on which the Self-Contributions are based, commenced before and was continuing on January 1, 2004. All references to Self-Contributions in this Section 1.08 and elsewhere in this Pension Plan are subordinate to the limitations of the preceding sentence.</u>** Self-Contributions are voluntary Contributions made to the Pension Fund by an Employee for a period of employment for which his Contributing Employer is not required by his Collective Bargaining Agreement, to make Employer Contributions on his behalf. Self-Contributions are subject to each of the following:

(1)    An Employee shall **not**, except as provided by a Collective Bargaining Agreement, be permitted to make Self-Contributions for any period of compensated

employment with the same Contributing Employer if the period of compensated employment is not covered by a Collective Bargaining Agreement.

(2)   An Employee must make a sufficient number of Self-Contributions which alone, or when combined with Employer Contributions, earn him Contributory Service Credit for the calendar year in which his Self-Contributions are to be applied.

(3)   An Employee must make Self-Contributions at the same rates as required by his Collective Bargaining Agreement and any renewal thereof.

(4)   An Employee shall be permitted to make Self-Contributions, in accordance with the following, for a period when he is on the seniority list of a Contributing Employer in a sick-leave (illness or injury) or layoff status for no more than a 60-month layoff period or is on approved strike:

(A)   **Pre-January 1, 1994 Self-Contributions:** Self-Contributions for a period preceding January 1, 1994 may be made at any time. If Self-Contributions for a pre-January 1, 1994 period are submitted within 24 months of the earliest date to which they apply, there shall not be any interest charged on such Self-Contributions. If such Self-Contributions are not submitted within this 24 month period, however, interest shall accrue and be charged from the earliest date to which such Self-Contributions apply to the date they are made. The interest charged shall be determined by the same rate (or rates) paid by Contributing Employers for delinquent Employer Contributions owed during the period for which such Self-Contributions are being made.

(B)   **January 1, 1994 and after Self-Contributions:** Self-Contributions for a period on or after January 1, 1994 must be submitted no later than December 31 of the year immediately following the calendar year to which they are to be applied. There shall not be any interest charged on Self-Contributions made for a period beginning on or after January 1, 1994.

(5)   An Employee shall also be permitted to make Self-Contributions for a period when he is on the seniority list of a Contributing Employer in an authorized leave of absence status. Self-Contributions for a leave of absence must be submitted at the time of the leave or as provided in the Collective Bargaining Agreement covering an Employee. An Employee whose Collective Bargaining Agreement does not require him to make Self-Contributions during a leave of absence, shall be permitted to make Self-Contributions in accordance with (4)(A) or (B) (whichever is applicable to the time period of his Self-Contributions) of this Section.

(6)   An Employee making Self-Contributions must comply with procedures established by the Board of Trustees, including the use of forms which his Contributing Employer is required to complete to confirm that he is in an employee status and remains on the seniority list.

(7)   An Employee may not make Self-Contributions which exceed 10% of all compensation he receives from Contributing Employers during his working career. In determining the 10% Self-Contribution limitation, any interest required by subsection (b)(4)(A) of this Section, shall be excluded.

(8)   An Employee whose layoff status commences on or after January 1, 2000, and is the result of a cessation of business by a Contributing Employer shall be permitted to make Self-Contributions for a maximum of 2 years after the initial business cessation date.

- 4 -

(c)   Employer Contributions shall be irrevocable, shall be held and invested according to the provisions of the Trust Agreement, and shall be used for providing benefits and paying the expenses of the Pension Fund. Employer Contributions made in error shall be subject to the refund policies adopted by the Board of Trustees.

(d)   Self-Contributions shall be non-forfeitable. If an Employee who has made Self-Contributions does not become eligible for benefits from the Pension Fund, the Self-Contributions that he made shall be returned to him with interest at the rate of 5.5% compounded annually.

(e)   If an Employee who has made Self-Contributions would qualify for a Contributory Credit Pension under Benefit Class 17a or 17b or higher or for a 25-And-Out Pension under Benefit Class 17a or higher or for a 30-And-Out Pension under Benefit Class 17b or higher, except for the exclusion of his Self-Contributions as required by the Pension Plan, including Section 1.09(b), and if the Employee requests a return of his Self-Contributions, the Self-Contributions that he made shall be returned to him with interest at the rate of 5.5% compounded annually.

(f)   There shall be a separate accounting maintained of the portion of the Accrued Benefit of each Participant derived from Self-Contributions.

**Section 1.09    CONTRIBUTORY SERVICE**

(a)   A Participant shall earn Contributory Service for any employment with a Contributing Employer required to make Employer Contributions on his behalf according to a Collective Bargaining Agreement.

(b)   A Participant shall earn Contributory Service for any period **commencing before January 1, 2004,** for which he makes Self-Contributions, except that**,** any Contributory Service earned from Self-Contributions shall not be counted in determining his eligibility for benefits under:

(1)   **Benefit Class 16,** if such Self-Contributions were made to meet any part of the 5-day or one-week Contribution requirement for benefits under this Benefit Class; or

(2)   **Benefit Class 17a,** if such Self-Contributions were made (A) for a period or periods preceding January 1, 1994, other than a Temporary Medical Absence Period or (B) to meet any part of the 100-day or 20-week Contribution requirement for benefits under this Benefit Class; or

(3)   **Benefit Class 17b,** if such Self-Contributions were made (A) for a period or periods preceding January 1, 1994, other than a Temporary Medical Absence Period or (B) to meet any part of the 10-day or 2-week or 100-day or 20-week Contribution requirements for benefits under this Benefit Class; or

(4)   **Benefit Class 18,** if such Self-Contributions were made (A) for a period or periods preceding January 1, 1994, other than a Temporary Medical Absence Period, or (B) to meet any part of the 10-day or 2-week or 100-day or 20-week Contribution requirements for benefits under this Benefit Class.

(5)   **Benefit Class 18+,** if such Self-Contributions were made (A) for a period or periods preceding January 1, 1994, other than a Temporary Medical Absence Period, or (B) to meet any part of the 10-day or 2-week or 100-day or 20- week Contribution requirements for benefits under this Benefit Class.

TM:619767 / 01096280 / 04/03/2023

As used in this Section 1.09(b) and in Sections 4.04(a), 4.05(a) and 4.06(b), a Temporary Medical Absence Period means and includes any period when the Participant, while continuing to be in employee status on the seniority list of a Contributing Employer, is temporarily absent from active employment by his Contributing Employer as a direct result of sickness or injury, provided that the aggregate maximum period of such absences for which such past Self-Contributions may be counted and included in determining Benefit Class 17a and 17b and 18 eligibility is 30 days of daily Self-Contributions or 6 weeks of weekly Self-Contributions, and provided further that, for Participants receiving continuing Workers' Compensation benefit payments during such absences, the aggregate maximum is one year of daily or weekly Self-Contributions.

(c)    A Participant may earn Contributory Service for his periods of service in the Uniformed Services if and to the extent:

    (1)    his service in the Uniformed Services begins during, and causes him to be absent from, employment by an employer that was, either at such beginning of service or before such service is concluded, a Contributing Employer;

    (2)    he would have earned Contributory Service based upon Employer Contributions if his employment by that employer had not been interrupted by such service in the Uniformed Services;

    (3)    he submits an application for reemployment to the **same** Contributing Employer within the following time limitations (except as those limitations are required by law to be extended):

        (A)    If his reemployment is initiated before December 11, 1994, his application for reemployment must be submitted to the Contributing Employer within 90 days after his discharge from the Uniformed Services; and

        (B)    If his reemployment is initiated on or after December 11, 1994, his application for reemployment must be submitted to the Contributing Employer;

            (i)    within 90 days after completion of a period of service in the Uniformed Services that was more than 180 days;

            (ii)    within 30 days after completion of a period of service in the Uniformed Services that was more than 30 days and less than 181 days; and

            (iii)    within one day after completion of a period of service in the Uniformed Services that was less than 31 days; and

    (4)    All such periods of service in the Uniformed Services do not, in the aggregate, exceed 5 years (except as that 5-year maximum is required by law to be enlarged).

For purposes of this Section 1.09(c) and Sections 1.08(a), 1.10(b) and 1.36, the term 'Uniformed Services' is as defined in the Uniformed Services Employment and Reemployment Rights Act of 1994 (as may be hereafter amended) ('USERRA'). For purposes of this Section 1.09(c) and Sections 1.08(a), 1.10(b) and 1.36, 'service in the Uniformed Services' includes the performance of duty by a Participant on a voluntary or involuntary basis in a Uniformed Service under competent authority and also includes any period during which a Participant is absent from employment for the purpose of an examination to determine the Participant's fitness to perform any such duty. As a prerequisite to earning Contributory Service based upon this Section 1.09(c), the Participant shall provide

TM:619767 / 01096280 / 04/03/2023

any notice and any documentation that is required by USERRA or other applicable law.

(d) A Participant may earn Contributory Service if his Bargaining Unit was accepted in this Pension Fund according to the Alternative Policy in Appendix G of this Pension Plan.

(e) A Participant may lose the Contributory Service he earned if he sustains a Break-in-Service.

(f) If a Collective Bargaining Agreement covering an Employee requires his Contributing Employer to make weekly Contributions, then he shall earn one week of Contributory Service for each week that he performs one Hour of Service and a weekly Contribution is required on his behalf.

(g) If a Collective Bargaining Agreement covering an Employee requires his Contributing Employer to make daily Contributions, then he shall earn one day of Contributory Service for each day that he performs one Hour of Service and a daily Contribution is required on his behalf.

**Section 1.10    CONTRIBUTORY SERVICE CREDIT**

(a) Contributory Service Credit is based on Contributory Service, and is determined as follows:

(1) For calendar years beginning before January 1, 1976:

(A) no Contributory Service Credit is earned for any calendar year with less than 20 weeks of Contributory Service; and

(B) ½ year of Contributory Service Credit is earned for any calendar year with at least 20 weeks but less than 35 weeks of Contributory Service; and

(C) one year of Contributory Service Credit is earned for any calendar year with at least 35 weeks of Contributory Service.

(2) For calendar years beginning on and after January 1, 1976:

(A) Contributory Service Credit is earned only for a calendar year in which a Participant has a Year of Participation;

(B) Contributory Service Credit equals the sum of the following:

(i) the number of weeks of Contributory Service earned by a Participant in a calendar year in which he has at least a Year of Participation divided by 40; and

(ii) the number of days of Contributory Service earned by a Participant in a calendar year in which he has at least a Year of Participation divided by 180.

(b) A Participant shall earn Contributory Service Credit for Contributory Service to which he is entitled, based upon Section 1.09(c), for his periods of service in the Uniformed Services, according to the following:

(1) For calendar years beginning before January 1, 1976:

- 7 -

(A)    no Contributory Service Credit is earned for any calendar year with less than 20 weeks of Contributory Service; and

(B)    ½ year of Contributory Service Credit is earned for any calendar year with at least 20 weeks but less than 35 weeks of Contributory Service; and

(C)    one year of Contributory Service Credit is earned for any calendar year with at least 35 weeks of Contributory Service.

(2)    For calendar years beginning on and after January 1, 1976:

(A)    Contributory Service Credit is earned only for a calendar year in which the Participant had at least 20 weeks of Contributory Service;

(B)    Contributory Service Credit equals the number of weeks of Contributory Service earned by the Participant in a calendar year in which he had at least 20 weeks of Contributory Service divided by 40.

(c)    A Participant shall be eligible to earn Contributory Service Credit in this Pension Plan for all of the contributory service credit he had earned while covered under a prior pension plan of an Employer which became required to make contributions to this Pension Fund on his behalf if:

(1)    his Bargaining Unit was accepted in this Pension Fund according to the Alternative Policy in Appendix G of this Pension Plan; and

(2)    he was a vested participant under that prior pension plan.

(d)    A Participant shall not earn more than one year of Contributory Service Credit during a calendar year.

**Section 1.11**    **COVERED SERVICE** means the combined Non-Contributory Service and Contributory Service of a Participant, subject to the following restrictions:

(a)    Covered Service shall not include any period of self-employment, or employment as an employer, or as a member of a partnership or in a managerial or supervisory capacity.

(b)    Covered Service, except as provided by Appendix D and Appendix G of this Pension Plan, shall not include any period of employment covered by another pension plan established and maintained according to a Teamster Contract.

**Section 1.12**    **DEFERRED RETIREMENT DATE** is the first day of any month selected by a Participant to be the month in which the Deferred Pension or Twenty-Year Deferred Pension he is eligible to receive becomes payable. A Participant's Deferred Retirement Date must be in a month later than the month in which his Retirement Date occurs. In no event, however, shall any benefit payable to a Participant begin any later than the date required by Section 4.15.

**Section 1.13**    **DISABLED PARTICIPANT**

(a)    A Participant is a Disabled Participant if he becomes disabled and is receiving payment of a disability benefit from this Pension Plan.

(b)    A Participant is no longer a Disabled Participant if he reaches his Normal Retirement Date and becomes a Pensioner, or if he recovers from his disability or becomes an Active Participant.

TM:619767 / 01096280 / 04/03/2023

**Section 1.14    EMPLOYEE**

    (a)    An Employee means an individual who is:

        (1)    employed by a Contributing Employer under the terms and conditions of a Collective Bargaining Agreement which requires that Employer Contributions be made to the Pension Fund, except that, any individual who is self-employed or a member of a partnership or employed in a managerial or supervisory capacity shall not be an Employee for purposes of this Pension Plan; or

        (2)    employed by a Union which has been accepted by the Board of Trustees as a Contributing Employer of its full-time and regular part-time employees, and on whom the Union is required to make Employer Contributions to the Pension Fund under the same conditions as any other Contributing Employer; or

        (3)    employed by the Pension Fund or by Central States, Southeast and Southwest Areas Health and Welfare Fund, and on whom the Board of Trustees is required to make Employer Contributions to the Pension Fund under the same conditions as any other Contributing Employer; or

        (4)    employed by a Contributing Employer and a member of the Board of Trustees, and on whom Employer Contributions are required to be made to the Pension Fund under the same conditions as any other Contributing Employer.

    (b)    The common law test or the applicable statutory definition of master-servant relationship shall be used to decide any dispute regarding employee status under (a)(1) of this Section.

    (c)    Continuation of employee status shall be subject to those rules and regulations the Board of Trustees may adopt according to law.

**Section 1.15    EMPLOYEE GROUP** means, all Employees who are employed by a Contributing Employer in a classification of work covered by a Collective Bargaining Agreement.

**Section 1.16    GENDER**

    Whenever used in the Pension Plan, the words "he," "she," "his" and "her," are interchangeable.

**Section 1.17    HOUR OF SERVICE**

    An Employee shall earn an Hour of Service for any of the following:

    (a)    each hour for which he is paid, or entitled to payment for employment performed for a Contributing Employer.

    (b)    each hour for which he is paid, or entitled to payment, by a Contributing Employer for a period of time during which no employment is performed (regardless of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty, or leave of absence.

    (c)    each hour for which he is paid, or entitled to payment of back pay (regardless of mitigation of damages) awarded or agreed to by a Contributing Employer.

**Section 1.18    INACTIVE PARTICIPANT**

A Participant who has not become a Pensioner or a Disabled Participant becomes an Inactive Participant at the end of any calendar year during which he no longer meets the definition of an Active Participant.

**Section 1.19    LOSS OF NON-CONTRIBUTORY SERVICE**

(a)    Any Participant employed in an Employee Group involved in a Voluntary Withdrawal (as defined in Section 1.38(b)) from the Pension Fund shall lose all right and claim to his Non-Contributory Service Credit unless:

(1)    If the Voluntary Withdrawal occurred before January 1, 1986, he permanently ceases to be employed in that Employee Group, as a result of a quit, discharge or retirement, before a calendar year in which less than 10 weeks of Contributions are made on his behalf;

(2)    If the Voluntary Withdrawal occurred on or after January 1, 1986 but before April 1, 1991, he permanently ceases to be employed in that Employee Group, as a result of a quit, discharge or retirement, before the 31st day following the date of the Voluntary Withdrawal;

(3)    If the Voluntary Withdrawal occurred on or after April 1, 1991:

(A)    he permanently ceases to be employed in that Employee Group, as a result of a quit, discharge or retirement, before the last day of the 6th calendar month following the date of the Voluntary Withdrawal; or

(B)    he and the other members of that Employee Group again become covered by a Collective Bargaining Agreement before the last day of the 18th calendar month following the date of the Voluntary Withdrawal.

(b)    Any Participant who sustains a loss of his right and claim to Non-Contributory Service Credit according to (a), above, shall retain only the benefit he may be eligible to receive from his Contributory Service Credit, if any.

**Section 1.20    MINIMUM CONTRIBUTION REQUIREMENT**

(a)    The Minimum Contribution Requirement used to determine the eligibility of a Participant for a Twenty-Year Service Pension or Early Retirement Pension shall be as follows:

(1)    at least 80 weeks of Contributions for an Employee who last became a Participant before July 1, 1967;

(2)    at least 120 weeks of Contributions for an Employee who last became a Participant between July 1, 1967 and March 31, 1969, inclusive;

(3)    at least 450 weeks of Contributions for an Employee who last became a Participant between April 1, 1969 and December 31, 1975, inclusive;

(4)    a number of years of Contributory Service Credit at least equal to the number of years of Non-Contributory Service an Employee is eligible to earn if he last became a Participant on or after January 1, 1976.

(b)     For purposes of (a)(1), (a)(2) and (a)(3) above, 5 days of Contributions required to be made on behalf of a Participant shall be considered equivalent to one week of Contributions.

(c)     The Minimum Contribution Requirement used to determine the eligibility of a Participant for a Monthly Disability Benefit or a Lump Sum Disability Benefit or the eligibility of a Participant's survivor for a Lump Sum Death Benefit shall be as follows:

(1)     at least 35 weeks of Contributions during each of 5 calendar years; or

(2)     at least 225 weeks of Contributions in total.

(d)     For purposes of (c)(1) and (c)(2) above, 5 days of Contributions required to be made on behalf of a Participant shall be equivalent to one week of Contributions.

**Section 1.21     NON-CONTRIBUTORY SERVICE**

(a)     If an Employee first becomes a Participant before April 1, 1985, he shall be eligible to earn Non-Contributory Service for any of the following types of employment he performed prior to the date he first became a Participant:

(1)     employment under a Teamster Contract; or

(2)     continuous past employment with a Contributing Employer in work classifications which become covered by a Collective Bargaining Agreement, if the Employee is a member of the Bargaining Unit on the date the Contributing Employer becomes required to make Employer Contributions for the first time; or

(3)     employment requiring the usual Teamster skills in traditional Teamster industries at the time of the employment; or

(4)     employment in a work classification and in an industry which, at the time of the employment, were normally covered by Teamster Contracts in that local metropolitan area; or

(5)     employment by a Union; or

(6)     service in the armed forces of the United States under Selective Service or during a war or international police action if he entered the armed forces directly from any Non-Contributory Service, defined above, and he returned directly from the armed forces to Contributory Service or Non-Contributory Service.

(b)     In addition to the types of employment described in (a) above, an Employee who first became a Participant before May 1, 1971 shall be eligible to earn Non-Contributory Service for any employment in the same classification of work which was covered by a Teamster Contract and for which Contributions were later made on his behalf.

(c)     An Employee who first becomes a Participant before April 1, 1985 shall be eligible to earn Non-Contributory Service for his continuous past employment with a Contributing Employer in a work classification which becomes covered by a Collective Bargaining Agreement if he is a member of the Bargaining Unit on the date the Contributing Employer is required to make Employer Contributions for the first time.

(d)     After the date an Employee first becomes a participant, he shall be eligible to earn Non-Contributory Service for service in the armed forces of the United States under Selective Service or during a war or international police action if he entered the armed forces

- 11 -

directly from Contributory Service and he returned directly from the armed forces to either Contributory Service or Non-Contributory Service.

(e) An Employee who first becomes a Participant on or after April 1, 1985, shall be eligible to earn Non-Contributory Service **only** for his continuous past employment with the Contributing Employer that began making Employer Contributions on his behalf only if his Bargaining Unit was accepted in this Pension Fund according to the Acceptance Policies in Appendix G of this Pension Plan.

**Section 1.22      NON-CONTRIBUTORY SERVICE CREDIT**

(a) For each year of his Contributory Service Credit, a Participant who first became a Participant prior to April 1, 1985 may earn up to one year of Non-Contributory Service Credit for his Non-Contributory Service as follows:

   (1) For Non-Contributory Service earned while serving in the armed forces of the United States:

   (A) no Non-Contributory Service Credit is earned for any calendar year with less than 18 weeks of Non-Contributory Service; and

   (B) ½ year of Non-Contributory Service Credit is earned for any calendar year with at least 18 weeks but less than 25 weeks of Non-Contributory Service; and

   (C) one year of Non-Contributory Service Credit is earned for any calendar year with at least 25 weeks of Non-Contributory Service.

   (2) For all other Non-Contributory Service:

   (A) no Non-Contributory Service Credit is earned for any calendar year with less than 500 hours of Non-Contributory Service; and

   (B) ½ year of Non-Contributory Service Credit is earned for any calendar year with at least 500 but less than 1,000 hours of Non-Contributory Service; and

   (C) one year of Non-Contributory Service Credit is earned for any calendar year with at least 1,000 hours of Non-Contributory Service.

(b) A Participant who first became a Participant prior to January 1, 1976, may earn Non-Contributory Service Credit according to (a)(1) and (a)(2), above, for all of his Non-Contributory Service.

(c) An Employee who becomes a Participant on or after April 1, 1985, and whose Bargaining Unit was accepted in this Pension Fund according to the Acceptance Policies in Appendix G of this Pension Plan, shall be eligible to earn Non-Contributory Service Credit as follows:

   (1) no Non-Contributory Service Credit is earned for any calendar year with less than 500 hours of Non-Contributory Service; and

   (2) ½ year of Non-Contributory Service Credit is earned for any calendar year with at least 500 but less than 1,000 hours of Non-Contributory Service; and

   (3) one year of Non-Contributory Service Credit is earned for any calendar year with at least 1,000 hours of Non-Contributory Service.

TM:619767 / 01096280 / 04/03/2023

(d)   A Participant shall not earn more than one year of Non-Contributory Service Credit during a calendar year.

(e)   During the calendar year an Employee who is eligible to earn Non-Contributory Service Credit becomes a Participant, he may earn ½ year of Non-Contributory Service Credit for 500 hours of Non-Contributory Service, or one year of Non-Contributory Credit for 1,000 hours of Non-Contributory Service. The combined Non-Contributory Service Credit and Contributory Service Credit earned during the calendar year an Employee becomes a Participant shall not exceed one year of Service Credit.

(f)   Regardless of any other rules or provisions in this Pension Plan, any Employee who first becomes a Participant in this Pension Plan on or after April 1, 1985 shall not be eligible to earn Non-Contributory Service Credit, except for his military service, and, except as provided for in Appendix G of this Pension Plan.

**Section 1.23   ONE-YEAR BREAK-IN-SERVICE**

(a)   Before January 1, 1976, a One-Year Break-in-Service is a calendar year with less than 10 weeks of Covered Service.

(b)   On and after January 1, 1976, a One-Year Break-in-Service is a calendar year during which the sum of (1), (2), (3) and (4) is less than one.

(1)   The number of weeks of Vesting Service due to employment under a Collective Bargaining Agreement requiring weekly Contributions divided by 10; and

(2)   The number of days of Vesting Service due to employment under a Collective Bargaining Agreement requiring daily Contributions limited to a 5 day per week maximum divided by 37; and

(3)   The number of days of Vesting Service due to employment under a Collective Bargaining Agreement requiring daily Contributions **not** limited to a 5 day per week maximum divided by 45; and

(4)   The number of hours of Vesting Service due to Continuous Compensated Employment (as defined in Section 1.36(f)) for which no Contributions are required divided by 450.

(c)   Before January 1, 1976 and only for the purpose of determining whether a One-Year Break-in-Service has been sustained, a Participant shall be treated as having been in Covered Service for any period during which he was unable to work because of illness, injury, disability or because he honored an approved strike. On and after January 1, 1976 and only for the purpose of determining whether a One-Year Break-in-Service has been sustained, a Participant shall be treated as having earned Vesting Service for any period during which he was unable to work because of illness, injury, disability or because he honored an approved strike.

(d)   A Participant who stops working in Covered Service on or after January 1, 1985 because of a pregnancy, the birth of a child, the adoption of a child, or to care for a child recently born or adopted, shall receive Vesting Service sufficient to avoid having a One-Year Break-in-Service in either:

(1)   the calendar year in which his leave begins, if the Vesting Service is required to avoid having a One-Year Break-in-Service during that calendar year; or, if not,

- 13 -

(2)    the calendar year immediately following the calendar year in which his leave begins.

(e)    A Participant shall not be eligible to earn any Vesting Service during a calendar year if any duplication of Vesting Service results from the application of (b), (c) and (d) above, or any combination thereof.

**Section 1.24    PARTICIPANT**

(a)    A Participant of any earlier version of the Pension Plan becomes a Participant of this Pension Plan if:

(1)    he has not had a One-Year Break-in-Service during 1984; or

(2)    he has had a Year of Participation ending after December 31, 1984; or

(3)    he is receiving, or is eligible to receive, a Twenty-Year Service Pension Benefit, an Early Retirement Pension Benefit, a Vested Pension Benefit or a Disability Pension Benefit from the Pension Plan in effect on December 31, 1984.

(b)    An Employee shall become a Participant as of the date the first Contribution is made on his behalf during a Year of Participation which ends after December 31, 1984.

(c)    A Participant of the Pension Plan in effect on December 31, 1984 who does not meet any of the conditions stated in (a) and (b), above, shall continue to be governed by the provisions of the Pension Plan in effect on December 31, 1984.

(d)    A Participant shall no longer be a Participant on the date of his death, or on the date he receives all benefits due him, or on the date he sustains a Break-in-Service.

(e)    Neither membership nor lack of membership in any labor organization shall be a basis for becoming a Participant in, or determining eligibility to receive benefits from the Pension Fund.

**Section 1.25    PENSIONER**

A Participant becomes a Pensioner on the date he begins to receive payment of the retirement pension for which he is eligible.

**Section 1.26    PENSION FUND** means, the Central States, Southeast and Southwest Areas Pension Fund established by the Trust Agreement.

**Section 1.27    PENSION PLAN** means, the rules and regulations for the payment of benefits from the employee benefit plan described in this document as well as any amendments to this document.

**Section 1.28    RECOVERY OF LOST SERVICE CREDIT**

A Participant who first became a Participant prior to April 1, 1985, and who sustains a Break-in-Service, shall recover one year of his lost Service Credit as Non-Contributory Service Credit for each year of Contributory Service Credit he earns on or after the later of:

(a)    January 1, 1973; or

(b)    his last employment or re-employment date following his last Break-in-Service.

TM:619767 / 01096280 / 04/03/2023

**Section 1.29**   **RETIREMENT DATE** is, the date a Participant stops working in Covered Service and terminates his employment. A Participant eligible for a retirement pension may become eligible to receive benefit payments on the 1st day of the month following his Retirement Date.

**Section 1.30**   **SERVICE CREDIT** means, the combined Contributory Service Credit and Non-Contributory Service Credit earned by a Participant, subject to the Break-in-Service and One-Year Break-in-Service provisions of this Pension Plan. A Participant shall not earn more than one year of Service Credit during a calendar year.

**Section 1.31**   **TEAMSTER CONTRACT** means, any collective bargaining agreement between an employer and a local union affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

**Section 1.32**   **TRUST AGREEMENT** means, the Agreement and Declaration of Trust for Central States, Southeast and Southwest Areas Pension Fund as originally made and entered into on March 16, 1955, together with any amendments.

**Section 1.33**   **UNION** means, those local unions which the Board of Trustees determines to have been affiliated Local Unions of the Central Conference of Teamsters and the Southern Conference of Teamsters when those two conferences were dissolved in or around June, 1994, and such other unions as the Board of Trustees may agree upon.

**Section 1.34**   **VESTED PARTICIPANT**

A Participant becomes a Vested Participant if:

(a)   he is an Active Participant or a Disabled Participant who has reached his Normal Retirement Date; or

(b)   he is an Active Participant or an Inactive Participant who has not reached his 65th birthday, but who has earned at least 3 Vesting Service Years after December 31, 1970, and has a total of at least:

   (1)   10 Vesting Service Years; or

   (2)   5 Vesting Service Years from employment performed outside a Bargaining Unit and at least One Hour of Service of such employment is after December 31, 1988; or

   (3)   5 Vesting Service Years from employment performed within a Bargaining Unit and at least one Hour of Service of such employment is after December 31, 1998; or

   (4)   5 Vesting Service Years from a combination of employment performed outside a Bargaining Unit and employment performed within a Bargaining Unit (provided that such combined employment is based in part upon at least one Hour of Service after December 31, 1998).

TM:619767 / 01096280 / 04/03/2023

**Section 1.35    VESTED PENSION RETIREMENT DATE (NORMAL RETIREMENT DATE)**

(a)    Normal Retirement Date of a Participant means the later of:

    (1)    the 65th birthday of an Employee; or

    (2)    the 5th anniversary of the date on which an Employee first became an Active Participant.

(b)    Normal Retirement Date is used to determine the date on which a Participant's Vested Pension becomes payable without reduction.

**Section 1.36    VESTING SERVICE**

(a)    Vesting Service is earned for Continuous Compensated Employment of an Active Participant or an Inactive Participant by a Contributing Employer. "Continuous Compensated Employment" means, employment performed while a member of the Bargaining Unit, and employment outside of a Bargaining Unit if such employment is performed immediately before or after Bargaining Unit employment with the same Contributing Employer and if it is not interrupted by a quit, discharge or retirement.

(b)    An Employee who becomes a Participant on or after April 1, 1985, and whose Bargaining Unit was accepted in this Pension Fund according to the Acceptance Policies in Appendix G of this Pension Plan, shall, in addition to (a) above, be eligible to earn one hour of Vesting Service for each Hour of Service of his continuous past employment with the Contributing Employer that became required to make Employer Contributions on his behalf.

(c)    If a Collective Bargaining Agreement covering an Employee requires his Contributing Employer to make weekly Contributions, then he shall earn one week of Vesting Service for each week that he performs an Hour of Service and a weekly Contribution is required on his behalf.

(d)    If a Collective Bargaining Agreement covering an Employee requires his Contributing Employer to make daily Contributions limited to a maximum of 5 days per week, then he shall earn one day of Vesting Service for each day that he performs one Hour of Service and a daily Contribution is required on his behalf.

(e)    If a Collective Bargaining Agreement covering an Employee requires his Contributing Employer to make daily Contributions **not** limited to a maximum of 5 days per week, then he shall earn one day of Vesting Service for each day that he performs one Hour of Service and a daily Contribution is required on his behalf.

(f)    One Hour of Vesting Service is earned for each Hour of Service of Continuous Compensated Employment for periods during which no Contributions are required on behalf of an Employee.

(g)    Vesting Service also includes any period of service in the Uniformed Services for which a Participant is entitled, based upon Section 1.09(c), to Contributory Service.

**Section 1.37**    **VESTING SERVICE YEAR** means, a calendar year during which the sum of (a), (b), (c), (d), and (e), below, equals or exceeds one.

(a)    The number of weeks of Vesting Service due to employment under a Collective Bargaining Agreement requiring weekly Contributions divided by 20; and

(b)    The number of days of Vesting Service due to employment under a Collective Bargaining Agreement requiring daily Contributions limited to a maximum of 5 days per week divided by 75; and

(c)    The number of days of Vesting Service due to employment under a Collective Bargaining Agreement requiring daily Contributions **not** limited to a maximum of 5 days per week divided by 90; and

(d)    The number of hours of Vesting Service due to Continuous Compensated Employment for which no Contributions are required divided by 900.

(e)    The number of hours of Vesting Service a Participant earned due to his continuous past employment with the Contributing Employer that became required to make Employer Contributions on his behalf divided by 900, if his Bargaining Unit was accepted according to the Acceptance Policies in Appendix G of this Pension Plan.

**Section 1.38**    **WITHDRAWAL OF AN EMPLOYEE GROUP**

(a)    Regardless of any other rules or provisions in this Pension Plan, any Participant, who was a member of an Employee Group at the time of its Voluntary Withdrawal from the Pension Plan, shall, subject to the following sentence, lose all right and claim to Non-Contributory Service Credit. This provision shall take effect if on or after the applicable date specified in Section 1.19(a), the Participant is employed by the same employer that made Contributions on his behalf immediately before the Voluntary Withdrawal and is performing or supervising work that was covered by the Collective Bargaining Agreement in effect immediately before the Voluntary Withdrawal.

(b)    A "Voluntary Withdrawal" occurs on the date a Contributing Employer is no longer required to make Employer Contributions to the Pension Fund as a result of actions by members of a Bargaining Unit, which actions include, but are not limited to the following:

(1)    decertification or other removal of the Union as a bargaining agent; and

(2)    ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan.

(c)    Any Participant whose Bargaining Unit was accepted according to the Acceptance Policies in Appendix G of this Pension Plan, shall immediately lose all right and claim to any Vesting Service, Non-Contributory Service Credit and Contributory Service Credit he may have earned before Employer Contributions began on his behalf, if within the "Five-Year Free Look" period defined in Section 8 of Appendix E of this Pension Plan, Employer Contributions are no longer required to be made on behalf of the members of the Bargaining Unit of which he was a member on the date he became a Participant.

TM:619767 / 01096280 / 04/03/2023

**Section 1.39**    **YEAR OF EMPLOYMENT means:**

(a)    The 12 consecutive month period which begins on the date an Employee becomes employed or reemployed by a Contributing Employer and which ends on his 1st anniversary date of employment or reemployment; and

(b)    Any calendar year that begins after the calendar year an Employee became employed or reemployed by a Contributing Employer, if the 1st anniversary date of his employment or reemployment occurs during that calendar year.

**Section 1.40**    **YEAR OF PARTICIPATION** means, a Year of Employment during which the sum of (a), (b), and, (c) below, equals or exceeds 1.

(a)    The number of weeks of Contributory Service due to employment under a Collective Bargaining Agreement requiring weekly Contributions divided by 20; and

(b)    The number of days of Contributory Service due to employment under a Collective Bargaining Agreement requiring daily Contributions limited to a maximum of 5 days per week divided by 75; and

(c)    The number of days of Contributory Service due to employment under a Collective Bargaining Agreement requiring daily Contributions **not** limited to a maximum of 5 days per week divided by 90.

- 18 -

**ARTICLE II**          **EFFECTIVE DATE \***

The provisions of this Pension Plan are applicable to every individual who is a Participant of this Pension Plan on any date on and after January 1, 1985, and to every beneficiary of such a Participant, except to the extent determination of the rights of such Participant or beneficiary was or is based upon a Retirement Date, death or disability prior to January 1, 1985. The provisions of this Pension Plan govern the consequences of all events on and after January 1, 1985 (such as any Retirement Date, death, disability, Covered Service, One-Year Break-in-Service, Break-in-Service, Reemployment and Suspension of Benefits Rules and Withdrawal of a Bargaining Unit). The provisions of this Pension Plan govern the consequences of events prior to January 1, 1985 only to the extent such events are relevant to determination of the rights of a Participant of this Pension Plan, or a beneficiary of such a Participant, based upon a Retirement Date, death or disability on or after January 1, 1985. To the extent this Pension Plan is not applicable, a relevant earlier version of this Pension Plan is applicable.

\*      This Article II was adopted at the same time as a complete restatement of this Pension Plan was approved by the Board of Trustees in 1985. Post-1985 amendments of this restated Pension Plan are effective as of separate dates after 1985, as determined by the Board of Trustees at the time it adopts those plan amendments.

TM:619767 / 01096280 / 04/03/2023

**ARTICLE III      BENEFIT CLASS**

**Section 3.01      BENEFIT CLASS OF A COLLECTIVE BARGAINING AGREEMENT**

(a) A Collective Bargaining Agreement shall be acceptable only if such agreement requires a Contributing Employer to make Employer Contributions:

    (1) on behalf of each Employee who receives compensation for any part of an applicable Contribution period; and

    (2) in accordance with the billing and collection procedures established by the Board of Trustees; and

    (3) at the same rate on behalf of all Employees in a Bargaining Unit, except as otherwise provided in Appendix J of this Pension Plan; and

    (4) at the same rate or a higher rate than that which was in effect during the preceding 12 month period; and

    (5) at Contribution rates at least equal to minimum Employer Contribution requirements adopted by the Board of Trustees and applicable to the Collective Bargaining Agreement, including the requirements stated in Appendix K-1 and Appendix K-2 of this Pension Plan; and

    (6) for the entire term of such Collective Bargaining Agreement.

    The Board of Trustees shall have the authority to reject any Collective Bargaining Agreement that fails to meet any of the requirements above.

(b) To maintain an existing Benefit Class, the Contribution rate in a Collective Bargaining Agreement must correspond to the Contribution Schedule adopted by the Board of Trustees for that Benefit Class.

(c) **No Collective Bargaining Agreement will be permitted to increase the Benefit Class of any Employee in a Bargaining Unit covered by that agreement, at any time after December 31, 2003, except to the extent of the following limited circumstances:**

    (1) **Benefit Class increases will be permitted for any purpose, including eligibility for a Contributory Credit Pension (Section 4.04), a 25-And-Out Pension (Section 4.05) and a 30-And-Out Pension (Section 4.06), to the extent that the increase is based upon the terms of a Collective Bargaining Agreement which was accepted by the Pension Fund on a date prior to November 18, 2003, provided that no such Benefit Class increase will be permitted if it is based upon any amendment of the previously accepted agreement which is first received by the Pension Fund after November 17, 2003; and**

TM:619767 / 01096280 / 04/03/2023

(2)    **Benefit Class increases will be permitted at any time to establish eligibility for (only) a Twenty-Year Service Pension (Section 4.01), an Early Retirement Pension (Section 4.02), a Deferred Pension (Section 4.08) or a Twenty-Year Deferred Pension (Section 4.09); and**

(3)    **if a Participant as of December 31, 2003, does not have Continuous Contributions and he has not as of that date ever received benefits from the Pension Fund, Benefit Class increases will be permitted at any time after December 31, 2003, to enable the Participant to restore only any Benefit Class he had earned and then lost before December 31, 2003, as a result of a One-Year Break-in-Service or a change in Bargaining Units, provided that the method of such restoration will be limited to calculations based upon the Non-Continuous Contribution Method specified in Section 3.03(b) and applied as of his Retirement Date.**

For any period prior to January 1, 2004 (and for the limited post-2003 exceptions specified in the preceding sentence), a Collective Bargaining Agreement can result in an increase of the Benefit Class of the Employees in the Bargaining Unit covered by that agreement to the next higher Benefit Class if the Contribution rate in the agreement corresponds to the Contribution Schedule adopted by the Board of Trustees for that next higher Benefit Class, provided that the increased Contribution rate must extend for at least 12 months during the term of the Collective Bargaining Agreement. For any period prior to January 1, 2004 (and for the limited post-2003 exceptions specified in the first sentence of this subsection [c]), the Benefit Class of a Collective Bargaining Agreement can result in an increase to the next higher Benefit Class only one time during a 12-month period, except that a one-time increase to higher than the next higher Benefit Class may be permitted if a Contributing Employer was making Contributions at a rate corresponding to Benefit Classes 15(A) or 15(B) and then entered into a Collective Bargaining Agreement requiring Contributions at rates corresponding to Benefit Classes 16(A), 16(B) and 16(C). This exception is described in Sections 4.01(b)(1)(B) and 4.06(c)(3)(A)(ii).

(d)    The Board of Trustees has adopted the following 2 Schedules of Benefit Classes and Required Minimum Contribution Rates which are referred to as "Schedule A" and "Schedule B":

**(1)    SCHEDULE A**

**SCHEDULE A OF BENEFIT CLASSES
AND REQUIRED MINIMUM CONTRIBUTION RATES**

| Benefit Class | Maximum Twenty-Year Service Pension Benefits | | Weekly Employer Contribution Rates |
|:---:|:---:|:---:|:---:|
| | **57 through 59** | **Age 60 Plus** | |
| (1) | $ 60 | $ 60 | $ 5.00 |
| (2) | 90 | 90 | 7.00 |
| (2A) | 125 | 125 | 9.00 |
| (3) | 140 | 170 | 11.00 |
| (3A) | 170 | 210 | 13.00 |
| (4) | 225 | 275 | 16.00 |
| (5) | 260 | 315 | 18.50 |
| (6) | 285 | 350 | 21.00 |
| (7) | 330 | 400 | 24.00 |
| (8) | 365 | 445 | 27.00 |
| (9) | 400 | 485 | 30.00 |
| (10) | 435 | 530 | 33.00 |
| (11) | 490 | 595 | 37.00 |
| (12) | 575 | 675 | 41.00 |
| (13) | 600 | 725 | 46.00 |
| (14) | 625 | 775 | 51.00 |

TM:619767 / 01096280 / 04/03/2023

**(2)    SCHEDULE B**

**SCHEDULE B OF BENEFIT CLASSES AND
REQUIRED MINIMUM WEEKLY CONTRIBUTION RATES**

| Benefit Class | | Maximum Twenty-Year Service Pension Benefits Ages | | | | | Weekly Employer Contribution Rates |
|---|---|---|---|---|---|---|---|
| | | 57 | 58 | 59 | 60 through 64 | 65 Plus | |
| **1** | | $  60 | $  60 | $  60 | $  60 | $  60 | $   6.00 |
| **2** | | 90 | 90 | 90 | 90 | 90 | 8.00 |
| **2** | **(A)** | 125 | 125 | 125 | 125 | 125 | 10.00 |
| **3** | | 140 | 140 | 140 | 170 | 170 | 12.00 |
| **3** | **(A)** | 170 | 170 | 170 | 210 | 210 | 15.00 |
| **4** | | 225 | 225 | 225 | 275 | 275 | 18.00 |
| **5** | | 260 | 260 | 260 | 315 | 315 | 21.00 |
| **6** | | 285 | 285 | 285 | 350 | 350 | 24.00 |
| **7** | | 330 | 330 | 330 | 400 | 400 | 27.00 |
| **8** | | 365 | 365 | 365 | 445 | 445 | 30.00 |
| **9** | | 400 | 400 | 400 | 485 | 485 | 33.00 |
| **10** | | 435 | 435 | 435 | 530 | 530 | 36.00 |
| **11** | | 490 | 490 | 490 | 595 | 595 | 40.00 |
| **12** | | 575 | 575 | 575 | 675 | 675 | 44.00 |
| **13** | | 600 | 600 | 600 | 725 | 725 | 49.00 |
| **14** | | 625 | 625 | 625 | 775 | 775 | 55.00 |
| **15** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 900 | 61.00 |
| | **(B)** | 700 | 750 | 800 | 900 | 900 | 65.00 |
| | **(C)** | 700 | 750 | 800 | 900 | 900 | 69.00 |
| | **(C)** | 700 | 750 | 800 | 900 | 900 | 73.00 |
| **16** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 79.00 |
| | **(B)** | 700 | 750 | 800 | 900 | 1,100 | 83.00 |
| | **(C)** | 700 | 750 | 800 | 900 | 1,100 | 85.00 |
| **17a** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 91.00 |
| | **(B)** | 700 | 750 | 800 | 900 | 1,100 | 100.00 |
| | **(C)** | 700 | 750 | 800 | 900 | 1,100 | 109.00 |
| | **(D)** | 700 | 750 | 800 | 900 | 1,100 | 118.00 |
| **17b** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 91.00 |
| | **(B)** | 700 | 750 | 800 | 900 | 1,100 | 100.00 |
| | **(C)** | 700 | 750 | 800 | 900 | 1,100 | 110.00 |
| | **(D)** | 700 | 750 | 800 | 900 | 1,100 | 124.00 |
| **18** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 122.00* |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 124.00* |
| | **(B)** | 700 | 750 | 800 | 900 | 1,100 | 136.00 |
| | **(C)** | 700 | 750 | 800 | 900 | 1,100 | 150.00 |
| | **(D)** | 700 | 750 | 800 | 900 | 1,100 | 158.00 |
| | **(E)** | 700 | 750 | 800 | 900 | 1,100 | 166.00 |
| **18+** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 150.00 |
| | **(B)** | 700 | 750 | 800 | 900 | 1,100 | 164.00 |
| | **(C)** | 700 | 750 | 800 | 900 | 1,100 | 172.00 |
| | **(D)** | 700 | 750 | 800 | 900 | 1,100 | 180.00 |

\*    If the Bargaining Unit is moving from Benefit Class 17a to Benefit Class 18, the weekly contribution rate for the first year is $122.00; otherwise it is $124.00

- 23 -

**SCHEDULE B OF BENEFIT CLASSES AND
REQUIRED MINIMUM DAILY CONTRIBUTION RATES**

| Benefit Class | | Maximum Twenty-Year Service Pension Benefits Ages | | | | | Daily Employer Contribution Rates |
|---|---|---|---|---|---|---|---|
| | | 57 | 58 | 59 | 60 through 64 | 65 Plus | |
| **15** | | | | | | | |
| | **(A)** | $700 | $750 | $800 | $900 | $ 900 | $13.00 |
| | **(B)** | 700 | 750 | 800 | 900 | 900 | 13.80 |
| | **(C)** | 700 | 750 | 800 | 900 | 900 | 14.60 |
| **16** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 16.60 |
| | **(B)** | 700 | 750 | 800 | 900 | 1,100 | 17.40 |
| | **(C)** | 700 | 750 | 800 | 900 | 1,100 | 17.80 |
| **17a** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 19.00 |
| | **(B)** | 700 | 750 | 800 | 900 | 1,100 | 20.80 |
| | **(C)** | 700 | 750 | 800 | 900 | 1,100 | 22.60 |
| | **(D)** | 700 | 750 | 800 | 900 | 1,100 | 24.40 |
| **17b** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 18.80 |
| | **(B)** | 700 | 750 | 800 | 900 | 1,100 | 20.60 |
| | **(C)** | 700 | 750 | 800 | 900 | 1,100 | 22.80 |
| | **(D)** | 700 | 750 | 800 | 900 | 1,100 | 25.60 |
| **18** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 25.20** |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 25.60** |
| | **(B)** | 700 | 750 | 800 | 900 | 1,100 | 28.00 |
| | **(C)** | 700 | 750 | 800 | 900 | 1,100 | 30.80 |
| | **(D)** | 700 | 750 | 800 | 900 | 1,100 | 32.40 |
| | **(E)** | 700 | 750 | 800 | 900 | 1,100 | 34.00 |
| **18+** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1,100 | 30.80 |
| | **(B)** | 700 | 750 | 800 | 900 | 1,100 | 33.60 |
| | **(C)** | 700 | 750 | 800 | 900 | 1,100 | 35.20 |
| | **(D)** | 700 | 750 | 800 | 900 | 1,100 | 36.80 |

** If the Bargaining Unit is moving from Benefit Class 17a to Benefit Class 18, the daily contribution rate for the first year is $25.20; otherwise it is $25.60.

Benefit Class 18+ of a Participant must be based upon the Continuous Contribution Method and not upon the Non-Continuous Contribution Method or any other method.

(e)    All references and cross references to Benefit Class 15 and higher shall include any or all of the Contribution rates designated (A), (B) and (C) for Benefit Class 15, (A), (B) and (C) for Benefit Class 16, (A), (B), (C) and (D) for Benefit Classes 17a and 17b unless a particular Contribution rate of a particular Benefit Class is specified, and (A), (B), (C), (D) and (E) for Benefit Class 18 and 18+ unless a particular Contribution rate of a particular Benefit Class is specified.

TM:619767 / 01096280 / 04/03/2023

(f)    A Contributing Employer that makes Contributions under Benefit Class 17a shall, upon expiration of the Collective Bargaining Agreement providing for such Benefit Class, be permitted to continue Contributions under the highest rate of such Benefit Class or negotiate to a higher Benefit Class, but shall not be permitted to negotiate to Benefit Class 17b. A Contributing Employer that makes Contributions under Benefit Class 17b shall likewise be permitted to continue Contributions at the highest rate of such Benefit Class or move to a higher Benefit Class, but shall not be permitted to negotiate Benefit Class 17a.

(g)    Benefit Classes 17a and 17b are parallel (equivalent) Benefit Classes with neither being lower or higher than the other. A Participant who moves from one of these Benefit Classes to the other as a result of a change in Bargaining Units shall have his Benefit Class determined by the provisions of Article III, Section 3.02(c).

(h)    The Pension Fund shall not accept a Collective Bargaining Agreement or a renewal of a Collective Bargaining Agreement that switches from Schedule B Contribution rates to Schedule A Contribution rates.

(i)    Any Contribution made at a rate which does not correspond to the Contribution rates for the Benefit Classes in (d)(1), or (d)(2), above, shall be treated as a Contribution made at the next lower Benefit Class.

(j)    In addition to the Schedules of Benefit Classes and Required Minimum Contribution Rates (referred to as 'Schedule A' and 'Schedule B'), which are provided in (d), above, the Board of Trustees has adopted Appendix K-1 and Appendix K-2 of this Pension Plan (entitled 'MINIMUM EMPLOYER CONTRIBUTION REQUIREMENTS').

## Section 3.02    CONTINUOUS CONTRIBUTIONS

(a)    Contributions made on behalf of a Participant are Continuous Contributions if the following conditions are met:

(1)    At least 250 weeks of Contributions are required to be made on his behalf where:

(A)    the Contributions are not interrupted by the Participant having a One-Year Break-in-Service; and

(B)    the Contributions are not interrupted by any period during which the Participant receives benefits from the Pension Fund; and

(C)    the Contributions:

(i)    prior to April 1,1991, are not interrupted by the Participant changing Bargaining Units and having Contributions made on his behalf at a rate corresponding to a lower Benefit Class or a rate higher than the next higher Benefit Class; and

(ii)    on or after April 1, 1991, are not interrupted by a Participant changing Bargaining Units and having Contributions made on his behalf at a rate corresponding to a lower or higher Benefit Class, except that, if he changes Bargaining Units as a result of his Contributing Employer ceasing business operations because of a bankruptcy, his Contributions shall remain Continuous Contributions unless made at a rate corresponding to a lower Benefit Class or to a Benefit Class higher than the next higher Benefit Class.

TM:619767 / 01096280 / 04/03/2023

(2)    The Participant meets at least one of the following requirements:

    (A)    he has at least a Year of Participation in each of the last 5 calendar years; or

    (B)    he has at least 150 weeks of Contributions in the last 5 calendar years.

(b)    For purposes of (a) above, 5 days of Contributions required to be made on behalf of a Participant shall be considered equivalent to one week of Contributions.

(c)    A Participant who has Continuous Contributions at Benefit Class 17a or 17b and who, as a result of a change in Bargaining Units, moves from one of these Benefit Classes to the other, shall be considered to have Continuous Contributions at the Benefit Class (17a or 17b) from which he moved unless and until he either: (1) moves to a Benefit Class lower than 17a or 17b, or (2) establishes Continuous Contributions at the Benefit Class of his new Bargaining Unit by having 250 weeks of Contributions made on his behalf after the date of his change in Bargaining Units.

(d)    Contributions required to be made on behalf of a Participant may be disregarded and will not be considered Continuous Contributions if those Contributions cause the Participant to fail to meet the conditions of (a), above.

(e)    All Continuous Contributions required to be made on behalf of a Participant shall be treated as having been made at the Benefit Class or Contribution rate corresponding to his last Continuous Contribution.

(f)    A Participant whose Bargaining Unit was accepted according to the Acceptance Policies in Appendix G, shall not have Continuous Contributions and shall have his Benefit Class determined by Section 3.03(b) unless and until he has had at least 250 weeks of Contributions required to be made on his behalf according to (a), above.

**Section 3.03**    **BENEFIT CLASS OF A PARTICIPANT**

The Benefit Class of a Participant is determined by one of the following two methods:

(a)    CONTINUOUS CONTRIBUTION METHOD: The Benefit Class of a Participant who had Continuous Contributions during his last 5 calendar years shall be the Benefit Class corresponding to the rate of his last weekly Continuous Contribution (or his last daily Continuous Contribution) in effect for at least his last 52 weeks of Contributory Service (except that the last rate will be for a shorter period [instead of his last 52 weeks] only in the following limited circumstances: it will be the rate in effect for his last 5 days of Contributory Service if his final Contributory Service ended before January 1, 2004; and it will be the rate in effect for his last 5 days of Contributory Service [or his last 10 days of Contributory Service in Benefit Class 17b, 18, or 18+] if the last rate was based upon the terms of a Collective Bargaining Agreement which was accepted by the Pension Fund on a date prior to January 1, 2004, and the agreement increased the Participant's Benefit Class to Benefit Class 15[A] or higher).

(b)    NON-CONTINUOUS CONTRIBUTION METHOD: The Benefit Class of a Participant who did not have Continuous Contributions during his last 5 calendar years shall be determined as follows:

(1)    The total dollar amount of Contributions made on behalf of the Participant during his last 250 weeks of Contributions is calculated by using the rates at which the Contributions were made where:

(A)    5 days of Contributions shall be equivalent to one week of Contributions and the dollar amount shall be the equivalent weekly Contribution; and

(B)    the dollar amount of the earliest week of Contributions included in the 250 week period shall be multiplied by the fraction representing the portion of that week needed to make up the last week of the 250 weeks of Contributions.

(2)    The dollar amount totaled in (1), above, is divided by 250 and rounded to the next highest whole dollar amount.

(3)    One of the following two schedules is used:

(A)    If the Participant's last 250 weeks of Contributions have been made only at Schedule B Contribution rates, the result of (2) above is compared to the **weekly** Contribution rates under Schedule B. If an exact match is found, the Benefit Class of the Participant is the Benefit Class corresponding to that weekly Contribution rate; otherwise, the Benefit Class of the Participant is the Benefit Class corresponding to the next lower weekly Contribution rate. SPECIAL BENEFIT CLASS 17a AND 17b RULE: In the event the result of (2), above, matches the weekly Contribution rates under both Benefit Classes 17a and 17b, the Benefit Class of the Participant shall be Benefit Class 17a if he has had more Contributions made on his behalf at Benefit Class 17a than at Benefit Class 17b, or Benefit Class 17b if he has had more Contributions made on his behalf at Benefit Class 17b than at Benefit Class 17a. If the Contributions made on behalf of the Participant are equally divided between Benefit Classes 17a and 17b, or if he has never had Contributions made on his behalf at either of these classes, his Benefit Class shall be the Benefit Class, either 17a or 17b, that provides him with the greatest benefit. In no event, shall the resulting Benefit Class of the Participant exceed the highest Benefit Class for which Contributions were made on his behalf during his last 250 weeks of Contributions.

(B)    If any of the Participant's last 250 weeks of Contributions have been made at Schedule A rates, the result of (2) above is compared to the **weekly** Contribution rates under Schedule A or Schedule B, whichever produces the greatest benefit. If an exact match is found, the Benefit Class of the Participant is the Benefit Class corresponding to that weekly Contribution rate; otherwise, the Benefit Class of the Participant is the Benefit Class corresponding to the next lower **weekly** Contribution rate. SPECIAL BENEFIT CLASS 17a AND 17b RULE: In the event the result of (2), above, matches the weekly Contribution rates under both Benefit Classes 17a and 17b, the Benefit Class of the Participant shall be Benefit Class 17a if he has had more Contributions made on his behalf at Benefit Class 17a than at Benefit Class 17b, or Benefit Class 17b if he has had more Contributions made on his behalf at Benefit Class 17b than at Benefit Class 17a. If the Contributions made on behalf of the Participant are equally divided between Benefit Classes 17a and 17b, or if he has never had Contributions made on his behalf at either of these classes, his Benefit Class shall be the Benefit Class, either 17a or 17b, that provides him with the greatest benefit. In no event, shall the resulting Benefit Class of a Participant exceed the highest Benefit Class for which Contributions were made on his behalf during his last 250 weeks of Contributions.

(4)    A Participant who has not had at least 250 weeks of Contributions made on his behalf, shall have his Benefit Class determined according to (b)(1), (2) and (3) above, except that:

(A)   The total dollar amount of all Contributions made on his behalf shall be used in lieu of the total dollar amount of his last 250 weeks of Contributions; and

(B)   The number of weeks of Contributions made on his behalf shall be used in lieu of 250.

**Section 3.04     BENEFIT CLASS MAINTENANCE**

(a)   A Participant who changes Bargaining Units and becomes covered by a Collective Bargaining Agreement requiring Contributions at a lower or higher Benefit Class shall have a period of "temporary maintenance" during which he (and any individual claiming benefits because of his death) shall be eligible to have benefits determined by his Benefit Class before his change of Bargaining Units.

(b)   The period of "temporary maintenance" in (a), above, shall end on the earlier of:

(1)   the end of the 5th calendar year following the last calendar year in which the Participant had at least 20 weeks of Contributions made on his behalf at his Benefit Class before his change in Bargaining Units; or

(2)   the date the Participant first becomes eligible for a Twenty-Year Service Pension, Early Retirement Pension, Deferred Pension or Twenty-Year Deferred Pension, except that, a Participant who is already eligible for one of these benefits at the time he changes Bargaining Units shall <u>not</u> have any temporary maintenance.

TM:619767 / 01096280 / 04/03/2023

**ARTICLE IV        RETIREMENT PENSION BENEFITS**

**Section 4.01        TWENTY-YEAR SERVICE PENSION**

(a)    To become eligible for a Twenty-Year Service Pension, an Active Participant must meet each of the following requirements at the time he stops working in Covered Service or becomes an Inactive Participant:

    (1)    he must have reached at least his 57th birthday; and

    (2)    he must have at least 20 years of Service Credit; and

    (3)    he must have met the Minimum Contribution Requirement.

(b)    The monthly amount of the Twenty-Year Service Pension is determined by the Benefit Class of a Participant and by his age, except that, in addition to his Benefit Class and age, he will not become eligible for the $1,100 age 65 monthly amount unless and until he meets the following requirements:

    (1)    he has, on or after April 1, 1991, at least 5 days or one week of Employer Contributions (and not Self-Contributions) made on his behalf at a rate corresponding to Benefit Class 16(A) or higher and:

        (A)    his Contributing Employer previously made Contributions at a rate corresponding to Benefit Class 15(C) or higher and his current Benefit Class, determined according to Section 3.03(a), is (16A) or higher; or

        (B)    his Contributing Employer previously made Contributions at a rate corresponding to either Benefit Class 15(A) or 15(B) but not Benefit Class 15(C), his current Benefit Class, determined according to Section 3.03(a), is 16(A) or higher and his Contributing Employer has been making Contributions at a rate corresponding to Benefit Class 16(A) or higher for at least 12 months preceding his Retirement Date; or

        (C)    his Benefit Class, determined according to Section 3.03(b), is 16(A) or higher; and

    (2)    he is covered by a Collective Bargaining Agreement requiring his Contributing Employer to begin making Contributions at a rate corresponding to at least Benefit Class 16(C) no later than 24 months after the date the last Contribution is made on his behalf.

(c)    The monthly amount of the Twenty-Year Service Pension payable to a Participant shall never be less than the monthly amount of any other retirement benefit he was eligible to receive from this Pension Fund at the end of any preceding calendar year.

(d)    Subject to the Rules and Procedures for Suspension of Benefits (as described in Section 4.13), the Contributory Service After Retirement Date or After Disability (as described in Section 4.14) and the Benefits Claim Filing Procedures (as described in Section 7.14), the Twenty-Year Service Pension becomes payable to a Participant on the 1st day of the month following the month in which his age was calculated according to (b), above, except that, a Participant whose Retirement Date follows the date on which his age was calculated, shall have his Twenty-Year Service Pension become payable on the 1st day of the month following his Retirement Date.

TM:619767 / 01096280 / 04/03/2023

(e)   The Pension Fund is not liable for benefits based upon this Section 4.01 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

**Section 4.02   EARLY RETIREMENT PENSION**

(a)   To become eligible for an Early Retirement Pension, an Active Participant must meet **one** of the following **two** requirements at the time he stops working in Covered Service or becomes an Inactive Participant:

  (1)   If the Participant has not reached his 50th birthday:

    (A)   he must have at least 30 years of Service Credit; and

    (B)   he must have met the Minimum Contribution Requirement.

  (2)   If the Participant has reached at least his 50th birthday:

    (A)   he must have at least 20 years of Service Credit; and

    (B)   he must have met the Minimum Contribution Requirement.

(b)   The monthly amount of the Early Retirement Pension is a reduced Twenty-Year Service Pension determined by the Benefit Class of a Participant and by his age. A Participant may choose to have his age calculated as of any date which does not precede his Retirement Date or extend beyond the date he becomes an Inactive Participant, except that, a Participant who becomes an Inactive Participant prior to his Retirement Date and who does not again become an Active Participant shall have his age determined as of the date he became an Inactive Participant. The reduction is ½ of 1% for each month the Participant's Retirement Date precedes his 57th birthday, and is applied to the age 57 amount of his Benefit Class.

(c)   The monthly amount of the Early Retirement Pension payable to a Participant shall never be less than the monthly amount of any other retirement benefit he was eligible to receive from this Pension Fund at the end of any preceding calendar year.

(d)   Subject to the Rules and Procedures for Suspension of Benefits (as described in Section 4.13), the Contributory Service After Retirement Date or After Disability (as described in Section 4.14) and the Benefits Claim Filing Procedures (as described in Section 7.14), the Early Retirement Pension becomes payable to a Participant on the 1st day of the month following the month in which his age was calculated according to (b), above, except that, a Participant whose Retirement Date follows the date on which his age was calculated, shall have his Early Retirement Pension become payable on the 1st day of the month following his Retirement Date.

(e)   The Pension Fund is not liable for benefits based upon this Section 4.02 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

**Section 4.03   CONTRIBUTION-BASED PENSION**

(a)   To become eligible for a Contribution-Based Pension, a Participant must meet each of the following requirements:

  (1)   he must be a Vested Participant; and

- 30 -

(2)    he must not have received payment of any benefit from this Pension Fund before January 1, 1987, except that, this requirement shall be waived if a Pensioner, after his Retirement Date, becomes employed by a Contributing Employer and meets the requirements of Article IV, Section 4.14(a).

(b)    Subject to sub-section (d), below, the Contribution-Based Pension of a Participant is his Accrued Benefit as determined in Article I, Section 1.01(b).

(c)    For purposes of determining the amount of his Contribution-Based Pension, a Vested Participant may choose to have his age calculated as of any date which does not precede his Retirement Date.

(d)    The monthly amount of the Contribution-Based Pension payable to a Vested Participant is either:

    (1)    the amount calculated in (b), above if:

        (A)    the Vested Participant has reached at least his 62nd birthday and has at least 20 years of Service Credit; or

        (B)    the Vested Participant has reached at least his 65th birthday and has less than 20 years of Service Credit; or

    (2)    the amount calculated in (b), above, reduced by ½ of 1% for each month the age of a Vested Participant precedes his:

        (A)    62nd birthday if he has at least 20 years of Service Credit; or

        (B)    65th birthday if he has less than 20 years of Service Credit.

(e)    Subject to the Rules and Procedures for Suspension of Benefits (as described in Section 4.13), the Contributory Service After Retirement Date or After Disability (as described in Section 4.14) and the Benefits Claim Filing Procedures (as described in Section 7.14), the Contribution-Based Pension becomes payable to a Participant on the 1st day of the month following the month in which his age was calculated according to (c), above.

(f)    The Pension Fund is not liable for benefits based upon this Section 4.03 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

**Section 4.04**    **CONTRIBUTORY CREDIT PENSION**

(a)    **The benefit described in this Section 4.04 is preserved, protected and limited as of December 31, 2003, to the extent described in this subsection (a).** Contributory Service Credit for any time period after December 31, 2003, will be disregarded, in determining eligibility for and the amount of a Contributory Credit Pension, except as otherwise provided in this subsection (a). For any Participant who has Contributory Service Credit both before and after December 31, 2003, the eligibility and amount of a Contributory Credit Pension will be determined in accordance with the following standards:

    (1)    The total of the Participant's Contributory Service Credit before, on and after December 31, 2003, will be included in the determination whether the Participant has the minimum years of Contributory Service Credit required to qualify for this benefit and, if he does, and if he satisfies all other eligibility requirements for a Contributory Credit Pension, his monthly share of the applicable benefit amount

TM:619767 / 01096280 / 04/03/2023

will equal a fraction of that amount, the numerator being the total years of his Contributory Service Credit as of December 31, 2003, and the denominator being the total of the Participant's Contributory Service Credit before, on and after December 31, 2003, provided that the denominator does not exceed the minimum years for the applicable benefit amount ("applicable benefit amount", for this calculation, means the amount in subsection [b] that is applicable to the Participant); and

(2)    The Benefit Class of the Participant, for purposes of a Contributory Credit Pension, will be determined as of December 31, 2003, unless any of the limited post-2003 exceptions specified in Section 3.01(c) is applicable; and

(3)    The age of the Participant, for purposes of a Contributory Credit Pension, will be his age on his Retirement Date or the earlier date on which he has became an Inactive Participant, in accordance with subsection (c); and

(4)    The Participant will also be entitled to receive, in addition to his share of a Contributory Credit Pension, a partial Contribution-Based Pension provided by Section 4.03, except that this partial benefit will be based solely upon his Contributory Service Credit on and after January 1, 2004.

(b)    A Contributory Credit Pension is available to a Participant who is eligible for a benefit under Benefit Class 15 or higher in accordance with the following:

(1)    **Benefit Classes 15(A) and 15(B):**

(A)    A Participant shall qualify for a Contributory Credit Pension under Benefit Classes 15(A) or 15(B), if he meets each of the requirements as follows:

(i)    He must be an Active Participant as of December 31, 1986 or any later calendar year; and

(ii)    His Benefit Class must be 15(A) or 15(B); and

(iii)    He must, before becoming an Inactive Participant for the last time, reach his 60th birthday; and

(iv)    He must have a Retirement Date which is on or after his 60th birthday; and

(v)    He must have at least 25 years of Contributory Service Credit; and

(vi)    He must not have received payment of any benefit from this Pension Fund before January 1, 1987, except that, this requirement shall be waived if a Pensioner, after his Retirement Date, becomes employed by a Contributing Employer and meets the requirements of Section 4.14(a).

(B)    A Participant who meets the requirements (1)(A), above, shall receive a Contributory Credit Pension in a monthly amount determined as follows:

(i)    If his Benefit Class is 15(A), he shall receive a benefit according to the following:

TM:619767 / 01096280 / 04/03/2023

| Age at Retirement Date | 25 Years of Contributory Service Credit | 30 Years of Contributory Service Credit |
|---|---|---|
| 60 | $ 950 | $1,050 |
| 61 | 950 | 1,050 |
| 62 | 1,050 | 1,125 |
| 63 | 1,050 | 1,125 |
| 64 | 1,050 | 1,125 |
| 65 and over | 1,125 | 1,250 |

   (ii)   If his Benefit Class is 15(B), he shall receive a benefit according to the following:

| Age at Retirement Date | 25 Years of Contributory Service Credit | 30 Years of Contributory Service Credit |
|---|---|---|
| 60 | $1,000 | $1,100 |
| 61 | 1,000 | 1,100 |
| 62 | 1,100 | 1,250 |
| 63 | 1,100 | 1,250 |
| 64 | 1,100 | 1,250 |
| 65 and over | 1,250 | 1,500 |

(2)   **Benefit Class 15(C):**

   (A)   A Participant shall qualify for a Contributory Credit Pension under Benefit Class 15(C), if he meets each of the requirements as follows:

      (i)   He has, on or after April 1, 1988, at least 5 days or one week of Employer Contributions **(and not Self-Contributions)** made on his behalf after that date at a rate corresponding to Benefit Class 15(C); and

      (ii)   His Benefit Class is 15(C); and

      (iii)   He reaches his 57th birthday before becoming an Inactive Participant for the last time; and

      (iv)   He has a Retirement Date that is on or after his 57th birthday; and

      (v)   He has at least 25 years of Contributory Service Credit; and

      (vi)   He has not received payment of any benefit from this Pension Fund, except that, this requirement shall be waived if a Pensioner, after his Retirement Date, becomes reemployed by a Contributing Employer and meets the requirements of Section 4.14(a).

   (B)   A Participant who meets the requirements of (2)(A), above, shall receive a Contributory Credit Pension in a monthly amount determined as follows:

      (i)   If the Participant stops working on or after April 1, 1988, he shall receive a benefit according to the following:

- 33 -

| Age at Retirement Date | With 25 Years of Contributory Service Credit | With 30 Years of Contributory Service Credit |
|---|---|---|
| 57 through 59 | $  900 | $1,125 |
| 60 through 61 | $1,125 | $1,350 |
| 62 through 64 | $1,225 | $1,500 |
| 65 and over | $1,375 | $1,750 |

(ii)    If the Participant stops working on or after April 1, 1989 and had at least 5 days or one week of Employer Contributions **(and not Self-Contributions)** made on his behalf after that date under a Collective Bargaining Agreement requiring Contributions at a rate corresponding to Benefit Class 15(C) for the 12 month period preceding his Retirement Date, he shall receive a benefit according to the following:

| Age at Retirement Date | With 25 Years of Contributory Service Credit | With 30 Years of Contributory Service Credit |
|---|---|---|
| 57 through 59 | $1,000 | $1,250 |
| 60 through 61 | $1,250 | $1,600 |
| 62 through 64 | $1,350 | $1,750 |
| 65 and over | $1,500 | $2,000 |

(3)    **Benefit Class 16:**

(A)    A Participant shall qualify for a Contributory Credit Pension under Benefit Class 16, if he meets each of the requirements as follows:

(i)    He has, on or after April 1, 1991, at least 5 days or one week of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 16(A) or higher and;

(aa)    His Contributing Employer previously made Contributions at a rate corresponding to Benefit Class 15(C) or higher and his current Benefit Class, determined according to Section 3.03(a), is 16(A) or higher; or

(bb)    His Contributing Employer previously made Contributions at a rate corresponding to either Benefit Class 15(A) or 15(B) but not Benefit Class 15(C) or higher, his current Benefit Class, determined according to Section 3.03(a), is 16(A) or higher and his Contributing Employer has been making Contributions at a rate corresponding to Benefit Class 16(A) or higher for at least 12 months preceding his Retirement Date; or

(cc)    His Benefit Class, determined according to Section 3.03(b), is 16(A) or higher; and

(ii)    He is covered by a Collective Bargaining Agreement which requires his Contributing Employer to begin making Contributions at a rate corresponding to at least Benefit Class 16(C) no later than 24 months after the date the last Contribution is made on his behalf; and

- 34 -

(iii)  He reaches his 57th birthday before becoming an Inactive Participant for the last time; and

(iv)  He has a Retirement Date that is on or after his 57th birthday; and

(v)  He has at least 20 years of Contributory Service Credit; and

(vi)  He has not received payment of any benefit from this Pension Fund, except that, this requirement shall be waived if a Pensioner, after his Retirement Date, becomes reemployed by a Contributing Employer and meets the requirements of Section 4.14(a).

(B)  A Participant who meets the requirements of (3)(A), above, shall receive a Contributory Credit Pension in a monthly amount determined by the following:

| Age at Retirement Date | With 20 Years of Contributory Credit | With 25 Years of Contributory Credit | With 30 Years of Contributory Credit |
|---|---|---|---|
| 57 | $ 900 | $1,200 | $2,000 |
| 58 | 950 | 1,300 | 2,000 |
| 59 | 1,000 | 1,400 | 2,000 |
| 60 | 1,050 | 1,500 | 2,000 |
| 61 | 1,100 | 1,600 | 2,100 |
| 62 | 1,200 | 1,700 | 2,200 |
| 63 | 1,300 | 1,800 | 2,300 |
| 64 | 1,400 | 1,900 | 2,400 |
| 65 | 1,500 | 2,000 | 2,500 |

(4)  **Benefit Class 17a**

(A)  A Participant shall qualify for a Contributory Credit Pension under Benefit Class 17a, if he meets each of the requirements as follows:

(i)  He has, on or after August 1, 1993, at least 100 days or 20 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 17a; and

(ii)  His Benefit Class is 17a; and

(iii)  He has, **excluding any Contributory Service Credit he earned from Self-Contributions he made for a period preceding January 1, 1994, other than a Temporary Medical Absence Period (as defined in Section 1.09(b)),** at least 25 years of Contributory Service Credit; and

(iv)  He meets, **excluding any Contributory Service Credit he earned from Self-Contributions he made for a period preceding January 1, 1994, other than a Temporary Medical Absence Period (as defined in Section 1.09(b)),** the Contributory Service Credit requirement for the benefit amount he wishes to receive; and

(v)  He has not received payment of any benefit from this Pension Fund, except that, this requirement shall be waived if a Pensioner, after his

- 35 -

Retirement Date, becomes reemployed by a Contributing Employer and meets the requirements of Section 4.14(a).

(B) A Participant who meets the requirements of (4)(A), above, shall receive a Contributory Credit Pension in a monthly amount determined by the following:

**YEARS OF CONTRIBUTORY SERVICE CREDIT**

| Age at Retirement Date | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **50** (and under) | 1500 | 1500 | 1500 | 1500 | 1500 | 2000 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **51** | 1500 | 1500 | 1500 | 1500 | 1500 | 2000 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **52** | 1500 | 1500 | 1500 | 1500 | 1500 | 2000 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **53** | 1500 | 1500 | 1500 | 1500 | 1500 | 2000 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **54** | 1500 | 1500 | 1500 | 1500 | 1500 | 2000 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **55** | 1500 | 1500 | 1500 | 1500 | 1500 | 2000 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **56** | 1500 | 1600 | 1600 | 1600 | 1600 | 2000 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **57** | 1500 | 1600 | 1700 | 1700 | 1700 | 2000 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **58** | 1500 | 1600 | 1700 | 1800 | 1800 | 2000 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **59** | 1500 | 1600 | 1700 | 1800 | 1900 | 2000 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **60** | 1500 | 1600 | 1700 | 1800 | 1900 | 2000 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **61** | 1600 | 1600 | 1700 | 1800 | 1900 | 2100 | 2100 | 2200 | 2300 | 2400 | 2500 |
| **62** | 1700 | 1700 | 1700 | 1800 | 1900 | 2200 | 2200 | 2200 | 2300 | 2400 | 2500 |
| **63** | 1800 | 1800 | 1800 | 1800 | 1900 | 2300 | 2300 | 2300 | 2300 | 2400 | 2500 |
| **64** | 1900 | 1900 | 1900 | 1900 | 1900 | 2400 | 2400 | 2400 | 2400 | 2400 | 2500 |
| **65** | 2000 | 2000 | 2000 | 2000 | 2000 | 2500 | 2500 | 2500 | 2500 | 2500 | 2500 |

(5) **Benefit Class 17b**

(A) A Participant shall qualify for a Contributory Credit Pension under Benefit Class 17b, if he meets each of the requirements as follows:

(i) He has, on or after April 1, 1994, at least 10 days or 2 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 17b or if he is employed as a casual Employee or changes Contributing Employers (but not Bargaining Units) on or after such date, he has at least 100 days or 20

- 36 -

weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 17b; and

(ii) His Benefit Class is 17b; and

(iii) He has, **excluding any Contributory Service Credit he earned from Self-Contributions he made for a period preceding January 1, 1994, other than a Temporary Medical Absence Period (as defined in Section 1.09(b)),** at least 30 years of Contributory Service Credit, or has reached at least age 55 before becoming an Inactive Participant, and has, **excluding any Contributory Service Credit he earned from Self-Contributions he made for a period preceding January 1, 1994, other than a Temporary Medical Absence Period (as defined in Section 1.09(b)),** at least 25 years of Contributory Service Credit; and

(iv) He meets, **excluding any Contributory Service Credit he earned from Self-Contributions he made for a period preceding January 1, 1994, other than a Temporary Medical Absence Period (as defined in Section 1.09(b)),** the Contributory Service Credit requirement for the benefit amount he wishes to receive; and

(v) He has not received payment of any benefit from this Pension Fund, except that, this requirement shall be waived if a Pensioner, after his Retirement Date, becomes reemployed by a Contributing Employer and meets the requirements of Section 4.14(a).

(B) A Participant who meets the requirements of (5)(A), above, shall receive a Contributory Credit Pension in a monthly amount determined by the following:

- 37 -

### YEARS OF CONTRIBUTORY SERVICE CREDIT

| Age at Retirement Date | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 50 (and under) | | | | | | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 51 | | | | | | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 52 | | | | | | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 53 | | | | | | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 54 | | | | | | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 55 | 1500 | 1500 | 1500 | 1500 | 1500 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 56 | 1500 | 1600 | 1600 | 1600 | 1600 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 57 | 1500 | 1600 | 1700 | 1700 | 1700 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 58 | 1500 | 1600 | 1700 | 1800 | 1800 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 59 | 1500 | 1600 | 1700 | 1800 | 1900 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 60 | 1500 | 1600 | 1700 | 1800 | 1900 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 61 | 1600 | 1600 | 1700 | 1800 | 1900 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 62 | 1700 | 1700 | 1700 | 1800 | 1900 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 63 | 1800 | 1800 | 1800 | 1800 | 1900 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 64 | 1900 | 1900 | 1900 | 1900 | 1900 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |
| 65 | 2000 | 2000 | 2000 | 2000 | 2000 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 |

**EARLY RETIREMENT PENSION IS PAID FOR THESE AGE AND SERVICE COMBINATIONS** (spanning columns 25–29 for ages 50 through 54)

(c)   For purposes of determining the amount of his Contributory Credit Pension, a Participant may choose to have his age calculated as of any date which does not precede his Retirement Date or extend beyond the date he becomes an Inactive Participant, except that, a Participant who becomes an Inactive Participant prior to his Retirement Date, and who does not again become an Active Participant, shall have his age determined as of the date he became an Inactive Participant.

(d)   Subject to the Rules and Procedures for Suspension of Benefits (as described in Section 4.13), the Contributory Service After Retirement Date or After Disability (as described in Section 4.14) and the Benefits Claim Filing Procedures (as described in Section 7.14), the Contributory Credit Pension becomes payable to a Participant on the 1st day of the month following the month in which his age was calculated according to (b), above, except that, a Participant whose Retirement Date follows the date on which his age was calculated, shall have his Contributory Credit Pension become payable on the 1st day of the month following his Retirement Date.

(6)   **Benefit Class 18**

(A)   A Participant shall qualify for a Contributory Credit Pension under Benefit Class 18, if he meets each of the requirements as follows:

TM:619767 / 01096280 / 04/03/2023

(i)     He has, on or after August 1, 1997, at least 10 days or 2 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 18 or, if he is employed as a casual Employee or changes Contributing Employers (but not Bargaining Units) on or after such date, he has at least 100 days or 20 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 18; and

(ii)    His Benefit Class is 18; and

(iii)   He meets, **excluding any Contributory Service Credit he earned from Self-Contributions he made for a period preceding January 1, 1994, other than a Temporary Medical Absence Period (as defined in Section 1.09(b)),** the Contributory Service Credit requirement for the benefit amount he wishes to receive; and

(iv)    He has not received payment of any benefit from this Pension Fund, except that, this requirement shall be waived if a Pensioner, after his Retirement Date, becomes reemployed by a Contributing Employer and meets the requirements of Section 4.14(a).

(B)   A Participant who meets the requirements of (6)(A), above, shall receive a Contributory Credit Pension in a monthly amount determined by the following:

### YEARS OF CONTRIBUTORY SERVICE CREDIT

| Age at Retirement Date | 20-24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Any Age | - | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 50 | 650 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 51 | 700 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 52 | 750 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 53 | 800 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 54 | 850 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 55 | 900 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 56 | 950 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 57 | 1000 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 58 | 1050 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 59 | 1100 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |

**YEARS OF CONTRIBUTORY SERVICE CREDIT**

| Age at Retirement Date | 20-24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60 | 1150 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 61 | 1200 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 62 | 1300 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 63 | 1400 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 64 | 1500 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 65 | 2000 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |

(7)   **Benefit Class 18+**

    (A)   A Participant shall qualify for Contributory Credit Pension under Benefit Class 18+, if he meets each of the requirements as follows:

        (i)   He has, on or after June 1, 1998, at least 10 days or 2 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 18+ or, if he is employed as a casual Employee or changes Contributing Employers (but not Bargaining Units) on or after such date, he has at least 100 days or 20 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 18+; and

        (ii)   His Benefit Class is 18+; and

        (iii)   He meets **excluding any Contributory Service Credit he earned from Self-Contributions he made for a period preceding January 1, 1994, other than a Temporary Medical Absence Period (as defined in Section 1.09(b)),** the Contributory Service Credit requirement for the benefit amount he wishes to receive; and

        (iv)   He has not received payment of any benefit from this Pension Fund, except that, this requirement shall be waived if a Pensioner, after his Retirement Date, becomes reemployed by a Contributing Employer and meets the requirements of Section 4.14(a).

    (B)   A Participant who meets the requirements of (7)(A), above, shall receive a Contributory Credit Pension in a monthly amount determined by the following:

- 40 -

**YEARS OF CONTRIBUTORY SERVICE CREDIT**

| Age at Retirement Date | 20-24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Any Age | - | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 50 | 650 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 51 | 700 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 52 | 750 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 53 | 800 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 54 | 850 | 2000 | 2100 | 2200 | 2300 | 2400 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 55 | 900 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 56 | 950 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 57 | 1000 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 58 | 1050 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 59 | 1100 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 60 | 1150 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 61 | 1200 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 62 | 1300 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 63 | 1400 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 64 | 1500 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |
| 65 | 2000 | 2500 | 2600 | 2700 | 2800 | 2900 | 3000 | 3100 | 3200 | 3300 | 3400 | 3500 |

(e)    The Pension Fund is not liable for benefits based upon this Section 4.04 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

**Section 4.05    25-AND-OUT PENSION - BENEFIT CLASS 17a, 18 and 18+ ONLY**

(a)    **The benefit described in this Section 4.05 is preserved, protected and limited as of December 31, 2003, to the extent described in this subsection (a)**. Contributory Service Credit for any time period after December 31, 2003, will be disregarded, in determining eligibility for and the amount of a 25-And-Out Pension, except as otherwise provided in this subsection (a). For any Participant who has Contributory Service Credit both before and after December 31, 2003, the eligibility and amount of a 25-And-Out Pension will be determined in accordance with the following standards:

(1)    The total of the Participant's Contributory Service Credit before, on and after December 31, 2003, will be included in the determination whether the Participant has the minimum 25 years of Contributory Service Credit required to qualify for this benefit and, if he does, and if he satisfies all other eligibility requirements for a 25-And-Out Pension, his monthly share of the applicable benefit amount (either

TM:619767 / 01096280 / 04/03/2023

$1,500 or $2,000, whichever applies) will equal a fraction of that amount, the numerator being the total years of his Contributory Service Credit as of December 31, 2003, and the denominator being 25 years; and

(2)    The Benefit Class of the Participant, for purposes of a 25-and-Out Pension, will be determined as of December 31, 2003, unless any of the limited post-2003 exceptions specified in Section 3.01(c) is applicable; and

(3)    The Participant will also be entitled to receive, in addition to his share of a 25-And-Out Pension, a partial Contribution-Based Pension provided by Section 4.03, except that this partial benefit will be based solely upon his Contributory Service Credit on and after January 1, 2004.

(b)    A Participant shall qualify for a 25-And-Out Pension under Benefit Class 17a, in a monthly amount of $1,500, if he meets each of the following requirements:

(1)    He has, on or after August 1, 1993, at least 100 days or 20 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf under Benefit Class 17a; and

(2)    His Benefit Class is 17a; and

(3)    He has, **excluding any Contributory Service Credit he earned from Self-Contributions he made for a period preceding January 1, 1994, other than a Temporary Medical Absence Period (as defined in Section 1.09(b)),** at least 25 years of Contributory Service Credit; and

(4)    He has not received payment of any benefit from this Pension Fund, except that, this requirement shall be waived if a Pensioner, after his Retirement Date, becomes reemployed by a Contributing Employer and meets the requirements of Section 4.14(a).

(c)    A Participant shall qualify for a 25-And-Out Pension under Benefit Class 18 or 18+, in a monthly amount of $2,000, if he meets each of the following requirements:

(1)    He has had at least 10 days or 2 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 18 or 18+ <u>or</u>, if he is employed as a casual Employee or changes Contributing Employers (but not Bargaining Units) on or after such date, he has at least 100 days or 20 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 18 or 18+; and

(2)    His Benefit Class is 18 or 18+; and

(3)    He has, **excluding any Contributory Service Credit he earned from Self-Contributions he made for a period preceding January 1, 1994, other than a Temporary Medical Absence Period (as defined in Section 1.09(b)),** at least 25 years of Contributory Service Credit; and

(4)    He has not received payment of any benefit from this Pension Fund, except that, this requirement shall be waived if a Pensioner, after his Retirement Date, becomes reemployed by a Contributing Employer and meets the requirements of Section 4.14(a).

(d)    Subject to the Rules and Procedures for Suspension of Benefits (as described in Section 4.13), the Contributory Service After Retirement Date or After Disability (as described in

Section 4.14) and the Benefits Claim Filing Procedures (as described in Section 7.14), a Participant may elect to have his 25-And-Out Pension become payable on the 1st day of the month following his Retirement Date.

(e)     A Participant who has stopped working in Covered Service may not elect to have his 25-And-Out Pension become payable later than the 1st day of the month following his Normal Retirement Date.

(f)     The 25-And-Out Pension a Participant becomes qualified to receive shall be his minimum monthly retirement benefit from this Pension Fund.

(g)     The Pension Fund is not liable for benefits based upon this Section 4.05 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

**Section 4.06     30-AND-OUT PENSION - SCHEDULE B BENEFIT ONLY**

(a)     **The benefit described in this Section 4.06 is preserved, protected and limited as of December 31, 2003, to the extent described in this subsection (a).** Contributory Service Credit for any time period after December 31, 2003, will be disregarded, in determining eligibility for and the amount of a 30-and-Out Pension, except as otherwise provided in this subsection (a). For any Participant who has Contributory Service Credit both before and after December 31, 2003, the eligibility and amount of a 30-And-Out Pension will be determined in accordance with the following standards:

(1)     The total of the Participant's Contributory Service Credit before, on and after December 31, 2003, will be included in the determination whether the Participant has the minimum 30 years of Contributory Service Credit required to qualify for this benefit and, if he does, and if he satisfies all other eligibility requirements for a 30-And-Out Pension, his monthly share of the applicable benefit amount will equal a fraction of that amount, the numerator being the total years of his Contributory Service Credit as of December 31, 2003, and the denominator being 30 years ("applicable benefit amount", for this calculation, means the amount in subsection [c] that is applicable to the Participant); and

(2)     The Benefit Class of the Participant, for purposes of a 30-And-Out Pension, will be determined as of December 31, 2003, unless any of the limited post-2003 exceptions specified in Section 3.01(c) is applicable; and

(3)     The Participant will also be entitled to receive, in addition to his share of a 30-And-Out Pension, a partial Contribution-Based Pension provided by Section 4.03, except that this partial benefit will be based solely upon his Contributory Service Credit on and after January 1, 2004.

(b)     A Participant shall qualify for a 30-And-Out Pension if he meets each of the following requirements:

(1)     He has at least 30 years of Contributory Service Credit; and

(2)     He has at least 5 days or one week of Contributions made on his behalf at Schedule B rates; and

(3)     He has not received payment of any benefit from this Pension Fund, except that, this requirement shall be waived if a Pensioner, after his Retirement Date, becomes reemployed by a Contributing Employer and meets the requirements of Section 4.14(a).

- 43 -

(c) A Participant who is eligible for a 30-And-Out Pension shall receive a benefit in a monthly amount determined as follows:

(1) He shall receive a 30-And-Out Pension in a monthly amount equal to the age 60 Twenty-Year Service Pension corresponding to his Benefit Class if his Benefit Class is below 15(A) and he is covered by a Collective Bargaining Agreement which contains a commitment for Schedule B rates.

(2) He shall receive a 30-And-Out Pension in a monthly amount of $1,000 if his Benefit Class is 15 or if his Benefit Class is 16(A) or higher and he fails to meet the requirements of (3), (4) and (5) below.

(3) He shall receive a 30-And-Out Pension in a monthly amount of $2,000 if he meets each of the following requirements:

(A) He has, on or after April 1, 1991, at least 5 days or one week of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 16(A) or higher, and;

(i) His Contributing Employer previously made Contributions at a rate corresponding to Benefit Class 15(C) or higher and his current Benefit Class, determined according to Section 3.03(a), is 16(A) or higher; or

(ii) His Contributing Employer previously made Contributions at a rate corresponding to either Benefit Class 15(A) or 15(B) **but not** Benefit Class 15(C), his current Benefit Class, determined according to Section 3.03(a), is 16(A) or higher and his Contributing Employer has been making Contributions at a rate corresponding to Benefit Class 16(A) or higher for at least 12 months preceding his Retirement Date; or

(iii) His Benefit Class, determined according to Section 3.03(b), is 16(A) or higher; and

(B) He is covered by a Collective Bargaining Agreement which requires his Contributing Employer to begin making Contributions at a rate corresponding to at least Benefit Class 16(C) no later than 24 months after the date the last Contribution is made on his behalf.

(4) He shall receive a 30-And-Out Pension in a monthly amount of $2,500 if he meets each of the following requirements:

(A) He has had, on or after April 1, 1994, at least 10 days or 2 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 17b or if he is employed as a casual Employee or changes Contributing Employers (but not Bargaining Units) on or after such date, he has at least 100 days or 20 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 17b; and

(B) His Benefit Class is 17b; and

(C) He has, **excluding any Contributory Service Credit he earned from Self-Contributions he made for a period preceding January 1, 1994, other than a Temporary Medical Absence Period (as defined in Section 1.09(b)),** at least 30 years of Contributory Service Credit.

TM:619767 / 01096280 / 04/03/2023

(5)　He shall receive a 30-And-Out Pension in a monthly amount of $3,000 if he meets each of the following requirements:

(A)　He has had at least 10 days or 2 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 18 or 18+ or, if he is employed as a casual Employee or changes Contributing Employers (but not Bargaining Units) on or after such date, he has at least 100 days or 20 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 18 or 18+; and

(B)　His Benefit Class is 18 or 18+; and

(C)　He has, **excluding any Contributory Service Credit he earned from Self-Contributions he made for a period preceding January 1, 1994, other than a Temporary Medical Absence Period (as defined in Section 1.09(b)),** at least 30 years of Contributory Service Credit.

(d)　Subject to the Rules and Procedures for Suspension of Benefits (as described in Section 4.13), the Contributory Service After Retirement Date or After Disability (as described in Section 4.14) and the Benefits Claim Filing Procedures (as described in Section 7.14), a Participant may elect to have his 30-And-Out Pension become payable on the 1st day of any month following his Retirement Date.

(e)　A Participant who has stopped working in Covered Service may not elect to have his 30-And-Out Pension become payable later than the 1st day of the month following his Normal Retirement Date.

(f)　The 30-And-Out Pension a Participant becomes qualified to receive shall be his minimum monthly retirement benefit from this Pension Fund.

(g)　The Pension Fund is not liable for benefits based upon this Section 4.06 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

## Section 4.07　VESTED PENSION

(a)　To become eligible for a Vested Pension, a Participant must be a Vested Participant and have a Retirement Date preceding January 1, 1987. A Vested Participant whose Retirement Date is on or after January 1, 1987 shall be eligible to receive a Contribution-Based Pension (as defined in Section 4.03) in lieu of a Vested Pension.

(b)　The monthly amount of the Vested Pension is determined as follows:

(1)　If the effective date of benefit payments is on or after the Normal Retirement Date of the Participant, the monthly amount is equal to his Accrued Benefit, as determined by Section 1.01(a).

(2)　If the effective date of benefit payments is before the Normal Retirement Date of the Participant, the monthly amount is determined by reducing his Accrued Benefit, as determined by Section 1.01(a), by ½ of 1% for each month his effective date of benefit payments precedes his 65th birthday;

(c)　Subject to the Rules and Procedures for Suspension of Benefits (as described in Section 4.13), the Contributory Service After Retirement Date or After Disability (as described in

- 45 -

Section 4.14) and the Benefits Claim Filing Procedures (as described in Section 7.14), a Participant may elect to have his Vested Pension become payable on the 1st day of any month following the later of:

    (1)    his 50th birthday; or

    (2)    his Retirement Date.

(d)    The Pension Fund is not liable for benefits based upon this Section 4.07 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

## Section 4.08    DEFERRED PENSION

(a)    A Participant who becomes eligible for a Deferred Pension may defer payment of his Twenty-Year Service Pension or Early Retirement Pension to a later age and receive a greater monthly benefit.

(b)    To become eligible for a Deferred Pension, a Participant must meet one of the following requirements at the time he stops working in Covered Service or becomes an Inactive Participant.

    (1)    he must be eligible for immediate payment of a Twenty-Year Service Pension; or

    (2)    he must be eligible for immediate payment of an Early Retirement Pension and have at least 20 years of Contributory Service Credit.

(c)    The monthly amount of the Deferred Pension is determined by the age of the Participant in the month immediately preceding his Deferred Retirement Date, and by his Benefit Class on the earlier of:

    (1)    the date he stops working in Covered Service; or

    (2)    the date he became an Inactive Participant.

(d)    Subject to the Rules and Procedures for Suspension of Benefits (as described in Section 4.13), the Contributory Service After Retirement Date or After Disability (as described in Section 4.14) and the Benefits Claim Filing Procedures (as described in Section 7.14), the Deferred Pension becomes payable on the Deferred Retirement Date of a Participant.

(e)    The Pension Fund is not liable for benefits based upon this Section 4.08 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

## Section 4.09    TWENTY-YEAR DEFERRED PENSION - SCHEDULE B BENEFIT ONLY

(a)    A Participant who becomes eligible for a Twenty-Year Deferred Pension may defer the payment of his Twenty-Year Service Pension or Early Retirement Pension and receive a greater monthly benefit.

(b)    To become eligible for a Twenty-Year Deferred Pension, a Participant must meet the following requirements at the time he stops working in Covered Service or becomes an Inactive Participant.

TM:619767 / 01096280 / 04/03/2023

(1)  (A)  he must have had at least one Year of Participation in which his Contributing Employer made Employer Contributions under Schedule B for members of his Bargaining Unit; or

(B)  he must not have had a One-Year Break-in-Service during the calendar year immediately preceding the calendar year his Contributing Employer began making Employer Contributions under Schedule B for members of his Bargaining Unit; and

(2)  he must have had at least 20 years of Contributory Service Credit.

(c)  The monthly amount of the Twenty-Year Deferred Pension is determined by the age of the Participant in the month immediately preceding his Deferred Retirement Date, and by his Benefit Class on the earlier of:

(1)  the date he stopped working in Covered Service; or

(2)  the date he became an Inactive Participant.

(d)  Subject to the Rules and Procedures for Suspension of Benefits (as described in Section 4.13), the Contributory Service After Retirement Date or After Disability (as described in Section 4.14) and the Benefits Claim Filing Procedures (as described in Section 7.14), the Twenty-Year Deferred Pension becomes payable on the Deferred Retirement Date of a Participant.

(e)  The Pension Fund is not liable for benefits based upon this Section 4.09 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

## Section 4.10    FORMS OF PAYMENT

(a)  Three forms of payment for retirement pensions are available from the Pension Plan. The form of payment affects the monthly amount of the retirement pension, and also determines what benefits, if any, shall be available after the death of the Participant.

(b)  FORM OF PAYMENT 1 - JOINT AND 50% SURVIVING SPOUSE OPTION

(1)  The Joint and 50% Surviving Spouse Option is the normal form of payment for retirement pensions and is available if:

(A)  a Pensioner is married on the effective date of his benefit payments; and

(B)  he and his spouse have not elected, in writing, to receive his retirement pension in any other form of payment.

(2)  The Joint and 50% Surviving Spouse Option provides a lifetime retirement pension to a Pensioner reduced to reflect the cost to the Pension Fund for this form of payment, and after his death, provides 50% of that reduced amount as a lifetime benefit to the surviving spouse. For purposes of this form of payment, a surviving spouse is the individual to whom the Pensioner is married on the effective date of his benefit payments, except as otherwise provided in subsection (g)(1)(E) and (F) of this section.

(3)  The reduction factors for the Joint and 50% Surviving Spouse Option appear in Appendix A-1.

- 47 -

(4)  A Pensioner whose reduced pension is based upon the Joint and 50% Surviving Spouse Option, and who is preceded in death by his spouse, shall have his retirement pension restored to the amount he would have received if he and his spouse had rejected the Joint and 50% Surviving Spouse Option. This provision shall apply to any Pensioner who, on or after January 1, 1990, is eligible to receive his retirement pension under the Joint and 50% Surviving Spouse Option and shall go into effect according to the following:

(A)  **If the date of death of a Pensioner's spouse is before January 1, 1990,** his retirement pension shall be restored effective January 1, 1990.

(B)  **If the date of death of a Pensioner's spouse is on or after January 1, 1990,** the Pensioner's retirement pension shall be restored effective the 1st day of the month following the month of his spouse's death.

(5)  If a Pensioner's reduced pension is based upon the Joint and 50% Surviving Spouse Option, and if that Pensioner's spouse executes a specific written waiver of any right to and interest in the Joint and 50% Surviving Spouse Option, and if that waiver is incorporated in a court-approved property settlement agreement that is part of a judgment or order entered by a court of competent jurisdiction in a divorce, marriage dissolution or marital separation proceeding, then the Pensioner shall have his retirement pension restored to the amount he would have received if he and his spouse had rejected the Joint and 50% Surviving Spouse Option. This restoration shall be effective the 1st day of the month following the month in which the judgment or order is entered, except that the restoration will not be applied to benefits paid or payable on any date prior to 1992.

(6)  Subject to the Benefits Claim Filing Procedures (as described in Section 7.14), benefits payable to a surviving spouse under the Joint and 50% Surviving Spouse Option form of payment shall become payable on the 1st day of the month following the Participant's death.

(c)  FORM OF PAYMENT 1A -- JOINT AND 75% SURVIVING SPOUSE OPTION

(1)  The Joint and 75% Surviving Spouse Option is a form of payment for retirement pensions which is an alternative to the Joint and 50% Surviving Spouse Option and which is available if:

(A)  a Pensioner is married on the effective date of his benefit payments; and

(B)  the effective date of the benefit payments of the Pensioner is on or after March 1, 2008; and

(C)  there has been an effective waiver by the Pensioner, with the consent of his spouse, of the Joint and 50% Surviving Spouse Option; and

(D)  the Pensioner, during the applicable election period (as defined in subsection [f] [7] [C] of this section), has elected the Joint and 75% Surviving Spouse Option and has not revoked that election before expiration of that period.

(2)  The Joint and 75% Surviving Spouse Option provides a lifetime retirement pension to a Pensioner reduced to reflect the cost to the Pension Fund for this form of payment and, after his death, provides 75% of that reduced amount as a lifetime benefit to his surviving spouse. For purposes of this form of payment, a surviving spouse is the individual to whom the Pensioner is married on the effective date of his benefit payments, except that, if the spouse of the Pensioner as of his

retroactive annuity starting date (as defined in this section) is no longer his spouse determined as of the date on which distribution of his retirement pension actually commences, that former spouse is not his spouse for purposes of this subsection (c) and is not entitled to a QOSA benefit.

(3)    The reduction factors for the Joint and 75% Surviving Spouse Option appear in Appendix A-2.

(4)    A Pensioner whose reduced pension is based upon the Joint and 75% Surviving Spouse Option, and who is preceded in death by his spouse, shall have his retirement pension restored to the amount he would have received if he had not elected the Joint and 75% Surviving Spouse Option, effective as of the 1st day of the month following his spouse's death.

(5)    If a Pensioner's reduced pension is based upon the Joint and 75% Surviving Spouse Option, and if that Pensioner's spouse executes a specific written waiver of any right to and interest in the Joint and 75% Surviving Spouse Option, and if that waiver is incorporated in a court-approved property settlement agreement that is part of a judgment or order entered by a court of competent jurisdiction in a divorce, marriage dissolution or marital separation proceeding, then the Pensioner shall have his retirement pension restored to the amount he would have received if he had not elected the Joint and 75% Surviving Spouse Option. This restoration shall be effective as of the 1st day of the month following the month in which the judgment or order is entered.

(6)    Subject to the Benefits Claim Filing Procedures (as described in Section 7.14), benefits payable to a surviving spouse under the Joint and 75% Surviving Spouse Option form of payment shall become payable on the 1st day of the month following the Pensioner's death.

(d)    FORM OF PAYMENT 2 - LIFETIME ONLY OPTION

(1)    A Participant whose Benefit Class is 3(A) or lower shall, after becoming a Pensioner, automatically receive his retirement pension benefit under the Lifetime Only Option if:

(A)    he is not married on the effective date of his retirement pension benefit payments; or

(B)    he and his spouse have elected in writing, not to receive his retirement pension benefits under the Joint and 50% Surviving Spouse Option.

(2)    The Lifetime Only Option provides a lifetime retirement pension to a Pensioner, and does not, upon his death, provide any monthly surviving spouse benefit.

(3)    The Lifetime Only Option does not provide any lump-sum death benefit upon the death of a Pensioner who was receiving a Contribution-Based Pension or Vested Pension or upon the death of his spouse, unless, upon retirement, he had met the requirements for an Early Retirement Pension or Twenty-Year Deferred Pension.

(4)    Subject to (d)(3), above, the Lifetime Only Option provides a $1,000 lump-sum death benefit upon the death of a Pensioner. This $1,000 lump-sum death benefit is payable in equal shares to all members of the highest level of survivors as follows:

(A)    Spouse;

- 49 -

(B)    Dependent Children;

(C)    Non-Dependent Children;

(D)    Parents;

(E)    Brothers and Sisters;

(F)    Estate.

(5)    Subject to (d)(3), above, the Lifetime Only Option provides a $500 lump-sum benefit upon the death of the spouse of a Pensioner. This $500 lump-sum benefit is payable to a Pensioner only once during his lifetime.

(e)    FORM OF PAYMENT 3 - LIFETIME WITH LIMITED SURVIVING SPOUSE OPTION

(1)    A Participant whose Benefit Class is (4) or higher shall, upon becoming a Pensioner, automatically receive his retirement pension benefit under the Lifetime With Limited Surviving Spouse Option if:

(A)    he is not married on the effective date of his retirement pension benefit payments; or

(B)    he and his spouse have elected, in writing, not to receive his retirement pension benefits under the Joint and 50% Surviving Spouse Option.

(2)    The Lifetime With Limited Surviving Spouse Option provides a lifetime retirement pension benefit to a Pensioner.

(3)    If a Pensioner receives at least 60 months of retirement pension benefit payments, the Lifetime With Limited Surviving Spouse Option **does not** provide any further benefits.

(4)    If a Pensioner does not receive at least 60 months of retirement pension benefit payments, the Lifetime With Limited Surviving Spouse Option, except in cases where he is receiving a Contribution-Based Pension or Vested Pension and, upon retirement, had not met the requirements for an Early Retirement Pension or Twenty-Year Deferred Pension, provides his surviving spouse with the difference in payments resulting when the payments received by the Pensioner before his death are subtracted from 60. For purposes of this form of payment, the surviving spouse of a Pensioner is the individual to whom he is married on the date of his death.

(5)    Subject to the Benefits Claim Filing Procedures (as described in Section 7.14) any benefits payable to a surviving spouse under the Lifetime With Limited Surviving Spouse Option form of payment shall become payable on the 1st day of the month following the death of the Pensioner.

(6)    If a Pensioner does not receive at least 60 months of retirement pension benefit payments and is not married at the time of his death, the Lifetime With Limited Surviving Spouse Option, except in cases where he is receiving a Contribution-Based Pension or Vested Pension and, upon retirement, had not met the requirements for an Early Retirement Pension or Twenty-Year Deferred Pension, provides that a $1,000 lump-sum death benefit will be payable in equal shares to the members of the highest level of survivors as follows:

- 50 -

(A)    Dependent Children;

(B)    Non-Dependent Children;

(C)    Parents;

(D)    Brothers and Sisters;

(E)    Estate.

(f)    ELECTION TO WAIVE QUALIFIED JOINT AND SURVIVOR ANNUITY AND/OR TO WAIVE QUALIFIED OPTIONAL SURVIVOR ANNUITY

(1)    Each Participant and Pensioner may elect at any time during the applicable election period to waive the qualified joint and survivor annuity form of benefit (hereinafter "QJSA benefit"), and, if such a waiver is effectively elected, he may elect at any time during the applicable election period to waive the qualified optional survivor annuity form of benefit (hereinafter "QOSA benefit"). He may also revoke such election (to waive the QJSA benefit and/or to waive the QOSA benefit) at any time during the applicable election period.

(2)    The QJSA benefit is the Joint and 50% Surviving Spouse Option described in subsection (b) of this section. The QOSA benefit is the Joint and 75% Surviving Spouse Option described in subsection (c) of this section.

(3)    An election by a Participant or Pensioner to waive the QJSA benefit shall not take effect unless during the applicable election period his spouse consents in writing to such waiver election, and unless the spouse's consent acknowledges the effect of such waiver election and is witnessed by a notary public. The definition of "spouse" is in subsections (f)(7)(D) and (g)(1)(E) and (F) of this section.

(4)    The requirements of a spouse's consent described in subsection (f)(3) of this section are not applicable in circumstances which establish to the satisfaction of the Pension Fund that the Participant or Pensioner is not married or that his spouse cannot be located.

(5)    The Pension Fund shall provide to each Participant and Pensioner a written explanation (hereinafter "QJSA-QOSA explanation") that will include: the terms and conditions of the QJSA benefit and the QOSA benefit; the right of the Participant or Pensioner to make, and the effect of, a timely election to waive the QJSA benefit and/or to receive the QOSA benefit; the rights of the spouse of the Participant or Pensioner as described in subsection (f)(3) of this section; and the right of the Participant or Pensioner to make, and the effect of, a timely revocation of his previous waiver of the QJSA benefit and/or his previous election to receive the QOSA benefit. The QJSA-QOSA explanation shall be written in a manner calculated to be understood by the average Participant and Pensioner. The QJSA-QOSA explanation shall include, as of the annuity starting date of the Participant or Pensioner (or, if applicable, his retroactive annuity starting date), a description of his QJSA benefit, a description of his QOSA benefit if he elects to waive his QJSA benefit, a description of his optional benefit if he elects to waive both his QJSA benefit and his QOSA benefit, a description of the eligibility conditions for his benefits and a description of the financial effects and relative values of his QJSA benefit, his QOSA benefit if he elects to waive his QJSA benefit, and his optional benefit if he elects to waive both his QJSA benefit and his QOSA benefit. The QJSA-QOSA explanation shall be provided to each Participant or Pensioner

- 51 -

no less than 30 days, and no more than 180 days (or a longer interval caused solely by administrative delay), before his annuity starting date, except as otherwise provided in subsections (f)(6) and (g) of this section.

(6)    The QJSA-QOSA explanation may be provided by the Pension Fund to a Participant or Pensioner on a date which is less than 30 days before his annuity starting date if the following conditions are satisfied:

(A)    the QJSA-QOSA explanation must clearly inform the Participant or Pensioner that the applicable election period, for his election to waive the QJSA benefit, and for his election to receive the QOSA benefit, and for his revocation of any such prior election, continues until 90 days after the date on which distribution of his retirement pension actually commences; and

(B)    distribution in accordance with an affirmative election to waive the QJSA benefit and/or to receive the QOSA benefit, or with a revocation of any such prior election, cannot commence before expiration of 10 days after the date on which the Participant or Pensioner receives the QJSA-QOSA explanation.

(7)    The following terms in subsections (f) and (g) of this section shall have the following meanings:

(A)    the term "annuity starting date" means the first day of the first period (of multiple periods) for which an amount is payable to a Pensioner as a retirement pension;

(B)    the term "retroactive annuity starting date" means an annuity starting date affirmatively elected by a Participant or Pensioner which occurs on or before the date on which the QJSA-QOSA explanation, as required by subsections (f)(5) and (f)(6) of this section, is provided to the Participant or Pensioner, and to which subsection (g) of this section applies;

(C)    the term "applicable election period" (for an election by a Participant or Pensioner to waive the QJSA benefit and/or to receive the QOSA benefit, and for his revocation of any such prior election) means the period which begins 180 days before the annuity starting date of the Participant or Pensioner and ends on the 90th day after the date on which distribution of his retirement pension actually commences; and

(D)    the "spouse" of a Participant or Pensioner means the person (if any) to whom he is married on his annuity starting date, except as otherwise provided in subsection (g) of this section.

(g)    RETROACTIVE ANNUITY STARTING DATES

(1)    This subsection (g) applies only to retroactive annuity starting dates, as defined in subsection (f)(7)(B) of this section, which are **on and after January 1, 2004**. To the extent any Participant or Pensioner is permitted to elect to receive a retirement pension based upon a retroactive annuity starting date which is **on or after January 1, 2004**, the following terms, conditions and requirements are applicable:

(A)    all future periodic payments with respect to a Participant or Pensioner who elects a retroactive annuity starting date must be the same as the future periodic payments that would have been paid to him if his payments had actually commenced on the retroactive annuity starting date, and he must receive a make-up payment to reflect all missed payments for the period from

the retroactive annuity starting date to the date of the actual make-up payment (with an appropriate adjustment for interest from the date each missed payment would have been made to the date of the actual make-up payment, provided that there is to be no such interest adjustment except to the extent that it is legally required);

(B)   no Participant or Pensioner will be permitted to elect a retroactive annuity starting date that precedes the date upon which he could have otherwise started receiving benefits;

(C)   the QJSA-QOSA explanation shall be provided to each Participant or Pensioner no less than 30 days, and no more than 180 days (or a longer interval if caused solely by administrative delay), before the date on which distribution of his retirement pension actually commences, except that the QJSA-QOSA explanation may be provided by the Pension Fund to a Participant or Pensioner on a date which is less than 30 days before the date on which distribution of his retirement pension actually commences if the following conditions are satisfied:

(i)   the QJSA-QOSA explanation must clearly inform the Participant or Pensioner that the applicable election period, for his election to waive the QJSA benefit, and for his election to receive the QOSA benefit, and for his revocation of any such prior election, continues until 90 days after the date on which distribution of his retirement pension actually commences; and

(ii)   distribution in accordance with an affirmative election to waive the QJSA benefit and/or to receive the QOSA benefit, or with a revocation of any such prior election, cannot commence before expiration of 10 days after the date on which the Participant or Pensioner receives the QJSA-QOSA explanation;

(D)   the term 'applicable election period' (for an election by a Participant or Pensioner to waive the QJSA benefit and/or to receive the QOSA benefit, and for his revocation of any such prior election) means the period which begins 180 days before the annuity starting date of the Participant or Pensioner and ends on the 90th day after the date on which distribution of his retirement pension actually commences;

(E)   if the spouse of the Participant or Pensioner as of the retroactive annuity starting date is no longer his spouse determined as of the date on which distribution of his retirement pension actually commences, that former spouse is not entitled to a QJSA benefit and the consent of that former spouse is not needed to waive the QJSA benefit unless otherwise required by a qualified domestic relations order; and

(F)   the requirements of a spouse's consent described in subsection (f)(3) of this section are applicable to the spouse of the Participant or Pensioner determined as of the date on which distribution of his retirement pension actually commences (including an alternate payee who is treated as his spouse based upon a qualified domestic relations order), and no election of a retroactive annuity starting date shall take effect without consent to the election by that spouse (in the manner prescribed by subsection [f][3] of this section) if such election will reduce the amount of the potential future QJSA benefit which, absent such election, would be payable to the spouse.

- 53 -

(h)    TRANSFER OF LIABILITIES TO THE UPS TRANSFER PLAN

(1)    For purposes of all forms of payments pursuant to this Section 4.10 and this Pension Plan, the Pension Fund is not liable for benefits to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan, provided that, in any instance in which the Pension Fund becomes responsible as a result of and pursuant to Section 3 of APPENDIX L for the payment of a qualified post-retirement joint and survivor annuity on and after the Participant's 65th birthday (or the date that would have been the Participant's 65th birthday if the Participant is then deceased), if such annuity was previously elected pursuant to and began to be paid by the UPS Transfer Plan, the form of the annuity paid by the Pension Fund will be either the Joint and 50% Surviving Spouse Option or the Joint and 75% Surviving Spouse Option (whichever was elected by the Participant pursuant to the UPS Transfer Plan), and all such payments by the Pension Fund will be determined and governed by the terms and provisions of this Section 4.10 and APPENDIX L.

## Section 4.11    BENEFITS UNDER ANOTHER PLAN

A Participant whose Employee Group was accepted according to the Alternative Policy in Appendix G of this Pension Plan, shall have the amount of any Twenty-Year Service Pension, Early Retirement Pension, Contributory Credit Pension, 25-And-Out Pension, 30-And-Out Pension, Deferred Pension or Twenty-Year Deferred Pension he becomes eligible to receive from this Pension Plan, reduced by the amount of any benefit he may have earned while covered by a prior pension plan maintained by the Contributing Employer that became required to make Employer Contributions to this Pension Fund on his behalf.

## Section 4.12    CHOICE OF BENEFITS

(a)    Except as otherwise provided in (b), below, only one type of retirement pension shall be payable to a Pensioner. Subject to that exception, if a Participant is eligible for more than one type of retirement pension, he must choose the one he is to receive. That choice, upon being made by a Participant, shall be irrevocable, except as provided by the Rules and Procedures for Suspension of Benefits (as described in Section 4.13) and the Contributory Service After Retirement Date or After Disability (as described in Section 4.14), and except in cases where a Participant chooses to receive any other benefit for which he is eligible before the Pension Fund completes the processing of his claim for any other retirement pension he may be eligible to receive.

(b)    For any Participant who has Contributory Service Credit both before and after December 31, 2003, and who becomes eligible to receive **both** a partial Contribution-Based Pension based solely upon his Contributory Service Credit on and after January 1, 2004, **and** a retirement benefit in accordance with Section 4.04(a) or Section 4.05(a) or Section 4.06(a), the initial effective date of both benefits will be the 1st day of the month following the Retirement Date of the Participant.

## Section 4.13    RULES AND PROCEDURES FOR SUSPENSION OF BENEFITS

This section governs the suspension by the Pension Fund of monthly (and any other periodic) benefits payable for any period. Definitions of terms are stated in subsection (g) as well as in Article I of this Pension Plan.

(a)    The Pension Fund shall permanently suspend all Periodic Benefit Payments of a Pensioner or Disabled Participant during periods of his Reemployment to the following extent:

(1)     all Periodic Benefit Payments to a Disabled Participant shall be permanently suspended during all periods of his Reemployment (even if it is not Restricted Reemployment);

(2)     all Periodic Benefit Payments to a Pensioner shall be permanently suspended during all periods of his Restricted Reemployment except that, after the 65th birthday or Vested Pension Retirement Date of a Pensioner, whichever is later, there shall be no suspension in conflict with applicable federal law, including 26 U.S.C. § 411 and 29 U.S.C. § 1053*; and

(3)     there shall be no suspension of Periodic Benefit Payments of any Pensioner or Disabled Participant after April 1 of the year after the calendar year in which the Pensioner or Disabled Participant attains age 70½, regardless of any Reemployment.

Any failure of a Pensioner to comply with any disclosure obligation described in subsection (b), or with any related disclosure request by the Pension Fund, shall, if the Pensioner has been or is engaged in any Reemployment, create a rebuttable presumption of an existing factual basis, in accordance with this subsection, for a permanent suspension of the Pensioner's Periodic Benefit Payments during all periods of his Reemployment, provided that such presumption will become inoperative if and to the extent the presumption is rebutted by clear and convincing evidence or is otherwise shown to be unreasonable under the circumstances. Each such permanent suspension of Periodic Benefit Payments shall apply not only to the Pensioner or Disabled Participant but also to any other potential payee of any part of his suspended Periodic Benefit Payments, including any payee pursuant to a qualified domestic relations order (such as a former spouse), and including a surviving spouse. Each such permanent suspension of Periodic Benefit Payments shall continue in effect until the Pension Fund has received what it determines to be both notice and clear and convincing evidence that the basis for the permanent suspension is no longer applicable, at which time

---

*

Applicable federal law, 26 U.S.C. § 411 and 29 U.S.C. § 1053, includes a regulation adopted by the Secretary of Labor, 29 CFR § 2530.203-3, which authorizes the permanent suspension by the Pension Fund of Periodic Benefit Payments, after a Pensioner's Vested Pension Retirement Date (age 65 in the Pension Fund in almost all instances), "for each calendar month, or for each four or five week payroll period ending in a calendar month" if during that month, the Pensioner:

"-Completes 40 or more hours of service … or

"-Receives payment for any such hours or service performed on each of 8 or more days (separate work shifts) in such month or payroll period…; in

" – An industry in which employees covered by the plan were employed and accrued benefits under the plan as a result of such employment at the time that the payment of benefits commenced or would have commenced if the employee had not remained in or returned to employment, and

" – A trade or craft in which the employee was employed at any time under the plan, and

" – The geographic area covered by the plan at the time that the payment of benefits commenced or would have commenced if the employee had not remained in or returned to employment."

That applicable law and that regulation are hereby incorporated into this Pension Plan.

TM:619767 / 01096280 / 04/03/2023

the suspension will be ended and the Periodic Benefit Payments will be resumed on a prospective basis only (without any restoration of payments for the period prior to that end of the suspension), subject to possible offset pursuant to subsection (e).

(b)     Every Participant, Pensioner and Disabled Participant is obliged, as a prerequisite to any receipt of Periodic Benefit Payments, to keep the Pension Fund fully and promptly informed of any employment or any other performance of services in which he was or is engaged during any time period for which he claims or has received Periodic Benefit Payments. The Pension Fund may at any time, and as often as is reasonable, require appropriate signed authorizations by any Pensioner or Disabled Participant to provide the Pension Fund with access to all information about his past and present circumstances of any employment or any other performance of services, including but not limited to all records of any employers and of the Social Security Administration. The Pension Fund may also at any time, and as often as is reasonable, require appropriate certifications signed by any Pensioner or Disabled Participant, and/or appropriate signed responses by any Pensioner or Disabled Participant to any requests from the Pension Fund, that relate to a determination whether or not he has been and/or is engaged in Reemployment or Restricted Reemployment. Any failure of a Pensioner or Disabled Participant to comply with any disclosure obligation described in this subsection (b), or with any related disclosure request by the Pension Fund, shall itself be independent grounds for temporary suspension of the Periodic Benefit Payments of the Pensioner or Disabled Participant until he complies with his disclosure obligations and/or such request to the satisfaction of the Pension Fund, at which point his Periodic Benefit Payments will be resumed (including full restoration of all payments that had been temporarily suspended) unless there is then in effect a permanent suspension of his Periodic Benefit Payments in accordance with subsection (a). At the time of any temporary suspension of Periodic Benefit Payments in accordance with this subsection (b), the Pension Fund shall provide written notice of the suspension to the Pensioner or Disabled Participant by first-class mail directed to his last known address on any date prior to the initial effective date of the suspension, and the notice shall describe the specific reasons for the suspension and its initial effective date, and shall inform the Pensioner or Disabled Participant of his right to appeal pursuant to subsection (d).

(c)     At the time of any permanent suspension of Periodic Benefit Payments in accordance with subsection (a), the Pension Fund shall provide written notice of the suspension to the Pensioner or Disabled Participant by first-class mail directed to his last known address on any date prior to the initial effective date of the suspension. The notice shall describe the specifics of the Reemployment (including, if applicable, Restricted Reemployment) on which the suspension is based, the dates of the Reemployment, the initial effective date of the suspension and the right of the Pension Fund to restitution (pursuant to subsection [e]) including an offset or deduction from post-suspension Periodic Benefit Payments, and the notice shall also inform the Pensioner or Disabled Participant of his right to appeal pursuant to subsection (d).

(d)     The Benefits Claim and Appeal Procedures of APPENDIX B of this Pension Plan shall be applicable to all written requests by a Pensioner or Disabled Participant for review of a permanent suspension or a temporary suspension of his Periodic Benefit Payments in accordance with subsection (a) or subsection (b), and for review of a status determination in accordance with subsection (f), except that the initial stage of such review shall be conducted by the Benefits Claim Appeals Committee and the second stage (if any) of such review shall be conducted by the Board of Trustees, provided that the Pensioner or Disabled Participant must exhaust both stages of review prior to commencement of any legal action with respect to any suspension of his Periodic Benefit Payments or any status determination.

(e)    The Pension Fund is entitled to restitution of all Periodic Benefit Payments that are distributed to a Pensioner or Disabled Participant for any period which is determined by the Pension Fund to be a period of Reemployment (including, if applicable, Restricted Reemployment) for which the Pensioner or Disabled Participant was not entitled to receive such payments. The Pension Fund may obtain that restitution by recoupment from any future Periodic Benefit Payments to which the Pensioner or Disabled Participant may be entitled for periods after the end of a suspension, provided that such recoupment will consist of 100% of the gross amount of the first three Periodic Benefit Payments and 25 percent of the gross amount of each Periodic Benefit Payment thereafter. The Pension Fund may also obtain that restitution by any other available remedy at law or at equity.

(f)    Every Participant, Pensioner and Disabled Participant is entitled to submit a written request to the Pension Fund at any time for a determination whether or not specific employment or other specific services constitute Reemployment or Restricted Reemployment. Upon receipt of any such request, the Pension Fund shall promptly make a determination whether or not the specific employment or other specific services constitute Reemployment or Restricted Reemployment, and shall promptly provide notice of that status determination to the Pensioner or Disabled Participant by first-class mail directed to his last known address, which notice shall also inform the Pensioner or Disabled Participant of his right to appeal pursuant to subsection (d).

(g)    The following definitions are applicable to this Section 4.13 and to all other provisions of this Pension Plan:

(1)    Reemployment means and includes any employment, self-employment, occupation or service of any kind and at any time which is a basis for any form of past, present or future wages, salary, commissions, profit or other income (including employment in a managerial or supervisory position, and including any occupation or service in which there is no employer-employee relationship);

(2)    Periodic Benefit Payments means and includes any retirement pension benefits payable in accordance with Article IV in monthly (or other periodic) amounts during retirement, and Monthly Disability Benefits payable in accordance with Section 5.02 during total and permanent disability; and

(3)    Restricted Reemployment means and includes any of the following, except that, effective as of April 9, 2009, a Pensioner age 65 or older, and who for a period of 12 months following his Retirement Date has not been engaged in any categories of reemployment described below in subsections (A) – (E) that would subject him to a suspension of benefits, shall not be deemed to be in Restricted Reemployment, regardless of the position or number of hours worked:

(A)    Reemployment in a Core Teamster Industry (as defined in paragraph 4.13(g)(4)), except that a Pensioner that has reached age 65 may work a maximum of 40 hours per month in such a position;

(B)    Reemployment by a Contributing Employer (or an employer which was a Contributing Employer at any time after September 25, 1980), except that a Pensioner that has reached age 65 may work a maximum of 40 hours per month in such a position;

(C)    Reemployment in any position (or supervising any position) that is covered by a Teamster Contract between that employer and any affiliate of the International Brotherhood of Teamsters, except that a Pensioner that has reached age 65 is not subject to this subparagraph (C);

(D)   Reemployment in any position in the same industry in which the Pensioner earned Contributory Service Credit while covered by the Pension Fund, except that a Pensioner that has reached age 60 is not subject to this subparagraph (D), and except that a Pensioner that has reached age 57 but has not reached age 60 may work a maximum of 80 hours per month in such position; or

(E)   Reemployment in any position in the same job classification as any other Participant then employed by a Contributing Employer located within 100 miles of the position, except that a Pensioner that has reached age 60 is not subject to this subparagraph (E), and except that a Pensioner that has reached age 57 but has not reached age 60 may work a maximum of 80 hours per month in such position.

(4)   Core Teamster Industry means and includes Reemployment in any of the following industries:

(A)   trucking and/or freight;

(B)   small package and/or parcel delivery;

(C)   car haul;

(D)   tank haul;

(E)   warehouse;

(F)   food processing and/or distribution (including grocery, dairy, bakery, brewery, and soft drink); and

(G)   building material and/or construction.

(5)   Notwithstanding the provisions of paragraphs 4.13(g)(3) and 4.13(g)(4), Reemployment with a government agency shall not constitute Restricted Reemployment unless such agency is a Contributing Employer (or an employer which was a Contributing Employer at any time after September 25, 1980).

(6)   Notwithstanding the provisions of subparagraph 4.13(g)(3)(C), and only for the purposes of subparagraph 4.13(g)(3)(C), Reemployment shall not constitute Restricted Reemployment if the Reemployment becomes Restricted Reemployment because the Pensioner is in a position (or supervising any position) that becomes covered by a Teamster Contract between that employer and any affiliate of the International Brotherhood of Teamsters subsequent to the beginning of the Pensioner's Reemployment with that employer.

(7)   For purposes of the exception in subparagraphs 4.13(g)(3)(D) and the exception in 4.13(g)(3)(E) which allow a Pensioner who is at least age 57 but less than age 60 to work a maximum of 80 hours a month in such positions, a Pensioner shall not be allowed to utilize both the exception in subparagraph 4.13(g)(3)(D) and the exception in subparagraph 4.13(g)(3)(E) to exceed a combined total of 80 hours per month in such positions.

(8)   If the application of Paragraph 4.13(g)(3) results in a Pensioner being found to be in Restricted Reemployment with respect to a position that would not have constituted Teamster Industry Reemployment under the Plan as defined

TM:619767 / 01096280 / 04/03/2023

immediately prior to January 1, 2004, then that position shall not constitute Restricted Reemployment.[**]

**Section 4.14    CONTRIBUTORY SERVICE AFTER RETIREMENT DATE OR AFTER DISABILITY**

(a)    A Pensioner who becomes reemployed by a Contributing Employer after his Retirement Date and who thereafter earns at least one additional year of Contributory Service Credit shall, upon retirement, have his retirement pension benefit redetermined as follows:

    (1)    If, during his period of reemployment, he had less than 250 weeks of Contributions made on his behalf, his benefit shall be recalculated (under the same Form of Payment as when he last retired) as the higher of:

        (A)    his Contribution-Based Pension; or

        (B)    the retirement pension benefit he originally received.

    (2)    If, during his period of reemployment, he had at least 250 weeks of Contributions made on his behalf, his benefit shall be recalculated as though he never retired and he and his spouse, if any, shall be free to choose any applicable Form of Payment for receiving his benefit.

(b)    A Pensioner who becomes reemployed by a Contributing Employer after his Retirement Date and who thereafter fails to earn at least one additional year of Contributory Service Credit shall not be eligible for any recalculation of his retirement pension benefit and shall, upon reretirement, receive his original benefit under the same Form of Payment.

(c)    A Disabled Participant who recovers from his disability and had less than 250 weeks of Contributory Service Credit from his employment by a Contributing Employer between the date of his recovery and his Retirement Date shall receive any retirement pension for which he is eligible (disregarding any Monthly Disability Benefit he has received), provided that, in the calculation of any retirement pension amount, his age shall be his age on December 31 of the year (after the date he became totally and permanently disabled) in which the amount of his actual Vesting Service for that calendar year is less than all minimum Vesting Service amounts specified in Section 1.23(b) for a calendar year, and provided further that, if he is eligible for a Contribution-Based Pension, Vested

---

[**]

Prior to January 1, 2004, paragraph Section 4.13(g)(3) provided:

    (3)    Teamster Industry Reemployment means and includes any of the following:

        (A)    Reemployment in any position by a Contributing Employer (or an employer which was a Contributing Employer at any time after September 25, 1980);

        (B)    Reemployment by an employer, other than a governmental agency in any position covered by a Teamster Contract between that employer and any affiliate of the International Brotherhood of Teamsters;

        (C)    Reemployment (other than governmental employment) in any position either in the same industry in which the Participant or Pensioner earned any Contributory Service Credit while covered by the Pension Fund, or in any other industry if the Participant or Pensioner is in the same job classification as are other Participants then employed by a Contributing Employer located within the same standard metropolitan statistical area.

Pension, Deferred Pension or Twenty-Year Deferred Pension, his age, for purposes of the calculation of the amount of any of those benefits (only), shall be his age on his Retirement Date. A recovered (former) Disabled Participant who is eligible for a retirement pension determined in accordance with the preceding sentence may become eligible for a greater retirement pension based upon his Benefit Class as determined by the Non-Continuous Contribution Method if he has (and includes in his eligibility determination) at least one year but less than 250 weeks of Contributory Service Credit from his employment by a Contributing Employer between the date of his recovery and his Retirement Date. A Disabled Participant who recovers from his disability and has at least 250 weeks of Contributory Service Credit from his employment by a Contributing Employer between the date of his recovery and his Retirement Date shall receive any retirement pension for which he is eligible, disregarding any Monthly Disability Benefit he has received.

(d)    The Pension Fund is not liable for benefits based upon this Section 4.14 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

**Section 4.15    PERIOD OF BENEFIT DISTRIBUTION**

Except for Participants born before July 1, 1917, the entire benefit and interest of each Participant shall be distributed in a period beginning no later than April 1 of the year after the calendar year in which he attains age 70-1/2 and ending no later than his death or the death of his spouse or other beneficiary eligible for a benefit according to this Pension Plan, whichever death is later. For each Participant born before July 1, 1917, his entire benefit and interest shall be distributed in a period beginning no later than April 1 of the year after the calendar year in which his Retirement Date occurs or in which he attains age 70-1/2, whichever event is later, and ending no later than his death or the death of his spouse or other beneficiary eligible for a benefit according to this Pension Plan, whichever death is later. Distributions of all benefits and interests will be made by the Pension Fund in a manner consistent with Section 401(a)(9) of the Internal Revenue Code and regulations issued pursuant to authority of that section.

TM:619767 / 01096280 / 04/03/2023

**ARTICLE V        DISABILITY BENEFITS**

**Section 5.01    DEFINITION OF DISABILITY**

(a)    A disability shall be considered total and permanent if a Participant is wholly disabled by bodily injury or disease and shall be permanently, continuously and wholly prevented by this disability from engaging in any occupation and performing any work for wage or profit during the remainder of his lifetime. The entire and irrevocable loss of sight in both eyes, or the severance of both hands above the wrist, or both feet above the ankle, or one hand above the wrist and one foot above the ankle shall be recognized by the Board of Trustees as total and permanent disability.

(b)    The Board of Trustees shall accept a Certificate of Social Insurance Award under Title II of the Social Security Act as evidence of total and permanent disability.

**Section 5.02    MONTHLY DISABILITY BENEFITS**

(a)    To become eligible for a Monthly Disability Benefit, a Participant must become totally and permanently disabled (as defined in Section 5.01) before his 62nd birthday and while he is an Active Participant or within 2 calendar years after becoming an Inactive Participant, and meet each of the following requirements at the time he stops working in Covered Service:

   (1)    he must have at least 10 years of Service Credit; and

   (2)    he must have met the Minimum Contribution Requirement; and

   (3)    he must have Contributions made on his behalf at the rates required by at least Benefit Class 4 of either Schedule A or Schedule B.

(b)    The amount of the Monthly Disability Benefit of a Participant whose Benefit Class is any of 4 through 17a and 17b (regardless of his age when he became disabled) shall be:

   (1)    $150 for a Participant whose effective date of benefit payments precedes July 1, 1986;

   (2)    $250 for a Participant whose effective date of benefit payments is on or after July 1, 1986.

(c)    The amount of the Monthly Disability Benefit of a Participant whose Benefit Class is 18 or 18+ on the date on which he becomes disabled, an amount which is based upon his age (Age at Disability) on that date, shall be:

| Age at Disability | Amount |
|---|---|
| 50 (and younger) | $  650 |
| 51 | 700 |
| 52 | 750 |
| 53 | 800 |
| 54 | 850 |
| 55 | 900 |
| 56 | 950 |
| 57 (and older) | 1,000 |

TM:619767 / 01096280 / 04/03/2023

(d)     Subject to the Rules and Procedures for Suspension of Benefits (as described in Section 4.13), the Contributory Service After Retirement Date or After Disability (as described in Section 4.14) and the Benefits Claim Filing Procedures (as described in Section 7.14), the Monthly Disability Benefit becomes payable to a Disabled Participant on the 1st day of the 6th month following the date the Participant became disabled. Monthly Disability Benefit payments shall continue to be made to a Disabled Participant until the 1st day of the month in which the earliest of the following occurs:

   (1)     he becomes a Pensioner; or

   (2)     he recovers from his disability; or

   (3)     he dies.

(e)     Effective July 1, 1986, a Participant eligible to receive a Monthly Disability Benefit from this Pension Plan, or any earlier version of this Pension Plan, shall receive a $100 increase in the monthly amount of his disability benefit (subject to the provisions of Appendix D of this Pension Plan) if:

   (1)     his effective date of disability benefit payments precedes July 1, 1986; and

   (2)     he is eligible to continue receiving his disability benefit on July 1, 1986.

(f)     The Pension Fund is not liable for benefits based upon this Section 5.02 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

## Section 5.03     LUMP SUM DISABILITY BENEFITS

(a)     To become eligible for a Lump Sum Disability Benefit, a Participant must become totally and permanently disabled (as defined in Section 5.01) on or after his 45th birthday, and while he is an Active Participant or within 2 calendar years after becoming an Inactive Participant, and meet each of the following requirements at the time he stops working in Covered Service:

   (1)     he must have at least 10 years of Service Credit; and

   (2)     he must have met the Minimum Contribution Requirement; and

   (3)     he must not be eligible to receive the Monthly Disability Benefit or, if eligible, he chooses not to receive the Monthly Disability Benefit.

(b)     The amount of the Lump Sum Disability Benefit payable to a Disabled Participant shall be either:

   (1)     the lesser of $3,000 or 50% of the Employer Contributions made on behalf of the Disabled Participant if he has had Contributions made **on his behalf under Schedule B;**

   (2)     the lesser of $2,000 or 50% of the Employer Contributions made on behalf of the Disabled Participant if he has had Contributions made **on his behalf under Schedule A.**

(c)     The amount of the Lump Sum Disability Benefit determined in (b), above, shall be reduced by any amounts previously paid as a Lump Sum Disability Benefit.

(d)    The Lump Sum Disability Benefit shall become payable to a Disabled Participant on the 1st day of the 6th month following the date he became disabled.

(e)    The Pension Fund is not liable for benefits based upon this Section 5.03 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

## Section 5.04    50% SURVIVING SPOUSE BENEFIT

(a)    In the event of the death of a Disabled Participant before his Normal Retirement Date and while he is married and receiving or eligible to receive a Monthly Disability Benefit, his surviving spouse will receive the 50% Surviving Spouse Benefit provided in Section 6.01, if the conditions of that section are satisfied, in an amount determined as if he were a Participant but not a Disabled Participant on the date of his death and calculated in accordance with Section 5.05(A).

(b)    In the event a Disabled Participant is alive and married on his Normal Retirement Date, he and his spouse will be entitled to elect the Joint and 50% Surviving Spouse Option (based upon a retirement pension and not the Monthly Disability Benefit), in accordance with Section 4.10(b) and (f) determined as if he were a Participant but not a Disabled Participant on his Normal Retirement Date and calculated in accordance with Section 5.05(A), provided that:

    (1)    in such circumstances, the election period of Section 4.10(f) will begin 90 days prior to his Normal Retirement Date and extend until the 90th day after his Normal Retirement Date; and

    (2)    unless the Disabled Participant and his spouse (as of his Normal Retirement Date) both elect in writing not to receive the Joint and 50% Surviving Spouse Option, then, if the Disabled Participant dies after his Normal Retirement Date and is survived by that spouse, the reduced amount of that surviving spouse's lifetime benefit will be determined as if he had never been a Disabled Participant and as if he had become a Pensioner on his Normal Retirement Date (even if there is a continuation of his Monthly Disability Benefit between his Normal Retirement Date and his death).

(c)    The Pension Fund is not liable for benefits based upon this Section 5.04 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

## Section 5.05    CHOICE OF DISABILITY BENEFITS

Only one type of retirement pension or disability benefit shall be payable to a Disabled Participant. If a Disabled Participant is eligible for both a retirement pension and a disability benefit, he must elect the benefit he is to receive. The election made by a Disabled Participant shall be irrevocable before his Normal Retirement Date, except as provided by Section 4.13 (Rules and Procedures for Suspension of Benefits and Section 4.14 (Contributory Service After Retirement Date or After Disability). On his Normal Retirement Date, a Disabled Participant may elect or, if he is married, he and his spouse may jointly elect, in writing, one of the following benefits:

(a)    any retirement pension for which he is eligible (disregarding any Monthly Disability Benefit he has received), provided that, in the calculation of any retirement pension amount, his age shall be his age on December 31 of the year (after the date he became totally and permanently disabled) in which the amount of his actual Vesting Service for that calendar year is less than all minimum Vesting Service amounts specified in Section

1.23(b) for a calendar year, and provided further that, if he is eligible for a Contribution-Based Pension, Vested Pension, Deferred Pension or Twenty-Year Deferred Pension, his age, for purposes of the calculation of the amount of any of those benefits (only), shall be his age on his Normal Retirement Date;

(b)    a continuation of the amount which he had been receiving as a Monthly Disability Benefit.

If a Disabled Participant is alive and married on his Normal Retirement Date, he and his spouse shall jointly make the above-referenced written benefits election and, if a retirement pension (instead of the Monthly Disability Benefit) is elected, he and his wife shall also jointly make a written election to receive or not to receive the Joint and 50% Surviving Spouse Option, in accordance with Sections 4.10(b) and (f) and 5.04(b). The Pension Fund is not liable for benefits based upon this Section 5.05 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

TM:619767 / 01096280 / 04/03/2023

**ARTICLE VI      BEFORE RETIREMENT DEATH BENEFITS**

**Section 6.01      50% SURVIVING SPOUSE BENEFIT**

(a)   For his surviving spouse to become eligible for a 50% Surviving Spouse Benefit, a Participant must have met each of the following requirements at the time of his death:

    (1)   he must have been married; and

    (2)   he must have been a Vested Participant or eligible for a Twenty-Year Service Pension or Early Retirement Pension.

(b)   The monthly amount of a 50% Surviving Spouse Benefit is 50% of the monthly amount a deceased Participant could have received under the Joint and 50% Surviving Spouse Option form of payment, and is determined as if he had stopped working in Covered Service on the day before his death and had retired during the month preceding the "effective date of payment" elected by his surviving spouse as described in (c), below.

(c)   Subject to the Benefits Claim Filing Procedures (as described in Section 7.14), the surviving spouse of a deceased Participant may elect an effective date of payment which is not earlier than the later of the 1st day of the month following the month in which the death of the Participant occurs, or the earliest date on which the Participant could have received immediate payment of a retirement pension from this Pension Plan if he had survived.

(d)   The Pension Fund is not liable for benefits based upon this Section 6.01 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

**Section 6.02      60 MONTH SURVIVOR BENEFIT**

(a)   For the surviving spouse or dependent child (or dependent children) of a Participant who dies before his Retirement Date to become eligible for the 60 Month Survivor Benefit, the Participant must die while he is an Active Participant or within 2 calendar years after becoming an Inactive Participant. In addition, the Participant must also have met each of the following requirements at the time of his death:

    (1)   he must have had at least 20 years of Service Credit; and

    (2)   he must have met the Minimum Contribution Requirement; and

    (3)   he must be survived by a spouse or dependent child or dependent children; and

    (4)   he must have been eligible to have his retirement pension determined by at least Benefit Class 4 of either Schedule A or Schedule B.

(b)   The monthly amount of the 60 Month Survivor Benefit is the greater of $160, or the monthly amount of the retirement pension benefit the deceased Participant could have received on the date of his death under the Lifetime With Limited Surviving Spouse Option.

(c)   The 60 Month Survivor Benefit is payable to the surviving spouse of a deceased Participant. If a deceased Participant is not survived by a spouse, then the 60 Month Survivor Benefit is payable to the surviving dependent child or in equal shares to the surviving dependent children of the deceased Participant.

- 65 -

(d)     For purposes of the 60 Month Survivor Benefit, a dependent child is the deceased Participant's natural or adopted unmarried, dependent child who is either under age 23 or is adjudged to be mentally or physically incompetent.

(e)     Subject to the Benefits Claim Filing Procedures (as described in Section 7.14), the 60 Month Survivor Benefit becomes payable to a recipient (or recipients) on the 1st day of the month following the month in which the death of a Participant occurs. Benefit payments shall continue until 60 months of benefits are paid to the recipient (or recipients) or, if earlier, the death of the recipient (or recipients).

(f)     The Pension Fund is not liable for benefits based upon this Section 6.02 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

**Section 6.03     DISABILITY DEATH BENEFIT**

(a)     A lump sum Disability Death Benefit of $1,000 is payable if a Disabled Participant dies while receiving or while eligible to receive, a Monthly Disability Benefit, provided that this Disability Death Benefit is not payable if the Benefit Class 18/18+ Death Benefit is payable pursuant to Section 6.05 or if the payee of this Disability Death Benefit would be the surviving spouse of a deceased Disabled Participant and the surviving spouse elects to receive a 50% Surviving Spouse Benefit in accordance with Section 5.04.

(b)     The Disability Death Benefit is payable in equal shares to all members of the highest level of survivors as follows:

(1)     Spouse;

(2)     Dependent Children;

(3)     Non-Dependent Children;

(4)     Parents;

(5)     Brothers and Sisters;

(6)     Estate.

(c)     The Disability Death Benefit provides a $500 lump sum benefit upon the death of the spouse of a Disabled Participant who is receiving or eligible to receive, a Monthly Disability Benefit. This $500 lump sum benefit is payable to a Disabled Participant only once during his lifetime.

(d)     The Pension Fund is not liable for benefits based upon this Section 6.03 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

TM:619767 / 01096280 / 04/03/2023

**Section 6.04**     **LUMP SUM DEATH BENEFIT**

(a)     For a survivor of a deceased Participant to become eligible for the Lump Sum Death Benefit, a Participant must have died while he was an Active Participant or within 2 calendar years after he became an Inactive Participant, provided that this Lump Sum Death Benefit is not payable if the Benefit Class 18/18+ Death Benefit is payable pursuant to Section 6.05. In addition, the Participant must also have met each of the following requirements at the time of his death:

    (1)     he must have had at least 10 years of Service Credit;

    (2)     he must have met the Minimum Contribution Requirement; and

    (3)     he must not have received any retirement pension or disability benefit from the Pension Fund; and

    (4)     his survivors must not have received any other death benefit from the Pension Fund.

(b)     The amount of a Lump Sum Death Benefit shall be:

    (1)     the lesser of $4,000 or 50% of the Employer Contributions made on behalf of a deceased Participant if he had had Contributions **made on his behalf under Schedule B;** or

    (2)     the lesser of $2,000 or 50% of the Employer Contributions made on behalf of a deceased Participant if he had had Contributions **made on his behalf under Schedule A.**

(c)     A Lump Sum Death Benefit is payable in equal shares to all members of the highest level of survivors as follows:

    (1)     Spouse;

    (2)     Dependent Children;

    (3)     Non-Dependent Children;

    (4)     Parents;

    (5)     Brothers and Sisters;

    (6)     Estate.

(d)     The Pension Fund is not liable for benefits based upon this Section 6.04 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

**Section 6.05**     **BENEFIT CLASS 18/18+ DEATH BENEFIT**

(a)     A Benefit Class 18/18+ Death Benefit consisting of a $10,000 payment to the surviving spouse of a deceased Participant or, if none, to his dependent children (if any) in equal shares is payable if the Participant met each of the following requirements at the time of his death:

TM:619767 / 01096280 / 04/03/2023

(1)   He has had at least 10 days or 2 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 18 or 18+ <u>or</u>, if he is employed as a casual Employee or changes Contributing Employers (but not Bargaining Units) on or after such date, he had at least 100 days or 20 weeks of Employer Contributions **(and not Self-Contributions)** made on his behalf at a rate corresponding to Benefit Class 18 or 18+; and

(2)   He died while he was an Active Participant or within 2 calendar years after he became an Inactive Participant; and

(3)   He had at least 10 years of Service Credit; and

(4)   He died prior to his Retirement Date if he was not a Disabled Participant or, if he was a Disabled Participant, he died while he was receiving a Monthly Disability Benefit and prior to his 65th birthday.

(b)   The Benefit Class 18/18+ Death Benefit is payable in addition to any survivor benefit payable in accordance with Section 6.01 or 6.02.

(c)   The Pension Fund is not liable for benefits based upon this Section 6.05 to the extent such liability has been transferred by the Pension Fund pursuant to APPENDIX L of this Pension Plan.

## Section 6.06    CHOICE OF SURVIVOR BENEFITS OR DEATH BENEFITS

Except as otherwise provided in Section 6.05, only one survivor benefit or death benefit is payable upon the death of a Participant. If a surviving spouse or other payee is eligible for more than one survivor benefit and/or death benefit, a choice must be made by the payee as to which single survivor benefit or which single death benefit will be paid, provided that a payee eligible to receive a Benefit Class 18/18+ Death Benefit may also be eligible to receive a survivor benefit payable in accordance with Section 6.01 or 6.02. That choice upon being made shall be irrevocable, except in cases where a choice is made to receive a Lump Sum Death Benefit for which the surviving spouse or other payee is eligible before the Pension Fund completes the processing of a claim for a survivor benefit or another death benefit the surviving spouse or other payee is also eligible to receive. The choice of the benefit to be received must be made in writing on documents furnished by the Pension Fund. Any such document must be signed by the surviving spouse or other payee and witnessed by a notary public.

## Section 6.07    SPECIAL RULES FOR DEATH OCCURRING DURING QUALIFIED MILITARY SERVICE

(a)   In the case of a Participant who dies on or after January 1, 2007 while performing Qualified Military Service, the survivors of the Participant are entitled to any additional benefits (other than benefit accruals relating to the period of Qualified Military Service) provided under the Pension Plan had the Participant resumed and then terminated employment on account of death.

(b)   For purposes of Section 6.07, the term "Qualified Military Service" means any Service in the Uniformed Services by a Participant if such Participant is entitled to USERRA reemployment rights provided in accordance with Internal Revenue Code § 414(u).

(c)   For purposes of Section 6.07, the term "Service in the Uniformed Services" is defined in chapter 43 of title 38, United States Code, which includes, but is not limited to the performance of duty on a voluntary or involuntary basis in a uniformed service including active duty, active duty and inactive duty training, and full-time National Guard duty, for

the United States Armed Forces (Army, Navy, Air Force, Marine Corps, and Coast Guard), the Army National Guard and the Air National Guard, the commissioned corps of the Public Health Service and National Oceanic and Atmospheric Administration, and any other category of persons designated by the President in time of war or national emergency.

TM:619767 / 01096280 / 04/03/2023

**ARTICLE VII        ADMINISTRATION**

**Section 7.01        ADMINISTRATION AUTHORITY**

The Board of Trustees has authority to control and manage jointly the operation and administration of the Pension Fund and of this Pension Plan in accordance with the terms of the Trust Agreement and of this Pension Plan and amendments thereof, including the authority to establish and effectuate funding policies and methods consistent with the objectives of this Pension Plan, and including the authority provided by the Trust Agreement to allocate responsibilities for the operation and administration of the Pension Fund and of this Pension Plan.

**Section 7.02        AMENDMENT OF THE PENSION PLAN**

This Pension Plan may be amended by the Board of Trustees at any time and to any lawful extent and purpose so long as such amendments comply with applicable provisions of the Internal Revenue Code, all other applicable federal laws and regulations, the contract articles creating the Pension Fund and the purposes set forth in the Trust Agreement.

**Section 7.03        DECISIONS OF BOARD OF TRUSTEES**

All decisions by the Board of Trustees, including all rules and regulations adopted by the Board of Trustees, all amendments of the Trust Agreement and this Pension Plan by the Board of Trustees and all interpretations by the Board of Trustees of any of said documents, shall be binding upon all parties to the Trust Agreement, the Union, each Contributing Employer, all individuals claiming benefits pursuant to this Pension Plan or any amendment thereof and all other individuals engaging in any transaction with the Pension Fund.

**Section 7.04        BENEFITS CLAIM AND APPELLATE PROCEDURES**

The Board of Trustees has adopted procedures to afford a fair and expeditious method for the processing of claims for pension and other benefits provided by this Pension Plan. APPENDIX B attached to this Pension Plan contains the Benefits Claim and Appeal Procedures effective at the present time (subject to possible amendment). Compliance with these procedures is a condition precedent to any legal action by a claimant with respect to a partial or complete denial of a claim for benefits.

**Section 7.05        RECOVERY OF OVERPAYMENTS**

(a)      Any misrepresentation in a claim by a claimant to the Pension Fund for pension or other benefits or in the course of a review in accordance with the procedures described in Section 7.04 of this Pension Plan, shall constitute grounds for adjustment of the claim and of the requested benefits, for recovery by the Pension Fund of any benefit payments in reliance upon said misrepresentation and for any other equitable or legal remedies available to the Pension Fund.

(b)      Whenever the Pension Fund has made benefit payments exceeding the amount determined by the provisions of its Pension Plan, due to a mistake, the Board of Trustees shall have a right to recover the excess payments.

**Section 7.06    PAYMENT OF BENEFITS FOR INDIVIDUALS UNDER LEGAL DISABILITY OR IN SIMILAR MENTAL OR PHYSICAL CONDITION**

In the event benefit payments pursuant to this Pension Plan are payable to an individual who is under legal disability, or to an individual who, while not adjudicated to be an incompetent, is shown to the satisfaction of the Board of Trustees to be unable, by reason of a mental or physical condition, to administer properly such payments, then such payments may be paid for the benefit of such individual in such of the following ways as the Board of Trustees determines to be appropriate:

(a)    directly to such individual; or

(b)    to the legally appointed guardian or conservator of such individual; or

(c)    to a spouse, parent, brother or sister of such individual for his welfare, support or maintenance; or

(d)    to an institution providing care to such individual for his support, maintenance and welfare.

**Section 7.07    SPENDTHRIFT CLAUSE**

No right to pension benefits or other benefits provided by this Pension Plan may be assigned or alienated in any manner, except as provided in this section and except as otherwise required or permitted by law. Upon receipt of written direction from any eligible recipient of monthly benefit payments, the Pension Fund will participate in an arrangement to make deductions from each monthly benefit payment, as authorized and directed by the recipient, and to transfer the amount of each such deduction to the Central States, Southeast and Southwest Areas Health and Welfare Fund as the recipient's monthly contribution to retain eligibility for coverage pursuant to the retiree benefit plan established by that fund. This deduction-transfer arrangement is effective commencing October 1, 1988 and will continue, relative to each such recipient who authorizes and directs it, until the Pension Fund receives the recipient's written cancellation of such authority and direction (or the earlier termination of benefits). Any authority and direction to the Pension Fund by a recipient of monthly benefit payments, to make such deductions and transfers, is revocable at any time by the recipient.

**Section 7.08    ELIGIBILITY VERIFICATION**

Each individual receiving pension or other benefits provided by this Pension Plan shall submit to the Pension Fund on request his sworn statement that verifies his continuing eligibility to receive such benefits. If such statement is not received by the Pension Fund within 60 days after a request therefor is mailed to his last known address, all benefit payments shall be suspended until such statement is received and approved by the Pension Fund.

**Section 7.09    TERMINATION OF THE PENSION PLAN**

It is the intention of the Board of Trustees that this Pension Plan shall continue to operate in full force and effect, although the Board of Trustees does reserve the power and right to terminate this Pension Plan in whole or in part. In the event of full or partial termination of this Pension Plan, the rights of all Participants to benefits accrued to the date of such full or partial termination, to the extent funded as of such date, shall be nonforfeitable.

**Section 7.10    MERGERS**

The Board of Trustees has authority to approve and effect any merger between the Pension Fund and another pension fund in accordance with the terms of the Trust Agreement and

applicable federal law. No participant's or beneficiary's accrued benefit will be lower immediately after the effective date of any such merger than the benefit immediately before that date.

**Section 7.11    CONSTRUCTION**

This Pension Plan is created and administered in the State of Illinois. All questions pertaining to the validity of construction of this Pension Plan shall be determined in accordance with the laws of the State of Illinois and, to the extent of pre-emption with the laws and regulations of the United States.

**Section 7.12    SAVINGS CLAUSE**

If any provisions of this Pension Plan shall be held to be unlawful, or unlawful as to any individual or instance, such fact shall not affect adversely any other provision contained within the Pension Plan or the application of such provision to any other individual or instance unless and until such illegality shall make impossible the administration of this Pension Plan.

**Section 7.13    CHANGE OF ADDRESS**

A Pensioner, Disabled Participant or other individual receiving benefit payments who fails to notify the Pension Fund of a change of address shall have all benefit payments which are undeliverable held without interest unless and until a claim therefor is made.

**Section 7.14    BENEFITS CLAIM FILING PROCEDURES**

(a)    The Benefits Claim Filing Procedures (in subsection (b) and (c), below) shall be applied to any written claim for benefits (other than Monthly Disability Benefits) filed by a Participant, surviving spouse or other individual claiming benefits under this Pension Plan for an event (the date of a retirement or death) which occurs on or after July 1, 1987.

(b)    A Participant, surviving spouse or any other individual claiming benefits under this Pension Plan shall be required to file a written claim for benefits (other than Monthly Disability Benefits) with this Pension Fund within the 12 month period following the event (retirement or death) for which benefits are being claimed. In addition, such a claimant shall also be required to notify the Pension Fund, in writing, and within the 12 month period following the date from which he intends his benefit payments to begin, that he wishes to begin receiving his benefit UNLESS he has already filed a written claim specifying that date.

(c)    If a Participant, surviving spouse or any other individual claiming benefits under this Pension Plan fails to comply with the requirements in (b), above, he shall, in addition to future benefits, receive benefits only for the 12 calendar months preceding the month which follows the month in which he meets the last applicable requirement in (b), above.

**Section 7.15    MAXIMUM BENEFIT LIMITATIONS**

(a)    No benefits payable in accordance with this Pension Plan shall exceed applicable maximum benefit limitations established by the Internal Revenue Code ('Code'), including past and future amendments of the Code. The compensation limit established by Section 415(b)(1)(B) of the Code, which is incorporated by reference in this Pension Plan, as that limit applies to the actual compensation of any Vested Participant whose Contributory Service is concluded, shall be adjusted by multiplying the Participant's actual compensation limit amount by a fraction, the numerator of which is the adjusted maximum dollar limitation (to be prescribed by the Secretary of the Treasury pursuant to Section 415 of the Code) for the current year and the denominator of which is the adjusted maximum dollar limitation for the final year of the Participant's Contributory Service. If a Pensioner is also entitled to benefits from one or more defined benefit plans and the required

- 72 -

combination of the Pensioner's benefit from the Pension Fund and the other plan or plans requires some benefit adjustments to maintain compliance with applicable maximum benefit limitations of the Code, the benefit adjustments will be made by all such plans and the adjustment of each plan will be based upon its proportionate share of the aggregate benefits that would be payable by all such plans if such adjustments were not made.

(b)     The term "compensation", for purposes of this Section 7.15 and of Section 415 of the Code, includes those items specified in paragraph (d)(2)(i) of 26 CFR 1.415-2 and excludes those items specified in paragraph (d)(3) of 26 CFR 1.415-2, if applicable. For limitation years beginning on and after January 1, 1998, and for purposes of applying the compensation limit of this Section 7.15 and of Section 415 of the Code, compensation paid or made available during such limitation years shall include any elective deferral as defined in Section 402(g)(3)) of the Code as well as any elective amount which is not includible in the gross income of the Employee by reason of Section 125 or Section 132(f)(4) or Section 457 of the Code.

(c)     As a result of an amendment (Public Law No. 107-16, Section 654) of Section 415 of the Code that became applicable to the Pension Fund and the Pension Plan in the plan year that began on January 1, 2002, the compensation limit of Section 415(b)(1)(B) of the Code is not applicable to any benefits distributed by the Pension Fund on and after January 1, 2002.

(d)     For purposes of this Section 7.15 and of Section 415 of the Code, the term "compensation" shall include amounts received as "differential wage payments" as defined in Section 3401(h)(2) of the Code, effective as of January 1, 2009.

**Section 7.16     DIRECT ROLLOVER PAYMENTS TO ELIGIBLE RETIREMENT PLANS**

(a)     This Section 7.16 applies to distributions made on or after January 1, 1993. Notwithstanding any provision of this Pension Plan to the contrary that would otherwise limit a distributee's election under this Section 7.16, a distributee may elect, at the time and in the manner prescribed by the Board of Trustees, to have an eligible rollover distribution (either the entire distribution or a portion no less than $500) paid directly to an eligible retirement plan specified by the distributee in a direct rollover. In the event of an eligible rollover distribution greater than $1,000, if the distributee does not elect either to have such distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover or to receive the distribution directly, the Pension Fund will pay the distribution in a direct rollover to an individual retirement plan designated by the Board of Trustees.

(b)     Definitions:

(1)     Code:     Internal Revenue Code.

(2)     Eligible rollover distribution: An eligible rollover distribution is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life of the distributee or the joint lives of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; and any distribution to the extent such distribution is required under Section 401(a)(9) of the Code. An eligible rollover distribution includes:

(A)     a lump sum benefit that is payable to a Pensioner upon the death of the spouse of the Pensioner, in accordance with Section 4.10(c)(5) of this Pension Plan;

- 73 -

(B)     each distribution of the balance of the first 60 months of retirement pension benefit payments that is payable to the surviving spouse of a Pensioner upon the death of the Pensioner before receiving 60 months of payments, in accordance with Section 4.10(d)(4) of this Pension Plan;

(C)     the Lump Sum Disability Benefit that is payable to a Participant (or, if the disabled Participant dies before this benefit is paid, to the surviving spouse of the Participant), in accordance with Section 5.03 of this Pension Plan; and

(D)     each distribution of the 60-Month Survivor Benefit that is payable to the surviving spouse of a Participant who dies before his Retirement Date, in accordance with Section 6.02 of this Pension Plan; and

(E)     the portion of a distribution that consists of after-tax employee contributions which are not included in gross income, provided that such portion may be paid only to an individual retirement account or annuity described in section 408(a) or (b) of the Code, or to a qualified trust or to an annuity contract described in section 403(b) of the Code that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

(3)     Eligible retirement plan: An eligible retirement plan is any one of the following entities which accepts the distributee's eligible rollover distribution: an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, an annuity contract described in Section 403(b) of the Code, a qualified trust described in Section 401(a) of the Code, or an eligible plan which is both described in Section 457(b) of the Code and maintained by an eligible employer defined in Section 457(e)(1)(A) of the Code ("a State, political subdivision of a State, and any agency or instrumentality of a State or political subdivision of a State"). This definition of eligible retirement plan shall also apply in the case of a distribution to a surviving spouse of a Participant or Pensioner, or to the spouse or former spouse of a Participant or Pensioner who is the alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code.

(4)     Distributee: A distributee includes an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse, and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are distributees with regard to the interest of the spouse or former spouse.

(5)     Direct rollover: A direct rollover is a payment by the Pension Fund to the eligible retirement plan specified by the distributee.

(c)     Special Rule for Designated Non-Spousal Beneficiary: Effective January 1, 2010, a Participant's non-spousal Beneficiary may elect to transfer a distribution that would be an eligible rollover distribution if it were made to a spousal Beneficiary to an IRA described in section 408(a) or (b) of the Code that will be treated as an inherited IRA, within the meaning of section 408(d)(3)(C) of the Code, pursuant to a direct rollover. A trust can be a designated beneficiary if it meets the requirements of section 401(a)(9)(E) of the Code.

(d)     Rollover to Roth IRA: Notwithstanding any provision of the Plan to the contrary, for distributions made on or after January 1, 2008 (effective January 1, 2010 with regard to a non-spousal Beneficiary), a distributee or non-spousal Beneficiary may roll over directly all or any portion of his eligible rollover distribution to a Roth IRA, subject to the limitations

set forth in Section 408A of the Code. The Board of Trustees is not responsible for assuring that the distributee or non-spousal Beneficiary is eligible to make a rollover under this Section.

**Section 7.17      ASSET-TRANSFER RULES UNDER SECTION 4234 OF ERISA**

The Pension Plan shall not transfer liabilities to a single-employer plan pursuant to Section 4232 of ERISA; accordingly, assets shall not be transferred pursuant to Section 4234 of ERISA. The preceding sentence shall not apply to any transfer of liabilities pursuant to APPENDIX L of this Pension Plan.

**Section 7.18      VALIDITY OF ELECTIONS AND CONSENTS MADE WITH RESPECT TO THE UPS/IBT FULL-TIME PENSION PLAN**

Notwithstanding anything to the contrary, any election or spousal consent made under the UPS/IBT Full-Time Employee Pension Plan by any Grandfathered Central States Pension Plan Participant (as defined in such other plan) shall be given full force and effect as an election or spousal consent with respect to any benefits payable under this Pension Plan (and shall not be subject to change or revocation by reason of the passage of time, change in marital status or any other event after benefits have commenced under the UPS/IBT Full-Time Employee Pension Plan).

**Section 7.19      REHABILITATION PLAN:  PENSION PROTECTION ACT OF 2006**

In compliance with the Pension Protection Act of 2006 (Pub.L. 109-280), the Board of Trustees adopted a rehabilitation plan (which is APPENDIX M of this Pension Plan) on March 25, 2008, effective immediately. Benefits, and rights to benefits, described in this Pension Plan may be reduced, eliminated and otherwise adjusted at any time to the extent provided in APPENDIX M of this Pension Plan, as initially adopted and as may be amended at any time, and any such reduction, elimination and other adjustment will be retroactively and prospectively applicable and effective to the extent provided in APPENDIX M.

TM:619767 / 01096280 / 04/03/2023

**APPENDIX A-1.  ADJUSTMENT FACTORS FOR THE JOINT AND 50% SURVIVING SPOUSE OPTION**

**Section 1.        ANTI-CUTBACK PROVISION**

(a)    <u>Relative to any effective date of benefit payments prior to March 1, 2008</u>, if the Participant who retires or otherwise becomes eligible for benefits from the Pension Plan on or after January 1, 1985, would have been eligible for benefits from the Pension Plan in effect on December 31, 1984, had he retired on December 31, 1984, the Participant, if he elects to receive his benefits under the Joint and 50% Surviving Spouse Option form of payment, shall be eligible to receive the greater of:

(1)    the amount determined under this Pension Plan using the Adjustment Factors provided in Section 2 of this Appendix A-1;

(2)    the amount he could have received if he had retired on December 31, 1984, using the adjustment factors provided in the Pension Plan in effect on that date.

As used in this Appendix A-1, the phrase "effective date of benefit payments" means the first day of the first period for which an amount is payable to a Pensioner as a retirement pension (including a "retroactive annuity starting date" as defined in Section 4.10 of this Pension Plan).

(b)    <u>Relative to any effective date of benefit payments on or after March 1, 2008</u>, the Participant, if he elects to receive his benefits under the Joint and 50% Surviving Spouse Option form of payment, shall be eligible to receive the greater of:

(1)    the amount determined under subsection (a) of this section;

(2)    the amount determined using the Adjustment Factors provided in Section 3 of this Appendix A-1.

**Section 2.        TABLE OF SEX NEUTRAL ADJUSTMENT FACTORS:  BENEFIT PAYMENTS INITIALLY EFFECTIVE PRIOR TO MARCH 1, 2008**

The Table below shall be used to calculate the Joint and 50% Surviving Spouse Option form of payment if:

(a)    the effective date of benefit payments is after December 31, 1984, and prior to March 1, 2008; or

(b)    the Participant had not reached his 55th birthday before his death or Retirement Date, but had earned any Contributory Service after August 18, 1984.

## APPENDIX A-1, SECTION 2

### Table of Sex Neutral Adjustment Factors

(age difference is determined by the difference between the
Participant's year of birth and the spouse's year of birth)

| PARTICIPANT OLDER THAN SPOUSE | | PARTICIPANT YOUNGER THAN SPOUSE | |
|---|---|---|---|
| AGE DIFFERENCE IN YEARS | ADJUSTMENT FACTOR | AGE DIFFERENCE IN YEARS | ADJUSTMENT FACTOR |
| 0 | .850 | 0 | .850 |
| 1 | .850 | 1 | .850 |
| 2 | .850 | 2 | .850 |
| 3 | .850 | 3 | .850 |
| 4 | .850 | 4 | .850 |
| 5 | .850 | 5 | .850 |
| 6 | .850 | 6 | .850 |
| 7 | .850 | 7 | .850 |
| 8 | .850 | 8 | .850 |
| 9 | .850 | 9 | .850 |
| 10 | .850 | 10 | .850 |
| 11 | .840 | 11 | .870 |
| 12 | .830 | 12 | .890 |
| 13 | .820 | 13 | .910 |
| 14 | .810 | 14 | .930 |
| 15 | .800 | 15 | .950 |
| 16 | .790 | 16 | .950 |
| 17 | .780 | 17 | .950 |
| 18 | .770 | 18 | .950 |
| 19 | .760 | 19 | .950 |
| 20 or more | .750 | 20 or more | .950 |

**Section 3.     TABLE OF SEX NEUTRAL ADJUSTMENT FACTORS:   BENEFIT PAYMENTS INITIALLY EFFECTIVE ON OR AFTER MARCH 1, 2008**

The Table below shall be used to calculate the Joint and 50% Surviving Spouse Option form of payment if the effective date of payments is on or after March 1, 2008.

|  | Spouse Age | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Retiree Age | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 |
| 28 | 0.9824 | 0.9829 | 0.9835 | 0.9840 | 0.9845 | 0.9851 | 0.9856 | 0.9861 | 0.9866 | 0.9871 |
| 29 | 0.9808 | 0.9814 | 0.9820 | 0.9826 | 0.9831 | 0.9837 | 0.9843 | 0.9848 | 0.9854 | 0.9859 |
| 30 | 0.9792 | 0.9798 | 0.9804 | 0.9810 | 0.9816 | 0.9822 | 0.9828 | 0.9834 | 0.9840 | 0.9846 |
| 31 | 0.9775 | 0.9782 | 0.9788 | 0.9795 | 0.9801 | 0.9808 | 0.9814 | 0.9821 | 0.9827 | 0.9833 |
| 32 | 0.9758 | 0.9765 | 0.9772 | 0.9778 | 0.9785 | 0.9792 | 0.9799 | 0.9806 | 0.9813 | 0.9819 |
| 33 | 0.9739 | 0.9746 | 0.9754 | 0.9761 | 0.9768 | 0.9775 | 0.9783 | 0.9790 | 0.9797 | 0.9804 |
| 34 | 0.9719 | 0.9727 | 0.9734 | 0.9742 | 0.9750 | 0.9757 | 0.9765 | 0.9773 | 0.9780 | 0.9788 |
| 35 | 0.9698 | 0.9706 | 0.9714 | 0.9722 | 0.9730 | 0.9738 | 0.9746 | 0.9754 | 0.9763 | 0.9771 |
| 36 | 0.9675 | 0.9684 | 0.9692 | 0.9700 | 0.9709 | 0.9717 | 0.9726 | 0.9735 | 0.9743 | 0.9752 |
| 37 | 0.9651 | 0.9660 | 0.9668 | 0.9677 | 0.9686 | 0.9695 | 0.9704 | 0.9713 | 0.9722 | 0.9731 |
| 38 | 0.9625 | 0.9634 | 0.9643 | 0.9652 | 0.9661 | 0.9671 | 0.9680 | 0.9690 | 0.9700 | 0.9709 |
| 39 | 0.9597 | 0.9606 | 0.9616 | 0.9625 | 0.9635 | 0.9645 | 0.9655 | 0.9665 | 0.9675 | 0.9685 |
| 40 | 0.9567 | 0.9577 | 0.9587 | 0.9596 | 0.9607 | 0.9617 | 0.9627 | 0.9638 | 0.9649 | 0.9659 |
| 41 | 0.9535 | 0.9545 | 0.9555 | 0.9565 | 0.9576 | 0.9587 | 0.9597 | 0.9609 | 0.9620 | 0.9631 |
| 42 | 0.9501 | 0.9511 | 0.9521 | 0.9532 | 0.9543 | 0.9554 | 0.9565 | 0.9577 | 0.9589 | 0.9600 |
| 43 | 0.9464 | 0.9474 | 0.9485 | 0.9496 | 0.9507 | 0.9519 | 0.9531 | 0.9543 | 0.9555 | 0.9567 |
| 44 | 0.9425 | 0.9435 | 0.9446 | 0.9458 | 0.9469 | 0.9481 | 0.9493 | 0.9506 | 0.9519 | 0.9531 |
| 45 | 0.9383 | 0.9393 | 0.9405 | 0.9416 | 0.9428 | 0.9441 | 0.9453 | 0.9466 | 0.9479 | 0.9493 |
| 46 | 0.9338 | 0.9349 | 0.9360 | 0.9372 | 0.9385 | 0.9397 | 0.9410 | 0.9424 | 0.9437 | 0.9451 |
| 47 | 0.9289 | 0.9301 | 0.9313 | 0.9325 | 0.9338 | 0.9351 | 0.9364 | 0.9378 | 0.9392 | 0.9406 |
| 48 | 0.9238 | 0.9250 | 0.9262 | 0.9274 | 0.9287 | 0.9301 | 0.9314 | 0.9329 | 0.9343 | 0.9358 |
| 49 | 0.9183 | 0.9195 | 0.9207 | 0.9220 | 0.9233 | 0.9247 | 0.9261 | 0.9276 | 0.9291 | 0.9306 |
| 50 | 0.9124 | 0.9136 | 0.9149 | 0.9162 | 0.9175 | 0.9189 | 0.9204 | 0.9219 | 0.9234 | 0.9250 |
| 51 | 0.9061 | 0.9073 | 0.9086 | 0.9099 | 0.9113 | 0.9127 | 0.9142 | 0.9158 | 0.9174 | 0.9190 |
| 52 | 0.8994 | 0.9007 | 0.9020 | 0.9033 | 0.9047 | 0.9062 | 0.9077 | 0.9093 | 0.9109 | 0.9126 |
| 53 | 0.8923 | 0.8936 | 0.8949 | 0.8963 | 0.8977 | 0.8992 | 0.9007 | 0.9024 | 0.9040 | 0.9057 |
| 54 | 0.8847 | 0.8860 | 0.8874 | 0.8888 | 0.8902 | 0.8917 | 0.8933 | 0.8950 | 0.8967 | 0.8984 |
| 55 | 0.8767 | 0.8780 | 0.8794 | 0.8808 | 0.8823 | 0.8838 | 0.8854 | 0.8871 | 0.8888 | 0.8906 |
| 56 | 0.8683 | 0.8696 | 0.8710 | 0.8724 | 0.8739 | 0.8755 | 0.8771 | 0.8788 | 0.8806 | 0.8824 |
| 57 | 0.8595 | 0.8608 | 0.8622 | 0.8636 | 0.8652 | 0.8667 | 0.8684 | 0.8701 | 0.8719 | 0.8738 |
| 58 | 0.8503 | 0.8516 | 0.8530 | 0.8545 | 0.8560 | 0.8576 | 0.8593 | 0.8610 | 0.8628 | 0.8647 |
| 59 | 0.8406 | 0.8420 | 0.8434 | 0.8448 | 0.8464 | 0.8480 | 0.8497 | 0.8515 | 0.8533 | 0.8552 |
| 60 | 0.8305 | 0.8318 | 0.8333 | 0.8348 | 0.8363 | 0.8379 | 0.8397 | 0.8414 | 0.8433 | 0.8453 |
| 61 | 0.8199 | 0.8213 | 0.8227 | 0.8242 | 0.8258 | 0.8274 | 0.8291 | 0.8310 | 0.8328 | 0.8348 |
| 62 | 0.8090 | 0.8103 | 0.8118 | 0.8133 | 0.8148 | 0.8165 | 0.8182 | 0.8200 | 0.8220 | 0.8240 |
| 63 | 0.7976 | 0.7989 | 0.8004 | 0.8019 | 0.8035 | 0.8051 | 0.8069 | 0.8087 | 0.8106 | 0.8126 |
| 64 | 0.7858 | 0.7872 | 0.7886 | 0.7902 | 0.7918 | 0.7934 | 0.7952 | 0.7970 | 0.7990 | 0.8010 |
| 65 | 0.7737 | 0.7750 | 0.7765 | 0.7780 | 0.7796 | 0.7813 | 0.7830 | 0.7849 | 0.7868 | 0.7889 |
| 66 | 0.7610 | 0.7624 | 0.7638 | 0.7654 | 0.7670 | 0.7686 | 0.7704 | 0.7723 | 0.7742 | 0.7763 |
| 67 | 0.7481 | 0.7495 | 0.7509 | 0.7524 | 0.7540 | 0.7557 | 0.7575 | 0.7594 | 0.7613 | 0.7634 |
| 68 | 0.7348 | 0.7361 | 0.7376 | 0.7391 | 0.7407 | 0.7424 | 0.7441 | 0.7460 | 0.7479 | 0.7500 |
| 69 | 0.7208 | 0.7222 | 0.7236 | 0.7251 | 0.7267 | 0.7284 | 0.7302 | 0.7320 | 0.7340 | 0.7361 |
| 70 | 0.7064 | 0.7077 | 0.7092 | 0.7107 | 0.7123 | 0.7139 | 0.7157 | 0.7176 | 0.7195 | 0.7216 |
| 71 | 0.6914 | 0.6928 | 0.6942 | 0.6957 | 0.6973 | 0.6990 | 0.7007 | 0.7026 | 0.7045 | 0.7066 |
| 72 | 0.6759 | 0.6772 | 0.6787 | 0.6801 | 0.6817 | 0.6834 | 0.6851 | 0.6870 | 0.6889 | 0.6910 |
| 73 | 0.6597 | 0.6611 | 0.6625 | 0.6639 | 0.6655 | 0.6672 | 0.6689 | 0.6707 | 0.6726 | 0.6747 |
| 74 | 0.6429 | 0.6442 | 0.6456 | 0.6471 | 0.6487 | 0.6503 | 0.6520 | 0.6538 | 0.6558 | 0.6578 |
| 75 | 0.6255 | 0.6269 | 0.6282 | 0.6297 | 0.6312 | 0.6328 | 0.6345 | 0.6364 | 0.6382 | 0.6403 |
| 76 | 0.6078 | 0.6091 | 0.6104 | 0.6119 | 0.6134 | 0.6150 | 0.6167 | 0.6184 | 0.6203 | 0.6223 |
| 77 | 0.5894 | 0.5907 | 0.5921 | 0.5935 | 0.5950 | 0.5966 | 0.5982 | 0.6000 | 0.6019 | 0.6038 |
| 78 | 0.5708 | 0.5721 | 0.5734 | 0.5748 | 0.5763 | 0.5778 | 0.5795 | 0.5812 | 0.5830 | 0.5850 |
| 79 | 0.5519 | 0.5531 | 0.5544 | 0.5558 | 0.5572 | 0.5588 | 0.5604 | 0.5621 | 0.5639 | 0.5658 |
| 80 | 0.5327 | 0.5339 | 0.5352 | 0.5365 | 0.5380 | 0.5395 | 0.5411 | 0.5427 | 0.5445 | 0.5464 |

Appendix A-1  (Page 3 of 9)

|  | Spouse Age | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Retiree Age | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 |
| 28 | 0.9876 | 0.9881 | 0.9885 | 0.9890 | 0.9894 | 0.9898 | 0.9902 | 0.9906 | 0.9910 | 0.9914 |
| 29 | 0.9864 | 0.9869 | 0.9874 | 0.9879 | 0.9884 | 0.9889 | 0.9893 | 0.9897 | 0.9902 | 0.9906 |
| 30 | 0.9852 | 0.9857 | 0.9863 | 0.9868 | 0.9873 | 0.9878 | 0.9883 | 0.9888 | 0.9892 | 0.9897 |
| 31 | 0.9839 | 0.9845 | 0.9851 | 0.9857 | 0.9862 | 0.9868 | 0.9873 | 0.9878 | 0.9883 | 0.9888 |
| 32 | 0.9826 | 0.9832 | 0.9839 | 0.9845 | 0.9851 | 0.9857 | 0.9862 | 0.9868 | 0.9874 | 0.9879 |
| 33 | 0.9811 | 0.9818 | 0.9825 | 0.9832 | 0.9838 | 0.9845 | 0.9851 | 0.9857 | 0.9863 | 0.9869 |
| 34 | 0.9796 | 0.9803 | 0.9810 | 0.9818 | 0.9825 | 0.9832 | 0.9839 | 0.9845 | 0.9852 | 0.9858 |
| 35 | 0.9779 | 0.9787 | 0.9795 | 0.9802 | 0.9810 | 0.9818 | 0.9825 | 0.9832 | 0.9839 | 0.9846 |
| 36 | 0.9760 | 0.9769 | 0.9777 | 0.9786 | 0.9794 | 0.9802 | 0.9810 | 0.9818 | 0.9825 | 0.9833 |
| 37 | 0.9741 | 0.9750 | 0.9759 | 0.9768 | 0.9777 | 0.9785 | 0.9794 | 0.9802 | 0.9811 | 0.9819 |
| 38 | 0.9719 | 0.9729 | 0.9738 | 0.9748 | 0.9757 | 0.9767 | 0.9776 | 0.9785 | 0.9794 | 0.9803 |
| 39 | 0.9696 | 0.9706 | 0.9716 | 0.9726 | 0.9736 | 0.9747 | 0.9756 | 0.9766 | 0.9776 | 0.9785 |
| 40 | 0.9670 | 0.9681 | 0.9692 | 0.9703 | 0.9714 | 0.9724 | 0.9735 | 0.9745 | 0.9756 | 0.9766 |
| 41 | 0.9642 | 0.9654 | 0.9665 | 0.9677 | 0.9688 | 0.9700 | 0.9711 | 0.9723 | 0.9734 | 0.9745 |
| 42 | 0.9612 | 0.9624 | 0.9637 | 0.9649 | 0.9661 | 0.9673 | 0.9685 | 0.9697 | 0.9709 | 0.9721 |
| 43 | 0.9580 | 0.9592 | 0.9605 | 0.9618 | 0.9631 | 0.9644 | 0.9657 | 0.9670 | 0.9683 | 0.9695 |
| 44 | 0.9545 | 0.9558 | 0.9571 | 0.9585 | 0.9599 | 0.9612 | 0.9626 | 0.9640 | 0.9653 | 0.9667 |
| 45 | 0.9507 | 0.9520 | 0.9535 | 0.9549 | 0.9563 | 0.9578 | 0.9592 | 0.9607 | 0.9621 | 0.9636 |
| 46 | 0.9466 | 0.9480 | 0.9495 | 0.9510 | 0.9525 | 0.9540 | 0.9555 | 0.9571 | 0.9586 | 0.9601 |
| 47 | 0.9421 | 0.9436 | 0.9452 | 0.9467 | 0.9483 | 0.9499 | 0.9515 | 0.9531 | 0.9548 | 0.9564 |
| 48 | 0.9374 | 0.9389 | 0.9405 | 0.9421 | 0.9438 | 0.9455 | 0.9472 | 0.9489 | 0.9506 | 0.9523 |
| 49 | 0.9322 | 0.9338 | 0.9355 | 0.9372 | 0.9389 | 0.9407 | 0.9424 | 0.9442 | 0.9460 | 0.9479 |
| 50 | 0.9267 | 0.9283 | 0.9301 | 0.9318 | 0.9336 | 0.9354 | 0.9373 | 0.9392 | 0.9411 | 0.9430 |
| 51 | 0.9207 | 0.9224 | 0.9242 | 0.9260 | 0.9279 | 0.9298 | 0.9317 | 0.9337 | 0.9357 | 0.9377 |
| 52 | 0.9143 | 0.9161 | 0.9180 | 0.9198 | 0.9218 | 0.9237 | 0.9258 | 0.9278 | 0.9299 | 0.9320 |
| 53 | 0.9075 | 0.9094 | 0.9113 | 0.9132 | 0.9152 | 0.9172 | 0.9193 | 0.9215 | 0.9236 | 0.9258 |
| 54 | 0.9002 | 0.9021 | 0.9041 | 0.9061 | 0.9081 | 0.9103 | 0.9124 | 0.9146 | 0.9169 | 0.9192 |
| 55 | 0.8925 | 0.8944 | 0.8964 | 0.8985 | 0.9006 | 0.9028 | 0.9050 | 0.9073 | 0.9096 | 0.9120 |
| 56 | 0.8843 | 0.8863 | 0.8883 | 0.8904 | 0.8926 | 0.8948 | 0.8972 | 0.8995 | 0.9019 | 0.9044 |
| 57 | 0.8757 | 0.8778 | 0.8798 | 0.8820 | 0.8842 | 0.8865 | 0.8889 | 0.8914 | 0.8939 | 0.8964 |
| 58 | 0.8667 | 0.8688 | 0.8709 | 0.8731 | 0.8754 | 0.8778 | 0.8802 | 0.8827 | 0.8853 | 0.8879 |
| 59 | 0.8573 | 0.8593 | 0.8615 | 0.8638 | 0.8661 | 0.8685 | 0.8710 | 0.8736 | 0.8763 | 0.8790 |
| 60 | 0.8473 | 0.8494 | 0.8516 | 0.8539 | 0.8563 | 0.8588 | 0.8614 | 0.8640 | 0.8667 | 0.8695 |
| 61 | 0.8369 | 0.8390 | 0.8413 | 0.8436 | 0.8460 | 0.8486 | 0.8512 | 0.8539 | 0.8567 | 0.8596 |
| 62 | 0.8260 | 0.8282 | 0.8305 | 0.8329 | 0.8353 | 0.8379 | 0.8406 | 0.8433 | 0.8462 | 0.8491 |
| 63 | 0.8148 | 0.8170 | 0.8193 | 0.8217 | 0.8242 | 0.8268 | 0.8295 | 0.8323 | 0.8352 | 0.8382 |
| 64 | 0.8031 | 0.8053 | 0.8077 | 0.8101 | 0.8126 | 0.8153 | 0.8180 | 0.8209 | 0.8239 | 0.8269 |
| 65 | 0.7910 | 0.7932 | 0.7956 | 0.7980 | 0.8006 | 0.8033 | 0.8061 | 0.8090 | 0.8120 | 0.8151 |
| 66 | 0.7784 | 0.7807 | 0.7830 | 0.7855 | 0.7881 | 0.7908 | 0.7936 | 0.7966 | 0.7997 | 0.8029 |
| 67 | 0.7655 | 0.7678 | 0.7702 | 0.7727 | 0.7753 | 0.7780 | 0.7809 | 0.7839 | 0.7870 | 0.7902 |
| 68 | 0.7522 | 0.7544 | 0.7568 | 0.7593 | 0.7620 | 0.7647 | 0.7676 | 0.7706 | 0.7738 | 0.7770 |
| 69 | 0.7382 | 0.7405 | 0.7429 | 0.7454 | 0.7481 | 0.7508 | 0.7537 | 0.7568 | 0.7599 | 0.7633 |
| 70 | 0.7237 | 0.7260 | 0.7284 | 0.7309 | 0.7336 | 0.7364 | 0.7393 | 0.7424 | 0.7456 | 0.7489 |
| 71 | 0.7087 | 0.7110 | 0.7134 | 0.7159 | 0.7186 | 0.7214 | 0.7243 | 0.7274 | 0.7306 | 0.7340 |
| 72 | 0.6931 | 0.6954 | 0.6978 | 0.7003 | 0.7029 | 0.7057 | 0.7087 | 0.7117 | 0.7150 | 0.7184 |
| 73 | 0.6768 | 0.6791 | 0.6815 | 0.6840 | 0.6866 | 0.6894 | 0.6923 | 0.6954 | 0.6987 | 0.7021 |
| 74 | 0.6599 | 0.6622 | 0.6645 | 0.6670 | 0.6697 | 0.6724 | 0.6754 | 0.6784 | 0.6817 | 0.6851 |
| 75 | 0.6424 | 0.6446 | 0.6469 | 0.6494 | 0.6520 | 0.6548 | 0.6577 | 0.6608 | 0.6640 | 0.6674 |
| 76 | 0.6244 | 0.6266 | 0.6289 | 0.6314 | 0.6340 | 0.6367 | 0.6396 | 0.6427 | 0.6459 | 0.6493 |
| 77 | 0.6059 | 0.6081 | 0.6104 | 0.6128 | 0.6154 | 0.6181 | 0.6209 | 0.6240 | 0.6272 | 0.6305 |
| 78 | 0.5870 | 0.5892 | 0.5914 | 0.5938 | 0.5964 | 0.5991 | 0.6019 | 0.6049 | 0.6080 | 0.6114 |
| 79 | 0.5678 | 0.5699 | 0.5722 | 0.5745 | 0.5770 | 0.5797 | 0.5825 | 0.5854 | 0.5886 | 0.5919 |
| 80 | 0.5484 | 0.5504 | 0.5526 | 0.5550 | 0.5574 | 0.5600 | 0.5628 | 0.5657 | 0.5688 | 0.5721 |

TM:619767 / 01096280 / 04/03/2023    Appendix A-1  (Page 4 of 9)

| | Spouse Age | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Retiree Age | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 |
| 28 | 0.9917 | 0.9921 | 0.9924 | 0.9927 | 0.9930 | 0.9933 | 0.9935 | 0.9938 | 0.9941 | 0.9943 |
| 29 | 0.9909 | 0.9913 | 0.9917 | 0.9920 | 0.9923 | 0.9926 | 0.9930 | 0.9932 | 0.9935 | 0.9938 |
| 30 | 0.9901 | 0.9905 | 0.9909 | 0.9912 | 0.9916 | 0.9920 | 0.9923 | 0.9926 | 0.9929 | 0.9932 |
| 31 | 0.9893 | 0.9897 | 0.9901 | 0.9906 | 0.9909 | 0.9913 | 0.9917 | 0.9920 | 0.9924 | 0.9927 |
| 32 | 0.9884 | 0.9889 | 0.9893 | 0.9898 | 0.9902 | 0.9907 | 0.9911 | 0.9914 | 0.9918 | 0.9922 |
| 33 | 0.9874 | 0.9880 | 0.9885 | 0.9890 | 0.9895 | 0.9899 | 0.9904 | 0.9908 | 0.9912 | 0.9916 |
| 34 | 0.9864 | 0.9870 | 0.9875 | 0.9881 | 0.9886 | 0.9891 | 0.9896 | 0.9901 | 0.9905 | 0.9909 |
| 35 | 0.9853 | 0.9859 | 0.9865 | 0.9871 | 0.9877 | 0.9883 | 0.9888 | 0.9893 | 0.9898 | 0.9903 |
| 36 | 0.9840 | 0.9847 | 0.9854 | 0.9860 | 0.9867 | 0.9873 | 0.9879 | 0.9884 | 0.9890 | 0.9895 |
| 37 | 0.9826 | 0.9834 | 0.9841 | 0.9849 | 0.9856 | 0.9862 | 0.9869 | 0.9875 | 0.9881 | 0.9887 |
| 38 | 0.9811 | 0.9820 | 0.9828 | 0.9836 | 0.9843 | 0.9851 | 0.9858 | 0.9864 | 0.9871 | 0.9877 |
| 39 | 0.9795 | 0.9804 | 0.9812 | 0.9821 | 0.9829 | 0.9837 | 0.9845 | 0.9853 | 0.9860 | 0.9867 |
| 40 | 0.9776 | 0.9786 | 0.9795 | 0.9805 | 0.9814 | 0.9823 | 0.9831 | 0.9839 | 0.9847 | 0.9855 |
| 41 | 0.9755 | 0.9766 | 0.9776 | 0.9787 | 0.9796 | 0.9806 | 0.9815 | 0.9824 | 0.9833 | 0.9841 |
| 42 | 0.9733 | 0.9744 | 0.9755 | 0.9766 | 0.9777 | 0.9787 | 0.9798 | 0.9807 | 0.9817 | 0.9826 |
| 43 | 0.9708 | 0.9720 | 0.9732 | 0.9744 | 0.9756 | 0.9767 | 0.9778 | 0.9789 | 0.9799 | 0.9809 |
| 44 | 0.9680 | 0.9693 | 0.9706 | 0.9719 | 0.9732 | 0.9744 | 0.9756 | 0.9768 | 0.9779 | 0.9790 |
| 45 | 0.9650 | 0.9664 | 0.9678 | 0.9692 | 0.9705 | 0.9719 | 0.9732 | 0.9744 | 0.9757 | 0.9769 |
| 46 | 0.9617 | 0.9632 | 0.9647 | 0.9662 | 0.9676 | 0.9691 | 0.9705 | 0.9718 | 0.9732 | 0.9745 |
| 47 | 0.9580 | 0.9596 | 0.9612 | 0.9628 | 0.9644 | 0.9660 | 0.9675 | 0.9690 | 0.9704 | 0.9718 |
| 48 | 0.9540 | 0.9558 | 0.9575 | 0.9592 | 0.9609 | 0.9625 | 0.9642 | 0.9658 | 0.9673 | 0.9689 |
| 49 | 0.9497 | 0.9515 | 0.9533 | 0.9551 | 0.9569 | 0.9587 | 0.9605 | 0.9622 | 0.9639 | 0.9656 |
| 50 | 0.9449 | 0.9468 | 0.9488 | 0.9507 | 0.9526 | 0.9545 | 0.9564 | 0.9583 | 0.9601 | 0.9619 |
| 51 | 0.9397 | 0.9418 | 0.9438 | 0.9458 | 0.9479 | 0.9499 | 0.9519 | 0.9539 | 0.9559 | 0.9578 |
| 52 | 0.9341 | 0.9363 | 0.9384 | 0.9406 | 0.9428 | 0.9449 | 0.9471 | 0.9492 | 0.9513 | 0.9534 |
| 53 | 0.9281 | 0.9303 | 0.9326 | 0.9349 | 0.9371 | 0.9394 | 0.9417 | 0.9440 | 0.9462 | 0.9485 |
| 54 | 0.9215 | 0.9239 | 0.9262 | 0.9286 | 0.9311 | 0.9335 | 0.9359 | 0.9383 | 0.9407 | 0.9431 |
| 55 | 0.9144 | 0.9169 | 0.9194 | 0.9219 | 0.9245 | 0.9270 | 0.9296 | 0.9321 | 0.9347 | 0.9372 |
| 56 | 0.9069 | 0.9095 | 0.9121 | 0.9148 | 0.9174 | 0.9201 | 0.9228 | 0.9255 | 0.9282 | 0.9309 |
| 57 | 0.8990 | 0.9017 | 0.9044 | 0.9072 | 0.9100 | 0.9128 | 0.9156 | 0.9185 | 0.9213 | 0.9242 |
| 58 | 0.8907 | 0.8934 | 0.8962 | 0.8991 | 0.9020 | 0.9050 | 0.9079 | 0.9109 | 0.9140 | 0.9170 |
| 59 | 0.8818 | 0.8847 | 0.8876 | 0.8906 | 0.8936 | 0.8967 | 0.8998 | 0.9029 | 0.9061 | 0.9093 |
| 60 | 0.8724 | 0.8754 | 0.8784 | 0.8815 | 0.8846 | 0.8878 | 0.8911 | 0.8944 | 0.8977 | 0.9010 |
| 61 | 0.8625 | 0.8656 | 0.8687 | 0.8719 | 0.8752 | 0.8785 | 0.8819 | 0.8853 | 0.8888 | 0.8922 |
| 62 | 0.8522 | 0.8553 | 0.8585 | 0.8618 | 0.8652 | 0.8687 | 0.8722 | 0.8757 | 0.8793 | 0.8830 |
| 63 | 0.8414 | 0.8446 | 0.8479 | 0.8513 | 0.8548 | 0.8583 | 0.8620 | 0.8657 | 0.8694 | 0.8732 |
| 64 | 0.8301 | 0.8334 | 0.8368 | 0.8403 | 0.8439 | 0.8476 | 0.8513 | 0.8552 | 0.8591 | 0.8630 |
| 65 | 0.8184 | 0.8218 | 0.8252 | 0.8288 | 0.8325 | 0.8363 | 0.8402 | 0.8441 | 0.8481 | 0.8522 |
| 66 | 0.8062 | 0.8096 | 0.8131 | 0.8168 | 0.8206 | 0.8245 | 0.8285 | 0.8325 | 0.8367 | 0.8409 |
| 67 | 0.7936 | 0.7971 | 0.8007 | 0.8044 | 0.8083 | 0.8123 | 0.8164 | 0.8206 | 0.8248 | 0.8292 |
| 68 | 0.7805 | 0.7840 | 0.7877 | 0.7915 | 0.7955 | 0.7995 | 0.8037 | 0.8080 | 0.8124 | 0.8170 |
| 69 | 0.7667 | 0.7703 | 0.7741 | 0.7780 | 0.7820 | 0.7861 | 0.7904 | 0.7948 | 0.7993 | 0.8040 |
| 70 | 0.7524 | 0.7560 | 0.7598 | 0.7638 | 0.7679 | 0.7721 | 0.7765 | 0.7810 | 0.7856 | 0.7904 |
| 71 | 0.7375 | 0.7412 | 0.7450 | 0.7490 | 0.7532 | 0.7575 | 0.7619 | 0.7665 | 0.7712 | 0.7761 |
| 72 | 0.7219 | 0.7256 | 0.7295 | 0.7335 | 0.7377 | 0.7421 | 0.7466 | 0.7513 | 0.7561 | 0.7611 |
| 73 | 0.7056 | 0.7094 | 0.7133 | 0.7173 | 0.7216 | 0.7260 | 0.7306 | 0.7353 | 0.7402 | 0.7453 |
| 74 | 0.6886 | 0.6924 | 0.6963 | 0.7004 | 0.7047 | 0.7091 | 0.7138 | 0.7186 | 0.7235 | 0.7287 |
| 75 | 0.6710 | 0.6747 | 0.6787 | 0.6828 | 0.6871 | 0.6916 | 0.6962 | 0.7011 | 0.7061 | 0.7113 |
| 76 | 0.6528 | 0.6566 | 0.6605 | 0.6646 | 0.6689 | 0.6734 | 0.6781 | 0.6830 | 0.6881 | 0.6934 |
| 77 | 0.6341 | 0.6378 | 0.6417 | 0.6459 | 0.6502 | 0.6547 | 0.6594 | 0.6643 | 0.6694 | 0.6747 |
| 78 | 0.6149 | 0.6186 | 0.6225 | 0.6266 | 0.6309 | 0.6354 | 0.6402 | 0.6451 | 0.6502 | 0.6555 |
| 79 | 0.5954 | 0.5990 | 0.6029 | 0.6070 | 0.6113 | 0.6158 | 0.6205 | 0.6254 | 0.6305 | 0.6359 |
| 80 | 0.5755 | 0.5792 | 0.5830 | 0.5870 | 0.5913 | 0.5958 | 0.6004 | 0.6053 | 0.6105 | 0.6158 |

TM:619767 / 01096280 / 04/03/2023                                Appendix A-1  (Page 5 of 9)

| | Spouse Age | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Retiree Age | 58 | 59 | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 |
| 28 | 0.9945 | 0.9948 | 0.9950 | 0.9952 | 0.9954 | 0.9955 | 0.9957 | 0.9959 | 0.9961 | 0.9962 |
| 29 | 0.9940 | 0.9943 | 0.9945 | 0.9947 | 0.9949 | 0.9951 | 0.9953 | 0.9955 | 0.9957 | 0.9959 |
| 30 | 0.9935 | 0.9937 | 0.9940 | 0.9942 | 0.9945 | 0.9947 | 0.9949 | 0.9951 | 0.9953 | 0.9955 |
| 31 | 0.9930 | 0.9933 | 0.9936 | 0.9938 | 0.9941 | 0.9943 | 0.9945 | 0.9948 | 0.9950 | 0.9952 |
| 32 | 0.9925 | 0.9928 | 0.9931 | 0.9934 | 0.9937 | 0.9939 | 0.9942 | 0.9944 | 0.9947 | 0.9949 |
| 33 | 0.9919 | 0.9923 | 0.9926 | 0.9929 | 0.9933 | 0.9935 | 0.9938 | 0.9941 | 0.9943 | 0.9946 |
| 34 | 0.9914 | 0.9917 | 0.9921 | 0.9925 | 0.9928 | 0.9931 | 0.9934 | 0.9937 | 0.9940 | 0.9942 |
| 35 | 0.9907 | 0.9911 | 0.9915 | 0.9919 | 0.9923 | 0.9926 | 0.9930 | 0.9933 | 0.9936 | 0.9939 |
| 36 | 0.9900 | 0.9905 | 0.9909 | 0.9913 | 0.9918 | 0.9921 | 0.9925 | 0.9929 | 0.9932 | 0.9935 |
| 37 | 0.9892 | 0.9897 | 0.9902 | 0.9907 | 0.9911 | 0.9916 | 0.9920 | 0.9924 | 0.9927 | 0.9931 |
| 38 | 0.9883 | 0.9889 | 0.9895 | 0.9900 | 0.9905 | 0.9909 | 0.9914 | 0.9918 | 0.9922 | 0.9926 |
| 39 | 0.9873 | 0.9880 | 0.9886 | 0.9892 | 0.9897 | 0.9902 | 0.9907 | 0.9912 | 0.9916 | 0.9921 |
| 40 | 0.9862 | 0.9869 | 0.9876 | 0.9882 | 0.9888 | 0.9894 | 0.9900 | 0.9905 | 0.9910 | 0.9915 |
| 41 | 0.9849 | 0.9857 | 0.9864 | 0.9872 | 0.9878 | 0.9885 | 0.9891 | 0.9897 | 0.9902 | 0.9907 |
| 42 | 0.9835 | 0.9843 | 0.9852 | 0.9859 | 0.9867 | 0.9874 | 0.9881 | 0.9887 | 0.9893 | 0.9899 |
| 43 | 0.9819 | 0.9828 | 0.9837 | 0.9846 | 0.9854 | 0.9862 | 0.9869 | 0.9877 | 0.9883 | 0.9890 |
| 44 | 0.9801 | 0.9811 | 0.9821 | 0.9830 | 0.9839 | 0.9848 | 0.9856 | 0.9864 | 0.9872 | 0.9879 |
| 45 | 0.9780 | 0.9792 | 0.9802 | 0.9813 | 0.9823 | 0.9833 | 0.9842 | 0.9851 | 0.9859 | 0.9867 |
| 46 | 0.9758 | 0.9770 | 0.9782 | 0.9793 | 0.9804 | 0.9815 | 0.9825 | 0.9835 | 0.9844 | 0.9853 |
| 47 | 0.9732 | 0.9746 | 0.9759 | 0.9771 | 0.9783 | 0.9795 | 0.9806 | 0.9817 | 0.9827 | 0.9837 |
| 48 | 0.9704 | 0.9718 | 0.9733 | 0.9746 | 0.9760 | 0.9772 | 0.9785 | 0.9797 | 0.9808 | 0.9819 |
| 49 | 0.9672 | 0.9688 | 0.9703 | 0.9718 | 0.9733 | 0.9747 | 0.9760 | 0.9774 | 0.9786 | 0.9798 |
| 50 | 0.9637 | 0.9654 | 0.9671 | 0.9687 | 0.9703 | 0.9718 | 0.9733 | 0.9747 | 0.9761 | 0.9774 |
| 51 | 0.9597 | 0.9616 | 0.9634 | 0.9652 | 0.9669 | 0.9686 | 0.9702 | 0.9718 | 0.9733 | 0.9748 |
| 52 | 0.9554 | 0.9574 | 0.9594 | 0.9613 | 0.9632 | 0.9650 | 0.9668 | 0.9685 | 0.9702 | 0.9718 |
| 53 | 0.9507 | 0.9528 | 0.9550 | 0.9570 | 0.9591 | 0.9610 | 0.9630 | 0.9648 | 0.9666 | 0.9684 |
| 54 | 0.9454 | 0.9478 | 0.9501 | 0.9523 | 0.9545 | 0.9566 | 0.9587 | 0.9608 | 0.9627 | 0.9646 |
| 55 | 0.9397 | 0.9422 | 0.9447 | 0.9471 | 0.9494 | 0.9518 | 0.9540 | 0.9562 | 0.9584 | 0.9605 |
| 56 | 0.9336 | 0.9362 | 0.9388 | 0.9414 | 0.9440 | 0.9465 | 0.9489 | 0.9513 | 0.9536 | 0.9559 |
| 57 | 0.9270 | 0.9298 | 0.9326 | 0.9354 | 0.9381 | 0.9408 | 0.9434 | 0.9460 | 0.9485 | 0.9510 |
| 58 | 0.9200 | 0.9230 | 0.9259 | 0.9289 | 0.9318 | 0.9347 | 0.9375 | 0.9403 | 0.9430 | 0.9457 |
| 59 | 0.9124 | 0.9156 | 0.9188 | 0.9219 | 0.9250 | 0.9281 | 0.9311 | 0.9341 | 0.9370 | 0.9399 |
| 60 | 0.9044 | 0.9077 | 0.9111 | 0.9144 | 0.9177 | 0.9210 | 0.9242 | 0.9274 | 0.9305 | 0.9336 |
| 61 | 0.8958 | 0.8993 | 0.9028 | 0.9063 | 0.9098 | 0.9133 | 0.9168 | 0.9202 | 0.9235 | 0.9268 |
| 62 | 0.8867 | 0.8904 | 0.8941 | 0.8978 | 0.9015 | 0.9052 | 0.9088 | 0.9125 | 0.9160 | 0.9196 |
| 63 | 0.8771 | 0.8809 | 0.8848 | 0.8887 | 0.8926 | 0.8965 | 0.9004 | 0.9043 | 0.9081 | 0.9119 |
| 64 | 0.8670 | 0.8711 | 0.8751 | 0.8792 | 0.8833 | 0.8874 | 0.8915 | 0.8956 | 0.8997 | 0.9037 |
| 65 | 0.8564 | 0.8606 | 0.8649 | 0.8692 | 0.8735 | 0.8778 | 0.8821 | 0.8864 | 0.8907 | 0.8950 |
| 66 | 0.8453 | 0.8496 | 0.8541 | 0.8585 | 0.8630 | 0.8676 | 0.8721 | 0.8766 | 0.8812 | 0.8857 |
| 67 | 0.8337 | 0.8382 | 0.8428 | 0.8475 | 0.8522 | 0.8569 | 0.8617 | 0.8664 | 0.8712 | 0.8760 |
| 68 | 0.8216 | 0.8263 | 0.8310 | 0.8358 | 0.8407 | 0.8457 | 0.8506 | 0.8556 | 0.8606 | 0.8657 |
| 69 | 0.8087 | 0.8136 | 0.8185 | 0.8235 | 0.8286 | 0.8337 | 0.8389 | 0.8441 | 0.8493 | 0.8546 |
| 70 | 0.7952 | 0.8002 | 0.8053 | 0.8105 | 0.8157 | 0.8210 | 0.8264 | 0.8318 | 0.8373 | 0.8428 |
| 71 | 0.7811 | 0.7862 | 0.7914 | 0.7967 | 0.8022 | 0.8077 | 0.8132 | 0.8189 | 0.8246 | 0.8303 |
| 72 | 0.7662 | 0.7714 | 0.7768 | 0.7822 | 0.7878 | 0.7935 | 0.7992 | 0.8051 | 0.8110 | 0.8170 |
| 73 | 0.7505 | 0.7558 | 0.7613 | 0.7669 | 0.7726 | 0.7784 | 0.7844 | 0.7904 | 0.7965 | 0.8028 |
| 74 | 0.7340 | 0.7394 | 0.7450 | 0.7507 | 0.7566 | 0.7626 | 0.7687 | 0.7749 | 0.7812 | 0.7876 |
| 75 | 0.7167 | 0.7222 | 0.7279 | 0.7337 | 0.7397 | 0.7458 | 0.7521 | 0.7584 | 0.7650 | 0.7716 |
| 76 | 0.6988 | 0.7044 | 0.7102 | 0.7161 | 0.7222 | 0.7284 | 0.7348 | 0.7413 | 0.7480 | 0.7548 |
| 77 | 0.6802 | 0.6859 | 0.6917 | 0.6977 | 0.7039 | 0.7102 | 0.7167 | 0.7234 | 0.7302 | 0.7372 |
| 78 | 0.6610 | 0.6668 | 0.6727 | 0.6787 | 0.6850 | 0.6914 | 0.6980 | 0.7048 | 0.7117 | 0.7189 |
| 79 | 0.6414 | 0.6472 | 0.6531 | 0.6592 | 0.6655 | 0.6720 | 0.6787 | 0.6856 | 0.6926 | 0.6999 |
| 80 | 0.6214 | 0.6271 | 0.6331 | 0.6392 | 0.6456 | 0.6521 | 0.6589 | 0.6658 | 0.6730 | 0.6803 |

TM:619767 / 01096280 / 04/03/2023    Appendix A-1  (Page 6 of 9)

|  | Spouse Age | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Retiree Age | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 |
| 28 | 0.9964 | 0.9965 | 0.9967 | 0.9968 | 0.9970 | 0.9971 | 0.9973 | 0.9974 | 0.9975 | 0.9976 |
| 29 | 0.9960 | 0.9962 | 0.9964 | 0.9965 | 0.9967 | 0.9968 | 0.9970 | 0.9971 | 0.9972 | 0.9974 |
| 30 | 0.9957 | 0.9958 | 0.9960 | 0.9962 | 0.9963 | 0.9965 | 0.9966 | 0.9968 | 0.9969 | 0.9971 |
| 31 | 0.9954 | 0.9956 | 0.9958 | 0.9959 | 0.9961 | 0.9963 | 0.9964 | 0.9966 | 0.9967 | 0.9969 |
| 32 | 0.9951 | 0.9953 | 0.9955 | 0.9957 | 0.9959 | 0.9960 | 0.9962 | 0.9964 | 0.9965 | 0.9967 |
| 33 | 0.9948 | 0.9950 | 0.9952 | 0.9954 | 0.9956 | 0.9958 | 0.9960 | 0.9962 | 0.9963 | 0.9965 |
| 34 | 0.9945 | 0.9947 | 0.9950 | 0.9952 | 0.9954 | 0.9956 | 0.9958 | 0.9960 | 0.9962 | 0.9963 |
| 35 | 0.9942 | 0.9944 | 0.9947 | 0.9949 | 0.9951 | 0.9953 | 0.9956 | 0.9958 | 0.9960 | 0.9961 |
| 36 | 0.9938 | 0.9941 | 0.9944 | 0.9946 | 0.9949 | 0.9951 | 0.9953 | 0.9955 | 0.9958 | 0.9960 |
| 37 | 0.9934 | 0.9937 | 0.9940 | 0.9943 | 0.9946 | 0.9948 | 0.9951 | 0.9953 | 0.9955 | 0.9958 |
| 38 | 0.9930 | 0.9933 | 0.9936 | 0.9940 | 0.9943 | 0.9945 | 0.9948 | 0.9951 | 0.9953 | 0.9955 |
| 39 | 0.9925 | 0.9929 | 0.9932 | 0.9936 | 0.9939 | 0.9942 | 0.9945 | 0.9948 | 0.9950 | 0.9953 |
| 40 | 0.9919 | 0.9923 | 0.9927 | 0.9931 | 0.9935 | 0.9938 | 0.9941 | 0.9944 | 0.9947 | 0.9950 |
| 41 | 0.9912 | 0.9917 | 0.9922 | 0.9926 | 0.9930 | 0.9934 | 0.9937 | 0.9941 | 0.9944 | 0.9947 |
| 42 | 0.9905 | 0.9910 | 0.9915 | 0.9920 | 0.9924 | 0.9929 | 0.9933 | 0.9936 | 0.9940 | 0.9943 |
| 43 | 0.9896 | 0.9902 | 0.9908 | 0.9913 | 0.9918 | 0.9923 | 0.9927 | 0.9931 | 0.9935 | 0.9939 |
| 44 | 0.9886 | 0.9893 | 0.9899 | 0.9905 | 0.9910 | 0.9916 | 0.9921 | 0.9925 | 0.9930 | 0.9934 |
| 45 | 0.9875 | 0.9882 | 0.9889 | 0.9895 | 0.9902 | 0.9908 | 0.9913 | 0.9918 | 0.9923 | 0.9928 |
| 46 | 0.9862 | 0.9870 | 0.9877 | 0.9885 | 0.9892 | 0.9898 | 0.9905 | 0.9910 | 0.9916 | 0.9921 |
| 47 | 0.9847 | 0.9856 | 0.9864 | 0.9872 | 0.9880 | 0.9888 | 0.9894 | 0.9901 | 0.9907 | 0.9913 |
| 48 | 0.9829 | 0.9839 | 0.9849 | 0.9858 | 0.9867 | 0.9875 | 0.9883 | 0.9890 | 0.9897 | 0.9904 |
| 49 | 0.9810 | 0.9821 | 0.9831 | 0.9842 | 0.9851 | 0.9860 | 0.9869 | 0.9877 | 0.9885 | 0.9893 |
| 50 | 0.9787 | 0.9800 | 0.9811 | 0.9823 | 0.9833 | 0.9844 | 0.9853 | 0.9863 | 0.9871 | 0.9880 |
| 51 | 0.9762 | 0.9775 | 0.9788 | 0.9801 | 0.9813 | 0.9824 | 0.9835 | 0.9845 | 0.9855 | 0.9864 |
| 52 | 0.9733 | 0.9748 | 0.9762 | 0.9776 | 0.9789 | 0.9802 | 0.9814 | 0.9826 | 0.9837 | 0.9847 |
| 53 | 0.9701 | 0.9717 | 0.9733 | 0.9748 | 0.9763 | 0.9777 | 0.9790 | 0.9803 | 0.9815 | 0.9827 |
| 54 | 0.9665 | 0.9683 | 0.9700 | 0.9717 | 0.9733 | 0.9749 | 0.9763 | 0.9778 | 0.9791 | 0.9804 |
| 55 | 0.9625 | 0.9645 | 0.9664 | 0.9682 | 0.9700 | 0.9717 | 0.9733 | 0.9749 | 0.9764 | 0.9778 |
| 56 | 0.9581 | 0.9602 | 0.9623 | 0.9643 | 0.9663 | 0.9681 | 0.9699 | 0.9717 | 0.9733 | 0.9749 |
| 57 | 0.9534 | 0.9557 | 0.9580 | 0.9602 | 0.9623 | 0.9643 | 0.9663 | 0.9682 | 0.9701 | 0.9718 |
| 58 | 0.9482 | 0.9508 | 0.9532 | 0.9556 | 0.9579 | 0.9602 | 0.9624 | 0.9644 | 0.9665 | 0.9684 |
| 59 | 0.9427 | 0.9454 | 0.9481 | 0.9507 | 0.9532 | 0.9556 | 0.9580 | 0.9603 | 0.9625 | 0.9646 |
| 60 | 0.9366 | 0.9396 | 0.9425 | 0.9453 | 0.9480 | 0.9507 | 0.9533 | 0.9558 | 0.9582 | 0.9605 |
| 61 | 0.9301 | 0.9333 | 0.9364 | 0.9394 | 0.9424 | 0.9453 | 0.9481 | 0.9508 | 0.9535 | 0.9560 |
| 62 | 0.9231 | 0.9265 | 0.9299 | 0.9332 | 0.9364 | 0.9395 | 0.9425 | 0.9455 | 0.9484 | 0.9511 |
| 63 | 0.9156 | 0.9193 | 0.9229 | 0.9264 | 0.9299 | 0.9333 | 0.9366 | 0.9398 | 0.9429 | 0.9459 |
| 64 | 0.9077 | 0.9116 | 0.9155 | 0.9193 | 0.9230 | 0.9267 | 0.9302 | 0.9337 | 0.9371 | 0.9404 |
| 65 | 0.8992 | 0.9034 | 0.9075 | 0.9116 | 0.9156 | 0.9195 | 0.9234 | 0.9271 | 0.9308 | 0.9344 |
| 66 | 0.8902 | 0.8946 | 0.8991 | 0.9034 | 0.9077 | 0.9119 | 0.9161 | 0.9201 | 0.9241 | 0.9279 |
| 67 | 0.8807 | 0.8855 | 0.8901 | 0.8948 | 0.8994 | 0.9039 | 0.9083 | 0.9127 | 0.9170 | 0.9211 |
| 68 | 0.8707 | 0.8757 | 0.8807 | 0.8856 | 0.8905 | 0.8953 | 0.9001 | 0.9048 | 0.9093 | 0.9138 |
| 69 | 0.8599 | 0.8652 | 0.8704 | 0.8757 | 0.8809 | 0.8860 | 0.8911 | 0.8961 | 0.9011 | 0.9059 |
| 70 | 0.8484 | 0.8539 | 0.8595 | 0.8650 | 0.8705 | 0.8760 | 0.8814 | 0.8868 | 0.8921 | 0.8973 |
| 71 | 0.8361 | 0.8420 | 0.8478 | 0.8536 | 0.8595 | 0.8653 | 0.8711 | 0.8768 | 0.8824 | 0.8880 |
| 72 | 0.8230 | 0.8291 | 0.8353 | 0.8414 | 0.8476 | 0.8537 | 0.8598 | 0.8659 | 0.8719 | 0.8779 |
| 73 | 0.8091 | 0.8154 | 0.8218 | 0.8282 | 0.8347 | 0.8412 | 0.8477 | 0.8541 | 0.8605 | 0.8668 |
| 74 | 0.7941 | 0.8007 | 0.8074 | 0.8141 | 0.8209 | 0.8277 | 0.8345 | 0.8413 | 0.8481 | 0.8549 |
| 75 | 0.7783 | 0.7852 | 0.7921 | 0.7991 | 0.8062 | 0.8133 | 0.8204 | 0.8276 | 0.8348 | 0.8419 |
| 76 | 0.7617 | 0.7688 | 0.7760 | 0.7832 | 0.7906 | 0.7980 | 0.8055 | 0.8131 | 0.8206 | 0.8281 |
| 77 | 0.7443 | 0.7516 | 0.7589 | 0.7665 | 0.7741 | 0.7818 | 0.7896 | 0.7975 | 0.8054 | 0.8133 |
| 78 | 0.7261 | 0.7336 | 0.7412 | 0.7489 | 0.7568 | 0.7648 | 0.7729 | 0.7811 | 0.7894 | 0.7977 |
| 79 | 0.7073 | 0.7149 | 0.7227 | 0.7306 | 0.7387 | 0.7470 | 0.7554 | 0.7639 | 0.7725 | 0.7812 |
| 80 | 0.6879 | 0.6956 | 0.7035 | 0.7117 | 0.7200 | 0.7285 | 0.7371 | 0.7459 | 0.7549 | 0.7639 |

TM:619767 / 01096280 / 04/03/2023

| | Spouse Age | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Retiree Age | 78 | 79 | 80 | 81 | 82 | 83 | 84 | 85 | 86 | 87 |
| 28 | 0.9978 | 0.9979 | 0.9980 | 0.9981 | 0.9982 | 0.9983 | 0.9984 | 0.9985 | 0.9986 | 0.9987 |
| 29 | 0.9975 | 0.9976 | 0.9978 | 0.9979 | 0.9980 | 0.9981 | 0.9982 | 0.9983 | 0.9984 | 0.9985 |
| 30 | 0.9972 | 0.9974 | 0.9975 | 0.9976 | 0.9977 | 0.9978 | 0.9979 | 0.9981 | 0.9981 | 0.9982 |
| 31 | 0.9970 | 0.9972 | 0.9973 | 0.9974 | 0.9976 | 0.9977 | 0.9978 | 0.9979 | 0.9980 | 0.9981 |
| 32 | 0.9969 | 0.9970 | 0.9971 | 0.9973 | 0.9974 | 0.9975 | 0.9977 | 0.9978 | 0.9979 | 0.9980 |
| 33 | 0.9967 | 0.9968 | 0.9970 | 0.9971 | 0.9973 | 0.9974 | 0.9975 | 0.9976 | 0.9978 | 0.9979 |
| 34 | 0.9965 | 0.9967 | 0.9968 | 0.9970 | 0.9971 | 0.9973 | 0.9974 | 0.9975 | 0.9976 | 0.9978 |
| 35 | 0.9963 | 0.9965 | 0.9967 | 0.9968 | 0.9970 | 0.9971 | 0.9973 | 0.9974 | 0.9975 | 0.9976 |
| 36 | 0.9961 | 0.9963 | 0.9965 | 0.9967 | 0.9968 | 0.9970 | 0.9971 | 0.9973 | 0.9974 | 0.9975 |
| 37 | 0.9960 | 0.9962 | 0.9963 | 0.9965 | 0.9967 | 0.9969 | 0.9970 | 0.9972 | 0.9973 | 0.9974 |
| 38 | 0.9958 | 0.9960 | 0.9962 | 0.9964 | 0.9966 | 0.9967 | 0.9969 | 0.9970 | 0.9972 | 0.9973 |
| 39 | 0.9955 | 0.9958 | 0.9960 | 0.9962 | 0.9964 | 0.9966 | 0.9968 | 0.9969 | 0.9971 | 0.9972 |
| 40 | 0.9953 | 0.9955 | 0.9958 | 0.9960 | 0.9962 | 0.9964 | 0.9966 | 0.9968 | 0.9969 | 0.9971 |
| 41 | 0.9950 | 0.9953 | 0.9955 | 0.9958 | 0.9960 | 0.9962 | 0.9964 | 0.9966 | 0.9968 | 0.9969 |
| 42 | 0.9946 | 0.9949 | 0.9952 | 0.9955 | 0.9957 | 0.9960 | 0.9962 | 0.9964 | 0.9966 | 0.9968 |
| 43 | 0.9942 | 0.9946 | 0.9949 | 0.9952 | 0.9954 | 0.9957 | 0.9959 | 0.9962 | 0.9964 | 0.9966 |
| 44 | 0.9938 | 0.9941 | 0.9945 | 0.9948 | 0.9951 | 0.9954 | 0.9957 | 0.9959 | 0.9961 | 0.9963 |
| 45 | 0.9932 | 0.9936 | 0.9940 | 0.9944 | 0.9947 | 0.9950 | 0.9953 | 0.9956 | 0.9959 | 0.9961 |
| 46 | 0.9926 | 0.9931 | 0.9935 | 0.9939 | 0.9943 | 0.9946 | 0.9950 | 0.9953 | 0.9955 | 0.9958 |
| 47 | 0.9919 | 0.9924 | 0.9929 | 0.9933 | 0.9937 | 0.9941 | 0.9945 | 0.9948 | 0.9951 | 0.9954 |
| 48 | 0.9910 | 0.9916 | 0.9921 | 0.9926 | 0.9931 | 0.9936 | 0.9940 | 0.9943 | 0.9947 | 0.9950 |
| 49 | 0.9900 | 0.9906 | 0.9912 | 0.9918 | 0.9923 | 0.9928 | 0.9933 | 0.9937 | 0.9941 | 0.9945 |
| 50 | 0.9887 | 0.9895 | 0.9902 | 0.9908 | 0.9914 | 0.9920 | 0.9925 | 0.9930 | 0.9934 | 0.9938 |
| 51 | 0.9873 | 0.9881 | 0.9889 | 0.9897 | 0.9903 | 0.9910 | 0.9916 | 0.9921 | 0.9926 | 0.9931 |
| 52 | 0.9857 | 0.9866 | 0.9875 | 0.9883 | 0.9891 | 0.9898 | 0.9905 | 0.9911 | 0.9917 | 0.9922 |
| 53 | 0.9838 | 0.9849 | 0.9858 | 0.9868 | 0.9876 | 0.9884 | 0.9892 | 0.9899 | 0.9905 | 0.9911 |
| 54 | 0.9817 | 0.9828 | 0.9839 | 0.9850 | 0.9859 | 0.9868 | 0.9877 | 0.9885 | 0.9892 | 0.9899 |
| 55 | 0.9792 | 0.9805 | 0.9817 | 0.9829 | 0.9840 | 0.9850 | 0.9859 | 0.9868 | 0.9876 | 0.9884 |
| 56 | 0.9764 | 0.9779 | 0.9793 | 0.9806 | 0.9818 | 0.9829 | 0.9840 | 0.9850 | 0.9859 | 0.9867 |
| 57 | 0.9735 | 0.9751 | 0.9766 | 0.9781 | 0.9794 | 0.9807 | 0.9819 | 0.9830 | 0.9840 | 0.9850 |
| 58 | 0.9702 | 0.9720 | 0.9737 | 0.9753 | 0.9768 | 0.9782 | 0.9795 | 0.9808 | 0.9819 | 0.9830 |
| 59 | 0.9667 | 0.9686 | 0.9705 | 0.9722 | 0.9739 | 0.9755 | 0.9770 | 0.9783 | 0.9796 | 0.9808 |
| 60 | 0.9627 | 0.9649 | 0.9669 | 0.9689 | 0.9707 | 0.9725 | 0.9741 | 0.9756 | 0.9770 | 0.9783 |
| 61 | 0.9584 | 0.9608 | 0.9630 | 0.9652 | 0.9672 | 0.9691 | 0.9709 | 0.9726 | 0.9742 | 0.9756 |
| 62 | 0.9538 | 0.9564 | 0.9588 | 0.9612 | 0.9634 | 0.9655 | 0.9675 | 0.9693 | 0.9711 | 0.9727 |
| 63 | 0.9488 | 0.9516 | 0.9543 | 0.9569 | 0.9593 | 0.9616 | 0.9638 | 0.9658 | 0.9677 | 0.9695 |
| 64 | 0.9435 | 0.9466 | 0.9495 | 0.9523 | 0.9550 | 0.9575 | 0.9599 | 0.9621 | 0.9642 | 0.9661 |
| 65 | 0.9378 | 0.9411 | 0.9443 | 0.9473 | 0.9503 | 0.9530 | 0.9556 | 0.9581 | 0.9603 | 0.9625 |
| 66 | 0.9316 | 0.9352 | 0.9387 | 0.9420 | 0.9452 | 0.9482 | 0.9510 | 0.9537 | 0.9562 | 0.9585 |
| 67 | 0.9251 | 0.9290 | 0.9328 | 0.9364 | 0.9399 | 0.9431 | 0.9462 | 0.9492 | 0.9519 | 0.9544 |
| 68 | 0.9182 | 0.9224 | 0.9265 | 0.9304 | 0.9341 | 0.9377 | 0.9411 | 0.9443 | 0.9472 | 0.9500 |
| 69 | 0.9106 | 0.9151 | 0.9195 | 0.9238 | 0.9279 | 0.9317 | 0.9354 | 0.9389 | 0.9421 | 0.9451 |
| 70 | 0.9023 | 0.9072 | 0.9120 | 0.9166 | 0.9210 | 0.9252 | 0.9292 | 0.9330 | 0.9365 | 0.9398 |
| 71 | 0.8934 | 0.8987 | 0.9039 | 0.9088 | 0.9136 | 0.9182 | 0.9225 | 0.9266 | 0.9305 | 0.9341 |
| 72 | 0.8837 | 0.8894 | 0.8949 | 0.9003 | 0.9055 | 0.9104 | 0.9151 | 0.9196 | 0.9238 | 0.9277 |
| 73 | 0.8731 | 0.8792 | 0.8851 | 0.8909 | 0.8965 | 0.9019 | 0.9070 | 0.9118 | 0.9163 | 0.9206 |
| 74 | 0.8615 | 0.8680 | 0.8744 | 0.8806 | 0.8866 | 0.8924 | 0.8979 | 0.9032 | 0.9081 | 0.9127 |
| 75 | 0.8490 | 0.8559 | 0.8627 | 0.8694 | 0.8759 | 0.8821 | 0.8880 | 0.8937 | 0.8990 | 0.9041 |
| 76 | 0.8356 | 0.8430 | 0.8503 | 0.8574 | 0.8643 | 0.8710 | 0.8774 | 0.8835 | 0.8893 | 0.8947 |
| 77 | 0.8212 | 0.8290 | 0.8368 | 0.8443 | 0.8517 | 0.8589 | 0.8658 | 0.8723 | 0.8785 | 0.8844 |
| 78 | 0.8060 | 0.8142 | 0.8224 | 0.8305 | 0.8383 | 0.8460 | 0.8533 | 0.8603 | 0.8670 | 0.8733 |
| 79 | 0.7899 | 0.7986 | 0.8072 | 0.8157 | 0.8240 | 0.8322 | 0.8400 | 0.8475 | 0.8547 | 0.8614 |
| 80 | 0.7730 | 0.7821 | 0.7911 | 0.8001 | 0.8089 | 0.8175 | 0.8258 | 0.8338 | 0.8415 | 0.8487 |

TM:619767 / 01096280 / 04/03/2023    Appendix A-1  (Page 8 of 9)

|  | Spouse Age | | | | | | | |
| Retiree Age | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 |
|---|---|---|---|---|---|---|---|---|
| 28 | 0.9987 | 0.9988 | 0.9989 | 0.9989 | 0.9990 | 0.9990 | 0.9991 | 0.9991 |
| 29 | 0.9986 | 0.9986 | 0.9987 | 0.9988 | 0.9988 | 0.9989 | 0.9989 | 0.9990 |
| 30 | 0.9983 | 0.9984 | 0.9985 | 0.9985 | 0.9986 | 0.9987 | 0.9987 | 0.9988 |
| 31 | 0.9982 | 0.9983 | 0.9984 | 0.9984 | 0.9985 | 0.9986 | 0.9986 | 0.9987 |
| 32 | 0.9981 | 0.9982 | 0.9983 | 0.9983 | 0.9984 | 0.9985 | 0.9985 | 0.9986 |
| 33 | 0.9980 | 0.9981 | 0.9981 | 0.9982 | 0.9983 | 0.9984 | 0.9984 | 0.9985 |
| 34 | 0.9979 | 0.9980 | 0.9980 | 0.9981 | 0.9982 | 0.9983 | 0.9983 | 0.9984 |
| 35 | 0.9977 | 0.9979 | 0.9979 | 0.9980 | 0.9981 | 0.9982 | 0.9983 | 0.9983 |
| 36 | 0.9976 | 0.9978 | 0.9979 | 0.9979 | 0.9980 | 0.9981 | 0.9982 | 0.9983 |
| 37 | 0.9976 | 0.9977 | 0.9978 | 0.9979 | 0.9979 | 0.9980 | 0.9981 | 0.9982 |
| 38 | 0.9975 | 0.9976 | 0.9977 | 0.9978 | 0.9979 | 0.9980 | 0.9980 | 0.9981 |
| 39 | 0.9973 | 0.9975 | 0.9976 | 0.9977 | 0.9978 | 0.9979 | 0.9980 | 0.9980 |
| 40 | 0.9972 | 0.9974 | 0.9975 | 0.9976 | 0.9977 | 0.9978 | 0.9979 | 0.9980 |
| 41 | 0.9971 | 0.9972 | 0.9974 | 0.9975 | 0.9976 | 0.9977 | 0.9978 | 0.9979 |
| 42 | 0.9969 | 0.9971 | 0.9972 | 0.9973 | 0.9975 | 0.9976 | 0.9977 | 0.9978 |
| 43 | 0.9967 | 0.9969 | 0.9971 | 0.9972 | 0.9973 | 0.9974 | 0.9975 | 0.9976 |
| 44 | 0.9965 | 0.9967 | 0.9969 | 0.9970 | 0.9972 | 0.9973 | 0.9974 | 0.9975 |
| 45 | 0.9963 | 0.9965 | 0.9967 | 0.9968 | 0.9970 | 0.9971 | 0.9972 | 0.9973 |
| 46 | 0.9960 | 0.9962 | 0.9964 | 0.9966 | 0.9968 | 0.9969 | 0.9970 | 0.9972 |
| 47 | 0.9957 | 0.9959 | 0.9961 | 0.9963 | 0.9965 | 0.9967 | 0.9968 | 0.9970 |
| 48 | 0.9953 | 0.9956 | 0.9958 | 0.9960 | 0.9962 | 0.9964 | 0.9966 | 0.9967 |
| 49 | 0.9948 | 0.9951 | 0.9954 | 0.9956 | 0.9958 | 0.9961 | 0.9962 | 0.9964 |
| 50 | 0.9942 | 0.9945 | 0.9949 | 0.9951 | 0.9954 | 0.9956 | 0.9958 | 0.9960 |
| 51 | 0.9935 | 0.9939 | 0.9942 | 0.9945 | 0.9948 | 0.9951 | 0.9953 | 0.9955 |
| 52 | 0.9927 | 0.9931 | 0.9935 | 0.9938 | 0.9942 | 0.9945 | 0.9947 | 0.9950 |
| 53 | 0.9917 | 0.9921 | 0.9926 | 0.9930 | 0.9934 | 0.9937 | 0.9940 | 0.9943 |
| 54 | 0.9905 | 0.9910 | 0.9915 | 0.9920 | 0.9924 | 0.9928 | 0.9932 | 0.9935 |
| 55 | 0.9891 | 0.9897 | 0.9903 | 0.9908 | 0.9913 | 0.9917 | 0.9921 | 0.9925 |
| 56 | 0.9875 | 0.9882 | 0.9889 | 0.9895 | 0.9900 | 0.9905 | 0.9910 | 0.9914 |
| 57 | 0.9858 | 0.9866 | 0.9874 | 0.9880 | 0.9886 | 0.9892 | 0.9897 | 0.9902 |
| 58 | 0.9839 | 0.9848 | 0.9857 | 0.9864 | 0.9871 | 0.9877 | 0.9883 | 0.9889 |
| 59 | 0.9819 | 0.9829 | 0.9838 | 0.9846 | 0.9854 | 0.9861 | 0.9868 | 0.9874 |
| 60 | 0.9795 | 0.9806 | 0.9817 | 0.9826 | 0.9835 | 0.9843 | 0.9850 | 0.9857 |
| 61 | 0.9770 | 0.9782 | 0.9793 | 0.9804 | 0.9813 | 0.9822 | 0.9830 | 0.9838 |
| 62 | 0.9742 | 0.9755 | 0.9768 | 0.9779 | 0.9790 | 0.9800 | 0.9809 | 0.9817 |
| 63 | 0.9711 | 0.9726 | 0.9740 | 0.9753 | 0.9765 | 0.9775 | 0.9785 | 0.9795 |
| 64 | 0.9679 | 0.9696 | 0.9711 | 0.9725 | 0.9738 | 0.9750 | 0.9761 | 0.9771 |
| 65 | 0.9644 | 0.9662 | 0.9679 | 0.9695 | 0.9709 | 0.9722 | 0.9734 | 0.9746 |
| 66 | 0.9607 | 0.9627 | 0.9645 | 0.9662 | 0.9677 | 0.9692 | 0.9705 | 0.9718 |
| 67 | 0.9568 | 0.9589 | 0.9609 | 0.9628 | 0.9645 | 0.9661 | 0.9675 | 0.9689 |
| 68 | 0.9526 | 0.9550 | 0.9571 | 0.9592 | 0.9610 | 0.9628 | 0.9644 | 0.9659 |
| 69 | 0.9480 | 0.9505 | 0.9529 | 0.9552 | 0.9572 | 0.9591 | 0.9608 | 0.9625 |
| 70 | 0.9429 | 0.9457 | 0.9483 | 0.9508 | 0.9530 | 0.9551 | 0.9570 | 0.9588 |
| 71 | 0.9374 | 0.9405 | 0.9434 | 0.9460 | 0.9484 | 0.9507 | 0.9528 | 0.9548 |
| 72 | 0.9313 | 0.9347 | 0.9378 | 0.9407 | 0.9434 | 0.9458 | 0.9481 | 0.9503 |
| 73 | 0.9246 | 0.9282 | 0.9316 | 0.9348 | 0.9377 | 0.9404 | 0.9429 | 0.9453 |
| 74 | 0.9170 | 0.9210 | 0.9248 | 0.9282 | 0.9314 | 0.9343 | 0.9371 | 0.9396 |
| 75 | 0.9087 | 0.9131 | 0.9171 | 0.9209 | 0.9243 | 0.9275 | 0.9305 | 0.9333 |
| 76 | 0.8997 | 0.9045 | 0.9088 | 0.9129 | 0.9167 | 0.9202 | 0.9234 | 0.9265 |
| 77 | 0.8899 | 0.8950 | 0.8997 | 0.9041 | 0.9082 | 0.9120 | 0.9156 | 0.9189 |
| 78 | 0.8792 | 0.8847 | 0.8899 | 0.8946 | 0.8991 | 0.9032 | 0.9070 | 0.9106 |
| 79 | 0.8678 | 0.8737 | 0.8792 | 0.8844 | 0.8891 | 0.8936 | 0.8977 | 0.9017 |
| 80 | 0.8555 | 0.8618 | 0.8678 | 0.8733 | 0.8785 | 0.8833 | 0.8877 | 0.8920 |

TM:619767 / 01096280 / 04/03/2023

Appendix A-1  (Page 9 of 9)

## APPENDIX A-2.  ADJUSTMENT FACTORS FOR THE JOINT AND 75% SURVIVING SPOUSE OPTION

**Section 1.**    The table below shall be used to calculate the Joint and 75% Surviving Spouse Option form of payment if applicable.

| | Spouse Age | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Retiree Age | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 |
| 28 | 0.9738 | 0.9746 | 0.9754 | 0.9762 | 0.9770 | 0.9778 | 0.9785 | 0.9793 | 0.9801 | 0.9808 |
| 29 | 0.9715 | 0.9724 | 0.9732 | 0.9741 | 0.9749 | 0.9758 | 0.9766 | 0.9774 | 0.9782 | 0.9790 |
| 30 | 0.9691 | 0.9700 | 0.9709 | 0.9718 | 0.9727 | 0.9736 | 0.9745 | 0.9754 | 0.9762 | 0.9771 |
| 31 | 0.9667 | 0.9676 | 0.9686 | 0.9695 | 0.9705 | 0.9714 | 0.9724 | 0.9733 | 0.9743 | 0.9752 |
| 32 | 0.9641 | 0.9651 | 0.9661 | 0.9671 | 0.9681 | 0.9691 | 0.9701 | 0.9711 | 0.9721 | 0.9731 |
| 33 | 0.9614 | 0.9624 | 0.9635 | 0.9645 | 0.9656 | 0.9667 | 0.9677 | 0.9688 | 0.9699 | 0.9709 |
| 34 | 0.9585 | 0.9596 | 0.9607 | 0.9618 | 0.9629 | 0.9640 | 0.9652 | 0.9663 | 0.9674 | 0.9685 |
| 35 | 0.9554 | 0.9565 | 0.9577 | 0.9589 | 0.9600 | 0.9612 | 0.9624 | 0.9636 | 0.9648 | 0.9660 |
| 36 | 0.9521 | 0.9533 | 0.9545 | 0.9557 | 0.9569 | 0.9582 | 0.9594 | 0.9607 | 0.9620 | 0.9632 |
| 37 | 0.9486 | 0.9498 | 0.9511 | 0.9523 | 0.9536 | 0.9549 | 0.9562 | 0.9576 | 0.9589 | 0.9602 |
| 38 | 0.9448 | 0.9461 | 0.9474 | 0.9487 | 0.9501 | 0.9514 | 0.9528 | 0.9542 | 0.9556 | 0.9570 |
| 39 | 0.9408 | 0.9421 | 0.9435 | 0.9448 | 0.9462 | 0.9477 | 0.9491 | 0.9506 | 0.9520 | 0.9535 |
| 40 | 0.9365 | 0.9378 | 0.9392 | 0.9407 | 0.9421 | 0.9436 | 0.9451 | 0.9466 | 0.9482 | 0.9497 |
| 41 | 0.9319 | 0.9333 | 0.9347 | 0.9362 | 0.9377 | 0.9392 | 0.9408 | 0.9424 | 0.9440 | 0.9457 |
| 42 | 0.9270 | 0.9284 | 0.9299 | 0.9314 | 0.9330 | 0.9346 | 0.9362 | 0.9378 | 0.9395 | 0.9412 |
| 43 | 0.9217 | 0.9232 | 0.9247 | 0.9263 | 0.9279 | 0.9295 | 0.9312 | 0.9329 | 0.9347 | 0.9365 |
| 44 | 0.9161 | 0.9176 | 0.9192 | 0.9208 | 0.9224 | 0.9241 | 0.9259 | 0.9277 | 0.9295 | 0.9313 |
| 45 | 0.9102 | 0.9117 | 0.9133 | 0.9149 | 0.9166 | 0.9184 | 0.9202 | 0.9220 | 0.9239 | 0.9258 |
| 46 | 0.9038 | 0.9054 | 0.9070 | 0.9087 | 0.9104 | 0.9122 | 0.9141 | 0.9160 | 0.9179 | 0.9199 |
| 47 | 0.8971 | 0.8987 | 0.9003 | 0.9020 | 0.9038 | 0.9057 | 0.9075 | 0.9095 | 0.9115 | 0.9135 |
| 48 | 0.8899 | 0.8915 | 0.8932 | 0.8949 | 0.8968 | 0.8986 | 0.9006 | 0.9026 | 0.9046 | 0.9067 |
| 49 | 0.8822 | 0.8839 | 0.8856 | 0.8874 | 0.8892 | 0.8911 | 0.8931 | 0.8951 | 0.8973 | 0.8994 |
| 50 | 0.8741 | 0.8758 | 0.8775 | 0.8793 | 0.8812 | 0.8831 | 0.8851 | 0.8872 | 0.8894 | 0.8916 |
| 51 | 0.8654 | 0.8671 | 0.8689 | 0.8707 | 0.8726 | 0.8746 | 0.8766 | 0.8788 | 0.8810 | 0.8832 |
| 52 | 0.8563 | 0.8580 | 0.8598 | 0.8617 | 0.8636 | 0.8656 | 0.8677 | 0.8698 | 0.8721 | 0.8744 |
| 53 | 0.8467 | 0.8484 | 0.8502 | 0.8521 | 0.8540 | 0.8560 | 0.8582 | 0.8603 | 0.8626 | 0.8650 |
| 54 | 0.8365 | 0.8382 | 0.8400 | 0.8419 | 0.8439 | 0.8459 | 0.8481 | 0.8503 | 0.8526 | 0.8550 |
| 55 | 0.8258 | 0.8275 | 0.8293 | 0.8312 | 0.8332 | 0.8353 | 0.8374 | 0.8397 | 0.8420 | 0.8444 |
| 56 | 0.8146 | 0.8164 | 0.8182 | 0.8201 | 0.8221 | 0.8241 | 0.8263 | 0.8286 | 0.8309 | 0.8334 |
| 57 | 0.8031 | 0.8048 | 0.8066 | 0.8085 | 0.8105 | 0.8126 | 0.8148 | 0.8171 | 0.8194 | 0.8219 |
| 58 | 0.7910 | 0.7928 | 0.7946 | 0.7965 | 0.7985 | 0.8006 | 0.8028 | 0.8051 | 0.8075 | 0.8100 |
| 59 | 0.7786 | 0.7803 | 0.7821 | 0.7840 | 0.7860 | 0.7881 | 0.7903 | 0.7926 | 0.7950 | 0.7975 |
| 60 | 0.7656 | 0.7673 | 0.7691 | 0.7710 | 0.7730 | 0.7751 | 0.7773 | 0.7796 | 0.7820 | 0.7846 |
| 61 | 0.7522 | 0.7539 | 0.7557 | 0.7576 | 0.7596 | 0.7617 | 0.7639 | 0.7662 | 0.7686 | 0.7711 |
| 62 | 0.7384 | 0.7401 | 0.7419 | 0.7438 | 0.7458 | 0.7479 | 0.7501 | 0.7524 | 0.7548 | 0.7573 |
| 63 | 0.7243 | 0.7260 | 0.7277 | 0.7296 | 0.7316 | 0.7336 | 0.7358 | 0.7381 | 0.7405 | 0.7430 |
| 64 | 0.7098 | 0.7115 | 0.7133 | 0.7151 | 0.7171 | 0.7191 | 0.7213 | 0.7236 | 0.7260 | 0.7285 |
| 65 | 0.6950 | 0.6967 | 0.6984 | 0.7002 | 0.7022 | 0.7042 | 0.7064 | 0.7086 | 0.7110 | 0.7135 |
| 66 | 0.6798 | 0.6815 | 0.6832 | 0.6850 | 0.6869 | 0.6889 | 0.6911 | 0.6933 | 0.6957 | 0.6982 |
| 67 | 0.6644 | 0.6661 | 0.6678 | 0.6696 | 0.6715 | 0.6735 | 0.6756 | 0.6778 | 0.6801 | 0.6826 |
| 68 | 0.6487 | 0.6503 | 0.6520 | 0.6538 | 0.6557 | 0.6576 | 0.6597 | 0.6619 | 0.6642 | 0.6667 |
| 69 | 0.6325 | 0.6341 | 0.6358 | 0.6375 | 0.6394 | 0.6413 | 0.6434 | 0.6456 | 0.6478 | 0.6502 |
| 70 | 0.6160 | 0.6175 | 0.6191 | 0.6209 | 0.6227 | 0.6246 | 0.6266 | 0.6288 | 0.6310 | 0.6334 |
| 71 | 0.5990 | 0.6006 | 0.6022 | 0.6039 | 0.6056 | 0.6075 | 0.6095 | 0.6116 | 0.6138 | 0.6162 |
| 72 | 0.5816 | 0.5831 | 0.5847 | 0.5864 | 0.5881 | 0.5900 | 0.5919 | 0.5940 | 0.5962 | 0.5985 |
| 73 | 0.5638 | 0.5653 | 0.5668 | 0.5684 | 0.5701 | 0.5720 | 0.5739 | 0.5759 | 0.5780 | 0.5803 |
| 74 | 0.5455 | 0.5470 | 0.5485 | 0.5501 | 0.5517 | 0.5535 | 0.5554 | 0.5574 | 0.5595 | 0.5617 |
| 75 | 0.5269 | 0.5283 | 0.5298 | 0.5313 | 0.5330 | 0.5347 | 0.5365 | 0.5384 | 0.5405 | 0.5426 |
| 76 | 0.5081 | 0.5095 | 0.5109 | 0.5124 | 0.5140 | 0.5157 | 0.5175 | 0.5194 | 0.5214 | 0.5235 |
| 77 | 0.4891 | 0.4904 | 0.4918 | 0.4932 | 0.4948 | 0.4964 | 0.4982 | 0.5000 | 0.5019 | 0.5040 |
| 78 | 0.4700 | 0.4712 | 0.4726 | 0.4740 | 0.4755 | 0.4771 | 0.4788 | 0.4806 | 0.4824 | 0.4844 |
| 79 | 0.4509 | 0.4521 | 0.4534 | 0.4548 | 0.4562 | 0.4578 | 0.4594 | 0.4611 | 0.4630 | 0.4649 |
| 80 | 0.4318 | 0.4330 | 0.4343 | 0.4356 | 0.4370 | 0.4385 | 0.4401 | 0.4417 | 0.4435 | 0.4454 |

- 85 -

|              | Spouse Age |        |        |        |        |        |        |        |        |        |
|--------------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| Retiree Age  | 38     | 39     | 40     | 41     | 42     | 43     | 44     | 45     | 46     | 47     |
| 28 | 0.9815 | 0.9822 | 0.9829 | 0.9835 | 0.9842 | 0.9848 | 0.9854 | 0.9860 | 0.9866 | 0.9871 |
| 29 | 0.9798 | 0.9805 | 0.9813 | 0.9820 | 0.9827 | 0.9834 | 0.9840 | 0.9847 | 0.9853 | 0.9859 |
| 30 | 0.9779 | 0.9787 | 0.9795 | 0.9803 | 0.9811 | 0.9818 | 0.9825 | 0.9832 | 0.9839 | 0.9846 |
| 31 | 0.9761 | 0.9770 | 0.9778 | 0.9787 | 0.9795 | 0.9803 | 0.9811 | 0.9818 | 0.9826 | 0.9833 |
| 32 | 0.9741 | 0.9750 | 0.9760 | 0.9769 | 0.9778 | 0.9787 | 0.9795 | 0.9803 | 0.9811 | 0.9819 |
| 33 | 0.9720 | 0.9730 | 0.9740 | 0.9750 | 0.9759 | 0.9769 | 0.9778 | 0.9787 | 0.9796 | 0.9804 |
| 34 | 0.9697 | 0.9707 | 0.9718 | 0.9729 | 0.9739 | 0.9750 | 0.9760 | 0.9769 | 0.9779 | 0.9788 |
| 35 | 0.9672 | 0.9683 | 0.9695 | 0.9706 | 0.9718 | 0.9729 | 0.9740 | 0.9750 | 0.9761 | 0.9771 |
| 36 | 0.9645 | 0.9657 | 0.9670 | 0.9682 | 0.9694 | 0.9706 | 0.9718 | 0.9729 | 0.9740 | 0.9751 |
| 37 | 0.9616 | 0.9629 | 0.9642 | 0.9656 | 0.9668 | 0.9681 | 0.9694 | 0.9706 | 0.9718 | 0.9730 |
| 38 | 0.9584 | 0.9599 | 0.9613 | 0.9627 | 0.9640 | 0.9654 | 0.9668 | 0.9681 | 0.9694 | 0.9707 |
| 39 | 0.9550 | 0.9565 | 0.9580 | 0.9595 | 0.9610 | 0.9625 | 0.9639 | 0.9653 | 0.9668 | 0.9681 |
| 40 | 0.9513 | 0.9529 | 0.9545 | 0.9561 | 0.9576 | 0.9592 | 0.9608 | 0.9623 | 0.9638 | 0.9653 |
| 41 | 0.9473 | 0.9490 | 0.9506 | 0.9523 | 0.9540 | 0.9556 | 0.9573 | 0.9589 | 0.9606 | 0.9622 |
| 42 | 0.9430 | 0.9447 | 0.9465 | 0.9482 | 0.9500 | 0.9518 | 0.9535 | 0.9553 | 0.9570 | 0.9587 |
| 43 | 0.9383 | 0.9401 | 0.9419 | 0.9438 | 0.9457 | 0.9475 | 0.9494 | 0.9513 | 0.9531 | 0.9550 |
| 44 | 0.9332 | 0.9351 | 0.9370 | 0.9390 | 0.9410 | 0.9429 | 0.9449 | 0.9469 | 0.9489 | 0.9508 |
| 45 | 0.9278 | 0.9298 | 0.9318 | 0.9338 | 0.9359 | 0.9380 | 0.9400 | 0.9421 | 0.9442 | 0.9463 |
| 46 | 0.9219 | 0.9240 | 0.9261 | 0.9282 | 0.9304 | 0.9326 | 0.9347 | 0.9370 | 0.9392 | 0.9414 |
| 47 | 0.9156 | 0.9178 | 0.9200 | 0.9222 | 0.9244 | 0.9267 | 0.9290 | 0.9313 | 0.9337 | 0.9360 |
| 48 | 0.9089 | 0.9111 | 0.9134 | 0.9157 | 0.9180 | 0.9204 | 0.9228 | 0.9252 | 0.9277 | 0.9301 |
| 49 | 0.9016 | 0.9039 | 0.9063 | 0.9086 | 0.9111 | 0.9136 | 0.9161 | 0.9186 | 0.9212 | 0.9238 |
| 50 | 0.8939 | 0.8962 | 0.8986 | 0.9011 | 0.9036 | 0.9062 | 0.9088 | 0.9115 | 0.9141 | 0.9169 |
| 51 | 0.8856 | 0.8880 | 0.8905 | 0.8930 | 0.8956 | 0.8983 | 0.9010 | 0.9037 | 0.9065 | 0.9094 |
| 52 | 0.8768 | 0.8792 | 0.8818 | 0.8844 | 0.8871 | 0.8898 | 0.8926 | 0.8955 | 0.8984 | 0.9013 |
| 53 | 0.8674 | 0.8699 | 0.8725 | 0.8752 | 0.8780 | 0.8808 | 0.8837 | 0.8866 | 0.8896 | 0.8927 |
| 54 | 0.8575 | 0.8601 | 0.8627 | 0.8654 | 0.8683 | 0.8712 | 0.8741 | 0.8772 | 0.8803 | 0.8835 |
| 55 | 0.8470 | 0.8496 | 0.8523 | 0.8551 | 0.8579 | 0.8609 | 0.8640 | 0.8671 | 0.8703 | 0.8736 |
| 56 | 0.8359 | 0.8386 | 0.8413 | 0.8442 | 0.8471 | 0.8502 | 0.8533 | 0.8565 | 0.8598 | 0.8632 |
| 57 | 0.8245 | 0.8272 | 0.8300 | 0.8329 | 0.8359 | 0.8389 | 0.8421 | 0.8454 | 0.8488 | 0.8523 |
| 58 | 0.8126 | 0.8153 | 0.8181 | 0.8210 | 0.8241 | 0.8272 | 0.8305 | 0.8338 | 0.8373 | 0.8408 |
| 59 | 0.8001 | 0.8029 | 0.8057 | 0.8087 | 0.8118 | 0.8150 | 0.8183 | 0.8217 | 0.8252 | 0.8288 |
| 60 | 0.7872 | 0.7900 | 0.7928 | 0.7958 | 0.7989 | 0.8022 | 0.8055 | 0.8090 | 0.8126 | 0.8163 |
| 61 | 0.7738 | 0.7765 | 0.7794 | 0.7824 | 0.7856 | 0.7888 | 0.7922 | 0.7957 | 0.7994 | 0.8032 |
| 62 | 0.7599 | 0.7627 | 0.7656 | 0.7686 | 0.7718 | 0.7751 | 0.7785 | 0.7821 | 0.7857 | 0.7896 |
| 63 | 0.7457 | 0.7485 | 0.7514 | 0.7544 | 0.7576 | 0.7609 | 0.7643 | 0.7679 | 0.7716 | 0.7755 |
| 64 | 0.7311 | 0.7339 | 0.7368 | 0.7398 | 0.7430 | 0.7463 | 0.7498 | 0.7534 | 0.7572 | 0.7611 |
| 65 | 0.7162 | 0.7189 | 0.7218 | 0.7248 | 0.7280 | 0.7313 | 0.7348 | 0.7385 | 0.7422 | 0.7462 |
| 66 | 0.7008 | 0.7035 | 0.7064 | 0.7094 | 0.7126 | 0.7159 | 0.7194 | 0.7231 | 0.7269 | 0.7308 |
| 67 | 0.6852 | 0.6879 | 0.6908 | 0.6938 | 0.6970 | 0.7003 | 0.7038 | 0.7074 | 0.7112 | 0.7152 |
| 68 | 0.6692 | 0.6719 | 0.6748 | 0.6778 | 0.6809 | 0.6842 | 0.6877 | 0.6913 | 0.6951 | 0.6991 |
| 69 | 0.6528 | 0.6555 | 0.6583 | 0.6612 | 0.6644 | 0.6676 | 0.6711 | 0.6747 | 0.6785 | 0.6825 |
| 70 | 0.6359 | 0.6386 | 0.6413 | 0.6443 | 0.6474 | 0.6506 | 0.6540 | 0.6576 | 0.6614 | 0.6654 |
| 71 | 0.6187 | 0.6213 | 0.6240 | 0.6269 | 0.6300 | 0.6332 | 0.6366 | 0.6401 | 0.6439 | 0.6478 |
| 72 | 0.6009 | 0.6035 | 0.6062 | 0.6090 | 0.6120 | 0.6152 | 0.6186 | 0.6221 | 0.6258 | 0.6297 |
| 73 | 0.5827 | 0.5852 | 0.5878 | 0.5907 | 0.5936 | 0.5967 | 0.6000 | 0.6035 | 0.6072 | 0.6110 |
| 74 | 0.5640 | 0.5665 | 0.5691 | 0.5718 | 0.5747 | 0.5778 | 0.5810 | 0.5845 | 0.5881 | 0.5919 |
| 75 | 0.5449 | 0.5473 | 0.5499 | 0.5526 | 0.5554 | 0.5584 | 0.5616 | 0.5650 | 0.5685 | 0.5722 |
| 76 | 0.5257 | 0.5280 | 0.5305 | 0.5331 | 0.5359 | 0.5389 | 0.5420 | 0.5453 | 0.5487 | 0.5524 |
| 77 | 0.5061 | 0.5084 | 0.5108 | 0.5134 | 0.5161 | 0.5190 | 0.5220 | 0.5252 | 0.5286 | 0.5322 |
| 78 | 0.4865 | 0.4888 | 0.4911 | 0.4936 | 0.4962 | 0.4990 | 0.5020 | 0.5051 | 0.5084 | 0.5119 |
| 79 | 0.4669 | 0.4691 | 0.4713 | 0.4738 | 0.4763 | 0.4790 | 0.4819 | 0.4849 | 0.4882 | 0.4916 |
| 80 | 0.4473 | 0.4494 | 0.4516 | 0.4540 | 0.4564 | 0.4591 | 0.4618 | 0.4648 | 0.4679 | 0.4712 |

TM:619767 / 01096280 / 04/03/2023                    Appendix A-2  (Page 2 of 7)

| | Spouse Age | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Retiree Age | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 |
| 28 | 0.9876 | 0.9881 | 0.9886 | 0.9891 | 0.9895 | 0.9899 | 0.9904 | 0.9907 | 0.9911 | 0.9915 |
| 29 | 0.9865 | 0.9870 | 0.9875 | 0.9881 | 0.9885 | 0.9890 | 0.9895 | 0.9899 | 0.9903 | 0.9907 |
| 30 | 0.9852 | 0.9858 | 0.9864 | 0.9869 | 0.9875 | 0.9880 | 0.9885 | 0.9889 | 0.9894 | 0.9898 |
| 31 | 0.9840 | 0.9846 | 0.9853 | 0.9859 | 0.9865 | 0.9871 | 0.9876 | 0.9881 | 0.9886 | 0.9891 |
| 32 | 0.9827 | 0.9834 | 0.9841 | 0.9848 | 0.9854 | 0.9860 | 0.9866 | 0.9872 | 0.9878 | 0.9883 |
| 33 | 0.9813 | 0.9821 | 0.9828 | 0.9836 | 0.9843 | 0.9850 | 0.9856 | 0.9862 | 0.9868 | 0.9874 |
| 34 | 0.9797 | 0.9806 | 0.9814 | 0.9822 | 0.9830 | 0.9838 | 0.9845 | 0.9852 | 0.9859 | 0.9865 |
| 35 | 0.9780 | 0.9790 | 0.9799 | 0.9808 | 0.9817 | 0.9825 | 0.9833 | 0.9840 | 0.9848 | 0.9855 |
| 36 | 0.9762 | 0.9772 | 0.9782 | 0.9792 | 0.9802 | 0.9811 | 0.9819 | 0.9828 | 0.9836 | 0.9843 |
| 37 | 0.9742 | 0.9753 | 0.9764 | 0.9775 | 0.9785 | 0.9795 | 0.9804 | 0.9814 | 0.9822 | 0.9831 |
| 38 | 0.9720 | 0.9732 | 0.9744 | 0.9755 | 0.9767 | 0.9777 | 0.9788 | 0.9798 | 0.9808 | 0.9817 |
| 39 | 0.9695 | 0.9708 | 0.9721 | 0.9734 | 0.9746 | 0.9758 | 0.9769 | 0.9780 | 0.9791 | 0.9801 |
| 40 | 0.9668 | 0.9682 | 0.9696 | 0.9710 | 0.9723 | 0.9736 | 0.9749 | 0.9761 | 0.9772 | 0.9784 |
| 41 | 0.9638 | 0.9653 | 0.9668 | 0.9683 | 0.9698 | 0.9712 | 0.9725 | 0.9739 | 0.9751 | 0.9764 |
| 42 | 0.9604 | 0.9621 | 0.9637 | 0.9654 | 0.9669 | 0.9685 | 0.9699 | 0.9714 | 0.9728 | 0.9741 |
| 43 | 0.9568 | 0.9586 | 0.9603 | 0.9621 | 0.9638 | 0.9654 | 0.9671 | 0.9686 | 0.9702 | 0.9716 |
| 44 | 0.9528 | 0.9547 | 0.9566 | 0.9585 | 0.9603 | 0.9621 | 0.9638 | 0.9656 | 0.9672 | 0.9688 |
| 45 | 0.9484 | 0.9504 | 0.9525 | 0.9545 | 0.9565 | 0.9584 | 0.9603 | 0.9621 | 0.9639 | 0.9657 |
| 46 | 0.9436 | 0.9458 | 0.9479 | 0.9501 | 0.9522 | 0.9543 | 0.9564 | 0.9584 | 0.9603 | 0.9622 |
| 47 | 0.9383 | 0.9407 | 0.9430 | 0.9453 | 0.9475 | 0.9498 | 0.9520 | 0.9542 | 0.9563 | 0.9583 |
| 48 | 0.9326 | 0.9351 | 0.9375 | 0.9400 | 0.9424 | 0.9448 | 0.9472 | 0.9495 | 0.9518 | 0.9540 |
| 49 | 0.9264 | 0.9290 | 0.9316 | 0.9342 | 0.9368 | 0.9393 | 0.9419 | 0.9444 | 0.9468 | 0.9492 |
| 50 | 0.9196 | 0.9223 | 0.9251 | 0.9278 | 0.9306 | 0.9333 | 0.9360 | 0.9387 | 0.9413 | 0.9439 |
| 51 | 0.9122 | 0.9151 | 0.9180 | 0.9209 | 0.9238 | 0.9267 | 0.9296 | 0.9324 | 0.9353 | 0.9380 |
| 52 | 0.9043 | 0.9074 | 0.9104 | 0.9135 | 0.9165 | 0.9196 | 0.9226 | 0.9257 | 0.9287 | 0.9317 |
| 53 | 0.8958 | 0.8990 | 0.9022 | 0.9054 | 0.9086 | 0.9118 | 0.9151 | 0.9183 | 0.9215 | 0.9246 |
| 54 | 0.8867 | 0.8900 | 0.8933 | 0.8967 | 0.9000 | 0.9034 | 0.9068 | 0.9102 | 0.9136 | 0.9170 |
| 55 | 0.8769 | 0.8803 | 0.8838 | 0.8873 | 0.8908 | 0.8944 | 0.8980 | 0.9015 | 0.9051 | 0.9087 |
| 56 | 0.8666 | 0.8701 | 0.8737 | 0.8774 | 0.8810 | 0.8848 | 0.8885 | 0.8923 | 0.8960 | 0.8998 |
| 57 | 0.8558 | 0.8595 | 0.8632 | 0.8669 | 0.8708 | 0.8746 | 0.8786 | 0.8825 | 0.8865 | 0.8904 |
| 58 | 0.8445 | 0.8482 | 0.8520 | 0.8559 | 0.8599 | 0.8639 | 0.8680 | 0.8721 | 0.8763 | 0.8804 |
| 59 | 0.8326 | 0.8364 | 0.8403 | 0.8444 | 0.8485 | 0.8526 | 0.8568 | 0.8611 | 0.8654 | 0.8698 |
| 60 | 0.8201 | 0.8240 | 0.8281 | 0.8322 | 0.8364 | 0.8407 | 0.8451 | 0.8495 | 0.8540 | 0.8585 |
| 61 | 0.8071 | 0.8111 | 0.8152 | 0.8194 | 0.8237 | 0.8282 | 0.8327 | 0.8373 | 0.8419 | 0.8466 |
| 62 | 0.7935 | 0.7976 | 0.8018 | 0.8061 | 0.8106 | 0.8151 | 0.8198 | 0.8245 | 0.8293 | 0.8342 |
| 63 | 0.7795 | 0.7837 | 0.7879 | 0.7924 | 0.7969 | 0.8015 | 0.8063 | 0.8112 | 0.8161 | 0.8212 |
| 64 | 0.7652 | 0.7694 | 0.7737 | 0.7782 | 0.7828 | 0.7876 | 0.7924 | 0.7974 | 0.8025 | 0.8077 |
| 65 | 0.7503 | 0.7545 | 0.7589 | 0.7635 | 0.7682 | 0.7730 | 0.7780 | 0.7831 | 0.7883 | 0.7936 |
| 66 | 0.7349 | 0.7392 | 0.7437 | 0.7483 | 0.7530 | 0.7580 | 0.7630 | 0.7682 | 0.7735 | 0.7790 |
| 67 | 0.7193 | 0.7236 | 0.7281 | 0.7328 | 0.7376 | 0.7426 | 0.7477 | 0.7530 | 0.7584 | 0.7640 |
| 68 | 0.7033 | 0.7076 | 0.7121 | 0.7168 | 0.7217 | 0.7267 | 0.7319 | 0.7373 | 0.7428 | 0.7485 |
| 69 | 0.6866 | 0.6910 | 0.6955 | 0.7002 | 0.7051 | 0.7102 | 0.7154 | 0.7209 | 0.7265 | 0.7322 |
| 70 | 0.6695 | 0.6739 | 0.6784 | 0.6831 | 0.6880 | 0.6931 | 0.6984 | 0.7039 | 0.7095 | 0.7154 |
| 71 | 0.6519 | 0.6563 | 0.6608 | 0.6655 | 0.6704 | 0.6755 | 0.6809 | 0.6864 | 0.6921 | 0.6980 |
| 72 | 0.6338 | 0.6381 | 0.6426 | 0.6473 | 0.6522 | 0.6573 | 0.6627 | 0.6682 | 0.6739 | 0.6799 |
| 73 | 0.6151 | 0.6194 | 0.6238 | 0.6285 | 0.6334 | 0.6385 | 0.6438 | 0.6494 | 0.6551 | 0.6611 |
| 74 | 0.5959 | 0.6001 | 0.6045 | 0.6092 | 0.6140 | 0.6191 | 0.6244 | 0.6299 | 0.6357 | 0.6416 |
| 75 | 0.5762 | 0.5803 | 0.5847 | 0.5893 | 0.5941 | 0.5992 | 0.6044 | 0.6099 | 0.6156 | 0.6216 |
| 76 | 0.5563 | 0.5604 | 0.5647 | 0.5692 | 0.5739 | 0.5789 | 0.5841 | 0.5896 | 0.5953 | 0.6012 |
| 77 | 0.5360 | 0.5400 | 0.5442 | 0.5487 | 0.5534 | 0.5583 | 0.5634 | 0.5688 | 0.5744 | 0.5803 |
| 78 | 0.5156 | 0.5195 | 0.5237 | 0.5280 | 0.5326 | 0.5375 | 0.5425 | 0.5478 | 0.5534 | 0.5592 |
| 79 | 0.4952 | 0.4990 | 0.5031 | 0.5073 | 0.5118 | 0.5165 | 0.5215 | 0.5267 | 0.5322 | 0.5379 |
| 80 | 0.4747 | 0.4785 | 0.4824 | 0.4866 | 0.4910 | 0.4956 | 0.5005 | 0.5056 | 0.5109 | 0.5166 |

|  | Spouse Age | | | | | | | | | |
| Retiree Age | 58 | 59 | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 |
|---|---|---|---|---|---|---|---|---|---|---|
| 28 | 0.9918 | 0.9921 | 0.9925 | 0.9928 | 0.9931 | 0.9933 | 0.9936 | 0.9939 | 0.9941 | 0.9944 |
| 29 | 0.9911 | 0.9914 | 0.9918 | 0.9921 | 0.9924 | 0.9927 | 0.9930 | 0.9933 | 0.9936 | 0.9938 |
| 30 | 0.9902 | 0.9906 | 0.9910 | 0.9914 | 0.9917 | 0.9920 | 0.9924 | 0.9927 | 0.9930 | 0.9932 |
| 31 | 0.9895 | 0.9900 | 0.9904 | 0.9908 | 0.9911 | 0.9915 | 0.9918 | 0.9922 | 0.9925 | 0.9928 |
| 32 | 0.9888 | 0.9893 | 0.9897 | 0.9901 | 0.9905 | 0.9909 | 0.9913 | 0.9917 | 0.9920 | 0.9923 |
| 33 | 0.9880 | 0.9885 | 0.9890 | 0.9895 | 0.9899 | 0.9903 | 0.9908 | 0.9911 | 0.9915 | 0.9919 |
| 34 | 0.9871 | 0.9877 | 0.9882 | 0.9887 | 0.9892 | 0.9897 | 0.9902 | 0.9906 | 0.9910 | 0.9914 |
| 35 | 0.9861 | 0.9868 | 0.9874 | 0.9879 | 0.9885 | 0.9890 | 0.9895 | 0.9900 | 0.9904 | 0.9909 |
| 36 | 0.9851 | 0.9858 | 0.9864 | 0.9871 | 0.9877 | 0.9883 | 0.9888 | 0.9893 | 0.9898 | 0.9903 |
| 37 | 0.9839 | 0.9847 | 0.9854 | 0.9861 | 0.9868 | 0.9874 | 0.9880 | 0.9886 | 0.9891 | 0.9897 |
| 38 | 0.9826 | 0.9834 | 0.9843 | 0.9850 | 0.9858 | 0.9865 | 0.9871 | 0.9878 | 0.9884 | 0.9890 |
| 39 | 0.9811 | 0.9821 | 0.9830 | 0.9838 | 0.9846 | 0.9854 | 0.9862 | 0.9869 | 0.9875 | 0.9882 |
| 40 | 0.9794 | 0.9805 | 0.9815 | 0.9824 | 0.9833 | 0.9842 | 0.9850 | 0.9858 | 0.9865 | 0.9872 |
| 41 | 0.9776 | 0.9787 | 0.9798 | 0.9808 | 0.9818 | 0.9828 | 0.9837 | 0.9846 | 0.9854 | 0.9862 |
| 42 | 0.9754 | 0.9767 | 0.9779 | 0.9791 | 0.9802 | 0.9812 | 0.9822 | 0.9832 | 0.9841 | 0.9850 |
| 43 | 0.9731 | 0.9744 | 0.9758 | 0.9770 | 0.9783 | 0.9794 | 0.9805 | 0.9816 | 0.9826 | 0.9836 |
| 44 | 0.9704 | 0.9719 | 0.9734 | 0.9748 | 0.9761 | 0.9774 | 0.9786 | 0.9798 | 0.9809 | 0.9820 |
| 45 | 0.9674 | 0.9691 | 0.9707 | 0.9722 | 0.9737 | 0.9751 | 0.9764 | 0.9778 | 0.9790 | 0.9802 |
| 46 | 0.9641 | 0.9659 | 0.9676 | 0.9693 | 0.9709 | 0.9725 | 0.9740 | 0.9754 | 0.9768 | 0.9781 |
| 47 | 0.9604 | 0.9623 | 0.9642 | 0.9661 | 0.9678 | 0.9696 | 0.9712 | 0.9728 | 0.9743 | 0.9758 |
| 48 | 0.9562 | 0.9583 | 0.9604 | 0.9624 | 0.9644 | 0.9662 | 0.9681 | 0.9698 | 0.9715 | 0.9731 |
| 49 | 0.9516 | 0.9539 | 0.9562 | 0.9583 | 0.9605 | 0.9625 | 0.9645 | 0.9664 | 0.9683 | 0.9700 |
| 50 | 0.9465 | 0.9490 | 0.9514 | 0.9538 | 0.9561 | 0.9583 | 0.9605 | 0.9626 | 0.9646 | 0.9665 |
| 51 | 0.9408 | 0.9435 | 0.9461 | 0.9487 | 0.9512 | 0.9536 | 0.9560 | 0.9582 | 0.9605 | 0.9626 |
| 52 | 0.9346 | 0.9375 | 0.9403 | 0.9431 | 0.9458 | 0.9484 | 0.9510 | 0.9535 | 0.9559 | 0.9582 |
| 53 | 0.9278 | 0.9309 | 0.9339 | 0.9369 | 0.9398 | 0.9427 | 0.9455 | 0.9482 | 0.9508 | 0.9533 |
| 54 | 0.9203 | 0.9236 | 0.9269 | 0.9301 | 0.9332 | 0.9363 | 0.9393 | 0.9423 | 0.9451 | 0.9479 |
| 55 | 0.9122 | 0.9158 | 0.9192 | 0.9227 | 0.9260 | 0.9293 | 0.9326 | 0.9357 | 0.9388 | 0.9418 |
| 56 | 0.9036 | 0.9073 | 0.9110 | 0.9146 | 0.9182 | 0.9218 | 0.9253 | 0.9287 | 0.9320 | 0.9353 |
| 57 | 0.8944 | 0.8983 | 0.9022 | 0.9061 | 0.9100 | 0.9138 | 0.9175 | 0.9211 | 0.9247 | 0.9282 |
| 58 | 0.8846 | 0.8887 | 0.8929 | 0.8970 | 0.9011 | 0.9051 | 0.9091 | 0.9130 | 0.9169 | 0.9206 |
| 59 | 0.8742 | 0.8785 | 0.8829 | 0.8873 | 0.8916 | 0.8959 | 0.9001 | 0.9043 | 0.9084 | 0.9124 |
| 60 | 0.8631 | 0.8677 | 0.8723 | 0.8768 | 0.8814 | 0.8859 | 0.8904 | 0.8949 | 0.8993 | 0.9036 |
| 61 | 0.8514 | 0.8562 | 0.8610 | 0.8658 | 0.8706 | 0.8754 | 0.8801 | 0.8848 | 0.8895 | 0.8941 |
| 62 | 0.8391 | 0.8441 | 0.8491 | 0.8541 | 0.8592 | 0.8642 | 0.8692 | 0.8742 | 0.8791 | 0.8840 |
| 63 | 0.8263 | 0.8314 | 0.8367 | 0.8419 | 0.8472 | 0.8524 | 0.8577 | 0.8630 | 0.8682 | 0.8734 |
| 64 | 0.8130 | 0.8183 | 0.8237 | 0.8292 | 0.8347 | 0.8402 | 0.8457 | 0.8512 | 0.8567 | 0.8622 |
| 65 | 0.7990 | 0.8046 | 0.8101 | 0.8158 | 0.8215 | 0.8272 | 0.8330 | 0.8388 | 0.8446 | 0.8503 |
| 66 | 0.7846 | 0.7902 | 0.7960 | 0.8018 | 0.8077 | 0.8137 | 0.8197 | 0.8257 | 0.8318 | 0.8378 |
| 67 | 0.7697 | 0.7755 | 0.7814 | 0.7874 | 0.7935 | 0.7997 | 0.8059 | 0.8122 | 0.8185 | 0.8248 |
| 68 | 0.7543 | 0.7602 | 0.7663 | 0.7724 | 0.7787 | 0.7851 | 0.7915 | 0.7980 | 0.8046 | 0.8112 |
| 69 | 0.7381 | 0.7442 | 0.7504 | 0.7567 | 0.7631 | 0.7697 | 0.7763 | 0.7830 | 0.7898 | 0.7967 |
| 70 | 0.7214 | 0.7275 | 0.7339 | 0.7403 | 0.7469 | 0.7536 | 0.7604 | 0.7673 | 0.7743 | 0.7814 |
| 71 | 0.7040 | 0.7103 | 0.7167 | 0.7232 | 0.7299 | 0.7368 | 0.7438 | 0.7509 | 0.7581 | 0.7654 |
| 72 | 0.6860 | 0.6923 | 0.6988 | 0.7054 | 0.7122 | 0.7192 | 0.7263 | 0.7336 | 0.7410 | 0.7485 |
| 73 | 0.6672 | 0.6736 | 0.6801 | 0.6868 | 0.6937 | 0.7008 | 0.7080 | 0.7154 | 0.7230 | 0.7307 |
| 74 | 0.6478 | 0.6542 | 0.6607 | 0.6675 | 0.6745 | 0.6816 | 0.6890 | 0.6965 | 0.7042 | 0.7120 |
| 75 | 0.6277 | 0.6341 | 0.6407 | 0.6475 | 0.6545 | 0.6617 | 0.6691 | 0.6767 | 0.6845 | 0.6925 |
| 76 | 0.6073 | 0.6137 | 0.6203 | 0.6271 | 0.6341 | 0.6413 | 0.6488 | 0.6564 | 0.6643 | 0.6724 |
| 77 | 0.5864 | 0.5927 | 0.5993 | 0.6061 | 0.6131 | 0.6203 | 0.6278 | 0.6355 | 0.6434 | 0.6516 |
| 78 | 0.5652 | 0.5715 | 0.5780 | 0.5848 | 0.5918 | 0.5990 | 0.6064 | 0.6141 | 0.6221 | 0.6303 |
| 79 | 0.5439 | 0.5501 | 0.5566 | 0.5633 | 0.5702 | 0.5774 | 0.5848 | 0.5925 | 0.6004 | 0.6086 |
| 80 | 0.5224 | 0.5286 | 0.5349 | 0.5416 | 0.5484 | 0.5555 | 0.5629 | 0.5705 | 0.5784 | 0.5866 |

Appendix A-2  (Page 4 of 7)

| Retiree Age | Spouse Age 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 |
|---|---|---|---|---|---|---|---|---|---|---|
| 28 | 0.9946 | 0.9948 | 0.9951 | 0.9953 | 0.9955 | 0.9957 | 0.9959 | 0.9961 | 0.9963 | 0.9965 |
| 29 | 0.9941 | 0.9943 | 0.9946 | 0.9948 | 0.9950 | 0.9952 | 0.9955 | 0.9957 | 0.9959 | 0.9961 |
| 30 | 0.9935 | 0.9938 | 0.9940 | 0.9943 | 0.9945 | 0.9947 | 0.9950 | 0.9952 | 0.9954 | 0.9956 |
| 31 | 0.9931 | 0.9934 | 0.9936 | 0.9939 | 0.9942 | 0.9944 | 0.9947 | 0.9949 | 0.9951 | 0.9953 |
| 32 | 0.9927 | 0.9930 | 0.9933 | 0.9935 | 0.9938 | 0.9941 | 0.9943 | 0.9946 | 0.9948 | 0.9951 |
| 33 | 0.9922 | 0.9925 | 0.9929 | 0.9932 | 0.9935 | 0.9937 | 0.9940 | 0.9943 | 0.9945 | 0.9948 |
| 34 | 0.9918 | 0.9921 | 0.9924 | 0.9928 | 0.9931 | 0.9934 | 0.9937 | 0.9940 | 0.9942 | 0.9945 |
| 35 | 0.9913 | 0.9916 | 0.9920 | 0.9924 | 0.9927 | 0.9930 | 0.9934 | 0.9937 | 0.9939 | 0.9942 |
| 36 | 0.9907 | 0.9912 | 0.9916 | 0.9919 | 0.9923 | 0.9927 | 0.9930 | 0.9933 | 0.9936 | 0.9939 |
| 37 | 0.9901 | 0.9906 | 0.9911 | 0.9915 | 0.9919 | 0.9923 | 0.9926 | 0.9930 | 0.9933 | 0.9936 |
| 38 | 0.9895 | 0.9900 | 0.9905 | 0.9910 | 0.9914 | 0.9918 | 0.9922 | 0.9926 | 0.9930 | 0.9933 |
| 39 | 0.9888 | 0.9893 | 0.9899 | 0.9904 | 0.9909 | 0.9913 | 0.9918 | 0.9922 | 0.9926 | 0.9930 |
| 40 | 0.9879 | 0.9885 | 0.9891 | 0.9897 | 0.9902 | 0.9908 | 0.9912 | 0.9917 | 0.9921 | 0.9925 |
| 41 | 0.9869 | 0.9876 | 0.9883 | 0.9889 | 0.9895 | 0.9901 | 0.9906 | 0.9911 | 0.9916 | 0.9921 |
| 42 | 0.9858 | 0.9866 | 0.9873 | 0.9880 | 0.9887 | 0.9893 | 0.9899 | 0.9905 | 0.9910 | 0.9915 |
| 43 | 0.9845 | 0.9854 | 0.9862 | 0.9870 | 0.9877 | 0.9884 | 0.9891 | 0.9897 | 0.9903 | 0.9909 |
| 44 | 0.9830 | 0.9840 | 0.9849 | 0.9858 | 0.9866 | 0.9874 | 0.9881 | 0.9888 | 0.9895 | 0.9901 |
| 45 | 0.9813 | 0.9824 | 0.9834 | 0.9844 | 0.9853 | 0.9862 | 0.9870 | 0.9878 | 0.9885 | 0.9892 |
| 46 | 0.9794 | 0.9806 | 0.9817 | 0.9828 | 0.9838 | 0.9848 | 0.9857 | 0.9866 | 0.9874 | 0.9882 |
| 47 | 0.9772 | 0.9785 | 0.9798 | 0.9810 | 0.9821 | 0.9832 | 0.9843 | 0.9852 | 0.9862 | 0.9870 |
| 48 | 0.9746 | 0.9761 | 0.9775 | 0.9789 | 0.9801 | 0.9814 | 0.9825 | 0.9836 | 0.9847 | 0.9856 |
| 49 | 0.9717 | 0.9734 | 0.9749 | 0.9764 | 0.9778 | 0.9792 | 0.9805 | 0.9817 | 0.9829 | 0.9840 |
| 50 | 0.9684 | 0.9702 | 0.9720 | 0.9736 | 0.9752 | 0.9767 | 0.9781 | 0.9795 | 0.9808 | 0.9821 |
| 51 | 0.9647 | 0.9666 | 0.9686 | 0.9704 | 0.9721 | 0.9738 | 0.9754 | 0.9770 | 0.9784 | 0.9798 |
| 52 | 0.9605 | 0.9627 | 0.9648 | 0.9668 | 0.9687 | 0.9706 | 0.9724 | 0.9741 | 0.9757 | 0.9772 |
| 53 | 0.9558 | 0.9582 | 0.9605 | 0.9627 | 0.9649 | 0.9669 | 0.9689 | 0.9708 | 0.9726 | 0.9743 |
| 54 | 0.9506 | 0.9532 | 0.9557 | 0.9581 | 0.9605 | 0.9628 | 0.9649 | 0.9670 | 0.9690 | 0.9709 |
| 55 | 0.9448 | 0.9476 | 0.9504 | 0.9530 | 0.9556 | 0.9581 | 0.9605 | 0.9628 | 0.9650 | 0.9671 |
| 56 | 0.9384 | 0.9415 | 0.9445 | 0.9474 | 0.9502 | 0.9530 | 0.9556 | 0.9581 | 0.9605 | 0.9629 |
| 57 | 0.9317 | 0.9350 | 0.9383 | 0.9414 | 0.9445 | 0.9475 | 0.9503 | 0.9531 | 0.9558 | 0.9583 |
| 58 | 0.9243 | 0.9279 | 0.9315 | 0.9349 | 0.9382 | 0.9414 | 0.9446 | 0.9476 | 0.9505 | 0.9533 |
| 59 | 0.9164 | 0.9203 | 0.9241 | 0.9278 | 0.9314 | 0.9349 | 0.9383 | 0.9416 | 0.9448 | 0.9479 |
| 60 | 0.9079 | 0.9120 | 0.9161 | 0.9201 | 0.9240 | 0.9278 | 0.9315 | 0.9351 | 0.9386 | 0.9419 |
| 61 | 0.8987 | 0.9031 | 0.9075 | 0.9118 | 0.9160 | 0.9201 | 0.9241 | 0.9280 | 0.9318 | 0.9354 |
| 62 | 0.8889 | 0.8937 | 0.8984 | 0.9030 | 0.9075 | 0.9119 | 0.9162 | 0.9204 | 0.9245 | 0.9285 |
| 63 | 0.8785 | 0.8836 | 0.8886 | 0.8935 | 0.8984 | 0.9031 | 0.9078 | 0.9123 | 0.9167 | 0.9210 |
| 64 | 0.8676 | 0.8730 | 0.8784 | 0.8836 | 0.8888 | 0.8939 | 0.8989 | 0.9037 | 0.9085 | 0.9131 |
| 65 | 0.8561 | 0.8618 | 0.8674 | 0.8730 | 0.8785 | 0.8840 | 0.8893 | 0.8946 | 0.8997 | 0.9047 |
| 66 | 0.8439 | 0.8499 | 0.8559 | 0.8618 | 0.8677 | 0.8734 | 0.8792 | 0.8848 | 0.8903 | 0.8956 |
| 67 | 0.8312 | 0.8375 | 0.8438 | 0.8501 | 0.8563 | 0.8625 | 0.8685 | 0.8745 | 0.8804 | 0.8862 |
| 68 | 0.8178 | 0.8244 | 0.8311 | 0.8377 | 0.8443 | 0.8508 | 0.8572 | 0.8636 | 0.8699 | 0.8761 |
| 69 | 0.8036 | 0.8105 | 0.8175 | 0.8244 | 0.8313 | 0.8382 | 0.8451 | 0.8519 | 0.8586 | 0.8652 |
| 70 | 0.7886 | 0.7958 | 0.8031 | 0.8103 | 0.8176 | 0.8249 | 0.8321 | 0.8393 | 0.8464 | 0.8534 |
| 71 | 0.7728 | 0.7803 | 0.7879 | 0.7954 | 0.8031 | 0.8107 | 0.8183 | 0.8259 | 0.8334 | 0.8409 |
| 72 | 0.7561 | 0.7639 | 0.7717 | 0.7796 | 0.7875 | 0.7955 | 0.8035 | 0.8115 | 0.8194 | 0.8273 |
| 73 | 0.7385 | 0.7465 | 0.7546 | 0.7627 | 0.7710 | 0.7793 | 0.7877 | 0.7960 | 0.8044 | 0.8127 |
| 74 | 0.7200 | 0.7282 | 0.7365 | 0.7449 | 0.7534 | 0.7621 | 0.7708 | 0.7795 | 0.7883 | 0.7970 |
| 75 | 0.7006 | 0.7090 | 0.7175 | 0.7261 | 0.7349 | 0.7438 | 0.7528 | 0.7619 | 0.7711 | 0.7802 |
| 76 | 0.6807 | 0.6891 | 0.6978 | 0.7067 | 0.7157 | 0.7248 | 0.7341 | 0.7436 | 0.7530 | 0.7626 |
| 77 | 0.6599 | 0.6685 | 0.6773 | 0.6863 | 0.6955 | 0.7049 | 0.7145 | 0.7242 | 0.7340 | 0.7439 |
| 78 | 0.6387 | 0.6473 | 0.6562 | 0.6654 | 0.6747 | 0.6843 | 0.6941 | 0.7041 | 0.7142 | 0.7244 |
| 79 | 0.6170 | 0.6257 | 0.6347 | 0.6439 | 0.6534 | 0.6631 | 0.6731 | 0.6833 | 0.6936 | 0.7042 |
| 80 | 0.5950 | 0.6037 | 0.6127 | 0.6220 | 0.6315 | 0.6414 | 0.6515 | 0.6618 | 0.6724 | 0.6832 |

TM:619767 / 01096280 / 04/03/2023    Appendix A-2  (Page 5 of 7)

|            | Spouse Age |        |        |        |        |        |        |        |        |        |
|------------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| **Retiree Age** | 78 | 79 | 80 | 81 | 82 | 83 | 84 | 85 | 86 | 87 |
| 28 | 0.9967 | 0.9968 | 0.9970 | 0.9972 | 0.9973 | 0.9975 | 0.9976 | 0.9978 | 0.9979 | 0.9980 |
| 29 | 0.9963 | 0.9965 | 0.9966 | 0.9968 | 0.9970 | 0.9971 | 0.9973 | 0.9974 | 0.9976 | 0.9977 |
| 30 | 0.9958 | 0.9960 | 0.9962 | 0.9964 | 0.9966 | 0.9968 | 0.9969 | 0.9971 | 0.9972 | 0.9974 |
| 31 | 0.9956 | 0.9958 | 0.9960 | 0.9962 | 0.9964 | 0.9965 | 0.9967 | 0.9969 | 0.9970 | 0.9972 |
| 32 | 0.9953 | 0.9955 | 0.9957 | 0.9959 | 0.9961 | 0.9963 | 0.9965 | 0.9967 | 0.9968 | 0.9970 |
| 33 | 0.9950 | 0.9953 | 0.9955 | 0.9957 | 0.9959 | 0.9961 | 0.9963 | 0.9965 | 0.9966 | 0.9968 |
| 34 | 0.9948 | 0.9950 | 0.9952 | 0.9955 | 0.9957 | 0.9959 | 0.9961 | 0.9963 | 0.9965 | 0.9966 |
| 35 | 0.9945 | 0.9948 | 0.9950 | 0.9952 | 0.9955 | 0.9957 | 0.9959 | 0.9961 | 0.9963 | 0.9965 |
| 36 | 0.9942 | 0.9945 | 0.9948 | 0.9950 | 0.9953 | 0.9955 | 0.9957 | 0.9959 | 0.9961 | 0.9963 |
| 37 | 0.9940 | 0.9942 | 0.9945 | 0.9948 | 0.9951 | 0.9953 | 0.9955 | 0.9958 | 0.9960 | 0.9962 |
| 38 | 0.9937 | 0.9940 | 0.9943 | 0.9946 | 0.9948 | 0.9951 | 0.9953 | 0.9956 | 0.9958 | 0.9960 |
| 39 | 0.9933 | 0.9937 | 0.9940 | 0.9943 | 0.9946 | 0.9949 | 0.9951 | 0.9954 | 0.9956 | 0.9958 |
| 40 | 0.9929 | 0.9933 | 0.9937 | 0.9940 | 0.9943 | 0.9946 | 0.9949 | 0.9952 | 0.9954 | 0.9956 |
| 41 | 0.9925 | 0.9929 | 0.9933 | 0.9936 | 0.9940 | 0.9943 | 0.9946 | 0.9949 | 0.9952 | 0.9954 |
| 42 | 0.9920 | 0.9924 | 0.9928 | 0.9932 | 0.9936 | 0.9940 | 0.9943 | 0.9946 | 0.9949 | 0.9952 |
| 43 | 0.9914 | 0.9919 | 0.9923 | 0.9928 | 0.9932 | 0.9936 | 0.9939 | 0.9943 | 0.9946 | 0.9949 |
| 44 | 0.9907 | 0.9912 | 0.9918 | 0.9922 | 0.9927 | 0.9931 | 0.9935 | 0.9939 | 0.9942 | 0.9945 |
| 45 | 0.9899 | 0.9905 | 0.9911 | 0.9916 | 0.9921 | 0.9926 | 0.9930 | 0.9934 | 0.9938 | 0.9941 |
| 46 | 0.9890 | 0.9896 | 0.9903 | 0.9909 | 0.9914 | 0.9920 | 0.9925 | 0.9929 | 0.9933 | 0.9937 |
| 47 | 0.9879 | 0.9886 | 0.9893 | 0.9900 | 0.9906 | 0.9912 | 0.9918 | 0.9923 | 0.9927 | 0.9932 |
| 48 | 0.9866 | 0.9874 | 0.9882 | 0.9890 | 0.9897 | 0.9904 | 0.9910 | 0.9915 | 0.9920 | 0.9925 |
| 49 | 0.9850 | 0.9860 | 0.9869 | 0.9878 | 0.9886 | 0.9893 | 0.9900 | 0.9906 | 0.9912 | 0.9917 |
| 50 | 0.9832 | 0.9843 | 0.9853 | 0.9863 | 0.9872 | 0.9880 | 0.9888 | 0.9895 | 0.9902 | 0.9908 |
| 51 | 0.9811 | 0.9823 | 0.9835 | 0.9846 | 0.9856 | 0.9865 | 0.9874 | 0.9882 | 0.9889 | 0.9896 |
| 52 | 0.9787 | 0.9801 | 0.9814 | 0.9826 | 0.9837 | 0.9848 | 0.9858 | 0.9867 | 0.9875 | 0.9883 |
| 53 | 0.9759 | 0.9775 | 0.9789 | 0.9803 | 0.9816 | 0.9828 | 0.9839 | 0.9849 | 0.9859 | 0.9867 |
| 54 | 0.9727 | 0.9744 | 0.9761 | 0.9776 | 0.9791 | 0.9804 | 0.9817 | 0.9828 | 0.9839 | 0.9849 |
| 55 | 0.9691 | 0.9710 | 0.9728 | 0.9745 | 0.9761 | 0.9777 | 0.9791 | 0.9804 | 0.9816 | 0.9827 |
| 56 | 0.9651 | 0.9672 | 0.9692 | 0.9711 | 0.9729 | 0.9746 | 0.9762 | 0.9776 | 0.9790 | 0.9802 |
| 57 | 0.9608 | 0.9631 | 0.9653 | 0.9674 | 0.9694 | 0.9713 | 0.9731 | 0.9747 | 0.9762 | 0.9776 |
| 58 | 0.9560 | 0.9586 | 0.9610 | 0.9634 | 0.9656 | 0.9677 | 0.9696 | 0.9714 | 0.9731 | 0.9747 |
| 59 | 0.9508 | 0.9537 | 0.9564 | 0.9589 | 0.9614 | 0.9637 | 0.9658 | 0.9678 | 0.9697 | 0.9714 |
| 60 | 0.9451 | 0.9482 | 0.9512 | 0.9540 | 0.9567 | 0.9592 | 0.9616 | 0.9639 | 0.9659 | 0.9678 |
| 61 | 0.9389 | 0.9423 | 0.9456 | 0.9487 | 0.9516 | 0.9544 | 0.9570 | 0.9595 | 0.9617 | 0.9639 |
| 62 | 0.9323 | 0.9360 | 0.9395 | 0.9429 | 0.9461 | 0.9491 | 0.9520 | 0.9547 | 0.9572 | 0.9596 |
| 63 | 0.9251 | 0.9291 | 0.9330 | 0.9367 | 0.9402 | 0.9435 | 0.9466 | 0.9496 | 0.9524 | 0.9549 |
| 64 | 0.9176 | 0.9219 | 0.9261 | 0.9301 | 0.9339 | 0.9376 | 0.9410 | 0.9442 | 0.9472 | 0.9500 |
| 65 | 0.9095 | 0.9142 | 0.9187 | 0.9230 | 0.9272 | 0.9311 | 0.9349 | 0.9384 | 0.9417 | 0.9447 |
| 66 | 0.9008 | 0.9059 | 0.9108 | 0.9155 | 0.9200 | 0.9242 | 0.9283 | 0.9321 | 0.9357 | 0.9390 |
| 67 | 0.8918 | 0.8972 | 0.9025 | 0.9076 | 0.9124 | 0.9171 | 0.9215 | 0.9256 | 0.9295 | 0.9332 |
| 68 | 0.8821 | 0.8879 | 0.8936 | 0.8991 | 0.9044 | 0.9094 | 0.9142 | 0.9187 | 0.9229 | 0.9268 |
| 69 | 0.8716 | 0.8779 | 0.8840 | 0.8899 | 0.8956 | 0.9010 | 0.9062 | 0.9110 | 0.9156 | 0.9199 |
| 70 | 0.8603 | 0.8670 | 0.8736 | 0.8799 | 0.8860 | 0.8919 | 0.8975 | 0.9028 | 0.9077 | 0.9124 |
| 71 | 0.8482 | 0.8554 | 0.8624 | 0.8692 | 0.8758 | 0.8821 | 0.8881 | 0.8939 | 0.8992 | 0.9043 |
| 72 | 0.8351 | 0.8428 | 0.8503 | 0.8575 | 0.8646 | 0.8714 | 0.8779 | 0.8840 | 0.8899 | 0.8953 |
| 73 | 0.8210 | 0.8291 | 0.8371 | 0.8448 | 0.8524 | 0.8597 | 0.8666 | 0.8733 | 0.8796 | 0.8854 |
| 74 | 0.8057 | 0.8143 | 0.8228 | 0.8310 | 0.8391 | 0.8469 | 0.8544 | 0.8615 | 0.8682 | 0.8746 |
| 75 | 0.7893 | 0.7984 | 0.8073 | 0.8161 | 0.8247 | 0.8330 | 0.8410 | 0.8486 | 0.8558 | 0.8627 |
| 76 | 0.7721 | 0.7816 | 0.7910 | 0.8003 | 0.8094 | 0.8182 | 0.8267 | 0.8349 | 0.8426 | 0.8499 |
| 77 | 0.7538 | 0.7638 | 0.7736 | 0.7834 | 0.7930 | 0.8023 | 0.8113 | 0.8200 | 0.8282 | 0.8361 |
| 78 | 0.7347 | 0.7450 | 0.7554 | 0.7656 | 0.7756 | 0.7855 | 0.7950 | 0.8042 | 0.8130 | 0.8213 |
| 79 | 0.7148 | 0.7255 | 0.7362 | 0.7469 | 0.7574 | 0.7677 | 0.7778 | 0.7875 | 0.7968 | 0.8056 |
| 80 | 0.6942 | 0.7052 | 0.7163 | 0.7274 | 0.7383 | 0.7491 | 0.7597 | 0.7699 | 0.7797 | 0.7890 |

TM:619767 / 01096280 / 04/03/2023                                              Appendix A-2  (Page 6 of 7)

|  | Spouse Age | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Retiree Age | 88 | 89 | 90 | 91 | 92 | 93 | 94 | 95 |
| 28 | 0.9981 | 0.9982 | 0.9983 | 0.9984 | 0.9985 | 0.9985 | 0.9986 | 0.9987 |
| 29 | 0.9978 | 0.9979 | 0.9980 | 0.9981 | 0.9982 | 0.9983 | 0.9984 | 0.9985 |
| 30 | 0.9975 | 0.9976 | 0.9977 | 0.9978 | 0.9979 | 0.9980 | 0.9981 | 0.9982 |
| 31 | 0.9973 | 0.9974 | 0.9975 | 0.9977 | 0.9978 | 0.9978 | 0.9979 | 0.9980 |
| 32 | 0.9971 | 0.9973 | 0.9974 | 0.9975 | 0.9976 | 0.9977 | 0.9978 | 0.9979 |
| 33 | 0.9970 | 0.9971 | 0.9972 | 0.9973 | 0.9974 | 0.9976 | 0.9976 | 0.9977 |
| 34 | 0.9968 | 0.9969 | 0.9971 | 0.9972 | 0.9973 | 0.9974 | 0.9975 | 0.9976 |
| 35 | 0.9966 | 0.9968 | 0.9969 | 0.9971 | 0.9972 | 0.9973 | 0.9974 | 0.9975 |
| 36 | 0.9965 | 0.9966 | 0.9968 | 0.9969 | 0.9970 | 0.9972 | 0.9973 | 0.9974 |
| 37 | 0.9963 | 0.9965 | 0.9967 | 0.9968 | 0.9969 | 0.9971 | 0.9972 | 0.9973 |
| 38 | 0.9962 | 0.9964 | 0.9965 | 0.9967 | 0.9968 | 0.9969 | 0.9971 | 0.9972 |
| 39 | 0.9960 | 0.9962 | 0.9964 | 0.9965 | 0.9967 | 0.9968 | 0.9969 | 0.9971 |
| 40 | 0.9958 | 0.9960 | 0.9962 | 0.9964 | 0.9965 | 0.9967 | 0.9968 | 0.9969 |
| 41 | 0.9956 | 0.9958 | 0.9960 | 0.9962 | 0.9964 | 0.9965 | 0.9967 | 0.9968 |
| 42 | 0.9954 | 0.9956 | 0.9958 | 0.9960 | 0.9962 | 0.9963 | 0.9965 | 0.9966 |
| 43 | 0.9951 | 0.9954 | 0.9956 | 0.9958 | 0.9960 | 0.9962 | 0.9963 | 0.9965 |
| 44 | 0.9948 | 0.9951 | 0.9953 | 0.9955 | 0.9957 | 0.9959 | 0.9961 | 0.9963 |
| 45 | 0.9944 | 0.9947 | 0.9950 | 0.9952 | 0.9955 | 0.9957 | 0.9959 | 0.9960 |
| 46 | 0.9940 | 0.9944 | 0.9946 | 0.9949 | 0.9952 | 0.9954 | 0.9956 | 0.9958 |
| 47 | 0.9935 | 0.9939 | 0.9942 | 0.9945 | 0.9948 | 0.9950 | 0.9953 | 0.9955 |
| 48 | 0.9929 | 0.9933 | 0.9937 | 0.9940 | 0.9943 | 0.9946 | 0.9949 | 0.9951 |
| 49 | 0.9922 | 0.9927 | 0.9931 | 0.9934 | 0.9938 | 0.9941 | 0.9944 | 0.9946 |
| 50 | 0.9913 | 0.9918 | 0.9923 | 0.9927 | 0.9931 | 0.9934 | 0.9938 | 0.9941 |
| 51 | 0.9903 | 0.9908 | 0.9913 | 0.9918 | 0.9922 | 0.9926 | 0.9930 | 0.9933 |
| 52 | 0.9890 | 0.9897 | 0.9902 | 0.9908 | 0.9913 | 0.9917 | 0.9921 | 0.9925 |
| 53 | 0.9875 | 0.9883 | 0.9889 | 0.9895 | 0.9901 | 0.9906 | 0.9911 | 0.9915 |
| 54 | 0.9858 | 0.9866 | 0.9874 | 0.9881 | 0.9887 | 0.9893 | 0.9898 | 0.9903 |
| 55 | 0.9837 | 0.9846 | 0.9855 | 0.9863 | 0.9870 | 0.9876 | 0.9883 | 0.9888 |
| 56 | 0.9814 | 0.9824 | 0.9834 | 0.9843 | 0.9851 | 0.9858 | 0.9865 | 0.9872 |
| 57 | 0.9789 | 0.9801 | 0.9812 | 0.9821 | 0.9831 | 0.9839 | 0.9847 | 0.9854 |
| 58 | 0.9761 | 0.9774 | 0.9786 | 0.9798 | 0.9808 | 0.9817 | 0.9826 | 0.9834 |
| 59 | 0.9730 | 0.9745 | 0.9759 | 0.9771 | 0.9782 | 0.9793 | 0.9803 | 0.9812 |
| 60 | 0.9696 | 0.9713 | 0.9728 | 0.9741 | 0.9754 | 0.9766 | 0.9777 | 0.9787 |
| 61 | 0.9658 | 0.9676 | 0.9693 | 0.9708 | 0.9722 | 0.9735 | 0.9748 | 0.9759 |
| 62 | 0.9617 | 0.9637 | 0.9656 | 0.9673 | 0.9688 | 0.9703 | 0.9716 | 0.9728 |
| 63 | 0.9573 | 0.9595 | 0.9615 | 0.9634 | 0.9651 | 0.9667 | 0.9682 | 0.9695 |
| 64 | 0.9526 | 0.9550 | 0.9573 | 0.9593 | 0.9612 | 0.9630 | 0.9646 | 0.9661 |
| 65 | 0.9476 | 0.9502 | 0.9526 | 0.9549 | 0.9570 | 0.9589 | 0.9607 | 0.9623 |
| 66 | 0.9421 | 0.9450 | 0.9477 | 0.9501 | 0.9524 | 0.9545 | 0.9564 | 0.9582 |
| 67 | 0.9365 | 0.9397 | 0.9425 | 0.9452 | 0.9477 | 0.9500 | 0.9521 | 0.9541 |
| 68 | 0.9305 | 0.9339 | 0.9371 | 0.9400 | 0.9427 | 0.9452 | 0.9475 | 0.9497 |
| 69 | 0.9239 | 0.9276 | 0.9310 | 0.9342 | 0.9371 | 0.9399 | 0.9424 | 0.9448 |
| 70 | 0.9167 | 0.9207 | 0.9245 | 0.9279 | 0.9311 | 0.9341 | 0.9368 | 0.9394 |
| 71 | 0.9090 | 0.9133 | 0.9174 | 0.9211 | 0.9246 | 0.9278 | 0.9308 | 0.9336 |
| 72 | 0.9004 | 0.9051 | 0.9095 | 0.9136 | 0.9174 | 0.9209 | 0.9242 | 0.9272 |
| 73 | 0.8909 | 0.8961 | 0.9008 | 0.9053 | 0.9094 | 0.9132 | 0.9167 | 0.9201 |
| 74 | 0.8805 | 0.8861 | 0.8912 | 0.8960 | 0.9005 | 0.9046 | 0.9085 | 0.9121 |
| 75 | 0.8691 | 0.8751 | 0.8806 | 0.8858 | 0.8906 | 0.8951 | 0.8993 | 0.9032 |
| 76 | 0.8568 | 0.8632 | 0.8692 | 0.8748 | 0.8800 | 0.8849 | 0.8894 | 0.8937 |
| 77 | 0.8434 | 0.8503 | 0.8568 | 0.8628 | 0.8684 | 0.8736 | 0.8785 | 0.8831 |
| 78 | 0.8291 | 0.8365 | 0.8434 | 0.8498 | 0.8559 | 0.8615 | 0.8667 | 0.8717 |
| 79 | 0.8139 | 0.8218 | 0.8291 | 0.8360 | 0.8425 | 0.8485 | 0.8541 | 0.8594 |
| 80 | 0.7978 | 0.8062 | 0.8140 | 0.8213 | 0.8281 | 0.8345 | 0.8405 | 0.8462 |

Appendix A-2  (Page 7 of 7)

## APPENDIX B.    BENEFIT CLAIMS AND APPEALS PROCEDURES

### Section 1.    CLAIMS FOR BENEFITS

(a)    All benefit claims must be filed in writing and submitted on claim forms authorized by the Pension Fund ("Fund"). Claim forms may be obtained from any local union or from the Fund.

(b)    To provide sufficient time for processing a claim for retirement pension benefits, a Participant should file a claim form with the Fund at least 6 months before his Retirement Date. An individual making a claim for death benefits or disability benefits should file a claim form as promptly as possible after the death or disability occurs. *See* the Benefits Claim Filing Procedures in Section 7.14 of this Pension Plan.

(c)    The Fund, upon its receipt of a written benefit claim form, shall notify the claimant of the Fund's benefit determination within a reasonable period of time and, if a claim is wholly or partially denied, not later than 90 days after the Fund receives the claim, provided that this period may be extended for as much as an additional 90 days if the Fund determines that such an extension is necessary due to special circumstances and notifies the claimant, prior to the expiration of the initial 90-day period, of the circumstances requiring the extension of time and the date by which the Fund expects to render the benefit determination. If such an extension is necessary due to a failure of the claimant to submit information necessary to decide the claim, the notice of extension shall specifically describe the required information, and the claimant shall be afforded at least 45 days from receipt of the notice within which to provide the specified information.

(d)    In the event that a time period for notice of any benefit determination by the Fund is extended to allow the claimant to submit information necessary to decide the claim, the time period for making the benefit determination and providing related notice shall be tolled (i.e., not counted) from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information.

(e)    Notice of any adverse benefit determination pursuant to this Section shall be provided in accordance with Section 2 of this APPENDIX B.

### Section 2.    NOTICE OF ADVERSE BENEFIT DETERMINATIONS

(a)    Whenever an adverse benefit determination (as defined in Section 2[b]) is made by the Fund, the Fund shall provide the claimant with written (or electronic) notice of the determination that shall include statements, in a manner calculated to be understood by the claimant, of the following:

(1)    the specific reason or reasons for each adverse benefit determination;

(2)    references to the specific provisions of this Pension Plan on which each adverse benefit determination is based;

(3)    a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4)    a description of the Fund's appellate review procedures and the time limitations applicable to those procedures, including a statement of the claimant's right to

- 92 -

bring a civil action pursuant to Section 502 of the Employee Retirement Income Security Act following an adverse benefit determination at the end of appellate review by the Fund.

(b) An "adverse benefit determination", for all purposes of this APPENDIX B, means any of the following: a denial, reduction or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, termination or failure to provide or make payment that is based on any exclusion or any limitation of this Pension Plan as applied to a claim for benefits, or that is based on a determination relative to the question of the claimant's or any other individual's eligibility.

## Section 3. PROCEDURES DURING APPELLATE REVIEW OF ADVERSE BENEFIT DETERMINATIONS

(a) Whenever an adverse benefit determination is made by the Fund, there are two available stages of the Fund's appellate review of the determination, the first stage of which is conducted by the Benefits Claim Appeals Committee and the second stage of which is conducted by the Trustee Appellate Review Committee. The Benefits Claim Appeals Committee shall be composed of one or more employees of the Fund appointed to that position by the Executive Director of the Fund, provided that the Executive Director retains the authority to terminate any such appointment at any time.

(b) All authority and responsibilities of the Fund's Board of Trustees with respect to appellate review of adverse benefit determinations is delegated to a committee of Trustees designated as the Trustee Appellate Review Committee.

(c) The following procedures shall govern the operations of the Trustee Appellate Review Committee:

(1) a quorum of the Trustees at any meeting of the Trustee Appellate Review Committee, for the conduct of its business and for all benefit determinations on review by that committee, shall be at least one Employer Trustee and at least one Employee Trustee (all Trustee members of the Board of Trustees are and shall be *de facto* members of the Trustee Appellate Review Committee);

(2) for each matter voted upon at any meeting of the Trustee Appellate Review Committee, the Employee Trustees and the Employer Trustees shall each have the same number of votes based upon the larger number (of Employee Trustees or Employer Trustees) in attendance, provided that each vote shall be cast as the vote of an individual Trustee and not as part of a block, and each determination by the Trustee Appellate Review Committee shall be based upon a majority vote of those present and voting;

(3) the meetings of the Trustee Appellate Review Committee shall be monthly according to a schedule approved by the Trustees;

(4) the Trustees who attend and participate in any meeting of the Trustee Appellate Review Committee shall be vested, relative to all appellate review of adverse benefit determinations, with all authority and responsibilities of the Board of Trustees established by the Fund's benefit plan documents, as heretofore and hereafter amended, including discretionary and final authority in making determinations during all such appellate review;

(5) the Trustees who attend and participate in any meeting of the Trustee Appellate Review Committee shall, in the same meeting, constitute and make decisions of

the Special Hardship Appeal Committee (which decisions shall be recorded in the minutes of the meeting of the Trustee Appellate Review Committee), pursuant to Section 6(f) of APPENDIX B of the Pension Plan; and

(6)     the records of monthly meetings of the Trustee Appellate Review Committee, and of its determinations during appellate review, shall be regularly kept and maintained with records of meetings of the Board of Trustees.

(d)     At all stages of appellate review of any adverse benefit determination, the following procedures shall be enforced:

(1)     the claimant shall be provided an opportunity to submit written comments, documents, records and other information relating to the claim for benefits;

(2)     the claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information possessed by the Fund and relevant to the claimant's claim for benefits;

(3)     the appellate review shall take into account all comments, documents, records and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination;

(4)     the appellate review shall not afford deference to the initial adverse benefit determination by the Fund and shall be conducted by one or more individuals each of whom shall be an appropriate named fiduciary of the Fund who is neither an individual who made the adverse benefit determination that is the subject of the review nor a subordinate of any such individual;

(5)     the appellate review shall require that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment; and

(6)     the appellate review shall require the identification to the claimant of any medical or vocational expert whose advice was obtained on behalf of the Fund in connection with the claimant's adverse benefit determination, whether or not the advice was relied upon in making that determination.

**Section 4.     TIME LIMITATIONS FOR APPELLATE REVIEW OF ADVERSE BENEFIT DETERMINATIONS**

(a)     Whenever an adverse benefit determination (as defined in Section 2[b]) is made by the Fund, the claimant may initiate appellate review of the determination by submission to the Fund, within 180 days after the claimant's receipt of the Fund's notice of such determination, of a request for appellate review. All requests for appellate review shall be submitted to the Fund in writing on forms authorized by the Fund.

(b)     The Fund, upon its receipt of a claimant's timely written request for appellate review of an earlier adverse benefit determination, shall perform and complete appellate review, and shall notify the claimant of the determinations upon completion of such review, in accordance with the following time limitations:

(1)     all appellate review and benefit determinations by the Benefits Claim Appeals Committee shall be completed, and the Fund shall provide written notice to the

- 94 -

claimant of those determinations, no later than 30 days after the Fund's receipt of the claimant's timely written request for appellate review of an adverse benefit determination;

(2)     whenever an adverse benefit determination is made by the Benefits Claim Appeals Committee at the end of its appellate review, the claimant may initiate appellate review by the Trustee Appellate Review Committee, by written request to the Fund within 180 days after the claimant's receipt of the Fund's notice of such determination;

(3)     appellate review by the Trustee Appellate Review Committee shall allow the claimant to exercise his right to make a personal presentation to Trustees (as provided in Section 6[e]), and all appellate review and benefit determinations by the Trustee Appellate Review Committee shall be completed within a reasonable period of time and at a monthly meeting that takes place no later than 90 or more days after the Fund receives the claimant's timely written request for appellate review by the Trustee Appellate Review Committee (since 29 CFR 2560.503-1[i] extends the aggregate time limit to a first quarterly board meeting more than 30 days after the review receipt's request, or to the "third meeting" in "special circumstances ... such as the need to hold a hearing", and since the same subsection allows an aggregate 120 days for review in "... special circumstances (such as the need to hold a hearing) ...", this maximum complies with the regulation);

(4)     after appellate review and benefit determinations by the Trustee Appellate Review Committee, the Fund shall provide written notice to the claimant of those determinations by the Trustees no later than 5 days after the determinations are made;

(5)     in the event that any time period for any appellate review by the Fund of an earlier adverse benefit determination, and for notice of the determinations upon completion of such review, is extended based upon a failure by the claimant to submit information necessary to decide the claim, each time period for the conduct and completion of such appellate review, and for making benefit determinations, and for providing notice of those determinations, relative to the claimant's claim, shall be tolled (i.e., not counted) from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information.

**Section 5.      NOTICE OF BENEFIT DETERMINATIONS AFTER APPELLATE REVIEW**

Whenever a benefit determination is made by the Benefits Claim Appeals Committee or the Trustees after appellate review, the Fund shall provide the claimant with written (or electronic) notice of the determination that shall include statements, in a manner calculated to be understood by the claimant, of the following:

(a)     the specific reason or reasons for each adverse benefit determination;

(b)     references to the specific provisions of this Pension Plan on which each determination is based;

(c)     a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the claimant's claim for benefits; and

- 95 -

(d)    a description of the Fund's appellate review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action pursuant to Section 502 of the Employee Retirement Income Security Act following an adverse benefit determination at the end of appellate review by the Fund.

Section 6.    **MISCELLANEOUS PROVISIONS**

(a)    Any time limitation specified in this APPENDIX B for a determination and/or a notice by the Fund may be waived and/or modified at any time on the basis of a request, agreement or consent by the claimant or by an authorized representative of the claimant, including a retroactive waiver and/or modification of an applicable time limitation after it has expired.

(b)    Each member of the Benefits Claim Appeals Committee is vested with discretionary and final authority in making any determination within the scope of this APPENDIX B, except that, upon further appellate review by the Trustees after a determination by the Benefits Claim Appeals Committee, the prior discretionary and final authority of the Benefits Claim Appeals Committee is displaced by the authority of the Trustees, who shall not afford deference to any determination by the Benefits Claim Appeals Committee.

(c)    The Trustees are vested with discretionary and final authority in making any determination within the scope of this APPENDIX B.

(d)    The burden of proof in demonstrating any fact essential to the approval of any claim for benefits, including eligibility for any claimed benefit and the extent to which a claimed benefit is covered or payable in accordance with this Pension Plan, shall at all times be the responsibility of the claimant, provided that the Fund will at all times during appellate review of an adverse benefit determination provide to the claimant, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information possessed by the Fund and relevant to the claimant's claim for benefits.

(e)    Subject to a determination by the Trustee Appellate Review Committee that a personal presentation will be of assistance in augmenting the record of appeal of an adverse benefit determination or in otherwise appropriately resolving the appeal, a claimant may make a personal presentation of his claims to the Trustee Appellate Review committee (either by himself or by his authorized representative, or both). In order to assist the Trustee Appellate Review Committee in determining whether to grant requests to make personal presentations, each such request shall be accompanied by a short written statement explaining why a personal presentation before the Trustee Appellate Review Committee would be of assistance in augmenting the record or in otherwise appropriately resolving the appeal.

(f)    A Special Hardship Appeal Committee exists in accordance with APPENDIX H of this Pension Plan and is composed of Trustees who meet on a monthly or other periodic basis and who, as members of such committee, are authorized by the Board of Trustees to consider and determine matters that include:

(1)    whether any benefits-related relief within the scope of APPENDIX H should be granted or denied to any individual; and

(2)    whether any claim of the Pension Fund, based upon Section 4.13, to restitution from any individual of Periodic Benefit Payments issued during Restricted Reemployment (or other Reemployment) should be enforced or waived or compromised.

Decisions of the Special Hardship Appeal Committee are recorded in minutes of its meetings. Whenever an adverse benefit determination is made by the Special Hardship Appeal Committee, all terms and provisions of Section 2 through Section 6 of this APPENDIX B shall be applicable to such determination, except that the Benefit Claim Appeals Committee is not authorized to participate in any requested appellate review of that determination.

(g)    It is a condition precedent to any civil action by a claimant or other individual to recover benefits covered or payable in accordance with this Pension Plan and/or to clarify any individual's rights to past, present or future benefits covered or payable in accordance with this Pension Plan, including any civil action pursuant to Section 502 of the Employee Retirement Income Security Act, that the claimant or other individual files a benefit claim and initiates and actively pursues appellate review of any adverse benefit determination upon any claim, and secures all related benefit determinations by the Fund, in accordance with this APPENDIX B, prior to the commencement of any civil action.

## APPENDIX C.   SCHEDULE A - EARLY RETIREMENT PENSION AMOUNTS

### RETIREMENT AGES

**BENEFIT
CLASS**

| | 56 | 55 | 54 | 53 | 52 | 51 | 50 | 49 | 48 | 47 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $56.40 | $52.80 | $49.20 | $45.60 | $42.00 | $38.40 | $34.80 | $31.20 | $27.60 | $24.00 |
| 2 | 84.60 | 79.20 | 73.80 | 68.40 | 63.00 | 57.60 | 52.20 | 46.80 | 41.40 | 36.00 |
| 2A | 117.50 | 110.00 | 102.50 | 95.00 | 87.50 | 80.00 | 72.50 | 65.00 | 57.50 | 50.00 |
| 3 | 131.60 | 123.20 | 114.80 | 106.40 | 98.00 | 89.60 | 81.20 | 72.80 | 64.40 | 56.00 |
| 3A | 159.80 | 149.60 | 139.40 | 129.20 | 119.00 | 108.80 | 98.60 | 88.40 | 78.20 | 68.00 |
| 4 | 211.50 | 198.00 | 184.50 | 171.00 | 157.50 | 144.00 | 130.50 | 117.00 | 103.50 | 90.00 |
| 5 | 244.40 | 228.80 | 213.20 | 197.60 | 182.00 | 166.40 | 150.80 | 135.20 | 119.60 | 104.00 |
| 6 | 267.90 | 250.80 | 233.70 | 216.60 | 199.50 | 182.40 | 165.30 | 148.20 | 131.10 | 114.00 |
| 7 | 310.20 | 290.40 | 270.60 | 250.80 | 231.00 | 211.20 | 191.40 | 171.60 | 151.80 | 132.00 |
| 8 | 343.10 | 321.20 | 299.30 | 277.40 | 255.50 | 233.60 | 211.70 | 189.80 | 167.90 | 146.00 |
| 9 | 376.00 | 351.00 | 328.00 | 304.00 | 280.00 | 256.00 | 232.00 | 208.00 | 184.00 | 160.00 |
| 10 | 408.90 | 382.80 | 356.70 | 330.60 | 304.50 | 278.40 | 252.30 | 226.20 | 200.10 | 174.00 |
| 11 | 460.60 | 431.20 | 401.80 | 372.40 | 343.00 | 313.60 | 284.20 | 254.80 | 225.40 | 196.00 |
| 12 | 540.50 | 506.00 | 471.50 | 437.00 | 402.50 | 368.00 | 333.50 | 299.00 | 264.50 | 230.00 |
| 13 | 564.00 | 528.00 | 492.00 | 456.00 | 420.00 | 384.00 | 348.00 | 312.00 | 276.00 | 240.00 |
| 14 | 587.50 | 550.00 | 512.50 | 475.00 | 437.50 | 400.00 | 362.50 | 325.00 | 287.50 | 250.00 |

TM:619767 / 01096280 / 04/03/2023

## APPENDIX C. SCHEDULE B - EARLY RETIREMENT PENSION AMOUNTS

### RETIREMENT AGES

**BENEFIT CLASS**

| | 56 | 55 | 54 | 53 | 52 | 51 | 50 | 49 | 48 | 47 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $56.40 | $52.80 | $49.20 | $45.60 | $42.00 | $38.40 | $34.80 | $31.20 | $27.60 | $24.00 |
| 2 | 84.60 | 79.20 | 73.80 | 68.40 | 63.00 | 57.60 | 52.20 | 46.80 | 41.40 | 36.00 |
| 2A | 117.50 | 110.00 | 102.50 | 95.00 | 87.50 | 80.00 | 72.50 | 65.00 | 57.50 | 50.00 |
| 3 | 131.60 | 123.20 | 114.80 | 106.40 | 98.00 | 89.60 | 81.20 | 72.80 | 64.40 | 56.00 |
| 3A | 159.80 | 149.60 | 139.40 | 129.20 | 119.00 | 108.80 | 98.60 | 88.40 | 78.20 | 68.00 |
| 4 | 211.50 | 198.00 | 184.50 | 171.00 | 157.50 | 144.00 | 130.50 | 117.00 | 103.50 | 90.00 |
| 5 | 244.40 | 228.80 | 213.20 | 197.60 | 182.00 | 166.40 | 150.80 | 135.20 | 119.60 | 104.00 |
| 6 | 267.90 | 250.80 | 233.70 | 216.60 | 199.50 | 182.40 | 165.30 | 148.20 | 131.10 | 114.00 |
| 7 | 310.20 | 290.40 | 270.60 | 250.80 | 231.00 | 211.20 | 191.40 | 171.60 | 151.80 | 132.00 |
| 8 | 343.10 | 321.20 | 299.30 | 277.40 | 255.50 | 233.60 | 211.70 | 189.80 | 167.90 | 146.00 |
| 9 | 376.00 | 352.00 | 328.00 | 304.00 | 280.00 | 256.00 | 232.00 | 208.00 | 184.00 | 160.00 |
| 10 | 408.90 | 382.80 | 356.70 | 330.60 | 304.50 | 278.40 | 252.30 | 226.20 | 200.10 | 174.00 |
| 11 | 460.60 | 431.20 | 401.80 | 372.40 | 343.00 | 313.60 | 284.20 | 254.80 | 225.40 | 196.00 |
| 12 | 540.50 | 506.00 | 471.50 | 437.00 | 402.50 | 368.00 | 333.50 | 299.00 | 264.50 | 230.00 |
| 13 | 564.00 | 528.00 | 492.00 | 456.00 | 420.00 | 384.00 | 348.00 | 312.00 | 276.00 | 240.00 |
| 14 | 587.50 | 550.00 | 512.50 | 475.00 | 437.50 | 400.00 | 362.50 | 325.00 | 287.50 | 250.00 |
| 15(A) or higher | 658.00 | 616.00 | 574.00 | 532.00 | 490.00 | 448.00 | 406.00 | 364.00 | 322.00 | 280.00 |

**APPENDIX D.   PARTIAL PENSIONS**

(a) **PREFACE:** The following provisions are included to comply with requirements of the National Reciprocal Agreement, effective January 1, 1964, and any other Reciprocal Agreements to which this Pension Fund is a party, and apply only to the following benefits:

(1) Twenty-Year Service Pension;

(2) Early Retirement Pension;

(3) Contributory Credit Pension;

(4) 25-And-Out Pension;

(5) 30-And-Out Pension;

(6) Monthly Disability Benefit;

(7) 50% Surviving Spouse Benefit; and

(8) 60 Month Survivor Benefit.

(b) **PURPOSE:** Partial Pensions are provided under this Pension Plan to a Participant or a former Participant who does not have sufficient Service Credit to be eligible for any benefits because his years of employment were divided between different pension plans or, if eligible, whose benefits would be less than the full amount because his employment was divided.

(c) **DEFINITIONS**

(1) **COMBINED SERVICE CREDIT:** The total of an individual's Service Credit under this Pension Plan and Related Service Credit together comprise the individual's Combined Service Credit. An individual shall not earn more than one year of Combined Service Credit in any calendar year.

(2) **EFFECTIVE DATE:** This Appendix D and the payment of partial pensions shall be effective on January 1, 1964.

(3) **RELATED SERVICE CREDIT:** Service Credit earned and maintained by an individual under a Related Plan shall be recognized under this Pension Plan as Related Service Credit. The Board of Trustees shall determine Service Credit on the basis on which Related Service Credit has been earned and credited under the Related Plan and certified by the Related Plan to this Pension Plan.

(4) **RELATED PLAN:** By resolution adopted, the Board of Trustees may recognize one or more other pension plans, which have executed a Reciprocal Agreement to which this Pension Plan is a party, as a Related Plan.

(5) **TERMINAL PLAN:** The Terminal Plan shall be the plan associated with the Union which represents the individual at the time of, or immediately prior to, his Retirement Date. If an individual was not represented by any Union immediately prior to his Retirement Date, then the Terminal Plan is the plan to which the greatest number of contributions were made on behalf of the individual in the 36 consecutive calendar months immediately preceding his Retirement Date.

- 100 -

(d) **ELIGIBILITY:** An individual shall be eligible for a Partial Pension under this Pension Plan if he meets all of the following requirements:

   (1) he would be eligible for any type of pension under this Pension Plan (other than a Partial Pension) if his Combined Service Credit were treated as Service Credit under this Plan; and

   (2) he has earned, in addition to any other requirements necessary to be eligible under (1), above, at least two years of Service Credit in this Pension Plan (or a lesser number of years of Service Credit as may be specified in any Reciprocal Agreement to which this Pension Fund is a party) based on actual employment after he became an Employee as defined in Article I, Section 1.14 of this Pension Plan; and

   (3) he is found to be (A) eligible for a Partial Pension from a Related Plan and (B) eligible for a Partial Pension from the Terminal Plan; and

   (4) he is not eligible to receive payment of a pension from a Related Plan independent of its provisions for a Partial Pension, except that, an individual who is eligible for a pension other than a Partial Pension from this Pension Plan or a Related Plan may elect to waive the other pension and receive the Partial Pension.

(e) **BREAK-IN-SERVICE:** In applying the Break-in-Service rules of this Pension Plan, any period for which an individual has earned Related Service Credit shall not be used to determine whether there has been a period of no Covered Service sufficient to constitute a Break-in-Service.

(f) **ELECTION OF PENSIONS:** If an individual is eligible for more than one type of pension under this Pension Plan, he may elect the type of pension he is to receive.

(g) **PARTIAL PENSION AMOUNT:** The amount of the Partial Pension shall be determined as follows:

   (1) the amount of the pension for which the individual would be eligible under this Pension Plan taking into account his Combined Service Credit shall be determined, then

   (2) the amount of Contributory Service Credit earned with this Pension Plan shall be divided by the total amount of Contributory Service Credit earned by the individual, then

   (3) the result determined in (2), above, shall be multiplied by the pension amount determined in (1), above, and the result shall be the Partial Pension amount payable by this Pension Plan.

(h) **PAYMENT OF PARTIAL PENSIONS:** The payment of a Partial Pension shall be subject to all of the conditions contained in this Pension Plan applicable to other types of benefits.

(i) In the event that any Related Plan, on or after July 20, 2004 liberalizes its service credit rules, or takes other action that has the effect of awarding service credit with retroactive effect (i.e., with respect to services performed in the past or with respect to service credit already granted), in a way that imposes unanticipated costs in the Pension Fund if the Pension Fund were to recognize such service credit for reciprocal pension purposes,

- 101 -

the Pension Fund reserves the right to terminate its participation in any reciprocal pension agreement to which it is a party with such Related Plan.

(j)     The Pension Fund is not liable for benefits based upon this APPENDIX D and any Reciprocal Agreement to which the Pension Fund is a party (including the National Reciprocal Agreement for Teamster Pension Funds) to the extent such liability has been transferred pursuant to APPENDIX L of this Pension Plan and the UPS-CSPF Agreement described in APPENDIX L.

TM:619767 / 01096280 / 04/03/2023                                      Appendix D  (Page 3 of 3)

**APPENDIX E.    RULES AND REGULATIONS PERTAINING TO EMPLOYER WITHDRAWAL LIABILITY**

**Section 1.        PREAMBLE**

This APPENDIX E to the Central States, Southeast and Southwest Areas Pension Plan (the "Plan") sets forth and describes rules and regulations applicable to the determination and payment of Employer Withdrawal Liability pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Multiemployer Pension Plan Amendments Act of 1980 (the "1980 Act"). The term Employer, as used herein, shall be defined as in ERISA and trades and businesses under common control shall constitute a single Employer as provided under ERISA Section 4001(b). Further, the term Employer refers to both Old Employers and New Employers (as defined in Sections 2.2(a) and 2.2(b), respectively) unless otherwise indicated.

**Section 2.        CALCULATION OF WITHDRAWAL LIABILITY**

**Section 2.1        Effective Date**

The amount of the unfunded vested benefits allocable to an Employer who withdraws from the Plan on or after October 14, 2011 and who is defined as an "Old Employer" under Section 2.2(a) shall be determined in accordance with Section 2.3. The amount of the unfunded vested benefits allocable to an Employer who withdraws from the Plan on or after October 14, 2011 and who is defined as a "New Employer" under Section 2.2(b) shall be determined in accordance with Section 2.4. The amount of unfunded vested benefits allocable to an Employer who withdraws from the Plan at any time before October 14, 2011 shall be determined in accordance with Section 2 of this Appendix E as in effect on October 13, 2011.

**Section 2.2        Definitions**

(a)    **Old Employer** means any Employer who had an obligation to contribute to the Plan for any period prior to October 14, 2011 and all other trades or businesses under common control with said Employer at any time such that together they constituted a single employer within the meaning of Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), and the regulations promulgated thereunder. The term "Old Employer" includes an Employer and all other trades or businesses who withdrew from the Plan prior to October 14, 2011.

(b)    **New Employer** means any Employer who satisfies either of the conditions set forth in paragraphs (1) or (2) below:

(1)    The Employer has never been an Old Employer or a trade or business under common control with an Old Employer at any time such that together they constituted a single employer within the meaning of Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), and the regulations promulgated thereunder; or

(2)    To the extent the Employer first had an obligation to contribute to the Plan before October 14, 2011 or has ever been considered an Old Employer, the Employer has completely satisfied all withdrawal liability related to its past participation in a lump sum or has provided the Pension Fund with a bond issued by a corporate surety company that is an acceptable surety for purposes of ERISA section 412, or an amount held in escrow by a bank or similar financial institution satisfactory to the Pension Fund for the full amount of the outstanding withdrawal liability.

(3)     An Employer satisfying paragraph (1) of this subsection shall be a New Employer on the date its obligation to contribute to the Plan begins. An Employer satisfying paragraph (2) of this subsection shall cease being an Old Employer and shall become a New Employer on the date all of the conditions specified in paragraph (2) are met.

(4)     An Old Employer who is or may be obligated under Section 4204 of ERISA, 29 U.S.C. § 1384, as a seller or purchaser, including without limitation the bonding or escrow requirements of Sections 4204(a)(1)(B) and 4204(a)(3) of ERISA, 29 U.S.C. §§ 1384(a)(1)(B) and 1384(a)(3), as well as the liability provisions of Section 4204(a)(1)(C) and 4204(a)(2), 29 U.S.C. §§ 1384(a)(1)(C) and 1384(a)(2), remains subject to those obligations notwithstanding the fact that the Old Employer becomes a New Employer.

(c)     **Modified Presumptive Pool** means the pool of assets and associated benefit liabilities relating to Contributions from Old Employers.

(d)     **Direct Attribution Pool** means the pool of assets and associated benefit liabilities relating to New Employer Contributions.

(e)     **New Employer Contributions** means contributions made by New Employers which are attributable to Participants' service with such Employer for periods during which the Employer qualifies as a New Employer under Section 2.2(b) plus contributions made by an Old Employer during the Plan Year in which such Old Employer becomes a New Employer.

(f)     **Modified Presumptive Pool Unfunded Vested Benefits** means all unfunded vested benefits under the Plan minus the Direct Attribution Pool Unfunded Vested Benefits minus the sum of all New Employer's Directly Attributable Unfunded Vested Benefits as calculated under Section 2.4(b).

(g)     **Direct Attribution Pool Unfunded Vested Benefits** means all unfunded vested benefits in the Direct Attribution Pool as calculated in Section 2.4(e).

(h)     **Plan Year** means the calendar year beginning and including January 1st through and including December 31st.

(i)     The definitions applicable to the Appendix E include all definitions stated in Article I and other definitions of the Pension Plan, except to the extent those definitions are contrary to those expressly stated in this Appendix E.

**Section 2.3          Calculation of Withdrawal Liability of an Old Employer**

The amount of the unfunded vested benefits allocable to an Old Employer who withdraws from the Plan shall be the product of:

(a)     an amount equal to:

(1)     the Modified Presumptive Pool Unfunded Vested Benefits as of the end of the Plan Year preceding the Plan Year in which the Old Employer withdraws; less

(2)     the sum of the value as of such date of all outstanding claims for withdrawal liability of Old Employers which can reasonably be expected to be collected, with respect to Old Employers withdrawing before such Plan Year; multiplied by

- 104 -

(b)    a fraction:

    (1)    the numerator of which is the total amount required to be contributed under the Plan by the Old Employer for the last 10 Plan Years ending before the date on which the Old Employer withdraws; and

    (2)    the denominator of which is the total amount contributed under the Plan by all Old Employers for the last 10 Plan Years ending before the date on which the Old Employer withdraws, increased by the amount of any Old Employer Contributions owed with respect to earlier periods which were collected in those Plan Years, and decreased by any amount contributed by an Old Employer who withdrew from the Plan during those Plan Years;

### Section 2.4    <u>Calculation of Withdrawal Liability of a New Employer</u>

(a)    **New Employer's Unfunded Vested Benefit Allocation.** The amount of the unfunded vested benefits allocable to a New Employer who withdraws from the Plan shall be the sum of:

    (1)    the New Employer's Unfunded Vested Benefits Attributable to Its Participants' Service (determined as of the end of the Plan Year preceding the Plan Year in which the New Employer withdraws, and as described in subsection (b) below); and

    (2)    the New Employer's Proportionate Share of the Direct Attribution Pool's Unfunded Vested Benefits (determined as of the end of the Plan Year preceding the Plan Year in which the New Employer withdraws) as described in subsection (f) below.

(b)    **New Employer's Unfunded Vested Benefits Attributable to Its Participants' Service.** A New Employer's Unfunded Vested Benefits Attributable to Its Participants' Service is equal to the value of nonforfeitable benefits under the Plan which are attributable to Participants' service with such New Employer (including service based upon contributions deemed New Employer Contributions under Section 2.2(b)) decreased by the New Employer's Share of the Direct Attribution Plan Assets which is allocated to the New Employer under Section 2.4(d). The amount equal to the value of nonforfeitable benefits under the Plan which are attributable to a Participants' service with such New Employer shall be determined by multiplying the Participant's nonforfeitable benefits by a fraction the numerator of which is the Participant's Contributory Service Credit earned with such New Employer (including Contributory Service Credit earned with an Old Employer during the Plan Year in which such Old Employer becomes a New Employer) and the denominator of which is the Participant's total years of Contributory Service Credit earned with all Employers. To the extent that the New Employer's Unfunded Vested Benefits Attributable to Its Participants' Service is less than zero, the New Employer's Directly Attributable Unfunded Vested Benefits shall be deemed to be zero.

(c)    **Direct Attribution Pool Plan Assets.** The value of Direct Attribution Pool Plan Assets determined under this Section 2.4(c) (a portion of which is to be allocated to the New Employer as provided under Section 2.4(d)) is the sum of: all New Employer Contributions made for each Plan Year preceding the Plan Year in which the New Employer withdraws, plus all withdrawal liability payments made by New Employers for withdrawals occurring as New Employers for each Plan Year preceding the Plan Year in which the New Employer withdraws, plus investment earnings or losses for each Plan Year preceding the Plan Year in which the New Employer withdraws attributable as provided under Section 2.4(c)(1), minus administrative expenses for each Plan Year

- 105 -

preceding the Plan Year in which the New Employer withdraws attributable as provided under Section 2.4(c)(2), minus all benefit payments which are made for each Plan Year preceding the Plan Year in which the New Employer withdraws that are attributable to service with New Employers as provided under Section 2.4(c)(3).

(1)   Investment earnings or losses attributable to the Direct Attribution Plan Pool Plan Assets shall be calculated for each Plan Year by applying the rate of return or loss on all Plan assets for each Plan Year beginning after October 14, 2011 and ending with the last day of the Plan Year prior to the Plan Year of the New Employer's withdrawal to the amount of Direct Attribution Plan Pool Plan Assets (after the application of paragraphs (2) and (3) of this subsection (c)) as of the last day of the Plan Year preceding the Plan Year in which the New Employer withdraws. For the Plan Year that includes October 14, 2011, the rate of return or loss shall be applied proportionate to the period after October 14, 2011 as compared to the entire Plan Year.

(2)   Administrative expenses attributable to the Direct Attribution Pool Plan Assets shall be calculated for each Plan Year beginning after October 14, 2011 and ending with the last day of the Plan Year prior to the Plan Year of the New Employer's withdrawal by multiplying the total Plan administrative expenses for a Plan Year by a fraction the numerator of which is the total number of Participants whose last Contributory Service Credit earned under the Plan as of the last day of the Plan Year was earned with a New Employer and the denominator is the total number of Participants in the Plan as of the last day of the Plan Year. For the Plan Year that includes October 14, 2011, the administrative expenses shall be applied proportionate to the period after October 14, 2011 as compared to the entire Plan Year.

(3)   Benefit payments that are attributable to service with New Employers shall mean the pro rata portion of a Participant's benefits determined by multiplying the benefit payments by a fraction the numerator of which is the Participant's years of Contributory Service Credit earned with New Employers (including a Participant's Contributory Service Credit with an Old Employer during the Plan Year in which such Participant's Old Employer becomes a New Employer) and the denominator of which is the Participant's total years of Contributory Service Credit earned with all Employers.

(d)   **New Employer's Share of Direct Attribution Pool Plan Assets.** The New Employer's Share of Direct Attribution Pool Plan Assets shall be determined by multiplying the value of the Direct Attribution Pool Plan Assets determined under Section 2.4(c) by the fractions in subparagraphs (d)(1) and (d)(2) of this subsection -

(1)    The first fraction –

(i)    the numerator of which is the value of nonforfeitable benefits (including such benefits attributable to contributions deemed New Employer Contributions under Section 2.2(b)) which are attributable to Participants' service with all New Employers who have an obligation to contribute under the Plan in the Plan Year preceding the Plan Year in which the New Employer withdraws, and

(ii)    the denominator of which is the value of all nonforfeitable benefits (including such benefits attributable to contributions deemed New Employer Contributions under Section 2.2(b)) attributable to all New Employers under the Plan; and

(2)    The second fraction –

(i)    the numerator of which is the value of the nonforfeitable benefits (including such benefits attributable to contributions deemed New Employer Contributions under Section 2.2(b)) which are attributable to the New Employer, and

(ii)    the denominator of which is the value of the nonforfeitable benefits (including such benefits attributable to contributions deemed New Employer Contributions under Section 2.2(b)) which are attributable to service with all New Employers who have an obligation to contribute under the Plan in the Plan Year preceding the Plan Year in which the New Employer withdraws.

(e)    **Direct Attribution Pool's Unfunded Vested Benefits.** The amount of the Direct Attribution Pool's Unfunded Vested Benefits for a Plan Year preceding the Plan Year in which a New Employer withdraws is equal to:

(1)    an amount equal to –

(i)    The value of all nonforfeitable benefits attributable to service with all New Employers (including such benefits attributable to contributions deemed New Employer Contributions under Section 2.2(b)) under the Plan at the end of such Plan Year; reduced by

(ii)    The value of nonforfeitable benefits under the Plan at the end of such Plan Year which are attributable to Participants' service with New Employers (including such benefits attributable to contributions deemed New Employer Contributions under Section 2.2(b)) who have an obligation to contribute under the Plan for such Plan Year; reduced by

(2)    an amount equal to –

(i)    The value of the Direct Attribution Pool Plan Assets as of the end of such Plan Year as determined under Section 2.4(c), reduced by

(ii)    The value of the Direct Attribution Pool Plan Assets as of the end of such Plan Year as determined under Section 2.4(c) multiplied by the fraction in Section 2.4(d)(1); reduced by

(3)    The value of all outstanding claims for withdrawal liability which can reasonably be expected to be collected with respect to New Employers withdrawing before the Plan Year preceding the Plan Year in which the New Employer withdraws.

If the Direct Attribution Pool's Unfunded Vested Benefits is less than zero, it shall be deemed to be zero.

(f)    **New Employer's Proportionate Share of the Direct Attribution Pool's Unfunded Vested Benefits.** The New Employer's Proportionate Share of the Direct Attribution Pool Unfunded Vested Benefits described in Section 2.4(a)(2) for a Plan Year is the amount determined under Section 2.4(e) multiplied by a fraction-

   (1)    the numerator of which is the value of the nonforfeitable benefits (including such benefits attributable to contributions deemed New Employer Contributions under Section 2.2(b)) which are attributable to the New Employer, and

   (2)    the denominator of which is the value of the nonforfeitable benefits (including such benefits attributable to contributions deemed New Employer Contributions under Section 2.2(b)) which are attributable to service with all New Employers who have an obligation to contribute under the Plan in the Plan Year preceding the Plan Year in which the New Employer withdraws.

## Section 2.5    Effect of Complete Withdrawal of All Old Employers

If all Old Employers completely withdraw from the Pension Fund, the Direct Attribution Pool and the Modified Presumptive Pool shall be discontinued and the amount of unfunded vested benefits allocable to an Employer that withdraws from the Pension Fund at any time beginning with the first day of the Plan Year in which all Old Employers cease to be obligated to contribute to the Fund shall be determined in accordance with Section 2 of this Appendix E as in effect on October 13, 2011 (the "Pre-2011 Methodology").

## Section 2.6    Effect of Complete Withdrawal of All New Employers

If in any Plan Year all New Employers completely withdraw from the Pension Fund, the Direct Attribution Pool and the Modified Presumptive Pool shall be discontinued and the amount of unfunded vested benefits allocable to an Employer that withdraws in the following Plan Year shall be determined in accordance with Section 2 of this Appendix E as in effect on October 13, 2011 (the "Pre-2011 Methodology").

## Section 2.7    Allocation of Reallocation Liability in the Event of Mass Withdrawal

In the event that, within the meaning of ERISA§ 4219(c)(1)(D), every Employer withdraws from the Plan or substantially all Employers withdraw from the Plan pursuant to an arrangement to withdraw (thus triggering a "Mass Withdrawal"), any Employers who are subject to Mass Withdrawal reallocation liability within the meaning of 29 C.F.R. § 4219.2(b)(2):

(a)    Shall have their initial allocable share of such reallocation liability determined as follows:

   **Initial allocable share.** Except as otherwise provided in subsection (c) below, an Employer's initial allocable share shall be equal to the product of the plan's unfunded vested benefits to be reallocated, multiplied by a fraction--

   (1)    The numerator of which is the sum of the Employer's initial withdrawal liability and the Employer's redetermination liability, if any; and

- 108 -

(2)    The denominator of which is the sum of all initial withdrawal liabilities and all the redetermination liabilities of all Employers liable for reallocation liability; and

(b)    Shall have their allocation of unassessable amounts determined as follows:

**Allocation of unassessable amounts.** If after computing each Employer's initial allocable share of unfunded vested benefits related to the Mass Withdrawal, the Trustees determine that any portion of an Employer's initial allocable share is unassessable as withdrawal liability because of the limitations in ERISA § 4225, the Trustees shall allocate any such unassessable amounts among all other liable Employers. This allocation shall be done by prorating the unassessable amounts on the basis of each such Employer's initial allocable share. No Employer shall be liable for unfunded vested benefits allocated under subsection (a) or this subsection (b) to another Employer that are determined to be unassessable or uncollectible subsequent to the Trustees' demand for payment of reallocation liability.

(c)    **Special rule for certain Employers with no or reduced initial withdrawal liability due to application of the free-look or *de minimis* rules.** If an Employer has no initial withdrawal liability because of the application of the free-look rule in ERISA § 4210, then, in computing the fraction prescribed in subsection (b), the Plan shall use the Employer's allocable share of unfunded vested benefits, determined under ERISA § 4211 at the time of the Employer's withdrawal and adjusted in accordance with ERISA § 4225, if applicable. If an Employer's initial withdrawal liability was reduced pursuant to ERISA § 4209 (a) or (b) and the Employer is not liable for *de minimis* amounts, then, in computing the fraction prescribed in subsection (b), the Plan shall use the Employer's allocable share of unfunded vested benefits, determined under ERISA § 4211 at the time of the Employer's withdrawal and adjusted in accordance with ERISA § 4225, if applicable.

(d)    **Special rule for determining the Initial withdrawal liability of certain New Employers.**

(1)    In the event of a Mass Withdrawal occurring on or before the end of the second full Plan year after the date on which a New Employer has qualified for New Employer status by meeting the requirements of Para. 2.2(b)(2) of this Appendix E and satisfying its withdrawal liability related to its past participation in the Plan, such New Employer's initial withdrawal liability (for purposes of any allocations of reallocation liability to be made under subsection (a), (b) and (c) of this section 2.7) shall be equal to the greater of (A) the amount of withdrawal liability that the Employer is deemed to have satisfied in order to qualify as a New Employer, and (B) the New Employer's initial withdrawal liability upon its actual withdrawal from the Plan in connection with such Mass Withdrawal.

(2)    In the event of a Mass Withdrawal occurring after the end of the second full Plan year after the date on which a New Employer has qualified for New Employer status by meeting the requirements of Para. 2.2(b)(2) of this Appendix E and satisfying its withdrawal liability related to its past participation in the Plan, any such New Employer's initial withdrawal liability (for purposes of any allocations of reallocation liability to be made under subsection (a), (b) and (c) of this section 2.7) shall be equal to the amount (if any) of the New Employer's initial withdrawal liability upon its actual withdrawal from the Plan in connection with such Mass Withdrawal.

**Section 2.8        Trustee Determinations**

The determinations pursuant to Section 2 of this Appendix E and Section 4202 of ERISA shall be based upon authorization by the Board of Trustees, except that any such determination may be initially authorized between board meetings by action of at least one Employer Trustee and at least one Employee Trustee (which action is to be recorded in a written document) provided such action is ratified by the Board of Trustees at its next meeting.

**Section 3.        SPECIAL RULES WITH RESPECT TO EMPLOYER CONTRIBUTIONS**

For purposes of determining the denominator defined at Sections 2.3(b)(2), 2.4(d)(2), 2.4(e)(3)(ii), and 2.4(f)(2), the amount of Employer Contributions "made" or "contributed" with respect to a Plan Year shall be based upon the amount of Employer Contributions reported on the Form 5500 filed by the Plan for such Plan Year.

**Section 4.        ACTUARIAL ASSUMPTIONS**

The actuarial assumptions used to determine the unfunded vested benefits of the Plan shall be determined by the Plan actuary based on his/her best estimate and in accordance with ERISA § 4213.

**Section 5.        PAYMENT OF WITHDRAWAL LIABILITY**

(a)    The amount of payment shall be calculated as follows:

(1)    Except as provided in (2) and (4) below, and in (c) and (d) below; the Employer shall pay the amount determined under Section 2 of this Appendix E appropriately adjusted for partial withdrawal and de minimis reductions of $50,000 or less as provided in ERISA Sections 4206 and 4209(a), over the period of years required to amortize the amount in level annual payments determined under (3) below, calculated as if the first payment were made on the first day of the Plan year following the Plan Year in which the withdrawal occurs and as if each subsequent payment were made on the first day of each subsequent Plan Year. Such amortization period shall be determined based on actuarial assumptions used in the most recent actuarial valuation of the Plan.

(2)    If the amortization period described in (1) above exceeds 20 years, the liability of the Employer shall be limited to the first 20 annual payments determined in (3) below.

(3)    Except as provided in (5) below, the amount of each annual payment shall be the product of:

(A)    the average number of weeks of contributions for the three consecutive Plan Years, during the 10 consecutive Plan Years ending before the date of withdrawal, in which the Employer had an obligation to contribute to the Plan for the greatest number of weeks of contributions; and

(B)    the highest contribution rate at which the Employer had an obligation to contribute to the Plan during the 10 Plan Years ending with the Plan Year in which the withdrawal occurs.

(4)    In the event of a withdrawal of all or substantially all Employers which contribute to the Plan (as described in Section 4219(c)(1)(D) of ERISA) (2) above shall not apply, and total unfunded vested benefits shall be allocated among all such

- 110 -

Employers according to regulations established by the Pension Benefit Guaranty Corporation (the "PBGC").

(5)   As described in Section 4219(c)(1)(E) of ERISA, the amount of annual payment may be adjusted in the event of a partial withdrawal.

(b)   Withdrawal liability shall be payable monthly, according to the schedule determined by the Trustees. Payment of withdrawal liability shall commence no later than 60 days after demand is made therefore by the Trustees.

(c)   An Employer shall be entitled to prepay his withdrawal liability and accrued interest without penalty.

(d)   Non-payment by an Employer of any amounts due shall not relieve any other Employer from its obligation to make payment. In addition to any other remedies to which the parties may be entitled, an Employer shall be obligated to pay interest on withdrawal liability owed to the Fund from the date when the payment was due to the date when the payment is made together with all expenses of collection incurred by the Trustees, including but not limited to attorneys' fees and such fees for late payment as the Trustees determine and as permitted by law. The interest payable by an Employer, in accordance with the preceding sentence, shall be computed and charged to the Employer at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by JPMorgan Chase Bank, NA (New York, New York) for the fifteenth (15th) day of the month for which the interest is charged. Any judgment against an Employer for withdrawal liability payments owed to this Fund, shall include the greater of (a) a doubling of interest computed and charged in accordance with this section or (b) single interest computed and charged in accordance with this section plus liquidated damages in the amount of 20% of the unpaid withdrawal liability payments. The interest rate after entry of a judgment against an Employer for withdrawal liability shall be due from the date the judgment is entered until the date of payment, shall be computed and charged to the Employer on the entire judgment balance at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by JPMorgan Chase Bank, NA (New York, New York) for the fifteenth (15th) day of the month for which the interest is charged and shall be compounded annually.

(e)   In the event of a default, the outstanding amount of the withdrawal liability shall immediately become due and payable. A default occurs if:

(1)   the Employer fails to make, when due, any payments of withdrawal liability, if such failure is not cured within 60 days after such Employer receives written notification from the Fund of such failure; or

(2)   the Trustees, in their discretion, deem the Fund insecure as a result of any of the following events with respect to the Employer:

(A)   the Employer's insolvency, or any assignment by the Employer for the benefit of creditors, or the Employer's calling of a meeting of creditors for the purpose of offering a composition or extension to such creditors, or the Employer's appointment of a committee of creditors or liquidating agent, or the Employer's offer of a composition or extension to creditors,

(B)   the Employer's failure or inability to pay its debts as they become due;

(C)   the commencement of any proceedings by or against the Employer (with or without the Employer's consent) pursuant to any bankruptcy or insolvency

- 111 -

laws or any laws relating to the relief of debtors, or the readjustment, composition or extension of indebtedness, or to the liquidation, receivership, dissolution or reorganization of debtors;

(D)    the withdrawal, revocation or suspension, by any governmental or judicial entity or by any national securities exchange or association, of any charter, license, authorization, or registration required by the Employer in the conduct of its business;

(E)    the cessation of all or substantially all of an Employer's operations, or the liquidation of all or substantially all of an Employer's assets;

(F)    the existence of a delinquency in any amount owed to the Pension Fund including, without limitation, the payment of contributions or prior withdrawal liability; or

(G)    any other event or circumstance which in the judgment of the Trustees materially impairs the Employer's credit worthiness or the Employer's ability to pay its withdrawal liability when due.

**Section 6.        RESOLUTION OF DISPUTES**

Any dispute concerning whether a complete or partial withdrawal has occurred, concerning the amount and/or payment of any withdrawal liability or any other matter pertaining to ERISA Sections 4201 through 4219 and ERISA Section 4225 will be resolved in the following manner:

(a)    REVIEW BY THE FUND: If, within ninety (90) days after an Employer receives a notice and demand for payment of withdrawal liability from the Fund, such Employer in writing to the Fund (i) requests a review of any specific matter relating to the determination of such liability and the schedule of payments, (ii) identifies any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the Employer, or (iii) furnishes any additional relevant information to the Fund, a review may be conducted by the Withdrawal Liability Review Committee. The Withdrawal Liability Review Committee consists of members of Staff of the Fund selected by the Executive Director of the Fund. The Withdrawal Liability Review Committee is responsible for the review of any matter pertaining to withdrawal liability which is timely made and the recommendation for decisions on such matters to the Trustees. This Committee acts by a majority of its members present and voting in making recommendations regarding the action which the Trustees may follow in determining questions of withdrawal liability. The decision of the Trustees may be communicated in writing to the Employer including the basis for the decision and the reason(s) for any change in the determination of an Employer's liability or schedule for liability payments.

(b)    ARBITRATION: Within 60 days following the earlier of receipt of a written decision from the Trustees in accordance with subparagraph (a) above, or 120 days after an Employer has made a timely written request for a review of such withdrawal liability matters specified above, either the Employer or the Fund may initiate an arbitration proceeding as provided herein.

(1)    Manner of Initiation: Arbitration is initiated by written notice to the Chicago Regional Office of the American Arbitration Association ("AAA") with copies to the Fund (or if initiated by the Fund to the Employer) and the bargaining representative (if any) of the affected employees of the Employer. Such arbitration will be conducted, except as otherwise provided in these rules, in accordance with the "Multiemployer Pension Plan Arbitration Rules" (the "AAA Rules") administered by the AAA. The

initial filing fee is to be paid by the party initiating the arbitration proceeding. Arbitration is timely initiated if received by the AAA along with the initial filing fee within the time period prescribed by ERISA Section 4221(a)(1).

(2)     Venue: All arbitrations under this Section shall be conducted in Chicago, Illinois. Any actions pursuant to ERISA §4221(b)(2), 29 U.S.C. §1401(b)(2), to enforce, vacate or modify any awards entered in such arbitrations shall be filed in the United States District Court for the Northern District of Illinois, Eastern Division.

(3)     Preliminary Statements: The Employer shall file with the AAA and serve upon the Fund at least 21 days prior to the hearing a Preliminary Statement. The Plan shall file with the AAA and serve upon the Employer a responsive Preliminary Statement at least seven days prior to the hearing. Each preliminary statement shall contain: (1) a statement of the factual and legal contentions of the party with respect to each of the issues before the arbitrator; (2) a list identifying the name, address, and occupation of each witness to be called by the party at the hearing and a specific description of the matters upon which the witness will testify; (3) a list describing each exhibit which the party will offer in evidence; and (4) a statement of the relief sought by the party.

(c)     LITIGATION: Section 43(c) of the AAA Rules shall not apply. Within 30 days after the issuance of a final award by an arbitrator in accordance with these procedures, any party to such arbitration proceeding may bring an action in an appropriate United States district court to enforce, modify, or vacate the arbitration award, in accordance with ERISA Sections 4221 and 4301.

## Section 7     CONSTRUCTION INDUSTRY EXEMPTION

ERISA section 4203(b) shall apply to those Employers described in ERISA section 4203(b)(1).

## Section 8     FIVE-YEAR FREE LOOK RULE

(a)     Pursuant to ERISA Section 4210, 29 U.S.C. §1390, an employer who withdraws from the Plan in a complete or partial withdrawal is not liable to the Plan if the Employer:

(1)     first had an obligation to contribute to the Plan after September 26, 1980;

(2)     had an obligation to contribute to the Plan for no more than 5 consecutive plan years preceding the date of its withdrawal;

(3)     was required to make contributions to the Plan for each such plan year in an amount equal to less than 2 percent of the sum of all employer contributions made to the Plan for each such year as reported on the Form 5500 filed by the Plan for each such year; and

(4)     has never avoided withdrawal liability because of the application of this Section 8 of Appendix E.

(b)     Paragraph (a) of this section shall apply to an Employer with respect to the plan only if -

(1)     the plan is not a plan which primarily covers employees in the building and construction industry;

(2)     the plan makes this exception applicable (as it has in paragraph (a) of this section);

(3) the plan provides (as it does in Appendix G, section (a)(5)) that the reduction under §411(a)(3)(E) of the Internal Revenue Code of 1954 applies with respect to the employees of the Employer; and

(4) the ratio of the assets of the plan for the plan year preceding the first plan year for which the Employer was required to contribute to the plan to the benefit payments made during that plan year was at least 8 to 1.

**Section 9.    ADJUSTMENT OF LIABILITY FOR WITHDRAWAL SUBSEQUENT TO PARTIAL WITHDRAWAL**

The amount of credit an Employer receives for payment of a prior year's partial withdrawal liability is determined in accordance with applicable regulations (29 CFR §4206). Pursuant to 29 CFR §4206, the amortization period defined at 29 CFR §4206.9 shall be ten years. A New Employer shall not be entitled to credit for any prior withdrawal liability incurred as an Old Employer.

**Section 10.    NO REDUCTION OR WAIVER OF LIABILITY FOR NEW EMPLOYER**

An Employer shall not be entitled to a reduction or waiver of withdrawal liability under ERISA sections 4207 or 4208 based upon the payment of withdrawal liability as an Old Employer for its resumption or continuation of participation in the Pension Fund as a New Employer.

**APPENDIX F.    RULES PERTAINING TO HOURLY RATES FOR CONSTRUCTION INDUSTRY PARTICIPANTS**

**Section 1.    CONSTRUCTION AND BUILDING MATERIALS INDUSTRY DEFINED**

The construction or building materials industry for purposes of this Appendix shall be defined as all Contributing Employers in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, highway, excavation, or other work, and(or) whose principal business is the supply and(or) transportation to and from such job sites of material, equipment or supplies to be utilized by an employee performing such construction work.

The definition in the preceding paragraph applies only for the purpose of this Appendix F and does not apply for any other purpose including, without limitation, the definition of "building and construction industry" for purposes of ERISA § 4203 (b).

**Section 2.    HOURLY CONTRIBUTION OBLIGATION**

(a)    Any Collective Bargaining Agreement between a Union and a Contributing Employer in the construction or building materials industry with an effective date on or after September 1, 1985 may require hourly Contributions as set forth in (b) below.

(b)    **SCHEDULE B OF BENEFIT CLASSES AND REQUIRED MINIMUM HOURLY CONTRIBUTION RATES**

| Employer Benefit Class | | 57 | 58 | Ages 59 | 60 to 64 | 65 Plus | Hourly Contribution Rates |
|---|---|---|---|---|---|---|---|
| **14** | | 625 | 625 | 625 | 775 | 775 | $1.75 |
| **15** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 900 | $1.90 |
| | **(B)** | 700 | 750 | 800 | 900 | 900 | $2.05 |
| | **(C)** | 700 | 750 | 800 | 900 | 900 | $2.20 |
| **16** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1100 | $2.45 |
| | **(B)** | 700 | 750 | 800 | 900 | 1100 | $2.55 |
| | **(C)** | 700 | 750 | 800 | 900 | 1100 | $2.65 |
| **17a** | | | | | | | |
| | **(A)** | 700 | 750 | 800 | 900 | 1100 | $2.85 |
| | **(B)** | 700 | 750 | 800 | 900 | 1100 | $3.15 |
| | **(C)** | 700 | 750 | 800 | 900 | 1100 | $3.40 |
| | **(D)** | 700 | 750 | 800 | 900 | 1100 | $3.70 |

The table above is headed by: **Maximum Twenty-Year Service Pension Benefits** (spanning the Ages columns).

|  |  | **Maximum Twenty-Year Service Pension Benefits** | | | | | |
|  |  | | | | | | |
| **Employer Benefit Class** | | **Ages** | | | | **65 Plus** | **Hourly Contribution Rates** |
|  |  | **57** | **58** | **59** | **60 to 64** |  |  |
| **17b** |  |  |  |  |  |  |  |
|  | **(A)** | 700 | 750 | 800 | 900 | 1100 | $2.85 |
|  | **(B)** | 700 | 750 | 800 | 900 | 1100 | $3.15 |
|  | **(C)** | 700 | 750 | 800 | 900 | 1100 | $3.45 |
|  | **(D)** | 700 | 750 | 800 | 900 | 1100 | $3.90 |
| **18** |  |  |  |  |  |  |  |
|  | **(A)** | 700 | 750 | 800 | 900 | 1100 | $3.80* |
|  | **(A)** | 700 | 750 | 800 | 900 | 1100 | $3.90* |
|  | **(B)** | 700 | 750 | 800 | 900 | 1100 | $4.25 |
|  | **(C)** | 700 | 750 | 800 | 900 | 1100 | $4.70 |
|  | **(D)** | 700 | 750 | 800 | 900 | 1100 | $4.95 |
|  | **(E)** | 700 | 750 | 800 | 900 | 1100 | $5.20 |
| **18+** |  |  |  |  |  |  |  |
|  | **(A)** | 700 | 750 | 800 | 900 | 1100 | $4.40 |
|  | **(B)** | 700 | 750 | 800 | 900 | 1100 | $4.85 |
|  | **(C)** | 700 | 750 | 800 | 900 | 1100 | $5.10 |
|  | **(D)** | 700 | 750 | 800 | 900 | 1100 | $5.35 |

Benefit Class 18+ of a Participant must be based upon the Continuous Contribution Method and not upon the Non-Continuous Contribution Method or any other method.

\* If the Bargaining Unit is moving from Benefit Class 17a to Benefit Class 18, the hourly contribution rate for the first year is $3.80; otherwise it is $3.90.

(c) If a Collective Bargaining Agreement requires a Contributing Employer to make hourly Contributions, then an hourly Contribution is required to be made on an Employee's behalf for each hour that he performs one Hour of Service.

(d) If a Collective Bargaining Agreement requires a Contributing Employer to make hourly Contributions, then an Employee shall earn one hour of Contributory Service for each hour of Contributions required to be made on his behalf.

(e) If a Collective Bargaining Agreement requires a Contributing Employer to make hourly Contributions, then an Employee shall earn one hour of Vesting Service for each hour of Contributions required to be made on his behalf.

(f) Self-Contributions made under Article I, Section 1.08 for periods during which the Collective Bargaining Agreement covering the Employee requires hourly Contributions shall be limited to 40 hours of Self-Contributions per week.

**Section 3.**       **RULES FOR DETERMINING SERVICE CREDIT WHEN HOURLY CONTRIBUTIONS ARE REQUIRED**

(a)    For purposes of Article I, Section 1.10, 30 hours of Contributions required to be made on behalf of a Participant shall be considered equivalent to one week of Contributions.

(b)    For any calendar year during which a Participant has had an hour of Contributions required to be made on his behalf, the number of hours of Vesting Service due to employment under a Collective Bargaining Agreement requiring hourly Contributions during such year divided by 600 shall be added to the sum determined in Article I, Section 1.40 for the purpose of determining whether he has had a Year of Participation.

(c)    For any calendar year during which a Participant has had an hour of Contributions required to be made on his behalf and during which he has at least a Year of Participation, the number of hours of Contributory Service during such year divided by 1,200 shall be added to the sum determined in Article I, Section 1.10(a)(2)(B) for the purpose of determining his Contributory Service Credit for that year.

(d)    For any calendar year during which a Participant has had an hour of Contributions required to be made on his behalf, the number of hours of Vesting Service due to employment under a Collective Bargaining Agreement requiring hourly Contributions during such year divided by 300 shall be added to the sum determined in Article I, Section 1.23(b) for the purpose of determining whether he has had a One-Year Break-in-Service.

(e)    For any calendar year during which a Participant has had an hour of Contributions required to be made on his behalf, the number of hours of Vesting Service due to employment under a Collective Bargaining Agreement requiring hourly Contributions during such year divided by 600 shall be added to the sum determined in Article I, Section 1.37 for the purpose of determining whether he has earned a Vesting Service Year.

**Section 4.**       **DETERMINATION OF THE BENEFIT CLASS OF A PARTICIPANT WITH HOURLY CONTRIBUTIONS**

(a)    Continuous Contribution Method: The Benefit Class of a Participant who has had Continuous Contributions during his last 5 calendar years shall be the Benefit Class corresponding to the rate of his last weekly Continuous Contribution, his last daily Continuous Contribution in effect for at least his last 5 days of Contributory Service, or his last hourly Continuous Contribution in effect for at least his last 30 hours of Contributory Service.

(b)    Non-Continuous Contribution Method: The Benefit Class of a Participant who has not had Continuous Contributions shall be determined by the Non-Continuous Contribution Method described in Article III, Section 3.03(b). For the purpose of determining a Participant's Benefit Class under the Non-Continuous Contribution Method, 30 hours of Contributions shall be equivalent to one week of Contributions and the dollar amount shall be the equivalent weekly Contribution.

TM:619767 / 01096280 / 04/03/2023                                     Appendix F  (Page 3 of 3)

**APPENDIX G.    ACCEPTANCE POLICIES FOR BARGAINING UNITS**

The Acceptance Policies in this Appendix G have been adopted by the Board of Trustees for Bargaining Units that have not had prior coverage under this Pension Fund. These policies make it possible for a Bargaining Unit Employee who has never been covered by a Collective Bargaining Agreement (as defined in Article I, Section 1.06) to earn Vesting Service, Non-Contributory Service Credit and Contributory Service Credit for his past employment with the Contributing Employer that begins making Contributions on his behalf.

(a)    **GENERAL POLICY APPLICABLE TO A BARGAINING UNIT:**

A Bargaining Unit may be accepted under this General Policy subject to the following conditions:

(1)    **BENEFIT CLASS:** The Bargaining Unit must be covered by a Collective Bargaining Agreement requiring Employer Contributions at any Benefit Class under Schedule B.

(2)    **AGE AND SERVICE OF EMPLOYEES:** The Employees in the Bargaining Unit may be any age and have any number of years of past employment with the Contributing Employer that becomes required to make Employer Contributions to the Pension Fund on their behalf.

(3)    **EARNING VESTING SERVICE AND NON-CONTRIBUTORY SERVICE CREDIT FOR PAST EMPLOYMENT:** An Employee who is a member of a Bargaining Unit on the "Effective Date of Acceptance" (as hereinafter defined), shall earn Vesting Service and Non-Contributory Service Credit for his periods of past employment according to the following:

(A)    he shall earn Vesting Service for all of his continuous past employment with the Contributing Employer that begins making Contributions on behalf of the Employees in his Bargaining Unit; and

(B)    he shall earn Non-Contributory Service Credit according to Article I, Section 1.22(c) for all of his employment with the Contributing Employer that begins making Contributions on behalf of the Employees in his Bargaining Unit, unless such employment was as a manager, supervisor, business partner, sole proprietor or business owner with supervisor authority. The "Effective Date of Acceptance" of a Bargaining Unit is the date Contributions to the Pension Fund begin on behalf of Employees who are members of a Bargaining Unit accepted under this policy or the Alternative Policy in (b), below.

(C)    Non-Contributory Service Credit earned according to (a)(3)(B), above, shall be subject to the limitations in Article I, Section 1.20(a)(4).

An Employee who is on lay-off, sick leave or authorized leave of absence on the Effective Date of Acceptance of his Bargaining Unit under this policy, shall be eligible to earn Vesting Service and Non-Contributory Service Credit according to the above.

(4) **EARNING VESTING SERVICE AND CONTRIBUTORY SERVICE CREDIT FOR FUTURE EMPLOYMENT:** An Employee who is a member of a Bargaining Unit accepted under this policy, shall earn Vesting Service and Contributory Service Credit for periods of future employment according to the benefit eligibility provisions of the Pension Plan.

(5) **CANCELLATION OF VESTING SERVICE AND NON-CONTRIBUTORY SERVICE CREDIT EARNED:** In the event a Bargaining Unit either voluntarily or involuntarily withdraws from the Pension Fund during the "Five-Year Free Look" period defined in Section 8 of Appendix E, the Vesting Service and Non-Contributory Service Credit earned by an Employee under (a)(3), above, shall be canceled. After the "Five-Year Free Look" period expires, the provisions of Article I, Section 1.38 shall be applied in the event of a Voluntary Withdrawal.

(6) **BENEFIT ELIGIBILITY:** The benefit eligibility rules of the Pension Plan, including the Break-in-Service rules, shall be used to determine whether an Employee in a Bargaining Unit accepted under this policy receives any benefit from the Pension Fund, and the Forms of Payment provisions of the Pension Plan shall be used to determine the manner in which any benefit to be received shall be paid.

(b) **ALTERNATIVE POLICY APPLICABLE TO A BARGAINING UNIT THAT HAD PRIOR PENSION PLAN COVERAGE FOR ITS MEMBERS:** A Bargaining Unit whose members have been covered by another pension plan may be accepted under this Alternative Policy rather than the General Policy stated above, subject to the following conditions:

(1) **BENEFIT CLASS:** The Employees in the Bargaining Unit must be covered by a Collective Bargaining Agreement requiring Employer Contributions under a Schedule B Benefit Class that provides benefits comparable to the benefits payable to them by the prior pension plan.

(2) **AGE AND SERVICE OF EMPLOYEES:** The Bargaining Unit must consist of less than 20% of Employees who are at an age greater than 55 with 15 or more years of past employment with the Contributing Employer that becomes required to make Employer Contributions to the Pension Fund on their behalf.

(3) **EARNING VESTING SERVICE, NON-CONTRIBUTORY SERVICE CREDIT AND CONTRIBUTORY SERVICE CREDIT FOR PAST EMPLOYMENT:** An Employee who is a member of a Bargaining Unit on the "Effective Date of Acceptance" (as defined in (a)(3), above), shall earn Vesting Service, Non-Contributory Service Credit and Contributory Service Credit for periods of past employment according to the following:

(A) he shall earn Vesting Service for all of his continuous past employment with the Contributing Employer that begins making Contributions on behalf of the Employees in his Bargaining Unit; and

(B) he shall earn Non-Contributory Service Credit according to Article I, Section 1.22(c) of the Pension Plan for all of his employment with the Contributing Employer required to make Contributions on behalf of the Employees in his Bargaining Unit, except that, no Non-Contributory Service Credit will be earned for:

(i) employment as a manager, supervisor, business partner, sole proprietor or business owner with supervisory authority; or

(ii) employment for which he earns Contributory Service Credit according to (b)(3)(C), below.

(C) he shall earn Contributory Service Credit under this Pension Plan for any contributory service credit he had earned under the prior pension plan if he had become a participant vested under the prior pension plan.

Non-Contributory Service Credit earned according to (b)(3)(B), above, shall be subject to the limitations in Article I, Section 1.20(a)(4) of the Pension Plan.

An Employee who is on lay-off, sick leave, or authorized leave of absence on the Effective Date of Acceptance of his Bargaining Unit under this policy, shall be eligible to earn Vesting Service, Non-Contributory Service Credit and Contributory Service Credit according to the above.

(4) **EARNING VESTING SERVICE AND CONTRIBUTORY SERVICE CREDIT FOR FUTURE EMPLOYMENT:** An Employee who is a member of a Bargaining Unit accepted under this policy, shall earn Vesting Service and Contributory Service Credit for periods of future employment according to the benefit eligibility provision of the Pension Plan.

(5) **CANCELLATION OF VESTING SERVICE, NON-CONTRIBUTORY SERVICE CREDIT AND CONTRIBUTORY SERVICE CREDIT EARNED:** In the event a Bargaining Unit accepted under this policy either voluntarily or involuntarily withdraws from the Pension Fund during the "Five-Year Free Look" period defined in Section 8 of Appendix E, the Vesting Service, Non-Contributory Service Credit and Contributory Service Credit earned by an Employee under (b)(3), above, shall be canceled. After the "Five-Year Free Look" period expires, the provisions of Article I, Section 1.38 shall be applied in the event of a Voluntary Withdrawal.

(6) **BENEFIT ELIGIBILITY:** The benefit eligibility rules of the Pension Plan, including the Break-in-Service rules, shall be used to determine whether an Employee who is a member of a Bargaining Unit accepted under this policy receives any benefit from the Pension Fund, and the Forms of Payment provisions of the Pension Plan shall be used to determine the manner in which any benefit to be received shall be paid, except that:

(A) The Twenty-Year Service Pension, Early Retirement Pension, Deferred Pension and Twenty-Year Deferred Pension shall be reduced by the amount of any benefit payable under the prior pension plan.

(B) The eligibility requirements for the Contributory Credit Pension, 25-And-Out Pension and 30-And-Out Pension shall also include the condition that at least ½ of the Contributory Service Credit needed for these benefits be earned after the Effective Date of Acceptance of a Bargaining Unit under this policy. These benefits shall also be reduced by the amount of any benefit payable under the prior pension plan.

(c) **POLICY UNDER WHICH VESTING SERVICE, NON-CONTRIBUTORY SERVICE CREDIT AND CONTRIBUTORY SERVICE CREDIT WILL BE RECOGNIZED:** Any Vesting Service, Non-Contributory Service Credit and Contributory Service Credit being claimed by an Employee in a Bargaining Unit accepted under the provisions of this Appendix G, must be reported to the Pension Fund at the time the Bargaining Unit petitions for acceptance. Only an Employee who is a member of a Bargaining Unit on

- 120 -

the Effective Date of Acceptance shall be eligible to have Vesting Service, Non-Contributory Service Credit and Contributory Service Credit recognized by the Pension Fund according to the provisions of this Appendix G. An Employee who is hired or rehired and becomes a member of a Bargaining Unit after its Effective Date of Acceptance shall not be eligible to claim any Vesting Service, Non-Contributory Service Credit or Contributory Service Credit under this Appendix G.

## APPENDIX H.    THE SPECIAL ELIGIBILITY APPENDIX

During 1987, a settlement was finalized in a class action lawsuit (Dutchak, Brock and Sullivan v. Fitzsimmons) that had been pending in the United States District Court in Chicago. This Appendix H adds a series of amendments to the Pension Plan to comply with this settlement. In general, the provisions of this Appendix H make the federal law requirements of the Employee Retirement Income Security Act of 1974 (ERISA), retroactive to February 1, 1955 (the inception of the Pension Fund) so as to cover any Participant or former Participant. The purpose of this Appendix H is to set forth the special eligibility amendments that apply to those who are affected by this settlement. These special eligibility amendments supersede any other provisions of this Pension Plan to the extent they are in conflict with those provisions.

(a)    If any Participant is entitled to benefits under any provisions of the Pension Plan other than these amendments, those other benefits must be paid in full and set off against any benefit payable because of the amendments. This will not result in a decrease in the total benefit to which any Participant is entitled.

(b)    Prior to ERISA, which became law in 1974, the Fund did not provide any form of vested benefits; that is (with one exception), no Participant was guaranteed a benefit unless the Participant had met all eligibility criteria at the time of the Participant's retirement. The ERISA rules, in general, provide a benefit to every Participant with 10 years of contributions made or required to be made to the Pension Fund not interrupted by a Break-in-Service (absence from contributory coverage) regardless whether the Participant subsequently left the Pension Fund for any period of time, however long, before retiring. As a result of these amendments, any Participant who has ever had 10 years of contributions made or required to be made to the Pension Fund on his behalf may receive a Vested Pension calculated under the ERISA mandated formula. Specifically, under these amendments, any Participant who is eligible to retire before December 31, 2015, will be entitled to choose either the benefits for which that Participant qualifies under the Pension Plan as it existed before these amendments became effective or, in the alternative, to receive a Vested Pension based upon all contributions required to be made to the Pension Fund on behalf of the Participant since 1955 (not counting certain non-contributory service as defined in the Pension Plan) if the Participant has received 10 Vesting Service Years (as defined in the Pension Plan), regardless whether at least 3 of those years were received after December 31, 1970 and regardless whether he was a Participant as defined by the Pension Plan.

(c)    Under the earlier pension plans, a Participant could have a Break-in-Service, and lose Service Credit if he left the Pension Fund for 2 to 5 years, regardless whether he returned to coverage at a later date. The Break could cause the loss of a Participant's entire pension. These amendments, however, will be subject to the ERISA Break-in-Service rules, which permit a Participant to regain all Service Credit if he returns to the Pension Fund in less years than he was originally in the Fund, regardless whether the Covered Service, Service Credit and Vesting Service occurred at any time after February 1, 1955. In all cases, the Break-in-Service rule which is most advantageous to the Participant will be applied in determining his eligibility for any benefit.

(d)    Service in a different fund which has reciprocity with the Pension Fund, or in another pension plan established by collective bargaining with an International Brotherhood of Teamsters affiliate which this Pension Fund does not have a reciprocal agreement, will not constitute a Break-in-Service regardless whether it is treated as Service Credit in this Pension Fund for purposes of the Pension Plan for employment covered by another pension plan. This amendment will remain in effect until December 31, 2015.

(e)    At present, the Pension Fund normally pays disability benefits on the same schedule as Social Security Disability Benefits; starting the 1st day of the month after 5 full calendar months of total disability. The present rules, however, delay such payments (and do not pay for the period of such delay) if a Participant does not file his claim for disability benefits during this 5 month period, so that a tardy filing will cause denial of benefits for any time prior to the 3rd month after such late claim. As a result of these amendments, the tardy filing rule will be waived so that the first monthly payment of a Disability Pension Benefit for any Participant disabled between the effective date of this amendment and December 31, 2015, will become due on the 1st day of the month after such Participant has been disabled for 5 full calendar months (and is otherwise eligible for a benefit under the Pension Plan).

(f)    Each participant receiving a Disability Pension Benefit of $100 as of October 15, 1981, will receive a $10 increase in his monthly payments effective retroactively to November 1, 1981 and to and including December 31, 2015, so long as that Participant is otherwise eligible under the Pension Plan. If the Disability Pension Benefit is increased above $150 before December 31, 2015, the eligible Participant will receive that increased benefit plus $15 per month, until December 31, 2015, at which time all additional payments made under this amendment will terminate totally, provided that Participants who qualified for a Disability Pension Benefit prior to December 31, 2015 and began to receive the increased monthly payments described under this Section (f) prior to that date, shall, subject to the requirements of all other provisions of this Pension Plan, continue to receive those increased payments.

(g)    A Special Hardship Appeal Committee will be created, composed of one Union Trustee and one Employer Trustee. This Committee will meet at least once each calendar quarter and may meet more often at its discretion. For each hardship claim presented, the Committee will attempt to reach fair and internally consistent decisions and will keep files which will include a summary of the basis of the claim and the Committee's findings and disposition of the claim. In addition, the Committee will maintain an index to all such files. These records will be available for inspection by any Participant or his attorney. The procedure for review of a claim by the Special Hardship Appeal Committee will be the same as that for review by the Board of Trustees as described in the Pension Plan, except to the extent that procedure is inconsistent with the procedure provided in this amendment.

(h)    The Special Hardship Appeal Committee will review appeals by and grant benefits to any Participant who does not qualify for benefits under the Pension Plan in cases where substantial justice requires deviation from the specific eligibility rules of the Pension Plan; these cases must substantially conform to circumstances in which:

(1)    the Participant would have been eligible for benefits but for written misinformation provided by the Pension Fund or its Employees;

(2)    the Participant would have been eligible for benefits but for inadequate or tardy release of information about the Pension Fund's eligibility rules or his status under these rules;

(3)    the Participant has at least 20 years of Covered Service on or after his 47th birthday, was not an active Employee on his 50th birthday, and demonstrated confusion as to the application of Pension Plan rules to those circumstances by having made a reasonably contemporaneous claim for benefits;

(i)    Any benefits payable to a Participant or former Participant becoming eligible under the terms of these amendments which have a present value (as computed by the Pension

- 123 -

Fund's actuary) of $2,500 or less at the time the benefits become effective, may (if the Pension Fund elects) be paid in lump-sum equivalent to the amount of that present value.

(j)    Any payment which would have been made to a deceased Participant under the amendments if not for the Participant's death, will be payable to the estate of the deceased Participant or those of the Participant's heirs as may be determined by the Pension Fund. Any payment of death benefits to which any person would be entitled under the amendments will be made to the person who would have been entitled to a death benefit at the time of the death of the Participant.

(k)    These amendments are enacted pursuant to the settlement and will expire and cease being effective on December 31, 2015, however, a Participant who is entitled to receive benefits other than the disability pension provided by the amendments (but subject to the final proviso clause concerning increased disability pension benefits set forth in section (f) of this Appendix H and the other eligibility rules of the Pension Plan) will continue to receive those benefits for the remainder of his life. Subject to any limitations of ERISA or any other applicable legal requirements, the Board of Trustees reserves the right to amend the Pension Plan to suspend or eliminate any of the benefits required by the amendments if the lawsuits are reopened or revived by court order in a way which challenges the general principles of the amendments and the settlement upon which they are based.

- 124 -

**APPENDIX I.    MEDICAL BENEFITS ACCOUNTS**

**Section 1.    PREAMBLE**

This Appendix I is added to the Pension Plan by the Board of Trustees, effective on and after June 1, 1999, in order to establish a basis for benefits to be payable by the Pension Fund in accordance with Section 401(h) of the Internal Revenue Code, which currently provides that "a pension or annuity plan may provide for the payment of benefits for sickness, accident, hospitalization, and medical expenses of retired employees, their spouses and their dependents" if certain conditions are satisfied.

**Section 2.    DEFINITIONS**

The definitions applicable to this Appendix I include all definitions stated in Article I and other provisions of the Pension Plan, as heretofore and hereafter amended, and the following:

(a)    **"Eligible Medical Beneficiary"** means any person (1) who is a Pensioner receiving monthly retirement pension benefits from the Pension Fund or the Spouse of such a Pensioner and (2) who is eligible to receive Medical Benefits in accordance with a Medical Benefits Account; and

(b)    **"Health and Welfare Fund"** means Central States, Southeast and Southwest Areas Health and Welfare Fund; and

(c)    **"Medical Benefits"** means those benefits which are specified in a Medical Benefits Account; and

(d)    **"Medical Benefits Account"** means a plan established by the Board of Trustees to provide benefits in accordance with Section 401(h) of the Internal Revenue Code, provided that the terms and provisions of each such separate plan shall be specified in a resolution adopted by the Board of Trustees; and

(e)    **"Spouse"** means any person (1) who is married to a Pensioner in a legally recognized civil or religious ceremony or (2) who is a party to a common-law marriage with a Pensioner in a jurisdiction in which common-law marriages are recognized to be valid, provided that the Pension Fund receives evidence confirming that all prerequisites to the validity of a common-law marriage, in that jurisdiction, have been satisfied.

**Section 3.    MEDICAL BENEFITS ACCOUNTS**

(a)    The Board of Trustees amends the Pension Plan by the addition of this Appendix I, effective on and after June 1, 1999, as the basis for Medical Benefits to be payable by the Pension Fund in accordance with separate Medical Benefits Accounts, the terms and provisions of each such separate account to be specified in a resolution adopted by the Board of Trustees.

(b)    The funding for the payment of all Medical Benefits in accordance with Medical Benefits Accounts shall be derived entirely from Contributions payable by Contributing Employers in accordance with Collective Bargaining Agreements and from investment earnings.

(c)    The terms and provisions of the Pension Plan relating to plan administration, including Article VII and Appendix B, are incorporated by reference into, and shall be applicable to, this Appendix I.

(d)    The Health and Welfare Fund shall provide administrative services in disbursing Medical Benefits in accordance with Medical Benefits Accounts, in exchange for which the Health and Welfare Fund shall receive reasonable compensation from the Pension Fund in amounts sufficient to reimburse the Health and Welfare Fund for the costs it incurs in providing such services.

(e)    Medical Benefits Account 18+ is established, effective on and after June 1, 1999, and is based upon the following terms and provisions:

    (1)    the funding for the payment of all Medical Benefits in accordance with Medical Benefits Account 18+ shall be derived entirely from a portion of the Contributions that are payable by Contributing Employers in accordance with Collective Bargaining Agreements that specify Benefit Class 18+ Contribution rates (and from investment earnings), provided that the portion of those Contributions allocable to Medical Benefits Account 18+ shall be limited to $6.00 per weekly Contribution or $1.20 per daily contribution or $.15 per hourly Contribution, and provided further that the Pension Fund shall not be obligated to fund Medical Benefits except to the extent of such specified portion of Contributions and investment earnings thereon; and

    (2)    the Medical Benefits that will be payable to an Eligible Medical Beneficiary in accordance with Medical Benefits Account 18+ will be equal to the Prescription Drug Benefit which is specified (as of June 1, 1999) in the Retiree Plan Document of the Health and Welfare Fund, the terms and exclusions of which are hereby incorporated by reference, provided that the Pension Fund will pay 80% of covered Prescription Drug Benefit charges, and provided further that such payments by the Pension Fund will be limited to $1,000 per Eligible Medical Beneficiary in each calendar year, and provided further that the terms, limitations and exclusions of Medical Benefits payable in accordance with Medical Benefits Account 18+ may be amended by the Board of Trustees at any time and to any lawful extent and purpose; and

    (3)    Medical Benefits in accordance with Medical Benefits Account 18+ will be payable to a Pensioner receiving monthly retirement benefits from the Pension Fund (only during periods in which such monthly benefits are payable), and to the Spouse of such a Pensioner, **if:**

        (A)    the Pensioner meets each of the requirements of Section 4.04(d)(7) and qualifies for a Contributory Credit Pension under Benefit Class 18+; and

        (B)    the Pensioner has at least 20 years of Contributory Service Credit; and

        (C)    the Pensioner's Retirement Date is during the period from the initial effective date through the expiration date of a Collective Bargaining Agreement which covers members of his Bargaining Unit and which provides for Employer Contributions at a rate corresponding to Benefit Class 18+; provided that such Medical Benefits will be payable only on and after the 65th birthday of a Pensioner or Spouse.

**Section 4.**     **MISCELLANEOUS**

In order to comply with the Internal Revenue Code, administration of each Medical Benefits Account shall comply with the following requirements:

(a)     all Medical Benefits shall be subordinate to the retirement pension benefits provided by and in accordance with the Pension Plan, provided that the aggregate actual Contributions allocated to Medical Benefits Accounts (when added to aggregate actual Contributions allocable to life insurance protection provided by and in accordance with the Pension Plan) shall not exceed 25% of all actual Contributions to the Pension Fund (other than Contributions allocated to the funding of past service credits) after the date on which a Medical Benefit Account is first established by the Pension Fund; and

(b)     a separate account shall be established and maintained with respect to Contributions allocated to each Medical Benefits Account, provided that this separate account requirement is for recordkeeping purposes only and that the funds allocated to Medical Benefits Accounts will be collectively invested with funds set aside for retirement purposes without identification of which investment properties are allocable to each account, and provided further that the investment earnings attributable to Medical Benefits Accounts must be allocated to each such account in a reasonable manner; and

(c)     each Contributing Employer, at or before the time he remits any Contribution to the Pension Fund of which part is to be allocated to a Medical Benefits Account, must designate the portion of the Contribution that is allocable to a Medical Benefits Account, and all Contributions by Contributing Employers to Medical Benefits Accounts must be reasonable and ascertainable; and

(d)     it shall be impossible, at any time prior to the satisfaction of all liabilities under the Pension Plan to provide Medical Benefits, for any part of the corpus or income of a Medical Benefits Account (as recorded in a separate account) to be used for, or diverted to, any purpose other than the providing of such Medical Benefits (within the taxable year or thereafter), provided that it is permissible to apply corpus and/or income of a Medical Benefits Account to the payment of necessary or appropriate expenses of administering a Medical Benefits Account; and

(e)     in the event the interest of an Eligible Medical Beneficiary in a Medical Benefits Account is forfeited prior to termination of the account, an amount equal to the amount of the forfeiture shall be applied as soon as possible to reduce Contributions to fund Medical Benefits payable in accordance with the account; and

(f)     in the case of any Pensioner who is a "key employee" (meaning a person who, at any time during the plan year or any preceding plan year during which Contributions were made to the Pension Fund on his or her behalf, was a "key employee" as defined in Section 416[i] of the Internal Revenue Code as heretofore or hereafter amended), a separate account shall be established and maintained for Medical Benefits payable on behalf of such Pensioner and his or her Spouse, and such Medical Benefits (for any plan year in which the person is a "key employee") shall be payable for such Pensioner and his or her Spouse only from such separate account; and

(g)     upon the satisfaction of all liabilities under the Pension Plan to provide Medical Benefits from a Medical Benefits Account, all of the corpus and income remaining in the Medical Benefits Account (as recorded in a separate account) shall be credited or refunded to the Contributing Employers whose Contributions funded the account, provided that such credits or refunds shall be limited to entities which are then Contributing Employers.

- 127 -

**APPENDIX J-1.   GROCERY WAREHOUSE PLAN A**

**Section 1.        PREAMBLE**

This Appendix J-1 is added to the Pension Plan by the Board of Trustees, <u>effective on and after January 1, 2000</u>, in order to establish the basis for the initial participation in the Pension Plan, after that date, of certain newly hired Employees of Contributing Employers which are Grocery Warehouse Employers. A principal objective of this Appendix J-1 is to fortify the contribution base of the Pension Fund by attracting certain additional Contributing Employers and Participants and by enabling certain existing Contributing Employers to continue their participation in the Pension Fund. The terms and provisions of this Appendix J-1 are available only to those Contributing Employers (and Participants employed by them) whose participation in this Grocery Warehouse Plan is expressly authorized and approved by the Trustees. (<u>This Appendix J-1 is inapplicable to any Collective Bargaining Agreement [including any renewal or extension of an earlier Collective Bargaining Agreement] that is initially effective in a period that begins on or after July 1, 2006. If the expiration date of a Collective Bargaining Agreement of a Grocery Warehouse Employer was on or after July 1, 2006, and the agreement is amended to provide an expiration date prior to July 1, 2006, the amended agreement will not be accepted by the Pension Fund and this Appendix J-1 will be inapplicable to the amended agreement after its pre-amendment expiration date.</u> *See* <u>Appendix J-2 of the Pension Plan.</u>)

**Section 2.        DEFINITIONS**

The definitions applicable to this Appendix J-1 include all definitions stated in Article I and other provisions of the Pension Plan, as heretofore and hereafter amended, and the following:

(a)    "Grocery Warehouse Employer" means a Contributing Employer which is bound by the terms of a Teamster Contract and which is engaged in grocery warehouse operations. The Trustees of the Pension Fund are vested with discretionary and final authority in determining whether or not a specific Contributing Employer is a Grocery Warehouse Employer and each such determination shall be binding upon that Contributing Employer, all other Contributing Employers and all Participants and beneficiaries of the Pension Fund.

(b)    "Grocery Warehouse Employee", within the scope and for purposes of this Appendix J-1, means a Participant (1) who is employed by a Grocery Warehouse Employer, (2) whose employment is limited to grocery warehouse operations and (3) whose <u>initial</u> employment by his Grocery Warehouse Employer begins during the period from January 1, 2000, through the date of the first expiration on or after July 1, 2006, of a Collective Bargaining Agreement (including any renewal or extension of an earlier agreement) of his Grocery Warehouse Employer. ("Grocery Warehouse Employee" does not include any employee who performs truck driving and/or other non-warehouse services for his Grocery Warehouse Employer.) The Trustees of the Pension Fund are vested with discretionary and final authority in determining whether or not a specific Participant is a Grocery Warehouse Employee and each such determination shall be binding upon that Participant, his Contributing Employer, all other Contributing Employers and all Participants and beneficiaries of the Pension Fund.

**Section 3.**     **AUTHORIZED LESS-THAN-100% EMPLOYER CONTRIBUTIONS (AND CONTRIBUTORY SERVICE CREDIT) DURING INITIAL EMPLOYMENT OF GROCERY WAREHOUSE EMPLOYEES**

(a)     Each Grocery Warehouse Employer shall be authorized and obligated to remit Employer Contributions on behalf of each Grocery Warehouse Employee it first employs on a date that is on or after January 1, 2000, and prior to July 1, 2006, beginning no later than the Contribution Start Date of that employee (as determined pursuant to this subsection), at no less than the following percentage of the Contribution Rates specified in Section 3.01(d) of the Pension Plan:

(1)     20% throughout the first 12-month period after the Contribution Start Date; and

(2)     40% throughout the second 12-month period after the Contribution Start Date; and

(3)     60% throughout the third 12-month period after the Contribution Start Date; and

(4)     80% throughout the fourth 12-month period after the Contribution Start Date; and

(5)     100% on and after the fourth anniversary of the Contribution Start Date.

For each Grocery Warehouse Employer whose initial Collective Bargaining Agreement providing for the above-described phased-in Employer Contributions is first effective on a date after March 31, 2005, the Contribution Start Date of each Grocery Warehouse Employee it first employs during or after the term of that agreement shall be the 31st calendar day after such employment begins. For each Grocery Warehouse Employer whose initial Collective Bargaining Agreement providing for the above-described phased-in Employer Contributions was first effective before April 1, 2005, the Contribution Start Date of each Grocery Warehouse Employee it first employs on or after January 1, 2000, shall be no later than the date of that employee's initial completion of 1,000 Hours of Service in a 12-month period based upon his compensated employment by that Grocery Warehouse Employer, provided that, for each renewal or extension of a Collective Bargaining Agreement of such Grocery Warehouse Employer that is first effective on or after April 1, 2005, the Contribution Start Date of each Grocery Warehouse Employee it first employs during or after the term of that renewed or extended agreement shall be the 31st calendar day after such employment begins.

(b)     Any Collective Bargaining Agreement that provides for a schedule of phased-in Employer Contributions over a maximum 48-month period as authorized by (a), *supra*, shall specify the full Contribution Rate to which each percentage is applicable and shall separately specify the amount and duration of each such percentage.

(c)     Any Participant on whose behalf Employer Contributions are owed at less than 100% of the applicable Contribution Rate(s) during the first 48 months after his Contribution Start Date, pursuant to (a) and (b), *supra*, shall, during that same period, earn full Contributory Service for the purposes of both calculating a Year of Participation and preventing a One-Year Break-in-Service (and a Break-in-Service) as if the Participant's Employer Contributions were owed at 100% (rather than partial percentages) of the full Contribution Rate(s), provided that only the same partial percentages of Contributory Service will be included in calculating Contributory Service Credit.

(d)     Any Participant on whose behalf Employer Contributions are owed at less than 100% of the applicable Contribution Rate(s) during the first 48 months after his Contribution Start Date, pursuant to (a) and (b), *supra*, shall earn full Vesting Service throughout that period

as if the Participant's Employer Contributions were owed at 100% (rather than partial percentages) of the full Contribution Rate(s).

(e)    Any Participant on whose behalf Employer Contributions are owed at less than 100% of the applicable Contribution Rate(s) during the first 48 months after his Contribution Start Date, pursuant to (a) and (b), *supra*, shall be limited to the same partial amount of Contributory Service Credit during that 48-month period (for example, if the Participant's Employer Contributions are owed at 20%, 40%, 60% and 80% of the full Contribution Rate[s], respectfully, during the first four 12-month periods after his Contribution Start Date, he will be entitled to Contributory Service Credit limited to the same corresponding percentage of each week, day or other partial period within each such 12-month period), and shall be limited to the same partial periods of Contributions solely for the purposes of calculating Continuous Contributions and calculating the amount of reemployment of a recovered (former) Disabled Participant or a reemployed Pensioner that may be credited toward the 250-week minimum provided in Section 4.14.

(f)    The terms and provisions of this Appendix J-1 shall be applied to each newly hired Grocery Warehouse Employee without taking into account any of his prior employment, except employment by the same Grocery Warehouse Employer. Each Grocery Warehouse Employer may owe partial rather than full Employer Contributions on behalf of each of its Grocery Warehouse Employees, during only the first 48 months after an employee's first Contribution Start Date during his initial employment by that Grocery Warehouse Employer, to the extent authorized by this Appendix J-1 (even if its employment of that employee is not continuous throughout that 48-month period).

**APPENDIX J-2.    GROCERY WAREHOUSE PLAN B**

**Section 1.        PREAMBLE**

This Appendix J-2 is added to the Pension Plan by the Board of Trustees, <u>effective on and after July 1, 2006</u>, in order to establish the basis for the initial participation in the Pension Plan, after that date, of certain newly hired Employees of Contributing Employers which are Grocery Warehouse Employers. A principal objective of this Appendix J-2 is to fortify the contribution base of the Pension Fund by attracting certain additional Contributing Employers and Participants and by enabling certain existing Contributing Employers to continue their participation in the Pension Fund. The terms and provisions of this Appendix J-2 are available only to those Contributing Employers (and Participants employed by them) whose participation in this Grocery Warehouse Plan is expressly authorized and approved by the Trustees.

**Section 2.        DEFINITIONS**

The definitions applicable to this Appendix J-2 include all definitions stated in Article I and other provisions of the Pension Plan, as heretofore and hereafter amended, and the following:

(a)    "Grocery Warehouse Employer" means a Contributing Employer which is bound by the terms of a Teamster Contract and which is engaged in grocery warehouse operations. The Trustees of the Pension Fund are vested with discretionary and final authority in determining whether or not a specific Contributing Employer is a Grocery Warehouse Employer and each such determination shall be binding upon that Contributing Employer, all other Contributing Employers and all Participants and beneficiaries of the Pension Fund.

(b)    "Grocery Warehouse Employee", within the scope and for purposes of this Appendix J-2, means a Participant (1) who is employed by a Grocery Warehouse Employer, (2) whose employment is limited to grocery warehouse operations and (3) whose <u>initial</u> employment by his Grocery Warehouse Employer begins on or after the inception date of the first Collective Bargaining Agreement of his Grocery Warehouse Employer (including any renewal or extension of an earlier agreement) that becomes effective on or after July 1, 2006. ("Grocery Warehouse Employee" does not include any employee who performs truck driving and/or other non-warehouse services for his Grocery Warehouse Employer.) The Trustees of the Pension Fund are vested with discretionary and final authority in determining whether or not a specific Participant is a Grocery Warehouse Employee and each such determination shall be binding upon that Participant, his Contributing Employer, all other Contributing Employers and all Participants and beneficiaries of the Pension Fund. (A Participant who, <u>as of June 30, 2006</u>, is a "Grocery Warehouse Employee" within the scope and for purposes of Appendix J-1, and whose first Contribution Start Date for Appendix J-1 purposes was after June 30, 2002, may prospectively be reclassified as a "Grocery Warehouse Employee" within the scope and purposes of this Appendix J-2, <u>but only for the remainder of the first 48 months after his first Contribution Start Date for Appendix J-1 purposes</u>, provided that any such reclassification is contingent on prior approval by the Trustees of a corresponding amendment to his Contributing Employer's Collective Bargaining Agreement [the Trustees are vested with discretionary and final authority in determining whether or not to approve such an amendment].)

**Section 3.**   **AUTHORIZED LESS-THAN-100% EMPLOYER CONTRIBUTIONS (AND CONTRIBUTORY SERVICE CREDIT) DURING INITIAL EMPLOYMENT OF GROCERY WAREHOUSE EMPLOYEES**

(a)   Each Grocery Warehouse Employer shall be authorized and obligated to remit Employer Contributions on behalf of each Grocery Warehouse Employee it first employs on or after July 1, 2006, beginning no later than the Contribution Start Date of that employee (as determined pursuant to this subsection), at no less than the following percentage of the Contribution Rates specified in Section 3.01(d) of the Pension Plan:

(1)   50% throughout the first 36-month period after the Contribution Start Date; and

(2)   100% on and after the third anniversary of the Contribution Start Date.

For each Grocery Warehouse Employer whose initial Collective Bargaining Agreement providing for the above-described phased-in Employer Contributions is first effective on a date on or after July 1, 2006, the Contribution Start Date of each Grocery Warehouse Employee it first employs on or after that date shall be the 31st calendar day after such employment begins.

(b)   Any Collective Bargaining Agreement that provides for a schedule of phased-in Employer Contributions over a maximum 36-month period as authorized by (a), *supra*, shall specify the full Contribution Rate to which the 50% percentage is applicable and shall specify the amount and duration of the 50% obligation.

(c)   Any Participant on whose behalf Employer Contributions are owed at 50% of the applicable Contribution Rate(s) during the first 36 months after his Contribution Start Date, pursuant to (a) and (b) *supra*, shall, during that same period, earn full Contributory Service for the purposes of both calculating a Year of Participation and preventing a One-Year Break-in-Service (and a Break-in-Service) as if the Participant's Employer Contributions were owed at 100% (rather than 50%) of the full Contribution Rate(s).

(d)   Any Participant on whose behalf Employer Contributions are owed at 50% of the applicable Contribution Rate(s) during the first 36 months after his Contribution Start Date, pursuant to (a) and (b), *supra*, shall earn full Vesting Service throughout that period as if the Participant's Employer Contributions were owed at 100% (rather than 50%) of the full Contribution Rate(s).

(e)   Any Participant on whose behalf Employer Contributions are owed at 50% of the applicable Contribution Rate(s) during the first 36 months after his Contribution Start Date, pursuant to (a) and (b), *supra*, shall earn full Contributory Service Credit throughout that period as if the Participant's Employer Contributions were owed at 100% (rather than 50%) of the full Contribution Rate(s) and, during that same 36-month period, 100% of the total weeks of Contributions will be included in any calculations of Continuous Contributions (Section 3.02) and of the amount of reemployment of a recovered (former) Disabled Participant or a reemployed Pensioner that may be credited toward the 250-week minimum provided in Section 4.14.

(f)   The terms and provisions of this Appendix J-2 shall be applied to each newly hired Grocery Warehouse Employee without taking into account any of his prior employment, except employment by the same Grocery Warehouse Employer. Each Grocery Warehouse Employer may owe 50% rather than full Employer Contributions

on behalf of each of its Grocery Warehouse Employees for only the first 36 months after an employee's first Contribution Start Date that occurs during his initial employment by that Grocery Warehouse Employer, and only to the extent authorized by this Appendix J-2 (even if its employment of that employee is not continuous throughout that 36-month period).

- 133 -

**APPENDIX K-1.   MINIMUM EMPLOYER CONTRIBUTION REQUIREMENTS**

**Section 1.        PREAMBLE**

This Appendix K-1 is added to the Pension Plan by the Board of Trustees, effective on and after November 8, 2005, in order to enable the Pension Fund to comply with minimum funding standards imposed by federal law. The Pension Fund is required to comply with minimum funding standards established by Section 302 of ERISA, 29 U.S.C. § 1082, and Section 412 of the Internal Revenue Code, 26 U.S.C. § 412. A letter from Internal Revenue Service ("IRS") dated July 13, 2005, to Thomas C. Nyhan, Executive Director of the Pension Fund, states in part (emphasis added):

> "This letter constitutes notice that your request for a 10-year extension for amortizing the unfunded liabilities described in section 412 (b) (2) (B) of the Internal Revenue Code ('Code') and section 302 (b) (2) (B) of the Employee Retirement Income Security Act of 1974 ('ERISA'), has been approved subject to the following conditions:"

> **\* \* \* \* \***

> **"... If any one of these conditions is not satisfied, the approval to extend the amortization periods for amortizing the unfunded liabilities would be retroactively null and void."**

The Trustees have received recommendations, information and expert advice that addition of this Appendix K-1 to the Pension Plan will be a reasonable measure to enable the Pension Fund to comply with the required conditions of the above-referenced IRS letter dated July 13, 2005, to prevent a deficiency in the Pension Fund's funding standard account and to comply with minimum funding standards imposed by ERISA and the Internal Revenue Code.

**Section 2.        DEFINITIONS**

The definitions applicable to this Appendix K-1 include all definitions stated in Article I and other provisions of the Pension Plan.

**Section 3.        MINIMUM EMPLOYER CONTRIBUTION REQUIREMENTS**

Every Collective Bargaining Agreement which required Employer Contributions to the Pension Fund as of November 8, 2005, and which as of that date was scheduled to expire between that date and December 31, 2006, and which is renewed for periods beyond its expiration shall require each Contributing Employer bound by that renewal agreement to make increased Employer Contributions to the Pension Fund at Contribution rates at least equal to the following requirements (with exceptions specified in Section 4)[1]*:

---

* As used in the Appendix K-1, "Current" means the final Employer Contribution rate for the highest Benefit Class negotiated in the Collective Bargaining Agreement expiring between November 8, 2005, and December 31, 2006; "Rate/Wk" means Weekly Employer Contribution Rates; "Rate/Day" means Daily Employer Contribution Rates; and "Rate/Hr" means Hourly Employer Contribution Rates.

Schedule A (Benefit Class 1-14):

| Benefit Class | Current Rate/Wk | Year 1 Rate/Wk | Year 2 Rate/Wk | Year 3 Rate/Wk | Year 4 Rate/Wk | Year 5 Rate/Wk |
|---|---|---|---|---|---|---|
| 1 | $ 5.00 | $ 5.40 | $ 5.80 | $ 6.20 | $ 6.60 | $ 7.10 |
| 2 | 7.00 | 7.50 | 8.00 | 8.60 | 9.20 | 9.80 |
| 2A | 9.00 | 9.60 | 10.30 | 11.30 | 11.80 | 12.60 |
| 3 | 11.00 | 11.80 | 12.60 | 13.50 | 14.40 | 15.40 |
| 3A | 13.00 | 13.90 | 14.90 | 15.90 | 17.00 | 18.20 |
| 4 | 16.00 | 17.10 | 18.30 | 19.60 | 21.00 | 22.50 |
| 5 | 18.50 | 19.80 | 21.20 | 22.70 | 24.30 | 26.00 |
| 6 | 21.00 | 22.50 | 24.10 | 25.80 | 27.60 | 29.50 |
| 7 | 24.00 | 25.70 | 27.50 | 29.40 | 31.50 | 33.70 |
| 8 | 27.00 | 28.90 | 30.90 | 33.10 | 35.40 | 37.90 |
| 9 | 30.00 | 32.10 | 34.30 | 36.70 | 39.30 | 42.10 |
| 10 | 33.00 | 35.30 | 37.80 | 40.40 | 43.20 | 46.20 |
| 11 | 37.00 | 39.60 | 42.40 | 45.40 | 48.60 | 52.00 |
| 12 | 41.00 | 43.90 | 47.00 | 50.30 | 53.80 | 57.60 |
| 13 | 46.00 | 49.20 | 52.60 | 56.30 | 60.20 | 64.40 |
| 14 | 51.00 | 54.60 | 58.40 | 62.50 | 66.90 | 71.60 |

TM:619767 / 01096280 / 04/03/2023

Appendix K-1  (Page 2 of 5)

Schedule B (Benefit Class 1-14)

| Benefit Class | Current Rate/Wk | Year 1 Rate/Wk | Year 2 Rate/Wk | Year 3 Rate/Wk | Year 4 Rate/Wk | Year 5 Rate/Wk |
|---|---|---|---|---|---|---|
| 1 | $ 6.00 | $ 6.40 | $ 6.80 | $ 7.30 | $ 7.80 | $ 8.30 |
| 2 | 8.00 | 8.60 | 9.20 | 9.80 | 10.50 | 11.20 |
| 2A | 10.00 | 10.70 | 11.40 | 12.20 | 13.10 | 14.00 |
| 3 | 12.00 | 12.80 | 13.70 | 14.70 | 15.70 | 16.80 |
| 3A | 15.00 | 16.10 | 17.20 | 18.40 | 19.70 | 21.10 |
| 4 | 18.00 | 19.30 | 20.70 | 22.10 | 23.60 | 25.30 |
| 5 | 21.00 | 22.50 | 24.10 | 25.80 | 27.60 | 29.50 |
| 6 | 24.00 | 25.70 | 27.50 | 29.40 | 31.50 | 33.70 |
| 7 | 27.00 | 28.90 | 30.90 | 33.10 | 35.40 | 37.90 |
| 8 | 30.00 | 32.10 | 34.30 | 36.70 | 39.30 | 42.10 |
| 9 | 33.00 | 35.30 | 37.80 | 40.40 | 43.20 | 46.20 |
| 10 | 36.00 | 38.50 | 41.20 | 44.10 | 47.20 | 50.50 |
| 11 | 40.00 | 42.80 | 45.80 | 49.00 | 52.40 | 56.10 |
| 12 | 44.00 | 47.10 | 50.40 | 53.90 | 57.70 | 61.70 |
| 13 | 49.00 | 52.40 | 56.10 | 60.00 | 64.20 | 68.70 |
| 14 | 55.00 | 58.90 | 63.00 | 67.40 | 72.10 | 77.10 |

TM:619767 / 01096280 / 04/03/2023                                        Appendix K-1  (Page 3 of 5)

Schedule B (Benefit Class 15[A] through 18+)

| Benefit Class | Current Rate/Wk | Year 1 Rate/Wk | Year 2 Rate/Wk | Year 3 Rate/Wk | Year 4 Rate/Wk | Year 5 Rate/Wk |
|---|---|---|---|---|---|---|
| 15A | $ 61.00 | $ 65.30 | $ 69.90 | $ 74.80 | $ 80.00 | $ 85.60 |
| 15B | 65.00 | 69.60 | 74.50 | 79.70 | 85.30 | 91.30 |
| 15C | 69.00 | 73.80 | 79.00 | 84.50 | 90.40 | 96.70 |
| 16 | 85.00 | 91.00 | 97.40 | 104.20 | 111.50 | 119.30 |
| 17A | 118.00 | 126.30 | 135.10 | 144.60 | 154.70 | 165.50 |
| 17B | 124.00 | 132.70 | 142.00 | 151.90 | 162.50 | 173.90 |
| 18 | 166.00 | 177.60 | 190.00 | 203.30 | 217.50 | 232.70 |
| 18+ | 180.00 | 192.20 | 205.20 | 219.10 | 234.00 | 250.00 |

| Benefit Class | Current Rate/Day | Year 1 Rate/Day | Year 2 Rate/Day | Year 3 Rate/Day | Year 4 Rate/Day | Year 5 Rate/Day |
|---|---|---|---|---|---|---|
| 15A | $13.00 | $13.90 | $14.90 | $15.90 | $17.00 | $18.20 |
| 15B | 13.80 | 14.80 | 15.80 | 16.90 | 18.10 | 19.40 |
| 15C | 14.60 | 15.60 | 16.70 | 17.90 | 19.20 | 20.50 |
| 16 | 17.80 | 19.00 | 20.30 | 21.70 | 23.20 | 24.80 |
| 17A | 24.40 | 26.10 | 27.90 | 29.90 | 32.00 | 34.20 |
| 17B | 25.60 | 27.40 | 29.30 | 31.40 | 33.60 | 36.00 |
| 18 | 34.00 | 36.40 | 38.90 | 41.60 | 44.50 | 47.60 |
| 18+ | 36.80 | 39.30 | 42.00 | 44.90 | 48.00 | 51.30 |

TM:619767 / 01096280 / 04/03/2023                Appendix K-1  (Page 4 of 5)

| Benefit Class | Current Rate/Hr | Year 1 Rate/Hr | Year 2 Rate/Hr | Year 3 Rate/Hr | Year 4 Rate/Hr | Year 5 Rate/Hr |
|---|---|---|---|---|---|---|
| 15A | $1.90 | $2.00 | $2.10 | $2.20 | $2.40 | $2.60 |
| 15B | 2.05 | 2.20 | 2.40 | 2.60 | 2.80 | 3.00 |
| 15C | 2.20 | 2.40 | 2.60 | 2.80 | 3.00 | 3.20 |
| 16 | 2.65 | 2.80 | 3.00 | 3.20 | 3.40 | 3.60 |
| 17A | 3.70 | 4.00 | 4.30 | 4.60 | 4.90 | 5.20 |
| 17B | 3.90 | 4.20 | 4.50 | 4.80 | 5.10 | 5.50 |
| 18 | 5.20 | 5.60 | 6.00 | 6.40 | 6.80 | 7.30 |

**Section 4.        EXCEPTIONS**

The terms and requirements of Section 3 of this Appendix K-1 will not be applicable to any Collective Bargaining Agreement expiring between November 8, 2005, and December 31, 2006, if the expiration date of the agreement is prior to January 1, 2006, and the renewal of the agreement is ratified prior to January 1, 2006, provided that the renewal Collective Bargaining Agreement must be received by the Pension Fund prior to July 1, 2006, in order to qualify for the exception described in this sentence.

**APPENDIX K-2.   MINIMUM EMPLOYER CONTRIBUTION REQUIREMENTS
(NOVEMBER 8, 2006 UPDATE)**

**Section 1.          PREAMBLE**

This Appendix K-2 is added to the Pension Plan by the Board of Trustees, effective on and after November 8, 2006, in order to enable the Pension Fund to comply with minimum funding standards imposed by federal law. The Pension Fund is required to comply with minimum funding standards established by Section 302 of ERISA, 29 U.S.C. § 1082, and Section 412 of the Internal Revenue Code, 26 U.S.C. § 412. A letter from Internal Revenue Service ("IRS") dated July 13 2005, to Thomas C. Nyhan, Executive Director of the Pension Fund, states in part (emphasis added):

> "This letter constitutes that your request for a 10-year extension for amortizing the unfolded liabilities described in section 412(b)(2)(B) of the Internal Revenue Code ('Code') and section 302(b)(2)(B) of the Employee Retirement Income Security Act of 1974 ('ERISA'), has been approved subject to the following conditions:"

> \* \* \* \* \*

> **"... If any one of these conditions is not satisfied, the approval to extend the amortization periods for amortizing the unfunded liabilities would be retroactively null and void."**

The Trustees have received recommendations, information and expert advice that addition of this Appendix K-2 to the Pension Plan will be a reasonable measure to enable the Pension Fund to comply with the required conditions of the above-referenced IRS letter dated July 13, 2005, to prevent a deficiency in the Pension Fund's funding standard account and to comply with minimum funding standards imposed by ERISA and the Internal Revenue Code.

**Section 2.          DEFINITIONS**

The definitions applicable to this Appendix K-2 include all definitions stated in Article I and other provisions of the Pension Plan.

**Section 3.          MINIMUM EMPLOYER CONTRIBUTION REQUIREMENTS**

Every Collective Bargaining Agreement requiring Employer Contributions to the Pension Fund as of January 1, 2007, and scheduled to expire between that date and December 31, 2007, which is renewed for periods beyond its expiration, shall require each Contributing Employer bound by that renewal agreement to make increased Employer Contributions to the Pension Fund at Contribution rates at least equal to the following requirements*:

---

\*        As used in the Appendix K-1, "Current" means the final Employer Contribution rate for the highest Benefit Class negotiated in the Collective Bargaining Agreement expiring between January 1, 2007, and December 31, 2007; "Rate/Wk" means Weekly Employer Contribution Rates; "Rate/Day" means Daily Employer Contribution Rates; and "Rate/Hr" means Hourly Employer Contribution Rates.

Schedule A (Benefit Class 1-14):

| Benefit Class | Current Rate/Wk | Year 1 Rate/Wk | Year 2 Rate/Wk | Year 3 Rate/Wk | Year 4 Rate/Wk | Year 5 Rate/Wk |
|---|---|---|---|---|---|---|
| 1 | $ 5.00 | $ 5.40 | $ 5.80 | $ 6.30 | $ 6.80 | $ 7.30 |
| 2 | 7.00 | 7.60 | 8.20 | 8.90 | 9.60 | 10.40 |
| 2A | 9.00 | 9.70 | 10.50 | 11.30 | 12.20 | 13.20 |
| 3 | 11.00 | 11.90 | 12.90 | 13.90 | 15.00 | 16.20 |
| 3A | 13.00 | 14.00 | 15.10 | 16.30 | 17.60 | 19.00 |
| 4 | 16.00 | 17.30 | 18.70 | 20.20 | 21.80 | 23.50 |
| 5 | 18.50 | 20.00 | 21.60 | 23.30 | 25.20 | 27.20 |
| 6 | 21.00 | 22.70 | 24.50 | 26.50 | 28.60 | 30.90 |
| 7 | 24.00 | 25.90 | 28.00 | 30.20 | 32.60 | 35.20 |
| 8 | 27.00 | 29.20 | 31.50 | 34.00 | 36.70 | 39.60 |
| 9 | 30.00 | 32.40 | 35.00 | 37.80 | 40.80 | 44.10 |
| 10 | 33.00 | 35.60 | 38.40 | 41.50 | 44.80 | 48.40 |
| 11 | 37.00 | 40.00 | 43.20 | 46.70 | 50.40 | 54.40 |
| 12 | 41.00 | 44.30 | 47.80 | 51.60 | 55.70 | 60.20 |
| 13 | 46.00 | 49.70 | 53.70 | 58.00 | 62.60 | 67.60 |
| 14 | 51.00 | 55.10 | 59.50 | 64.30 | 69.40 | 75.00 |

TM:619767 / 01096280 / 04/03/2023                              Appendix K-2  (Page 2 of 4)

## Schedule B (Benefit Class 1-14)

| Benefit Class | Current Rate/Wk | Year 1 Rate/Wk | Year 2 Rate/Wk | Year 3 Rate/Wk | Year 4 Rate/Wk | Year 5 Rate/Wk |
|---|---|---|---|---|---|---|
| 1 | $ 6.00 | $ 6.50 | $ 7.00 | $ 7.60 | $ 8.20 | $ 8.90 |
| 2 | 8.00 | 8.60 | 9.30 | 10.00 | 10.80 | 11.70 |
| 2A | 10.00 | 10.80 | 11.70 | 12.60 | 13.60 | 14.70 |
| 3 | 12.00 | 13.00 | 14.00 | 15.10 | 16.30 | 17.60 |
| 3A | 15.00 | 16.20 | 17.50 | 18.90 | 20.40 | 22.00 |
| 4 | 18.00 | 19.40 | 21.00 | 22.70 | 24.50 | 26.50 |
| 5 | 21.00 | 22.70 | 24.50 | 26.50 | 28.60 | 30.90 |
| 6 | 24.00 | 25.90 | 28.00 | 30.20 | 32.60 | 35.20 |
| 7 | 27.00 | 29.20 | 31.50 | 34.00 | 36.70 | 39.60 |
| 8 | 30.00 | 32.40 | 35.00 | 37.80 | 40.80 | 44.10 |
| 9 | 33.00 | 35.60 | 38.40 | 41.50 | 44.80 | 48.40 |
| 10 | 36.00 | 38.90 | 42.00 | 45.40 | 49.00 | 52.90 |
| 11 | 40.00 | 43.20 | 46.70 | 50.40 | 54.40 | 58.80 |
| 12 | 44.00 | 47.50 | 51.30 | 55.40 | 59.80 | 64.60 |
| 13 | 49.00 | 52.90 | 57.10 | 61.70 | 66.60 | 71.90 |
| 14 | 55.00 | 59.40 | 64.20 | 69.30 | 74.80 | 80.80 |

## Schedule B (Benefit Class 15[A] through 18+)

| Benefit Class | Current Rate/Wk | Year 1 Rate/Wk | Year 2 Rate/Wk | Year 3 Rate/Wk | Year 4 Rate/Wk | Year 5 Rate/Wk |
|---|---|---|---|---|---|---|
| 15A | $ 61.00 | $ 65.90 | $ 71.20 | $ 76.90 | $ 83.10 | $ 89.80 |
| 15B | 65.00 | 70.20 | 75.80 | 81.90 | 88.50 | 95.60 |
| 15C | 69.00 | 74.50 | 80.50 | 86.90 | 93.90 | 101.40 |
| 16 | 85.00 | 91.80 | 99.10 | 107.00 | 115.60 | 124.80 |
| 17a | 118.00 | 127.40 | 137.60 | 148.60 | 160.50 | 173.30 |
| 17b | 124.00 | 133.90 | 144.60 | 156.20 | 168.70 | 182.20 |
| 18 | 166.00 | 179.30 | 193.60 | 209.10 | 225.80 | 243.90 |
| 18+ | 180.00 | 193.90 | 208.90 | 225.10 | 242.60 | 261.50 |

TM:619767 / 01096280 / 04/03/2023

Appendix K-2  (Page 3 of 4)

| Benefit Class | Current Rate/Day | Year 1 Rate/Day | Year 2 Rate/Day | Year 3 Rate/Day | Year 4 Rate/Day | Year 5 Rate/Day |
|---|---|---|---|---|---|---|
| 15A | $ 13.00 | $ 14.00 | $ 15.10 | $ 16.30 | $ 17.60 | $ 19.00 |
| 15B | 13.80 | 14.90 | 16.10 | 17.40 | 18.80 | 20.30 |
| 15C | 14.60 | 15.80 | 17.10 | 18.50 | 20.00 | 21.60 |
| 16 | 17.80 | 19.20 | 20.70 | 22.40 | 24.20 | 26.10 |
| 17a | 24.40 | 26.40 | 28.50 | 30.80 | 33.30 | 36.00 |
| 17b | 25.60 | 27.60 | 29.80 | 32.20 | 34.80 | 37.60 |
| 18 | 34.00 | 36.70 | 39.60 | 42.80 | 46.20 | 49.90 |
| 18+ | 36.80 | 39.70 | 42.80 | 46.10 | 49.70 | 53.60 |

| Benefit Class | Current Rate/Hr | Year 1 Rate/Hr | Year 2 Rate/Hr | Year 3 Rate/Hr | Year 4 Rate/Hr | Year 5 Rate/Hr |
|---|---|---|---|---|---|---|
| 15A | $ 1.90 | $ 2.10 | $ 2.30 | $ 2.50 | $ 2.70 | $ 2.90 |
| 15B | 2.05 | 2.20 | 2.40 | 2.60 | 2.80 | 3.00 |
| 15C | 2.20 | 2.40 | 2.60 | 2.80 | 3.00 | 3.20 |
| 16 | 2.65 | 2.90 | 3.10 | 3.30 | 3.60 | 3.90 |
| 17a | 3.70 | 4.00 | 4.30 | 4.60 | 5.00 | 5.40 |
| 17b | 3.90 | 4.20 | 4.50 | 4.90 | 5.30 | 5.70 |
| 18 | 5.20 | 5.60 | 6.00 | 6.50 | 7.00 | 7.60 |

TM:619767 / 01096280 / 04/03/2023                    Appendix K-2  (Page 4 of 4)

**APPENDIX L.    TRANSFER OF LIABILITIES TO THE UPS TRANSFER PLAN**

**Section 1.        PREAMBLE**

This Appendix L is added to the Pension Plan ("this Pension Plan") by the Board of Trustees, effective on and after January 1, 2008, in accordance with certain rights, obligations, terms and provisions in an agreement signed and effective on September 30, 2007, between United Parcel Service, Inc. and the Trustees of the Pension Fund.

**Section 2.        DEFINITIONS**

The definitions applicable to this Appendix L include all definitions stated in Article I and other provisions of this Pension Plan, as heretofore and hereafter amended, and the following:

(a)    **"Accrued Benefit Payable at Age 65"** means the Accrued Benefit of a Participant under this Pension Plan, as determined and calculated in accordance with this Pension Plan (as stated on December 26, 2007), both (1) that has been earned as of December 26, 2007 (including post-retirement death benefits payable to a surviving spouse that are part of a survivor annuity form of benefit, pursuant to Section 4.10 of this Pension Plan), and (2) that will be or would have been payable from and/or after the first day of the month following the 65th birthday of a Participant who is a member of the UPS Transfer Group if the Participant as of December 26, 2007, had sustained a Break-in-Service (as defined in Section 1.05[a] of this Pension Plan) and there had been no transfer of liabilities of the Pension Fund to the UPS Transfer Plan pursuant to the UPS-CSPF Agreement.

(b)    **"CSPF Participant Not in Pay Status"** means a Participant who both (1) as of January 1, 2008, was not a Pensioner as defined in Section 1.25 of this Pension Plan and (2) as of January 1, 2008, had not submitted to the Pension Fund a valid and bona fide application (that had been received by the Pension Fund before January 1, 2008) to become a Pensioner and to commence to receive retirement benefit payments from the Pension Fund on a date before January 1, 2008.

(c)    **"Non-Retired UPS Participant"** means each individual who both (1) as of January 1, 2008, was a CSPF Participant Not in Pay Status and (2) either (A) as of January 1, 2008, was both employed by the UPS Employer and not employed by any other employer that was then a Contributing Employer (as defined in Section 1.07 of this Pension Plan) or (B) as of the last Hour of Service (as defined in Section 1.17 of this Pension Plan) earned by the individual under the Pension Fund prior to January 1, 2008, was employed by the UPS Employer.

(d)    **"UPS-CSPF Agreement"** means an agreement which was signed and effective on September 30, 2007, between United Parcel Service, Inc. and the Trustees of the Pension Fund, which agreement is entitled "SPIN-OFF AND WITHDRAWAL LIABILITY AGREEMENT AND RELEASE".

(e)    **"UPS Employer"** means a group consisting of United Parcel Service, Inc., and all other trades and businesses under common control with United Parcel Service, Inc. as described in section 4001(b)(1) of the Employee Retirement Income Security Act of 1974, as amended, and each entity that is a member of that group.

(f)    **"UPS Transfer Group"** means the Non-Retired UPS Participants, the liabilities for whose rights to benefits from the Pension Fund were, are and will be transferred from the Pension Fund to the UPS Transfer Plan pursuant to the UPS-CSPF Agreement.

- 143 -

(g)    **"UPS Transfer Plan"** means the plan or plans maintained by the UPS Employer to which liabilities of the Pension Fund were, are and will be transferred pursuant to the UPS-CSPF Agreement.

**Section 3.      TRANSFER OF LIABILITIES**

(a)    The Board of Trustees amends this Pension Plan by the addition of this APPENDIX L, effective on and after January 1, 2008, to effectuate and evidence a complete transfer of liabilities from the Pension Fund to the UPS Transfer Plan on that date to the extent that such transfer of liabilities is contemplated by and in accordance with the UPS-CSPF Agreement.

(b)    Effective on and after January 1, 2008, all liabilities of the Pension Fund for any and all benefits that the Pension Fund would have paid at any time on and after January 1, 2008, to any Participants who are members of the UPS Transfer Group and to any other individuals to the extent that their benefits from the Pension Fund would have been based upon Service Credit (as defined in this Pension Plan) of Participants who are members of the UPS Transfer Group, including retirement, survivor, death, disability and all other benefits of any kind, are transferred from the Pension Fund to the UPS Transfer Plan, except:

(1)    relative to every Participant who is a member of the UPS Transfer Group and is alive on the Participant's 65th birthday that is on a date after January 1, 2008, whether or not the Participant is employed on that 65th birthday and whether or not the Participant has retired as of that 65th birthday, the Pension Fund will be responsible to pay the Accrued Benefit Payable at Age 65 to that Participant beginning on the first day of the next month after that 65th birthday, provided that:

(A)    the amount of the monthly benefits payable by the Pension Fund will be calculated on the basis of a Retirement Date on the Participant's 65th birthday, provided that there will be no reduction if the Participant actually retired and began to receive a retirement pension from the UPS Transfer Plan prior to that date, and provided further that such amount will be no greater than the amount of monthly benefits being paid by the UPS Transfer Plan as of the date on which benefits are first payable by the Pension Fund pursuant to this subsection (b); and

(B)    if the Participant is married on a retirement date prior to the Participant's 65th birthday and is receiving a retirement pension from the UPS Transfer Plan as of that 65th birthday, the Participant's binding and effective election to receive or waive a qualified post-retirement joint and survivor annuity ("JSO benefit") from the UPS Transfer Plan will be irrevocable and will be binding upon the Pension Fund, the Participant and the Participant's spouse on and after the Participant's 65th birthday, and the monthly benefits payable by the Pension Fund, if the Participant's election was to receive a JSO benefit from the UPS Transfer Plan, will be in the form of a JSO benefit payable pursuant to Section 4.10 of this Pension Plan, reduced by adjustment factors for that benefit as stated in this Pension Plan, provided further that only the individual who was the Participant's spouse on the date on which distribution of a retirement pension from the UPS Transfer Plan to the Participant commenced will be considered by the Pension Fund to be the Participant's spouse for JSO benefit purposes (and only that individual will be eligible to receive a JSO benefit, calculated according to this Pension Plan, if that individual survives the retired Participant); and

- 144 -

(C) if, on the Participant's retirement date prior to the Participant's 65th birthday, either the Participant is not married or the Participant is married and makes a binding and effective election to waive the JSO benefit from the UPS Transfer Plan with consent by the Participant's spouse, and the Participant is receiving a retirement pension from the UPS Transfer Plan on that 65th birthday, the monthly benefits payable by the Pension Fund will be continued for the lifetime of the Participant and there will be no JSO benefit payable by the Pension Fund; and

(2) relative to every Participant who is a member of the UPS Transfer Group and who dies on a date that is after January 1, 2008, and prior to the date that would have been the Participant's 65th birthday, if the Participant was married on a retirement date prior to the Participant's 65th birthday and elected to receive a qualified post-retirement joint and survivor annuity ("JSO benefit") from the UPS Transfer Plan, and if the Participant's surviving spouse (determined as of the date on which distribution of a retirement pension from the UPS Transfer Plan commenced) is receiving monthly JSO benefits from the UPS Transfer Plan that commenced after the Participant's death and are still being paid on the date that would have been the Participant's 65th birthday, the Pension Fund will be responsible to pay the surviving spouse's share of the Participant's Accrued Benefit Payable at Age 65 to that surviving spouse beginning on the first day of the next month after what would have been the Participant's 65th birthday, calculated in the form of a JSO benefit payable pursuant to Section 4.10 of this Pension Plan, reduced by adjustment factors for that benefit as stated in this Pension Plan, provided that there will be no reduction based upon the Participant's earlier retirement age and receipt of a retirement pension from the UPS Transfer Plan prior to the Participant's 65th birthday, and further provided that such amount will be no greater than the amount of monthly benefits being paid by the UPS Transfer Plan as of the date on which benefits are first payable by the Pension Fund pursuant to this subsection (b).

Relative to every Participant who is a member of the UPS Transfer Group and who dies on a date that is after January 1, 2008, and prior to the date that would have been the Participant's 65th birthday, if the Participant never retired and never began to receive a retirement pension from the UPS Transfer Plan before his death, the Pension Fund will not be responsible to pay any benefits to the Participant's surviving spouse or to any other individual as a result of the death of the Participant.

(c) Effective on and after January 1, 2008, all liabilities of the Pension Fund for all benefit rights of Non-Retired UPS Participants (whether payable before or after age 65), payable at any time on and after January 1, 2008, to the extent those liabilities are based upon the National Reciprocal Agreement for Teamster Pension Funds, are transferred from the Pension Fund to the UPS Transfer Plan.

(d) No assets will be transferred from the Pension Fund to the UPS Transfer Plan. All liabilities transferred from the Pension Fund to the UPS Transfer Plan pursuant to the UPS-CSPF Agreement will immediately cease to be liabilities of the Pension Fund and will be immediately assumed by the UPS Transfer Plan. The Pension Fund will have no responsibility for payment of any liabilities transferred from the Pension Fund to the UPS Transfer Plan pursuant to the UPS-CSPF Agreement.

**APPENDIX M-1.   REHABILITATION PLAN**

**Section 1.          PREAMBLE AND DEFINITIONS.**

This Appendix M-1 is added to the Pension Plan effective on and after March 26, 2008 in order to comply with the requirements of the Pension Protection Act of 2006 ("PPA"). The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA. The Fund's Board of Trustees, as the plan sponsor of a "critical status" pension plan, is charged under the PPA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA. That is the purpose of this Rehabilitation Plan.

Under the PPA, a rehabilitation plan must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document – or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit).

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.          SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

**A.     PRIMARY SCHEDULE (PRESERVES ALL CURRENT BENEFITS).**

**1.     Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008.

However, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(F) below eliminated or reduced to the extent indicated in Subsection B(1) below.

2.    **Contributions**

Compliance with the Primary Schedule requires annually compounded contribution rate increases effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated below, depending on the year that the new agreement is effective (as shown below). Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

- Pre-2006 agreements: 7% per year
  (beginning with 2006 agreement
  anniversary or reallocation dates)

- 2006 agreements: 7% per year

- 2007 agreements: 8% per year

- 2008 agreements: 8% per year

- 2009 agreements: 8% per year

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule (*see* Exhibit A).

B.    **DEFAULT SCHEDULE.**

1.    **Benefits**

With regard to Bargaining Units (and any non- Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- Adjustable Benefits listed in Section 2(F) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit

- 147 -

payable at age 65 is reduced by ½% per month for each month prior to age 65 at the time of retirement, with a minimum retirement age of 57.

**2.   Contributions**

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

**3.   Effect of agreement to or imposition of Default Schedule.**

(i)   If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)   If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

**C.   ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection C, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(F)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)   whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)   who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal (*see* Section 2(G) below), and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

*Provided, however*, that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Subsection C(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii)

- 148 -

the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

*And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection C(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

D. **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(F)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1) who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2) whose *last* year of Contributory Service Credit *prior* to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

*Provided, however*, that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection D, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

*And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection D, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

E.   **RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C) or 2(D) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)   in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (*see* Section 2(G) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)   in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

F.   **ADJUSTABLE BENEFITS.**

As used herein, Adjustable Benefits shall mean and include:

(1)   Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (i*v*) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)   Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan Section 4.02); *(ii)* a 25-And-Out Pension (Pension Plan Section 4.05); or a 30-And-Out Pension (Pension Plan Section 4.06)].

(3)   All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)   Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)   Post-retirement death benefits that are not part of the annuity form of payment.

(6)   All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)   All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by ½% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by ½% per month for each month prior to age 65 at the time of retirement.

(8)     To the extent not already included in paragraphs (1) – (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA § 305(e)(8)(iv):

(i)     benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)    any early retirement benefit or retirement-type subsidy (within the meaning of ERISA section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)   benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however*, that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

## G.    REHABILITATION PLAN WITHDRAWAL.

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Section 2(G), a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)     decertification or other removal of the Union as a bargaining agent;

(2)     ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)     administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement [including, without limitation, a provision providing for a split bargaining unit]; or (ii) a violation of any other Fund rule or policy [including, without limitation, practices or arrangements that result in adverse selection];

(4)     any transaction or other event [including without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting] whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction.

*Provided, however,* that with respect to the circumstances described in Subparas. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to consider,

weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

    (i)    the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

    (ii)    the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

    (iii)    the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

    (iv)    the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

    (v)    the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**Section 3.**        **REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to --

- Meet the increasingly stringent requirements of the amortization extension granted to the Fund by the Internal Revenue Service (IRS) in July 2005. The requirements include a–funded ratio and a required minimum credit balance requirement (*see* attached Exhibit B) (pertinent portions of IRS amortization extension).

- Enable the Fund to emerge from critical status in approximately the year 2028.

The annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

- The annual actuarial valuation for the Fund shows that, as of the valuation date, the Fund satisfies the annual funding ratio and required credit balance conditions contained in the IRS amortization extension approval letter.

- Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will continue to satisfy the increasingly more stringent IRS amortization extension requirements.

- Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (or as amended from time to time) the Fund is expected to emerge from Critical Status. The Board of Trustees recognize that actual experience may differ from their reasonable assumptions, and therefore the exact year of emergence may be difficult to predict.

**Section 4.          ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives (including combinations of contribution rate increases and benefit adjustments) that would satisfy the amortization extension conditions and might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which begins on January 1, 2011 and ends on December 31, 2020). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees to emerge by the end of the Rehabilitation Period on December 31, 2020

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

The Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA section 305(e)(4) would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, emergence by the end of the presumptive 10 year Rehabilitation Period could require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

In the last several years, the Trustees have implemented numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate about $400 million per year of benefit contributions to the Pension Fund;

- Obtaining the amortization extension with its IRS-imposed conditions; and

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases.

The Board of Trustees determined that mandating additional significant benefit cuts, or mandating contribution rate increases at levels beyond those required in recent years, would substantially accelerate the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals.

TM:619767 / 01096280 / 04/03/2023                                                      Appendix M-1  (Page 9 of 12)

**EXHIBIT A**

**Primary Schedule:  Contribution Rate Increases By Bargaining Agreement Year
(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increase | Year of New Bargaining Agreement | | | |
|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 |
| 2006 | 7% | | | |
| 2007 | 7% | 8% | | |
| 2008 | 7% | 8% | 8% | |
| 2009 | 7% | 8% | 8% | 8% |
| 2010 | 7% | 8% | 8% | 8% |
| 2011 | 6% | 8% | 8% | 8% |
| 2012 | 5% | 6% | 8% | 8% |
| 2013 | 4% | 4% | 6% | 8% |
| 2014 | 4% | 4% | 6% | 8% |
| 2015 | 4% | 4% | 6% | 8% |
| 2016 | 4% | 4% | 4% | 6% |
| 2017 | 4% | 4% | 4% | 4% |
| 2018 | 4% | 4% | 4% | 4% |
| 2019 | 4% | 4% | 4% | 4% |
| 2020 | 4% | 4% | 4% | 4% |
| 2021 | 4% | 4% | 4% | 4% |
| 2022 | 4% | 4% | 4% | 4% |
| 2023 | 4% | 4% | 4% | 4% |
| 2024 | 4% | 4% | 4% | 4% |
| 2025 | 4% | 4% | 4% | 4% |
| 2026 | 4% | 4% | 4% | 4% |
| 2027 | 4% | 4% | 4% | 4% |

TM:619767 / 01096280 / 04/03/2023                    Appendix M-1  (Page 10 of 12)

**EXHIBIT B**

Significant Index No. 0412.00-00

**200620024**

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

TAX EXEMPT AND
GOVERNMENT ENTITIES
DIVISION

FEB 22 2006

SE:T:EP:RA:T:A2

In re:

    Fund =

    Industry =

This letter constitutes notice that your request for a 10-year extension for amortizing the unfunded liabilities described in section 412(b)(2)(B) of the Internal Revenue Code ("Code") and section 302(b)(2)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), has been approved subject to the following conditions:

    (1)    A credit balance is maintained such that the credit balance is at least as large as the accumulation (at the plan's valuation rate) of the amortized (at the Plan's valuation rate over a period of 15 years) differences between the amortization payments of the extended bases (amortized at the section 6621(b) rate) and the amortization payments of such bases had such bases been extended and amortized at the Plan's valuation rate;

    (2)    The Plan's funded ratio, calculated by dividing the market value of Plan assets as of the Plan's valuation date by the Plan's actuarial accrued liability (computed using the unit credit method and the Plan assumptions as of January 1, 2004), is:

        (a)    no less than 59% for each valuation date from January 1, 2005, through January 1, 2011, inclusive;
        (b)    no less than 60% as of January 1, 2012 and as of January 1, 2013;
        (c)    no less than 61% as of January 1, 2014, and as of January 1, 2015;
        (d)    no less than 62% as of January 1, 2016;

**200620024**

2

(e)    for each valuation date subsequent to January 1, 2016, no less than 1% greater than the floor funded ratio as of the previous valuation date. (For example, because the floor funded ratio as of January 1, 2016, is 62%, the funded ratio must be at least 63% as of January 1, 2017, and 64% as of January 1, 2018); and

(3)    For each plan year that the extension remains in effect, starting with the plan year beginning January 1, 2004, a copy of the actuarial valuation report for each plan year will be provided to this office by September 15 of the following calendar year at the address below:

Your authorized representative agreed to these conditions in a letter dated July 13, 2005. If any one of these conditions is not satisfied, the approval to extend the amortization periods for amortizing the unfunded liabilities would be retroactively null and void. However, the Service will consider modifications of these conditions especially in the event that unforeseen circumstances beyond the control of the Fund cause the actual experience of the Plan to fail the funded ratio condition. An example of such an unforeseen circumstance would include a market fluctuation affecting the value of the Plan's assets. Of course, any request for a modification is considered another ruling request and would be subject to an additional user fee.

The extensions of the amortization periods of the unfunded liabilities of the Plan have been granted in accordance with section 412(e) of the Code and section 304(a) of ERISA. Section 412(e) of the Code and section 304(a) of ERISA authorize the Secretary to extend the period of time required to amortize any unfunded liability (described in section 412(b)(2)(B) of the Code and section 302(b)(2)(B) of ERISA) of a plan for a period of time (not in excess of 10 years) if the Secretary determines that such extension would carry out the purposes of ERISA and would provide adequate protection for participants under the plan and their beneficiaries and if the Secretary determines that the failure to permit such extension would (1) result in (A) a substantial risk to the voluntary continuation of the plan, or (B) a substantial curtailment of pension benefit levels or employee compensation, and (2) be adverse to the interests of plan participants in the aggregate.

**APPENDIX M-2.   REHABILITATION PLAN (INCLUDING 2010 UPDATE)**

**Section 1.         PREAMBLE AND DEFINITIONS.**

An amended Appendix M was added to the Pension Plan effective on and after December 31, 2010 in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA"). This Appendix M-2 is added to the Pension Plan in order to incorporate effective as of May 17, 2011, the Distressed Employer Schedule provisions (Section 2(C) and 2(F) below) into the Rehabilitation Plan.

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA; the Fund's actuary has also certified the Fund to be in critical status for the 2009 and 2010 plan years. The Fund's Board of Trustees, as the plan sponsor of a "critical status" pension plan, is charged under the PPA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for plan year 2010 the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document – or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.         SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

**A.    PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).**

**1.    Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section H below eliminated or reduced to the extent indicated in Subsection B(1) below.

**2.    Contributions**

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule (*see* Exhibit A).

*Provided, however*, that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

**B.    DEFAULT SCHEDULE.**

  **1.    Benefits**

With regard to Bargaining Units (and any non- Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

  - Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

  **2.    Contributions**

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

  **3.    Effect of agreement to or imposition of Default Schedule.**

  (i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

  (ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

C.   **DISTRESSED EMPLOYER SCHEDULE.**

1.   **Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that*, for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (*see* Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (*see* Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

2.   **Contributions and Qualifications for the Distressed Employer Schedule.**

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)   the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)   the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii)   during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees,

- 161 -

paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)    the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)    on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)    the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3.**    **Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.**    **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)    whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)    who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal (*see* Section 2(I) below), and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

- 162 -

    

*Provided, however*, that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Subsection D(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

*And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

E. **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)  who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)  whose *last* year of Contributory Service Credit *prior* to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

*Provided, however*, that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

*And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

F.    **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Subsection C(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)    who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)    whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

*And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits, due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

G.    **RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)    in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (*see* Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the

- 164 -

meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)   in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

## H.    ADJUSTABLE BENEFITS.

As used herein, Adjustable Benefits shall mean and include:

(1)   Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (i*v*) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)   Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan Section 4.02); *(ii)* a 25-And-Out Pension (Pension Plan Section 4.05); or a 30-And-Out Pension (Pension Plan Section 4.06)].

(3)   All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)   Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)   Post-retirement death benefits that are not part of the annuity form of payment.

(6)   All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)   All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by ½% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by ½% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)   To the extent not already included in paragraphs (1) – (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA § 305(e)(8)(iv):

- 165 -

(i)     benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)    any early retirement benefit or retirement-type subsidy (within the meaning of ERISA section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)   benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however*, that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

## I.    REHABILITATION PLAN WITHDRAWAL.

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Section 2(I), a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)    decertification or other removal of the Union as a bargaining agent;

(2)    ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)    administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement [including, without limitation, a provision providing for a split bargaining unit]; or (ii) a violation of any other Fund rule or policy [including, without limitation, practices or arrangements that result in adverse selection];

(4)    any transaction or other event [including without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting] whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparas. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to consider,

weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)     the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)    the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)   the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)    the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)     the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.     BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**Section 3.     REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2023. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

• Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2021.

- 167 -

**Section 4.    ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which begins on January 1, 2011 and ends on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

<u>Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31, 2020:</u>

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability <u>to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension</u> would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the rehabilitation plan in 2010, the Trustees concluded that in light of current valuation data, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010 update process that requiring annual contribution increases above the level described in the Primary Schedule

would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

In recent years, the Trustees have implemented numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate about $400 million per year of benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and seeking a waiver of the conditions of that extension in 2009 in light of anticipated investment losses resulting from the 2008 collapse of the financial markets;

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases; and

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund.

The Board of Trustees determined that mandating additional significant benefit cuts (beyond those provided in this updated rehabilitation plan), or mandating contribution rate increases at levels beyond those required in recent years, would substantially accelerate the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, accelerate the Fund's insolvency and would be counterproductive to the Trustees' effort to forestall insolvency.

**EXHIBIT A**

**Primary Schedule:  Contribution Rate Increases By Bargaining Agreement Year**
**(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increase | Year of Initial Bargaining Agreement Conforming to Primary Schedule | | | |
|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 & Later |
| 2006 | 7% | | | |
| 2007 | 7% | 8% | | |
| 2008 | 7% | 8% | 8% | |
| 2009 | 7% | 8% | 8% | 8% |
| 2010 | 7% | 8% | 8% | 8% |
| 2011 | 6% | 8% | 8% | 8% |
| 2012 | 5% | 6% | 8% | 8% |
| 2013 | 4% | 4% | 6% | 8% |
| 2014 | 4% | 4% | 6% | 8% |
| 2015 | 4% | 4% | 6% | 8% |
| 2016 | 4% | 4% | 4% | 6% |
| 2017 | 4% | 4% | 4% | 4% |
| 2018 | 4% | 4% | 4% | 4% |
| 2019 | 4% | 4% | 4% | 4% |
| 2020 | 4% | 4% | 4% | 4% |
| 2021 | 4% | 4% | 4% | 4% |
| 2022 | 4% | 4% | 4% | 4% |
| 2023 | 4% | 4% | 4% | 4% |
| 2024 | 4% | 4% | 4% | 4% |
| 2025 | 4% | 4% | 4% | 4% |
| 2026 | 4% | 4% | 4% | 4% |
| 2027 | 4% | 4% | 4% | 4% |

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(applicable to Default Schedule and Rehabilitation Plan
Withdrawal benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011)**

| Age | Percent of Age 65 Benefit Based on Actuarial Equivalence |
|-----|---------|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

TM:619767 / 01096280 / 04/03/2023                Appendix M-2  (Page 14 of 14)

**APPENDIX M-3.   REHABILITATION PLAN (INCLUDING 2011 UPDATE)**

**Section 1.          PREAMBLE AND DEFINITIONS.**

An amended Appendix M was added to the Pension Plan effective on and after December 31, 2010 in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA"). Appendix M-2 was added to the Pension Plan in order to incorporate effective as of May 17, 2011, the Distressed Employer Schedule provisions (Section 2(C) and 2(F) below) into the Rehabilitation Plan.

This Appendix M-3 is added to the Pension Plan effective on and after December 31, 2011 in order to update the Rehabilitation Plan in compliance with the requirements of the PPA.

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA; the Fund's actuary has also certified the Fund to be in critical status for the 2009 and 2010 plan years. The Fund's Board of Trustees, as the plan sponsor of a "critical status" pension plan, is charged under the PPA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document – or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.          SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

A.    **PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).**

1.    **Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

2.    **Contributions**

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule (*see* Exhibit A).

*Provided, however*, that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

- 173 -

**B.   DEFAULT SCHEDULE.**

**1.   Benefits**

With regard to Bargaining Units (and any non- Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

**2.   Contributions**

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

**3.   Effect of agreement to or imposition of Default Schedule.**

(i)   If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)   If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

**C.    DISTRESSED EMPLOYER SCHEDULE.**

**1.    Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that*, for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (*see* Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (*see* Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

**2.    Contributions and Qualifications for the Distressed Employer Schedule.**

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)    the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)    the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii)    during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees,

- 175 -

paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)   the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)    on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)   the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3.    Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.    ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)    whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)    who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal (*see* Section 2.I below), and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

- 176 -

Proviso 1: *Provided, however*, that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i) the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii) the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

(iii) the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv) the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v) the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted

a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

Proviso 3: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

E. **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1) who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2) whose *last* year of Contributory Service Credit *prior* to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

Proviso 1: *Provided, however*, that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

F. **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

- 178 -

(1)     who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)     whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits, due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

## G.    RESTORATION OF ADJUSTED BENEFITS.

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)     in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (*see* Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)     in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

**H.    ADJUSTABLE BENEFITS.**

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (*iv*) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan Section 4.02); (*ii*) a 25-And-Out Pension (Pension Plan Section 4.05); or a 30-And-Out Pension (Pension Plan Section 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by ½% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by ½% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)    To the extent not already included in paragraphs (1) – (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA § 305(e)(8)(iv):

(i)    benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)    any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)    benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA

- 180 -

because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however*, that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

## I.    REHABILITATION PLAN WITHDRAWAL.

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)    decertification or other removal of the Union as a bargaining agent;

(2)    ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)    administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement [including, without limitation, a provision providing for a split bargaining unit]; or (ii) a violation of any other Fund rule or policy [including, without limitation, practices or arrangements that result in adverse selection];

(4)    any transaction or other event [including without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting] whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)    the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)    the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)   the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)   the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)   the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.**   **BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**Section 3.**      **REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2023. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

- Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2021.

**Section 4.**      **ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on January 1, 2011 and ends on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

- 182 -

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31, 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the rehabilitation plan in 2010, and again in 2011, the Trustees concluded that in light of current valuation data, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010 and 2011 update process that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

In recent years, prior to Plan/calendar year 2011, the Trustees have implemented numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate about $400 million per year of benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and seeking a waiver of the conditions of that extension in 2009 in light of anticipated investment losses resulting from the 2008 collapse of the financial markets;

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases; and

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund.

And specifically during the Plan/calendar year 2011, the Trustees have, in addition to continuing with the implementation of the measures listed above, implemented the following measures to improve the Fund's funding:

- Approved a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan. Pursuant to this Schedule, YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers whose participation in the Fund the Trustees had been terminated by the Board of Trustees in July 2009 due to chronic contribution delinquencies, were permitted to resume Contributions at a rate lower than would have been permitted under the pre-2011 Rehabilitation Plan Schedules. The Trustees determined that this Contribution rate was the highest these Employers could pay without unduly risking their insolvency and dissolution. Therefore, the Trustees permitted these Employers to resume contributions in June 2011 at these lower rates under a newly approved Distressed Employer Schedule; this Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would improve the Fund's funding.

- Adopted a new withdrawal liability method, and obtained approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method (*i.e.*, the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method. Under direct attribution method, the Trustees believe that a Contributing Employer's potential exposure to future withdrawal is virtually eliminated. The Trustees believe that this new "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method. This, in turn, will tend to improve the Fund's funding position as Employers who might otherwise withdraw from the Fund are encouraged to continue to participate.

The Board of Trustees determined that mandating additional significant benefit cuts (beyond those provided in this updated rehabilitation plan), or mandating contribution rate increases at levels beyond those required in recent years, would substantially accelerate the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, accelerate the Fund's insolvency and would be counterproductive to the Trustees' effort to forestall insolvency.

- 184 -

**EXHIBIT A**

**Primary Schedule:  Contribution Rate Increases By Bargaining Agreement Year**
**(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increase | Year of Initial Bargaining Agreement Conforming to Primary Schedule | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| 2006 | 7% | | | | | | |
| 2007 | 7% | 8% | | | | | |
| 2008 | 7% | 8% | 8% | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

- 185 -

Appendix M-3  (Page 14 of 15)

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(applicable to Default Schedule and Rehabilitation Plan
Withdrawal benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011)**

|  Age  | Percent of Age 65 Benefit Based on Actuarial Equivalence |
|:-----:|:--------------------------------------------------------:|
|  65   |  100%  |
|  64   |  90%   |
|  63   |  81%   |
|  62   |  74%   |
|  61   |  67%   |
|  60   |  61%   |
|  59   |  55%   |
|  58   |  50%   |
|  57   |  46%   |

- 186 -

**APPENDIX M-4.   REHABILITATION PLAN (INCLUDING 2012 UPDATE)**

**Section 1.          PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-4 is added to the Pension Plan effective on and after December 31, 2012 in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 2012. The Fund's Board of Trustees, as the plan sponsor of a "critical status" pension plan, is charged under the PPA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.     SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

A. **PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).**

1. **Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

2. **Contributions**

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies

- 188 -

as a New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

**B.    DEFAULT SCHEDULE.**

**1.    Benefits**

With regard to Bargaining Units (and any non- Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

**2.    Contributions**

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

**3.    Effect of agreement to or imposition of Default Schedule.**

(i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date

- 189 -

of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C.    DISTRESSED EMPLOYER SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- •    Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

### 2.    Contributions and Qualifications for the Distressed Employer Schedule.

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)    the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)    the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii) during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv) the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v) on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi) the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3.    Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.    ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1) whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2) who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see* Section 2(I) below),

and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)) one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i)     the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

(iii)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced  in, the circumstances that led to the administrative termination of the Employer;

(iv)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that

- 192 -

were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)    the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

Proviso 3: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

**E.    ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section 8(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)    who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)    whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

Proviso 1: *Provided, however.* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)) prior to the date on which the Contributing Employer became subject to the Default Schedule.

F.   **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F. effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)   who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)   whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)) one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

G.   **RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)   in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the

- 194 -

meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)   in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

### H.   ADJUSTABLE BENEFITS.

As used herein, Adjustable Benefits shall mean and include:

(1)   Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan§ 4.07); (iv) a Deferred Pension (Pension Plan§ 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)   Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan Section 4.02); *(ii)* a 25-And-Out Pension (Pension Plan Section 4.05); or a 30-And-Out Pension (Pension Plan Section 4.06)].

(3)   All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)   Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)   Post-retirement death benefits that are not part of the annuity form of payment.

(6)   All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)   All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)   To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA§ 305(e)(8)(iv):

- 195 -

(i)     benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)    any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)   benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

## I.    REHABILITATION PLAN WITHDRAWAL

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)    decertification or other removal of the Union as a bargaining agent;

(2)    ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)    administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit]; or (ii) a violation of any other Fund rule or policy [including, without limitation, practices or arrangements that result in adverse selection];

(4)    any transaction or other event (including without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting] whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full

discretionary authority to consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)     the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)    the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)   the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)    the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)     the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.      BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**Section 3.        REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2023. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

•       Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2021.

**Section 4.**        **ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on January 1, 2011 and ends on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31. 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in 2010, 2011 and 2012, the Trustees concluded that in light of current valuation data, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010, 2011 and 2012 update process that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

In recent years, prior to Plan/calendar year 2012, the Trustees have implemented numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and seeking a waiver of the conditions of that extension in 2009 in light of investment losses resulting from the weakness in financial in recent years;

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011) Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method (i.e., the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

And specifically during 2012, the Trustees continued to implement the funding improvement measures listed above, and also amended the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal liability and to continue their participation in the Fund as New Employers under the hybrid method; the Trustees determined that the New Employers' participation on these terms would tend to improve overall pension funding.

- 199 -

As part of their responsibility to consider updates to the Rehabilitation Plan for Plan Year 2012, the Board of Trustees also determined that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan), or (as noted) mandating contribution rate increases at levels beyond those required in recent years, would substantially accelerate the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to forestall possible insolvency.

**Exhibit A**

**Primary Schedule: Contribution Rate Increases By Bargaining Agreement Year**
**(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increase | Year of Initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| 2006 | 7% | | | | | | | |
| 2007 | 7% | 8% | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

- 201 -

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(applicable to Default Schedule and Rehabilitation Plan Withdrawal
benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**

| Age | Percent of Age 65 Benefit Based on Actuarial Equivalence |
|-----|-----|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

TM:619767 / 01096280 / 04/03/2023

**APPENDIX M-5.   REHABILITATION PLAN (INCLUDING 2013 UPDATE)**

**Section 1.          PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-5 is added to the Pension Plan effective on and after December 31, 2013 in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 2013. The Fund's Board of Trustees, as the plan sponsor of a "critical status" pension plan, is charged under the PPA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.          SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

A.    **PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).**

1.    **Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

2.    **Contributions**

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies as a

- 204 -

New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

## B.    DEFAULT SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

### 2.    Contributions

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

### 3.    Effect of agreement to or imposition of Default Schedule.

(i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date

- 205 -

of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C.    DISTRESSED EMPLOYER SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

### 2.    Contributions and Qualifications for the Distressed Employer Schedule.

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)    the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)    the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii)    during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)    the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)    on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)    the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3.**    **Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.**    **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)    whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)    who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see Section 2(I) below),*

- 207 -

and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

(iii)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that

- 208 -

were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)    the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

Proviso 3: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

**E.**    **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)    who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)    whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

Proviso 1: *Provided, however.* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

**F.   ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)   who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)   whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

**G.   RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)   in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the

- 210 -

meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)    in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

## H.    ADJUSTABLE BENEFITS.

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (iv) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan § 4.02); *(ii)* a 25-And-Out Pension (Pension Plan § 4.05); or a 30-And-Out Pension (Pension Plan § 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)    To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA§ 305(e)(8)(iv):

- 211 -

(i)     benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)    any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)   benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

I.    **REHABILITATION PLAN WITHDRAWAL**

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)    decertification or other removal of the Union as a bargaining agent;

(2)    ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)    administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit); or (ii) a violation of any other Fund rule or policy (including, without limitation, practices or arrangements that result in adverse selection);

(4)    any transaction or other event (including, without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting) whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to

consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i) the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii) the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii) the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv) the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v) the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.   BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**Section 3.      REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2026. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

• Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2023.

**Section 4.**  **ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on January 1, 2011 and ends on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31. 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|----------|--------------------|-----------------------------|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in 2010, 2011, 2012 and 2013 the Trustees concluded that in light of current valuation data available in each of those years, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010, 2011, 2012 and 2013 update process that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

In recent years, prior to Plan/calendar year 2013, the Trustees have implemented (and, where applicable, have continued to implement) numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and seeking a waiver of the conditions of that extension in 2009 in light of investment losses resulting from the weakness in financial markets in recent years;

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011) Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method (*i.e.,* the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

- Amending the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal liability and to continue their participation in the Fund as New Employers under the hybrid method; the Trustees determined that the New Employers'

- 215 -

participation on these terms would tend to improve overall pension funding.

As part of their responsibility to consider updates to the Rehabilitation Plan for Plan Year 2013, the Board of Trustees also determined that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan), or (as noted) mandating contribution rate increases at levels beyond those required in recent years, would substantially accelerate the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to forestall possible insolvency.

TM:619767 / 01096280 / 04/03/2023

**Exhibit A**

**Primary Schedule: Contribution Rate Increases By Bargaining Agreement Year**
**(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increase | Year of initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| 2006 | 7% | | | | | | | | |
| 2007 | 7% | 8% | | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

**EXHIBIT B**


**Schedule for Actuarial Reduction of Age 65 Benefits**


**(Applicable to Default Schedule and Rehabilitation Plan Withdrawal
benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**


| Age | Percent of Age 65 Benefit Based on Actuarial Equivalence |
|-----|-----|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

TM:619767 / 01096280 / 04/03/2023

**APPENDIX M-6.   REHABILITATION PLAN (INCLUDING 2014 UPDATE)**

**Section 1.          PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-6 is added to the Pension Plan effective on and after December 31, 2014 in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 201. The Fund's Board of Trustees, as the plan sponsor of a "critical status" pension plan, is charged under the PPA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.          SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

A.   **PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).**

1.   **Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

2.   **Contributions**

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies as a

- 220 -

New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

## B.    DEFAULT SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

### 2.    Contributions

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

### 3.    Effect of agreement to or imposition of Default Schedule.

(i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates

- 221 -

that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C.    DISTRESSED EMPLOYER SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- •    Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

### 2.    Contributions and Qualifications for the Distressed Employer Schedule.

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)    the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)    the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii) during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv) the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v) on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi) the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3. Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D. ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1) whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2) who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see Section 2(I) below)*,

and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i)     the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

(iii)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of

operations that were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)    the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

Proviso 3: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

**E.    ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)    who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)    whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

Proviso 1: *Provided, however.* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

F.   **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)   who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)   whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

G.   **RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)   in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the

- 226 -

meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)    in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

## H.    ADJUSTABLE BENEFITS.

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (iv) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan § 4.02); *(ii)* a 25-And-Out Pension (Pension Plan § 4.05); or a 30-And-Out Pension (Pension Plan § 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)    To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA§ 305(e)(8)(iv):

(i)   benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)   any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)   benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

## I.   REHABILITATION PLAN WITHDRAWAL

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)   decertification or other removal of the Union as a bargaining agent;

(2)   ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)   administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit); or (ii) a violation of any other Fund rule or policy (including, without limitation, practices or arrangements that result in adverse selection);

(4)   any transaction or other event (including, without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting) whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to

- 228 -

consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)   the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)   the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)   the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)   the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)   the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.   BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**Section 3.          REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2026. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

•   Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2023.

**Section 4.        ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on January 1, 2011 and ends on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31. 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in each applicable year subsequent to 2008, the Trustees concluded that in light of current valuation data available in each of those years, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010 - 2014 update processes that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

In recent years, prior to Plan/calendar year 2014, the Trustees have implemented (and, where applicable, have continued to implement) numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and seeking a waiver of the conditions of that extension in 2009 in light of investment losses resulting from the weakness in financial markets in recent years;

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011) Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method (*i.e.,* the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

- Amending the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal liability and to continue their participation in the Fund as New

Employers under the hybrid method; the Trustees determined that the New Employers' participation on these terms would tend to improve overall pension funding.

As part of their responsibility to consider updates to the Rehabilitation Plan for Plan Year 2014, the Board of Trustees also determined that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan), or (as noted) mandating contribution rate increases at levels beyond those required in recent years, would substantially accelerate the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to forestall possible insolvency.

**Exhibit A**

**Primary Schedule: Contribution Rate Increases By Bargaining Agreement Year
(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increase | Year of initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| 2006 | 7% | | | | | | | | | |
| 2007 | 7% | 8% | | | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | | | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | | |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

TM:619767 / 01096280 / 04/03/2023

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(Applicable to Default Schedule and Rehabilitation Plan Withdrawal
benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**

| Age | Percent of Age 65 Benefit Based on Actuarial Equivalence |
|:---:|:---:|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

TM:619767 / 01096280 / 04/03/2023          Appendix M-6  (Page 16 of 16)

**APPENDIX M-7.   REHABILITATION PLAN (INCLUDING 2015 UPDATE)**

**Section 1.          PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-7 is added to the Pension Plan effective on and after December 31, 2015 in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 2014. For 2015, the actuary certified the Fund to be in "critical and declining status", pursuant to the Multiemployer Pension Reform Act of 2014 ("MPRA"). The Fund's Board of Trustees, as the plan sponsor of a "critical and declining status" pension plan, is charged under the PPA and MPRA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions, as amended to date, including any applicable amendments under MPRA.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.**            **SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

**A.    PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).**

**1.    Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

**2.    Contributions**

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered by the National Master Automobile Transporter Agreement, and (2) $342 per week

**- 236 -**

for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies as a New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

## B.    DEFAULT SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- • Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

### 2.    Contributions

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

### 3.    Effect of agreement to or imposition of Default Schedule.

(i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties have failed to adopt either of the Schedules compliant with this

Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C.    DISTRESSED EMPLOYER SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

• Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

### 2.    Contributions and Qualifications for the Distressed Employer Schedule.

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)    the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)     the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii)    during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)    the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)     on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)    the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3.     Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.     ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)     whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any

time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)    who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see* Section 2(I) below), and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

(iii)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv)     the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)     the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

Proviso 3: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

**E.     ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)     who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)     whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

Proviso 1: *Provided, however.* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

**- 241 -**

F.   **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)   who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)   whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

G.   **RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)   in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or

- 242 -

trades or businesses under common control with such Employer within the meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)    in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

## H.   ADJUSTABLE BENEFITS.

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (iv) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan § 4.02); *(ii)* a 25-And-Out Pension (Pension Plan § 4.05); or a 30-And-Out Pension (Pension Plan § 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)    To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA§ 305(e)(8)(iv):

(i)    benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)   any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)  benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

I.    **REHABILITATION PLAN WITHDRAWAL**

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)    decertification or other removal of the Union as a bargaining agent;

(2)    ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)    administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit); or (ii) a violation of any other Fund rule or policy (including, without limitation, practices or arrangements that result in adverse selection);

(4)    any transaction or other event (including, without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting) whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to

consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)     the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)    the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)   the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)    the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)     the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.    BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Section 3.  **REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2025. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

- Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2023.

Section 4.  **ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on January 1, 2011 and ends on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31. 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the

terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in each applicable year subsequent to 2008, the Trustees concluded that in light of current valuation data available in each of those years, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010 - 2015 update processes that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

In recent years, prior to Plan/calendar year 2015, the Trustees have implemented (and, where applicable, have continued to implement) numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and seeking a waiver of the conditions of that extension in 2009 in light of investment losses resulting from the weakness in financial markets in recent years;

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011) Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers,

**- 247 -**

and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method *(i.e.,* the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

- Amending the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need (under their current collective bargaining agreements) for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal liability and to continue their participation in the Fund as New Employers under the hybrid method; the Trustees determined that the New Employers' participation on these terms would tend to improve overall pension funding.

As part of their responsibility to consider updates to the Rehabilitation Plan for Plan Year 2015, the Board of Trustees approved the continuation of each of the measures listed above.

As part of the 2015 update the Board of Trustees also noted that it authorized the filing, on September 25, 2015, of an application with the United States Department of the Treasury requesting approval of a plan of suspension of benefits under MPRA. The Trustees have determined that the filing of this application was a reasonable measure designed to forestall insolvency, and therefore one that they were required to take under the PPA.

However, the Trustees have also determined, as part of the 2015 Rehabilitation Plan update process, that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan or as proposed in the MPRA application filed with Treasury), or (as noted) mandating significant contribution rate increases at levels beyond those required in recent years, would, in the absence of an approval by Treasury of the pending MPRA application, substantially accelerate the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to forestall possible insolvency.

**Exhibit A**

**Primary Schedule: Contribution Rate Increases By Bargaining Agreement Year
(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increase | Year of initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| 2006 | 7% | | | | | | | | | | |
| 2007 | 7% | 8% | | | | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | | | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | | | | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | | | |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | | |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 8% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

**EXHIBIT B**


**Schedule for Actuarial Reduction of Age 65 Benefits**


**(Applicable to Default Schedule and Rehabilitation Plan Withdrawal
benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**


| Age | Percent of Age 65 Benefit Based on Actuarial Equivalence |
|-----|-----|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

- 250 -

**APPENDIX M-8.   REHABILITATION PLAN (INCLUDING 2016 UPDATE)**

**Section 1.          PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-8 is added to the Pension Plan effective on and after December 31, 2016 in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 2014. For 2015 and 2016, the actuary certified the Fund to be in "critical and declining status", pursuant to the Multiemployer Pension Reform Act of 2014 ("MPRA"). The Fund's Board of Trustees, as the plan sponsor of a "critical and declining status" pension plan, is charged under the PPA and MPRA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions, as amended to date, including any applicable amendments under MPRA.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.          SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

- 251 -

A.  **PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).**

1.  **Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

2.  **Contributions**

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies as a

- 252 -

New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

## B.    DEFAULT SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

### 2.    Contributions

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

### 3.    Effect of agreement to or imposition of Default Schedule.

(i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates

that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C.    DISTRESSED EMPLOYER SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

### 2.    Contributions and Qualifications for the Distressed Employer Schedule.

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)    the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)    the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

**- 254 -**

(iii)     during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)     the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)     on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)     the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

3.     **Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

D.     **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)     whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)     who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see* Section 2(I) below),

**- 255 -**

and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i)     the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

(iii)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that

- 256 -

were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)    the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

Proviso 3: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

**E.    ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)    who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)    whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

Proviso 1: *Provided, however.* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

F.  **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)  who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)  whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

G.  **RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)  in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the

- 258 -

meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)    in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

## H.    ADJUSTABLE BENEFITS.

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (iv) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan § 4.02); *(ii)* a 25-And-Out Pension (Pension Plan § 4.05); or a 30-And-Out Pension (Pension Plan § 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)    To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA§ 305(e)(8)(iv):

(i)    benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)    any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)    benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

I.    **REHABILITATION PLAN WITHDRAWAL**

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)    decertification or other removal of the Union as a bargaining agent;

(2)    ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)    administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit); or (ii) a violation of any other Fund rule or policy (including, without limitation, practices or arrangements that result in adverse selection);

(4)    any transaction or other event (including, without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting) whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to

- 260 -

consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)     the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)    the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)   the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)    the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)     the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.     BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**K.     SPECIAL SCHEDULE: QUALIFYING NEW ("HYBRID METHOD") EMPLOYERS (EXCEPT AS NOTED, PRESERVES ALL BENEFITS).**

**1.     Benefits.**

Bargaining Units (and any non-Bargaining Unit groups participating in the Fund) whose Contributing Employers have been specifically accepted and approved by the Trustees as satisfying the requirements for this Qualifying New Employer Schedule will, as it relates to benefits or potential benefit adjustments, be treated in the same way as Bargaining Units (and non-Bargaining Unit groups) under the Primary Schedule (Section 2(A) above).

**2. Contributions.**

Contributing Employers who have qualified as New Employers within the meaning of Appendix E of the Plan Document, Section 2.2 (b) (and are thus eligible for treatment under the Pension Fund's alternative, or "hybrid," method of calculating Employer Withdrawal Liability), *and* who have fulfilled all requirements relating to the duration and/or level of continued participation in the Pension Fund contained in the agreement under which the Fund accepted the Employer as a New Employer, may contribute under this Schedule to the Fund at a rate to be specifically and separately approved by the Board of Trustees with respect to each such New Employer (the "New Rate"), subject to a specific determination by the Board of Trustees that the following conditions have been or will be met:

(i) The New Employer has in fact fulfilled its contribution or participation commitments under the agreement in which the Fund accepted the Employer's New Employer status, and the New Employer has fulfilled all other obligations under that agreement, is current in its ongoing contribution obligations to the Fund and is in compliance with the Fund's rules and polices applicable to Contributing Employers;

(ii) Unless a New Rate is determined and made available under this Schedule, the New Employer would likely withdraw from the Fund on about the expiration date of its most recent Collective Bargaining Agreement requiring contributions to the Fund;

(iii) The New Employer's continued participation in the Fund at the New Rate, under the specific circumstances presented, will result in net positive cash flow to the Fund, in comparison to the net cash flow that would result from a withdrawal by the New Employer from the Fund; and

(iv) The New Employer's obligation to contribute to the Fund at the New Rate is documented in a Collective Bargaining Agreement that is or will be acceptable to the Board of Trustees, and contains (or will contain) terms under which the bargaining representative of the affected Bargaining Unit specifically agrees or acknowledges that any reductions in labor costs resulting from the New Employer's contributions at the New Rate have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

**Section 3.        REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2025. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

- Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2023.

**Section 4.        ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on January 1, 2011 and ends on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31. 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in each applicable year subsequent to 2008, the Trustees concluded that in light of current valuation data available in each of those years, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible

- 263 -

insolvency. The Trustees also concluded during the 2010 - 2016 update processes that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

Prior to Plan/calendar year 2016, the Trustees have implemented (and, where applicable, have continued to implement) numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and successfully seeking a waiver of the conditions of that extension in light of investment losses resulting from the weakness in financial markets in recent years (waiver or alteration of conditions granted in 2016);

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011) Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method (i.e., the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

- Amending the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need (under their current collective bargaining

- 264 -

agreements) for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal liability and to continue their participation in the Fund as New Employers under the hybrid method; the Trustees determined that the New Employers' participation on these terms would tend to improve overall pension funding.

- Authorizing the filing, on September 25, 2015, of an application with the United States Department of the Treasury requesting approval of a plan of suspension of benefits under MPRA. (The Trustees determined that the filing of this application was a reasonable measure designed to forestall insolvency, and therefore one that they were required to take under the PPA. However, the Fund's MPRA application was denied by the Department of Treasury on May 6, 2016, and the Trustees have determined that it is not feasible for the Fund to submit a revised MPRA application.)

As part of their responsibility to consider updates to the Rehabilitation Plan for Plan Year 2016, the Board of Trustees approved the continuation, to the extent feasible, of the measures listed above and also approved the Special Schedule relating to Qualifying New ("Hybrid Method") Employers indicated in Section 2(K) of this Appendix.

However, the Trustees have also determined, as part of the 2016 Rehabilitation Plan update process, that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan), or (as noted) mandating significant contribution rate increases at levels beyond those required in recent years, would substantially accelerate the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to forestall possible insolvency.

**Exhibit A**

**Primary Schedule: Contribution Rate Increases By Bargaining Agreement Year**
**(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increases | Year of initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| 2006 | 7% | | | | | | | | | | | |
| 2007 | 7% | 8% | | | | | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | | | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | | | | |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | | | |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(Applicable to Default Schedule and Rehabilitation Plan
Withdrawal benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**

| Age | Percent of Age 65 Benefit Based on Actuarial Equivalence |
|:---:|:---:|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

TM:619767 / 01096280 / 04/03/2023                                        Appendix M-8  (Page 17 of 17)

**APPENDIX M-9.   REHABILITATION PLAN (INCLUDING 2017 UPDATE)**

**Section 1.          PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-9 is added to the Pension Plan effective on and after December 31, 2017 (except where a different effective date for any provision is noted below) in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 2014. For 2015, 2016, and 2017 the actuary certified the Fund to be in "critical and declining status", pursuant to the Multiemployer Pension Reform Act of 2014 ("MPRA"). The Fund's Board of Trustees, as the plan sponsor of a "critical and declining status" pension plan, is charged under the PPA and MPRA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions, as amended to date, including any applicable amendments under MPRA.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.**        **SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

### A.    PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).

#### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

#### 2.    Contributions

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered

by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies as a New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

## B.   DEFAULT SCHEDULE.

### 1.   Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- • Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

### 2.   Contributions

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

### 3.   Effect of agreement to or imposition of Default Schedule.

(i)   If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)   If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties

have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C.   DISTRESSED EMPLOYER SCHEDULE.

### 1.   Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

### 2.   Contributions and Qualifications for the Distressed Employer Schedule.

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)     the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)    the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii)   during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)    the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)     on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)    the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3.     Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.     ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be

eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)     whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)     who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see* Section 2(I) below), and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i)     the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

- 273 -

(iii)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)   the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

Proviso 3: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

**E.   ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)   who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)   whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

Proviso 1: *Provided, however.* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

F. **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1) who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2) whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

G.    **RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)    in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)    in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

H.    **ADJUSTABLE BENEFITS.**

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (iv) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan § 4.02); *(ii)* a 25-And-Out Pension (Pension Plan § 4.05); or a 30-And-Out Pension (Pension Plan § 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based

- 276 -

Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)    To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA§ 305(e)(8)(iv):

(i)    benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)    any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)    benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

I.    **REHABILITATION PLAN WITHDRAWAL**

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)    decertification or other removal of the Union as a bargaining agent;

(2)    ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)    administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit); or (ii) a violation of any other Fund rule or policy (including, without limitation, practices or arrangements that result in adverse selection);

(4)    any transaction or other event (including, without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting) whereby all or a portion of the operations for which the Contributing Employer has

- 277 -

an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)     the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)    the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)   the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)    the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)     the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.     BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**K.     SPECIAL SCHEDULE: QUALIFYING NEW ("HYBRID METHOD") EMPLOYERS (EXCEPT AS NOTED, PRESERVES ALL BENEFITS).**

**1.     Benefits.**

Bargaining Units (and any non-Bargaining Unit groups participating in the Fund) whose Contributing Employers have been specifically accepted and approved by the Trustees as satisfying the requirements for this Qualifying New Employer Schedule will, as it relates to benefits or potential benefit adjustments, be treated

in the same way as Bargaining Units (and non-Bargaining Unit groups) under the Primary Schedule (Section 2.A. above).

**2. Contributions.**

Contributing Employers who have qualified as New Employers within the meaning of Appendix E of the Plan Document, Section 2.2 (b) (and are thus eligible for treatment under the Pension Fund's alternative, or "hybrid," method of calculating Employer Withdrawal Liability), *and* who have fulfilled all requirements relating to the duration and/or level of continued participation in the Pension Fund contained in the agreement under which the Fund accepted the Employer as a New Employer, may contribute under this Schedule to the Fund at a rate to be specifically and separately approved by the Board of Trustees with respect to each such New Employer (the "New Rate"), subject to a specific determination by the Board of Trustees that the following conditions have been or will be met:

(i)     The New Employer has in fact fulfilled its contribution or participation commitments under the agreement in which the Fund accepted the Employer's New Employer status, and the New Employer has fulfilled all other obligations under that agreement, is current in its ongoing contribution obligations to the Fund and is in compliance with the Fund's rules and polices applicable to Contributing Employers;

(ii)    Unless a New Rate is determined and made available under this Schedule, the New Employer would likely withdraw from the Fund on about the expiration date of its most recent Collective Bargaining Agreement requiring contributions to the Fund;

(iii)   the New Employer's continued participation in the Fund at the New Rate, under the specific circumstances presented, will result in net positive cash flow to the Fund, in comparison to the net cash flow that would result from a withdrawal by the New Employer from the Fund; and

(iv)    the New Employer's obligation to contribute to the Fund at the New Rate is documented in a Collective Bargaining Agreement that is or will be acceptable to the Board of Trustees, and contains (or will contain) terms under which the bargaining representative of the affected Bargaining Unit specifically agrees or acknowledges that any reductions in labor costs resulting from the New Employer's contributions at the New Rate have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

**L.    SPECIAL SCHEDULE: QUALIFYING BARGAINING UNITS THAT HAVE BEEN SUBJECT TO A WAGE FREEZE (EXCEPT AS NOTED PRESERVES ALL BENEFITS). (Effective on and after March 14, 2017)**

**1. Benefits.**

With regard to any Bargaining Unit subject to a Collective Bargaining Agreement in effect as of March 1, 2017 (the "Current Agreement") that –

(i)     was (or is) of 3 to 5 years in duration,

(ii)    did not (or does not) provide for any wage increases for the entire duration of the Agreement, and

- 279 -

(iii)   required (or requires) pension contribution rate increases in compliance with the Primary Schedule (Section 2.A of this Rehabilitation Plan) for the entire duration of the Agreement, but did not (or does not) at any time require contributions at rates equal to or in excess of any of the maximum rates specified under the provisos to the Primary Schedule the benefits available to any such Bargaining Unit under any new Collective Bargaining Agreement that is the immediate successor or renewal Agreement of the Current Agreement, and is not in compliance with the Primary Schedule ("Successor Agreement"), will be nevertheless identical to the benefits available to Bargaining Units whose Collective Bargaining Agreements are in compliance with the Primary Schedule, provided that any such Successor Agreement has the characteristics specified in Section 2.L.2 below.

**2.   Contributions.**

In order for a Bargaining Unit to qualify for the benefits specified under Section 2.L.1 above, the Successor Agreement must:

(i)   Not be of less duration than the Current Agreement, but not exceeding 5 years in duration;

(ii)   require pension contributions at a rate that is at least as high as the highest rate required under the Current Agreement, but need not provide for any increase in the contribution rates for the duration of the Successor Agreement (the "Special Rate"); and

(iii)   contain terms under which the bargaining representative of the affected Bargaining Unit specifically agrees and acknowledges that any reduction in labor costs resulting from contributions at the Special Rate (*i.e.,* contributions without the rate increases otherwise required under the Primary Schedule) have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

**Section 3.      REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2025. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

•   Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2023.

**Section 4.      ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light

of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on January 1, 2011 and ends on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31. 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in each applicable year subsequent to 2008, the Trustees concluded that in light of current valuation data available in each of those years, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010 - 2016 update processes that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

Prior to Plan/calendar year 2017, the Trustees have implemented (and, where applicable, have continued to implement) numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and successfully seeking a waiver of the conditions of that extension in light of investment losses resulting from the weakness in financial markets in recent years (waiver or alteration of conditions granted in 2016);

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011) Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method (*i.e.,* the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

- Amending the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need (under their current collective bargaining agreements) for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal liability and to continue their participation in the Fund as New Employers under the

hybrid method; the Trustees determined that the New Employers' participation on these terms would tend to improve overall pension funding.

- Authorizing the filing, on September 25, 2015, of an application with the United States Department of the Treasury requesting approval of a plan of suspension of benefits under MPRA. (The Trustees determined that the filing of this application was a reasonable measure designed to forestall insolvency, and therefore one that they were required to take under the PPA. However, the Fund's MPRA application was denied by the Department of Treasury on May 6, 2016, and the Trustees have determined that it is not feasible for the Fund to submit a revised MPRA application.)

As part of their responsibility to consider updates to the Rehabilitation Plan during Plan Year 2017, the Board of Trustees approved the continuation, to the extent feasible, of the measures listed above and also approved the Special Schedule relating to Qualifying New ("Hybrid Method") Employers indicated in Section 2.K. of this Appendix. In March 2017 the Trustees added Section 2.L relating to Qualifying Bargaining Units that Have Been Subject to a Wage Freezes as an additional update to this Appendix.

However, the Trustees have also determined, as part of the 2017 Rehabilitation Plan update process, that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan), or (as noted) mandating significant contribution rate increases at levels beyond those required in recent years, would risk substantially accelerating the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to forestall possible insolvency.

**Exhibit A**

**Primary Schedule: Contribution Rate Increases by Bargaining Agreement Year
(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increases | Year of initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| 2006 | 7% | | | | | | | | | | | |
| 2007 | 7% | 8% | | | | | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | | | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | | | | |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | | | |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

- 284 -

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(Applicable to Default Schedule and Rehabilitation Plan
Withdrawal benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**

| <u>Age</u> | **Percent of Age 65 Benefit Based on**<br>**<u>Actuarial Equivalence</u>** |
|:---:|:---:|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

- 285 -

**APPENDIX M-10. REHABILITATION PLAN (INCLUDING 2018 UPDATE)**

**Section 1.        PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-10 is added to the Pension Plan effective on and after December 31, 2018 (except where a different effective date for any provision is noted below) in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 2014. For 2015, 2016, 2017 and 2018 the actuary certified the Fund to be in "critical and declining status", pursuant to the Multiemployer Pension Reform Act of 2014 ("MPRA"). The Fund's Board of Trustees, as the plan sponsor of a "critical and declining status" pension plan, is charged under the PPA and MPRA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions, as amended to date, including any applicable amendments under MPRA.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.**       **SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

### A.   PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).

#### 1.   Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

#### 2.   Contributions

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered

- 287 -

by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies as a New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

**B.    DEFAULT SCHEDULE.**

**1.    Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

**2.    Contributions**

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

**3.    Effect of agreement to or imposition of Default Schedule.**

(i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties

have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C. DISTRESSED EMPLOYER SCHEDULE.

### 1. Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

### 2. Contributions and Qualifications for the Distressed Employer Schedule.

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)    the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)    the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii)    during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)    the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)    on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)    the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3.    Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.    ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be

eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)    whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)    who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see* Section 2(I) below), and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

**- 291 -**

(iii)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)    the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

<u>Proviso 3</u>: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

**E.    ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)    who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)    whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

<u>Proviso 1</u>: *Provided, however.* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

<u>Proviso 2</u>: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming

subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

**F.    ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10) is on or after April 8, 2008, and:

(1)    who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)    whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

**G.    RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)    in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)    in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

**H.    ADJUSTABLE BENEFITS.**

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (iv) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan § 4.02); *(ii)* a 25-And-Out Pension (Pension Plan § 4.05); or a 30-And-Out Pension (Pension Plan § 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however*, for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based

Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)  To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA§ 305(e)(8)(iv):

(i)   benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)  any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii) benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

## I.   REHABILITATION PLAN WITHDRAWAL

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)  decertification or other removal of the Union as a bargaining agent;

(2)  ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)  administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit); or (ii) a violation of any other Fund rule or policy (including, without limitation, practices or arrangements that result in adverse selection);

(4)  any transaction or other event (including, without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting) whereby all or a portion of the operations for which the Contributing Employer has

- 295 -

an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)  the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)  the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)  the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)  the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)  the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.   BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**K.   SPECIAL SCHEDULE: QUALIFYING NEW ("HYBRID METHOD") EMPLOYERS (EXCEPT AS NOTED, PRESERVES ALL BENEFITS).**

**1.   Benefits.**

Bargaining Units (and any non-Bargaining Unit groups participating in the Fund) whose Contributing Employers have been specifically accepted and approved by the Trustees as satisfying the requirements for this Qualifying New Employer Schedule will, as it relates to benefits or potential benefit adjustments, be treated

in the same way as Bargaining Units (and non-Bargaining Unit groups) under the Primary Schedule (Section 2.A. above).

**2. Contributions.**

Contributing Employers who have qualified as New Employers within the meaning of Appendix E of the Plan Document, Section 2.2 (b) (and are thus eligible for treatment under the Pension Fund's alternative, or "hybrid," method of calculating Employer Withdrawal Liability), *and* who have fulfilled all requirements relating to the duration and/or level of continued participation in the Pension Fund contained in the agreement under which the Fund accepted the Employer as a New Employer, may contribute under this Schedule to the Fund at a rate to be specifically and separately approved by the Board of Trustees with respect to each such New Employer (the "New Rate"), subject to a specific determination by the Board of Trustees that the following conditions have been or will be met:

(i)  The New Employer has in fact fulfilled its contribution or participation commitments under the agreement in which the Fund accepted the Employer's New Employer status, and the New Employer has fulfilled all other obligations under that agreement, is current in its ongoing contribution obligations to the Fund and is in compliance with the Fund's rules and polices applicable to Contributing Employers;

(ii)  Unless a New Rate is determined and made available under this Schedule, the New Employer would likely withdraw from the Fund on about the expiration date of its most recent Collective Bargaining Agreement requiring contributions to the Fund;

(iii)  the New Employer's continued participation in the Fund at the New Rate, under the specific circumstances presented, will result in net positive cash flow to the Fund, in comparison to the net cash flow that would result from a withdrawal by the New Employer from the Fund; and

(iv)  the New Employer's obligation to contribute to the Fund at the New Rate is documented in a Collective Bargaining Agreement that is or will be acceptable to the Board of Trustees, and contains (or will contain) terms under which the bargaining representative of the affected Bargaining Unit specifically agrees or acknowledges that any reductions in labor costs resulting from the New Employer's contributions at the New Rate have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

**L.  SPECIAL SCHEDULE: QUALIFYING BARGAINING UNITS THAT HAVE BEEN SUBJECT TO A WAGE FREEZE (EXCEPT AS NOTED PRESERVES ALL BENEFITS). (Effective on and after March 14, 2017)**

**1. Benefits.**

With regard to any Bargaining Unit subject to a Collective Bargaining Agreement in effect as of March 1, 2017 (the "Current Agreement") that –

(i)  was (or is) of 3 to 5 years in duration,

(ii)  did not (or does not) provide for any wage increases for the entire duration of the Agreement, and

- 297 -

(iii)    required (or requires) pension contribution rate increases in compliance with the Primary Schedule (Section 2.A of this Rehabilitation Plan) for the entire duration of the Agreement, but did not (or does not) at any time require contributions at rates equal to or in excess of any of the maximum rates specified under the provisos to the Primary Schedule

the benefits available to any such Bargaining Unit under any new Collective Bargaining Agreement that is the immediate successor or renewal Agreement of the Current Agreement, and is not in compliance with the Primary Schedule ("Successor Agreement"), will be nevertheless identical to the benefits available to Bargaining Units whose Collective Bargaining Agreements are in compliance with the Primary Schedule, provided that any such Successor Agreement has the characteristics specified in Section 2.L.2 below.

**2.    Contributions.**

In order for a Bargaining Unit to qualify for the benefits specified under Section 2.L.1 above, the Successor Agreement must:

(i)    Not be of less duration than the Current Agreement, but not exceeding 5 years in duration;

(ii)    require pension contributions at a rate that is at least as high as the highest rate required under the Current Agreement, but need not provide for any increase in the contribution rates for the duration of the Successor Agreement (the "Special Rate"); and

(iii)    contain terms under which the bargaining representative of the affected Bargaining Unit specifically agrees and acknowledges that any reduction in labor costs resulting from contributions at the Special Rate (*i.e.,* contributions without the rate increases otherwise required under the Primary Schedule) have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

**Section 3.        REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2025. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

•    Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2023.

**Section 4.        ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

- 298 -

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on January 1, 2011 and ends on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31. 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in each applicable year subsequent to 2008, the Trustees concluded that in light of current valuation data available in each of those years, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010 - 2017 update processes that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

- 299 -

Prior to Plan/calendar year 2018, the Trustees have implemented (and, where applicable, have continued to implement) numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and successfully seeking a waiver of the conditions of that extension in light of investment losses resulting from the weakness in financial markets in recent years (waiver or alteration of conditions granted in 2016);

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011) Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method (*i.e.,* the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

- Amending the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need (under their current collective bargaining agreements) for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal

- 300 -

liability and to continue their participation in the Fund as New Employers under the hybrid method; the Trustees determined that the New Employers' participation on these terms would tend to improve overall pension funding.

- Authorizing the filing, on September 25, 2015, of an application with the United States Department of the Treasury requesting approval of a plan of suspension of benefits under MPRA. (The Trustees determined that the filing of this application was a reasonable measure designed to forestall insolvency, and therefore one that they were required to take under the PPA. However, the Fund's MPRA application was denied by the Department of Treasury on May 6, 2016, and the Trustees have determined that it is not feasible for the Fund to submit a revised MPRA application.)

- Approval of the Special Schedule relating to Qualifying New ("Hybrid") Method Employers indicated in Section 2.K. of this Appendix.

- And the addition of Section 2.L. to this Appendix dealing with Qualifying Bargaining Units that have been subject to wage freezes.

However, the Trustees have also determined, as part of the 2018 Rehabilitation Plan update process, that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan), or (as noted) mandating significant contribution rate increases at levels beyond those required in recent years, would risk substantially accelerating the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to forestall possible insolvency.

**Exhibit A**
**Primary Schedule: Contribution Rate Increases by Bargaining Agreement Year**
**(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increases | Year of initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| 2006 | 7% | | | | | | | | | | | | |
| 2007 | 7% | 8% | | | | | | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | | | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | | | | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | | | | |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

TM:619767 / 01096280 / 04/03/2023

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(Applicable to Default Schedule and Rehabilitation Plan
Withdrawal benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**

| Age | Percent of Age 65 Benefit Based on Actuarial Equivalence |
|:---:|:---:|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

- 303 -

**APPENDIX M-11. REHABILITATION PLAN (INCLUDING 2019 UPDATE)**

**Section 1.**        **PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-11 is added to the Pension Plan effective on and after December 31, 2019 (except where a different effective date for any provision is noted below) in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 2014. For 2015, 2016, 2017, 2018 and 2019 the actuary certified the Fund to be in "critical and declining status", pursuant to the Multiemployer Pension Reform Act of 2014 ("MPRA"). The Fund's Board of Trustees, as the plan sponsor of a "critical and declining status" pension plan, is charged under the PPA and MPRA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions, as amended to date, including any applicable amendments under MPRA.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.**          **SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

### A.    PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).

#### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

#### 2.    Contributions

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered by the National Master Automobile Transporter Agreement, and (2) $342 per week

for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies as a New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

## B.    DEFAULT SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement or accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

### 2.    Contributions

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

### 3.    Effect of agreement to or imposition of Default Schedule.

(i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties have failed to adopt either of the Schedules compliant with this Rehabilitation

- 306 -

Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C.    DISTRESSED EMPLOYER SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

### 3.    Contributions and Qualifications for the Distressed Employer Schedule.

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)    the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

**- 307 -**

(ii)   the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii)   during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)   the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)   on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)   the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3.**    **Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.**    **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)   whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any

time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)   who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see* Section 2(I) below), and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

(iii)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)   the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

Proviso 3: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

E.   **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)   who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)   whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

Proviso 1: *Provided, however.* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

F.   **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)   who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)   whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

G.   **RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)   in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the

- 311 -

meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)    in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

**H.    ADJUSTABLE BENEFITS.**

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (iv) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan § 4.02); *(ii)* a 25-And-Out Pension (Pension Plan § 4.05); or a 30-And-Out Pension (Pension Plan § 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)    To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA§ 305(e)(8)(iv):

(i)     benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)    any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)   benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

I.   **REHABILITATION PLAN WITHDRAWAL**

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)    decertification or other removal of the Union as a bargaining agent;

(2)    ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)    administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit); or (ii) a violation of any other Fund rule or policy (including, without limitation, practices or arrangements that result in adverse selection);

(4)    any transaction or other event (including, without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting) whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to

- 313 -

consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)     the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)    the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)   the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)    the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)     the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.      BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**K.      SPECIAL SCHEDULE: QUALIFYING NEW ("HYBRID METHOD") EMPLOYERS (EXCEPT AS NOTED, PRESERVES ALL BENEFITS).**

**1.      Benefits.**

Bargaining Units (and any non-Bargaining Unit groups participating in the Fund) whose Contributing Employers have been specifically accepted and approved by the Trustees as satisfying the requirements for this Qualifying New Employer Schedule will, as it relates to benefits or potential benefit adjustments, be treated in the same way as Bargaining Units (and non-Bargaining Unit groups) under the Primary Schedule (Section 2.A. above).

- 314 -

2. **Contributions.**

Contributing Employers who have qualified as New Employers within the meaning of Appendix E of the Plan Document, Section 2.2 (b) (and are thus eligible for treatment under the Pension Fund's alternative, or "hybrid," method of calculating Employer Withdrawal Liability), *and* who have fulfilled all requirements relating to the duration and/or level of continued participation in the Pension Fund contained in the agreement under which the Fund accepted the Employer as a New Employer, may contribute under this Schedule to the Fund at a rate to be specifically and separately approved by the Board of Trustees with respect to each such New Employer (the "New Rate"), subject to a specific determination by the Board of Trustees that the following conditions have been or will be met:

(i)    The New Employer has in fact fulfilled its contribution or participation commitments under the agreement in which the Fund accepted the Employer's New Employer status, and the New Employer has fulfilled all other obligations under that agreement, is current in its ongoing contribution obligations to the Fund and is in compliance with the Fund's rules and polices applicable to Contributing Employers;

(ii)   Unless a New Rate is determined and made available under this Schedule, the New Employer would likely withdraw from the Fund on about the expiration date of its most recent Collective Bargaining Agreement requiring contributions to the Fund;

(iii)  the New Employer's continued participation in the Fund at the New Rate, under the specific circumstances presented, will result in net positive cash flow to the Fund, in comparison to the net cash flow that would result from a withdrawal by the New Employer from the Fund; and

(iv)   the New Employer's obligation to contribute to the Fund at the New Rate is documented in a Collective Bargaining Agreement that is or will be acceptable to the Board of Trustees, and contains (or will contain) terms under which the bargaining representative of the affected Bargaining Unit specifically agrees or acknowledges that any reductions in labor costs resulting from the New Employer's contributions at the New Rate have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

L.   **SPECIAL SCHEDULE: QUALIFYING BARGAINING UNITS THAT HAVE BEEN SUBJECT TO A WAGE FREEZE (EXCEPT AS NOTED PRESERVES ALL BENEFITS). (Effective on and after March 14, 2017)**

1. **Benefits.**

With regard to any Bargaining Unit subject to a Collective Bargaining Agreement in effect as of March 1, 2017 (the "Current Agreement") that –

(i)    was (or is) of 3 to 5 years in duration,

(ii)   did not (or does not) provide for any wage increases for the entire duration of the Agreement, and

(iii)  required (or requires) pension contribution rate increases in compliance with the Primary Schedule (Section 2.A of this Rehabilitation Plan) for the entire duration of the Agreement, but did not (or does not) at any time require contributions at

rates equal to or in excess of any of the maximum rates specified under the provisos to the Primary Schedule

the benefits available to any such Bargaining Unit under any new Collective Bargaining Agreement that is the immediate successor or renewal Agreement of the Current Agreement, and is not in compliance with the Primary Schedule ("Successor Agreement"), will be nevertheless identical to the benefits available to Bargaining Units whose Collective Bargaining Agreements are in compliance with the Primary Schedule, provided that any such Successor Agreement has the characteristics specified in Section 2.L.2 below.

**B.    Contributions.**

In order for a Bargaining Unit to qualify for the benefits specified under Section 2.L.1 above, the Successor Agreement must:

(i)    Not be of less duration than the Current Agreement, but not exceeding 5 years in duration;

(ii)    require pension contributions at a rate that is at least as high as the highest rate required under the Current Agreement, but need not provide for any increase in the contribution rates for the duration of the Successor Agreement (the "Special Rate"); and

(iii)    contain terms under which the bargaining representative of the affected Bargaining Unit specifically agrees and acknowledges that any reduction in labor costs resulting from contributions at the Special Rate (*i.e.,* contributions without the rate increases otherwise required under the Primary Schedule) have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

**Section 3.    REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2025. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

• Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2023.

**Section 4.    ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on January 1, 2011 and ends on December 31, 2020), or to forestall possible insolvency

- 316 -

indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31. 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
| --- | --- | --- |
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in each applicable year subsequent to 2008, the Trustees concluded that in light of current valuation data available in each of those years, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010 - 2017 update processes that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

Prior to Plan/calendar year 2019, the Trustees have implemented (and, where applicable, have continued to implement) numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and successfully seeking a waiver of the conditions of that extension in light of investment losses resulting from the weakness in financial markets in recent years (waiver or alteration of conditions granted in 2016);

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011) Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method (*i.e.,* the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

- Amending the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need (under their current collective bargaining agreements) for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal liability and to continue their participation in the Fund as New Employers under the hybrid method; the Trustees determined that the New Employers' participation on these terms would tend to improve overall pension funding.

- Authorizing the filing, on September 25, 2015, of an application with the United States Department of the Treasury requesting approval of a plan of suspension of benefits under MPRA. (The Trustees determined that the filing of this application was a reasonable measure designed to forestall insolvency, and therefore one that they were required to take under the PPA. However, the Fund's MPRA application was denied by the Department of Treasury on May 6, 2016, and the Trustees have determined that it is not feasible for the Fund to submit a revised MPRA application.)

- Approval of the Special Schedule relating to Qualifying New ("Hybrid") Method Employers indicated in Section 2.K. of this Appendix.

- And the addition of Section 2.L. to this Appendix dealing with Qualifying Bargaining Units that have been subject to wage freezes.

However, the Trustees have also determined, as part of the 2019 Rehabilitation Plan update process, that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan), or (as noted) mandating significant contribution rate increases at levels beyond those required in recent years, would risk substantially accelerating the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to forestall possible insolvency.

**Exhibit A**
**Primary Schedule: Contribution Rate Increases by Bargaining Agreement Year**
**(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increases | Year of initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| 2006 | 7% | | | | | | | | | | | | | |
| 2007 | 7% | 8% | | | | | | | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | | | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | | | | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | | | | | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(Applicable to Default Schedule and Rehabilitation Plan
Withdrawal benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**

| Age | Percent of Age 65 Benefit Based on Actuarial Equivalence |
|:---:|:---:|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

TM:619767 / 01096280 / 04/03/2023

**APPENDIX M-12. REHABILITATION PLAN (INCLUDING 2020 UPDATE)**

**Section 1.          PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-12 is added to the Pension Plan effective on and after December 31, 2020 (except where a different effective date for any provision is noted below) in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 2014. For 2015, 2016, 2017, 2018, 2019 and 2020 the actuary certified the Fund to be in "critical and declining status", pursuant to the Multiemployer Pension Reform Act of 2014 ("MPRA"). The Fund's Board of Trustees, as the plan sponsor of a "critical and declining status" pension plan, is charged under the PPA and MPRA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions, as amended to date, including any applicable amendments under MPRA.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.**　　　　**SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

**A.　PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).**

**1.　Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

**2.　Contributions**

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered

by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies as a New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

## B.    DEFAULT SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- •   Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

### 2.    Contributions

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

### 3.    Effect of agreement to or imposition of Default Schedule.

(i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties

- 324 -

have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C.    DISTRESSED EMPLOYER SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

### 2.    Contributions and Qualifications for the Distressed Employer Schedule.

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)     the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)    the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii)   during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)    the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)     on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)    the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3.      Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.     ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be

- 326 -

eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1) whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2) who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see* Section 2(I) below), and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i) the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii) the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

(iii)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)   the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

<u>Proviso 3</u>: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

## E.   ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)   who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)   whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

<u>Proviso 1</u>: *Provided, however.* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

<u>Proviso 2</u>: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of

Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

**F.  ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)  who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)  whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

**G.  RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

- 329 -

(1)    in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)    in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

## H.    ADJUSTABLE BENEFITS.

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (iv) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan § 4.02); *(ii)* a 25-And-Out Pension (Pension Plan § 4.05); or a 30-And-Out Pension (Pension Plan § 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)    To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA§ 305(e)(8)(iv):

(i)    benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)    any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)    benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

## I.    REHABILITATION PLAN WITHDRAWAL

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)    decertification or other removal of the Union as a bargaining agent;

(2)    ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)    administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit); or (ii) a violation of any other Fund rule or policy (including, without limitation, practices or arrangements that result in adverse selection);

(4)    any transaction or other event (including, without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting) whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)  the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)  the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)  the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)  the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)  the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.  BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**K.  SPECIAL SCHEDULE: QUALIFYING NEW ("HYBRID METHOD") EMPLOYERS (EXCEPT AS NOTED, PRESERVES ALL BENEFITS).**

**1.  Benefits.**

Bargaining Units (and any non-Bargaining Unit groups participating in the Fund) whose Contributing Employers have been specifically accepted and approved by the Trustees as satisfying the requirements for this Qualifying New Employer Schedule will, as it relates to benefits or potential benefit adjustments, be treated in the same way as Bargaining Units (and non-Bargaining Unit groups) under the Primary Schedule (Section 2.A. above).

- 332 -

**2.    Contributions.**

Contributing Employers who have qualified as New Employers within the meaning of Appendix E of the Plan Document, Section 2.2 (b) (and are thus eligible for treatment under the Pension Fund's alternative, or "hybrid," method of calculating Employer Withdrawal Liability), *and* who have fulfilled all requirements relating to the duration and/or level of continued participation in the Pension Fund contained in the agreement under which the Fund accepted the Employer as a New Employer, may contribute under this Schedule to the Fund at a rate to be specifically and separately approved by the Board of Trustees with respect to each such New Employer (the "New Rate"), subject to a specific determination by the Board of Trustees that the following conditions have been or will be met:

(i)    The New Employer has in fact fulfilled its contribution or participation commitments under the agreement in which the Fund accepted the Employer's New Employer status, and the New Employer has fulfilled all other obligations under that agreement, is current in its ongoing contribution obligations to the Fund and is in compliance with the Fund's rules and polices applicable to Contributing Employers;

(ii)    Unless a New Rate is determined and made available under this Schedule, the New Employer would likely withdraw from the Fund on about the expiration date of its most recent Collective Bargaining Agreement requiring contributions to the Fund;

(iii)    the New Employer's continued participation in the Fund at the New Rate, under the specific circumstances presented, will result in net positive cash flow to the Fund, in comparison to the net cash flow that would result from a withdrawal by the New Employer from the Fund; and

(iv)    the New Employer's obligation to contribute to the Fund at the New Rate is documented in a Collective Bargaining Agreement that is or will be acceptable to the Board of Trustees, and contains (or will contain) terms under which the bargaining representative of the affected Bargaining Unit specifically agrees or acknowledges that any reductions in labor costs resulting from the New Employer's contributions at the New Rate have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

**L.    SPECIAL SCHEDULE: QUALIFYING BARGAINING UNITS THAT HAVE BEEN SUBJECT TO A WAGE FREEZE (EXCEPT AS NOTED PRESERVES ALL BENEFITS). (Effective on and after March 14, 2017)**

**1.    Benefits.**

With regard to any Bargaining Unit subject to a Collective Bargaining Agreement in effect as of March 1, 2017 (the "Current Agreement") that –

(i)    was (or is) of 3 to 5 years in duration,

(ii)    did not (or does not) provide for any wage increases for the entire duration of the Agreement, and

(iii)    required (or requires) pension contribution rate increases in compliance with the Primary Schedule (Section 2.A of this Rehabilitation Plan) for the entire

duration of the Agreement, but did not (or does not) at any time require contributions at rates equal to or in excess of any of the maximum rates specified under the provisos to the Primary Schedule

the benefits available to any such Bargaining Unit under any new Collective Bargaining Agreement that is the immediate successor or renewal Agreement of the Current Agreement, and is not in compliance with the Primary Schedule ("Successor Agreement"), will be nevertheless identical to the benefits available to Bargaining Units whose Collective Bargaining Agreements are in compliance with the Primary Schedule, provided that any such Successor Agreement has the characteristics specified in Section 2.L.2 below.

**2. Contributions.**

In order for a Bargaining Unit to qualify for the benefits specified under Section 2.L.1 above, the Successor Agreement must:

(i) Not be of less duration than the Current Agreement, but not exceeding 5 years in duration;

(ii) require pension contributions at a rate that is at least as high as the highest rate required under the Current Agreement, but need not provide for any increase in the contribution rates for the duration of the Successor Agreement (the "Special Rate"); and

(iii)  contain terms under which the bargaining representative of the affected Bargaining Unit specifically agrees and acknowledges that any reduction in labor costs resulting from contributions at the Special Rate (*i.e.,* contributions without the rate increases otherwise required under the Primary Schedule) have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

**Section 3.      REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2025. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

• Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2023.

**Section 4.      ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on

- 334 -

January 1, 2011 and ends on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31. 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in each applicable year subsequent to 2008, the Trustees concluded that in light of current valuation data available in each of those years, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010 - 2020 update processes that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

Prior to Plan/calendar year 2020, the Trustees have implemented (and, where applicable, have continued to implement) numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and successfully seeking a waiver of the conditions of that extension in light of investment losses resulting from the weakness in financial markets in recent years (waiver or alteration of conditions granted in 2016);

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011) Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method (*i.e.,* the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

- Amending the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need (under their current collective bargaining agreements) for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal liability and to continue their participation in the Fund as New Employers under the hybrid method; the Trustees determined that the New Employers' participation on these terms would tend to improve overall pension funding.

- Authorizing the filing, on September 25, 2015, of an application with the United States Department of the Treasury requesting approval of a plan of suspension of benefits under MPRA. (The Trustees determined that the filing of this application was a reasonable measure designed to forestall insolvency, and therefore one that they were required to take under the PPA. However, the Fund's MPRA application was denied by the Department of Treasury on May 6, 2016, and the Trustees have determined that it is not feasible for the Fund to submit a revised MPRA application.)

- Approval of the Special Schedule relating to Qualifying New ("Hybrid") Method Employers indicated in Section 2.K. of this Appendix.

- And the addition of Section 2.L. to this Appendix dealing with Qualifying Bargaining Units that have been subject to wage freezes.

However, the Trustees have also determined, as part of the 2020 Rehabilitation Plan update process, that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan), or (as noted) mandating significant contribution rate increases at levels beyond those required in recent years, would risk substantially accelerating the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to forestall possible insolvency.

**Exhibit A**
**Primary Schedule: Contribution Rate Increases by Bargaining Agreement Year**
**(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increases | Year of initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| 2006 | 7% | | | | | | | | | | | | | | |
| 2007 | 7% | 8% | | | | | | | | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | | | | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | | | | | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | | | | | | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | | |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% |
| 2028 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% |

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(Applicable to Default Schedule and Rehabilitation Plan
Withdrawal benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**

| Age | Percent of Age 65 Benefit Based on Actuarial Equivalence |
|-----|-----|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

TM:619767 / 01096280 / 04/03/2023        Appendix M-12  (Page 18 of 18)

**APPENDIX M-13. REHABILITATION PLAN (INCLUDING 2021 UPDATE)**

Section 1.          **PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-13 is added to the Pension Plan effective on and after December 31, 2021 (except where a different effective date for any provision is noted below) in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 2014. For 2015, 2016, 2017, 2018, 2019, 2020 and 2021 the actuary certified the Fund to be in "critical and declining status", pursuant to the Multiemployer Pension Reform Act of 2014 ("MPRA"). The Fund's Board of Trustees, as the plan sponsor of a "critical and declining status" pension plan, is charged under the PPA and MPRA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions, as amended to date, including any applicable amendments under MPRA.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

Section 2.          **SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

A.    **PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).**

1.    **Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

2.    **Contributions**

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect

- 341 -

to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies as a New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

**B.    DEFAULT SCHEDULE.**

**1.    Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

**2.    Contributions**

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

**3.    Effect of agreement to or imposition of Default Schedule.**

(i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties have failed to adopt either of the Schedules compliant with this

Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C.    DISTRESSED EMPLOYER SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

### 2.    Contributions and Qualifications for the Distressed Employer Schedule.

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)     the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)    the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii)   during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)    the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)     on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)    the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3.     Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.     ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be

- 344 -

eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)  whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)  who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see* Section 2(I) below), and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i)  the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii)  the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

**- 345 -**

(iii)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)    the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

Proviso 3: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

## E.    ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)    who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)    whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

Proviso 1: *Provided, however.* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of

- 346 -

Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

**F.  ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)   who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)   whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

**G.  RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)    in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)    in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

## H.    ADJUSTABLE BENEFITS.

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (iv) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan § 4.02); *(ii)* a 25-And-Out Pension (Pension Plan § 4.05); or a 30-And-Out Pension (Pension Plan § 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8) To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA§ 305(e)(8)(iv):

   (i) benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

   (ii) any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

   (iii) benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

## I.    REHABILITATION PLAN WITHDRAWAL

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1) decertification or other removal of the Union as a bargaining agent;

(2) ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3) administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit); or (ii) a violation of any other Fund rule or policy (including, without limitation, practices or arrangements that result in adverse selection);

(4) any transaction or other event (including, without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting) whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)     the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)    the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)   the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)    the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)     the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.    BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**K.    SPECIAL SCHEDULE: QUALIFYING NEW ("HYBRID METHOD") EMPLOYERS (EXCEPT AS NOTED, PRESERVES ALL BENEFITS).**

**1.    Benefits.**

Bargaining Units (and any non-Bargaining Unit groups participating in the Fund) whose Contributing Employers have been specifically accepted and approved by the Trustees as satisfying the requirements for this Qualifying New Employer Schedule will, as it relates to benefits or potential benefit adjustments, be treated in the same way as Bargaining Units (and non-Bargaining Unit groups) under the Primary Schedule (Section 2.A. above).

2.    **Contributions.**

Contributing Employers who have qualified as New Employers within the meaning of Appendix E of the Plan Document, Section 2.2 (b) (and are thus eligible for treatment under the Pension Fund's alternative, or "hybrid," method of calculating Employer Withdrawal Liability), *and* who have fulfilled all requirements relating to the duration and/or level of continued participation in the Pension Fund contained in the agreement under which the Fund accepted the Employer as a New Employer, may contribute under this Schedule to the Fund at a rate to be specifically and separately approved by the Board of Trustees with respect to each such New Employer (the "New Rate"), subject to a specific determination by the Board of Trustees that the following conditions have been or will be met:

(i)    The New Employer has in fact fulfilled its contribution or participation commitments under the agreement in which the Fund accepted the Employer's New Employer status, and the New Employer has fulfilled all other obligations under that agreement, is current in its ongoing contribution obligations to the Fund and is in compliance with the Fund's rules and polices applicable to Contributing Employers;

(ii)    Unless a New Rate is determined and made available under this Schedule, the New Employer would likely withdraw from the Fund on about the expiration date of its most recent Collective Bargaining Agreement requiring contributions to the Fund;

(iii)    the New Employer's continued participation in the Fund at the New Rate, under the specific circumstances presented, will result in net positive cash flow to the Fund, in comparison to the net cash flow that would result from a withdrawal by the New Employer from the Fund; and

(iv)    the New Employer's obligation to contribute to the Fund at the New Rate is documented in a Collective Bargaining Agreement that is or will be acceptable to the Board of Trustees, and contains (or will contain) terms under which the bargaining representative of the affected Bargaining Unit specifically agrees or acknowledges that any reductions in labor costs resulting from the New Employer's contributions at the New Rate have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

L.    **SPECIAL SCHEDULE: QUALIFYING BARGAINING UNITS THAT HAVE BEEN SUBJECT TO A WAGE FREEZE (EXCEPT AS NOTED PRESERVES ALL BENEFITS). (Effective on and after March 14, 2017)**

1.    **Benefits.**

With regard to any Bargaining Unit subject to a Collective Bargaining Agreement in effect as of March 1, 2017 (the "Current Agreement") that –

(i)    was (or is) of 3 to 5 years in duration,

(ii)    did not (or does not) provide for any wage increases for the entire duration of the Agreement, and

(iii)    required (or requires) pension contribution rate increases in compliance with the Primary Schedule (Section 2.A of this Rehabilitation Plan) for the entire

- 351 -

duration of the Agreement, but did not (or does not) at any time require contributions at rates equal to or in excess of any of the maximum rates specified under the provisos to the Primary Schedule

the benefits available to any such Bargaining Unit under any new Collective Bargaining Agreement that is the immediate successor or renewal Agreement of the Current Agreement, and is not in compliance with the Primary Schedule ("Successor Agreement"), will be nevertheless identical to the benefits available to Bargaining Units whose Collective Bargaining Agreements are in compliance with the Primary Schedule, provided that any such Successor Agreement has the characteristics specified in Section 2.L.2 below.

**2.    Contributions.**

In order for a Bargaining Unit to qualify for the benefits specified under Section 2.L.1 above, the Successor Agreement must:

(i)    Not be of less duration than the Current Agreement, but not exceeding 5 years in duration;

(ii)    require pension contributions at a rate that is at least as high as the highest rate required under the Current Agreement, but need not provide for any increase in the contribution rates for the duration of the Successor Agreement (the "Special Rate"); and

(iii)    contain terms under which the bargaining representative of the affected Bargaining Unit specifically agrees and acknowledges that any reduction in labor costs resulting from contributions at the Special Rate (*i.e.,* contributions without the rate increases otherwise required under the Primary Schedule) have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

**Section 3.        REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2025. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

•    Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2023.

**Section 4.        ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on

- 352 -

January 1, 2011 and ended on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31. 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in each applicable year subsequent to 2008, the Trustees concluded that in light of current valuation data available in each of those years, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010 - 2020 update processes that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

Prior to Plan/calendar year 2021, the Trustees have implemented (and, where applicable, have continued to implement) numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and successfully seeking a waiver of the conditions of that extension in light of investment losses resulting from the weakness in financial markets in recent years (waiver or alteration of conditions granted in 2016);

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011) Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method (*i.e.,* the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

- Amending the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need (under their current collective bargaining agreements) for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal liability and to continue their participation in the Fund as New Employers under the

- 354 -

Appendix M-13  (Page 15 of 18)

hybrid method; the Trustees determined that the New Employers' participation on these terms would tend to improve overall pension funding.

- Authorizing the filing, on September 25, 2015, of an application with the United States Department of the Treasury requesting approval of a plan of suspension of benefits under MPRA. (The Trustees determined that the filing of this application was a reasonable measure designed to forestall insolvency, and therefore one that they were required to take under the PPA. However, the Fund's MPRA application was denied by the Department of Treasury on May 6, 2016, and the Trustees have determined that it is not feasible for the Fund to submit a revised MPRA application.)

- Approval of the Special Schedule relating to Qualifying New ("Hybrid") Method Employers indicated in Section 2.K. of this Appendix.

- And the addition of Section 2.L. to this Appendix dealing with Qualifying Bargaining Units that have been subject to wage freezes.

However, the Trustees have also determined, as part of the 2021 Rehabilitation Plan update process, that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan), or (as noted) mandating significant contribution rate increases at levels beyond those required in recent years, would risk substantially accelerating the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to forestall possible insolvency.

**Exhibit A**
**Primary Schedule: Contribution Rate Increases by Bargaining Agreement Year**
**(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increases | Year of Initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
| 2006 | 7% | | | | | | | | | | | | | | | |
| 2007 | 7% | 8% | | | | | | | | | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | | | | | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | | | | | | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | | | | | | | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | | | |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | | |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | |
| 2017 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |
| 2028 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% |

TM:619767 / 01096280 / 04/03/2023

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(Applicable to Default Schedule and Rehabilitation Plan
Withdrawal benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**

| <u>Age</u> | Percent of Age 65 Benefit Based on <u>Actuarial Equivalence</u> |
|:---:|:---:|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

## APPENDIX M-14. REHABILITATION PLAN (INCLUDING 2022 UPDATE)

**Section 1.**　　　　**PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-14 is added to the Pension Plan effective on and after December 31, 2022 (except where a different effective date for any provision is noted below) in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 2014. For 2015, 2016, 2017, 2018, 2019, 2020, 2021 and 2022, the actuary certified the Fund to be in "critical and declining status", pursuant to the Multiemployer Pension Reform Act of 2014 ("MPRA"). The Fund's Board of Trustees, as the plan sponsor of a "critical and declining status" pension plan, is charged under the PPA and MPRA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions, as amended to date, including any applicable amendments under MPRA.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.**　　　　**SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

### A.  PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).

#### 1.  Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

#### 2.  Contributions

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring contributions of (1) $348 per week for each full-time employee with respect to Participants covered by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect

- 359 -

to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies as a New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

**B.    DEFAULT SCHEDULE.**

    **1.    Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

    **2.    Contributions**

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

    **3.    Effect of agreement to or imposition of Default Schedule.**

    (i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

    (ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining

- 360 -

parties have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C.   DISTRESSED EMPLOYER SCHEDULE.

### 1.   Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

### 2.   Contributions and Qualifications for the Distressed Employer Schedule.

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the

Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)     the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)    the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii)   during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full-time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)    the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)     on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)    the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

3.     **Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that

- 362 -

Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.    ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)    whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)    who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see* Section 2(I) below), and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application

- 363 -

prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii)     the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

(iii)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv)     the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)      the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

Proviso 3: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

**E.     ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)      who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)      whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a

Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

Proviso 1: *Provided, however.* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

F.   **ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)   who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)   whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

- 365 -

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

G.    **RESTORATION OF ADJUSTED BENEFITS.**

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)    in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

(2)    in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

H.    **ADJUSTABLE BENEFITS.**

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (iv) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan § 4.02); *(ii)* a 25-And-Out Pension (Pension Plan § 4.05); or a 30-And-Out Pension (Pension Plan § 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)    To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA § 305(e)(8)(iv):

(i)    benefits, rights, and features under the plan, including post-retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

(ii)    any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)    benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

I.    **REHABILITATION PLAN WITHDRAWAL**

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)   decertification or other removal of the Union as a bargaining agent;

(2)   ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan;

(3)   administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit); or (ii) a violation of any other Fund rule or policy (including, without limitation, practices or arrangements that result in adverse selection);

(4)   any transaction or other event (including, without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting) whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)    the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)   the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)  the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)  the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)   the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J. BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**K. SPECIAL SCHEDULE: QUALIFYING NEW ("HYBRID METHOD") EMPLOYERS (EXCEPT AS NOTED, PRESERVES ALL BENEFITS).**

**1. Benefits.**

Bargaining Units (and any non-Bargaining Unit groups participating in the Fund) whose Contributing Employers have been specifically accepted and approved by the Trustees as satisfying the requirements for this Qualifying New Employer Schedule will, as it relates to benefits or potential benefit adjustments, be treated in the same way as Bargaining Units (and non-Bargaining Unit groups) under the Primary Schedule (Section 2.A. above).

**2. Contributions.**

Contributing Employers who have qualified as New Employers within the meaning of Appendix E of the Plan Document, Section 2.2 (b) (and are thus eligible for treatment under the Pension Fund's alternative, or "hybrid," method of calculating Employer Withdrawal Liability), *and* who have fulfilled all requirements relating to the duration and/or level of continued participation in the Pension Fund contained in the agreement under which the Fund accepted the Employer as a New Employer, may contribute under this Schedule to the Fund at a rate to be specifically and separately approved by the Board of Trustees with respect to each such New Employer (the "New Rate"), subject to a specific determination by the Board of Trustees that the following conditions have been or will be met:

(i)     The New Employer has in fact fulfilled its contribution or participation commitments under the agreement in which the Fund accepted the Employer's New Employer status, and the New Employer has fulfilled all other obligations under that agreement, is current in its ongoing contribution obligations to the Fund and is in compliance with the Fund's rules and polices applicable to Contributing Employers;

(ii)    Unless a New Rate is determined and made available under this Schedule, the New Employer would likely withdraw from the Fund on about the expiration date of its most recent Collective Bargaining Agreement requiring contributions to the Fund;

(iii)   the New Employer's continued participation in the Fund at the New Rate, under the specific circumstances presented, will result in net positive cash flow to the Fund, in comparison to the net cash flow that would result from a withdrawal by the New Employer from the Fund; and

- 369 -

(iv) the New Employer's obligation to contribute to the Fund at the New Rate is documented in a Collective Bargaining Agreement that is or will be acceptable to the Board of Trustees, and contains (or will contain) terms under which the bargaining representative of the affected Bargaining Unit specifically agrees or acknowledges that any reductions in labor costs resulting from the New Employer's contributions at the New Rate have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

**L.   SPECIAL SCHEDULE: QUALIFYING BARGAINING UNITS THAT HAVE BEEN SUBJECT TO A WAGE FREEZE (EXCEPT AS NOTED PRESERVES ALL BENEFITS). (Effective on and after March 14, 2017)**

**1.   Benefits.**

With regard to any Bargaining Unit subject to a Collective Bargaining Agreement in effect as of March 1, 2017 (the "Current Agreement") that –

(i) was (or is) of 3 to 5 years in duration,

(ii) did not (or does not) provide for any wage increases for the entire duration of the Agreement, and

(iii) required (or requires) pension contribution rate increases in compliance with the Primary Schedule (Section 2.A of this Rehabilitation Plan) for the entire duration of the Agreement, but did not (or does not) at any time require contributions at rates equal to or in excess of any of the maximum rates specified under the provisos to the Primary Schedule

the benefits available to any such Bargaining Unit under any new Collective Bargaining Agreement that is the immediate successor or renewal Agreement of the Current Agreement, and is not in compliance with the Primary Schedule ("Successor Agreement"), will be nevertheless identical to the benefits available to Bargaining Units whose Collective Bargaining Agreements are in compliance with the Primary Schedule, provided that any such Successor Agreement has the characteristics specified in Section 2.L.2 below.

**2.   Contributions.**

In order for a Bargaining Unit to qualify for the benefits specified under Section 2.L.1 above, the Successor Agreement must:

(i) Not be of less duration than the Current Agreement, but not exceeding 5 years in duration;

(ii) require pension contributions at a rate that is at least as high as the highest rate required under the Current Agreement, but need not provide for any increase in the contribution rates for the duration of the Successor Agreement (the "Special Rate"); and

(iii) contain terms under which the bargaining representative of the affected Bargaining Unit specifically agrees and acknowledges that any reduction in labor costs resulting from contributions at

- 370 -

the Special Rate (*i.e.,* contributions without the rate increases otherwise required under the Primary Schedule) have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

Section 3.        **REHABILITATION PLAN STANDARDS AND OBJECTIVES.**

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to forestall the possible insolvency of the Fund prior to 2025. Projections of insolvency may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

• Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will forestall its possible insolvency *prior* to 2023.

Section 4.        **ALTERNATIVES CONSIDERED BY THE TRUSTEES.**

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on January 1, 2011 and ended on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31, 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|----------|--------------------|-----------------------------|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

- 371 -

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in each applicable year subsequent to 2008, the Trustees concluded that in light of current valuation data available in each of those years, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010 - 2021 update processes that requiring annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

Prior to Plan/calendar year 2022, the Trustees have implemented (and, where applicable, have continued to implement) numerous measures to improve the Fund's funding. These have included:

- Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

- Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and successfully seeking a waiver of the conditions of that extension in light of investment losses resulting from the weakness in financial markets in recent years (waiver or alteration of conditions granted in 2016);

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011)

- 372 -

Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method *(i.e.,* the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

- Amending the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need (under their current collective bargaining agreements) for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal liability and to continue their participation in the Fund as New Employers under the hybrid method; the Trustees determined that the New Employers' participation on these terms would tend to improve overall pension funding.

- Authorizing the filing, on September 25, 2015, of an application with the United States Department of the Treasury requesting approval of a plan of suspension of benefits under MPRA. (The Trustees determined that the filing of this application was a reasonable measure designed to forestall insolvency, and therefore one that they were required to take under the PPA. However, the Fund's MPRA application was denied by the Department of Treasury on May 6, 2016, and the Trustees have determined that it is not feasible for the Fund to submit a revised MPRA application.)

- Approval of the Special Schedule relating to Qualifying New ("Hybrid") Method Employers indicated in Section 2.K. of this Appendix.

- And the addition of Section 2.L. to this Appendix dealing with Qualifying Bargaining Units that have been subject to wage freezes.

However, the Trustees have also determined, as part of the 2022 Rehabilitation Plan update process, that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan), or (as noted) mandating significant contribution rate increases at levels beyond those required in recent years, would risk substantially accelerating the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to forestall possible insolvency.

**Exhibit A**
**Primary Schedule: Contribution Rate Increases by Bargaining Agreement Year**
**(all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increases | Year of Initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| 2006 | 7% | | | | | | | | | | | | | | | | |
| 2007 | 7% | 8% | | | | | | | | | | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | | | | | | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | | | | | | | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | | | | | | | | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | | | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | | | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | | |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | | | | |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | | | |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | | |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2028 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |

TM:619767 / 01096280 / 04/03/2023                Appendix M-14  (Page 17 of 18)

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(Applicable to Default Schedule and Rehabilitation Plan
Withdrawal benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**

|      | **Percent of Age 65 Benefit Based on** |
| **Age** | **Actuarial Equivalence** |
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

**APPENDIX M-15. REHABILITATION PLAN (INCLUDING 2023 UPDATE)**

**Section 1.          PREAMBLE AND DEFINITIONS.**

Appendix M comprising the Rehabilitation Plan was added to the Pension Plan effective on and after March 26, 2008, and has been amended from time to time since then.

This Appendix M-15 is added to the Pension Plan effective on and after April 3, 2023 (except where a different effective date for any provision is noted below) in order to update the Rehabilitation Plan in compliance with the requirements of the Pension Protection Act of 2006 ("PPA").

The Central States, Southeast and Southwest Areas Pension Fund (the "Fund") was initially certified on March 24, 2008 by its actuary to be in "critical status" (sometimes referred to as the "red zone") under the PPA: the Fund's actuary has also certified the Fund to be in critical status in March of each subsequent year through March 2014. For 2015, 2016, 2017, 2018, 2019, 2020, 2021 and 2022, the actuary certified the Fund to be in "critical and declining status", pursuant to the Multiemployer Pension Reform Act of 2014 ("MPRA"). For 2023, the Fund's actuary certified the Fund to be in critical status. The Fund's Board of Trustees, as the plan sponsor of a "critical status" pension plan, is charged under the PPA and MPRA with developing a "rehabilitation plan" designed to improve the financial condition of the Fund in accordance with the standards set forth in the PPA, and with annually updating the rehabilitation plan. Although for plan year 2009 the Fund was exempt from the update requirement, pursuant to an election under the Worker Retiree and Employer Recovery Act of 2008, for subsequent plan years the PPA provisions concerning the rehabilitation plan update process are applicable to the Fund. The purpose of this updated Rehabilitation Plan is to comply with those PPA provisions, as amended to date, including any applicable amendments under MPRA.

Under the PPA, a rehabilitation plan, including annual updates to the plan, must include one or more schedules showing revised benefit structures, revised contributions, or both, which, if adopted by the parties obligated under agreements participating in the pension plan, may reasonably be expected to enable the Fund to emerge from critical status in accordance with the rehabilitation plan. The PPA also provides that one of the rehabilitation plan schedules of benefits and contributions shall be designated the "default" schedule. The default schedule must assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum extent permitted by law. The PPA also creates certain categories of "adjustable benefits" which may be reduced or eliminated dependent upon the outcome of bargaining over the rehabilitation plan schedules and dependent on the exercise of certain flexibility and discretion conferred upon the Board of Trustees by the PPA. Adjustable benefits that may be affected in this manner include post-retirement death benefits, early retirement benefits or retirement-type subsidies, and generally any benefit that would be payable prior to normal retirement age (age 65 benefits under the Fund's Plan Document - or, as discussed below, a Contribution Based Benefit actuarially reduced to be equivalent to an age 65 benefit). As noted, the PPA also requires annual updates of the rehabilitation plan.

Unless otherwise indicated, all capitalized terms herein shall have the definitions and meanings assigned to them in the Fund's Pension Plan Document.

**Section 2.**          **SCHEDULES OF CONTRIBUTIONS AND BENEFITS.**

With the PPA requirements outlined above in mind, the Fund's Board of Trustees hereby provides the following PPA Schedules to the parties charged with bargaining over agreements requiring contributions to the Fund.

**A.   PRIMARY SCHEDULE (EXCEPT AS NOTED, PRESERVES ALL CURRENT BENEFITS).**

**1.   Benefits**

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers are in compliance with this Primary Schedule, there will be no change in benefit formulas, levels or payment options in effect on January 1, 2008, *except that* as provided in Section 2(J) below, Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date (within the meaning of ERISA § 305(i)(10)) on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

Further, subject to the notice requirements of the PPA and other applicable law, any Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers incur a Rehabilitation Plan Withdrawal on or after March 26, 2008 shall have their Adjustable Benefits listed in Section 2(H) below eliminated or reduced to the extent indicated in Section 2(B)(1) below.

**2.   Contributions**

Compliance with the Primary Schedule requires annually compounded contribution rate increases in accordance with Exhibit A effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each agreement anniversary date (or reallocation anniversary, where applicable) during the term of the new bargaining agreement to the extent indicated in Exhibit A, depending on the year that the new agreement is effective. Note that all contribution rate increases are annually compounded on the total contribution rate (including any reallocations of employee benefit contributions or agreed mid-contract contribution increases) immediately prior to the increase.

The required annual rate increase may be provided through annual allocations to pension contributions of general and aggregate employee benefit contribution increases that were negotiated at the outset of an agreement, but were not specifically allocated to pension contributions until subsequent contract years. The Primary Schedule requires 8% per year contribution rate increases for the first 5 years, 6% per year contribution rate increases for the next 3 years and 4% per year contribution rate increases each year thereafter for 2008 agreements under the Primary Schedule and comparable rate increases over time for all other agreements under the Primary Schedule *(see* Exhibit A).

*Provided, however,* that absent further amendment to this rehabilitation plan, as of June 1, 2011, any Collective Bargaining Agreement requiring

- 377 -

contributions of (1) $348 per week for each full-time employee with respect to Participants covered by the National Master Automobile Transporter Agreement, and (2) $342 per week for each full-time employee with respect to all other Participants, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided, further,* that absent further amendment to this rehabilitation plan, as of April 3, 2023, any Collective Bargaining Agreement or Participation Agreement requiring contributions of:
(1) $69.60 per day or $344.00 per week for employers whose participants are covered under Benefit Class 18+, and (2) $68.40 per day or $338.00 per week for employers whose participants are covered under all other Benefit Classes, will be deemed to be in compliance with the Primary Schedule *without* the need for additional annual rate increases.

*Provided, further,* that absent further amendment to this rehabilitation plan, that for Collective Bargaining Agreements that have a stated expiration date on or after April 3, 2023: Rate increases continue to be required on the regular annual schedule until the stated expiration date of the Collective Bargaining Agreement. This rule applies even if the prior Collective Bargaining Agreement had a stated expiration date on or after April 3, 2023, but a new Collective Bargaining Agreement was ratified in advance of the stated expiration date but prior to April 3, 2023. **However, in the latter circumstance, the bargaining parties would be allowed to agree to amend the Collective Bargaining Agreement to not require contribution rate increases beyond the highest contribution rate required by the original Collective Bargaining Agreement.** The annual contribution rate increases are required for the entire term of the Collective Bargaining Agreement even if those contribution rate increases are not specified in the Collective Bargaining Agreement, or if the Collective Bargaining Agreement purports to allow the employer to cease contribution rate increases mid- contract. Nor shall the bargaining parties be allowed to renegotiate or terminate the Collective Bargaining Agreement mid-contract (or amend the stated expiration date of the Collective Bargaining Agreement to an earlier date) to alter the required contribution rate increases. After the stated expiration date of the Collective Bargaining Agreement, annual contribution rate increases will not be required beyond the rate at the stated expiration date unless the bargaining parties agree to a higher rate.

*Provided, further,* that absent further amendment to this rehabilitation plan, for Collective Bargaining Agreements that expired prior to April 3, 2023: Rate increases continue to be required on the regular annual schedule until the latter of three years after expiration date of the Collective Bargaining Agreement or until the date a new Collective Bargaining Agreement is ratified, fully executed, and received by the Pension Fund. The rate shall include all rate increases required during the period between the stated expiration date of the Collective Bargaining Agreement and the date the new Collective Bargaining Agreement that is ratified and fully executed is received by the Pension Fund. The annual contribution rate increases are required for the entire term of the Collective Bargaining Agreement even if those contribution rate increases are not specified in the Collective Bargaining Agreement, or if the Collective Bargaining Agreement purports to allow the employer to cease contribution rate increases mid- contract. Nor shall the bargaining parties be allowed to renegotiate or terminate the Collective Bargaining Agreement mid-contract (or amend the stated expiration date of the Collective Bargaining Agreement to an earlier date) to alter the required contribution rate increases.

- 378 -

The new Collective Bargaining Agreement will not be required to include annual contribution rate increases beyond the rate required as of the date the new Collective Bargaining Agreement that is ratified and fully executed is received by the Pension Fund unless the bargaining parties agree to a higher rate.

*Provided, further,* that absent further amendment to this rehabilitation plan, for those groups covered only by a Participation Agreement, rate increases specified in the Participation Agreement will continue to be required on the regular annual schedule. A new Participation Agreement for that group will not be accepted unless it includes all rate increases specified in the Participation Agreement in effect on April 3, 2023 even if those increases are not scheduled to happen until after April 3, 2023. For new Participation Agreements entered into on or after April 3, 2023, subject to the requirements listed in the preceding sentences, rate increases will not be required beyond the rate in effect on April 3, 2023 (or such higher rate(s) specified in the current Participation Agreement) unless a new Participation Agreement containing a higher rate is executed and received by the Pension Fund.

*Provided further* that any Employer that qualifies as a New Employer under § 2.2(b) of Appendix E of the Pension Plan will be deemed, as of the date it qualifies as a New Employer, to be in compliance with the Primary Schedule *without* the need for additional contribution rate increases.

### B.    DEFAULT SCHEDULE.

#### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers agree to comply with this Default Schedule [or who become subject to the Default Schedule due to a failure to achieve an agreement to accept one of the Rehabilitation Plan Schedules within the time frame specified under ERISA § 305(e)(3)(C)], the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Default Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee groups participating in the Fund):

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension) remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by 1/2% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57.

- 379 -

### 2.    Contributions

Compliance with the Default Schedule consists of annually compounded contribution rate increases of 4% effective immediately after the expiration of the Collective Bargaining Agreement (or other agreement requiring contributions to the Fund) and each anniversary thereof during the term of the agreement.

*Provided, further,* that absent further amendment to this rehabilitation plan, as of April 3, 2023, any Collective Bargaining Agreement or Participation Agreement requiring contributions of: (1) $69.60 per day or $344.00 per week for employers whose participants are covered under Benefit Class 18+, and (2) $68.40 per day or $338.00 per week for employers whose participants are covered under all other Benefit Classes, will be deemed to be in compliance with the Default Schedule *without* the need for additional annual rate increases.

### 3.    Effect of agreement to or imposition of Default Schedule.

(i)    If a Contributing Employer agrees to the Default Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

(ii)    If a Contributing Employer becomes subject to the Default Schedule by operation of ERISA Section 305(e)(3)(C), because the bargaining parties have failed to adopt either of the Schedules compliant with this Rehabilitation Plan within 180 days of the expiration of their prior Collective Bargaining Agreement, the Fund will then accept a Collective Bargaining Agreement that is compliant with the Primary Schedule described in this Rehabilitation Plan, provided that such new Collective Bargaining Agreement provides for Primary Schedule contribution rates that are retroactive to the expiration date of the last Collective Bargaining Agreement that covered the affected Bargaining Unit.

## C.    DISTRESSED EMPLOYER SCHEDULE.

### 1.    Benefits

With regard to Bargaining Units (and any non-Bargaining Unit employee groups participating in the Fund) whose Contributing Employers and contribution rates have been specifically accepted and approved by the Board of Trustees as satisfying the Qualifications for the Distressed Employer Schedule (as set forth in Section 2(C)(2) below), the benefit formulas, levels, and payment options in effect on January 1, 2008 will remain in effect except for the following, upon the effective date that the Distressed Employer Schedule applies to the Bargaining Unit (or to any non-Bargaining Unit employee group participating in the Fund) that is accepted by the Board of Trustees as qualifying under the Distressed Employer Schedule:

- Adjustable Benefits listed in Section 2(H) below are eliminated or reduced to the maximum extent permitted by law, but the future benefit accrual rate of 1% of contributions (the Contribution-Based Pension)

- 380 -

remains in effect, with the modification that the Contribution Based Pension monthly benefit payable at age 65 is reduced by ½% per month for each month prior to age 65 with a minimum retirement age of 57, *except that,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) have not achieved a Retirement Date on or before July 1, 2011, the Contribution Based Pension monthly benefit payable at age 65 shall be reduced to an actuarially equivalent benefit in accordance with the Schedule attached as Exhibit B with a minimum retirement age of 57, *and except that* any Participant who (i) has achieved a minimum age of 55 as of the date of the Distressed Employer's termination of participation in the Fund (see Section 2(C)(2) below) and (ii) has accrued a minimum of 25 years credit towards a Contributory Credit Pension or an And-Out Pension as of that date (see Pension Plan §§ 4.04, 4.05 and 4.06), shall be entitled to retain his eligibility for (but not gain further credit towards) any such Pension, *provided that* any such Participant has a minimum retirement age of 62.

2.   **Contributions and Qualifications for the Distressed Employer Schedule.**

The Board of Trustees may deem a Collective Bargaining Agreement with contribution rates not in compliance with either the Primary Schedule or the Default Schedule to be in compliance with and subject to the Distressed Employer Schedule, if in the Board of Trustees' sole discretion, the Board determines that the Contributing Employer meets each of the following qualifications:

(i)    the common stock of the Employer or its parent corporation (or other affiliate under 80% or more common control with the Employer) is publicly traded and registered pursuant to the securities laws of the United States;

(ii)   the Employer has previously incurred a termination of its participation in the Fund due to an inability to remain current in its Contribution obligations, and the Employer was in terminated status immediately prior to executing the Agreement sought to be qualified under the Distressed Employer Schedule;

(iii)  during the last ten years in which the Employer participated in the Fund prior to its termination, it had paid contributions to the Fund on behalf of at least 1,000 full- time employees per month (or had, including part-time employees, paid contributions on behalf of the equivalent of at least 1,000 full-time employees per month for the specified ten year period);

(iv)   the Employer submits to a review of its financial condition and operations by the Fund's Staff and outside expert and consultants, and agrees to reimburse the Fund for all fees and expenses incurred by the Fund in this review (including, but not limited to, reimbursement to the Fund for the time devoted by the Fund's Staff to any such review, with this reimbursement to be made at market rates for comparable services performed by Fund's Staff);

(v)    on the basis of this financial and operational review, it appears that the Employer is not able to contribute to the Fund at a higher rate than is

- 381 -

indicated in the Collective Bargaining Agreement proposed for acceptance under the Distressed Employer Schedule, *and* that acceptance of the proposed Agreement is in the best interest of the Fund under all the circumstances and advances the goals of this Rehabilitation Plan; and

(vi)   the Employer provides the Fund with first lien collateral in any and all unencumbered assets to the fullest extent it is able in order to fully secure (i) any delinquent or deferred Contribution obligations owed to the Fund, (ii) the Employer's obligation to make current and future pension contributions to the Fund, and (iii) any future withdrawal liability potentially incurred by the Employer (with the amount of such potential withdrawal liability to be determined based on estimates to be provided by the Fund).

**3.    Effect of agreement to or imposition of the Distressed Employer Schedule.**

If a Contributing Employer becomes subject to the Distressed Employer Schedule with respect to a particular Bargaining Unit, the Fund will not accept any subsequent Collective Bargaining Agreements covering that Bargaining Unit which are compliant with the Primary Schedule, except as determined by the Board of Trustees in their sole discretion.

**D.    ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER INCURRING A REHABILITATION PLAN WITHDRAWAL.**

Subject to the provisos indicated in the final clauses of this Subsection D, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Subsection B(1) above) with respect to Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] with the Fund is on or after April 8, 2008, and:

(1)   whose last Hour of Service prior to January 1, 2008 was earned while employed by United Parcel Service, Inc. ("UPS"), or with any trades or businesses at any time under common control with UPS, within the meaning of ERISA § 4001(b)(1); *or*

(2)   who *(i)* has earned or earns an Hour of Service while employed with a Contributing Employer (or any predecessor or successor entity) that at any time on or after March 26, 2008 incurs a Rehabilitation Plan Withdrawal *(see* Section 2(I) below), and *(ii)* whose *last* year of Contributory Service Credit *prior* to the Rehabilitation Plan Withdrawal was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) ultimately incurring such Withdrawal.

Proviso 1: *Provided, however,* that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant Section 2(D)(2) above, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the earlier of: (i) the date of such Rehabilitation Plan Withdrawal or (ii) the date of the expiration of the last Collective Bargaining Agreement requiring Employer Contributions under the Primary Schedule prior to such Withdrawal, shall not be subject to the elimination of Adjustable Benefits provided that the

- 382 -

Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: And provided further that in the event of a Rehabilitation Plan Withdrawal resulting from an administrative termination of a Contributing Employer as referenced in Section 2(I)(3)(ii) below, the Board of Trustees shall have full discretionary authority (A) to decline to apply the elimination of Adjustable Benefits to Participants otherwise affected by a Rehabilitation Plan Withdrawal of this type who have submitted a pension application naming a Retirement Date to the Fund on or before the date selected by the Trustees as the effective date of the administrative termination which ended the Employer's obligation to contribute to the Pension Fund, and (B) to decline to apply the requirement of Section 2(G) below that a Participant incurring a benefit adjustment due to Rehabilitation Plan Withdrawal must cease employment with and the performance of services for the withdrawn Employer within 60 days of the Rehabilitation Plan Withdrawal in order to eventually qualify for a restoration of benefits; in exercising their discretionary authority under this

Proviso 2, the Board of Trustees shall consider, weigh and balance the following factors:

(i)     the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination were aware of, participated in or controlled, or could have controlled or prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the circumstances that led to the administrative termination of the Employer;

(ii)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination benefited, directly or indirectly from the cessation of Employer Contributions or from the circumstances that led to the administrative termination of the Employer;

(iii)   the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination resisted or attempted to alter, or acquiesced in, the circumstances that led to the administrative termination of the Employer;

(iv)    the extent to which any actively employed members of the affected Bargaining Unit or any members who submitted a retirement application prior to the effective date of the administrative termination have become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Employer that has undergone the administrative termination; and

(v)     the extent of the hardship that might be incurred by any actively employed members of the affected Bargaining Unit or by any

- 383 -

members who submitted a retirement application prior to the effective date of the administrative termination due to the elimination of Adjustable Benefits.

Proviso 3: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to a Rehabilitation Plan Withdrawal pursuant to Subsection D(2) above, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date of the Rehabilitation Plan Withdrawal.

**E.   ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DEFAULT SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection E, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be eliminated or reduced (to the same extent indicated in Section B(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)   who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Default Schedule described herein; and

(2)   whose *last* year of Contributory Service Credit prior to the Employer's becoming subject to the Default Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Default Schedule.

Proviso 1: *Provided, however*. that any Pensioner otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant to this Subsection E, who has a benefit commencement date [within the meaning of ERISA § 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Default Schedule, shall not be subject to the elimination of Adjustable Benefits provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the elimination of Adjustable Benefits, due to his Contributing Employer becoming subject to the Default Schedule pursuant this Subsection E. shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Default Schedule.

**F.   ADJUSTMENT OF BENEFITS OF CERTAIN PARTICIPANTS WHO HAVE EARNED CONTRIBUTORY SERVICE WITH AN EMPLOYER WHO BECOMES SUBJECT TO THE DISTRESSED EMPLOYER SCHEDULE.**

Subject to the provisos indicated in the final clauses of this Subsection F, effective March 26, 2008, all Adjustable Benefits (listed below in Section 2(H)) shall be

eliminated or reduced (with the exception indicated in Section 2(C)(1) above) with respect to any Participants whose benefit commencement date [within the meaning of ERISA § 305(i)(10)] is on or after April 8, 2008, and:

(1)    who have earned any Contributory Service Credit with a Contributing Employer (or any predecessor or successor entity) that at any time becomes subject (by agreement or otherwise) to the Distressed Employer Schedule described herein; and

(2)    whose last year of Contributory Service Credit prior to the Employer's becoming subject to the Distressed Employer Schedule was earned while a member of a Bargaining Unit (or any predecessor or successor Bargaining Unit) that ultimately became subject to the Distressed Employer Schedule.

Proviso 1: Provided, however, that any Pensioner otherwise subject to the reduction in Adjustable Benefits indicated in the Distressed Employer Schedule, due to his Contributing Employer becoming subject to that Schedule pursuant to this Subsection F, who has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] one year or more prior to the Contributing Employer becoming subject to the Distressed Employer Schedule, shall not be subject to the reduction of Adjustable Benefits otherwise mandated by the Distressed Employer Schedule provided that the Pensioner does not engage in Restricted Reemployment at any time subsequent to the benefit commencement date, and provided further that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no Pensioners with Retirement Dates prior to September 24, 2010 shall be subject to such Distressed Employer Schedule benefit reduction.

Proviso 2: *And provided further* that the spouse of any Participant otherwise subject to the reduction of Adjustable Benefits. due to his Contributing Employer becoming subject to the Distressed Employer Schedule pursuant to this Subsection F, shall not incur a loss of Adjustable Benefits with respect to any Surviving Spouse Benefits for which such surviving spouse has a benefit commencement date [within the meaning of ERISA Section 305(i)(10)] prior to the date on which the Contributing Employer became subject to the Distressed Employer Schedule, *and provided* further in any event that with respect to Bargaining Units that become subject to the Distressed Employer Schedule on or prior to June 1, 2011, no spouse shall be subject to such Distressed Employer Schedule benefit reduction if the Participant's death occurred prior to September 24, 2010.

## G.    RESTORATION OF ADJUSTED BENEFITS.

Any Participant who incurs a benefit adjustment or elimination under the terms of Sections 2(A), 2(B), 2(C), 2(D), 2(E) or 2(F) above may have those affected benefits restored if, subsequent to the event causing the benefit adjustment, the Participant:

(1)    in the case of benefit adjustment caused by a Rehabilitation Plan Withdrawal (see Section 2(I) below), permanently ceases all employment with, and performance of services in any capacity for, the Contributing Employer (and any successors or trades or businesses under common control with such Employer within the meaning of ERISA § 4001(b)(1)) within 60 days of the occurrence of such Rehabilitation Plan Withdrawal; and

- 385 -

(2)    in any case, subsequently earns one year of Contributory Service Credit with a Contributing Employer while that Employer is in compliance with the Primary Schedule described herein.

**H.    ADJUSTABLE BENEFITS.**

As used herein, Adjustable Benefits shall mean and include:

(1)    Any right to receive a Retirement Pension Benefit (Pension Plan, Article IV) prior to age 65 [including without limitation any pre-age 65 benefits that would otherwise be payable as *(i)* a Twenty Year Service Pension (Pension Plan § 4.01); *(ii)* a Contributory Credit Pension (Pension Plan § 4.04); *(iii)* a Vested Pension (Pension Plan § 4.07); (iv) a Deferred Pension (Pension Plan § 4.08); or *(v)* a Twenty-Year Deferred Pension (Pension Plan § 4.09)].

(2)    Early retirement benefit or retirement-type subsidies [including without limitation *(i)* an Early Retirement Pension (Pension Plan § 4.02); *(ii)* a 25-And-Out Pension (Pension Plan § 4.05); or a 30-And- Out Pension (Pension Plan § 4.06)].

(3)    All Disability Benefits not yet in pay status (Pension Plan, Article V).

(4)    Before Retirement Death Benefits (Pension Plan, Article VI) other than the 50% surviving spouse benefit.

(5)    Post-retirement death benefits that are not part of the annuity form of payment.

(6)    All Partial Pensions (Pension Plan, Appendix D), to the extent any such pension is tied to one or more of the Adjustable Benefits listed above.

(7)    All Contribution-Based Pensions (Pension Plan § 4.03) except that, assuming the Participant meets all other requirements for receiving a Contribution-Based Pension, the Contribution-Based Pension is payable at age 65 reduced by 1/2% per month for each month prior to age 65 at the time of retirement with a minimum retirement age of 57. Such minimum retirement age shall not apply if the Participant retired prior to age 57 before the Participant's Adjustable Benefits were eliminated or reduced. In such circumstance, the Participant shall be entitled to receive the Contribution-Based Pension reduced by 1/2% per month for each month prior to age 65 at the time of retirement. *Provided, however,* for Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, the reductions in the Contribution-Based Pensions payable at age 65 referenced in this subparagraph (7) shall be based on actuarial equivalence in accordance with the Schedule attached as Exhibit B hereto.

(8)    To the extent not already included in paragraphs (1) - (7) above, the following categories of benefits listed and defined as "adjustable benefits" under ERISA§ 305(e)(8)(iv):

(i)    benefits, rights, and features under the plan, including post- retirement death benefits, 60-month guarantees, disability benefits not yet in pay status, and similar benefits,

- 386 -

(ii)    any early retirement benefit or retirement-type subsidy (within the meaning of ERISA Section 204(g)(2)(A)) and any benefit payment option (other than the qualified joint and survivor annuity), and

(iii)   benefit increases that would not be eligible for a guarantee under ERISA Section 4022A on the first day of the Fund's initial critical year under the PPA because the increases were adopted (or, if later, took effect) less than 60 months before such first day.

*Provided, however,* that except as provided in subparagraph (8)(iii) above, nothing in this paragraph shall be construed to reduce the level of a Participant's accrued benefit payable at normal retirement.

## I.    REHABILITATION PLAN WITHDRAWAL

Subject to the discretionary authority of the Board of Trustees indicated in the final clause of this Subsection I, a "Rehabilitation Plan Withdrawal" occurs on the date a Contributing Employer (a) is no longer required to make Employer Contributions to the Pension Fund under one or more of its Collective Bargaining Agreements, or (b) undergoes a significant reduction in its obligation to make Employer Contributions resulting from outsourcing or subcontracting work covered by the applicable Collective Bargaining Agreement(s), as a result of actions by members of a Bargaining Unit (or its representatives) or the Contributing Employer, which actions include, but are not limited to the following:

(1)    decertification or other removal of the Union as a bargaining agent;

(2)    ratification or other acceptance of a Collective Bargaining Agreement which permits withdrawal of the Bargaining Unit, in whole or in part, from the Pension Plan; administrative termination of the Contributing Employer with respect to any or all of its Collective Bargaining Agreements due to: (i) a violation of the Fund's rules with respect to the terms of a Collective Bargaining Agreement (including, without limitation, a provision providing for a split bargaining unit); or (ii) a violation of any other Fund rule or policy (including, without limitation, practices or arrangements that result in adverse selection);

(3)    any transaction or other event (including, without limitation, a merger, consolidation, division, asset sale (other than an asset sale complying with ERISA § 4204), liquidation, dissolution, joint venture, outsourcing, subcontracting) whereby all or a portion of the operations for which the Contributing Employer has an obligation to contribute are continued (whether by the Contributing Employer or by another party) in whole or in part without maintaining the obligation to contribute to the Fund under the same or better terms (including, for example, as to number of participants and contribution rate) as existed before the transaction;

*Provided, however,* that with respect to the circumstances described in Subparagraphs. (3)(ii) or (4) above, the Board of Trustees shall have full discretionary authority to consider, weigh and balance the following factors in determining whether a Rehabilitation Plan Withdrawal has occurred:

(i)    the extent to which the affected Bargaining Unit or its bargaining representative participated in or controlled, or could have controlled or

- 387 -

prevented, through bargaining, grievance procedures, NLRB proceedings, litigation or other means, the cessation of Employer Contributions;

(ii)   the extent to which the affected Bargaining Unit benefited, directly or indirectly, from the cessation of Employer Contributions;

(iii)  the extent to which the affected Bargaining Unit, or its bargaining representative, resisted or attempted to resist, or acquiesced in, the cessation of Employer Contributions;

(iv)  the extent to which the affected Bargaining Unit, or any of its members, become engaged as employees or independent contractors in the service of operations that were or are in whole or in part a successor of the operations of the Contributing Employer who incurred the cessation of Employer Contributions; and

(v)   the extent of the hardship that might be incurred by members of the affected Bargaining Unit by the elimination of Adjustable Benefits.

**J.   BENEFIT ADJUSTMENTS APPLICABLE TO ALL PARTICIPANTS (INCLUDING INACTIVE VESTED PARTICIPANTS) WHO HAVE NOT SUBMITTED A RETIREMENT APPLICATION ON OR BEFORE JULY 1, 2011 AND DO NOT HAVE A BENEFIT COMMENCEMENT ON OR BEFORE THAT DATE.**

**Minimum Retirement Age 57.**

Participants who (i) have not submitted a retirement application on or before July 1, 2011 and (ii) do not have a benefit commencement date [within the meaning of ERISA § 305(i)(10)] on or before July 1, 2011, will not be granted a Retirement Date prior to their 57th birthday and will not be eligible to receive retirement benefit payments of any type until after achieving age 57.

**K.   SPECIAL SCHEDULE: QUALIFYING NEW ("HYBRID METHOD") EMPLOYERS (EXCEPT AS NOTED, PRESERVES ALL BENEFITS).**

**1.   Benefits.**

Bargaining Units (and any non-Bargaining Unit groups participating in the Fund) whose Contributing Employers have been specifically accepted and approved by the Trustees as satisfying the requirements for this Qualifying New Employer Schedule will, as it relates to benefits or potential benefit adjustments, be treated in the same way as Bargaining Units (and non-Bargaining Unit groups) under the Primary Schedule (Section 2.A. above).

**2.   Contributions.**

Contributing Employers who have qualified as New Employers within the meaning of Appendix E of the Plan Document, Section 2.2 (b) (and are thus eligible for treatment under the Pension Fund's alternative, or "hybrid," method of calculating Employer Withdrawal Liability), *and* who have fulfilled all requirements relating to the duration and/or level of continued participation in the Pension Fund contained in the agreement under which the Fund accepted the Employer as a New Employer, may contribute under this

- 388 -

Schedule to the Fund at a rate to be specifically and separately approved by the Board of Trustees with respect to each such New Employer (the "New Rate"), subject to a specific determination by the Board of Trustees that the following conditions have been or will be met:

(i)     The New Employer has in fact fulfilled its contribution or participation commitments under the agreement in which the Fund accepted the Employer's New Employer status, and the New Employer has fulfilled all other obligations under that agreement, is current in its ongoing contribution obligations to the Fund and is in compliance with the Fund's rules and polices applicable to Contributing Employers;

(ii)    Unless a New Rate is determined and made available under this Schedule, the New Employer would likely withdraw from the Fund on about the expiration date of its most recent Collective Bargaining Agreement requiring contributions to the Fund;

(iii)   the New Employer's continued participation in the Fund at the New Rate, under the specific circumstances presented, will result in net positive cash flow to the Fund, in comparison to the net cash flow that would result from a withdrawal by the New Employer from the Fund; and

(iv)    the New Employer's obligation to contribute to the Fund at the New Rate is documented in a Collective Bargaining Agreement that is or will be acceptable to the Board of Trustees, and contains (or will contain) terms under which the bargaining representative of the affected Bargaining Unit specifically agrees or acknowledges that any reductions in labor costs resulting from the New Employer's contributions at the New Rate have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

L.   **SPECIAL SCHEDULE: QUALIFYING BARGAINING UNITS THAT HAVE BEEN SUBJECT TO A WAGE FREEZE (EXCEPT AS NOTED PRESERVES ALL BENEFITS). (Effective on and after March 14, 2017)**

1.   **Benefits.**

With regard to any Bargaining Unit subject to a Collective Bargaining Agreement in effect as of March 1, 2017 (the "Current Agreement") that –

(i)     was (or is) of 3 to 5 years in duration,

(ii)    did not (or does not) provide for any wage increases for the entire duration of the Agreement, and

(iii)   required (or requires) pension contribution rate increases in compliance with the Primary Schedule (Section 2.A of this Rehabilitation Plan) for the entire duration of the Agreement, but did not (or does not) at any time require contributions at rates equal to or in excess of any of the maximum rates specified under the provisos to the Primary Schedule

the benefits available to any such Bargaining Unit under any new Collective Bargaining Agreement that is the immediate successor or renewal Agreement of the Current Agreement, and is not in compliance with the

- 389 -

Primary Schedule ("Successor Agreement"), will be nevertheless identical to the benefits available to Bargaining Units whose Collective Bargaining Agreements are in compliance with the Primary Schedule, provided that any such Successor Agreement has the characteristics specified in Section 2.L.2 below.

2.   **Contributions.**

In order for a Bargaining Unit to qualify for the benefits specified under Section 2.L.1 above, the Successor Agreement must:

(i)   Not be of less duration than the Current Agreement, but not exceeding 5 years in duration;

(ii)   require pension contributions at a rate that is at least as high as the highest rate required under the Current Agreement, but need not provide for any increase in the contribution rates for the duration of the Successor Agreement (the "Special Rate"); and

(iii)   contain terms under which the bargaining representative of the affected Bargaining Unit specifically agrees and acknowledges that any reduction in labor costs resulting from contributions at the Special Rate (*i.e.,* contributions without the rate increases otherwise required under the Primary Schedule) have been allocated to the Bargaining Unit in a manner that is satisfactory to the bargaining representative.

## Section 3.   REHABILITATION PLAN STANDARDS AND OBJECTIVES.

The Schedules of Contributions and Benefits discussed above have been formulated by the Fund's Board of Trustees as reasonable measures which, under reasonable actuarial assumptions, are designed and projected to allow the Fund to emerge from critical status in 2052. Projections may vary from year to year as actual experience may differ from assumptions.

The Trustees recognize the possibility that actual experience could be less favorable than the reasonable assumptions used for the Rehabilitation Plan on an annual basis. Consequently, the annual standards for meeting the requirements of the Rehabilitation Plan are as follows:

•   Actuarial projections updated for each year show, based on reasonable assumptions, that under the Rehabilitation Plan and its schedules (as amended and updated from time to time) the Fund will emerge from critical status in 2052.

## Section 4.   ALTERNATIVES CONSIDERED BY THE TRUSTEES.

The Board of Trustees considered numerous alternatives [including combinations of contribution rate increases (and other updates to the schedules of contribution rates in light of the experience of the Fund) and benefit adjustments] that might enable the Fund to emerge from Critical Status either by the end of ten year PPA Rehabilitation Period (which began on January 1, 2011 and ended on December 31, 2020), or to forestall possible insolvency indefinitely (beyond the date referenced above under the "Standards and Objectives" heading). Some of the alternatives considered were determined to be unreasonable measures. The various default and alternative schedules considered included the following:

Schedules considered by the Board of Trustees in formulating an initial 2008 rehabilitation plan that might permit the Fund to emerge by the end of the Rehabilitation Period on December 31, 2020:

| Schedule | Benefit Reductions | Contribution Rate Increases |
|---|---|---|
| Default | Immediate maximum Critical Status benefit cuts for all participants to the extent permitted by law | 15% per year until emergence in 2021 (plus an additional 1.6% annual increase for Benefit Classes 14 and below) |
| Alternative 1 | Maintain current benefits | 17% per year until emergence in 2021 |
| Alternative 2 | On the second anniversary of the new bargaining agreement, reduce the future benefit accrual rate from 1% of contributions payable at age 62 to 1% of contributions at payable at age 65 | 16% per year until emergence in 2021 |

In formulating the Fund's initial rehabilitation plan in 2008, the Board of Trustees concluded that utilizing any and all *possible* measures to emerge from Critical Status by the end of the 10-year presumptive Rehabilitation Period described in ERISA Section 305(e)(4), would be unreasonable and would involve considerable risk to the Fund and Fund participants. In particular, the Board of Trustees concluded that the continued existence of the Fund and the Trustees' ability to maintain and improve the Fund's funded status in accordance with the terms of the IRS approved amortization extension would be jeopardized by any attempt to emerge from critical status by the end of the presumptive 10-year Rehabilitation Period.

As shown above, based on January 1, 2008 valuation data, the emergence by the end of the presumptive 10 year Rehabilitation Period would require double-digit annual contribution rate increases. For example, the daily contribution rate would generally have to grow from $52 to over $300. Therefore, the Trustees concluded in 2008 that annual contribution rate increases above the 8%/6%/4% level in the Primary Schedule were not reasonable and could trigger mass withdrawals and significant losses to the Fund and the participants.

During the process of updating the Rehabilitation Plan in each applicable year subsequent to 2008, the Trustees concluded that in light of current valuation data available in each of those years, the experience of the Fund and projections, the option available to the Fund under ERISA Section 305(e)(3)(ii) was to pursue reasonable measures to forestall a possible insolvency. The Trustees also concluded during the 2010 - 2022 update processes that requiring  annual contribution increases above the level described in the Primary Schedule would not be reasonable and would likely accelerate a possible insolvency of the Fund rather than forestall it.

Prior to Plan/calendar year 2023, the Trustees have implemented (and, where applicable, have continued to implement) numerous measures to improve the Fund's funding. These have included:

•   Reducing the benefit accrual rate from 2% of contributions to 1% of contributions;

•   Protecting the "and-out" and early retirement benefits while freezing them at their year-end 2003 levels;

- 391 -

- Obtaining agreements from the major bargaining parties to reallocate significant amounts of annual benefit contributions to the Pension Fund;

- Obtaining an amortization extension from the Internal Revenue Service in 2005, and successfully seeking a waiver of the conditions of that extension in light of investment losses resulting from the weakness in financial markets in recent years (waiver or alteration of conditions granted in 2016);

- Requiring as a condition of continued participation in the Fund that new bargaining agreements in the last several years include significant annual contribution rate increases;

- Providing information to Congress and federal agencies with respect to legislative or regulatory proposals that appear to assist in addressing the funding challenges confronting the Fund;

- Approving a Distressed Employer Schedule as part of the Fund's Rehabilitation Plan under which YRC, Inc. and its affiliate USF Holland, Inc., two distressed (but historically significant) Contributing Employers, resumed Contributions in June 2011 at rates lower than would have been permitted under previous (pre-2011) Rehabilitation Plan Schedules; this Distressed Employer Schedule significantly adjusted the benefits of the affected Bargaining Unit members, and helped assure that despite the lower Contribution rates, the continued participation of these Employers would tend to improve overall pension funding; and

- Adopting a new withdrawal liability method, and obtaining approval of that method by the Pension Benefit Guaranty Corporation, under which new Contributing Employers, and existing Contributing Employers who satisfy their withdrawal liability under the Fund's historic (pre-2011) withdrawal liability method (*i.e.,* the "modified presumptive method"), will have any future withdrawal liability determined under the "direct attribution" method; the Trustees believe that this "hybrid" method will be attractive to some Contributing Employers who wish to continue to participate in the Fund, but may be concerned about the potential for future growth of their estimated withdrawal liability as calculated under the Fund's prior (pre-2011) withdrawal liability method, and that this, in turn, will encourage continued participation in the Fund and tend to improve overall pension funding.

- Amending the Primary Schedule of the Rehabilitation Plan to permit Contributing Employers, who satisfy their existing withdrawal liability and qualify as New Employers eligible for the direct attribution method under the hybrid method, to comply with the Primary Schedule without the need (under their current Collective Bargaining Agreements) for the contribution rate increases otherwise required under the Primary Schedule. The Trustees determined that this amendment to the Rehabilitation Plan will encourage existing Contributing Employers to satisfy their existing withdrawal liability and to continue their participation in the Fund as New Employers under the hybrid method; the Trustees determined that the New Employers' participation on these terms would tend to improve overall pension funding.

- Authorizing the filing, on September 25, 2015, of an application with the United States Department of the Treasury requesting approval of a plan of suspension of benefits under MPRA. (The Trustees determined that the filing of this application was a reasonable measure designed to forestall insolvency, and therefore one that they were required to take under the PPA. However, the Fund's MPRA application was denied

by the Department of Treasury on May 6, 2016, and the Trustees have determined that it is not feasible for the Fund to submit a revised MPRA application.)

• Approval of the Special Schedule relating to Qualifying New ("Hybrid") Method Employers indicated in Section 2.K. of this Appendix.

• And the addition of Section 2.L. to this Appendix dealing with Qualifying Bargaining Units that have been subject to wage freezes.

• Authorizing the filing in 2022 of an application with the Pension Benefit Guaranty Corporation (PBGC) requesting Special Financial Assistance (SFA) under the American Rescue Plan Act of 2021. The PBGC approved the application in December 2022, and the Fund received $35,764,910,109.99 in SFA on January 12, 2023.

However, the Trustees have also determined, as part of the 2023 Rehabilitation Plan update process, that mandating additional significant benefit cuts (beyond those provided in this updated Rehabilitation Plan), or (as noted) mandating significant contribution rate increases at levels beyond those required in recent years, would risk substantially accelerating the rate at which employers would withdraw from the Fund, in large part because the Union could conclude that it would be in its members' best interest to agree to withdrawals. The Board of Trustees also determined that this acceleration of employer withdrawals would, in turn, be counterproductive to the Trustees' effort to emerge from critical status in 2052.

**Exhibit A**
**Primary Schedule: Contribution Rate Increases by Bargaining Agreement Year (all rate increases are to be compounded annually)**

| Calendar Year of Contribution Rate Increases | Year of Initial Bargaining Agreement Conforming to Primary Schedule | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 & Earlier | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| 2006 | 7% | | | | | | | | | | | | | | | | | |
| 2007 | 7% | 8% | | | | | | | | | | | | | | | | |
| 2008 | 7% | 8% | 8% | | | | | | | | | | | | | | | |
| 2009 | 7% | 8% | 8% | 8% | | | | | | | | | | | | | | |
| 2010 | 7% | 8% | 8% | 8% | 8% | | | | | | | | | | | | | |
| 2011 | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | | | | | |
| 2012 | 5% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | | | | |
| 2013 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | | | | | | | | | | |
| 2014 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | | | | | |
| 2015 | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | | | | |
| 2016 | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | | | |
| 2017 | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | | |
| 2018 | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | | |
| 2019 | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | | |
| 2020 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | | |
| 2021 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | | |
| 2022 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% | |
| 2023 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2024 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% | 8% |
| 2025 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% | 8% |
| 2026 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% | 8% |
| 2027 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% | 8% |
| 2028 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% | 8% |
| 2029 | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 4% | 6% | 8% |

- 394 -

**EXHIBIT B**

**Schedule for Actuarial Reduction of Age 65 Benefits**

**(Applicable to Default Schedule and Rehabilitation Plan
Withdrawal benefit adjustments for Participants who
(i) have not submitted a retirement application on or
before July 1, 2011 and (ii) do not have a benefit commencement
date [within the meaning of ERISA§ 305(i)(10)] on or before July 1, 2011)**

| Age | Percent of Age 65 Benefit Based on Actuarial Equivalence |
|-----|-----|
| 65 | 100% |
| 64 | 90% |
| 63 | 81% |
| 62 | 74% |
| 61 | 67% |
| 60 | 61% |
| 59 | 55% |
| 58 | 50% |
| 57 | 46% |

- 395 -

## APPENDIX N.    PUERTO RICO PROVISIONS

### Section 1.    PREAMBLE

This Appendix N is added to the Pension Plan (this "Pension Plan") by the Board of Trustees, effective on or after January 1, 2014. The provisions of this Appendix N shall apply solely with respect to Participants who are employed by a Contributing Employer that is engaged in business in the Commonwealth of Puerto Rico (a "Puerto Rico Employer") and who are bona fide residents of the Commonwealth of Puerto Rico or who perform labor or services primarily within the Commonwealth of Puerto Rico, regardless of residence for other purposes (the "Puerto Rico Participants"). With respect to the Puerto Rico Participants, the Board of Trustees intends the Plan to qualify, effective January 1, 2011, under Section 1081.01(a) of the Puerto Rico Internal Revenue Code of 2011, as amended from time to time (the "2011 PR Code"), such that benefits provided hereunder, prior to distribution, are not currently taxable to the Puerto Rico Participant, the Puerto Rico Employers are entitled to a deduction for Puerto Rico tax purposes, and the Puerto Rico Participants may enjoy any preferential tax treatment available under the 2011 PR Code for rollovers from and to, and distributions from a Puerto Rico tax qualified retirement plan. The provisions of this Appendix N are generally effective January 1, 2014 unless provided otherwise. Notwithstanding anything herein to the contrary, no Puerto Rico Participant's Accrued Benefit as of December 31, 2011, shall be reduced because of this Appendix N. Notwithstanding the foregoing, solely for Puerto Rico tax qualification purposes and solely with respect to the Puerto Rico Participants, this Appendix N is effective as of January 1, 2011, unless otherwise provided in this Appendix N.

### Section 2.    TYPE OF PLAN

Effective January 1, 2011, the Board of Trustees intends that the Plan (including the trust agreement forming a part thereof), as applied to Puerto Rico Participants, be a defined benefit plan for the exclusive benefit of its Employees or their Beneficiaries as provided for in Section 1081.01(a) of the 2011 PR Code, and is to be interpreted and administered in a manner consistent with that intent. With respect to the Puerto Rico Participants, the Plan will at all times be maintained and administered in accordance with any applicable laws and regulations of the Commonwealth of Puerto Rico in connection with contributions and accrual of benefits related to the Puerto Rico Participants, unless contrary to the applicable provisions of the Code or ERISA.

### Section 3.    AFFILIATE

Effective for Plan Years beginning on or after January 1, 2012, for purposes of the qualification requirements and the non-discrimination and coverage testing provisions of Sections 1081.01(a) of the 2011 PR Code, the term "Affiliate" means the employers that are corporations and business organizations which together with a Puerto Rico Employer are members of a controlled group of corporations, or organizations under common control, or of affiliated service groups, as such terms are defined in Sections 1081.01(a)(14)(B) and 1010.04 of the 2011 PR Code. For purposes of determining whether or not a person is an employee of the controlled group and the period of employment of such person, each entity (other than the Puerto Rico Employer) shall be considered an Affiliate only for such period or periods during which such entity is a member of a controlled group or under common control.

**Section 4.          PUERTO RICO COMPENSATION**

Notwithstanding any provision of the Plan to the contrary, only with respect to a Puerto Rico Participant, a Puerto Rico Participant's Compensation shall include contributions made on behalf of the Puerto Rico Participant by his/her Puerto Rico Employer that are not currently includible in the Puerto Rico Participant's gross income by reason of the application of Sections 1081.01(b)(1) and (d)(5). Notwithstanding the foregoing, effective for Plan Years beginning on or after January 1, 2012, a Puerto Rico Participant's Compensation shall not exceed the applicable annual compensation limit for any Plan Year determined under Section 1081.01(a)(12) of the 2011 PR Code.

**Section 5.          MAXIMUM BENEFIT LIMITATION**

Notwithstanding any provision of the Plan to the contrary, only with respect to a Puerto Rico Participant, effective for Plan Years beginning on or after January 1, 2012, the amount of a Puerto Rico Participant's Annual Benefit, including the right to any optional benefit provided under the Plan, credited to a Puerto Rico Participant for any Limitation Year shall not exceed the applicable annual limit provided in Section 1081.01(a)(11) of the 2011 PR Code (i.e., for 2012, the lesser of (i) $200,000 (expressed as a straight life annuity with no ancillary benefits) or (ii) one hundred percent of the Participant's average highest Compensation for a period not exceeding three years). For the purpose of this Section 5, all Puerto Rico tax qualified defined benefit plans maintained by the Puerto Rico Employer shall be treated as one defined benefit plan.

**Section 6.          DIRECT ROLLOVER PAYMENTS**

Notwithstanding any provision of the Plan to the contrary, only with respect to a Puerto Rico Participant, a Puerto Rico Participant may elect, at the time and in the manner prescribed by the Board of Trustees, to have all or part of a lump-sum distribution received from the Plan on account of separation from service or the termination of the Plan paid directly in a direct rollover to a "Puerto Rico Eligible Retirement Plan" (as defined below) that accepts the Puerto Rico Participant's Eligible Rollover Distribution (as defined in Section 7.16(b)(2) of the Plan). For purposes of this Section 6, the term "Puerto Rico Eligible Retirement Plan" means a qualified trust described in Section 1081.01(a) of the 2011 PR Code and an individual retirement account or annuity described in Sections 1081.02(a) and (b) of the 2011 PR Code, respectively, that accepts the Puerto Rico Participant's Eligible Rollover Distribution. Notwithstanding the foregoing, in order for such Eligible Rollover Distribution not to be subject to both applicable US and Puerto Rico income tax withholdings and to defer taxation under both the Code and the 2011 PR Code, such Puerto Rico Participant's benefit must be distributed in the form of a direct rollover distribution to a trust that is tax qualified under both Code Section 401(a) and 2011 PR Code Section 1081.01(a), at the time of the rollover distribution.

**Section 7.          PUERTO RICO EMPLOYER CONTRIBUTIONS**

Only with respect to a Puerto Rico Participant, each contribution made by a Puerto Rico Employer to the Plan with respect to a Puerto Rico Participant is expressly conditioned on the deductibility of such contribution under the 2011 PR Code, for the taxable year for which it is contributed. If the Puerto Rico Department of the Treasury disallows the deduction, or if the contribution was made by a mistake of fact, to the extent permissible under ERISA and the Code, such contributions shall be returned to the Puerto Rico Employer within one (1) year after the disallowance of the deduction (to the extent disallowed), or after the payment of the contribution, respectively.

- 397 -

**Section 8.**          **PAYMENT OF CONTRIBUTIONS**

Contributions to the Plan by a Puerto Rico Employer with respect to the Puerto Rico Participants shall be paid to the Trustee not later than the due date for filing the Puerto Rico Employer's Puerto Rico income tax return for the taxable year in which such payroll period falls, including any extension thereof.

**Section 9.**          **HIGHLY COMPENSATED EMPLOYEES**

Solely for qualification purposes under the 2011 PR Code, a Highly Compensated Employee means, with respect to a Plan Year:

(i)     is an officer (as defined by applicable regulations) of a Puerto Rico Employer; or

(ii)    at any time during the calendar year ending with or within the Plan Year or the preceding calendar year ending with or within the Plan Year was a 5% owner of a Puerto Rico Employer; or

(iii)   for the preceding calendar year had Compensation in excess of the applicable dollar amount provided under Section 1081.01(d)(3)(E)(iii)(IV) of the 2011 PR Code.

The term "Puerto Rico Highly Compensated Employee" also includes any former Employee of a Puerto Rico Employer eligible to participate in the Plan who separated from service (or has a deemed separation from service) prior to the Plan Year, performs no service for the Employer during the Plan Year, and was a Puerto Rico Highly Compensated Employee for the separation year.

**Section 10.**          **PLAN MERGER, CONSOLIDATION OR TRANSFER**

Any merger or consolidation of the Plan with, or transfer in whole or in part of the assets and liabilities of the Trust to, another trust as applied to a Puerto Rico Participant under the Plan will be limited to the extent such other plan and trust are qualified under Section 1081.01(a) of the 2011 PR Code.

**Section 11.**          **GOVERNING LAW**

Only with respect to the Puerto Rico Participants and the Puerto Rico Employers, it is the intent that the Plan be administered, governed and construed according to the Code and ERISA unless this Appendix N applies.

**Section 12.**          **USE OF TERMS**

Unless otherwise indicated and unless the context clearly indicates otherwise, terms defined in the Plan will also apply to terms used in this Appendix N. All terms and provisions of the Plan shall apply to this Appendix N, except that where the terms and provisions of the Plan and this Appendix N conflict, the terms and provisions of this Appendix N shall govern, unless contrary to the applicable provisions of the Code or ERISA.

- 398 -

## APPENDIX O.    SPECIAL FINANCIAL ASSISTANCE FROM THE PBGC

Beginning with the SFA measurement date selected by the plan in the plan's application for special financial assistance, notwithstanding anything to the contrary in this or any other governing document, the plan shall be administered in accordance with the restrictions and conditions specified in section 4262 of ERISA and 29 CFR part 4262. This amendment is contingent upon approval by PBGC of the plan's application for special financial assistance.