## Exhibit 1 to the Declaration

### UNIVERSAL SERVICE AGREEMENT

| | | | |
|---|---|---|---|
| Client Name: | YRC Worldwide Inc. | Agreement No: | |
| Address: | 10990 Roe Avenue | | |
| | Overland Park, KS 66211 | Effective Date: | July 31, 2015 |
| Attn: | | | |
| Telephone: | | | |

This UNIVERSAL SERVICE AGREEMENT (the "Agreement") is entered into and shall be binding upon the parties as of the last date executed below by and between TALX Corporation (a provider of Equifax Workforce Solutions), a Missouri corporation ("EWS"), and YRC Worldwide Inc. ("Client"), a Delaware corporation on behalf of itself and as agent for its Affiliates. For purposes of this Agreement, an "Affiliate" shall mean an organization which (i) directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control, with Client. All references herein, or any applicable schedule, or schedule set attached hereto, to "party" or "parties" (where such terms refer to Client) and all references to "Client", shall apply to equally and separately to Client and each such Affiliate. The parties agree as follows.

### 1.0    CONTRACT SERVICES

By entering into this Agreement, Client hereby authorizes EWS to provide the employment or payroll related services (the "Services") as described in each applicable schedule, or schedule set, and any exhibits attached thereto (the "Schedule(s)"). The parties may enter into one or more Schedule(s), each Schedule corresponding to a service or group of services provided by EWS, and such schedules, whether attached hereto or entered into after the execution of this Agreement, shall be a part of this Agreement. The terms of this Agreement shall apply to each Service, except as the parties may otherwise provide in the Schedule(s).

### 2.0    TERM

The term for each Service is set forth in the applicable Schedule. A Schedule may expire or be terminated without affecting the other Schedules. This Agreement shall remain in effect as long as there is an outstanding schedule with a term then in effect.

### 3.0    EWS OBLIGATIONS

EWS warrants that the Service (i) will be provided in compliance with laws and regulations applicable to EWS's performance thereof, (ii) will be performed in a manner in accord with industry standard practices, and (iii) will not infringe trademarks, patents, trade secret or other intellectual property and/or proprietary rights of others. EWS MAKES NO OTHER WARRANTIES AS TO THE SERVICE OR THE DATA, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, AND/OR FITNESS FOR A PARTICULAR PURPOSE EVEN IF EWS KNOWS OF SUCH PURPOSE.

### 4.0    CONFIDENTIALITY

4.1    The parties agree that the following will be treated as "Confidential Information": (i) all employment and income data ("Data") provided by or on behalf of Client to EWS; (ii) all information provided by EWS to Client pertaining to the Services; (iii) all information which is labeled as such in writing and prominently marked as "Confidential," "Proprietary" or words of similar meaning by either party; or (iv) business information of a party which a reasonable person would understand under the circumstances to be confidential. Any Confidential Information acquired or received by either party (the "Recipient") in the course of this Agreement will not be disclosed or transferred to any person or entity other than to a party's directors, officers, employees, agents, or representatives who have a need to know, including, without limitation, its attorneys, accountants, consultants, advisors, auditors, banks and financial advisors being bound to a similar duty of confidentiality and, as to EWS, for the purpose of performing its obligations under this Agreement. Confidential Information received under this Agreement will be treated with the same degree of care and security as each party uses with respect to its own Confidential Information, but not less than a reasonable degree of care. The parties agree to use Confidential Information only for the purpose of performance of this Agreement and to make no copies except as necessary for performance of this Agreement.

4.2 "Confidential Information" does not include information which (i) is or becomes generally available to the public other than as a result of disclosure by the Recipient , (ii) was known by the  Recipient at the time of disclosure of the information without any obligation of confidence, and that knowledge is evidenced by reasonable proof, (iii) was or becomes available from a source other than the owner if the source was not legally bound to maintain the confidentiality of the information, or (iv) the Recipient independently develops without use of or reference to the Confidential Information. Each party acknowledges that unauthorized disclosure or use of the Confidential Information by a party may irreparably damage the other party in such a way that adequate compensation could not be obtained from damages in an action at law.   Accordingly, the actual or threatened unauthorized disclosure or use of any Confidential Information shall give the owner the right to seek injunctive relief restraining such unauthorized disclosure or use, in addition to any other remedy otherwise available (including reasonable attorneys' fees). If the Recipient becomes compelled by law or regulation to disclose any Confidential Information, the Recipient will provide the owning party (the "Owner") with prompt written notice so that the Owner may seek an appropriate protective order or other remedy. If a remedy acceptable to the Owner is not obtained by the date that the Recipient must comply with the request, the Recipient will furnish only that portion of the Confidential Information that it is advised by counsel that it is legally required to furnish, and the Recipient will exercise commercially reasonable efforts to obtain confidential treatment of the Confidential Information disclosed. Each party hereby waives the posting of a bond with respect to any action for injunctive relief.

4.3 Upon Client's written request at any time during the Term of this Agreement (including termination or completion of the Services hereunder), EWS will purge or destroy Data housed in the EWS production database(s), provided that EWS may retain archival copies of Data for audit and dispute resolution purposes and EWS may retain copies of Data on encrypted back-up media in which such Data is co-resident with other employment and income data.   EWS shall remain under its contractual obligation of confidentiality and security to Client during such retention and such obligations shall survive termination of the Agreement.

4.4 This Section 4 constitutes the entire understanding of the parties and supersedes all prior or contemporaneous agreements, representations or negotiations, whether oral or written, with respect to Confidential Information.

4.5 This Section 4 shall survive the termination of this Agreement.

## 5.0    DATA SECURITY AND PRIVACY

EWS shall maintain an information security program that includes appropriate administrative, technical and physical safeguards reasonably designed to: 1) ensure the security and confidentiality of Data; 2) protect against any anticipated threats or hazards to the security or integrity of such Data; 3) protect against unauthorized access to or use of such Data that could result in substantial harm or inconvenience to Client; and 4) dispose of such Data in a secure manner.

To comply with the safeguard obligations generally described above, EWS has (a) designated an employee to coordinate its information security program, (b) identified reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of Data that could result in the unauthorized disclosure, misuse, alteration, destruction, or other compromise of such Data, and assessed the sufficiency of any safeguards in place to control these risks, and (c) designed and implemented information safeguards to control the risks identified through the risk assessment, and regularly tests or otherwise monitors the effectiveness of safeguards' key controls, systems and procedures.

EWS shall notify Client in writing as soon as possible and without unreasonable delay, after EWS has either actual or constructive knowledge of a breach which affects Data (an "Incident").   Notification may be delayed as required by law enforcement to prevent any impediment(s) to its investigation of the Incident. EWS shall have actual or constructive knowledge of an Incident if EWS actually knows there has been an Incident or if EWS has reasonable basis in facts or circumstances, whether acts or omissions, for its belief that an Incident has occurred.   EWS shall cooperate with law enforcement in accordance with applicable law provided however, that such cooperation shall not result in or cause an undue delay to remediation of the Incident. EWS shall promptly take appropriate action to mitigate such risk or potential problem at EWS's expense.   In the event of an Incident, EWS shall, at its sole cost and expense, fully restore the Data and institute appropriate measures to prevent any recurrence of the problem as soon as is commercially practicable.

9.4 **Severability**. If any provision of this Agreement is held to be invalid or unenforceable under applicable law in any jurisdiction, the validity or enforceability of the remaining provisions thereof shall be unaffected as to such jurisdiction and such holding shall not affect the validity or enforceability of such provision in any other jurisdiction. To the extent that any provision of this Agreement is held to be invalid or unenforceable because it is overbroad, that provision shall not be void but rather shall be limited only to the extent required by applicable law and enforced as so limited.

9.5 **Assignment/Modification**. Neither party may assign, sell, lease, or otherwise transfer, in whole or in part, this Agreement or any right or obligation under this Agreement and any such attempted assignment shall be void and of no effect without the advanced, express written consent of the other party, which consent shall not be unreasonably withheld or denied, *provided, however*, that such consent shall not be required if (i) either party assigns this Agreement in connection with a merger, acquisition, or sale of all or substantially all of its assets, unless the surviving entity is a direct competitor of the other party, or (ii) EWS assigns its right to receive and collect payments hereunder. This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their permitted successors and assigns. Except as provided in each applicable Schedule hereto, this Agreement may be amended or modified only by the written and signed consent of the parties.

9.6 **Notices**. Every notice required under this Agreement shall be in writing and effective three (3) days after being mailed first class postage prepaid, or upon delivery by an overnight or other courier or delivery service, in either case addressed to the parties as follows:

| To Client: | To EWS: |
|---|---|
| YRC Worldwide Inc. | TALX Corporation |
| 10990 Roe Avenue | 11432 Lackland Road |
| Overland Park, KS 66211 | St. Louis, MO 63146 |
| Attn: Director-Total Rewards | Attn: President |

Either Party may change its notice address with written notice to the other party.

9.7 **Counterparts/Execution by Facsimile**. For the convenience of the parties, copies of this Agreement, including Schedules hereto, may be executed in two or more counterparts and signature pages exchanged by facsimile or scanned copies via e-mail. The parties intend that counterpart copies signed and exchanged as provided in the preceding sentence shall be fully binding as an original handwritten executed copy hereof and all of such copies together shall constitute one instrument.

9.8 **Waiver.** The waiver by either party of any default or breach of this Agreement shall not constitute a waiver of any other or subsequent default or breach.

9.9 **Relationship Between the Parties.** Except as required to perform the Service, the parties are independent contractors; nothing in this Agreement shall be construed to create a partnership or joint venture relationship between the parties.

9.10 **Use of Name/Marks.** Except as required to perform the Service, neither party shall advertise, market or otherwise make known to others any information relating to the Services performed under this Agreement, including mentioning or implying the name of the other party, or any of its personnel, without first obtaining the prior written consent of such other party. The parties recognize that they have no right, title or interest, propriety or otherwise, in or to the name or any logo, copyright, service mark or trademark owned or licensed by the other party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

| Client: YRC Worldwide Inc. | TALX Corporation, provider of Equifax Workforce Solutions |
|---|---|
| By: _[signature]_ | By: _[signature]_ |
| Name: TODD D. KNEALE | Name: Michael Mohr |
| Title: DIRECTOR-TOTAL REWARDS | Title: Vice President |
| Date: 8-3-15 | Date: 8/10/15 |

## 6.0    DATA QUALITY AND DATA TRANSMISSION

Client acknowledges that the ability of EWS to provide accurate information is dependent upon receipt of accurate Data from Client. Client shall provide current and accurate Data necessary for EWS to provide the Services. Client agrees to provide such Data to EWS in the EWS format within a mutually agreeable timeframe and to promptly correct and update Data. Client further agrees to test and validate the accuracy of the Data on a mutually agreeable frequency using paper-based or electronic Data validation reports provided by EWS. Both parties agree to work together to identify and resolve all identified historical and ongoing Data errors within two (2) of Client's pay periods. Client agrees that any action required of EWS to correct the Data for Client may result in additional fees, as provided in each applicable Schedule attached hereto.

Furthermore, Client agrees to transfer Data to EWS using one of the approved secure shipping methods provided in Attachment 1.

## 7.0    PROPRIETARY RIGHTS

Neither party's ownership rights, including but not limited to, any intellectual property rights in or used by EWS to perform the Services nor any intellectual property rights in or to Client's Data, shall be transferred pursuant to this Agreement. This Section shall survive termination of this Agreement.

## 8.0    INDEMNIFICATION/LIMITATION OF LIABILITY

8.1    Each party agrees to indemnify, defend and hold harmless the other party and its affiliates, and their directors, officers and employees (each, an "Indemnified Party"), from and against any and all third party claims, demands, liabilities, suits, damages, expenses and costs (including reasonable attorneys' fees) incurred by the Indemnified Party arising from or related in whole or in part to the indemnifying party's, or its affiliates', or its directors', officers' or employees' (i) breach of Section 4.0 or Section 6.0 of this Agreement, (ii) infringement on the intellectual property rights of third parties and/or (iii) (a) gross negligence, or (b) intentional wrongful act or omission, provided that (a) the party seeking indemnity promptly notifies the indemnifying party of any claim for indemnity and cooperates fully in the defense of the claim, and (b) the party providing indemnity shall select counsel to defend any such claim.

8.2    EXCEPT AS PROVIDED IN SECTION 8.4 BELOW, IN NO EVENT SHALL DAMAGES BY EITHER PARTY HEREUNDER EXCEED THE GREATER OF (A) THE TOTAL FEES PAID BY CLIENT DURING THE 12 MONTHS PRIOR TO THE ACT OR OCCURRENCE WHICH GIVES RISE TO THE CLAIM, OR (B) THE SUM OF ONE HUNDRED THOUSAND DOLLARS ($100,000).

8.3    EXCEPT AS PROVIDED IN SECTION 8.4 BELOW, IN NO EVENT SHALL EITHER PARTY, OR ITS AFFILIATES, THEIR DIRECTORS, OFFICERS OR EMPLOYEES BE LIABLE FOR LOSS OF PROFITS OR FOR INDIRECT, PUNITIVE, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR RELATED TO THE PERFORMANCE OF THIS AGREEMENT, EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.4    THE LIMITATION OF LIABLITY IN THIS SECTION 8.2 and 8.3 SHALL NOT APPLY TO (A) A PARTY'S INDEMNIFICATION OBLIGATIONS IN SECTION 8.1, (B) BREACH OF CONFIDENTIALITY IN SECTION 4.0, (C) BREACH OF DATA SECURITY AND PRIVACY IN SECTION 5.0 (TO THE EXTENT SUCH BREACH RESULTS IN AN INCIDENT).

## 9.0    MISCELLANEOUS

9.1    **Entire Agreement**. This Agreement, which includes all schedules attached hereto and/or entered into after the execution hereof, comprises the entire Agreement between the parties, which supersedes and merges all prior proposals, purchase orders, understandings and agreements with respect to the subject matter hereof.

9.2    **Force Majeure**. Neither party shall be responsible for any failure or delay in the performance of any obligations to the extent that it is prevented from performing any obligation or service, in whole or in part, as a result of causes beyond its reasonable control, and without its fault or negligence, provided, however, that Client shall not be relieved of its obligation to pay for Services rendered as soon as commericially practicable.

9.3    **Applicable Law**. This Agreement shall be construed in accordance with, and its performance governed by, the laws of the State of Missouri, without regard to its conflict of law principles.

### Attachment 1
#### Security Requirements when Client Sends Employment and Income Data to EWS

The following table outlines the acceptable options for the secure transfer of employment and income Data, to EWS. Client agrees to use one of the approved secure shipping methods provided below.  The EWS preferred method of receiving Data is Secure File Transfer Protocol (SFTP) with PGP encryption.

| | Transfer Option | Description | Requirement |
|---|---|---|---|
| 1 | FTP/S (SSL), SFTP (SSH) | Eliminate data files traveling through 3rd party courier.  Secures information in the file. | PGP desktop software and exchange of PGP keys. WinZip Version 9 or later software, use of AES-256 encryption, and exchange of passwords (Passwords are required to be AT LEAST 32 characters) |
| 2 | Email Attachment | Eliminate media traveling through a 3rd party courier. Secures information in e-mail attachment.  Information in the body of the message is not secured. | PGP desktop software and exchange of PGP keys. WinZip Version 9 or later software, use of AES-256 encryption, and exchange of passwords (Passwords are required to be AT LEAST 32 characters) |
| 3 | CD/DVD | Allows for sending data files using encryption software with additional password protection. | PGP desktop software and exchange of PGP keys. WinZip Version 9 or later software, use of AES-256 encryption, and exchange of passwords (Passwords are required to be AT LEAST 32 characters) |
| 4 | Secure e-mail (Voltage, TLS) | Eliminate media traveling through a 3rd party courier. Secures information in the body of the e-mail and attachments. | Internet web access |
| 5 | Client specific solution | Any option other than the 4 listed above. | Approval from EWS VP of Technology and business unit director |

**Additional Security requirements:**

- When using Win Zip or PGP the following must be met:
    - o  Win Zip files must be zipped using WinZip 9.0 or later
    - o  File Encryption using AES-256 encryption
    - o  Data file must be password protected using a password of at LEAST 32 characters
    - o  Passwords must be sent using a separate path from the file (e.g. if the file is sent via email, password must be in a separate email which does not indicate this is a password.  If the file is sent via physical media or electronic medium, such as FTP, the password must be communicated via telephone, email, or other approved communication.)

When using PGP the following is required:
- o  The Equifax Workforce Solutions public key must be used.

The following secure delivery requirements must be met.
- o  Use the following delivery method for unencrypted data files or bulk paper documents only:
     **Secured transport service approved by EWS for unencrypted media and documents**.
- o  Use one of the following mailing methods for encrypted data files only:
    1. USPS Certified Mail
    2. USPS Overnight delivery
    3. FedEx Overnight or 2-day delivery
    4. UPS (United Parcel Service) Overnight or 2-day delivery
    5. Other mutually approved methods

PAGE INTENTIONALLY LEFT BLANK

# SCHEDULE A – ACA MANAGEMENT PLATFORM

## SERVICE PROVIDER, TERM AND FEES FOR SERVICES

**Client Name:    YRC Worldwide Inc. ("Client")**                     **Effective Date: July 31, 2015**

The ACA Management Platform and corresponding Activation Services (as described in Schedule B hereto) (the "Management Platform") is a software product that provides employers with reports and dashboards that empower them to analyze data relevant to their compliance with the Patient Protection and Affordable Care Act regulations. The Management Platform is provided by TALX Corporation (provider of Equifax Workforce Solutions), a Missouri corporation ("EWS"). EWS shall provide the Management Platform in accordance with the Universal Service Agreement (the "Agreement") dated **July 31, 2015**, this Schedule A, and Schedule B (which are part of the Agreement) utilizing the employment information supplied by and on behalf of Client. All capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Agreement.

1)  **Scope of Undertaking:** EWS shall provide the Management Platform in relation to certain of Client's group health plans, which may or may not be "employee welfare benefit plans," within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974 (ERISA) ("Plans"), as more specifically set forth in Schedule B. The Management Platform is designed to assist Client in understanding its options with respect to its Plans under the employer shared responsibility provisions of Internal Revenue Code Section 4980H and related issues under the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, and the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, and the regulations and guidance issued thereunder ("PPACA").

2)  **Term:** These Schedules A and B shall be for an initial term of one (1) year from the Effective Date hereof (the "Initial Term"). These Schedules A and B shall automatically renew for successive one (1) year terms unless either party provides the other with written notice of termination at least ninety (90) days prior to the end of the then-current term.

3)  **Termination:** Either party may terminate these Schedules A and B if the other party has materially breached the Agreement, provided that the party claiming breach must give the other party at least thirty (30) days prior written notice in which to cure the breach before terminating these Schedules A and B. Client may terminate these Schedules A and B at any time upon thirty (30) days written notice to EWS, provided however, any and all prepaid fees by Client will not be refunded.

4)  **Payment Terms and Fees:** All prices and fees for the Management Platform performed under these Schedules A and B are stated in Exhibit 1 - Fees, attached hereto and made part of this Schedule A.

    - All fees will commence upon execution of these Schedules A and B.

    - Invoices are due net forty-five (45) days from Client's receipt.

    - EWS shall have the right to charge 1.5% monthly interest for payments not received within forty-five (45) days of invoice upon providing Client advance notice and rights to cure any undisputed past due balances within thirty (30) days of such notice. Client must notify EWS of disputed amounts within thirty (30) days of invoice.

    - Except to the extent that Client has provided an exemption certificate, direct pay permit, or other such appropriate documentation, EWS shall add to each invoice any sales, use, excise, value-added, gross receipts, services, consumption, and other similar transaction taxes, however designated, that are properly levied by any taxing authority upon the provision of the Management Platform, excluding, however, any state or local privilege or franchise taxes, taxes based upon EWS's net income, and any taxes or amounts in lieu thereof paid or payable by EWS as a result of the foregoing excluded items.

    - All fees are in U.S. dollars.

5)  **Data:** Client acknowledges that Client is solely responsible for the quality of the Data provided by Client or by a third-party on behalf of Client. Client will validate the completeness and accuracy of all Data prior to submitting to EWS. EWS may use depersonalized Client Data to perform analytics, modeling and/or demographic studies. Depersonalized Client Data shall not include any information that individually, or collectively, could be used to specifically identify either Client or Client's employees.

6)  **Activation:** Client acknowledges that it must undertake certain steps for the Management Platform to be provided correctly and timely, including, without limitation, providing Data in a proper format, undergoing testing procedures, and assisting with the associated Activation Services. Client agrees to fully cooperate with EWS to activate the Management Platform. EWS shall have no liability with regard to any errors that result from Client's failure to timely provide Data (or update Data) accurately and completely and in the format required by EWS.

7)  **Responsibilities:** Client understands that EWS is not a law firm and EWS has not and cannot provide legal advice to Client or the Plan concerning any legal issues associated with the Management Platform. Client is responsible for compliance with all applicable federal, state and local laws and regulations, including, but not limited to, compliance with PPACA, the San Francisco Health Care Security Ordinance and the Massachusetts Health Care Act. Client is responsible for working with legal counsel to develop and implement any strategies (tax, legal or otherwise), and to make all determinations regarding whether to offer coverage under its Plans and to whom coverage should be offered, in response to Data or information developed as part of the Management Platform, and to monitor and comply with any applicable laws, regulations and guidance (formal or informal) that affect the Management Platform and/or the Client's Plans. Client understands that Client's failure to follow any established parameters of the Management Platform

## SCHEDULE A – ACA MANAGEMENT PLATFORM

### SERVICE PROVIDER, TERM AND FEES FOR SERVICES

may materially affect the risks and liabilities associated with any development and implementation of any strategies based on the Management Platform .  Client acknowledges that EWS is not providing tax or legal advice and that EWS is not responsible for determining the legal and tax status of the Management Platform and/or the Client's Plans.  EWS does not have authority to control and manage the operation of Client's Plans.  EWS does not assume any responsibility for the general policy design of the Plans, the terms of the Plans, the legal compliance of the Plans, the administration of the Plans or any act or omission or breach of duty by Client related to the Plans.  In addition, EWS does not assume any financial risk or obligation with respect to the Plans. Nothing herein shall be deemed to constitute EWS as a party to the Plans or to confer upon EWS any discretionary authority, responsibility or control concerning or with respect to management of the Plans, administration of the Plans or operation of the Plans.  Nothing in this Schedule shall be deemed to impose upon EWS any obligation to any employee of Client or any person who is participating in the Plans.  EWS is and shall remain an independent contractor with respect to the Management Platform and shall not for any purpose be deemed an employee of Client. Nor shall EWS and Client be deemed partners, engaged in a joint venture or governed by any legal relationship other than that of independent contractor.

8) **Third Party Indemnification.**  In addition to indemnification obligations set forth elsewhere in the Agreement, Client hereby agrees to indemnify, defend or pay the cost of defense, and hold EWS harmless with regard to any third party claims, actions, demands, damages, liabilities, costs and expenses as a result of any action arising out of or relating to (i) any premium charge, tax, penalty, payment or similar assessment (federal, state or local), for which the Plans or Client are liable, including, but not limited to, any assessable payment or tax under Section 4980H or Section 4980D of the Internal Revenue Code, or any provision of PPACA, (ii) Client's violation of laws or regulations applicable to the Plans, and (iii) any of Client's responsibilities as set forth in Paragraph 7 of this Schedule.  This Paragraph shall survive termination of this Schedule and/or the Agreement.

9) **No Third Party Beneficiaries:**  Nothing express or implied in this Schedule A or Schedule B is intended to confer, and nothing herein shall confer, upon any person, including any Plan participant, other than the parties hereto, any rights, remedies, obligation or liabilities whatsoever.

Schedule A and Schedule B shall be binding on the parties upon the date last executed below.

Client – YRC Worldwide Inc.

By: _____

Name: ____TODD D. KNEALE_____

Title: ____DIRECTOR-TOTAL REWARDS____

Date: ____8-3-15____

TALX Corporation,
provider of Equifax Workforce Solutions

By: _____

Name: ____Michael Mohr____

Title: ____Vice President____

Date: ____8/10/15____

## SCHEDULE A—ACA MANAGEMENT PLATFORM

### EXHIBIT 1—FEES

**Subscription Schedule**

The ACA Management Platform is being provided on a subscription basis, billed annually. The subscription fees shall be in the amounts set forth below and the change in fees will take place on each anniversary of the Effective Date. Invoices for renewing annual fees will be billed sixty (60) days prior to the start of the annual term. Invoices for all Year 1 fees will be generated upon execution of this Agreement.

**The terms, conditions and pricing contained in these Schedules A and B are subject to Client's prompt execution and delivery of these Schedules A and B to EWS. In the event Client does not execute and deliver these Schedules A and B prior to the Effective Date stated above, these Schedules A and B and all the terms, conditions and pricing contained herein shall be void.**

Annual Fees will increase annually from the prior year total at a rate of 5%

| Description | Qty | Unit Price | Year 1 Total |
|---|---|---|---|
| **Annual Fees** | | | |
| ACA Management Platform<br>*Includes 99 Data Viewer licenses and 4 Data Explorer licenses. Fee is calculated on a per employee, per year (PEPY) basis. Value in the Qty field reflects the number of people Client employs. The minimum annual fee for the Management Platform is $10,000.* | 38,000 | $2.75 | $104,500 |
| Additional Data Explorer Licenses | - | $379 | $0 |
| Additional Data Viewer Licenses | - | $99 | $0 |
| Additional Annual Support Incidents (Block of 5 incidents)<br>*Unused incidents expire at the end of the year.* | - | $995 | $0 |
| | | *Sub-Total Annual Fees* | *$104,500* |
| **One-Time Fees for Activation Services** | | | |
| Management Platform Activation Service | 1 | $20,000 | $20,000 |
| IRS Reporting Activation Service | 1 | $0 | $0 |
| Additional Data File Service (Optional Service)<br>*Value in the Qty field indicates the number of additional files Client will be providing above what is defined in the Management Platform Activation Service.* | - | $1,500 | $0 |
| Dynamic Controlled Group & Employee Category Activation Service (Optional Service) | - | $10,000 | $0 |
| Organizational Security Activation Service (Optional Service) | - | $10,000 | $0 |
| | | *Sub-Total One-Time Fees* | *$20,000* |
| | | **Grand Total** | **$124,500** |

**Pricing for Future Services**

EWS intends to offer additional services beginning in 2015: IRS Form Fulfillment and Employee Call Center Services.

The IRS Form Fulfillment Service will produce IRS form 1095-C. Once available, a detailed description of the IRS Form Fulfillment Service will be provided to Client, and should Client elect to use the service, EWS will charge Client an annual setup fee of $5,000 plus $0.85 per form, regardless of whether it is produced in electronic or hardcopy format. If the form is produced in a hardcopy format, an additional postage fee will apply to each hardcopy form. Client will be required to execute an amendment to this contract in order for EWS to provide this service.

**Terms & Conditions**

Client agrees and understands the tasks associated with the Activation Services ("Activation Service Tasks") in Schedule B are scheduled to be delivered over a period of no more than sixty (60) business days. If any such Activation Service Tasks fails to be completed within sixty (60) business days of EWS contacting Client to begin the Activation Service Tasks, through no fault of EWS, all Activation Service Tasks will be considered delivered and complete, and all fees associated with the Activation Service Tasks will be considered due and earned. In consideration of EWS' additional effort to continue delivering Activation Service Tasks, Client will pay EWS 33.33% of the total One-Time Fees for Activation Services for each additional twenty (20) business day period, or portion thereof, following the completion of the initial sixty (60) business days period. Client will be invoiced every twenty (20) business days for this additional fee. By way of example, if Activation Service Tasks are completed seventy (70) business days after EWS contacts Client to begin Activation Service Tasks, and the total One-Time Fees for Activation Services were $10,000, Client would pay EWS $13,333.33 for the One-Time Fees for Activation Services.

Client has the option to place the Activation Service Tasks on-hold, for a maximum of thirty (30) business days, at any time during the sixty (60) business day period. On the sooner of the thirty-first (31) business day, or Client asking to restart the Activation Service Tasks, the sixty (60) business day counter will resume. Client understands that during the time the Activation Service Tasks are on-hold, the EWS resources assigned to the Activation Service Tasks will not be available to Client.

## SCHEDULE B—ACA MANAGEMENT PLATFORM
### MANAGEMENT PLATFORM DESCRIPTION OVERVIEW

**ACA Management Platform**

<u>Platform Description</u>

The ACA Management Platform ("Management Platform") is a hosted application that uses Client's employee Data to assist Client with certain aspects of the Patient Protection and Affordable Care Act. Specifically, the Management Platform will assist Client with the following:

*Eligibility and Affordability*

The Management Platform will calculate Client employees' full-time status under the look-back and/or the monthly measurement method set forth in Internal Revenue Code (IRC) Section 4980H and the regulations and guidance issued thereunder. Calculations performed by the Management Platform include, but are not limited to:

1. The date an employee's initial measurement period starts and ends.
2. The date an employee's initial stability period starts and ends.
3. The date an employee's current standard measurement period starts and ends.
4. The date an employee's current standard stability period starts and ends.
5. The hours of service an employee has provided during their initial measurement period.
6. The hours of service an employee has provided during the current standard measurement period.
7. Calculation of an employee's full-time/part-time status upon completion of an applicable initial or current standard measurement period.
8. Calculation of whether an employee is trending full-time or trending part-time based on the hours of services provided in their current measurement period.
9. Whether an employee will be treated as a continuing employee or a new employee based on consecutive weeks without service and/or the Rule of Parity.
10. Estimate the maximum required contribution for the Client's lowest cost, self-only coverage for each employee under the Federal Poverty Line, Rate of Pay, and W-2 Affordability Safe Harbor methods

*IRS Reporting*

The Management Platform will support the collection and configuration of Data fields required to comply with the reporting requirements under IRC 6055 and 6056. Information stored by the Management Platform includes, but are not limited to:

1. The date an employee was offered coverage, if eligible for benefits.
2. The employee's response to the offer of coverage.
3. The health plan selected by the employee and the plan's cost.
4. The dependents covered by the health plan, if any.
5. The lowest cost plan available to the employee.

In addition to the information stored by the Management Platform, the Management Platform will support the following functions:

1. Ability to export Data from the Management Platform for the purpose of populating form 1095-C and/or 1095-B for their employees.
2. Ability to transmit Data to the IRS for the purpose of delivering form 1094.

EWS will offer fulfillment functions to support print and electronic distribution of form 1095 B/C to applicable employees, retirees, and COBRA participants. Should Client elect to use EWS for fulfillment, the pricing provided for the Management Platform expressly excludes any costs associated with fulfillment, including but not limited to printing and postage. Should Client choose to use a vendor other than EWS for fulfillment functions Client will be responsible for exporting their data to a file and providing their preferred fulfillment partner with that data file. EWS assumes no liability for any failures of Client's fulfillment vendor other than EWS.

Each of the items listed above may require that Client and EWS agree to certain standard parameters and rules, including the measurement periods, administrative periods and stability periods that will be used by the Client and/or its Plans. In other cases, the Management Platform may provide alternative parameters and rules that may be used by the Client and/or its Plans. However, in all cases, the functionality of the Management Platform will be limited by the parameters, rules, alternatives and options that the Management Platform currently uses and is designed to permit as of a given time to address the issues listed above. See Service Activation Tasks below for additional rules and limitations.

## SCHEDULE B—ACA MANAGEMENT PLATFORM
### MANAGEMENT PLATFORM DESCRIPTION OVERVIEW

Platform License Types

Each user of the Management Platform must be assigned a license to the Management Platform. The number of licenses available to Client, by type, is specified in Schedule A, Exhibit 1. Listed below is the functionality associated with each type of license:

| End-User Licenses | Description |
| --- | --- |
| Data Viewer Licenses | The following functions are available to holders of a Data Viewer license:<br>• View DataBooks and Dashboards<br>• Print Databooks to a PDF<br>• Create a Favorites folder<br>• Drill-down into visualizations |
| Data Explorer Licenses | In addition to the rights available to Data Viewers, the following functions are available to holders of a Data Explorer license:<br>• Create, edit, and delete user-created DataBooks<br>• Create, edit, and delete user-created eXcerpts<br>• Create, edit, and delete user-created Dashboards<br>• Create, edit, and inactivate user-created user accounts |

Platform Support

During the term of Client's subscription, Client will be permitted to contact EWS for support with the Management Platform. EWS will provide support to Client per the following terms and conditions:

1.  Client will identify the people that may contact EWS for assistance with the Management Platform ("named contacts"). The number of named contacts shall not exceed the number of Data Explorer licenses owned by Client and each named contact must be licensed as a Data Explorer in the Management Platform

2.  Client may log a total of 12 support incidents, annually, plus any additional incidents purchased by Client as outlined in Schedule A, Exhibit 1 or in an amendment to this Agreement. If a support incident is determined to be a result of a defect in the Management Platform, the incident will not be counted against Client's available support incidents. Additional support incidents are available for purchase as outlined in Schedule A, Exhibit 1 at any time.

3.  Should Client's support incident be in relation to an issue with Client's Data in the Management Platform:

    a.  Should a Client-provided Data file fail to successfully load into the Management Platform, through no fault of EWS, Client will be charged an hourly rate of $253 per hour, or EWS's then-current hourly rate, for all efforts associated with identifying the cause of the failure and implementing a solution to ensure that valid Data is loaded to the Management Service. Client will be notified prior to EWS charging Client for these efforts.

    b.  Should the Data in Client-provided Data file change in a way that impacts the operation or accuracy of the Management Service, through no fault of EWS, Client will be charged an hourly rate of $253 per hour, or EWS's then-current hourly rate, for all efforts associated with restoring the operation and accuracy of the Management Service to an accurate and operational state. Client will be notified prior to EWS charging Client for these efforts.

    c.  Should Client determine the Data in the Management Platform is in some way inaccurate or incomplete, through no fault of EWS, Client will be charged an hourly rate of $253 per hour, or EWS's then-current hourly rate, for all efforts associated with assisting Client with replacing and/or updating the Data in the Management Platform. Client will be notified prior to EWS charging Client for these efforts.

Assumptions

1.  Client understands the Data in the Management Platform is not updated in real-time and, at the very least, will be one day older than the date Client provided Data to EWS.

2.  Client understands the accuracy and completeness of the Data loaded into the Management Platform is directly impacted by the accuracy and completeness of the Data provided by or on behalf of Client.

3.  Client understands that updates to the Management Platform may cause certain client-created analyses to no longer be available. A "client-created analysis" is any DataBook that is created by Client, or that is created by Client under the direction of EWS, or that is created by EWS on behalf of Client.

4.  All applicable assumptions set forth in Schedule A and this Schedule B apply.

**Management Platform Activation Service**

Description

The Management Platform Activation Service ("Platform Activation Service") allows EWS to enable the Management Platform for use by Client. Activation includes installing the Management Platform in the EWS hosted environment, and configuring the Management Platform to process Client's employee Data.

## SCHEDULE B—ACA MANAGEMENT PLATFORM
### MANAGEMENT PLATFORM DESCRIPTION OVERVIEW

Activation Service Tasks

EWS will perform the following tasks in delivering the Platform Service:

1. Install one instance of the Management Platform, for use by Client, in the EWS hosting Data center.

2. Configure the Management Platform to use the Client's employee Data.

3. Configure the Management Platform with applicable controlled groups, employee categories and other Client-provided values necessary to activate the Management Platform. This is a one-time configuration. EWS will have no responsibility for ensuring the Client-provided values conform to any applicable laws or regulations.

4. For each of the employee categories, configure the Management Platform with additional Client-provided values including, but not limited to, average lowest cost plan amount, measurement method, measurement period start date, measurement period duration, stability period start date, stability period duration.

5. Provide Client with dates and times for Management Platform training webinars as well as enrollment instructions. The webinar trainings can be attended as often as Client needs to develop proficiency with the Management Platform. However, it is the responsibility of the Client to ensure training is completed. Completion of Activation Service Tasks will not be dependent on Client's completion of Management Platform training.

Assumptions

1. The Platform Activation Service will be delivered using EWS's project management methodology. Client acknowledges the Platform Activation Service is a fixed fee service and agrees to adhere to the timelines and milestones established during the initial kick-off call.

2. Client understands that Client will be required to send leave of absence Data (including, but not limited to, leave under the Family and Medical Leave Act of 1993, under the Uniformed Services Employment and Reemployment Rights Act of 1994, for jury duty and for employment break periods) directly to the Management Platform.

3. Client will provide Data in a Comma-Separated-Value (CSV) file format.

4. Client will validate all Data extracts prior to delivering to EWS.

5. Client will provide Data files in the format defined in the Management Platform file specification.

6. Data will be reloaded a maximum of three (3) times during the activation of the Management Platform to accept Client-provided Data files. Additional loads of Client Data during delivery of the Platform Activation Service will result in EWS charging Client for continued efforts at a rate of $1,500 per file, per load. Client will be notified prior to EWS charging Client for these efforts.

7. Client understands that once the Platform Activation Service is complete, should the PPACA regulations or EWS's interpretation of the PPACA regulations require a change to the Management Platform file specifications, Client may be required to purchase additional Activation Services to ensure the Management Platform continues to properly function. Client will be given at least ninety (90) days' notice of any changes to the file specification. Client will be notified prior to EWS charging Client for these efforts.

8. Client understands that EWS may make enhancements to the Management Platform that result in new, optional functionality being made available to Client and that functionality may result in optional Data requirements being added to the Management Platform file specifications. Should this functionality be made available after the Platform Activation Service is complete, and should Client desire to use this optional functionality, Client may be required to purchase additional Activation Services.

9. Unless Client has purchased the Dynamic Group Activation Service, new controlled groups and/or employee categories will result in Client incurring a change fee. The Change Fee will be commensurate with the effort required.

10. Unless Client has purchased the Organizational Security Activation Service, all users with access to the Management Platform will be able to see all Data in the Management Platform.

11. EWS will configure a maximum of four (4) user accounts for the Management Platform. Client will be responsible for configuring all other user accounts. Client will be responsible for ongoing changes to accounts, password resets, etc.

12. All applicable assumptions set forth in Schedule A and this Schedule B apply

**IRS Reporting Activation Service**

Description

The IRS Reporting Activation Service ("IRS Activation Service") allows EWS to enable the Management Platform to provide Client with certain Data elements required for IRS 6055 and 6056 reporting. Activation includes, but is not limited to, configuring the Management Platform to accept additional Data files containing Data elements not required by the Management Platform Activation Service.

Activation Service Tasks

EWS will perform the following tasks in delivering the IRS Activation Service:

1. Configure the Management Platform to use Client's benefits offer and enrollment Data. This is a one-time configuration. EWS will have no responsibility for ensuring Client-provided Data values conform to any applicable laws or regulations.

2. Provide Client with dates and times for Management Platform training webinars as well as enrollment instructions. The webinar trainings can be attended as often as Client needs to develop proficiency with the Management Platform. However, it is the

## SCHEDULE B—ACA MANAGEMENT PLATFORM
### MANAGEMENT PLATFORM DESCRIPTION OVERVIEW

responsibility of Client to ensure training is completed. Completion of Activation Service Tasks will not be dependent on Client's completion of Management Platform training.

Assumptions

1. Client will provide Data files in the format required by EWS.
2. Client will provide Data in a Comma-Separated-Value (CSV) file format.
3. Client will validate all Data extracts for completeness and accuracy prior to delivering to EWS. Full Data validation is required to occur prior to the Data being submitted.
4. Data will be reloaded a maximum of three (3) times during the activation process. Additional loads of Client Data during delivery of the IRS Activation Service will result in EWS charging Client for continued efforts at a rate of one–thousand-five hundred dollars ($1,500) per file, per load. Client will be notified in advance of EWS charging Client for these efforts.
5. Client understands that once the IRS Activation Service is complete, should the PPACA regulations or EWS's good faith interpretation of the PPACA regulations require a change to the IRS Activation Service file specifications, Client may be required to purchase additional Activation Services to ensure the Management Platform continues to properly function and remain compliant. Client will be given at least ninety (90) days advance notice of any changes to the file specification. Client will be notified prior to EWS charging Client for these efforts.
6. Unless Client has purchased the Organizational Security Activation Service, all users with access to the Management Platform will be able to see all Data in the Management Platform.
7. All applicable assumptions set forth in Schedule A and this Schedule B apply.

**Additional Data Files Activation Service (Optional Service)**

Description

If purchased, the Additional Data File Activation Service ("File Service") allows Client to provide Data to the Management Platform in multiple files, each of which will adhere to the same specifications set forth in the Platform Activation service and no variations in format are permissible between files. For example, if Client has multiple payroll systems, Client may find it easier to provide Data from each payroll system individually instead of combining Data into the files described in the Platform Activation Service. The number of additional files Client will be providing will be specified in the Quantity field of the pricing grid in Schedule A – Exhibit 1 on the "Additional Data Files Activation Service" line item.

Service Delivery Tasks

EWS will perform the following tasks in delivering the File Service:

1. Configure the Management Platform to import the additional Data files provided by Client.

Assumptions

1. All Data and file assumptions specified in the Platform Activation Service and /or the IRS Activation Service apply to the Additional Data File Activation Service.
2. All applicable assumptions set forth in Schedule A and this Schedule B apply.

**Dynamic Controlled Group and Employee Activation Service (Optional Service)**

Description

If purchased, the Dynamic Controlled Group and Employee Activation Service ("Group Service") allows Client to automatically add new, or edit existing, controlled groups and/or employee categories once the Platform Activation Service is completed.

Service Delivery Tasks

EWS will perform the following tasks in delivering the Group Service:

1. Configure the Management Platform to dynamically create and update controlled groups and/or employee categories.
2. Import a maximum of 1 file to manage the configuration of controlled groups.
3. Import a maximum of 1 file to manage the configuration of employee categories.

Assumptions

1. EWS will configure the Management Platform to add and update controlled groups and employee categories, and associate employees with categories, based on the Client-provided values. EWS will have no responsibility for ensuring the Client-provided values conform to any applicable laws or regulations.
2. All applicable assumptions set forth in Schedule A and this Schedule B apply

**Organizational Security Activation Service (Optional Service)**

Description

If purchased, the Organizational Security Activation Service ("Org Security Service") allows Client to secure each employee record by using a security key value to associate that record with a specific node in an organizational hierarchy. User accounts will associate a given

## SCHEDULE B—ACA MANAGEMENT PLATFORM
### MANAGEMENT PLATFORM DESCRIPTION OVERVIEW

user with a node in the hierarchy thereby restricting the records that can be viewed by the user to the records in that node and any nodes beneath that node in the hierarchy. The user need not be associated with a specific security key value but may instead be associated with a higher level node in the organizational structure that may view all child values (each one of the security keys that are descendants in the hierarchy).

Service Delivery Tasks

EWS will perform the following tasks in delivering the Org Security Service:

1. Configure the Management Platform to import a Data file containing Client's desired organizational hierarchy. Imported Data file will be used to populate the Organizational Security structure in the Management Platform.
2. Configure the Management Platform to import a Data file containing user accounts Client has authorized to use the Management Platform. Imported Data file will be used to create, activate, and inactivate user accounts in the Management Platform. Additionally the Data file will be used to grant users access to specific nodes in the organizational hierarchy and by extension, the employee records associated with those nodes. A user granted access to a node will only be able to see employee records for employees associated with that node and any nodes below the node where they are assigned.
3. Configure Management Platform to associate employee records with an organizational node based on the value in the security key field of the employee record. All records without a security key value matching a security key value assigned to an organizational node will be inaccessible in the Management Platform to any user, regardless of the user's organizational hierarchy association(s).

Assumptions

1. Client's organizational hierarchy will be a maximum of five (5) levels deep. An example of the levels and the relationship between them is shown below:

    • Level 1 (e.g. Corporate)
        o Level 2 (e.g. VP Region)
            ▪ Level 3 (e.g. Director Region)
                • Level 4 (e.g. Supervisor Area)
                    o Level 5 (e.g. Store)

2. Every Data file submission must include all records as each import will reset all permissions and association with the organizational hierarchy for each of the imported users.
3. Data files will be imported a maximum of one time per day.
4. All users imported via the Data file will be licensed as "DataBook Viewers". "DataBook Explorer" users will be manually maintained outside of this feed including the permissions of the explorer users and each user's association within the Platform.
5. All imported Viewer users will have the same role in the platform. This means that each of these users will have the same functional permissions and Data access permissions will only differ through the application of filtering the complete results set based on the given user's position in the hierarchy.
6. Client will provide Data in a Comma-Separated-Value (CSV) file format.
7. Client will provide Data files in the format defined in the Management Platform file specification.
8. Client will provide all required files for the Org Security Service for each load into the Management Platform.
9. Client will validate all Data extracts prior to delivering to EWS.
10. Data will be reloaded a maximum of three times during the configuration of the Management Service to accept client-provided Data files. Additional loads of Client Data during the configuration and validation efforts will result in EWS charging Client for continued efforts at a rate of $1,500 per file, per load. Client will be notified prior to EWS charging Client for these efforts.
11. All applicable assumptions set forth in Schedule A and this Schedule B apply

**Modification to the Service Description Overview**

EWS reserves the right to modify the Management Platform from time to time, provided that any such modification applies in an identical manner to all other clients of the Management Platform and the changes made will only enhance and not reduce the quality of the Management Platform. If the modification shall be a substantial change from this Service Description Overview, EWS shall provide notice of the change to Client. A substantial change shall be a change which is inconsistent with this Service Description Overview. A change that does not alter functionality of the Management Platform, such as a change for upgraded security of Data, is not a substantial change. Client may terminate this Schedule A and B by notice given to EWS within thirty (30) days after notice of an amendment to the Service Description Overview, and termination shall be effective ninety (90) days after notice is provided unless Client provides for an earlier or later effective date of termination in the notice of termination. Absence of such termination shall constitute Client's agreement to the modified Service Description Overview.

## SCHEDULE A – W-2 MANAGEMENT SERVICE
### SERVICE PROVIDER, TERM AND FEES FOR SERVICES

**CLIENT NAME:**    YRC Worldwide, Inc                          **EFFECTIVE DATE:**    October 1, 2015

The W-2 Management Service is an automated U.S. tax statement service provided by EWS and EWS T4 Service is a similar service for Canada. EWS will provide tax statement services (the "Service") to Client that will enable authorized employees to have automated access for certain tax and income Data. If Client subscribes to the Employment Verifications Service provided by EWS, then authorized third parties will also have the option to access certain U.S. Data as part of an employment and income verification. Client authorizes EWS as its authorized agent to provide the Service. EWS shall provide the Service in accordance with the Universal Service Agreement ("Agreement") dated August 31, 2015, this Schedule and Schedule B  (which are part of the Agreement) utilizing the Data supplied by Client.

1) **Term:** This Schedule shall be for an initial term commencing on the Effective Date above through December 31, 2015. Invoicing for tax years shall be as set forth under Payment Terms. The Service will be provided for the following tax years: 2015, 2016, and 2017. This Schedule shall automatically renew on the anniversary of the Effective Date following the Initial Term, through December 31, 2017, to include tax year (2017), unless either party provides the other with written notice of termination at least ninety (90) days prior to the end of the current term.

2) **Termination:** Either party may terminate this Schedule and Schedule B  if the other party has materially breached the Agreement,   provided that the party claiming breach must give the other party at least thirty (30) days prior written notice in which to  cure the breach before terminating this Schedule. Client may terminate this Schedule and Schedule B at any time upon thirty (30) days written notice to EWS. In the event of termination under this Agreement, EWS shall refund any and all prepaid fees as of the date of the termination.

3) **Payment Terms:** All prices and fees for Services performed under this Schedule are as stated in Exhibit 1, attached hereto and made part of this Schedule A. All prices and fees shall increase by two percent (2%) on each anniversary of the Effective Date.

   - Service fees are invoiced monthly.
   - Annual Fee is based on the number of Tax Statements in the Production Data.
   - Optional Services are invoiced in monthly.
   - Invoices are due net thirty (30) days from Client's receipt. EWS shall have the right to charge 1.5% monthly interest for payments not received within forty-five (45) days of invoice upon providing Client advance notice and rights to cure any undisputed past due balances within thirty (30) days of such notice.  Client must notify EWS of disputed amounts within thirty (30) days of invoice.
   - Except to the extent that Client has provided an exemption certificate, direct pay permit or other such appropriate documentation, EWS shall add to each invoice any sales, use, excise, value-added, gross receipts, services, consumption and other similar transaction taxes however designated that are properly levied by any taxing authority upon the provision of the Services, excluding, however, any state or local privilege or franchise taxes, taxes based upon EWS's net income and any taxes or amounts in lieu thereof paid or payable by EWS as a result of the foregoing excluded items.
   - All fees are in U.S. dollars.
   - Client must sign the necessary postage reduction authorization form(s) upon request.

4) **Data:** Client acknowledges that the ability of EWS to provide accurate information is dependent upon accurate payroll Data from Client. Client agrees to maintain its Data in an accurate, complete and current manner, to provide EWS with Data on employees of Client, and to notify EWS in advance of any and all changes or modifications in format of the Client's computer interface and/or the Data. EWS may use depersonalized Client Data to perform analytics, modeling and/or demographic studies. Depersonalized Client Data shall not include any information that individually, or collectively, could be used to specifically identify either Client or Client's employees.

5) **Master File:** Client acknowledges that it shall maintain full responsibility for maintenance, storage, and production of the Employee Master File (as defined herein).  Employee Master File shall mean the file which retains all employee data required under state and federal recordkeeping and retention laws, which may include, but is not limited to, name, address, social security number, date of birth, work location, wage and hour data, tax and payroll information, human resources data, and benefits information.

| YRC Worldwide, Inc. | TALX Corporation, |
| --- | --- |
|  | provider of Equifax Workforce Solutions |
| By: _Stephanie D. Fisher_ | By: _scfc._ |
| Name: _Stephanie D Fisher_ | Name: |
| Title: _VP and Controller_ | Title: Scott Collins |
| Date: _11/18/15_ | Sr Vice President |
|  | Date: _12-9-15_ |

## SCHEDULE A – W-2 MANAGEMENT
### SERVICES EXHIBIT 1 - FEES

**FEES:** Fees for the Service provided under this Schedule include:

**DOMESTIC US - STANDARD W-2 MANAGEMENT SERVICES PRICE**

*Total Number of W-2s in client's current year Data (estimate):_____27,461_____

Annual Set-up Fee (Per Employer Code                                                          $3,163.00
          Annual Service Fee (U.S. W-2s, current tax year only)

__X_____Initial Service with Electronic Consent, Reissue, Correction, and Download Services  $0.4743 per W-2

__X_____Live Call Center Support (optional)                                          $0.00 per W-2

__X____Multi-Service DISCOUNT for clients LIVE on Employment Verifications           minus $0.00 Per W-2

_____ Employee Tax Preparation Coupon DISCOUNT                                   minus $0.08 per W-2


**Net  $0.4743 Per W-2**
- **Initial Service**
  - Printing and delivery of original W-2s
  - CD-ROM archive of original W-2s
  - Postage and/or Shipping on domestic and foreign mailings invoiced at cost
- **Electronic Consent for US W-2s**
  - Electronic Consent Enrollment
  - Electronic Consent Processing and Administration
  - Electronic Notification of Electronic W-2 Availability
  - Early Availability of Paperless W-2s
    - Batch Consent File Processing
- **Reissue Service**
  - W-2 reprints via Web, fax, or mail
  - Administrator Access to all W-2s
  - Ability to import current tax year W-2s into supported tax preparation products and services
  - Access to the TurboTax® Finance Manager Web site
  - Employee Fees for Reissue Statements
    - First Reissue for the Current Tax Year – No Charge (U.S. Only)
    - Subsequent Reissues (second, third, etc) for the Current Tax Year - $12 each
    - All reissues for the Current Tax Year for those who consent to an electronic W-2 – No Charge
    - Prior year W-2 reissues for all employees - $18 each
- **Correction Service**
  - Web site for employees to request a W-2c
  - Administrative Web site for client to approve or deny W-2c requests
  - Delivery of printed and paperless W-2c'ss
  - Historical IRS Compliance: Maintain up to four years of W-2cs associated with original W-2 on the Service
- **Download Service**
  - Free Employee W-2 Download Service into Third Party W-2 Tax Preparation Software and/or Service
- **Historical IRS Compliance: Maintain up to four years of W-2s on the service**
- **Web and Automated Phone access**
- **Implementation services including statement of work, proofing, and testing**
- **Free Employee Discount Coupon on printed W-2s for employee discount for Third Party W-2 Tax**
- **Preparation Software and/or Service if available**
- **Optional Live Call Center support to back up the Automated Phone access during normal business hours**


| OPTIONAL W-2 SERVICE PACKAGES | PRICE |
|---|---|
| **Governmental Reporting Package (Annually)** | |
| **Annual Setup Fee** | $800.00 |
| _____ Create U.S. Federal Reporting (EFW2) | |
| W-2s on the reporting file (per W-2) | $0.01 |
| _____ Create U.S. State Reporting | |
| Per State Creation Fee | $625.00 |

| | | |
|---|---|---|
| | W-2s on the reporting file (per W-2) | $0.01 |
| _____ | W-2 Hard Copy Reporting | |
| _____ | State Hard Copy (4 Employees per Sheet) (Per Sheet) | $0.48 |
| _____ | Local Hard Copy (4 Employees per Sheet) (Per Sheet) | $0.48 |
| _____ | Employer Hard Copy (4 Employees per Sheet) (Per Sheet) | $0.48 |

**Enhanced Correction Package (Annually)**

| | | |
|---|---|---|
| _____ | Create U.S. Federal Reporting (EFW2C) (No States) (per report) | $5,000.00 |
| _____ | Batch W-2c Data Import | |
| | Annual Service Fee | $2,500.00 |
| | Add W-2c to Database | $2.00 per W-2c |
| | Add W-2c to Database, print and mail to employee | $4.00 per W-2c |
| | Add W-2c to Database, print and mail to employee with a letter of explanation | $5.00 per W-2c |

**Portal Integration Implementation and Ongoing Support Package**

| | | |
|---|---|---|
| _____ | Onetime Set-up Fee | $7500.00 |
| _____ | Ongoing Support Fee (required) (per month) | $200.00 |

**Additional Tax Statements**

| | | |
|---|---|---|
| _____ | 1099 Service (1099-B, 1099-C, 1099-DIV, 1099-INT, 1099-MISC, 1099-R*) | |
| | Print and Mail 1099s (per 1099) (minimum of 1,000 statements) | $2.50 |
| | • Create and mail CD-ROM Archives (except 1099-R) | Included |
| | • Create and mail CD-ROM Archives of 1099-R | $500.00 |
| | ∗ All 1099-R statements will be on a separate CD-ROM from the other 1099 statements | |
| | • Postage and/or Shipping on domestic and foreign mailings invoiced at cost | |
| _____ | 1042-S Service | |
| | Print and Mail 1042-S (per 1042-S) | $2.50 |
| | • Create and mail CD-ROM Archives | Included |
| | • Postage and/or Shipping on domestic and foreign mailings invoiced at cost | |

**Additional Optional Services**

| | | |
|---|---|---|
| _____ | Annual Earnings Summary | $0.12 Per W-2 |
| _____ | Archive CD-ROM for Reissue and Correction Only Client | |
| | Annual Set-up Fee | $500.00 |
| | Per W-2 | $0.04 |
| _____ | Additional CD-ROM Archive (each one) | $350.00 |
| _____ | Roll-off CD-ROM Archive | |
| | Annual Set-up Fee | $1,200.00 |
| | Per W-2 and W-2c | $0.10 |
| _____ | Extended TY availability (Annually) | $2,500.00 |
| _____ | Historical Data Load for past tax years (includes 2 files per year) | |
| | Per Tax Year (list tax years_____,_____,_____) | $2,500.00 |
| | Per Tax Statement | $0.05 |

## DATA FILE ADDITIONAL SERVICE FEES

- EWS accepts up to 2 separate files for each Employer Code      $1,000.00 per each file over 2
- EWS provides for 2 print test cycles. Each additional print test cycle      $1,000.00 per file
- EWS provides for 1 production cycle. Each additional production cycle      $1,000.00 per file
- Additional Production Run      $0.08 per statement in the Data
  Minimum charge $2,500.00
  in addition to standard service fees for each tax statement

- Custom data conversion, correction or other services             $185.00/hour

---

**\*A minimum count of 80% of the Total number of Tax Statements in Client's current year Data (as estimated above) will be charged on Standard Services.**

**W-2 IMPORT SERVICE:** Client agrees that it desires its employees to have the ability to import W-2 information via the EWS W-2 Service into tax preparation products and services such as desktop software, on-line services, and store based tax services. Client authorizes EWS to enable the W-2 import function into such tax preparation products through the Service. Client further agrees to grant EWS a limited, non-exclusive license, sub-licensable to tax preparation providers, to use and display the employer name(s) listed below and content for the purpose of developing, displaying and maintaining the authentication page in the tax products and services for the W-2 import program. Client understands and agrees that the employer name(s) will be included in a listing of employers participating in the W-2 import program.

**EMPLOYEE TAX PREPARATION COUPON DISCOUNTS:** Pricing is contingent upon Client granting EWS the right to provide a coupon at no additional charge on each W-2 distributed to employees of Client under the Agreement.

## SCHEDULE B – W-2 MANAGEMENT SERVICES
### SERVICE DESCRIPTION OVERVIEW

The following is an overview of the three components (each referred to as a "Service") of W-2 Management Services: Initial Service with Electronic Consent, Reissue, and Correction. Also included is a statement regarding the integration of W-2 Management Services and Employment Verifications Services. Each of the Services is designed to allow Client to outsource some facet of tax statement management to EWS. The implementation process begins with the completion of a Configuration Checklist that details Client's requirements, Service options, mailing and shipping instructions, change management, and the selected test and production run schedules. Once completed, all parties sign the Configuration Checklist. The Configuration Checklist must be completed no later than November 1st of the prior tax year in order to permit EWS to implement the Service in a timely manner. Access to the Service is available at a variety of locations including home computers and telephones, work computers and telephones, libraries, and shipping and business centers that provide Internet and fax services to their customers.

## DOMESTIC US – STANDARD W-2 MANAGEMENT SERVICES

### Initial Service
The Initial Service is designed to allow Client to outsource the printing and distribution of original federal tax statements for their active and former employees (each, an "Employee") as well as the electronic furnishing of original U.S. statements to consenting employees. Client creates a complete Data file and submits it for testing and production processing per the schedule so statements can be printed and distributed or furnished electronically according to statutory requirements. Electronic W-2s for the current tax year are available through December 31, after which an Employee may utilize the Reissue Service. Client must provide the Data in the EWS designated file format or contract for conversion services. The same file is used for the initial, reissue, and correction services.

The statements are printed on paper that meets federal regulations and those of the United States Postal Service ("USPS"). The W-2 statements are printed on a substitute Form W-2 that meets the requirements of the Social Security Administration ("SSA"). The printing for all statements is laser quality providing a statement that is easy to read. Mailing services are available to domestic and foreign locations. Statements can optionally be shipped to one or more Client locations.

After the Configuration Checklist is agreed to, Client creates the Data file and submits it for testing. Client signs the appropriate forms to authorize EWS to process the file so that it complies with the USPS' regulations to reduce postage costs. W-2 statements produced from a Client Data file that is not NCOA certified are subject to non-discounted postage rates. -
Original electronic tax statements are distributed to employees via the EWS website if an employee has consented to receive their original tax statement via electronic distribution and has satisfied all requirements for electronic distribution per the tax statement regulatory body. Batch consent files may also be accepted from the Client. Batch consent files must adhere to EWS file format standards. By submitting the consent file, client acknowledges that is has reviewed and complied with IRS regulations regarding employee consent to receive W-2s electronically.

The final phase is the production of the statements. Client's final Data files are submitted for processing per the schedule. The printed statements are sorted and packed and can be mailed to employees or shipped to designated Client locations. The electronic W-2 statements are posted on a Web site designed to be secure under normal circumstances and the employee is notified. The CD-ROM is created and mailed to Client.

### Reissue Service
The Reissue Service is designed to allow Client's Employees 24-hour access to request a reprint of their W-2 statement and all associated W-2c statements, if any. Employees can request a reprint of their current or prior year statements, if the Data is provided to the Service. The Service supports up to four years of statements, in compliance with IRS data retention policies. Client must provide Data in an EWS designated file format. The same file is used for the initial, reissue, and correction services.
Employees access the Service via the Web or telephone. The Employee is prompted to select their employer and enter their Employee ID and PIN to complete the login process. The Service allows the Employee to select the tax year desired.
Employees can have their reprint faxed or mailed. If fax is selected, the statement is faxed to the Employee's designated fax number. If mail is selected, address information on file is displayed or voiced to the Employee for confirmation. Employees using the Web can view and print their statement online or download it over a secure session. The Employee can opt to e-mail the downloaded PDF statement at their own risk.

If the address on the statement is incorrect or the Employee wants the statement mailed to a different address, the new address information is collected either by the Employee entering the address information on the Web or leaving the information in a voice mailbox. Mail requests are typically sent out within two (2) business days.

The Service creates reprints using information downloaded from Client's year-end Data file, and possibly augmented with corrected information provided by Client. All reprint requests are logged in an audit file. The initial issue and first reissue of the current tax year are provided to the employee at no charge.

### Correction Service

The Correction Service is designed to allow Employees to request a U.S. statement correction (W-2c), collect and present such requests in an organized manner to Client, and issue corrected statements where appropriate. The Service consists of the following steps:

- Service collects from the Employee the detailed reasons they are requesting a W-2c;
- Service presents this information to Client;
- Client evaluates the merits of the Employee's request and either approves or does not approve the request;
- Service communicates back to the Employee the results of Client's approval decision;
- Service issues a W-2c statement where appropriate.

To collect the details of the Employee's request, the Employee either types in a text box on the Web the reason for the W-2c or, if the optional Call Center feature is available, they dictate this information to an EWS Client Service Representative. After hours and on weekends, the Service asks the Employee to call back the next business day. The Employee's e-mail address and daytime phone number will also be requested, in case Client needs to contact the Employee.

The request is then placed on a Web session designed to be secure under normal circumstances. Client will access the requests on a regular basis, review the request, and may hold, approve or deny the request. When approved by Client, the Service generates a W-2c and mails it to the Employee. If a request is approved or denied, Client can generate a letter of explanation online that will be mailed to the Employee by the Service. The Service allows Client to generate a W-2c online without a request from the Employee. Client can opt to communicate W-2c information directly to Employees.

### Annual Set up Fees

Each Tax Year brings about a new implementation of Tax Statement data. Implementation services include the statement of work, proofing, and testing.

### Download Service

Importing W-2 information into numerous tax preparation products and services, with the employee's authorization, is a standard part of the service. Client authorizes EWS to enable the Service's import function and allows their employer name(s), if supported, to be included in such tax products and services. Employees select their employer name from a list in the tax product to import their W-2 information.

### Employee Discounts for Third Party Tax Preparers

EWS will include special coupons from third party tax preparation software products and service providers on the printed and electronic copy of the W-2. These coupons can offer savings to employees who use tax preparation software or services to file their tax returns.

### Optional Live Call Center support

EWS client service representatives are available Monday through Friday between the hours of 7:00 a.m. and 8:00 p.m., Central time. If your employee forgets or loses their PIN, they can reset it online or contact the call center to have their PIN reset to the default.

### Integration of W-2 Management Services and Employment Verifications Services

If Client subscribes to Employment Verification services, then Client authorizes EWS to utilize the Data to provide tax statements to verifiers who have been properly authorized by Employees to verify income.

## OPTIONAL W-2 SERVICE PACKAGES

### Governmental Reporting Package

➢ **U.S. Federal Reporting (EFW2)**
This service is designed to prepare your EFW2 data. You are responsible for submitting the data to the SSA. After preparing your EFW2 data, a CD ROM containing your data in EFW2 format will be shipped to you. The CD ROM will be shipped to the recipient and address you select in your Configuration Checklist.

> **U.S. State Reporting**
> This service is designed to prepare your W-2 State Reporting. You select the state(s) for which you are requesting reporting in your Configuration Checklist. In your Configuration Checklist, you also determine the recipient and address to which we ship state reporting. All state reporting is formatted according to each state's specifications.
>
> You are required to obtain state approval for submitting W-2 information on reporting. W-2 does not transmit W-2 data to the states. You are responsible for submitting the data to individual states.
>
> W-2 does not support reporting services for states that require quarterly reporting.

> **W-2 Hard Copy Reporting**
> This service is designed to create state and local hard copy statements that may be filed with some state and local governments to meet reporting obligations. Each state and local statement is printed with four different individuals per sheet (4-up format). You are responsible to ensure the state and local reporting forms meet each state(s) or localities requirement.
>
> The service can also create an Employer Hard Copy statement. The statements are printed with four different individuals per sheet (4-up format).

## Enhanced Correction Package

> **U.S. Federal Reporting (EFW2C)**

> This service is designed to prepare your EFW2C data for federal reporting purposes. State data is not included in the EFW2C. You are responsible for submitting the data to the SSA. After preparing your EFW2C data, a CD ROM containing your data in EFW2 format will be shipped to you.

> **Batch W-2c Data Import**
> This service is designed to import multiple W-2cs created in the client's payroll system into the W-2 database. The batch W-2c data import allows a client to keep a complete record of an employee's tax documents on the W-2 Service thus eliminating the need to manually enter individual corrections online.
>
> The client may choose to have the W-2c printed and mailed to the employee with or without an explanatory letter. The client is responsible for providing the W-2c data in the EWS Batch W-2c File Format.

## Portal Integration Implementation and Ongoing Support Package

A Client with a Web and/or interactive voice response ("IVR") portal may use their existing user authentication process to remotely authenticate users to one or more EWS services. Client must enhance their portal(s) to support the standard Extensible Markup Language application programming interface to the EWS single sign-on server. There is a three-step process to complete the development and testing of the single sign-on interface. The first step is a stand-alone proof-of-concept used to demonstrate that Client's portal(s) can communicate with the EWS development server utilizing the basic technology. The second step is a full test implementation of the interface communicating with an EWS test server. This implementation allows Client and EWS to test the functionality of the complete interface with each portal. The third step is to promote the implementation to the production environments of both Client and EWS. EWS provides ongoing technical support for the interface to Client.

## Additional Tax Statements

> **1099 Services**
> The optional service for U.S. 1099 statements is designed to print and mail select 1099 statements for Client subscribing to one or more of the standard W-2 Management services. Client receives all original 1099 statements on a CD-ROM archive that can be used to fill reprint requests. 1099B, 1099C, 1099INT, 1099DIV, 1099MISC, and 1099-R are included with this service.

> **1042-S Services**
> The optional service for U.S. 1042-S Foreign Person's U.S. Source Income Subject to Withholding statements is designed to print and mail 1042-S statements for Client subscribing to one or more of the standard W-2 Management Services. Client receives all original 1042-S statements on a CD-ROM archive that can be used to fill reprint requests.

## ADDITIONAL OPTIONAL SERVICES

- ➢ **Annual Earnings Summary**
  The earnings statement is simply a screen dump of data that is provided by the employer. All of the amount types and amounts are displayed exactly as they are supplied by the employer, with no modification or manipulation. The earnings summary may also be printed on the W-2 exactly as it is supplied by the employer, with no modification or manipulation.

- ➢ **Archive CD-ROM for Reissue and Correction Only Client**
  An archival CD-ROM of all original W-2s for the current Tax Year.

- ➢ **Additional CD-ROM Archive**
  An archival CD-ROM of all original W-2s or 1099s is included in the Initial Service. However, if your organization requires multiple copies of the archived W-2s or 1099s on CD-ROM, you may order additional copies.

- ➢ **Roll-off CD-ROM Service**
  The optional service for U.S. W-2 and W-2c statements is designed to provide Client with a CD-ROM archive of the statements on the Service. This optional CD-ROM is a final archive of the W-2 information on the Service before it is removed (the fifth year for standard W-2 history, the eighth year for expanded W-2 history). The CD-ROM includes all W-2s and W-2cs on the Service for the "roll-off" year. (For example, for tax year 2009 the roll-off CD-ROM will contain tax year 2005 statements for a standard W-2 history client and tax year 2002 statements for an expanded W-2 history client .)

- ➢ **Extended Tax Year availability**
  Clients contracting for Extended Tax Year Availability can store up to seven years of W-2 history on the system, which will be available to employees for the same level of service the Client is contracted for under "Standard Services" (i.e. reissues, correction, call-center).

- ➢ **Historical Data Load for past tax years**
  Clients may elect to have historical W-2 data available to their employees through the Service. The process for loading historical data follows the same steps for current year file loads. The client receives all Audit/Error and Load reports for their review. In addition, clients may access the historical data within the Service for testing purposes.

- ➢ **Custom data conversion, correction or other services**
  Custom programming or services not specifically mentioned in Schedules A or B – W-2 will be evaluated on a case by case basis.


EWS reserves the right to modify the Service from time to time. If the modification shall be a substantial change from this Service Description Overview, EWS shall provide notice of the change to Client. A substantial change shall be a change which is inconsistent with this Service Description Overview. A change that does not alter functionality of the service, such as a change for upgraded security of data, is not a substantial change. Client may terminate the Service by notice given to EWS within thirty (30) days after notice of an amendment to the Service Description Overview, and termination shall be effective ninety (90) days after notice is provided unless Client provides for an earlier or later effective date of termination in the notice of termination. Absence of such termination shall constitute Client's agreement to the modified Service Description Overview.

**AMENDMENT TO THE ACA Management Platform AGREEMENT**

This Amendment is accepted and agreed to by the following authorized representatives of the parties and each person signing below represents and warrants that he or she has the necessary authority to bind the principal set forth below.

IN WITNESS WHEREOF, the parties have executed this Amendment effective as of the Effective Date written below.

| | | | |
|---|---|---|---|
| **CLIENT:** | **YRC Worldwide Inc.** | | **TALX Corporation, provider of Equifax Verification Services,** |
| **ADDRESS:** | **10990 Roe Avenue** | **ADDRESS:** | **11432 Lackland Road** |
| | **Overland Park, KS 66211** | | **St. Louis, MO 63146** |
| **Signed By:** | *[signature]* | **Signed By:** | *[signature]* |
| **Printed Name:** | TODD D. KNEALE | **Printed Name:** | ~~Michael Mohr~~ |
| **Title:** | DIRECTOR-TOTAL REWARDS | **Title:** | ~~Vice President~~ |
| **Date:** | 10-6-15 | **Date:** | 10/16/15 |

   This Amendment ("**Amendment**") is by and between **TALX Corporation, provider of Equifax Verification Services** (hereinafter, TALX shall be referred to as "EVS") and YRC Worldwide ("**Client**"), and is effective as of **October 1, 2015** ("**Effective Date**"). This Amendment is entered into with the express agreement that except as addressed herein, all terms, conditions and stipulations contained in the ACA Management Platform Agreement between EVS and Client, with an Effective Date of July 31, 2015, (the "**Agreement**") shall remain in full force and effect and without any change or modification whatsoever. For the purposes of this Amendment, all capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Agreement.

   **WHEREAS**, the parties desire to amend the Agreement, as set forth herein and hereby reaffirm and ratify each of the terms and conditions in the Agreement.

   **NOW, THEREFORE**, in consideration of the premises and mutual covenants set forth herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to amend the Agreement as follows:

**ACA Management Platform**

   Client desires to send 24 data files to the ACA Management Platform, in addition to the number of files defined in the initial Agreement and any previously executed amendments to the Agreement. Client will pay EWS for the effort associated with processing these data files for a total amount of $6,000.

**Effect of Amendment; Entire Agreement**. This Amendment together with the Agreement (and any attachments, addenda, and supplements thereto) shall be the complete and exclusive statement of the Agreement between the parties as to the subject matter of the Agreement, and shall be binding upon each of the parties hereto, their respective successors and to the extent permitted their assigns. In the event of a conflict between the terms and conditions hereof, and the terms and conditions of the Agreement, the specific terms and conditions set forth in the Amendment shall govern.

**Miscellaneous; Other Terms**.   Neither this Amendment nor the Agreement can be amended or otherwise modified, except as agreed to in writing by each of the parties hereto.

## AMENDMENT TO UNIVERSAL SERVICE AGREEMENT

This Amendment ("**Amendment**") is by and between **TALX Corporation, provider of Equifax Workforce Solutions** (hereinafter, TALX shall be referred to as "EWS") and <u>YRC Worldwide Inc.</u> ("**Client**"), and is effective as of **August 1, 2016** ("**Effective Date**"). This Amendment is entered into with the express agreement that except as addressed herein, all terms, conditions and stipulations contained in the Universal Service Agreement between EWS and Client, with an Effective Date of July 31st, 2015, (the "**Agreement**") shall remain in full force and effect and without any change or modification whatsoever. For the purposes of this Amendment, all capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Agreement.

**WHEREAS**, the parties desire to amend their Agreement, as set forth herein, to add ACA Subsidy Appeals Management Service, described more fully in Exhibit 1 to Schedule B—ACA Management Platform attached hereto, which is hereby made part of the Agreement, to the Services provided under the <u>**Schedule A - ACA Management Platform**</u>; and hereby reaffirm and ratify each of the terms and conditions in the Agreement.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants set forth herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to amend the Agreement as follows:

1. Exhibit 1 to Schedule B—ACA Management Platform attached hereto, is hereby attached to Schedule B—ACA Management Platform and made part of the Agreement.

2. The Fees for the ACA Subsidy Management Service described in Exhibit 1 to Schedule B—ACA Management Platform are as follows:

All fees stated below will increase annually from the prior year at a rate of      5%

**Number of Employees:**      More than 20,001
**Estimated Number of Subsidy Notice Cases to be processed in Year 1 of Agreement:**   1,000

| Annual Fee Description | Purchased | Unit Price | Annual Fee |
|---|---|---|---|
| ACA Subsidy Appeals Annual Service Fee | Yes | $7,500 | $7,500 |
| | | **Total Annual Fees** | **$7,500** |

| Per-Notification Fee Description | Fee |
|---|---|
| Subsidy Notice Case - *defined as an alleged employee on subsidy notice; in the event of multiple alleged employees listed on the same notice, each alleged employee will represent a unique subsidy notice case* | $10 per subsidy notice case received |
| Subsidy Appeal - *each case for which Client requests an appeal* | $10 per appeal requested |

3.  In addition to the Payment Terms in the Schedule A - ACA Management Platform, the following Payment Terms shall apply to the ACA Subsidy Appeals Management Service

- All One-Time Fees above will be invoiced upon execution of this Amendment.
- A prorated portion of the Annual Fees above will be invoiced upon execution of this Amendment, calculated at the rate of 1/12 of the Annual fee for each month remaining in the current contract year of the Schedule A - ACA Management Platform. Thereafter, the Annual Fees above will be invoiced upon on the anniversary of the Effective Date of the Schedule A - ACA Management Platform.
- All Per-Notification Fees above will be invoiced monthly.

**Effect of Amendment; Entire Agreement.** This Amendment together with the parties Agreement (and any attachments, addenda, and supplements thereto) shall be the complete and exclusive statement of the Agreement between the parties as to the subject matter of the Agreement, and shall be binding upon each of the parties hereto, their respective successors and to the extent permitted their assigns. All prior negotiations, discussions and understandings between the parties are fully merged into the Agreement and amendments thereto. In the event of a conflict between the terms and conditions hereof, and the terms and conditions of the Agreement, the specific terms and conditions set forth in the Amendment shall govern.

**Miscellaneous; Other Terms.** Neither this Amendment nor the Agreement can be amended or otherwise modified, except as agreed to in writing by each of the parties authorized representatives hereto.

This Amendment is accepted and agreed to by the following authorized representatives of the parties and each person signing below represents and warrants that he or she has the necessary authority to bind the principal set forth below.

IN WITNESS WHEREOF, the parties have executed this Amendment effective as of the Effective Date written above.

| CLIENT: | YRC Worldwide Inc. | | TALX Corporation, provider of Equifax Workforce Solutions | |
|---|---|---|---|---|
| ADDRESS: | 10990 Roe Avenue | ADDRESS: | 11432 Lackland Road | |
| | Overland Park, KS 66211 | | St. Louis, MO 63146 | |
| Signed By: | *[signature]* | Signed By: | *Mike Mohr* | |
| Printed Name: | TODD D. KNEALE | Printed Name: | MIKE MOHR | |
| Title: | DIRECTOR-TOTAL REWARDS | Title: | VP Sales Operations | |
| Date: | 9-23-16 | Date: | 10/3/2016 \| 15:31:24 PDT | |

## SCHEDULE B—ACA MANAGEMENT PLATFORM
### EXHIBIT 1

**ACA Subsidy Management Service**

<u>Description</u>

The Subsidy Management Service (the "Subsidy Management Service") is designed to assist Client with the communication and management of subsidy notices from state and federal health insurance exchanges.

<u>Subsidy Management Service Delivery Tasks</u>

EWS will perform the following tasks in the delivery of this Subsidy Management Service:

1. Provide Client with a checklist that captures information from Client necessary to respond to a subsidy notification. This information includes, but is not limited to, Client's legal company name, address, Federal Employer Identification Number, number of employees, authorized representatives, and key company contacts.

2. Configure Subsidy management systems and processes to recognize Client's subsidy notifications and initiate the appeal process upon receipt of notice from Client that Client desires to file an appeal.

3. Deliver a maximum of three training sessions on the subsidy management process. These sessions will be conducted in a train-the-trainer session via a web collaboration session.

4. Receive notices from Client, state health insurance exchanges, or the federal health insurance exchange concerning Client's employee(s) being granted a health insurance subsidy from a state or federal exchange.

5. Timely notify Client that a notice was received and the process for appealing the notice should Client desire to do so.

6. Deliver affordability analysis based on data contained in Client's Management Platform.

7. Complete the appeal from and submit it to the requesting party by the required response date, upon receipt of notice from Client that Client desires to file an appeal.

8. Should an appeal result in a hearing, Client may request that EWS provide a representative for Client at the hearing. In the event Client makes this request, EWS will provide Client with an estimated fee for such representation. If Client accepts EWS's estimate, EWS and Client will enter into a separate agreement for the hearing representation service. No charges will be incurred by Client for this service prior to an agreement being executed.

9. Notify Client of the final outcome of any appeal as handled by EWS.

10. On a quarterly basis, provide analysis of the outcome of any appeals as handled by EWS.

<u>Assumptions</u>

1. The Subsidy Management Service will be delivered using EWS's project management methodology. Client agrees to adhere to the timelines and milestones established during the kick-off call.

2. Client understands it is responsible for training its team on the subsidy management process, including the creation of any training materials.

3. Client acknowledges it must have an active Management Platform for EWS to provide the ACA Subsidy Management Service.

4. Unless Client has designated EWS as its authorized representative with the various exchanges, Client acknowledges that it will be required to collect subsidy notifications and forward them to EWS.

5. Client acknowledges EWS will only accept documentation via electronic mail, fax, or in hard-copy.

6. Client acknowledges that the ability of EWS to provide services which comply with state laws and procedures is dependent upon the receipt of accurate and timely information. Client agrees to provide notices to EWS no later than 60 days prior to the date an exchange requires a response from the Client.

7. Client acknowledges it may be required to provide EWS with additional documentation in order for EWS to respond sufficiently to the exchange within the required time period. Client agrees to timely provide such documentation and acknowledges that its failure to do so and/or its failure to provide accurate documentation may prevent EWS from responding in a timely or adequate manner.

8. Client acknowledges that analysis reports will be provided in EWS' standard reporting format. Providing these reports to Client in a different format or on a different frequency may require an additional Agreement and additional fees.

## SCHEDULE A – ACA TAX FORM SERVICE

### SERVICE PROVIDER, TERM AND FEES FOR SERVICES

**Client Name:** YRC Worldwide, Inc. ("Client")                    **Effective Date: September 1, 2016**

The ACA Tax Form Service and corresponding Activation Services (as described in Schedule B hereto) (the "Service") is an automated tax statement service that will enable authorized current and former employees (each an "Employee") of Client to have automated access to federal tax form 1095-C (the "Employee Tax Form") and for Client to transmit tax form 1094-C to the United States (US) Internal Revenue Service (IRS). The Service is provided by TALX Corporation (provider of Equifax Workforce Solutions), a Missouri corporation ("EWS"). Client authorizes EWS as its authorized agent to provide the Service. EWS shall provide the Service in accordance with the Universal Service Agreement ("Agreement") dated **July 31, 2015**, this Schedule A and Schedule B (which are part of the Agreement) utilizing the tax form information supplied by and/or on behalf of Client. All capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Agreement.

1) **Term:** These Schedules A and B shall be for an initial term of three (3) years from the Effective Date hereof (the "Initial Term") through December 31 of the last year of the Initial Term. Invoicing for tax years shall be as set forth under Payment Terms. This Schedule shall automatically renew on January 1st of the year immediately following the Initial Term and each January 1st thereafter, unless either party provides the other with written notice of termination at least ninety (90) days prior to the end of the current term.

2) **Termination:** Either party may terminate this Schedule if the other party has materially breached the Agreement, provided that the party claiming breach must give the other party at least thirty (30) days prior written notice in which to cure the breach before terminating this Schedule. Notwithstanding anything to the contrary, this Agreement may not be terminated for convenience.

3) **Payment Terms:** All prices and fees for the Service performed under these Schedules A and B are as stated in Exhibit 1 - Fees, attached hereto and made part of this Schedule A.

   - All One-Time Fees in Schedule A – Exhibit 1 – Fees will be invoiced upon execution of this Agreement.
   - All Annual Fees in Schedule A – Exhibit 1 – Fees will be invoiced annually on October 1.
   - All Per-Form Fees in Schedule A – Exhibit 1 – Fees will be invoiced annually in February. Fees are based on the number of Tax Form 1095-Cs processed by the Service for the current tax year. A minimum charge of $2,500 will apply.
   - If applicable, any postage and/or shipping charges will be invoiced annually in April.
   - Invoices are due net thirty (30) days.
   - Payments not received within forty-five (45) days of invoice will bear interest at a rate of 1.5% per month.
   - Except to the extent that Client has provided an exemption certificate, direct pay permit, or other such appropriate documentation, EWS shall add to each invoice any sales, use, excise, value-added, gross receipts, services, consumption, and other similar transaction taxes, however designated, that are properly levied by any taxing authority upon the provision of the Service, excluding, however, any state or local privilege or franchise taxes, taxes based upon EWS's net income, and any taxes or amounts in lieu thereof paid or payable by EWS as a result of the foregoing excluded items.
   - All fees are in U.S. dollars.

4) **Data:** Client acknowledges that Client is solely responsible for the quality of the Data provided by Client or by a third-party on behalf of Client. Client will validate the completeness and accuracy of all Data prior to submitting to EWS. EWS may use depersonalized Client Data to perform analytics, modeling and/or demographic studies. Depersonalized Client Data shall not include any information that individually, or collectively, could be used to specifically identify either Client or Client's Employees.

5) **Master File:** Client acknowledges that it shall maintain full responsibility for maintenance, storage, and production of the Employee Master File (as defined herein). Employee Master File shall mean the file which retains all Employee data required under state and federal recordkeeping and retention laws, which may include, but is not limited to, name, address, social security number, date of birth, work location, wage and hour data, tax and payroll information, human resources data, and benefits information.

6) **Activation:** Client acknowledges that it must undertake certain steps for the Service to be provided correctly and timely, including, without limitation, providing Data in a proper format, undergoing testing procedures, and assisting with the associated Activation Services. Client agrees to fully cooperate with EWS to activate the Service. EWS shall have no liability with regard to any errors that result from Client's failure to timely provide Data (or update Data) accurately and completely and in the format required by EWS.

Schedule A and Schedule B shall be binding on the parties upon the date last executed below.

Client – YRC Worldwide, Inc.                    TALX Corporation,
                                                provider of Equifax Workforce Solutions

By: _[signature]_                               By: _[signature]_

Name: TODD D. KNEALE                            Name: Michael Mohr

Title: DIRECTOR-TOTAL REWARDS                   Title: Vice President

Date: 8-16-16                                   Date: 8/22/16

## SCHEDULE A – ACA TAX FORM SERVICE

#### EXHIBIT 1 - FEES

**Fee Schedule**

All fees stated below (except Employee Reissue Fees) will increase annually from the prior year at a rate of      5%

| | |
|---|---|
| **Term of Contract (years)** | 3 |
| **Will Tax Form data be provided by ACAMP or direct from Client?** | ACAMP |
| **Does the Client have a W-2 contract with EWS valid for the life of this 1095 contract?** | Yes |
| **Is the Client requesting that a Tax Prep Coupon be excluded from their forms?** | Yes |
| **Is the Client requesting that their employees not be charged reissue fees?** | No |
| **Estimated Number of 1095-Cs to be processed in Year 1 of Agreement:** | 43,000 |

| Annual Fixed-Fee Description | Purchased | Unit Price | Annual Fee |
|---|---|---|---|
| Tax Platform Activation Service | Yes | $2,500 | $2,500 |
| Tax Form 1094-C Transmittal Service (includes 2 transmissions); Subsequent submissions will be invoiced at $1,500/each | Yes | $3,000 | $3,000 |
| **Total Annual Fixed-Fees** | | | **$5,500** |

| Per-Form Fee Description | Purchased | Per-Form Fee |
|---|---|---|
| Tax Form 1095-C Electronic Fulfillment Service<br>*Client will be charged for all 1095-Cs produced regardless of whether or not the Employee has consented to electronic delivery. If Client has not opted for the "Tax Form 1095-C Print Service", it will be Client's responsibility to provide a 1095-C to any employee that has not consented to electronic delivery.* | Yes | $0.89 |
| Tax Form 1095-C Print Service (Optional)<br>*Client will be charged for shipping and postage required to mail the 1095-C to the employee. The fee for this services is in addition to the fee for the Tax Form 1095-C Electronic Fulfillment Service.* | Yes | Actual cost for Postage and Shipping |

| Employee Reissue Fees<br>(Paid by Employees who have not consented to electronic delivery) | Per-Form Fee |
|---|---|
| First Reissue (Current Tax Year) | No cost |
| Additional Reissues | |
|    Current Tax Year | $12.00 |
|    Prior Tax Year | $18.00 |

## SCHEDULE B – ACA TAX FORM SERVICE

### SERVICE DESCRIPTION OVERVIEW

**Tax Form Platform Activation Service**

Description

The Tax Platform Activation Service ("Activation Service") is an annual service that allows EWS to configure the Tax Form Platform for the production and distribution of US Tax Form 1095-C (the "Tax Form") and transmittal of US Tax Form 1094-C to the IRS.

Service Delivery Tasks

EWS will perform the following tasks in the delivery of this service:

1. Provide Client with a Configuration Checklist that captures Client's requirements, Service options, mailing and shipping instructions, change management, and the selected test and production run schedules.
2. Configure Tax Platform per the Configuration Checklist.
3. Configure Tax Platform to import and process files containing test Tax Form data.
4. Provide Client with a maximum of two (2) Tax Form proofs / validation reports during the testing cycle.
5. Configure Tax Platform to import and process files containing production Tax Form data.
6. Provide Client with a maximum of one (1) Tax Form proofs / validation reports during the production cycle.
7. Provide Client with a maximum of one (1) print run with print vendor.

Assumptions

1. The Activation Service will be delivered using EWS's project management methodology. Client acknowledges the Activation Service is a fixed fee service and agrees to adhere to the timelines and milestones established during the kick-off call.
2. Client understands Client requirements captured in the Configuration Checklist are governed by the functionality available in the Tax Platform at the time of the Activation Service.
3. If Client is subscribed to the EWS ACA Management Platform (the "Management Platform"):
    a. Client will transmit tax form data from the Management Platform to the Tax Platform for both test and production runs.
    b. Client understands that Client must have an enforceable agreement for the Management Platform in order for Client to send data from the Management Platform to the Tax Platform.
4. If Client is not subscribed to the Management Platform:
    a. Client will provide data in the format defined by the Tax Platform file specification.
    b. Client will validate all data extracts prior to delivering to EWS.
    c. Client will be granted a maximum of three (3) attempts to provide data, cumulative between both test and production, to the Tax Platform. Additional attempts will result in EWS charging Client $1,500 for each additional file. EWS will notify Client prior to charging for these efforts.
5. Client understands the Configuration Checklist must be completed no later than October 15th of the calendar year for which tax year forms will be produced in order to permit EWS to implement the Fulfillment Service in a timely manner.
6. Client will provide their data in a maximum of 2 data files per test or production cycle per Employer Code. EWS will charge Client $1,500 for each additional file. EWS will notify Client prior to charging for these efforts.
7. Client understands if Client does not authorize EWS to process the file so that it complies with the United States Postal Service's regulations to reduce postage costs, Client will be subject to non-discounted postage rates.
8. Client understands that additional proofs / validation reports over what is specified in the Service Delivery Tasks will result in Client being charged $1,500 per additional proof / validation report. EWS will notify Client prior to charging for these efforts.
9. Client understands that once a production print run has been generated, if Client should request additional production print runs, EWS will charge Client $1,500 per additional production print run plus a surcharge of $0.08 per form in addition to the per form price for the Tax Form 1095-C Fulfillment Service.

**Tax Form 1094-C Transmittal Service**

Description

The 1094-C IRS Transmittal Service (the "Transmittal Service") is designed to transmit Client's data to the IRS per the instructions for Tax Form 1094-C.

Service Delivery Tasks

EWS will perform the following tasks in the delivery of this service:

1. Transmit Tax Form 1094-C to IRS upon instructions from Client.

Assumptions

1. Client understands that for EWS to transmit Tax Form 1094-C to the IRS, Client must have completed the Activation Service and have uploaded all required data to the Tax Platform.
2. EWS will charge Client $3,000 for each subsequent transmission to the IRS if additional transmissions are required.

## SCHEDULE B – ACA TAX FORM SERVICE

### SERVICE DESCRIPTION OVERVIEW

**Tax Form 1095-C Fulfillment Service**

Description

The Tax Form 1095-C Fulfillment Service (the "Fulfillment Service") is designed to allow Client to outsource the creation of Tax Form 1095-C (the "Tax Form") for Employees, for whom Client must provide a 1095-C. Once the 1095-Cs are created, the Fulfillment Service will allow Employees to download a copy of their Tax Forms via the Tax Form Management Platform (the "Tax Platform"). EWS will support up to four years of statements, in compliance with IRS data retention policies, assuming Client has provided data.

Service Delivery Tasks

EWS will perform the following tasks in the delivery of this service:

1. EWS will make completed Tax Forms available via a secure website to all Employees. EWS will notify Client when completed forms are available.
2. EWS will make completed Tax Forms for the current tax year available through December 31. After this date, Employees will be able to request a prior year's Tax Form by website or telephone.
   a. EWS will record all requests for an additional copy of the Tax Form (a "Reissue") in an audit log.
   b. Reissues will be provided via secure website, fax, or US Post Office (USPS) mail, as requested by Employee. Client must purchase the Tax Form 1095-C Print Service in order for Employees to receive Reissues by USPS mail.
   c. EWS will allow Employees who have consented to electronic delivery, to download, through the Tax Form Platform, an unlimited number of copies of their prior-year Tax Form 1095-C through December 31 of the current year.
   d. For Employees who have not consented to electronic delivery, the Employee shall be required to pay the Employee Reissue Fees stated in Exhibit 1 for each Reissue requested through the Tax Form Platform.
3. EWS will make Tax Forms available for download into tax preparation products.
4. EWS will provide Clients subscribed to the EWS print service with an archive CD-ROM of all Tax Forms for the current tax year.

Assumptions

1. Client understands unless the Tax Form 1095-C Print Service was purchased, Client will be responsible for printing Tax Forms for all Employees that did not consent to electronic delivery.
2. Client understands any corrected 1095-C will result in an additional per-form charge.
3. Client understands EWS does not support downloading of Tax Forms into all tax preparation products.
4. Client understands the name of their organization will appear in tax preparation products when users are prompted to download Tax Forms.
5. Client understands that, if available, EWS will include coupons from third-party tax preparation software products and service providers on the 1095-C. If EWS does not include coupons with 1095-Cs, EWS will charge Client and additional $0.25 per form.
6. Client understands that additional CD-ROMs will be provided for a fee of $500 per CD-ROM.

**Tax Form 1095-C Print Service (Optional Service)**

Description

The Tax Form 1095-C Print Service (the "Print Service") is designed to print and mail U.S. Tax Form 1095-C (the "Tax Form") for their active and former Employee that did not consent to electronic delivery of their Tax Form.

Service Delivery Tasks

EWS will perform the following tasks in the delivery of this service:

1. Print Tax Forms on paper that meets federal regulations and those of the United States Postal Service ("USPS")
2. Print Tax Forms in a format that meets the requirements of the Internal Revenue Service.
3. Print text on Tax Forms at laser printer quality or better
4. Mail printed Tax Forms directly to individuals at the location specified in the Client-provided Tax Form data files.

**Modification to the Service Description Overview**

EWS reserves the right to modify the Service from time to time, provided that any such modification applies in an identical manner to all other clients of the Service and the changes made will only enhance and not reduce the quality of the Service. If the modification shall be a substantial change from this Service Description Overview, EWS shall provide notice of the change to Client. A substantial change shall be a change which is inconsistent with this Service Description Overview. A change that does not alter functionality of the Service, such as a change for upgraded security of data, is not a substantial change. Client may terminate this Schedule A and B by notice given to EWS within thirty (30) days after notice of an amendment to the Service Description Overview, and termination shall be effective ninety (90) days after notice is provided unless Client provides for an earlier or later effective date of termination in the notice of termination. Absence of such termination shall constitute Client's agreement to the modified Service Description Overview.

## AMENDMENT TO THE UNIVERSAL SERVICE AGREEMENT

This Amendment is accepted and agreed to by the following authorized representatives of the parties and each person signing below represents and warrants that he or she has the necessary authority to bind the principal set forth below.

IN WITNESS WHEREOF, the parties have executed this Amendment effective as of the Effective Date written below.

| CLIENT: | YRC Worldwide Inc, | TALX Corporation, provider of Equifax Workforce Solutions | |
|---|---|---|---|
| ADDRESS: | 10990 Roe Avenue | ADDRESS: | 11432 Lackland Road |
| | Overland Park, KS 66211 | | St. Louis, MO 63146 |
| Signed By: | *[signature]* | Signed By: | *Javad Ra'ed* |
| Printed Name: | SEAN SAUNDERS | Printed Name: | Javad Ra'ed |
| Title: | SVP HR & SAFETY | Title: | VP Strategic Accounts |
| Date: | 10/4/17 | Date: | 1/9/2018 | 22:20:49 EST |

This Amendment ("**Amendment**") is by and between **TALX Corporation** (a provider of Equifax Workforce Solutions), a Missouri corporation ("EWS") and YRC Worldwide Inc., ("**Client**"), and is effective as of **09/12/2017** ("**Effective Date**"). This Amendment is entered into with the express agreement that except as addressed herein, all terms, conditions and stipulations contained in the Universal Service Agreement between EWS and Client, with an Effective Date of 07/31/2015, (the "**Agreement**") shall remain in full force and effect and without any change or modification whatsoever. For the purposes of this Amendment, all capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Agreement.

**WHEREAS**, the parties attached that certain Schedule A – eThority™ Analytics – ACA Management Service with an Effective Date of 07/31/2015 and its associated Schedule B: ACA Management Service (the "Schedules") to the Agreement; and

**WHEREAS**, Currently, Client's instance of The Affordable Care Act Management Platform ("**ACAMP**") is configured to receive 5 (five) set of eligibility files (employee, payroll, LOA) and four (4) sets of IRS files (benefit plans, FEIN addresses, employee benefit transactions, dependent benefit transactions, and non-employee demographics.

**WHEREAS**, Client has changed source systems for eligibility files provided on the designated SetID-04 for the Affordable Care Act Management Platform ("ACAMP") consumption.

Currently, Client supplies or has supplied the following files:
• Eligibility Reporting
    Four (4) employee
    four (4) payroll
    four (4) unpaid, protected leave of absence

• IRS Reporting
    one (1) benefits plans
    one (1) FEIN addresses
    four (4) employee benefit transactions
    three (3) dependent benefit transactions
    two (2) non-employee demographics

Client has requested EWS to add configuration for ACAMP to test the following data feeds
    one (1) Employee
    one (1) payroll
    one (1) unpaid, protected leave of absence

WHEREAS, the parties desire to amend the Agreement, as set forth herein and hereby reaffirm and ratify each of the terms and conditions in the Agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants set forth herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to amend the Agreement as follows:

In consideration for the sum of six Thousand and No/100 dollars ($6,000), EWS will provide the services as applicable and as described in the attached Schedule A and B, plus the additional work effort described here.

Details are as follows:

• Create a TEST instance of ACAMP to allow Client to confirm the new eligibility and IRS files will import without any issues and to validate the Data.  The following parameters will apply to the TEST instance:

1. The TEST instance will have its own separately identifiable URL.

2. The TEST instance will be a single, point in time copy of the PRODUCTION instance.  Ongoing copies with the PRODUCTION instance will not be made and there will be no effort made to maintain consistency between the TEST and PRODUCTION instances.

3. The TEST instance will be accessible by the same users that can access the PRODUCTION instance unless Client personnel choose to inactive users within the TEST instance.

4. The TEST instance will be used for directly supplied file import testing and Data validation only.

5. The TEST instance will not be used to compare final results between the two systems as the two systems will not be in sync with each other and it will not be feasible for the results always to be the same between both.

• EWS will assign a dedicated Onboarding Manager and Business Analyst to this project.

• EWS will hold an introductory conference call to discuss the project plan and timeline, and the differences between Client's current configuration and what will need to change in the Client's data files.

• EWS will hold regular status calls with Client throughout the life of the project, the frequency to be determined by the EWS and Client project managers.

• EWS will deliver an updated configuration acceptance document, reflecting the new data consumption plan, for signature.

• Client will develop the six (3) new Data files according to the Data Specification Version 1.7 and submit those files via the standard established SFTP with PGP encryption process.

• EWS will configure a new data consumption process for the new data feeds as necessary.

• Once files are received, if needed, EWS will provide feedback to Client should there be issues to remediate. Client will address issues within the files and resubmit until all issues are resolved. If the files are consumed yet are causing validation failures, EWS will review these with Client through ACAMP to remediate via redelivery of the file(s) causing the failure.

• When data files are properly consumed and pass validation tests, EWS will notify Client that Data is ready to be viewed and validated.

• A validation log will be provided to Client with the minimum validation tests to be performed, and when that log is completed by and signed by Client, EWS will consider the project closed and Client will continue to be supported by the Equifax Client Support team.  It is expected that Client will validate Data scenarios specific to their business processes that are beyond the list of validation checks supplied by EWS.

- Additional Assumptions:

    1. The duration of this project is established to be six (6) weeks starting at the initial kick-off call. A formal timeline will be designed and drafted by EWS after the initial kick-off call to reflect the agreed upon milestone and active engagement periods. Should the overall duration, engagement period length, or scope of work change, an amendment to this contract will be created to reflect the additional work requested.

    2. The Key Fields as defined in the Configuration Acceptance for employee and payroll will not change.

    3. The standard Key Fields defined for IRS Reporting in the data specification will not change unless due to an upgrade to a new data specification as defined and distributed by Equifax.

    4. Client has custom configuration in the ACAMP with regard to future years of data submissions and employee primary assignment determinations. Because of the complications arising from this configuration and the addition of file feeds, further conversations will be conducted between Client and EWS to determine the course of action to be taken with values presented in the DataSource field of the employee file and the file naming conventions that should be used for the new file feeds.

    5. EWS' active involvement during the Data load process is available for a maximum of four (4) times per feed. Should Client require assistance for additional loads of Data, this effort may be subject to a $1,500 flat rate fee per file. Client will be notified prior to EWS charging Client for these efforts.

    6. Client is responsible for ensuring that complete and accurate data is provided from the current source system.

    7. Client will be responsible for validating the new data files prior to sending to Equifax and will    be solely responsible for performing any validation within the Equifax platform once the data is imported..

**Effect of Amendment; Entire Agreement**. This Amendment together with the Agreement (and any attachments, addenda, and supplements thereto) shall be the complete and exclusive statement of the Agreement between the parties as to the subject matter of the Agreement, and shall be binding upon each of the parties hereto, their respective successors and to the extent permitted their assigns. In the event of a conflict between the terms and conditions hereof, and the terms and conditions of the Agreement, the specific terms and conditions set forth in the Amendment shall govern.

**Miscellaneous; Other Terms**.   Neither this Amendment nor the Agreement can be amended or otherwise modified, except as agreed to in writing by each of the parties hereto.

## AMENDMENT TO THE UNIVERSAL SERVICE AGREEMENT

This Amendment ("**Amendment**") is by and between **TALX Corporation** (a provider of Equifax Workforce Solutions), a Missouri corporation ("EWS") and YRC Worldwide Inc. ("**Client**"), and is effective as of May 1, 2019 ("**Effective Date**").  This Amendment is entered into with the express agreement that except as addressed herein, all terms, conditions and stipulations contained in the Universal Service Agreement between EWS and Client, with an Effective Date of 7/31/2015, as previously amended, (the "**Agreement**") shall remain in full force and effect and without any change or modification whatsoever.  For the purposes of this Amendment, all capitalized terms used herein and not otherwise defined shall have the meaning set forth in the Agreement.

**WHEREAS**, the parties desire to amend the Agreement, as set forth herein and hereby reaffirm and ratify each of the terms and conditions in the Agreement.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants set forth herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to amend the Agreement as follows:

**Amendment to Schedule A - ACA Management Platform and its associated Schedule B with an Effective Date of July 31, 2015**

1.  Schedule A, section 2) term. The Term of the Schedules is extended for an additional three (3) years, through 07/30/2022 and shall automatically renew for successive one year term unless either party provides the other with written notice of termination at least ninety (90) days prior to the end of the then current term.

2.  Schedule A, Exhibit 1 – Fees. The Annual Fees table is replaced with the following:

| Description | Qty | Unit Price | 2019-2020 Total | 2020-2021 Total | 2021-2022 Total |
|---|---|---|---|---|---|
| **Annual Fees** | | | | | |
| ACA Management Platform<br>*Includes 99 Data View licenses and 4 Data Explorer licenses.  Fee is calculated on a per employee, per year (PEPY) basis.  Value in the Qty field reflects the number of people the client employs. The minimum annual fee for the Management Platform is $10,000.* | 38,000 | $2.865 | $108,870 | $114,314 | $120,030 |
| ACA Subsidy Appeals Management Annual Service Fee | 1 | $7,442 | $7,442 | $7,814 | $8,205 |
| Additional Data Explorer Licenses | - | N/A | $0 | $0 | $0 |
| Additional Data Viewer Licenses | - | N/A | $0 | $0 | $0 |
| Additional Annual Support Incidents<br>*Unused incidents expire at the end of the year.* | - | N/A | $0 | $0 | $0 |
| | | Sub-Total Annual Fees | $116,312 | $122,128 | $128,235 |
| **One-Times Fees for Activation Services** | | | | | |
| Management Platform Activation Service | Already Live | N/A | $0 | $0 | $0 |
| IRS Reporting Activation Service | Already Live | N/A | $0 | $0 | $0 |
| Additional Data File Service (Optional Service)<br>*Value in the Qty field reflects the number of additional files Client will be providing above what is defined in the Management Platform Activation Service.* | Already Live | N/A | $0 | $0 | $0 |
| Dynamic Controlled Group & Employee Category Activation Service (Optional Service) | - | N/A | $0 | $0 | $0 |
| Organizational Security Activation Service (Optional Service) | - | N/A | $0 | $0 | $0 |
| | | Sub-Total One-Time Fees | $0 | $0 | $0 |
| | | Grand Total | $116,312 | $122,128 | $128,235 |

All fees stated above will increase annually from the prior year at a rate of 5%.

| Transactional Fees for Subsidy Appeals Management Service | Fee |
|---|---|
| Each Subsidy Notice Received | $10 |
| Each Subsidy Appeal Requested | $10 |
| Each Subsidy Appeal Hearing Representation Requested | $300 |

**Amendment to Schedule A – ACA Tax Form Service and its associates Schedule B with an Effective Date of September 1, 2016**

3.  Schedule A, section 1) Term. The Term of the Schedules is extended for an additional three (3) years, through 12/31/2022 to include tax years (2019, 2020, and 2021) and shall automatically renew unless either party provides the other with written notice of termination at least ninety (90) days prior to the end of the current term.

4.  Schedule A, Exhibit 1 – Fees, Fee Schedule. The Fee Schedule is replaced with the following:

**Fee Schedule**

All fees stated below (except Employee Reissue Fees) will increase annually from the prior year at a rate of  3%

| | |
|---|---|
| Term of Contract (Years) | 3 |
| Will Tax Form data be provided by ACAMP or direct from Client? | ACAMP |
| Does Client have a W-2 contract with EWS valid for the life of this 1095 contract? | No |
| Does Client desire to utilize a third-party tax preparation coupon, if available, to qualify for a discount? | Yes |
| Does Client want to pay for their employees' reissue fees rather rather than having them charged to the | No |
| Estimated Number of 1095-Cs to be processed in Year 1 of Agreement: | 33,710 |

| Annual Fixed-Fee Description | Purchased | Unit Price | Annual Fee |
|---|---|---|---|
| Tax Platform Activation Service | Yes | $2,481 | $2,481 |
| Tax Form 1094-C Transmittal Service (includes 2 transmissions); Subsequent submissions will be invoiced at $1,500/each | Yes | $2,977 | $2,977 |
| | | Total Annual Fixed-Fees | $5,458 |

| Per-Form Fee Description | Purchased | Per-Form Fee |
|---|---|---|
| Tax Form 1095-C Electronic Fulfillment Service *Client will be charged for all 1095-Cs produced regardless of whether or not the Employee has consented to electronic delivery. If Client has not opted for the "Tax Form 1095-C Print Service", it will be Client's responsibility to provide a 1095-C to any employee that has not consented to electronic delivery.* | Yes | $0.883 |
| Tax Form 1095-C Print Service (Optional) *Client will be charged for shipping and postage required to mail the 1095-C to the employee. The fee for this services is in addition to the fee for the Tax Form 1095-C Electronic Fulfillment Service.* | Yes | Actual cost for Postage and Shipping |

| Employee Reissue Fees | Per-Form Fee |
|---|---|
| First Reissue (Current Tax Year) | No cost |
| Additional Reissues | |
| Current Tax Year (Paid by Employees who have not consented to electronic delivery) | $12.00 |
| Prior Tax Year | $18.00 |

**Effect of Amendment; Entire Agreement**. This Amendment together with the Agreement (and any attachments, addenda, and supplements thereto) shall be the complete and exclusive statement of the Agreement between the parties as to the subject matter of the Agreement, and shall be binding upon each of the parties hereto, their

respective successors and to the extent permitted their assigns.  In the event of a conflict between the terms and conditions hereof, and the terms and conditions of the Agreement, the specific terms and conditions set forth in the Amendment shall govern.

**Client Purchase Orders**  If the use of a Purchase Order ("PO") or similar ordering document is required by Client, the following information must be provided as part of the Agreement. Failure to include this information reflects Client's agreement that a PO shall not be required by Client. Client shall provide notice of any PO changes no less than ninety (90) days prior to the expiration of the current PO. No additional terms and conditions shall be included in the PO unless expressly agreed to in writing by the Parties. If there is a conflict between language in the PO and the Agreement, the Agreement shall control.
PO Number:
PO effective dates (does not impact the Effective Date(s) or Term(s) specified in the Agreement): from
        to
Dollar limit, if applicable, of initial PO (does not limit or otherwise impact any minimum ordering obligations or purchase commitments specified in the Agreement): $

**Miscellaneous; Other Terms**.   Neither this Amendment nor the Agreement can be amended or otherwise modified, except as agreed to in writing by each of the parties hereto.


        This Amendment is accepted and agreed to by the following authorized representatives of the parties and each person signing below represents and warrants that he or she has the necessary authority to bind the principal set forth below.

        IN WITNESS WHEREOF, the parties have executed this Amendment effective as of the Effective Date written below.


**YRC Worldwide Inc.**

By: _SEAN SAUNDERS_

Name: _Sean Saunders_

Title: _SVP HR + SAFETY_

Date: _May 9, 2019_

**TALX Corporation,
provider of Equifax Workforce Solutions**

By: _Javad Ra'ed_

Name: Javad Ra'ed

Title: VP of Strategic Accounts

Date: 5/14/2019 | 17:17:23 EDT