## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| YELLOW CORPORATION, et al., | ) | |
| | ) | Case No. 23-11069 (CTG) |
| Debtors. | ) | |
| | ) | **Related Docket No. 1322** |

## CENTRAL STATES FUNDS' RESPONSE TO
## DEBTORS' OBJECTIONS TO THE FUNDS' PROOFS OF CLAIMS

Central States, Southeast and Southwest Areas Pension Fund ("Central States Pension Fund") and Central States, Southeast and Southwest Areas Health and Welfare Fund ("Central States Health Fund," collectively "Central States Funds") by and through their undersigned counsel, ask this Court to abstain from resolving Debtors' objections to Central States Pension Fund's proofs of claim for withdrawal liability, Claims Numbers 4312 through 4335, and grant Central States Pension Fund's motion to compel arbitration (Dkt. 1655).[1] Alternatively, Central States Pension Fund requests that this Court allow the Fund's withdrawal liability claims in their entirety. Furthermore, Central States Funds ask this Court to deny Debtors' objections to the Funds' remaining proofs of claim, which include Central States Pension Fund's claim for breach of contract, and Central States Funds' claims for unpaid pension and health and welfare contributions. In support of their response to Debtors' claims objections (Dkt. 1322), Central States Funds set forth the following.

---

[1] Although Debtors claim they are objecting only to Central States Pension Fund's claims, Debtors in their Claim Objections also assert arguments with respect to claims filed by Central States Health Fund. Accordingly, Central States Health Fund joins in with Central States Pension Fund in responding to certain of Debtors' objections.

## INTRODUCTION

1.      Debtors had one goal in mind in objecting to Central States Pension Fund's claims, particularly the Fund's withdrawal liability claims: eliminate the claims by invalidating Pension Benefit Guaranty Corporation ("PBGC") regulations enacted pursuant to Congress' express authority granted to the PBGC in 29 U.S.C. § 1432(m)(1) (which would also assist Debtors in erasing the withdrawal liability claims of other multiemployer pension plans in these cases), thereby aiding MFN Partners, LP ("MFN") and its investors in cashing in on the lottery tickets (*i.e.*, stock) MFN purchased just before these bankruptcy cases were filed. Debtors' goal is the antithesis of what Congress had in mind when enacting and amending the Multiemployer Pension Plan Amendments Act over the last forty years (*i.e.*, to secure workers' pensions), and serve no legitimate purpose. That is, by objecting to Central States Pension Fund's claims, Debtors are not promoting the reorganization of the companies, the creation or the maintenance of jobs, or the payment of hard-earned pension benefits to Debtors' former employees, but instead only serve to ensure that hedge fund MFN and its investors receive massive payouts. This Court should not indulge Debtors' or MFN's efforts.

2.      In any event, and as Central States Pension Fund established in its separately filed motion to compel arbitration, or alternatively, for relief from the automatic stay to initiate arbitration (Dkt. 1655), arbitration is the appropriate forum for resolving Debtors' disputes concerning the withdrawal liability claims. Nevertheless, if this Court were to consider Debtors' objections to Central States Pension Fund's withdrawal liability claims, this Court should overrule them and allow the Fund's withdrawal liability claims in the amount asserted.

3.      Debtors' primary argument with respect to the withdrawal liability claims is that certain special financial assistance ("SFA") that Central States Pension Fund received pursuant to

the American Rescue Plan Act ("ARPA") should have been taken into account in calculating Debtors' withdrawal liability, and regulations issued by the PBGC pursuant to the express authority granted to it by Congress under ARPA should be disregarded. Debtors' argument ignores not only Congressional intent, but also the precise language of the statute, in which Congress specifically instructed the PBGC to enact regulations related to SFA to be received by multiemployer pension plans under ARPA, including specifically, regulations related to withdrawal liability. Debtors' argument also contravenes the regulations enacted by the PBGC pursuant to that Congressional grant of authority, which regulations specify how SFA is to be phased in for purposes of calculating withdrawal liability.

4.      Moreover, Debtors' catch-all estoppel argument is both legally and factually flawed, and Debtors' other challenges to the withdrawal liability claims similarly cannot be sustained.

5.      Debtors' attempt to invalidate an agreement they reached with Central States Pension Fund in 2014 fares no better. Debtors claim the agreement is merely another attempt by Central States Pension Fund to collect withdrawal liability. Yet, unlike Central States' claim for withdrawal liability, a statutory claim which was calculated in accordance with the precise formula set forth in the statute, this claim is simply one for a breach of contract, and the calculation of the damages owed pursuant to the contract is entirely different and is calculated specifically as set forth in the agreement reached by the parties. Further, and contrary to Debtors' assertion, the agreement does not include an improper penalty provision.

6.      Finally, this Court should reject Debtors' objections to Central States Pension Fund and Central States Health Fund's respective pension and health and welfare contributions claims.

The claims are properly supported and to a large extent reflect Debtors' own calculations of what they owe Central States Funds.

## FACTUAL BACKGROUND

7.      Central States Funds are multiemployer pension and health and welfare plans covered by the Employee Retirement Income Security Act of 1974 ("ERISA"). Central States Funds are primarily funded by contributions remitted by multiple participating employers pursuant to negotiated collective bargaining agreements with local unions affiliated with the International Brotherhood of Teamsters ("IBT") on behalf of employees of those same employers. All principal and income from such contributions and investments thereof is held and used for the exclusive purpose of providing pension and health and welfare benefits to participants and beneficiaries of Central States Pension Fund and Central States Health Fund, respectively, and paying the Funds' administrative expenses.

8.      There are presently approximately 950 employers that participate in Central States Pension Fund, representing more than 32,000 active participants. Moreover, there are approximately 350,000 participants and beneficiaries of Central States Pension Fund entitled to pension benefits, and that includes the more than 190,000 participants and beneficiaries currently receiving pension payments. There are approximately 900 employers that participate in Central States Health Fund, representing more than 210,000 active participants.

9.      Pre-petition, Central States Pension Fund provided pension and health and welfare credit to thousands of union employees of Debtors YRC Inc. ("YRC") and USF Holland LLC ("USFH"), both being wholly owned subsidiaries of Yellow Corporation ("Yellow"). Under collective bargaining agreements and participation agreements applicable to Debtors YRC and

USFH, YRC and USFH's obligations to Central States Funds and its union members included regular payments of pension and health and welfare contributions to Central States Funds.

10.    Debtors cast considerable blame on others for their current predicament and engage in a fictional accounting to explain how they ended up in bankruptcy. For instance, in support of their claims objections, Debtors argue that Central States Pension Fund was poorly managed and had difficulty managing its assets. (Dkt. 1322, ¶ 2.) But Debtors' support for this statement is merely a magazine opinion editorial, and the opinions expressed in the editorial cannot at all be squared with conclusions reached by the Government Accountability Office ("GAO") and a federal district court judge in the Northern District of Illinois, which conclusions squarely rebut Debtors' bald claims that Central States Pension Fund has been mismanaged.

11.    More specifically, in response to Central States Funds' Independent Special Counsel's ("ISC") recommendation that Consent Decrees under which Central States Funds had been operating since the 1980s be dissolved, the Department of Labor ("DOL") opposed the ISC's recommendation. *Su v. Estate of Frank E. Fitzsimmons*, No. 78 C 00342, No. 78 C 04075, No. 82 C 07951, 2023 WL 3916304, at *1 (N.D. Ill. June 9, 2023). In ordering that the Consent Decrees be dissolved over the DOL's objection, the court explained why it was agreeing with the ISC's recommendation:

> "[Central States Pension [and Health and Welfare] Funds have also complied perfectly with the Consent Decrees since they were entered. As the Department [of Labor], the ISC, and GAO have all acknowledged, there has been no indication or hint of wrongdoing or ERISA violations since the entry of the Consent Decrees. Such a record is almost incredible, given that it has been 41 years since the first Consent Decree was entered in *Fitzsimmons*."

*Id.* at *4 (N.D. Ill. June 9, 2023). The court also cited to GAO investigative reports from 2018 which found that, as of 2016:

• The Pension Fund's investment returns (4.9%) were in line with those of comparable pension plans (4.8%);

• The Pension Fund's average investment expense fee ratio was 9% lower than comparable pension plans;

• The Pension Fund's administrative expenses were 16% lower than comparable pension plans . . . .

*Id.* at *1.

12.     In the referenced GAO report (which covered the period of 1982 through 2016), the GAO identified several conditions outside of Central States Pension Fund's control that led to the Fund's severe financial problems. (*See* U.S. Gov't Accountability Office, GAO-18-105, *Central States Pension Fund: Department of Labor Activities under the Consent Decree and Federal Law* (June 2018), https://www.gao.gov/assets/gao-18-105.pdf.) For instance, the GAO noted significant declines in union membership and deregulation of the trucking industry and the resulting bankruptcies of numerous unionized trucking companies, and the withdrawals of numerous employers. (*Id.* at 23-26.) This meant that Central States Pension Fund had far fewer participants on whose behalf it was receiving pension contribution payments, and more participants and beneficiaries receiving pension payments. (*Id.* at 24-27.) Under these circumstances, multiemployer pension plans have limited opportunities to recoup investment losses.  (*Id.* at 28-30.) And Central States Pension Fund was adversely affected by the market downturns of 2001 and 2008. (*Id.* at 32.) The GAO also cited as a significant factor the combination of the UPS withdrawal from Central States Pension Fund, UPS' payment of withdrawal liability, and the Fund's investment of that payment immediately before the 2008 severe market downturn. (*Id.* at 34.) The GAO also noted that there had been discussions between Central States Pension Fund and the DOL as far back as 2002 concerning whether to dissolve the consent decree, and that in 2011 Central States Pension Fund's ISC wrote that "the plan was well-run and the role of the independent special counsel was no longer necessary." (U.S. Gov't Accountability Office, GAO-

18-105, *Central States Pension Fund: Department of Labor Activities under the Consent Decree and Federal Law*, at 37–38 (June 2018), https://www.gao.gov/assets/gao-18-105.pdf.)

13.    Debtors' strained accounting continues with their recitation of how they were "forced" to file for bankruptcy protection. Debtors note that in the early 2000s, Yellow acquired a number of other trucking companies. (Aug. 7, 2023 Declaration of Brian A. Doheny, Dkt. 14, ¶¶ 32-36.) And while Yellow admits that in 2006 it "faced a series of financial and operational headwinds," it notes that it ultimately reached "a consensual agreement with its stakeholders to place the company on stronger financial footing." (*Id.* at ¶¶ 35-36.) Debtors then fast forward to shortly before the bankruptcy was filed, pretending that the ship had been sailing smoothly for years until the company was purportedly upended by the IBT. (*See, e.g.*, *id.* at ¶ 2.)

14.    Obviously missing from Debtors' accounting is how in 2009, Yellow was suffering financially when on June 17, 2009, certain of the Debtors entered into a Contribution Deferral Agreement (the "Original CDA") with Central States Pension Fund and the other multiemployer pension funds to which they contributed, whereby the pension funds agreed to defer more than $100 million in contribution payments that Debtors had failed to make in 2009 to such pension funds. (*See* Second Amended and Restated Contribution Deferral Agreement (Jan. 31, 2014), https://www.sec.gov/Archives/edgar/data/716006/000119312514031213/d667949dex101.htm, (the "2014 CDA"),[2] at 1 (recitals), and at 10, § 2.01 (describing "Deferred Pension Payments")).

15.    Also missing from Debtors' accounting is any acknowledgement that their dire financial problems resulted in YRC and USFH temporarily ceasing participation in Central States Pension Fund from 2009 into 2011, meaning that their IBT-represented employees who had participated in Central States Pension Fund were not accruing any pension credit during this

---

[2]  A copy of the 2014 CDA is attachment 6 to Claim No. 4337.

period. Debtors' IBT-represented employees were also forced to accept 15% wage cuts to help keep the company afloat. (YRC Worldwide Inc., Quarterly Report for the period ending September 30, 2009 (Form 10-Q), at 11 (Nov. 9, 2009), https://investors.myyellow.com/static-files/d1b9e0bb-5754-418b-b576-24f5d9618422.) And while YRC and USFH ultimately resumed participation in Central States Pension Fund, they did so at only a small fraction of the contribution rate that they had previously paid, meaning that their IBT-represented employees who participated in Central States Pension Fund were not only suffering from reduced wages, but they were also receiving a significantly reduced pension benefit accrual. (*See* YRC Worldwide Inc., 2011 Annual Report (Form 10-K), at 14 (Feb. 28, 2012), https://investors.myyellow.com/static-files/9f661029-8450-4964-8064-bf6154140bb1.)

16.     At the same time, Yellow's continuing financial troubles resulted in Debtors seeking to extend their contribution deferral. (2014 CDA, recitals.)[3] Upon receiving the request for the continued deferral in 2014, and having already deferred payment of the 2009 contributions obligations for nearly five years (and having separately agreed to accept contributions from YRC and USFH at a rate significantly lower than that required for other employers pursuant to the National Master Freight Agreement), Central States Pension Fund informed Debtors in 2014 that

---

[3]  Debtors' blasé statement that "Indeed, the Proofs of Claim and attached exhibits clearly acknowledge that the Debtors had paid all outstanding contributions to CSPF in full on January 3, 2023 and were not delinquent at all" is thus severely misleading. (Dkt. 1322, ¶ 49.) In support of their statement, Debtors cite to Central States Pension Fund's proof of claims for the proposition that "there was a 'January 3, 2023 payoff of the [contribution] balance." (*Id.* (insertion in original)). But Debtors' bracketed insertion of the word "[contribution]" completely changes the meaning of the original sentence in Central States Pension Fund's proof of claim, which actually stated that there was a January 3, 2023 payoff of the "CDA," or the balance owed under the Original CDA and its successors, as amended. (Claim No. 4336 at p. 4.) The amounts due under the contribution deferral agreements are specifically those delinquent contributions beginning in 2009 in connection with the Original CDA, not all contributions arising thereafter, as the agreements themselves make clear. (*See* 2014 CDA, at p. 1 (recitals) ("WHEREAS, pursuant to that certain [Original CDA] . . . each of the Funds agreed to defer one or more payments otherwise due to the Funds from the [Debtors] . . .  for services rendered by certain employees . . . during certain periods in 2009.")).

Debtors would therefore need to agree to one of two potential alternatives in order to induce Central States Pension Fund to agree to the 2014 CDA:

> The execution of a side letter whereby the company guaranties the continued participation in the Central States Pension Fund ("CSPF") for a period of 10 years after the date upon which the CDA balance is repaid in full and there is no other outstanding indebtedness to the CSPF. In the alternative, [Yellow Corporation] agrees that for purposes of computing withdrawal liability, the contribution rate used for purposes of computing the payment schedule will be deemed to be the published contribution rate under the National Master Freight Agreement [rather than Debtors' discounted rate] for each year until the CDA is paid in full.

(Letter Agreement Re: Guarantee of Continued Participation (the "2014 Letter Agreement"), attached hereto as Exhibit A, at p. 1.) Debtors YRC and USFH (the "Primary Obligors") preferred and chose the former option. (*Id.*) Accordingly, the parties entered into the 2014 Letter Agreement, which provided that:

> The undersigned Primary Obligors, and each of them (jointly and severally), hereby agree and guarantee that they will continue to participate in and pay contributions to the [Central States] Pension Fund pursuant to collective bargaining agreements for a period of not less than 10 (ten) full years after all balances (including all principal, interest and any applicable expenses or fees) owed to the Pension Fund under the [2014] CDA . . . are completely and fully paid and satisfied by all such Primary Obligors.

(2014 Letter Agreement, Ex. A, ¶ 1(a)). The 2014 Letter Agreement then provided that, if the Primary Obligors breached their guarantee to continue participating in Central States Pension Fund for 10 years after repayment of the 2014 CDA, they and certain Guarantors[4] would be required to pay damages in an amount that corresponds to the amount that would have been paid had the Primary Obligors continued to participate as promised. (2014 Letter Agreement, Ex. A, ¶ 2). Specifically, the 2014 Letter Agreement states, in relevant part:

---

[4] The "Guarantors" are the following Debtors: Yellow Corporation; Express Lane Services, Inc.; New Penn Motor Express LLC; Roadway Express International, Inc.; Roadway LLC; Roadway Next Day Corporation; USF Bestway Inc.; USF Dugan Inc.; USF RedStar LLC; USF Reddaway Inc.; YRC Association Solutions, Inc.; YRC Enterprise Services, Inc.; YRC Logistics Services, Inc.; YRC Mortgages, LLC; and YRC Regional Transportation, Inc.

(2) To the extent that the Primary Obligors, or any of them, are in breach of the Participation Guarantee, or other obligations and undertakings set forth in Paragraph 1. above, the Primary Guarantors, and each of them (jointly and severally), shall be required to pay damages in the following amounts to the Pension Fund, and subject to the following procedures:

> a) In the event of a breach involving a complete failure by one or more of the Primary Obligors to have a contribution obligation to the Pension Fund during the Guarantee Period (or any portion thereof), the Primary Obligors, and each of them, will be required (as an obligation for which they are jointly and severally liable) to pay to the Pension Fund, in addition to any other contribution amounts and obligations owed to the Pension Fund, an amount for each month during the continuation of such breach (payable on or before the 15th day of the following month) that is equivalent to the greater of (i) the amount of contributions that would be owed to the Pension Fund based upon current levels and periods of work and compensation during each month of continuation of the breach, calculated as if the last collective bargaining agreement (including the last agreed contribution rate) requiring contributions to the Pension Fund by the breaching Primary Obligor(s) were still in effect, or (ii) the amount of contributions that would be owed to the Pension Fund based upon the highest monthly levels and periods of work and compensation for which pension contributions were owed measured by CBUs that the breaching Primary Obligor(s) experienced during the period of July 2009 through and including December 2019, but calculated as if the last collective bargaining agreement requiring contributions on the part of the breaching Primary Obligor(s) to the Pension Fund (including the last contribution rate) were still in effect.

> [. . .]

> e) The remedies, damages and procedures set forth in Subparagraphs 2.a), 2.b), 2.c) and 2.d) above are non-exclusive in nature and do not preclude any other remedies at law or in equity that may be available to the Pension Fund in the event of a breach of this letter-agreement.

(2014 Letter Agreement, Ex. A, ¶ 2). The 2014 Letter Agreement also provides that it is governed by Illinois law. (*Id.*, ¶ 2(f).) Furthermore, each of the Guarantors agreed to "fully guarantee . . . the Participation Guarantee and other obligations under this letter-agreement of the Primary Obligors." (*Id.* ¶ 3(a)). Following the Debtors' entry into certain amendments to the 2014 CDA, the amounts due to Central States Pension Fund under the 2014 CDA (but not necessarily those contributions

owed for periods after 2009) were fully paid by the Primary Obligors on or around January 3, 2023.

17.    Despite having finally paid the amounts due to Central States Pension Fund under the 2014 CDA in early 2023, Debtors then failed to pay their pension contributions due to the Fund for June 2023 (that is, the payment due by July 15, 2023) and also informed the Fund that they would not pay their contributions due for July 2023 (that is, the payment due by August 15, 2023). (*See* Aug. 7, 2023 Declaration of Brian A. Doheny, Dkt. 14, ¶ 11.) Central States Pension Fund's Board of Trustees decided[5] on July 17, 2023 to conditionally terminate YRC and USFH's participation in Central States Pension Fund, effective July 23, 2023, unless they paid their required pension contributions. (July 18, 2023 letter, attached hereto as Exhibit E.) YRC and USFH failed to pay the required contributions, and accordingly directly caused the termination of their participation in Central States Pension Fund. In any event, Debtors permanently ceased all covered operations prior to the August 6, 2023 petition date. (Aug. 7, 2023 Declaration of Brian A. Doheny, Dkt. 14, ¶ 17.) Because YRC and USFH stopped paying contributions and permanently ceased all covered operations following their July 2023 shutdown, they were in breach of Paragraph 1(a) of the 2014 Letter Agreement, and the damages owed under the Agreement include the remaining 113 months of the guarantee period under Paragraph 2(a) of the Agreement (that is, August 2023 through December 2032).

18.    When Debtors YRC and USFH permanently ceased to have an obligation to contribute to Central States Pension Fund, they and the other Debtors effected a complete

---

[5]  Pursuant to participation agreements entered at various times, both YRC and USFH agreed to be bound by the Trust Agreement of Central States Pension Fund (and all amendments thereto), including deference to the decisions of the Pension Fund's Board of Trustees, including the decision of July 17, 2023. (*See, e.g.,* July 29, 2008 Participation Agreement of USFH, attached hereto as Exhibit B, ¶ 1; March 11, 2021 Participation Agreement of USFH, attached hereto as Exhibit C, ¶ 1; March 11, 2019 Participation Agreement of YRC, attached hereto as Exhibit D, ¶ 1.)

withdrawal from Central States Pension Fund pursuant to 29 U.S.C. § 1383, and incurred withdrawal liability, jointly and severally, pursuant to 29 U.S.C. §§ 1301(b)(1) and 1381, and the regulations thereunder.

19.     Debtors' version of the events leading to its bankruptcy filing also overlooks the findings set forth in a July 2020 report of a Congressional Oversight Commission, which noted that Yellow had been rated non-investment grade for more than a decade when it obtained its $700 million loan from the United States Treasury ("Treasury") in 2020 and had suffered financially for years. (Congressional Oversight Commission, *Third Report of the Congressional Oversight Commission*, at 15 (July 20, 2020), https://coc.senate.gov/report/the-third-report-of-the-congressional-oversight-commission-2/.) And despite Yellow having received the $700 million loan from Treasury, Debtors having paid their employees lower wages, and Debtors having received a discount on their overall pension contribution obligations to Central States Pension Fund of more than $2 billion (based upon both the period of temporary withdrawal and Debtors' reduced contribution rate), Debtors nonetheless managed to fail. And in its final report addressing the appropriateness of the $700 million UST loan, the Congressional Oversight Commission noted that "Yellow's very high credit risk was not a new development but instead a product of decades of mismanagement by Yellow, evidenced by Yellow's financial restructurings in both 2009 and 2011." (Congressional Oversight Commission, *A Special Report of the Congressional Oversight Commission*, at 12 (June 27, 2023), https://coc.senate.gov/report/the-yellow-report-final/.) The Commission also concluded that the Treasury loan to Yellow exposed United States taxpayers to risk. And as of June 22, 2023, Treasury's 15.9 million shares of Yellow's common stock (representing approximately 29.6% of such stock) was valued at approximately $21 million. (*Id.* at 15.)

20.     Nonetheless, as Yellow drew closer to a bankruptcy filing and reports of Yellow's anticipated demise were widespread, MFN was not dissuaded by the findings of the Congressional Oversight Commission's June 27, 2023 report, and began fervently buying Yellow stock, beginning approximately July 10, 2023 and continuing through July 31, 2023. (Yellow Corp., Schedule 13D (Amendment No. 1), at 12 (Aug. 1, 2023), https://investors.myyellow.com/static-files/5e86f107-2814-4800-bbbc-25100ef3f123.) Indeed, MFN was purchasing the stock even after Yellow had informed the White House that it was on the verge of shutting down. (John D. Schulz, *Yellow is 'on verge of closing,' company tells Biden in plea for mediation*, Logistics Management (July 3, 2023), https://www.logisticsmgmt.com/article/yellow_is_on_verge_of_closing_company_tells_biden_in_plea_for_mediation.) By July 31, 2023, MFN had amassed 22,067,795 of the 51,983,126 shares of common stock outstanding for Yellow (approximately 42.5% of such total stock). (Yellow Corp., Schedule 13D (Amendment No. 1), at 2 (Aug. 1, 2023), https://investors.myyellow.com/static-files/5e86f107-2814-4800-bbbc-25100ef3f123.) MFN paid a total of $22,926,265.97 (including commissions) for this stock. (*Id.* at 8.)

21.     And in September 2023, MFN succeeded in getting two additional persons appointed to Yellow's board of directors. (Yellow Corp., Current Report (Form 8-K), at 2 (Sept. 11, 2023), https://investors.myyellow.com/static-files/d7eea490-7549-4766-a1d9-ea51fbad5c94.)

22.     Pursuant to this Court's bar date order, Central States Pension Fund timely filed proofs of claim that included claims for statutory withdrawal liability (Claims Nos. 4312 through 4335) and claims pursuant to the 2014 Letter Agreement, under which Debtors guaranteed the payment of certain pension contributions to Central States Pension Fund (Claims Nos. 4336-4352).

23.     Central States Funds also filed claims for unpaid pension and health and welfare contributions (Claims Nos. 4303-4306).

24.     On December 8, 2023, Debtors filed their objections to the proofs of claims filed by Central States Funds in these cases (Dkt. 1322).

## STATUTORY BACKGROUND

25.     Congress enacted ERISA to provide comprehensive regulation for private pension plans. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 214 (1986). In enacting ERISA, Congress sought to guarantee that workers would receive the pension benefits they were promised. *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 607 (1993).

26.     Soon after ERISA was enacted, Congress became concerned about the debilitating effect that employer withdrawals were having on multiemployer pension plans. *Connolly*, 475 U.S. at 215. Specifically, employers were incentivized to withdraw from financially troubled plans rather than remain and potentially be required to pay a share of the plan's underfunding if the plan later became insolvent. *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 416-17 (1995). This created the possibility that there would be an employer stampede for the exits, thus ensuring that the plan would fail. *Id.* If left unmanaged, this would lead to increased taxpayer expenses because the PBGC, a government corporation, must ultimately cover the shortfall between the benefits a plan owes to its participants and the benefits an insolvent plan is able to pay. *Trs. of the Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Corp.*, 76 F.3d 824, 837 (7th Cir. 1996).

27.     Congress therefore asked the PBGC to recommend possible solutions to the multiemployer pension plan crisis. *Connolly*, 475 U.S. at 215. The PBGC recommended that withdrawing employers pay their share of the plan's unfunded vested benefits ("UVBs"), i.e., withdrawal liability. *Id.* at 216. In recommending this approach, PBGC Executive Director Matthew Lind explained as follows:

"We think that such withdrawal liability would, first of all, discourage voluntary withdrawals and curtail the current incentives to flee the plan. Where such withdrawals nonetheless occur, we think that withdrawal liability would cushion the financial impact on the plan."

*Id.* at 217 (quoting Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2nd Sess., 22 (1978) (statement of Matthew M. Lind, at 23)).

28.     Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), an amendment to ERISA, 29 U.S.C. §§ 1301–1461, to address these concerns. *Connolly*, 475 U.S. at 217. Withdrawal liability, created pursuant to MPPAA, acts as this safeguard, ensuring that the costs associated with a plan paying vested pension benefits does not then get shifted to the employers that remain in the pension plan, or to the PBGC. *Cent. States, Se. & Sw. Areas Pension Fund v. Bomar, Nat'l, Inc.*, 253 F.3d 1011, 1014-15 (7th Cir. 2001).

29.     Notably, Congress was concerned that employers would attempt to withdraw from multiemployer pension plans while the legislation was under consideration, which would further negatively impact the stability of such plans, so Congress applied the statute retroactively to ensure that the purpose of the legislation would be achieved. *Gray*, 467 U.S. at 723.

30.     In enacting MPPAA, Congress determined that imposing withdrawal liability upon employers that exit multiemployer pension plans was the best means of ensuring both that employers remain in these plans, and that the burdens otherwise created by employers withdrawing from these plans would not be passed onto the employers that remained in the plans, and ultimately to taxpayers. *Peick v. PBGC*, 724 F.2d 1247, 1267 (7th Cir. 1983). As the Third Circuit has noted, even where withdrawing employers have made all their required contributions to the plan, those contributions may not have been in an amount sufficient to fund the employer's share of the

benefits the plan will ultimately be obligated to pay. *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 315-16 (3d Cir. 2011).

31.     Even with the enactment of MPPAA, multiemployer pension plans continued to struggle, including for reasons set forth by the GAO in analyzing Central States Pension Fund. In furtherance of its decades-long effort to improve the health of multiemployer pension plans and ensure that workers receive the retirement benefits they have been promised, Congress passed ARPA in 2021. As part of ARPA, Congress authorized the PBGC to provide SFA to certain multiemployer pension plans. 29 U.S.C. § 1432(a)(1).

32.     As part of ARPA, Congress also authorized the PBGC, acting in consultation with Treasury, to issue regulations that place reasonable conditions upon multiemployer pension plans that receive SFA, including specifically, conditions that relate to withdrawal liability:

> The corporation, in consultation with the Secretary of the Treasury, may impose, by regulation or other guidance, reasonable conditions on an eligible multiemployer plan that receives special financial assistance relating to increases in future accrual rates and any retroactive benefit improvements, allocation of plan assets, reductions in employer contribution rates, diversion of contributions to, and allocation of expenses to, other benefit plans, and withdrawal liability.

29 U.S.C. § 1432(m)(1). Conversely, in 29 U.S.C. § 1432(m)(2), Congress declared that the PBGC "shall not" impose conditions related to prospective benefit reductions, plan governance or funding rules.

33.     Congress also imposed restrictions on how SFA may be used, stating that "[SFA] received under [29 U.S.C. § 1432] and any earnings thereon may be used by an eligible multiemployer plan to make benefit payments and pay plan expenses." 29 U.S.C. § 1432(l). Consequently, SFA may not be used by a plan to subsidize an employer's contribution or withdrawal liability payment requirements.

34.     Relying on the authority specifically granted to it by Congress, the PBGC imposed such conditions in 29 C.F.R. § 4262.16, including but not limited to conditions related to withdrawal liability. Among the conditions the PBGC imposed are requirements regarding when SFA is to be recognized as a plan asset, how SFA is to be phased in for purposes of calculating a plan's UVBs (for purposes of calculating a withdrawing employer's withdrawal liability), and the interest assumptions plans must use in calculating their UVBs. 29 C.F.R. § 4262.16(g)(1-2).

35.     For purposes of determining a plan's UVBs, SFA is gradually phased in over the number of years over which it is projected to be exhausted. 29 C.F.R. § 4262.16(g)(2). Furthermore, under 29 C.F.R. § 4262.16(g)(2)(xiii), SFA is excluded from the determination of a plan's UVBs (which are determined as of the last day of the plan year preceding the year of withdrawal) until the SFA has been paid to the plan regardless of when the PBGC approves the SFA application.

36.     When the PBGC issued its final rule, it explained that it was enacting regulations regarding the recognition of SFA as an asset, as well as certain interest assumptions to be used in valuing a plan's liabilities, "[t]o ensure that SFA is not used to subsidize employer withdrawals rather than to make benefit payments and pay plan expenses." Special Financial Assistance by PBGC, 87 Fed. Reg. 40968, 40996 (July 8, 2022). Regarding the phasing in of SFA for purposes of calculating a plan's UVBs, the PBGC cited to 29 U.S.C. § 1432(j)(1) and (l) as support for the conditions and explained that "[r]equiring phased recognition of SFA as a plan asset is a reasonable condition because SFA does not result from employer contributions, but is a transfer of taxpayer funds to eligible financially distressed plans for the purpose of enabling these plans to pay benefits and expenses . . . . Without the condition, the payment of SFA could instead result in indirect

transfers of SFA to withdrawing employers from plans by reducing their withdrawal liability." (*Id.* at 40997.)

37.    Indeed, Congress' grant of authority to the PBGC to craft regulations related to the SFA, including regulations relating to withdrawal liability, fit within the precise objectives Congress sought to achieve when it created the PBGC in the first place, *i.e.*, to encourage the continuation of multiemployer pension plans, and to ensure the payment of pensions to the participants and beneficiaries of such plans. 29 U.S.C. § 1302(a)(1-2). Similarly, the PBGC's explanation that the phase-in rules were designed to ensure that there was not a rush by employers to withdraw from such pension plans is tailored to both Congress' purpose in creating the PBGC, as well as the goals Congress sought to achieve when it first established withdrawal liability and made it retroactive, *i.e.*, to prevent an employer stampede for the exits of such plans. *See Gray*, 467 U.S. at 723. The PBGC had projected that absent these phase-in rules, more than one-third of employers would withdraw from such pension plans, and the PBGC (and therefore, taxpayers) would have had to pay an additional $15-20 billion in SFA. Special Financial Assistance by PBGC, 86 Fed. Reg. 36598, 36617 (July 12, 2021) (Interim Rule).

38.    Moreover, and as the PBGC noted, the gradual phasing in of SFA for purposes of calculating a plan's UVBs is similar to the method for calculating a plan's minimum funding requirements under the Treasury's regulation, *i.e.*, 26 CFR 1.412(c)(2)–1(b), under which multiemployer pension plans are permitted to smooth plan asset values by averaging the value of plan assets over as many as five years instead of simply using the current fair market value of such assets. Special Financial Assistance by PBGC, 87 Fed. Reg. at 40997. The PBGC also compared the phase-in requirement to the gradual recognition of SFA for purposes of determining minimum funding under the Internal Revenue Code. *Id.* Specifically, under 26 U.S.C. § 432(k)(2)(D), SFA

is disregarded in determining contributions owed pursuant to 26 U.S.C. § 431, but under IRS Notice 2021–38, the SFA is recognized over time in that "any benefit or plan expense paid from the [SFA] account in a plan year will be included in the actuarial gain or loss for that plan year and amortized over 15 years in accordance with [26 U.S.C.] § 431(b)(3)(B)(ii)."

39.     Returning to the provisions of MPPAA, an employer effects a complete withdrawal from a multiemployer pension fund when it "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." *Concrete Pipe*, 508 U.S. at 610-11; 29 U.S.C. § 1383(a). The employer then becomes liable for withdrawal liability, which represents the employer's proportionate share of the plan's UVBs, which is the difference between the present value of a pension plan's assets and the present value of the benefits it will be obligated to pay in the future.[6] *Connolly*, 475 U.S. at 217; 29 U.S.C. §§ 1381, 1391. This liability is a joint and several obligation of the employer that had the obligation to contribute to the plan and all commonly owned trades or businesses. *Steelworkers Pension Trust by Bosh v. Renco Group, Inc.*, 694 Fed. Appx. 69, 71-2 (3d Cir. 2017); 29 U.S.C. § 1301(b)(1); 26 C.F.R. 1.414(c)-2(b)(2).

40.     To collect withdrawal liability, the plan calculates the employer's withdrawal liability, notifies the employer of the amount of the liability, the schedule of payments, and sends the employer a demand for payment. 29 U.S.C. § 1399(b)(1). In calculating an employer's withdrawal liability, Central States Pension Fund uses the modified presumptive method, set forth in 29 U.S.C. § 1391(c)(2), which calculation focuses on the employer's proportional share of the Fund's UVBs measured "as of the end of the plan year preceding the plan year in which the

---

[6]  Technically, for a plan like Central States Pension Fund that uses the modified presumptive method allowed by 29 U.S.C. § 1391(c)(2), an employer's withdrawal liability is based on its allocable share of the "Net Change Value," which is the UVBs less the sum of all outstanding claims for withdrawal liability that can reasonably be expected to be collected. 29 U.S.C. § 1391(c)(2)(C).

employer withdraws," and based upon the most recent 10 years of contributions pursuant to 29 U.S.C. § 1391(c)(5)(C). *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 418; *Cent. States, Se. & Sw. Areas Pension Fund v. Safeway, Inc.*, 229 F.3d 605, 608 (7th Cir. 2000). The notice and demand for payment of the withdrawal liability need not take any specific form, and a notice and demand filed in a Chapter 11 bankruptcy constitutes one recognized means of satisfying the notice and demand requirements of 29 U.S.C. § 1399(b)(1). *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. El Paso CGP Co.*, 525 F.3d 591, 598 (7th Cir. 2008).

41.    If the employer disputes the withdrawal liability, it must then request review of the withdrawal liability assessment and, if dissatisfied with the response to that request, initiate arbitration. 29 U.S.C. §§ 1399(b)(2), 1401(a)(1). *Flying Tiger Line v. Teamsters Pension Tr. Fund of Phila.*, 830 F.2d 1241, 1244 (3d Cir. 1987). Under 29 U.S.C. § 1401(a), the employer and the plan are both entitled to separately initiate arbitration, or the employer and the plan may jointly initiate arbitration.

## RELIEF REQUESTED

42.    As set forth in Central States Pension Fund's motion to compel arbitration with respect to Debtors' objections to the Fund's withdrawal liability claims (Dkt. 1655), Central States Pension Fund requests that this Court defer resolving those objections since arbitration is the appropriate forum for resolving those disputes. Central States Funds further request that this Court reject Debtors' remaining objections to the Funds' claims, including Central States Pension Fund's claims related to Debtors' breach of the 2014 Letter Agreement, and Central States Funds' claims for unpaid pension and health and welfare contributions.

## ARGUMENT

**I.      This Court should abstain from resolving Debtors' disputes with Central States Pension Fund's claims for withdrawal liability and should defer the dispute to arbitration.**

43.      Initially, and as noted in Central States Pension Fund's motion to compel arbitration (Dkt. 1655), the disputes concerning Central States Pension Fund's withdrawal liability proofs of claim (Claims Nos. 4312 through 4335) should be referred to arbitration. Specifically, 29 U.S.C. § 1401(a)(1) provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title *shall* be resolved through arbitration." (emphasis added.) Courts have vigorously enforced this requirement. As explained by the Supreme Court, if the employer requests review to dispute the withdrawal liability, and if the employer and pension fund are unable to resolve the dispute, then the matter "shall be referred to arbitration." *Concrete Pipe*, 508 U.S. at 611.

44.      United States Courts of Appeals, including the Third Circuit, have enforced Congress' arbitration mandate where the employer was subject to MPPAA, and where the dispute falls within the MPPAA sections subject to arbitration, declaring that MPPAA's arbitration procedures "must be followed." *See, e.g.*, *Flying Tiger Line*, 830 F.2d at 1247. The requirement that withdrawal liability disputes be arbitrated was upheld by the bankruptcy court in *In re BFW Liquidation, LLC*, 459 B.R. 757 (Bankr. N.D. Ala. 2011). After conducting an extensive analysis of the reasons Congress established the arbitration requirement, as embodied in case law from the various United States Courts of Appeals, the court concluded that objections to withdrawal liability claims filed in bankruptcy are the "perfect" subject for arbitration under MPPAA. *Id.* at 778. Specifically, the court found that it was appropriate to defer to arbitration and allow an arbitrator with expertise in withdrawal liability matters to resolve the dispute, and because abstaining from

resolving the issue would conserve judicial resources. *Id.* at 779, 785-794. Ultimately, the court determined that arbitration of the withdrawal liability dispute would not only satisfy Congressional intent but would also serve the purpose of the bankruptcy claims dispute resolution process. *Id.* at 799.

45.     Debtors purport to challenge 29 U.S.C. §§ 1381, 1391, 1393, 1432(m)(1), as well as PBGC regulations enacted pursuant to the express authority granted to the PBGC by Congress under 29 U.S.C. § 1432(m)(1), *i.e.*, 29 C.F.R. § 4262.16(g)(2), that addresses the phasing in of certain SFA that Central States Pension Fund received pursuant to that statute and regulation. (Dkt. 1322, ¶¶ 59-69.)

46.     And to be clear, Debtors' objections concerning the SFA Central States Pension Fund received, and the effect if any upon Debtors' withdrawal liability, implicate and arise under 29 U.S.C. §§ 1381, 1391 and 1393, which sections are all within the range of MPPAA sections for which Congress provided that arbitration of disputes is mandatory under 29 U.S.C. § 1401. Indeed, Debtors make clear in their objections to Central States Pension Fund's withdrawal liability claims (including their challenge to 29 C.F.R. § 4262.16(g)(2), which dictates how funds are to phase in SFA for purposes of calculating their UVBs) that their principal objection concerns Central States Pension Fund's determination of its UVBs under 29 U.S.C. § 1391 (Dkt. 1322, ¶¶ 43-47, 59-61), which dispute falls within the MPPAA sections reserved for arbitration (*i.e.*, sections 1381 through 1399). Accordingly, and as Central States Pension Fund requested in its separately filed motion (Dkt. 1665), this Court should either order Debtors to initiate arbitration to contest Central States Pension Fund's claims for withdrawal liability (Claims Nos. 4312-4335) or grant Central States Pension Fund relief from the automatic stay to initiate arbitration.

47.     Indeed, the invalidation of these regulations could have a catastrophic, nationwide impact upon multiemployer pension funds, not to mention the PBGC. Given that more than 65 multiemployer pension plans have been approved to receive SFA (Pension Benefit Guaranty Corporation, *Special Financial Assistance Applications Under Review* (Jan. 12, 2024), https://www.pbgc.gov/sites/default/files/documents/sfa-application-status-current.xlsx (last visited Jan. 18, 2024)), and further given that most of those plans have no claims in this case, the effects of a ruling invalidating the PBGC's regulation would reach nationwide and far beyond the confines of this bankruptcy case. That is, Debtors seek to invalidate and overturn a PBGC rule enacted under authority granted to the PBGC by Congress providing how SFA is to be phased in, and which ruling, if issued, would entirely frustrate the intent of Congress and the PBGC, respectively, in enacting the statute and the regulations.

II.     **Even if not deferred to arbitration, Debtors' challenges to Central States Pension Fund's withdrawal liability claims should be rejected.**

    A.     *Debtors' challenges to Central States Pension Fund's withdrawal liability claims ignore both the statutory language and PBGC regulations.*

48.     Even if this Court were to consider Debtors' challenges to Central States Pension Fund's withdrawal liability claims, those challenges must be rejected. First, Debtors argue that the approximate $35.8 billion Central States Pension Fund received in SFA should have been factored into the calculation of Debtors' withdrawal liability. But Debtors' position ignores and runs afoul of both 29 U.S.C. § 1432 and the underlying PBGC regulations, 29 C.F.R. § 4262.16(g)(2). As noted above, under these regulations, enacted by the PBGC pursuant to express authority granted to it by Congress under 29 U.S.C. § 1432(m)(1), there are two provisions that directly impact the calculation of Central States Pension Fund's UVBs for purposes of the Fund's withdrawal liability assessment against Debtors.

49.     First, pursuant to 29 C.F.R. § 4262.16(g)(2)(xiii), "[SFA] assets must be excluded from the determination of unfunded vested benefits until the date that special financial assistance is paid to the plan." Thus, since Debtors concede that Central States Pension Fund did not receive its SFA until January 2023 (Dkt. 1322, ¶ 36), the SFA Central States Pension Fund received is excluded from Debtors' 2023 withdrawal liability calculation, which as discussed above, is calculated based upon Central States Pension Fund's UVBs at the end of 2022. 29 U.S.C. § 1391(c)(2); *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 418. That is, Central States Pension Fund's plan year is the same as a calendar year. (Central States Pension Fund plan document, copy attached hereto as Exhibit F, at Appendix E, § 2.2(h).)

50.     Second, even if 29 C.F.R. § 4262.16(g)(2)(xiii) were to be ignored, as discussed above, 29 C.F.R. § 4262.16(g)(2) also provides that SFA is to be phased in over time, specifically the time over which the SFA is projected to be exhausted, beginning with the year *after* the year in which the plan receives such SFA. 29 C.F.R. § 4262.16(g)(2). In other words, under 29 C.F.R. § 4262.16(g)(2), no portion of the SFA is phased in for purposes of calculating Central States Pension Fund's UVBs prior to the end of the 2024 plan year, meaning that Debtors' withdrawal liability assessment would remain unaffected by Central States Pension Fund's receipt of SFA, even absent the separate restriction set forth in 29 C.F.R. § 4262.16(g)(2)(xiii).

51.     And to be clear, Debtors do not contend that Central States Pension Fund has misapplied 29 U.S.C. § 1432 or 29 C.F.R. § 4262.16(g)(2) in calculating Debtors' withdrawal liability. Rather, Debtors make clear that they believe the statute and regulation should be ignored, arguing that the regulations are absurd. (Dkt. 1322, ¶¶ 59-61.)

52.     And yet, both the statute and regulations are entirely consistent with MPPAA, the specific goals Congress sought to achieve in enacting the statute more than 40 years ago, and the

efforts Congress has taken in the past 40 years to ensure that multiemployer pension plans survive and are able to pay pensions to the workers who have earned these retirement benefits. Again, Congress was expressly concerned with the effects that employer withdrawals were having upon multiemployer pension plans and enacted MPPAA to ensure that workers' pensions were protected. *Connolly*, 475 U.S. at 217. Moreover, Congress went even further and made MPPAA's application retroactive to ensure that employers anticipating the enactment of MPPAA could not seek to exploit any delay in enacting the statute to further harm the financial soundness of multiemployer pension plans by withdrawing from them while the legislation was under consideration. *Gray*, 467 U.S. at 723. Finally, Congress enacted ARPA and authorized the payment of SFA to financially troubled multiemployer pension plans, and Congress made clear that such "[SFA] received under [29 U.S.C. § 1432] and any earnings thereon may be used by an eligible multiemployer plan to make benefit payments and pay plan expenses." 29 U.S.C. § 1432(l).

53.     In authorizing the PBGC, acting in consultation with Treasury, to enact regulations relating to SFA, including conditions related to withdrawal liability, Congress understood precisely the type of regulations the PBGC would enact. Remember that Congress created the PBGC to encourage the continuation of multiemployer pension plans, and to ensure the payment of pensions to the participants and beneficiaries of such plans. 29 U.S.C. § 1302(a)(1-2). Accordingly, and consistent with Congress' directive in 29 U.S.C. §1432(l) regarding how SFA is to be used, the PBGC explained that the phase-in rules were designed to ensure that the SFA is used to pay pension benefits and plans' administrative expenses, and that the SFA is not used to indirectly subsidize employers' withdrawals from such plans. Special Financial Assistance by PBGC, 87 Fed. Reg. at 40996. This was a reasonable and obvious condition that the PBGC placed

upon multiemployer pension plans receiving SFA, to ensure that the SFA is used to meet Congress'

objective, *i.e.*, being used to pay pension benefits and plans' administrative expenses.

54.     In addition to Debtors' challenges to 29 U.S.C. § 1432 and 29 C.F.R. § 4262.16,

Debtors also contend they are entitled to the 20-year limitation on payments set forth in 29 U.S.C.

§ 1399(c)(1)(B). However, Debtors are in default under 29 U.S.C. § 1399(c)(5)(B) and therefore

are not entitled to the limitation on payments. *See*, *e.g.*, *GCIU-Emp'r Ret. Fund v. Lillie Suburban*

*Newspapers, Inc.*, No. 17-cv-7372, 2018 WL 6137603, at *4 (C.D. Cal. Feb. 20, 2018). That is,

their withdrawal liability is owed in a single payment, such that the 20-year payment limitation is

not implicated.

55.     Furthermore, even if Debtors were not in default and were entitled to pay the

present value of a 20-year payment schedule, the calculation of the present value of that schedule

is controlled by 29 U.S.C. §§ 1399(c)(1)(A)(ii) and 1432(m)(1), and 29 C.F.R. § 4262.16(g)(1).

Thus, Debtors' arguments concerning how the present value should be calculated (Dkt. 1322, ¶¶

68-69) ignores the underlying statute.

> B.     *Central States Pension Fund is not equitably estopped from recovering on its withdrawal liability claims.*

56.     Debtors also argue that Central States Pension Fund should be equitably estopped

from recovering on its withdrawal liability claims based solely on the Fund's projection in its

revised SFA application (dated August 11, 2022) that Debtors would likely be collectible for only

a "de minimis" amount of withdrawal liability. (Dkt. 1322, ¶¶ 54-56.) As an initial matter, courts

have cast serious doubt on whether it is ever appropriate to apply equitable estoppel against

multiemployer pension plans (like Central States Pension Fund). Unlike single employer pension

plans, multiemployer pension plans are funded by—and provide benefits to employees of—

multiple employers. Applying equitable estoppel to benefit certain employers of a multiemployer

plan would have the inequitable result of depleting "plan assets to benefit one employer and its employees at the expense of others." *Durham v. Laborers' Benefits St. Louis, Inc*., No. 18-cv-1184, 2020 WL 4049891, at *7 (E.D. Mo. July 20, 2020) (quoting *Slice v. Sons of Norway*, 34 F.3d 630, 633 (8th Cir. 1994)). Further, such depletion of plan assets is detrimental to multiemployer plans' solvency and actuarial soundness. *See, e.g.*, *Black v. TIC Inv. Corp*., 900 F.2d 112, 115 (7th Cir. 1990); *see also Russo v. Health, Welfare & Pension Fund, Local 705, Int'l Bhd. of Teamsters,* 984 F.2d 762, 767 n.4 (7th Cir. 1993) ("our concerns about actuarial soundness expressed in *Black* would argue against applying estoppel to a multi-employer funded pension plan").[7]

57.     This result would be especially inequitable given that the purpose of MPPAA is to ensure that multiemployer pension plans have sufficient assets to pay pension benefits to the workers who rely on them, so as to avoid the "great personal tragedy" that occurs when such benefits are reduced or eliminated. *Cent. States, Se. & Sw. Areas Pension Fund v. Johnson*, 991 F.2d 387, 392 (7th Cir. 1993). Debtors ignore this purpose and, instead, assert that any distribution to Central States Pension Fund on its withdrawal liability claims would be a "windfall" because of the Fund's receipt of SFA. (Dkt. 1322, ¶ 7.)

58.     Debtors also claim that Treasury (and therefore, taxpayers) would suffer if Central States Pension Fund's withdrawal liability claims were allowed because that would result in a reduced distribution to Treasury (which holds approximately 30% of Yellow's stock) (Dkt. 1322,

---

[7] Debtors cite three cases in support of their estoppel argument (Dkt. 1322, ¶ 56 ), but none of those cases support their argument. As an initial matter, none of those cases applied equitable estoppel in relation to an ERISA claim, let alone in relation to a claim of a multiemployer plan. And in *In re Vebeliunas*, 332 F.3d 85, 94 (2d Cir. 2003), the court declined to apply equitable estoppel, finding (like here) that the party that equitable estoppel was being asserted against had not made any misrepresentation, let alone a misrepresentation relied upon by the party arguing for equitable estoppel.

¶ 56). Of course, Debtors conveniently ignore the fact that if the PBGC had not acted on Congress'
directive to ensure that the SFA is used solely to pay pension benefits and plan administrative
expenses, and had the PBGC not implemented the phase-in regulation, that would have cost
taxpayers another $15-20 billion according to the PBGC's estimate. Special Financial Assistance
by PBGC, 86 Fed. Reg. at 36617. This amount dwarfs any reasonable estimate of the value of the
stock Treasury holds. Furthermore, the PBGC, in following Congress' directive and enacting these
conditions related to withdrawal liability, did so in consultation with Treasury. *See* 29 U.S.C. §
1432(m)(1). Thus, Debtors' assertion that they are acting on behalf of Treasury is laughable.

59.    Clearly, Debtors are working to help MFN and its investors cash in on the lottery
tickets MFN purchased shortly before Yellow's bankruptcy filing. That is, in the month leading
up to the bankruptcy filing, when the entire world knew Yellow was on the verge of filing for
bankruptcy protection and going out of business, MFN paid $22,926,265.97 to acquire an
approximate 42.5% interest in Yellow, hoping only to turn its purchases of Yellow's stock into
massive gains for MFN's investors. (Yellow Corp., Schedule 13D (Amendment No. 1), at 2, 8, 12
(Aug.    1,    2023),    https://investors.myyellow.com/static-files/5e86f107-2814-4800-bbbc-
25100ef3f123.) MFN then succeeded in having two additional persons named to Yellow's board
of directors (Yellow Corp., Current Report (Form 8-K), at 2 (Sept. 11, 2023),
https://investors.myyellow.com/static-files/d7eea490-7549-4766-a1d9-ea51fbad5c94.)

60.    Eliminating the withdrawal liability claims asserted against Debtors by Central
States Pension Fund and other multiemployer pension plans (which claims represent the
overwhelming majority of Yellow's unsecured debt) could result in MFN and its investors
achieving that goal, and a tenfold (or greater) return on its purchases of Yellow's stock. Although
Debtors assert that allowing Central States Pension Fund's withdrawal liability claims will result

in a windfall, this so-called windfall would be used by the Fund solely to pay pension benefits to the Fund's participants and to cover the Fund's administrative expenses. The real windfall in this matter is the windfall sought by MFN, who gambled on buying stock in a company they knew was heading into bankruptcy. Debtors and MFN express no concern, and Debtors fail to even note, the havoc that invalidating the PBGC regulations would have on the more than 65 other multiemployer plans that have received SFA.

61.    In support of their estoppel argument, Debtors also claim that any recovery by Central States Pension Fund on its withdrawal liability claims would result in a windfall since the Fund projected in its application for SFA that it would only collect a de minimis amount of withdrawal liability in the event Yellow were to file for bankruptcy.

62.    However, the amount of SFA that Central States Pension Fund received was based in part upon the validity of the PBGC regulations, which were designed to ensure that participating employers would continue to participate as the SFA was gradually phased in for purposes of calculating an employers' withdrawal liability, rather than allowing employers to withdraw in the short term while paying little or no withdrawal liability. In short, the amount of SFA that Central States Pension Fund received was based on the assumption that the Fund would continue to receive pension contributions from employers.

63.    This last point is critical, as Debtors conveniently ignore the portion of the SFA application where Central States Pension Fund projected that even by 2051, the likelihood that Yellow would be in default (and therefore need to file for bankruptcy) was only 44.07% (Central States, Southeast and Southwest Areas Pension Fund, *Revised Special Financial Assistance Application of the Cent. States, Se. & Sw. Areas Pension Fund*, Dkt. 1322-2, (the "Revised SFA Application") at 14 (Aug. 12, 2022)). Thus, Central States Pension Fund assumed that it was more

likely than not that YRC and USFH would continue to contribute to the Fund at least through 2051. Debtors YRC and USFH remitted more than $60 million in pension contributions to Central States Pension Fund in 2022 (the last full year for which they remitted pension contributions), and the Fund projected that YRC and USFH would most likely continue contributing through at least 2051, with the Fund presuming that YRC and USFH would remit hundreds of millions of dollars in additional pension contributions through 2051 (*See* Claim No. 4312 at 4; Revised SFA Application at 14.).

64.     As such, Debtors' argument that any distribution on Central States Pension Fund's withdrawal liability claims would constitute a windfall is baseless. And to suggest that monies used solely to pay vested pension benefits and plan administrative expenses (indeed, administrative expenses which the GAO found are substantially lower than that of similar plans) would constitute a windfall is preposterous. Furthermore, based upon the PBGC's estimate that absent the phase-in regulation, $15-20 billion in additional SFA would have been required, it is obvious that far from providing a windfall, the PBGC regulations resulted in the need to pay less taxpayer monies to multiemployer plans. Put another way, the funded status of multiemployer plans that receive SFA presumes the validity of the PBGC regulations because otherwise the funded status of such plans changes for the worse.

65.     Additionally, the Third Circuit has held that equitable estoppel may be applied in ERISA cases only in exceptional circumstances. And, the cases in which the Third Circuit has held this have overwhelmingly involved single employer plans, and none have involved claims for withdrawal liability. *See, e.g., Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1156 (3d Cir. 1990) (involving single employer plan); *Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310, 1311 (3d Cir. 1991) (same); *Araujo v. Kraft Foods Global, Inc.*, 387 F. App'x 212, 213 (3d Cir. 2010)

(same). Moreover, the types of extraordinary circumstances that the Third Circuit has recognized as overcoming the presumption against considering equitable estoppel in ERISA cases "generally involve acts of bad faith . . . , attempts to actively conceal a significant change in the plan, or commission of fraud." *Burstein v. Ret. Account Plan for Emps. of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 383 (3d Cir. 2003).

66.     Further, even assuming equitable estoppel could apply to a withdrawal liability claim, Debtors cannot come close to establishing either (let alone both) of the requirements for applying equitable estoppel: (1) a material misrepresentation by Central States Pension Fund; and (2) Debtors' reasonable and detrimental reliance upon the representation. *See, e.g.*, *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 151 (3d Cir. 1999). First, there was not a misrepresentation. Central States Pension Fund's assumption that any withdrawal liability collected from Debtors would be de minimis is merely a prediction about what the Fund believed was likely to occur in the future. An incorrect prediction about future events is not a misrepresentation. *Siemens Fin. Servs., Inc. v. Robert J. Combs Ins. Agency, Inc.*, 166 F. App'x 612, 617 (3d Cir. 2006); *see also, e.g.*, *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J. 1998), *aff'd*, 172 F.3d 859 (3d Cir. 1998) ("[s]tatements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong.").

67.     Second, Debtors do not even allege that they relied on the statement that the Pension Fund's recovery on the withdrawal liability would likely be de minimis. Instead, Debtors baldly assert that equity holders, including Treasury, relied on the Pension Fund's representations in the revised SFA application. (Dkt. 1322, ¶ 56.) Initially, Debtors cannot raise an estoppel defense for

other parties. Regardless, in both its 2019 and 2020 annual reports (Yellow obtained the loan from Treasury in 2020), Yellow was projecting that its contingent withdrawal liability was in the cumulative amount of approximately $8 billion. (Yellow Corp., Annual Report (Form 10-K), at 11 (March 11, 2020) https://investors.myyellow.com/node/27841/html; Yellow Corp., Annual Report (Form 10-K), at 11 (Feb. 11, 2021) https://investors.myyellow.com/node/28441/html). Thus, any suggestion that Treasury believed Yellow would not have withdrawal liability if it were to withdraw from its multiemployer pension plans defies common sense. Accordingly, Debtors' estoppel defense cannot be sustained.

### III. Central States Pension Fund's claims based upon Debtors' breach of the 2014 Letter Agreement should be allowed.

#### A. *Debtors breached the contribution guarantee set forth in the 2014 Letter Agreement.*

68.     Debtors' argument that Central States Pension Fund's contribution guarantee claim based upon the 2014 Letter Agreement is not "cognizable" because Debtors were expelled from the Fund fails for at least three reasons. (*See* Dkt. 1322, ¶ 51.) First, Debtors' argument that they did not breach the 2014 Letter Agreement because they were expelled is based on an absurd twisting of the facts. In the 2014 Letter Agreement, Debtors agreed that they would continue to participate and pay contributions every month for the ten-year period after the repayment of their obligations under the 2014 CDA. (2014 Letter Agreement, Ex. A, ¶ 1(a).). Yet Debtors do not dispute that they withheld the payment of pension contributions due on July 15, 2023, that they unequivocally told Central States Pension Fund that they would similarly withhold the contributions due on August 15, 2023, and that they failed to provide any concrete date by which these obligations would actually be paid. Put differently, Debtors promised they would contribute, they did not contribute, and they therefore breached. (2014 Letter Agreement, Ex. A, ¶1(a).)

Against this background, Debtors' description of events is willfully obtuse: Debtors argue that they did not breach the 2014 Letter Agreement's contribution guarantee *because* they failed to pay the contributions they guaranteed and forced their own expulsion from the plan. But it cannot be the case that the 2014 Letter Agreement allows a party to insulate itself from damages by breaching.

69.    Second, Central States Pension Fund did not unilaterally or definitively "evict" Debtors (Dkt. 1322, ¶ 51), but instead Debtors themselves chose to terminate their own participation by withholding the payment of contributions that were indisputably owed to the Fund. As communicated by letter dated July 18, 2023 to Mr. Daniel Olivier, Debtors' Chief Financial Officer, Central States Pension Fund's Trustees determined that YRC and USFH's participation in Central States Pension Fund would cease effective July 23, 2023 so long as they failed to "fully pay[] the required contributions." (July 18, 2023 Letter, Ex. E.) Furthermore, the July 18, 2023 letter also provided that Debtors' participation in Central States Pension Fund would be reinstated upon Debtors' payment of the past-due pension contributions. (*Id.*) Accordingly, Debtors' participation in Central States Pension Fund terminated as of July 23, 2023, as a direct result of their decision to continue to withhold required pension contributions following receipt of this letter, not as a result of any unilateral action by Central States Pension Fund.

70.    Third, prior to and after their entry into the 2014 Letter Agreement, YRC and USFH entered into participation agreements whereby, among other things, they agreed to be bound by Central States Pension Fund's Trust Agreement and by the decisions of the Fund's Board of Trustees. (*See, e.g.,* July 29, 2008 Participation Agreement of USFH, attached hereto as Exhibit B, ¶ 1; March 11, 2021 Participation Agreement of USFH, attached hereto as Exhibit C, ¶ 1; March 11, 2019 Participation Agreement of YRC, attached hereto as Exhibit D, ¶ 1.)

71.     The Trust Agreement, in turn, provides that Central States Pension Fund's Board of Trustees is empowered to terminate an employer who "is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund," including the practice of unilaterally and indefinitely withholding lawfully required contributions. (Trust Agreement, Ex. G, Art. III, § 1, at 8–9; Art. IV, § 20, at 20.) The Trust Agreement further provides that the Trustees have discretion to construe the Trust Agreement (*Id.*, Art. IV, § 17, at 19) and to decide questions or controversies involving the participation of employers (*Id.*, Art. V, § 2, at 21), and that these determinations are binding on employers.

72.     Therefore, through their participation agreements, YRC and USFH agreed and understood that their participation in Central States Pension Fund was subject to the governance of Central States Pension Fund's Board of Trustees, who were empowered to police the participation of employers in the Fund for the benefit of the Fund as a whole. Notably, Central States Pension Fund's Board of Trustees is comprised of representatives of both employers and unions. (Trust Agreement, Ex. G, Art. II, § 2.) Accordingly, this was not an "eviction" as Debtors contend, but rather Central States Pension Fund's diligent exercise of a right conferred upon them by YRC and USFH through their participation agreements and the Trust Agreement. (*See also* 2014 Letter Agreement, Ex. A, ¶ 2(e) ("The remedies, damages and procedures set forth . . . above are non-exclusive in nature and do not preclude any other remedies at law or in equity that may be available to the Pension Fund . . . ").)

73.     Indeed, Central States Pension Fund is obligated to provide pension benefits to the workers who have earned those benefits, even if the employers fail to pay the corresponding

contributions. *Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d

1148, 1151 (7th Cir. 1989). As the Seventh Circuit explained in *Gerber*:

> Multi-employer plans are defined-contribution in, defined-benefit out. Once they promise a level of benefits to employees, they must pay even if the contributions they expected to receive do not materialize—perhaps because employers go broke, perhaps because they are deadbeats, perhaps because they have a defense to the formation of the contract. If some employers do not pay, others must make up the difference in higher contributions, or the workers will receive less than was promised.

*Id.*

    B.    *The contribution guarantee claims are breach of contract claims, and not claims for withdrawal liability.*

74.    Debtors' argument that the contribution guarantee claims under the 2014 Letter

Agreement are really withdrawal liability claims also fails. (Dkt. 1322, ¶ 51.) Tellingly, despite

objecting to the contract, Debtors do not reference—much less interpret—the text of the 2014

Letter Agreement at any time. The text itself provides:

> Primary Obligors' obligations to make payments specified under this Paragraph 2 shall not be excused by any withdrawal incurred by the Primary Obligors from the Pension Fund and shall be due in addition to (and not in place of) any withdrawal liability payments owed to the Pension Fund. . . .

> The remedies, damages and procedures set forth in Subparagraphs 2.a), 2.b), 2.c) and 2.d) above are non-exclusive in nature and do not preclude any other remedies at law or in equity that may be available to the Pension Fund in the event of a breach of this letter – agreement.

(2014 Letter Agreement, Ex. A, ¶¶ 2(c), 2(e)). This unambiguous language conclusively disposes

of Debtors' vague and unsupported argument that the 2014 Letter Agreement is actually

coterminous with withdrawal liability.

75.    For the avoidance of doubt, the 2014 Letter Agreement's unambiguous language

accurately reflects the law. Withdrawal liability is a creature of statute. *Milwaukee Brewery

Workers' Pension Plan*, 513 U.S. at 417. Debtors' obligations under the contribution guarantee

originate in a contract, *i.e.*, the 2014 Letter Agreement. Thus, not only does Paragraph 2 of the 2014 Letter Agreement make clear that the damages set forth therein are not withdrawal liability, as a legal matter the 2014 Letter Agreement claims categorically cannot be construed as claims for withdrawal liability because Central States Pension Fund's right to relief arises under contract rather than under MPPAA provisions like 29 U.S.C. § 1399.

76.     This is further reinforced by the mechanics of the 2014 Letter Agreement itself. As Debtors themselves stress repeatedly (albeit misleadingly), withdrawal liability is to be calculated by reference to a number of factors including (but not limited to) a plan's UVB's as of the end of the year preceding withdrawal. The 2014 Letter Agreement, however, speaks to damages measured by the contributions YRC and USFH had remitted, not UVBs, and the obligation of Debtors under the 2014 Letter Agreement is the obligation to "continue to participate . . . and pay contributions," not the obligation to pay the employers' proportionate share of Central States Pension Fund's UVBs. (2014 Letter, Ex. A, ¶ 1(a).) Furthermore, the calculation of the amounts owed by Debtors under the 2014 Letter Agreement is performed in a manner similar to how Debtors' contribution obligations had been calculated, *i.e.*, by multiplying the amount of work that had been performed by the contribution rate that was in effect. (*Id.*, ¶ 2(a).) Accordingly, the amounts owed under the 2014 Letter Agreement not only have a separate legal basis from claims for withdrawal liability, but as a factual matter they are also calculated in a different manner.

      C.    *This Court should enforce the parties' agreement as to the damages for breach of the 2014 Letter Agreement.*

77.     Debtors' argument that the 2014 Letter Agreement is unenforceable as a penalty similarly lacks any basis in fact or law. (Dkt. 1322, ¶¶ 52–53.) The question of whether a contractual provision is an unenforceable penalty clause or a reasonable liquidated damages clause

is a question of law.[8] *Smart Oil, LLC v. DW Mazel, LLC,* 970 F.3d 856, 863 (7th Cir. 2020). Under Illinois law,[9] a damages provision is enforceable if: "(1) the parties intended to agree in advance to the settlement of damages that might arise from the breach; (2) the amount of liquidated damages was reasonable at the time of contracting, bearing some relation to the damages which might be sustained; and (3) actual damages would be uncertain in amount and difficult to prove." *Id.* (citing *Karimi v. 401 N. Wabash Venture, LLC*, 952 N.E.2d 1278, 1285 (Ill. App. 1st Dist. 2011)). The burden of persuasion "rests on the party resisting enforcement of a liquidated damages clause to show that the agreed-upon damages are clearly disproportionate to a reasonable estimate of the actual damages likely to be caused by a breach." *XCO Int'l, Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1003 (7th Cir. 2004). Despite having the burden on this purely legal question, Debtors provide no arguments as to why the agreement should be disallowed beyond vague fairness considerations. (*See* Dkt. 1322, ¶ 53 ("This is 'free money' that CSPF does not need.")).

78.     In any event, and putting aside Debtors' failure to meet their burden, the 2014 Letter Agreement is enforceable under Illinois law. As to the first element, whether the parties intended to agree in 2014 to the settlement of damages that might arise from the breach, "the courts of Illinois give effect to such damage provisions and do not treat them as penalties where the parties have expressed their agreement in clear and explicit terms." *Pierce v. B & C Elec., Inc.*, 432 N.E.2d 964, 966 (Ill. App. 1st Dist. 1982) (citing *Burnett v. Nolen*, 84 N.E.2d 155 (Ill. App. 4th Dist. 1949)). Indeed, the tendency to enforce "clear and explicit terms" is especially strong where, as here, both parties are highly sophisticated: "[w]here both parties are substantial commercial

---

[8]  For this reason, Debtors' expansive discovery requests are inappropriate to the extent that they relate to Central States' Pension Fund's contribution guarantee claim.

[9]  As noted above, the 2014 Letter Agreement provides that it is governed by Illinois law (2014 Letter Agreement, Ex. A, ¶ 2(f).)

enterprises, it is difficult to see why the law should take an interest in whether the estimate of harm underlying the liquidation of damages is reasonable. Courts don't review the other provisions of contracts for reasonableness; why this one?" *Smart Oil, LLC*, 970 F.3d at 863 (citation and ellipsis omitted); *see Zerjal v. Daech & Bauer Constr., Inc.*, 939 N.E.2d 1067, 1074 (Ill. App. 5th Dist. 2010) ("Illinois courts give effect to liquidated-damages provisions so long as . . . there is no evidence of fraud or unconscionable oppression, a legislative directive to the contrary, or a special social relationship between the parties of a semipublic nature." (citation omitted)).

79.     Here, the 2014 Letter Agreement sets forth the consequences for the breach of the contribution guarantee in clear and explicit terms, showing that Debtors and Central States Pension Fund indeed intended to agree in advance to the settlement of damages that might arise from the breach. (2014 Letter Agreement, Ex. A, ¶ 2.) Moreover, indications of consent are particularly strong here, not only because Debtors were represented by sophisticated counsel in connection with the 2014 Letter Agreement, but also because the Debtors themselves selected the contribution guarantee provision that Debtors now claim is unenforceable. (2014 Letter Agreement, Ex. A at p. 1.)[10] Accordingly, the parties to the 2014 Letter Agreement clearly and explicitly agreed to be bound by the damages provision in question.

80.     The second element, whether the amount of liquidated damages was reasonable at the time of contract, also favors enforcing the 2014 Letter Agreement. As an initial matter, Debtors' main argument—that the provision is an unenforceable penalty because Central States Pension Fund is well-funded in 2023 (Dkt. 1322, ¶ 53)—misses the point entirely. Instead, the question is whether the provision was "reasonable at the time of contract." *Smart Oil, LLC*, 970

---

[10]  If anything, Debtors are estopped from now arguing that the provision is unenforceable, because they are the parties that chose to include that provision in the 2014 Letter Agreement. (2014 Letter Agreement, Ex. A, at 1.)

F.3d at 863. Indeed, "whether [a party] ultimately incurred any actual damages is not relevant to the reasonableness decision, and actual damages are not required under Illinois law before liquidated damages can be assessed." *Id.* at 864. "[T]he predetermined amount may or may not exceed the actual damages and both parties agree to accept this inherent risk." *Id.* at 863 (internal citation omitted). Accordingly, the Court should look past Debtors' ad hoc complaints and instead focus on whether the parties' estimate of damages was reasonable in 2014.

81.    An examination of the relevant provision itself reflects a reasonable and mutual judgment by the parties. In this case, the amount to be paid is to be calculated in one of two ways: (a) looking to the actual amount of work performed by the employer during the breach, or (b) by multiplying a month of the breaching employer's contribution history during the period that Debtors were repaying their contribution deferral obligation (through December 31, 2022) by the last contribution rate in effect. (2014 Letter Agreement, Ex. A, ¶ 2(a)). And, in either event, damages are only to be paid for the duration of the breach. *Id.* Agreeing to a damages formula that awards Central States Pension Fund with an amount roughly equivalent to the amount of contributions that would have been paid absent a breach is thus reasonable, especially when one considers the sophistication of the parties. *XCO Int'l Inc.*, 369 F.3d at 1004 ("The element common to most liquidated damages clauses that get struck down as penalty clauses is that they specify the same damages regardless of the severity of the breach.")

82.    It bears noting that this damages calculation is not a windfall, because it does not compensate Central States Pension Fund for other harms caused by Debtors' breach. Depriving a multiemployer fund of contributions, for example, leaves the fund more exposed to economic volatility. *Ganton Techs., Inc. v. Natl. Indus. Group Pension Plan*, 865 F. Supp. 201, 207 (S.D.N.Y. 1994), *aff'd*, 76 F.3d 462 (2d Cir. 1996) (citations omitted). Withholding contributions

also causes administrative expenses resulting from collection costs and from increased difficulty in financial forecasting. *United Or. of Am. Bricklayers & Stone Masons Union No. 21 v. Thorleif Larsen & Son, Inc.*, 519 F.2d 331, 333 (7th Cir. 1975). As a result, tying damages under the 2014 Letter Agreement to past contribution levels was a reasonable way to protect Central States Pension Fund from the harm that would be caused by Debtors' breach, which includes the loss of contributions themselves, increased exposure to economic volatility, and increased administrative costs.

83.    Even putting aside that Debtors focus on the present rather than 2014 and do not consider the harms caused by their breach, Debtors' argument that Central States Pension Fund is not entitled to damages under the 2014 Letter Agreement because "any plan benefits for those employees stopped accruing" has been repeatedly rejected by courts. (Dkt. 1322, ¶ 52.) Indeed, the fundamental premise of this argument is simply wrong: "Nothing depends on proof that a given plan will be unable to satisfy its obligations if a given employer avoids payment." *Gerber Truck Serv., Inc.*, 870 F.2d at 1155. As the Supreme Court has recognized, "[a]n employer's contributions are not solely for the benefit of its employees or employees who have worked for it alone." *Concrete Pipe*, 508 U.S. at 638. Accordingly, an employer like Debtors cannot escape obligations to a pension plan by claiming that the plan is already fully funded or that the payment will not result in a benefit payment to specific employees. The Third Circuit, for example, has noted that benefits are not a predicate for an ERISA plan to be entitled to payment of contributions, stating:

> In essence, [the employer] claims that, because there is no evidence that the Fund provided coverage for any new employees for whom [the employer] did not pay [contributions] . . . the Fund should not receive the delinquent funds. However, a welfare fund is not unjustly enriched simply because it has received benefit payments on behalf of particular employees who have not made claims, . . . a lack of actual claims is irrelevant. Furthermore, the welfare fund expected to have those funds at hand for payout of benefits on behalf of other employees, including

employees of other employers who are members of the multiemployer Welfare Fund.

*Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1109 (3d Cir. 1996); *see also Gerber Truck Serv., Inc.*, 870 F.2d at 1155 ("The [multiemployer pension] scheme works only if the plan receives contributions on behalf of persons who will not get benefits."). Thus, the parties' decision in 2014 to tie damages to work history remains reasonable notwithstanding Debtors' protests that they laid off their employees in 2023 and in so doing deprived those employees of future benefit accruals. (Dkt. 1322, ¶ 52.)

84.     The third element, whether future damages would have been uncertain in amount and difficult to prove from the parties' perspective in 2014, also favors enforcing the 2014 Letter Agreement's provisions. Indeed, "[t]here is no way to estimate in dollar terms the harm which results when an employer submits late contributions," or, by extension, when the employer fails to submit contributions altogether. *Pierce,* 432 N.E.2d at 967. In addition to the lost contribution base itself, *Ganton Techs., Inc.*, 865 F. Supp. at 207, a failure to contribute causes administrative expenses resulting from collection costs as well increased difficulty in financial forecasting, both of which are difficult to estimate. *Thorleif Larsen & Son, Inc.*, 519 F.2d at 333. Accordingly, the 2014 Letter Agreement's damages provision represents the parties' mutual answer in 2014 to the uncertain estimation of future damages, and thus should be upheld.

85.     Debtors' objections contains at least one more misstatement of the law with respect to Central States Pension Fund's enforcement of the 2014 Letter Agreement. (Dkt. 1322, ¶ 53.) Even if the Court were to find the damages provision of the 2014 Letter Agreement unenforceable as a penalty, the remedy would not be invalidation of the agreement as a whole or disallowance of the guarantee claims. Instead, "the proper judicial remedy would be to reform the clause to limit it to . . . a reasonable specification of damages. There would be no reason to invalidate the clause in

its entirety." *XCO Int'l Inc.*, 369 F.3d at 1005. Accordingly, to the extent the Court finds that the provision is unenforceable, it should nonetheless award Central States Pension Fund an amount to be determined based on a reformation of the clause to a reasonable specification of damages.

**IV.    Debtors do not have any viable objections to Central States Funds' contributions claims.**

86.     As noted above, Debtors object not only to Central States Pension Fund's contributions claims (Claims Nos. 4303 and 4305), but also to Central States Health Fund's contributions claims (Claims Nos. 4304 and 4306). Debtors argue that these claims should be rejected as unidentifiable. (Dkt. 1322, ¶¶ 70-71.)

87.     By way of background, Debtors YRC and USFH, on the one hand, and certain local unions affiliated with the IBT on the other hand, entered into collective bargaining agreements requiring YRC and USFH to contribute to Central States Funds on behalf of their covered employees. These collective bargaining agreements were comprised of the YRC National Master Freight Agreement ("NMFA") (the April 1, 2019 through March 31, 2024 version of which is attached hereto as Exhibit H) and supplements thereto. YRC and USFH on the one hand and the local unions on the other hand also entered participation agreements required by Central States Funds, which agreements set forth additional terms regarding YRC and USFH's participation in the Funds. (*See, e.g.*, July 29, 2008 Participation Agreement of USFH, attached hereto as Exhibit B, ¶ 1; March 11, 2021 Participation Agreement of USFH, attached hereto as Exhibit C, ¶ 1; March 11, 2019 Participation Agreement of YRC, attached hereto as Exhibit D, ¶ 1.)

88.     Central States Funds rely on contributing employers (like YRC and USFH) to self-report the work history of the employees for whom pension and health and welfare contribution are owed. Central States Funds then calculate the contributions owed from such employers based on the work history that those employers submit (as well as any audits conducted). Indeed, the

contributions claims asserted by Central States Pension Fund here (Claims Nos. 4303 and 4305) exclusively seek contributions that are owed (but were not paid) based on the work history submitted by (and the audits conducted of) YRC and USFH. Specifically, Claim No. 4303 seeks $3,199,507.90 in such delinquent contributions (including pre-petition interest) from USFH, and Claim No. 4305 seeks $5,722,810.92 in such delinquent contributions (including pre-petition interest) from YRC.

89.    Debtors' sole objection to Central States Pension Fund's contributions claims— that they are unidentifiable—is odd given that YRC and USFH identified those claims in their schedules, listed very similar amounts to what Central States Pension Fund asserts is owed, and listed the claims as undisputed. (*See* Schedule of Assets and Liabilities of YRC, Dkt. 473, at p. 3084 (identifying undisputed Pension Fund contributions claim in amount of $6,070,387.89); Schedule of Assets and Liabilities of USFH, Dkt. 470, at p. 1287 (identifying undisputed Pension Fund contributions claim in amount of $3,429,640.88)). In fact, the amounts scheduled by YRC and USFH are even slightly higher than the amounts sought by Central States Pension Fund in its proofs of claim.

90.    As for Central States Health Fund's contributions claims against YRC (Claim No. 4306) and USFH (Claim No. 4304), each of those claims consist of two categories. First, as with Central States Pension Fund's contributions claims, there are contributions—including pre-petition interest—that are owed (but were not paid) based on the work history submitted by (and the audits conducted of) YRC (Claim No. 4306) and USFH (Claim No. 4304). For USFH (Claim No. 4304), that first category of Central States Health Fund claims equals $13,900,182.95 and consists of all amounts for "Contribution Periods" of "7-2023" and earlier listed on the "Breakdown of Contributions Outstanding" attachment to the proof of claim. For YRC (Claim No.

4306), that first category of Central States Health Fund claims equals $27,031,891.21 and, likewise, consists of all amounts for "Contribution Periods" of "7-2023" and earlier listed on the "Breakdown of Contributions Outstanding" attachment to the proof of claim.

91.     As with Central States Pension Fund's contributions claims, Debtors' sole objection to this first category of Central States Health Fund claims—that they are unidentifiable—is demonstrably false, as USFH and YRC identified those claims in their schedules, listed very similar amounts to what Central States Health Fund is now seeking in its Proofs of Claim, and identified the claims as undisputed. (*See* Schedule of Assets and Liabilities of USFH, Dkt. 470, at p. 1287 (identifying undisputed Central States Health Fund contributions claim in amount of $13,756,524.88); Schedule of Assets and Liabilities of YRC, Dkt. 473, at p. 3084 (identifying undisputed Central States Health Fund contributions claim in amount of $26,500,032.05).) That said, the amounts scheduled by USFH and YRC are slightly lower than the amounts sought by Central States Health Fund in this first category of claims. Debtors have submitted discovery relating to the amounts of these claims, and Central States Health Fund is providing information and documents to show that the Health Fund's claims amounts are correct.

92.     The second category of Central States Health Fund claims against YRC and USFH consists of contributions for periods for which YRC and USFH were obligated to pay compensation to their covered employees—specifically, pay for time off due to on-the-job injuries, pay for accrued vacation days, and payments resulting from the employees' WARN Act claims. For YRC (Claim No. 4306), that second category of Central States Health Fund claims equals $50,631,468.42 and, likewise, consists of all amounts for "Contribution Periods" of "8-2023" and later listed on the "Breakdown of Contributions Outstanding" attachment to the proof of claim. For USFH (Claim No. 4304), that second category of Central States Health Fund claims equals

$26,546,694.40 and consists of all amounts for "Contribution Periods" of "8-2023" and later listed on the "Breakdown of Contributions Outstanding" attachment to the proof of claim.[11]

93.    With respect to this second category of Central States Health Fund contributions claims, YRC and USFH entered into participation agreements, pursuant to which they agreed "to remit contributions" to Central States Health Fund "on behalf of each Covered Employee for any period he/she receives, or is entitled to receive, compensation (regardless of whether the employment relationship is terminated), including . . . disability or illness pay, layoff/severance pay, [and] vacation pay." (*E.g.*, March 11, 2021 Participation Agreement of USFH, Ex. C, ¶ 8; March 11, 2019 Participation Agreement of YRC, Ex. D, ¶ 8.).) Accordingly, pursuant to these participation agreements (as well as certain provisions of the NMFA and the supplements thereto), Central States Health Fund seeks contributions for any covered employees during the periods in which those employees were entitled to vacation pay or pay for on-the-job injuries. (See first page of "Breakdown of Contributions Outstanding" attachment to Claims Nos. 4304 and 4306.)

94.    Also, in this second category of contributions claims, Central States Health Fund seeks contributions for YRC and USFH's covered employees for the period those employees were entitled to receive compensation under the WARN Act, 29 U.S.C. § 2101 *et seq*. More specifically, on or about July 31, 2023, YRC and USFH effected a series of plant closings and/or mass layoffs within the meaning of 29 U.S.C. § 2101(a). Pursuant to 29 U.S.C. § 2104(a)(1)(A), YRC and USFH were required to pay compensation to their covered employees for 60 days after these plant closings/mass layoffs because YRC and USFH failed to provide the notice required by 29 U.S.C. § 2102(a). Under 29 U.S.C. § 2104(a)(1)(B), YRC and USFH were also required to pay benefits

---

[11]  Central States Health Fund notes that this second category of contributions claims is based on the limited information regarding YRC and USFH's covered employees that was available to Central States Health Fund at the time it filed its proofs of claim. Central States Health Fund reserves the right to conduct discovery relating to these claims.

to ERISA benefit funds (such as Central States Health Fund) on the affected employees' behalf. These contributions are also owed pursuant to the participation agreements' requirement that YRC and USFH pay contributions for covered employees during any period those employees are entitled to compensation.

95.     Central States Health Fund estimates the relevant WARN Act 60-day period ran from Monday, July 31, 2023 through Thursday, September 28, 2023. Accordingly, Central States Health Fund seeks contributions for each of the nine weeks that the covered employees were entitled to WARN ACT pay. (See the claims identified as "USF WARN Act/Coverage – 7-30/23 – 8/5/23", "USF (LU 89B)/ WARN ACT / Coverage – 7/30/23 – 8/5/23," "USF WARN ACT / Coverage – 7/30/23 – 8/5/23," "YRC WARN Act/Coverage – 7-30/23 – 8/5/23," "USF WARN Act – 8/6/23 – 9/30/23," and "YRC WARN Act – 8/6/23 – 9/30/23" on first page of "Breakdown of Contributions Outstanding" attachment to Claims Nos. 4304 and 4306.)

96.     Finally, even if contributions were not otherwise owed by YRC and USFH to Central States Health Fund for the period of July 31, 2023 to September 28, 2023, the contributions are owed for the first week of such period by virtue of the fact that Central States Health Fund provided health coverage to YRC and USFH's covered employees for such week. Specifically, Central States Health Fund provided an extension of health coverage to YRC and USFH's covered employees through August 5, 2023, which the Fund provided in an attempt to allow the IBT, YRC and USFH additional time to attempt to resolve their issues in labor negotiations. As such, YRC and USFH would be unjustly enriched if they were not required to pay Central States Health Fund for this period during which the Fund provided health coverage to YRC and USFH's covered employees.

## CONCLUSION

For the reasons set forth in this response, and the reasons separately set forth in Central States Pension Fund's motion to compel arbitration, Central States Pension Fund requests that this Court grant its motion and order Debtors to initiate arbitration as provided for under Appendix E to Central States Pension Fund's plan document with respect to the Central States Pension Fund's withdrawal liability claims (Claim Nos. 4312 through 4335). Alternatively, Central States Pension Fund requests that this Court grant Central States Pension Fund relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) so that Central States Pension Fund may initiate arbitration with respect to Debtors' objections to Central States Pension Fund's withdrawal liability claims (Claims Nos. 4312 through 4335). Alternatively, Central States Pension Fund requests that this Court deny Debtors' objections to the withdrawal liability claims and hold that such claims are allowed in the amounts as filed.

Central States Funds further request that this Court deny Debtors' remaining objections to Central States Funds' claims (Claims Nos. 4303-4306 and 4336-4352) for the reasons set forth in this response and hold that all such claims are allowed in the amounts set forth in the respective proofs of claim.

Dated: January 19, 2024
      Wilmington, DE

**SULLIVAN · HAZELTINE · ALLINSON LLC**

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
Email: bsullivan@sha-llc.com
      whazeltine@sha-llc.com

and

Brad R. Berliner, Esq.
Andrew J. Herink, Esq.
Daniel Sullivan, Esq.
Central States Funds
8647 W. Higgins Road
Chicago, IL 60631
(847) 939-2478 - Office
bberliner@centralstatesfunds.org
aherink@centralstatesfunds.org
dsulliva@centralstatesfunds.org

*Attorneys for Central States, Southeast and Southwest Areas Pension Fund*