## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**Hearing Date: March 6, 2024 at 2:00 p.m. (ET)**
**Response Deadline: February 9, 2024 at 4:00 p.m. (ET)**

## DEBTORS' SECOND OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM FOR WITHDRAWAL LIABILITY

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
tcairns@pszjlaw.com
pkeane@pszjlaw.com
ecorma@pszjlaw.com

*Co-Counsel for the Debtors and Debtors in Possession*

Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    patrick.nash@kirkland.com
david.seligman@kirkland.com
michael.slade@kirkland.com

Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email:    michael.esser@kirkland.com
john.christian@kirkland.com

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................. 7

RELIEF REQUESTED .......................................................................................................... 10

JURISDICTION & VENUE .................................................................................................. 10

BACKGROUND .................................................................................................................... 11

A.     Congress Has Established Multiple Safeguards for Multiemployer Pension Plans. ........ 11

      1.     Federal law insures multiemployer pension plans and imposes liability on employers who withdraw from the funds. ............................................................ 11

      2.     Congress provided pension funds with tools to address short-term funding issues. ................................................................................................................ 13

B.     Congress Enacts ARPA To Solve MEPPs' Problems. ..................................................... 14

C.     The Pension Plans Submit SFA Applications Seeking Billions of Taxpayer Dollars. ............................................................................................................................ 16

D.     The Debtors Commence These Chapter 11 Cases, and the Pension Plans File 150 Proofs of Claim Seeking More than $1.6 billion. ............................................................ 20

LEGAL STANDARD ............................................................................................................ 21

ARGUMENT .......................................................................................................................... 22

A.     The Pension Plans Cannot File Duplicative Claims or Seek Double Recovery. .............. 22

B.     Western PA Teamsters Should Be Estopped from Seeking Withdrawal Liability Payments, However Characterized. .................................................................................. 25

C.     The Proofs of Claim Must Be Reduced Or Eliminated. .................................................. 26

      1.     The Pension Plans' efforts to ignore millions in SFA funding to calculate withdrawal liability cannot succeed. ................................................................. 26

      2.     Many of the Pension Plans failed to properly calculate annual withdrawal liability payments and/or apply ERISA's cap for withdrawal liability payments. ....................................................................................................... 28

      3.     Many of the Pension Plans' Proofs of Claim must be discounted to net present value. .................................................................................................... 31

CONCLUSION ....................................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Combs v. Classic Coal Corp.*,
   931 F.2d 96 (D.C. Cir. 1991) ................................................................................................36

*Connolly v. Pension Ben. Guar. Corp.*,
   475 U.S. 211 (1986) ...........................................................................................................17

*Cott Corp. v. New England Teamsters & Trucking Indus. Pension Fund (In re Cott Corp.*),
   26 B.R. 332 (Bankr. D. Conn. 1982) .................................................................................37

*Granfinanciera, S.A., v. Nordberg*,
   492 U.S. 33 (1989) .............................................................................................................26

*In re Affiliated Foods, Inc.*,
   249 B.R. 770 (Bankr. W.D. Mo. 2000) ..............................................................................37

*In re Allegheny Int'l, Inc.*,
   954 F.2d 167 (3d Cir. 1992) .........................................................................................26, 27

*In re Anson*,
   457 B.R. 130 (Bankr. M.D. Fla. 2011) ..............................................................................29

*In re Cont'l Airlines Corp.*,
   57 B.R. 845 (Bankr. S.D. Tex. 1985) ................................................................................28

*In re F.W.D.C., Inc.*,
   158 B.R. 523 (Bankr. S.D. Fla. 1993) ...............................................................................29

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
   160 B.R. 882 (Bankr. S.D.N.Y. 1993) ..............................................................................28

*In re Holm*,
   931 F.2d 620 (9th Cir. 1991) .............................................................................................27

*In re Marcal Paper Mills, Inc.*,
   650 F.3d 311 (3d Cir. 2011) ..............................................................................................34

*In re Pierport Dev. & Realty, Inc.*,
   491 B.R. 544, 547 (Bankr. N.D. Ill. 2013) ........................................................................28

*In re Sacred Heart Hosp. of Norristown*,
   182 B.R. 413 (Bankr. E.D. Pa. 1995) ................................................................................29

*In re Stone & Webster, Inc.*,
   279 B.R. 748 (Bankr. D. Del. 2002) ...................................................36

*In re Town Sports Int'l*,
   2023 WL 8827193 (D. Del. Dec. 21, 2023)...........................................26

*In re U.S. Airways Grp., Inc.*,
   303 B.R. 784 (Bankr. E.D. Va. 2003)...................................................36

*In re Vanguard Nat. Res., LLC*,
   2021 WL 220697 (Bankr. S.D. Tex. Jan. 21, 2021) ..............................28

*In re Vebeliunas*,
   332 F.3d 85 (2d Cir. 2003).....................................................................31

*In re Webb*,
   99 B.R. 283 (Bankr. E.D. Pa. 1989) .....................................................31

*In re Winstar Commc'ns, Inc.*,
   554 F.3d 382 (3d Cir. 2009)...................................................................26

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
   274 F.3d 706 (2d Cir. 2001)...................................................................31

*Langenkamp v. Culp*,
   498 U.S. 42 (1990).................................................................................26

*Matter of Baldwin-United Corp.*,
   55 B.R. 885 (Bankr. S.D. Ohio 1985)...................................................29

*Pension Benefit Guar. Corp. v. R.A. Gray Co.*,
   467 U.S. 717 (1984)...............................................................................34

*Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund*,
   15 F.4th 407 (6th Cir. 2021) .............................................17, 18, 33, 36

*Travellers Int'l AG v. Robinson*,
   982 F.2d 96 (3d Cir. 1992).....................................................................26

*Trs. of the Local 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc.*,
   692 F.3d 127 (2d Cir. 2012)...................................................................34

*United Student Aid Funds, Inc. v. Espinosa*,
   559 U.S. 260 ..........................................................................................26

**Statutes**

11 U.S.C. § 502............................................................................................11, 16

11 U.S.C. § 502(a) ................................................................................................26

11 U.S.C. § 502(b) ...........................................................................................15, 26

28 U.S.C. § 157 .....................................................................................................15

28 U.S.C. § 1334 ...................................................................................................15

28 U.S.C. § 1408 ...................................................................................................16

28 U.S.C. § 1409 ...................................................................................................16

29 U.S.C. § 1085(b)(6) ..........................................................................................19

29 U.S.C. § 1085(e)(9)(B)(i) ..................................................................................19

29 U.S.C. § 1381(a) ...............................................................................................33

29 U.S.C. § 1382 ...................................................................................................17

29 U.S.C. § 1393(a)(1) ...........................................................................................18

29 U.S.C. § 1399 ...................................................................................................17

29 U.S.C. § 1399(b) ...............................................................................................12

29 U.S.C. § 1399(c)(1)(B) .....................................................................................34

29 U.S.C. § 1401(a)(3)(B) .....................................................................................18

29 U.S.C. § 1405(b) ...............................................................................................37

**Rules**

Fed. R. Bankr. P. 3001(f) .......................................................................................26

Fed. R. Bankr. P. 3007 ................................................................................11, 15, 16

Fed. R. Bankr. P. 9013-1(f) ....................................................................................16

**Other Authorities**

29 C.F.R. § 1432(a)(2) ...........................................................................................20

29 C.F.R. § 4211.4(a)(1) .........................................................................................34

29 C.F.R. § 4211.4(a)(2) .........................................................................................34

29 C.F.R. § 4211.21(c) ...........................................................................................33

29 C.F.R. § 4219(c).................................................................................................................34, 35

29 C.F.R. § 4219(c)(1)(B)...........................................................................................................34

29 C.F.R. § 4225(b) ....................................................................................................................37

29 C.F.R. § 4262 .........................................................................................................................30

29 C.F.R. § 4262.16(g)(2)...........................................................................................................32

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby object, pursuant to Section 502 of chapter 11 of of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to each proof of claim for withdrawal liability (each a "Proof of Claim," and together, the "Proofs of Claim") filed by Freight Drivers and Helpers 557 Pension ("Freight Drivers")[2]; International Association of Motor City Machinists Pension Fund ("IAM")[3]; Management Labor Pension Fund Local 1730 ("Local 1730")[4]; Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund ("Local 701")[5]; New York State Teamsters Conference Pension & Retirement Fund ("New York Teamsters")[6]; Road Carriers Local 707 Pension Fund ("Local 707")[7]; Teamsters Local 617 Pension Plan ("Local 617")[8]; Teamsters Local 641 Pension Plan ("Local 641")[9]; Trucking Employees of North Jersey Pension Fund ("TENJ")[10]; Western Pennsylvania Teamsters and Employers Pension Fund ("Western PA Teamsters")[11] (collectively, the "Pension Plans").

---

[2]   *See* Proofs of Claim Nos. 16705, 18597, 18605, 18610, 18616, 18619, 18625, 18629, 18630, 18634, 18640, 18643, 18647, 18652, 18655, 18659, 18667, 18673, 18679, 18681, 18687, 18690, 18694, 18699.

[3]   *See* Proofs of Claim Nos. 16895, 16905.

[4]   *See* Proof of Claim No. 14718.

[5]   *See* Proofs of Claim Nos. 15001, 15002, 15003, 15004, 15005, 15008, 15009, 15011, 15012, 15013, 15014, 15015, 15016, 15017, 15018, 15019, 15020, 15021, 15023, 15024, 15025, 15026, 15027, 15029.

[6]   *See* Proofs of Claim Nos. 4489, 4490, 4491, 4492, 4493, 4494, 4495, 4496, 4497, 4498, 4499, 4500, 4501, 4502, 4503, 4504, 4505, 4506, 4507, 4508, 4509, 4510, 4511, 4512.

[7]   *See* Proofs of Claim Nos. 14941, 19144.

[8]   *See* Proofs of Claim Nos. 15727, 15728, 15730, 15735, 15738, 15740, 15741, 15743, 15745, 15747, 15750, 15751, 15753, 15755, 15757, 15759, 15760, 15761, 15763, 15764, 15765, 15767, 15768, 15770.

[9]   *See* Proofs of Claim Nos. 5505, 5506, 5507, 5508, 5509, 5510, 5511, 5512, 5513, 5514, 5515, 5516, 5517, 5518, 5519, 5520, 5521, 5522, 5523, 5524, 5525, 5526, 5527, 5528.

[10]   *See* Proof of Claim No. 14722.

[11]   *See* Proofs of Claim Nos. 18200, 18217, 18230, 18244, 18257, 18267, 18282, 18292, 18307, 18318, 18329, 18339, 18348, 18358, 18369, 18378, 18389, 18397, 18410, 18416, 18422, 18430, 18438, 18442.

The Pension Plans are multi-employer pension funds that filed 150 Proofs of Claim against the estates, seeking more than *$1.6 billion* in withdrawal liability.[12]  But these Proofs of Claim are demonstrably overstated.  As of the Petition Date, the Pension Plans had applied for and received more than *$5.32 billion* in special financial assistance from the U.S. Treasury based on its assessment of what the Pension Plans would need cover all benefits and required payments until 2051 (and, for all realistic and practical purposes, forever).  This financial assistance thus ensured that the Pension Plans will have sufficient funding for decades, wiping out any unfunded vested benefits the Pension Plans may have had and any withdrawal liability the Debtors may have owed.

But even if such financial assistance were not taken into account (it should be), the Pension Plans' Proofs of Claim would still have to be substantially reduced or disallowed entirely, as they rely on overstated contribution rates, failed to apply relevant statutory caps, and/or were not discounted to present value, inflating the amounts allegedly owed by hundreds of millions.

For these reasons, and as the Debtors will establish following fact and expert discovery and trial, the Pension Plans' Proofs of Claim should be disallowed in full or in overwhelming part.[13]

## INTRODUCTION

1.    The Pension Plans have struggled to manage their funds for years.  At various points between 2015 and 2022, the federal government considered each of the Pension Plans to be in "critical" or "critical and declining" status because of their severe funding and/or liquidity issues.[14]

---

[12]    *See supra* notes 2-11.

[13]    This Objection is intended to, among other things, satisfy any obligation to request review by the Pension Plans of their alleged withdrawal liability assessment, as set forth under ERISA § 4219(b), 29 U.S.C. § 1399(b), to the extent, if any, that making such a request is required of any Debtor.

[14]    *See, e.g.*, https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2015-funding-status-notices#2015-c-and-d (Local 1730, New York Teamsters, and Western PA Teamsters in "critical" status; Local 707, Local 641, Freight Drivers, Local 617, and IAM in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2016-funding-status-notices#2016-c-and-d (Western PA Teamers in "critical" status; Local 1730, New York Teamsters, Local 707, Local 641, TENJ, Freight Drivers, Local 617, and IAM in "critical and declining" status);

2.      For this reason, in 2021 and 2022, the Pension Plans asked the government for a bailout of billions in taxpayer dollars.  Without this bailout, the Pension Plans warned, they would be unable to avoid projected insolvency, and/or would not be able to restore benefits they had previously suspended.[15]  Based on these and other representations relating to the Pension Plans' financial standing, the government ultimately awarded the Pension Plans more than $5 billion in federal funding.

---

https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2017-funding-status-notices#2017-c-and-d (Local 617 in "critical" status; Local 1730, Local 701, New York Teamsters, Local 641, Western PA Teamsters, Freight, and IAM in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2018-funding-status-notices#2018-c-and-d (New York Teamsters, IAM, and Local 617 in "critical" status; Local 1730, Local 701, Local 641, Western PA Teamsters, and Freight Drivers in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2019-funding-status-notices#2019-c-and-d (New York Teamsters and Local 617 in "critical" status; Local 1730 and Western PA Teamsters in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2020-funding-status-notices#2020-c-and-d (New York Teamsters, Western PA Teamsters, and Local 617 in "critical" status; Local 641 and Freight Drivers in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2021-funding-status-notices#2021-c-and-d (New York Teamsters, Western PA Teamers, and Local 617 in "critical" status; Local 641 in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2022-funding-status-notices#2022-c-and-d (New York Teamsters in "critical" status).

[15] *See, e.g.,* Local 1730's Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/local-1730-ila.pdf, at 3 (noting that the plan had been insolvent since 2014); Local 701's Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/mid-jersey-trucking-app-sfa.pdf, at 1-3 (noting that Local 701 had suspended benefits under ERISA effective April 1, 2019, and would reinstate such benefits "effective as of the month in which the SFA is paid to the Plan"); New York Teamsters Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/ny-state-teamsters-conference-app-sfa.pdf, at 3, 14 (noting that New York Teamsters had suspended benefits under ERISA, and would reinstate such benefits "effective as of the first month in which SFA is paid to the Fund"); Local 707's Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/road-carriers-local-707-sfa.pdf, at 5 (noting the fund has been insolvent since February 1, 2017); Local 641's Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/teamsters-641-sfa.pdf, at 3 (noting that the fund has been insolvent since March 1, 2021, and had suspended benefits under ERISA); TENJ's Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/trucking-ees-nj-sfa.pdf, at 1 (noting that the fund has been insolvent since July 1, 2021, and had suspended benefits under ERISA); Western PA Teamsters' Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/western-pa-teamsters-sfa-app.pdf, at 2 (noting that the fund had suspended benefits effective August 1, 2019); Freight Drivers' Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/freight-drivers-local-577-app-sfa-revised.pdf, at 1 ("Without SFA, the Plan will be insolvent within one year of this application, on January 1, 2023, the first day of the next plan year."); IAM's Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/iam-motor-city-pension-plan-sfa-app.pdf, at 17-18 (noting that IAM would pay previously suspended benefits "as soon as administratively possible after receipt of the Special Financial Assistance.").

4866-9848-2592.1 96859.001

3.      The Pension Plans' assertion of approximately $1.6 billion in claims against the chapter 11 estates completely ignores this funding—which they actually received and physically possess.  Instead, the Pension Plans appear to assume that they are as underfunded today as they were prior to their government bailout last year.  The Pension Plans' Proofs of Claim thus belie the reality of their situation as of the Petition Date and seek an inequitable result fundamentally inconsistent with the Bankruptcy Code.

4.      More specifically, the Pension Plans' Proofs of Claim ignore the fact that, in March 2021, Congress enacted the American Rescue Plan Act ("ARPA") to salvage failing multi-employer pension funds with special financial assistance ("SFA").  SFA funding under ARPA involves "loans" that do not have to be repaid to cover a pension fund's liabilities, thereby reducing or—as here—eliminating a pension fund's unfunded vested benefits (vested liabilities less assets) ("UVBs") to ensure there are sufficient funds to pay all benefits owed by the plan to its retirees, beneficiaries, and active participants.  The opportunity to secure this funding was a lifeline to many multiemployer pension plans, which promptly submitted applications seeking such assistance.

5.      In this case, the Pension Plans possessed every dollar of that $5.32 billion in SFA funding as of the Petition Date.  The Debtors believe and will prove that such SFA funding, together with the Pension Plans' other assets, investment returns, and contributions, is sufficient to cover any and all benefits and expenses owed to Pension Plan retirees, beneficiaries, and active participants.  Stated succinctly, the Pension Plans are fully funded and there should be no withdrawal liability because there are no UVBs.

6.      Nevertheless, the Pension Plans have proceeded to file approximately 150 Proofs of Claim against the estates, alleging withdrawal liability and seeking nearly $1.6 billion.  This is an improper attempt to seek a windfall and double recovery.  The Pension Plans cannot ignore the

9

SFA or feign a need to allocate to the Debtors an attributable share of UVBs that do not exist, at the expense of the Debtors' unsecured creditors and equity holders. The bankruptcy process cannot, and principles of equity do not, countenance such an inequitable result.

7. Moreover, even if the Pension Plans' Proofs of Claim were (following discovery and trial) to be allowed in any amount, they must be significantly reduced. As described above, the Pension Plans' Proofs of Claim ignores $5.32 billion in funding that was on their balance sheets and in their possession long before the Petition Date. That funding eliminates any purpose of, or basis for, an assessment of "withdrawal liability." In addition, while the Pension Plans' calculations are not entirely clear and the Debtors will need discovery to fully understand the claims, it appears that the Pension Plans failed to account for required liability caps, and their claims (if allowed at all) must be discounted to present value.

8. Based on these and other arguments set forth more fully below, and that will be further demonstrated at trial, the Court should sustain the Debtors' objection to the Pension Plans' Proofs of Claim.

## RELIEF REQUESTED

9. The Debtors request entry of an order pursuant to Section 502(b) of the Bankruptcy Code and Rule 3007 of the Bankruptcy Rules disallowing the Pension Plans' Proofs of Claim in their entirety or reducing them by, among other things, eliminating any double counting, applying relevant statutory caps, and discounting the claims to present value—any of which would reduce any allowed claim(s) by hundreds of millions of dollars.

## JURISDICTION & VENUE

10. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Pension Plans have waived any objection to this Court's

10

adjudication of their Proofs of Claim by voluntarily filing 150 Proofs of Claim in this Court and seeking allowance of such claims here.  But in any event, the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Practice and Procedure of the U.S. Bankruptcy Court for the District of Delaware, to this Court entering a final order in connection with the Proofs of Claim and this Objection to the extent that it is later found that the Court, absent consent, cannot enter final orders or judgments in connection herewith consistent with Article III of the U.S. Constitution.

11.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.    The statutory bases for the relief requested herein are sections 502 of the Bankruptcy Code, Rule 3007 of the Bankruptcy Rules, and Rule 3007-1 of the Local Rules.

## BACKGROUND

**A.    Congress Has Established Multiple Safeguards for Multiemployer Pension Plans.**

**1.    Federal law insures multiemployer pension plans and imposes liability on employers who withdraw from the funds.**

13.    Most multiemployer pension plans ("MEPPs") were established in the decade following the passage of the Taft-Hartley Act of 1947.  The Taft-Hartley Act set forth procedural and substantive standards for unions and employers regarding the provision of pension benefits. At the time, participating employers negotiated a contribution rate to the plan, and the plan's board of trustees set pension benefits consistent with the expected contributions.

14.    Rules governing the contributions-benefits process changed with the passage of the Employee Retirement Income Security Act of 1974 ("ERISA"), which set forth a comprehensive scheme to regulate private pension plans.    ERISA established reporting and disclosure requirements; minimum funding standards; fiduciary duties; and plan termination insurance.  It also established the Pension Benefit Guaranty Corporation ("PBGC"), an administrative agency

11

under the Department of Labor that manages the plan termination insurance program. This effectively put the federal government in the position of guaranteeing benefits under MEPPs.

15. In the late 1970s, Congress directed PBGC to report on the challenges of insuring MEPPs and to propose legislative solutions. *See Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund*, 15 F.4th 407, 415 (6th Cir. 2021). PBGC, in turn, found that ERISA did not adequately protect multiemployer plans from individual employer withdrawals. *Id.* The problem was that "[e]mployer withdrawals reduce[d] a plan's contribution base," which would "push[] the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan." *Id.* (quoting *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 216 (1986)). Such increased rates would encourage further withdrawals, "thereby increasing the inherited liabilities to be funded by an ever decreasing contribution base," and creating a "vicious downward spiral". *Id.* (quoting *Connolly*, 475 U.S. at 216). PBGC thus recommended imposing withdrawal liability on employers leaving MEPPs, "requiring them to pay for their fair share of the plan's unfunded liabilities." *Id.* at 416. (internal quotations and citations omitted). Congress later incorporated these recommendations into the Multiemployer Pension Plan Amendments Act ("MPPAA"), which became law in 1980.

16. Through ERISA and the MPPAA, "Congress has established a comprehensive scheme for assessing and challenging an assess[ed] withdrawal liability. When an employer withdraws from a multiemployer plan, the plan sponsor is responsible for assessing withdrawal lability and sending the employer a demand for payment." *Sofco Erectors*, 15 F.4th at 416 (internal citation omitted) (citing 29 U.S.C. §§ 1382, 1399). Plan sponsors typically conduct these assessments in accordance with the requirements of ERISA and MPPAA: professional actuaries

12

calculate withdrawal liability by using "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a)(1).

17.    It is the responsibility of the pension fund (here, Freight Drivers, Local 1730, Local 701, New York Teamsters, Local 641, Local 617, Local 707, Local 741, TENJ, Western PA Teamsters) to perform an initial formal assessment of withdrawal liability.  A current or former employer (such as the Debtors) that participated in the fund can then challenge any such assessment by, among other things, showing "that the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable . . . or the plan's actuary made a significant error in applying the actuarial assumptions or methods." *Sofco Erectors,* 15 F.4th at 416-17 (quoting 29 U.S.C. §§ 1393(a)(1), 1401(a)(3)(B)).  Here, while it is unclear how exactly the Pension Plans calculated their Proofs of Claim seeking withdrawal liability, it appears they did not do so in a manner that reflects the actual status of the Pension Plans' current assets and liabilities.

### 2.    Congress provided pension funds with tools to address short-term funding issues.

18.    During the 1990s, many MEPPs experienced investment returns significantly higher than anticipated by actuarial assumptions, and increased their benefit levels accordingly. But following the stock market crash in 2000, some MEPPs were left with unfunded liabilities.[16]

19.    Concerns about addressing these liabilities were among the driving forces behind the multiemployer part of the Pension Protection Act of 2006 ("PPA").  The PPA gave plans tools to address short-term funding issues without cutting benefits or requiring additional contributions.

---

[16]    Multiemployer Pension Plans: Report to Congress Required by the Pension Protection Act of 2006 at 2.

For instance, the PPA allowed for an automatic five-year extension of the amortization period required to amortize liabilities for minimum funding purposes, and for automatic approval of the "shortfall" funding method.[17]  The PPA also created categories of "troubled plans" based on three measures: the plan's funded percentage (the smoothed actuarial value of assets divided by the present value of accrued benefits using the plan's assumptions)[18]; the number of years before the plan is projected to have a minimum funding deficiency under ERISA; and the number of years before the plan projects to become insolvent.[19]  Based on these measures, a troubled plan could be categorized as in the (1) Yellow Zone, or "endangered" if the funded percentage is less than 80% or a minimum funding deficiency is projected in the next seven years; (2) Orange Zone, or "seriously endangered" if the funded percentage is less than 80% and a minimum funding deficiency is projected in the next seven years; or (3) Red Zone, or "critical" if a funding deficiency is projected in the next four years, or five years if the funded percentage is less than 65%.[20]

20.    The Multiemployer Pension Reform Act of 2014 ("MPRA") further modified other rules for MEPPs.  For instance, a plan in "critical and declining" status could apply for an exception to reduce otherwise protected accrued benefits to as low as 110% of the PBGC guaranteed level. However, reductions would only be permitted by the U.S. Treasury if the plan actuary certified that, accounting for certain factors, the plan would be projected to avoid insolvency.[21]

**B.    Congress Enacts ARPA To Solve MEPPs' Problems.**

---

[17]    *Id*. at 2-4, 30-34.

[18]    *Id*. at n.47.

[19]    *See* 29 U.S.C. § 1085(b)(6).

[20]    *See id.* § 1085(b)(1)-(2); CONG. RSCH. SERV., R43305, MULTIEMPLOYER DEFINED BENEFIT (DB) PENSION PLANS: A PRIMER 18 (Apr. 3, 2020).  When the PPA provisions were modified in 2014 by MPRA, a new category was added to the list, and if a plan in the Red Zone was projected to become insolvent in the next 20 years, it would be categorized as "critical and declining."  *See* 29 U.S.C. § 1085(b)(6).

[21]    29 U.S.C. § 1085(e)(9)(B)(i), (e)(9)(C).

21.     On March 11, 2021, Congress passed ARPA, which established an SFA program to save and secure what were then severely underfunded MEPPs in critical status.  Under ARPA, eligible MEPPs can receive special financial assistance in the amount needed to pay participants' full plan benefits through at least 2051.[22]

22.     There is no cap on the amount of financial assistance that may be granted by the PBGC to an eligible MEPP.[23]  In fact, the very purpose of the legislation was to save failing MEPPs and to ensure that all promised benefits were and are paid.

23.     Section 9704 of ARPA appropriated funds in "such amounts as are necessary" to provide special financial assistance to eligible MEPPs.  Unlike past financial assistance programs run by the PBGC, any SFA awarded under ARPA ***does not have to be repaid***.  29 C.F.R. § 1432(a)(2) ("A plan receiving special financial assistance pursuant to this section shall not be subject to repayment obligations with respect to such special financial assistance.").

24.     To qualify for the SFA program, a MEPP must submit an application to the PBGC and demonstrate either that it (1) is in critical and declining status in any plan year from 2020 through 2022; (2) had an application to suspend benefits under the MPRA approved prior to the enactment of ARPA; (3) has a modified funded percentage of less than 40% and a ratio of active to inactive participants in the plan is less than 2:3; or (4) became insolvent after December 14, 2014 but was not terminated by the date ARPA was enacted.[24]

25.     In this case, each of the Pension Plans qualified for the SFA program under one or more of ARPA's prongs, to wit: Freight Drivers qualified for the SFA program because it was

---

[22]     Am. Rescue Plan Act of 2021, H.R. 1319, 117th Cong. § 4262(j)(1).

[23]     Am. Rescue Plan Act of 2021, H.R. 1319, 117th Cong. § 4262(i)(2).

[24]     CONG. RSCH. SERV., R46803, MULTIEMPLOYER DEFINED BENEFIT PENSION PLANS POTENTIALLY ELIGIBLE FOR SPECIAL FIN. ASSISTANCE UNDER THE AM. RESCUE PLAN ACT  1 (May 28, 2021) at 3.

certified as a "critical and declining" pension fund in the 2020 plan year[25]; Local 1730, Local 707, Local 641, and TENJ were insolvent but did not terminate prior to ARPA[26]; and IAM, Local 617, Local 701, New York Teamsters, and Western PA Teamsters suspended benefits prior to ARPA.[27]

### C.    The Pension Plans Submit SFA Applications Seeking Billions of Taxpayer Dollars.

26.    Between 2021 and 2022, each of the Pension Plans submitted applications and supplemental applications to PBGC seeking SFA funding.  Specifically:

- **Freight Drivers**: On March 4, 2022, Freight Drivers submitted an SFA application, which Freight Drivers later withdrew and resubmitted on June 9, 2022.  Freight Drivers supplemented this application on November 8, 2022.  Through these applications, Freight Drivers ultimately sought $198,868,856 in SFA funding.[28]

- **IAM:** On August 26, 2022, IAM submitted an SFA application, seeking a total of $64,772,320 in SFA funding.[29]

---

[25]    *See* Freight Drivers' SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/freight-drivers-local-577-app-sfa-revised.pdf, at 1 ("The Fund is a multiemployer defined benefit pension plan that has been certified to be in critical and declining status.").

[26]    *See* Local 1730's Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/local-1730-ila.pdf, at 3; Local 707's Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/road-carriers-local-707-sfa.pdf, at 5; Local 641's Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/teamsters-641-sfa.pdf, at 3; TENJ's Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/trucking-ees-nj-sfa.pdf, at 1.

[27]    Local 701's Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/mid-jersey-trucking-app-sfa.pdf, at 1; New York Teamsters Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/ny-state-teamsters-conference-app-sfa.pdf, at 3; Western PA Teamsters' Special Financial Assistance Application, *available at* https://www.pbgc.gov/sites/default/files/documents/western-pa-teamsters-sfa-app.pdf, at 2; IAM's SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/iam-motor-city-pension-plan-sfa-app.pdf, at 16 ("[IAM] meets the eligibility requirements . . . because the Plan implemented a suspension of benefits under [ERISA] effective prior to March 11, 2021."); Local 617's SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/teamsters-617-sfa.pdf, at 1 ("The Teamsters Local 617 Pension Fund became insolvent in March 2020 and benefits were suspended under [ERISA] effective March 1, 2020.")

[28]    *See* Freight Drivers' SFA Applications, *available at* https://www.pbgc.gov/arp-sfa/sfa-applications/500383.

[29]    *See* IAM's SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/iam-motor-city-pension-plan-sfa-app.pdf.

4866-9848-2592.1 96859.001

- **Local 617**: On September 10, 2021, Local 617 submitted an SFA application, which Local 617 later withdrew and resubmitted on December 30, 2021.  Local 617 supplemented this application on August 15, 2022.[30]

- **Local 641:** On September 9, 2021, Local 641 submitted an SFA application, which Local 641 later withdrew and resubmitted on December 1, 2021.  Local 641 then supplemented this application on September 23, 2022.  Through these applications, Local 641 ultimately sought $582,080,104 in SFA funding.[31]

- **Local 701:** On February 7, 2022, Local 701 submitted an SFA application, which Local 701 later supplemented on August 10, 2022.  Through these applications, Local 701 ultimately sought $189,464,921 in SFA funding.[32]

- **Local 707:** On August 13, 2021, Local 707 submitted an SFA application, which Local 707 later withdrew and resubmitted on November 12, 2021.  Local 707 then supplemented this application on August 8, 2022.  Through these applications, Local 707 ultimately sought $819,340,672 in SFA funding.[33]

- **Local 1730:** On September 23, 2021, Local 1730 submitted an SFA application, which Local 1730 later withdrew and resubmitted on January 20, 2022.  Local 1730 then supplemented this application on August 23, 2022.  Through these applications, Local 1730 ultimately sought $64,399,591 in SFA funding.[34]

- **New York Teamsters:** On January 28, 2022, New York Teamsters submitted an SFA application, which New York Teamsters later withdrew

---

[30] *See* Local 617's SFA Applications, *available at* https://www.pbgc.gov/sites/default/files/documents/teamsters-617-sfa.pdf; https://www.pbgc.gov/sites/default/files/documents/teamsters-617-revised-app-sfa.pdf; https://www.pbgc.gov/sites/default/files/documents/teamsters-617-sfa-supplemented.pdf.

[31] *See* Local 641's SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/teamsters-641-sfa-application-revised.pdf (seeking $490,608,022); Local 641's Supplemental SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/teamsters-641-sfa-supplemented-resubmitted.pdf (seeking an additional $91,472,082).

[32] *See* Local 701's SFA Application, *available at* _ (seeking $138,606,547); Local 701's Supplemental SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/mid-jersey-trucking-sfa-supplemented.pdf (seeking an additional $50,858,374).

[33] *See* Local 707's SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/road-carriers-local-707-sfa-revised2.pdf (seeking $710,402,487); Local 707's Supplemental SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/road-carriers-local-707-sfa-supplemented.pdf (seeking an additional $108,938,185).

[34] *See* Local 1730's SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/local-1730-ila-revised.pdf (seeking $58,572,767); Local 1730's Supplemental SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/local-1730-ila-sfa-supplemented.pdf (seeking an additional $5,826,824).

and resubmitted on July 21, 2022. New York Teamsters then supplemented this application on December 9, 2022. Through these applications, New York Teamsters ultimately sought $1,339,417,395 in SFA funding.[35]

- **TENJ:** On September 23, 2021, TENJ submitted an SFA application, which TENJ later withdrew and resubmitted on January 11, 2022. TENJ then supplemented this application on August 9, 2022. Through these applications, TENJ ultimately sought $736,485,521 in SFA funding.[36]

- **Western PA Teamsters:** On March 30, 2022, Western PA Teamsters submitted an SFA application, which Western PA Teamsters later supplemented on March 9, 2023. Through these applications, Western PA Teamsters ultimately sought $958,661,932 in SFA funding.[37]

27. To justify the amount of SFA funding for which they were applying, the Pension Plans had to show how much they expected to receive on a go-forward basis from employer contributions and withdrawal liability payments, relative to its estimated liabilities. To project future employer contributions, the Pension Plans made certain assumptions regarding employers' contribution base units and contribution rates. The Pension Plans also had to make assumptions about the amount of withdrawal liability payments it would receive from employers that withdrew from the fund prior to March 31, 2022, and those that may withdraw in the future. At least one of the Pension Plans – Western PA Teamsters – affirmatively represented in its SFA application that

---

[35] *See* New York Teamsters' SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/ny-state-teamsters-conference-sfa-app-revised.pdf (seeking $918,076,344); New York Teamsters' Supplemental SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/ny-state-teamsters-conference-sfa-app-supplemented.pdf (seeking an additional $421,341,361).

[36] *See* TENJ's SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/trucking-ees-nj-revised-app-sfa.pdf (seeking $655,771,967); TENJ's Supplemental SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/trucking-ees-nj-sfa-supplemented.pdf (seeking an additional $80,713,554).

[37] *See* Western PA Teamsters' SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/western-pa-teamsters-sfa-app.pdf (seeking $691,506,257); Western PA Teamsters' Supplemental SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/western-pennsylvania-teamsters-and-employers-pension-fund-sfa-app-supplemented.pdf (seeking an additional $267,155,675).

it did not expect to receive any such withdrawal liability payments from the Debtors because the Debtors were "either unlikely to withdraw or would be bankrupt at withdrawal."[38]

28.    Between January 2022 and July 2023, and based on the information in the Pension Plans' applications and supplemental applications, PBGC awarded the Pension Plans approximately $5.32 billion in SFA funding – $205.6 million to Freight Drivers[39]; $66 million to IAM[40]; $186.9 million to Local 617[41]; $68.1 million to Local 1730[42]; $194.6 million to Local 701[43]; $1.4 billion to New York Teamsters[44]; $840.7 million to Local 707[45]; $613 million to Local 641[46]; $757.6 million to TENJ[47]; and $994.6 million to Western PA Teamsters.[48]  Upon receiving notice of such awards, the Pension Plans advised their members that the funds were now secure and would be able to continue paying benefits well into the future.[49]

---

[38]    *See*    Western    PA    Teamsters'    SFA    Application,    *available    at*, https://www.pbgc.gov/sites/default/files/documents/western-pa-teamsters-sfa-app.pdf, at 11.

[39]    *See*    https://www.pbgc.gov/news/press/releases/pr22-35    (awarding    Freight    Drivers    $192.8    million); https://www.pbgc.gov/news/press/releases/pr23-013 (awarding Freight Drivers an additional $12.8 million).

[40]    *See* https://www.pbgc.gov/news/press/releases/pr22-62 (awarding IAM $66 million).

[41]    *See*    https://www.pbgc.gov/news/press/releases/pr22-13    (awarding    Local    617    $155.8    million); https://www.pbgc.gov/news/press/releases/pr22-56 (awarding Local 617 an additional $31.1 million);

[42]    *See*    https://www.pbgc.gov/news/press/releases/pr22-24    (awarding    Local    1730    $62    million); https://www.pbgc.gov/news/press/releases/pr22-60 (awarding Local 1730 an additional $6.1 million).

[43]    *See*    https://www.pbgc.gov/news/press/releases/pr22-26    (awarding    Local    701    $142.2    million) https://www.pbgc.gov/news/press/releases/pr22-48 (awarding Local 701 an additional $52.4 million).

[44]    *See*    https://www.pbgc.gov/news/press/releases/pr22-42    (awarding    New    York    Teamsters    $963.4    million); https://www.pbgc.gov/news/press/releases/pr23-017 (awarding New York Teamsters an additional $438 million).

[45]    *See*    https://www.pbgc.gov/news/press/releases/pr22-03    (awarding    Local    707    $726.6    million); https://www.pbgc.gov/news/press/releases/pr22-52 (awarding Local 707 an additional $114.1 million).

[46]    *See*    https://www.pbgc.gov/news/press/releases/pr22-08    (awarding    Local    641    $516.9    million); https://www.pbgc.gov/news/press/releases/pr23-002 (awarding Local 641 an additional $96.1 million).

[47]    *See*    https://www.pbgc.gov/news/press/releases/pr22-18    (awarding    TENJ    $673.1    million); https://www.pbgc.gov/news/press/releases/pr22-49 (awarding TENJ an additional $84.5 million).

[48]    *See* https://www.pbgc.gov/news/press/releases/pr22-30 (awarding Western PA Teamsters $715 million); https://www.pbgc.gov/news/press/releases/pr23-030 (awarding Western PA Teamsters an additional $279.6 million).

[49]    *See, e.g.*,    https://www.nystpensionfund.org/media/1244/20230502-nyst-final-sfa-payment-participant-communication.pdf ("The receipt of SFA is an extremely positive development for the NYS Fund and its participants. ***In addition to allowing the restoration of benefits previously suspended under MPRA, SFA monies***

19

29.     The Pension Plans ultimately received the vast majority of their SFA funds in advance of the Debtors' bankruptcy and the Pension Plans' decision to file the instant Proofs of Claim.[50]

**D.     The Debtors Commence These Chapter 11 Cases, and the Pension Plans File 150 Proofs of Claim Seeking More than $1.6 billion.**

30.     In July 2023, as a result of unconscionable conduct by Teamsters leadership that is detailed in the Debtors' First-Day Declaration,[51] the Debtors commenced a permanent reduction

---

*will help strengthen the long-term financial health of the NYS Fund.*") (emphasis added); https://www.nystpensionfund.org/media/1239/20221118-sfa-notice-of-approval.pdf ("The Trustees are mindful of the hardships that the MPRA benefit suspensions imposed on participants and pledged to make every effort to obtain a legislative solution that would allow for the restoration of benefits. *The Trustees are happy to have satisfied that pledge and look forward not only to restoring benefits previously suspended, but to providing benefits into the future.*") (emphasis added); https://641funds.org/pension-fund#:~:text=Teamsters%20Local%20641%20Pension%20Fund%20is%20greatly%20appreciative%20for%20the,families%20and%20ensure%20their%20futures ("Teamsters Local 641 Pension Fund is greatly appreciative for the assistance provided by the PBGC that has permitted Pension Plans such as ours to *retroactively fully restore all suspended benefits* for all the hardworking Teamsters men and women and their families *and ensure their futures.*") (emphases added); http://www.wpapensionfund.com/#:~:text=In%20August%202022%2C%20the%20Pension,exhaust%20on%20December%2031%2C%202051 ("*The first [SFA] grant was projected to keep the Pension Fund solvent until assets were to exhaust on December 31, 2051.* The initial grant enabled the Pension Fund to restore suspended benefits and issue make-up payments for benefits suspended since 2019. . . . The Pension Fund has been advised by PBGC that it will receive an additional $279 million on August 7, 2023. *This is an extremely positive development and a complete reversal of the situation facing participants as little as 5 years ago as its funding percentage was headed towards insolvency. Now, the funding percentage has dramatically improved and is on course to continue increasing.*") (emphases added).

50      *See, e.g.,* Ex. 1 (Local 1730's Form 5500 for the fiscal year ending December 31, 2022) at 68 (the fund received $68,001,807 from PBGC during the year ended December 31, 2022); Ex. 2 (Local 701's Form 5500 for the fiscal year ending May 31, 2022) at 85 (the fund received $142,240,069 from PBGC on June 30, 2022); Ex. 3 (New York Teamsters' Form 5500 for the fiscal year ending December 31, 2022) at 65 (recognizing SFA funds as "other income"); Ex. 4 (Local 707's Form 5500 for the fiscal year ending January 31, 2023) at 31 (the fund received two lump sum payments totaling $840,693,583 in the plan year ending January 31, 2023); Ex. 5 (Local 641's Form 5500 for the fiscal year ending February 28, 2023) at 79 (the fund received $503,925,448 in May 2022 and $96,093,000 from PBGC in February 2023); Ex. 6 (TENJ's Form 5500 for the fiscal year ending December 31, 2022) at 38 (the fund received $673.14 million from PBGC on May 26, 2022); Ex. 7 (Western PA Teamsters' Form 5500 for the fiscal year ending December 31, 2022) at 58 (the fund received $715,008,193 from PBGC on August 24, 2022, and $279,585,939 from PBGC on August 7, 2023); Ex. 8 (Freight Drivers' Form 5500 for the fiscal year ending December 31, 2022) at 19 (recognizing SFA funding as "other income"); Ex. 9 (Local 617's Form 5500 for the fiscal year ending February 23, 2023) at 55 (acknowledging receipt of $155.8 million in SFA funding in May 2022, and an additional $31.1 million in SFA funding in January 2023).

51      *See* ECF No. 14, *Decl. of Matt Doheny, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Ch 11 Pets. & First Day Mots.* (filed August 7, 2023).

of their workforce, began clearing their freight network, and ceased substantially all operations.[52] On August 6, 2023, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

31.     Shortly before the claims bar date of November 13, 2023, the Pension Plans filed 150 Proofs of Claim, seeking more than $1.6 billion in withdrawal liability.[53]

## **LEGAL STANDARD**

32.     Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of this title is deemed allowed, unless a party in interest . . . objects."  11 U.S.C. § 502(a).  Once a party in interest objects, the Bankruptcy Court "shall determine the amount" (if any) of the claim.  *Id*. § 502(b); *Langenkamp v. Culp*, 498 U.S. 42, 45 (1990) ("Respondents filed claims against the bankruptcy estate, thereby bringing themselves within the equitable jurisdiction of the Bankruptcy Court. Consequently, they were not entitled to a jury trial on the trustee's preference action.").[54]

33.     A proof of claim loses the presumption of prima facie validity under Bankruptcy Rule 3001(f) where, as here, an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency.  *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d

---

[52]   *See* Alan Rappeport, *After $700 Million U.S. Bailout, Trucking Firm is Shutting Down, N.Y. Times* (July 28, 2023), https://www.nytimes.com/2023/07/28/business/bailout-trucking-firm-yellow-yrc-shutdown.html

[53]   *See supra* n.2-11.

[54]   *See also United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (creditor "fil[ing] a proof of claim" constitutes "submitting itself to the Bankruptcy Court's jurisdiction with respect to that claim"); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 406 (3d Cir. 2009) (by filing a claim, creditor "brings itself within the equitable jurisdiction of the Bankruptcy Court") (citing cases); *In re Town Sports Int'l*, 2023 WL 8827193, at *7 (D. Del. Dec. 21, 2023) ("The Supreme Court has held that when a creditor files a claim against a bankruptcy estate, the filing triggers a process of allowance and disallowance of claims, thereby subjecting the creditor to the equity power of the bankruptcy court. *See Granfinanciera, S.A., v. Nordberg*, 492 U.S. 33, 58 (1989) (explaining that the filing of a proof of claim subjects the claimant to the equitable jurisdiction of the bankruptcy court); *Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990) (same); *see also Travellers Int'l AG v. Robinson*, 982 F.2d 96, 99-100 (3d Cir. 1992) (same). Thus, claimants face a choice when determining whether to file a proof of claim in a bankruptcy case: assert a proof of claim, and submit to the jurisdiction of the bankruptcy court … or do not submit a proof of claim, and be barred from collecting on a debt and sharing in a pro rata share of a bankruptcy estate.").

Cir. 1992). Once such an allegation is refuted, "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *Id.* at 174. Despite this shifting burden during the claim objection process, "[t]he burden of persuasion is always on the claimant." *Id*. (citing *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991)).

## ARGUMENT

34.     The Pension Plans' Proofs of Claim seek more than $1.6 billion in withdrawal liability. For the following reasons and others that will be demonstrated following discovery and trial, the Court should disallow the Proofs of Claim in their entirety or significantly reduce them.[55]

**A.      The Pension Plans Cannot File Duplicative Claims or Seek Double Recovery.**

35.     The Pension Plans' Proofs of Claim, which collectively seek more than $1.6 billion, are naked attempts to make the Debtors cover a shortfall—UVBs—that no longer exists. This shortfall, supposedly representing the difference between the Pension Plans' assets and vested benefits, was the subject of the Pension Plans' applications for SFA benefits—applications that PBGC approved prior to the Petition Date, and which precipitated the Pension Plans' receipt of $5.32 billion in taxpayer-subsidized funding. The purpose of that funding was to ensure that the Pension Plans would be able to make benefit payments and satisfy plan expenses, the same purpose that the Pension Plans are allegedly seeking to fulfill through their Proofs of Claim.

36.     While the Pension Plans' withdrawal liability calculations are unclear to date, on their face, many of these Proofs of Claim appear to concede that the Pension Plans have either zero UVBs, or substantially fewer UVBs than they are representing, to justify the assessment of withdrawal liability ***at all***. Indeed, the Pension Plans already received $5.32 billion from the government, assets that the Pension Plans' withdrawal liability calculations ignore. Using

---

[55]    For the avoidance of doubt, the Debtors reserve their rights to modify or add to their bases for objection to the Pension Plans' Proofs of Claim once the actual allegations made by the Pension Plans are clarified in discovery.

reasonable rate of return assumptions on this $5.32 billion in federal funding, the Pension Plans are in fact fully funded and have zero or near-zero UVBs to allocate to withdrawing employers.[56]

37.     The Pension Plans are asking to be paid on the same obligations when they have already been satisfied in full.  This is clearly not permissible under the Bankruptcy Code, whether for pension withdrawal liability or otherwise.  *See, e.g.*, *In re Pierport Dev. & Realty, Inc.*, 491 B.R. 544, 547 (Bankr. N.D. Ill. 2013) ("A claim that seeks duplicat[ive] recovery for the same debt is partially unenforceable to the extent of the duplication.") (holding that a portion of the $334,876 claim was unenforceable because "[t]he union would not be able to recover the same debt from both Debtor and a separate bond procured by Debtor"); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 894 (Bankr. S.D.N.Y. 1993) (disallowing a pension trustee's deficiency claim for minimum funding contributions that debtor allegedly owed to its ERISA pension plan because it was duplicative of PBGC's unfunded benefits claim, and, offsetting PBGC's claim by the allowed amount of the pension trustee's minimum funding claim); *In re Vanguard Nat. Res., LLC*, 2021 WL 220697, at *28 (Bankr. S.D. Tex. Jan. 21, 2021) (ordering "no further payment" on the claim since allowing it would constitute an impermissible double-recovery on a satisfied claim); *In re Cont'l Airlines Corp.*, 57 B.R. 845, 853 (Bankr. S.D. Tex. 1985) ("[T]he Bankruptcy Code does not permit the presentation of two claims and the recovery of double damages for what is essentially one legally compensable claim.").

38.     Stated differently, where (as here) a claimant seeks payment on a debt that a third-party has already satisfied, in whole or in part, the debt must be reduced, dollar-for-dollar, to the

---

[56]  In this regard, it is important to note that MEPPs are not for-profit entities intended to generate income for shareholders.  Their only purpose is to invest contributions and ensure that benefits promised to participants are paid.  The purpose of the withdrawal liability rules is to ensure that occurs even if participating employers have withdrawn.  No purpose is served by assessing penalties to withdrawing employers where a MEPP is already fully funded and all beneficiaries' promised benefits are in fact secure, as is the case here.

extent of such satisfaction. *See, e.g.*, *See Matter of Baldwin-United Corp.*, 55 B.R. 885, 910-11 (Bankr. S.D. Ohio 1985) (finding that equity required disallowance of claims for contribution and indemnity by brokers who marketed deferred annuities issued by insurance companies owned by debtor-corporations where annuity holders would be made whole or nearly so by payments from the insurance companies' rehabilitation fund); *see also In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 421 (Bankr. E.D. Pa. 1995) ("There is no mistake that, if an insured claim had been liquidated in whole or in part by an insurance payment prior to the effective date of confirmation of the Plan, the claim of the creditor receiving the insurance payment would have had to have been reduced dollar-for-dollar by the amount of the insurance proceeds received."); *see also In re Anson*, 457 B.R. 130, 138 (Bankr. M.D. Fla. 2011) ("It is fundamental that a creditor is not entitled to recover more than the full amount of the debt."); *see also In re F.W.D.C., Inc.*, 158 B.R. 523, 528 (Bankr. S.D. Fla. 1993) ("Finally, it must be emphasized that although the Court is herein allowing a creditor to prove the total amount of an indebtedness against a guarantor-debtor without deducting the amount of collateral received from a third party, that such creditor may not collect more than the total amount of the indebtedness.").

39.     In sum, the Pension Plans already sought and obtained the funds necessary to eliminate all or virtually all UVBs, covering all, or almost all, of the Debtors' withdrawal liability (which is a withdrawing employer's allocable share of a plan's UVBs).  The Court should disallow the Proofs of Claim seeking to assess "withdrawal liability" in the face of admitted full funding and receipt of $5.32 billion in funds explicitly intended by the Pension Plans and the federal government to cover the Pension Plans' previously existing UVBs as duplicative of the Pension Plans' earlier claim and recovery.[57]

---

[57]    *See* Exs. A through D, *infra*, for the Proofs of Claim subject to this objection.

4866-9848-2592.1 96859.001

**B.      Western PA Teamsters Should Be Estopped from Seeking Withdrawal Liability Payments, However Characterized.**

40.      Even if its Proofs of Claim did not seek double recovery, Western PA Teamsters should still be estopped from seeking recovery thereon.[58]  In the last two years, PBGC has awarded Western PA Teamsters nearly $1 billion in funding based in part on Western PA Teamsters' representation that, "in calculating the SFA, the actuary assumes it is no longer reason to include . . . YRCW . . . in the projection of receivables relating to future employer withdrawals.  [YRCW is] either unlikely to withdraw or would be bankrupt at withdrawal."[59]  Had Western PA Teamsters instead represented that it expected to obtain nearly $175 million in withdrawal liability from the Debtors—the amount sought in Western PA Teamsters' Proofs of Claim—Western PA Teamsters would not have been eligible for, and PBGC would not have granted, the amount of SFA funding requested.  *See* 29 C.F.R. 4262 ("To the extent that a plan has other means available to pay benefits, it does not require or need SFA for that purpose.").

41.      That Western PA Teamsters is now wholly disregarding representations it made in the last two years ago smacks of misrepresentation.  If anything, the Debtors' ability to make withdrawal liability payments has only *decreased* since Western PA Teamsters submitted its SFA applications, yet Western PA Teamsters has ostensibly *increased* the amount it expects to recover from nothing to nearly $175 million.

42.      Any recovery on these Proofs of Claim would only come at the expense of unsecured creditors and equity holders—including the United States government,[60] which relied upon Western PA Teamsters' representations in granting Western PA Teamsters nearly $1 billion

---

[58]    *See* Ex. B, *infra*, for the Proofs of Claim subject to this objection.

[59]    *See* Western PA Teamsters' SFA Application, *available at* https://www.pbgc.gov/sites/default/files/documents/western-pa-teamsters-sfa-app.pdf, at 11.

[60]    The U.S. Treasury is the Debtors' second largest shareholder, holding more than 30% of Yellow's common stock.

in bailout funding.  The equitable doctrine of estoppel is designed to avoid precisely this type of injustice, and should apply here.  *See, e.g.*, *In re Webb*, 99 B.R. 283, 290 (Bankr. E.D. Pa. 1989) (estoppel is appropriate where a party makes "a false representation . . . calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which [CSPF] subsequently attempts to assert"); *In re Vebeliunas*, 332 F.3d 85, 93 (2d Cir. 2003) ("Equitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result."); *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001) ("The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct.").

> **C.** **The Proofs of Claim Must Be Reduced Or Eliminated.**
>
> **1.** **The Pension Plans' efforts to ignore millions in SFA funding to calculate withdrawal liability cannot succeed.**

43.    Should the Proofs of Claim be allowed in any amount, they must still be reduced such that they comply with the logic underlying the calculation of withdrawal liability.  And in that regard, the first problem with the Pension Plans' Proofs of Claim is that they calculate withdrawal liability for Yellow based on the assumption that the Pension Plans do not have access to $5.32 billion in SFA funding—even though the Pension Plans acknowledged receipt of such funding prior to the Petition Date.[61]    That position is illogical and cannot comply with the Bankruptcy Code.

---

[61]    *See, e.g.*, *supra* n.50.

44.     In fact, the Debtors believe, and will be prepared to prove at trial, that based on a rational set of economic assumptions, the Pension Plans actually had either *zero* or close to zero UVBs as of the Petition Date, and/or were fully funded as of the Petition Date, and did not need to assess a single dollar of withdrawal liability to ensure their ability to meet the Debtors' allocable share of vested benefits promised.

45.     The Pension Plans may rely on 29 C.F.R. § 4262.16(g)(2), which purports to provide for phasing in SFA funding when calculating alleged withdrawal liability. But the Pension Plans conveniently ignore several other regulations, including those described below regarding the calculation of contribution rates and imposing a 20-year cap. In any event, the Debtors will demonstrate at trial that 29 C.F.R. § 4262.16(g)(2), which purports to advise MEPPs to ignore reality, including the Pension Plans' actual physical possession of $5.32 billion in SFA funding, cannot be enforced, as it is inconsistent with ERISA and federal law more generally. Under ERISA, withdrawal liability is an employer's allocable share of UVBs, after certain adjustments that reduce an employer's withdrawal liability. UVBs, as defined under ERISA § 4213, consist of a plan's assets less its vested liabilities. 29 C.F.R. § 4262.16(g)(2) purports to alter the statutory definition of UVBs by excluding millions of dollars of assets that MEPPs actually possess to pay benefits and expenses and to invest, thus *increasing* an employer's withdrawal liability contrary to ERISA § 4201. By doing so, PBGC has purported to change the statutory definition of UVBs such that it is completely untethered to the MEPP's underfunding or to ERISA. In short, PBGC's regulation purports to permit plans to assess an employer for an allocable share of unfunded vested

27

liabilities when there are no unfunded vested liabilities to allocate. PBGC's regulation, therefore, is not consistent with the statute.[62]

46.    In sum, withdrawal liability is supposed to assess a withdrawing employer's allocable share of a multi-employer plan's UVBs. *See, e.g., Sofco Erectors*, 15 F.4th at 416-19 (withdrawal liability intends to assess withdrawing employers their "fair share of the plan's unfunded liabilities.") (quotation omitted). As the Sixth Circuit recently described in rejecting a MEPP's assessment of withdrawal liability, UVBs are calculated by actuaries who "compare the present value of future liabilities (how much money do we need?) to the current assets in the fund (how much money do we have?) . . . If the fund has less money than it needs, then there is an unfunded liability." *Id*. Where (as here) the Pension Plans have **more** money than they need as a result of the SFA funding, it makes no sense to assess withdrawal liability, and asserting a claim assuming the **absence** of such funding is precisely the artificial claims-creation that Bankruptcy Courts frequently reject.

>    **2.    Many of the Pension Plans failed to properly calculate annual withdrawal liability payments and/or apply ERISA's cap for withdrawal liability payments.**

47.    Should the Proofs of Claim be allowed at all, they must still be reduced such that they comply with the actual statutory requirements for calculating withdrawal liability and the Bankruptcy Code's requirements for properly calculating claims as of the Petition Date.[63]

48.    Section 4201 of the MPPAA provides that a withdrawing employer is liable for its proportionate share of a plan's unfunded vested benefits. 29 U.S.C. § 1381(a). Unfunded vested

---

[62]    The Pension Plans' calculation method as applied here is also flatly unreasonable, as PBGC has recognized it is improper in prior regulations. *See* 29 C.F.R. § 4211.21(c) (a MEPP may not use a UVB allocation method "that results in a systematic and substantial overallocation of the plan's unfunded vested benefits").

[63]    *See* Ex. C, *infra*, for the Proofs of Claim subject to this objection.

28

benefits are "calculated as the difference between the present value of vested benefits and the current [present] value of the plan's assets." *Pension Benefit Guar. Corp. v. R.A. Gray Co.*, 467 U.S. 717, 725 (1984). "Put differently, withdrawal liability is intended to make up for any deficiency in the [plan]'s assets—any such deficiency [that] would prevent the employer from fulfilling its promise to provide a specific retirement benefit, a promise which is made in exchange for the employees' work." *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 318 (3d Cir. 2011).

49.    Three factors are typically relevant to the calculation of withdrawal liability for a withdrawing employer.  First, the difference between the value of benefits promised to plan participants and the value of the plan's assets.  29 C.F.R. § 4211.4(a)(1).  Second, the withdrawing employer's contribution history.  *Id*. § 4211.4(a)(2).  And third, whether factors one and two entail an initial allocation of unfunded benefits that would require more than 20 payment years to satisfy. *Id*. § 4219(c)(1)(B); 29 U.S.C. § 1399(c)(1)(B).

50.    The third factor is important.  Under ERISA, an employer's liability is capped at the amount to be paid over 20 years, and the amounts are spread over, and required to be paid over, that 20-year period.  *See Trs. of the Local 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc.,* 692 F.3d 127, 130 (2d Cir. 2012) ("[ERISA] limits the employer's obligation to make these payments to 20 years, even if it would take more than 20 [annual] payments for the employer to pay its full withdrawal liability.") (citing 29 C.F.R. § 4219(c)(1)(B); 29 U.S.C. § 1399(c)(1)(B)).  Put differently, 29 C.F.R. § 4219(c) requires that withdrawing employers make annual payments to the MEPP *for the lesser of* (1) the number of years it would take to satisfy its initial allocation of unfunded benefits, or (2) 20 years.  *See* 29 C.F.R. § 4219(c)(1)(B); 29 U.S.C. § 1399(c)(1)(B)).

51.    These annual withdrawal liability payments are calculated independently of the withdrawal liability itself. ERISA specifically provides that the annual withdrawal liability

29

payment is capped at (a) the highest contribution rate in effect during the ten-year period ending with the year in which the employer withdraws multiplied by (b) the highest average annual contribution base units during three consecutive plan years during the ten-year period ending with the plan year prior to the plan year in which the employer withdrew. *See* 29 C.F.R. § 4219(c).

52.     Here, IAM, Local 617, Local 701, New York Teamsters, Local 707, Local 641, and Western PA Teamsters collectively seek approximately $1.54 billion in total withdrawal liability from the Debtors, but they have either not attempted to calculate the Debtors' annual withdrawal liability, improperly calculated such annual withdrawal liability by using inflated contribution rates, and/or failed to apply 20-year statutory cap to any annual withdrawal liability payments.

53.     For example, in calculating the Debtors' annual withdrawal liability payment, New York Teamsters and Western PA Teamsters appear to assume the Debtors had contributed $22.5 million and $6.7 million per year to their respective funds over the last ten years.  That is demonstrably not the case, and the Debtors will be prepared to show at trial that they had contributed ***substantially less*** per year to these funds than is assumed in the Proofs of Claim. Similarly, the Debtors will be prepared to show that their contribution rate to Local 641 was not $2.87 per year, as Local 641 asserts in its Proofs of Claim, but was in fact much lower, such that the Debtors' annual withdrawal liability payment must also be much lower.

54.     But these were not the Pension Plans' only errors.  In addition to miscalculating (and overstating) the Debtors' annual withdrawal liability payments, many of the Pension Plans failed to apply ERISA's 20-year statutory cap to such payments.  Had these plans performed their withdrawal liability calculations using the framework set forth above, they would have been forced to concede that it would take the Debtors far more than 20 years of payments to satisfy their claims. Indeed, under such framework, and using the Debtors' actual contribution rates to determine

30

annual withdrawal liability, it would take the Debtors more than *4,000 years* to satisfy Local 617's claim; more than *470 years* to satisfy New York Teamsters' claims; more than *120 years* to satisfy Local 701's claims; more than *100 years* to satisfy IAM's, Local 641's, Western PA Teamsters' claims; and more than *90 years* to satisfy Local 707's claims.  That violates ERISA.

55.     Accordingly, and even if it were appropriate to assess withdrawal liability at all, IAM, Local 617, Local 641, Local 701, Local 707, New York Teamsters, and Western PA Teamsters would need to properly calculate the Debtors' annual withdrawal liability payments, and apply the 20-year cap to such payments.

**3.      Many of the Pension Plans' Proofs of Claim must be discounted to net present value.**

56.     IAM, Local 617, Local 641, Local 701, Local 707, New York Teamsters, TENJ, and Western PA Teamsters' withdrawal liability claims must be further reduced to net present value.[64]  That is, after applying the 20-year cap and reducing these plans' claims to nominal sums paid annually for 20 years, as applicable, a discount rate must then be applied to those sums to arrive at a present value of the claim as of the Petition Date.  *See Sofco Erectors*, 15 F.4th at 420; *In re U.S. Airways Grp., Inc.*, 303 B.R. 784, 793 (Bankr. E.D. Va. 2003) ("In fixing the amount of a claim 'as of the date of the filing of the petition,' there is no dispute that the court must discount future damages to present value."); *In re Stone & Webster, Inc.*, 279 B.R. 748, 806 (Bankr. D. Del. 2002) (finding that all damages estimates based on a future payment stream must be reduced by use of a present value adjustment); *Combs v. Classic Coal Corp.*, 931 F.2d 96, 101 (D.C. Cir. 1991) (explaining that an "erroneously low" discount rate, without appropriate offsetting assumptions, might "destroy the validity of the entire calculation" of unfunded vested benefits).

---

[64]     *See* Ex. D, *infra*, for the Proofs of Claim subject to this objection.

57.     Many economic factors should be considered in choosing the right discount rate, which should account for both the time value of money (as a 20-year stream of payments is being reduced to a single lump-sum which is assumed, under the Bankruptcy Code, to be paid on the Petition Date), and the risks of the underlying cash flows not being paid.  Expert testimony will establish that appropriate discount rate will be material even *if* it were appropriate to assess withdrawal liability here at all.  Indeed, applying such discount rate to the Pension Plans' Proofs of Claim, as modified by the 20-year cap where applicable, would reduce such claims by hundreds of millions of dollars, ***even if*** there is withdrawal liability at all.[65]

### Compliance with Local Rule 3007-1

58.     To the best of Debtors' knowledge and belief, this Objection and accompanying exhibits comply with Local Rule 3007-1.  To the extent this Objection does not comply in all respects with the requirements of Local Rule 3007-1, the Debtors believe such deviations are not material and respectfully request that any such requirement be waived.

### CONCLUSION

**WHEREFORE**, the Debtors respectfully request that this Court enter an order disallowing or modifying the Pension Plans' Proofs of Claim.

| | |
|---|---|
| Dated:  January 26, 2024<br>Wilmington, Delaware | */s/ Laura Davis Jones* |

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)

---

[65]  Finally, and again even *if* the Pension Plans were entitled to assess *any* withdrawal liability against the Debtors, some portion would nevertheless have to be subordinated under 29 U.S.C. § 1405(b) and 29 C.F.R. § 4225(b), such that the subordinated amount would only be recoverable if all other creditor claims were satisfied in full. *See, e.g., In re Affiliated Foods, Inc.*, 249 B.R. 770, 785 (Bankr. W.D. Mo. 2000) (citing *Cott Corp. v. New England Teamsters & Trucking Indus. Pension Fund* (*In re Cott Corp.*), 26 B.R. 332, 335 (Bankr. D. Conn. 1982).

| Telephone: | (302) 652-4100 |
| Facsimile: | (302) 652-4400 |
| Email: | ljones@pszjlaw.com |
| | tcairns@pszjlaw.com |
| | pkeane@pszjlaw.com |
| | ecorma@pszjlaw.com |

Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:       patrick.nash@kirkland.com
             david.seligman@kirkland.com
             michael.slade@kirkland.com


-and-
Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:   (415) 439-1400
Facsimile:   (415) 439-1500
Email:       michael.esser@kirkland.com
             john.christian@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*