## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (CTG) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

## DEBTORS' OPPOSITION TO CENTRAL STATES PENSION FUNDS' MOTION TO COMPEL ARBITRATION

---

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
           tcairns@pszjlaw.com
           pkeane@pszjlaw.com
           ecorma@pszjlaw.com

*Co-Counsel for the Debtors and Debtors in Possession*

Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    patrick.nash@kirkland.com
           david.seligman@kirkland.com
           michael.slade@kirkland.com

Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email:    michael.esser@kirkland.com
           john.christian@kirkland.com

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 5

BACKGROUND ................................................................................................................ 7

ARGUMENT ................................................................................................................... 11

A.     The Debtors' Objection to CSPF's Withdrawal Liability Proofs of Claim Is Not
       Subject to ERISA's Arbitration Requirement ................................................... 11

       1.      The Bankruptcy Code Requires this Court to Determine Withdrawal
               Liability Claims. ..................................................................................... 11

       2.      CSPF Did Not Issue a Formal Assessment of Withdrawal liability, as
               Required Under ERISA, Such That Any Arbitration Requirement Was Not
               Triggered. ................................................................................................. 17

B.     This Court Should Deny CSPF's Request for Relief from the Automatic Stay
       and/or for Abstention. ....................................................................................... 18

       1.      Granting CSPF's Motion Would Plunge the Debtors' Chapter 11
               Proceedings Into Chaos ........................................................................... 18

       2.      CSPF Has Not Shown "Cause" to Lift the Automatic Stay ..................... 22

CONCLUSION ................................................................................................................ 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amalgamated Ins. Fund. v. Kessler*,
  55 B.R. 735 (S.D.N.Y.1985)................................................................11

*Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. BES Servs., Inc.*,
  469 F.3d 369 (4th Cir. 2006) ..............................................................14

*Chicago Truck Drivers v. El Paso Co.*,
  525 F.3d 591 (7th Cir. 2008) .........................................................15, 16

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S.*
  *Cal.*,
  508 U.S. 602 (1993).............................................................................14

*Flying Tiger Line v. Teamsters Pension Tr. Fund of Phila.*,
  830 F.2d 1241 (3d Cir. 1987)..............................................................13

*Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension*
  *Fund*,
  748 F.2d 42 (1st Cir.1984)..................................................................11

*Granfinanciera, S.A., v. Nordberg*,
  492 U.S. 33 (1989)..............................................................................10

*In re Amalgamated Foods, Inc.*,
  41 B.R. 616 (Bankr. C.D. Cal. 1984)..............................................10, 12

*In re Amtrol Holdings, Inc.*,
  *384 B.R. 686* (Bankr. D. Del. 2008).......................................................9

*In re APF Co.*,
  264 B.R. 344 (Bankr. D. Del. 2001) ....................................................17

*In re Bankruptcy Case No. 91 B 23969*,
  No. 94 C 6226, 1994 WL 673055 (N.D. Ill. 1994)...............................12

*In re BFW Liquidation*,
  LLC, 459 B.R. 757 (Bankr. N.D. Ala. 2011)....................................14, 15

*In re Cott Cor*p.,
  26 B.R. 332 (Bankr. D. Conn. 1982) ...............................................10, 12

*In re FTX Trading Ltd.*,
  2024 WL 204456 (3d Cir. Jan. 19, 2024) .............................................13

ii

*In re Great Northeastern Lumber and Millwork Corp.*,
    64 B.R. 426 (Bankr.E.D.Pa.1986) ........................................................................11

*In re Int'l Shipholding Corp.*,
    2021 WL 624042 (Bankr. S.D.N.Y. Feb. 16, 2021) ...............................................15

*In re Interco Incorporated*,
    137 B.R. 993 (Bankr. E.D. Mo. 1992) ..................................................10, 11, 12

*In re Pulaski Highway Express*,
    *57 B.R.* 502 (Bankr.M.D.Tenn.1986) ....................................................................11

*In re The SCO Group, Inc.*,
    395 B.R. 852 (Bankr. D. Del. 2007) .....................................................................20

*In re T.D.M.A., Inc.*,
    66 B.R. 992 (Bankr. E.D. Pa. 1986) ...............................................................10, 11

*In re Town Sports Int'l*,
    No. BR 20-12168 (CTG), 2023 WL 8827193 (D. Del. Dec. 21, 2023) ...................9

*In re UAL*,
    310 B.R. 373 (Bankr. N.D. Ill. 2004) ......................................................................9

*In re United Department Stores*,
    49 B.R. 462 (Bankr. S.D.N.Y. 1985) .....................................................................11

*In re Winstar Communications, Inc.*,
    554 F.3d 382 (3d Cir. 2009) ....................................................................................9

*In re Zolner*,
    173 B.R. 629 (Bankr. N.D. Ill. 1994), *aff'd*, 249 B.R. 287 (N.D. Ill. 2000) ...........15

*Izzarelli v. Rexene Prods. Co.*,
    141 B.R. 574 (Bankr. D. Del. 1992) ......................................................................20

*Kannikal v. Att'y Gen. U.S.*,
    776 F.3d 146 (3d Cir. 2015) ..................................................................................13

*Langenkamp v. Culp*,
    498 U.S. 42 (1990) ............................................................................................9, 10

*Logan v. Credit General Insurance (In re PRS Insurance Group, Inc.)*,
    335 B.R. 77 (Bankr. D. Del. 2005) ........................................................................16

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ..............................................................................................13

*Nat'l Shopmen Pension Fund v. DISA Indus., Inc.*,
   653 F.3d 573 (7th Cir. 2011) ...............................................................................14

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012)............................................................................................13

*Travellers Int'l AG v. Robinson*,
   982 F.2d 96 (3d Cir. 1992)..................................................................................10

*Trustees of Amalgamated Insurance v. McFarlin's*,
   789 F.2d 98 (2d Cir.1986)...................................................................................11

*United Student Aid Funds, Inc. v. Espinosa*,
   559 U.S. 260 ........................................................................................................9

**Statutes**

11 U.S.C. § 362(d) ....................................................................................................20

11 U.S.C. § 502(b) ............................................................................................. *passim*

11 U.S.C.A. § 502(c) ...............................................................................................10

11 U.S.C § 1104(c) ..................................................................................................13

28 U.S.C. § 157(b)(2) ..............................................................................................16

29 U.S.C § 1392(c) ..................................................................................................14

29 U.S.C § 1399 .......................................................................................................15

29 U.S.C § 1401 ........................................................................................... 10, 11, 13-16

**Other Authorities**

Docket No. 14, *Declaration of Matt Doheny, Chief Restructuring Officer of the
   Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day
   Motions* (filed August 7, 2023)..............................................................................5

H.Rep. No. 595, 95th Cong., 1st Sess. 340-42 (1977)...............................................12

S.Rep. No. 989, 95th Cong., 2nd Sess. 49-54 (1978) ................................................12

*Shutting Down, N.Y. Times* (July 28, 2023) ...............................................................7

## INTRODUCTION

1.      CSPF voluntarily filed 45 separate Proofs of Claim against the bankruptcy estate, 24 of which seek nearly $4.8 billion in alleged withdrawal liability.  As described in detail in the Debtors' Objection,[2] CSPF seeks that sum even though it affirmatively told the United States government that it would receive zero in withdrawal liability in the event of a Yellow bankruptcy, even though CSPF has zero (or close to zero) unfunded vested benefits ("UVBs"), and even though United States taxpayers have already ensured that CSPF is fully funded and does not need a single dollar from this bankruptcy estate to pay every dollar it owes to beneficiaries.  Further, given the size of CSPF's Proofs of Claim and the remainder of the claims pool, giving CSPF any material allowed claim would grant it a huge windfall, eliminating the prospect of an equity recovery and massively diluting unsecured creditors for no logical reason.

2.      Because of these basic realities, CSPF seeks to dodge this Court's authority, asserting that this Court either cannot or should not address the Debtors' Objection on the merits. Nonsense.  It is settled law that, by filing Proofs of Claim in this Court, CSPF submitted its claims to the Bankruptcy Court's jurisdiction.  And Congress has already answered the question posed by CSPF's Motion in clear and unequivocal language: once the Debtors object (and they have), this Court "shall" determine the amount of CSPF's claims (if any) to be allowed.  11 U.S.C. § 502(b).

3.      CSPF nevertheless argues that this Court must instead refer its withdrawal liability Proofs of Claim to an arbitrator.  In the alternative, CSPF argues that this Court should abstain in favor of a not-yet-existent arbitration, claiming that an arbitrator would be better equipped to render a decision on these claims and that compelling arbitration would not materially disrupt the Debtors' reorganization.  But each of these arguments has no merit whatsoever.

---

[2]      Any capitalized but undefined terms herein shall have the meanings set forth in the Debtors' Objection to the Proofs of Claim Filed by the Central States Pension Fund [ECF No. 1322] (the "Objection").

4. **First,** CSPF is wrong to suggest that this Court is required, under ERISA or otherwise, to compel arbitration of withdrawal liability claims. To the contrary, the Bankruptcy Code provides, in no uncertain terms, that this Court "shall determine" whether to allow the proofs of claim filed by CSPF and other multiemployer pension plans ("MEPPs") asserting withdrawal liability and, if so, in what amounts. *Id.* It is this specific and unambiguous delegation of authority to bankruptcy courts that controls, not the more general language in ERISA applicable to "employers" outside of bankruptcy. The Bankruptcy Code is clear, and there is no published case holding that a bankruptcy court must defer to an arbitration to resolve a proof of claim asserting withdrawal liability. This Court should not be the first.

5. **Second,** CSPF is also wrong to suggest that this Court needs the assistance of an arbitrator specializing in calculating withdrawal liability. Rather, and as set forth in the Debtors' Objection (and parallel objections to dozens of other withdrawal liability claims), the primary issues to be decided are legal and equitable in nature—issues with which this Court has unquestioned familiarity, and which could (and should) moot the technical questions CSPF raises as to withdrawal liability calculations (which this Court could easily answer in any event).

6. **Third,** and finally, CSPF's suggestion that allowing these claims to proceed in arbitration would benefit (or, at the very least, not harm) the estates is myopic and frankly absurd. CSPF is not the only pension fund to file withdrawal liability claims against the Debtors. Rather, at least **19** other multiemployer pension plans have also filed claims against the Debtors, seeking an additional **$2.5 billion** in withdrawal liability (meaning that the collective MEPP proofs of claim asserting withdrawal liability **exceed $7 billion**). The Debtors have already objected to and sought discovery on certain of these claims and will ultimately object to each claim on similar grounds. These claims are by far the largest in the claims pool, and the answers to the questions posed by

6

the Debtors' objections will determine whether general unsecured creditors get a full recovery with cash left over for equity, or whether general unsecured creditors are limited to modest fractional distributions.  It is obvious, moreover, that if the Debtors were forced to litigate each of these disputes in separate arbitral proceedings before 20 different arbitrators, as CSPF suggests, it would gravely impede and delay administration of the estates; cause the Debtors to waste significant time and resources waging the same fight on multiple fronts; and subject the Debtors (and all stakeholders) to the risk of inconsistent rulings.  Neither the bankruptcy process nor principles of equity would countenance such a result.

7.      For these and other reasons set forth more fully below, this Court should deny CSPF's Motion to Compel Arbitration.

## **BACKGROUND**

8.      Prior to these bankruptcy proceedings and the events that precipitated them, the Debtors had been a leading trucking and logistics company for nearly 100 years and operated one of the most comprehensive less-than-truckload ("LTL") networks in North America.[3]  As of July 2023, the Debtors employed nearly 30,000 dock, maintenance, and clerical workers, drivers, and other personnel, most of whom belonged to a union, including the International Brotherhood of Teamsters ("IBT"), the International Association of Machinists and Aerospace Workers, and the Office and Professional Employees International Union (together, the "Unions").[4]

9.      The Debtors' collective bargaining agreements ("CBAs") governed the Debtors' relationship with each Union.  Among other things, certain of these CBAs required that the Debtors

---

[3]      *See* ECF No. 14, *Decl. of Matt Doheny, Chief Restructuring Officer of the Debtors, in Supp. of the Debtors' Chapter 11 Pets. and First Day Mots.* (filed August 7, 2023) (the "Doheny Decl."), at 1.

[4]      *Id.* at 14.

7

make regular contributions to dozens of multi-employer pension plans and various health and welfare funds[5] for the Unions' active employees and retirees.[6]

10.     Still, many of these funds, including CSPF, suffered from mismanagement and/or severe funding issues for years, such that, by 2021, they had terminated or reduced benefit payments to participants, and/or certified themselves to the federal government as in "critical" or "critical and declining" status.[7]  For that reason, in 2021 and 2022, most of the relevant funds, including CSPF, Freight Drivers, IAM, Local 617, Local 641, Local 701, Local 707, Local 1730, New York Teamsters, TENJ, and Western PA Teamsters, applied for ***billions*** in taxpayer funded,

---

[5]     In addition to CSPF, the Debtors were, at various points, also required to contribute to the Central Pennsylvania Teamsters Defined Benefit Plan; Freight Drivers and Helpers 557 Pension ("Freight Drivers"); IBT Local 705; International Association of Motor City Machinists Pension Fund ("IAM"); IAM National Pension Fund; Management Labor Pension Fund Local 1730 ("Local 1730"); Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund ("Local 701"); New England Teamsters Pension Plan; New York State Teamsters Conference Pension & Retirement Fund ("New York Teamsters"); Road Carriers Local 707 Pension Fund ("Local 707"); Teamsters Joint Council #83; Teamsters Local 617 Pension Plan ("Local 617"); Teamsters Local 641 Pension Plan ("Local 641"); Teamsters Local 710; Teamsters Pension Trust Fund of Philadelphia & Vicinity; Trucking Employees of North Jersey Pension Fund ("TENJ"); Western Conference of Teamsters Pension Plan; and Western Pennsylvania Teamsters and Employers Pension Fund ("Western PA Teamsters").

[6]     *See, e.g.*, NMFA, Art. 14 § 2(g); IAM Multi-States Area Agreement, Art. 24; YRC Freight Inc. & OPEIU Agreement § 11; 2019 I.L.A. Local 1730 Contract Negotiations Economic Settlement § 7.

[7]     *See, e.g.*, Debtors Objection at 16-17; *see also, e.g.*, https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2015-funding-status-notices#2015-c-and-d (Local 1730, New York Teamsters, and Western PA Teamsters in "critical" status; Local 707, Local 641, Freight Drivers, Local 617, and IAM in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2016-funding-status-notices#2016-c-and-d (Western PA Teamers in "critical" status; Local 1730, New York Teamsters, Local 707, Local 641, TENJ, Freight Drivers, Local 617, and IAM in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2017-funding-status-notices#2017-c-and-d (Local 617 in "critical" status; Local 1730, Local 701, New York Teamsters, Local 641, Western PA Teamsters, Freight, and IAM in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2018-funding-status-notices#2018-c-and-d (New York Teamsters, IAM, and Local 617 in "critical" status; Local 1730, Local 701, Local 641, Western PA Teamsters, and Freight Drivers in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2019-funding-status-notices#2019-c-and-d (New York Teamsters and Local 617 in "critical" status; Local 1730 and Western PA Teamsters in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2020-funding-status-notices#2020-c-and-d (New York Teamsters, Western PA Teamsters, and Local 617 in "critical" status; Local 641 and Freight Drivers in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2021-funding-status-notices#2021-c-and-d (New York Teamsters, Western PA Teamers, and Local 617 in "critical" status; Local 641 in "critical and declining" status); https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/public-disclosure/2022-funding-status-notices#2022-c-and-d (New York Teamsters in "critical" status).

obligation-free, SFA funding.  The federal government ultimately granted these applications and

not subject to repayment, awarded the funds ***more than $41.1 billion*** between 2022 and 2023.[8]

11.    In July 2023, as a result of unconscionable, unforeseen conduct by IBT leadership

detailed in the Debtors' First-Day Declaration,[9] the Debtors commenced a permanent reduction of

their workforce, began clearing their freight network, and ceased substantially all operations.[10]

Ultimately, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

12.    Following the Debtors' bankruptcy filing but before the claims bar date, and

notwithstanding their receipt of tens of billions of dollars in federal funding, CSPF and nineteen

other MEPPs proceeded to file ***more than 300 proofs of claim***, seeking ***more than $7.2 billion*** in

withdrawal liability from the Debtors.  Of these, CSPF's Proofs of Claim are by far the largest and

seek nearly ***double*** the amount of withdrawal liability as the other 292 proofs of claim ***combined***.

---

[8]    *See*    https://www.pbgc.gov/news/press/releases/pr22-45    (awarding    CSPF    $35.8    billion);
https://www.pbgc.gov/news/press/releases/pr22-13    (awarding    Local    617    $155.8    million);
https://www.pbgc.gov/news/press/releases/pr22-56  (awarding  Local  617  an  additional  $31.1  million);
https://www.pbgc.gov/news/press/releases/pr22-35    (awarding    Freight    Drivers    $192.8    million);
https://www.pbgc.gov/news/press/releases/pr23-013 (awarding Freight Drivers an additional $12.8 million);
https://www.pbgc.gov/news/press/releases/pr22-62    (awarding    IAM    $66    million);
https://www.pbgc.gov/news/press/releases/pr22-24    (awarding    Local    1730    $62    million);
https://www.pbgc.gov/news/press/releases/pr22-60  (awarding  Local  1730  an  additional  $6.1  million);
https://www.pbgc.gov/news/press/releases/pr22-26    (awarding    Local    701    $142.2    million)
https://www.pbgc.gov/news/press/releases/pr22-48  (awarding  Local  701  an  additional  $52.4  million);
https://www.pbgc.gov/news/press/releases/pr22-42  (awarding  New  York  Teamsters  $963.4  million);
https://www.pbgc.gov/news/press/releases/pr23-017 (awarding New York Teamsters an additional $438 million);
https://www.pbgc.gov/news/press/releases/pr22-03    (awarding    Local    707    $726.6    million);
https://www.pbgc.gov/news/press/releases/pr22-52  (awarding  Local  707  an  additional  $114.1  million);
https://www.pbgc.gov/news/press/releases/pr22-08    (awarding    Local    641    $516.9    million);
https://www.pbgc.gov/news/press/releases/pr23-002  (awarding  Local  641  an  additional  $96.1  million);
https://www.pbgc.gov/news/press/releases/pr22-18    (awarding    TENJ    $673.1    million);
https://www.pbgc.gov/news/press/releases/pr22-49    (awarding    TENJ    an    additional    $84.5    million);
https://www.pbgc.gov/news/press/releases/pr22-30  (awarding  Western  PA  Teamsters  $715  million);
https://www.pbgc.gov/news/press/releases/pr23-030 (awarding Western PA Teamsters another $279.6 million).

[9]    *See* Doheny Decl.

[10]    *See* Alan Rappeport, *After $700 Million U.S. Bailout, Trucking Firm is Shutting Down, N.Y. Times* (July 28, 2023), https://www.nytimes.com/2023/07/28/business/bailout-trucking-firm-yellow-yrc-shutdown.html.

13.    Because of the size of such claims and the obstacles that uncertainty over their status presented to proposing a plan, the Debtors first focused on and prioritized CSPF's Proofs of Claim for objection, and ultimately filed such Objection on December 8, 2023, arguing, *inter alia*, that CSPF improperly sought duplicative recovery and/or payment of UVBs that did not exist; failed to account for billions of taxpayer dollars that CSPF had already received from the federal government; and improperly calculated withdrawal liability in any event.  Contemporaneous with their Objection, the Debtors propounded discovery on CSPF to clarify the scope of, bases for, and calculations underlying the amounts sought in its Proofs of Claim (CSPF has, to date, largely refused to comply).  The Debtors also attempted to negotiate a litigation schedule for the Objection, but CSPF demanded an extremely prolonged timetable and refused to agree to *any* trial date. Thereafter, the Debtors agreed to extend CSPF's deadline for responding to the Objection as a professional courtesy, and CSPF sandbagged the Debtors by filing the instant Motion first.

14.    The Debtors are now undertaking the same process for the other MEPPs, filing objections to and seeking discovery about the remaining proofs of claim for withdrawal liability.[11] Though its objections to the other MEPPs' proofs of claim will differ in some regards from its Objection to CSPF's Proofs of Claim, many of the arguments overlap—including the extent to which fully funded MEPPs with no UVBs can seek withdrawal liability from the Debtors, notwithstanding their receipt of ***all*** of the SFA funds, and whether the MEPPs properly calculated withdrawal liability ***even if*** they had UVBs.  Collectively, given the magnitude of the MEPP Proofs of Claim, these Objections will be ***by far*** the most consequential issues in these chapter 11 cases, making the difference between creditors recovering in full and equity receiving a material recovery and equity being wiped out while unsecured creditors receive pennies on the dollar.

---

[11]    *See, e.g.,* ECF No. 1962 (Second Omnibus Objection to MEPP Claims, which addresses the MEPPs).

## **ARGUMENT**

**A.      The Debtors' Objection to CSPF's Withdrawal Liability Proofs of Claim Is Not Subject to ERISA's Arbitration Requirement.**

15.      The Bankruptcy Code and attendant case law are clear.  Congress gave this Court the responsibility to hear and rule on CSPF's withdrawal liability claim.  ERISA's provisions ***do not*** override this Court's responsibility under the Bankruptcy Code to adjudicate objected-to proofs of claim.  And in any event, CSPF does not satisfy the ERISA requirements to trigger arbitration and thus would not qualify for arbitration even if ERISA's requirements applied (they do not).

### **1.      The Bankruptcy Code Requires this Court to Determine Withdrawal Liability Claims.**

16.      "Except as provided in subsections (e)(2), (f), (g), (h), and (i) of this section," if an objection to a proof of claim is asserted, a bankruptcy court "***shall*** determine the amount of such claim" and "***shall*** allow such claim in such amount." 11 U.S.C.A. § 502(b) (emphases added). Here, in accord with 502(b), CSPF filed 24 separate Proofs of Claim for withdrawal liability, to which the Debtors objected.  CSPF does not argue, nor could it plausibly argue, that any of the enumerated exceptions to Section 502(b) apply.  Moreover, it is beyond cavil that by filing a claim against a bankruptcy estate, a creditor submits that claim to the bankruptcy court's jurisdiction and even subordinates any right to a jury trial outside of bankruptcy. *Langenkamp v. Culp*, 498 U.S. 42, 45 (1990) ("Respondents filed claims against the bankruptcy estate, thereby bringing themselves within the equitable jurisdiction of the Bankruptcy Court. Consequently, they were not entitled to a jury trial on the trustee's preference action."); *see also In re UAL*, 310 B.R. 373, 377-78 (Bankr. N.D. Ill. 2004) ("[T]he assertion of a claim against an estate in bankruptcy is sufficient to bring that claim within the bankruptcy jurisdiction, regardless of whether a right to a jury trial would attach to the claim outside of bankruptcy and regardless

11

of the nature of the claim—whether it arises under federal or state law").[12] Therefore, per Congress's

charge, this Court "shall determine the amount" (if any) of CSPF's withdrawal liability claim.

17.    This Court's mandate over claims adjudication extends beyond allowance or

disallowance and includes claim estimation. 11 U.S.C.A. § 502(c). Specifically, the Code requires

that this Court "***shall***" estimate "for purpose of allowance … any contingent or unliquidated claim,

the fixing or liquidation of which, as the case may be, would unduly delay the administration of

the case[.]" 11 U.S.C.A. § 502(c)(1) (emphasis added); *see In re T.D.M.A., Inc.*, 66 B.R. 992, 997

(Bankr. E.D. Pa. 1986) ("Bankruptcy courts are empowered by 11 U.S.C. § 502(c) to 'estimate

any contingent or unliquidated claims which would unduly delay the closing of the estate.'")

(quoting *In re Amalgamated Foods, Inc.*, 41 B.R. 616, 618 (Bankr. C.D. Cal. 1984)).

18.    Despite or perhaps inspired by the inevitable consequence of delaying the

disallowance of its claim and massively complicating these chapter 11 cases, CSPF asserts that

this Court lacks authority over its withdrawal liability claim because ERISA provides for resolving

withdrawal liability disputes between "an employer and the plan sponsor" in arbitration, subject

to review in district court. 29 U.S.C § 1401. But CSPF fails to cite a single opinion holding that

ERISA requires bankruptcy courts to abdicate their core claims allowance and estimation functions

in deference to arbitrators. In fact, **all** the published judicial decisions uniformly hold otherwise.

---

[12] *See also United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010) (creditor "fil[ing] a proof of claim" constitutes "submitting itself to the Bankruptcy Court's jurisdiction with respect to that claim"); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 406 (3d Cir. 2009) (by filing a claim, creditor "brings itself within the equitable jurisdiction of the Bankruptcy Court") (citing cases); *In re Town Sports Int'l,* 2023 WL 8827193, at *7 (D. Del. Dec. 21, 2023) ("The Supreme Court has held that when a creditor files a claim against a bankruptcy estate, the filing triggers a process of allowance and disallowance of claims, thereby subjecting the creditor to the equity power of the bankruptcy court.") *See Granfinanciera, S.A., v. Nordberg*, 492 U.S. 33, 58 (1989) (explaining that the filing of a proof of claim subjects the claimant to the equitable jurisdiction of the bankruptcy court); *Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990) (same); *see also Travellers Int'l AG v. Robinson*, 982 F.2d 96, 99-100 (3d Cir. 1992) (same). "Thus, claimants face a choice when determining whether to file a proof of claim in a bankruptcy case: assert a proof of claim and submit to the jurisdiction of the bankruptcy court … or do not submit a proof of claim, and be barred from collecting on a debt and sharing in a pro rata share of a bankruptcy estate." *In re Town Sports,* 2023 WL 8827193, at *7.

*See, In re Interco Inc.*, 137 B.R. 993, 997 (Bankr. E.D. Mo. 1992); *In re T.D.M.A.*, 66 B.R. at 996-97; *In re Amalgamated Foods*, 41 B.R. at 617-18; *In re Cott Cor*p., 26 B.R. 332, 335 (Bankr. D. Conn. 1982).

19.     In *In re Interco*, as here, a pension fund filed a proof of claim for ERISA withdrawal liability within the chapter 11 process. *In re Interco Inc.*, 137 B.R. at 994. Just as CSPF claims here, the fund in *Interco* asserted that bankruptcy courts must defer any withdrawal liability dispute to an arbitrator pursuant to ERISA § 4221; 29 U.S.C § 1401. After careful consideration, the *Interco* court determined that "[n]either the provisions of ERISA, nor the established case law mandates that the bankruptcy court defer to arbitration the estimation of … withdrawal liability for the purpose of allowance under Section 502." *In re Interco*, 137 B.R. at 997.

*20.*     In *In re T.D.M.A*, a pension fund likewise asserted that ERISA required the court to "refrain from determining the Debtor's withdrawal liability," and "submit [the] issue to arbitration[.]" *In re T.D.M.A.*, 66 B.R. at 994. In determining that ERISA did not supplant the Bankruptcy Code's clear mandate, the court made note of "numerous" cases where "bankruptcy courts *have* in fact resolved MPPAA withdrawal liability claims[.]" *Id.* at 997 (citing *Trustees of Amalgamated Ins. v. McFarlin's*, 789 F.2d 98 (2d Cir. 1986); *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42 (1st Cir. 1984); *Amalgamated Ins. Fund. v. Kessler*, 55 B.R. 735 (S.D.N.Y. 1985); *In re Great Ne. Lumber & Millwork Corp.*, 64 B.R. 426 (Bankr. E.D. Pa. 1986); *In re Pulaski Highway Express, 57 B.R.* 502 (Bankr. M.D. Tenn. 1986); *In re United Dep't Stores*, 49 B.R. 462 (Bankr. S.D.N.Y. 1985)) (emphasis in original). As noted by the *In re T.D.M.A* court, the prevalence of cases where bankruptcy courts determine withdrawal liability claims speaks to the technical competence of this Court to follow the normal course and determine CSPF's claim. *See In re T.D.M.A.*, 66 B.R. at 997.

13

21.     In *In re Amalgamated Foods*, a pension fund asserting mandatory arbitration under ERISA was rebuffed. *In re Amalgamated Foods,* 41 B.R. at 617-18. After recognizing the facial conflict between ERISA and the Bankruptcy Code, the court determined that ERISA did not prohibit bankruptcy courts from hearing withdrawal liability claims. *Id*. at 620 ("Obeying the Congressional mandate that there be prompt resolution of ERISA withdrawal liability claims, I find and order that the debtor need not submit to arbitration in this matter.").

22.     And in *In re Cott Corp.*, a pension fund filed a proof of claim for withdrawal liability and later sent demand letters for payment to the debtor. 26 B.R. 332, 334 (Bankr. D. Conn. 1982).   In response, the debtor sought to enjoin the fund from acting to collect its claim amount outside of bankruptcy and for declaratory relief asserting that collection efforts occur in bankruptcy, not arbitration. *Id.* at 334-36. Rebuffing the fund's attempt to circumvent the bankruptcy process, the court held that it had jurisdiction, and that outside-of-bankruptcy collection attempts violated the automatic stay. *Id.*

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws .... The commencement or continuation, including the issuance of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the bankruptcy case is stayed under [§ 362(a)(1) ]. The scope of this paragraph is broad. All proceedings are stayed, *including arbitration*, license revocation, administrative, and judicial proceedings.

*Id*. at 336 (emphasis in original) (quoting H. Rep. No. 595, 95th Cong., 1st Sess. 340-42 (1977); S.Rep. No. 989, 95th Cong., 2nd Sess. 49-54 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5836-40, 6296-97.)); *see also In re Bankruptcy Case*, 1994 WL 673055, at *5, *10 (N.D. Ill. 1994) (citing *Cott* and *Interco*, holding that "a bankruptcy court is not precluded by ERISA 1401(a) from resolving withdrawal liability claims" and deferring to arbitration only regarding a dispute between the pension fund and the non-debtor parent).

14

23.    Congress's direction that this Court "shall" rule on the Debtors' Objection to CSPF's withdrawal liability claim in Section 502 was unambiguous.  As the Third Circuit held last week in reversing a Bankruptcy Court's flexible interpretation of the word "shall" elsewhere in the Bankruptcy Code, "Congress made plain its intention to mandate … by using the word 'shall'". *In re FTX Trading Ltd.*, 2024 WL 204456, at *4 (3d Cir. Jan. 19, 2024) (holding that Congress's use of "shall" in 11 U.S.C § 1104(c) required the court to follow the code's directive "regardless of whether it agrees with the result").  The reasoning in *FTX* is on all fours with the question at issue here, as the Bankruptcy Court "shall determine the amount of such claim," 11 U.S.C. § 502(b), now that the Debtors have objected, or alternatively "shall" estimate "for the purpose of allowance … any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case," 11 U.S.C.A. § 502(c).

24.    Basic principles of statutory interpretation require that the Bankruptcy Code's specific mandate that this Court rule on claims objections supersede ERISA's broad call for arbitration of withdrawal liability.  "[I]t is a commonplace of statutory construction that the specific governs the general.'" *Kannikal v. Att'y Gen. U.S.*, 776 F.3d 146, 150 (3d Cir. 2015) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).  And "'[t]hat is particularly true where ... 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" *Id.* (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).  The Bankruptcy Code is the "specific solution" passed to resolve Proofs of Claim on the merits, and Section 502 cannot be read any other way.

25.    None of the cases cited by CSPF requires or supports any other conclusion. In arguing that 29 U.S.C. § 1401(a)(1) requires arbitration, CSPF only cites cases that do ***not*** address proofs of claim filed in chapter 11 cases.  *See e.g., Flying Tiger Line v. Teamsters Pension Tr.*

15

*Fund of Phila.*, 830 F.2d 1241 (3d Cir. 1987) (holding that the question of employer status in the 29 U.S.C 1392(c) context should be heard in arbitration rather than federal district court); *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602 (1993) (holding that the MPPAA does not violate Constitutional Due Process); *Nat'l Shopmen Pension Fund v. DISA Indus., Inc.*, 653 F.3d 573 (7th Cir. 2011) (holding that a fund must be able to revise an assessment of withdrawal liability, within reasonable time limits, upon discovery it undercharged an employer); *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. BES Servs., Inc.*, 469 F.3d 369 (4th Cir. 2006) (holding that an employer waived its right to claim reductions). None of those cases addresses the situation at issue here, or minimizes the clear direction given to this Court by Section 502(b).

26.      Thus, CSPF's argument that 29 U.S.C. § 1401(a) requires arbitration of bankruptcy proofs of claim asserting withdrawal liability is unsupported by a single published case.  While CSPF attempts to cite one related case favorably, the court there explicitly refused to decide whether 29 U.S.C. § 1401(a)(1) mandates arbitration in bankruptcy.  *In re BFW Liquidation*, LLC, 459 B.R. 757, 762-78 (Bankr. N.D. Ala. 2011). Instead, the *BFW* court devoted 16 pages to a section of its opinion titled: "It Is Not Necessary to Decide if Arbitration Is Required by the MPPAA for Withdrawal Liability Claims in Bankruptcy." *Id.* In short, in asserting that 29 U.S.C. § 1401(a)(1) requires circumventing the bankruptcy process and deferring the outcome of these chapter 11 cases for creditors to the whims of 20 unidentified arbitrators, CSPF ignores the Bankruptcy Code's clear mandates, asks the Court to disregard all of the existing on-point caselaw, and asks this Court to defy the Code, basic principles of statutory construction, and as discussed in Section II, the interests of creditors.

27.     In sum, the Bankruptcy Code and case law interpreting it defy CSPF's demand. Through Sections 11 U.S.C. 502(b)-(c), Congress gave this Court the responsibility to hear and resolve the Debtors' Objection to CSPF's withdrawal liability claim, and it should do so.

### 2.     CSPF Did Not Issue a Formal Assessment of Withdrawal liability, as Required Under ERISA, Such That Any Arbitration Requirement Was Not Triggered.

28.     CSPF failed to trigger ERISA's arbitration provision in any event. To trigger ERISA's mandatory arbitration provision outside of bankruptcy, a pension fund "shall" notice the employer of "the amount of the liability," provide a "schedule for liability payments," and "demand payment in accordance with the schedule." 29 U.S.C. §§ 1399(a)-(b); see 29 U.S.C. § 1401(a)(1).  As explained in *In re BFW*, a case upon which CSPF relies:

> When an employer withdraws, the plan sponsor calculates the amount of liability and, "[a]s soon as practicable," notifies the employer of the liability and demands payment. 29 U.S.C. § 1399(b)(1). This "notice and demand" must include the amount of liability and a schedule of installment payments.

*In re BFW*, 459 B.R. at 762 (quoting *Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591 (7th Cir. 2008)); *see also In re Int'l Shipholding Corp.*, 2021 WL 624042, at *16 (Bankr. S.D.N.Y. Feb. 16, 2021) (outlining the ERISA notice requirement); *In re Zolner*, 173 B.R. 629, 636 (Bankr. N.D. Ill. 1994), *aff'd*, 249 B.R. 287 (N.D. Ill. 2000) (same).

29.     CSPF disregarded the plain language of these strictures.  It did not perform a formal assessment of withdrawal liability and did not make a demand for payments in accordance with a specific schedule.  Instead, in accord with typical claims procedure, but out of step with ERISA's notice requirement, CSPF simply filed proofs of claim asserting withdrawal liability against the bankruptcy estates.  Fatal for ERISA purposes, CSPF included neither a payment schedule, nor a demand for payment in accord with that schedule.  *See* 29 U.S.C § 1399; 29 U.S.C. § 1401.

30.     In other words, CSPF adhered to the bankruptcy claims process and failed the ERISA procedure for triggering arbitration.[13]  Now, it seeks to subvert the bankruptcy process in favor of arbitration.  The clear text of the Bankruptcy Code precludes this result.  *See In re PRS Ins. Grp.*, 335 B.R. 77, 84 (Bankr. D. Del. 2005) ("The allowance and disallowance of claims, which are core matters arising under or in the Bankruptcy Code, fall within the exclusive jurisdiction of the bankruptcy courts.").[14]

**B.     This Court Should Deny CSPF's Request for Relief from the Automatic Stay and/or for Abstention.**

**1.     Granting CSPF's Motion Would Plunge the Debtors' Chapter 11 Proceedings Into Chaos.**

31.     Even if this Court *could* refer this dispute to another tribunal or decisionmaker (it lacks discretion to avoid determining the amount of CSPF's claim, if any, upon objection), the realities of these proceedings, including stakeholders' need for efficient and orderly administration of the estate, would require this Court not to exercise such discretion.

32.     As previously discussed, *twenty different MEPPs*, including CSPF, have filed more than *300 proofs of claim* collectively seeking more than *$7.2 billion* in withdrawal liability. The Debtors have already objected to certain of these claims,[15] and will ultimately object to all of

---

[13]   Citing *Chicago Truck Drivers*, a case holding that a proof of claim <u>failed to satisfy</u> 29 U.S.C. § 1399(b)(1) notice requirements, Central States incredibly asserts (Mot. at 7) that ERISA creates no formal requirements whatsoever. *Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591, 599 (7th Cir. 2008) ("[T]he proof of claim filed on June 3, 1999 was an insufficient notice and demand under the statute.").  This excuse does not justify Central States' failure to comply with the very statute it purports to invoke.

[14]   Another way of looking at the issue is this:  what CSPF did was file 24 Proofs of Claim *against the bankruptcy estates*, seeking a piece of estate assets pro rata with other general unsecured creditors (as a practical matter, CSPF seeks to seize for itself the overwhelming majority of the Debtors' assets).  *See* 28 U.S.C. § 157(b)(2) (court adjudicates as a "core" proceeding the "allowance or disallowance of claims against the estate").  That is not the same thing as a "dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title."  29 U.S.C. § 1401(a)(1).

[15]   The Debtors have objected to the MEPP claims that have largely overlapping issues with CSPF, including their receipt of SFA funding that eliminates their UVBs.  *See* ECF No. 1962.  The Debtors will be objecting to the remaining sets of several hundred MEPP claims, which also present largely overlapping issues, prior to February 14, 2024.

18

them, with many such objections turning on the same or similar arguments involved here (i.e., the extent to which fully funded MEPPs can seek withdrawal liability payments from the Debtors, notwithstanding their receipt of SFA funds and the absence of UVBs, and/or whether the MEPPs properly calculated withdrawal liability in any event).  Referring each of these disputes to 20 different arbitrators, as CSPF suggests must happen, would, among other things, cause extensive and unnecessary disruption to the Debtors' chapter 11 cases; cause the Debtors to waste significant time and resources litigating the same issues and waging the same discovery fights 20 different times in front of 20 different decisionmakers; and subject the Debtors, their creditors, and their equity holders to the risk of inconsistent rulings.  The Bankruptcy Code does not countenance such a result.  *See, e.g.*, *In re APF Co.*, 264 B.R. 344, 364 (Bankr. D. Del. 2001) (holding that, "staying the subject adversary proceeding in favor of arbitration [would] seriously jeopardize[] Bankruptcy Code Objectives," including "preservation of the Debtors' estate by not requiring [the expenditure of] limited resources and energies pursuing similar cases in several geographically diverse fora" and "conflict[] with the fundamental tenet of centralized resolution of purely bankruptcy issues").

33.    This Court, as centralized decisionmaker, could and should hear and determine and apply uniform rulings to ***all*** such withdrawal liability claims and related discovery disputes, and thus administer the estates in a far more efficient manner than would otherwise be possible if the Debtors had to engage in 20 separate arbitral proceedings.

34.    Moreover, having this Court determine the Proofs of Claim makes sense given their obvious significance to the estates.  These withdrawal liability claims represent, on their own and by an enormous margin, the largest unsecured claims against the Debtors, such that their resolution will determine whether the Debtors' other unsecured creditors obtain a full—or extremely small—recovery.  And that is not an overstatement:  depending on how these massive withdrawal liability

proofs of claim are decided, creditor recoveries in these chapter 11 cases could range from 100 cents on the dollar (with equity receiving a material recovery, too) to less than 10 cents on the dollar. CSPF's suggestion that 20 different arbitrators should decide a question of this magnitude and that the Bankruptcy Court should cede authority over what is by orders of magnitude the most relevant and important issue to creditors' ultimate recoveries is thus completely without merit. The power to effect such resolution clearly should remain with this Court, which is far more familiar with the Debtors' business and bankruptcy proceedings than any arbitrator could be, and which is imminently capable of deciding the legal and equitable issues at stake.

35.     CSPF does not show otherwise. Instead, CSPF's Motion focuses almost exclusively on and analogizes to nonprecedential and distinguishable caselaw from other jurisdictions (*see* Section A, *supra*). CSPF argues that this Court should compel arbitration, lift the automatic stay, and/or abstain from hearing withdrawal liability disputes because (1) doing so would "conserv[e] judicial resources" but not "disrupt the bankruptcy case or impede its progression"; and (2) such withdrawal liability disputes "are best resolved by arbitrators with expertise in this particular area of the law." *See* Mot. at 15-17. Neither argument is availing.

36.     ***First***, and as previously discussed, it is untenable to suggest that requiring the Debtors to arbitrate 20 different withdrawal liability disputes before 20 different arbitrators on 20 different schedules would be anything less than chaotic, time consuming, and exorbitantly expensive for the estates.

37.     ***Second***, these disputes do ***not*** require expertise in calculating withdrawal liability, as CSPF suggests. Withdrawal liability calculations are only required (indeed, they are only ***permitted***) where a pension fund is not fully funded or otherwise has UVBs, which CSPF, by its own admission, does not. Here, the first issue this Court will have to decide is whether,

4856-9394-9856.1 96859.001

notwithstanding their receipt of billions of dollars in SFA funding, the absence of any UVBs, and other factors (such as CSPF's assertion to the federal government that it would receive zero in withdrawal liability in a Yellow bankruptcy and its statements to plan members that all participant benefits are safe), CSPF and other MEPPs can seek billions more in withdrawal liability from the Debtors, and thus obtain double recovery.  Moreover, as the Debtors have also pointed out in the Objection, CSPF seeks funds from the Debtors that it affirmatively represented to the government it would not receive, and as a result of which CSPF actually received an additional $4 billion that is physically in its possession; it is estopped from making that argument.  *See* ECF No. 1322 (Debtors' Objection) at 22-29.  While discovery and facts will certainly be relevant to the answers, these questions are legal ones completely outside of any arbitrator's expertise and that this Court is more than capable of deciding.  Indeed, CSPF itself flat-out refused to respond to many of the Debtors' Interrogatories and Requests for Production, claiming the Debtors' Objection (in CSPF's opinion) "present[s] purely legal issues, for which no discovery is relevant."[16]  Moreover, and in any event, the Debtors are not aware of any arbitrator (one who frequently resolves withdrawal liability disputes or otherwise) ever having decided these issues before (much less having any expertise thereon), and CSPF identifies none.

38.    As such, and given the importance of these withdrawal liability disputes to the estates, this Court's obligation to resolve such disputes under 11 U.S.C. § 502(b), and the havoc that individual arbitrations of the disputes would wreak on the estates, this Court should decline to refer these matters to arbitration or otherwise abstain or lift the automatic stay.

---

[16]    *See* Ex. 1, CSPF's Responses to the Debtors' First Set of RFPs (refusing to produce documents in response to RFP Nos. 2, 7, 9-14, 17-18, 20-21 because the Debtors' Objection "present[s] purely legal issues"); Ex. 2, CSPF's Responses to the Debtors' First Set of Interrogatories (refusing to respond to ROG Nos. 2, 6-7 for the same reason).  The PBGC has similarly stiffed the Debtors on their discovery efforts to date, and the Debtors expect that the Court's assistance may well be needed to resolve these discovery disputes.

## 2.    CSPF Has Not Shown "Cause" to Lift the Automatic Stay.

39.    This Court should also decline to lift the automatic stay for the separate and simple reason that CSPF did not even attempt to argue there was cause for such relief.

40.    Section 362 of the Bankruptcy Code provides that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest" and under other circumstances not otherwise present here.  *See* 11 U.S.C. § 362(d).  Notably, "[e]xcept for lack of adequate protection, 'cause' is not defined by § 362(d)," and for that reason, Delaware courts "often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay."  *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007) (citing cases).  This balancing test is three-pronged: (1) whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit; (2) whether the hardship to the non-bankruptcy party by maintenance of the stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits.  *Izzarelli v. Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

41.    In this case, CSPF made no effort to argue that cause exists, under *Rexene* or otherwise, to lift the automatic stay.  It did not argue that its interest in any property of the Debtors "lack[ed] adequate protection."  It did not argue that the Debtors would suffer no prejudice if the stay were lifted, or that CSPF would suffer ***more*** prejudice if the stay were not lifted.  And it did not argue that it had a probability of prevailing on the underlying merits of the Debtors' Objection.

42.    Nor could it.  As discussed more fully above, the Debtors would suffer great prejudice if these withdrawal liability disputes were to proceed in separate, parallel arbitrations.  At the very least, the Debtors would have to litigate the same dispute on dozens of different fronts,

which would be time consuming, expensive, and wasteful, would disrupt the Debtors' efforts to reorganize, and would subject the Debtors to the risk of conflicting judgments.  CSPF, by contrast, would stand to suffer no such prejudice if its claims were to proceed through the usual dispute resolution process before this Court–much less prejudice "considerably outweigh[ing]" that which the Debtors would suffer if the automatic stay were lifted.

43.      In short, because CSPF failed to articulate any cause for lifting the automatic stay, and because the relevant considerations for such relief weigh in favor of the Debtors, this Court should deny CSPF's request.  *See, e.g.*, *In re Trump Ent. Resorts, Inc.*, 526 B.R. 116, 121 (Bankr. D. Del. 2015) ("[T]he Court finds that Trump AC is not entitled to relief from the automatic stay under a traditional *Rexene* analysis. The Court's finding is based predominantly on Trump AC's failure to demonstrate that any significant hardship would result from maintenance of the stay as well as the Court's observation that continuation of the State Court Action would impose a substantial burden on the Debtors' reorganizational efforts.").

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that this Court deny CSPF's Motion to Compel Arbitration.

23

| | |
|---|---|
| Dated:  January 26, 2024<br>Wilmington, Delaware | */s/ Peter J. Keane* |

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com
              pkeane@pszjlaw.com
              ecorma@pszjlaw.com


Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              david.seligman@kirkland.com
              michael.slade@kirkland.com


-and-
Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email:        michael.esser@kirkland.com
              john.christian@kirkland.com


*Co-Counsel for the Debtors and Debtors in Possession*