## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Yellow Corporation, *et al.*, [1] | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors | ) | (Jointly Administered) |
| | ) | |
| | ) | **Objection Deadline:  February 28, 2024 at 4:00 p.m.** |
| | ) | **Hearing Date:  March 6, 2024 at 2:00 p.m.** |

**NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND RETIREMENT FUND, ROAD CARRIERS LOCAL 707 PENSION FUND, TEAMSTERS LOCAL 641 PENSION FUND, WESTERN PENNSYLVANIA TEAMSTERS AND EMPLOYERS PENSION FUND, MANAGEMENT LABOR PENSION FUND LOCAL 1730, INTERNATIONAL ASSOCIATION OF MOTOR CITY MACHINISTS PENSION FUND, MID-JERSEY TRUCKING INDUSTRY & TEAMSTERS LOCAL 701 PENSION AND ANNUITY FUND, TEAMSTERS LOCAL 617 PENSION FUND, TRUCKING EMPLOYEES OF NORTH JERSEY PENSION FUND, AND FREIGHT DRIVERS AND HELPERS 557 PENSION FUND'S JOINT MOTION TO COMPEL ARBITRATION OF WITHDRAWAL LIABILITY DISPUTES, OR ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY TO INITIATE ARBITRATION**

Pursuant to Section 362 of Title 11 of the United States Code and Rules 4001(a) and 9014 of the Federal Rules of Bankruptcy Procedure, ten multiemployer pension funds (the "Funds"), by and through their undersigned counsel, hereby jointly move the Court for an order compelling arbitration with respect to Debtors' Second Omnibus Objections ("Omnibus Objections"), Dkt. 1962, to the Funds' proofs of claim for more than $1.5 billion of withdrawal liability. Alternatively, the Funds ask the Court to grant them relief from the automatic stay to initiate arbitration with respect to the issues raised in the Omnibus Objections.  The Funds set forth the following in support of its motion.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 10990 Roe Avenue, Overland Park, Kansas 66211.

## INTRODUCTION

Debtors are pursuing piecemeal challenges to the pension fund withdrawal liability claims at issue in this case.  They began by objecting to the proofs of claim filed by Central States, Southeast and Southwest Areas Pension Fund ("Central States") on December 8, 2023, Dkt. 1322, after which Central States moved to compel arbitration.  Dkt. 1665 ("Central States Motion").  In response, on January 26, 2024, Debtors filed Omnibus Objections to the proofs of claim filed by the Funds and then immediately opposed Central States' motion to compel arbitration by arguing to the Court that because Debtors "already objected to . . . these claims . . . [r]eferring each of these disputes to . . . different arbitrators . . . would . . . cause extensive and unnecessary disruption to the Debtors' chapter 11 cases" and "[p]lunge the . . . [p]roceedings [i]nto [c]haos."  Dkt. 1965 ("Debtors' Opposition"), at p. 18, ¶ 32.

The Funds want an efficient resolution of their more than $1.5 billion in withdrawal liability claims, which are critical to ensuring their ability to pay benefits to more than 70,000 participants and beneficiaries—and have already averted any concern about "chaos" in resolving their claims.  Within two weeks of Debtors filing the Omnibus Objections, the Funds each retained the same law firms, and coordinated with Debtors and Central States to: (i) stipulate to a common schedule to address Debtors' overlapping objections; and (ii) agree that Central States' and the Funds' respective motions to compel arbitration would be heard at the same hearing.  *See* Dkt. 2141-1 & n.2.[2]  With those logistical challenges already solved, the Funds hereby jointly move (with the consent of Central States) to compel arbitration before one arbitrator—who can expertly and efficiently resolve all of their withdrawal liability claims, just as Congress mandated.  In the

---

[2] With respect to their common issues, the Funds join the Central States Motion.

alternative, the Funds seek to have the automatic stay lifted so they can initiate arbitration against Debtors regarding their withdrawal liability claims.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      Pursuant to Local Rule 9013-1(f), to the extent that it is later determined that the Court may not, in accordance with Article III of the U.S. Constitution, enter final orders or judgments in connection with this contested matter without the parties' consent, the Funds so consent solely with respect to the determination of this Motion.  Notwithstanding the foregoing, pursuant to Local Rule 9013-1(h), the Funds do not consent to the entry of a final order or judgment by this Court on Debtors' objections to the Fund's withdrawal liability claims against Debtors, if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the U.S. Constitution.

3.      Venue is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

## ARGUMENT

### I.  The Funds and Their Withdrawal Liability Claims.

4.      One of the types of pension plans governed by the Employee Retirement Income Security Act ("ERISA") "is the multiemployer pension plan, in which multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." *Trustees of Loc. 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 129 (2d Cir. 2012).  When an employer withdraws from a multiemployer pension plan, it is responsible for paying withdrawal liability, which "is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated

as the difference between the present value of vested benefits and the current value of the plan's assets." *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984).

5.      Debtors participated in and then withdrew from each of the Funds, and have not paid their withdrawal liability obligations. *See* Omnibus Objections, ¶ 17. The Funds and the amount of their claims that the Omnibus Objections purport to challenge are: New York State Teamsters Conference Pension and Retirement Fund ($757,200,000), Road Carriers Local 707 Pension Fund ($245,800,000), Teamsters Local 641 Pension Plan ($217,160,000), Western Pennsylvania Teamsters and Employers Pension Fund ($174,827,536), Management Labor Pension Fund Local 1730 ($65,891,164), International Association of Machinists Motor City Pension Fund ($60,579,471), Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund ($48,230,076), Teamsters Local 617 Pension Fund ($41,932,295), Trucking Employees of North Jersey Pension Fund ($14,448,229), and Freight Drivers and Helpers 557 Pension Fund ($6,158,876). *See* Dkt. 1962-2, Ex. A.[3]

6.      The Funds expect that Debtors will take similar positions in opposing this Motion as they did in opposing the Central States Motion. Accordingly, where relevant, this Motion directly addresses positions Debtors have already taken in connection with the Central States Motion. While the Funds generally agree with the positions expressed in the Central States Motion, this Motion also addresses the unique reasons a multi-party arbitration should proceed and relies on additional case law and theories not addressed in the Central States Motion.

---

[3] While the numbers listed here from Debtors' Omnibus Objections do not line up exactly with the withdrawal liability proofs of claim actually filed by every fund, the differences are not material for purposes of this Motion.

## II. The Omnibus Objections Clearly Fall Within the Scope of MPPAA's Mandatory Arbitration Provision.

7.      "One of Congress' central purposes in enacting [ERISA] was to prevent the 'great personal tragedy' suffered by the employees whose vested benefits are not paid when pension plans are terminated."  *Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 374 (1980) (footnote omitted).

8.      In 1980, Congress amended ERISA by passing the Multiemployer Pension Plan Amendments Act ("MPPAA"), which imposed withdrawal liability on employers who withdrew from their participation in multiemployer funds. *See R.A. Gray & Co.*, 467 U.S. at 725.  In enacting MPPAA, Congress agreed with the analysis of the Pension Benefit Guaranty Corporation ("PBGC") that "withdrawal liability would . . . discourage voluntary withdrawals and curtail the current incentives to flee the plan."  *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 217 (1986) (quoting testimony from the PBGC Executive Director).

9.      MPPAA requires that disputes regarding the determination and calculation of withdrawal liability be resolved through arbitration.  *See* 29 U.S.C. § 1401(a)(1) ("Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title ***shall*** be resolved through arbitration.") (emphasis added).  The Third Circuit has explained that the purposes of the arbitration requirement include that it: (i) "substantially reduces the expenses incurred by multiemployer plans"; (ii) "promotes judicial economy"; (iii) avoids "delay"; and (iv) allows for resolution by arbitrators with "special" "expertise." *See Flying Tiger Line v. Teamsters Pension Tr. Fund of Philadelphia*, 830 F.2d 1241, 1248-49, 1252 (3d Cir. 1987).

10.      The issues raised in the Omnibus Objections clearly fall within the scope of MPPAA's mandatory arbitration provision.  The central claim in the Omnibus Objections is that

the proofs of claim improperly calculated the Funds' "unfunded vested benefits" or "UVBs." *See, e.g.*, Omnibus Objections, ¶ 5 ("Stated succinctly . . . there should be no withdrawal liability because there are no UVBs."), ¶ 44 ("Debtors . . . will be prepared to prove at trial, that based on a rational set of economic assumptions, the Pension Plans actually had either zero or close to zero UVBs as of the Petition Date . . . .") (emphasis omitted). Challenges to the determination of UVBs, and the assumptions on which they are based, fall squarely within the scope of the statutory sections to which MPPAA's mandatory arbitration provision applies. *See, e.g.*, 29 U.S.C. §§ 1391(a) ("The amount of the unfunded vested benefits allocable to an employer that withdraws from a plan shall be determined in accordance with subsection (b), (c), or (d) of this section."); 1393(a) ("Use [of actuarial assumptions] by plan actuary in determining unfunded vested benefits of a plan for computing withdrawal liability of employer.").

11.     Unable to argue that the subject matter of their objections falls outside the scope of MPPAA's mandatory arbitration provision, Debtors argued that Central States "failed to trigger ERISA's arbitration provision" based on a procedural technicality. Debtors' Opposition, ¶ 28. Specifically, Debtors claim that "simply fil[ing] proofs of claim asserting withdrawal liability against the bankruptcy estate"—as Central States and the Funds did—does not satisfy MPPAA's requirement that a pension fund issue a "notice and demand" for payment to the employer setting forth a specific schedule. *See id.* ¶¶ 28-29; 29 U.S.C. § 1399(b)(1). Debtors' argument is wrong for at least two reasons.

12.     *First*, whether the Funds complied with the notice and demand for payment requirements in 29 U.S.C. § 1399(b) is itself a dispute to be resolved in arbitration. *See* 29 U.S.C. § 1401(a)(1) ("Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 ***through 1399*** of this title shall be resolved

through arbitration.") (emphasis added).  Indeed, in a decision affirmed by the Third Circuit, a

court held that "whether the notice and demand in a Chapter 11 bankruptcy must include a schedule

of payments, concern[s] compliance with Section 1399, and thus, [is] subject to arbitration."

*Steelworkers Pension Tr. v. Renco Grp.*, 2016 WL 5173664, at *8 (W.D. Pa. Aug. 22, 2016),

*report and recommendation adopted*, 2016 WL 5121803 (W.D. Pa. Sept. 21, 2016), *aff'd*, 694 F.

App'x 69 (3d Cir. 2017) (holding that "whether the Trust served statutorily sufficient notice of its

demand for withdrawal liability" by filing proofs of claim in bankruptcy is "governed by section

1399(b) . . . " and, accordingly, is subject to arbitration).

13.    *Second*, Debtors' argument that a proof of claim cannot satisfy MPPAA's

requirement of a notice and demand for payment unless it has a specific schedule has been squarely

rejected by courts that have considered the issue:

> We have been indulgent about the specific form a notice and demand may take, and
> have recognized proofs of claim in bankruptcy to be adequate notices under the
> statute, at least in some situations . . . ***[including] in Chapter 11 bankruptcies*** . . .
> . Here, the Defendants contend that the proof of claim did not contain a demand for
> payment but we have held that a proof of claim is, by definition, a demand for
> payment.  The Defendants also complain that the proof of claim here did not contain
> a schedule, which they interpret to mean a "timetable" rather than a "list." This is
> beside the point. A proof of claim filed in bankruptcy need not contain a schedule
> of payment; such a schedule would be useless in that context, for the bankruptcy
> court can ultimately set its own schedule.

*Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591, 598 (7th Cir. 2008) (emphasis added;

citations omitted).  *El Paso* went on to explain that proofs of claim in Chapter 7 cases, unlike in

Chapter 11 cases, may be insufficient because they do not "come to the attention of the employer."

*Id.* at 599.  That distinction, however, does not help Debtors because this is a Chapter 11 case.  *Cf.*

Debtors' Opposition, ¶ 30 n.13 (attempting to distinguish *El Paso* on this basis, without disclosing

that portion of the holding was specific to Chapter 7 cases).

### III.  Debtors' Arguments That the Court Cannot Permit Arbitration Are Wrong.

14.     Although the issues raised by the Omnibus Objections clearly fall within the scope of MPPAA's mandatory arbitration provision, *see supra at* ¶¶ 7-13, Debtors have argued that the Court is precluded by the Bankruptcy Code from allowing the issues to be resolved in arbitration. *See, e.g.*, Debtors' Opposition, ¶ 15 ("The Bankruptcy Code and attendant case law are clear. Congress gave this Court the responsibility to hear and rule on [Central State]'s withdrawal liability claim.").  Debtors are wrong.  Bankruptcy courts have at least the authority (if not also the obligation, *see infra* at ¶¶ 34-36) to allow an arbitrator to decide disputes over withdrawal liability, as the very cases cited in Debtors' Opposition confirm.

15.     At least two cases cited by Debtors confirm that bankruptcy courts, at a minimum, have the discretion to allow objections to claims regarding withdrawal liability to be resolved in arbitration.  *See In re BFW Liquidation, LLC*, 459 B.R. 757, 784 (Bankr. N.D. Ala. 2011) ("[S]ince Congress wished for withdrawal liability claims to be decided by arbitration, and that wish may be readily accommodated by deferring resolution of the Fund's withdrawal liability claim to arbitration . . . this Court should . . . ***exercise its discretion*** to abstain from determining and liquidating the Fund's withdrawal liability claim so that such determination and liquidation of said claim may be addressed and accomplished by arbitration.") (emphasis added); *In re Interco Inc.*, 137 B.R. 993, 997 (Bankr. E.D. Mo. 1992) ("The key issue to be addressed in this determination is whether deferral of this matter to arbitration would unduly delay administration of these bankruptcy cases. Undue delay is not defined by the Code; rather, it is a problem 'whose solution ultimately rests on the ***exercise of judicial discretion*** in light of the circumstances of the case,

particularly the probable duration of the liquidation process as compared with the future uncertainty due to the contingency in question.'") (emphasis added).

16.     Rather than acknowledge these holdings, Debtors merely note that the courts did not hold that withdrawal liability issues always must be resolved in arbitration.  *See* Debtors' Opposition, ¶ 26 (noting that *In re BFW Liquidation* "explicitly refused to decide whether 29 U.S.C. § 1401(a)(1) *mandates* arbitration in bankruptcy") (emphasis added); *id.* ¶ 19 (noting that "the *Interco* court determined that 'neither the provisions of ERISA, nor the established case law *mandates* that the bankruptcy court defer to arbitration the estimation of withdrawal liability . . . .'") (emphasis added) (cleaned up).

17.     However, instead of addressing the directly-on-point holdings in their own case law, Debtors advanced three baseless arguments to avoid arbitration.

18.     *First*, Debtors argued that "[b]asic principles of statutory interpretation require that the Bankruptcy Code's specific mandate that this Court rule on claims objections supersede ERISA's broad call for arbitration of withdrawal liability."  Debtors' Opposition, ¶ 24.  *See also* 11 U.S.C. § 502(b) ("if such objection to a claim is made, the court . . . *shall* determine the amount of such claim . . . ."); 29 U.S.C. § 1401(a)(1) ("Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title *shall* be resolved through arbitration.") (emphasis added).

19.     Debtors, however, offer no rationale, much less any case law, to support their conclusory assertion that a general principle that bankruptcy courts should rule on disputes over claims filed against a debtor (applicable to, *inter alia,* disputes over claims of virtually any kind

filed in connection with the approximately 17,000 corporate bankruptcies each year)[4] is more specific than ERISA's command that arbitration apply to withdrawal liability disputes (applicable only to a specific type of dispute involving a specific type of pension plan, of which there are only approximately 1,400 in existence).[5]   Indeed, if anything, Debtors have it backwards: ERISA's more specific command, which is applicable to a narrower class of claims, should supersede the Bankruptcy Code's general principle.  *See also infra* at ¶¶ 34-36 (addressing the question, which the Court need not reach, of whether ERISA *requires* arbitration of withdrawal liability claims in bankruptcy).

20.     Moreover, the Supreme Court has rejected Debtors' argument that the term "shall" in a statute assigning responsibility to the federal courts to adjudicate a specific type of claim overrides a statutory provision generally requiring arbitration.  *See* Debtors' Opposition, ¶¶ 23-24; *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227-28 (1987) (rejecting argument that the Securities Exchange Act, which provided that the "[t]he district courts of the United States . . . shall have exclusive jurisdiction over violations of this title . . . and all suits . . . brought to enforce any liability or duty created by this title . . . ," overrode the Federal Arbitration Act's provision mandating the enforcement of arbitration agreements).

21.     *Second*, Debtors argued that "[t]he clear text of the Bankruptcy Code precludes" "subvert[ing] the bankruptcy process in favor of arbitration" because "[t]he allowance and disallowance of claims, which are core matters arising under or in the Bankruptcy Code, fall within the exclusive jurisdiction of the bankruptcy courts."  Debtors' Opposition, ¶ 30 (citing *In re PRS*

---

[4] Administrative Office of the U.S. Courts, *Bankruptcy Filings Rise 13 Percent* (Oct. 26, 2023), https://www.uscourts.gov/news/2023/10/26/bankruptcy-filings-rise-13-percent.
[5] Pension Benefit Guaranty Corporation, *Introduction to Multiemployer Plans* (Feb. 17, 2022), https://www.pbgc.gov/prac/multiemployer/introduction-to-multiemployer-plans.

*Ins. Grp.*, 335 B.R. 77, 84 (Bankr. D. Del. 2005)).  But *In re PRS* does not mention arbitration, and Debtors' theory that permitting arbitration is inconsistent with a statutory grant of exclusive jurisdiction is foreclosed by the Supreme Court's decision in *McMahon*.  *See also infra* at ¶¶ 35-36.

22.    Moreover, this Court held in *In re GWI* that even "[w]here a matter is a core proceeding, it is left to the bankruptcy court's discretion to decide whether to refer the matter to arbitration."  269 B.R. 114, 117 (Bankr. D. Del. 2001).  *Accord In re BFW*, 459 B.R. at 778 ("this Court rejects the argument that a core matter should not be arbitrated simply because it is a core proceeding").  Although Central States cited this Court's decision in *In re GWI* in support of its motion to compel arbitration, *see* Central States Motion, ¶ 49, Debtors simply ignored it.  *See generally* Debtors' Opposition.

23.    *Third*, Debtors argued "[i]t is settled law that, by filing Proofs of Claim in this Court, [Central States] submitted its claims to the Bankruptcy Court's jurisdiction."  *See* Debtors' Opposition, ¶¶ 2, 16.  But, again, none of Debtors' case law pertains to arbitration, and "numerous courts have concluded that a creditor who files a proof of claim does not, by that act alone, waive its contractual right to arbitrate a dispute."  *In re Herrington*, 374 B.R. 133, 147 (Bankr. E.D. Pa. 2007) (collecting cases).  *See also In re Am. Classic Voyages*, Co., 298 B.R. 222, 226 (D. Del. 2003) (reversing bankruptcy court decision that refused to lift the automatic stay based, in part, on the erroneous reasoning that "[b]y filing the claim, this Creditor . . . has submitted to the jurisdiction of the Bankruptcy Court").

**IV.  The Issues Raised by the Omnibus Objections Should Be Resolved by an Arbitrator.**

24.    As set forth above, the issues raised by the Omnibus Objections fall squarely within the scope of MPPAA's mandatory arbitration provision, and the Court has the authority to direct

that they be resolved in arbitration. *See supra* at ¶¶ 7-23. The Court should exercise that authority and allow the withdrawal liability claims to be resolved in arbitration for at least three reasons.

25.     *First*, as the Third Circuit has held, resolution of withdrawal liability disputes in arbitration "substantially reduces the expenses incurred by multiemployer plans" and avoids "delay." *Flying Tiger Line*, 830 F.2d at 1248-49. Relying on *Flying Tiger Line*, the *In re BFW* court exercised its discretion to allow withdrawal liability claims to be resolved by an arbitrator, explaining that Congress intended "the MPPAA arbitration provisions to be the preeminent method for resolving withdrawal liability disputes because it believed them to constitute the most expeditious and economical method for resolving those disputes." *In re BFW*, 459 B.R. at 797. Moreover, this Court has held that arbitration "often results in a quicker and more economic resolution of claims" than "the bankruptcy process," which "favor[s] arbitration." *In re GWI*, 269 B.R. at 118-19. *See also* Dkt. 1329, ¶¶ 3-4 (Debtors advocating for the use of alternative dispute resolution in order to, *inter alia*, "minimize[e] expenses for all interest parties (including the Debtors)," "avoid the delay and expenses associated with protracted litigation," and "promote the early resolution of [claims]").

26.     Debtors had argued that permitting arbitration of withdrawal liability issues here "Would Plunge the Debtors' Chapter 11 Proceedings Into Chaos" because "[r]eferring each of these disputes to 20 different arbitrators . . . would . . . cause extensive and unnecessary disruption to the Debtors' chapter 11 cases; cause the Debtors to waste significant time and resources litigating the same issues and waging the same discovery fights 20 different times in front of 20 different decision makers; and subject the Debtors, their creditors, and their equity holders to the

risk of inconsistent rulings." Debtors' Opposition, ¶ 32.[6]  None of these theoretical concerns would

arise if the Court orders that the parties arbitrate, with the same arbitrator presiding over all of

Debtors' challenges to each funds' withdrawal liability claims.  *See also* 29 C.F.R. §§ 4221.1-

4221.14 (setting forth procedures for withdrawal liability arbitrations under MPPAA, including

the selection of an arbitrator and approval of alternative procedures); American Arbitration

Association, *Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes*, §

5  (Jan. 1, 2020) (PBGC-approved alternative arbitration procedure administered by the American

Arbitration Association, which maintains a specialized expert National Panel of Multiemployer

Pension Plan Withdrawal Liability Arbitrators).[7]  Notably, "multiparty arbitrations have been seen

with increasing frequency in recent years and now constitute a significant proportion of the

caseload of certain arbitral institutions."  S.I. Strong, *Does Class Arbitration "Change the Nature"*

*of Arbitration? Stolt-Nielsen, AT&T, and A Return to First Principles*, 17 Harv. Negot. L. Rev.

201, 211 (2012).

27.    *Second*, having an arbitrator address these issues, including the merits and, as

Debtors foretell, "discovery fights," Debtors' Opposition, ¶ 32, would clearly promote "judicial

economy" by preserving the Court's resources.  *See Flying Tiger Line*, 830 F. 2d at 1248.  *See also*

*In re BFW*, 459 B.R at 765, 787-88 (holding that "[s]ending matters to arbitration conserves

---

[6] Between Debtors' objections to Central States' withdrawal liability proofs of claim, and their
Omnibus Objections, Debtors have objected to the withdrawal liability claims from the 11
multiemployer pension funds that they believe "have largely overlapping issues . . . including their
receipt of SFA funding."  Omnibus Objections, ¶ 32 n.15.  Debtors also indicated that they intend
to "object[] to the remaining sets of several hundred MEPP [multiemployer pension plan] claims
. . . ."  *Id*.  Regardless of the objections Debtors may make to the claims of other pension funds,
which would presumably be less similar to the objections to date (or otherwise they would have
been included in the Omnibus Objections), Debtors cannot avoid their obligation to arbitrate by
intentionally dividing up their objections in a piecemeal fashion and then claiming to be prejudiced
by piecemeal arbitration.

[7] https://www.adr.org/sites/default/files/Multiemployer_Pension_Plan_Withdrawal_Liability.pdf.

precious and limited judicial resources" and emphasizing that preserving "judicial economy is an important consideration . . . in bankruptcy cases" across a wide range of issues, including withdrawal of the reference, deciding whether to exercise supplemental jurisdiction, deciding whether to abstain, and whether to lift the automatic stay).

28.    *Third*, arbitration would allow an arbitrator with "special" "expertise" with respect to withdrawal liability and multiemployer funds to hear the case. *See Flying Tiger Line*, 830 F.2d at 1252. *See also In re BFW*, 459 B.R. at 799 (holding that withdrawal liability arbitrators have "superior experience, training, and expertise" as compared to bankruptcy courts).

29.    Debtors have argued that resolving their objections would "***not*** require expertise in calculating withdrawal liability" because there purportedly are no UVBs. Debtors' Opposition, ¶ 37. This argument is belied by Debtors' own Omnibus Objections which, for example, assert that "the Pension Plans' calculations are not entirely clear and the Debtors will need discovery to fully understand the claims," after which Debtors will rely on "expert discovery," including to "establish the appropriate discount rate," and "will be prepared to prove at trial, that based on a rational set of economic assumptions, the Pension Plans actually had either ***zero*** or close to zero UVBs as of the Petition Date . . . ." Omnibus Objections at p. 7, ¶¶ 7, 44, 52. Understanding complex actuarial calculations, evaluating expert testimony, determining the appropriate discount rate, and making findings as to the resulting "amount of the liability, are quintessentially within the expertise of an arbitrator skilled in pension matters." *See Connors v. B.M.C. Coal Co.*, 634 F. Supp. 74, 75 (D.D.C. 1986).

30.    In any event, Congress did not limit its desire for specialized withdrawal liability arbitrators solely to issues of "calculating withdrawal liability" as Debtors suggest, but broadly included issues relating to the determination and existence of withdrawal liability. *See, e.g.*, 29

U.S.C. §§ 1383, 1385 (determination of when a withdrawal occurs); §§ 1384, 1398 (impact of corporate transactions); § 1392 (obligations to contribute and transactions to evade or avoid withdrawal liability).  In doing so Congress did "not differentiate between legal and factual questions," and the Third Circuit has explained that, in any event, "whether an employer's defense is a question of fact, or of law, or a mixed question of fact and law, is often difficult to discern." *Flying Tiger Line*, 830 F.2d at 1255 (quoting *Robbins v. Chipman Trucking Inc.*, 693 F. Supp. 628, 638 (N.D. Ill. 1986)).

31.    Debtors offered no authority in support of their argument that disputes about whether there are any UVBs or whether estoppel applies are "legal ones completely outside of any arbitrator's expertise," and claim to be unaware "of any arbitrator . . .  ever having decided these issues before."  Debtors' Opposition, ¶ 37.  Arbitrators, of course, have familiarity with these issues.  *See, e.g.*, *RXDC, Inc. v. Oil, Chem. & Atomic Workers Union-Indus. Pension Fund*, 781 F. Supp. 1516, 1525 (D. Colo. 1992) ("The Court has examined the motions, briefs, and record before it and concludes that the arbitrator did not, as a matter of law, err in his application of the doctrine of equitable estoppel, and properly determined the application of the doctrine in light of relevant facts and that the fact that the Fund may have had no UVB's in the year preceding withdrawal does not dictate a finding that, as a matter of law, there could be no withdrawal liability.").

32.    Moreover, the purported basis for Debtors' estoppel argument in their Omnibus Objections—which they apparently plan to raise only against the Western Pennsylvania Teamsters and Employers Pension Fund ("Western PA Fund")—is based entirely on a single "***assum[ption]***" (cherry-picked by Debtors) made by the Western PA Fund's "***actuary***" about what was "***reason[able]***."  Omnibus Objections, ¶ 40 (emphasis added).  While the PBGC already assessed the reasonableness of those assumptions when it approved the Western PA Fund's SFA

15

application—which Debtors cannot now collaterally attack—it is worth noting that the reasonableness of assumptions made by actuaries is a topic on which withdrawal liability arbitrators have extensive expertise. *See, e.g.*, 29 U.S.C. §§ 1393(a)(1), 1401(a)(1) (tasking arbitrators with deciding whether "actuarial assumptions . . . are reasonable"). So too, other issues raised by Debtors fall within areas Congress designated for arbitration and are within the expertise of arbitrators. *See, e.g.*, Omnibus Objections, ¶¶ 49-55 and Ex. C (alleging that eight of the Funds failed to comply with the 20-year cap set forth in 29 U.S.C. § 1399(c)(1)(B), which Debtors allege will require new actuarial calculations).

33.      At the end of the day, Debtors are left with one argument against arbitration—which has nothing to do with cost, efficiency, or expertise in resolving the underlying merits of the Funds' claims. Debtors argue that because of the size of the withdrawal liability claims, in order for equity to recover in this bankruptcy, the Court must use its "equitable" powers to prevent pension plans from receiving a "double recovery." Debtors' Opposition, ¶¶ 34, 37, 38. *See also id.* ¶ 1 (arguing that allowing Central States' claim would "eliminat[e] the prospect of an equity recovery"); ¶ 6 (arguing that the resolution of the withdrawal liability claims will decide whether there is "cash left over for equity"); ¶ 14 (arguing that the resolution of the withdrawal liability claims will decide whether "equity receiv[es] a material recovery" or is "wiped out"). The source of the purported "double recovery" was money Congress provided under the American Rescue Plan Act of 2021, in the form of "special financial assistance" or "SFA" to multiemployer funds. *See id.* at ¶ 4. Debtors offer no precedent indicating that this is a relevant inquiry in deciding whether a matter should be resolved in arbitration, and are plainly trying to subvert the will of Congress thrice over. Congress (i) provided money for the benefit of pension funds and their participants (not withdrawing employers and their hedge fund owners who bought "lottery tickets"

on the eve of bankruptcy, *see* Dkt. 1833, ¶ 1); (ii) set up the Bankruptcy Code to give priority to creditors (not equity holders); and (iii) provided that disputes over the determination and calculation of withdrawal liability should be heard by arbitrators (not courts).

**V.  In the Alternative, the Court Should Hold that the Omnibus Objections Must Be Heard in Arbitration.**

34.      As in *In re BFW*, the Court should conclude that because ordering arbitration as a matter of discretion is warranted, "It is Not Necessary to Decide if Arbitration is Required by the MPPAA for Withdrawal Liability Claims in Bankruptcy."  *In re BFW*, 459 B.R. at 762.  If, however, the Court declines to order arbitration as a matter of discretion, it should order arbitration because it is required as a matter of law.  *See also In re Mintze*, 434 F.3d 222, 228 (3d Cir. 2006) ("Whether a bankruptcy court has the discretion to deny enforcement of an arbitration clause is . . . a question of law.").  According to at least one bankruptcy court in the Third Circuit, "[t]he extent of [withdrawal] liability ***must*** be determined under the arbitration provisions of MPPAA (unless the parties agree as to its amount)."  *In re Mushroom Transp. Co., Inc.*, 90 B.R. 718, 728 (Bankr. E.D. Pa. 1988) (emphasis added).

35.      In *In re Mintze*, the Third Circuit held that because there was no "inherent conflict between arbitration and the Bankruptcy Code" under the standard set forth by the Supreme Court in *McMahon*, "the Bankruptcy Court lacked the authority and discretion to deny enforcement of the arbitration provision."  434 F.3d at 226, 231.  There are "no post-*Mintze* reported cases in which any court in the Third Circuit refused to enforce an arbitration clause because of a fundamental conflict with the Bankruptcy Code."  *In re Rotondo Weirich Enterprises, Inc.*, 583 B.R. 860, 871 n.16 (Bankr. E.D. Pa. 2018).  Under *McMahon*, "[t]he burden is on the party opposing . . . arbitration" to show that Congress intended to preclude arbitration with respect to "the statutory rights at issue."  *McMahon*, 482 U.S. at 226-27.  Debtors cannot meet that burden

17

here, and, indeed, elected to ignore *McMahon* entirely even though it is binding Supreme Court precedent that Central States cited twice.  *See* Central States Motion, ¶¶ 35, 55.

36.      None of Debtors' case law provides any basis for concluding they can meet their burden under *McMahon* or *Mintze*.  As the court in *In re BFW* noted—referring to three of the cases Debtors rely on which held that arbitration of withdrawal liability disputes is not mandatory—"all three were decided prior to *McMahon*, so that the judges in those cases did not have the benefit of the emphatic endorsement of the federal policy favoring arbitration found in that case or its revelation of the proper test to employ when two ostensibly exclusive federal statutes come into direct conflict with one another." *In re BFW*, 459 B.R. at 796-97 (citing *In re T.D.M.A., Inc.*, 66 B.R. 992 (Bankr. E.D. Pa. 1986); *In re Amalgamated Foods, Inc.*, 41 B.R. 616 (Bankr. C.D. Cal. 1984), and *In re Cott Corp.*, 26 B.R. 332 (Bankr. D. Conn. 1982)).  *See also* Debtors' Opposition, ¶ 18.  The fourth case, while decided after *McMahon*, did not discuss *McMahon*.  *See In re Interco Inc.*, 137 B.R. at 996.  Instead, the *In re Interco* court relied on its interpretation of then-existing Third Circuit precedent as requiring arbitration of "*non-core* bankruptcy proceedings" but allowing discretion as to whether to order arbitration for "a core proceeding." *In re Interco Inc.*, 137 B.R. at 997 (citing *Hays & Co. v. Merrill Lynch*, 885 F.2d 1149 (3d Cir. 1989)).  But the Third Circuit subsequently disavowed that reading of *Hays* in *In re Mintze*, holding that: "We disagree with this interpretation—that the application of *Hays* is limited to non-core proceedings. . . . We find that the standard we articulated in *Hays* applies equally to core and non-core proceedings." *In re Mintze*, 434 F.3d at 230-31.

**VI. The Court's Order May Compel Arbitration and/or Lift the Automatic Stay.**

37.      Despite Debtors' putative position that the Court cannot compel arbitration of its Omnibus Objections consistent with the Bankruptcy Code, *see supra* at ¶¶ 14-23, they do not

dispute that the Court plainly has the authority to lift the automatic stay to allow arbitration to proceed, if the requirements of Section 362(d) are met.  Indeed, the *In re BFW* court simultaneously granted a motion to compel arbitration by ordering that "Debtors' objection to [the] claim shall be accomplished in an arbitration proceeding" and by lifting the automatic stay "to permit the Fund to institute, prosecute, and participate in an arbitration proceeding . . . ."  *In re BFW*, 459 B.R. at 800.  The Court here may similarly lift the automatic stay, for, as in *In re BFW*, many of the same reasons the Court may exercise discretion to compel arbitration.  *See supra* at ¶¶ 24-33.

38.    Under Section 362(d), "[o]n the request of a party in interest . . . the court ***shall*** grant relief from the stay . . . for cause . . . ."  11 U.S.C. § 362(d)(1) (emphasis added).  "[C]ourts . . . consider what constitutes cause based on the totality of the circumstances in each particular case."  *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997).  As discussed above, the totality of the circumstances—including efficiency, cost, expertise, and judicial economy—dictate that this case should be resolved in arbitration.  *See supra* at ¶¶ 24-33.  *See also In re Quad Sys. Corp.*, No. 00-35667F, 2001 WL 1843379, at *6 (E.D. Pa. Mar. 20, 2001) ("[I]f there is a need to fix the amount of the allowed unsecured claim—because the administration of the bankruptcy case requires it— and if the claim would normally be determined by a specialized forum, it may be appropriate to allow that forum to fix the amount of the claim.").  Moreover, as Debtors' own case law makes clear, relief from the automatic stay may be "particularly" warranted where, as here, "the nonbankruptcy suit involves multiple parties . . . ."  *In re SCO Grp., Inc.*, 395 B.R. 852, 857 (Bankr. D. Del. 2007) (quoting Lawrence P. King, *Collier on Bankruptcy* 362.07[3][a] (15th ed. 2006)).

39.    Debtors reference a three-factor balancing test set forth by this Court in *Izzarelli v. Rexene Prods. Co.* 141 B.R. 574, 576 (Bankr. D. Del. 1992).  *See* Debtors' Opposition, ¶ 40.  Those factors are:

19

1. Whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit;

2. Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and

3. The probability of the creditor prevailing on the merits.

*In re Trump Ent. Resorts, Inc.*, 526 B.R. 116, 120–21 (Bankr. D. Del. 2015) (citing *Rexene*).

"Cause under Section 362(d)(1), though, is a flexible concept and not confined solely to the *Rexene*

factors." *Id.* at 121.  *See also In re Cont'l Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993) ("There

is no rigid test for determining whether sufficient cause exists to modify an automatic stay.").

40.    Debtors' only claim of "great prejudice" was that:

> **[I]f these withdrawal liability disputes were to proceed in separate, parallel arbitrations** . . . the Debtors would have to litigate the same dispute on dozens of different fronts, which would be time consuming, expensive, and wasteful, would disrupt the Debtors' effort to reorganize, and would subject the Debtors to the risk of conflicting judgment.

Debtors' Opposition, ¶ 42 (emphasis added).   Debtors would face no such prejudice if the

proceedings were conducted before a single arbitrator, and, accordingly, have not demonstrated

prejudice weighing against lifting the automatic stay.  By contrast, the Funds would be prejudiced

by not being able to proceed in the more efficient, less expensive and expert forum that Congress

provided.  *See supra* at ¶¶ 24-33; *In re Am. Classic Voyages*, 298 B.R. at 226 (reversing bankruptcy

court decision that refused to lift the automatic stay for, *inter alia*, failing to give adequate

consideration to "the strong federal policy favoring arbitration").

41.    Finally, with respect to the merits, courts merely look to "whether the movant has

**some probability** of success on the merits in the proposed litigation."  *In re Cont'l Airlines*, 152

B.R. at 425 (emphasis added).  As *Rexene* itself explains: "[t]he required showing is **very slight**."

*Rexene Prods. Co.*, 141 B.R. at 578 (emphasis added).  The Funds' claims pass this test with flying

colors.  Debtors' principal theory is that the Funds erred by ***following*** a binding federal regulation issued by the PBGC, which they were required to follow in order to obtain the taxpayer funds that Debtors now seek to co-opt for their new hedge fund owners.  *See, e.g.*, Omnibus Objections, at 1, ¶ 45; 29 C.F.R. § 4262.16(g)(2) (providing that for the purpose of "determining unfunded vested benefits . . . for determining withdrawal liability" plans "must" "[p]hase-in" their receipt of money from the government over time).  Despite leading with this theory on the first page of their Omnibus Objections, Debtors devote only a single paragraph of analysis to the regulation. Incredibly, in the Omnibus Objections, Debtors claimed the regulation "is inconsistent with ERISA and federal law more generally" without:

> (i) Acknowledging, much less addressing, the amendment to ERISA that specifically authorized it, *see* 29 U.S.C. § 1432(m)(1) ("The corporation, in consultation with the Secretary of the Treasury, may impose, by regulation . . . reasonable conditions on an eligible multiemployer plan that receives special financial assistance relating to . . . withdrawal liability."); or

> (ii) Acknowledging, much less disputing, PBGC's explanation that the regulation was necessary to avoid "35% of contributing employers . . . withdraw[ing] immediately," thereby costing taxpayers an additional "$15 to $20 billion" and causing plans to "become insolvent" much sooner than projected—all of which would be directly contrary to Congress' clear intent.  *See* Dkt. 1630 at 7-8.

42.    For the first time, in their Reply in support of their objections to Central States' withdrawal liability proofs of claim, Debtors finally acknowledged the existence of PBGC's authority under 29 U.S.C. § 1432(m)(1).  *See* Dkt. 2130 ("Debtors' Reply"), ¶ 16.  But Debtors still have not confronted the actual language of the statute, which gives PBGC the authority to impose "reasonable conditions on a[] . . . multiemployer plan . . . ***relating to*** . . . withdrawal liability."  29 U.S.C. § 1432(m)(1) (emphasis added).

43.    In *Morales v. Trans World Airlines, Inc.*, the Supreme Court held that "[t]he ordinary meaning" of the phrase "relating to . . . is a broad one—'to stand in some relation; to have

bearing or concern; to pertain; refer; to bring into association with or connection with[.]'"  504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)).  Obviously, a condition regarding how a multiemployer fund can treat SFA money for the purpose of "determining unfunded vested benefits . . . for determining withdrawal liability," 29 C.F.R. § 4262.16(g)(2), has a "bearing" on or "concerns" withdrawal liability.  Debtors have not contended otherwise, and, instead, chose to omit any mention of the "relating to" language from their briefing.  *See, e.g.*, Debtors' Reply, ¶¶ 16, 17.

44.    Similarly, even when given the direct opportunity to respond to PBGC's explanation of the need for its regulation and that it is indisputably consistent with Congress' intent, *see,* Dkt. 1630 at 7-8, Debtors chose to ignore PBGC's position on the merits.  Instead, Debtors responded only to PBGC's argument about the scope of the Court's authority to rule on the validity of its regulation.  *See generally* Debtors' Reply.[8]

45.    The Funds are not aware of any even remotely analogous case that declined to lift the automatic stay based on a conclusory assertion that a creditor should *not* have followed a binding federal regulation.

---

[8] PBGC has raised significant arguments that the U.S. Constitution, the Bankruptcy Code, and the Administrative Procedure Act ("APA") each preclude the Court from ruling on any challenge to the validity of its regulation in the context of a claims objection.  *See* Dkt. 1630 at 11-13.  In the event that the Court does not order arbitration, it would need to rule on PBGC's objections to the Court's jurisdiction, likely either forcing Debtors to initiate a separate lawsuit in district court under the APA that they could have filed months ago or positioning PBGC to file an appeal in district court of the Court's procedural decision.  *See also* Dkt. 2149, ¶¶ 18, 20 (where PBGC argues that "a decision by this Court that PBGC is not entitled to defend the agency's own regulations would prompt an appeal by PBGC" and "[s]hould Debtors . . . move to compel on [their discovery] request [to PBGC], additional arguments about the APA would ensue, again followed by possible appeals").

## CONCLUSION

46.     For the reasons set forth above, the Court should order that the issues raised in

Debtors' Omnibus Objections be resolved in arbitration.


Date:  February 13, 2024                **SULLIVAN · HAZELTINE · ALLINSON LLC**
       Wilmington, DE


                                        */s/ William D. Sullivan*
                                        William D. Sullivan (No. 2820)
                                        William A. Hazeltine (No. 3294)
                                        919 North Market Street, Suite 420
                                        Wilmington, DE 19801
                                        Tel: (302) 428-8191
                                        Email: bsullivan@sha-llc.com
                                                whazeltine@sha-llc.com

                                        and

                                        Edward Meehan, Esq.
                                        Samuel Levin, Esq.
                                        Groom Law Group
                                        1701 Pennsylvania Avenue, N.W.
                                        Washington, D.C.  20006-5811
                                        Tel: 202-861-2602
                                        Fax: 202-659-4503
                                        Email: emeehan@groom.com
                                                slevin@groom.com

                                        *Special Counsel to the Funds*