**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | Case No. 23-11069 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 968, 1112, 1695, 2157** |

**OBJECTION OF M4 TERMINALS, LLC TO THE DEBTORS' PROPOSED**
**ASSUMPTION OF MONTAGUE LEASE AND RELATED CURE**

M4 Terminals, LLC ("**Landlord**") hereby objects (the "**Objection**") to the *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Certain Unexpired Leases and (II) Granting Related Relief* [Docket No. 2157] (the "**Motion**").[2] In support of this Objection, Landlord respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      On July 1, 2023, Landlord and Debtors entered into a pre-petition agreement to terminate their real property lease on September 30, 2023 in exchange for three months of fully abated rent and a $1.8M termination fee, subject to the satisfaction or waiver of certain conditions precedent. Debtors performed under the termination agreement, received their abated rent, and abruptly decided to put Landlord's terminated lease through their marketing and sale process

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/case/yellowcorporation/info. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2] In support of the Motion, Debtors filed the (i) *Declaration of Brian Whittman in Support of the Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Certain Unexpired Leases and (II) Granting Related Relief* [Docket No. 2201] (the "**Whittman Declaration**"; cited herein as Whittman Decl., ¶ __); and (ii) *Declaration of Cody Leung Kaldenberg in Support of the Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Certain Unexpired Leases and (II) Granting Related Relief* [Docket No. 2202] (the "**Kaldenberg Declaration**"; cited herein as Kaldenberg Decl., ¶ __).

anyway, even though Landlord was (and remains) ready, willing, and able to pay the sizeable termination fee. Then, three months after landlord submitted a timely, irrevocable bid for the lease in accordance with the Court-approved bidding procedures, Debtors filed the Motion seeking to unilaterally re-write those procedures, hold landlord's bid in abeyance indefinitely, and assume the terminated lease.

2.      The Court should deny the Motion for at least six reasons. First, Debtors may not assume a terminated lease. Second, Debtors' proposed assumption would eviscerate Landlord's protections under Section 365(d)(4) of the Bankruptcy Code. Third, Debtors' proposed assumption would necessitate a gross deviation from the Court-approved sale timeline to the detriment of Landlord and other good-faith bidders who have already placed irrevocable bids. Fourth, Debtors, as liquidating entities, have not provided a sound business reason for their *en masse* assumption of seventy-five real property leases which they admit they have not fully vetted. Fifth, Debtors may not assume the lease without also assuming its anti-assignment provision and integrated termination agreement. Sixth, Debtors' proposed monetary cure is insufficient, and the Debtors' non-monetary breaches of the lease render assumption impossible.

## BACKGROUND

### I.      The Terminated Lease and Vacant Property

3.      Landlord is the landlord under a lease, dated January 30, 2009 ("**Montague**" or the "**Lease**") with Debtor YRC Inc. ("**Tenant**") for a motor freight terminal located at 1700 Montague Expressway, San Jose, California (the "**Property**").

4.      In December 2018, Tenant entered into a five-year sublease (the "**Sublease**") with a third-party (the "**Subtenant**") that was scheduled to expire on December 31, 2023. The terms of the Sublease were highly favorable to Tenant, which was collecting substantially more rent from Subtenant than it was obligated to pay Landlord.

2

5.      Nevertheless, in February 2023, Landlord learned through its own efforts, rather than from Tenant, that Subtenant had vacated the Property. Because neither Subtenant nor Tenant took any steps to secure the vacant terminal or notified Landlord that the Property was now vacant, the Property incurred significant vandalism and damages (the "**Damages**") totaling nearly **$500,000**.

6.      Around this same time, Landlord and Tenant began negotiating the termination of the Lease, and ultimately executed that certain *Conditional Lease Termination Agreement* (the "**CLTA**"), dated as of July 1, 2023 (the "**Effective Date**"). Section 2 of the CLTA provides that, "[s]ubject to the satisfaction or waiver of the Termination Conditions, the Lease shall terminate effective as of 5:00 p.m. Pacific Daylight Time (PDT) on the date that is three (3) months after the Effective Date (the "**Termination Date**")."[3] Upon entry into the CLTA, Landlord agreed to abate Tenant's obligation to pay an aggregate amount of $144,115 in rent for the months of July, August, and September (the "**Abated Rent**"). Section 2 of the CLTA also obligated Landlord to pay Tenant a termination fee of $1,856,038.00 (the "**Termination Fee**") within three days of the Termination Date.

7.      All of the Termination Conditions, which were expressly included for the benefit of Landlord, have been satisfied or waived by Landlord.

8.      Between the Effective Date and the Termination Date, the Debtors filed for bankruptcy. As a result of that filing, Landlord and the Debtors spent significant time negotiating and drafting a post-petition amendment to the CLTA (the "**Amendment**") that contemplated rejection of the Lease and an adjusted Termination Fee to account for certain additional damages to the Property. Because of the unanticipated bankruptcy and the active and ongoing negotiation

---

[3] As used herein, the defined term "Termination Date" means September 30, 2023.

93514959.3

of the Amendment, Landlord did not pay the Termination Fee within three days of the Termination Date.

9.      On October 17, 2023—after the Amendment was substantially final and ready to be filed—Debtors advised Landlord for the first time that Debtors would not be pursuing the Amendment because the Debtors' DIP lender wanted to put the Lease through a sale and auction process.

10.     Since then, Debtors have rebuffed Landlord's repeated attempts to pay the Termination Fee and reclaim the Property, which remains vacant and secured only as a result of Landlord's ongoing efforts, and at Landlord's expense.[4]

## II.      The Debtors' Approved Bidding Procedures and Sale Timeline

11.     One day after the Petition Date, the Debtors filed a motion [Docket No. 22] (the "**Bidding Procedures Motion**") seeking this Court's approval of certain procedures (the "**Bidding Procedures**") that would govern the sale of substantially all of the Debtors' assets through one or multiple sale transactions, including a proposed timeline that would, according to the Debtors, "provide sufficient time for the Debtors to market the Assets, receive and evaluate bids, execute a Stalking Horse Agreement…and hold an auction for the Debtors' Assets." Bidding Procedures Motion at ¶ 3. In the Bidding Procedures Motion, the Debtors proposed a timeline for the sale of their real estate assets which, according to them, "balance[d] a thorough marketing process to maximize value with the need to proceed expeditiously," and "[would] assist in establishing whether and to what extent a market exists for the Assets, and provides interested parties with sufficient opportunity to participate in any sale transaction(s) and ultimately, will result in the

---

[4] Landlord reserves its right to seek administrative payment for these ongoing expenses.

93514959.3

highest and best bid for the underlying Assets under the circumstances." Bidding Procedures Motion at ¶ 14.

12.     The Debtors supported their proposal by noting that their investment banker, Ducera Partners LLC ("**Ducera**") had already commenced a "robust" pre-petitioning marketing process, including contacting over 200 interested parties that were considered "likely participants" in the sale process of the Debtors' assets and entering into 63 confidentiality agreements. Bidding Procedures Motion at ¶ 11.

13.     On September 15, 2023, the Court entered an order approving the Bidding Procedures with modifications [Docket No. 575] (the "**Bidding Procedures Order**"). Through the Bidding Procedures Order, the Court approved, with respect to the Debtors' real estate assets, (i) a bid deadline of **November 9, 2023 at 5:00 p.m. (ET)** (the "**Bid Deadline**"); (ii) an auction (if required) to begin on **November 28, 2023 at 9:00 a.m. (ET)** (the "**Auction Date**"); and (iii) a sale hearing for **December 12, 2023**, subject to the Court's availability (the "**Sale Hearing Date**"). Bidding Procedures Order at ¶ 25.

### III.     Landlord's *Irrevocable* Bid for the Lease

14.     Because Debtors deny that the CLTA terminated the Lease, Landlord was forced to participate in the sale and auction process for the Lease approved in the Bidding Procedures Order. Still optimistic that the Debtors—who enjoyed the Abated Rent under the CLTA—would uphold their end of that agreement, at the recommendation of Debtors' counsel, Landlord submitted the executed CLTA as its bid for the Lease prior to the Bid Deadline.

15.     To submit its bid, Landlord, like all bidders, was required to include a statement "acknowledging and agreeing that such Bid and each of its provisions is binding upon the bidder and irrevocable in all respects." Bidding Procedures § 5.16. More specifically, by submitting a bid

93514959.3

for the Lease, Landlord agreed that its bid would remain binding and irrevocable until the Court approved a sale of the Lease: *See* Bidding Procedures p. 15.

## <u>OBJECTION</u>

**I.    The Lease cannot be assumed because it was no longer property of the Debtors' estates as of September 30.**

16.    As of the Termination Date, whatever remaining interest the Debtors had in the Lease, if any, was no longer property of their estates. *See* 11 U.S.C. § 541(b)(2). "Once a contract has expired on its own terms, there is nothing left for the trustee to reject or assume." *Gloria Mfg. Corp. v. Int'l. Ladies' Garment Workers' Union*, 734 F.2d 1020, 1022 (4th Cir. 1984) (citing 2 Collier on Bankruptcy ¶ 365.02 (15th Ed.1983)); *Counties Contracting and Const. Co. v. Constitution Life Ins. Co.*, 855 F.2d 1054, 1061 (3d Cir. 1988) ("Once the contract is no longer in existence, the right to assume it is extinguished. A contract may not be assumed under § 365 if it has already expired according to its terms.") (citing 2 Collier on Bankruptcy ¶ 365.04).

17.    Under the terms of the CLTA, the Lease terminated on September 30, 2023. The Termination Conditions in the Lease were all either satisfied or waived. Accordingly, the only obligation outstanding was for Landlord to pay the Termination Fee. That payment was not made promptly after the Termination Date because of the filing of this case, Landlord's good-faith attempt to negotiate the Amendment, and Debtors' subsequent refusal to accept payment.

18.    Payment of the Termination Fee was not a Termination Condition under the CLTA. Under the CLTA, "[s]ubject to the satisfaction or waiver of the Termination Conditions, ***the Lease shall terminate effective as of 5:00 p.m. Pacific Daylight Time (PDT) on the date that is three (3) months after the Effective Date…***"). Lease § 2 (emphasis added). Once the Termination Conditions were satisfied or waived, the Lease terminated on the Termination Date. It was only *after* the Lease terminated that Landlord became obligated to pay the Termination Fee, which

93514959.3

expressly survived termination of the Lease. *See id*. Landlord's excusable failure to timely pay the Termination Fee cannot revive the Lease. Debtors' remedy is their entitlement to payment of the Termination Fee.

19.     Because the Lease expired by its terms, as modified by the CLTA, there is no remaining interest thereunder for Debtors to assume, and the Motion should be denied.

## II.     Even if the Lease is assumable, the Motion does not satisfy Section 365(d)(4) of the Bankruptcy Code.

20.     Under section 365(d)(4) of the Bankruptcy Code:

> [A]n unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected . . . if the [debtor in possession] does not assume or reject the unexpired lease by the earlier of—(i) the date that is 120 days after the order for relief; or (ii) the date of the entry of an order confirming a plan[; however, the] court may extend the period . . . , prior to the expiration of the 120- day period, for 90 days on the motion of the [debtor in possession] or lessor for cause.

11 U.S.C. § 365(d)(4).

21.     "It is [] well-established that the primary purpose of section 365(d)(4) is 'to protect lessors . . . from delay and uncertainty by forcing a trustee or a debtor in possession to decide quickly whether to assume unexpired leases.'" *In re Am. Healthcare Mgmt., Inc.*, 900 F.2d 827, 830 (5th Cir. 1990) (quoting *Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, 1079 (9th Cir. 1989)).

22.     Further, section 365(d)(4) "was adopted to limit the discretion of judges to extend time to assume or reject certain commercial contracts and to provide landlords with greater certainty as to such tenancies." *In re Eastman Kodak Co.*, 495 B.R. 618, 622-23 (Bankr. S.D.N.Y. 2013) (citing *Tully Constr. Co., Inc. v. Cannonsburg Env. Assocs., Ltd. (In re Cannonsburg Env. Assocs., Ltd.)*, 72 F.3d 1260, 1266 (6th Cir. 1996)). *See also In re Treasure Isles HC, Inc.*, 462 B.R. 645, 650 (6th Cir. B.A.P. 2011) ("Congress was concerned with balancing the interests of

93514959.3

debtor lessees in having enough time to make 'informed' decisions about leases against the interests of lessors in not being left in doubt concerning their status vis-à-vis the estate.") (citation and quotation omitted); *In re Michael H. Clement Corp.*, 446 B.R. 394, 402 (N.D. Cal. 2011) ("The purpose of § 365(d)(4) . . . is to protect lessors from delay and uncertainty by forcing the trustee or debtor-in-possession to act quickly to assume unexpired leases.").

23.    Assumption of a lease must be clear, unequivocal, and unconditional. Courts have broadly recognized that a "**[t]he [] debtor-in-possession must manifest an unconditional and unambiguous decision.**" *In re 1 Potato 2, Inc.*, 58 B.R. 752, 755 (Bankr. D. Minn. 1986) (citing *In re Bon Ton Rest. and Pastry Shop, Inc.*, 52 B.R. 850, 854 (Bankr. N.D. Ill. 1985) (emphasis added).

24.    Moreover:

> [C]onditional assumption . . . violates the requirement of § 365(d)(4) that a lease be definitively assumed or rejected by a specific date. . . . **There is no provision in § 365(d)(4) allowing for a conditional assumption - an assumption subject to a later option to reject.** Rather, the purpose of § 365(d)(4), which became effective in 2005 under BAPCPA, is "to establish a firm, bright line deadline by which an unexpired lease of nonresidential real property must be assumed or rejected."

*In re Dickinson Theatres, Inc.*, Case No. 12-22602, 2012 WL 6043360, at *2 (Bankr. D. Kan. Dec. 4, 2012) (quoting H.R. Rep. No. 109-31, Pt.1, p. 86 109th Cong. 1st Sess. (2005)) (emphasis added).

25.    The Debtors do not expressly elect to assume the leases listed on Exhibit 1 to the Motion or express a clear commitment to assume them.[5] Instead, Debtors admit that "the decision

---

[5] In fact, in their lengthy reservation of rights, Debtors claim "Nothing contained in this motion or any order granting the relief requested…is intended as or shall be construed or deemed to be:…(e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code." Motion at ¶ 22.

93514959.3

whether to assume or reject any particular unexpired lease takes time to determine," and that "outright rejection of the Leases *now* will result in . . . value lost." Motion at ¶¶ 10,13 (emphasis added). Most notably, the Debtors tacitly reserve their right to reject the leases in the future through the following language in the proposed order providing that nothing in the order "is intended, or should be construed, as. . .(e) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law." Proposed Order at ¶ 7.

26.      Section 365(d)(4) of the Bankruptcy Code already provides Debtors with a mechanism to extend their time to assume or reject the leases beyond the 210 days that Congress provided: Landlord consent. *See* 11 U.S.C. § 365(d)(4)(B)(ii). Yet, Debtors made no effort to obtain Landlord's consent to a subsequent extension before (or after) filing the Motion. Instead, Debtors ask to bypass Landlord entirely by equivocally "assuming" the Lease now so that they may decide whether to reject or assign the Lease at some unspecified future date, perhaps years from now. Because this proposal violates both the letter and spirit of the Bankruptcy Code, the Court should deny the Motion.

III.      **The Debtors have not demonstrated that assumption of the Lease is in the best interests of their estates.**

27.      Debtors correctly observe in the Motion that the decision whether to accept or reject *an* executory contract or unexpired lease is a matter within the Debtors' business judgment. But the Debtors are not asking this Court to approve the assumption of *an* unexpired lease. They are requesting *en masse* approval of the assumption of over **<u>seventy-five</u>** real property leases across the United States and Canada which, by their own admission, require additional time for proper evaluation. At bottom, Debtors ask this Court to countenance their desire to gamble with creditors' money. The Court should deny this request.

93514959.3

28.    "[T]he business judgment rule does not provide [Debtors] unfettered freedom to use the power given by Code § 365(a) however they will." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009). "In applying the business judgment rule in deciding whether to grant a debtor's motion to reject a contract a court is not adjured to blindly accept, but rather only to show proper deference to the business judgment of the debtor's management." *Id.* "Initially, a debtor must show a sound business purpose for assuming an unexpired lease." *In re Filene's Basement, LLC*, Case No. 11-12511, 2014 WL 1713416, at *10 (Bankr. D. Del. Apr. 29, 2014) (KJC). The Court should not approve assumption when "the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (quotation omitted).

29.    ***First***, the Debtors have not provided one scintilla of evidence that assuming Montague (as opposed to their lease portfolio as a whole) is in the best interest of their estates. They make no effort to demonstrate the value of any *particular* lease (including Montague), and have submitted no evidence that they have considered the marketability of Montague specifically, or analyzed the *particular* burdens and administrative expenses that will result from assuming Montague.

30.    The Debtors instead claim that "the decision whether to assume or reject any particular unexpired lease takes time to determine." Motion at ¶ 10. Debtors' circular logic puts the proverbial cart before the horse. If they need more time to determine *whether* to assume or reject the leases (including the Lease), they cannot claim know *now* that assumption is, in fact, in the best interest of the Debtors' estates. *See Official Creditors' Committee v. X10 Wireless Tech., Inc. (In re X10 Wireless Tech., Inc.)*, Case No. 03-23561, BAP No. WW-06-1328, 2005 WL 6960205, at *4 (9th Cir. B.A.P. Apr. 5, 2005) (affirming Bankruptcy Court's finding that

assumption was not the result of business judgment where "debtor's decision to assume was driven by the fact that rejection was the only other option, not by debtor's informed analysis that assumption would benefit the estate").

31.     *In re Gateway Apparel, Inc.*, 210 B.R. 567 (Bankr. E.D. Mo. 1997) is instructive on this point. There, the Court ruled that a debtor's proposed assumption of certain retail leases would not constitute an exercise of its business judgment because, like here, the debtor had no plan for the leases post-assumption. The Court explained that, "[p]rior to the formation of a long-term business plan, and in the absence of a showing of a unique benefit to the estate, the less than orderly assumption of unexpired leases is not consistent with the concept of a debtor's best business judgment." *Gateway Apparel* at 570.

32.     **Second**, the primary purpose of assuming the leases *en masse* is, according to them, to provide the Debtors with additional time to market and sell them. Yet Debtors make no consideration of the diminishing returns that such additional marketing and sale efforts will yield in light of their extensive marketing efforts to date. Instead of putting the leases that have already received bids up for a value-maximizing auction, the Debtors propose that they prolong the sale process indefinitely in the hopes that a potential new bidder will come forward who operates in the Debtors' highly-niche industry yet somehow avoided all of Ducera's targeted marketing efforts and the substantial media coverage of this bankruptcy case. This is precisely the type of "speculative" maneuver that falls outside of the Debtors' business judgment.

33.     Debtors' inability or unwillingness to put the leases (including Montague) through an auction now is especially questionable given their self-reported success at auction to date, which was achieved without such additional marketing efforts. *See* Kaldenberg Decl. at ¶ 7.

93514959.3

34.    *Third*, the Debtors' decision to assume the Lease now ignores the added value of immediate cash to the Debtors' estates. In accordance with the Bid Procedures, Landlord submitted a timely—and very substantial—offer to terminate the Lease. This offer, if accepted, would *immediately* provide an influx of over $1.8M in cash to the Debtors' estates—without incurring additional administrative costs.

## IV.    The Debtors' proposed assumption would constitute an impermissible violation of the Bidding Procedures Order.

35.    Through the Bidding Procedures Order, the Court approved a timeline for the sale of substantially all of the Debtors' assets pursuant to which all bidders, including Landlord, were required to submit irrevocable bids by the Bid Deadline. Landlord assumed, when it placed its bid and agreed to its open-ended irrevocable nature, that the Debtors would adhere to the sale timeline that they themselves had proposed and the Court had approved. Indeed, Landlord believed that its "commitment to close the proposed Sale Transaction as soon as practicable, and in any event within the timeline contemplated by these Bidding Procedures"[6] included a reciprocal commitment by the Debtors to do the same. Accordingly, Landlord never considered that the Debtors' approved 90-day timeline could somehow morph into a potentially years-long process, and the irrevocable bid it placed in November was not designed to account for the tremendous market fluctuations that may occur during that time.

36.    Debtors provide no support for their implicit assertion that a two-year sale process is permissible under the approved Bidding Procedures, which contemplated a closing before the new year. Debtors could have requested approval of different timelines for different groups of assets (such as subgroup of leases), but instead requested approval a single timeline that would

---

[6] Bidding Procedures p. 14, § 5.15.

93514959.3

govern the sale of substantially *all* of their real property assets. Nothing in the Bidding Procedures Order gives the Debtors carte blanche to re-write the approved Bidding Procedures to accommodate their novel assumption strategy.

37.     Landlord is not unsympathetic to Debtors' need for a degree of reasonable flexibility to adjust to developing facts. But Debtors' protections in the Bidding Procedures Order,[7] which are customary in this District, were designed as a safety valve, not a sword to be used against innocent bidders who participate in Debtors' approved sale process in good faith. Landlord submitted its irrevocable bid over three months ago with the expectation that an auction and sale hearing would follow shortly thereafter. Debtors never disclosed to Landlord (or the Court) that Landlord's bid could be held open this long—and certainly not for the **two-year** period contemplated in Motion. Because Debtors' purported justification for assuming the Lease is premised on the continuation of a sale process that violates both the letter and spirit of the Bidding Procedures Order, the Court should deny the Motion.

## V.     The Debtors have not satisfied Section 365(b)(1) of the Bankruptcy Code.

38.     Under section 365(b)(1) of the Bankruptcy Code, in order to assume an unexpired lease, under which there has been a default, the debtor in possession must, at the time of assumption: (a) cure, or provide adequate assurance that it will promptly cure, such default; (b) compensate or provides adequate assurance that it will promptly compensate the counter-party for actual pecuniary losses resulting from such default, and (c) provide adequate assurance of future performance under such lease. 11 U.S.C. § 365(b)(1).

---

[7] While paragraph 17 of the Bidding Procedures Order does allow the Debtors to extend or waive deadlines and adopt new rules and procedures for conducting the bidding and auction process, they may only do so to the extent that "such extensions, waivers, new rules and procedures, accommodations and modifications…(i) do not conflict with and are not inconsistent with this Order, the Bidding Procedures…the Bankruptcy Code or any order of the Court…"

93514959.3

39.      "The Bankruptcy Code does not provide a definition of adequate assurance." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. May 28, 2009) (citations omitted). As such, "[t]he particular facts and circumstances of each case are evaluated and taken into consideration to determine what constitutes adequate assurance." *Id*. However, "[s]peculative, conjectural, or unrealistic projections cannot support a debtor's prediction of future performance." *In re Patriot Place, Ltd.*, 486 B.R. 773, 807 (Bankr. W.D. Tex. 2013) (citation omitted).

40.      Debtors claim that the "combination of (1) cash on hand and (2) cash proceeds to be generated from pending or future sales of Real Property Assets and Rolling Stock Assets are sufficient to provide adequate assurance of [future] performance[.]" Motion at ¶ 18. But as liquidating entities, there is no guarantee that Debtors will be able to satisfy their obligations under the Lease through its expiration in 2029.[8] And Debtors do not try to claim otherwise. Instead, they assert that Section 365(b)(1) is satisfied because they have enough cash on hand to satisfy their lease obligations for the next ***two years***. It is not.

41.      ***First***, assurances that the Debtors will perform for only a portion of the remaining life of the Lease cannot constitute adequate assurance of future performance as a matter of law. It is well-established in the Third Circuit that a debtor "may not blow hot and cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other." *In re Fleming Cos., Inc.*, 499 F.3d 300, 308 (3d Cir. 2007) (quoting *In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951)). In entering into Montague, Landlord bargained for certain terms, including, perhaps most fundamentally, the length of the Lease. Debtors may not modify the parties' bargained-for exchange by assuming a lease which they will be unable to completely perform.

---

[8] This assumes that the Court does not find that the Lease terminated on September 30, 2023.

42.     The fact that Debtors may assign Montague to a hypothetical third-party at some unspecified point in the future does not change this analysis. Section 365(b)(1)(C) requires the Debtors to provide adequate assurance of future performance "**at the time of assumption[.]**" 11 U.S.C. § 365(b)(1)(C). Because Debtors plan to assume Montague now, they must provide adequate assurance of future performance under Montague now, not upon the occurrence of a theoretical assignment to an as-yet-unknown purchaser.

43.     *Second*, even if Debtors' proposed adequate assurance was legally sound, the factual underpinning for such assurance is shaky at best. Debtors' claims that they have sufficient cash on hand for two years of *lease* obligations is little comfort to Landlord given Debtors' pending litigation, accruing professional fees, and other ongoing administrative expenses—none of which Debtors address in their Motion and supporting declarations. Moreover, experience teaches that the Debtors may have already sold their most valuable assets at the outset of this case, calling into question the degree to which their success during the initial leased property auction is fairly considered evidence of their future ability to perform. *See, e.g.*, Kaldenberg Decl. at ¶ 13.

## VI.    Debtors may not assume the Lease without also assuming its anti-assignment provision and the CLTA.

44.     "Section 365(f) requires a debtor to assume a contract subject to the benefits and burdens thereunder." *Fleming Cos.*, 499 F.3d at 308. "If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other." *Id*. (quoting *Italian Cook Oil*, 190 F.2d at 997)). "The *cum onere* rule 'prevents the [bankruptcy] estate from avoiding obligations that are an integral part of an assumed agreement.'" *Id*. (quoting *United Air Lines, Inc. v. U.S. Bank Trust Nat'l. Ass'n. (In re UAL Corp.)*, 346 B.R. 456, 468 n.11 (Bankr. N.D. Ill. 2006)). Through the Motion, Debtors seek to assume the benefits

of Montague without the burdens of the CLTA or the Lease's anti-assignment provision. This is not permissible under Section 365(f).

## A. The Lease and CLTA must be assumed together.

45.    "[C]ourts may review a single contract to determine whether it includes multiple agreements that are severable, thereby permitting a debtor to assume part of the contract while rejecting its other, severable parts." *In re Contract Research Sols., Inc.*, Case No. 12-11004, 2013 WL 1910286, at *2 (Bankr. D. Del. May 1, 2013). Whether an agreement is severable is a question of state law. *Id*. Under California law, and the law of most jurisdictions, "whether the parties intend multiple instruments to constitute a single contract must be decided on a case by case basis." *In re Plitt Amusement Co. of Washington, Inc.*, 233 B.R. 837, 843 (Bankr. C.D. Cal. 1999). *See also* Cal. Civ. Code § 1642 ("Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."). The analysis turns on "the parties' intent based upon the substance and language of the agreement at issue." *In re Pollock*, 139 B.R. 938, 940 (BAP 9th Cir. 1992). *See also Keene v. Harling*, 392 P.2d 273, 275 (Cal. 1964). "Absent ambiguity in the terms of the instruments, the intent of the parties must be gleaned from the terms contained within the four corners of the documents involved." *Plitt* at 844 (citing *Pollock* at 940).

46.    Because most state and federal courts follow the same general analysis for determining severability, decisions from other Courts are instructive to this analysis, even though they will not be precedential. In *In re S.E. Nichols Inc.*, 120 B.R. 745 (Bankr. S.D.N.Y. 1990), the debtor and landlord entered into to a lease for the second and third floors of the building. Three years later (still prepetition), they entered into a new agreement entitled "First Amendment to Agreement of Lease" which added additional space on the fourth floor and increased the annual rent amount. In bankruptcy, the debtor sought to reject only the lease amendment covering the

fourth floor and assume the original lease for the second and third floors only. Interpreting New York state law, the Court explained that "a subsequent agreement, in order to be a modification and deemed part of a single contract, must do more than label itself an amendment or incorporate terms and provisions from the earlier agreement: it must alter original terms and provisions in the first agreement." *Id*. at 749. Because it was not clear from the terms of the "First Amendment" that there was any change to the parties' rights and obligations with respect to the second and third floors, the Court denied the motion to reject and deferred a ruling pending an evidentiary hearing with parol evidence.

47.      More recently, in *Development Specialists, Inc. v. 1114 6th Ave. Co., LLC (In re Coudert Bros. LLP)*, Case No. 09 CIV. 5047, 2009 WL 2868722 (S.D.N.Y. Sept. 4, 2009), the District Court affirmed the Bankruptcy Court's dismissal of an action seeking to avoid obligations under a lease amendment related to a lease the debtor assumed in the bankruptcy. In 1992, the debtor entered into a lease with the landlord with a termination date of May 30, 2013 covering floors 4, 37, and 40-45. On September 23 2005, the landlord and debtor entered into an agreement styled "Amendment of Lease" pursuant to which the debtor (i) immediately surrendered all of floors 4, 37, 40, 42, 43, and 44 to the landlord; (ii) agreed to surrender the remainder of floor 41 on December 31, 2006, and (iii) agreed to surrender the remainder of floor 45 on June 30, 2008. A year later, the debtor filed for bankruptcy and obtained authorization to assume and assign the remaining portion of the lease which, by that time, was only the remaining portion of floor 45. Thereafter, the plan administrator filed an adversary proceeding against the landlord seeking to avoid the lease amendment. Judge Drain concluded that the lease amendment was a modification of the lease that could not be severed from the lease and had therefore been assumed through the assumption order. The plan administrator appealed.

48.     Relying on *S.E. Nichols*, the Court explained that a subsequent agreement modifies a lease if "any original provision of the earlier agreement was altered, changed, deleted, or cancelled by the subsequent agreement." *Coudert* at *4 (quoting *S.E. Nichols* at 749). Because the amendment altered several terms of the lease by permitting the debtor to, among other things, "surrender space, change the term of the lease on its remaining space, reduce its rental payments, recover its security deposit, [and] assign its subleased space to the Landlord[,]" *id.*, the lease and lease amendment had to be construed as a single document.

49.     So too here, the CLTA allowed the Debtors to "surrender space" to Landlord, shorten the existing term of the lease period by over five years, and reduce their rental payment obligations through the Abated Rent. Section 7(f) of the CLTA leaves no question that the parties intended the CLTA to operate as a modification of the Lease that would alter their rights and obligations thereunder:

> The terms, covenants and conditions of the Lease, ***as modified herein***, shall be binding upon and inure to the benefit of the successors-in-interest and assigns of the parties hereto. Except to the extent expressly modified in this Agreement, all other terms, conditions and obligations of the Lease shall remain in full force and effect

CLTA, § 7(f) (emphasis added).

50.     Because the parties intended for the CLTA to modify the Lease, and the CLTA did, in fact, modify the parties' rights and obligations under the Lease, the CLTA and Lease and properly construed as a single document that must be assumed together.

### B.  The Debtors cannot avoid the anti-assignment provision in the Lease.

51.     Paragraph 8 of the proposed order Debtors attached to the Motion includes the following language purporting to nullify the Lease's anti-assignment provision:

> To the extent applicable, the Debtors may assign each Lease in accordance with sections 363 and 365 of the Bankruptcy Code, and

> any provisions in any Lease that prohibit or condition the
> assignment of such Lease or allow the party to such Lease to
> terminate, recapture, impose any penalty, condition renewal or
> extension, or modify any term or condition upon the assignment of
> such Lease, constitute unenforceable anti-assignment provisions
> which are void and of no force and effect.

52.     Despite this provision's obvious significance for counterparties, Debtors provide no argument in the Motion supporting the legality of such a sweeping nullification of Landlord's bargained-for anti-assignment rights, and Landlord is aware of no authority from this or any other District that authorizes the relief they are seeking. Indeed, Debtors seek not only the post-assumption preservation their own rights under Section 365(f), but also a determination that the anti-assignment provisions *themselves* are unenforceable, void, and of no force and effect. Not only can the Court approve such relief only following a successful declaratory judgment adversary proceeding (which Debtors have not commenced), but the breathtaking invalidation of the Lease's anti-assignment provision purports to be permanent. Thus, under Debtors' proposed order, any assignee of the leases will *also* take such leases free and clear of their anti-assignment provisions—even though the assignee never had Section 365(f) powers.

53.     The only way for the Debtors to assume Montague *cum onere* is for them to assume *all* of Montague—including the anti-assignment provisions contained therein. *See In re G-I Holdings, Inc.*, 568 B.R. 731, 767 (Bankr. D.N.J. 2017) ("A debtor may not 'cherry-pick' the provisions of an assumed contract with which it will comply.").

## VII.   The Debtors' proposed monetary cure is incorrect and the Debtors cannot cure of their non-monetary defaults under the Lease and CLTA.

54.     Assumption requires cure of all defaults, both monetary and non-monetary. *See, e.g., In re Empire Equities Capital Corp.*, 405 B.R. 687, 690 (Bankr. S.D.N.Y. 2009) ("In 2005 Congress revised the language of § 365(b)(2)(D) by including the word 'penalty' as a modifier to the word "provision," making it clear that most non-monetary defaults are not exempted from the

93514959.3

cure requirements."); *In re Escarent Entities, L.P.*, 423 Fed. App'x 462, 465 (5th Cir. 2011) (observing that an incurable nonmonetary default precluded assumption of a contract). The cure requirement ensures "that contracting parties receive the full benefit of their bargain if they are forced to continue performance." *In re Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1174 (7th Cir. 1996).

### A.  Monetary Defaults

55.  The Debtors' calculation of Landlord's cure amount is incorrect. In Schedule 1 to the Motion, Debtors identify the outstanding cure amount as $48,038. Properly calculated, the Debtors owe an amount of not less than **$361,558.22** in cure amounts associated with Montague, as set forth below:

| MONTAGUE LEASE | | |
|---|---|---|
| **Description** | **Expense** | **Additional Notes** |
| General Contractor Unpaid Balance | $ 49,696.54 | Unpaid balance stemming from vandalism repair. Landlord paid contractor directly to clear lien. |
| Fire Alarm System Repairs | $ 13,428.91 | Vendor repaired fire alarm panel after vandalism. Landlord paid vendor directly. |
| Wheelchair Lift Repair | $ 2,307.00 | Tenant obligation to maintain, not currently operational. Landlord quoted $2,307.00 to repaid and $3,307.00 to replace. Landlord will amend claim down if repair is possible. |
| Asphalt | $ 7,205.00 | Due to be reimbursed to Landlord for asphalt sealcoat project, pursuant to lease terms. |
| Secondary Containment Test | $ 2,400.00 | Tenant failed to perform state compliance testing for underground diesel storage tank. Landlord contracted to perform testing. |
| Concrete Striping Removal | $ 25,500.00 | Landlord provided Tenant with approval to strike the lot with the condition that striping would be removed upon lease termination. Tenant advised that sub-tenant would be performing this word as part of move out repair, but repair was not completed. |
| Fixturized Ramps | $ 57,340.00 | Landlord provided Tenant with approval to install exterior mounted ramps at the property provided they were to remain as fixtures at the termination of Lease. Tenant removed the ramps. |

| Three months Abated Rent | $ 144,115.00 | **Landlord provided Tenant with three months of abated rent (July - September 2023) as part of the Conditional Lease Termination Agreement** |
|---|---|---|
| Fire Panel Replacement | $ 9,461.14 | Landlord assumed fire monitoring as a result of Tenant failing to continue fire monitoring after vacating the property. Landlord discovered panel has mechanical failures and is not usable in current condition, requiring replacement. |
| Property Taxes | $ 42,750.77 | |
| Security Services – Setup | $ 2,500.00 | Initial setup for two surveillance trailers and related ongoing security service which are required as a vandalism deterrent due to the property being vacant and unmonitored. |
| Security Services – Monthly (January 2024) | $ 13,815.00 | Monthly security expense for vacated property. |
| Underground Storage Tank Monitoring (October 2023 – December 2023) | $ 375.00 | $125/mo for underground storage tank monitoring. Will continue on a monthly basis. |
| **TOTAL** | **$ 361,558.22** | |

56.     It is notable that Debtors have retained the benefit of the Abated Rent while simultaneously disclaiming the effectiveness of the CLTA.

**B.  The Debtors' non-monetary defaults cannot be cured.**

57.     In addition to the monetary defaults described above, the Debtors materially defaulted under the CLTA (and have continued in default through the date of this filing) by, among other things, failing to surrender the (vacant) Property to Landlord on the Termination Date. *See In re Walden Ridge Dev.,* LLC, 292 B.R. 58, 67 (Bankr. D.N.J. 2003) ("[W]here the default is non-monetary the debtor may be precluded from assuming an executory contract…if the default is material or if the default causes substantial economic detriment.") (citing *In re Joshua Slocum, Ltd.*, 922 F.2d 10821, 1092 (3d Cir. 1990)).

58.     The nature of this non-monetary default renders cure logically impossible because the act of curing the default (i.e., surrendering the premises), by its nature, reaffirms the

extinguishment of the Lease. Because Debtors cannot cure all of their defaults under the Lease, they cannot assume the Lease.

**VIII.    Landlord objects to the entry of any order that purports to bar its claims.**

59.    Landlord strenuously objects to entry of any order that purports to operate as an injunction or bar against Landlord's right to assert any claim against the Debtors. Debtors have provided no support in the Motion for the sweeping claim bar contained in Paragraph 6 of their proposed order, and Landlord is aware of no such authority. To the extent the Court approves assumption of the Lease, any order approving such assumption must fully and expressly preserve Landlord's rights to assert any and all of its claims against Debtors.

## <u>RESERVATION OF RIGHTS</u>

60.    Landlord reserves all rights to object to the assumption and assignment of Montague to any winning bidder because the Debtors have not provided any information relating to such party's ability to adequately perform thereunder. Accordingly, Landlord is unable to determine at this time whether it objects to assumption and assignment to any winning bidder of the Landlord's Leases. Landlord reserves its right to supplement and amend this Objection or to make such other and further objections as may be appropriate or necessary with respect to any potential assumption, assignment, or sale of the Lease. Nothing in this Objection shall operate as an election of remedies or waive Landlord's right to request payment of administrative expenses.

93514959.3

**WHEREFORE**, Landlord requests that the Court deny the Motion and grant Landlord such other and further relief as is just and proper.

Dated: February 20, 2024

Respectfully submitted,

*/s/ Katherine M. Devanney*
Katherine M. Devanney (No. 6356)
POLSINELLI PC
222 Delaware Ave., Suite 1101
Wilmington, DE 19801
Phone: 302-252-0933
E-mail: kdevanney@polsinelli.com

*Counsel for M4 Terminals, LLC*