# Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | Case No. 23-11069 (CTG) |
|  | (Jointly Administered) |
| Debtors. | **Hearing Date:** |
|  | **January 22, 2024 at 2:00 p.m. (ET)** |

## LIMITED RESPONSE OF THE PENSION BENEFIT GUARANTY CORPORATION TO OBJECTION OF THE DEBTORS TO THE PROOFS OF CLAIM FILED BY THE CENTRAL STATES PENSION FUND

In the *Debtors' Objection to the Proofs of Claim Filed by the Central States Pension Fund* (Docket. No. 1322) ("Objection"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") object to each proof of claim (individually, a "Claim," and together with other proofs of claim, the "Claims") filed by the Central States Pension Fund ("CSPF"). The Objection addresses Claims arising from Yellow Corp.'s withdrawal from CSPF, a multiemployer pension plan, the liability for which arises under and is defined by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301-1461 (2018 & Supp. III 2021).

The Pension Benefit Guaranty Corporation ("PBGC"), as the government regulator established under Title IV of ERISA, submits this Limited Response to the Objection to respond to Debtors' efforts to convince the Court to disregard a PBGC regulation that has the force of law. The underlying substantive law may not be disregarded unless it conflicts with a specific

---

[1]A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

provision of the Code, which Debtors have not alleged.  To the extent Debtors seek to invalidate PBGC's regulation, they have not requested such relief, they lack standing, and they cannot do so in these bankruptcy proceedings.  Therefore, the Court must deny Debtors' Objection insofar as it seeks to ignore or invalidate PBGC's regulation.

## BACKGROUND

### ERISA and the multiemployer pension system

PBGC is a wholly owned United States government corporation, and an agency of the United States, that administers the defined benefit pension plan insurance program under Title IV of ERISA.  Under Title IV, PBGC insures the payment of pension benefits under both single-employer and multiemployer pension plans, subject to statutory limits.[2]  PBGC protects the retirement security of over 31 million American workers and retirees and their beneficiaries.[3]  The multiemployer insurance program alone covers about 11 million participants in about 1,360 insured multiemployer plans.[4]

The purposes of Title IV are "(1) to encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants, (2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which [Title IV] applies, and (3) to maintain premiums . . . at the lowest level consistent with carrying out [PBGC's] obligations under [Title IV]."[5]

A multiemployer pension plan is one in which more than one employer contributes under collective bargaining agreements with one or more unions.[6]  A multiemployer plan provides

---

[2] ERISA §§ 4022, 4022A, 29 U.S.C. §§ 1322, 1322a.
[3] PBGC, *FY2023 Annual Report* 1 (Nov. 15, 2023), https://www.pbgc.gov/sites/default/files/documents/pbgc-annual-report-2023.pdf.
[4] PBGC, *FY2023 Annual Report* 39.
[5]  ERISA § 4002(a), 29 U.S.C. § 1302(a).
[6] ERISA §§ 3(37)(A), 4001(a)(3), 29 U.S.C. §§ 1002(37)(A), 1301(a)(3); *accord* 26 U.S.C. § 414(f)(1).

retirement benefits for employees of all contributing employers and allows employers to provide

portable pensions with advantageous cost and risk-sharing mechanisms.[7]

Multiemployer plans are funded by employer contributions, withdrawal liability, and

returns on investment of plan assets. When an employer withdraws from a multiemployer plan,[8]

the plan remains liable for the benefits of the withdrawn employer's employees. ERISA protects

plan participants and contributing employers by imposing withdrawal liability on the withdrawn

employer. Because withdrawal liability is a source of plan funds, it also protects PBGC's

multiemployer-plan insurance fund.

Withdrawal liability is the withdrawing employer's share of the plan's unfunded vested

benefits ("UVBs"), with certain adjustments.[9] A plan's UVBs are the value of vested benefits

minus the value of plan assets, as determined for purposes of withdrawal liability in accordance

with Title IV of ERISA.[10] A plan's UVBs may differ from its underfunding as measured for

determining its minimum funding requirements.[11]

---

[7] *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 605-07 (1993).

[8] An employer completely withdraws from a multiemployer plan when it permanently ceases to have an obligation to contribute to the plan or to have operations covered by the plan *See* ERISA § 4203(a), 29 U.S.C. § 1383(a).

[9] *See* ERISA § 4201(b)(1), 29 U.S.C. § 1381(b)(1).

[10] *See* ERISA § 4213(c), 29 U.S.C. § 1393(c).

[11] Minimum funding is governed by Title I of ERISA and the Internal Revenue Code, while withdrawal liability is governed by Title IV. Determining the minimum funding for a plan year, like determining UVBs, requires determining the present value of future liabilities for benefits and of the costs of plan administration. Each multiemployer plan must retain an actuary to prepare an annual valuation of the plan's liabilities and a calculation of the total amount of contributions necessary to avoid an accumulated funding deficiency for the plan year, which amount is reported to the Internal Revenue Service. 26 U.S.C. §§ 412(a)(1), (2)(C), 431(c)(7), 6059; ERISA §§ 302(a)(1), (2)(C), 304(c)(7)(A), 29 U.S.C. §§ 1082(a)(1), (2)(C), 1084(c)(7)(A); 26 C.F.R. § 301.6059-1. UVBs may be determined using actuarial assumptions and methods prescribed by PBGC, whereas minimum funding must be determined using assumptions and methods that are "reasonable (taking into account the experience of the plan and reasonable expectations), and . . . which, in combination, offer the actuary's best estimate of anticipated experience under the plan." *Compare* ERISA § 4213(a), 29 U.S.C. § 1393 *with* 26 U.S.C. § 431(c)(3); 29 U.S.C. § 1084(c)(3).

**The financial crisis threatening multiemployer plans and the multiemployer insurance system and Congress's response**

Although multiemployer plans are subject to statutory minimum funding standards,[12] plans can become severely underfunded. As of September 2020, 124 multiemployer plans were expected to become insolvent within twenty years, in addition to approximately 100 multiemployer plans that were already insolvent.[13]

When a multiemployer plan becomes insolvent, it is required to reduce benefits to the amounts guaranteed by statute—often much less than participants have earned under the plan—and PBGC begins providing the plan financial assistance, in periodic installments, to pay guaranteed benefits and reasonable administrative expenses.[14] In 2021, when many multiemployer plans were headed toward insolvency, PBGC's multiemployer insurance program was itself projected to become insolvent in 2026.[15]

Congress addressed the funding crisis in the multiemployer pension system by enacting the American Rescue Plan Act of 2021 ("ARP"). ARP amended Title IV to create a new "special financial assistance" ("SFA") program, administered by PBGC, to provide eligible financially distressed multiemployer plans a lump-sum payment of funds projected to be sufficient to enable the plan to pay all benefits due through the plan year ending in 2051.[16] In July 2021, PBGC estimated that the SFA program would provide approximately $94 billion in SFA to assist more than 200 severely underfunded plans covering millions of participants and

---

[12] *See id.*

[13] PBGC, *FY2019 Projections Report* 2 (Sept. 14, 2020), https://www.pbgc.gov/sites/default/files/fy-2019-projections-report.pdf. As of May, 2018, about one quarter of all multiemployer plans were in "critical" status as defined by 26 U.S.C. § 432; ERISA § 305, 29 U.S.C. § 1085. PBGC, *FY2017 Projections Report* 1 (May 31, 2018), https://www.pbgc.gov/sites/default/files/fy-2017-projections-report.pdf.

[14] ERISA §§ 4022A, 4245, 4261, 29 U.S.C. §§ 1322a, 1426, 1431.

[15] PBGC, *FY2020 Projections Report* 1, 3 (Sept. 20, 2021), https://www.pbgc.gov/sites/default/files/documents/092021-fy2020-projrep.pdf.

[16] American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9704, 135 Stat. 4, (2021); ERISA § 4262(a)(1), 29 U.S.C. § 1432(a)(1).

their beneficiaries, restoring to solvency 30 insolvent plans and forestalling the insolvency of 100 plans that would have otherwise become insolvent by 2036.[17]  With the passage of ARP, PBGC's multiemployer insurance program is now projected to remain solvent for more than 40 years.[18]

### PBGC issued a regulation to carry out Congress's intent to protect distressed multiemployer plans and their participants.

In enacting ARP, Congress authorized PBGC, in consultation with the Secretary of the Treasury, to impose by regulation reasonable conditions relating to withdrawal liability on plans receiving SFA.[19]  PBGC exercised that authority by issuing  a regulation, 29 C.F.R. § 4262 (the "Regulation"), which imposes such conditions on plans receiving SFA.[20]  Here, the Debtors criticize the condition requiring a multiemployer plan receiving SFA to phase in recognition of the SFA payment over time in determining the plan's UVBs.  Under the Regulation, SFA is phased in for withdrawal liability purposes over the projected number of years it will take to exhaust SFA and earnings thereon (assuming such exhaustion before any other plan resources are used to pay benefits and expenses).[21]  Because more SFA is recognized each year of the phase-in period, the effect of the condition will lessen over time.

The Debtors' objections to the Regulation are focused solely on the effects on the contributing employers and not on the interests of the multiemployer plans, their participants and beneficiaries, or the health of the pension insurance system.  The phase-in condition in the

---

[17] Special Financial Assistance by PBGC, 86 Fed. Reg. 36598, 36614 (July 12, 2021).  In July 2022, PBGC revised its estimate of aggregate SFA from $94 billion to $82.3 billion.  Special Financial Assistance by PBGC, 87 Fed. Reg. 40968, 40999 (July 8, 2022).
[18] PBGC, *FY2023 Annual Report* 8.
[19] ERISA § 4262(m)(1), 29 U.S.C. § 1432(m)(1).  "The corporation, in consultation with the Secretary of the Treasury, may impose, by regulation or other guidance, reasonable conditions on an eligible multiemployer plan that receives special financial assistance relating to . . . withdrawal liability."
[20] 29 C.F.R. § 4262.16(g).
[21] 29 C.F.R. § 4262.16(g)(2).

Regulation was designed to serve the express purposes of Title IV of encouraging the continuation and maintenance of voluntary private pension plans for the benefit of their participants, and providing for timely and uninterrupted payment of pension benefits to participants.[22]  If a plan immediately recognized the entire amount of SFA as an asset, its UVBs would immediately decline, and so too, generally, the prospective withdrawal liability of contributing employers.  Contributing employers could withdraw immediately with vastly reduced withdrawal liability.[23]  For example, contributing employers to a plan with $100 million in UVBs pre-SFA and—absent the phase-in condition—$1 million in UVBs post-SFA, might have their prospective withdrawal liability reduced by 99%.  SFA funds would effectively subsidize employer withdrawals rather than paying benefits and administrative costs, as the statute contemplates.[24]  Subsidizing withdrawals from multiemployer plans would be contrary to the purposes of ERISA by discouraging the continuation and maintenance of plans receiving SFA, and potentially interfering with the purpose of providing for timely and uninterrupted payment of pension benefits to participants and beneficiaries.

SFA does not end a plan's need for employer contributions.  SFA is provided as a lump-sum payment in an amount projected to be sufficient to enable the plan to pay all benefits due through the plan year ending in 2051—not for the life of the plan.[25]  The projection assumes a certain level of employer withdrawals.[26]  If more employers withdraw than projected, the plan

---

[22] ERISA § 4002(a), 29 U.S.C. § 1302(a).

[23] Withdrawal liability is measured as of the last day of the plan year preceding the plan year in which the employer withdrew.  *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 418 (1995) (citing 29 U.S.C. §§ 1391(b)(2)(A)(ii), (b)(2)(E)(i), (c)(2)(C)(i), (c)(3)(A), and (c)(4)(A)).  So, with no phase-in, SFA would reduce UVBs and withdrawal liability beginning with the plan year immediately after the plan receives SFA.

[24] ERISA § 4262(*l*), 29 U.S.C. § 1432(*l*).

[25] ERISA §§ 4262(i)(1), (j)(1), 29 U.S.C. §§ 1432(i)(1), (j)(1).

[26] Debtors argue that representations purportedly made by CSPF to PBGC in its SFA application estop it from filing its withdrawal liability claims.  Objection at ¶¶ 54-56.  But estoppel *only* applies between the parties involved.  Even

will not receive the projected employer contributions and the plan may become insolvent sooner

than projected.  Additionally, because the financial needs of the plan are projected, if

circumstances change from the amount the plan projected it would need, the plan may require

more contributions to keep it solvent.  By phasing in SFA funds over time in determining a

plan's UVBs, the Regulation seeks to ensure continuing employer contributions.

Imposing the SFA withdrawal liability phase-in condition is also an appropriate

stewardship of tax dollars.  The function of the SFA program, manifest in the text of ARP, is to

enable an eligible, financially distressed plan that applies for SFA to continue to pay the pension

benefits earned by plan participants and, to that end, the plan's reasonable administrative

expenses.[27]  Nowhere did Congress indicate that the SFA program was intended to subsidize

employer withdrawals, which would be antithetical to the purposes of Title IV and the SFA

provision.

PBGC projected in July 2021 that, if it imposed no condition related to withdrawal

liability and plans could reasonably assume, in projecting the amount of SFA required, that 35%

of contributing employers would withdraw immediately following plans' receipt of SFA, PBGC

would have to pay an additional $15 to $20 billion in SFA to make up for plans' lost income.[28]

The SFA-phase-in requirement rendered unreasonable any such assumption about immediate

---

cases cited by Debtors make this clear.  As the Debtors state in their Objection, "[t]he doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party, *due to the latter's justifiable reliance upon the former's words or conduct.*"  Objection at ¶ 56 (emphasis added), *citing Kasakow v. New Rochelle Radiology Assocs., P.C.,* 274 F.3d 706, 725 (2d Cir 2001).  Estoppel thus requires reliance by the party invoking it.  As Debtors did not rely on statements in CSPF's SFA application, they cannot use such statements to estop CSPF's claims.

[27] *See* ERISA §§ 4262(j)(1), (*l*), 29 U.S.C. §§ 1432(j)(1), (*l*).  Subsection (j)(1) generally requires SFA be provided in "such amount required for the plan to pay all benefits due during the period beginning on the date of payment of the [SFA] and ending on the last day of the plan year ending in 2051."  Subsection (*l*) says that SFA and earnings thereon "may be used by an eligible multiemployer plan to make benefit payments and pay plan expenses."

[28] 86 Fed. Reg. 36617.  In response to these serious projections, PBGC initially considered the rule that *no* SFA funds be included in estimates of withdrawal liability.  *See id.* at 36611 (interim final rule).  The SFA phase-in requirement in the final rule was decided to be the best approach for balancing the prevention of extensive employer withdrawals while still considering the interests of various stakeholders.  *See* 87 Fed. Reg. 40970.

extensive employer withdrawals, and PBGC has paid SFA to 69 plans based on projections that include no such assumption.  If courts were to invalidate or decline to enforce the requirement, more employers will withdraw from SFA-recipient plans than the plans projected in applying for SFA, and the plans are likely to become insolvent much sooner than projected.  The statute provides no way for a plan to apply for a second infusion of SFA, even if a judicial decision negates the assumptions on which the plan's SFA application was based.[29]

The Regulation's phased recognition of SFA as a plan asset is consistent with ERISA, the Internal Revenue Code, and actuarial practice.  It is conceptually similar to the smoothed recognition of plan assets in calculating a plan's minimum funding requirements.  A Treasury regulation permits multiemployer plans to smooth plan asset values in determining minimum funding by averaging the value of plan assets over up to five years rather than using the current fair market value of plan assets.[30]  It is also comparable to the gradual recognition of SFA in determining minimum funding.  The Internal Revenue Code requires that SFA be disregarded in determining required contributions but recognized over time in actuarial calculations.[31]

---

[29] ERISA § 4262(h), 29 U.S.C. § 1432(h) (requiring that PBGC pay SFA as a single, lump-sum payment).  IRS Notice 2021-38 provides that SFA is recognized in the plan's funding standard account over time, in that any benefit or plan expense paid from the SFA account generates an actuarial gain that is amortized over 15 years.
[30] 26 C.F.R. § 1.412(c)(2)-1(b).
[31] 26 U.S.C. § 432(k)(2)(D)(i).  IRS Notice 2021-38 provides that SFA is instead recognized in the plan's funding standard account over time, in that any benefit or plan expense paid from the SFA account generates an actuarial gain that is amortized over 15 years.

**ARGUMENT**

**I.   PBGC's phase-in Regulation cannot be ignored in favor of general bankruptcy principles.**

Debtors argue that the Regulation providing for phase-in of SFA should be ignored as inconsistent with the Bankruptcy Code and general bankruptcy principles.[32]   Debtors fail to identify any specific Code provision that bars the application of the Regulation. And in its decision in *Raleigh,* the Supreme Court directly stated that "[b]ankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditor's entitlements . . . ."[33]   Instead, when evaluating a claim, courts must look to the "underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provision of the Bankruptcy Code."[34]   The Supreme Court later elaborated on its *Raleigh* ruling, finding that an exception to substantive law must be explicitly identified in the Bankruptcy Code.[35]

To the extent that the CSPF's withdrawal liability claims involve calculations governed by the Regulation's phase-in provision, that provision has the force of law and cannot be disregarded.  In ARP, Congress explicitly stated that "[PBGC], in consultation with the Secretary of the Treasury, may impose, by regulation or other guidance, reasonable conditions on an eligible multiemployer plan that receives special financial assistance relating to…withdrawal

---

[32] *See* Objection at ¶¶ 57, 61 (application of PBGC's regulation "cannot comply with the Bankruptcy Code" and would create "precisely the artificial sort of claims-creation that Bankruptcy Courts frequently reject.").
[33] *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 24-25 (2000).
[34] *Id.* at 20.
[35] *See Travelers Cas. & Sur. Co. v. Pac. Gas & Elec.,* 549 U.S. 443, 450-51 (2007) (holding that claims that arise under substantive law are to be allowed under section 502(b), unless one of the nine enumerated exceptions apply). None of the enumerated exceptions apply to PBGC's Regulation.

liability."[36]  It is well settled that administrative regulations adopted pursuant to an express

delegation give rise to legislative rules that have the "force and effect of law."[37]  While we are

not aware of any cases evaluating a claim affected by the Regulation's conditions on plans

receiving SFA, courts have repeatedly looked to *Raleigh* to hold that PBGC's regulation

governing its single employer underfunding claims cannot be disregarded by bankruptcy courts

when calculating those claims.[38]

   To be clear, PBGC takes no position concerning Debtors' other arguments regarding

CSPF's Claims. But with respect to Debtors' arguments against PBGC's Regulation, *Raleigh* is

clear that, when evaluating a withdrawal liability claim created pursuant to the Regulation, this

Court cannot simply ignore it or set it aside.[39]

---

[36] 29 U.S.C. § 1432(m)(1). In *dicta* within the *Sofco* decision*,* the Sixth Circuit recognized this statutory authorization, writing that "[ARP] explicitly authorized the PBGC to impose conditions on calculating withdrawal liability for employers leaving funds that had accepted this assistance." 15 F.4th 407, 422 n.2 (6th Cir. 2021).

[37] *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979*); Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977).

[38] *See, e.g., In re US Airways Group, Inc.*, 303 B.R. 784, 798 (Bankr. E.D. Va. 2003) (applying PBGC's valuation regulation for the calculation of PBGC's unfunded benefit liabilities.).  Although the Sixth Circuit, writing the same year *Raleigh* was decided, determined that *Raleigh* only impacts the question of whether a claim is valid, *see Pension Benefit Guaranty Corp. v. Belfance (In re CSC Indus.,Inc.)*, 232 F.3d 505, 509-10 (6th Cir. 2000) ("While the *validity* of a claim might be a matter for nonbankruptcy law, bankruptcy courts have the statutory authority to determine the *allowability* and *amount* of the claim."), all subsequent authority has rejected such limitations and held that *Raleigh* requires application of PBGC's regulations to PBGC's claim. *See, In re Durango Georgia Paper Co.*, No. 02-21669, 2017 WL 221785, at *3 (Bankr. S.D. Ga. Jan. 18, 2017) (concluding the *CSC* decision "misreads" *Raleigh*); *In re Wolverine, Proctor & Schwartz, LLC* 436 B.R. 253, 262-63 (D. Mass. 2010), *aff'g* 2009 WL 1271953 (Bankr. D. Mass. May 5, 2009), *aff'd* No. 10-1334 (1st Cir. Apr. 20, 2011) (copy included in Exhibit 1) (bankruptcy court approved settlement informed by *US Airways* and rejected *CSC Industries*; district court and court of appeals affirmed); *Dugan v. PBGC (In re Rhodes, Inc.)*, 382 B.R. 550, 559-560 (Bankr. N.D. Ga. 2008); *In re High Voltage Eng'g Corp.*, No. 05-10787, slip op. at 2 (Bankr. D. Mass. July 26, 2006) (copy included in Exhibit 2); *In re UAL Corp., No. 02-48191* (Bankr. N.D. Ill. Dec. 30, 2005) (Order and Trans. of Hearing, Dec. 16, 2005, at 32-33) (copy included in Exhibit 3); *In re US Airways,* 303 B.R. at 798 ("It is simply not a correct reading of *Raleigh* to say that nonbankruptcy law determines only the abstract validity of the claim—that is, whether the debtor has some liability to the creditor—as divorced from the *amount* of the claim."). *See also In re Kaiser Aluminum Corp.,* 339 B.R. 91, 96 (D. Del. 2006) (noting conflicting decisions concerning the application of *Raleigh*, and holding that the Bankruptcy Court did not abuse its discretion in approving the settlement of a claim calculated pursuant to PBGC's regulation).

[39] *Raleigh*, 530 U.S. at 24-25. ("Bankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditor's entitlements.").

## II.   PBGC's phase-in Regulation cannot be directly challenged by Debtors in a claims objection.

Debtors state that they "will demonstrate at trial that 29 C.F.R. § 4262.16(g)(2) . . . cannot be enforced as it is inconsistent with ERISA . . . ."[40]  This direct challenge to the enforceability of the Regulation cannot be shoehorned into a claims objection.  Debtors have no standing to request relief from the Regulation from *CSPF* rather than *PBGC*.  The Supreme Court has stated that, for a party to have standing, "there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... traceable to the challenged action of the defendant, and not ... the result of the independent action of some third party not before the court.'"[41]  As CSPF did not enact the Regulation, any injury alleged related to the content of the Regulation is not traceable to CSPF.  Thus, the Debtors lack standing to raise a challenge to the Regulation against CSPF, and that lack of standing deprives this Court of subject matter jurisdiction under Article III.[42]

Rather, any challenge to the validity of the Regulation is governed by the Administrative Procedure Act (the "APA").[43]  The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  PBGC is a U.S. government agency, and its promulgation of regulations is agency action.[44]

---

[40] *See* Objection at ¶ 59 ("the Debtors will demonstrate at trial that 29 C.F.R. 4262.16(g)(2) …cannot be enforced as it is inconsistent with ERISA . . . .").

[41] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (*citing Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976)).

[42] *Adam v. Barone*, 41 F.4th 230, 233 (3d Cir. 2022).

[43] 5 U.S.C. §§ 551 *et seq.  See, e.g., Louisiana Forestry Assoc., Inc. v. U.S. Dep't of Labor*, 745 F.3d 653 (3d Cir. 2014) (reviewing challenge to a Department of Labor regulation under the APA).

[44] *See generally, PBGC v LTV Corp.*, 496 U.S. 633, 653 (S. Ct. 1990).  5 U.S.C. § 551(13) (agency action defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof.")

The APA directs complainants to the agency's enabling statute for relief.  Bankruptcy Courts, including this one, have recognized that the APA controls review of agency action regardless of the status of the complainant as a Debtor in bankruptcy.[45]  The enabling statute here, ERISA, allows a plan sponsor that is negatively affected by PBGC action to bring an action against PBGC for "appropriate equitable relief in the appropriate court."[46]  In this case, that section provides that the "appropriate" courts would be the United States district court for the judicial district where the plan has its principal office (here, the United States District Court for the Northern District of Illinois), or the United States District Court for the District of Columbia.[47]  Yellow cannot challenge the validity of the PBGC Regulation or its consistency with ERISA in this claims objection action before this Court.

Even if this Court were an appropriate forum for challenging PBGC's Regulation, the Debtors could not do so in a claims objection but could only do so by filing an adversary proceeding.  In addition to the Debtors' lack of standing, discussed above, Fed. R. Bankr. P. 3007(b) prohibits a party in interest from including "a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding."  Rule 7001 specifies what kind of actions must be brought in an adversary proceeding, including "a proceeding to obtain an injunction or other equitable relief . .

---

[45] 5 U.S.C. § 703 (judicial review can be had in a court specified by statute).  *In re Dineen v. U.S. Dep't of Housing & Urban Dev.*, 1990 WL 257278 (Bankr. D. Del. 1990) (holding that "the APA provides for judicial review of" an action by debtors challenging a decision by the Department of Housing and Urban Development not to take assignment of the Debtors' defaulted mortgage).  Much of the limited caselaw applying the APA in bankruptcy arose in the context of challenges to regulations implemented by the Small Business Administration ("SBA") related to the Payroll Protection Program ("PPP") loans created by the Coronavirus Aid, Relief and Economic Security Act ("CARES" Act. Courts assessing those challenges looked to the Small Business Act to assess available relief.  *See In re Hidalgo Cty Emer. Svc Found. v. Carranza,* 962 F.3d 838, (5th Cir. 2020) (vacating bankruptcy court's injunction against operation of a regulation of the SBA because the Small Business Act prohibited injunctive relief); *Schuessler v. SBA*, 202 WL 2621186, (Bankr. E.D. Wisc. 2020) at, *8 n.1 (bankruptcy court looked to the Small Business Act to assess available relief in a challenge to an SBA regulation).
[46] 29 U.S.C. § 1303(f)
[47] 29 U.S.C. § 1303(f)(2).

. ."[48]  While Debtors fail to specify any appropriate relief regarding the Regulation, and instead seek only reduction or elimination of the bankruptcy claims,[49] any such relief can only be equitable relief, as required by 29 U.S.C. § 1303(f).[50]

Additionally, if this Court were to entertain such a challenge, any consideration of the validity of the Regulation would be noncore.[51]  As such, this Court would be limited to issuing proposed findings of fact and conclusions of law for de novo review by the district court.[52]  In determining whether an action is core or noncore, the Court "must first consult § 157(b) to determine if the claim at issue fits within that provision's illustrative list of proceedings that may be considered core."[53]  The Court must then conduct a "two-step test, according to which a claim will be deemed core if (1) it invokes a substantive right provided by title 11 or (2) if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case."[54]  Although a claims objection is a core proceeding under 28 U.S.C. § 157(b)(2)(B), a challenge to a federal regulation  with broad application is not.  Debtors cannot convert a noncore action into core cause of action simply by including it in a claims objection.[55]

---

[48] Fed.R.Bankr.P. 7001(7).

[49] Objection at ¶ 11 ("The Debtors request entry of an order pursuant to Section 502(b) of the Bankruptcy Code and Rule 3007 of the Bankruptcy Rules disallowing CSPF's Proofs of Claim in their entirety.  Alternatively, the Debtors request entry of an Order reducing CSPF's Proofs of Claim by, among other things, eliminating the double counting, applying relevant caps, and discounting the claims to present value . . . .")

[50] *See supra* n. 46.

[51] *Cf. Schuessler*, 202 WL 2621186, (Bankr. E.D. Wisc. 2020) (challenges to a regulation issued by the SBA prohibiting the grant of PPP loans to debtors in bankruptcy were noncore proceedings); *In re Dancor Transit v. U.S.,* 2020 WL 4730896 (Bankr. W.D. Ark. 2020) (same).  But see *In re Skefos v U.S.S.B.A.* 2020 WL 2893413 (Bankr. W.D. Tenn. 2020) (finding challenges to the SBA regulation to be core proceeding because it only applied to debtors in bankruptcy and thus "arose in" bankruptcy proceedings).

[52] *In re Allied Systems Holdings, Inc.*, 524 B.R. 598, 605 (Bankr. D. Del. 2015).

[53] *In re Winstar Comm'ns, Inc.*, 554 F.3d 382, 405 (3d Cir. 2009).

[54] *In re Exide Technologies,* 544 F3d 196, 206 (3d Cir. 2008).

[55] *See Halper v. Halper,* 164 F.3d 830, 837 (3d Cir. 1999) (in deciding whether claims in an adversary proceeding are core or noncore, the court must examine each claim individually); *Exide,* 544 F3d at 220 (non-core claims do not become core simply by virtue of being pursued in the same litigation as core claims).

A challenge to the Regulation meets neither of the tests for a core proceeding. First, a challenge to the Regulation does not invoke a right provided by the Bankruptcy Code, and the Debtors have not alleged that it does.  In fact, Debtors' language makes clear that, in this challenge, they are addressing solely ERISA, not the Bankruptcy Code.[56]  Second, a regulatory challenge is not one that "could arise only in the context of a bankruptcy case."  The Third Circuit is clear that claims that "arise in" a bankruptcy case "are claims that by their nature, *not their particular factual circumstance*, could only arise in the context of a bankruptcy case."[57]

The Regulation applies broadly to all SFA recipients and impacts the calculation of withdrawal liability for all withdrawing employers of SFA recipient plans, regardless of whether the withdrawing employer is a debtor in bankruptcy or not.[58]  Thus, a challenge to the Regulation is not a matter that could only arise within the context of a bankruptcy case and is a noncore matter subject to review by a district court.

Accordingly, pursuant to Local Rule 9013-1(h), PBGC does not consent to the entry of a final order or judgement by the Bankruptcy Court regarding the validity of the Regulation if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgements consistent with Article III of the United States Constitution.

---

[56] Objection at ¶¶ 59-60 (alleging that the Regulation cannot be enforced because it is "inconsistent with ERISA," and changes the statutory definition of UVBs "such that it is completely untethered to the MEPP's underfunding or ERISA.")  Debtors allege that they will "prove [these contentions] at trial," failing to mention that a Court reviewing a duly enacted regulation such as the one at issue here looks only at whether the regulation is "arbitrary, capricious, or otherwise contrary to law," or violates other similarly limited standards.  5 U.S.C. § 706(2).  That review is limited to the administrative record compiled by the agency.  *Id.*

[57] *Stoe v Flaherty,* 436 F.3d 209, 218 (3d Cir. 2006) (emphasis added).

[58] *See supra* n. 8.

## CONCLUSION

PBGC requests the Court deny the Objection to the extent that it seeks to ignore or

invalidate 29 C.F.R. § 4262.16 or any other PBGC regulation.

Dated: January 8, 2024                          Respectfully submitted,

 

/s/ Andrew Philip Walker

KAREN L. MORRIS
General Counsel
KARTAR S. KHALSA
DANIEL LIEBMAN
Deputy General Counsels
PAULA CONNELLY
STEPHANIE THOMAS
JOHN GINSBERG
Assistant General Counsels
ANDREW PHILIP WALKER
REBECCA L. STARK
BENJAMIN KELLY
EMILY ALLENDER
Attorneys
Office of the General Counsel
**PENSION BENEFIT GUARANTY
CORPORATION**
445 12th Street, SW
Washington, D.C. 20024
Telephone: (202) 229-6863
Emails: Walker.Andrew@pbgc.gov and
        efile@pbgc.gov

# EXHIBIT 1

# United States Court of Appeals
## For the First Circuit

No.    10-1068

IN RE: WOLVERINE, PROCTOR & SCHWARTZ, LLC,

Debtor,

PETER A. CRAWFORD,

Plaintiff, Appellant,

v.

WOLVERINE PROCTOR & SCHWARTZ, INC., ET AL.,

Defendants, Appellees,

LYNNE F. RILEY, Chapter 7 Trustee of Wolverine, Proctor & Schwartz, LLC,

Trustee, Appellee.

No.    10-1334

IN RE: WOLVERINE PROCTOR & SCHWARTZ, LLC,

Debtor,

PETER A. CRAWFORD,

Appellant,

v.

LYNNE F. RILEY, Chapter 7 Trustee of Wolverine, Proctor & Schwartz, LLC; and
THE PENSION BENEFIT GUARANTY CORPORATION,

Appellees.

———————————

No.    10-2230

PETER A. CRAWFORD,

Plaintiff, Appellant,

v.

WOLVERINE PROCTOR & SCHWARTZ, INC., ET AL.,

Defendants, Appellees.

———————————

Before

Lynch, <u>Chief Judge</u>,
Torruella and Lipez, <u>Circuit Judges</u>.

———————————

**JUDGMENT**

Entered:  April 20, 2011

Peter A. Crawford, a former Chief Operating Officer of Wolverine, Proctor & Schwartz, Inc. ("Wolverine"), a precursor of the Debtor in No. 10-1334, appeals a long list of bankruptcy and district court rulings, including (without limitation) the approval of the settlement agreement between the Bankruptcy Trustee and the Pension Benefit Guaranty Corporation; the jury verdict rejecting his claim to a bonus under his Employment Agreement, which he believes was tainted by trial error; the submission of the bonus issues to the jury and the denial of his post-trial motion for judgment as a matter of law; and summary judgment against his various other claims.

In No. 10-1334, we find no error in the approval of the bankruptcy settlement.  The objections raised by appellant are debatable to doubtful and not so promising as to make the settlement unreasonable.  As for the use of estimates, the parties did not have to use exact numbers to settle a benefit liabilities claim that is by nature probabilistic.

In Nos. 10-1068 and 10-2230, after careful consideration of appellant's arguments and the record, we are satisfied that the jury verdict was reasonable; that any trial error did not prejudice appellant; and that his remaining claims were subject to summary judgment.

<u>Affirmed</u>.

By the Court:

<u>/s/ Margaret Carter, Clerk</u>.

cc:
Michael L. Altman
Janet E. Bostwick
Steven F. Chilinski
Peter A. Crawford
John P. Dennis
Ronald J. Friedman
John P. Fitzgerald
Jennifer H. Lagerquist
Jennifer Bombard McGovern
Lynne F. Riley
Brad Q. Rogers
Mark C. Rossi
Joel W. Ruderman
Annapoorni Rohini Sankaran
Sara J. VanDeCarr
Mark M. Whitney

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**HIGH VOLTAGE ENGINEERING
CORPORATION, et al.,**
    Debtors

Chapter 11
Case No. 05-10787-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## ORDER

Upon consideration of 1) the Preliminary Objection of the Chapter 11 Trustee to

Claims Asserted by Pension Benefit Guaranty Corporation against Debtors High Voltage

Engineering Corporation, et al. (the "Preliminary Objection); 2) the PBGC's Response to the

Preliminary Objection; 3) the representations and arguments made at the June 21, 2006

hearing on the Preliminary Objection, at which hearing the parties agreed to narrow the

initial issue for determination to whether this Court should utilize the underlying

substantive law, namely the PBGC's regulations, to determine the amount of its claim or

whether the Court should utilize a prudent investor approach advocated by the Chapter

11 Trustee ; 4) the Joint Statement of Facts of the Chapter 11 Trustee and Pension Benefit

Guaranty Corporation; 5) the Supplemental Brief in Support of the Preliminary Objection

of the Chapter 11 Trustee; 6) the PBGC's Response to the Supplemental Brief; 7) the

decisions cited by the parties including, *inter alia*, Raleigh v. Ill. Dep't of Revenue, 530 U.S.

15 (2002); In re US Airways Group, Inc., 303 B.R. 784 (Bankr. E.D. Va. 2003); and In re UAL

1

Corp., No. 02 B 48191 (Bankr. N.D. Ill. December 30, 2005), the Court hereby overrules the

Chapter 11 Trustee's Preliminary Objection. For the reasons stated by Judge Wedoff in

UAL Corp., the Court finds that ERISA and the regulations found in 29 C.F. R. § 4044

control the calculation of the PBGC's claim in these solvent Chapter 11 cases.

By the Court,

Joan N. Feeney
Joan N. Feeney
United States Bankruptcy Judge

Dated: July 26 2006
cc: Jeffrey B. Cohen, Esq., Stephanie Thomas, Esq., John F. Ventola, Esq.

2

# EXHIBIT 3

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Honorable   Eugene R. Wedoff                          Hearing Date   December 30, 2005

Bankruptcy Case No.           02 B 48191              Adversary No.

Title of Case   UAL Corporation, et al.

Brief         Motion of PBGC for partial summary judgment
Statement of
Motion        (Docket entry no. 13442)

Names and
Addresses of
moving
counsel

Representing

## ORDER

It is hereby ordered that the above-stated motion, being treated as a motion in limine, is granted for the reasons
stated on the record on December 16, 2005.

12_16_05 United Omnibus Hearing Transcript.txt
```
21              THE COURT:  Well, if you can give ten days
22    notice, you would do it electronically, pursuant to
23    the case management order.
24              MR. LIPKE:  We will.
25              THE COURT:  I would expect that would
0074
 1    probably be enough.  If someone opposes the
 2    diminution of the time, I will hear the objection.
 3    But I would expect that won't be objected to and
 4    we'll be able to go ahead.
 5              MR. LIPKE:  Understood, Your Honor.
 6              THE COURT:  Okay.
 7              MR. LIPKE:  Thank you.  Have a good day.
 8              MR. CIMINO:  Your Honor, can I hand these
 9    up?
10              THE COURT:  If you'd like.
11                   (Document tendered.)
12              THE COURT:  Okay.  The next items on the
13    agenda are items 22 through 24, having to do with
14    the creditors committee's objection to the PBGC
15    claim.
16              MR. ABBOTT:  Your Honor, David Abbott from
17    General Foods Credit Corp.  I'd just like to
18    interrupt for a moment.  You had skipped item number
19    18.
20              THE COURT:  Oh, excuse me.
21              MR. ABBOTT:  And we can certainly come back
22    to it after you continue with where you are.  But
23    the --
24              THE COURT:  Oh, I didn't skip it.  That's
25    the omnibus objection.
0075
 1              MR. ABBOTT:  No, the -- that was item
 2    number 17, the duplicative issue.  General Foods
 3    Credit Corp. does not have that duplicative issue.
 4    And we're prepared to proceed on that argument.
 5              THE COURT:  Okay.  Well, I'm not prepared.
 6    We're going to continue that for status until the
 7    30th of December.
 8              MR. ABBOTT:  Okay.  Thank you, Your Honor.
 9              THE COURT:  Okay.  Again then, items 22
10    through 24 dealing with the creditors committee's
11    objection to the PBGC claim.
12              MR. SELIGMAN:  Good morning, Your Honor.
13    David Seligman on behalf of the debtors.
14              MR. PRINCE:  Good morning, Your Honor.
15    Christopher Prince of Sonnenschein Nath & Rosenthal
16    for the committee.
17              MR. BOYLE:  Good morning, Your Honor.  Joe
18    Boyle from Kelley Drye & Warren on behalf of PBGC.
19              MS. CECCOTTI:  Good morning, Your Honor.
20    Babette Ceccotti for the Air Line Pilots
21    Association.
22              MS. HEERMANS:  And, Your Honor, Nancy
23    Heermans and Shannon Novey here for PBGC on the
24    phone.
25              THE COURT:  Okay.  Thank you, Ms. Heermans.
0076
 1              Anyone else want to enter an
 2    appearance?
 3                   (No response.)
 4              THE COURT:  All right.  This matter, as I
 5    said, is before the court on the creditors
 6    committee's objection to the claim of the PBGC, but
```
Page 31

12_16_05 United Omnibus Hearing Transcript.txt
```
 7    this claim is subject to a motion for what's called
 8    partial summary judgment.  I think it's more
 9    properly considered as a motion in limine.  There is
10    some authority for the proposition that summary
11    judgment is inappropriate unless it completely
12    disposes of a claim, and this does not completely
13    dispose of a claim.  But, either way, as we had
14    discussed at the last omnibus, this motion is part
15    of an effort to potentially narrow the issues that
16    would have to be determined at a trial.  And so it
17    is of real significance in advancing the resolution
18    of the dispute and the reorganization in general.
19                  There is a number 24, a motion of the
20    creditors committee to exceed the page limit, and
21    that will be granted.
22                  As to the motion for summary judgment,
23    the PBGC seeks a determination that its claim should
24    be valued according to a regulation that it has
25    adopted for such valuation.  The applicable
0077
 1    bankruptcy law is found in Section 502(b) of the
 2    Bankruptcy Code which states --
 3                  The parties may want to sit down.
 4    This isn't as long as some of the other ones I've
 5    had to read, but still long enough that you might be
 6    more comfortable sitting.
 7                  Section 502(b) states that claims are
 8    to be allowed, quote, "as of the date of the filing
 9    of the petition," close quote, and then quoting
10    again, "except to the extent," close quote, that
11    they are subject to disallowance under one of the
12    grounds specified in the nine paragraphs set out in
13    Section 502(b).
14                  Allowance under Section 502(b)
15    necessarily involves the amount of the claim in
16    addition to its validity, since many of the grounds
17    set out in Section 502(b) deal only with the amount
18    of the claim.  For example, see Section 502(b)(4)
19    which disallows a claim for services of an insider
20    or an attorney of the debtor to the extent that the
21    claim exceeds the reasonable value of the services
22    rendered.  Thus -- or I should say the question of
23    payment is distinct from allowance.  Allowed claims
24    may be separately classified by the debtor or they
25    may be subject to equitable subordination.  But
0078
 1    allowance under 502(b) is in the amount that would
 2    be applicable under nonbankruptcy law except to the
 3    extent that one of the provisions of Section 502(b)
 4    applies.  There is no general equitable power in
 5    bankruptcy courts to disallow claims since that
 6    would conflict with Section 502(b).  See Raleigh
 7    versus Illinois Department of Revenue, 503 U.S. 15,
 8    a 2000 decision of the United States Supreme Court.
 9                  The amount of a valid claim must
10    therefore be determined as of the petition date
11    according to applicable nonbankruptcy law unless one
12    of the grounds in the nine paragraphs of Section
13    502(b) applies.
14                  Now, the governing nonbankruptcy law
15    here provides that upon an involuntary termination
16    of a pension plan covered by ERISA, the sponsoring
17    employer and each member of its control group are
18    liable to the PBGC in the amount of, quote,
```
Page 32

12_16_05 United Omnibus Hearing Transcript.txt
19    "unfunded benefit liabilities," close quote, 29
20    U.S.C. Section 1362(a) and (b).
21          Under Section 1362(b)(1)(A), the
22    amount of the unfunded benefit liabilities is to be,
23    quote, "calculated from the termination date in
24    accordance with regulations proscribed by the PBGC."
25    Under Section 1301(a)(18), the, quote, "amount of
0079
1     unfunded benefit liabilities," close quote, means
2     the excess of the benefit liabilities under the plan
3     determined on the basis of assumptions prescribed by
4     the PBGC for purposes of Section 1344 of this title
5     over the current value of the assets of the plan.
6          The PBGC has adopted regulations under
7     Section 1334 for calculating the amount of unfunded
8     benefit liabilities. 29 CFR 4044.52 to 4044.75, and
9     neither the committee nor ALPA have argued that the
10    regulations are inapplicable or would not be used to
11    determine the amount of United's unfunded benefit
12    liabilities under applicable nonbankruptcy law.
13    Thus, they are binding here in determining PBGC's
14    claim.
15          In reviewing the precedent on this
16    question, the reasoning that I've outlined is
17    consistent with the decision in In re US Airways
18    Group, Inc., 303 BR 784, Bankruptcy Court for the
19    Eastern District of Virginia, 2003.  The contrary
20    decisions in In re CF&I Fabricators of Utah, Inc.,
21    150 F.3d 1293, 10th Circuit, 1998, and In re CSC
22    Industries, Inc., 232 F.3d 505, Sixth Circuit, 2000,
23    are based on holdings that bankruptcy courts do have
24    an equitable power to determine the amount of claims
25    in a manner different than what applicable
0080
1     nonbankruptcy law would require.  Those holdings do
2     not accurately reflect the provisions of the code
3     that I outlined earlier and so cannot be followed.
4          On that basis then, the PBGC's motion,
5     treated as a motion in limine, would be granted.
6     And we need to discuss what remaining steps should
7     take place to determine the amount of that claim,
8     including the need to determine the claim as of the
9     petition date.
10          MR. SELIGMAN:  Your Honor, if I could
11    perhaps just make a suggestion on behalf of the
12    debtors?  Obviously this narrows the issues.  I
13    think we had said before that we thought that the
14    relative -- you know, the relevant actuaries with
15    this ruling could probably get together and figure
16    out the amounts.  So I would suggest that perhaps we
17    continue this for a short period of time.  I don't
18    even think next -- maybe we can do it in two weeks
19    when there is going to be already the hearing on --
20          THE COURT:  Well, I was going to say as
21    long as the parties are going -- some of the parties
22    are going to be present on the 30th.  If that works,
23    I would be happy to have you come in on the 30th and
24    tell me where things stand.
25          MR. PRINCE:  Your Honor, I think you've
0081
1     properly characterized it as a motion in limine.
2     And in that connection, I'm not sure that it narrows
3     the issues as much as is presented.  And this was an
4     issue raised in our opposition, the 1362(b)(2)(B),
                          Page 33

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | Case No. 23-11069 (CTG) (Jointly Administered) |
| Debtors. | **Hearing Date:** **January 22, 2024 at 2:00 p.m. (E.T.)** |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 8, 2024, the **Limited Response of the Pension Benefit Guaranty Corporation to Objection of the Debtors to the Proofs of Claim Filed by the Central State Pension Fund** was electronically filed with the Clerk of the Court using the ECF system and was served on all parties registered for ECF notification, by electronic email, or by Federal Express:

| | |
|---|---|
| **Philip C. Dublin** **Meredith A. Lahaie** **Kevin Zuzolo** Akin Gump Strauss Hauer & Feld LLP, One Bryant Park Bank of America Tower New York, NY 10036-6745 pdublin@akingump.com mlahaie@akingump.com kzuzolo@akingump.com  *Counsel to the Committee* | **Jane Leamy** **Richard Shepacarter** Office of United States Trustee 844 King Street, Suite 2207 Lockbox 35 Wilmington, Delaware 19801 jane.m.leamy@usdoj.gov richard.shepacarter@usdoj.gov  *Counsel to the U.S. Trustee* |

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

| | |
|---|---|
| **Patrick J. Nash, Jr.** (admitted *pro hac vice*)<br>**David Seligman** (admitted *pro hac vice*)<br>**Whitney Fogelberg** (admitted *pro hac vice*)<br>Kirkland & Ellis LLP<br>Kirland & Ellis International LLP<br>300 North LaSalle<br>Chicago, Illinois, 60654<br>whitney.fogelberg@kirkland.com<br><br>**Allyson B. Smith** (admitted *pro hac vice*)<br>Kirkland & Ellis LLP<br>Kirland & Ellis International LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>allyson.smith@kirkland.com<br><br>**Laura Davis Jones**<br>**Timothy P. Cairns**<br>**Peter J. Keane**<br>**Edward Corma**<br>Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street, 17th Floor<br>PO Box 8705<br>Wilmington, Delaware 19801<br>ljones@pszjlaw.com<br>tcairns@pszjlaw.com<br>pkeane@pszjlaw.com<br>ecorma@pszjlaw.com<br><br>***Counsel to the Debtors*** | **Jennifer R. Hoover**<br>**Kevin M. Capuzzi**<br>Benesch Friedlander Coplan & Aronoff LLP<br>1313 North Market Street<br>Suite 1201<br>Wilmington, DE, 19801<br>jhoover@beneschlaw.com<br>kcapuzzi@beneschlaw.com<br><br><br>***Co-counsel to the Committee*** |
| **General Counsel**<br>Yellow Corporation<br>11500 Outlook Street, Suite 400<br>Overland Park, KS 66211<br><br>***Debtor***<br>***Via FedEx*** | |

/s/ Andrew Philip Walker
    Andrew Philip Walker