## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## DEBTORS' OPPOSITION TO THE SFA-FUNDED PENSION PLANS' MOTION TO COMPEL ARBITRATION

---

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
    tcairns@pszjlaw.com
    pkeane@pszjlaw.com
    ecorma@pszjlaw.com

*Co-Counsel for the Debtors and Debtors in Possession*

Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    pnash@kirkland.com
    dseligman@kirkland.com
    mslade@kirkland.com


Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email:    michael.esser@kirkland.com
    john.christian@kirkland.com

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 4

I.      The Bankruptcy Court Must Hear This Claims Objection. ................................... 4

      A.      The Pension Plans Submitted To This Court's Jurisdiction To Adjudicate Objections To Their Proofs Of Claim....................................................... 4

      B.      ERISA Does Not Supplant the Bankruptcy Code.................................... 7

      C.      The Federal Arbitration Act and Attendant Case Law are Irrelevant. ................... 11

II.     Arbitration Would Needlessly Delay the Debtors' Restructuring and Waste Estate and Judicial Resources. .................................................................................... 15

III.    The Pension Plans Have Not Shown "Cause" to Lift the Automatic Stay. ...................... 19

CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amalgamated Foods, Inc.*,
  41 B.R. 616 (Bankr. C.D. Cal. 1984) ...............................................................5, 15

*In re APF Co.*,
  264 B.R. 344 (Bankr. D. Del. 2001) ........................................................................18

*In re Bankr. Case No. 91 B 23969*,
  1994 WL 673055 (N.D. Ill. Nov. 28, 1994) ........................................................6, 15

*In re BFW Liquidation, LLC*,
  459 B.R. 757 (Bankr. N.D. Ala. 2011) ...............................................................6, 15

*Ceasars Ent. Corp. v. IUOE Local 68 Pension Fund*,
  932 F.3d 91 (3d Cir. 2019) ................................................................................17, 18

*In re Cott Corp.*,
  26 B.R. 332 (Bankr. D. Conn. 1982) ..................................................................6, 15

*In re E & G Waterworks, LLC*,
  571 B.R. 500 (Bankr. D. Mass. 2017) .....................................................................14

*In re Erwin*,
  2018 WL 1614160 (Bankr. E.D.N.C. Mar. 30, 2018) .............................................14

*In re FTX Trading Ltd.*,
  91 F.4th 148 (3d Cir. 2024) ....................................................................................13

*Granfinanciera, S.A., v. Nordberg*,
  492 U.S. 33 (1989) .....................................................................................................4

*In re Herrington*,
  374 B.R. 133 (Bankr. E.D. Pa. 2007) ......................................................................12

*In re Interco Inc.*,
  137 B.R. 993 (Bankr. E.D. Mo. 1992) ...................................................5, 6, 14, 15

*In re Johnson*,
  649 B.R. 735 (Bankr. N.D. Ill. 2023) ......................................................................14

*In re Kaiser Grp. Int'l, Inc.*,
  307 B.R. 449 (D. Del. 2004) ....................................................................................12

*Kannikal v. Att'y Gen. U.S.*,
    776 F.3d 146 (3d Cir. 2015) ............................................................. 9

*In re Kiskaden*,
    571 B.R. 226 (Bankr. E.D. Ky. 2017) ........................................... 14

*Tristani ex rel. Karnes v. Richman*,
    652 F.3d 360 (3d Cir. 2011) ............................................................. 7

*Langenkamp v. Culp*,
    498 U.S. 42 (1990) ...................................................................... 4, 12

*In re Loewen Grp. Int'l, Inc.*,
    274 B.R. 427 (Bankr. D. Del. 2002) .............................................. 10

*Lorillard v. Pons*,
    434 U.S. 575 (1978) .......................................................................... 6

*In re Martinez*,
    2007 WL 1174186 (Bankr. S.D. Tex. Apr. 19, 2007) .................... 14

*In re Mintze*,
    434 F.3d 222 (3d Cir. 2006) ........................................................... 12

*In re Mirant Corp.*,
    316 B.R. 234 (Bankr. N.D. Tex. 2004) .......................................... 14

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) .......................................................................... 9

*In re Mushroom Transp. Co., Inc.*,
    90 B.R. 718 (Bankr. E.D. Pa. 1988) ................................................ 7

*In re Payton Const. Corp.*,
    399 B.R. 352 (Bankr. D. Mass. 2009) ........................................... 13

*In re Rexene Prods. Co.*,
    141 B.R. 574 (Bankr. D. Del. 1992) .............................................. 20

*Rodgers v. United States*,
    185 U.S. 83 (1902) ........................................................................... 9

*In re Rotondo Weirich Enters., Inc.*,
    583 B.R. 860 (Bankr. E.D. Pa. 2018) ............................................ 12

*In re SCO Grp., Inc.*,
    395 B.R. 852 (Bankr. D. Del. 2007) .............................................. 19

*Shearson/Am. Exp., Inc. v. McMahon,*
    482 U.S. 220 (1987)..................................................................................12, 13

*Steelworkers Pension Tr. by Bosh v. Renco Grp., Inc.,*
    694 F. App'x 69 (3d Cir. 2017)...................................................................11

*Steelworkers Pension Tr. v. Renco Grp., Inc.,*
    2016 WL 5173664 (W.D. Pa. Aug. 22, 2016) .........................................11

*SUPERVALU, Inc. v. Bd. Of Trs. Of Sw. Pa. & W. Md. Area Teamsters & Emp'rs*
    *Pension Fund,*
    500 F.3d 334 (3d Cir. 2007)........................................................................17

*In re T.D.M.A., Inc.,*
    66 B.R. 992 (Bankr. E.D. Pa. 1986) .......................................................5, 14

*In re Town Sports Int'l,*
    2023 WL 8827193 (D. Del. Dec. 21, 2023), *appeal filed Jan. 5, 2024*....................4

*Travellers Int'l AG v. Robinson,*
    982 F.2d 96 (3d Cir. 1992)...........................................................................4

*In re Trump Ent. Resorts, Inc.,*
    526 B.R. 116 (Bankr. D. Del. 2015) ..........................................................20

*In re UAL,*
    310 B.R. 373 (Bankr. N.D. Ill. 2004) ..........................................................4

*United Student Aid Funds, Inc. v. Espinosa,*
    559 U.S. 260 (2010)......................................................................................4

*In re Winstar Commc'ns, Inc.,*
    554 F.3d 382 (3d Cir. 2009).........................................................................4

*In re Yarbrough,*
    2010 WL 3885046 (Bankr. M.D. Ala. Sept. 29, 2010)............................14

**Statutes**

9 U.S.C. §§ 1-16 ...............................................................................11, 12, 14, 17

11 U.S.C. § 362................................................................................................6, 19

11 U.S.C. § 502.......................................................................................... *passim*

11 U.S.C. § 1104(c) ............................................................................................13

28 U.S.C. § 157(b)(2)(B) .....................................................................................2

29 U.S.C. §§ 1381-1399 ........................................................................1, 8, 9, 11

29 U.S.C. § 1382 ........................................................................................11

29 U.S.C. § 1385 ........................................................................................17

29 U.S.C. § 1391 ..........................................................................................8

29 U.S.C. § 1393(c)(A)-(B) ........................................................................8

29 U.S.C. § 1401 ................................................................................ *passim*

**Other Authorities**

The AAA Withdrawal Liability Rules
https://www.adr.org/sites/default/files/Multiemployer_Pension_Plan_Withdra
wal_Liability.pdf ....................................................................................17

Christopher R. Drahozal, *Arbitration Costs and Forum Accessibility: Empirical
Evidence*, 41 U. MICH. J.L. REFORM 813, 840-41 (2008) ...................................16

Jill I. Gross, *Justice Scalia's Hat Trick and the Supreme Court's Flawed
Understanding of Twenty-First Century Arbitration*, 81 BROOK. L. REV. 111,
138-39 (2015) ..........................................................................................16

S&P GLOB. MKT. INTEL. (Jan. 9, 2024),
https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-
headlines/us-bankruptcies-hit-13-year-peak-in-2023-50-new-filings-in-
december-79967180 ....................................................................................11

Thomas J. Stipanowich & J. Ryan Lamare, *Living with ADR: Evolving
Perceptions and Use of Mediation, Arbitration and Conflict Management in
Fortune 1000 Corporations*, 19 HARV. NEGOT. L. REV. 1, 51-54 (2014) ..........................16

**INTRODUCTION**[2]

1.    The Pension Plans voluntarily filed 150 Proofs of Claim against the Debtors seeking more than $1.6 billion in alleged withdrawal liability—without previously "assessing" any such liability or seeking relief from the automatic stay to do so.  As set forth more fully in the Debtors' Second Omnibus Objection (the "Objection"), ECF No. 1962, the Pension Plans seek that sum even though they have little to no unfunded vested benefits ("UVBs"), even though United States taxpayers have already ensured that the Pension Plans are fully or near fully funded, and even though they do not need a single dollar from the bankruptcy estate to make any benefit payments to anyone.[3]  The Pension Plans seek nothing more than a windfall at the expense of the Debtors' unsecured creditors, who would recover only pennies on the dollar if the Pension Plans succeed, and equity holders, who would be wiped out.

2.    Under all circumstances, the legal issues presented by the Pension Plans' Proofs of Claim will ultimately be decided *de novo* by the federal courts.  Indeed, even if the Pension Plans could somehow convince this Court to be the first bankruptcy court ***ever*** to deem itself required to refer proofs of claim seeking withdrawal liability to arbitration, the legal questions at issue (which are the key questions) would be appealed under a *de novo* standard to federal court after the parties wasted their time, money, and energy in arbitration.  Still, because assessing withdrawal liability where a plan has no UVBs is so unprecedented, the Pension Plans seek to dodge this Court, asserting that it either cannot or should not address the Debtors' Objection on the merits.

---

[2] The Debtors incorporate herein by reference the arguments set forth in their Opposition to Central States Pension Funds' Motion to Compel Arbitration ¶¶ 15-43, ECF No. 1965 ("Opposition").

[3] As explained below, the Pension Plans failed to comply with 29 U.S.C. §§ 1381-1399 in determining their UVBs or the Debtors' allocable share of UVBs, if any, and adjusting such allocation as required by 29 U.S.C. § 1381(b) to determine the Debtors' withdrawal liability, if any. The Debtors believe that no UVBs and, therefore, no withdrawal liability, exists following the PBGC's approval of the Pension Plans' respective SFA applications.  But whether any UVBs exist after inclusion of the SFA, or whether any withdrawal liability exists after proper application of 29 U.S.C. § 1381(b), should ultimately be determined at trial after the completion of all necessary discovery.

3.       The Pension Plans' challenge to this Court's authority has no merit.  It is settled law that, by filing Proofs of Claim in this Court, the Pension Plans submitted such claims to this Court's jurisdiction.  And Congress has already answered the question posed by the Pension Plans' Motion in clear and unequivocal language: once the Debtors object (and they have), this Court "shall" determine the amount of the Pension Plans' claims (if any) to be allowed "as of the date of the filing of the petition."  11 U.S.C. § 502(b).  Moreover, Congress made clear that the allowance or disallowance of most proofs of claim (including these) is part of this Court's "core" jurisdiction.  28 U.S.C. § 157(b)(2)(B).  Congress could have excluded withdrawal liability claims from this ambit (as it did explicitly with certain other claims, *see id.*); it did not.

4.       The Pension Plans nevertheless argue that this Court must refer their withdrawal liability claims to an arbitrator.  In the alternative, they argue that this Court should abstain in favor of one or more not-yet-existent arbitrations, claiming that an unidentified arbitrator or arbitrators would be better equipped to render a decision and that compelling arbitration would not materially disrupt the Debtors' reorganization.  But none of these arguments have any merit whatsoever.

5.       *First*, the Pension Plans incorrectly suggest ERISA requires the Court to compel arbitration of withdrawal liability claims.  To the contrary, the Bankruptcy Code dictates that this Court "shall determine" whether to allow the Pension Plans' Proofs of Claim for withdrawal liability, and, if so, in what amounts.  11 U.S.C. § 502(b).  It is this specific, clear direction to bankruptcy courts that controls, not more general language in ERISA applicable to "employers" outside bankruptcy.  For that reason, no published case holds that a bankruptcy court must defer to an arbitration to resolve a proof of claim asserting withdrawal liability (let alone hundreds of claims that make up 90% of the claims pool), and six published cases have rejected the Pension Plans' argument.  This Court should not be the first to accept it.

6.    ***Second***, the Pension Plans are also wrong to suggest that this Court needs the assistance of arbitrators specializing in calculating withdrawal liability.  Rather, and as set forth in the Debtors' Objection, the primary disputes at issue concern questions of law for which no relevant arbitrator would have "specialized" knowledge, and certain other legal and equitable issues, with which this Court has unquestioned familiarity and is more than capable of determining.

7.    ***Third***, the Pension Plans' suggestion that allowing these claims to proceed in arbitration would benefit (or, at the very least, not harm) the estates is absurd.  Even if the parties proceeded with a consolidated arbitration, as the Pension Plans suggest,[4] there is no reason to think (and the Pension Plans offer none) that such arbitration would be more efficient or less costly than proceeding under the scheduling order that the Court recently entered.  *See* Sched. Order ¶¶ 1-4, ECF No. 2195 ("Scheduling Order").  That Order requires the parties to complete fact and expert discovery and resolve these disputes, by dispositive motion or trial, by the first week of August.  The Pension Plans cannot seriously claim arbitration would be anywhere near as efficient.  Even more obviously, even if arbitration proceeded on the schedule the parties have now (it would not), it ultimately would all be for naught: one or more parties would inevitably appeal the arbitrator(s)' decision, the legal analysis of which would be entitled to no deference.  But, of course, in the Pension Plans' world, this would occur only *after* the parties had wasted significant time and resources in needless arbitration(s).  This would be pointless and unjust and, for these and other reasons set forth more fully below, the Court should deny the Motion to Compel Arbitration.

---

[4] In yet another gambit to escape this Court's authority, the Pension Plans suggest that they would be willing to consolidate the 11 pending MEPPs' 200+ withdrawal liability Proofs of Claim for resolution before a single arbitrator. They point to no provision of ERISA providing for this, identify no circumstance in which it has ever happened, and ignore the undeniable reality that the critical questions decided in arbitration(s) would be reexamined *de novo* in federal court anyway.  The truth is that even if arbitration were ordered (it should not be), and even if the Debtors agreed to a single arbitrator holding the fate of these chapter 11 cases in his/her hands (which is unlikely), the parties would still be haggling over the identity of any arbitrator(s) in August 2024 when, under this Court's Scheduling Order, the parties would otherwise be trying this case.

## ARGUMENT

### I.    The Bankruptcy Court Must Hear This Claims Objection.

8.    The Bankruptcy Code and attendant case law are clear.  Congress obliged this Court to hear and rule on the Pension Plans' withdrawal liability claims.  ERISA's provisions ***do not*** incidentally erase this Court's duty to adjudicate objected-to proofs of claim.

####    A.    The Pension Plans Submitted To This Court's Jurisdiction To Adjudicate Objections To Their Proofs Of Claim.

9.    It remains undisputed that, by filing a proof of claim against a bankruptcy estate, a creditor submits its claim to the bankruptcy court's jurisdiction, even eliminating a party's constitutional right to a jury trial outside of bankruptcy.  *Langenkamp v. Culp*, 498 U.S. 42, 45 (1990) (per curiam) ("Respondents filed claims against the bankruptcy estate, thereby bringing themselves within the equitable jurisdiction of the Bankruptcy Court.  Consequently, they were not entitled to a jury trial on the trustee's preference action."); *see In re UAL*, 310 B.R. 373, 377 (Bankr. N.D. Ill. 2004) ("[T]he assertion of a claim against an estate in bankruptcy is sufficient to bring that claim within the bankruptcy jurisdiction, regardless of whether a right to a jury trial would attach to the claim outside of bankruptcy and regardless of the nature of the claim—whether it arises under federal or state law").[5]  Thus, per Congress's charge, this Court "shall determine the amount" (if any) of the Pension Plans' withdrawal liability claims.  11 U.S.C. § 502(b).

---

[5] *See also, e.g., United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010) (creditor "fil[ing] a proof of claim" constitutes "submitting itself to the Bankruptcy Court's jurisdiction with respect to that claim"); *Granfinanciera, S.A., v. Nordberg*, 492 U.S. 33, 57-58 (1989) (explaining that the filing of a proof of claim subjects the claimant to the equitable jurisdiction of the bankruptcy court); *Langenkamp*, 498 U.S. at 44-45 (same); *Travellers Int'l AG v. Robinson*, 982 F.2d 96, 99-100 (3d Cir. 1992) (same); *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 406 (3d Cir. 2009) (by filing a claim, creditor "brings itself within the equitable jurisdiction of the Bankruptcy Court") (internal quotation omitted) (citing cases); *In re Town Sports Int'l*, 2023 WL 8827193, at *7 (D. Del. Dec. 21, 2023), *appeal filed Jan. 5, 2024,* ("The Supreme Court has held that when a creditor files a claim against a bankruptcy estate, the filing triggers a process of allowance and disallowance of claims, thereby subjecting the creditor to the equity power of the bankruptcy court.").  "Thus, claimants face a choice when determining whether to file a proof of claim in a bankruptcy case: assert a proof of claim and submit to the jurisdiction of the bankruptcy court … or do not submit a proof of claim and be barred from collecting on a debt and sharing in a pro rata share of a bankruptcy estate." *Id.*

10.     The applicable statutory language is crystal clear: "Except as provided in subsections (e)(2), (f), (g), (h), and (i) of this section," if an objection to a proof of claim is asserted, a bankruptcy court "shall determine the amount of such claim." *Id*.  Here, in accord with Section 502(b), the Pension Plans filed *150* Proofs of Claim for withdrawal liability, to which the Debtors objected.  The Pension Plans do not argue, nor could they plausibly argue, that any of the enumerated exceptions to Section 502(b) apply; thus, the paradigmatic rule does.[6]

11.     The Pension Plans assert that this Court lacks authority over their withdrawal liability claims because ERISA provides for resolving withdrawal liability disputes between "an employer and the plan sponsor" in arbitration, subject to review in district court.  29 U.S.C. § 1401(a)(1).  But the Pension Plans do not cite a single opinion holding that ERISA requires bankruptcy courts to abdicate their core claims adjudication functions in deference to arbitrators. In fact, ***every single one of the*** published judicial decisions uniformly holds otherwise.  *See In re Interco Inc.*, 137 B.R. 993, 997 (Bankr. E.D. Mo. 1992) (holding that "[n]either the provisions of ERISA, nor the established case law mandates that the bankruptcy court defer to arbitration the estimation of . . . withdrawal liability for the purpose of allowance under Section 502"); *In re T.D.M.A., Inc.*, 66 B.R. at 992 (holding that "a dispute concerning an employer's 'withdrawal liability'" is not "an extraordinary situation" that would require deference to "an extra-bankruptcy dispute-mechanism"); *In re Amalgamated Foods, Inc.*, 41 B.R. 616, 620 (Bankr. C.D. Cal. 1984) ("Obeying the Congressional mandate that there be prompt resolution of ERISA withdrawal liability claims, I find and order that the debtor need not submit to arbitration in this matter."); *In*

---

[6] This Court's mandate over claims adjudication extends beyond allowance or disallowance and includes claim estimation. 11 U.S.C. § 502(c).  Specifically, the Code requires that this Court "shall" estimate "for purpose of allowance . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1); *see In re T.D.M.A., Inc.,* 66 B.R. 992, 997 (Bankr. E.D. Pa. 1986) ("Bankruptcy courts are empowered by 11 U.S.C. § 502(c) to estimate any contingent or unliquidated claims which would unduly delay the closing of the estate.") (internal quotation and citation omitted).

*re BFW Liquidation, LLC*, 459 B.R. 757, 762-78 (Bankr. N.D. Ala. 2011) (finding it "[n]ot [n]ecessary to [d]ecide if [a]rbitration [i]s [r]equired by the MPPAA for [w]ithdrawal [l]iability [c]laims in [b]ankruptcy"); *In re Cott Corp.*, 26 B.R. 332, 336 (Bankr. D. Conn. 1982) ("The scope of [§ 362(a)(1)] is broad. All proceedings are stayed, including arbitration, license revocation, administrative, and judicial proceedings."); *In re Bankr. Case No. 91 B 23969*, 1994 WL 673055, at *5, *10 (N.D. Ill. Nov. 28, 1994) (citing *Cott* and *Interco* and holding that "a bankruptcy court is not precluded by ERISA § 1401(a) from resolving withdrawal liability claims" and deferring to arbitration only regarding a dispute between the Pension Plan and a non-debtor parent).

12.     Congress could have amended the Bankruptcy Code's well-known claims adjudication process to provide for mandatory arbitration of withdrawal liability proofs of claim— and if Congress had disagreed with the uniform body of law cited above, it would have done so. That Congress has passed no such amendment in the ***decades*** since these cases were decided, notwithstanding Congress's decision to enact many other statutory amendments in that period,[7] confirms Congress's intent that bankruptcy courts, not arbitrators, hear objections to withdrawal liability proofs of claim. *See, e.g.*, *Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware . . . [of a] judicial interpretation of a statute and to adopt that interpretation when it reenacts a statute without change."); *Tristani ex rel. Karnes v. Richman*, 652 F.3d 360, 375 (3d Cir. 2011) ("[D]isparate federal and state courts have overwhelmingly endorsed th[e] practice [of using liens to recoup medical expenses]. Since then, Congress has had occasion to amend the anti-lien and anti-recovery provisions [of the Social Security Act], and has chosen not to prohibit

---

[7] Congress last amended Section 502(b) in 2020, repealing the third subsection of the ninth "extent that" exception to 502(b)'s claim's allowance scope.  11 U.S.C. § 502(b)(9)(c) (repealed).  Congress did not take that or any other opportunity to subordinate 502(b) to ERISA—even though every one of the six cases to examine the question had expressly held that Bankruptcy Courts had authority to rule on Proofs of Claim related to withdrawal liability. If Congress had disagreed with the uniform body of law on the subject, it would have said so.

this widespread and pervasive practice. Its failure to do so further supports our holding that Medicaid medical expense liens are excepted from the anti-lien and anti-recovery provisions.") (internal citations omitted).   No authority suggests that ERISA incidentally supplanted the Bankruptcy Code's mandate over the allowance or disallowance of claims (it did not).

13.     Perhaps recognizing the absence of any cases supporting their proposed outcome, the Pension Plans rely on dicta in a single unrelated case focused on an unrelated, narrow issue: that two entities can be considered one for withdrawal liability purposes. *In re Mushroom Transp. Co., Inc.*, 90 B.R. 718, 722 (Bankr. E.D. Pa. 1988) ("[T]he instant contested matter involves the narrow issue of whether Robbey, which had never made MPPAA contributions, is by virtue of MPPAA part of a conglomerate the whole of which is the employer . . . ."). But even that case did not require deferring anything to arbitrators; the "narrow issue" in dispute was decided in federal court.   Put simply, inclusive of *Mushroom*, seven courts have all refused to hold that ERISA supplants the Bankruptcy Code's claims adjudication provisions and requires withdrawal liability proofs of claim to be decided in arbitration.   *Zero* hold otherwise.   This case calls for no revolution.

**B.     ERISA Does Not Supplant the Bankruptcy Code.**

14.     The Pension Plans argue that this Court is incompetent to hear their Proofs of Claim because ERISA supplants the Bankruptcy Code.   Not so. First, the Pension Plans failed to "determine" withdrawal liability as ERISA requires, therefore failing to trigger ERISA's statutory arbitration provision.   Second, even if the Pension Plans *had* properly assessed withdrawal liability (they have not), the Bankruptcy Code's claims adjudication provisions are more specific and clearly applicable than ERISA's arbitration provision, and thus the Code's dictates apply.

15.     As a threshold matter, ERISA's arbitration provision only concerns "determination[s]" of withdrawal liability "made under sections 1381 through 1399" of ERISA. 29 U.S.C. § 1401(a)(1). ERISA defines withdrawal liability as an employer's allocated UVBs

minus certain statutory adjustments. 29 U.S.C. § 1381(b)(1) ("The withdrawal liability of an employer to a plan is the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits, adjusted . . ."). To "determine" an employer's withdrawal liability under ERISA, a MEPP must compute the resources it has available to pay benefits and expenses and then subtract from that sum any vested liabilities. 29 U.S.C. § 1393(c)(A)-(B) (defining the "[*d*]*etermination* of [the] amount of unfunded vested benefits" as "the value of nonforfeitable benefits under the plan, less the value of the assets of the plan") (emphasis added).

16.     A large part of the problem here is that the Pension Plans filed 150 Proofs of Claim alleging withdrawal liability even though ***they have no UVBs***. Indeed, the Pension Plans did not predicate their Proofs of Claim on what ERISA defines as a "determination" of UVBs; thus, they did not issue a "determination" under 1401(a)(1). To the contrary, in their response to Debtors' Objection, the Pension Plans disclaimed any need to make a "determination" under Sections 1381-1399, instead arguing that the PBGC gave them license to circumvent those provisions.

17.     But again, Section 1393(c)(A)-(B) mandates that pension funds calculate UVBs by first valuing their "nonforfeitable benefits under the plan, less the value of the assets of the plan." In their Proofs of Claim, the Pension Plans did not subtract assets actually available to the plans to pay benefits—including $5.32 billion in SFA funding that eliminates their UVBs entirely.

18.     In other words, the Pension Plans argue on the merits that they need not follow the strictures of Sections 1381-1399 in calculating what they contend the Debtors owe. Nor did they seek to lift the automatic stay to assess withdrawal liability against the Debtors, or provide what ERISA requires (a calculation and payment schedule) to the Debtors. Instead, they simply filed 150 Proofs of Claim, and now (after the Debtors objected) paradoxically seek to invoke Section 1401(a)(1). But the Pension Plans cannot have it both ways: they cannot ignore Sections 1381-

1399 to manufacture withdrawal liability where no UVBs exist and baldly assert as much in 150

Proofs of Claim (using the form approved by the Bankruptcy Court), then claim to have issued a

determination under Sections 1381 through 1399 when convenient.  Because the Pension Plans

failed to "determine" withdrawal liability as ERISA requires, the Pension Plans did not and could

not have triggered Section 1401(a)(1)'s statutory arbitration provision even outside of bankruptcy.

19.     But even if the Pension Plans **had** properly made a determination and assessment

subject to Section 1401, the Bankruptcy Code controls the resolution thereof because it is far more

specifically applicable to the situation here.  *See, e.g., Rodgers v. United States,* 185 U.S. 83, 88-

89 (1902) ("[W]hen the mind of the legislator has been turned to the details of a subject, and he

has acted upon it, a subsequent statute in general terms or treating the subject in a general manner

and not expressly contradicting the original act, shall not be considered as intended to affect the

more particular or positive previous provisions, unless it is absolutely necessary to give the latter

act such a construction, in order that its words shall have any meaning at all.").

20.     The Pension Plans agree that "it is a commonplace of statutory construction that

the specific governs the general.'" *Kannikal v. Att'y Gen. U.S.,* 776 F.3d 146, 150 (3d Cir. 2015)

(*quoting Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)); ECF No. 2180 ¶¶ 18-20.

That Section 502(b)'s claims adjudication mandate applies more specifically here than ERISA is

not subject to reasonable disagreement.  The Bankruptcy Code specifically defines where

objections to Proofs of Claim should be adjudicated.  ERISA is silent on the matter, even though

the Bankruptcy Code's provisions are no secret to Congress—which clearly could have provided

otherwise in the nearly 50 years since Section 502 of the Bankruptcy Code was passed, during

which the Pension Plan's argument has been rejected by six different courts.[8]

---

[8] *See supra* ¶¶ 11-13 & n.7.

21.     In other words, this dispute concerns the allowance or disallowance of 150 specific Proofs of Claim that were voluntarily filed in these bankruptcy cases.  Only the Bankruptcy Code (and not ERISA) specifically speaks to the allowance or disallowance of proofs of claim. 11 U.S.C. § 502(b) ("Except as provided in subsections (e)(2), (f), (g), (h), and (i) of this section," if an objection to a proof of claim is asserted, a bankruptcy court "shall determine the amount of such claim" and "shall allow such claim in such amount.").  ERISA's Section 1401(a) remains loudly silent regarding the subject of this dispute: the allowance or disallowance of proofs of claim.  And Congress's refrain from modifying the clear mandate of the Bankruptcy Code when faced with a slew of authority confirming the Debtors' position tells all.  The Code is "clear and unambiguous." *In re Loewen Grp. Int'l, Inc.*, 274 B.R. 427, 433-34 (Bankr. D. Del. 2002). With respect to where a Proof of Claim filed against a bankruptcy estate is to be adjudicated, the Bankruptcy Code is categorically more specific than a statue that does not mention the issue at all.

22.     Moreover, even if one were to ignore the Bankruptcy Code's extreme specificity as to claims adjudication, the Code's clear mandate is far more specific than ERISA's text in general. Aside from formal notice requirements that the Pension Plans stridently argue (because they did not follow them) are immaterial, Section 1401(a)(1)'s generality is transparent: "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a ***determination***[9]

---

[9] Unlike CSPF, the Pension Plans realize that resting what is a threshold issue *for them* on out-of-Circuit cases in which claimants better complied with ERISA's formal notice strictures is unwise.  *Steelworkers Pension Tr. v. Renco Grp., Inc.,* 2016 WL 5173664, at *8 (W.D. Pa. Aug. 22, 2016), *report and recommendation adopted*, 2016 WL 5121803, at *1 (W.D. Pa. Sept. 21, 2016), *aff'd*, 694 F. App'x 69 (3d Cir. 2017) (acknowledging that "the notice in *El Paso* included a schedule").  Thus, the Pension Plans raise a new argument: because Section 1401(a)(1) calls for arbitration of "***determination[s]*** made under sections 1381 through 1399", ***notice*** must also be arbitrated. 29 U.S.C § 1401(a)(1) (emphasis added).  Not so.  Section 1382 clarifies that determinations and notice are distinct entities under ERISA.  29 USC § 1382(1) (mandating Pension Plan determinations); 29 U.S.C. § 1382(2) (mandating Pension Plans notice employers about determinations).  Moreover, the Third Circuit case affirming the district court case upon which the Pension Plans rely explicitly exempts the facts present here from its holding.  *Steelworkers Pension Tr. by Bosh v. Renco Grp., Inc.*, 694 F. App'x 69, 75 (3d Cir. 2017) (distinguishing itself from cases where it was "undisputed . . . that the employer requested review of its withdrawal liability" and, as Pension Plans did by filing Proofs of Claim, "cases in which the parties consented to have a federal court determine issues that may instead be arbitrable.").

made under Sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1) (emphasis added). By contrast, Section 502(b) requires that bankruptcy courts "shall determine" proofs of claim following "objection to a claim" after a "notice and a hearing" aside from over 15 enumerated exceptions (none concerning withdrawal liability).

23.     The Pension Plans do not assert otherwise. Instead, the Pension Plans argue that, because (they claim) there are more corporate bankruptcies than withdrawal liability disputes,[10] Section 1401 is somehow more specific than the language of Section 502(b) with respect to claims adjudication. Mot. ¶¶ 14-20. But that is not what the maxim that specific statutory language prevails over general refers to at all. The dispute at bar is the Debtors' objection to 150 proofs of claim, and Section 502(b) is far more specifically applicable to the Debtors' objection than ERISA.

### C.     The Federal Arbitration Act and Attendant Case Law are Irrelevant.

24.     Unable to show that the subject matter of this dispute falls outside the scope of the Bankruptcy Code's specified process for resolving claims objections, Section 502, the Pension Plans analogize to contractual arbitration clauses and the Federal Arbitration Act's ("FAA's") dictate that such contractual provisions be enforced. The Pension Plans argue that "a creditor who files a proof of claim does not, by that act alone, waive its contractual right to arbitrate a dispute."[11] But that assertion is misplaced and irrelevant where, as here, the dispute facing the Bankruptcy Court is an objection to the proofs of claim that the creditor filed.[12]

---

[10] This bald assertion appears incorrect too. There were 642 corporate bankruptcies filed in 2023, which was the largest number since 2010. *See US bankruptcies hit 13-year peak in 2023; 50 new filings in December,* S&P GLOB. MKT. INTEL. (Jan. 9, 2024), *available at* https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/us-bankruptcies-hit-13-year-peak-in-2023-50-new-filings-in-december-79967180. There will be disputes over more than 300 withdrawal liability Proofs of Claim in this chapter 11 case by itself.

[11] Mot. at 11 (citing *In re Herrington,* 374 B.R. 133, 147 (Bankr. E.D. Pa. 2007) (holding that *arbitration agreements* under the Federal Arbitration Act are enforced); *In re Rotondo Weirich Enters., Inc.*, 583 B.R. 860 (Bankr. E.D. Pa. 2018) (same); *In re Mintze*, 434 F.3d 222, 228 (3d Cir. 2006)).

[12] *See Langenkamp*, 498 U.S. at 45 ("Respondents filed claims against the bankruptcy estate, thereby bringing themselves within the equitable jurisdiction of the Bankruptcy Court. Consequently, they were not entitled to a jury trial on the trustee's preference action."); *see also* cases cited at *supra* note 4.

25.     Indeed, the Pension Plans' reference to the FAA caselaw makes clear that their Motion should be denied.  The cases upon which the Pension Plans primarily rely involve debtors initiating adversary proceedings seeking affirmative relief against contractual counterparties based on pre-petition contracts containing arbitration clauses.[13]  In those situations, some courts have held the debtors bound to the arbitration clauses in the contracts upon which their affirmative lawsuits were based and required the debtors to arbitrate those affirmative lawsuits against contract counterparties.

26.     The Pension Plans cite *zero* cases where, as they are asking the Court to do here, a bankruptcy court declined to rule on an objection to a proof of claim based on statutory provisions calling for arbitration.  The reason is simple: as the Supreme Court held in *McMahon* and the Third Circuit found in *Mintze*, even the FAA's requirement that contractual arbitration agreements be enforced gives way where "Congress intended" the dispute to be resolved outside arbitration. *Mintze*, 434 F.3d at 229 ("The FAA's mandate can, however, be overridden.  If a party opposing arbitration can demonstrate that "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue," the FAA will not compel courts to enforce an otherwise applicable arbitration agreement.") (citing *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987)).

27.     That is exactly what Congress did when it passed Section 502(b).  The provisions of Section 502(b) are not ambiguous, providing that when a proof of claim is filed and a Debtor objects, the bankruptcy court "after notice and a hearing, shall determine the amount of such claim in lawful currency . . . as of the date of the filing of the petition."  Congress could not have been

---

13 *Mintze*, 434 F.3d at 229 (adversary proceeding initiated by debtor seeking to rescind a loan agreement containing an arbitration clause); *In re Kaiser Grp. Int'l, Inc.*, 307 B.R. 449, 451-52 (D. Del. 2004) (adversary proceeding initiated by debtor challenging allegedly improper draw on a letter of credit containing an arbitration clause); *Rotondo*, 583 B.R. at 871 (adversary proceeding initiated by Debtor for breach of contract against construction counterparty who allegedly breached agreement containing arbitration clause); *Herrington*, 374 B.R. at 136 (adversary proceeding initiated by debtor related to contract containing arbitration clause).

any clearer in dictating who should resolve proofs of claim. *Cf. In re FTX Trading Ltd.*, 91 F.4th 148, 153 (3d Cir. 2024) ("Congress made plain its intention to mandate the appointment of an examiner by using the word 'shall,' as in the Bankruptcy Court 'shall' appoint an examiner if the terms of the statute have been met. 11 U.S.C. § 1104(c). The meaning of the word 'shall' is not ambiguous. It is a 'word of command,' that 'normally creates an obligation impervious to judicial discretion.' We have held that 'shall' in a statute is interpreted as 'must,' which means 'shall' signals when a court must follow a statute's directive regardless of whether it agrees with the result.") (internal citations omitted).

28.     That is why most courts addressing the clash between the FAA's preference for arbitration where provided in a pre-petition contract, and core functions of the bankruptcy court, have routinely declined to require arbitration of proofs of claim against a bankruptcy estate.[14] And

---

[14] *See, e.g., In re Payton Const. Corp.,* 399 B.R. 352, 363–64 (Bankr. D. Mass. 2009) ("A bankruptcy case is a centralized and collective proceeding for which a special court and special rules were created. These exist to facilitate the expeditious and relatively inexpensive resolution of all matters relating to a particular bankruptcy case, so as to make reorganization possible, enhance a debtor's fresh start, and, where applicable, maximize value and expedite recovery for creditors. In view of the unique and collective nature of bankruptcy cases, of the creation of this special forum for adjudication of matters in bankruptcy, and of the establishment of an elaborate body of rules for adjudication of bankruptcy-related proceedings in the Bankruptcy Court, there arises a presumption that Congress intended for the Bankruptcy Court to be the principal and usual, if not exclusive, forum for most matters in bankruptcy, and that it should be available to debtors, creditors, and the estate representatives for bankruptcy purposes. . . . The Court summarizes the above considerations as follows. The matters at issue concern the bankruptcy estate, including both a claim against it and a counterclaim to recover and liquidate certain of its assets. Congress, through the District Court, gave to the Bankruptcy Court both exclusive jurisdiction over the estate and wide jurisdiction over matters related to the bankruptcy case to facilitate the expeditious and inexpensive liquidation of estate assets and adjudication of claims against the estate. Considerations of expedience are as real and pertinent in this case as they usually are in bankruptcy liquidations. And Jalbert, the estate, and the creditors—the real parties in interest here—have not waived *their* right to a judicial determination of these matters. In view of these considerations, the Court finds that there would be an inherent conflict between arbitration and the bankruptcy laws' underlying purposes with respect to the matters at issue, and that Congress intended to preclude a waiver of judicial remedies for such matters. The motion to compel arbitration will therefore be DENIED."); *In re Johnson,* 649 B.R. 735, 750 (Bankr. N.D. Ill. 2023) (denying motion to compel arbitration as to claims against an estate) ("The Bankruptcy Code brings together various parties in interest, centralizing disputes regarding the debtor's assets and obligations. The bankruptcy court has *in rem* jurisdiction over property of the estate and the several parties in interest making claims against it. Arbitration proceedings, meanwhile, have bilateral arbitration as the prototype of the individualized and informal form protected by the FAA. While there is a contract between Johnson and SAIL, with an arbitration clause, there are strangers to that clause and that contract who are parties in interest in the bankruptcy case. The Federal Arbitration Act does not promote arbitration at the expense of strangers. The Bankruptcy Code is a unique piece of legislation in that the forum in which it is implemented is not party-specific or bilateral. . . . The Code provides a comprehensive jurisdictional structure to bankruptcy courts so that they can deal with all of the rights, interests and obligations of the varied parties who appear and seek to be

it is precisely why every single case addressing the exact situation before this Court has held that bankruptcy courts are not required to defer to arbitrators when resolving objections to proofs of claim alleging withdrawal liability. *Interco*, 137 B.R. at 997 (holding that "[n]either the provisions of ERISA, nor the established case law mandates that the bankruptcy court defer to arbitration the estimation of . . . withdrawal liability for the purpose of allowance under Section 502"); *T.D.M.A.*, 66 B.R. at 992 (holding that "a dispute concerning an employer's 'withdrawal liability'" is not "an extraordinary situation" that would require deference to "an extra-bankruptcy dispute-mechanism"); *Amalgamated Foods*, 41 B.R. at 620 ("Obeying the Congressional mandate that there be prompt resolution of ERISA withdrawal liability claims, I find and order that the debtor need not submit to arbitration in this matter."); *BFW Liquidation*, 459 B.R. at 762-78 (finding it "[n]ot [n]ecessary to [d]ecide if [a]rbitration [i]s [r]equired by the MPPAA for [w]ithdrawal [l]iability [c]laims in [b]ankruptcy"); *Cott*., 26 B.R. at 336 (same); *Bankr. Case No. 91 B 23969*, 1994 WL 673055, at *5, *10 (citing *Cott* and *Interco* and holding that "a bankruptcy court is not precluded by ERISA § 1401(a) from resolving withdrawal liability claims" and deferring to arbitration only regarding a dispute between the Pension Plan and a non-debtor parent).

---

heard.") (internal quotations and citations omitted); *In re Erwin*, 2018 WL 1614160, at *12 (Bankr. E.D.N.C. Mar. 30, 2018) ("To send both the core and non-core claims or even just to send the non-core UDTP Claim to arbitration would have a significant adverse effect upon the adjudication of these claims and upon the fundamental purposes of the Bankruptcy Code . . ..  Denying the arbitration and retaining the matters in the bankruptcy court will provide for the orderly, efficient and effective administration of the bankruptcy estate."); *In re Kiskaden*, 571 B.R. 226, 238 (Bankr. E.D. Ky. 2017) (declining to mandate arbitration of counts "directly related to the claims allowance process that congress established in the Bankruptcy Code and Rules as part of creating a single forum to resolve disputes"); *In re Yarbrough*, 2010 WL 3885046, at *4 (Bankr. M.D. Ala. Sept. 29, 2010) ("When a creditor is making a claim against the debtor, 'there is a policy interest of concentrating matters involving a debtor in one centralized and specialized forum, i.e. the Bankruptcy Court.' This policy interest creates an inherent conflict with the underlying policy of the Federal Arbitration Act, resulting in a finding in favor of keeping the proceeding in Bankruptcy Court.") (internal citation omitted); *In re Martinez*, 2007 WL 1174186, at *6 (Bankr. S.D. Tex. Apr. 19, 2007) (rejecting effort to compel arbitration of proof of claim and finding that "all objections to claim inherently derive from the Bankruptcy Code"); *In re Mirant Corp.*, 316 B.R. 234, 239–40 (Bankr. N.D. Tex. 2004) ("Section 502(b) of the Code also evidences Congress's intent to leave quantification of a claim to the bankruptcy court when a party in interest objects to the claim. This procedure for liquidation of claims against a bankruptcy estate and their allowance and disallowance is at the very heart of the bankruptcy court's function and purpose."); *cf. In re E & G Waterworks, LLC*, 571 B.R. 500, 509 (Bankr. D. Mass. 2017) (providing similar reasoning in turnover context).

29.     In sum, Congress gave this Court the responsibility to hear and resolve the Debtors'

Objection to the Pension Plans' withdrawal liability claims.  It should do so.[15]  And the Pension

Plans' detour to off-point FAA-related cases undermines rather than supports their position.

## II.     Arbitration Would Needlessly Delay the Debtors' Restructuring and Waste Estate and Judicial Resources.

30.     The Pension Plans also argue that, the Bankruptcy Code aside, the Court should

compel arbitration of the instant withdrawal liability disputes because any such proceeding would

"substantially reduce" the Pension Plans' expenses, "avoid[] delay," "promote judicial economy,"

and permit "an arbitrator with special expertise . . . to hear the case."  *See* Mot. ¶¶ 25-30 (internal

quotations omitted).  The Pension Plans are wrong on all counts.

31.     As a threshold matter, it is at best unclear whether arbitration is ever, or usually,

more efficient than litigation in the federal courts.[16]  But arbitration is rarely (if ever) more efficient

than litigation in bankruptcy courts, and the Pension Plans do not even try to explain how

arbitration could be more efficient here.  Indeed, the Court recently entered a scheduling order that

requires the parties to complete fact discovery in May, expert discovery in July, and trial in August.

Sched. Order ¶¶ 1-4.  In other words, if the Court were to deny the Pension Plans' arbitration

---

[15] It is of course true that Bankruptcy Courts sometimes permit proofs of claim to be liquidated elsewhere, for example, where any liability is going to be covered by insurance anyway (not the estate) and thus have no impact on the estate, or where any impact on the estate or creditors would be insignificant.  This dispute is the polar opposite.  Ceding jurisdiction over the MEPP Proofs of Claim to arbitrators here would cede jurisdiction over what are by far the most consequential questions to creditors and equity holders in these multi-billion-dollar chapter 11 cases.  There is no precedent for a bankruptcy court deferring to arbitration in even a remotely comparable circumstance.

[16] *See, e.g.*, Jill I. Gross, *Justice Scalia's Hat Trick and the Supreme Court's Flawed Understanding of Twenty-First Century Arbitration*, 81 BROOK. L. REV. 111, 138-39 (2015) ("[M]any scholars question the cost savings of modern arbitration. Litigation-like arbitration procedures—including extensive document and e-discovery, motion practice, and pre-and post-hearing briefs—have become far more common, driving up arbitration costs dramatically. . . . At best, the empirical evidence gathered to date is inconclusive as to whether arbitration is still less expensive than litigation."); Thomas J. Stipanowich & J. Ryan Lamare, *Living with ADR: Evolving Perceptions and Use of Mediation, Arbitration and Conflict Management in Fortune 1000 Corporations*, 19 HARV. NEGOT. L. REV. 1, 51-54, 64-65 (2014) (describing the modern commercial arbitration process as a costlier, more litigation-like process); Christopher R. Drahozal, *Arbitration Costs and Forum Accessibility: Empirical Evidence*, 41 U. MICH. J.L. REFORM 813, 840-41 (2008) (concluding that arbitration may be as costly or more costly than litigation for certain types of disputes).

motion, the parties would resolve these withdrawal liability disputes in less than six months. The Pension Plans do not even attempt to argue that any arbitration of such disputes would be completed in a similar time frame, or at a similar expense to the parties. It is highly unlikely that the 11 pension funds and the Debtors could even agree on arbitrators, and *that dispute alone* would likely require court review and decision (which might still be undecided by August).

32. Indeed, under the American Arbitration Association's rules, which most (if not all) the Pension Plans have adopted for withdrawal liability disputes, it could take months just for the parties to select arbitrators. And assuming that the parties are unable to reach agreement on the identity of arbitrator(s)—which seems inevitable—the parties would have to seek relief in federal district court, a process that could *itself* take months.[17] The upshot is that the parties may well be able to complete discovery and trial in this Court before arbitration could even begin.

33. What is worse, unlike arbitral decisions under the Federal Arbitration Act, arbitral decisions under the MPAA are appealable, and are *not* entitled to deferential review on appeal to the extent such decisions concern questions of law. *E.g.*, *SUPERVALU, Inc. v. Bd. Of Trs. Of Sw. Pa. & W. Md. Area Teamsters & Emp'rs Pension Fund*, 500 F.3d 334, 340 (3d Cir. 2007) (arbitrator's legal conclusions subject to *de novo* review). Here, the key issues driving the outcome of the Proofs of Claim are questions of law—among others, whether the Pension Plans can exclude SFA funding in calculating UVBs; whether PBGC's authority to place reasonable conditions on withdrawal liability enables PBGC to change the statutory definition of UVBs; and whether the Pension Plans can ignore ERISA's 20-year statutory cap on annual withdrawal liability payments.

---

[17] *See* Section 11 of The AAA Withdrawal Liability Rules that can be found at:
https://www.adr.org/sites/default/files/Multiemployer_Pension_Plan_Withdrawal_Liability.pdf

*See, e.g.*, Obj. ¶¶ 43-55.[18]  As such, by the time the arbitrations of these disputes were to conclude, which is unlikely to be in 2024, the losing parties would inevitably seek *de novo* review in federal court—effectively starting from scratch.  The Pension Plans do not and cannot argue that this outcome is "more efficient" or "less expensive" than simply proceeding in this Court under the agreed scheduling order.

34.     *Ceasars Entertainment Corp. v. IUOE Local 68 Pension Fund* is illustrative.  That case concerned a withdrawal liability dispute that was, by any measure, much simpler than the disputes at issue here: it involved only one employer, one pension fund, one contested question of law (how to interpret a provision of Section 1385), and the amount at stake was only $381,338— .005% of the amount at stake here.  *See* 2018 WL 3000176, at *3-4 (D.N.J. June 15, 2018).  Even so, and notwithstanding that the arbitration did not proceed past the summary judgment stage, it still took the parties nine months to obtain a decision on the merits, which the employer promptly appealed to the district court for *de novo* review.  *Id*.  From there, it took an additional fourteen months for the parties to brief, and the district court to decide, the appeal, with the district court ruling in favor of the employer and vacating the arbitrator's award.  *Id*. at *11.  Predictably, the pension fund appealed this decision to the Third Circuit, which— thirteen months later—affirmed. *See Ceasars Ent. Corp. v. IUOE Local 68 Pension Fund*, 932 F.3d 91, 98 (3d Cir. 2019).

35.     In other words, a proceeding in arbitration that involved many fewer parties, far less relevant discovery, fewer and less novel issues of law, and far less money at stake, still took 36 total months—and the final outcome was a reversal of the arbitrator's decision.  There is no reason to think, and the Pension Plans offer none, that any arbitration and inevitable appeal of the

---

[18] Indeed, both Central States and the PBGC have affirmatively argued that all of the key questions at issue are questions of law as their rationale for refusing to cooperate in good faith with any of the Debtors' discovery requests. *See* Ex. 1 (CSPF's RFP Objections); Ex. 2 (PBGC's Objections).

instant withdrawal liability disputes, which are undeniably more complex and contentious, would be any different, or take any less time. Indeed, in all likelihood, it would take considerably ***more*** time, and would come only at the (great) expense of the Debtors' restructuring efforts, which would effectively be in limbo until these disputes were resolved. The Pension Plans' arguments to the contrary are conclusory and baseless. *See, e.g.*, *In re APF Co.*, 264 B.R. 344, 364 (Bankr. D. Del. 2001) ("I am mindful of the strong federal policy favoring arbitration. However, it seems to me that particularly in a case such as this, where the parties have not commenced or requested arbitration outside of bankruptcy, this court is the most efficient and effective forum in which to resolve these fundamental Bankruptcy Code issues. The efficient resolution of claims and the conservation of the bankruptcy estate assets is an integral purpose of bankruptcy and inures to the benefit of the Debtors' creditors.").

36.     The Pension Plans' assertions about the purported "special expertise" of any arbitrators that might handle the initial disputes (subject to *de novo* review in federal court) are weaker still. As the Debtors previously explained in opposition to CSPF's motion to compel arbitration, the instant disputes turn on questions of law that ***no*** arbitrator has ever had to decide, and no arbitrator could possibly have special "expertise" regarding those questions. *See, e.g.*, Opp'n ¶ 37. Moreover, as the Debtors have also explained, to the extent any factual or other issues must be decided, including the proper calculation of the Debtors' withdrawal liability, this Court is more than capable of deciding such issues, as numerous other bankruptcy courts have done under similar circumstances. *See, e.g.*, *id*. ¶ 20 (collecting cases).

37.     For these and other reasons set forth more fully in the Debtors' opposition to CSPF's motion to compel arbitration, the Court should decline to compel arbitration in favor of the more efficient and less costly procedure to which the parties have already agreed.

**III.    The Pension Plans Have Not Shown "Cause" to Lift the Automatic Stay.**

38.    Finally, this Court should also decline to lift the automatic stay because the Pension Plans failed to show cause for any such relief.

39.    The Bankruptcy Code provides that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . for cause . . .."  11 U.S.C. § 362(d)(1).  Notably, "'cause' is not defined by § 362(d)(1)," and for that reason, Delaware courts "often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay."  *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007) (citing cases).  This balancing test is three-pronged: (1) whether any great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit; (2) whether the hardship to the non-bankruptcy party by maintenance of the stay considerably outweighs the hardship to the debtor; and (3) the probability of the creditor prevailing on the merits.  *In re Rexene Prods. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992).

40.    None of these factors supports relief from the automatic stay.  Again, this Court has already entered a scheduling order that provides for a trial to resolve these disputes (if they are not resolved beforehand) in August.  *See* Scheduling Order ¶ 4.  As set forth above, the Debtors would suffer great prejudice if they had to litigate these disputes in either piecemeal or consolidated arbitration, as such proceedings would be much less efficient and more costly than simply adhering to the parties' agreed scheduling order.  *Id.* ¶¶ 3-4.  The Pension Plans do not and cannot argue that any arbitrations would conclude in a similar time frame, and the results of any arbitrations would be subject to an effective *de novo* review in federal court anyway.  *See supra* Section II. For the same reason, the Pension Plans stand to suffer no prejudice—much less prejudice that "considerably outweighs the hardship" to Debtors—from abiding by a schedule to which they already agreed, which will produce quicker results.  The Pension Plans do not show otherwise.

41.     Nor do the Pension Plans show they have any probability of prevailing on the merits—which includes, *inter alia*, whether the Pension Plans can ignore their receipt of billions of dollars in taxpayer-subsidized funding in calculating their UVBs and the Debtors' alleged withdrawal liability; whether principles of equity, including estoppel, should preclude the Pension Plans from obtaining double recovery; and whether the Pension Plans can ignore the 20-year statutory liability cap and/or refuse to discount their withdrawal liability claims to present value. *See generally* Obj.  Instead, the Pension Plans devote only two sentences to arguing that their position on the first issue is "[o]bviously" correct, and ignore the remaining issues entirely.  *See* Mot. ¶ 43.  This does not come close to satisfying their burden.  In any event, and for the reasons set forth more fully in the Debtors' Objection and related briefing, the Pension Plans ***cannot*** show a probability of prevailing on the merits, as they improperly performed their withdrawal liability calculations, based in part on their refusal to abide by ERISA's requirements therefor, and in part on an unlawful regulation that exceeded the scope of PBGC's authority.  *See generally* Obj. ¶¶ 34-57; Debtors' Reply in Supp. of Their Obj. to Proofs of Claim by CSPF, ECF No. 2130 ¶¶ 12-20.

42.     In short, because the Pension Plans failed to show "cause" for lifting the automatic stay, and because the relevant considerations for such relief all weigh in favor of the Debtors, this Court should deny the Pension Plans' request. *See, e.g.*, *In re Trump Ent. Resorts, Inc.*, 526 B.R. 116, 121 (Bankr. D. Del. 2015) (denying lift stay request where the stay did not materially harm the movant and lifting it would impair the debtor's restructuring efforts).

## **CONCLUSION**

**WHEREFORE**, the Debtors respectfully request that this Court deny the Pension Plans' Motion to Compel Arbitration.

Dated: February 28, 2024          */s/ Peter J. Keene*
Wilmington, Delaware              Laura Davis Jones (DE Bar No. 2436)
                                 Timothy P. Cairns (DE Bar No. 4228)
                                 Peter J. Keane (DE Bar No. 5503)
                                 Edward Corma (DE Bar No. 6718)
                                 **PACHULSKI STANG ZIEHL & JONES LLP**
                                 919 North Market Street, 17th Floor
                                 P.O. Box 8705
                                 Wilmington, Delaware 19899-8705 (Courier 19801)
                                 Telephone:    (302) 652-4100
                                 Facsimile:    (302) 652-4400
                                 Email:        ljones@pszjlaw.com
                                               tcairns@pszjlaw.com
                                               pkeane@pszjlaw.com
                                               ecorma@pszjlaw.com


                                 Patrick J. Nash, P.C. (admitted *pro hac vice*)
                                 David Seligman, P.C. (admitted *pro hac vice*)
                                 Michael B. Slade (admitted *pro hac vice*)
                                 **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 300 North LaSalle
                                 Chicago, Illinois 60654
                                 Telephone:    (312) 862-2000
                                 Facsimile:    (312) 862-2200
                                 Email:        patrick.nash@kirkland.com
                                               david.seligman@kirkland.com
                                               michael.slade@kirkland.com


                                 -and-


                                 Michael Esser (admitted *pro hac vice*)
                                 John Christian (admitted *pro hac vice*)
                                 **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 555 California Street
                                 San Francisco, California 94104
                                 Telephone:    (415) 439-1400
                                 Facsimile:    (415) 439-1500
                                 Email:        michael.esser@kirkland.com
                                               john.christian@kirkland.com


                                 *Co-Counsel for the Debtors and Debtors in Possession*