**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| YELLOW CORPORATION, et al., | ) | |
| | ) | Lead Case No. 23-11069 (CTG) |
| Debtors. | ) | |

**NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND RETIREMENT FUND, ROAD CARRIERS LOCAL 707 PENSION FUND, TEAMSTERS LOCAL 641 PENSION FUND, WESTERN PENNSYLVANIA TEAMSTERS AND EMPLOYERS PENSION FUND, MANAGEMENT LABOR PENSION FUND LOCAL 1730 INTERNATIONAL ASSOCIATION OF MOTOR CITY MACHINISTS PENSION FUND, MID-JERSEY TRUCKING INDUSTRY & TEAMSTERS LOCAL 701 PENSION AND ANNUITY FUND, TEAMSTERS LOCAL 617 PENSION FUND, TRUCKING EMPLOYEES OF NORTH JERSEY PENSION FUND, AND FREIGHT DRIVERS AND HELPERS 557 PENSION FUND'S
REPLY IN SUPPORT OF THEIR MOTION TO COMPEL ARBITRATION OF WITHDRAWAL LIABILITY DISPUTES, OR ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY TO INITIATE ARBITRATION**

The Funds,[1] by and through undersigned counsel, file this reply in support of their motion to compel arbitration, or, alternatively, for relief from the automatic stay to initiate arbitration. ("Motion to Compel," Dkt. 2180).

## INTRODUCTION

As set forth in the Funds' Motion to Compel, Debtors' Second Omnibus Objections ("Omnibus Objections") (Dkt. 1962) relate exclusively to the determination and calculation of multiemployer pension plan withdrawal liability, and, therefore, should be resolved in arbitration

---

[1] The "Funds" are ten multiemployer pension plans: New York State Teamsters Conference Pension and Retirement Fund, Road Carriers Local 707 Pension Fund, Teamsters Local 641 Pension Plan, Western Pennsylvania Teamsters and Employers Pension Fund, Management Labor Pension Fund Local 1730, International Association of Machinists Motor City Pension Fund, Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund, Teamsters Local 617 Pension Fund, Trucking Employees of North Jersey Pension Fund, and Freight Drivers and Helpers 557 Pension Fund.

before a specialized arbitrator, not in a bankruptcy court.  Debtors' Opposition (Dkt. 2438) fails to meaningfully rebut the points made in the Funds' Motion to Compel.  Instead, in their Opposition, Debtors: (i) ignore many of the Funds' arguments and cases; (ii) continue to rely on cases that are no longer good law under Third Circuit precedent; (iii) cite out-of-circuit cases at variance with Third Circuit precedent, without disclosing the irrelevance of their citations; (iv) cite old case law of this Court without disclosing that it has been expressly repudiated by the Third Circuit; (v) baselessly imply that the federal judiciary's own statistics about case filings are wrong; and (vi) despite having argued that the Court should not order multiple arbitrations because the risk of inconsistent judgments could prejudice the estates, now threaten that, if ordered to arbitrate, they will refuse to consent to a single arbitrator, thereby creating the same problem they told the Court they wanted to avoid in an attempt to frustrate an orderly arbitration.  The Funds' Motion to Compel should be granted, as arbitration is the proper way to resolve the Omnibus Objections.

## ARGUMENT

**I.    Debtors' Arguments That the Dispute Over Withdrawal Liability Does Not Fall Within the Scope of MPPAA's Mandatory Arbitration Provision Are Wrong.**

1.      MPPAA mandates that ***any*** disputes regarding the determination and calculation of withdrawal liability be resolved through arbitration. *See* 29 U.S.C. § 1401(a)(1) ("***Any dispute*** between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title ***shall*** be resolved through arbitration.") (emphasis added).

2.      Debtors' Omnibus Objections to the Funds' withdrawal liability proofs of claim raise numerous issues under Sections 1381 through 1399.  *See, e.g.*, Motion to Compel, ¶ 10. Debtors nevertheless raise meritless arguments that their challenges to the Funds' withdrawal liability proofs of claim fall outside MPPAA's mandatory arbitration provision.

3.      *First*, Debtors argue, without citing a single case, that, because they do not believe the Funds properly applied Sections 1381 through 1399, arbitration is not required.  *See* Opposition, ¶¶ 15-18.  But the entire point of mandatory arbitration for disputes regarding those sections is to provide a specialized forum for employers to raise challenges regarding the proper application of the provisions in Sections 1381 through 1399.  Debtors' interpretation would render MPPAA's mandatory arbitration provision a nullity.

4.      Nor is it true that the Funds failed to make any determination covered by Sections 1381 through 1399 or that they "disclaimed any need to make a 'determination' under Sections 1381-1399, instead arguing that the PBGC gave them license to circumvent those provisions." Opposition, ¶ 16.  The binding regulations issued by the Pension Benefit Guaranty Corporation ("PBGC") dictated how the Funds applied certain aspects of their determinations under Sections 1381 through 1399.  But that does not mean that no such determinations were made.

5.      Nor does it make any sense—legally or factually—for Debtors to argue that there cannot be arbitration because there (purportedly) are "no UVBs."  Opposition, ¶ 16.  A dispute over unfunded vested benefits is an archetypical example of a dispute governed by MPPAA's mandatory arbitration provision.  *See* 29 U.S.C. §§ 1391(a) ("The amount of the unfunded vested benefits allocable to an employer that withdraws from a plan shall be determined in accordance with subsection (b), (c), or (d) of this section."); § 1401(a)(1) ("Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections ***1381 through 1399*** of this title shall be resolved through arbitration.") (emphasis added).  Moreover, Debtors are simply wrong that there are "no UVBs," regardless of whether the Special Financial Assistance ("SFA") the Funds received from the government is excluded from the

3

determination of UVBs.  *See* Dkt. 2224, ¶ 29 (explaining that the Funds still have **billions** of dollars

of UVBs, "even counting the SFA").

6.      *Second*, in a footnote, Debtors claim that "[u]nlike [Central States], the Pension

Plans realize that resting . . . on out-of-Circuit cases" like *Chicago Truck Drivers v. El Paso Co.*,

525 F.3d 591, 598 (7th Cir. 2008)—for the proposition that filing a proof of claim, even without a

separate payment schedule, satisfies MPPAA's requirement for a notice and demand for

payment—"is unwise."  Opposition, ¶ 22, n.9.  Once again, Debtors have it backwards:  far from

shying away from *El Paso*, *El Paso* was the only case in the Funds' Motion to Compel that was

highlighted in a block quote.  *See* Motion to Compel, ¶ 13.

7.      Debtors wrongly imply that *El Paso* is not the law in the Third Circuit, mistakenly

based on a Western District of Pennsylvania decision where the court actually held that it could

*not* resolve whether a proof of claim satisfied MPPAA's notice and demand for payment

requirement because that issue was subject to arbitration.  *Steelworkers Pension Tr. v. Renco Grp.*,

2016 WL 5173664, at *8 (W.D. Pa. Aug. 22, 2016) ("whether the notice and demand in a Chapter

11 bankruptcy must include a schedule of payments, concern[s] compliance with Section 1399,

and thus, [is] subject to arbitration"), *report and recommendation adopted*, 2016 WL 5121803

(W.D. Pa. Sept. 21, 2016), *aff'd*, 694 F. App'x 69 (3d Cir. 2017) (holding that "whether the Trust

served statutorily sufficient notice of its demand for withdrawal liability" by filing proofs of claim

in bankruptcy is "governed by section 1399(b) . . . " and, accordingly, is subject to arbitration).

8.      Moreover, *Steelworkers Pension Tr.* favorably cited *El Paso* for the proposition

that "schedules serve little purpose where the recipient is in bankruptcy, where the bankruptcy

court can ultimately set its own schedule."  2016 WL 5173664, at *8.  While the *Steelworkers

Pension Tr.* went on to note, in dicta, that "the notice in *El Paso* included a schedule, which is not

the case here," the court was discussing the issue in the context of a multiemployer plan arguing that the employer had waived its right to arbitration—and, therefore, any resolution on the merits—by not timely responding to the proofs of claim, which is not at issue here. *See id.* Debtors do not rebut the reasoning of *El Paso* or cite a single contrary case.

9.      In any event, Debtors fail to acknowledge that many of the Funds' proofs of claims went above and beyond by including payment schedules, even though they are not required as a matter of law in a bankruptcy proof of claim and because Debtors are in default. *See, e.g.*, Claim No. 16895 at 4 ("Calculated Payment Schedule"); Claim. No. 17320 at 9 ("ESTIMATED Payment Schedule"); Claim No. 14941 at 19 ("Withdrawal Liability Payment Schedule"). *See also* Dkt. 2224, ¶ 33 ("Indeed, the statutory provision which contains the 20-year cap makes clear that the entire exercise of setting annual payments, to which the 20-year cap then applies, is inapplicable in the event of a default.").

10.      *Third*, Debtors wrongly claim that the Third Circuit "explicitly exempts the facts present here," Opposition, ¶ 22 n.9, from its holding that "whether the Trust served statutorily sufficient notice of its demand for withdrawal liability" by filing proofs of claim in bankruptcy is "governed by section 1399(b) . . . " and, accordingly, is subject to arbitration. *Steelworkers Pension Tr.*, 694 F. App'x at 74. *First*, Debtors claim that the Third Circuit's opinion does not apply where the "employer requested review of its withdrawal liability." Opposition, ¶ 22 n.9 (quoting *Steelworkers Pension Tr.*, 694 F. App'x at 75). But the Third Circuit created no such carveout; rather it discussed that issue in the context of explaining that a dispute about whether an arbitration demand was timely filed under Section 1401(a)(1)'s deadlines, rather than a dispute under Sections 1391 through 1399, may not be arbitrable. *See Steelworkers Pension Tr.*, 694 F. App'x at 74-75. *Second*, Debtors claim that the Third Circuit created a carveout for "as Pension

Plans did by filing Proofs of Claim, 'cases in which the parties consented to have a federal court determine issues that may instead be arbitrable.'"  Opposition, ¶ 22 n.9 (quoting *Steelworkers Pension Tr.*, 694 F. App'x at 75).  But the Third Circuit did not hold that arbitration was not appropriate where proofs of claim had been filed, as the Third Circuit repeatedly discussed the fact that proofs of claim had been filed and nevertheless ordered that the case must proceed in arbitration.  *See, e.g.*, *Steelworkers Pension Tr.*, 694 F. App'x at 72 ("The Trust submitted Proofs of Claim for withdrawal liability of over $86 million to the court-approved Claims and Noticing Agent in the RG Steel Bankruptcy on September 24, 2012.").

## II.  Debtors' Arguments That the Bankruptcy Code Prohibits Withdrawal Liability Disputes From Being Arbitrated Are Wrong.

11.  Debtors do not dispute that "[a]t least two cased cited by Debtors confirm that bankruptcy courts, at a minimum, have the discretion to allow objections to claims regarding withdrawal liability to be resolved in arbitration."  Motion to Compel, ¶ 15 (citing *In re BFW Liquidation, LLC*, 459 B.R. 757, 784 (Bankr. N.D. Ala. 2011); *In re Interco Inc.*, 137 B.R. 993, 997 (Bankr. E.D. Mo. 1992)).  As the Funds' Motion to Compel pointed out, in Debtors' briefing against Central States, "[r]ather than acknowledge these holdings, Debtors merely note[d] that the courts did not hold that withdrawal liability issues ***must always be*** resolved in arbitration."  Motion to Compel, ¶ 16 (emphasis added).

12.  In their Opposition, Debtors again conflate the issue of whether withdrawal liability arbitrations are mandated with whether they are allowed.  As a result, Debtors cite *In re Interco* as the first case in the body of their brief after arguing that Section 502 mandates that bankruptcy courts resolve withdrawal liability disputes, even though it held that bankruptcy courts have the discretion to send such disputes to arbitration.  *See* Opposition ¶¶ 10-12; *In re Interco Inc.*, 137 B.R. 993, 997 (Bankr. E.D. Mo. 1992) ("The key issue to be addressed in this determination is

whether deferral of this matter to arbitration would unduly delay administration of these bankruptcy cases. Undue delay is not defined by the Code; rather, it is a problem 'whose solution ultimately rests on the ***exercise of judicial discretion*** in light of the circumstances of the case, particularly the probable duration of the liquidation process as compared with the future uncertainty due to the contingency in question.'") (emphasis added).

13.     Rather than confront their own directly-on-point case law against their position, Debtors present a series of meritless positions similar to those they presented against Central States.  Because the Funds correctly anticipated that Debtors would take many of the same positions here, the Funds already explained why those positions were incorrect.  Debtors' responses to the Funds' arguments, where made at all, are not persuasive.

14.     *First,* Debtors claim that "[i]t remains undisputed that, by filing a proof of claim against a bankruptcy estate, a creditor submits its claim to the bankruptcy court's jurisdiction . . . ." Opposition, ¶ 9.  In support of this argument, they simply cite the same cases the Funds already pointed out do not "pertain[] to arbitration."  *See* Motion to Compel, ¶ 23.

15.     Later in their brief, Debtors acknowledge that the Funds cited case law holding that filing a proof of claim is not a waiver of the "right to arbitrate a dispute."  *See* Opposition, ¶ 24; Motion to Compel ¶ 23 (both citing *In re Herrington*, 374 B.R. 133, 147 (Bankr. E.D. Pa. 2007)). Debtors, however, argue that *In re Herrington* does not apply "where, as here, the dispute facing the Court is an objection to the proofs of claim that the creditor filed" rather than an "adversary proceeding[] seeking affirmative relief . . . ."  Opposition, ¶¶ 25-26.  But *In re Herrington* itself rejected this exact distinction, holding in the context of an adversary proceeding that: "Wells Fargo has not waived any contractual arbitration rights simply by filing its claim in this chapter 13 case. ***Nor would an objection to the proof of claim be per se non-arbitrable***."  *In re Herrington*, 374

B.R. at 147 (citing *In re Transp. Assocs., Inc.*, 263 B.R. 531, 535 (Bankr. W.D. Ky. 2001)) (emphasis added).  Debtors cite no contrary case law.

16.    *Second*, Debtors invoke the principle "of statutory construction that the specific governs the general."  Opposition, ¶ 20 (quoting *Kannikal v. Att'y Gen. U.S.*, 776 F.3d 146, 150 (3d Cir. 2015)).  In this respect, they then assert that the Bankruptcy Code "is far more specifically applicable" than MPPAA's mandatory arbitration requirement, a point they claim "is not subject to reasonable disagreement" because "[o]nly the Bankruptcy Code (and not ERISA) specifically speaks to the allowance or disallowance of proofs of claim."  Opposition, ¶¶ 19-21.  But so too, only MPPAA specifically speaks to the resolution of disputes regarding withdrawal liability.

17.    Debtors also claim that "Section 1401(a)(1)'s generality is transparent" because it applies to "[a]ny dispute" regarding a determination made under Sections 1381 through 1399 of MPPAA.  Opposition, ¶ 22.  But Debtors offer no meaningful response to the Funds' argument that the Bankruptcy Code applies to a far broader class of disputes: "disputes over claims of virtually any kind filed in connection with the approximately 17,000 corporate bankruptcies each year."  Motion to Compel, ¶ 19.  Debtors merely quibble with the statistics the Funds cited as to the number of business bankruptcies each year, baselessly suggesting that it "appears" that the Administrative Office of the United States Courts' statistics about case filings are inaccurate.  *See* Opposition, ¶ 24 & n.10; Motion to Compel, ¶ 19 & n.4 (citing Administrative Office of the U.S. Courts, *Bankruptcy    Filings    Rise    13    Percent*    (Oct.    26,    2023), https://www.uscourts.gov/news/2023/10/26/bankruptcy-filings-rise-13-percent).  The sole basis for Debtors' meager attempt to impugn the integrity of the federal judiciary is a news article from a private credit rating agency, which Debtors fail to disclose makes clear that it did not count all business bankruptcies, but only those of "public companies or private companies with public debt"

that had also certain asset minimums.  *See* S&P Glob. Mkt. Intel., *US bankruptcies hit 13-year peak in 2023; 50 new filings in December* (Jan. 9, 2024), https://www.spglobal.com/marketintelligence/en/news-insights/latest-newsheadlines/us-bankruptcies-hit-13-year-peak-in-2023-50-new-filings-in-december-79967180; Opposition, ¶ 24 & n.10.[2]

18.    In any event, Debtors ignore the Funds' observation that "the Supreme Court has rejected Debtors' argument that the term 'shall' in a statute assigning responsibility to the federal courts to adjudicate a specific type of claim overrides a statutory provision generally requiring arbitration."  *See* Motion to Compel, ¶ 20; *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227-28 (1987) (rejecting argument that the Securities and Exchange Act, which provided that the "[t]he district courts of the United States . . . shall have exclusive jurisdiction over violations of this title . . . and all suits . . . brought to enforce any liability or duty created by this title . . . ," overrode the Federal Arbitration Act's provision mandating the enforcement of arbitration agreements).  Instead, Debtors mention *McMahon* only once, later in their brief, merely for the proposition that the Supreme Court acknowledged that another statute could "override[]" mandatory arbitration if "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue."  *See* Opposition, ¶ 26.  In doing so, Debtors ignore that the Supreme Court found "no basis for concluding that Congress intended to prevent enforcement of agreements

---

[2] Debtors also state that "[t]here will be disputes over more than 300 withdrawal liability Proofs of Claim in this chapter 11 case by itself."  Opposition, ¶ 23 n.10.  Debtors ignore, that, as the Funds have already explained, "many of the Funds have filed the same proofs of claim against each of the Debtors" as "a result of ERISA's controlled group rules, which make affiliated companies jointly and severally liable for withdrawal liability."  Dkt. 2224, ¶ 60 n.4.  Nevertheless, without addressing the Funds' explanation for this ordinary multiplicity of claims, Debtors continue to repeat the overall number of proofs of claim filed, without any explanation of its relevance.  *See, e.g.*, Opposition, ¶¶ 1, 5, 7 n.4, 10, 16, 18, 19, 21, 23 & n.10.

to arbitrate" even where, as here, a statute provided that the federal courts "shall" resolve a particular category of disputes.  *See McMahon*, 482 U.S. 220 at 242; Motion to Compel, ¶ 20.

19.     Debtors cite a case that has nothing to do with arbitration, *In re Loewen Grp..* for the proposition that Section 502 is "clear and unambiguous."   Opposition, ¶ 21 (quoting *In re Loewen Grp. Int'l, Inc.*, 274 B.R. 427, 433-34 (Bankr. D. Del. 2002)).   While *In re Loewen Grp.* is of no relevance, it is worth noting that Debtors failed to disclose that, as shown below, *In re Loewen Grp.* is red-flagged on Westlaw (the database Debtors apparently used to conduct their research given the numerous "WL" citations) because the Third Circuit subsequently disagreed with *In re Loewen Grp.* on this exact point.  *See In re Oakwood Homes Corp.*, 449 F.3d 588, 601 (3d Cir. 2006) ("We reject, as detailed above, the *Loewen* court's baseline conclusion that 11 U.S.C. § 502(b) is clear and unambiguous. We decline to follow the approach of *Loewen*."):

🚩 **In re Loewen Group Intern., Inc.** 🖙
United States Bankruptcy Court, D. Delaware.  ·  February 19, 2002  ·  274 B.R. 427   (Approx. 30 pages)

**Document**    Filings (1)    Negative Treatment (6)    History (6)    Citing References (243) ▾    Table of Authorities

☰                                                                🔍  ☐ **Go**

**Synopsis**

🚩 Declined to Follow by In re Oakwood Homes Corp., 3rd Cir.(Del.), June 9, 2006

📄 Original Image of 274 B.R. 427 (PDF)

20.     Finally, Debtors evidently concede that "[d]espite [their] putative position that the Court cannot compel arbitration of its Omnibus Objections consistent with the Bankruptcy Code . . . they did not dispute that the Court plainly has the authority to lift the automatic stay to allow arbitration to proceed, if the requirements of Section 362(d) are met."  *See* Motion to Compel, ¶ 37.  *See also infra* at ¶¶ 38-40.

**III.     The Issues Raised by the Omnibus Objections Should be Resolved by an Arbitrator.**

21.     Debtors argue that, even if the Court had the authority to order that the issues raised by the Omnibus Objections be resolved in arbitration, it should not do so because—as set forth in the title of Section II of Debtors' Opposition—"Arbitration Would Needlessly Delay the Debtors' Restructuring and Waste Estate and Judicial Resources."  Opposition, p. 15.  Yet, Debtors' Opposition never even directly addresses two of these three issues: "Judicial Resources" and "Delaying the Debtors' Restructuring."

22.     *First*, the Funds' Motion to Compel made the point, supported by Third Circuit precedent, that "having an arbitrator address . . . the merits and, as Debtors foretell, 'discovery' fights . . . would clearly promote 'judicial economy' by preserving the Court's resources."  Motion to Compel, ¶ 27.  Debtors never directly respond to this point.  While Debtors observe that questions of law could be reviewed "de novo" in federal court, *see* Opposition, ¶ 33, *infra* at ¶ 37, Debtors' challenges go well beyond purely legal arguments.  *See, e.g.*, *infra* at ¶ 30.  Moreover, judicial resources would clearly still be preserved by an arbitrator (who is experienced in the minutia of withdrawal liability disputes) resolving discovery disputes, holding a hearing, evaluating expert testimony, making factual findings—which Debtors concede is necessary for them to even attempt to show that, under their legal theory, there are no unfunded vested benefits, *see* Opposition, ¶ 1 n. 3—and writing a thorough and reasoned opinion.  These are the same core functions that trial courts perform every day, dramatically reducing the burden on appellate courts.  The same is true here, and, despite the heading in their brief about "Judicial Resources," Debtors do not contend otherwise.

23.     Debtors also fail to respond to the Funds' observation that, "[i]n the event that the Court does not order arbitration, it would need to rule on PBGC's objections to the Court's

11

jurisdiction, likely either forcing Debtors to initiate a separate lawsuit in district court under the APA that they could have filed months ago or positioning PBGC to file an appeal in district court of the Court's procedural decision."  Motion to Compel, ¶ 44 n.8 (citing PBGC filings indicated their intent to appeal if the Court rules against their positions).  This would cause further judicial resources to be expended, regardless of the outcome.  Moreover, ruling against PBGC's objections to the Court's jurisdiction would cast a pall of uncertainty over the Court's proceedings, with the possibility that the Court's efforts would be nullified by a procedural ruling on appeal about the scope of the Court's authority.  While the issue PBGC has raised is a thoughtful one, Debtors' response is not.  *See, e.g.*, Dkt. 2276 at ¶ 8, Dkt. 2451 at p. 1, 9, ¶¶ 3, 9 (Debtors calling PBGC "arrogant" and accusing it of "extreme administrative overreach" for asking to "be heard at the omnibus hearing on March 6, 2024," which Debtors' counsel does not dispute having apparently "suggested" in the first place, deriding PBGC's positions as "peculiar and flat-out frivolous" and "independently absurd," and accusing PBGC of trying "to hide the sausage-making").

24.     *Second*, while, as discussed below, Debtors make unpersuasive arguments regarding the efficiency and length of an arbitration, Debtors do not and cannot offer any argument that, even if the arbitration took longer than the parties' existing Scheduling Order, it would "Delay the Debtors' Restructuring."

25.     Debtors cannot show—and make no attempt to show—that if the arbitration is not completed by August 2024 it will delay their restructuring.  Other major issues remain outstanding.  For example, Debtors are pursuing affirmative litigation seeking in excess of $137 million in the United States District Court for the District of Kansas, with an anticipated twelve-day trial that will not be set until "after the court rules on dispositive motions," which are not due until July 26, 2024.  *See Yellow Corp., et al. v. International Brotherhood of Teamsters, et al.*, Case No. 6:23-

cv-01131-JAR-ADM, Dkt. 21, ¶ 34, Dkt. 82 at 2, 9 (D. Kan. July 19, 2023 and Dec. 7, 2023).[3]

Debtors also recently answered a class action adversary complaint regarding alleged WARN Act

violations. *See Coughlen v. Yellow Corp., et al.*, Case No. 1:23-AP-50761, Dkt. 4 (Bankr. D. Del.

Feb. 7, 2024). Moreover, the United States recently filed a proof of claim in excess of $2 billion

related to environmental liabilities. *See* Claim No. 19,438.

26.      Debtors' conduct is at odds with their claim to be in a rush to have their withdrawal

liability issues resolved. For example, after objecting to Central States' withdrawal liability proofs

of claim on December 8, 2023, *see* Dkt. 1322, Debtors waited nearly two months, until January

26, 2024, to file nearly identical objections to the Funds' withdrawal liability proofs of claim, *see*

Dkt. 1962—and only did so then, so that they could, literally moments later, file an opposition to

Central States' motion to compel arbitration that argued: because Debtors "*already* objected to . .

. these claims . . . [r]eferring each of these disputes to . . . different arbitrators . . . would . . . cause

extensive and unnecessary disruption to the Debtors' chapter 11 cases" and "[p]lunge the . . .

[p]roceedings [i]nto [c]haos." Dkt. 1965 at p. 18, ¶ 32 (emphasis added). Of course, now that the

problem of piecemeal arbitration has been solved by the Funds' and Central States' cooperation,[4]

Debtors now state that they actually *prefer* piecemeal arbitration and the attendant delay and

inefficiency to a single arbitrator. *See infra* at ¶¶ 31-32; Opposition, ¶¶ 7 n.4, 31-32. And Debtors

*still* have not objected to what they have described as "the remaining sets of several hundred MEPP

---

[3] While several of the Funds cover Teamsters union employees, the Funds are separate and
legally distinct entities that are not implicated in any of the allegations in Debtors' Amended
Verified Complaint against the International Brotherhood of Teamsters. *See generally id.*, Dkt.
21.

[4] The Funds and Central States are working to develop a long list of arbitrators acceptable to each
of them, and are prepared to move expeditiously with the selection of a single arbitrator for all of
their withdrawal liability claims. Debtors show no signs of any similar willingness to move
promptly to pick an arbitrator.

claims, which also present largely overlapping issues," which they told the Court—in connection

to their opposition to Central States' motion to compel arbitration—that they would do "prior to

February 14, 2024."  Dkt. 1965, ¶ 32 n.15.

      27.     *Third*, with respect to efficiency and the parties' resources, Debtors argue that, "[a]s

a threshold matter, it is at best unclear whether arbitration is ever, or usually, more efficient than

litigation in the federal courts."  Opposition, ¶ 31.  In doing so, Debtors ignore the Third Circuit

precedent repeatedly cited by the Funds—specifically addressing withdrawal liability disputes—

holding that arbitrations are more efficient, in favor of law review articles that say nothing about

withdrawal liability.  *See, e.g.*, Motion to Compel, ¶ 9 ("The Third Circuit has explained that the

purposes of the arbitration requirement include that it: (i) 'substantially reduces the expenses

incurred by multiemployer plans'; (ii) 'promotes judicial economy'; (iii) avoids 'delay'; and (iv)

allows for resolution by arbitrators with 'special' 'expertise.' *See Flying Tiger Line v. Teamsters*

*Pension Tr. Fund of Philadelphia*, 830 F.2d 1241, 1248-49, 1252 (3d Cir. 1987).");  Opposition, ¶

31 n.16.

      28.     Next, Debtors argue, with no authority, that "arbitration is rarely (if ever) more

efficient than litigation in bankruptcy courts."  Opposition, ¶ 31.  Once again, Debtors simply

ignore the directly-on-point case law to the contrary cited by the Funds.  *See In re BFW*, 459 B.R.

at 797 (relying on *Flying Tiger Line* to order that withdrawal liability claims be resolved by an

arbitrator rather than a bankruptcy court, explaining that Congress intended "the MPPAA

arbitration provisions to be the preeminent method for resolving withdrawal liability disputes

because it believed them to constitute the most expeditious and economical method for resolving

those disputes");  Motion to Compel, ¶ 25.  Debtors also ignore this Court's own case law, cited by

the Funds, holding that arbitration "often results in a quicker and more economic resolution of

claims" than "the bankruptcy process," which "favor[s] arbitration." *In re GWI*, 269 B.R. 114, 118-19 (Bankr. D. Del. 2001).  *See also* Dkt. 1329, ¶¶ 3-4 (Debtors advocating for the use of alternative dispute resolution in order to, *inter alia*, "minimize[e] expenses for all interested parties (including the Debtors)," "avoid the delay and expenses associated with protracted litigation," and "promote the early resolution of [claims]").

29.    While ignoring *Flying Tiger Line*, *In re BFW* and *In re GWI*, Debtors rely on a single decision of this Court that is plainly distinguishable—for reasons that Debtors already explained to the Court, but now ignore.  In their Opposition to Central States' Motion to Compel Arbitration, Debtors argued that "[r]eferring each of these disputes to 20 different arbitrators . . . would . . . cause extensive and unnecessary disruption the Debtors' chapter 11 cases" by, *inter alia*, creating "the risk of inconsistent rulings."  *See* Dkt. 1965, ¶ 32.  In making that argument, Debtors explained that this Court held, in *In re APF Co.*, that "staying the subject adversary proceeding in favor of arbitration [would] seriously jeopardize[] Bankruptcy Code Objectives," including "preservation of the Debtors' estate by . . . requiring [the expenditure of] limited resources and energies pursuing similar cases in several geographically diverse fora."  Dkt. 1965, ¶ 32 (quoting *In re APF Co.*, 264 B.R. 344, 364 (Bankr. D. Del. 2001)).  *See also In re APF Co.*, 264 B.R. at 364 (explaining that the "fragmentation of this adversary proceeding" which would "resolve only those claims which are based on contracts that happen to contain arbitration clauses will result in piecemeal litigation," would not be "in the bests interests of either party").  Debtors have now excised those portions of the *In re APF* decision from their briefing and suggest that it stands for the general proposition that arbitration is inefficient and expensive in the bankruptcy context (which it does not).  *See* Opposition, ¶ 35.

30.    Debtors purport to incorporate by reference their "opposition to [Central States]'s motion to compel arbitration," claiming that "the instant disputes turn on questions of law that ***no*** arbitrator has ever had to decide, and no arbitrator could possibly have special 'expertise' regarding those questions."  Opposition, ¶ 36.  The Funds already responded to these arguments, including by:

(a) Disproving, with case law, Debtors' claim that no arbitrator has dealt with questions about whether there are any UVBs or whether estoppel applies; Motion to Compel, ¶ 31;

(b) Pointing out that Debtors' claim that they are pursuing purely legal issues is "belied by Debtors' own Omnibus Objections which, for example, assert that 'the Pension Plans' calculations are not entirely clear and the Debtors will need discovery to fully understand the claims,' after which Debtors will rely on 'expert discovery,' including to 'establish the appropriate discount rate,' and 'will be prepared to prove at trial, that based on a rational set of economic assumptions, the Pension Plans actually had either ***zero*** or close to zero UVBs as of the Petition Date . . . .'" Motion to Compel, ¶ 29; and

(c) Identifying multiple issues raised by the Omnibus Objections, including the reasonableness of assumptions, that "fall within areas Congress designated for arbitration and are within the expertise of arbitrators."  Motion to Compel, ¶ 32.

Debtors offer no response to the Funds' arguments in this regard beyond the conclusory opinion that they are "weaker still" than the Funds' arguments about the efficiency of arbitration.  *See* Opposition, ¶ 36.

31.    Unable to muster a legal argument against arbitration, Debtors argue that arbitration will be less efficient, only because they seem determined to do everything in their power to make

it less efficient.  In particular, Debtors state that it "is unlikely" they will "agree[] to a single arbitrator" to hear all the withdrawal liability claims and that, even if they did, "the parties would still be haggling over the identity of any arbitrator(s) in August 2024 when, under this Court's Scheduling Order, the parties would otherwise be trying this case."  *See* Opposition, ¶ 7 n.4; *id.* ¶¶ 31-32 ("It is highly unlikely that the 11 pension funds and the Debtors could even agree on arbitrators, and that dispute alone would likely require court review and decision (which might still be undecided by August). . . . [A]ssuming that the parties are unable to reach agreement on the identity of arbitrator(s)—which seems inevitable—the parties would have to seek relief in federal district court, a process that could ***itself*** take months.").

32.      As an initial matter, Debtors need not consent to a single arbitrator, as the Court can and should order it given that Debtors have also objected to piecemeal arbitration.  *See* Dkt. 1965, ¶ 42 ("[T]he Debtors would suffer great prejudice if these withdrawal liability disputes were to proceed in separate, parallel arbitrations" that "would subject the Debtors to the risk of conflicting judgments.").  Debtors identify no prejudice from a single arbitrator, as opposed to multiple arbitrators.

33.      As for Debtors' claim that it "seems inevitable" that "the parties would have to seek relief in federal district court" to select an arbitrator, Opposition, ¶ 32, that has occurred only in rare cases, generally where the parties have behaved poorly.  *See, e.g.*, *Gen. Elec. Co. v. Boilermaker-Blacksmith Nat'l Pension Tr.*, No. 19-2780-EFM, 2020 WL 3455198, at *1 (D. Kan. May 28, 2020) (appointing withdrawal liability arbitrator after the parties engaged in "petty squabbling" and the defendant reneged on its willingness to agree to an arbitrator it had previously proposed).  Further, the Funds are willing for this Court to hear any dispute over the appointment, and to resolve any dispute over the selection, of such single arbitrator.

34.     The Funds agreed, in good faith, to a joint scheduling order ("Scheduling Order," Dkt. 2195) with Central States and Debtors, so that the objections to their claims could move forward regardless of whether they are resolved in Bankruptcy Court or arbitration.  The parties agreed, and the Court ordered, that "[a]ll rights of all parties with respect to demanding arbitration are reserved and neither the Parties' agreement to this Order nor the Court's entry thereof shall prejudice any Party with respect to the pending and anticipated arbitration motion."  *See id.* n.2. Disregarding this agreement (framed in language Debtors proposed) and the Court's order, Debtors now repeatedly argue that the Scheduling Order should preclude arbitration.  *See, e.g.*, Opposition, ¶ 40 ("[T]his Court has already entered a scheduling order . . . [T]he Pension Plans stand to suffer no prejudice . . . from abiding by a schedule to which they already agreed . . . ."); ¶ 33 ("The Pension Plans do not and cannot argue that this outcome is 'more efficient' or 'less expensive' than simply proceeding in this Court under the agreed scheduling order.").

35.     As their only evidence that an arbitration would be slower and more expensive, Debtors cherry pick a random withdrawal liability dispute that they claim "took 36 total months" to resolve.  *See* Opposition, ¶ 34.  Not only is this example cherry-picked and of no relevance, but it is an apples-to-oranges comparison for several reasons, including: (i) discovery has already commenced in this case; (ii) the apparent principal source of the delays were in district court and at the Third Circuit; and (iii) the American Arbitration Association rules, which Debtors rely on, provide that an arbitration "award shall be made promptly by the Arbitrator and, unless otherwise agreed to by the parties, no later than 30 days from the date of the closing of the hearings . . . ." American Arbitration Association, *Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes*, § 36 (Jan. 1, 2020).[5]  MFN, in its Joinder, otherwise addressed *infra* at ¶¶ 48-

---

[5] https://www.adr.org/sites/default/files/Multiemployer_Pension_Plan_Withdrawal_Liability.pdf

54, engages in a similarly arbitrary exercise with a "Sample List" of arbitration timelines that is an even more egregious apples-to-oranges comparison since it starts counting on the "Date of Withdrawal Liability Assessment," which is the equivalent of the filings of the Funds' proofs of claim, which occurred long ago. *See* 2440-1, Appx. A.

36.     There is no cause for concern about schedule:  the Funds are 100% committed to meeting the schedule agreed among the parties and ordered by this Court, whether the dispute over their withdrawal liability claims proceeds in this Court or before an arbitrator.[6]

37.     Moreover, implicit in both Debtors' argument regarding timing and their argument that arbitration would waste time because "the losing parties would inevitably seek *de novo* review in federal court" on "questions of law," *see* Opposition, ¶ 33, is the untenable premise that arbitration decisions are appealable to federal district court, but this Court's decisions are not. *See, e.g.*, *In re Oakwood Homes,* 449 F.3d at 592 ("We exercise plenary review over the Bankruptcy Court's legal decisions, and application of law to fact.").

38.     Finally, Debtors' arguments against lifting the automatic stay generally track their arguments against granting a motion to compel arbitration, *see generally* Opposition, ¶¶ 38-42, with two exceptions.  *First*, Debtors concede that the Court has the statutory authority to, in its discretion, lift the automatic stay to allow arbitration to proceed.  *See supra* at ¶ 20.  *Second*, Debtors argue that "the Pension Plans [do not] show that they have any probability of prevailing on the merits," because the "the Pension Plans devote only two sentences to arguing that their

---

[6] As Debtors' counsel pointed out during the negotiations of the schedule, the parties cannot know the availability of the arbitrator to begin the hearing in August as the agreed schedule contemplates since (s)he has not yet been selected.  But the parties are already moving forward with the pre-hearing tasks in accord with the Scheduling Order and the Funds hereby confirm what they have already represented to Debtors—the Funds intend to be ready for trial on the objections to their withdrawal liability claims starting no later than August 2024, on as early a date as the arbitrator is available.

position . . . is '[o]bviously' correct . . . .'" Opposition, ¶ 41 (citing Motion to Compel, ¶ 43).  In

reality, those two sentences were not the only sentences on the topic, *see* Motion to Compel, ¶¶

41-45, but they were key sentences:

> Obviously, a condition regarding how a multiemployer fund can treat SFA money
> for the purpose of "determining unfunded vested benefits . . . for determining
> withdrawal liability," 29 C.F.R. § 4262.16(g)(2), has a "bearing" on or "concerns"
> withdrawal liability. Debtors have not contended otherwise, and, instead, chose to
> omit any mention of the "relating to" language from their briefing. *See, e.g.*,
> Debtors' Reply, ¶¶ 16, 17.

Motion to Compel, ¶ 43.  *See also id.* ("In *Morales v. Trans World Airlines, Inc.*, the Supreme

Court held that "[t]he ordinary meaning" of the phrase "relating to . . . is a broad one—'to stand

in some relation; to have bearing or concern; to pertain; refer; to bring into association with or

connection with[.]'" 504 U.S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed.

1979))").

39.     Despite correctly identifying these two sentences as key sentences in the Funds'

argument on the merits, Debtors have offered no substantive response.  None.  In other words,

Debtors—after at least five months of work on this exact topic (as discussed below)—are still

failing to acknowledge the key language in the statute that they claim PBGC errantly relied on

when it issued the regulation with which Debtors claim the Funds wrongly complied.  Moreover,

Debtors do not dispute that there are no "even remotely analogous case[s] that declined to lift the

automatic stay based on a conclusory assertion that a creditor should *not* have followed a binding

federal regulation."  Motion to Compel, ¶ 45.

40.     As for the other merits issues Debtors identify—"whether principles of equity,

including estoppel, should preclude the Pension Plans from obtaining a double recovery; and

whether the Pension Plans can ignore the 20-year statutory cap and/or refuse to discount their

withdrawal liability claims to present value," Opposition, ¶ 41—the Funds addressed all of them,

in detail, each with case law citations and analysis, in their Response to the Debtors' Omnibus Objections. *See* Dkt. 2224 ¶¶ 31-36 (explaining that the 20-year cap and a discount to present value are not required because Debtors are in default); ¶¶ 57-65 (explaining that there is no double recovery here, and, in any event, bankruptcy courts cannot invoke principles of equity to modify rights under non-bankruptcy law without a specific statutory authorization). Rather than address any of the Funds' substantive arguments—to which they still have not replied—Debtors imply that the Funds made no such Response and purport to incorporate their Omnibus Objections, to which the Funds already responded. *See* Opposition, ¶ 41. The Funds need only make a "very slight" showing on the merits necessary to warrant relief from the automatic stay, *see Izzarelli v. Rexene Prods. Co.* 141 B.R. 574, 578 (Bankr. D. Del. 1992). By not offering a substantive response, Debtors have conceded the point.

## IV.    In the Alternative, the Court Should Hold that the Omnibus Objections Must Be Heard in Arbitration.

41.     Debtors argue that holding withdrawal liability claims must be arbitrated would be a "revolution" with no "cases supporting [that] outcome." Opposition, ¶ 13. Debtors are wrong.

42.     To begin with, Debtors do not dispute that "[a]ccording to at least one bankruptcy court in the Third Circuit, '[t]he extent of [withdrawal] liability ***must*** be determined under the arbitration provisions of MPPAA (unless the parties agree as to its amount).'" Motion to Compel, ¶ 34 (quoting *In re Mushroom Transp. Co., Inc.*, 90 B.R. 718, 728 (Bankr. E.D. Pa. 1988)). Debtors, however, characterize this holding as dicta in an "unrelated case focusing on an unrelated, narrow issue: that two entities can be considered one for withdrawal liability purposes." Opposition, ¶ 13. In reality, the court held that Third Circuit precedent requires withdrawal liability disputes to be arbitrated, except to the extent they involve "the narrow issue of whether [a company], which had never made MPPAA contributions, is by virtue of MPPAA part of a

21

conglomerate the whole of which is the employer." *In re Mushroom Transp.*, 90 B.R. at 721–22. The court, therefore, resolved that narrow issue, concluded that the companies were under common control and subject to withdrawal liability, and, as a result, ordered that "[t]he extent of this liability must be determined under the arbitration provisions of MPPAA (unless the parties agree as to its amount)." *Id.* 90 B.R. at 728. Debtors' assertion that, "***inclusive of Mushroom*** . . . courts have all refused to hold that ERISA supplants the Bankruptcy Code's claims adjudication provisions and requires withdrawal liability proofs of claim to be decided in arbitration," Opposition, ¶ 13 (emphasis added), is simply not accurate.

43.     Debtors offer only one case that post-dates *Mushroom* and the Supreme Court's decision in *McMahon*—which Debtors concede sets the relevant framework for addressing a purported conflict between statutes over whether arbitration is required. *See* Motion to Compel, ¶ 36; Opposition, ¶¶ 26. Debtors do not dispute that this one case, *In re Interco*, "did not discuss *McMahon*" and relied on what the Third Circuit subsequently clarified in *In re Mintze* was the wrong test to determine whether arbitration was required:

> [The] *In re Interco* court relied on its interpretation of then-existing Third Circuit precedent as requiring arbitration of "*non-core* bankruptcy proceedings" but allowing discretion as to whether to order arbitration for "a core proceeding." *In re Interco Inc.*, 137 B.R. at 997 (citing *Hays & Co. v. Merrill Lynch*, 885 F.2d 1149 (3d Cir. 1989)). But the Third Circuit subsequently disavowed that reading of *Hays* in *In re Mintze*, holding that: "We disagree with this interpretation—that the application of *Hays* is limited to non-core proceedings. . . . We find that the standard we articulated in *Hays* applies equally to core and non-core proceedings." *In re Mintze*, 434 F.3d at 230-31.

Motion to Compel, ¶ 36. Nevertheless, Debtors continue to rely on *In re Interco*, without even acknowledging (much less disputing) that it is no longer good law in the Third Circuit.

44.     Debtors had previously argued that this now-repudiated core/non-core distinction was the reason this Court could not allow arbitration. *See* Dkt. 1965, ¶ 18 ("[Central States] fails

to cite a single opinion holding that ERISA requires bankruptcy courts to abdicate their ***core claims allowance*** . . . function[] in deference to arbitrators."); *id.* ¶ 30 ("[Central States] seeks to subvert the bankruptcy process in favor of arbitration. The clear text of the Bankruptcy Code precludes this result . . . 'The allowance and disallowance of claims, which are ***core matters*** arising under . . . the Bankruptcy Code, fall within the exclusive jurisdiction of bankruptcy courts.'") (quoting *In re PRS Ins. Grp.*, 335 B.R. 77, 84 (Bankr. D. Del. 2005)).

45.      In light of *Mintze*, Debtors now concede that the core/non-core distinction is the wrong way to determine whether arbitration is mandatory.  Debtors now claim that the correct test, under *Mintze*, is whether a case is an "adversary proceeding[]" (which would be subject to mandatory arbitration) or an objection to a proof of claim (which would not be subject to mandatory arbitration).  *See* Opposition, ¶¶ 25-28.  But that is not what *Mintze* says.  *Mintze* says that the relevant distinction is "between causes of action derived from the debtor [which are subject to mandatory arbitration] and bankruptcy actions that the Bankruptcy Code created for the benefit of the creditors of the estate [which are not subject to mandatory arbitration]."  *In re Mintze*, 434 F.3d at 230.  As this case involves claims that were created under MPPAA, not any cause of action created under the Bankruptcy Code, there is no "inherent conflict" between the Bankruptcy Code and MPPAA that would authorize declining to enforce MPPAA's mandatory arbitration provision. *See In re Mintze*, 434 F.3d at 230-32.

46.      Debtors do not and cannot dispute that there are "no post-*Mintze* reported cases in which any court in the Third Circuit refused to enforce an arbitration clause because of a fundamental conflict with the Bankruptcy Code." *In re Rotondo Weirich Enterprises, Inc.*, 583 B.R. 860, 871 n.16 (Bankr. E.D. Pa. 2018).  *See also* Motion to Compel, ¶ 35.  Debtors therefore turn to out-of-circuit case law, while failing to disclose that their lead case, which expressly

disagrees with *Mintze* and explains why Debtors' argument fails under *Mintze*, is not good law in this Circuit. *See* Opposition, ¶ 28 n.14 (citing *In re Payton Const. Corp.,* 399 B.R. 352, 363–64 (Bankr. D. Mass. 2009)). *In re Payton Const.* explained that "[n]umerous courts have opined on this issue, but with diverse results" and that the "test" adopted by four courts of appeal, including "*In re Mintze*, 434 F.3d 222, 231 (3rd Cir.2006)" "has two problems," including that "many 'core' proceedings—for example claims against the estate . . . do not arise exclusively under the Bankruptcy Code" and therefore "[a]rbitration would still be required." *In re Payton Const.*, 399 B.R. at 361–62 & n.9. *Mintze*, of course, remains binding precedent in the Third Circuit, and as Debtors' own case law now confirms, the Funds' Motion to Compel arbitration must be granted under *Mintze*. Again, this was readily apparent on the Westlaw database:



47.     Finally, Debtors reiterate their argument that the "shall" language in Section 502(b) means there is a conflict between the Bankruptcy Code and MPPAA, which, under *McMahon*, must be resolved against arbitration. *See* Opposition, ¶¶ 26-27. But, as discussed above, Debtors fail to confront the reality that *McMahon* held exactly the opposite: finding "no basis for concluding that Congress intended to prevent enforcement of agreements to arbitrate" even where, as here, a statute provided that the federal courts "shall" resolve a particular category of disputes. *See McMahon*, 482 U.S. 220 at 242; *supra* at ¶ 18.

## V.    MFN's Joinder in Opposition to Arbitration Does Not Change the Outcome.

48.    In an 11th hour effort to shore up Debtors' opposition to arbitration, Debtors' self-described "largest equity security holder," MFN Partners, LP ("MFN"), filed a joinder to Debtors' oppositions to both Central States' Motion to Compel and the Funds' Motion to Compel ("Joinder," Dkt. 2440).  *See also id.*, ¶ 8.

49.    The apparent purpose of the Joinder is to complain that "Creditors and other shareholders of an employer are not entitled to participate in an ERISA arbitration as a matter of right" such that they "can object and have their voices heard."  Joinder, at 3, ¶ 7 & n.5.[7]

50.    If it was of importance to MFN to have the right to weigh in on Central States' or the Funds' withdrawal liability proofs of claim in bankruptcy court—or even join in Debtors' objections—MFN does not explain why it failed to pursue such a right until now.  Debtors objected to Central States' withdrawal liability proofs of claim nearly three months ago, on December 8, 2023.  *See* Dkt. 1322.  Only one interested party weighed in: PBGC.  *See* Dkt. 1630.  PBGC was also the only interested party to weigh in on Debtors' objections to the Funds' withdrawal liability proofs of claim.  *See* Dkt. 2128.  In both instances, PBGC opposed, in part, Debtors' objections. *See generally* Dkts. 1630, 2128.  Nobody weighed in to support, in whole or in part, Debtors' objections.

51.    MFN, of course, as Debtors' largest shareholder, has no need "to participate in an ERISA arbitration" as a separate party, Joinder, ¶ 7, and offers no explanation of why it would need to participate.  Debtors and MFN are, for all intents and purposes, one and the same.  *See* Joinder, ¶ 8 ("this Court should be aware that the Debtors' largest equity securities holder stands shoulder to shoulder with the Debtors").  Indeed, until now, MFN worked with Debtors behind the

---

[7] The Joinder has two paragraphs numbered "7."

scenes.  Prior to its Joinder, MFN had not a made a single filing in this case other than a notice of appearance and *pro hac vice* applications on August 8, 2023.  *See* Dkts. 90-93.  Instead—as Debtors' lead counsel's fee applications reveal—MFN and its counsel at Quinn Emanuel Urquhart & Sullivan, LLP, Eric Winston, have long been working together on Debtors' withdrawal liability challenges, including:

• Discussing "pension withdrawal liability" in August 2023.  *See* Dkt. 858-5 at 47 ("telephone conference with E. Winston re pension withdrawal liability");

• Coordinating throughout October and November 2023 on "withdrawal claim liability considerations" "pension considerations, "pension issues", and the "claims objection" to Central States' withdrawal liability claims.  *See, e.g.* Dkt. 1484-5 at 131 ("conference with . . . MFN re pension considerations;" "conference with . . . Quinn team[] re withdrawal claim liability considerations") (Oct. 12, 2023); *id.* at 136 ("conference with . . . MFN re pension issues") (Oct. 20, 2023); Dkt. 2083-5 at 130 ("Conference with Quinn Emmanuel re claims objection" and "Conference with E. Winston re claims objection") (Nov. 30, 2023);[8] and

• Collaborating, on December 20 and 21, 2023, on a draft of the subpoena that Debtors served on PBGC on December 22, 2023 regarding Central States' withdrawal liability claims and the validity of the PBGC's SFA regulation.  *See* Dkt. 2083-5 at 30 ("correspond with . . . E. Winston re draft subpoena re pension, related considerations"); *id.* at 31

---

[8] Adjacent entries make clear that the "claims objection" Debtors were working on at the time was the "objection to Central States proofs of claim" and the "pension plan claims objection," and that, in connection with it, they were working "with M. Hofing re draft claims objection."  *Id.* at 8-9. Mitchell Hofing is an actuary and "consult[ant] to employers on all aspects of their participation in multiemployer pension plans including testifying on their behalf in a variety of arbitration and court cases."  *See* https://www.dexhof.com/bios.php. *See also* Dkt. 756 (declaration of disinterestedness submitted by Mitchell Hofing).

("correspond with . . . E. Winston . . . re draft subpoena"); Dkt. 1465-1 (subpoena served on PBGC).

52.     If all it took to avoid arbitration and remain in bankruptcy court was a request from debtors' largest shareholder (or any shareholder, for that matter), no debtor would ever be required to arbitrate anything—which is clearly not the law.

53.     Finally, in a footnote, MFN claims that joint subpoenas issued by Central States and the Funds to MFN and its affiliates, on the last day to issue "written discovery requests in connection with the Objection" under the Scheduling Order, is "[b]izarre[]" and "inconsistent with seeking private arbitration between them and the Debtors."  *See* Joinder, ¶ 8 n. 7; Scheduling Order, ¶ (1)(a); Dkt. 2482 (notice of subpoenas).  Not so.  Discovery, even directed to third parties, happens in arbitrations.  Central States and the Funds were merely *complying* with the parties' agreement, and the Court's order, to proceed with issuing discovery on precisely this schedule, without "prejudice [to] any Party with respect to the pending and anticipated arbitration motion." Scheduling Order n.2.

54.     The same footnote also claims that "MFN believes there is no reason for it to be targeted with the discovery sought and reserves all rights to seek judicial relief," an odd stance for an interested party that demands that its "voice[]" be "heard" in the proceeding.  The joint subpoena, another sign of the efficiency the Funds and Central States have brought to this matter by their cooperation, is precisely the opportunity MFN has wished for, since its information relevant to this dispute will be considered, at a minimum through its response to the subpoena.[9]

---

[9] The time for the parties to notice depositions under the agreed Scheduling Order has not yet passed.

## CONCLUSION

For the reasons set forth above and in the Funds' Motion to Compel, the Court should order that the issues raised in Debtors' Omnibus Objections be resolved in arbitration.

Date:   March 3, 2024
        Wilmington, Delaware

SULLIVAN · HAZELTINE · ALLINSON LLC

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
        whazeltine@sha-llc.com

GROOM LAW GROUP, CHARTERED
Edward J. Meehan (*pro hac vice*)
Samuel I. Levin (*pro hac vice*)
Tel: (202) 857-0620
Email: emeehan@groom.com
        slevin@groom.com

*Special Counsel for the Funds*