## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**MOTION (I) TO ENFORCE SALE ORDER AND ORDER TO COMPEL; (II) TO SANCTION ALLSTAR INVESTMENTS INC. FOR CONTEMPT FOR VIOLATING THE SAME; AND (III) FOR ENTRY OF AN ORDER REQUIRING ALL STAR TO CLOSE TRANSACTION AND TO PAY ALL OF THE COSTS AND EXPENSES INCURRED BY THE DEBTORS IN ADDRESSING THIS MATTER**

Yellow Corporation and its above-captioned debtor affiliates (the "Debtors")[2], through its undersigned counsel, hereby file this motion (the "Motion") requesting an order (i) enforcing the Sale Order and the Order to Compel (each as defined below) against Allstar Investments Inc. ("All Star"), (ii) directing All Star to immediately close the Quebec Transaction (defined below); (iii) holding All Star in civil contempt for violating the Sale Order and the Order to Compel (each as defined below); and (iv) ordering monetary sanctions against All Star to pay all costs and expenses, including attorneys' fees, incurred by the Debtors in addressing such violations. In support of this Motion, the Debtors respectfully state as follows:

**Jurisdiction and Venue**

1. The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended*

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

*Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein is section 105 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 9014 and 9020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

4. On December 4, 2023, the Debtors filed the *Notice of Winning Bidders and, If Applicable, Back-Up Bidders With Respect to Certain of the Debtors' Real Property Assets* [Docket No. 1268], announcing, among other things, the sale of 930 Route 147, Stanhope, Province of Quebec, Canada (the "Quebec Property") to All Star for $550,000 (USD).

5. Prior thereto, All Star had (i) submitted to the Debtors a Qualified Bid (including an agreed form of Asset Purchase Agreement) by the Bid Deadline of November 9, 2023 at 5:00 p.m. (E.T.) for the Quebec Property, (ii) participated in the Debtors' Real Estate Auction for the Quebec Property on November 29, 2023 at 9:00 a.m. (E.T.), and (iii) submitted to the Debtors a binding bid—the Winning Bid—for the Quebec Property.

---

[2] Capitalized terms not otherwise defined herein shall have the meaning given to them in the Motion to Compel, the Order to Compel, or the All Star Asset Purchase Agreement, as applicable.

6. On December 7, 2023, All Star and the Debtors executed the All Star Asset Purchase Agreement, memorializing the terms and provisions of the sale of the Quebec Property to All Star (the "Quebec Transaction"), which the Debtors filed on the Court's docket the following day as an attachment to the *Notice of Filing of Form of Asset Purchase Agreement Between the Debtors and All Star Investments, Inc.* [Docket No. 1311].

7. On December 12, 2023, the Court entered the Sale Order,[3] approving the "[All Star] Asset Purchase Agreement . . . and all of the terms and conditions thereof . . . and the Sale and the related transactions contemplated thereby . . . in all respects." Sale Order, ¶ 2.1 ("the [All Star] Asset Purchase Agreement is a valid and binding contract between the Sellers and [All Star] and shall be enforceable pursuant to its terms." Id. at ¶ U).

8. Pursuant to the Sale Order, the Court specifically retained jurisdiction with respect to all matters relating to the interpretation, implementation and *enforcement* of the terms and provisions of the Sale Order and each of the Asset Purchase Agreements subject thereto, including the All Star Asset Purchase Agreement. Id. at ¶ 7.24 (emphasis added).

9. Pursuant to section 6.5 of the All Star Asset Purchase Agreement, All Star is obligated, but has completely failed to, in furtherance of achieving Closing by the Outside Date (which was (i) February 6, 2024 under the All Star Asset Purchase Agreement and (ii) extended to March 7, 2024 under the Order to Compel):

> use its . . . reasonable best efforts to perform its . . . obligations hereunder and to take, or cause to be taken, and do, or cause to be done, ***all things necessary, proper or advisable to cause the Transactions to be effected as soon as practicable, but in any event on or prior to the Outside Date***, in accordance with the

---

[3] The "Sale Order" refers to that certain *Order (I) Approving Certain Asset Purchase Agreements; (II) Authorizing and Approving Sales of Certain Real Property Assets of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, in Each Case Pursuant to the Applicable Asset Purchase Agreement; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, in Each Case as Applicable Pursuant to the Applicable Asset Purchase Agreement; and (IV) Granting Related Relief* entered by the Court December 12, 2023 at Docket No. 1354.

> terms hereof and to cooperate with each other Party . . . in connection with ***any step required*** to be taken as a part of its obligations hereunder.

All Star Asset Purchase Agreement § 6.5 (emphasis added).

10. The parties expressly agreed under the All Star Asset Purchase Agreement that specific performance was an appropriate remedy for a failure to perform thereunder.

> The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, ***including if any of the Parties fails to take any action required of it hereunder to consummate the Transactions***. It is accordingly agreed that (a) ***the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief*** to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 10.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) ***the right of specific performance and other equitable relief is an integral part of the Transactions*** and without that right, neither Sellers nor Purchaser would have entered into this Agreement . . . The remedies available to Sellers . . . will be ***in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit any Seller from seeking to collect or collecting damages***.

Id. § 10.12 (emphasis added).

11. The parties further agreed that the Bankruptcy Court would resolve any disputes under the All Star Asset Purchase Agreement and be the "exclusive venue" for resolving any such disputes:

> Each of the Parties irrevocably agrees that any Action of any kind whatsoever . . . based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement of the Transactions . . . ***will be brought and determined only in the Bankruptcy Court*** . . . .

Id. § 10.13 (emphasis added).

12. The parties further agreed that the prevailing party in any such dispute would be entitled to its fees and costs for bringing and prosecuting such dispute from the non-prevailing party:

> If any litigation or other court action . . . is sought, taken, instituted or brought by Sellers or Purchaser to enforce its rights under this Agreement, ***all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, of the prevailing party in such action, suit or proceeding shall be borne by the party against whose interest the judgment or decision is rendered***.

Id. § 10.22 (emphasis added).

13. On February 9, 2024, three days after the Closing Date and in light of All Star's refusal to Close the Quebec Transaction by the Closing Date, the Debtors filed the *Debtors' Motion to Enforce the Sale Order and Compel Performance by All Star Investments, Inc. Under the All Star Asset Purchase Agreement* [Docket No. 2138] (the "Motion to Compel") and the *Motion of Debtors for Entry of an Order Shortening Notice of Debtors' Motion to Enforce the Sale Order and Compel Performance by All Star Investments, Inc. Under the All Star Asset Purchase Agreement* [Docket No. 2139] (the "Motion to Shorten"), and served the same upon All Star. See Docket Nos. 2138 and 2139.

14. On February 10, 2024, the Court entered the *Order Shortening the Notice and Objection Period for Debtors' Motion to Enforce the Sale Order and to Compel Performance by All Star Investments, Inc. Under the All Star Asset Purchase Agreement* [Docket No. 2142], setting a hearing (the "Hearing") to consider the relief requested in the Motion to Compel for February 14, 2024 at 10:00 a.m. (E.T.), and the Debtors served the same upon All Star. See Docket No. 2142.

15. On February 12, 2024, the Debtors filed the *Notice of Hearing on Debtors' Motion to Enforce the Sale Order and to Compel Performance by All Star Investments, Inc. Under the All Star Asset Purchase Agreement* [Docket No. 2146] (the "Hearing Notice") and served the same upon All Star. See Docket No. 2146.

16. On February 12, 2024, the Debtors filed the *Declaration in Support of Jon Cremeans of Entry of Order Enforcing Sale Order and Compelling Specific Performance by All Star Investments, Inc. Under the All Star Asset Purchase Agreement* [Docket No. 2147] (the "Cremeans Declaration") in support of the Motion to Compel, and the Debtors served the same upon All Star. See Docket No. 2147.

17. On February 13, 2024, Varinder Singh of All Star ("Mr. Singh") emailed the Debtors that All Star "will be moving forward with this deal." See **Exhibit A**.

18. At the Hearing on February 14, 2024, All Star failed to appear, the Debtors proceeded with prosecuting the Motion to Compel, and the Court entered the *Order Enforcing Sale Order and Compelling Specific Performance by All Star Investments, Inc. Under the All Star Asset Purchase Agreement* [Docket No. 2194] (the "Order to Compel"), setting an extended Outside Date of March 7, 2024 (the "Extended Outside Date") by which All Star was compelled by the Court to Close the Quebec Transaction. Following the Hearing, the Debtors served the Order to Compel upon All Star. See Docket No. 2194.

19. On February 14, 2024, Spencer Applegate, Senior Vice President of Sacramento Brokerage and real estate broker to All Star ("Mr. Applegate"), emailed the Debtors: "I am working directly with [All Star] to get this done now. I will coordinate with escrow to insure the process is moving forward and they can start filling out the forms required." See **Exhibit B**.

20. On February 16, 2024, the Debtors' Canadian counsel, Goodmans LLP ("Goodmans") emailed Mr. Singh (copying Mr. Applegate) a closing agenda and draft closing documents. See **Exhibit C**.

21. On February 22, 2024, there being no response from All Star, Goodmans sent a follow-up email to Mr. Singh, copying Mr. Applegate. See **Exhibit D**.

22. On February 23, 2024, there still being no response from All Star, Goodmans sent an additional follow-up email to Mr. Singh, copying Mr. Applegate:

> We are following up again on this. We remind you of the Order to Compel that was issued by the U.S. Bankruptcy Court on February 14, 2024, which among things, requires Allstar to take all actions and steps necessary and required for the parties to close this transaction as soon as possible. Allstar will be in violation of two orders of the U.S. Bankruptcy Court if Allstar continues not to respond or work towards closing.

See **Exhibit E**.

23. On February 23, 2024, Mr. Applegate responded to Goodmans, copying Mr. Singh and Mr. Singh's business associates Messrs. Jay Singh, Gurinderjit Singh, and Jasdeep Singh:

> Allstar Investment Inc. will be ready to close next week. All Star Investment is a CA corporation. They would like to close under United Holding Group LLC, which I have included the Bylaws. Jay Singh [] will provide the most up to date article of corporation, which shows the relation between Allstar and UHG, and the GST.

See **Exhibit F**.

24. On February 26, 2024, Goodmans emailed Mr. Singh, Jay Singh, Gurinderjit Singh, Jasdeep Singh, and Mr. Applegate that, pursuant to paragraph 9 of the Canadian recognition order of the Sale Order, Allstar Investments Inc. must remain the purchaser entity on the closing documents. See **Exhibit G**. Two days then passed with no word from All Star.

25. On February 28, 2024—one week shy of the Extended Closing Date—Goodmans followed up by email to All Star for "any comments on the draft closing documents that we previously circulated [on February 16]." See **Exhibit H**. Two additional days then passed with no word from All Star.

26. On March 1, 2024, Goodmans followed up by email again with All Star (see **Exhibit I**), then again on March 4, 2024— there *still* being no response from All Star just three days shy of the Extended Outside Date pursuant to the Order to Compel. See **Exhibit J**.

27. On March 4, 2024, All Star, through Mr. Applegate, finally responded by email to Goodmans:

> Jay, who is copied on this email is Varinder and can provide all items required. Please provide wiring instructions and we can send funds.

See **Exhibit K**. Goodmans responded with the wiring instructions. See **Exhibit L**.

28. On March 5, 2024, there being no response from All Star, Goodmans sent a follow-up email asking All Star for a response "ASAP given the upcoming March 7 closing date." See **Exhibit M**.

29. On March 5, 2024, Gary Singh emailed Goodmans: "Varinder Singh (AllStar) would like to know if he can close the property under a Canadian corporation which he is the member director of the Corp. Please advise." See **Exhibit N**. Goodmans responded by email reiterating (per Goodmans' February 26 email) that Allstar Investments Inc. must be the purchaser entity registered on title as the purchaser of the Quebec Property.

30. On March 6, 2024, now just one day before the Extended Closing Date, Goodmans emailed All Star an updated closing checklist and proposed execution versions of the closing documents "in advance of closing tomorrow", noting "[w]e have sent all transaction

documents to the company for signature.  Can Allstar please confirm that it is arranging for signature as well?"  See **Exhibit O**.

   31. In email response to Goodmans, on March 6, 2024, Mr. Applegate wrote:

> I have sent all document[s] to Varinder of Allstar Investments to review and execute.  I am waiting for those items that you shared to be returned signed.  Please share the new Statement of adjustment, so Allstar can schedule the full wire first thing in the morning.

See **Exhibit P**.

   32. Time running out, the Debtors' U.S. counsel, Kirkland & Ellis LLP ("Kirkland"), sent a "chaser" email to All Star that morning, as well.

> What is the delay now?  I understand Canadian counsel has been in touch with you to close this transaction, in accordance with that is now two Bankruptcy Court Orders, and you have not been responsive.  Please respond and prepare for closing, so we can avoid pursuing further remedies . . . [which] may include, among other things, order for contempt of court and related penalties.

See **Exhibit Q**.

   33. Mr. Applegate responded by email to Kirkland:

> Allstar will be returning the documents fully executed and scheduling their FULL wire in the AM once they receive the updated closing statement and we can close this deal in a timely manner.

See **Exhibit R**.

   34. On March 7, 2024—the Extended Closing Date—Goodmans emailed All Star at 5:52 a.m. (E.T.): "[C]an the Allstar team please confirm status for closing today?" (see **Exhibit S**) and Kirkland emailed All Star at 9:09 a.m. (E.T.): "Checking in on where things stand today as we need to coordinate wires/utility reads, etc.  Please let us know if the funds have been sent and when we can expect executed documents."  See **Exhibit T**.

35. At 11:12 a.m. (E.T.) on the Extended Closing Date, Mr. Applegate responded by email to Goodmans, copying Mr. Singh, Jay Singh, and Gurinderjit Singh:

> I still have not received executed documents back yet. @ Jay Singh please update the Seller's team on when you expect to sign and wire fund[s].

See **Exhibit T**. Mr. Applegate then emailed Kirkland at 11:49 a.m. (E.T.): "We are waiting for Jay/Varinder to update the team on when the wires were sent and if they have signed the documents." See **Exhibit U**.

36. All Star then went radio silent for the remainder of the day.

37. On March 8, 2024—now a day past the Extended Closing Date imposed by the Court in the Order to Compel—Kirkland emailed Mr. Applegate, copying Mr. Singh, at 9:34 a.m. (E.T.):

> Any update from your clients? It would be much easier for all involved to close this and be done, but we're getting [to] a point where we will soon seek a contempt order from the court.

See **Exhibit V**.

38. At 1:46 p.m. (E.T.) on March 8, 2024, Mr. Applegate responded to Kirkland by email:

> Jay/Varinder has been unresponsive to me as I push for them to update the team & complete the wire and execution of the documents . . . I will continue to reach out to him and if I hear anything I will update all.

See **Exhibit W**.

39. Three days then passed with no further word from All Star, and on March 11, 2024, Kirkland emailed Mr. Applegate (copying Mr. Singh) to "please advise of the status and if you will be funding the closing today ASAP as we need to update the court of the same." See **Exhibit X**.

40. On March 12, 2024, there being no response from All Star and with yet another day having passed, Kirkland sent the below email to Mr. Singh:

> Varinder, given your lack of responsiveness and refusal to close, we will proceed with seeking an order from the court to hold you in contempt, including holding you liable for the costs and expenses incurred by Yellow in connection therewith. Absent receipt of wire **today**, we will proceed.

See **Exhibit Y**.

41. There being no response from All Star and the Extended Closing Date now *eight* (8) days ago—the Debtors filed the Motion.

## Relief Requested

42. By this Motion, the Debtors seek entry of an order (i) enforcing the Sale Order and the Order to Compel against All Star, (ii) directing All Star to close the Quebec Transaction immediately in accordance with the All Star Asset Purchase Agreement; (iii) holding All Star in civil contempt for violating this Court's Sale Order and Order to Compel; and (iv) ordering monetary sanctions against All Star to pay all costs and expenses, including attorneys' fees, incurred by the Debtors in addressing such violations.

## All Star Should Be Found in Civil Contempt and Sanctioned

43. As the United States Supreme Court explained, a bankruptcy court has the authority to enforce its own orders. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). *See also*, *In re Continental Airlines, Inc.*, 236 B.R. 318, 325 (Bankr. D. Del. 1999) ("It is axiomatic that a court possesses the inherent authority to enforce its own orders").

44. To that end, the Court may issue orders to enforce compliance with prior orders. *See Continental*, 236 B.R. at 331 (imposing sanctions for violation of bankruptcy court's confirmation order). This includes the power to issue civil contempt orders. *See, e.g.*, *In re Kennedy*, 80 B.R. 673 (Bankr. D. Del. 1987) (finding party in contempt of court order and

awarding attorneys' fees incurred in bringing motion for contempt). *See also*, *In re Swanson*, 207 B.R. 76, 79 (Bankr. D.N.J. 1997) ("Pursuant to Bankruptcy Code § 105, a bankruptcy court may award damages for civil contempt"); *In re Baker*, 195 B.R. 309, 316 (Bankr. D.N.J. 1996) ("The bankruptcy court has the power to sanction parties for contempt") (citations omitted). An order finding civil contempt may be appropriate to "enforce compliance with a court order and to compensate a party damaged by a violation of that order." *Swanson*, 207 B.R. at 79 (citations omitted).

45. This Court is "afforded broad discretion to fashion a sanction that will achieve full remedial relief." *John T. v. Delaware County Intermediate Unit*, 318 F.3d 545, 554 (3rd Cir. 2003) (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193-94 (1949)). *See also*, *In re Miller*, 2007 Bankr. LEXIS 4144, *11-12 (Bankr. E.D. Penn. Dec. 11, 2007) ("the law affords courts considerable discretion in fashioning an appropriate sanctions for contempt") (citing *Robin Woods Inc. v. Woods*, 28 F.3d 396, 399 (3rd Cir. 1994)). "Often this discretion involves ordering payment for the costs of past non-compliance[.]" *Id.* In addition, "'[a] primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Fellheimer, Eichen & Braverman v. Charter Technologies*, 57 F.3d 1215, 1224 (3rd Cir. 1995) (quoting *Chambers v. Nasco, Inc.*, 501 U.S. 32, 44-45 (1991)).

46. The Debtors need only show the existence of a clear and enforceable order, the Debtors' notice of, and All Star's noncompliance with that order. *See In re Keene*, 110 B.R. 477, 482-83 (S.D. Cal. 1990); *Baker*, 195 B.R. at 316-19. That is, to obtain sanctions for civil contempt, three elements must be established: (1) a valid order of the court must exist; (2) the person to be charged with contempt must have actual knowledge of the order; and (3) the person must have disobeyed the order. *In re Continental Airlines, Inc.*, 236 B.R. 318, 330 (Bankr. D. Del. 1999); *In re Baker,* 195 B.R. 309, 317 (Bankr. D.N.J. 1996) (quoting *Roe, et al.*

*v. Operation Rescue,* 54 F.3d 133, 137 (3d Cir. 1995)). In order to be found in civil contempt, the offending party must have knowingly and willfully violated a definite and specific court order. *In re Ryan*, 100 B.R. 411, 417 (Bankr. N.D. Ill. 1989); *In re Kennedy*, 80 B.R. 673 (Bankr. D. Del. 1987) (courts have inherent contempt powers to enforce compliance with their lawful orders).

47. Compensatory damages, including attorneys' fees, may be awarded as sanctions pursuant to section 105 of the Bankruptcy Code for violations of court orders. *In re Hardy*, 97 F.3d 1384, 1390 (11th Cir. 1996) (violation of discharge injunction); *In re Fluke*, 305 B.R. 635, 644 (Bankr. D. Del. 2004) ("A bankruptcy court has the power to issue a wide range of sanctions, including costs, attorneys' fees and compensatory and punitive damages.").

48. All criteria to warrant a contempt finding and sanctions are met here.

49. *First*, no dispute exists that the Sale Order and the Order to Compel are clear and unambiguous orders that includes terms All Star knew about and understood. Also, no dispute exists that the Sale Order and the Order to Compel are enforceable. They are valid orders of the Court, each in full force and effect and not subject to any appeal.

50. *Second*, All Star did not comply with the Sale Order and subsequently did not comply with the Order to Compel. All Star has failed to close the Quebec Transaction by both the Outside Date (as required by the Sale Order) and the Extended Outside Date (as required by the Order to Compel)—and has been wholly uncooperative with the Debtors to achieve Closing despite the Sale Order, the Order to Compel, and the Debtors' best efforts to cooperate with All Star and achieve Closing.

51. *Third*, All Star had actual notice of the Sale Order and the Order to Compel, and received timely mail and email notice of the same and related documents and hearings, as described above. Nevertheless, All Star has failed to comply with the Sale Order

and the Order to Compel and to abide by the Court's directives and rulings.

52. All Star has caused the Debtors to incur unnecessary costs and expenses, including attorneys' fees, in responding to All Star's violations and disregard of the Sale Order and the Order to Compel—to the detriment of the Debtors' estates. The Debtors respectfully request that the Court order All Star pay for the cost of cleaning-up the mess that it has created. To that end, the Court should permit the Debtors to (i) submit a bill to this Court and All Star for all of the Debtors' costs and expenses, including attorneys' fees, incurred in connection with prosecuting this matter, and (ii) order All Star to pay all such costs and expenses to the Debtors within three (3) days thereafter.

53. All Star's refusal to Close the Quebec Transaction has demonstrated a clear disregard for this Court's authority.

54. For these reasons, the Court should enforce the Sale Order and the Order to Compel against All Star, require All Star to close the Quebec Transaction immediately, hold All Star in civil contempt for its violations of the Sale Order, the Order to Compel, and this Court's authority generally, and issue the requested sanctions.

## Conclusion

WHEREFORE, based on the foregoing, the Debtors respectfully request that the Court grant the Motion and enter an order, substantially in the form attached hereto.

Dated: March 15, 2024
Wilmington, Delaware

*/s/ Peter J. Keane*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | **KIRKLAND & ELLIS LLP** |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | 300 North LaSalle |
| 919 North Market Street, 17th Floor | Chicago, Illinois 60654 |
| P.O. Box 8705 | Telephone: (312) 862-2000 |
| Wilmington, Delaware 19801 | Facsimile: (312) 862-2200 |
| Telephone: (302) 652-4100 | Email: patrick.nash@kirkland.com |
| Facsimile: (302) 652-4400 | david.seligman@kirkland.com |
| Email: ljones@pszjlaw.com | |
| tcairns@pszjlaw.com | |
| pkeane@pszjlaw.com | |
| ecorma@pszjlaw.com | -and- |

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*