## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>(Jointly Administered)<br><br>**Related Docket Nos. 1665, 2180, 2276** |

## <u>MEMORANDUM OPINION</u>

Yellow Corporation and its affiliates were once among the nation's oldest and largest freight trucking companies. In mid-2023, however, after a well-publicized dispute with the Teamsters Union, the company collapsed into bankruptcy – shutting down its operations and filing for bankruptcy protection. Before bankruptcy, the debtors had participated in several multiemployer pension plans. Under such a plan, multiple employers contribute, typically under a collective bargaining agreement, to fund employees' pension benefits. The plan, in turn, takes on responsibility for paying those benefits to the participating employers' retirees. When an employer withdraws participation from such a plan, the employer is subject to liability under the Employee Retirement Security Act.[1] Here, the shuttering of the debtors' business operations amounted to a withdrawal from those plans.

Multiemployer pension plans face particular problems when an employer withdraws its participation. While the plan remains liable to provide the employees with pension benefits, it no longer receives contributions from the withdrawn

---

[1] The Employee Retirement Income Security Act of 1974 is referred to as "ERISA."

employer. Moreover, when one employer exits a plan, there is a risk that other participating employers may also exit to avoid paying for the unfunded benefits of another company. Accordingly, much like a run on a bank, there is a risk that one employer's exit could send a multiemployer plan into a downward spiral. Congress enacted the Multiemployer Pension Plan Amendments Act of 1980, which amended ERISA, to address this problem. The MPPAA imposes liability on employers to cover their unfunded obligations to the pension plan when they exit.[2]

The MPPAA establishes a procedure for resolving withdrawal liability. The fund initiates the process with an assessment of liability against the employer. If the employer disputes that assessment, or if the fund seeks to enforce its assessment, either party may initiate arbitration. But unlike arbitral awards entered in arbitrations governed by the Federal Arbitration Act, the decisions of an arbitrator under the MPPAA may be reviewed in a federal district court under a standard similar to that applicable to an ordinary appeal—with deference paid to factual findings but legal rulings subject to *de novo* review.[3]

Here, a number of multiemployer pension plans filed proofs of claim in the debtors' bankruptcy cases for withdrawal liability under the MPPAA, which total $7.8 billion.[4] The debtors objected to some of those claims and represented that objections

---

[2] The Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381-1461, is referred to as the "MPPAA."

[3] *Compare* 29 U.S.C. § 1401(b)(2) (providing for judicial review of an arbitral award in district court) *with* 9 U.S.C. § 10(a) (identifying grounds for vacating an arbitral award under the Federal Arbitration Act). The Federal Arbitration Act is referred to, at times, as the "FAA."

[4] The automatic stay, 11 U.S.C. § 362, would of course, preclude the pension plans from initiating MPPAA arbitrations against the debtors after the bankruptcy filing.

to other proofs of claim will be forthcoming.  In addition, one of the debtors' largest equity holders filed a joinder in the debtors' claim objection and seeks to participate in the claims allowance process.  The multiemployer pension funds have filed motions in this Court seeking to compel arbitration in accordance with the MPPAA.

The funds have calculated the withdrawal liability due to them in accordance with a regulation issued by the Pension Benefit Guaranty Corporation.[5]  In objecting to the proofs of claim, the debtors take issue with the validity of that regulation.[6]  The PBGC, in turn, has filed a motion contending that the Administrative Procedure Act requires this Court to accept its regulation as valid for the purpose of the claims allowance process.  The PBGC's argument is that, under the APA and ERISA, the only way to challenge the agency regulation is to file a lawsuit against the PBGC in a federal district court.  The debtors may not, the PBGC contends, challenge its regulation in a regular civil enforcement action, such as in connection a claims allowance dispute.

---

[5] The Pension Benefit Guaranty Corporation is referred to as the "PBGC."

[6] The regulation, in particular, phases in government assistance provided to the pension plans through the American Rescue Act of 2021.  The pension plans received funding from the PBGC under that Act, which the debtors contend reduced the plans' unfunded vested benefits.  The PBGC regulation treats the receipt of those benefits as being phased in over time.  D.I. 2276 at 5-9.  Without the phased vesting provided for in the PBGC regulation, the funds might have substantially less (if any) unfunded pension liabilities, which would reduce or eliminate the funds' withdrawal liability claims against the debtors.

The Court will deny the funds' motions, and defer consideration of the PBGC's motion, for the following reasons:

(1)   The pension funds' motions are styled as ones to "compel" arbitration or, in the alternative, for relief from the stay to permit the funds to initiate an arbitration.  The funds point to no authority for the court to "compel" the debtors to initiate an arbitration.  The debtors' position is analogous to a defendant in a civil lawsuit.  Courts do not ordinarily force *defendants* to initiate arbitration.  The motions are therefore most properly viewed through the lens of motions for relief from the automatic stay to permit the *funds* to initiate arbitrations through which their prepetition claims against the estate would be liquidated.

(2)   While governing caselaw dictates that in some circumstances a bankruptcy court must enforce an arbitration provision, the Court concludes that this is not such a circumstance.  When a fund seeks to assert a claim against a bankruptcy estate for withdrawal liability, the MPPAA and § 502 of the Bankruptcy Code present a conflict.  The statutory commands that a dispute under the MPPAA "shall" be subject to arbitration and the Bankruptcy Code's directive that the bankruptcy court "shall" resolve objections to proofs of claim cannot both be given full effect.  There is, however, a way to reconcile the principles and objectives that underlie these statutory provisions.

4

The Court concludes that the most appropriate manner in which to do so is to treat the matter as a motion for relief from the stay in which the Court has the discretion to grant stay relief to permit arbitration. Bankruptcy courts should resist the perhaps natural inclination to view the goals of bankruptcy as paramount to all others. Instead, the MPPAA's arbitration provisions should be treated as creating a presumption in favor of granting stay relief to permit arbitration.

(3)     In the unusual circumstances presented here, however, the Court concludes that this presumption is overcome. The question is a close one and the arguments in favor of arbitration are serious. In this case, however, the Court finds those concerns to be outweighed by several factors: the participation of other parties-in-interest in the claims allowance process, the fact that the parties agree that the dispute is perhaps the most important issue to be decided in the bankruptcy case, and the uncertainties about how long an arbitration process might take, particularly in light of the arguments advanced by the PBGC (discussed in Part IV). The motions for relief from stay will therefore be denied. The withdrawal liability claims should be liquidated through the claims allowance process in this Court.

(4)     The PBGC's motion asks for a declaration that this Court lacks the authority to find the agency's regulation invalid in a claims allowance dispute. The PBGC raises important questions, but they are premature.

The points are more properly considered in connection with the meris of the claims allowance process. For the benefit of the parties, however, the Court will set forth some preliminary observations on the issue. The usual rule under the APA is that a challenge to an agency regulation may be asserted in a civil enforcement action. As a preliminary matter, the Court believes that this claims allowance dispute is such a civil enforcement action. The Court also has doubts about the PBGC's argument that the statutory language at issue creates an exception to this usual principle.

It bears note, however, that the PBGC's claim that an arbitrator would be precluded from considering the validity of its regulation appears to be stronger than the claim that this Court, which is a unit of the district court, cannot consider the regulation's validity. The risk that an arbitration might require complex parallel proceedings (before an arbitrator and also in district court) counsels in favor of denying the funds' motions for stay relief.

### Factual and Procedural Background

The debtors operated as a transportation company that was among the nation's largest less-than-truckload carriers. Its employees included a substantial number of union members, whose collective bargaining agreements provided for them to receive pension benefits under multiemployer pension plans.[7]

---

[7] D.I. 14 at 1.

Those pension plans are regulated by the MPPAA.  Soon after ERISA was enacted, Congress became concerned about the "death spiral" that could occur when an employer withdrew from a multiemployer plan.[8]  When a multiemployer plan becomes financially distressed, employers have an incentive to leave rather than potentially being responsible for the plan's underfunding if it becomes insolvent.  The MPPAA imposes liability on companies that exit those plans and thereby addresses gaps in ERISA to ensure that employers who remain in a pension plan are not later responsible for contributions of employers who leave the plan.[9]

Section 1399(b) of the MPPAA requires a plan sponsor to provide a withdrawing employer with a formal assessment.  The assessment is to include the amount of liability and a schedule for liability payments.  The plan is then to demand payment from the employer in accordance with that schedule.[10]  If the employer disputes the liability, it must first raise its objections to the pension fund.  If the parties are unable to resolve the matter consensually, the statute provides that either the employer or the pension fund may initiate an arbitration.[11]

The debtors' employees participated in at least 20 multiemployer pension plans, the largest of which is Central States.[12]  These pension funds experienced

---

[8] *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416-417 (1995) (citing H.R.Rep. No. 96–869, pt. 1, pp. 54–55 (1980)).

[9] *Id.*

[10] 29 U.S.C. § 1399(b).

[11] 29 U.S.C. § 1401(a).

[12] D.I. 1965 at 6-7 (debtors assert that at least 20 multiemployer pension plans filed proofs of claim in the bankruptcy proceeding).  The Central States, Southeast and Southwest Areas Pension Fund is referred to as "Central States."

financial difficulties before the commencement of this case, in part (the funds assert) because of the debtors' pre-petition woes.[13]  Due to their substantial underfunding, Congress provided for "special financial assistance" to certain distressed multiemployer plans in the American Rescue Act of 2021.  The PBGC, a government agency that covers shortfalls between pension plans and benefits owed, was tasked with distributing those funds.  The various pension funds whose claims are at issue in the motions now before the Court received such payments.

The debtors filed chapter 11 bankruptcy petitions in August 2023. Central States filed proofs of claim for $4.8 billion in withdrawal liability under the MPPAA, reflecting the amount that the pension fund asserts that it expected to receive from the debtors but was unfunded.[14]  Ten other pension plans filed similar proofs of claim totaling $1.5 billion.[15]  The debtors objected to the proofs of claim, arguing that, among other things, the payments from the PBGC made up any shortfall that the debtors owed.[16]  The PBGC filed a limited response to the debtors' claim objection, arguing that the debtors' objection would undermine its regulation and that its regulation could only be challenged in a suit brought against the agency under the

---

[13] *See, e.g.,* D.I. 1833 at 7-9.

[14] Central States filed 24 claims for withdrawal liability, Claim Nos. 4312-4335, and 21 claims for other liabilities. Claim Nos. 4303-4306, 4336-4352.

[15] D.I. 1962-2 at 34-36 (listing claims from each fund).  The eleven funds that are the movants in the two motions are referred to collectively as the "funds."  At argument on the motion, counsel explained that at least nine other pension funds filed proofs of claim against the bankruptcy estates.  D.I. 2529 (hearing audio).

[16] D.I. 1322 (debtors' objection to Central States), D.I. 1833 (Central States' response), D.I. 2130 (debtors' reply to Central States); D.I. 1962 (debtors' omnibus objection to proofs of claim); D.I. 2224 (pension funds' response).

APA.[17]  The parties then entered into a stipulated scheduling order regarding the resolution of the claims allowance dispute in this Court.  Under that schedule, the parties will proceed to trial before this Court on August 5, 2024, unless the Court were to lift the stay to permit the funds to initiate arbitral proceedings.[18]

Central States filed a motion that it called one "to compel arbitration of withdrawal liability disputes" or, in the alternative, relief from the automatic stay to permit it to initiate an arbitration against the debtors under § 1401 of the MPPAA.[19]  The other ten funds then filed a separate motion similarly styled.[20]  The debtors objected to the motions to arbitrate, arguing that the determination of whether to allow these claims against the bankruptcy estates should be decided by this Court.[21]  MFN Partners, the largest holder of publicly traded stock of debtor Yellow Corporation, objected to the motion to compel arbitration and disputed the validity of the pension plans' claims.[22]  MFN asserts the value of its equity holdings is dependent on the outcome of the claims allowance process.  Equity in Yellow Corporation would be worthless if the pension funds' claims were allowed but might have substantial value if $7.8 billion in unsecured claims were disallowed.[23]  In addition, the PBGC

---

[17] D.I. 1630 (limited response to Central States objection); D.I. 2128 (limited response to omnibus objection).

[18] D.I. 2195 ¶ 4.

[19] D.I. 1665.

[20] D.I. 2180.

[21] D.I. 1965; D.I. 2438.

[22] D.I. 2440.

[23] *Id.* at 3.

filed a motion in which it reasserts that this Court lacks the authority to find its regulation to be inconsistent with the terms of the statute.[24]

## Jurisdiction

The district court has subject-matter jurisdiction over this contested matter under 28 U.S.C. § 1334(b).  This case has been referred to this Court under 28 U.S.C. § 157(a) and the district court's standing order of February 29, 2012.  Both the motion to compel arbitration and the PBGC's motion arise in connection with a claims allowance dispute, which is a core bankruptcy matter.[25]

## Analysis

### I.    The funds' motions are best understood as motions for relief from the automatic stay.

The funds style their motions as ones to compel arbitration or, in the alternative, for relief from the automatic stay.  Because the specific relief sought determines the applicable legal standard for assessing the motion, the logical starting point is an evaluation of the relief sought in the motions.

Central States' motion makes clear that what it means by an order compelling arbitration is an "order compelling the Debtors to initiate an arbitration" regarding

---

[24] D.I. 2276; D.I. 2451 (debtors' opposition); D.I. 2500 (PBGC's reply).

[25] 28 U.S.C. § 157(b)(2)(B) ("Core proceedings include … allowance or disallowance of claims against the estate").  If the PBGC is correct in arguing that the Court may not consider the validity of its regulation in connection with the claims allowance dispute and that a separate lawsuit against it is required, then such a separate lawsuit may well be (as the PBGC argues) a non-core matter, even if the debtors' reason for bringing it relates to claims allowance.  In view of the procedural posture of the current motions, however, it is unnecessary to resolve that question at this point in the case.

the allowance of Central States' claim.[26]  Because the funds are seeking to recover from the bankruptcy estates, they are essentially in the position of plaintiffs, with the debtors as defendants.  Outside of bankruptcy, the Court is unaware of any authority, under either the MPPAA or the FAA, holding that a defendant in a dispute subject to arbitration can be ordered to *initiate* an arbitration.

Under the MPPAA, the process for determining withdrawal liability begins when the plan sponsor determines the amount of liability and notifies the employer of that amount.[27]  If there is a dispute over that determination, "[e]ither party may initiate [an] arbitration proceeding."[28]  There is no suggestion in the language of the statute, however, that a plan sponsor may obtain a court order directing the employer to commence an arbitration.

Nor is there reason to suggest that, under the FAA, a plaintiff would be able to obtain an order directing a defendant to initiate an arbitration.  It is true that the FAA provides that contractual agreements to arbitrate are enforceable in federal court.[29]  The FAA likewise authorizes district courts, in appropriate circumstances, to "make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."[30]  But there is no occasion for a court to direct a defendant to initiate an arbitration against a plaintiff.  A plaintiff can, of course,

---

[26] D.I. 1665 at 1.

[27] 29 U.S.C. § 1399(b).

[28] *Id.* § 1401(a).

[29] 9 U.S.C. § 2.

[30] *Id.* § 4.

11

initiate an arbitration in the first instance.  A defendant that is refusing to participate can, under § 4 of the FAA, be compelled to do so.[31]  And a defendant can enforce its right to have a dispute resolved in arbitration by having a plaintiff's lawsuit stayed in favor of arbitration.[32]  But the Court is unaware of a setting, and the parties have pointed to none, in which a plaintiff could compel a defendant to *initiate* an arbitration to resolve a dispute.[33]

If such an authority does not exist outside of bankruptcy, there is certainly nothing in the Bankruptcy Code that gives the bankruptcy court that authority.  The Court made a similar point in its recent decision in *Miller v. Shattil*, in which a chapter 7 trustee refused to participate in a prepetition lawsuit against the debtor after having agreed to have the stay lifted to allow that suit to proceed.[34]  "Just like a debtor in possession in a chapter 11 case, a chapter 7 trustee serves as a fiduciary to the bankruptcy estate. The Bankruptcy Code leaves the decision about how to carry out those duties, in the first instance, in the hands of the trustee."[35]  The Court noted

---

[31] *Id.* ("upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement").

[32] *Id.* § 3 ("[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement").

[33] *Cf. Nixon v. Delaware Title Loans, Inc.*, No. 12-7005, 2013 WL 2257836, * 6 (E.D. Pa. May 23, 2013) (explaining that while either party to a dispute could initiate an arbitration, doing so was the party's option, not a "path [a party] was required to pursue").

[34] *Miller v. Shattil, et al.*, Adv. Proc. No. 23-50591, 2024 WL 958080, *6 (Bankr. D. Del. Mar. 5, 2024).

[35] *Id.*

that "[c]ertain transactions such as the use of property or the incurrence of new indebtedness outside the ordinary course of business require bankruptcy court approval."[36] But it added that the Code does not contemplate a role for the Court in micromanaging the trustee's day-to-day affairs.[37]

The same principle applies here. The Court does not see any statutory basis, either in non-bankruptcy law or under the Bankruptcy Code, for the funds' request that it direct the debtors to themselves initiate an arbitration. Accordingly, the question before the Court should be understood as arising in the context of a motion for relief from stay. The next question, therefore, is whether the MPPAA's directive that disputes over withdrawal liability be subject to arbitration imposes a mandatory obligation to grant such relief.[38]

## II.    The Court is not required by applicable law to lift the stay to permit arbitration of the debtors' MPPAA withdrawal liability.

Counsel for the movants largely acknowledged at oral argument that the motions are best understood as ones for relief from the automatic stay and that the question whether to grant such relief was effectively committed to the discretion of

---

[36] *Id.*

[37] *Id.*

[38] The debtors also argued that the plans failed to fulfill the prerequisites before seeking arbitration. This Court, however, believes that the funds satisfied these requirements through the filing of their proofs of claim. *In re Amalgamated Foods*, 41 B.R. 616, 617-618 (Bankr. C.D. Cal. 1984); *see also Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591, 598 (7th Cir. 2008) ("schedules serve little purpose where the recipient is in bankruptcy, where the bankruptcy court can ultimately set its own schedule" and "whether the notice and demand in a Chapter 11 bankruptcy must include a schedule of payments, concern[s] compliance with Section 1399, and thus, [is] subject to arbitration").

the Court through the application of the *Rexene* factors.[39]  The briefs can be read to suggest, however, that the Court is *required* to grant such relief.  The Court will therefore explain why it concludes that the MPPAA does not require it to grant the motions and permit the withdrawal liability claims to be liquidated in arbitration.[40]

### A.    Cases addressing bankruptcy claims subject to arbitration under the FAA are instructive in understanding the effect of the MPPAA's arbitration provision here.

Cases involving conflicting federal statutes pose challenges to federal courts and the litigants who appear before them.  This is such a case.  The MPPAA states that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration."[41]  But § 502(b) of the Bankruptcy Code says that when an objection is filed to a proof of claim, the "court … shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount."[42]

The Supreme Court explained in *Epic Systems* that when "confronted with two Acts of Congress allegedly touching on the same topic," courts are "not at liberty to pick and choose among congressional enactments and must instead strive to give

---

[39] *See In re Rexene Products Co.*, 141 B.R. 574 (Bankr. D. Del. 1992).

[40] Counsel for the funds, in acknowledging that the matter was likely one committed to the Court's discretion, also emphasized that it did not intend to waive the funds' rights in any way.  In pointing to this acknowledgment, the Court accordingly does not suggest that counsel's statements should limit the funds' ability to argue, on appeal or otherwise, that this Court was required to grant the relief the funds sought.

[41] 29 U.S.C. § 1401(a)(1).

[42] 11 U.S.C. § 502(b).

effect to both."[43]  And it is also true, as the *Epic Systems* Court explained, that in "many cases over many years, [the Supreme Court] has heard and rejected efforts to conjure conflicts between the Arbitration Act and other federal statutes."[44]  But as Professor Lawless points out, there is no way fully to harmonize a statutory directive stating that certain disputes "shall" be resolved in bankruptcy with another stating that the same dispute "shall" be decided by arbitration.[45]

In recent years, a robust body of caselaw has addressed this question in cases involving the conflict between the Bankruptcy Code and the FAA.  The jurisprudence is far thinner in the context of the MPPAA.  All of those decisions are from bankruptcy courts outside of this district and reach conflicting decisions.  The most recent of these cases was decided 13 years ago.[46]

That said, the task of reconciling the Bankruptcy Code's dispute resolution mechanisms and a statutory requirement to arbitrate is essentially the same in both contexts.  It is of little moment whether the requirement to arbitrate is reflected in the FAA or the MPPAA.  Because the caselaw addressing this issue is far more developed and more recent in the context of the FAA, the Court believes it appropriate to rely on that precedent in connection with the present motions.

---

[43] *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

[44] *Id.* at 516.

[45] Robert M. Lawless, *Reframing Arbitration & Bankruptcy*, 96 Am. Bankr. L.J. 701, 715 (2022).

[46] From most recent to least recent: *In re BFW Liquidation*, 459 B.R. 757 (Bankr. N.D. Ala. 2011)); *In re Zolner*, 173 B.R. 629 (Bankr. N.D. Ill. 1994); *In re Interco, Inc.*, 137 B.R. 993 (Bankr. E.D. Mo. 1992); *In re T.D.M.A., Inc.*, 66 B.R. 992 (Bankr. E.D. Pa. 1986); *In re Amalgamated Foods, Inc.*, 41 B.R. 616 (Bankr. C.D. Cal. 1984); *In re Cott Corp.* 26 B.R. 332 (Bankr. D. Conn. 1982).

**B.    Third Circuit precedent does not require a court to enforce an arbitration provision in the claims allowance context.**

The context in which the dispute arises in bankruptcy is critical to understanding conflicts between the Bankruptcy Code and arbitration.  The two leading Third Circuit cases, *Hays* and *Mintze*, make that clear.[47]  Those cases explain that when a trustee or debtor-in-possession asserts a pre-bankruptcy claim against a counterparty, an arbitration clause must be enforced.  But when the debtor brings an avoidance action, the arbitration clause in a pre-bankruptcy contract does not apply.  While the cases do not definitively address the context presented here, the claims allowance process, the court's analysis is nevertheless highly instructive.  The ultimate lesson of the caselaw, in this Court's view, is that in the context of claims allowance, a court must find a way to try to harmonize the conflicting statutory directives.

**1.    Arbitration provisions are enforced when a trustee asserts a pre-bankruptcy claim against a counterparty that contains an arbitration clause, but not when a trustee brings a creditor's avoidance action under § 544(b).**

*Hays* explains that when a trustee is bringing suit against a third party on a claim that the debtor held prepetition, and is subject to an arbitration clause, courts should enforce those arbitration provisions.[48]  In light of the "'federal policy favoring arbitration'" described by the Supreme Court in *McMahon*, the fact that the

---

[47] *See Hays and Co v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989); *In re Mintze*, 434 F.3d 222 (3d Cir. 2006).

[48] *Hays*, 885 F.2d 1149.  In this context, "trustee" includes a debtor in possession in its capacity as trustee under § 1107 of the Bankruptcy Code.

Bankruptcy Code generally contemplates the centralization of disputes before a bankruptcy court is insufficient to defeat arbitration.[49]  Rather, to defeat arbitration one would need to show a conflict between the Bankruptcy Code and arbitration. Applying that principle, the *Hays* court found no such conflict when a bankruptcy trustee asserted a claim against a third party that the debtor held before the bankruptcy case, as opposed to a claim created by bankruptcy law itself.

Appreciating that the Bankruptcy Code seeks (at least in part) to consolidate litigation affecting the bankruptcy estate before the bankruptcy court, the Third Circuit rejected a "hierarchy of congressional concerns that places the bankruptcy law in a position of superpriority over" all other federal laws.[50]  Rather, the court believed that the task was "carefully [to] determine whether any underlying purpose of the Bankruptcy Code would be adversely affected" by enforcing an arbitration clause.[51]  "Where, as here, a trustee seeks to enforce a claim inherited from the debtor in an adversary proceeding in a district court, we perceive no adverse effect on the underlying purposes of the Code from enforcing arbitration."[52]

---

[49] *Id.* at 1156 (quoting *Shearson/American Exp. v. McMahon*, 482 U.S. 220 (1987)).

[50] *Hays*, 885 F.2d at 1161.

[51] *Id.*

[52] *Id.*  The Ninth Circuit reached the opposite conclusion in *In re Thorpe*, 677 F.3d 8869 (9th Cir. 2012), holding that even when the debtor in possession was pursuing a prepetition claim against a third party, the bankruptcy court had the authority to decline to enforce an arbitration clause where the resolution of the claim was important to the debtor's plan of reorganization and would substantially affect creditor recoveries.  *Hays* is, of course, controlling in this Court.  It bears note, however, that like the Third and Ninth Circuits, well regarded bankruptcy scholars have divided over this question.  *Compare* Lawless, *supra* note 45, at 744 ("[C]ourts should find the estate takes [a cause of action that the debtor held prepetition] subject to the arbitration clause") *and* Stephen J. Ware, *Bankruptcy Law's Treatment of Creditor's Jury-Trial and Arbitration Rights*, 17 Am. Bankr. Int. L.J. 479, 488

On the other hand, the *Hays* court distinguished a claim that the debtor held prepetition and that came into the bankruptcy estate under § 541 from an avoidance action that a bankruptcy trustee may assert under § 544(b).  Because § 544(b) gives the trustee in bankruptcy the authority to pursue claims that *creditors* could have otherwise asserted against the debtor outside of bankruptcy, the *debtor's* agreement to arbitrate could not extend to such a claim.  As the Third Circuit explained, there "is no justification for binding creditors to an arbitration clause with respect to claims that are not derivative from one who was a party to it."[53]  Accordingly, the law in this jurisdiction is settled that a defendant in an avoidance action under § 544(b) cannot enforce against a trustee an arbitration agreement that the defendant had with the prepetition debtor.

> **2.    Third Circuit caselaw does not resolve the question whether a claims allowance dispute is subject to arbitration if the underlying claim, outside of bankruptcy, would be.**

The two examples set forth in *Hays* are perhaps the "easy cases" at opposite poles that establish the framework for the current dispute.  But what about in the context of claims allowance?

---

n.38 (2009) ("[C]ourts generally grant creditors' requests to order arbitration in debtor-derivative, noncore matters, such as adversary proceedings to enforce state or federal law claims that the debtor could have asserted prepetition") (internal citation and quotation omitted) *with* Anthony J. Casey & Joshua C. Macey, *The Bankruptcy Tribunal*, 96 Am. Bankr. L.J. 749, 750 (2022) ("Our general principle is that the bankruptcy tribunal should be the exclusive tribunal to resolve a dispute if sending that dispute elsewhere would thwart the Code's purpose of providing a collective forum where parties can coordinate to resolve multiparty disputes that involve distressed firms.").

[53] *Hays*, 885 F.2d at 1155.

No Third Circuit case squarely addresses that question. The closest case, however, is *Mintze*. There, a chapter 13 debtor sought to disallow a secured claim filed by her prepetition lender by seeking to rescind the mortgage via an adversary proceeding under the Truth in Lending Act.[54] The lender argued that the adversary proceeding was subject to mandatory arbitration by virtue of an arbitration clause contained in the mortgage documents.[55]

The bankruptcy court disagreed, holding that it had discretion to determine whether the adversary proceeding should be subject to arbitration, and that the matter was best resolved in the bankruptcy court, because "the outcome of Mintze's recission claim would affect her bankruptcy plan and the distribution of monies to her other creditors."[56]

The Third Circuit, however, found that to be an insufficient basis to decline to enforce an arbitration provision. The court first explained the question whether the dispute is a "core" or "non-core" matter under 28 U.S.C. § 157 affects only the allocation of decisional authority between the bankruptcy court and the district court. The core/non-core distinction has nothing at all to do with the question whether an arbitration provision should be enforced.[57] The court then turned to the question

---

[54] The Truth in Lending Act is referred to as "TILA."

[55] *Mintze*, 434 F.3d at 226.

[56] *Id.* at 227 (citing *In re Mintze*, 288 B.R. 95 (Bankr. E.D. Pa. 2003)).

[57] 434 F.3d at 229. *See also* Lawless, *supra* note 45, at 707-713 (explaining that the distinction between core and non-core matters does not bear on whether a bankruptcy dispute is arbitrable). Several courts of appeals, however, nevertheless reach the opposition conclusion. *See, e.g., In re Elec. Mach. Enters., Inc.*, 479 F.3d 791, 796 (11th Cir. 2007); *In re Moses*, 781 F.3d 63 (4th Cir. 2015); *MBNA America Bank v. Hill*, 436 F.3d 104 (2d Cir. 2006).

whether the bankruptcy court was required to enforce the arbitration clause. It noted the "strong policy in favor of arbitration" reflected in the FAA and a line of cases culminating in the Supreme Court's *McMahon* decision.[58] To overcome the force of that principle, one must show a congressional intent to create an exception to it, which may be shown (as relevant here) either through the statutory text or an inherent conflict between arbitration and another federal statute's underlying purpose.[59]

The Third Circuit found no such conflict in *Mintze*. In reaching that decision, the court framed the issue as a two-party adversary proceeding between Mintze and her mortgage lender. Rather than viewing the dispute as part of the claims allowance process under § 502(b) of the Bankruptcy Code, the Third Circuit described Mintze's claims as "statutory claims… based on TILA and several state and federal consumer protection laws."[60] The court added that "Mintze has failed to raise any statutory claims that were created by the Bankruptcy Code."[61] Accordingly, because there was "no bankruptcy issue to be decided by the Bankruptcy Court," the Third Circuit concluded that there was no "inherent conflict between arbitration of Mintze's state

---

[58] *Mintze*, 434 F.3d at 229 (citing *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, (1983); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 220 (1985); and *McMahon*, 482 U.S. at 226).

[59] *Mintze,* 434 F.3d at 229.

[60] *Id.* at 231.

[61] *Id.*

and federal consumer protection issues and the underlying purposes of the Bankruptcy Code."[62]

Significantly, the court placed emphasis on the fact that *Mintze*, like *Hays,* involved a two-party dispute (arising in an adversary proceeding) between the debtor and a third party. "In *Hays*, the trustee sought to enforce a claim it inherited from the debtor in an adversarial proceeding in the district court…. Here, the debtor herself seeks to enforce a claim in an adversary proceeding in the bankruptcy court."[63]

This Court does not read *Mintze* to hold that the presence of an arbitration clause *requires* that a claim against the debtor's bankruptcy estate be liquidated through arbitration rather than through the claims allowance process in bankruptcy. Rather, the Third Circuit emphasized the fact that the debtor was asserting a TILA claim in an adversary proceeding. In fairness, the alternate reading would not be inconsistent with the posture in which the case arose. The adversary proceeding in *Mintze* was filed in response to the lender's proof of claim.[64] And this procedural posture was reflected in the bankruptcy court's reasoning.[65] Even so, the Third Circuit opinion in *Mintze* focused heavily on the fact that the claim at issue was a

---

[62] *Id.*

[63] *Id.* at 232.

[64] *Mintze*, 434 F.3d at 225-226.

[65] *See In re Mintze*, 288 B.R. at 100 ("the outcome of this adversary proceeding will directly affect how the Debtor's monthly payments are distributed among [the debtor's] creditors"). Note that in *Mintze*, Judge Carey, then sitting on the Bankruptcy Court for the Eastern District of Pennsylvania, stated expressly that the adversary proceeding would determine "whether American General's claim is secured."

claim arising under non-bankruptcy law and that the case involved a two-party adversary proceeding between the debtor and the lender.

There are two critical differences between claims allowances disputes and the Third Circuit's characterization of *Mintze*. *First*, claims allowance disputes arise out of the bankruptcy court's *in rem* jurisdiction over the bankruptcy estate rather than being ordinary civil lawsuits between two parties. The Supreme Court has made clear that the claims allowance process is at the heart of a bankruptcy court's jurisdiction over the property of the bankruptcy estate. "The whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests in a claimed *res*."[66]  Or as Professor Lawless put the point: "A claim objection again implicates the exclusive power of the bankruptcy tribunal over the bankruptcy estate. To use an old metaphor, the bankruptcy estate is a pie, and the bankruptcy process is about dividing up the pie among creditors….  There is only one pie, and it can be divided up only once."[67]

Any "party-in-interest" has a statutory right to participate in a claims allowance dispute, precisely because the resolution of the dispute affects every party that asserts a claim to the "pie."[68]  Unsurprisingly, both case law and the leading

---

[66] *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947).

[67] Lawless, *supra* note 45, at 733-734.

[68] 11 U.S.C. § 1109(b) (granting any party in interest the right to appear and be heard on any issue, including "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee"); *id.* § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, *unless a party in interest… objects*.").

22

treatise thus make plain that any party in interest is entitled to participate in the claims allowance process.[69]

*Second*, while the Third Circuit emphasized that the claim in *Mintze* arose under TILA rather than the Bankruptcy Code, claims allowance disputes—even though they require consideration of non-bankruptcy law—are at bottom matters arising under § 502 of the Bankruptcy Code.[70]

These features of the claims allowance process, particularly in a context in which (as here) a party-in-interest seeks to exercise its statutory right to object to a claim, are sufficient to distinguish this case from *Mintze*. The Court is thus left with the task of reconciling the statutory directives provided in the MPPAA and § 502(b) of the Bankruptcy Code.

### C. The MPPAA's arbitration provision is best understood to create a presumption in favor of granting stay relief to permit the claim to be liquidated through arbitration.

There is no getting around the fact § 502(b) of the Bankruptcy Code and the MPPAA cannot simultaneously be given their full effect. Taken literally, the directives that disputes over MPPAA withdrawal liability "shall" be resolved through arbitration and that the bankruptcy court "shall" resolve disputes over claims allowance necessarily conflict.[71] In that sense, the unavoidable reality is that

---

[69] *See In re Weinstein Co. Holdings*, 595 B.R. 455 (Bankr. D. Del. 2018) (holding that parties in interest, other than a chapter 7 trustee, have standing to seek modification of another creditor's claim); *Collier on Bankruptcy* ¶ 502.02[2][d] (16th ed. 2024) ("[T]he right of a creditor to object to the allowance of another creditor's claim should be undisputed.").

[70] This is why claims allowance disputes may, consistent with Article III, be treated as core matters. *See* 28 U.S.C. § 157(b)(2)(B).

[71] *See* 29 U.S.C. § 1401(a)(1); 11 U.S.C. § 502(b).

something has got to give.  But that does not mean that the provisions cannot be reconciled, at least in part.  Courts are obligated to seek to harmonize federal statutes whenever there is a way to do so.  The conflict between the Bankruptcy Code's claims allowance process and the federal policy in favor of arbitration (whether reflected in the FAA or the MPPAA) is best reconciled by treating the arbitration provision as creating a *presumption* in favor of stay relief to permit the claim to be liquidated in arbitration.

The Supreme Court has been crystal clear that when confronting conflicting provisions of federal law, a court may not throw up its hands and simply choose to follow the directive that it prefers.  The imperative to harmonize federal statutes, whenever possible, stems from the need to respect congressional policy choices rather than leave courts the option of adopting the judge's preferred policy.  "Allowing judges to pick and choose between statutes risks transforming them from expounders of what the law is into policymakers choosing what the law should be.  Our rules aiming for harmony over conflict in statutory interpretation grow from an appreciation that it's the job of Congress by legislation, not [the courts] by supposition, both to write the laws and to repeal them."[72]

A means of reconciling these statutory directives is available, given the procedural posture of the motions.  As described above in Part I, the pension plans' motions seek relief from the automatic stay to permit the funds to initiate arbitral proceedings under the MPPAA.  And in this jurisdiction, the balancing test set forth

---

[72] *Epic Systems*, 584 U.S. at 511.

in *Rexene* is sufficiently flexible to allow the Court to give appropriate weight to the policy favoring arbitration as a factor to consider in deciding whether to lift the stay.[73]

Creditors commonly seek relief from the automatic stay when they believe a prepetition claim against the debtor is more properly liquidated in another forum. *Rexene* involved precisely such a situation. There, a creditor sought stay relief to permit a claim arising out of a company's allocation of stock under a company's stock bonus plan to proceed in district court where it had been pending for eight months, and was ready to be tried, as of the time of the bankruptcy. In light of the district court's familiarity with the dispute, Judge Balick concluded that it made sense to allow the case to proceed "in a single forum and with the same judge who was originally assigned to the case."[74]

The *Rexene* decision sets forth a standard for considering such a motion. The question is whether "a) [a]ny great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit, b) the hardship to the [non-bankrupt party] by maintenance of the stay considerably outweighs the hardship of the debtor, and c) the creditor has a probability of prevailing on the merits."[75]

The statutory directive to resolve disputes such as this in arbitration is, of course, another important factor that is entitled to substantial weight in this analysis. If the Court believed arbitration were *required*, then the statutory directive

---

[73] *See Rexene*, 141 B.R. 574.

[74] *Id.* at 577.

[75] *Id.* at 576.

would override the other *Rexene* factors.[76]  Despite this Court's decision that it is not required to permit arbitration to proceed, it nevertheless concludes that the MPPAA's inclusion of an arbitration provision, and a mechanism for selecting an arbitrator with relevant expertise, are factors that are entitled to substantial weight in this analysis.

The Second Circuit's decision in *Sonnax* fleshes out the balancing test set forth in *Rexene*.  The court there said that a court that is considering whether to permit a prepetition claim to be liquidated in a different tribunal should consider:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.[77]

---

[76] The bankruptcy court would presumably retain discretion to decide *when* it was appropriate to lift the stay, given the importance of the "breathing spell" to the bankruptcy process.

[77] *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990).  The fact that bankruptcy courts will at times grant stay relief to permit prepetition claims to be liquidated outside of bankruptcy suggests that some of the rhetoric in the caselaw and academic literature about the imperative to centralize all claims allowance before a single judge is perhaps overblown. Relatedly, 28 U.S.C. § 157(b)(5) provides that personal injury and wrongful death tort claims are to be liquidated in the district court – though in such cases, the district court is acting (as it would if it were to withdraw the reference) in its capacity as part of the "bankruptcy tribunal."  *See* Lawless, *supra* note 45, at 703; Casey & Macey, *supra* note 52, at 750 ("We consciously avoid the term 'bankruptcy court,' which creates a false distinction between a

This Court views that 12-factor test to be of only some assistance. As the Third Circuit said in *Owens Corning* of such multi-factor balancing tests, "[t]oo often, the factors in a checklist fail to separate the unimportant from the important, or even to set out a standard to make the attempt.... This often results in rote following of a form containing factors where courts tally up and spit out a score without an eye on the principles" that should inform the decision.[78]

Here, the congressional judgment that MPPAA withdrawal liability disputes should be resolved in arbitration is entitled to very substantial weight in the lift stay analysis. Put in terms of the *Sonnax* factors, the fourth factor—the establishment of a specialized tribunal—counsels in favor of stay relief.[79] Indeed, in this Court's view, the policy favoring arbitration should mean that a bankruptcy court should *presumptively* grant a motion for stay relief.

That presumption, however, is one that can be overcome in appropriate circumstances where the imperatives of the bankruptcy case (which will typically be reflected in other *Sonnax* factors) so require. For example, in a bankruptcy case in which general unsecured claims were going to receive only pennies on the dollar, the common sense of liquidating a claim through an "expeditious and economical" claims estimation proceeding under § 502(c) would likely be sufficient to overcome the

---

bankruptcy proceeding in a United States Bankruptcy Court and a bankruptcy proceeding in a United States District Court. For our purposes here, the District Court and the Bankruptcy Court are constituent parts of the same bankruptcy tribunal and function in the same role when presiding over bankruptcy matters.").

[78] *In re Owens Corning*, 419 F.3d 195, 210 (3d Cir. 2005).

[79] 907 F.2d at 1286.

presumption in favor of arbitration—particularly if the arbitration was likely to be a long and expensive one.[80]

That said, this Court is acutely aware of the fact that in engaging this analysis, there is a risk that this Court, as a bankruptcy court, may place too much weight on the sound operation of the bankruptcy process. Some argue that bankruptcy judges tend to place an outsized premium on the importance of the sphere with which they are most familiar.[81] This Court appreciates those risks, and believes it is obligated to guard against this way of thinking. It will endeavor to do so in considering, in Part III, whether the presumption is overcome by other factors that counsel strongly in favor of the bankruptcy court's retention of jurisdiction over that dispute.

## III.    The presumption in favor of arbitrating a claims allowance dispute is overcome; the withdrawal liability claims will be liquidated in this Court through the claims allowance process.

This Court concludes that the unusual circumstances of this case counsel strongly in favor of resolving the withdrawal liability disputes through the claims

---

[80] *See id.* (factor 10).

[81] *See generally*, Jonathan M. Seymour, *Against Bankruptcy Exceptionalism*, 89 U. Chi. L. Rev. 1925 (2022). On this view, bankruptcy courts tend to perceive the relative importance of bankruptcy law versus everything else much like the *New Yorker* magazine cover of a *View of the World from Ninth Avenue*, with the imperatives of the bankruptcy case appearing prominently in the front and center, while everything else is of receding importance as it fades into the distance. *See View of the World from 9th Avenue & Steinbergian Cartography*, Saul Steinberg Found., https://saulsteinbergfoundation.org/essay/view-of-the-world-from-9th-avenue/.

allowance process, notwithstanding the presumption in favor of arbitration.  The considerations supporting that conclusion are the following:[82]

*First*, in the typical claims allowance dispute, only the debtor-in-possession objects to a creditor's claim.  In this case, MFN Partners has filed claims objections and is entitled under the Bankruptcy Code to participate in the claims allowance process.  The funds represented at argument that they would not object to MFN Partners' participation as a party in the arbitration.  The Court has no reason whatsoever to doubt the representations of counsel.  That said, because the MPPAA describes the arbitration as one between the employer and a fund, the Court cannot be confident that the arbitrators (who have not yet been identified) might conclude that other parties in interest are precluded by the MPPAA from participating.[83]

*Second*, this Court has entered a scheduling order providing for trial on the claims allowance dispute to take place in August of this year.  The parties agree that this dispute is among the most important matters to be resolved in this bankruptcy case, and obtaining such a resolution promptly is of particular importance.  The outcome of this dispute is likely to determine the allocation of hundreds of millions of dollars in proceeds of the debtors' highly successful asset sales.  While the funds have represented that they would seek to keep the same schedule in the event the matter proceeded to arbitration (which representation this Court again accepts at face

---

[82] While neither party presented evidence in connection with the hearing on the instant motions, the facts at issue are not contested and all involve matters of which the Court believes it can take judicial notice.

[83] 29 U.S.C. § 1401(a)(1) ("Any dispute between an employer and the plan sponsor of a multiemployer plan").

value), doing so will depend in part on the schedules and availability of arbitrators who have not yet been named.  In the unusual circumstances of this case, in which such substantial sums will need to be held in reserve (and will therefore be earning a very low, nearly risk-free rate of return), the Court concludes that the risk of delay counsels strongly in favor of denying stay relief.

*Third,* unlike an arbitration under the FAA, in a MPPAA arbitration, the decision of the arbitrator is subject to judicial review.  Indeed, the standard of review is that the arbitrator's factual findings are entitled to deference while its legal conclusions can be reviewed *de novo* by the district court.[84]  In that regard, the arbitrator's determination would be reviewed by a district court in essentially the same manner in which this Court's claims allowance decision would be reviewed.  That standard is quite different from the very narrow bases under which arbitral awards are subject to judicial review under the FAA.[85]  For this reason, who hears the dispute in the first instance is far less likely to be outcome determinative than it would be in an FAA arbitration.  Because the parties are looking at the same type of appellate review process regardless of which tribunal decides the dispute in the first instance, the policy favoring arbitration should be afforded somewhat less weight

---

[84] 29 U.S.C. § 1401(c) ("there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct"); *Carl Colteryahn Dairy, Inc. v. Western Pa. Teamsters and Employers Pension Fund*, 847 F.2d 113, 123 n.17 (3d Cir. 1988) (discussing *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204, 1207 n.7 (D.C. Cir. 1984) and the applicability of these standards of review).

[85] *See generally* 9 U.S.C. § 10(a).

than it would be in an FAA dispute, where the arbitrator's decision would be nearly unreviewable.

*Finally*, as described below in Part IV, in this case the PBGC contends that neither this Court nor an arbitrator would have authority to address the challenge the debtors assert to the PBGC regulation. As a result, the PBGC believes that it is necessary to conduct a complex parallel proceeding in the district court, which the PBGC contends has exclusive authority to pass on the validity of its regulation. While the Court's preliminary view is that this is incorrect, the PBGC has a much stronger argument about the need for a separate parallel proceeding in the district court if the case were to proceed before an arbitrator. This counsels further against arbitration.

The Court does not believe that the presumption in favor of arbitration is one that should lightly be overcome. Nevertheless, for the reasons set forth above, the Court concludes that it will deny the motions for relief from stay and resolve the withdrawal liability dispute through the claims allowance process.

## IV. The Court is doubtful of the PBGC's argument that the Administrative Procedure Act bars this Court from considering the validity of the agency regulation but need not decide the issue at this preliminary stage; however, the implications of this argument counsel in favor of denying the motion for relief from stay.

The PBGC asks this Court to determine that the debtors are precluded from challenging the validity of its regulation in connection with the claims allowance process. It argues such a challenge to an agency regulation can only be made in an affirmative suit brought against the agency in federal district court under the Administrative Procedure Act.

31

That question need not be decided at this stage in the case.  Rather, the PBGC may participate as a party-in-interest (or, if it prefers, as *amicus*) in the claims allowance process and is welcome at that point to put forward any argument it seeks to advance in defense of its regulation.  At that stage of the litigation, the parties should address the implications of the Supreme Court's decision in *PDR Network*, which indicates that the usual rule is the opposite of the position the PBGC advances here.[86]  Section 703 of the APA permits a party to challenge an agency regulation in an ordinary civil action to enforce a statutory right, much like (it would appear) the claim for withdrawal liability under the MPPAA filed by the funds.  There is an exception to that usual rule where there is a "prior, adequate, and exclusive" opportunity for judicial review set forth by statute.  But the provisions of the MPPAA to which the PBGC cites do not appear to create such an exception.

Section 703 of the APA states that:

> The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.[87]

---

[86] *See PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S.Ct. 2051 (2019).

[87] 5 U.S.C. § 703.

According to the PBGC, the "special statutory review proceeding relevant to the subject matter" is 29 U.S.C. § 1303(f)(1), which states that "[e]xcept with respect to withdrawal liability disputes under part 1 of subtitle E, any person who is a[n] … employer … and is adversely affected by any action of the corporation with respect to a plan in which such person has an interest … may bring an action against the corporation for appropriate equitable relief in the appropriate court."  Under 29 U.S.C. § 1303(f)(2), an "appropriate court" can only be a district court.  And 29 U.S.C. § 1303(f)(4), in turn provides that "[t]his subsection shall be the exclusive means for bringing actions against the corporation under this subchapter."

Taking these provisions together, the PBGC contends only a federal district court may hear a challenge to a PBGC regulation.[88]  While the Court need not address this contention on the merits until it becomes ripe in the claims allowance process, it sets forth these preliminary views to assist the parties in that regard.

As an initial matter, this Court is a "unit" of the district court.[89]  The PBGC may proceed as a party in interest in connection with the claims allowance proceeding.  As such, even if the "exclusive" mechanism for challenging a PBGC regulation would be an action against the agency in a federal district court, it is not obvious that the claims allowance process in this Court would not satisfy these statutory requirements.

---

[88] D.I. 1630 at 12.

[89] 28 U.S.C. § 151.

But perhaps more fundamentally, it is not clear that § 1303 should be read to make a district court the exclusive venue to challenge the validity of a PBGC regulation.  Section 1303(f)(4) says that an action under the subsection is the only means to sue the PBGC.  But there is nothing in the statute that suggests that the only way to challenge a PBGC regulation is by suing the PBGC.  Indeed, the reference in § 703 of the APA to such a challenge being asserted in an ordinary civil enforcement action suggests the opposite.

The Supreme Court recently considered a similar question in *PDR Network*.  That case was a class action lawsuit by a health care practice under the Telephone Consumer Protection Act, brought against a company (PDR Network) that had sent it an unsolicited fax.  The Telephone Consumer Protection Act prohibits sending an "unsolicited advertisement" by fax.[90]  The statute defines an unsolicited advertisement as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission."[91]

The fax that PDR had sent to the plaintiff, however, offered a way to download, for free, a book that PDR had published.  As such, PDR's defense to the lawsuit was that its fax did not advertise the "commercial availability" of any goods or services.  The difficulty with that defense, however, was that the Federal Communications Commission had issued a regulation stating that fax messages that "promote goods

---

[90] 47 U.S.C. § 227(b)(1)(C).

[91] *Id.* § 227(a).

34

or services even at no cost, such as free magazine subscriptions, catalogs, or free consultations or seminars, are unsolicited advertisements under the [statutory] definition."[92]

PDR accordingly sought to argue, in the district court in which the class action lawsuit had been filed, that the FCC's regulation was invalid on the ground that it conflicted with the text of the statute.  The district court agreed and ruled for PDR. The Fourth Circuit, however, reversed on the ground that only the court of appeals had statutory authority to consider the validity of the FCC's regulation.[93]

The relevant statutory language there was the Hobbs Act.  While regulations promulgated by most administrative agencies (including the PBGC) can be challenged in any federal district court under the Administrative Procedure Act, the Hobbs Act provides courts of appeals exclusive jurisdiction to consider pre-enforcement review of certain agency actions.[94]  The relevant statutory provision here, § 1303(f), is far less clear than the Hobbs Act, which grants the courts of appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" certain "final orders of the Federal Communication Commission."[95]

The question presented in *PDR Network* was whether the Hobbs Act was the type of special statutory review proceeding that, when it is available, precludes a

---

[92] *PDR Networks*, 139 S.Ct. at 2054.

[93] *Id.*

[94] *Id.* at 2055.

[95] 28 U.S.C. § 2342(1).

court from reviewing an agency action in an ordinary civil lawsuit – "judicial review in civil …proceedings for judicial enforcement."[96]

The government argued that the availability of pre-enforcement review under the Hobbs Act *did* preclude judicial review in a civil proceeding.  It explained that "Section 703 … establishes a general rule that, when a defendant's liability depends in part on the propriety of an agency action, that action can ordinarily be challenged in a civil … enforcement suit."[97]  A court in a civil enforcement action, however, is not permitted to consider a challenge to the regulation if "an 'adequate' opportunity to obtain review was previously available and that avenue has been designated as 'exclusive.'"[98]

The government went on to argue that under the language of the Hobbs Act a petition for review of the agency action in the court of appeals was such an "adequate" and "exclusive" mechanism for challenging the FCC regulation.  That language, the government contended, thus created an exception to the "general rule."  PDR, by contrast, argued that Hobbs Act review was "inadequate" within the meaning of the APA, such that the "general rule" remained in place.

The Supreme Court ultimately did not reach that question, with a five-justice majority deciding the case on a different ground.[99]  Four justices, however, would

---

[96] *PDR Network*, 139 S.Ct. at 2056.

[97] Brief of the United States as Amicus Curiae in Support of Resp. at 24, *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S.Ct. 2051 (2019) (No. 17-1705).

[98] *Id*.

[99] *PDR Network*, 139 S.Ct. at 2055-2056.

have reached the issue. Their analysis, in a concurring opinion written by Justice Kavanaugh, was fairly simple:

> The general rule of administrative law is that in an enforcement action, a defendant may argue that an agency's interpretation of a statute is wrong, at least unless Congress has expressly precluded the defendant from advancing such an argument. The Hobbs Act does not expressly preclude judicial review of an agency's statutory interpretation in an enforcement action. Therefore, in this enforcement action, PDR may argue to the District Court that the FCC's interpretation of the TCPA is wrong. The District Court is not bound by the FCC's interpretation of the TCPA. Rather, the District Court should interpret the TCPA under usual principles of statutory interpretation, affording appropriate respect to the agency's interpretation.[100]

What does all of this mean for the PBGC's argument that this Court would be precluded, in a claims allowance proceeding, from considering the debtor's challenge to the validity of its regulation? That question need not be decided at this stage in the litigation. The PBGC may participate as a party in interest in the claims allowance process for the purpose of defending its regulation, including advancing the argument that this Court is precluded from considering any challenge thereto.

In engaging that argument, however, the parties should be prepared to address the following questions:

- Does the PBGC agree with the position set forth by the government in *PDR Networks* that the "general rule" is that an agency regulation may, under the APA, be challenged in an ordinary civil enforcement action?

- If so, do the provisions of 29 U.S.C. § 1303(f) establish the kind of "special statutory review proceeding" that operates to preclude a

---

[100] *Id.* at 2058 (Kavanaugh, J., joined by Thomas, Alito and Gorsuch, J.J., concurring).

challenge to the regulation in an ordinary enforcement action?  What is the Court to make of the fact that unlike the Hobbs Act, which by its terms bars any challenge to an agency's final action, § 1303(f) simply limits the ability to bring suit against the agency?  How can the (implicit) argument that a challenge to an agency regulation requires an affirmative suit against the agency be squared with reference in § 703 of the APA to a challenge being asserted as a defense in a civil enforcement action, like the class action suit in *PDR Networks* or the claims dispute before this Court?

- Do the parties dispute that the claims allowance process before this Court, in its capacity as a unit of the district court with legal rulings subject to *de novo* review in the district court, constitutes a civil enforcement action within the meaning of the APA?

- What should the court make of the language in § 1303(f)(1) that creates an exception for "withdrawal liability disputes under part 1 of subtitle E"?  Does that language render the "special statutory review proceeding" established by 1303(f) (if indeed it qualifies as such) "unavailable" in this case?

To the extent it may be of assistance of the parties, the Court notes that its preliminary reactions are (a) that the claims allowance process in this Court *is* a civil enforcement action within the meaning of § 703 of the APA, and (b) that the argument that 1303(f) creates a "special statutory review proceeding"—if that provision is even

applicable here—is far weaker than the argument that the Hobbs Act created one. None of this is to say that the Court has definitively rejected the PBGC's argument that the § 1303(f) precludes it from considering a challenge to its regulation. The Court remains opening to considering those arguments in connection with the claims allowance process. But it is fair to say that the arguments advanced in the briefs that the PBGC has submitted in connection with the existing motion have not yet persuaded the Court of that position.

The Court notes, however, that the PBGC may well have a somewhat stronger argument that an *arbitral tribunal* would be prohibited from considering a challenge to its regulation. While § 703 of the APA contemplates "judicial review" of agency action, it is at least not immediately obvious that an arbitration would count as such "judicial review."[101] The PBGC might therefore have a stronger argument that its regulation would need to be treated as valid in an arbitral proceeding. And if that were correct, perhaps it could be argued that an appeal to the district court of an arbitral award is not the type of civil proceeding for judicial enforcement contemplated by § 703 of the APA. This Court, of course, need not and should not purport to resolve those questions here. But as noted above, even the possibility that obtaining the resolution of the claims dispute through an MPPAA arbitration might require a cumbersome separate APA action filed in district court counsels in favor of proceeding with the claims allowance process in this Court.

---

[101] *But see Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia*, 830 F.2d 1241 (3d Cir. 1987) (purely legal dispute over the application of the MPPAA to a particular case was to be decided, in the first instance, through the arbitral process).

**Conclusion**

For the foregoing reasons, the funds' motions for relief from stay and the PBGC's motion for a determination that the Court may not consider the validity of its regulation will be denied.  The Court will issue a separate order so providing.

Dated: March 27, 2024

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE