## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | Case No. 23-11069 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 2576 – 2582** |

## <u>CERTIFICATE OF SERVICE</u>

I, JANICE LIVINGSTONE, hereby certify that:

1. I am employed as a Senior Case Manager by Epiq Corporate Restructuring, LLC, with their principal office located at 777 Third Avenue, New York, New York 10017. I am over the age of eighteen years and am not a party to the above-captioned action.

2. I caused to be served the:

   a. "Debtors' Third Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," dated March 12, 2024 [Docket No. 2576], (the "3rd Objection"),

   b. "Debtors' Fourth Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," dated March 12, 2024 [Docket No. 2577], (the "4th Objection"),

   c. "Debtors' Fifth Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," dated March 12, 2024 [Docket No. 2578], (the "5th Objection"),

   d. "Declaration of Brian Whittman in Support of Debtors' Third, Fourth, and Fifth Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," dated March 12, 2024 [Docket No. 2579], (the "Whittman Declaration"),

   e. "Declaration of Cody Leung Kaldenberg in Support of Debtors' Third, Fourth, and Fifth Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," dated March 12, 2024 [Docket No. 2580], (the "Kaldenberg Declaration"),

   f. "Declaration of Darren Hawkins in Support of Debtors' Third, Fourth, and Fifth Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," dated March 12, 2024 [Docket No. 2581], (the "Hawkins Declaration"),

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the December 12 Sale Order, the January 12 Sale Order, or the February 22 Sale Order, as applicable.

g.  "Declaration of Sarah Statlander in Support of Debtors' Third, Fourth, and Fifth Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," dated March 12, 2024 [Docket No. 2582], (the "Statlander Declaration"),

h.  "Debtors' Fourth Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," *without Exhibits,* dated March 12, 2024, *related to Docket No. 2577,* a copy of which is annexed hereto as <u>Exhibit A</u>, (the "Slipsheet 4th Objection"),

i.  "Debtors' Fifth Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," *without Exhibits,* dated March 12, 2024, *related to Docket No. 2578,* a copy of which is annexed hereto as <u>Exhibit B</u>, (the "Slipsheet 5th Objection"),

j.  *slipsheet version of* "Declaration of Darren Hawkins in Support of Debtors' Third, Fourth, and Fifth Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," *related to Docket No. 2581,* a copy of which is annexed hereto as <u>Exhibit C</u>, (the "Slipsheet Hawkins Declaration"),

k.  *customized* "Debtors' Fourth Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," *related to Docket No. 2577,* a sample of which is annexed hereto as <u>Exhibit D</u>, (the "Custom 4th Notice"), and

l.  *customized* "Debtors' Fifth Omnibus (Substantive) Objection to Proofs of Claim for Warn Liability," *related to Docket No. 2578,* a sample of which is annexed hereto as <u>Exhibit E</u>, (the "Custom 5th Notice"),

by causing true and correct copies of the:

i.  3rd Objection, 4th Objection, 5th Objection, Whittman Declaration, Kaldenberg Declaration, Slipsheet Hawkins Declaration, and Statlander Declaration to be enclosed securely in separate postage pre-paid envelopes and delivered via first class mail to those parties listed on the annexed <u>Exhibit F</u>, on March 12, 2024,

ii.  3rd Objection to be enclosed securely in separate postage pre-paid envelopes and delivered via first class mail to those parties listed on the annexed <u>Exhibit G</u>, on March 12, 2024,

iii.  3rd Objection, 4th Objection, 5th Objection, Whittman Declaration, Kaldenberg Declaration, Hawkins Declaration, and Statlander Declaration to be delivered via electronic mail to those parties listed on the annexed <u>Exhibit H</u>, on March 12, 2024,

iv.  Custom 4th Notice and Slipsheet 4th Objection to be enclosed securely in separate postage pre-paid envelopes and delivered via first class mail to those parties listed on the annexed <u>Exhibit I</u>, on March 12, 2024,

v.   Custom 5th Notice and Slipsheet 5th Objection to be enclosed securely in separate postage pre-paid envelopes and delivered via first class mail to those parties listed on the annexed <u>Exhibit J</u>, on March 12, 2024, and

vi.   Whittman Declaration, Kaldenberg Declaration, Slipsheet Hawkins Declaration, and Statlander Declaration to be enclosed securely in separate postage pre-paid envelopes and delivered via first class mail to those parties listed on the annexed <u>Exhibit K</u>, on March 13, 2024.

3. All envelopes utilized in the service of the foregoing contained the following legend: "LEGAL DOCUMENTS ENCLOSED. PLEASE DIRECT TO THE ATTENTION OF ADDRESSEE, PRESIDENT OR LEGAL DEPARTMENT."

<u>*/s/ Janice Livingstone*</u>
Janice Livingstone

**EXHIBIT A**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | ) |
|  | ) Case No. 23-11069 (CTG) |
| Debtors. | ) |
|  | ) (Jointly Administered) |
|  | ) |
|  | ) |
|  | ) |

**Response Deadline: March 26, 2024, at 4:00 p.m. (ET)**
**Hearing Date: April 11, 2024, at 11:00 a.m. (ET)**

## DEBTORS' FOURTH OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM FOR WARN LIABILITY

**THIS OBJECTION SEEKS TO DISALLOW, REDUCE, OR EXPUNGE CERTAIN CLAIMS. PARTIES RECEIVING THIS OBJECTION SHOULD REVIEW SCHEDULE 1 TO THE PROPOSED ORDER TO DETERMINE IF THEIR CLAIM IS SUBJECT TO THIS OBJECTION.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this fourth omnibus objection to the claims (this "Objection") and respectfully request an order, substantially in the form attached hereto as **Exhibit A** (the "Order"): (a) disallowing and expunging each of the claims identified on Schedule 1 to Exhibit A attached hereto, or to the extent the claim mixes other non-WARN related claims to expunge the WARN related portion of the claim (the "No Liability WARN Claims); and (b) granting related relief.[2]  In support of this

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]   This Court previously entered the *Order (I) Modifying the Requirements of Local Rule 3007-1(F)(I) and (II) Granting Related Relief* [Docket No. 1068], which permits the Debtors to file four substantive omnibus claims objections per month, each containing up to 500 claims. To date, the Debtors have identified over 1,300 proofs of claim asserting WARN liability.  The Debtors are thus filing the Third, Fourth, and Fifth Omnibus Objections contemporaneously, each objecting to proofs of claim asserting WARN liability on substantially similar grounds.

Objection, the Debtors rely on the declarations of Darren Hawkins, Cody Kaldenberg, Brian Whittman, and Sarah Statlander (the "Declarations") filed contemporaneously herewith. In further support of this Objection, the Debtors respectfully state as follows:

## JURISDICTION

1.     The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.     Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by this Court in connection with this Objection if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

3.     Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory and legal predicates for the relief requested in this Objection are §§ 105(a) and 502(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 3007 and 9004, and Local Rule 3007-1.

## INTRODUCTION

5.     Under some circumstances, federal and (where they exist) state Worker Adjustment and Retraining Notification ("WARN") Acts can require employers to provide employees with approximately 60 days of notice before a mass layoff or plant closing. At the same time, WARN Acts are not suicide pacts, and the law encourages employers to "take all reasonable action to preserve the company," *In re Jevic Holding Corp.*, 496 B.R. 151, 163 (Bankr. D. Del. 2013), by

2

providing "leeway for a company's exercise of reasonable business judgment," *In re AE Liquidation, Inc.*, 556 B.R. 609, 618 (D. Del. 2016), *aff'd*, 866 F.3d 515 (3d Cir. 2017).

6.      The circumstances requiring WARN notice are far removed from the facts here. Yellow Corporation ("Yellow" or the "Company"), prior to ceasing its business operations, exercised reasonable business judgment in attempting to preserve its business and avoid laying off nearly its entire work force.  Throughout the first half of 2023, Yellow undertook a series of initiatives meant to position the Company for long-term success and preserve the jobs of its 30,000 employees, roughly 22,000 of which were unionized.  Chief among these was the final completion of One Yellow, a vital multi-year strategic initiative launched in 2019, that ultimately would unify the different entities under the Yellow corporate umbrella, optimize its operational network, enable it to better compete with the non-union carriers who dominate its market, and save the Company hundreds of millions annually.  By the start of 2023, the completion of One Yellow primarily required completing Phase 2 of its network optimization plan.  With Phase 1 having been completed in late 2022—and with the Company's largest union, the International Brotherhood of Teamsters ("IBT" or "Union"), having already agreed to every other One Yellow change in the preceding period—the Company entered 2023 confident that the Union would agree to these final but critical changes.

7.      Like any unionized employer, Yellow also assumed that its ongoing negotiations with the IBT over the completion of One Yellow would include the standard give-and-take that often informed significant operational changes.  This assumption was based on the historical record: in 2009-10, 2014, and 2020, Yellow and the IBT had negotiated hard but ultimately navigated challenging financial circumstances. Based on this historical record, Yellow understood

4855-5583-8893.1 96859.001

that the IBT would drive a hard bargain but never drive the Company to the brink of failure, which would risk losing 22,000 unionized jobs.

8.      Throughout the first half of 2023, the IBT made a series of demands as a precondition for its agreement to proceed with One Yellow.  These ranged from expanding existing agreements, pay increases, allowing membership to vote on the One Yellow operational changes, and others.  Yellow bargained in good faith regarding each of these demands, and conceded key points to the Union, expecting they would secure the IBT's agreement to proceed with the vital work of completing One Yellow.  But despite Yellow's efforts—and to the Company's surprise given the pre-2023 negotiations with the Union—the IBT refused to allow One Yellow to proceed.

9.      The IBT's intransigence culminated on July 17, 2023, when, without any warning, the IBT issued a highly publicized threat to strike, starting on July 24, 2023.  This strike was premised on Yellow temporarily deferring contributions to union health, welfare, and pension funds to preserve liquidity, a step necessary only because of the IBT's refusal to proceed with One Yellow.  In the parties' prior practice, when the Company faced liquidity concerns, as in 2009-10 and in 2020, the Company and Union worked together to obtain deferrals of such payments.  The Company expected in July 2023 that it, the IBT, and funds could again work out an agreement.  But to Yellow's surprise, the Union used these same deferments to issue a strike notice for the first time in decades.  Even then, Yellow acted swiftly and decisively to attempt to prevent the strike, including filing a lawsuit and moving for a temporary restraining order in the District of Kansas (which was denied).

10.     But that strike threat (over issues that could have been easily resolved) scared off Yellow's customers, leading to the sudden, unexpected collapse of Yellow in a matter of days.  Yellow went from picking up over 40,000 shipments daily on July 17 to under 10,000 on July 21,

4

to nearly zero on July 26.  Yellow was shocked at the rapidity of its knife-edge transition from an operating business to an entity existing only to liquidate its assets for the benefit of its stakeholders.

11.     The Company had no time to plan, much less provide WARN notice for, what became mass layoffs on July 28 and July 30, 2023.  Those layoffs, and the unexpectedly abrupt manner in which they occurred, are solely the fault of the IBT, which for reasons best known to it decided to act directly contrary to the interests of the approximately 20,000 Teamsters then employed at Yellow by taking deliberate steps to execute, rather than save, Yellow.  Under such circumstances, providing 60 days of notice under WARN Acts was neither feasible nor required. Thus, the WARN Act claimants have no valid claims for multiple independent reasons.

12.     *First*, WARN applies only to an "employer."  Under binding Third Circuit authority, a debtor or other entity that is not operating on a going concern basis, but instead is winding up its affairs and liquidating, is not an "employer" and not subject to WARN obligations. *In re United Healthcare Sys., Inc.*, 200 F.3d 170, 177-79 (3d Cir. 1999).  By July 26, 2023, Yellow had implemented the process to discontinue accepting new shipments, was completing delivery of its final packages, was preparing for bankruptcy, and thus was no longer an employer.  Instead, Yellow's efforts had turned to filing for chapter 11 and winding up its affairs.  Thus, when the layoffs occurred Yellow was no longer an "employer" and the WARN Acts did not apply to it.

13.     Moreover, even for employers (which Yellow was not at the relevant time) WARN acts recognize exceptions, two of which apply here.  Thus, the *second* reason notice is not required is that the faltering company exception applies where (as here) the employer was actively seeking capital or business that would have enabled it to avoid layoffs and believed providing a WARN notice would have prevented the Company from obtaining the capital or business.  At the time relevant to the faltering company exception, Yellow was actively pursuing the One Yellow

5

initiative, repeatedly and persistently attempting to get the Union to agree to a change of operations to allow One Yellow to proceed.  Achieving One Yellow would have provided Yellow with savings in the projected amount of $22.85 million per month, providing Yellow with additional capital and allowing it to compete for business that would have enabled the Company's long-term success and avoid any layoff.  Yellow also had retained the investment bank Ducera Partners, which was was actively negotiating with existing lenders, potential new lenders, and private equity fund Atlas Holdings to obtain new cash that would have extended Yellow's runway and allowed the Company to continue.  Providing a WARN notice during these sensitive negotiations would have scared off the Company's customers and any potential new financing, leading to its collapse, the same as the effect of the Union's highly publicized strike threat.

14.     The other exception and *third* reason Yellow has no WARN Act liability is that it was not foreseeable that the Union would choose to exterminate Yellow rather than negotiate Phase 2 of One Yellow.  Specifically, the IBT threatened a strike despite Yellow's repeated good faith efforts to negotiate the IBT's agreement to the essential One Yellow initiative.  Over the past decade-plus, the IBT had engaged in hard bargaining but never issued a strike threat, even when it had the legal right to do so, or took actions that could destroy the company.  Indeed, the IBT had previously worked with the Company on temporarily deferring contributions to the health, welfare, and pension funds when necessary to preserve Yellow's liquidity, but here the IBT used that as a trigger for striking.  Moreover, in the months leadings up to that threat, Yellow was diligently working to save the Company.  The result of that strike threat was Yellow's rapid collapse over just several days, going from delivering 40,000-plus packages to nearly zero, as customers fled from the Company.  Thus, Yellow could not have expected (nor would any reasonable person have expected) that the IBT would deliberately end the careers of 22,000 unionized employees.

6

15.     *Fourth*, even if a company is an employer and no exception applies, the amount of any liability may be reduced in the court's discretion if the absence of notice was in good faith and the employer had reasonable grounds for believing that this omission was not a violation of the WARN act.  Throughout the first half of 2023, Yellow was negotiating in good faith with the IBT—repeatedly conceding to Union demands—in an attempt to secure the IBT's approval of One Yellow Phase 2.  Indeed, just a few days before the layoffs, Yellow had finally secured the IBT's conditional agreement to proceed with the operational changes necessary for One Yellow.  The Company also was actively seeking financing to improve its liquidity, including negotiating with potential financiers even after the Union issued its strike threat.  Issuing a WARN notice of a mass layoff of nearly the entire workforce would have crushed any opportunity to save the Company.  Thus, Yellow objectively and in good faith believed it had no obligation to issue WARN notices any earlier than it did.

## **BACKGROUND**

### A.     **Yellow's Business and Unionized Work Force.**

16.     Before the events leading to its Chapter 11 filing, Yellow offered its customer a full range of services for transporting goods through its North American ground distribution network.  Hawkins Decl. ¶ 6.  On an average workday, Yellow's approximately 30,000 employees handled approximately 50,000 freight shipments daily.  *Id.* ¶ 9.

17.     Of Yellow's 30,000 employees, approximately 22,000 were unionized, with the vast majority of these being represented by the IBT.  *Id.* ¶ 9.  Prior to the July 2023 strike notice, the IBT had not issued a strike notice in nearly 30 years, even when challenging economic circumstances required Yellow to seek concessions and when the IBT had a legal right to strike.  *Id.* ¶¶ 13-15.  Instead, while engaging in hard bargaining, the IBT would agree to the changes necessary to save the Company.  *Id.*

7

18.     For example, in 2009 the Company faced severe liquidity issues from the financial crisis.  *Id.* ¶ 13.  For several months, to maintain liquidity the Company deferred payments to the pension funds that provide pensions to its unionized members, but the IBT never issued a strike threat.  *Id*.

19.     In 2014, the Company's existing collective bargaining agreement ("CBA") expired, the Company sought concessions that the IBT did not support, and the Company put its proposal to a vote by the IBT membership, which rejected it.  *Id.* ¶ 14.  At that point, the IBT could have sent a strike notice, but instead of doing so it engaged in good faith negotiations to reach an agreeable position for both sides that was accepted by the membership.  *Id.*

20.     In 2020, the COVID pandemic again drained the Company's liquidity.  *Id.* ¶ 15. Yellow determined that it needed to defer contribution to Central States, which is the fund that provide health and welfare funds, pension, and other benefits to its unionized employees.  *Id*. Yellow negotiated with Central States, and its efforts were supported by the IBT.  *Id*.  Central States agreed to the deferral.  *Id*.  At no time did the IBT issue a strike notice over Yellow's deferral of contributions.  *Id*.

**B.      The Benefits and Necessity of One Yellow.**

21.     Yellow had pursued various acquisitions of transportation companies over the years, resulting in a number of different brands within the Yellow family.  Hawkins Decl. ¶ 12. This resulted in numerous operating companies within Yellow's corporate structure competing for the same business.  *Id.* ¶ 18.  Such inefficiencies harmed Yellow's ability to compete with other transportation carriers.  *Id*.

22.     Yellow developed the One Yellow restructuring initiative, intended to unify its various companies, modernize the business, and upgrade the efficiency of its operations so that the

8

company could continue to compete successfully.  *Id.* ¶ 24.  One Yellow required execution in three carefully planned phases.  *Id.* ¶ 26.  All of the Company's stakeholders, including its employees, customers, creditors, and shareholders, knew and understood the criticality of the successful and timely implementation of each phase. *Id.* ¶ 25.

23.  The Company projected that One Yellow would significantly improve its finances. Proceeding with One Yellow would have allowed Yellow to achieve operational savings of approximately $22.85 million per month.  *Id.* ¶ 73.  Yellow projected that One Yellow would increase EBITDA from $341.4 million for the 12 months ending March 31, 2022, to $450 million within one full year of implementation, an increase of over 30%. *Id.* ¶ 19.  Yellow also expected that One Yellow would create an opportunity to capture over $675 million in annual revenue with favorable operating margins.  *Id.*

24.  In sum, One Yellow was Yellow's most vital strategic initiative, and Yellow's survival depended on completing it as soon as possible.  *Id.*  This need was widely understood, including by the IBT.  *Id.* ¶ 25.

## C.  Yellow's Repeated Good Faith Attempts to Negotiate with the IBT Over the Changes Necessary for One Yellow.

25.  One Yellow would proceed in three phases, the first phase covering approximately 20% of Yellow's network.  Hawkins Decl. ¶ 26.  Under Yellow's CBA, when Yellow made a changes of operations ("CHOPS") it and the IBT would resolve the seniority of affected Union members.  *Id.* ¶ 27.  The CHOPS process is usually routine and easily dealt with through the contractual mechanisms set forth in the CBA.  *Id.*

26.  During the first phase of One Yellow, the Company negotiated with the IBT over the CHOPS necessary to implement Phase 1.  *Id.* ¶ 28.  In August 2022, the IBT approved the Phase 1 CHOPS quickly and without any issue.  *Id.*

9

27.     Yellow promptly proceeded with Phase 1.  *Id.*  This phase was a success, and in the fourth quarter of 2022 Yellow had its best operating income in 16 years.  *Id.* ¶¶ 20, 30.  Because of Phase 1's success, Yellow was in a strong financial position as it prepared for Phase 2, the largest and most important phase which covered approximately 70% of the Company's network. *Id.* ¶ 26.  Nevertheless, the Company needed to complete all Phases of the Yellow One initiative to effectively compete against both non-unionized companies, which have lower operational costs than unionized ones, and its remaining union competitors.  *Id.* ¶¶ 30-31.

28.     Soon after the Phase 1 CHOPS approval, on October 19, 2022, Yellow submitted the Phase 2 CHOPS to the Union for approval.  *Id.* ¶ 33.  This CHOPS mirrored the Phase 1 CHOPS the Union had approved just two months earlier.  *Id.*  Yellow thus expected the Union would approve the Phase 2 CHOPS without significant difficulties.  *Id.* ¶¶ 33-34.

29.     Instead of simply approving the Phase 2 CHOPS, the IBT began asking for concessions.  *Id.* ¶ 34.  Throughout the first half of 2023, Yellow believed it could convince the Union to see reason and agree to resolve the Phase 2 issues, as the parties had for the Phase 1. During this time, Yellow repeatedly conceded to Union demands, expecting this would clear the way for the Company and Union to proceed with the essential One Yellow initiative.

30.     For example, the Union insisted that Yellow expand a designated terminal agreement permitting road drivers to unload freight and swap trailers themselves, and Yellow agreed.  *Id.* ¶¶ 34-39, 41.  In early April 2023, the Union demanded that IBT member employees be allowed to vote on the revised Phase 2 CHOPS, and Yellow agreed.  *Id.* ¶¶ 44, 46.  Also in April 2023, the Union demanded that Yellow agree to reopen the CBA to increase monetary compensation for IBT members, and on April 21 Yellow agreed to that demand.  *Id.* ¶¶ 48-55. When Yellow accepted the Union demand to reopen the CBA, the Union then conditioned any re-

10

opening on the union being allowed to strike and that all terms would be submitted to the IBT membership for a vote. *Id.* ¶¶ 55-56. On May 25, 2023, the Union demanded that its support of Phase 2 was conditioned on Yellow agreeing to pay an immediate $1.50 wage increase. *Id.* ¶ 61. On July 12, Yellow agreed to this hourly increase in the context of a five-year agreement that would enable Yellow to achieve the One Yellow network modernization. *Id.* ¶ 86.

31.     Yellow explained to its employees the consequences of not agreeing to Phase 2. In April 2023, Yellow provided the IBT with secure access to Yellow financial records and documents showing that Yellow would have liquidity concerns that could only be avoided if Phase 2 moved forward. *Id.* ¶¶ 50, 52. Yellow also organized town hall meetings with thousands of non-union employees to explain the consequences to the Company if a deal with the Union on Phase 2 were not reached. *Id.* ¶ 90. On June 8, the Company sent an email to Yellow's employees regarding the ongoing impasse with the IBT. *Id.* ¶ 69. Yellow also prepared additional written communications to be mailed to employees' homes that would emphasize the importance of One Yellow to the Company's future. *Id*.

32.     Throughout this period, the Union's self-described "militant" line was believed to be part of the IBT's approach to gain leverage in negotiations and extract concessions from Yellow. The reason is simple: any absolute IBT refusal to support One Yellow would be irrational; it risked not only destroying the Company but also losing the jobs of the more than 20,000 employees the IBT purported to represent.

**D.     Yellow's Efforts To Obtain New Financing To Improve Its Liquidity.**

33.     The Union's delay in approving the necessary operational changes in Phase 2, combined with challenging business conditions, caused Yellow to begin losing liquidity. On June 5, 2023, Yellow had a total liquidity of nearly $157 million, which dropped to under $125 million

by June 23, and less than $92 million on July 12.  Hawkins Decl. ¶¶ 65, 72, 86.  These amounts were sufficient for Yellow to continue operations.  At the same time, these decreases represented a concerning trend, causing Yellow to explore methods of shoring up its liquidity to continue negotiations with the IBT to proceed with One Yellow Phase 2.

34.    Yellow had previously hired investment banker Ducera Partners in January 2023 to help it evaluate strategic financial alternatives.  Kaldenberg Decl. ¶ 7.  Yellow was optimistic and, at the time, had no idea that it would be fighting for its life within six months—to the contrary, it had every reason to believe it would be operating for years.

35.    On May 26, 2023, Ducera sent a proposal to Yellow's existing lenders that would modify the loans to improve liquidity, including changes to the collateral that would allow for increased loans and additional borrowing.  *Id.* ¶ 12.  This included Ducera offering proposed terms to modify Yellow's term loan with Apollo Global Management.  *Id.*  These terms included expediting the sale of a shipping terminal in Compton to use the net sale proceeds to pay down the loan, ability to pay interest in-kind, and a waiver of the minimum EBITDA covenant through the end of of 2023.  *Id.*

36.    On June 5, Ducera reached out to new potential asset-based lenders to refinance the Company's existing asset-based loans to provide additional financing that would increase Yellow's cash-on-hand and liquidity.  *Id.* ¶ 13.  At the same time, Ducera entered into negotiations with the Company's existing asset-based lenders to potentially modify the borrowing base, again with the goal of bringing in additional cash to enhance liquidity.  *Id.*

37.    On June 8, Ducera began discussions with private equity fund Atlas Holdings regarding a potential debt or equity investment in Yellow.  *Id.*  Given Atlas's existing holdings and relationships, Ducera believed that Atlas was in a strong place to provide favorable financing

solutions to the Company.  *Id.* ¶ 15.  Members of Atlas, including a co-founder and managing

partner, met with representatives of Yellow and Ducera on July 12 and 13.  *Id.*  At Yellow's July

17 board meeting, a Ducera partner explained that Atlas had a strong interest in a transaction with

Yellow, while noting that time was of the essence.  *Id.*  During this entire period, Yellow had no

reason to believe that the IBT would soon take precipitous and irrational action that would kill the

Company within a week.

38.      Even after the July 17 strike notice, Ducera remained in communication with the

Atlas.  On July 18, the day after the strike notice, Atlas sent an extensive list of diligence requests

to the Company.  *Id.* ¶ 17.  Throughout the following week, Ducera remained in close contact with

Atlas, continuing to discuss a potential refinancing in back-and-forth communications.  *Id.*  The

private fund's interest only ended as continuing events showed that the Company's customers had

left to competitors and there was no clear means of implementing One Yellow.  *Id.* ¶ 18.

**E.     The IBT's Unforeseeable Strike Threat.**

39.      In the weeks leading up to the IBT's July 17 strike threat, Yellow's overall business

was stable.  As noted previously, on an average workday, Yellow handled approximately 50,000

freight shipments daily.  Hawkins Decl. ¶ 9.  On June 5, the Company picked up approximately

50,000 shipments; it picked up approximately 45,950 shipments on June 23, and approximately

44,550 shipments on July 12.  *Id.* ¶¶ 65, 72, 86.  Thus, Yellow's business during June and July

was consistent with its typical operations.

40.      Nevertheless, because of the Company's declining liquidity, Yellow was obliged

to seek further ways to maintain its liquidity as it continued to negotiate with the IBT.  *Id.* ¶ 75.

Accordingly, on June 14-15, Yellow asked the Central States health, welfare, and pension funds

covering its unionized members to defer contributions that would be due in July and August, with

13

a promise that this would only be a short-term deferral which would be promptly repaid, with interest, as Yellow had previously done. *Id.* ¶ 72. This was not an unprecedented step; as noted before, Yellow, the IBT, and Central States had previously negotiated deferrals of fund contributions when the Company was facing challenging economic circumstances. *Id.* ¶¶ 13-15. Yet none of the funds granted the requests. *Id.* ¶ 72.

41.     On July 7, Yellow determined to defer paying the contributions to Central States due in July and August to preserve liquidity—a step that would not have been necessary if the Union had approved One Yellow Phase 2 in a timely manner. *Id.* ¶ 89. Instead of negotiating over the deferrals—as Central States, IBT, and Yellow had done in the past, *id.* ¶¶ 13-15—on July 17 Central States sent a memorandum stating that Yellow participation in the funds would be terminated effective July 23, *id.* ¶ 88. Just hours later, the IBT gave a 72-hour notice that it intended to strike on or after July 24—something that it had not done for nearly 30 years. *Id.*

42.     Even after the IBT's strike threat, Yellow continued trying to engage with the IBT. For example, on July 18, Yellow reached out to the President's National Economic Council for advice on engaging in constructive negotiations with the IBT. *Id.* ¶ 93. But the Council advised that the IBT had no interest in talking with Yellow. *Id.*

43.     Yellow also sought legal remedies, and on July 19 filed a lawsuit seeking a temporary restraining order and preliminary injunction to, among other things, enjoin the Union from engaging in a strike or other work stoppage. *Id.* ¶ 93. On Friday, July 21, the court denied Yellow's TRO and PI on the grounds that it lacked jurisdiction. In denying that relief, the court prophetically stated that "I will say that I understand the grave consequences that may flow from

14

this.  I hope the union understands that perhaps 22,000 or 30,000 jobs will be lost.  It could be a situation where you win a battle and lose a war, I don't know."[3]

44.    The court's comments appeared to have opened the IBT's eyes as to the ultimate result of its intransigence.  After months of obstruction, on July 23 the IBT reached out to the Company to engage in negotiations.  Hawkins Decl. ¶ 98.  As a result of these discussions, and the IBT's request, Central States agreed to extend benefits for Yellow's workers.  *Id.*

45.    But the uncertainty of the strike had caused customers to drop Yellow as a carrier, and competitors immediately absorbed Yellow's shipments.  On July 12, Yellow picked up 44,550 shipments.  *Id.* ¶ 86.  But on July 19, two days after the strike threat, Yellow picked up only 32,500 shipments, a drop of nearly a quarter in two days.  *Id.* ¶ 94.  After another two days, on July 21, Yellow picked up just 10,450 shipments, meaning that three-quarters of its business was gone within four days of the IBT's strike notice.  *Id.* ¶ 97.  Given the plight of the company and due to the ongoing disruptions to the Company's business, to ensure that existing orders could be fulfilled Yellow decided to begin the process to discontinue accepting new shipment orders on July 24, 2023.  *Id.* ¶ 100.

**F.    Yellow Ceases To Operate, and Lays Off Its Employees and Issues WARN Notices.**

46.    Even after Yellow stopped accepting additional shipments, it continued to work to save the Company.  Yellow and the IBT continued the negotiations that had started on July 23, and by July 25 the IBT finally conditionally approved the operational changes necessary to implement Phase 2 of One Yellow.  Hawkins Decl. ¶ 102.  Yellow also provided the IBT with information about the Company's communications with the federal government, hoping that the

---

[3]    Transcript of Hearing on Motion for Temporary Restraining Order, at 54:14-17, *Yellow Corp., v. Int'l Brotherhood of Teamsters, et. al.*, No. 23- CV-1131-JAR (D. Kan. July 21, 2023).

IBT might be able to improve the chances that the federal government would intervene to aid the Company. *Id.* But the optimism created by the IBT finally agreeing to Phase 2 operational changes proved short-lived. The damage was done, and the customers lost during the strike threat would not return. *Id.* ¶ 103.

47.     At a July 26 board of directors meeting, the board discussed the Company's available liquidity, and depending on the pace of the liquidity decline, the timing of a potential filing under chapter 11 of the Bankruptcy Code. *Id.* ¶ 104. On that same date, Yellow's delivered shipments fell to nearly zero. *Id.* ¶ 105.

48.     Because of the strike threat devastating Yellow's business, the Company implemented a full scale winddown of its business operations and began working on its liquidation. *Id.* ¶¶ 112-14. On July 28, the Company terminated approximately 3,500 non-union employees, most of whom executed release agreements in consideration for severance payments from the Company. *Id.* ¶ 106.

49.     On July 29, Yellow picked up a single shipment—its last ever. By July 30, Yellow had no shipments or customers remaining, and the Company sent notice to the IBT and other unions that it was laying off approximately 22,000 union employees. *Id.* ¶¶ 107-08.

50.     During this period, the sole purpose of Yellow and its remaining employees transitioned to liquidating the company and winding down its business while maximizing value for all stakeholders. *Id.* ¶ 113. Yellow filed for chapter 11 on August 6, 2023. *Id.* As explained in the declaration in support of its first day motions, Yellow's express purpose in filing for chapter 11 was "to effectuate an orderly, value-maximizing winddown of their business for the benefit of all parties in interest." *See Declaration of Matt Doheny, Chief Restructuring Officer, in Support*

*of the Debtors' Chapter 11 Petitions and First Day Motions* ¶ 19 (Aug. 7, 2023), ECF No. 14 ("<u>Doheny</u> <u>Decl.</u>").

51.     On July 31, 2023, the Company sent notices to its laid off and otherwise terminated employees under the WARN Act.  Hawkins Decl. ¶ 108.

**C.     The Bar Date Motion and Order**

52.     On August 31, 2023, the Debtors filed a motion to establish a claims adjudication process.  *See Motion of Debtors Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and Manner of Notice Thereof Filed by Yellow Corporation*, ECF No. 393 (the "<u>Bar Date Motion</u>"). Two weeks later, the Court granted the Debtors' Motion and set a general claims bar date of November 13, 2023 (the "<u>Bar Date</u>").

**D.     Summary of WARN Related Proofs of Claim**

53.     In aggregate, approximately 1,292 WARN-related proofs of claim were filed, which includes 13 proofs of claims filed after the Bar Date.  *See* Whittman Decl. ¶ 14.

54.     Of the 1,292 WARN-related proofs of claim, 48 were submitted by unions or union-related health or pension funds, 1,207 were filed by individual former employees, 30 were filed as purported class action claims, and 7 were filed by state taxing authorities on behalf of former employees.  *Id*. ¶ 15.

55.     The majority of individual proofs of claim overlap with the union claims, as the unions filed their claims on the individuals' behalf.  Specifically, 1,147 of the individual proofs of claim that mention WARN were filed by union-represented employees, 42 were filed by non-

17

bargaining unit level employees, and 18 were filed by individuals that have not been able to be identified by Debtors as either former union or non-union employees. *Id.* ¶ 9. Accordingly, there are between 41 and 59 individuals who are not affiliated with unions who filed proofs of claim mentioning WARN prior to the Bar Date. *Id.*

56.    Of the 41 individuals who are not affiliated with unions and were identified in the Debtors' employee rosters who filed Proofs of Claim mentioning WARN prior to the Bar Date, 32 of them had signed agreements, the majority of which were received prior to the Petition Date, in which they released all claims (including WARN claims) in exchange for severance, which was paid. *Id.* ¶ 11.

57.    The WARN-related proofs of claim typically purport to bring claims under both federal and state WARN acts.

## RELIEF REQUESTED

58.    By this Objection, the Debtors seek entry of the Proposed Order, pursuant to sections 105(a) and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and 9004, and Local Rule 3007-1, disallowing and expunging the No Liability Employee WARN Claims identified on Schedule 1 to the Proposed Order.

59.    The reality is that the Debtors shut down their businesses on an extremely short time frame as the result of completely irrational behavior from the IBT that neither the Debtors nor any other rational employer would have expected or planned for. No WARN act provides for liability under these circumstances.

## BASIS FOR RELIEF

60.    Section 502(a) of the Bankruptcy Code provides that a filed proof of claim is "deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). When asserting a proof of claim against a bankruptcy estate, a claimant must allege facts that, if true, would support a

18

finding that the debtor is legally liable to the claimant. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). Where the claimant alleges sufficient facts to support its claim, its claim is afforded prima facie validity. *Id*. A party wishing to dispute a claim's validity must produce evidence sufficient to negate the claim's prima facie validity. *Id*. at 173-74. Once an objecting party produces such evidence, the burden shifts back to the claimant to prove the validity of his or her claim by a preponderance of the evidence. *Id*. at 174. Ultimately, the burden of persuasion is on the claimant. *Id*. Once the *prima facie* validity of a Proof of Claim is rebutted, "it is for the claimant to prove his claim, not for the objector to disprove it." *In re Kahn,* 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990) (citations omitted).

61.    A chapter 11 debtor "has the duty to object to the allowance of any claim that is improper." *Int'l Yacht & Tennis, Inc. v. Wasserman Tennis, Inc. (In re Int'l Yacht & Tennis, Inc.)*, 922 F.2d 659, 661-62 (11th Cir. 1991); *see also* 11 U.S.C. §§ 704(a)(5), 1106(a)(1), and 1107(a).

**A.     Federal And State Warn Acts.**

**i.     The Federal Warn Act.**

62.    The federal WARN Act provides that an "employer shall not order a plaintiff closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to representatives of the affected employees, or the affect employees themselves, and to certain State entities. 29 U.S.C. § 2102(a). WARN creates a civil action against an "employer" for back pay and benefits for each day of a violation, subject to reductions for the employer's payment of wages, contributions (such as for health benefits or pensions) on the employee's behalf, or the employer's voluntary payments to employees. 29 U.S.C. § 2104(a).

63.    By its terms, the Act only applies to an "employer," defined as a "business enterprise" that employs 100 or more employees. 29 U.S.C. § 2101(a)(1).

64.     The WARN Act also contains a number of exceptions, two of which are relevant

here.  One is referred to as the faltering company exception:

> An employer may order the shutdown of a single site of employment before the
> conclusion of the 60-day period if as of the time that notice would have been
> required the employer was actively seeking capital or business which, if obtained,
> would have enabled the employer to avoid or postpone the shutdown and the
> employer reasonably and in good faith believed that giving the notice required
> would have precluded the employer from obtaining the needed capital or business.

29 U.S.C. § 2102(b)(1).  The other is that an "employer may order a plant closing or mass layoff

before the conclusion of the 60-day period if the closing or mass layoff is caused by business

circumstances that were not reasonably foreseeable as of the time that notice would have been

required."  29 U.S.C. § 2102(b)(2)(A).

65.     WARN also provides for a discretionary reduction in any liability or penalties for

any good faith violations:

> If an employer which has violated this chapter proves to the satisfaction of the court
> that the act or omission that violated this chapter was in good faith and that the
> employer had reasonable grounds for believing that the act or omission was not a
> violation of this chapter the court may, in its discretion, reduce the amount of the
> liability or penalty provided for in this section.

29 U.S.C. § 2104(a)(4).

66.     The Third Circuit has rejected interpretations of the WARN Act and its exceptions

that "might require an employer to provide frequent WARN notice" so as to "require an

economically viable employer to provide notice of a possible—but unlikely—closing."  *Hotel*

*Emps. & Rest. Empls. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 185 n.7 (3d

Cir. 1998).  The Third Circuit explained that such frequent notices would be antithetical to the

Act's purposes and harm the very employees it is intended to help:

> Once the employer's creditors learn of the notice, they may seek to enforce existing
> debts and become unwilling to extend the employer more credit.  In addition,
> employees may overestimate the risk of closing and prematurely leave their
> employer, forfeiting (among other things) seniority and unvested benefits.  Such

20

> behavior by creditors and employees would increase the chance that an employer will be forced to close and lay off its employees, harming precisely those persons WARN attempts to protect.

*Id.*; *see also In re AE Liquidation, Inc.*, 556 B.R. 609, 618 (D. Del. 2016) ("*AE Liquidation I*") ("The WARN Act allows leeway for a company's exercise of reasonable business judgment, and the regulations are intended to encourage employers to take all reasonable actions to the preserve the company and the jobs."), *aff'd*, 866 F.3d 515 (3d Cir. 2017) ("*AE Liquidation II*"); *In re Jevic Holding Corp.*, 496 B.R. 151, 163 (Bankr. D. Del. 2013) (explaining that where "events are indicative of a company attempting to stave off layoffs, and attempting to save jobs and the company," then "[i]t would run counter to the WARN Act's policy of encouraging employers to take all reasonable action to preserve the company and the jobs to impose liability upon the Debtors for not giving notice sooner than they did"); *In re Flexible Flyer Liquidating Tr.*, 511 F. App'x 369, 374 (5th Cir. 2013) ("The WARN Act allows good faith, well-grounded hope, and reasonable expectations. Its regulations protect the employer's exercise of business judgment and are intended to encourage employers to take all reasonable actions to preserve the company and the jobs. Holding Flexible Flyer liable for a WARN Act violation on the facts found by the bankruptcy court would serve only to encourage employers to abandon companies even when there is some probability of some success.").

### ii. State WARN Acts.

67.     A minority of states have passed laws modeled after the federal WARN Act. Of the 50 states where Yellow's former employees worked, 40 do not have an applicable state WARN Act or similar law requiring notice of layoffs to employees.[4] Claimants who worked in these 40 states have no state claims.

---

[4]   Alabama, Alaska, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Michigan, Missouri, Mississippi, Montana, Nebraska, New Mexico, Nevada, North Carolina, North Dakota,

68.     The remaining 10 state acts[5] largely track the federal WARN Act.  *E.g.*, *In re TransCare Corp.*, 611 B.R. 160, 167 (Bankr. S.D.N.Y. 2020) ("The NY WARN Act and regulations largely mirror the US WARN Act and regulations."); *Jevic*, 496 B.R. at 165 ("The New Jersey WARN Act was modeled after its federal counterpart.").  The state statutes often cover employers with, or layoffs concerning, fewer employees than would trigger the federal Act.  *E.g.*, *MacIsaac v. Waste Mgt. Collection & Recycling, Inc.*, 36 Cal Rptr. 3d 650, 661 (Cal. App. Ct. 2005) (discussing legislative history of California act showing that it was intended to cover layoffs that would fall under the threshold of the federal WARN Act).  The state statutes typically use the same 60-day period as federal law, though some have longer or short notification periods.  *E.g.*, N.Y. Comp. Codes R. & Regs. Tit. 12 § 921 (90-day notice period); N.J. Stat. Ann. § 34:21-2 (90-day notice period); Iowa Code Ann. § 84C.3(1)(a) (30-day notice period).  Likewise, most state

Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming have no WARN or similar acts requiring notice to employees.

Connecticut does not have a law requiring notice for a layoff but does have a Plant Closing Law concerning an employer that closes a plant pay for continued health insurance for terminated employees.  This law, however, does not apply to employers, like Yellow, who close plants under the federal Bankruptcy Act.  Conn. Gen. Stat. Ann. § 31-51n(6).

Hawaii's Act does not apply to "[b]usiness shutdowns which occur … in connection with factors such as business failure [or] bankruptcy."  Haw. Admin. R. § 12-506-4(b).

Maryland's Act does not apply to layoffs that result from an employer filing for bankruptcy.  Md. Code Ann., Lab. & Empl. § 11-302(a).

Massachusetts has a law requiring notice for plant closing for employers that received financing from specified quasi-public agencies, which Yellow does not, Mass. Gen. Law Ch. 149, § 182, and another unfunded and unenforced law concerning giving notice of plant closing to a state agency, not employees, Mass Gen. Law. Ch. 151A, §§ 71A-71G.

Minnesota has a law that encourages providing notice of layoffs but does not require such notice.  Minn. Stat. Ann. § 116L.976.

Tennessee has a Plant Closing and Reduction in Operation Act that applies to employers when 50 to 99 employees are laid off.  Tenn. Code Ann. §§ 50-1-601 *et al.*

[5]     These are California, Delaware, Illinois, Iowa, Maine, New Hampshire, New Jersey, New York, Vermont, Wisconsin.

acts contain the same exceptions and limitations as the federal Act, with a handful of exceptions, such as the New Jersey Act not providing any exceptions.  *Jevic*, 496 B.R. at 165.

69.    Given the similarity of these handful of state WARN Acts to the federal Act, the same arguments establishing that the federal WARN Act does not require notice generally apply equally to the state WARN Acts.  Accordingly, claimants cannot recover on any state law WARN claims.

**B.    No Federal Or State WARN Acts Apply To Yellow, Which Was Liquidating And Thus Not An "Employer" When The Layoffs Occurred.**

70.    The Third Circuit and other courts have held that a liquidating company is not an employer under the WARN Acts and has no obligation to provide notice, known as the liquidating fiduciary exception.  Specifically, the federal WARN Act applies only to an "employer":  "An *employer* shall not order a plant closing or mass layoff until the end of a 60-period after the *employer* serves written notice … ." 29 U.S.C. § 2102(a) (emphasis added).  And an "employer" is  defined as a "business enterprise" that employs 100 or more employees. 29 U.S.C. § 2101(a)(1). State WARN acts similarly apply only to an "employer."  *E.g.*, N.Y. Comp. Codes R. & Regs. tit. 12 § 921-2.1 ("… no employer may order a mass layoff … unless … the employer provides notice …"); Cal. Lab. Code § 1401(a) ("An employer may not order a mass layoff … unless … the employer gives written notice …"); N.J. Stat. Ann. § 34:21-2 ("… if an employer conducts a mass layoff, the employer who ... conducts the mass layoff" shall provide notice).

71.    Reviewing the legal authorities regarding the WARN Act, the Third Circuit held that a liquidating company is not an "employer."  *In re United Healthcare Sys., Inc.*, 200 F.3d 170, 177-79 (3d Cir. 1999).  Among other sources, the Third Circuit relied on the Department of Labor's ("DOL") commentary on WARN regulations stating that an employer includes entities "'which *engage in business* (i.e., take part in a commercial or industrial enterprise, supply a service or good

on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments).'" *Id.* at 177 (quoting 20 C.F.R. § 639.3(a)(1)(ii), 54 Fed. Reg. 16,042, 16,065 (1989) (emphasis in *United Healthcare*). The "'DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligation of the former employer because the fiduciary is not operating a 'business enterprise' in the normal commercial sense.'" *Id.* (quoting 54 Fed. Reg. 16,045). The Third Circuit explained that "the commentary's focus on the bankruptcy fiduciary's responsibilities indicates that whether a bankrupt entity is an 'employer' under the WARN Act depends in part on the nature and extent of the entity's business conduct and activities while in bankruptcy." *Id.* "The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an 'employer;' the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act." *Id.* at 178.

72.     Applying these principles, the Third Circuit held that the hospital debtor at issue in *United Healthcare* "was operating not as a 'business operating as a going concern,' but rather as a business liquidating its affairs." *Id.* at 178. In that case, the hospital began experiencing financial difficulties in 1996, including difficulty maintaining essential supplies such as blood. *Id.* at 172. In January 1997, United Healthcare began negotiating to have the hospital purchased by another healthcare group. *Id.* But at the same time, one of United Healthcare's secured creditors, Daiwa, began expressing concern about its financial viability, suspending funding to it on February 3. *Id.* As a result, United Healthcare could not meet its operating expenses, closed its emergency room, and reduced its number of patients. *Id.* The State then gave United Healthcare emergency funding of $5 million, which allowed it to increase its number of patients. *Id.* But this did not mollify

24

Daiwa, which on February 13 issued a notice of default terminating all financing. *Id.* at 172-73. On February 16, United Healthcare agreed to sell a portions of its assets to another group and terminate its operations. *Id.* at 173. On February 19, United Healthcare filed a voluntary chapter 11 petition, and on that same day issued WARN notices to its employees. *Id.* Just a few weeks later, on March 6, United Healthcare terminated nearly all its employees immediately, continuing to retain less than 10% of its employees to secure it facilities and maintain equipment. *Id.*

73.     The Third Circuit relied on a slew of facts that parallel this case to hold that when United Healthcare laid off its employees, it was not acting as employer and thus was not subject to WARN Acts. The hospital entered Chapter 11 and ultimately "filed a voluntary bankruptcy plan under which it would liquidate its assets and cease to exist." *Id.* at 178. In the interim, the hospital had "discharged or transferred all of its patients and was no longer admitting new patients." *Id.* Accordingly, the court held, the remaining "employees were no longer engaged in their regular duties but instead were performing tasks solely designed to prepare United Healthcare for liquidation." *Id.*

74.     In addition to *United Healthcare*, the "'liquidating fiduciary' principle has been recognized by courts throughout the country." *In re MF Glob. Holdings Ltd.*, 481 B.R. 268, 280 (Bankr. S.D.N.Y. 2012) (collecting cases); *see also Chauffeurs, Sales Drivers, Warehousemen Helpers Union Local 572 v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir. 1995) ("WARN's obligations ... can apply ... only where the [secured] creditor operates the debtor's asset as a 'business enterprise' in the 'normal commercial sense' ...; where the creditor does no more than exercise that degree of control over the debtor's collateral necessary to protect the security interest, and acts only to preserve the business asset for liquidation or sale, the notice requirement of

4855-5583-8893.1 96859.001

WARN will not apply."); *In re Century City Doctors Hosp., LLC*, 2010 WL 6452903, *6-7 (B.A.P. 9th Cir. 2010) (same as *Weslock*).

75.    These authorities demonstrate that Yellow was a liquidating fiduciary on July 28 and 30 when it laid off its employees, and thus had no obligations under federal or state WARN Acts.  It is an indisputable fact that the IBT's threat on July 17 to strike or on after July 24 caused massive uncertainty among Yellow's customers and led directly and promptly to a sharp decline in Yellow's new business, and the business drying up entirely within approximately a week. Yellow began the process to discontinue accepting new shipment orders on July 24, 2023. Hawkins Decl. ¶ 100.  The shipments that its customers had placed sharply dwindled during the course of the two weeks from July 17 to July 26, falling from over 40,000 on July 17 to near zero.

76.    Accepting and delivering packages was the core of Yellow as an ongoing, operating business.  On July 26, Yellow's customers had left it, it was in the process of discontinuing accepting new shipments, its deliveries had collapsed to near zero, and the Company's board and employees were preparing for bankruptcy.  At that time, as a direct result of the IBT's strike threat and its aftermath, Yellow had clearly stopped as a normal business and instead had turned to liquidating.  This is the same as when the *United Healthcare* hospital stopped admitting new patients and discharged and transferred existing patients, which the Third Circuit relied on to hold that the entity was no longer a business enterprise but instead engaged in liquidating its assets and winding up its affairs.  200 F.3d at 178.  Moreover, the Yellow employees that would remain after the layoff were shifting from their regular duties serving the business—which no longer existed— and began preparing for Chapter 11 and liquidating Yellow's assets, the same as in *United Healthcare*.  Hawkins Decl. ¶ 113.  All these objective facts showing that Yellow was liquidating were corroborated by Yellow's first day declaration, which told this Court that it was

26

"effectuat[ing] an orderly, value-maximizing winddown of their businesses for the benefit of all parties in interest." *See* Doheny Decl. ¶ 19.[6]

77.    Thus, by July 28 when the Union's strike threat forced Yellow to lay off most the companies' employees, Yellow was no longer operating as a going concern. Instead, its only function by that time was to liquidate its assets. Accordingly, Yellow was not an "employer" when the layoffs occurred and thus the federal and state WARN Acts did not apply to it. All the claimants' WARN-related claims fail for this reason alone.

**C.    The WARN Acts Do Not Require Yellow To Provide Earlier Notice Under The Faltering Company Exception As It Was Actively Seeking Savings And Financing That Would Have Rescued The Company.**

78.    The faltering company exception requires the defendant to show that "(1) it was actively seeking capital at the time the 60–day notice would have been required, (2) it had a realistic opportunity to obtain the financing sought, (3) the financing would have been sufficient, if obtained, to enable the employer to avoid or postpone the shutdown, and (4) the employer reasonably and in good faith believed that sending the 60-day notice would have precluded it from obtaining the financing." *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 246-47 (3d Cir. 2008). Actively seeking capital means "'seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of *internally generated financing*; or the employer must have been seeking additional money, credit or business through any other commercially reasonable method.'" *Id.* at 249 (emphasis added) (quoting 20 C.F.R. § 639.9(a)(1)).

---

[6]    These facts distinguish this case from *In re Start Man Furniture, LLC*, where the debtor continued operating its normal business selling furniture after filing for Chapter 11, and after the company was shut down its counsel stated that it hoped the shutdown would be temporary and that outright liquidation could be avoided. 647 B.R. 116, 122-23, 130 (D. Del. 2022). By contrast, Yellow had begun the process to stop accepting new shipment orders and thus ended its business before laying off its employees, and expressly stated that it intended to liquidate.

i.    **The Savings From One Yellow Satisfy The Exception.**

79.    Yellow was seeking two types of financing in the months before the layoffs, both of which satisfy the faltering company exception.  The first type of financing was from the One Yellow initiative.  Proceeding with One Yellow would have allowed Yellow to achieve operational savings of approximately $22.85 million per month.  *APA* holds that the faltering company exception specifically applies to this kind of "internally generated financing," as well as "money" and "business through any other commercially reasonable method."  541 F.3d at 249.

80.    The savings from One Yellow satisfy all four elements of the faltering company exception.  *First*, Yellow was actively seeking to achieve the One Yellow savings 60 days before the layoffs, as well as before and after that period.  Yellow had already implemented Phase 1 from One Yellow in 2022, showing that it was committed to the project.  Throughout late 2022 and the first half of 2023, Yellow constantly sought to negotiate in good faith with the IBT to obtain the Union's approval of the Phase 2 CHOPS.  And Yellow repeatedly made concessions to the IBT in an effort to obtain its agreement to Phase 2.  These facts are sharply different from those in *APA*, where the debtor engaged in a single exchange with its lender and then sat around hoping the lender would offer additional financing.  *Id.* at 249.  By contrast, here Yellow took the initiative to reach out to the IBT numerous times, for months before the layoff.  The only reasons Phase 2 did not proceed was because of the IBT's unyielding intransigence, not for Yellow's lack of effort.

81.    *Second*, looking from an objective viewpoint at the time, and without the benefit of hindsight, Yellow had a realistic opportunity to achieve One Yellow.  Phase 1 of the initiative had proceeded smoothly.  The IBT agreed to the One Yellow Phase 1 CHOPS without issue, providing no hint that it would oppose the remaining Phases.  Yellow implemented the Phase 1 operational changes, and as a result Yellow achieved in the fourth quarter of 2022 its best quarterly operating

28

income in 16 years.  As for Phase 2, as explained previously, a reasonable similarly situated company would have understood the IBT's apparent obstinance as an attempt to extract concessions.  Indeed, in prior times such as 2009-10, 2014, and 2020, the Union had eventually cooperated with Yellow to make necessary changes for the Company's survival.  And even here, the IBT eventually did conditionally agree to these changes during negotiations from July 23 to 25; while that agreement turned out to come too late, it further confirms that Yellow had a realistic opportunity to proceed with Phase 2.  Based on the circumstances at the time, a reasonable company would *not* have expected the IBT to destroy the Company through a strike threat rather than agree to a CHOPS similar to the one it had agreed to less than a year earlier.

82.     *Third*, the operational savings from One Yellow would have allowed the Company to avoid (or at least postpone) any shutdown.  After Phase 1, the Company had its best quarterly operating income in over a decade.  Achieving Phase 2 would have provided approximately $22.85 million per month.  This nearly $275 million annually obviously is substantial and would have allowed Yellow to maintain and improve its liquidity, while also refinancing its debt coming due in 2024 and 2026.  Such a significant improvement in operating income also would have made Yellow more attractive to potential investors, such as the one Ducera was negotiating with.

83.     *Fourth*, that sending a 60–day notice would have precluded Yellow from obtaining the financing it sought is obvious.  One Yellow depended on its employees agreeing to operational changes to integrate Yellow while continuing to provide a high level of service to customers.  Sending a notice that the Company was laying off nearly all employees would have caused all employees to start looking for other jobs, severely disrupting the Company's operations.  Such a notice also would have caused the Company's lenders to demand greater protection, draining Yellow's liquidity and hastening its demise.  Where the layoffs involve the Company shutting

29

down, this element is easily satisfied. "As long as Debtor's management had a reasonable prospect of securing either additional loan money or a capital investment, it is unreasonable to expect a 60 day notice of plant closing to have been given, since that would have foreclosed the possibility of staying open." *In re Old Electralloy Corp.*, 162 B.R. 121, 125-26 (Bankr. W.D. Pa. 1993).

### ii.    Yellow's Attempts To Obtain New Financing Satisfy The Exception.

84.    Separately, Yellow's attempts to refinance its loans to obtain additional liquidity also qualify under the faltering company exception. *First*, in the relevant time period in late May and early June, Yellow was actively seeking financing. On May 26, 2023—squarely within the relevant time period—Yellow's investment bank Ducera sent a proposal to Yellow's existing lenders to modify the loans to improve liquidity, including freeing up collateral that would have allowed Yellow to bring in additional financing and thus cash to increase liquidity. On June 5, Ducera contacted new potential asset-based lenders to refinance the Company's existing asset-based loans to provide additional cash and liquidity. On the same date, Ducera also entered into negotiations with the Company's existing asset-based lenders to potentially modify the borrowing base, again with the goal of bringing in additional cash to enhance Yellow's liquidity. On June 8, Ducera began discussions with private equity fund Atlas Holdings regarding a potential debt or equity investment in Yellow that would have provided additional cash and liquidity, which continued throughout June and July. Thus, this is not a case where a debtor was sitting around, *cf. APA*, 541 F.3d at 249, as Yellow hired an investment banker who was actively pursuing refinancing, new financing, and new investments during the relevant time period, sending proposals to old and new lenders and negotiating with potential investors.

85.    *Second*, Yellow had a realistic opportunity to execute these refinancings, new financings, and potential new investment. Several lenders and investors targeted by the Debtors

had discussions with Ducera and were willing to negotiate over potential financing.  In particular, private equity fund Atlas Holdings had repeated calls and meetings to explore an investment in Yellow, performing substantial due diligence toward a new investment.  To be sure, Yellow proceeding with the One Yellow initiative would have improved the chances of Yellow obtaining this financing.  But even with the IBT's obstinance, these negotiations show that Yellow at least had a "realistic opportunity" of obtaining this financing.

86.    *Third*, the relevant legal question for this element is whether the financing would have been sufficient to "avoid *or postpone* the shutdown," and the refinancings and investments Yellow was exploring through Ducera would at least have postponed the shutdown.  *APA*, 541 F.3d at 246-47 (emphasis added).  The express goal of each of these options was to provide Yellow with additional cash and improve its liquidity.  While achieving One Yellow was necessary to put the Company on a firm long-term economic footing, the extra money from potential refinancing, financings, and investments would have postponed any shutdown.

87.    *Fourth*, as with the savings from One Yellow, there can be no doubt that announcing a layoff of nearly all employees in late May or early June would have destroyed Yellow's attempts to refinance or obtain new financings or investments.  No lender or investor would have wanted to invest money in a company that clearly was in the process of liquidating.  Thus, for these two independent reasons Yellow satisfies the faltering company exception.

**D.    The WARN Acts Do Not Require Yellow To Provide Earlier Notice Because Unforeseeable Business Circumstances—The IBT's Strike Threat—Caused The Layoffs.**

88.    WARN does not require an employer to provide sixty days' notice when the closing is "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."  29 U.S.C.A. § 2102(b)(2)(A).  Important indicators of whether layoffs

31

fall within the unforeseeable business circumstances exception include whether the circumstances are "sudden, dramatic, unexpected, [and/or] outside of the employer's control." *Elsinore*, 173 F.3d at 185. "When determining whether a closing was caused by unforeseeable business circumstances, [courts] evaluate whether a 'similarly situated employer' in the exercise of commercially reasonable business judgment would have foreseen closing." *Id.* at 186. "What is a harbinger of disaster in one context may be an everyday occurrence in another." *Id.* "Courts evaluate the [unforeseeable business circumstances] exception objectively, at the time the decisions were made, and not with the benefit of 20/20 hindsight." *AE Liquidation I*, 556 B.R. at 618.

89.    The WARN Act is not triggered by layoffs merely being "possible"; instead, layoffs must be "probable." The Third Circuit has held "that the WARN Act is triggered when a mass layoff becomes probable—that is, when the objective facts reflect that the layoff was more likely than not." *AE Liquidation II*, 866 F.3d at 530; *see also Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589 (7th Cir. 2005); *Watson v. Mich. Indus. Holdings, Inc.*, 311 F.3d 760, 765 (6th Cir. 2002); *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998). "Companies in financial distress will frequently be forced to make difficult choices on how best to proceed, and those decisions will almost always involve the possibility of layoffs if they do not pan out exactly as planned." *AE Liquidation II*, 866 F.3d at 530. Thus, "the triggering event does not need to be an 'out-of-the-blue' event" to satisfy the exception. *Jevic*, 496 B.R. at 161.

90.    For example, in *Elsinore*, the Third Circuit held that a casino being shut down by the state was unforeseeable even though the state Division of Gaming Enforcement had recommended the casino be closed. 173 F.3d at 187. Even though that recommendation raised the possibility of a shutdown, it had to be balanced against other efforts to keep the casino open

32

and the government's historical reluctance to shut down casinos, which made an ultimate shutdown unforeseeable.  *Id.*  Similarly, *AE Liquidation II* held that a mass layoff was not probable even though a deal to purchase the debtor was delayed, some of the debtors' disinterested directors were skeptical of the deal's financing, and they began contemplating liquidation.  866 F.3d at 531.

91.     Binding precedent also addresses the time frame this Court examines to determine if the circumstances causing the layoffs were unforeseeable.  An "employer may validly assert the unforeseeable business circumstance exception unless closing is foreseeable 60 days in advance and within a 14-day window." *Elsinore*, 173 F.3d at 185.  This timing rule arise from the 60-day notice period, and DOL regulations stating that the notice must provide a 14-day window during which the closing is expected to occur.  *Id.*  Here, Yellow's layoffs occurred on July 28 and July 30, 2023, and thus the relevant time frame for determining whether the layoffs' cause was unforeseeable is May 22 to June 7, 2023.

92.     During the period in late May and early June when (in hindsight) notice would have been required, Yellow could not have foreseen that the IBT would decide to sacrifice Yellow along with 22,000 unionized jobs.  Yellow did not consider this a "possibility," much less the legally required "probability."  During this time, while the Company was facing liquidity concerns, its business was generally stable.  Yellow was regularly receiving orders for and delivering more than 40,000 packages daily.  Yellow had sufficient total liquidity—such as having nearly $157 million on June 5.  While Yellow could foresee its liquidity declining, the Company also planned measures—such as selling a terminal in Compton, California, for $80 million and negotiating with existing lenders and potential new financiers—that would extend the Company's liquidity and allow it to keep negotiating with the IBT.

33

93.     Moreover, Yellow was actively negotiating with the IBT and repeatedly made concessions that Yellow reasonably believed would cause IBT to allow One Yellow Phase 2 to proceed.  These concessions included allowing the union membership to vote on the revised CHOPS, accepting the demand to re-open the CBA, and agreeing to a pay increase.  Yellow also reached out to union-friendly politicians for their aid in negotiating with IBT.  Starting in late May and extending through late July, Yellow was employing investment bank Ducera to negotiate with Yellow's existing and new potential lenders to increase its cash reserves and seek an investment from Atlas.  All these actions further demonstrate that there was no objective reason to believe that the Union would force Yellow to shutter.  If Yellow had realized that the IBT would destroy the Company at the end of July, it would not have bothered with any of these efforts.

94.     The IBT's rhetoric through June 7—and even up to July 16—did not include a strike threat, which is what ultimately caused the Company's end.  Moreover, Yellow's view of the IBT's conduct must be put in the context of the history of Yellow-IBT negotiations specifically, as well as union-employer negotiations generally.  As for the specific history, Yellow knew that the IBT had not issued strike threats previously, even when it had the right to do so in 2014. Similarly, the IBT had previously worked with Yellow to preserve the Company in challenging financial circumstances.  These included the IBT seeking to have Central States agree to deferring Yellow's contributions, as had happened in 2010 and 2020—and as would eventually happen again on July 23, 2023.  Yellow's belief based on history and logic was that the IBT, while engaging in hard bargaining, would not destroy the Company.

95.     Yellow's understanding of the IBT's position must be understood in the context of employer-union negotiations generally.  As the Third Circuit has held, a court must "evaluate whether a '*similarly situated employer*' in the exercise of commercially reasonable business

34

judgment would have foreseen closing." *Elsinore*, 173 F.3d at 186 (emphasis added). A reasonable similarly situated employer—that is, one with a unionized work force—would believe that union obstinance was a typical negotiating tactic to extract concessions from the employer, not a suicide pact to destroy the Company and over 22,000 union jobs. That is, the IBT's statements in the first half of 2023 "must be viewed in the context of collective bargaining, which is a robust and dynamic negotiation process where leverage is sought through posturing." *N. Am. Airlines, Inc. v. Int'l Bhd. of Teamsters, AFL-CIO*, 2005 WL 646350, at *14 (S.D.N.Y. Mar. 21, 2005); *see also NLRB v. WPIX, Inc.*, 906 F.2d 898, 902 (2d Cir. 1990) (describing negotiation where union "dismissed certain company proposals as being 'ridiculous' or a 'slap in the face' to the bargaining unit" and "both sides engaged in some exaggeration, posturing and dilatory tactics"). "Employers and unions can be expected to take aggressive bargaining positions and freely threaten dire consequences when they are rejected." *Fed. Exp. Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 964-65 (D.C. Cir. 1995); *see also N. Am. Airlines*, 2005 WL 646350, at *14 (rejecting employers' arguments that IBT engaged in self-help, such as work slowdowns, during negotiations: "what the record reveals is much posturing and bravado of a type that is often found in labor negotiations"). "What a party tells its partisans during negotiations, perhaps to rally support, may well have little bearing on the terms of employment that party ultimately accepts." *WPIX*, 906 F.2d at 902.

96.    In addition to this general context of union-employer negotiations, Yellow had no reason to believe that the IBT would irrationally destroy the Company and put 30,000 employees—including 22,000 union employees—out of work. Yellow presented its financial information to the IBT, and thus the Union could see the operational and liquidity challenges the Company faced and the need for One Yellow. Even after the IBT announced its strike threat, a reasonable

35

employer in Yellow's circumstances would have believed the threat was another effort to extract more concessions, and that the strike could be averted.  In fact, the IBT did withdraw its strike threat on July 23—just as a reasonable, similarly situated employer would have expected, especially given the Yellow-IBT bargaining history in 2010, 2014, and 2020—but unfortunately the damage of driving away Yellow's customers had already been done and the IBT's withdrawal came too late.  Neither Yellow nor any other similarly situated employer would have foreseen— not just as a possibility, but as a probability—that IBT would deliberately put the Company out of business to the detriment of tens of thousands of its own members.

97.    Even after June 7, 2023, Yellow had no objective reason to see a mass layoff as probable.  While the Company's liquidity was decreasing, its shipments were stable through July 17.  Yellow continued to negotiate with—and make concessions to—the IBT in the belief that the union would agree to One Yellow Phase 2 and save 22,000 unionized jobs before Yellow ran out of liquidity.  Yellow continued to take steps, including through Ducera, to renegotiate its loans to raise fresh cash as well as obtain a liquidity injection from Atlas, to maintain its liquidity and continue normal operations.

98.    Even after the July 17 strike threat, which came less than two weeks before the layoffs, the objective circumstances show that mass layoffs were not a probability.  Yellow filed a suit to enjoin any strike, and its motion was not denied until July 21, demonstrating that Yellow was working to avoid any strike and preserve the Company.  Yellow also continued to seek all avenues to negotiate with the IBT.  Those efforts eventually were successful on July 23 and the following days, when the IBT withdrew its strike threat and finally conditionally agreed to the One Yellow Phase 2 changes.  The IBT's own actions demonstrate that it must have believed the Company could have been saved, as otherwise there would have been no point in negotiating with

36

Yellow. Moreover, Ducera's communications with Atlas on and after July 18 showed that Atlas was still interested in investing in Yellow even after the strike threat. Even through July 25, Yellow had been negotiating with IBT and providing it with information regarding Yellow's communications with the federal government so that the IBT could use its government contacts to seek relief. Only at that point, as Yellow's shipment pickups fell near to zero on July 26, did the fact that the strike threat's damage was irreparable become apparent. Thus, not until July 26 did the end of the Company and resulting mass layoffs become a probability.

99.     In sum, during the relevant period from May 22 to June 7, 2023—and even afterward—Yellow was vigorously negotiating in good faith to obtain the IBT's consent to the Phase 2 CHOPS and taking other steps to shore up its liquidity and continue operating for the foreseeable future. Even after the IBT's strike threat, Yellow continued its efforts to save the Company, and that those efforts had a reasonable probability of success is supported by the Union's conduct from July 23 to 25 and Atlas's continued interested in Yellow. Yellow did not foresee that the Union would drive it out of business and destroy more than 20,000 jobs of its own members, and for that reason, Yellow is exempted from the notice period of the federal WARN Act and all state acts recognizing this exception.

**E.     Yellow Acted In Good Faith In Not Issuing WARN Notices Sooner, Which Would Have Destroyed Its Attempts To Save The Company.**

100.     If an employer acted "in good faith and [] the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section." 29 U.S.C. § 2104(a)(4). The facts here, both from the viewpoint of Yellow and an objective reasonable company, establish that Yellow acted in good faith in not providing earlier notice of the layoffs. Not until July 26— as Yellow's customers had fled, its shipment pickups approached zero, the IBT's belated

37

conditional agreement to Phase 2 proved too little too late, and the board of directors contemplated bankruptcy—did both Yellow's subjective belief and the objective facts show that the Company could not be saved.

101.    During the late May to early June time frame where—in hindsight—notice would have been provided, Yellow had no reason to believe notice was required.  The Company's business was stable.  Liquidity was a concern, but the Company had enough money to operate and was developing methods to preserve liquidity.  The Company was actively attempting to negotiate with the IBT to proceed with One Yellow Phase 2.  The Company had impressed on the IBT the need for proceeding with Phase 2, including through providing financial information.  Based on Yellow's negotiating history with the IBT, Yellow reasonably expected that the IBT would not destroy the Company.  The Company also was negotiating with its existing creditors, potential new creditors, and private equity fund Atlas for cash that would improve its liquidity.  Given all these facts, Yellow had no reason whatsoever to believe than in late May to early June the Company would cease to exist two months later.  Accordingly, Yellow had no reason to issue WARN notices, as during late May and early June it reasonably believed no layoffs would be necessary, much less that the Company would collapse.  Indeed, issuing WARN notices at that time would have guaranteed the Company's end with no benefit to its workers or other stakeholders.

102.    Even after the period 60 days before July 28 and July 30, events showed the Company had no reason to expect a mass layoff through July 17.  To be sure, once the IBT issued its strike threat, the danger to the Company increased, but Yellow continued to believe the Company would survive, and that belief is supported by the objective facts.  Atlas was still interested in investing in Yellow after July 18, even with knowledge of the strike threat.  Yellow

38

believed its court action could stop the Union from striking.  While that effort failed, the judge's prophetic words appear to have caused the IBT to negotiate in good faith.  From July 23 to July 25, Yellow and the IBT negotiated, with the IBT withdrawing its strike threat and then conditionally agreeing to the Phase 2 operational changes.

103.    "Accordingly, even if the Debtor had violated the WARN Act, the mitigating circumstances would negate any penalty." *Old Electralloy*, 162 B.R. at 126.

**F.      Yellow's WARN Notices Satisfy All The Requirements For The Exceptions To Apply.**

104.    Under the faltering company and unforeseeable business circumstances exceptions (though not when an entity is a liquidating fiduciary), an employer "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3); *see also* 20 C.F.R. § 639.7(d) (further discussing the notice's content).  Yellow's WARN notices easily satisfy both these requirements.

105.    As for timing, the DOL's own regulations acknowledge that "the employer must give as much notice as is practicable … and this may, in some circumstances, be notice after the fact." 20 C.F.R. § 639.9.  Third Circuit precedent similarly holds that "as much notice as is practicable" can be after-the-fact notice.  In *AE Liquidation II*, the company informed its employees they were being furloughed indefinitely on February 18, 2009.  866 F.3d at 521.  On February 24, after a sale of the company fell through, the company sent all employes an email stating that their furloughs were being converted to a layoff effective February 19. *Id.* at 524-25.  Even though the WARN notice was not sent until five days after the layoffs occurred (the notice was sent on February 24 for layoffs effective February 19), the Third Circuit held it was sufficient. *Id.* at 524-25; *see also AE Liquidation I*, 556 B.R. at 624-25 (rejecting plaintiffs' argument that after-the-fact notice cannot satisfy the WARN Act, and holding that the employer's five day after-

39

the-fact notice constituted "as much notice as practicable under the circumstances, even if it was

after the fact"); *Butler v. Fluor Corp.*, 511 F. Supp. 3d 688, 719 (D.S.C. 2021) (holding that notices

provided on August 4 and 9-10 was "as soon as practicable" after layoffs occurred on July 31); *see*

*generally Old Electralloy*, 162 B.R. at 126 (notice given the day of the layoff was sufficient).

106.    Here, Yellow sent a warn notice on July 31, 2023, for layoffs of unionized

employees that occurred on July 30—just a day before—and a smaller number of non-union

employees laid off on July 28.  These time periods of one and three days are less than the five days

at issue in *AE Liquidation* and the four to ten days in *Butler*.  Moreover, this timing was as soon

as practicable given Yellow's efforts up until the last moment to save its employees' jobs.  As

explained previously, the IBT withdrew the strike threat on July 23.  Over the next days through

July 25, Yellow and the IBT negotiated the Union's conditional agreement to the One Yellow

Phase 2 operational changes, and Yellow encouraged the IBT to seek federal government

intervention that could sustain the Company.  Only afterwards, on July 26, did it become apparent

that the strike threat's damage was irreversible.  At this point, Yellow needed time to prepare and

send WARN notices to tens of thousands of employees, which required the few days to July 31.

*Compare Butler*, 511 F. Supp. 3d at 719 (holding a lengthier delay was "as soon as practicable"

because of "the presence of thousands of workers at the job site, and the abrupt nature of the

shutdown").  Thus, Yellow "g[a]ve as much notice as is practicable" under the circumstances.

107.    The notices also "give a brief statement of the basis for reducing the notification

period."  29 U.S.C. § 2102(b)(3).  The notices explain that the Company could not provide earlier

notice of the shut down because it qualifies under the "unforeseeable business circumstances,"

"faltering company," and "liquidating fiduciary" exceptions set forth in the WARN Act.  Hawkins

Decl. ¶ 110.  Specifically, the notice to unionized employees explains that the "Company had

40

hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so." *Id.* "These circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice is further excused because the business is being liquidated." *Id.* The notices also explain that the closure is permanent, all employees were being terminated, and no bumping system (where a more senior employee displaces a more junior one) or other jobs opportunities will be available. *Id.*

108.    Moreover, Third Circuit precedent holds that the sufficiency of the notice should be considered in light of other communications made to employees. In *Kalwaytis v. Preferred Meal. Sys., Inc.*, Preferred Meal Systems sent a WARN notice to employees on June 26, 1992 saying they would be laid off but that it would contract with another company, Culi-Services, to offer employment to those workers. 78 F.3d 117, 119 (3d Cir. 1996). On July 10, Preferred sent another letter stating that Culi-Services would not be offering employment to all workers, and any employment offers would depend on Culi-Services' discretion. *Id. Kalwaytis* explained that the WARN Act reflects "[f]lexibility in the notice requirement" and considered the two letters together to conclude "they do meet the statutory requirements of notice." *Id.* at 121-22. Relying on *Kalwaytis*, *AE Liquidation I* later held that "the Third Circuit has allowed that multiple communications to employees, read together, may satisfy the statute." 556 B.R. at 626; *see also id.* at 618 (holding that the "Court may also consider whether multiple communications to employees, read together, satisfy the statute"). *AE Liquidation I* expressly rejected the employees' argument that "piecemeal communications" were insufficient, and then considered together a February 18 email announcing furloughs and a February 24 email converting the furloughs to permanent layoffs in determining that this content was sufficient to satisfy the WARN Act. *Id.* at

41

626 ("the Court finds no genuine issue of material fact that these communications, considered together, contain the information required by the statute").

109.    Yellow sent several written communications to its employees in June and July 2023 explaining the circumstances facing the Company, and that should be considered in conjunction with the July 31 WARN notices.  Hawkins Decl. ¶¶ 69, 71, 75, 76, 78, 96.  For example, a June 8, 2023 letter explained the need to Complete One Yellow, discussed the militant talk of IBT President Sean O'Brien, and stated that "the reality is that, until the IBT leadership stops the posturing and deals with the reality of the current situation, he is leading you down a road to ruin." *Id.* ¶ 69.  A June 21 letter, in explaining why Yellow was deferring payments to Central States, stated that as "a consequence of our inability to proceed with One Yellow, combined with the challenging business conditions confronting the entire [] industry, Yellow has recently been operating at a loss as it continues to serve its customers." *Id.* ¶ 75.  On July 20, Yellow sent another letter explaining it had offered a wage increase to "clear[] a path to advance One Yellow.  All stakeholders – lenders, shareholders, employees, and customers need to see progress." *Id.* ¶ 96.  These repeated communications further detailed why Yellow eventually failed and why WARN Act notice could not be provided earlier:  the Company was continually attempting to negotiate with the IBT to allow the essential One Yellow initiative, and the IBT's refusal to bargain in good faith could end the Company.  Sadly, that is exactly what happened.  No reasonable employee can claim that they did not know why Yellow conducted a mass layoff or why it could not have given notice sooner.

## COMPLIANCE WITH BANKRUPTCY RULE 3007(e)

110.    The Debtors respectfully submit that this Objection complies with the requirements for omnibus objections set forth by Bankruptcy Rule 3007(e).  Namely, the Debtors have created

a form of notice that shall be served upon each claimant affected by this Objection. Such notices'
exhibits prominently identify the claimant's: (a) name; (b) address; (c) applicable claim number;
and (d) proposed treatment pursuant to the Objection.

111. As a result, each claimant can readily identify its claim and proposed treatment and
respond accordingly. The proposed form of order further identifies each claimant by category of
claims subject to objection. This Objection complies with Bankruptcy Rule 3007(e) and Local
Rule 3007-1. To the extent that the Objection not be found to comply in all respects with Local
Rule 3007-1, the Debtors respectfully request that any such requirement be waived.

## RESPONSES TO THE OBJECTION

112. <u>Filing and Service of Responses</u>: To contest the Objection, a Claimant must file
and serve a written response to the Objection (a "<u>Response</u>") so that it is actually received by the
Clerk of the Bankruptcy Court and the parties in the following paragraph no later than **March 26,
2024 at 4:00 p.m. (ET)** (the "<u>Response Deadline</u>"). Claimants should locate their names and
claims in this Objection, and carefully review the Proposed Order and the exhibits attached thereto.
A Response must address each ground upon which the Debtors object to a particular claim. A
hearing (the "<u>Hearing</u>") to consider the Debtors' Objection shall be held on **April 11, 2024, at
10:00 a.m. (ET)**, before the Honorable Craig T. Goldblatt, at the United States Bankruptcy Court
for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, 3rd Floor,
Courtroom No. 7.

113. Every Response must also be served upon the following persons at the following
addresses:

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:        (302) 652-4100
Facsimile:        (302) 652-4400
Email:              ljones@pszjlaw.com
                        tcairns@pszjlaw.com
                        pkeane@pszjlaw.com
                        ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:              patrick.nash@kirkland.com
                        david.seligman@kirkland.com
                        michael.slade@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:              allyson.smith@kirkland.com

114.    Content of Responses: Every Response to the Objection must contain, at a minimum, the following:

(a)        a caption setting forth the name of the Court, the above-referenced case number and the title of the Objection to which the Response is directed; the name of the Claimant and description of the basis for the amount of the Claim;

(b)        a concise statement setting forth the reasons why a particular Claim should not be disallowed for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which the claimant will rely in opposing the Objection at the Hearing;

44

(c)      all documentation or other evidence of the Claim in question, to the extent not already included with the Claimant's proof of claim, upon which the claimant will rely in opposing the Objection at the Hearing;

(d)      the name, address telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on behalf of the Claimant; and

(e)      the name, address, telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) to whom the Debtors should serve any reply to the Response.

115.    <u>Timely Response Required; Hearing; Replies</u>: If a Response is properly and timely filed and served in accordance with the above procedures, the Debtors will endeavor to reach a consensual resolution with the applicable Claimant.  If no consensual resolution is reached, the Court will conduct the Hearing with respect to the Objection and the Response on **April 11, 2024 at 10:00 a.m. (ET)**, or such other date and time as the parties filing Responses may be notified. Only those Responses made in writing and timely filed and received will be considered by the Court at any such hearing.

116.    <u>Adjournment of Hearing</u>: The Debtors reserve the right to adjourn the Hearing on any Claim included in this Objection.  In the event that the Debtors adjourn the Hearing, they will state that the Hearing on that particular Claim referenced in this Objection, and/or Response, has been adjourned on the agenda for the Hearing on this Objection, which agenda will be served on the person designated by the Claimant in each Response.

4855-5583-8893.1 96859.001

117.     If a Claimant whose Claim is subject to the Objection, and who is served with the Objection, fails to file and serve a timely Response in compliance with the foregoing procedures, the Debtors will present to the Court an appropriate order <u>without further notice to the Claimant</u>.

118.     <u>Separate Contested Matter</u>: Each of the Disputed Claims and the Debtors' objections thereto, as asserted in this Objection, constitutes a separate contested matter as contemplated by Bankruptcy Rule 9014.  The Debtors request that any order entered by the Court with respect to an objection asserted herein shall be deemed a separate order with respect to each such Amended Claim and/or Duplicate Claim.

**<u>RESERVATION OF RIGHTS</u>**

119.     By filing this Objection, the Debtors object to all No Liability Employee WARN Claims because the No Liability Employee WARN Claims present the same legal and factual issues.  However, many of the WARN-related proofs of claim combine WARN-related assertions with additional, unrelated assertions, some of which might be legitimate and others which, in the Debtors' view, are not.  To object to the WARN-related assertions together with these unrelated bases for objection would be inefficient and distract from the WARN issues at hand.  The Debtors therefore intend to file additional substantive and non-substantive objections to the additional, non-WARN related portions of the WARN-related proofs of claims, to the extent that the Debtors deem it necessary and appropriate to do so.  As such the Debtors expressly reserve the right to amend, modify, or supplement this Objection and to file additional objections to any proofs of claim filed in these Chapter 11 Cases including, without limitation, objections as to the liability, amount or priority of any Claims, including the No Liability Employee WARN Claims identified on Schedule 1 to the Proposed Order, and, to the extent necessary, seek relief from Local Rule 3007-1 in order to do so.

46

**NOTICE**

120.    The Debtors shall provide notice of this Objection on the following parties, or their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the Committee and Akin Gump Strauss Hauer & Feld LLP as counsel to the Committee; (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) each of the claimants identified on Schedule 1; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

121.    No prior request for the relief sought in this Objection has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as is appropriate under the circumstances.

47

Dated:  March 12, 2024
Wilmington, Delaware

*/s/ Peter J. Keane*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                tcairns@pszjlaw.com
                pkeane@pszjlaw.com
                ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                david.seligman@kirkland.com
                michael.slade@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

THIS OBJECTION SEEKS TO DISALLOW, REDUCE, OR EXPUNGE CERTAIN CLAIMS.  PARTIES RECEIVING THIS OBJECTION SHOULD REVIEW <u>SCHEDULE 1</u> TO THE PROPOSED ORDER TO DETERMINE IF THEIR CLAIM IS SUBJECT TO THIS OBJECTION.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

Response Deadline: March 26, 2024, at 4:00 p.m. (ET)
Hearing Date: April 11, 2024, at 11:00 a.m. (ET)

## NOTICE OF DEBTORS' FOURTH OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM FOR WARN LIABILITY

**PLEASE TAKE NOTICE** that, on March 12, 2024, the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") the *Debtors' Fourth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability* (the "<u>Objection</u>").  **Your claim(s) may be disallowed and/or modified and/or expunged as a result of the Objection.  Therefore, you should read the attached Objection carefully.**

**PLEASE TAKE FURTHER NOTICE THAT YOUR RIGHTS MAY BE AFFECTED BY THE OBJECTION AND BY ANY FURTHER CLAIM OBJECTION THAT MAY BE FILED BY THE DEBTORS OR OTHERWISE.  THE RELIEF SOUGHT HEREIN**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

**IS WITHOUT PREJUDICE TO THE DEBTORS' RIGHTS TO PURSUE FURTHER OBJECTIONS AGAINST YOUR CLAIM(S) SUBJECT TO THE OBJECTION IN ACCORDANCE WITH APPLIABLE LAW AND APPLICABLE ORDERS OF THE BANKRUPTCY COURT.**

      **PLEASE TAKE FURTHER NOTICE** that if the holder of a claim that is the subject of the Objection wishes to respond to the Objection, the holder must file a written response on or before **March 26, 2024 at 4:00 p.m. (ET)** with the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware: 824 North Market Street, 3rd Floor**,** Wilmington, Delaware 19801. In addition each written response must be served on the counsel identified in this notice.

      **PLEASE TAKE FURTHER NOTICE** that responses to the Objection must contain, at minimum, the following: (a) a caption setting forth the name of the Court, the above-referenced case number and the title of the Objection to which the Response is directed; the name of the Claimant and description of the basis for the amount of the Claim; (b) a concise statement setting forth the reasons why a particular Claim should not be disallowed for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which the claimant will rely in opposing the Objection at the Hearing; (c) all documentation or other evidence of the Claim in question, to the extent not already included with the Claimant's proof of claim, upon which the claimant will rely in opposing the Objection at the Hearing; (d) the name, address telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on behalf of the Claimant; and (e) the name, address, telephone number, and fax number of the person(s) (who may be

2

the Claimant or a legal representative thereof) to whom the Debtors should serve any reply to the Response.

PLEASE TAKE FURTHER NOTICE that if you would like to obtain a copy of the Objection or any other documents in the chapter 11 cases, you should contact Epiq Corporate Restructuring, LLC, the Debtors' noticing agent in these chapter 11 cases, (a) by calling (866)-641-1076; (b) by visiting the Debtors' restructuring website at https://dm.epiq11.com/YellowCorporation; or (c) for a fee via PACER by visiting https://pacer.uscourts.gov.

PLEASE TAKE FURTHER NOTICE that if no response to the Objection is timely filed and received in accordance with the above procedures, an order may be entered sustaining the Objection without further notice or a hearing. If a response is properly filed, served and received in accordance with the above procedures and such response is not resolved, a hearing to consider such response and the Objection will be held before The Honorable Craig T. Goldblatt, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, 3rd Floor, Courtroom No. 7, on **April 11, 2024, at 10:00 a.m. (ET)** (the "Hearing"). Only a response made in writing and timely filed and received will be considered by the Bankruptcy Court at the Hearing.

**IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY SUSTAIN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.**

DE:4891-2230-4429.2 96859.001

Dated:  March 12, 2024
Wilmington, Delaware

/s/ Peter J. Keane
_____

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | Michael B. Slade (admitted *pro hac vice*) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |
| Wilmington, Delaware 19801 | Telephone:   (312) 862-2000 |
| Telephone:   (302) 652-4100 | Facsimile:   (312) 862-2200 |
| Facsimile:   (302) 652-4400 | Email:   patrick.nash@kirkland.com |
| Email:   ljones@pszjlaw.com | david.seligman@kirkland.com |
|            tcairns@pszjlaw.com | michael.slade@kirkland.com |
|            pkeane@pszjlaw.com | |
|            ecorma@pszjlaw.com | -and- |

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:   allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in
Possession*

4

# **EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. __** |

### ORDER SUSTAINING
### DEBTORS' FOURTH OMNIBUS (SUBSTANTIVE) OBJECTION
### TO PROOFS OF CLAIM FOR WARN LIABILITY

Upon the objection (the "Objection")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order"), disallowing the claims set forth on **Schedule 1** attached hereto, all as more fully set forth in the Objection; and upon the Hawkins Declaration, the Kaldenberg Declaration, the Whittman Declaration, and the Statlander Declaration; and the district court having jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Objection in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Objection and opportunity for a hearing on

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection.

the Objection were appropriate and no other notice need be provided, except as set forth herein; and this Court having reviewed the Objection and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Objection and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY ORDERED THAT:**

1.      The Objection is SUSTAINED as set forth herein.

2.      The No Liability Claims set forth on the attached **Schedule 1** are hereby disallowed and expunged in their entirety.

3.      To the extent that a response is filed regarding any No Liability Claim listed in the Objection and the Debtors are unable to resolve the response, each such No Liability Claim and the Objection by the Debtors to each such No Liability Claim shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014.  This Order shall be deemed a separate order with respect to each claim.  Any stay of this Order pending appeal by a claimant subject to this Order shall only apply to the contested matter that involves such claimant and shall not act to stay the applicability or finality of this Order with respect to the other contested matters covered hereby.

4.      The Claims Agent is authorized and directed to modify the claims register in accordance with entry of the relief granted in this Order.

5.      Nothing in the Objection or this Order shall be construed as an allowance of any claim.

6.      The Debtors' right to object in the future to any No Liability Claim listed in this Objection or on the schedules attached hereto on any ground, and to amend, modify, and/or

4895-8787-5757.1 96859.001

2

KE 106209347

supplement the Objection, including to object to amended or newly filed claims is fully reserved. Any and all rights, claims, and defenses of the Debtors and their estates with respect to any and all of the claims subject to this Objection are reserved, and nothing included in or omitted from the Objection is intended or shall be deemed to impair, prejudice, waive, or otherwise affect any rights, claims, or defenses of the Debtors and their estates with respect to such claims.

7.     To the extent that the Objection does not comply in all respects with the requirements of Local Rule 3007-1, the requirements of Local Rule 3007-1 are waived.

8.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Objection.

9.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# EXHIBIT B

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | )  Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*,[1] | )  Case No. 23-11069 (CTG) |
| | ) |
| Debtors. | )  (Jointly Administered) |
| | ) |
| | ) |
| | ) |

Response Deadline: March 26, 2024, at 4:00 p.m. (ET)
Hearing Date: April 11, 2024, at 11:00 a.m. (ET)

## DEBTORS' FIFTH OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM FOR WARN LIABILITY

> **THIS OBJECTION SEEKS TO DISALLOW, REDUCE, OR EXPUNGE CERTAIN CLAIMS. PARTIES RECEIVING THIS OBJECTION SHOULD REVIEW <u>SCHEDULE 1</u> TO THE PROPOSED ORDER TO DETERMINE IF THEIR CLAIM IS SUBJECT TO THIS OBJECTION.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") file this fifth omnibus objection to the claims (this "<u>Objection</u>") and respectfully request an order, substantially in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Order</u>"): (a) disallowing and expunging each of the claims identified on Schedule 1 to Exhibit A attached hereto, or to the extent the claim mixes other non-WARN related claims to expunge the WARN related portion of the claim (the "<u>No Liability WARN Claims</u>); and (b) granting related relief.[2]  In support of this

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]   This Court previously entered the *Order (I) Modifying the Requirements of Local Rule 3007-1(F)(I) and (II) Granting Related Relief* [Docket No. 1068], which permits the Debtors to file four substantive omnibus claims objections per month, each containing up to 500 claims. To date, the Debtors have identified over 1,300 proofs of claim asserting WARN liability.  The Debtors are thus filing the Third, Fourth, and Fifth Omnibus Objections contemporaneously, each objecting to proofs of claim asserting WARN liability on substantially similar grounds.

Objection, the Debtors rely on the declarations of Darren Hawkins, Cody Kaldenberg, Brian Whittman, and Sarah Statlander (the "Declarations") filed contemporaneously herewith. In further support of this Objection, the Debtors respectfully state as follows:

## JURISDICTION

1.     The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.     Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by this Court in connection with this Objection if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

3.     Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory and legal predicates for the relief requested in this Objection are §§ 105(a) and 502(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 3007 and 9004, and Local Rule 3007-1.

## INTRODUCTION

5.     Under some circumstances, federal and (where they exist) state Worker Adjustment and Retraining Notification ("WARN") Acts can require employers to provide employees with approximately 60 days of notice before a mass layoff or plant closing. At the same time, WARN Acts are not suicide pacts, and the law encourages employers to "take all reasonable action to preserve the company," *In re Jevic Holding Corp.*, 496 B.R. 151, 163 (Bankr. D. Del. 2013), by

2

providing "leeway for a company's exercise of reasonable business judgment," *In re AE Liquidation, Inc.*, 556 B.R. 609, 618 (D. Del. 2016), *aff'd*, 866 F.3d 515 (3d Cir. 2017).

6.     The circumstances requiring WARN notice are far removed from the facts here. Yellow Corporation ("Yellow" or the "Company"), prior to ceasing its business operations, exercised reasonable business judgment in attempting to preserve its business and avoid laying off nearly its entire work force.  Throughout the first half of 2023, Yellow undertook a series of initiatives meant to position the Company for long-term success and preserve the jobs of its 30,000 employees, roughly 22,000 of which were unionized.  Chief among these was the final completion of One Yellow, a vital multi-year strategic initiative launched in 2019, that ultimately would unify the different entities under the Yellow corporate umbrella, optimize its operational network, enable it to better compete with the non-union carriers who dominate its market, and save the Company hundreds of millions annually.  By the start of 2023, the completion of One Yellow primarily required completing Phase 2 of its network optimization plan.  With Phase 1 having been completed in late 2022—and with the Company's largest union, the International Brotherhood of Teamsters ("IBT" or "Union"), having already agreed to every other One Yellow change in the preceding period—the Company entered 2023 confident that the Union would agree to these final but critical changes.

7.     Like any unionized employer, Yellow also assumed that its ongoing negotiations with the IBT over the completion of One Yellow would include the standard give-and-take that often informed significant operational changes.  This assumption was based on the historical record: in 2009-10, 2014, and 2020, Yellow and the IBT had negotiated hard but ultimately navigated challenging financial circumstances.  Based on this historical record, Yellow understood

3

that the IBT would drive a hard bargain but never drive the Company to the brink of failure, which would risk losing 22,000 unionized jobs.

8.  Throughout the first half of 2023, the IBT made a series of demands as a precondition for its agreement to proceed with One Yellow.  These ranged from expanding existing agreements, pay increases, allowing membership to vote on the One Yellow operational changes, and others.  Yellow bargained in good faith regarding each of these demands, and conceded key points to the Union, expecting they would secure the IBT's agreement to proceed with the vital work of completing One Yellow.  But despite Yellow's efforts—and to the Company's surprise given the pre-2023 negotiations with the Union—the IBT refused to allow One Yellow to proceed.

9.  The IBT's intransigence culminated on July 17, 2023, when, without any warning, the IBT issued a highly publicized threat to strike, starting on July 24, 2023.  This strike was premised on Yellow temporarily deferring contributions to union health, welfare, and pension funds to preserve liquidity, a step necessary only because of the IBT's refusal to proceed with One Yellow.  In the parties' prior practice, when the Company faced liquidity concerns, as in 2009-10 and in 2020, the Company and Union worked together to obtain deferrals of such payments.  The Company expected in July 2023 that it, the IBT, and funds could again work out an agreement.  But to Yellow's surprise, the Union used these same deferments to issue a strike notice for the first time in decades.  Even then, Yellow acted swiftly and decisively to attempt to prevent the strike, including filing a lawsuit and moving for a temporary restraining order in the District of Kansas (which was denied).

10.  But that strike threat (over issues that could have been easily resolved) scared off Yellow's customers, leading to the sudden, unexpected collapse of Yellow in a matter of days.  Yellow went from picking up over 40,000 shipments daily on July 17 to under 10,000 on July 21,

4

to nearly zero on July 26.  Yellow was shocked at the rapidity of its knife-edge transition from an operating business to an entity existing only to liquidate its assets for the benefit of its stakeholders.

11.     The Company had no time to plan, much less provide WARN notice for, what became mass layoffs on July 28 and July 30, 2023.  Those layoffs, and the unexpectedly abrupt manner in which they occurred, are solely the fault of the IBT, which for reasons best known to it decided to act directly contrary to the interests of the approximately 20,000 Teamsters then employed at Yellow by taking deliberate steps to execute, rather than save, Yellow.  Under such circumstances, providing 60 days of notice under WARN Acts was neither feasible nor required.  Thus, the WARN Act claimants have no valid claims for multiple independent reasons.

12.     *First*, WARN applies only to an "employer."  Under binding Third Circuit authority, a debtor or other entity that is not operating on a going concern basis, but instead is winding up its affairs and liquidating, is not an "employer" and not subject to WARN obligations. *In re United Healthcare Sys., Inc.*, 200 F.3d 170, 177-79 (3d Cir. 1999).  By July 26, 2023, Yellow had implemented the process to discontinue accepting new shipments, was completing delivery of its final packages, was preparing for bankruptcy, and thus was no longer an employer.  Instead, Yellow's efforts had turned to filing for chapter 11 and winding up its affairs.  Thus, when the layoffs occurred Yellow was no longer an "employer" and the WARN Acts did not apply to it.

13.     Moreover, even for employers (which Yellow was not at the relevant time) WARN acts recognize exceptions, two of which apply here.  Thus, the *second* reason notice is not required is that the faltering company exception applies where (as here) the employer was actively seeking capital or business that would have enabled it to avoid layoffs and believed providing a WARN notice would have prevented the Company from obtaining the capital or business.  At the time relevant to the faltering company exception, Yellow was actively pursuing the One Yellow

5

initiative, repeatedly and persistently attempting to get the Union to agree to a change of operations to allow One Yellow to proceed. Achieving One Yellow would have provided Yellow with savings in the projected amount of $22.85 million per month, providing Yellow with additional capital and allowing it to compete for business that would have enabled the Company's long-term success and avoid any layoff. Yellow also had retained the investment bank Ducera Partners, which was was actively negotiating with existing lenders, potential new lenders, and private equity fund Atlas Holdings to obtain new cash that would have extended Yellow's runway and allowed the Company to continue. Providing a WARN notice during these sensitive negotiations would have scared off the Company's customers and any potential new financing, leading to its collapse, the same as the effect of the Union's highly publicized strike threat.

14.    The other exception and *third* reason Yellow has no WARN Act liability is that it was not foreseeable that the Union would choose to exterminate Yellow rather than negotiate Phase 2 of One Yellow. Specifically, the IBT threatened a strike despite Yellow's repeated good faith efforts to negotiate the IBT's agreement to the essential One Yellow initiative. Over the past decade-plus, the IBT had engaged in hard bargaining but never issued a strike threat, even when it had the legal right to do so, or took actions that could destroy the company. Indeed, the IBT had previously worked with the Company on temporarily deferring contributions to the health, welfare, and pension funds when necessary to preserve Yellow's liquidity, but here the IBT used that as a trigger for striking. Moreover, in the months leadings up to that threat, Yellow was diligently working to save the Company. The result of that strike threat was Yellow's rapid collapse over just several days, going from delivering 40,000-plus packages to nearly zero, as customers fled from the Company. Thus, Yellow could not have expected (nor would any reasonable person have expected) that the IBT would deliberately end the careers of 22,000 unionized employees.

6

15.     *Fourth*, even if a company is an employer and no exception applies, the amount of any liability may be reduced in the court's discretion if the absence of notice was in good faith and the employer had reasonable grounds for believing that this omission was not a violation of the WARN act.  Throughout the first half of 2023, Yellow was negotiating in good faith with the IBT—repeatedly conceding to Union demands—in an attempt to secure the IBT's approval of One Yellow Phase 2.  Indeed, just a few days before the layoffs, Yellow had finally secured the IBT's conditional agreement to proceed with the operational changes necessary for One Yellow.  The Company also was actively seeking financing to improve its liquidity, including negotiating with potential financiers even after the Union issued its strike threat.  Issuing a WARN notice of a mass layoff of nearly the entire workforce would have crushed any opportunity to save the Company.  Thus, Yellow objectively and in good faith believed it had no obligation to issue WARN notices any earlier than it did.

## **BACKGROUND**

### A.     **Yellow's Business and Unionized Work Force.**

16.     Before the events leading to its Chapter 11 filing, Yellow offered its customer a full range of services for transporting goods through its North American ground distribution network.  Hawkins Decl. ¶ 6.  On an average workday, Yellow's approximately 30,000 employees handled approximately 50,000 freight shipments daily.  *Id.* ¶ 9.

17.     Of Yellow's 30,000 employees, approximately 22,000 were unionized, with the vast majority of these being represented by the IBT.  *Id.* ¶ 9.  Prior to the July 2023 strike notice, the IBT had not issued a strike notice in nearly 30 years, even when challenging economic circumstances required Yellow to seek concessions and when the IBT had a legal right to strike.  *Id.* ¶¶ 13-15.  Instead, while engaging in hard bargaining, the IBT would agree to the changes necessary to save the Company.  *Id.*

7

18.     For example, in 2009 the Company faced severe liquidity issues from the financial crisis.  *Id.* ¶ 13.  For several months, to maintain liquidity the Company deferred payments to the pension funds that provide pensions to its unionized members, but the IBT never issued a strike threat.  *Id*.

19.     In 2014, the Company's existing collective bargaining agreement ("CBA") expired, the Company sought concessions that the IBT did not support, and the Company put its proposal to a vote by the IBT membership, which rejected it.  *Id.* ¶ 14.  At that point, the IBT could have sent a strike notice, but instead of doing so it engaged in good faith negotiations to reach an agreeable position for both sides that was accepted by the membership.  *Id.*

20.     In 2020, the COVID pandemic again drained the Company's liquidity.  *Id.* ¶ 15. Yellow determined that it needed to defer contribution to Central States, which is the fund that provide health and welfare funds, pension, and other benefits to its unionized employees.  *Id*. Yellow negotiated with Central States, and its efforts were supported by the IBT.  *Id*.  Central States agreed to the deferral.  *Id*.  At no time did the IBT issue a strike notice over Yellow's deferral of contributions.  *Id*.

**B.      The Benefits and Necessity of One Yellow.**

21.     Yellow had pursued various acquisitions of transportation companies over the years, resulting in a number of different brands within the Yellow family.  Hawkins Decl. ¶ 12. This resulted in numerous operating companies within Yellow's corporate structure competing for the same business.  *Id.* ¶ 18.  Such inefficiencies harmed Yellow's ability to compete with other transportation carriers.  *Id.*

22.     Yellow developed the One Yellow restructuring initiative, intended to unify its various companies, modernize the business, and upgrade the efficiency of its operations so that the

8

company could continue to compete successfully. *Id.* ¶ 24. One Yellow required execution in three carefully planned phases. *Id.* ¶ 26. All of the Company's stakeholders, including its employees, customers, creditors, and shareholders, knew and understood the criticality of the successful and timely implementation of each phase. *Id.* ¶ 25.

23.     The Company projected that One Yellow would significantly improve its finances. Proceeding with One Yellow would have allowed Yellow to achieve operational savings of approximately $22.85 million per month. *Id.* ¶ 73. Yellow projected that One Yellow would increase EBITDA from $341.4 million for the 12 months ending March 31, 2022, to $450 million within one full year of implementation, an increase of over 30%. *Id.* ¶ 19. Yellow also expected that One Yellow would create an opportunity to capture over $675 million in annual revenue with favorable operating margins. *Id.*

24.     In sum, One Yellow was Yellow's most vital strategic initiative, and Yellow's survival depended on completing it as soon as possible. *Id.* This need was widely understood, including by the IBT. *Id.* ¶ 25.

## C.     Yellow's Repeated Good Faith Attempts to Negotiate with the IBT Over the Changes Necessary for One Yellow.

25.     One Yellow would proceed in three phases, the first phase covering approximately 20% of Yellow's network. Hawkins Decl. ¶ 26. Under Yellow's CBA, when Yellow made a changes of operations ("CHOPS") it and the IBT would resolve the seniority of affected Union members. *Id.* ¶ 27. The CHOPS process is usually routine and easily dealt with through the contractual mechanisms set forth in the CBA. *Id.*

26.     During the first phase of One Yellow, the Company negotiated with the IBT over the CHOPS necessary to implement Phase 1. *Id.* ¶ 28. In August 2022, the IBT approved the Phase 1 CHOPS quickly and without any issue. *Id.*

9

27.     Yellow promptly proceeded with Phase 1.  *Id.*  This phase was a success, and in the fourth quarter of 2022 Yellow had its best operating income in 16 years.  *Id.* ¶¶ 20, 30.  Because of Phase 1's success, Yellow was in a strong financial position as it prepared for Phase 2, the largest and most important phase which covered approximately 70% of the Company's network.  *Id.* ¶ 26.  Nevertheless, the Company needed to complete all Phases of the Yellow One initiative to effectively compete against both non-unionized companies, which have lower operational costs than unionized ones, and its remaining union competitors.  *Id.* ¶¶ 30-31.

28.     Soon after the Phase 1 CHOPS approval, on October 19, 2022, Yellow submitted the Phase 2 CHOPS to the Union for approval.  *Id.* ¶ 33.  This CHOPS mirrored the Phase 1 CHOPS the Union had approved just two months earlier.  *Id.*  Yellow thus expected the Union would approve the Phase 2 CHOPS without significant difficulties.  *Id.* ¶¶ 33-34.

29.     Instead of simply approving the Phase 2 CHOPS, the IBT began asking for concessions.  *Id.* ¶ 34.  Throughout the first half of 2023, Yellow believed it could convince the Union to see reason and agree to resolve the Phase 2 issues, as the parties had for the Phase 1.  During this time, Yellow repeatedly conceded to Union demands, expecting this would clear the way for the Company and Union to proceed with the essential One Yellow initiative.

30.     For example, the Union insisted that Yellow expand a designated terminal agreement permitting road drivers to unload freight and swap trailers themselves, and Yellow agreed.  *Id.* ¶¶ 34-39, 41.  In early April 2023, the Union demanded that IBT member employees be allowed to vote on the revised Phase 2 CHOPS, and Yellow agreed.  *Id.* ¶¶ 44, 46.  Also in April 2023, the Union demanded that Yellow agree to reopen the CBA to increase monetary compensation for IBT members, and on April 21 Yellow agreed to that demand.  *Id.* ¶¶ 48-55.  When Yellow accepted the Union demand to reopen the CBA, the Union then conditioned any re-

10

opening on the union being allowed to strike and that all terms would be submitted to the IBT membership for a vote.  *Id.* ¶¶ 55-56.  On May 25, 2023, the Union demanded that its support of Phase 2 was conditioned on Yellow agreeing to pay an immediate $1.50 wage increase.  *Id.* ¶ 61.  On July 12, Yellow agreed to this hourly increase in the context of a five-year agreement that would enable Yellow to achieve the One Yellow network modernization.  *Id.* ¶ 86.

31.     Yellow explained to its employees the consequences of not agreeing to Phase 2.  In April 2023, Yellow provided the IBT with secure access to Yellow financial records and documents showing that Yellow would have liquidity concerns that could only be avoided if Phase 2 moved forward.  *Id.* ¶¶ 50, 52.  Yellow also organized town hall meetings with thousands of non-union employees to explain the consequences to the Company if a deal with the Union on Phase 2 were not reached.  *Id.* ¶ 90.  On June 8, the Company sent an email to Yellow's employees regarding the ongoing impasse with the IBT.  *Id.* ¶ 69.  Yellow also prepared additional written communications to be mailed to employees' homes that would emphasize the importance of One Yellow to the Company's future.  *Id*.

32.     Throughout this period, the Union's self-described "militant" line was believed to be part of the IBT's approach to gain leverage in negotiations and extract concessions from Yellow.  The reason is simple:  any absolute IBT refusal to support One Yellow would be irrational; it risked not only destroying the Company but also losing the jobs of the more than 20,000 employees the IBT purported to represent.

**D.     Yellow's Efforts To Obtain New Financing To Improve Its Liquidity.**

33.     The Union's delay in approving the necessary operational changes in Phase 2, combined with challenging business conditions, caused Yellow to begin losing liquidity.  On June 5, 2023, Yellow had a total liquidity of nearly $157 million, which dropped to under $125 million

11

by June 23, and less than $92 million on July 12.  Hawkins Decl. ¶¶ 65, 72, 86.  These amounts were sufficient for Yellow to continue operations.  At the same time, these decreases represented a concerning trend, causing Yellow to explore methods of shoring up its liquidity to continue negotiations with the IBT to proceed with One Yellow Phase 2.

34.     Yellow had previously hired investment banker Ducera Partners in January 2023 to help it evaluate strategic financial alternatives.  Kaldenberg Decl. ¶ 7.  Yellow was optimistic and, at the time, had no idea that it would be fighting for its life within six months—to the contrary, it had every reason to believe it would be operating for years.

35.     On May 26, 2023, Ducera sent a proposal to Yellow's existing lenders that would modify the loans to improve liquidity, including changes to the collateral that would allow for increased loans and additional borrowing.  *Id.* ¶ 12.  This included Ducera offering proposed terms to modify Yellow's term loan with Apollo Global Management.  *Id.*  These terms included expediting the sale of a shipping terminal in Compton to use the net sale proceeds to pay down the loan, ability to pay interest in-kind, and a waiver of the minimum EBITDA covenant through the end of of 2023.  *Id.*

36.     On June 5, Ducera reached out to new potential asset-based lenders to refinance the Company's existing asset-based loans to provide additional financing that would increase Yellow's cash-on-hand and liquidity.  *Id.* ¶ 13.  At the same time, Ducera entered into negotiations with the Company's existing asset-based lenders to potentially modify the borrowing base, again with the goal of bringing in additional cash to enhance liquidity.  *Id.*

37.     On June 8, Ducera began discussions with private equity fund Atlas Holdings regarding a potential debt or equity investment in Yellow.  *Id.*  Given Atlas's existing holdings and relationships, Ducera believed that Atlas was in a strong place to provide favorable financing

solutions to the Company. *Id.* ¶ 15. Members of Atlas, including a co-founder and managing partner, met with representatives of Yellow and Ducera on July 12 and 13. *Id.* At Yellow's July 17 board meeting, a Ducera partner explained that Atlas had a strong interest in a transaction with Yellow, while noting that time was of the essence. *Id.* During this entire period, Yellow had no reason to believe that the IBT would soon take precipitous and irrational action that would kill the Company within a week.

38.    Even after the July 17 strike notice, Ducera remained in communication with the Atlas. On July 18, the day after the strike notice, Atlas sent an extensive list of diligence requests to the Company. *Id.* ¶ 17. Throughout the following week, Ducera remained in close contact with Atlas, continuing to discuss a potential refinancing in back-and-forth communications. *Id.* The private fund's interest only ended as continuing events showed that the Company's customers had left to competitors and there was no clear means of implementing One Yellow. *Id.* ¶ 18.

**E.    The IBT's Unforeseeable Strike Threat.**

39.    In the weeks leading up to the IBT's July 17 strike threat, Yellow's overall business was stable. As noted previously, on an average workday, Yellow handled approximately 50,000 freight shipments daily. Hawkins Decl. ¶ 9. On June 5, the Company picked up approximately 50,000 shipments; it picked up approximately 45,950 shipments on June 23, and approximately 44,550 shipments on July 12. *Id.* ¶¶ 65, 72, 86. Thus, Yellow's business during June and July was consistent with its typical operations.

40.    Nevertheless, because of the Company's declining liquidity, Yellow was obliged to seek further ways to maintain its liquidity as it continued to negotiate with the IBT. *Id.* ¶ 75. Accordingly, on June 14-15, Yellow asked the Central States health, welfare, and pension funds covering its unionized members to defer contributions that would be due in July and August, with

13

a promise that this would only be a short-term deferral which would be promptly repaid, with interest, as Yellow had previously done. *Id.* ¶ 72. This was not an unprecedented step; as noted before, Yellow, the IBT, and Central States had previously negotiated deferrals of fund contributions when the Company was facing challenging economic circumstances. *Id.* ¶¶ 13-15. Yet none of the funds granted the requests. *Id.* ¶ 72.

41.    On July 7, Yellow determined to defer paying the contributions to Central States due in July and August to preserve liquidity—a step that would not have been necessary if the Union had approved One Yellow Phase 2 in a timely manner. *Id.* ¶ 89. Instead of negotiating over the deferrals—as Central States, IBT, and Yellow had done in the past, *id.* ¶¶ 13-15—on July 17 Central States sent a memorandum stating that Yellow participation in the funds would be terminated effective July 23, *id.* ¶ 88. Just hours later, the IBT gave a 72-hour notice that it intended to strike on or after July 24—something that it had not done for nearly 30 years. *Id.*

42.    Even after the IBT's strike threat, Yellow continued trying to engage with the IBT. For example, on July 18, Yellow reached out to the President's National Economic Council for advice on engaging in constructive negotiations with the IBT. *Id.* ¶ 93. But the Council advised that the IBT had no interest in talking with Yellow. *Id.*

43.    Yellow also sought legal remedies, and on July 19 filed a lawsuit seeking a temporary restraining order and preliminary injunction to, among other things, enjoin the Union from engaging in a strike or other work stoppage. *Id.* ¶ 93. On Friday, July 21, the court denied Yellow's TRO and PI on the grounds that it lacked jurisdiction. In denying that relief, the court prophetically stated that "I will say that I understand the grave consequences that may flow from

14

this.  I hope the union understands that perhaps 22,000 or 30,000 jobs will be lost.  It could be a situation where you win a battle and lose a war, I don't know."[3]

44.    The court's comments appeared to have opened the IBT's eyes as to the ultimate result of its intransigence.  After months of obstruction, on July 23 the IBT reached out to the Company to engage in negotiations.  Hawkins Decl. ¶ 98.  As a result of these discussions, and the IBT's request, Central States agreed to extend benefits for Yellow's workers.  *Id.*

45.    But the uncertainty of the strike had caused customers to drop Yellow as a carrier, and competitors immediately absorbed Yellow's shipments.  On July 12, Yellow picked up 44,550 shipments.  *Id.* ¶ 86.  But on July 19, two days after the strike threat, Yellow picked up only 32,500 shipments, a drop of nearly a quarter in two days.  *Id.* ¶ 94.  After another two days, on July 21, Yellow picked up just 10,450 shipments, meaning that three-quarters of its business was gone within four days of the IBT's strike notice.  *Id.* ¶ 97.  Given the plight of the company and due to the ongoing disruptions to the Company's business, to ensure that existing orders could be fulfilled Yellow decided to begin the process to discontinue accepting new shipment orders on July 24, 2023.  *Id.* ¶ 100.

**F.    Yellow Ceases To Operate, and Lays Off Its Employees and Issues WARN Notices.**

46.    Even after Yellow stopped accepting additional shipments, it continued to work to save the Company.  Yellow and the IBT continued the negotiations that had started on July 23, and by July 25 the IBT finally conditionally approved the operational changes necessary to implement Phase 2 of One Yellow.  Hawkins Decl. ¶ 102.  Yellow also provided the IBT with information about the Company's communications with the federal government, hoping that the

---

[3]    Transcript of Hearing on Motion for Temporary Restraining Order, at 54:14-17, *Yellow Corp., v. Int'l Brotherhood of Teamsters, et. al.*, No. 23- CV-1131-JAR (D. Kan. July 21, 2023).

IBT might be able to improve the chances that the federal government would intervene to aid the Company. *Id.* But the optimism created by the IBT finally agreeing to Phase 2 operational changes proved short-lived. The damage was done, and the customers lost during the strike threat would not return. *Id.* ¶ 103.

47.   At a July 26 board of directors meeting, the board discussed the Company's available liquidity, and depending on the pace of the liquidity decline, the timing of a potential filing under chapter 11 of the Bankruptcy Code. *Id.* ¶ 104. On that same date, Yellow's delivered shipments fell to nearly zero. *Id.* ¶ 105.

48.   Because of the strike threat devastating Yellow's business, the Company implemented a full scale winddown of its business operations and began working on its liquidation. *Id.* ¶¶ 112-14. On July 28, the Company terminated approximately 3,500 non-union employees, most of whom executed release agreements in consideration for severance payments from the Company. *Id.* ¶ 106.

49.   On July 29, Yellow picked up a single shipment—its last ever. By July 30, Yellow had no shipments or customers remaining, and the Company sent notice to the IBT and other unions that it was laying off approximately 22,000 union employees. *Id.* ¶¶ 107-08.

50.   During this period, the sole purpose of Yellow and its remaining employees transitioned to liquidating the company and winding down its business while maximizing value for all stakeholders. *Id.* ¶ 113. Yellow filed for chapter 11 on August 6, 2023. *Id.* As explained in the declaration in support of its first day motions, Yellow's express purpose in filing for chapter 11 was "to effectuate an orderly, value-maximizing winddown of their business for the benefit of all parties in interest." *See Declaration of Matt Doheny, Chief Restructuring Officer, in Support*

16

*of the Debtors' Chapter 11 Petitions and First Day Motions* ¶ 19 (Aug. 7, 2023), ECF No. 14

("<u>Doheny</u> <u>Decl.</u>").

51.     On July 31, 2023, the Company sent notices to its laid off and otherwise terminated

employees under the WARN Act.  Hawkins Decl. ¶ 108.

**C.      The Bar Date Motion and Order**

52.     On August 31, 2023, the Debtors filed a motion to establish a claims adjudication

process.  *See Motion of Debtors Seeking Entry of an Order (I) Setting Bar Dates for Filing Proofs*

*of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended*

*Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner*

*for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Form and*

*Manner of Notice Thereof Filed by Yellow Corporation*, ECF No. 393 (the "<u>Bar Date Motion</u>").

Two weeks later, the Court granted the Debtors' Motion and set a general claims bar date of

November 13, 2023 (the "<u>Bar Date</u>").

**D.      Summary of WARN Related Proofs of Claim**

53.     In aggregate, approximately 1,292 WARN-related proofs of claim were filed,

which includes 13 proofs of claims filed after the Bar Date.  *See* Whittman Decl. ¶ 14.

54.     Of the 1,292 WARN-related proofs of claim, 48 were submitted by unions or union-

related health or pension funds, 1,207 were filed by individual former employees, 30 were filed as

purported class action claims, and 7 were filed by state taxing authorities on behalf of former

employees.  *Id*. ¶ 15.

55.     The majority of individual proofs of claim overlap with the union claims, as the

unions filed their claims on the individuals' behalf.  Specifically, 1,147 of the individual proofs of

claim that mention WARN were filed by union-represented employees, 42 were filed by non-

17

bargaining unit level employees (one of the 41 employees filed two claims), and 18 were filed by individuals that have not been able to be identified by Debtors as either former union or non-union employees. *Id.* ¶ 9. Accordingly, there are between 41 and 59 individuals who are not affiliated with unions who filed proofs of claim mentioning WARN prior to the Bar Date. *Id.*

56.     Of the 41 individuals who are not affiliated with unions and were identified in the Debtors' employee rosters who filed Proofs of Claim mentioning WARN prior to the Bar Date, 32 of them had signed agreements, the majority of which were received prior to the Petition Date, in which they released all claims (including WARN claims) in exchange for severance, which was paid. *Id.* ¶ 11.

57.     The WARN-related proofs of claim typically purport to bring claims under both federal and state WARN acts.

## RELIEF REQUESTED

58.     By this Objection, the Debtors seek entry of the Proposed Order, pursuant to sections 105(a) and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and 9004, and Local Rule 3007-1, disallowing and expunging the No Liability Employee WARN Claims identified on Schedule 1 to the Proposed Order.

59.     The reality is that the Debtors shut down their businesses on an extremely short time frame as the result of completely irrational behavior from the IBT that neither the Debtors nor any other rational employer would have expected or planned for. No WARN act provides for liability under these circumstances.

## BASIS FOR RELIEF

60.     Section 502(a) of the Bankruptcy Code provides that a filed proof of claim is "deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). When asserting a proof of claim against a bankruptcy estate, a claimant must allege facts that, if true, would support a

18

finding that the debtor is legally liable to the claimant. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). Where the claimant alleges sufficient facts to support its claim, its claim is afforded prima facie validity. *Id*. A party wishing to dispute a claim's validity must produce evidence sufficient to negate the claim's prima facie validity. *Id*. at 173-74. Once an objecting party produces such evidence, the burden shifts back to the claimant to prove the validity of his or her claim by a preponderance of the evidence. *Id*. at 174. Ultimately, the burden of persuasion is on the claimant. *Id*. Once the *prima facie* validity of a Proof of Claim is rebutted, "it is for the claimant to prove his claim, not for the objector to disprove it." *In re Kahn,* 114 B.R. 40, 44 (Bankr. S.D.N.Y. 1990) (citations omitted).

61.    A chapter 11 debtor "has the duty to object to the allowance of any claim that is improper." *Int'l Yacht & Tennis, Inc. v. Wasserman Tennis, Inc. (In re Int'l Yacht & Tennis, Inc.)*, 922 F.2d 659, 661-62 (11th Cir. 1991); *see also* 11 U.S.C. §§ 704(a)(5), 1106(a)(1), and 1107(a).

## A.    Federal And State Warn Acts.

### i.    The Federal Warn Act.

62.    The federal WARN Act provides that an "employer shall not order a plaintiff closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order" to representatives of the affected employees, or the affect employees themselves, and to certain State entities. 29 U.S.C. § 2102(a). WARN creates a civil action against an "employer" for back pay and benefits for each day of a violation, subject to reductions for the employer's payment of wages, contributions (such as for health benefits or pensions) on the employee's behalf, or the employer's voluntary payments to employees. 29 U.S.C. § 2104(a).

63.    By its terms, the Act only applies to an "employer," defined as a "business enterprise" that employs 100 or more employees. 29 U.S.C. § 2101(a)(1).

19

64.     The WARN Act also contains a number of exceptions, two of which are relevant here.  One is referred to as the faltering company exception:

> An employer may order the shutdown of a single site of employment before the conclusion of the 60-day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

29 U.S.C. § 2102(b)(1).  The other is that an "employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."  29 U.S.C. § 2102(b)(2)(A).

65.     WARN also provides for a discretionary reduction in any liability or penalties for any good faith violations:

> If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.

29 U.S.C. § 2104(a)(4).

66.     The Third Circuit has rejected interpretations of the WARN Act and its exceptions that "might require an employer to provide frequent WARN notice" so as to "require an economically viable employer to provide notice of a possible—but unlikely—closing."  *Hotel Emps. & Rest. Empls. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 185 n.7 (3d Cir. 1998).  The Third Circuit explained that such frequent notices would be antithetical to the Act's purposes and harm the very employees it is intended to help:

> Once the employer's creditors learn of the notice, they may seek to enforce existing debts and become unwilling to extend the employer more credit.  In addition, employees may overestimate the risk of closing and prematurely leave their employer, forfeiting (among other things) seniority and unvested benefits.  Such

20

behavior by creditors and employees would increase the chance that an employer
will be forced to close and lay off its employees, harming precisely those persons
WARN attempts to protect.

*Id.*; *see also In re AE Liquidation, Inc.*, 556 B.R. 609, 618 (D. Del. 2016) ("*AE Liquidation I*")

("The WARN Act allows leeway for a company's exercise of reasonable business judgment, and

the regulations are intended to encourage employers to take all reasonable actions to the preserve

the company and the jobs."), *aff'd*, 866 F.3d 515 (3d Cir. 2017) ("*AE Liquidation II*"); *In re Jevic*

*Holding Corp.*, 496 B.R. 151, 163 (Bankr. D. Del. 2013) (explaining that where "events are

indicative of a company attempting to stave off layoffs, and attempting to save jobs and the

company," then "[i]t would run counter to the WARN Act's policy of encouraging employers to

take all reasonable action to preserve the company and the jobs to impose liability upon the Debtors

for not giving notice sooner than they did"); *In re Flexible Flyer Liquidating Tr.*, 511 F. App'x

369, 374 (5th Cir. 2013) ("The WARN Act allows good faith, well-grounded hope, and reasonable

expectations.  Its regulations protect the employer's exercise of business judgment and are

intended to encourage employers to take all reasonable actions to preserve the company and the

jobs.  Holding Flexible Flyer liable for a WARN Act violation on the facts found by the bankruptcy

court would serve only to encourage employers to abandon companies even when there is some

probability of some success.").

### ii.    State WARN Acts.

67.    A minority of states have passed laws modeled after the federal WARN Act.  Of

the 50 states where Yellow's former employees worked, 40 do not have an applicable state WARN

Act or similar law requiring notice of layoffs to employees.[4]  Claimants who worked in these 40

states have no state claims.

---

[4]    Alabama, Alaska, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana,
Michigan,  Missouri, Mississippi, Montana, Nebraska, New Mexico, Nevada, North Carolina, North Dakota,

68.     The remaining 10 state acts[5] largely track the federal WARN Act.  *E.g.*, *In re TransCare Corp.*, 611 B.R. 160, 167 (Bankr. S.D.N.Y. 2020) ("The NY WARN Act and regulations largely mirror the US WARN Act and regulations."); *Jevic*, 496 B.R. at 165 ("The New Jersey WARN Act was modeled after its federal counterpart.").  The state statutes often cover employers with, or layoffs concerning, fewer employees than would trigger the federal Act.  *E.g.*, *MacIsaac v. Waste Mgt. Collection & Recycling, Inc.*, 36 Cal Rptr. 3d 650, 661 (Cal. App. Ct. 2005) (discussing legislative history of California act showing that it was intended to cover layoffs that would fall under the threshold of the federal WARN Act).  The state statutes typically use the same 60-day period as federal law, though some have longer or short notification periods.  *E.g.*, N.Y. Comp. Codes R. & Regs. Tit. 12 § 921 (90-day notice period); N.J. Stat. Ann. § 34:21-2 (90-day notice period); Iowa Code Ann. § 84C.3(1)(a) (30-day notice period).  Likewise, most state

---

Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, Washington, West Virginia, and Wyoming have no WARN or similar acts requiring notice to employees.

Connecticut does not have a law requiring notice for a layoff but does have a Plant Closing Law concerning an employer that closes a plant pay for continued health insurance for terminated employees.  This law, however, does not apply to employers, like Yellow, who close plants under the federal Bankruptcy Act.  Conn. Gen. Stat. Ann. § 31-51n(6).

Hawaii's Act does not apply to "[b]usiness shutdowns which occur … in connection with factors such as business failure [or] bankruptcy."  Haw. Admin. R. § 12-506-4(b).

Maryland's Act does not apply to layoffs that result from an employer filing for bankruptcy.  Md. Code Ann., Lab. & Empl. § 11-302(a).

Massachusetts has a law requiring notice for plant closing for employers that received financing from specified quasi-public agencies, which Yellow does not, Mass. Gen. Law Ch. 149, § 182, and another unfunded and unenforced law concerning giving notice of plant closing to a state agency, not employees, Mass Gen. Law. Ch. 151A, §§ 71A-71G.

Minnesota has a law that encourages providing notice of layoffs but does not require such notice.  Minn. Stat. Ann. § 116L.976.

Tennessee has a Plant Closing and Reduction in Operation Act that applies to employers when 50 to 99 employees are laid off.  Tenn. Code Ann. §§ 50-1-601 *et al.*

[5]     These are California, Delaware, Illinois, Iowa, Maine, New Hampshire, New Jersey, New York, Vermont, Wisconsin.

22

acts contain the same exceptions and limitations as the federal Act, with a handful of exceptions, such as the New Jersey Act not providing any exceptions. *Jevic*, 496 B.R. at 165.

69.     Given the similarity of these handful of state WARN Acts to the federal Act, the same arguments establishing that the federal WARN Act does not require notice generally apply equally to the state WARN Acts. Accordingly, claimants cannot recover on any state law WARN claims.

**B.      No Federal Or State WARN Acts Apply To Yellow, Which Was Liquidating And Thus Not An "Employer" When The Layoffs Occurred.**

70.     The Third Circuit and other courts have held that a liquidating company is not an employer under the WARN Acts and has no obligation to provide notice, known as the liquidating fiduciary exception. Specifically, the federal WARN Act applies only to an "employer": "An *employer* shall not order a plant closing or mass layoff until the end of a 60-period after the *employer* serves written notice … ." 29 U.S.C. § 2102(a) (emphasis added). And an "employer" is defined as a "business enterprise" that employs 100 or more employees. 29 U.S.C. § 2101(a)(1). State WARN acts similarly apply only to an "employer." *E.g.*, N.Y. Comp. Codes R. & Regs. tit. 12 § 921-2.1 ("… no employer may order a mass layoff … unless … the employer provides notice …"); Cal. Lab. Code § 1401(a) ("An employer may not order a mass layoff … unless … the employer gives written notice …"); N.J. Stat. Ann. § 34:21-2 ("… if an employer conducts a mass layoff, the employer who ... conducts the mass layoff" shall provide notice).

71.     Reviewing the legal authorities regarding the WARN Act, the Third Circuit held that a liquidating company is not an "employer." *In re United Healthcare Sys., Inc.*, 200 F.3d 170, 177-79 (3d Cir. 1999). Among other sources, the Third Circuit relied on the Department of Labor's ("DOL") commentary on WARN regulations stating that an employer includes entities "'which *engage in business* (i.e., take part in a commercial or industrial enterprise, supply a service or good

23

on a mercantile basis, or provide independent management of public assets, raising revenue and making desired investments).'" *Id.* at 177 (quoting 20 C.F.R. § 639.3(a)(1)(ii), 54 Fed. Reg. 16,042, 16,065 (1989) (emphasis in *United Healthcare*). The "'DOL agrees that a fiduciary whose sole function in the bankruptcy process is to liquidate a failed business for the benefit of creditors does not succeed to the notice obligation of the former employer because the fiduciary is not operating a 'business enterprise' in the normal commercial sense.'" *Id.* (quoting 54 Fed. Reg. 16,045). The Third Circuit explained that "the commentary's focus on the bankruptcy fiduciary's responsibilities indicates that whether a bankrupt entity is an 'employer' under the WARN Act depends in part on the nature and extent of the entity's business conduct and activities while in bankruptcy." *Id.* "The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an 'employer;' the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act." *Id.* at 178.

72.     Applying these principles, the Third Circuit held that the hospital debtor at issue in *United Healthcare* "was operating not as a 'business operating as a going concern,' but rather as a business liquidating its affairs." *Id.* at 178. In that case, the hospital began experiencing financial difficulties in 1996, including difficulty maintaining essential supplies such as blood. *Id.* at 172. In January 1997, United Healthcare began negotiating to have the hospital purchased by another healthcare group. *Id.* But at the same time, one of United Healthcare's secured creditors, Daiwa, began expressing concern about its financial viability, suspending funding to it on February 3. *Id.* As a result, United Healthcare could not meet its operating expenses, closed its emergency room, and reduced its number of patients. *Id.* The State then gave United Healthcare emergency funding of $5 million, which allowed it to increase its number of patients. *Id.* But this did not mollify

24

Daiwa, which on February 13 issued a notice of default terminating all financing.  *Id.* at 172-73.

On February 16, United Healthcare agreed to sell a portions of its assets to another group and

terminate its operations.  *Id.* at 173.  On February 19, United Healthcare filed a voluntary chapter

11 petition, and on that same day issued WARN notices to its employees.  *Id.*  Just a few weeks

later, on March 6, United Healthcare terminated nearly all its employees immediately, continuing

to retain less than 10% of its employees to secure it facilities and maintain equipment.  *Id.*

73.     The Third Circuit relied on a slew of facts that parallel this case to hold that when

United Healthcare laid off its employees, it was not acting as employer and thus was not subject

to WARN Acts.  The hospital entered Chapter 11 and ultimately "filed a voluntary bankruptcy

plan under which it would liquidate its assets and cease to exist."  *Id.* at 178.  In the interim, the

hospital had "discharged or transferred all of its patients and was no longer admitting new

patients."  *Id.*  Accordingly, the court held, the remaining "employees were no longer engaged in

their regular duties but instead were performing tasks solely designed to prepare United Healthcare

for liquidation."  *Id.*

74.     In addition to *United Healthcare*, the "'liquidating fiduciary' principle has been

recognized by courts throughout the country."  *In re MF Glob. Holdings Ltd.*, 481 B.R. 268, 280

(Bankr. S.D.N.Y. 2012) (collecting cases); *see also Chauffeurs, Sales Drivers, Warehousemen

Helpers Union Local 572 v. Weslock Corp.*, 66 F.3d 241, 244 (9th Cir. 1995) ("WARN's

obligations ... can apply ... only where the [secured] creditor operates the debtor's asset as a

'business enterprise' in the 'normal commercial sense' ...; where the creditor does no more than

exercise that degree of control over the debtor's collateral necessary to protect the security interest,

and acts only to preserve the business asset for liquidation or sale, the notice requirement of

DE:4862-4403-2685.1 96859.001

WARN will not apply."); *In re Century City Doctors Hosp., LLC*, 2010 WL 6452903, *6-7 (B.A.P. 9th Cir. 2010) (same as *Weslock*).

75.     These authorities demonstrate that Yellow was a liquidating fiduciary on July 28 and 30 when it laid off its employees, and thus had no obligations under federal or state WARN Acts.  It is an indisputable fact that the IBT's threat on July 17 to strike or on after July 24 caused massive uncertainty among Yellow's customers and led directly and promptly to a sharp decline in Yellow's new business, and the business drying up entirely within approximately a week. Yellow began the process to discontinue accepting new shipment orders on July 24, 2023. Hawkins Decl. ¶ 100.  The shipments that its customers had placed sharply dwindled during the course of the two weeks from July 17 to July 26, falling from over 40,000 on July 17 to near zero.

76.     Accepting and delivering packages was the core of Yellow as an ongoing, operating business.  On July 26, Yellow's customers had left it, it was in the process of discontinuing accepting new shipments, its deliveries had collapsed to near zero, and the Company's board and employees were preparing for bankruptcy.  At that time, as a direct result of the IBT's strike threat and its aftermath, Yellow had clearly stopped as a normal business and instead had turned to liquidating.  This is the same as when the *United Healthcare* hospital stopped admitting new patients and discharged and transferred existing patients, which the Third Circuit relied on to hold that the entity was no longer a business enterprise but instead engaged in liquidating its assets and winding up its affairs.  200 F.3d at 178.  Moreover, the Yellow employees that would remain after the layoff were shifting from their regular duties serving the business—which no longer existed— and began preparing for Chapter 11 and liquidating Yellow's assets, the same as in *United Healthcare*.  Hawkins Decl. ¶ 113.  All these objective facts showing that Yellow was liquidating were corroborated by Yellow's first day declaration, which told this Court that it was

26

"effectuat[ing] an orderly, value-maximizing winddown of their businesses for the benefit of all parties in interest." *See* Doheny Decl. ¶ 19.[6]

77.     Thus, by July 28 when the Union's strike threat forced Yellow to lay off most the companies' employees, Yellow was no longer operating as a going concern.  Instead, its only function by that time was to liquidate its assets.  Accordingly, Yellow was not an "employer" when the layoffs occurred and thus the federal and state WARN Acts did not apply to it.  All the claimants' WARN-related claims fail for this reason alone.

**C.     The WARN Acts Do Not Require Yellow To Provide Earlier Notice Under The Faltering Company Exception As It Was Actively Seeking Savings And Financing That Would Have Rescued The Company.**

78.     The faltering company exception requires the defendant to show that "(1) it was actively seeking capital at the time the 60–day notice would have been required, (2) it had a realistic opportunity to obtain the financing sought, (3) the financing would have been sufficient, if obtained, to enable the employer to avoid or postpone the shutdown, and (4) the employer reasonably and in good faith believed that sending the 60-day notice would have precluded it from obtaining the financing." *In re APA Transp. Corp. Consol. Litig.*, 541 F.3d 233, 246-47 (3d Cir. 2008).  Actively seeking capital means "'seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of *internally generated financing*; or the employer must have been seeking additional money, credit or business through any other commercially reasonable method.'" *Id.* at 249 (emphasis added) (quoting 20 C.F.R. § 639.9(a)(1)).

---

[6]     These facts distinguish this case from *In re Start Man Furniture, LLC*, where the debtor continued operating its normal business selling furniture after filing for Chapter 11, and after the company was shut down its counsel stated that it hoped the shutdown would be temporary and that outright liquidation could be avoided.  647 B.R. 116, 122-23, 130 (D. Del. 2022).  By contrast, Yellow had begun the process to stop accepting new shipment orders and thus ended its business before laying off its employees, and expressly stated that it intended to liquidate.

### i. The Savings From One Yellow Satisfy The Exception.

79.     Yellow was seeking two types of financing in the months before the layoffs, both of which satisfy the faltering company exception.  The first type of financing was from the One Yellow initiative.  Proceeding with One Yellow would have allowed Yellow to achieve operational savings of approximately $22.85 million per month.  *APA* holds that the faltering company exception specifically applies to this kind of "internally generated financing," as well as "money" and "business through any other commercially reasonable method."  541 F.3d at 249.

80.     The savings from One Yellow satisfy all four elements of the faltering company exception.  *First*, Yellow was actively seeking to achieve the One Yellow savings 60 days before the layoffs, as well as before and after that period.  Yellow had already implemented Phase 1 from One Yellow in 2022, showing that it was committed to the project.  Throughout late 2022 and the first half of 2023, Yellow constantly sought to negotiate in good faith with the IBT to obtain the Union's approval of the Phase 2 CHOPS.  And Yellow repeatedly made concessions to the IBT in an effort to obtain its agreement to Phase 2.  These facts are sharply different from those in *APA*, where the debtor engaged in a single exchange with its lender and then sat around hoping the lender would offer additional financing.  *Id.* at 249.  By contrast, here Yellow took the initiative to reach out to the IBT numerous times, for months before the layoff.  The only reasons Phase 2 did not proceed was because of the IBT's unyielding intransigence, not for Yellow's lack of effort.

81.     *Second*, looking from an objective viewpoint at the time, and without the benefit of hindsight, Yellow had a realistic opportunity to achieve One Yellow.  Phase 1 of the initiative had proceeded smoothly.  The IBT agreed to the One Yellow Phase 1 CHOPS without issue, providing no hint that it would oppose the remaining Phases.  Yellow implemented the Phase 1 operational changes, and as a result Yellow achieved in the fourth quarter of 2022 its best quarterly operating

28

income in 16 years.  As for Phase 2, as explained previously, a reasonable similarly situated company would have understood the IBT's apparent obstinance as an attempt to extract concessions.  Indeed, in prior times such as 2009-10, 2014, and 2020, the Union had eventually cooperated with Yellow to make necessary changes for the Company's survival.  And even here, the IBT eventually did conditionally agree to these changes during negotiations from July 23 to 25; while that agreement turned out to come too late, it further confirms that Yellow had a realistic opportunity to proceed with Phase 2.  Based on the circumstances at the time, a reasonable company would *not* have expected the IBT to destroy the Company through a strike threat rather than agree to a CHOPS similar to the one it had agreed to less than a year earlier.

82.    *Third*, the operational savings from One Yellow would have allowed the Company to avoid (or at least postpone) any shutdown.  After Phase 1, the Company had its best quarterly operating income in over a decade.  Achieving Phase 2 would have provided approximately $22.85 million per month.  This nearly $275 million annually obviously is substantial and would have allowed Yellow to maintain and improve its liquidity, while also refinancing its debt coming due in 2024 and 2026.  Such a significant improvement in operating income also would have made Yellow more attractive to potential investors, such as the one Ducera was negotiating with.

83.    *Fourth*, that sending a 60–day notice would have precluded Yellow from obtaining the financing it sought is obvious.  One Yellow depended on its employees agreeing to operational changes to integrate Yellow while continuing to provide a high level of service to customers. Sending a notice that the Company was laying off nearly all employees would have caused all employees to start looking for other jobs, severely disrupting the Company's operations.  Such a notice also would have caused the Company's lenders to demand greater protection, draining Yellow's liquidity and hastening its demise.  Where the layoffs involve the Company shutting

29

down, this element is easily satisfied. "As long as Debtor's management had a reasonable prospect of securing either additional loan money or a capital investment, it is unreasonable to expect a 60 day notice of plant closing to have been given, since that would have foreclosed the possibility of staying open." *In re Old Electralloy Corp.*, 162 B.R. 121, 125-26 (Bankr. W.D. Pa. 1993).

ii.     **Yellow's Attempts To Obtain New Financing Satisfy The Exception.**

84.     Separately, Yellow's attempts to refinance its loans to obtain additional liquidity also qualify under the faltering company exception. *First*, in the relevant time period in late May and early June, Yellow was actively seeking financing. On May 26, 2023—squarely within the relevant time period—Yellow's investment bank Ducera sent a proposal to Yellow's existing lenders to modify the loans to improve liquidity, including freeing up collateral that would have allowed Yellow to bring in additional financing and thus cash to increase liquidity. On June 5, Ducera contacted new potential asset-based lenders to refinance the Company's existing asset-based loans to provide additional cash and liquidity. On the same date, Ducera also entered into negotiations with the Company's existing asset-based lenders to potentially modify the borrowing base, again with the goal of bringing in additional cash to enhance Yellow's liquidity. On June 8, Ducera began discussions with private equity fund Atlas Holdings regarding a potential debt or equity investment in Yellow that would have provided additional cash and liquidity, which continued throughout June and July. Thus, this is not a case where a debtor was sitting around, *cf. APA*, 541 F.3d at 249, as Yellow hired an investment banker who was actively pursuing refinancing, new financing, and new investments during the relevant time period, sending proposals to old and new lenders and negotiating with potential investors.

85.     *Second*, Yellow had a realistic opportunity to execute these refinancings, new financings, and potential new investment. Several lenders and investors targeted by the Debtors

had discussions with Ducera and were willing to negotiate over potential financing.  In particular, private equity fund Atlas Holdings had repeated calls and meetings to explore an investment in Yellow, performing substantial due diligence toward a new investment.  To be sure, Yellow proceeding with the One Yellow initiative would have improved the chances of Yellow obtaining this financing.  But even with the IBT's obstinance, these negotiations show that Yellow at least had a "realistic opportunity" of obtaining this financing.

86.     *Third*, the relevant legal question for this element is whether the financing would have been sufficient to "avoid *or postpone* the shutdown," and the refinancings and investments Yellow was exploring through Ducera would at least have postponed the shutdown.  *APA*, 541 F.3d at 246-47 (emphasis added).  The express goal of each of these options was to provide Yellow with additional cash and improve its liquidity.  While achieving One Yellow was necessary to put the Company on a firm long-term economic footing, the extra money from potential refinancing, financings, and investments would have postponed any shutdown.

87.     *Fourth*, as with the savings from One Yellow, there can be no doubt that announcing a layoff of nearly all employees in late May or early June would have destroyed Yellow's attempts to refinance or obtain new financings or investments.  No lender or investor would have wanted to invest money in a company that clearly was in the process of liquidating.  Thus, for these two independent reasons Yellow satisfies the faltering company exception.

**D.     The WARN Acts Do Not Require Yellow To Provide Earlier Notice Because Unforeseeable Business Circumstances—The IBT's Strike Threat—Caused The Layoffs.**

88.     WARN does not require an employer to provide sixty days' notice when the closing is "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."  29 U.S.C.A. § 2102(b)(2)(A).  Important indicators of whether layoffs

31

fall within the unforeseeable business circumstances exception include whether the circumstances are "sudden, dramatic, unexpected, [and/or] outside of the employer's control." *Elsinore*, 173 F.3d at 185. "When determining whether a closing was caused by unforeseeable business circumstances, [courts] evaluate whether a 'similarly situated employer' in the exercise of commercially reasonable business judgment would have foreseen closing." *Id.* at 186. "What is a harbinger of disaster in one context may be an everyday occurrence in another." *Id.* "Courts evaluate the [unforeseeable business circumstances] exception objectively, at the time the decisions were made, and not with the benefit of 20/20 hindsight." *AE Liquidation I*, 556 B.R. at 618.

89.    The WARN Act is not triggered by layoffs merely being "possible"; instead, layoffs must be "probable." The Third Circuit has held "that the WARN Act is triggered when a mass layoff becomes probable—that is, when the objective facts reflect that the layoff was more likely than not." *AE Liquidation II*, 866 F.3d at 530; *see also Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589 (7th Cir. 2005); *Watson v. Mich. Indus. Holdings, Inc.*, 311 F.3d 760, 765 (6th Cir. 2002); *Halkias v. Gen. Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998). "Companies in financial distress will frequently be forced to make difficult choices on how best to proceed, and those decisions will almost always involve the possibility of layoffs if they do not pan out exactly as planned." *AE Liquidation II*, 866 F.3d at 530. Thus, "the triggering event does not need to be an 'out-of-the-blue' event" to satisfy the exception. *Jevic*, 496 B.R. at 161.

90.    For example, in *Elsinore*, the Third Circuit held that a casino being shut down by the state was unforeseeable even though the state Division of Gaming Enforcement had recommended the casino be closed. 173 F.3d at 187. Even though that recommendation raised the possibility of a shutdown, it had to be balanced against other efforts to keep the casino open

DE:4862-4403-2685.1 96859.001

and the government's historical reluctance to shut down casinos, which made an ultimate shutdown unforeseeable.  *Id.*  Similarly, *AE Liquidation II* held that a mass layoff was not probable even though a deal to purchase the debtor was delayed, some of the debtors' disinterested directors were skeptical of the deal's financing, and they began contemplating liquidation.  866 F.3d at 531.

91.     Binding precedent also addresses the time frame this Court examines to determine if the circumstances causing the layoffs were unforeseeable.  An "employer may validly assert the unforeseeable business circumstance exception unless closing is foreseeable 60 days in advance and within a 14-day window."  *Elsinore*, 173 F.3d at 185.  This timing rule arise from the 60-day notice period, and DOL regulations stating that the notice must provide a 14-day window during which the closing is expected to occur.  *Id.*  Here, Yellow's layoffs occurred on July 28 and July 30, 2023, and thus the relevant time frame for determining whether the layoffs' cause was unforeseeable is May 22 to June 7, 2023.

92.     During the period in late May and early June when (in hindsight) notice would have been required, Yellow could not have foreseen that the IBT would decide to sacrifice Yellow along with 22,000 unionized jobs.  Yellow did not consider this a "possibility," much less the legally required "probability."  During this time, while the Company was facing liquidity concerns, its business was generally stable.  Yellow was regularly receiving orders for and delivering more than 40,000 packages daily.  Yellow had sufficient total liquidity—such as having nearly $157 million on June 5.  While Yellow could foresee its liquidity declining, the Company also planned measures—such as selling a terminal in Compton, California, for $80 million and negotiating with existing lenders and potential new financiers—that would extend the Company's liquidity and allow it to keep negotiating with the IBT.

33

93. Moreover, Yellow was actively negotiating with the IBT and repeatedly made concessions that Yellow reasonably believed would cause IBT to allow One Yellow Phase 2 to proceed. These concessions included allowing the union membership to vote on the revised CHOPS, accepting the demand to re-open the CBA, and agreeing to a pay increase. Yellow also reached out to union-friendly politicians for their aid in negotiating with IBT. Starting in late May and extending through late July, Yellow was employing investment bank Ducera to negotiate with Yellow's existing and new potential lenders to increase its cash reserves and seek an investment from Atlas. All these actions further demonstrate that there was no objective reason to believe that the Union would force Yellow to shutter. If Yellow had realized that the IBT would destroy the Company at the end of July, it would not have bothered with any of these efforts.

94. The IBT's rhetoric through June 7—and even up to July 16—did not include a strike threat, which is what ultimately caused the Company's end. Moreover, Yellow's view of the IBT's conduct must be put in the context of the history of Yellow-IBT negotiations specifically, as well as union-employer negotiations generally. As for the specific history, Yellow knew that the IBT had not issued strike threats previously, even when it had the right to do so in 2014. Similarly, the IBT had previously worked with Yellow to preserve the Company in challenging financial circumstances. These included the IBT seeking to have Central States agree to deferring Yellow's contributions, as had happened in 2010 and 2020—and as would eventually happen again on July 23, 2023. Yellow's belief based on history and logic was that the IBT, while engaging in hard bargaining, would not destroy the Company.

95. Yellow's understanding of the IBT's position must be understood in the context of employer-union negotiations generally. As the Third Circuit has held, a court must "evaluate whether a '*similarly situated employer*' in the exercise of commercially reasonable business

34

judgment would have foreseen closing." *Elsinore*, 173 F.3d at 186 (emphasis added).  A reasonable similarly situated employer—that is, one with a unionized work force—would believe that union obstinance was a typical negotiating tactic to extract concessions from the employer, not a suicide pact to destroy the Company and over 22,000 union jobs.  That is, the IBT's statements in the first half of 2023 "must be viewed in the context of collective bargaining, which is a robust and dynamic negotiation process where leverage is sought through posturing." *N. Am. Airlines, Inc. v. Int'l Bhd. of Teamsters, AFL-CIO*, 2005 WL 646350, at *14 (S.D.N.Y. Mar. 21, 2005); *see also NLRB v. WPIX, Inc.*, 906 F.2d 898, 902 (2d Cir. 1990) (describing negotiation where union "dismissed certain company proposals as being 'ridiculous' or a 'slap in the face' to the bargaining unit" and "both sides engaged in some exaggeration, posturing and dilatory tactics").  "Employers and unions can be expected to take aggressive bargaining positions and freely threaten dire consequences when they are rejected." *Fed. Exp. Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 964-65 (D.C. Cir. 1995); *see also N. Am. Airlines*, 2005 WL 646350, at *14 (rejecting employers' arguments that IBT engaged in self-help, such as work slowdowns, during negotiations:  "what the record reveals is much posturing and bravado of a type that is often found in labor negotiations").  "What a party tells its partisans during negotiations, perhaps to rally support, may well have little bearing on the terms of employment that party ultimately accepts." *WPIX*, 906 F.2d at 902.

96.    In addition to this general context of union-employer negotiations, Yellow had no reason to believe that the IBT would irrationally destroy the Company and put 30,000 employees—including 22,000 union employees—out of work.  Yellow presented its financial information to the IBT, and thus the Union could see the operational and liquidity challenges the Company faced and the need for One Yellow.  Even after the IBT announced its strike threat, a reasonable

35

employer in Yellow's circumstances would have believed the threat was another effort to extract more concessions, and that the strike could be averted.  In fact, the IBT did withdraw its strike threat on July 23—just as a reasonable, similarly situated employer would have expected, especially given the Yellow-IBT bargaining history in 2010, 2014, and 2020—but unfortunately the damage of driving away Yellow's customers had already been done and the IBT's withdrawal came too late.  Neither Yellow nor any other similarly situated employer would have foreseen— not just as a possibility, but as a probability—that IBT would deliberately put the Company out of business to the detriment of tens of thousands of its own members.

97.    Even after June 7, 2023, Yellow had no objective reason to see a mass layoff as probable.  While the Company's liquidity was decreasing, its shipments were stable through July 17.  Yellow continued to negotiate with—and make concessions to—the IBT in the belief that the union would agree to One Yellow Phase 2 and save 22,000 unionized jobs before Yellow ran out of liquidity.  Yellow continued to take steps, including through Ducera, to renegotiate its loans to raise fresh cash as well as obtain a liquidity injection from Atlas, to maintain its liquidity and continue normal operations.

98.    Even after the July 17 strike threat, which came less than two weeks before the layoffs, the objective circumstances show that mass layoffs were not a probability.  Yellow filed a suit to enjoin any strike, and its motion was not denied until July 21, demonstrating that Yellow was working to avoid any strike and preserve the Company.  Yellow also continued to seek all avenues to negotiate with the IBT.  Those efforts eventually were successful on July 23 and the following days, when the IBT withdrew its strike threat and finally conditionally agreed to the One Yellow Phase 2 changes.  The IBT's own actions demonstrate that it must have believed the Company could have been saved, as otherwise there would have been no point in negotiating with

36

Yellow.  Moreover, Ducera's communications with Atlas on and after July 18 showed that Atlas was still interested in investing in Yellow even after the strike threat.  Even through July 25, Yellow had been negotiating with IBT and providing it with information regarding Yellow's communications with the federal government so that the IBT could use its government contacts to seek relief.  Only at that point, as Yellow's shipment pickups fell near to zero on July 26, did the fact that the strike threat's damage was irreparable become apparent.  Thus, not until July 26 did the end of the Company and resulting mass layoffs become a probability.

99.    In sum, during the relevant period from May 22 to June 7, 2023—and even afterward—Yellow was vigorously negotiating in good faith to obtain the IBT's consent to the Phase 2 CHOPS and taking other steps to shore up its liquidity and continue operating for the foreseeable future.  Even after the IBT's strike threat, Yellow continued its efforts to save the Company, and that those efforts had a reasonable probability of success is supported by the Union's conduct from July 23 to 25 and Atlas's continued interested in Yellow.  Yellow did not foresee that the Union would drive it out of business and destroy more than 20,000 jobs of its own members, and for that reason, Yellow is exempted from the notice period of the federal WARN Act and all state acts recognizing this exception.

**E.    Yellow Acted In Good Faith In Not Issuing WARN Notices Sooner, Which Would Have Destroyed Its Attempts To Save The Company.**

100.    If an employer acted "in good faith and [] the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section."  29 U.S.C. § 2104(a)(4).  The facts here, both from the viewpoint of Yellow and an objective reasonable company, establish that Yellow acted in good faith in not providing earlier notice of the layoffs.  Not until July 26—as Yellow's customers had fled, its shipment pickups approached zero, the IBT's belated

37

conditional agreement to Phase 2 proved too little too late, and the board of directors contemplated bankruptcy—did both Yellow's subjective belief and the objective facts show that the Company could not be saved.

101.    During the late May to early June time frame where—in hindsight—notice would have been provided, Yellow had no reason to believe notice was required.  The Company's business was stable.  Liquidity was a concern, but the Company had enough money to operate and was developing methods to preserve liquidity.  The Company was actively attempting to negotiate with the IBT to proceed with One Yellow Phase 2.  The Company had impressed on the IBT the need for proceeding with Phase 2, including through providing financial information.  Based on Yellow's negotiating history with the IBT, Yellow reasonably expected that the IBT would not destroy the Company.  The Company also was negotiating with its existing creditors, potential new creditors, and private equity fund Atlas for cash that would improve its liquidity.  Given all these facts, Yellow had no reason whatsoever to believe than in late May to early June the Company would cease to exist two months later.  Accordingly, Yellow had no reason to issue WARN notices, as during late May and early June it reasonably believed no layoffs would be necessary, much less that the Company would collapse.  Indeed, issuing WARN notices at that time would have guaranteed the Company's end with no benefit to its workers or other stakeholders.

102.    Even after the period 60 days before July 28 and July 30, events showed the Company had no reason to expect a mass layoff through July 17.  To be sure, once the IBT issued its strike threat, the danger to the Company increased, but Yellow continued to believe the Company would survive, and that belief is supported by the objective facts.  Atlas was still interested in investing in Yellow after July 18, even with knowledge of the strike threat.  Yellow

38

believed its court action could stop the Union from striking. While that effort failed, the judge's prophetic words appear to have caused the IBT to negotiate in good faith. From July 23 to July 25, Yellow and the IBT negotiated, with the IBT withdrawing its strike threat and then conditionally agreeing to the Phase 2 operational changes.

103.    "Accordingly, even if the Debtor had violated the WARN Act, the mitigating circumstances would negate any penalty." *Old Electralloy*, 162 B.R. at 126.

**F.    Yellow's WARN Notices Satisfy All The Requirements For The Exceptions To Apply.**

104.    Under the faltering company and unforeseeable business circumstances exceptions (though not when an entity is a liquidating fiduciary), an employer "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3); *see also* 20 C.F.R. § 639.7(d) (further discussing the notice's content). Yellow's WARN notices easily satisfy both these requirements.

105.    As for timing, the DOL's own regulations acknowledge that "the employer must give as much notice as is practicable … and this may, in some circumstances, be notice after the fact." 20 C.F.R. § 639.9. Third Circuit precedent similarly holds that "as much notice as is practicable" can be after-the-fact notice. In *AE Liquidation II*, the company informed its employees they were being furloughed indefinitely on February 18, 2009. 866 F.3d at 521. On February 24, after a sale of the company fell through, the company sent all employes an email stating that their furloughs were being converted to a layoff effective February 19. *Id.* at 524-25. Even though the WARN notice was not sent until five days after the layoffs occurred (the notice was sent on February 24 for layoffs effective February 19), the Third Circuit held it was sufficient. *Id.* at 524-25; *see also AE Liquidation I*, 556 B.R. at 624-25 (rejecting plaintiffs' argument that after-the-fact notice cannot satisfy the WARN Act, and holding that the employer's five day after-

39

the-fact notice constituted "as much notice as practicable under the circumstances, even if it was

after the fact"); *Butler v. Fluor Corp.*, 511 F. Supp. 3d 688, 719 (D.S.C. 2021) (holding that notices

provided on August 4 and 9-10 was "as soon as practicable" after layoffs occurred on July 31); *see*

*generally Old Electralloy*, 162 B.R. at 126 (notice given the day of the layoff was sufficient).

106.    Here, Yellow sent a warn notice on July 31, 2023, for layoffs of unionized

employees that occurred on July 30—just a day before—and a smaller number of non-union

employees laid off on July 28.  These time periods of one and three days are less than the five days

at issue in *AE Liquidation* and the four to ten days in *Butler*.  Moreover, this timing was as soon

as practicable given Yellow's efforts up until the last moment to save its employees' jobs.  As

explained previously, the IBT withdrew the strike threat on July 23.  Over the next days through

July 25, Yellow and the IBT negotiated the Union's conditional agreement to the One Yellow

Phase 2 operational changes, and Yellow encouraged the IBT to seek federal government

intervention that could sustain the Company.  Only afterwards, on July 26, did it become apparent

that the strike threat's damage was irreversible.  At this point, Yellow needed time to prepare and

send WARN notices to tens of thousands of employees, which required the few days to July 31.

*Compare Butler*, 511 F. Supp. 3d at 719 (holding a lengthier delay was "as soon as practicable"

because of "the presence of thousands of workers at the job site, and the abrupt nature of the

shutdown").  Thus, Yellow "g[a]ve as much notice as is practicable" under the circumstances.

107.    The notices also "give a brief statement of the basis for reducing the notification

period."  29 U.S.C. § 2102(b)(3).  The notices explain that the Company could not provide earlier

notice of the shut down because it qualifies under the "unforeseeable business circumstances,"

"faltering company," and "liquidating fiduciary" exceptions set forth in the WARN Act.  Hawkins

Decl. ¶ 110.  Specifically, the notice to unionized employees explains that the "Company had

40

hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so." *Id.* "These circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice is further excused because the business is being liquidated." *Id.* The notices also explain that the closure is permanent, all employees were being terminated, and no bumping system (where a more senior employee displaces a more junior one) or other jobs opportunities will be available. *Id.*

108.    Moreover, Third Circuit precedent holds that the sufficiency of the notice should be considered in light of other communications made to employees. In *Kalwaytis v. Preferred Meal. Sys., Inc.*, Preferred Meal Systems sent a WARN notice to employees on June 26, 1992 saying they would be laid off but that it would contract with another company, Culi-Services, to offer employment to those workers. 78 F.3d 117, 119 (3d Cir. 1996). On July 10, Preferred sent another letter stating that Culi-Services would not be offering employment to all workers, and any employment offers would depend on Culi-Services' discretion. *Id. Kalwaytis* explained that the WARN Act reflects "[f]lexibility in the notice requirement" and considered the two letters together to conclude "they do meet the statutory requirements of notice." *Id.* at 121-22. Relying on *Kalwaytis*, *AE Liquidation I* later held that "the Third Circuit has allowed that multiple communications to employees, read together, may satisfy the statute." 556 B.R. at 626; *see also id.* at 618 (holding that the "Court may also consider whether multiple communications to employees, read together, satisfy the statute"). *AE Liquidation I* expressly rejected the employees' argument that "piecemeal communications" were insufficient, and then considered together a February 18 email announcing furloughs and a February 24 email converting the furloughs to permanent layoffs in determining that this content was sufficient to satisfy the WARN Act. *Id.* at

41

626 ("the Court finds no genuine issue of material fact that these communications, considered together, contain the information required by the statute").

109.    Yellow sent several written communications to its employees in June and July 2023 explaining the circumstances facing the Company, and that should be considered in conjunction with the July 31 WARN notices.  Hawkins Decl. ¶¶ 69, 71, 75, 76, 78, 96.  For example, a June 8, 2023 letter explained the need to Complete One Yellow, discussed the militant talk of IBT President Sean O'Brien, and stated that "the reality is that, until the IBT leadership stops the posturing and deals with the reality of the current situation, he is leading you down a road to ruin." *Id.* ¶ 69.  A June 21 letter, in explaining why Yellow was deferring payments to Central States, stated that as "a consequence of our inability to proceed with One Yellow, combined with the challenging business conditions confronting the entire [] industry, Yellow has recently been operating at a loss as it continues to serve its customers." *Id.* ¶ 75.  On July 20, Yellow sent another letter explaining it had offered a wage increase to "clear[] a path to advance One Yellow.  All stakeholders – lenders, shareholders, employees, and customers need to see progress." *Id.* ¶ 96.  These repeated communications further detailed why Yellow eventually failed and why WARN Act notice could not be provided earlier:  the Company was continually attempting to negotiate with the IBT to allow the essential One Yellow initiative, and the IBT's refusal to bargain in good faith could end the Company.  Sadly, that is exactly what happened.  No reasonable employee can claim that they did not know why Yellow conducted a mass layoff or why it could not have given notice sooner.

## COMPLIANCE WITH BANKRUPTCY RULE 3007(e)

110.    The Debtors respectfully submit that this Objection complies with the requirements for omnibus objections set forth by Bankruptcy Rule 3007(e).  Namely, the Debtors have created

42

a form of notice that shall be served upon each claimant affected by this Objection.  Such notices'

exhibits prominently identify the claimant's: (a) name; (b) address; (c) applicable claim number;

and (d) proposed treatment pursuant to the Objection.

111.    As a result, each claimant can readily identify its claim and proposed treatment and

respond accordingly.  The proposed form of order further identifies each claimant by category of

claims subject to objection.  This Objection complies with Bankruptcy Rule 3007(e) and Local

Rule 3007-1.  To the extent that the Objection not be found to comply in all respects with Local

Rule 3007-1, the Debtors respectfully request that any such requirement be waived.

## <u>RESPONSES TO THE OBJECTION</u>

112.    <u>Filing and Service of Responses</u>: To contest the Objection, a Claimant must file

and serve a written response to the Objection (a "<u>Response</u>") so that it is actually received by the

Clerk of the Bankruptcy Court and the parties in the following paragraph no later than **March 26,**

**2024 at 4:00 p.m. (ET)** (the "<u>Response Deadline</u>").  Claimants should locate their names and

claims in this Objection, and carefully review the Proposed Order and the exhibits attached thereto.

A Response must address each ground upon which the Debtors object to a particular claim.  A

hearing (the "<u>Hearing</u>") to consider the Debtors' Objection shall be held on **April 11, 2024, at**

**10:00 a.m. (ET)**, before the Honorable Craig T. Goldblatt, at the United States Bankruptcy Court

for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, 3rd Floor,

Courtroom No. 7.

113.    Every Response must also be served upon the following persons at the following

addresses:

43

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:          ljones@pszjlaw.com
                    tcairns@pszjlaw.com
                    pkeane@pszjlaw.com
                    ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          patrick.nash@kirkland.com
                    david.seligman@kirkland.com
                    michael.slade@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:          allyson.smith@kirkland.com

114.    Content of Responses: Every Response to the Objection must contain, at a minimum, the following:

(a)       a caption setting forth the name of the Court, the above-referenced case number and the title of the Objection to which the Response is directed; the name of the Claimant and description of the basis for the amount of the Claim;

(b)       a concise statement setting forth the reasons why a particular Claim should not be disallowed for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which the claimant will rely in opposing the Objection at the Hearing;

44

(c)      all documentation or other evidence of the Claim in question, to the extent not already included with the Claimant's proof of claim, upon which the claimant will rely in opposing the Objection at the Hearing;

(d)      the name, address telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on behalf of the Claimant; and

(e)      the name, address, telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) to whom the Debtors should serve any reply to the Response.

115.      <u>Timely Response Required; Hearing; Replies</u>: If a Response is properly and timely filed and served in accordance with the above procedures, the Debtors will endeavor to reach a consensual resolution with the applicable Claimant.  If no consensual resolution is reached, the Court will conduct the Hearing with respect to the Objection and the Response on **April 11, 2024 at 10:00 a.m. (ET)**, or such other date and time as the parties filing Responses may be notified. Only those Responses made in writing and timely filed and received will be considered by the Court at any such hearing.

116.      <u>Adjournment of Hearing</u>: The Debtors reserve the right to adjourn the Hearing on any Claim included in this Objection.  In the event that the Debtors adjourn the Hearing, they will state that the Hearing on that particular Claim referenced in this Objection, and/or Response, has been adjourned on the agenda for the Hearing on this Objection, which agenda will be served on the person designated by the Claimant in each Response.

117.    If a Claimant whose Claim is subject to the Objection, and who is served with the Objection, fails to file and serve a timely Response in compliance with the foregoing procedures, the Debtors will present to the Court an appropriate order <u>without further notice to the Claimant</u>.

118.    <u>Separate Contested Matter</u>: Each of the Disputed Claims and the Debtors' objections thereto, as asserted in this Objection, constitutes a separate contested matter as contemplated by Bankruptcy Rule 9014.  The Debtors request that any order entered by the Court with respect to an objection asserted herein shall be deemed a separate order with respect to each such Amended Claim and/or Duplicate Claim.

## **RESERVATION OF RIGHTS**

119.    By filing this Objection, the Debtors object to all No Liability Employee WARN Claims because the No Liability Employee WARN Claims present the same legal and factual issues.  However, many of the WARN-related proofs of claim combine WARN-related assertions with additional, unrelated assertions, some of which might be legitimate and others which, in the Debtors' view, are not.  To object to the WARN-related assertions together with these unrelated bases for objection would be inefficient and distract from the WARN issues at hand.  The Debtors therefore intend to file additional substantive and non-substantive objections to the additional, non-WARN related portions of the WARN-related proofs of claims, to the extent that the Debtors deem it necessary and appropriate to do so.  As such the Debtors expressly reserve the right to amend, modify, or supplement this Objection and to file additional objections to any proofs of claim filed in these Chapter 11 Cases including, without limitation, objections as to the liability, amount or priority of any Claims, including the No Liability Employee WARN Claims identified on Schedule 1 to the Proposed Order, and, to the extent necessary, seek relief from Local Rule 3007-1 in order to do so.

DE:4862-4403-2685.1 96859.001

## **NOTICE**

120.    The Debtors shall provide notice of this Objection on the following parties, or their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the Committee and Akin Gump Strauss Hauer & Feld LLP as counsel to the Committee; (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) each of the claimants identified on Schedule 1; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

121.    No prior request for the relief sought in this Objection has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as is appropriate under the circumstances.

DE:4862-4403-2685.1 96859.001

Dated:  March 12, 2024
Wilmington, Delaware

/s/ Peter J. Keane
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                tcairns@pszjlaw.com
                pkeane@pszjlaw.com
                ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                david.seligman@kirkland.com
                michael.slade@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

48

> **THIS OBJECTION SEEKS TO DISALLOW, REDUCE, OR EXPUNGE CERTAIN CLAIMS. PARTIES RECEIVING THIS OBJECTION SHOULD REVIEW SCHEDULE 1 TO THE PROPOSED ORDER TO DETERMINE IF THEIR CLAIM IS SUBJECT TO THIS OBJECTION.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

Response Deadline: March 26, 2024, at 4:00 p.m. (ET)
Hearing Date: April 11, 2024, at 11:00 a.m. (ET)

## NOTICE OF DEBTORS' FIFTH OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM FOR WARN LIABILITY

**PLEASE TAKE NOTICE** that, on March 12, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") the *Debtors' Fifth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability* (the "Objection"). **Your claim(s) may be disallowed and/or modified and/or expunged as a result of the Objection. Therefore, you should read the attached Objection carefully.**

**PLEASE TAKE FURTHER NOTICE THAT YOUR RIGHTS MAY BE AFFECTED BY THE OBJECTION AND BY ANY FURTHER CLAIM OBJECTION THAT MAY BE FILED BY THE DEBTORS OR OTHERWISE. THE RELIEF SOUGHT HEREIN IS WITHOUT PREJUDICE TO THE DEBTORS' RIGHTS TO PURSUE FURTHER**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

**OBJECTIONS AGAINST YOUR CLAIM(S) SUBJECT TO THE OBJECTION IN ACCORDANCE WITH APPLIABLE LAW AND APPLICABLE ORDERS OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE** that if the holder of a claim that is the subject of the Objection wishes to respond to the Objection, the holder must file a written response on or before **March 26, 2024 at 4:00 p.m. (ET)** with the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware:  824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.  In addition each written response must be served on the counsel identified in this notice.

**PLEASE TAKE FURTHER NOTICE** that responses to the Objection must contain, at minimum, the following: (a) a caption setting forth the name of the Court, the above-referenced case number and the title of the Objection to which the Response is directed; the name of the Claimant and description of the basis for the amount of the Claim; (b) a concise statement setting forth the reasons why a particular Claim should not be disallowed for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which the claimant will rely in opposing the Objection at the Hearing; (c) all documentation or other evidence of the Claim in question, to the extent not already included with the Claimant's proof of claim, upon which the claimant will rely in opposing the Objection at the Hearing; (d) the name, address telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on behalf of the Claimant; and (e) the name, address, telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) to whom the Debtors should serve any reply to the Response.

DE:4888-0635-5629.1 96859.001

PLEASE TAKE FURTHER NOTICE that if you would like to obtain a copy of the Objection or any other documents in the chapter 11 cases, you should contact Epiq Corporate Restructuring, LLC, the Debtors' noticing agent in these chapter 11 cases, (a) by calling (866)-641-1076; (b) by visiting the Debtors' restructuring website at https://dm.epiq11.com/YellowCorporation; or (c) for a fee via PACER by visiting https://pacer.uscourts.gov.

PLEASE TAKE FURTHER NOTICE that if no response to the Objection is timely filed and received in accordance with the above procedures, an order may be entered sustaining the Objection without further notice or a hearing.  If a response is properly filed, served and received in accordance with the above procedures and such response is not resolved, a hearing to consider such response and the Objection will be held before The Honorable Craig T. Goldblatt, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, 3rd Floor, Courtroom No. 7, on **April 11, 2024, at 10:00 a.m. (ET)** (the "Hearing").  Only a response made in writing and timely filed and received will be considered by the Bankruptcy Court at the Hearing.

**IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY SUSTAIN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.**

DE:4888-0635-5629.1 96859.001

Dated:  March 12, 2024
Wilmington, Delaware

/s/ Peter J. Keane
_____

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | Michael B. Slade (admitted *pro hac vice*) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |
| Wilmington, Delaware 19801 | Telephone:  (312) 862-2000 |
| Telephone:  (302) 652-4100 | Facsimile:  (312) 862-2200 |
| Facsimile:  (302) 652-4400 | Email:  patrick.nash@kirkland.com |
| Email:  ljones@pszjlaw.com |  david.seligman@kirkland.com |
|  tcairns@pszjlaw.com |  michael.slade@kirkland.com |
|  pkeane@pszjlaw.com | -and- |
|  ecorma@pszjlaw.com | |

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:  allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

4

# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. __** |

## ORDER SUSTAINING
## DEBTORS' FIFTH OMNIBUS (SUBSTANTIVE) OBJECTION
## TO PROOFS OF CLAIM FOR WARN LIABILITY

Upon the objection (the "Objection")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an order (this "Order"), disallowing the claims set forth on **Schedule 1** attached hereto, all as more fully set forth in the Objection; and upon the Hawkins Declaration, the Kaldenberg Declaration, the Whittman Declaration, and the Statlander Declaration; and the district court having jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Objection in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Objection and opportunity for a hearing on

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection.

the Objection were appropriate and no other notice need be provided, except as set forth herein; and this Court having reviewed the Objection and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Objection and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefore;

**IT IS HEREBY ORDERED THAT:**

1.      The Objection is SUSTAINED as set forth herein.

2.      The No Liability Claims set forth on the attached **Schedule 1** are hereby disallowed and expunged in their entirety.

3.      To the extent that a response is filed regarding any No Liability Claim listed in the Objection and the Debtors are unable to resolve the response, each such No Liability Claim and the Objection by the Debtors to each such No Liability Claim shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014.  This Order shall be deemed a separate order with respect to each claim.  Any stay of this Order pending appeal by a claimant subject to this Order shall only apply to the contested matter that involves such claimant and shall not act to stay the applicability or finality of this Order with respect to the other contested matters covered hereby.

4.      The Claims Agent is authorized and directed to modify the claims register in accordance with entry of the relief granted in this Order.

5.      Nothing in the Objection or this Order shall be construed as an allowance of any claim.

6.      The Debtors' right to object in the future to any No Liability Claim listed in this Objection or on the schedules attached hereto on any ground, and to amend, modify, and/or

2

supplement the Objection, including to object to amended or newly filed claims is fully reserved. Any and all rights, claims, and defenses of the Debtors and their estates with respect to any and all of the claims subject to this Objection are reserved, and nothing included in or omitted from the Objection is intended or shall be deemed to impair, prejudice, waive, or otherwise affect any rights, claims, or defenses of the Debtors and their estates with respect to such claims.

7.      To the extent that the Objection does not comply in all respects with the requirements of Local Rule 3007-1, the requirements of Local Rule 3007-1 are waived.

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Objection.

9.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

3

**EXHIBIT C**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| YELLOW CORPORATION, et al.,[1] | ) Case No. 23-11069 (CTG) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |

## DECLARATION OF DARREN HAWKINS
## IN SUPPORT OF DEBTORS' THIRD, FOURTH, AND FIFTH
## OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM FOR WARN
## LIABILITY

1.      I, Darren Hawkins, make this Declaration pursuant to 28 U.S.C. § 1746:

2.      I am Chief Executive Officer and a member of the Board of Directors of Yellow Corporation ("Yellow" or the "Company"), positions I assumed in April 2018. Just before my promotion to Chief Executive Officer of Yellow Corporation, I served as its President and Chief Operating Officer from January to April 2018. Prior to that, I served as President of YRC Freight Inc. (d/b/a YRC Freight, Yellow's then-largest operating company), a position I assumed in February 2014; and before that, I was Senior Vice President, Sales and Marketing for YRC Inc. beginning in January 2013. Before that, I served as Director of Sales and then Director of Operations at Con-way for four total years, positions I took after seventeen years at Yellow Transportation, Inc., serving as Director of Field Sales and in various operations and sales roles.

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

3.      I hold a Bachelor of Business Administration in marketing and supply chain management from the University of Memphis.

4.      I submit this declaration (this "Declaration") in support of the *Debtors' Third Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability*, the *Debtors' Fourth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability*, and the *Debtors' Fifth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability*.

5.      Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein, and if called upon to testify, I would testify competently to all the facts set forth herein.

I.      **OVERVIEW OF THE DEBTORS' BUSINESS**

  A.      **Yellow's Business Operations**

6.      When it was serving customers, Yellow offered its customers a full range of services for the transportation of industrial, commercial and retail goods in national, regional and international markets, primarily through the operation of owned or leased equipment in its North American ground distribution network.  Yellow provided its customers with both less-than-truckload ("LTL") services, which combine shipments from multiple customers on a single trailer, and truckload ("TL") services, whereby the quantity of freight shipped by customers filled the entire trailer.  While Yellow offered both LTL and TL services, deliveries were predominately LTL shipments, with truckload services offered to maximize equipment utilization and reduce empty miles (the distance empty or partially full trailers travel to balance the network).

7.      In addition to LTL and TL transportation services generally, Yellow also provided higher-margin specialized services, including guaranteed expedited services, time-specific deliveries, cross-border services, exhibit services, product returns, and government material shipments.

8.     Yellow was a transportation provider to numerous customers, including the United States federal government, and provider of logistics solutions for customer-specific needs with custom projects, consolidation and distribution, reverse logistics, and residential white glove service offerings.  A substantial majority of Yellow's services were provided wholly within the United States.

9.     Yellow was the largest unionized LTL carrier in the United States, transporting approximately 10% of the nation's LTL freight.  As of July 27, 2023, Yellow employed nearly 30,000 people, approximately two thirds of whom are or were members of the International Brotherhood of Teamsters (the "IBT" or "Union"), who primarily comprised the Company's drivers and dock, maintenance, and clerical workers.  Yellow operated service terminals in 300 communities, with employees in all fifty states.  In 2022, Yellow transported approximately 14.2 million shipments for approximately 250,000 customers and generated more than $5.2 billion in operating revenue.  On an average workday, Yellow's approximately 30,000 employees handled approximately 50,000 freight shipments.

10.     Yellow's fleet was comprised of approximately 12,700 tractors, including approximately 11,700 owned tractors and approximately 1,000 leased tractors, and approximately 42,000 trailers, including approximately 34,800 owned trailers and 7,200 leased trailers.  Yellow's network included 308 strategically located service facilities, including 169 owned facilities with approximately 10,000 doors and 140 leased facilities with approximately 9,100 doors, in addition to six warehouses managed by Yellow's logistics solution provider, Yellow Logistics.

11.     Yellow operated in a highly competitive environment.  Overall, when Yellow was still operating, the LTL market was increasingly dominated by non-union trucking companies who carried approximately 80% of all LTL freight.  Key competitors included global, integrated freight

3

transportation services providers, global freight forwarders, national freight services providers (including intermodal providers), regional and interregional carriers, third-party logistics providers, and small, intraregional transportation companies.  Yellow also had competitors within several different modes of transportation including LTL, truckload, air and ocean cargo, intermodal rail, parcel and package companies, transportation consolidators, reverse logistics firms, and privately-owned fleets.  Ground-based transportation includes private fleets and "for-hire" provider groups.

12.     With its family of trucking brands, including Holland, New Penn, YRC Freight, Reddaway, and Yellow Logistics, Yellow provided transportation services for various categories of goods, which included (among others) apparel, appliances, automotive parts, chemicals, food, furniture, glass, machinery, metal, metal products, non-bulk petroleum products, rubber, textiles, wood and other manufactured products or components.  Each of Yellow's trucking brands provided different transportation and logistics services to its customers, as summarized in the following chart:

| Brand | Description |
| --- | --- |
| Holland | Offered the most next-day service lanes in its territory and consistently recorded one of the lowest claim ratios in the industry. |
| NEW PENN | Provided next-day regional LTL shipping services through the northeastern United States, Canada and Puerto Rico. |
| YRC FREIGHT | Transported industrial, commercial and retail goods, specializing in shipping solutions with an expansive network across North America. |
| Reddaway | Offered next-day and two-day service, with a footprint that encompassed all of the Western United States, including Alaska and Hawaii. |
| YELLOW LOGISTICS | Coast-to-coast 3PL brokerage combined trucks, technology and talented people to create customized logistics solutions. |

**B.      Prior To The July 2023 Strike Notice, The IBT Had Never Issued A 72-Hour Strike Notice Despite Negotiations With The Company.**

13.      Beginning in 2009, years before the current Board and management team were in place, the Company faced severe liquidity issues caused by the 2008 financial crisis coupled with an aggressive global acquisition strategy spearheaded by then-CEO Bill Zollars.  For an extended period of months, the Company deferred payments to Central States Pension Fund ("Central States") and other pension funds.  The IBT never issued a strike notice in connection therewith.

14.      Then, in early 2014, the Company engaged in intensive negotiations with the IBT.  The Company's existing collective bargaining agreement was expiring, and the Company was seeking approval of a new memorandum of understanding ("MOU") with its IBT employees.  Unfortunately, the IBT was not supportive of several proposals in the MOU.  The Company put the MOU to a vote with its IBT employees.  The vote failed, and the Company was left with a 30-day window to propose an alternative.  Representatives of the Company immediately traveled to Washington D.C. to meet with the IBT leadership, and within 30 days proposed an updated MOU that had the full backing of the IBT.  When the initial MOU was voted down, the IBT had every legal right to initiate a strike notice, and yet it did not do so.  Instead, the IBT agreed to work with the Company's leadership to reach an agreeable position for both sides.  Yellow's understanding at the time was that the IBT did not want the Company to fail, which would result in terminating the employment of thousands of union members, and those union jobs would likely disappear permanently when the Yellow business was absorbed by the dominating non-union LTL carriers.

15.      In 2020 the Company navigated successfully in negotiations with both the IBT and Central States.  At the time, given the economic devastation resulting from the COVID-19 pandemic, Yellow was experiencing low levels of liquidity and in the process of applying for relief under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which could provide

both a capital infusion and temporary relief related to the payment of employer payroll taxes and non-union pension payments. The Company determined that a deferral of health and welfare contributions to Central States (and all other funds its employees were members of) was necessary to preserve the business until financial relief was available. Negotiations ensued with Central States, and the Company ensured that Central States had access to key financial information about the Company's liquidity so that it understood the gravity of the deferral request. With the support of the IBT—which at the time was led by Jim Hoffa, Jr. —Central States agreed to defer the Company's health and welfare contributions for a period of months. The Company resumed contributions before the deferral terminated, interest was paid by Yellow as promised, and business with Central States resumed as it had prior to the deferral. At no time during this process did the IBT issue a strike notice. The IBT was supportive of the deferral request and worked with Yellow and Central States to ensure an outcome that was agreeable to all parties.

### C. The Company's "One Yellow" Initiative

16. In 2019, Yellow announced the "One Yellow" initiative. One Yellow was intended to combine the vast national network of the YRC Freight brand with the speed and consistency of Yellow's regional brands to create one "super-regional carrier."

17. In addition, One Yellow, once implemented, was set to address operational inefficiencies that hampered the Company's ability to compete in the LTL sector of the trucking market and gain market share that had been lost to non-unionized competitors that do not have the same burdensome operational cost structure.

18. Prior to the One Yellow initiative, numerous operating companies within Yellow's corporate structure were competing for the same business. For instance, on any given day, multiple trucks from competing companies that were under Yellow's corporate umbrella could be dispatched to the same location to pick up and deliver shipments of freight, resulting in a massive

amount of redundancy, higher costs, and general waste of resources.  Yellow could not reasonably

compete with other LTL carriers while its own brands were competing with one another.  One

Yellow was therefore a common-sense integration initiative that would eliminate unnecessary

duplication, prevent Yellow's trucking brands from competing with one another for, quite literally,

the exact same business, and ultimately transform Yellow from a disparate set of operating

companies into a single unified national platform.  Once completed, One Yellow would have

resulted in the following benefits, among others:

- network optimization of all zip codes in pickup and delivery zones, thereby eliminating redundancy where multiple terminals serve the same zip codes;

- brand enhancement through superior service and customer satisfaction;

- volume accretion attributable to Yellow's ability to provide a structurally higher level of service and increase its LTL market share, especially its next-day/same-day delivery market share;

- increased yield; and

- enhanced pricing abilities - due to greater competitiveness and higher service levels.

19.    One Yellow was Yellow's most vital strategic initiative, and the very survival of

Yellow depended on completing One Yellow as soon as possible.  Yellow anticipated that One

Yellow would enable Yellow to dramatically improve its financial performance, including by

growing EBITDA to $450 million within one full year of implementation up from $341.4 million

in EBITDA for the last twelve months ending March 31, 2022.  Yellow further anticipated that

One Yellow would create a financial opportunity to capture upwards of $675 million in additional

annual revenue at operating margins of 13.5%.  One Yellow not only made sense financially as a

method to improve synergies, but also as a practical matter to position Yellow for long-term

success.  Both the pre-Sean O'Brien Union and the management team at Yellow were aligned in

7

achieving these objectives.  In fact, the Union had agreed to every One Yellow change in the period before it decided to obstruct the initiative.

20.     Indeed, in the ten months prior to these chapter 11 cases, Yellow was performing well.  In fact, for Fourth Quarter 2022, Yellow reported its best operating income and operating ratio in 16 years.  As detailed below, Phase 1 of the One Yellow initiative was a tremendous success.

## II.     CIRCUMSTANCES LEADING UP TO IBT'S STRIKE NOTICE

### A.     COVID-19 Pandemic Disrupts Shipping and Freight Industry Globally

21.     During 2019, the freight industry experienced a recession.  This recession appeared to have stabilized in the first quarter of 2020.  However, beginning the last two weeks of March, the freight industry and the economy at large experienced a precipitous and significant decline in economic activity due to the impact of the COVID-19.

22.     The COVID-19 pandemic and related economic repercussions created significant uncertainty and resulted in a material decrease in the volume that was expected during 2020 by both Yellow and the industry as a whole.  This market downcycle forced Yellow into a liquidity crunch.  To maintain adequate liquidity to fund operations, Yellow took preservation actions in late March and early April 2020, including layoffs, furloughs, further eliminations of short-term incentive compensation for non-union employees and reductions in capital expenditures, and deferment of payments to various parties.

23.     In addition, Yellow benefited from the support afforded to it under the CARES Act.  Specifically, the UST Credit Agreements, which provided Yellow $700 million, to be used for very specific purposes outlines by UST, were entered into pursuant to the CARES Act.  The CARES Act loan saved Yellow and allowed it to move forward on solid economic footing to

complete the One Yellow initiative already in the early stages of preparation for future implementation.

**B.    The IBT Worked with Yellow to Successfully Implement Phase One of One Yellow**

24.    One Yellow was a critical strategic initiative designed to, among other things, enable the Company to operate efficiently, enhance customer service, increase productivity, strengthen financial results, and importantly, operate without internal competition among its affiliated subsidiary companies.  Ultimately, the implementation of One Yellow would ensure that Yellow could compete successfully with the non-union LTL carriers that dominate the market, and allow Yellow to provide a competitive, viable, "ready to go to the market" product, i.e. super-regional service—just like FedEx or Old Dominion Freight Line.

25.    When Yellow received its CARES Act loan in 2020, it was widely understood, including by the UST, that the timely and successful completion of One Yellow, made possible by the IBT's support of the initiative, would be critical to ensuring that Yellow had a modern and efficient network that is vital for carriers to be successful in the highly competitive LTL market.

26.    The One Yellow process contained three phases, with full implementation expected to be completed by early 2023.  The three phases of the One Yellow initiative can be summarized as follows:

- Phase 1 (20% of network): to consolidate YRC Freight's operations with Reddaway's operations in the West;

- Phase 2 (70% of network): to consolidate YRC Freight's operations with Holland's and New Penn's operations in the Northeast, Midwest, and Southeast; and

- Phase 3 (10% of network): to consolidate YRC Freight's operations with Holland's remaining operations in the Central and Southern regions.

27.    When Yellow decided on an operational change, the Union would resolve with Yellow the seniority of affected Union members.  YRCW National Master Freight Agreement

("NMFA") Art. 5 § 2, Art. 8 § 6.  The change of operations process is usually routine and easily dealt with through the contractual mechanisms set forth in the collective bargaining agreement. *See, e.g.*, *id.* at Art. 8 § 6.  When Yellow decided to make a change of operations ("CHOPS") proposal, it would meet with affected local unions and then participate in a CHOPS Committee hearing where any remaining issues are worked out.  *Id.*

28.     In 2022, Yellow proposed CHOPS for Phase 1 of One Yellow, the Union approved the Phase 1 CHOPS by following mandatory procedures incorporated within the NMFA, the collective bargaining agreement.  The IBT approved the Phase 1 CHOPS quickly and without any issue.  Notably, in an April 19, 2023 Yellow Update Call to IBT members, Mr. John A. Murphy, Director of the National Freight Division and the chair of the Union's CHOPS Committee admitted that the Phase 1 CHOPS he approved "did not violate the [NMFA]."  Following the Union's approval, in September 2022, Yellow began implementation of Phase 1 of One Yellow.

29.     In September 2022, Phase 1 was launched, with Union support and Union approval of the change of operations Yellow needed to implement Phase 1.  As a result, the linehaul networks of YRC Freight and Reddaway in the Western region, which covered approximately 20% of Yellow's overall network, were integrated to support both regional and long-haul services.  This was one of the first major steps Yellow took to improve operational performance, and the preliminary results of Phase 1 were very positive.

30.     Implementation of Phase 1 was a success.  For example, missed pick-ups in the Western region dropped by 32%, on time departures of shipments increased by 44%, and late deliveries dropped by 72%.  Yellow's financial position was strong when Yellow began preparations to implement Phase 2.    As a result, Yellow sought to refinance its funded debt obligations and simplify its capital structure to further capture value associated with the full

implementation of One Yellow.  But for Mr. O'Brien and other Union leadership halting further One Yellow integration in its tracks, the Company would have been on much more stable footing to refinance the term loan with Apollo Global Management, LLC ("Apollo").

31.     Even before Yellow's successful implementation of Phase 1, Yellow was preparing for Phase 2 of One Yellow to address operations in the East, Central, and portions of the Southern region—covering 70% of Yellow's network.   In addition to consolidating YRC Freight's operations with Holland's and New Penn's in the East, Central, and portions of the Southern regions, Phase 2 would: (a) establish one dispatch system across all three operating companies; (b) create 35 new velocity distribution centers; and (c) combine terminals in near proximity with one another in the YRC Freight-Holland-New Penn network.  The majority of employees were to be offered the opportunity to work at terminals within the same city (in some cases at a different terminal right across the street).  Yellow planned to implement and complete Phase 2 by the end of 2022 and to begin and complete the final Phase 3 implementation in early 2023.  Unfortunately, these efforts never bore fruit.

32.     As the phases of One Yellow were implemented, operational efficiencies would have been achieved, and EBITDA would have increased materially.

C.     **The IBT Stalled The Implementation of Phase Two of One Yellow, But The Company and The IBT Continued To Negotiate**

33.     On October 19, 2022, following on the heels of the approval of the One Yellow Phase 1 CHOPS, Yellow submitted two CHOPS for approval of One Yellow Phase 2: a "2022 Terminal Zip Code Realignment, Velocity Center & Road Network Realignment Change of Operations (Article 8, Section 6)," and a "2022 Utility Employee Change of Operations (Article 3, Section 7)."  The CHOPS submitted for Phase 2, which sought to consolidate 70% of Yellow's

network in the Midwest, Southeast and East, mirrored the Phase 1 CHOPS that the Union had just approved two months earlier.  True and correct copies are attached herewith as Exhibits 1 and 2.

34.     Following its submission of the Phase 2 CHOPS, Yellow met with Union leadership, including Mr. Murphy, as well as representatives of local unions affected by the CHOPS.  Rather than adopt the Phase 2 CHOPS, like they had just done with the Phase 1 CHOPS, the Union instead insisted that Yellow expand a pre-existing "designated terminal" agreement concerning Holland (the "Holland DTA"), which, since 2008, permits road drivers to load and unload freight and swap out trailers themselves at certain designated terminals.  A true and correct copy of the Holland DTA is attached as Exhibit 3.

35.     The Union explained it preferred expanding the Holland DTA because it would significantly reduce the number of new Utility Employees positions that Yellow was proposing; minimize the need for road drivers to bid into Utility Employee positions; and merge seniority lists where there were multiple locations under the jurisdiction of the same local union, thereby providing more opportunities for drivers to "follow the work" to a new terminal, maintaining their existing routes and seniority, and reducing the number of pool bids.  None of the affected local unions objected to the Union's insistence that Yellow rewrite the CHOPS following the Holland DTA model.

36.     Starting in November, 2022, Yellow began looking for potential investment banking partners with the intention of overhauling its capital structure—particularly the Apollo term loan and the CARES term loan—once implementation of One Yellow was finalized.  Ducera Partners was one of the investment bankers invited to enter into discussions with Yellow. Negotiations with Ducera Partners continued throughout December, 2022 and into January, 2023.

**D.    Yellow Revised the Phase Two CHOPS and the Union Continued to Stall Phase Two of One Yellow**

37.    Per the Union's request, Yellow informed the Union it would revise the October Phase 2 Chops.  In a December 12, 2022 memorandum, Mr. Murphy apprised Yellow's local unions that Yellow was withdrawing its proposed CHOPS and would modify and refile CHOPS related to Phase 2.  A true and correct copy of the December 12, 2022 memorandum is attached as Exhibit 4.

38.    Thereafter, acquiescing to the Union's wishes, Yellow withdrew its October 2022 CHOPS and informed Mr. Murphy it intended to submit a revised CHOPS that would expand the Holland DTA to include 36 velocity distribution centers.  Yellow also emphasized that the One Yellow transformation was critical to the Company's ability to meet its immediate competitive challenges and secure long-term viability and success and reiterated to the Union that time was of the essence in implementing Phase 2.

39.    As Yellow began to consider new strategies to address its liquidity needs, it retained Ducera Partners in January 2023 as its investment banker to provide strategic financial alternatives.

40.    Yellow provided Mr. Murphy with a summary of proposed revisions.  As a result, on January 4, 2023, Mr. Bryan Reifsnyder, Yellow's Senior Vice President of Trucker Relations at the time, met with Mr. Murphy and the Freight Division Leadership in Chicago to continue discussions.  During the meeting, Mr. Murphy reiterated that the Union would not accept or consider the original Phase 2 CHOPS proposal and wanted a revised proposal that would expand the Holland DTA.

41.    Following further communications throughout the remainder of January, on February 6, 2023, acquiescing to the Union's demand that Yellow revise its initial Phase 2 CHOPS, Yellow submitted two revised Phase 2 CHOPS: a "2023 Terminal Consolidation, Terminal Zip

Code Realignment, Designated Terminal & Road Network Realignment Change of Operations (Article 8, Section 6)" and a "2023 Utility Employee Change of Operations (Article 3, Section 7)." True and correct copies are attached herewith as Exhibits 5 and 6.

42.     On February 27, 2023, S&P downgraded Yellow's issuer credit rating from B- to CCC+ and its issue-level rating on Yellow's Apollo term loan from B- to CCC+ because of uncertainty regarding Yellow's ability to refinance its Apollo term loan and loans under the UST Credit Agreement.  Further, S&P indicated it could lower Yellow's ratings again if it did not believe Yellow's refinancing plans would address its upcoming maturities before they became current.

43.     Per the revised CHOPS, and consistent with the Union's preferred approach, Yellow proposed expanding the Holland DTA to include the 36 velocity distribution centers to be established during Phase 2 and reduce the number of Utility Employees positions from 998 to 121. Yellow also revised the Phase 2 CHOPS to eliminate any concerns about mandatory Utility Employee classification in response to the Union's concerns.  Yellow also requested a hearing before the CHOPS Committee the week of March 10, 2023, and implementation no later than April 30, 2023.

44.     Although the Union was aware that time was of the essence, the Union pushed off the CHOPS Committee hearing until April 5-7, 2023.

45.     In an effort to ensure its revised Phase 2 CHOPS would be approved at the upcoming CHOPS hearing, Yellow sought a meeting with Union leadership and the parties agreed to meet on March 23, 2023 in Washington, D.C. to discuss the revised Phase 2 CHOPS.

46.     The meeting was little more than a Union publicity stunt at which Union leadership brought in photographers and unilaterally canceled the April 5-7 hearing, categorically rejected

Yellow's revised Phase 2 CHOPS, and, for the first time, insisted that IBT members needed to vote on the revised Phase 2 CHOPS. None of the affected local unions objected to the Union's unilateral cancellation of the April 5-7 CHOPS hearing. The Union's unilateral cancellation of the CHOPS hearing was so last-minute and unexpected that Yellow incurred a $58,500 hotel cancellation fee.

47.     That same day, Mr. Murphy sent a letter "to confirm that the Change of Operations hearing that had been scheduled to commence on April 5, 2023 in Irving, Texas is cancelled." Mr. Murphy also falsely stated that the "Company reluctantly agreed" to the hearing's cancelation. Yellow did not agree to such a cancellation prior to, at, or after the March 23 meeting. A true and correct copy of Mr. Murphy's March 23, 2023 letter is attached as Exhibit 7.

48.     Later that same day, in an effort to move forward with the desperately needed implementation of One Yellow Phase 2, Yellow acquiesced to the Union's demand that Yellow's IBT member employees be allowed to vote on the revised Phase 2 CHOPS despite the additional implementation delay that would cause and despite the fact that approval was not required under the relevant collective bargaining agreements. A true and correct copy of Yellow's letter is attached as Exhibit 8.

49.     In order to again attempt to reach a resolution, on April 6, 2023, Yellow representatives met with IBT leadership, as well as other Union representatives, at the IBT's headquarters.

50.     During the April 6, 2023 meeting, the Union demanded, for the first time, that before any progress could be made on the revised Phase 2 CHOPs, Yellow must agree to reopen the NMFA and increase monetary compensation for IBT members.

### E.     Yellow Agrees to Reopen the NMFA & the Union Demands Wage Increases

51.     Still desiring to reach resolution on the long-delayed and much-needed Phase 2 implementation, the next day, on April 7, 2023, Yellow presented a proposal to facilitate approval and implementation of Phase 2, titled "Letter of Agreement Regarding Yellow Corporation's Transformation to a Super-Regional Carrier" (the "Letter Proposal").  A true and correct copy of the Letter Proposal is attached as Exhibit 9.

52.     That same day, under a non-disclosure agreement, Yellow gave the IBT access to a repository of its key financial documents and Dan Olivier, Yellow's Chief Financial Officer, offered to walk the IBT's financial leadership and economists through them to ensure they fully understood Yellow's current financial condition, including information specifically requested by the IBT.

53.     On April 10, 2023, Mr. Murphy rejected the Letter Proposal as "unacceptable," demanding that, if Yellow wished to proceed with Phase 2, it would have to agree to formally reopen the Yellow NMFA for negotiations and "include significant economic improvements for the members" as part of any new agreement.  A true and correct copy of Mr. Murphy's April 10, 2023 letter is attached as Exhibit 10.  None of the affected local unions objected to Mr. Murphy's rejection of the Letter Proposal or his demand that Yellow formally reopen the NMFA and include significant economic improvements for members.

54.     On April 14, 2023, Mr. Reifsnyder called Mr. Murphy to ask whether the Union had any feedback or questions concerning the information in the repository.  Mr. Murphy called back that same day and told Mr. Reifsnyder that the Union was not interested in discussing Yellow's situation, but that the Union was reviewing the Yellow's financial models.

55.     On April 21, 2023, I sent the IBT a letter agreeing to reopen NMFA negotiations upon certain conditions to expedite the Phase 2 implementation.  A true and correct copy of the April 21, 2023 letter is attached as Exhibit 11.

56.     On May 4, 2023, Mr. Murphy sent a letter, which purported to accept my request to formally reopen the NMFA, but conditioned any reopening as follows: (i) as of August 1, 2023, the Yellow NMFA would be formally reopened with respect to all of Yellow's companies and terms; (ii) the parties would be permitted "use of their economic weapons (e.g., strike/lockout)"; and (iii) all agreed-upon terms would be submitted for membership ratification in accordance with the IBT Constitution.  Mr. Murphy stated that TNFINC would be available to commence bargaining on August 1, 2023.  A true and correct copy of the May 4, 2023 letter is attached as Exhibit 12.  None of the affected local unions objected to Mr. Murphy's insistence on these conditions.

57.     On May 5, 2023, Mr. Reifsnyder responded to Mr. Murphy by letter, noting, among other things, that "waiting until August to commence bargaining will not work under the circumstances as Yellow may not exist if we wait until then to start."  The letter also noted the fact that Yellow had made the Company's financial information available to the Union weeks prior and that "Yellow faces a serious and immediate liquidity crisis."  Mr. Reifsnyder again emphasized the Company's desire to reach a resolution and that Yellow is "prepared to do whatever it takes to ensure that both parties are on the same page with respect to the urgency of [Yellow's] financial situation."  A true and correct copy of the May 5, 2023 letter is attached as Exhibit 13.

58.     On May 15, 2023, Mr. Murphy responded to Mr. Reifsnyder's May 5 letter.  Among other things, Mr. Murphy maintained that the collective bargaining agreement had not been

reopened because Yellow did not agree to all of the conditions Mr. Murphy had imposed in his May 4 letter.  A true and correct copy of the May 15, 2023 letter is attached as Exhibit 14.

59.     Also on May 15, 2023, Moody's downgraded Yellow's ratings—the corporate family rating, the probability of default rating, the senior secured rating, and the speculative grade liquidity rating—citing delays in implementing Phase 2 and weaker sector fundamentals.

60.     On May 23, 2023, Yellow's board of directors (the "Board") met and discussed the delays to the implementation of the One Yellow initiative.  Mr. Reifsnyder noted his belief that the IBT was aware of Yellow's increasing need to implement the One Yellow Phase 2 program.

61.     On May 25, 2023, Mr. Reifsnyder along with labor counsel for Yellow met with Mr. Murphy, the rest of the Freight Division leadership, IBT counsel, and an IBT economist in Kansas City, Missouri.  During that meeting, Mr. Murphy demanded that the Union's support of Phase 2 was conditioned on Yellow agreeing to pay an immediate $1.50 per hour wage increase. None of the affected local unions objected to Mr. Murphy's demand that Yellow agree to an immediate $1.50 per hour wage increase.

62.     As further described in the declaration of Cody Kaldenberg, in May, Ducera was negotiating with Yellow's key capital structure partners seeking to alleviate some of the pressures on the company's liquidity position.  On May 26, 2023, Ducera proposed terms that would modify Yellow's loans to various of those lenders.

**F.      Yellow Agrees to Wage Increases and the Union Continues to Obstruct The Implementation of Phase 2**

63.     On May 29, 2023, Yellow convened an emergency meeting of its Board.  During this meeting the Board authorized Yellow management to offer the Union a conditional wage increase in exchange for the IBT's approval of Phase 2.

64.    On May 30, 2023, consistent with its Board authorization, Mr. Reifsnyder sent Mr. Murphy a new proposed Letter of Agreement ("New LOA").  A true and correct copy of the New LOA is attached as Exhibit 15.

65.    On June 5, 2023, Yellow had a total liquidity of $156,799,103 and picked up approximately 50,000 shipments.  That same day, Mr. Murphy responded to Mr. Reifsnyder's communication by letter and stated that TNFINC "unequivocally reject[ed]" Yellow's New LOA. A true and correct copy of the June 5, 2023 letter is attached as Exhibit 16.

66.    Also on June 5, 2023, Mr. Murphy issued a memorandum to "Yellow Local Unions," characterizing the New LOA as "offensive," and maintaining IBT leadership's demand that Yellow agree to substantial wage increases in exchange for the Union's cooperation.  A true and correct copy of the June 5, 2023 memorandum is attached as Exhibit 17.

67.    As further described in the declaration of Cody Kaldenberg, on June 5, 2023, Ducera reached out to new potential asset-based lenders with the hopes of increasing the Company's cash-on-hand and liquidity.

68.    On June 6, 2023, the Board met and discussed IBT's ongoing intransigence.  The Board was in agreement that the appropriate leadership at the IBT had been provided ample materials from the Company to show why progress on One Yellow was critical.  Mr. Reifsnyder noted that during recent town hall meetings hosted by the Company, local chapters of the IBT generally supported implementation of Phase 2 of One Yellow.  At the same meeting, the Board authorized a lawsuit against the IBT, hopeful that the commencement of litigation would encourage the union to resume productive discussion.

69.    On June 8, 2023, I sent an email communication to Yellow's employees regarding the ongoing impasse with the IBT.  I also devoted time to responding to individual employee

questions and feedback, and began preparing additional communications to be shared with Yellow's employees that would be mailed to their homes and distributed to terminal managers that would emphasize the importance of One Yellow to the Company's future. I also took a moment to address the militant talk of Mr. O'Brien, stating that "the reality is that, until the IBT leadership stops the posturing and deals with the reality of the current situation, [Mr. O'Brien] is leading you down a road to ruin." A true and correct copy of my June 8, 2023 email communication is attached as Exhibit 18.

70.     On June 12, 2023, Yellow had a total liquidity of $150,465,875 and picked up approximately 49,600 shipments.

71.     On June 13, 2023, I sent another email to all Yellow employees. In the email, I emphasized the positive impact that Phase 1 of One Yellow was having on the West Coast network. I also addressed some of the claims that Mr. O'Brien had been publicly making to the Union. A true and correct copy of my June 13, 2023 email communication is attached as Exhibit 19.

72.     On June 14-15, 2023, on behalf of Yellow, Mr. Daniel Olivier, Chief Financial Officer of Yellow, asked the health and welfare and pension funds, to which Yellow contributes for employees covered by collective bargaining agreements (the "Funds") to allow Yellow to defer millions of dollars in contributions that otherwise would be due in July and August. Like prior successful requests to negotiate a deferral from the Funds, Yellow was prepared to offer a reasonable interest rate on the deferral. True and correct copies of these letters to the Central States funds are attached as Exhibits 20, 21, and 22. None of the funds granted the requests. On June 23, 2023, Yellow had a total liquidity of $124,897,782 and picked up approximately 45,950 shipments.

20

73.    Reduced to dollars and cents, the inability to proceed with One Yellow cost Yellow the operational savings of approximately $22.85 million per month that, without Union obstruction, Yellow should have been able to achieve.

74.    In the second half of June 2023, the Union and ABF Freight, one of Yellow's competitors, reached an agreement on terms for their governing agreement.  That agreement included a wage increase of $3.50 per hour with a total of $6.50 per hour in raises over the life of the agreement.  After reaching that agreement, Mr. O'Brien began insisting that the ABF "agreement [would] serve as the model for the rest of the freight industry," and "[would] set the tone for national freight contracts moving forward."

75.    On June 21, 2023, I sent an email communication to all Yellow employees.  I noted that Yellow was continuing to do everything it could to meet with the Union to negotiate a path forward on One Yellow.  However, I explained that "a consequence of our inability to proceed with One Yellow, combined with the challenging business conditions confronting the entire [] industry, Yellow has recently been operating at a loss as it continues to serve its customers."  I also made it clear that the Company had requested a limited two-month deferral of contributions to the health & welfare and pension funds, to be repaid with interest.  I emphasized that "[t]he Company is NOT requesting either a permanent waiver or an extension of credit, but only a short-term, two-month deferral of contributions."  A true and correct copy of my June 21, 2023 email communication is attached as Exhibit 23.

76.    On June 23, 2023, I sent an email communication to all Yellow employees thanking them for their work.  A true and correct copy of my June 23, 2023 email communication is attached as Exhibit 24.

### G.    Yellow's Deferral of Pension Contributions

77.    On June 27, 2023, Yellow filed a complaint against the IBT in the United States District Court for the District of Kansas.  The complaint alleged that the IBT had breached its contract with the Company after continuing to unjustifiably block the implementation of Phase 2 of One Yellow.  After the filing, the Company noticed an uptick in the number of shipments picked up per day.  Two customers in particular, Walmart and Home Depot, offered support to the Company as it tried to delicately navigate its stalled negotiations with the IBT.  Nevertheless, given the delayed negotiations and a growing concern over financial covenants, Yellow retained the services of Alvarez & Marsal North America, LLC and Kirkland & Ellis LLP to consider potential alternatives to address Yellow's liquidity issues.

78.    Also on June 27, I sent an email communication to all Yellow employees letting them know that Yellow had filed suit against the Union.  A true and correct copy of my June 27, 2023 email communication is attached as Exhibit 25.

79.    In June and July 2023, as further described in the declaration of Cody Kaldenberg, Yellow began negotiations with Atlas Holdings, a private equity fund, regarding a potential debt or equity investment in the Company.  On July 7, 2023, I updated the Board on inquiries that the Company had been receiving from major customers including Amazon and Walmart.  I had been in direct communication with these customers to explain the situation and negotiations with the IBT.  Daily shipment pick-ups remained stable.

80.    With liquidity deteriorating, Yellow was forced to take cash-conservation measures—Yellow had to stop paying some of its bills in the ordinary course in an effort to save itself and ultimately save 30,000 American jobs, including 22,000 union jobs.  On July 7, 2023, Yellow's Board of Directors determined it was in the best interest of the Company, its shareholders, and its other stakeholders to cease contributions payable in July and August to six

22

of the health and welfare and pension funds to which Yellow contributes for employees covered by collective bargaining agreements. Yellow did not make its July payments. That same day, as further described in the declaration of Cody Kaldenberg, Ducera assisted Yellow with obtaining waivers of certain covenants under its credit agreements with Apollo.

81. Had the Union not blocked the implementation of One Yellow, thus depriving Yellow of over $137 million in EBITDA (as of June 27, 2023 and which amount continued to grow), Yellow almost certainly would have had sufficient funds available to pay its contractual contributions to both the Central States Health and Welfare Fund and the Central States Pension Fund when they became due without putting the business at risk.

### H. Yellow Requests Assistance from President Biden and Senator Sanders to Resolve the Dispute with IBT

82. When trying to work directly with the Union yielded no results—not the original Phase 2 CHOPS, the revised CHOPS, agreement to a member vote, a memorandum of agreement, agreement to reopen the NMFA, a proposed new letter agreement with a wage increase, or an agreement to match the increase in wages and benefits that the Union agreed to with competitor ABF Freight—and with Yellow's financial position growing more precarious as a result, Yellow simultaneously pursued another angle to try to save itself. Darrel Harris, then President and Chief Operating Officer of Yellow, as well as other representatives of Yellow reached out to members of the Biden Administration and Senator Sanders for assistance in bringing the IBT back to the table.

83. Representatives of Yellow apprised members of the Biden Administration of the loss of tens of thousands of jobs, the damage to America's already fragile supply chains, and the anticompetitive impact that would result from Yellow's closure. The Administration was specifically informed that the loss of Yellow would have significant negative economic impact,

beyond just the loss of its $5 billion in annual revenue and 30,000 jobs, including 22,000 union jobs that would be permanent; given Yellow's size and criticality to the LTL freight shipping sector, the loss of its capacity in the system would be unprecedented and send shock waves through numerous critical supply chains; and the loss of Yellow's freight handling capacity would dilute competition in the LTL freight sector and have the anticompetitive effect of enabling other LTL carriers to immediately increase their prices.

84.     Representatives of Yellow asked the Administration for help in getting the Union to return to table.  I understand that the Administration encouraged the Union to return to the negotiating table, but the Union failed to do so.

85.     Yellow also reached out to the office of Senator Sanders, for whom, based on Mr. O'Brien's public statements, Mr. O'Brien appears to have much respect, to seek the Senator's assistance.  But Senator Sanders' office refused to assist Yellow.  According to Senator Sanders' representatives, Yellow was not the sort of company Senator Sanders wanted to help because Yellow obtained relief under the CARES Act in the previous administration.[2]

86.     On July 12, 2023, I sent Mr. O'Brien a letter stating Yellow was prepared to match that hourly increase in the context of a five-year agreement that enables Yellow to achieve its One Yellow network modernization and improve its competitive position in the marketplace.  At the time, Yellow had a total liquidity of $91,642,919 and picked up approximately 44,550 shipments.

---

[2]     Tens of thousands of companies—never mind millions of individual Americans—received assistance under the CARES Act after being financially devastated by COVID-19 in 2020.  The vast majority of these companies—and individuals—were never required to repay the U.S. Government.  Yellow completed repayment of the CARES Act loan in full, along with over $151 million in interest, on February 5, 2024.

## III.    COMPANY PERFORMANCE PRE-STRIKE NOTICE WAS STABLE

87.    Through July 17, 2023, Yellow was performing well within acceptable economic parameters.  From June 1, 2023 to July 16, 2023, just one day before the strike notice was issued, the company was consistently picking up over 40,000 shipments per day while unrestricted U.S. cash and overall liquidity generally hovered between $100 million and $120 million given the liquidity conservation efforts described above.



## IV.    THE IBT'S UNFORESEEABLE STRIKE NOTICE RENDERED A 60 DAY WARN NOTICE AN IMPOSSIBILITY

88.    On July 17, 2023, Central States sent a memorandum to the IBT and all local unions in the Central States' system with YRC Inc. and USF Holland LLC members which advised that Yellow's participation in the Central States Pension Fund would be terminated effective July 23, 2023.  Within hours of receipt of Central States' memorandum and in retaliation for Yellow's decision to defer the Contributions, which Yellow could not pay because of the Union's obstruction of One Yellow and the resulting liquidity crisis, Mr. Murphy, on behalf of all local

unions affected by the deferred Contributions, gave a 72-hour notice that the affected local unions were authorized and intended to strike on or after July 24, 2023. A true and correct copy of the strike notice and memo are attached as Exhibit 26. I was surprised at this response, given Central States and IBT cooperating to temporarily suspend Yellow's contributions in 2020.

89.    The same day as the strike notice was issued, Yellow picked up approximately 43,200 shipments.

90.    As discussed previously, in April 2023, Yellow provided Mr. O'Brien and the IBT secure access to much of Yellow's financial records and documents. These documents clearly showed that Yellow was approaching a cash wall, a cliff that could only be avoided if Phase 2 of the One Yellow initiative could move forward. As the negotiations continued to fall apart, Yellow organized town hall meetings with some of its approximately 8,000 non-union employees to discuss the consequences of a failed negotiation with the Union. Yellow made it abundantly clear to those employees that if a deal with Mr. O'Brien was not reached, both the union and non-union employees could lose their jobs. Thus, Mr. O'Brien's decision to issue the 72-hour strike notice was not foreseeable.

91.    While Yellow was aware of the cash wall it was approaching, the company's performance through the July 17 strike notice was stable. So long as Phase 2 of One Yellow moved forward, Yellow reasonably believed it could manage its cash needs and avoid terminating substantially all of the company's employees. In fact, Yellow reasonably believed the Union would ultimately act in its own best interest—and in the interest of the union members—and not act to permanently eliminate 22,000 union jobs, as it did.

92.    Because the completion of One Yellow was such an obvious cure to Yellow's acute liquidity issues, all throughout Yellow's negotiations with Mr. O'Brien and the IBT, it was

26

unforeseeable that the IBT senior leadership would continue to thwart those efforts to the point where the company was left with no choice but to terminate all of its nearly 22,000 union employees. Yellow was at all times negotiating in good faith with the representatives of those same employees and was doing everything it could to retain them.

**A.     Negotiations With IBT Post-Strike Notice**

93.     On July 18, 2023, Yellow apprised the President's National Economic Council ("NEC") in Washington D.C. of the Teamsters' threat to strike and sought guidance with respect to engaging in constructive discussion with the Teamsters. The NEC advised that the Teamsters had no interest in talking with Yellow. Furthermore, Yellow's customers began to express that they would be diverting their business elsewhere. The Board understood that to mean that Yellow would suddenly expect to see a massive decline in shipments per day. That same day, Yellow picked up approximately 40,500 shipments.

94.     Moreover, the IBT's threatened strike caused Yellow's banking partners to exercise certain protective remedies. On July 19, 2023, Citizens Business Capital ("Citizens"), Yellow's ABL lender, sent Yellow a notice of establishment of availability reserve in the amount of $25 million, which came due July 21, 2023. On July 19, Yellow picked up approximately 32,500 shipments.

95.     Also on July 19, 2023, Yellow filed a motion in the United States District Court for the District of Kansas seeking a temporary restraining order and preliminary injunction to compel the IBT to resume negotiations regarding Phase 2 of One Yellow and prohibit the IBT from initiating a strike.

96.     On July 20, 2023, I sent an email to all Yellow employees. I emphasized that Yellow had proposed a wage increase for Union employees to "clear[] a path to advance One Yellow. All stakeholders – lenders, shareholders, employees, and customers need to see progress."

27

I also noted that "commencement of meaningful negotiations with the Teamsters would set the stage for Yellow to reengage in comprehensive refinancing efforts." A true and correct copy of my July 20, 2023 email communication is attached as Exhibit 27.

97. On July 21, 2023, the motion for a temporary restraining order was denied on jurisdictional grounds. Yellow picked up approximately 10,450 shipments, a decrease of over 20,000 from just two days prior and a decrease of over 30,000 since the day the strike notice was issued.

98. On July 23, 2023, Mr. O'Brien finally ended his month's long stone-walling and reached out to Yellow's senior management—just ten hours before the strike deadline. It was not until then, hours before that strike deadline, that the Union finally decided to use its influence over Central States to avert the threatened IBT strike. At the Union's direct request, Central States agreed to extend benefits for workers at Yellow operating companies Holland and YRC Freight for 30 days, thus averting a strike that could have begun Monday, July 24.

99. The Company made it clear to Mr. O'Brien that a deal would need to be reached quickly, and that the Union would need to exert whatever influence it had to assist the Company in obtaining financing.

100. On July 24, Yellow picked up 17,695 shipments. The same day, due to the ongoing disruptions to the Company's business, Yellow decided to begin the process to discontinue accepting new shipment orders in order to ensure that existing orders could be fulfilled.

101. On July 25, 2023, Citizens again sent another notice of establishment of availability reserve in the amount of $25 million, exacerbating Yellow's rapidly deteriorating liquidity, which came due on July 27, 2023. That same day, Yellow picked up 11,109 shipments.

102.    On July 26, 2023, Yellow picked up just 726 shipments.  I updated the Board on the ongoing negotiations with the IBT that had begun on July 23.  After months of stonewalling, the IBT conditionally approved the operational changes necessary to implement Phase 2 of One Yellow.   In a last-ditch effort, the Company provided the IBT with information on its communications with the federal government, hoping that maybe action taken by the IBT could improve the chances that the federal government intervene.

103.    It was, however, too little too late.  The IBT was unable to secure government assistance for the Company.  Ultimately, the threat of the IBT strike had already caused irreversible damage to Yellow and was enough to seal its fate, as it had caused Yellow's customers to flee to Yellow's competitors.

104.    At the July 26, 2023 Board meeting, the Board discussed the Company's available liquidity, and depending on the pace of the liquidity decline, the timing of a potential filing for bankruptcy under Chapter 11 of the United States Bankruptcy Code.  The Board also discussed the need to obtain Debtor in Possession ("DIP") financing which would be necessary in a liquidation process.

105.    On July 27, 2023, Yellow picked up 178 shipments.  On July 28, 2023, Yellow picked up 43 shipments.



### B.    Termination of Employees and Issuance of WARN Notices

106.    On July 28, 2023, approximately 3,500 non-union employees were laid off.  All eligible non-union employees who were laid off were offered a Notice of Separation & Release of Claims (hereafter "Severance Agreement") in which they would be paid severance (calculated based on years of service and/or position) in exchange for a release of claims.  The form of Severance Agreement offered to all such employees is attached hereto as Exhibit 28.  The form of Severance Agreement expressly required a release of all claims, including claims under the Workers' Adjustment Notification Act ("WARN") or its state level equivalents.

107.    On July 29, 2023, just twelve days after the IBT issued the strike notice, Yellow picked up a single shipment.  That was the last shipment Yellow ever picked up.  By this point, Yellow had ceased normal business operations.

108.    On July 30, 2023, the final Yellow truck on the road, after 99 years in operation, pulled into a terminal gate.  With no shipments or customers remaining, Yellow laid off all

remaining union employees, approximately 22,000 people.  WARN Notices in connection with the layoffs were issued on July 31, 2023.

109.    Given that tens of thousands of employees across the country were being laid off, the Company focused primarily on ensuring that WARN Notices went out to all of its affected employees.  Given the suddenness of the necessity to terminate so many employees, it was impracticable at the time for Yellow to customize WARN Notices for each state's relevant WARN Act requirements.

110.    Further, the notices explained that the Company could not provide earlier notice of the shut down because it qualified under the "unforeseeable business circumstances," "faltering company," and "liquidating fiduciary" exceptions set forth in the WARN Act.  Specifically, the notice to unionized employees explained that the "Company had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so."  The notice went on to say that, "[t]hese circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice is further excused because the business is being liquidated."  Finally, the notices explained that the closure is permanent, all employees were being terminated, and no bumping system (where a more senior employee displaces a more junior one) or other jobs opportunities would become available.

111.    The Board met on July 30, 2023, where attorneys from Kirkland & Ellis gave a presentation summarizing the Company's current position, provided a potential filing timeline and venue, and described additional logistical considerations that accompany a large-scale chapter 11 filing.

112.     On August 1, 2023, in the wake of the value destruction caused by the IBT strike threat, and in light of the fact that Yellow was forced to take initial steps to wind-down its operations, S&P once again downgraded Yellow's issuer credit rating from a CCC- to a CC.

113.     On August 2, 2023, the Board met with Kirkland & Ellis to discuss ensuring that DIP financing would be in place prior to the filing of a bankruptcy petition.  By this point, the sole purpose of Yellow's remaining employees was to liquidate the company and wind down the bankruptcy estate.  To that end, the Board authorized and directed Kirkland & Ellis to file for chapter 11 on August 6, 2023.

## V.     CONCLUSION

114.     Up until the mass layoff, we were still working productively with Ducera on several avenues for additional financing, amending the terms of our existing loans, and working in good faith to negotiate with Mr. O'Brien and the IBT.  Even after the IBT issued its strike notice, which was withdrawn six days later, Yellow was still attempting to save the Company and its nearly 30,000 employees' jobs, until events during the week from July 24 to 28 showed this was no longer possible.

115.     Issuing WARN notices before Yellow actually did so would have served no purpose other than to rapidly accelerate the departure of Yellow's customer base and guarantee the Company's destruction.  Given Yellow's longstanding history of working through its financial hardships collaboratively via negotiations with Central States and the IBT, we could not have foreseen the rapid escalation of both Central States' July 17 memorandum and Mr. O'Brien's July 17 strike notice occurring within hours of one another.

116.     Even after these events, Yellow continued to reach out and negotiate with both parties in a good faith effort to resolve the strike threats and maintain Central States' coverage of its employees.  Yellow continued attempting to save the Company during the following week, until

it became apparent that the strike threat's damage could not be undone and Yellow was eventually forced to issue WARN notices and lay off its workers.

[*Remainder of page left intentionally blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 12, 2024

/s/ Darren Hawkins

Darren Hawkins
Chief Executive Officer of Yellow
Corporation

# YELLOW CORPORATION, *et al.*

### DECLARATION OF DARREN HAWKINS
### IN SUPPORT OF DEBTORS' THIRD, FOURTH, AND FIFTH
### OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM FOR WARN
### LIABILITY)
### [Docket No.2581]

The remaining documents related to the Hawkins Declaration (the "Exhibits") have been excluded from service due to the size of the documents.

The Exhibits are available for review and can be downloaded free of charge at the website of the Noticing Agent, Epiq Corporate Restructuring, LLC ("Epiq") at https://dm.epiq11.com/case/yellowcorporation/info. The Exhibits are located within Docket No. 2581

You may also request a copy of the Exhibits by contacting Epiq directly at (646) 282-2400 or email at YellowCorporationInfo@epiqglobal.com.

**EXHIBIT D**

**Epiq Corporate Restructuring, LLC**
**PO BOX 4470**
**Beaverton, OR 97076-4470**
**Address Service Requested**

Legal Documents Enclosed
Please direct to the attention
of the Addressee,
Legal Department or President



YRC WARN 03-12-2024 (MERGE2,TXNUM2) 4000070804

BAR(23) MAIL ID *** 000223079840 ***



GARY, MICHAEL
C/O HEARN LAW FIRM PLLC
ATTN PHILIP A HEARN, ESQ
PO BOX 5009
JACKSON, MS  39296-5009

# THE REMAINDER OF THIS PAGE

# INTENTIONALLY LEFT BLANK

4100001

> **THIS OBJECTION SEEKS TO DISALLOW, REDUCE, OR EXPUNGE CERTAIN CLAIMS.  PARTIES RECEIVING THIS OBJECTION SHOULD REVIEW <u>SCHEDULE 1</u> TO THE PROPOSED ORDER AND THE ATTACHED EXHIBIT TO DETERMINE IF THEIR CLAIM IS SUBJECT TO THIS OBJECTION.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

**Response Deadline: March 26, 2024, at 4:00 p.m. (ET)**
**Hearing Date: April 11, 2024, at 11:00 a.m. (ET)**

## NOTICE OF DEBTORS' FOURTH OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM FOR WARN LIABILITY

**PLEASE TAKE NOTICE** that, on March 12, 2024, the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") filed with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") the *Debtors' Fourth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability* (the "<u>Objection</u>").  **Your claim(s) may be disallowed and/or modified and/or expunged as a result of the Objection.  Therefore, you should read the attached Objection carefully.**

**PLEASE TAKE FURTHER NOTICE THAT YOUR RIGHTS MAY BE AFFECTED BY THE OBJECTION AND BY ANY FURTHER CLAIM OBJECTION THAT MAY BE FILED BY THE DEBTORS OR OTHERWISE.  THE RELIEF SOUGHT HEREIN**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

**IS WITHOUT PREJUDICE TO THE DEBTORS' RIGHTS TO PURSUE FURTHER OBJECTIONS AGAINST YOUR CLAIM(S) SUBJECT TO THE OBJECTION IN ACCORDANCE WITH APPLIABLE LAW AND APPLICABLE ORDERS OF THE BANKRUPTCY COURT.**

 **PLEASE TAKE FURTHER NOTICE** that if the holder of a claim that is the subject of the Objection wishes to respond to the Objection, the holder must file a written response on or before **March 26, 2024 at 4:00 p.m. (ET)** with the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware:  824 North Market Street, 3rd Floor**,** Wilmington, Delaware 19801.  In addition each written response must be served on the counsel identified in this notice.

 **PLEASE TAKE FURTHER NOTICE** that responses to the Objection must contain, at minimum, the following: (a) a caption setting forth the name of the Court, the above-referenced case number and the title of the Objection to which the Response is directed; the name of the Claimant and description of the basis for the amount of the Claim; (b) a concise statement setting forth the reasons why a particular Claim should not be disallowed for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which the claimant will rely in opposing the Objection at the Hearing; (c) all documentation or other evidence of the Claim in question, to the extent not already included with the Claimant's proof of claim, upon which the claimant will rely in opposing the Objection at the Hearing; (d) the name, address telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on behalf of the Claimant; and (e) the name, address, telephone number, and fax number of the person(s) (who may be

DE:4891-2230-4429.2 96859.001

the Claimant or a legal representative thereof) to whom the Debtors should serve any reply to the Response.

       **PLEASE TAKE FURTHER NOTICE** that if you would like to obtain a copy of the Objection or any other documents in the chapter 11 cases, you should contact Epiq Corporate Restructuring, LLC, the Debtors' noticing agent in these chapter 11 cases, (a) by calling (866)-641-1076; (b) by visiting the Debtors' restructuring website at https://dm.epiq11.com/YellowCorporation; or (c) for a fee via PACER by visiting https://pacer.uscourts.gov.

       **PLEASE TAKE FURTHER NOTICE** that if no response to the Objection is timely filed and received in accordance with the above procedures, an order may be entered sustaining the Objection without further notice or a hearing.  If a response is properly filed, served and received in accordance with the above procedures and such response is not resolved, a hearing to consider such response and the Objection will be held before The Honorable Craig T. Goldblatt, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, 3rd Floor, Courtroom No. 7, on **April 11, 2024, at 10:00 a.m. (ET)** (the "Hearing").  Only a response made in writing and timely filed and received will be considered by the Bankruptcy Court at the Hearing.

       **IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY SUSTAIN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.**

DE:4891-2230-4429.2 96859.001

Dated:  March 12, 2024
Wilmington, Delaware

/s/ Peter J. Keane

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | Michael B. Slade (admitted *pro hac vice*) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                tcairns@pszjlaw.com
                pkeane@pszjlaw.com
                ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                david.seligman@kirkland.com
                michael.slade@kirkland.com

-and-


Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

4

DE:4891-2230-4429.2 96859.001

**EXHIBIT E**



**Epiq Corporate Restructuring, LLC**
**PO BOX 4470**
**Beaverton, OR 97076-4470**
**Address Service Requested**

Legal Documents Enclosed
Please direct to the attention
of the Addressee,
Legal Department or President

YRC WARN 03-12-2024 (MERGE2,TXNUM2) 4000065520

BAR(23) MAIL ID *** 000223080477 ***



FITZPATRICK, JOHN

# THE REMAINDER OF THIS PAGE

# INTENTIONALLY LEFT BLANK

5100001

> **THIS OBJECTION SEEKS TO DISALLOW, REDUCE, OR EXPUNGE CERTAIN CLAIMS. PARTIES RECEIVING THIS OBJECTION SHOULD REVIEW THE OMNIBUS OBJECTION AND/OR THE ATTACHED EXHIBIT TO DETERMINE IF THEIR CLAIM IS SUBJECT TO THIS OBJECTION.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

**Response Deadline: March 26, 2024, at 4:00 p.m. (ET)**
**Hearing Date: April 11, 2024, at 11:00 a.m. (ET)**

## NOTICE OF DEBTORS' FIFTH OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM FOR WARN LIABILITY

**PLEASE TAKE NOTICE** that, on March 12, 2024, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") the *Debtors' Fifth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability* (the "Objection"). **Your claim(s) may be disallowed and/or modified and/or expunged as a result of the Objection. Therefore, you should read the attached Objection carefully.**

**PLEASE TAKE FURTHER NOTICE THAT YOUR RIGHTS MAY BE AFFECTED BY THE OBJECTION AND BY ANY FURTHER CLAIM OBJECTION THAT MAY BE FILED BY THE DEBTORS OR OTHERWISE. THE RELIEF SOUGHT HEREIN IS WITHOUT PREJUDICE TO THE DEBTORS' RIGHTS TO PURSUE FURTHER**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

OBJECTIONS AGAINST YOUR CLAIM(S) SUBJECT TO THE OBJECTION IN
ACCORDANCE WITH APPLIABLE LAW AND APPLICABLE ORDERS OF THE
BANKRUPTCY COURT.

  **PLEASE TAKE FURTHER NOTICE** that if the holder of a claim that is the subject of the Objection wishes to respond to the Objection, the holder must file a written response on or before **March 26, 2024 at 4:00 p.m. (ET)** with the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware:  824 North Market Street, 3rd Floor**,** Wilmington, Delaware 19801.  In addition each written response must be served on the counsel identified in this notice.

  **PLEASE TAKE FURTHER NOTICE** that responses to the Objection must contain, at minimum, the following: (a) a caption setting forth the name of the Court, the above-referenced case number and the title of the Objection to which the Response is directed; the name of the Claimant and description of the basis for the amount of the Claim; (b) a concise statement setting forth the reasons why a particular Claim should not be disallowed for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which the claimant will rely in opposing the Objection at the Hearing; (c) all documentation or other evidence of the Claim in question, to the extent not already included with the Claimant's proof of claim, upon which the claimant will rely in opposing the Objection at the Hearing; (d) the name, address telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on behalf of the Claimant; and (e) the name, address, telephone number, and fax number of the person(s) (who may be the Claimant or a legal representative thereof) to whom the Debtors should serve any reply to the Response.

DE:4888-0635-5629.1 96859.001

PLEASE TAKE FURTHER NOTICE that if you would like to obtain a copy of the Objection or any other documents in the chapter 11 cases, you should contact Epiq Corporate Restructuring, LLC, the Debtors' noticing agent in these chapter 11 cases, (a) by calling (866)-641-1076; (b) by visiting the Debtors' restructuring website at https://dm.epiq11.com/YellowCorporation; or (c) for a fee via PACER by visiting https://pacer.uscourts.gov.

PLEASE TAKE FURTHER NOTICE that if no response to the Objection is timely filed and received in accordance with the above procedures, an order may be entered sustaining the Objection without further notice or a hearing.  If a response is properly filed, served and received in accordance with the above procedures and such response is not resolved, a hearing to consider such response and the Objection will be held before The Honorable Craig T. Goldblatt, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801, 3rd Floor, Courtroom No. 7, on **April 11, 2024, at 10:00 a.m. (ET)** (the "Hearing").  Only a response made in writing and timely filed and received will be considered by the Bankruptcy Court at the Hearing.

**IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY SUSTAIN THE OBJECTION WITHOUT FURTHER NOTICE OR HEARING.**

DE:4888-0635-5629.1 96859.001

Dated:  March 12, 2024
Wilmington, Delaware

/s/ Peter J. Keane
_____

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | Michael B. Slade (admitted *pro hac vice*) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 919 North Market Street, 17th Floor | 300 North LaSalle |
| P.O. Box 8705 | Chicago, Illinois 60654 |
| Wilmington, Delaware 19801 | Telephone:     (312) 862-2000 |
| Telephone:     (302) 652-4100 | Facsimile:      (312) 862-2200 |
| Facsimile:      (302) 652-4400 | Email:           patrick.nash@kirkland.com |
| Email:           ljones@pszjlaw.com | david.seligman@kirkland.com |
| tcairns@pszjlaw.com | michael.slade@kirkland.com |
| pkeane@pszjlaw.com | |
| ecorma@pszjlaw.com | -and- |

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

DE:4888-0635-5629.1 96859.001

**EXHIBIT F**

| Claim Name | Address Information |
|---|---|
| BRYAN CAVE LEIGHTON PAISNER LLP | (COUNSEL TO SAIA INC; SAIA MOTOR FREIGHT) ATTN LAURENCE M FRAZEN; JARRET HITCHINGS ONE KANSAS CITY PLACE 1200 MAIN ST, STE 3800 KANSAS CITY MO 64105-2122 |
| COMMONWEALTH OF PUERTO RICO ATTY GENERAL | ATTN: DOMINGO EMANUELLI HERNANDEZ PO BOX 9020192 SAN JUAN PR 00902-0192 |
| NY OFFICE OF THE ATTORNEY GEN | ENVIRONMENTAL PROTECTION BUREAU ATTN STEVE H NGUYEN THE CAPITOL ALBANY NY 12224 |
| STATE OF ALABAMA ATTORNEY GENERAL | ATTN: STEVE MARSHALL 501 WASHINGTON AVE MONTGOMERY AL 36104 |
| STATE OF ALABAMA ATTORNEY GENERAL | ATTN: STEVE MARSHALL PO BOX 300152 MONTGOMERY AL 36130-0152 |
| STATE OF CALIFORNIA ATTORNEY GENERAL | ATTN: ROB BONTA 1300 'I' ST SACRAMENTO CA 95814-2919 |
| STATE OF FLORIDA ATTORNEY GENERAL | ATTN: ASHLEY MOODY PL 01 THE CAPITOL TALLAHASSEE FL 32399-1050 |
| STATE OF IDAHO ATTORNEY GENERAL | ATTN: RAUL R. LABRADOR 700 W JEFFERSON ST, STE 210 PO BOX 83720 BOISE ID 83720-0010 |
| STATE OF ILLINOIS ATTORNEY GENERAL | ATTN: KWAME RAOUL 100 W RANDOLPH ST CHICAGO IL 60601 |
| STATE OF INDIANA ATTORNEY GENERAL | ATTN: TODD ROKITA INDIANA GOVERNMENT CENTER SOUTH 302 W WASHINGTON ST, 5TH FL INDIANAPOLIS IN 46204 |
| STATE OF KANSAS ATTORNEY GENERAL | ATTN: KRIS W. KOBACH 120 SW 10TH AVE, 2ND FL TOPEKA KS 66612 |
| STATE OF KENTUCKY ATTORNEY GENERAL | ATTN: DANIEL CAMERON 700 CAPITOL AVE, STE 118 FRANKFORT KY 40601-3449 |
| STATE OF MINNESOTA ATTORNEY GENERAL | ATTN KEITH ELLISON 445 MINNESOTA ST, STE 1400 ST. PAUL MN 55101-2131 |
| STATE OF MISSISSIPPI ATTORNEY GENERAL | ATTN: LYNN FITCH PO BOX 220 JACKSON MS 39205 |
| STATE OF MONTANA ATTORNEY GENERAL | ATTN: AUSTIN KNUDSEN JUSTICE BLDG 215 N SANDERS ST HELENA MT 59601 |
| STATE OF NEW JERSEY ATTORNEY GENERAL | ATTN: MATTHEW J. PLATKIN RJ HUGHES JUSTICE COMPLEX 25 MARKET ST - PO BOX 080 TRENTON NJ 08625-0080 |
| STATE OF NEW MEXICO ATTORNEY GENERAL | ATTN: RAUL TORREZ 408 GALISTEO ST VILLAGRA BLDG SANTA FE NM 87501 |
| STATE OF NORTH CAROLINA ATTORNEY GENERAL | ATTN: JOSH STEIN PO BOX 629 RALEIGH NC 27602-0629 |
| STATE OF NORTH CAROLINA ATTORNEY GENERAL | ATTN: JOSH STEIN 9001 MAIL SERVICE CTR RALEIGH NC 27699-9001 |
| STATE OF WISCONSIN ATTORNEY GENERAL | ATTN: JOSH KAUL WISCONSIN DEPARTMENT OF JUSTICE 17 PO BOX 7857 MADISON WI 53703-7857 |
| STATE OF WYOMING ATTORNEY GENERAL | ATTN: BRIDGET HILL 109 STATE CAPITAL 200 W. 24TH ST CHEYENNE WY 82002 |
| U.S. DEPARTMENT OF JUSTICE | 950 PENNSYLVANIA AVENUE, NW WASHINGTON DC 20530-0001 |

**Total Creditor count  22**

**EXHIBIT G**

| Claim Name | Address Information |
|---|---|
| ABERNATHY, RICK | ADDRESS ON FILE |
| ABERNATHY, RICK | ADDRESS ON FILE |
| ABERNATHY, RICK | ADDRESS ON FILE |
| ACEVEDO, FIDELIO | ADDRESS ON FILE |
| ACKER, LAWANNA | ADDRESS ON FILE |
| ACKER, LAWANNA M | ADDRESS ON FILE |
| ACKER, LAWANNA M | ADDRESS ON FILE |
| ACKERMAN, ROBERT | ADDRESS ON FILE |
| ACKERMAN, ROBERT | ADDRESS ON FILE |
| ACKERMAN, ROBERT | ADDRESS ON FILE |
| ADAMS, DAVID | ADDRESS ON FILE |
| ADAMS, MICHAEL GERARD | ADDRESS ON FILE |
| ADCOCK, DEAN | ADDRESS ON FILE |
| ADCOCK, STEVEN | ADDRESS ON FILE |
| ADKINS, JUSTIN | ADDRESS ON FILE |
| AGAN, JOSEPH | ADDRESS ON FILE |
| AGAPAY, JUSTIN | ADDRESS ON FILE |
| AGUILAR, RAY | ADDRESS ON FILE |
| ALBANESE, SCOTT M | ADDRESS ON FILE |
| ALESSANDRO, JOSEPH, JR | ADDRESS ON FILE |
| ALESSANDRO, JOSEPH, JR | ADDRESS ON FILE |
| ALESSANDRO, JOSEPH, JR | ADDRESS ON FILE |
| ALICEA, EDUARDO V | ADDRESS ON FILE |
| ALICEA, EDUARDO V | ADDRESS ON FILE |
| ALICEA, EDUARDO V | ADDRESS ON FILE |
| ALLEMAN, PHILLIP A | ADDRESS ON FILE |
| ALLEN, JOHN FRANKLIN | ADDRESS ON FILE |
| ALLEN, JOHN FRANKLIN | ADDRESS ON FILE |
| ALLEN, JOHN FRANKLIN | ADDRESS ON FILE |
| ALLEN, RONALD | ADDRESS ON FILE |
| ALLEN, SHAWN | ADDRESS ON FILE |
| ALLGOOD, JONATHAN | ADDRESS ON FILE |
| ALLRED, CHARLES E | ADDRESS ON FILE |
| ALLRED, CHARLES E | ADDRESS ON FILE |
| ALVARADO, DAVID | ADDRESS ON FILE |
| ALVARADO, DAVID | ADDRESS ON FILE |
| AMIN, TANYA | ADDRESS ON FILE |
| AMRHEIN, DARBY | ADDRESS ON FILE |
| AMSPACHER, KYLE | ADDRESS ON FILE |
| ANDERSON, DAVID W, SR | ADDRESS ON FILE |
| ANDERSON, JEFFREY | ADDRESS ON FILE |
| ANDERSON, MARCUS | ADDRESS ON FILE |
| ANDERSON, RANDALL | ADDRESS ON FILE |
| ANDERSON, RANDALL | ADDRESS ON FILE |
| ANDERSON, RANDALL | ADDRESS ON FILE |
| ANDERSON, STANLEY | ADDRESS ON FILE |
| ANDERSON, THOMAS R JR | ADDRESS ON FILE |
| ANDERSON, TROY E | ADDRESS ON FILE |
| ANGELLOTTI, ATTILIO C | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| ANGELLOTTI, ATTILIO C | ADDRESS ON FILE |
| ANGELLOTTI, ATTILIO C | ADDRESS ON FILE |
| ANSELL, JAMES L | ADDRESS ON FILE |
| ANSELL, ROBERT L | ADDRESS ON FILE |
| ARDREY, DAVID | ADDRESS ON FILE |
| ARIAS, RICHARD | ADDRESS ON FILE |
| ARMON, CURTIS | ADDRESS ON FILE |
| ARNETT, DARRELL LEE | ADDRESS ON FILE |
| ARNOLD, TERRENCE T | ADDRESS ON FILE |
| ARNOLD, TERRENCE T | ADDRESS ON FILE |
| ARNOLD, TERRENCE T | ADDRESS ON FILE |
| ARREOLA MEDINA, JUAN J | ADDRESS ON FILE |
| ASHE, PAUL ALAN | ADDRESS ON FILE |
| ASPDEN, JOHN | ADDRESS ON FILE |
| ATHERTON, ANNE MARIE | ADDRESS ON FILE |
| AUTO MECHS LOCAL 701 PENSION FUND | C/O JOHNSON & KROL LLC 311 S WACKER DR, STE 1050 CHICAGO IL 60606 |
| AUTO MECHS LOCAL 701 WELFARE FUND | C/O JOHNSON & KROL LLC 311 S WACKER DR, STE 1050 CHICAGO IL 60606 |
| AVILA, BRIAN | ADDRESS ON FILE |
| AVILA, BRIAN | ADDRESS ON FILE |
| AVILA, BRIAN | ADDRESS ON FILE |
| AYALA, MARIO | ADDRESS ON FILE |
| BAHAN, MICHAEL DENNIS JR | ADDRESS ON FILE |
| BAILEY, PAMELA | ADDRESS ON FILE |
| BAILEY, PAMELA | ADDRESS ON FILE |
| BAILOR, KENNETH | ADDRESS ON FILE |
| BAKER, ROBERT | ADDRESS ON FILE |
| BALDERAS, RODRIGO | ADDRESS ON FILE |
| BALDRIDGE, RICKY | ADDRESS ON FILE |
| BANKERT, GREGORY L | ADDRESS ON FILE |
| BARAJAS, JOVANY | ADDRESS ON FILE |
| BARAJAS, RAMIRO | ADDRESS ON FILE |
| BARAJAS, RAMIRO | ADDRESS ON FILE |
| BARANEK, ERIC T | ADDRESS ON FILE |
| BARANEK, ERIC T | ADDRESS ON FILE |
| BARANOSKI, GARY | ADDRESS ON FILE |
| BARBOSA, DANIEL | ADDRESS ON FILE |
| BARHAM, JIMMY | ADDRESS ON FILE |
| BARKER, JAMES BRIAN | ADDRESS ON FILE |
| BARTROM, ANTHONY W | ADDRESS ON FILE |
| BARTROM, ANTHONY W | ADDRESS ON FILE |
| BATTAGLIA, FRANK J, III | ADDRESS ON FILE |
| BAUSEMAN, RODNEY | ADDRESS ON FILE |
| BAUTISTA, ARTHUR | ADDRESS ON FILE |
| BAUTISTA, ARTHUR | ADDRESS ON FILE |
| BEAL, MICHAEL L | ADDRESS ON FILE |
| BEALE, MICA L | ADDRESS ON FILE |
| BEALE, MICA L | ADDRESS ON FILE |
| BECHTOLD, DOUGLAS | ADDRESS ON FILE |
| BECKER, CHUCK M | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| BECKETTE, CALEB | ADDRESS ON FILE |
| BELCHER, ANDREWSON | ADDRESS ON FILE |
| BELL, JAMES | ADDRESS ON FILE |
| BELL, MARRIO | ADDRESS ON FILE |
| BELL, MICHAEL JEROME | ADDRESS ON FILE |
| BENJAMIN, ASMENT | ADDRESS ON FILE |
| BENJAMIN, BRENDALIE | ADDRESS ON FILE |
| BENNETT, HUGH P JR | ADDRESS ON FILE |
| BENNETT, JAMES | ADDRESS ON FILE |
| BENNETT, MICHAEL K | ADDRESS ON FILE |
| BENNETT, MICHAEL K | ADDRESS ON FILE |
| BENSON, BRADLEY | ADDRESS ON FILE |
| BENSON, JAMES L | ADDRESS ON FILE |
| BERMAN, PETER | ADDRESS ON FILE |
| BERMAN, PETER | ADDRESS ON FILE |
| BERRY, DAVID SCOTT | ADDRESS ON FILE |
| BETTS, DONALD | ADDRESS ON FILE |
| BICKHEM, JOSEPH | ADDRESS ON FILE |
| BICKHEM, JOSEPH | ADDRESS ON FILE |
| BINGHAM, JAMAINE | ADDRESS ON FILE |
| BIROSCAK, WILLIAM H | ADDRESS ON FILE |
| BISHOP, CHARLES | ADDRESS ON FILE |
| BLAKLEY, KELVIN | ADDRESS ON FILE |
| BLALOCK, SCOTT | ADDRESS ON FILE |
| BLEES, WILLIAM R, III | ADDRESS ON FILE |
| BLOUNT, PAUL | ADDRESS ON FILE |
| BLOUNT, PAUL | ADDRESS ON FILE |
| BOARTS, DAVID | ADDRESS ON FILE |
| BOARTS, DAVID C | ADDRESS ON FILE |
| BOBBITT, DWIGHT DARON | ADDRESS ON FILE |
| BODENSCHATZ, DENTON R, JR | ADDRESS ON FILE |
| BOENS, GREGORY A | ADDRESS ON FILE |
| BOHANNON, STANLEY | ADDRESS ON FILE |
| BOONE, COREY | ADDRESS ON FILE |
| BORDEAUX, CHRISTOPHER | ADDRESS ON FILE |
| BORDERS, MICHAEL W | ADDRESS ON FILE |
| BOTZ, BRENDON EDWARD | ADDRESS ON FILE |
| BOUCHARD, DUSTIN | ADDRESS ON FILE |
| BOWDEN, DAVID | ADDRESS ON FILE |
| BOWDEN, MICHAEL | ADDRESS ON FILE |
| BOYER, TERESA | ADDRESS ON FILE |
| BRAHAM, EUGENE C JR | ADDRESS ON FILE |
| BRANCATO, JOSEPH | ADDRESS ON FILE |
| BRANCH, MORRIS | ADDRESS ON FILE |
| BRANDON, DAVID W | ADDRESS ON FILE |
| BRANT, THOMAS W, III | ADDRESS ON FILE |
| BRETZ, ANGELA | ADDRESS ON FILE |
| BREWER, DUANE | ADDRESS ON FILE |
| BREWER, ERIC | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| BRIDGES, JAMES, JR | ADDRESS ON FILE |
| BRIGGS, CHAD | ADDRESS ON FILE |
| BRIGHAM, RICHARD | ADDRESS ON FILE |
| BROUWER, DAVID | ADDRESS ON FILE |
| BROUWER, DAVID | ADDRESS ON FILE |
| BROWN, CHRISTOPHER | ADDRESS ON FILE |
| BROWN, CLIFTON MCCLAIN, JR | ADDRESS ON FILE |
| BROWN, DESHAUN | ADDRESS ON FILE |
| BROWN, DESHAUN | ADDRESS ON FILE |
| BROWN, KENNETH HUGH | ADDRESS ON FILE |
| BROWN, KEVIN WAYNE | ADDRESS ON FILE |
| BROWN, ROBERT G | ADDRESS ON FILE |
| BROWN, ROBERT G | ADDRESS ON FILE |
| BROWN, ROGER | ADDRESS ON FILE |
| BROWNAWELL, JAMES C | ADDRESS ON FILE |
| BRUBAKER, KEVIN | ADDRESS ON FILE |
| BRUNO, MICHAEL C | ADDRESS ON FILE |
| BUCK, STANLEY L, III | ADDRESS ON FILE |
| BUCK, STANLEY L, III | ADDRESS ON FILE |
| BULLOCK, DAVID | ADDRESS ON FILE |
| BUMBAUGH, PAUL | ADDRESS ON FILE |
| BUMBAUGH, PAUL J | ADDRESS ON FILE |
| BURLESON, JESS | ADDRESS ON FILE |
| BURNS, MIKE | ADDRESS ON FILE |
| BURNS, RODNEY J | ADDRESS ON FILE |
| BURTON, RODNEY | ADDRESS ON FILE |
| BUTLER, BONNIE | ADDRESS ON FILE |
| BYNUM, SHANNON | ADDRESS ON FILE |
| BYROADE, DENNIS L, JR | ADDRESS ON FILE |
| CALFAS, DORIAN | ADDRESS ON FILE |
| CAMARDELLA, LOUIS | ADDRESS ON FILE |
| CAMPBELL, JOHN R, III | ADDRESS ON FILE |
| CAMPBELL, MARK C | ADDRESS ON FILE |
| CAMPBELL, MARK C | ADDRESS ON FILE |
| CAMPBELL, MICHAEL M | ADDRESS ON FILE |
| CANNADY, ZARAK | ADDRESS ON FILE |
| CAREY, SEAN | ADDRESS ON FILE |
| CARLISLE, MARCUS | ADDRESS ON FILE |
| CARLSON, RONALD | ADDRESS ON FILE |
| CARPENTER, DONALD | ADDRESS ON FILE |
| CARPIO, MARIO | ADDRESS ON FILE |
| CARR, GARY | ADDRESS ON FILE |
| CARR, GARY | ADDRESS ON FILE |
| CARRANO JR, RUSSELL A | ADDRESS ON FILE |
| CARRANO JR, RUSSELL A | ADDRESS ON FILE |
| CARRANO JR, RUSSELL A | ADDRESS ON FILE |
| CARROLL, MIKE | ADDRESS ON FILE |
| CARSON, SANFORD J | ADDRESS ON FILE |
| CARTER, JOSEPH | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| CARTER, KEITH | ADDRESS ON FILE |
| CARTER, MARK | ADDRESS ON FILE |
| CASEY, JON E | ADDRESS ON FILE |
| CASSELL, LOY WILLIAM III | ADDRESS ON FILE |
| CASSELL, SAM | ADDRESS ON FILE |
| CASTELLANOS, GEORGE | ADDRESS ON FILE |
| CASTILLO, LORENZO | ADDRESS ON FILE |
| CASTROCOREA, JONATHAN | ADDRESS ON FILE |
| CENTRAL PA TEAMSTERS HEALTH&WELFARE FUND | C/O WILLIG WILLIAMS & DAVIDSON ATTN JAMES S BEALL, ESQ 1845 WALNUT ST, 24TH FL PHILADELPHIA PA 19103 |
| CENTRAL PA TEAMSTERS HEALTH&WELFARE FUND | ATTN JOSEPH J SAMOLEWICZ, ADMINISTRATOR 1055 SPRING ST WYOMISSING PA 19610 |
| CENTRAL PA TEAMSTERS HEALTH&WELFARE FUND | ATTN MICHAEL BUSENKELL, ESQ GELLERT SCALI BUSENKELL & BROWN LLC 1201 N ORANGE ST STE 300 WILMINGTON DE 19801 |
| CENTRAL PA TEAMSTERS HEALTH&WELFARE FUND | C/O GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL ESQ 1201 N ORANGE ST STE 300 WILMINGTON DE 19801 |
| CENTRAL PA TEAMSTERS PENSION FUND | C/O WILLIG WILLIAMS & DAVIDSON ATTN JAMES S BEALL, ESQ 1845 WALNUT ST, 24TH FL PHILADELPHIA PA 19103 |
| CENTRAL PA TEAMSTERS PENSION FUND | ATTN JOSEPH J SAMOLEWICZ, ADMINISTRATOR 1055 SPIRNG ST WYOMISSING PA 19610 |
| CENTRAL PA TEAMSTERS PENSION FUND | C/O GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL, ESQ 1201 N ORANGE ST, STE 300 WILMINGTON DE 19801 |
| CENTRAL PA TEAMSTERS PENSION FUND | ATTN MICHAEL BUSENKELL, ESQ GELLERT SCALI BUSENKELL & BROWN LLC 1201 N ORANGE ST STE 300 WILMINGTON DE 19801 |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST | AREAS HEALTH AND WELFARE FUND ATTN ANDREW SPRAU 8647 W HIGGINS RD CHICAGO IL 60631 |
| CHACON, JOHN | ADDRESS ON FILE |
| CHAMBERS, MICHAEL JAMES, SR | ADDRESS ON FILE |
| CHAMBERS, YOLANZA | ADDRESS ON FILE |
| CHAPMAN, DONALD WAYNE | ADDRESS ON FILE |
| CHAPPELL, HERMAN | ADDRESS ON FILE |
| CHAPUT, JAMES | ADDRESS ON FILE |
| CHAVEZ, ANGEL | ADDRESS ON FILE |
| CHAVEZ, GABRIEL | ADDRESS ON FILE |
| CHAVEZ, RICHARD | ADDRESS ON FILE |
| CHEEKS, PATRICK | ADDRESS ON FILE |
| CHENEY, JAY | ADDRESS ON FILE |
| CHRISTIE, CRAIG D | ADDRESS ON FILE |
| CHRISTIE, MICHAEL A | ADDRESS ON FILE |
| CHRISTMAN, ALBERT F, JR | ADDRESS ON FILE |
| CIFUENTES, ELVI | ADDRESS ON FILE |
| CLARETT, KENNETH | ADDRESS ON FILE |
| CLARK, DARRELL | ADDRESS ON FILE |
| CLAY, JERRY | ADDRESS ON FILE |
| CLEMENS, JEFFERY | ADDRESS ON FILE |
| CLEVELAND, MARIO | ADDRESS ON FILE |
| CLINGENPEEL, STEVEN | ADDRESS ON FILE |
| COLBERT, MILTON | ADDRESS ON FILE |
| COLE, MIKE | ADDRESS ON FILE |
| COLE, TRENTON | ADDRESS ON FILE |
| COLLINGWOOD, ANTHONY | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| COLLINS, GARY | ADDRESS ON FILE |
| COLQUHOUN, SCOTT | ADDRESS ON FILE |
| COLTER, DERRICK | ADDRESS ON FILE |
| COMO, ARTHUR F | ADDRESS ON FILE |
| COMO, ARTHUR F | ADDRESS ON FILE |
| COMPAGNONI, JAMES | ADDRESS ON FILE |
| CONCIALDI, ANTONINO | ADDRESS ON FILE |
| CONCIALDI, ANTONINO | ADDRESS ON FILE |
| CONERLY, KERRY | ADDRESS ON FILE |
| CONNER, FRED J | ADDRESS ON FILE |
| CONRAD, MICHAEL A | ADDRESS ON FILE |
| CONSAUL, ERIC | ADDRESS ON FILE |
| CONSAUL, ERIC | ADDRESS ON FILE |
| COOK, CLAUDE EDWARD | ADDRESS ON FILE |
| COOK, CLAUDE EDWARD | ADDRESS ON FILE |
| COOK, MIKE | ADDRESS ON FILE |
| COOMER, ROBERT H | ADDRESS ON FILE |
| COOPER, WILLIAM LOUIS | ADDRESS ON FILE |
| COOPER, WILLIAM LOUIS | ADDRESS ON FILE |
| COREY, TIMOTHY | ADDRESS ON FILE |
| COREY, TIMOTHY | ADDRESS ON FILE |
| CORN, MAURICE | ADDRESS ON FILE |
| CORNISH, BRAD ALAN | ADDRESS ON FILE |
| CORRALES, JOSE C | ADDRESS ON FILE |
| CORSON, SHAWNE | ADDRESS ON FILE |
| CORTEZ, MIGUEL | ADDRESS ON FILE |
| CORTEZ, MIGUEL | ADDRESS ON FILE |
| COSS, APOLINAR | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G AS CLASS CLAIMANT170 | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G AS CLASS CLAIMANT170 | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G, AS CLASS CLAIMANT | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G, AS CLASS CLAIMANT | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G. AS CLASS CLAIMANT | ADDRESS ON FILE |
| COVARRUBIAS, ENRIQUE | ADDRESS ON FILE |
| COX, NERVILLE | ADDRESS ON FILE |
| CRANKFIELD, JEROME CURTIS | ADDRESS ON FILE |
| CRAVEN, GEOFFREY | ADDRESS ON FILE |
| CRAWFORD, BRIAN | ADDRESS ON FILE |
| CRESPIN, ROBERT | ADDRESS ON FILE |
| CREW, ROBERT E, JR | ADDRESS ON FILE |
| CROFT, RONALD | ADDRESS ON FILE |
| CROMWELL, MICHAEL | ADDRESS ON FILE |
| CROSS, KATHLEEN | ADDRESS ON FILE |
| CROSS, KATHLEEN | ADDRESS ON FILE |
| CROSSWHITE, JAMES L | ADDRESS ON FILE |
| CRUZ, CHRISTOPHER | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| CRUZ, CHRISTOPHER | ADDRESS ON FILE |
| CRUZ, JOSE L | ADDRESS ON FILE |
| CURLEY, KEVIN | ADDRESS ON FILE |
| CURLEY, KEVIN | ADDRESS ON FILE |
| CURTIS, LARRY | ADDRESS ON FILE |
| CUZUBAN, IONEL | ADDRESS ON FILE |
| DALFONZO, MARK W | ADDRESS ON FILE |
| DALLAS, ROBERT | ADDRESS ON FILE |
| DANIELS, DANNY | ADDRESS ON FILE |
| DANIELS, JAMES, JR | ADDRESS ON FILE |
| DAVEY, DANIEL | ADDRESS ON FILE |
| DAVILA, STEPHANIE | ADDRESS ON FILE |
| DAVIS, RUFUS | ADDRESS ON FILE |
| DAVIS, TOBY | ADDRESS ON FILE |
| DAVIS, TOBY | ADDRESS ON FILE |
| DEAN, BRANDON HEATH | ADDRESS ON FILE |
| DEAN, RANDALL | ADDRESS ON FILE |
| DEIBLER, RANDOLPH S | ADDRESS ON FILE |
| DEITZ, PAUL | ADDRESS ON FILE |
| DEL HORNO, PEDRO | ADDRESS ON FILE |
| DELA CRUZ, MARCO A | ADDRESS ON FILE |
| DELANCEY, ALBERT | ADDRESS ON FILE |
| DELARSO, ALAN | ADDRESS ON FILE |
| DENDY, TIMOTHY W | ADDRESS ON FILE |
| DENNIS, CHRISTOPHER | ADDRESS ON FILE |
| DEPILLO, JEFFERY | ADDRESS ON FILE |
| DESMOND, JAMES | ADDRESS ON FILE |
| DESMOND, JAMES | ADDRESS ON FILE |
| DEUTSCHMAN, JAMES A | ADDRESS ON FILE |
| DEWALT, DREW | ADDRESS ON FILE |
| DEWALT, ROSE | ADDRESS ON FILE |
| DIAZ, ARTURO | ADDRESS ON FILE |
| DIAZ, ARTURO | ADDRESS ON FILE |
| DIAZ, ARTURO | ADDRESS ON FILE |
| DIAZ, GERARDO | ADDRESS ON FILE |
| DIAZ, GERARDO | ADDRESS ON FILE |
| DIAZ, HELADIO LOPEZ | ADDRESS ON FILE |
| DIAZ, JULIO | ADDRESS ON FILE |
| DIAZ, MARY KAY | ADDRESS ON FILE |
| DIAZ, MARY KAY | ADDRESS ON FILE |
| DIAZ, RAFAEL | ADDRESS ON FILE |
| DIETRICH, RICHARD | ADDRESS ON FILE |
| DILLS, TOMMY | ADDRESS ON FILE |
| DIXON, JASPER | ADDRESS ON FILE |
| DIXON, JASPER | ADDRESS ON FILE |
| DOBER, JEFFREY | ADDRESS ON FILE |
| DOBER, JEFFREY | ADDRESS ON FILE |
| DODDERER, BRIAN | ADDRESS ON FILE |
| DOERHOFF, ROGER J | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| DOMIN, STEVEN | ADDRESS ON FILE |
| DOMS, HERMAN W | ADDRESS ON FILE |
| DONALDSON, MICHAEL | ADDRESS ON FILE |
| DONMOYER, KENNETH M, JR | ADDRESS ON FILE |
| DOOLEY, MARK WILLIAM | ADDRESS ON FILE |
| DOUD, BRIAN | ADDRESS ON FILE |
| DRESSLER, THOMAS R, JR | ADDRESS ON FILE |
| DRUMMER, JIMMIE | ADDRESS ON FILE |
| DUFFY, TOM | ADDRESS ON FILE |
| DUKE, MICHAEL | ADDRESS ON FILE |
| DUNCAN, ARNOLD | ADDRESS ON FILE |
| DUNCAN, ARNOLD | ADDRESS ON FILE |
| DUNLAP, TIMOTHY L | ADDRESS ON FILE |
| DURAN, STEVE | ADDRESS ON FILE |
| DURK, DENNIS A | ADDRESS ON FILE |
| DURK, DENNIS A | ADDRESS ON FILE |
| DURKIN, BRIAN | ADDRESS ON FILE |
| DURNIN, PAUL V, III | ADDRESS ON FILE |
| DUVALL, KIRK O | ADDRESS ON FILE |
| DYMEK, LESLAW | ADDRESS ON FILE |
| DYMEK, LESLAW | ADDRESS ON FILE |
| DYNARSKI, LAWRENCE | ADDRESS ON FILE |
| DYSON, KEITH | ADDRESS ON FILE |
| EADS, BRIAN S | ADDRESS ON FILE |
| EARLEY, STEPHANIE | ADDRESS ON FILE |
| EATON, PLUMMER D | ADDRESS ON FILE |
| ECKLOFF, JOHN | ADDRESS ON FILE |
| EDGIN, JAMES | ADDRESS ON FILE |
| EDVARDSEN, SCOTT | ADDRESS ON FILE |
| EDVARDSEN, SCOTT | ADDRESS ON FILE |
| EDWARDS, KENNETH RAY | ADDRESS ON FILE |
| ELDRIDGE, LARRY | ADDRESS ON FILE |
| ELLERMAN, MICHELLE | ADDRESS ON FILE |
| ELLERMAN, MICHELLE | ADDRESS ON FILE |
| ELLIOTT, ROBERT | ADDRESS ON FILE |
| ELLIS, DANIEL | ADDRESS ON FILE |
| ELLIS, DANIEL | ADDRESS ON FILE |
| ELROD, KOEY | ADDRESS ON FILE |
| EMPLOYMENT PARTNERS BENEFITS FUND | ATTN: WILLIAM L. PARRY, JR., DIRECTOR 50 ABELE ROAD SUITE 1005 BRIDGEVILLE PA 15017 |
| ENGLISH, ALLEN | ADDRESS ON FILE |
| EPLER, MICHAEL J | ADDRESS ON FILE |
| EPLER, MICHAEL J | ADDRESS ON FILE |
| ESCO, CATRINA | ADDRESS ON FILE |
| ESCOBEDO, JESUS M | ADDRESS ON FILE |
| ESPENOZA, JUAN | ADDRESS ON FILE |
| ESPINOZA, LAURO | ADDRESS ON FILE |
| ESPINOZA, MAVRICIO | ADDRESS ON FILE |
| ETTER, JESSE | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| ETTER, JESSE E | ADDRESS ON FILE |
| EWING, KATHLEEN | ADDRESS ON FILE |
| FAGGANS, HOWARD | ADDRESS ON FILE |
| FARLEY, SAMUEL | ADDRESS ON FILE |
| FARMER, MICHAEL | ADDRESS ON FILE |
| FARNER, MACHELL E | ADDRESS ON FILE |
| FARRELL, MARTY | ADDRESS ON FILE |
| FARRELL, MARTY | ADDRESS ON FILE |
| FATTORE, CATHY | ADDRESS ON FILE |
| FAULKNER, CLARK | ADDRESS ON FILE |
| FAULKNER, CLARK | ADDRESS ON FILE |
| FAUVER, RANDY | ADDRESS ON FILE |
| FENNER, MARCUS | ADDRESS ON FILE |
| FENNER, MARCUS | ADDRESS ON FILE |
| FERNANDEZ, RAYMOND, JR | ADDRESS ON FILE |
| FERRER, BENJAMIN | ADDRESS ON FILE |
| FERRER, BENJAMIN | ADDRESS ON FILE |
| FIGUEROA, SALVADOR | ADDRESS ON FILE |
| FILIPPI, PAUL | ADDRESS ON FILE |
| FILIPPI, PAUL | ADDRESS ON FILE |
| FISCHER, WILLIAM L | ADDRESS ON FILE |
| FISCHER, WILLIAM L | ADDRESS ON FILE |
| FISHER, ROBERT | ADDRESS ON FILE |
| FITCH, NICK | ADDRESS ON FILE |
| FLEMING, DEMARCO | ADDRESS ON FILE |
| FLEMING, DEMARCO | ADDRESS ON FILE |
| FLEMING, DEMARCO | ADDRESS ON FILE |
| FLEMING, DEMARCO | ADDRESS ON FILE |
| FLETCHER, MCKINLEY | ADDRESS ON FILE |
| FLORES, ANA | ADDRESS ON FILE |
| FOGEL, JOSEPH W, II | ADDRESS ON FILE |
| FOHRMAN, PAUL | ADDRESS ON FILE |
| FOHRMAN, PAUL | ADDRESS ON FILE |
| FORSYTH, AMOS J | ADDRESS ON FILE |
| FOSTER, ANISSA | ADDRESS ON FILE |
| FOSTER, JACKSON K | ADDRESS ON FILE |
| FRANCO, JORGE C | ADDRESS ON FILE |
| FRANKS, BOBBY LEWIS | ADDRESS ON FILE |
| FREDERICK, RALPH (RANDY) A, III | ADDRESS ON FILE |
| FREDERICKS, RAYMOND C | ADDRESS ON FILE |
| FREDERICKS, RAYMOND CHARLES | ADDRESS ON FILE |
| FREDRICK, JERRY | ADDRESS ON FILE |
| FREEMAN, MONDO | ADDRESS ON FILE |
| FREEMAN, PATRICK J | ADDRESS ON FILE |
| FREEMAN, PATRICK J | ADDRESS ON FILE |
| FRITH, BARBARA | ADDRESS ON FILE |
| FRONTCZAK, ERIC | ADDRESS ON FILE |
| FUENTES, ROBERT | ADDRESS ON FILE |
| FURMANEK, TOM | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| FURROW, EUGENE | ADDRESS ON FILE |
| GABBARD, DARRELL | ADDRESS ON FILE |
| GARCIA, CHRISTINA | ADDRESS ON FILE |
| GARCIA, CHRISTINA | ADDRESS ON FILE |
| GARCIA, FRANK | ADDRESS ON FILE |
| GARCIA, FRANK | ADDRESS ON FILE |
| GARCIA, GUSTAVO | ADDRESS ON FILE |
| GARCIA, JAVIER | ADDRESS ON FILE |
| GARCIA, SELENA | ADDRESS ON FILE |
| GARCIA, SERGIO | ADDRESS ON FILE |
| GARDNER, SCOTT | ADDRESS ON FILE |
| GARDNER, VICTOR | ADDRESS ON FILE |
| GARNER, RICHARD | ADDRESS ON FILE |
| GARNER, RICHARD | ADDRESS ON FILE |
| GARRETT, RUSSELL E | ADDRESS ON FILE |
| GAUKER, GLENN JR | ADDRESS ON FILE |
| GILLES, AROLD JEAN | ADDRESS ON FILE |
| GILLESPIE, STEVE | ADDRESS ON FILE |
| GONZALES, CHRISTOPHER A | ADDRESS ON FILE |
| HARPER, MICHAEL RAY | ADDRESS ON FILE |
| HEGEWALD, DAVID | ADDRESS ON FILE |
| HERNANDEZ, JERRY | ADDRESS ON FILE |
| HEYSER, MIKE | ADDRESS ON FILE |
| HILL, AMBER | ADDRESS ON FILE |
| HRABNICKY, ANGELA | ADDRESS ON FILE |
| IAMAW | C/O THE PREVIANT LAW FIRM SC ATTN EMMA M WOODS 310 W WINSCONSIN AVE, STE 100MW MILWAUKEE WI 53203 |
| IBT AND TNFINC | C/O THE PREVIANT LAW FIRM SC ATTN EMMA M WOODS 310 W WISCONSIN AVE, STE 100 MW MILWAUKEE WI 53203 |
| IBT AND TNFINC | THE PREVIANT LAW FIRM, S.C. C/O EMMA M. WOODS 310 W WISCONSIN AVE SUITE 100 MW MILWAUKEE WI 53203 |
| INT'L ASSN. MOTOR CITY MCH. PENSION FUND | C/O NOVARA LAW ATTN PAUL M NEWCOMER 888 W. BIG BEAVER RD, STE 600 TROY MI 48084 |
| INT'L ASSN. MOTOR CITY MCH. WELFARE FUND | C/O NOVARA LAW ATTN PAUL M NEWCOMER 888 W BIG BEAVER RD, STE 600 TROY MI 48084 |
| JOHNSON, TROY | ADDRESS ON FILE |
| JONES, JOSEPH S, JR | ADDRESS ON FILE |
| KAPPEL, AMY | ADDRESS ON FILE |
| KRAGT, AARON | ADDRESS ON FILE |
| LEE, ROBERT | ADDRESS ON FILE |
| LOPEZ LEMUS, JULIO ERNESTO | ADDRESS ON FILE |
| MAY, SHANNON | ADDRESS ON FILE |
| MAYES, GALEN | ADDRESS ON FILE |
| MCDONNELL, CHRIS | ADDRESS ON FILE |
| MID-JERSEY TRUCKING INDUSTRY | C/O BRADY M CONNAUGHTON, ESQ 669 RIVER DR, STE 125 ELMWOOD PARK NJ 07407 |
| MID-JERSEY TRUCKING INDUSTRY AND | C/O BRADY M CONNAUGHTON, ESQ 669 RIVER DR, STE 125 ELMWOOD PARK NJ 07407 |
| MILNE, THOMAS | ADDRESS ON FILE |
| NADEAU, DAWN E | ADDRESS ON FILE |
| NADEAU, DAWN E | ADDRESS ON FILE |
| NEW YORK STATE DEPARTMENT OF LABOR | 1220 WASHINGTON AVE, RM 509 ALBANY NY 12226 |

| Claim Name | Address Information |
|---|---|
| NORTH, ROBERT | ADDRESS ON FILE |
| NY STATE TEAMSTERS COUNCIL H&H FUND | C/O PARAVATI, KARL, GREEN & DEBELLA LLP ATTN VINCENT M DEBELLA, ESQ 520 SENECA ST, STE 105 UTICA NY 13501 |
| NY STATE TEAMSTERS COUNCIL H&H FUND | C/O PARAVATI, KARL, GREEN & DEBELLA LLP ATTN VINCENT M DEBELLA, ESQ 520 SENECA ST, STE 105 UTICA NY 13502 |
| ORTLIEB, KEITH | ADDRESS ON FILE |
| PADILLA, JAIME DIAZ | ADDRESS ON FILE |
| PEREZ, JORDAN | ADDRESS ON FILE |
| PERNAS, NOEL | ADDRESS ON FILE |
| PFAU, SALLY | ADDRESS ON FILE |
| PHIPPIN, THOMAS | ADDRESS ON FILE |
| PICHEL, CONRADO | ADDRESS ON FILE |
| PITTMAN, SANDRA | ADDRESS ON FILE |
| POWELL, JAMES | ADDRESS ON FILE |
| RADICH, TIMOTHY | ADDRESS ON FILE |
| REDAROWICZ, TIMOTHY | ADDRESS ON FILE |
| ROBERSON, ROBBIE L | ADDRESS ON FILE |
| ROBERSON, ROBBIE L | ADDRESS ON FILE |
| ROBERTS, BRYANT | ADDRESS ON FILE |
| RODRIGUEZ, AMAURY R | ADDRESS ON FILE |
| RUIZ, CARLOS FLORES | ADDRESS ON FILE |
| SACHA, JOSIAH | ADDRESS ON FILE |
| SANTORO, GENEVIEVE | ADDRESS ON FILE |
| SENA, GRACE | ADDRESS ON FILE |
| SHANNON, DAVID | ADDRESS ON FILE |
| SHERMAN, CANDICE A | ADDRESS ON FILE |
| SMITH, CHARLES GREYSON | ADDRESS ON FILE |
| SMITH, SAMMIE | ADDRESS ON FILE |
| TEAMSTERS LOCAL 170 HEALTH & | WELFARE FUND ATTN RAYMOND J REED 330 SW CUTOFF, STE 202 WORCESTER MA 01604 |
| TEAMSTERS LOCAL 170 HEALTH & | RAYMOND J REED FUND COUNSEL/ADMINISTRATOR TEAMSTER 170 HEALTH & WELFARE FUND 330 SW CUTOFF STE 202 WORCESTER MA 01604 |
| TEAMSTERS LOCAL 170 HEALTH & | RAYMOND J REED FUND COUNSEL/ADMINISTRATOR TEAMSTERS 170 HEALTH & WELFARE FUND 330 SW CUTOFF STE 202 WORCESTER MA 01604 |
| TEAMSTERS LOCAL 170 HEALTH & | RAYMOND J REED FUND COUNSEL/ADMINISTRATOR TEAMSTER LOCAL 170 HEALTH & WELFARE FUND 330 SW CUTOFF STE 202 WORCESTER MA 01604 |
| TEAMSTERS LOCAL 170 HEALTH & | RAYMOND J REED FUND COUNSEL/ADMINISTRATOR TEAMSTERS LOCAL 170 HEALTH & WELFA[MORE] 330 SW CUTOFF, STE. 202 WORSTER MA 01604 |
| TEAMSTERS LOCAL 701 | C/O BRADY M CONNAUGHTON, ESQ 669 RIVER DR, STE 125 ELMWOOD PARK NJ 07407 |
| TEAMSTERS LOCAL 710 | 9000 W 187TH ST MOKENA IL 60448 |
| TEAMSTERS LOCAL 710 | TEAMSTERS LOCAL 710 ATTN PHILIP REAMS, TRUSTEE/BUSINESS AGENT 9000 W 187TH ST MOKENA IL 60448 |
| TEAMSTERS LOCAL 710 HEALTH & WELFARE FND | C/O WILLIG WILLIAMS & DAVIDSON ATTN JAMES S BEALL, ESQ 1845 WALNUT ST, 24TH FL PHILADELPHIA PA 19103 |
| TEAMSTERS LOCAL 710 HEALTH & WELFARE FND | C/O GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL, ESQ 1201 N ORANGE ST, STE 300 WILMINGTON DE 19801 |
| TEAMSTERS LOCAL 710 HEALTH & WELFARE FND | GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL, ESQ 1201 N ORANGE ST, STE 300 WILMINGTON DE 19801 |
| TEAMSTERS LOCAL 710 HEALTH & WELFARE FND | ATTN MICHAEL O'MALLEY, ADMINISTRATOR 9000 W 187THST, STE 200 MOKENA IL 60448 |
| TEAMSTERS LOCAL 710 HEALTH & WELFARE FND | ATTN MICHAEL O'MALLEY, ADMINISTRATOR 9000 W 187TH ST, STE1200 PHILADELPHIA PA 60448 |

| Claim Name | Address Information |
|---|---|
| TEAMSTERS LOCAL 710 PENSION FUND | C/O WILLIG WILLIAMS & DAVIDSON ATTN JAMES S BEALL, ESQ 1845 WALNUT ST, 24TH FL PHILADELPHIA PA 19103 |
| TEAMSTERS LOCAL 710 PENSION FUND | GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL, ESQ 1201 N ORANGE ST, STE 300 WILMINGTON DE 19801 |
| TEAMSTERS LOCAL 710 PENSION FUND | C/O GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL, ESQ 1201 N ORANGE ST, STE 300 WILMINGTON DE 19801 |
| TEAMSTERS LOCAL 710 PENSION FUND | ATTN MICHAEL O'MALLEY, ADMINISTRATOR 9000 W 187TH ST, STE 200 MOKENA IL 60448 |
| TEAMSTERS LOCAL UNION 560 | C/O BRADY M CONNAUGHTON, ESQ 669 RIVER DR, STE 125 ELMWOOD PARK NJ 07407 |
| TORRES, VIDAL | ADDRESS ON FILE |
| TORRES, VIDAL | ADDRESS ON FILE |
| TORRES, VIDAL | ADDRESS ON FILE |
| TORRES, VIDAL | ADDRESS ON FILE |
| TOSO, MICHAEL | ADDRESS ON FILE |
| UNDERKOFFLER, MICHAEL | ADDRESS ON FILE |
| WEDEL, RYAN | ADDRESS ON FILE |
| WESTERN PA TEAMSTERS PENSION FUND | ATTN VINCENT P SZELIGO, ESQ 900 PARISH ST, STE 101 PITTSBURGH PA 15220 |
| WESTERN PA TEAMSTERS PENSION FUND | C/O VINCENT P SZELIGO, ESQ 900 PARISH ST, STE 101 PITTSBURGH PA 15220 |
| WESTERN PA TEAMSTERS PENSION FUND | ATTN VINCENT P SZELIGO, ESQ 900 PARISH ST, STE 101 PO BOX 223604 PITTSBURGH PA 15220 |
| WHITE, ARTHUR | ADDRESS ON FILE |
| WI DEPT OF WORKFORCE DEVELOPMENT ERD | ATTN MATTHEW WHITE, DIRECTOR, ERD 201 E WASHINGTON AVE, A100 MADISON WI 53703 |
| WI DEPT OF WORKFORCE DEVELOPMENT ERD | ATTN MICHAEL D MORRIS, AAG 17 W MAIN PO BOX 7857 MADISON WI 53707 |
| WRIGHT, ARTHUR | ADDRESS ON FILE |
| XIDES, NICK | ADDRESS ON FILE |
| ZEIGLER, KENNETH | ADDRESS ON FILE |

**Total Creditor count  536**

**EXHIBIT H**

Yellow Corporation, *et al.*,  Case No. 23-11069 (CTG)
Electronic Mail Master Service List

| NAME | ATTN | EMAIL ADDRESS |
|------|------|---------------|
| ABERNATHY ROEDER BOYD & HULLETT PC | ATTN PAUL M LOPEZ; LARRY R BOYD; EMILY M HAHN | plopez@abernathy-law.com; bankruptcy@abernathy-law.com; ehahn@abernathy-law.com |
| ACAR LEASING LTD D/B/A GM FINANCIAL LEASING | ATTN LORENZO NUNEZ | leasesvcbnkrpcy@gmfinancial.com |
| AIS PORTFOLIO SERVICES CORP | ATTN ALLY BANK DEPT | ecfnotices@aisinfo.com |
| AKERMAN LLP | ATTN MARK S. LICHTENSTEIN | mark.lichtenstein@akerman.com |
| AKIN GUMP STRAUSS HAUER & FELD LLP | ATTN PHILIP C. DUBLIN; MEREDITH A. LAHAIE; KEVIN ZUZOLO | pdublin@akingump.com; mlahaie@akingump.com; kzuzolo@akingump.com |
| ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP | ATTN MICHAEL S GREGER | mgreger@allenmatkins.com |
| ALTER DOMUS PRODUCTS CORP. | ATTN LEGAL DEPT, E. PAPPAS & C CAPEZUTI | legal_agency@alterdomus.com; emily.ergangpappas@alterdomus.com; cpcagency@alterdomus.com |
| ARNOLD & PORTER KAYE SCHOLER LLP | ATTN BENJAMIN MINTZ | benjamin.mintz@arnoldporter.com |
| ARNOLD & PORTER KAYE SCHOLER LLP | ATTN ROSA EVERGREEN | rosa.evergreen@arnoldporter.com |
| ARNOLD & PORTER KAYE SCHOLER LLP | ATTN MICHAEL MESSERSMITH | michael.messersmith@apks.com |
| ASHBY & GEDDES PA | ATTN MICHAEL D DEBAECKE | mdebaecke@ashbygeddes.com |
| ASHBY & GEDDES PA | ATTN GREGORY A. TAYLOR | gtaylor@ashbygeddes.com |
| ASHBY & GEDDES PA | ATTN DON A BESKRONE | dbeskrone@ashbygeddes.com |
| BAKER & HOSTETLER LLP | ATTN JEFFREY J LYONS; ELIZABETH A GREEN; JORIAN L ROSE; JIMMY D PARRISH | jjlyons@bakerlaw.com; egreen@bakerlaw.com; orlbankruptcy@bakerlaw.com; jrose@bakerlaw.com; jparrish@bakerlaw.com |
| BALLARD SPAHR LLP | ATTN LESLIE C HEILMAN; LAUREL D ROGLEN; NICHOLAS J BRANNICK; MARGARET A VESPER | heilmanl@ballardspahr.com; roglenl@ballardspahr.com; brannickn@ballardspahr.com; vesperm@ballardspahr.com |
| BEAL BANK USA | | commercialloans@bealbank.com |
| BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP | ATTN JENNIFER R. HOOVER; KEVIN M. CAPUZZI; JOHN C. GENTILE | jhoover@beneschlaw.com; kcapuzzi@beneschlaw.com; jgentile@beneschlaw.com |
| BIELLI & KLAUDER LLC | ATTN DAVID M KLAUDER; MELISSA M HARTLIPP | dklauder@bk-legal.com |
| BIFFERATO FIRM PA | ATTN IAN CONNOR BIFFERATO | cbifferato@tbf.legal |
| BINGAMAN HESS COBLENTZ & BELL | ATTN THOMAS A ROTHERMEL | tarothermel@bingamanhess.com |
| BNSF RAILWAY COMPANY | JILL RUGEMA | jill.rugema@bnsf.com |
| BROWN McGARRY NIMEROFF LLC | ATTN: JAMI B. NIMEROFF | jnimeroff@bmnlawyers.com |
| BRYAN CAVE LEIGHTON PAISNER LLP | ATTN LAURENCE M FAZEN; JARRET HITCHINGS | larry.frazen@bclplaw.com; jarret.hitchings@bclplaw.com |
| BUCHANAN INGERSOLL & ROONEY | ATTN GEOFFREY G GRIVNER; KODY M SPARKS; TIMOTHY P PALMER | geoffrey.grivner@bipc.com; kody.sparks@bipc.com; timothy.palmer@bipc.com |
| MONTGOMERY MCCRACKEN WALKER & RHOADS LLP | ATTN MARC J PHILLIPS | mphillips@mmwr.com |
| CAVA LAW LLC | ATTN JESUS SANTIAGO | jesus@cavalegal.com |
| CENTRAL STATES FUNDS | ATTN BRAD R BERLINER; ANDREW J HERINK; DANIEL SULLIVAN | bberliner@centralstatesfunds.org; aherink@centralstatesfunds.org; dsulliva@centralstatesfunds.org |
| CENTRAL STATES PENSION | | bberline@centralstatesfunds.org |
| CHAFFETZ LINDSEY LLP | ATTN ALAN J LIPKIN; ALEX LUPSAIU | alan.lipkin@chaffetzlindsey.com; alex.lupsaiu@chaffetzlindsey.com |
| CHARLES E DORR PC | ATTN CHARLES E DORR | ced@cedpc.com |

Yellow Corporation, *et al.*,  Case No. 23-11069 (CTG)

Electronic Mail Master Service List

| NAME | ATTN | EMAIL ADDRESS |
|------|------|---------------|
| CHIPMAN BROWN CICERO & COLE LLP | ATTN WILLIAM E CHIPMAN, JR; MARK D OLIVERE | chipman@chipmanbrown.com; olivere@chipmanbrown.com |
| CHOATE HALL & STEWART LLP | ATTN KEVIN J SIMARD, JONATHAN D MARSHALL, SETH D MENNILLO, M HAMPTON FOUSHEE | jmarshall@choate.com; smennillo@choate.com; hfoushee@choate.com; ksimard@choate.com |
| CLARK HILL PLC | ATTN KAREN M GRIVNER | kgrivner@clarkhill.com |
| COHEN LEDER MONTALBANO & CONNAUGHTON | ATTN PAUL A MONTALBANO; BRADY M CONNAUGHTON | paul.montalbano@clmc-law.com; brady.connaughton@clmc-law.com |
| COHNE KINGHORN PC | ATTN GEORGE HOFMANN | ghofmann@ck.law |
| COOKSEY TOOLEN GAGE DUFFY & WOOG | ATTN KIM GAGE; RANDALL P MROCZYNSKI | kgage@cookseylaw.com; rmroczynski@cookseylaw.com |
| COUSINS LAW LLC | ATTN SCOTT D COUSINS | scott.cousins@cousins-law.com |
| CROSS & SIMON LLC | ATTN CHRISTOPHER P SIMON | csimon@crosslaw.com |
| DAIMLER TRUCKS NA | JOHN OLEARY, PRESIDENT & CEO | john.oleary@daimler.com; kirstin.abel@daimlertruck.com |
| DEMAYO LAW OFFICES LLP | ATTN ADRIENNE S BLOCKER | ablocker@demayolaw.com |
| DILWORTH PAXSON LLP | ATTN MARTIN J WEIS | mweis@dilworthlaw.com |
| DLA PIPER LLP | ATTN STUART M BROWN; RACHEL EHRLICH ALBANESE | stuart.brown@us.dlapiper.com; rachel.albanese@us.dlapiper.com |
| DISTRICT OF COLUMBIA ATTORNEY GENERAL | ATTN BRIAN L. SCHWALB | oag@dc.gov |
| DOSHI LEGAL GROUP PC | ATTN AMISH R DOSHI | amish@doshilegal.com |
| DUANE MORRIS LLP | ATTN SOMMER L ROSS | slross@duanemorris.com |
| EMMET MARVIN & MARTIN LLP | ATTN THOMAS A PITTA | tpitta@emmetmarvin.com |
| EPSTEIN BECKER & GREEN | ATTN WENDY G MARCARI | wmarcari@ebglaw.com |
| FAEGRE DRINKER BIDDLE & REATH LLP | ATTN BRETT D FALLON; JOSEPH N ARGENTINA, JR | brett.fallon@faegredrinker.com; joseph.argentina@faegredrinker.com |
| FARNAN LLP | ATTN BRIAN E FARNAN; MICHAEL J FARNAN | bfarnan@farnanlaw.com; mfarnan@farnanlaw.com |
| FEINBERG DUMONT & BRENNAN | ATTN MELISSA A BRENNAN | mab@fdb-law.com |
| FONTANEZ, FERNANDO | | EMAIL ADDRESS ON FILE |
| FOX SWIBEL LEVIN & CARROLL | ATTN MARGARET ANDERSON; RYAN SCHULTZ; KENNETH M THOMAS | panderson@foxswibel.com; rschultz@foxswibel.com; kthomas@foxswibel.com |
| GELLERT SCALI BUSENKELL & BROWN LLC | ATTN MICHAEL BUSENKELL; MICHAEL VAN GORDER | mbusenkell@gsbblaw.com; mvangorder@gsbblaw.com |
| GENERAL TEAMSTERS LOCAL 439 | ATTN CATHERINE E HOLZHAUSER | cholzhauser@beesontayer.com |
| GGRM LAW FIRM | ATTN DILLON COIL; RYAN LOOSVELT | dcoil@ggrmlawfirm.com; rloosvelt@ggrmlawfirm.com |
| GRAY ROBINSON PA | ATTN JEFFREY SCHLERF | jeffrey.schlerf@gray-robinson.com |
| GREENBERG TRAURIG LLP | ATTN ANTHONY W CLARK; DENNIS A MELORO | anthony.clark@gtlaw.com; dennis.meloro@gtlaw.com |
| GRIMES & LINEBARGER LLP | ATTN JOHN KENDRICK TURNER | dallas.bankruptcy@lgbs.com |
| GROOM LAW GROUP | ATTN EDWARD MEEHAN; SAMUEL LEVIN | emeehan@groom.com; slevin@groom.com |
| HAYNES AND BOONE LLP | ATTN IAN T PECK; DAVID L STAAB; JORDAN E CHAVEZ | ian.peck@haynesboone.com; david.staab@haynesboone.com; jordan.chavez@haynesboone.com |
| HILLER LAW LLC | ATTN ADAM HILLER | ahiller@adamhillerlaw.com |
| HOGAN LOVELLS | ATTN: RONALD SILVERMAN; ROBERT A RIPIN; CHRISTOPHER R BRYANT | ronald.silverman@hoganlovells.com; robert.ripin@hoganlovells.com; chris.bryant@hoganlovells.com |
| HOLLAND & KNIGHT LLP | ATTN: JOSHUA M. SPENCER | joshua.spencer@hklaw.com; alterdomus@hklaw.com |
| INTERNAL REVENUE SERVICE | | millie.h.agent@irs.gov |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS | ATTN FRED ZUCKERMAN | fzuckerman@teamster.org |
| JACK SHRUM PA | ATTN J JACKSON SHRUM | jshrum@jshrumlaw.com |

Yellow Corporation, *et al.,*   Case No. 23-11069 (CTG)
Electronic Mail Master Service List

| NAME | ATTN | EMAIL ADDRESS |
|---|---|---|
| JACOBY & MEYERS LLP | ATTN SHANE HAPUARACHY; ALICIA CURRAN | shapuarachy@jacobyandmeyers.com; acurran@jacobyandmeyers.com |
| JAVERBAUM WURGAFT HICKS KAHN WIKSTROM & SININS PC | ATTN RAYMOND M PATELLA | rpatella@lawjw.com |
| KELLLEY DRYE & WARREN | ATTN ROBERT L LEHANE; RICHARD GAGE; STEVEN YACHIK | KDWBankruptcyDepartment@kelleydrye.com; rlehane@kelleydrye.com; rgage@kelleydrye.com; syachik@kelleydrye.com |
| KEURIG DR. PEPPER | RICHARD W WARD | rwward@airmail.net |
| KING & SPALDING LLP | ATTN THADDEUS D WILSON; MICHAEL FISHEL | thadwilson@kslaw.com; mfishel@kslaw.com |
| KLEHR HARRISON HARVEY BRANZBURG LLP | ATTN RAYMOND H LEMISCH | rlemisch@klehr.com |
| KLEINBARD LLC | ATTN E DAVID CHANIN | dchanin@kleinbard.com |
| KOHNER MANN & KAILAS SC | ATTN SAMUEL C WISOTZKEY | swisotzkey@kmksc.com |
| KROLL HEINEMAN PTASIEWICZ & PARSONS | ATTN SETH PTASIEWICZ | sptasiewicz@krollfirm.com |
| KYE LAW GROUP, P.C. | ATTN: MATTHEW F. KYE | mkye@kyelaw.com |
| LANE & ADAM PC | ATTN ADAM N NACH | adam.nach@lane-nach.com |
| LAW OFFICES OF JAMES TOBIA LLC | ATTN JAMES TOBIA | jtobia@tobialaw.com |
| LAW OFFICES OF SUSAN E KAUFMAN LLC | ATTN SUSAN E KAUFMAN | skaufman@skaufmanlaw.com |
| LINEBARGER GOGGAN BLAIR & SAMPSON LLP | | sanantonio.bankruptcy@lgbs.com; houston_bankruptcy@lgbs.com; austin.bankruptcy@lgbs.com; dallas.bankruptcy@lgbs.com |
| LIPSON NEILSON PC | ATTN MICHAEL D LIEBERMAN | mlieberman@lipsonneilson.com |
| LOIZIDES PA | ATTN CHRISTOPHER D LOIZIDES | loizides@loizides.com |
| MADDIN HAUSER ROTH & HELLER PC | ATTN DAVID M EISENBERG | deisenberg@maddinhauser.com |
| MARICOPA COUNTY ATTORNEY'S OFFICE | ATTN PETER MUTHIG | muthigk@mcao.maricopa.gov |
| MCCARTER & ENGLISH LLP | ATTN KATE ROGGIO BUCK; JOSEPH LUBERTAZZI, JR; SHEILA E CALELLO; WILLIAM F TAYLOR, JR; SHANNON D HUMISTON | kbuck@mccarter.com; jlubertazzi@mccarter.com; scalello@mccarter.com; wtaylor@mccarter.com; shumiston@mccarter.com |
| MCCREARY VESELKA BRAGG & ALLEN PC | ATTN JULIE ANNE PARSONS | jparsons@mvbalaw.com |
| MCELROY DEUTSCH MULVANEY & CARPENTER LLP | ATTN DAVID P PRIMACK | dprimack@mdmc-law.com |
| MICHELIN NORTH AMERICA INC | ATTN BRIAN GUTBROD | brian.gutbrod@michelin.com |
| MILBANK LLP | ATTN: DENNIS F. DUNNE & MATTHEW L. BROD | ddunne@milbank.com; mbrod@milbank.com |
| MORRIS NICHOLS ARSHT & TUNNEL LLP | ATTN CURTIS S MILLER; MATTHEW B HARVEY; JONATHAN M WEYAND | cmiller@morrisnichols.com; mharvey@morrisnichols.com; jweyand@morrisnichols.com |
| MUNSCH HARDT KOPF & HARR PC | ATTN DEBORAH M PERRY | dperry@munsch.com |
| MYERS & MYERS PLLC | ATTN REBECCA JS CASSELL | rcassell@myers2law.com |
| NATIONAL LABOR RELATIONS BOARD | ATTN STEVEN CARLSON | steven.carlson@nlrb.gov |
| NEW YORK STATE TEAMSTERS PENSION & HEALTH FUNDS | ATTN KENNNETH R STILWELL | krgstil@nytfund.org |
| NORTON ROSE FULBRIGHT US LLP | ATTN REBECCA J. WINTHROP | rebecca.winthrop@nortonrosefulbright.com |
| OFFICE OF THE UNITED STATES ATTORNEY | | usade.ecfbankruptcy@usdoj.gov; ellen.slights@usdoj.gov |
| OFFICE OF THE US TRUSTEE | | ustrustee.program@usdoj.gov; jane.m.leamy@usdoj.gov |
| OFFIT KURMAN PA | ATTN BRIAN J MCLAUGHLIN | brian.mclaughlin@offitkurman.com |

Yellow Corporation, *et al.*,  Case No. 23-11069 (CTG)

Electronic Mail Master Service List

| NAME | ATTN | EMAIL ADDRESS |
|------|------|---------------|
| OKLAHOMA COUNTY TREASURER | ATTN TAMMY JONES | tammy.jones@oklahomacounty.org |
| OSLER HOSKIN & HARCOURT LLP | ATTN TRACY SANDLER; KATHRYN ESAW | tsandler@osler.com; kesaw@osler.com |
| PACHULSKI STANG ZIEHL & JONES LLP | ATTN PETER J KEANE | pkeane@pszjlaw.com |
| PARAVATI KARL GREEN & DEBELLA LLP | ATTN VINCENT M DEBELLA | vdebella@pkgdlaw.com |
| PASHMAN STEIN WALDER HAYDEN | ATTN JOSEPH C BARSALONA II | jbarsalona@pashmanstein.com |
| PENNSYLVANIA DEPARTMENT OF LABOR & INDUSTRY | ATTN RYAN STARNOWSKY | ra-li-ucts-bankrupt@state.pa.us |
| PENSION BENEFIT GUARANTY CORPORATION | REBECCA STARK; ANDREW PHILIP WALKER; DESIREE M AMADOR; STEPHANIE THOMAS; JOHN HOLLAND GINSBERG; BENJAMIN KELLY | stark.rebecca@pbgc.gov; efile@pbgc.gov; serspinski.sven@pbgc.gov; hristova.donika@pbgc.gov; amador.desiree@pbgc.gov; thomas.stephanie@pbgc.gov; ginsberg.john@pbgc.gov; kelly.benjamin@pbgc.gov |
| PERDUE BRANDON FIELDER COLLINS & MOTT LLP | ATTN LAURA J MONROE | lmbkr@pbfcm.com |
| PIERSON FERDINAND LLP | ATTN CARL NEFF; MAURA BURKE | carl.neff@pierferd.com; maura.burke@pierferd.com |
| POLSINELLI PC | ATTN CHRISTOPHER A WARD; KATHERINE M DEVANNEY; MICHAEL V DIPIETRO | cward@polsinelli.com; kdevanney@polsinelli.com; mdipietro@polsinelli.com |
| POTTER ANDERSON & CORROON LLP | ATTN L KATHERINE GOOD; MARIA KOTSIRAS | kgood@potteranderson.com; mkotsiras@potteranderson.com |
| PREVIANT LAW FIRM SC, THE | ATTN FREDERICK PERILLO; JILL M HARTLEY; EMMA M WOODS | fp@previant.com; jh@previant.com; emw@previant.com |
| PULLMAN & COMLEY LLC | ATTN KRISTIN B MAYHEW | kmayhew@pullman.com |
| QUINN EMANUEL URQUHART & SULLIVAN LLP | ATTN SUSHEEL KIRPALANI; ERIC WINSTON | susheelkirpalani@quinnemanuel.com; ericwinston@quinnemanuel.com |
| RAINES FELDMAN LITTRELL LLP | ATTN DAVID S FORSH | dforsh@raineslaw.com |
| RFT LOGISTICS LLC | CHRISTOPHER MEJIA, CEO | truckload@rftlogistics.com; chris.mejia@rftlogistics.com |
| RAISNER ROUPINIAN LLP | ATTN JACK A RAISNER; RENE S ROUPINIAN; ARMANDO RIVERA | jar@raisnerroupinian.com; rsr@raisnerroupinian.com; rsr@raisnerroupinian.com |
| REED SMITH LLP | ATTN KURT F GWYNNE; MARK W ECKARD | kgwynne@reedsmith.com; meckard@reedsmith.com |
| REGER RIZZO & DARNALL | ATTN LOUIS J RIZZO | lrizzo@regerlaw.com |
| RICHARDS LAYTON & FINGER PA | ATTN MARK D COLLINS, JOHN H KNIGHT, DAVID T QUEROLI, ALEXANDER R STEIGER | collins@rlf.com; knight@rlf.com; queroli@rlf.com; steiger@rlf.com |
| ROBINSON & COLE LLP | ATTN JAMIE L EDMONSON; KATHERINE S DUTE | jedmonson@rc.com; kdute@rc.com |
| ROCK ISLAND COUNTY TREASURER | ATTN AUSTIN CARLSON | carlsona@rockislandcountyil.gov |
| ROPES & GREY | ATTN NATASHA HWANGO; LUKE SMITH | natasha.hwangpo@ropesgray.com; luke.smith@ropesgray.com |
| ROSNER LAW GROUP LLC | ATTN FREDERICK B ROSNER | rosner@teamrosner.com |
| S&D LAW | ATTN MICHAEL L SCHLEPP, ESQ | mschlepp@s-d.com |
| SALDUTTI LAW GROUP | ATTN ROBERT L SALDUTTI; REBECCA K MCDOWELL | rsaldutti@slgcollect.com; rmcdowell@slgcollect.com |

Yellow Corporation, *et al.*,   Case No. 23-11069 (CTG)
Electronic Mail Master Service List

| NAME | ATTN | EMAIL ADDRESS |
|---|---|---|
| SANDBERG PHOENIX & VON GONTARD | ATTN SHARON L STOLTE | sstolte@sandbergphoenix.com |
| SAUDER SCHELKOPF LLC | ATTN JOSEPH G SAUDER; JOSEPH B KENNEY | jgs@sstriallawyers.com; jbk@sstriallawyers.com |
| SECURITIES & EXCHANGE COMMISSION | ATTN ANDREW CALAMARI, REGIONAL DIRECTOR | nyrobankruptcy@sec.gov |
| SEYFARTH SHAW LLP | ATTN JAMES B SOWKA | jsowka@seyfarth.com |
| SORENSON VAN LEUVEN PLLC | ATTN JAMES E SORENSON | bk@svllaw.com |
| SPOTTS FAIN PC | ATTN NEIL E MCCULLAGH | nmccullagh@spottsfain.com |
| STATE OF ALASKA ATTORNEY GENERAL | ATTN TREG TAYLOR | attorney.general@alaska.gov |
| STATE OF AMERICAN SAMOA ATTORNEY GENERAL | ATTN FAINU'ULELEI FALEFATU ALA'ILIMAUTU | ag@la.as.gov |
| STATE OF ARIZONA ATTORNEY GENERAL | ATTN KRIS MAYES | aginfo@azag.gov |
| STATE OF ARKANSAS ATTORNEY GENERAL | ATTN TIM GRIFFIN | oag@arkansasag.gov |
| STATE OF COLORADO ATTORNEY GENERAL | ATTN PHIL WEISER | attorney.general@coag.gov |
| STATE OF CONNECTICUT ATTORNEY GENERAL | ATTN WILLIAM TONG | attorney.general@ct.gov |
| STATE OF DELAWARE ATTORNEY GENERAL | ATTN KATHY JENNINGS | attorney.general@delaware.gov |
| STATE OF GEORGIA ATTORNEY GENERAL | ATTN CHRIS CARR | agcarr@law.ga.gov |
| STATE OF HAWAII ATTORNEY GENERAL | ATTN ANN E LOPEZ | hawaiiag@hawaii.gov |
| STATE OF IOWA ATTORNEY GENERAL | ATTN BRENNA BIRD | webteam@ag.iowa.gov |
| STATE OF LOUISIANA ATTORNEY GENERAL | ATTN JEFF LANDRY | constituentservices@ag.louisiana.gov |
| STATE OF LOUISIANA ATTORNEY GENERAL | ATTN JEFF LANDRY | constituentservices@ag.louisiana.gov |
| STATE OF MAINE ATTORNEY GENERAL | ATTN AARON FREY | attorney.general@maine.gov |
| STATE OF MARYLAND ATTORNEY GENERAL | ATTN ATHONY G. BROWN | oag@oag.state.md.us |
| STATE OF MASSACHUSETTS ATTORNEY GENERAL | ATTN ANDREA JOY CAMPBELL | ago@state.ma.us |
| STATE OF MICHIGAN ATTORNEY GENERAL | ATTN DANA NESSEL; JEANMARIE MILLER | miag@michigan.gov; millerj51@michigan.gov |
| STATE OF NEW YORK ATTORNEY GENERAL; ENVIRONMENTAL PROTECTION BUREAU | ATTN STEVE H NGUYEN; STEPHEN M NAGLE | steve.nguyen@ag.ny.gov; stephen.nagle@ag.ny.gov |
| STATE OF OHIO ATTORNEY GENERAL | ATTN KRISTIN RADWANICK | kristin.radwanick@ohioago.gov |
| STEVENS & LEE PC | ATTN JOSEPH H HUSTON, JR; JOHN C KILGANNON | joseph.huston@stevenslee.com; john.kilgannon@stevenslee.com |
| STRADLEY RONON STEVENS & YOUNG LLP | ATTN JULIE M MURPHY | jmmurphy@stradley.com |
| STREUSAND LANDON OZBURN & LEMMON LLP | ATTN SABRINA L STREUSAND | streusand@slollp.com |
| SULLIVAN HAZELTINE ALLINSON | ATTN WILLIAM D SULLIVAN; WILLIAM A HAZELTINE; ELIHU E ALLINSON | bsullivan@sha-llc.com; whazeltine@sha-llc.com; zallinson@sha-llc.com |
| SUSSMAN SHANK LLP | ATTN GARRETT S EGGEN | geggen@sussmanshank.com |
| SWEETBAUM MILLER PC | ATTN ALAN D SWEETBAUM | asweetbaum@sweetbaumlaw.com |
| TENNESSEE ATTORNEY GENERAL'S OFFICE | ATTN JONATHAN SKRMETTI | agbankdelaware@ag.tn.gov |

Yellow Corporation, *et al.*, Case No. 23-11069 (CTG)
Electronic Mail Master Service List

| NAME | ATTN | EMAIL ADDRESS |
|---|---|---|
| TEXAS ATTORNEY GENERAL | ATTN SEAN T FLYNN; LAYLA D MILLIGAN | sean.flynn@oag.texas.gov; layla.milligan@oag.texas.gov |
| TEXAS COMPTROLLER | ATTN KIMBERLY A WALSH, ASST ATTORNEY GENERAL | kimberly.walsh@oag.texas.gov |
| THE BANK OF NEW YORK MELLON | ATTN HECTOR HERRERA | hector.herrera@bnymellon.com; ust.cares.program@bnymellon.com |
| THOMPSON HINE LLP | ATTN SEAN A GORDON; AUSTIN B ALEXANDER | sean.gordon@thompsonhine.com; austin.alexander@thompsonhine.com |
| THOMPSON O'BRIEN | ATTN MICHAEL B PUGH | mpugh@tokn.com |
| TRAVIS COUNTY | ATTN JASON A STARKS | jason.starks@traviscountytx.gov |
| U.S. DEPARTMENT OF JUSTICE | | millie.h.agent@irs.gov; i-heng.hsu@usdoj.gov; crystal.geise@usdoj.gov |
| UNION PACIFIC RAILROAD | ATTN CHRISTINE A. NEUHARTH; LILA L. HOWE | bankruptcynotices@up.com |
| VINSON & ELKINS LLP | ATTN BRADLEY FOXMAN; SARA ZOGLMAN | bfoxman@velaw.com; szoglman@velaw.com |
| WELTMAN WEINBERG & REIS CO LPA | ATTN SCOTT D FINK | sfink@weltman.com; bronationalecf@weltman.com |
| WISCONSIN DEPARTMENT OF JUSTICE | ATTN MICHAEL D MORRIS | morrismd@doj.state.wi.us |
| WHITE & CASE LLP | ATTN SCOTT GREISSMAN; ANDREW ZATZ; ELIZABETH FELD; JZAKIA@WHITECASE.COM | sgreissman@whitecase.com; azatz@whitecase.com; efeld@whitecase.com; jzakia@whitecase.com |
| WHITE & WILLIAMS LLP | ATTN AMY E VULPIO; MICHAEL A INGRASSIA | vulpioa@whiteandwilliams.com; ingrassiam@whiteandwilliams.com |
| WHITEFORD TAYLOR & PRESTON LLP | ATTN MICHAEL J JOESCHENTHALER; DANIEL R SCHIMIZZI; DAVID W GAFFEY; DAVID B STRATTON; RICHARD W RILEY | mroeschenthaler@whitefordlaw.com; dschimizzi@whitefordlaw.com; dgaffey@whitefordlaw.com; dstratton@whitefordlaw.com; rriley@whitefordlaw.com |
| WILSON SONSINI GOODRICH & ROSATI PC | ATTN ERIN R FAY; CATHERINE C LYONS | efay@wsgr.com; clyons@wsgr.com |
| WOMBLE BOND DICKINSON LLP | ATTN JAMES S LIVERMON, III; KEVIN J MANGAN | charlie.livermon@wbd-us.com; kevin.mangan@wbd-us.com |
| ZINDA LAW GROUP LLC | ATTN COLE GUMM | cole@zindalaw.com |

**EXHIBIT I**

| Claim Name | Address Information |
|---|---|
| GARY, MICHAEL | ADDRESS ON FILE |
| GARZA, LEONARDO | ADDRESS ON FILE |
| GAWRON, STEPHEN | ADDRESS ON FILE |
| GEARING, DIAMOND | ADDRESS ON FILE |
| GEEDEY, STEVEN | ADDRESS ON FILE |
| GERMAN, ZERMENO | ADDRESS ON FILE |
| GESFORD, COREY | ADDRESS ON FILE |
| GEYER, STEPHEN | ADDRESS ON FILE |
| GILBERT, BRYCE | ADDRESS ON FILE |
| GILLESPIE, LAVETTACU L | ADDRESS ON FILE |
| GILLIAM, AUTURIEO | ADDRESS ON FILE |
| GILLON, CARL S | ADDRESS ON FILE |
| GIPSON, BERNARD | ADDRESS ON FILE |
| GITT-ETTER, JODI | ADDRESS ON FILE |
| GLASS, CORY L | ADDRESS ON FILE |
| GLASS, CORY L | ADDRESS ON FILE |
| GLISSON, KEITH | ADDRESS ON FILE |
| GOBRECHT, THOMAS MARION | ADDRESS ON FILE |
| GOESER, KENNETH | ADDRESS ON FILE |
| GOMEZ, LEONARDO | ADDRESS ON FILE |
| GOMEZ, LUIS | ADDRESS ON FILE |
| GONZALES GAMBOA, ALEXANDER | ADDRESS ON FILE |
| GONZALEZ, JOSE ARMENDARIZ | ADDRESS ON FILE |
| GONZALEZ, WENCE | ADDRESS ON FILE |
| GOODHEER, THOMAS C | ADDRESS ON FILE |
| GORE, TOM | ADDRESS ON FILE |
| GOSSERAND, ANTHONY | ADDRESS ON FILE |
| GRACE, WILLIE JAMES, JR | ADDRESS ON FILE |
| GRADY, CINDY | ADDRESS ON FILE |
| GRADY, CINDY | ADDRESS ON FILE |
| GRADY, JERMAINE S | ADDRESS ON FILE |
| GRADY, JERMAINE S | ADDRESS ON FILE |
| GREEN, JOHN | ADDRESS ON FILE |
| GREENFIELD, DOUGLAS L | ADDRESS ON FILE |
| GREENWOOD, MATTHEW | ADDRESS ON FILE |
| GREER, HARRY, III | ADDRESS ON FILE |
| GREGOLUNAS, JOHN F, JR | ADDRESS ON FILE |
| GREGOLUNAS, JOHN F, JR | ADDRESS ON FILE |
| GREGOR, HARRY | ADDRESS ON FILE |
| GREGOR, HARRY | ADDRESS ON FILE |
| GRIBBEN, ROBERT | ADDRESS ON FILE |
| GRIBBEN, ROBERT | ADDRESS ON FILE |
| GRIBBEN, ROBERT | ADDRESS ON FILE |
| GRIFFIN, BRENTLEY | ADDRESS ON FILE |
| GRINSTON, ANTHONY | ADDRESS ON FILE |
| GROEBEL, BRIAN A | ADDRESS ON FILE |
| GROFF, MICHAEL R | ADDRESS ON FILE |
| GRUBB, DONALD | ADDRESS ON FILE |
| GRUENBERG, JEREMY | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| GUERRERO, JILDARDO | ADDRESS ON FILE |
| HADAWAY, JASON | ADDRESS ON FILE |
| HAIR, JODY | ADDRESS ON FILE |
| HALES, BENJAMIN | ADDRESS ON FILE |
| HALES, BENJAMIN | ADDRESS ON FILE |
| HALWEG, CHARLES R | ADDRESS ON FILE |
| HALWEG, CHARLES R | ADDRESS ON FILE |
| HANSEN, TODD | ADDRESS ON FILE |
| HARDY, ERIC | ADDRESS ON FILE |
| HARNER, ROY D | ADDRESS ON FILE |
| HARPER, ARICO | ADDRESS ON FILE |
| HARRALL, GARY JOE | ADDRESS ON FILE |
| HARRALL, GARY W | ADDRESS ON FILE |
| HARRIS, AHKEEM | ADDRESS ON FILE |
| HARRISON, DANNY | ADDRESS ON FILE |
| HARRISON, GARY | ADDRESS ON FILE |
| HARTMAN, CARL | ADDRESS ON FILE |
| HARTMAN, RANDY R | ADDRESS ON FILE |
| HARVEY, KEVIN | ADDRESS ON FILE |
| HARVEY, REGINALD | ADDRESS ON FILE |
| HAYES, BEARRY | ADDRESS ON FILE |
| HAYNES, STANLEY | ADDRESS ON FILE |
| HAYNES, STANLEY | ADDRESS ON FILE |
| HAYWARD, ANTHONY | ADDRESS ON FILE |
| HAZELWOOD, EMMETT | ADDRESS ON FILE |
| HEATER, ANGELA | ADDRESS ON FILE |
| HEATH, JASON B | ADDRESS ON FILE |
| HECTOR, LOUIS, JR | ADDRESS ON FILE |
| HECTOR, LOUIS, JR | ADDRESS ON FILE |
| HEISEY, ROBERT JR | ADDRESS ON FILE |
| HENDERSON, HALLE | ADDRESS ON FILE |
| HENDERSON, SCOTT S | ADDRESS ON FILE |
| HENDERSON, SCOTT S | ADDRESS ON FILE |
| HENNIS, DENNIS | ADDRESS ON FILE |
| HENNIS, DENNIS | ADDRESS ON FILE |
| HENRY, CORY C | ADDRESS ON FILE |
| HENRY, CORY C | ADDRESS ON FILE |
| HENRY, PAUL A | ADDRESS ON FILE |
| HENSEL, TIMOTHY M | ADDRESS ON FILE |
| HENSEL, TIMOTHY M | ADDRESS ON FILE |
| HERNANDEZ, JORGE | ADDRESS ON FILE |
| HERNANDEZ, JOSE J | ADDRESS ON FILE |
| HERNANDEZ, PABLO | ADDRESS ON FILE |
| HERNANDEZ-LACY, SEAN | ADDRESS ON FILE |
| HERRERA, BRIAN P | ADDRESS ON FILE |
| HERRERA, BRIAN P | ADDRESS ON FILE |
| HERRINGTON, DAVID | ADDRESS ON FILE |
| HERTZOG, RANDY | ADDRESS ON FILE |
| HESSION, ALEX | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| HICKEY, HAROLD | ADDRESS ON FILE |
| HIDA, KHALID | ADDRESS ON FILE |
| HIGAREDA, LUIS E | ADDRESS ON FILE |
| HIGHTOWER, HUSANI | ADDRESS ON FILE |
| HIGHTOWER, HUSANI | ADDRESS ON FILE |
| HILLS, TAS | ADDRESS ON FILE |
| HOBBS, ALICE | ADDRESS ON FILE |
| HOBBS, ALICE | ADDRESS ON FILE |
| HOCH, ROBERT L | ADDRESS ON FILE |
| HOCKENBERRY, BRADLEY A | ADDRESS ON FILE |
| HOERLER, MICHAEL E | ADDRESS ON FILE |
| HOERLER, MICHAEL E | ADDRESS ON FILE |
| HOLEWINSKI, ANDREW | ADDRESS ON FILE |
| HOLLINS, KENNY | ADDRESS ON FILE |
| HOLLIS, AARON | ADDRESS ON FILE |
| HOLLIS, AARON | ADDRESS ON FILE |
| HOLLIS, AARON | ADDRESS ON FILE |
| HOLLON, STEVEN | ADDRESS ON FILE |
| HOLLON, STEVEN | ADDRESS ON FILE |
| HOLT, ROGER K | ADDRESS ON FILE |
| HOMYAK, DANIEL | ADDRESS ON FILE |
| HOOVER, CARL M | ADDRESS ON FILE |
| HORNBAKER, RUSSELL J, JR | ADDRESS ON FILE |
| HOUGH, KERRY | ADDRESS ON FILE |
| HOWARD, JOSHUA | ADDRESS ON FILE |
| HOWARD, REED | ADDRESS ON FILE |
| HOWARD, REED | ADDRESS ON FILE |
| HUBBERT, KARENA | ADDRESS ON FILE |
| HUBBS, MICHAEL | ADDRESS ON FILE |
| HUBERTZ, ROBERT | ADDRESS ON FILE |
| HUDSON, JERRY | ADDRESS ON FILE |
| HUDSON, JERRY | ADDRESS ON FILE |
| HUDSON, STEPHEN, SR | ADDRESS ON FILE |
| HUERTA, CESAR | ADDRESS ON FILE |
| HUERTA, JESUS | ADDRESS ON FILE |
| HUERTA, MARIO | ADDRESS ON FILE |
| HUFF, LEE | ADDRESS ON FILE |
| HUGHES, KEIDRON JERMAINE | ADDRESS ON FILE |
| HUGUNIN, CURTIS | ADDRESS ON FILE |
| HURD, DERON | ADDRESS ON FILE |
| HURD, DERON | ADDRESS ON FILE |
| HURLEY, DARREL | ADDRESS ON FILE |
| HURLEY, DARREL | ADDRESS ON FILE |
| ISBELL, KENNETH D | ADDRESS ON FILE |
| ISIDORO, ANTONIO | ADDRESS ON FILE |
| ISTRE, DANIEL | ADDRESS ON FILE |
| JACKSON, DWIGHT | ADDRESS ON FILE |
| JACKSON, GINA D | ADDRESS ON FILE |
| JACKSON, JAMES W | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| JACKSON, JERRY | ADDRESS ON FILE |
| JACKSON, KYLE | ADDRESS ON FILE |
| JACOBS, BENJAMIN | ADDRESS ON FILE |
| JACOBS, DWIGHT | ADDRESS ON FILE |
| JACOBS, DWIGHT | ADDRESS ON FILE |
| JAMES, GARY | ADDRESS ON FILE |
| JAMES, MARTHA J | ADDRESS ON FILE |
| JAMES, MARTHA J | ADDRESS ON FILE |
| JAMES, NOAH | ADDRESS ON FILE |
| JAMES, RANDY | ADDRESS ON FILE |
| JAMES, ZACHARY | ADDRESS ON FILE |
| JEFFREY, DAVID L | ADDRESS ON FILE |
| JEFFREY, DAVID L | ADDRESS ON FILE |
| JENKINS, DUANE A | ADDRESS ON FILE |
| JENKINS, PHEAR | ADDRESS ON FILE |
| JENSEN, JEFFERY A | ADDRESS ON FILE |
| JENSEN, TRENT | ADDRESS ON FILE |
| JIMENEZ, IAN A | ADDRESS ON FILE |
| JOHANSEN, HENRY AL | ADDRESS ON FILE |
| JOHNSON, DERRELL | ADDRESS ON FILE |
| JOHNSON, DERRELL | ADDRESS ON FILE |
| JOHNSON, EDWARD, JR | ADDRESS ON FILE |
| JOHNSON, JACKIE LEE | ADDRESS ON FILE |
| JOHNSON, JEFFREY S | ADDRESS ON FILE |
| JOHNSON, JOHNNY | ADDRESS ON FILE |
| JOHNSON, MARVIN | ADDRESS ON FILE |
| JOHNSON, MARVIN | ADDRESS ON FILE |
| JOHNSON, SAMUEL | ADDRESS ON FILE |
| JOHNSON, SAMUEL | ADDRESS ON FILE |
| JOHNSON, TIMOTHY | ADDRESS ON FILE |
| JOHNSTON, SHAREE RENEE | ADDRESS ON FILE |
| JOHNSTON, SHAREE RENEE | ADDRESS ON FILE |
| JONES, BRYAN E | ADDRESS ON FILE |
| JONES, CHUCK | ADDRESS ON FILE |
| JONES, GARY WESLY | ADDRESS ON FILE |
| JONES, JAMES F | ADDRESS ON FILE |
| JORDAN, ANTHONY P | ADDRESS ON FILE |
| JORDAN, ANTHONY P | ADDRESS ON FILE |
| JOSEPH, MICHAEL | ADDRESS ON FILE |
| JOYCE, THOMAS | ADDRESS ON FILE |
| JOYCE, THOMAS | ADDRESS ON FILE |
| JUDGE, ALLEN | ADDRESS ON FILE |
| JUDGE, ALLEN | ADDRESS ON FILE |
| KANAGY, REBECCA | ADDRESS ON FILE |
| KARLUK, CHRISTINE D | ADDRESS ON FILE |
| KARR, JON W | ADDRESS ON FILE |
| KASPER, DALE | ADDRESS ON FILE |
| KASPER, DONNA | ADDRESS ON FILE |
| KASPER, RYAN | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| KAUSHAL, VARUN | ADDRESS ON FILE |
| KEEF, ROGER | ADDRESS ON FILE |
| KEEF, ROGER | ADDRESS ON FILE |
| KEITH, KEVIN | ADDRESS ON FILE |
| KELLOGG, DAVID J | ADDRESS ON FILE |
| KELLOGG, DAVID J | ADDRESS ON FILE |
| KELLY, JOHNNY L, JR | ADDRESS ON FILE |
| KELLY, RICHARD A | ADDRESS ON FILE |
| KELLY, RICHARD A | ADDRESS ON FILE |
| KELSHAW, STEVEN | ADDRESS ON FILE |
| KERN, KENNETH | ADDRESS ON FILE |
| KERN, KENNETH | ADDRESS ON FILE |
| KIMMEL, SHARON K | ADDRESS ON FILE |
| KIMMEL, SHARON K | ADDRESS ON FILE |
| KING, ADAM | ADDRESS ON FILE |
| KING, MELODY | ADDRESS ON FILE |
| KINNEY, SHELDON LEE | ADDRESS ON FILE |
| KIRBY, COREY | ADDRESS ON FILE |
| KLINE, KENNETH E, JR | ADDRESS ON FILE |
| KLINE, SCOTT | ADDRESS ON FILE |
| KLINGER, SHAWN M | ADDRESS ON FILE |
| KLINGLER, SHAWN M | ADDRESS ON FILE |
| KNAPP, JOHN | ADDRESS ON FILE |
| KNAPP, JOHN | ADDRESS ON FILE |
| KOCH, KEITH | ADDRESS ON FILE |
| KOEHLER, JOHN | ADDRESS ON FILE |
| KOEHLER, JOHN | ADDRESS ON FILE |
| KOFRON, JOE | ADDRESS ON FILE |
| KOFRON, JOE | ADDRESS ON FILE |
| KOGUT, MARK | ADDRESS ON FILE |
| KOHL, JOHNNY | ADDRESS ON FILE |
| KOHMAN, JAMES L | ADDRESS ON FILE |
| KOLEILAT, MAHER | ADDRESS ON FILE |
| KOLESNIKOV, FEDOR | ADDRESS ON FILE |
| KOLESNIKOV, FEDOR | ADDRESS ON FILE |
| KOTULA, JOHN JOSEPH, JR | ADDRESS ON FILE |
| KOZLOWSKI, MARK A | ADDRESS ON FILE |
| KOZLOWSKI, MARK A | ADDRESS ON FILE |
| KRANZ, LLOYD E | ADDRESS ON FILE |
| KRANZ, LLOYD E | ADDRESS ON FILE |
| KRESEFSKI, RAYMOND B | ADDRESS ON FILE |
| KRISKE, JEFFEREY | ADDRESS ON FILE |
| KROLCZYK, ROBERT | ADDRESS ON FILE |
| KUHN, PAUL A III | ADDRESS ON FILE |
| KULICK, DANIEL C | ADDRESS ON FILE |
| KUNSMAN, JAMES | ADDRESS ON FILE |
| KUNSMAN, JAMES | ADDRESS ON FILE |
| KUSMAN, JOSEPH J | ADDRESS ON FILE |
| LAFFERTY, JAMES J JR | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| LAIRD, BENJAMIN | ADDRESS ON FILE |
| LAIRD, BENJAMIN | ADDRESS ON FILE |
| LAKEBERG, KATHRYN M | ADDRESS ON FILE |
| LAKEBERG, KATHRYN M | ADDRESS ON FILE |
| LAKHAL, RACHID | ADDRESS ON FILE |
| LAMB, CURTIS | ADDRESS ON FILE |
| LAMB, DOUGLASS K | ADDRESS ON FILE |
| LAMB, DOUGLASS K | ADDRESS ON FILE |
| LANG, JOSEPH | ADDRESS ON FILE |
| LARSON, ERIC | ADDRESS ON FILE |
| LAWRENCE, RICK | ADDRESS ON FILE |
| LAWRENCE, RICK | ADDRESS ON FILE |
| LAWRENCE, ROBERT S | ADDRESS ON FILE |
| LAWRENCE, TERRAL | ADDRESS ON FILE |
| LAWS, SCOTT | ADDRESS ON FILE |
| LAZUK, THOMAS | ADDRESS ON FILE |
| LAZUK, THOMAS | ADDRESS ON FILE |
| LEACH, HARVEY J | ADDRESS ON FILE |
| LEASAU, EDWINA | ADDRESS ON FILE |
| LEE, MARCUS | ADDRESS ON FILE |
| LEE, SHAUN | ADDRESS ON FILE |
| LEE, SHAUN | ADDRESS ON FILE |
| LEE, TOBY | ADDRESS ON FILE |
| LEEKS, ERNIE | ADDRESS ON FILE |
| LEEKS, ERNIE | ADDRESS ON FILE |
| LEGARE, REBECCA | ADDRESS ON FILE |
| LEHMAN, JEFFREY | ADDRESS ON FILE |
| LEHMAN, LUKE | ADDRESS ON FILE |
| LEINER, JACOB A | ADDRESS ON FILE |
| LEINER, JACOB A | ADDRESS ON FILE |
| LEMON, JASON | ADDRESS ON FILE |
| LENICH, CHRISTOPHER A | ADDRESS ON FILE |
| LENING, MIKE | ADDRESS ON FILE |
| LENKER, GARY L | ADDRESS ON FILE |
| LEON, BALTAZAR | ADDRESS ON FILE |
| LESTER, SHEILA | ADDRESS ON FILE |
| LEWIS, ALEXIA | ADDRESS ON FILE |
| LEWIS, DEMARCUS | ADDRESS ON FILE |
| LEWIS, JOHN | ADDRESS ON FILE |
| LEWIS, KEVIN | ADDRESS ON FILE |
| LEWIS, KEVIN S | ADDRESS ON FILE |
| LEWIS, MICHAEL | ADDRESS ON FILE |
| LEWIS, MORRIS | ADDRESS ON FILE |
| LEWIS, PETER M. | ADDRESS ON FILE |
| LEWIS, TIMOTHY C | ADDRESS ON FILE |
| LILES, DARRIN | ADDRESS ON FILE |
| LILLY, MARCUS | ADDRESS ON FILE |
| LIPOME, SALVATORE | ADDRESS ON FILE |
| LITZAU, DAVID | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| LIVINGSTON, YUREE | ADDRESS ON FILE |
| LIZAK, DANIEL | ADDRESS ON FILE |
| LIZAK, DANIEL | ADDRESS ON FILE |
| LIZAK, DANIEL | ADDRESS ON FILE |
| LIZAMA, ALEXANDER | ADDRESS ON FILE |
| LIZAMA, ALEXANDER | ADDRESS ON FILE |
| LIZAMA, ALEXANDER | ADDRESS ON FILE |
| LOEVE, JEFF | ADDRESS ON FILE |
| LOGAN. RODNEY | ADDRESS ON FILE |
| LOJKO, RICHARD M | ADDRESS ON FILE |
| LOJKO, RICHARD M | ADDRESS ON FILE |
| LOJKO, RICHARD M | ADDRESS ON FILE |
| LOLLAR, GENE | ADDRESS ON FILE |
| LONG, CRAIG | ADDRESS ON FILE |
| LONG, CRAIG | ADDRESS ON FILE |
| LONG, CRAIG | ADDRESS ON FILE |
| LONGE, JUSTIN | ADDRESS ON FILE |
| LOPER, DOUGLAS | ADDRESS ON FILE |
| LOPEZ, ISREAL | ADDRESS ON FILE |
| LOPEZ, JUAN, JR | ADDRESS ON FILE |
| LOPEZ, JUAN, JR | ADDRESS ON FILE |
| LOPEZ, JUAN, JR | ADDRESS ON FILE |
| LOPEZ, MANUEL, SR | ADDRESS ON FILE |
| LOPEZ, MANUEL, SR | ADDRESS ON FILE |
| LOPEZ, MANUEL, SR | ADDRESS ON FILE |
| LOWE, JACK | ADDRESS ON FILE |
| LOWE, WILEY | ADDRESS ON FILE |
| LOWE, WILEY | ADDRESS ON FILE |
| LUCAS, AARON | ADDRESS ON FILE |
| LUCAS, AARON | ADDRESS ON FILE |
| LUIKEN, NOAH | ADDRESS ON FILE |
| LUMSDEN, JAMES | ADDRESS ON FILE |
| LUNA, CARLOS | ADDRESS ON FILE |
| LUNA, DANIEL | ADDRESS ON FILE |
| LUND, JACLYN | ADDRESS ON FILE |
| MABON, NORMAN | ADDRESS ON FILE |
| MACKEY, PATRICK | ADDRESS ON FILE |
| MACKEY, PATRICK | ADDRESS ON FILE |
| MACKEY, PATRICK | ADDRESS ON FILE |
| MADDEN, THOMAS | ADDRESS ON FILE |
| MADISON, ROBERT | ADDRESS ON FILE |
| MADISON, ROBERT A | ADDRESS ON FILE |
| MAEA, WAYNE | ADDRESS ON FILE |
| MAGALLANES, GUSTAVO | ADDRESS ON FILE |
| MAGGIEFIELD, JACQUINNS | ADDRESS ON FILE |
| MAHER, MICHAEL D | ADDRESS ON FILE |
| MAHL, ARTHUR | ADDRESS ON FILE |
| MAHL, ARTHUR | ADDRESS ON FILE |
| MAHL, ARTHUR | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| MAIER PRZEKWAS, LINDA | ADDRESS ON FILE |
| MALLON, WAYNE P | ADDRESS ON FILE |
| MANAS, WILLIAM | ADDRESS ON FILE |
| MANCUSO, MARK PHIL | ADDRESS ON FILE |
| MANGOLD, BRYAN | ADDRESS ON FILE |
| MANNA, STEVEN | ADDRESS ON FILE |
| MARCHANT, STEPHEN | ADDRESS ON FILE |
| MARKLE, DAVID | ADDRESS ON FILE |
| MARKLE, DAVID L | ADDRESS ON FILE |
| MARNEY, MICHAEL | ADDRESS ON FILE |
| MARTIN, MATTHEW | ADDRESS ON FILE |
| MARTINEZ, ANTONIO | ADDRESS ON FILE |
| MARTINEZ, ERIC | ADDRESS ON FILE |
| MARTINEZ, ERIC | ADDRESS ON FILE |
| MARTORANA, MICHAEL | ADDRESS ON FILE |
| MASI, PHILLIP C | ADDRESS ON FILE |
| MASSARA, ANGELO | ADDRESS ON FILE |
| MASSARA, ANGELO | ADDRESS ON FILE |
| MATOS, MICHAEL | ADDRESS ON FILE |
| MATYASHUK, ALEKSANDR | ADDRESS ON FILE |
| MAURICE, ERIC L | ADDRESS ON FILE |
| MAYFIELD, MARVIN | ADDRESS ON FILE |
| MAYFIELD, WILLIAMD D | ADDRESS ON FILE |
| MAYFIELD, WILLIAMD D | ADDRESS ON FILE |
| MAYFIELD, WILLIAMD D | ADDRESS ON FILE |
| MAYNARD, MICHAEL | ADDRESS ON FILE |
| MCAFEE, WILLIAM | ADDRESS ON FILE |
| MCALLISTER, HARRY J | ADDRESS ON FILE |
| MCCALEB, BRYAN C | ADDRESS ON FILE |
| MCCANN, CHRISTOPHER T | ADDRESS ON FILE |
| MCCARTNEY, MARTIN V IV | ADDRESS ON FILE |
| MCCAULEY, BRIAN DAVID | ADDRESS ON FILE |
| MCCLENDON, DWAIN L | ADDRESS ON FILE |
| MCCLENDON, DWAIN L | ADDRESS ON FILE |
| MCCLOUD, LAWRENCE, III | ADDRESS ON FILE |
| MCCLURE, WILLIAM | ADDRESS ON FILE |
| MCCRAW, WAYNE | ADDRESS ON FILE |
| MCCULLOUGH, VERSHAWN | ADDRESS ON FILE |
| MCCULLOUGH, VERSHAWN | ADDRESS ON FILE |
| MCCULLOUGH, VERSHAWN | ADDRESS ON FILE |
| MCGINTY, ALAN L | ADDRESS ON FILE |
| MCGRATH, SCOTT | ADDRESS ON FILE |
| MCGUIRE, JAMES MICHAEL | ADDRESS ON FILE |
| MCINTYRE, JOHN A | ADDRESS ON FILE |
| MCKARCHEY, CHARLES R JR | ADDRESS ON FILE |
| MCMILLEN, ADAM | ADDRESS ON FILE |
| MCMULLEN, KEVIN J | ADDRESS ON FILE |
| MCNEIL, JOHN | ADDRESS ON FILE |
| MCWHORTER, TIM | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| MEADATH, TYLER C | ADDRESS ON FILE |
| MEDINA, JOSE GUADALUPE | ADDRESS ON FILE |
| MELAND, KEVIN | ADDRESS ON FILE |
| MELAND, KEVIN | ADDRESS ON FILE |
| MELAND, KEVIN | ADDRESS ON FILE |
| MELOY, MARK A | ADDRESS ON FILE |
| MELOY, MARK A | ADDRESS ON FILE |
| MERLINI, THOMAS A | ADDRESS ON FILE |
| MERLINI, THOMAS A | ADDRESS ON FILE |
| MERLINI, THOMAS A | ADDRESS ON FILE |
| MERRILL, RICHARD | ADDRESS ON FILE |
| MERRILL, RICHARD | ADDRESS ON FILE |
| MEWSHAW, KARL | ADDRESS ON FILE |
| MEYERS, THOMAS RICHARD | ADDRESS ON FILE |
| MEYERS, THOMAS RICHARD | ADDRESS ON FILE |
| MIDDLEBROOK, DERRICK | ADDRESS ON FILE |
| MIKHNOVSKY, SERGEY | ADDRESS ON FILE |
| MIKHNOVSKY, SERGEY | ADDRESS ON FILE |
| MILANO, OLGA | ADDRESS ON FILE |
| MILES, HAROLD A JR | ADDRESS ON FILE |
| MILLER, BRIAN | ADDRESS ON FILE |
| MILLER, LARRY K | ADDRESS ON FILE |
| MILLER, LARRY K | ADDRESS ON FILE |
| MILLER, RONNIE | ADDRESS ON FILE |
| MINER, JORDAN | ADDRESS ON FILE |
| MINOR, MICHAEL | ADDRESS ON FILE |
| MIRANDA, CARLOS | ADDRESS ON FILE |
| MIRANDA, CARLOS | ADDRESS ON FILE |
| MISTER, BRIAN KEITH | ADDRESS ON FILE |
| MITCHELL, MICHAEL | ADDRESS ON FILE |
| MOBLEY, TERRELL | ADDRESS ON FILE |
| MOL, WILLIAM J | ADDRESS ON FILE |
| MONTANO, CASTULO | ADDRESS ON FILE |
| MONTEMAYOR, JOSE A | ADDRESS ON FILE |
| MONTEMAYOR, JOSE A | ADDRESS ON FILE |
| MONTEMAYOR, JOSE A | ADDRESS ON FILE |
| MOORE, BRET | ADDRESS ON FILE |
| MOORE, DANIEL | ADDRESS ON FILE |
| MOORE, DANIEL | ADDRESS ON FILE |
| MOORE, KEITH | ADDRESS ON FILE |
| MOORE, RODRICK | ADDRESS ON FILE |
| MORALES, JESUS | ADDRESS ON FILE |
| MORALES, WILFREDO | ADDRESS ON FILE |
| MORENO, JOSE | ADDRESS ON FILE |
| MORGAN, ROBERT | ADDRESS ON FILE |
| MORRIS, ANDRE L | ADDRESS ON FILE |
| MORRIS, GREGORY | ADDRESS ON FILE |
| MORRIS, STEPHEN KENNETH | ADDRESS ON FILE |
| MORRISON, JERRY T | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| MORSUCCI, RUBEN | ADDRESS ON FILE |
| MOSCHINI, MARK | ADDRESS ON FILE |
| MOSER, DAVID | ADDRESS ON FILE |
| MOSLEY, TONY | ADDRESS ON FILE |
| MUDD, ROBERT CLINTON | ADDRESS ON FILE |
| MULARZ, JOHN | ADDRESS ON FILE |
| MULLEN, JAMES | ADDRESS ON FILE |
| MULLINS, TOMMY | ADDRESS ON FILE |
| MUMMA, MICHAEL | ADDRESS ON FILE |
| MUNOZ, JUAN | ADDRESS ON FILE |
| MUNOZ, JUAN | ADDRESS ON FILE |
| MUNOZ, MANUEL A | ADDRESS ON FILE |
| MUNOZ, MANUEL A | ADDRESS ON FILE |
| MURILLO, PASCUAL | ADDRESS ON FILE |
| MURRAY, PATRICK | ADDRESS ON FILE |
| MURRAY, PATRICK | ADDRESS ON FILE |
| MYERS, JOHN C JR | ADDRESS ON FILE |
| NAPOLITANO, MICHAEL | ADDRESS ON FILE |
| NAPOLITANO, THOMAS J | ADDRESS ON FILE |
| NARON, DARYL | ADDRESS ON FILE |
| NASH, SAMMIE | ADDRESS ON FILE |
| NASTELLI, SANDRA | ADDRESS ON FILE |
| NAVARRO, BRIAN D | ADDRESS ON FILE |
| NAVARRO, JORGE | ADDRESS ON FILE |
| NAVARRO, VICKIE | ADDRESS ON FILE |
| NAVRATIL, DAVID J | ADDRESS ON FILE |
| NAVRATIL, DAVID J | ADDRESS ON FILE |
| NEAGLE, ANTHONY | ADDRESS ON FILE |
| NEAGLE, ANTHONY | ADDRESS ON FILE |
| NEAL, STEVIE | ADDRESS ON FILE |
| NEELY, SHAWN R | ADDRESS ON FILE |
| NELSON, RICKY | ADDRESS ON FILE |
| NELSON, RICKY | ADDRESS ON FILE |
| NEMETH, DAVID STEVEN | ADDRESS ON FILE |
| NESMITH, RAY | ADDRESS ON FILE |
| NEVILLE, THOMAS | ADDRESS ON FILE |
| NEWELL, MICHAEL | ADDRESS ON FILE |
| NEWMAN, DERON A | ADDRESS ON FILE |
| NICHOLS, MIKE | ADDRESS ON FILE |
| NIELSEN, FRANK | ADDRESS ON FILE |
| NIELSEN, FRANK | ADDRESS ON FILE |
| NILSON, TIMOTHY J | ADDRESS ON FILE |
| NILSON, TIMOTHY J | ADDRESS ON FILE |
| NIXON, WILLIE I | ADDRESS ON FILE |
| NIZNIK, DAVID J | ADDRESS ON FILE |
| NIZNIK, DAVID J | ADDRESS ON FILE |
| NIZNIK, DAVID J | ADDRESS ON FILE |
| NOVAK, DAVID | ADDRESS ON FILE |
| NOVAK, JOHN R | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| NOVAK, JOHN R | ADDRESS ON FILE |
| OBRIEN, AUSTIN | ADDRESS ON FILE |
| OBROCHTA, ANTHONY | ADDRESS ON FILE |
| OCAMPO, MANUEL S, JR | ADDRESS ON FILE |
| OCHOA, MIKE | ADDRESS ON FILE |
| OCHOA, MIKE | ADDRESS ON FILE |
| ODELL, BRIAN T | ADDRESS ON FILE |
| ODELL, BRIAN T | ADDRESS ON FILE |
| ODORAN, MICHAEL J | ADDRESS ON FILE |
| ODORAN, MICHAEL J | ADDRESS ON FILE |
| OLLIE, TOMMIE | ADDRESS ON FILE |
| OLLIE, TOMMIE | ADDRESS ON FILE |
| OLLIE, TOMMIE | ADDRESS ON FILE |
| OLSON, GARY O | ADDRESS ON FILE |
| OLSON, GARY O | ADDRESS ON FILE |
| OLSON, RAYMOND | ADDRESS ON FILE |
| OLSON, RAYMOND | ADDRESS ON FILE |
| OLSON, RAYMOND | ADDRESS ON FILE |
| ORTAL, JOHNNY | ADDRESS ON FILE |
| OSBURN, DAWN E | ADDRESS ON FILE |
| OSBURN, DAWN E | ADDRESS ON FILE |
| OSTORGA, JULIO | ADDRESS ON FILE |
| OSWALD, TERRY | ADDRESS ON FILE |
| OWHENE, WILLIAM J | ADDRESS ON FILE |
| OWHENE, WILLIAM J | ADDRESS ON FILE |
| PACE, MARK | ADDRESS ON FILE |
| PAINTER, JACK | ADDRESS ON FILE |
| PAINTER, JACK | ADDRESS ON FILE |
| PALATO, ARTURO | ADDRESS ON FILE |
| PALMER, DEMARRIO | ADDRESS ON FILE |
| PALMER, DUSTIN | ADDRESS ON FILE |
| PAOLUCCI, ROBERTO | ADDRESS ON FILE |
| PARENT, ANDREW | ADDRESS ON FILE |
| PARK, CLARENCE E | ADDRESS ON FILE |
| PARKER, RAPHAEL | ADDRESS ON FILE |
| PARKINSON, BENJAMIN | ADDRESS ON FILE |
| PARTIN, ANDREW | ADDRESS ON FILE |
| PATRICIA A REISSER | ADDRESS ON FILE |
| PATRICIA A REISSER | ADDRESS ON FILE |
| PATRICK, GERALD A, JR | ADDRESS ON FILE |
| PATRIDGE, GORDON W | ADDRESS ON FILE |
| PATTERSON, LARRY | ADDRESS ON FILE |
| PATTERSON, MICHAEL L | ADDRESS ON FILE |
| PATTERSON, ROOSEVELT | ADDRESS ON FILE |
| PATTERSON, ROOSEVELT | ADDRESS ON FILE |
| PAULAUSKY, ANTHONY | ADDRESS ON FILE |
| PAULAUSKY, ANTHONY | ADDRESS ON FILE |
| PAYSEUR, DONALD | ADDRESS ON FILE |
| PAYSEUR, RON, JR | ADDRESS ON FILE |

| Claim Name | Address Information |
|------------|---------------------|
| PEACH, GEORGE W, JR | ADDRESS ON FILE |
| PEAVEY, DARREL | ADDRESS ON FILE |
| PECKA, GEORGE | ADDRESS ON FILE |
| PEDRICK, JENNIFER M | ADDRESS ON FILE |
| PEMBROOK, TROY | ADDRESS ON FILE |
| PENICK, JAMES DURELL | ADDRESS ON FILE |
| PEREZ, FRANK | ADDRESS ON FILE |
| PEREZ, ROGERIO, JR | ADDRESS ON FILE |
| PEREZ, ROGERIO, JR | ADDRESS ON FILE |
| PERKINS, DONNELL | ADDRESS ON FILE |
| PERKINS, DONNELL | ADDRESS ON FILE |
| PETERS, ALVIN | ADDRESS ON FILE |
| PETERSON, RICHARD D | ADDRESS ON FILE |
| PETRY, CHRISTIAN | ADDRESS ON FILE |
| PETTIT, WAYNE | ADDRESS ON FILE |
| PETTIT, WAYNE | ADDRESS ON FILE |
| PEW, STEVE | ADDRESS ON FILE |
| PHAN, YOUNG | ADDRESS ON FILE |
| PHILLIPS, BARRY | ADDRESS ON FILE |
| PHILLIPS, JESSIE L | ADDRESS ON FILE |
| PHILLIPS, JOSIAH | ADDRESS ON FILE |
| PHILLIPS, JOSIAH | ADDRESS ON FILE |
| PHILLIPS, LAMONT | ADDRESS ON FILE |
| PHILLIPS, LAMONT | ADDRESS ON FILE |
| PICKETT, JASON | ADDRESS ON FILE |
| PICKETT, JASON | ADDRESS ON FILE |
| PIERCE, CLYDE ALLEN | ADDRESS ON FILE |
| PILATE, DARRYLE | ADDRESS ON FILE |
| PILATE, DARRYLE | ADDRESS ON FILE |
| PINKNEY, TERRELL L | ADDRESS ON FILE |
| PISTOLE, CRAIG | ADDRESS ON FILE |
| PLOTT, JC | ADDRESS ON FILE |
| POLES, MAURICE | ADDRESS ON FILE |
| POOLE, BRIAN | ADDRESS ON FILE |
| POOLE, BRIAN | ADDRESS ON FILE |
| PORRAS, NICHOLAS | ADDRESS ON FILE |
| PORRAS, NICHOLAS | ADDRESS ON FILE |
| PORTER, DOUGLAS | ADDRESS ON FILE |
| POTURALSKI, ROGER M | ADDRESS ON FILE |
| POWELL, MALCOM | ADDRESS ON FILE |
| POWERS, RYAN | ADDRESS ON FILE |
| PRINCE, DENNIS | ADDRESS ON FILE |
| PROCASCO, STEVE | ADDRESS ON FILE |
| PROELS, FRANK | ADDRESS ON FILE |
| PUCKETT, CHARLES | ADDRESS ON FILE |
| PUTNAM, DAMON | ADDRESS ON FILE |
| QUALLS, WILLIAM | ADDRESS ON FILE |
| QUARANTA, JUSTIN | ADDRESS ON FILE |
| QUICK, LEONARD | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| QUIRARTE, GERARDO | ADDRESS ON FILE |
| RAFFERTY, WILLIAM | ADDRESS ON FILE |
| RAFFERTY, WILLIAM | ADDRESS ON FILE |
| RAINER, LUSHAWN | ADDRESS ON FILE |
| RAINER, LUSHAWN | ADDRESS ON FILE |
| RAMIREZ, ARISTEO | ADDRESS ON FILE |
| RAMIREZ, JAMES | ADDRESS ON FILE |
| RAMIREZ, JAMES | ADDRESS ON FILE |
| RAMOS, BRYAN | ADDRESS ON FILE |
| RAMOS, BRYAN | ADDRESS ON FILE |
| RANDLE, COREY | ADDRESS ON FILE |
| RANDLE, ROOSEVELT | ADDRESS ON FILE |
| RANDLE, ROOSEVELT | ADDRESS ON FILE |
| RANGE, PAUL | ADDRESS ON FILE |
| RASMUSSEN, CLINT | ADDRESS ON FILE |
| RATHNAU, STEPHEN | ADDRESS ON FILE |
| RATHNAU, STEPHEN | ADDRESS ON FILE |
| RATLIFF, GARY H | ADDRESS ON FILE |
| RATLIFF, GARY H | ADDRESS ON FILE |
| RAWLS, DEANA | ADDRESS ON FILE |
| RAYBURN, WILLIAM D | ADDRESS ON FILE |
| RAYBURN, WILLIAM D | ADDRESS ON FILE |
| RAYNOR, ALLAN B, JR | ADDRESS ON FILE |
| RAYNOR, REGINALD | ADDRESS ON FILE |
| REDMOND, TOMMY L | ADDRESS ON FILE |
| REDMOND, TOMMY L | ADDRESS ON FILE |
| REECE, LUANA | ADDRESS ON FILE |
| REED, WILLIAM | ADDRESS ON FILE |
| REICHARD, JASON | ADDRESS ON FILE |
| REICHEL, JOSEPH P | ADDRESS ON FILE |

**Total Creditor count  618**

**EXHIBIT J**

| Claim Name | Address Information |
| --- | --- |
| FITZPATRICK, JOHN | ADDRESS ON FILE |
| REID, BOBBY T | ADDRESS ON FILE |
| REID, BOBBY T | ADDRESS ON FILE |
| REIFF, JOHN, JR | ADDRESS ON FILE |
| REIFF, JOHN, JR | ADDRESS ON FILE |
| REISSER, PATRICIA | ADDRESS ON FILE |
| RENDE, CHARLES | ADDRESS ON FILE |
| RENNINGER, GREGORY | ADDRESS ON FILE |
| REYNOLDS, JEFFREY | ADDRESS ON FILE |
| REYNOLDS, JEFFREY | ADDRESS ON FILE |
| RHODES, DERRICK | ADDRESS ON FILE |
| RICHARDS, TERRANCE | ADDRESS ON FILE |
| RICHARDSON, CURLEY | ADDRESS ON FILE |
| RICHARDSON, CURLEY | ADDRESS ON FILE |
| RICHARDSON, DWIGHT | ADDRESS ON FILE |
| RICHARDSON, DWIGHT | ADDRESS ON FILE |
| RICHARDSON, EDWARD C | ADDRESS ON FILE |
| RICHARDSON, EDWARD C | ADDRESS ON FILE |
| RICKER, BEN | ADDRESS ON FILE |
| RICKORD, ERIN | ADDRESS ON FILE |
| RIGGLEMAN, KEVIN A | ADDRESS ON FILE |
| RIGSBEE, DANIEL EDWARD | ADDRESS ON FILE |
| RILEY, RICHARD W | ADDRESS ON FILE |
| RILEY, RICHARD W | ADDRESS ON FILE |
| RISBON, SCOTT | ADDRESS ON FILE |
| RITSKY, KIMBERLY | ADDRESS ON FILE |
| RITTER, TIMOTHY | ADDRESS ON FILE |
| RITTER, TIMOTHY C | ADDRESS ON FILE |
| RITZ, JOHN | ADDRESS ON FILE |
| RIVAS, RENATO | ADDRESS ON FILE |
| RIVAS, RENATO A | ADDRESS ON FILE |
| RIVERA, DIANA | ADDRESS ON FILE |
| ROBBINS, WILLIAM G | ADDRESS ON FILE |
| ROBERTS, TIMOTHY E | ADDRESS ON FILE |
| ROBERTSON, BRICE | ADDRESS ON FILE |
| ROBINSON, GARY JR | ADDRESS ON FILE |
| ROBINSON, JOE L, JR | ADDRESS ON FILE |
| ROBINSON, KARL | ADDRESS ON FILE |
| ROBINSON, KARL | ADDRESS ON FILE |
| ROBINSON, KENNETH | ADDRESS ON FILE |
| ROBINSON, RICHARD | ADDRESS ON FILE |
| ROBINSON, STACEY BRIAN | ADDRESS ON FILE |
| ROBINSON, STACEY BRIAN | ADDRESS ON FILE |
| RODARTE, ROBERT, JR | ADDRESS ON FILE |
| RODARTE, ROBERT, JR | ADDRESS ON FILE |
| RODRIGUEZ, ANTHONY J | ADDRESS ON FILE |
| RODRIGUEZ, SERGIO | ADDRESS ON FILE |
| ROE, DAVID | ADDRESS ON FILE |
| ROESCH, CHRISTIAN | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| ROME, JAMES | ADDRESS ON FILE |
| ROME, MICHAEL | ADDRESS ON FILE |
| ROMIG, SAMUEL | ADDRESS ON FILE |
| ROSALES, CHRISTOPHER | ADDRESS ON FILE |
| ROSE, DORINDA | ADDRESS ON FILE |
| ROSENKRANZ, JOHN | ADDRESS ON FILE |
| ROSS, LOGAN | ADDRESS ON FILE |
| ROSS, RONNISHA | ADDRESS ON FILE |
| ROUNSAVILLE, JAMES | ADDRESS ON FILE |
| ROUNSAVILLE, JAMES | ADDRESS ON FILE |
| ROYSTER, CLARENCE | ADDRESS ON FILE |
| ROYSTER, CLARENCE | ADDRESS ON FILE |
| ROZMUS, THOMAS | ADDRESS ON FILE |
| ROZMUS, THOMAS | ADDRESS ON FILE |
| RUNKLES, MICHELE | ADDRESS ON FILE |
| RUSHING, PAT | ADDRESS ON FILE |
| RUSSO, TONY | ADDRESS ON FILE |
| SAAVEDRA, RODOLFO | ADDRESS ON FILE |
| SALANOA, CHAD | ADDRESS ON FILE |
| SANCHEZ, MICHAEL A | ADDRESS ON FILE |
| SANDERS, EARL W | ADDRESS ON FILE |
| SANDRY, DALE | ADDRESS ON FILE |
| SANDS, PAUL | ADDRESS ON FILE |
| SANTIAGO, ABEL | ADDRESS ON FILE |
| SANTIAGO, ABEL | ADDRESS ON FILE |
| SANTIAGO, BENJAMIN | ADDRESS ON FILE |
| SANTIAGO, BENJAMIN | ADDRESS ON FILE |
| SANTIAGO, RICARDO | ADDRESS ON FILE |
| SANTIAGO, RICARDO | ADDRESS ON FILE |
| SANTORO, CARMINE | ADDRESS ON FILE |
| SANTORO, VICTOR N JR | ADDRESS ON FILE |
| SANTOS, ERIC | ADDRESS ON FILE |
| SARGENT, JERRY | ADDRESS ON FILE |
| SATORY, GEORGE | ADDRESS ON FILE |
| SATORY, GEORGE | ADDRESS ON FILE |
| SAUCEDO, JOSE A | ADDRESS ON FILE |
| SAUCEDO, JOSE A | ADDRESS ON FILE |
| SAVERSON, NEKIA | ADDRESS ON FILE |
| SAVERSON, NEKIA | ADDRESS ON FILE |
| SCHMIDT, KENNETH W | ADDRESS ON FILE |
| SCHMIDT, KENNETH W | ADDRESS ON FILE |
| SCHNEIDER, JEFFREY | ADDRESS ON FILE |
| SCHNEIDER, JEFFREY | ADDRESS ON FILE |
| SCHOFIELD, MARK | ADDRESS ON FILE |
| SCHRECKHISE, JACK | ADDRESS ON FILE |
| SCHREIWEIS, JARED | ADDRESS ON FILE |
| SCHULTZ, JOHN | ADDRESS ON FILE |
| SCHULTZ, JOHN | ADDRESS ON FILE |
| SCHWARTZMEYER, THOMAS J | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| SCHWARTZMEYER, THOMAS J | ADDRESS ON FILE |
| SCOTT, ANTHONY | ADDRESS ON FILE |
| SCOTT, FELIX | ADDRESS ON FILE |
| SCOTT, FELIX | ADDRESS ON FILE |
| SEARS, GERALD F | ADDRESS ON FILE |
| SEARS, GERALD F | ADDRESS ON FILE |
| SEARS, RANDY | ADDRESS ON FILE |
| SECHRIST, BRIAN | ADDRESS ON FILE |
| SEEP, ROBERT | ADDRESS ON FILE |
| SELER, MICHAEL J | ADDRESS ON FILE |
| SEMENYNA, DAVID | ADDRESS ON FILE |
| SEMENYNA, DAVID | ADDRESS ON FILE |
| SERAFINN, LAMONT C | ADDRESS ON FILE |
| SERAFINN, LAMONT C | ADDRESS ON FILE |
| SEVILLA, MICHAEL | ADDRESS ON FILE |
| SHADE, GLEN TODD | ADDRESS ON FILE |
| SHADE, STEVEN R | ADDRESS ON FILE |
| SHATTO, KENNETH W | ADDRESS ON FILE |
| SHERIFF, CURTIS | ADDRESS ON FILE |
| SHORTWAY, ANTHONY T | ADDRESS ON FILE |
| SHREEVE, DAVID AUSTIN | ADDRESS ON FILE |
| SHUGHART, JERIMY JAMES | ADDRESS ON FILE |
| SILVA, BENJAMIN | ADDRESS ON FILE |
| SIMMONS, D'ARRIUS | ADDRESS ON FILE |
| SIMS, CHRISTOPHER | ADDRESS ON FILE |
| SIMS, VINCENT F | ADDRESS ON FILE |
| SKIMEHORN, RONALD | ADDRESS ON FILE |
| SLAGER, JERRY ALLEN | ADDRESS ON FILE |
| SLAGER, JERRY ALLEN | ADDRESS ON FILE |
| SLATEN, JOSHUA | ADDRESS ON FILE |
| SMILEY, DANIEL | ADDRESS ON FILE |
| SMITH, GEORGE | ADDRESS ON FILE |
| SMITH, JAMES J | ADDRESS ON FILE |
| SMITH, JAMIE C | ADDRESS ON FILE |
| SMITH, JOHN | ADDRESS ON FILE |
| SMITH, REGINALD D | ADDRESS ON FILE |
| SMITH, SHANE | ADDRESS ON FILE |
| SMITH, TODD | ADDRESS ON FILE |
| SMYROCK, JOANN | ADDRESS ON FILE |
| SMYROCK, JOANN | ADDRESS ON FILE |
| SNYDER, JAMES L | ADDRESS ON FILE |
| SNYDER, JOHN JR | ADDRESS ON FILE |
| SOLE, JEROME | ADDRESS ON FILE |
| SOLE, JEROME | ADDRESS ON FILE |
| SOLOMON, BRAHMA | ADDRESS ON FILE |
| SOLOMON, JEROME | ADDRESS ON FILE |
| SOMMERS, STEPHEN W | ADDRESS ON FILE |
| SOTO, JAVIER | ADDRESS ON FILE |
| SOWINSKI, GENE | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| SPEARS-COBB, KIMBERLY | ADDRESS ON FILE |
| SPEESE, CRAIG | ADDRESS ON FILE |
| SPERTZEL, RODNEY | ADDRESS ON FILE |
| SPRY, CHARLES, SR | ADDRESS ON FILE |
| SQUIRES, SCOTT G | ADDRESS ON FILE |
| STASCH, GEOFFREY M | ADDRESS ON FILE |
| STASCH, GEOFFREY M | ADDRESS ON FILE |
| STAUFFACHER, MICHAEL | ADDRESS ON FILE |
| STAVERT, KEITH | ADDRESS ON FILE |
| STEC, SANDRA | ADDRESS ON FILE |
| STEC, SANDRA | ADDRESS ON FILE |
| STEFFEL, LAWRENCE | ADDRESS ON FILE |
| STEFFEL, LAWRENCE | ADDRESS ON FILE |
| STERLING, JERRELL | ADDRESS ON FILE |
| STEVENS, ALLEN | ADDRESS ON FILE |
| STEVENS, KENNETH | ADDRESS ON FILE |
| STEVENS, KENNETH | ADDRESS ON FILE |
| STEVENSON, JODIE | ADDRESS ON FILE |
| STICKLER, MICHAEL | ADDRESS ON FILE |
| STOLTZFUS, DWANE E | ADDRESS ON FILE |
| STORM, BRIAN | ADDRESS ON FILE |
| STOVALL, DONALD | ADDRESS ON FILE |
| STOVALL, DONALD | ADDRESS ON FILE |
| STRAIT, LEWIS | ADDRESS ON FILE |
| STRATTON, FREDERICK | ADDRESS ON FILE |
| STRAUB, JOHN D | ADDRESS ON FILE |
| STRAUSER, KEITH A | ADDRESS ON FILE |
| STRONG, LAVALE | ADDRESS ON FILE |
| STUBBS, GARY | ADDRESS ON FILE |
| STUTER, DANIEL JOSEPH | ADDRESS ON FILE |
| SUASTE, ALVARO | ADDRESS ON FILE |
| SUCHAN, BRIAN C | ADDRESS ON FILE |
| SUCHAN, BRIAN C | ADDRESS ON FILE |
| SULLIVAN, EDDIE L | ADDRESS ON FILE |
| SULLIVAN, JOHN | ADDRESS ON FILE |
| SUTHERLAND, LUKE | ADDRESS ON FILE |
| SUTHERLAND, LUKE | ADDRESS ON FILE |
| SWAB, MICHAEL A | ADDRESS ON FILE |
| SWORD, JEFFREY C | ADDRESS ON FILE |
| SYKES, STEVEN PAUL | ADDRESS ON FILE |
| SZPAK, RONALD R | ADDRESS ON FILE |
| TALBOT, MICHAEL | ADDRESS ON FILE |
| TAYLOR, ANTHONY | ADDRESS ON FILE |
| TAYLOR, MEKO | ADDRESS ON FILE |
| TERRAZAS, EDGAR | ADDRESS ON FILE |
| TERRAZAS, EDGAR | ADDRESS ON FILE |
| TESTERMAN, MICHAEL R | ADDRESS ON FILE |
| THIRTYACRE, BRYAN | ADDRESS ON FILE |
| THOMAS, EVA | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| THOMAS, EVA | ADDRESS ON FILE |
| THOMAS, JEFFERY | ADDRESS ON FILE |
| THOMASON, DANIEL | ADDRESS ON FILE |
| THOMPSON, DIANA LYNN | ADDRESS ON FILE |
| THOMPSON, KENNETH | ADDRESS ON FILE |
| THOMPSON, KENNETH | ADDRESS ON FILE |
| TIDD, REBECCA | ADDRESS ON FILE |
| TIETZE, GERALD J JR | ADDRESS ON FILE |
| TOLBERT, DONALD W | ADDRESS ON FILE |
| TOMASETTI, MARK | ADDRESS ON FILE |
| TOMCZUK, STANLEY E | ADDRESS ON FILE |
| TOMLINSON, ORANE | ADDRESS ON FILE |
| TOMLINSON, ORANE | ADDRESS ON FILE |
| TOMLINSON, PERRY | ADDRESS ON FILE |
| TOMLINSON, PERRY | ADDRESS ON FILE |
| TONG, JOSEFINA | ADDRESS ON FILE |
| TOOLES, COTILLA | ADDRESS ON FILE |
| TORRES, ESTHER | ADDRESS ON FILE |
| TORRES, HERIBERTO | ADDRESS ON FILE |
| TORRES, HERIBERTO | ADDRESS ON FILE |
| TOWNSELL, WILLIE | ADDRESS ON FILE |
| TOWNSEND, KEVIN | ADDRESS ON FILE |
| TRAMMELL, CHARLES F | ADDRESS ON FILE |
| TRANKINA, TIMOTHY J | ADDRESS ON FILE |
| TRENT, MARCUS | ADDRESS ON FILE |
| TRINIDAD, MICHAEL | ADDRESS ON FILE |
| TRINIDAD, MICHAEL | ADDRESS ON FILE |
| TRUFFA, MARK | ADDRESS ON FILE |
| TRUFFA, MARK | ADDRESS ON FILE |
| TRUFFA, MARK | ADDRESS ON FILE |
| TRUJILLO, MARIO | ADDRESS ON FILE |
| TUNU, VAIULA | ADDRESS ON FILE |
| TURNER, CHARLES LARRY | ADDRESS ON FILE |
| TURNER, LORENZO | ADDRESS ON FILE |
| TYLER, TERRY | ADDRESS ON FILE |
| TYLER, TERRY | ADDRESS ON FILE |
| TYLER, TERRY | ADDRESS ON FILE |
| UDCHITZ, JEFFREY W | ADDRESS ON FILE |
| UDCHITZ, JEFFREY W | ADDRESS ON FILE |
| VALDEZ, ANDREA | ADDRESS ON FILE |
| VALDEZ, LUIS | ADDRESS ON FILE |
| VALDEZ, MICHAEL | ADDRESS ON FILE |
| VALUM, DONALD | ADDRESS ON FILE |
| VALUM, DONALD | ADDRESS ON FILE |
| VALUM, DONALD | ADDRESS ON FILE |
| VANCE, PAUL | ADDRESS ON FILE |
| VANCE, PAUL | ADDRESS ON FILE |
| VANDERSCHUUR, RONALD | ADDRESS ON FILE |
| VANSETTERS, BILL | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| VARGAS JR, LUIS A | ADDRESS ON FILE |
| VARGAS, LIONEL | ADDRESS ON FILE |
| VARGAS, LIONEL | ADDRESS ON FILE |
| VARGAS, LIONEL | ADDRESS ON FILE |
| VARGAS, MIGUEL | ADDRESS ON FILE |
| VEJAR, LUIS | ADDRESS ON FILE |
| VELAZQUEZ, JOSE | ADDRESS ON FILE |
| VENIA-STOKES, CAROL | ADDRESS ON FILE |
| VERGUSON, QUINESHA | ADDRESS ON FILE |
| VEST, DESIREE | ADDRESS ON FILE |
| VILLA, ROBERT N | ADDRESS ON FILE |
| VILLA, ROBERT N | ADDRESS ON FILE |
| VILLA, ROBERT N | ADDRESS ON FILE |
| VILLALTA, TAYA M | ADDRESS ON FILE |
| VIVIANS, CARLOS | ADDRESS ON FILE |
| VIVIANS, CARLOS | ADDRESS ON FILE |
| VIVIANS, CARLOS | ADDRESS ON FILE |
| VRANJES, MILAN JR | ADDRESS ON FILE |
| VRANJES, MILAN JR | ADDRESS ON FILE |
| VULOPAS, ANTHONY S, JR | ADDRESS ON FILE |
| WAHEED, ABDUL | ADDRESS ON FILE |
| WAHEED, ABDUL | ADDRESS ON FILE |
| WAHEED, ABDUL | ADDRESS ON FILE |
| WALDEN, BILLY | ADDRESS ON FILE |
| WALES, CRAIG | ADDRESS ON FILE |
| WALL, WILLIAM BRIAN | ADDRESS ON FILE |
| WALL, WILLIAM BRIAN | ADDRESS ON FILE |
| WALL, WILLIAM BRIAN | ADDRESS ON FILE |
| WALLACE, ABIGAIL | ADDRESS ON FILE |
| WALLACE, ABIGAIL | ADDRESS ON FILE |
| WALLACE, ABIGAIL | ADDRESS ON FILE |
| WALLACE, JOESPH | ADDRESS ON FILE |
| WALLACE, JOESPH | ADDRESS ON FILE |
| WALLACE, JOHN | ADDRESS ON FILE |
| WALLACE, JOHN | ADDRESS ON FILE |
| WALLOCK, MARKEYON | ADDRESS ON FILE |
| WALLOCK, MARKEYON | ADDRESS ON FILE |
| WALS, DANIEL | ADDRESS ON FILE |
| WARD, RICHARD | ADDRESS ON FILE |
| WARD, TIMOTHY | ADDRESS ON FILE |
| WASHINGTON, LARRY L JR | ADDRESS ON FILE |
| WASHINGTON, LEROY | ADDRESS ON FILE |
| WATSON, DANNY | ADDRESS ON FILE |
| WAY, DONALD T | ADDRESS ON FILE |
| WAYMAN, JEFF | ADDRESS ON FILE |
| WAYNE, JEFFERSON C | ADDRESS ON FILE |
| WEAVER, ELIZABETH | ADDRESS ON FILE |
| WEAVER, ROBERT | ADDRESS ON FILE |
| WEEDEN, CHERYL | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| WEISSEG, MICHAEL J | ADDRESS ON FILE |
| WEISSEG, MICHAEL J | ADDRESS ON FILE |
| WEISSEG, MICHAEL J | ADDRESS ON FILE |
| WELLS, CRIS | ADDRESS ON FILE |
| WEST, BRYAN L | ADDRESS ON FILE |
| WESTLAKE, GLENN | ADDRESS ON FILE |
| WETZEL, RICHARD | ADDRESS ON FILE |
| WETZEL, RICHARD W | ADDRESS ON FILE |
| WHITAKER, ANTHONY | ADDRESS ON FILE |
| WHITE, FRANK | ADDRESS ON FILE |
| WHITE, KEVIN | ADDRESS ON FILE |
| WHITE, KEVIN | ADDRESS ON FILE |
| WHITE, MILTON | ADDRESS ON FILE |
| WHITE, MILTON | ADDRESS ON FILE |
| WHITEAKER, JOSEPH W | ADDRESS ON FILE |
| WHITLEDGE, FORREST | ADDRESS ON FILE |
| WHITLEY, CLINTON M, JR | ADDRESS ON FILE |
| WHITLEY, CLINTON M, JR | ADDRESS ON FILE |
| WHITLEY, CLINTON M, JR | ADDRESS ON FILE |
| WHITT, ROBIN M | ADDRESS ON FILE |
| WIENER, PAUL | ADDRESS ON FILE |
| WILEY, EARL JANSEN | ADDRESS ON FILE |
| WILEY, EARL JANSEN | ADDRESS ON FILE |
| WILFONG, CHARLES | ADDRESS ON FILE |
| WILKERSON, ERIC | ADDRESS ON FILE |
| WILLBANKS, TOM | ADDRESS ON FILE |
| WILLIAMS, ADAM | ADDRESS ON FILE |
| WILLIAMS, BILLY | ADDRESS ON FILE |
| WILLIAMS, BILLY | ADDRESS ON FILE |
| WILLIAMS, BILLY | ADDRESS ON FILE |
| WILLIAMS, DARRELL | ADDRESS ON FILE |
| WILLIAMS, ELRIC | ADDRESS ON FILE |
| WILLIAMS, ELRIC | ADDRESS ON FILE |
| WILLIAMS, ELRIC | ADDRESS ON FILE |
| WILLIAMS, MARIA L | ADDRESS ON FILE |
| WILLIAMS, MICHAEL SCOTT | ADDRESS ON FILE |
| WILLIAMS, SHANNON | ADDRESS ON FILE |
| WILLIS, RODNEY | ADDRESS ON FILE |
| WILLNER, FRED | ADDRESS ON FILE |
| WILSON, ELIJAH DEWAYNE | ADDRESS ON FILE |
| WINDOM, CAMERON | ADDRESS ON FILE |
| WIRTH, THOMAS E | ADDRESS ON FILE |
| WIRTH, THOMAS E | ADDRESS ON FILE |
| WITZKE, ROBERT, JR | ADDRESS ON FILE |
| WITZKE, ROBERT, JR | ADDRESS ON FILE |
| WOLAK, MARK | ADDRESS ON FILE |
| WOLAK, MARK | ADDRESS ON FILE |
| WOLFE, THOMAS | ADDRESS ON FILE |
| WOLFE, THOMAS | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| WOLFE, THOMAS | ADDRESS ON FILE |
| WOOD, DANIEL RYAN | ADDRESS ON FILE |
| WOOD, SHEILA | ADDRESS ON FILE |
| WOOD, STEVEN MARK | ADDRESS ON FILE |
| WOOD, STEVEN MARK | ADDRESS ON FILE |
| WOODS, RODERICK B | ADDRESS ON FILE |
| WRIGHT, DEWEY DAVID | ADDRESS ON FILE |
| WRIGHT, GERARDO | ADDRESS ON FILE |
| WRIGHT, MARCUS | ADDRESS ON FILE |
| WRIGLEY, KEITH | ADDRESS ON FILE |
| YANCEY, WESLEY | ADDRESS ON FILE |
| YANCEY, WESLEY | ADDRESS ON FILE |
| YANCEY, WESLEY | ADDRESS ON FILE |
| YANKEE, JOSEPH | ADDRESS ON FILE |
| YATES, RODERICK | ADDRESS ON FILE |
| YATES, RODERICK | ADDRESS ON FILE |
| YATES, RODERICK | ADDRESS ON FILE |
| YEARWOOD, JOSEPH | ADDRESS ON FILE |
| YEKICH, MICHAEL M | ADDRESS ON FILE |
| YEKICH, MICHAEL M | ADDRESS ON FILE |
| YEKICH, MICHAEL M | ADDRESS ON FILE |
| YERKINS, JOHN | ADDRESS ON FILE |
| YOUMAN, JOSHUA | ADDRESS ON FILE |
| YOUNG, EDDIE | ADDRESS ON FILE |
| ZELLMER, DONALD W | ADDRESS ON FILE |
| ZELLNER, MARK | ADDRESS ON FILE |
| ZIEMAN, MATTHEW STEVEN | ADDRESS ON FILE |
| ZIEMAN, MATTHEW STEVEN | ADDRESS ON FILE |
| ZIEMAN, MATTHEW STEVEN | ADDRESS ON FILE |
| ZIEMKIEWICZ, IRENEUSZ | ADDRESS ON FILE |
| ZOWASKI, SCOTT | ADDRESS ON FILE |
| ZOWASKI, SCOTT | ADDRESS ON FILE |
| ZOWASKI, SCOTT | ADDRESS ON FILE |
| ZWIER, ROBERT M | ADDRESS ON FILE |
| ZWIER, ROBERT M | ADDRESS ON FILE |
| ZWIER, ROBERT M | ADDRESS ON FILE |
| ZYMANTAS, CHRISTOPHER | ADDRESS ON FILE |
| ZYMANTAS, CHRISTOPHER | ADDRESS ON FILE |
| ZYMANTAS, CHRISTOPHER | ADDRESS ON FILE |

**Total Creditor count  382**

**EXHIBIT K**

| Claim Name | Address Information |
| --- | --- |
| FITZPATRICK, JOHN | ADDRESS ON FILE |
| REID, BOBBY T | ADDRESS ON FILE |
| REID, BOBBY T | ADDRESS ON FILE |
| REIFF, JOHN, JR | ADDRESS ON FILE |
| REIFF, JOHN, JR | ADDRESS ON FILE |
| REISSER, PATRICIA | ADDRESS ON FILE |
| RENDE, CHARLES | ADDRESS ON FILE |
| RENNINGER, GREGORY | ADDRESS ON FILE |
| REYNOLDS, JEFFREY | ADDRESS ON FILE |
| REYNOLDS, JEFFREY | ADDRESS ON FILE |
| RHODES, DERRICK | ADDRESS ON FILE |
| RICHARDS, TERRANCE | ADDRESS ON FILE |
| RICHARDSON, CURLEY | ADDRESS ON FILE |
| RICHARDSON, CURLEY | ADDRESS ON FILE |
| RICHARDSON, DWIGHT | ADDRESS ON FILE |
| RICHARDSON, DWIGHT | ADDRESS ON FILE |
| RICHARDSON, EDWARD C | ADDRESS ON FILE |
| RICHARDSON, EDWARD C | ADDRESS ON FILE |
| RICKER, BEN | ADDRESS ON FILE |
| RICKORD, ERIN | ADDRESS ON FILE |
| RIGGLEMAN, KEVIN A | ADDRESS ON FILE |
| RIGSBEE, DANIEL EDWARD | ADDRESS ON FILE |
| RILEY, RICHARD W | ADDRESS ON FILE |
| RILEY, RICHARD W | ADDRESS ON FILE |
| RISBON, SCOTT | ADDRESS ON FILE |
| RITSKY, KIMBERLY | ADDRESS ON FILE |
| RITTER, TIMOTHY | ADDRESS ON FILE |
| RITTER, TIMOTHY C | ADDRESS ON FILE |
| RITZ, JOHN | ADDRESS ON FILE |
| RIVAS, RENATO | ADDRESS ON FILE |
| RIVAS, RENATO A | ADDRESS ON FILE |
| RIVERA, DIANA | ADDRESS ON FILE |
| ROBBINS, WILLIAM G | ADDRESS ON FILE |
| ROBERTS, TIMOTHY E | ADDRESS ON FILE |
| ROBERTSON, BRICE | ADDRESS ON FILE |
| ROBINSON, GARY JR | ADDRESS ON FILE |
| ROBINSON, JOE L, JR | ADDRESS ON FILE |
| ROBINSON, KARL | ADDRESS ON FILE |
| ROBINSON, KARL | ADDRESS ON FILE |
| ROBINSON, KENNETH | ADDRESS ON FILE |
| ROBINSON, RICHARD | ADDRESS ON FILE |
| ROBINSON, STACEY BRIAN | ADDRESS ON FILE |
| ROBINSON, STACEY BRIAN | ADDRESS ON FILE |
| RODARTE, ROBERT, JR | ADDRESS ON FILE |
| RODARTE, ROBERT, JR | ADDRESS ON FILE |
| RODRIGUEZ, ANTHONY J | ADDRESS ON FILE |
| RODRIGUEZ, SERGIO | ADDRESS ON FILE |
| ROE, DAVID | ADDRESS ON FILE |
| ROESCH, CHRISTIAN | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| ROME, JAMES | ADDRESS ON FILE |
| ROME, MICHAEL | ADDRESS ON FILE |
| ROMIG, SAMUEL | ADDRESS ON FILE |
| ROSALES, CHRISTOPHER | ADDRESS ON FILE |
| ROSE, DORINDA | ADDRESS ON FILE |
| ROSENKRANZ, JOHN | ADDRESS ON FILE |
| ROSS, LOGAN | ADDRESS ON FILE |
| ROSS, RONNISHA | ADDRESS ON FILE |
| ROUNSAVILLE, JAMES | ADDRESS ON FILE |
| ROUNSAVILLE, JAMES | ADDRESS ON FILE |
| ROYSTER, CLARENCE | ADDRESS ON FILE |
| ROYSTER, CLARENCE | ADDRESS ON FILE |
| ROZMUS, THOMAS | ADDRESS ON FILE |
| ROZMUS, THOMAS | ADDRESS ON FILE |
| RUNKLES, MICHELE | ADDRESS ON FILE |
| RUSHING, PAT | ADDRESS ON FILE |
| RUSSO, TONY | ADDRESS ON FILE |
| SAAVEDRA, RODOLFO | ADDRESS ON FILE |
| SALANOA, CHAD | ADDRESS ON FILE |
| SANCHEZ, MICHAEL A | ADDRESS ON FILE |
| SANDERS, EARL W | ADDRESS ON FILE |
| SANDRY, DALE | ADDRESS ON FILE |
| SANDS, PAUL | ADDRESS ON FILE |
| SANTIAGO, ABEL | ADDRESS ON FILE |
| SANTIAGO, ABEL | ADDRESS ON FILE |
| SANTIAGO, BENJAMIN | ADDRESS ON FILE |
| SANTIAGO, BENJAMIN | ADDRESS ON FILE |
| SANTIAGO, RICARDO | ADDRESS ON FILE |
| SANTIAGO, RICARDO | ADDRESS ON FILE |
| SANTORO, CARMINE | ADDRESS ON FILE |
| SANTORO, VICTOR N JR | ADDRESS ON FILE |
| SANTOS, ERIC | ADDRESS ON FILE |
| SARGENT, JERRY | ADDRESS ON FILE |
| SATORY, GEORGE | ADDRESS ON FILE |
| SATORY, GEORGE | ADDRESS ON FILE |
| SAUCEDO, JOSE A | ADDRESS ON FILE |
| SAUCEDO, JOSE A | ADDRESS ON FILE |
| SAVERSON, NEKIA | ADDRESS ON FILE |
| SAVERSON, NEKIA | ADDRESS ON FILE |
| SCHMIDT, KENNETH W | ADDRESS ON FILE |
| SCHMIDT, KENNETH W | ADDRESS ON FILE |
| SCHNEIDER, JEFFREY | ADDRESS ON FILE |
| SCHNEIDER, JEFFREY | ADDRESS ON FILE |
| SCHOFIELD, MARK | ADDRESS ON FILE |
| SCHRECKHISE, JACK | ADDRESS ON FILE |
| SCHREIWEIS, JARED | ADDRESS ON FILE |
| SCHULTZ, JOHN | ADDRESS ON FILE |
| SCHULTZ, JOHN | ADDRESS ON FILE |
| SCHWARTZMEYER, THOMAS J | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| SCHWARTZMEYER, THOMAS J | ADDRESS ON FILE |
| SCOTT, ANTHONY | ADDRESS ON FILE |
| SCOTT, FELIX | ADDRESS ON FILE |
| SCOTT, FELIX | ADDRESS ON FILE |
| SEARS, GERALD F | ADDRESS ON FILE |
| SEARS, GERALD F | ADDRESS ON FILE |
| SEARS, RANDY | ADDRESS ON FILE |
| SECHRIST, BRIAN | ADDRESS ON FILE |
| SEEP, ROBERT | ADDRESS ON FILE |
| SELER, MICHAEL J | ADDRESS ON FILE |
| SEMENYNA, DAVID | ADDRESS ON FILE |
| SEMENYNA, DAVID | ADDRESS ON FILE |
| SERAFINN, LAMONT C | ADDRESS ON FILE |
| SERAFINN, LAMONT C | ADDRESS ON FILE |
| SEVILLA, MICHAEL | ADDRESS ON FILE |
| SHADE, GLEN TODD | ADDRESS ON FILE |
| SHADE, STEVEN R | ADDRESS ON FILE |
| SHATTO, KENNETH W | ADDRESS ON FILE |
| SHERIFF, CURTIS | ADDRESS ON FILE |
| SHORTWAY, ANTHONY T | ADDRESS ON FILE |
| SHREEVE, DAVID AUSTIN | ADDRESS ON FILE |
| SHUGHART, JERIMY JAMES | ADDRESS ON FILE |
| SILVA, BENJAMIN | ADDRESS ON FILE |
| SIMMONS, D'ARRIUS | ADDRESS ON FILE |
| SIMS, CHRISTOPHER | ADDRESS ON FILE |
| SIMS, VINCENT F | ADDRESS ON FILE |
| SKIMEHORN, RONALD | ADDRESS ON FILE |
| SLAGER, JERRY ALLEN | ADDRESS ON FILE |
| SLAGER, JERRY ALLEN | ADDRESS ON FILE |
| SLATEN, JOSHUA | ADDRESS ON FILE |
| SMILEY, DANIEL | ADDRESS ON FILE |
| SMITH, GEORGE | ADDRESS ON FILE |
| SMITH, JAMES J | ADDRESS ON FILE |
| SMITH, JAMIE C | ADDRESS ON FILE |
| SMITH, JOHN | ADDRESS ON FILE |
| SMITH, REGINALD D | ADDRESS ON FILE |
| SMITH, SHANE | ADDRESS ON FILE |
| SMITH, TODD | ADDRESS ON FILE |
| SMYROCK, JOANN | ADDRESS ON FILE |
| SMYROCK, JOANN | ADDRESS ON FILE |
| SNYDER, JAMES L | ADDRESS ON FILE |
| SNYDER, JOHN JR | ADDRESS ON FILE |
| SOLE, JEROME | ADDRESS ON FILE |
| SOLE, JEROME | ADDRESS ON FILE |
| SOLOMON, BRAHMA | ADDRESS ON FILE |
| SOLOMON, JEROME | ADDRESS ON FILE |
| SOMMERS, STEPHEN W | ADDRESS ON FILE |
| SOTO, JAVIER | ADDRESS ON FILE |
| SOWINSKI, GENE | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| SPEARS-COBB, KIMBERLY | ADDRESS ON FILE |
| SPEESE, CRAIG | ADDRESS ON FILE |
| SPERTZEL, RODNEY | ADDRESS ON FILE |
| SPRY, CHARLES, SR | ADDRESS ON FILE |
| SQUIRES, SCOTT G | ADDRESS ON FILE |
| STASCH, GEOFFREY M | ADDRESS ON FILE |
| STASCH, GEOFFREY M | ADDRESS ON FILE |
| STAUFFACHER, MICHAEL | ADDRESS ON FILE |
| STAVERT, KEITH | ADDRESS ON FILE |
| STEC, SANDRA | ADDRESS ON FILE |
| STEC, SANDRA | ADDRESS ON FILE |
| STEFFEL, LAWRENCE | ADDRESS ON FILE |
| STEFFEL, LAWRENCE | ADDRESS ON FILE |
| STERLING, JERRELL | ADDRESS ON FILE |
| STEVENS, ALLEN | ADDRESS ON FILE |
| STEVENS, KENNETH | ADDRESS ON FILE |
| STEVENS, KENNETH | ADDRESS ON FILE |
| STEVENSON, JODIE | ADDRESS ON FILE |
| STICKLER, MICHAEL | ADDRESS ON FILE |
| STOLTZFUS, DWANE E | ADDRESS ON FILE |
| STORM, BRIAN | ADDRESS ON FILE |
| STOVALL, DONALD | ADDRESS ON FILE |
| STOVALL, DONALD | ADDRESS ON FILE |
| STRAIT, LEWIS | ADDRESS ON FILE |
| STRATTON, FREDERICK | ADDRESS ON FILE |
| STRAUB, JOHN D | ADDRESS ON FILE |
| STRAUSER, KEITH A | ADDRESS ON FILE |
| STRONG, LAVALE | ADDRESS ON FILE |
| STUBBS, GARY | ADDRESS ON FILE |
| STUTER, DANIEL JOSEPH | ADDRESS ON FILE |
| SUASTE, ALVARO | ADDRESS ON FILE |
| SUCHAN, BRIAN C | ADDRESS ON FILE |
| SUCHAN, BRIAN C | ADDRESS ON FILE |
| SULLIVAN, EDDIE L | ADDRESS ON FILE |
| SULLIVAN, JOHN | ADDRESS ON FILE |
| SUTHERLAND, LUKE | ADDRESS ON FILE |
| SUTHERLAND, LUKE | ADDRESS ON FILE |
| SWAB, MICHAEL A | ADDRESS ON FILE |
| SWORD, JEFFREY C | ADDRESS ON FILE |
| SYKES, STEVEN PAUL | ADDRESS ON FILE |
| SZPAK, RONALD R | ADDRESS ON FILE |
| TALBOT, MICHAEL | ADDRESS ON FILE |
| TAYLOR, ANTHONY | ADDRESS ON FILE |
| TAYLOR, MEKO | ADDRESS ON FILE |
| TERRAZAS, EDGAR | ADDRESS ON FILE |
| TERRAZAS, EDGAR | ADDRESS ON FILE |
| TESTERMAN, MICHAEL R | ADDRESS ON FILE |
| THIRTYACRE, BRYAN | ADDRESS ON FILE |
| THOMAS, EVA | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| THOMAS, EVA | ADDRESS ON FILE |
| THOMAS, JEFFERY | ADDRESS ON FILE |
| THOMASON, DANIEL | ADDRESS ON FILE |
| THOMPSON, DIANA LYNN | ADDRESS ON FILE |
| THOMPSON, KENNETH | ADDRESS ON FILE |
| THOMPSON, KENNETH | ADDRESS ON FILE |
| TIDD, REBECCA | ADDRESS ON FILE |
| TIETZE, GERALD J JR | ADDRESS ON FILE |
| TOLBERT, DONALD W | ADDRESS ON FILE |
| TOMASETTI, MARK | ADDRESS ON FILE |
| TOMCZUK, STANLEY E | ADDRESS ON FILE |
| TOMLINSON, ORANE | ADDRESS ON FILE |
| TOMLINSON, ORANE | ADDRESS ON FILE |
| TOMLINSON, PERRY | ADDRESS ON FILE |
| TOMLINSON, PERRY | ADDRESS ON FILE |
| TONG, JOSEFINA | ADDRESS ON FILE |
| TOOLES, COTILLA | ADDRESS ON FILE |
| TORRES, ESTHER | ADDRESS ON FILE |
| TORRES, HERIBERTO | ADDRESS ON FILE |
| TORRES, HERIBERTO | ADDRESS ON FILE |
| TOWNSELL, WILLIE | ADDRESS ON FILE |
| TOWNSEND, KEVIN | ADDRESS ON FILE |
| TRAMMELL, CHARLES F | ADDRESS ON FILE |
| TRANKINA, TIMOTHY J | ADDRESS ON FILE |
| TRENT, MARCUS | ADDRESS ON FILE |
| TRINIDAD, MICHAEL | ADDRESS ON FILE |
| TRINIDAD, MICHAEL | ADDRESS ON FILE |
| TRUFFA, MARK | ADDRESS ON FILE |
| TRUFFA, MARK | ADDRESS ON FILE |
| TRUFFA, MARK | ADDRESS ON FILE |
| TRUJILLO, MARIO | ADDRESS ON FILE |
| TUNU, VAIULA | ADDRESS ON FILE |
| TURNER, CHARLES LARRY | ADDRESS ON FILE |
| TURNER, LORENZO | ADDRESS ON FILE |
| TYLER, TERRY | ADDRESS ON FILE |
| TYLER, TERRY | ADDRESS ON FILE |
| TYLER, TERRY | ADDRESS ON FILE |
| UDCHITZ, JEFFREY W | ADDRESS ON FILE |
| UDCHITZ, JEFFREY W | ADDRESS ON FILE |
| VALDEZ, ANDREA | ADDRESS ON FILE |
| VALDEZ, LUIS | ADDRESS ON FILE |
| VALDEZ, MICHAEL | ADDRESS ON FILE |
| VALUM, DONALD | ADDRESS ON FILE |
| VALUM, DONALD | ADDRESS ON FILE |
| VALUM, DONALD | ADDRESS ON FILE |
| VANCE, PAUL | ADDRESS ON FILE |
| VANCE, PAUL | ADDRESS ON FILE |
| VANDERSCHUUR, RONALD | ADDRESS ON FILE |
| VANSETTERS, BILL | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| VARGAS JR, LUIS A | ADDRESS ON FILE |
| VARGAS, LIONEL | ADDRESS ON FILE |
| VARGAS, LIONEL | ADDRESS ON FILE |
| VARGAS, LIONEL | ADDRESS ON FILE |
| VARGAS, MIGUEL | ADDRESS ON FILE |
| VEJAR, LUIS | ADDRESS ON FILE |
| VELAZQUEZ, JOSE | ADDRESS ON FILE |
| VENIA-STOKES, CAROL | ADDRESS ON FILE |
| VERGUSON, QUINESHA | ADDRESS ON FILE |
| VEST, DESIREE | ADDRESS ON FILE |
| VILLA, ROBERT N | ADDRESS ON FILE |
| VILLA, ROBERT N | ADDRESS ON FILE |
| VILLA, ROBERT N | ADDRESS ON FILE |
| VILLALTA, TAYA M | ADDRESS ON FILE |
| VIVIANS, CARLOS | ADDRESS ON FILE |
| VIVIANS, CARLOS | ADDRESS ON FILE |
| VIVIANS, CARLOS | ADDRESS ON FILE |
| VRANJES, MILAN JR | ADDRESS ON FILE |
| VRANJES, MILAN JR | ADDRESS ON FILE |
| VULOPAS, ANTHONY S, JR | ADDRESS ON FILE |
| WAHEED, ABDUL | ADDRESS ON FILE |
| WAHEED, ABDUL | ADDRESS ON FILE |
| WAHEED, ABDUL | ADDRESS ON FILE |
| WALDEN, BILLY | ADDRESS ON FILE |
| WALES, CRAIG | ADDRESS ON FILE |
| WALL, WILLIAM BRIAN | ADDRESS ON FILE |
| WALL, WILLIAM BRIAN | ADDRESS ON FILE |
| WALL, WILLIAM BRIAN | ADDRESS ON FILE |
| WALLACE, ABIGAIL | ADDRESS ON FILE |
| WALLACE, ABIGAIL | ADDRESS ON FILE |
| WALLACE, ABIGAIL | ADDRESS ON FILE |
| WALLACE, JOESPH | ADDRESS ON FILE |
| WALLACE, JOESPH | ADDRESS ON FILE |
| WALLACE, JOHN | ADDRESS ON FILE |
| WALLACE, JOHN | ADDRESS ON FILE |
| WALLOCK, MARKEYON | ADDRESS ON FILE |
| WALLOCK, MARKEYON | ADDRESS ON FILE |
| WALS, DANIEL | ADDRESS ON FILE |
| WARD, RICHARD | ADDRESS ON FILE |
| WARD, TIMOTHY | ADDRESS ON FILE |
| WASHINGTON, LARRY L JR | ADDRESS ON FILE |
| WASHINGTON, LEROY | ADDRESS ON FILE |
| WATSON, DANNY | ADDRESS ON FILE |
| WAY, DONALD T | ADDRESS ON FILE |
| WAYMAN, JEFF | ADDRESS ON FILE |
| WAYNE, JEFFERSON C | ADDRESS ON FILE |
| WEAVER, ELIZABETH | ADDRESS ON FILE |
| WEAVER, ROBERT | ADDRESS ON FILE |
| WEEDEN, CHERYL | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| WEISSEG, MICHAEL J | ADDRESS ON FILE |
| WEISSEG, MICHAEL J | ADDRESS ON FILE |
| WEISSEG, MICHAEL J | ADDRESS ON FILE |
| WELLS, CRIS | ADDRESS ON FILE |
| WEST, BRYAN L | ADDRESS ON FILE |
| WESTLAKE, GLENN | ADDRESS ON FILE |
| WETZEL, RICHARD | ADDRESS ON FILE |
| WETZEL, RICHARD W | ADDRESS ON FILE |
| WHITAKER, ANTHONY | ADDRESS ON FILE |
| WHITE, FRANK | ADDRESS ON FILE |
| WHITE, KEVIN | ADDRESS ON FILE |
| WHITE, KEVIN | ADDRESS ON FILE |
| WHITE, MILTON | ADDRESS ON FILE |
| WHITE, MILTON | ADDRESS ON FILE |
| WHITEAKER, JOSEPH W | ADDRESS ON FILE |
| WHITLEDGE, FORREST | ADDRESS ON FILE |
| WHITLEY, CLINTON M, JR | ADDRESS ON FILE |
| WHITLEY, CLINTON M, JR | ADDRESS ON FILE |
| WHITLEY, CLINTON M, JR | ADDRESS ON FILE |
| WHITT, ROBIN M | ADDRESS ON FILE |
| WIENER, PAUL | ADDRESS ON FILE |
| WILEY, EARL JANSEN | ADDRESS ON FILE |
| WILEY, EARL JANSEN | ADDRESS ON FILE |
| WILFONG, CHARLES | ADDRESS ON FILE |
| WILKERSON, ERIC | ADDRESS ON FILE |
| WILLBANKS, TOM | ADDRESS ON FILE |
| WILLIAMS, ADAM | ADDRESS ON FILE |
| WILLIAMS, BILLY | ADDRESS ON FILE |
| WILLIAMS, BILLY | ADDRESS ON FILE |
| WILLIAMS, BILLY | ADDRESS ON FILE |
| WILLIAMS, DARRELL | ADDRESS ON FILE |
| WILLIAMS, ELRIC | ADDRESS ON FILE |
| WILLIAMS, ELRIC | ADDRESS ON FILE |
| WILLIAMS, ELRIC | ADDRESS ON FILE |
| WILLIAMS, MARIA L | ADDRESS ON FILE |
| WILLIAMS, MICHAEL SCOTT | ADDRESS ON FILE |
| WILLIAMS, SHANNON | ADDRESS ON FILE |
| WILLIS, RODNEY | ADDRESS ON FILE |
| WILLNER, FRED | ADDRESS ON FILE |
| WILSON, ELIJAH DEWAYNE | ADDRESS ON FILE |
| WINDOM, CAMERON | ADDRESS ON FILE |
| WIRTH, THOMAS E | ADDRESS ON FILE |
| WIRTH, THOMAS E | ADDRESS ON FILE |
| WITZKE, ROBERT, JR | ADDRESS ON FILE |
| WITZKE, ROBERT, JR | ADDRESS ON FILE |
| WOLAK, MARK | ADDRESS ON FILE |
| WOLAK, MARK | ADDRESS ON FILE |
| WOLFE, THOMAS | ADDRESS ON FILE |
| WOLFE, THOMAS | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| WOLFE, THOMAS | ADDRESS ON FILE |
| WOOD, DANIEL RYAN | ADDRESS ON FILE |
| WOOD, SHEILA | ADDRESS ON FILE |
| WOOD, STEVEN MARK | ADDRESS ON FILE |
| WOOD, STEVEN MARK | ADDRESS ON FILE |
| WOODS, RODERICK B | ADDRESS ON FILE |
| WRIGHT, DEWEY DAVID | ADDRESS ON FILE |
| WRIGHT, GERARDO | ADDRESS ON FILE |
| WRIGHT, MARCUS | ADDRESS ON FILE |
| WRIGLEY, KEITH | ADDRESS ON FILE |
| YANCEY, WESLEY | ADDRESS ON FILE |
| YANCEY, WESLEY | ADDRESS ON FILE |
| YANCEY, WESLEY | ADDRESS ON FILE |
| YANKEE, JOSEPH | ADDRESS ON FILE |
| YATES, RODERICK | ADDRESS ON FILE |
| YATES, RODERICK | ADDRESS ON FILE |
| YATES, RODERICK | ADDRESS ON FILE |
| YEARWOOD, JOSEPH | ADDRESS ON FILE |
| YEKICH, MICHAEL M | ADDRESS ON FILE |
| YEKICH, MICHAEL M | ADDRESS ON FILE |
| YEKICH, MICHAEL M | ADDRESS ON FILE |
| YERKINS, JOHN | ADDRESS ON FILE |
| YOUMAN, JOSHUA | ADDRESS ON FILE |
| YOUNG, EDDIE | ADDRESS ON FILE |
| ZELLMER, DONALD W | ADDRESS ON FILE |
| ZELLNER, MARK | ADDRESS ON FILE |
| ZIEMAN, MATTHEW STEVEN | ADDRESS ON FILE |
| ZIEMAN, MATTHEW STEVEN | ADDRESS ON FILE |
| ZIEMAN, MATTHEW STEVEN | ADDRESS ON FILE |
| ZIEMKIEWICZ, IRENEUSZ | ADDRESS ON FILE |
| ZOWASKI, SCOTT | ADDRESS ON FILE |
| ZOWASKI, SCOTT | ADDRESS ON FILE |
| ZOWASKI, SCOTT | ADDRESS ON FILE |
| ZWIER, ROBERT M | ADDRESS ON FILE |
| ZWIER, ROBERT M | ADDRESS ON FILE |
| ZWIER, ROBERT M | ADDRESS ON FILE |
| ZYMANTAS, CHRISTOPHER | ADDRESS ON FILE |
| ZYMANTAS, CHRISTOPHER | ADDRESS ON FILE |
| ZYMANTAS, CHRISTOPHER | ADDRESS ON FILE |

**Total Creditor count  382**

| Claim Name | Address Information |
|---|---|
| ABERNATHY, RICK | ADDRESS ON FILE |
| ABERNATHY, RICK | ADDRESS ON FILE |
| ABERNATHY, RICK | ADDRESS ON FILE |
| ACEVEDO, FIDELIO | ADDRESS ON FILE |
| ACKER, LAWANNA | ADDRESS ON FILE |
| ACKER, LAWANNA M | ADDRESS ON FILE |
| ACKER, LAWANNA M | ADDRESS ON FILE |
| ACKERMAN, ROBERT | ADDRESS ON FILE |
| ACKERMAN, ROBERT | ADDRESS ON FILE |
| ACKERMAN, ROBERT | ADDRESS ON FILE |
| ADAMS, DAVID | ADDRESS ON FILE |
| ADAMS, MICHAEL GERARD | ADDRESS ON FILE |
| ADCOCK, DEAN | ADDRESS ON FILE |
| ADCOCK, STEVEN | ADDRESS ON FILE |
| ADKINS, JUSTIN | ADDRESS ON FILE |
| AGAN, JOSEPH | ADDRESS ON FILE |
| AGAPAY, JUSTIN | ADDRESS ON FILE |
| AGUILAR, RAY | ADDRESS ON FILE |
| ALBANESE, SCOTT M | ADDRESS ON FILE |
| ALESSANDRO, JOSEPH, JR | ADDRESS ON FILE |
| ALESSANDRO, JOSEPH, JR | ADDRESS ON FILE |
| ALESSANDRO, JOSEPH, JR | ADDRESS ON FILE |
| ALICEA, EDUARDO V | ADDRESS ON FILE |
| ALICEA, EDUARDO V | ADDRESS ON FILE |
| ALICEA, EDUARDO V | ADDRESS ON FILE |
| ALLEMAN, PHILLIP A | ADDRESS ON FILE |
| ALLEN, JOHN FRANKLIN | ADDRESS ON FILE |
| ALLEN, JOHN FRANKLIN | ADDRESS ON FILE |
| ALLEN, JOHN FRANKLIN | ADDRESS ON FILE |
| ALLEN, RONALD | ADDRESS ON FILE |
| ALLEN, SHAWN | ADDRESS ON FILE |
| ALLGOOD, JONATHAN | ADDRESS ON FILE |
| ALLRED, CHARLES E | ADDRESS ON FILE |
| ALLRED, CHARLES E | ADDRESS ON FILE |
| ALVARADO, DAVID | ADDRESS ON FILE |
| ALVARADO, DAVID | ADDRESS ON FILE |
| AMIN, TANYA | ADDRESS ON FILE |
| AMRHEIN, DARBY | ADDRESS ON FILE |
| AMSPACHER, KYLE | ADDRESS ON FILE |
| ANDERSON, DAVID W, SR | ADDRESS ON FILE |
| ANDERSON, JEFFREY | ADDRESS ON FILE |
| ANDERSON, MARCUS | ADDRESS ON FILE |
| ANDERSON, RANDALL | ADDRESS ON FILE |
| ANDERSON, RANDALL | ADDRESS ON FILE |
| ANDERSON, RANDALL | ADDRESS ON FILE |
| ANDERSON, STANLEY | ADDRESS ON FILE |
| ANDERSON, THOMAS R JR | ADDRESS ON FILE |
| ANDERSON, TROY E | ADDRESS ON FILE |
| ANGELLOTTI, ATTILIO C | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| ANGELLOTTI, ATTILIO C | ADDRESS ON FILE |
| ANGELLOTTI, ATTILIO C | ADDRESS ON FILE |
| ANSELL, JAMES L | ADDRESS ON FILE |
| ANSELL, ROBERT L | ADDRESS ON FILE |
| ARDREY, DAVID | ADDRESS ON FILE |
| ARIAS, RICHARD | ADDRESS ON FILE |
| ARMON, CURTIS | ADDRESS ON FILE |
| ARNETT, DARRELL LEE | ADDRESS ON FILE |
| ARNOLD, TERRENCE T | ADDRESS ON FILE |
| ARNOLD, TERRENCE T | ADDRESS ON FILE |
| ARNOLD, TERRENCE T | ADDRESS ON FILE |
| ARREOLA MEDINA, JUAN J | ADDRESS ON FILE |
| ASHE, PAUL ALAN | ADDRESS ON FILE |
| ASPDEN, JOHN | ADDRESS ON FILE |
| ATHERTON, ANNE MARIE | ADDRESS ON FILE |
| AUTO MECHS LOCAL 701 PENSION FUND | C/O JOHNSON & KROL LLC 311 S WACKER DR, STE 1050 CHICAGO IL 60606 |
| AUTO MECHS LOCAL 701 WELFARE FUND | C/O JOHNSON & KROL LLC 311 S WACKER DR, STE 1050 CHICAGO IL 60606 |
| AVILA, BRIAN | ADDRESS ON FILE |
| AVILA, BRIAN | ADDRESS ON FILE |
| AVILA, BRIAN | ADDRESS ON FILE |
| AYALA, MARIO | ADDRESS ON FILE |
| BAHAN, MICHAEL DENNIS JR | ADDRESS ON FILE |
| BAILEY, PAMELA | ADDRESS ON FILE |
| BAILEY, PAMELA | ADDRESS ON FILE |
| BAILOR, KENNETH | ADDRESS ON FILE |
| BAKER, ROBERT | ADDRESS ON FILE |
| BALDERAS, RODRIGO | ADDRESS ON FILE |
| BALDRIDGE, RICKY | ADDRESS ON FILE |
| BANKERT, GREGORY L | ADDRESS ON FILE |
| BARAJAS, JOVANY | ADDRESS ON FILE |
| BARAJAS, RAMIRO | ADDRESS ON FILE |
| BARAJAS, RAMIRO | ADDRESS ON FILE |
| BARANEK, ERIC T | ADDRESS ON FILE |
| BARANEK, ERIC T | ADDRESS ON FILE |
| BARANOSKI, GARY | ADDRESS ON FILE |
| BARBOSA, DANIEL | ADDRESS ON FILE |
| BARHAM, JIMMY | ADDRESS ON FILE |
| BARKER, JAMES BRIAN | ADDRESS ON FILE |
| BARTROM, ANTHONY W | ADDRESS ON FILE |
| BARTROM, ANTHONY W | ADDRESS ON FILE |
| BATTAGLIA, FRANK J, III | ADDRESS ON FILE |
| BAUSEMAN, RODNEY | ADDRESS ON FILE |
| BAUTISTA, ARTHUR | ADDRESS ON FILE |
| BAUTISTA, ARTHUR | ADDRESS ON FILE |
| BEAL, MICHAEL L | ADDRESS ON FILE |
| BEALE, MICA L | ADDRESS ON FILE |
| BEALE, MICA L | ADDRESS ON FILE |
| BECHTOLD, DOUGLAS | ADDRESS ON FILE |
| BECKER, CHUCK M | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| BECKETTE, CALEB | ADDRESS ON FILE |
| BELCHER, ANDREWSON | ADDRESS ON FILE |
| BELL, JAMES | ADDRESS ON FILE |
| BELL, MARRIO | ADDRESS ON FILE |
| BELL, MICHAEL JEROME | ADDRESS ON FILE |
| BENJAMIN, ASMENT | ADDRESS ON FILE |
| BENJAMIN, BRENDALIE | ADDRESS ON FILE |
| BENNETT, HUGH P JR | ADDRESS ON FILE |
| BENNETT, JAMES | ADDRESS ON FILE |
| BENNETT, MICHAEL K | ADDRESS ON FILE |
| BENNETT, MICHAEL K | ADDRESS ON FILE |
| BENSON, BRADLEY | ADDRESS ON FILE |
| BENSON, JAMES L | ADDRESS ON FILE |
| BERMAN, PETER | ADDRESS ON FILE |
| BERMAN, PETER | ADDRESS ON FILE |
| BERRY, DAVID SCOTT | ADDRESS ON FILE |
| BETTS, DONALD | ADDRESS ON FILE |
| BICKHEM, JOSEPH | ADDRESS ON FILE |
| BICKHEM, JOSEPH | ADDRESS ON FILE |
| BINGHAM, JAMAINE | ADDRESS ON FILE |
| BIROSCAK, WILLIAM H | ADDRESS ON FILE |
| BISHOP, CHARLES | ADDRESS ON FILE |
| BLAKLEY, KELVIN | ADDRESS ON FILE |
| BLALOCK, SCOTT | ADDRESS ON FILE |
| BLEES, WILLIAM R, III | ADDRESS ON FILE |
| BLOUNT, PAUL | ADDRESS ON FILE |
| BLOUNT, PAUL | ADDRESS ON FILE |
| BOARTS, DAVID | ADDRESS ON FILE |
| BOARTS, DAVID C | ADDRESS ON FILE |
| BOBBITT, DWIGHT DARON | ADDRESS ON FILE |
| BODENSCHATZ, DENTON R, JR | ADDRESS ON FILE |
| BOENS, GREGORY A | ADDRESS ON FILE |
| BOHANNON, STANLEY | ADDRESS ON FILE |
| BOONE, COREY | ADDRESS ON FILE |
| BORDEAUX, CHRISTOPHER | ADDRESS ON FILE |
| BORDERS, MICHAEL W | ADDRESS ON FILE |
| BOTZ, BRENDON EDWARD | ADDRESS ON FILE |
| BOUCHARD, DUSTIN | ADDRESS ON FILE |
| BOWDEN, DAVID | ADDRESS ON FILE |
| BOWDEN, MICHAEL | ADDRESS ON FILE |
| BOYER, TERESA | ADDRESS ON FILE |
| BRAHAM, EUGENE C JR | ADDRESS ON FILE |
| BRANCATO, JOSEPH | ADDRESS ON FILE |
| BRANCH, MORRIS | ADDRESS ON FILE |
| BRANDON, DAVID W | ADDRESS ON FILE |
| BRANT, THOMAS W, III | ADDRESS ON FILE |
| BRETZ, ANGELA | ADDRESS ON FILE |
| BREWER, DUANE | ADDRESS ON FILE |
| BREWER, ERIC | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| BRIDGES, JAMES, JR | ADDRESS ON FILE |
| BRIGGS, CHAD | ADDRESS ON FILE |
| BRIGHAM, RICHARD | ADDRESS ON FILE |
| BROUWER, DAVID | ADDRESS ON FILE |
| BROUWER, DAVID | ADDRESS ON FILE |
| BROWN, CHRISTOPHER | ADDRESS ON FILE |
| BROWN, CLIFTON MCCLAIN, JR | ADDRESS ON FILE |
| BROWN, DESHAUN | ADDRESS ON FILE |
| BROWN, DESHAUN | ADDRESS ON FILE |
| BROWN, KENNETH HUGH | ADDRESS ON FILE |
| BROWN, KEVIN WAYNE | ADDRESS ON FILE |
| BROWN, ROBERT G | ADDRESS ON FILE |
| BROWN, ROBERT G | ADDRESS ON FILE |
| BROWN, ROGER | ADDRESS ON FILE |
| BROWNAWELL, JAMES C | ADDRESS ON FILE |
| BRUBAKER, KEVIN | ADDRESS ON FILE |
| BRUNO, MICHAEL C | ADDRESS ON FILE |
| BUCK, STANLEY L, III | ADDRESS ON FILE |
| BUCK, STANLEY L, III | ADDRESS ON FILE |
| BULLOCK, DAVID | ADDRESS ON FILE |
| BUMBAUGH, PAUL | ADDRESS ON FILE |
| BUMBAUGH, PAUL J | ADDRESS ON FILE |
| BURLESON, JESS | ADDRESS ON FILE |
| BURNS, MIKE | ADDRESS ON FILE |
| BURNS, RODNEY J | ADDRESS ON FILE |
| BURTON, RODNEY | ADDRESS ON FILE |
| BUTLER, BONNIE | ADDRESS ON FILE |
| BYNUM, SHANNON | ADDRESS ON FILE |
| BYROADE, DENNIS L, JR | ADDRESS ON FILE |
| CALFAS, DORIAN | ADDRESS ON FILE |
| CAMARDELLA, LOUIS | ADDRESS ON FILE |
| CAMPBELL, JOHN R, III | ADDRESS ON FILE |
| CAMPBELL, MARK C | ADDRESS ON FILE |
| CAMPBELL, MARK C | ADDRESS ON FILE |
| CAMPBELL, MICHAEL M | ADDRESS ON FILE |
| CANNADY, ZARAK | ADDRESS ON FILE |
| CAREY, SEAN | ADDRESS ON FILE |
| CARLISLE, MARCUS | ADDRESS ON FILE |
| CARLSON, RONALD | ADDRESS ON FILE |
| CARPENTER, DONALD | ADDRESS ON FILE |
| CARPIO, MARIO | ADDRESS ON FILE |
| CARR, GARY | ADDRESS ON FILE |
| CARR, GARY | ADDRESS ON FILE |
| CARRANO JR, RUSSELL A | ADDRESS ON FILE |
| CARRANO JR, RUSSELL A | ADDRESS ON FILE |
| CARRANO JR, RUSSELL A | ADDRESS ON FILE |
| CARROLL, MIKE | ADDRESS ON FILE |
| CARSON, SANFORD J | ADDRESS ON FILE |
| CARTER, JOSEPH | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| CARTER, KEITH | ADDRESS ON FILE |
| CARTER, MARK | ADDRESS ON FILE |
| CASEY, JON E | ADDRESS ON FILE |
| CASSELL, LOY WILLIAM III | ADDRESS ON FILE |
| CASSELL, SAM | ADDRESS ON FILE |
| CASTELLANOS, GEORGE | ADDRESS ON FILE |
| CASTILLO, LORENZO | ADDRESS ON FILE |
| CASTROCOREA, JONATHAN | ADDRESS ON FILE |
| CENTRAL PA TEAMSTERS HEALTH&WELFARE FUND | C/O WILLIG WILLIAMS & DAVIDSON ATTN JAMES S BEALL, ESQ 1845 WALNUT ST, 24TH FL PHILADELPHIA PA 19103 |
| CENTRAL PA TEAMSTERS HEALTH&WELFARE FUND | ATTN JOSEPH J SAMOLEWICZ, ADMINISTRATOR 1055 SPRING ST WYOMISSING PA 19610 |
| CENTRAL PA TEAMSTERS HEALTH&WELFARE FUND | ATTN MICHAEL BUSENKELL, ESQ GELLERT SCALI BUSENKELL & BROWN LLC 1201 N ORANGE ST STE 300 WILMINGTON DE 19801 |
| CENTRAL PA TEAMSTERS HEALTH&WELFARE FUND | C/O GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL ESQ 1201 N ORANGE ST STE 300 WILMINGTON DE 19801 |
| CENTRAL PA TEAMSTERS PENSION FUND | C/O WILLIG WILLIAMS & DAVIDSON ATTN JAMES S BEALL, ESQ 1845 WALNUT ST, 24TH FL PHILADELPHIA PA 19103 |
| CENTRAL PA TEAMSTERS PENSION FUND | ATTN JOSEPH J SAMOLEWICZ, ADMINISTRATOR 1055 SPIRNG ST WYOMISSING PA 19610 |
| CENTRAL PA TEAMSTERS PENSION FUND | C/O GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL, ESQ 1201 N ORANGE ST, STE 300 WILMINGTON DE 19801 |
| CENTRAL PA TEAMSTERS PENSION FUND | ATTN MICHAEL BUSENKELL, ESQ GELLERT SCALI BUSENKELL & BROWN LLC 1201 N ORANGE ST STE 300 WILMINGTON DE 19801 |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST | AREAS HEALTH AND WELFARE FUND ATTN ANDREW SPRAU 8647 W HIGGINS RD CHICAGO IL 60631 |
| CHACON, JOHN | ADDRESS ON FILE |
| CHAMBERS, MICHAEL JAMES, SR | ADDRESS ON FILE |
| CHAMBERS, YOLANZA | ADDRESS ON FILE |
| CHAPMAN, DONALD WAYNE | ADDRESS ON FILE |
| CHAPPELL, HERMAN | ADDRESS ON FILE |
| CHAPUT, JAMES | ADDRESS ON FILE |
| CHAVEZ, ANGEL | ADDRESS ON FILE |
| CHAVEZ, GABRIEL | ADDRESS ON FILE |
| CHAVEZ, RICHARD | ADDRESS ON FILE |
| CHEEKS, PATRICK | ADDRESS ON FILE |
| CHENEY, JAY | ADDRESS ON FILE |
| CHRISTIE, CRAIG D | ADDRESS ON FILE |
| CHRISTIE, MICHAEL A | ADDRESS ON FILE |
| CHRISTMAN, ALBERT F, JR | ADDRESS ON FILE |
| CIFUENTES, ELVI | ADDRESS ON FILE |
| CLARETT, KENNETH | ADDRESS ON FILE |
| CLARK, DARRELL | ADDRESS ON FILE |
| CLAY, JERRY | ADDRESS ON FILE |
| CLEMENS, JEFFERY | ADDRESS ON FILE |
| CLEVELAND, MARIO | ADDRESS ON FILE |
| CLINGENPEEL, STEVEN | ADDRESS ON FILE |
| COLBERT, MILTON | ADDRESS ON FILE |
| COLE, MIKE | ADDRESS ON FILE |
| COLE, TRENTON | ADDRESS ON FILE |
| COLLINGWOOD, ANTHONY | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| COLLINS, GARY | ADDRESS ON FILE |
| COLQUHOUN, SCOTT | ADDRESS ON FILE |
| COLTER, DERRICK | ADDRESS ON FILE |
| COMO, ARTHUR F | ADDRESS ON FILE |
| COMO, ARTHUR F | ADDRESS ON FILE |
| COMPAGNONI, JAMES | ADDRESS ON FILE |
| CONCIALDI, ANTONINO | ADDRESS ON FILE |
| CONCIALDI, ANTONINO | ADDRESS ON FILE |
| CONERLY, KERRY | ADDRESS ON FILE |
| CONNER, FRED J | ADDRESS ON FILE |
| CONRAD, MICHAEL A | ADDRESS ON FILE |
| CONSAUL, ERIC | ADDRESS ON FILE |
| CONSAUL, ERIC | ADDRESS ON FILE |
| COOK, CLAUDE EDWARD | ADDRESS ON FILE |
| COOK, CLAUDE EDWARD | ADDRESS ON FILE |
| COOK, MIKE | ADDRESS ON FILE |
| COOMER, ROBERT H | ADDRESS ON FILE |
| COOPER, WILLIAM LOUIS | ADDRESS ON FILE |
| COOPER, WILLIAM LOUIS | ADDRESS ON FILE |
| COREY, TIMOTHY | ADDRESS ON FILE |
| COREY, TIMOTHY | ADDRESS ON FILE |
| CORN, MAURICE | ADDRESS ON FILE |
| CORNISH, BRAD ALAN | ADDRESS ON FILE |
| CORRALES, JOSE C | ADDRESS ON FILE |
| CORSON, SHAWNE | ADDRESS ON FILE |
| CORTEZ, MIGUEL | ADDRESS ON FILE |
| CORTEZ, MIGUEL | ADDRESS ON FILE |
| COSS, APOLINAR | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G AS CLASS CLAIMANT170 | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G AS CLASS CLAIMANT170 | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G, AS CLASS CLAIMANT | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G, AS CLASS CLAIMANT | ADDRESS ON FILE |
| COUGHLEN, WILLIAM G. AS CLASS CLAIMANT | ADDRESS ON FILE |
| COVARRUBIAS, ENRIQUE | ADDRESS ON FILE |
| COX, NERVILLE | ADDRESS ON FILE |
| CRANKFIELD, JEROME CURTIS | ADDRESS ON FILE |
| CRAVEN, GEOFFREY | ADDRESS ON FILE |
| CRAWFORD, BRIAN | ADDRESS ON FILE |
| CRESPIN, ROBERT | ADDRESS ON FILE |
| CREW, ROBERT E, JR | ADDRESS ON FILE |
| CROFT, RONALD | ADDRESS ON FILE |
| CROMWELL, MICHAEL | ADDRESS ON FILE |
| CROSS, KATHLEEN | ADDRESS ON FILE |
| CROSS, KATHLEEN | ADDRESS ON FILE |
| CROSSWHITE, JAMES L | ADDRESS ON FILE |
| CRUZ, CHRISTOPHER | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| CRUZ, CHRISTOPHER | ADDRESS ON FILE |
| CRUZ, JOSE L | ADDRESS ON FILE |
| CURLEY, KEVIN | ADDRESS ON FILE |
| CURLEY, KEVIN | ADDRESS ON FILE |
| CURTIS, LARRY | ADDRESS ON FILE |
| CUZUBAN, IONEL | ADDRESS ON FILE |
| DALFONZO, MARK W | ADDRESS ON FILE |
| DALLAS, ROBERT | ADDRESS ON FILE |
| DANIELS, DANNY | ADDRESS ON FILE |
| DANIELS, JAMES, JR | ADDRESS ON FILE |
| DAVEY, DANIEL | ADDRESS ON FILE |
| DAVILA, STEPHANIE | ADDRESS ON FILE |
| DAVIS, RUFUS | ADDRESS ON FILE |
| DAVIS, TOBY | ADDRESS ON FILE |
| DAVIS, TOBY | ADDRESS ON FILE |
| DEAN, BRANDON HEATH | ADDRESS ON FILE |
| DEAN, RANDALL | ADDRESS ON FILE |
| DEIBLER, RANDOLPH S | ADDRESS ON FILE |
| DEITZ, PAUL | ADDRESS ON FILE |
| DEL HORNO, PEDRO | ADDRESS ON FILE |
| DELA CRUZ, MARCO A | ADDRESS ON FILE |
| DELANCEY, ALBERT | ADDRESS ON FILE |
| DELARSO, ALAN | ADDRESS ON FILE |
| DENDY, TIMOTHY W | ADDRESS ON FILE |
| DENNIS, CHRISTOPHER | ADDRESS ON FILE |
| DEPILLO, JEFFERY | ADDRESS ON FILE |
| DESMOND, JAMES | ADDRESS ON FILE |
| DESMOND, JAMES | ADDRESS ON FILE |
| DEUTSCHMAN, JAMES A | ADDRESS ON FILE |
| DEWALT, DREW | ADDRESS ON FILE |
| DEWALT, ROSE | ADDRESS ON FILE |
| DIAZ, ARTURO | ADDRESS ON FILE |
| DIAZ, ARTURO | ADDRESS ON FILE |
| DIAZ, ARTURO | ADDRESS ON FILE |
| DIAZ, GERARDO | ADDRESS ON FILE |
| DIAZ, GERARDO | ADDRESS ON FILE |
| DIAZ, HELADIO LOPEZ | ADDRESS ON FILE |
| DIAZ, JULIO | ADDRESS ON FILE |
| DIAZ, MARY KAY | ADDRESS ON FILE |
| DIAZ, MARY KAY | ADDRESS ON FILE |
| DIAZ, RAFAEL | ADDRESS ON FILE |
| DIETRICH, RICHARD | ADDRESS ON FILE |
| DILLS, TOMMY | ADDRESS ON FILE |
| DIXON, JASPER | ADDRESS ON FILE |
| DIXON, JASPER | ADDRESS ON FILE |
| DOBER, JEFFREY | ADDRESS ON FILE |
| DOBER, JEFFREY | ADDRESS ON FILE |
| DODDERER, BRIAN | ADDRESS ON FILE |
| DOERHOFF, ROGER J | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| DOMIN, STEVEN | ADDRESS ON FILE |
| DOMS, HERMAN W | ADDRESS ON FILE |
| DONALDSON, MICHAEL | ADDRESS ON FILE |
| DONMOYER, KENNETH M, JR | ADDRESS ON FILE |
| DOOLEY, MARK WILLIAM | ADDRESS ON FILE |
| DOUD, BRIAN | ADDRESS ON FILE |
| DRESSLER, THOMAS R, JR | ADDRESS ON FILE |
| DRUMMER, JIMMIE | ADDRESS ON FILE |
| DUFFY, TOM | ADDRESS ON FILE |
| DUKE, MICHAEL | ADDRESS ON FILE |
| DUNCAN, ARNOLD | ADDRESS ON FILE |
| DUNCAN, ARNOLD | ADDRESS ON FILE |
| DUNLAP, TIMOTHY L | ADDRESS ON FILE |
| DURAN, STEVE | ADDRESS ON FILE |
| DURK, DENNIS A | ADDRESS ON FILE |
| DURK, DENNIS A | ADDRESS ON FILE |
| DURKIN, BRIAN | ADDRESS ON FILE |
| DURNIN, PAUL V, III | ADDRESS ON FILE |
| DUVALL, KIRK O | ADDRESS ON FILE |
| DYMEK, LESLAW | ADDRESS ON FILE |
| DYMEK, LESLAW | ADDRESS ON FILE |
| DYNARSKI, LAWRENCE | ADDRESS ON FILE |
| DYSON, KEITH | ADDRESS ON FILE |
| EADS, BRIAN S | ADDRESS ON FILE |
| EARLEY, STEPHANIE | ADDRESS ON FILE |
| EATON, PLUMMER D | ADDRESS ON FILE |
| ECKLOFF, JOHN | ADDRESS ON FILE |
| EDGIN, JAMES | ADDRESS ON FILE |
| EDVARDSEN, SCOTT | ADDRESS ON FILE |
| EDVARDSEN, SCOTT | ADDRESS ON FILE |
| EDWARDS, KENNETH RAY | ADDRESS ON FILE |
| ELDRIDGE, LARRY | ADDRESS ON FILE |
| ELLERMAN, MICHELLE | ADDRESS ON FILE |
| ELLERMAN, MICHELLE | ADDRESS ON FILE |
| ELLIOTT, ROBERT | ADDRESS ON FILE |
| ELLIS, DANIEL | ADDRESS ON FILE |
| ELLIS, DANIEL | ADDRESS ON FILE |
| ELROD, KOEY | ADDRESS ON FILE |
| EMPLOYMENT PARTNERS BENEFITS FUND | ATTN: WILLIAM L. PARRY, JR., DIRECTOR 50 ABELE ROAD SUITE 1005 BRIDGEVILLE PA 15017 |
| ENGLISH, ALLEN | ADDRESS ON FILE |
| EPLER, MICHAEL J | ADDRESS ON FILE |
| EPLER, MICHAEL J | ADDRESS ON FILE |
| ESCO, CATRINA | ADDRESS ON FILE |
| ESCOBEDO, JESUS M | ADDRESS ON FILE |
| ESPENOZA, JUAN | ADDRESS ON FILE |
| ESPINOZA, LAURO | ADDRESS ON FILE |
| ESPINOZA, MAVRICIO | ADDRESS ON FILE |
| ETTER, JESSE | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| ETTER, JESSE E | ADDRESS ON FILE |
| EWING, KATHLEEN | ADDRESS ON FILE |
| FAGGANS, HOWARD | ADDRESS ON FILE |
| FARLEY, SAMUEL | ADDRESS ON FILE |
| FARMER, MICHAEL | ADDRESS ON FILE |
| FARNER, MACHELL E | ADDRESS ON FILE |
| FARRELL, MARTY | ADDRESS ON FILE |
| FARRELL, MARTY | ADDRESS ON FILE |
| FATTORE, CATHY | ADDRESS ON FILE |
| FAULKNER, CLARK | ADDRESS ON FILE |
| FAULKNER, CLARK | ADDRESS ON FILE |
| FAUVER, RANDY | ADDRESS ON FILE |
| FENNER, MARCUS | ADDRESS ON FILE |
| FENNER, MARCUS | ADDRESS ON FILE |
| FERNANDEZ, RAYMOND, JR | ADDRESS ON FILE |
| FERRER, BENJAMIN | ADDRESS ON FILE |
| FERRER, BENJAMIN | ADDRESS ON FILE |
| FIGUEROA, SALVADOR | ADDRESS ON FILE |
| FILIPPI, PAUL | ADDRESS ON FILE |
| FILIPPI, PAUL | ADDRESS ON FILE |
| FISCHER, WILLIAM L | ADDRESS ON FILE |
| FISCHER, WILLIAM L | ADDRESS ON FILE |
| FISHER, ROBERT | ADDRESS ON FILE |
| FITCH, NICK | ADDRESS ON FILE |
| FLEMING, DEMARCO | ADDRESS ON FILE |
| FLEMING, DEMARCO | ADDRESS ON FILE |
| FLEMING, DEMARCO | ADDRESS ON FILE |
| FLEMING, DEMARCO | ADDRESS ON FILE |
| FLETCHER, MCKINLEY | ADDRESS ON FILE |
| FLORES, ANA | ADDRESS ON FILE |
| FOGEL, JOSEPH W, II | ADDRESS ON FILE |
| FOHRMAN, PAUL | ADDRESS ON FILE |
| FOHRMAN, PAUL | ADDRESS ON FILE |
| FORSYTH, AMOS J | ADDRESS ON FILE |
| FOSTER, ANISSA | ADDRESS ON FILE |
| FOSTER, JACKSON K | ADDRESS ON FILE |
| FRANCO, JORGE C | ADDRESS ON FILE |
| FRANKS, BOBBY LEWIS | ADDRESS ON FILE |
| FREDERICK, RALPH (RANDY) A, III | ADDRESS ON FILE |
| FREDERICKS, RAYMOND C | ADDRESS ON FILE |
| FREDERICKS, RAYMOND CHARLES | ADDRESS ON FILE |
| FREDRICK, JERRY | ADDRESS ON FILE |
| FREEMAN, MONDO | ADDRESS ON FILE |
| FREEMAN, PATRICK J | ADDRESS ON FILE |
| FREEMAN, PATRICK J | ADDRESS ON FILE |
| FRITH, BARBARA | ADDRESS ON FILE |
| FRONTCZAK, ERIC | ADDRESS ON FILE |
| FUENTES, ROBERT | ADDRESS ON FILE |
| FURMANEK, TOM | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| FURROW, EUGENE | ADDRESS ON FILE |
| GABBARD, DARRELL | ADDRESS ON FILE |
| GARCIA, CHRISTINA | ADDRESS ON FILE |
| GARCIA, CHRISTINA | ADDRESS ON FILE |
| GARCIA, FRANK | ADDRESS ON FILE |
| GARCIA, FRANK | ADDRESS ON FILE |
| GARCIA, GUSTAVO | ADDRESS ON FILE |
| GARCIA, JAVIER | ADDRESS ON FILE |
| GARCIA, SELENA | ADDRESS ON FILE |
| GARCIA, SERGIO | ADDRESS ON FILE |
| GARDNER, SCOTT | ADDRESS ON FILE |
| GARDNER, VICTOR | ADDRESS ON FILE |
| GARNER, RICHARD | ADDRESS ON FILE |
| GARNER, RICHARD | ADDRESS ON FILE |
| GARRETT, RUSSELL E | ADDRESS ON FILE |
| GAUKER, GLENN JR | ADDRESS ON FILE |
| GILLES, AROLD JEAN | ADDRESS ON FILE |
| GILLESPIE, STEVE | ADDRESS ON FILE |
| GONZALES, CHRISTOPHER A | ADDRESS ON FILE |
| HARPER, MICHAEL RAY | ADDRESS ON FILE |
| HEGEWALD, DAVID | ADDRESS ON FILE |
| HERNANDEZ, JERRY | ADDRESS ON FILE |
| HEYSER, MIKE | ADDRESS ON FILE |
| HILL, AMBER | ADDRESS ON FILE |
| HRABNICKY, ANGELA | ADDRESS ON FILE |
| IAMAW | C/O THE PREVIANT LAW FIRM SC ATTN EMMA M WOODS 310 W WINSCONSIN AVE, STE 100MW MILWAUKEE WI 53203 |
| IBT AND TNFINC | C/O THE PREVIANT LAW FIRM SC ATTN EMMA M WOODS 310 W WISCONSIN AVE, STE 100 MW MILWAUKEE WI 53203 |
| IBT AND TNFINC | THE PREVIANT LAW FIRM, S.C. C/O EMMA M. WOODS 310 W WISCONSIN AVE SUITE 100 MW MILWAUKEE WI 53203 |
| INT'L ASSN. MOTOR CITY MCH. PENSION FUND | C/O NOVARA LAW ATTN PAUL M NEWCOMER 888 W. BIG BEAVER RD, STE 600 TROY MI 48084 |
| INT'L ASSN. MOTOR CITY MCH. WELFARE FUND | C/O NOVARA LAW ATTN PAUL M NEWCOMER 888 W BIG BEAVER RD, STE 600 TROY MI 48084 |
| JOHNSON, TROY | ADDRESS ON FILE |
| JONES, JOSEPH S, JR | ADDRESS ON FILE |
| KAPPEL, AMY | ADDRESS ON FILE |
| KRAGT, AARON | ADDRESS ON FILE |
| LEE, ROBERT | ADDRESS ON FILE |
| LOPEZ LEMUS, JULIO ERNESTO | ADDRESS ON FILE |
| MAY, SHANNON | ADDRESS ON FILE |
| MAYES, GALEN | ADDRESS ON FILE |
| MCDONNELL, CHRIS | ADDRESS ON FILE |
| MID-JERSEY TRUCKING INDUSTRY | C/O BRADY M CONNAUGHTON, ESQ 669 RIVER DR, STE 125 ELMWOOD PARK NJ 07407 |
| MID-JERSEY TRUCKING INDUSTRY AND | C/O BRADY M CONNAUGHTON, ESQ 669 RIVER DR, STE 125 ELMWOOD PARK NJ 07407 |
| MILNE, THOMAS | ADDRESS ON FILE |
| NADEAU, DAWN E | ADDRESS ON FILE |
| NADEAU, DAWN E | ADDRESS ON FILE |
| NEW YORK STATE DEPARTMENT OF LABOR | 1220 WASHINGTON AVE, RM 509 ALBANY NY 12226 |

| Claim Name | Address Information |
|---|---|
| NORTH, ROBERT | ADDRESS ON FILE |
| NY STATE TEAMSTERS COUNCIL H&H FUND | C/O PARAVATI, KARL, GREEN & DEBELLA LLP ATTN VINCENT M DEBELLA, ESQ 520 SENECA ST, STE 105 UTICA NY 13501 |
| NY STATE TEAMSTERS COUNCIL H&H FUND | C/O PARAVATI, KARL, GREEN & DEBELLA LLP ATTN VINCENT M DEBELLA, ESQ 520 SENECA ST, STE 105 UTICA NY 13502 |
| ORTLIEB, KEITH | ADDRESS ON FILE |
| PADILLA, JAIME DIAZ | ADDRESS ON FILE |
| PEREZ, JORDAN | ADDRESS ON FILE |
| PERNAS, NOEL | ADDRESS ON FILE |
| PFAU, SALLY | ADDRESS ON FILE |
| PHIPPIN, THOMAS | ADDRESS ON FILE |
| PICHEL, CONRADO | ADDRESS ON FILE |
| PITTMAN, SANDRA | ADDRESS ON FILE |
| POWELL, JAMES | ADDRESS ON FILE |
| RADICH, TIMOTHY | ADDRESS ON FILE |
| REDAROWICZ, TIMOTHY | ADDRESS ON FILE |
| ROBERSON, ROBBIE L | ADDRESS ON FILE |
| ROBERSON, ROBBIE L | ADDRESS ON FILE |
| ROBERTS, BRYANT | ADDRESS ON FILE |
| RODRIGUEZ, AMAURY R | ADDRESS ON FILE |
| RUIZ, CARLOS FLORES | ADDRESS ON FILE |
| SACHA, JOSIAH | ADDRESS ON FILE |
| SANTORO, GENEVIEVE | ADDRESS ON FILE |
| SENA, GRACE | ADDRESS ON FILE |
| SHANNON, DAVID | ADDRESS ON FILE |
| SHERMAN, CANDICE A | ADDRESS ON FILE |
| SMITH, CHARLES GREYSON | ADDRESS ON FILE |
| SMITH, SAMMIE | ADDRESS ON FILE |
| TEAMSTERS LOCAL 170 HEALTH & | WELFARE FUND ATTN RAYMOND J REED 330 SW CUTOFF, STE 202 WORCESTER MA 01604 |
| TEAMSTERS LOCAL 170 HEALTH & | RAYMOND J REED FUND COUNSEL/ADMINISTRATOR TEAMSTER 170 HEALTH & WELFARE FUND 330 SW CUTOFF STE 202 WORCESTER MA 01604 |
| TEAMSTERS LOCAL 170 HEALTH & | RAYMOND J REED FUND COUNSEL/ADMINISTRATOR TEAMSTERS 170 HEALTH & WELFARE FUND 330 SW CUTOFF STE 202 WORCESTER MA 01604 |
| TEAMSTERS LOCAL 170 HEALTH & | RAYMOND J REED FUND COUNSEL/ADMINISTRATOR TEAMSTER LOCAL 170 HEALTH & WELFARE FUND 330 SW CUTOFF STE 202 WORCESTER MA 01604 |
| TEAMSTERS LOCAL 170 HEALTH & | RAYMOND J REED FUND COUNSEL/ADMINISTRATOR TEAMSTERS LOCAL 170 HEALTH & WELFA[MORE] 330 SW CUTOFF, STE. 202 WORSTER MA 01604 |
| TEAMSTERS LOCAL 701 | C/O BRADY M CONNAUGHTON, ESQ 669 RIVER DR, STE 125 ELMWOOD PARK NJ 07407 |
| TEAMSTERS LOCAL 710 | 9000 W 187TH ST MOKENA IL 60448 |
| TEAMSTERS LOCAL 710 | TEAMSTERS LOCAL 710 ATTN PHILIP REAMS, TRUSTEE/BUSINESS AGENT 9000 W 187TH ST MOKENA IL 60448 |
| TEAMSTERS LOCAL 710 HEALTH & WELFARE FND | C/O WILLIG WILLIAMS & DAVIDSON ATTN JAMES S BEALL, ESQ 1845 WALNUT ST, 24TH FL PHILADELPHIA PA 19103 |
| TEAMSTERS LOCAL 710 HEALTH & WELFARE FND | C/O GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL, ESQ 1201 N ORANGE ST, STE 300 WILMINGTON DE 19801 |
| TEAMSTERS LOCAL 710 HEALTH & WELFARE FND | GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL, ESQ 1201 N ORANGE ST, STE 300 WILMINGTON DE 19801 |
| TEAMSTERS LOCAL 710 HEALTH & WELFARE FND | ATTN MICHAEL O'MALLEY, ADMINISTRATOR 9000 W 187THST, STE 200 MOKENA IL 60448 |
| TEAMSTERS LOCAL 710 HEALTH & WELFARE FND | ATTN MICHAEL O'MALLEY, ADMINISTRATOR 9000 W 187TH ST, STE1200 PHILADELPHIA PA 60448 |

| Claim Name | Address Information |
|---|---|
| TEAMSTERS LOCAL 710 PENSION FUND | C/O WILLIG WILLIAMS & DAVIDSON ATTN JAMES S BEALL, ESQ 1845 WALNUT ST, 24TH FL PHILADELPHIA PA 19103 |
| TEAMSTERS LOCAL 710 PENSION FUND | GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL, ESQ 1201 N ORANGE ST, STE 300 WILMINGTON DE 19801 |
| TEAMSTERS LOCAL 710 PENSION FUND | C/O GELLERT SCALI BUSENKELL & BROWN LLC ATTN MICHAEL BUSENKELL, ESQ 1201 N ORANGE ST, STE 300 WILMINGTON DE 19801 |
| TEAMSTERS LOCAL 710 PENSION FUND | ATTN MICHAEL O'MALLEY, ADMINISTRATOR 9000 W 187TH ST, STE 200 MOKENA IL 60448 |
| TEAMSTERS LOCAL UNION 560 | C/O BRADY M CONNAUGHTON, ESQ 669 RIVER DR, STE 125 ELMWOOD PARK NJ 07407 |
| TORRES, VIDAL | ADDRESS ON FILE |
| TORRES, VIDAL | ADDRESS ON FILE |
| TORRES, VIDAL | ADDRESS ON FILE |
| TORRES, VIDAL | ADDRESS ON FILE |
| TOSO, MICHAEL | ADDRESS ON FILE |
| UNDERKOFFLER, MICHAEL | ADDRESS ON FILE |
| WEDEL, RYAN | ADDRESS ON FILE |
| WESTERN PA TEAMSTERS PENSION FUND | ATTN VINCENT P SZELIGO, ESQ 900 PARISH ST, STE 101 PITTSBURGH PA 15220 |
| WESTERN PA TEAMSTERS PENSION FUND | C/O VINCENT P SZELIGO, ESQ 900 PARISH ST, STE 101 PITTSBURGH PA 15220 |
| WESTERN PA TEAMSTERS PENSION FUND | ATTN VINCENT P SZELIGO, ESQ 900 PARISH ST, STE 101 PO BOX 223604 PITTSBURGH PA 15220 |
| WHITE, ARTHUR | ADDRESS ON FILE |
| WI DEPT OF WORKFORCE DEVELOPMENT ERD | ATTN MATTHEW WHITE, DIRECTOR, ERD 201 E WASHINGTON AVE, A100 MADISON WI 53703 |
| WI DEPT OF WORKFORCE DEVELOPMENT ERD | ATTN MICHAEL D MORRIS, AAG 17 W MAIN PO BOX 7857 MADISON WI 53707 |
| WRIGHT, ARTHUR | ADDRESS ON FILE |
| XIDES, NICK | ADDRESS ON FILE |
| ZEIGLER, KENNETH | ADDRESS ON FILE |

**Total Creditor count  536**

| Claim Name | Address Information |
|---|---|
| GARY, MICHAEL | ADDRESS ON FILE |
| GARZA, LEONARDO | ADDRESS ON FILE |
| GAWRON, STEPHEN | ADDRESS ON FILE |
| GEARING, DIAMOND | ADDRESS ON FILE |
| GEEDEY, STEVEN | ADDRESS ON FILE |
| GERMAN, ZERMENO | ADDRESS ON FILE |
| GESFORD, COREY | ADDRESS ON FILE |
| GEYER, STEPHEN | ADDRESS ON FILE |
| GILBERT, BRYCE | ADDRESS ON FILE |
| GILLESPIE, LAVETTACU L | ADDRESS ON FILE |
| GILLIAM, AUTURIEO | ADDRESS ON FILE |
| GILLON, CARL S | ADDRESS ON FILE |
| GIPSON, BERNARD | ADDRESS ON FILE |
| GITT-ETTER, JODI | ADDRESS ON FILE |
| GLASS, CORY L | ADDRESS ON FILE |
| GLASS, CORY L | ADDRESS ON FILE |
| GLISSON, KEITH | ADDRESS ON FILE |
| GOBRECHT, THOMAS MARION | ADDRESS ON FILE |
| GOESER, KENNETH | ADDRESS ON FILE |
| GOMEZ, LEONARDO | ADDRESS ON FILE |
| GOMEZ, LUIS | ADDRESS ON FILE |
| GONZALES GAMBOA, ALEXANDER | ADDRESS ON FILE |
| GONZALEZ, JOSE ARMENDARIZ | ADDRESS ON FILE |
| GONZALEZ, WENCE | ADDRESS ON FILE |
| GOODHEER, THOMAS C | ADDRESS ON FILE |
| GORE, TOM | ADDRESS ON FILE |
| GOSSERAND, ANTHONY | ADDRESS ON FILE |
| GRACE, WILLIE JAMES, JR | ADDRESS ON FILE |
| GRADY, CINDY | ADDRESS ON FILE |
| GRADY, CINDY | ADDRESS ON FILE |
| GRADY, JERMAINE S | ADDRESS ON FILE |
| GRADY, JERMAINE S | ADDRESS ON FILE |
| GREEN, JOHN | ADDRESS ON FILE |
| GREENFIELD, DOUGLAS L | ADDRESS ON FILE |
| GREENWOOD, MATTHEW | ADDRESS ON FILE |
| GREER, HARRY, III | ADDRESS ON FILE |
| GREGOLUNAS, JOHN F, JR | ADDRESS ON FILE |
| GREGOLUNAS, JOHN F, JR | ADDRESS ON FILE |
| GREGOR, HARRY | ADDRESS ON FILE |
| GREGOR, HARRY | ADDRESS ON FILE |
| GRIBBEN, ROBERT | ADDRESS ON FILE |
| GRIBBEN, ROBERT | ADDRESS ON FILE |
| GRIBBEN, ROBERT | ADDRESS ON FILE |
| GRIFFIN, BRENTLEY | ADDRESS ON FILE |
| GRINSTON, ANTHONY | ADDRESS ON FILE |
| GROEBEL, BRIAN A | ADDRESS ON FILE |
| GROFF, MICHAEL R | ADDRESS ON FILE |
| GRUBB, DONALD | ADDRESS ON FILE |
| GRUENBERG, JEREMY | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| GUERRERO, JILDARDO | ADDRESS ON FILE |
| HADAWAY, JASON | ADDRESS ON FILE |
| HAIR, JODY | ADDRESS ON FILE |
| HALES, BENJAMIN | ADDRESS ON FILE |
| HALES, BENJAMIN | ADDRESS ON FILE |
| HALWEG, CHARLES R | ADDRESS ON FILE |
| HALWEG, CHARLES R | ADDRESS ON FILE |
| HANSEN, TODD | ADDRESS ON FILE |
| HARDY, ERIC | ADDRESS ON FILE |
| HARNER, ROY D | ADDRESS ON FILE |
| HARPER, ARICO | ADDRESS ON FILE |
| HARRALL, GARY JOE | ADDRESS ON FILE |
| HARRALL, GARY W | ADDRESS ON FILE |
| HARRIS, AHKEEM | ADDRESS ON FILE |
| HARRISON, DANNY | ADDRESS ON FILE |
| HARRISON, GARY | ADDRESS ON FILE |
| HARTMAN, CARL | ADDRESS ON FILE |
| HARTMAN, RANDY R | ADDRESS ON FILE |
| HARVEY, KEVIN | ADDRESS ON FILE |
| HARVEY, REGINALD | ADDRESS ON FILE |
| HAYES, BEARRY | ADDRESS ON FILE |
| HAYNES, STANLEY | ADDRESS ON FILE |
| HAYNES, STANLEY | ADDRESS ON FILE |
| HAYWARD, ANTHONY | ADDRESS ON FILE |
| HAZELWOOD, EMMETT | ADDRESS ON FILE |
| HEATER, ANGELA | ADDRESS ON FILE |
| HEATH, JASON B | ADDRESS ON FILE |
| HECTOR, LOUIS, JR | ADDRESS ON FILE |
| HECTOR, LOUIS, JR | ADDRESS ON FILE |
| HEISEY, ROBERT JR | ADDRESS ON FILE |
| HENDERSON, HALLE | ADDRESS ON FILE |
| HENDERSON, SCOTT S | ADDRESS ON FILE |
| HENDERSON, SCOTT S | ADDRESS ON FILE |
| HENNIS, DENNIS | ADDRESS ON FILE |
| HENNIS, DENNIS | ADDRESS ON FILE |
| HENRY, CORY C | ADDRESS ON FILE |
| HENRY, CORY C | ADDRESS ON FILE |
| HENRY, PAUL A | ADDRESS ON FILE |
| HENSEL, TIMOTHY M | ADDRESS ON FILE |
| HENSEL, TIMOTHY M | ADDRESS ON FILE |
| HERNANDEZ, JORGE | ADDRESS ON FILE |
| HERNANDEZ, JOSE J | ADDRESS ON FILE |
| HERNANDEZ, PABLO | ADDRESS ON FILE |
| HERNANDEZ-LACY, SEAN | ADDRESS ON FILE |
| HERRERA, BRIAN P | ADDRESS ON FILE |
| HERRERA, BRIAN P | ADDRESS ON FILE |
| HERRINGTON, DAVID | ADDRESS ON FILE |
| HERTZOG, RANDY | ADDRESS ON FILE |
| HESSION, ALEX | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| HICKEY, HAROLD | ADDRESS ON FILE |
| HIDA, KHALID | ADDRESS ON FILE |
| HIGAREDA, LUIS E | ADDRESS ON FILE |
| HIGHTOWER, HUSANI | ADDRESS ON FILE |
| HIGHTOWER, HUSANI | ADDRESS ON FILE |
| HILLS, TAS | ADDRESS ON FILE |
| HOBBS, ALICE | ADDRESS ON FILE |
| HOBBS, ALICE | ADDRESS ON FILE |
| HOCH, ROBERT L | ADDRESS ON FILE |
| HOCKENBERRY, BRADLEY A | ADDRESS ON FILE |
| HOERLER, MICHAEL E | ADDRESS ON FILE |
| HOERLER, MICHAEL E | ADDRESS ON FILE |
| HOLEWINSKI, ANDREW | ADDRESS ON FILE |
| HOLLINS, KENNY | ADDRESS ON FILE |
| HOLLIS, AARON | ADDRESS ON FILE |
| HOLLIS, AARON | ADDRESS ON FILE |
| HOLLIS, AARON | ADDRESS ON FILE |
| HOLLON, STEVEN | ADDRESS ON FILE |
| HOLLON, STEVEN | ADDRESS ON FILE |
| HOLT, ROGER K | ADDRESS ON FILE |
| HOMYAK, DANIEL | ADDRESS ON FILE |
| HOOVER, CARL M | ADDRESS ON FILE |
| HORNBAKER, RUSSELL J, JR | ADDRESS ON FILE |
| HOUGH, KERRY | ADDRESS ON FILE |
| HOWARD, JOSHUA | ADDRESS ON FILE |
| HOWARD, REED | ADDRESS ON FILE |
| HOWARD, REED | ADDRESS ON FILE |
| HUBBERT, KARENA | ADDRESS ON FILE |
| HUBBS, MICHAEL | ADDRESS ON FILE |
| HUBERTZ, ROBERT | ADDRESS ON FILE |
| HUDSON, JERRY | ADDRESS ON FILE |
| HUDSON, JERRY | ADDRESS ON FILE |
| HUDSON, STEPHEN, SR | ADDRESS ON FILE |
| HUERTA, CESAR | ADDRESS ON FILE |
| HUERTA, JESUS | ADDRESS ON FILE |
| HUERTA, MARIO | ADDRESS ON FILE |
| HUFF, LEE | ADDRESS ON FILE |
| HUGHES, KEIDRON JERMAINE | ADDRESS ON FILE |
| HUGUNIN, CURTIS | ADDRESS ON FILE |
| HURD, DERON | ADDRESS ON FILE |
| HURD, DERON | ADDRESS ON FILE |
| HURLEY, DARREL | ADDRESS ON FILE |
| HURLEY, DARREL | ADDRESS ON FILE |
| ISBELL, KENNETH D | ADDRESS ON FILE |
| ISIDORO, ANTONIO | ADDRESS ON FILE |
| ISTRE, DANIEL | ADDRESS ON FILE |
| JACKSON, DWIGHT | ADDRESS ON FILE |
| JACKSON, GINA D | ADDRESS ON FILE |
| JACKSON, JAMES W | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| JACKSON, JERRY | ADDRESS ON FILE |
| JACKSON, KYLE | ADDRESS ON FILE |
| JACOBS, BENJAMIN | ADDRESS ON FILE |
| JACOBS, DWIGHT | ADDRESS ON FILE |
| JACOBS, DWIGHT | ADDRESS ON FILE |
| JAMES, GARY | ADDRESS ON FILE |
| JAMES, MARTHA J | ADDRESS ON FILE |
| JAMES, MARTHA J | ADDRESS ON FILE |
| JAMES, NOAH | ADDRESS ON FILE |
| JAMES, RANDY | ADDRESS ON FILE |
| JAMES, ZACHARY | ADDRESS ON FILE |
| JEFFREY, DAVID L | ADDRESS ON FILE |
| JEFFREY, DAVID L | ADDRESS ON FILE |
| JENKINS, DUANE A | ADDRESS ON FILE |
| JENKINS, PHEAR | ADDRESS ON FILE |
| JENSEN, JEFFERY A | ADDRESS ON FILE |
| JENSEN, TRENT | ADDRESS ON FILE |
| JIMENEZ, IAN A | ADDRESS ON FILE |
| JOHANSEN, HENRY AL | ADDRESS ON FILE |
| JOHNSON, DERRELL | ADDRESS ON FILE |
| JOHNSON, DERRELL | ADDRESS ON FILE |
| JOHNSON, EDWARD, JR | ADDRESS ON FILE |
| JOHNSON, JACKIE LEE | ADDRESS ON FILE |
| JOHNSON, JEFFREY S | ADDRESS ON FILE |
| JOHNSON, JOHNNY | ADDRESS ON FILE |
| JOHNSON, MARVIN | ADDRESS ON FILE |
| JOHNSON, MARVIN | ADDRESS ON FILE |
| JOHNSON, SAMUEL | ADDRESS ON FILE |
| JOHNSON, SAMUEL | ADDRESS ON FILE |
| JOHNSON, TIMOTHY | ADDRESS ON FILE |
| JOHNSTON, SHAREE RENEE | ADDRESS ON FILE |
| JOHNSTON, SHAREE RENEE | ADDRESS ON FILE |
| JONES, BRYAN E | ADDRESS ON FILE |
| JONES, CHUCK | ADDRESS ON FILE |
| JONES, GARY WESLY | ADDRESS ON FILE |
| JONES, JAMES F | ADDRESS ON FILE |
| JORDAN, ANTHONY P | ADDRESS ON FILE |
| JORDAN, ANTHONY P | ADDRESS ON FILE |
| JOSEPH, MICHAEL | ADDRESS ON FILE |
| JOYCE, THOMAS | ADDRESS ON FILE |
| JOYCE, THOMAS | ADDRESS ON FILE |
| JUDGE, ALLEN | ADDRESS ON FILE |
| JUDGE, ALLEN | ADDRESS ON FILE |
| KANAGY, REBECCA | ADDRESS ON FILE |
| KARLUK, CHRISTINE D | ADDRESS ON FILE |
| KARR, JON W | ADDRESS ON FILE |
| KASPER, DALE | ADDRESS ON FILE |
| KASPER, DONNA | ADDRESS ON FILE |
| KASPER, RYAN | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| KAUSHAL, VARUN | ADDRESS ON FILE |
| KEEF, ROGER | ADDRESS ON FILE |
| KEEF, ROGER | ADDRESS ON FILE |
| KEITH, KEVIN | ADDRESS ON FILE |
| KELLOGG, DAVID J | ADDRESS ON FILE |
| KELLOGG, DAVID J | ADDRESS ON FILE |
| KELLY, JOHNNY L, JR | ADDRESS ON FILE |
| KELLY, RICHARD A | ADDRESS ON FILE |
| KELLY, RICHARD A | ADDRESS ON FILE |
| KELSHAW, STEVEN | ADDRESS ON FILE |
| KERN, KENNETH | ADDRESS ON FILE |
| KERN, KENNETH | ADDRESS ON FILE |
| KIMMEL, SHARON K | ADDRESS ON FILE |
| KIMMEL, SHARON K | ADDRESS ON FILE |
| KING, ADAM | ADDRESS ON FILE |
| KING, MELODY | ADDRESS ON FILE |
| KINNEY, SHELDON LEE | ADDRESS ON FILE |
| KIRBY, COREY | ADDRESS ON FILE |
| KLINE, KENNETH E, JR | ADDRESS ON FILE |
| KLINE, SCOTT | ADDRESS ON FILE |
| KLINGER, SHAWN M | ADDRESS ON FILE |
| KLINGLER, SHAWN M | ADDRESS ON FILE |
| KNAPP, JOHN | ADDRESS ON FILE |
| KNAPP, JOHN | ADDRESS ON FILE |
| KOCH, KEITH | ADDRESS ON FILE |
| KOEHLER, JOHN | ADDRESS ON FILE |
| KOEHLER, JOHN | ADDRESS ON FILE |
| KOFRON, JOE | ADDRESS ON FILE |
| KOFRON, JOE | ADDRESS ON FILE |
| KOGUT, MARK | ADDRESS ON FILE |
| KOHL, JOHNNY | ADDRESS ON FILE |
| KOHMAN, JAMES L | ADDRESS ON FILE |
| KOLEILAT, MAHER | ADDRESS ON FILE |
| KOLESNIKOV, FEDOR | ADDRESS ON FILE |
| KOLESNIKOV, FEDOR | ADDRESS ON FILE |
| KOTULA, JOHN JOSEPH, JR | ADDRESS ON FILE |
| KOZLOWSKI, MARK A | ADDRESS ON FILE |
| KOZLOWSKI, MARK A | ADDRESS ON FILE |
| KRANZ, LLOYD E | ADDRESS ON FILE |
| KRANZ, LLOYD E | ADDRESS ON FILE |
| KRESEFSKI, RAYMOND B | ADDRESS ON FILE |
| KRISKE, JEFFEREY | ADDRESS ON FILE |
| KROLCZYK, ROBERT | ADDRESS ON FILE |
| KUHN, PAUL A III | ADDRESS ON FILE |
| KULICK, DANIEL C | ADDRESS ON FILE |
| KUNSMAN, JAMES | ADDRESS ON FILE |
| KUNSMAN, JAMES | ADDRESS ON FILE |
| KUSMAN, JOSEPH J | ADDRESS ON FILE |
| LAFFERTY, JAMES J JR | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| LAIRD, BENJAMIN | ADDRESS ON FILE |
| LAIRD, BENJAMIN | ADDRESS ON FILE |
| LAKEBERG, KATHRYN M | ADDRESS ON FILE |
| LAKEBERG, KATHRYN M | ADDRESS ON FILE |
| LAKHAL, RACHID | ADDRESS ON FILE |
| LAMB, CURTIS | ADDRESS ON FILE |
| LAMB, DOUGLASS K | ADDRESS ON FILE |
| LAMB, DOUGLASS K | ADDRESS ON FILE |
| LANG, JOSEPH | ADDRESS ON FILE |
| LARSON, ERIC | ADDRESS ON FILE |
| LAWRENCE, RICK | ADDRESS ON FILE |
| LAWRENCE, RICK | ADDRESS ON FILE |
| LAWRENCE, ROBERT S | ADDRESS ON FILE |
| LAWRENCE, TERRAL | ADDRESS ON FILE |
| LAWS, SCOTT | ADDRESS ON FILE |
| LAZUK, THOMAS | ADDRESS ON FILE |
| LAZUK, THOMAS | ADDRESS ON FILE |
| LEACH, HARVEY J | ADDRESS ON FILE |
| LEASAU, EDWINA | ADDRESS ON FILE |
| LEE, MARCUS | ADDRESS ON FILE |
| LEE, SHAUN | ADDRESS ON FILE |
| LEE, SHAUN | ADDRESS ON FILE |
| LEE, TOBY | ADDRESS ON FILE |
| LEEKS, ERNIE | ADDRESS ON FILE |
| LEEKS, ERNIE | ADDRESS ON FILE |
| LEGARE, REBECCA | ADDRESS ON FILE |
| LEHMAN, JEFFREY | ADDRESS ON FILE |
| LEHMAN, LUKE | ADDRESS ON FILE |
| LEINER, JACOB A | ADDRESS ON FILE |
| LEINER, JACOB A | ADDRESS ON FILE |
| LEMON, JASON | ADDRESS ON FILE |
| LENICH, CHRISTOPHER A | ADDRESS ON FILE |
| LENING, MIKE | ADDRESS ON FILE |
| LENKER, GARY L | ADDRESS ON FILE |
| LEON, BALTAZAR | ADDRESS ON FILE |
| LESTER, SHEILA | ADDRESS ON FILE |
| LEWIS, ALEXIA | ADDRESS ON FILE |
| LEWIS, DEMARCUS | ADDRESS ON FILE |
| LEWIS, JOHN | ADDRESS ON FILE |
| LEWIS, KEVIN | ADDRESS ON FILE |
| LEWIS, KEVIN S | ADDRESS ON FILE |
| LEWIS, MICHAEL | ADDRESS ON FILE |
| LEWIS, MORRIS | ADDRESS ON FILE |
| LEWIS, PETER M. | ADDRESS ON FILE |
| LEWIS, TIMOTHY C | ADDRESS ON FILE |
| LILES, DARRIN | ADDRESS ON FILE |
| LILLY, MARCUS | ADDRESS ON FILE |
| LIPOME, SALVATORE | ADDRESS ON FILE |
| LITZAU, DAVID | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| LIVINGSTON, YUREE | ADDRESS ON FILE |
| LIZAK, DANIEL | ADDRESS ON FILE |
| LIZAK, DANIEL | ADDRESS ON FILE |
| LIZAK, DANIEL | ADDRESS ON FILE |
| LIZAMA, ALEXANDER | ADDRESS ON FILE |
| LIZAMA, ALEXANDER | ADDRESS ON FILE |
| LIZAMA, ALEXANDER | ADDRESS ON FILE |
| LOEVE, JEFF | ADDRESS ON FILE |
| LOGAN. RODNEY | ADDRESS ON FILE |
| LOJKO, RICHARD M | ADDRESS ON FILE |
| LOJKO, RICHARD M | ADDRESS ON FILE |
| LOJKO, RICHARD M | ADDRESS ON FILE |
| LOLLAR, GENE | ADDRESS ON FILE |
| LONG, CRAIG | ADDRESS ON FILE |
| LONG, CRAIG | ADDRESS ON FILE |
| LONG, CRAIG | ADDRESS ON FILE |
| LONGE, JUSTIN | ADDRESS ON FILE |
| LOPER, DOUGLAS | ADDRESS ON FILE |
| LOPEZ, ISREAL | ADDRESS ON FILE |
| LOPEZ, JUAN, JR | ADDRESS ON FILE |
| LOPEZ, JUAN, JR | ADDRESS ON FILE |
| LOPEZ, JUAN, JR | ADDRESS ON FILE |
| LOPEZ, MANUEL, SR | ADDRESS ON FILE |
| LOPEZ, MANUEL, SR | ADDRESS ON FILE |
| LOPEZ, MANUEL, SR | ADDRESS ON FILE |
| LOWE, JACK | ADDRESS ON FILE |
| LOWE, WILEY | ADDRESS ON FILE |
| LOWE, WILEY | ADDRESS ON FILE |
| LUCAS, AARON | ADDRESS ON FILE |
| LUCAS, AARON | ADDRESS ON FILE |
| LUIKEN, NOAH | ADDRESS ON FILE |
| LUMSDEN, JAMES | ADDRESS ON FILE |
| LUNA, CARLOS | ADDRESS ON FILE |
| LUNA, DANIEL | ADDRESS ON FILE |
| LUND, JACLYN | ADDRESS ON FILE |
| MABON, NORMAN | ADDRESS ON FILE |
| MACKEY, PATRICK | ADDRESS ON FILE |
| MACKEY, PATRICK | ADDRESS ON FILE |
| MACKEY, PATRICK | ADDRESS ON FILE |
| MADDEN, THOMAS | ADDRESS ON FILE |
| MADISON, ROBERT | ADDRESS ON FILE |
| MADISON, ROBERT A | ADDRESS ON FILE |
| MAEA, WAYNE | ADDRESS ON FILE |
| MAGALLANES, GUSTAVO | ADDRESS ON FILE |
| MAGGIEFIELD, JACQUINNS | ADDRESS ON FILE |
| MAHER, MICHAEL D | ADDRESS ON FILE |
| MAHL, ARTHUR | ADDRESS ON FILE |
| MAHL, ARTHUR | ADDRESS ON FILE |
| MAHL, ARTHUR | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| MAIER PRZEKWAS, LINDA | ADDRESS ON FILE |
| MALLON, WAYNE P | ADDRESS ON FILE |
| MANAS, WILLIAM | ADDRESS ON FILE |
| MANCUSO, MARK PHIL | ADDRESS ON FILE |
| MANGOLD, BRYAN | ADDRESS ON FILE |
| MANNA, STEVEN | ADDRESS ON FILE |
| MARCHANT, STEPHEN | ADDRESS ON FILE |
| MARKLE, DAVID | ADDRESS ON FILE |
| MARKLE, DAVID L | ADDRESS ON FILE |
| MARNEY, MICHAEL | ADDRESS ON FILE |
| MARTIN, MATTHEW | ADDRESS ON FILE |
| MARTINEZ, ANTONIO | ADDRESS ON FILE |
| MARTINEZ, ERIC | ADDRESS ON FILE |
| MARTINEZ, ERIC | ADDRESS ON FILE |
| MARTORANA, MICHAEL | ADDRESS ON FILE |
| MASI, PHILLIP C | ADDRESS ON FILE |
| MASSARA, ANGELO | ADDRESS ON FILE |
| MASSARA, ANGELO | ADDRESS ON FILE |
| MATOS, MICHAEL | ADDRESS ON FILE |
| MATYASHUK, ALEKSANDR | ADDRESS ON FILE |
| MAURICE, ERIC L | ADDRESS ON FILE |
| MAYFIELD, MARVIN | ADDRESS ON FILE |
| MAYFIELD, WILLIAMD D | ADDRESS ON FILE |
| MAYFIELD, WILLIAMD D | ADDRESS ON FILE |
| MAYFIELD, WILLIAMD D | ADDRESS ON FILE |
| MAYNARD, MICHAEL | ADDRESS ON FILE |
| MCAFEE, WILLIAM | ADDRESS ON FILE |
| MCALLISTER, HARRY J | ADDRESS ON FILE |
| MCCALEB, BRYAN C | ADDRESS ON FILE |
| MCCANN, CHRISTOPHER T | ADDRESS ON FILE |
| MCCARTNEY, MARTIN V IV | ADDRESS ON FILE |
| MCCAULEY, BRIAN DAVID | ADDRESS ON FILE |
| MCCLENDON, DWAIN L | ADDRESS ON FILE |
| MCCLENDON, DWAIN L | ADDRESS ON FILE |
| MCCLOUD, LAWRENCE, III | ADDRESS ON FILE |
| MCCLURE, WILLIAM | ADDRESS ON FILE |
| MCCRAW, WAYNE | ADDRESS ON FILE |
| MCCULLOUGH, VERSHAWN | ADDRESS ON FILE |
| MCCULLOUGH, VERSHAWN | ADDRESS ON FILE |
| MCCULLOUGH, VERSHAWN | ADDRESS ON FILE |
| MCGINTY, ALAN L | ADDRESS ON FILE |
| MCGRATH, SCOTT | ADDRESS ON FILE |
| MCGUIRE, JAMES MICHAEL | ADDRESS ON FILE |
| MCINTYRE, JOHN A | ADDRESS ON FILE |
| MCKARCHEY, CHARLES R JR | ADDRESS ON FILE |
| MCMILLEN, ADAM | ADDRESS ON FILE |
| MCMULLEN, KEVIN J | ADDRESS ON FILE |
| MCNEIL, JOHN | ADDRESS ON FILE |
| MCWHORTER, TIM | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| MEADATH, TYLER C | ADDRESS ON FILE |
| MEDINA, JOSE GUADALUPE | ADDRESS ON FILE |
| MELAND, KEVIN | ADDRESS ON FILE |
| MELAND, KEVIN | ADDRESS ON FILE |
| MELAND, KEVIN | ADDRESS ON FILE |
| MELOY, MARK A | ADDRESS ON FILE |
| MELOY, MARK A | ADDRESS ON FILE |
| MERLINI, THOMAS A | ADDRESS ON FILE |
| MERLINI, THOMAS A | ADDRESS ON FILE |
| MERLINI, THOMAS A | ADDRESS ON FILE |
| MERRILL, RICHARD | ADDRESS ON FILE |
| MERRILL, RICHARD | ADDRESS ON FILE |
| MEWSHAW, KARL | ADDRESS ON FILE |
| MEYERS, THOMAS RICHARD | ADDRESS ON FILE |
| MEYERS, THOMAS RICHARD | ADDRESS ON FILE |
| MIDDLEBROOK, DERRICK | ADDRESS ON FILE |
| MIKHNOVSKY, SERGEY | ADDRESS ON FILE |
| MIKHNOVSKY, SERGEY | ADDRESS ON FILE |
| MILANO, OLGA | ADDRESS ON FILE |
| MILES, HAROLD A JR | ADDRESS ON FILE |
| MILLER, BRIAN | ADDRESS ON FILE |
| MILLER, LARRY K | ADDRESS ON FILE |
| MILLER, LARRY K | ADDRESS ON FILE |
| MILLER, RONNIE | ADDRESS ON FILE |
| MINER, JORDAN | ADDRESS ON FILE |
| MINOR, MICHAEL | ADDRESS ON FILE |
| MIRANDA, CARLOS | ADDRESS ON FILE |
| MIRANDA, CARLOS | ADDRESS ON FILE |
| MISTER, BRIAN KEITH | ADDRESS ON FILE |
| MITCHELL, MICHAEL | ADDRESS ON FILE |
| MOBLEY, TERRELL | ADDRESS ON FILE |
| MOL, WILLIAM J | ADDRESS ON FILE |
| MONTANO, CASTULO | ADDRESS ON FILE |
| MONTEMAYOR, JOSE A | ADDRESS ON FILE |
| MONTEMAYOR, JOSE A | ADDRESS ON FILE |
| MONTEMAYOR, JOSE A | ADDRESS ON FILE |
| MOORE, BRET | ADDRESS ON FILE |
| MOORE, DANIEL | ADDRESS ON FILE |
| MOORE, DANIEL | ADDRESS ON FILE |
| MOORE, KEITH | ADDRESS ON FILE |
| MOORE, RODRICK | ADDRESS ON FILE |
| MORALES, JESUS | ADDRESS ON FILE |
| MORALES, WILFREDO | ADDRESS ON FILE |
| MORENO, JOSE | ADDRESS ON FILE |
| MORGAN, ROBERT | ADDRESS ON FILE |
| MORRIS, ANDRE L | ADDRESS ON FILE |
| MORRIS, GREGORY | ADDRESS ON FILE |
| MORRIS, STEPHEN KENNETH | ADDRESS ON FILE |
| MORRISON, JERRY T | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| MORSUCCI, RUBEN | ADDRESS ON FILE |
| MOSCHINI, MARK | ADDRESS ON FILE |
| MOSER, DAVID | ADDRESS ON FILE |
| MOSLEY, TONY | ADDRESS ON FILE |
| MUDD, ROBERT CLINTON | ADDRESS ON FILE |
| MULARZ, JOHN | ADDRESS ON FILE |
| MULLEN, JAMES | ADDRESS ON FILE |
| MULLINS, TOMMY | ADDRESS ON FILE |
| MUMMA, MICHAEL | ADDRESS ON FILE |
| MUNOZ, JUAN | ADDRESS ON FILE |
| MUNOZ, JUAN | ADDRESS ON FILE |
| MUNOZ, MANUEL A | ADDRESS ON FILE |
| MUNOZ, MANUEL A | ADDRESS ON FILE |
| MURILLO, PASCUAL | ADDRESS ON FILE |
| MURRAY, PATRICK | ADDRESS ON FILE |
| MURRAY, PATRICK | ADDRESS ON FILE |
| MYERS, JOHN C JR | ADDRESS ON FILE |
| NAPOLITANO, MICHAEL | ADDRESS ON FILE |
| NAPOLITANO, THOMAS J | ADDRESS ON FILE |
| NARON, DARYL | ADDRESS ON FILE |
| NASH, SAMMIE | ADDRESS ON FILE |
| NASTELLI, SANDRA | ADDRESS ON FILE |
| NAVARRO, BRIAN D | ADDRESS ON FILE |
| NAVARRO, JORGE | ADDRESS ON FILE |
| NAVARRO, VICKIE | ADDRESS ON FILE |
| NAVRATIL, DAVID J | ADDRESS ON FILE |
| NAVRATIL, DAVID J | ADDRESS ON FILE |
| NEAGLE, ANTHONY | ADDRESS ON FILE |
| NEAGLE, ANTHONY | ADDRESS ON FILE |
| NEAL, STEVIE | ADDRESS ON FILE |
| NEELY, SHAWN R | ADDRESS ON FILE |
| NELSON, RICKY | ADDRESS ON FILE |
| NELSON, RICKY | ADDRESS ON FILE |
| NEMETH, DAVID STEVEN | ADDRESS ON FILE |
| NESMITH, RAY | ADDRESS ON FILE |
| NEVILLE, THOMAS | ADDRESS ON FILE |
| NEWELL, MICHAEL | ADDRESS ON FILE |
| NEWMAN, DERON A | ADDRESS ON FILE |
| NICHOLS, MIKE | ADDRESS ON FILE |
| NIELSEN, FRANK | ADDRESS ON FILE |
| NIELSEN, FRANK | ADDRESS ON FILE |
| NILSON, TIMOTHY J | ADDRESS ON FILE |
| NILSON, TIMOTHY J | ADDRESS ON FILE |
| NIXON, WILLIE I | ADDRESS ON FILE |
| NIZNIK, DAVID J | ADDRESS ON FILE |
| NIZNIK, DAVID J | ADDRESS ON FILE |
| NIZNIK, DAVID J | ADDRESS ON FILE |
| NOVAK, DAVID | ADDRESS ON FILE |
| NOVAK, JOHN R | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| NOVAK, JOHN R | ADDRESS ON FILE |
| OBRIEN, AUSTIN | ADDRESS ON FILE |
| OBROCHTA, ANTHONY | ADDRESS ON FILE |
| OCAMPO, MANUEL S, JR | ADDRESS ON FILE |
| OCHOA, MIKE | ADDRESS ON FILE |
| OCHOA, MIKE | ADDRESS ON FILE |
| ODELL, BRIAN T | ADDRESS ON FILE |
| ODELL, BRIAN T | ADDRESS ON FILE |
| ODORAN, MICHAEL J | ADDRESS ON FILE |
| ODORAN, MICHAEL J | ADDRESS ON FILE |
| OLLIE, TOMMIE | ADDRESS ON FILE |
| OLLIE, TOMMIE | ADDRESS ON FILE |
| OLLIE, TOMMIE | ADDRESS ON FILE |
| OLSON, GARY O | ADDRESS ON FILE |
| OLSON, GARY O | ADDRESS ON FILE |
| OLSON, RAYMOND | ADDRESS ON FILE |
| OLSON, RAYMOND | ADDRESS ON FILE |
| OLSON, RAYMOND | ADDRESS ON FILE |
| ORTAL, JOHNNY | ADDRESS ON FILE |
| OSBURN, DAWN E | ADDRESS ON FILE |
| OSBURN, DAWN E | ADDRESS ON FILE |
| OSTORGA, JULIO | ADDRESS ON FILE |
| OSWALD, TERRY | ADDRESS ON FILE |
| OWHENE, WILLIAM J | ADDRESS ON FILE |
| OWHENE, WILLIAM J | ADDRESS ON FILE |
| PACE, MARK | ADDRESS ON FILE |
| PAINTER, JACK | ADDRESS ON FILE |
| PAINTER, JACK | ADDRESS ON FILE |
| PALATO, ARTURO | ADDRESS ON FILE |
| PALMER, DEMARRIO | ADDRESS ON FILE |
| PALMER, DUSTIN | ADDRESS ON FILE |
| PAOLUCCI, ROBERTO | ADDRESS ON FILE |
| PARENT, ANDREW | ADDRESS ON FILE |
| PARK, CLARENCE E | ADDRESS ON FILE |
| PARKER, RAPHAEL | ADDRESS ON FILE |
| PARKINSON, BENJAMIN | ADDRESS ON FILE |
| PARTIN, ANDREW | ADDRESS ON FILE |
| PATRICIA A REISSER | ADDRESS ON FILE |
| PATRICIA A REISSER | ADDRESS ON FILE |
| PATRICK, GERALD A, JR | ADDRESS ON FILE |
| PATRIDGE, GORDON W | ADDRESS ON FILE |
| PATTERSON, LARRY | ADDRESS ON FILE |
| PATTERSON, MICHAEL L | ADDRESS ON FILE |
| PATTERSON, ROOSEVELT | ADDRESS ON FILE |
| PATTERSON, ROOSEVELT | ADDRESS ON FILE |
| PAULAUSKY, ANTHONY | ADDRESS ON FILE |
| PAULAUSKY, ANTHONY | ADDRESS ON FILE |
| PAYSEUR, DONALD | ADDRESS ON FILE |
| PAYSEUR, RON, JR | ADDRESS ON FILE |

| Claim Name | Address Information |
| --- | --- |
| PEACH, GEORGE W, JR | ADDRESS ON FILE |
| PEAVEY, DARREL | ADDRESS ON FILE |
| PECKA, GEORGE | ADDRESS ON FILE |
| PEDRICK, JENNIFER M | ADDRESS ON FILE |
| PEMBROOK, TROY | ADDRESS ON FILE |
| PENICK, JAMES DURELL | ADDRESS ON FILE |
| PEREZ, FRANK | ADDRESS ON FILE |
| PEREZ, ROGERIO, JR | ADDRESS ON FILE |
| PEREZ, ROGERIO, JR | ADDRESS ON FILE |
| PERKINS, DONNELL | ADDRESS ON FILE |
| PERKINS, DONNELL | ADDRESS ON FILE |
| PETERS, ALVIN | ADDRESS ON FILE |
| PETERSON, RICHARD D | ADDRESS ON FILE |
| PETRY, CHRISTIAN | ADDRESS ON FILE |
| PETTIT, WAYNE | ADDRESS ON FILE |
| PETTIT, WAYNE | ADDRESS ON FILE |
| PEW, STEVE | ADDRESS ON FILE |
| PHAN, YOUNG | ADDRESS ON FILE |
| PHILLIPS, BARRY | ADDRESS ON FILE |
| PHILLIPS, JESSIE L | ADDRESS ON FILE |
| PHILLIPS, JOSIAH | ADDRESS ON FILE |
| PHILLIPS, JOSIAH | ADDRESS ON FILE |
| PHILLIPS, LAMONT | ADDRESS ON FILE |
| PHILLIPS, LAMONT | ADDRESS ON FILE |
| PICKETT, JASON | ADDRESS ON FILE |
| PICKETT, JASON | ADDRESS ON FILE |
| PIERCE, CLYDE ALLEN | ADDRESS ON FILE |
| PILATE, DARRYLE | ADDRESS ON FILE |
| PILATE, DARRYLE | ADDRESS ON FILE |
| PINKNEY, TERRELL L | ADDRESS ON FILE |
| PISTOLE, CRAIG | ADDRESS ON FILE |
| PLOTT, JC | ADDRESS ON FILE |
| POLES, MAURICE | ADDRESS ON FILE |
| POOLE, BRIAN | ADDRESS ON FILE |
| POOLE, BRIAN | ADDRESS ON FILE |
| PORRAS, NICHOLAS | ADDRESS ON FILE |
| PORRAS, NICHOLAS | ADDRESS ON FILE |
| PORTER, DOUGLAS | ADDRESS ON FILE |
| POTURALSKI, ROGER M | ADDRESS ON FILE |
| POWELL, MALCOM | ADDRESS ON FILE |
| POWERS, RYAN | ADDRESS ON FILE |
| PRINCE, DENNIS | ADDRESS ON FILE |
| PROCASCO, STEVE | ADDRESS ON FILE |
| PROELS, FRANK | ADDRESS ON FILE |
| PUCKETT, CHARLES | ADDRESS ON FILE |
| PUTNAM, DAMON | ADDRESS ON FILE |
| QUALLS, WILLIAM | ADDRESS ON FILE |
| QUARANTA, JUSTIN | ADDRESS ON FILE |
| QUICK, LEONARD | ADDRESS ON FILE |

| Claim Name | Address Information |
|---|---|
| QUIRARTE, GERARDO | ADDRESS ON FILE |
| RAFFERTY, WILLIAM | ADDRESS ON FILE |
| RAFFERTY, WILLIAM | ADDRESS ON FILE |
| RAINER, LUSHAWN | ADDRESS ON FILE |
| RAINER, LUSHAWN | ADDRESS ON FILE |
| RAMIREZ, ARISTEO | ADDRESS ON FILE |
| RAMIREZ, JAMES | ADDRESS ON FILE |
| RAMIREZ, JAMES | ADDRESS ON FILE |
| RAMOS, BRYAN | ADDRESS ON FILE |
| RAMOS, BRYAN | ADDRESS ON FILE |
| RANDLE, COREY | ADDRESS ON FILE |
| RANDLE, ROOSEVELT | ADDRESS ON FILE |
| RANDLE, ROOSEVELT | ADDRESS ON FILE |
| RANGE, PAUL | ADDRESS ON FILE |
| RASMUSSEN, CLINT | ADDRESS ON FILE |
| RATHNAU, STEPHEN | ADDRESS ON FILE |
| RATHNAU, STEPHEN | ADDRESS ON FILE |
| RATLIFF, GARY H | ADDRESS ON FILE |
| RATLIFF, GARY H | ADDRESS ON FILE |
| RAWLS, DEANA | ADDRESS ON FILE |
| RAYBURN, WILLIAM D | ADDRESS ON FILE |
| RAYBURN, WILLIAM D | ADDRESS ON FILE |
| RAYNOR, ALLAN B, JR | ADDRESS ON FILE |
| RAYNOR, REGINALD | ADDRESS ON FILE |
| REDMOND, TOMMY L | ADDRESS ON FILE |
| REDMOND, TOMMY L | ADDRESS ON FILE |
| REECE, LUANA | ADDRESS ON FILE |
| REED, WILLIAM | ADDRESS ON FILE |
| REICHARD, JASON | ADDRESS ON FILE |
| REICHEL, JOSEPH P | ADDRESS ON FILE |

**Total Creditor count  618**