IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>(Jointly Administered)<br><br>Obj. Deadline: April 4, 2024, at 4:00 p.m. (ET)<br>Hearing Date: April 11, 2024, at 10:00 a.m. (ET)<br><br>Ref. D.I. 968, 1113, 1663, 2157, 2245, & 2316 |

**SOUTHEASTERN FREIGHT LINES' (A) AMENDED, SUPPLEMENTAL, AND RESTATED OBJECTION TO THE DEBTORS' OMNIBUS MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ASSUME CERTAIN UNEXPIRED LEASES AND (II) GRANTING RELATED RELIEF AND (B) JOINDER TO OBJECTION AND RESERVATION OF RIGHTS OF CERTAIN LANDLORDS**

Southeastern Freight Lines ("SEFL"), by and through its undersigned counsel, hereby amends, supplements, and restates (this "Objection") its prior objections [Docket Nos. 1113, 1663, & 2245] and joins the objection of certain landlords [Docket Nos. 2243 & 2515] (the "Adequate Assurance Objections") to the *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Certain Unexpired Leases and (II) Granting Related Relief* [Docket No. 2157] (the "Assumption Motion") on the grounds that the proposed assumption is not within the reasonable business judgment of the Debtors, and even if it were, the Debtors have not offered to cure defaults or provide adequate assurance of future performance to SEFL as required by 11 U.S.C. § 365(b). In support of this Objection, SEFL respectfully states as follows:

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/case/yellowcorporation/info. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

1

**BACKGROUND**

1.      On August 6, 2023 (the "Petition Date"), each of the above-captioned debtors (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. The Debtors are operating their businesses and maintaining their assets as debtors in possession pursuant to 1107(a) and 1108 of the Bankruptcy Code.

**A.    The SEFL Leases**

2.      Prior to the Petition Date, the Debtors leased from SEFL the following five parcels of non-residential real property: (i) 11301 NW 134th St. Miami, FL (the "Miami Property"); (ii) 3924 S. County Rd 1290 Odessa, TX (the "Odessa Property"); (iii) 1317 E. 38th St., Lubbock, TX (the "Lubbock Property"); (iv) 3500 McColl Rd. McAllen, TX (the "McAllen Property"); (v) 14549 E. Admiral Pl. Tulsa, OK (the "Tulsa Property") (collectively, the "Properties" and the leases thereof, the "SEFL Leases").

3.      As of the Petition Date, the Debtors owed rent and taxes to SEFL pursuant to the SEFL Leases in the total amount of $131,878.89, as summarized in SEFL's corresponding proofs of claim ("Prepetition Claims"), and below:

| Property | Unpaid Pre-Petition Rent | Source |
|---|---|---|
| Miami Property | $90,360.20[2] | SEFL00000164[3] |
| Odessa Property | $5,303.67 | SEFL00000164 |
| Lubbock Property | $9,007.58 | SEFL00000164 |

---

[2]    Includes 7% State of Florida sales tax.

[3]    Attached hereto as **Exhibit 1**.

2

| Property | Unpaid Pre-Petition Rent | Source |
|---|---|---|
| McAllen Property | $14,084.56 | SEFL00000164 |
| Tulsa Property | $13,123.28 | SEFL00000164 |
| **TOTAL:** | $131,878.89 | |

4. On October 26, 2023, the Debtors filed the *Notice of Potential Assumption or Assumption and Assignment of Certain Contracts or Leases Associated with the Non-Rolling Stock Assets* [Docket No. 968] (the "Cure Notice"). The Cure Notice identifies a total cure amount of $131,880.00 for the SEFL Leases, equal to the amount of the Prepetition Claims.

5. However, the SEFL Leases also require Debtor YRC, Inc. ("YRC") to pay ongoing rent, certain taxes, and perform various other obligations with respect to the Properties, including to maintain the good and safe operating condition of the Properties (the "Additional Obligations"). *See* SEFL00000479 (Miami Lease Agreement), attached hereto as **Exhibit 2**; SEFL00000749 (Odessa Lease Agreement), attached hereto as **Exhibit 3**; SEFL00000173 (Lubbock Lease Agreement), attached hereto as **Exhibit 4**; SEFL00000631 (McAllen Lease Agreement), attached hereto as **Exhibit 5**; SEFL00000901 (Tulsa Lease Agreement), attached hereto as **Exhibit 6**.

6. For example, Section 4 of each lease agreement provides:

> **Tenant shall pay as Additional Rent all Real Estate Taxes** (as hereinafter defined). 'Real Estate Taxes' shall mean all taxes, rates, assessments and impositions, general and special, levied or imposed with respect to the Premises (including any accessories and improvements therein or thereto) for schools, public betterment, general or local improvements and any surtax and tax on nonresidential real properties, any water or sewer rate and service tax, whether such taxes, rates, assessments or impositions are charged by a municipal, state, federal or any other body of competent jurisdiction, as well as any tax on capital imposed on the Landlord or the owner of the

3

Premises, accruing during and payable after the Commencement of the Lease Term.

7. In addition, Section 10 of each lease agreement requires that:

> **Tenant at its cost shall maintain, and repair in a good and safe operating condition, all portions of the Leased Premises** including, but not limited to, repair of the building structure, roof, yard, fence and underground utilities, windows, doors, dock doors, dock levelers, entrances and vestibules, and all electrical, mechanical, HVAC, plumbing and other fixtures and systems located within the leased Premises, including the sprinkler system servicing the leased Premises.

8. As detailed below, YRC has also defaulted on its Additional Obligations under the SEFL Leases, and the Debtors have failed to account for those defaults in their proposed cure amount.

B. **The Initial and Amended Cure Objections**

9. To comply with the deadline established by the premature Cure Notice, and before SEFL had an opportunity to conduct a reasonable investigation of the Properties, SEFL filed the *Objection of Southeastern Freight Lines to the Debtors' Notice of Potential Assumption or Assumption and Assignment of Certain Contracts or Leases Associated with the Non-Rolling Stock Assets* [Docket No. 1113] (the "Initial Cure Objection") on November 9, 2023, providing notice of the Debtors' defaults under the SEFL Leases and addressing the inadequacy of the cure amounts identified in the Cure Notice. While the Debtors' proposed cure amounts matched SEFL's Prepetition Claims, the Debtors failed to acknowledge or propose any payment to SEFL for the Additional Obligations under the SEFL Leases. As of the date of filing the Initial Cure Objection, SEFL estimated that the amount necessary for the Debtors to cure all defaults under the SEFL Leases was no less than $1,718,117.03, with the amount expected to increase due to numerous continuing events of default.

10. On January 8, 2024, SEFL filed the *Amended Objection of Southeastern Freight Lines to the Debtors' Notice of Potential Assumption or Assumption and Assignment of Certain Contracts or Leases Associated with the Non-Rolling Stock Assets* [Docket No. 1663] (the "Amended Cure Objection") to the Cure Notice in which SEFL identified additional cure costs attributable to the Debtors' ongoing failure to pay taxes (many of which had come due before year end, and which SEFL ultimately paid) and otherwise maintain the Properties as required by the SEFL Leases. More specifically, SEFL asserted cure costs in the total amount of $9,104,817.03 based on YRC's non-payment of taxes and various internal and external estimates for paving, grounds maintenance, fencing, roofing, and building repairs following more recent visits to the Properties. As set forth in the Amended Objection, this amount was expected to continually increase due to the Debtors' continuing neglect of the Properties and failure to fulfill the Additional Obligations under the SEFL Leases. Upon information and belief, the Properties, other than the Odessa Property, which has been sub-leased to FedEx with consent of SEFL, were all vacant at the time of the Amended Cure Objection.

C. **The Assumption Motion**

11. On February 12, 2024, the Debtors filed the Assumption Motion, identifying a total cure amount for the SEFL Leases of $131,880, yet again, in an amount equal only to SEFL's Prepetition Claims.

12. In other words, the Debtors proposed to pay SEFL only 0.7% of the total estimated cure costs known as of November 9, 2023, and 0.01% of the total estimated cure costs known as of January 8, 2024. Moreover, notwithstanding the Debtors' assertions in the Assumption Motion that they had been marketing the SEFL Leases, the "List of Remaining

Properties" filed on February 12, 2024 [Docket No. 2158] confirmed the Debtors did not yet have bids on the SEFL Leases.[4]

**D.      The Second Amended Objection**

13.    To comply with the deadline established by the Assumption Motion, on February 20, 2024, SEFL filed the *Objection of Southeastern Freight Lines to the Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Certain Unexpired Leases and (II) Granting Related Relief* [Docket No. 2245] (the "Second Amended Objection").

14.    As of the filing of the Second Amended Objection, SEFL had learned from a neighboring property owner that the vacant Tulsa Property had been broken into, vandalized, and stripped of valuable assets, including all electrical wiring and receptacles.  An employee of the Debtors confirmed that damage had occurred to the Tulsa Property, that the Debtors were aware of the damage, and that the Debtors had filed a claim with their insurer.  However, SEFL was never notified of the damage prior to SEFL's inquiry, notwithstanding the Debtors' obligation to provide such notice.  SEFL immediately informally requested from the Debtors a copy of any insurance claim submitted to the insurer and the amount of any insurance proceeds received, but no such information was ever provided to SEFL—notwithstanding subsequent formal discovery requests on this issue.

15.    Accordingly, as stated in the Second Amended Objection, SEFL was sending a representative to the Tulsa Property to assess the damage and meet with a general contractor, and SEFL anticipated that the cure amount for the Tulsa Property would increase to the extent of any loss not covered by insurance.

---

[4]    Subsequent discovery has confirmed that despite the Debtors' vigorous marketing efforts, no bids have ever been received for the Properties subject to the SEFL Leases.

16. To further support its cure objection, SEFL also hired general contractors from Schwob Building and P.J. Callaghan to independently assess damage at, and provide estimated repair costs for, the Miami, Odessa, Lubbock, and McAllen Properties

**E.     The Stipulation**

17. Following the filing of the Second Amended Cure Objection, the Debtors and SEFL entered a stipulation [Docket No. 2315] (the "Stipulation") (i) extending the Debtors' deadline to assume or reject nonresidential real property leases under 11 U.S.C. § 365(d)(4), previously set as March 4, 2024 according to the *Court's Order, Pursuant to Section 365(d)(4) of the Bankruptcy Code, Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 1127], with respect to the SEFL Leases through and including April 11, 2024; (ii) extending SEFL's objection deadline for the Assumption Motion to April 4, 2024; and (iii) adjourning the hearing on the Assumption Motion with respect to the cure amount under the SEFL Leases to April 11, 2024, at 10:00 a.m. (ET).[5] The Court entered an Order approving the Stipulation on February 22, 2024. Docket No. 2316.

**F.     Discovery**

18. After entry into the Stipulation, SEFL and the Debtors engaged in discovery on the issue of cure amounts under the SEFL Leases [*see, e.g.,* Docket Nos. 2490, 2605], pursuant to which SEFL produced approximately 700 documents, deposed four witnesses as of the date of this Objection, and will be making a witness from SEFL available for deposition.

---

[5] SEFL has indicated to the Debtors that it intends to proceed solely on the issue of cure amounts under the SEFL Leases at the April 11 hearing. To avoid redundancy, SEFL has joined the Adequate Assurance Objections of certain landlords and intends to carry the balance of its objection on the issue of adequate assurance of future performance to the April 18 hearing.

19. SEFL specifically produced, among other things, documentation to support the various tax obligations YRC was required, but failed, to pay as Additional Obligations under the SEFL Leases (and thus, which SEFL ultimately paid):

| Property | Property Tax Due | Source |
|---|---|---|
| Miami Property | $354,526.03[6] | SEFL00001125[7] |
| Odessa Property | $5,543.61 | SEFL00001120[8] |
| Lubbock Property | $4,737.39 | SEFL0000118[9] |
| McAllen Property | $10,358.12 (City) $42,933.38 (County) | SEFL00001123[10] SEFL00001124[11] |
| Tulsa Property | $20,119.00 | SEFL00001122[12] |
| TOTAL: | $438,217.52 | |

20. In addition, SEFL produced to the Debtors invoices and receipts totaling $14,594.00 for annual structural and electrical inspections required by the State of Florida in respect of the Miami Property, which constitute Additional Obligations of YRC under the Miami Lease Agreement, but which YRC did not pay. SEFL00001127.[13]

21. SEFL also produced to the Debtors hundreds of photos and videos of the Properties taken by, or in the presence of, the general contractors hired by SEFL to walk through the Properties to assess their condition and estimate the costs of repair, together with the written repair estimates.

---

[6]  Includes 7% State of Florida sales tax.

[7]  Attached as **Exhibit 7**.

[8]  Attached as **Exhibit 8**.

[9]  Attached as **Exhibit 9**.

[10] Attached as **Exhibit 10**.

[11] Attached as **Exhibit 11**.

[12] Attached as **Exhibit 12**.

[13] Attached as **Exhibit 13**.

US.363072037.04

22. As evidenced by the photos and the repair estimates, and as further described by the representatives of Schwob Building and P.J. Callaghan at their respective depositions,[14] almost all the Properties will require complete asphalt replacement, roof replacement, electrical re-wiring or replacement due to theft, and loading dock door replacement and repairs to be returned to good, safe, and leasable condition; given the extent of the damage, the Debtors had already exhausted the possibility of cheaper, short term fixes to the Properties. *See, e.g.,* Ex. 16 at 118:12-21 (Q [by Debtors]: "Are there any cheaper alternatives to the suggestions noted in your report that would bring the [Miami] paving back up to a leasable condition?" A: "No. Like I said, I agreed with the paving contractor that it's past the point where you could do what's called a 'resealing.' Resealing, if it -- ten years ago, we probably could have resealed it, and it's a fraction of the cost of resurfacing, but outside of resurfacing . . . and just limited patches, I don't know of another approach."); Ex. 16 at 128:11-14 (Q [by Debtors]: "Are there any cheaper alternatives to the suggestions you noted in your report that would bring the area of the cross-dock back up to a leasable condition?" A: "No, sir."); Ex. 16 at 132:8-12 (Q [by Debtors]: "Are there any cheaper alternatives to the suggestions that you noted in your report that would bring the [Miami] office space back up to a leasable condition?" A: "No, not anymore.").

23. Indeed, the general contractors agreed that the damage to the Properties far exceeded regular "wear and tear" and appeared to result from years of deferred maintenance. *See* Ex. 15 at 185:11-19 (Q [by SEFL]: "I just want to get your impression of the [Tulsa] property as a whole, whether the property appeared maintained and whether what you were

---

[14] The contractors, all of whom are outside the subpoena power, *see* FRCP 45(c)(1), each voluntarily agreed to accept subpoenas to be deposed by both SEFL and the Debtors regarding their respective estimates of repair costs for the Properties. *See* FRE 804(a)(5)(A). The transcript of the deposition of Travis Taylor (Schwob Building) is attached hereto as **Exhibit 14**. The transcript of the deposition of Andy Erickson (Schwob Building) is attached hereto as **Exhibit 15**. The transcript of the deposition of Tom Burket (P.J. Callaghan) is attached hereto as **Exhibit 16**.

seeing was normal wear and tear or something more than that?" A: "No, it -- I mean, it didn't appear to be that the facility was maintained inside or out. No, I would not describe it as normal wear and tear."); Ex. 15 at 187:12-15 (Q [by SEFL]: "And would you consider the conditions at McAllen to be generally the result of normal wear and tear?" A: "No."); Ex. 15 at 188:2-19 (Q [by SEFL]: "Do you have a view on whether the Odessa property had been maintained to some extent and whether that was normal wear and tear?" A: "Yeah, I mean, as far as the [building] itself, the building, inside and out, I mean to me, it's normal wear and tear . . . [but the] asphalt paving was neglected. . . . ." Q: "Was the Odessa property occupied?" A: "Yes." Q: "And who was occupying it?" A: "FedEx."); Ex. 16 at 35:13-16 (Q [by SEFL]: "Would you describe the damage to the garage doors as regular wear and tear?" A: "The majority of the doors were actually inoperable. I would say it goes beyond wear and tear.").

24. As of the date of this Objection, the total cost of repair of the Properties, based on the Debtors' defaults on their Additional Obligations, is no less than $10,238,996.00, comprised of the following:

| Property | Visiting Contractor | Total Estimated Repair Costs | Source |
|---|---|---|---|
| Miami Property | P.J. Callaghan T. Burket | $4,635,616.00 | SEFL00001111[15] |
| Odessa Property | Schwob Building A. Erickson | $406,595.00 | SEFL00000719[16] |
| Lubbock Property | Schwob Building T. Taylor | $1,658,983.00 | SEFL00000013[17] |
| McAllen Property | Schwob Building A. Erickson | $1,558,560.00 | SEFL00000518[18] |

---

[15] Attached hereto as **Exhibit 17**.

[16] Attached hereto as **Exhibit 18**.

[17] Attached hereto as **Exhibit 19**.

[18] Attached hereto as **Exhibit 20**.

US.363072037.04

| Property | Visiting Contractor | Total Estimated Repair Costs | Source |
|---|---|---|---|
| Tulsa Property | Schwob Building A. Erickson | $1,979,242.00 | SEFL00000823[19] |
| | **TOTAL:** | **$10,238,996.00** | |

25. While the Debtors have confirmed in discovery that an insurance claim was submitted to an insurer in respect of the vandalism to the Tulsa Property, the Debtors have not provided SEFL with a copy of such insurance claim or identified any amounts received from the insurer, despite SEFL's repeated informal and formal discovery requests to the Debtors for same. Upon information and belief, the Debtors have simply retained the insurance proceeds without applying such funds to the repair of significant damage at the Tulsa Property, as required by the Tulsa Lease Agreement.

26. Thus, as of the time of this Objection, the amount necessary to cure all defaults under the SEFL Leases at the time of any assumption and assignment will total no less than **$10,823,686.42**, as further summarized below:

| Property | SEFL Proofs of Claim (Prepetition Claims) | Additional ObligationsDefaults | | Total Cure (Prepetition Claims + Additional Obligation Defaults) |
|---|---|---|---|---|
| | | Taxes | Repairs | |
| Miami Property | $90,359.80 | $354,526.03 $14,594.00 (inspection) | $4,635,616.00 | $5,095,095.83 |
| Odessa Property | $5,303.67 | $5,543.61 | $406,595.00 | $417,442.28 |
| Lubbock Property | $9,007.58 | $4,737.39 | $1,658,983.00 | $1,672,727.97 |
| McAllen Property | $14,084.56 | $10,358.12 $42,933.38 | $1,558,560.00 | $1,625,936.06 |

---

[19] Attached hereto as **Exhibit 21**.

11

| Property | SEFL Proofs of Claim (Prepetition Claims) | Additional ObligationsDefaults | | Total Cure (Prepetition Claims + Additional Obligation Defaults) |
|---|---|---|---|---|
| | | Taxes | Repairs | |
| Tulsa Property | $13,123.28 | $20,119.00 | $1,979,242.00 | $2,012,484.28 |
| | | | TOTAL: | $10,823,686.42 |

## OBJECTION

27.     Section 365(b) provides in pertinent part as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default. . . .;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

28.     As this Court has previously explained, "the purpose of § 365(b)(1) is to restore the debtor-creditor relationship to pre-default conditions, bringing the [lease] back into compliance with its terms." *In re DBSI, Inc.*, 405 B.R. 698, 704 (Bankr. D. Del. 2009) (cleaned up).

29.     SEFL objects to the Assumption Motion on the basis that the proposed assumption is not within the reasonable business judgment of the Debtors, and even if it were, the Debtors do not propose to satisfy their cure obligations consistent with section 365(b)(1) of the Bankruptcy Code, or to provide adequate assurance of future performance under the SEFL

12

Leases. Absent satisfaction of all requirements for assumption under section 365(b)(1), the Assumption Motion must be denied.

A. **The Debtors' Assumption of the SEFL Leases is Not a Reasonable Exercise of Their Business Judgment.**

30. Under ordinary circumstances, a debtor need only show a "sound business purpose" for assuming an unexpired lease. *See, e.g., In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *10 (Bankr. D. Del. Apr. 29, 2014). "Court approval of a debtor in possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code." *Id.* (quoting *In re Great Atlantic & Pacific Tea Co., Inc.*, 472 B.R. 666, 672-73 (S.D.N.Y. 2012)).

31. Here, the Debtors' judgment suffers all such defects. As set forth above, all of the Properties subject to the SEFL Leases, other than the Odessa Property, are currently vacant. Despite the Debtors' vigorous marketing efforts, none of the Properties has ever been subject to any bid. This is unsurprising. At the hearing in this matter, SEFL will demonstrate that the Debtors' continuing neglect of the Properties has resulted in an immediate need for substantial rehabilitation. Given the current condition of the Properties, the Debtors will be unable to lease them at anything approaching market rents. Thus, the Properties will remain solely liabilities of the Debtors without any corresponding benefit, or the Debtors will have to provide excessive allowances to any tenant to rehabilitate the Properties so they may be used for their intended purposes. The Debtors appear to face the same fate with respect to numerous other leases for which no bids have been received. *See generally* Adequate Assurance Objections. Accordingly, the Debtors' assumption of the SEFL Leases in their present condition without the rehabilitation proposed by SEFL, and without any go-forward business plan with respect to the Properties, is not a reasonable exercise of business judgment. *See, e.g., In re Gateway Apparel, Inc.*, 210 B.R.

13

567, 570 (Bankr. E.D. Mo. 1997) ("Prior to the formation of a long-term business plan, and in the absence of a showing of a unique benefit to the estate, the less than orderly assumption of unexpired leases is not consistent with the concept of a debtor's best business judgment.").

**B.     The Proposed Cure Amounts are Insufficient**

33. When a contract is assumed under section 365 of the Bankruptcy Code, the non-debtor third-party to that contract must be "made whole at the time of the Debtors' assumption of the contract." *In re Entertainment, Inc.*, 223 B.R. 141, 151 (Bankr. N.D. Ill. 1998) (citations omitted). Accordingly, to the extent the Debtors seek to assume any of the SEFL Leases, and assuming the Court finds the business judgment standard satisfied, the Debtors must pay the full cure amounts based upon the actual amounts that are due on the date the SEFL Leases are assumed. 11 U.S.C. § 365(b)(1).

33. As set forth above, the amount necessary to cure all defaults under the SEFL Leases as of the date of this Objection is not less than $10,823,686.42. This amount is the minimum amount required to bring the Properties back into good, safe, and leasable condition. *See, e.g.,* Ex. 13 at 66:14-23 (Q [by SEFL]: "Were there any repairs during your inspection that you found required immediate attention due to safety hazard?" A: "The [Lubbock] property is vacant, so there wasn't anything that was a life-safety issue that needed to be repaired immediately." Q: "But if the property had been – been in use, did you identify anything that would have been an immediate safety hazard for workers?" A: "Yes."). In the Assumption Motion, however, the Debtors propose a woefully deficient cure amount of only $131,880.00.

34. The Debtors attempt to avoid this stark disparity through the inclusion of paragraph 5 to the proposed order attached to the Assumption Motion (the "Proposed Order") which states that the assumption of the SEFL Leases "shall be effective notwithstanding any

14

dispute over cure costs" and that any cure costs that are subject to dispute will "be paid promptly after the earlier of (a) the date on which Debtors and the Lease Counterparty agree to an amount or (b) the date specified in a final and non-appealable order entered by this Court determining such amount." Proposed Order ¶ 5. However, under the Bankruptcy Code, the date after which the defaults must be "promptly" cured is the date of the assumption of the SEFL Leases, not a future undetermined date on which the cure objections are finally resolved. *See* 11 U.S.C. § 365(b)(1).

35. Further, the Proposed Order states that the counterparties to the SEFL Leases are "forever barred and enjoined from asserting against the Debtors any defaults, claims, interest, or other default penalties under the SEFL Leases arising before the date of this Order." Proposed Order ¶ 6. Taken together, paragraphs 5 and 6 of the Proposed Order purport not only to kick the can down the road with respect to SEFL's Objection, with no actual progress toward resolution, but also to bind SEFL to the cure amounts contained in the Assumption Motion. SEFL objects to the inclusion of paragraph 6 of the Proposed Order to the extent it purports to limit SEFL's ability to assert or negotiate the alleged cure amounts set forth herein while the Objection remain unresolved.

36. Moreover, because the cure amount in the Assumption Motion is woefully deficient, SEFL submits the Assumption Motion should be denied for failure to comply with section 365(b)(1).

**C.   The Debtors Have Not Provided Adequate Assurance of Future Performance**

37. In addition to the Debtors' failure to offer, or even negotiate, the proper cure amounts, they have also failed to sufficiently establish adequate assurance of future performance. Critically, the discovery SEFL received confirms the Debtors have still not

received any bids on the Properties subject to the SEFL Leases, and all the Properties, other than the Odessa Property, are currently vacant. *See also* Docket No. 2158. Indeed, without the repairs described by Messrs. Taylor, Erickson, and Burket, SEFL has no expectation that the Properties can be leased or used in their current condition. *See, e.g.,* Ex. 15 at 114:5-21 (Q [by the Debtors]: "And hypothetically, assuming the [Miami] property were in use today, was there anything that stood out to you that you identified that would pose an immediate safety hazard for the worker; something stands out?" A: "Yeah. The perforations in the roof. Obviously, you know, you're getting water on the slab where these folks are moving freight around so that's -- that would be a big red flag. Some of the asphalt areas where the base was exposed, that would be an issue. But probably the biggest one would be the overhead doors, how they -- you know, I guess maybe towards the end they weren't using all the doors, but it would definitely limit your capability to operate out of each door with -- with so many of them being completely inoperable.").

38. Thus, as set forth in the Adequate Assurance Objections, which SEFL hereby joins, the Debtors' bare assertion that they have approximately $300 million in cash on hand, and expect to generate more cash through future sales, does not, by itself, satisfy the requirement to provide SEFL with adequate assurance of future performance. *In re RS Legacy Corp.*, Case No. 15-10197 (BLS), 2015 Bankr. LEXIS 2206, at *6 (Bankr. D. Del. June 25, 2015) ("[U]naudited financials and projections are insufficient to satisfy the statutory requirement to provide adequate assurance of future performance"). Rather, adequate assurance requires a foundation that is nonspeculative and sufficiently substantive so as to assure that a landlord will receive the bargained-for performance. *See In re World Skating Center, Inc.*, 100 B.R. 147, 148-49 (Bankr. D. Conn. 1989).

39. Through the Assumption Motion, the Debtors sought to assume 77 leases, and projected it would take a maximum of two years to complete the sale process for the Debtors' remaining assets. The Debtors concede in a footnote that they "are aware of certain objections to the Cure Amounts and continue to negotiate and reconcile such amounts with the applicable Lease Counterparty." Assumption Motion, ¶ 15 n.4. Yet, nowhere in the Assumption Motion do the Debtors address the magnitude of the discrepancies between the Debtors' proposed cure amounts and those asserted by the lease counterparties—such as the significant discrepancy between the proposed cure amount for SEFL and the cure amount set forth in this Objection ($131,880.00 vs. $10,823,686.42). This is cause for significant concern to SEFL where the Debtors are apparently in default under numerous real property leases, including based on their continuing failure to comply with their maintenance, repair, and replacement obligations under those leases as well. *See* D.I. 2515. ¶ 32.

40. The Debtors have also offered no satisfactory quantification or substantive backup supporting their contention that they have the ability to fund all cure amounts plus an additional two years of lease obligations and other expenses while they continue marketing efforts. In sum, the assurance the Debtors have offered is generalized, conclusory and inadequate.[20] *See In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 173 (Bankr. E.D. Va. 1993) ("[W]hile an absolute guarantee of future performance is not required, more than speculative plans are needed").

41. The Assumption Motion should also be denied for failure to provide adequate assurance of future performance under section 365(b)(1).

---

[20] The Debtors' conclusory declarations from Cody Leung Kaldenberg and Brian Whittman are wholly inadequate to establish the factual bases for Debtors' contentions.

**CONCLUSION**

WHEREFORE, SEFL joins the Adequate Assurance Objections and respectfully requests that the Court deny the relief requested in the Assumption Motion with respect to the SEFL Leases, or in the alternative, that any order entered by this Court authorizing assumption of the SEFL Leases require the Debtors to cure all defaults under the SEFL Leases in a manner consistent with this Objection, and grant to SEFL such other and further relief as the Court deems just and appropriate under the circumstances.

Dated: April 4, 2024

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Brett D. Fallon*
Brett D. Fallon (No. 2480)
Jaclyn C. Marasco (No. 6477)
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 467-4200
Facsimile: (302) 467-4201
Emails: brett.fallon@faegredrinker.com
        jaclyn.marasco@faegredrinker.com

-and-

**MAYNARD NEXSEN PC**
Lisa P. Sumner
4141 Parklake Avenue, Suite 200
Raleigh, North Carolina 27612
Telephone: (919) 573-7423
Facsimile: (919) 653-0435
Email: lsumner@maynardnexsen.com

*Counsel to Southeastern Freight Lines*

US.363072037.04