**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| | ) |
| | ) Chapter 11 |
| In re: | ) |
| | ) Case No. 23-11069 (CTG) |
| YELLOW CORPORATION, *et al.*,[1] | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) Related to D.I. 2595 |
| | ) |

**RESPONSE OF THE TEAMSTERS PENSION TRUST FUND OF**
**PHILADELPHIA & VICINITY TO DEBTORS' SEVENTH OMNIBUS (SUBSTANTIVE)**
**OBJECTION TO PROOFS OF CLAIM FOR WITHDRAWAL LIABILITY**

The Teamsters Pension Trust Fund of Philadelphia & Vicinity (the "Philadelphia Fund"),

by and through its undersigned counsel, hereby responds to the *Debtors' Seventh Omnibus*

*(Substantive) Objections to Proofs of Claim for Withdrawal Liability* (the "Objection")[2] as

follows:

I. **INTRODUCTION**

1.    The Objection must be overruled because the Debtors have not presented ***any***

evidence or argument that would refute the *prima facie* validity of the Philadelphia Fund's

claims for withdrawal liability.  Nor can the Debtors overcome the broad deference afforded the

Philadelphia Fund under ERISA in calculating the amount of withdrawal liability.

2.    Instead, the Debtors essentially assert a baseless "books and records" objection

that offers no factual or legal support for the disallowance or reduction of the withdrawal liability

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal
place of business and the Debtors' service address in these chapter 11 cases is:  10990 Roe Avenue, Overland
Park, Kansas 66211.

[2]    The Philadelphia Fund's deadline to respond to the Objection was extended to April 18, 2024 upon agreement of
counsel.

claims.  Indeed, the absence of any factual or evidentiary basis for the Objection is demonstrated by the Objection's failure to identify a proposed amount of a modified claim.  As discussed below, the Philadelphia Fund's entitlement to the full allowance of its claims – against each of the Debtors as members of a controlled group -- is supported by uncontroverted facts and federal law.

3.    By way of brief background, certain Debtors contributed to the Philadelphia Fund pursuant to a collective bargaining agreement.  Prior to their bankruptcy filing, the Debtors terminated their business operations and, consequently, withdrew from the Philadelphia Fund.

4.    Under ERISA, when a contributing employer withdraws from a multiemployer pension plan (such as the Philadelphia Fund), it becomes absolutely liable for its proportionate share of the fund's unfunded vested liability.  This obligation, referred to as withdrawal liability, is calculated by the difference between the "present value of the vested benefits and the current value of the plan assets."

5.    As a result of the termination of the Debtors' business operations and their consequent withdrawal from the Philadelphia Fund, the Debtors thus incurred withdrawal liability in the amount of $36,794,461.38, plus liquidated damages, attorneys' fees and costs. The Philadelphia Fund's calculation of the amount of withdrawal liability, which was performed in accordance with the methodology established under ERISA, is outlined below.

6.    In addition to their failure to refute the *prima facie* validity of the Philadelphia Fund's claim, the Debtors failed to follow the proper procedural requirements to contest withdrawal liability under federal law, demonstrated as follows:  ERISA mandates that following an assessment of withdrawal liability, a contributing employer must timely request a review of the assessment by the pension fund, *see* 29 U.S.C. § 1399(b)(2)(A), and if the employer

2

disagrees with the results of the review, the employer must initiate arbitration. If no arbitration proceeding is filed, the amounts demanded by the fund are due and owing on the schedule set forth by the fund.

7. The adjudication of the Objection will require a reconciliation of competing federal interests under ERISA and the Bankruptcy Code. In so doing, the federal policy that led to the enactment of ERISA – the protection of multiemployer pension plans for the benefit of American workers who rely on them – cannot be disregarded. Congress enacted ERISA, and its amendments, to create a specialized statutory framework that contributing employers must follow in order to challenge withdrawal liability assessments. When an employer fails to do so, ERISA provides that the amount of the assessment becomes liquidated and immediately due and owing without offset or reduction.

8. Accordingly, for these reasons, as well as those set forth below, the Objection should be overruled and the Philadelphia Fund should be granted an allowed unsecured claim for withdrawal liability against each of the Debtors in the amount of $36,794,461.38.

## II. BACKGROUND

### (a) The Philadelphia Fund

9. The Philadelphia Fund is an "employee pension benefit plan" within the meaning of § 3(2)(A) of the Employee Retirement Security Income Security Act ("ERISA"), 29 U.S.C. § 1002(2)(A), and a "multiemployer plan" within the meaning of § 3(37) of ERISA, 29 U.S.C. § 1002(37). The Philadelphia Fund was established pursuant to § 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5). The Philadelphia Fund exists for the exclusive purpose of providing benefits to its participants and beneficiaries in accordance with § 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5), and ERISA.

04/15/2024 SL1 2052136v2 027202.00304

10. The Philadelphia Fund is administered by Trustees in accordance with the LMRA Section 302(c)(5), 29 U.S.C. § 186(c)(5), and ERISA. The Trustees of the Philadelphia Fund are appointed in equal numbers by management and labor and owe their exclusive fiduciary obligations to the participants and beneficiaries of the Philadelphia Fund. The Philadelphia Fund maintains its offices at 2500 McClellan Avenue, Suite 140, Pennsauken, New Jersey 08109.

11. The Philadelphia Fund is a not-for-profit multiemployer pension plan which is operated in accordance with a trust agreement under ERISA. All contributions received by the Philadelphia Fund (including any contributions that were previously made by the Debtors) are used for the exclusive purpose of providing pension benefits to beneficiaries of the Philadelphia Fund and for paying administrative expenses.

**(b)  The Debtors' Obligation To Contribute To The Philadelphia Fund**

12. Prior to the Petition Date, certain Debtors, including, without limitation, YRC Inc., USF Holland, LLC and New Penn Motor Express, LLC, entered into a collective bargaining agreement with the Teamsters National Freight Industry Negotiating Committee entitled "YRCW National Master Freight Agreement" (together with all amendments, supplements, addenda, exhibits and related agreements and collective bargaining agreements, the "Collective Bargaining Agreement") pursuant to which certain Debtors were obligated to, among other things, make monthly pension fund contributions to the Philadelphia Fund.

13. Specifically, the Collective Bargaining Agreement provides that, in consideration for the services rendered by covered fund participants, those participants would receive bargained-for compensation in the form of: (i) present income paid in wages; (ii) deferred retirement income through a pension administered by the Philadelphia Fund; and (iii) other benefits.

4

**(c)  The Debtors' Cessation of Business Operations and Bankruptcy Filing**

14.  On or about July 31, 2023, the Debtors terminated their business operations. As a result, the Debtors triggered an event of withdrawal from the Philadelphia Fund.

15.  On August 6, 2023 and continuing on August 7, 2023 (collectively, the "Petition Date"), Yellow Corporation and certain affiliated companies (collectively, the "Debtors") each filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

16.  The Philadelphia Fund timely filed Proofs of Claim in each of the jointly-administered bankruptcy cases (collectively, the "Claims") asserting claims for, *inter alia,* withdrawal liability under the Multiemployer Pension Plan Amendments Act, 29 U.S.C. § § 1381, *et seq*., ("MPPAA") that accrued as a result of the Debtors' withdrawal from the Philadelphia Fund.

17.  The Claims were filed against each of the Debtors as members of a controlled group pursuant to 29 U.S.C. § 1301(b)(1) because the Debtors are under common control within the meaning of 29 U.S.C. § 1301(14)(A),(B); 26 U.S.C. §414(b), (c); 26 C.F.R. §§ 1.414(b)-1.1.414(c)-2.

18.  On March 13, 2024, the Debtors filed the Objection asserting, *inter alia*, that the Claims should be substantially reduced.  The Objection offers scant details as to the bases for the requested reduction of the Philadelphia Fund's withdrawal liability claims.[3]

19.  The Objection also sought to modify and reduce the claims for withdrawal liability filed by the Central Pennsylvania Teamsters Defined Benefit Plan, IBT Local 705, IAM

---

[3]   The absence of sufficient factual or legal detail in the Objection fails to provide the Philadelphia Fund with adequate information necessary to formulate an informed and comprehensive response.  As such, the Philadelphia Fund reserves the right to seek leave to file a supplemental response.

04/15/2024 SL1 2052136v2 027202.00304

National Pension Fund, New England Teamsters Pension Plan, Teamsters Joint Council #83 of

Virginia Pensions Funds and Teamsters Local 710 (together with the Philadelphia Fund, the

"Pension Plans.")

### III. <u>ARGUMENT</u>

20.  The Objection should be disallowed because the Debtors cannot present any

evidence to rebut the *prima facie* validity of the Claims.  Indeed, there is no genuine dispute that:

(i) the Debtors were contractually obligated to contribute to the Philadelphia Fund; (ii) the

Debtors terminated their business operations; (iii) the termination of business operations and

cessation of pension fund contributions triggered withdrawal liability to the Philadelphia Fund;

and (iv) as a result of such withdrawal, the Debtors have incurred withdrawal liability in the

amount of $36,23,562.90.

21.  Additionally, the bases alleged by the Debtors for the reduction of the

Philadelphia Fund's claims fail to overcome the broad deference afforded pension plans in

calculating withdrawal liability under federal law.  Indeed, the Debtors contend that the

Philadelphia Fund's claims are "demonstrably overstated" and "must be substantially reduced."

Without delving into specifics, the Objection simply identifies several alleged categorical

deficiencies in the calculation of withdrawal liability that warrant the reduction of the

Philadelphia Fund's Claims.[4]  Specifically, the Objection contends that the Pension Plans relied

upon: (i) inflated contribution rates; (ii) failed to account for statutory liability caps; and/or (iii)

neglected to discount their claims to present value.

---

[4] Notably, these categorized objections are asserted against all of the Pension Plans that were implicated in the Objection.

6

22. The Debtors contend that the Philadelphia Fund never attempted to calculate the Debtors' annual withdrawal liability, *see* Objection p. 10, and asserted that many of the Pension Plans failed to apply ERISA's 20-year statutory cap to such payments. *Id.* at p. 11. The Debtors incorrectly allege that the Philadelphia Fund's withdrawal liability claim exceeds the statutory 20-year cap by 17 years. *Id.* Lastly, the Debtors assert that the Pension Plans failed to properly discount their claims to present value stating that the Pension Plans "either failed to discount their claims to present value entirely, or used purposefully low discount rates that do not reflect reality…" *Id.* at p. 12. The Philadelphia Fund will address each of these issues below.

**(a) Withdrawal Liability Under ERISA**

23. As stated above, the Claims seek to recover withdrawal liability from the Debtors arising from the termination of the Debtors' business operations. Withdrawal liability is an obligation imposed on a contributing employer, triggered by its withdrawal from a multiemployer pension plan to which the employer had an obligation to contribute, to pay to the plan the employer's share of "unfunded vested benefits" accrued by beneficiaries of the plan in their work for the employer. 29 U.S.C. § 1381.[5]

24. Withdrawal liability consists of "the employer's proportionate share of the plan's unfunded vested benefits calculated as the difference between the present value of the vested benefits and the current value of the plan assets." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 725 (1984).

25. ERISA was designed to ensure that employees would not, upon retirement, be deprived of a promised pension by termination of pension before sufficient funds had

---

[5] The Philadelphia Fund frequently initiates lawsuits in federal court to recover withdrawal liability from contributing employers. See generally, *Einhorn v. Kaleck Bros., Inc.,* 713 F. Supp. 2d 417 (D.N.J. 2010).

accumulated in them.  *In re CD Realty Partners*, 205 B.R. 651, 657 (Bankr. D. Mass. 1997).

Toward that end, ERISA required employers to make contributions that would produce pension

plan assets sufficient to meet future vested pension liabilities.  *Milwaukee Brewery Workers'*

*Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 416, 115 S. Ct. 981, 985-987, 130 L.Ed.

2d 932 (1995).

 26.  The Multiemployer Pension Plan Amendments Act ("MPPAA") was enacted by

Congress in 1980 to protect participants in multi-employer plans from the loss of their pensions.

*Board of Trustees of Trucking Employees of New Jersey Welfare Fund, Inc. v. Gotham Fuel*

*Corporation*, 860 F. Supp. 1044, 1047 (D. N.J. 1993).  In essence, MPPAA was created to

protect the solvency of multiemployer plans.  *Id*. at 1047.

 27.  Under 29 U.S.C. § 1383(2), a complete withdrawal occurs when a contributing

employer ceases all "covered operations."  29 U.S.C. § 1383(a)(2).  In other words, a complete

withdrawal occurs when a contributing employer terminates its business.  *See generally*,

*SUPERVALU, Inc. v. Board of Trustees of Southwestern Pennsylvania and Western Area*

*Teamsters and Employers Philadelphia Fund*, 500 F.3d 334, 343 (3d Cir. 2007)(finding that a

contributing employer withdrew when it closed its business facility); *Combs v. Adkins & Adkins*

*Coal, Co., Inc.,* 597 F. Supp. 122, 126 (D. D.C. 1984)(employer that had ceased operations and

reconstituted as a new company permanently withdrew).  Thus, the termination of the Debtors'

business operations triggered withdrawal liability owed to the Philadelphia Fund.

 28.  Here, there is no genuine dispute that the Debtors ceased operations.  As a result,

under 29 U.S.C. § § 1383 and 1384, each of the Debtors has incurred withdrawal liability in the

liquidated amount of $36,233,562.90 that is due and owing to the Philadelphia Fund.

29.  Because the Debtors are members of a controlled group, the Philadelphia Fund has asserted claims against each of them.  *See also, Board of Trustees of Trucking Employees of North Jersey Welfare Fund v. CenTra, Inc.,* 983 F.2d 495, 502 (3d Cir. 1992)(discussing common control of corporate entities). Each of the Debtors is jointly and severally liable for the withdrawal liability as members of a controlled group pursuant to 29 U.S.C. § 1301(14)(A),(B); 26 U.S.C. §414(b), (c); 26 C.F.R. §§ 1.414(b)-1.1.414(c)-2.[6]

---

[6] Debtor, Yellow Corporation, is the direct or indirect parent of the other Debtors. Yellow Corporation owns one hundred percent (100%) of the equity interests of the following Debtors:

    (i)  1105481 Ontario, Inc.;
    (ii)  Express Loan Service, Inc.;
    (iii)  New Penn Motor Express, LLC;
    (iv)  Roadway, LLC;
    (v)  USF Holland, LLC;
    (vi)  YRC Association Solutions, Inc.;
    (vii)  YRC Enterprise Services, Inc.;
    (viii)  YRC International Investments, Inc.;
    (ix)  YRC Mortgages, LLC;
    (x)  YRC Regional Transportation, LLC.

YRC, Inc. owns one hundred percent (100%) of the equity interests of the following Debtors:

    (xi)  Roadway Express International, Inc.;
    (xii)  Yellow Freight Corporation;
    (xiii)  Yellow Logistics, Inc.;
    (xiv)  YRC Freight Canada Company.

Roadway, LLC owns one hundred percent (100%) of the equity interests of following Debtors:

    (xv)  Roadway Next Pay Corporation;
    (xvi)  YRC, Inc.

YRC Regional Transportation, Inc. owns one hundred percent (100%) of the equity interests of the following Debtors:

    (xvii)  USF Bestway, Inc.;
    (xviii)  USF Dugan, Inc.;

9

**(b)  The Calculation Of Withdrawal Liability**

30.    In accordance with Section 4211(b)(1) of ERISA, 29 U.S.C. § 1391(b), the

Philadelphia Fund determines an employer's total withdrawal liability by aggregating two sums.

The first consists of the employer's proportional share of the change in the Philadelphia Fund's

Unfunded Vested Benefit ("UVB") for every relevant year before and after September 26, 1980,

the date that ERISA was amended, to create withdrawal liability.  *See* Section 4211(b)(1)(A) and

(B) of ERISA, 29 U.S.C. § 1391(b)(1)(A) and (B).  The UVB is the difference between the

present value of the Philadelphia Fund's vested benefits and the present value of the Philadelphia

Fund's assets.

31.    The second sum is the employer's proportional share of the unamortized

reallocated UVB for each year in the same time period.  *See* Section 4211(b)(1)(C), 29 U.S.C.

§ 1391(b)(1)(C).  The reallocated UVB consists of the UVB: (i) attributable to other contributing

employers that have withdrawn from the Philadelphia Fund; and (ii) which the Philadelphia Fund

has determined to be uncollectible.

32.    Pursuant to 29 U.S.C. §§ 1381 and 1383, the withdrawal liability that accrued

upon the termination of business operations represents the Debtors' proportionate share of the

---

     (xix)  YRC Regional Transportation, Inc.;
     (xx)  USF Reddaway, Inc.;
     (xxi)  YRC Logistics Services, Inc.

   USF Holland LLC owns one hundred percent (100%) of the equity interests of the
following Debtors:
     (xxii)  USF Holland International Sales Corporation

   YRC Logistics Services, Inc. owns one hundred percent (100%) of the equity
interests of the following Debtors:
     (xxiii)  YRC Logistics, Inc.

Philadelphia Fund's unfunded vested liabilities.  Thus, upon the occurrence of their respective

withdrawals, the Debtors became obligated to pay their proportionate share of the Philadelphia

Fund's unfunded vested benefits calculated as the difference between the present value of vested

benefits and the current value of plan assets.

> **(c)  The Debtors Have Not Presented any Evidence to Support the Disallowance or Reduction of the Claims**

33.    Given the Philadelphia Fund's clear entitlement to recover in full on its Claims, it

is not surprising that the Objection is unable to assert a valid basis for disallowance or reduction

of the Claims.  As such, the Objection must be overruled because the Debtors have failed to:

(i) overcome the presumption that the Claims are valid; and (ii) state a factually or legally

supportable objection that would justify the disallowance of the Claims.

34.    The Debtors' conclusory statements that the Claims should be substantially

reduced is a legally insufficient basis for objecting to a claim under the Bankruptcy Code. The

Debtors failed to substantiate their allegations with either factual or legal support, relying instead

on categorical allegations that do not overcome the presumption of validity under the Bankruptcy

Code and the deference afforded pension plans under ERISA.

35.    Indeed, the Debtors have failed to overcome the statutory presumption that the

Claims are valid.  It is well-settled that a creditor's properly filed proof of claim constitutes

*prima facie* evidence of the validity and amount of the claim.  11 U.S.C. § 502(a); Fed. R. Bankr.

P. 3001(f).  Once a proof of claim has been properly executed and filed "it is [the] debtor who

bears the initial burden of going forward to produce evidence sufficient to negate the *prima facie*

validity of the filed claim."  *In re Desert Village Ltd. P'ship*, 321 B.R. 443, 446 (Bankr. N.D.

Ohio 2004) (emphasis added) (citing *In re Morton*, 298 B.R. 301, 307 (B.A.P. 6th Cir. 2003).

11

36. A debtor objecting to a claim must present ***affirmative evidence*** to overcome the presumption of validity. *See In re King*, 305 B.R. 152, 162 (Bankr. S.D.N.Y. 2004) ("It is well settled that the party objecting to a proof of claim has the burden of coming forward with *sufficient evidence* rebutting the validity of a properly filed proof of claim."); *In re Allegheny International, Inc.,* 954 F.2d 167, 176 (3d Cir. 1992) (burden shifts to objector to produce sufficient evidence to negate the *prima facie* validity of the filed claim); *see also In re Sterling Packaging Corp.*, 265 B.R. 701 (Bankr. W.D. Pa. 2001); *In re Planet Hollywood International,* 274 B.R. 391, 394 (D. Del. 2001). "[A] party objecting to a claim has the initial burden of presenting a substantial factual basis to overcome the *prima facie* validity of proof of claim [and] [t]his evidence must be a probative force equal to that of the creditor's proof of claim." *In re Hinkley,* 58 B.R. 339, 348 (Bankr. S.D. Tex. 1986)*, aff'd.* 89 B.R. 608, *aff'd*. 875 F.2d 859 (5th Cir. 1989); s*ee also In re Lewis,* 80 B.R. 39, 40 (E.D. Pa. 1987); *citing* 3 *Collier on Bankruptcy,* ¶ 502.02 at 502-22. "[T]o overcome this *prima facie* evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *In re Reilly,* 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000). Only when "the debtor has met that burden, the burden of going forward shifts back to the creditor, and the creditor bears the ultimate burden of persuasion." *Morton*, 298 B.R. at 307.

37. Here, the Objection is legally insufficient because it offers ***no evidence*** to support the Objection and overcome the presumption that the Claims are valid. The Debtors' mere formal objection and boilerplate, categorical reasonings, without more, will not defeat claims that constitute evidence of their *prima facie* validity. *In re Garner,* 246 B.R. 617, 623 (B.A.P. 9th Cir. 2000); *In re Circle J Dairy, Inc.,* 112 B.R. 297, 299 (Bankr. W. D. Ark. 1990).

Consequently, the Debtors have failed to overcome the *prima facie* validity of the Claims and, accordingly, the Objection should be overruled.

38.   Furthermore, ERISA provides that "any determination made by a plan sponsor under [the provisions governing calculation of withdrawal liability] is presumed correct unless the party contesting the determination shows by a *preponderance of the evidence* that the determination was unreasonable or clearly erroneous." *Id.* § 1401(a)(3)(A) (emphasis supplied).

39.   As set forth below, each of the categorical reasons for the proposed (but unquantified) claim reduction must be rejected.  The Philadelphia Fund will address each of the reasons in turn below.

### (d)  The Twenty-Year Cap Does Not Apply to the Philadelphia Fund's Claims

40.   The application of the twenty-year cap applied to withdrawal liability claims under ERISA does not implicate or warrant the reduction of the Claims.  The twenty-year cap referenced in the Objection is based upon 29 USC §1399 which provides, in relevant part:

> **(A)(i)** Except as provided in subparagraphs (B) and (D) of this paragraph ..., an employer shall pay the amount determined under section 1391 of this title, adjusted if appropriate first under section 1389 of this title and then under <u>section 1386</u> of this title over the period of years necessary to amortize the amount in level annual payments determined under subparagraph (C)....

> **(B)** In any case in which the amortization period described in subparagraph (A) exceeds 20 years, the employer's liability shall be limited to the first 20 annual payments determined under subparagraph (C).

29 U.S.C. § 1399(c)(1).

41.   Section 1399 of ERISA gives withdrawing employers a choice about how to pay the withdrawal liability: in a lump sum payment or in installments. *See* 29 U.S.C.

§1399(c)(1), (c)(4); *Milwaukee Brewery Workers' Pension Plan* v. Joseph Schlitz Brewing Co.,

513 U.S. 414, 418 (1995).

42.  Section 1399(c)(1)(A)(i) provides that, with some exceptions, "an employer shall

pay the amount determined under section 1391 of this title, adjusted if appropriate first under

section 1389 of this title and then under section 1386 of this title over the period of years

necessary to amortize the amount in level annual payments determined under subparagraph (C)."

An employer's annual payment amount under §1399(c)(1)(C) is equal to the employer's greatest

average annual "contribution base units" ("CBUs") for three consecutive years during the ten-

year period preceding the year of withdrawal, multiplied by the highest contribution rate at

which the employer had an obligation to contribute during the ten-year period ending with the

year of withdrawal.  Subparagraph (C) "(roughly speaking) equals the withdrawing employer's

typical contribution in earlier years." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at

418; *see* 29 U.S.C. § 1399(c)(1)(C).

43.  In plain language, § 1399(c) requires the plan sponsor to calculate the allocable

amount of UVB, apply the first two potential adjustments, and then calculate how long it would

take to pay that amount (plus interest) if the employer continued its previous rate of contributions

that it made before the withdrawal.

44.  If it would take longer than twenty years to pay, "the employer's liability shall be

limited to the first 20 annual payments." 29 U.S.C. § 1399(c)(1)(B). This cap acts as a limitation

on the amount of money a plan can collect from a withdrawing employer.  *Perfection Bakeries,*

*Inc. v. Retail Wholesale and Department Store International Union and Industry Pension Fund*,

2023 WL 4412165 *5 (July 7, 2023 N.D. Ala).

45.   Upon withdrawal by a contributing employer, MPPAA requires a pension fund to send a notice and demand for payment for an employer's withdrawal liability "as soon as practicable" after the employer's complete withdrawal. *Id.* § 1399(b)(1).  "Payments are set at a level that *approximates the periodic contributions the employer had made before withdrawing from the plan." Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.,* 522 U.S. 192, 197, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997) (citing 29 U.S.C. § 1399(c)(1)(C)).(emphasis added).  "The statute limits the employer's obligation to make these payments to 20 years, even if it would take more than 20 payments for the employer to pay its full withdrawal liability." *Trs. of Local 138 Pension Trust Fund v. F.W. Honerkamp Co.,* 692 F.3d 127, 130 (2d Cir. 2012*); 692 F.3d at 130; see also Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.,* 513 U.S. 414, 419, 115 S.Ct. 981, 130 L.Ed.2d 932 (1995) (noting that "the statute forgives all debt outstanding after 20 years").

46.   On a consolidated basis, the Debtors' highest annual average CBUs for a three-consecutive year period during the ten years preceding the year of its withdrawal were $590,402.67 and their highest contribution rate during the ten-year period ending with the year of their withdrawals was $16.95.  Thus, the Debtors' required annual payment amount is $10,007,325.26 ($590,402.67 x $16.95), and the maximum amount they would be required to pay under ERISA's 20-year cap would accordingly be **$200,146,505, *approximately $163,000,000 more than the Claims*.**

47.   As such, the 20-year cap does not limit the Debtors' withdrawal liability because the maximum amount it would be required to pay under the 20-year cap is **more than 5 times** its total withdrawal liability of $36,794,461.38.

04/15/2024 SL1 2052136v2 027202.00304

**(e) The Interest Rate Applied by the Philadelphia Fund to Discount Vested Benefits to Present Value Was Appropriate and is Entitled to Deference**

48.  The Objection asserts, again in conclusory fashion, that the Philadelphia Fund failed to use the appropriate rate to discount vested benefits to present value.  Notably, the Debtors do not allege or suggest what they believe *is* an appropriate rate.[7]  Withdrawal liability is calculated by professional actuaries who must use "actuarial assumptions and methods, which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations and which, in combination, offer the actuary's best estimate of the anticipated experience under the plan.  *Sofco Erectors, Inc. v. Trustees of Ohio*, 15 F.4th 407, 416 (6th Cir. 2021) quoting 29 U.S.C. 1393(a)(1).  If the contributing employer disagrees with the assessment, the employer can request that the plan review it.  29 USC §1399(b)(2)(A).

49.  Employers who wish to challenge assessments must arbitrate their disputes first and, if dissatisfied with the result, then appeal the arbitrator's decision to federal court.  29 USC §1401(a)(1), (b)(2).

50.  The arbitrator must presume that the plan sponsor's factual determinations are correct unless the employer disproves a determination by a preponderance of the evidence.  29 USC §1401(a)(3)(A).

51.  To challenge an actuary's calculation of withdrawal liability, the employer must show "that the actuarial assumptions and methods used in the determination were, in the aggregate, *unreasonable* (taking into account the experience of the plan and reasonable expectations, of the plan's actuary made a significant error in applying the actuarial assumptions or methods.  29 USC §1401 (a)(3)(B).(emphasis supplied).

---

[7] To the extent that the Objection suggests that the Philadelphia Fund did not discount to present value, that is not correct.

04/15/2024 SL1 2052136v2 027202.00304

**(f) The Philadelphia Fund's Actuary Had Broad Discretion to Apply the Blended Rate Assumption.**

52.   In *Concrete Pipe and Products of California v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 113 S.Ct. 2246 (1993), the United States Supreme Court held that an arbitrator or court that reviews an actuary's assumptions must focus on "what the actuarial profession considers to be within the scope of professional acceptability in making an unfunded calculation." *Id*. at 635.  To prevail, the employer must prove that the plan's actuary has employed a set of assumptions and methods *so unreasonable* as to fall "outside the range of reasonable actuarial practice." *Id*. (emphasis added).  *Concrete Pipe* also recognized that:  (1) "actuarial practice has been described as more in the nature of an 'actuarial art' than a science," and (2) hence, there may be "several correct approaches" to selecting a combination of actuarial assumptions and methods. *Id*. (emphasis added).

**(g) The Actuary's Role in Calculating Withdrawal Liability**

53.   Stated simply, *Concrete Pipe* recognized that different professional actuaries disagree concerning the proper actuarial assumptions and methods used to calculate withdrawal liability.  Here, the Debtors must show that the Philadelphia Fund's actuary, Milliman, selected an array of assumptions that fell outside the "series of approaches" recognized by "reasonable . . . actuarial practice."  As explained below, the Debtors cannot bear that burden.

54.   Pension funds hire actuaries to prepare annual reports and calculate funding levels and withdrawal liability. *E.g.*, 26 U.S.C. §§ 431, 6059; 29 U.S.C. §§ 1023, 1084, 1393.  Generally, employer contributions plus the income generated from them need to be sufficient to pay future benefits and cover administrative expenses. *Sofco*, 15 F.4th at 418. (citations omitted).  Determining a fund's future liabilities, or how much it will have to pay out in benefits, requires

17

actuaries to make assumptions about how many employees will vest their benefits, how much they will receive in benefits, and how long they will live. *Id.*

55.   Once an actuary determines how much the fund will need to spend on benefits payments and administrative costs, it must determine the present value of future liabilities—how much the fund needs in assets today in order to pay those liabilities in the future. *Id.*  This requires the actuary to make certain assumptions about the income the assets will generate.  *Id.*  If the actuary assumes that the fund's investments will have a higher long-term growth rate, then the fund will not need as many assets today to pay liabilities in the future.  *Id.* at 419.  However, if the actuary assumes a lower long-term growth rate, the fund will need more assets now to pay those liabilities in the future (and thus may have to take in more money through contributions). *Id.*

56.   The actuary must then compare the present value of future liabilities to the current assets in the fund.  *Id.* This can be done by looking at the market value of those assets. *Id.*  If the fund has less money than it needs, then there is an unfunded liability. *Id.*  The interest-rate assumption is a critical factor in determining the present value of future liabilities. The higher the interest rate, the less money the fund needs today to pay liabilities in the future. The lower the interest rate, the more money the fund needs today.  *Id.*

57.   The interest-rate assumption is also critical in withdrawal-liability calculations. A lower interest rate produces a higher unfunded liability. Because employers withdrawing from funds must pay a proportionate amount of the unfunded liability, *see Pension Benefit Guaranty Corp. v. R.A. Gray*, 467 U.S. 717, 725, 104 S.Ct. 2709, 81 L.Ed. 601 (1984), a lower interest-rate assumption results in higher withdrawal liability. For withdrawal-liability purposes, a lower interest-rate assumption is more favorable for the fund.

04/15/2024 SL1 2052136v2 027202.00304

58. For purposes of calculating withdrawal liability, the Philadelphia Fund, at the recommendation of its actuary, utilized a "blended rate." In other words, in determining the present value of vested benefits, the assumed rate of investment return is a blend of interest assumptions for current liability (2.55%) and ERISA minimum funding assumptions (7.00%).

59. The Philadelphia Fund's blended rate is determined by valuing liabilities matched to assets using the rate established by the Pension Benefit Guaranty Corporation ("PBGC") and the liabilities that are not matched to assets using the 7.0% funding rate.

**(h) The Philadelphia Fund's Use of the Blended Rate Has Been Approved By Other Federal Courts**

60. Significantly, in litigation challenging the Philadelphia Fund's use of the blended rate, the United States District Court for the Eastern District of Pennsylvania upheld the use of the blended rate. *Miller & Son Paving, Inc. v. Teamsters Pension Trust Fund of Philadelphia & Vicinity*, 2016 WL 4802752 (E.D. Pa. 2016). In *Miller*, another contributing employer of the Philadelphia Fund challenged the Fund's blended interest rate assumption. An arbitrator chosen under the statutory scheme of administrative remedies ruled for the Fund. The employer then appealed the arbitrator's ruling to District Court. *Id.* at *6.

The *Miller* Court commenced its analysis by examining the record established during the arbitration. The evidence showed that Milliman had initially implemented the blended interest rate assumption for the Philadelphia Fund in 2008 – because the Fund was "unhealthy" and needed increased collections of withdrawal liability. *Id.* at *6. The Court sustained the arbitrator for the following reasons:

> *I find that the Fund's use of the blended rate to calculate withdrawal liability consistent with ERISA's goal of ensuring that the Fund has adequate funds to pay out vested benefits for its members.* As the arbitrator found, if after 2008 the Fund had continued to use a 7.5% valuation rate to calculate withdrawal liability, this would "have been going against its best estimate of what interest rate calculation would best

19

serve a Fund in an unhealthy status." This would have been inconsistent with ERISA's requirement that withdrawal liability be based on assumptions that "offer the actuary's best estimate of anticipated experience under the plan." I therefore find the Fund's decision consistent with the valid purpose of ensuring the economic health of the Plan.

*Id.* (emphasis added).(internal citations omitted).

*Miller* conclusively establishes that the blended rate constituted Milliman's "best estimate of [the Fund's] future experience." Milliman, moreover, has continued to certify use of the blended interest rate for withdrawal liability in every year since 2008. *See also*, *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F.Supp. 3d 365 (D.N.J. 2018); *Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc.,* 698 F. 3d 346 (7th Cir. 2012).[8]

Thus, Debtors cannot challenge that rate without satisfying the burden of proof established by *Concrete Pipe*.

### (i) The Philadelphia Fund's Use of the Blended Rate is permitted pursuant to Proposed PBGC Guidance

61. On October 13, 2022, the PBGC released a proposed rule providing guidance on the assumptions used for withdrawal liability purposes for ongoing plans. The proposed rule

---

[8] The Philadelphia Fund recognizes that some opinions issued outside of the Third Circuit disapprove of the application of the blended rate for the calculation of withdrawal liability. *See e.g., New York Times Co. v. Newspaper and Mail Deliverers' Publishers' Pension Fund*, 403 F.Supp. 3d. 236 (SDNY 2018). That case was appealed to the Second Circuit but was settled by the parties prior to decision by the Second Circuit. *New York Times* is distinguishable because the actuary for the plan testified that the actuary's "best estimate" of how the pension fund's assets would perform over the long term was different than the assumptions used to determine withdrawal liability. *New York Times*, 403 F.Supp. 3d at 255. This testimony was instrumental in the court's finding that the use of the blended interest rate in that instance was inappropriate. *See also, Sofco Erectors, Inc. v. Trustees of the Ohio Operating Engineers Pension Fund*, 15 F.4th 407 (6th Cir. 2021), where the Sixth Circuit disapproved of the use of the blended interest rate assumption under the facts present therein. However, notwithstanding this contrary precedent, the Philadelphia Fund's actuary has continued to maintain the position that the utilization of the blended interest rate remains reasonable (taking into account the experience of the plan and reasonable expectations) and which in combination continues to offer the actuary's best estimate of anticipated experience under the plan consistent with ERISA §4213.

acknowledges three common approaches to selecting the interest rate used for determining

unfunded vested liability for withdrawal liability purposes for ongoing plans:

1. Interest rate used for ERISA minimum funding purposes;
2. Settlement interest rates prescribed by the PBGC as if the plan were terminating by a mass withdrawal of all employers;
3. An interest assumption that combines the use of both 1 and 2.

62.  The proposed rule makes clear that any of the above is "a valid approach to

selecting an interest rate assumption to determine withdrawal liability in all circumstances."

Additionally, the proposed rule states that selection of the interest rate assumption would not be

subject to ERISA 4213(a)(1) and therefore, does not necessarily need to take into account the

experience of the plan, nor reflect the actuary's best estimate for anticipated experience under the

plan.

63.  The PBGC acted in accordance with the congressional mandate from 1980, which

authorized the PBGC to issue regulations on the actuarial assumptions and methods used to

calculate withdrawal liability. While the changes in the proposed regulations would apply only to

the calculation of withdrawal liability that is created after the final regulations are affected, the

PBGC specifically noted that the proposed rule does not preclude the use of an interest rate

permitted by the regulations before the final regulations are affected. The Philadelphia Fund's

interest rate assumption herein utilizes the blended interest rate as specifically permitted pursuant

to the proposed PBGC guidance.

**WHEREFORE,** the Philadelphia Fund respectfully requests that the Court deny the

Objection as to the Philadelphia Fund, and grant such other and further relief as is just.

Dated:  April 18, 2024                           STEVENS & LEE, P.C.

_/s/ Joseph H. Huston, Jr._
Joseph H. Huston, Jr. (No. 4035)
919 North Market Street, Suite 1300
Wilmington, DE 19801
Telephone:  (302) 425-3310
Fax:  (610) 371-7972
Email:  joseph.huston@stevenslee.com

John C. Kilgannon, Esquire
1500 Market Street, East Tower
Suite 1800
Philadelphia, PA 19012
Telephone: (215) 751-1943
Fax: (610) 371-7954
Email: john.kilgannon@stevenslee.com

*Counsel for the Teamsters Pension Trust Fund of*
*Philadelphia & Vicinity*