## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:

YELLOW CORPORATION, *et al.*,[1]

Debtors.

---------------------------------------------------------------- x

Chapter 11

Case No. 23-11069 (CTG)

(Jointly Administered)

**Related Docket No. 2595**

## NEW ENGLAND TEAMSTERS PENSION FUND'S RESPONSE TO DEBTORS' SEVENTH OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM FOR WITHDRAWAL LIABILITY

Mark D. Collins
Cory D. Kandestin
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701

Dennis F. Dunne
(*pro hac vice* pending)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

Andrew M. Leblanc
(*pro hac vice* pending)
Erin E. Dexter
(*pro hac vice* pending)
Melanie Westover Yanez
(*pro hac vice* pending)
**MILBANK LLP**
1850 K St. NW, Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

*Counsel for New England Teamsters Pension Fund*

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is:  11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL BACKGROUND.......................................................................................... 3

    A.    The Debtors and NETTI ................................................................................. 3

          1.    Yellow's Financial Difficulties Following 2008 and NETTI's Forbearance............................................................................................4

          2.    Yellow Resumes Contributions to NETTI in 2011 at a Significantly Reduced Rate.........................................................................5

          3.    Yellow Acknowledges Its Withdrawal Liability Obligations......................6

    B.    Yellow Withdraws from NETTI and Commences Bankruptcy Proceedings ........ 6

WITHDRAWAL LIABILITY UNDER ERISA AND THE PLAN.............................................7

    A.    Withdrawal Liability Calculation ................................................................... 8

    B.    Annual Payment Calculation ......................................................................... 9

    C.    Notice of and Challenges to Withdrawal Liability ........................................ 10

LEGAL STANDARD................................................................................................. 10

RESPONSE............................................................................................................. 11

    A.    The Correct Reference Period Is Applied to the Claims...................................... 13

    B.    The 20-Year "Cap" Does Not Meaningfully Affect the Stated Claim Amount ... 15

          1.    20 Years of Amortized Annual Payments Has Little Impact on the Claim...........................................................................................15

          2.    Discounting the Claim to Present Value Is an Impermissible "Double Discount".......................................................................16

          3.    NETTI is Entitled to Demand Immediate Payment of Yellow's Withdrawal Liability ...............................................................17

    C.    The Correct Interest Rate Is Applied to the Claims............................................ 19

    D.    Subordination of the Claims is Unwarranted....................................................... 20

    E.    Future Receipt of Special Financial Assistance Will Not Affect the Allowable Claim Amount......................................................................... 21

CONCLUSION........................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Affiliated Foods, Inc.*,
249 B.R. 770 (Bankr. W.D. Mo. 2000)....................................................................20

*In re Allegheny Int'l, Inc.*,
954 F.2d 167 (3d Cir. 1992)................................................................................11

*Benitec Australia Ltd. v. Promega Corp.*,
No. 04-CV-889, 2005 WL 549552 (D. Del. Mar. 8, 2005) .....................................14

*Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*,
252 F.3d 911 (7th Cir. 2001) .............................................................................18

*Cott Corp. v. New Eng. Teamsters & Trucking Indus. Pension Fund (In re Cott Corp.)*,
26 B.R. 332 (Bankr. D. Conn. 1982) ...................................................................20

*In re Exide Techs.*,
378 B.R. 762 (Bankr. D. Del. 2007) ....................................................................14

*In re F-Squared Inv. Mgmt., LLC*,
546 B.R. 538 (Bankr. D. Del. 2016) ........................................................11, 12, 19

*In re Glob. Indus. Techs., Inc.*,
344 B.R. 382 (Bankr. W.D. Pa. 2006) ..................................................................22

*In re M & M Fishing Corp.*,
468 B.R. 461 (Bankr. D. Mass. 2012) ..................................................................20

*In re Oakwood Homes Corp.*,
449 F.3d 588 (3d Cir. 2006)...........................................................................17, 21

*In re Promise Healthcare Grp., LLC*,
No. 18-12491, 2023 WL 3026715 (Bankr. D. Del. Apr. 20, 2023)........................21

*In re Trib. Media Co.*,
No. 15-CV-01116, 2018 WL 6167504 (D. Del. Nov. 26, 2018).............................22

*In re US Airways Group, Inc.*,
303 B.R. 784 (Bankr. E.D. Va. 2003)...................................................................16

*In re W.R. Grace & Co.*,
626 B.R. 217 (Bankr. D. Del. 2021) .....................................................................21

**Statutes**

11 U.S.C. § 502(b) ........................................................................................21, 22

29 U.S.C. § 1381(a) ....................................................................................................7

29 U.S.C. § 1381(b) ..................................................................................................16

29 U.S.C. § 1391 ........................................................................................................8

29 U.S.C. § 1391(c)(5) ..........................................................................................8, 14

29 U.S.C. § 1399 ........................................................................................................9

29 U.S.C. § 1399(b) ....................................................................................................7

29 U.S.C. § 1399(b)(1) ............................................................................................10

29 U.S.C. § 1399(b)(2)(A) ..................................................................................10, 12

29 U.S.C. § 1399(c)(1)(A)(i) ....................................................................................17

29 U.S.C. § 1399(c)(1)(B) ........................................................................................10

29 U.S.C. § 1399(c)(1)(C) ..........................................................................................9

29 U.S.C. § 1399(c)(5) ..................................................................................10, 17, 18

29 U.S.C. § 1401 ......................................................................................................10

29 U.S.C. § 1401(a)(3)(A) ............................................................................10, 12, 19

29 U.S.C. § 1405(b) ..................................................................................................20

**Rules**

Fed. R. Bankr. P. 3001 ............................................................................................11

Fed. R. Bankr. P. 3001(f) ........................................................................................10

**Other Authorities**

29 C.F.R. § 4262.16(g)(2) ........................................................................................22

29 C.F.R. § 4262.16(g)(2)(xiii) ................................................................................22

## PRELIMINARY STATEMENT

1.    The *Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [Dkt. No. 2595] (the "Objection") fails to overcome the presumptive validity of the New England Teamsters & Trucking Industry Pension Fund's ("NETTI") asserted Claim (as defined herein).  The Debtors (also referred to herein as "Yellow") assert that they will obtain evidence through discovery to prove their various arguments, but nearly all such arguments fail on legal grounds alone.  For any that remain, the evidence will in fact show that the Claim is calculated correctly and the Debtors are liable for the full amount thereof.

2.    The Debtors do not dispute that they owe withdrawal liability to NETTI.  They dispute only how that withdrawal liability was calculated.  Contrary to what the Debtors would have this Court believe, withdrawal liability calculations are a straightforward exercise, generated primarily from knowable inputs and a publicly available formula.   NETTI routinely calculates the withdrawal liability of its employers, either upon request or when necessary for collection from withdrawing employers, and does so in accordance with the relevant provisions of the Employee Retirement Income Security Act of 1974 ("ERISA") and NETTI's governing rules and regulations (the "Plan").[2]  Moreover, in ERISA, Congress specifically afforded deference to a multi-employer pension plan's withdrawal liability calculations, likely because these plans are the party best-suited to perform them.

3.    NETTI's calculation of the Debtors' withdrawal liability, including the formula used and inputs applied, is set forth in the Worksheet (as defined herein) attached to NETTI's Claim. The Debtors cannot credibly claim that NETTI's calculations in the Worksheet are inaccurate;

---

[2]    The Plan, titled the "Complete Rules and Regulations for the New England Teamsters Pension Fund," amended and restated as of January 1, 2022, is publicly available at https://nettipf.com/wp-content/uploads/2023/01/NETPF-Rules-and-Regs-Effective-1-1-2022-FINAL.pdf.

instead, they make several collateral attacks on the calculation that are readily dismissed.  *First*, NETTI's calculation applies the appropriate Reference Period (as defined herein), expressly required by the Plan.  The Debtors do not describe how they calculate their liability to NETTI, but they offer no justification for deviating from the Plan.  *Second*, even if the 20-year statutory "cap" on withdrawal liability were applied, it would not meaningfully reduce the face amount of the Claim (and could in fact operate to increase it).  As the Worksheet clearly sets out, twenty years of amortized payments sums to nearly $452 million; any reasonable discounting of this total figure would result in an amount substantially similar to NETTI's $285 million Claim.  *Third*, and relatedly, the Debtors' argument that the Claim is not appropriately discounted to present value fails for the simple reason that NETTI's Claim is already asserted in present value:  the calculation of withdrawal liability is itself an exercise in determining the present value of the Plan's future obligations to beneficiaries and the withdrawing employer's share of those obligations.  Any further reduction is an impermissible "double discount."

4.    The Debtors' remaining arguments should fail because they are, at best, conclusory and in any event, wrong.  The Debtors broadly assert that the claimants named in their omnibus Objection used the wrong interest rate, without identifying whether NETTI is one such claimant, what interest rate is in fact incorrect, or what the "right" interest rate may be; they claim that half of NETTI's claim should be subordinated, citing authority that fails to support this position; and they "reserve their right" to argue that any funds NETTI may receive from the Special Financial Assistance program ***in the future***—for it has received none to date, and certainly none prior to the Petition Date or Yellow's withdrawal—will somehow affect the prepetition calculation of the Debtors' withdrawal liability.  They are wrong on all accounts.

5.    The Debtors' unsupported and generalized complaints about the Claim fail utterly to disturb the Claim's *prima facie* validity.   The Objection should be overruled and the Debtors should be ordered to pay the full amount of NETTI's Claim.

## FACTUAL BACKGROUND

### A.    The Debtors and NETTI

6.    NETTI is a multiemployer pension plan ("MEPP") covered by ERISA, as amended by the Multiemployer Pension Plan Amendments Act of 1980.  MEPPs like NETTI perform a critical role in retirement planning for union employees and serve as a crucial component of the bargain struck between employers and employees.  MEPPs pool periodic contributions from a number of employers (NETTI serves more than 350) and provide the required and earned pension benefits to those employees eligible to receive them.  The employer's contribution rates are agreed between the employer and the union for its employees and are set forth in the respective collective bargaining agreement.

7.    Yellow's collective bargaining agreements have required it to contribute to NETTI for decades.  Yellow's collective bargaining agreements generally set an initial contribution rate for the first year and require Yellow to contribute to NETTI at increasing rates each year the collective bargaining agreement remains in effect.  These collective bargaining agreements, which contain numerous terms governing the relationship between Yellow and its employees in addition to the pension fund contribution rate, generally ran for a period of approximately four years.

### 1.  Yellow's Financial Difficulties Following 2008 and NETTI's Forbearance

8.    As has been well-documented elsewhere in these cases, Yellow entered a period of significant financial difficulty following the financial crisis of 2008.[3]  Although it was required by its governing collective bargaining agreements to make monthly contributions to NETTI, Yellow failed to make payments to NETTI in April, May, and June of 2009 (the "Missed Contributions"). Around the same time, Yellow similarly failed to make payments to other MEPPs to which it was required to contribute.[4]

9.    Cognizant of its failure to make required payments to MEPPs and, consequently, the rights of NETTI and other MEPPs to assess withdrawal liability against it, Yellow negotiated with the MEPPs for forbearance.  These efforts resulted in a Contribution Deferral Agreement, originally executed on June 17, 2009, between Yellow and the Central States, Southeast and Southwest Areas Pension Fund (another MEPP seeking to recover withdrawal liability from the Debtors in these bankruptcy proceedings) and to which other MEPPs, including NETTI, executed joinders and became bound.[5]

10.   The Contribution Deferral Agreement provided that Yellow would be granted a temporary moratorium on contributions to the MEPPs for the period from June 30, 2009 to January 15, 2010.  Yellow further agreed to resume contributing to the MEPPs on a later date and that upon resuming contributions, Yellow would repay the Missed Contributions on an amortizing schedule.

---

[3]   *See, e.g., Declaration of Darren Hawkins in Support of Debtors' Third, Fourth, and Fifth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability* [Dkt. No. 2581] ¶ 13 ("Beginning in 2009 . . . the Company faced severe liquidity issues caused by the 2008 financial crisis coupled with an aggressive global acquisition strategy spearheaded by then-CEO Bill Zollars. For an extended period of months, the Company deferred payments to Central States Pension Fund ["Central States"] and other pension funds.").

[4]   *See* YRC Worldwide Inc., Quarterly Report (Form 10-Q) at 12, 34 (Aug. 10, 2009), https://investors.myyellow.com/node/21951/html.

[5]   *See id.* at 12; YRC Worldwide Inc., Quarterly Report (Form 10-Q) at 11, 16, Exhibit 10.5 (Nov. 9, 2009), https://investors.myyellow.com/node/22036/html.

The MEPPs agreed not to assess complete or partial withdrawal liability against Yellow during the moratorium.  The Contribution Deferral Agreement was amended several times between 2009 and 2011 to further extend the contribution moratorium and adjust the amortization schedule on which the Missed Contributions would be repaid, all on the understanding that Yellow was working towards a recapitalization transaction that would enable it to resume contributing to NETTI and other MEPPs.[6]

11.  Throughout this process, Yellow emphasized that should any MEPP assess withdrawal liability against it, Yellow would have no choice but to file for bankruptcy.  In good faith and upon reliance on the Contribution Deferral Agreement, NETTI and other MEPPs continued to forbear from assessing withdrawal liability against Yellow.  Without the MEPPs' forbearance, Yellow could have been subject to approximately $9 billion in cumulative withdrawal liability to its MEPPs.[7]

2.  <u>Yellow Resumes Contributions to NETTI in 2011 at a Significantly Reduced Rate</u>

12.  In 2011, Yellow and NETTI reached an agreement regarding Yellow's resumption of contributions to NETTI.[8]  In June 2011, Yellow resumed making contributions to NETTI at a contribution rate that was only ***one-quarter*** (25%) of the rate in place prior to the contribution moratorium.  NETTI applied these resumed payments first to pay down the amounts Yellow owed

---

[6]  *See, e.g.*, YRC Worldwide Inc., Quarterly Report (Form 10-Q), at 55 (Aug. 9, 2010), https://investors.myyellow.com/node/22676/html; YRC Worldwide Inc., Quarterly Report (Form 10-Q), at 56 (Nov. 9, 2010), https://investors.myyellow.com/node/22731/html.

[7]  *See* YRC Worldwide, Inc., Annual Report (Form 10-K), at 14 (Feb. 28, 2012), https://investors.myyellow.com/node/23571/html ("We believe that based on information obtained from public filings and from plan administrators and trustees, our portion of the contingent liability in the case of a full withdrawal or termination from all of the multi-employer pension plans would be an estimated $9 billion on a pre-tax basis.").

[8]  *See* YRC Worldwide, Inc., Quarterly Report (Form 10-Q), at 20 (Aug. 8, 2011), https://investors.myyellow.com/node/22986/html; YRC Worldwide, Inc., Annual Report (Form 10-K), at 54 (Feb. 28, 2012), https://investors.myyellow.com/node/23571/html.

NETTI on account of the Missed Contributions (which amounts were memorialized in a promissory note from Yellow to NETTI).[9]  Once this promissory note was repaid in full, NETTI treated Yellow's contributions at the significantly reduced rate as a resumption of contributions to NETTI.

### 3.  Yellow Acknowledges Its Withdrawal Liability Obligations

13.  Yellow has repeatedly affirmed its knowledge of and agreement to NETTI's governing rules and regulations in its collective bargaining agreements with its employees.[10]  Yellow has also repeatedly affirmed, in public filings, that it will be subject to withdrawal liability if it fails to make contributions to the MEPPs.[11]

**B.    Yellow Withdraws from NETTI and Commences Bankruptcy Proceedings**

14.  In July 2023, the Debtors permanently reduced their workforce and ceased operations. *See* Objection ¶ 14.  As the Court has recognized, "the shuttering of the debtors' business operations amounted to a withdrawal from [the MEPPs]." *See Memorandum Opinion* [Dkt. No. 2765] at 1.  On August 6, 2023, the Debtors commenced these chapter 11 cases with "one broad objective":  "to effectuate an orderly, value-maximizing winddown of their businesses for the

---

[9]    *See* YRC Worldwide, Inc., Quarterly Report (Form 10-Q), at Exhibit 10.6 (Aug. 8, 2011), https://investors.myyellow.com/node/22986/html.

[10]   *See, e.g.*, Master Freight Agreement for the period April 1, 2019 to March 31, 2024, Art. 65(b), https://teamster.org/wp-content/uploads/2022/08/8292271480YRCWNEWENGLANDSUPPLEMENT.pdf ("The Employer agrees to and has executed a copy of the New England Teamsters and Trucking Industry Pension Fund Agreement and Declaration of Trust dated April 11, 1958, and accepts such Agreement and Declaration of Trust, as amended, and ratifies the selection of the Employer Trustees now or hereafter serving as such, and all action heretofore or hereafter taken by them within the scope of their authority under such Agreement and Declaration of Trust.").

[11]   *See, e.g.*, Yellow Corp., Annual Report (Form 10-K), at 51 (Feb. 9, 2023), https://investors.myyellow.com/node/30511/html; Yellow Corp., Quarterly Report (Form 10-Q), at 10 (Aug. 14, 2023), https://investors.myyellow.com/node/30816/html ("A potential result of the Company ceasing its ongoing contributions in the multi-employer pension plan funds in which our union employees participate (the 'MEPP Funds') is exposure to penalties including potential withdrawal liabilities from those MEPP Funds.").

benefit of all parties in interest." *See Declaration of Matthew A. Doheny in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Dkt. No. 14] ¶ 19.

15. On August 17, 2023, NETTI sent a Demand for Payment of Withdrawal Liability (the "Notice") to the Debtors confirming Yellow's withdrawal from NETTI and notifying the Debtors of NETTI's calculation of the Debtors' withdrawal liability. *See* Claim Number 18617. NETTI attached a withdrawal liability worksheet (the "Worksheet") to the Notice, explaining the calculations of and basis for NETTI's calculation of Yellow's withdrawal liability. *Id.*

16. On November 13, 2023, NETTI filed its proofs of claim[12] (each individually, and collectively, the "Claim") against the Debtors to assert the full outstanding amount of the Debtors' withdrawal liability to NETTI. NETTI attached the Notice and the Worksheet to the Claim.

## WITHDRAWAL LIABILITY UNDER ERISA AND THE PLAN

17. To protect the retirement benefits of covered employees, ERISA provides that an MEPP shall assess a withdrawal liability against an employer who withdraws from the MEPP. An employer completely or partially withdraws from the MEPP, making withdrawal liability due and owing, when the employer, among other things, winds down its business, ceases covered operations, or reduces contributions beneath a certain threshold. *See* 29 U.S.C. §§ 1381(a), 1399(b).

18. Upon withdrawal, the withdrawing employer must pay to the MEPP its "withdrawal liability," which approximates the withdrawing employer's *pro rata* share of the MEPP's unfunded vested benefits owed to employees that stand to receive benefits from the MEPP. The method of

---

[12] NETTI filed 24 proofs of claim against the Debtors for withdrawal liability in the amount of $285,022,057.00. *See* Claims Numbers 18617, 18621, 18627, 18631, 18638, 18644, 18649, 18654, 18664, 18671, 18677, 18682, 18688, 18692, 18696, 18703, 18706, 18707, 18709, 18713, 18717, 18720, 18725, and 18729. The Debtors are jointly and severally liable for the total amount of the Claim. NETTI also filed a proof of claim against the Debtors for payment of missed contributions, which proof of claim is not the subject of the Objection nor this Response. *See* Claim Number 18599.

calculation of a withdrawing employer's withdrawal liability is generally set out in ERISA at 29 U.S.C. § 1391, although MEPPs may elect to adopt in their plan alternative methods for calculating withdrawal liability so long as such method would not increase the risk of loss to plan participants and beneficiaries.  *See* 29 U.S.C. § 1391(c)(5)(A).

### A.    Withdrawal Liability Calculation

19.   Consistent with ERISA, the Plan sets forth the methodology for NETTI's assessment of withdrawal liability.  *See* Plan § 15.02.  The Plan utilizes slightly different methodologies for NETTI's existing employers (employers with contribution history prior to 2010), new employers (employer with contributions only 2010-present), and existing employers that suspended contributions in plan year 2008[13] but subsequently resumed contributions and later withdrew from the Plan (a "2008 Suspending Employer").  *See id.* § 15.02(c).

20.   For NETTI's existing employers, withdrawal liability is generally the employer's *pro rata* share of NETTI's unfunded vested benefits as of the date of the employer's withdrawal.  The *pro rata* percentage is determined by looking at the withdrawing employer's contributions relative to all employers' contributions over the 10 years before the date of withdrawal.  *See id.* § 15.02(b). For NETTI's 2008 Suspending Employers, the calculation of unfunded vested benefits is largely the same, but the withdrawal date is fixed:  a 2008 Suspending Employer is deemed to have withdrawn on the day just before it resumed making contributions to NETTI.  *See* Plan Art. 15.02(c)(i) (unfunded vested benefits are allocated to a 2008 Suspending Employer "as if it withdrew on the day immediately preceding the day on which the 2008 Suspending Employer resumed contributions").

---

[13]   A plan year runs from October 1 of the relevant year to September 30 of the following year.  *See* Plan Art. 1.46.

21. Yellow suspended its contributions to NETTI in plan year 2008 (which runs from October 1, 2008 to September 30, 2009), and resumed contributions mid-2011; Yellow is a 2008 Suspending Employer. Thus, pursuant to the Plan, the applicable reference period for calculating the Debtors' withdrawal liability (the "Reference Period") is the period from 2001 to 2011.

**B.    Annual Payment Calculation**

22. ERISA generally permits a withdrawing employer to pay its withdrawal liability over time with interest, and provides a formula for determining what amount is payable annually. *See generally* 29 U.S.C. § 1399. This annual payment amount (the "Annual Payment") is calculated differently than the total withdrawal liability figure: it is premised on the employer's highest contribution rate and the hours worked by the employer's employees (the average annual number of hours in the highest consecutive three-year period) within the 10 years prior to the withdrawal date. *See id.* § 1399(c)(1)(C).

23. The Plan accords with ERISA in generally permitting withdrawing employers to make Annual Payments determined by that same formula. *See* Plan § 15.06. When calculating Annual Payments for 2008 Suspending Employers, as with the calculation of total withdrawal liability, the Plan treats the 2008 Suspending Employer as if it withdrew on the day before it resumed its contributions:

> . . . the amount of each annual payment . . . payable by any 2008 Suspending Employer who withdraws from the Fund subsequent to September 30, 2008, shall be no less than the amount calculated . . . ***as if the 2008 Suspending Employer withdrew on the day immediately preceding the day on which the 2008 Suspending Employer resumed contributions to the Fund*** and . . . the highest Contribution Rate shall be computed including the Contribution Rates under the applicable Collective Bargaining Agreement during the period of suspension until resumption of contributions to the Fund.

Plan Art. 15.06(a)(vi) (emphasis added). Accordingly, the appropriate Reference Period for assessing the amount of the Debtors' Annual Payments is the period from 2001 to 2011.

24.    ERISA further provides that the withdrawing employer is required to make Annual Payments to the MEPP for the lesser of (i) the number of years it would take to amortize its withdrawal liability or (ii) twenty years.  *See* 29 U.S.C. § 1399(c)(1)(B).  Again, the Plan accords. *See* Plan § 15.06(a)(ii).[14]

## C.    Notice of and Challenges to Withdrawal Liability

25.  Upon an employer's withdrawal, ERISA tasks the MEPP with determining and notifying the employer of the amount of its withdrawal liability and the Annual Payments, and with demanding payment thereof.  *See id*. § 1399(b)(1).  Within 90 days of receiving notice from the MEPP, the employer may (i) request the MEPP to review "any specific matter" relating to the determination of withdrawal liability; (ii) identify any errors in the plan sponsor's determination; or (iii) furnish the plan sponsor with any additional relevant information.  *See id*. § 1399(b)(2)(A)). Any dispute between the MEPP and the employer regarding the MEPP's determination of withdrawal liability is ordinarily governed by ERISA in 29 U.S.C. § 1401, which requires the dispute to be resolved in arbitration.

26.  ERISA mandates that the MEPP's determination of withdrawal liability is "presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous."  *Id*. § 1401(a)(3)(A).

## LEGAL STANDARD

27.  Under Bankruptcy Rule 3001(f), a proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim."  *See* Fed. R. Bankr. P. 3001(f).  When a claim objection

---

[14]    If a withdrawing employer is in default, ERISA provides that the MEPP may demand, in a lump sum, payment of the full outstanding amount of the withdrawal liability.  *See* 29 U.S.C. § 1399(c)(5); *see also* Plan § 15.06(e). In a default scenario, the total amount of the withdrawal liability is immediately due; a withdrawing employer in default is not entitled to make Annual Payments.  Interest accrues on the unpaid amount of the withdrawal liability from the due date of the first payment owed.  *See* 29 U.S.C. § 1399(c)(5); Plan § 15.06(d).

is filed in a bankruptcy case, the burden of proof as to the validity of the claim shifts between

parties.  The Third Circuit explained the burden shifting as follows:

> Initially, the claimant must allege facts sufficient to support the claim.  If the averments in his filed claim meet this standard of sufficiency, it is '*prima facie*' valid.  In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the initial obligation to go forward.  The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim.  It is often said that the objector must produce evidence equal in force to the *prima facie* case.  In practice, the objector must produce evidence, which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.  If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

*In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992) (internal citations omitted).

28.  "Because a properly filed proof of claim is treated not merely as a document containing

arguments and assertions, but as evidence that sufficiently supports its claims, a proof of claim

that is filed 'in accordance' with Bankruptcy Rule 3001 serves to satisfy the claimant's initial

burden of production."  *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 543 (Bankr. D. Del.

2016).  Here, NETTI's Claim was filed in accordance with Bankruptcy Rule 3001 and is thus

*prima facie* valid.  *See id.*  NETTI met its initial burden, thus shifting the burden to the Debtors

"to produce evidence sufficient to negate the *prima facie* validity of the filed claim."  *In re*

*Allegheny Int'l, Inc.*, 954 F.2d at 173.  As such, the Debtors must "produce actual evidence; mere

allegations, unsupported by evidence, are insufficient to rebut the movant's *prima facie* case."  *In*

*re F-Squared Inv. Mgmt.*, 546 B.R. at 544 (citation and internal quotation marks omitted).

## RESPONSE

29.  NETTI has properly submitted proofs of claim for the Debtors' withdrawal liability,

which amount was calculated correctly and is supported by attachments to the Claim.  The Debtors,

while making vague and generalized allegations in their omnibus objection to many claims, fail to put forth any credible legal or factual arguments that rebut this Claim's *prima facie* validity.

30.    The Debtors misunderstand or ignore relevant provisions of the Plan and ERISA—and fundamental principles of the Bankruptcy Code—that support the validity of the Claim.    The Objection is devoid of any "actual evidence" and instead consists only of "mere allegations" and unsubstantiated conclusions about the Claim and its calculations.    *In re F-Squared Inv. Mgmt.*, 546 B.R. at 544.    The foremost example is the Debtors' bald assertion that NETTI failed to conduct a "formal assessment" of its Claim.    This is wrong, as NETTI attached a detailed Worksheet to the Claim (and to the Notice it provided to the Debtors in August 2023); it is the Debtors that make no serious attempt to engage with the calculations set forth therein.    These unfounded arguments are not nearly enough to defeat the presumption of *prima facie* validity or the deference afforded to an MEPP's determination of an employer's withdrawal liability under ERISA.    *See* 29 U.S.C. § 1401(a)(3)(A) ("[A]ny determination made by a plan sponsor under sections 1381 through 1399 of this title . . . is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.").[15]

31.    The Debtors and NETTI contemplate discovery in connection with the resolution of this Claim; the Debtors presumably contend that following the close of the discovery period they will be able to provide the evidentiary support the Objection currently lacks.    But as discussed

---

[15]    The Debtors assert that their Objection is intended to satisfy the obligation under ERISA for the withdrawing employer to request that the MEPP review the withdrawal liability assessment.    *See* Objection at 2 n.10.    Pursuant to ERISA, however, a withdrawing employer has 90 days from receipt of the notice of the withdrawal liability to "ask the plan sponsor to review any specific matter relating to the determination of the employer's liability[,] . . . identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer, . . . [or] may furnish any additional relevant information to the plan sponsor."    29 U.S.C. § 1399(b)(2)(A).    NETTI sent the Notice to the Debtors on August 17, 2023, and the 90-day window to challenge the calculation of the withdrawal liability has long since expired.    Nevertheless, to the extent that the Debtors' Objection is a request for review of the withdrawal liability determination, this Response constitutes NETTI's response.

below, certain grounds advanced in the Objection fail on a legal basis alone.  And the evidence adduced in these proceedings will serve only to bolster NETTI's entitlement to its Claim.

A.    **The Correct Reference Period Is Applied to the Claims**

32.  The only challenge Debtors raise specific to NETTI is accusing NETTI of "cherry picking contribution rates" by calculating the Debtors' withdrawal liability with a Reference Period of 2001 to 2011.  Objection ¶ 26.  Yellow asserts that the Reference Period should be 2012 through 2022,[16] but in doing so, disregards the Plan's terms:   the Plan expressly requires application of the 2001 to 2011 Reference Period.  *See* Plan §§ 15.02(c), 15.06(a)); *supra* ¶¶ 19-21.

33.  As explained above, NETTI granted Yellow a moratorium on contributions beginning in plan year 2008, due to Yellow's then-dire financial condition.  The moratorium was granted and repeatedly extended, at Yellow's request and for Yellow's benefit, on the basis of Yellow's representations that bankruptcy would be imminent if NETTI and other MEPPs asserted withdrawal liability.  When Yellow resumed contributions in 2011, Yellow did so at 25% of the rate it contributed prior to the moratorium, again at Yellow's request and for Yellow's benefit:  the lower contributions greatly reduced Yellow's cash burn.  Accordingly, NETTI protected its participants and beneficiaries from those reduced contributions by providing that any subsequent withdrawal liability for Yellow, as a 2008 Suspending Employer, would be calculated by reference to the 10-year period ***ending immediately before*** Yellow resumed making contributions to NETTI at the reduced rate.  This benefitted Yellow, but also ensured that NETTI would not be left

---

[16]    Although the Debtors refer to this as the "2013-2022" reference period, as noted *supra* n.13, the plan year runs from October 1 of a given year and ends on September 30 of the following year.

significantly underfunded by any 2008 Suspending Employer's drastically reduced contribution rates.

34. Yellow has never raised with NETTI any issues regarding the Plan's method of calculating withdrawal liability. Indeed, the Plan's application of the earlier Reference Period to 2008 Suspending Employers is consistent with ERISA's statutory goal of protecting plan participants and beneficiaries. *See* 29 U.S.C. § 1391(c)(5)(A) (standard for approval of alternative withdrawal liability calculation methods is that such method "would not significantly increase the risk of loss to plan participants and beneficiaries"). These Plan provisions serve the statutory purpose of ***avoiding*** risk of loss to plan participants and beneficiaries.

35. The Plan is valid and binding on Yellow. Yellow has repeatedly affirmed its knowledge of and agreement with the Plan's provisions in its collective bargaining agreements with its employees. Furthermore, Yellow benefited enormously from NETTI's agreement to allow Yellow to temporarily suspend contributions without becoming liable for withdrawal liability, and to later resume contributions at a significantly reduced rate. Yellow cannot now—as it tries to generate recoveries for equity[17]—denounce NETTI's assessment of withdrawal liability after it has received all the benefits of this bargain. *See In re Exide Techs.*, 378 B.R. 762, 767 n.5 (Bankr. D. Del. 2007) (a party is equitably estopped from receiving all the benefits of a bargain and then disclaiming benefits owed to the counterparty when the party's conduct "intentionally or unintentionally leads [the counterparty], in reliance on that conduct, to change position to his detriment") (quoting *Benitec Australia Ltd. v. Promega Corp.,* No. 04-CV-889, 2005 WL 549552, at *5 (D. Del. Mar. 8, 2005))).

---

[17] *See Debtors' Objection to the Proofs of Claim Filed by the Central States Pension Fund* [Dkt. No. 1322] at 8 ("[T]hese chapter 11 cases should result in the truly rare circumstance of allowed claims being paid in full and equity holders obtaining a material recovery[.]").

36.  The Debtors do not explain why the Plan's clear provision for use of the 2001-2011 Reference Period does not govern here.  Indeed, the Debtors do not address the relevant Plan provisions at all.  Accordingly, the Debtors fail to overcome the Claim's *prima facie* validity.

**B.    The 20-Year "Cap" Does Not Meaningfully Affect the Stated Claim Amount**

37.  The Debtors' generalized arguments regarding the so-called "20-year cap" are a red herring, offering no support for their position.  *First*, the Debtors are incorrect that NETTI failed to apply the 20-year cap, as those calculations are plainly set out in the Worksheet.  But the withdrawal liability calculated with amortized Annual Payments has little effect on the Debtors' total liability to NETTI.  20 years of such Annual Payments sum to $452 million; when discounted to present value using a range of reasonable discount rates, the result is substantially similar to, if not in excess of, the stated Claim amount.  *Second*, because the Claim is already stated in present value, further reducing the Claim through additional, unwarranted discounting is an impermissible "double discount" of the Claim.  *Finally*, NETTI is entitled to demand a lump sum payment of the total withdrawal liability, as the Debtors are in default.

1.    <u>20 Years of Amortized Annual Payments Has Little Impact on the Claim</u>

38.  The Debtors' attempt to reduce the Claim through the so-called "20-year cap" is futile, as this would do little to move the needle on the Debtors' overall liability to NETTI.  While the Debtors claim that NETTI has ignored this "cap" (Objection ¶ 25), they neglect to mention that NETTI calculates and presents a schedule of 20 years of Annual Payments on the Worksheet attached to its Claim.

39.  As the Worksheet indicates, when applying Yellow's highest contribution rate and the relevant average of annual employee hours between 2001 and 2011 (the correct Reference Period), the Debtors' Annual Payment is $22,422,276.  These Annual Payments, amortized across 20 years, total approximately $452 million.  After applying a reasonable discount rate to this amount (as the

Debtors insist is the appropriate method), the result is not materially different than the face amount of NETTI's stated Claim—and may even be greater than the stated Claim amount.  Accordingly, the Debtors' arguments regarding the 20-year "cap" fail to meaningfully reduce NETTI's Claim.

40. The Debtors assert, falsely, that it would take them 140 years to repay the stated amount of the Claim.  *See* Objection ¶ 27.  The Debtors, however, offer no explanation as to how they arrived at this number.  In any event, this assertion ignores the plain terms of ERISA acknowledged elsewhere in the Objection: the Annual Payments "are calculated independently of the withdrawal liability itself."  Objection ¶ 24.  In accordance with ERISA and the Plan, and as shown in the Claim, NETTI determined Yellow's withdrawal liability to be $285,022,057 and determined the Annual Payments to be in the amount of $22,422,576 paid over 20 years.  No one has suggested that the Debtors simply divide up their withdrawal liability due now over time.  The Debtors' argument thus is based on a false premise.

### 2. Discounting the Claim to Present Value Is an Impermissible "Double Discount"

41. The Debtors argue that a discount rate must be applied to the Claim to arrive at a present value of the Claim as of the Petition Date.  *See* Objection ¶¶ 29-30.  But the stated amount of the Claim ***is already in present value***.  The determination of an employer's withdrawal liability is, itself, a calculation of the present value of future obligations:  withdrawal liability is the withdrawing employer's share of the unfunded, vested benefits a MEPP will be required to make in the future.  *See* 29 U.S.C. §§ 1381(b) ("[t]he withdrawal liability of an employer to a plan is . . . the allocable amount of unfunded vested benefits"), 1393(c) (defining "unfunded vested benefits" as the value of the plan's nonforfeitable benefits less the value of the plan's assets). [18]  Accordingly,

---

[18]    The case cited by the Debtors does not hold differently.  *See In re US Airways Group, Inc.*, 303 B.R. 784, 793 (Bankr. E.D. Va. 2003) (noting that the PBGC had a present right to recover an amount determined under ERISA).

the first step in a withdrawal liability calculation is determining the present value of those future, unfunded payments the MEPP must make; the second step is determining the withdrawing employer's *pro rata* share of that amount.

42.   The stated amount of the Claim, therefore, is the Debtors' share of the present value of NETTI's future unfunded benefit payments.  It has already been discounted to present value. Discounting the Claim further is a prohibited "double discount."  *See In re Oakwood Homes Corp.*, 449 F.3d 588, 599-601 (3d Cir. 2006) (discounting the principal amount of a claim to present value is an impermissible "double discount").[19]

      3.   <u>NETTI is Entitled to Demand Immediate Payment of Yellow's Withdrawal Liability</u>

43.   Under ERISA and the Plan, NETTI is entitled to seek immediate payment of all outstanding withdrawal liability because Yellow is in default, in which case Yellow is not entitled to make Annual Payments.  *See* 29 U.S.C. § 1399(c)(5) ("[i]n the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made"); *id*. § 1399(c)(1)(A)(i) (an employer shall make Annual Payments "[e]xcept as provided in . . . *paragraphs* (4) and *(5)*" of this section, where paragraph (5) addresses employers in default (emphasis added)); Plan § 15.06(e) ("In the event of a default, the outstanding amount of the withdrawal liability shall immediately become due and payable.").

44.   ERISA provides that an employer is in default when:  (i) it fails "to make, when due, any payment under [29 U.S.C. § 1399]" and that failure is not cured within 60 days of written

---

[19]   NETTI's Claim would, if amortized in Annual Payments over time, accrue additional interest, similar to repayment of any principal amount of a debt over time.  But the stated Claim amount for total withdrawal liability does not include that interest.  As discussed above, the total of Annual Payments over twenty years is approximately $452 million; a reasonable discounting of that amount to present value arrives at a figure very similar to, if not greater than, the stated face amount of the Claim.

notice by NETTI; or (ii) "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." *See id*. § 1399(c)(5)(A). The Plan provides that a default occurs, among other events, when an "event or circumstance which in the judgment of the Trustees materially impairs the Employer's creditworthiness or the Employer's ability to pay its withdrawal liability when due." Plan Art. 15.06(e)(ii)(E).

45. The Debtors cannot deny they are in default under ERISA and the Plan. First, the Debtors have not made any withdrawal liability payments to NETTI despite their withdrawal in July 2023 and NETTI's Notice in August 2023. Second, the Debtors' cessation of operations and winddown of its business in July 2023 constitutes a default under the Plan, as it materially impaired the Debtors' ability to pay its withdrawal liability. *See* Plan Art. 15.06(e)(ii)(E); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 918 (7th Cir. 2001) (a chapter 11 debtor defaulted on its withdrawal liability to the Central States pension fund when it ceased operations because "Central States knew it would never see any of the scheduled installment payments").

46. In July 2023, when Yellow publicly announced that it would wind down its operations, and again, in August 2023, when it told this Court that its sole objective in these chapter 11 cases is to "effectuate an orderly, value-maximizing winddown of their businesses," Yellow sent a clear message that NETTI could not expect Yellow to satisfy its withdrawal liability on an amortized payment schedule when due. Accordingly, NETTI is fully within its rights to demand accelerated payment of Yellow's withdrawal liability under ERISA and the Plan.[20] And while the Debtors

---

[20]    The Debtors' assertion that NETTI was "cherry picking" rates to increase its Claim, in addition to being incorrect for the reasons discussed *supra* ¶¶ 32-36, is also ironic given that calculating withdrawal liability for the 2012-2022 period would result in the Debtors owing NETTI approximately $312 million—nearly ***$27 million more***

have filed for chapter 11 protection and the automatic stay prohibits NETTI from seeking to collect on its Claim, the Debtors cannot credibly deny that they are in default for failure to pay withdrawal liability when due.

### C.   The Correct Interest Rate Is Applied to the Claims

47.   The Debtors further assert in a footnote that "[s]ome" of the Pension Plans "may" have used an incorrect interest rate.  Objection ¶ 27 n.22.  But the Debtors do not identify which of the MEPPs they contend used incorrect interest rates (including whether NETTI is one such MEPP), do not identify which of the interest rates used in calculating withdrawal liability is incorrect, and do not identify the correct interest rate that should be applied.  The Debtors thus fail to meet their burden to rebut the interest rates applied in the Claim.  *See In F-Squared Inv. Mgmt.*, 546 B.R. at 544 ("[M]ere allegations, unsupported by evidence, are insufficient to rebut the movant's *prima facie* case.") (citation and internal quotation marks omitted).

48.   What is more, under ERISA, the MEPP's determination of withdrawal liability is "presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous."   29 U.S.C. § 1401(a)(3)(A).  The Debtors have not satisfied their burden to establish by a preponderance of evidence (let alone any evidence) that NETTI's calculation is incorrect.

49.   To the extent the Debtors intend to make further arguments following discovery regarding the interest rate applied by the Pension Plans (*see* Objection ¶ 27 n.22), NETTI reserves the right to do the same.

---

than the amount sought in the Claim.  To the extent the Court determines that the correct reference period to be applied to the Claim is 2012-2022, NETTI reserves its right to amend its Claim to seek the greater amount.

**D.    Subordination of the Claims is Unwarranted**

50.  In a parting footnote, the Debtors argue that "some portion" of the Claim must also be subordinated under ERISA.  *See* Objection ¶ 31 n.24 (citing 29 U.S.C. § 1405(b)).  But the Debtors themselves have repeatedly disclaimed the circumstances that would give rise to such subordination, as the Debtors and their new shareholders make no secret of their desire to create returns for equity through these cases.[21]  The Debtors admit that where returns are paid to equity, even claims subordinated under ERISA's so-called "insolvency cap" must be paid in full.  *See id.* (acknowledging that any subordinated amount is recoverable "if all other creditor claims were satisfied in full").

51.  Further, the Debtors' own cited authority fails to support their position.  Rather than supporting application of an "insolvency cap," the sole case the Debtors cite that in fact applies it also suggests that the Debtors are barred entirely from challenging the Claim.  *In re Affiliated Foods, Inc.*, 249 B.R. 770, 785 (Bankr. W.D. Mo. 2000) (determining unsecured creditors' committee lost the right to contest the assessment of withdrawal liability when they failed to request a review of the assessment or file a notice of initiation of arbitration by 90 days after the latest notice and demand of withdrawal liability).[22]  Similarly, in *In re M & M Fishing Corp.*, the "insolvency cap" was found not to apply because the employer waived its right to challenge the asserted withdrawal liability amount, as it did not initiate arbitration to resolve the disputed

---

[21]    In a previous claim objection, the Debtors confirmed that their objective in these cases is to provide a "material recovery" for equity.  *See Debtors' Objection to the Proofs of Claim Filed by the Central States Pension Fund* [Dkt. No. 1322] at 8 ("these chapter 11 cases should result in the truly rare circumstance of allowed claims being paid in full and equity holders obtaining a material recovery"); *see also* Hr'g Tr. 62:14-19, Mar. 6, 2024 (counsel for holders of 42.5% of the Debtors' equity stating "[w]e believe the resolution of these [certain MEPP] claims is the difference between general unsecured claims being paid in full with a substantial return to equity. . . and equity being wiped out and general unsecured creditors receiving pennies on the dollar").

[22]    *In re Affiliated Foods, Inc.*, the Debtors note, cites *Cott Corp. v. New Eng. Teamsters & Trucking Indus. Pension Fund (In re Cott Corp.)*, 26 B.R. 332 (Bankr. D. Conn. 1982)—a case that makes no determination at all regarding the application of the "insolvency cap."  *See* Objection ¶ 13 n.24.

liability.  468 B.R. 461, 464 (Bankr. D. Mass. 2012) (noting "by failing to initiate arbitration, an employer waives its insolvency defense") (internal quotation marks omitted).  Under the Debtors' own cited precedent, the "insolvency cap" can have no application here because the Debtors did not request a review of NETTI's withdrawal liability assessment or initiate arbitration.[23]

### E.  Future Receipt of Special Financial Assistance Will Not Affect the Allowable Claim Amount

52.  Finally, the Debtors purport to reserve their right to object to the Claim on the basis that it is duplicative of any special financial assistance ("SFA") under the American Rescue Plan Act of 2021 collected by NETTI down the line.  *See* Objection ¶ 13 n.14.  This reservation is in vain.

53. NETTI's assessment of prepetition withdrawal liability is unaffected by any postpetition receipt of SFA.  The Debtors' withdrawal liability accrued entirely prepetition.  It is illogical, and antithetical to the Bankruptcy Code, to suggest that hypothetical government assistance funding received in the future—*postpetition*—would alter NETTI's prepetition Claim for that withdrawal liability.  *See* 11 U.S.C. § 502(b) (requiring that a court "shall determine the amount of [a] claim in lawful currency of the United States *as of the date of the filing of the petition*, and shall allow such claim in such amount." (emphasis added)).[24]  Indeed, pursuant to 29

---

[23]  Indeed, the Debtors have vigorously resisted arbitration.  *See Debtors' Opposition to Central States Pension Funds' Motion to Compel Arbitration* [Dkt. No. 1965]; *Debtors' Opposition to the SFA-Funded Pension Plans' Motion to Compel Arbitration* [Dkt. No. 2438].

[24]  As this Court recently reiterated: "[t]hat statutory language [in section 502(b) of the Bankruptcy Code] means that, unlike other civil litigation in which courts examine the facts as they exist at the time of trial, the decision of a bankruptcy court on a claim objection looks at a 'snapshot' of the debtor's liabilities as they existed as of the bankruptcy filing.  If a creditor held a valid 'right of payment' against the debtor on the petition date, that creditor is entitled to an allowed claim in bankruptcy."  *In re Promise Healthcare Grp., LLC*, No. 18-12491, 2023 WL 3026715, at *1 (Bankr. D. Del. Apr. 20, 2023) (denying summary judgment on claim objection where trustee argued that validity of claim should be assessed as of the date of the claims allowance decision rather than petition date); *see also In re Oakwood Homes Corp.*, 449 F.3d at 595 ("Stated simply, 11 U.S.C. § 502(b) speaks in terms of determining the 'amount' of a claim 'as of' the petition date."); *In re W.R. Grace & Co.*, 626 B.R. 217, 238 n.17 (Bankr. D. Del. 2021) ("Pursuant to 11 U.S.C. § 502(b), if an objection to claim is made, the court shall

C.F.R. § 4262.16(g)(2)(xiii), "[SFA] assets must be excluded from the determination of unfunded vested benefits until the date that special financial assistance is paid to the plan."[25]  Considering that Yellow withdrew from NETTI prepetition, that the Bankruptcy Code requires claims to be calculated as of the petition date, and that NETTI has not yet received SFA, any future receipt of SFA is irrelevant to the Claim.

## **CONCLUSION**

Accordingly, NETTI is entitled to the full claim amount of $285,022,057 stated in its Claim.

---

determine the amount of such claim as of the filing of the petition."); *In re Trib. Media Co.*, No. 15-CV-01116, 2018 WL 6167504, at *1 (D. Del. Nov. 26, 2018) ("When an interested party objects, Section 502(b) [of the Bankruptcy Code] instructs the bankruptcy court to 'determine the amount of such claim. . . and. . . allow such claim in such amount' subject to certain enumerated exceptions."); *In re Glob. Indus. Techs., Inc.*, 344 B.R. 382, 386 (Bankr. W.D. Pa. 2006) ("Section 502(b) [of the Bankruptcy Code] requires calculation of the amount of a claim as of the petition date."); 4 Collier on Bankruptcy ¶ 502.03[1][b] (2023) ("[Section] 502(b) [of the Bankruptcy Code] requires that a claim be determined 'as of the date of the filing of the petition.'") (citing 11 U.S.C. § 502(b)).

[25]    Even if 29 C.F.R. § 4262.16(g)(2)(xiii) were to be ignored, 29 C.F.R. § 4262.16(g)(2) also provides that SFA is to be phased in over time, specifically the time over which the SFA is projected to be exhausted, beginning with the year *after* the year in which the plan receives such SFA.  *See* 29 C.F.R. § 4262.16(g)(2).  In other words, no portion of the SFA is phased in for purposes of calculating withdrawal liability prior to yet an even later date in the future.  The Debtors' Claim would thus remain unaffected by NETTI's receipt of SFA, even absent the separate restriction set forth in 29 C.F.R. § 4262.16(g)(2)(xiii).

Dated:  April 18, 2024  
Wilmington, Delaware

/s/  Mark D. Collins
Mark D. Collins (No. 2981)
Cory D. Kandestin (No. 5025)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile:  (302) 651-7701
Email:  collins@rlf.com
            kandestin@rlf.com

-and-

Dennis F. Dunne (*pro hac vice* pending)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Andrew M. Leblanc (*pro hac vice* pending)
Erin E. Dexter (*pro hac vice* pending)
Melanie Westover Yanez (*pro hac vice* pending)
**MILBANK LLP**
1850 K St. NW, Suite 1100,
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile:  (202) 263-7586

*Counsel for New England Teamsters Pension Fund*