UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION., *et. al.*[1] | ) | Case No. 23-11069 CTG |
| | ) | Jointly Administered |
| *Debtors*. | ) | |
| | ) | **Re: Docket No. 2595** |

**TEAMSTERS JOINT COUNCIL NO. 83 OF VIRGINIA PENSION FUND RESPONSE
TO THE DEBTORS' SEVENTH OMNIBUS (SUBSTANTIVE) OBJECTION TO
PROOFS OF CLAIM FOR WITHDRAWAL LIABILITY [DKT. NO. 2595]**

Creditor Teamsters Joint Council No. 83 of Virginia Pension Fund (the "Fund"), by and through its undersigned counsel, asks the Court to deny the Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability [Dkt. No. 2595] ("Objection") to the Fund's Proofs of Claim for $21,400,083 and to allow those claims in their entirety. In support of its response to the Objection, the Fund sets forth the following.

## INTRODUCTION

The Objection presents only one substantive argument, namely, that the Fund should have calculated the Debtors' withdrawal liability as the present value of their withdrawal liability installment payments, ERISA Section 4219(c)(1)(A), 29 U.S.C. § 1399(c)(1)(A), after applying the "20-year cap" of ERISA Section 4219(c)(1)(B), 29 U.S.C. § 1399(c)(1)(B), which limits installment payments to twenty years if they are insufficient to amortize the full liability by the end of that period. Objection ¶¶22-23, 27 and 29. For the reasons set forth in Part II of the Argument below, the 20-year cap applies only when the withdrawn employer has the right to pay withdrawal liability

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.

in installments. In this case, the Debtors are in default, and their withdrawal liability is payable in a single lump sum equal to the full amount of the liability. The 20-year cap avails them nothing.

Beyond that, the Objection offers only hazy intimations of possible arguments. Paragraph 10 seems to assert that the Fund's claim is undermined by alleged failure "to perform an initial formal assessment of withdrawal liability", although the Objection nowhere offers a concrete challenge to the Fund's claim on that basis. Paragraph 25 suggests, without specifics, that the Fund may have "improperly calculated such annual withdrawal liability by using inflated contribution rates". Paragraph 20 and a footnote to Paragraph 27 (n. 22) asserts, with equal lack of specificity, that "[s]ome of the Pension Plans may also have used an interest rate to determine the present value of vested benefits that does not comply with 29 U.S.C. § 1393(a) because such rates were not based on the experience and future expectations of the relevant Pension Plan." These vague, conclusory assertions fall far short of overcoming the presumption of that a properly filed Proof of Claim is *prima facie* evidence of the claim's validity and amount.[2] *See* Argument, Part I, *infra*. For that reason alone, the Objection should be rejected.

In the interest of saving time for the Court and the parties, the Fund will address the Debtors' inchoate objections to the extent that it can discern them.

### FACTUAL BACKGROUND

1.  The Fund is an employee pension benefit plan within the meaning of ERISA Section 3(2), 29 U.S.C. § 1002(2), and a multiemployer pension plan within the meaning of Title IV of

---

[2] A footnote to Paragraph 31 (n. 24) calls attention to section 4225(b) of ERISA, 29 U.S.C. §1405(b), which in certain circumstances subordinates a portion of pension funds' withdrawal liability claims to the claims of non-plan creditors, without asserting that those circumstances are present here. The Fund reserves that right to address arguments based on section 4225(b) if and when the Debtors offer them.

ERISA, which governs withdrawal liability and related matters that are before this Court.  ERISA § 4001(a)(3), 29 U.S.C. § 1301(a)(3).  It was established in 1957 pursuant to collective bargaining agreements between various local unions affiliated with the International Brotherhood of Teamsters, acting through Teamsters Joint Council No. 83 of Virginia ("Joint Council No. 83") and various employers (the "Contributing Employers") for the purpose of providing pension and related benefits to covered employees and their beneficiaries.

2. The Fund is governed by an Agreement and Declaration of Trust (currently the Eighth Reaffirmation and Restatement of Agreement and Declaration of Trust Establishing the Teamsters Joint Council No. 83 of Virginia Pension Fund, as amended (the "Trust Agreement")), which provides for a joint board of trustees, half of whom are appointed by the Joint Council No. 83 and half by the Contributing Employers.  The Fund's plan of pension benefits, as set forth in a separate plan document, is funded by contributions to the Fund's trust from Contributing Employers, including withdrawal liability payments by former Contributing Employers, and investment earnings thereon.  The Fund is headquartered and administered in Richmond, Virginia.

3. As of January 1, 2023, the Fund covered 8,043 participants and beneficiaries of deceased participants, of whom 3,126 were currently working covered employment, 3,879 were receiving benefits, and 1,038 were neither in covered employment nor receiving benefits but had a right to future vested benefits.

4. Immediately prior to the Contributing Employers' withdrawal, 17 employers, mostly small parcel and less-than-load trucking carriers operating within the jurisdiction of Joint Council No. 83, were obligated to contribute to the Fund.  No withdrawn employers were making installment payments of withdrawal liability.  A single employer accounts for approximately 90

percent of the contributions to the Fund. Hence, the Fund's continuance as a going concern is crucially dependent on that employer's fortunes. *See* ¶26 *infra*.

5.　　The following Debtors (the "Contributing Employers") are signatories to the YRCW National Master Freight Agreement ("NMFA") and YRCW Virginia Freight Council City Pickup & Delivery and Over-the-Road Supplemental Agreement ("Supplemental Agreement" and collectively with the NMFA):[3] (i) YRC Inc., (ii) USF Holland LLC, (iii) New Penn Motor Express, LLC, and (iv) Yellow Corporation (Case No. 23-11069). The Contributing Employers are bound by the Trust Agreement. *See* Supplemental Agreement, Article 47, §§ 3 and 5. Contributing Employers have two sets of obligations: (i) They must pay weekly contributions at the rates set by their collective bargaining agreements for as long as they have an obligation to contribute to the Fund and (ii) they must pay withdrawal liability following a partial or complete cessation of either the obligation to contribute or their covered operations. *See* ¶8 *infra*.

6.　　The Fund filed proofs of claim numbers 4461, 4462, 4463, 4464, 4465, 4466, 4467, 4468, 4469, 4470, 4471, 4472, 4473, 4474, 4475, 4476, 4477, 4478, 4479, 4480, 4481, 4482, 4483, and 4484 (collectively, the "Proofs of Claim") asserting withdrawal liability claims against each of the Debtors. The Proofs of Claim also served as notifications of withdrawal liability. Four of the Proofs of Claim asserted claims for both withdrawal liability and unpaid contributions. The Objection does not identify those four claims (Claim Number 4480 against Yellow Corporation (Case No. 23-11069), Claim Number 4481 against New Penn Motor Express LLC (Case No. 23-11072), Claim Number 4483 against USF Holland LLC (Case No. 23-11079), and Claim Number 4484

---

[3] The NMFA and Supplemental Agreement have been updated from time to time, with the most recent versions of each for the period from April 1, 2019, through March 31, 2024.

against YRC Inc (Case No. 23-11087)) as subject to the Objection. *See* Objection fn. 6, Exhibit 1, and Exhibit 2.

7.      All Debtors, whether or not they are Contributing Employers, (i) are trades or businesses and (ii) control, are controlled by or are under common control with Contributing Employers. Under Section 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), and 29 C.F.R. §4001.3(a)(2), they are treated as a single employer for purposes of, *inter alia*, the obligation to satisfy withdrawal liability and are jointly and severally liable to satisfy it.

8.      ERISA, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), provides that an employer that completely withdraws from a multiemployer pension plan, such as the Fund, is obligated to pay "withdrawal liability". ERISA § 4201(a), 29 U.S.C. § 1381(a). A complete withdrawal occurs when an employer (i) permanently ceases to have an obligation to contribute to the plan, or (ii) permanently ceases all covered operations under the plan. ERISA § 4203(a), 29 U.S.C. §1383(a). This obligation is recited in Article VI, § 2 of the Trust Agreement.

9.      On or about July 30, 2023, the Contributing Employers shut down their covered operations under the Fund, laid off all covered employees employed in those operations and announced that the cessation of operations was permanent. As a result, the Contributing Employers incurred a complete withdrawal from the Fund by virtue of their permanent cessation of all covered operations; the Objection does not contend otherwise. The Debtors, including the Contributing Employers, subsequently instituted this bankruptcy proceeding on August 6 and 7, 2023.

10.      The Fund has calculated the Contributing Employers' withdrawal liability, which totals $21,400,083. The Proofs of Claim included exhibits showing the liability calculation, as performed by the Fund's enrolled actuary and as determined by the Trustees of the Fund.

11. The key element in the calculation of withdrawal liability is the present value of the plan's "unfunded vested benefits," which equals the present value of covered employees' nonforfeitable accrued benefits minus the value of plan assets, each calculated as of the last day of the plan year preceding the year of withdrawal. ERISA § 4213(c), 29 U.S.C. § 1393(c); 29 C.F.R. § 4211.2. In determining the present value of benefits, the plan's enrolled actuary must utilize "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan". ERISA § 4213(a)(1), 29 U.S.C. § 1393(a)(1).

12. Withdrawal liability is ordinarily payable in installments, except, as explained in the next Paragraph, by employers in default. ERISA § 4219(c)(1)(A)(i), 29 U.S.C. § 1399(c)(1)(A)(i). The annual installment equals (i) the average annual number of the employer's "contribution base units" ("CBUs")[4] for the three consecutive plan years, out of the ten plan years preceding the year of withdrawal, with the highest total number of CBUs multiplied by (ii) the employer's highest contribution rate per CBU during the ten-year period ending with the year of the withdrawal. ERISA § 4219(c)(1)(C)(i), 29 U.S.C. § 1399(c)(1)(C)(i). Installment payments continue until they amortize the employer's withdrawal liability with interest at the plan's valuation rate, ERISA § 4219(c)(1)(A)(ii), 29 U.S.C. § 1399(c)(1)(A)(ii), but for no longer than 20 years. ERISA § 4219(c)(1)(B), 29 U.S.C. § 1399(c)(1)(B)

13. There is, however, an exception to an employer's ability to pay in installments. "In the event of a default, a plan sponsor may require immediate payment of the outstanding amount

---

[4] The Fund's contribution base unit is a week in which a covered employee performs services in covered employment, except for one employer that contributes on the basis of days of covered employment.

of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." ERISA § 4219(c)(5), 29 U.S.C. §1399(c)(5). An employer's failure to make a payment when due is defined by the statute as an event of default, ERISA § 4219(c)(5)(A), 29 U.S.C. §1399(c)(5)(A). Plans may also specify as events of default "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability". ERISA § 4219(c)(5)(B), 29 U.S.C. §1399(c)(5)(B). The Fund's Trust Agreement, Article VI, § 10(d)(3)(ii), sets forth the Fund's default rules, and the Debtors are in default under them.

14.     The Debtors, being in default, no longer have the right to pay withdrawal liability in installments.

15.     Before a plan can collect withdrawal liability, it must notify the employer of (i) "the amount of the liability" and (ii) "the schedule for liability payments" and must "demand payment in accordance with the schedule". ERISA §4219(b)(1), 29 U.S.C. §1399(b)(1). The Fund's Proofs of Claim fulfill those requirements. No payment schedule was required, because the Debtors had no right to pay in installments.

## ARGUMENT

I.     **The Proofs of Claim Are Presumed Valid.**

16.     The Proofs of Claim are *prima facie* evidence of the validity and amount of the claims. *See* Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with the rules shall constitute prima facie evidence of the validity and amount of the claim."); 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title is deemed allowed, unless a party in interest . . . objects."); *In re F-Squared Investment Management, LLC*, 546 B.R. 538, 544 (Bankr. D. Del. 2016).

17. The Debtors assert that a proof of claim loses the presumption of *prima facie* validity if "an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency." Objection ¶ 17. But a party that files an objection carries the burden of going forward with evidence concerning the validity and amount of the claim. A claim remains *prima facie* valid unless and until the objector produces *evidence* sufficient to refute at least one of the allegations essential to the claim's legal sufficiency. Only after that evidence is produced does the burden of going forward shift back to the claimant to prove the validity of the claim by a preponderance of the evidence. *In re Allegheny International, Inc.,* 954 F.2d 167, 173-74 (3d Cir. 1992); Richard Levin & Henry J. Somme, 9 Collier on Bankruptcy ¶ 3001.09 (16th ed. 2024) ("The party objecting to the claim has the burden of going forward and of introducing evidence sufficient to rebut the presumption of validity.").

18. Accordingly, unless and until the objecting party introduces evidence as to the invalidity of the claim, the claimant need offer no further proof of its merits. 4 Collier on Bankruptcy ¶ 502.02 (16th 2023). Moreover, only "*substantial evidence*" can deprive the proof of claim of its presumptive validity. *In re Hemingway Transport, Inc.,* 993 F.2d 915, 925 (1st Cir. 1993) (emphasis in original). *In re International Wireless Communications Holdings, Inc.,* 257 B.R. 739, 742 (Bankr. D. Del. 2001), *aff'd,* 279 B.R. 463 (D. Del. 2002), *aff'd,* 68 F. App'x 275 (3d Cir. 2003) ("If an objection is filed, the objecting party bears the initial burden of presenting sufficient evidence to overcome the presumed validity and amount of the claim."); *In re Mid-American Waste Systems, Inc.,* 284 B.R. 53, 65 (Bankr. D. Del. 2002) (same). The objecting party must "produce evidence of probative force equal to that of the allegations of the creditor's proof of claim to rebut the presumption in favor of the creditor". *In re Unimet Corporation,* 74 B.R. 156, 165 (Bankr. N.D. Ohio 1987); *see also In re F-Squared Investment Management, LLC*, 546 B.R. at 544; *In re Allegheny*

*International, Inc.*, 954 F.2d at 173; *In re Radnor Holdings Corp.,* 353 B.R. 820, 846 (Bankr. D. Del. 2006) (where proof of claim includes assertions sufficient to support a legal basis for the claim, the claimant has met its burden of proof, and "its proof of claim is allowed until an objection supported by substantial evidence is presented to the Court."). Only if the objecting party provides such substantial evidence does the burden shift back to the claimant to establish the validity of the claim. *In re Mid-American Waste Systems, Inc.,* 285 B.R. at 65 ("where the objecting party presents substantial evidence to overcome the prima facie validity of the claim, the burden shifts to the claimant to prove his claim by a preponderance of the evidence"); *see also In re Unimet Corporation*, 74 B.R. at 165. Bare allegations are insufficient. *In re F-Squared Investment Management, LLC*, 546 B.R. at 544 ("The objector must produce actual evidence; '[m]ere allegations, unsupported by evidence, are insufficient to rebut the movant's prima facie case.'") (internal citation omitted; alteration in original); *In re Jackson*, No. 10-11716-MSH, 2013 WL 6903752, at *5 (Bankr. D. Mass. Dec. 31, 2013), *aff'd*, No. AP 13-01064-MSH, 2017 WL 3822869 (B.A.P. 1st Cir. 2017), *aff'd*, 988 F.3d 583 (1st Cir. 2021) ("'Substantial evidence' entails more than bare assertions of error" and "consists of evidentiary-quality material which, if accepted, would qualify or contradict the claimant's asserted rights.", *quoting In re Perron*, 474 B.R. 310, 313-14 (Bankr. D. Me. 2012)); *see also Hood v. American Express Centurion Bank*, No. 11-CV-0028-MJR, 2011 WL 1519650, at *7 (S.D. Ill. April 20, 2011), *aff'd sub nom. In re Hood,* 449 F. App'x 507 (7th Cir. 2011); *In re Hollars*, 198 B.R. 270, 271 (Bankr. S.D. Ohio 1996) ("A bald assertion, a mere conclusory statement, is, in and of itself, insufficient to rebut the presumption of validity."); *In re Unimet Corporation,* 74 B.R. at 167 ("The court finds that the bare allegations of Mr. DiCola are without any substantiation and thus insufficient to rebut the prima facie validity of the IRS' claim.").

19. Here, the Proofs of Claim included multiple pages explaining the nature and basis for the claim and exhibits showing the withdrawal liability calculation, as performed by the Fund's enrolled actuary. The Proofs of Claim thus provide sufficient evidence and support for the claim asserted therein. In response, the Debtors' Objection proffers only vague assertions that the Fund may have improperly calculated the liability, without specifying any errors, bringing forward evidence in support of a different calculation or providing a reasoned basis for a different calculation. As noted in the Introduction to this Response, the Objection simply alleges, without specificity, that the Fund may have "improperly calculated such annual withdrawal liability by using inflated contribution rates", Objection ¶ 27, and that some "of the Pension Plans may also have used an interest rate to determine the present value of vested benefits that does not comply with 29 U.S.C. § 1393(a) because such rates were not based on the experience and future expectations of the relevant Pension Plan." Objection ¶ 27 (n.22). Nowhere in the Objection do the Debtors provide a single piece of evidence to suggest that the Fund's calculations in its Proof of Claim are incorrect. They have wholly failed to present "substantial evidence" and to "produce evidence of probative force equal to that of the allegations of the creditor's proof of claim to rebut the presumption in favor of the creditor." Therefore, the Debtors have failed to overcome the presumption of validity.

**II.     The Fund acted correctly when it did not apply the 20-year cap to the calculation of the present value of its withdrawal liability claims.**

20. The Debtors contend that the 20-year cap is "a cap on withdrawal liability", Objection ¶23. Hence, as they see it, an employer's true liability is determined by calculating its annual withdrawal liability payment installments, applying the 20-year cap and reducing the stream of payments to its net present value. Objection ¶29. The Debtors cite only one case for that alleged rule, *National Shopmen Pension Fund v. DISA Industries, Inc.*, 653 F.3d 573, 576 (7th Cir. 2011), and that case does not support it. There the plan on its own initiative assessed only the present

value of 20 years of installment payments. Whether that course of action was or was not the proper interpretation of the statute was not at issue, and the court did not discuss it even in dictum.[5]

21.   The premise of the Debtors' theory is that they are entitled to pay withdrawal liability in installments. Although Section 4219(c)(1)(A) of ERISA, 29 U.S.C. §1399(c)(1)(A), provides that that right in some circumstances, it begins with this proviso: "Except as provided in subparagraphs (B) and (D) of this paragraph and in paragraphs (4) and (5)". Paragraph (5) expressly states that "[i]n the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability." *See also* 29 C.F.R. §4219.31(b)(2). In other words, the right to installment payments disappears when the employer is in default, as is the case here. That "the outstanding amount of an employer's withdrawal liability" refers to the full amount of the employer's share of the plan's unfunded vested benefits, rather than to the portion payable in installments under paragraph (1), is clear from comparison with paragraph (4), which gives the employer the right "to prepay the outstanding amount of *the unpaid annual withdrawal liability payments determined under paragraph (1)(C)*, plus accrued interest, if any, in whole or in part, without penalty" (emphasis added) and provides that doing so will extinguish its withdrawal liability unless it participates in a mass withdrawal as defined in subparagraph (1)(D). Hence, based on the plain language of the statute, the 20-year cap becomes irrelevant following default. That is an entirely reasonable restriction on the cap. Limiting installment payments to 20 years is a concession to solvent employers that responsibly adhere to their schedules of withdrawal liability payments. There is no reason to make a similar concession to those that either will not or cannot make

---

[5] The application of the 20-year cap was not an issue in the only other case that the Debtors cite, *Trustees of the Local 138 Pension Trust Fund v. F.W. Honerkamp Co., Inc.*, 692 F.3d 127 (2d Cir. 2012).

the scheduled payments. The Debtors' interpretation of the cap, when imported into a bankruptcy proceeding, transforms it into relief for the employer's other creditors at the expense of the plan.

### III. The Fund's Proofs of Claim satisfied MPPAA's requirements for notifying the Debtors of their withdrawal liability.

22. As noted in the Introduction, the Debtors have not actually challenged the sufficiency of the Fund's Proofs of Claim for want of "an initial formal assessment of withdrawal liability." Nor could they. Each Proof of Claim referenced in Paragraph 4 *supra* includes as an exhibit a "Calculation of Employer Withdrawal Liability for Yellow Corporation" and identifies that withdrawal liability as a claim asserted by the Fund against the Debtor. *See, e. g.*, Proof of Claim 4462 (Express Lane Services, Inc.), Item 7. No schedule of installment payments was necessary, because the Debtors, being in default, had no right to that method of payment. Therefore, the Proofs of Claim satisfied all statutory requirements for notifications of withdrawal liability.[6] See ¶15 *supra*.

### IV. The "blended" interest rate used by the Fund to calculate the present value of unfunded vested benefits represents the Fund's actuaries' best estimate of anticipated experience and takes into account the experience of the Fund and reasonable expectations.

23. Withdrawal liability calculations begin with the determination of the present value of a plan's "unfunded vested benefits", *i. e.*, the excess of the present value of nonforfeitable accrued benefits over the value of plan assets. The Debtors baldly suggest (Objection, ¶¶20 and 27 n.22) that the interest assumption used by the challenged pension funds in valuing unfunded vested benefits does not comply with MPPAA's requirements that the actuarial assumptions used in calculating withdrawal liability be "reasonable (taking into account the experience of the plan and reasonable expectations)" and "offer the actuary's best estimate of anticipated experience under the

---

[6] As noted in the Factual Background (¶6 *supra*), the Debtors have not objected to Claims 4480, 4481, 4483 and 4484, each of which includes a claim for withdrawal liability.

plan". ERISA § 4213(a)(1), 29 U.S.C. § 1393(a)(1). Other than this non-specific suggestion, the Objection raises no issues concerning other actuarial assumptions used in the withdrawal liability calculation.

24. While it is far from clear that the Debtors have or will challenge the Fund's withdrawal liability claim on this basis, any such challenge is without merit. To determine the present value of unfunded vested benefits, the Fund's enrolled actuary uses a "blended" interest rate that combines (i) the interest rate used in the annual valuation of liabilities for the purpose of complying with ERISA's minimum funding standards, and (ii) the set of interest rates prescribed by the Pension Benefit Guaranty Corporation for valuing the liabilities of terminated single employer pension plans, which are set forth at 29 C.F.R., Part 4044, Appendix B. In recent years, the latter rates have been lower than the valuation rates typically used in minimum funding calculations and hence have resulted in a higher value of liabilities than would the use of the valuation rate alone, although that is not necessarily and has not always been the case.

25. If ultimately challenged, the Fund will demonstrate that, under the Fund's circumstances, its actuary's use of the blended interest rate was "reasonable (taking into account the experience of the plan and reasonable expectations)" and "offer[ed] the actuary's best estimate of anticipated experience under the plan", as required by ERISA § 4213(a)(1), 29 U.S.C. §1393(a)(1), and thus was wholly appropriate and proper. The rationale for the blended method is that, to the extent that a plan's benefit liabilities are not currently funded, the actuary has no pertinent plan experience on which to base the interest assumption. Hence, the interest rate assumption for valuing that portion of the liability can only be based on "reasonable expectations". It is reasonable to posit that employer contributions that are not in hand and will be collected over an indefinite future period will not necessarily yield the same rate of return as the plan's current assets and to value

them on the basis of market-based assumptions concerning long-term rates of return, which are reflected in the interest assumptions prescribed by the PBGC.

26.     In the Fund's case, there are specific additional reasons to value liabilities funded by current assets differently from those to be funded by future contributions. Roughly 90 percent of employer contributions to the Fund are made by a single employer. Reasonable expectations concerning the future must take into account the possibility of that employer's withdrawal, including the possibility of the Fund's termination by mass withdrawal. ERISA §4219(c)(1)(D), 29 U.S.C. §1399(c)(1)(D). Should such a mass withdrawal occur, withdrawal liability *must* be calculated using the PBGC's interest assumptions rather than the plan's valuation assumptions. 29 C.F.R. §4281.13(a). While there is no way to assign a probability to such a future withdrawal, the state of the freight industry and future economic and technological conditions cannot be ignored, as, indeed, the fate of Yellow demonstrates.[7]

### V. The Fund's calculation of the amount of withdrawal liability owed by the Debtors took into account only contributions by the Contributing Employers that are properly considered under the Fund's method of allocating unfunded vested benefits.

27.     The Objection asserts that the Fund had "either not attempted to calculate the Debtors' annual withdrawal liability" or had "improperly calculated such annual withdrawal liability by

---

[7] The Fund notes that the use of the blended interest rate method has been upheld within this Circuit. *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F. Supp. 3d 365, 396-401 (D. N.J.), *appeal dismissed*, 2018 U.S. App. LEXIS 37327 (3d Cir. 2018). Of the authorities that the Debtors cite from other Circuits, only one addressed the blended method, faulting it "as not tailored to the unique characteristics of the plan." *Sofco Erectors, Inc. v. Trustees of the Ohio Operating Engineers Pension Fund*, 15 F.4th 407, 421 (6th Cir. 2021) (citation and quotation marks omitted). The two other decisions cited did not address the blended method at all. They found only that the use of PBGC interest assumptions *alone* to value benefits does not comply with MPPAA. *GCIU-Employer Retirement Plan v. MNG Enterprises, Inc.*, 51 F.4th 1092, 1098-1100 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 2665 (June 26, 2023); *United Mine Workers of America 1974 Pension Plan v. Energy West Mining Company*, 39 F.4th 730, 737-40 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 1024 (March 20, 2023). So far as the reported decisions disclose, the selection of interest assumptions in those cases did not consider *any* "unique characteristics of the plan".

using inflated contribution rates". Objection ¶25. The Fund's actuary did in fact calculate what the annual withdrawal liability installments would have been if the Debtors had possessed the right to pay in installments. The results were not included in the Proofs of Claim, because they were irrelevant. *See* Part III, *supra*.

28. In their Objection to Proofs of Claim by other plans, the Debtors assert that the highest contribution rate used to calculate annual installments was one imposed by a "funding improvement plan" or a "rehabilitation plan". Those "plans", which must be adopted by multiemployer pension plans that are in "endangered" or "critical" status, may include mandatory increases in contribution rates beyond the rates set forth in the employers' collective bargaining agreements. While the Debtors appear to argue that those increases are not properly taken into account in calculating installments, that issue would have no bearing on the Fund's claim, even if the amount of the installments were relevant. The highest contribution rates that would have been used in calculating installments were those in effect from 2019 through 2023. During that period, the Fund was not in endangered or critical status. Thus, those calculations would not reflect any rates imposed by a funding improvement plan or rehabilitation plan.

29. The Debtors offer no other clue in the Objection for their suggestion that the Fund may have utilized "inflated contributions rates" in its withdrawal liability calculation. Nor is there any merit to such suggestion. The Debtors' contributions used in determining their withdrawal liability are set forth in the withdrawal liability calculation included in the Fund's Proofs of Claim. As that calculation indicates, those amounts reflect the Debtors' actual contributions except for the period from March 2009 through June 2011, during which "presumed contributions" based on the contribution rate specified in the Debtors' collective bargaining agreement were used. The use of presumed contributions was necessitated by the Debtors' suspension of contributions to the Fund

during that period. The Debtors have not identified any inaccuracies in the contribution amounts used in the calculation or lodged any challenge to the "presumed contribution" methodology identified in the Fund's proofs of claim.

30. In any event, the use of the presumed contributions at the Debtors' contracted rate in the calculation was entirely lawful and is not subject to challenge. The Fund's calculation of the Debtors' withdrawal liability was performed in accordance with an alternative method for allocating unfunded vested benefits that is set forth in Trust Amendment 2012-1. (Exhibit A). That alternative method was specifically approved by the Pension Benefit Guaranty Corporation ("PBGC") under the authority granted to it by ERISA § 4211(c)(5)(A), 29 U.S.C. § 1391(c)(5)(A), implemented by 29 C.F.R. § 4211.21. In its approval (Exhibit B), the PBGC determined that Trust Amendment 2012-1 satisfies the conditions for approval of alternative allocation methods. 29 C.F.R. § 4211.23(b).

31. The withdrawal liability calculations attached to the Funds' Proofs of Claims show that the alternative method was properly applied to the calculation of the Contributing Employers' withdrawal liability. Therefore, the contributions used in the calculation were not "inflated" but, rather were determined in the manner required by the Fund's approved allocation method.

## RESERVATION

32. As noted in the Introduction to this Response and throughout this Response, the Objection is vague and conclusory, without specific factual arguments, but rather high-level potential arguments that the Debtors might raise regarding the Fund's claims (or might not raise as to the Fund's claims, but raise only with respect to claims against other pension funds). The Fund intends to take discovery of the Debtors and reserves all of its rights to modify, amend or add additional arguments in future responses as the Debtors' positions, arguments and actual allegations are

clarified.  The Fund will establish, following fact and expert discovery and trial, that its Proofs of Claim should be allowed in full and the Objection should be denied.

## CONCLUSION

33.   For the reasons set forth above, the Court should deny the Debtors' Objection and allow the Fund's withdrawal liability claims in their entirety.

Date:   April 18, 2024
       Wilmington, Delaware

**CROSS & SIMON, LLC**

*/s/ Kevin Mann*
Kevin Mann (No. 4576)
1105 North Market Street
Suite 901
Wilmington, DE  19801
Tel: 302-777-4200
Email: kmann@crosslaw.com

-and –

**STEPTOE LLP**

Paul Ondrasik (*pro hac vice forthcoming*)
Joshua R. Taylor (*pro hac vice forthcoming*)
1330 Connecticut Ave., NW
Washington, D.C. 20036
Tel: 202-429-3000
Email: pondrasik@steptoe.com
       jrtaylor@steptoe.com

*Counsel to Teamsters Joint Council No. 83 of Virginia Pension Fund*