# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | Case No. 23-11069 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 3433**<br>**Hearing Date: June 3, 2024 at 10:00 a.m. (ET)** |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
OBJECTION TO THE MOTION OF DEBTORS FOR ENTRY OF AN ORDER
(I) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11
PLAN AND SOLICIT ACCEPTANCES THEREOF PURSUANT TO SECTION
1121 OF THE BANKRUPTCY CODE AND (II) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors" and such cases, the "Chapter 11 Cases"), by and through its undersigned counsel, hereby files this objection (the "Objection") to the *Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 3433] (the "Exclusivity Motion"). In support of this Objection, contemporaneously herewith, the Committee is filing the *Declaration of John C. DiDonato in Support of the Official Committee of Unsecured Creditors' Objection to the Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* (the "DiDonato Declaration") and

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

the *Declaration of John D'Amico in Support of the Official Committee of Unsecured Creditors'*
*Objection to the Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive*
*Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of*
*the Bankruptcy Code and (II) Granting Related Relief* (the "D'Amico Declaration") and the
Committee respectfully submits as follows:

## PRELIMINARY STATEMENT[2]

1.     By the Exclusivity Motion, the Debtors seek a further extension of their Exclusivity
Periods that should not be granted given the current state of these Chapter 11 Cases.  The Debtors
ceased operations and filed for bankruptcy nearly ten months ago for the stated purpose of
monetizing their assets and distributing sale proceeds through a plan of liquidation.  To that end, a
majority of the Debtors' assets were auctioned off and sold in December 2023 and January 2024
through a very successful, but to date incomplete, sale process.  For the last four months, the
Debtors' attention has shifted away from monetizing their remaining assets and effectuating
distributions to creditors to being almost singularly focused on full-scale, scorched-earth litigation
against their largest unsecured creditors, litigation that is projected to cost the Debtors' unsecured
creditors tens of millions of dollars over the next several months.  Having grown very concerned
at the professional fee burn rate in these cases, the Committee requested that the Debtors pause the
very expensive litigation machine for a limited 30-day period to engage in settlement negotiations
to resolve the myriad contested issues now pending before the Court.  The Debtors rejected that
request without elaboration.

2.     It is increasingly apparent to the Committee that the Debtors' litigation efforts are
not being carried out for the benefit of unsecured creditors (creditors who have asserted, in the

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them elsewhere in this Objection or in the Exclusivity Motion, as applicable.

aggregate, over $11 billion[3] in claims) but, instead, to attempt to pull off a triple lindy for the Debtors' largest equity holder, MFN Partners Management, LP ("MFN")—an entity that has two representatives on the Debtors' board of directors.  By choosing continued extraordinarily expensive litigation against the Debtors' major claimants and refusing to agree to even a short litigation pause to explore a potential settlement of any of the pending disputes, the Debtors have elected to set aside the interests of unsecured creditors and pursue a highly unlikely recovery for equity holders at tremendous cost to these estates and their unsecured creditors.  The Debtors' strategy similarly furthers their management team's seemingly-personal and seemingly-baseless desire to prove that the actions of the International Brotherhood of Teamsters ("IBT") caused the Debtors' demise, notwithstanding the undisputed fact that the Debtors' attacks have been rebuked at every turn by the United States District Court for the District of Kansas (the "Kansas District Court"), which recently dismissed all of the Debtors' claims against the IBT.

3.    Against this backdrop, the Debtors now seek yet another extension of their Exclusivity Periods in an effort to, among other things, preclude the Committee from working with its own constituents to formulate and prosecute its own plan of liquidation.  The Debtors' request, however, is not supported by applicable law under the facts and circumstances of these cases.  For these reasons and the reasons that follow, the Exclusivity Motion should be denied.

4.    Indeed, the Committee files this Objection not only to voice its opposition to the Debtors' continued (and increasingly inappropriate) control over the trajectory of these cases, but to communicate to the Court and all parties in interest that it stands ready and willing to formulate and propose its own plan of liquidation, pursuant to which the Debtors' remaining assets would be liquidated in a manner designed to maximize the value of such assets, and pending litigation

---

[3] DiDonato Declaration ¶¶ 25-26.

matters moved into a liquidation trust overseen by an independent, unbiased liquidation trustee who would serve as a true, unbiased fiduciary for the trust's beneficiaries.  The Committee is also prepared to support, on a parallel track with its development and prosecution of a plan, a comprehensive mediation process through which the material disputes that now burden these estates can be addressed and hopefully resolved, thereby facilitating an even more expeditious and value-maximizing resolution to these cases.  The Committee believes, however, that any such mediation process should be combined with a stay of the pending litigation matters to ensure that all parties are able to devote their time and attention and appropriate estate resources to pursuing a consensual resolution of pending litigation while simultaneously curbing the Debtors' extraordinary cash burn.

5.      Even if the Court is not prepared to order mediation together with a limited pause in litigation, the Debtors simply have not met their burden to warrant an additional extension of the Exclusivity Periods.  As such, the Committee should be permitted to take immediate actions to prevent the further dissipation of limited and rapidly diminishing estate resources, propose a straightforward waterfall plan of liquidation, and otherwise progress these cases in a manner designed to maximize value and provide unsecured creditors with the recoveries to which they are legally entitled as quickly and efficiently as possible.

## **BACKGROUND**

### I.     **Events Preceding the Chapter 11 Cases**

#### a.   *"One Yellow" and Other Challenges*

6.      Prior to the commencement of these Chapter 11 Cases, the Debtors' operations were divided into four subsidiaries, which created many operating inefficiencies and often led to companies within the Yellow corporate umbrella competing with each other to the detriment of the

4

enterprise as a whole.[4]  In 2019, Yellow Corporation ("<u>Yellow</u>" and, together with each of its direct and indirect subsidiaries, the "<u>Company</u>") announced the "One Yellow" initiative, a multi-year plan to transform and unify the Company's businesses by merging into one company, thereby eliminating inefficiencies.[5]  The Company viewed One Yellow as essential to the go-forward viability of its business operations, as implementation of the plan was intended to increase efficiency and improve financial performance.[6]  The One Yellow plan contained three phases and was expected to consolidate and connect the Company's operations over a four-year period.[7]  The Company successfully implemented the first phase of One Yellow, but failed to implement the second phase.[8]  According to the Debtors, the resulting turmoil, as described further below, caused irreparable financial damage to the Company.[9]

7.      In 2019 and 2020, the Company experienced economic headwinds, including as a result of a recession in the freight industry and the COVID-19 pandemic.[10]  Notwithstanding these headwinds and the operational inefficiencies that necessitated implementation of the One Yellow plan, the Debtors have repeatedly stated that the Company's demise was the result of actions taken (or refused to be taken) by the IBT.[11]  According to the Debtors, "Yellow . . . faced a severe liquidity crisis orchestrated by… [IBT] General-President Sean O'Brien and carried out by [IBT] leadership who acted at all times at his behest and direction."[12]  More specifically, the Debtors

---

[4] *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [ECF No. 14] (the "<u>First Day Declaration</u>") ¶¶ 3, 47.

[5] First Day Declaration ¶ 45-46.

[6] *Id*. ¶ 47–48.

[7] *Id*. ¶ 74.

[8] *Id*. ¶ 81.

[9] *Id*. ¶ 79–88.

[10] *Id*. ¶ 52.

[11] *Id*. ¶ 80.

[12] *Id*. ¶ 2.

claim that the IBT breached the applicable collective bargaining agreement ("CBA") to block implementation of the second phase of the One Yellow initiative.[13]  According to the Debtors, "[b]y stonewalling Yellow's implementation of Phase 2 [of One Yellow], Mr. O'Brien and [the IBT] knowingly and intentionally triggered a death spiral for Yellow."[14]

### b.    IBT Litigation

8.      On June 27, 2023, Yellow and certain of its affiliates (the "Yellow Plaintiffs") filed a complaint (as amended on July 19, 2023, the "IBT Complaint") against the IBT and certain other IBT-affiliated local unions in the Kansas District Court alleging that the IBT refused to comply with contractual obligations "to cooperate with and not impede the implementation of…One Yellow" in breach of the parties' CBA (the "IBT Litigation").[15]  By the IBT Complaint, the Yellow Plaintiffs sought over $137.3 million in damages and $1.5 billion for lost enterprise value attributable to the IBT's alleged CBA breaches.[16]

9.      In July 2023, the Company failed to make required contribution payments to certain pension and health and welfare funds for its unionized workforce.  The Company was required to make these contribution payments under its CBA and related agreements, and the IBT was permitted to strike in the event that payments were not timely made.[17]

10.     Following the missed contribution payments, the IBT issued a 72-hour strike notice.[18]  Two days later, the Yellow Plaintiffs sought a temporary restraining order and preliminary

---

[13] *Id*. ¶ 10.

[14] *Id*. ¶ 9.

[15] *First Amended Verified Complaint* [ECF No. 21] ¶ 5, *Yellow Corp. v. International Brotherhood of Teamsters*, Case No. 23-1131-JAR-ADM (D. Kansas July 19, 2023), attached hereto as Exhibit A.

[16] *First Day Declaration* ¶ 10.  As discussed below, the Yellow Plaintiffs' claims ultimately were dismissed in their entirety on March 25, 2024.

[17] *Yellow Corp. v. International Brotherhood of Teamsters*, Hr'g Tr. at 50:16–51:12, Case No. 23-1131-JAR-ADM (D. Kansas July 21, 2023) [ECF No. 41] (the "TRO Transcript"), attached hereto as Exhibit B.

[18] First Day Declaration ¶ 12.

injunction against the defendants in the IBT Litigation, asking the Kansas District Court to (i) enjoin the defendants from striking and (ii) compel them to engage in certain grievance procedures under the CBA.[19]  Ruling from the bench, the Kansas District Court denied the Yellow Plaintiffs' request, finding that the IBT was authorized to strike following the Company's admitted failure to make the contribution payments.[20]

11.    Although a strike ultimately was averted, the Debtors claim that "the threat of the IBT strike was enough to seal Yellow's fate."[21]  In the First Day Declaration, Mattew Doheny, the former Chairman of Yellow's board of directors (the "Board") and current Chief Restructuring Officer, stated that the Company's total shipments went from 40,000 to "near zero" over the course of five days following the IBT's strike notice.[22]  Interestingly, a sworn declaration from Darren Hawkins, the Debtors' CEO, tells a different story.  Most notably, Mr. Hawkins states that on July 24, 2023—the day the strike was scheduled to commence—the Company picked up over 17,000 shipments, but the Company *itself* made the decision to "begin the process to discontinue accepting new shipment orders" on that day.[23]  Given the Company's self-imposed decision to cease accepting new shipments on July 24, its shipments soon dwindled to zero, and the Company began winding down its business.[24]  On July 28, 2023, the Company began terminating employees.[25]

---

[19] *Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction* [ECF No. 22], *Yellow Corp. v. International Brotherhood of Teamsters*, Case No. 23-1131-JAR-ADM (D. Kansas July 19, 2023).

[20] TRO Transcript at 55:1–20.

[21] First Day Declaration ¶ 100.

[22] *Id*. ¶ 13.

[23] *Declaration of Darren Hawkins in Support of Debtors' Third, Fourth, and Fifth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability* [ECF No. 2581] ¶ 100 (the "Hawkins Declaration").

[24] First Day Declaration ¶ 13; Hawkins Declaration ¶ 107.

[25] First Day Declaration ¶ 17.

### c.  *Equity Acquisition by MFN*

12.     According to public documents, from July 10, 2023 through July 31, 2023, during which time the Company was embroiled in a public dispute with the IBT and eventually determined to cease operations as described above, MFN purchased approximately 22.1 million shares in Yellow at an average price of $1.02 each, resulting in an approximately 42.5% equity ownership stake in Yellow.[26]  Upon information and belief, MFN has not had any additional equity transactions as of July 31, 2023 and continues to own approximately 22.1 million Yellow shares.

## II.     The Chapter 11 Cases

13.     On August 6, 2023 and continuing into August 7, 2023 (together, the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing these Chapter 11 Cases.  According to the First Day Declaration, the Debtors filed for chapter 11 with the objective of effectuating an orderly, value-maximizing winddown of their businesses for the benefit of all parties in interest.[27]

14.     On August 16, 2023, the United States Trustee for the District of Delaware appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code.[28]  An amended notice of appointment was filed on May 20, 2024.[29]  The Committee currently comprises eight members.[30]

---

[26] Yellow Corp., Schedule 13D (Aug. 1, 2023).

[27] First Day Declaration ¶19.

[28] *Notice of Appointment of Committee of Unsecured Creditors* [ECF No. 269].

[29] *First Amended Notice of Appointment of Committee of Unsecured Creditors* [ECF No. 3430].

[30] The Committee comprises the following parties: (i) BNSF Railway; (ii) Central States, Southeast and Southwest Areas Pension Fund; (iii) Daimler Trucks, N.A.; (iv) International Brotherhood of Teamsters; (v) New York State Teamsters Pension and Health Funds; (vi) Pension Benefit Guaranty Corporation; (vii) RFT Logistics LLC; and (viii) Mr. Armando Rivera.

### III.    The Debtors' Board, Executive Team, and Employees

15.    On September 5, 2023, shortly after the Petition Date, the Debtors elected two new members to the Board, Mary Nell Browning and Thomas Knott, who were "specifically recommended" by MFN.[31]

16.    Despite having no ongoing business operations, as of the date hereof, the Company still employs a significant number of senior executives, including, but not limited to: (i) Darren Hawkins, Chief Executive Officer; (ii) Daniel Olivier, Chief Financial Officer; (iii) Tony Carreño, Senior Vice President, Treasury and Investor Relations; and (iv) Matthew Doheny, Chief Restructuring Officer.[32] Below is a chart detailing the salaries and bonuses of the Company's senior executives as of May 20, 2024.[33]

| Name | Position | Salary | Bonus |
|---|---|---|---|
| Darren Hawkins | CEO | $1.3m | $0.6m |
| Daniel Olivier | CFO | $0.5m | $0.5m |
| Tony Carreño | SVP, Treasure, Investor Relations | $0.3m | $0.2m |
| Matthew Doheny | CRO | $1.8m | $1.0m |
| | **Total** | $3.9m | $2.3m |

17.    As of May 6, 2024, the Debtors continue to employ a total of 275 employees, 233 of whom are full-time and 42 of whom are flex-time.[34]  The Debtors' employees' monthly salaries currently total approximately $2.5 million per month, of which approximately $325,000 is attributable to the Debtors' executive team.[35]

---

[31] *See* Yellow Corp., Form 8-K (Sep. 11, 2023).

[32] DiDonato Declaration ¶ 16.  Leah Dawson, EVP, General Counsel and Secretary, is currently employed as a part-time employee paid at an hourly rate.

[33] *Id.*

[34] *Id.* ¶ 14.

[35] *Id.* ¶¶ 14, 16.

IV.     **The Asset Sales and Repayment of All Secured Debt**

18.     On August 7, 2023, the Debtors filed a motion (the "Bidding Procedures Motion")[36]
by which they requested authorization to establish bidding procedures (the "Bidding Procedures")
for the sale of their owned real estate (collectively, the "Owned Real Estate"), leased real estate
(collectively, the "Leased Real Estate" and, together with the Owned Real Estate, the "Real Estate
Assets"), and rolling stock (collectively, the "Rolling Stock").  On September 15, 2023, the Court
entered an order approving the Bidding Procedures Motion, which order provided for, among other
things, an auction and sale schedule.

19.     In November and December 2023, the Debtors conducted multi-day auctions in
accordance with the Bidding Procedures, following which the Court approved multiple sales
covering 128 of the Debtors' Owned Real Estate—or approximately three quarters—and 35 of the
Debtors' Leased Real Estate properties, for total proceeds of approximately $1.97 billion.[37]

20.     Despite their initial progress, the Debtors have not yet announced a timeline or
process by which the remaining Real Estate Assets will be monetized.  Upon information and

---

[36] *Motion of the Debtors for Entry of an Order (I)(A) Approving Bidding Procedures for the Sale or Sales of the Debtors' Assets; (B) Scheduling an Auction and Approving the Form and Manner of Notice Thereof; (C) Approving Assumption and Assignment Procedures, (D) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances And (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [ECF No. 22].

[37] D'Amico Declaration ¶ 13.  The Exclusivity Motion states that the Debtors "monetized 130 owned properties for $1.88 billion" pursuant to "Docket No. 1354" and "23 leased properties for $92 million" pursuant to "Docket No. 1735." Exclusivity Motion ¶ 2.  In fact, Docket No. 1354 approved the sale of 128 owned properties and 2 leased properties and Docket No. 1735 approved the sale of 23 leased properties for $82 million.  *See Order (I) Approving Certain Asset Purchase Agreements; (II) Authorizing and Approving Sales of Certain Real Property Assets of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, in Each Case Pursuant to the Applicable Asset Purchase Agreement; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, in Each Case as Applicable Pursuant to the Applicable Asset Purchase Agreement; and (IV) Granting Related Relief* [ECF No. 1354]; *Order (I) Approving Certain Asset Purchase Agreements; (II) Authorizing and Approving Sales of Certain Real Property Assets of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, in Each Case Pursuant to the Applicable Asset Purchase Agreement; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, in Each Case as Applicable Pursuant to the Applicable Asset Purchase Agreement; and (IV) Granting Related Relief* [ECF No. 1735].

belief, the Debtors are instead in the process of retaining a third-party real estate broker to manage the monetization of their remaining Real Estate Assets.[38]

21.     On October 16, 2023, the Debtors entered into an agency agreement with Ritchie Bros. Auctioneers and Nations Capital (collectively, "Ritchie Brothers") to act as auctioneer, broker and marketing agent with respect to the Debtors' Rolling Stock.[39]  To date, Ritchie Brothers has completed sales of approximately 34%[40] of the Debtors' existing Rolling Stock for approximately ██████.[41] ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████.[42]

22.     On February 8, 2024, the Debtors filed a notice stating that they had repaid in full all outstanding prepetition and postpetition funded debt with the proceeds from the sales of the Real Estate Assets, inclusive of their postpetition DIP facilities, prepetition ABL facility, prepetition B-2 term loan and both tranches of debt outstanding under their United States Treasury prepetition loan agreement.[43]  In total, the Debtors repaid approximately $1.6 billion in prepetition and postpetition funded debt obligations.[44]

---

[38] D'Amico Declaration ¶ 14.

[39] On October 27, 2023, the Court approved the agreement with Ritchie Brothers. *Order (I) Approving Agency Agreement with Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bros. Auctioneers (Canada) Ltd., and IronPlanet Canada Ltd. Effective as of October 16, 2023; (II) Authorizing the Sale of Rolling Stock Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (III) Granting Related Relief* [ECF No. 981].

[40] D'Amico Declaration ¶ 15.

[41] *Id.* ¶ 15.

[42] *Id.* ¶ 18.

[43] *Notice of (A) Debtors' Repayment of (I) Prepetition Secured Obligations, (II) Prepetition UST Secured Obligations, and (III) DIP Obligations and (B) Termination of (I) Prepetition B-2 Credit Agreement, (II) Prepetition UST Loan Documents, and (III) DIP Loan Documents* [ECF No. 2119].

[44] DiDonato Declaration ¶ 11.

23.     Additional assets remain to be monetized for the benefit of unsecured creditors.  As of the date hereof, the Debtors still have approximately 25% of the Owned Real Estate, 66% of the Rolling Stock, and 50% the Leased Real Estate remaining to be sold.[45]

## V.    Claims Objections and Pending Litigation Matters

24.     Since the Petition Date, the Debtors have objected to over 2,760 proofs of claim through twelve omnibus claims objections (the "Claims Objections").    The most significant Claims Objections challenge claims asserted by the Debtors' multi-employer pension funds (the "MEPPs", and all such claims asserted by the MEPPs, the "MEPP Claims"), and claims related to alleged violations of the federal Worker Adjustment and Retraining Notification Act of 1988 and state law analogs (collectively, the "WARN Act", and such claims, the "WARN Act Claims"). Yellow and certain of its affiliates also are party to two class action adversary proceedings alleging violations of the WARN Act (the "WARN Adversary Proceedings", and together with the WARN Act Claims Objections, the "WARN Litigation").

### a.    The MEPP Claims

25.     The MEPP Claims, by which the MEPP claimants assert over $7 billion in claims, primarily relate to ERISA withdrawal liability obligations arising from the Debtors' withdrawal from various MEPPs.  The MEPP Claims generally fall into two categories: (i) proofs of claim filed by MEPPs who received Special Financial Assistance ("SFA") under the 2021 American Rescue Plan Act (the "SFA MEPPs"), including Central States, Southeast and Southwest Areas Pension Fund ("Central States"); and (ii) proofs of claim filed by MEPPs who did not receive SFA funds (the "Non-SFA MEPPs").  On December 8, 2023, the Debtors objected to Central States'

---

[45] D'Amico Declaration ¶ 16.

claims for withdrawal liability and related contract claims.[46] On January 26, 2024, the Debtors objected to claims asserted by SFA MEPP funds other than Central States.[47]  On March 13, 2024, the Debtors objected to claims asserted by Non-SFA MEPPs.[48]

26.    The MEPP Claims have been the subject of extensive briefing.  On January 8 and February 13, 2024, respectively, Central States and various other MEPPs filed motions to compel arbitration of the withdrawal liability disputes.[49]   On February 21, 2024, the Pension Benefit Guaranty Corporation ("PBGC") separately moved to dismiss or deny the Debtors' challenge to the PBGC-issued regulation requiring MEPPs to phase in the recognition of SFA when calculating withdrawal liability.[50]  PBGC subsequently filed a motion to withdraw the reference as to the enforceability of its regulation, which is now fully briefed before the United States District Court for the District of Delaware and is awaiting further action from the court.[51]  On March 27, 2024, the Court issued a decision denying the motions to compel arbitration and adjourning PBGC's motion to dismiss until the Court considers the merits of the claims allowance disputes that were the subject of the motions to compel arbitration.[52]

---

[46] *Debtors' Objection to the Proofs of Claim Filed by the Central States Pension Fund* [ECF No. 1322].

[47] *Debtors' Second Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [ECF No. 1962].

[48] *Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [ECF No. 2595].

[49] *Central States Pension Fund's Motion to Compel Arbitration of Withdrawal Liability Disputes, or Alternatively, for Relief from the Automatic Stay to Initiate Arbitration* [ECF No. 1665]; *New York State Teamsters Conference Pension and Retirement Fund, Road Carriers Local 707 Pension Fund, Teamsters Local 641 Pension Fund, Western Pennsylvania Teamsters and Employers Pension Fund, Management Labor Pension Fund Local 1730, International Association Of Motor City Machinists Pension Fund, Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund, Teamsters Local 617 Pension Fund, Trucking Employees Of North Jersey Pension Fund, And Freight Drivers and Helpers 557 Pension Fund's Joint Motion to Compel Arbitration of Withdrawal Liability Disputes, or Alternatively, for Relief from the Automatic Stay to Initiate Arbitration* [ECF No. 2180].

[50] *The Pension Benefit Guaranty Corporation's Motion for Denial or Dismissal of Debtors' Challenge to PBGC's Regulation Contained in Debtors' Objections to the Proofs of Claim Filed by Certain Multiemployer Pension Plans* [ECF No. 2276].

[51] *Motion of the Pension Benefit Guaranty Corporation for Mandatory Withdrawal of the Reference of the Debtors' Objections to Proofs of Claim for Pension Withdrawal Liability* [ECF No. 2640].

[52] *Memorandum Opinion* [ECF No. 2765].

27.     The SFA MEPP and Non-SFA MEPP Claims Objections are governed by separate scheduling orders entered by the Court on February 14, 2024 and April 12, 2024, respectively.[53] Fact discovery is ongoing in both litigations, with trial dates set for early August 2024 for the SFA MEPP Claims Objections and late September 2024 for the Non-SFA MEPP Claims Objections.

### b. The WARN Act Claims

28.     As with the MEPP Claims, there has been extensive motion practice in the WARN Litigation.  On March 12, 2024, the Debtors filed multiple Claims Objections to the WARN Act Claims.[54]  Numerous WARN Act claimants filed responses between March 25 and April 8, 2024, and the Debtors filed a reply on April 9, 2024.[55]  As to the WARN Adversary Proceedings, the plaintiffs on behalf of the non-union employees have fully briefed a motion for class certification (which the Court orally indicated it would grant), and fully briefed a motion for partial summary judgment.

29.     At a scheduling conference on April 11, 2024 regarding the WARN Act Claims, the Court indicated it would hear all WARN Litigation on the "same track."   Under the current schedule, discovery for the WARN Litigation is underway and is to be completed by August 16, 2024.  A hearing on dispositive motions, if any, is set for October 14, 2024, and a trial, if necessary, is scheduled to commence on December 9, 2024.[56]

---

[53] *Order Scheduling Certain Dates and Deadlines in Connection with the Debtors' Objections to Proofs of Claim Filed by the Pension Funds that Received Special Financial Assistance* [ECF No. 2195]; *Order Scheduling Certain Dates and Deadlines in Connection with the Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [ECF No. 2961].

[54] *Debtors' Third Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability* [ECF No. 2576]; *Debtors' Fourth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability* [ECF No. 2577]; *Debtors' Fifth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability* [ECF No. 2578].

[55] *Debtors' Reply in Support of their Third Omnibus (Substantive), Fourth Omnibus (Substantive), and Fifth Omnibus (Substantive) Objections to Proofs of Claim Alleging WARN Liability* [ECF No. 2909] (the "Reply Supporting Third, Fourth, and Fifth Omnibus Objections").

[56] *Scheduling Order* [ECF No. 3186].

### c.    IBT Litigation

30.    Prior to the Petition Date, on July 20, 2023, the IBT and certain other union defendants filed separate motions to dismiss the IBT Complaint in the IBT Litigation for failure to state a claim.[57]  On August 18, 2023, the Yellow Plaintiffs filed a motion to transfer the case to this Court, along with a memorandum in support, seeking to have the issues heard before this Court.[58] The Kansas District Court denied the motion to transfer on October 12, 2023.[59]  On March 25, 2024, the Kansas District Court granted the defendants' motions to dismiss the IBT Complaint without prejudice based on Yellow's failure to exhaust the grievance procedures set out in the CBA.[60]  On April 22, 2024, the Yellow Plaintiffs filed a motion to alter or amend the Kansas District Court's judgment and a memorandum in support, as well as a motion for leave to file a proposed second amended complaint.  The reply deadline for each motion is June 10, 2024, after which time the matters will be fully briefed and will await rulings from the Kansas District Court.

### d.    The Committee's Efforts to Facilitate Settlement Discussions

31.    On May 9, 2024, the Committee authorized its counsel to commence settlement discussions with the Debtors and MFN, as the Debtors' largest equity holder, in an effort to facilitate a global resolution of the Debtors' material litigation matters, inclusive of the IBT Litigation, the WARN Litigation and the MEPP Claims, and the terms of a liquidating chapter 11 plan.  The Committee's objective was to attempt to reach settlements with various stakeholders in

---

[57] *International and Negotiating Committee's Motion to Dismiss* [ECF No. 29]; *Memorandum in Support of the International and Negotiating Committee's Motion to Dismiss* [ECF No. 30]; *Local Defendants' Motion to Dismiss* [ECF No. 31]; *Memorandum in Support of the Local Defendants' Motion to Dismiss* [ECF No. 32], *Yellow Corp. v. International Brotherhood of Teamsters*, Case No. 23-1131-JAR-ADM (D. Kansas July 20, 2023).

[58] *Motion to Transfer* [ECF No. 47], *Yellow Corp. v. International Brotherhood of Teamsters*, Case No. 23-1131-JAR-ADM (D. Kansas August 18, 2023).

[59] *Memorandum and Order* [ECF No. 57], *Yellow Corp. v. International Brotherhood of Teamsters*, Case No. 23-1131-JAR-ADM (D. Kansas October 12, 2023).

[60] *Memorandum and Order* [ECF No. 109], *Yellow Corp. v. International Brotherhood of Teamsters*, Case No. 23-1131-JAR-ADM (D. Kansas March 25, 2024).

phases including settlements with equity holders, the IBT, WARN Act claimants and the MEPPs. To that end, counsel to the Committee communicated a "phase 1" settlement proposal authorized by the Committee to counsel to the Debtors and MFN by e-mail on May 13, 2024.  Committee counsel encouraged the Debtors and MFN to engage on the Committee's proposal, but indicated that any such engagement would need to be combined with an initial 30-day pause and extension of relevant litigation dates to ensure that all parties involved were given the ability to devote the necessary time and resources that would be required to participate in the various phases of settlement discussions, while simultaneously preventing the accrual of millions of dollars in professional fees that were projected to be incurred in respect of the litigation matters for the relevant period.  On May 16, 2024, the Debtors responded to the Committee's settlement proposal, stating that they did not support any extension of the litigation deadlines, but were working on a counter-proposal.  To date, the Committee has not received a counter-proposal from the Debtors, and has received no response to its settlement proposal from MFN.

## VI.    The Debtors' Excessive Cash Burn

32.    As of May 10, 2024, the Debtors' ending cash balance was approximately ███ █████, having burned approximately $30 million of cash in April 2024 alone.[61]  The Debtors' primary use of cash is currently professional fees and, according to the Debtors' monthly operating reports, the Debtors paid approximately $16.9 million in professional fees in April 2024.[62]  A chart identifying the primary professionals retained by the Debtors and the Committee and the amounts that each has billed thus far in the Chapter 11 Cases is set forth below:

---

[61] DiDonato Declaration ¶ 13.

[62] DiDonato Declaration ¶ 17; *Chapter 11 Monthly Operating Report for the Month Ending: 04/30/2024* [ECF No. 3442].

| Name of Firm | Role | Time Period | Amount Billed |
|---|---|---|---|
| **Debtors' Professionals** | | | |
| Kirkland & Ellis LLP | Counsel to the Debtors | August 2023 – March 2024 | $26,179,079.07 |
| Ducera Partners LLC | Investment Banker to the Debtors | August 2023 – April 2024 | $25,389,733.04 |
| Alvarez & Marsal North America, LLC | Financial Advisor to the Debtors | August 2023 – March 2024 | $13,921,178.33 |
| Kasowitz Benson Torres LLP | Special Litigation Counsel to the Debtors | August 2023 – March 2024 | $6,839,421.62 |
| Ernst & Young LLP | Tax Services Provider to the Debtors | August 2023 – April 2024 | $3,822,816.13 |
| Pachulski Stang Ziehl & Jones LLP | Counsel to the Debtors | August 2023 – April 2024 | $1,734,170.69 |
| KPMG LLP | Audit Services Provider to the Debtors | August 2023 – April 2024 | $926,166.50 |
| Goodmans LLP | Canadian Restructuring Counsel to the Debtors | August 2023 – January 2024 | $920,902.75 |
| **Total (Debtors' Professionals)** | | | **$79,733,468.13** |
| **Committee's Professionals** | | | |
| Akin Gump Strauss Hauer & Feld LLP | Counsel to the Committee | August 2023 – March 2024 | $14,206,951.18 |
| Huron Consulting Services LLC | Financial Advisor to the Committee | August 2023 – February 2024 | $4,455,479.08 |
| Miller Buckfire | Investment Banker to the Committee | August 2023 – January 2024 | $1,068,493.11 |
| Benesch, Friedlander, Coplan & Aronoff LLP | Counsel to the Committee | August 2023 – March 2024 | $838,384.51 |
| **Total (Committee's Professionals)** | | | **$20,569,307.88** |
| **Total (All Debtor and Committee Professionals)** | | | **$100,302,776.01** |

33.     The Debtors have provided the Committee's advisors with a long-term budget,

which estimates that the Debtors expect to expend approximately ███████████████

████████████████████████████████████████████████████████████████

███████████████████████.[63]

---

[63] DiDonato Declaration ¶ 18.

**VII.    The Exclusivity Motion and the Debtors' Prior Motions to Extend the Exclusivity Periods**

34.    On November 8, 2023, the Court approved the Debtors' first extension of their Exclusivity Periods to (i) file a chapter 11 plan by 90 days, to March 4, 2024 and (ii) solicit votes on a plan by 90 days, to May 2, 2024.[64]

35.    On February 28, 2024, the Court approved the Debtors' second extension of their Exclusivity Periods for an additional 90 days to, respectively, June 3, 2024 and July 31, 2024.[65]

36.    On May 20, 2024, the Debtors filed the Exclusivity Motion, by which they request a third extension of the Exclusivity Periods by another 90 days to September 2, 2024 for plan filing and to October 29, 2024 for plan solicitation.[66]  A hearing on the Exclusivity Motion is scheduled for June 3, 2024 at 10:00 a.m. (ET).  Specifically, the Debtors make several factual assertions to support that these Chapter 11 Cases have meaningfully progressed, and therefore a further extension of the Exclusivity Periods is justified, including:

- The Debtors have monetized 130 owned properties for $1.88 billion and 23 leased properties for $92 million and used a significant portion of such proceeds to pay off all prepetition secured debt and DIP financing.[67]

- The Debtors have sought to assume 78 nonresidential real property leases to ensure value from those assets is maximized.[68]

- The Debtors prevailed on the merits as to whether they could assume certain unexpired real property leases.[69]

---

[64] *Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 1065].

[65] *Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of The Bankruptcy Code and (II) Granting Related Relief* [ECF No. 2449].

[66] Exclusivity Motion.

[67] *Id.* at ¶ 2.  As noted above, the Committee understands that the Debtors have to date monetized 128 owned properties and that the 23 leased properties were sold for $82 million.

[68] *Id.*

[69] *Id.* at ¶ 3.

- The Debtors continue to prosecute their objections to MEPP and WARN Act claims, which, if successful, will reduce the unsecured claims pool by $8.0 billion in disallowed claims.[70]

- The Debtors have been served with 334 requests for production and 126 interrogatories.[71]

- The Debtors have negotiated 72 customer setoff agreements, securing $12.6 million in collections on outstanding accounts receivable.[72]

37.    On May 21, 2024, in connection with the Exclusivity Motion, the Committee served discovery on the Debtors seeking the production of relevant documents and deposition notices for a Rule 30(b)(6) witness and Matthew A. Doheny.   As of the date of this Objection, discovery remains on-going, and a deposition of Mr. Doheny has been scheduled for May 31, 2024.

38.    To date, no substantive discussions have taken place between the Debtors and the Committee as to the terms of a potential plan of liquidation, or the timeline on which prosecution of a potential plan of liquidation might proceed.

## **OBJECTION**

### A.    **Legal Standard for Exclusivity Extension**

39.    The Bankruptcy Code limits the period of time during which a debtor has the exclusive right to file a plan and solicit acceptances from creditors.  *See* 11 U.S.C. § 1121(b), (c). A debtor seeking an extension of exclusivity bears the evidentiary burden of proving "cause."  *See, e.g.,* 11 U.S.C. § 1121(d)(1); *In re Lehigh Valley Prof'l Sports Clubs, Inc*., Case No. 00-11296-DWS, 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000).  Bankruptcy Code section 1121(d) provides bankruptcy courts with flexibility to modify any period of exclusivity at their own discretion.  *See First Am. Bank of N.Y. v. Sw. Gloves & Safety Equip., Inc.*, 64 B.R. 963, 965 (D.

---

[70] *Id*. at ¶ 4–5.

[71] *Id*. at ¶ 22.

[72] *Id*. at ¶ 24.

Del. 1986). Although "cause" is not defined in Bankruptcy Code section 1121(d)(1), courts have regularly considered the following factors for determining whether cause exists to terminate or modify exclusivity:

(i)    whether the debtor has made progress negotiating with creditors;

(ii)   whether the debtor is seeking an extension to pressure creditors;

(iii)  whether the debtor is paying its debts as they become due;

(iv)   the size and complexity of the case;

(v)    whether or not unresolved contingencies exist;

(vi)   the necessity of sufficient time to negotiate and prepare adequate information;

(vii)  the existence of good faith progress toward reorganization;

(viii) whether the debtor has demonstrated reasonable prospects for filing a viable plan; and

(ix)   the length of time the case has been pending.

*See e.g., In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) (explaining that while "cause" is not defined in the Bankruptcy Code, courts have developed a list of factors to inform the inquiry, which have come to be called the "*Adelphia* factors"); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002) (considering the above factors); *In re Indianapolis Downs*, No. 11-11046 (BLS), Hr'g Tr. at 56:11-56:14 (Bankr. D. Del. Aug. 26, 2011) [ECF No. 410] (noting that courts consider the various exclusivity factors in a fact-driven analysis).

40.    The mere existence of one or more of the *Adelphia* factors is not sufficient to justify an extension. *See In re Mid-State Raceway, Inc.*, 323 B.R. 63, 67–68 (Bankr. N.D.N.Y. 2005) (citation omitted) ("[T]he court is mindful that whether or not to grant an extension of exclusivity pursuant to [Bankruptcy] Code § 1121(d) is a matter of discretion based on all the facts and

circumstances"). In determining whether to terminate or modify a debtor's exclusivity, "the primary consideration should be whether or not doing so would facilitate moving the case forward." *In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997); *see also Adelphia*, 352 B.R. at 590; *In re Indianapolis Downs*, No. 11-11046 (BLS), Hr'g Tr. at 56:14-56:16 (Bankr. D. Del. Aug. 26, 2011) [ECF No. 410] (explaining that that the analysis comes down to whether or not reasonable progress is being made).

41.  Extensions of exclusivity should "be granted neither routinely nor cavalierly," even in the context of a debtor's first extension request—let alone third request. *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y 1987); see also *In re Borders Grp., Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011) ("A court's decision to extend a debtor's exclusive periods is a serious matter[.]"). Significantly, a "debtor's burden gets heavier with each extension it seeks as well as the longer the period of exclusivity lasts." *Official Comm. of Unsecured Creditors of Mirant Ams. Generation, L.L.C. v. Mirant Corp. (In re Mirant Corp.)*, No. 04-CV-476-A, 04-CV-530-A, 2004 WL 2250986, at *2 (N.D. Tex. Sept. 30, 2004). Moreover, a bankruptcy court's discretion extends not just to whether exclusivity should be extended or terminated, but also to the length of any extension deemed appropriate. *See, e.g.*, *In re Sharon Steel Corp.*, 78 B.R. 762, 763–65 (Bankr. W.D. Pa. 1987) (explaining that, because Bankruptcy Code section 1121(d) provides that a court "may for cause" reduce or increase the exclusive periods, a court may decline to extend exclusivity notwithstanding a showing of "cause"); *see also In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 601 (Bankr. S.D.N.Y. 2014) (explaining that "courts have not hesitated to deny a . . . motion to extend exclusivity where the circumstances warrant it," even if it was the debtor's first such motion).

42.     The Debtors rely on the non-exclusive list of factors set forth in *Adelphia* to support their request for an extension of the Exclusivity Periods, however, substantially all, if not all, of the *Adelphia* factors weigh **against** granting the extension.  For the reasons set forth below, the Debtors have not satisfied their burden of demonstrating that cause exists to extend the Exclusivity Periods by any amount, much less for the 90 days requested.  The Exclusivity Periods should instead be terminated to enable the Committee—as the statutory fiduciary for all unsecured creditors—to propose and prosecute a liquidating plan that will effectuate the transfer of all remaining assets and contested matters to one or more trusts to be overseen by an independent fiduciary or fiduciaries, provide for a waterfall of recoveries to stakeholders in accordance with the absolute priority rule and curtail the excessive administrative costs that continue to accrue in these cases.

**B.     Application of the *Adelphia* Factors Does Not Support Further Extension of Exclusivity**

   **(i)     *Adelphia Factor 1: Whether the Debtors Have Made Progress Negotiating with Creditors (weighs against granting extension)***

43.     The Debtors have not commenced—let alone progressed—negotiations with creditors, and the first *Adelphia* factor weighs strongly against the requested relief.  When considering whether a debtor has made progress negotiating with creditors for purposes of granting an extension of exclusivity, courts look to the subjective perspective of the creditors.  *See In re All Seasons Industries, Inc.*, 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) (considering the creditors' view of the situation without considering whether such view was justified).  Courts will weigh whether creditors have lost confidence in a debtor, or otherwise no longer trust the debtor's management to act capably.  *See id.* (refusing to extend the exclusivity period where creditors had "lost faith in the capability and perhaps the integrity of debtor's management"); *In re Fountain Powerboat Industries*, No. 09-07132-8-RDD, 2009 WL 4738202, at *6 (Bankr. E.D.N.C. Dec. 4,

2009) (considering whether a creditor had lost confidence in the debtors' management when deciding a motion to terminate exclusivity); *In re Samson Resources Corp.*, No. 15-11934 (CSS), Hr'g Tr. 98:16-99:6 (Bankr. D. Del. Sept. 27, 2016) (denying the debtors' motion for an extension of exclusivity where the debtor failed to engage in negotiations with the creditors' committee).

44.     During the first phase of these cases, the Debtors and the Committee were appropriately focused on the sale processes that resulted in the repayment of all of the Debtors' prepetition and postpetition funded debt.  This phase had largely concluded by the end of January 2024, by which time the Court had approved the sales of the Owned Real Estate subject to successful bids at the Debtors' auctions.  Rather than utilize the subsequent time afforded under the Exclusivity Periods to begin to negotiate (or even complete negotiations) regarding the terms of a liquidating plan, the Debtors were singularly focused on litigating with their most significant unsecured creditors.

45.     With the exception of the IBT Litigation, the Committee acknowledges that the disputes presented by the pending litigation matters are undoubtedly important to the resolution of the Debtors' claims pool, and the Committee does not object to the commencement of such matters (or to the Debtors' obligation to defend claims asserted against them, as applicable).  The Committee does, however, object to the Debtors' inappropriate determination to pursue all litigation matters, across all fronts, at all costs—and without giving the parties an opportunity to see if there might be a chance to settle all or any subset of the matters.  Indeed, virtually all of the litigation matters have progressed to a point where the parties know and understand the positions taken by their counterparts, and in the Committee's view, these issues are ripe for, and should be subject to, settlement discussions through mediation.  It is telling that the Debtors refused to extend the relevant litigation deadlines by just 30 calendar days to see if consensual resolutions might be

reached with all or a subset of the significant creditors against whom they have commenced litigation, and the Committee can only conclude that the Debtors are using litigation for an improper purpose.

46.     The Committee believes the Debtors' improper purpose here to be two-fold. First, the Debtors appear to be using these Chapter 11 Cases (and the estates' cash) to pursue their own (or their management team's) agenda to see the IBT held "accountable" for the Company's demise. Indeed, the Debtors have been extraordinarily consistent in claiming that, but for the IBT, the Debtors never would have had cause to commence these Chapter 11 Cases. Beginning with the First Day Declaration and in numerous subsequent pleadings filed in these cases, the Debtors have not missed an opportunity to disparage the IBT and blame it and its members for the Debtors' business failures.[73] Notwithstanding the Debtors' unwavering commitment to the cause, the claims asserted by the Debtors in the IBT Litigation have thus far proven to be wholly without merit. First, the Debtors were denied a temporary restraining order prior to the commencement of these cases when the Kansas District Court determined that the IBT was authorized to strike following the Company's admitted failure to make required pension and health plan contribution payments. Next, the Debtors moved to transfer the IBT Litigation to this Court, presumably because they believed that this Court would be more receptive to their asserted claims. The motion to transfer was denied, with the Kansas District Court noting that there was evidence that the Debtors were engaging in forum shopping.[74] Finally, the Debtors' claims for damages and $1.5 billion for lost

---

[73] *See, e.g.,* First Day Declaration at ¶8 ("[IBT] used Yellow as a sacrificial lamb in an apparent attempt to gain leverage."); Reply Supporting Third, Fourth, and Fifth Omnibus Objections at ¶22 ("Only the IBT's truly irrational conduct pushed Yellow over the brink."); *Id.* at ¶32 ("As none of these transactions closed—primarily because of the IBT's obstinance and surprising willingness to sacrifice 22,000 unionized jobs—Yellow lacked the funds to continue operating."); *Debtors' Opposition to Central States Pension Funds' Motion to Compel Arbitration* [ECF No. 1965] ¶ 11 ("as a result of unconscionable, unforeseen conduct by IBT leadership . . . the Debtors commenced a permanent reduction of their workforce, began clearing their freight network, and ceased substantially all operations.").

[74] *Memorandum and Order* [ECF No. 57] at 16, *Yellow Corp. v. International Brotherhood of Teamsters*, Case No. 23-1131-JAR-ADM (D. Kan. Oct. 12, 2023) attached hereto as <u>Exhibit C</u>.

enterprise value were recently dismissed in their entirety, in connection with which the Kansas District Court granted the unions' motions to dismiss. Notwithstanding these rulings against them, the Debtors have forged ahead, expending millions of dollars in estate resources prosecuting claims against the IBT, including most recently by filing a motion to alter or amend the Kansas District Court's judgment and a motion to amend their complaint. These actions are wholly inconsistent with the Debtors' stated desire to maximize (as opposed to dissipate) value, and they do not support an extension of the Exclusivity Periods.

47. Further, the Debtors' insistence that the IBT is solely responsible for the Debtors' demise ignores the historical financial challenges faced by the Debtors and the multiple lifelines that key stakeholders attempted to extend to the Debtors. For example, from 2009 to 2011, the Debtors' financial problems obligated them to temporarily cease their participation in the Central States Pension Fund and, when participation resumed, the Debtors did so at a fraction of the contribution rate previously paid.[75] In addition, the Debtors' IBT-represented employees were also forced to accept 15% wage cuts to keep the Debtors afloat.[76] Moreover, in 2014, continuing financial troubles resulted in the Debtors seeking to extend their contribution deferral with Central States Pension Fund.[77] Finally, in 2020, the Debtors received a $700 million loan from the United States Treasury to address their long-standing financial challenges.[78] As such, the Debtors have struggled financially and required significant accommodations from their business partners for many years prior to filing these Chapter 11 Cases, and to date they have not provided any evidence to support a finding that the IBT is to blame for the Company's ultimate demise.

---

[75] *Central States Fund's Response to Debtors' Objections to the Funds' Proofs of Claims* [ECF No. 1833] ("Central States' Response") ¶ 15.

[76] *Id.*

[77] *Id.* at ¶ 16.

[78] *Id.* at ¶ 19.

48.    Second, the Committee is increasingly of the view that equity holders (including the Debtors' largest shareholder MFN, who holds two board seats and appears to be in frequent contact with the Debtors) are exercising undue influence over the Debtors' litigation strategy, and that the Debtors have abdicated their duties to act in the best interests of the Debtors' estates in favor of a hail mary attempt to obtain a recovery for equity.  The most compelling evidence supporting the Committee's view is the Debtors' inexplicable refusal to pause any of the litigation pending with respect to any of the contested matters.  This fact is of particular importance here because, based on the Committee's understanding of the Debtors' own claims estimates, the Debtors must prevail on all or virtually all of the issues raised in all or virtually all of the contested matters before equity could even hypothetically be entitled to a recovery in these cases.

49.    As set forth in the DiDonato Declaration,



[79]

[80]

---



50.     The Debtors have also provided estimated ranges for administrative, secured and priority claims ("SPA Claims") on a Professionals' Eyes Only ("PEO") basis to the Committee's advisors as follows: [81]

- Administrative Claims - ████████████████
- Secured Claims – ████████
- Priority Claims – ██████████████

51.     Additionally, as noted above, various creditors also have asserted WARN Act Claims.  The Debtors have estimated that the total union-related WARN Act Claims asserted are approximately $244 million, but for purposes of this analysis and solely for illustrative purposes, the total allowable WARN Act Claims are assumed to be zero.[82] ████████████████

████████████████████████████████

---

[81] *Id.* ¶ 21.
[82] *Id.* ¶ 22.

███████████████████████████████████████████████████████

███████████████████████████████████.[83]

52.    General unsecured claims ("GUCs") filed in these Chapter 11 Cases can generally be separated into two categories:  (1) GUCs subject to, or expected to be subject to, litigation (collectively, "Litigation GUCs"); and (2) non-litigation related GUCs (*i.e.*,  accounts payable claims, former customer claims, contract rejection damage claims, trade creditor claims, and other claims not expected to be subject to material litigation) (collectively "Non-Litigation GUCs").[84]

53.    The Litigation GUCs, as filed, have been asserted in the approximate amount of $10.6 billion and are comprised of the following: [85]

| Claim Category | Claim Amount |
|---|---|
| Single Employer Plans | $      206,098,885 |
| New York State Teamsters Withdrawal Liability | 832,936,718 |
| Non-SFA MEPP Withdrawal Liability | 840,063,338 |
| SFA MEPP Withdrawal Liability (excl. NYS Teamsters and Central States) | 858,620,765 |
| Central States Contractual Guarantee Letter | 917,028,152 |
| DOJ Environmental | 2,134,313,629 |
| Central States Withdrawal Liability | 4,827,470744 |
| **Total** | **$10,616,532,231** |

54.    The Debtors have not provided any estimates of the expected allowed amounts of the Litigation GUCs.[86] ███████████████████████████████████████

---

[83] *Id.* at ¶ 23.

[84] *Id.* at ¶ 24.

[85] *Id.* at ¶ 25.

[86] *Id.* at ¶ 25.

██████████████████████████████████████████████████████████

████████████████. [87]



55.     As stated above, using the high end of the Debtors' most recent assumptions, ██

██████████████████████████████████████████████████████████

████████████████. [88] ██████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████. [89] ████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████. [90]

56.     Stated differently, the Debtors would need to prevail on virtually all of their pending

challenges to all of the WARN Act Claims and Litigation GUCs aside from the Single Employer

Plan claims before any value would potentially be available for a return to equity holders. [91]  Even

---

[87] *Id.* at ¶ 26.

[88] *Id.* at ¶ 27.

[89] *Id.*

[90] *Id*.

[91] *Id.* at ¶ 28.

this scenario does not account for either (i) the claims asserted by the IBT[92], in connection with which analysis remains ongoing, or (ii) claims for postpetition interest, both of which would need to be satisfied before value would be available for equity holders [93]  Given this analysis and the unlikelihood that the Debtors will succeed in reducing their allowed claims pool to such an extreme degree, these Chapter 11 Cases demand that the Debtors consider the value-maximizing path of a consensual resolution.

57.    A settlement, by definition, requires parties to meet somewhere between the goal posts of their respective asserted positions, and any agreement by the Debtors to deviate from their asserted position—as to virtually any disputed matter—would almost certainly result in no recovery for equity.  Equity, therefore, only stands to benefit if the Debtors prosecute—***and win***— virtually every dispute now pending in these cases, leaving the Debtors disincentivized to engage in settlement discussions if the Committee's suppositions are correct.  As a result, the Debtors have not made any settlement progress—opting instead to foster unnecessary animosity and expend millions in incremental professional fees.  Indeed, it is telling that the Debtors seek to justify their requested extension of the Exclusivity Periods on the fact that "[t]he Debtors also have active shareholders, some of whom believe that there should be sufficient value in these Chapter 11 Cases to make a distribution to equity once all of the Debtors' assets are sold and all of the claims against these chapter 11 estates are reconciled."[94]  Notably, the Debtors do not confirm whether their own analyses support equity's view.  These circumstances warrant termination of the Exclusivity Periods.

---

[92] Although not reflected in the foregoing analysis, the IBT also has asserted claims against the Debtors totaling in excess of $3 billion (*see* Claim Nos..17248, 17253, 17258, 17261).  To date, the Debtors have not objected to these claims.  These claims will, however, also need to be paid (or successfully objected to) before equity holders are entitled to receive a recovery.

[93] *Id*.

[94] Exclusivity Motion ¶ 22.

58.     The Committee's concerns as to the foregoing would be more than sufficiently addressed if the Court were to deny the Exclusivity Motion and allow the Committee to formulate and prosecute a liquidating plan.   Among other things, any liquidation plan proposed by the Committee would effectuate:   (1) the distribution of proceeds from the monetization of the Debtors' remaining assets in accordance with the priority scheme set forth in the Bankruptcy Code and (2) the establishment of a liquidation trust combined with the appointment of an independent fiduciary—one without bias or vendetta—who would serve as trustee and make appropriate determinations regarding whether to settle, abandon or pursue the litigation matters to which the Debtors are now party and how best to monetize the Debtors' remaining assets.   A liquidating plan proposed by the Committee consistent with these objectives would enable the Chapter 11 Cases to proceed to conclusion on a timely basis preventing, among other things, the expenditure of tens of millions of dollars in professional fees currently earmarked for the pursuit of scorched-earth litigation and accelerating the distribution of recoveries to stakeholders.

### (ii)     *Adelphia Factor 2:  Whether the Extension is Being Sought to Pressure Creditors (weighs against granting extension)*

59.     The second *Adelphia* factor similarly weighs strongly against the Debtors' requested relief.  Courts have recognized that a debtor's ability to exert undue pressure on creditors through the extension of exclusivity must be monitored and limited. *In re Texaco Inc.,* 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) ("An extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory.") (quoting S. Re. No. 95-989, 95th Cong. 2d Sess. 118 (1978)); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.),* 808 F.2d 363, 372 (5th Cir. 1987) (characterizing Bankruptcy Code section 1121 as "a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say

in the future of that enterprise"), *aff'd*, 484 U.S. 365 (1988).  Further, the legislative history of Bankruptcy Code section 1121 shows that Congress was explicitly concerned in drafting this section that "unlimited exclusivity gave a debtor 'undue bargaining leverage,' because it could use the threat of delay to force unfair concessions." *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 102 (3d Cir. 1988) (*quoting* House Report, 1978 U.S.C.C.A.A.N. at 6191) (emphasis omitted); *In re Timbers,* 808 F.2d at 372 ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.").  Here, this factor weighs against granting an extension because the Debtors are seeking to use the requested extension for the express purpose of pressuring and litigating against their creditors, rather than engaging in constructive settlement or plan negotiations.

60.     As noted above, the Committee takes no issue with the Debtors' determination to commence the pending litigation matters (again, aside from the IBT Litigation), and understands that commencing litigation is often necessary to foster resolution of disputed issues.   The Committee does, however, take issue with the overly-burdensome manner in which the Debtors have determined to pursue that litigation, which of course is highlighted by the Debtors' refusal to pause the schedules governing the contested matters as addressed at length above.  In addition, the Debtors have served extraordinarily burdensome discovery on their litigation counterparties—for example, in the WARN Litigation alone, the Debtors have served ***285 separate requests for admission*** on the IBT, the International Association of Machinists and Aerospace Workers, and other WARN Act claimants, in addition to innumerable document requests and interrogatories, including subpoenas for depositions to President Biden, Senator Bernie Sanders, and the acting U.S. Secretary of Labor in the IBT Litigation.[95]   Moreover, the Debtors have noticed ***11***

---

[95] *See* ECF Nos. 104, 105, and 106, *Yellow Corp. v. International Brotherhood of Teamsters*, Case No. 23-1131-JAR-ADM (D. Kansas March 13, 2024).

depositions in the SFA MEPP Claims Objection litigation alone, with likely **dozens more** to come in the Non-SFA MEPP Claims Objection litigation and WARN Litigation.  These tactics present at least two issues:  first, the Debtors are now expending extraordinary sums of money on various litigation-related processes that might be avoided, in whole or in part, if the parties are able to successfully mediate the underlying disputes; and second, the Debtors' extreme and antagonistic approach (culminating in their refusal to extend the relevant litigation deadlines to provide an opportunity for settlement discussions) has driven parties farther from—not closer to—any consensual resolution of the claims at issue.  The Exclusivity Motion should thus be denied on this basis as well.

### (iii)    *Adelphia Factor 3: Whether the Debtors are Paying Their Debts as They Become Due (weighs against granting extension)*

61.     The inability of a debtor to pay its debts as they become due would typically weigh in favor of terminating exclusivity.  While the Debtors may nominally be able to pay their debts as they come due in these cases (where the debts implicated largely involve the payment of professional fees), the Debtors have a finite pool of assets and are clearly not generating any "new" proceeds other than those obtained through the monetization of their remaining assets—which has virtually stalled.  These cases therefore represent the type of "melting ice cube" scenario that is of particular concern to creditors who would otherwise be entitled to a distribution of the funds that are instead being expended to pay current debts.  The professional fees that have been incurred since the Petition Date are of particular concern—approximately $79.7 million has been billed by the Debtors' professionals alone since the Petition Date.  Moreover, the Debtors' most recent budget projects that the Debtors will spend approximately ███████████████████████ ████████████████████████████████████–a figure that does not account for the extraordinary expense and delay that unsecured creditors will be obligated to bear if the matters

do not settle and all parties exercise their respective appellate rights.[96] The Committee is increasingly of the view that the estates are not receiving a commensurate benefit for the continued expenditure of such significant sums.

62.    In addition, the Debtors—who ceased all business operations prior to the Petition Date—have also made the inexplicable decision to maintain a robust suite of costly senior executives.[97]  Each month, the Debtors pay $325,000 in senior executive salaries to: (i) Darren Hawkins; (ii) Daniel Olivier; (iii) Tony Carreño; and (iv) Matthew Doheny.[98]  The Committee questions why any liquidating debtor would need to retain the services of all of these executives nearly ten months into its chapter 11 case (and indeed without any hope of effectuating a "restructuring" over which a chief restructuring officer would presumably preside, especially given the Debtors' chief restructuring officer's apparent reluctance to engage in cost-saving settlement discussions and focus on losing litigation after litigation against the IBT).

63.    In light of the foregoing, this factor does not support an extension of the Debtors' Exclusivity Periods under these circumstances.

###### (iv)    *Adelphia Factors 4 and 5: Whether the Chapter 11 Cases are Complex and Have any Unresolved Contingencies (weigh against granting extension)*

64.    As evidence in support of the fourth *Adelphia* factor that the Debtors' cases are large and complex, the Debtors cite the complexity of the various pending litigation matters, many of which they themselves commenced.  Significantly, however, courts have found that the existence of litigation alone is not sufficient to justify an extension and, thus, the facts here simply do not support a finding that this factor has been met.  *See In re Southwest Oil Co.*, 84 B.R. 448,

---

[96] DiDonato Declaration ¶ 18, 28.

[97] *Id.* at ¶ 16.

[98] *Id.*

452 (Bankr. W.D. Tex. 1987) ("[T]he fact that litigation is pending with creditors is not in itself sufficient cause to justify an extension of the exclusivity period."); *see also In re R.G. Pharmacy, Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) (denying a debtor's request to extend exclusivity because pending litigation and investigations were not "sufficient to establish the requisite cause for granting an extension[]").

65.     For example, in *Southwest Oil,* the court considered a debtor's motion to extend the exclusivity deadline on the basis that ongoing litigation prevented it from formulating a plan. *In re Southwest Oil Co.*, 84 B.R. at 449. The court determined that the litigation did not constitute cause for an extension because (i) the litigation itself was "no more than predictable creditor litigation," (ii) the litigation was initiated by the debtor, who "should not be allowed to substitute a lawsuit for the filing of a plan" and (iii) the debtor had engaged separate litigation counsel, and thus, could not argue that it did not have time to formulate a plan. *Id.* at 452–53. The facts here are highly analogous to those presented in *Southwest Oil* and support a similar finding. More specifically, the IBT Litigation, the WARN Litigation, and the Claims Objections all constitute "predictable" litigation matters involving the Debtors' most significant unsecured creditors, most of the matters were commenced by the Debtors themselves, and at least one of the matters is being pursued by special litigation counsel (Kasowitz).

66.     Further, where the litigation at issue is unlikely to be completed within the requested extension period, the litigation on its own similarly does not justify the grant of an extension. *See In re Acceptance Ins. Co.,* No. BK05-80059-TJM, 2008 Bankr. LEXIS 2265, at *2 (Bankr. D. Neb. Aug. 20, 2008) (denying an extension of exclusivity because continuing litigation in the case was unlikely to be completed within the requested timeframe for the extension). Here, absent a settlement, the pending litigations will extend well past the 90-day extension requested

by Debtors, which would terminate on September 2, 2024.  In fact, only the SFA MEPP claims, which are scheduled to be tried in early August, could even potentially be resolved by September, whereas the Non-SFA MEPP claims will not proceed to trial until late September and the WARN Litigation will not proceed to trial until mid-December.  Indeed, if a plan is not proposed and the parties do not settle the disputed matters, the Committee understands that most if not all of the parties involved in each of the disputed matters intend to exhaust all appellate rights, including appealing relevant rulings to the U.S. Supreme Court.  As such, the mere existence of pending litigation should not be permitted to delay the development and prosecution of a plan and/or the Debtors' exit from chapter 11.  Any litigation that remains outstanding at the time of confirmation can be transferred to a liquidation trust and resolved on a post-confirmation/post-effective date basis.

67.    In addition, although the size and complexity of a case are relevant considerations, this factor cannot warrant an extension on its own even if the Court were otherwise inclined to find that these Chapter 11 Cases remain large and complex as of the date hereof.  *See*, *e.g.*, *In re Pub. Serv. Co. of N.H.*, 88 B.R. 521, 537 (Bankr. D.N.H. 1988) ("[S]ize and complexity must be accompanied by other factors . . . to justify extension of plan exclusivity . .  ."); *see also Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hosp. (In re Henry Mayo Newhall Mem'l Hosp.),* 282 B.R. 444, 452 (B.A.P. 9th Cir. 2002) (recognizing as "debunked" the view that complex cases require extended exclusivity).  Indeed, when courts view this factor as supporting an extension, the complexity of the cases is generally extreme.  *See, e.g. In re Manville Forest Prods. Corp.*, 31 B.R. 991, 995 (S.D.N.Y. 1983) ("[t]he sheer mass, weight, volume and complication of the Manville filings undoubtedly justify a shakedown period"); *In re McLean*

*Indus., Inc.*, 87 B.R. 830, 835 (Bankr. S.D.N.Y. 1987) ("[T]he complex nature and the size and volume of proceedings in related cases can constitute cause for the extension of exclusivity[.]").

68.     Notwithstanding their stated position, the Debtors effectively concede through the Exclusivity Motion that these cases are no longer complex.  *See* Exclusivity Motion ¶ 2 (discussing how most of the Debtors' assets have been sold off and how all secured debt has been eliminated); Exclusivity Motion ¶ 4 (discussing how the claims pool continues to be reconciled and how pension plans have been merged); Exclusivity Motion ¶ 9 (discussing the Debtors' many accomplishments in these Chapter 11 Cases).  Indeed, these cases are simply not complex—the Debtors are non-operating entities and a majority of the Debtors' assets have now been sold.  Any perceived complexity inherent in the Debtors' pending litigation can easily be addressed by the establishment of a liquidation trust under a plan, which would drastically reduce the number of advisors currently looking to these estates for payment.  Accordingly, the Exclusivity Periods should be terminated to allow the Committee to do that which the Debtors have thus far refused to do—formulate and prosecute a chapter 11 plan.

69.     The Debtors do not expressly address the fifth *Adelphia* factor of whether unresolved contingencies exist.  To the extent the Debtors rely on unresolved litigation, such reliance is misplaced and not a valid justification for the requested relief.  Instead, this factor turns on whether "there are [any] unresolved contingencies that must occur before [the debtor] can propose a plan[,]" which "refers to some event external to the case that must occur or not occur in order for the case to succeed," such as the resolution of non-bankruptcy litigation.  *In re GMG Capital Partners III, L.P.*, 503 B.R. at 603 (citation omitted).  The Debtors have not offered any evidence of unresolved litigation that would preclude them from proposing a plan.  As noted above,

any pending litigation can and should be transferred to a liquidation trust.  Accordingly, this factor similarly does not support the Debtors' requested relief.

> **(v)    *Adelphia Factors 6 and 7: Whether the Debtors Have Had Sufficient Time to Negotiate a Plan and the Existence of Good Faith Progress Toward Reorganization (weigh against granting extension)***

70.    These Chapter 11 Cases have been pending for approximately ten months, during which time the Debtors have had ample opportunity to commence (and indeed conclude) negotiations over the terms of a consensual plan but to date have declined to do so.  Courts routinely deny extensions of exclusivity in cases where the debtors have not shown progress toward a plan.  *In re New Meatco Provisions, LLC*, Case No. 2:13-bk-22155, 2014 WL 917335, at *3 (Bankr. C.D. Cal. Mar. 10, 2014) (granting motion to terminate exclusivity where, among other things, "there is little credible evidence upon which the court can base a finding that [the debtor] will either make further progress in negotiating with creditors or be able to present a plan of liquidation that has creditor support and a prospect at confirmation within a reasonable period of time"); *In re New Millennium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115, at *7 (Bankr. S.D. Tex. Feb. 25, 2014) (rejecting the debtor's motion to extend exclusivity period, pointing to the lack of progress made when denying exclusivity, where the debtor had sufficient time to negotiate a plan, but had not done so, had made little progress toward reorganization and had not demonstrated reasonable prospects for filing a viable plan); *In re Public Svc. Co. of N.H.*, 99 B.R. 155, 175–77 (Bankr. D.N.H. 1989) (denying the motion to extend exclusivity when the court considered that the stalemate between the debtor and a creditor would not promote a consensual plan within a reasonable time frame).

71.    The Debtors' extensive litigation efforts have been addressed at length in the preceding sections of this Objection.  Notwithstanding those efforts, the Debtors undoubtedly have the capacity and the capability to dual or even triple-track a number of different work-streams to

minimize the timeline and costs of these cases.  These work-streams could and should include settlement discussions with the parties they are litigating against, efforts to accelerate the monetization of the Debtors' remaining assets and the development of a liquidating chapter 11 plan that utilizes those monetization strategies to effectuate plan distributions in accordance with the absolute priority rule.

72.    The Debtors have clearly had sufficient time to advance a chapter 11 plan process that would bring these cases to conclusion, but they simply have not done so.  Therefore, this factor has not been satisfied and the Exclusivity Periods should be terminated.

### (vi)    *Adelphia Factor 8: Whether the Debtors Have Demonstrated Reasonable Prospects for Filing a Viable Plan (weighs against granting extension)*

73.    As described above in connection with other factors, the Debtors have not demonstrated that they possess the ability, within any reasonable time frame, to propose a plan of liquidation and secure the necessary creditor support to confirm any such plan.  Indeed, in the Exclusivity Motion, the Debtors are unable to offer, let alone commit, to ***any*** timeline for a plan and simply say "the Debtors intend to do so as soon as they are able."[99]  Given that the Debtors have made no progress—demonstrable or otherwise—in proposing a viable plan, this factor similarly supports termination of the Exclusivity Periods.  Indeed, a simple waterfall plan that complies with the absolute priority rule is relatively easy to construct and prosecute on a reasonable time frame.  Of course, the Debtors know that to obtain the acceptance of such a plan, the votes of unsecured creditors would be required and, while unsecured creditors undoubtedly would vote to accept a waterfall plan, they also would want to select the independent fiduciary that would be the liquidating trustee.  Could it be that the Debtors are not filing a plan because they want to pursue their own agenda, one that is not in accord with basic tenets upon which the Bankruptcy Code is

---

[99] Exclusivity Motion ¶ 8.

based: negotiation, compromise and maximization of value? *See In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (holding that "[s]ettlements are generally favored in bankruptcy" because "[t]hey minimize litigation and expedite administration of the estate[]"); *see also In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (holding the same); *Key3Media Grp., Inc. v. Pulver.com, Inc. (In re Key3Media Grp., Inc.)*, 336 B.R. 87, 93 (Bankr. D. Del. 2005) (noting that "to minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy"). This factor weighs against extending the Exclusivity Periods.

### (vii) *Adelphia Factor 9: The Length of Time the Cases Have Been Pending (weighs against granting extension)*

74. The Debtors' Chapter 11 Cases have been pending for almost ten months and this is the Debtors' **third** request for an extension of their Exclusivity Periods. The Committee notes, yet again, that there has been no progress of any kind towards a plan of liquidation and the Debtors can no longer point to their robust sale processes to support a further extension.[100] Moreover, the Debtors' proposed extension would extend the Exclusivity Periods more than a year beyond the Petition Date, which highlights the length of time these cases have been pending. These circumstances therefore do not support an extension of the Debtors' Exclusivity Periods. *See e.g., In re GMG Capital Partners III, L.P.*, 503 B.R. at 601 (denying the debtor's first motion to extend exclusivity and noting that the debtor had sufficient time to formulate a plan); *In re New*

---

[100] *See Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code* [ECF No. 2131] ¶ 1 ("On December 12, 2023, following a robust postpetition marketing process and a tremendously successful auction, the Court entered an order approving the sale of one-hundred and thirty (130) properties—approximately three-quarters of Yellow's owned real estate portfolio . . . allowing the Debtors to pay off the B-2 Term Loan and the Prepetition ABL Facility following the closing of those sales. In addition, on January 12, 2024, following another robust postpetition marketing process and tremendously successful auction, the Court entered an order approving the sales of twenty-three (23) leased properties to six (6) winning bidders for an aggregate purchase price of approximately $90 million[.]"); *Id*. at ¶ 2 ("Despite these monumental achievements, there remains substantial work to be done . . . . By way of example, the Debtors are in the midst of . . . continuing the marketing and sale process for approximately 160 remaining owned and leased properties[.]").

*Millennium Mgmt., LLC*, 2014 WL 792115, at *7 (Bankr. S.D. Tex. Feb. 25, 2014) (rejecting

debtor's first motion to extend exclusivity as the debtor had sufficient time to negotiate a plan, but

had not done so).

**C.   Denying the Exclusivity Motion Will Move the Cases Forward for the Benefit of the Estates and Will Not Prejudice the Debtors.**

75.   The factors recited above each weigh against granting the Debtors' requested

extension under the circumstances of these Chapter 11 Cases.   While these factors are all

significant in the Court's consideration of the Exclusivity Motion, a "primary consideration" in

determining whether to terminate exclusivity is whether doing so will "facilitate moving the case

forward." *In re Dow Corning Corp.,* 208 B.R. at 670; *In re Adelphia Communications Corp.*, 352

B.R. at 590 ("[T]he test is better expressed as determining whether terminating exclusivity would

move the case forward materially, to a degree that wouldn't otherwise be the case."); *see also In*

*re Pliant Corp.*, Case No. 09-10443(MFW), Hr'g Tr. at 228:13-230:6 (Bankr. D. Del. June 30,

2009) [ECF No. 765] (denying an exclusivity extension and finding there may be value in pressing

two competing plans).   There can be no doubt that terminating exclusivity is in the interests of

moving these Chapter 11 Cases forward.

76.   The Committee is prepared to propose its own liquidating plan to bring these cases

to conclusion.   All of the remaining activity in the Chapter 11 Cases directly impacts recoveries to

unsecured creditors.   Therefore, the Committee and unsecured creditors (whose interests the

Committee represents) have the highest degree of motivation to propose a viable liquidating plan.

The Committee is ready for the plan process to commence and is willing to lead the charge.   The

process is not complex—a liquidating plan will be straightforward and can be prepared in a

relatively short period of time.   Denying the Debtors' requested extension will allow the

Committee to move swiftly and progress these Chapter 11 Cases towards conclusion.

77.     In addition, it is well established that terminating the Debtors' Exclusivity Periods will not prejudice the Debtors.  *In re All Seasons Industries, Inc.*, 121 B.R. at 1005 (noting that terminating exclusivity "affords creditors their right to file the plan; there is no negative effect upon the debtor's co-existing right to file its plan"); *In re Mother Hubbard, Inc.*, 152 B.R. 189, 195 (Bankr. W.D. Mich. 1993) (holding that termination of exclusivity is not prejudicial to the debtor because the debtor retains the ability to attempt to confirm its own plan); *In re Grossinger's Assocs.*, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) (holding that termination of exclusivity does not foreclose the debtor from proposing a plan, it only means that the right to propose a plan will not be exclusive with the debtor); *In re R.G. Pharmacy, Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) ("The fact that the debtor no longer has the *exclusive* right to file a plan does not affect its concurrent right to file a plan." (emphasis in original)).

78.     The Debtors and their unsecured creditors are the only constituencies that are necessary for plan negotiations, though the Committee encourages MFN's participation.  This is a unique opportunity that is not present in other cases with complex capital structures and various tranches of secured debt.  Because these Chapter 11 Cases essentially constitute a liquidation proceeding that is now being pursued for the benefit of unsecured creditors, there is no rational reason for the Debtors to maintain sole control over the plan process.  *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 161 (Bankr. D. Me. 1982) (holding that shortening exclusive periods to permit parties in interest to file a plan was in the "interests of all creditors and the interests of the debtor").

79.     As the Debtors will not be prejudiced by allowing other parties to propose a plan at this stage, and in light of the other reasons set forth herein, the Debtors' Exclusivity Motion should be denied.

## <u>RESERVATION OF RIGHTS</u>

80.     This Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights, claims, defenses and remedies, including the right to amend, modify or supplement this Objection, including based on the results of discovery and to introduce evidence at any hearing relating to the Exclusivity Motion and without in any way limiting any other rights of the Committee to further object to the Exclusivity Motion, on any grounds, as may be appropriate.

## <u>CONCLUSION</u>

**WHEREFORE**, the Committee respectfully requests that the Court deny the relief requested in the Exclusivity Motion and grant such other relief as is just, proper and equitable.

Date:  May 28, 2024
Wilmington, Delaware

**BENESCH, FRIEDLANDER,**
    **COPLAN & ARONOFF LLP**

 */s/ John C. Gentile*
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile:  (302) 442-7012
E-mail:   jhoover@beneschlaw.com
        kcapuzzi@beneschlaw.com
        jgentile@beneschlaw.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Philip C. Dublin (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
Joseph Sorkin (admitted *pro hac vice*)
Kevin Zuzolo (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: pdublin@akingump.com
      aqureshi@akingump.com
      mlahaie@akingump.com
      jsorkin@akingump.com
      kzuzolo@akingump.com

*Counsel to the Official Committee*
*of Unsecured Creditors of Yellow Corporation, et al.*