**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON SFA MEPPS'
WITHDRAWAL LIABILITY CLAIMS**

---

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES
LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com
              pkeane@pszjlaw.com
              ecorma@pszjlaw.com

*Co-Counsel for the Debtors and Debtors in
Possession*

Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
Shirley Chan (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
333 W. Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        pnash@kirkland.com
              dseligman@kirkland.com
              mslade@kirkland.com
              shirley.chan@kirkland.com


Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email:        michael.esser@kirkland.com
              john.christian@kirkland.com

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ....................................................... 3

A.     THE LEGISLATIVE HISTORY OF ERISA DOES NOT SUPPORT THE PBGC'S PHASE-IN REGULATION OR EXERCISE OF AUTHORITY. .................... 3

      i.     ERISA Imposes "Withdrawal Liability" on Employers Who Withdraw. .............. 3

      ii.    MEPPs Must Calculate Withdrawal Liability in Accordance with ERISA............ 5

      iii.   Congress Enacts ARPA to Solve the SFA MEPPs' Problems. .............................. 7

      iv.   Congress Considered But Did Not Include a SFA "Phase-In" within ARPA. ....................................................................................................... 8

      v.    The PBGC Unilaterally Promulgates Its Own SFA Phase-In Regulation. ............. 9

B.     THE PENSION PLANS APPLIED FOR AND RECEIVED BILLIONS OF DOLLARS IN TAXPAYER-SUBSIDIZED SPECIAL FINANCIAL ASSISTANCE. ...................................................................................... 11

C.     THE DEBTORS COMMENCED THESE CHAPTER 11 CASES, AND THE PENSION PLANS FILED 174 PROOFS OF CLAIM SEEKING MORE THAN $6.5 BILLION IN WITHDRAWAL LIABILITY ............................................... 15

      i.     The Pension Plans Excluded Billions of Dollars in SFA Funding from Their "Assets" in Performing UVB Calculations. ................................................ 15

      ii.    Most of the Pension Plans Failed to Apply Required Statutory Caps on Debtors' Withdrawal Liability............................................................... 16

      iii.   New York Teamsters and Western PA Teamsters Used Improper Allocation or Other Calculation Methods in Calculating Debtors' Withdrawal Liability........................................................................... 18

      iv.   The Pension Plans Failed to Discount Their Claims to Net Present Value. ......... 21

LEGAL STANDARDS .................................................................................... 21

ARGUMENT ................................................................................................... 22

A.     THE COURT SHOULD REQUIRE THAT THE SFA MEPPS DISREGARD PBGC'S PHASE-IN REGULATION IN CALCULATING DEBTORS' WITHDRAWAL LIABILITY. ............................................................................................... 22

i.    PBGC Exceeded Its Congressionally Delegated Authority in Passing a
Regulation Inconsistent with ERISA. ........................................................................ 22

ii.   The PBGC Regulation is Arbitrary and Capricious. .................................................... 31

B.    THE PENSION PLANS' PROOFS OF CLAIM FOR WITHDRAWAL LIABILITY
MUST BE REDUCED TO COMPLY WITH ERISA'S REQUIREMENTS. .......................... 33

i.    The 20-Year Cap Should Be Applied to the Proofs of Claim of Ten Pension
Plans. ......................................................................................................................... 33

ii.   New York State Teamsters and Western PA Teamsters Improperly
Allocated Debtors' UVBs or Calculated Debtors' Withdrawal Liability
Using Imputed Contribution Rates and CBUs. ........................................................... 37

C.    THE SFA MEPPS' PROOFS OF CLAIM SHOULD BE REDUCED TO THEIR NET
PRESENT VALUE. ......................................................................................................... 39

CONCLUSION ........................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*,
33 F.C.C. Rcd. 9088 (2018) ...............................................................................35

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...........................................................................................21

*Associated Gen. Contractors of Am. et al. v. U.S. Dep't of Labor*,
No. 5:23-cv-272-C, Dkt. 61 (N.D. Tex. June 24, 2024) .....................................30

*In re B456 Sys., Inc.*,
2017 WL 6603817 (Bankr. D. Del. Dec. 22, 2017) ............................................40

*Bintz v. Fed. Emergency Mgmt. Agency*,
413 F. Supp. 3d 349 (D. Del. 2019) ...................................................................22

*Caesars Entm't Corp. v. Int'l Operating Eng'rs Local 68 Pension Fund*,
932 F.3d 91 (3d Cir. 2019) ...................................................................................4

*Caminetti v. United States*,
242 U.S. 470 (1917) ...........................................................................................25

*Camp v. Pitts*,
411 U.S. 138 (1973) ...........................................................................................21

*Cellco P'ship v. White Deer Twp. Zoning Hearing Bd.*,
74 F.4th 96 (3d Cir. 2023) .................................................................................35

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...........................................................................................21

*Cent. States Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*,
620 F.3d 766 (7th Cir. 2010) ........................................................................36, 37

*Chesapeake & Ohio Ry. Co. v. Kelly*,
241 U.S. 485 (1916) ...........................................................................................40

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ...........................................................................................23

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992) ...........................................................................................25

*Connolly v. PBGC,*
  475 U.S. 211 (1986)..............................................................1, 3

*Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund,*
  572 U.S. 782 (2018)...................................................................4

*EBC Inc. v. Clark Bldg. Sys., Inc.,*
  618 F.3d 253 (3d Cir. 2010)...................................................21

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021)............................................................32, 33

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000)................................................................31

*In Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. D & A Bus Co.,*
  270 F. Supp. 3d 593 (E.D.N.Y. 2017) ..................................41

*INS v. Cardoza-Fonseca,*
  480 U.S. 421 (1987)................................................................26

*INS v. Phinpathya,*
  464 U.S. 183 (1984)................................................................25

*Judulang v. Holder,*
  565 U.S. 42 (2011)..................................................................32

*La. Pub. Serv. Comm'n v. FCC,*
  476 U.S. 355 (1986)................................................................23

*Loper Bright Enters., Inc. v. Raimondo,*
  603 U.S. __, 2024 WL 3208360 (June 28, 2024) ...............22, 23, 25, 26

*In re Luna,*
  406 F.3d 1192 (10th Cir. 2005) ............................................24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)............................................................32, 33

*In re O.P.M Leasing Servs., Inc.,*
  79 B.R. 161 (S.D.N.Y. 1987)..................................................40

*Matter of Penn Central Transp. Co.,*
  596 F.2d 1102 (3d Cir. 1979)................................................40

*Ragsdale v. Wolverine World Wide, Inc.,*
  535 U.S. 81 (2002)..................................................................30

*Rodriguez v. United States,*
   480 U.S. 522 (1987) ................................................................................4

*Russello v. United States,*
   464 U.S. 16 (1983) ...............................................................................28

*Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund,*
   15 F.4th 407 (6th Cir. 2021) .................................................................3

*Till v. SCS Credit Corp.,*
   541 U.S. 465 (2004) ............................................................................40

*Trs. of Leather Goods, Plastics, Handbags, & Novelty Workers Union Local 1
   Joint Ret. Fund v. Key Handling Sys. Inc.,*
   2015 WL 5604178 (Sept. 23, 2015) ...............................................37, 41

*United States v. Smukler,*
   991 F.3d 472 (3d Cir. 2021) ................................................................24

*Utility Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) ............................................................................31

*W. Va. v. EPA,*
   597 U.S. 697 (2022) ..............................................................26, 30, 31

*Whitman* v. *Am. Trucking Ass'ns., Inc.,*
   531 U. S. 457 (2001) ...........................................................................31

**Statutes**

5 U.S.C. § 706(2) .........................................................................22, 23, 34

29 U.S.C. §1085 ...........................................................................27, 28, 40

29 U.S.C. § 1381(b) .......................................................................4, 5, 34, 35

29 U.S.C. § 1386 ...................................................................................5

29 U.S.C. § 1389 ...................................................................................5

29 U.S.C. § 1391(c)(5)(A) ..............................................................5, 34, 38, 39

29 U.S.C. § 1393(c) ..............................................................................24

29 U.S.C. § 1396(b) ..............................................................................34

29 U.S.C. § 1399(c) .......................................................................5, 6, 35, 38

29 U.S.C. § 1400(a) ..............................................................................38

29 U.S.C. § 1405 ..................................................................................................5

29 U.S.C. § 1432(j)(1) ..........................................................................................7

29 U.S.C. § 1432(l) ..........................................................................................5, 23

29 U.S.C. § 1432(m)(1) ........................................................................7, 23, 29, 32

**Rules**

Fed. R. Civ. P. 56 ................................................................................................21

**Other Authorities**

29 C.F.R. § 4211.4 .............................................................................................38

29 C.F.R. § 4211.11 .......................................................................................5, 38

29 C.F.R. § 4211.12 .......................................................................................5, 38

29 C.F.R. § 4211.13 .......................................................................................5, 38

29 C.F.R. § 4211.23(b) .....................................................................................39

29 C.F.R. § 4262.16(g) ...............................................................................8, 9, 25

29 C.F.R. § 4262.16(h) ....................................................................................7, 29

126 Cong. Rec. H12180 (May 22, 1980) ............................................................4

86 Fed. Reg. 36598 (July 12, 2021) .........................................................9, 10, 32, 33

87 Fed. Reg. 40968 (July 8, 2022) .....................................................................9, 31, 32

88 Fed. Reg. 4900 (Jan. 26, 2023) ....................................................................11

*Assets*, BARRON'S DICTIONARY OF BUSINESS AND ECONOMICS TERMS (5th ed. 2012) ...................24

*Assets*, BLACK'S LAW DICTIONARY (6th ed. 1990) ............................................24

*Assets*, BLACK'S LAW DICTIONARY 112 (7th ed. 1999) ....................................24

*Assets*, BLACK'S LAW DICTIONARY, *available at*
    https://thelawdictionary.org/asset-2/ (last visited July 3, 2024) ...........................24

*Condition*, AMERICAN HERITAGE DICTIONARY, *available at*
    https://www.ahdictionary.com/word/search.html?q=condition (last visited
    July 3, 2024) ..................................................................................................29

*Condition*, MERRIAM-WEBSTER DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/condition (last visited July 3, 2024) .................................................29

Congressional Research Service, "The Budget Reconciliation Process: The Senate's 'Byrd Rule'" (Sept. 28, 2022) .......................................................................................8

DICTIONARY OF BUSINESS AND ECONOMICS TERMS (5th ed. 2012) ..............................................24

H.R. 1319 § 9704(Engrossed in House, March 3, 2021)......................................................8, 9, 30

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by and through their undersigned counsel hereby, move this Court for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 and Federal Rules of Bankruptcy Procedure 7056 and 9014.

## INTRODUCTION

1.      In 2021, following 40 years of failed efforts to save struggling multiemployer pension plans ("**MEPPs**") from themselves, Congress passed its most drastic measure yet: legislation authorizing the Pension Benefit Guaranty Corporation ("**PBGC**") to award qualifying MEPPs billions of dollars in taxpayer funding—federal grants with no repayment obligations, ensuring that those MEPPs could pay all expenses and benefits for at least the next three decades.

2.      This dispute concerns 11 MEPPs that received such funding.[2]   The Debtors contributed to them for decades before filing for chapter 11 protection in August 2023.  The SFA MEPPs collectively received *$41.1 billion* in government bailouts (collectively, the "**SFA**") over the last two years and, by their own admission and as a direct result of such bailouts, are solvent and currently have little to no unfunded vested benefits (or "**UVBs**") (nonforfeitable liabilities less assets available to pay benefits and plan expenses).  The SFA MEPPs either are or will be nearly 100% funded—in some cases more than 100% funded—regardless of whether they recover anything through these bankruptcy proceedings.

---

[2]    These plans (collectively, the "**SFA MEPPs**") include Central States Pension Fund ("**Central States**"), Freight Drivers and Helpers 557 Pension ("**Freight Drivers**"); International Association of Motor City Machinists Pension Fund ("**IAM**"); Management Labor Pension Fund Local 1730 ("**Local 1730**"); Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund ("**Local 701**"); New York State Teamsters Conference Pension & Retirement Fund ("**New York Teamsters**"); Road Carriers Local 707 Pension Fund ("**Local 707**"); Teamsters Local 617 Pension Plan ("**Local 617**"); Teamsters Local 641 Pension Plan ("**Local 641**"); Trucking Employees of North Jersey Pension Fund ("**TENJ**"); Western Pennsylvania Teamsters and Employers Pension Fund ("**Western PA Teamsters**").

3.      Yet the SFA MEPPs filed proofs of claim against the Debtors seeking *$6.5 billion* in withdrawal liability—money that the plans do not (and will not) need to pay plan expenses or participants' benefits in the future.  The SFA MEPPs insist that, notwithstanding the demonstrable lack of UVBs, they can pursue this windfall at the expense of other creditors because of a PBGC regulation that purports to change Congress's statutorily established formula for calculating UVBs. This regulation purports to allow these MEPPs to pretend that the bailout funding they received— funds that sit on their balance sheets and that the MEPPs have already invested and used to pay expenses and benefits—is in whole or part not a plan "asset" for purposes of calculating UVBs.[3]

4.      This PBGC regulation provides no shelter for the SFA MEPPs and is unlawful for two independent reasons.  *First*, the PBGC exceeded its statutory authority by attempting to rewrite the definition of plan "assets" as it relates to various UVB calculation methods in the Employee Retirement Income Security Act of 1974 ("**ERISA**").  *Second*, the regulation is arbitrary and capricious.  These are issues of law ripe for summary judgment.

5.      Two other issues of law are also ripe for summary judgment: whether the SFA MEPPs can disregard ERISA's statutory caps on withdrawal liability claims due to the Debtors' alleged "default," and whether the SFA MEPPs can use unauthorized annual withdrawal liability payment calculation methods, or use statutorily disregarded contribution rate increases in such payment calculation methods, to artificially inflate the Debtors' withdrawal liability.  As set forth more fully below, the answer to both these questions (as a matter of law) is no, and the Court should order that the SFA MEPPs' claims be reduced in a manner consistent with ERISA.

---

[3]    Under the current PBGC regulations, SFA is phased-in over a number of years as an included plan asset in the UVB calculation.  However, because of the timing of the Debtors' withdrawal in relation to the SFA MEPPs' receipt of SFA, the PBGC regulation provides that none of the SFA is included as a plan asset in calculating UVBs in the SFA MEPPs' determination of the Debtors' withdrawal liability, even though it is indisputably an asset on the SFA MEPPs' balance sheet that is available to pay plan expenses and benefits.

6.      In sum, for the reasons set forth here and the Debtors' previously-filed objections[4], the Court should grant partial summary judgment in favor of the Debtors.

## STATEMENT OF UNDISPUTED FACTS

**A.      The Legislative History of ERISA Does Not Support the PBGC's Phase-In Regulation or Exercise of Authority.**

i.      *ERISA Imposes "Withdrawal Liability" on Employers Who Withdraw.*

7.      ERISA sets forth a comprehensive scheme to regulate multiemployer pension plans.  ERISA established reporting and disclosure requirements, minimum funding standards, fiduciary duties, and termination insurance.  It also established the PBGC, an administrative agency under the Department of Labor that manages the plan termination insurance program and, in some situations, provides a backstop of certain plan obligations.

8.      In the late 1970s, Congress directed the PBGC to report on the challenges of insuring MEPPs and propose legislative solutions.  *See Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs Pension Fund*, 15 F.4th 407, 415 (6th Cir. 2021).  PBGC found that ERISA did not adequately protect multiemployer plans from individual employer withdrawals.  *Id*.  The problem was that "[e]mployer withdrawals reduce[d] a plan's contribution base," which would "push[] the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan." *Id*. (quoting *Connolly v. PBGC*, 475 U.S. 211, 216 (1986)).  Such increased rates would encourage further withdrawals, "thereby increasing the inherited liabilities to be funded by an ever decreasing contribution base" and creating a "vicious downward spiral." *Id*.

---

[4]      Debtors' Objection to the Proofs of Claim Filed by the Central States Pension Fund [ECF No. 1322] ("**CSPF Objection**"); Debtors' Second Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability [ECF No. 1962] ("**Omnibus Objection**," and together with the CSPF Objection, the "**Objections**").

3

9.      The PBGC thus recommended imposing withdrawal liability on employers leaving

MEPPs, "requiring them to pay for their fair share of the plan's unfunded liabilities." *Id*. at 416.

Congress incorporated that recommendation into the Multiemployer Pension Plan Amendments

Act of 1980 ("**MPPAA**").  But nothing in the legislative history or congressional findings suggests

that withdrawal liability was meant to punish withdrawing employers or provide a windfall for any

MEPP.  Instead, withdrawal liability has always had one purpose: for the withdrawing employer

to "fund a reasonable share of the plan's unfunded vested obligations."  126 Cong. Rec. H12180

(May 22, 1980).

10.      Similarly, the Third Circuit has recognized that a MEPP's ability to recover

withdrawal liability is not limitless.  *See Caesars Entm't Corp. v. Int'l Operating Eng'rs Local 68

Pension Fund*, 932 F.3d 91, 97 (3d Cir. 2019) (citing *Rodriguez v. United States*, 480 U.S. 522,

526 (1987) (*per curiam*)) (rejecting a MEPP's effort to assess partial withdrawal liability where

under the statutory definition, no partial withdrawal had occurred).  Instead, Congress "wrote the

statute it wrote—meaning, a statute going so far and no further." *Id.* at 98 (quoting *Cyan, Inc. v.

Beaver Cty. Emps. Ret. Fund*, 572 U.S. 782, 794 (2018)).

11.      Relevant here, ERISA defines withdrawal liability as a withdrawing employer's

"allocable amount of unfunded vested benefits," subject to certain adjustments.  29 U.S.C.

§ 1381(b)(1).  ERISA further defines "unfunded vested benefits" as "an amount equal to – (A) the

value of nonforfeitable benefits under the plan, less (B) the value of the assets of the plan." *Id.* at

§ 1393(c).  These words are not ambiguous.  By statutory definition, the more assets a MEPP has

available to it compared to its liabilities and projected expenses, the less UVBs the MEPP has.

Further, by definition, if the MEPP's assets are equal to or greater than its liabilities and expenses,

then the MEPP has no UVBs.

ii.    *MEPPs Must Calculate Withdrawal Liability in Accordance with ERISA.*

12.    ERISA provides a multi-step process for determining withdrawal liability.  The first step requires MEPPs to determine the amount of their UVBs (if any), 29 U.S.C. § 1381(b)(1), which ERISA defines as "an amount equal to [] the value of nonforfeitable benefits under the plan, less [] the value of the assets of the plan," *id*. at § 1393(c).

| UVBs = Nonforfeitable Benefits - Assets |
|---|

13.    Notably, while the statutory term "assets" is not separately defined, Congress has specifically called SFA a plan asset.  *See* 29 U.S.C. § 1432(l) (". . . [SFA] and any earnings on such assistance shall be segregated from ***other plan assets***") (emphasis added).  Where Congress wanted to distinguish SFA from other "plan assets," it did so; it did not when defining UVBs.

14.    If a MEPP has UVBs, the MEPP's next step in calculating withdrawal liability is to allocate a portion of its total UVBs to the withdrawn employer.  *See id*. at § 1381(b)(1).  ERISA requires a MEPP to use one of four different UVB allocation methods to do so, *see* 29 U.S.C. § 1391, 29 C.F.R. § 4211.11–13, unless the MEPP obtains authorization from PBGC to use an alternative allocation method, 29 U.S.C. § 1391(c)(5)(A) ("[PBGC] shall prescribe by regulation a procedure by which a [MEPP] may, by amendment, adopt any other alternative method for determining an employer's allocable share of [UVBs] under this section, subject to the approval of [PBGC] based on its determination that adoption of the method by the [MEPP] would not significantly increase the risk of loss to plan participants and beneficiaries or to the corporation").

15.    Once the MEPP has allocated a portion of its UVBs to the withdrawn employer using any of the ERISA-prescribed allocation methods and/or an authorized alternative method, the MEPP's next step is to make certain final adjustments to the allocated UVBs as applicable.  *Id*. § 1381(b)(1)(A)–(D).  These adjustments include (i) any *de minimis* reduction required under 29

U.S.C. § 1389; (ii) adjustments for partial withdrawals under 29 U.S.C. § 1386; (iii) application of the 20-year cap on annual payments under 29 U.S.C. § 1399(c)(1)(B); and (iv) any limitations on withdrawal liability set forth in 29 U.S.C. § 1405 ("**Applicable Adjustments**").

16.    Once a MEPP has made all Applicable Adjustments to the employer's allocable UVBs, the resulting amount is the employer's total withdrawal liability.  29 U.S.C. § 1381(b)(1).

> Withdrawal Liability = Allocable UVBs - Applicable Adjustments

17.    The third Applicable Adjustment—the 20-year cap on annual payments—applies by statute in all cases except a "mass withdrawal."[5]  29 U.S.C. § 1399(c)(1)(D).  Outside of a mass withdrawal, to determine the amount of a withdrawn employer's withdrawal liability, a MEPP must prepare an annual payment schedule.  If, under this schedule, the withdrawn employer would have to make more than 20 annual payments to fully amortize its allocable UVBs and any applicable interest, then the amount of the withdrawn employer's withdrawal liability is equal *only* to the sum of the first 20 such payments.  *See* 29 U.S.C. § 1399(c)(1)(B).

> If Allocable UVBs > 20 x Annual Payment, Then Withdrawal Liability = 20 x Annual Payment

18.    The amount of each annual payment is a product of (i) the employer's highest average contribution base units ("**CBUs**") over three consecutive plan years during the 10 preceding consecutive plan years ending before the plan year of withdrawal ("**Highest Average CBUs**"), and (ii) the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 preceding plan years ending with the plan year of withdrawal ("**Highest Contribution Rate**").  *See* 29 U.S.C. § 1399(c)(1)(C)(i).

> Annual Payment = Highest Average CBUs x Highest Contribution Rate

---

[5]    Only one of the 11 SFA MEPPs – Local 1730 – claims to have experienced a mass withdrawal as a result of Debtors' bankruptcy and withdrawal from the fund.  *See* Slade Decl., Ex. 36 (Local 1730's Response to ROG No. 8) ("[T]he fund states that the 20-year cap does not apply because a mass withdrawal occurred.").

19.     Still, where a withdrawn employer is in "default," the multiemployer plan "may require immediate payment of the outstanding amount of an employer's withdrawal liability," plus any accrued interest. *See* 29 U.S.C. § 1399(c)(5). ERISA defines default to mean "the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days . . . and . . . any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." *Id.*

      iii.    *Congress Enacts ARPA to Solve the SFA MEPPs' Problems.*

20.     On March 11, 2021, Congress passed the American Rescue Plan Act ("**ARPA**"), which established a program to save and secure what were then severely underfunded MEPPs in critical status. Under ARPA, eligible MEPPs can receive special financial assistance in the amount needed to pay its participants' full plan benefits through at least 2051. 29 U.S.C. § 1432(j)(1). There is no cap on the amount of financial assistance that the PBGC can grant to an eligible MEPP. *See id.* at § 4262(i)(2). In fact, the very purpose of the legislation was to save failing MEPPs and to ensure that all promised benefits were and are paid. Any SFA paid to a MEPP under ARPA does not have to be repaid. *Id.* § 4262(a)(2).

21.     ARPA also gave the PBGC authority to adopt "reasonable conditions" on MEPPs that receive SFA. The reasonable conditions that PBGC is permitted to adopt include reasonable conditions relating to withdrawal liability. 29 U.S.C. § 1432(m)(1) ("The corporation, in consultation with the Secretary of the Treasury, may impose, by regulation or other guidance, ***reasonable conditions on an eligible multiemployer plan*** that receives special financial assistance ***relating to*** increases in future accrual rates and any retroactive benefit improvements, allocation of plan assets, reductions in employer contribution rates, diversion of contributions to, and allocation of expenses to, other benefit plans, and ***withdrawal liability***.") (emphases added). The

7

PBGC has since adopted one relevant "reasonable condition" on "plans" related to withdrawal liability: requiring that plans get PBGC approval to settle withdrawal liability claims in excess of $50 million. 29 C.F.R. § 4262.16(h). But the PBGC has also stretched 29 U.S.C. § 1432(m)(1) beyond all recognition, enacting a SFA "phase-in" regulation that is *not* a "condition" on "plans" at all, but rather—as described in more detail below—a back-door amendment to ERISA's plain language that Congress considered and affirmatively rejected. 29 C.F.R. § 4262.16(g)(2).

      iv.    *Congress Considered But Did Not Include a SFA "Phase-In" within ARPA.*

22.    ARPA was passed as a reconciliation measure using the expedited procedures available under the Congressional Budget Act of 1974. *See* H.R. Rep. 117-7 at 3 (Feb. 24, 2021). Under the Byrd Rule, the Senate will not consider a bill eligible for reconciliation if it contains provisions that are "extraneous" to the goal of deficit reduction. *See* Congressional Research Service, "The Budget Reconciliation Process: The Senate's 'Byrd Rule'" at 5 (Sept. 28, 2022).

23.    The initial version of ARPA passed in the House contained a provision regarding future calculation of withdrawal liability in plans receiving SFA. It provided:

> [A]n employer's withdrawal liability for purposes of this title shall be calculated without taking into account special financial assistance received under this section until the plan year beginning 15 calendar years after the effective date of the special financial assistance.

H.R. 1319 § 9704(l) (Engrossed in House, March 3, 2021). But during consideration of ARPA under reconciliation rules in the Senate, the Senate Parliamentarian determined that this provision violated the Byrd Rule. To proceed through the reconciliation process (as opposed to a normal Senate vote), the bill's sponsors needed to excise this provision from the final version of the bill. As a result, because this "phase-in" would need full Senate consideration and would need 60 votes to pass (which it would not get), Congress ultimately passed and President Biden signed a bill that did *not* include any type of "phase-in" of SFA assets for withdrawal liability purposes.

24.      In other words, Congress passed ARPA knowing that it would need to operate through its regular legislative process to pass such a "phase-in" provision.[6]  No such process occurred, and ERISA's stand-alone formula for calculating UVBs stood as passed in 1980.

     v.      *The PBGC Unilaterally Promulgates Its Own SFA Phase-In Regulation.*

25.      Even though the "phase-in" concept never made it into the version of ARPA that was signed into law, the PBGC unilaterally promulgated its own phase-in regulation.  *See* 29 C.F.R. § 4262.16(g) (the "**Phase-In Regulation**").  The Phase-In Regulation requires a phased recognition of SFA as a plan asset for purposes of determining a plan's UVBs in the calculation of a withdrawn employer's withdrawal liability; accordingly, withdrawals that occurred shortly after ARPA's passage (whether they were voluntary or involuntary) will lead (as here) to calculations of withdrawal liability that assume massive SFA payments to MEPPs did not exist.

26.      Notably, in its interim final rule, the PBGC considered a similar requirement under which PBGC would have mandated that, during the SFA coverage period, SFA assets be entirely disregarded in the determination of UVBs for the assessment of withdrawal liability.  86 Fed. Reg. 36598, 36619 (July 21, 2021).  The PBGC determined this condition to be "administratively complex and therefore less desirable," and thus, it did not include such a condition in the interim final rule.  *Id.*

27.      In its final rule, the PBGC claimed that phased recognition of SFA was necessary to "ensure that SFA is not used to subsidize employer withdrawals rather than make benefit payments and pay plan expenses."  87 Fed. Reg. 40968, 40996 (July 8, 2022).  But nowhere in the

---

[6]     The initial version of ARPA that excluded SFA from withdrawal liability calculations already included the provision providing PBGC with authority to impose "reasonable conditions" relating to withdrawal liability. H.R. 1319 §9704(o)(1) (Engrossed in House, March 3, 2021).  Thus, the House knew that allowing the PBGC to impose "reasonable conditions" on "plans" receiving SFA was insufficient to justify the SFA "phase in" to fundamentally modify ERISA's UVB calculation, so it drafted the additional language in H.R. 1319 § 9704(l) to do so.  But that "phase in" language could not pass in the Senate, so it was removed from the bill.

final rule did the PBGC explain how phased-in recognition of SFA is any less "administratively complex" than the approach of fully disregarding SFA as discussed and rejected in the interim final rule.  (Indeed, as a matter of logic, it is far more complex.)

28.     Moreover, in these proceedings, the PBGC has repeatedly stated that it included the SFA phase-in requirement because it "projected in July 2021 that if it imposed no condition related to withdrawal liability, 35% of contributing employers would withdraw immediately following plans' receipt of SFA and PBGC would have to pay an additional $15 to $20 billion in SFA to make up for plans' lost income."  ECF No. 2640 ¶ 13; *see also* ECF No. 1630 at 7–8.  PBGC cites 86 Fed. Reg. 36617 to support this contention, but that source does not support the PBGC's theory.  There, the PBGC merely stated that if it ***assumed*** 35% of employers would immediately withdraw after receipt of SFA without a change in the withdrawal liability formula, it may have to pay an additional $15-20 billion.  86 Fed. Reg. 36598, 36617 (July 12, 2021) (describing "employers representing 35% of active members withdraw immediately after receiving SFA" as a "benchmark scenario assumption," and $15-20 billion in SFA as the "estimated benchmark impact").  The PBGC's administrative record does not include any materials that remotely support the assertion that 35% of employers *would* withdraw absent the SFA phase-in requirement.  *See* Declaration of Michael Slade in Support of Debtors' Motion for Partial Summary Judgment ("**Slade Decl.**"), Ex. 1 (PBGC Administrative Record).

29.     A comment the PBGC received in response to its proposed SFA regulation reinforces the reality that the phase-in provision the PBGC ultimately enacted conflicts with Congress's intent.  United States Senator Josh Hawley, in a July 28, 2022, letter, wrote: "[T]his portion of the final rule is an attempt to do through administrative regulation what could not be accomplished legislatively.  The American Rescue Plan Act said nothing about how SFA payments

would impact the calculation of withdrawal liability for employers exiting pension plans." *See* Slade Decl., Ex. 2 (Letter from Senator Josh Hawley Re: Special Financial Assistance). Senator Hawley further commented that "regulatory changes like this one that will have sweeping impacts on American businesses should be deliberated in the halls of Congress, not pushed through by administrative fiat." *Id.*[7]

**B.** **The Pension Plans Applied for and Received Billions of Dollars in Taxpayer-Subsidized Special Financial Assistance.**

30. It is undisputed that, between 2021 and 2023, each of the SFA MEPPs submitted applications to PBGC seeking SFA funding. Specifically:

- **Central States**: On April 28, 2022, Central States submitted an SFA application, which it later withdrew and resubmitted on August 12, 2022. Central States ultimately sought $34,965,401,436 in SFA funding.[8]

- **Freight Drivers**: On March 4, 2022, Freight Drivers submitted an SFA application, which it later withdrew and resubmitted on June 9 and November 8, 2022. Freight Drivers ultimately sought $198,868,856 in SFA funding.[9]

- **IAM**: On August 26, 2022, IAM submitted an SFA application, seeking a total of $64,772,320 in SFA funding.[10]

- **Local 617**: On September 10, 2021, Local 617 submitted an SFA application, which it later withdrew and resubmitted on December 30, 2021. Local 617 supplemented this application on August 15, 2022. Through these applications, Local 617 ultimately sought $182,016,789 in SFA funding.[11]

---

[7] The PBGC disagreed with this comment, claiming that it had acted within statutory authority. *See* 88 Fed. Reg. 4900, 4902 (Jan. 26, 2023) ("Congress chose to expressly delegate authority in section 4262(m) of ERISA to PBGC to impose reasonable conditions on a plan that receives SFA relating to withdrawal liability. This grant by Congress expands PBGC's authority beyond its existing authority under section 4002(b)(3) and sections 4201 through 4225 of ERISA to regulate withdrawal liability and authorizes PBGC to provide rules that define how SFA should be treated in the calculation of withdrawal liability. The condition in § 4262.16(g)(2) reflects the authority Congress delegated to PBGC to oversee the SFA program and ensure that SFA is preserved for the payment of benefits and expenses."). As described in more detail herein, the Debtors entirely disagree.

[8] *See* https://www.pbgc.gov/arp-sfa/sfa-applications/388657.

[9] https://www.pbgc.gov/arp-sfa/sfa-applications/500383.

[10] https://www.pbgc.gov/arp-sfa/sfa-applications/423404.

[11] https://www.pbgc.gov/arp-sfa/sfa-applications/259512.

- **Local 641**: On September 9, 2021, Local 641 submitted an SFA application, which it withdrew, resubmitted on December 1, 2021, and supplemented in 2022. Local 641 ultimately sought $582,080,104 in SFA funding.[12]

- **Local 701**: On February 7, 2022, Local 701 submitted an application which it later supplemented on August 10, 2022. Through these applications, Local 701 ultimately sought $189,464,921 in SFA funding.[13]

- **Local 707**: On August 13, 2021, Local 707 submitted an SFA application, which it later withdrew and resubmitted on November 12, 2021. Local 707 then supplemented this application on August 8, 2022. Through these applications, Local 707 ultimately sought $819,340,672 in SFA funding.[14]

- **Local 1730**: On September 23, 2021, Local 1730 submitted an SFA application, which it later withdrew and resubmitted on January 20, 2022. Local 1730 then supplemented this application on August 23, 2022. Through these applications, Local 1730 ultimately sought $64,399,591 in SFA funding.[15]

- **New York Teamsters**: On January 28, 2022, New York Teamsters submitted an SFA application, which it later withdrew and resubmitted on July 21, 2022. New York Teamsters then supplemented this application on December 9, 2022. New York Teamsters ultimately sought $1,339,417,395 in SFA funding.[16]

- **TENJ**: On September 23, 2021, TENJ submitted an SFA application, which it later withdrew and resubmitted on January 11, 2022 and supplemented on August 9, 2022. TENJ ultimately sought $736,485,521 in SFA funding.[17]

- **Western PA Teamsters**: On March 30, 2022, Western PA Teamsters submitted an SFA application, which it later supplemented on March 9, 2023. Western PA Teamsters ultimately sought $958,661,932 in SFA funding.[18]

31.    It is further undisputed that, based on the information in the SFA MEPPs' applications, PBGC awarded the SFA MEPPs approximately $41.1 billion in SFA funding. Specifically:

---

[12] https://www.pbgc.gov/arp-sfa/sfa-applications/233193.

[13] https://www.pbgc.gov/arp-sfa/sfa-applications/153036.

[14] https://www.pbgc.gov/arp-sfa/sfa-applications/485219.

[15] https://www.pbgc.gov/arp-sfa/sfa-applications/153102.

[16] https://www.pbgc.gov/arp-sfa/sfa-applications/175540.

[17] https://www.pbgc.gov/arp-sfa/sfa-applications/229295.

[18] https://www.pbgc.gov/arp-sfa/sfa-applications/276595.

- **Central States**: On December 8, 2022, PBGC awarded Central States $35.8 billion in SFA funding.[19]

- **Freight Drivers**: On October 4, 2022, PBGC awarded Freight Drivers $192.8 million in SFA funding.[20] PBGC awarded an additional $12.8 million on February 17, 2023, bringing Freight Drivers' total SFA funding to $205.6.[21]

- **IAM**: On December 22, 2202, PBGC awarded IAM $66 million in SFA.[22]

- **Local 617**: On April 19, 2022, PBGC awarded Local 617 $155.8 million in SFA funding. PBGC awarded it $31.1 million in supplemental SFA funding on December 13, 2022, bringing its total SFA funding to $186.9 million.[23]

- **Local 641**: On March 31, 2022, PBGC awarded Local 641 $516.9 million in SFA funding.[24] PBGC awarded it $96.1 million in supplemental SFA funding on January 18, 2023, bringing Local 641's total SFA funding to $613 million.[25]

- **Local 701**: On May 31, 2022, PBGC awarded Local 701 $142.2 million in SFA funding.[26] PBGC awarded it $52.4 in supplemental funding on December 9, 2022, bringing Local 701's total SFA funding to $194.6 million.[27]

- **Local 707**: On January 19, 2022, PBGC awarded Local 707 $726.6 million in SFA funding.[28] PBGC awarded it $114.1 million in supplemental funding on December 9, 2022, bringing Local 707's total SFA funding to $840.7 million.[29]

- **Local 1730**: On May 17, 2022, PBGC awarded Local 1730 $62 million in SFA funding.[30] PBGC awarded it $6.1 million in supplemental SFA funding on December 20, 2022, bringing its total SFA funding to $68.1 million.[31]

---

[19] https://www.pbgc.gov/news/press/releases/pr22-45.

[20] https://www.pbgc.gov/news/press/releases/pr22-35.

[21] https://www.pbgc.gov/news/press/releases/pr23-013.

[22] https://www.pbgc.gov/news/press/releases/pr22-62.

[23] https://www.pbgc.gov/news/press/releases/pr22-13; https://www.pbgc.gov/news/press/releases/pr22-56.

[24] https://www.pbgc.gov/news/press/releases/pr22-08.

[25] https://www.pbgc.gov/news/press/releases/pr23-002.

[26] https://www.pbgc.gov/news/press/releases/pr22-26.

[27] https://www.pbgc.gov/news/press/releases/pr22-48.

[28] https://www.pbgc.gov/news/press/releases/pr22-03.

[29] https://www.pbgc.gov/news/press/releases/pr22-52.

[30] https://www.pbgc.gov/news/press/releases/pr22-24.

[31] https://www.pbgc.gov/news/press/releases/pr22-60.

- **New York Teamsters**: On November 18, 2022, PBGC awarded New York Teamsters $963.4 million in SFA funding.[32] PBGC awarded it $438 million in supplemental SFA funding on April 6, 2023, bringing New York Teamsters' total SFA funding to $1.4 billion.[33]

- **TENJ**: On April 29, 2022, PBGC awarded TENJ $673.1 million in SFA funding.[34] PBGC awarded it $84.5 million in supplemental SFA funding on December 9, 2022, bringing TENJ's total SFA funding to $757.6 million.[35]

- **Western PA Teamsters**: On July 25, 2022, PBGC awarded Western PA Teamsters $715 million in SFA funding.[36] PBGC awarded it $279.6 million in supplemental SFA funding on July 11, 2023, bringing Western PA Teamsters' total SFA funding to $994.6 million.[37]

32.    The SFA MEPPs have access to every penny of this SFA funding.  *See* Slade Decl., Ex. 3 (D. Ciner Dep. Tr.) at 22:12-18, 22:23-23:8; Ex. 4 (K. Culp. Dep. Tr.) at 142:2-22; Ex. 5 (Decl. of Randee Sekol) ("**Sekol Decl.**"), ¶ 20; Ex. 6 (Decl. of Vincent Regalbuto) ("**Regalbuto Decl.**"), ¶ 20; Ex. 7 (Decl. of Paul Bullock) ("**Bullock Decl.**"), ¶ 20; Ex. 8 (Decl. of Frank Iannucci) ("**Iannucci Decl.**"), ¶ 20; Ex. 9 (Decl. of Dewey Dennis) ("**Dennis Decl.**"), ¶ 20; *see also* Slade Decl., Ex. 37 (Local 1730's Form 5500 for the plan or fiscal year ended December 31, 2022) at 67-69; Ex. 38 (Local 617's Form 5500 for the plan or fiscal year ended February 28, 2023) at 53, 55; Ex. 39 (TENJ's Form 5500 for the plan or fiscal year ended December 31, 2022) at 34-35, 38; Ex. 40 (Freight Drivers' Form 5500 for the plan or fiscal year ended December 31, 2022) at 17.

33.    The SFA MEPPs do not dispute that—for purposes other than calculating UVBs (as part of the withdrawal liability calculation) under the Phase-In Regulation—the SFA funding is a plan asset and that the SFA MEPPs can and have invested and used such funding to pay plan

---

[32]    https://www.pbgc.gov/news/press/releases/pr22-42.

[33]     https://www.pbgc.gov/news/press/releases/pr23-017.

[34]    https://www.pbgc.gov/news/press/releases/pr22-18.

[35]    https://www.pbgc.gov/news/press/releases/pr22-49.

[36]    https://www.pbgc.gov/news/press/releases/pr22-30.

[37]     https://www.pbgc.gov/news/press/releases/pr23-030.

expenses and participant benefits.  *See* D. Ciner Dep. Tr. at 23:12-16, 24:8-13; K. Culp. Dep. Tr. at 146:21-147:5; Sekol Decl. ¶¶ 21, 23-24; Regalbuto Decl. ¶ 21, 23-24; Bullock Decl. ¶¶ 21, 23-24; Iannucci Decl. ¶¶ 21, 23-24; Dennis Decl. ¶¶ 21, 23-24.

### C.    The Debtors Commenced These Chapter 11 Cases, and the Pension Plans Filed 174 Proofs of Claim Seeking More than $6.5 Billion in Withdrawal Liability.

34.    In July 2023, the Debtors commenced a permanent reduction of their workforce, began clearing their freight network, and ceased substantially all operations.  On August 6, 2023, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

35.    Shortly before the claims bar date of November 13, 2023, the SFA MEPPs filed 174 Proofs of Claim seeking more than $6.5 billion in withdrawal liability.  The Debtors objected to these Proofs of Claim, arguing (among other things) that the SFA MEPPs failed to comply with ERISA in calculating their claims.  *See generally* Debtors' Objections.  At this point, following discovery[38], the Debtors do not believe there are remaining disputes about how the MEPPs calculated the Debtors' alleged withdrawal liability; they only dispute whether such calculations are correct, used the correct inputs, and/or are consistent with ERISA's requirements.

     i.    *The Pension Plans Excluded Billions of Dollars in SFA Funding from Their "Assets" in Performing UVB Calculations.*

36.    It is undisputed that none of the SFA MEPPs included SFA funding as a plan asset in determining their alleged UVBs.  *See* Slade Decl., Ex. 3 (D. Ciner Dep. Tr.) at 21:9-14; Ex. 4 (K. Culp Dep. Tr.) at 46:1-7, 147:6-11; Ex. 5 (Sekol Decl.) ¶ 25; Ex. 6 (Regalbuto Decl.) ¶ 25; Ex. 7 (Bullock Decl.) ¶ 25; Ex. 8 (Iannucci Decl.) ¶ 25; Ex. 9 (Dennis Decl.) ¶ 25.

---

[38]    Respectfully, it has been like pulling teeth to pry basic information from certain SFA MEPPs during discovery. The Debtors do not believe there are remaining factual disputes about the SFA MEPPs' calculations that are germane to this Motion, but if any SFA MEPP claims there to be such a dispute, the Debtors reserve the right to seek relief (including evidentiary sanctions) due to certain SFA MEPPs' refusal to timely provide relevant data.

      ii.   *Most of the Pension Plans Failed to Apply Required Statutory Caps on Debtors'*
            *Withdrawal Liability.*

37.      It is undisputed that nine of the SFA MEPPs calculated Debtors' annual payment
and/or prepared an annual payment schedule for Debtors but did not limit the withdrawal liability
they were seeking to 20 years of such annual payments.  For example, in its Proofs of Claim, Local
707 asserted that the Debtors' allocable share of the fund's UVBs totaled $245.9 million and that
Debtors' annual payment was $2.59 million.  *See* Slade Decl., Ex. 10 (Proof of Claim No. 14941)
at 1, 18.  At this annual payment rate, it would take Debtors more than 94 years to amortize their
alleged allocable share of the fund's alleged UVBs.  But Local 707 did not cap its claim to 20
years of payments; instead, it sought the full amount of alleged allocable UVBs—a difference
(even without discounting the 20-year payment stream to present value) of $194,143,538.
*Compare id*. at 1 (seeking $245,908,018.92) and *id*. at 18 (20 years of annual payments would total
$51,764,480); *see also* Slade Decl., Ex. 6 (Regalbuto Decl.) ¶¶ 38 ("In determining the Debtors'
withdrawal liability to [Local 707], the Fund did calculate the value of Debtors' annual payment
to the Fund."), 51 ("[Local 707] did not apply the 20-year cap on annual payments in determining
the Debtors' withdrawal liability to the Fund.").

38.      Local 641, Local 701, IAM, Western PA Teamsters, New York Teamsters, Local
617, TENJ, and Freight Drivers similarly calculated an annual payment or included an annual
payment schedule for Debtors in their Proofs of Claim but did not cap the amount they were
seeking to 20 years of such payments, even though it would take Debtors more than 20 years to
amortize Debtors' alleged allocable share of each funds' respective UVBs.  *See* Slade Decl., Ex.
11 (Proof of Claim No. 5505) at 1, 9 (Local 641 seeking $217.16 million, but Debtors' annual
payment only $2.05 million); Ex. 8 (Iannucci Decl.) ¶¶ 37, 50 (confirming that Local 641 prepared
an annual payment schedule for Debtors but did not apply 20-year cap); Ex. 12 (Proof of Claim

No. 15001) at 2, 8 (Local 701 seeking $48.23 million in withdrawal liability, but Debtors' annual

payment only $416,496); Ex. 9 (Dennis Decl.) ¶ 52 ("[Local 701] did calculate the 20-year cap on

annual payments, however, the Fund's proofs of claim demand the entire amount of the withdrawal

liability assessment . . . ."); Ex. 13 (Proof of Claim No. 16895) at 2, 4 (IAM seeking $44.06 million

in withdrawal liability, but Debtors' annual payment only $368,847); Ex. 7 (Bullock Decl.) ¶¶ 39,

45 (IAM calculated annual payment for "informational purposes" but did not apply 20-year cap);

Ex. 14 (Proof of Claim No. 19671) at 2, 8 (Western PA Teamsters seeking $157.04 million in

withdrawal liability, but Debtors' annual payment only $6.62 million); Ex. 5 (Sekol Decl.) ¶¶ 38,

43, 52 (Western PA Teamsters calculated Debtors' annual payment for "informational purposes"

but did not apply 20-year cap); Ex. 15 (Proof of Claim No. 4489) at 1, 5 (New York Teamsters

seeking $833.36 million in withdrawal liability, but Debtors' annual payment only $23.47 million);

Ex. 4 (K. Culp. Dep. Tr.) at 110:21-111:1 ("Q: New York Teamsters didn't apply the twenty-year

cap on annual payments in determining Yellow's withdrawal liability; did it? A: My understanding

is no, they did not."); Ex. 16 (Proof of Claim No. 15727) at 2, 8 (Local 617 seeking $41.93 million

in withdrawal liability but Debtors' annual payment only $10,692); Ex. 17 (Proof of Claim No.

14722) at 2, 14 (TENJ seeking $14.45 million in withdrawal liability but Debtors' annual payment

only $161,971); Ex. 19 (Proof of Claim No. X) at 2, 9 (Freight Drivers seeking $55.91 million in

withdrawal liability, but Debtors' annual payment only $506,564).

39.     Unlike these SFA MEPPs, Central States did not include a schedule of annual

payments or otherwise identify Debtors' annual payment amount in its Proofs of Claim at all. *See,*

*e.g.*, Slade Decl., Ex. 18 (Proof of Claim No. 4312) at 1, 4-6 (seeking $4.83 billion in withdrawal

liability but not providing amount of Debtors' annual payment); Ex. 20 (A. Sprau Dep. Tr.) at

42:25-43:3 ("We did not provide an adjustment for annual payments, correct."). Nevertheless,

Central States' corporate representative testified that Central States has calculated Debtors' annual payment amount and determined that it would take more than 20 years for the Debtors to amortize their alleged allocable UVBs of $4.83 billion.  *See* Slade Decl., Ex. 20 (A. Sprau Dep. Tr.) at 47:24-48:23.

       iii.    *New York Teamsters and Western PA Teamsters Used Improper Allocation or Other Calculation Methods in Calculating Debtors' Withdrawal Liability.*

     40.    New York Teamsters calculated the Debtors' withdrawal liability pursuant to Schedule G of its Rehabilitation Plan.  *See* Slade Decl., Ex. 4 (K. Culp. Dep. Tr.) at 97:8-14, 104:19-105:9.  In 2013, the Debtors reentered the New York Teamsters fund pursuant to Schedule G, which allowed Yellow to pay reduced contribution rates for employees (who received commensurately lower accruals).  *Id.*, Ex. 21 (YELLOW_NYST 000023) (Debtors to reenter in 2013); Ex. 22 (YELLOW_NYST001349) ("**Schedule G**") § a (employers under Schedule G to pay contribution rates as low as 25% of their last effective rate).  Schedule G further stated that, if the Debtors were to withdraw from the fund, New York Teamsters could calculate their withdrawal liability "as if Alternative Schedule G had not been elected."  *See* Schedule G, § d.

     41.    The upshot of these provisions was that, instead of allocating UVBs to the Debtors or calculating Debtors' annual payment using the reduced contribution rates Debtors actually paid, New York Teamsters could use the higher contribution rates "applicable to [Debtors] immediately prior to [their] becoming covered by Alternative Schedule G."  *Id.*  The same applied to Debtors' CBUs: instead of using Debtors' actual CBUs in calculating Debtors' allocable share of UVBs or annual payment, New York Teamsters could use CBUs from "the three years immediately prior to [Debtors] becoming covered by Alternative Schedule G, which [would] be imputed for each year of participation in said Schedule."  *Id.*; *see also* Slade Decl., Ex. 4 (K. Culp. Dep. Tr.) at 106:17-108:1 (confirming same).

42.     That is what New York Teamsters did in its Proofs of Claim: it calculated Debtors' allocable UVBs and annual payment using "imputed" contribution rates and CBUs and not the contribution rates that Debtors actually paid or CBUs that Debtors actually had during the relevant timeframe.  *See* Slade Decl., Ex. 35 (YELLOW_NYST001304) (reflecting imputed contribution rates and CBUs for Debtors); Ex. 4 (K. Culp. Dep. Tr.) at 97:8-14, 104:19-105:9.

43.     But New York Teamsters did not receive PBGC authorization to use this alternative method of allocating UVBs, including the alternative method for calculating the annual withdrawal liability payment to the Debtors and/or assessing the Debtors' withdrawal liability.  *See* Slade Decl., Ex. 4 (K. Culp Dep. Tr.) at 117:23-118:2 ("Q: New York Teamsters also never got approval from the PBGC for amending the rehabilitation plan to include a Schedule G; correct? A: I believe that's correct.").

44.     Western PA Teamsters took a similar approach.  In 2013, the Debtors reentered the Western PA Teamsters fund pursuant to a "Distressed Employer Schedule" of Western PA Teamsters' Rehabilitation Plan.  *See* Slade Decl., Ex. 5 (Sekol Decl.) ¶ 39; Ex. 23 (YELLOW_WPA 000387) ("**Distressed Employer Schedule**").  Like Schedule G, this "Distressed Employer Schedule" provided that the Debtors would pay a reduced contribution rate to Western PA Teamsters (with employees receiving commensurately lower accruals), but if the Debtors were to withdraw from the fund, Western PA Teamsters would use an alternative UVB allocation method, including the annual payment calculation, in calculating withdrawal liability. *See* Slade Decl., Ex. 23 (YELLOW_WPA 000387) §§ E.1.5, E.2.2.  In other words, Western PA Teamsters would "adjust[]" the Debtors' allocable UVBs, including the annual payment calculation, by "us[ing] contribution rates, including any increases, required by the employer's collective bargaining agreement immediately prior to becoming covered by [the] Distressed

19

Employer Schedule." *See id.* § E.2.2.  Western PA Teamsters would further adjust the Debtors' allocable UVBs, including the annual payment, by using CBUs that were "the greater of the actual [CBUs] while participating in Distressed Employer Schedule or an average of the [CBUs] during the three years immediately preceding, which will be imputed for each year of participation in said Schedule." *Id*.

45.      Western PA Teamsters did precisely that in calculating its Proofs of Claim for withdrawal liability: instead of calculating the annual payment to Debtors based on contribution rates that the Debtors *actually* paid Western PA Teamsters, as ERISA requires, Western PA Teamsters instead used rates that the Debtors would have paid had the Distressed Employer Schedule not existed in the first place.  *See* Slade Decl., Ex. 5 (Sekol Decl.) ¶¶ 40-43, 49-50 ("As of December 31, 2014, the Debtors' contribution rate being paid to the Fund [$69.50] was disregarded for purposes of allocating shares of UVB to Debtors. The prevailing National Freight rate of $432.48 was used for the 2015 pool . . . Annual increases in the NMF rate, if any, were used for subsequent pools.").

46.      As with New York Teamsters, Western PA did not receive PBGC authorization to use this alternative method of allocating the fund's UVBs, including the method for calculating the annual payment and/or assessing Debtors' withdrawal liability.  *See* Slade Decl., Ex. 5 (Sekol Decl.) ¶ 39.[39]

---

[39]     The same basic principles are applicable to Local 641.  Local 641 calculated Debtors' annual payment using contribution rate increases that became effective after December 31, 2014.  *See* Slade Decl., Ex. 8 (Iannucci Decl.) ¶¶ 39-41.  To the Debtors' knowledge, Local 641 did not negotiate these rate increases above that required under its rehabilitation plan in order to provide an increase in participant benefits, or increase participant benefits via a specific plan amendment, nor did Local 641's actuary certify that any such amendment would not worsen the plan's funding status.  Nor, to the Debtors' knowledge, did Local 641 get PBGC approval for this alternative method.  The Debtors have sought Local 641's admissions on these issues, including through interrogatories, deposition notices, and written stipulations/declarations, but to date, Local 641 has not provided sufficient information, despite numerous extensions of the fact discovery deadline.  If Local 641 disputes these points, the Debtors reserve the right to seek any appropriate relief.

    iv.    *The Pension Plans Failed to Discount Their Claims to Net Present Value.*

47.    None of the SFA MEPPs reduced the withdrawal liability amounts in their Proofs of Claim to present value.  *See, e.g.*, Slade Decl., Ex. 18 (Proof of Claim No. 4312) (Central States did not discount to net present value), Ex. 19 (Proof of Claim No. 19540) (same for Freight Drivers), Ex. 13 (Proof of Claim No. 16895) (same for IAM), Ex. 24 (Proof of Claim No. 14718) (same for Local 1730), Ex. 12 (Proof of Claim No. 15001) (same for Local 701), Ex. 15 (Proof of Claim No. 4489) (same for New York Teamsters), Ex. 10 (Proof of Claim No. 14941) (same for Local 707), Ex. 16 (Proof of Claim No. 15727) (same for Local 617), Ex. 11 (Proof of Claim No. 5505) (same for Local 641), Ex. 17 (Proof of Claim No. 14722) (same for TENJ), Ex. 14 (Proof of Claim No. 19671) (same for Western PA Teamsters).

## LEGAL STANDARDS

48.    A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Facts are "material" only if they could "alter the outcome." *EBC Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (cleaned-up).  A dispute is "genuine" only if "evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."  *Id*. (cleaned-up); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In opposing a motion for summary judgment, a party "must set forth specific facts showing that there is a genuine issue for trial," *id*. at 256, through affidavits, depositions, admissions, or similar record materials.  Fed. R. Civ. P. 56(c)(1)(A); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

49.    In a challenge to agency action, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142 (1973).  While "[s]ummary judgment is the mechanism

21

for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the [Administrative Procedure Act] standard of review . . . [t]he customary summary judgment standard does not apply." *Bintz v. Fed. Emergency Mgmt. Agency,* 413 F. Supp. 3d 349, 360 (D. Del. 2019) (internal quotation marks and citations omitted). Rather, as the Supreme Court made clear last week, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters., Inc. v. Raimondo*, 603 U.S. __, 2024 WL 3208360, at *22 (June 28, 2024). Courts "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Bintz*, 413 F. Supp. 3d at 360 (internal quotation marks omitted).

## ARGUMENT

**A.      THE COURT SHOULD REQUIRE THAT THE SFA MEPPS DISREGARD PBGC'S PHASE-IN REGULATION IN CALCULATING DEBTORS' WITHDRAWAL LIABILITY.**

50.      Under the Administrative Procedure Act, a court must set aside an agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A), (C). The Phase-In Regulation is unlawful under both provisions.

### i.      **PBGC Exceeded Its Congressionally-Delegated Authority in Passing a Regulation Inconsistent with ERISA.**

51.      The PBGC's Phase-In Regulation, which requires phase-in recognition of SFA for purposes of determining withdrawal liability, impermissibly changes ERISA's statutorily prescribed formula for calculating UVBs by excluding massively large assets from the calculations and thereby changing the withdrawal liability calculation formula set forth in ERISA via administrative fiat.

52.     "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Judicial review of agency action under 5 U.S.C. § 706(2)(C) focuses on whether the court can "reasonably [] conclude that the grant of authority contemplates the regulations issued."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 308 (1979).  And today, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," affording no deference to the agency's interpretation of any ambiguity in the statute.  *Loper Bright*, 603 U.S. __, 2024 WL 3208360, at *22.  As the Supreme Court explained just last week in overruling *Chevron*, "agency interpretations of statutes—like agency interpretations of the Constitution—are ***not*** entitled to deference . . ." because "agencies have no special competence in resolving statutory ambiguities.  Courts do."  *Id.* at *12, 16 (emphasis in original).  Moreover, "[t]hat is no less true when the ambiguity is about the scope of an agency's own power—perhaps the occasion on which abdication in favor of the agency is ***least*** appropriate."  *Id.* at *16 (emphasis in original).

> I.     *SFA Is Clearly an Asset and Should Be Included When Determining the Amount of UVBs.*

53.     SFA cannot reasonably be excluded, either in whole or in part, as "plan assets" for purposes of calculating UVBs.  Congress itself recognized SFA as a "plan asset" in 29 U.S.C. § 1432(l), where it stated that SFA is to be segregated from "other plan assets" used to pay benefits and expenses and must be invested as approved by PBGC.  29 U.S.C. § 1432(l).  By its nature, the SFA will be used to pay nonforfeitable benefits: that was its very purpose.  *Id.*  Had Congress wished to exclude SFA from the calculation of a plan's UVBs, it could have done so, just as it legislated that SFA will not be "considered for certain purposes," namely, that a MEPP that receives SFA will still be deemed to be in critical status until 2051.  *See* 29 U.S.C. § 4262(m)(4).

54.     More generally, excluding SFA funding as a "plan asset" in the calculation of UVBs cannot possibly be what Congress intended when it passed MPPAA in 1980.  When it created withdrawal liability as a concept, Congress only intended for withdrawal liability to fill *actual holes* in MEPPs' *actual* UVBs—which is why it required MEPPs to calculate UVBs as the difference (if any) between the value of the MEPP's projected liabilities and "the value of the assets of the plan." 29 U.S.C. § 1393(c).  ARPA did not change that at all.

55.     A "fundamental canon of statutory construction" is to "interpret the words consistent with their ordinary meaning."  *United States v. Smukler*, 991 F.3d 472, 482 (3d Cir. 2021).  The definition of "assets" is straightforward: "anything owned that has value" or "property that can be used for payment of debts."  BARRON'S DICTIONARY OF BUSINESS AND ECONOMICS TERMS (5th ed. 2012).   Indeed, "[a]ssets are credits to the balance sheet," BLACK'S LAW DICTIONARY, *available at* https://thelawdictionary.org/asset-2/ (last visited July 3, 2024),[40] and each SFA MEPP admits that SFA funding in fact appears on its balance sheet as an asset.  *See, e.g.*, Slade Decl., Ex. 8 (Iannucci Decl.) ¶ 21; *see also In re Luna*, 406 F.3d 1192, 1199 (10th Cir. 2005) ("An 'asset' is defined as '**1.** An item that is owned and has value. **2.** The entries on a balance sheet showing the items of property owned, including cash, inventory, equipment, real estate, accounts receivable, and goodwill. **3.** All the property of a person available for paying debts.'") (quoting BLACK'S LAW DICTIONARY 112 (7th ed. 1999)).  If anyone is to change ERISA's statutory method of calculating of UVBs—in this case by excluding massive sums of "assets" from the calculation—that must be Congress, not an administrative agency.

---

[40]     *See also* BLACK'S LAW DICTIONARY (6th ed. 1990) (defining "Assets" as "Property of all kinds, real and personal, tangible and intangible . . . . The entire property of a person, association, corporation, or estate that is applicable or subject to the payment of his or her or its debts.").

> II.    *ARPA Does Not Grant PBGC Unlimited Authority to Change the UVB Calculation Formula.*

56.    While the PBGC was granted limited authority to issue guidance and regulations implementing ARPA, 29 C.F.R. § 4262.16(g), Congress (and the Constitution more generally) does not permit the PBGC to implement a policy directly contrary to statute, let alone one that was previously considered and outright rejected by Congress.

57.    Statutory construction begins with the express language employed by Congress and the assumption that the plain and ordinary meaning of that language accurately articulates Congress's intent. *INS v. Phinpathya*, 464 U.S. 183, 189 (1984) (noting that "in all cases involving statutory construction, our starting point must be the language employed by Congress . . . and we assume that the legislative purpose is expressed by the ordinary meaning of the words used"); *Caminetti v. United States*, 242 U.S. 470, 485-86 (1917) ("Statutory words are uniformly presumed, unless the contrary appears, to be used in their ordinary and usual sense, and with the meaning commonly attributed to them."). As the Supreme Court has explained, "[c]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

58.    Here, ARPA certainly does not grant the PBGC authority to change the long-established methods for determining a MEPP's UVBs (for purposes of determining an employer's withdrawal liability) by excluding certain assets from the calculation. Indeed, as explained above, ARPA is clear that SFA is included as a "plan asset," and no further inquiry is required. And to the extent the Court determines there is ambiguity in the statutory language, the PBGC's interpretation of the statute is no longer afforded any deference, and the Court must exercise its "independent judgment in deciding whether [PBGC] has acted within its statutory authority." *Loper Bright.*, 603 U.S. __, 2024 WL 3208360, at *22.

59.     Even if there is a question as to the plain meaning of either the word "assets" or the

ERISA formula for calculating UVBs, ARPA's legislative history makes clear that the withdrawal

liability limitation PBGC proposed was not permissible under the Senate's reconciliation rules.

Congress was thus faced with a choice: remove the provision so that the package could pass, or

retain the provision and proceed under regular order, which required 60 Senate votes to pass.

Congress chose the former.  PBGC cannot and should not attempt to do by way of regulation or

guidance which Congress affirmatively could not accomplish by way of direct legislation.  Indeed,

after striking the withdrawal liability provision, no changes were made to the provisions in ARPA

granting PBGC authority to issue guidance or regulations.  Absent further action from Congress,

*ERISA stands*; PBGC cannot implement procedures to align with draft language stricken from the

final ARPA law, and PBGC's decision to do so is awarded no deference. *INS v. Cardoza-Fonseca*,

480 U.S. 421, 442 (1987) (reviewing congressional record and rejection of Senate version of bill,

and explaining "the enactment of the House bill rather than the Senate bill in turn demonstrates

that Congress eventually refused to restrict eligibility for asylum only to aliens meeting the stricter

standard"); *W. Va. v. EPA*, 597 U.S. 697, 724 (2022) (Congress did not grant EPA authority to

devise a program that Congress had "conspicuously and repeatedly declined to enact itself"); *see

also Loper Bright.*, 603 U.S. __, 2024 WL 3208360, at *12, 16 ("agency interpretations of

statutes—like agency interpretations of the Constitution—are *not* entitled to deference" because

"agencies have no special competence in resolving statutory ambiguities.  Courts do.").

60.     History also supports this conclusion.  Of the twenty-two measures passed through

reconciliation, the Byrd Rule has been used to strike provisions in ten such laws, including

ARPA.[41]  Before now, no federal agency has *ever* tried to implement policies via regulation that

---

[41]   Tax Cuts and Jobs Act of 2017, E.A.S. 115-97, 115th Cong. §§ 11033(7) (2017) (provisions relating to 529
account funding for expenses in connection with homeschool and criteria for excise tax based on investment

align with a provision stricken under the Byrd Rule, except where Congress later legitimately enacted such provision through a separate legislative vehicle. *See, e.g.,* Tongass Timber Reform Act of 1989, P.L. 101-626 (1989).

61.     Further, when Congress previously created a special program for financially troubled plans and simultaneously wanted to modify certain ERISA's withdrawal liability inputs, it included explicit statutory rules on how the program impacted the determination of UVBs. Specifically, under the Multiemployer Pension Reform Act of 2014 ("**MPRA**"), Congress amended ERISA to provide that:

> Any benefit reductions under subsection [29 U.S.C. §1085](e)(8) or (f) or benefit reductions or suspensions while in critical and declining status under subsection (e)(9), unless the withdrawal occurs more than ten years after the effective date of a benefit suspension by a plan in critical and declining status, shall be disregarded in determining a plan's unfunded vested benefits for purposes of determining an employer's withdrawal liability under section 1381 of this title.

29 U.S.C. § 1085(g)(1).  In contrast, ARPA did ***not*** provide special treatment for SFA with respect to determining UVBs.  As such, it cannot be within the PBGC's authority to change the definition of UVBs where Congress did so on a previous occasion, but not this one.  *Russello v. United States,*

---

income of private colleges and universities struck); Health Care and Education Reconciliation Act of 2010, H.R. 4872, 111th Cong., §§ 2101(a)(2)(C)-(D) (2010) (provisions regarding limitation on decreases under formula setting maximum Pell grant amount annually and repeal of certain technical aspects of Pell grant funding struck); Deficit Reduction Act of 2005, H.R. 4241, 109th Cong. § 3123(a)(4) (2005) (provisions requiring HHS to submit to Congress various reports relating to its administration of the Medicaid program, as well as provisions relating to the negligence standard for hospitals and physicians who treat patients struck); Taxpayer Relief Act of 1997, E.A.S. 105-34, 105th Cong. § 601 (1997) (provisions regarding D.C. government reform struck); Balanced Budget Act of 1997, S. 947, 105th Cong. §§ 5713, 5822, 5987 (1997) (provisions related to Medicaid requirements for state programs, enrollment eligibility for welfare-to-work grant program, and the repeal of certain Acts struck); Personal Responsibility and Work Opportunity Act of 1996, E.A.S. 104-193, 104th Cong. (1996) (provisions related to Medicaid supplemental umbrella fund, limiting assistance to per family instead of per child, abstinence education programs, and food stamp, school lunch, child nutrition programs, and welfare reform struck); Omnibus Budget Reconciliation Act of 1993, H.R. 2264, 103rd Cong. (1993) (provisions related to commercial use of bovine growth hormone in other countries, and childhood immunizations and tax return preparer standards struck); Omnibus Reconciliation Act of 1990, H.R. 5835, 101st Cong. (1990) (provisions related to apportionment of highway funds between states, OSHA penalties, and harvesting of timber in Tongass National Forest in Alaska struck); Omnibus Reconciliation Act of 1986, H.R. 5300, 99th Cong. (1986) (provisions related to conservation programs struck).

464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

62.     Notably, other historically proposed legislation regarding ERISA that would have provided financial assistance to troubled plans but limited the use of this assistance in withdrawal liability calculations also contained specific provisions related to the limits—demonstrating that such changes are to be done through the legislative process, not via administrative fiat.  *See, e.g.*, H.R. 397, 116th Cong., Rehabilitation for Multiemployer Pension Act of 2019, Section 5, Coordination with Withdrawal Liability and Funding Rules (proposing a new Internal Revenue Code Section 432(k)(1), which would have required, for any employer in a plan receiving financial assistance that withdrew from the plan any time in the following 30 years, the employer's withdrawal liability to be calculated as if there were a mass withdrawal under Section 4219(c)(1)(D) of ERISA); H.R. 6800, 116th Cong. (Engrossed in House, May 15, 2020) (proposing a new ERISA Section 4233A that provides for a special partition program for troubled plans, but specifically stating under Section 4233A(k) that an employer's withdrawal liability must be calculated taking into account any plan liabilities that are partitioned for 15 years, but also stating under Section 4233A(j)(1) that PBGC could impose reasonable conditions relating to withdrawal liability on partitioned plans, suggesting PBGC cannot impose conditions beyond the 15 years).

63.     The bottom line is that Congress decided *not* to alter the calculation of withdrawal liability when it passed ARPA.  Instead, ARPA merely gives PBGC authority to adopt "reasonable conditions" *on the MEPPs* that receive SFA, including reasonable conditions relating to withdrawal liability.  29 U.S.C. § 1432(m)(1) ("The corporation, in consultation with the Secretary of the Treasury, may impose, by regulation or other guidance, ***reasonable conditions on an***

*eligible multiemployer plan* that receives special financial assistance **relating to** increases in future accrual rates and any retroactive benefit improvements, allocation of plan assets, reductions in employer contribution rates, diversion of contributions to, and allocation of expenses to, other benefit plans, and **withdrawal liability**." (emphases added)).

64.    The PBGC regulation, which purports to change the UVB calculation formula, is not at all a "condition" on a plan that received SFA, let alone a reasonable one.  A "condition" would need to be a "restricting or modifying factor" on *the plan itself*. *See Condition*, MERRIAM-WEBSTER DICTIONARY, *available at* https://www.merriam-webster.com/dictionary/condition (last visited July 3, 2024); *see also Condition*, AMERICAN HERITAGE DICTIONARY, *available at* https://www.ahdictionary.com/word/search.html?q=condition (last visited July 3, 2024) (defining condition as "one that restricts or modifies another; a qualification").  Changing ERISA's statutory definition of UVBs is not a "condition" on a MEPP.  It is instead a fundamental modification of ERISA's formula for calculating UVBs by excluding SFA as an "asset" within the statutorily-required calculation.

65.    At the same time, PBGC can, and has, adopted "reasonable conditions" on MEPPs receiving SFA related to withdrawal liability pursuant to ARPA that *are* consistent with ERISA, so a court would not render 29 U.S.C. § 1432(m)(1) meaningless by finding that the SFA Phase-In Regulation is inconsistent with ERISA.  Specifically, PBGC has adopted regulations requiring that any settlement of withdrawal liability claims over $50 million for MEPPs that receive SFA must be approved by the PBGC.  29 C.F.R. § 4262.16(h).  That is the sort of "reasonable condition" on a MEPP relating to withdrawal liability that Congress had in mind.  If Congress wanted to give MEPPs authority to fundamentally rewrite the formula for calculating UVBs—which has been a cornerstone of ERISA for over 40 years—it would have done so; it affirmatively did not.

29

66.     Indeed, the "reasonable condition" language was already included in the draft, unpassed version of ARPA that (if it had passed) would have excluded SFA from the UVBs calculation.  H.R. 1319 §9704(o)(1) (Engrossed in House, March 3, 2021).  Therefore, Congress could not have intended a "reasonable condition" on MEPPs as permitting a fundamental change to ERISA's UVB calculation formula, and the PBGC's Phase-In Regulation must be set aside because the PBGC "exercise[d] its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law."  *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91 (2002) (internal quotation omitted); *see also Associated Gen. Contractors of Am. v. U.S. Dep't of Labor*, No. 5:23-cv-272-C, Dkt. 61, Findings of Fact and Conclusions of Law & Order Granting Prelim. Inj., at 27 (N.D. Tex. June 24, 2024) ("[A]gencies . . . do violence to the Constitution when they attempt to unilaterally amend Acts of Congress to suit their policy choice.").

### III.     The PBGC Regulation Is Barred by the Major Questions Doctrine.

67.     The lack of congressional intent supporting PBGC's Phase-In Regulation is particularly significant and counsels against allowing an agency regulation where, as here, the regulation implicates a "major question."

68.     In *West Virginia v. EPA*, the Supreme Court held that if an agency action implicates a question of major "economic or political significance," it requires a clear congressional statement permitting it to so act.  597 U.S. 697, 735 (2022) ("A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to a clear delegation from that representative body.").  As in *West Virginia*, the regulation at issue here implicates a multi-billion-dollar problem of major economic and political significance.  *See, e.g.*, 87 Fed. Reg. 40968, 40999 (July 8, 2022) (Office of Management and Budget ("**OMB**") designated the PBGC rule as a "major rule" and a "significant regulatory action" since it will "likely result in . . . an annual effect on the

economy of $100 million or more.")  The Proofs of Claim in this case alone demonstrate that this Phase-In Regulation, already designated "major" by OMB, will have a multi-billion-dollar impact. Unlike *West Virginia*, the PBGC's interpretation of ERISA is implausible, as explained above. 597 U.S. at 723 ("something more than a merely plausible textual basis for the agency action is necessary").

69.     Because Congress did not clearly delegate to PBGC the immense power to amend ERISA in a fashion that grants pension funds multi-billion-dollar windfalls to the detriment of a company's other stakeholders,[42] PBGC cannot do so here.  *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance'") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)); *West Virginia*, 597 U.S. at 723 ("[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s]'") (quoting *Whitman* v. *Am. Trucking Ass'ns., Inc.*, 531 U. S. 457, 468 (2001)).

ii.     **The PBGC Regulation Is Arbitrary and Capricious.**

70.     As described above, it is hard to characterize the Phase-In Regulation as a "condition" on a "plan" related to withdrawal liability; that interpretation does violence to the words.  Regardless, ARPA requires that any condition PBGC adopted on "plans" receiving SFA be "reasonable."  29 U.S.C. § 1432(m)(1).  Indeed, an agency action qualifies as arbitrary or capricious if it is not "reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Thus, the agency must offer "a satisfactory explanation for its action[,]

---

[42]     Bankruptcy is a zero-sum game.  Perhaps most vividly illustrated here, if the SFA MEPPs receive the multi-billion dollar claims they seek—even though the SFA they received eliminated their UVBs—the several other multi-employer pension plan creditors that actually have UVBs and were *ineligible* for SFA will receive a far smaller recovery.  This is an absurd result, and it is impossible to understand why the PBGC would prefer such a result.  It is also beyond comprehension that Congress would intend such a result.

including a rational connection between the facts found and the choice made" and cannot simply ignore "an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Reviewing agency action under this standard "involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011).

71.     The Phase-In Regulation fails this test for at least two independent reasons. First, the PBGC considered, but did not include, in its interim rule a condition that SFA assets be wholly disregarded when determining UVBs in assessing withdrawal liability during the SFA coverage period. 86 Fed. Reg. 36598, 36619 (July 21, 2021). The PBGC had determined this condition to be "administratively complex and therefore less desirable." *Id.* In its final rule, the PBGC imposed phased-in recognition of SFA, stating that "[w]ithout the condition, the payment of SFA could instead result in indirect transfers of SFA to withdrawing employers from plans by reducing their withdrawal liability." 87 Fed. Reg. 40968, 40997 (July 8, 2022). But the final rule in no way explains how phased-in recognition of SFA is less "administratively complex" than the approach of fully disregarding SFA that was rejected in the interim rule. Logic dictates that the chosen approach is far *more* complex, making clear the regulation was not "reasonable and reasonably explained" and ignored "an important aspect" that the PBGC itself identified in its interim rule. *Prometheus Radio*, 592 U.S. at 423; *State Farm*, 463 U.S. at 43.

72.     Second, the PBGC has stated in these proceedings that the phased recognition of SFA was necessary because the agency "projected in July 2021 that if it imposed no condition related to withdrawal liability, 35% of contributing employers would withdraw immediately following plans' receipt of SFA and PBGC would have to pay an additional $15 to $20 billion in SFA to make up for plans' lost income." ECF No. 2640 ¶ 13; *see also* ECF No. 1630, at 7–8. But

nothing in the administrative record remotely supports that assertion.  PBGC cites to 86 Fed. Reg. 36617 for support, but it provides none.  Rather, it merely states that if the PBGC imposed no condition related to withdrawal liability **and if it assumed** that 35% of employers would immediately withdraw after receipt of SFA, then PBGC would have to pay an additional $15-20 billion in SFA.  86 Fed. Reg. 36598, 36617 (July 12, 2021).  In other words, the only support that PBGC has ever been able to identify, even in these proceedings, for its Phase-In Regulation is an **assumption** that PBGC itself made about how contributing employers might react in the absence of such regulation; PBGC has not identified any facts or studies supporting that assumption, and the administrative record reveals none.  *See* Slade Decl., Ex. 1 (PBGC Administrative Record).

73.    As a matter of logic, there is no reason to believe that employers would even have the ability to withdraw from MEPPs that are fully funded by the SFA.  Most employers participate in MEPPs because they are required to by collective bargaining agreements that cannot be escaped on a whim, and unions would surely be **more** entrenched in requiring MEPP participation where the MEPPs are newly fully funded through a government bailout.  In all respects, the Phase-In Regulation was not "reasonable and reasonably explained," and the PBGC has no "satisfactory explanation for its action."  *Prometheus Radio*, 592 U.S. at 423; *State Farm*, 463 U.S. at 43.

74.    For these reasons, the Phase-In Regulation is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and "arbitrary [or] capricious."  5 U.S.C. § 706 (2)(A), (C).  The Phase-In Regulation should be set aside, and the Court should require that the SFA MEPPs disregard it in calculating Debtors' withdrawal liability.

**B.**    **THE PENSION PLANS' PROOFS OF CLAIM FOR WITHDRAWAL LIABILITY MUST BE REDUCED TO COMPLY WITH ERISA'S REQUIREMENTS.**

i.    **The 20-Year Cap Should Be Applied to the Proofs of Claim of Ten Pension Plans.**

75.    10 of the 11 SFA MEPPs—all but Local 1730—failed to calculate Debtors' withdrawal liability by limiting it to the sum of the first 20 years of annual payments from the Debtors, as required by ERISA.  *See* 29 U.S.C. §§ 1381(b)(1)(C), 1391(c)(1)(B).  These MEPPs do not (and cannot) argue that they disregarded the statutory cap in calculating Debtors' withdrawal liability pursuant to any of ERISA's noted exceptions because: (1) they have not experienced a mass withdrawal of contributing employers, (2) they are not a MEPP described in 29 U.S.C. § 1396(b), and (3) they cannot establish it would take less than 20 years for the Debtors to amortize their alleged allocable share of UVBs through annual payments.

76.    Instead, these SFA MEPPs argue only that, due to Debtors' bankruptcy and/or potential inability to satisfy their withdrawal liability in full, the Debtors are in "default," such that the SFA MEPPs can accelerate and demand Debtors' entire withdrawal liability—an amount they contend is equal to Debtors' allocable share of UVBs and not subject to ERISA's statutory cap. *See* Slade Decl., Ex. 20 (A. Sprau Dep. Tr.) at 42:25-43:18 ("Q: As you're sitting here today, are you aware of any other reason aside from this alleged default that Central States believes it doesn't owe Yellow an annual payment schedule? A: I cannot think of one right now."); Ex. 4 (K. Culp Dep. Tr.) at 112:7-15 (same); *see also, e.g.*, Slade Decl., Ex. 34 (Western PA Teamsters' Resp. to ROG No. 8) ("[T]he Fund states that . . . the 20-year cap does not apply because Debtors are in default and the full outstanding amount of the withdrawal liability is due and owing in a lump sum."); Ex. 25, Local 641's Resp. to ROG No. 8 (same); Ex. 26, Local 707's Resp. to ROG No. 8 (same); Ex. 27, Local 701's Resp. to ROG No. 8 (same); Ex. 28, IAM's Resp. to ROG No. 8 (same); Ex. 29, TENJ's Resp. to ROG No. 8 (same); Ex. 30, Local 617's Resp. to ROG No. 8 (same); Ex. 31, New York Teamsters' Resp. to ROG No. 8 (same); Ex. 32, Central States' Resp. to ROG No. 8 (same); Ex. 33, Freight Drivers' Resp. to ROG No. 8 (same).

77.     That is not the case.  Even assuming, for purposes of this Motion, that Debtors were in default, the SFA MEPPs would only be entitled to accelerate and demand the "outstanding amount of [Debtors'] ***withdrawal liability***," *see* 29 U.S.C. § 1399(c)(5) (emphasis added)—not Debtors' allocable share of UVBs.  These are not the same thing.  Section 1381 of ERISA explicitly defines withdrawal liability, not as allocable UVBs alone, but as "[a fund's allocable UVBs], adjusted . . . to reflect the limitation on annual payments under section 1399(c)(1)(B)" and certain other reductions.  29 U.S.C. § 1381(b)(1) (emphases added).  "Withdrawal liability" does not mean something different in Section 1381 than it does in the default provision of Section 1399, as the SFA MEPPs insist.  *Cellco P'ship v. White Deer Twp. Zoning Hearing Bd.*, 74 F.4th 96, 105 (3d Cir. 2023) ("It would defy the 'basic canon of statutory interpretation that identical words appearing in neighboring provisions of the same statute generally should be interpreted to have the same meaning,' to apply one standard under [one part of a statute] and a different one under [another].").  Rather, these provisions collectively provide that, in the event of default, a multiemployer plan can accelerate and demand payment of a withdrawn employer's "withdrawal liability," which is the employer's allocable share of the SFA MEPP's UVBs less the Applicable Adjustments (including application of the 20-year cap on annual payments).  A default, in other words, does not entitle the SFA MEPPs to disregard any Applicable Adjustments to Debtors' withdrawal liability or otherwise ***increase*** the amount they are seeking; it just entitles them to recover the same amount of withdrawal liability immediately, rather than over 20 years.

78.     This interpretation accords with the purpose of Section 1399's default provision, which is to protect multiemployer plans—again, not to punish defaulting employers:

> [T]he purpose of section 1399(c)(5)(B) is to allow multiemployer plans to protect
> themselves and their participants against events indicating a substantial likelihood of
> an employer's inability to pay its withdrawal liability. If there is a substantial likelihood
> that an employer will be unable to meet its obligations, then there is a need for urgent

action that is not present if the employer simply misses a payment. In the former situation, if the fund is unable to collect quickly, it likely never will collect. The fund, and the employees whose pensions it serves, therefore would be unprotected.

*See, e.g.*, *Cent. States Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*, 620 F.3d 766, 774 (7th Cir. 2010) (internal quotations and punctuations omitted).

79. Other courts agree. On this point, *Trustees of Leather Goods, Plastics, Handbags, & Novelty Workers Union Local 1 Joint Retirement Fund v. Key Handling Systems* is instructive. *See* 2015 WL 5604184, at *1 (E.D.N.Y. June 5, 2015). There, the plaintiff fund determined that defendant's allocable share of UVBs (less any deductions) was $1.56 million, but because it would take more than 20 annual payments for defendant to amortize that amount, plaintiff applied the statutory cap, determined that the amount of defendant's withdrawal liability was the present value of the first 20 annual payments—$107,107—and demanded that amount. *Id.* But defendant never responded to demands for payment, such that, several months later, plaintiff declared defendant in default and demanded that it immediately pay its allocable share of UVBs, $1.56 million plus interest, rather than the capped amount originally demanded. *Id.* at *2. Again, defendant never responded to this demand for payment. As such, plaintiff filed suit and sought default judgment, arguing that it was entitled to disregard the 20-year statutory cap because defendant was in default. *Id.* at *4. But the court rejected this argument, noting that not only had plaintiff proffered no authority showing that the 20-year cap ceases to apply in cases of default, but also that plaintiff's new demand "exceed[ed] their original demand by a substantial amount (*$1,557,659.00 v. 107,107.00*)." *Id.* The court thus limited plaintiff's award (and defendant's withdrawal liability) to the original, capped amount plus interest. *Id.*; *see also Trs. of Leather Goods, Plastics, Handbags, & Novelty Workers Union Local 1 Joint Ret. Fund v. Key Handling Sys. Inc.*, 2015 WL 5604178, at *1 (Sept. 23, 2015) (adopting magistrate's report and recommendation).

36

80.     The result here should be no different.  As in *Key Handling*, the SFA MEPPs rely on a flawed reading of ERISA (and nothing else) to justify their decision not to apply the statutory cap, and the difference between their capped and uncapped claims is staggering: *even if* the SFA MEPPs properly calculated their UVBs and Debtors' annual payments, the statutory cap would apply to and collectively reduce the SFA MEPPs' claims by **more than $4 billion**.

81.     In sum, this is a statutory interpretation dispute—whether "withdrawal liability" means something different in one part of ERISA than it does in another—and is ripe for summary judgment.  Because Section 1381 defines withdrawal liability to include adjustments for the 20-year cap, and Section 1399 permits (in certain circumstances) the SFA MEPPs to accelerate only what is outstanding "withdrawal liability," the Court should hold that any accelerated amount must include the statutory cap on payments and require the SFA MEPPs' claims be reduced accordingly.

ii.     **New York State Teamsters and Western PA Teamsters Improperly Allocated Debtors' UVBs or Calculated Debtors' Withdrawal Liability Using Imputed Contribution Rates and CBUs.**

82.     There is no dispute of material fact that New York and Western PA Teamsters relied on invalid UVB allocation methods.  Under ERISA, MEPPs must use a prescribed method of UVB allocation or obtain PBGC approval for alternative allocation methods. 29 U.S.C. § 1391. No authority exists for a MEPP to adopt an alternative annual payment calculation method, even if presented to PBGC for approval; instead they must comply with 29 U.S.C. § 1399(c).  Further, PBGC approval is limited to rules authorized by ERISA. 29 U.S.C. § 1400(a).  Here, Western PA Teamsters and New York State Teamsters neither used allocation methods prescribed by statute nor sought or received approval from PBGC to use an alternative method.  Thus, as a matter of law, their UVB allocation methods are invalid and should be held inapplicable to the Debtors.

83.     ERISA provides four methods for allocating UVBs to withdrawing employers. *See* 29 C.F.R. § 4211.11-13. Each requires a MEPP to allocate UVBs based on contribution rates that withdrawn employers actually paid and CBUs that withdrawn employers actually had, over a given period. 29 C.F.R. § 4211.4(a)(1). Here, it is undisputed that New York and Western PA Teamsters did not allocate Debtors' UVBs or calculate Debtors' annual payment using actual contribution rates or CBUs. Instead, Western PA Teamsters admits that it "determine[ed] … Debtors' allocable shares of the Fund's [UVBs] … based [on] the Fund's Rehabilitation Plan Distressed Employer Schedule, which requires that Debtors' … reduced contribution rates be disregarded for purposes of allocating shares of [UVBs]." *See* Slade Decl., Ex. 5 (Sekol Decl.) ¶ 34. New York Teamsters did the same thing: it allocated the fund's UVBs and calculated Debtors' annual payment based on imputed contribution rates and CBUs, rather than Debtors' actual contribution rates and CBUs from the relevant timeframe—which resulted in an inflated annual payment and allocable share of UVBs. Slade Decl., Ex. 15 (Proof of Claim No. 4489); Exhibit 35 (YELLOW_NYST 001304).

84.     By changing the definition of "contribution rate" and "CBUs" from what Debtors actually paid and the work that Debtors' employees actually performed in the years before Debtors' withdrawal to these imputed, counterfactual amounts, New York and Western PA Teamsters employed an allocation method for the Debtors not found in ERISA. Such alternative allocation methods are only permissible where a MEPP first sought and obtained approval of the PBGC. *See* 29 U.S.C. § 1391(c)(5)(A) (any amended procedure is "subject to the approval of the corporation based on its determination that adoption of the method by the plan would not significantly increase the risk of loss to plan participants and beneficiaries or to the corporation."); 29 C.F.R. § 4211.23(b) (criteria for approving alternative allocation methods).

85.    Here, it is undisputed that PBGC did not approve Western PA or New York Teamsters' alternative methods.  *See* Slade Decl., Ex. 5 (Sekol Decl.) ¶¶ 34, 39; Ex. 4 (K. Culp Dep. Tr.) at 117:23-118:2.  For this reason, as a matter of law, their calculations of the Debtors' annual payment and UVBs are void, and the Court should require that the funds' Proofs of Claim be reduced such that they comply with one of the permissible allocation methods under ERISA.[43]

## C.    THE SFA MEPPS' PROOFS OF CLAIM SHOULD BE REDUCED TO THEIR NET PRESENT VALUE.

86.    Inside and outside bankruptcy, courts, pension plans, and employers typically discount 20-year withdrawal liability payment streams to present value.  As a matter of law, the SFA MEPPs' claims for 20 years of withdrawal liability payments must be so discounted.

87.    As a threshold matter, "the promise of a dollar payable in several years is not worth 100 cents today."  *Matter of Penn Central Transp. Co.*, 596 F.2d 1102, 1116 (3d Cir. 1979); *see also Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 489 (1916) ("It is self-evident that a given sum of money in hand is worth more than the like sum of money payable in the future.").  As Justice Stevens explained, "[a] debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment."  *Till v. SCS Credit Corp.*, 541 U.S. 465, 474 (2004).  To account for this, in bankruptcy, "future damage claims are typically discounted to present value."  *In re B456 Sys., Inc.*, 2017 WL 6603817, at *22 (Bankr. D. Del. Dec. 22, 2017) (citing *In re O.P.M Leasing Servs., Inc.*, 79 B.R. 161, 167 (S.D.N.Y. 1987); *Penn Central*, 596 F.2d at 1116).

---

[43]    Using the same legal analysis, Local 641's annual payment calculation must be reduced to exclude post-2014 contribution rate increases.  ERISA does not permit Local 641 to include such increases except in circumstances not present here. 29 U.S.C. § 1085(g)(3) (increases to employer contribution rates required under a pension fund's rehabilitation plan must be disregarding in determining the employer's withdrawal liability payments).

88.     Here, it is undisputed that the SFA MEPPs filed Proofs of Claim representing 20 (or more) years of withdrawal liability payments but did not discount those claims to the amount they are worth today in a lump sum.  The SFA MEPPS instead seek artificially enlarged claims because they are against a debtor in bankruptcy—but there is no such bankruptcy premium. Instead, this Court should follow others in allowing claimants to pursue exactly what they would have received had they been paid in a lump sum outside of bankruptcy: a lump sum equal, in today's dollars, to 20 years of future payments via discounting.  *See e.g.*, *Key Handling*, 2015 WL 5604184, at *4 (explaining that plaintiff pension fund computed an employer's "total withdrawal liability as $1,557.659.00" but demanded "$107,107.00" because the pension plan's demand "reflects … the present value of 20 years of payments."); *In Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. D & A Bus Co.*, 270 F. Supp. 3d 593 (E.D.N.Y. 2017) (holding that a default judgment for 20 years of withdrawal liability payments totaling $1,058,667,20 entitled plaintiff pension fund to the "full principal of withdrawal liability" which it determined was the present value discounted amount of "$575,545").

89.     Outside of bankruptcy, the discount rate is typically negotiated.  Here, the Debtors are prepared to litigate the *amount* of the discount rate (and have provided an expert report describing what the Debtors believe to be the appropriate range), but the SFA MEPPs have not discounted *at all*.  This Court should confirm that the SFA MEPPs are required to reduce their Proofs of Claim to present value, permitting the parties to negotiate an appropriate discount rate or the parties' respective experts to testify on that point at trial for the Court to resolve.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter partial summary judgment on the SFA MEPPs' Proofs of Claim for withdrawal liability.

| | |
|---|---|
| Dated: July 3, 2024<br>Wilmington, Delaware | */s/ Laura Davis Jones* |

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:             ljones@pszjlaw.com
                       tcairns@pszjlaw.com
                       pkeane@pszjlaw.com
                       ecorma@pszjlaw.com


Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
Shirley Chan (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 W. Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:             pnash@kirkland.com
                       dseligman@kirkland.com
                       mslade@kirkland.com
                       shirley.chan@kirkland.com


-and-
Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:      (415) 439-1400
Facsimile:      (415) 439-1500
Email:             michael.esser@kirkland.com
                       john.christian@kirkland.com


*Co-Counsel for the Debtors and Debtors in Possession*