IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MOTION TO RECONSIDER IN PART THE SEPTEMBER 13, 2024 MEMORANDUM OPINION FINDING A WITHDRAWAL LIABILITY DEFAULT IN ADVANCE OF A WITHDRAWAL LIABILITY PAYMENT OBLIGATION**

The Debtors bring this motion ("**Motion**") for partial and limited reconsideration of certain findings in the Court's Memorandum Opinion [ECF No. 4326] ("**Memorandum Opinion**") on Debtors' and SFA Multiemployer Pension Plans' ("**SFA MEPPs**") cross motions for summary judgment [ECF Nos. 3803-05, 3825, 3917, 3950, 3975, 3992, 4009-11]. Specifically, the Debtors seek reconsideration of the Court's finding that the Debtors "defaulted" on any withdrawal liability obligations to SFA MEPPs and/or that SFA MEPPs had accelerated claims for such withdrawal liability prior to these bankruptcy proceedings.

Unless the Court was referring simply to the Debtors' chapter 11 filings as a "default," it is unclear on what basis the Court concluded that there was any default. The summary judgment record is bereft of any evidence of pre-petition default (none is cited in the Memorandum Opinion). As set forth in more detail below, the factual record demonstrates just the opposite: prior to the Petition Date, not one of the SFA MEPPs assessed or demanded payment of Debtors' withdrawal liability, let alone determined under plan rules that there existed a substantial likelihood that the

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

1

Debtors would be unable to pay the yet-to-be-assessed withdrawal liability (an "Insecurity Default"), meaning that Debtors could not have "defaulted" on any such payments before seeking the protections of chapter 11. Simply put, the Debtors could not have defaulted on an obligation that did not yet exist. Because Debtors believe this finding to be in error, and because that finding could have wide ranging implications for proper calculation of both the SFA MEPPs' Proofs of Claim and numerous proofs of claim filed by other MEPPs—specifically, whether such claims must be discounted to their net present value—the Debtors respectfully request that the Court reconsider these findings, as set forth herein.

## BACKGROUND

1.  In its Memorandum Opinion, this Court agreed with the Debtors that each MEPP's withdrawal liability payments are capped at what would be 20 years of properly-calculated annual payments, "even if it would take 25 or 50 or 1,000 such payments to repay the employer's annual share of the fund's unfunded vested benefits." Memorandum Opinion at 4. But the Court disagreed that the MEPPs' bankruptcy claims should be the present value of these 20 annual payments, finding instead that there was a "default" that "operates to accelerate the payments that would otherwise have been due over 20 years." *Id.* Accordingly, the Court held that the MEPPs' withdrawal liability claims should be calculated by summing each of the would be payment years after applying the 20-year-cap. *Id* at 4-5.

2.  The Debtors disagree with several points in the Memorandum Opinion and are considering whether to appeal at the appropriate time. At this point, however, the Debtors ask this Court to reconsider the portion of the Opinion relating to discounting because, while the opinion is not clear, it appears to be based on a mistaken premise of a pre-petition "default." There was

2

no such "default," and there is no evidence in the summary judgment record of any pre-petition "default" upon which the Court could have come to that conclusion.

3. A withdrawn employer's withdrawal liability obligations arise upon its partial or complete withdrawal from a MEPP, but under 29 U.S.C. § 1399(c)(2) any payments on such obligations are only owed after the MEPP satisfies ERISA's notice and demand requirements. Specifically, ERISA Section 1399(b) provides that, following an employer's complete withdrawal from a MEPP, the MEPP must, as soon as practicable, notify the employer of the amount of liability, furnish a payment schedule, and demand payment in accordance with that schedule. It is only *after* a MEPP provides the withdrawn employer a liability amount, payment schedule, and demand for payment in accordance with that schedule, that the withdrawn employer has *any* obligation to pay withdrawal liability under ERISA. 29 U.S.C. § 1399(c)(2). The Debtors believe this framework is undisputed.

4. It is further undisputed that the SFA MEPPs only satisfied Section 1399(b)'s notice and demand requirements by filing Proofs of Claim in the Bankruptcy Case *after* the Petition Date. Indeed, during litigation over the MEPPs' motion to compel arbitration, the SFA MEPPs relied on their Proofs of Claim to argue that they had satisfied ERISA's notice and demand requirements—they did not purport to have provided Debtors with any pre-petition notice or demand. *See* CSPF's Motion to Compel Arbitration [ECF No. 1665] ¶ 19 ("a notice and demand filed in a Chapter 11 bankruptcy constitutes one recognized means of satisfying the notice and demand requirements of 29 U.S.C. § 1399(b)(1)");[2] Other MEPPs' Joint Motion to Compel Arbitration [ECF No. 2180] ¶ 12 (claiming that whether filing of proofs of claim satisfied 1399 was an issue to be arbitrated).

---

[2] For its part, the Court appears to have accepted these arguments. *In re: Yellow Corp.*, 2024 WL 1313308, at *6 (Bankr. D. Del. Mar. 27, 2024) ("This Court, however, believes that the funds satisfied these [29 U.S.C. § 1399 notice] requirements through the filing of their proofs of claim.").

3

5.  This timeline is unsurprising. The Debtors only effected a complete withdrawal from the SFA MEPPs in the last few days of July 2023, when the Debtors laid off the vast majority of their employees. The Debtors' demise was sudden and unexpected and occurred less than 10 days before the Debtors filed for bankruptcy. The funds would not have had time to assess Debtors' withdrawal liability, obtain internal approvals to seek such liability, and send notice and demand payment of withdrawal liability to the Debtors in the narrow window between withdrawal and the initiation of these bankruptcy proceedings. And there is no evidence in the summary judgment record that any of the SFA MEPPs determined an Insecurity Default had occurred before the Debtors filed for bankruptcy or notified Debtors of any such determinations—indeed, as they had not even calculated withdrawal liability, let alone demanded its repayment, it is hard to understand how the SFA MEPPs could have found "default" pre-petition.

6.  The SFA MEPPs cannot argue otherwise. Indeed, in their Proofs of Claim—again, the sole basis on which the SFA MEPPs claimed to have complied with ERISA's notice and demand requirements—the SFA MEPPs attached withdrawal liability valuations that their actuaries performed so that the funds could demand withdrawal liability from the Debtors. The funds that dated these documents explicitly say that their withdrawal liability calculations were performed after the Petition Date.[3] And nothing in the Proofs of Claim suggests that the MEPPs had declared an Insecurity Default before Debtors filed for bankruptcy—nor could they have done so given that, at the time, no withdrawal liability had been assessed at all.

---

[3] *See e.g.* Ex. A (Slade Decl.), Exhibit 1 (Central States's Proof of Claim No. 4312 showing that CSPF's actuary calculated Debtors' withdrawal liability on October 20, 2023); *see also* Ex. A (Slade Decl.) Exhibit 2 (IAM Motor City Pension Fund Proof of Claim No. 16895 showing that IAM's actuary calculated Debtors' withdrawal liability on November 6, 2023; Exhibit 3 (Local 1730 Proof of Claim No. 14718 showing that Local 1730's actuary calculated Debtors' withdrawal liability on October 9, 2023); Exhibit 4 (New York Teamsters Proof of Claim No. 4489 showing that its actuary calculated Debtors' withdrawal liability on October 5, 2023); Exhibit 5 (Local 707 Proof of Claim No. 14941 showing that Local 707's actuary calculated Debtors' withdrawal liability on October 23, 2023); Exhibit 6 (Local 641 Proof of Claim No. 5505 showing that its actuary calculated Debtors' withdrawal liability on September 7, 2023).

7. The summary judgment record thus does not support a finding that Debtors defaulted on any withdrawal liability obligations or that any of the MEPPs determined that an Insecurity Default occurred prior to the bankruptcy filing.[4] If that was the basis for the Court's conclusion, such finding was in error and is ripe for reconsideration.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the Motion pursuant to 28 U.S.C §§ 157 and 1334, the Amended Order of Reference from the United States District Court for the District of Delaware dates February 29, 2012. The SFA MEPPs have waived any objection to this Court's adjudication of their Proofs of Claim by voluntarily filing Proofs of Claim in this Court and seeking allowance of such claims here. In any event, the Debtors confirm their consent, pursuant to Rule 9013(f) of the Local Rules of Practice and Procedure of the U.S. Bankruptcy Court for the District of Delaware, to this Court entering a final order in connection with the Proofs of Claim and this Objection to the extent that it is later found that the Court, absent consent, cannot enter final orders or judgments in connection herewith consistent with Article III of the U.S. Constitution.

9. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The statutory bases for the relief requested herein are sections 502 of the Bankruptcy Code and Rule 9024 of the Bankruptcy Rules.

## RELIEF REEQUESTED

11. The Debtors request this Court reconsider the Memorandum Opinion to the limited extent it found the Debtors "defaulted" on their withdrawal liability obligations by initiating these

---

[4] At the parties' summary judgment hearing, and for the first time, counsel for CSPF suggested that CSPF accelerated Debtors' withdrawal liability pre-petition. Ex. B (Hr'g Tr.) at 103:24-104:8 (CSPF Counsel: "it was unlikely Central States would be able to collect the full withdrawal liability and as a result Central States accelerated under (c)(5)(b)" … The Court: "That acceleration, was that before or after the day of the petition?" CSPF Counsel: "Before".). Respectfully, there is no summary judgment record evidence to support that assertion and the Debtors, having looked, are unaware of any correspondence or other contemporaneous support for such statement.

bankruptcy proceedings or otherwise. The Debtors further request this Court correct its ruling for either the factual error that the Debtors defaulted pre-petition or via an ipso facto Insecurity Default (they did not).

## BASIS FOR RELIEF REEQUESTED

12. Under Bankruptcy Rule 9023, the Memorandum Opinion is subject to review and modification by this Court. "'The purpose of a motion for reconsideration … is to correct manifest errors of law or fact'" *Max's Seafood Café ex rel. Lou-Ann*, *Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)). The standard is disjunctive, meaning that this Court should revise its pre-obligation-default ruling if it finds it was based on either a "manifest error[] of law *or* fact." *Id*. (emphasis added); *see also In re Vehicle Carrier Servs. Antitrust Litig.,* 846 F.3d 721, 87-88 (3d Cir. 2017) (same).

13. In its Memorandum Opinion, the Court agreed with the Debtors that the MEPPs' withdrawal liability claims were limited to what would be 20 years of properly calculated annual payments. *See* Memorandum Opinion at 36-38. But the Court found present value discounting of what would have been 20 years of annual payments inappropriate because "the debtors were not disputing that they had defaulted on the obligation to make withdrawal payments before the petition date" and "[t]he result of that default is that the obligation to make payments over 20 years is accelerated." *Id.* at 38. Those statements are, respectfully, incorrect.

14. Under ERISA, it is well-settled that withdrawing employers' payment obligations do not commence unless and until pension plans validly notice and demand such withdrawal liability. 29 U.S.C. §§ 1399(b)(1), (c)(2). That is why withdrawing employers have no obligation to make any withdrawal liability payments to plans that fail to provide a valid notice and demand. *See Allied Painting & Decorating, Inc. v. Int'l Painters and Allied Trades Indus. Pens. Fund*, 107

6

F.4th 190, 199 (3rd Cir. 2024) (employer had no payment obligation to a pension plan that failed to furnish a valid notice and demand for payment of withdrawal liability "'as soon as practicable'": "The 'as soon as practicable' requirement under § 1399(b)(1) is an independent statutory requirement, and it was not met here.  So the Fund cannot recover the withdrawal-liability amount from Allied under the MPPAA. . ..").

15. In fact, in prior and extensive briefing over whether arbitration of these withdrawal liability disputes was mandatory, all parties and this Court agreed that the SFA MEPPs had to meet Section 1399(b)(1)'s notice and demand requirements before any withdrawal liability payment obligation would accrue. The only dispute at the time concerned whether the SFA MEPPs' Proofs of Claim satisfied these notice and demand requirements. *Compare* CSPF's Motion to Compel Arbitration [ECF No. 1665] ¶ 19 *and* Other MEPPs' Joint Motion to Compel Arbitration [ECF No. 2180] ¶ 12 *with* Debtors' Reply in Support of their Objection to the Proofs of Claim [ECF No. 2130] ¶ 8 (quoting *In re BFW Liquidation*, LLC, 459 B.R. 757, 762-78 (Bankr. N.D. Ala. 2011)). This Court agreed with the MEPPs that the Proofs of Claim satisfied Section 1399(b)(1)'s requirements but agreed with all parties that Section 1399(b)(1) imposed requirements upon the MEPPs before any such withdrawal liability payments would be owed. *See Yellow Corp.*, 2024 WL 1313308, at *6 ("This Court, however, believes that the funds satisfied these [29 U.S.C. § 1399(b)(1)'s notice] ***requirements*** through the filing of their proofs of claim.") (emphasis added).

16. Thus, the factual record unambiguously shows that Debtors' withdrawal liability obligations—and thus, any default thereon—only arose *after* the SFA MEPPs filed their Proofs of Claim.  Based on a review of the Debtors' records, none of the SFA MEPPs advised the Debtors of their liability and demanded that it be paid pre-petition.  And the summary judgment record lacks any evidence that any SFA MEPP noticed and demanded withdrawal liability pre-petition,

let alone validly accelerated withdrawal liability pre-petition. Moreover, the notion that any of the SFA MEPPs validly accelerated withdrawal liability flies in the face of the funds' posture during the arbitration dispute where they successfully argued their Proofs of Claim—and nothing else—satisfied Section 1399(b)(1). *See* ECF No. 1665 ¶ 19.

17.     Because it is undisputed that pre-petition Debtor's payment obligations had not commenced under 29 U.S.C. § 1399(c)(2), a default under 29 U.S.C. § 1399(c)(5)(A) is impossible.

18.     The only other kind of default — Section 1399(c)(5)(B) Insecurity Default — likewise could not have occurred pre-petition or ipso facto. Crucially, an Insecurity Default is a default on withdrawal liability—not contribution payments. Under Section 1399(c)(5)(B), MEPPs may adopt plan rules providing for such Insecurity Default when, in the MEPPs' determination, an event has occurred that indicates a substantial likelihood that an employer would be unable to pay its withdrawal liability. In other words, for an Insecurity Default to occur, (i) a withdrawn employer must already have had its withdrawal liability assessed, (ii) a MEPP must determine that such employer is subject to plan rules for Insecurity Default, and (iii) there must be a substantial likelihood that the employer will be unable to pay its assessed withdrawal liability. Here, it is impossible for an Insecurity Default to have occurred pre-petition because the SFA MEPPs did not assess Debtors withdrawal liability until after the bankruptcy filing. *Supra* n.3.

19.     It is also impossible because none of the SFA MEPPs could have determined that an Insecurity Default occurred pre-petition. Though the SFA MEPPs may contend that they exercised their option to call an Insecurity Default *after* the petition date based on plan rules, the MEPPs did not and cannot point to any automatic ipso facto provisions, and there is no evidence in the summary judgment record that they did so at all.

20. For these reasons, the Court's statement that "the debtors were not disputing that they had defaulted on their obligation to make withdrawal payments before the petition date" (Memorandum Opinion at 38) is not accurate.[5] The Debtors had no such obligation, and it cannot be that the Debtors "defaulted" on any withdrawal liability obligation before they received the notice and demand ERISA requires or before a SFA MEPP declared an Insecurity Default. "A default is a failure to act *when an action is required.*" See Bryan A. Garner, Dictionary of Modern Legal Usage (2d ed. 1995) (emphasis added). And the Debtors could not have defaulted on withdrawal liability obligations before they existed (that is, before the SFA MEPPs filed their Proofs of Claim). This is because, as previously explained, withdrawal liability obligations only commence under Section 1399(c)(2) after an employer satisfies Section 1399(b)(1)'s notice and demand requirements. Put differently:

> The term "default" in common parlance and as used by lawyers and judges is not arcane or controversial. Simply stated, it means the failure to perform or fulfill some obligation or duty imposed by law or contract.

*In re Metromedia Fiber Network, Inc.*, 335 B.R. 41, 49 (Bankr. S.D.N.Y. 2005), *aff'd sub nom. Abovnet, Inc. v. SBC Telecom, Inc.*, 2007 WL 636602 (S.D.N.Y. Feb. 27, 2007).

21. Accordingly, the Debtors respectfully request that the Court reconsider its statements that the Debtors "defaulted" on withdrawal liability payments pre-petition and, as a result, owe 20-years of annual payments that are added together and not discounted to present value for the MEPPs' withdrawal liability claims. The Debtors agree that they filed for bankruptcy

---

[5] For avoidance of doubt, an employer's failure to pay required contributions is not a default on withdrawal liability payment obligations under 29 U.S.C. § 1399(c)(5). The requirement to make contributions before a withdrawal occurs is a separate obligation under ERISA, and an employer's failure to make such contributions are subject to claims under 29 U.S.C. § 1145. An employer's failure to make required contributions does not result in an employer's withdrawal from a MEPP. A withdrawal only occurs when the employer permanently ceases to have a contribution obligation or permanently ceases covered operations that required contributions. 29 U.S.C. § 1393.

but certainly disagree that there was any pre-petition default (there was not) and disagree that the fact of bankruptcy is a "default" having the consequence the Court found it to have.[6]

22.    Among other things, the Court's ruling will massively increase calculations of the SFA MEPPs' withdrawal liability claims and, at the same time, drastically and unfairly diminish distributions to non-MEPP unsecured creditors who are entitled to equal treatment. *In re Net Pay Sols., Inc.*, 822 F.3d 144, 150 (3d Cir. 2016) ("A 'central policy' of the Bankruptcy Code is '[e]quality of distribution among creditors.' 'According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property.'") (quoting *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990)). As this Court recognized, "if what the debtors owed on the petition date was a stream of payments that would be made over time, bankruptcy law would typically provide that the allowed claim would be discounted to its present value." Memorandum Opinion at 38. That should be true for *all* claims—both MEPP claims, and other claims based on a stream of payments. The rationale is simple: "[a] debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation

---

[6] It could be that the Court considers the actual bankruptcy filing to be the "default" and that part of the statements made by the Court on page 48 ("The whole point of the prior section, however, was that the debtors were not disputing that they had defaulted on the obligation to make withdrawal payments ***before the petition date***.") (emphasis added) were made in error. That might explain the Court's reference to *In re AMR Corp.,* 730 F.3d 88 (2d Cir. 2013) on page 36, footnote 112, of the Memorandum Opinion. And if that is in fact the Court's view, the Debtors still respectfully disagree. *See e.g., In re W.R. Grace & Co.*, 475 B.R. 34, 153 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), *and aff'd,* 532 F. App'x 264 (3d Cir. 2013)*, and aff'd,* 729 F.3d 311 (3d Cir. 2013) ("Courts have interpreted this legislative history [the legislative history of the bankruptcy code sections explicitly prohibiting ipso facto clauses] as 'indicat[ing] that bankruptcy-default clauses are to be invalid in all types of contracts, without limitation.... The only congressional statement is clear that in most, if not all, instances, such clauses are not enforceable.... Thus, there is simply no reason to assume that Congress intended to make these clauses enforceable only in non-executory contracts.' As such, the Court agrees with the general trend of the federal courts that the prohibition against ipso facto clauses is not limited to actions based upon §§ 541(c) and 365(e).") Moreover, under Section 1399(c)(5)(B), a bankruptcy filing is not an ipso facto Insecurity Default; rather the MEPPs had to have adopted a plan rule establishing Insecurity Defaults, and the MEPPs had to determine that the event created a substantial likelihood that the employer would be unable to pay its withdrawal liability. None of this could have happened pre-petition. Notwithstanding the above, the Debtors would appreciate clarification as to the Court's basis for determining a default had occurred to assist in the appellate briefing, should any party choose to appeal.

may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment." *Till v. SCS Credit Corp.*, 541 U.S. 465, 474 (2004). The Debtors respectfully request that the Court reconsider this aspect of the Memorandum Opinion.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that this Court reconsider its pre-obligation-default ruling and hold Debtors' withdrawal liability obligations to be 20-year payment streams, meaning that the MEPP withdrawal liability claims would be the appropriate 20-year payment stream discounted at a rate to be determined by the Court.

| | |
|---|---|
| Dated: September 27, 2024<br>Wilmington, Delaware | */s/ Laura Davis Jones* |

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:   (302) 652-4100
Facsimile:    (302) 652-4400
Email:          ljones@pszjlaw.com
                    tcairns@pszjlaw.com
                    pkeane@pszjlaw.com
                    ecorma@pszjlaw.com

Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Michael B. Slade (admitted *pro hac vice*)
Shirley Chan (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
330 W. Wolf Point Plaza
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200
Email:          patrick.nash@kirkland.com
                    david.seligman@kirkland.com
                    michael.slade@kirkland.com
                    shirley.chan@kirkland.com

-and-

Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:   (415) 439-1400
Facsimile:    (415) 439-1500
Email:          michael.esser@kirkland.com
                    john.christian@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*