# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | Case No. 23-11069 (CTG) |
| Debtors. | (Jointly Administered) |
| | Hearing Date: October 28, 2024 at 10:00 a.m. (ET)<br>Objection Deadline: October 11, 2024 at 4:00 p.m. (ET) |
| | Re: Docket No. 4326 |

**MOTION OF MFN PARTNERS, LP AND MOBILE STREET HOLDINGS, LLC PURSUANT TO 11 U.S.C. § 502(j) AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 3008 AND 9023 REQUESTING RECONSIDERATION OF COURT'S ENTRY OF PARTIAL SUMMARY JUDGMENT IN FAVOR OF PENSION PLANS AND JOINING DEBTOR RECONSIDERATION MOTION**

---

[1] A complete list of each of the debtors in these chapter 11 cases (the "Debtors") may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 10990 Roe Avenue, Overland Park, Kansas 66211.

MFN Partners, LP ("MFN") and Mobile Street Holdings, LLC ("Mobile Street" and, with MFN, the "Movants") hereby respectfully submit this motion (the "Motion") requesting, pursuant to 11 U.S.C. § 502(j) and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 3008 and 9023, reconsideration of the Court's entry of partial summary judgment in favor of the MEPPs (as defined below) as set forth in the "Memorandum Opinion" [Dkt No. 4326] (the "Withdrawal Liability Decision").[2]

The Movants also join in the *Debtors' Motion to Reconsider in Part the September 13, 2024 Memorandum Opinion [Dkt. No. 4326] Finding a Withdrawal Liability Default in Advance of a Withdrawal Liability Obligation* ("Debtor Reconsideration Motion"), which was filed today, and incorporate herein the Debtors' arguments contained in the Debtor Reconsideration Motion.

## I. PRELIMINARY STATEMENT

On September 13, 2024, the Court issued the Withdrawal Liability Decision, which directed summary judgment in favor of the MEPPs on several matters- effectively finding that the MEPPs can receive the non-recourse benefit of United States Treasury's funds to pay plan benefits and expenses *and yet* not count that benefit when filing a claim against the Debtors, to the detriment of every other creditor of the Debtors. Movants request the Court reconsider this portion of its holding relating to allowance and disallowance of the MEPPs' proofs of claim , as permitted by Bankruptcy Code section 502(j) and Bankruptcy Rules 3008 and 9023. As further described below, the Court's reliance on the reasoning in *Philpott v. Essex County Welfare Bd.*, 409 U.S. 413 (1973), as analogous to the dispute here is the type of error that satisfies the high bar of reconsideration.

---

[2] All capitalized terms not otherwise defined herein have the same meanings as in the Withdrawal Liability Decision.

The Court granted summary judgment that funds provided by the United States Treasury ("SFA") under the American Rescue Plan Act ("ARPA") and disbursed by the PBGC are not "plan assets" for calculating a Plan's "unfunded vested benefits" ("UVBs") because the PBGC issued two regulations[3] that the Court held fall within express grants of Congressional authority and were reasonable. Withdrawal Liability Decision at 3 (the "SFA Ruling"). The effect of the two regulations is that even though the MEPPs received SFA funding, count such funding as an asset on their balance sheets, and have and will exclusively use such funds to pay plan benefits (which thus are *funded* vested benefits) and plan expenses, 29 U.S.C. § 1432(*l*), each such MEPP gets to also assert withdrawal liability claims against the Debtors as if they had not received any SFA.

During the August 6 hearing, the Court stated that the two regulations were "an unusual restriction on the use of [SFA] funds" and that ". . . to the extent that there's an example of any federal program that imposes a condition on the receipt of funds, and the consequence of that is that it alters the legal rights of a third party [the Court would] be interested in understanding that . . . " Transcript of August 6, 2024 Hearing, D.I. 4056 ("Transcript"), p. 66:13-19. Neither the MEPPs nor the PBGC came up with an example of a federal agency issuing such a regulation at the Hearing (defined below). The PBGC and the MEPPs were concerned enough to attempt to answer the Court's question that they submitted supplemental briefing [Dkt. Nos. 4078, 4079, 4086], citing a case that the Withdrawal Liability Decision recognized as inapplicable. Withdrawal Liability Decision at 20 n.71.

But the Court instead pointed to a different case not cited by any party, *Philpott v. Essex County Welfare Bd.*, 409 U.S. 413 (1973). Specifically, the Court stated at page 3 that "in the

---

[3] The PBGC promulgated rules under 29 C.F.R. 4262.16(g)(2) requiring (i) the phase-in of SFA solely for the purpose of determining UVBs in the calculation of a withdrawn employer's withdrawal liability and (ii) that SFA not be recognized as an asset for purposes of withdrawal liability when approved but only when received (the "PBGC Regulations").

analogous context of Congress' power under the Spending Clause, the Supreme Court has enforced similar provisions that bind third parties, not just the party that agreed to the terms when it accepted the federal funds." *Id.* at 3; *see also id.* at 19-20, n.71.

*Philpott* does not address the key question that makes this matter unique: whether a federal agency administering a program (as opposed to implementing an express statutory restriction as in *Philpott*) can issue a regulation adversely affecting the rights of third parties as a condition of receiving federal funds.  Movants have located no case blessing a federal agency, as part of implementing its interpretation of a Congressional directive, to issue a regulation adversely impacting third parties as is the undisputed case here.  Even more so, Movants found no case where a federal agency was able to issue a regulation that necessarily amends an existing federal statutory right.  Here, Congress did not amend in ARPA the definition of UVBs that existed since 1980, which no party disputes, and the definition of UVBs – as the Third Circuit recently stated – is "an amount equal to the value of nonforfeitable benefits under the plan less the value of the assets of the plan.  29 U.S.C. § 1393(c)." *Allied Painting & Decorating, Inc. v. Int'l Painters & Allied Trades Indus. Pension Fund*, No. 23-1537, 2024 WL 3366492, at *1 & n.1 (3d Cir. July 11, 2024). Because *Philpott* does not address the circumstance here, but yet was deemed analogous such that the Withdrawal Liability Decision relies on it, Movants respectfully submit the Court should reconsider the SFA Ruling.

The net effect of the Withdrawal Liability Decision is that the claims of the MEPPs that received SFA, and particularly the claim of Central States Pension Fund ("Central States"),[4] asserted against the Debtors are far higher than they should be, leaving MEPPs that never received

---

[4] It is far from clear whether any MEPP that received SFA, other than Central States, actually benefits from the SFA Ruling.

SFA, all other general unsecured creditors, and equity security holders with little chance of anything other than a *de minimis* recovery from the Debtors' remaining real estate, rolling stock, accounts receivable, and cash on hand. In particular, the plans that never tapped the United States Treasury to obtain SFA funding are impaired by the claims of the MEPPs that did, thus harming the very pension system the PBGC claims needed protection through the promulgation of the PBGC Regulations.

Movants acknowledge, as they must, that reconsideration is a remedy to be granted sparingly, *see Flash Seats, LLC v. Paciolan, Inc.*, No. CIV. 07-575-LPS, 2011 WL 4501320, at *2 (D. Del. Sept. 28, 2011), *aff'd,* 469 F. App'x 916 (Fed. Cir. 2012), but this an extraordinary case. Because of the massive impact on the course of these cases, Movants request reconsideration now, as opposed to proceeding with appeals, which could easily take, at minimum, many months, if not years, to be heard.[5]

## II. BACKGROUND

1. This Motion incorporates by reference the factual background set forth in the *Debtors' Motion for Partial Summary Judgment on SFA MEPPs' Withdrawal Liability Claims* [Dkt. No. 3852]. Additional facts are set forth below.

2. The Debtors commenced these chapter 11 cases on August 6, 2023. Prior to the Petition Date, the Debtors made contributions to numerous multi-employer pension plans, including the eleven plans that received SFA funding and whose claims were adjudicated by the Withdrawal Liability Decision (the "MEPPs"). The eleven MEPPs each filed proofs of claim against the Debtors even though they each received SFA funding. In addition to the eleven MEPPs,

---

[5] No order has been settled, much less entered, as the Court directed in the Withdrawal Liability Decision. To the extent reconsideration is not granted, Movants anticipate immediately requesting this Court certify any such order for direct appeal to the Third Circuit.

the Debtors also contributed prepetition to several other multi-employer pension plans that did not receive SFA funding.

3. On December 8, 2023, the Debtors objected to the proofs of claim of Central States, Dkt. No. 1322, and then, on January 26, 2024, to the ten other MEPPs that received SFA funding. Dkt. No. 1962.

4. On August 6, 2024, the Court heard oral argument from the parties (the "Hearing"), including MFN and other creditors and shareholders of Yellow supporting Debtors' challenges to the proofs of claim filed by Central States and the other MEPPs. At the Hearing, the Court repeatedly asked the MEPPs' counsel and the PBGC for any example of a federal agency issuing regulations placing conditions on receipt of funds that alter the legal rights of third parties, noting that the PBGC had imposed an "unusual restriction on the use of [SFA] funds." Transcript, p. 66:13-19. The Court recognized the distinction between harm and altering a legal right, stating that a third party "might be harmed, but altering a legal right is a different thing." Transcript, p. 78:16-21. During the Hearing, no counsel representing the MEPPs or the PBGC could come up with an example.

5. Thereafter, the PBGC and the MEPPs requested leave to submit supplemental briefing to attempt to address the question the Court posed at the Hearing concerning any example of a federal agency promulgating a regulation like the PBGC Regulations that impacted the legal rights of third parties. The only case they cited was *Zinman v. FDIC*, 567 F. Supp. 243 (E.D. Pa. 1983). They did not cite any other case, including *Philpott*.

6. On September 13, 2024, the Court issued the Withdrawal Liability Decision. In the Withdrawal Liability Decision, the Court rejected *Zinman* because, as the Debtors and MFN

argued (Dkt. Nos. 4104, 4108), the regulation's effect was merely incidental. Withdrawal Liability Decision at 20 n.71.

7.  MFN, as the single largest equity security holder of the publicly traded stock of Yellow, objected to the MEPPs' proofs of claim on the same grounds advanced by the Debtors. MFN disclosed in its filings that one of its affiliates had acquired unsecured claims [Dkt. No. 3918 at 2 n.2]. That affiliate is Mobile Street, which is wholly owned by MFN. Mobile Street holds several general unsecured claims, including the claims asserted by two of the MEPPs that sought summary judgment against the Debtors: Western Pennsylvania Teamsters & Employers Pension Fund ("Western PA Fund") and International Association of Machinists Motor City Pension Fund ("Motor City Fund"). *See* Dkt. No. 4346, 4347. For avoidance of doubt, Mobile Street is seeking reconsideration despite the fact that both Western PA Fund and Motor City Fund received SFA funding.[6]

### III. JURISDICTION AND VENUE

8.  The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. Movants confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot

---

[6] Debtors stated that Western PA Fund received $994.6 million in SFA funding and Motor City Fund (aka IAM) received $66 million. Dkt. No. 3852 at 13-14.

enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief requested herein are section 502(j) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Rules 3008 and 9023 of the Bankruptcy Rules.

## IV.  RELIEF REQUESTED

9. Movants file this Motion for entry of an order granting reconsideration of the grant of summary judgment in favor of the MEPPs with respect to the SFA Ruling.

## V.  BASIS FOR RELIEF

### A.  Legal Standards for Reconsideration of Claim Allowance and Disallowance

10. Movants seek reconsideration under Bankruptcy Code section 502(j) and Bankruptcy Rule 3008.  Bankruptcy Code section 502(j) provides that "[a] claim that has been allowed or disallowed may be reconsidered for cause.  A reconsidered claim may be allowed or disallowed according to the equities of the case."  11 U.S.C. § 502(j).  Bankruptcy Rule 3008 implements section 502(j), providing that "[a] party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate."  Fed. R. Bankr. P. 3008.

11. Bankruptcy Code section 502(j) does not define "cause."  Courts in this District have held that "for cause" under section 502(j) requires a showing under at least one of the grounds set forth in Rule 59 or Rule 60(b) of the Federal Rules of Civil Procedure ("FRCP").[7]  *See, e.g.,*

---

[7] Bankruptcy Rule 9024 incorporates Rule 60 of the FRCP, which applies to final orders.  Rule 59(e) of the FRCP applies to reconsideration of entered orders that are not final.  Because no order has yet been entered, the Court may reconsider under Bankruptcy Rule 7054 and FRCP Rule 54(b).  *See In re Healthcare Real Est. Partners, LLC (Healthcare Real Est. Partners, LLC v. Summit Healthcare Reit, Inc.)*, No. 15-11931 (CTG), 2023 WL 7786065, at *1 (Bankr. D. Del. Nov. 14, 2023) ("The May 2023 Memorandum Opinion concluded by directing the parties to settle a form of order and/or judgment reflecting the Court's rulings. Before doing so, however, both parties pointed to alleged errors in the Court's analysis, primarily with respect to aspects of the Court's ruling on which it lacked the benefit of briefing by the parties. Because no judgment had yet been entered, the Court's ruling was interlocutory and subject to reconsideration without being subject to the more demanding Rule 59(e) standard.").  Out of abundance of caution, Movants seek relief under Bankruptcy Rule 7054 but, if not applicable, then under Bankruptcy Rule 9023 and FRCP Rule 59(e).

*Hayes v. Genesis Health Ventures, Inc. (In re Genesis Health Ventures, Inc.)*, 362 B.R. 657, 661 (D. Del. 2007); *Gonzalez v. Green (In re TK Hldgs. Inc.)*, 2024 WL 964205 *1, *6 (D. Del. Mar. 6, 2024); *In re Nortel Networks Inc.*, 2017 WL 3141906 *1, *1 (Bankr. D. Del. July 24, 2017).

12. Bankruptcy Rule 9023 incorporates Rule 59 of the FRCP, which provides that a court may grant a new trial on any issue and as to any party "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Fed. R. Civ. Pro. 59(a). Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after entry of the judgment." "A proper Rule 59(e) motion ... must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010). The Third Circuit has described reconsideration's purpose as follows: "'The purpose of a motion for reconsideration … is to correct manifest errors of law or fact'" *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).

**B.    The Court Should Reconsider Its SFA Ruling Under Rule 59(e) Standards**

13. This Court should reconsider the SFA Ruling. The Withdrawal Liability Decision relies on the Supreme Court's *Philpott* decision. *Philpott* is materially distinguishable and does not support the proposition that, absent direct Congressional legislative enactment, federal regulations may adversely impact the legal rights of employers as a condition of MEPPs receiving SFA.

14. As the Withdrawal Liability Decision indicates, the Supreme Court in *Philpott* addressed a provision of the Social Security Act that provided that for disability insurance benefits "none of the moneys paid or payable . . . under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process." Withdrawal Liability Decision at 19 (quoting 42

U.S.C. § 407). The Social Security Act was first enacted in 1935, and though amended several times prior to the matters at issue in *Philpott*, the text of section 407 of the Social Security Act never changed prior to *Philpott*. At all times, by statute, Congress provided that the payment of disability insurance benefits under the Social Security Act would be exempt from creditors' rights that might otherwise exist or might come into existence.

15.  In 1966, petitioner sought welfare assistance from one of New Jersey's welfare agencies and executed an agreement that stated that he would reimburse the agency for any payments he received from subsequently discovered or acquired property. The agency awarded him welfare benefits, which would have been calculated to be less if he had been receiving federal disability insurance benefits under the Social Security Act, and encouraged petitioner to apply for them. *Id.* at 414. In 1968, petitioner was awarded retroactive federal benefits, extending back to May 1966 through the summer of 1968, which were deposited into his bank account. The welfare agency sued to attach the bank account. *Id.* at 415. The Supreme Court held that the Social Security Act barred the state agency notwithstanding the agreement the recipient had made with the State. *Philpott*, 409 U.S. at 415-16. Justice Douglas, writing for the unanimous Court, explained that the language of the statute was "all-inclusive" and that "[w]e see no reason why a State, performing its statutory duty to take care of the needy, should be in a preferred position as compared to any other creditor." *Id.* at 416.

16.  There are three critically important distinctions between the law at issue in *Philpott* and the PBGC Regulations here. **One**, unlike the Social Security Act in *Philpott*, which did expressly restrict disability insurance payments from attachment or levy, Congress did **not** include in ARPA the conditions the PBGC Regulations impose on employers. Nothing in ARPA in any

way suggests that SFA funding cannot be counted as a "plan asset" or that, for purposes of calculating UVBs, it can be excluded from a multiemployer plan's assets.

17. Had Congress done in ARPA what it did in the Social Security Act, then there may be no objections to the MEPPs' exclusion of SFA assets. Congress could have easily stated in ARPA, analogous to *Philpott*, that SFA funding was not a "plan asset" for purposes of calculating UVBs or that no withdrawn employer could challenge a multiemployer plan's assessment of liability that did not credit SFA funding. But Congress clearly did not include such conditions in the text of the statute itself.

18. Thus, *Philpott* does not address the question that the MEPPs tried, but failed, to answer when they cited *Zinman*. It is not only unusual, but unprecedented, for a federal agency to issue a regulation (and Congress to not enact a statute) imposing conditions which adversely affect the legal rights of third parties, or alter existing statutory provisions, not the rights of the recipient of federal funds. Since withdrawal liability was created in 1980, Congress has *never* intended to impose withdrawal liability on an employer that withdraws from a multiemployer plan without UVBs. There is no reason to believe that Congress intended to impose that penalty for the first time in ARPA.

19. **Two**, whereas the Social Security Act in *Philpott* was legislation with the restrictive provision on creditors' rights that pre-existed (by decades) the relationship between the State (as a creditor) and the recipient of federal funds (as debtor), and thus the state was already subject to the existing restriction, here, it is the reverse. In ERISA and MPPAA, Congress established by statute that a withdrawing employer was liable for withdrawal liability, but only to the extent of its allocable share of UVBs. If no UVBs, no withdrawal liability. UVBs are calculated by determining a multiemployer plan's assets against its liabilities. That has been the law since 1980.

20.     ARPA *did not* change any of this. If there has been a change, it is solely through the PBGC issuing a regulation in 2021 to change the calculation of UVBs that has existed since 1980. Congress chose, with the enactment of MPPAA, to base withdrawal liability on the UVBs actually existing in the multiemployer plan when an employer withdraws, and it did nothing with the enactment of ARPA to change that calculation. *See* 29 U.S.C. §§ 1381, 1391, 1393. Therefore, a withdrawing employer from a multiemployer plan has more than forty years of authority establishing its legal right to have its withdrawal liability calculated based on existing, actual, and not fictional, UVBs.[8]

21.     And although Congress authorized PBGC to put conditions *on the multiemployer plans* receiving SFA, nothing authorized PBGC to require multiemployer plans to put conditions *on employers* that would change how the employers' withdrawal liability is determined. *Philpott* simply stands for the proposition that a party (including a state agency) cannot override an existing statutory restriction by contract, and nothing in *Philpott* supports the proposition that if pre-existing law establishes rights and obligations by statute, a federal agency can issue a regulation changing such rights and obligations as a condition to giving money to someone else.

22.     ***Three***, the Withdrawal Liability Decision states the *Philpott* Court made this holding "even though the Social Security Act was an exercise of Congress's Spending Power and

---

[8] The Withdrawal Liability Opinion cites to the Supreme Court's *Brown & Williamson* opinion for the proposition that a specific policy embodied in a later federal statute should control construction of the earlier statute, and that ARPA controls over the MPPAA's calculation of withdrawal liability. Withdrawal Liability Opinion at 23. Movants respectfully disagree with the conclusion that MPPAA only calculates withdrawal liability "in general," but even so, unlike *Brown & Williamson*, ARPA did not have the "specific policy embedded" in the statute concerning calculation of UVBs. In *Williamson*, the Supreme Court found that the policy of a later enacted *statutory* regime showed that a prior enacted *statute* did not grant the FDA jurisdiction over tobacco products, and only because the regulatory regime was found to ratify the FDA's own long-held position, which Congress knew of while legislating on the topic for 35 years. *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144, 149, 156-59 (2000). This does not show that the policy of a later enacted statute can be used as authority for *a federal agency* to *amend* by regulation a prior enacted statute, which is what the PBGC did here, without the requisite explicit Congressional delegation.

the Essex County Board was not the recipient of the Social Security Act funds and therefore did not agree to be bound to its conditions." Withdrawal Liability Decision at 20.  However, *Philpott* does not discuss whether the legislation (which, again, existed for decades) bound the Essex County Board without its consent and somehow deprived it of an existing right.  The statute in *Philpott* was not challenged as a condition improperly altering a third parties' rights.  The statute was not actually challenged at all.  The Essex County Board just thought there should be an implied exception, which the Supreme Court rejected.

23.   Movants recognize and appreciate the Court's emphasis and reliance on the fact that the Social Security Act was an exercise of Congress' Spending Power, which is a power to impose conditions on recipients of federal funds.  *See* Withdrawal Liability Decision at 3, 18–19.  However, the power of Congress, even under the Spending Clause, is nonetheless more expansive (*e.g.*, pursuant to the Necessary and Proper Clause) than that of a federal agency, which is strictly limited by the Congressional delegation explicated by statute.  As described by the Congressional Research Service:

> The Spending Clause … gives Congress broad power to authorize spending for the "general Welfare."  The Necessary and Proper Clause supplements Congress's spending authority, allowing Congress to restrict how federal funds are used . . . .  Additional considerations arise when the executive branch, rather than Congress, imposes a funding condition . . . .  Ultimately, however, the "power of the purse" belongs to the legislative branch, not the executive branch.  Accordingly, when a federal agency places a condition on federal funding, that condition could give rise to constitutional (i.e., separation-of-powers) or statutory (e.g., Administrative Procedure Act) challenges if the condition arguably exceeds the scope of the agency's delegated authority.[9]

---

[9]  VICTORIA L. KILLION, CONGRESSIONAL RESEARCH SERVICE, FUNDING CONDITIONS: CONSTITUTIONAL LIMITS ON CONGRESS'S SPENDING POWER, Congressional Research Service (2021), available at http://www.fpc.state.gov/documents/organization/8045.pdf (last visited Sept. 26, 2024) (internal citations omitted).

Movants do not argue that the statutory provision at issue in *Philpott* exceeds the outer limits of Congress' constitutional authority under the Spending Clause, but as discussed, the constitutionality of that provision was not challenged in *Philpott*, nor has it ever been challenged on these grounds to Movants' knowledge.  The PBGC

24. The Movants acknowledge that the standard for reconsideration is, properly, high. But this is such a case. There is a manifest error to tether the outcome of the allowance of billions of dollars in asserted claims against the Debtors' estates to a Supreme Court decision that is simply not analogous.

## NOTICE

25. Notice of this Motion is being provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors; (iii) the Committee; (iv) Central States; (v) PBGC; (vi) SFA MEPPs; and (vii) all parties requesting notice pursuant to Bankruptcy Rule 2002. Movants respectfully submit that no further notice of this Motion is required under the circumstances.

*[Remainder of Page Intentionally Left Blank]*

---

Regulations thus remain an unprecedented exercise of a delegation to "impose … conditions on [a multiemployer plan]." *See* 29 U.S.C. § 1432(m).

**CONCLUSION**

For the above reasons, the Court should reconsider the Withdrawal Liability Decision and grant the Debtors' motion for summary judgement as to the SFA funding issue,[10] and withdrawal liability claims of the MEPPs should be recalculated in accordance with such ruling.

Dated: September 27, 2024
       Wilmington, Delaware

Respectfully Submitted,

*/s/ L. Katherine Good*
L. Katherine Good (No. 5101)
Maria Kotsiras (No. 6840)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: kgood@potteranderson.com
       mkotsiras@potteranderson.com

– and –

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Eric Winston (*pro hac vice* admitted)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
Email: ericwinston@quinnemanuel.com

*Counsel for MFN Partners, LP and Mobile Street Holdings LLC*

---

[10] Given the nature of the relief requested herein, Movants request a waiver of Local Rule 9013-1(f)'s requirement to include a proposed form of order specifying the exact relief to be granted. To the extent the Court grants the Motion, Movants will work with the Debtors and any responding parties on an appropriate form of order.