**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

_____

| | |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*, | Case No. 23-11069 CTG |
| | (Jointly Administered) |
| Debtors. | Ref. D.I. Nos. 4290, 4291, 4316 |

_____    _____

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS AND TEAMSTERS
NATIONAL FREIGHT NEGOTIATING COMMITTEE and INTERNATIONAL
ASSOCIATION OF MACHINISTS' MEMORANDUM OF LAW IN OPPOSITION TO
DEBTORS' MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

The Debtors have filed a pro forma motion for summary judgment and memorandum of law that failed to substantively respond to the International Brotherhood of Teamsters ("IBT") and Teamsters National Freight Negotiating Committee ("TNFINC," and collectively, "Teamsters") and the International Association of Machinists' ("IAM" or "Machinists") (together "Union(s)") arguments, which have already been filed with the Court, for why the Debtors' defenses to WARN liability fail on the merits. Instead of granting the Debtors' summary judgment motion, the Court should instead hold that each of the Debtors' defenses to WARN liability fail as a matter of law.

First, the Debtors have WARN liability because Yellow was an employer subject to WARN rather than a liquidating fiduciary when it decided to lay off its Teamsters and Machinists represented employees. At that time, Yellow both was not a fiduciary; and was shipping tens of thousands of shipments per day. The Court should easily reject the Debtors' attempt to focus on

the number of shipments it picked up rather than the number of shipments it delivered, since the Debtors concede delivering shipments was the core of its business.

Next, neither of the exceptions to WARN liability apply. As to the faltering company defense, at the time WARN notice became due on May 31, 2023, Yellow was not actively seeking capital or business with the possible exception of its proposal for permission to pay-interest-in-kind ("PIK interest"), i.e. add interest payments it owed to the principal amounts of its existing loans. Debtors cannot rely on Yellow's proposal to PIK interest to satisfy the faltering company defense both because its lenders' refusal to provide it with new financing demonstrated it did not have a realistic opportunity to obtain permission to PIK interest; and because Yellow never believed issuing WARN notices would foreclose it from obtaining permission to PIK interest, since it never considered issuing WARN notices to its employees on or before May 31, 2023. Yellow's reliance on the Unforeseeable Business Circumstances ("UBC") defense similarly fails. Debtors cannot rely on Yellow's asserted reason for its closure, the TNFINC strike notice, as an unforeseeable business circumstance both because Yellow's WARN notices to the Unions never mentioned the strike notice; and because the strike notice was caused by Yellow's own decision to not make owed fringe benefit contributions, and not by some sudden, dramatic, or unexpected event outside Yellow's control. Moreover, the strike notice was foreseeable when it was expressly authorized by the parties' labor agreement, when a union would obviously undertake steps to protect its membership from losing health and pension coverage, and when Yellow's pre-2023 proposals and steps undertaken to generate savings did not trigger strike notices because those proposals and steps never jeopardized continued health and pension coverage for Yellow's employees.

Once the Court finds the Debtors have liability under WARN, it should reject the Debtors' plea to reduce the amount of damages, because the Debtors are ineligible for the reduction when they cannot demonstrate their subjective good faith effort to comply with WARN. By the end of May of 2023 Yellow knew that there was a risk it may not exist by August of 2023, yet did not consider whether to issue WARN notices to its employees. A law-abiding employer, blessed with employees familiar with the requirements of WARN, would have made a reasonable effort to evaluate whether to issue WARN notices to its employees by the end of May of 2023.

Finally, to the extent the Debtors' argument about not owing fringe benefit contributions on hours for which WARN damages are awarded is a back door argument against assigning priority claim status to most of the Unions' WARN claims, the Court should reject the argument both because Debtors waived the argument; and because WARN damages are fourth priority unsecured claims under the Bankruptcy Code.

## II.   COUNTERSTATEMENT OF FACTS

Darren Hawkins' claim in his declaration that the 2020 "negotiations" with Central States came down to the wire is contradicted by his own deposition testimony that (1) Central States continued to provide coverage as it discussed with Yellow its request to extend the time to remit contributions; (2) Central States then agreed to extend coverage for 8 weeks starting on May 10, 2020; and (3) Yellow resumed making contributions to Central States before the 8 weeks extension expired. (D.I. #4286-1, *Second Supplemental Ho Decl*., Ex. 35, pg. 89-90) Any negotiations between Yellow and Central States in 2020 could not have come to the wire, when there is no evidence Central States ever set a deadline when it would stop providing coverage to Yellow's employees. Yellow's brief is even further off the mark by claiming Yellow negotiated contribution deferrals with the IBT. As Hawkins explained in his declaration, the IBT supported, and worked

with Yellow and Central States on the deferral, rather than that Yellow negotiated any fringe benefit deferrals with the IBT. (D.I. #2581, *Hawkins Decl.*, ¶15) Yellow's own course of conduct demonstrates its understanding that it must deal with the fringe benefit funds, not the IBT, on any contribution deferrals: In 2023, Yellow sent its request to defer contributions to the fringe benefit funds without even copying the IBT; and understood that it was the Funds, not the IBT, that denied its request to defer contributions. (D.I. #2581; *Hawkins Decl.*, ¶72; Ex. 20-22)

Before May 26, 2023, Yellow's investment banker Ducera did not either make any proposals to Yellow's existing lenders or discuss with the lenders the modification of any of Yellow's existing loans. (*Third Supplemental Ho Decl.*, Ex. 40: *Kaldenberg Dep.* Pg. 22:4-7) Ducera sent a proposal to two of Yellow's lenders, Apollo Global Management, LLC ("Appolo") and the United States Treasury ("UST") on May 26, 2023. (D.I. #4316-3, ¶10) The May 26 proposal, therefore, was Yellow's first proposal, not a continuation of its efforts to modify its existing loans. Yellow has identified to the Court four components of its May 26, 2023 proposal to its existing lenders: To expedite the sale of a shipping terminal in Compton, California; ability to pay interest-in-kind, a waiver of the minimum EBITDA covenant through the end of 2023, and for both Apollo and UST to free up $50 million of rolling stock assets to add to Yellow's ABL borrowing facility. (D.I. #4316-3, ¶10)

Debtors acknowledge that on May 25, 2023, TNFINC (whom the Debtors for some reason insist on calling the IBT) demanded an immediate $1.50 per hour wage increase or it would not support Phase 2 of One Yellow. (D.I. #4316, pg. 17) Debtors also acknowledge that its May 30, 2023, Letter of Agreement told TNFINC that it could not comply with TNFINC's proposed wage increases without refinancing or additional financing. (D.I. #4316, pg. 18) Debtors also acknowledge that any new wage increases and acceleration of existing wage increases made by its

May 30, 2023 offer was contingent on the fulfillment of certain conditions; and that the wage increase it offered equaled $1.50 per hour only if one included the acceleration of an already required wage increase plus monies that Yellow was already required to pay as fringe benefit contributions. (*Id*.) Debtors also acknowledge that as of May 30, 2023, without an agreement on One Yellow, its existing lenders were not willing to refinance its debt. (D.I. #4316, pg. 19)  Yellow additionally also told TNFINC on May 30, 2023 that it needed the Teamsters' support to convince its lenders to agree to proposals to provide it with temporary relief. (D.I. #2778-1, Murphy Dec., Ex. 11)

Documentation that Ducera prepared, which lists its contacts with lenders and prospective lenders, does not show any contacts between Ducera and new lenders before June 5, 2023. (*Third Supplemental Ho Decl.*, Ex. 38) Nor could Ducera recall any contacts between itself and an entity that was not yet a lender to Yellow, which occurred between May 26, 2023, and June 7, 2023. (*Third Supplemental Ho Decl.*, Exhibit 40, *Kaldenberg Dep.* Pg. 51:14-52:5) The cover letter to Yellow's May 30, 2023 proposed Letter of Agreement told TNFINC that Yellow has been in contact with its lenders, but does not claim (as the Debtors now claim for the first time in their brief , *see* D.I. #4316, pg. 18), that it was in contact with *new* lenders. (D.I. #2778-1, *Murphy Decl.,* Ex. 11)

TNFINC did not tell Teamster bargaining unit members working at Yellow to look for other jobs because: "that is not what we do, we don't go out and tell them to look for other jobs." (*Third Supplemental Ho Decl*., Ex. 39: *Murphy Dep.* Pg. 328:5-8) Debtors have presented no evidence that the Teamsters would tell its members to look for non-union employment in the open market, rather than rely on internal mechanisms like job referrals to try to find union employment for displaced employees, if an employer went out of, or was about to go out of business.

While TNFINC and John Murphy did not intend to utilize a strike as an economic weapon during actual negotiations, the strike notice was issued because Yellow did not make contributions to the Funds, rather than because of an impasse reached in negotiations. (*Third Supplemental Ho Decl.*, Ex. 39: *Murphy Dep.* Pg. 322:22-323:18) On July 17, 2023, Central States issued a notice to local unions stating that because Yellow failed to remit contributions, on and after July 23, 2023 Yellow employees will stop earning pension credits for their hours worked, and will have to make self-pays to maintain their health coverage. (D.I. #2581, *Hawkins Decl.*, Ex. 26, pg. 2) In contrast, in 2020, the only notice that Yellow employees received was a notice from then Freight Director Ernie Sohl that notified them that Central States had continued to provide coverage as it negotiated with Yellow its request to extend the time to pay contributions; and that Central States had agreed to extend coverage for 8 weeks starting on May 10, 2020. (D.I. #2778-1, Ex. 2; D.I. #4312-1 *Second Supplemental Ho Decl.* Ex. 35, pg. 93:10-17) The NMFA expressly authorizes the issuance of a strike notice if an employer is delinquent in its health or pension payments; but does not contain any provisions that authorize a strike in support of demands made during mid-term contract negotiations. (D.I. #2778-1, *Murphy Decl.*, Ex. 1, Art. 8, Sec. 3(b)). That TNFINC did not issue strike notices to support its bargaining demands does not mean it would not issue a strike notice if Yellow's failure to pay contributions jeopardized continued health and pension coverage for its employees represented by TNFINC.

Yellow admits that the primary lender it was working with by the second half of July 2023, Atlas, only remained interested in a deal with Yellow before the fallout from TNFINC's strike notice became clear. (D.I. #4316, pg. 17) Indeed, by July 24, 2023, after the fallout from TNFINC's strike notice became clear, Atlas only sent to Ducera due diligence requests for Yellow's non-union Logistics business. (D.I. #4316-3, *Kaldenberg, Decl.*, ¶18)

## III.    ARGUMENT

1.    <u>Debtors Have Misstated The Applicable Standard When A Party With The Burden Of Proof At Trial Moves For Summary Judgment.</u>

An employer has the burden of establishing defenses to WARN liability. *Childress v. Darby Lumber*, 357 F. 3d 1000, 1007 (9th Cir. 2004) (employer has burden to prove good faith defense); 20 C.F.R. §639.9 ("the employer bears the burden of proof that conditions for the exceptions have been met"); *In re AE Liquidation*, 866 F. 3d 515, 523 (3d. Cir. 2017) (Recognizing that the unforeseeable business circumstances defense must be offered by the employer as an affirmative defense); *United Paperworkers v. Aiden Corrugated Container Corp.*, 901 F. Supp. 426, 442 (D. Mass. 1995) (Finding employer failed to carry its burden of proof to demonstrate the applicability of the faltering company exception).

Because Debtors have the burden to prove each of their asserted defenses to WARN liability, its citation to *EBC, Inc. v. Clark Bldg. Systems, Inc.*, 618 F. 3d 253, 262 (3d. Cir. 2010) to describe the standard governing their motion for summary judgment is incorrect. In *EBC, Inc.*, the Court described the applicable summary judgment standard as follows:

> Summary judgment is appropriate "only when the record 'shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. "Facts that could alter the outcome are 'material facts,' and *disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."*

Emphasis added. As shown by the italicized language, the above paragraph describes the applicable standard when a motion for summary judgment is filed against the person with the burden of proof at trial. A more rigorous standard applies when a party with the burden of proof at trial, like the Debtors for their WARN defenses, moves for summary judgment:

> "it is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to

find its way on the facts needed to rule in its favor on the law." In such a case, "if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact," summary judgment is inappropriate. All reasonable inferences should be drawn against the party moving for summary judgment.

*U.S. v. Donovan*, 661 F. 3d 174, 185 (3d. Cir. 2011) (Internal citations omitted). A party with the burden of proof at trial is entitled to summary judgment only if the evidentiary support for each element of its claim (or defense) is so one sided that no reasonable fact finder could rule in the opposing party's favor. *Huber v. Simon's Agency, Inc.*, 2021 WL 5356772 * 2 (E.D. PA. 2021); *Estate of Allen v. Cumberland County*, 2020 WL 3468180 * 3 (D.N.J. 2020) (Proof on each element must be so powerful that no reasonable fact finder would be free to disbelieve it). See also *Hunt v. Cromartie*, 526 U.S. 541, 555 (1999) (When a party with the burden of proof at trial moves for summary judgment, summary judgment is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact.

Debtors cannot meet this heightened summary judgment standard both because their defenses to, and arguments to avoid WARN liability fail as a matter of law; and because a reasonable finder of fact can conclude that (a) Debtor had no realistic opportunity to obtain the right to pay interest in kind by the end of May of 2023, because the proposal to pay interest in kind is analogous to new financing that its then current condition precluded its lenders from providing; (b) A union, as a matter of course, would issue a strike notice to protect its membership once an employer's failure to pay contributions jeopardized continued health and pension coverage for the membership; and (c) Yellow cannot demonstrate it had the subjective intent to comply with WARN required for its good faith defense, when by the end of May of 2023 it was aware that it may close by August, yet never considered whether to issue WARN notices to its employees.

2.    Yellow Was Not A Liquidating Fiduciary When It Decided To Lay Off Its Employees Both Because It Was Not A Fiduciary; And Because At The Time It Was Still Delivering Tens Of Thousands Of Shipments Per Day.

Debtors open their summary judgment arguments with a whopper of a misrepresentation, by informing the Court that the Third Circuit held in *In Re United Health Care*, 200 F. 3d 170 (3d. Cir. 1999), that a liquidating *company* is not an employer. Each step of the Third Circuit's analysis in *United Healthcare* was tied to the fact that United Healthcare notified its employees of their immediate terminations 17 days after it filed for bankruptcy, so that it was a *bankruptcy fiduciary* when it decided to discharge its employees without giving them 60 days' notice. *See* 200 F. 3d at 173.[1] To decide whether United Healthcare had WARN liability, the Third Circuit looked to DOL commentary that specifically addressed *entities in bankruptcy* at the time the closing or layoff occurred. 200 F. 3d at 177. The Third Circuit framed the question before it as whether United Healthcare, *as the debtor-in-possession*, was operating as an ongoing business enterprise, or whether it was merely engaged in the liquidation of assets. 200 F. 3d at 177. Answering this question, the Third Circuit found that United Healthcare, *as the fiduciary in bankruptcy proceedings*, was operating not as a "business operating as a going concern," but rather as a business liquidating its affairs. 200 F. 3d at 178.[2] The Court ultimately described the applicable

---

[1] United Healthcare provided its employees with 60 days' notice of termination before it filed for bankruptcy, but shortened the notice period after the Unsecured Creditors Committee asked the Bankruptcy Court to order the immediate termination of the employees. *See* 200 F. 3d at 173.

[2] Debtors have additionally misled the Court by citing to an incomplete passage from United Healthcare. The full relevant passage states:

> we believe that whether a bankrupt entity is an "employer" under the WARN Act depends on the nature and extent of the entity's business and commercial activities *while in bankruptcy*, and not merely on whether the entity's employees continue to work "on a daily basis." The more closely the entity's activities resemble those of a business operating as a going concern, the more likely it is that the entity is an "employer;" the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act.

200 F. 3d at 178. Debtors only cited to the Court the second but not the first sentence above. (D.I. #4316, pg. 24). The first sentence that Debtors omit make clear that in the second sentence, the Court is talking about the entity's business

legal standard as follows: An employer *as fiduciary* will succeed to its WARN Act obligations if an examination of the debtor's economic activities leading up to and during the bankruptcy proceedings reveals that the *fiduciary* has continued in an "employer" capacity, operating the business as an ongoing concern. 200 F. 3d at 179. Because the liquidating fiduciary exception asks whether a bankruptcy fiduciary succeeded to the WARN Act obligations of an employer, a liquidating fiduciary clearly must be a fiduciary. *See also In re Start Man Furniture, LLC*, 647 B.R. 116, 128 (D. Del. 2022) (Recognizing as authoritative DOL guidance stating that a *fiduciary* whose sole function *in the bankruptcy process* is to liquidate a failed business for the benefit of creditors *does not succeed to the notice obligations of the former employer*… In other situations, *where the fiduciary may continue to operate the business for the benefit of creditors*, the *fiduciary* would succeed to the WARN obligations of the employer precisely because the *fiduciary* continues the business in operation).

Yellow decided to lay off its employees on July 26, 2023; and laid off its union represented employees on July 30, 2023, yet did not file for bankruptcy until August 7, 2023. (D.I. #4312-1 *Second Supplemental Ho Decl.*, Ex. 41: *Hawkins Dep.* 9:18-25; D.I. #2581, *Hawkins Decl.*, ¶108; D.I. #1). An employer cannot become a liquidating fiduciary by filing for bankruptcy after it decided to lay off its employees. *In re Jamesway Corp.*, 235 B.R. 329, 335, 343-344 (Bakr. S.D. N.Y. 1999) (Employer was not a liquidating fiduciary when it identified the employees to be fired on October 12 and filed for bankruptcy on October 18). Similarly, Yellow cannot be a liquidating fiduciary when it was not a fiduciary both when it decided to, and when it laid off its Teamster and Machinist represented employees.

---

and commercial activities after it filed for bankruptcy. Even if Yellow was winding up its affairs between July 26, 2023, and August 6, 2023, it cannot satisfy this requirement because it was not performing these activities while in bankruptcy.

Even if Yellow somehow was a fiduciary, it still is not eligible to claim the liquidating fiduciary exception, because after it decided to lay off its employees it continued to operate its core business of delivering shipments. A fiduciary is not a liquidating fiduciary if it continued to operate its core business, even if the continued operation of its business was a part of its liquidation. *In re Start Man Furniture*, 647 B.R. at 130-131 (Bankrupt entity was not a liquidating fiduciary because after it announced the layoffs, it continued to employ the same employees to continue the same commercial business of selling furniture within a liquidation). *See also Law v. American Enterprise Strategies, Ltd*., 2007 WL 221671 * 16 (M.D. Tenn. 2007) (Employer was not a liquidating fiduciary because on the morning of its shutdown and layoffs, it continued to operate a trucking business by delivering items already in the pipeline). Whether a fiduciary is a liquidating fiduciary is measured on the date it decided to discharge its employees, rather than on the dates when the terminations occurred. *In re Jamesway Corp*., 235 B.R. at 335, 343-344 (Focusing on date employer identified its employees to be fired, though employees were fired over the next month); *Start Man Furniture*, 647 B.R. at 122, 130 (Employer was not liquidating fiduciary because it continued normal store operations after it announced the layoffs but before the layoffs occurred).

Similarly, Yellow cannot be a liquidating fiduciary when it decided to lay off its union represented employees on July 26, 2023, yet continued  to deliver tens of thousands of shipments per day between July 26 and July 30, 2023, even if these deliveries were a part of its business plan to liquidate the business.[3] Debtors cannot avoid this conclusion by characterizing its core business operation as picking up rather than delivering shipments. In *Start Man Furniture* the district court

---

[3] There is no merit to Debtors' citation to the Teamsters' briefing, which in turn cite to Debtors' Motion for Entry of Orders Authorizing the Debtors to Pay Compensation, which states that after the union represented employees were laid off, Debtors retained 1,650 non-union employees to implement a value maximizing winddown. (D.I. #20, ¶¶11, 13) Even if Yellow was a fiduciary, whether it was a liquidating fiduciary focuses on whether it continued to deliver tens of thousands of shipments per day after it decided to lay off its union represented employees, but before those union represented employees were laid off. *Law*, 2007 WL 221671 * 16.

found an employer was not a liquidating fiduciary because it continued to engage in the retail sale of furniture, without considering whether the employer was still obtaining new inventory for sale. As the Debtors themselves earlier informed the Court, "if Yellow was operating as a going concern, it would have been delivering its customers' freight—the core of its business." (D.I. #2909, pg. 6) After all, Yellow was paid for delivering shipments, not for picking them up. United Healthcare is easily distinguishable because in that case the employer made a clear break between operating and liquidating its business, whereas in this case Yellow continued to operate its core business of delivering shipments (even if) as a part of its liquidation. *See United Healthcare*, 200 F. 3d at 173-174, 178; *In re Start Man Furniture*, 647 B.R. at 130.

    3.    <u>The Debtors' Faltering Company Defense Fails As A Matter Of Law.</u>

To explain why the faltering company defense should apply, Debtors instead cite to cases that explain the public policy rationale behind the UBC defense. *See Elsinore Shores*, 173 F. 3d at 184-185 n. 7; *In re AE Liquidation*, 556 B.R. at 618; *Jevic*, 496 B.R. at 161.[4] The policy rationale behind the Faltering Company and UBC defenses are not the same because whereas the UBC defense is concerned about economically viable employers prematurely issuing WARN notices, the faltering company defense is concerned about whether giving WARN notice would prevent an

---

[4] The final case cited by the Debtors, *In re Old Electralloy Corp*., 162 B.R. 121, 126 (Bankr. W.D. PA. 1993), did discuss the faltering company defense but is not persuasive. The Court appeared to be hostile to the idea of ever awarding WARN damages against an employer who has filed for bankruptcy. *See* 162 B.R. at 126 ("In this case, the penalty does not fall upon the owner because the owner is in Chapter 7. The impact here and the penalty falls upon other creditors, so that it is doubtful that the purpose of the WARN Act would be fulfilled by allowing the USWA's claims for WARN Act penalties"). Perhaps because of its hostility to WARN claims in the bankruptcy context, though the Court paid lip service to 20 C.F.R. §639.9(a)(4)'s requirement that the employer reasonably and in good faith must have believed that giving the required notice would have precluded the employer from obtaining the needed capital or business, the court found the faltering company defense applied without finding that the employer ever considered issuing WARN notices to its employees before it closed. *Contrast Childress,* 357 F. 3d at 1009 (9th Cir. 2004) (Faltering company defense failed because appellants provided no evidence that they reasonably and in good faith believed that giving the sixty-day notice to their employees during the negotiations with U.S. Bank would have precluded them from obtaining the credit from the bank.)

employer who was already faltering from obtaining the capital or business that it needed to avoid

or postpone its shutdown. *Contrast Elsinore Shores*, 175 F. 3d at 185 with 20 C.F.R. §639.9(a).

      a.      *Yellow Did Not Actively Seek Capital Or Business By Attempting To Implement One Yellow.*

Debtors cannot avoid its obligation to demonstrate it was actively seeking capital or

business by arguing that its attempts to implement One Yellow constituted actively seeking capital

or business. Debtors claim that implementing One Yellow constitutes internally generated

financing ignores the plain language of 20 C.F.R. §639.9(a)(1), which says that to actively seek

capital or business an employer must:

> Seek financing or refinancing through the issuance of stocks, bonds, or other methods of internally generated financing, or seeking additional money, credit, or business through *any other* commercially reasonable method…

(Emphasis added). The use of the phrase "any other" clearly demonstrates that internally

generating financing within the meaning of the regulation must be a commercially reasonable

method to seek additional money, credit, or business. If someone has $100 and changed his

spending habits to spend the money more frugally, he cannot be said to have received any

additional money or credit. Seeking additional money or credit clearly refers to attempts to bring

new money or credit into the company; not attempts to spend more efficiently monies already in

the company's possession. Courts that have interpreted this provision have similarly held that

seeking additional money, credit, or business means bringing new cash into the company, such as

by obtaining a loan, issuing bond or stock, or securing new business. *Electrical Workers Local 397

v. Midwest Fasteners, Inc.*, 763 F. Supp. 78, 82 (D.N.J. 1990), *citing* 134 Cong. Rec. S8686, 58693.

Implementing One Yellow does not qualify as actively seeking capital or business because it would

only allow Yellow to more efficiently spend monies it already has (such as by only paying one

13

driver for making pickups and deliveries in an area); but would not bring any new cash into the company.

The Court should reject Debtors' argument that undertaking any steps that have the same effect as bringing new cash into the company should constitute actively seeking capital or business. For example, *Midwest Fasteners* held the sale of a plant did not constitute actively seeking capital or business, even though selling the plant brought new cash into the company. Moreover, if the Court accepts Debtors' argument, then implementing other cost savings measures such as cutting employee wages would also constitute actively seeking capital or business. Applying the faltering company defense to each employer who implemented any cost cutting measures would expand the defense beyond recognition. Moreover, the faltering company defense was never intended to apply to companies who only implemented cost savings measures, as shown by §639.9(a)(4)'s requirement that:

> The employer must be able to objectively demonstrate that it reasonably thought that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given.

Actively seeking financing means dealing with a source of financing who can refuse to provide the new capital sought. The implementation of One Yellow would not result in the Teamsters, Yellow's employees, or any other source of financing providing a single penny of new capital to Yellow. The requirement that there must be a source of financing further demonstrates that actively seeking financing means bringing new money into the company; and not the company's efforts to spend monies it already has more efficiently without having to deal with any sources of financing.

      b.      *Yellow's Only Possible Attempt To Seek External Capital On Or Before May 31, 2023, Was Its Proposal For Permission To PIK Interest.*

Debtors' analysis of whether they actively sought external capital or business is perfunctory at best. First, Debtors provide no explanation for why Yellow's attempts to seek financing on and after June 1, 2023, are relevant to the faltering company defense. To qualify to assert the faltering company defense, an employer must have been actively seeking capital or business at the time that 60-day notice would have been required. 20 C.F.R. §639.9(a)(1); *Jevic*, 496 B.R. at 160 (Faltering company defense failed because the employers' only attempts to obtain financing occurred fewer than 60 days before it discharged its workforce). Even when an employer decides to lay off its employees over a period of 14 days rather than on a single date, the WARN notice must be issued 60 days before the first day of the 14 days period. 29 U.S.C. §2102(a); 20 C.F.R. §639.7(b). Because Yellow laid off its union represented employees on July 30, 2023, 60-day notice would have been required by May 31, 2023; so that Debtors can only rely on Yellow's attempts to actively seek capital or business on or before May 31, 2023 to establish their faltering company defense.

The only proposal Yellow made to any lenders on or before May 31, 2023, was the May 26, 2023, proposal that Ducera presented to Appollo and the United States Treasury. However, that the proposal would create incremental liquidity would not by itself demonstrate the proposal sought capital or business, since a proposal to sell a terminal (just like Yellow's proposal to expedite the sale of a terminal) does not constitute actively seeking capital or business. *Midwest Fasteners, Inc.*, 763 F. Supp. at 82. Similarly, the proposal to free up collateral for Yellow ABL loan constituted preparing for rather than actively seeking financing, since Yellow's ABL lenders must separately agree to increase the borrowing base even after the collateral was freed up. *Third Supplemental Ho Decl.*, Ex. 40: *Kaldenberg Dep.* Pg. 43:10-13; *see by analogy Alden Corrugated Container Corp.*, 901 F. Supp. at 441 (Developing new customers does not constitute actively

seeking new business). Nor did Yellow seek new capital or business by asking its lenders to waive an EBITDA covenant. *In re APA Transport Corp.*, 541 F. 3d 233, 236, 250 (3d. Cir. 2008) (Employer did not undertake any steps to secure additional financing between October 24, 2001 and January 2, 2022, though it persuaded its lender to waive a loan covenant on December 10, 2021).

      c.      *The Proposal To PIK Interest Cannot Support The Faltering Company Defense Both Because Yellow Did Not Have A Realistic Opportunity To Obtain Permission To PIK Interest; And Because Yellow Never Timely Considered Issuing Warn Notices To Its Employees.*

The only aspect of Yellow's May 26, 2023, proposal that arguably constituted actively seeking capital or business was its proposal to pay interest in kind, i.e. to add the owed interest payments to the principal amount of its loan rather than to pay the interest in cash. However, for the two reasons stated below, Debtors cannot rely on Yellow's proposal to PIK interest to establish the faltering company defense either.

First, Debtors cannot show Yellow had a realistic opportunity to obtain leave to PIK interest. Whether there was a realistic opportunity to obtain financing must be measured on the date WARN notice would have been required. *In re Organogenesis Inc.*, 316 B.R. 574, 586 (Bankr. D. Mass. 2004) (Faltering company defense failed because as of the date 60–day notice was due the Claimants, July 25, 2002, the debtor had no realistic chance to obtain the sought financing). As of May 30, 2023, Debtors' lenders were unwilling to refinance its existing debt because of Yellow's then current condition, not just because it did not have an agreement with TNFINC on One Yellow. (D.I. #2778-1, *Murphy Decl.*, Ex. 11) A proposal to pay interest in kind, just like a proposal for new financing, would increase the principal amount that Yellow must repay to the lender.  That Yellow's lenders believed Yellow's then-current condition precluded new financing similarly

demonstrates the lenders believed Yellow's then-current condition precluded granting to Yellow leave to add to the principal amount of its loans by PIK interest.   Nor have the Debtors, who have the burden of proof on the issue, presented to the Court a shred of evidence demonstrating that any of their lenders were open to PIK interest as of May 31, 2023.

Moreover, even if Yellow's lenders would agree to PIK interest had there been an agreement on One Yellow, Yellow did not have a realistic opportunity to reach an agreement with TNFINC on One Yellow as of May 30, 2023. As of May 30, 2023, TNFINC was demanding an immediate $1.50 per hour wage increase, while Debtors were only offering $0.60 per hour of new money, and only if its lenders supported the wage increase. (D.I. #2581, ¶61; Ex. 15, pg. 2)[5] Whether there was a realistic opportunity to obtain financing is determined based on the actual behavior of the entities that the employer interacted with; not hypotheticals of what would be rational for those entities to do. *Chaney v. Vermont Bread Co.*, 2023 WL 5589113 * 12 (D. VT. 2023) (No evidence of a realistic opportunity when one potential buyer failed to show up to a meeting while a second was rejected by a bank). Similarly, analyzing whether Yellow had a realistic opportunity to reach agreement with TNFINC should focus on TNFINC's actual bargaining demands, not what the Debtors think a union that cooperated and negotiated a deal in good faith should have done. As of May 31, 2023, Yellow did not have a realistic opportunity to reach agreement with TNFINC when it both could not afford and was not offering the immediate $1.50 per hour wage increase that TNFINC was demanding in return for an agreement.

Second, to establish the faltering company defense, an employer must a) reasonably *have believed* that giving the WARN notice would have precluded *it* from obtaining the needed capital

---

[5] In addition, Debtors also proposed to accelerate a $0.40 per hour wage increase its employees were already scheduled to receive; and to reduce its fringe benefit contributions by $0.50 per hour so that it could place the money into wages instead. (D.I. #2581. *Hawkins Decl.*, Ex. 15, pg. 2)

or business; and (b) be able to objectively demonstrate that it *reasonably thought* that a potential customer or financing source would have been unwilling to provide the capital or business if notice were given. 29 U.S.C. §2102(b)(1); 20 C.F.R. §639.9(a)(4). The deliberate usage of the past tense by both the statute and the regulation demonstrates the employer's belief that giving WARN notice would preclude it from obtaining financing must be a historical fact. The Court should also note that 20 C.F.R. §639.9(a)(2) and (4) impose parallel requirements that an employer must meet to establish the faltering company defense, namely the employer must show both that it had a realistic opportunity to obtain the sought financing, and that it believed giving WARN notice would have precluded it from obtaining the needed capital or business.   Because these are parallel requirements, whether an employer has complied with the requirement should be measured at the same time, so that at the time WARN notice would have been required, the employer must have believed that giving WARN notice would have precluded it from obtaining the needed capital or business. *In re Organogenesis Inc.*, 316 B.R. at 586. After all, an employer cannot rely on the fear of losing financing to justify its failure to provide 60-day notice to its employees if its concerns about losing capital or business cannot explain its decision to not issue timely WARN notice to its employees.

Debtors admit that Yellow did not explicitly consider and reject the possibility of issuing WARN notices to at least 50% of its U.S. based employees on or before June 7, 2023. (D.I. #4312-1 *Second Supplemental Ho Decl.* Ex. 31, Pg. 2) Each of Debtors' attempts to present evidence required by §639.9(a)(4) is phrased in the hypothetical, rather than stating what the Debtors as a matter of historical facts believed. (*See* D.I. #4316-2, ¶36 (Yellow would not have issued WARN notices even if it could predict that it would shut down two months later); D.I. #2580, ¶20; #4316-3, ¶20 (Issuing WARN notices during negotiations with lenders would have negatively impacted

potential lenders and likely resulted in avenues for new liquidity to dissipate)) Debtors have presented no evidence that before July 30, 2023 (let alone May 31, 2023 when WARN notice would have been required), Yellow believed that giving WARN notices would have precluded it from obtaining its lenders' leave to PIK interest. Yellow could not have formed such a belief, when it never considered issuing WARN notices to its employees on or before May 31, 2023.

4.   Debtors Cannot Demonstrate That The UBC Defense Applies.

To establish the UBC defense, an employer must demonstrate (1) that the business circumstances that caused the layoff were not reasonably foreseeable and (2) that those business circumstances were the cause of the layoff. *In re AE Liquidation*, 866 F. 3d at 523.[6] The Debtors are not entitled to summary judgment both because they cannot rely on TNFINC's strike notice as an unforeseeable business circumstance, and because a reasonable fact finder may (and indeed would be compelled to conclude) that it was foreseeable that TNFINC would issue a strike notice, once Yellow's failure to make contributions jeopardized continued health and pension coverage for its employees.

a.   *Debtors Cannot Rely On TNFINC's Strike Notice As The Unforeseeable Business Circumstance For Their Ubc Defense.*

Yellow admits that TNFINC's strike notice was the business circumstance that caused a downward spiral that it could not recover from. (D.I. #4316, pg. 38) An employer who is entitled to shorten the notice period is required to provide its employees with a brief statement of its basis for reducing the notice period. 29 U.S.C. §2102(b)(3). An employer cannot rely on a business

---

[6] Indeed, the conclusion the Court drew in *AE Liquidation* on the UBC defense was that: "applying this foreseeability analysis to the facts of this case, we conclude that Eclipse has met its burden of demonstrating that ETIRC's failure to obtain the financing necessary to close the sale was not probable prior to Eclipse's decision to lay off its employees on February 24, 2009." The UBC defense analyzes the foreseeability of the business circumstance that caused the employer's closure, i.e. in AE Liquidation the employer's failure to obtain financing necessary to close the sale.

circumstance to establish a UBC defense if it never gave its employees notice that the business circumstance caused it to shorten the notice period. *Chaney*, 2023 WL 5589113 * 10 (Employer cannot rely on the seller's fraud by hiding the true condition of the business as an unforeseeable business circumstance because its WARN notice mentioned four other reasons for shortening the notice period, but not the seller's fraud). A Court would have a difficult time upholding the employer relying on a business circumstance to support the UBC defense where its WARN notice mentioned the business circumstance, but did not explain how the business circumstance caused it to shorten the notice period. *Alarcon v. Keller Industries, Inc.*, 27 F. 3d 386, 391 (9th Cir. 1994).

WARN notices that Yellow issued to the IBT and IAM only cited to its WARN defenses by name; and stated that Yellow had hoped to but was not able to complete one or more transactions to secure funds and business. (D.I. #2778-1, *Murphy Decl.*, Ex. 15; D.I. #3794-2, *Hughes Decl.* Ex. 1) Merely mentioning a WARN defense by name or providing a conclusory statement that summaries the statutory provision is insufficient to constitute providing the employees with a brief statement of the basis for reducing the notice period. *Alarcon*, 27 F. 3d at 389; *In re Tweeter OPCO, LLC*, 453 B.R. 534, 547 (Bankr. D. Del. 2011). Nor could anyone be expected to understand that when Yellow says in the WARN notice that it was hoping to but was not able to complete transactions to secure funds, it actually meant TNFINC's strike notice caused its closure. Yellow's inadequate WARN notice to the IBT and IAM undermined the purpose of the shortened notice requirement, by depriving the unions of an understanding of why Yellow believed the notice period was shortened; and therefore, an opportunity to evaluate whether the notice period was properly shortened. *Alarcon*, 27 F. 3d at 389.

While some courts have permitted an employer to supplement an inadequate WARN notice by pointing to other communications with employees, those cases do not support Debtors' defense

because no other Yellow communications to the IBT, IAM, or its unionized workforce cite to TNFINC's strike notice as a reason for shortening the notice period. First, none of Hawkins' direct communications to Yellow employees reference any strikes let alone TNFINC's strike notice. (D.I. #2581, *Hawkins Decl*., Ex. 18, 19, 23, 24, 27) Second, while Yellow's script for its supervisors to use to communicate with non-union employees did reference TNFINC's strike authorization and the effect of the strike authorization on Yellow's business, Debtors have not produced a shred of evidence showing that, prior to the commencement of discovery for the WARN litigation in 2024, the script's explanation for Yellow's closure was ever communicated the IBT, the IAM, or to any Teamster or Machinist represented employees. Under §2102(a)(1), 60-day notice of closing must be issued to the employees' representative. Since §2102(b)(3) does not specify a different recipient for shortened notice, a brief statement of the employer's reason for reducing the notice period must similarly be issued to the employees' representative. Debtors have provided no explanation for why information that it only provided to its non-union employees constitute appropriate notice of its reasons for shortening the notice period to its union represented employees' representatives.

Finally, the Court should easily reject the Debtors' argument that they somehow substantially complied with §2102(b)(3), an argument that they have relegated to a footnote. (D.I. #4316, n. 19) The regulatory provision that excuses minor, inadvertent violations, 20 C.F.R. §639.7(a)(4) only appears in the regulation that governs, and only applies to 60 day WARN notices. Section 639.7(a)(4) does not apply to the employer's notice of its reason for reducing the notice period, which is regulated by §639.9. In any event, §639.7(a)(4) cannot excuse an employer's failure to explain to its employees the facts that caused it to shorten the notice period. *Grimmer v. Lord Day & Lord*, 937 F. Supp. 255, 257-258 (S.D.N.Y. 1996). Whether an employer acted in good faith is a valid consideration after a statutory violation has been established, so that the employer's

purported good faith cannot be relied upon to establish a UBC defense against a statutory violation. *Grimmer*, 937 F. Supp. at 258; 29 U.S.C. §2104(a)(4) (Good faith defense only applies if employer has violated this Chapter).  Moreover, Yellow admits that its HR Department and its in-house Legal Department were very experienced in WARN matters. (D.I. #4286-1 *Second Supplemental Ho Decl.*, Ex. 35: *Hawkins Dep.*, Pg. 188:21 – 189:3) Given Yellow's belief that the strike notice caused its closure without giving advanced notice to its employees, it should have been obvious to Yellow's employees who were very experienced in WARN matters that its outside counsel had erred by not referencing the strike notice in WARN notices Yellow was issuing to the IBT and IAM.

Moreover, to be unforeseeable, a business circumstance should be caused by some sudden, dramatic, and unexpected action or condition outside the employer's control. 29 C.F.R. §639.9(b)(1). Business circumstances caused in part by decisions within the employer's control cannot constitute unforeseeable business circumstances. *Carpenters District Council of New Orleans v. Dillard's Department Stores, Inc*., 15 F. 3d 1275, 1281-1282 (5th Cir. 1994) (Uncertainty of when the SEC would approve a merger caused by the employers' own decision to pursue a merger is not an unforeseeable business circumstance). TNFINC's strike notice was caused by Yellow's own failure to remit contributions, not by some sudden, dramatic, or unexpected action or condition outside Yellow's control. Moreover, the UBC defense does not apply when the employer's own actions could have prevented the company's closure.  For example, in *Vermont Bread Company*, 2023 WL 5589113 * 13, though the buyer discovered the seller had failed to fully disclose the stressed nature of the business, the Court found the investor's breach of its own promise to invest $2.5 million into the business was not the sort of external event that could support a UBC defense.  Similarly, Yellow's own refusal to pay the owed fringe benefit contributions to

secure its workforce's availability, once TNFINC issued a strike notice and its customers began to flee, is not the sort of external event that can support a UBC defense.

        b.    *TNFINC's Strike Notice Was Foreseeable.*

To establish the UBC defense, an employer must demonstrate its closing was caused by a business circumstance that was not foreseeable at the time that notice would have been required. 29 U.S.C. §2102(b)(2)(A). The Court should reject the Debtors' argument that "at the time that notice would have been required necessarily" means 60 days before closing, since an employer who must shorten the notice period must still give as much notice as is practicable. 29 U.S.C. §2102(b)(3). In *In re AE Liquidation*, for example, the Court considered whether the failure to obtain financing to close a sale was foreseeable throughout the 60 days between when WARN notice was required and when the employer closed, rather than only at the point in time 60 days before the employer closed. *See* 866 F. 3d at 531-533.  Similarly, Debtors cannot avoid liability altogether by arguing TNFINC's strike notice was not foreseeable by May 31, 2023.

In any event, it was always foreseeable that should Yellow's failure to remit contributions jeopardize continued health and pension coverage for its union represented employees, TNFINC would issue a strike notice. Debtors have not produced any evidence showing that in prior instances in which there was a deferral of contributions, continued health and pension coverage for Yellow employees was ever jeopardized. In 2020, for example, Central States continued to provide coverage as it negotiated with Yellow its proposal to extend its time to make the contributions, agreed to extend coverage for eight weeks starting on May 10, 2020, and Yellow resumed making contributions before the eight-week extension expired. (D.I. #2778-1, *Murphy Decl*., Ex. 2; D.I. #4312-1 *Second Supplemental Ho Decl.*, Ex. 35, pg. *Hawkins Dep.*, Pg. 90:19-23) That TNFINC did not issue a strike notice when the fringe benefit funds worked with Yellow to extend coverage

does not demonstrate TNFINC would not issue a strike notice, if the fringe benefit funds declined to work with Yellow, so that Yellow's failure to remit contributions jeopardized continued health and pension coverage for its employees. In 2023 Central States declined to work with Yellow by rejecting its request to defer contributions. (D.I. #2581; *Hawkins Decl*., ¶72)

The Court should even more easily reject the Debtors' reliance upon its history of bargaining with TNFINC. This case is about how TNFINC was likely to react to Yellow's contract violations that jeopardized continued health and pension coverage for its employees; not whether TNFINC would strike in support of its bargaining position. Even if prior negotiations occurred after a contract expired, Yellow was still required to maintain the status quo of making contributions required by the expired contract. *Operating Engineers Local 324 Funds v. Rieth-Riley Const. Co*., 43 F. 4th 617, 619 (6th Cir. 2022); *Oak Harbor Freight Lines, Inc*., 361 NLRB No. 82 (2014). That TNFINC did not issue a strike notice in support of its bargaining demands, while its members who worked for Yellow continued to receive health and pension benefits, does not suggest TNFINC would not issue a strike notice to prevent the disruption of its members' health and pension coverage caused by Yellow's contract breach by failing to pay contributions.

A union exists to protect its membership. Any union worth its salt would try to protect its members by issuing a strike notice to convince the employer to come to its senses by making the contributions that would allow continued health and pension coverage for the union membership. (D.I. #2778-1, *Murphy Decl*., ¶50). Indeed, Yellow itself predicted that it would likely pay the owed contributions once TNFINC threatened to strike. (D.I. #4286-1 *Second Supplemental Ho Decl*. Ex. 32, pg. 2) Moreover, the NMFA explicitly authorized Teamster members to strike if it fell behind on remitting contributions. (D.I. #2778-1, *Murphy Decl*., Ex. 1, Art. 8, ¶3(b))

TNFINC's strike notice in response to the threatened loss of coverage for its members caused by Yellow's failure to remit contributions therefore was foreseeable as of May 31, 2023.

The Wisconsin Department of Workforce Development's Initial Determination cited by Yellow provides no support for Yellow's position. Federal Courts afford state administrative agencies the deference that they would receive under state law. *Twp. Of Bordentown v. FERC*, 903 F. 3d 234, 270 (3d. Cir. 2018). Under Wisconsin law, a court should give respectful, appropriate consideration to the agency's views while exercising its independent judgment to decide questions of law; so that whether to give due weight to the agency's decision presents a question of persuasion rather than deference. *Tetra Tech Inc. v. Wisconsin Dep't of Revenue*, 2018 WI 75 ¶78, 382 Wis. 2d 496. This standard is similar to *Skidmore v. Swift*, pursuant to which a court decides whether an agency's interpretation is persuasive by considering factors including the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Under this standard, the DWD's decision is not persuasive because it does not contain a shred of reasoning or analysis for why the strike notice was not foreseeable. (D.I. #4316-1, Ex. 8, ¶20)

5.      WARN Act Damages Should Not Be Reduced On Account Of Yellow's Alleged Good Faith.

The good faith defense only applies when the employer has violated the WARN Act. 29 U.S.C. §2104(a)(4). The good faith defense therefore requires proof of the employer's subjective intent to comply with the WARN Act along with the objective reasonableness in its (incorrect) application of the WARN Act. *Castro v. Chicago Housing Authority*, 361 F. 3d 721, 730 (7th Cir. 2004). Whether an employer demonstrated its subjective intent to comply with the WARN Act

depends on the thoroughness of the employer's effort to determine, and to comply with the WARN Act's requirements. *Contrast Castro*, 361 F. 3d at 731 (Employer failed to demonstrate seriousness of its efforts to comply with WARN when its ultimate decision makers showed no interest in the conclusions of their legal counsel; and when there is no evidence whether the attorney extensively researched or only glanced at the statutes and the case law to ascertain the employer's WARN obligations) and *Washington v. Air Cap Industries, Inc*., 860 F. Supp. 307, 318 (D. S.C. 1994) (To hold the employer acted in good faith by obtaining an "off the cuff" oral opinion about its WARN liability would eviscerate the purpose of the WARN Act) with *General Elec. Co. v. Porter*, 208 F. 2d 805, 816 (9th Cir. 1953) (Employer demonstrated good faith when its administrative personnel and attorneys studied for a long time period whether the Fair Labor Standards Act applied to firemen, before ultimately rendering the incorrect opinion that the Act did not apply). As these cases demonstrate whether the employer had a subjective intent to comply with WARN is analyzed based on the thoroughness of the employer's effort to analyze its duties under the law.

By the end of May of 2023, Yellow's obligation to analyze its duties under WARN was triggered, because, as it told TNFINC, it understood that it may not be around by August 1, 2023. (D.I. #2581, Ex. 13, pg. 1) Indeed, by May of 2023, Yellow projected that it would violate its $200 million EBITDA covenant in the second, third, and fourth quarters of 2023. (*Third Supplemental Ho Decl*., Ex. 40: *Kaldenberg Dep.* Pg. 30:23 – 31:9) A violation of the EBITDA covenant is a default that may entitle Yellow's lenders to require the repayment of the principal amounts of its loans, while Yellow's projected cash was less than, and therefore insufficient to pay the principal amounts of its loans in full. (*Third Supplemental Ho Decl*., Ex. 40: *Kaldenberg Dep.* Pg. 27:2-3; 27:15 – 28:2; 29:7 – 8) Nor could Yellow look to its lenders for help, given that its lenders were refusing to refinance its loans even had TNFINC not asked for any wage increases. (D.I. #2778-1,

*Muphy Decl*., Ex. 11) Nor could Yellow look to TNFINC for salvation when TNFINC was demanding an immediate $1.50 per hour wage increase in return for its support for Phase 2 of One Yellow; while Yellow both could not afford and was not willing to offer the demanded wage increase. (D.I. #2581, *Hawkins Decl*., ¶61; Ex. 15, pg. 1-2) Nor can Debtors rely on its earlier bargaining history with TNFINC to ignore the concrete demand for an immediate $1.50 per hour wage increase that TNFINC made on May 25, 2023.  Indeed, Yellow itself construed TNFINC's demand as a concrete bargaining position rather than a bluff, as demonstrated by its effort to recharacterize compensation already payable to or promised to Teamster members under the relevant NMFA to make it look like it was offering TNFINC a $1.50 per hour wage increase. (D.I. #2581, *Hawkins Decl*., Ex. 15, p. 2.)

To demonstrate subjective good faith, once an employer realized that there was some risk of its closing it must make a reasonable and diligent attempt to analyze the WARN Act's requirements. Though Yellow understood it may close by August 1, 2023, it never considered on or before June 7, 2023, whether to issue WARN notices to its employees. (D.I. #4312-1 *Second Supplemental Ho Decl.,* Ex. 31, Pg. 2) Debtors therefore cannot demonstrate subjective good faith for Yellow's violation of WARN. Debtors have completely missed the mark by arguing that had it considered issuing WARN notices to its employees by the end of May of 2023, it would not have done so.  Yellow's lack of subjective intent to comply with WARN is demonstrated by its failure to consider altogether on or before May 31, 2023 whether to issue WARN notices to its employees; not by what Yellow would have decided to do had it, hypothetically, considered on or before May 31, 2023 whether to issue WARN notices to its employees.

6.      <u>Debtors Have Waived, And On The Merits Cannot Challenge The Priority Of The Teamsters' WARN Claims.</u>

In their summary judgment brief, Debtors make the argument that unionized employees' recovery under WARN cannot constitute hours worked for which they owe contributions. To the extent Debtors may rely on a similar rationale to argue that the Unions WARN claims should be treated as general unsecured rather than fourth priority unsecured claims (up to the $15,150 limit per employee), the Debtors have not properly raised the issue with the Court.

The proofs of claim that the Unions filed with the Court identified the majority of their WARN claims, up to the cumulative $15,150 limit per employee, as priority unsecured claims.[7] Debtors' objections to these proofs of claims did not object to assigning priority under 11 U.S.C. §507(a)(4) to up to $15,150 of the WARN claim for each employee. Under Local Rule 3007-1(f)(iii), an objection based on substantive grounds shall include all substantive objections to a proof of claim. Upon the filing of a response to any such substantive objection, the objector may only amend such objection with the leave of Court or the consent of the claimant. *See* Local Rule 3007-1(f)(v). *See also Oaks v. Bank One Corp.*, 126 Fed. Appx. 689, 691 (6th Cir. 2005) (Unpublished) (An objection to a proof of claim is like a defense that can be waived if it is not included in the answer). Similarly, once the Unions responded to the Debtors' substantive objection to the proofs of claim, Debtors cannot add an objection to the assigned priority of the WARN claims unless either the Court grants leave, or the Unions consent. Since no leave has been obtained from the Court, and the Unions do not consent, any objection as to the priority to be assigned to the Unions' WARN claims is not properly before the Court.

---

[7] *See* Proofs of Claim numbers 16880, 16881, 17248 amended by claim number 19589, 17253 amended by claim number 19588, 17258, and 17261.

Even were the Court to consider the issue on the merits, WARN damages qualify as priority unsecured claims under §507(a)(4). Courts, including a case that the Debtors rely on, hold that WARN damages are akin to severance pay. *United Paperworkers Local 340 v. Specialty Paperboard, Inc*., 999 F. 2d 51, 55 (2d Cir. 1993) ("WARN Act damages compensate an employee for the injuries caused by his or her improper termination, much akin to either an action for wrongful discharge or severance pay."); *In re Cargo Inc*., 138 B.R. 923, 927 (Bankr. N.D. IA. 1992) ("WARN act awards are comparable to severance pay, so that they constitute wages entitled to status of priority unsecured claims rather than penalties.") Severance pay up to the limit of $15,150 are fourth priority unsecured claims under 11 U.S.C. §507(a)(4)(A). The Delaware Bankruptcy Court has similarly held that WARN damages are remedial rather than punitive so that they are in the nature of wages under the Bankruptcy Code; so that just like severance pay WARN damages for a violation that occurred pre-petition are entitled to treatment as priority unsecured claims. *In re PowerMate Holding Corp*., 394 B.R. 765, 771, 778 (Bankr. D. Del. 2008). The Supreme Court has similarly stated that a judgment for WARN damages counts as priority unsecured claims under §507(a)(4). *Czyzewski v. Jevic Holding Corp*., 580 U.S. 451, 459 (2017).

7.    Conclusion

For the above stated reasons, each of the Debtors defenses to WARN liability fail as a matter of law. The Debtors clearly are not entitled to summary judgment dismissing the Unions' meritorious claims for WARN liability.

Date:  September 27, 2024                   LAW OFFICE OF SUSAN E. KAUFMAN, LLC

                                           */s/ Susan E. Kaufman*
                                           Susan E. Kaufman, (DSB# 3381)
                                           919 North Market Street, Suite 460
                                           Wilmington, DE 19801
                                           (302) 472-7420
                                           (302) 792-7420 Fax
                                           skaufman@skaufmanlaw.com

                                           -and-

                                           Yingtao Ho (WI Bar No. 1045418)
                                           Emma Woods (WI Bar No. 1120187)
                                           THE PREVIANT, LAW FIRM, S.C.
                                           310 W Wisconsin Ave, Suite 100MW
                                           Milwaukee, Wisconsin 53203
                                           Telephone: 414.271.4500
                                           Facsimile: 414.271.6308
                                           emw@previant.com
                                           yh@previant.com

                                           *Counsel for International Brotherhood of Teamsters,
                                           Teamsters National Freight Industry Negotiating
                                           Committee and International Association of Machinists*