**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Yellow Corporation, *et al.* | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THIRD SUPPLEMENTAL DECLARATION OF YINGTAO HO**

I, Yingtao Ho, make this Declaration pursuant to 28 U.S.C. § 1746:

1. I am one of the attorneys for the International Brotherhood of Teamsters ("IBT"), the Teamsters National Freight Division ("TNFINC"), and the International Association of Machinists ("IAM"). I make this third supplemental declaration to present to the Court additional documents that support the IBT, TNFINC, and IAM's motion for summary judgment.

2. I have attached as exhibit 38 to this declaration the document that Cody Kaldenberg had in front of her, when she testified as the Debtors' Rule 30(b)(6) designee on August 5, 2024.

3. I have attached as exhibit 39 to this declaration excerpts from the transcript of the Deposition of John Murphy. (Pg. 322, 328)

4. I have attached as exhibit 40 to this declaration additional excerpts from the transcript of the deposition of Cody Kaldenberg. (Pg. 22, 27-29, 30-31, 43, 51, )

5. I have attached as exhibit 41 to this declaration an additional excerpt from the transcript of the deposition of Darren Hawkins. (Pg. 9)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief on this 27th day of September, 2024.

                                                             */s/ Yingtao Ho*
                                                             Yingtao Ho

# Exhibit 38

**Yellow** – Timeline

---

[Calendars for June 2023, July 2023, and August 2023]

<u>January – April:</u>

- Engaged, doing prep work for financing
- IBT cancels hearing on One Yellow on March 23
- Ongoing back and forth between Company and IBT after hearing was cancelled

<u>May 15:</u> Ducera meeting with Kaitlyn Long

<u>May 16:</u> Receive preliminary version of May Outlook which shows:

- Liquidity trough of $34mm in mid-July (based on adjusted liquidity) – see *Project Prime Illustrative Forecast Materials deck dated June 2023 (YELLOW_WARN_155351.pdf)*
- Following this, evaluated alternatives to address liquidity shortfall with Company and prepared amendment term sheet for lenders

<u>May 26:</u> Sent amendment term sheet to Apollo and UST, which contemplated:

- Ability to pay interest in kind for remainder of 2023
- Waive minimum EBITDA covenant through 4Q23
- Apollo and UST each modify priority of $50mm rolling stock to be added to ABL borrowing base
- ABL borrowing base amended to include rolling stock and commitment increased by $100mm
- Pro forma, would have added ~$66mm+ liquidity at mid-July trough (such that trough liquidity would now be at least $100mm)
- *Project Prime Illustrative Forecast Materials deck dated June 2023 (YELLOW_WARN_155351.pdf)*

<u>June 5:</u>

- Reached out to Ares re: refinancing ABL
- Sent amendment term sheet to Citizens and held call

<u>June 8:</u> Began discussions with Atlas

<u>June 15:</u> Reached out to Sound Point re: refinancing ABL

<u>June 27:</u> Yellow files KC district court lawsuit against IBT

<u>June 29:</u> Initial management meeting with Atlas (via Zoom)

<u>July 7:</u> Receive waiver of minimum EBITDA covenant from Apollo and UST

**Yellow** – Timeline

[Calendars for June 2023, July 2023, and August 2023]

- Waiver of minimum EBITDA covenant for 2Q23 and 3Q23
- Added $35mm minimum liquidity covenant
- Added various reporting requirements – weekly liquidity reports, 13-week cash flow, weekly lender calls, etc.
- Added a 2% exit fee to Apollo loan
- Sale of Compton terminal completed prior to signing of amendment, with $79mm proceeds used to pay down Apollo loan

July 13: In-person management meeting with Atlas in KC

July 17: IBT issues strike notice, which had following impact to shipments:

- Pre-strike notice: Over 40,000 per day
- July 19: 32,500
- July 21: 10,450

July 18: Atlas sends comprehensive follow-up diligence request list

July 19: First Citizens notice for reserve of $25mm due on July 21

July 23:

- Strike notice withdrawn and negotiations with IBT commence
- Further due diligence information provided to Atlas

July 24:

- Yellow begins process to stop accepting new shipments and ensure it can deliver all existing shipments
- Further due diligence requests from Atlas (specifically with respect to non-union third-party logistics business)
- Yellow picked up 17,695 shipments

July 25:

- Second Citizens notice for reserve of $25mm due on July 27
- A&M prepares & distributes DIP sizing analysis internally
- Yellow picked up 11,109 shipments

**Yellow** – Timeline

[Calendars for June 2023, July 2023, and August 2023]

July 26:

- DIP sizing analysis sent to Apollo
- Board meeting to discuss timing of potential filing
- Yellow picked up 726 shipments

July 27: Call with Atlas and Greenhill (Atlas' banker)

July 29: Apollo sends DIP term sheet

July 30-31: WARN Notices sent to unions and unionized employees

August 3: Atlas NDA requests amendments to NDA to accommodate potential bankruptcy filing / 363 sale process

August 6: Yellow files for Chapter 11

# Exhibit 39

Page 1

```
 1

 2              UNITED STATES BANKRUPTCY COURT

 3               FOR THE DISTRICT OF DELAWARE

 4     - - - - - - - - - - - - - - - x
                                     :
 5     In re:                        : Case No.
                                     : 23-11069 (CTG)
 6     YELLOW CORPORATION, et al.,   :
                                     :
 7              Debtors.             :
                                     :
 8     - - - - - - - - - - - - - - - x

 9                    August 9, 2024

10                    9:13 a.m. EDT

11         Videotaped deposition of JOHN A. MURPHY,

12     held at the offices of Kirkland & Ellis LLP,

13     1301 Pennsylvania Avenue, N.W., Washington D.C., 80

14     before Misty Klapper, Registered Merit Reporter,

15     Certified Realtime Reporter, Certified Shorthand

16     Reporter and Notary Public.

17

18

19

20

21

22
```

Page 322

1  BY MR. SCIACCOTTA:
2  Q. You can answer.
3  A. What happened in the past was not
4  of my concern or my involvement.
5  Q. Okay.
6  A. They still could have issued a
7  strike notice back then too.
8  Q. But they chose not to, correct?
9  A. I -- I don't -- well, obviously
10 they did, but I don't know why.
11 Q. Did you coordinate sending the
12 strike notice on the same day as Central
13 States' notice?
14     MR. HO: Objection. Question's
15 vague.
16     You can try to answer if you
17 understand it.
18     THE WITNESS: Yeah, I don't --
19 I -- I don't know if it actually went
20 out or what day it went out.
21     BY MR. SCIACCOTTA:
22 Q. Prior to issuing the strike

Page 323

1  notice, did you anticipate organizing a
2  strike in the midst of the negotiations with
3  Yellow?
4  A. No.
5  Q. That was not an economic tool you
6  intended to use?
7  A. I would say we could use it, but
8  I -- I didn't anticipate using it. It's a
9  last resort. We -- I don't -- I -- I -- I'm
10 not sure we were there. We certainly
11 wouldn't be there during negotiations, actual
12 negotiations.
13     The -- the issue here, at hand
14 here, is they didn't make contributions to
15 the plans.
16 Q. At the time you issued the strike
17 notice, did you understand why Yellow had
18 deferred its pension contributions?
19 A. I understood what they said and
20 why they did it.
21 Q. Did you not believe what they
22 were saying?

Page 324

1  A. I don't think it's a matter of
2  whether I believed them or not. It's a
3  matter of following the contract.
4  Q. Did you consider the fact that
5  Yellow was on the brink of bankruptcy when
6  you issued the strike notice?
7  A. I just told you. It's a matter
8  of contractual.
9  Q. When was the strike activity set
10 to commence? Do you recall?
11 A. I -- I -- I don't. I believe --
12 I -- I -- I don't -- I don't remember.
13 Q. Let's take a look at the notice
14 real quick.
15 A. Okay.
16     MR. SCIACCOTTA: Go to Tab 34.
17     (Thereupon, John Murphy
18 Deposition Exhibit 0027 was marked for
19 identification.)
20     THE WITNESS: Thank you.
21     BY MR. SCIACCOTTA:
22 Q. For the record, Exhibit 27 is the

Page 325

1  letter from you to Mr. Reifsnyder, dated
2  July 17, 2023, with the Bates number 047329.
3     Mr. Murphy, this is the strike
4  notice we were just discussing?
5  A. Yes.
6  Q. And in the paragraph -- the third
7  paragraph down, beginning with the word
8  Consequently, it states, please be advised
9  that such strike activity shall commence any
10 time on or after Monday, July 24, 2023.
11     Did I read that correctly?
12 A. Correct.
13 Q. Had you ever approved issuing a
14 strike notice in the past to any company, not
15 just to Yellow?
16 A. I -- I may have at Local 25, but
17 not at the national level -- level.
18 Q. Okay. And after a strike notice
19 is issued, did you understand that a work
20 stoppage at Yellow would likely occur?
21 A. Yes.
22 Q. Um-hmm. And a work stoppage

Page 326
1  means that Yellow's daily operations would
2  cease?
3      MR. HO: Objection, foundation,
4  calls for speculation.
5      THE WITNESS: We -- we -- we
6  would stop working. I don't know if
7  the operation would stop, but ...
8      BY MR. SCIACCOTTA:
9  Q.  It's -- could you agree with me
10 that it's difficult to pick up and deliver
11 shipments without employees?
12 A.  I don't -- in other strikes that
13 we've done this, companies found ways to make
14 those deliveries.
15 Q.  And that was your --
16 A.  I -- I would -- I would agree
17 that it makes it tough to do deliveries with
18 their own employees.
19 Q.  And at the time of the strike
20 notice, I believe we discussed you were aware
21 of Yellow's financial condition, correct?
22 A.  Correct.

Page 327
1  Q.  You understood that issuing this
2  notice could have a detrimental impact on
3  union members' jobs?
4  A.  To save an argue -- yes.
5      MS. REPORTER: I'm sorry?
6      THE WITNESS: To save an
7  argument, yes. Company knew the same
8  thing.
9      BY MR. SCIACCOTTA:
10 Q.  I'm asking what you knew, sir.
11 A.  What I knew?
12 Q.  Yeah.
13 A.  I knew the company knew that if
14 they didn't pay the contributions, there
15 would be a strike.
16 Q.  Did you understand, Mr. Murphy,
17 that issuing the notice, the strike notice,
18 may sound alarms for Yellow's customers?
19 A.  Sure.
20 Q.  Prior to issuing the strike
21 notice, did TNFINC or the IBT tell its
22 members employed by Yellow to start looking

Page 328
1  for other jobs?
2  A.  TNFINC never told Yellow
3  employees to start looking for other jobs,
4  never.
5  Q.  Why not?
6  A.  It's not what we do. We don't --
7  we don't go out and tell them to look for
8  other jobs.
9  Q.  Before the strike notice went
10 out, were you aware of the identities of
11 Yellow's largest customers?
12 A.  Somewhat. I mean, nobody --
13 nobody told me who they were or -- I mean, I
14 assumed Walmarts and big companies like that,
15 government.
16 Q.  Are you aware of where those
17 largest customers have transitioned their
18 business to now?
19 A.  No.
20 Q.  So you don't know whether those
21 freight customers are unionized?
22 A.  I don't.

Page 329
1  Q.  Okay. Were you aware that after
2  the strike notice was issued, customers
3  immediately began expressing concerns with
4  taking their business elsewhere?
5  A.  I -- I don't know directly.
6  Q.  Indirectly you were aware?
7  A.  I -- you could assume that.
8  Q.  Um-hmm. Were you aware that
9  after the IBT issued the strike notice,
10 Yellow received two separate $25 million
11 calls from its asset-based lenders for
12 collateral?
13 A.  The IBT didn't send a strike
14 notice. TNFINC did.
15 Q.  Oh, excuse me. I retract that
16 statement.
17     Were you aware that after TNFINC
18 issued the strike notice, Yellow received two
19 separate $25 million calls from its
20 asset-based lenders for collateral?
21 A.  I do not.
22 Q.  Did you subsequently learn that

# Exhibit 40

HIGHLY CONFIDENTIAL

Page 1

1  UNITED STATES BANKRUPTCY COURT
2  FOR THE DISTRICT OF DELAWARE
3
4  In Re:
5  Yellow Corporation,
6  et al.,                         Case No. 23-11069
7         Debtor              (CTG)
8  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~
9
10         *** HIGHLY CONFIDENTIAL ***
11         REMOTE VIDEO DEPOSITION OF
12              CODY KALDENBERG
13
14
15              August 5, 2024
16             10:05 a.m. Eastern
17
18
19
20      Stenographically Reported By:
21   Deanna Amore - CRR, RPR, CSR - 084-003999
22
23
24
25

Page 22

 1  pro forma models based on achieving the amendments
 2  that we laid out.
 3  BY MR. HO:
 4      Q.  Before May 26, 2023, did Ducera make any
 5  proposals to Yellow's existing lenders to modify
 6  any of Yellow's existing loans?
 7      A.  No, not that I can recall.
 8      Q.  Before May 26, 2023, did Ducera have any
 9  discussions with Yellow's existing lenders to
10  modify any of Yellow's existing loans?
11      A.  Not that I can recall.
12      Q.  Before May 26, 2023, did Ducera have any
13  discussions with any lenders about bringing new
14  capital into Yellow?
15      MR. ESSER:  Object to form.
16          You can answer.
17      THE WITNESS:  Can you repeat the question?
18  BY MR. HO:
19      Q.  Sure.
20          Before May 26, 2023, did Ducera have any
21  discussions with any lenders about bringing any new
22  cash into the company?
23      MR. ESSER:  Object to form.
24          You can answer.
25      THE WITNESS:  So Ducera was engaged in January

Page 23

 1  of 2023 to refinance the existing loans.  We would
 2  have been doing prefatory work starting from that
 3  date to prepare for a financing.
 4  BY MR. HO:
 5      Q.  My question is more specific, though.
 6          Were there any discussions between Ducera
 7  and the lenders before May 26, 2023, about bringing
 8  new cash into Yellow?
 9      MR. ESSER:  Object to form.
10          You can answer.
11      THE WITNESS:  Sitting here today, I can't say
12  for sure, but I do recall that we would have had
13  discussions with Apollo and potentially some of the
14  other lenders before this term sheet was provided.
15  BY MR. HO:
16      Q.  Who else do you remember discussing --
17      A.  I recall -- I recall that Apollo was aware
18  that Ducera had been engaged to raise financing for
19  the company, and we would have had discussions
20  around that.
21      Q.  And what would those discussions have
22  addressed?
23      A.  Can you repeat the question?
24      Q.  Sure.
25          So you just told me that before

Page 24

 1  May 26, 2023, there were discussions between Ducera
 2  and Apollo.  I just asked you what those
 3  discussions would have addressed.
 4      A.  So, again, sitting here today, this was a
 5  long time ago, but I do recall that Apollo was
 6  aware that Ducera had been engaged by the company
 7  to raise financing.  So the conversations were
 8  likely around the situation with the company and
 9  the potential for Ducera to raise financing.
10      Q.  Before May 26, 2023, do you remember
11  Ducera having discussions with any other lenders
12  for Yellow?
13      A.  I believe that we would have talked to
14  Blue Torch and potentially Beal.
15      Q.  Can you go back to Exhibit 1?  Go to
16  page 4 of the document and find "Executive
17  Summary."  Get to that page and let me know when
18  you're there.
19      A.  Yes.
20      Q.  Was Yellow experiencing challenging
21  economic conditions in 2023?
22      MR. ESSER:  Object to form.
23          I'm sorry.  I couldn't make that question
24  out.
25

Page 25

 1  BY MR. HO:
 2      Q.  Sure.
 3          Was Yellow experiencing challenging
 4  economic conditions in 2023?
 5          If you look at the second bullet point of
 6  the page you have in front of you, do you see where
 7  it refers to challenging macroeconomic conditions?
 8      A.  I do.
 9      Q.  What are those challenging macroeconomic
10  conditions that Ducera is referring to?
11      A.  I believe at the time the company had not
12  experienced the full rebound in the freight cycle.
13      Q.  What does that mean, "the company had not
14  experienced a full rebound in the freight cycle"?
15      A.  It means that shipments were not as high
16  as they would be in more positive macroeconomic
17  conditions, which would impact revenue.
18      Q.  So all shippers were experiencing some
19  decrease in shipments because of the macroeconomic
20  conditions that were present?
21      A.  I can't speak to all shippers.
22      Q.  And the challenging macroeconomic
23  conditions was one of the reasons why Yellow's
24  performance wasn't as good as they had projected;
25  right?

Page 26

1 A. The challenging macroeconomic conditions
2 would have contributed to more challenged financial
3 performance for Yellow.
4 Q. The same page right-hand side also refers
5 to covenant headroom.
6 Do you see that?
7 A. Can you repeat it?
8 Q. Sure.
9 On the right-hand side of the page there
10 is a reference to covenant headroom.
11 A. Yep.
12 Q. What does that mean?
13 A. The loans had covenants tests in them that
14 the company had to comply with. There were minimum
15 EBITDA requirements. And what this bullet point is
16 saying is that the difference between the covenant
17 requirements and where the actual EBITDA would have
18 come in was projected to be very close.
19 Q. And if Yellow missed those projections,
20 what would be the harm to Yellow?
21 MR. ESSER: Object to form.
22 BY MR. HO:
23 Q. Let me rephrase the question.
24 So if Yellow's EBITDA fell below the
25 minimum required by the covenant, what would be the

Page 27

1 consequence to Yellow?
2 A. If EBITDA was below the minimum EBITDA,
3 I believe that would have been an event of default.
4 Q. And in an event of default, the lender
5 would have been able to require Yellow to repay the
6 principal amount of the loan; right?
7 MR. ESSER: Object to form. Calls for a legal
8 conclusion.
9 But to the extent you can answer without
10 divulging any advice you received from counsel, you
11 may answer.
12 THE WITNESS: Can you repeat the question?
13 BY MR. HO:
14 Q. Sure.
15 In the event of default, the lender would
16 have been able to require -- the lender would have
17 the right to require Yellow to repay the principal
18 amount of loan; correct?
19 MR. ESSER: Same objection.
20 You can answer to the extent you can
21 without divulging any attorney-client privileged
22 advice.
23 THE WITNESS: In an event of default, the
24 lenders, I believe, would have certain remedies,
25 which may include seizing collateral or requiring

Page 28

1 -- potentially requiring payment of principal, but
2 that's more of a legal question.
3 BY MR. HO:
4 Q. Sure.
5 And the loans that had the -- the loans
6 that had the -- the covenant we are talking about
7 is a $200 million minimum LPM EBITDA covenant;
8 right?
9 A. Yes.
10 Q. Which loans had that covenant in them?
11 A. I actually don't recall exactly.
12 I believe it was at least the Apollo loan and may
13 have also been the Treasury loan.
14 Q. And in May of 2023, Yellow did not have
15 enough cash to repay the principal amount of either
16 one of those two loans; right?
17 A. I don't recall the cash balance.
18 Q. Well, if you look at page 5 of the
19 document, that shows the existing and projected
20 cash that Yellow would have had; right?
21 A. Uh-huh.
22 Q. If you look at page 5, the 13-Week Cash
23 Flow Forecast?
24 A. Right.
25 Q. That shows the actual and projected amount

Page 29

1 of cash Yellow would have had; right?
2 A. Yes. This was the projected cash over
3 13 weeks.
4 Q. And those amounts of cash were nowhere
5 near enough to repay the Apollo loan or the U.S.
6 Treasury loan in full; correct?
7 A. The amount of cash was less than the
8 principal amount of those loans, but there are
9 other ways that the company could have repaid those
10 loans potentially, including new financing to
11 raise -- to repay those loans.
12 Q. How would they refinance in other ways?
13 MR. ESSER: Object to form.
14 THE STENOGRAPHER: Can you repeat that?
15 MR. ESSER: Can you repeat that?
16 BY MR. HO:
17 Q. Sure.
18 Any other ways of getting new financing?
19 A. Any other way to repay the loan?
20 Q. To repay these loans other than getting
21 new financing?
22 A. The company could have reached a deal with
23 the lenders to amend the covenant, get additional
24 runway from the existing lenders --
25 (Simultaneous speaking.)

Page 30

1  THE WITNESS: -- into default.
2  BY MR. HO:
3  Q. What are the chances of Yellow getting a
4  new loan from a different lender once it defaulted
5  on the existing loan?
6  MR. ESSER: Object to form. Calls for
7  speculation.
8  But you can answer.
9  THE WITNESS: There's always a possibility of
10  getting new financing, and that could have happened
11  prior to a default, a potential default.
12  BY MR. HO:
13  Q. Look at page 6 of the document you have in
14  front of you.
15  Would it be correct that this document
16  projects Yellow violating the $200 million
17  liquidity covenant in the second quarter of 2023?
18  MR. ESSER: Object to the form just as to the
19  term "violating."
20  But you can answer.
21  BY MR. HO:
22  Q. Let me rephrase the question.
23  The chart on page 6 shows Yellow's EBITDA
24  falling below $200 million in the second quarter of
25  2023; right?

Page 31

1  A. This chart shows, according to the May
2  outlook, that EBITDA would have been 186 million,
3  which is less than the $200 million covenant.
4  Q. And this chart similarly shows Yellow's
5  covenant falling below $200 million for the third
6  quarter and fourth quarter of 2023; right?
7  A. The chart shows, according to the May
8  outlook, that EBITDA for the third quarter and the
9  fourth quarter would have been below $200 million.
10  Q. So when the Ducera material says that
11  compliance with the covenant is tested quarterly,
12  when during each quarter is the compliance tested?
13  A. I'm sorry. Where does the Ducera document
14  say that?
15  Q. The second bullet point on page 6 says
16  "tested quarterly."
17  A. The second on page 6.
18  Okay. Can you repeat the question?
19  Q. Sure.
20  At what time during the quarter is
21  Yellow's compliance to the $200 million covenant
22  tested?
23  A. I don't recall exactly, but I would guess
24  it would be when the company files its financial
25  reports, which for the second quarter would have

Page 32

1  been probably 45 days roughly after the end of the
2  period.
3  Q. On May 31, 2023, did any of Yellow's
4  lenders agree to waive or modify the $200 million
5  minimum EBITDA covenant?
6  A. By May, you said?
7  Q. Yes.
8  By May 31 had any of the lenders agreed to
9  waive the $200 million -- I'm sorry -- EBITDA
10  covenant?
11  A. No, I don't believe we received the waiver
12  until July.
13  Q. What does Ducera mean by "liquidity
14  runway"?
15  A. Can you point me to where you're reading
16  that?
17  Q. Take, for example, page 4, on the
18  right-hand side, it refers to "liquidity runway"
19  and "covenant headroom."
20  Do you see that?
21  What does Ducera mean by "liquidity
22  runway"?
23  A. The company -- we would have been
24  referring to a need for additional liquidity for
25  the company to continue to operate.

Page 33

1  Q. Well, was the liquidity to continue to
2  operate or liquidity to complete negotiations with
3  the Teamsters?
4  MR. ESSER: Object to form.
5  You can answer.
6  THE WITNESS: I would say those things are tied
7  together. So the company needed additional
8  liquidity to continue to negotiate with the IBT in
9  order to implement One Yellow, in order to improve
10  operations, and extend the runway for the business.
11  BY MR. HO:
12  Q. And would it be accurate to say one of
13  Ducera's goals was to keep Yellow alive until it
14  concluded those negotiations with IBT?
15  A. Ducera was involved with the company's
16  capital structure and was exploring all strategic
17  alternatives to extend runway as it related to the
18  capital structure covenants, liquidity, et cetera.
19  Q. I don't think that's an answer to my
20  question, though.
21  Was one of Ducera's goals to keep Yellow
22  alive until it could conclude negotiations with
23  Teamsters?
24  MR. ESSER: Object to form. Asked and
25  answered.

Page 42

1  this as a global transaction, but, no, this
2  specific bullet point was saying that we wanted to
3  waive the minimum EBITDA covenant.
4  BY MR. HO:
5      Q.  And you're saying, in addition, that this
6  bullet point could allow -- could put Yellow in a
7  position to get new financing in the future?
8      MR. ESSER:  Object to form.  Misstates prior
9  testimony.
10         You can answer.
11     THE WITNESS:  This transaction would have
12 brought in capital simultaneously, not necessarily
13 in the future.  We'll get to that if we are going
14 bullet point by bullet point.
15 BY MR. HO:
16     Q.  Okay.  And are you referring to the next
17 bullet point, the "Collateral Modification"?
18     A.  Yes.
19     Q.  What does NOLV mean?
20     A.  Net orderly liquidation value.
21     Q.  And rolling stock is the tractors and
22 trailers that Yellow owned; right?
23     A.  That's right.
24     Q.  The purpose of the collateral modification
25 was to add $50 million of rolling stock to Yellow's

Page 43

1  collateral for its ABL borrowing base; right?
2      A.  Yeah, we were seeking to get 50 from the
3  first interim loan and 50 million from the
4  U.S. Treasury loan.  So it would have been
5  100 total.
6      Q.  In layman's terms it would add
7  $100 million to Yellow's ABL borrowing base; right?
8      A.  It would have increased the commitment
9  from the ABL by $100 million.
10     Q.  Would Yellow's ABL lender have to
11 separately agree to increase the borrowing base
12 even after the collateral was freed up?
13     A.  Yes.
14     Q.  What is the UST -- UST term loans is the
15 U.S. Treasury loan; right?
16     A.  Yes.
17     Q.  The PIK option listed here, is that the
18 same as for the Apollo loan?
19         The PIK option for the U.S. Treasury loan,
20 is that the same proposal as the Apollo loan?
21     A.  Yes, it was the same proposal to PIK
22 interest through the remainder of 2023, but each
23 loan had different interest payments that were
24 coming due.
25     Q.  I remember seeing that.  The minimum

Page 44

1  EBITDA covenant waiver proposal, was that the same
2  for both for Apollo loan and the U.S. Treasury
3  loan?
4      A.  We were seeking the same concession, but
5  I don't recall if we had the same EBITDA test in
6  both loans.
7      Q.  Prior to modification, was that the same
8  proposal to both Apollo and to the U.S. Treasury?
9      A.  Yes.  Same as what I said before.
10     Q.  So you told me earlier that Citizens was
11 the lender for Yellow's ABL facility; right?
12     A.  Yeah, I believe they were the lead lender.
13     Q.  Who did -- who did Ducera deal with, if
14 anyone, concerning the ABL facility on behalf of
15 Yellow?
16     A.  There were many discussions over time.  We
17 were in discussions with Citizens.  We also worked
18 closely with the company's management team.  There
19 would have been discussions with Citizens as well.
20     Q.  So you would have dealt with the
21 representatives for Citizens in discussing the ABL
22 loan?
23         So Ducera would have dealt with a
24 representative of Citizens in connection with the
25 ABL loan for Yellow?

Page 45

1      A.  Again, there were many discussions over,
2  you know, a somewhat longer period of time, but,
3  yes, I believe that there were a number of
4  discussions that we had with professionals at
5  Citizens.  They also had advisors at some point
6  that we dealt with.
7      Q.  Okay.  Was a copy of Exhibit 1 provided to
8  Citizens on May 26, 2023?
9      A.  I believe something like this presentation
10 was provided to Citizens, yes.
11     MR. HO:  Can you pull up her calculation?
12     THE WITNESS:  Should I do that?
13 BY MR. HO:
14     Q.  No, we are going to do that.
15     A.  Okay.
16     MR. ESSER:  I think we click back in the
17 exhibit to get back to the folder and then just
18 refresh.
19         (Whereupon, IBT-IAM Exhibit 2
20          was marked for identification.)
21     MR. ESSER:  I don't see it yet.
22     THE WITNESS:  Okay.  I have my declaration
23 open.
24 BY MR. HO:
25     Q.  Okay.  Now, Exhibit 2 is your declaration

Page 50

1  not listed in the document in front of you?
2      MR. ESSER: Object to form.
3          You can answer, if you can.
4      THE WITNESS: Yeah. Sitting here today,
5  I can't recall exactly, but I'm sure there would
6  have been ongoing, frequent conversations with the
7  lenders based on the situation.
8  BY MR. HO:
9      Q. Do you recall any specifically?
10     A. Sitting here today, I don't recall any
11  details.
12     Q. Are there any documents you can look at to
13  refresh your recollection --
14     MR. ESSER: Object to form.
15  BY MR. HO:
16     Q. -- on whether or not there were other
17  discussions between Ducera and Yellow's existing
18  lenders between May 26, 2023, and June 7, 2023?
19     MR. ESSER: Object to form.
20         You can answer.
21     THE WITNESS: I don't believe there were
22  additional documents because we prepared very
23  thoroughly.
24  BY MR. HO:
25     Q. Did Ducera have any contact with potential

Page 51

1  lenders between May 26, 2023, and June 7, 2023,
2  that is not listed in the document in front of you?
3      MR. ESSER: Object to form.
4          You can answer.
5      THE WITNESS: So in the document in front of
6  me, I have Apollo, the U.S. Treasury, Aries, and
7  Citizens. We may have had discussions with
8  Blue Torch and Beal Bank, and there may have been
9  discussions with other -- I believe there were
10  other lenders to the ABL, but Citizens was the
11  lead, but there were others, but I actually don't
12  recall right now.
13  BY MR. HO:
14     Q. Can you recall any discussions between
15  Yellow -- between Ducera and a potential lender
16  that is not yet a lender to Yellow that occurred
17  between May 26, 2023, and June 7, 2023, that's not
18  listed in the document you have in front of you?
19     MR. ESSER: Object to form.
20         You can answer.
21     THE WITNESS: Based on the prep work that we
22  did, I believe Aries was the primary non-existing
23  lender.
24  BY MR. HO:
25     Q. Do you recall anyone else between May 26

Page 52

1  and June 7?
2      MR. ESSER: Object to form.
3          You can answer.
4      THE WITNESS: No, I can't recall the details of
5  those exact days.
6      MR. HO: Can you pull up the Project Prime,
7  June 2023, materials?
8      THE WITNESS: Is this going to be a new
9  exhibit?
10  BY MR. HO:
11     Q. Yes.
12     A. Okay.
13         (Whereupon, IBT-IAM Exhibit 3
14         was marked for identification.)
15  BY MR. HO:
16     Q. Can you identify Exhibit 3, please?
17     A. This looks like it would have been a
18  presentation made to one or some of the lenders
19  about the amendment.
20     Q. And this is a document that would have
21  been prepared in June of 2023?
22     A. The date says June. So I would presume
23  that's right.
24     Q. Is there any part of this document that
25  was prepared -- is there any part of Exhibit 3 that

Page 53

1  was prepared by Yellow rather than by Ducera?
2      A. We may have received language from Yellow,
3  and we would have received input on the numbers
4  from Yellow.
5      Q. Would it be correct that any language
6  received from Yellow would have been reviewed by
7  Ducera and vetted before being put into this
8  document?
9      MR. ESSER: Object to form.
10         You can answer.
11     THE WITNESS: Yes, Ducera would have reviewed
12  all the language in this document.
13  BY MR. HO:
14     Q. Can you look at -- if you go to page 3 of
15  this document.
16     A. Yes.
17     Q. There's a "13-Week Adjusted Cash Forecast"
18  in the chart. Do you see that?
19     A. I do.
20     Q. Are the actual and projected numbers shown
21  in that chart received from Yellow?
22     A. Can you repeat the question?
23     Q. Were the actual and projected weekly
24  numbers showing in the chart on page 3 of Exhibit 3
25  received from Yellow?

# Exhibit 41

```
1         IN THE UNITED STATES BANKRUPTCY COURT
               FOR THE DISTRICT OF DELAWARE
2
     IN RE:                         ) Chapter 11
3                                   )
                                    ) Case No.
4    YELLOW CORPORATION, et         ) 23-11069 (CTG)
     al.,                           )
5                                   )
             Debtors.               )
6                                   )
                                    )
7                                   )
                                    )
8                                   )
                                    )
9                                   )
                                    )
10                                  )
     _____
11
12
13
             VIDEOTAPED DEPOSITION OF:
14
             DARREN HAWKINS
15
             August 13, 2024
16
17
18
19
20
21
22
23
24
25
```

|  | Page 6 |
|---|---|
| 1 | The videotaped deposition of |
| 2 | DARREN HAWKINS, was had on the 13th day of |
| 3 | August, 2024, commencing at 9:00 a.m., in the |
| 4 | offices of Hilton Hotel BNA, Two Terminal Drive, |
| 5 | Nashville, Tennessee, for all purposes under the |
| 6 | Delaware Rules of Civil Procedure. |
| 7 | The formalities as to notice, caption, |
| 8 | certificate, et cetera, are waived. All |
| 9 | objections, except as to the form of the |
| 10 | questions, are reserved to the hearing. |
| 11 | It is agreed that Jennifer Haynie, being |
| 12 | a Notary Public and Court Reporter for the State |
| 13 | of Tennessee, may swear the witness, and that |
| 14 | the reading and signing of the completed |
| 15 | deposition by the witness are reserved. |
| 16 | |
| 17 | * * * |

|  | Page 7 |
|---|---|
| 1 | THE VIDEOGRAPHER: Good morning. |
| 2 | We're going on the record on August 13, 2024, at |
| 3 | 9:06 a.m. Please note that the microphones are |
| 4 | sensitive and may pick up whispering and private |
| 5 | conversations. Please mute your phones at this |
| 6 | time. Audio and video recording will continue |
| 7 | to take place unless all parties agree to go off |
| 8 | the record. |
| 9 | This is Media Unit 1 in the |
| 10 | video-recorded deposition of Darren Hawkins in |
| 11 | the matter regarding Yellow Corporation, et al., |
| 12 | filed in the United States Bankruptcy Court for |
| 13 | the District of Delaware. Case Number 2311069. |
| 14 | This deposition is being held at the |
| 15 | Hilton BNA Nashville Airport located at 2 |
| 16 | Terminal Drive in Nashville, Tennessee. |
| 17 | My name's David Drumel. I'm the |
| 18 | videographer with Veritext. The court reporter |
| 19 | is Jennifer Haynie. |
| 20 | Counsel, please state your |
| 21 | appearances for the record, which will then be |
| 22 | followed by the swearing of the witness by the |
| 23 | court reporter. |
| 24 | MR. HO: For the International |
| 25 | Brotherhood of Teamsters and International |

|  | Page 8 |
|---|---|
| 1 | Association of Machinists, Yingtao Ho and |
| 2 | Emma Woods of the Previant Law Firm S.C. |
| 3 | MR. ESSER: For the debtors or |
| 4 | Yellow Corporation, Mike Esser, Kirkland & Ellis |
| 5 | LLP. |
| 6 | DARREN HAWKINS, |
| 7 | Having been sworn to tell the truth, |
| 8 | the whole truth and nothing but the truth, testified as follows: |
| 9 | DIRECT EXAMINATION |
| 10 | BY MR. HO: |
| 11 | Q.    Mr. Hawkins, do you understand you just |
| 12 | swore to an oath? |
| 13 | A.    Yes. |
| 14 | Q.    It's the same oath you would swear in in |
| 15 | a court of law, right? |
| 16 | A.    Yes. |
| 17 | Q.    Are you aware of any reasons, medical or |
| 18 | otherwise, why you cannot answer questions |
| 19 | truthfully and accurately today? |
| 20 | A.    No. |
| 21 | Q.    Let me show you Exhibit 1. |
| 22 |       (Exhibit Number 1 was marked.) |
| 23 | BY MR. HO: |
| 24 | Q.    And I'll represent to you that what I've |
| 25 | handed you are the debtor's responses to the |

|  | Page 9 |
|---|---|
| 1 | Union's First Set of Discovery Requests. I'm |
| 2 | going to ask you to go to Interrogatory Number |
| 3 | 2, which is on pages 12 and 13, and specifically |
| 4 | I'm going to direct you to the answer to the |
| 5 | interrogatory, which can be found on the last |
| 6 | full paragraph on page 13. |
| 7 | Do you see where it says: Subject, |
| 8 | without waiving their general or specific |
| 9 | objections, debtors stated, determined they had |
| 10 | to layoff Union employees on or about July 26, |
| 11 | 2023? |
| 12 | A.    Yes. |
| 13 | Q.    Is that an accurate answer? |
| 14 |       MR. ESSER: Object to form. |
| 15 |       You can answer. |
| 16 |       THE WITNESS: Yes. |
| 17 | BY MR. HO: |
| 18 | Q.    Why does the answer say "on or about" |
| 19 | instead of just July 26, 2023? |
| 20 | A.    The set of circumstances that week, there |
| 21 | was multiple discussions happening, but my |
| 22 | recollection is July 26th is the right time |
| 23 | period for that. |
| 24 | Q.    July 26th is the right date for that? |
| 25 | A.    Yes. |