# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,[1]<br><br>                      Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>(Jointly Administered)<br><br>**Re: Docket Nos. 4462, 4718** |

**MFN PARTNERS, LP'S AND MOBILE STREET HOLDINGS, LLC'S RESPONSES TO THE COURT'S PRELIMINARY OBSERVATIONS REGARDING RECONSIDERATION**

---

[1] A complete list of each of the debtors in these chapter 11 cases (the "<u>Debtors</u>") may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 10990 Roe Avenue, Overland Park, Kansas 66211.

MFN Partners, LP ("MFN") and Mobile Street Holdings, LLC ("Mobile Street" and, with MFN, "Movants") hereby respectfully submit this Response to the Court's "Preliminary Observations" entered on October 29, 2024. All terms not otherwise defined herein have the same meanings as defined in Movants' Reconsideration Motion (the "Reconsideration Motion").

## I. PRELIMINARY STATEMENT

Movants thank the Court for providing them a chance to address the Preliminary Observations. The Preliminary Observations pertain to the argument "that the [PBGC] regulations at issue, whose net effect was to increase the withdrawal liability employers owed the plans upon withdrawal, could not be described as a condition that was impose[d] on the plan." Preliminary Observations at 1. The Preliminary Observations identify three additional cases as possibly falling into the rubric of a condition imposed on the recipient of federal funds that altered the legal rights of third parties. *Id.* at 5.

But as described below, Movants respectfully submit these cases do not fall within that rubric at all. There is a common thread between all the cases the Court cited in the Preliminary Observations: All three concern ***federal*** legislation possibly displacing ***state*** law under the Supremacy Clause. And not one involves a federal agency issuing a regulation without express Congressional authority that alters legal rights already set forth in the ***same*** existing federal law. The same is true of *Philpott*—the bottom line holding there was that "[b]y reason of the Supremacy Clause the judgment below is reversed." *Philpott*, 409 U.S. at 417. But the Supremacy Clause is not at issue here when the issue is a federal regulation versus a federal statute.

Importantly, the Court's Preliminary Observations highlight two fundamental questions. The first question is whether in enacting ARPA Congress ***did*** grant the PBGC the authority to issue the PBGC Regulations to change ERISA's existing definition and calculation method for determining UVBs, as a reasonable condition on a MEPP relating to withdrawal

1

liability. Much of the prior briefing and the August 6 hearing considered this question. And after the August 6 hearing, the objecting parties all believed that to answer it, they needed an example of a federal agency issuing a similar regulation burdening the legal rights of third parties. They thought they found one in *Zinman*. But, as this Court already determined, *Zinman* does not support the validity of the PBGC Regulations. The objecting parties have not identified a single other example.

The second fundamental question, implicated by the reliance on *Philpott* as an analogy, is whether Congress ***could*** grant to the PBGC such authority as an exercise of Congressional authority under the Spending Clause. Movants believed that the Court's reliance on *Philpott* was error because *Philpott* involved an express provision in a statute (and not agency action), did not interfere with any existing legal rights, and to the extent Congress bound third parties to conditions imposed on recipients of federal funds, it did so through the Necessary and Proper Clause, which is not implicated here.

Thus, Movants sought reconsideration because they believe that it is legally wrong to hold that Congress both ***did and could*** authorize the PBGC to issue the PBGC Regulations, when the effect is to burden third parties' rights to pay withdrawal liability only to the extent, if any, there are UVBs and when the PBGC Regulations necessarily change existing law that Congress itself did not change. Still no example has been provided where Congress gave an agency authority to regulate the recipients of federal funds, yet instead the agency's regulations directly change the existing statutory rights of a third party. Yet that is what the PBGC Regulations do to ERISA's calculation of UVBs, which adversely impact withdrawing (including involuntarily withdrawing) employers but *benefit* MEPPs.

2

## II. RESPONSE

Movants respectfully submit that the cases identified in the Preliminary Observations do not support upholding the PBGC Regulations through analogy to conditions that Congress can place on recipients of federal funds through its Spending Clause power.

***United States v. Miami Univ.*, 294 F.3d 797 (6th Cir. 2002)**. The Court cites to *Miami* for the proposition that "the Sixth Circuit [] held that FERPA operated to preempt the Chronicle of Higher Education's state-law right under the Ohio Public Records Act [("OPRA")] to obtain [] records." Preliminary Observation at 4–5. Movants respectfully disagree with this characterization.

*Miami* involved FERPA's interaction with OPRA. Two Ohio universities that received federal funding under FERPA were requested to disclose student records under OPRA. But one of FERPA's explicit purposes was to protect students' rights to privacy by limiting the transferability of their records without consent. *Id.* at 817. FERPA expressly provided (in the statute) that "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records." *Id.* at 817-18 (quoting 20 U.S.C. § 1232g(b)(2)). So, the federal government successfully sued to prevent disclosure.

There are four reasons why *Miami* does not support the PBGC's challenged regulations.

*First* and most importantly, *Miami* is not about spending conditions that burden the rights of third parties. There, the third party newspaper had no right to the documents that it sought under OPRA, because there is no OPRA right of disclosure when disclosure would violate a federal law (such as FERPA). *Id.* Thus, *Miami* does not speak to the question of whether Congress—much less a federal agency—can burden the rights of third parties when imposing conditions on federal funds. Indeed, *Miami* is not even about preemption of a state law right. In fact, the Sixth Circuit

3

specifically held that "preemption is not implicated in this case" because there was no state law right that could conflict with the bar on disclosure under FERPA when a university accepts federal funds. *Id.* So as properly understood, *Miami* provides no support—even through analogy—here. Unlike the newspaper in *Miami*, Movants have a federal statutory right to have UVBs calculated in a certain way and nothing in ERISA, unlike OPRA, allows the PBGC to ignore that right.

*Second*, the FERPA condition clearly burdened the funding recipient, with, at most, an incidental effect on third parties. In this way, *Miami* is like *Zinman*, which this Court determined was not analogous.

*Third*, and again unlike the PBGC Regulations, Congress expressly included the FERPA condition in federal statute. *See* 20 U.S.C. § 1232g(a). Similar to why *Philpott* does not apply, *Miami* provides no support because it is not a case of a federal agency acting on its own accord.

*Finally,* page 809 of *Miami* does not stand for the proposition that "the 'condition' … could bar the Chronicle of Higher Education from obtaining student records." Preliminary Observations at 5, n.9. Rather, the Spending Clause discussion about conditions related only to the United States' standing to request injunctive relief under a breach of contract theory. *Miami*, 294 F.3d at 809 ("If [legal] remedies are inadequate, then the government may seek contractual relief through a court of equity."). As explained, the Sixth Circuit simply held that the condition in FERPA fits within the exemption in OPRA, and therefore, no disclosure was required under OPRA. *Id.* at 811.

**Chicago Trib. Co. v. Bd. of Trustees of Univ. of Illinois, 680 F.3d 1001 (7th Cir. 2012)**. Also in the FERPA context, the Preliminary Observations briefly cites *Chicago Tribune* (as a *cf.*). *See* Preliminary Observations at 5 n.9. In *Chicago Tribune*, a newspaper sued a state university's trustees, asserting that FERPA did not bar the release of university admission records under Illinois's FOIA. *Id.* at 1002. As in *Miami*, the trustees argued that the university could refuse to

4

disclose under an exemption in the state law for complying with federal law. The Seventh Circuit found that it did not have jurisdiction to resolve that dispute because it was a question of state law. *Id.* at 1004-05. Nothing in *Chicago Tribune*'s holding or reasoning suggests that FERPA itself displaced third party legal rights, or that Congress authorized a federal agency to displace such rights. Moreover, like *Miami*, no court was considering whether a federal agency could issue a regulation to affect legal rights under an existing federal statute.

**Norfolk Southern Railway Co. v. Shanklin, 529 U.S. 344 (2000)**. The Court cites to *Norfolk*, where "[t]he Supreme Court held that [a] condition on the receipt of federal funds operated to preclude a tort suit by a plaintiff who contended that [] warning devices were designed improperly." Preliminary Observations at 5. But *Norfolk* does not prove that the Spending Clause authorizes Congress to alter the rights of third parties by imposing conditions of accepting federal funds; to the contrary, *Norfolk* is primarily about preemption and the Supremacy Clause.

In *Norfolk*, a widow of a motorist killed in a crossing accident sued the railroad for failure to maintain proper warning devices that had been installed using federal funds. The railroad argued that because the crossing had warning devices installed in compliance with federal regulations issued under the Federal Railroad Safety Act and Federal Railway-Highway Crossings Program (the "Program"), and the state had received federal funds under such regulations, those regulations preempted state tort law. The Supreme Court agreed, holding that the regulations issued under the Program preempted state tort law pursuant to the preemption clause in the Federal Railroad Safety Act. *Norfolk*, 529 U.S. at 358-59.

*Norfolk* is inapposite here. *First*, the statute at issue contains an express preemption clause, *id.* at 347-48, evincing Congress's unambiguous intent. *See South Dakota v. Dole*, 483 U.S. 203, 207 (1987). So it was not the agency regulations displacing the right of the plaintiff in *Norfolk*

5

from bringing a tort suit, but rather the federal statute itself. In contrast, ARPA contains no provision expressly enabling the PBGC to override decades of consistent law on calculating withdrawal liability. *Second*, *Norfolk* did not hold accepting of a condition under the Spending Clause altered the plaintiff's rights; it held that as result the State's acceptance of the funds, the Supremacy Clause displaced state tort law. But the Supremacy Clause has no bearing here when the question is whether a federal regulation violated or exceeded the authorizing federal statute. *Third*, *Norfolk* is a prime example, analogous to *Zinman*, where accepting funds merely affects the rights of a third party in an incidental manner. In contrast, the PBGC Regulations are aimed at the rights of third parties: the modified calculation of withdrawal liability only burdens employers, while no MEPP faces any "condition" on withdrawal liability by accepting SFA Funding.[2]

\* \* \*

It bears repeating that ARPA § 1432(*l*) does not modify ERISA's existing framework to calculate UVBs and does not in any way direct the PBGC to change the calculation of UVBs. Section 1432(*l*) merely clarifies that SFA funding is like any other plan asset and **may** be used to pay pension benefits and expenses, but that – unlike other plan assets – such funds must be segregated and invested in a certain way.[3] The House version of ARPA (which did not pass) contained **both** what became section 1432(*l*) and a separate, express provision stating "[a]n employer's withdrawal liability for purposes of this title shall be calculated without taking into

---

[2]  Confirming this fact, Central States recently published its balance sheet for 2023. It shows that it received $35.8 billion in SFA Funding in 2022, which it records as an asset, and an additional $1.6 billion in recoverable withdrawal liability payments, leaving it with $41.8 billion in net assets, and the value of future benefit liabilities was $41.4 billion. *See* https://www.efast.dol.gov/5500Search/ (filed on October 10, 2024). Central States had (and has) no UVBs.

[3]  As demonstrated in Movants' reply [Dkt No. 4652], it has always been the law that plan assets must be used to pay only plan benefits and expenses, and even though the amount of plan assets impacts the calculation of withdrawal liability, no court has ever held that this mathematical calculation somehow violates ERISA or subsidizes withdrawing employers. The PBGC and the objecting MEPPs cannot deny this fact.

6

account special financial assistance received under this section until the plan year beginning 15 calendar years after the effective date of the special financial assistance." H.R. 1319 § 9704(l) (Engrossed in House, March 3, 2021).[4] Had the final version of ARPA contained this provision, the PBGC would have had the requisite authority to require that SFA funding not count in the calculation of UVBs.

If there was any doubt that the PBGC Regulations were an exercise of policymaking by the PBGC without specific Congressional direction, the PBGC states it in the preamble to the PBGC Regulations:

> To ensure that SFA is not used to subsidize employer withdrawals rather than to make benefit payments and pay plan expenses, a condition relating to the recognition of SFA as an asset in calculating UVBs is needed in addition to the condition prescribing the interest assumptions to be used in valuing plan liabilities.

87 Fed. Reg. 41001 (July 8, 2022). The PBGC's statement does not identify any Congressional mandate that SFA funding not be included in the calculation of UVBs or that existing ERISA provisions, such as 29 U.S.C. § 1393(c), are to be modified by PBGC regulations. Regardless of the PBGC's policy rationale, it is not the job of a federal agency to change the law; rather Congress "wrote the statute it wrote." *Caesars v. Local 68 Operating Engineers Pension Fund,* 932 F.3d 91, 98 (3d. Cir. 2019) (internal citations and quotations omitted). But that is precisely what the PBGC did here.

Courts have rejected attempts by federal agencies absent clear Congressional mandate to issue regulations that change existing federal law. The cases Movants identify below all have their specific attributes, but each recognizes that federal agencies cannot by regulation change the law that Congress wrote, regardless of the policy wisdom of doing so.

---

[4] Movants are not asserting that unpassed legislation is dispositive; rather, the statutory history demonstrates that ARPA as passed does not contain a specific directive changing the existing calculation of withdrawal liability.

7

In *City & Cty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001 (N.D. Cal. 2019), a district court enjoined a federal agency's regulation expanding the definitions in a federal statute which were in conflict with that statute. *See id.* at 1022 ("An interpretative rule can never add to or subtract from a statute itself. A legislative rule can never subtract from a statute, though one can add to it if the addition falls within the delegation of authority. No rule of either type can ever conflict with the statute itself."). This is analogous to the PBGC changing the definition of UVBs or the formula for calculating withdrawal liability, in conflict with 29 U.S.C. § 1393(c).

In *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020), the Seventh Circuit affirmed a permanent injunction against a federal agency that had sought to influence immigration policy by imposing conditions on federal funds, in contravention of existing statutory authorization for those funds. Among other reasons, the panel explained that accepting the agency's position would "allow the executive to impose conditions that Congress repeatedly declined to institute itself; . . . render irrelevant or illogical other provisions of the Byrne JAG statute and . . . conflict with another statutory provision." *Id.* at 902. Many of the same concerns are present here. Congress did not authorize in ARPA what the PBGC has imposed, even though the unpassed House version of ARPA expressly provided for it, and elsewhere in ARPA Congress expressly dealt with the impact of SFA funding. *See* 26 U.S.C. § 432(k)(2)(D).[5] The PBGC took it upon itself to change how to calculate UVBs, when there is already a ***very detailed*** formula in ERISA. And the PBGC Regulations both render illogical, and conflict with, 29 U.S.C. § 1393(c). Similar to the concerns the Seventh Circuit had with the Executive Branch "overrid[ing] Congress's refusal to endorse" proposed legislation and "legislat[ing] a different result," *City of Chicago*, 961 F.3d at 903 (internal

---

[5] *See also American Health Care Ass'n v. Burwell*, 217 F. Supp. 3d 921, 936 (N.D. Miss. 2016) (enjoining federal regulations that had not been enacted in proposed legislation, and noting that in other circumstances "Congress has made it clear that it knows how to grant a federal agency the authority to limit arbitration agreements, and it has done so with plain and unambiguous language.").

quotations omitted), here the PBGC Regulations impose an outcome that Congress did not adopt and that changes existing law, to the detriment of parties other than the MEPPs.

In *Merck & Co. v. United States Dept' of Health & Human Servs.*, 385 F. Supp. 3d 81 (D.D.C. 2019), the Department of Health & Human Services asserted authority to require the disclosure of drug prices in advertisements. Even under the now-overturned *Chevron* doctrine of deference to agencies, the district court held that the agency's regulation was invalid. Pertinent to the immediate dispute over ERISA and ARPA, the *Merck* court noted that Congress had previously enacted legislation requiring the FDA to prescribe specific regulations on drug advertising, which did not include disclosure of prices. *Id.* at 95. "Congress deliberately and precisely legislated in the area of drug marketing under the FDCA. Such purposeful action demonstrates that Congress knows how to speak on that subject when it wants to." *Id.* at 96.

Each of these cases involve a federal agency taking action where a court had to determine whether agency action interfered with federal law. In nearly every case, the adverse impact was on the recipient itself; *a fortioiri*, a condition on a third party is impossible to defend. The Second Circuit's *Tripathy* decision and the Third Circuit's *Sharp* decision, which confirm that the Spending Power cannot be used to impose conditions on third parties (or such conditions are not binding on third parties), cement the outcome.

In sum, this Court can and should reconsider its ruling, which can be narrowly tailored to the facts here: the PBGC could not issue regulations that changed the statutory meaning of UVBs or how to calculate it and bind employers who are only responsible to pay withdrawal liability as set forth in 29 U.S.C. § 1393(c). This Court need not go beyond this narrow ruling, which nonetheless has enormous impact in these cases.

## CONCLUSION

Movants respectfully request that the Court grant the Reconsideration Motion.

Dated: November 4, 2024
Wilmington, Delaware

Respectfully Submitted,

*/s/ L. Katherine Good*
L. Katherine Good (No. 5101)
Maria Kotsiras (No. 6840)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: kgood@potteranderson.com
      mkotsiras@potteranderson.com

– and –

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Eric Winston (*pro hac vice* admitted)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
Email: ericwinston@quinnemanuel.com

*Counsel for MFN Partners, LP and Mobile Street Holdings LLC*