## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,<br><br>   Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>(Jointly Administered)<br><br>**Related Docket Nos. 3803, 3805, 3825, 3882** |

## AMENDED MEMORANDUM OPINION

As part of the American Rescue Plan Act of 2021, Congress authorized the Pension Benefit Guaranty Corporation to provide billions of dollars in "special financial assistance" to financially troubled pension plans.[1]  Congress addressed the use of these federal funds and specified that they may be used only to "make benefit payments and pay plan expenses."[2]  The debtors assert without contradiction that the eleven multiemployer pension plans that are parties to this claims-allowance dispute collectively received more than $40 billion in special financial assistance.[3]

The debtors, who once operated one of the nation's largest trucking companies, shut down their business in the summer of 2023.  As a result of shutting down, the debtors withdrew from the various multiemployer pension plans to which they had contributed.  When an employer withdraws from a multiemployer pension plan that has "unfunded vested benefits," ERISA makes the withdrawing employer liable to the

---

[1] 29 U.S.C. § 1432.  The Pension Benefit Guaranty Corporation is referred to as the "PBGC." In citing and referring to provisions of ERISA, this Memorandum Opinion points to the statutory provisions as codified in titles 26 and 29 of the United States Code.

[2] 29 U.S.C. § 1432(*l*).

[3] D.I. 3825 at 1.

plan for that employer's share of those unfunded vested benefits.[4]  The employer's share of unfunded vested benefits (with certain adjustments) is generally referred to as the employer's "withdrawal liability."

The principal question now before the Court is whether federal funds awarded to the plans under the American Rescue Plan Act should count as "plan assets" for the purposes of calculating the plans' "unfunded vested benefits" and thus for determining (and potentially reducing or eliminating) the debtors' withdrawal liability.  The debtors contend that the federal funds should count.  The PBGC, however, issued two regulations designed to ensure that a plan's receipt of special financial assistance would not operate to let a withdrawing employer off the hook for withdrawal liability it would have otherwise owed.  One regulation (referred to as the "No-Receivables Regulation") provides that American Rescue Plan Act funds that have been awarded but not yet paid to the plan do not count as assets of the plan.[5]  The other regulation (referred to as the "Phase-In Regulation") provides that, for the purpose of calculating plan assets, the funds received under the American Rescue Plan Act should be treated as if they were received by the plans over time, even after they are in fact paid to the plan in a lump sum.[6]

In the present motions for partial summary judgment, the debtors argue that these two regulations exceed the PBGC's statutory authority and are contrary to law.

---

[4] 29 U.S.C. § 1381(a).  The Employee Retirement Income Security Act is referred to as ERISA.

[5] 29 C.F.R. § 4262.16(g)(2)(xiii).

[6] *Id.* § 4262.13(g)(viii).

2

The Court rejects that argument. The American Rescue Plan Act gave the PBGC express authority to "impose, by regulation or other guidance, reasonable conditions on an eligible multiemployer plan that receives special financial assistance relating to … withdrawal liability."[7]  In addition, ERISA gives the PBGC general authority to adopt "regulations as may be necessary to carry out the purposes" of Title IV of ERISA, which includes the provisions that relate to an employer's withdrawal liability.[8]  The Phase-In and No-Receivables Regulations fall within these express grants of authority.  The regulations implement Congress's specific directive in the American Rescue Plan Act that special financial assistance be used only to pay plan benefits and costs.  The regulations prevent such funds from instead being used, in effect, to reduce amounts that employers would otherwise be required to pay upon withdrawal from a plan.

The debtors argue that the regulations cannot properly be regarded as "reasonable conditions *on an eligible multiemployer plan* that receives special financial assistance relating to … withdrawal liability" because the conditions affect the withdrawal liability of *the employer*, which is not the entity that receives the federal funds.  But in the analogous context of Congress' power under the Spending Clause, the Supreme Court has enforced similar provisions that bind third parties, not just the party that agreed to the terms when it accepted the federal funds.  The debtors also argue that the Phase-In Regulation is contrary to a statutory provision

---

[7] 29 U.S.C. § 1432(m).

[8] *Id.* § 1302(b)(3); *id.* § 1393(a).

that describes the special financial assistance funds, once paid to a plan, as an "asset." The Court concludes, however, that this passing use of the term "asset" cannot prevail over the specific directive of the American Rescue Plan Act that expressly prohibits the use of special financial assistance for any purpose other than paying benefits and plan expenses.

The debtors alternatively contend that the regulations are arbitrary and capricious. The administrative record, however, makes clear that the PBGC considered the relevant factors and provided a reasoned analysis in support of its regulatory decision.

Finally, the debtors seek partial summary judgment on three discrete issues regarding the calculation of withdrawal liability. ~~The Court concludes that the debtors are correct that the effect of the debtors' default on their obligations is simply to accelerate what would otherwise be a 20-year payment schedule to pay their withdrawal liability.~~ That liability is calculated is by determining (through a formula) a cap on the withdrawing employer's annual payment obligation. Under the statute, an employer's withdrawal liability will never exceed 20 times that annual payment, even if it would take 25 or 50 or 1,000 such payments to repay the employer's allocable share of the fund's unfunded vested benefits. A default ~~operates to,~~ if one occurred, would accelerate the payments that would have otherwise been due over 20 years. It ~~does~~ would not however, contrary to the arguments made by the plans, remove the cap imposed on the employer's withdrawal liability, which limits that liability to no more than 20 times the amount of the annual payments. ~~But~~

~~because the default *does* accelerate the debtors' obligation, the debtors are incorrect to argue that their obligation needs to be present discounted to be equal to the value of payments spread out over 20 years.  The point of the acceleration is that the obligation is *not* spread out over 20 years, it is presently due and owing.~~<u>The question of whether the debtors defaulted, however, is not properly resolved on the current summary judgment record.</u>  The debtors are also incorrect in arguing that there is anything in ERISA that should relieve them of their contractual obligation to pay the New York Teamsters and the Western Pennsylvania Teamsters more than they might have otherwise owed in the absence of such agreement.

**Factual and Procedural Background**

**A.    The statutory and regulatory framework**

      *1.    ERISA as amended by the Multiemployer Pension Plan Amendments Act of 1980*

Congress enacted ERISA to establish minimum standards for pension plans in private industries.  The PBGC is a government agency, created under ERISA, whose purpose is to ensure the stability of the pension system, both for single-employer and multiemployer pension plans.  The PBGC is charged by statute with the task of encouraging voluntary private pension plans for the benefit of participants, providing for the timely and uninterrupted payment of benefits, and maintaining premiums (which are paid to the pension plans) at the lowest level consistent with carrying out

these obligations.[9]  The PBGC also operates as an insurer for pension benefits, guaranteeing a portion of the benefits if a plan becomes insolvent.[10]

Soon after the enactment of ERISA, Congress became concerned about multiemployer pension plans.  The structure of multiemployer pension plans created incentives for employers to withdraw from financially troubled plans.  When an employer exits a financially distressed plan, the remaining employers would bear the costs of filling whatever funding shortfall the plan faced, without the assistance of the departing employer.  This created a problem much like the paradigmatic run on a bank.  Once an employer exited, others (who did not want to be left shouldering the departing employer's share) would have an incentive to do the same.  And once those participants left, whomever remained in the plan would have even greater incentives to exit, leading to what a former PBGC Executive Director described, in testimony before Congress, as a "vicious downward spiral."[11]  As the insurer of these plans, much of the cost of withdrawal would fall upon the PBGC.[12]

Congress enacted the Multiemployer Pension Plan Amendments Act of 1980, as an amendment to ERISA, to address these concerns.[13]  The MPPAA imposed liability on employers when they withdraw from a multiemployer pension plan.  If an

---

[9] 29 U.S.C. § 1302(a)(1)-(3).

[10] 29 U.S.C. §§ 1322, 1322(a), 1361.

[11] *See, e.g.*, *Connolly v. PBGC*, 475 U.S. 211, 216 (1986) (quoting Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2nd Sess., 22 (1978) (statement of Matthew M. Lind)).

[12] 29 U.S.C. § 1361.

[13] *See Connolly*, 475 U.S. at 217.  The Multiemployer Pension Plan Amendments Act of 1980 is referred to as the "MPPAA."

employer chose to leave, the departing employer, rather than the employers remaining in the pension plan (and the PBGC), would be on the hook for the departing employer's portion of the shortfall.[14]   This ensured that employers would have incentives to stay in a plan even if another employer were to leave.

The MPPAA sets forth a formula to calculate withdrawal liability, which is the withdrawing employer's portion of the pension plan's shortfall, or "unfunded vested benefits."[15] Unfunded vested benefits are "the value of nonforfeitable benefits under the plan" (or liabilities of the plan) less "the value of the assets of the plan."[16]

After an employer has withdrawn from a multiemployer plan, the pension plan calculates the liability and notifies the employer of the amount of liability and the schedule for payments.[17]   The statute provides that the withdrawing employer's proportional share of the plan's unfunded vested benefits is measured "as of the end of the plan year preceding the plan year in which the employer withdraws," and is based upon the most recent 10 years of contributions.[18]

This framework is subject to an exception. The MPPAA requires that the proportional share be amortized into level annual payments that are roughly equal

---

[14] *Peick v. PBGC*, 724 F.2d 1247, 1267-1268 (7th Cir. 1983).

[15] 29 U.S.C. § 1381(b)(1).

[16] *Id*. § 1393(c).

[17] *Id*. § 1399(b).

[18] *Id*. § 1391(c)(4)(C).  *See also Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 418 (1995); *Central States, Se. & Sw. Areas Pension Fund v. Safeway, Inc.*, 229 F.3d 605, 608 (7th Cir. 2000).

to the payments owed in recent years.[19]  If the amortized payments require more than 20 years of payments, the employer's liability is capped at the first 20 annual payments.[20]  But like a standard acceleration provision in a loan agreement, the employer's obligations may be accelerated (with the total amount becoming immediately due and payable) if the employer defaults on its payment obligations.[21]

2.    <em>The American Rescue Plan Act</em>

After the enactment of the MPPAA, multiemployer pension plans continued to struggle financially, leaving the retirements of many union workers at risk.  In the American Rescue Plan Act of 2021, a sweeping legislative enactment that sought to respond to the financial crises caused by the pandemic, Congress sought to shore up the nation's faltering pension system.  The legislation included an appropriation of funds to support multiemployer pension plans, in the form of "special financial assistance."  Eligible pension plans could receive amounts to pay participants' full benefits through at least 2051.[22]  These funds could only be used "to make benefit payments and pay plan expenses" and must be "segregated from other plan assets."[23]

---

[19] 29 U.S.C. § 1399(c)(1)(A) ("Except as provided in subparagraphs (B) . . . and in paragraph[] . . . (5), an employer shall pay the amount determined . . . over the period of years necessary to amortize the amount in level annual payments . . .."); *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 418.

[20] 29 U.S.C. § 1399(c)(1)(B) ("In any case in which the amortization period . . . exceeds 20 years, the employer's liability shall be limited to the first 20 annual payments . . ..)

[21] *Id.* § 1399(c)(5).

[22] *Id.* § 1432(j)(1).

[23] *Id.* § 1432(*l*).

Congress delegated authority to the PBGC to solicit applications for these funds, distribute them, and issue regulations that placed "reasonable conditions [upon a] … multiemployer plan that receives special financial assistance" including conditions "relat[ed] to… withdrawal liability."[24]  In granting this authority, Congress also listed a number of specific areas that the PBGC could not regulate.[25]

This delegation added to the PBGC's preexisting sources of regulatory authority.  Since ERISA was first enacted in 1974, the PBGC has had the authority to adopt "regulations as may be necessary to carry out the purposes" of Title IV of ERISA.[26]  When Congress adopted the MPPAA in 1980, it also granted the PBGC other authority relating to withdrawal liability, including the authority to prescribe "actuarial assumptions and methods" for determining withdrawal liability.

As discussed above, the federal funds at issue here were awarded pursuant to the American Rescue Plan Act, which in relevant part authorized special financial assistance for troubled multiemployer pension plans.  The American Rescue Plan Act was passed as a budget reconciliation measure, which under the Senate's parliamentary rules meant that it was not subject to a filibuster.  The parliamentary rules relating to budget reconciliation measures (referred to as the "Byrd Rule") also provide that the legislation may only contain measures related to the federal budget,

---

[24] *Id.* §§ 1432(a)(1), 1432(m)(1).

[25] *Id.* § 1432(m)(2).

[26] 29 U.S.C. § 1302(b)(3).

and nothing "extraneous" thereto.[27]  The House version of the American Rescue Plan Act contained a provision that expressly provided that funds received under the Act would not be taken into account for the purposes of calculating withdrawal liability, until 15 years after the funds are received.[28]  The debtors contend, without contradiction from any other party, that this provision was removed as extraneous under the Byrd Rule.[29]

As enacted, however, the American Rescue Plan Act specified that special financial assistance may be used only to "make benefit payments and pay plan expenses"[30] and gave the PBGC authority to "impose, by regulation or other guidance, reasonable conditions on an eligible multiemployer plan that receives special financial assistance relating to … withdrawal liability."[31]  After notice and comment, the PBGC promulgated the two regulations at issue here (among other regulations).[32] The "Phase-In Regulation" directs plans to phase in the special financial assistance gradually, over a number of years, for purposes of the calculation of withdrawal

---

[27] Congressional Research Service, "The Budget Reconciliation Process: The Senate's 'Byrd Rule'" at 5 (Sept. 28, 2022), https://crsreports.congress.gov/product/pdf/RL/RL30862/20.

[28] H.R. 1319 § 9704(l) (Engrossed in House, March 3, 2021).

[29] D.I. 3852 at 8-9.  Comments in the administrative record are to the same effect.  *See*, *e.g.*, D.I. 3882-2 at 579 of 729.

[30] 29 U.S.C. § 1432(*l*).

[31] *Id.* § 1432(m).

[32] *See generally,* D.I. 3882-3 at 2 of 729 (listing a combined 111 public comments received in response to the SFA Interim Final Rule and SFA Final Rule), and *id.* at 6-10 of 729 (listing communications with stakeholders that pre-date the SFA Interim Final Rule).

liability.[33]   The "No-Receivables Regulation" restricts multiemployer plans from recognizing, as an asset, special financial assistance that they have been awarded before the funds are actually paid to the plan.[34]

The pension plans that are parties to this proceeding submitted applications to the PBGC for special financial assistance between 2021 and 2022.[35]  They were awarded, in aggregate, $41.1 billion in financial assistance.[36]  The PGBC made payments "as soon as practicable."  The application for special financial assistance submitted by Central States, which is the pension fund with the largest proof of claim at issue here, was approved by the PGBC on December 5, 2022; Central States received those funds as a lump sum on January 12, 2023.[37]

### B.   The bankruptcy case and claims objections

The debtors ceased business operations in July 2023 and filed these bankruptcy cases on August 6, 2023.[38]  The 11 pension plans whose claims are now at issue calculated the debtors' annual payment or prepared an annual payment

---

[33] *See* 29 C.F.R. § 4262.16(g)(ii) ("***SFA assets excluded***. The value of the plan assets taken into account as of the end of each determination year is the value of the assets that would otherwise be taken into account in the absence of this provision reduced by the amount described in paragraph (g)(2)(ix) of this section. The value of plan assets determined under this paragraph (g)(2)(viii) may not be less than zero.")

[34] *See* 29 C.F.R. § 4262.16(g)(2)(xiii) ("***No receivable.*** Special financial assistance assets must be excluded from the determination of unfunded vested benefits until the date that special financial assistance is paid to the plan under § 4262.12, and no receivable shall be set up as of any earlier date in anticipation of the plan receiving such payment.") (emphasis in original).

[35] *See* D.I. 3825 at 11-12 n.8-18.

[36] *Id.* at 12-14 n.19-37.

[37] D.I. 1322 at 19.

[38] D.I. 1.

schedule for the debtors and filed 174 proofs of claim in the bankruptcy case, seeking $6.5 billion in withdrawal liability. The pension plans did not include special financial assistance funding in the determination of the debtors' withdrawal liability.[39]

Central States, the pension plan with the largest proof of claim, calculated the debtors' withdrawal liability "as of the end of the plan year preceding the plan year in which the employer withdraws," or December 31, 2022. Central States did not receive its special financial assistance until January 2023. Since PBGC regulation barred Central States from including the SFA as a "receivable," Central States did not include those funds as "assets" in its calculation of withdrawal liability.

The ten other pension plans that received special financial assistance also calculated debtors' annual payment or prepared an annual payment schedule for debtors. These plans gave effect to the Phase-In Regulation. In addition, these plans assert that the debtors, by virtue of the bankruptcy, were in default of their obligations. As a result, these plans contend that the debtors' withdrawal liability obligations were accelerated. In calculating that accelerated liability, these plans did not limit the withdrawal liability they were seeking to 20 years of the annual payments, but instead included the debtors' entire allocable share of the plans' unfunded vested benefits.[40]

---

[39] D.I. 3852-6 at 21 (Ciner Dep. Tr.); D.I. 3852-7 at 46, 147 Culp Dep. Tr.); D.I. 3852-8 ¶ 25 (Sekol Decl.); D.I. 3852-9 ¶ 25 (Regalbuto Decl.); D.I. 3852-10 ¶ 25 (Bullock Decl.); D.I. 3852-11 ¶ 25 (Iannucci Decl.); D.I. 3852-12 ¶ 25 (Dennis Decl.).

[40] D.I. 3852 at 16-17.

The debtors objected to all of the pension plans' proofs of claim. The parties then submitted an agreed scheduling order on the claims allowance issues, anticipating a week-long trial to occur in the first week of August 2024.[41] The pension plans then filed a motion that was styled as a motion to compel arbitration, but that the Court concluded was better understood as a motion for stay relief to permit the plans to initiate an arbitration. The Court denied the motion.[42]

Central States moved for partial summary judgment regarding the validity of the Phase-In and No-Receivables Regulations, arguing they are consistent with the text of the American Rescue Plan Act and ERISA.[43] The ten other pension plans that received special financial assistance moved for summary judgment regarding the validity of the PBGC's Phase-In Regulation.[44] The debtors moved for partial summary judgment regarding the validity of the PBGC regulations as well as on certain issues relating to the calculation of withdrawal liability.[45] The PBGC filed its own motion for summary judgment in defense of its regulations.[46] The Unsecured Creditors' Committee filed a statement that took no positions regarding the validity of the PBGC regulations at issue, but generally in support of the debtors on the

---

[41] D.I. 2195.

[42] *In re Yellow Corp.*, No. 23-11069, 2024 WL 1313308 (Bankr. D. Del. Mar. 27, 2024).

[43] D.I. 3803.

[44] D.I. 3805.

[45] D.I. 3825.

[46] D.I. 3882.

calculation issues.[47]   An ad hoc group of equity holders and an unsecured creditor joined the debtors' motion for partial summary judgment.[48]  After full briefing on each of the motions, the Court held oral argument on August 6, 2024.[49]  The Court issued its original Memorandum Opinion on September 13, 2024.  Following the filing of the debtors' motion for reconsideration, the Court issues this Amended Memorandum Opinion.

## Jurisdiction

The district court has subject-matter jurisdiction over this contested matter under 28 U.S.C. § 1334(b).  This case has been referred to this Court under 28 U.S.C. § 157(a) and the district court's standing order of February 29, 2012.  The motions for partial summary judgment arise in connection with a claims allowance dispute, which is a core bankruptcy matter.[50]

---

[47] D.I. 3998 at 3 ("The Committee submits, however, that to the extent the Court determines that the Pension Funds have allowed withdrawal liability claims, the Committee agrees with the Debtors that the 20-Year Cap must be applied and that such withdrawal liability claims should be discounted to net present value. Because the appropriate discount rate appears to be a factual dispute not suitable for summary judgment, the Committee takes no position on the appropriate discount rate at this time.").

[48] D.I. 4015; D.I. 4028.

[49] D.I. 3803 (Central States' motion for summary judgment), D.I. 3805 (other pension funds' motion for summary judgment), D.I. 3917 (debtors' opposition brief), D.I. 3918 (MFN's opposition brief), D.I. 4009 (other pension funds' reply), D.I. 4010 (Central States' reply), D.I. 4009 (other pension funds' reply); D.I. 3825 (debtors' motion for summary judgment), D.I. 3950 (Central States' opposition brief), D.I. 3975 (other pension funds' opposition brief), D.I. 4011 (debtors' reply brief), D.I. 4012 (MFN's reply); D.I. 3882 (PBGC's motion for summary judgment), D.I. 3992 (debtors' opposition brief), D.I. 3993 (MFN's opposition brief), D.I. 4034 (PBGC's reply).

[50] 28 U.S.C. § 157(b)(2)(B) ("Core proceedings include … allowance or disallowance of claims against the estate").

## Analysis

This claims allowance dispute is a contested matter whose procedures are governed by Bankruptcy Rule 9014, which incorporates Civil Rule 56.[51]  Under Rule 56, summary judgment (in whole or in part) may be entered if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[52]  In opposing a motion for summary judgment, a party must "set forth specific facts showing that there is a genuine issue for trial."[53]

The parties agree that with respect to the matters on which summary judgment is sought, there is no genuine dispute of material fact.  Rather, the differences between the parties are over questions of law.  The parties therefore sensibly agreed to present these issues to the Court for resolution on cross-motions for partial summary judgment, in the hope that, following the Court's resolution of the disputed legal questions, it may be relatively easy to resolve the remaining questions with respect to claims allowance (preserving, of course, all parties' rights to seek review of this Court's resolution of the legal issues presented).

## I.  The Phase-In and No-Receivables Regulations are valid.

The framework for considering Yellow's challenge to the PBGC regulations is set forth in the Supreme Court's recent decision in *Loper Bright*.[54]  Overruling *Chevron*, the Supreme Court in *Loper Bright* rejected the "fiction" that every

---

[51] *See* Fed. R. Bankr. P. 9014(c).

[52] Fed. R. Civ. P. 56(a).

[53] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[54] *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).

ambiguity in a statute is an implicit delegation of authority to an agency charged with administering the program.[55]  The Supreme Court instructed judges to resolve questions of statutory interpretation independently.[56]

At the same time, *Loper Bright* recognized that the correct reading of a statute may well be that it authorizes an agency to exercise discretion.[57]  "For example, some statutes expressly delegate to an agency the authority to give meaning to a particular statutory term.  Others empower an agency to prescribe rules to fill up the details of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'"[58]  As examples, the Supreme Court pointed to the language of the Fair Labor Standards Act and the Atomic Energy Act that authorized administrative agencies to issue regulations that define statutory terms, as well as environmental statutes that authorized the Environmental Protection Agency to regulate power plants if "such regulation is appropriate and necessary."[59]  When "the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the" Administrative Procedure Act "is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."[60]  To

---

[55] *Id.* at 2268.

[56] *Id.*

[57] *Id.* at 2263.

[58] *Id.* at 2263 (citations, brackets, and internal quotations omitted).

[59] *Id.* n. 5 & 6.

[60] *Id.*  The Administrative Procedure Act is referred to as the "APA."

"stay out of discretionary policymaking left to the political branches," judges should "independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA."[61]

Furthermore, *Loper Bright* reaffirmed that in resolving statutory ambiguities, courts should give "due respect" to the Executive Branch.[62]  The Supreme Court explained that the "interpretations and opinions" of a government agency with "specialized experience" could be a source "to which courts and litigants [could] properly resort for guidance," particularly when the agency's view was well reasoned, longstanding, and consistently held.[63]

Congress has expressly granted the PBGC the type of gap-filling authority that *Loper Bright* described, both in ERISA as originally enacted in 1974 and again in the provisions of the American Rescue Plan Act that are directly at issue here.  As originally enacted, ERISA authorized the PBGC to adopt "regulations as may be necessary to carry out the purposes" of Title IV of ERISA, which is the chapter of the statute addressed to the insurance of defined benefit pension plans.[64]  And in the

---

[61] *Id.* at 2263.  *See also Mayfield v. Department of Labor*, No. 23-50724, 2024 WL 4142760, at *4 (5th Cir. Sept. 11, 2024) ("[h]ere, because there is an uncontroverted, explicit delegation of authority, the question is whether the Rule is within the outer boundaries of that delegation").

[62] *Id.* at 2257.

[63] *Id.* at 2259 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-140 (1944) (brackets in original)).

[64] 29 U.S.C. § 1302(b)(3); *see also, e.g., Doe v. United States*, 372 F.3d 1347, 1357 (Fed. Cir. 2004) (explaining that a similar grant of rulemaking authority – the authority to issue "regulations … necessary for the administration of this subchapter" – allows an agency to issue substantive regulations).

provisions of the American Rescue Plan Act that provided special financial assistance for troubled multiemployer pension plans, Congress authorized the PBGC to "impose, by regulation or other guidance, reasonable conditions on an eligible multiemployer plan that receives special financial assistance relating to … withdrawal liability."[65]

Accordingly, the questions for this Court are whether the No-Receivables Regulation and the Phase-In Regulation exceed the boundaries of these express delegations of authority and, alternatively, whether the regulations are arbitrary and capricious.  For the reasons described below, the answer to each of these questions is no.

### A.     The regulations are authorized by 29 U.S.C. §§ 1302(b)(3) and 1432(m).

As explained above, in both §§ 1302(b) and 1432(m) of Title 29, Congress expressly granted the PBGC the authority to fill statutory gaps through regulation. The Phase-In and No-Receivables Regulations fall within the boundaries of those delegations because they implement the American Rescue Plan Act's directive that special financial assistance funds may be used only to "make benefit payments and pay plan expenses."[66]  If such funds instead were to eliminate or reduce the payments a withdrawing employer would have otherwise have been required to make, those federal funds would, in effect, be used to subsidize the withdrawing employer, even if indirectly.   These regulations are therefore precisely the kind of "gap-filling" regulation that *Loper Bright* contemplated.  Moreover, for the reasons set forth below,

---

[65] 29 U.S.C. 1432(m).

[66] 29 U.S.C. § 1432(*l*).

the Phase-In and No-Receivables Regulations are not contrary to other relevant statutory provisions.

> **1.    The No-Receivables Regulation and the Phase-In Regulation are properly regarded as conditions on the plans' receipt of the special financial assistance.**

The American Rescue Plan Act authorized the PBGC to "impose, by regulation or other guidance, reasonable conditions on an eligible multiemployer plan that receives special financial assistance relating to … withdrawal liability."[67]  The debtors contend that the Phase-In and No-Receivables Regulations impermissibly impose conditions on *employers* – who do not receive special assistance funds and thus do not agree to the terms of such grants – rather than conditions on the plans.

The Supreme Court, however, has rejected a similar argument when addressing the scope of Congress's authority to attach conditions on federal grants pursuant to the Constitution's Spending Clause.  The Supreme Court has explained that "Congress may attach conditions on the receipt of federal funds."[68]  And, as particularly relevant here, the Supreme Court has not limited such "conditions" to those matters that can be accomplished by the *recipient's* agreement to comply.  In *Philpott v. Essex County Welfare Board*, for example, the Supreme Court addressed a provision of the Social Security Act that provided that "none of the moneys paid or payable … under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process."[69]  Although the social security benefits were

---

[67] 29 U.S.C. § 1432(m).

[68] *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

[69] 42 U.S.C. § 407.

paid to an individual, the Supreme Court held that the quoted condition prevented a state agency (the Essex County Welfare Board) from garnishing the payments to offset the individual's debts to the state agency.  The Supreme Court so held even though the Social Security Act was an exercise of Congress's Spending Power[70] and the Essex County Welfare Board was not the recipient of the Social Security Act funds and therefore did not agree to be bound to its conditions.

The same reasoning applies here.  Despite the superficial appeal of the debtors' argument that the No-Receivables Regulation and the Phase-In Regulation essentially impose additional *obligations* on withdrawing employers and operate only to the *benefit* of the plans, under the precedent described above (which dealt with an analogous situation), the regulations may fairly be described as conditions on the plans, and thus comport with § 1432(m).[71]

---

[70] *See Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 588-589 (1937).

[71] In post-hearing submissions, the plans point to the decision in *Zinman v. FDIC*, 567 F. Supp. 243 (E.D. Pa. 1983), as support for the proposition that a condition imposed on one party can affect others who did not agree to the condition.  In *Zinman*, a bank received financial assistance from the FDIC on the condition that it issue warrants in favor of the FDIC.  A preexisting shareholder of the bank's objected to the issuance of the warrants on the ground they would dilute the shareholder's ownership interest.  The court rejected that contention.  Reliance on *Zinman* misses the heart of the debtors' argument.  The argument is *not* that a condition imposed on one party cannot have incidental effects on other parties.  It is instead that one cannot achieve, through the imposition of a condition on a party, anything that cannot be accomplished on account of that party's *agreement* to the condition.  In *Zinman*, there was no suggestion that the bank lacked the authority to issue warrants in favor of the FDIC.  The dilutive effect on its prior shareholders was simply incidental to the bank's decision to agree to the FDIC's condition.  *Philpott*, however, is different (and more like the PBGC regulations at issue here) in that the individual's receipt of social security funds operated to bar the exercise of the collection remedies of Essex County Welfare Board, which (like the debtors here) never agreed to the conditions at issue.

2.   **In light of the specific statutory directive that special financial assistance be used only to pay benefits and plan administrative costs, the regulations do not run afoul of any other applicable statutory command.**

Section 1432(m) expressly limits the PBGC's authority to the adoption of "reasonable" conditions. The debtors contend that even if the Phase-In and No-Receivables Regulations are properly described as conditions on the plans, they are contrary to another statutory requirement and are therefore not "reasonable." Specifically, the debtors argue that a general ERISA provision that predates the American Rescue Plan Act, 29 U.S.C. § 1393(c), defines the term "unfunded vested benefits" to mean the value of the "nonforfeitable benefits" minus "the value of the assets of the plan." The debtors argue that the term "asset" has an ordinary meaning that includes anything of value. Because the plan's right to receive special financial assistance once it is awarded by the PBGC is something of value, the debtors argue that the No-Receivables Regulation and the Phase-In Regulation are not "reasonable" within the meaning of Section 1432(m), which is the later-enacted provision of the American Rescue Plan Act. The Court addresses each regulation separately and rejects the debtors' argument with respect to both regulations.

*The Phase-In Regulation.* The Phase-In Regulation provides that the special financial assistance funds that the plans received should not be treated as plan assets immediately after they are paid to the plans. Rather, those funds should be "phased in" over a 15-year period.

In challenging this regulation, the debtors point to § 1432(*l*), which provides that the special financial assistance funding must be segregated from "other plan

21

assets." They argue that this provision implies that the special financial assistance funding is a plan asset and must be included in the calculation of withdrawal liability. In response, the PBGC does not dispute that special financial assistance, once it has been paid to a plan (as opposed to when it is just a receivable), is an asset. The question is whether the manner in which the Phase-In Regulation treats that asset, for the purpose of calculating withdrawal liability, is consistent with the text of ERISA.

To that end, it must be borne in mind that statutory construction is a holistic exercise that cannot begin and end with a single snippet of statutory text.[72]  In measuring the Phase-In Regulation against ERISA as a whole, the Court must take account of the statutory requirement that special financial assistance be used only "to make benefit payments and pay plan expenses."[73]  In light of the magnitude of the special financial assistance provided and the statutory formula for how withdrawal liability is determined, it would necessarily be the case that the mechanical application of ERISA's § 1393(c) formula would mean that the special financial assistance funding would go toward reducing the withdrawal liability employers would be required to pay to plans in the absence of the cash infusion.  That result, however, could not be squared with the specific restriction on the use of the funds imposed by § 1432(*l*).

---

[72] *See, e.g., In re Hertz Corp.*, No. 23-1169, 2024 WL 4132132, at *14 (3d Cir. Sept. 10, 2024).

[73] 29 U.S.C. § 1432(*l*).

The Supreme Court observed in *Brown & Williamson* that the "classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute."[74]  The Supreme Court noted that this "is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand."[75]  In such a case, "a specific policy embodied in a later federal statute should control our construction of the earlier statute, even though it has not been expressly amended."[76]

That account describes this case.  The statutory language regarding the computation of withdrawal liability in § 1393(c) dates to the original adoption of the MPPAA in 1980 and governs the calculation of withdrawal liability *in general*.  The PBGC was then presented with a more specific question in 2021 when Congress enacted the American Rescue Plan Act and added the restriction set forth in § 1432(*l*).  As in *Brown & Williamson*, the specific policy embodied in the subsequent legislation – here, to ensure that the special financial assistance be used only to pay benefits and plan expenses, not to reduce an employer's withdrawal liability – conflicted with the literal application of § 1393(c).  Under these circumstances, the later and more specific enactment controls.  When read in light of that established principle of

---

[74] *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (internal quotation and citation omitted).

[75] *Id.*

[76] *Id.* (internal quotation, citation, and brackets omitted).

statutory construction, the Phase-In Regulation poses no conflict with ERISA as a whole.

The Court does not rely on an alternative rationale the PBGC and the plans have offered for upholding the Phase-In Regulation. They suggest that the Phase-In Regulation is analogous to a Department of Treasury Regulation that relates to minimum funding standards. Section 431(c)(2)(A) of Title 26 requires a plan to value its assets, for the purpose of determining the minimum funding required, using "any reasonable actuarial method of valuation that takes into account fair market value and which is permitted under regulations prescribed by the Secretary [of Treasury]."[77] And the Treasury regulations permit some "smoothing" of the value of assets, such that the minimum funding obligations would not vary sharply based on short-term swings in the present value of perhaps volatile assets.

The Treasury's "smoothing" regulation, however, can fairly be described as an effort to capture the "true" value of a plan's assets. The point of the smoothing regulation is to minimize the impact of short-term volatility in an asset's price, and thus avoid "spiking" that may turn out to be more artifactual than representative of the asset's true value. The same is not true of the Phase-In Regulation, as no one contends that the Phase-In Regulation is a better or more accurate long-term assessment of the assets' true value than would be provided by short-term market prices. But as explained above, the Phase-In Regulation does accord with a holistic reading of ERISA, particularly in view of the principle that specific and more recent

---

[77] 26 U.S.C. § 431(c)(2)(A).

statutory language should be given primacy over older and more general language. On that ground, the Court concludes that the regulation is permissible.

*The No-Receivables Regulation.*   The No-Receivables Regulation does not conflict with any statutory text.   ERISA provides that the employer's allocable share of unfunded vested benefits is based on the unfunded vested benefits "as of the end of the plan year preceding the plan year in which the employer withdraws."[78]   The No-Receivables Regulation provides that special financial assistance should not be counted as a plan asset, for the purpose of calculating withdrawal liability, unless and until the plan actually receives the promised payment.

At least with respect to Central States (which represents the overwhelming majority of the debtors' potential withdrawal liability), this is the critical regulation. The PBGC awarded Central States $35.8 billion in special financial assistance on December 5, 2022.[79]   Central States actually received those funds on January 12, 2023.[80]   Central States' plan year ended on December 31, 2022.[81]   So as of the time at which the calculation of Central States' unfunded vested benefits was required to be made, it had been awarded $35.8 billion from the PBGC, but those funds had not yet been received.   The No-Receivables Regulation thus provides that the $35.8 billion should not count as an asset for the purpose of calculating Yellow's withdrawal liability.

---

[78] 29 U.S.C. § 1391.

[79] D.I. 3804-5.

[80] D.I. 3804-6.

[81] D.I. 3950-6 at 26, 30 of 71.

How to value a receivable can fairly be described as one of the "details" of the "statutory scheme" that Congress may authorize an administrative agency to "fill up."[82]  Disputes over how best to value or account for a receivable are of course commonplace.[83]  The debtors' argument is that once the PBGC awarded special financial assistance to Central States, the right to receive that payment is properly understood as an "asset" that has value.  And at least as far as bankruptcy law is concerned, that point has some force.  No one would contend, for example, that a receivable held by a debtor was not property of its bankruptcy estate – an estate asset – under § 541 of the Bankruptcy Code.

On this question, however, it is significant that the No-Receivables Regulation is similar to and consistent with how the agencies implementing ERISA had long addressed similar questions.  For example, regardless of the creditworthiness of the employer, the Department of Labor's position is that an employer's obligation to make contributions to a plan should not be counted, in annual reports or otherwise, until they are actually received.[84]

---

[82] *Loper Bright*, 144 S. Ct. at 2263.

[83] *See generally In re Nobilis Health Corp.*, No. 21-51183, 2024 WL 2965204 (Bankr. D, Del. June 12, 2024) (granting summary judgment for defendants in claim alleging that company's management breached fiduciary duties by improperly valued and accounted for receivables).

[84] The Department of Labor "has taken the position that employer contributions become an asset of the [pension] plan only when the contribution has been made."  U.S. Department of Labor, *Field Assistance Bulletin No. 2008-01* (Feb. 1, 2008), https://www.dol. gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2008-01.  In a plan's annual report, it cannot use unpaid contributions as plan assets.  29 U.S.C. § 1024(a) (delegating regulatory authority to the Secretary of Labor regarding a plan's annual report); Instructions for Form 5500, Schedule R, line 6b ("do not include receivable contributions"), Line    19(a)    ("do    not    include    the    value    of    any    receivables"),

*Loper Bright* emphasized that respect for an agency determination is "especially warranted" where its construction is "longstanding" and "consistent over time."[85]  Similarly, in the course of upholding a regulation that required federally funded healthcare facilities to ensure that their employees were vaccinated against COVID-19, the Supreme Court emphasized that the vaccination requirement was consistent with "the longstanding practice of Health and Human Services in implementing the relevant statutory authorities."[86]  The Supreme Court explained that although the agency had not previously imposed a vaccination requirement, federally funded healthcare facilities "have always been obligated to satisfy a host of conditions that address the safe and effective provision of healthcare."[87]

The No-Receivables Regulation, like the vaccine mandate, imposes a rule that is similar to those that had long been applicable in analogous circumstances.  The No-Receivables Regulation is thus a valid exercise of the rulemaking authority that Congress has given to the PBGC.

### 3.    The major questions doctrine is inapplicable.

The debtors' reliance on the major questions doctrine is misplaced.  Under that doctrine, "separation of powers principles and a practical understanding of legislative intent" counsel against interpreting a general or ancillary statutory provision to give

---

https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2023-instructions.pdf.

[85] *Loper Bright*, 144 S. Ct. at 2258.

[86] *Id.* at 94.

[87] *Id.*

an agency authority to adopt regulations that would have a sweeping economic or political significance.[88]  Even if the regulations at issue here implicate that doctrine, Congress clearly stated in the American Rescue Plan Act that it did not want the special financial assistance it was providing to be used for purposes other than to pay benefits and plan expenses.  The regulations at issue here give effect to that specific congressional directive.  Accordingly, the major questions doctrine poses no obstacle to the challenged regulations.

> **4.    No inference should be drawn, in either direction, from proposed statutory language that Congress declined to include in the American Rescue Plan Act or from the enumeration of areas that the PBGC may not regulate.**

Congress considered but failed to enact statutory language that would have required special financial assistance to be excluded from plan assets for 15 years, for purposes of calculating withdrawal liability.  The debtors argue that the Court should infer from that decision that the regulations at issue here are unauthorized.  The PBGC argues that the Court should infer from the enumeration of areas that the PBGC may not regulate that the regulations are authorized.  The Court does not accept either side's argument in this regard.

The debtors argue that the Court should infer from the failure to adopt the language that was stricken under the Byrd Rule that the regulations at issue are necessarily invalid – an attempt to do by regulation what could not be accomplished legislatively.  But even without that proposed language, the text of the American

---

[88] *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).  *See also Biden v. Nebraska*, 143 S. Ct. 2355 (2023).

Rescue Plan Act makes plain that Congress was focused on ensuring that the special financial assistance being provided would be used to shore up the nation's faltering pension system and not for other purposes. In light of this statutory context, the Court does not believe it should ascribe significance to the proposed statutory language that Congress considered but did not adopt.

The Supreme Court has long made clear that courts must be "reluctant to draw inferences from the failure of Congress to act."[89] Sometimes Congress considers but rejects certain statutory language because it believes the remaining legislation is sufficient and the additional language is extraneous. Other times, it may be because of a substantive disagreement with what was proposed and rejected. The point of the cases cited in the margin (at n. 89) is that, at the very least, one must exercise care before drawing an inference from the failure to enact language that was considered but rejected. In fairness, in some number of more recent cases, the Supreme Court has pointed to Congress' failure to enact legislation as a basis to invalidate regulations that might accomplish what the proposed legislation did not.[90] But even so, at least in cases like this one, where a reasoned case can be made that the omitted language was unnecessary in light of other statutory language, such an inference is inappropriate.

---

[89] *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 220 (1983); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306 (1988).

[90] *See West Virginia*, 597 U.S. at 731 ("Finally, we cannot ignore that the regulatory writ EPA newly uncovered conveniently enabled it to enact a program that, long after the dangers posed by greenhouse gas emissions had become well known, Congress considered and rejected multiple times.") (citation and internal quotation omitted).

For its part, the PBGC emphasizes that Congress identified certain areas that the PBGC could *not* regulate. In § 1432(m)(2), Congress identified certain areas that it excluded from the agency's regulatory authority, including prospective benefit reductions, plan governance, and funding rules.[91] The PBGC suggests that the Court can draw a negative inference: The fact that the No-Receivables Regulation and the Phase-In Regulation are not on the list of things that the agency *cannot* do, the PBGC implies, means that Congress effectively authorized them. That argument is not persuasive. In its context, including the detail and complexity of ERISA, the express exclusion of certain specific areas from the agency's regulatory authority cannot fairly be read to mean that Congress granted the agency the authority to adopt any and every regulation that was not on its list of exclusions. The task of deciding whether a regulation is consistent with the statute still requires a careful assessment of the rest of the applicable statutory language. As stated above, the PBGC regulations at issue here are within the scope of its expressly delegated authority and are consistent with the applicable statutory text.

## B.    The PBGC did not act in an arbitrary and capricious manner.

In the alternative, the debtors contend that the regulations are arbitrary and capricious. An agency action is "arbitrary or capricious if it is not reasonable and reasonably explained."[92] Unlike with questions of law, for questions of policy, the court does not approach the question anew and may not substitute its own judgment

---

[91] *See* 29 U.S.C. § 1432(m)(2).

[92] *Ohio v. Environ. Protec. Agency*, 144 S. Ct. 2040, 2053 (2024) (citation and internal quotations omitted).

for that of the agency.[93]  Rather, the enquiry ensures that the agency provided "a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."[94]  The agency cannot circumvent this analysis by ignoring "an important aspect of the problem."[95]

The backdrop of the PBGC's rulemaking was the history of ERISA and the MPPAA.  Congress' concern was with avoiding a circumstance in which one employer's withdrawal from a troubled multiemployer plan would have a cascading effect that would destroy the plan.[96]  The PBGC was required to balance the objectives set forth by Congress in the MPPAA (to continue employer contributions and maintain the plans for its beneficiaries) with the one-time cash payment provided under the American Rescue Plan Act to struggling pension plans without destabilizing the plans.[97]

The PBGC provided interested parties with multiple opportunities to weigh in.  The notice and comment process included review of letters from industry stakeholders, including employers, pension plans, actuarial firms, law firms, individuals, and members of Congress.  The PBGC also held a listening tour with relevant stakeholders.[98]  Certain employers expressed concerns that if special

---

[93] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

[94] *Motor Vehicle Mfrs. Assn of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted).

[95] *Id.*

[96] *See, e.g., Milwaukee Brewery Workers*, 513 U.S. at 416-417.

[97] *See* 29 U.S.C. § 1302(a).

[98] 87 Fed. Reg. at 40968, 40970 (July 8, 2022); D.I. 3820-1 at 2-5 of 13.

financial assistance were immediately recognized in the calculation of unfunded vested benefits that employers would withdraw from the pension plans – leaving those who remain holding the bag.[99] The primary concern arising from the comments was that the special financial assistance would subsidize employer withdrawals rather than fund benefit payments and plan expenses.[100]

Based on the comments, the PBGC concluded that a phased recognition was a reasonable condition that respected the purpose of the MPPAA and the fact that the source of the special financial assistance is a one-time payment from taxpayers, not the payment of regular plan contributions from employers.[101] The PBGC was concerned about the impact on pension plans if the special financial assistance were recognized immediately, since doing so would provide employers with a greater incentive to withdraw from the plans.[102]

The debtors' and equity holders' challenges to the agency's procedures in adopting the regulations are not persuasive. With respect to the Phase-In Regulation, the administrative record shows that the PBGC considered various alternatives to the phasing in of the special financial assistance and ultimately adopted the Phase-In Regulation after considering the comments of interested parties. The decision to phase in the special financial assistance was fully considered and explained in the agency's final rule:

---

[99] D.I. 3820-1 at 6-8, 9-13 of 13 (Bimbo's and Albertsons' comments).

[100] 87 Fed. Reg. at 40996.

[101] *Id.* at 40997.

[102] *Id.* at 40996.

After consideration of comments and analysis of the effectiveness of the interim final rule's withdrawal liability condition, PBGC declined to adopt the approach of fully disregarding [special financial assistance] that was discussed in the interim final rule and suggested by some commenters. Instead, PBGC has concluded that a better approach to addressing commenters' concerns would be to phase in the recognition of [special financial assistance] for purposes of withdrawal liability in a manner that is a more accurate and reasonable reflection of the period over which [special financial assistance] is likely to be spent down by plans. Thus, under § 4262.16(g)(2) of the final rule, pursuant to PBGC's authority under [29 U.S.C. § 1432(m)], PBGC imposes an additional condition relating to withdrawal liability on a plan that receives [special financial assistance]. This condition requires plans to recognize over time the amount of [special financial assistance] received by the plan for the purpose of determining the plan's [unfunded vested benefits] for calculating withdrawal liability.[103]

Nor is there merit to the debtors' contention that the agency's litigation position is a *post hac* rationalization. To the contrary, the final rule offers the same explanation for the rule's statutory basis as the PBGC does before this Court:

Requiring phased recognition of [special financial assistance] as a plan asset is a reasonable condition because [special financial assistance] does not result from employer contributions, but is a transfer of taxpayer funds to eligible financially distressed plans for the purpose of enabling these plans to pay benefits and expenses. That purpose is reflected in [29 U.S.C. §§ 1432(j)(1) and 1432(*l*)]. Without the condition, the payment of [special financial assistance] could instead result in indirect transfers of [special financial assistance] to withdrawing employers from plans by reducing their withdrawal liability. For a majority of plans that receive [special financial assistance], all [special financial assistance] will be recognized as a plan asset for withdrawal liability purposes within 10 years, and because additional [special financial assistance] will be incorporated into the determination of withdrawal liability each year, the effect of the condition will lessen over time.[104]

---

[103] *Id.* at 40996.

[104] *Id.* at 40997.

The debtors and the equity holder also fault the agency for not limiting the regulations to employers that are voluntarily withdrawing from a plan, as opposed to those (like the debtors) whose withdrawal from a plan might be described as involuntary.  But the PBGC is correct to respond that such a distinction, even assuming that it were administratively possible to draw it, would be a total stranger to ERISA itself, which neither makes nor suggests of any such distinction.  The agency's failure to consider a proposal that was neither proposed during the notice and comment period, nor is grounded in the statutory text, does not render its decision arbitrary and capricious.

**II.    The debtors are correct that their withdrawal liability is subject to the 20-year cap; ~~because~~the current record does not permit the entry of summary judgment on whether that liability is accelerated~~, the issue of discounting to present value does not arise~~ on account of default; and the debtors should be held to their agreements with the New York Teamsters and Western Pennsylvania Teamsters.**

The debtors and the pension plans also seek partial summary judgment with respect to three questions relating to the calculation of the debtors' withdrawal liability.  *First*, the debtors contend that the withdrawal liability should be subject to ERISA's 20-year cap.  *Second*, the debtors contend that the 20-year stream of payments that would otherwise be due needs to be reduced to present value.  And *third*, the debtors challenge the manner in which two plans calculated their withdrawal liability.

A.    **ERISA's 20-year cap is applicable to the plans' claims.**

The debtors contend that 10 of the 11 plans failed to limit their asserted claims to the first 20 years of annual payments, as they contend §§ 1381(b)(1)(C) and 1391(c)(1)(B) require.

ERISA sets forth a multi-step process for calculating withdrawal liability. *First*, the plan needs to calculate the amount of its unfunded vested benefits, which (as described above) is the plan's nonforfeitable benefits minus the value of the plan's assets.[105]  *Second*, the plan must determine what share of those unfunded vested benefits are properly allocated to the withdrawing employer.  ERISA requires the plan to use one of four different allocation methods unless the plan receives authorization from the PBGC to use an alternative method.[106]  The result of this process is the employer's allocable share of the plan's unfunded vested benefits.

*Third*, § 1399 provides for four adjustments to the amount of withdrawal liability, the only one of which that is applicable here being the 20-year cap.[107] Withdrawal liability is paid through annual payments.  Those annual payments are determined through a formula derived from the employers' actual contributions over the ten preceding plan years.[108]  Section 1399(c)(1)(B) provides that "[i]n any case in which" the employer's allocable share of the plan's unfunded vested benefits (from

---

[105] 29 U.S.C. § 1393(c).

[106] *Id.* § 1391.

[107] *Id.* § 1399.

[108] The formula multiplies the highest contribution rate during the ten-year period times the highest average "contribution base units" over three consecutive plan years in the ten-year period.

step 2) exceeds 20 annual payments (from step 3) "the employer's liability shall be limited to the first 20 annual payments."[109]   This amount is the employer's "withdrawal liability."

Section 1399(c)(5) provides that in "the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest."[110]   The definition of "default" includes not only the failure to make an annual payment when due, but also "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability."[111]   For purposes of the present motion, the parties do not contest that the debtors have defaulted by virtue of their bankruptcy filing.[112]

The question, however, is determining the consequence of the default.  TheThe plans contend that if the debtors defaulted, the 20-year cap is inapplicable.  For that proposition, the plans rely on § 1399(c)(1)(A), which provides (as relevant) that "[e]xcept as provided in … subparagraph[] … 5, an employer shall pay the amount determined … over the period of years necessary to amortize the amount in level

---

[109] 29 U.S.C. § 1399(c)(1)(B).

[110] 29 U.S.C. § 1399(c)(5).

[111] *Id.* § 1399(c)(5)(B).

[112] As the Second Circuit explained in *In re AMR Corp.*, 730 F.3d 88, 105-107 (2d Cir. 2013), while various provisions of the Bankruptcy Code prohibit the enforcement of *ipso facto* clauses in the specific context of executory contracts, the definition of property of the estate, and the trustee's authority to sell or lease property, the Bankruptcy Code does not prohibit the enforcement of *ipso facto* clauses outside of those contexts.

annual payments."[113] Section 1399(c)(1)(B) caps the length of the payment obligation at 20 years.

On the plans' view, the point of the "except" clause does not merely permit acceleration. Rather, the clause provides that, in the event of default, the 20-year cap is abrogated, and the employer is responsible for its entire share of the plan's unfunded vested benefits. There is indeed a case that supports that view. In *GCIU-Employer Retirement Fund v. Professional Printers, Inc.*, the employer defaulted on its obligation to make withdrawal payments.[114] The plan then sued to recover withdrawal liability. The plan apparently argued that the amount of liability in the event of a default was the full amount of the employer's allocable share of the plan's unfunded vested benefits. The employer did not respond to the complaint, so the court considered the issue on the plan's motion for a default judgment. In a footnote, the court adopted the plan's position: "Title 29 U.S.C. section 1399(c)(1)(B) provides that an employer's withdrawal liability is limited to 20 annual payments calculated in accordance with Section 1399(c)(1)(C). This restriction is inapplicable, however, because an employer is permitted to make such 'level annual payments' under Section 1399(c)(1) only if it is not in 'default' under Section 1399(c)(5)."[115]

That reasoning, however, is not persuasive. The exception that § 1399(c)(1)(A) authorizes is the one set out in § 1399(c)(5). And § 1399(c)(5) provides for acceleration

---

[113] 29 U.S.C. § 1399(c)(1)(A)(i).

[114] No. 18-01592, 2018 WL 5880281 (C.D. Cal. Aug. 3, 2018).

[115] *Id.* at *3 n.4.

37

of the 20 years of payments.  Nothing in § 1399(c)(5) suggests that what is accelerated is the employer's full share of the plan's unfunded vested benefits.  To the contrary, the statute says that what is accelerated is the employer's "withdrawal liability," a term that, in this context, is best read to mean the amount the employer owes *after* the application of the 20-year cap.

This reading also brings the statute into accord with ordinary commercial terms.  It is commonplace for a loan agreement to provide for the loan's acceleration in the event of the borrower's default.[116]  The commonsense reading of the acceleration upon default provision of § 1399 is one that reads the statute to codify this ordinary practice.  ~~The debtors are thus~~Accordingly, even if the debtors had defaulted on their withdrawal liability obligations, the debtors are entitled to summary judgment on their claim that the plans' claims for withdrawal liability are limited to the amounts that would have been due over 20 years as calculated under ERISA.

**B.**    **The ~~debtors are incorrect to suggest that~~question of whether the ~~claim is subject to being present~~debtors' liability should be discounted to present value cannot be decided on the existing summary judgment record.**

The debtors further argue that the 20-year stream of payment should be discounted to its present value.  Under the Bankruptcy Code, the amount of an allowed claim is "the amount of such claim in lawful currency of the United States as

---

[116] *See generally In re Energy Future Holdings Corp.*, 540 B.R. 96, 99 (Bankr. D. Del. 2015) (quoting commercial loan agreement as providing that, in the event of the borrower's default, that "all principal of *and premium, if any*, interest (including Additional Interest, if any) *and any other monetary obligations* on the outstanding Notes shall be due and payable immediately without further action or notice") (emphasis in original).

of the date of the filing of the petition."[117] ~~And the debtors are correct that, if what the debtors owed on the petition date was a stream of payments that would be made over time, bankruptcy law would typically provide that the allowed claim would be discounted to its present value.[118]~~ The predicate of that argument, however, is that as of the petition date, the debtors owed a 20-year stream of payments and that those payments have not been accelerated.  Whether that predicate is correct, however, cannot properly be decided on the current record.  The record shows that in calculating its withdrawal liability Central States declared an "insecurity default," as a result of the debtors' bankruptcy filing, under 29 U.S.C. § 1399(c)(5)(B).[119]  The record is silent as to the other pension plans.  And even as to Central States, determining the effect of the declared insecurity default raises questions about the enforceability of *ipso facto* provisions for claims allowance purposes, which has not been briefed sufficiently.  Nor have the parties engaged the analysis required under the Third Circuit's decision in *In re Oakwood Homes* to determine whether present discounting is appropriate.[120]  In light of this uncertainty of both law and fact, the Court will not resolve this question on the current summary judgment record.

~~The whole point of the prior section, however, was that the debtors were not disputing that they had defaulted on the obligation to make withdrawal payments~~

---

[117] 11 U.S.C. § 502(b).

[118] ~~*See In re B456 Systems, Inc.*, No. 12-12859 (KJC), 2017 WL 6603817 (Bankr. D. Del. Dec. 22, 2017).~~

[119] *See* D.I. 3983 at 33-34 & n.14.

[120] *In re Oakwood Homes*, 449 F.3d 588 (3d Cir. 2006).

before the petition date.  The result of that default is that the obligation to make payments over 20 years is accelerated.  And as a result of the acceleration, the debtors are no longer obligated to make the payments for 20 years into the future.  Rather, the entire amount became immediately due and owing.  Indeed, the core point of § 1399(c)(5) is that it entitled the plan to "require immediate payment of the outstanding amount of an employer's withdrawal liability."[121]  That being the case, the debtors' obligations would be due immediately, not paid in equal installments over 20 years.  Accordingly, the notion of present discounting the value of a stream of future payments is inapplicable here.

**C.    The New York Teamsters and the Western Pennsylvania Teamsters are entitled to use higher contribution rates when calculating the debtors' withdrawal liability.**

Section 1391 sets out the four methods for calculating unfunded vested benefits.  Alternative allocation methods are only permissible where a pension plan first seeks and obtains approval of the PBGC.[122]

In 2013, the debtors reentered the New York Teamsters Fund and the Western Pennsylvania Teamsters Fund.[123]  The agreements to reenter the pension funds allowed the debtors to pay reduced contribution rates for employees, for the New York

---

[121] 29 U.S.C. § 1399(c)(5).

[122] 29 U.S.C. § 1391(c)(5)(A) (any amended procedure is "subject to the approval of the corporation based on its determination that adoption of the method by the plan would not significantly increase the risk of loss to plan participants and beneficiaries or to the corporation."); 29 C.F.R. § 4211.23(b) (criteria for approving alternative allocation methods).

[123] D.I. 3825-25 (Debtors to reenter New York Teamsters Fund in 2013); D.I. 3825-8 at 7-8 of 10 (Sekol Decl.); D.I. 3825-26 at 2 of 9 ("Distressed Employer Schedule").

fund only 25% of the usual rate, leading to diminished accruals for those employees.[124] If the debtors withdrew from the pension plans, both agreements allowed the plans to calculate the withdrawal liability at the full 100% of the contribution rate.[125]

In calculating their proofs of claim, the New York Teamsters Fund and the Western Pennsylvania Teamsters Fund calculated the debtors' withdrawal liability based on the higher contribution rates.[126] Neither plan received PBGC authorization to use this alternative method of allocating the plan's unfunded vested benefits and calculating the debtors' annual payments.[127]

The question then is whether to use the 25% contribution rate based on actual contributions or the 100% contribution rate based upon the agreement. The debtors argue that the New York Teamsters and the Western Pennsylvania Teamsters funds should use the reduced contribution rates that correspond with their actual contributions. And because these plans did not obtain approval from the PBGC, they must use the actual contribution rates.

---

[124] D.I. 3825-25 ("Schedule G" for New York Teamsters Fund) § a (employers under Schedule G to pay contribution rates as low as 25% of their last effective rate).

[125] *See* Schedule G, § d; *See* D.I. 3825-26 at 8 of 9, §§ E.1.5, E.2.2.

[126] D.I. 3852 at 26-28 of 49; *See* D.I. 3825-38 (reflecting imputed contribution rates and contribution base units for Debtors); D.I. 3825-7 at 97, 104-105 (Culp. Dep. Tr.). *See* D.I. 3825-8 ¶¶ 40-43, 49-50 (Sekol Decl.) ("As of December 31, 2014, the Debtors' contribution rate being paid to the Fund [$69.50] was disregarded for purposes of allocating shares of UVB to Debtors. The prevailing National Mater Freight rate of $432.48 was used for the 2015 pool . . . Annual increases in the NMF rate, if any, were used for subsequent pools.").

[127] *See* D.I. 3825-7 at 117-118 (Culp Dep. Tr.) ("Q: New York Teamsters also never got approval from the PBGC for amending the rehabilitation plan to include a Schedule G; correct? A: I believe that's correct."); *See* D.I. 3825-8 ¶ 39.3 (Sekol Decl.).

The pension plans explain, however, that they did not need PBGC approval since the debtors *agreed* to treat their withdrawal liability claims in this manner. And while the plans also make additional arguments, the Court need not consider them, since this first response is sufficient.

Courts have read the MPPAA as establishing a withdrawal liability floor, rather than a withdrawal liability ceiling.  The Seventh Circuit wrote in *Artistic Carton*, "the MPPAA establishes mandatory liability, overriding contracts that allowed firms to withdraw with an effective transfer of unfunded liability to the federal Treasury.  It does not forbid employers from agreeing to pay extra money to a pension trust."[128]

Here, as in *Artistic Carton*, there is an agreement by the debtors to pay more in the case of withdrawal liability.  While it is true that pension plans cannot unilaterally impose a change in the withdrawal liability calculations without seeking approval from the PBGC under § 1391, there is nothing to prevent the debtors from forming a contract with the plans that provides for a greater contribution.

That is precisely what has occurred here.  Nothing in the text or purpose of ERISA provides a reason why the debtors should not be held to their bargain.  The plans are entitled to summary judgment on this point.

---

[128] *Artistic Carton Co. v. Paper Indus. Union-Management Pension Fund*, 971 F.2d 1346, 1353 (7th Cir. 1992).

**Conclusion**

For the reasons stated above, the Court will enter partial summary judgment in favor of the plans and partial summary judgment in favor of the debtors.  The parties are directed to settle an order so providing.

Dated: ~~September 13~~November 5, 2024

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE