IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>(Jointly Administered)<br><br>**Related Docket No. 4461** |

**ORDER GRANTING MOTION FOR RECONSIDERATION AND
POSING FURTHER QUESTIONS FOR THE PARTIES TO CONSIDER**

By Memorandum Opinion dated September 13, 2024, the Court resolved various motions for summary judgment related to the withdrawal liability the debtors owe to various multiemployer pension plans.[1] The principal issue addressed in that Memorandum Opinion related to the validity of certain regulations issued by the Pension Benefit Guaranty Corporation.[2] The Court found those regulations to be valid. MFN Partners, LP and Mobile Street Holdings, LLC have sought reconsideration of that determination. On October 29, 2024, this Court offered its preliminary observations on that motion. The Court pointed to additional authority that it believes supports the correctness of its initial holding. Because that authority has not been cited by any party, however, the Court believed it appropriate to afford the parties the opportunity to respond to the Court's preliminary observations. The Court noted that it hopes to issue a decision resolving that motion by November 15, 2024.

---

[1] D.I. 4326.

[2] The Pension Benefit Guaranty Corporation is referred to as the "PBGC."

In addition to the challenge to the PBGC's regulations, the parties also sought summary judgment on three specific issues that bear on the calculation of withdrawal liability. One of those issues was whether the debtors had defaulted on their withdrawal liability obligations. If they had, ERISA provides that the 20-year stream of payments may be accelerated, such that it is immediately due and owing. The Court held that the debtors had defaulted and that the 20-year liability had therefore accelerated. The debtors have sought reconsideration of that determination. On reviewing the September 13, 2024 Memorandum Opinion and the existing summary judgment record, the Court is persuaded that it should not have resolved that issue on the incomplete record before it.

Under ERISA, there are two ways an employer can default on its withdrawal liability obligations, either of which would provide a statutory basis for accelerating the 20-year stream of payments. *First*, under 29 U.S.C. § 1399(c)(5)(A), an employer defaults if it fails "to make, when due, any payment under this section [and] the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure."[3] *Second*, under 29 U.S.C. § 1399(c)(5(B), a plan may declare an "insecurity default" upon the occurrence of "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability."[4]

---

[3] 29 U.S.C. § 1399(c)(5)(A).

[4] *Id.* § 1399(c)(5)(B).

2

There is no suggestion that that debtors defaulted on their obligation to pay withdrawal liability prepetition. Indeed, because the debtors withdrew from the pension funds in the days leading up to the bankruptcy filing, and § 1399(c)(5)(A) provides for a 60-day cure period, that would not be possible. To be sure, there is no dispute that the debtors had defaulted prepetition on their obligations to the pension plans to fund plan benefits. But that is not the kind of default that is the subject of § 1399(c)(5)(A).

As Central States pointed out in its summary judgment motion, the record does suggest that Central States determined, post-petition, that the debtors' bankruptcy filing was an insecurity default under 29 U.S.C. § 1399(c)(5)(B).[5] The other pension plans repeatedly assert in their summary judgment motion that the debtors were "in default," but pointed to no record evidence to support that assertion. Indeed, it is less than clear from their motion which default they were referring to: a default under the withdrawal liability obligations or on the regular obligation to fund plan benefits.[6] In fairness, one could perhaps fault the debtors for failing to take issue, in their reply brief, with the plans' assertion that the debtors had defaulted, raising it (at least with sufficient clarity for the Court to appreciate the point) only in their motion for reconsideration.[7]

---

[5] *See* D.I. 3983 at 33-34 & n.14.

[6] D.I. 3975 at 43.

[7] *Compare* D.I. 4011 at 27-31 *with* D.I. 4461 at 4-5.

Under the circumstances, however, the Court is inclined to prioritize its obligation to reach the right answer over the strict enforcement of the discretionary rules of waiver.[8] These issues raise high-stakes questions.[9] In light of the number of complex and novel issues presented by these motions, however, the parties understandably devoted most of their briefs to the PBGC regulation issue and relatively little to the issues of calculating withdrawal liability.  The issues were further confounded by the fact that the plans contended that ERISA's 20-year cap was rendered inapplicable by virtue of the debtors' (acknowledged) prepetition default under their obligation to fund plan benefits.  The Court rejected that argument, holding that only a default under the obligation to pay withdrawal liability (or an insecurity default) would count as a "default" under the applicable statute. And while there was some imprecision in the briefing, the point is a sufficiently fine one that the Court believes it would be inappropriate to leave in place a substantively incorrect determination on the ground that the briefing could have been clearer.

---

[8] *See generally Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 834-835 (3d Cir. 2011) ("While waiver ordinarily bars raising new arguments for the first time on appeal, this rule is one of discretion rather than jurisdiction, and it may be relaxed whenever the public interest so warrants.") (internal citations, quotations, and ellipses omitted); *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 527 n.11 (D.N.J. 2008) (recognizing that the trial court has discretion to consider new arguments); *Sabert Corp. v. PWP Indus., Inc.*, 2015 WL 5007838, at *1 n.3 (D.N.J. Aug. 20, 2015) (same); *Office for Planning and Architecture, Inc. v. City of Harrisburg*, 2021 WL 12313054, at *3 n.2 (M.D. Pa. June 8, 2021) (same).

[9] By way of context, counsel for the debtors represented at the hearing on the summary judgment motion that Central States filed proofs of claim for $5 billion in withdrawal liability. Aug. 6, 2024 Hr'g Tr. at 141.  Counsel further represented that, under ERISA, the annual cap would be approximately $50 million, such that the application of the 20-year cap (without present discounting) would reduce that claim to $1 billion. *Id.*  And simply by way of illustration, by the Court's (undoubtedly imperfect) math, the present value such a stream of payments would be approximately $530 million if discounted at a rate of 7 percent and approximately $744 million if discounted at a rate of 4 percent.

Additionally, upon further review of the Memorandum Opinion, the Court has concluded that some of its related observations on the legal effect of actions taken post-petition to accelerate liability because of an insecurity default raise more complicated questions than the Court initially appreciated, and that those questions have not been sufficiently briefed by the parties. The Court has accordingly decided to grant the debtors' motion for reconsideration. The Court is amending its Memorandum Opinion to state that the question of whether the debtors had defaulted under § 1399(c)(5) is not properly resolvable on the current summary judgment record. The Court is also deleting the (premature) discussion of the *ipso facto* issue, which the Court believes would benefit from further briefing by the parties. A clean version of the Amended Memorandum Opinion has been docketed at D.I. 4769. For the convenience of the parties, a redline showing the changes has been docketed at D.I. 4770.

In view of all of this, there are now a number of questions that need to be resolved, some factual, some legal, in order to complete the task of liquidating the claims at issue. To facilitate the prompt and orderly resolution of this claims allowance dispute, the Court will set forth the questions that occur to it, in what appears to be their logical order:

- Does it even matter whether a particular pension plan did or did not declare the 20-year stream of payments to be accelerated? There is certainly a view, reflected in the legislative history of § 502, that a bankruptcy filing "operates as the acceleration of the principal amount

of all claims against the debtor."[10] This view is also reflected in pre-Code practice.[11]

- If the 20-year stream of payments contemplated by ERISA was *not* automatically accelerated by the bankruptcy filing, then the Court may need to resolve:

    o The *factual* question of whether the plans have the right, under their plan documents, to assert an "insecurity default" pursuant to 29 U.S.C. § 1399(c)(5)(B); and

    o The *legal* questions of whether such an *ipso facto* provision is enforceable in bankruptcy, and if it is, what effect the automatic stay may have on a creditor's right to declare an "insecurity default" after the petition date. Note that the Court appreciates (in light of the briefing on the motion for reconsideration) that the *ipso facto* issue is a question on which there appears to be a division of authority.[12]

---

[10] H. Rep. No. 595, 95th Cong., 1st Sess., 352-353 (1977).

[11] *See Sexton v. Dreyfus*, 219 U.S. 339, 344 (1911) (Holmes, J.) (bankruptcy law "simply fixes the moment when the affairs of the bankrupt are supposed to be wound up" as of the petition date, such that future-arising obligations are accelerated). On this view, the inclusion of bankruptcy default provisions in commercial agreements would be essentially a form of belt-and-suspenders protection. *See generally* David Zarfes and Michael L. Bloom, *Contracts and Commercial Transactions* (2011) (chapter introduction by Douglas Baird, noting that "the filing of a bankruptcy petition automatically accelerates obligations," and that while *ipso facto* clauses "have long ceased to do any work, they do no harm either").

[12] *Compare In re AMR Corp.,* 730 F.3d 88, 92 (2d Cir. 2013) (enforcing *ipso facto* provisions), *with In re W.R. Grace & Co.*, 475 B.R. 34, 153 (D. Del. 2012) (finding *ipso facto* clauses to be unenforceable).

- If, following resolution of the questions above, the Court were to conclude that the debtors owed a 20-year stream of payments that is not subject to acceleration, the Court would then need to address whether the claim should be discounted to present value. Under *Oakwood,* it is clear that when a debtor owes a stream of payments consisting of both principal and interest, any unmatured interest would need to be backed out of the claim under § 502(b)(2) of the Bankruptcy Code.[13] As *Oakwood* explains, removing unmatured interest from a stream of payments does the same thing as discounting that stream of payments to present value (with the discount rate being the rate of interest reflected in the stream of payments).[14] That is why the *Oakwood* court found that *both* disallowing unmatured interest *and* present discounting effectively operated to "double discount" the creditor's claim.

- That, however, leaves unresolved the question whether to discount a future payment stream that does *not* appear to include an interest component. The dissent in *Oakwood* would have held that payment streams that do not include interest *should* be subject to present discounting and criticized the majority for suggesting otherwise.[15] In *B456 Systems*, Judge Carey, applying *Oakwood*, concluded that future

---

[13] *In re Oakwood Homes Corp.,* 449 F.3d 588 (3d Cir. 2006).

[14] *Id.* at 600

[15] *Id.* at 609 (Smith, J., dissenting).

7

damages for rejection of an executory contract *are* subject to being discounted to present value.[16] But what is the right way to think about the 20-year stream of payment on withdrawal liability provided for under ERISA? Should it be viewed as, in effect, an interest-free loan? If so, one could argue that even if (a) the loan had not been accelerated on account of default and (b) bankruptcy does not automatically accelerate, the stream of payments *still* should not be present discounted. The reason could be that the stream of payments set forth in ERISA provides, in effect, for an interest-free loan. In that case, the effective discount rate should then be zero.[17]

- If, after answering the questions above, the conclusion is that the stream of payments should be present discounted, the Court would then need to determine the proper rate at which to discount the streams of payment owed to each of the pension funds. The parties' submissions take conflicting views on the proper discount rate and suggest that the matter may properly be the subject of expert testimony.

Given the questions above (and any others not listed that the parties may raise), the Court believes it may be helpful to schedule a status conference to discuss

---

[16] *In re B456 Systems, Inc.,* No. 12-12859 (KJC), 2017 WL 6603817, at *23 (Bankr. D. Del. Dec. 22, 2017).

[17] It may bear note that when a debtor comes into bankruptcy as a party to a below-market rate loan, reorganizing debtors will commonly seek to obtain the time benefit of money by another means – decelerating the loan by curing any default and reinstating the prior maturity date under § 1124 of the Bankruptcy Code.

a sensible way to proceed. To isolate the number of moving parts, the Court believes it will make the most sense to hold that status conference after the motion for reconsideration on the validity of the PBGC regulations is resolved.

The Court accordingly directs the parties to meet and confer, and then reach out to chambers to schedule a status conference for some time during or after the week of November 18, 2024.

For the foregoing reasons, the debtors' motion for reconsideration is hereby GRANTED.

Dated: November 5, 2024

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE