## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>(Jointly Administered)<br><br>**Related Docket No. 4462** |

## <u>MEMORANDUM OPINION</u>

After the enactment of the American Rescue Plan Act of 2021, the PBGC issued a series of regulations that provided, in effect, that funds received by pension plans under that Act would not be considered for the purpose of determining an employer's withdrawal liability.[1]  The debtors in this case withdrew from various pension plans in the days leading up to the bankruptcy.  Several pension plans that received funds under American Rescue Plan Act filed proofs of claim for withdrawal liability.  The pension plans calculated the amounts due as provided in the PBGC regulations.  They therefore did not treat federal funds they received (or that they would receive) under the Act as plan assets.

The debtors, joined by MFN Partners (which holds equity in the debtors), objected to those proofs of claim.[2]  In connection with this claims allowance dispute, they sought summary judgment, seeking a determination that the PBGC regulations were invalid on the ground that they were inconsistent with the applicable statute.  The pension plans, joined by the PBGC, filed cross motions seeking summary

---

[1] The Pension Benefit Guaranty Corporation is referred to as the "PBGC."

[2] MFN Partners, LP is referred to as "MFN Partners."

judgment that the regulations were consistent with the statute.  In a Memorandum Opinion dated September 13, 2024, this Court held that the regulations were valid.[3]

MFN Partners and Mobile Street have moved for reconsideration.[4]  The principal basis for the motion is that the Court erred in concluding that the PBGC regulations are authorized by 29 U.S.C. § 1432(m), which authorizes the PBGC to "impose, by regulation or other guidance, *reasonable conditions on an eligible multiemployer plan* that receives special financial assistance relating to … withdrawal liability."  The motion for reconsideration argues that the regulations in question regulate employers rather than pension plans.

In the Summary Judgment Opinion, this Court relied on the Supreme Court's decision in *Philpott*, a case that none of the parties cited, for the proposition that an authority to impose a "condition" on a party that accepts federal funds may also "bind third parties, not just the party that agreed to the terms when it accepted the federal funds."[5]  The principal point of the rehearing petition is that *Philpott* is different because it was about a statute enacted by Congress under its constitutional Spending Clause authority, whereas this case involves an agency regulation.  The rehearing petition argues that the "Movants have located no case blessing a federal agency, as

---

[3] D.I. 4326.  The September 13, 2024 Memorandum Opinion is referred to as the "Summary Judgment Opinion."

[4] D.I. 4462.  Mobile Street Holdings, LLC is referred to as "Mobile Street."

[5] D.I. 4326 at 3.  *See also Philpott v. Essex County Welfare Board*, 409 U.S. 413 (1973).

part of implementing its interpretation of a Congressional directive, to issue a regulation adversely impacting third parties as is the undisputed case here."[6]

The Court, however, has since come across further caselaw that it believes supports its reading of the statute. Because that caselaw had not been cited by any party, the Court issued "preliminary observations" explaining that it was inclined to deny the motion for reconsideration, but affording the parties the opportunity to address the caselaw on which the Court was inclined to rely.[7] The parties have filed briefs in response to those preliminary observations. Having reviewed the briefing, the Court will deny the motion for reconsideration.

## I. The Supreme Court's decision in *Philpott* is analogous to the circumstances presented here.

The rehearing petition argues that *Philpott* is different from this case for three reasons. The *first* is that the condition in *Philpott* was statutory, whereas here the condition is contained in an agency regulation. That is true. But the point of the Court's reliance on *Philpott*, however, is that it provided a very close analogy to the question presented here. As the Summary Judgment Opinion explained, when exercising its Spending Clause power, Congress may impose conditions on the receipt of federal funds, and there is a body of caselaw addressing the kinds of "conditions" that may validly be imposed.[8] The American Rescue Plan Act similarly granted the PBGC authority to impose conditions on pension plans that receive such funds. In

---

[6] D.I. 4462 at 3.

[7] D.I. 4718.

[8] D.I. 4326 at 19 (citing *South Dakota v. Dole*, 483 U.S. 203, 206 (1987)).

construing the statutory language authorizing the PBGC to impose conditions on pension plans that receive American Rescue Plan Act funds, it only makes sense to draw upon the body of law that sets forth the kinds of conditions that Congress may impose under the Spending Clause on the recipients of federal funds.

*Second*, the petition argues that in *Philpott*, the Social Security Act *preceded* the relationship between the state and the individual who received the federal funds. In this case, by contrast, the withdrawal liability calculation provisions of the Multiemployer Pension Plan Amendments Act of 1980 had been in place long before the enactment of the American Rescue Plan Act and the promulgation of the PBGC regulations.

While that point about timing may be descriptively correct, it does not speak to the validity of the regulation. There is no reason why a condition imposed on the receipt of federal funds cannot alter parties' existing expectations. So, while it may be true that *Philpott* is different from this case in this respect, it is not a distinction that makes a difference to the relevant analysis.

*Third*, the petition suggests that *Philpott* does not stand for the proposition that the Social Security Act was a valid exercise of the Spending Clause power because the Essex County Welfare Board did not expressly argue that the conditions imposed on it were improper. But by the time of its *Philpott* decision, the Supreme Court had long made clear that the Social Security Act was an exercise of Congress' authority under the Spending Clause, which permitted it to condition the grant of

funds on the recipient's agreement to comply with the terms of the grant.[9]  And it was by then also well established that when Congress exercises its Spending Clause power, it may do so in a way that is "not limited by the direct grants of legislative power found in the Constitution."[10]

Against that backdrop, the Supreme Court made clear in *Philpott* that the Social Security Act "imposes a broad bar against the use of any legal process to reach all social security benefits.  That is broad enough to include all claimants, including a State."[11]  In this context, it necessarily follows that the *Philpott* Court decided, even if implicitly, that a "condition" on the use of federal funds is not limited to the terms to which the recipient of the federal funds agrees, but further extends to include restrictions on third parties' receipt of those funds.  That implicit holding by the Supreme Court is certainly binding on this Court.

## II.    Additional authority further supports the proposition that a condition on the receipt of federal funds can bind third parties.

Following argument on the motion for reconsideration, this Court issued preliminary observations in which it suggested that additional authority, including the Supreme Court's decision in *Norfolk Southern Railway* and the Sixth Circuit's decision in *United States v. Miami University*, support the Spending Clause analogy

---

[9] *See generally King v. Smith*, 392 U.S. 309, 333 (1968); *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 589-590 (1937).  *See also* Brief for State of New Jersey as Amicus Curiae at 5, *Philpott v. Essex County Welfare Board*, 409 U.S. 413 (1973) (No. 71-5656), 1972 WL 135832 (describing how program at issue "provides assistance payments to needy disabled persons out of monies appropriated by the federal government and the states which participate").

[10] *United States v. Butler*, 297 U.S. 1, 66 (1936).

[11] *Philpott*, 409 U.S. at 417.

on which the Court relied.[12]   The Court provided both parties the opportunity to respond to those points.

The points made in MFN Holdings and Mobile Street's response can be placed into two categories.  They *first* reiterate the contention set out above, that those cases are different because they involve congressional legislation that imposed conditions on the receipt of federal funds, rather than agency action.  Again, it is true that in this context the condition on the use of federal funds is set forth in the PBGC regulations whereas the conditions at issue in *United States v. Miami University* and *Norfolk Southern* were statutory.  The Court nevertheless views this body of caselaw to be highly relevant to the statutory question at issue here – what Congress would have meant, in the American Rescue Plan Act, when it granted the PBGC the authority to "impose, by regulation or other guidance, reasonable conditions on an eligible multiemployer plan that receives special financial assistance relating to … withdrawal liability."[13]

*Second*, MFN Partners and Mobile Street make a series of additional points, all of which are premised on the notion that the PBGC's regulations are inconsistent with other provisions of ERISA.  To be sure, if that premise were correct, the rest of their arguments would be valid ones.  But for the reasons set forth in the Summary Judgment Opinion and addressed further Part III, the regulations do not conflict with other statutory language.

---

[12] D.I. 4718 (citing *Norfolk Southern Railway Co. v. Shanklin*, 529 U.S. 344 (2000); *United States v. Miami Univ.*, 294 F.3d 797, 809 (6th Cir. 2002)).

[13] 29 U.S.C. § 1432(m)(1).

**III.    In view of the principle that the specific controls over the general, the PBGC regulations do not conflict with the text of the statute.**

Much of the rehearing petition and the response to the Court's preliminary observations is premised on the argument that the PBGC's regulations improperly "change" the statutorily required method for calculating withdrawal liability. As the response to the Court's preliminary observations puts the point, "the PBGC Regulations necessarily change existing law that Congress itself did not change."[14]

The Court addressed this basic point in the Summary Judgment Opinion. It explained that 29 U.S.C. § 1432(*l*) calls for the segregation of special financial assistance provided under the American Rescue Plan Act from "other plan assets." This, standing alone, would suggest that the special financial assistance is itself a "plan asset" that ought to be included when calculating unfunded vested benefits. The preceding sentence of § 1432(*l*), however, contains an unambiguous and specific contrary instruction: "Special financial assistance received under this section and any earnings thereon may be used by an eligible multiemployer plan to make benefit payments and pay plan expenses."[15]

If the net effect of a plan's receipt of special financial assistance were to reduce an employer's withdrawal liability, this specific statutory command would be violated. A stylized example may help illustrate the point. Consider a pension plan

---

[14] D.I. 4758 at 2.

[15] 29 U.S.C. § 1432(*l*).

that held $200 in plan assets and owed $300 in nonforfeitable benefits.[16]  That plan's "unfunded vested benefits" would be $100.  If an employer with a 50% allocable share of those unfunded vested benefits withdrew from the plan, that employer's withdrawal liability (subject to specific adjustments as provided by statute) would be $50.  After the employer paid that withdrawal liability, the plan would have $250 in plan assets.  (Let's call this result, Scenario A.)

Now consider the result if that plan were to receive $100 in special financial assistance before the date on which withdrawal liability were calculated.  If that $100 were to be treated as a plan asset, the employer would have $300 in plan assets and $300 in nonforfeitable benefits, meaning that it would have no unfunded vested benefits.  The withdrawing employer, in turn, would be off the hook from its obligation to pay $50 in withdrawal liability into the plan.  (Let's call this Scenario B.)

What is the net difference between Scenario A and Scenario B?  In Scenario A, the pension plan ends up with $250 in plan assets, whereas in Scenario B it has $300.  From the employer's perspective, in Scenario A it owes $50 in withdrawal liability, whereas in Scenario B it owes nothing.

Therefore, if the $100 in special financial assistance were treated as a plan asset, the net result of the plan's receipt of that $100 would be that the plan would get $50 of that payment (increasing its assets from $250 to $300) and the employer could keep the $50 that it would have otherwise owed to the plan.  That state of

---

[16] D.I. 4326 at 7 (citing 29 U.S.C. § 1381).  *See also Allied Painting & Decorating, Inc. v. Int'l Painters & Allied Trades Indus. Pension Fund,* No. 23-1537, 2024 WL 3366492, at *1 & n.1 (3d Cir. July 11, 2024).

affairs, in which $50 of the special financial assistance would reduce the employer's obligations to the plans, would violate Congress' express instruction that special financial assistance may only be used "to make benefit payments and pay plan expenses."[17]

To be sure, the $100 in special financial assistance would need to be "segregated from other plan assets" and "invested by plans in investment-grade bonds or other investments as permitted by the [PBGC]."[18]  But even so, it would blink economic reality to suggest that $50 of the $100 in special financial assistance has not been used to reduce the employer's withdrawal liability.

The Supreme Court acknowledged this commonsense point when it upheld, against constitutional challenge, a statute that prohibits the bribery of state and local officials of entities that receive at least $10,000 in federal funds.  The defendant argued that to fall within the spending power, there needed to be a showing that the federal funds themselves were tied in some way to the bribes received by the government officials.  The Supreme Court had none of that.  "It is true … that not every bribe or kickback … will be traceably skimmed from specific federal payments."[19]  The Court held, however, that "[m]oney is fungible," and that

---

[17] 29 U.S.C. § 1432(*l*).

[18] *Id.*

[19] *Sabri v. United States*, 541 U.S. 600, 605-606 (2004).

"[l]iquidity is not a financial term for nothing."[20]  Rather, "money can be drained off here because a federal grant is pouring in there."[21]

The PBGC regulations were motivated by the same economic reality.  Reducing the employer's contribution by $50 as a result of the $100 in special financial assistance is exactly what the Supreme Court meant in saying that "money can be drained off here because a federal grant is pouring in there."[22]  The PBGC regulations at issue were thus necessary to give effect to the specific statutory requirement that the special financial assistance not be used for any purpose other than to pay plan benefits and expenses.  For that reason, it is irrelevant that more general provisions of the Multiemployer Pension Plan Amendments Act of 1980 might suggest that anything of economic value owned by the pension plans should be treated as an asset for the purpose of calculating withdrawal liability.  This case is controlled by principle set out in *Brown & Williamson* and other cases that explain that a specific statutory provision must control over a more general one.[23]

For these reasons, the attempts by MFN Partners and Mobile Street to distinguish *Philpott*, *Norfolk Southern,* and *United States v. Miami University* on the ground that this case involves an agency regulation that conflicts with the statutory text are unpersuasive.  The Court accordingly adheres to the views set forth in its

---

[20] *Id.* at 606.

[21] *Id.*

[22] *Id.*

[23] *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000).

preliminary observations, which are incorporated by reference.  The motion for reconsideration will therefore be denied.

The parties should settle an appropriate order reflecting the Court's ruling on the motions for summary judgment [D.I. 4326], including its decisions granting the debtors' motion for reconsideration [D.I. 4461] and denying this one [D.I. 4462].


Dated: November 12, 2024

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE