**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**Response Deadline: Dec. 5, 2024, at 4:00 p.m. (ET)**
**Hearing Date: Jan. 21, 2025, at 10:00 a.m. (ET)**

**DEBTORS' TWENTY-SECOND OMNIBUS (SUBSTANTIVE) OBJECTION TO
CLAIMS PURSUANT TO BANKRUPTCY CODE SECTION 502(B) BANKRUPTCY
RULES 3003 AND 3007, AND LOCAL RULE 3007-1**

---

**THIS OBJECTION SEEKS TO DISALLOW CERTAIN CLAIMS. PARTIES RECEIVING THIS OBJECTION SHOULD REVIEW THE SCHEDULE ATTACHED TO THE PROPOSED ORDER TO DETERMINE IF THEIR CLAIM IS SUBJECT TO THIS OBJECTION.**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Yellow") hereby object, pursuant to 11 U.S.C. § 502 and Rule 3007 of the Federal Rules of Bankruptcy Procedure, to the so-called "CARES Act" proofs of claim filed by the International Brotherhood of Teamsters, the Teamsters National Freight Industry Negotiating Committee, its affiliated local unions, and their respective bargaining unit members (collectively, the "IBT"). The IBT has filed proofs of claim alleging that the CARES Act requires the Debtors to pay two years' worth of salary and benefits for each IBT member, totaling billions of dollars. There is zero legal basis for the IBT's CARES Act claims, and they should be summarily disallowed.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

The Debtors respectfully request an order, substantially in the form attached hereto as **Exhibit A** (the "Order"): (a) disallowing the claim identified on **Schedule 1** to **Exhibit A** attached hereto, or to the extent the claim mixes other non-CARES Act related claims, to expunge the CARES Act related portion of the claim (the "No Liability CARES Act Claim(s)"); and (b) granting related relief.  In support of this Objection, the Debtors respectfully state as follows:

## INTRODUCTION AND BACKGROUND

A.      **Yellow's Business**

1.      On August 6, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court.  These chapter 11 cases have been consolidated for procedural purposes and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 169].  The Debtors are managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      As the Court knows, Yellow historically offered customers a range of services for the transport of industrial, commercial, and retail goods in national, regional, and international markets.  First Hawkins Decl. ¶ 6.[2]  Yellow provided less-than-truckload ("LTL") services, which combined multiple customers' shipments in one trailer, and truckload ("TL") services, in which one customer's freight occupies an entire trailer.  *Id*.  Yellow handled approximately 50,000 freight shipments per day on average.  *Id*.  Approximately 22,000 of Yellow's 30,000 employees were unionized, most of which were represented by the IBT.  *Id*.

---

[2] *See Declaration of Darren Hawkins in Support of Debtors' Third, Fourth, and Fifth Omnibus (Substantive) Objection to Proofs of Claim for WARN Liability* [ECF No. 2581] (the "First Hawkins Decl."), which is incorporated by reference.

**B.**    **Coronavirus Aid, Relief, and Economic Security Act.**

3.    On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was signed into law to respond to the COVID-19 outbreak and its impact on public health, the economy, and businesses.  H.R. 748, 116th Cong. (2020).  Section 4003 of the CARES Act authorized the Department of the Treasury to make loans in support of, in relevant part, businesses critical to maintaining national security.  CARES Act, Pub. L. 116-136, Div. A., Title IV, § 4003 (c)(3)(D)(i)(IX).

4.    In April 2020, given the economic devastation resulting from the COVID-19 pandemic, Yellow was experiencing low levels of liquidity and applied for relief under the CARES Act, which could provide both capital infusion and temporary relief related to the payment of employer payroll taxes and non-union pension payments.  Yellow's loan application was approved by the U.S. Treasury ("Treasury") on July 7, 2020—following months of due diligence and Yellow receiving the necessary national security certification from the Department of Defense.[3]

5.    Yellow received the $700 million CARES Act loan (the "CARES Act Loan" or "Loan") in two tranches, both of which were secured.  *See* **Ex. B**.  Tranche A consisted of a $300 million term loan with an interest rate of LIBOR plus 3.5%, with 1.5% cash and 2.0% payment in kind.  Tranche B of Yellow's CARES Act Loan consisted of a $400 million loan for capital investments made under capital plans subject to approval by Treasury, with an interest rate equal to LIBOR plus 3.5% in cash.  *See* **Ex. C**.

---

[3]    Yellow has since paid back the entire CARES Act loan, in full, with interest.  *See, e.g.,* News Release, Yellow Corp., Yellow Pays Back $700 Million Cares Act Loan (Feb. 5, 2024) (available at https://investors.myyellow.com/node/31056/pdf).

**C.      The IBT's Proofs of Claim.**

6.      As the Court knows, the IBT's ill-fated strike threat caused the Debtors' customers to flee and the entire business to be shut down, leading to the loss of 30,000 jobs (22,000 of which were held by the IBT's members).[4]  While the IBT itself caused Yellow's demise (and the loss of 22,000 union jobs), on November 10, 2023, and March 19, 2024, the IBT filed Proofs of Claim claiming various amounts for alleged breaches of the collective bargaining agreements (or the "CBAs").  The IBT's most recent Proof of Claim filed on March 19, 2024, seeks $2,460,359,945.45 for alleged breaches of the CBAs and back wages.  ***See* Ex. D at 1**. Specifically, the IBT alleges that its bargaining unit members are entitled to accrued vacation, other paid time off, sick pay, various outstanding grievances, WARN Act claims, and purported CARES Act damages described in detail below.[5]

7.      The Debtors have already spent massive amounts of time and estate assets addressing others of the IBT's meritless claims.  Here, the IBT alleges that Debtors' CARES Act Loan required Yellow to keep all existing CBAs in full force and effect for the term of the loan

---

[4]      *See* Decl. of Matt Doheny, Chief Restructuring Officer, in Supp. of the Debtors' Chapter 11 Pets. and First Day Mots. ¶ 16 (Aug. 7, 2023), ECF No. 14 ("Doheny Decl.") at 32.

[5]      The Debtors have already objected to the IBT's WARN Act related claims.  More detailed explanations of the facts relevant to the various WARN claims is included in Debtors' Third Omnibus (Substantive), Fourth Omnibus (Substantive), and Fifth Omnibus (Substantive) Objections To Proofs Of Claim Alleging WARN Liability and the related declarations, *see* D.I. 2576–2579 (the "Whittman Decl."), 2580 (the "First Kaldenberg Decl."), 2581 (the "First Hawkins Decl."), and 2852 (the "First Statlander Decl."), Debtors' Memorandum of Law in Support of Their Motion for Summary Judgment and the related declarations, *see* D.I. 4316 ("Debtors' MSJ"), 4316-1 (the "Second Slade Decl."), 4316-2 (the "Second Hawkins Decl."), 4316-3 (the "Second Kaldenberg Decl."), and 4316-4 (the "Second Statlander Decl."), and Debtors'/Defs.' Opp. to Pls.' Mot. for Partial Summ. J., *see Moore v. Yellow Corp.*, Adv. Proc. No. 23-50457 (Bankr. D. Del. Apr. 19, 2024) D.I. 51 ("*Moore* D.I. 51") and related declarations, including Moore D.I. 51-5 (the "First Slade Decl."); Dkt. No. 4291, Debtors' Memorandum of Law in Support of Their Motion for Summary Judgment; Dkt. No. 4452, Debtors' Oppo. to Teamsters' Amend. MSJ; D.I. 77, Debtors' Oppo. to Coughlen Plaintiffs' MSJ; D.I. 114, Debtors'/Defs.' Opp. to Moore Pls.' Second Mot. for Partial Summ. J.; Dkt. No. 4506, Debtors' Reply in Support of Their Motion for Summary Judgment, which are all hereby incorporated by reference.

and two years thereafter.  *See* **Ex. D, ¶ 11**.[6]  The IBT alleges that the Debtors violated an "implied

covenant of good faith and fair dealing" by shutting down operations.  *Id.*  Further, the IBT claims

this alleged violation caused damages in the amount of wages that would have been paid from the

shutdown through September 30, 2026.  *Id.*  To support this claim, the IBT attached to its Proofs

of Claim questionable calculations of average weekly compensation costs, which in any event fail

to show how the IBT arrived at its damages calculations at all.  *See e.g.,* **Ex. D**, **Ex. J**.

8.　　　The IBT CBAs expired on March 31, 2024, and the Debtors terminated them upon

their expiration, as permitted by the agreements.  On January 30, 2024, Yellow formally notified

the IBT that it terminated the NMFA and all associated agreements, supplemental agreements, and

ancillary agreements, upon their expiration on March 31, 2024.  *See* **Ex. E**.

9.　　　This objection addresses the IBT's Proofs of Claim seeking billions of dollars for

2 years' pay and benefits pursuant to the CARES Act.  The IBT's claims fail for many reasons.

**First**, the IBT lacks standing, as it lacks a private right of action, either express or implied, under

the CARES Act; separately, the IBT cannot establish a contractual right to payment as third-party

beneficiary (or otherwise).  **Second**, the IBT fails to reference any particular CARES Act provision

as support for its argument that the Debtors were required to keep all existing collective bargaining

---

[6]　　The IBT has filed at least 10 proofs of claim, in four categories: (1) at least three proofs of claim against New Penn Motor Express LLC., alleging CARES Act liability of $2,261,698,827.05, *see* International Brotherhood of Teamsters, the Teamsters National Freight Industry Negotiating Committee Proofs of Claim (IBT's Proofs of Claim), Nos. 5336, 17253, 19588, (2) at least three proofs of claim against YRC Inc., CARES Act liability of $2,261,698,827.05, *see* IBT's Proofs of Claim Nos. 5400, 17248, 19589 (3) at least two proofs of claim against USF Reddaway, Inc., alleging Cares Act liability of $273,424,482.54, *See* IBT's Proofs of Claim Nos. 5337, 17258, (4) at least two proofs of claim against USF Holland LLC alleging Cares Act liability of $766,024,246.33, *See* IBT's Proofs of Claim Nos. 53338, 17261.  For the avoidance of doubt, the Debtors object to each and every one of the IBT's Proofs of Claim.  Proofs of Claim Nos. 5336, 5337, 5338, and 5400 were disallowed on the Court's Order Sustaining Debtors' First Omnibus (Non-Substantive) Objection as Amended Claims [ECF 2189] filed on February 14, 2024.  These Proofs of Claim have been excluded from **Schedule 1** to **Ex. A**.  Furthermore, timely filed Proof of Claim No. 17253 was amended by late filed Proof of Claim No. Claim 19588, and timely filed Proof of Claim No. 17248 was amended by late filed Proof of Claim No. 19589.  Proofs of Claim Nos. 17253 and 17248 are included in **Schedule 1** to **Ex. A** because the Debtors had not yet filed an Objection to these Proofs of Claims until now.  For the avoidance of doubt, the Debtors object to each and every one of the IBT's Proofs of Claim.

agreements in full force and effect for the term of the loan and two years subsequent. But assuming the IBT intended to reference section 4003(c)(3)(D)(I)(IX) of the CARES Act, that provision would not apply to the Debtors at all, leaving no valid basis to support the IBT's arguments. **Third**, in any event, Section 301 of the Labor Management Relations Act ("LMRA") preempts state claims requiring interpretation of collective bargaining agreements. The covenant of good faith and fair dealing (implied covenant) is an implied term of contract, which is preempted, as it requires interpretation of the CBAs between the Debtors and the IBT. **Fourth,** the common law doctrine of the implied covenant of good faith and fair dealing is completely inapposite in any event. **Fifth,** the IBT's implied covenant claims violate Section 8(b)(6) of the National Labor Relations Act ("NLRA"). For any or all of these reasons, the IBT's CARES Act claims should be disallowed.

## RELIEF REQUESTED

10.    The Debtors request entry of an order pursuant to Section 502(b) of the Bankruptcy Code and Rule 3007 of the Bankruptcy Rules disallowing the IBT's Proofs of Claim based on the CARES Act pursuant to sections 105(a) and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007 and 9004, and Local Rule 3007-1.

## JURISDICTION

11.    The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

12.    Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors

confirm their consent to the entry of a final order by this Court in connection with this Objection

if it is later determined that this Court, absent consent of the parties, cannot enter final orders or

judgments in connection therewith consistent with Article III of the United States Constitution.

13.      Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

14.      The statutory and legal predicates for the relief requested in this Objection are §§

105(a) and 502(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy

Code"), Bankruptcy Rules 3007 and 9004, and Local Rule 3007-1.

## LEGAL STANDARD

15.      Section 502(a) of the Bankruptcy Code provides that, "[a] claim or interest, proof

of which is filed under section 501 of this title is deemed allowed, unless a party in interest . . .

objects." 11 U.S.C. § 502(a).  The term "party in interest", encompasses any party with a legally

protected interest or stake in the bankruptcy proceedings, including the debtor. *See, e.g.*, *In re*

*Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985) (defining party in interest as one who "has a

sufficient stake in the proceeding so as to require representation") (internal quotations omitted); *In*

*re Olympia Off. LLC*, 574 B.R. 38, 46 (Bankr. E.D.N.Y. 2017) ("Because § 502(b) provides that a

party in interest may object to a claim, and because Section 1109(b) expressly allows a debtor to

be heard on any issue in a case, it logically follows that, on the face of the statute, a debtor is a

party in interest for purposes of Section 502(b).").

16.      Upon receiving any objection to a claim under section 502(a), the court must then

"determine the amount of such claim . . . and allow such claim in such amount," unless the claim

"is unenforceable against the debtor and property of the debtor, under any agreement or applicable

law." 11 U.S.C. § 502(b)(1).

17.      As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of

claim constitutes *prima facie* evidence of the validity and amount of the claim under section 402(a)

of the Bankruptcy Code.  See Fed. R. Bankr. P. 3001(f).  But a proof of claim loses the presumption

of *prima facie* validity under Bankruptcy Rule 3001(f) if an objecting party refutes at least one of

the allegations that are essential to the claim's legal sufficiency.  *See In re Allegheny Int'l, Inc.*,

954 F.2d 167, 173-74 (3d Cir. 1992).  Once such an allegation is refuted, "the burden reverts to

the claimant to prove the validity of the claim by a preponderance of the evidence."  *Id.* at 174

(citation omitted).  Despite this shifting burden during the claim objection process, "[t]he burden

of persuasion is always on the claimant."  *Id.* (citing *In re Holm*, 931 F.2d 620, 623 (9th Cir.

1991)).  Here, the IBT cannot satisfy that burden.

## ARGUMENT

18.      Nothing in the CBAs supports the IBT's theory that the Debtors must pay its

members for two years following the IBT's ill-fated destruction of the Debtors' businesses.  So,

instead of claiming damages for breach of any CBA terms, the IBT presses an esoteric implied

covenant claim based on the CARES Act.  The IBT's Proofs of Claim fail for four independent

reasons: (1) The IBT lacks standing to enforce the CARES Act; (2) the CARES Act does not

obligate the Debtors to pay their employees for two years post-loan repayment as the IBT alleges;

(3) the Labor Management Relations Act (the "LMRA") preempts and moots implied covenant

claims; (4) leaving all that aside, the implied covenant would not apply; and (5) the IBT's implied

covenant claims violate Section 8(b)(6) of the NLRA.  For these reasons, the court should disallow

the IBT's Proofs of Claim summarily, as a matter of law.

**A.      The IBT Lacks Standing As It Has No Private Right of Action Under The CARES Act.**

19.      The IBT states that the Debtors received "a loan from the US Treasury (CARES

Act Loan)" in 2020.  According to the IBT, "loan terms required [Debtors] to keep all existing

collective bargaining agreements in full force and effect for the term of the loan and two years

subsequent." **Ex. D, ¶ 11**. The IBT failed to cite any CARES Act provision that substantiate its

arguments—its Proofs of Claim have a "CITE" placeholder that the IBT never filled in. *Id.* No

such provision exists, and the IBT could not enforce that law even if the CARES Act supported its

theory.

**1.    The IBT Lacks Standing; There Is No Private Right of Action Under The CARES Act.**

20.    To bring a claim under a federal law, that law must afford a right to the plaintiff to

bring suit. *Alexander v. Sandoval*, 121 S.Ct. 1511, 1514, 532 U.S. 275, 276 (2001) ("[P]rivate

rights of action to enforce federal law must be created by Congress."); *Jasmine v. Gainey*, 2022

WL 10662879, at *3 (W.D. Pa. Aug. 11, 2022) (collecting cases). That private right of action may

be created expressly or implicitly. *See* 2022 WL 10662879 at *3. As a threshold matter, it is clear

that the IBT has no express private right of action under the CARES Act—no such right exists,

and the IBT has not identified any language that would provide such an express right. *Autumn*

*Court Operating Co. v. Healthcare Ventures of Ohio*, 2021 WL 325887, at *5 (S.D. Ohio Feb. 1,

2021) ("There is no explicit private right of action enumerated in the CARES Act.").

21.    Likewise, the IBT has no implied private right of action under the CARES

Act. *Jasmine*, 2022 WL 10662879, at *3 (cleaned-up) ("This Court's review has failed to reveal

the existence of any decision holding . . . that the CARES Act . . . provides an implied right of

action under any circumstance . . . .") (collecting cases). In assessing whether Congress intended

to imply a private right of action to enforce a law, "courts consider the text and structure of the

statute to determine whether it displays an intent to create not just a private right but also a private

remedy." *Genesis Lab. Mgmt. LLC v. United Health Grp., Inc.*, 2023 WL 2387400, at *3 (D.N.J.,

Mar. 6, 2023) (internal quotations omitted). Where a statutory scheme has no express remedy, "a

court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. (TAMA) v.*

*Lewis*, 444 U.S. 11, 19 (1979).  As a matter of law, statutory silence is not enough.  *Saloojas, Inc.*

*v. Aetna Health of California, Inc.*, 80 F.4th 1011, 1016 (9th Cir. 2023) (finding no private cause

of action under CARES where, "[Plaintiff] correctly points out that nothing in the language of the

statute shows an intent to deny a remedy, but that statutory silence is not enough.").  "Without

evidence of a congressional intent to create both a private right and a private remedy, a private

right of action 'does not exist and courts may not create one, no matter how desirable that might

be as a policy matter, or how compatible with the statute.'"  *UFCW Local 1500 Pension Fund v.*

*Mayer*, 895 F.3d 695, 699 (9th Cir. 2018) (quoting *Sandoval*, 532 U.S. at 286-87, 121 S.Ct. 1511).

22.     Following the Supreme Court's decision in *Sandoval*, the test for determining

whether a private right exists has two steps: (1) Did Congress intend to create a personal right?;

and (2) Did Congress intend to create a private remedy?  "Only if the answer to both of these

questions is 'yes' may a court hold that an implied private right of action exists under a federal

statute." *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 301 (3d Cir. 2007); *see also Genesis*, 2023 WL

2387400, at *3.

23.     The IBT fails to point to any substantive evidence that Congress intended to create

a private remedy under the CARES Act, and no court has ever held that there is one.  Regardless,

even if Congress bore such an intention for those in Plaintiffs' shoes, nothing in the text nor

structure of the CARES Act suggests Congress intended to offer plaintiffs a private

remedy.  *Genesis*, 2023 WL 2387400, at *3; *see Am. Video Duplicating, Inc. v. City Nat'l Bank*,

2020 WL 6882735, at *5 (C.D. Cal. Nov. 20, 2020) ("Unsurprisingly, every court to address

whether the CARES Act created an implied private right of action has held that it does not.").

24.     Accordingly, the CARES Act affords no shelter for the IBT—there is neither an

express nor implied private right of action thereunder.  *Thompson v. U.S. Dep' of Treasury Internal*

*Revenue Serv.*, 2023 WL 4744751, at *2 (D.N.J. July 25, 2023) ("Courts in this district, as well as the other districts around the country, agree that there is no implied private right of action for individuals under the CARES Act."); *Jackson v. Jackson*, 2023 WL 8096900, at *2 n.4 (E.D. Pa. Nov. 21, 2023); *Aetna*, 80 F.4th at 1016; *Betancourt v. Total Prop. Mgmt.*, 2022 WL 2359286, at *3 (E.D. Cal. June 30, 2022) (same) (collecting cases); *Horvath v. JP Morgan Chase & Co.*, 2022 WL 80474, at *5 (S.D. Cal. Jan. 6, 2022) ("Plaintiff does not have a cause of action under the CARES Act.").

### 2. The IBT Does Not Have A Contractual Right To Damages As A Third-Party Beneficiary Of The CARES Act Loan.

25. Nor can the IBT establish a contractual right to payment as an alleged third-party beneficiary of Yellow's CARES Act Loan. This follows, as the IBT has no standing to assert common-law claims pursuant to any statutory provision for which it has no private right of action. *Astra USA, Inc. v. Santa Clara Cnty.*, Cal., 563 U.S. 110, 113, 118 (2011) (stating where plaintiff's suit is "in essence a suit to enforce" a federal statute lacking a private right of action, it is "incompatible with the statutory regime" to permit common-law claims based on alleged statutory violations).

26. Affording such a right would render the absence of a private right under the CARES Act meaningless, as the IBT could simply overcome that obstacle by bringing a third-party private contract action to enforce the alleged obligation instead. *Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003). Thus, in *Astra*, the Supreme Court dispensed with the theory that third-party beneficiaries—who were afforded no right to sue under the applicable federal statute itself—could nonetheless enforce contracts running between the defendant and the government. 563 U.S. at 113. So too here.

27.    The *Astra* plaintiffs argued that when the Government utilizes a contract to secure a benefit, the intended recipient acquires an enforceable federal common law right to such benefit. *Id*. at 118.  But the Supreme Court rejected that theory, as it overlooked the fact that the agreements, in addition to recording the defendants' accord to abide thereto, merely incorporated statutory obligations with non-negotiable terms (*opt-in*).

> [T]he 340B Program agreements serve as the means by which drug manufacturers opt into the statutory scheme.  A third-party suit to enforce an HHS-drug manufacturer agreement, therefore, is in essence a suit to enforce the statute itself.  The absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the contract's ceiling-price obligations instead.  The statutory and contractual obligations, in short, are one and the same.

*Id.*  As the Supreme Court held the *Astra* plaintiffs could not enforce a federal statute under which they lacked a private right of action, so too did the District Court of Arizona in *Radix*, but there, specifically in the CARES Act context.  *Radix Law PLC v. JPMorgan Chase Bank N.A.*, 508 F. Supp. 3d 515, 520 (D. Ariz. 2020) ("Plaintiff's state law claims for unjust enrichment and violation of the Arizona Consumer Fraud Act are not viable because they are in essence attempts to enforce the CARES Act [under which they have no private right of action].").

28.    Hence, at its core, the IBT's claim would be an indirect attempt to privately enforce a provision under the CARES Act.  To permit this third-party private contract action, directed toward enforcing such provision, "would be inconsistent with . . . the legislative scheme . . . to the same extent as would a cause of action directly under the statute." *Grochowski*, 318 F.3d at 86 (internal quotations omitted); *Astra*, 563 U.S. at 118; *see also Johnson v. JPMorgan Chase Bank, N.A.*, 488 F.Supp.3d 144, 158 (S.D.N.Y. 2020) ("[T]he breach of contract claims would be foreclosed by controlling precedent that forbids third-party suits to enforce agreements that merely incorporate obligations under a statute [CARES Act] that does not itself permit the third-party to enforce it.").  This claim should be disallowed.  *Saloojas, Inc. v. Cigna Healthcare of Cal., Inc.*,

2022 WL 5265141, at *9 (N.D. Cal. Oct. 6, 2022) (dismissing CARES Act claim with prejudice, as amendment would be futile); *Genesis*, 2023 WL 2387400, at *3 (same); *Radix*, 508 F.Supp.3d at 520 ("Even if Plaintiff had a viable argument on the merits, this claim would be dismissed because there is no private right of action to enforce the CARES Act."); *Ortiz v. Bus. Consumers & Hous. Agency*, 2023 WL 2188694, at *2 (C.D. Cal. Feb. 23, 2023) (same); *Murphy Med. Assocs., LLC v. Cigna Health & Life Ins. Co.*, 2022 WL 743088, at *4-6 (D. Conn. Mar. 11, 2022) (same).

**B.    Even If The CARES Act Created A Private Right Of Action, The Requirements Referenced By The IBT Are Inapplicable To The Debtors.**

29.    The IBT failed to reference any particular CARES Act provision supporting its argument that the Debtors were required to "keep all existing collective bargaining agreements in full force and effect for the term of the loan and two years subsequent." **Ex. D, ¶ 11**.  But based on the substance of the claim, the Debtors assume, however, that the IBT intended to refer to section 4003(c)(3)(D)(i)(IX)[7] of the CARES Act, which states, among other things, that "the recipient will not abrogate existing collective bargaining agreements for the term of the loan and 2 years after completing repayment of the loan."  CARES Act, Pub. L. 116-136, Div. A., Title IV, § 4003 (c)(3)(D)(i)(IX).  This provision does not apply to the Debtors, as it relates only to loans used to mid-sized businesses, while Yellow received its loans under a separate provision of the CARES Act that relates to companies important to national security.

30.    Yellow acquired its CARES Act Loan under the national security provisions of the CARES Act, as it was classified as a national security business by the U.S. Treasury—based on a certification by the Secretary of Defense that YRC was critical to maintaining national security

---

[7]    Available at https://www.congress.gov/116/plaws/publ136/PLAW-116publ136.pdf.  The CARES Act Statute was signed into law on March 27, 2020, and amended in 2024.  The 2024 version is available at https://www.govinfo.gov/content/pkg/COMPS-15754/pdf/COMPS-15754.pdf.  While the 2024 version does not contain the amounts specified in the 2020 version, Debtors believe the IBT intended to cite provisions in both the 2020 and 2024 versions.  Thus, the amendment to the 2024 version does not affect the Debtors' arguments.

during the COVID-19 pandemic.  Indeed, the U.S. Treasury 4003 loan program website classified

Yellow as a national security business[8] and the U.S. Treasury press release announcing the Loan

confirmed as much.[9]

31.     Thus, Yellow received the Loan as a national security business under §4003(b)(3)

which states, "Not more than $17,000,000,000 shall be available to make loans and loan guarantees

for businesses critical to maintaining national security."[10]  CARES Act, Pub. L. 116-136, Div. A.,

Title IV, § 4003 (b)(3).  Businesses provided loans under sections 4003(b)(1), (2) and (3) are

subject to specific terms and conditions, but none of these restrictions required the Debtors to

"keep all existing collective bargaining agreements in full force and effect for the term of the loan

and two years subsequent" as alleged by the IBT.

32.     Unlike these provisions pursuant to which Yellow received its CARES Act Loans,

Section 4003(c)(3)(D)(i)(IX) provides:

> (D) **ASSISTANCE FOR MID-SIZED BUSINESSES.**— (i) IN GENERAL.—
> Without limiting the terms and conditions of the programs and facilities that the
> Secretary may otherwise provide financial assistance to under subsection (b)(4)[11],
> the Secretary shall endeavor to seek the implementation of a program or facility
> described in subsection (b)(4) *that provides financing to banks and other lenders*
> *that make direct loans to eligible businesses including, to the extent practicable,*
> *nonprofit organizations, with between 500 and 10,000 employees*, with such direct
> loans being subject to an annualized interest rate that is not higher than 2 percent

---

[8]     *See, e.g.,* The 4003 Loan Program, U.S. Department of The Treasury (available at
https://home.treasury.gov/policy-issues/coronavirus/assistance-for-industry/loans-to-air-carriers-eligible-businesses-and-national-security-businesses); *see also,* News Release, Yellow Corp., YRC Worldwide Expects To Receive $700
Million CARES Act Loan from U.S. Treasury (Jul. 1, 2020) (available at
https://investors.myyellow.com/node/28051/pdf).

[9]     Statements & Remarks, U.S. Department of Treasury, Treasury to Provide Loan to YRC Worldwide (Jul. 1, 2020)
(available at https://home.treasury.gov/news/press-releases/sm1049).

[10]    CARES Act, Pub. L. 116-136, Div. A., Title IV, § 4003 (b)(3).

[11]    Section 4003(b)(4) states, "Not more than the sum of $454,000,000,000 and any amounts available under
paragraphs (1), (2), and (3) that are not used as provided under those paragraphs shall be available to make loans and
loan guarantees to, and other investments in, programs or facilities established by the Board of Governors of the
Federal Reserve System for the purpose of providing liquidity to the financial system that supports lending to eligible
businesses, States, or municipalities by . . . ."  CARES Act, Pub. L. 116-136, Div. A., Title IV § 4003 (b)(4).

per annum . . . **Any eligible borrower applying for a direct loan under this program shall make a good-faith certification that**—. . . .

. . . .

(IX) *the recipient will not abrogate existing collective bargaining agreements for the term of the loan and 2 years after completing repayment of the loan* . . . .

CARES Act, Pub. L. 116-136, Div. A., Title IV, § 4003 (c)(3)(D)(i)(IX) (emphasis added).

33.     The plain definition of mid-sized businesses in Section 4003 (c)(3)(D)(i)(IX) unmistakably excluded Yellow from the requirements the IBT seeks to impose. Specifically, mid-sized businesses in the context of Section 4003(c)(3)(D)(i)(IX) and section 4003 are defined as "***eligible businesses including, to the extent practicable, nonprofit organizations, with between 500 and 10,000 employees***." Section 4003(c)(3)(D)(i) (emphasis added).

34.     If, as here, "a statute includes an explicit definition, [courts] must follow that definition, even if it varies from that term's ordinary meaning." *Biskupski v. Att'y Gen.*, 503 F.3d 274, 280 (3d Cir. 2007) (applying the definition of "aggravated felony" provided by Congress because Congress plainly and unambiguously included the offenses described in 8 U.S.C. § 1324(a)(1)(A) and (2) as part of the definition of "aggravated felony" in § 1101(a)(43)(N)); *see also Meese v. Keene*, 481 U.S. 465, 484, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987) (recognizing "the respect we normally owe to the Legislature's power to define the terms that it uses in legislation"); *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201, 69 S.Ct. 503, 93 L.Ed. 611 (1949) ("Statutory definitions control the meaning of statutory words . . . .").

35.     Clearly, Section 4003(c)(3)(D)(i)(IX) is only applicable to mid-sized business loan recipients, defined as businesses, including nonprofits, with between 500 and 10,000 employees. Here, it is undisputed that Yellow had more than 30,000 employees at the time of the loan and at all times prior to its shut down, and that Yellow received its CARES Act Loans under provisions

applicable to companies important to maintaining national security. Thus, the restriction alleged

by the IBT is not applicable to Yellow.

**C.     Section 301 Of The Labor Management Relations Act Preempts The IBT's Implied Covenant of Good Faith and Fair Dealing Claim.**

36.     In any event, to the extent the IBT is suggesting that Yellow's actions somehow

breached an implied covenant in its IBT CBA, Section 301 of the LMRA preempts state law claims

requiring interpretation of collective bargaining agreements. And the IBT's implied covenant

claims would clearly require interpretation of collective bargaining agreements. This is because

"the covenant of good faith and fair dealing is not an implied contract, but rather an implied term

*of a contract.*" *Maddox v. City of Newark*, 50 F. Supp. 3d 606, 631 (D.N.J. 2014) (finding that

Section 301 preempts implied covenant claims implicating collective bargaining agreements).

Here, the IBT urges this Court to imply CBA terms that do not otherwise exist based on state

common law. Overwhelming precedent bars the IBT's theory: Third Circuit courts consistently

reject implied covenant claims as preempted by Section 301. Thus, for yet another reason, this

Court should disallow the IBT's Proofs of Claim.

37.     Case law interpreting Section 301 renders it indisputable that it preempts state law.

*Cherilus v. Bloomingdale Operating Co.*, 2012 WL 3038525, at *3 (D.N.J. July 25, 2012) (citing

*Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962)) ("The Court has consistently held that, in

enacting Section 301, Congress intended that a uniform federal labor law would prevail over

inconsistent state and local common law."). And Section 301 preemption defeats implied covenant

claims. Third Circuit law is unequivocal: "there is complete preemption under § 301 where 'the

plaintiff, in its well-pleaded complaint, . . . plead[s] an action that requires interpretation of [a]

collective bargaining agreement.'" *Briones v. Bon Secours Health Sys.*, 69 F. App'x 530, 534 (3d

Cir. 2003) (alterations in original) (quoting *Berda v. CBS Inc.,* 881 F.2d 20, 25 (3d Cir. 1989)).

16

And implied covenant claims require collective bargaining agreement interpretation. *Guerrero v. Hovensa LLC*, 259 F. App'x 453, 458 (3d Cir. 2007); *Allis–Chalmers Corp.*, 471 U.S. at 202, 218 (1985) (observing that liability for breach of a contractual duty of good faith "inevitably will involve contract interpretation"). "Whether there is an 'implied *contractual* duty,' will necessarily require an analysis of the terms of the CBA to determine if the contract as a whole obliges the employer to act with good faith and fair dealing." *Guerrero*, 259 F. App'x at 458 *(*quoting *Allis–Chalmers Corp.*, 471 U.S. at 218). That is why courts in this Circuit hold that "[f]ederal law preempts *any claim of breach of the covenant of good faith and fair dealing* that is an implied term of the CBA." *Maddox*, 50 F. Supp. 3d at 631 (emphasis added) (citing *Allis–Chalmers Corp.*, 471 U.S. at 218).

38.     Courts agree that Section 301 preempts implied covenant claims attendant to CBAs and systematically reject them. *See e.g., Guerrero*, 259 F. App'x at 459 (affirming the dismissal of an implied covenant claim as preempted by Section 301); *Maddox*, 50 F. Supp. 3d at 637 (granting defendants' motion for summary judgment against an implied covenant claim based on a Section 301 preemption defense.); *Bergen Reg'l Med. Ctr., L.P. v. Health Pros.*, 2005 WL 3216549, at *8 (D.N.J. Nov. 29, 2005) (same); *Devoy v. Tricomm Servs., Inc.*, 2002 WL 31640481, at *3 (D.N.J. Oct. 15, 2002) (same); *Pagano v. Bell Atl.-N.J., Inc.*, 988 F. Supp. 841, 847 (D.N.J. 1997) (same); *see also Garley v. Sandia Corp.*, 236 F.3d 1200, 1215 (10th Cir. 2001) (affirming dismissal of an implied covenant claim as Section 301 preempted). Thus, in step with overwhelming precedent, this Court should disallow the IBT's Proofs of Claim.

**D.     The IBT's Implied Covenant Of Good Faith And Fair Dealing Claim Also Fails On Substantive Grounds.**

39.     Even if the IBT could bring an implied covenant claim (it cannot), any common law theory fails for at least two other reasons. First, the CBAs between the IBT and Debtors could

not create any expectation of compliance with the CARES Act—a statutory scheme that post-dates the CBAs in their entirety.  Second, even if the collective bargaining agreements implied that the Debtors owed two years of severance (they do not), Section 8(b)(6) of the National Labor Act prohibits payments for "services not performed or not to be performed."  *Am. Newspaper Publishers Ass'n v. N.L.R.B.*, 345 U.S. 100, 110 (1953).  Thus, even if the IBT could raise an implied covenant claim, this Court should disallow the IBT's Proofs of Claim.

40.     Since inception, implied covenant doctrine has merely preserved an agreement's efficacy as the parties intended at the time of contracting.  *Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 91, 118 N.E. 214 (1917) (internal quotation omitted) (finding an implied promise because "[w]ithout an implied promise, the transaction cannot have such business efficacy, as both parties must have intended that at all events it should have"); *Huang v. BP Amoco Corp*, 271 F.3d 560, 564–65 (3d Cir. 2001) (quoting *Slater v. Pearle Vision Ctr., Inc.*, 546 A.2d 676, 679 (Pa. Super. Ct. 1988)) ("[W]here it is clear that an obligation is within the contemplation of the parties at the time of contracting or is necessary to carry out their intentions, the court will imply it . . . even where the contract itself is not ambiguous.").  In rare cases, statutes can imply obligations between contractual counterparties, but "compliance with the statute or regulation" must be a "justified expectation of the parties based on the intention and spirit of the[] contact."  *Tualli v. EverBank*, 2017 WL 5196701, at \*5 (D. Nev. Nov. 6, 2017).

41.     The IBT cites only *Tuali v. EverBank* for the proposition that an implied covenant can arise from background statutory law.  **Ex. D, ¶ 11** (citing 2017 WL 5196701).  But *Tuali* cuts against the IBT's claim.  2017 WL 5196701, at \*10 (dismissing an implied covenant claim).  In *Tuali*, a Nevada District Court granted a defendant loan servicer's motion to dismiss a plaintiff's implied covenant claim.  The mortgager plaintiff brought a claim for breach of the implied

covenant predicated on state and federal law. *Id*. at \*1-2. Unlike here, the plaintiff in *Tuali* pointed to loan documents that explicitly referenced the state and federal law that he claimed gave rise to an implied covenant. *Id*. \*5-7. Despite these facts, the *Tuali* court found that the mortgager plaintiff failed to allege a "'rare and exceptional case' of misconduct by the defendants, so severe that it must be said to have violated a duty created by law, not merely by contract, justifying the imposition of additional, special damages for bad faith conduct." *Id* at \*10 (quoting *K Mart Corp. v. Ponsock*, 103 Nev. 39, 49, 732 P.2d 1364, 1370-71 (Nev. 1987), *abrogated on other grounds by Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 111 S. Ct. 478, 112 L. Ed. 2d 474 (1990)).

42.    Here, the IBT's implied covenant claim is considerably weaker than the failed claim in *Tuali*. It is not possible to assert that the IBT and the Debtors had a background expectation of implied obligations under a federal law that did not exist when the CBAs were signed. Unlike the loan documents in *Tuali*, the CBAs did not and could not reference the CARES Act. And, as explained above, the CARES Act provisions the IBT apparently rely upon do not apply to the Debtors in any event. Thus, the IBT lacks any viable claim for breach of the implied covenant.

43.    Separately, the IBT's Proofs of Claim seek wages for work that will not and cannot ever occur, a claim that itself would flagrantly violate Section 8(b)(6) of the NLRA. It is unlawful for labor organizations to "exact pay from an employer in return for *services not performed or not to be performed*." *Am. Newspaper Publishers Ass'n*, 345 U.S. at 110 (emphasis added). Here, the IBT demands in its Proofs of Claim payment for wages not paid because no work was done; the IBT singlehandedly destroyed Yellow, causing more than 20,000 of its own members to lose their jobs. The CBAs between the IBT and Yellow do not contain any implied covenant guaranteeing wages for labor that cannot and will not ever be performed. But even if any such implied covenant existed, it would be invalid, as it would violate Section 8(b)(6) of the NLRA. It defies logic to

expansively interpret CARES in a manner that explicitly violates the NLRA, but that is exactly what the IBT presses.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, disallowing IBT's Proofs of Claim attached hereto as **Schedule 1** to **Exhibit A**.

Dated: November 21, 2024

*/s/ Peter J. Keane*
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                tcairns@pszjlaw.com
                pkeane@pszjlaw.com
                ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Casey McGushin (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                david.seligman@kirkland.com
                michael.slade@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          allyson.smith@kirkland.com