**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED DISCLOSURE STATEMENT FOR THE SECOND
AMENDED JOINT CHAPTER 11 PLAN OF YELLOW CORPORATION AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com
              pkeane@pszjlaw.com
              ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2000
Email:        patrick.nash@kirkland.com
              david.seligman@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is:  11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

---

**THE DEADLINE TO VOTE ON THE PLAN IS**
**January 21, 2025, at 4:00 p.m. (prevailing Eastern Time)**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY EPIQ CORPORATE RESTRUCTURING, LLC ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *SECOND AMENDED JOINT CHAPTER 11 PLAN OF YELLOW CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO <u>ACCEPT</u> THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE CHAPTER 11 CASES AND THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN OR THEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED UPON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND UPON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND ASSETS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS OR ASSETS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR THE LIQUIDATING TRUSTEE MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS, WITH THE CONSENT OF THE COMMITTEE, SUCH CONSENT NOT TO BE UNREASONABLY WITHHELD, RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH

IN ARTICLE X OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE, WITHOUT LIMITATION, STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS AND LIQUIDITY;

- FINANCIAL STRATEGY, BUDGET, AND PROJECTIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- ADVERSE TAX CHANGES;

- COUNTERPARTY CREDIT RISK;

- PENDING AND FUTURE LITIGATION; AND

- PLANS, OBJECTIVES, AND EXPECTATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' OR THE LIQUIDATING TRUST'S FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE REORGANIZED DEBTOR'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING, WITHOUT LIMITATION: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION OR SERIES OF TRANSACTIONS IF THE PLAN IS NOT CONFIRMED; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON, AMONG OTHER THINGS, THE DEBTORS' ASSETS, CASH FLOWS, MANAGEMENT AND EMPLOYEES; THE RISKS ASSOCIATED WITH WINDING DOWN THE DEBTORS' PREPETITION BUSINESS OPERATIONS DURING THE CHAPTER 11 CASES; CUSTOMER, VENDOR, AND LANDLORD RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' ABILITY TO ENJOIN, BAR, OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO AND THE OUTCOMES OF LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES AND ASSETS; AND ADVERSE TAX CHANGES.

THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION BY THE DEBTORS FROM TIME TO TIME AND MAY BE AMENDED, WITH THE CONSENT OF THE COMMITTEE, SUCH CONSENT NOT TO BE UNREASONABLY WITHHELD, BY THE DEBTORS TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, TO PROVIDE SUPPLEMENTAL OR UPDATED INFORMATION REGARDING ANY MATTER SET FORTH IN THIS DISCLOSURE STATEMENT OR THE PLAN (IN EACH CASE INCLUDING ALL ATTACHMENTS, EXHIBITS, AND SUPPLEMENTS THERETO), AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................................1

II.   PRELIMINARY STATEMENT .............................................................................................1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
      THE PLAN .............................................................................................................................5

      A.    What is chapter 11? ........................................................................................................5
      B.    Why are the Debtors sending me this Disclosure Statement? ........................................5
      C.    Am I entitled to vote on the Plan? .................................................................................5
      D.    What will I receive from the Debtors if the Plan is consummated? ...............................6
      E.    What does it mean if I have a Convenience Class Claim? ............................................11
      F.    What happens to my recovery if the Plan is not confirmed or does not go effective? ...12
      G.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
            Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
            "Consummation?" .......................................................................................................12
      H.    What are the sources of Cash and other consideration required to fund the Plan? ........12
      I.    Is there potential litigation related to the Plan? ..........................................................12
      J.    Will the final amount of Allowed General Unsecured Claims affect the recovery of
            Holders of Allowed General Unsecured Claims under the Plan? ..................................13
      K.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ...13
      L.    What is the deadline to vote on the Plan? ...................................................................15
      M.    How do I vote for or against the Plan? ........................................................................15
      N.    Why is the Bankruptcy Court holding a Confirmation Hearing? ..................................15
      O.    When is the Confirmation Hearing set to occur? .........................................................15
      P.    What is the purpose of the Confirmation Hearing? ......................................................15
      Q.    What is the effect of the Plan on the Debtors' ongoing business? ................................15
      R.    Who do I contact if I have additional questions with respect to this Disclosure Statement
            or the Plan? ................................................................................................................16
      S.    Could subsequent events potentially affect recoveries under the Plan? ........................16
      T.    Do the Debtors recommend voting in favor of the Plan? .............................................16

IV.   OVERVIEW OF THE PLAN ...............................................................................................16

      A.    General Settlement of Claims and Interests .................................................................16
      B.    Third-Party Sale Transactions and Liquidation Transactions .......................................17
      C.    The Liquidating Trust .................................................................................................17
      D.    The Liquidating Trustee ..............................................................................................18
      E.    Dissolution of the Debtors ..........................................................................................18
      F.    Causes of Action ........................................................................................................18
      G.    Releases .....................................................................................................................18

V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ...........22

      A.    Yellow's Corporate History and Business Operations ..................................................22
      B.    The Debtors' Prepetition Capital Structure .................................................................23

VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS .....................................................27

      A.    COVID-19 ..................................................................................................................27
      B.    One Yellow .................................................................................................................27
      C.    Yellow's Inability to Complete Phase 2 Causes Irreparable Damage ...........................28
      D.    Yellow's Liquidity Issues ...........................................................................................29
      E.    IBT Threatens to Strike ..............................................................................................30

      F.     Exploration of Strategic Alternatives ..................................................................31

**VII.**    **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** ........................................................................................................................**32**

      A.     First Day Relief ..................................................................................................32
      B.     Appointment of Official Committee of Unsecured Creditors ..............................32
      C.     Other Procedural and Administrative Motions ....................................................32
      D.     Canadian Recognition Proceedings.....................................................................36
      E.     Retention of Debtor Professionals.......................................................................37
      F.     Approval of Debtor-in-Possession Financing ......................................................37
      G.     Bidding Procedures and Marketing Process.........................................................38
      H.     Litigation Matters ..............................................................................................42
      I.      Plan Settlement and Structure Proposals..............................................................51
      J.      Assumption and Rejection of Executory Contracts and Unexpired Leases ...........51
      K.     Claims Based on Rejection of Executory Contracts or Unexpired Leases ............52
      L.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ..........52
      M.    Liquidating Trust Governance Matters ................................................................53

**VIII.**    **RISK FACTORS** .......................................................................................................**53**

      A.     Certain Bankruptcy Law Considerations .............................................................53
      B.     Disclosure Statement Disclaimer ........................................................................57

**IX.**     **SOLICITATION AND VOTING PROCEDURES** ....................................................**59**

      A.     Holders of Claims Entitled to Vote on the Plan ..................................................59
      B.     Voting Record Date............................................................................................59
      C.     Voting on the Plan..............................................................................................60
      D.     Ballots Not Counted ..........................................................................................60

**X.**      **CONFIRMATION OF THE PLAN** .........................................................................**61**

      A.     Requirements for Confirmation of the Plan .........................................................61
      B.     Best Interests of Creditors/Liquidation Analysis .................................................61
      C.     Feasibility .........................................................................................................62
      D.     Acceptance by Impaired Classes .........................................................................62
      E.     Confirmation Without Acceptance by All Impaired Classes .................................63

**XI.**     **MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ...............**64**

      A.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ..................65
      B.     Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 4A, 4B, 5 Claims and/or Class 8 Interests ..............................................66
      C.     Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Class 4A, 4B, 5 Claims and/or Class 8 Interests .......................................68
      D.     Tax Matters Regarding the Liquidating Trust.......................................................70
      E.     Information Reporting and Backup Withholding...................................................71

**XII.**    **RECOMMENDATION**................................................................................................**72**

**EXHIBITS**

**EXHIBIT A**    Chapter 11 Plan

**EXHIBIT B**    Liquidation Analysis

## I.    INTRODUCTION

Yellow Corporation and the above-captioned debtors and debtors in possession (collectively, with their Debtor affiliates, the "Debtors" or "Yellow") submit this disclosure statement (as may be amended, supplemented, and modified from time to time, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Second Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, Filed contemporaneously herewith (as may be altered, amended, modified, or supplemented from time to time, and in a manner reasonably acceptable to the Committee, the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS SUPPORT THE PLAN AND BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS.  AT THIS TIME, THE DEBTORS BELIEVE THAT THE PLAN REPRESENTS THE BEST (*I.E.*, MOST VALUE MAXIMIZING) AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.[2]**

## II.    PRELIMINARY STATEMENT[3]

Throughout these chapter 11 cases, the Debtors have worked to obtain the best possible outcome under the circumstances for their stakeholders.  Consistent with that goal, and as discussed in more detail herein, the Debtors embarked on a sale process for their assets, which enabled them to pay off not only all of their prepetition funded debt obligations, but also both tranches of their debtor-in-possession financing.  The Debtors continue to advance their efforts to maximize value, having recently retained CBRE, Inc. ("CBRE") as broker and real estate advisor to assist in the sale efforts for the Debtors' remaining real estate portfolio.  As described in the previously filed Disclosure Statement [Docket No. 4254] (the "Initial Disclosure Statement"), the Debtors received a non-binding proposal labeled "for discussion purposes only" (attached to the Initial Disclosure Statement as Exhibit C) from MFN Partners, LP ("MFN"), Conversant Opportunity Master Fund LP (or its designee), and Carronade Capital (collectively, the "Participating Equity Interest Holders") pursuant to which the Participating Equity Interest Holders would have potentially backstopped a rights offering that could have potentially funded a chapter 11 plan premised upon (a) a go-forward subleasing and/or REIT entity, (b) payment in full of all Allowed General Unsecured Claims

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning given to them in the Plan.

[2]    The Committee has included a letter with this Disclosure Statement setting forth its concerns with the Plan.  As such, the Committee cannot, at this time, recommend that unsecured creditors vote in favor of, or against, the Plan.  The Committee will, however, file a further notice on the docket of these chapter 11 cases which can be found at https://dm.epiq11.com/case/yellowcorporation/dockets prior to the Voting Deadline established by the Bankruptcy Court providing its recommendation as to how unsecured creditors should vote on the Plan, which notice will also be served on all creditors entitled to vote on the Plan.

[3]    The Debtors understand that certain of the descriptions of events contained in this preliminary statement concerning the circumstances leading up to the commencement of the Chapter 11 Cases are disputed by the International Brotherhood of Teamsters (which also disputes certain descriptions of the same as set forth in the First Day Declaration).  Provision of this preliminary statement should not be construed as the assent of the International Brotherhood of Teamsters to such descriptions.

(premised upon a ruling in favor of the Debtors in the SFA MEPP Litigation),[4] and (c) a distribution of reorganized equity interests, if any, to Holders of Interests in Yellow Corporation. Based upon the ruling set forth in the Bankruptcy Court's *Memorandum Opinion* dated September 13, 2024 [Docket No. 4326], the Debtors believe that such proposal is not actionable, and this Plan represents the value maximizing path for the Chapter 11 Cases.

Prior to commencing these chapter 11 cases, Yellow, a 99-year old American company, was the largest unionized less-than-truckload ("LTL") carrier in the United States and the third largest LTL freight carrier and the fifth largest transportation company in North America. Yellow transported approximately 10% of the nation's LTL freight and, as of July 27, 2023, employed nearly 30,000 people, approximately two thirds of whom were members of the International Brotherhood of Teamsters (the "IBT" or the "Union"), who primarily comprised the Company's drivers and dock, maintenance, and clerical workers. Yellow operated service terminals in approximately 300 communities, with employees in all fifty states and nine Canadian provinces. In 2022, Yellow transported approximately 14.2 million shipments, for approximately 250,000 customers, including the U.S. Government, generating more than $5.2 billion in operating revenue. On an average workday, Yellow's approximately 30,000 employees handled approximately 50,000 freight shipments.

As of the Petition Date, Yellow's fleet was comprised of approximately 12,700 tractors, including approximately 11,700 owned tractors and approximately 1,000 leased tractors, and approximately 42,000 trailers, including approximately 34,800 owned trailers and 7,200 leased trailers. Yellow's network included 308 strategically located service facilities, including 169 owned facilities with approximately 10,000 doors and 140 leased facilities with approximately 9,100 doors, in addition to six warehouses managed by Yellow's logistics solution provider, Yellow Logistics.

When it was serving customers prior to the Petition Date, Yellow offered its customers a full range of services for the transportation of industrial, commercial, and retail goods in national, regional, and international markets, primarily through the operation of owned or leased equipment in its North American ground distribution network. Yellow provided its customers with both LTL services, which combine shipments from multiple customers on a single trailer, and truckload ("TL") services, whereby the quantity of freight shipped by customers fill the entire trailer. While Yellow offered both LTL and TL services, deliveries were predominately LTL shipments, with truckload services offered to maximize equipment utilization and reduce empty miles (the distance empty or partially full trailers travel to balance the network).

In addition to LTL and TL transportation services, Yellow also provided higher-margin specialized services, including guaranteed expedited services, time-specific deliveries, cross-border services, exhibit services, product returns, and government material shipments. Yellow was a transportation provider to, among other key customers, the United States federal government, as well as a provider of logistics solutions for customer-specific needs with custom projects, consolidation and distribution, reverse logistics, and residential white glove service offerings. A substantial majority of Yellow's services were provided within the United States.

---

[4]   The SFA MEPP Litigation refers to, collectively, the *Central States Pension Fund's Motion for Partial Summary Judgment* [Docket No. 3803] (the "Central States Summary Judgement Motion"), *Motion for Summary Judgment Filed by Certain Pension Funds* [Docket No. 3805] (the "Pension Funds Summary Judgment Motion"), *Debtors' Motion for Partial Summary Judgment on SFA MEPPS' Withdrawal Liability Claims* [Docket No. 3825] (the "Debtors' Summary Judgement Motion"), and the *Pension Benefit Guaranty Corporation's Motion for Partial Summary Judgment & Opposition to Summary Judgement for Debtors* [Docket No. 3882] (the "PBGC's Summary Judgement Motion").

On August 6, 2023 (the "Petition Date"), certain of the Debtors commenced the chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A comprehensive discussion of the events leading up to the commencement of the chapter 11 cases is included in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 14] (the "First Day Declaration") Filed on the Petition Date. Once the Debtors realized that filing for chapter 11 protection was inevitable, they immediately began engaging with their secured lenders regarding holistic restructuring transactions to be effectuated through a chapter 11 process, which would include a potential debtor-in-possession financing facility and a marketing and sale process for substantially all of the Debtors' assets.

The Debtors commenced these Chapter 11 Cases to execute value-maximizing section 363 sales to sell the Debtors' assets free and clear of all Claims and Interests, followed by a chapter 11 plan. The Debtors, prepetition secured lenders, and MFN (the then proposed junior DIP lender) engaged in a series of negotiations to pursue all value-maximizing avenues, funded through a significantly less expensive DIP Facility (relative to that certain originally proposed DIP Facility to be provided by certain investment funds and accounts managed by affiliates of Apollo Capital Management, L.P., Filed on the Petition Date at Docket No. 16) and use of Cash Collateral. These hard-fought negotiations proved fruitful and paved the way for the value maximizing processes discussed in greater detail in this Disclosure Statement.

As contemplated by the Final DIP Order (defined below), the Debtors Filed a motion seeking Bankruptcy Court approval of the Bidding Procedures for a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, with such Bidding Procedures specifically and deliberately designed to provide the Debtors with flexibility to auction less than all real estate assets, to pursue individual sales, and to modify the Bidding Procedures in manners that promote value. The Bankruptcy Court entered an order approving the Bidding Procedures on September 14, 2023 [Docket No. 575] (the "Bidding Procedures Order"), which, among other things, (i) established dates and deadlines for the Debtors' sale and marketing process for their Assets, including their Rolling Stock and Real Property Assets, (ii) provided the Debtors with built-in flexibility to modify the Bidding Procedures in manners that promote value, and (iii) authorized the Debtors to enter into stalking horse purchase agreements, against which higher or otherwise better offers could be sought, providing a clear path to consummate a transaction.

The stalking horse purchase agreements contemplated by the Bidding Procedures Order were a part of a market-tested sale process as they could set the floor for a competitive bidding process and ensure that the Debtors obtained the highest or otherwise best offer, or combination of offers, for some or all of their assets. Accordingly, the Debtors Filed the *Debtors' Motion for Entry of an Order (I) Approving the Debtors' Selection of a Real Estate Stalking Horse Bidder, (II) Approving Bid Protections in Connection Therewith, and (III) Granting Related Relief* [Docket No. 518], seeking approval of Estes Express Lines ("Estes") as the stalking horse bidder with an initial bid of $1.525 billion dollars for all of the Debtors' owned and leased real estate (the "Real Property Assets"). The Bankruptcy Court entered an order approving Estes as the stalking horse for the Debtors' Real Property Assets on September 21, 2023 [Docket No. 624].

As of the filing of this Disclosure Statement and the Plan, the Debtors have sold only a portion of their valuable real estate portfolio. As set forth in more detail in Articles VII.E and VII.G herein, these value-maximizing sale transactions generated sufficient proceeds to pay off in full all DIP Facility and prepetition secured funded debt claims. And, over $350 million in Cash remained on the Debtors' balance sheet and dozens of valuable owned and leased Real Property Assets remain available for further value-maximizing monetization efforts.

Since the entry of the Sale Orders, the Debtors, the Debtors' advisors, the purchasers (as applicable), and their respective professionals have, in each case, worked to consummate the applicable

contemplated transfer(s) of the Debtors' Assets, in one or more transactions, free and clear of all Liens, Claims, charges, and other encumbrances pursuant to the applicable Sale Orders (collectively, the "Sale Transactions"). The Debtors' efforts to market their remaining Real Property Assets remain ongoing, and the Debtors retained CBRE as broker and real estate advisor to assist in this process for purposes of further maximizing value. *See Order (I) Authorizing the Retention and Employment of CBRE, Inc. as Real Estate Broker and Advisor to the Debtors Effective as of August 16, 2024 and (II) Granting Related Relief* [Docket No. 4183], entered by the Bankruptcy Court on August 23, 2024.

While the Debtors initially intended to sell their tractors, trucks, trailers, tank trailers, and other trailers, or similar vehicles and trailers, railroad cars, locomotives, stacktrains and other rolling stock and accessors used on such railroad cars (the "Rolling Stock Assets") pursuant to the Bidding Procedures Order, the Debtors pivoted to realize an opportunity to partner with Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bros. Auctioneers (Canada) Ltd., and IronPlanet Canada Ltd. (collectively, the "Agent"), one of the world's preeminent industrial equipment auctioneers. This opportunity allowed the Debtors to minimize rent at the properties where the Rolling Stock Assets were held, while maximizing the value of the Rolling Stock Assets due to the Agent's extensive industry experience and its ability to efficiently transport the Rolling Stock Assets. The Agent's role is discussed in more detail in Article VII.G herein.

The Debtors intend to continue to monetize their remaining assets through and following the confirmation of a Plan. Subsequent to the confirmation of the Plan, subject to Bankruptcy Court approval, the Debtors propose to liquidate or otherwise enter into a value-maximizing transaction or series of transactions for their remaining assets under chapter 11 of the Bankruptcy Code. Under chapter 11, a debtor may reorganize or liquidate its business for the benefit of its stakeholders.

The principal objective of the Plan is to maximize value for all Holders of Allowed Claims and, to the extent applicable, Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates, and continue to explore any viable paths that would further maximize recoveries.

Generally, the Plan:

- provides the vesting of certain assets following the Effective Date in the Liquidation Trust for the purpose of distribution to Holders of Claims;

- designates a Liquidating Trustee to wind down the Debtors' affairs, pay, and reconcile Claims, and administer the Plan in an efficient manner; and

- contemplates recoveries to Holders of Administrative Claims and Other Priority Claims as is necessary to satisfy section 1129 of the Bankruptcy Code.

The Debtors believe that Confirmation of the Plan will expedite distributions on account of Allowed Claims as quickly and efficiently as is practicable while avoiding the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases as any currently actionable alternative to the transactions embodied in the Plan would be expected to materially reduce and delay recoveries to Holders of Claims and, if applicable, Interests. Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Epiq Corporate

Restructuring, LLC, the Debtors' claims and noticing agent (the "Claims and Noticing Agent"),[5] *__actually receives__* such ballots by January 21, 2025, 4:00 p.m. prevailing Eastern Time (the "Voting Deadline"). Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

### III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

#### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly-situated creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

#### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

#### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

---

[5]    The Bankruptcy Court approved the Debtors' retention of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent on August 9, 2023 [Docket No. 170].

| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
|---|---|---|---|
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4A | Employee PTO/Commission Full Pay GUC Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4B | Convenience Class Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Reject) / Not Entitled to Vote (Presumed to Accept) |
| 7 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Reject) / Not Entitled to Vote (Presumed to Accept) |
| 8 | Interests in Yellow Corporation | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.    What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Subject to Article VI of the Plan, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Interest** | **Treatment of Claim/Interest** | **Projected Amount of Claims (in $mm)** | **Projected Recovery** |
| 1 | Secured Tax Claims | Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, in exchange for such Secured Tax Claim, on the first Distribution Date after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of a Secured Tax Claim shall receive, at the option of the applicable Debtor or Liquidating Trust: (i) payment in full in Cash of such Holder's Allowed Secured Tax Claim, or (ii) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the applicable Debtor or Liquidating Trustee to prepay the entire amount of such Allowed Secured Tax Claim during such time period. | <$1.0 | 100% |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for such Allowed Other Secured Claim, on the first Distribution Date after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Liquidating Trust: (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; (ii) the collateral securing such Holder's Allowed Other Secured Claim; (iii) Reinstatement of such Holder's Allowed Other Secured Claim; or (iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | $0.0 — $405.0 | 100% |
| 3 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for such Allowed Other Priority Claim, on the first Distribution Date after the later to occur of | $130.0 — $275.0 | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Amount of Claims (in $mm) | Projected Recovery |
| | | (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Other Priority Claim, will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | | |
| 4A | Employee PTO/Commission Full Pay GUC Claims | Except to the extent that a Holder of an Allowed Employee PTO/Commission Full Pay GUC Claim agrees to less favorable treatment, in exchange for such Allowed Employee PTO/Commission Full Pay GUC Claim, in one or more distributions (in the Liquidating Trustee's reasonable discretion) after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Employee PTO/Commission Full Pay GUC Claim, will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $30.0 — $40.0 | 100% |
| 4B | Convenience Class Claims | Except to the extent that a Holder of an Allowed Convenience Class Claim by amount or election agrees to less favorable treatment, in exchange for such Allowed Convenience Class Claim, in one or more distributions (in the Liquidating Trustee's reasonable discretion) after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Convenience Class Claim, will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided*, that prior to the date of the distribution(s), the Debtors shall give the Holders of Allowed Convenience Class Claims ten (10) days' notice prior to such distribution(s); *provided further*, that to the extent that a Holder of an Allowed Convenience Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtor arising from or relating to the same obligations or liability as such Allowed Convenience Class Claim, such Holder shall only be entitled to a distribution on one Convenience Class | $12.0 — $25.0 | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Amount of Claims (in $mm) | Projected Recovery |
| | | Claim against the Debtors in full and final satisfaction of all such Claims. For the avoidance of doubt, Employee PTO/Commission Class 5 GUC Claims shall not be Convenience Class Claims. | | |
| 5 | General Unsecured Claims | Except to the extent that a Holder of a General Unsecured Claim agrees to less favorable treatment, in exchange for such General Unsecured Claim, each Holder of an | $2,300.0 — $4,700.0[6] | See table below |

---

[6]    The Debtors previously argued that the Withdrawal Liability Claims may be substantially reduced or subordinated, by as much as 50%, under 29 U.S.C. § 1405(b), given that unsecured creditors will not recover in full. *See Debtors' Second Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [Docket No. 1962], *fn.* 65; *Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [Docket No. 2595], *fn.* 24. As set forth in more detail in *Central States Pension Fund's Objection to Debtors' First Amended Disclosure Statement* [Docket No. 4777] and the *Multiemployer Pension Plans' Joinder of Central States Pension Fund's Objection to Debtors' First Amended Disclosure Statement* [Docket No. 4865], certain MEPPS dispute the possibility of reduction or subordination of any Withdrawal Liability Claims. This argument remains unresolved, and it is unclear which parties' argument will be successful or the amount by which the Withdrawal Liability Claims would be reduced or subordinated, if at all. The projection listed here assumes no reduction or subordination of Withdrawal Liability Claims.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Amount of Claims (in $mm) | Projected Recovery |
| | | Allowed General Unsecured Claim shall receive (i) its Pro Rata share of the GUC Liquidating Trust Interests and as a Beneficiary shall receive, on the applicable Distribution Date, its Pro Rata share of Distributable Proceeds derived from the Liquidating Trust Assets available for distribution on each such Distribution Date as provided under the Plan and Liquidating Trust Agreement, *plus* (ii) if and only to the extent Distributable Proceeds are available after all Allowed General Unsecured Claims are paid in full, in Cash, Postpetition Interest from the Petition Date through and including the date of satisfaction of such Allowed General Unsecured Claim in full, in Cash; *provided*, Allowed Withdrawal Liability Claims may be reduced and/or subordinated to all other General Unsecured Claims in an amount as determined by an order of the Bankruptcy Court or as otherwise agreed to by the Debtors and the applicable claimant, subject to the consent of the Committee, such consent not to be unreasonably withheld. For the avoidance of doubt, the Holders of Allowed General Unsecured Claims shall receive the Postpetition Interest set forth in Article III.B.6 of the Plan on a *pari pasu* basis with Allowed Subordinated Withdrawal Liability Claims, if any. | $1,300.0— $2,700.0[7] | See table below |
| 6 | Intercompany Claims | Allowed Intercompany Claims, to the extent not assumed pursuant to the terms of the Sale Transaction Documents, shall, at the election of the applicable Debtor and with the consent of the Committee, be (a) Reinstated, (b) converted to equity, (c) otherwise set off, settled, distributed, contributed, cancelled, or released, or (d) otherwise addressed at the option of the Liquidating Trustee without any distribution; *provided,* such election shall not adversely affect the treatment provided to Classes 4A, 4B, and 5 | N/A | N/A |
| 7 | Intercompany Interests | Allowed Intercompany Interests shall, at the election of the applicable Debtor and with the consent of the Committee, be (a) Reinstated or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, or (c) otherwise | N/A | N/A |

---

[7]    This projection assumes that Withdrawal Liability Claims are reduced or subordinated by as much as 50%, *supra* note 5.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Amount of Claims (in $mm) | Projected Recovery |
| | | addressed at the option of the Liquidating Trustee without any distribution; *provided, however,* such election shall not adversely affect the treatment provided to Classes 4A, 4B, and 5. | | |
| 8 | Interests in Yellow Corporation | If and only to the extent Distributable Proceeds are available after all Allowed General Unsecured Claims are paid in full, including Postpetition Interest, except to the extent that a Holder of an Interest in Yellow Corporation agrees to less favorable treatment, in exchange for such Interest in Yellow Corporation, each Holder of an Interest in Yellow Corporation shall receive its Pro Rata share of the Equity Liquidating Trust Interests and as a Beneficiary shall receive, on the applicable Distribution Date, their Pro Rata share of Distributable Proceeds derived from the Liquidating Trust Assets available for distribution on each such Distribution Date as provided under the Plan and Liquidating Trust Agreement. | N/A | N/A |
| 9 | Section 510(b) Claims[8] | Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | N/A | N/A |

| CLASS 5 GENERAL UNSECURED CLAIMS PROJECTED RECOVERY | | |
|---|---|---|
| Debtor | No Reduction or Subordination of Withdrawal Liability Claims[9] | 50% Reduction/Subordination of Withdrawal Liability Claims[10] |
| 1105481 Ontario Inc. | 0.0% - 0.0% | 0.0% - 0.0% |
| Express Lane Service, Inc. | 0.0% - 0.0% | 0.0% - 0.0% |
| New Penn Motor Express LLC | 0.4% - 1.3% | 0.7% - 2.3% |
| Roadway Express International, Inc. | 0.0% - 0.0% | 0.0% - 0.0% |
| Roadway LLC | 0.8% - 5.6% | 2.5% - 15.6% |

---

[8]   Although the Debtors are unaware of any Section 510(b) Claims, this class is included out of an abundance of caution.

[9]   *See* note 5.

[10]   This estimated recovery range assumes that Withdrawal Liability Claims are reduced or subordinated by as much as 50%, *supra* note 5.

| CLASS 5 GENERAL UNSECURED CLAIMS PROJECTED RECOVERY | | |
|---|---|---|
| **Debtor** | **No Reduction or Subordination of Withdrawal Liability Claims[9]** | **50% Reduction/Subordination of Withdrawal Liability Claims[10]** |
| Roadway Next Day Corporation | 0.0% - 0.0% | 0.0% - 0.0% |
| USF Bestway Inc. | 0.0% - 0.0% | 0.0% - 0.0% |
| USF Dugan Inc. | 0.0% - 0.0% | 0.0% - 0.0% |
| USF Holland International Sales Corporation | 0.0% - 0.0% | 0.0% - 0.0% |
| USF Holland LLC | 0.0% - 2.1% | 0.0% - 4.2% |
| USF Reddaway Inc. | 0.6% - 2.7% | 1.1% - 5.1% |
| USF Redstar LLC | 0.0% - 0.0% | 0.0% - 0.0% |
| Yellow Corporation | 0.0% - 0.0% | 0.0% - 0.0% |
| Yellow Freight Corporation | 0.0% - 0.0% | 0.0% - 0.0% |
| Yellow Logistics, Inc. | 0.0% - 0.1% | 0.1% - 0.2% |
| YRC Association Solutions, Inc. | 0.0% - 0.0% | 0.0% - 0.0% |
| YRC Enterprise Services, Inc. | 0.0% - 0.0% | 0.0% - 0.0% |
| YRC Freight Canada Company | 0.1% - 0.5% | 0.2% - 0.9% |
| YRC Inc. | 6.3% - 24.2% | 10.7% - 38.3% |
| YRC International Investments, Inc. | 0.0% - 0.0% | 0.0% - 0.0% |
| YRC Logistics Inc. | 0.0% - 0.0% | 0.0% - 0.0% |
| YRC Logistics Services, Inc. | 0.0% - 0.0% | 0.0% - 0.0% |
| YRC Mortgages, LLC | 0.0% - 0.0% | 0.0% - 0.0% |
| YRC Regional Transportation, Inc. | 0.1% - 0.1% | 0.1% - 0.2% |

**E.     What does it mean if I have a Convenience Class Claim?**

If you have a Convenience Class Claim, that means (a) the total amount of your Allowed General Unsecured Claim is less than $7,500 and is not (i) an Administrative Claim, (ii) a Priority Claim, (iii) a Secured Tax Claim, or (iv) an Employee PTO/Commission Class 5 GUC Claim; or (b) you elected on your Ballot to treat your Allowed General Unsecured Claim as a Convenience Class Claim, including, if applicable, reducing your Allowed General Unsecured Claim to $7,500; *provided*, *however*, that no Claims asserted by a current or former employee may be a Convenience Class Claim.  You will receive the treatment provided to Holders of Class 4B Convenience Class Claims.  Holders of Convenience Class Claims are entitled to Cash payment of their Allowed Convenience Class Claims (the "Convenience Class Claim Recovery").  The Convenience Class Claim Recovery may be fulfilled in one or more Distributions.

If you have a Class 5 General Unsecured Claim above $7,500 you may irrevocably elect on your Ballot to have your Class 5 General Unsecured Claim reduced to $7,500 and treated as a Class 4B Convenience Class Claim (the "Convenience Claim Election").  To be clear, if you make the Convenience Claim Election, such Claim will be reduced to $7,500 (as applicable), considered a Convenience Class Claim, and you *may not* revoke your Convenience Claim Election.

The Convenience Class Claim Recovery is a Cash payment that may be made over one or more Distributions.  Holders of Allowed Convenience Class Claims and Holders of Allowed General Unsecured Claims above $7,500 making the Convenience Claim Election will not be entitled to additional payment other than the Convenience Class Claim Recovery.

F.    **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  In the alternative, the Chapter 11 Cases may be dismissed. Conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and such trustee's additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Class.  *See, e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2).  The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.  *See* Fed. R. Bankr. P. 1019(2), 3002(c).  Either alternative will bring additional risks and uncertainties.

G.    **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases approving the Plan.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter or otherwise as specified in the Plan and/or Liquidating Trust Agreement, as applicable.  *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan. "Consummation" means the occurrence of the Effective Date.

H.    **What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors shall fund the distributions and obligations under the Plan with Cash on hand held by the Debtors on and after the Effective Date, net Cash proceeds generated by the sale, lease, liquidation, or other disposition of Estate property, including pursuant to Third-Party Sale Transactions, and Cash generated by the use, sale, lease, liquidation or other disposition of any property belonging to the Liquidation Trust.

I.    **Is there potential litigation related to the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.  Additionally, as described in Article VII.H of this Disclosure Statement, there is currently pending litigation related to various classes of Claims.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes, so long as Class 5 votes to accept the Plan.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**J.     Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?**

The Debtors' estimate of aggregate Allowed General Unsecured Claims ranges from approximately $2.3 billion to $4.7 billion[11] or $1.3 billion to $2.7 billion.[12]

Although the Debtors' estimate of Allowed General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information, the projected amount of General Unsecured Claims set forth herein is subject to material change (either higher or lower), which difference could materially affect Class 5 recoveries.  The Debtors have already Filed twenty omnibus objections to Claims, which have sought to right-size the claims pool by approximately $4 billion.  The Debtors will continue to object to certain Proofs of Claim, and any such objections could cause the total amount of Allowed General Unsecured Claims to change further.  These changes could affect recoveries to Holders of General Unsecured Claims and such changes could be material.

As of the Petition Date, certain Debtors were parties to litigation initiated by, among others, Holders of personal injury and property damage Claims.  The Debtors could also become parties to additional litigation in the future.  The Debtors are currently engaged in an ongoing ADR process that they had previously negotiated at length with their insurance carrier and various claimants with respect to certain bodily injury and property damage claims.  As a result of this work, as of August 28, 2024, approximately 674 claims have been settled.  Further, the Debtors plan to continue to work through the claims reconciliation process, and they may dispute asserted Claims asserted by litigation counterparties.  However, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of General Unsecured Claims could change, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.

**K.     Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes.  The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' chapter 11 efforts and were an essential element of the negotiations among the Debtors, the Exculpated Parties, and the Released Parties in obtaining their support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through efforts to negotiate and implement the Plan, which will maximize the value of the Debtors' estates for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.  Importantly, each of the Releasing Parties will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors and the Released Parties.

The Releasing Parties are [each of, and in each case in its capacity as such: (a) the Debtors; (b) the Liquidating Trustee, (c) all Holders of Claims who vote to accept the Plan and who affirmatively opt in to the releases provided by the Plan; (d) all Holders of Claims who vote to reject the Plan and who

---

11    *See* note 9.

12    *See* note 11.

affirmatively opt in to the releases provided by the Plan; (e) all Holders of Claims who are deemed to reject the Plan and who affirmatively opt in to the releases provided by the Plan; (f) all Holders of Claims who are presumed to accept the Plan and who affirmatively opt in to the releases provided by the Plan; (g) all Holders of Interests who affirmatively opt in to the releases provided by the Plan; (h) the Committee and its members (including any *ex officio* member(s)); (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j) for which such Entity is legally entitled to bind such Affiliate to the releases contained in the Plan under applicable non-bankruptcy law; and (j) each Related Party of each Entity in clause (a) through clause (i) for which such Affiliate or Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law; *provided* that each such Entity that elects not to opt into the releases contained in the Plan, such that it is not a Releasing Party in its capacity as a Holder of a Claim or Interest shall nevertheless be a Releasing Party in each other capacity applicable to such Entity.][13]

The Released Parties are [each of, and in each case in its capacity as such: (a) the Debtors; (b) the Liquidating Trustee, (c) all Holders of Claims; (d) all Holders of Interests; (e) the Committee and its members (including any *ex-officio* member(s)); (f) each Releasing Party; (g) the Information Officer; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through clause (h); *provided* that with respect to any Entity in clause (c) or (d), such Entity shall not be a Released Party if it elects not to opt into the releases described in Article IX of the Plan.][14]

The Exculpated Parties means, collectively, and in each case solely in its capacity as such: (a) each of the Debtors and their current and former directors, managers, officers that served in such capacity between the Petition Date and Effective Date; (b) the Committee and each of its respective members (including any *ex-officio* member(s)); (c) the Liquidating Trustee; and (d) with respect to the Entities in clause (a) through (c), each of their respective current and former attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and the Effective Date.

The Debtors believe that the releases and exculpations in the Plan are consensual, necessary and appropriate, and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.G of this Disclosure Statement, entitled "Third-Party Sale Transactions and Liquidation Transactions

The Confirmation Order shall constitute full and complete authority for the Debtors, the Purchasers, and the Liquidating Trustee to take all actions that may be necessary, useful, or appropriate to consummate the Plan, the Third-Party Sale Transaction(s), and the Liquidation Transactions without any further judicial or corporate authority, subject to the terms of the Plan and the Third-Party Sale Procedures, as applicable. The Third-Party Sale Transactions shall be free and clear of any Liens, Claims, Interests, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code as of the earlier of (i) the Sale Closing Date and (ii) the Effective Date.

---

[13]   Pending the Committee's investigation of certain potential Causes of Action that may be asserted against one or more of the Debtors' current and/or former D&O's.

[14]   Pending the Committee's investigation of certain potential Causes of Action that may be asserted against one or more of the Debtors' current and/or former D&O's.

Further, on the Effective Date, or as soon as reasonably practicable thereafter, the Liquidating Trustee shall take all actions as may be necessary or appropriate to effectuate the Liquidation Transactions, including the actions enumerated in Article IV.B of the Plan.

**L.      The Liquidating Trust**

On the Effective Date, pursuant to the Liquidating Trust Agreement and Article VIII of the Plan, the Debtors, on their own behalf and on behalf of the Beneficiaries, and the Liquidating Trustee shall execute the Liquidating Trust Agreement and take all other steps necessary to establish the Liquidating Trust.  Further, on the Effective Date, the Liquidating Trust Board of Managers will be appointed in accordance with the terms of the Plan and to the Liquidating Trust Agreement.  The rights, responsibilities, and duties of the Liquidating Board of Managers are set forth in the Liquidating Trust Agreement.

The Liquidating Trust will be established on behalf of the Beneficiaries pursuant to the Liquidating Trust Agreement, with the Beneficiaries to be treated as the grantors and deemed owners of the Liquidating Trust Assets.  The relevant parties will take the necessary actions to cause title of the Liquidating Trust Assets to be transferred to the Liquidating Trust on the Effective Date pursuant to Article VIII.C of the Plan.

The primary purpose of the Liquidating Trust is to maximize the value its assets and make distributions in accordance with the Plan, the Confirmation Order, and the Liquidating Trust Agreement. Except to the extent reasonably necessary to, and consistent with, its liquidating purpose, the Liquidating Trust will have no objective to continue or engage in the conduct of a trade or business.

As set forth in Article VIII.F of the Plan, the Liquidating Trust shall be terminated when certain conditions are met, but in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date, unless the Bankruptcy Court determines upon the motion of the Liquidating Trustee that a fixed period extension is necessary to facilitate or complete the liquidation, recovery, and distribution of the Liquidating Assets.

**M.      The Liquidating Trustee**

The powers, authority, responsibilities, and duties of the Liquidating Trust and the Liquidating Trustee are set forth and will be governed by the Liquidating Trust Agreement, the Plan, and the Confirmation Order.

The Liquidating Trustee shall be discharged pursuant to Article VIII.F of the Plan, and the duties, responsibilities, and powers of the Liquidating Trustee will terminate in accordance with the terms of the Liquidating Trust Agreement.

**N.      Dissolution of the Debtors**

On or as soon as reasonably practicable after the Effective Date and after the transfer of all Liquidating Assets to the Liquidating Trust, pursuant to Article VIII.C of the Plan, the Debtors shall be disposed of, dissolved, wound down, or liquidated under applicable law without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**O.      Causes of Action**

Retained Causes of Action shall initially remain with the Debtors and shall immediately vest with the Liquidating Trust as of the Effective Date; *provided* that the Debtors shall have sole discretion as to whether or not (i) the claims held by the Debtors arising from severance payments paid to certain former

Yellow employees and (ii) the pending litigations and actions regarding the multiemployer pension plan matters and WARN Act matters shall be treated as Liquidation Trust Assets.

Releases."

**P.      What is the deadline to vote on the Plan?**

The Voting Deadline is January 21, 2025, at 4:00 p.m. (prevailing Eastern Time).

**Q.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' Claims and Noticing Agent **on or before the Voting Deadline, which is January 21, 2025, at 4:00 p.m. prevailing Eastern Time**.  *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**R.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**S.      When is the Confirmation Hearing set to occur?**

The Confirmation Hearing is scheduled for **February 4, 2025 at 2:00 p.m. (prevailing Eastern Time)**, or such other time as may be scheduled by the Bankruptcy Court.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be Filed and served on the Debtors, and certain other parties, by no later than **January 21, 2025 at 4:00 p.m. (prevailing Eastern Time)** in accordance with the notice of the Confirmation Hearing.

**T.      What is the purpose of the Confirmation Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

**U.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article X of the Plan have been satisfied or waived.  On or after the Effective Date, and unless otherwise provided in the Plan, the Liquidating Trustee shall take all actions as may be necessary or appropriate to effectuate the Liquidation Transactions in

accordance with the terms of the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**V.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Yellow Corporation, et al., c/o Epiq Ballot Processing, 10300 SW Allen Boulevard, Beaverton, OR 97005
>
> *By electronic mail at:*
> YellowCorporationInfo@epiqglobal.com
>
> *By telephone (toll free) at:*
> (866) 641-1076 (Domestic) or +1 (503) 461-4134 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the Claims and Noticing Agent at https://dm.epiq11.com/YellowCorporation (free of charge) or the Bankruptcy Court's website at http://www.deb.uscourts.gov/bankruptcy (for a fee).

**W.     Could subsequent events potentially affect recoveries under the Plan?**

Potentially, yes.  Recoveries under the Plan are only guaranteed after the Plan is Confirmed and the Effective Date has occurred.  Any number of subsequent events may interfere with Plan recoveries, including the amount of proceeds generated from the liquidation of Estate assets subsequent to Confirmation and the pursuit of Estate Causes of Action, as well as the litigation outcomes with respect to Claims post-Confirmation.

**X.     Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors, and potentially equity holders, than would otherwise result from any other available alternative. The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**IV.    OVERVIEW OF THE PLAN**

As discussed herein, the Plan contemplates liquidating the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code.  The Plan contemplates the following key terms, among others described herein and therein:

**A.     General Settlement of Claims and Interests**

As discussed in detail herein and as otherwise provided in the Plan, to the extent provided by the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled,

compromised, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and Causes of Action, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to **Error! Reference source not found.** of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

The recoveries to Holders of Claims and Interests are described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### B.      Third-Party Sale Transactions and Liquidation Transactions

The Confirmation Order shall constitute full and complete authority for the Debtors, the Purchasers, and the Liquidating Trustee to take all actions that may be necessary, useful, or appropriate to consummate the Plan, the Third-Party Sale Transaction(s), and the Liquidation Transactions without any further judicial or corporate authority, subject to the terms of the Plan and the Third-Party Sale Procedures, as applicable. The Third-Party Sale Transactions shall be free and clear of any Liens, Claims, Interests, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code as of the earlier of (i) the Sale Closing Date and (ii) the Effective Date.

Further, on the Effective Date, or as soon as reasonably practicable thereafter, the Liquidating Trustee shall take all actions as may be necessary or appropriate to effectuate the Liquidation Transactions, including the actions enumerated in Article IV.B of the Plan.

### C.      The Liquidating Trust

On the Effective Date, pursuant to the Liquidating Trust Agreement and Article VIII of the Plan, the Debtors, on their own behalf and on behalf of the Beneficiaries, and the Liquidating Trustee shall execute the Liquidating Trust Agreement and take all other steps necessary to establish the Liquidating Trust.  Further, on the Effective Date, the Liquidating Trust Board of Managers will be appointed in accordance with the terms of the Plan and to the Liquidating Trust Agreement.  The rights, responsibilities, and duties of the Liquidating Board of Managers are set forth in the Liquidating Trust Agreement.

The Liquidating Trust will be established on behalf of the Beneficiaries pursuant to the Liquidating Trust Agreement, with the Beneficiaries to be treated as the grantors and deemed owners of the Liquidating Trust Assets.  The relevant parties will take the necessary actions to cause title of the Liquidating Trust Assets to be transferred to the Liquidating Trust on the Effective Date pursuant to Article VIII.C of the Plan.

The primary purpose of the Liquidating Trust is to maximize the value its assets and make distributions in accordance with the Plan, the Confirmation Order, and the Liquidating Trust Agreement. Except to the extent reasonably necessary to, and consistent with, its liquidating purpose, the Liquidating Trust will have no objective to continue or engage in the conduct of a trade or business.

As set forth in Article VIII.F of the Plan, the Liquidating Trust shall be terminated when certain conditions are met, but in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date, unless the Bankruptcy Court determines upon the motion of the Liquidating Trustee that a fixed period extension is necessary to facilitate or complete the liquidation, recovery, and distribution of the Liquidating Assets.

### D.     The Liquidating Trustee

The powers, authority, responsibilities, and duties of the Liquidating Trust and the Liquidating Trustee are set forth and will be governed by the Liquidating Trust Agreement, the Plan, and the Confirmation Order.

The Liquidating Trustee shall be discharged pursuant to Article VIII.F of the Plan, and the duties, responsibilities, and powers of the Liquidating Trustee will terminate in accordance with the terms of the Liquidating Trust Agreement.

### E.     Dissolution of the Debtors

On or as soon as reasonably practicable after the Effective Date and after the transfer of all Liquidating Assets to the Liquidating Trust, pursuant to Article VIII.C of the Plan, the Debtors shall be disposed of, dissolved, wound down, or liquidated under applicable law without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### F.     Causes of Action

Retained Causes of Action shall initially remain with the Debtors and shall immediately vest with the Liquidating Trust as of the Effective Date; *provided* that the Debtors shall have sole discretion as to whether or not (i) the claims held by the Debtors arising from severance payments paid to certain former Yellow employees and (ii) the pending litigations and actions regarding the multiemployer pension plan matters and WARN Act matters shall be treated as Liquidation Trust Assets.

### G.     Releases

The Plan contains certain releases, as described in Article K of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"  The release, exculpation, and injunction provisions that are contained in the Plan are copied below.

#### 1.     Release of Liens

**Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan and, in the case of a Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Error! Reference source not found. of the Plan, on the Effective Date (or the Sale Closing Date with respect to assets that are transferred by a Debtor under a Third-Party Sale Transaction), all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Liquidating Trustee to evidence the release of such Lien and/or security interest, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

If any Holder of a Secured Claim that has been satisfied or settled in full pursuant to the Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Liquidating Trustee that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Liquidating Trustee shall be entitled to make any such filings or recordings on such Holder's behalf.

2.    Releases by the Debtors[15]

[Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order and effective as of the Effective Date, to the fullest extent permitted by applicable law, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors, the Liquidating Trust, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Liquidating Trust, or their Estates, that any such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor, the Liquidating Trust, or other Entity, or that any Holder of any Claim against or Interest in a Debtor, the Liquidating Trust, or other Entity could have asserted on behalf of the Debtors or the Liquidating Trust, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Liquidating Trust (including the Debtors' and the Liquidating Trust's capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Liquidating Trust and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Liquidating Trust, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors or the Liquidating Trust), intercompany transactions between or among a Debtor, a post-Effective Date Debtor, or an affiliate of a Debtor and another Debtor, or the Liquidating Trust, the Chapter 11 Cases, the Canadian Recognition Proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, the Financing Documents and any other Definitive Document or any Restructuring Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, any other Definitive Documents, the Chapter 11 Cases, the Canadian Recognition Proceedings, the filing of the Chapter 11 Cases, the commencement of the Canadian Recognition Proceedings, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a

---

[15]    Pending the Committee's investigation of certain potential Causes of Action that may be asserted against one or more of the Debtors' current and/or former D&Os.

Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (2) any matters retained by the Debtors and the Liquidating Trust pursuant to the Schedule of Retained Causes of Action.]

3. Releases by the Releasing Parties[16]

[Except as otherwise expressly set forth in the Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each Releasing Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Liquidating Trust, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors or the Liquidating Trust (including the Debtors' and the Liquidating Trust's capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Liquidating Trust and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Liquidating Trust, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted by the Debtors or the Liquidating Trust), intercompany transactions, the Chapter 11 Cases, the Canadian Recognition Proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, the Financing Documents, and any other Definitive Document or any Liquidation Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, any other Definitive Document, the Chapter 11 Cases, the Canadian Recognition Proceedings, the filing of the Chapter 11 Cases, the commencement of the Canadian Recognition Proceedings, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan,

---

[16] Pending the Committee's investigation of certain potential Causes of Action that may be asserted against one or more of the Debtors' current and/or former D&O's.

or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (2) the rights of any Holder of Allowed Claims or Interests, if applicable, to receive distributions under the Plan.]

4.    **Exculpation**

Except as otherwise specifically provided in the Plan or the Confirmation Order, and to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur any liability for, and each Exculpated Party shall be exculpated from any Cause of Action for any claim related to any act or omission occurring between the Petition Date and the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases or the Canadian Recognition Proceedings prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Third-Party Sale Transactions, the Plan, the Plan Supplement, any other Definitive Document, or any Liquidation Transaction, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, any other Definitive Document, the filing of the Chapter 11 Cases, the commencement of the Canadian Recognition Proceedings, the pursuit of Confirmation, the pursuit of the Third-Party Sale Transactions, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or actual fraud.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

5.    **Injunction**

In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims, Interests, or Causes of Action in the Debtors and the Liquidating Trust, shall be precluded and permanently enjoined on and after the Effective Date, from taking any of the following actions against the Debtors, the Liquidating Trust (but solely to the extent such action is brought against the Debtors or the Liquidating Trust to directly or indirectly recover upon any property of the Estates upon the Effective Date), the Exculpated Parties, the Released Parties, and any successors, assigns or representatives of such Persons or Entities, solely with respect to any Claims, Interests or Causes of Action that will be or are treated by the Plan: (a) commencing or continuing in any manner any Claim, action, or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order; (c) creating, perfecting or enforcing any encumbrance of any kind; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.  All Persons or Entities who directly or indirectly have held, hold, may hold, or seek to assert Claims or Causes of Action that (x) have been released in the Plan

(the "Released Claims") or (y) that are subject to exculpation (the "Exculpated Claims"), shall be enjoined from (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (iii) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (iv) asserting any right of subrogation on account of or in connection with or with respect to the Released Claims and Exculpated Claims, except to the extent that a permissible right of subrogation is asserted with respect to a timely Filed Proof of Claim; or (v) or commencing or continuing in any manner any action or other proceeding on account of or in connection with or with respect to the Released Claims and Exculpated Claims; *provided*, however, that the foregoing injunction shall have no effect on the liability of any person or Entity that results from any act or omission based on or arising out of gross negligence, fraud or willful misconduct.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors and any property dealt with by the Plan until the closing of these Chapter 11 Cases.  Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any obligations arising on or after the Effective Date of any Person or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Error! Reference source not found. of the Plan.

## V.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.     Yellow's Corporate History and Business Operations

As a storied American icon for approximately 100 years, Yellow was a leading trucking and logistics company, boasting one of the largest LTL networks in North America that enabled Yellow to provide customers with regional, national, and international shipping services of transportation logistics and LTL services.  Entering 2023, Yellow was the largest unionized LTL carrier in the United States, in addition to being the third largest LTL freight carrier and the fifth largest transportation company in North America.

Yellow transported approximately 10% of the nation's LTL freight.  As of July 27, 2023, Yellow employed nearly 30,000 people, approximately two thirds of whom were members of the IBT, who primarily comprised the Company's drivers and dock, maintenance, and clerical workers.  Yellow operated service terminals in 300 communities, with employees in all fifty states.  In 2022, Yellow transported approximately 14.2 million shipments, for approximately 250,000 customers, including the U.S. Government, generating more than $5.2 billion in operating revenue.  On an average workday, Yellow's approximately 30,000 employees handled approximately 40,000 freight shipments.

As of the Petition Date, Yellow's fleet was comprised of approximately 12,700 tractors, including approximately 11,700 owned tractors and approximately 1,000 leased tractors, and approximately 42,000

trailers, including approximately 34,800 owned trailers and 7,200 leased trailers. Yellow's network included 308 strategically located service facilities, including 169 owned facilities with approximately 10,000 doors and 140 leased facilities with approximately 9,100 doors, in addition to six warehouses managed by Yellow's logistics solution provider, Yellow Logistics.

With its family of trucking brands, including Holland, New Penn, YRC Freight, Reddaway, and Yellow Logistics, Yellow provided transportation services for various categories of goods, which included (among others) apparel, appliances, automotive parts, chemicals, food, furniture, glass, machinery, metal, metal products, non-bulk petroleum products, rubber, textiles, wood, and other manufactured products or components. Each of Yellow's trucking brands provided different transportation and logistics services to its customers, as summarized in the following chart:

| Brand | Description |
|-------|-------------|
|  | Offered the most next-day service lanes in its territory and consistently recorded one of the lowest claim ratios in the industry. |
|  | Provided next-day regional LTL shipping services through the northeastern United States, Canada and Puerto Rico. |
|  | Transported industrial, commercial and retail goods, specializing in shipping solutions with an expansive network across North America. |
|  | Offered next-day and two-day service, with a footprint that encompassed all of the Western United States, including Alaska and Hawaii. |
|  | Coast-to-coast 3PL brokerage combined trucks, technology and talented people to create customized logistics solutions. |

Debtor Yellow Corporation has 23 wholly-owned direct and indirect subsidiaries that are Debtors in these Chapter 11 Cases.

**B.      The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors had approximately $1.2 billion in total funded debt obligations. The table below summarizes the Debtors' prepetition capital structure:

| ($ in millions) | Maturity | Outstanding Principal |
|---|---|---|
| UST Tranche A | September 30, 2024 | $337,042,758 |
| UST Tranche B | September 30, 2024 | $399,999,770 |
| B-2 Term Loan Facility | June 30, 2024 | $485,372,693 |
| ABL Facility | January 9, 2026 | $858,520 |
| **Total Funded Debt** | | $1,223,273,741 |

## 1. The UST Credit Agreements

Beginning in the last two weeks of March 2020, the transportation industry and the economy at large experienced an unexpected and significant decline in economic activity due to the impact of the 2019 coronavirus disease ("COVID-19") and the resulting business shutdown and shelter-in-place orders made across North America by various governmental entities and private enterprises. As a result, Yellow pursued a loan with the UST pursuant to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").

Accordingly, on July 7, 2020, Yellow and certain of its subsidiaries, as guarantors (the "Term Guarantors"), entered into the UST Tranche A Term Loan Credit Agreement (as amended, restated, amended and restated, modified or otherwise supplemented from time to time, the "Tranche A UST Credit Agreement") with The Bank of New York Mellon, as administrative agent and collateral agent and the UST Tranche B Term Loan Credit Agreement (as amended, restated, amended and restated, modified or otherwise supplemented from time to time, the "Tranche B UST Credit Agreement" and, together with the Tranche A UST Credit Agreement, the "UST Credit Agreements") with The Bank of New York Mellon, as administrative agent and collateral agent, pursuant to which the United States Treasury ("UST") committed an aggregate principal amount of $700.0 million to the Company pursuant to the CARES Act. The obligations of the Company under the UST Credit Agreements were guaranteed by the Term Guarantors.

The UST Credit Agreements had maturity dates of September 30, 2024, with a single payment at maturity of the outstanding balance. The Tranche A UST Credit Agreement consisted of a $300.0 million term loan and bore interest at a rate of the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 3.5% per annum, consisting of 1.50% in cash and the remainder paid-in-kind. Proceeds from the Tranche A UST Credit Agreement were used to meet Yellow's contractual obligations, maintain working capital and finance technology and infrastructure development. The Tranche B UST Credit Agreement consisted of a $400.0 million term loan and bore interest at a rate of the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 3.5% per annum, paid in cash. Proceeds from the Tranche B UST Credit Agreement were used predominantly for the acquisition of tractors and trailers.

Obligations under the UST Credit Agreements were secured by a perfected first-priority security interest in the escrow or controlled account supporting the respective UST Credit Facility, certain tractors and trailers (solely in the case of the Tranche B UST Credit Agreement) and a perfected junior priority security interest (subject in each case to permitted liens) in substantially all other assets of the Company and the Term Guarantors, subject to certain exceptions.

On July 7, 2023, the Company and certain of its subsidiaries entered into a waiver agreement (the "UST Credit Agreement Waiver") under the UST Credit Agreements. The UST Credit Agreement Waiver provided for a waiver of the minimum Consolidated EBITDA financial covenant of $200.0 million LTM set forth in the UST Credit Agreements for the covenant testing period that ended on June 30, 2023. LTM Consolidated EBITDA for fourth quarter 2022 was $343.1 million.

As of the Petition Date, approximately $337 million in borrowings remained outstanding under the Tranche A UST Credit Agreement, and approximately $400 million in borrowings remained outstanding under the Tranche B UST Credit Agreement.  As of February 5, 2024, the Debtors paid off all commitments and all obligations of the UST Credit Agreement [Docket No. 2119].

### 2. B-2 Term Loan

On September 11, 2019, Yellow and certain of its subsidiaries, as guarantors (the "B-2 Term Guarantors"), amended and restated the existing credit facilities under the credit agreement dated February 13, 2014 (the "Prior Term Loan Agreement") and entered into a $600.0 million term loan agreement (the "B-2 Term Loan") with funds managed by Apollo Global Management, LLC acting collectively as lead lender ("Apollo"), and Alter Domus, as administrative agent and collateral agent.  The obligations of the Company under the governing agreement (the "B-2 Term Loan Agreement") were guaranteed by the B-2 Term Guarantors.

The B-2 Term Loan had a maturity date of June 30, 2024, with a single payment due at maturity of the outstanding balance.  The B-2 Term Loan initially bore interest at the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 7.5% per annum, payable at least quarterly in cash, subject to a 1.0% margin step down in the event the Company achieves greater than $400.0 million in trailing-twelve-month Adjusted EBITDA.  Obligations under the B-2 Term Loan were secured by a perfected first-priority security interest in (subject to permitted liens) assets of the Company and the B-2 Term Guarantors, including but not limited to all of the Company's wholly owned terminals, tractors, and trailers other than the tractors and trailers funded by the UST Tranche B loan, subject to certain limited exceptions.

On April 7, 2020, the Company and certain of its subsidiaries entered into Amendment No. 1 (the "First Term Loan Amendment") to the B-2 Term Loan as a result of expected future covenant and liquidity tightening due to unprecedented economic deterioration.  The First Term Loan Amendment principally provided additional liquidity allowing the Company to defer quarterly interest payments for the quarter ending March 31, 2020 and the quarter ending June 30, 2020 with almost all of such interest to be paid-in-kind.  The First Term Loan Amendment also provided for a waiver with respect to the Adjusted EBITDA financial covenant during each fiscal quarter during the fiscal year ending December 31, 2020.  The interest rate was retroactively reset to a fixed 14% during the first six months of 2020.

On July 7, 2020, the Company and the B-2 Term Guarantors entered into Amendment No. 2 (the "Second Term Loan Amendment") to the B-2 Term Loan Agreement.  The material terms of the Second Term Loan Amendment include, among other things, a consent to the refinancing and conforming changes to the description of collateral set forth in the UST Credit Agreements, permanently capitalizing previously paid-in-kind interest on borrowings under the B-2 Term Loan Agreement, and that all future interest shall accrue at Adjusted LIBO rate plus a margin of 7.5% per annum and 6.5% per annum in the case of alternative base rate borrowings paid in cash.  Additionally, the Company was subject to certain financial covenant requirements identical to those of the UST credit agreements.

On July 7, 2023, but effective as of June 30, 2023, the Company and certain of its subsidiaries entered into Amendment No. 3 (the "Third Term Loan Amendment") to the B-2 Term Loan.  The Third Term Loan Amendment required, among other things, that the Debtors provide a weekly liquidity report and that the Debtors do not permit liquidity to fall below $35 million at any time.  The Third Term Loan Amendment also provided for a change from the Adjusted LIBO rate to the Secured Overnight Financing Rate ("SOFR") plus the ARRC recommended credit spread adjustment.

In July 2023, the Company announced that it closed on the sale of an obsolete terminal property in Compton, California with a third-party purchaser for a sale price of $80 million.  In accordance with the

terms and conditions of the Third Term Loan Amendment, the net proceeds of the sale, totaling approximately $79.5 million, were applied to the outstanding principal balance of the B-2 Term Loan.

As of the Petition Date, approximately $485.3 million in borrowings remained outstanding under the B-2 Term Loan.  As of December 21, 2023, the Debtors had paid off in full all of their outstanding obligations under the B-2 Term Loan [Docket No. 2119].

### 3.  ABL Facility

On February 13, 2014, Yellow entered into a $450 million asset-based loan facility (the "<u>ABL Facility</u>") from a syndicate of banks arranged by Citizens Business Capital (the "<u>ABL Agent</u>"), Merrill Lynch, Pierce, Fenner & Smith and CIT Finance LLC.  Yellow and its subsidiaries YRC Freight, Reddaway, Holland and New Penn were borrowers under the ABL Facility, and certain of the Company's domestic subsidiaries were guarantors thereunder.  Availability under the ABL Facility was derived by reducing the amount that may be advanced against eligible receivables plus eligible borrowing base cash by certain reserves imposed by the ABL Agent and the Company's outstanding letters of credit and revolving loans.  Eligible borrowing base cash was cash that was deposited from time to time into a segregated restricted account and was included in "Restricted amounts held in escrow" in the accompanying consolidated balance sheet.

At Yellow's option, borrowings under the ABL Facility bore interest at either:  (i) the applicable USD LIBOR rate plus 2.25%, as amended, or (ii) the base rate (as defined in the ABL Facility) plus 1.25%, as amended.  Letter of credit fees equal to the applicable USD LIBOR margin in effect, 2.25% as amended, are charged quarterly in arrears on the average daily stated amount of all letters of credit outstanding during the quarter.  Unused line fees were charged quarterly in arrears (such unused line fee percentage is equal to 0.375% per annum if the average revolver usage is less than 50% or 0.25% per annum if the average revolver usage is greater than 50%).  The ABL Facility was secured by a perfected first-priority security interest (subject to permitted liens) in accounts receivable, cash, deposit accounts, and other assets related to accounts receivable of Yellow and the other loan parties and an additional second-priority security interest (subject to permitted liens) in substantially all remaining assets of the borrowers and the guarantors.

On October 31, 2022, the Company and certain of its subsidiaries entered into Amendment No. 7 (the "<u>ABL Treasury Amendment</u>") in which the maturity date of the ABL Facility was extended to January 9, 2026 and included a springing maturity commencing thirty days prior to the maturity of any of the Term Debt, the UST Tranche A Facility Indebtedness, or the UST Tranche B Facility Indebtedness.  Further, as part of the ABL Treasury Amendment, the approximately $359 million in outstanding and undrawn Letters of Credit fees under the ABL Facility became the applicable margin for SOFR Loans.  The amended facility had an increased capacity of $50 million up to $500 million and an interest rate of SOFR plus 1.75% plus a credit spread adjustment of .10%.

As of the Petition Date, $0.9 million in borrowings remained outstanding under the ABL Facility as well as approximately $359 million of undrawn letters of credit issued and outstanding under the ABL Facility supporting workers compensation insurance, among other obligations.  As of December 21, 2023, the Debtors had repaid in full all of their outstanding obligations under the ABL Credit Agreement other than accrued and accruing ABL Adequate Protection Fees and Expenses pursuant to Section 14(a)(iii) of the Final DIP Order [Docket No. 2119].

As discussed further herein, the Debtors repaid all outstanding secured debt obligations.

## VI.     EVENTS LEADING TO THE CHAPTER 11 FILINGS[17]

Yellow operated in a highly competitive environment.  Overall, when Yellow was still operating, the LTL market was increasingly dominated by non-union trucking companies who carried approximately 80% of all LTL freight.  Key competitors included global, integrated freight transportation services providers, global freight forwarders, national freight services providers (including intermodal providers), regional and interregional carriers, third-party logistics providers, and small, intraregional transportation companies.  Yellow also had competitors within several different modes of transportation including:  LTL, truckload, air and ocean cargo, intermodal rail, parcel and package companies, transportation consolidators, reverse logistics firms, and privately-owned fleets.  Ground-based transportation includes private fleets and "for-hire" provider groups.

### A.     COVID-19

During 2019, the freight industry experienced a recession.  This recession appeared to have stabilized in the first quarter of 2020.  However, beginning the last two weeks of March, the freight industry and the economy at large experienced a precipitous and significant decline in economic activity due to the impact of COVID-19.

The COVID-19 pandemic and related economic repercussions created significant uncertainty and resulted in a material decrease in the volume that was expected during 2020 by both Yellow and the industry as a whole.  This market downcycle forced Yellow into a liquidity crunch.  In order to maintain adequate liquidity to fund operations, Yellow took preservation actions in late March and early April 2020, including layoffs, furloughs, further eliminations of short-term incentive compensation and reductions in capital expenditures, and deferment of payments to various parties.

In addition, Yellow benefited from the support afforded to it under the CARES Act, which provided temporary relief related to the payment of employer payroll taxes and delayed the due date for funding minimum required pension contributions.  Specifically, the UST Credit Agreements, which provided Yellow $700 million, were entered into pursuant to the CARES Act.  The CARES Act loan enabled Yellow to stabilize its operations for a period of time.

### B.     One Yellow

In 2019, Yellow announced the "One Yellow" enterprise initiative ("One Yellow").  One Yellow was intended to combine the vast national network of the YRC Freight brand with the speed and consistency of Yellow's regional brands to create one "super-regional carrier."   In addition, One Yellow, once implemented, was set to address operational inefficiencies that hampered the Company's ability to compete in the LTL sector of the trucking market and gain market share.

Prior to the One Yellow initiative, numerous operating companies within Yellow's corporate structure were competing for the same business.  For instance, on any given day, multiple trucks from competing companies that were under Yellow's corporate umbrella could be dispatched to the same location to pick up and deliver shipments of freight, resulting in a massive amount of redundancy, higher costs, and general waste of resources.  Yellow could not reasonably compete with other LTL carriers while its own brands were competing with one another.  One Yellow was therefore a commonsense integration initiative that would eliminate unnecessary duplication, prevent Yellow's trucking brands from competing

---

[17]   The Debtors understand that certain of the descriptions of events contained in this preliminary statement concerning the circumstances leading up to the commencement of the Chapter 11 Cases are disputed by the International Brotherhood of Teamsters (which also disputes certain descriptions of the same as set forth in the First Day Declaration).  Provision of this preliminary statement should not be construed as the assent of the International Brotherhood of Teamsters to such descriptions.

with one another for, quite literally, the exact same business, and ultimately transform Yellow from a disparate set of operating companies into a single unified national platform.

If completed, One Yellow would have resulted in the following benefits:  (a) network optimization of all zip codes in pickup and delivery zones, thereby eliminating redundancy where multiple terminals serve the same zip codes; (b) brand enhancement through superior service and customer satisfaction; (c) volume accretion attributable to Yellow's ability to provide a structurally higher level of service and increase its LTL market share, especially its next-day/same-day delivery market share; (d) increased yield; and (e) enhanced pricing abilities, due to greater competitiveness and higher service levels.  The One Yellow process contained three phases, with full implementation expected to be completed by early 2023. The three phases of the One Yellow initiative can be summarized as follows:

- Phase 1 (20% of network):  to consolidate YRC Freight's operations with Reddaway's operations in the West;

- Phase 2 (70% of network):  to consolidate YRC Freight's operations with Holland's and New Penn's operations in the Northeast, Midwest, and Southeast; and

- Phase 3 (10% of network):  to consolidate YRC Freight's operations with Holland's remaining operations in the Central and Southern regions.

One Yellow was Yellow's most vital strategic initiative, and the very survival of Yellow depended on completing One Yellow as soon as possible.  Yellow anticipated that One Yellow would enable Yellow to dramatically improve its financial performance, including by growing EBITDA to $450 million within one full year of implementation.  Yellow further anticipated that One Yellow would create a financial opportunity to capture upwards of $675 million in additional annual revenue at operating margins of 13.5%. One Yellow not only made sense financially as a method to improve synergies, but also as a practical matter to position Yellow for long-term success.

When Yellow decided to make a change of operations ("CHOPS") proposal, it would meet with affected local unions and then participate in a CHOPS Committee hearing.  *See* YRCW National Master Freight Agreement ("NMFA") Art. 8 § 6.

In 2022, Yellow proposed CHOPS for Phase 1 of One Yellow, the Union approved the Phase 1 CHOPS and Yellow successfully implemented Phase 1.  In September 2022, Phase 1 was launched, with Union support and Union approval of the change of operations Yellow needed to implement Phase 1.  As a result, the linehaul networks of YRC Freight and Reddaway in the Western region were integrated to support both regional and long-haul services.  This was one of the first major steps Yellow took to improve operational performance, and the preliminary results of Phase 1 were very positive.

With the success of the implementation of Phase 1, and Yellow's strong financial position, Yellow continued preparations to implement Phase 2.  In fact, Yellow was seeking to refinance its funded debt obligations and simplify its capital structure in order to further capture value associated with the full implementation of One Yellow.

### C.    Yellow's Inability to Complete Phase 2 Causes Irreparable Damage

Even before Yellow's successful implementation of Phase 1, Yellow was preparing for Phase 2 of One Yellow to address operations in the East, Central, and portions of the Southern region—covering 70% of Yellow's network.  In addition to consolidating YRC Freight's operations with Holland's and New Penn's in the East, Central, and portions of the Southern regions, Phase 2 was designed to:  (a) establish one dispatch system across all three operating companies; (b) create 35 new velocity distribution centers;

and (c) combine terminals in near proximity with one another in the YRC Freight-Holland-New Penn network. Yellow planned to implement and complete Phase 2 by the end of 2022 and to begin and complete the final Phase 3 implementation in early 2023. Yellow had every expectation that it would be able to achieve agreement with the Union on implementation of Phases 2 and 3 on a timely basis, leading to its long-term success. Indeed, Yellow had a long history of reaching agreement with the Union in challenging circumstances, and it was in both parties' best interests to reach such agreement. Unfortunately, Yellow's efforts never bore fruit, as Phase 2 met with heavy resistance by the Union, and, Yellow and the Union could not reach an agreement that would permit Phase 2 to move forward until it was too late.

As described above, One Yellow was designed, among other things, to unify Yellow's disparate operating companies into a single company and brand, modernize Yellow's LTL network, address certain operational inefficiencies, improve Yellow's operating footprint and create a super-regional carrier, enhance the Yellow brand, increase the number of shipments Yellow transports, and expand Yellow's market share. Looking to the future, One Yellow was designed to better position Yellow to take market share from both non-unionized competitors and from the remaining union competitors. Without Phase 2, Yellow could not implement these changes or achieve these improvements for the 80% of Yellow's network that Phase 2 and Phase 3 were intended to address. Reduced to dollars and cents, the inability to proceed with One Yellow cost Yellow the operational savings of approximately $22.85 million per month.

Yellow also pursued other angles to try to save itself. Yellow actively sought additional financing, with Ducera leading its efforts to secure that additional funding. Yellow also reached out to key political figures, including Senator Bernie Sanders, and former United States Secretary of Labor Marty Walsh for assistance in bringing the Union back to the negotiating table. Yellow apprised members of President Biden's administration of the loss of tens of thousands of jobs, the damage to America's already fragile supply chains, and the anti-competitive impact that would result from Yellow's closure, and asked the administration for assistance in convincing the Union to negotiate with Yellow. The Debtors understand that President Biden's administration reached out to the Union, but the outreach did not result in constructive negotiations. While Yellow reached out to other high-level, pro-Union government officials for assistance, these efforts were similarly unsuccessful.

On July 12, 2023, after reports that the Union had reached a new collective bargaining agreement with Yellow competitor ABF Freight that included an $11.00/hour wage and benefit increase, Yellow offered to match the $11.00/hour wage and benefit increase subject to certain contingencies. The Union rejected Yellow's contingent offer.

Yellow's inability to implement Phase 2 created a liquidity crisis, as a direct result of which Yellow was forced to take cash-conservation measures, including deferring payment of certain contractual contributions in the amount of approximately $22.5 million to both the Central States Health and Welfare Fund and Central States Pension Fund (the "Contributions"). On June 27, 2023, Yellow filed a lawsuit against the IBT, TNFINC, and several local unions for their alleged breaches of the NMFA. On March 25, 2024, the U.S. District Court for the District of Kansas dismissed Yellow's lawsuit. The court found that Yellow failed to exhaust the grievance procedure in the parties' collective bargaining agreement. On April 22, 2024, Yellow asked the court to alter or amend the decision to dismiss the lawsuit and filed a motion to amend the dismissed complaint. However, on July 15, 2024, the court denied the motion to reconsider the March 25, 2024 decision as well as the request to amend Yellow's complaint. Yellow has appealed the dismissal to the Tenth Circuit Court of Appeals.

### D.   Yellow's Liquidity Issues

Yellow anticipated that, as the phases of One Yellow were implemented, operational efficiencies would be achieved, and EBITDA would increase. However, Yellow was not able to realize the projected

savings or increased revenues from implementation of Phases 2 or 3. As a result, Yellow had been operating at a loss and exhausting its liquidity.

Furthermore, the overall LTL industry had been experiencing challenging business conditions. In 2022, as the manufacturing sector's strength began to waver, demand for LTL capacity decreased. Subsequently, the first quarter of 2023 was characterized by soft demand, and Yellow did not experience the typical seasonal uplift in demand during the second half of the first quarter of 2023.

This combination of economic headwinds and a liquidity crisis created a perfect storm. Accordingly, Yellow retained the services of Alvarez & Marsal North America, LLC and Kirkland & Ellis LLP to consider potential alternatives to address Yellow's liquidity issues. This liquidity crisis was sufficiently acute that it necessitated Yellow obtaining waivers of certain covenants under its current credit agreements, including waiver of a minimum EBITDA financial covenant, which it obtained on July 7, 2023. The credit agreement amendment required, among other things, that Yellow provide lenders with a weekly liquidity report and that Yellow's liquidity not fall below $35 million. Further, as part of efforts to pay off the more than $1.2 billion in loans, Yellow sold a terminal in Compton, California, for $80 million.

Again, Yellow had every expectation, based on history and the reality of its present circumstances, that it would be able to reach agreement with the Union on a deal that would permit Phases 2 and 3 to move forward. Had Yellow been able to successfully implement Phase 2 and 3, Yellow almost certainly would have had sufficient funds available to pay the Contributions when they became due without putting the business at risk.

Indeed, as of June 30, 2023, Yellow had a $485 million Term Loan that was set to mature in June 2024 and a $737.0 million US Treasury Loan that was set to mature in September 2024. Yellow had to refinance its $1.2 billion in debt before it matured. The financial markets and credit rating agencies took notice.

Yellow's stock price sharply declined over the course of the ten months prior to the Petition Date. At the same time, the credit-rating agencies steadily downgraded Yellow. On February 27, 2023, S&P downgraded Yellow's issuer credit rating from B- to CCC+ and its issue-level rating on Yellow's Term Loan from B- to CCC+ because of uncertainty regarding Yellow's ability to refinance the Term Loan and US Treasury Loan. Further, S&P indicated it could lower Yellow's ratings again if it did not believe Yellow's refinancing plans would address its upcoming maturities before they became current.

On May 15, 2023, Moody's downgraded Yellow's ratings—the corporate family rating, the probability of default rating, the senior secured rating, and the speculative grade liquidity rating—citing delays in implementing Phase 2 and weaker sector fundamentals. On July 6, 2023, S&P further downgraded Yellow's issuer credit rating from CCC+ to CCC- and its issue-level rating on Yellow's Term Loan from CCC+ to CCC-, citing contentious labor contract negotiations and Yellow's need to address looming maturities. On August 1, 2023, in the wake of the IBT strike threat, and in light of the fact that Yellow was forced to take steps to wind-down its operations, S&P once again downgraded Yellow's issuer credit rating from a CCC- to a CC.

### E.    IBT Threatens to Strike

In or about July, 2023, Yellow sought the permission of certain union affiliated health and welfare and defined benefit funds to defer contribution payments in order to preserve liquidity. On July 17, 2023, after Central States Pension Fund denied Yellow's payment deferral request and Yellow did not timely pay, it sent a notice to Yellow and to the IBT and Teamsters National Freight Negotiating Committee that it would suspend benefits for all Yellow employees participating in the fund based on Yellow's failure to remit certain benefits. Also on July 17, 2023, Mr. Murphy, on behalf of the IBT and all local unions, gave

a 72-hour notice that the affected local unions were authorized and intended to strike Yellow on or after July 24, 2023, pursuant to Article 8, Section 3(b) of the parties' collective bargaining agreement.

On July 19, 2023, Yellow sought a temporary restraining order and preliminary injunction to, among other things, enjoin the Union from engaging in a strike work stoppage, slow down, or interruption of work (the "TRO Motion").   On July 20, 2023, the Union opposed Yellow's request for a temporary restraining order and preliminary injunction, and, on July 21, 2023, U.S. District Judge Julie A. Robinson of the District of Kansas denied the TRO Motion on the basis that the court lacked jurisdiction to do so pursuant to the Norris-La Guardia Act, which prohibits federal injunctions of lawful work stoppages.   In denying the TRO, Judge Robinson forecasted that the Union's strike threat might in fact kill Yellow and that the 22,000 Union members might lose their jobs as a result.

On July 23, 2023, Mr. O'Brien reached out to Yellow's senior management[18]—ten hours before the strike deadline.   As a result of these discussions, and at the Union's direct request, Central States agreed to extend benefits for workers at Yellow operating companies Holland and YRC Freight for thirty days, thus averting a strike that could have begun Monday, July 24.

However, Yellow's customers fled to Yellow's competitors.   In addition, Yellow's banking partners elected to exercise certain protective remedies.   Specifically, on July 19, 2023, Citizens Business Capital ("Citizens") sent Yellow a notice of establishment of availability reserve in the amount of $25 million, which came due July 21, 2023.   On July 25, 2023, Citizens again sent a notice of establishment of availability reserve in the amount of $25 million, exacerbating Yellow's rapidly deteriorating liquidity, which came due on July 27, 2023.

F.    **Exploration of Strategic Alternatives**

As described above, the Debtors have been engaged for several years with advisors and stakeholders to address the Debtors' business challenges.   The Debtors worked to explore and execute alternative measures to continue their operations and maximize value for all stakeholders.   Ultimately, however, those efforts could not provide the relief the Debtors needed, and the Debtors determined that it was necessary to pivot to an in-court process.

Specifically, facing a dire liquidity shortfall and the fact that customers had fled to competitors following the Union's strike threat, the Debtors' management team and advisors determined that it was appropriate to clear the Debtors' freight network, close their facilities, and commence layoffs of their workforce.   Shortly thereafter, the Debtors Filed these Chapter 11 Cases to pursue an orderly sale process in order to maximize value and minimize the impact of the shutdown for all stakeholders.

Thus, the Debtors, with the assistance of their advisors, have engaged with their stakeholders every step of the way on potential out-of-court solutions, and the Debtors Filed for chapter 11 protection only after, among other things, (a) exhaustive review of available alternative pathways, (b) failure to address a liquidity crisis without the protections of chapter 11, (c) pressure caused by macroeconomic conditions affecting the Debtors' industry, and (d) the Debtors' customers fled to competitors following the Union's strike threat, crushing demand for the Debtors' services.   The Chapter 11 Cases are the Debtors' best opportunity to fully and fairly resolve their liabilities in a manner that maximizes value for the Debtors' stakeholders.

---

[18]    The IBT disputes that Mr. O'Brien initiated his discussion with Yellow's senior management on July 23, 2024.

VII.        **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES**

A.        **First Day Relief**

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  On August 9–17, 2023, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis. From September 13–15, 2023, the Bankruptcy Court entered orders approving certain of the First Day Motions on a final basis.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://dm.epiq11.com/case/yellowcorpo ration/dockets.

B.        **Appointment of Official Committee of Unsecured Creditors**

On August 16, 2023, the U.S. Trustee Filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 269], notifying parties in interest that the U.S. Trustee had appointed the Committee in these Chapter 11 Cases.  The Committee was initially comprised of: (a) BNSF Railway; (b) Michelin North America, Inc.;[19] (c) Daimler Trucks, N.A., (d) RFT Logistics L.L.C.; (e) Pension Benefit Guaranty Corporation; (f) International Brotherhood of Teamsters; (g) Central States, Southeast and Southwest Areas Pension Fund; (h) New York State teamsters Pension and Health Funds; and (i) Mr. Armando Rivera.  On May 20, 2024, the *First Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 3430] was Filed to reflect the resignation of Michelin North America, Inc. as of May 8, 2024.

On October 4, 2023, the Bankruptcy Court approved the Committee's applications to retain (a) Akin Gump Strauss Hauer & Feld LLP as co-counsel [Docket No. 760], (b) Benesch, Friedlander, Coplan & Aronoff LLP as co-counsel [Docket No. 762], (c) Miller Buckfire as investment banker [Docket No. 764], (d) Huron Consulting Services LLC as financial advisor to the Committee on [Docket No. 761]. The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on September 14, 2023.

C.        **Other Procedural and Administrative Motions**

During these Chapter 11 Cases, the Debtors also Filed several other motions to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- De Minimis Asset Sales Motion.  The *Motion of Debtors to Approve Procedures for De Minimis Asset Transactions and Abandonment of De Minimis Assets* [Docket No. 360] (the "De Minimis Asset Sales Motion"), Filed on August 29, 2023, seeking authority to sell certain obsolete, excess, burdensome, or otherwise de minimis assets in individual transactions or a series of transactions with an aggregate sale price equal to or less than $5 million or abandon certain De Minimis

---

19    Michelin North America, Inc. resigned from the Committee in May 2024.

Assets with a value of $250,000 or less.  On September 14, 2023, the Debtors Filed a certification of counsel and revised order to the De Minimis Asset Sales Motion resolving certain reservations of rights and other stakeholder inquiries, asking the Bankruptcy Court to enter an order granting the De Minimis Asset Sale Motion [Docket No. 547].  On the same day, the Bankruptcy Court entered an order approving the De Minimis Asset Sale Motion on a final basis [Docket No. 551].

- SOFA Extension Motion.  The *Motion of Debtors Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief* [Docket No. 361] (the "SOFA Extension Motion"), Filed on August 29, 2023, seeking an extension of the deadlines by which the Debtors must File certain schedules of assets and liabilities and statements of financial affairs for each Debtor (the "Schedules and SOFAs") to and including September 11, 2023.  On September 11, 2023, the Debtors Filed a certification of counsel stating that no objections to the SOFA Extension Motion had been Filed and asking the Bankruptcy Court to enter an order granting the SOFA Extension Motion [Docket No. 443].  On September 12, 2023, the Bankruptcy Court entered an order approving the SOFA Extension Motion on a final basis [Docket No. 493].  The Debtors Filed the Schedules and SOFAs on September 11–12.  *See* Docket Nos. 445–92.

- Ordinary Course Professionals Motion.  The *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 392] (the "OCP Motion"), Filed on August 31, 2023, seeking authorization for the Debtors to retain and compensate certain professionals utilized in the ordinary course of business.  On September 19, 2023, the Debtors Filed a certificate of counsel with a revised proposed order, asking the Bankruptcy Court to enter an order granting the OCP Motion [Docket No. 604].  On September 20, 2023, the Bankruptcy Court entered an order approving the OCP Motion on a final basis [Docket No. 617].

- Claims Bar Date Motion.  The *Motion of Debtors Seeking Entry an Order (A) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving the Form and Manner of Notice Thereof* [Docket No. 393] (the "Claims Bar Date Motion"), Filed on August 31, 2023, seeking to establish bar dates for Filing Proofs of Claim, amended schedules, and rejection damages, and approving the form and manner for filing Proofs of Claim.  On September 12, 2023, the Debtors Filed a certification of counsel and revised order, asking the Bankruptcy Court to enter an order granting the Claims Bar Date Motion [Docket No. 505].  On September 13, 2023, the Bankruptcy Court entered an order approving the Claims Bar Date Motion on a final basis [Docket No. 194].  On September 15, 2023, the Debtors Filed notice of the bar dates [Docket No. 566].  On September 21, 2023, the Debtors caused notice of the bar dates to be published in *The New York Times* and *The Globe and Mail* [Docket Nos. 643–44].

- Interim Compensation Procedures Motion.  The *Motion of Debtors for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (II) Granting Related Relief* [Docket No. 398] (the "Interim Compensation Procedures Motion"), Filed on June 30, 2023, seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases.  On September 12, 2023, the Debtors Filed a certification of counsel stating that no formal objections to the Interim Compensation Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Interim Compensation Motion [Docket No. 496].  On September 13, 2023, the Bankruptcy Court entered an order approving the Interim Compensation Motion on a final basis [Docket No. 519].

- Agency Agreement Motion.  *See* Article VII.G of this Disclosure Statement for a discussion of the Agency Agreement Motion and related sale processes.

- Local Rule 3007-1(f) Motion.  The *Motion of Debtors for Entry of an Order (I) Modifying the Application of Local Rule 3007-1(f) and (II) Granting Related Relief* [Docket No. 999] (the "Local Rule 3007-1(f) Motion"), Filed on October 30, 2023, seeking modification of the application of Local Rule 3007-1(f) to allow the Debtors to file up to four substantive omnibus claims objections per calendar month, and allowing each such objection to include up to five hundred claims.  On November 8, 2023, the Debtors Filed a certification of counsel stating that no formal objections to the Local Rule 3007-1(f) Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Local Rule 3007-1(f) Motion [Docket No. 1054], and the Bankruptcy Court entered an order approving the Local Rule 3007-1(f) Motion on a final basis [Docket No. 1068].

- Removal Extension Motions.  The *Motion of Debtors for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 996] (the "Removal Extension Motion"), Filed on October 30, 2023, seeking an extension of the period within which the Debtors may remove civil actions.  On November 8, 2023, the Debtors Filed a certification of counsel stating that no formal objections to the Removal Extension Motion had been Filed, asking the Bankruptcy Court to enter an order granting the Removal Extension Motion [Docket No. 1053], and the Bankruptcy Court entered an order approving the Removal Extension Motion on a final basis [Docket No. 1056].  The *Debtors' Second Motion for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 2497] (the "Second Removal Extension Motion"), Filed on March 1, 2024, seeking an extension of the period within which the Debtors may remove civil actions.  On March 18, 2024, the Debtors Filed a certification of counsel stating that no formal objections to the Removal Extension Motion had been Filed, asking the Bankruptcy Court to enter an order granting the Removal Extension Motion [Docket No. 2648], and the Bankruptcy Court entered an order approving the Removal Extension Motion on a final basis on March 19, 2024 [Docket No. 2654].  The *Debtors' Third Motion for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 3802] (the "Third Removal Extension Motion"), Filed on June 28, 2024, seeking an extension of the period within which the Debtors may remove civil actions.  On July 15, 2024, the Debtors Filed a certification of counsel stating that no formal objections to the Removal Extension

Motion had been Filed, asking the Bankruptcy Court to enter an order granting the Removal Extension Motion [Docket No. 3897], and the Bankruptcy Court entered an order approving the Removal Extension Motion on a final basis on July 16, 2024 [Docket No. 3908]

- <u>Exclusivity Extension Motions</u>.  The *Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 997] (the "<u>Exclusivity Extension Motion</u>"), Filed on October 30, 2023, seeking an extension of the period within which the Debtors have the exclusive right to File a chapter 11 plan and solicit acceptances thereof.  On November 8, 2023, the Debtors Filed a certification of counsel stating that no formal objections to the Exclusivity Extension Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Exclusivity Extension Motion [Docket No. 1055], and the Bankruptcy Court entered an order approving the Exclusivity Extension Motion on a final basis [Docket No. 1065]. On February 9, 2024, the *Debtors Filed the Second Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 2131]. The Bankruptcy Court entered an order granting the Second Exclusivity Extension Motion on February 28, 2024 [Docket No. 2449].  On May 20, 2024, the Debtors Filed a third *Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 3433].  The Committee objected to the third Exclusivity Extension Motion on May 28, 2024 [Docket No. 3511].  A contested evidentiary hearing was held on June 3, 2024, and the Bankruptcy Court, overruling the Committee's objection, entered an order granting the third Exclusivity Extension Motion on June 4, 2024 [Docket No. 3590].  On September 2, 2024, the Debtors Filed the *Debtors' Fourth Motion for Entry of an Order (I) Extending the Debtors' Exclusive Period to Solicit Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 4252] (the "<u>Fourth Solicitation Extension Motion</u>"), seeking a further 60-day extension of the period during which the Debtors have the exclusive right to solicit votes on a chapter 11 plan through and including December 30, 2024, without prejudice to the Debtors' right to seek a further extension of the Solicitation Exclusivity Period. The Bankruptcy Court entered an order granting the Fourth Solicitation Extension Motion on September 11, 2024 [Docket No. 4306].

- <u>365(d)(4) Extension Motion</u>.  The *Debtors' Motion for Entry of an Order, Pursuant to Section 365(d)(4) of the Bankruptcy Code, Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 995] (the "<u>365(d)(4) Extension Motion</u>"), Filed on October 30, 2023, seeking an extension of the period within which the Debtors may assume or reject unexpired leases of nonresidential real property.  On November 9, 2023, the Debtors Filed a certification of counsel stating that no formal objections to the 365(d)(4) Extension Motion had been Filed and asking the Bankruptcy Court to enter an order granting the 365(d)(4) Extension Motion [Docket No. 1115].  On November 13, 2023, the Bankruptcy Court entered an order approving the 365(d)(4) Extension Motion on a final basis [Docket No. 1127].

- **Destruction of Documents Motion.**  The *Debtors' Motion for Entry of an Order Authorizing the Abandonment and Destruction of Certain Documents and Records* [Docket No. 2000] (the "Destruction of Documents Motion"), Filed January 31, 2024, seeking to abandon or destroy unnecessary documents being stored at Debtors' expense.  On February 14, 2024, the Debtors Filed a certification of counsel stating that no formal objections to the Destruction of Documents Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Destruction of Documents Motion.  On February 15, 2024, the Bankruptcy Court entered an order approving the Destruction of Documents Motion on a final basis [Docket No. 2205].   The Debtors also Filed the *Debtors Motion for Entry of an Order Authorizing the Abandonment and Destruction of Certain Digital Records* [Docket No. 3432] on May 20, 2024, but they withdrew this motion on June 25, 2024 [Docket No. 3770].

- **De Minimis Claims Motion.**  The Debtors' *Motion of Debtors to Approve Procedures for Settlement of De Minimis Claims Held By or Against the Debtors* [Docket No. 4025], Filed on August 1, 2024, authorizing and approving the procedures for the Debtors to compromise and settle prepetition and postpetition claims, cross-claims, litigation, and causes of action (the "De Minimis Claims").  On August 12, 2024, the Debtors Filed a certification of counsel proposing a revised form of order incorporating third-party comments.  On August 13, 2024, the Bankruptcy Court entered an order approving the procedures for settlement of De Minimis Claims [Docket No. 4085].

### D.    Canadian Recognition Proceedings

Concurrent with the filing of the First Day Motions, the Debtors filed the *Motion for Entry of an Order (I) Authorizing Yellow Corporation to Act as Foreign Representative Pursuant to 11 U.S.C 1505, and (II) Granting Related Relief* [Docket No. 9], by which the Debtors requested that the Court enter an order, among other things, confirming that Yellow Corporation may act as the "foreign representative" on behalf of the Debtors' estate in connection with a proceeding to be commenced in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") to recognize the Debtors' chapter 11 cases as "foreign main proceedings" under Part IV of the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36, as amended (the "CCAA"), and, on August 9, 2023, the Bankruptcy Court entered such order [Docket No. 172].  On August 29, 2023, the Canadian Court granted the Initial Recognition Order and a Supplemental Order (Foreign Main Proceeding) (collectively, the "Recognition Orders").  The Recognition Orders, among other things, granted a stay of proceedings for the Canadian Debtors and Yellow Corporation pursuant to the CCAA, recognized the Debtors' chapter 11 cases as a "foreign main proceeding" in respect of the Canadian Debtors, appointed Alvarez & Marsal Canada Inc. to act as the Information Officer in respect of the Canadian Recognition Proceedings, and recognized and granted full force and effect in Canada to certain of the first day granted by the Court in the Debtors' chapter 11 cases.  The Canadian Court has also issued various additional orders in the Canadian Recognition Proceedings that recognized and granted full force and effect in Canada to certain orders subsequently entered by the Court in the Chapter 11 Cases in order to maximize the value of the Debtors' businesses and assets in Canada.  The Recognition Order and other materials and information in respect of the Canadian Recognition Proceedings can be found on the Information Officer's website at https://www.alvarezandmarsal.com/YRCFreightCanada.

As it relates to the Canadian Debtors, the implementation of the Plan and the transactions contemplated thereby is conditional on the granting of an order of the Canadian Court recognizing and

giving full force and effect in Canada to the Confirmation Order and the Plan. The Canadian Debtors expect to seek such order prior to the occurrence of the Effective Date.

### E.    Retention of Debtor Professionals

The Bankruptcy Court entered orders approving, the Debtors' applications to retain various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:

- Kirkland & Ellis, LLP, as primary restructuring counsel [Docket No. 639];

- Pachulski Stang Ziehl & Jones LLP, as co-counsel [Docket No. 607];

- Goodmans LLP, as Canadian restructuring counsel [Docket No. 606];

- Ducera Partners LLC, as investment banker [Docket No. 648];

- Alvarez & Marsal North America, LLC, as financial advisor [Docket No. 585];

- Ernst & Young LLP as tax services provider [Docket No. 586];

- Epiq Corporate Restructuring LLC, as claims and noticing agent and administrative advisor [Docket Nos. 170, 604];

- KPMG, as audit service provider [Docket No. 887];

- Kasowitz Benson Torres LLP, as special litigation counsel [Docket No. 1257];

- CBRE, as real estate broker and advisor [Docket No. 4183]; and

- Ritchie Brothers and Nations Capital, as rolling stock agent [Docket No. 981].

The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases. The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court (unless otherwise indicated in the orders reference above).

### F.    Approval of Debtor-in-Possession Financing[20]

On August 7, 2023, the Debtors Filed the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief [Docket No. 16] (the "DIP Motion"), initially requesting that the Bankruptcy Court authorize the Debtors to receive senior secured postpetition financing on a superpriority basis in the form of a senior secured, super priority multiple draw term loan facility in an aggregate principal amount of new money of $142.5 million and to continue using the UST Cash Collateral to provide sufficient liquidity for administration of the Chapter 11 Cases. The DIP Facility also featured a roll-up of prepetition debt in the amount of approximately $501 million. In consideration

---

[20]  The description of the DIP Facility contained herein is qualified in its entirety by the terms of the Bankruptcy Court's Final DIP Order.

for the consensual use of UST Cash Collateral, the Debtors agreed to provide the Prepetition Lenders with adequate protection as set forth in the DIP Motion and the accompanying proposed interim order.

After Filing the DIP Motion, the Debtors received other offers to provide DIP financing to the Debtors that proved to be on substantially superior economic terms for the Debtors and their stakeholders, and after a series of arms'-length, good faith negotiations, came to a new agreement, which was reflected, along with describing resolution of certain objections, in a certification of counsel the Debtors Filed on September 15, 2023 [Docket No. 563]. Also on September 15, 2023, the Bankruptcy Court entered the Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief [Docket No. 571] (the "Final DIP Order").

The Final DIP Order authorized, among other things, the Debtors to obtain a postpetition credit facility of up to $212.5 million with no roll-up. The DIP Facility consists of: (i) a junior secured, superpriority debtor in possession multi-draw term loan facility (the "Junior DIP Facility"), including (a) new money term loans in the aggregate principal amount of $42.5 million and (b) up to $70 million of additional new money term loans; (ii) an incremental postpetition tranche of the Facility (as defined in the Postpetition B-2 Credit Agreement) constituting a senior secured, superpriority debtor in possession multi-draw term loan facility, with an aggregate principal amount of $100 million, which was drawn in the amount of $50 million. The Debtors estimate that they saved over $30 million in interest expense and other fees by pursuing and ultimately entering into the DIP Facility, an economically far superior alternative to the proposed DIP facility (to be provided by Apollo) as originally set forth in the DIP Motion.

With sale proceeds from certain of the Real Property Asset Sales, which closed on a rolling basis between December 2023 and March 2024, on December 21, 2023, the Debtors paid off in full the obligations under their B-2 Term Loan Facility and the Prepetition ABL Facility.[21] These paydowns ended the monthly interest payment of over $17 million accruing under these prepetition facilities and the Debtors' obligations, under the Final DIP Order, to pay the ongoing legal fees of these secured prepetition lenders. Thereafter, on February 5, 2024, the Debtors repaid in full all of their outstanding obligations under the Prepetition UST Tranche B Credit Agreement and the Prepetition UST Tranche A Credit Agreement. On February 8, 2024, the Debtors repaid in full all of their outstanding obligations under the Junior DIP Credit Agreement and, upon such payment, the Junior DIP Credit Agreement, all commitments provided thereunder, and all obligations thereunder, and all documents related thereto, in each case, were automatically terminated. Further, all liens and security interests granted thereunder to secure the obligations under the Junior DIP Credit Agreement were automatically terminated as of February 8, 2024. See *Notice of (A) Debtors' Repayment of (I) Prepetition Secured Obligations, (II) Prepetition UST Secured Obligations, and (III) DIP Obligations and (B) Termination of (I) Prepetition B-2 Credit Agreement, (II) Prepetition UST Loan Documents, and (III) DIP Loan Documents* [Docket No. 2119] (the "Notice of Debt Repayments").

## G.    Bidding Procedures and Marketing Process[22]

The Debtors conducted a marketing process for all of substantially all of their assets. In the period leading up to the Petition Date, the Debtors and their advisors worked with the DIP Facility providers to

---

[21]  As provided at fn. 3 of the Notice of Debt Repayments, as of the ABL Repayment Date (as defined therein), the Debtors remained obligated to the Prepetition ABL Secured Parties solely for accrued and accruing ABL Adequate Protection Fees and Expenses pursuant to Section 14(a)(iii) of the Final DIP Order.

[22]  Capitalized terms used but not otherwise defined in this section have the meaning given to them in the documents referenced within this section, as applicable.

prepare for a robust postpetition marketing process on an expedited basis that aligned with the anticipated milestones required by the DIP Facility.  Indeed, the liquidity provided by the DIP Facility helped facilitate a fulsome and value-maximizing postpetition marketing process for the possible sale of all or substantially all of the Debtors' assets, but designed not to require the immediate sale of such assets.  The Debtors and the DIP Facility providers anticipated that interest in the assets would be sufficiently robust that the Debtors could likely sell just a portion to pay in full all DIP Facility and prepetition secured claims.  The Debtors and their advisors identified and contacted more than 650 parties, including strategic and financial partners, as potential bidders for the Debtors' assets.

On August 7, 2023, the Debtors Filed the Bidding Procedures Motion [Docket No. 22], a motion seeking, among other things, approval of the Bidding Procedures for a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  The Bidding Procedures Motion contemplated procedures pursuant to which the Debtors would seek bids for the sales of their assets, which include a significant portfolio of owned real property across numerous states and Canadian provinces as well as thousands of trucks, trailers, and other forms of operational equipment.  After weeks of negotiations with their stakeholders, the Debtors were able to reach consensus on the final form of the Bidding Procedures, and, on September 15, 2023, the Bankruptcy Court entered the order approving the Bidding Procedures Motion [Docket No. 575] (the "Bidding Procedures Order").

Under the Bidding Procedures Order, the Bid Deadline for Rolling Stock (as defined in the Bidding Procedures) was October 13, 2023 at 5:00 p.m. and the Bid Deadline for Non-Rolling Stock Assets (as defined in the Bidding Procedures) was November 9, 2023 at 5:00 p.m., prevailing Eastern Time. Qualified Bids were required to satisfy the general Bid Requirements set forth in the Bidding Procedures. The deadline to object to Rolling Stock sales was October 25, 2023, at 5:00 p.m., prevailing Eastern Time and the sale objection deadline for Non-Rolling Stock Assets was December 8, 2023 at 5:00 p.m., prevailing Eastern Time.  In accordance with the Bidding Procedures Order, the Debtors Filed notices of potentially assumed executory contracts and unexpired leases on October 12, 2023 and October 26, 2023. *See Amended Notice of Potential Assumption or Assumption and Assignment of Certain Contracts or Leases Associated With the Rolling Stock* [Docket No. 824]; *Notice of Potential Assumption or Assumption and Assignment of Certain Contracts or Leases Associated With the Non-Rolling Stock Assets* [Docket No. 968].

The Debtors engaged in a thorough marketing process for the sales of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures with respect to (a) Rolling Stock Assets (*e.g.*, vehicles, tractors, trucks, trailers, or similar vehicles and trailers, railroad cars, locomotives, stacktrains, and other tolling stock and accessories) and (b) Real Property Assets (*e.g.*, owned real estate, including terminals).  The Bidding Procedures Order authorized the Debtors to enter into stalking horse purchase agreements, against which higher or otherwise better offers may be sought, providing a clear path to consummate value maximizing transactions.

With respect to Real Property Assets, and in conjunction with the Bidding Procedures, on September 13, 2023, the Debtors Filed a motion [Docket No. 518] seeking, among other things, approval of (a) Estes Express Lines ("Estes") as the Real Estate Stalking Horse Bidder for a sale of all or substantially all of the Debtors' Owned Properties and certain other Assets related to the Debtors' Owned Properties pursuant to section 363 of the Bankruptcy Code, (b) Bid Protections for Estes in connection therewith, and (c) entry into that certain asset purchase agreement dated as of September 11, 2023 by and among Estes Express lines, as purchaser, and Yellow Corporation and its subsidiaries named therein, as sellers (the "Real Property Stalking Horse APA").  *See* Docket No. 624, Exhibit A.  The Real Property Stalking Horse APA was part of a market-tested sale process as it set the floor for a competitive bidding process and ensured that the Debtors obtained the highest or otherwise best offer, or combination of offers, for their Real Property Assets.  As consideration for the purchase of the Acquired Assets (as defined in the Real Property Stalking Horse APA), the Real Property Stalking Horse APA contemplated, among other consideration, a

41

total cash payment of approximately $1.52 million.  The Bankruptcy Court entered an order approving Estes as the stalking horse for the Debtors' Real Property Assets on September 21, 2023 [Docket No. 624].

On November 28, 2023, the Debtors commenced an auction for one-hundred and twenty-eight (128) owned properties and two (2) leased properties.  Following a full, fair, and robust sale and auction process, the Debtors received binding offers pursuant to twenty-one (21) Asset Purchase Agreements (as defined in the Real Property Assets Sale Order (as defined below)) for these properties, totaling approximately $1.88 billion of sale proceeds in the aggregate.  The Debtors determined that the Asset Purchase Agreements constituted, in each case as applicable, the highest or otherwise best offer for the applicable Acquired Assets and sought approval of the sale transactions contemplated by the Asset Purchase Agreements.  *See Notice of Winning Bidders and, if Applicable, Back-Up Bidders with Respect to Certain of the Debtors' Real Property Assets* [Docket No. 1268].  A hearing was held on December 12, 2023 before the Bankruptcy Court to consider approval of the Debtors' entry into and performance under the Asset Purchase Agreements (the "Real Property Asset Sale Hearing").  The Bankruptcy Court approved the Debtors' Sale of one-hundred and twenty-eight Owned Real Properties and two Leased Real Properties for approximately $1.88 billion on December 12, 2023 [Docket No. 1354] (the "Real Property Assets Sale Order").

Additionally, the Bidding Procedures Order authorized the Debtors to conduct a sales process for additional Unexpired Leased Properties.  The Debtors conducted auctions for certain of their Leased Properties on December 18, 2023, and December 19, 2023.  A hearing was held on January 12, 2024 before the Bankruptcy Court (the "Leased Property Asset Sale Hearing") to consider approval of the Debtors' entry into and performance under the applicable Asset Purchase Agreements (as defined in the Leased Real Property Assets Sale Order (as defined below)).  The Bankruptcy Court approved the Debtors' Sale of 23 Leased Properties for approximately $83 million on January 12, 2024.  *See Order (I) Approving Certain Asset Purchase Agreements; (II) Authorizing and Approving Sales of Certain Leased Properties of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, in Each Case Pursuant to the Applicable Asset Purchase Agreement; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, in Each Case as Applicable Pursuant to the Applicable Asset Purchase Agreement; and (IV) Granting Related Relief* [Docket No. 1735] (the "Leased Real Property Assets Sale Order").

An additional sale hearing was held on February 26, 2024 to consider the sale of ten leased properties to Knight-Swift Transportation, Inc. for an aggregate purchase price of $2.2 million.  *See Notice of (A) Winning Bidder for Certain of the Debtors' Leased Properties, (B) Filing of Asset Purchase Agreement and Proposed Sale Order with Respect to the Proposed Transaction; and (C) Scheduling of Sale Hearing, Objection Deadline, and Adequate Assurance Objection Deadline with Respect to the Proposed Transaction* [Docket No. 2158].  The Debtors did not receive any objections prior to the objection deadline, and they incorporated all informal comments in a revised form of sale order Filed on February 22, 2024.  *See Certification of Counsel Regarding Revised Proposed Order (I) Approving the Asset Purchase Agreement; (II) Authorizing and Approving the Sale of Certain Leases Properties of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances Pursuant to the Asset Purchase Agreement; (III) Approving the Assumption and Assignment of Certain Unexpired Leases in Connection Therewith Pursuant to the Asset Purchase Agreement; and Granting Related Relief* [Docket No. 2327].  The Bankruptcy Court entered the revised proposed sale order on February 22, 2024.  *See Order (I) Approving the Asset Purchase Agreement; (II) Authorizing and Approving the Sale of Certain Leases Properties of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances Pursuant to the Asset Purchase Agreement; (III) Approving the Assumption and Assignment of Certain Unexpired Leases in Connection Therewith Pursuant to the Asset Purchase Agreement; and Granting Related Relief* [Docket No. 2346].

On April 18, 2024, the Debtors prevailed on the merits at a contested hearing as to whether (among other litigated issues) the Debtors were permitted under section 365 of the Bankruptcy Code to assume

42

approximately 78 unexpired real property leases so that the Debtors may pursue strategic alternatives to maximize the leases' value at a later date. *See Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Certain Unexpired Leases and (II) Granting Related Relief Filed by Yellow Corporation* [Docket No. 2157] Filed on February 12, 2024 and *Debtors' Motion for Leave to File Late Debtors' Omnibus Reply in Further Support of the Court's Entry of Proposed Order (I) Authorizing the Debtors to Assume Certain Unexpired Leases and (II) Granting Related Relief* [Docket No. 2371] Filed on February 23, 2024. On April 19, 2024, the Bankruptcy Court entered that certain *Order (A) Authorizing the Debtors to Assume Certain Unexpired Leases and (B) Granting Related Relief* [Docket No. 3086].

Further, in connection with the Debtors' remaining lease portfolio, the Debtors have Filed and obtained entry of orders in connection with several stipulations with landlord counterparties memorializing the consensual extension of the deadline to assume or reject certain non-residential real property leases under section 354(d)(4) [Docket Nos. 2427, 2687, 2727, 2750, 2764, 3031, 3032, 3415, 3680, 3688, 3694, 3815, 3878, 4064, 4182, 4213, 4236, 4273, 4285, 4304, 4357, 4366, 4412, 4413, 4468, 4522, 4874].

On September 25, 2024, the Debtors Filed the *Supplemental Notice of Dates and Deadlines Under Bidding Procedures Order Regarding Debtors' Continued Sale Process* [Docket No. 4425], setting October 18, 2024 as the deadline for parties to submit non-binding written indications of interest for the Debtors' remaining Real Property Assets. On November 18, 2024, the Debtors Filed the *Notice of Further Supplemental Dates and Deadlines Regarding Continued Sale Process for Debtors' Remaining Properties, Including Bid Deadline, Auction, and Sale Hearing* [Docket No. 4952], setting January 6, 2025 as the Bid Deadline, January 13-15, 2025 as the Auction, if necessary, January 17, 2025 as the deadline to File Notices of Winning Bidders and Back-up Bidders, January 27, 2025 as the Objection Deadline, and January 30, 2025 as the Sale Hearing.[23]

With respect to the Debtors' marketing efforts for their Rolling Stock Assets, the Debtors Filed the *Motion of Debtors for Entry of an Order (I) Approving Agency Agreement with Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bros. Auctioneers (Canada) LTD., and IronPlanet Canada Ltd. Effective as of October 16, 2023; (II) Authorizing the Sale of Rolling Stock Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (III) Granting Related Relief* (the "Agency Agreement Motion"). *See* Docket Nos. 852, 986. The Agency Agreement Motion requested (a) approval of the Agency Agreement (as defined in the Agency Agreement Motion), (b) approval of the sales of Rolling Stock Assets free and clear of any liens, claims, interests, and encumbrances pursuant to transactions to be sought by the Agent (as defined in the Agency Agreement Motion), and (c) certain related relief. The Agency Agreement contemplated a process whereby the Agent would ready the Debtors' Rolling Stock Assets for sale and dispose of the Rolling Stock Assets through private treaty, online, webcast, or unreserved public auctions to maximize the value of the Rolling Stock Assets. Under the Agency Agreement, the Agent was to, among other things, over a term of eighteen (18) months from the Effective Date (as defined in the Agency Agreement), (a) market, refurbish, and sell the Rolling Stock Assets in a value maximizing manner and (b) remove the Rolling Stock Assets from the Company Properties no later than six (6) months from entry of the Agency Agreement so that the Debtors' Real Property Assets purchaser(s) could enter and utilize those premises. [Docket Nos. 981, Exhibit 1; 1174, Exhibit A]. The Bankruptcy Court entered an order approving the Agency Agreement Motion on a final basis on October 27, 2023 [Docket No. 981] (together with that certain *Supplemental Order Regarding Agency Agreement with Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bros. Auctioneers (Canada) Ltd. and IronPlanet Canada Ltd Effective as of October 16, 2023; (I) Authorizing and Directing the Reattachment on Rolling Stock Assets Under Certain Circumstances; and*

---

[23] Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the *Notice of Further Supplemental Dates and Deadlines Regarding Continued Sale Process for Debtors' Remaining Properties, Including Bid Deadline, Auction, and Sale Hearing.*

*(II) Granting Related Relief* [Docket No. 1186] entered by the Bankruptcy Court on November 21, 2023, the "Agency Agreement Order," and together with the Real Property Assets Sale Order, the De Minimis Asset Sales Order, and any other Final Order in the Chapter 11 Cases providing for the Sale or other disposition of any of the Debtors' Assets free and clear of liens, claims, interests, and encumbrances the "Sale Orders"). Since the entry of the Sale Orders, in each case as applicable, the Debtors, the purchasers, and their respective professionals have been working to consummate the applicable Sale Transactions.

### H.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

### 1.    Pension Benefit Guaranty Corporation Termination Claim

Prior to the Petition Date, the Debtors sponsored three single-employer pension plans which were referred to as the Yellow Corporation Pension Plan, the Yellow Retirement Pension Plan (formerly known as the YRC Retirement Pension Plan), and the Roadway LLC Pension Plan (collectively, the "Single Employer Pension Plans"). Following the Petition Date, in an effort to maximize value of the Debtors' assets and minimize Claims against the Estates, the Debtors merged their Single Employer Pension Plans into one qualified defined benefit pension plan (the "Surviving Plan").

On March 1, 2024, the Debtors provided notice to the Pension Benefit Guaranty Corporation (the "PBGC") of their intent to terminate the Surviving Plan in a "distress termination" under Section 4041(c)(2)(B)(i) of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1341(c)(2)(B)(i), with a proposed termination date of May 1, 2024, because the Debtors had no remaining business operations, were in the process of liquidating, and the Surviving Plan was significantly underfunded on a termination basis. On August 2, 2024, finding the Debtors had satisfied the requirements for distress termination, the PBGC executed the Agreement for Appointment of Trustee and Termination of Plan, reflecting the termination of the Surviving Plan as of May 1, 2024.

In connection with the termination of the Surviving Plan, the PBGC has a General Unsecured Claim against the Estates reflecting the difference between the Surviving Plan's liabilities and its assets as of the termination date. Shortly before the Claims Bar Date and prior to the merger, anticipating the termination of all three Single Employer Pension Plans separately, the PBGC Filed Proofs of Claim totaling approximately $206 million. The Debtors estimate the value of the PBGC's claims at approximately $177 million. The Debtors have asked the PBGC to engage in discussions about resolving its Proofs of Claim related to termination of the Surviving Plan and have provided the PBGC with data relating to the assets and liabilities of the Surviving Plan. Based on past history, the Debtors' counsel believe the Debtors will be able to resolve the amount of this liability with the PBGC. To date, the PBGC has not been ready to engage in such discussions.

### 2.    Central States Pension Fund Claims

The Central States Pension Fund ("CSPF") is a multiemployer pension fund that Filed Proofs of Claim against the Estates, seeking nearly $4.8 billion for withdrawal liability (the "CSPF Withdrawal Liability Claim") and nearly $5.8 billion total. Specifically, prior to the Claims Bar Date, CSPF Filed at least forty-five Proofs of Claim (the "CSPF Proofs of Claim"), generally falling in three categories: (a) twenty-four Proofs of Claim asserting withdrawal liability of $4,827,470,743.87, *see, e.g.*, Proofs of Claim Nos. 4312–35, (b) seventeen Proofs of Claim claiming breach of an alleged "contributions guarantee" and seeking $917,028,151.83, *see, e.g.*, Proofs of Claim No. 4336–52; and (c) assorted other

Claims, ranging from $3–$77 million, that provide theories such as "vacation pay" or "WARN", *see, e.g.*, Proofs of Claim Nos. 4303–06.

On December 8, 2023, the Debtors Filed an objection to CSPF's Claims [Docket No. 1322] (the "Central States Objection").  The Debtors argued that, among other things, CSPF applied for and received special financial assistance in the amount of $35.8 billion from the U.S. Treasury that eliminated the unfunded vested benefits ("UVBs") that are a prerequisite for any withdrawal liability and that CSPF's withdrawal liability claim otherwise violated ERISA.  With respect to the alleged "contributions guarantee" Claim, the Debtors argued that, among other things, the Claim sought double recovery and reflected an unenforceable liquidated damages provision.  The Debtors also objected to CSPF's remaining Claims on other grounds.  Additionally, the Debtors argued in the Central States Objection that even if CSPF were entitled to assess any withdrawal liability against the Debtors, some portion would nevertheless have to be subordinated under 29 U.S.C. § 1405(b) and 29 C.F.R. § 4225(b), such that the subordinated amount would only be recoverable if all other creditor claims were satisfied in full (the "CSPF Subordination Argument").  The Debtors' claims objections and briefs in support are available on the Docket as Docket Nos. 1322, 3825, 3917, 3922, 4011, and 4104.  Central States' motions and opposition briefs are available on the Docket as Docket Nos. 3803, 3950, 4010, and 4078.

CSPF Filed a motion to compel arbitration regarding the pension Claims [Docket No. 1665], which the Bankruptcy Court denied.  *See* Docket Nos. 2765, 2766.  At a hearing on February 14, 2024, the Bankruptcy Court set a timeline for discovery on Debtors' Objections to Proofs of Claim Filed by CSPF and the SFA MEPPs and scheduled a trial for August 5, 2024 [Docket No. 2195].  On June 28, 2024, CSPF Filed a partial summary judgment motion regarding the withdrawal liability Claims [Docket No. 3803].  The Debtors Filed their own partial summary judgment motion, asking the Bankruptcy Court to enter judgment in their favor.  [Docket No. 3825].  On July 12, 2024, PBGC Filed a summary judgment motion for the Central States Objection and the SFA Objection (defined below) [Docket No. 3882].  The parties thereafter agreed to a stipulation where the competing summary judgment motions were briefed and heard by the Bankruptcy Court, and all other activity with respect to the Central States Objection (and related SFA objection) was stayed until after the Bankruptcy Court resolved the series of threshold legal issues presented by the summary judgment motions. [Docket No. 3862].  Holders of both General Unsecured Claims and Interests in Yellow Corporation objected to, or otherwise joined in, the Debtors' objections to the CSPF Proofs of Claim.[24]

A hearing was held on the summary judgment motions on August 6, 2024, and on September 13, 2024, the Bankruptcy Court issued that certain *Memorandum Opinion* [Docket No. 4326], providing its reasoning in entering partial summary judgment in favor of CSPF and the Other SFA MEPPs (as defined below) and partial summary judgment in favor of the Debtors.  Specifically, the Bankruptcy Court held, among other things, that:  (a) the Phase-In and No-Receivables Regulations are valid as the regulations are (i) authorized by 29 U.S.C. §§ 1302(b)(3) and 1432(m) and (ii) the regulations are not arbitrary and capricious; and (b) the Debtors' withdrawal liability is subject ERISA's 20-year cap, but the notion that the withdrawal liability Claims should be discounted to present value is inapplicable.  The Bankruptcy Court rejected the Debtors' argument that the MEPP Claims (most notably the CSPF Withdrawal Liability Claim)

---

[24]  *See Ad Hoc Group of Equity Holders' Joinder to and Statement in Support of Debtors' Motion for Summary Judgment* [Docket No. 4015]; *MFN Partners, LP's Opposition to SFA MEPPS Motions for Summary Judgment* [Docket No. 3918]; *Joinder of Argo Partners in Debtors Motion for Partial Summary Judgment on SFA MEPPs' Withdrawal Liability Claims* [Docket No. 4028]; *see also Statement of the Official Committee of Unsecured Creditors of Yellow Corporation, et al., Regarding Motions for Summary Judgment Regarding Withdrawal Liability* [Docket No. 3998] (submitting that, "[if] the Court determines that the Pension Funds are entitled to withdrawal liability claims, then the Committee agrees with the Debtors that the 20-Year Cap must be applied and that such withdrawal liability claims should be discounted to net present value").

should be fully disallowed on the basis of the pension plans' prior receipt, during the COVID-19 pandemic, of federal special financial assistance.

To date, CSPF and the Debtors have not reached a settlement agreement with respect to Allowance of the CSPF Proofs of Claim and the CSPF Subordination Argument remains unresolved.

### 3. Other SFA MEPP Proofs of Claim

Shortly after Filing the Central States Objection, the Debtors Filed an omnibus objection to Proofs of Claim Filed by ten other multiemployer pension plans (the "Other SFA MEPPs")[25] seeking over $1.6 billion in withdrawal liability [Docket No. 1962] (the "SFA Objection").[26]  The Debtors argue that these Proofs of Claim are overstated for many of the same reasons stated in their Central States Objection (and other reasons), as, among other things, the SFA MEPPs received more than $5.32 billion in special financial assistance from the U.S. Treasury as of the Petition Date which the Debtors believe should negate any withdrawal liability of the Debtors.  The Debtors also believe that the Other SFA MEPPs' proofs of claim are overstated and violate ERISA for a variety of other reasons, described in the Debtors' prior briefs on this subject and expert reports that the Debtors have exchanged with the Other SFA MEPPs.  *See* Docket Nos. 3825, 3917, 3992, 4011, 4104.  Specifically, the Debtors argued in the SFA Objection that even if the Other SFA MEPPS were entitled to assess any withdrawal liability against the Debtors, some portion would nevertheless have to be subordinated under 29 U.S.C. § 1405(b) and 29 C.F.R. § 4225(b), such that the subordinated amount would only be recoverable if all other creditor claims were satisfied in full (the "Other SFA Subordination Argument").

Like the CSPF Proofs of Claim, the Debtors and the Other SFA MEPPs Filed competing summary judgment motions on a series of threshold legal issues and agreed by stipulation to defer further discovery and trial on all matters until such issues were resolved by the Bankruptcy Court.  *See* Docket Nos. 3805, 3825; *see also* Docket No. 3862 (stipulation).  Holders of both General Unsecured Claims and Interests in

---

[25]  The Other SFA MEPPs are, collectively, Freight Drivers and Helpers 557 Pension ("Freight Drivers"); International Association of Motor City Machinists Pension Fund ("IAM"); Management Labor Pension Fund Local 1730 ("Local 1730"); Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund ("Local 701"); New York State Teamsters Conference Pension & Retirement Fund ("New York Teamsters"); Road Carriers Local 707 Pension Fund ("Local 707"); Teamsters Local 617 Pension Plan ("Local 617"); Teamsters Local 641 Pension Plan ("Local 641"); Trucking Employees of North Jersey Pension Fund ("TENJ"); Western Pennsylvania Teamsters and Employers Pension Fund ("Western PA Teamsters").

[26]  *See* Docket No. 1962, Exhibit A, which reflects the Debtors' omnibus objection to:  (a) *Freight Drivers Proofs of Claim* asserting *$6,158,876 in the aggregate*, *see* Proof of Claim Nos. 16705, 18597, 18605, 18610, 18616, 18619, 1862518625, 18629, 18630, 18634, 18640, 18643, 18647, 18652, 18655, 18659, 18667, 18673, 18679, 18681, 18687, 18690, 18694, 18699; (b) *IAM Proofs of Claim* 16895 and 16905, asserting *$44,064,589* and *$16,514,882*, respectively; (c) *Local 1730 Proof of Claim* 14718 *asserting $65,891,164*; (d) *Local 701 Proofs of Claim* asserting *$48,230,076 in the aggregate*, *see* Proof of Claim Nos. 15001, 15002, 15003, 15004, 15005, 15008, 15009, 15011, 15012, 15013, 15014, 15015, 15016, 15017, 15018, 15019, 15020, 15021, 15023, 15024, 15025, 15026, 15027, 15029; (e) *New York Teamsters Proofs of Claim* asserting *$757,200,000 in the aggregate*, *see* 4489, 4490, 4491, 4492, 4493, 4494, 4495, 4496, 4497, 4498, 4499, 4500, 4501, 4502, 4503, 4504, 4505, 4506, 4507, 4508, 4509, 4510, 4511, 4512; (f) *Local 707 Proofs of Claim* asserting *$245,800,000 in the aggregate*, *see* Proof of Claim Nos. 14941, 19144; (g) *Local 617 Proofs of Claim* asserting *$41,932,295* in the aggregate, *see* Proof of Claim Nos. 15727, 15728, 15730, 15735, 15738, 15740, 15741, 15743, 15745, 15747, 15750, 15751, 15753, 15755, 15757, 15759, 15760, 15761, 15763, 15764, 15765, 15767, 15768, 15770; (h) *Local 641 Proofs of Claim* asserting *$217,160,000* in the aggregate, *see* 5505, 5506, 5507, 5508, 5509, 5510, 5511, 5512, 5513, 5514, 5515, 5516, 5517, 5518, 5519, 5520, 5521, 5522, 5523, 5524, 5525, 5526, 5527, 5528; (i) *TENJ Proof of Claim* 14722 asserting *$14,448,229*; and (j) *Western PA Teamsters Proofs of Claim* asserting *$174,827,536* in the aggregate, *see* Proof of Claim Nos. 18200, 18217, 18230, 18244, 18257, 18267, 18282, 18292, 18307, 18318, 18329, 18339, 18348, 18358, 18369, 18378, 18389, 18397, 18410, 18416, 18422, 18430, 18438, 18442.

Yellow Corporation joined in, or otherwise supported, the Debtors' Motion for Summary Judgment.[27] As described above, the Bankruptcy Court issued a split summary judgment decision that, notably, rejected the Debtors' arguments regarding the disallowance of the MEPP Claims on the basis of prior receipt of federal special assistance financing. *See Memorandum Opinion* at Docket No. 4326. On September 27, 2024, the Debtors and MFN each filed motions asking the Bankruptcy Court to reconsider certain aspects of its ruling at Docket Nos. 4461 and 4462, respectively, to which an AD Hoc Group of Equity Holders joined. *See* Docket No. 4463. Specifically, the Debtors sought reconsideration of the Bankruptcy Court's finding that the Debtors "defaulted" on any withdrawal liability obligations to SFA MEPPs and/or that SFA MEPPs had accelerated claims for such withdrawal liability prior to these Chapter 11 Cases. Docket No. 4461. MFN joined in the Debtors' reconsideration motion and sought the Bankruptcy Court's reconsideration of its findings that the MEPPs can receive the non-recourse benefit of United States Treasury's funds to pay plan benefits and expenses and yet not count that benefit when filing a Claim against the Debtors. Docket No. 4462.

Combined, the potential sum of the Claims related to CSPF and the Other SFA MEPPs range from $0 to approximately $7.5 billion. However, the Debtors are unable to estimate the amount of Allowed Claims related to CSPF and the Other SFA MEPPs at this time.

### 4. Non-SFA MEPPs

The Debtors are also facing 139 Proofs of Claim Filed by multi-employer pension funds who did not receive the SFA bailout funding from the federal government prior to the Petition Date. Those funds are: Central Pennsylvania Teamsters Defined Benefit Plan ("Central PA Teamsters");[28] IBT Local 705 ("Local 705");[29] IAM National Pension Fund ("IAM National");[30] New England Teamsters Pension Plan ("New England Teamsters");[31] Teamsters Joint Council # 83 of Virginia Pension Fund ("Virginia Teamsters");[32] Teamsters Local 710 ("Local 710");[33] and Teamsters Pension Trust Fund of Philadelphia &

---

[27]  *See Ad Hoc Group of Equity Holders' Joinder to and Statement in Support of Debtors' Motion for Summary Judgment* [Docket No. 4015]; *MFN Partners, LP's Omnibus Reply in Support of Debtors' Motion for Partial Summary Judgment on SFA MEPPS' Withdrawal Liability Claims* [Docket No. 4012]; *Joinder of Argo Partners in Debtors Motion for Partial Summary Judgment on SFA MEPPS' Withdrawal Liability Claims* [Docket No. 4028]; *see also Statement of the Official Committee of Unsecured Creditors of Yellow Corporation, et al., Regarding Motions for Summary Judgment Regarding Withdrawal Liability* [Docket No. 3998] (submitting that, "[if] the Court determines that the Pension Funds are entitled to withdrawal liability claims, then the Committee agrees with the Debtors that the 20-Year Cap must be applied and that such withdrawal liability claims should be discounted to net present value").

[28]  *See* Proofs of Claim Nos. 17671, 17676, 17679, 17683, 17686, 17692, 17698, 17710, 17715, 17720, 17728, 17736, 17744, 17752, 17759, 17763, 17767, 17770, 17778, 17783, 17788, 17795, 17799, and 17808 (asserting ***$81,771,134 in the aggregate***).

[29]  *See* Proofs of Claim Nos. 15906, 15917, 15943, 15944, 15949, 15951, 15953, 15955, 15957, 15965, 15969, 15971, 15975, 15978, 15979, 15985, 15989, 15995, 15998, 16001, 16005, and 16006 (asserting ***$21,367,019.34 in the aggregate***).

[30]  *See* Proof of Claim No. 18620 (asserting ***$22,820,838.36***).

[31]  *See* Proofs of Claim Nos. 18617, 18621, 18627, 18631, 18638, 18644, 18649, 18654, 18664, 18671, 18677, 18682, 18688, 18692, 18696, 18703, 18706, 18707, 18709, 18713, 18717, 18720, 18725, and 18729 (asserting ***$285,022,057 in the aggregate***). New England Teamsters has now received its own SFA bailout from the federal government, so it is now only a "Non-SFA MEPP" in the sense that it had not received SFA funds prior to the Petition Date.

[32]  *See* Proofs of Claim Nos. 4461, 4462, 4463, 4464, 4465, 4466, 4467, 4468, 4469, 4470, 4471, 4472, 4473, 4474, 4475, 4476, 4477, 4478, 4479, and 4482 (asserting ***$21,400,083 in the aggregate***).

[33]  *See* Proofs of Claim Nos. 17473, 17474, 17477, 17478, 17480, 17481, 17482, 17483, 17485, 17486, 17487, 17490, 17492, 17493, 17495, 17496, 17498, 17499, 17501, 17502, 17504, 17506, 17509, and 17510 (asserting ***$113,717,722 in the aggregate***).

Vicinity ("<u>Philadelphia Teamsters</u>").[34]  These funds collectively Filed 139 Proofs of Claim against the Estates, collectively seeking more than $582 million in withdrawal liability.[35]

The Debtors Filed the Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability (the "<u>Seventh Objection</u>") to these Proofs of Claim [Docket No. 2595], arguing that they are overstated and should be substantially reduced.  Specifically, the Debtors argued in the Seventh Objection that even if the Holders of these asserted withdrawal liability Claims were entitled to assess any withdrawal liability against the Debtors, some portion would nevertheless have to be subordinated under 29 U.S.C. § 1405(b) and 29 C.F.R. § 4225(b), such that the subordinated amount would only be recoverable if all other creditor claims were satisfied in full (the "<u>Seventh Objection Subordination Argument</u>").  The Bankruptcy Court initially entered a separate scheduling order for the Seventh Objection with a trial scheduled for September 23–26 and September 30, 2024 [Docket No. 2961].  However, the Debtors and the Non-SFA MEPPs entered into a stipulation and order extending those deadlines, calling for summary judgment briefing to occur in October 2024 and trial, if necessary, beginning December 16, 2024 [Docket No. 4216].

At the same time, the Debtors believe that these Claims should be settled, something that the Committee has seconded.[36]  In an effort to minimize the costs and expense of this case, the Debtors made settlement proposals to Central PA Teamsters, Local 705, IAM National, Virginia Teamsters, Local 710, and Philadelphia Teamsters, though no settlement agreement has been reached to date, including with respect to the Seventh Objection Subordination Argument.

### 5.  Western Conference

Western Conference of Teamsters Pension Trust Fund ("<u>Western Conference</u>") Filed Proofs of Claim for approximately $257 million, alleging withdrawal liability.[37]  The Debtors withdrew from Western Conference in June 2009, and withdrawal liability was not assessed at that time.  Instead, the Debtors entered into several agreements with Western Conference pursuant to which Western Conference decided to defer, at least for some time period, any assessment of withdrawal liability.  Prior to the Petition Date, the Debtors were never assessed withdrawal liability by Western Conference (even though applicable law requires a MEPP to assess withdrawal liability as soon as practicable) and did not pay any withdrawal liability to Western Conference.  Western Conference, for its part, prospered—according to the fund, it "never missed a benefit payment promised to participants, retirees, and beneficiaries"[38] and currently has no unfunded vested benefits ("<u>UVBs</u>").[39]

Prior to the Claims Bar Date, Western Conference Filed Proofs of Claim alleging withdrawal liability of approximately $169 million and interest of an additional approximately $88 million.  The

---

[34]  *See* Proof of Claim Nos. 13913, 14076, 14079, 14082, 14084, 14109, 14111, 14112, 14116, 14119, 14137, 14211, 14213, 14216, 14235, 14238, 14242, 14259, 14263, 14265, 14315, 14316, 14318, and 14319 (asserting ***$36,794,461.38 in the aggregate***).

[35]  *See* Docket No. 2595, Exhibits 1 and 2, which reflects the Debtors' omnibus objection to the above-referenced Proofs of Claim Filed by the Central PA Teamsters, Local 705, IAM National, New England Teamsters, Virginia Teamsters, Local 710, and Philadelphia Teamsters, which collectively assert approximately $582.9 million.

[36]  *See Joinder of the Official Committee of Unsecured Creditors of Yellow Corporation, et al., to Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [Docket No. 3057], ¶ 6.

[37]  *See* Proofs of Claim Nos. 160, 163, 12876.

[38]  *See* https://wctpension.org/wct-pension-trust-65th-anniversary.

[39]  *See* https://wctpension.org/local-unions/letter-union-chairman; https://wctpension.org/employers/letter-employer-chairman.

Debtors intend to object to these Claims and currently cannot estimate whether the Debtors' objections will succeed or fail. While the Debtors made a settlement proposal to Western Conference, no settlement agreement has been reached to date.

### 6. WARN-Related Matters

Shortly after the Petition Date, three separate class action adversary proceeding complaints were Filed against the Debtors alleging "failure to provide its works [sic] with the 60-day advance notice required under the federal WARN Act. *Class Action Adversary Proceeding Complaint by Roger Keef Against Yellow Corporation* [Docket No. 47] ("Keef Compl.") ¶ 1; *see also Complaint by Elizabeth Brooke Moore, Jeff Moore Against Yellow Freight Corporation, et al.* [Docket No. 25] ("Moore Compl.") ¶ 3; *Class Action Adversary Proceeding Complaint for (1) Violation of WARN Act 29 U.S.C. § 2101, et seq.; (2) Violation of New Jersey Millville Dallas Airmotive Plant Job Loss Notification Act; (3) Violation of California Labor Code §§ 1400 et seq. and (4) Violation of New York WARN Act, NYLL § 860, et seq* [Docket No. 21] ("Rivera Compl.") ¶ 1. All three complaints purported to bring claims for relief for violation of 29 U.S.C. § 2101 et seq., individually and on behalf of all other similarly situated former employees. *See* Keef Compl. ¶ 31; Moore Compl. at ¶ 26; Rivera Compl. ¶ 70. Two of the complaints Filed on August 7, 2023, brought state WARN Act claims, too. *See* Keef Compl. ¶¶ 42–53; Rivera Compl. ¶¶ 81–111. On November 10, 2023, the *Moore* plaintiffs amended their complaint, bringing a second claim for relief under the California WARN Act [Moore Adv. Proc. Docket No. 12].

On November 13, 2023, a fourth class action adversary complaint alleging violation of 29 U.S.C. § 2101 et seq. was Filed. *Class Action Adversary Complaint for (1) Violation of Federal Warn Act 29 U.S.C. § 2101 et seq., (2) Breach of Contract, (3) Unjust Enrichment, (4) Declaratory Relief, (5) Violation of California Labor Code §1400 et seq., (6) Violation of California Labor Code § 201 et seq., (7) Violation of North Carolina Wage and Hour Act §§ 95-25.1 et seq., (8) Violation of New York WARN Act, NYLL § 860 et seq., and (9) Violation of New Jersey Millville Dallas Airmotive Plant Job Loss Notification Act* [Docket No. 1126] (the "Coughlen Compl."). A few days later, on November 17, 2023, the *Keef* plaintiffs dismissed their complaint without prejudice. *See* Keef Adv. Proc. Docket No. 13.

On December 15, 2023, the *Moore* plaintiffs sought leave to file a second amended complaint, which was granted on December 26, 2023. Moore Adv. Proc. Docket Nos. 19, 23. The second amended complaint merged the *Moore* and *Rivera* matters, leaving only the *Moore* and *Coughlen* matters remaining as active adversary proceedings. *See* Moore Adv. Proc. Docket No. 19. The Bankruptcy Court then certified a class of certain non-union former employees of the Debtors in the Moore lawsuit, *see* Moore Adv. Proc. Docket No. 69, but declined to certify the *Coughlen* class.

Separately, more than 1000 WARN-related Proofs of Claim were Filed against the Estates, including, among others, omnibus proofs of claim Filed by the IBT and International Association of Machinists on behalf of all bargaining unit members. All WARN-related matters in or relating to the Chapter 11 Cases, including the WARN-related Proofs of Claim, the Keef Compl., the Moore Compl., the Rivera Compl, and the Coughlen Compl., are referred to in this Disclosure Statement as the "WARN Claims and Proceedings."

On April 26, 2024, the Bankruptcy Court entered scheduling orders for the WARN Claims and Proceedings, which set a dispositive motion deadline of October 14, 2024. *See* Docket No. 3186; Moore Adv. Proc. Docket No. 52; Coughlen Adv. Proc. Docket No. 21. Various claimants, however, Filed dispositive motions far in advance of the stipulated deadlines, *see* Coughlen Adv. Proc. Docket Nos. 53–54, and in fact far in advance of any discovery, *see* Moore Adv. Proc. Docket Nos. 42–43 and Docket Nos. 3728 and 3794, which certain claimants later amended [Docket No. 4036]. The Debtors drafted responses to such motions because they were required to do so, and the claimants stated their intent to further amend their various motions yet again. Accordingly, on August 16, 2024, the Debtors and the

various WARN claimants agreed to and Filed a revised scheduling stipulation, *see* Docket Nos. 4109-1, 4360, Moore Adv. Proc. Docket No. 91-1, and Coughlen Adv. Proc. Docket No. 59-1, which provided for the Filing of any amended, supplemented, or new summary judgment pleadings on or before September 6, 2024, and a hearing on all WARN-related summary judgment matters before the Bankruptcy Court on October 28, 2024.  On September 6, 2024, the Debtors filed motions for summary judgment [Moore Adv. Proc. Docket Nos. 98, 99; Coughlen Adv. Proc. Docket Nos. 65, 66], as did the Moore plaintiffs [Moore Adv. Proc. Docket No. 100, 102] and the IBT and IAM [Docket No. 3728, 3729].  On September 37, 2024, (i) the Debtors filed their oppositions to the motions for summary judgment filed by the Coughlen plaintiffs, the Moore plaintiffs, and the IBT and IAM.  *See* Coughlen Adv. Proc. Docket No. 77, Moore Adv. Proc. Docket No. 114, Docket No. 4452; (ii) the Moore plaintiffs filed their opposition to the motion for summary judgment filed by the Debtors [Moore Adv. Proc. Docket No. 113]; (iii) the Coughlen plaintiffs filed their opposition to the motion for summary judgment filed by the Debtors [Coughlen Adv. Proc. Docket No. 75]; and (iv) the IBT filed its opposition to the motion for summary judgment filed by the Debtors [Docket No. 4440].

The Debtors do not believe they have any valid WARN liability and believe such Claims will be disallowed and dismissed either on summary judgment or following trial.  The plaintiffs and claimant parties that are party to the WARN Claims and Proceedings dispute the Debtors' valuation of WARN Claims and assert that the Debtors owe the full damages allowable under applicable law.  The final decision on such matters rests with the Bankruptcy Court (and any appellate courts) and, if any WARN-related claims are Allowed, such Claims would materially dilute recoveries to all other Holders of General Unsecured Claims.

### 7.  IBT-Related Matters

On June 27, 2023, Yellow Corporation and four of its operating subsidiaries (as referenced in this section, together "Yellow") commenced a lawsuit in the U.S. District Court for the District of Kansas against International Brotherhood of Teamsters, Teamsters National Freight Industry Negotiating Committee, and three local Teamsters unions (as referenced in this section, together, the "Union") alleging that, in breach of the operative collective bargaining agreement, the Union stonewalled Yellow's implementation of Phase 2 of its One Yellow enterprise transformation.  In its complaint, Yellow sought to recover the damages it incurred from delayed implementation of Phase 2 that the Union's breaches allegedly caused. The Union disputes the Debtors' allegations.  The Union moved to dismiss Yellow's complaint for failure to state a claim.

On March 25, 2024, the district court judge granted the Union's motions to dismiss, dismissed Yellow's complaint, and entered judgment against Yellow, holding that Yellow was required to exhaust grievance procedures in the collective bargaining agreement before it could file suit, and it had not done so and had not alleged an excuse for its failure to exhaust.

On April 22, 2024, Yellow moved for reconsideration.  Specifically, Yellow argued that the trial court erred in determining that the collective bargaining agreement required further grievance, that Yellow had not pled futility as an excuse for failure to exhaust, and that the facts and circumstances at hand demonstrated futility of further grievance.

On August 12, 2024, Yellow filed a notice of appeal with the Tenth Circuit Court of Appeals. Yellow filed its appellate brief on October 7, 2024, and the Union filed its response brief on November 6, 2024.  Yellow's reply brief is due November 27, 2024.  Yellow has requested oral argument.  If the appeal reverses the trial court decision and the case is remanded, Yellow will seek damages against the Union, the success of which could materially improve the recovery to unsecured creditors.  Regardless of the outcome of the appeal, there has yet been no resolution as to the merits of the Debtors' claims against IBT, TNFINC, and several local unions.  The IBT has separately filed unfair labor practice charges against Yellow claiming

that Yellow's lawsuit is a violation of the National Labor Relations Act, which Yellow disputes. The National Labor Relations Board filed proofs of claim against the Debtors' based on the IBT's unfair labor practice charges but has not made a final ruling on the merits. In the event that the dismissal is affirmed, Yellow (including any post-confirmation trust) reserves its rights to pursue claims against the Union through a grievance process and otherwise reserves any and all rights, claims, and defenses against the Union.

### 8. Automatic Stay Matters

With certain exceptions, the Filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases may be subject to enjoinment, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be barred and enjoined in connection with the Chapter 11 Cases.

### 1. BIPD Claims and ADR Procedures

Beginning on August 24, 2023, various claimants Filed motions to lift the automatic stay to proceed with litigation relating to prepetition personal injury, wrongful death, wrongful termination, alleged violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, negligent supervision, defamation, property damage, and other related claims in courts across the country and recover against the Debtors and/or under the Debtors' Motor Carrier's Indemnity Insurance Policy (the "Auto Policy") with Old Republic Insurance Company ("ORIC") or any other potentially applicable insurance policy on account of such Claims. The Debtors spent many months working at length to negotiate and achieve consensus to establish alternative dispute resolution procedures with ORIC, the Committee, and various claimants. The Debtors Filed a motion seeking approval of such procedures on December 11, 2023 [Docket No. 1329] (the "ADR Procedures Motion").

After Filing the ADR Procedures Motion, the Debtors continued to work with various stakeholders to resolve a web of issues between and among the Debtors, the claimants, the Committee, and ORIC to establish a workable framework for the parties to efficiently resolve these litigation Claims pursuant to the procedures reflected in the Bankruptcy Court's order entered on February 26, 2024 [Docket No. 2389] (the "ADR Procedures Order," and such procedures, the "ADR Procedures"). The ADR Procedures have avoided costly and time-consuming piecemeal litigation across the country, while affording claimants a mechanism to pursue recoveries they might not otherwise be able to obtain for years. As of August 28, 2024, approximately 674 of the claims have been settled, including some of claimants who had previously Filed lift-stay motions and/or objected to the ADR Procedures Motion. The Debtors and ORIC will continue their efforts to resolve claims against the Debtors and/or ORIC that relate to personal injury, property damage, or both, as efficiently as possible.

### 9. EPA Matters

The U.S. Department of Justice ("DOJ") Filed two Proofs of Claim against the Debtors seeking a total of approximately $2.13 billion in past and future costs related to addressing contamination at the Newtown Creek Superfund Site located in New York City.[40]

---

[40]    *See* Proof of Claim Nos. 19438, 19439.

The Debtors are coordinating with an environmental consultant and are engaged in negotiations with the relevant government entities in order to explain why the Proofs of Claim are overstated and should be substantially reduced.  This process remains ongoing.

The Debtors have owned or operated numerous underground and above ground storage tanks and associated systems ("USTs" and "ASTs").  On May 10, 2024, the Debtors Filed the Notice of Abandonment (Unused Fuel) [Docket No. 3353] to effectuate the removal of fuel from and subsequent decommissioning of certain of their tanks by third parties on certain of their owned or leased properties.  Such process remains ongoing.  The Debtors own or operate certain other USTs and ASTs that were not subject to the Notice of Abandonment.  Some of the Debtors' USTs and ASTs are still in operable status and others have been placed or are in the process of being placed into temporary out-of-service status under applicable regulations.  Other USTs and ASTs are in the process of being closed or decommissioned.  The Debtors have sold some USTs and ASTs and/or the real property on which they are located.  To the extent applicable, the Debtors will coordinate regulated activities with licensed vendors, certified contractors, government agencies, landlords, and property owners, as appropriate, to permanently close or decommission the tank, extend temporary out-of-service, or place the tank in operable status in accordance with applicable federal and state law.  To the extent that there is a new owner or operator of a UST or AST or landowner of the underlying real property, the Debtors anticipate that certain liabilities relating to the USTs and ASTs will be the responsibility of the new property owners, landlords or tenants, as appropriate under applicable non-bankruptcy law, once the Debtors exit such properties.

The United States on behalf of the EPA and several state environmental agencies (the "Governments") have informed the Debtors that they contend that:  (1) the Liquidating Trustee must comply with all applicable state and federal laws, regulations, and rules for the Debtors' USTs and ASTs (it is the Debtors' position that this obligation, if at all, is only applicable to the extent such USTs and ASTs are transferred to the Liquidating Trust or otherwise remain under the ownership or operation of the Debtors and/or Liquidating Trust, as applicable), including but not limited to those governing operations, out of service status, decommissioning, closure, and corrective action for releases relating to its USTs and ASTs; (2) the Liquidating Trustee will be liable for residual liabilities, if any, with respect to the USTs and ASTs or releases relating to the USTs and ASTs under applicable non-bankruptcy law; and (3) funding in the Liquidating Trust must be made available to address such liabilities; and (4) the Liquidating Trustee may not abandon any USTs and ASTs without conditions in place protecting public health and safety and without providing the Governments reasonable opportunity to object.  The Governments have informed the Debtors that they believe that the proposed Plan is not confirmable because it fails to provide any mechanism or winddown funding for compliance with the Debtors' UST and AST obligations to protect public health and safety, and that bankruptcy may not be used to evade compliance with important public health and safety requirements.  Nothing in the Disclosure Statement shall prejudice the rights of the Governments to make the above contentions to the Court in an objection to the Plan or the rights of the Debtors, the Liquidating Trustee, or other parties in interest to disagree with the above contentions.

## I.    Plan Settlement and Structure Proposals

Prior to the hearing on the Third Exclusivity Motion, the Committee made a settlement proposal that would provide Holders of Interests in Yellow Corporation with a guaranteed cash recovery, irrespective of the various disputed matters at issue in these cases.  Since the hearing on the Debtors' Third Exclusivity Motion, the Debtors made a proposal to both their largest Interest Holder—MFN—and the Committee.

More recently, MFN provided a proposal to the Debtors (the "MFN Proposal"), which was shared with the Committee, but is not actionable.  On August 28, 2024, the Participating Equity Interest Holders sent an amended, joint, and non-binding proposal (labeled as "for discussion purposes only"), which is also not actionable, but was attached to the Initial Disclosure Statement as Exhibit C (the "Equity Holders' Proposal").  The Equity Holders' Proposal did not provide for the disposition of the Debtors' remaining

real estate portfolio, but instead contemplated, among other things, a go-forward subleasing and/or REIT entity, including a backstopped equity rights offering to facilitate payment in full of all Allowed General Unsecured Claims. However, the Equity Holders' Proposal was contingent upon, among other things, the Debtors prevailing in the SFA MEPP Litigation. The Debtors, however, did not prevail in the SFA MEPP Litigation with respect to their arguments to disallow the MEPP Claims, as reflected in the Bankruptcy Court's memorandum opinion at Docket No. 4326.

The currently Filed Plan would allow the Debtors to continue the evaluation, marketing, and monetization of their assets, including their real estate portfolio, in order to best maximize value for their stakeholders and distribute this value in accordance with the absolute priority rule. Prior to Filing the currently Filed Plan and this Disclosure Statement, the Debtors shared drafts thereof with, and solicited feedback from, the Committee.

### J.    Assumption and Rejection of Executory Contracts and Unexpired Leases

The Debtors are party to a substantial number of executory contracts. The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code. To facilitate this process, the Debtors have Filed the following motions:

- Rejection Procedures Motion. The *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 391] (the "Rejection Procedures Motion") on August 31, 2023, seeking approval of procedures for rejecting executory contracts and unexpired leases. On September 13, 2023, the Debtors Filed a certification of counsel and a revised proposed order resolving certain objections, reservation of rights, and informal inquiries, asking the Bankruptcy Court to enter an order granting the Rejection Procedures Motion [Docket No. 538]. On September 14, 2023, the Bankruptcy Court entered an order approving the Rejection Procedures Motion on a final basis [Docket No. 550]. On October 30, 2023, the Debtors also Filed the *Debtors' Motion for Entry of an Order, Pursuant to Section 365(d)(4) of the Bankruptcy Code, Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 995] and the Bankruptcy Court entered an order approving the 365(d)(4) Extension Motion on a final basis on November 13, 2023 [Docket No. 1127]. On February 12, 2024, the Debtors Filed the *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Certain Unexpired Leases and (II) Granting Related Relief* [Docket No. 2157] and the Bankruptcy Court entered an order approving the assumption of certain leases and executory contracts on February 26, 2024 [Docket No. 2385].

- Omnibus Rejection Motion. The *Omnibus Motion of Debtors Seeking Entry of an Order (I) Authorizing (A) Rejection of Certain Executory Contracts and Unexpired Leases Effective as of Dates Specified Herein and (B) Abandonment of Certain Personal Property, If Any, and (II) Granting Related Relief* [Docket No. 394] (the "Omnibus Rejection Motion"), Filed on August 31, 2023, seeking authorization for the Debtors to, among other things, reject certain executory contracts and unexpired leases and abandon certain personal property related to the same. On September 14, 2023, the Debtors Filed a certification of counsel and revised order, asking the Bankruptcy Court to enter an order granting the Omnibus Rejection Motion [Docket No. 541]. On September 14, 2023, the Bankruptcy

Court entered an order approving the Omnibus Rejection Motion on a final basis [Docket No. 548].

On the Effective Date pursuant to section 365 and 1123 of the Bankruptcy Code, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected, shall be deemed automatically rejected, unless such Executory Contract or Unexpired Lease shall be categorized pursuant to one of those enumerated categories at Article V.A of the Plan.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Final Order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases pursuant to the Plan; *provided* that neither the Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under the Third-Party Sale Transaction Documents to assume and assign Executory Contracts and Unexpired Leases pursuant to the Third-Party Sale Transaction Documents. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Liquidating Trustee. Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Liquidating Trustee in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

Although their analysis is ongoing, the Debtors currently estimate that the aggregate amount of Claims on account of rejection of Executory Contracts and Unexpired Leases may be significant.

**K.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of service of notice of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with **Error! Reference source not found.** of the Plan or such other treatment as agreed to by the Liquidating Trust and the Holder of such Claim.

**L.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

As further detailed in Article V.D of the Plan, any monetary defaults under an assumed Executory Contract or Unexpired Lease, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitations described in Article V.D. of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Pursuant to Article V.D. of the Plan, in the event of a dispute the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served, and actually received by the Debtors at least seven days before the

Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object will be deemed to have assented to the assumption or assumption and assignment and cure amount.

>        **M.      Liquidating Trust Governance Matters**

>        While the Debtors have worked constructively with the Committee and other parties in interest regarding the terms of the Plan, matters with respect to the selection of the Liquidating Trustee and the Liquidating Trust Board of Managers remain unresolved as of the date of this Disclosure Statement. The Plan proposes that (a) the Debtors will select, in consultation with the Committee, the Liquidating Trustee and all three managers on the Liquidating Trust Board of Managers and (b) if Allowed General Unsecured Claims are satisfied in full in Cash (including Postpetition Interest), the Liquidating Trust Board of Managers may be replaced by Holders of Equity Liquidating Trust Interests.  On November 14, 2024, MFN and Mobile Street, LLC Filed a limited objection to the Disclosure Statement, which expressed concern that (a) conflicts of interest could dominate the Liquidating Trust Board of Managers were certain Committee members to sit on the board or nominate board members and therefore (b) a recusal mechanism should be included in the Liquidating Trust Agreement to ensure fair administration of the assets of the Liquidating Trust, which voting classes should be informed of in advance of any voting deadline. *See* Docket No. 4864.  On November 18, 2024, the Committee also Filed a statement expressing its concerns regarding Liquidating Trust governance and that the right to control the governance of the Liquidating Trust should belong solely to the Committee. *See* Docket No. 4950.  The parties are continuing to engage and negotiate these post-Confirmation governance matters in advance of the Plan Supplement Filing deadline and the Confirmation Hearing.  For the avoidance of doubt, voting classes will receive notice of the recusal mechanisms (as and if applicable) by January 14, 2025 so that voting classes will have sufficient time to consider before voting on whether to accept or reject the Plan.

# VIII.      RISK FACTORS

>        Holders of Claims should read and consider carefully the risk factors, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, below before voting to accept or reject the Plan.  Although several risk factors are discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

>        **A.      Certain Bankruptcy Law Considerations**

>        The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

>                **1.      Parties in Interest May Object to the Plan's Classification of Claims and Interests**

>        Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article X of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are waived or not met, the Effective Date will not occur.

### 3. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind down the Estates, such as confirm an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests. The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors reserve the right to modify the Plan (with the consent of the Committee, which consent shall not be unreasonably withheld) whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, if permissible under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to such Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided*, *however*, that the Debtors shall not amend or modify the Plan in a manner that adversely affects the treatment of any Class of Claims without resoliciting such Class of Holders of Claims.

### 5. Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan need not satisfy these requirements at this time, but the Debtors reserve their rights to pursue nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. The Debtors believe that the Plan satisfies the requirements, but there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Plan Exclusivity Period

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon Filing their Petitions and subsequent extensions approved by the Bankruptcy Court. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals. Such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Class. *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c).

### 8. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement. Specifically, without limiting the generality of the foregoing, while the Debtors have raised the MEPP Subordination Argument, that issue has not yet been resolved and it remains unclear whether or not the MEPP Subordination Argument will be successful. The outcome of such dispute could have a material effect on recoveries for Holders of General Unsecured Claims.

### 9.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10.    Contingencies May Affect Votes of the Impaired Voting Class to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, the outcome of pending claims objections Filed by the Debtors.  The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Voting Class to accept or reject the Plan or require any sort of revote by the Impaired Voting Class.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 11.    Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Liquidating Trustee, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 12.    The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated by the Debtors

With respect to Holders of Allowed General Unsecured Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Debtors have estimated.  As noted above, and without limiting the generality of the foregoing, the outcome with respect to the subordination of Withdrawal Liability Claims (*i.e.*, the MEPP Subordination Argument) remains uncertain.  If Withdrawal Liability Claims are not subordinated to all other General Unsecured Claims, the total amount of Allowed General Unsecured Claims would be higher than if portions of the Withdrawal Liability Claims are subordinated to all other General Unsecured Claims.

### 13.    Subsequent Events May Affect Recoveries Under the Plan

Holders of Allowed Claims should carefully review Article III.W of this Disclosure Statement, entitled "Could Subsequent Events Potentially Affect Recoveries Under the Plan?", for a summary of certain potential events that could have the effect of impacting recoveries under the Plan.

### 14.    Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES," to determine

how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the post-Effective Date Debtor(s), Liquidating Trust, and Holders of Claims and Interests.

### B. Disclosure Statement Disclaimer

#### 1. The Financial Information Contained in this Disclosure Statement Has Not Been Audited

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

#### 2. Information Contained in This Disclosure Statement Is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

#### 3. This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

#### 4. This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Forward-looking statements are neither historical facts nor assurances of future performance.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology.  All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  Any forward-looking statement made herein is based only on information currently available to the Debtors and speaks only as of the date on which it is made.  Except as may be required by applicable law, the Debtors undertake no obligation to publicly update any forward-looking statement whether as a result of new information, future developments, or otherwise.

#### 5. No Legal or Tax Advice Is Provided to You by this Disclosure Statement

***This Disclosure Statement does not constitute legal advice to you.***  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 6.    No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

### 7.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Liquidating Trustee may seek to investigate, file, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### 8.    No Waiver of Right to Object to Claim or Interest

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### 9.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

### 10.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, as amended, will be accompanied by a ballot to be used for voting on the Plan, and is being distributed to the Holders of Claims in the Class that is entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines shall be as set forth in the exhibits annexed to the Disclosure Statement Order.

*The Disclosure Statement Order will be incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.*

> ### THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

The Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 5 (the "Voting Class").  The Holders of Claims in the Voting Class are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 4A, 4B, 6, 7,  8, and 9.  Additionally, the Disclosure Statement Order will provide that certain Holders of Claims in the Voting Class, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

The Voting Record Date is November 14, 2024.  The Voting Record Date will be the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim in the Voting Class.

### C.    Voting on the Plan

The Voting Deadline is January 21, 2025, at 4:00 p.m. (prevailing Eastern Time).  To be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot containing your vote is **actually** **received** by the Claims and Noticing Agent on or before the Voting Deadline, once determined.

To vote, complete, sign, and date your ballot and return it (with an original signature) ***promptly*** to one of the below addresses.

---

**By regular mail, overnight mail, or hand delivery at:**

**Yellow Corporation, et al., c/o Epiq Ballot Processing, 10300 SW Allen Boulevard, Beaverton, OR 97005**

---

**OR**

**SUBMIT VIA AN ELECTRONIC BALLOT THROUGH THE CLAIMS AND NOTICING AGENT'S ONLINE ELECTRONIC BALLOT SUBMISSION PORTAL AT https://dm.epiq11.com/YellowCorporation**

**PLEASE SELECT JUST ONE OPTION TO VOTE.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT TOLL FREE AT (866) 641-1076 (DOMESTIC) or +1 (503) 461-4134 (INTERNATIONAL) OR VIA ELECTRONIC MAIL TO YellowCorporationInfo@epiqglobal.com.**

  D.  **Ballots Not Counted**

  <u>**No ballot will be counted toward Confirmation if, among other things**</u>: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no Proof of Claim was Filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors instead of the Claims and Noticing Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **You should refer to the Disclosure Statement Order, to be subsequently Filed, for additional requirements with respect to voting to accept or reject the Plan.**

  **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

**X.**  **CONFIRMATION OF THE PLAN**

  A.  **Requirements for Confirmation of the Plan**

  Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are that the Plan: (1) is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) is feasible; and (3) is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

## B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit B** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

A large portion of the assets of the Debtors' business will have been liquidated through the Third-Party Sale Transactions and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Third-Party Sale Transactions. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the increased expenses that would be incurred in a chapter 7 liquidation, with the appointment of the chapter 7 trustee. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained, if any, to be lost, and the chapter 7 trustee will not have the technical expertise and knowledge of the Debtors' business that the Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses. Therefore, the appointment of a chapter 7 trustee would potentially delay distributions to creditors and reduce the present value of any recovery for Holders. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be

obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any subsequent chapter 7 case.

A conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately Filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

## C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets pursuant to the terms of the Plan, including the Liquidating Trust Agreement. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

## D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class that contains Claims is eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtors shall request that the Bankruptcy Court deem the Plan accepted by the Holders of such Claims in such Class.

## E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection

or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors with the consent of the Committee, such consent not to be unreasonably withheld, reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors, with the consent of the Committee, such consent not to be unreasonably withheld, reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class. As to a dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### XI.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, Liquidating Trust, and beneficial owners of Claims or Interests (each owner, a "Holder"). This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling

or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not address foreign, state, local, or non-income tax consequences of the Plan (*e.g.*, U.S. federal gift or estate tax or the 3.8% Medicare tax on net investment income), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein.  Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.  This summary also does not address the U.S. federal income tax consequences to Holders that are not Holders of Class 4A, 4B, or 5 Claims, and/or Class 8 Interests.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

A.      **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

Pursuant to the terms and provisions of the Plan, Debtors would recognize gain or loss upon the transfer in an amount equal to the difference between the fair market value of assets sold or transferred and the Debtors' tax basis in such assets. To the extent any gains are recognized, such gains may be able to be offset, in whole or in part, by the Debtors' available tax attributes. As of the end of December 31, 2023, the Debtors estimate that they had approximately $727 million of U.S. federal net operating losses (the "NOLs") and approximately $334 million of disallowed business interest carryovers under section 163(j) of the Tax Code (the "163(j) Carryovers"). If the Debtors were to recognize gain in connection with the Plan and such gain could not be entirely offset with available NOLs, 163(j) Carryovers, and other tax attributes, a cash tax liability could arise.

   1.   **COD Income**

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The amount of any COD Income that will be realized by the Debtors has not been determined and will not be determinable until after the consummation of the Plan.

B.      **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 4A, 4B, 5 Claims and/or Class 8 Interests**

The following discussion assumes that the transactions contemplated by the Plan will become effective and occur. Holders of Claims and Interests are urged to and should consult their tax advisors regarding the tax consequences of the Plan.

   1.   **U.S. Federal Income Tax Consequences for Holders of Allowed Class 4A, 4B, 5 Claims and/or Class 8 Interests**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, and release of the Allowed Class 4A, 4B, 5 Claims and/or Class 8 Interests, each Holder thereof will receive (as provided for and to the extent set forth in the Plan, as applicable) Cash or beneficial interests in the Liquidating Trust formed pursuant to Articles IV.D and VIII of the Plan (such interests, the "Liquidating Trust Units").

Additionally, as further discussed below in Section D, the Debtors expect (and the Liquidating Trust documents shall provide) that the trustee(s) of the Liquidating Trust(s) will treat any Liquidating Trust

as a grantor trust of which the applicable Holders of Allowed Claims and Interests are the grantors. Each U.S. Holder of an Allowed Claim receiving Liquidating Trust Units should accordingly be treated as having (a) received its share of the Liquidating Trust Assets from the Debtors and (b) contributed such assets to the Liquidating Trust in exchange for Liquidating Trust Units.

Each such U.S. Holder will be treated as exchanging such Allowed Class 4A, 4B, 5 Claim and/or Class 8 Interest in a taxable exchange under section 1001 of the Tax Code for Cash or Liquidating Trust Units. Accordingly, subject to the rules regarding accrued but untaxed interest as discussed below, each U.S. Holder of such Claim or Interest should recognize gain or loss equal to the difference between (1) the amount of Cash or the fair market value of the Liquidating Trust Assets underlying the Liquidating Trust Units received, as applicable, in exchange for such Allowed Claim, and (2) such Holder's adjusted basis, if any, in such Allowed Claim or Interest.

Generally, the gain or loss recognized by a U.S. Holder with respect to an Allowed Class 4A, 4B, 5 Claim and/or Class 8 Interest will be a capital gain or loss unless the Allowed Claim was acquired at a market discount (as discussed below) and depending on whether and the extent to which the Holder previously claimed a bad debt deduction. Any such capital gain or loss generally should be long-term if the U.S. Holder's holding period in the Allowed Claim or Interest is more than one (1) year and otherwise should be short-term. Under current U.S. federal income tax law, certain non-corporate U.S. Holders are eligible for preferential rates of U.S. federal income tax on long-term capital gains.

A U.S. Holder of an Allowed Class 4A, 4B, 5 Claim and/or Class 8 Interest who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) and ordinary income to the extent of the lesser of (x) $3,000 ($1,500 for married individuals filing separate returns) or (y) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income in later years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three (3) years preceding the capital loss year or may carry over unused capital losses for the five (5) years following the capital loss year.

A U.S. Holder of such Allowed Claims or Interests should obtain a tax basis in its share of each of the Liquidating Trust Assets received (if any) equal to the fair market value of such U.S. Holder's share of each of the Liquidating Trust Assets as of the date such property is treated as having been distributed to the U.S. Holder pursuant to the Plan. The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

## 2. Accrued but Untaxed Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Class 4A, 4B, and/or 5 Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Allowed Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Class 5 Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Class 5

Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Allowed Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Allowed Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNTAXED INTEREST.

### 3. Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Class 4A, 4B, and/or 5 Claim who exchanges the Allowed Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument immediately after such acquisition is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Class 4A, 4B, and/or 5 Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### 4. Ownership of Liquidating Trust Units

The U.S. federal income tax obligations of U.S. Holders of Allowed Claims and/or Interests receiving Liquidating Trust Units (as applicable) are not dependent on the Liquidating Trust distributing any Cash or other proceeds. U.S. Holders of such Claims and/or Interests will be required to report on their U.S. federal income tax returns their share of the Liquidating Trust's items of income, gain, loss, deduction, and credit in the year recognized by the Liquidating Trust. This requirement may result in such U.S. Holders being subject to tax on their allocable share of the Liquidating Trust's taxable income prior to receiving any cash distributions from the Liquidating Trust (as applicable). In general, a distribution of Cash by the Liquidating Trust will not be separately taxable to a holder of a beneficial interest in the Liquidating Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust).

### 5. Delayed Distributions

The Plan provides that certain distributions may be delayed while contingent, unliquidated, or disputed Claims are addressed. Pending the resolution of such Claims, a portion of the property to be received by Holders of Claims or Interests (as applicable) may be deposited into the Liquidating Trust as described in the Plan. The property that is subject to delayed distribution will be subject to "disputed

ownership fund" treatment under section 1.468B-9 of the Treasury Regulations as further discussed below in Section D.

### C.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Class 4A, 4B, 5 Claims and/or Class 8 Interests

The following discussion includes only certain U.S. federal income tax consequences of the Plan to non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex.  Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, local and non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Holder.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

### 1.   Gain Recognition

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID, if any), any gain realized by a non-U.S. Holder on the exchange of its Allowed Class 4A, 4B, 5 Claim and/or Class 8 Interest pursuant to (and to the extent applicable under) the Plan generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the transactions contemplated by the Plan occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax (and possibly withholding tax) with respect to any gain realized on the exchange if such gain is effectively connected with the non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.   Accrued Interest

Subject to the discussion of FATCA below, payments to a non-U.S. Holder that are attributable to accrued but untaxed interest with respect to Claims generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W 8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

1.   the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of the applicable Debtor's stock entitled to vote;

2. the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the applicable Debtor (each, within the meaning of the Tax Code);

3. the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

4. such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W 8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "Accrued but Untaxed Interest," the aggregate consideration to be distributed to Holders of Allowed Class 4A, 4B, and/or 5 Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

### 3. FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final Treasury Regulations become effective.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder's exchange of its Claim or Interest.

### D.    Tax Matters Regarding the Liquidating Trust

The Plan provides that, among other things, under certain circumstances, assets may be transferred by the Debtors to a Liquidating Trust in order to facilitate the sale of such assets and the disposition of the proceeds thereof to (as and to the extent applicable) Holders of Claims and (as and to the extent applicable)

Interests as provided pursuant to the terms and provisions of the Plan. As further described in the Plan, such assets may either be subject to:

### 1. Liquidating Trust Treatment

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims or (as and to the extent applicable) Interests, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to challenge successfully the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the Holders of Claims or Interests (as and to the extent applicable) receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a

liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (*e.g.*, income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

## 2. Disputed Ownership Fund Treatment

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

## E. Information Reporting and Backup Withholding

The Debtors and the Liquidating Trustee will withhold all amounts required by law to be withheld from distributions or payments. The Debtors and Liquidating Trustee will comply with all applicable reporting requirements of the Tax Code. In general, information reporting may apply to distributions or payments made to (as and to the extent applicable) a Holder of a Claim or Interest under the Plan. In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH**

**HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS THAT ARE NOT HOLDERS OF CLASS 4A, 4B, 5 CLAIMS OR CLASS 8 INTERESTS.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.      RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  November 21, 2024

Yellow Corporation
on behalf of itself and its debtor affiliates

*/s/ Matthew Doheny*
Matthew Doheny
Chief Restructuring Officer,
Debtors and Debtors in Possession

74