## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Yellow Corporation, *et al.* | ) | Case Nos. 23-11069 (CTG) |
| | ) | (Jointly Administered) |
| Debtors | ) | **Obj. Deadline:  Dec. 5, 2024 @ 4:00 p.m.** |
| | ) | **Hearing Date:  Jan. 21, 2024 @ 10:00 a.m.** |
| | ) | Ref. D.I. 5018 |

## THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS AND TEAMSTERS NATIONAL FREIGHT INDUSTRY NEGOTIATING COMMITTEE'S RESPONSE TO DEBTORS' TWENTY-SECOND OMNIBUS (SUBSTANTIVE) OBJECTION TO PROOFS OF CLAIM

Creditors, The International Brotherhood of Teamsters ("IBT"), Teamsters National Freight Industry Negotiating Committee ("TNFINC"), its affiliated local unions, and their respective bargaining unit members[1], (collectively "Teamsters"), by and through their undersigned counsel, submit this Response to *Debtors' Twenty Second Omnibus (Substantive) Objection to Proofs of Claim* ("Objection") [D.I No. 5018].  The Teamsters are creditors in their capacity as the exclusive bargaining representatives of the employees, who are also creditors in their own right. As further explained below, the Teamsters, on behalf of the bargaining unit members that they represent, are seeking to recover wages and fringe benefit contributions required by the National Master Freight Agreement ("NMFA"), pursuant to promises that Yellow Corporation and its "Operating Companies" (YRC, Inc., USF Holland, LLC, New Penn Motor Express, LLC, and USF Reddaway, Inc.), using its trade name YRC Worldwide, Inc., (collectively, "Yellow") made to the United States Treasury that it will continue to operate, with the NMFA in full force and effect, through September 30, 2024.  The Teamsters have standing to bring a claim in bankruptcy to recover wages required

---

[1] The Teamsters filed proofs of claim on behalf the approximately 21,000 Teamster affiliated former employees of Yellow Corporation's subsidiaries: YRC Inc., USF Holland, LLC, New Penn Motor Express, LLC and USF Reddaway Inc.  Teamsters sought so called Cares Act Damages for the vast majority of these employees for the time period through September 30, 2026.

by a collective bargaining agreement. *In re Altair Airlines, Inc.*, 727 F. 2d 88, 90-91 (3d Cir. 1984).

## I. INTRODUCTION

1.    In their Objection, the Debtors called the Teamsters' claims under the WARN Act baseless, though on the same day that the Objection was filed the Court clarified that he was likely to reject each of the Debtors' affirmative defenses to WARN liability, so that the Debtors' violation of the WARN Act has been established, and the only remaining question is whether a reduction of damages for the WARN Act violation is warranted pursuant to 29 U.S.C. §2104(b)(4).  Most of Debtors' defenses to the Teamsters' claim to recover backpay for the time period on and after August of 2023 are baseless just like the Court will find the Debtors' affirmative defenses to WARN Act liability are without merit.

2.    The Teamsters agree with the Debtors that the provision of 15 U.S.C. §9042(3)(D)(VIII) that prohibits the recipient of a CARES Act loan from abrogating a collective bargaining agreement until two years after it completes repayment of the loan only applies to mid-sized businesses, and that YRC Worldwide Inc., as a party to the Trench A and Trench B loans with the United States Treasury, was too large to qualify as a mid-sized business.  Consequently, Teamsters cannot base their proof of claim on the a claim that they can enforce Yellow's violation of the CARES Act through an implied duty of good faith and fair dealing.

3.    Rather, the loan covenants that the Debtors agreed to with the United States Treasury required it to continue operations (i.e. by neither filing for bankruptcy nor agreeing to a change of control), with the NMFA in full force and effect, through the full loan repayment date of September 30, 2024.  By requiring for the NMFA to remain in full force and effect through September 30, 2024, the Treasury intended TNFINC and the former employees of the Operating Companies it represents to benefit from the loan, since such a covenant is not necessary to ensure

either that Yellow was generating sufficient revenue to meet its loan obligations, or that Yellow's operations would not be disrupted by labor disputes.  The Court should therefore find that TNFINC and the Yellow employees for whom it and the Teamsters local unions served as collective bargaining representatives are intended third-party beneficiaries of Yellow's promise made to the United States Treasury to continue to operate as a unionized operation, with the NMFA remaining in full force and effect, through September 30, 2024.

4.      Each of the Debtors' defenses to liability fails:  Because the Teamsters are seeking to enforce an independent contractual obligation, rather than a contract obligation that parallels a requirement of the CARES Act, the CARES Act's lack of a private right of action does not bar the Teamsters' claim.  To decide whether the Debtors are liable to TNFINC and its former employees requires the Court to interpret the Loan Documents entered into by YRC Worldwide and the United States Treasury, not any contracts significant to the maintenance of labor peace within the meaning of 29 U.S.C. §185.  Moreover, the Teamsters' claim would not be preempted by §185 even if the Court must apply federal law to interpret the NMFA to compute damages for the claim.  Finally, 29 U.S.C. §158(b)(6) prohibits a union from requiring employers to hire un-necessary workers for future work; but does not prohibit awarding backpay to employees for time periods during which they should have been, but were not permitted to work.  Moreover, this Court does not have jurisdiction to adjudicate whether the Teamsters' seeking of backpay violated §158(b)(6), since enforcement of that provision is entrusted to the exclusive jurisdiction of the National Labor Relations Board.

5.      For these reasons, the Court should allow the Teamsters' claim, but only for the reduced time period between July 31, 2023 and September 30, 2024.

## II.    ARGUMENT

I.    <u>TNFINC and Former Yellow Employees are Intended Beneficiaries of the Provision of the Loan Agreements that Require Yellow to Maintain the NMFA in Full Force and Effect Through September 30, 2024</u>.

6.    Debtors are wrong to argue that the CARES Act was solely concerned with providing funding to companies that are critical to the United States economy. The CARES Act was also concerned with preserving American jobs, so that for example each agreement for a CARES Act loan must require the eligible business receiving the loan to reduce its employment levels by no more than 10 percent between March 24, 2020 and September 30, 2020.  15 U.S.C. §9042 (c)(2)(G).   The same goal of preserving American jobs also animated the Trench A and Trench B loans that the United States Treasury made to Yellow, as shown by the Treasury's press release announcing the loans, which explained the loans would enable Yellow to maintain approximately 30,000 trucking jobs, in addition to continuing to support essential military supply chain operations and the operations of other North America corporate customers.[2]

7.    As shown by the Loan Agreements themselves, in entering into the loans with YRC Worldwide, Inc., the United States Treasury was concerned with preserving union employment, not just with the preservation of American jobs.  The loan agreements for the Trench A and Trench B loans both referred to the "IBT" and the "IBT Agreement" (referring to the NMFA, see D.I. #5018-3, 5018-4, Definition of "IBT Agreement") dozens of times.    The Loan Agreements required for the IBT Agreement remain in effect on the Initial Funding Date.  (D.I. #5018-3, 5018-4, Art.  4.02(e)).  Both Loan Agreements also required that Yellow maintain the NMFA in full force and effect for the duration of the loan. (D.I. #5018-3, #5018-4, Art. 8.01(n)).

---

[2] The press release can be accessed at: https://home.treasury.gov/news/press-releases/sm1049.

8.      Both loan agreements also required Yellow to continue to operate its business for the duration of the loans by prohibiting Yellow from either initiating any bankruptcy or insolvency proceedings or agreeing to a change of control for the duration of the loans.  (D.I. #5018-3, #5018-4, Art. 8.01(f) and (j)).  Given the number of buildings and rolling stock that Yellow owned, any decision by Yellow to stop operations would clearly lead to a bankruptcy filing.  By prohibiting Yellow from either filing for bankruptcy or agree to a change of control of the company for the duration of the loan, the Loan Agreements required Yellow to continue its business operations for the duration of the loans, consistent with the CARES Act's objective of preserving American jobs.

9.      The provision of the Loan Agreements that required Yellow to keep the NMFA in full force and effect for the duration of the loans can only be explained by the Treasury's objective to benefit TNFINC and the former Yellow employees it represents by preserving unionized employment. If Treasury was only concerned with Yellow generating sufficient revenue to comply with its repayment obligations, other provisions of the Loan Agreements would have sufficed including their minimum EBITDA requirements, their deadlines for Yellow to pay principal and interest on the loans, their prohibition against Yellow initiating bankruptcy or insolvency proceedings for the duration of the loan, and their prohibition against Yellow becoming unable to pay its debts as they become due for the duration of the loan.   (D.I. #5018-3, #5018-4, Art. 7.10, 8.01(a), (f), (g)).  Similarly, if Treasury was only concerned with Yellow enjoying labor peace so that its business operations would not be disrupted, the Loan Agreements could have included a covenant that prohibited strikes and lockouts, rather than a covenant that required for the NMFA to remain in full force and effect for the duration of the loans, which would be violated even if the Teamsters amicably disclaimed interest to continue to represent Yellow employees.  Treasury was clearly concerned with preserving unionized employment for Yellow employees through

September 30, 2024, in return for the large $700 million dollar lifeline that Treasury was providing to Yellow.

10.    Pursuant to the Loan Agreements, any violation of the loan covenants by Yellow, such as the covenant that the NMFA must remain in full force and effect, would allow the lenders to ask the administrative agent to declare that the lenders' commitments to make the loans are terminated, and that the unpaid principal amount of all loans shall be immediately due and payable. (D.I. #5018-3, 5018-4, Art. 8.02).  Each of the loan covenants, including those that required Yellow to continue operations and those that required for the NMFA to remain in full force and effect, therefore were intended to remain in effect until Yellow repaid the principal amount of the loans to the Treasury on September 30, 2024.  (D.I. #5018-3, 5018-4, Definition of "Maturity Date").

11.    An individual or an entity is a third-party beneficiary of a government contract if the government agency had an express or implied intent to directly benefit the third party.  *G4S Technology, LLC v. U.S.*, 779 F. 3d 1337, 1340 (Fed Cir. 2015).  Under this standard, a plaintiff was a third-party beneficiary of a loan guarantee agreement between the Small Business Administration and a lender where the purpose of the Small Business Act is to aid, counsel, assist, and protect, insofar as possible, the interests of small-business concerns, while the purpose of the loan guarantee agreement was to facilitate this statutory objective by guaranteeing loans to allow small businesses to obtain loans from the bank that they otherwise may not have gotten. *Audio Odyssey, Ltd v. U.S.*, 255 F. 3d 512, 521 (8th Cir. 2001).  Similarly, tenants are intended beneficiaries of a contract between the government and project owners where the primary purpose of the contract was to benefit tenants, as shown by the fact that the contract required for project funds to be disbursed based on the financial needs of tenants rather than the financial conditions of housing projects. *Holbrook v. Pitt*, 643 F. 2d 1261, 1271-1273 (7th Cir. 1981).

12.     In this case, as shown by the provisions of the loan agreements outlined above, in return for the extraordinary $700 million lifeline that it received from the United States government, Yellow promised to the Treasury to provide unionized employment to tens of thousands of employees represented by TNFINC and the local Teamsters unions for the duration of the loans through September 30, 2024. The requirement that Yellow must keep the NMFA in full force and effect for the duration of the loan was clearly intended for the benefit of TNFINC and the former Yellow employees it represents, since such a provision is not necessary to either ensure Yellow was generating revenue needed to remain current with loan payments, or to ensure that Yellow enjoyed labor peace so that its business operations would not be disrupted. Moreover, no provision of either Loan Agreement prohibited third parties from relying on promises contained in the Agreements for their benefit. Consistent with the CARES Act's goal of preserving American jobs and the Loan Agreements' goal of preserving unionized employment for employees represented by the Teamsters, the Court should find that TNFINC and the former employees it represents are the intended beneficiaries of Yellow's promise to the Treasury to continue to provide unionized employment to Teamsters represented employees through September 30, 2024.

13.     Moreover, there is nothing extraordinary about classifying employees as intended beneficiaries of government contracts. *Mosley v. Bay Ship Management, Inc*., 174 F. Supp. 2d 194, 201 (D.N.J. 2000) (Employee is third-party beneficiary of contract between government and employer that required employer to observe the civil rights laws of the United States); *Berry v. Transdev Services, Inc*., 2017 WL 1364658 * 5-6 (W.D. Wash. 2017) (Employees are third-party beneficiaries of government dispatch services contract that required contractor to provide breaks and lunches to its employees).

14.     By terminating its Teamster represented employees and filing for bankruptcy, Yellow breached its promise to the Treasury to continue business operations with the NMFA in full force and effect through September 30, 2024.  The Teamsters, on behalf of the employees who are third-party beneficiaries of that promise, are entitled to recover backpay and fringe benefit contributions those employees would have received had Yellow honored its promise.

II.     <u>The CARES Act's Lack of A Private Right of Action Does not Bar the Teamsters' Claim, Because the Teamsters are Seeking to Enforce a Contractual Obligation For Which There is no Parallel Requirement in the CARES Act</u>.

15.     The main case that the Debtors rely upon to argue that the Teamsters cannot state a viable breach of contract claim, *Astra USA, LLC v. Santa Clara County*, 563 U.S. 110 (2011) is easily distinguishable.  *Astra USA's* claim for breach of contract was barred, because the plaintiff in that case was seeking to enforce a contractual obligation that was one and the same with a statutory obligation; as an end-run around the lack of a private right of action provided by the statute. *See* 560 U.S. 110, 114, 118 (2011).

16.     The Supreme Court in *Astra USA* dismissed the Complaint before it only because it did not allege any violation of an independent substantive obligation that only arose from the contract.  See 560 U.S. at 119.  The Supreme Court therefore recognized that the lack of a private right of action in a statute does not bar an action to enforce a purely contractual obligation that is related to, but is not the same as, any obligations imposed by a federal statute.  In this case, the CARES Act by itself does not guarantee employment for Teamsters employees for any period of time, so that by seeking to enforce Yellow's promise to provide unionized employment for tens of thousands of employees through September 30, 2024, the Teamsters are not seeking to enforce a contractual obligation that is one and the same as Yellow's statutory obligation.  The CARES Act's lack of a private cause of action therefore cannot bar the Teamsters' purely contractual claim.

Other cases cited by the Debtors are equally distinguishable because they involved breach of contract actions to enforce obligations imposed by statutes that do not authorize private rights of action, rather than actions that only seek to enforce contractual promises. *See Grochowski*, 318 F. 3d at 86 (Plaintiff cannot attempt to collect wages required by the Davis-Bacon Act, a statute that does not provide a private cause of action, by bringing a third-party beneficiary claim to enforce a contract); *Radix Law*, 508 F. Supp. 3d at 520 (A lawsuit based on state law is barred if it is in essence an action to enforce a federal statute that lacks a private right of action).

17.    The remaining cases cited by the Debtors are even more distinguishable when they only held that a private right of action is not available through the CARES Act, rather than that any claims for breach of contract could be barred because a private right of action is not available through the CARES Act. *See Johnson*, 488 F. Supp.3d at 127-128; *Saloojas, Inc.*, 2022 WL 5265141 * 3-9; *Ortiz*, 2023 WL 2188694 * 2; *Murphy*, 2022 WL 743088 * 4-6.

III.    <u>Resolving Whether Yellow is Liable to the Teamsters on the Proof of Claim Does not Require the Court to Interpret Any Contract Between an Employer and a Labor Organization.</u>

18.    As explained above, the Teamsters' claim seeks to enforce promises made by the Loan Agreements that YRC Worldwide, Inc. entered into with the United States Treasury, rather than any work guarantees provided by the NMFA. The Court therefore has no need to interpret the NMFA to decide whether Yellow assumed an enforceable obligation to continue to offer unionized employment to its Teamsters represented employees through September 30, 2024.

19.    While the Teamsters do seek to enforce promises contained in Loan Agreements between the UST and YRC Worldwide, Inc., said Loan Agreements are not contracts between an employer and a labor organization within the meaning of 29 U.S.C. §185(a). Pursuant to §185(a), a contract between an employer and a labor organization is a contract that is important to the

maintenance of labor peace between labor and management. *Retail Clerks v. Lion Dry Goods, Inc.*, 369 U.S. 17, 28 (1962). In this case, labor peace between Yellow and the Teamsters is maintained by the NMFA, while the Loan Agreements only dictate the duration by which the NMFA must remain in full force and effect. The need to interpret the Loan Agreements to decide the Teamsters' claim does not establish the Teamsters' claim is preempted by §301.

20.    Once the Court determines that TNFINC and the former Yellow employees it represents are third-party beneficiaries who are entitled to recover pursuant to the Loan Agreements, damages owed to the members had Yellow continued its operations through September 30, 2024 can be computed using the average wage rate earned by each employee classification, the average number of hours worked by each employee classification, and the average health and pension rates of contribution that Yellow paid. Because Teamsters used average wage and fringe benefit rates that were in effect in July of 2023 to compute damages, the Court need not refer to the NMFA to determine whether and what wage and fringe contribution increases the employees would have received after July of 2023 had Yellow continued to operate.

21.    As the Third Circuit held in cases cited by the Debtors, a state law cause of action is completely preempted by 29 U.S.C. §185 only when claims raised on the face of the complaint require interpreting the collective bargaining agreement for their resolution. *See Berda v. CBS*, 881 F. 2d 20, 24 (3d Cir. 1988). On the other hand, if the Court can determine the validity of a state law claim without interpreting collective bargaining agreements, the court's need to interpret a labor agreement's terms defining the rates of pay and other benefits to compute damages for the state law claim does not make the state law claim preempted by §185. *Lingle v. Norge Division of Magic Chef*, 486 U.S. 399, 412 n. 12 (1988), *followed by Rutledge v. International Longshoremen's Association*, 701 Fed. Appx. 156, 162 (3d Cir. 2017) (Unpublished). Similarly, in this case, the

Teamsters' claim is not preempted by §185, because the Court can decide whether the Teamsters are third-party beneficiaries of the Loan Agreements without interpreting the NMFA, even if the Court must interpret the NMFA to compute the additional amount of wages and fringe benefit contributions Teamsters members should receive through September 30, 2024.

22.    The cases cited by the Debtors in which the Court found preemption under §301 are easily distinguishable because they involved attempts to create rights created by a collective bargaining agreement, rather than claims to enforce rights that arise independently from any collective bargaining agreement. *Teamsters v. Lucas Flour Co*., 369 U.S. 95, 103-105 (1962). (Federal law controlled because the Court must interpret the agreement to decide whether a dispute was subject to arbitration, and therefore whether a no-strike obligation should be read into the CBA); *Allis-Chalmers v. Lueck*, 471 U.S. 202, 218 (1985) (Complete preemption where the right asserted not only derives from the contract but is defined by the contractual obligation of good faith).  The Circuit and District Court cases cited by the Debtors similarly involved claims for rights created by collective bargaining agreements, rather than claims for rights created by state law.  *Guerrero*, 259 Fed. Appx. at 458; *Maddox*, 50 F. Supp. 3d at 631 (Plaintiff only claimed that her termination violated policies and procedures that fell within the scope of the CBA; while the independent Operating Policies and Procedures did not apply to her); *Cherilus*, 2020 WL 3038525 * 3-4 (Court must interpret collective bargaining agreement to decide whether it was violated by the plaintiff's termination).

IV.    The Court is Without Jurisdiction to Decide Whether the Teamsters' Claim Violated 29 U.S.C. §158(b)(6); and in Any Event §158(b)(6) only prohibits Featherbedding, not the Recovery of Backpay for Time Periods During Which Employees Were Wrongfully Prevented from Working.

23.    The Debtors cannot defend against the Teamsters' Claim by arguing that the Teamsters violated 29 U.S.C. §158(b)(6) by filing the proof of claim, because such a defense based

on a claim that the Plaintiff's claim violated the National Labor Relations Act falls within the exclusive jurisdiction of the National Labor Relations Board. *Huge v. Long's Hauling, Inc*., 590 F. 2d 457, 460-461 (3d Cir. 1978). *See also In re Tristar Fire Protection, Inc*., 466 B.R. 392, 407 (Bankr. E.D. Mich. 2012) (The NLRB has exclusive jurisdiction over unfair labor practice proceedings, so that a bankruptcy court cannot adjudicate whether an unfair labor practice has occurred).

24.     In any event, §158(b)(6) only prohibits a union from attempting to cause an employer to make payments to employees for services that were not *to be* performed. *NLRB v. Gamble Enterprises*, 345 U.S. 117, 122 (1953). The law therefore prohibits featherbedding (i.e. a union requiring an employer to hire men that will not be needed for future work) and does not prohibit the recovery of backpay for periods of time during which the employee should have but was not allowed to work for the employer. *American Newspaper P. Ass'n. v. NLRB*, 345 U.S. 100, 109-110 (1953); *Gamble Enterprises v. NLRB*, 196 F. 2d 61, 63 (6th Cir. 1952), *reversed on unrelated grounds by* 345 U.S. 117 (1953) (Holding that an award of back pay is distinguishable from a payment that is prohibited by §158(b)(6)). Indeed, Courts have routinely upheld the National Labor Relations Board's authority to award backpay to employees for time periods that they did not and were wrongfully prevented from working for the employer. *AFB Freight Systems, Inc. v. NLRB*, 510 U.S. 317 (1994) (Uphold backpay award for an employee who was terminated for engaging in union activities); *NLRB v. J.H. Rutter-Rex Mfg. Co*., 396 U.S. 258, 263 (1969) (The legitimacy of back pay as a remedy for unlawful discharge or unlawful failure to reinstate is beyond dispute; so that backpay should be awarded to unfair labor practice strikers the employer wrongfully refused to reinstate). If §158(b)(6) prohibits any award of backpay for time periods

during which the employee did not work for the employer, then each of these awards of backpay upheld by the Supreme Court would be unlawful.

25.     Moreover, statutes related to the same subject matter should be interpreted harmoniously with each other.  *L.Y. Ex Rel. J.Y. v. Bayonne Bd. Of Educ.*, 384 Fed. Appx. 58, 62 (3d Cir. 2010) (Unpublished). The Court should harmonize §158(b)(6) with 29 U.S.C. §186, which similarly limits payments that an employer may make to a labor organization.  Section 186((c)(2) expressly authorizes the payment or delivery of any money or other thing of value in satisfaction of a judgment of any court, such as for example the payment of backpay that a labor organization can accept on behalf of the employees that it represents.  The presence of §186 further support the conclusion that §158(b)(6) prohibits a labor organization from requiring an employer to hire employees that it does not need for future work; but does not prohibit the recovery of backpay for time periods that the employee should have been, but wrongfully was prevented from working for the employer.

26.     Nor can the Debtors rely on their numerous citations to the duty of good faith and fair dealing to defeat the Teamsters' claim, given that the Teamsters are seeking to enforce a promise that YRC Worldwide made to the United States Treasury, rather than any duty of good faith and fair dealing associated with a statutory obligation.

### III.  CONCLUSION

27.     For the above stated reasons, the Court should deny the Debtors' objection in part, and find that each employee represented by the Teamsters, who remained with one of Yellow's Operating Companies as of July 30, 2023, is entitled to recover full contractual wages and fringe benefit contributions required by the NMFA for the time period of July 31, 2023 through September 30, 2024.

Date: December 3, 2024

LAW OFFICE OF SUSAN E. KAUFMAN, LLC

*/s/ Susan E. Kaufman*
Susan E. Kaufman, (DSB# 3381)
919 North Market Street, Suite 460
Wilmington, DE 19801
(302) 472-7420
(302) 792-7420 Fax
skaufman@skaufmanlaw.com

-and-

Yingtao Ho (WI Bar No. 1045418)
Emma Woods (WI Bar No. 1120187)
THE PREVIANT, LAW FIRM, S.C.
310 W Wisconsin Ave, Suite 100MW
Milwaukee, Wisconsin 53203
Telephone: 414.271.4500
Facsimile: 414.271.6308
yh@previant.com
emw@previant.com

*Counsel for International Brotherhood of Teamsters ("IBT"), Teamsters National Freight Industry Negotiating Committee ("TNFINC"), its affiliated local unions, and their respective bargaining unit members*