IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | ) ) | Case No. 23-11069 (CTG) |
| Debtors. | ) ) ) ) ) ) ) ) ) | (Jointly Administered) <br><br> **Hearing Date:** <br> **January 21, 2025 at 10:00 a.m. (ET)** <br> **Response Deadline:** <br> **January 3, 2025 at 4:00 p.m. (ET)** |

**DEBTORS' TWENTY-FOURTH OMNIBUS (SUBSTANTIVE) OBJECTION TO THE PROOFS OF CLAIM OF THE UNITED STATES OF AMERICA, FILED ON BEHALF OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, THE UNITED STATES DEPARTMENT OF THE INTERIOR, AND THE UNITED STATES DEPARTMENT OF COMMERCE, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION [CLAIM NOS. 19438 AND 19439]**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully submit this objection (this "Objection") to *Proof of Claim of the United States of America on Behalf of the United States Environmental Protection Agency, the United States Department of the Interior, and the United States Department of Commerce, National Oceanic and Atmospheric Administration* [Claim No. 19438] (the "New Penn Environmental Claim") and *Proof of Claim of the United States of America on Behalf of the United States Environmental Protection Agency, the United States Department of the Interior, and the United States Department of Commerce, National Oceanic and Atmospheric Administration* [Claim No. 19439] (the "YRC Inc. Environmental Claim," and together with the New Penn Environmental Claim,

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

1

the "Environmental Claims"), attached as **Exhibit A** attached hereto.[2] In support of this Objection, the Debtors submit (a) the *Declaration of Travis McGuire in Support of the Debtors' Twenty-Fourth Omnibus (Substantive) Objection to the Proofs of Claim of the United States of America, Filed On Behalf of the United States Environmental Protection Agency, the United States Department of the Interior, and the United States Department of Commerce, National Oceanic and Atmospheric Administration*, attached hereto as **Exhibit B** (the "McGuire Declaration"), and (b) the *Declaration of Matthew A. Doheny in Support of the Debtors' Twenty-Fourth Omnibus (Substantive) Objection to the Proofs of Claim of the United States of America, Filed On Behalf of the United States Environmental Protection Agency, the United States Department of the Interior, and the United States Department of Commerce, National Oceanic and Atmospheric Administration*, attached hereto as **Exhibit C** (the "Doheny Declaration"), and respectfully state as follows:

**Preliminary Statement**

1. By the Environmental Claims, the United States Environmental Protection Agency (the "EPA"), the United States Department of the Interior (the "DOI"), and the United States Department of Commerce, National Oceanic and Atmospheric Administration (the "NOAA," and collectively with the EPA and the DOI, the "Claimants") seek allowance of $2,134,313,629.43 in asserted (a) response costs incurred and to be incurred by the Government (the "Response Costs") under Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" or "Superfund"), 42 U.S.C. §§ 9601-9675, and (b) natural resource damages, including assessment costs (the "Natural Resource Damages"), in connection with the Debtors'

---

[2] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings ascribed to them in the Objection.

2

former ownership and/or operation of certain facilities near the Newtown Creek Superfund Site (the "Newtown Creek Site" or the "Site") located in Queens County and Kings County, New York. Claimants had nearly fourteen years to identify Debtors as Potentially Responsible Parties ("PRPs") at the Site, and tellingly, did not—despite having identified twenty-one unaffiliated non-Debtor entities as PRPs during the same period. Now, after fourteen years, Claimants are attempting to use the Debtors' bankruptcy proceedings to identify the Debtors as liable at the Site *for the first time*. Without providing any evidence whatsoever of the Debtors' alleged pollution responsibility, Claimants demand payment from the Debtors of approximately $2 billion in both past and future Site costs.[3] The Environmental Claims also fail to provide any financial documentation itemizing or describing in any detail the past or future Site costs, demonstrating that the amounts asserted are both uncertain and speculative.[4] In sum, the Environmental Claims are based on highly contingent costs for which the Debtors are not solely responsible, where twenty-one unaffiliated non-Debtor entities have been previously named by Claimants as PRPs and certain PRPs have been performing remedial and/or investigative work for over a decade at the Site. Accordingly, to the extent the Debtors are responsible at all—which Claimants have not established—the Environmental Claims should be reduced by approximately 99.99% to reflect

---

[3] While EPA has not provided any direct evidence supporting the Debtors' alleged liability at the Site, information made publicly available by EPA suggests that the pollution alleged was either (1) actually remediated, (2) attributable to third parties, and/or (3) of a negligible magnitude. For example, the Environmental Claims note that heavy oil contamination associated with the removal of underground storage tanks ("USTs") was observed on the subsurface at the facility located at 460 Kingsland Avenue. *See* Environmental Claims, ¶ 7. However, a 1994 preliminary site assessment report noted that no evidence of a release of petroleum products from USTs at the site had been detected, and that any potential release would have had little or no impact on the water table aquifer, whereas the soils and groundwater at the site had been impacted by the industrial practices of Mobil, a former operator. *See* New York State Department of Environmental Conservation, *1994 Preliminary Site Assessment Report*, 460 Kingsland Avenue, Brooklyn, NY, https://extapps.dec.ny.gov/cfmx/extapps/derexternal/haz/details.cfm?ProgNo=224135.

[4] Since filing the Environmental Claims, Claimants have provided only limited itemized estimates of certain portions of the Environmental Claims incurred by NOAA and United States Fish and Wildlife Service for certain periods of time through and until the fourth quarter of 2023.

3

Debtors' equitable apportionment under judicially defined factors, for a new claim amount of $64,029.41.

**Relief Requested**

2. The Debtors request entry of an order, substantially in the form attached hereto as **Exhibit D** (the "Order"): (a) disallowing the Environmental Claims set forth on Schedule 1 attached thereto in their entirety or reducing them to $64,029.41 by, among other things, applying the principles of apportionment set forth by the Supreme Court in *Burlington Northern* to the Response Costs and Natural Resource Damages claimed by Claimants, *see Burlington Northern and Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599 (2009), pursuant to Section 502(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 3007-1 of the *Local Rules for the United States Bankruptcy Court District of Delaware* (the "Local Rules"); and (b) granting related relief.

**Jurisdiction and Venue**

3. The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules, to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory bases for the relief requested herein are Section 502 of Bankruptcy Code, Rule 3007 of the Bankruptcy Rules, and Rule 3007-1 of the Local Rules.

**Background**

6.      On August 6, 2023 (the "Petition Date"), and continuing into August 7, 2023, each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to rule 1015(b) of the Bankruptcy Rules [Docket No. 169]. The Debtors are managing their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On August 16, 2023, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 269] (the "Committee"). No trustee or examiner has been appointed in these chapter 11 cases.

7.      Prior to the Petition Date, Debtor YRC Inc. ("YRC"), Debtor New Penn Motor Express ("New Penn"), and predecessor entities of YRC and/or New Penn each owned and/or operated a total of five facilities within the Newtown Creek Site, which is located on the border of Queens County and Kings County, New York and includes Newtown Creek, a tidal arm of the East River, and its tributaries.[5] Doheny Declaration, ¶ 5-6. Since the mid-19th century, the Newtown Creek Site has been one of the busiest industrial areas in New York City, with more than 50 oil refineries, petrochemical plants, fertilizer and glue factories, sawmills, lumber and coal yards, and other industrial facilities. Newtown Creek Analysis, Slide 2. During the same period, industrial pollution at the Newtown Creek Site was further exacerbated by the city's dumping of

---

[5] Specifically, the Debtors owned and/or operated a facility at (a) 1313 Grand Street, Brooklyn, NY for 43 years spanning from 1980 to 2023, (b) 57-54 Page Place, Queens, NY for 28 years spanning from 1983 to 2011; (c) 460 Kingsland Avenue, Brooklyn, NY for 28 years spanning from 1977 to 2005; (d) 58-60 Page Place, Queens, NY for 31 years ranging from 1993 to present; and (e) 416 Maspeth Avenue, Brooklyn, NY for two years spanning 1976 to 1978 (collectively, the "Yellow Newtown Facilities").

5

raw sewage directly into Newtown Creek. *Id*. Many factories and other industrial facilities still operate at the Newtown Creek Site today. *Id*.

8. Of the five Yellow Newtown Facilities, three were located directly adjacent to Newtown Creek, while two were located within one mile of Newtown Creek. Doheny Declaration, ¶ 7; *see also* Newtown Creek Analysis, Slide 7. Each Yellow Newtown Facility generally conducted logistics operations, such as trucking terminals or garages where the loading and unloading of freight and the maintenance, storage, and parking of vehicles and other equipment took place. Environmental Claims, ¶ 3-4. As such, the Debtors' operations at the Yellow Newtown Sites involved the use of vehicle-related chemicals, including relatively small amounts of oil, antifreeze, lubrication oil, fuel, and related products and wastes. Environmental Claims, ¶ 4. Storage operations at certain sites also involved the maintenance of diesel, fuel oils, and other substances in underground storage tanks ("USTs"). Environmental Claims, ¶ 4.

9. In 2009, the EPA conducted an Expanded Site Investigation ("ESI") of Newtown Creek as part of EPA's Hazard Ranking System scoring process pursuant to CERCLA. Environmental Claims, ¶ 14. The ESI focused on Newtown Creek rather than its tributaries or the upland properties. *Id*. Based on the ESI, the EPA concluded that various metals, volatile organic compounds, and semi-volatile organic compounds were present in the Newtown Creek sediments at concentration levels above those in nearby locations in the Atlantic basin. *Id*. Accordingly, the EPA added the Newtown Creek Site to the Superfund National Priorities List in September 2010. Environmental Claims, ¶ 15.

10. In July 2011, approximately one year after the Newtown Creek Site was designated a Superfund site, the EPA commenced a remedial investigation ("RI") and feasibility study ("FS") of the Newtown Creek Site with the goal of understanding the nature and extent of the

contamination of the waters and sediments of Newtown Creek.[6] The EPA determined from this RI/FS that there is adequate information to pursue an early action remedy, or an action that is designed to address the immediate threat to the environment and human health before long-term solutions are implemented, and in August 2024, the EPA proposed an interim, early action remedy for the East Branch of Newtown Creek (the "Early Action Remedy").[7] Environmental Claims, ¶ 16; Newtown Creek Analysis, Slide 3. The EPA estimates that its preferred remedial alternative for the Early Action Remedy will cost approximately $279.2 million.[8]

11. In July 2011, as part of the commencement of the RI/FS, the EPA signed an administrative order on consent with six PRPs—five private companies and the City of New York—who agreed to conduct the RI/FS under the oversight of the EPA. See Newtown Creek Analysis, Slide 5. Throughout the course of this multi-year, multi-phased RI/FS, the EPA has identified fifteen additional PRPs and continues its search for additional PRPs. See Environmental Analysis, Slide 5. The named PRPs are predominantly corporations who engaged in pollution intensive industrial manufacturing activities at the Site, including the refining and storage of petroleum products.[9]

---

[6] See USEPA, 2024. Newtown Creek, Brooklyn, Queens, NY. https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0206282.

[7] The Early Action Remedy for the East Branch portion of Newtown Creek concerns the last of four operable units ("OUs") concerned by this RI/FS ("OU4"); apart from the area concerned by the Early Action Remedy, EPA characterizes the East Branch of Newtown Creek as part of OU1. See Newtown Creek Analysis, Slide 3. An operable unit constitutes a distinct area subject to a cleanup, study, or action. The division of a Superfund site into OUs is intended to increase the efficiency of the response. An OU may be designated based on criteria including geographic area, medium (e.g. groundwater, soil, etc.), and complexity. McGuire Declaration, ¶ 9.

[8] See USEPA, 2024. Proposed Plan for OU4 East Branch Early Action for the Newtown Creek Site. https://semspub.epa.gov/work/02/744520.pdf.

[9] See USEPA, Newtown Creek/Greenpoint Oil Spill Study, Brooklyn, New York. September 12, 2007. https://semspub.epa.gov/src/document/02/348795, pg. 2-3 (outlining industrial history of petroleum storage and refining activities and oil spill at the Site by predecessor entities of PRPs such as ExxonMobil Oil Corporation, ChevronTexaco, and BP).

12.  In 2013, the EPA sent a request for information to YRC (d/b/a YRC Freight) and YRC Worldwide, Inc. to assess their connection to the Newtown Creek Site (the "2013 Information Requests"). Doheny Declaration, ¶ 8. For more than a decade after responding to the 2013 Information Requests, the Debtors did not receive any special notice letter or any further communication from the EPA indicative of any basis for liability at the Newtown Creek Site, until Debtors commenced these chapter 11 cases. Doheny Declaration, ¶ 8.

13.  Still, despite that the FS remains ongoing and that Yellow has not been named a PRP for the Newtown Creek Site, Claimants seek recovery of over $2.1 billion from the Debtors alone. This amount includes (a) an approximately $200 million claim requested by the EPA for the cost associated with the selected remediation alternative for OU4; (b) approximately $850,000 in unreimbursed past response costs claimed by the EPA for, among other things, performing the ESI and the search for additional PRPs; and (c) projected future cleanup costs claimed by the EPA in excess of $2 billion. *See* Environmental Claims, ¶ 16-17. In summary, Claimants assert Debtors are jointly and severally liable along with named PRPs and seek "all unreimbursed past and future response costs, plus interest, for which YRC and New Penn are liable to the [Claimants] in connection with the Newtown Creek Site." Environmental Claims, ¶ 19. To the contrary, as described in greater detail below, the Debtors are fairly characterized as a *de micromis* contributor.

14.  In addition to these response costs, the Environmental Claims request additional amounts in connection with natural resource damages—including injuries to Newtown Creek, its tributaries, and the fish, birds, and related species who make their habitat there—and the reasonable costs of assessing the injury to, or destruction or loss of, natural resources. Specifically, the Environmental Claims request (a) approximately $132 million in estimated damages claimed by the DOI and NOAA for the cost of restoration projected to compensate for the natural resource

injury, (b) $963,304.98 claimed by the NOAA in connection with unreimbursed past assessment costs, and (c) $500,324.44 claimed by the DOI in connection with unreimbursed past assessment costs. Environmental Claims, ¶ 23.

15. While the Debtors do not dispute their prior ownership and/or operation of the Yellow Newtown Facilities, the historical nature of industry and complexity of wastes disposed at the Newtown Creek Site necessitate an in-depth strategy for allocating Response Costs and Natural Resource Damages. Accordingly, the Debtors, with the assistance of GSI Environmental Inc. ("GSI"), prepared a liability allocation analysis attached as Exhibit 1 to the McGuire Declaration (the "Newtown Creek Analysis"). The Newtown Creek Analysis, a prior draft of which the Debtors and GSI presented to Claimants on July 25, 2024, calculates the Debtors' potential apportionment at the Newtown Creek Site utilizing EPA-approved reports and judicially-defined equitable factors. Guided by the EPA-approved methodologies and scientific and equitable principles supporting the Newtown Creek Analysis, the Debtors calculate that the Debtors are responsible, if at all, for at most $64,029.41, or 0.003%, of the Environmental Claims. Newtown Creek Analysis, Slide 19. In contrast, the Claimants provided no such analysis instead asserting Environmental Claims that attribute the contributions of unaffiliated, non-debtor entities to the Debtors without articulating any basis for doing so.

16. Accordingly, through this Objection, the Debtors respectfully request that the Court either disallow or reduce the Environmental Claims by, among other things, applying the principles of apportionment described herein.

**Objection**

I. **TO THE EXTENT THAT THE DEBTORS ARE A CONTRIBUTOR TO THE NEWTOWN CREEK SITE, THEY ARE A *DE MINIMIS* OR *DE MICROMIS* CONTRIBUTER AND, ACCORDINGLY, THE ENVIRONMENTAL CLAIMS SHOULD BE APPROPRIATELY APPORTIONED AMONGST RESPONSIBLE PARTIES.**

   a. **The Newtown Creek Analysis Presents a Reasonable Basis for Apportioning the Environmental Claims.**

17. CERCLA imposes strict liability for environmental contamination upon four broad classes of PRPs, including the current and former owners and operators of a facility, which is the basis that Claimants state in support of the Environmental Claims. *See* 42 U.S.C. § 9607(a). CERCLA instructs, however, that in resolving claims, courts "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). It is well-established that a court may consider equitable factors in allocating costs, including the Gore factors discussed herein. An equitable allocation methodology, including one that applies the Gore factors, is especially appropriate here, where a significant number of solvent PRPs have and continue to participate in the investigation and cleanup activities at the Site due to their determined relative fault and other equitable factors. *See Environmental Transportation Systems v. Ensco, Inc.*, 969 F.2d 503, 508-509 (7th Cir. 1992) (a court has "power to weigh and consider relevant factors, including [relative] fault" of the parties). Further, "CERCLA does not *mandate* the imposition of joint and several liability, it permits it in cases of indivisible harm." *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 181 (4th Cir. 2013).

18. CERCLA defendants may avoid the imposition of joint and several liability where they can show that there is a reasonable basis for apportioning the liability. *Burlington Northern and Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 614 (2009); see also *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802, 805-07 (S.D. Ohio 1983) (the court concluding, upon review of

CERCLA's history, that although the statute imposes a strict liability standard, it does not mandate joint and several liability in every case, instead intended to provide broad scope liability to "be determined from traditional and evolving principles of common law"); *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 181-82 (4th Cir. 2013) ("when two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused...."). Such liability can be apportioned even where wastes have become commingled, as commingling of contamination is not synonymous with indivisible liability. *See U.S. v. Alcan Alum. Corp.*, 892 F.Supp. 648, 656 (M.D. Pa. 1995), *aff'd*, 96 F.3d 1434 (3d Cir. 1996) (table).

19.     In *Burlington Northern*, an agricultural chemical distributor operated on a parcel of land owned by two railroad companies and, over time, contaminated soil and groundwater at the site such that EPA and California's Department of Toxic Substances Control cleaned the site and each filed CERCLA actions against the railroad companies and other involved parties for reimbursement of their investigation and cleanup costs. 556 U.S. 599, 602-08. The District Court apportioned 9% of the governments' total response costs to the railroad companies, and the Ninth Circuit Court of Appeals disagreed, finding the railroad companies jointly and severally liable for the governments' response costs. *Id*. at 606-07. The Supreme Court held that the district court, which had relied on estimates rather than specific and detailed records, reasonably apportioned the railroads' liability for site remediation costs incurred by the government, because their analysis looked at (a) the surface area of petitioners' parcel relative to the entire Superfund site, (b) the amount of time that operations impacting the site were attributable to petitioners, (c) and the number of key contaminants that had originated from the petitioners' parcel. 556 U.S. at 615-17.

20. Here, the Debtors incorporated each such component into the Newtown Creek Analysis, and therefore demonstrate a reasonable basis for apportioning Response Costs and Natural Resource Damages. Specifically, the analyses account for (a) the land area of each Yellow Newtown Facility to determine the amount of contaminants potentially discharged to Newtown Creek via stormwater and groundwater, where applicable; (b) the period of operation of YRC and/or New Penn to determine contaminant amounts potentially discharged via stormwater as well as groundwater; and (c) each of the three contaminants considered to be the primary drivers of potential risk to human health and the environment. *See* McGuire Declaration ¶ 11-14; *see also* Newtown Creek Analysis, Slide 7. In addition, whereas the district court in *Burlington Northern* relied on estimates, certain aspects of the Newtown Creek Analysis utilized data specific to certain Yellow Newtown Facilities. *See* McGuire Declaration ¶ 11; *see also* Newtown Creek Analysis, Slides 7, 20. Lastly, *Alcan Aluminum Corporation* indicates that CERCLA liability can still be apportioned should any waste attributable to the Yellow Newtown Facilities be commingled with contaminants from other industrial operations on Newtown Creek.

21. Further supporting Debtors' reasonable basis for apportionment is their application of the "Gore Factors" in the Newtown Creek Analysis. The EPA has long recognized the application of all or some of the Gore Factors as a means to allocate site remediation costs. The Gore factors include (i) the distinguishability of a party's waste; (ii) the amount of that waste; (iii) the toxicity of the waste at issue; (iv) the degree of a party's involvement in generating the waste; (v) the extent of a party's cooperation with environmental authorities to mitigate harm; and (vi) the overall care taken by a party in handling the waste.[10] Here, the Debtors' analysis

---

[10] *See* Gore Factors: USEPA, 1994. *Developing Allocations Among Potentially Responsible Parties for the Costs of Superfund Site Cleanups. U.S. Env't Prot. Ag., Developing Allocations Among Potentially Responsible Parties for the Costs of Superfund Site Cleanups* (Oct. 1994), https://www.epa.gov/sites/default/files/2020-02/documents/allocation-prps-1994.pdf ("Since proposed, the Gore factors have been applied as relevant factors,

considered the Gore Factors, highlighting distinguishability, quantity, and toxicity as the key factors relevant to the allocation analysis, which was calculated with site-specific data and EPA-approved methodologies. McGuire Declaration ¶ 10; *see also* Newtown Creek Analysis, Slide 8.

22.  The Debtors' apportionment applies the same methodologies that the EPA approved to characterize damages and remedial options at the Newtown Creek Site. In 2023, the EPA approved the Remedial Investigation Report (the "2023 RI Report") for the Newtown Creek Site, which analyzes results of the RI from 2011 through 2018 and helps characterize key drivers of cost under the Environmental Claims: the nature and extent of contamination, as well as the resultant risks to human health and the environment.[11] The 2023 RI Report identifies three contaminants—total polycyclic aromatic hydrocarbons ("TPAH"), total polychlorinated biphenyls ("TPCB") and Copper (collectively, the "Contaminants of Concern" or "COCs")—as a representative subset of contaminants and as the primary drivers of human and ecological risk at Newtown Creek. Newtown Creek Analysis, Slide 6. The 2023 RI Report also articulates the calculations appropriate for determining the amount of each Contaminant of Concern discharged to Newtown Creek, whether via stormwater or groundwater. *See* Newtown Creek Analysis, Slide 10. The analyses of the Contaminants of Concern as a representative subset of COCs is both appropriate and EPA-approved. *See* McGuire Declaration ¶ 13. Lastly, by incorporating data from the 2023 RI Report in the calculations, the Newtown Creek Analysis captures the seven years of study dedicated to the Newtown Creek Site. *See* McGuire Declaration, ¶ 14. In short, the

---

in whole or in part, by allocators in private allocations and by courts in contribution actions").

[11]  *See generally,* Anchor QEA, 2023. *Remedial Investigation Report, Remedial Investigation/Feasibility Study, Newtown Creek.*

Newtown Creek Analysis provided a reasonable basis for apportioning Debtors' potential liability under CERCLA because it relied on EPA-approved methodologies and the EPA-approved 2023 RI Report.  McGuire Declaration, ¶ 13-15.

### b. Under the Newtown Creek Analysis, the Debtors Are Only a *De Minimis* or *De Micromis* Source of Releases to Newtown Creek.

23. Pursuant to CERCLA § 122(g)(1)(A), the EPA may enter into *de minimis* settlements with potentially responsible parties who contributed wastes that are considered minimal relative to other hazardous substances at a Superfund site, both in terms of volume and toxicity.  With respect to toxicity, *de minimis* settlements remain appropriate where the evidence indicates the contributed waste is just as toxic as other hazardous substances at the Superfund site.  *See U.S. v. George W. Whiting Paper Co.*, 644 F.3d 368, 374 (7th Cir. 2011) (upholding a *de minimis* settlement, despite studies from intervenors suggesting that certain types of PCBs are more toxic than others, given government-provided evidence indicating the toxicity is consistent across the types of PCBs).  Since 1993, the EPA has also had a policy to enter into *de micromis* settlements under CERCLA § 122(g)(1)(A) with potentially responsible parties who contributed only miniscule amounts of hazardous substances to a Superfund site.  *See EPA*, *Guidance on CERCLA Settlements with De Micromis Waste Contributors*, OSWER Directive No. 9834.17, 1993 WL 816059 (July 30, 1993); *U.S. v. Keystone Sanitation Co., Inc.*, 1996 WL 33410106 (M.D. Pa. 1996) (ordering that *de micromis* settlements are a subset of settlements provided for in CERCLA § 122(g)(1)(A)).[12]

---

[12] *See also, generally,* EPA, *Superfund Cleanup Subject Listing De Minimis/De Micromis Policies and Models* (2024), https://cfpub.epa.gov/compliance/resources/policies/cleanup/superfund/index.cfm?action=3&sub_id=26.

24. The holding in *George W. Whiting Paper Company* indicates that a *de minimis* allocation should remain available to the Debtors because the EPA-approved 2023 RI Report indicates that the Contaminants of Concern potentially attributable to the Yellow Newtown Facilities are representative of the other contaminants at the Site. *See* Newtown Creek Analysis, Slide 6.

25. Furthermore, the Newtown Creek Analysis, which utilized EPA-approved methodologies and available site-specific data on potential discharges of the COCs from the Yellow Newtown Facilities, shows that no more than 0.003% of the COCs are potentially attributable to the Yellow Newtown Facilities. *See* Newtown Creek Analysis, Slide 19. In this way, the Debtors are distinguishable from significant contributors of pollution to the Site. No evidence of a large volume or otherwise significant release has been identified as originating from any of the Yellow Newtown Facilities. In fact, a 2014 analysis *approved by EPA* stated, regarding the Debtor facility located on Kingsland Avenue in Brooklyn, NY, that the facility is *not a significant contributor* of non-point source releases to the Newtown Creek Site given the potential sources of releases at the site and the nature of operations (*i.e.*, logistics operations).[13] Each of the additional Yellow Newtown Facilities were comparable with respect to their potential sources of releases and operations, as each maintained logistics operations. As such, a *de micromis* settlement is appropriate.

    **c. The Environmental Claims Fail to Consider the Contribution of the Twenty-One Named PRPs.**

26. Additionally, the Environmental Claims fail to reflect that twenty-one other entities have been named as PRPs and are responsible for contributing to the waste and other risks at

---

[13] *See* Anchor QEA, 2014. *Draft Sources Sampling Approach Memorandum RI/FS Report, Table E4-1,* pg. 175.

Newtown Creek. Generally, named PRPs are likely to be responsible for the majority share of cleanup costs, and the fact that the Debtors have not been named as a PRP would indicate that the Debtors' contribution is anticipated to be relatively small compared to the other PRPs. McGuire Declaration, ¶ 12. Furthermore, many of the named PRPs are associated with operations and waste discharges far more impactful to Newtown Creek than Debtors' logistics operations, including oil refineries, petrochemical plants, and industrial factories. McGuire Declaration, ¶ 12. As mentioned above, and noted in the Newtown Creek Analysis, six PRPs in particular accepted their responsibility to remediate and pay certain response costs as PRPs through prior agreement with the EPA.[14] *See* Newtown Creek Analysis, Slide 5. The Debtors have not accepted responsibility for the Environmental Claims or their alleged contributions, and should not be made to contribute by force what other parties have contributed pursuant to consensual agreement.

27. In significant contrast to the named PRPs, the Debtors have, since the 2013 Information Requests sent over ten years ago, only been sought after by the EPA for information, or had liability asserted against them in relation to the Site, after the Debtors commenced these chapter 11 cases, in connection with the Environmental Claims; absent the bankruptcy proceedings, the EPA had not indicated to Debtors any basis for CERCLA liability at the Site since its requests for information in 2013. Doheny Declaration, ¶ 8. Furthermore, the Environmental Claims provide no financial- or contamination-related documentation that evidences a basis for Debtor liability at the Newtown Creek Site, and the Environmental Claims already reflect "a contingency cost of 30%...to account for both scope and bid uncertainties" as investigation of the Site continues.[15] To saddle Debtors with Environmental Claims of over $2.1 billion that include

---

[14] *See* USEPA, *Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study*. July 7, 2011, https://semspub.epa.gov/src/document/02/109610.

[15] Anchor QEA, 2024. *East Branch Early Action Focused Feasibility Study – Draft Final. August.*

a large margin of uncertainties—absent any documentation from Claimants indicating CERCLA liability or an equitable allocation share—would undermine the nature and purpose of bankruptcy proceedings to the disservice of Debtors and their creditors.

### Reservation of Rights

28.  Nothing contained herein is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, priority, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

### Statement of Compliance with Local Rule 3007-1

29.  Counsel for the Debtors has reviewed the requirements of Local Rule 3007-1 and certifies that this Objection substantially complies with such Local Rule. To the extent that the Objection does not comply in all respects with the requirements of Local Rule 3007-1, the Debtors

---

https://semspub.epa.gov/work/02/707558.pdf (indicating that EPA's total response costs for remedial projects include a 30% contingency cost; in the Environmental Claim, Claimants seek recovery of response costs incurred and to be incurred by the Government under CERCLA).

believe such deviations are not material and respectfully request that any such requirement be waived.

## Notice

30. The Debtors will provide notice of this objection to: (a) the U.S. Trustee; (b) the Committee and Akin Gump Strauss Hauer & Feld LLP as counsel to the Committee; (c) the office of the attorney general for each of the states in which the Debtors operate; (d) United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States of America on behalf of the Claimants; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). In light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of page intentionally left blank]*

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form attached hereto as **Exhibit D**, disallowing the Environmental Claims set forth on Schedule 1 thereto in their entirety, or, in the alternative, reducing them to $64,029.41 to reflect the Debtors' equitable apportionment.

Dated: December 20, 2024
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | **KIRKLAND & ELLIS LLP** |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | 333 W Wolf Point Plaza |
| 919 North Market Street, 17th Floor | Chicago, Illinois 60654 |
| P.O. Box 8705 | Telephone: (312) 862-2000 |
| Wilmington, Delaware 19801 | Facsimile: (312) 862-2200 |
| Telephone: (302) 652-4100 | Email: patrick.nash@kirkland.com |
| Facsimile: (302) 652-4400 | david.seligman@kirkland.com |
| Email: ljones@pszjlaw.com | |
| tcairns@pszjlaw.com | |
| pkeane@pszjlaw.com | |
| ecorma@pszjlaw.com | -and- |

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*