## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 5096** |

## DEBTORS' OBJECTION TO MOTION OF
## THE PENSION BENEFIT GUARANTY CORPORATION FOR
## ALLOWANCE AND PAYMENT OF PREMIUMS AS ADMINISTRATIVE EXPENSE

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") respectfully submit this objection (this "<u>Objection</u>") to the *Motion of the Pension Benefit Guaranty Corporation for Allowance and Payment of Premiums as Administrative Expense* [Docket No. 5096] (the "<u>Motion</u>") and respectfully state as follows:

### Preliminary Statement[2]

1. The Pension Benefit Guaranty Corporation ("<u>PBGC</u>" or "<u>Movant</u>") seeks allowance and payment, pursuant to Section 503(b)(1)(A) of the Bankruptcy Code, of an administrative claim for $1,702,474.67 in postpetition insurance premium obligations related to the Pension Plan formerly maintained by the Debtors as plan administrator (the "<u>Claim</u>"). The Claim not only relates to obligations that accrued during a period of time in which the estate derived no benefit from the Pension Plan, but relies on a deviation from an established ERISA

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings ascribed to them in this Objection.

statutory scheme predicated on de facto adherence to administrative regulation by PBGC that is owed no deference in a post-*Chevron* environment. To the extent that PBGC alternatively attempts to classify the Claim as a governmental tax under 11 U.S.C. § 503(b)(1)(B), their classification is misguided. As such, there is no basis for the Debtors' liability for the Claim and the Motion should be denied.

## Background

2.  On August 6, 2023 (the "Petition Date"), the Debtors commenced the filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 169]. The Debtors are managing their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On August 16, 2023, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 269] (the "Committee"). No trustee or examiner has been appointed in these chapter 11 cases.

3.  Through March 1, 2024, the Debtors served as sponsor and plan administrator to three pension plans: the Yellow Corporation Pension Plan, the Roadway LLC Pension Plan, and the Yellow Retirement Pension Plan.[3] On March 1, 2024, the three plans were merged together forming the surviving Yellow Retirement Pension Plan (the "Pension Plan").

4.  Also on March 1, 2024, the Debtors submitted an application to terminate the Pension Plan in a distress termination (the "Termination Application") effective May 1, 2024

---

[3] Each of these pension plans was a single employer defined benefit pension plan covered by Title IV of ERISA. *See* 29 U.S.C. §1321.

(the "Pension Plan Termination Date"). PBGC subsequently determined that the Debtors met the requirements for a distress termination under 29 U.S.C. § 1341(c).

5. On August 2, 2024, the Debtors, as plan administrator, and PBGC executed an agreement for the appointment of a trustee and the termination of the plan (the "Trusteeship Agreement"). Under the Trusteeship Agreement, the Pension Plan was terminated, effective on the Pension Plan Termination Date, and trusteeship of the Pension Plan was transferred from the Debtors to PBGC on August 2, 2024 (the "Trusteeship Transfer Date").

6. Under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), the contributing sponsor or plan administrator of single-employer pension plans (a) must make periodic contributions to their plans, *see* 26 U.S.C. § 412, 29 U.S.C. § 1082, and (b) is the designated payor of PBGC insurance premiums (the "Pension Plan Premiums"), *see* 29 U.S.C. §§ 1307(a), (e). For plan years prior to 2024, all Pension Plan Premiums were paid from assets of the Pension Plan's trust, as is permitted under ERISA.

7. On December 9, 2024, PBGC filed the Motion, requesting payment of a $1,702,474.67 administrative expense claim for Pension Plan Premiums allegedly due for the postpetition period spanning the beginning of the 2024 plan year, or January 1, 2024, "through the date that PBGC was appointed as trustee under 29 U.S.C. § 1342(c)" or the Trusteeship Transfer Date. Motion, ¶ 10. The Motion offered no basis for, or calculation supporting, the amount of Claim.

**Basis for Relief**

I. **The Claim Asserted by PBGC is Misplaced Because the Continued Payment of the Pension Plan Premiums from Plan Assets Is Appropriate.**

8. Under ERISA, the Pension Plan Premiums "continue to accrue until a plan's assets are distributed pursuant to a termination procedure, or until a trustee is appointed pursuant to

3

section 1342 of this title, whichever is earlier." 29 U.S.C. § 1307(a). Under the statue, "the designated payor of each plan shall pay the premiums impose by the corporation . . . with respect to that plan when they are due." *Id*. In the case of a single-employer plan, the "designated payor" means the contributing sponsor or plan administrator. 29 U.S.C. § 1307(e)(1). However, while the plan administrator may carry the duty of ensuring that Pension Plan Premiums are paid post-trusteeship, nothing in ERISA prohibits the plan administrator from paying the Pension Plan Premiums (as well as any penalties and interest thereon) from plan assets, or otherwise dictates that the Debtors must deviate from their longstanding practice of doing so. As such, PBGC's attempt to collect payment for the Pension Plan Premiums from the Debtors as a consequence of their appointment as trustee of the Pension Plan is misplaced.

9.   To the extent that any authority at all can be read as a limitation on the funding source of post-trusteeship Pension Plan Premiums, that authority is provided exclusively by a PBGC rule cited to, and commented on, in a PBGC advisory letter issued approximately thirty years ago. *See* PBGC Opinion Letter 94-6 (explaining that 29 U.S.C. § 1307 is limited only by 29 CFR 2610.26(b) [now 29 CFR 4007], which provided "that premiums may not be paid by plan assets for any year beginning with the plan year in which a distress of involuntary termination is initiated"). Tellingly, the Motion relies on ERISA alone, favoring silence on this point to an outdated regulation that has been since revised to omit an explicit prohibition on payment from plan assets. *See* 29 CFR 4007 (providing only that, "After a plan administrator issues [] the first notice of intent to terminate in a distress termination under section 4041(c) of ERISA or PBGC issues a notice of determination under section 4042(a) of ERISA, the obligation to pay the premiums (and any interest or penalties thereon) imposed by ERISA and this part for a single-

4

employer plan shall be an *obligation* solely of the contributing sponsor and the members of its controlled group, if any.") (emphasis added).

10. Even if PBGC had issued an advisory opinion that was on point, an advisory opinion is nothing more than a non-binding interpretation of the law, as one "do[es] not rise to the level of a regulation and do[es] not have the effect of law." *Madison v. Res. for Hum. Dev., Inc.*, 233 F.3d 175, 186 (3d Cir. 2000) (*citing Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 135 (3d Cir. 1999). At most, "informal agency interpretations given in opinion letters and similar documents" are "entitled to respect"—as opposed to *Chevron* deference— to the extent that they "have the power to persuade." *Id*. (internal quotations omitted).

11. Finally, given that the Supreme Court, in *Loper Bright Enters. v. Raimondo*, recently nullified administrative deference under *Chevron,* holding that "courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," strict adherence to any administrative guidance from PBGC—including by regulation—is no longer appropriate. *Loper Bright Enterprises v. Raimondo,* 144 S. Ct. 2244, 2267, 73 (2024) (noting that "agencies have no special competence in resolving statutory ambiguities."). Accordingly, PBGC's interpretation of the long-established statutory scheme provided by ERISA is not a *de facto* limit on the payment of the Pension Plan Premiums from plan assets.

**II.    Even If Pension Plan Premiums Are to be Paid by the Debtors, PBGC Has Failed to Demonstrate the Claim Is Entitled to Administrative Expense Status Pursuant to Section 503(b)(1)(A) of the Bankruptcy Code.**

12. Section 503(b)(1)(A) of the Bankruptcy Code provides special priority for "actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commission for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A).

13. Parties seeking administrative expense status carry a "*heavy burden* to demonstrate that the costs and fees for which it seeks payment provided an actual benefit to the estate"

5

(*In re Bernard Techs., Inc.*, 342 B.R. 174 (Bankr. D. Del. Apr. 13, 2006) (emphasis added)) and that these costs were "necessary to preserve the value of the estate assets." *In re O'Brien Envt'l. Energy, Inc.*, 181 F.3d 527, 533 (3d Cir. 1999); *see also In re MTE Holdings LLC*, No. 19-12269 (CTG), 2021 WL 2258270 at *5 (Bankr. D. Del. June 2, 2021) (citing *In re Goody's Family Clothing Inc.*, 610 F.3d 812, 818 (3d Cir. 2010)) (same); *In re Energy Future Holdings Corp.*, 990 F.3d 728, 742 (3d Cir. 2021) (explaining there must be a real, actual benefit, not a merely hypothetical benefit to a debtor for administrative expense priority to be appropriate); *In re Lucky's Mkt. Parent Co.*, 2022 WL 843763, at *6 (D. Del. 2022) (citing *In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001) ("Section 503 is strictly construed to keep administrative expenses at a minimum, so as to preserve the estate for the benefit of creditors.")).

14. PBGC does not come close to satisfying this heavy burden, merely stating that the "Pension Plan was part of the compensation package for Debtors' employees, and the expenses of administering and maintaining said Pension Plan include the payment of statutorily required pension insurance." Motion, ¶ 4. In attempting to bolster this conclusory statement, PBGC cites to two cases, both of which present entirely different factual situations than the one at issue here.

15. PBGC cites to the non-binding providence of the Eighth Circuit in *In re MEI Diversified, Inc.*, where the court granted administrative priority to postpetition workers' compensation premiums where that insurance product was "essential to its postpetition operations." *In re MEI Diversified, Inc.*, 106 F.3d 829, 832 (8th Cir. 1997). In so ruling, the court noted that MEI could have terminated the insurance and failed to do so. *Id*. Still, the court held that the insurer was entitled administrative claim status but only for "the period in which the estate received benefits from the [insurance] contract." *Id*. at 832. Unlike in *MEI Diversified*, where the employees covered by the relevant pension plan were essential to postpetition operations, the

6

Debtors commenced these cases to effectuate an orderly winddown of its business and liquidation of its assets in the days after the Debtors' business was halted and nearly all operational employees were laid off. As of the Petition Date, the Debtors employed only approximately 304 of 4,333 total Pension Plan participants. This number has continuously decreased over the course of these chapter 11 cases—by the Pension Plan Termination Date, approximately 106 Pension Plan participants, or 2.5% of the total number of Pension Plan participants, remained employed by the Debtors. As of the Trusteeship Transfer Date, approximately 58 Pension Plan participants, or fewer than 1.4% of the total number of Pension Plan participants, remained employed by the Debtors.[4]

16.  Much like the Eighth Circuit in *MEI Diversified*, the Third Circuit in *In re Marcal Paper Mills* held that postpetition withdrawal liability for a multi-employer pension plan was entitled to administrative expense priority where the benefit to the estate was "unquestionabl[e]" because "it [wa]s clear that the covered employees were required to perform work postpetition in order to keep [debtor] in operation." *In re Marcal Paper Mills,* 650 F.3d 311, 317 (3d Cir. 2011). Setting aside the fact that withdrawal liability—as an obligation predicated on withdrawal from a pension plan rather than the maintenance of it—should not be analogized to the obligation presented by the Pension Plan Premiums, *Marcal Paper* found that the withdrawal liability obligation was entitled to administrative expense priority because, where such obligation correlated to the employees' postpetition employment, it was essentially equivalent to a postpetition wage benefit. Such a comparison is irrelevant here where, as described above, the

---

[4]  All counts reported herein represent actuarial estimates for the value of benefits accrued as of certain dates throughout these chapter 11 cases.

7

majority of the Debtors' participating workforce had been laid off prior to the Petition Date, let alone January 1, 2024.

17. Furthermore, the Pension Plan was closed to new participants on January 1, 2004, and benefit accruals under the Pension Plans were later frozen for all participating employees, effective July 1, 2008. At least one court has held that pension plan premiums allegedly accrued during the administration of a chapter 11 estate were not entitled to administrative expense priority treatment where the pension plan was frozen six years prior to the commencement of the bankruptcy case. *See generally, In re Kent Plastics Corp.*, 183 B.R. 841 (Bankr. S.D. Ind. 1995). There, the court reasoned that expenses could only be deemed administrative "to the extent that the consideration supporting the claimant's right to payment was *both* supplied to and beneficial to the debtor-in-possession in the operation of the business." *Id*., at 847 (further explaining that "the timing of the payment cannot be the determinative factor in granting administrative status" and dictating that, "[i]nstead, the [c]ourt must look at the postpetition operations of the debtor and the relationship between those operations and the postpetition accrual.").

18. Furthermore, the Pension Plans were frozen fifteen years prior to the Petition Date, halting the accumulation of new benefits for all participants, and the Debtors' have, for the last nearly sixteen months, maintained a skeletal staff working only to effectuate a winddown of their business. Therefore, the consideration allegedly supporting PBGC's right to payment was *neither supplied to nor beneficial to* the estate. As such, PBGC seeks an administrative claim for expenses that "bear no relation to the ongoing affairs of the debtor-in-possession while in Chapter 11." *Id*., at 847.

19. PBGC also suggests that the consideration supporting their right to payment of the Pension Plan Premiums, if not the operation of the Pension Plan and its role in maintaining the

Debtors' workforce, is the distress termination itself, which it notes "presumably. . . benefitted the estate." Motion, ¶ 17. To the contrary, the Debtors' sought the termination of the Pension Plan precisely because they were no longer deriving any benefit from it. Nevertheless, PBGC's argument fails in that it is explicitly based on presumption where courts have routinely held that "[t]he benefit must be *actual*, not hypothetical." *In re Energy Future Holdings Corp*., 990 F.3d 728, 742 (3d Cir. 2021).

20. Further to the fact that the timing of the Pension Plan Premium payment should not be determinative of Claim's priority, the Debtors note that had they paid the Pension Plan Premiums from plan assets, as they had routinely done in prior plan years, prior to the Trusteeship Transfer Date and ahead of schedule—the Debtors have traditionally paid Pension Plan Premiums in late September or early October—the payment from the plan assets would have increased underfunding under the Pension Plan, which would have resulted in what the parties agree would be a general unsecured claim.[5]

21. Finally, PBGC cites to references to pension-related work and meetings held between the Debtors and PBGC from fee applications filed with this Court by Debtors' counsel as evidence that the Debtors "were aware of their obligations concerning the Pension Plan." Motion, ¶ 16. To be sure, evidence of fees accrued in connection with the Debtors' right and statuary duty to examine and object to the claims filed by PBGC is irrelevant to any analysis of administrative expense priority endorsed by bankruptcy jurisprudence. *See* 11 U.S.C. § 704 ("A trustee shall . . . if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper.").

---

[5] *See, e.g.*, claim no. 16466, filed by PBGC and asserting a $90,100,000.00 general unsecured claim related to "unfunded benefit liabilities" of the Pension Plan.

**III.     The Pension Plan Premiums Are Not Entitled to Priority Under 11 U.S.C. § 503(b)(1)(B) Because the Pension Plan Premiums Are Not a Tax.**

22.     PBGC asserts that the Pension Plan Premiums are entitled to administrative expense priority under 11 U.S.C § 503(b)(1)(B) precisely because they are *not* a tax "of a kind specified in section 507(a)(8)," but— in the event that the Debtors argue that it is such a tax— attempt to reclassify the Pension Plan Premiums as a tax eligible for administrative expense priority under 11 U.S.C. § 503(b)(1)(B).  PBGC's analysis is nothing more than a mischaracterization.

23.     In mischaracterizing the Pension Plan Premiums as a tax, PBGC relies on the *Lorber-Suburban* factors, a set of six factors that the Third Circuit has noted may be relied on by courts in determining whether an exaction is a tax. *See In re Szczyporski*, 34 F.4th 179, 187 (3d Cir. 2022).  PBGC believes that the Pension Plan Premiums could be categorized as a tax under the *Lorber-Suburban* factors because "five of the six factors weigh in favor of PBGC, and none weigh against [it]." *See* Motion, ¶ 18.  The Debtors disagree with this analysis.  For example, PBGC's assertion that payment of its Claim will not disadvantage private creditors with similar claims for postpetition services simply "due to the size of the estate" is both false—every dollar paid out of a finite claims pool necessarily affects the claims of other claimants— and unfounded, seemingly having been made without any data or analysis as to the size of the estate as compared to the Debtors' postpetition obligations.

24.     Furthermore, it bears noting that these "six factors [do not] constrain our inquiry." *In re Szczyporski*, 34 F.4th 179, 185 (3d Cir. 2022) (*citing In re United Healthcare Sys., Inc*., 396 F.3d 247, 255 (3d Cir. 2005)).  To the contrary, "any relevant factor" may be considered. *Id*., at 185-86 (explaining that the court's "examination of an exaction . . . is a flexible one that allows us to consider the characteristics of the obligation in light of the evolving treatment of priority claims

under the Bankruptcy Code."). The Third Circuit has, for example, ruled that "the ability to manipulate the assessment to encourage or discourage a certain activity is a characteristic of a tax." *In re United Healthcare Sys., Inc.*, 396 F.3d 247, 254 (3d Cir. 2005). PBGC itself notes that the Pension Plan Premiums include flat-rate premiums based "upon a fixed amount per participant in the pension plan" and variable-rate premiums calculated as a function of the "pension plan's underfunding." Motion, ¶ 10. A fixed rate is not able to be altered, while a variable rate based on past underfunding suggests that the variable rate-based premiums are penal, rather than meant to encourage or discourage a certain activity. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 214 (1996) (holding that a liability arising under an Internal Revenue Code provision imposing ten percent "tax" on any "accumulated funding deficiency" of certain pension plans had an "obviously penal character," that signaled that the liability was a penalty, and not a tax).

25. Expanding the tax analysis to include factors outside of the limiting *Lorber-Suburban* factors shows that the Pension Plan Premiums are more appropriately considered a penalty, rather than a tax. As such, the Pension Plan Premiums are not eligible for priority treatment under 11 U.S.C. § 503(b)(1)(B).

IV. **Even If PBGC Is Entitled to Allowance of the Claim with Administrative Expense Priority, It Is Not Entitled to Immediate Payment.**

26. The Bankruptcy Code does not require immediate payment of allowed administrative expenses prior to the effective date of a debtor's chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9). Any acceleration of allowed administrative claims during a debtor's chapter 11 cases is left to the discretion of the Court. *In re Bookbinders' Rest., Inc.*, 2006 WL 3858020, at *4 (Bankr. E.D. Pa. Dec. 28, 2006) (finding that timing of the payment of an administrative claim is within the discretion of the bankruptcy court); *In re Garden Ridge Corp.*, 323 B.R. 136, 143

(Bankr. D. Del. 2005) ("Courts have discretion to determine when an administrative expense will be paid.").

27. In order to qualify for the "exceptional" discretionary grant of immediate payment of an administrative claim, a creditor must show that "there is a necessity to pay and not merely that the debtor has the ability to pay." *In re Cont'l Airlines, Inc.*, 146 B.R. at 531 (emphasis added) (internal quotations omitted). In exercising this discretion, courts have adopted a three-factor test to determine whether to require payment of administrative claims upon request: (a) the prejudice to the debtors in making an early payment; (b) the hardship to the claimant in waiting for payment; and (c) the potential detriment to other creditors that could result from an early payment. *See Garden Ridge*, 323 B.R. at 143; *Modern Metal Prod. Co.*, 2009 WL 1362632, at *2; *see also In re HQ Global Holdings, Inc.*, 282 B.R. 169, 173 (Bankr. D. Del. 2002) (holding that, in making a determination as to timing of payment of administrative expenses, "one of the chief factors courts consider is bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to a debtor's assets" (internal citations omitted)).

28. PBGC's request fails to satisfy any prong of the acceleration test. ***First***, PBGC has provided no explanation to justify immediate payment of the Claim. The request for immediate payment fails on this basis alone. *See In re Cont'l Airlines, Inc.*, 146 B.R. at 531 (requiring a creditor to show the necessity of immediate payment, not just a showing that the Debtors has the ability to pay).

29. ***Second***, the Debtors would certainly be prejudiced were they forced to make immediate payment of the Claim. A grant of an immediate payment could result in similarly situated creditors racing to the courthouse to request immediate payment of their claims at a time in the case where Debtors are, and should be, focused on the confirmation of these chapter 11

12

cases.[6]  The Debtors should not be made to divert their attention and available funds for this purpose at this pivotal time in the chapter 11 cases.  Furthermore, piecemeal payment of administrative expenses prior to the Debtors' consummation of a chapter 11 plan is distracting, detrimental, and needlessly complicates the Debtors' prosecution of their chapter 11 cases.

30.  ***Third***, PBGC will not be prejudiced, nor has PBGC demonstrated that it would face any hardship, much less meaningful, extraordinary hardship, by waiting until the end of these chapter 11 cases to receive payment on the Claim, regardless of its priority.  The Debtors are continuing to work through what has been an efficient and value-maximizing sale process—ultimately to fund equitable distributions to stakeholders pursuant to a plan.  While the payment of claims may be delayed by this process, delay does not amount to material hardship.

31.  Lastly, paying certain administrative claimants ahead of others would undermine one of the Bankruptcy Code's chief goals:  orderly distribution.  *See In re Glob. Home Prod.*, 2006 WL 3791955, at *3 (*citing HQ Global Holdings*, 282 B.R. at 173) (ruling that, in making the determination regarding the timing of payment of administrative expenses, "one of the chief factors courts consider is bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to a debtor's assets").  As noted above, acceding to PBGC's request for immediate payment could result in other potential administrative expense claimants requesting immediate relief in the near term, needlessly creating an uncontrolled scramble for payment of administrative claims and undermining the orderly and equitable distribution among similarly situated claimants, all while the Debtors' focus should be on confirming these chapter 11 cases after a nearly sixteen months after they were commenced.

---

6  *See* Confirmation Hearing Notice [Docket No. 5029].

## Conclusion

32. For the foregoing reasons, the Debtors respectfully request that this Court deny the Motion.

## Reservation of Rights

33. Nothing contained herein is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, priority, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

[*Remainder of Page Left Intentionally Blank.*]

Dated: December 23, 2024
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | **KIRKLAND & ELLIS LLP** |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | 333 W Wolf Point Plaza |
| 919 North Market Street, 17th Floor | Chicago, Illinois 60654 |
| P.O. Box 8705 | Telephone: (312) 862-2000 |
| Wilmington, Delaware 19801 | Facsimile: (312) 862-2200 |
| Telephone: (302) 652-4100 | Email: patrick.nash@kirkland.com |
| Facsimile: (302) 652-4400 | david.seligman@kirkland.com |
| Email: ljones@pszjlaw.com | |
| tcairns@pszjlaw.com | |
| pkeane@pszjlaw.com | |
| ecorma@pszjlaw.com | -and- |
| | Allyson B. Smith (admitted *pro hac vice*) |
| | **KIRKLAND & ELLIS LLP** |
| | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone: (212) 446-4800 |
| | Facsimile: (212) 446-4900 |
| | Email: allyson.smith@kirkland.com |

*Co-Counsel for the Debtors and Debtors in Possession*