## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

_____
                                        )
In re:                                  )        Chapter 11
                                        )
    YELLOW CORPORATION, *et al.*,       )        Case No. 23-11069 (CTG)
                                        )
                        Debtors.        )        (Jointly Administered)
                                        )
                                        )        **Hearing Date:**
                                        )        **January 21, 2025 at 10:00 a.m. (ET)**
                                        )        **Response Deadline:**
_____)        **January 10, 2025 at 4:00 p.m. (ET)**

**RESPONSE TO DEBTORS' TWENTY-FOURTH OMNIBUS (SUBSTANTIVE) OBJECTION TO THE PROOFS OF CLAIM OF THE UNITED STATES OF AMERICA, FILED ON BEHALF OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, THE UNITED STATES DEPARTMENT OF THE INTERIOR, AND THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION [CLAIM NOS. 19438 AND 19439]**

### I.    INTRODUCTION

The United States, on behalf of the United States Environmental Protection Agency ("EPA"), as well as the Natural Resource Trustees, the United States Department of the Interior ("DOI") and the National Oceanic and Atmospheric Administration ("NOAA"), hereby submits this Response to the Objection, Dkt. No. 5237, filed by YRC Inc. ("YRC") and New Penn Motor Express ("New Penn") (collectively, "Debtors"). For the reasons explained below, Debtors' objections are without merit, and Debtors are jointly and severally liable for EPA's past and future response costs, as well as natural resource damages including the Trustees' assessment costs.[1]

---

[1]As with other responsible parties, Debtors have the option of reaching a timely settlement with the United States for a lower claim, or in this case, possibly a cap on the United States' claim. Thus far, however, Debtors have been unable to reach an agreement on a fair resolution of the

## II.    PROCEDURAL BACKGROUND

1.      On August 6, 2023, and continuing into August 7, 2023, Yellow Corporation and its affiliates, including Debtors, filed a voluntary petition for Chapter 11 relief under the Bankruptcy Code.  The cases have been consolidated and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Code.

2.      On February 5, 2024, the United States timely filed Proofs of Claim asserting Debtors' liabilities for past and future response costs, as well as natural resource damages including assessment costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.*, often called the "Superfund" law.  Claim Nos. 19438 and 19439.  The Proofs of Claim are attached as Exhibits 1 and 2.

3.      On December 20, 2024, Debtors filed their Objection to the United States' Proofs of Claim.  Dkt. 5237 ("Objection").

4.      Debtors seek an order from the Court that the United States' Proofs of Claim should be disallowed and expunged in their entirety, or reduced by 99.99 percent, *see* Objection ¶ 2, Exhibit D ¶ 1–2.

5.      The United States' response was originally due on January 3, 2025.  Pursuant to Local Bankruptcy Rule 9006-1, the response deadline was extended to January 10, 2025, by agreement of Debtors and the United States.

6.      The United States files this Response to Debtors' Objection in accordance with Local Rule 3007-1(h).

---

claim or a reasonable cap, although the United States sought discussion of these terms on multiple occasions.

7.      A scheduling/status conference hearing has been set for January 21, 2025.  *See*

Del. Bankr. Local Rule 3007-1(h)(i) and (i).

8.      The United States consents to the entry of final orders or judgments by the Court

if it is determined that the Court cannot enter final orders or judgments consistent with Article III

of the United States Constitution.

### III.    STATUTORY BACKGROUND

9.      "In 1980, Congress enacted [CERCLA] . . . in response to the serious

environmental and health risks posed by industrial pollution."  *Burlington N. & Santa Fe Ry. Co.*

*v. United States*, 556 U.S. 599, 602 (2009).  CERCLA "was designed to promote the timely

cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne

by those responsible for the contamination."  *Id.* (internal quotations and citation omitted).  *See*

*also In re Kaiser Grp. Int'l, Inc.*, 289 B.R. 597, 601 (Bankr. D. Del. 2003).  "As numerous courts

have observed, CERCLA is a remedial statute which should be construed liberally to effectuate

its goals."  *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3d Cir. 1992).

10.      CERCLA imposes strict liability for environmental contamination upon four

"broad classes" of potentially responsible parties, known as PRPs, *Burlington N.*, 556 U.S. at

608, including "the owner and operator of a vessel or a facility," 42 U.S.C. § 9607(a)(1), and

"any person who at the time of disposal of any hazardous substance owned or operated any

facility at which such hazardous substances were disposed of," 42 U.S.C. § 9607(a)(2).  "Once

an entity is identified as a PRP, it may be compelled to clean up a contaminated area or

reimburse the Government for its past and future response costs."  *Burlington N.*, 556 U.S. at

609.

11.      In addition to recovery of response costs, Sections 107(a) and 107(f) of CERCLA,

42 U.S.C. §§ 9607(a) and 9607(f), provide for the recovery of damages for injury to, or destruction or loss of, natural resources resulting from the release of hazardous substances to the environment.  Injured resources may include, but are not limited to, birds, mammals, fish, plants and their supporting habitats.  42 U.S.C. § 9601(16).  The United States, through DOI and NOAA, is authorized to act on behalf of the public as a trustee to recover natural resource damages, including the reasonable cost of assessing the injury to, or destruction or loss of, natural resources.  42 U.S.C. § 9607(f)(2)(A); 40 C.F.R. § 300.600(b)(1)–(2).

### IV.    FACTUAL BACKGROUND[2]

#### A.  Claim for Response Costs

12.     The Newtown Creek Superfund Site (the "Newtown Creek Site") is located in Queens County and Kings County, New York, and includes the Newtown Creek, a tidal arm of the East River that flows approximately 3.8 miles easterly into the East River across from 34th Street in Manhattan, New York, and forms the northern border of Brooklyn, New York, and the southern border of Queens, New York.  The Newtown Creek Site includes Newtown Creek's five tributaries that, from west to east, are Dutch Kills, Whale Creek, Maspeth Creek, English Kills, and East Branch.  Proofs of Claim ¶ 2.

13.     YRC and New Penn owned and/or operated five facilities within the Newtown Creek Site in New York: (1) 1313 Grand Street, Brooklyn; (2) 57-54 Page Place, Queens; (3) 460 Kingsland Avenue, Brooklyn; (4) 58-60 Page Place, Queens; and (5) 416 Maspeth Avenue, Brooklyn (together, "Debtors' Properties").  Operations at these facilities generally involved vehicle maintenance and washing activities as well as outdoor vehicle and equipment storage and

---

[2] The Court should consider the allegations pled in the Proofs of Claim as true until such time as it may hold an evidentiary hearing to resolve disputed issues of fact.  Fed. R. Bankr. P. 3001(f).

parking.  Contaminants commonly released from these types of operations include polycyclic aromatic hydrocarbons ("PAHs"), chlorinated solvents, used oil, heavy metals, acid/alkaline wastes, ethylene glycol, arsenic, detergents, phosphorus, salts, suspended solids, hydraulic fluids, organics, and fuel.  All of Debtors' Properties are located directly adjacent to or in close proximity to Newtown Creek and directly discharged via an outfall or stormwater into Newtown Creek, in some instances without a permit or in exceedance of permitted levels.  Proofs of Claim ¶ 3.

14.     YRC and its predecessor entities operated a freight terminal at 1313 Grand Street in Brooklyn, New York, since 1980, and YRC owned the property from 1985-2009.  Throughout the time YRC and its predecessors operated at 1313 Grand Street, which is directly adjacent to Newtown Creek, the facility was used as a trucking terminal, where various types of freight were unloaded, reloaded, and then shipped off the property.  The freight station had 74 bays.  Truck maintenance was conducted in the garage on the north end of the property.  Chemicals used in the garage at 1313 Grand Street included oil, antifreeze, and lubrication oil.  YRC also engaged in fueling operations at the facility as well as the storage of related products and wastes.  Storage operations at the facility included diesel, fuel oil #1, fuel oil #2, and other unidentified substances being maintained in underground storage tanks ("USTs").  Proofs of Claim ¶ 4.

15.     Environmental assessments of the property showed measurable levels of lead, copper, semi-volatile organic compounds ("SVOCs"), volatile organic compounds ("VOCs"), and PAHs in the soil and groundwater on the facility's premises.  Between 1986 and 2006, Roadway Express, Inc. (a predecessor entity of YRC) operated at 1313 Grand Street without a National Pollutant Discharge Elimination System ("NPDES") permit and did not monitor stormwater discharge.  Stormwater at 1313 Grand Street either directly entered English

Kills/Newtown Creek or drained to these waterways via outfalls. Roadway Express, Inc. acknowledged in its permit report to New York State that poor housekeeping practices and the storing of "deprocessed vehicles" contributed to used oil, grease, and chemical oxygen demand exceedances of the stormwater discharge permit parameters in 2008. In 2012, YRC's discharge to English Kills/Newtown Creek contained elevated levels of toluene, benzene, ethylbenzene, and xylene. Proofs of Claim ¶ 5.

16.     YRC and its predecessor entities operated a freight trucking operation at 57-54 Page Place in Queens, New York, from approximately 1983 until 2011. Activities conducted at 57-54 Page Place, which is in close proximity to Newtown Creek, included truck maintenance, storage of related products, and unloading, reloading, and shipping various types of freight. Environmental site assessments conducted at 57-54 Page Place during YRC's operation revealed the presence of elevated levels of benzene and trichloroethylene in groundwater and PAHs in soil. Prior to 2006, YRC operated at 57-54 Page Place without a NPDES permit, and stormwater at the facility was untreated, untested, and discharged into Newtown Creek. Proofs of Claim ¶ 6.

17.     YRC and its predecessor, Yellow Freight System, Inc. ("YFS"), owned and operated a motor freight terminal at 460 Kingsland Avenue in Brooklyn, New York, from approximately 1977 until the mid-1990's. In 1994, YFS removed 15 USTs from 460 Kingsland Avenue, which is directly adjacent to Newtown Creek, including thirteen 550-gallon diesel USTs, one 1,000-gallon used oil UST, and one 1,000-gallon heating oil UST. During the removal of diesel fuel, heating oil, and used oil USTs at the facility, YRC's consultant, Woodward-Clyde Consultants, observed heavy oil contamination in the subsurface. Limited excavation was performed to remove soils associated with the USTs, and an additional investigation was conducted to identify the source of the heavy oil contamination. Upon

information and belief, the heavy oil contamination migrated into Newtown Creek, including via stormwater. The United States anticipates taking further discovery in connection with this allegation. Proofs of Claim ¶ 7.

18.    New Penn has operated a facility at 58-60 Page Place in Queens, New York, since approximately 1993. Publicly available records indicate that spills and closures of USTs at 58-60 Page Place, which is in close proximity to Newtown Creek, were documented on the property as well as various Clean Water Act violations. For example, since 1982, six chemical and/or petroleum spill incidents at 58-60 Page Place were documented. Upon information and belief, the chemicals and/or petroleum spilled during these spill incidents, UST closures, and Clean Water Act violations migrated into Newtown Creek, including via stormwater. The United States anticipates taking further discovery in connection with this allegation. Proofs of Claim ¶ 8.

19.    YFS, a predecessor company to YRC, owned 416 Maspeth Avenue in Brooklyn, New York, from 1986 to 1988. Multiple USTs are present at this facility. Environmental assessments conducted at 430 Maspeth Avenue, which is adjacent to 416 Maspeth Avenue, revealed elevated concentrations of total petroleum hydrocarbons and lead in soil samples. Upon information and belief, YRC's operations at 416 Maspeth Avenue resulted in the release of petroleum hydrocarbons and lead which migrated to 430 Maspeth Avenue and to Newtown Creek, including via stormwater. The United States anticipates taking further discovery in connection with this allegation. Proofs of Claim ¶ 9.

20.    In 2009, EPA conducted an Expanded Site Investigation ("ESI") of Newtown Creek as part of EPA's Hazard Ranking System scoring process pursuant to CERCLA. The ESI focused on Newtown Creek and not its tributaries or the upland properties. Based on the ESI,

EPA concluded that metals, VOCs, and SVOCs (including PAHs and polychlorinated biphenyls) were present in the Newtown Creek sediments at concentration levels above those in nearby locations in the Atlantic basin. Proofs of Claim ¶ 14.

21.     EPA added the Newtown Creek Site to the Superfund National Priorities List at 40 C.F.R. Part 300, Appendix B, on September 23, 2010. *See* 75 Fed. Reg. 59983. Proofs of Claim ¶ 15.

### B.     Claim for Natural Resource Damages

22.     Information available to date indicates that hazardous substances located at the Newtown Creek Site and CERCLA releases into nearby waterways, have harmed natural resources at the Site including, but not limited to, injuries to Newtown Creek and its tributaries, injuries to fish, birds, related species, and their supporting habitat, as well as their lost ecological services. Proofs of Claim ¶ 20–22.

### V.     RESPONSE TO DEBTORS' OBJECTIONS

### A.     Debtors Are Responsible Parties under CERCLA Section 107.

23.     There are four elements to liability under CERCLA Section 107(a): (1) a "release" or a "threatened release" of a "hazardous substance"; (2) from a "facility"; (3) the United States has incurred "response costs" in connection with the release and/or threat of release of hazardous substances; and/or, with respect to natural resource damages, the release of hazardous substances has resulted in injury to, destruction of, or loss of natural resources and/or reasonable costs of assessment; and (4) the defendant is among the four classes of covered persons set forth in CERCLA Section 107(a)(1)–(a)(4). *See* 42 U.S.C. § 9607(a). EPA is not required to notify a PRP that it is a PRP prior to filing a proof of claim.

24.     These four elements of CERCLA liability have been met—a conclusion that Debtors do not dispute. *See* Objection ¶ 15. Moreover, the United States' Proofs of Claim

contain all of the information necessary to establish CERCLA liability, discussed below.  Under

Bankruptcy Rule 3001(f), "[a] proof of claim signed and filed in accordance with these rules is

prima facie evidence of the claim's validity and amount."  The Third Circuit has explained that

"[t]he burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a)

rests on different parties at different times.  Initially, the claimant must allege facts sufficient to

support the claim.  If the averments in his filed claim meet this standard of sufficiency, it is

'prima facie' valid."  *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992) (citation

omitted).  Once a claimant alleges sufficient facts in the initial proof of claim:

> [t]he burden of going forward then shifts to the objector to produce
> evidence sufficient to negate the *prima facie* validity of the filed
> claim.  It is often said that the objector must produce evidence equal
> in force to the *prima facie* case.  In practice, the objector must
> produce evidence which, if believed, would refute at least one of the
> allegations that is essential to the claim's legal sufficiency.  If the
> objector produces sufficient evidence to negate one or more of the
> sworn facts in the proof of claim, the burden reverts to the claimant
> to prove the validity of the claim by a preponderance of the
> evidence.  The burden of persuasion is always on the claimant.

*Id.* (internal citations omitted).  *See also In re G-I Holdings, Inc.*, 443 B.R. 645, 664 (Bankr.

D.N.J. 2010).

   25. Debtors have not met their burden to produce evidence that the United States'

Proofs of Claim are deficient in establishing CERCLA liability.

   26. In addition, after the United States filed its Proofs of Claim, Debtors requested

additional documentation underlying the United States' Proofs of Claim, and in response the

United States provided certified cost packages for DOI and NOAA's assessment costs, a

narrative description of the Trustees' damages assessment, and the Preassessment Screen for the

Newtown Creek Site[3] as well as a narrative description of EPA's past and future response costs. While Debtors assert that the United States has not provided cost documentation for EPA's costs, *see* Objection ¶ 27, they did not specifically request a cost package for EPA's costs. The United States will prepare and produce an EPA cost package in accordance with the discovery schedule to be set by the Court. The United States also provided the Proposed Plan[4] for the East Branch of Newtown Creek, which describes the contamination at the Newtown Creek Site in detail and estimates a total net-present value cost of $243.5 million for EPA's preferred alternative for the East Branch portion of the Newtown Creek Site. Finally, the United States provided to Debtors the Section 104(e), 42 U.S.C. § 9604(e), CERCLA Information Request responses for Debtors' Properties at (1) 1313 Grand Street, Brooklyn; (2) 57-54 Page Place, Queens; (3) 460 Kingsland Avenue, Brooklyn; and (4) 430 Maspeth Avenue, Brooklyn, which is adjacent to 416 Maspeth Avenue.

27.    For the reasons described below, the United States has alleged sufficient facts to establish Debtors' CERCLA liability.

### 1.    Release of a Hazardous Substance

28.    CERCLA broadly defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." 42 U.S.C. § 9601(22). The term "hazardous substance" includes all compounds designated as such by EPA as well as substances listed under certain other federal

---

[3]*See Preassessment Screen for Newtown Creek, Brooklyn and Queens, New York*, *available at* https://pub-data.diver.orr.noaa.gov/admin-record/6837/Newtown%20Creek%20PAS%20Final%20SEPT%202012.pdf (last visited Jan. 9, 2025).

[4] *See Newtown Creek Superfund Site East Branch Early Action* (Aug. 28, 2024) *available at* https://semspub.epa.gov/work/02/744520.pdf (last visited Jan. 7, 2025).

statutes. *See* 42 U.S.C. §§ 9601(14), 9602. A comprehensive listing of CERCLA hazardous substances is found at 40 C.F.R. § 302.4, App. A. Any release of a hazardous substance is sufficient to establish this element of liability. *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1200 (2d Cir. 1992) ("[q]uantity or concentration" of hazardous substances "is not a factor" for CERCLA liability).

29.     Hazardous substances, as that term is defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), have been released at or from the Newtown Creek Site, and there is a threat of further such releases into the environment. During Debtors' ownership and/or operation of Debtors' Properties, unpermitted discharges of wastewaters and spilled materials as well as stormwater discharges resulted in the disposal of hazardous substances, including VOCs, heavy metals, and SVOCs (including PAHs), at the Newtown Creek Site. *See* ¶¶ 13–19, 22, above; Proofs of Claim ¶ 10.

### 2.  From a Facility

30.     CERCLA Section 101(9) provides an expansive definition of "facility" which includes, *inter alia*, "any building, structure, installation, [or] equipment" and "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9)(A) and (B).

31.     The Newtown Creek Site, and each of Debtors' Properties, constitute a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), because they include buildings, structures, and equipment as well as areas where hazardous substances have been disposed of, placed, or otherwise come to be located. *See* ¶¶ 13–19, 22, above; Proofs of Claim ¶ 11.

### 3. The United States Has Incurred "Response Costs" and the Release Has Resulted in Natural Resource Injury Giving Rise to Natural Resource Damages

32.     The third element of CERCLA Section 107(a) liability is that the United States has incurred response costs in connection with the release or threat of release of hazardous substances.  Response costs include costs relating to the cleanup or removal of hazardous substances, including "actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances" and "such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment."  42 U.S.C. § 9601(25), (23).  This element is satisfied merely by showing that *some* amount of response costs has been incurred.  *See Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994); *United States v. Kramer*, 757 F. Supp. 397, 420 (D.N.J. 1991).  It does not require proof that a particular defendant caused the release leading to the incurrence of response costs.  *United States v. Hercules, Inc.*, 247 F.3d 706, 716 n.8 (8th Cir. 2001).

33.     As of the petition date, EPA's unreimbursed past response costs at the Newtown Creek Site for which it is seeking recovery total at least $850,000 which were incurred for, among other things, performing the ESI, performing a search for additional PRPs under CERCLA, and negotiating administrative orders.  EPA estimates that the total cost of cleanup of the Newtown Creek Site will exceed $2 billion.  Proofs of Claim ¶ 17.

34.     With respect to natural resource damages, DOI and NOAA have estimated natural resource damages to be in excess of approximately $132 million, based, in part, on the cost of the restoration projects needed to compensate for the natural resource injury.  NOAA also has unreimbursed past assessment costs of $963,304.98.  DOI has unreimbursed past assessment costs in excess of $500,324.44.  Proofs of Claim ¶ 23.

12

35.     In August 2024, EPA proposed an interim, early action remedy for the East

Branch of Newtown Creek.  *See* ¶ 26, above.  According to the draft final focused feasibility

study, the active alternatives for the East Branch remediation range in total cost from

approximately $175 million up to $610 million.  The estimated present-worth cost of the

preferred alternative as outlined in the Proposed Plan for the East Branch of Newtown Creek is

$243.5 million.  Proofs of Claim ¶ 16.

36.     Certain properties upland of the Newtown Creek Site may require investigation

and remediation to eliminate any ongoing sources of contamination identified during a remedial

investigation.  The costs for investigation and remediation of other areas are currently unknown.

Proofs of Claim ¶ 18.

37.     Pursuant to Section 101(5) of the Bankruptcy Code future response costs and

damages are permitted even if unliquidated.  11 U.S.C. § 101(5)(A) (defining "claim" as "right

to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured").

**4.  Debtors Are Among the Four Classes of Covered Persons under
CERCLA Section 107**

38.     The final element of liability is established because Debtors fall within the first

category of covered persons, set forth in CERCLA Section 107(a)(1): "the owner and operator of

a vessel or a facility," 42 U.S.C. § 9607(a)(1), and/or the second category of covered persons,

"any person who at the time of disposal of any hazardous substance owned or operated any

facility at which such hazardous substances were disposed of," 42 U.S.C. § 9607(a)(2).

39.     As of the petition date, New Penn is the owner and/or operator of 58-60 Page

Place in Queens, New York, and YRC is the owner and/or operator of 1313 Grand Street in

Brooklyn, New York, within the meaning of Section 107(a)(1) of CERCLA, 42 U.S.C.

§ 9607(a)(1), *See* ¶¶ 14, 18, above; Proofs of Claim ¶ 12.

40.     As of the petition date, YRC was the former owner and/or operator of the three other Debtors' Properties within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), *see* ¶¶ 16, 17, 19, above; Proofs of Claim ¶ 13.  Debtors do not dispute their prior ownership and/or operation of its facilities.  *See* Objection ¶¶ 7, 15.

## B. <u>Debtors are Jointly and Severally Liable for All Costs at the Site.</u>

### 1. Debtors Conflate Divisibility and Allocation, Which Are Distinct Concepts.

41.     Congress created two distinct causes of action under CERCLA: (1) a "cost recovery" claim under Section 107, 42 U.S.C. § 9607(a) and (2) a "contribution" claim under Section 113(f), 42 U.S.C. § 9613(f).  *In re APCO Liquidating Trust*, 370 B.R. 625, 631 (Bankr. D. Del. 2007).  Where, as here, the United States asserts a Section 107 cost recovery claim, the United States "may seek to recover its full response costs from a party . . . who may be potentially responsible for the contamination." *Id.*  Under Section 107, liability is "strict, joint, and several—without regard to fault or willfulness. . . . . under section 107(a), once liability is demonstrated, a [defendant] PRP may be held liable for the entire cost of cleanup, even if multiple PRPs are involved." *Id.* at 631–32 (internal quotation marks and citations omitted).  "It is . . . well settled that § 107 imposes joint and several liability on PRPs regardless of fault." *In re Kaiser Grp. Int'l, Inc.*, 289 B.R. at 602 (quoting *United States v. Colorado & Eastern R.R. Co.*, 50 F.3d 1530, 1535 (10th Cir. 1995)).

42.     Contribution actions under Section 113(f) differ from cost recovery actions under Section 107.  In a Section 113(f) contribution action, a PRP may recoup from other PRPs "the portion of its cleanup and remediation costs which exceeds its fair share of the overall liability." *In re APCO Liquidating Trust*, 370 B.R. at 632 (internal quotation and citation omitted).  Thus,

"in contrast to a section 107(a) action in which liability is joint and several, under section 113(f)(1), a court is called upon to allocate the response costs among the PRPs based upon each PRP's percentage of fault and, to do so, may use 'such equitable factors as the court determines are appropriate.'" *Id.* (quoting 42 U.S.C. § 9613(f)(1)).

43.     Such equitable factors stand in contrast to the "stringent standard" defendants must satisfy to avoid joint and several liability in a cost recovery action by the government. *O'Neil v. Picillo*, 883 F.2d 176, 183 (1st Cir. 1989).  *See also Hercules Inc.*, 247 F.3d at 718 (noting that contribution or allocation of damages is "conceptually distinct" from divisibility, in that the former is an "equitable" inquiry while the latter "by contrast, is guided not by equity . . . but by principles of causation alone.").

44.     Numerous courts have upheld joint and several liability in bankruptcy.  *See In re Ford*, 125 B.R. 735, 738 (E.D. Tex. 1991), *aff'd*, 967 F.2d 1047 (5th Cir. 1992); *In re Nat'l Gypsum Co.*, 139 B.R. 397, 414–15 (N.D. Tex. 1992); *In re Kaiser Grp. Int'l, Inc.*, 289 B.R. 597 (Bankr. D. Del. 2003); *Pension Benefit Guaranty Corp. v. Reorganized CF&I Fabricators of Utah, Inc. (In re CF&I Fabricators of Utah, Inc.)*, 179 B.R. 704, 711-12 (D. Utah 1994); *In re Lloyd McKee Motors, Inc.*, 157 B.R. 484, 486 (Bankr. D.N.M. 1993).

45.     In sum, liability under CERCLA Section 107(a) "is ordinarily joint and several, except in the rare cases where the environmental harm to a site is shown to be divisible." *Pakootas v. Teck Cominco Metals, Ltd. ("Pakootas II")*, 905 F.3d 565, 588 (9th Cir. 2018).

## 2.     Debtors Have Failed to Show that the Harm at the Newtown Creek Site Is Divisible.

46.     "Divisibility/apportionment is not a defense to liability itself.  It is a judicially created defense to joint and several liability."  *Pakootas v. Teck Comino Metals, Ltd. ("Pakootas*

*I")*, 868 F. Supp. 2d 1106, 1110 n.2 (E.D. Wash. 2012). "Divisibility/apportionment becomes an issue only after liability has been determined." *Id.* at 1113.

47.     As to the Debtors' assertion concerning the potential application of equitable factors in allocating liability (the "Gore Factors"), *see* Objection ¶ 21, the United States disagrees. EPA does not recognize the "Gore Factors" as a methodology to apportion harm when the United States asserts a claim under CERCLA Section 107. Indeed, Debtors repeatedly confuse equitable allocation, which may use the Gore Factors but applies only to contribution actions between PRPs, with apportionment of harm, which applies only where a PRP defendant establishes a divisibility defense against joint and several liability under CERCLA Section 107. In fact, equitable factors (like the Gore Factors) play no role in the divisibility analysis and are inapplicable to a United States CERCLA Section 107 claim. *Burlington N.*, 556 U.S. at 615 n.9. Rather, "apportionment is proper only when the evidence supports the divisibility of the damages jointly caused by the PRPs." *Id.* As the Third Circuit has explained, "where joint tortfeasors cause a single and indivisible harm for which there is no reasonable basis for division according to the contribution of each, each tortfeasor is subject to liability for the entire harm." *Alcan Aluminum Corp.*, 964 F.2d at 268–69.

48.     "Because courts must not consider equitable factors, 'where causation is unclear, divisibility is not an opportunity for courts to 'split the difference' in an attempt to achieve equity.'" *City of W. Sacramento, California v. R & L Bus. Mgmt.*, No. 218CV00900WBSEFB, 2020 WL 5545272, at *4 (E.D. Cal. Sept. 16, 2020) (quoting *Hercules*, 247 F.3d at 718). *See also United States v. Twp. of Brighton*, 153 F.3d 307, 318 (6th Cir. 1998). The Supreme Court has explained that "[w]hen two or more [defendants] causes a single, indivisible harm, 'courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is

charged with responsibility for the entire harm.'" *Burlington N.*, 556 U.S. at 614–615 (quoting Restatement (Second) of Torts § 433A, Comment *i*, at 440 (1963–1964)).

49.     Absent a settlement or proof by Debtors that any harm at the Newtown Creek Site is divisible, the Court should determine the amount of the United States' claim on a joint and several basis.

50.     Debtors appear to believe that the Court should assume that the harm at the Newtown Creek Site is divisible and should determine, without any discovery, that they are responsible for an equitable share of liability of .003 percent under CERCLA based on equitable factors. *See* Objection ¶ 25.

51.     However, outside of bankruptcy, courts have concluded that the inquiry into equitable factors has no place, except in the context of contribution actions. *See, e.g.*, *In re Bell Petroleum Servs.*, 3 F.3d 889, 901 (5th Cir. 1993); *Alcan Aluminum Corp.*, 964 F.2d at 270 n.29. Thus, even if the Debtors are correct that the harm is divisible, the Court should not rely on the Debtors' equity-based allocation of responsibility.

52.     And, to establish that the harm is divisible, the Debtors bear a heavy burden. *Burlington N.*, 556 U.S. at 614; *Pakootas II*, 905 F.3d at 589.

53.     To do so, Debtors must satisfy a two-step process. *Pakootas II*, 905 F.3d at 588. In the first step, "the court considers whether the environmental harm is theoretically capable of apportionment." *Id.* at 588.  In the second step, "if the harm is theoretically capable of apportionment, the fact-finder determines whether the record provides a 'reasonable basis' on which to apportion liability, which is purely a question of fact." *Id.* at 589.  *See also Alcan Aluminum Corp.*, 964 F.2d at 269 (stating that "of critical importance in this analysis is whether a harm is divisible and reasonably capable of apportionment, or indivisible, thereby subjecting

the tortfeasor to potentially far-reaching liability"). During both steps of the divisibility analysis, "the defendant asserting the divisibility defense bears the burden of proof." *Pakootas II*, 905 F.3d at 589; *see also Burlington N.*, 556 U.S. at 614. This burden is "substantial because the divisibility analysis is intensely factual" and requires a "fact intensive, site-specific assessment, generating concrete and specific evidence." *Pakootas II*, 905 F.3d at 589 (quotations and internal citations omitted).

54.    Step one of the divisibility analysis "is primarily a question of law," as informed by relevant facts. *Pakootas II*, 905 F.3d at 588-89. In step one, "'[e]ven if a party's waste stream can be separately accounted for, its effect on the site and on other parties' wastes at the site must also be taken into account'" and the "defendant must take into account a number of factors relating not just to the contribution of a particular defendant to the harm, but also to the effect of that defendant's waste on the environment." *Id.* at 591 (quotation omitted). Factors relevant to this analysis include:

> when the pollution was discharged to a site, where the pollutants are found, how the pollutants are presented in the environment, and what are the substances' chemical and physical properties. **Chief among the relevant properties are the relative toxicity, migratory potential, degree of migration, and synergistic capacities of the hazardous substances at the site.**

*Id.* (emphasis added) (internal citations and quotations omitted).

55.    At step two of the divisibility analysis "if the harm is theoretically capable of apportionment, the fact-finder determines whether the record provides a 'reasonable basis' on which to apportion liability, which is purely a question of fact." *Pakootas II*, 905 F.3d at 589 (quoting Restatement (Second) of Torts §§ 433A(1)(b), 434 cmt. d). Whether an apportionment method is reasonable requires a case-by case analysis. *See id.* at 595. "[T]he basis for apportionment may rely on the 'simplest of considerations,' most commonly volumetric,

chronological, or geographic factors.  The only requirement is that the record must support a 'reasonable assumption that the respective harm done is proportionate to' the factor chosen to approximate a party's responsibility."  *Id.* (citations omitted).

56.    Debtors have failed to satisfy their burden at both steps of the divisibility analysis. Debtors have made no attempt to evaluate the effect of their waste on the environment as they are required to do in step one of a divisibility analysis.  Instead, Debtors have assumed that the harm at the Newtown Creek Site is divisible and performed an inapplicable equitable allocation (which has nothing to do with divisibility) based on their purported equitable contribution to the harm.  This approach turns a well-settled divisibility analysis on its head both by completely disregarding the requirement to show that the harm is theoretically capable of apportionment and by then applying an equity-based approach rather than an evidence-based apportionment of harm.  *See* Objection ¶¶ 20–22.

57.    Since step two of the divisibility analysis is "intensely factual," *Pakootas II*, 905 F.3d at 589, it can only be decided based on evidence.  The United States has not had an opportunity to conduct discovery in this matter, including taking depositions, and does not believe Debtors will carry their burden at an evidentiary hearing.  In sum, step two of the divisibility analysis cannot be determined at this stage.  Instead, the Court may only determine the divisibility issue after an evidentiary hearing.

58.    At a minimum, however, Debtors cannot satisfy their burden to demonstrate a reasonable basis on which to apportion liability because they have not presented any apportionment theory at all, instead relying on an inapplicable equitable analysis.  In any event, their analysis is flawed because it does not evaluate all Newtown Creek contaminants of concern (COCs) (*e.g.*, lead, C19-C36 aliphatic petroleum hydrocarbons, dioxins/furans), nor does it

consider lateral (shallow) groundwater discharge or other discharges besides stormwater and groundwater, such as direct discharges to Newtown Creek.  In addition, any apportionment theory must account for the fact that the concentrations/discharges to Newtown Creek have varied over time and were likely higher in the past.  *See Pakootas II*, 905 F.3d at 596 (rejecting apportionment approach that did not account for whether certain pollutants were more toxic than others or whether the migratory potentials of the pollutants were evaluated).

### 3. The United States' Claim Must be Allowed Because There Is Nothing in the Bankruptcy Code that Disallows It.

59.     Debtors believe that the United States' further claims for joint and several liability should be disallowed, whether or not Debtors can show the harm is divisible at the Newtown Creek Site, and whether or not a claim for joint and several liability would be valid outside of Bankruptcy Court.

60.     A valid claim for joint and several liability under CERCLA must be allowed because there is nothing in the Code providing for its disallowance.  *See* 11 U.S.C. § 502(b) (providing grounds for disallowing claims); *In re Nat'l Gypsum Co.*, 139 B.R. 397, 414–15 (N.D. Tex. 1992) (CERCLA claims to be estimated on basis of joint and several liability under applicable law).

61.     It is a well-settled rule that bankruptcy courts must look to nonbankruptcy law in evaluating claims in bankruptcy.  In *Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co.*, 549 U.S. 443 (2007), the Supreme Court considered a proof of claim by a surety bondholder for contractual attorney's fees for litigating issues of bankruptcy law.  Following the language of the Bankruptcy Code, 11 U.S.C. § 502(b), the Supreme Court held that bankruptcy courts "shall allow" claims except to the extent that one of the nine enumerated exceptions in Section 502(b) is found to apply.  The only exception that was relevant was whether the claim was

20

"unenforceable against the debtor . . . under any agreement or applicable law." *Id.* at 449 (citing 11 U.S.C. § 502(b)(1)). The Court explained that this provision follows what has "long [been] recognized:" that nonbankruptcy law governs the substance of claims, subject to any contrary provisions of the Bankruptcy Code. *Id.* at 450–451. Since the claim for attorney's fees was valid under nonbankruptcy law, and nothing in the Code disallowed it, the Court vacated the disallowance of the proof of claim. *See also In re Trib. Media Co.*, No. 1:15-cv-01116-RGA, 2018 WL 6167504, at *2 (D. Del. Nov. 26, 2018) (discussing *Travelers* and stating that "I cannot conclude that Section 506(b) 'expressly' disallows the claims at issue here. Thus, I agree with the position adopted by every court of appeals faced with this question; Section 506(b) does not limit the allowability of unsecured claims for contractual post-petition attorneys' fees under Section 502.").

62.    Similarly, in *In re Nat'l Medical Imaging, LLC*, No. 22-1727, 2023 WL 4249265, (3d Cir. June 29, 2023), the Third Circuit considered whether the district court properly barred a setoff of debt as a matter of public policy, even though a Pennsylvania statute expressly stated that setoff was allowed. The Third Circuit explained that "[w]e do not perceive the Bankruptcy Court to have assumed the posture of a court sitting in equity. . . . And we are reluctant to displace state law in bankruptcy without clear statutory direction." *Id.* at *2. The Third Circuit stated that "[o]ur takeaway is that the Bankruptcy Court should have considered state law—the threshold question underpinning setoff . . . ." *Id.*

63.    Following the Supreme Court's reasoning in *Travelers* and the Third Circuit's reasoning in *In re Nat'l Medical Imaging, LLC*, the United States' claims for joint and several liability cannot be disallowed unless they are unenforceable against Debtors under nonbankruptcy law or contrary to express provisions of the Bankruptcy Code.

64.     Therefore, a joint and several claim that is valid under CERCLA must be allowed since there is nothing in the Code providing for its disallowance.

65.     This result is consistent with the ruling on this very issue in *In re Nat'l Gypsum Co.*, 139 B.R. 397, 414–15 (N.D. Tex. 1992).  In *Nat'l Gypsum*, the court held that CERCLA claims must be estimated under the usual rules under CERCLA governing joint and several liability and divisibility.  *See also In re Ford*, 125 B.R. 735, 738 (E.D. Tex. 1991) (bank entitled to joint and several liability in bankruptcy), *aff'd*, 967 F.2d 1047 (5th Cir. 1992).

### 4.    Joint and Several Liability Is an Important Component of CERCLA Liability.

66.     Joint and several liability is an important component of CERCLA liability, particularly because it encourages responsible parties to settle their environmental liabilities at a savings—rather than taking a matter to trial and risking a finding of liability for the entire amount of damages or debt.  Likewise, this concept plays an important purpose in supporting a streamlined approach to resolve environmental liabilities, while protecting public health and safety.  If the United States were forced to litigate every issue that defense counsel may raise in order to hold responsible parties liable under CERCLA, both the United States and the courts would be inundated with litigation.  Likewise, resolution of liability through voluntary cleanups and payments through settlements would be significantly reduced.  This result would undermine CERCLA's mandate that the polluter must pay for their damage.  Worse, without the application of joint and several liability, polluters would have a positive incentive to forum shop by declaring bankruptcy—and attempting to evade their environmental responsibilities—while the United States and taxpayers are burdened with the cost of cleaning up the Newtown Creek Site. This result is contrary to CERCLA's purpose "to ensure that the costs of such cleanup efforts

were borne by those responsible for the contamination," *Burlington N.*, 556 U.S. at 602, not the public.  Public health and safety would suffer.

67.     These dangers are of particular concern in bankruptcy cases, which must be resolved expeditiously.  Outside of bankruptcy, the United States has chosen to bring its environmental complaint.  However, in bankruptcy, the debtor (through a mandatory Bar Date Order) forces the United States to come forward with an immediate proof of claim for a site that includes multiple operable units in various stages of investigation and remediation.  In this circumstance, it is even more important to apply joint and several liability in bankruptcy as an incentive to early settlement instead of litigation.  Without the risk of the application of joint and several liability, as would apply outside of bankruptcy, debtors would lack adequate incentive to settle valid CERCLA liabilities in bankruptcy.

68.     In addition, should this Court rule that debtors seeking bankruptcy protection can receive a more favorable resolution of their CERCLA liabilities, polluters would flee to the bankruptcy courts for refuge.

69.     While Debtors appear to believe they are entitled to an equitably allocated share because there may be other PRPs at the Newtown Creek Site, *see* Objection ¶¶ 26–27, a debtor cannot try to escape joint and several liability that would apply outside of bankruptcy, barring a successful divisibility defense, in the guise of trying to somehow satisfy its parochial view of what is "equitable."  The other PRPs at the Newtown Creek Site are therefore irrelevant, and Debtors "can always bring a contribution action under section 113(f), 42 U.S.C. § 9613(f), against other pollution sources it identified, which mitigates any inequity arising from the unavailability of apportionment." *Pakootas II*, 905 F.3d at 596 (internal quotations and citation omitted).

70.     Debtors are free to engage in settlement discussions with the United States for their fair share of liability but thus far no settlement has been reached.  Debtors have also rejected discussing or negotiating a cap on the magnitude of the claim.

71.     The result Debtors seek is not in any way equitable in the view of the United States.  Debtors seek to have the United States and taxpayers bear the risk of paying to clean up the Newtown Creek Site, but CERCLA was designed "to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination," *Burlington N.*, 556 U.S. at 602, not the public.  The United States' rights and public health and safety would therefore suffer in a most unfair manner.  Other polluters would have an incentive to forum shop through bankruptcy to evade joint and several liability.

72.     In short, the supposed equity that Debtors assert would result in unfair treatment to others.  That is why bankruptcy courts follow applicable nonbankruptcy law in evaluating claims unless the Bankruptcy Code specifically provides otherwise.  Bankruptcy courts may not create substantive rights not otherwise available under nonbankruptcy law and are not a "roving commission" to do equity.  *See Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1116 (5th Cir. 1995); *Chiasson v. J. Louis Matherne & Assocs. (In re Oxford Mgmt.)*, 4 F.3d 1329, 1334 (5th Cir. 1993); *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986).

73.     In *In re Lloyd McKee Motors, Inc.*, 157 B.R. 484, 486 (Bankr. D.N.M. 1993), the Bankruptcy Court followed the Fifth Circuit's ruling in *Ford* and emphasized the dangerous pitfalls of deviating from nonbankruptcy law in a misguided attempt to achieve equity:

> It would recharacterize all joint-obligation promissory note debts . . . and allow bankruptcy judges to dice up debtors' liability for these notes. The noteholder's claims would be unjustly reduced allowing the other creditors to unfairly benefit. The debtors who borrowed on the commitment of joint and several liability would find themselves protected against full liability simply by filing for bankruptcy.

24

> And, finally, this would weaken the noteholder's bargained-for protection and reduce his incentive for granting future 'joint and several liability' loans.

Similar problems are inherent in any attempt to do equity by splicing up valid joint and several environmental claims.

74.     The Supreme Court has rejected analogous attempts by Debtors to use general equitable principles to subordinate disfavored claims that are valid under nonbankruptcy law.  In *United States v. Noland*, 517 U.S. 535, 536 (1996), and *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 228–229 (1996), the Supreme Court held that a bankruptcy court may not equitably subordinate penalty claims that are valid under nonbankruptcy law.  The Supreme Court held that only Congress, not the judiciary, may prioritize or disallow in bankruptcy categories of claims that are valid under nonbankruptcy law. Since Congress has not provided for the disallowance of otherwise valid joint and several liability claims, they may not be disallowed based on equitable arguments by Debtors.

### C.     Debtors Are Neither *De Minimis* nor *De Micromis* Parties.

75.     CERCLA Section 122(a), 42 U.S.C. § 9622(a) provides that "[t]he President, *in his discretion*, may enter into an agreement with any person . . . to perform any response action . . . if the President determines that such action will be done properly by such person." (emphasis added).

76.     Debtors appear to believe they are entitled to a *de micromis* settlement.  *See* Objection ¶ 25.  Debtors cannot request that this Court order that the United States enter into a *de minimis* or *de micromis* settlement with them, *see* Objection ¶¶ 23-25, because CERCLA expressly states that the settlement provisions of CERCLA Section 122, 42 U.S.C. § 9622, are "not subject to judicial review."  42 U.S.C. § 9622(a).  EPA has not identified any *de minimis* or *de micromis* PRPs at the Newtown Creek Site.  Likewise, numerous courts have rejected

attempts at court intervention to force *de minimis* settlements. *See United States v. City of Grand Rapids*, 166 F. Supp. 2d 1213, 1221 (W.D. Mich. 2000) ("The CERCLA statute clearly provides that a decision of the EPA to use or not use the settlement procedures of § 9622 is not subject to judicial review. . . . No party has the right to compel the United States to settle with it on its own terms, particularly when those terms are *de minimis* treatment."); *United States v. Mid-State Disposal, Inc.*, 131 F.R.D. 573, 577 (W.D. Wis. 1990) (stating that EPA's settlement process under CERCLA "is not subject to judicial review" under 42 U.S.C. § 9622(a)); *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 698 (D.N.J. 1989) ("There is simply no authority for this Court to require the United States to treat a PRP as a *de minimis* party.  Nor may we review the EPA's refusal to accord a party such status.  Section 122(a) of CERCLA expressly provides that a 'decision of the President to use or not to use the procedures [set forth in § 122] is not subject to judicial review.'  We read this provision as applicable to the EPA's decision not to enter into a settlement with a particular PRP.  *Indeed, we know of no authority . . . which permits us to compel any litigant, much less the United States, to settle a lawsuit with a particular defendant*." (emphasis added)).

77.     The United States remains open to discussing settlement with Debtors, but it is inappropriate for Debtors to seek this Court's intervention by seeking an order that Debtors be treated as *de minimis* or *de micromis* parties.

## CONCLUSION

The United States seeks an Order of this Court dismissing Debtors' Omnibus Objection with respect to the United States' Claim Nos. 19438 and 19439.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


ALAN S. TENENBAUM
National Bankruptcy Coordinator
Environment and Natural Resources Division
United States Department of Justice

*/s/ Alexandra B. Sherertz*
ALEXANDRA B. SHERERTZ
JEANNE T. COHN
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice


*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that copies of this Response were served through ECF on participating parties and by e-mail to:

Counsel for Debtors:

Kirkland & Ellis LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Attn.: Rob Jacobson
Rob.jacobson@kirkland.com

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn.: Allyson B. Smith
Allyson.smith@kirkland.com

Pachulski Stanang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington DE 19801
Attn.: Laura Davis Jones (ljones@pszjlaw.com)
Timothy P. Cairns (tcairns@pszjlaw.com
Peter J. Keane (pkeane@pszjlaw.com)
Edward Corma (ecorma@pszjlaw.com)

The Office of the United States Trustee for the District of Delaware
844 King Street
Suite 2207, Lockbox 35
Wilmington, DE 19801
Attn.: Jane Leamy (jane.m.leamy@usdoj.gov)
Richard Shepacarter (Richard.shepacarter@usdoj.gov)