## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| YELLOW CORPORATION, et al., | ) | |
| | ) | Lead Case No. 23-11069 (CTG) |
| Debtors. | ) | |

## CENTRAL STATES PENSION FUND'S RESPONSE
## IN OPPOSITION TO DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT

William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
**SULLIVAN HAZELTINE ALLINSON LLC**
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
Email: bsullivan@sha-llc.com
          whazeltine@sha-llc.com

and

Brad R. Berliner, Esq.
Andrew J. Herink, Esq.
Daniel Sullivan, Esq.
Central States Funds
8647 W. Higgins Road
Chicago, IL 60631
Tel: (847) 939-2478
Email: bberliner@centralstatesfunds.org
          aherink@centralstatesfunds.org
          dsulliva@centralstatesfunds.org

*Attorneys for Central States, Southeast and Southwest Areas Pension Fund*

**TABLE OF CONTENTS**

Introduction ............................................................................................................................. 1

Argument .............................................................................................................................. 5

I.  Debtors' Default Is Not Affected by the *Ipso Facto* Prohibitions of the Bankruptcy Code. ............................................................................................ 5

II.  The Automatic Stay Does Not Affect Debtors' Default under 29 U.S.C. § 1399(c)(5)(B). ........................................................................................... 10

III.  The Court Should Not Use a Present-Value Analysis to Discount the Withdrawal Liability Claims. ................................................................................... 12

IV.  Subordination Under 29 U.S.C. § 1405 Is Inappropriate ................................... 17

V.  29 U.S.C. § 1085(g)(3) Does Not Affect the Payment Schedule. ..................... 20

VI.  The Court Should Hold Debtors to their Bargain and Allow the Claim for Breach of the Contribution Guarantee. .............................................................. 22

Conclusion ......................................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.*,
   33 F. Supp. 2d 235 (S.D.N.Y. 1998) .............................................................................. 7, 11

*Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*,
   971 F.2d 1346 (7th Cir. 1992) ............................................................................................ 24

*Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*,
   522 U.S. 192 (1997) ............................................................................................................ 23

*Cent. States Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*,
   620 F.3d 766 (7th Cir. 2010) ............................................................................................. 10

*Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*,
   252 F.3d 911 (7th Cir. 2001) ........................................................................................ 2, 6, 7

*Cent. States, Se. & Sw. Areas Pension Fund v. Dworkin, Inc.*,
   No. 19-cv-6716, 2020 WL 5365968 (N.D. Ill. Sept. 8, 2020) ......................................... 10

*Cent. States, Se. & Sw. Areas Pension Fund v. Event Media, Inc.*,
   No. 22-cv-6133, 2024 WL 1363542 (N.D. Ill. Mar. 29, 2024) ....................................... 20

*Elec. Co., Inc. v. United Jersey Bank*,
   959 F.2d 1194 (3d Cir. 1991) ............................................................................................. 11

*Ely v. Bd. of Trs. of Pace Indus. Union-Mgmt. Pension Fund*,
   No. 3:18-CV-00315-CWD, 2019 WL 438338 (D. Idaho Feb. 4, 2019) .......................... 25

*In re Affiliated Foods, Inc.*,
   249 B.R. 770 (Bankr. W.D. Mo. 2000) ............................................................................. 18

*In re AMR Corp.*,
   730 F.3d 88 (2d Cir. 2013) ................................................................................................... 6

*In re B456 Sys., Inc.*,
   No. 12-bk-12859, 2017 WL 6603817 (Bankr. D. Del. Dec. 22, 2017) ........................... 15

*In re CF & I Fabricators of Utah, Inc.*,
   150 F.3d 1293 (10th Cir. 1998) .................................................................................... 15, 16

*In re Chateaugay Corp. v. Aetna Cas. Ins. Co.*,
   No. 94-cv-1257, 1996 WL 346010 (S.D.N.Y. June 24, 1996) ........................................ 14

*In re Chemtura Corp.*,
   448 B.R. 635 (Bankr. S.D.N.Y. 2011) ............................................................. 15

*In re CSC Indus., Inc.*,
   232 F.3d 505 (6th Cir. 2000) ........................................................................... 15

*In re CSC Indus., Inc.*, 232,
   F.3d 505 (6th Cir. 2000) .................................................................................. 16

*In re Exide Techs.*,
   600 B.R. 753 (Bankr. D. Del. 2019) .............................................................. 2, 9

*In re Majestic Star Casino, LLC*,
   716 F.3d 736 (3d Cir. 2013) ............................................................................ 10

*In re Marcal Paper Mills, Inc.*,
   650 F.3d 311 (3d Cir. 2011) ....................................................................... 15, 16

*In re O.P.M. Leasing Servs., Inc.*,
   56 B.R. 678 (Bankr. S.D.N.Y. 1986) .............................................................. 14

*In re Oakwood Homes Corp.*,
   449 F.3d 588 (3d Cir. 2006) ..................................................................... passim

*In re Split Vein Coal Co., Inc.*, No. 03-bk-02974,
   2009 WL 4937760 (Bankr. M.D. Pa. Dec. 11, 2009) ........................................ 7

*In re Stone & Webster, Inc.*,
   279 B.R. 748 (Bankr. D. Del. 2002) ................................................................ 14

*In re Thomson McKinnon Sec., Inc.*,
   149 B.R. 61 (Bankr. S.D.N.Y. 1992) ............................................................... 14

*In re U.S. Airways Group, Inc.*,
   303 B.R. 784 (Bankr. E.D. Va. 2003) .............................................................. 16

*In re Ultra Petroleum Corp.*,
   624 B.R. 178 (Bankr. S.D. Tex. 2020) ............................................................ 14

*In re White Motor Corp.*,
   831 F.2d 106 (6th Cir. 1987) ........................................................................... 14

*In re Wisc. Engine Co.*,
   234 F. 281 (7th Cir. 1916) ............................................................................... 14

*Kucin v. Devan*,
   251 B.R. 269 (D. Md. 2000) ............................................................................ 14

*Matter of Penn Cent. Transp. Co.*,
   596 F.2d 1102 (3d Cir. 1979)........................................................................ 14

*Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*,
   513 U.S. 414 (1995).......................................................................... 3, 15, 17

*N.L.R.B. v. Amax Coal Co.*,
   453 U.S. 322 (1981)...................................................................................... 28

*Royal Ice Cream Co. v. Cent. States, Se. & Sw. Areas Pension Fund*,
   732 F. Supp. 3d 888 (N.D. Ill. 2024)............................................................ 20

*Smart Oil, LLC v. DW Mazel, LLC*,
   970 F.3d 856 (7th Cir. 2020) .................................................................. 23, 26

*Till v. SCS Credit Corp.*,
   541 U.S. 465 (2004)...................................................................................... 14

*TransCanada Pipelines Ltd. v. USGen New Eng., Inc.*,
   458 B.R. 195 (D. Md. 2011) ......................................................................... 14

*Travelers Casualty & Surety Co. of Am. v. Pac. Gas & Elec. Co.*,
   549 U.S. 443 (2007)...................................................................................... 10

*WestRock RKT Co. v. Pace Indus. Union-Mgmt. Pension Fund*,
   856 F.3d 1320 (11th Cir. 2017) .................................................................... 25

*XCO Int'l, Inc. v. Pac. Sci. Co.*,
   369 F.3d 998 (7th Cir. 2004) ........................................................................ 25

*Zerjal v. Daech & Bauer Constr., Inc.*,
   939 N.E.2d 1067 (Ill. App. 5th Dist. 2010) ................................................. 25

**Statutes**

11 U.S.C. § 362........................................................................................ passim

11 U.S.C. § 1129.......................................................................................... 7, 8

11 U.S.C. § 365........................................................................................... 6, 7

11 U.S.C. § 502........................................................................................ passim

29 U.S.C. § 1085...................................................................................... passim

29 U.S.C. § 1301............................................................................................ 16

29 U.S.C. § 1381...................................................................................... 18, 19

29 U.S.C. § 1383 ........................................................................................................ 23

29 U.S.C. § 186 ......................................................................................................... 28

29 U.S.C. § 1392 ....................................................................................................... 23

29 U.S.C. § 1393 ....................................................................................................... 24

29 U.S.C. § 1399 ................................................................................................. passim

29 U.S.C. § 1405 ................................................................................................. passim

**Regulations**

Notice and Collection of Withdrawal Liability,
49 Fed. Reg. 22642-01 (1984) ............................................................................ 8

## INTRODUCTION

1.      Debtors' Motion for Summary Judgment (Dkt. No. 5217, cited hereinafter as "Debtors' Motion") should be denied. For the reasons set forth herein and in the opening brief (Dkt. No. 5169)[1] filed by Central States, Southeast and Southwest Areas Pension Fund ("Central States Pension Fund"), the Court should allow Central States Pension Fund's claims for withdrawal liability against Debtors, jointly and severally (Claims Nos. 4312–4335), in the amount of $1,579,806,536.80[2] and Central States Pension Fund's claims in connection with Debtors' breach of the contribution guarantee contained within the January 29, 2014 letter agreement (the "2014 Letter Agreement" (Ex. H to Central States Pension Fund's Opening Brief), which is the subject of Claims Nos. 4336–4352) in the amount of $917,028,151.94. Debtors' attempts to argue otherwise lack any basis in bankruptcy law or the relevant documents and thus should be disregarded.

2.      In addition to being waived (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶¶ 30–34), Debtors' contention that their prepetition withdrawal liability default should be nullified by application of the *ipso facto* prohibitions of the Bankruptcy Code fails for several other reasons. First and foremost, the provision of Central States Pension Fund's Plan Document under which Central States Pension Fund determined Debtors to be in default does not concern Debtors' bankruptcy filing but rather their undisputed prepetition failure to make contributions and thus is not an *ipso facto* clause. Second, there is not textual basis in the Bankruptcy Code for invalidating

---

[1] Terms not explicitly defined herein are intended to have the meaning ascribed to them in Central States Pension Fund's opening brief. (Dkt. No. 5169.)

[2] The withdrawal liability amount Central States Pension Fund seeks via the present summary judgment proceeding is based upon the law of the case. Central States Pension Fund reserves the right to contend on appeal that Debtors' withdrawal liability in the event of default is not limited to the sum of the first twenty annual payments that Debtors would have owed absent a default.

Debtors' statutory default under 29 U.S.C. § 1399(c)(5)(B) as impermissibly ipso facto. Third, as Debtors' principal case on this point holds, a Debtor cannot avoid a default under 29 U.S.C. § 1399(c)(5)(B) by virtue of its status as a debtor in bankruptcy. *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 918 (7th Cir. 2001) (holding that the Fund was entitled to declare debtor in default during a bankruptcy). (*See* Debtors' Motion at 29, ¶ 2 (sic).) Debtors' argument that they are not in default on their withdrawal liability boils down to the incorrect assertion that a creditor cannot declare a default on a debt at any time after a bankruptcy petition is filed, even where the default event occurred before (and independent of) the filing of that petition.

3.      Debtors' resort to the automatic stay provisions similarly fails for lack of any textual basis. The automatic stay prohibits only certain specific actions, none of which were implicated here. 11 U.S.C. § 362(a). Further, Debtors' approach is contrary to the law of the Third Circuit, under which a claim (here, the claim for the full defaulted amount of withdrawal liability) accrues when its factual predicates occur, as here the factual predicate occurred prepetition. *In re Exide Techs.*, 600 B.R. 753, 762 (Bankr. D. Del. 2019).

4.      Debtors' reliance upon 11 U.S.C. § 502(b) for the proposition that the withdrawal liability claims should be discounted to present value fails as well. Given that Debtors are in default under 29 U.S.C. § 1399(c)(5), they owe the gross amount of the 20-year payment schedule (*i.e.*, present value discounting is not appropriate), as the Court found in its original September 13, 2024 opinion. (Dkt. No. 4326 at 38–39.) The Court's initial determination—that, if a default had occurred under 29 U.S.C. § 1399(c)(5), present value discounting is inappropriate—remains correct for the reasons stated in the Court's September 13, 2024 opinion, which the Debtors simply do not address. Although Debtors argue that present value discounting is appropriate under 11

U.S.C. § 502(b), they also ignore that the specific provision of 29 U.S.C. § 1399(c)(5) controls over the general provision of 11 U.S.C. § 502(b) and requires no discounting for present value.

5.      But even if one puts aside the Court's correct previous analysis, the Third Circuit has rejected Debtors' theory that 11 U.S.C. § 502 provides for present-value discounting as a matter of course. *In re Oakwood Homes Corp.*, 449 F.3d 588, 598 (3d Cir. 2006). Instead, the Third Circuit has instructed bankruptcy courts to apply present value discounting only if warranted by the specific financial circumstances. *Id.* But here, Debtors have already received a discount by virtue of the Court's application of the 20-year limitation on payments, which "forgives all annual installment payments after 20 years." *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 426 (1995). Accordingly, providing an additional present-value discount would result in impermissible double discounting. *In re Oakwood Homes Corp.*, 449 F.3d at 601.

6.      Debtors' attempt to seek subordination under 29 U.S.C. § 1405(b) also fails, including because they mischaracterize the text of 29 U.S.C. § 1405(b). 29 U.S.C. § 1405(b)(1) does not "reduce" the amount of Debtors' "withdrawal liability." Instead, when applicable, it operates to reduce a Debtors' allocable share of "unfunded vested benefits" ("UVBs"). Here, the Court has already determined that "withdrawal liability" equates to "the amount the employer owes after the application of the 20-year cap," as opposed to meaning the employer's allocable share of the plan's UVBs. (Amended Memorandum Opinion, Dkt. No. 4769, at 37.) And Debtors have already successfully argued that these two terms "are not the same thing" such that Debtors should be estopped from changing course now. (Debtors' Motion for Summary Judgment, Dkt. No. 3852, ¶ 77.) Indeed, Debtors maintain this distinction even in their opening brief. (Debtors' Motion, ¶ 10.) As such, assuming that 29 U.S.C. § 1405(b) applies, it would have no effect, as the result

would be that Debtors' proportionate share of UVBs is decreased, which indisputably would not affect Debtors' 20-year payment schedule.

7.    Debtors' attempt to reduce their withdrawal liability under 29 U.S.C. § 1085(g)(3)(A) by claiming that their contribution rate increases were required by Central States Pension Fund's Plan Document fails because the Plan Document never required any contribution increases by Debtors. Indeed, and unlike the employers in the other cases cited by Debtors, Debtors were subject to the Plan Document's Distressed Employer Schedule, which did not require any contribution increases but rather allowed any employers subject to that schedule to voluntarily negotiate their own contribution rate increases (if any). Further, the contribution rate used to calculate Debtors' withdrawal liability ($106.55) is significantly lower than the contribution rate that was in effect when Central States Pension Fund's rehabilitation plan was first implemented ($258.00). Thus, Debtors cannot show that the rehabilitation plan required them to increase their contribution rates for the additional reason that their contribution rates decreased. Moreover, any contribution rate increases were used to provide an increase in benefits by operation of Central States Pension Fund's benefit accrual formula, further demonstrating that those contribution rate increases are not to be excluded under 29 U.S.C. § 1085(g)(3).

8.    Tellingly, in their argument regarding the 2014 Letter Agreement, Debtors do not refer to the text of the agreement at all. The agreement—which was extensively negotiated by attorneys of Kirkland & Ellis LLP—explicitly repudiates Debtors' arguments. Nor do Debtors address the fact that Debtors themselves chose the contribution guarantee in the 2014 Letter Agreement instead of the deemed-contribution-rate agreements (entered into between Debtors and other multiemployer pension plans ("MEPPs")) already upheld by the Court. In any event, the undisputed evidence shows that at all relevant times Debtors understood that the cessation of their

contribution obligation would have "dire financial consequences" for Central States Pension Fund, (June 14, 2023 Letter of Dan Olivier, Ex. K to Central States Pension Fund's Opening Brief; Hawkins Transcript, Ex. F to Central States Pension Fund's Opening Brief, at 105:6-106:15), such that there is no reason why "the [D]ebtors should not be held to their bargain." (Amended Memorandum Opinion, Dkt. No. 4769, at 39–41.)

## ARGUMENT

I. **Debtors' Default Is Not Affected by the *Ipso Facto* Prohibitions of the Bankruptcy Code.**[3]

9.      Debtors' assertion that the "exact provisions [of the Central States Plan Document] at issue here" (Debtors' Motion, at 29, ¶ 2 (sic)) are impermissibly *ipso facto* fails for the simple reason that Debtors identify the wrong provision: while Debtors focus on the plan provision allowing Central States to "treat a member's declaration of bankruptcy as a default," (*id.* at 29, ¶ 2 (sic)) the "event . . . which indicate[d] a substantial likelihood that" Debtors would "be unable to pay [their] withdrawal liability" for purposes of 29 U.S.C. § 1399(c)(5)(B) was the "existence of a delinquency" in the form of unpaid contributions, rather than the filing of bankruptcy. (Central States Plan Document, Ex. A to Central States Pension Fund's Opening Brief, App'x E, § 5(e), at CS-0034827–CS-0034828; Sept. 12, 2023 Minutes of the Pension Board Meeting, Ex. M to Central States Pension Fund's Opening Brief, at CS-0032738.) For this reason, the default here was not predicated on Debtors' bankruptcy filing, but rather on Debtors' prepetition contribution delinquencies. (Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to Consider, Dkt. No. 4771 at 3.) Contrary to Debtors' characterization, in *Basic American* the Seventh Circuit did not address Central States Plan Document's provision providing for

---

[3] As Central States Pension Fund previously explained, Debtors have waived any challenge to whether they were in default through their consistent failure to raise that issue in discovery or in their summary judgment briefing. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶¶ 30–34.)

defaults in connection with preexisting contribution delinquencies at all, but rather focused only upon a provision not at issue here: the provision allowing for default premised on a bankruptcy petition. *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 917 (7th Cir. 2001). Because the provision at issue here is not an *ipso facto* provision in the first place (and Debtors do not argue otherwise), Debtors' default under that provision is not barred by the Bankruptcy Code.

10.     Debtors' argument that the default authorized under 29 U.S.C. § 1399(c)(5)(B) is impermissibly *ipso facto* fails for the additional reason that there is no "provision of the Bankruptcy Code . . . that provides support for . . . a per se prohibition" on *ipso facto* clauses, let alone a restriction on statutory rights like the right to declare default under 29 U.S.C. § 1399(c)(5)(B). *In re AMR Corp.*, 730 F.3d 88, 107 (2d Cir. 2013). Indeed, 29 U.S.C. § 1399(c)(5)(B) provides that a plan sponsor may require "immediate payment of the outstanding amount of an employer's withdrawal liability" upon "*any* . . . event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." (Emphasis added). Congress' use of the broad word "any" should be understood according to its plain meaning, especially given that Debtors do not point to any competing language in the Bankruptcy Code that would suggest that statutory default is impermissible. As explained in Central States Pension Fund's opening brief (Dkt. No. 5619, ¶¶ 38-39), there is thus no reason to believe that the specific *ipso facto* prohibitions that appear in 11 U.S.C. §§ 365(e)(1) and 541(c) apply here, let alone that they control over the broad language of 29 U.S.C. § 1399(c)(5)(B).

11.     Further, Debtors provide no support for their broad premise that a creditor can never declare a default during the pendency of a bankruptcy, let alone for the related premise that such

a default is impermissible even if based on prepetition conduct. Indeed, Debtors themselves do not even consistently argue in their own brief that a default based on prepetition conduct is invalid, as at one point they phrase their argument as "*post-petition* conduct has no bearing on what was actually due and owing as of the date the petition was filed." (Debtors' Motion, ¶ 70 (emphasis added).) In any event, nothing in the Bankruptcy Code prohibits a creditor from declaring a default against a debtor in bankruptcy. *In re Split Vein Coal Co., Inc.*, No. 03-bk-02974, 2009 WL 4937760, at *9 (Bankr. M.D. Pa. Dec. 11, 2009); *Am-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.*, 33 F. Supp. 2d 235, 242 (S.D.N.Y. 1998).

12. Indeed, even Debtor's own case law is in accordance with this straightforward conclusion, as the Seventh Circuit in *Basic American* held that the debtors there fell into default on their withdrawal liability by ceasing operations during the pendency of their bankruptcy, even though Central States Pension Fund's Board of Trustees never exercised its discretion to declare a default based on this cessation. *Basic Am. Indus., Inc.*, 252 F.3d at 918. The *ipso facto* discussion in *Basic American* is thus dicta,[4] because the event of default found by the Seventh Circuit was not the bankruptcy filing itself, but instead the post-petition cessation of operations coupled with the bankruptcy. That is, the Seventh Circuit's actual holding was that debtors' cessation of operations during their bankruptcy automatically caused a default under 29 U.S.C. § 1399(c)(5), regardless of the fact that the Fund's Trustees did not subsequently declare a default:

> So the only question is whether there was a default. There was. When Allied ceased operating, Central States knew it would never see any of the scheduled installment payments. It had an unsecured claim, so Allied could not make any of the installment payments without violating the absolute priority rule of 11 U.S.C. § 1129(b). With fewer assets than claims, Allied would certainly pay the fund less than the full value of its claim. The best the fund could hope for was a partial

---

[4] Debtors' reliance on this dicta is particularly misplaced because the Seventh Circuit did not discuss whether 11 U.S.C. §§ 365(e)(1) and 541(c) (which speak only to contractual provisions and to property of the estate) restrict the statutory right to declare default under 29 U.S.C. § 1399(c)(5). *Basic Am. Indus.*, 252 F.3d at 918.

> settlement of the withdrawal liability. It should therefore have concluded on June 2, 1990, that Allied had repudiated its withdrawal liability. Put differently, on that day it became clear that Allied had disabled itself from paying the withdrawal liability.

*Id.* For this reason, the Seventh Circuit concluded that "Central States was entitled to accelerate the due date of all the installments to the present." *Id.* Accordingly, the Bankruptcy Code does not prevent Debtors' default under 29 U.S.C. § 1399(c)(5)(B).

13. This result is also consistent with ERISA, as 29 U.S.C. § 1399(c)(5)(B) provides that a plan sponsor may require "immediate payment of the outstanding amount of an employer's withdrawal liability" upon "*any* . . . event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." (Emphasis added). Indeed, this has been the long-held view of the PBGC. Notice and Collection of Withdrawal Liability, 49 Fed. Reg. 22642-01, 22,644 (1984) ("Such a substantial likelihood [under 29 U.S.C. § 1399(c)(5)(B)] would exist, for example, when an employer declares bankruptcy . . . .").

14. An examination of the facts further shows that Debtors' approach is not only inconsistent with bankruptcy law and ERISA, but also leads to absurd results. Prepetition, Debtors failed to pay their pension contributions due to Central States Pension Fund for June 2023 (the payment due by July 15, 2023) and informed Central States Pension Fund that they would not pay their contributions for July 2023 (the payment due by August 15, 2023). (*See* Aug. 7, 2023 Declaration of Matthew A. Doheny, Dkt. 14, ¶ 11; June 14, 2023 Letter of Dan Olivier, Ex. K to Central States Pension Fund's Opening Brief.) Central States Pension Fund's Board of Trustees decided on July 17, 2023 to conditionally terminate Debtors' participation in Central States Pension Fund, effective July 23, 2023, unless they paid their required pension contributions, which they did not. (July 18, 2023 Letter of Thomas Nyhan, Ex. L to Central States Pension Fund's

Opening Brief.) At its next meeting thereafter, the Board of Trustees approved Debtors' withdrawal liability assessment and determined that Debtors were in default due to their pre-petition failure to pay contributions. (Sept. 12, 2023 Minutes of the Pension Board Meeting, Ex. M to Central States Pension Fund's Opening Brief, at CS-0032738; Affidavit of Andrew M. Sprau, attached hereto as **Exhibit 1**, ¶ 12.)

15.     Nothing in 11 U.S.C. § 362 or the Bankruptcy Code more generally supports the notion that Debtors may use the filing of bankruptcy as a "get-out-of-jail-free card" to avoid a default, especially where the default is indisputably based on prepetition conduct. Again, the Trustees declared a default at their first scheduled meeting following Debtors' withdrawal. (Affidavit of Andrew M. Sprau, Ex. 1, ¶ 12.)  Contrary to Debtors' contention that a party may violate its obligations with impunity so long as it files bankruptcy before the creditor has the chance to take the procedural steps necessary to protect itself, the key factor in bankruptcy law is when the offending conduct actually occurs. *In re Exide Techs.*, 600 B.R. at 762. Debtors' *ad hoc* position is thus not only contrary to the law but would also mean that parties with the same substantive rights would be treated differently based on the happenstance of whether a default that indisputably occurred based on prepetition conduct was technically declared pre- or post-petition.

16.     Debtors' claim that Central States Pension Fund was required to provide a notice and demand under 29 U.S.C. § 1399(b)(1) before declaring an insecurity default under 29 U.S.C. § 1399(c)(5)(B) is simply an invention and contradicts Debtors' own cited cases. (*See* Debtors' Motion, ¶ 64 ("probably most glaring is the fact that the declaration was made *before* Central States ever notified Debtors of their withdrawal liability obligations as required under 29 U.S.C. § 1399(b)(1)" (emphasis in original))). As opposed to declaring Debtors in default under 29 U.S.C. § 1399(c)(5)(A) for missing a payment under an already-issued notice and demand, Central States

Pension Fund declared Debtors in default in accordance with 29 U.S.C. § 1399(c)(5)(B), under which a multiemployer plan may demand "immediate payment" upon the occurrence of "any event" referenced in the plan's rules that indicates a substantial risk of collectability. Nothing in 29 U.S.C. § 1399(c)(5)(B) states or suggests that a fund must serve a notice and demand with a payment schedule before declaring an insecurity default. And, in line with the plain text of 29 U.S.C. § 1399(c)(5)(B), the case law cited by Debtors holds that a fund may declare an insecurity default as soon as an employer withdraws and before issuing any notice and demand. *See Cent. States, Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*, 620 F.3d 766, 774 (7th Cir. 2010) (cited in Debtors' Motion, ¶ 60) (holding that employer was required to pay entire amount of withdrawal liability under 29 U.S.C. § 1399(c)(5) even though fund declared a default before issuing notice and demand and sought accelerated amount in only notice and demand it issued); *Cent. States, Se. & Sw. Areas Pension Fund v. Dworkin, Inc.*, No. 19-cv-6716, 2020 WL 5365968, at *2, *5 (N.D. Ill. Sept. 8, 2020) (cited in Debtors' Motion, ¶ 60) (same). Further, although Debtors cite to general definitions of the term "default" (Debtors' Motion, ¶ 61), they ignore that 29 U.S.C. § 1399(c)(5)(B) expressly defines a "default" as including any "event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability."

## II. The Automatic Stay Does Not Affect Debtors' Default under 29 U.S.C. § 1399(c)(5)(B).

17.     Debtors' cursory argument that the default declaration is barred by the automatic stay fails for a lack of a basis in the statute. (Debtors' Motion, ¶ 70.) *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 452 (2007). Specifically, the assessment of withdrawal liability premised on Debtors' default does not implicate any property interests of the estate and thus does not fall under 11 U.S.C. § 362(a)(3)-(5). *See In re Majestic Star Casino, LLC*,

716 F.3d 736, 757 (3d Cir. 2013) ("The Code's property definition is not without limitations"

(internal citations omitted)). Indeed, the definition of property of the bankruptcy estate "does not

extend so far as to override rights statutorily granted to" other parties, meaning that the Debtors

should not be permitted to include the statutory power to declare default conferred by 29 U.S.C.

§ 1399(c)(5) as property of the estate. *Id.* In other words, although a contract entered into by the

Debtor may become property of the estate upon a bankruptcy filing, Central States Pension Fund's

acceleration was based on a statute (MPPAA), not a contract. As such, Central States Pension Fund

has not performed "any act to obtain possession of property of the estate," or "any act to create,

prefect, or enforce any lien," and thus has not implicated 11 U.S.C. § 362(a)(3)-(5).

18.     Nor did Central States Pension Fund initiate any actions to recover its withdrawal

liability claims outside of this Court, and as a result 11 U.S.C. § 362(a)(1)-(2) and (6)-(8) similarly

do not apply. *Am-Haul Carting*, 33 F. Supp. 2d at 242. The gravamen of Debtors' argument

appears to be that even the act of determining the amount of Debtors' withdrawal liability and

seeking that amount in the Bankruptcy Court violated the automatic stay, which cannot be the case.

*See Mar. Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1207 (3d Cir. 1991) (stating that

the goal of the automatic stay is "[c]onsolidating all pre-petition claims against the debtor in one

collective proceeding before a bankruptcy court").

19.     Debtors' reliance on the automatic stay provision fails for the additional reason that

the factual predicate for Central States Pension Fund's default declaration occurred prepetition.

Again, 29 U.S.C. § 1399(c)(5) defines "default" as any "event defined in rules adopted by the plan

which indicates a substantial likelihood that an employer will be unable to pay its withdrawal

liability."[5] Here, the "event" that Central States Pension Fund's Board of Trustees identified as having "indicate[d] a substantial likelihood" that Debtors would be unable to pay per rules adopted by Central States Pension Fund was the prepetition "existence of a delinquency in . . . the payment of contributions." (Central States Pension Fund Plan Document, Ex. A to Central States Pension Fund's Opening Brief, at CS-0034827–CS-0034828; *see also* Sept. 12, 2023 Minutes of the Pension Board Meeting, Ex. L to Central States Pension Fund's Opening Brief, at CS-0032738.) Thereafter, at its first meeting following Debtors' bankruptcy filing, Central States Pension Fund's Board of Trustees approved the calculation of Debtors' withdrawal liability and formally declared a default under the plan document. (Sept. 12, 2023 Minutes of the Pension Board Meeting, Ex. L to Central States Pension Fund's Opening Brief, at CS-0032738; Affidavit of Andrew M. Sprau, Ex. 1, ¶ 12.) Again, nothing in 11 U.S.C. § 362 or the bankruptcy code more generally supports the notion that Debtors may use the automatic stay as a "get out of jail free card" to avoid a default, especially where the default is indisputably based on prepetition conduct.

III.    **The Court Should Not Use a Present-Value Analysis to Discount the Withdrawal Liability Claims.**

20.    Given that Debtors are in default under 29 U.S.C. § 1399(c)(5), they owe the gross amount of the 20-year payment schedule (*i.e.*, present value discounting is not appropriate), as the Court found in its original September 13, 2024 opinion. (Dkt. No. 4326 at 38–39.) The Court's

---

[5] Although Central States Pension Fund's Plan Document defines a "default" in terms of a declaration by the Trustees, the difference merely reflects that 29 U.S.C. § 1399(c)(5) is framed in permissive terms as it describes what a plan "may" recover. For purposes of the statutory definition of "default," a multiemployer plan's substantive right to payment for the full amount of withdrawal liability arises upon the occurrence of the "event" that "indicates a substantial likelihood" that payment would not occur, which in this case was the withholding of contributions. In the event of a statutory default, however, the multiemployer plan retains the discretion to demand the amount to which it is entitled. In other words, what matters for this analysis is when Central States Pension Fund's claim for defaulted withdrawal liability arose as a factual matter, not when Central States Pension Fund decided to formally demand this amount. Accordingly, Central States Pension Fund had a statutory entitlement to the full defaulted amount before Debtors filed for bankruptcy, even if the Trustees did not exercise that statutory entitlement until after the petition was filed.

initial determination—that, if a default had occurred under 29 U.S.C. § 1399(c)(5), present value discounting is inappropriate—remains correct for the reasons stated in the Court's September 13, 2024 opinion, which the Debtors simply do not address. Although the Court ultimately entered an amended opinion in response to Debtors' motion asking the Court to reconsider the threshold question of whether a default had occurred, nothing in that opinion suggests that that the Court was abandoning or altering its determination that, if a default had occurred under 29 U.S.C. § 1399(c)(5), the gross amount of the 20-year payment schedule would be owed. To the contrary, the Court only asked the parties to address the question of whether, if a default had *not* occurred, the withdrawal liability claim should be reduced to present value. (*See* Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to Consider, Dkt. No. 4771 at 7.) And although Debtors argue that present value discounting is appropriate under 11 U.S.C. § 502(b), they ignore that the specific provision of 29 U.S.C. § 1399(c)(5) controls over the general provision of 11 U.S.C. § 502(b) and requires no discounting for present value.

21.     That said, for the sake of completeness, Central States Pension Fund will address Debtors' argument that present value discounting is required under 11 U.S.C. § 502(b). As explained in Central States Pension Fund's opening brief (Dkt. No. 5169, ¶ 35), it is a "basic bankruptcy law tenet that 'bankruptcy operates as the acceleration of the principal amounts of all claims against the debtor.'" *In re Oakwood Homes Corp.*, 449 F.3d at 602 n.19 (quoting H.R. Rep. No. 95-595, at 352-54 (Sept. 8, 1977)). Debtors similarly concede that "[i]t is almost certain that 11 U.S.C. § 502(b) accelerates any and all claims upon filing a bankruptcy petition for the purpose of identifying allowable claims." (Debtors' Motion, ¶ 33.) But Debtors err where they claim that "Section 502(b) still allows for discounting these types of claims to present value." (*Id.*)

22.     Tellingly, Debtors point to no actual text of 11 U.S.C. § 502(b) that would permit the present-value discounting for which they advocate, instead alluding only to the provision in the most general terms. (Debtors' Motion, ¶ 38.) The Third Circuit, however, has rejected this approach and explained that the Bankruptcy Code "does not. . . require [discounting] for all claims evaluated under § 502," and instead held only that discounting may "sometimes be appropriate" if warranted by the financial circumstances. *In re Oakwood Homes Corp.*, 449 F.3d at 598. Here, as further discussed below, the financial circumstances do not warrant discounting to present value, as that would result in improper double discounting. Accordingly, Debtors' assertion that 11 U.S.C. § 502(b) establishes a general rule in favor of discounting must fail, as it is contrary to the law of the Third Circuit and because it finds no basis in the text of the Bankruptcy Code. (Debtors' Motion, ¶¶ 34–38.)

23.     Not only is Debtors' "general rule" approach contrary to *Oakwood Homes*, but the cases collected by Debtors are inapposite because they almost all relate to voluntarily negotiated contractual obligations.[6] (Debtors' Motion, ¶¶ 35–36.) Debtors give no reason to believe that these cases should apply here, as withdrawal liability is not the product of a negotiated contract, but is

---

[6] *Till v. SCS Credit Corp.*, 541 U.S. 465, 470 (2004) (cited in Debtors' Motion, ¶¶ 35, 72) (relating to commercial loan for automobile); *In re O.P.M. Leasing Servs., Inc.*, 56 B.R. 678, 679 (Bankr. S.D.N.Y. 1986) (cited in Debtors' Motion, ¶ 35) (relating to commercial equipment leases); *In re Chateaugay Corp. v. Aetna Cas. Ins. Co.*, No. 94-cv-1257, 1996 WL 346010, at *1 (S.D.N.Y. June 24, 1996) (cited in Debtors' Motion, ¶¶ 35, 36) (relating to surety bonds); *TransCanada Pipelines Ltd. v. USGen New Eng., Inc.*, 458 B.R. 195, 224 (D. Md. 2011) (cited in Debtors' Motion, ¶ 36) (relating to oil and gas contracts); *In re Ultra Petroleum Corp.*, 624 B.R. 178, 182 (Bankr. S.D. Tex. 2020) (cited in Debtors' Motion, ¶ 36) (relating to promissory notes); *In re Wisc. Engine Co.*, 234 F. 281, 283 (7th Cir. 1916) (cited in Debtors' Motion, ¶ 36) (same); *Kucin v. Devan*, 251 B.R. 269, 270 (D. Md. 2000) (cited in Debtors' Motion, ¶ 36) (relating to deferred compensation agreements); *In re Thomson McKinnon Sec., Inc.*, 149 B.R. 61, 63 (Bankr. S.D.N.Y. 1992) (cited in Debtors' Motion, ¶ 36) (same). *See also Matter of Penn Cent. Transp. Co.*, 596 F.2d 1102, 1107 (3d Cir. 1979) (cited in Debtors' Motion, ¶ 72) (relating to commercial bonds); *In re White Motor Corp.*, 831 F.2d 106, 110 (6th Cir. 1987) (cited in Debtors' Motion, ¶ 73) (relating to advertising contract); *In re Stone & Webster, Inc.*, 279 B.R. 748, 754 (Bankr. D. Del. 2002) (cited in Debtors' Motion, ¶ 73 n.7) ("This dispute arises from a contract . . .").

rather a statutory creation that reflects the "pre-existing obligation on the employer's part" to pay for a their allocable share of unfunded vested benefits. *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 318 (3d Cir. 2011). Thus, Debtors' citation to *In re B456 Systems, Inc.* fails, as the present-value approach adopted by the court there relied upon on the observation that the creditor's claim was effectively for breach of contract, a context in which present-value discounting is typically appropriate. No. 12-bk-12859, 2017 WL 6603817, at *24 (Bankr. D. Del. Dec. 22, 2017) (discussing *In re Chemtura Corp.*, 448 B.R. 635, 673 (Bankr. S.D.N.Y. 2011) ("The basic principle of recovery for breach of contract is that the injured party should be placed in the same position it would have been in had the contract been performed. . . .")). Debtors' unsupported analogy to the law of contracts should not persuade the Court, as the withdrawal liability claims here instead involve a detailed statutory scheme that the Supreme Court has explained results in obligations that are fundamentally unlike commercial loans. *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 423.

24.    Indeed, as discussed in paragraph 19 *supra*, the Court has already found that 29 U.S.C. § 1399(c)(5) mandates that there be no present-value discounting when an employer defaults. (Sept. 13, 2024 Memorandum Opinion, Dkt. No. 4326 at 38–39.) And although Debtors cite three cases involving non-contract-based claims subject to present-value discounting, two of those three cases were rejected by the Third Circuit. *In re Oakwood Homes Corp.*, 449 F.3d at 599 n.13 (rejecting *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1293, 1300 (10th Cir. 1998) ((cited in Debtors' Motion, ¶ 35) and *In re CSC Industries, Inc.*, 232 F.3d 505, 507 (6th Cir. 2000) (cited in Debtors' Motion, ¶ 73)). specifically, the Third Circuit explained: "these courts made sweeping statements declaring 11 U.S.C. § 502(b) to require discounting all claims to present value. However, these courts either conducted no inquiry at all into the issue, or concluded (contrary to

our holding above) that § 502(b) was clear and unambiguous." *In re Oakwood Homes Corp.*, 449 F.3d at 599, n.13. As the Third Circuit noted, *id.*, in those two cases the issue of whether present value discounting was warranted under 11 U.S.C. § 502(b) was not even at issue. *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d at 1300 (cited in Debtors' Motion, ¶ 35) (making no holding as to appropriateness of present-value discounting because it was not subject to dispute); *In re CSC Industries, Inc.*, 232 F.3d at 507 (cited in Debtors' Motion, ¶ 73) (reducing claim to present value because it was undisputed that such present-valuing was required by 29 U.S.C. § 1301(a)(18), rather than by any specific provision of 11 U.S.C. § 502(b)). The third case cited by Debtors, *In re U.S. Airways Group, Inc.*, 303 B.R. 784, 792 (Bankr. E.D. Va. 2003) (cited in Debtors' Motion, ¶ 73 n. 7), closely resembles *CSC Industries*, as it involved a claim under 29 U.S.C. § 1301(a)(18) (which explicitly requires a present value analysis), such that the parties conceded that present value discounting was appropriate under that provision. In contrast, this case involves a claim for defaulted withdrawal liability under 29 U.S.C. § 1399(c)(5), and, as this Court has already determined, present-value discounting is not appropriate for such a claim. (Sept. 13, 2024 Memorandum Opinion, Dkt. No. 4326 at 38–39.)

25. Even ignoring the Court's prior holding that 29 U.S.C. § 1399(c)(5) mandates that there be no present-value discounting, such discounting is not appropriate here for the additional reason that it would be impermissible double discounting. *In re Oakwood Homes Corp.*, 449 F.3d at 601. Debtors have already received a massive discount on their obligation to pay their allocable share of Central States Pension Fund's UVBs through application of the 20-year limitation on payments. *See In re Marcal Paper Mills, Inc.*, 650 F.3d at 318 ("The liability for unfunded vested benefits represents a pre-existing obligation on the employer's part . . . ."). Specifically, as noted in Central States Pension Fund's opening brief, the gross amount of the 20-year payment schedule

does not come close to satisfying the principal amount of Debtors' allocable share of UVBs, as application of the 20-year limitation results in an approximately $3 billion dollar reduction of the Debtors' liability for Central States Pension Fund's UVBs. (Central States Pension Fund Opening Brief, Dkt. No. 5169, ¶ 42.) For this reason, the Supreme Court has explained that the statute "forgives all annual installment payments after 20 years." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 426. If anything, this discounting is *more* beneficial to Debtors than an interest-free loan would be because, again, Debtors' total payments do not even come close to the principal amount of their allocable share of UVBs.

26.     Nor should the Court be persuaded by Debtors' argument that present-value discounting is necessary for equal treatment among general unsecured creditors. (Debtors' Motion, ¶¶ 74–77.) As an initial matter, Debtors identify no other claims outside of the withdrawal liability context in these cases where present-value discounting has already occurred or where Debtors have objected in order to seek such discounting. Even more critically, Debtors fail to acknowledge that Central States Pension Fund's claims *have* been reduced by more than $3 billion by operation of the Court's prior orders and the 20-year limitation on payments. (Central States Pension Fund Opening Brief, Dkt. No. 5169, ¶ 42.) Accordingly, fairness and equity instead require that Central States Pension Fund's claims for withdrawal liability (and the withdrawal liability claims filed by other multiemployer pension plans) not be singled out by the Debtors as the only ones subject to double discounting. *In re Oakwood Homes Corp.*, 449 F.3d at 601.

## IV.    Subordination Under 29 U.S.C. § 1405 Is Inappropriate.

27.     As explained in Central States Pension Fund's opening brief (Dkt. No. 5169, ¶¶ 46–48), Debtors' newfound contention that "unfunded vested benefits" as used in 29 U.S.C. § 1405(b) actually means "withdrawal liability" is contrary to the law of the case and Debtors' past statements. Debtors' attempt to seek subordination under 29 U.S.C. § 1405(b) thus seeks to rewrite

the statute, as 29 U.S.C. § 1405(b) does not provide that an employer's withdrawal liability is reduced. Instead, the text states that in certain situations, the *UVBs* allocable to the employer "shall not exceed an amount equal to the sum of" 50% of its UVBs plus that portion of the remaining 50% that does not exceed the employer's liquidation value.  Here, the Court has already determined that "withdrawal liability" equates to "the amount the employer owes after the application of the 20-year cap," as opposed to meaning the employer's allocable share of the plan's UVBs. (Amended Memorandum Opinion, Dkt. No. 4769, at 37.) Indeed, even in their most recent filing, Debtors continue to assert that withdrawal liability is the amount due after the four adjustments listed in 29 U.S.C. § 1381(b)(1) are applied. (Debtors' Motion, ¶ 10.)

28.     Debtors' reliance on *In re Affiliated Foods, Inc.*, 249 B.R. 770 (Bankr. W.D. Mo. 2000), is misplaced because that decision involved withdrawal liability for which the payment schedule did not go longer than 20 years (*i.e.*, the payment schedule did not implicate the 20-year limitation on payments). (Affidavit of Andrew M. Sprau, Ex. 1, ¶ 14.) Accordingly, in that case, the terms withdrawal liability and the employer's allocable share of UVBs were used interchangeably for the purpose of applying 29 U.S.C. § 1405(b) because the full amount of the employer's allocable share of UVBs (and amortization interest) would be paid over the course of the payment schedule. *In re Affiliated Foods, Inc.*, 249 B.R. at 785-86. Thus, the Court should reject any attempt by Debtors to analogize *Affiliated Foods* to this case, as *Affiliated Foods* is silent as to the interaction between the 20-year limitation on payments and 29 U.S.C. § 1405(b).

29.     Further, Debtors' reference to 29 U.S.C. § 1381(b)(1) represents a red herring. (Debtors' Motion, ¶¶ 93–97.) There is no dispute that 29 U.S.C. § 1405(b) is applied as the last step of 29 U.S.C. § 1381(b)(1), but that does not change the plain text of 29 U.S.C. § 1405(b), which refers to an employer's allocable share of unfunded vested benefits, which in this case is

$4,827,470,743.87. The other provisions of the statute bely Debtors' unsupported arguments, as in 29 U.S.C. § 1405(a)(1) Congress referred to the "unfunded vested benefits allocable to an employer (*after the application of all sections of this part having a lower number designation than this section*)." 29 U.S.C. § 1405(a)(1) (emphasis added). That Congress did not include this language in 29 U.S.C. § 1405(b) thus demonstrates that Congress did not intend "unfunded vested benefits allocable to an employer" to mean the amount after application of the other adjustments listed in 29 U.S.C. § 1381(b)(1). Accordingly, and as noted in the Fund's opening brief, regardless of whether the amount being amortized over 20 years is $4,827,470,743.87 or $2,413,735,371.94, the gross amount of the withdrawal liability payment schedule would remain the same. (Central States Pension Fund Opening Brief, Dkt. No. 5169, ¶¶ 44–51.)

30.     Debtors also ignore 29 U.S.C. § 1405(b)(2), which together with paragraph 1405(b)(1), provides that the allocable share of UVBs shall not exceed 50% of the UVBs allocable to the employer *plus* the amount of the liquidation or dissolution value of the employer as of the commencement of the liquidation, up to the remaining 50% of the allocable share of UVBs. It is undisputed that Debtors have already sold a significant portion of their assets for approximately $1.88 billion. (Real Estate Asset Sales Order, Dkt. No. 1354.) Furthermore, Debtors have claimed that the remaining distributable value in the bankruptcy cases will likely be "in the low ten digits" (Joint Motion of Debtors, MFN Partners, LP, and Mobile Street Holdings, LLC for Leave to File Interlocutory Appeal, Dkt. No. 5178, ¶ 42), meaning $1 billion or more. Accordingly, there is no reason to believe that the "portion of 50 percent of the unfunded vested benefits allocable to the employer . . . which does not exceed the liquidation or dissolution value of the employer" under 29 U.S.C. § 1405(b)(2) is zero, as Debtors imply. Accordingly, 29 U.S.C. § 1405(b) would not

affect Debtors' payment schedule for the additional reason that the liquidation value of the Debtors measured as of the initiation of their liquidation exceeds $2.88 billion.[7]

## V.    29 U.S.C. § 1085(g)(3) Does Not Affect the Payment Schedule.

31.    Debtors' attempts to apply 29 U.S.C. § 1085(g)(3) to reduce the contribution rate used to calculate their annual withdrawal liability payments (Debtors' Motion, ¶¶ 100–104) should also be rejected. As an initial matter, although Debtors cite several arbitration awards and district court opinions regarding 29 U.S.C. § 1085(g)(3), the common holding of those awards and opinions is that 29 U.S.C. § 1085(g)(3) generally requires a fund to exclude any contribution rate increases that are required by (or made in compliance with) the rehabilitation plan that the fund has adopted under 29 U.S.C. § 1085(e). *See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. Event Media, Inc.*, No. 22-cv-6133, 2024 WL 1363542, at *3 (N.D. Ill. Mar. 29, 2024); *Royal Ice Cream Co. v. Cent. States, Se. & Sw. Areas Pension Fund*, 732 F. Supp. 3d 888, 891 (N.D. Ill. 2024). But Debtors' reliance on these cases fails for two reasons. First, Central States Pension Fund's rehabilitation plan did not require Debtors to increase their contribution rate at all. Indeed, and unlike the employers in the cases cited by Debtors, at all relevant times, Debtors were subject to Central States Pension Fund's "Distressed Employer Schedule," which appears at Section 2(C) of Appendix M of the Plan Document. (Central States Plan Document, Ex. A to Central States Pension Fund's Opening Brief, App'x M-15, § 2(C), at CS-0035096–CS-0035097; Affidavit of Andrew M. Sprau, Ex 1, ¶ 11.) Unlike the Primary Schedule or the Default Schedule contained in the Plan Document, the Distressed Employer Schedule contains no required contribution rate

---

[7] Notably, Debtors continue to assert that they are in fact solvent, such that equity will receive a distribution from the bankruptcy estates. (Debtors' Fourth Motion for Entry of An Order Extending Exclusivity Period, Dkt. No. 4252, ¶ 3.) Consistent with their apparent belief in their solvency, Debtors continue to proceed in lockstep with equity holders notwithstanding the staggering (and increasing) costs to the estate. (Joint Motion for Leave to File Interlocutory Appeal, Dkt. No. 5178.) If solvent, Debtors would not be able to rely upon 29 U.S.C. § 1405(b).

increases, and instead leaves the contribution rate to be bargained by the parties under the relevant collective bargaining agreements. (Central States Plan Document, Ex. A to Central States Pension Fund's Opening Brief, App'x M-15, § 2(C), at CS-0035096–CS-0035097; Affidavit of Andrew M. Sprau, Ex 1, ¶ 11.) Accordingly, no rate increases were required by (or made in compliance with) Central States Pension Fund's rehabilitation plan. Second, Debtors' contribution rate *decreased* since the adoption of Central States Pension Fund's rehabilitation plan. Specifically, when the Central States Pension Fund implemented its rehabilitation plan in 2008, Debtors' contribution rate was $258 per week. (Affidavit of Andrew M. Sprau, Ex. 1, ¶ 9.) But the rate used to calculate Debtors' withdrawal liability payment schedule is less than half of that ($106.55). (*See* December 13, 2024 Affidavit of Andrew M. Sprau, Ex. B to Central States Pension Fund's Opening Brief, ¶ 12.) Thus, Debtors cannot show that the rehabilitation plan required them to increase their contribution rates for the additional reason that their contribution rates decreased under the rehabilitation plan. In short, if the Court were to adopt the awards and opinions cited by Debtors, the result would be that 29 U.S.C. § 1085(g)(3) does *not* apply here because Debtors' contribution rate increases were not required by (or made in compliance with) the Fund's rehabilitation plan.

32.    Conversely, if the Court were to decline to adopt those awards and opinions (and instead accept the statutory interpretation advanced by Central States Pension Fund in those cases), the result would be the same, as Central States Pension Fund would be entitled to include Debtors' contribution rate increases under the plain language of 29 U.S.C. § 1085(g)(3)(B), which provides that contribution rate increases may be included in calculating withdrawal liability payments if the rate increases "are used to provide an increase in benefits, including an increase in future benefit accruals, permitted by [29 U.S.C. § 1085(f)(1)(B)]."

33.    First, every post-2014 contribution rate increase was used to provide an increase in benefits by virtue of Central States Pension Fund's long-standing benefit accrual formula, whereby a participant earns a monthly benefit equal to 1% of all contributions made on their behalf. (Central States Plan Document, Ex. A to Central States Pension Fund's Opening Brief, Art. I, § 1.01(c), at CS-0034717.) Under this formula, every contribution rate increase paid by an employer leads to increased benefit accruals for its employees.

34.    Second, all of Debtors' increases in benefit accruals were "permitted by" 29 U.S.C. § 1085(f)(1)(B) such that the underlying contribution rate increases are to be included under the text of 29 U.S.C. § 1085(g)(3)(B). Specifically, 29 U.S.C. § 1085(f)(1)(B) contains only a narrow prohibition against benefit increases accomplished by rehabilitation plan amendments that lack actuarial certification. Because the benefit increases at issue here were not accomplished via a prohibited amendment and instead occurred as a result of Central States Pension Fund's long-standing 1% benefit accrual formula (Affidavit of Andrew M. Sprau, Ex. 1, ¶ 7), the benefit increases were therefore "permitted by" 29 U.S.C. § 1085(f)(1)(B), such that the underlying contribution rate increases may be included for purposes of calculating the Debtors' withdrawal liability payments.

## VI.    The Court Should Hold Debtors to their Bargain and Allow the Claim for Breach of the Contribution Guarantee.

35.    Although the starting point for any contractual analysis is the contract itself, Debtors' brief does not quote the text of the 2014 Letter Agreement at all but instead liberally mischaracterizes the document. (Debtors' Motion, ¶¶ 105–118.) Indeed, the 2014 Letter Agreement—which was negotiated on Debtors' behalf by attorneys at Kirkland & Ellis LLP (Hawkins Transcript, Ex. F to Central States Pension Fund's Opening Brief, at 84:7–20 85:14–87:14; 89:19–90:16; 91:11–18.)—reflects an agreement between sophisticated parties that the

Court should uphold and enforce. *See XCO Int'l, Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1003 (7th Cir. 2004) ("[w]here both parties are substantial commercial enterprises, it is difficult to see why the law should take an interest in whether the estimate of harm underlying the liquidation of damages is reasonable."). Indeed, this agreement was chosen by Debtors over the deemed-contribution-rate alternative that Debtors accepted with respect to other pension funds. (January 21, 2014 Email of Harry Wilson, Ex. J to Central States Pension Fund's Opening Brief, at CS-0011114–CS0011115.)[8] If the 2014 Letter Agreement were unreasonable (as Debtors' counsel now suggests), Kirkland & Ellis LLP presumably would not have advised its client to enter into the agreement in the first place.

36.     Further, Debtors mischaracterize ERISA in describing the basis for withdrawals under 29 U.S.C. § 1383(a). (Debtors' Motion, ¶ 106.) Specifically, 29 U.S.C. § 1383(a)(1) states that a withdrawal occurs when an employer "permanently ceases to have an obligation to contribute under the plan." But the "obligation to contribute" described in 29 U.S.C. § 1383(a)(1) is specifically the obligation imposed by a collective bargaining agreement or by labor law. *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 n.1 (1997) (discussing 29 U.S.C. § 1392). Accordingly, Debtors' obligation to contribute under the relevant collective bargaining agreements ceased prepetition, triggering their withdrawal, notwithstanding their separate obligations under the 2014 Letter Agreement.

37.     Debtors similarly mischaracterize ERISA where they claim that they did not cease covered operations sufficient to trigger a withdrawal under 29 U.S.C. § 1383(a)(2). (Debtors'

---

[8] As explained in Central States Pension Fund's opening brief, had Debtors chose the other option presented to them, the total amount of withdrawal liability owed (after application of the Court's ruling with respect to the 20-year limitation on payments) would exceed $5 billion, more than three times the amount Central States Pension Fund seeks in its motion for summary judgment. (Central States Pension Fund's Opening Brief, ¶ 59.)

Motion, ¶ 107.) Indeed, 29 U.S.C. § 1393(a)(2) is simple—it says that a complete withdrawal occurs when the employer "permanently ceases all covered operations." There is no dispute that Debtors ceased all operations prepetition (Aug. 7, 2023 Declaration of Matthew A. Doheny, Dkt. 14, ¶ 17), and this total cessation necessarily includes all operations covered by a collective bargaining agreement. The Court need not entertain Debtors' unsupported tangent on this point. (Debtors' Motion, ¶ 107.)

38.     In any event, the 2014 Letter Agreement itself is sufficient to defeat Debtors' arguments. To begin with, Debtors mischaracterize the 2014 Letter Agreement where they state (without citation) that the amounts owed under the 2014 Letter Agreement and withdrawal liability are mutually exclusive "by definition" and that "Central States cannot have it both ways." (Debtors' Motion, ¶¶ 106, 109.) To the contrary, the 2014 Letter Agreement explicitly states that Debtors' payments under the agreement and any withdrawal liability payments are separate amounts owed and are *not* mutually exclusive: "the payments specified under this Paragraph 2 shall not be excused by any withdrawal incurred . . . from the Pension Fund and shall be due in addition to (and not in place of) any withdrawal liability payments owed to the Pension Fund." (2014 Letter Agreement, Ex. H to Central States Pension Fund's Opening Brief, ¶ 2(c).)

39.     The Court should also reject Debtors' implication that withdrawal liability and contractual remedies are mutually exclusive under MPPAA. (Debtors' Motion, ¶ 109.) Tellingly, the Debtors do not address the Court's previous holding that it will enforce "an agreement by the debtors to pay more in the case of withdrawal liability." (Amended Order and Opinion, Dkt. No. 4769 at 41.) The Court's holding was correct, because "MPPAA establishes mandatory liability . . . . It does not forbid employers from agreeing to pay extra money to a pension trust." *Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund*, 971 F.2d 1346, 1353 (7th Cir. 1992). That

is, MPPAA does not forbid pension funds from imposing additional costs upon employers when they withdraw: "[t]here is nothing in the text that indicates Congress intended for 'withdrawal liability' to be the only payments a withdrawing employer would ever face, and because of the comprehensive nature of ERISA, we read the absence of such language as intentional." *WestRock RKT Co. v. Pace Indus. Union-Mgmt. Pension Fund*, 856 F.3d 1320, 1326 (11th Cir. 2017) (upholding multiemployer fund's policy of requiring withdrawing employers to make payments in connection with fund's accumulated funding deficiency in addition to payments for withdrawal liability); *see also Ely v. Bd. of Trs. of Pace Indus. Union-Mgmt. Pension Fund*, No. 18-cv-315, 2019 WL 438338, at *5-6 (D. Idaho Feb. 4, 2019) (upholding multiemployer fund's policy of requiring withdrawing employers to pay an "exit fee" in addition to payments for withdrawal liability). Thus, nothing in MPPAA renders the 2014 Letter Agreement unenforceable.

40.     The Court should also reject Debtors' argument that the 2014 Letter Agreement's damages provision is unenforceable under Illinois law. First, Debtors mischaracterize the burden of persuasion on this issue, which "rests on the party resisting enforcement of a liquidated damages clause to show that the agreed-upon damages are" unenforceable. *XCO Int'l, Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1003 (7th Cir. 2004) (applying Illinois law). Tellingly, Debtors do not cite a single fact in support of their burden that the damages in question are not enforceable. *Id; see Zerjal v. Daech & Bauer Constr., Inc.*, 939 N.E.2d 1067, 1074 (Ill. App. 5th Dist. 2010) ("Illinois courts give effect to liquidated-damages provisions so long as . . . there is no evidence of fraud or unconscionable oppression, a legislative directive to the contrary, or a special social relationship between the parties of a semipublic nature." (citation omitted)). Instead, Debtors attempt to invert the burden of persuasion by baldly asserting that "Central States [is] unable to show that the liquidated damages provision . . . is anything other than an unenforceable penalty." (Debtors'

Motion, ¶ 110.) On that basis alone, the Court can and should grant summary judgment in favor of Central States.

41.     But even if the burden were reversed, there is no genuine dispute that the 2014 Letter Agreement is enforceable. Debtors' only argument that the 2014 Letter Agreement is unenforceable under Illinois law is that "there is nothing in the record to suggest that, at the time of contracting, the parties reasonably believed Central States would suffer $1 billion in damages if the Debtors were to discontinue operations." (Debtors' Motion, ¶ 113.) Again, Debtors introduce no evidence whatsoever in support of this contention as to which they have the burden. In any event, the question is not whether the precise amount of liquidated damages now sought by Central States Pension Fund was something the parties anticipated; instead, the question is whether at the time of contracting the parties believed that the liquidated damages calculation was reasonable and bore "some relation to the damages which might be sustained." *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 863 (7th Cir. 2020) (applying Illinois law).

42.     An examination of the relevant provision itself (which Debtors do not analyze) reflects a reasonable and mutual judgment by the parties. Specifically, the amount to be paid is to be calculated in one of two ways: (a) looking to the actual amount of work performed by the employer during the breach, or (b) by multiplying a month of the employer's contribution history during the period that the employer was repaying its contribution deferral obligation (through December 31, 2022) by the last contribution rate in effect. (2014 Letter Agreement, Ex. H to Central States Pension Fund's Opening Brief, ¶ 2(a)). And, in either event, damages are only to be paid for the duration of the breach. (*Id.*) Agreeing to a damages formula that awards Central States Pension Fund with an amount roughly equivalent to the amount of contributions that would have been paid absent a breach is reasonable, especially when one considers the sophistication of the

parties. *XCO Int'l*, 369 F.3d at 1004 ("The element common to most liquidated damages clauses that get struck down as penalty clauses is that they specify the same damages regardless of the severity of the breach.")

43.     Indeed, Debtors' contention that the thousands of employees they laid off "would stop accruing any benefits … for which continuing contributions would be required" is precisely the sort of harm that Congress has long identified as a major threat to the health of multiemployer funds: "One of the most serious threats to the security of benefits under a multiemployer plan is an unanticipated decline in employment covered by the plan." Joint Explanation of MPPAA, 126 Cong. Rec. at S20209. At the time that the 2014 Letter Agreement was negotiated, Debtors acknowledged that Central States Pension Fund's agreement to defer certain contributions for 2009, to receive no contributions from June 15, 2009 through July 1, 2011, and to accept significantly reduced contributions amounts thereafter, constituted a "significant sacrifice." (Hawkins Transcript, Ex. F to Central States Pension Fund's Opening Brief, at 33:15–35:3.) As recently as 2023, Debtors themselves acknowledged that the elimination of contributions received from Debtors would be a "dire financial consequence" for Central States Pension Fund. (June 14, 2023 Letter of Dan Olivier, Ex. K to Central States Pension Fund's Opening Brief; Hawkins Transcript, Ex. F to Central States Pension Fund's Opening Brief, at 105:6–106:15.) Thus, at all times the parties understood that requiring damages in an amount roughly equivalent to the amount of contributions that would have been paid absent a breach was reasonable.

44.     The reasonableness of the damages set forth within the 2014 Letter Agreement is further demonstrated by the fact that Debtors themselves chose the contribution guarantee reflected in the 2014 Letter Agreement over an alternative whereby future withdrawal liability would be assessed according to a much higher, deemed contribution rate, which alternative Debtors

themselves agreed to with respect to certain other MEPPs. (Amended Memorandum Opinion, Dkt. No. 4769, at 39–41; 2014 Letter Agreement, Ex. H to Central States Pension Fund's Opening Brief, at p. 1.)) Had Debtors chose this other option presented to them, the total amount of withdrawal liability owed (after application of the Court's ruling with respect to the 20-year limitation on payments) would exceed $5 billion, more than three times the amount Central States Pension Fund seeks in its motion for summary judgment. (Central States Pension Fund's Opening Brief, ¶ 59.)

45.    Debtors' last-ditch argument that the 2014 Letter Agreement violates the National Labor Relations Act ("NLRA") fails for the simple reason that Central States Pension Fund is not an agent of the International Brotherhood of Teamsters. (Debtors' Motion, ¶ 116.) Central States Pension Fund is administered by a board of eight Trustees, four of whom are selected by employers and four of whom are appointed by local unions affiliated with the International Brotherhood of Teamsters. *See* 29 U.S.C. § 186(c)(5)(B). (Affidavit of Andrew M. Sprau, Ex. 1, ¶ 6.) And, in the exercise of their fiduciary duties to Central States Pension Fund, the Trustees are not agents of the parties that appointed them; to the contrary, their duties are "directly antithetical" and "totally alien" to those of such agency. *N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 331–32, 338 (1981). Indeed, the Supreme Court has explained that multiemployer pension plans are fundamentally distinct from labor organizations like the International Brotherhood of Teamsters:

> Congress treated the issues of multiemployer bargaining units and multiemployer trust funds quite distinctly. . . . [T]he union exerts economic pressure . . .   The atmosphere in which employee benefit trust fund fiduciaries must operate, as mandated by [29 U.S.C. § 186(c)(5)] and ERISA, is wholly inconsistent with this process of compromise and economic pressure.

*Id.* at 335–36. Put differently, because Central States Pension Fund does not exist to bargain with employers, it is not a labor organization.

40.    In any event, Debtors' suggestion that the damages under the 2014 Letter Agreement are a windfall to Central States Pension Fund for which there was no consideration is false. As Debtors themselves acknowledged when they negotiated and signed the 2014 Letter Agreement:

> All parties signatory to this letter agreement acknowledge that it has been entered for good and valuable consideration . . . . Further, YRCW and each of its affiliates that have executed this letter-agreement. . . acknowledge that they will receive reasonably equivalent value for the Participation Guarantee . . . and other undertakings they have given and made hereunder, in that, among other items of value provided by this letter-agreement . . . this letter-agreement is a necessary component and condition of a debt restructuring that, if not effectuated, would create substantial risks negatively impacting the financial viability of all the YRCW Companies.

(2014 Letter Agreement, Ex. H to Central States Pension Fund's Opening Brief, ¶ 2(g).) As explained in Central States Pension Fund's opening brief, the 2014 Letter Agreement was voluntarily chosen by Debtors as a condition of a comprehensive restructuring program that required "sacrifice" by Central States Pension Fund and that was "absolutely essential to the company's restructuring efforts." (Hawkins Transcript, Ex. F to Central States Pension Fund's Opening Brief, at 46:23–52:4.) Indeed, Debtors chose the contribution guarantee reflected in the 2014 Letter Agreement over an alternative whereby future withdrawal liability would be assessed according to a much higher, deemed rate, which alternative Debtors themselves agreed to with respect to certain other MEPPs. (Amended Memorandum Opinion, Dkt. No. 4769, at 39–41; 2014 Letter Agreement, Ex. H to Central States Pension Fund's Opening Brief, at p. 1.) As the Court already ruled with respect to those agreements with the other MEPPs, because Debtors voluntarily agreed to the 2014 Letter Agreement in exchange for Central States Pension Fund's agreement to their 2014 restructuring, there is no reason why "the [D]ebtors should not be held to their bargain." (Amended Memorandum Opinion, Dkt. No. 4769, at 39–41.)

## CONCLUSION

For the reasons set forth above, Central States Pension Fund asks the Court to deny Debtors' motion for summary judgment and to grant summary judgment to Central States Pension Fund allowing Central States' claims for withdrawal liability against each one of the Debtors, jointly and severally (Claims Nos. 4312–4335), in the amount of $1,579,806,536.80 and allowing Central States' claims in connection with Debtors' breach of the 2014 Letter Agreement (Claims Nos. 4336–4352) in the amount of $917,028,151.94.

Date:   January 10, 2024
        Wilmington, Delaware

**SULLIVAN · HAZELTINE · ALLINSON LLC**

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
          whazeltine@sha-llc.com

Brad R. Berliner, Esq.
Andrew J. Herink, Esq.
Daniel Sullivan, Esq.
Central States Funds
8647 W. Higgins Road
Chicago, IL 60631
Tel: (847) 939-2478
Email: bberliner@centralstatesfunds.org
          aherink@centralstatesfunds.org
          dsulliva@centralstatesfunds.org

*Attorneys for Central States Pension Fund*