## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.,* | Case No. 23-11069 (CTG) |
| Debtors. | (Jointly Administered) |

**Hearing Date: January 21, 2025 at 10:00 a.m. (ET)**
**Objection Deadline: December 23, 2024 at 4:00 PM (ET)**

### REPLY OF THE PENSION BENEFIT GUARANTY CORPORATION IN SUPPORT OF MOTION FOR ALLOWANCE AND PAYMENT OF PREMIUMS AS ADMINISTRATIVE EXPENSE

Under ERISA, plan sponsors and their controlled group members are liable to PBGC for any pension insurance premiums incurred up to the date of a defined-benefit pension plan's date of trusteeship by PBGC. If Debtors had terminated their single-employer pension plans in 2023, the liabilities at issue here would not have arisen. Instead, Debtors delayed the termination and PBGC trusteeship of their single-employer pension plans, incurring additional post-petition pension costs, specifically, liability for PBGC premiums for the 2024 plan year. In their objection, Debtors do not explain why these costs were incurred. Debtors have not rebutted PBGC's argument that its premiums benefited the estate. And their only argument against PBGC's assertion that the premiums are entitled to priority as a tax relies exclusively on a Supreme Court case that is inapplicable here. PBGC premiums are used to fund its statutory mission and are entitled to payment as an administrative expense.

### ARGUMENT

**I.      Debtors are required by statute to pay administrative premiums.**

1.      When it comes to the question of which party must pay pension plan premiums, the oft-complex language of ERISA is straightforward: "the designated payor of each plan shall

pay the premiums imposed by [PBGC]…when they are due."[1] The designated payor of a single-payor plan is "the contributing sponsor or plan administrator."[2]

2.     Premiums for defined-benefit pension plans are calculated according to statutorily required formulae.[3] A spreadsheet containing the calculation of Debtors' premiums, based on information provided by Debtors, is attached hereto as Exhibit A.[4]

3.     Debtors do not contest that, as the Plan's contributing sponsor, they are the designated payor pursuant to the statute.[5] Instead, they argue that they owe no liability due to their "longstanding practice" of paying pension plan premiums from plan assets.[6] Debtors point to no authority, however, showing that they are exempt from premium liabilities because they can no longer fund them from the Plan's assets.  And, indeed, a closer look at the statutory scheme demonstrates that Debtors have mischaracterized ERISA's requirements and their own practice.

4.     Debtors and their controlled group members cannot pay their liability for premiums from Plan assets, because they are no longer the plan administrator, and these assets are no longer under Debtors' authority. By agreement with the Debtors (the "Trusteeship Agreement"), PBGC became statutory trustee of the Debtors' remaining single employer pension plan on August 2, 2024.[7]  When executing the Trusteeship Agreement, Debtors agreed to

---

[1] 29 U.S.C. § 1307(a).

[2] 29 U.S.C. § 1307(e)(1).

[3] 29 U.S.C. § 1306.

[4] PBGC's total premium claim against Debtors includes the premiums due for two of the plans that were sponsored by Debtors, the Yellow Corporation Pension Plan and the Roadway LLC Pension Plan, which were merged into the Yellow Retirement Pension Plan on March 1, 2024.

[5] 29 U.S.C. § 1307(e)(1).

[6] D.I. 5269 at 4.

[7] *See* Exhibit B, Trusteeship Agreement. As described above, at the commencement of these proceedings,

surrender all plan assets to PBGC.[8]   The Trusteeship Agreement does not state that transfer of these assets satisfies Debtors' already-incurred liability with respect to premiums, nor was it so-intended. While PBGC does not disagree with Debtors' statement that "nothing in ERISA prohibits the pension plan administrator from paying the Pension Plan Premiums. . . from plan assets,"[9] there is no statutory provision releasing Debtors from their obligation to pay the premiums, even if they must pay them from a different source.

5.      Perhaps more importantly, Debtors' statement that ERISA does not prohibit premium payments "from plan assets" mischaracterizes ERISA's requirements. If a plan administrator pays PBGC premiums from plan assets, the plan sponsor must include the amount of the expected premiums in the required contributions.  In calculating required contributions, plan sponsors must account for expenses to be paid from the plan, including premiums.[10]  In other words, Debtors' statement that "nothing in ERISA prohibits" payment from plan assets is "literally true but actually misleading."[11]

---

Debtors sponsored three single-employer plans. Debtors merged these plans into one prior to applying to PBGC for plan termination.

[8]*See* Exhibit B, Trusteeship Agreement at ¶ 4 (agreeing to deliver "any…assets" as part of agreement); *Pension Benefit Guar. Corp. v. Fay Constr. Co.,* No. 2:24-CV-1860-JDW, 2024 WL 4656215, at *3 (E.D. Pa. Oct. 31, 2024) (finding former plan sponsor and controlled group member directly liable for pension premiums following trusteeship).

[9] D.I. 5269 at 4.

[10] The Internal Revenue Code, 26 U.S.C. § 430(a) requires that an employer contribute (inter alia) the "target normal cost" for the applicable Plan Year, and § 430(b) specifies that "target normal cost" includes the "amount of plan-related expenses expected to be paid from plan assets during the plan year."

[11] *See In re Taylor,* 655 F.3d 274, 283 (3d Cir. 2011). Debtors also incorrectly characterize 29 C.F.R. § 4007, quoting from PBGC Opinion Letter 94-6 to give this court the impression that the regulation was "revised to omit an explicit prohibition on payment from plan assets." No such explicit prohibition was ever included in any version of the Regulation. Although 29 C.F.R. § 4007 does not technically apply given the facts of this case, the regulation is valid nevertheless. As this Court recognized in its September 13 opinion regarding the calculation of multiemployer claims, PBGC has been explicitly delegated "the authority to adopt 'regulations as may be necessary to carry out the purposes' of Title IV of ERISA" and that the *Loper Bright* decision recognizes this type of authority. D.I. 4326 at 9.

6.     Debtors' presentation of their own "longstanding practice" is similarly incorrect. While the payments to PBGC may have been drawn from Plan assets, Debtors needed to account for these premiums expenses in calculating and making their overall contributions to the Plan itself. Following trusteeship, although Debtors will presumably no longer be contributing to the plans, they must still satisfy their statutory obligations with respect to premiums accrued prior to PBGC trusteeship.

7.     Debtors are essentially arguing that, following its trusteeship of a Plan, ERISA requires PBGC to pay itself to satisfy the designated payor's own liability. That interpretation is at sharp odds with ERISA's stated purpose for premiums, which must be used by PBGC to support its mission.[12] And the idea that PBGC must pay itself following trusteeship would lead to absurd results. For example, ERISA provides that designated payors are also often liable for "termination premiums" at the time of termination and PBGC's trusteeship of a plan.[13] If PBGC were responsible for all payments as a result of its trusteeship, this statutory requirement would almost always be rendered superfluous.

8.     Debtors' argument that they are not liable for pension premiums is a novel one and directly contradicts the statutory provisions cited above. Indeed, the undersigned is unaware of any instance where a party has even argued that it was not obligated to pay pension premiums following plan termination and trusteeship, even as it failed to contest that it was the designated payor.

---

[12] *See* 29 U.S.C. § 1306 (PBGC shall impose premiums "to provide sufficient revenue . . . to carry out its functions under" Title IV). *Cf.* 29 CFR § 4007.12(b): "After a plan administrator issues . . . the first notice of intent to terminate in a distress termination under section 4041(c) of ERISA, . . . the obligation to pay the premiums (and any interest or penalties thereon) imposed by ERISA and this part for a single-employer plan shall be an obligation solely of the contributing sponsor and the members of its controlled group, if any".

[13] 29 U.S.C. § 1306(a)(7).

II.     **PBGC's Claims are entitled to priority as a benefit to Debtors' estate.**

9.      Additionally, Debtors argue that, even if PBGC does have a claim, it is not entitled to administrative priority, because PBGC's continued insurance of Debtors' sponsored pension plans did not provide a benefit to the estate. But the Debtors chose to delay termination (and thus incur additional premiums) in order to merge the plans and file a distress termination. Debtors' counsel charged the estate considerable fees in doing so, asserting that those actions were necessary to the estate.  That benefit to the estate resulted in post-petition premiums.

10.     The Third Circuit has stated that "the concept of 'necessary costs'…is broader than one of absolute requirement."[14] Accordingly, "less readily calculable benefits, such as the ability to conduct business as usual" can qualify as administrative costs.[15]  Furthermore, the benefit to the estate does not "have to be substantial" to qualify as administrative costs.[16]

11.     Debtors' efforts to tie premiums to labor is misguided. While unfunded benefit liabilities and unpaid contributions are related to participants' labor and attendant accrual of benefits, premiums are not. Premiums are based on the number of participants and the funded status of the plan. [17] They are akin to the kind of costs the Third Circuit held warranted administrative priority in *Marcal Paper Mills.*[18] In that decision concerning withdrawal liability, the Court held that inclusion of non-labor factors, such as market effects on underfunding, nonetheless gave rise to valid post-petition expenses. The Court rejected an argument that the post-petition portion of withdrawal liability was not entitled to administrative priority because it

---

[14] *In re Energy Future Holdings Corp.,* 990 F.3d 728, 742 (3d Cir. 2021)

[15] *Id.*  (quoting *Matter of TransAmerican Nat. Gas Corp*, 978 F.2d 1409, 1420 (5th Cir. 1992)).

[16] *Id.*

[17] *See generally* 29 U.S.C. § 1306.

[18] *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 317–18 (3d Cir. 2011).

was "based on a variety of factors, some of which have nothing to do with the work performed by the covered employees . . . ."[19]

12.     In so holding, the Court noted that the sponsor had "assumed" its withdrawal liability obligations with "open eyes."[20] Here, Debtors, guided by sophisticated counsel who have billed the estate for pension advice,[21] also made the decision to continue their pension plan into 2024 with "open eyes."[22]

13.     Debtors specifically chose *not* to terminate their pension plan prior to May 1, 2024. Instead, the Debtors merged the pre-existing three pension plans into one and filed a distress termination. At least one hundred hours that were billed concerning pension issues appear to directly involve the merger and termination of the pension plans.[23] Thus, Debtors' claim that their "pension-related work and meetings" were simply accrued "in connection with Debtors' right and statutory duty to examine and object to the claims filed by PBGC…."[24] is disingenuous. Instead, Debtors' counsel believed and represented to the Court that time spent on the merger and distress termination were "reasonable and *necessary* professional services."[25]

---

[19] *Id.* at 317.

[20] *Id.* at 318.

[21] *See, e.g.*, D.I. 1484-5 at 133 (1.8 hour billing entry from Jack Frisbie to "Review, revise analysis re fulfilling Company's pension obligations"; .5 billing entry from Trent William Huskey concerning revisions to board presentation on "pension considerations").

[22] 650 F.3d at 318.

[23] *See* Exhibit C (compiling billing entries that appear to specifically concern the merger or termination of the pension plans). Debtors' counsel started working on this issue no later than November, 2023, *see* D.I.. 2083-5 at 220 (11/13/2023 time entry of Noah Allen re "correspond with  A. Smith, K&E team re merger of pension plans and related board resolutions" and 11/14/2023 also re "resolutions related to merger of pension plans."). PBGC did not include many other time entries that also appear to relate to the merger and distress termination but were less specific.

[24] D.I. 5269 at 9.

[25] D.I.. 2083 at 12.

6

Debtors' counsel would not have spent the time they did on these matters if they were not

beneficial. "The services for which compensation is sought *must benefit the estate* . . . ."[26]

14.    Debtors' claim that it "sought termination of the Pension Plan precisely because

they were no longer deriving any benefit from it" is similarly disingenuous.[27] Debtors chose to

*continue* the plans for nearly seven months after initiating these proceedings. It is undisputed that

Debtors did *not* seek termination straightaway, instead only seeking plan termination after it had

combined it with two of its other sponsored plans. While the benefit to Debtors of this

transaction may not be entirely quantifiable, a distress termination under test 1 (liquidation in

bankruptcy), eliminates PBGC's claim for termination premiums.[28] That claim would have been

approximately $16 million.[29] And the Third Circuit has made it clear that even less-quantifiable

claims are not "hypothetical" when they still provide actual benefits to the estate.[30]

15.    Debtors also seek to distinguish their case by arguing that, because the plan was

closed to new participants and its benefits were frozen, PBGC premiums did not benefit the

estate in the post-petition period. In support, they cite *In re Kent Plastics Corp.*, 183 B.R. 841

(Bankr. S.D. Ind. 1995). This court should disregard the decision in *Kent Plastics*, however, for a

number of reasons. The *Kent Plastics* court improperly conflates premium payments with

required contributions and incorrectly states that premiums are tied to pre-petition services.[31]

---

[26] 3 Collier on Bankruptcy ¶ 330.03[1][b][iii] (2024).

[27] D.I. 5269 at ¶ 19. If the Debtors were deriving no benefit from the pension plan, then it was necessary
to terminate it, for the benefit of the estate.

[28] 29 U.S.C. § 1307(a)(7)(B).

[29] Termination premiums are calculated at a rate of $1,250 per plan participant per year for three years.
*See* 29 U.S.C. § 1306(a)(7). As of January 1, 2024, the participant count for the three pre-merger pension
plans totaled 4,236. *See* Exhibit A.

[30] *In re Energy Future Holdings Corp.,* 990 F.3d at 742.
[31] 183 B.R.at 847-848.

Contrary to the *Kent Plastic*'s court's conclusory statement, the benefit provided by the PBGC premiums does not cease once a plan is frozen. In fact, in relying on the freeze of benefit accruals, *Kent Plastics* conflicts with the Third Circuit's holding in *Marcal Paper Mills*, that administrative priority status is not restricted to pension *benefits* earned post-petition but extends to related costs.[32] PBGC continued to provide insurance to Debtors through the post-petition period until August 2024.

16.    In finding that there could be no post-petition transaction involving a frozen plan, the *Kent Plastics* court appeared to be relying on a rigid application of the *Mammoth Mart* test that Delaware and the Third Circuit have rejected.[33] Indeed, as one Delaware district court observed, the *Mammoth Mart* decision itself stated that "[w]hen third parties are induced to supply goods or services to the debtor-in-possession pursuant to a [pre-petition] contract that has not been rejected, the purposes of [§ 503(b)(1)] plainly require that their claims be afforded priority."[34] The Eight Circuit applied similar reasoning in *In re MEI Diversified*, where it held that a post-petition continuation of insurance was entitled to priority in part because the debtors could have terminated their insurance "at any time."[35]

17.    In performing work that benefitted the estate while delaying termination and trusteeship of the plan, Debtors incurred over $1,702,474.67 in premium fees during 2024. As set forth in Section I above, these premiums are owed by the Debtors. If the delay in termination did

---

[32] *Marcal Paper Mills.*, 650 F.3d at 317–18.

[33] *See In re Goody's Fam. Clothing, Inc.,* 401 B.R. 656, 672 (D. Del. 2009) (rejecting application of *Mammoth Mart* to bar claim for administrative expense), *aff'd sub nom. In re Goody's Fam. Clothing Inc.*, 610 F.3d 812 (3d Cir. 2010).

[34] *Id.* (quoting *In re Mammoth Mart, Inc.* 536 F.2d 950, 954 (1st Cir. 1976)) (alterations in original).

[35] *In re MEI Diversified, Inc.*, 106 F.3d 829, 832 (8th Cir. 1997)

not benefit the estate, Debtors' counsel must– either here or when their final fees are approved - answer the question: why did they not act sooner to minimize premium expenses?

### III.    Debtors have failed to rebut PBGC's argument that post-petition premiums are alternatively entitled to tax priority.

18.    PBGC has established that it inarguably satisfied at least five of the *Lorber-Suburban* factors.[36] Debtors disagree with PBGC's analysis concerning all the *Lorber-Suburban* factors but address only one factor -- whether a priority distribution to PBGC would disadvantage similar creditors. Moreover, Debtors' analysis is limited to the self-evident fact that money paid in priority claims is unavailable to general unsecured claimants. But Debtors cite no precedent that this is the test applied under *Lorber-Suburban*, and PBGC knows of no such cases. Debtors' argument is contrary to the Third Circuit's decision in In *In re Szczyporski,* 34 F. 4th 179 (3d Cir. 2022). There, the Third Circuit held that priority status applied to the "shared responsibility payment" the IRS assessed against individual taxpayers who failed to maintain health insurance as required under the Affordable Care Act.[37] In examining the "similarly situated creditors" factor, the Court did not look to the entire claims pool but held instead that there were *no* similarly situated creditors.[38] Likewise, given that PBGC has the exclusive ability to provide defined-benefit pension insurance, there should, therefore, be zero creditors with similar claims.[39]

---

[36] With respect to the remaining factor, although ERISA's premium statutes do not explicitly state that they were authorized pursuant to "to the police or taxing power of the state," a House Committee Report specifically cites Congress' taxing power as authority for ERISA premium changes that were made in 2005.15 H.R. Rep. No.109-232 (II) (2005), at 176 (citing Art I, Sec 8, Clause 1 (Congressional power to lay and collect taxes, duties, imposts, and excises) and the 16th Amendment (Congressional power to lay and collect taxes on incomes, from whatever source derived)).

[37] *In re Szczyporski,* 34 F. 4th at 187.

[38] *See id.*

[39] *See id.*; *United States v. Brown*, 658 F. Supp. 3d 716, 725 (D. Ariz. 2023)

19.     Even other priority creditors with "claims for providing post-petition services" are not disadvantaged. Debtors' own disclosures predict that there will be ample resources to pay creditors with similar claims for providing post-petition services *arguably entitled to administrative priority.*[40]

20.     Debtors are correct that a court's inquiry into an alleged tax is not limited by the *Lorber-Suburban* factors. But Debtors' attempt to characterize PBGC's variable premiums as a penalty only further reveals the tax-like nature of PBGC premiums.

21.     The Supreme Court has made it clear that a penalty "means a punishment for an unlawful act or omission…."[41]  Debtors argue that, because variable premiums are calculated with reference to unfunded vested benefits, they are therefore a penalty. But the existence of unfunded vested benefits in a pension plan is not, in and of itself, an "unlawful act or omission." Plan sponsors are required to make minimum required contributions, calculated according to 26 U.S.C. § 430. Failure to make such contributions is penalized by the I.R.S., via excise taxes linked to the amount of the contribution.[42]  That was the tax at issue in *CF & I Fabricators,* which the Court held to be a penalty.[43]

22.     In contrast, PBGC premiums are tied to the funding level of the plan itself and thus to PBGC's risk. Ongoing single-employer pension plans often have unfunded vested benefits despite making all of their legally required contributions.[44] Moreover, the variable rate

---

[40] *See Second Amended Disclosure Statement*, D.I. 5027 at 7-8.

[41] *United States v. Reorganized CF & I Fabricators of Utah, Inc*., 518 U.S. 213, 224 (1996),

[42]  26 U.S.C. § 4971(a).

[43] 518 U.S. at 224.

[44] Indeed, ERISA and other statutes contemplate that such unfunded vested benefits may exist as a matter of course. *See, e.g.*, 26 U.S.C § 430(h)(B)(5)(ii*)* (stating that certain requirement concerning "large changes in actuarial assumptions" does not apply to plans where unfunded vested benefits do not exceed $50,000,000); 29 U.S.C. §1343(b)(1)(A) (stating that aggregate unfunded vested benefits exceeding

premium payment "does not impose a heavy financial burden, has no scienter requirement, cannot be enforced through punitive means like criminal prosecution, and is not imposed for an unlawful act," all factors that the Third Circuit has held indicate that a government-imposed payment constitutes a tax.[45]

23.     Instead, the statutory premiums scheme discourages plans from increasing their unfunded vested benefits, which risks the eventual imposition of a large burden on the PBGC insurance system. This "ability to manipulate the assessment to encourage or discourage a certain activity is a characteristic of a tax."[46] In other words, the variable premiums' reference to unfunded vested benefits actually provides further evidence that PBGC premiums may be properly characterized as a tax.

**IV.     PBGC's administrative expenses should be paid immediately.**

24.     Debtors state that courts within this Circuit have adopted a "three-factor test" for allowing immediate payment. While at least one court in this district has referenced these factors,[47] Debtors cite no cases from any circuit where these factors have been applied as an ironclad "test."

25.     In *HQ Global Holdings*, however, a Delaware court did identify a "chief" factor for consideration in determining the timing of administrative payment. There, the court stated:

> [O]ne of the chief factors courts consider is bankruptcy's goal of an orderly and equal distribution among creditors and the need to prevent a race to a debtor's assets . . . . Thus, distributions prior to confirmation of a plan are usually disallowed when the estate may

---

$50,000,000 trigger a "reportable event").

[45] *In re Szczyporski*, 34 F. 4th at 187. The Court also relied on the fact that shared responsibility payments are not imposed on households with low income.  Similarly, the PBGC variable rate premiums are capped.  https://www.pbgc.gov/prac/prem/premium-rates

[46] *In re United Healthcare Sys., Inc.*, 396 F.3d 247, 254 (3d Cir. 2005).

[47] *See In re Garden Ridge Corp.,* 323 B.R. 136, 143 (Bankr. D. Del. 2005)

not be able to pay all administrative expenses in full.[48]

26.     Debtors quote the "orderly and equal distribution" portion of this language twice in their objection. And, in seeking to establish that payment to PBGC will create disorder, Debtors theorize that other administrative claimants will be emboldened to bring their own claims for administrative payment, thereby sapping Debtors' "focus." But Debtors fail to acknowledge the district court's second sentence, which states that harm to "orderly and equal distribution" is usually demonstrated by a showing that "the estate may not be able to pay all the administrative expenses in full." Because Debtors themselves have acknowledged that they expect to be able to pay all administrative claims,[49] payment to PBGC clearly would not have the impact on "orderly and equal distribution" contemplated by the *HQ Global Holdings* court.

27.     PBGC's operations are financed in large part by the insurance premiums set by Congress. Given that funds are available, that expenditure of these funds should not create any financial hardship for Debtors' continuing operations, and that the premiums will be used to fund PBGC's ongoing insurance program, this Court should enter the order allowing PBGC to receive immediate payment.

28.     PBGC acknowledges that the decision to order immediate payment is within this court's discretion, and confirmation of Debtors' plan of reorganization will likely occur in the coming weeks. If the court exercises its discretion to disallow immediate payment, PBGC respectfully requests that this court issue an order determining that its claims for premiums are valid, entitled to priority, and should be satisfied when other priority claims are fulfilled.

---

[48] *In re HQ Global Holdings, Inc.,* 282 B.R. 169, 173 (Bankr. D. Del. 2002).

[49] *See Second Amended Disclosure Statement*, D.I. 5027 at 7-9.

## CONCLUSION

29.    PBGC respectfully requests that the Court enter an Order allowing PBGC an

administrative expense claim pursuant to 11 U.S.C. § 503(b)(1) in the amount of $1,702,474.67,

directing payment when appropriate, and granting PBGC such other relief as may be just and

proper.


Respectfully submitted,


                                    /s/ Andrew Philip Walker
January 15, 2025                    Karen L. Morris, *General Counsel*
Washington, D.C.                    Kartar S. Khalsa, *Deputy General Counsel*
                                    Stephanie Thomas, *Ass't General Counsel*
                                    Andrew Philip Walker, *Attorney*
                                    Desiree M. Amador, *Attorney*
                                    Rebecca Stark, *Attorney*

                                    Pension Benefit Guaranty Corporation
                                    445 12th Street SW
                                    Washington, D.C. 20024-2101
                                    Telephone: (202) 321-1588
                                    Walker.andrew@pbgc.gov & efile@pbgc.gov