**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| YELLOW CORPORATION, *et al.*,[1] | ) Case No. 23-11069 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' REPLY IN SUPPORT OF ITS TWENTY-SECOND OMNIBUS (SUBSTANTIVE) OBJECTION TO CLAIMS PURSUANT TO BANKRUPTCY CODE SECTION 502(B) BANKRUPTCY RULES 3003 AND 3007, AND LOCAL RULE 3007-1**

**INTRODUCTION**

1.    In a surprising turnabout, the IBT's amended response ("Amended Response")[2] to the Debtors' Objection[3] disclaims the legal theory included in the IBT's initial Proofs of Claim ("Original Proofs of Claim") to support its CARES Act Claim.  The IBT now asks the Court to allow a claim of ***over $2 billion*** based on a legal theory introduced for the first time nearly a year after the General Bar Date of November 13, 2023 ("Bar Date").[4]  And the substance of this new argument fares no better than the original theory.  The IBT now seeks to enforce rights that do not exist under a contract to which they are not a party.  For several reasons, this attempt fails, and the Court should disallow the IBT's CARES Act Claim in its entirety.

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]    The IBT filed its initial response on December 3, 2024, [D.I. 5065] and then filed its amended response on December 5, 2024. [D.I. 5085]. The only change included a paragraph discussing its damages. "The amount of the proof of claim that the Court should allow is therefore $34,319,307.00 times 61 weeks, which totals $2,093,477,727.00."  Debtors will reference D.I. 5085 instead of D.I. 5065.

[3]    [D.I. 5018]. Capitalized terms and defined terms in the Debtors' Objection have been retained and reused in the Debtors' Reply.

[4]    [D.I. 521].

2.      ***First,*** the Amended Response now relies on a new third-party beneficiary legal theory that should be rejected because 1) it is a new claim that is barred by the Bar Date, and 2) equitable considerations weigh in favor of denying it.  Furthermore, the IBT's Original Proofs of Claim do not provide any factual or legal basis for its new contractual theory that the Debtors' contract with Treasury granted the IBT any enforceable rights to payment, which was introduced only in response to the Debtors' Objection.  The failure to either allege supporting facts for its newly modified theory or provide a justifiable reason for its failure to do so, calls for disallowance.

3.      ***Second,*** the IBT is not a third-party beneficiary to the Debtors' CARES Act Loan from the Treasury.  The IBT is not identified as an express beneficiary of the CARES Act Loan Agreement, and the terms of the Loan Agreement explicitly exclude implied beneficiaries.  And no language in the CARES Act Loan between the Debtors and Treasury implies, let alone clearly evinces, an intent to provide the IBT with third-party beneficiary status.

4.      ***Third,*** even if the IBT were a third-party beneficiary, this Court still should disallow IBT's Proofs of Claim because the only remedy for this alleged breach is acceleration of the CARES Act Loan, not damages.

5.      For these reasons, this Court should disallow the IBT's Amended Response and grant the Debtors' Objection to the IBT's Proofs of Claim.

## **ARGUMENT**

### I.      **The IBT's Amended Response Constitutes An Improper Amendment To Its Original Proofs of Claim And Should Be Disallowed.**

6.      The IBT's Amended Response, is not a response, but an improper amendment, made without leave,[5] to its Original Proofs of Claim filed in November 2023 and March 2024.

---

[5]     The IBT has filed at least 10 proofs of claim, in four categories: (1) at least three proofs of claim against New Penn Motor Express LLC., alleging CARES Act liability of $2,261,698,827.05, *see* International Brotherhood of Teamsters, the Teamsters National Freight Industry Negotiating Committee Proofs of Claim (IBT's Proofs of

[D.I. 5085].[6]  *See In re: FTX Trading LTD.*, 2024 Bankr. LEXIS 3024, at *18-19 (D. Del. Dec. 18, 2024) (finding that creditor's amended proofs of claim were improper, as creditor did not seek leave to amend and could be disallowed on this independent basis).

7.     The Amended Response sets forth new claims based upon a new legal theory the IBT did not present in its Original Proofs of Claim.  Specifically, in its Original Proofs of Claim, the IBT asserted the following:

> **CARES Act Default**. Yellow Corporation received a loan from the US Treasury (CARES Act loan) of approximately $700 million in 2020. **The loan terms required Yellow to keep all existing collective bargaining agreements in full force and effect for the term of the loan and two years subsequent. CITE. [*sic*] The loan maturity date is September 30, 2024. By shutting down its operations and failing to adhere to the existing collective bargaining agreements that Yellow's operating companies are party to with the Teamsters, Yellow and its operating companies violated an implied covenant of good faith and fair dealing, as the Teamsters had a reasonable expectation that Yellow would comply with federal law and the terms of the loan.** *See Tualli v. EverBank*, No. 217CV1870JCMPAL, 2017 WL 5196701 (D. Nev. Nov. 6, 2017). Yellow's violation caused the Teamsters damages in the amount of wages that would have been paid from the period of the shutdown until September 30, 2026.

> [D.I. 5018-5 ¶ 11] (emphasis added).

8.     The only case cited by the IBT in its Original Proofs of Claim—*Tualli v. EverBank*, 2017 WL 5196701 (D. Nev. Nov. 6, 2017)—involved the plaintiff asserting that the defendant had

---

Claim), Nos. 5336, 17253, 19588, (2) at least three proofs of claim against YRC Inc., CARES Act liability of $2,261,698,827.05, *see* IBT's Proofs of Claim Nos. 5400, 17248, 19589 (3) at least two proofs of claim against USF Reddaway, Inc., alleging Cares Act liability of $273,424,482.54, *See* IBT's Proofs of Claim Nos. 5337, 17258, (4) at least two proofs of claim against USF Holland LLC alleging Cares Act liability of $766,024,246.33, *See* IBT's Proofs of Claim Nos. 53338, 17261.  For the avoidance of doubt, the Debtors object to each and every one of the IBT's Proofs of Claim.  Proofs of Claim Nos. 5336, 5337, 5338, and 5400 were disallowed on the Court's Order Sustaining Debtors' First Omnibus (Non-Substantive) Objection as Amended Claims [D.I. 2189] filed on February 14, 2024.  These Proofs of Claim were excluded from Debtors' Objection. [D.I. 5018].  Furthermore, timely filed Proof of Claim No. 17253 was amended by late filed Proof of Claim No. Claim 19588, and timely filed Proof of Claim No. 17248 was amended by late filed Proof of Claim No. 19589.  Proofs of Claim Nos. 17253 and 17248 were included in the Debtors' Objection.

[6]    The IBT filed its initial response on December 3, 2024, [D.I. 5065] and then filed its amended response on December 5, 2024. [D.I. 5085]. The only change included a paragraph discussing its damages. "The amount of the proof of claim that the Court should allow is therefore $34,319,307.00 times 61 weeks, which totals $2,093,477,727.00."  Debtors will reference D.I. 5085 instead of D.I. 5065.

violated a duty of good faith and fair dealing under a contract by failing to comply with a statute and related regulations. *Id*. at *6. The Debtors thus expended substantial resources preparing and filing their objection to the Original Proofs of Claim, asserting primarily that, because the IBT has no private right of action under the CARES Act, it lacked standing to pursue its implied covenant of good faith and fair dealing claim.

9.       In its Amended Response, the IBT concedes it cannot base its Proofs of Claim argument on the implied covenant of good faith and fair dealing. [D.I. 5085 ¶ 2] ("Consequently, Teamsters cannot base their proof of claim on the [*sic*] a claim that they can enforce Yellow's violation of the CARES Act through an implied duty of good faith and fair dealing."). But for the very first time, the IBT now argues that it is actually an intended third-party beneficiary of the CARES Act Loan with the ability to bring a direct breach of contract action against the Debtors:

> Rather, the loan covenants that the Debtors agreed to with the United States Treasury required it to continue operations (i.e. by neither filing for bankruptcy nor agreeing to a change of control), with the NMFA in full force and effect, through the full loan repayment date of September 30, 2024. By requiring for the NMFA to remain in full force and effect through September 30, 2024, the Treasury intended TNFINC and the former employees of the Operating Companies it represents to benefit from the loan, since such a covenant is not necessary to ensure either that Yellow was generating sufficient revenue to meet its loan obligations, or that Yellow's operations would not be disrupted by labor disputes. The Court should therefore find that TNFINC and the Yellow employees for whom it and the Teamsters local unions served as collective bargaining representatives are intended third-party beneficiaries of Yellow's promise made to the United States Treasury to continue to operate as a unionized operation, with the NMFA remaining in full force and effect, through September 30, 2024.

[D.I. 5085 ¶ 3].

10.       As the IBT has completely abandoned its implied covenant of good faith and fair dealing legal theory under the CARES Act and asserted a new legal theory—that the IBT is a third-party beneficiary under the CARES Act Loan, the Court should analyze the IBT's Amended Response as what it truly is—an amendment disguised as a response.

11.     And the Court should disallow the IBT's Amended Response.  Courts in the Third

Circuit, like others, have held that post-bar date amendments "must be scrutinized to assure that it

is not an attempt to file a new claim." *In re Exide Techs.*, 601 B.R. 271, 291 (Bankr. D. Del. 2019);

*In re Int'l Horizons, Inc.*, 751 F.2d 1213, 1216 (11th Cir. 1985) ("[T]he court must subject post

bar date amendments to careful scrutiny to assure that there was no attempt to file a new claim

under the guise of an amendment.").  Bankruptcy courts "should deny leave to amend a claim

when the proposed amendment asserts a new claim." *In re Charge Enters.*, 2024 WL 5112999, at

*4-6 (Bankr. D. Del. Dec. 13, 2024).

12.     Furthermore, while Rule 9006(b)(1) allows a court to permit late filings in a

Chapter 11 case where the failure to file was the result of excusable neglect, the IBT has not even

attempted to meet its burden for excusable neglect under Rule 9006(b)(1).  *Pioneer Inv. Servs. Co.

v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993) (discussing factors for excusable neglect).

### (A)     The IBT's Claim Should be Disallowed Because Its Amended Response Asserts A New Claim.

13.     "The decision to allow amendments to a proof of claim is within the discretion of

the Bankruptcy Court." *In re Ben Franklin Hotel Assocs.,* 186 F.3d 301, 309 (3d Cir. 1999).  The

Third Circuit has explained that "amendments to proofs of claim should be freely allowed where

the purpose is to cure defects in a claim as originally filed, to describe a claim with greater

particularity, or to plead new theories of recovery on facts set forth in the original claim." *Id.*

However, this is not the case here.  The IBT's third-party beneficiary argument is a new claim

because the IBT failed to allege facts or include any legal argument to put the Debtors on notice

of this new theory in its Original Proofs of Claim.

14.     "Courts typically apply a two-pronged inquiry when considering whether to allow

post-bar-date amendments to proofs of claim." *In re Mallinckrodt Plc*, 2022 WL 3545583, at *3

(D. Del. Aug. 18, 2022).  The first prong focuses on whether the initial proof of claim provided the debtor with reasonable notice of the later claim.  *Id.*  Even if the claimant meets this first prong, "the court must then determine whether it would be equitable to allow the amendment . . . applying the excusable-neglect standard."  *Id.* at *3, *5.

15.     In determining whether the first prong is satisfied, courts also look to Rule 7015(c), which adopts Federal Rule of Civil Procedure 15(c), to determine whether "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading . . . ."  *In re G-I Holdings, Inc.*, 514 B.R. 720, 755 (Bankr. D.N.J. 2014).

16.     Courts "inquire into whether the opposing party has been put on notice regarding the claim or defense raised by the amended pleading."  *In re Maxus Energy Corp.*, 2023 WL 5543612, at *7 (Bankr. D. Del. Aug. 28, 2023) (citing 6A *Federal Practice and Procedure* § 1497 (3d ed. 2023))*.*  If "the alteration of the original pleading is so substantial that it cannot be said that defendant was given adequate notice of the conduct, transaction, or occurrence that forms the basis of the new claim or defense, then the amendment will not relate back and will be time barred if the limitations period has expired."  *Id.*

17.     The IBT's Amended Response fails the first prong of this inquiry because the Original Proofs of Claim failed to identify facts to support its third-party beneficiary argument and failed to put the Debtors on notice of this new legal argument.  In *In re Charge Enterprises*, this Court emphasized, "[t]he purpose of a proof of claim is to put the debtor on notice of the nature and basis of the claim, but [the creditor's] proof of claim failed to put [the debtor] on notice of either the legal theory or the requisite facts on which the theory was based."  2024 WL 5112999, at *6.  This Court denied a creditor's motion for leave to amend its original proof of claim, as "it

was filed after the bar date, it asserted a new claim, and equitable considerations weigh[ed] in favor of denying it." *Id*. This Court found the creditor's proposed amendment was a new claim because it asserted a "new legal theory that would require supporting facts that [were] not set forth in [the creditor's] proof of claim." *Id*. at *4. The creditor asserted a new legal theory for the first time in its response to the debtor's objection filed a week before the hearing and over four months after the bar date. *Id*. Similarly, the IBT asserted a new legal theory in its Amended Response to the Debtors' Objection more than a year after the Bar Date. This contradicts this Court's stated purpose of a proof of claim discussed in *In re Charge Enterprises*.

18.     Likewise, the Original Proofs of Claim make no reference to being an intended third-party beneficiary of the CARES Act Loan between the Debtors and US Treasury, and thus the IBT is presenting an entirely new legal theory in its Amended Response. The third-party beneficiary legal theory also requires additional facts not present in the Original Proofs of Claim, such as the provisions in the CARES Act Loan the IBT claims support its position as a third-party beneficiary. In sum, there is not a single fact that could reasonably be read as forming the basis of an intended third-party beneficiary claim. *See In re: FTX Trading LTD.*, 2024 Bankr. LEXIS 3024, at *20 (disallowing creditor's amended proofs of claim and finding that creditor's failure to include any facts relevant to its new claims in its original proofs of claim was fatal.).

### (B)     There Is No Excusable Neglect To Justify The IBT's Late Filing Of Its New Claims Contained In its Amended Response.

19.     Nor can the IBT meet the second prong's "excusable neglect" standard. "The first prong is met when the purported amended claim 'relates' back to the original claim under Rule 7015(c) while the second prong relies on equitable considerations determined by the court." *In re J.S. II, L.L.C.*, 389 B.R. 563, 567 (Bankr. N.D. Ill. 2008) (finding that creditor's amended proofs of claims filed more than eight months after bar date did not relate back to original proof of claims

and there was no excusable neglect). A court should grant permission to file a late claim only if the party's failure to file a timely claim was the result of "excusable neglect." *In re Exide Techs.*, 601 B.R. at 291 n.84. This Court has stated that the *Pioneer* "excusable neglect" standard would apply to any effort to file a new or different proof of claim. *Maxus Energy Corp.*, 2023 WL 5543612, at *5 n.28. Factors to be considered include "the danger of prejudice to the debtor, the length of delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer*, 507 U.S. at 395. As the party seeking to assert a late claim, the IBT has the burden of proving excusable neglect. *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000) (citations omitted) ("The burden of proving excusable neglect lies with the late-claimant.").

20.     The *Pioneer* factors strongly support disallowing the IBT's attempt to assert a new claim. **First,** the Debtors have already been unfairly prejudiced by the IBT's Amended Response. The Debtors spent substantial resources objecting to the IBT's Original Proofs of Claim based on the implied covenant of good faith and fair dealing argument, only for the IBT to immediately acknowledge in its Amended Response that it cannot recover under such a theory and assert an entirely different claim.

21.     ***Second,*** the IBT is asserting a new claim in its Amended Response a year after the Bar Date of November 13, 2023. This delay exceeds what courts have found to be undue delay. *See In re Charge Enterprises*, 2024 WL 5112999, at *6 (finding that the creditor "did unduly delay submitting its motion for leave to amend . . . four months after the bar date"). And this delay does threaten to impact the Debtors' overall cases, as this is a turnabout by the IBT on a claim it is asserting for more than $2 billion, at a time the Debtors are soliciting votes on their proposed Plan.

22.     *Third*, the IBT has not presented any explanations for this delay and any mistaken belief that it could prevail on its implied covenant of good faith and fair dealing theory is also not excusable.  Ignorance of the law is not excusable neglect.  *In re Nortel Networks, Inc.*, 573 B.R. 522, 528 ("The law is clear: ignorance is not a sufficient reason to permit amendment."); *Toxel Mfg. Co. v. Schwinn Bicycle Co.*, 489 F. 2d 968, 971 (6th Cir. 1973) ("misconception of the law is not an excuse for the late presentation of an alternative theory of recovery").  The IBT should not be permitted to make new arguments and claims simply because it was unprepared to defend the arguments in its Original Proofs of Claim.

23.     For these reasons, the Court should disallow the IBT's CARES Act Claim because the IBT concedes the claim as stated in its Original Proofs of Claim—based on the duty of good faith and fair dealing—cannot succeed, and the IBT should not be permitted to amend these Proofs of Claim through its Amended Response to assert a new claim.

## II.     The IBT Is Not A Third-Party Beneficiary To The CARES Act Loan.

24.     As its new theory, the IBT claims it is a third-party beneficiary under the CARES Act Loan.  The IBT bases this assertion on several aspects of the Loan Agreements.  Specifically, the IBT points to (1) the number of times the CARES Act loan refers to the "IBT" and the "IBT Agreement"; (2) the Loan Agreements' provision that "required for the IBT Agreement [to] remain in effect on the Initial Funding Date"[7]; (3) the Loan Agreements' requirement "that Yellow maintain the NMFA in full force and effect for the duration of the loan"[8]; and (4) the Loan Agreements' requirement that "Yellow . . . continue to operate its business for the duration of the loans by prohibiting Yellow from either any bankruptcy or insolvency proceedings or agreeing to

---

[7]     [D.I. 5085, at 4-5, citing Art. 4.02(e).]

[8]     [*Id*. at 5, citing Art. 8.01(n).]

a change of control for the duration of the loans."[9] [D.I. 5085, at 4-5].  Because none of these

provisions separately or together meet the standard for third-party beneficiary status, the IBT's

argument fails.

> **(A)    The IBT Must be an Intended Beneficiary to Claim Third-Party Beneficiary Status.**

25.    Under federal common law, "[b]efore a stranger can avail himself of the

exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must, at

least, show that it was intended for his direct benefit."[10]  *Robins Dry Dock & Repair Co. v. Flint*,

275 U.S. 303, 307-08 (1927) (internal quotations omitted).  To analyze whether a non-party is an

intended beneficiary, "[t]he Third Circuit look[s] to the Restatement of Contracts for the federal

law on third-party beneficiaries."  *10x Genomics, Inc. v. Vizgen, Inc.*, 681 F. Supp. 3d 252, 263

(D. Del. 2023).  The Restatement recognizes that a third-party beneficiary must be an intended

beneficiary, whereas an incidental beneficiary acquires no enforceable contract rights.  *Jama v.*

*U.S. I.N.S.*, 334 F. Supp. 2d 662, 687 (D.N.J. 2004) ("There must be language evincing an intent

that the party contracting with the government will be held liable to third parties in the event of

nonperformance . . . .  Otherwise, the third parties are merely incidental beneficiaries having no

actionable rights under the contract.").  "An incidental beneficiary is a beneficiary who is not an

intended beneficiary."  *In re 23S23 Constr., Inc.*, 445 B.R. 417, 422 (Bankr. E.D. Pa. 2010).

26.    Moreover, when analyzing government contracts, "the Third Circuit has interpreted

the Restatement to require the contract at issue contain some specific language or provision

reflecting the intent to make the party contracting with the government liable to third parties should

---

[9]    [*Id*. at 5, citing Art. 8.01(f) and (j).]

[10]    The CARES Act Loan is governed by federal common law, and, if federal common law is silent as to a point, New York law applies.  *See* Art. 10.07; [D.I. 5018-3, 5018-4].

it fail to perform."[11] *Allstate Transp. Co. v. Se. Pa. Transp. Auth.*, 2000 WL 329015, at *16 (E.D. Pa. Mar. 27, 2000) (citing *Nguyen v. U.S. Cath. Conf.*, 719 F.2d 52, 55 (3rd Cir. 1983).[12] Thus, to qualify as a third-party beneficiary, "the party seeking such status must establish that the contract was made for the benefit of that third party within the intent and contemplation of the contracting parties." *Rottlund Homes of N.J., Inc. v. Saul, Ewing, Remick & Saul, L.L.P.*, 243 F. Supp. 2d 145, 153 (D. Del. 2003) (internal quotations omitted).

**(B)     The IBT is Not an Intended Beneficiary of the CARES Act Loan.**

27.     Even if this Court were to allow the IBT's Amended Response, the IBT is not an intended third-party beneficiary of the CARES Act Loan and, therefore, does not possess a right to bring a claim thereunder.  First and foremost, even the IBT does not claim the Loan Agreements expressly identify the IBT as a third-party beneficiary.  Notably, the Loan Agreements **do** identify specific groups of third-party beneficiaries.  Under Sections 10.23(a) and (b), the Permitted Junior Priority Additional Debt and ABL Secured Parties are identified expressly as third-party beneficiaries of the Loan Agreements.  The Loan Agreements then expressly state, in the merger clause, that except as "expressly contemplated hereby" nothing in the Loan Agreements "is intended to confer upon any Person . . . any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents."[13]   The plain language of the Loan

---

[11]   *See* Restatement (Second) of Contracts Section 313 ("[A] promisor who contracts with [the] government . . . is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless . . . the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract . . . .").

[12]   In *Nguyen*, the federal government and the U.S. Catholic Conference ("USCC") entered into a contract (the "Grant Agreement") to reimburse the USCC for every refugee it assisted in resettling.  Six refugees alleged they were third-party beneficiaries of the agreements and sued the USCC for breach.  Applying the specific language rule, the Third Circuit affirmed the district court's finding that the refugees were not third-party beneficiaries, as the Plaintiffs could "point to no provision of the grant agreements that reflects the notion that U.S.C.C. will be liable to refugees should it fail to perform."  *Nguyen v. U.S. Cath. Conf.*, 719 F.2d 52, 55 (3rd Cir. 1983).

[13]   *See* Section 10.10.  [D.I. 5018-3, 5018-4]:

Agreements thus demonstrates both that the parties knew how to specifically identify third-party beneficiaries and that the parties sought to disclaim third-party beneficiary status for any other parties.

28.     Such a merger provision is strong evidence against the IBT's claimed third-party beneficiary status.   "[W]here a no-third-party beneficiary provision is 'customized' by the inclusion of a carve-out, this signals a 'strong intent' to disclaim third-party beneficiaries that do not fall within the carve-out."  *Arnold v. X Corp.*, 2024 WL 4987032, at *7 (D. Del. Dec. 5, 2024) (citing *Fortis Advisors LLC v. Meds. Co.*, 2019 WL 7290945, at *4 (Del. Ch. Dec. 18, 2019).   In *Fortis*, the court held that inclusion of a no-third-party beneficiary provision along with a carve-out for certain "Financing Sources" to be a third-party beneficiary demonstrated the parties knew how to expressly confer third-party beneficiary status—and that other unnamed parties were not intended beneficiaries.  *Fortis*, 2019 WL 7290945 at *4.  Similar to *Fortis*, Section 10.10 of the CARES Act Loan contains a no-third party beneficiary provision barring the conferral of rights, express or implied, along with a carve-out for other named parties.  As in *Fortis*, these provisions demonstrate that the Debtors and the Treasury knew how to expressly confer third-party beneficiary status, and that the IBT was not one of them.

29.     Instead of grappling with this plain language—which the IBT does not address at all in its Amended Response—the IBT invites the Court to divine a contrary intent from a smattering of references to the IBT or its collective bargaining agreement throughout the Loan

---

Section 10.10. *Entire Agreement.* This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof. . . **Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder and, to the extent expressly contemplated hereby, the Related Parties of each of the Required Lenders, Administrative Agent, the Collateral Agent and the Lenders) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents**. (emphasis added).

Agreements.   But mere references alone are simply not enough to provide third-party beneficiary

rights.  And the IBT misconstrues the import of the various sections that do reference the IBT.  For

instance, Section 4.02, which references the "IBT Agreement" being in full force and effect, is

simply a condition precedent to each Lender making the Term Loans on the Initial Funding Date:

> *Initial Funding Date.*  The obligation of each UST Tranche B Term Lender to make
> the UST Tranche B Term Loans on the Initial Funding Date shall be subject to the
> occurrence of the Effective Date and satisfaction (or waiver pursuant to Article 9)
> of the following conditions precedent: . . . (e) Prior to or substantially concurrently
> with the funding of the Loans on the Initial Funding Date, the IBT Agreement shall
> be in full force and effect.

> Section 4.02.  [D.I. 5018-3, 5018-4].

30.     In making such a substantial loan to the Debtors, it is no surprise the Treasury

would want assurance that the Debtors' collective bargaining agreement covering the majority of

the Debtors' drivers remained in full force and effect as of the funding date.

31.     Similarly, the various Events of Default in Section 8.01 cannot support IBT's claim

to being an intended beneficiary.  The IBT argues that 8.01(n), along with other Events of Default,

"can only be explained" by the Treasury's objective to benefit TNFINC and the Debtors' former

employees it represents by preserving unionized employment.  *See* [D.I. 5085, at 5].  Further,

relying on Section 8.01(n), the IBT also argues that proof of the Treasury's intent to benefit the

IBT is found in the fact that the Debtors were required to maintain the CBAs in full force and

effect through September 30, 2024.  Again, turning to the language of the CARES Act Loan, this

argument is unsound.[14]

---

[14]    Section 8.01(n) states: "*IBT Agreement*.  The IBT Agreement shall be declared invalid or illegal, shall be
terminated, or shall no longer be in full force and effect."  [D.I. 5018-3, 5018-4].  Notably, this provision does
not require that the CBAs remain in effect until September 30, 2024; the IBT implies that deadline based on the
original maturity date of the Loans.

32.     First, the IBT's tortured reasoning concerning the intent of including these provisions elides the basic commercial reality: the IBT Agreement covered the overwhelming majority of the Debtors' workforce, and therefore it would be shocking if the Loan Agreements did ***not*** include an event of default for the termination of the IBT Agreements.  A lender protecting itself against such material adverse business events is completely commonplace.

33.     Second, a review of Section 8.02, *Remedies Upon Event of Default*—which immediately follows the provision the IBT relies on, Section 8.01(n), the default provision concerning the CBAs—reveals the only remedies afforded are termination and acceleration of the CARES Act Loan.[15]  And these remedies are only available to the Lenders.  Accordingly, the CARES Act Loan explicitly provides the Required Lenders with enforcement mechanisms and the lack of parallel language for the IBT supports the Debtors' position.

34.     Third, the IBT's argument that these Events of Default were intended to confer a benefit on the IBT of keeping the IBT Agreement in place for a fixed period of time ignores the pre-payment rights of the Debtors.  Section 2.12 of the Loan Agreements permitted the Debtors, at any time, to make voluntary prepayments without penalty.[16]  If, as happened, the Debtors prepaid the CARES Act Loan before September 30, 2024, only certain specified contractual provisions—none of which included the Events of Default or other provisions identified by the IBT—would survive.  *See* Section 10.02.[17]

---

[15]   *See* Sections 8.01(n) and 8.02. [D.I. 5018-3, 5018-4].

[16]   *See* Section 2.12. [D.I. 5018-3, 5018-4].("(a) The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written (email) notice in the case of Eurodollar Loans, or written (email) notice at least one Business Day prior to the date of prepayment in the case of ABR Loans, to the Administrative Agent before 12:00 p.m., New York City time; *provided*, *however*, that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $2,000,000.").

[17]   *See* Section 10.02. [D.I. 5018-3, 5018-4].

35.    In other words, the Debtors entered into the CARES Act Loan, which permitted repayment at any point in time.  Thereafter, the Debtors repaid the loan in February 2024, which effectively terminated the Debtors' obligations under the CARES Act Loan, save for a few provisions not applicable to this dispute.  If, as the IBT claims, the Treasury sought to ensure employment of the Debtors' workforce for some discrete period of time, the actual provisions of the Loan Agreements utterly fail in effectuating that purpose.

36.    Consequently, while there may be nothing extraordinary about classifying employees as intended beneficiaries of government contracts, the IBT has failed to detail how such is the case here.  While government contracts tend to confer benefits upon even the public at large, the receipt of such benefits alone is not in itself sufficient to infer an intention to make any individual a third-party beneficiary.  Accordingly, the IBT is, at most, an incidental beneficiary of the CARES Act Loan.[18]

37.    As discussed above, the CARES Act Loan does not expressly name the IBT as an intended third-party beneficiary, nor does it authorize the IBT to enforce any obligations.  Without a doubt, the IBT lacks standing to sue under the CARES Act Loan as third-party beneficiaries. The benefit to the IBT is incidental, not direct, and the language in the CARES Act Loan indicates the parties thereto did not intend to give individually enforceable rights to the IBT.  In other words, the IBT is not entitled to any damages.

---

[18]    To be sure, IBT may have in fact benefited from the CARES Act Loan insofar as it allowed and encouraged the Debtors to continue to keep the same number of employees.  But the mere fact that the IBT may have benefited does not make it a third-party beneficiary.  *Allstate*, 2000 WL 329015, at *16–17 (E.D. Pa. Mar. 27, 2000) ("Something more than mere intent to benefit some third party must be shown for the third party to have actionable rights under the contract.").  As stated above, "[t]here must be language evincing an intent that the party contracting with the government will be held liable to the third parties in the event of nonperformance." *Id*.  There is nothing in the Loan Agreements reflecting an intent to allow the IBT to hold the Debtors' liable; in fact, the merger agreement says exactly the opposite.

**III.    The Debtors Did Not Breach And The Only Remedy for Breach is Acceleration of The Loan, Not Damages.**

38.    Even assuming the IBT had standing to enforce the Loan Agreements as a third-party beneficiary, it would still not have a claim it could assert against the Debtors.  The Debtors did not breach the CARES Act Loan provisions requiring that it keep the IBT Agreement in force, and even if the Debtors did, the IBT cannot pursue damages because that would be a remedy greater than the contracting parties have.

39.    The IBT is asking this Court to award damages to the IBT as a third-party beneficiary of the CARES Act Loan for an alleged "breach [of the Debtors'] promise to the Treasury to continue business operations" under the Loan Agreements.  *See* D.I. 5085 ¶ 14.  However, damages are unavailable to the IBT for two reasons.

40.    *First*, as previously explained, Debtors did not breach the CARES Act Loan, as the promise to keep the CBAs in full force and effect throughout the term of the Loan Agreements was fulfilled.  The Debtors repaid the CARES Act Loans in full in February 2024, and the IBT Agreement was not terminated until March 2024.[19]  Thus, even if the IBT could enforce that "promise" against the Debtors, it would have no basis to claim a breach.

41.    *Second*, under the terms of the Loan Agreements, if the Debtors *did* trip an Event of Default—such as by terminating the IBT Agreement—the only remedy available was to enforce the loan *via* acceleration of repayment.  The IBT does not appear to contest this, stating in its response "any violation of the loan covenants by Yellow, such as the covenant that the NMFA must remain in full force and effect, would allow the lenders to ask the administrative agent to declare that the lender's commitments to make the loans are terminated, and that the unpaid

---

[19]    [D.I. 2778-1, Ex. 1; D.I. 5018-6.]

principal amount of all loans shall be immediately due and payable." [D.I. 5085 ¶ 10.] Although the IBT recognizes the limited remedy available to the Lenders, it does not explain why it should be entitled to a greater remedy. Under federal law, "a third-party's right to enforce a contract cannot rise higher than the rights of the contracting party through whom he claims . . . because the beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract." *Joint Admin. Comm. of Plumbing & Pipefitting Indus. in Detroit Area v. Washington Grp. Int'l, Inc.*, 568 F.3d 626, 631 (6th Cir. 2009) (internal quotes omitted). Similarly, under New York law "a third-party beneficiary has no greater rights or remedies than the direct parties to [a contract]." *Saska v. Metro. Museum of Art*, 975 N.Y.S.2d 605, 615 (Sup. Ct. 2013), *aff'd sub nom. Grunewald v. Metro. Museum of Art*, 3 N.Y.S.3d 23 (1st Dep't. 2015) (internal quotations omitted). In other words, "[t]hird party beneficiaries do not have contractual rights that go beyond or contravene the explicit terms of the contract." *Saska*, 975 N.Y.S. at 616.

42.    Applying this principle to the IBT's claim, as an alleged third-party beneficiary of the CARES Act Loan, the IBT would have no greater rights than the Lenders, whose remedies are limited to calling a default and accelerating the Loans. *See* Section 8.02.[20] If, while the CARES Act Loan was outstanding, the Debtors defaulted by terminating the IBT Agreement, the loan terms would not permit the Lenders to sue to recover damages for amounts owed to the Debtors' employees. There is no basis for the law to allow the IBT to do so, even if it were a third-party beneficiary.

---

[20]    [D.I. 5018-3, 5018-4.]

## <u>CONCLUSION</u>

**WHEREFORE**, for the reasons described in their Objection and here, the Debtors respectfully request that this Court enter an order granting the Debtors' Objection and disallowing the IBT's Proofs of Claim.

Dated: January 15, 2025

/s/ Peter J. Keane

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: jones@pszjlaw.com
      tcairns@pszjlaw.com
      pkeane@pszjlaw.com
      ecorma@pszjlaw.com

-and-

Patrick J. Nash, P.C. (admitted pro hac vice)
David Seligman, P.C. (admitted pro hac vice)
Casey McGushin (admitted pro hac vice)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: patrick.nash@kirkland.com
      david.seligman@kirkland.com
      casey.mcgushin@kirkland.com

-and-

Allyson B. Smith (admitted pro hac vice)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: allyson.smith@kirkland.com

*Co-Counsel for The Debtors and The Debtors in Possession*