**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| YELLOW CORPORATION, et al., | ) | |
| | ) | Lead Case No. 23-11069 (CTG) |
| Debtors. | ) | |
| | ) | |

**CENTRAL STATES PENSION FUND'S REPLY**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ITS**
**WITHDRAWAL LIABILITY AND CONTRIBUTION GUARANTEE CLAIMS**

William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
**SULLIVAN HAZELTINE ALLINSON LLC**
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Fax: (302) 428-8195
Email: bsullivan@sha-llc.com
        whazeltine@sha-llc.com

and

Brad R. Berliner, Esq.
Andrew J. Herink, Esq.
Daniel Sullivan, Esq.
Central States Funds
8647 West Higgins Road
Chicago, IL 60631
Tel: (847) 939-2478
Email: bberliner@centralstatesfunds.org
        aherink@centralstatesfunds.org
        dsulliva@centralstatesfunds.org

*Attorneys for Central States, Southeast and Southwest Areas Pension Fund*

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Argument ................................................................................................................... 2

   I.   Debtors Fail to Meaningfully Address Their Waiver. ......................................... 2

   II.   Debtors Are Liable for the Gross Amount of the Payment Schedule Because They Defaulted under MPPAA. .................................................................................. 4

   III.   Even Ignoring the Court's Prior Ruling that a Default Under MPPAA Results in the Gross Amount of the Payment Stream Being Owed, the Court Should Not Use a Present-Value Analysis to Discount the Withdrawal Liability Claim. .............................. 7

      A.   29 U.S.C. § 1405(e) Does Not Affect the Analysis.......................................... 7

      B.   Debtors Misinterpret 11 U.S.C. § 502(b) in Contravention of Third Circuit Precedent. .................................................................................................... 9

   IV.   Subordination under 29 U.S.C. § 1405 Is Inappropriate.................................... 11

   V.   If the Court Finds that Discounting Is Appropriate, the Correct Rate Would Be the 4.00% Rate Used to Amortize the Withdrawal Liability................................. 12

   VI.   The Court Should Hold Debtors to their Bargain and Allow the Claim for Breach of the Contribution Guarantee.............................................................................. 13

Conclusion ................................................................................................................ 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.*,
33 F. Supp. 2d 235 (S.D.N.Y. 1998) .................................................................. 6

*Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*,
252 F.3d 911 (7th Cir. 2001) ........................................................................ 5

*Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*,
472 U.S. 559 (1985)..................................................................................... 8

*Cent. States, Se. & Sw. Areas Pension Fund v. Dworkin, Inc.*,
No. 19-cv-6716, 2020 WL 5365968 (N.D. Ill. Sept. 8, 2020)........................... 7

*Cent. States, Se. & Sw. Areas Pension Fund v. N.C. Allstates Serv.*,
No. 86-cv-8734, 1988 WL 1392682 (N.D. Ill. Dec. 19, 1988)........................... 3

*Cent. States, Se. & Sw. Areas Pension Fund v. Nitehawk Express, Inc.*,
No. 95-cv-3944, 1996 WL 4672317 (N.D. Ill. Aug. 15, 1996) ......................... 3

*Cent. States, Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*,
620 F.3d 766 (7th Cir. 2010) ..................................................................... 6, 7

*Dairy Emps. Union Local No. 17 v. Poel*,
No. 12-cv-4550, 2014 WL 12884088, (C.D. Cal. Sept. 15, 2014) .................... 3

*Ganton Techs., Inc. v. Nat'l Indus. Group Pension Plan*,
865 F. Supp. 201 (S.D.N.Y. 1994) .............................................................. 15

*In re AMR Corp*,
730 F.3d 88 (2d Cir. 2013)....................................................................... 1, 4

*In re Asbestos Prods. Liab. Litig.*,
921 F.3d 98 (3d Cir. 2019)........................................................................... 3

*In re B456 Sys., Inc.*,
No. 12-bk-12859, 2017 WL 6603817 (Bankr. D. Del. Dec. 22, 2017) ............ 12

*In re CF & I Fabricators of Utah, Inc.*,
150 F.3d 1293 (10th Cir. 1998) .................................................................. 10

*In re Chemtura Corp.*,
448 B.R. 635 (Bankr. S.D.N.Y. 2011) ............................................... 12, 13, 17

*In re CSC Indus., Inc.*,
232 F.3d 505 (6th Cir. 2000) ...................................................................... 10

*In re Frescati Shipping Co.*,
    886 F.3d 291 (3d Cir. 2018)..................................................................... 3

*In re Loewen Grp. Int'l, Inc.*,
    274 B.R. 427 (Bankr. D. Del. 2002) ................................................... 7, 9

*In re Marcal Paper Mills, Inc.*,
    650 F.3d 311 (3d Cir. 2011)..................................................................... 9

*In re Mirant Corp.*,
    332 B.R. 139 (Bankr. N.D. Tex. 2005).......................................... 12, 17

*In re Oakwood Homes Corp.*,
    449 F.3d 588 (3d Cir. 2006)........................................................ 9, 10, 17

*In re Sixteen to One Mining Corp.*,
    9 B.R. 636 (Bankr. D. Nev. 1981) .......................................................... 6

*In re Split Vein Coal Co., Inc.*,
    No. 03-bk-02974, 2009 WL 4937760 (Bankr. M.D. Pa. Dec. 11, 2009) ........................... 6

*In re Value Recreation, Inc.*,
    228 B.R. 692 (Bankr. D. Minn. 1999) .................................................. 12

*In re War Eagle Constr. Co., Inc.*,
    283 B.R. 193 (S.D.W. Va. 2002) ............................................................. 6

*In re Winston Mills, Inc.*,
    6 B.R. 587 (Bankr. S.D.N.Y. 1980)....................................................... 12

*Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*,
    513 U.S. 414 (1995)....................................................................... 1, 10, 15

*NYSA-ILA Pension Trust Fund v. Am. Stevedoring, Inc.*,
    No. 12-cv-2506, 2013 WL 12349573 (S.D.N.Y. Mar. 26, 2013)........................ 3

*Pennsylvania v. U.S. Dep't of Health & Human Serv.*,
    101 F.3d 9395 (3d Cir. 1996).................................................................. 18

*Penske Truck Leasing Co. v. Cent. States, Se. & Sw. Areas Pension Plan*,
    No. 21-cv-5518, 2022 WL 1028927 (N.D. Ill. Apr. 6, 2022)............................. 8

*Pierce v. B & C Elec., Inc.*,
    432 N.E.2d 964 (Ill. App. 1st Dist. 1982) ......................................... 14, 16

*Till v. SCS Credit Corp.*,
    541 U.S. 465 (2004)................................................................................ 12

*Trustees of Leather Goods, Plastics, Handbags & Novelty Workers Union Local 1 Joint Ret. Fund v. Key Handling* Sys. Inc.,
No. 14-cv-2675, 2015 WL 5604184 (E.D.N.Y. June 5, 2015) ........................................ 13

*XCO Int'l, Inc. v. Pac. Sci. Co.*,
369 F.3d 998 (7th Cir. 2004) ...................................................................................... 14

**Statutes**

11 U.S.C. § 365 ............................................................................................................ 4

11 U.S.C. § 502 ............................................................................................. 1, 4, 9, 17

29 U.S.C. § 1381 ............................................................................................... 3, 10, 11

29 U.S.C. § 1399 ............................................................................................... passim

29 U.S.C. § 1405 ............................................................................................... passim

**Regulations**

Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980, 126 Cong. Rec. S20189, S20209 (Jul 29, 1980) ............................................................... 14, 15

Notice and Collection of Withdrawal Liability,
49 Fed. Reg. 22642-01 (1984) ..................................................................................... 6

# INTRODUCTION

1.  In their opposition (Dkt. No. 5381, cited herein after as "Debtors' Opposition"), Debtors fail to address the arguments raised by Central States, Southeast and Southwest Areas Pension Fund ("Central States Pension Fund") in its opening brief (Dkt. No. 5169 (cited hereinafter as "Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶____"))[1] that Debtors' default under 29 U.S.C. § 1399(c)(5)(B) was undisputedly premised on prepetition conduct and that such statutory default declarations are permissible under the Bankruptcy Code. *See In re AMR Corp.*, 730 F.3d 88, 107 (2d Cir. 2013). Accordingly, the Court should hold that under MPPAA, Debtors defaulted and thus owe the gross amount of the withdrawal liability payment schedule.

2.  Even ignoring MPPAA, the result under 11 U.S.C. § 502(b) would be the same, as no present-value discounting would be permitted. Debtors' arguments to the contrary ignore *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.,* 513 U.S. 414 (1995), which explains that Debtors have already benefitted by a 20-year limitation on payments which "forgives" debt, 513 U.S. at 426–27, such that Debtors' argument for further present-value discounting would run afoul of the Third Circuit's prohibition against double discounting. *In re Oakwood Homes Corp.*, 449 F.3d 588, 601 (3d Cir. 2006).

3.  Debtors' arguments regarding the 2014 Letter Agreement fare no better, as Debtors ignore that Debtors themselves chose the contribution guarantee as well as the undisputed evidence that at all relevant times Debtors understood that the cessation of their contribution obligation would have "dire financial consequences" for Central States Pension Fund. (June 14, 2023 Letter of Dan Olivier, Ex. K to Central States Pension Fund's Opening Brief; Hawkins Transcript, Ex. F

---

[1] Terms not explicitly defined herein are intended to have the meaning ascribed to them in Central States Pension Fund's opening brief. (Dkt. No. 5169.)

to Central States Pension Fund's Opening Brief, at 105:6-106:15). Simply put, there is no reason why "the [D]ebtors should not be held to their bargain." (Amended Memorandum Opinion, Dkt. No. 4769, at 39-41.)

## ARGUMENT

### I.    Debtors Fail to Meaningfully Address Their Waiver.

4.      Debtors do not address the prolonged course of conduct by which they waived their challenges to their default under 29 U.S.C. § 1399(c)(5)(B). (Debtors' Opposition, ¶ 22 n.8; *see* Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶¶ 30-34.) Instead, Debtors argue they had no notice that Central States Pension Fund declared them defaulted under 29 U.S.C. § 1399(c)(5)(B). (Debtors' Opposition, ¶ 22 n.8.) But this is simply not so, as Central States Pension Fund stated in its pleadings that "Debtors are in default under 29 U.S.C. § 1399(c)(5)(B) and therefore . . . their withdrawal liability is owed in a single payment." (Central States Pension Fund's January 19, 2024 Response to Debtors' Objection to Central States Pension Fund's Claims, Dkt. No. 1833, ¶ 54.) And, in discovery Central States Pension Fund stated: "[A] defaulted employer (like Debtors) is liable for the full, lump sum amount of withdrawal liability, not a lesser amount based on a payment schedule." (Central States Pension Fund's January 19, 2024 Response to Debtors' First Set of Interrogatories, attached as Ex. Q to Central States Pension Fund's Opening Brief, at 25.) Indeed, Debtors openly acknowledged that they understood Central States Pension Fund calculated Debtors' withdrawal liability using the assumption that Debtors were in default. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶ 32, and Ex. S thereto.)

5.      Debtors' argument that their waiver should be excused because it relates to a "general" defense as opposed to an affirmative defense (Debtors' Opposition, ¶ 22 n.8) also fails. Local Rule 3007-1(f)(iii) requires that an "[o]bjection based on substantive grounds, other than incorrect classification of a claim, shall include all substantive objections to such claim." And, as

Central States Pension Fund previously explained (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶¶ 33–34), the relevant inquiry under Third Circuit precedent is not whether a defense is general or affirmative; instead, it is whether Debtors' conduct constitutes "[b]ehavior that is consistent with waiver." *In re Asbestos Prods. Liab. Litig.*, 921 F.3d 98, 106 (3d Cir. 2019). As Central States Pension Fund has shown (and as Debtors still do not dispute), Debtors represented throughout discovery and their filings that the default determination was not at issue, and accordingly their eleventh-hour challenge is waived. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶¶ 30–32.) In any event, challenges to a MEPP's withdrawal liability determinations under 29 U.S.C. §§ 1381-1399 are waivable affirmative defenses. *Dairy Emps. Union Local No. 17 v. Poel*, No. 12-cv-4550, 2014 WL 12884088, at *4-5 (C.D. Cal. Sept. 15, 2014); *NYSA-ILA Pension Trust Fund v. Am. Stevedoring, Inc.*, No. 12-cv-2506, 2013 WL 1234957, at *3 (S.D.N.Y. Mar. 26, 2013); *Cent. States, Se. & Sw. Areas Pension Fund v. Nitehawk Express, Inc.*, No. 95-cv-3944, 1996 WL 467231, at *7 (N.D. Ill. Aug. 15, 1996); *Cent. States, Se. & Sw. Areas Pension Fund v. N.C. Allstates Servs., Inc.*, No. 86-cv-8734, 1988 WL 139268, at *2 (N.D. Ill. Dec. 19, 1988).

6.      Thus, all that remains is Debtors' statement that their waiver should be excused because the issue of default is "high-stakes." (Debtors' Opposition, ¶ 22 n.8.) But because the waiver rules ensure that arguments are raised in a "pragmatically sufficient" time and prevent prejudice to the party to whom the late argument is directed, *In re Frescati Shipping Co., Ltd.*, 886 F.3d 291, 313 (3d Cir. 2018), those rules should be applied uniformly. If anything, ensuring an efficient process in high-stake cases like this one is even more important, as such cases already tend to strain judicial (and party) resources significantly.

II.     **Debtors Are Liable for the Gross Amount of the Payment Schedule Because They Defaulted under MPPAA.**

7.      Debtors do not address the observation (cited in Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶ 2) that there is no "provision of the Bankruptcy Code . . . that provides support for . . . a per se prohibition" on *ipso facto* clauses, let alone a restriction on statutory rights like the right to declare default under 29 U.S.C. § 1399(c)(5)(B). *In re AMR Corp.*, 730 F.3d at 107. Nor do Debtors address the unambiguous language of 29 U.S.C. § 1399(c)(5)(B), which provides that a plan sponsor may require "immediate payment of the outstanding amount of an employer's withdrawal liability" upon "*any* . . . event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability" (emphasis added). Indeed, Debtors do not cite the specific *ipso facto* prohibitions that appear in 11 U.S.C. §§ 365(e)(1) and 541(c) at any point, let alone explain how those prohibitions would apply here or how they would control over the broad language of 29 U.S.C. § 1399(c)(5)(B). (*See* Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶¶ 38-39.) In short, declaring a default based on Debtors' bankruptcy filing would have been proper and not unlawfully *ipso facto.*

8.      Moreover, as Central States Pension Fund previously noted and as Debtors do not dispute, Debtors' default was not based on Debtors' filing of bankruptcy; instead, it was based on Debtors' undisputed prepetition failure to pay contributions. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶ 36.) Thus, Debtors' *ispo facto* discussion is not relevant to Central States Pension Fund's claim.

9.      Although Debtors spend a significant portion of their response brief discussing the effect of an acceleration under 11 U.S.C. § 502(b), 29 U.S.C. § 1399(c)(5) controls under the law of the case, because as noted in Central States Pension Fund's response brief (Central States Pension Fund's Response in Opposition to Debtors' Motion for Summary Judgment, Dkt. No.

5376, ¶ 20), the Court has already held that if Debtors defaulted under 29 U.S.C. § 1399(c)(5), then Debtors owe the gross amount of the withdrawal liability payments, not an amount based on present value. (*See* Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to Consider, Dkt. No. 4771 at 7.) Again, Debtors do not explain why the Court's previous analysis would be incorrect or how it is not the law of the case.

10.     And, to be clear, Debtors have indeed defaulted under 29 U.S.C. § 1399(c)(5)(B). Specifically, the "event . . . which indicate[d] a substantial likelihood that an employer will be unable to pay its withdrawal liability" for purposes of 29 U.S.C. § 1399(c)(5)(B) was the "existence of a delinquency" in the form of unpaid contributions that were due prepetition. (Central States Plan Document, Ex. A to Central States Pension Fund's Opening Brief, App'x E, § 5(e), at CS-0034827–CS-0034828; *see also* Sept. 12, 2023 Minutes of the Pension Board Meeting, Ex. M to Central States Pension Fund's Opening Brief, at CS-0032738.) As noted in Central States Pension Fund's response brief, even Debtors' own cited authority is clear that a withdrawal liability default may occur during the pendency of a bankruptcy. (Central States Pension Fund's Response in Opposition to Debtors' Motion for Summary Judgment, Dkt. No. 5376, ¶ 20 (discussing *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 918 (7th Cir. 2001) ("So the only question is whether there was a default. There was."))).

11.     This result best comports with the text of 29 U.S.C. § 1399(c)(5)(B), by which Congress sought to further protect MEPPs by allowing a demand for "immediate payment of the outstanding amount of an employer's withdrawal liability" upon "any" event indicating that the withdrawal liability would not be otherwise collectible. As the Seventh Circuit explained:

> If there is a substantial likelihood that an employer will be unable to meet its obligations, then there is a need for urgent action that is not present if the employer simply misses a payment. In the former situation, if the fund is unable to collect

quickly, it likely never will collect. The fund, and the employees whose pensions it serves, therefore would be unprotected.

*Cent. States, Se. & Sw. Areas Pension Fund v. O'Neill Bros. Transfer & Storage Co.*, 620 F.3d 766, 774 (7th Cir. 2010). Debtors do not dispute the PBGC's longstanding and commonsense view that bankruptcy is an event that indicates a "substantial likelihood that an employer will be unable to pay its withdrawal liability." Notice and Collection of Withdrawal Liability, 49 Fed. Reg. 22642-01, 22644 (1984). (*See* Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶ 39.) Accordingly, the Court should reject Debtors' interpretation, which would exclude bankruptcy from the deliberately broad scope of 29 U.S.C. § 1399(c)(5)(B), despite a bankruptcy being one of the most common events indicating a likelihood of nonpayment.

12.    Even if one sets aside MPPAA and Congress's chosen policy of protecting MEPPs from employer insolvency it would make no sense if a debtor could always avoid a default based on prepetition conduct due to the happenstance of when the creditor technically declared the default. (Central States Pension Fund's Response in Opposition to Debtors' Motion for Summary Judgment, Dkt. No. 5376, ¶ 15.) In this vein, it is well settled that a post-petition declaration of default is permitted under the Bankruptcy Code, especially where the default occurred prepetition. *In re Split Vein Coal Co.*, No. 03-bk-02974, 2009 WL 4937760, at *9, *12 (Bankr. M.D. Pa. Dec. 11, 2009); *In re Sixteen to One Mining Corp.*, 9 B.R. 636, 638, 639 (Bankr. D. Nev. 1981); *see also Am-Haul Carting, Inc. v. Contractors Cas. & Sur. Co.*, 33 F. Supp. 2d 235, 242 (S.D.N.Y. 1998); *In re War Eagle Constr. Co., Inc.*, 283 B.R. 193, 199 (S.D.W. Va. 2002) ("[D]eclar[ing] the bond forfeited . . . is in the nature of the fixing of damages and the entry of a money judgment, and distinguishable from the enforcement or collection of such judgment."). Thus, Debtors' citation to *Loewen* is inapposite because that case was premised on the finding that the underlying events required for the creditor to declare a default (debtors failing to make certain payments)

occurred post-petition. *In re Loewen Grp. Int'l, Inc.*, 274 B.R. 427, 438 (Bankr. D. Del. 2002).

Here, in contrast, the event that led Central States Pension Fund to declare a default was Debtors'

failure to pay contributions, which occurred prepetition.[2]

13.     Accordingly, present value discounting Central States Pension Fund's withdrawal

liability claim is inappropriate because, under MPPAA and the law of this case, Debtors are liable

for the entire lump sum under 29 U.S.C. § 1399(c)(5).

**III.    Even Ignoring the Court's Prior Ruling that a Default Under MPPAA Results in the Gross Amount of the Payment Stream Being Owed, the Court Should Not Use a Present-Value Analysis to Discount the Withdrawal Liability Claim.**

*A.    29 U.S.C. § 1405(e) Does Not Affect the Analysis.*

14.     Debtors' proclamation that 29 U.S.C. § 1405(e) sounds a "death knell" is false.

(Debtors' Opposition, ¶ 10.) 29 U.S.C. § 1405(e) provides:

> In the case of one or more withdrawals of an employer attributable to the same sale, liquidation, or dissolution, under regulations prescribed by the corporation—
>
>> (1) all such withdrawals shall be treated as a single withdrawal for the purpose of applying this section, and
>>
>> (2) the withdrawal liability of the employer to each plan shall be an amount which bears the same ratio to the present value of the withdrawal liability payments to all plans (after the application of the preceding provisions of this section) as the withdrawal liability of the employer to such plan (determined without regard to this section) bears to the withdrawal liability of the employer to all such plans (determined without regard to this section).

Debtors assert that 29 U.S.C. § 1405(e)(2) requires that Debtors' withdrawal liability be discounted

to a present value. (Debtors' Opposition, ¶ 8.) But, as the plain language makes clear, 29 U.S.C.

---

[2] Debtors' suggestion that Central States Pension Fund was required to serve an initial notice and demand for payment of withdrawal liability before declaring an insecurity default under 29 U.S.C. § 1399(c)(5)(B) (Debtors' Opposition, ¶ 40) is a mere invention that contradicts Debtors' own cited case law. (Central States Pension Fund's Response in Opposition to Debtors' Motion for Summary Judgment, Dkt. No. 5376, ¶ 16; (discussing *O'Neill Bros.*, 620 F.3d at 774; *Cent. States, Se. & Sw. Areas Pension Fund v. Dworkin, Inc.*, No. 19-cv-6716, 2020 WL 5365968, at *2, *5 (N.D. Ill. Sept. 8, 2020)).)

§ 1405(e)(2) simply requires that the *status quo ante* among funds be preserved after application of "the preceding provisions of" 29 U.S.C. § 1405. That is, to the extent an employer owes withdrawal liability to multiple pension funds and 29 U.S.C. § 1405(a) and (b)'s provisions regarding "sale, liquidation, or dissolution" result in a decrease in the amount of such withdrawal liability, 29 U.S.C. § 1405(e) requires that the withdrawal liability received by each fund still be in the same proportion as before application of 29 U.S.C. § 1405. But here, as Central States Pension Fund has shown throughout its briefing (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶¶ 46-48; Central States Pension Fund's Response in Opposition to Debtors' Motion for Summary Judgment, Dkt. No. 5376, ¶ 15; *and see* Part IV *infra*), 29 U.S.C. § 1405(b) does not reduce Debtors' withdrawal liability (and Debtors do not suggest that 29 U.S.C. § 1405(a) would reduce their withdrawal liability either). 29 U.S.C. § 1405(e) simply plays no role here.

15.    Further, by its plain text, 29 U.S.C. § 1405(e) only applies to withdrawal liability for withdrawals "*attributable to* the same sale, dissolution, or liquidation" (emphasis added).  As explained in Central States Pension Fund's opening brief, and as Debtors do not dispute, Central States Pension Fund terminated Debtors' participation in Central States Pension Fund effective July 23, 2023 as a result of Debtors' contributions delinquency. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶ 20, and Ex. L thereto, July 18, 2023 Letter of Thomas Nyhan.) Central States Pension Fund's Board of Trustees may terminate an employer who "is engaged in one or more practices or arrangements that threaten to cause economic harm to, and/or impairment of the actuarial soundness of, the Fund," including the practice of withholding lawfully required contributions. (Trust Agreement, attached hereto as **Exhibit A**, Art. III, § 1, at CS-0022701–CS-0022702; Art. IV, § 20, at CS-0022713.) *See Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 568 (1985); *Penske Truck Leasing Co. v. Cent. States, Se. & Sw. Areas*

*Pension Plan*, No. 21-cv-05518, 2022 WL 1028927, at *12 (N.D. Ill. Apr. 6, 2022).[3] Moreover, Debtors have not even challenged their pre-petition termination of participation in Central States Pension Fund as being unlawful.

16.     Because Debtors withdrew from Central States Pension Fund on July 23, 2023 as a result of Trustee action, the withdrawal is not "attributable" to Debtors' liquidation. Indeed, Debtors' liquidation was not even contemplated until July 26, 2023. (Dec. 19, 2024 Memorandum Opinion, Dkt. No. 5227, at 13.) Accordingly, 29 U.S.C. § 1405(e) does not apply to Central States Pension Fund's claims for withdrawal liability.

   B.   *Debtors Misinterpret 11 U.S.C. § 502(b) in Contravention of Third Circuit Precedent.*

17.     Although Debtors and Central States Pension Fund agree that a bankruptcy filing automatically accelerates claims under 11 U.S.C. § 502(b), any notion that 11 U.S.C. § 502(b) requires discounting in all cases was explicitly rejected by the Third Circuit: "where the Bankruptcy Code intends a court to discount something to present value, the Code clearly uses the term '*value, as of*' a certain date," as opposed to the term "amount," which is term used in 11 U.S.C. § 502(b). *Oakwood Homes*, 449 F.3d at 597 (emphasis added) (rejecting *In re Loewen Grp.*, 274 B.R. at 439).

18.     Furthermore, and as Debtors do not dispute, the 20-year limitation on annual payments means that Debtors' total withdrawal liability payments will not come close to paying the full principal amount of their obligation (*i.e.*, their proportionate share of unfunded vested benefits, *In re Marcal Paper Mills, Inc.*, 650 F.3d 311, 318 (3d Cir. 2011)), let alone the full

---

[3] YRC, Inc. and USF Holland, LLC agreed to be bound by the Trust Agreement (and all amendments thereto), including deference to the decisions of the Pension Fund's Board of Trustees. (See, *e.g.*, March 11, 2021 Participation Agreement of USFH, attached as Exhibit C to Central States Pension Fund's Opening Brief, ¶ 1; March 11, 2019 Participation Agreement of YRC, attached as Exhibit D to Central States Pension Fund's Opening Brief, ¶ 1.)

amount of principal *and* interest. *See Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 419

("The practical effect of this concern with maintaining level payments is that any amortization

interest § 1399(c)(1)(A)(i) may cause to accrue is added to the end of the payment schedule (unless

forgiven by § 1399(c)(1)(B)).").[4] (Central States Pension Fund's Opening Brief, Dkt. No. 5169

¶¶ 41–42.) In other words, Debtors have already received a significant discount by virtue of the

"forgiveness" under 29 U.S.C. § 1399(c)(1)(B), *Milwaukee Brewery Workers' Pension Plan*, 513

U.S. at 426, such that a further discount would be "double discounting" inappropriate under

*Oakwood Homes*, 449 F.3d at 601. In their response, Debtors merely assert the tautology that a

payment schedule is a future stream of payments (Debtors' Opposition, ¶ 50), but the fact remains

that Debtors have already received a significant discount on their obligation, such that further

discounting is inappropriate.

19.     Debtors' suggestion that the Third Circuit indicated in footnote 13 of *Oakwood*

*Homes* that its analysis would not apply in the withdrawal liability context is incorrect. (Debtors'

Opposition, ¶ 19 n.7.) The Third Circuit did not use the phrase "withdrawal liability" in footnote

13 at all, but rather the phrase "unfunded benefit liability." *Oakwood Homes*, 449 F.3d at 599 n.13.

The Court should take note of this distinction, because the statutory provisions at issue in the two

cases discussed in footnote 13 were 29 U.S.C. §§ 1301(a)(18) and 1362(b)(1)(A), which refer to

"benefit liabilities" (and which by definition is a present value calculation under 29 U.S.C. §

1301(a)(18)), as opposed to "withdrawal liability," which arises under 29 U.S.C. § 1381 *et seq*.

*Oakwood Homes*, 449 F.3d at 599 n.13 (distinguishing *In re CF & I Fabricators of Utah, Inc.*, 150

F.3d 1293, 1300 (10th Cir. 1998), and *In re CSC Indus., Inc.*, 232 F.3d 505, 508 (6th Cir. 2000)).

---

[4] As the Court has already noted, to the extent that the withdrawal liability schedule "[s]hould be viewed as, in effect, an interest-free loan. . . the effective discount rate should then be zero." (*See* Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to Consider, Dkt. No. 4771 at 8.)

## IV.     Subordination under 29 U.S.C. § 1405 Is Inappropriate.

20.     As explained in Central States Pension Fund's opening brief (Dkt. No. 5169, ¶¶ 46–48), Debtors' attempt to seek subordination under 29 U.S.C. § 1405(b) seeks to rewrite the statute, as 29 U.S.C. § 1405(b) does not provide that an employer's *withdrawal liability* is reduced. Instead, the text states that in certain situations, the *unfunded vested benefits* ("UVBs") allocable to the employer "shall not exceed an amount equal to the sum of" 50% of its UVBs plus that portion of the remaining 50% that does not exceed the employer's liquidation value. Here, the Court has already determined that "withdrawal liability" equates to "the amount the employer owes after the application of the 20-year cap," as opposed to meaning the employer's allocable share of the plan's UVBs. (Amended Memorandum Opinion, Dkt. No. 4769, at 37.) Thus, although there is no dispute that 29 U.S.C. § 1405(b) is applied as the last step of 29 U.S.C. § 1381(b)(1) (Debtors' Opposition, ¶ 63), that does not change the plain text of 29 U.S.C. § 1405(b), which refers to an employer's allocable share of UVBs, not "withdrawal liability."

21.     The other provisions of the statute belie Debtors' unsupported arguments. In 29 U.S.C. § 1405(a)(1), Congress referred to the "unfunded vested benefits allocable to an employer (*after the application of all sections of this part having a lower number designation than this section*)." 29 U.S.C. § 1405(a)(1) (emphasis added). That Congress did not include this language in 29 U.S.C. § 1405(b) demonstrates that Congress did not intend "unfunded vested benefits allocable to an employer" to mean the amount after application of the other adjustments listed in 29 U.S.C. § 1381(b)(1).

22.     As noted in the Fund's opening brief, regardless of whether the amount being amortized over 20 years is $4,827,470,743.87 (100% of Debtors' allocable share of UVBs) or $2,413,735,371.94 (50% of that allocable share), the gross amount of the withdrawal liability payment schedule would remain the same. (Central States Pension Fund Opening Brief, Dkt. No.

5169, ¶¶ 44-51.) Thus, 29 U.S.C. § 1405(b) (as correctly read) has no effect on the payment schedule.

V. **If the Court Finds that Discounting Is Appropriate, the Correct Rate Would Be the 4.00% Rate Used to Amortize the Withdrawal Liability.**

23.     In support of their claim that discounting should use a rate equivalent to Debtors' cost of debt, Debtors rely exclusively on cases applying the inapposite law of contracts. (Debtors' Opposition, ¶¶ 56-60.) There is no provision of the Bankruptcy Code that requires using a rate equivalent to the contemporaneous cost of debt; accordingly, to the extent a cost of debt rate appears in Debtors' case law, it is the result of the substantive law of contracts, which does not apply here. *See In re Chemtura Corp.*, 448 B.R. 635, 673 (Bankr. S.D.N.Y. 2011). In *In re B456 Systems, Inc.*, for example, the court relied upon on the observation that present-value discounting is typically appropriate for claims for breach of contract. No. 12-bk-12859, 2017 WL 6603817, at *24 (Bankr. D. Del. Dec. 22, 2017).[5]

24.     The rate of 4.00% used to calculate the withdrawal liability is far more sensible than Debtors' cost-of-debt approach. In the contract cases Debtors cited, the contract terms (including interest rates thereunder) were negotiated to reflect the Debtors' risk of non-performance: "The creditworthy contract party would typically not enter into the same contract as the prospective debtor; their different creditworthiness would be accounted for in dickered terms of their respective bargains." *In re Mirant Corp.*, 332 B.R. 139, 158 (Bankr. N.D. Tex. 2005). Using the risk of non-performance to value those contracts claims afterwards therefore represented

---

[5] The other cases cited by Debtors are similarly distinguishable. *Till v. SCS Credit Corp.*, 541 U.S. 465, 470 (2004) (cited in Debtors' Opposition, ¶ 56) (dealing with contract damages); *In re Value Recreation, Inc.*, 228 B.R. 692, 694–95 (Bankr. D. Minn. 1999) (cited in Debtors' Opposition, ¶ 56) (addressing negotiated note); *In re Mirant Corp.*, 332 B.R. 139, 158 (Bankr. N.D. Tex. 2005) (cited in Debtors' Opposition, ¶ 56) (dealing with breach of contract); *In re Winston Mills, Inc.*, 6 B.R. 587, 588 (Bankr. S.D.N.Y. 1980) (cited in Debtors' Opposition, ¶ 17) (dealing with unexpired leases).

an apples-to-apples comparison: "the damages award must reflect the same payment risk . . . *as the original contract did*." *Chemtura*, 448 B.R. at 673 (emphasis added).

25.     But looking to contract principles to determine the discount rate in a non-contract setting (such as this) does not make sense, because that does not comport with the "economic objectives" of the underlying relationship. *Id.* That is, the amount of withdrawal liability is not affected by the employer's creditworthiness at all. Instead, the withdrawal liability is calculated using certain actuarial assumptions (as required by 29 U.S.C. § 1399(c)(1)(A)(ii)), which in this case resulted in an applicable interest rate of 4.00%. (Central States Pension Fund January 1, 2023 Valuation Report, Ex. O to Central States Pension Fund's Opening Brief, at CS-0017140 (setting forth actuarial valuation rate for funding purposes).) Accordingly, just as *Chemtura* stands for the proposition that a claim should be valued with an eye to the underlying contractual transaction, 448 B.R. at 673, so too here the Court should look to the underlying economic objectives of withdrawal liability in selecting the proper discount rate (if any).[6] *See Trustees of Leather Goods, Plastics, Handbags & Novelty Workers Union Local 1 Joint Ret. Fund v. Key Handling Sys. Inc.*, No. 14-cv-2675, 2015 WL 5604184, at *4 (E.D.N.Y. June 5, 2015) (applying ERISA interest rates to withdrawal liability default calculation). (*See* Debtors' First Motion for Summary Judgment, Dkt. No. 3825, ¶ 88 (encouraging the Court to follow the *Key Handling* decision).)

## VI.    The Court Should Hold Debtors to their Bargain and Allow the Claim for Breach of the Contribution Guarantee.

26.     The Court should also reject Debtors' argument that the 2014 Letter Agreement's damages provision is unenforceable under Illinois law. First, Debtors mischaracterize the burden

---

[6] The Court should not credit Debtors' suggestion that the exchange of expert reports on the Debtors' cost of debt demonstrates that such an approach is legally warranted. (Debtors' Opposition, ¶ 57.) For the avoidance of doubt, Mr. O'Connor did not opine that using a cost-of-debt rate was proper, but rather opined what such a rate should be *if* the Court decided that such an approach was warranted.

of persuasion on this issue (Debtors' Opposition, ¶ 69), which rests on Debtors. *XCO Int'l, Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1003 (7th Cir. 2004) (applying Illinois law). Debtors cite no record evidence in support of their argument that the contribution guarantee provision is unenforceable and thus do not even attempt to carry their burden.

27.    In any event, all three requirements for enforcing a liquidated damages provision under Illinois law are met here. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶¶ 54–60.) The first requirement—that the parties intended to agree in advance to the settlement of damages that might arise from the breach—is met because, among other things, the sophisticated parties here "expressed their agreement in clear and explicit terms." *Pierce v. B & C Elec., Inc.*, 432 N.E.2d 964, 966 (Ill. App. 1st Dist. 1982). (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶¶ 54–55.) In their response, Debtors do not seriously contest that the first requirement is met, but instead focus on rebutting a strawman argument that the sophistication of the parties itself necessarily means that the provision is enforceable. (Debtors' Opposition, ¶ 74.)

28.    The second requirement—that the liquidated damages terms be reasonable at the time of contracting, bearing some relation to the damages which might be sustained—is also met. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶¶ 56–59.) In noting that the thousands of employees they laid off "would stop accruing any benefits . . . for which continuing contributions would be required" (Debtors' Opposition, ¶ 72), Debtors fail to contest that this is precisely the sort of harm that Congress has long identified as a major threat to the health of multiemployer funds: "One of the most serious threats to the security of benefits under a multiemployer plan is an unanticipated decline in employment covered by the plan." Joint Explanation of S. 1076: Multiemployer Pension Plan Amendments Act of 1980 ("Joint Explanation of MPPAA"), 126 Cong. Rec. S20189, S20209 (Jul 29, 1980). (Central States Pension

Fund's Opening Brief, Dkt. No. 5169, ¶¶ 58, 60.) Indeed, significant declines in participation can result in a "rush to the exits," as additional employers face an incentive to leave a multiemployer plan that has already been weakened by each previous exit. *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 416-17. Here, Debtors represented a very substantial share of Central States Pension Fund's contribution base. (*See* Claim No. 4312 at 4 (Debtors paid approximately 13% of all contributions received by Central States Pension Fund in applicable 10-year period)). Central States Pension Fund, like any insurance vehicle, grows weaker as its contribution base decreases because Central States Pension Fund becomes more vulnerable to market shocks, correlated employer failures within a single industry, and other significant uncertainties. *Ganton Techs., Inc. v. Nat'l Indus. Group Pension Plan*, 865 F. Supp. 201, 207 (S.D.N.Y. 1994), *aff'd*, 76 F.3d 462 (2d Cir. 1996). Thus, as Congress and the Supreme Court have noted, the loss of a significant portion of the contribution base has economic effects that extend far beyond the loss of the contribution dollars themselves. *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 416-17; Joint Explanation of MPPAA, 126 Cong. Rec. at S20209.

29.     Indeed, and directly contrary to Debtors' statements about lack of evidence (Debtors' Opposition, ¶ 73), Debtors' own corporate representative testified that the elimination of contributions received from Debtors would be a "dire financial consequence" for Central States Pension Fund. (June 14, 2023 Letter of Dan Olivier, Ex. K to Central States Pension Fund's Opening Brief; Hawkins Transcript, Ex. F to Central States Pension Fund's Opening Brief, at 105:6–106:15.) Further, at the time that the 2014 Letter Agreement was negotiated, Debtors acknowledged that Central States Pension Fund's agreement to defer certain contributions for 2009, to receive no contributions from June 15, 2009 through July 1, 2011, and to accept significantly reduced contributions amounts thereafter, constituted a "significant sacrifice."

(Hawkins Transcript, Ex. F to Central States Pension Fund's Opening Brief, at 33:15–35:3.) Tellingly, Debtors do not address their previous statements and testimony regarding the importance of their contributions. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶ 58.)

30.     Debtors also ignore another critical piece of evidence showing that the 2014 Letter Agreement is reasonable: that attorneys for Kirkland & Ellis LLP were actively involved in negotiating and drafting it. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶ 19; Hawkins Transcript, Ex. F to Central States Pension Fund's Opening Brief, at 84:7–20 85:14–87:14; 89:19–90:16; 91:11–18.)

31.     Debtors similarly ignore that Debtors chose the contribution guarantee reflected in the 2014 Letter Agreement over an alternative agreed to with respect to certain other MEPPs whereby future withdrawal liability would be calculated using a higher, deemed contribution rate. (Amended Memorandum Opinion, Dkt. No. 4769, at 39–41; 2014 Letter Agreement, Ex. H to Central States Pension Fund's Opening Brief, at p. 1.) Had Debtors chosen this other option presented to them, the total amount of withdrawal liability owed (after application of the Court's ruling with respect to the 20-year limitation on payments) would exceed $5 billion, more than three times the amount Central States Pension Fund seeks based upon the Court's Amended Memorandum Opinion. (Central States Pension Fund's Opening Brief, ¶ 59.)

32.     Debtors do not contest that the third and final requirement—the amount of damages would be uncertain—is met as well. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶ 60.) Indeed, "[t]here is no way to estimate in dollar terms the harm which results when an employer submits late contributions," *Pierce*, 432 N.E.2d at 967, or, by extension, when the

employer fails to submit contributions altogether. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶ 60.)

33.    In connection with the calculation of its claim amount, Central States Pension Fund showed in its opening brief that discounting is inappropriate because there is no unmatured interest to be eliminated under 11 U.S.C. § 502(b)(2). (*Id.*, ¶ 65 (citing *Oakwood Homes*, 449 F.3d at 601).) In response, Debtors simply note that the contribution guarantee involves a stream of payments, without even attempting to rebut the Fund's point that this is the type of payment stream that would not be discounted under *Oakwood*. (Debtors' Opposition, ¶ 76.) Accordingly, the Court should not discount the claim.

34.    Similarly, Debtors do not contest Central States Pension Fund's alternative argument that a 4.00% discount rate be applied to the payments under the 2014 Letter Agreement. (Central States Pension Fund's Opening Brief, Dkt. No. 5169, ¶ 66.) The 2014 Letter Agreement guarantees contributions, and thus the logic of *Chemtura* (as explained above) would, at most, require that the liquidated damages accordingly be treated in the same way as contributions, their economic equivalent. 448 B.R. at 672. Indeed, Debtors' risk-based approach would make no sense here because there is no evidence that the contribution guarantee terms reflect any risk of non-performance. *In re Mirant Corp.*, 332 B.R. at 158. Moreover, the Debtors do not contest that the amount due under such a discount rate would be a lump sum payment amount of $767,996,182.80.

35.    And even if discounting were appropriate on a cost-of-debt basis, as Debtors suggest, Debtors do not genuinely dispute that the highest possible discount rate for such an analysis is 7.3%, which is the contemporaneous cost of debt for the Debtors at the time of the 2014 Letter Agreement. *In re Mirant Corp.*, 332 B.R. at 158 ("The risk to be taken into account is the risk of non-performance at the time Debtors contracted with [creditor]."). (Central States Pension

Fund's Opening Brief, Dkt. No. 5169, ¶ 67.) Accordingly, the Debtors' milquetoast statement that "the applicable discount rate should be based on the Debtors' cost of debt to be determined at trial" should be disregarded altogether. *Pennsylvania v. U.S. Dep't of Health & Human Serv.*, 101 F.3d 939, 945 (3d Cir. 1996) ("arguments mentioned in passing, but not squarely argued, will be deemed waived"). The time for Debtors to demonstrate a genuine dispute of material fact as to the applicable cost of debt is now, not at trial, and the Court should not excuse Debtors' failure raise a genuine dispute as to Central States Pension Fund's calculation of the amount of $672,233,580.18, if a rate of 7.3% is used.

**[Remainder of Page Intentionally Left Blank]**

## CONCLUSION

For the reasons set forth above, Central States Pension Fund moves the Court for summary judgment allowing Central States Pension Fund's claims for withdrawal liability against each one of the Debtors, jointly and severally (Claims Nos. 4312–4335), in the amount of $1,579,806,536.80 and allowing Central States Pension Fund's claims in connection with Debtors' breach of the 2014 Letter Agreement (Claims Nos. 4336–4352) in the amount of $917,028,151.94, or alternatively, in the amount of $767,996,182.80 using a rate of 4.00% or, in the further alternative, in the amount of $672,233,580.18 using a rate of 7.3%.

Date:   January 21, 2025
        Wilmington, Delaware

**SULLIVAN · HAZELTINE · ALLINSON LLC**

*/s/ William D. Sullivan*
William D. Sullivan (No. 2820)
William A. Hazeltine (No. 3294)
919 North Market Street, Suite 420
Wilmington, DE 19801
Tel: (302) 428-8191
Email: bsullivan@sha-llc.com
         whazeltine@sha-llc.com

Brad R. Berliner, Esq.
Andrew J. Herink, Esq.
Daniel Sullivan, Esq.
Central States Funds
8647 West Higgins Road
Chicago, IL 60631
Tel: (847) 939-2478
Email: bberliner@centralstatesfunds.org
         aherink@centralstatesfunds.org
         dsulliva@centralstatesfunds.org

*Attorneys for Central States Pension Fund*