**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------------- x
: 
In re: : Chapter 11
: 
YELLOW CORPORATION, *et al.*,[1] : Case No. 23-11069 (CTG)
: 
Debtors. : (Jointly Administered)
: 
---------------------------------------------------------------- x

## THE FUNDS' REPLY IN SUPPORT OF ITS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

| | | |
|---|---|---|
| Mark D. Collins | Dennis F. Dunne | Andrew M. Leblanc |
| Cory D. Kandestin | (admitted *pro hac vice*) | (admitted *pro hac vice*) |
| **RICHARDS, LAYTON & FINGER, P.A.** | **MILBANK LLP** | Erin E. Dexter |
| | 55 Hudson Yards | (admitted *pro hac vice*) |
| One Rodney Square | New York, NY 10001 | Melanie Westover Yanez |
| 920 North King Street | Telephone: (212) 530-5000 | (admitted *pro hac vice*) |
| Wilmington, DE 19801 | Facsimile:  (212) 530-5219 | Riah Kim |
| Telephone: (302) 651-7700 | | (admitted *pro hac vice*) |
| Facsimile:  (302) 651-7701 | | **MILBANK LLP** |
| | | 1850 K St. NW, Suite 1100 |
| | | Washington, DC 20006 |
| | | Telephone: (202) 835-7500 |
| | | Facsimile:  (202) 263-7586 |

*Counsel for the Funds*

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is:  11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 2

I. THE FUNDS' CLAIMS HAVE BEEN ACCELERATED AS A MATTER OF LAW .... 2

II. THE DEBTORS ARE INCORRECT THAT THE FUNDS' CLAIMS SHOULD BE DISCOUNTED TO PRESENT VALUE ................................................................................ 3

    A. The Debtors Fail to Show that Discounting is Appropriate .................................... 4

    B. The Debtors Fail to Demonstrate Section 1405(e)'s Application .......................... 6

III. THE DEBTORS CANNOT SHOW AS A MATTER OF LAW THAT A DISCOUNT RATE REFLECTING THE DEBTORS' COST OF DEBT SHOULD BE APPLIED ...... 8

CONCLUSION .............................................................................................................................. 9

# TABLE OF AUTHORITIES

**Cases**

*Arcelik A.S. v. EI DuPont de Nemours & Co.*,
   2023 WL 3862506 (3d Cir. June 7, 2023) ............................................................... 8

*Bell v. City of Phila.*,
   275 F. App'x 157 (3d Cir. 2008) ............................................................................. 8

*In re CF & I Fabricators of Utah, Inc.*,
   150 F.3d 1293 (10th Cir. 1998) ............................................................................... 4

*In re CSC Indus., Inc.*,
   232 F.3d 505 (6th Cir. 2000) ................................................................................... 4

*In re Loewen Grp. Int'l., Inc.*,
   274 B.R. 427 (Bankr. D. Del. 2002) ........................................................................ 4

*In re Oakwood Homes Corp.*,
   449 F.3d 588 (3d Cir. 2006) ............................................................................... 4, 5

**Statutes**

11 U.S.C. § 502 ............................................................................................................. 3, 4

11 U.S.C. § 502(b) .................................................................................................... 2, 3, 4

29 U.S.C. § 1381(a) ....................................................................................................... 5, 6

29 U.S.C. § 1383(e) ....................................................................................................... 5, 6

29 U.S.C. § 1399 ................................................................................................................ 6

29 U.S.C. § 1399(c)(5)(B) ................................................................................................. 2

29 U.S.C. § 1405 ............................................................................................................ 6, 7

29 U.S.C. § 1405(b) ....................................................................................................... 6, 7

29 U.S.C. § 1405(e) ............................................................................................... 3, 6, 7, 8

29 U.S.C. § 1405(e)(2) ....................................................................................................... 7

The Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan ("Central PA Teamsters"), the International Brotherhood of Teamsters Union No. Local 710 Pension Fund ("Teamsters Local 710"), the New England Teamsters Pension Fund ("NETTI"), the Teamsters Joint Council No. 83 of Virginia Pension Fund ("Virginia Teamsters"), and the holder of the claims of the Teamsters Local 641 Pension Plan[2] ("Teamsters Local 641" and, together with Central PA Teamsters, Teamsters Local 710, NETTI, and Virginia Teamsters, the "Funds"), by and through their undersigned counsel, respectfully submits this reply (the "Reply") in support of their Motion for Partial Summary Judgment [Dkt. No. 5175] (the "Funds' MSJ") and in response to the Debtors' Omnibus Opposition to the Motion [Dkt. No. 5381] (the "Debtors' Opp.").

## PRELIMINARY STATEMENT

1. In opposing the Funds' motion for summary judgment, the Debtors fail to address the core legal issue at hand and instead resort to a series of misguided arguments.

2. The Debtors concede that filing their bankruptcy petitions operated to accelerate the Funds' claims. This concession renders moot any inquiry into whether the Funds declared an insecurity default or whether any *ipso facto* issues are implicated. It is unclear to the Funds why the Debtors continue to insist that these issues must be decided.

3. This same concession also implies, necessarily, that any further discounting of the Funds' claims—after they have been accelerated as a matter of law—constitutes an impermissible double-discount. Resisting this conclusion, the Debtors attempt to liken the prepetition liability here to post-petition obligations arising in other cases, and raise for the first time an argument that a specific provision within ERISA in fact compels present value discounting. Neither approach

---

[2] A notice of transfer of Teamsters Local 641's proofs of claim was filed at Dkt. No. 4965.

can overcome the Third Circuit's clear guidance that claims may not be discounted twice. The Funds' claims must be allowed in their accelerated principal amount and not discounted further.

4. Lastly, even if the Court determines that the withdrawal liability claims here should be discounted to present value rather than accelerated, what discount rate should be applied is a factual matter for this Court to determine and is not ripe for summary judgment. The Debtors' suggestion that the claims must be discounted using a rate based on the Debtors' cost of debt is flatly wrong—but the matter is not appropriate for adjudication at this stage.

5. For these reasons, and as discussed more fully herein, the Funds respectfully request entry of summary judgment that their withdrawal liability claims have been accelerated and should not be further discounted.

**ARGUMENT**

**I.     THE FUNDS' CLAIMS HAVE BEEN ACCELERATED AS A MATTER OF LAW**

6. The Debtors focus nearly half of their Opposition on the Funds' alleged failure to make "valid declarations of default" or to "properly accelerat[e] the Debtors' withdrawal liability obligations either under their plan rules or otherwise pursuant to 29 U.S.C. § 1399(c)(5)(B)." Debtors' Opp. at ¶ 27. But it is entirely irrelevant whether any one Fund did or did not declare the 20-year stream of payments to be accelerated. The Debtors withdrew from the Funds prepetition; the Funds' claims for withdrawal liability are prepetition claims. *See* Funds' MSJ at ¶ 15. The moment the Debtors filed bankruptcy petitions, the full principal amount of the Debtors' withdrawal liability was accelerated and became due.

7. The Debtors acknowledge exactly this: "a core tenet of bankruptcy law is the fact that a bankruptcy filing serves to accelerate all debts as of the petition date." Debtors' Opp. at ¶ 13; *see also Debtors' Motion for Partial Summary Judgment on SFA MEPP's and Non-SFA MEPP's Claims* [Dkt. No. 5181] (the "Debtors' Motion") at ¶ 33 ("It is almost certain that 11 U.S.C. §

2

502(b) accelerates any and all claims upon filing a bankruptcy petition for the purpose of identifying allowable claims."). But then the Debtors spill considerable ink arguing that they were not in default prepetition. This is unnecessary. The Debtors again provide no explanation for why the Funds must prove that acceleration occurred under plan documents when the Debtors agree that the Bankruptcy Code leads to the same result.

8. Section 502's acceleration of the Annual Payments ends the analysis—as this Court has recognized. *See Order Granting Motion for Reconsideration and Posing Further Questions for the Parties to Consider* [Dkt. No. 4771] (the "Reconsideration Order") at 6 (explaining "[i]f the 20-year stream of payments contemplated by ERISA was *not* automatically accelerated by the bankruptcy filing, then the Court may need to resolve" the factual question of whether insecurity defaults occurred under plan documents and the legal question of whether *ipso facto* concerns exist). The Court does not need to reach questions regarding whether insecurity defaults occurred or whether *ipso facto* concerns exist because, as the Debtors unreservedly agree, their bankruptcy petitions accelerated the Funds' claims.

II. **THE DEBTORS ARE INCORRECT THAT THE FUNDS' CLAIMS SHOULD BE DISCOUNTED TO PRESENT VALUE**

9. Declining to engage with the fact that their liability to the Funds arose prepetition and was accelerated upon their bankruptcy filing, the Debtors advance several arguments suggesting that, despite this acknowledged acceleration, the Funds' claims should be further discounted. But their cited cases continue to be distinguishable, including because many concern postpetition liabilities. And the Debtors now conjure a last-minute argument in favor of discounting under 29 U.S.C. § 1405(e) that raises more questions than it answers. Each of the Debtors' arguments fails to defeat the Funds' motion for summary judgment.

### A. The Debtors Fail to Show that Discounting is Appropriate

10. Notwithstanding section 502's conceded effect, the Debtors contend the Funds' accelerated claims must be discounted to present value because the Debtors owed the Funds long-term streams of payment rather than a lump sum. Debtors' Opp. at ¶ 47. Not so.

11. As set forth in the Funds' MSJ and the Funds' Opp.[3], the Third Circuit unequivocally holds that discounting an accelerated principal amount is improper double discounting. *In re Oakwood Homes Corp.*, 449 F.3d 588, 600 (3d Cir. 2006). The Debtors' obligation to pay withdrawal liability to the MEPPs arose prepetition, and the principal amount of that obligation was accelerated by the Debtors' bankruptcy filing. This is the precise scenario in which the Third Circuit explained that present value discounting is not proper.

12. The Debtors argue that *Oakwood Homes* is factually inapposite and urge the Court to follow *Loewen*—a case explicitly rejected by *Oakwood Homes*. *Id.* at 601 ("We decline to follow the approach of *Loewen*."). In *Loewen*, the Court determined that amounts owed post-petition under non-interest-bearing promissory notes should be discounted to present value as of the petition date because section 502(b) of the Bankruptcy Code always compels this result. *See In re Loewen Grp. Int'l, Inc.*, 274 B.R. 427, 439 (Bankr. D. Del. 2002). The Third Circuit disagreed with precisely that reasoning. *See Oakwood Homes*, 449 F.3d at 595 ("[W]e cannot say that § 502(b) clearly and unambiguously requires discounting to present value in all situations."). As *Loewen*'s approach is expressly contrary to binding authority, it is not persuasive here.

13. The Debtors make much of *Oakwood Homes*' citation of *In re CSC Indus., Inc.*, 232 F.3d 505 (6th Cir. 2000) and *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1293 (10th Cir. 1998)—two cases that concern "unfunded benefit liabilities," which are future liabilities that an

---

[3] *The Funds' Response in Opposition to Debtors' Motion for Partial Summary Judgment* [Dkt. No. 5378] (the <u>Funds' Opp.</u>").

4

employer of a single-employer plan owes to the PBGC to cover benefit payments the PBGC will make to beneficiaries after the plan's termination. According to the Debtors, that *Oakwood Homes* acknowledges "unfunded benefit liabilities" to be non-interest-bearing means the Third Circuit considers withdrawal liability to be non-interest-bearing, too. Debtors' Opp. at ¶ 19, n. 7. *Oakwood Homes* does not weigh in one way or another on that issue—it references "unfunded benefit liabilities" in two case parentheticals only, and does not engage with the nature of those claims at all. But *Oakwood Homes* does observe that discounting non-interest-bearing claims may be appropriate because receipt of something less than the principal amount ***is what the parties bargained for***. *See Oakwood Homes,* 449 F.3d at 601 ("The point is to recognize *what the creditor bargained for*, while avoiding a windfall.") (emphasis added); *id.* at 601 n.17 ("The [non-interest-bearing] instrument holders *did not bargain* to receive principal plus interest on the notes.") (emphasis added). Withdrawal liability is not a bargained-for exchange. It is a statutory allocation of liability and entitlement to which the Debtors and the MEPPs are both bound. The logic behind discounting non-interest-bearing obligations the Third Circuit discussed, which turns entirely on the debtor's *bargain* to receive a non-interest-bearing instrument, does not apply here.

14. The Debtors' remaining cases rely exclusively on the treatment of post-petition claims. But the Debtors became liable for withdrawal liability before their petitions were filed. ERISA is unequivocal on this point: the date of withdrawal is the date on which an employer becomes liable for withdrawal liability. *See* 29 U.S.C. §§ 1381(a) ("If an employer withdraws from a multiemployer plan in a complete withdrawal . . . ***then the employer is liable to the plan*** in the amount determined under this part to be the withdrawal liability") (emphasis added), 1383(e) ("the date of a complete withdrawal is the date of the cessation of the obligation to contribute or the cessation of covered operations"). The Debtors withdrew in July 2023. *Memorandum Opinion*

5

[Dkt. No. 4326] at 1. The Debtors' pre-petition liability to the Funds is fundamentally different than claims for future damages that arise post-petition.

15. The Debtors disagree. Their position appears to be that their liability could only arise after the statutory notice and demand process under section 1399 ran its course, and that if any MEPP failed to adhere strictly to that timeline (which, here, necessarily occurred post-petition), its claim would suffer. This is not true—as noted directly above, it was Yellow's *withdrawal* alone, and not the notice and demand process, that gave rise to its withdrawal liability. *See* 29 U.S.C. §§ 1381(a), 1383(e).[4] The Funds' withdrawal liability claims crystallized when Yellow withdrew, not when the Funds filed their proofs of claim. Filing these cases accelerated the principal amount of the Funds' claims. Third Circuit law prohibits any further discounting.

**B.    The Debtors Fail to Demonstrate Section 1405(e)'s Application**

16. In opposing the Funds' motion, the Debtors invoke—for the very first time in these cases—ERISA section 1405(e). (This is a different part of section 1405 than the one the Debtors have affirmatively sought summary judgment on, section 1405(b).) The Debtors argue that this newfound subsection *per se* requires present value discounting of withdrawal liability claims. Debtors' Opp. at ¶ 8. But even if this were what the statute says (which is far from clear), the Debtors do not articulate why this subsection is applicable, how it works, or how it interacts with the other subsections of the same statute the Debtors insist must also apply.

---

[4] Moreover, the Court has already overruled the Debtors' argument that the MEPPs in these cases have not satisfied ERISA's statutory prerequisites in connection with withdrawal liability disputes. *See Memorandum Order* [Dkt. No. 2765] at 13 n.38 ("The debtors also argued that the plans failed to fulfill the [statutory] prerequisites before seeking arbitration. This Court, however, believes that the funds satisfied these requirements through the filing of their proofs of claim.") (denying certain MEPPs' motions for arbitration).

17. Section 1405(e), when in fact applicable,[5] appears to contemplate a present value calculation in connection with determining a ratio that is used as one step in calculating withdrawal liability. *See* 29 U.S.C. § 1405(e)(2). But the Debtors do not calculate this ratio, nor do they explain how it would affect the claims derived from the Annual Payments here.

18. Moreover, section 1405(e) expressly references the other subsections of section 1405, certain of which the Debtors contend should also apply to the MEPPs' claims. 29 U.S.C. § 1405(e)(2) ("the withdrawal liability of the employer to each plan shall be an amount which bears the same ratio to the present value of the withdrawal liability payments to all plans (*after the application of the preceding provisions of this section*) as the withdrawal liability of the employer to such plan (determined without regard to this section) bears to the withdrawal liability of the employer to all such plans (determined without regard to this section).") (emphasis added); *see* Debtors' Motion at ¶¶ 91-99 (arguing for application of section 1405(b)); Debtors' Opp. at ¶¶ 61-68 (same). It is entirely unclear how the various sections of 1405—assuming their applicability has been established (it has not been)— should work together.

19. And this argument's belated appearance in these cases raises (yet again) serious questions of prejudice and waiver. The Debtors did not cite this statutory provision in their claim objection or in their opening motion for summary judgment. *See Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [Dkt. No. 2595]; Debtors'

---

[5] The Debtors have not established that section 1405 applies in these cases at all. *See* Funds' Opp. at ¶ 20 ("It is not enough to make conclusory assertions about insolvency and value, and it is not enough to borrow from separate reports and analyses that might be submitted for other purposes elsewhere in these cases. ERISA provides express instructions that are prerequisites to section 1405(b)'s application, and the Debtors have not followed them here.").

7

Motion [Dkt. No. 5181].[6]  In fact, the Funds cannot discover that the Debtors have ever mentioned ERISA section 1405(e) before in the long history of this case.  It should be given no weight.

**III. THE DEBTORS CANNOT SHOW AS A MATTER OF LAW THAT A DISCOUNT RATE REFLECTING THE DEBTORS' COST OF DEBT SHOULD BE APPLIED**

20. Even if the Debtors are correct that the Funds' claims should be discounted, it is absolutely incorrect that a discount rate reflecting the Debtors' cost of debt should be applied.  The Debtors contend (again, for the first time) that *as a matter of law*, the Court should compel use of a rate reflecting the Debtors' cost of debt when discounting MEPP claims to present value.  *See* Debtors' Opp. at ¶ 56.  The suggestion that this result is *legally* necessary should be rejected out of hand.  Setting aside that it contradicts the Debtors' own admissions that this is an issue of fact, there is no legal argument that a debtor's cost of debt is the only appropriate rate to use for this purpose.

21. What discount rate should apply is a purely factual issue to be determined at trial.  The Debtors have explicitly agreed.  Not only have they presented their own expert on this matter (certain Funds have done the same), the parties have reserved their rights to conduct expert discovery on the appropriate discount rate after the Court determines whether the MEPP claims must be discounted at all.  *See Amended Order Scheduling Certain Dates and Deadlines in Non-SFA MEPP Litigation* [Dkt. No. 4839] at 3 n.4 (noting that the parties have reserved rights to complete depositions of discount rate experts after the deadline for expert discovery "should the need for such depositions arise"); *see also* Reconsideration Order at 8 ("If . . . the conclusion is

---

[6] The Debtors' choice to make this argument only in opposition—and on an issue the Debtors themselves sought summary judgment—exceeds the scope of arguments that the Debtors may appropriately raise. *See Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008) (declining to consider the plaintiff's new argument raised for the first time in an opposition to the defendant's motion for summary judgment); *Arcelik A.S. v. EI DuPont de Nemours & Co.*, 2023 WL 3862506, at *2 n.2 (3d Cir. June 7, 2023) (explaining that if an argument had "been raised that late [in an opposition to summary judgment], it may well have been waived").

that the stream of payments should be present discounted, the Court would then need to determine the proper rate at which to discount the streams of payment owed to each of the pension funds. The parties' submissions take conflicting views on the proper discount rate and suggest that the matter may properly be the subject of expert testimony."). It beggars belief the Debtors would suggest that, *as a legal matter*, the appropriate discount rate must reflect the "risk" of the Debtors.[7] If consideration of an appropriate discount rate becomes relevant, fact evidence will be necessary to establish what that rate is.

## CONCLUSION

For the foregoing reasons, the Funds respectfully request that the Court grant their motion for partial summary judgment on the issues identified herein.

---

[7] The Funds are prepared to demonstrate—through fact evidence—that this approach is inappropriate, and that the discount rate should reflect what investments the Debtors would need to make today to ensure their ability to make the necessary payments over twenty years.

9

| | | |
|---|---|---|
| Dated: | January 21, 2025<br>Wilmington, Delaware | */s/ Cory D. Kandestin*<br>Mark D. Collins (No. 2981)<br>Cory D. Kandestin (No. 5025)<br>**RICHARDS, LAYTON & FINGER, P.A.**<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 651-7700<br>Facsimile: (302) 651-7701<br>Email:  collins@rlf.com<br>           kandestin@rlf.com |

-and-

Dennis F. Dunne (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

-and-

Andrew M. Leblanc (admitted *pro hac vice*)
Erin E. Dexter (admitted *pro hac vice*)
Melanie Westover Yanez (admitted *pro hac vice*)
Riah Kim (admitted *pro hac vice*)
**MILBANK LLP**
1850 K St. NW, Suite 1100,
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
*Counsel for the Funds*