# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' OMNIBUS REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON SFA MEPPS' AND NON-SFA MEPPS' CLAIMS

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
    tcairns@pszjlaw.com
    pkeane@pszjlaw.com
    ecorma@pszjlaw.com

*Co-Counsel for the Debtors and Debtors in Possession*

Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Shirley Chan (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 W. Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    pnash@kirkland.com
    dseligman@kirkland.com
    shirley.chan@kirkland.com

Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:    (415) 439-1400
Facsimile:    (415) 439-1500
Email:    michael.esser@kirkland.com
    john.christian@kirkland.com

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 4

    A.    THE DEBTORS ARE ENTITLED TO DISCOUNT THE MEPPS'
    WITHDRAWAL LIABILITY CLAIMS TO PRESENT VALUE ...................... 4

        i.    29 U.S.C. § 1405(e) Requires Withdrawal Liability Claims to be
            Discounted to Present Value in Liquidation Proceedings.......................... 4

        ii.    Even if Section 1405(e) Does Not Apply, the MEPPs' Withdrawal
            Liability Claims Can Be Discounted to Present Value After They
            Are Accelerated Pursuant to Section 502 of the Bankruptcy Code. .......... 6

        iii.    The MEPPs Cannot Establish that They Validly Declared Debtors
            to be in Default or that They Validly Accelerated Their Claims
            Pursuant to ERISA Either Prepetition or Ipso Facto. ............................. 11

        iv.    To the Extent the Plan Provisions at Issue are Ipso Facto, They are
            Unenforceable and Violate the Automatic Stay Requirements. ............... 17

        v.    Withdrawal Liability Payment Streams Should be Discounted to
            Present Value ...................................................................................... 21

    B.    1405(B) SUBORDINATION SHOULD BE APPLIED TO
    WITHDRAWAL LIABILITY CLAIMS IF DEBTORS ARE
    INSOLVENT AT THE BEGINNING OF LIQUIDATION ............................... 29

        i.    Section 1405(b), if Applicable, Adjusts the Debtors' Allocable
            UVBs After the 20-Year Cap................................................................ 29

        ii.    The Debtors Did Not Waive Any Challenge Under Section
            1405(b) ............................................................................................... 34

    C.    CENTRAL STATES AND LOCAL 641 MUST EXCLUDE POST-2014
    CONTRIBUTION RATE INCREASES FROM ANNUAL PAYMENT
    CALCULATIONS ......................................................................................... 36

    D.    CENTRAL STATES' CLAIMS FOR "CONTRIBUTIONS
    GUARANTEE" ARE NOT ALLOWABLE ...................................................... 39

        i.    The 2014 Guarantee Letter's Liquidated Damages Provision is
            Unenforceable. .................................................................................... 39

ii.     Central States' Contributions Guarantee and Withdrawal Liability
         Claims are Mutually Exclusive ................................................................. 42

iii.    The 2014 Guarantee Letter Violates the National Labor Relations
         Act ............................................................................................................ 44

CONCLUSION ..................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*2336 North Clark, LLC v. Hair Fairies, Inc.*,
   2022 WL 17249039 (Ill. App. Ct. Nov. 28, 2022)....................................................41

*In re Affiliated Foods*,
   249 B.R. 770 (Bankr. W.D. Mo. 2000)....................................................................31

*Aiellos v. Zisa*,
   2010 WL 421083 (D.N.J. Feb. 2, 2010) ..................................................................35

*Allied Painting & Decorating, Inc. v. Int'l Painters and Allied Trades Indus.
   Pens. Fund*,
   107 F.4th 190 (3rd Cir. 2024) ............................................................................8, 13

*In re AMR Corp.*,
   730 F.3d 88 (2d Cir. 2013)................................................................................ *passim*

*In re B456 Sys., Inc.*,
   2017 WL 6603817 (Bankr. D. Del. Dec. 22, 2017)......................................... *passim*

*Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*,
   252 F.3d 911 (7th Cir. 2001) .............................................................................19, 20

*Cent. States, Se. & Sw. Areas Pension Fund v. Event Media, Inc.*,
   2024 WL 1363542 (N.D. Ill. Mar. 29, 2024)...........................................................38

*Cerro Metal Prod. v. Marshall*,
   620 F.2d 964 (3d Cir. 1980)....................................................................................26

*In re CF&I Fabricators of Utah, Inc.*,
   150 F.3d 1293 (10th Cir. 1998) ..........................................................................7, 11

*Checkers Eight Ltd. P'ship v. Hawkins*,
   241 F.3d 558 (7th Cir. 2001) ..................................................................................39

*Chicago Truck Drivers v. El Paso Co.*,
   525 F.3d 591 (7th Cir. 2008) .............................................................................8, 13

*Conroy v. Leone*,
   316 Fed. App'x 140 (3d Cir. 2009)..........................................................................35

*In re CSC Indus., Inc.*,
   232 F.3d 505 (6th Cir.2000) ...................................................................................11

*In re EBC I, Inc.,*
    356 B.R. 631 (Bankr. D. Del. 2006) ...........................................................................18

*In re Energy Future Holdings Corp.,*
    842 F.3d 247 (3d Cir. 2016)..............................................................................2, 21

*In re Federal-Mogul Glob.,*
    402 B.R. 625 (D. Del. 2009) ....................................................................................26

*GK Dev., Inc. v. Iowa Malls Fin. Corp.,*
    3 N.E.3d 804 (Ill. App. Ct. 2013) .....................................................................39, 41

*In re Hertz Corp.,*
    120 F.4th 1181 (3d Cir. 2024) ..................................................................................27

*In re Hutchins,*
    99 B.R. 56 (Bankr. D. Colo. 1989) ...........................................................................19

*In re Loewen Grp. Int'l, Inc.,*
    274 B.R. 427 (Bankr. D. Del. 2002) ................................................................. *passim*

*Markert v. PNC Fin. Servs. Grp., Inc.,*
    828 F. Supp. 2d 765 (E.D. Pa. 2011) ........................................................................35

*In re McDonald,*
    205 F.3d 606 (3d Cir. 2000)......................................................................................26

*Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.,*
    513 U.S. 414 (1995).............................................................................................9, 13

*In re Mirant Corp.,*
    332 B.R. 139 (Bankr. N.D. Tex. 2005)......................................................................24

*In re Murray,*
    169 B.R. 263 (Bankr. D. Mass. 1994) ......................................................................34

*In re Oakwood Homes,*
    449 F.3d 588 (3d Cir. 2006)....................................................................... *passim*

*Matter of Penn Central Transp. Co.,*
    596 F.2d 1102 (3d Cir. 1979)....................................................................................23

*In re Perry,*
    29 B.R. 787 (D. Md. 1983) .......................................................................................19

*In re Public Service co. of New Hampshire,*
    114 B.R. 8800 (Bankr. D. N.H. 1990) ......................................................................27

iv

*In re Railway Reorganization Estate, Inc.*,
    133 B.R. 578 (Bankr. D. Del. 1991) ...................................................19

*Riggs Nat'l Bank of Wash. v. Perry*,
    729 F.2d 982 (4th Cir. 1984) ...........................................................19

*In re Rose*,
    21 B.R. 272 (Bankr. D.N.J. 1982) ...................................................19

*Royal Ice Cream Co. v. Cent. States, Se. & Sw. Areas Pension Fund*,
    732 F. Supp. 3d 888 (N.D. Ill. 2024) ....................................36, 37, 38

*Till v. SCS Credit Corp.*,
    541 U.S. 465 (2004) (Stevens. J) .....................................................27

*Tymon v. Wolitzer*,
    240 N.Y.S.2d 888 (N.Y. Sup. Ct.1963) ...........................................17

*In re Value Recreation, Inc.*,
    228 B.R. 692 (Bankr. D. Minn. 1999) ..............................................27

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d
    332 (3d Cir. 2013)..........................................................................18

*In re Yellow Corp.*,
    2024 WL 4194560 (Bankr. D. Del. Sept. 13, 2024) ...........................7

*In re: Yellow Corp.*,
    2024 WL 1313308 (Bankr. D. Del. Mar. 27, 2024)...........................13

**Statutes**

11 U.S.C. .................................................................................................10

11 U.S.C. § 502.............................................................................*passim*

11 U.S.C. § 502(b) ........................................................................*passim*

11 U.S.C. § 502(b)(2) .......................................................23, 24, 27, 28

11 U.S.C. § 1405(b)(2) ...........................................................................32

29 U.S.C. § 158(b)(6) .............................................................................44

29 U.S.C. § 1085(f)(1)(B) ......................................................................37

29 U.S.C. § 1085(g)(3)(A).......................................................................36

29 U.S.C. § 1085(g)(3)(B) .................................................................................36, 37

29 U.S.C. § 1381(b) ......................................................................................1, 13, 32

29 U.S.C. § 1381(b)(1) .............................................................................29, 31, 32, 33

29 U.S.C. § 1381(b)(1)(A) ....................................................................................5

29 U.S.C. § 1381(b)(1)(A)-(D) .......................................................................... *passim*

29 U.S.C. § 1381(b)(1)(D) ....................................................................................5

29 U.S.C. § 1383 ..............................................................................................13

29 U.S.C. § 1383(a)(1) .......................................................................................42

29 U.S.C. § 1386 ..............................................................................................30

29 U.S.C. § 1386(a)(2) .......................................................................................43

29 U.S.C. § 1388(d)(2) ........................................................................................5

29 U.S.C. § 1389 ..............................................................................................30

29 U.S.C. § 1392 ..............................................................................................42

29 U.S.C. § 1392(a)(1) .......................................................................................42

29 U.S.C. § 1399 ..............................................................................................13

29 U.S.C. § 1399(b)(1) ...................................................................................8, 13

29 U.S.C. § 1399(c)(1) ..............................................................................8, 15, 30

29 U.S.C. § 1399(c)(2) .......................................................................................14

29 U.S.C. § 1399(c)(5) ................................................................................. *passim*

29 U.S.C. § 1405 ........................................................................................ *passim*

29 U.S.C. § 1405(b) ..................................................................................... *passim*

29 U.S.C. § 1405(d)(1) ...................................................................................32, 34

29 U.S.C. § 1405(e) ..................................................................................... *passim*

29 U.S.C. § 1405(e)(2) .................................................................................5, 22, 27

The debtors and debtors-in-possession (collectively, "**Debtors**") submit this reply in support of their motion for partial summary judgment [ECF No. 5181] and in response to the oppositions of Central States Pension Fund ("**Central States**") [ECF No. 5376], seven MEPPs receiving Special Financial Assistance ("**Seven SFA MEPPs**")[2] [ECF No. 5377], five SFA and non-SFA MEPPs ("**Five SFA and Non-SFA MEPPs**")[3] [ECF No. 5378], non-SFA MEPP Local 705 International Brotherhood of Teamsters Pension Fund ("**Local 705**") [ECF No. 5375], and non-SFA MEPP Teamsters Pension Trust Fund of Philadelphia & Vicinity ("**Philadelphia Teamsters**") [ECF No. 5370], and state as follows:[4]

## INTRODUCTION

1.    The MEPPs claim that the Debtors are not entitled to discount the MEPPs' withdrawal liability claims to present value.  But that assertion is directly belied by 29 U.S.C. § 1405(e), which requires that withdrawal liability claims be discounted to present value in the event of a dissolution or liquidation where, as here, said event causes the employer to withdraw from one or more pension plans.  This present value discount is a required step in calculating withdrawal liability as set forth in 29 U.S.C. § 1381(b).  On this basis alone, the MEPPs' withdrawal liability claims must be discounted to present value.

---

[2]    The seven SFA MEPPs are New York State Teamsters Conference Pension and Retirement Fund ("**New York Teamsters**"), Road Carriers Local 707 Pension Fund ("**Local 707**"), Management Labor Pension Fund Local 1730 ("**Local 1730**"), Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund "("**Local 701**"), Teamsters Local 617 Pension Fund ("**Local 617**"), Trucking Employees of North Jersey Pension Fund ("**TENJ**"), and Freight Drivers and Helpers 557 Pension Fund ("**Freight Drivers**").

[3]    The five MEPPs are SFA MEPP Teamsters Local 641 Pension Plan ("**Local 641**") and four non-SFA MEPPs: Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan ("**Central PA Teamsters**"), International Brotherhood of Teamsters Union No. Local 710 Pension Fund ("**Teamsters Local 710**"), New England Teamsters Pension Fund ("**NETTI**"), and Teamsters Joint Council No. 83 of Virginia Pension Fund ("**Virginia Teamsters**").

[4]    The Debtors incorporate by reference the arguments and materials cited in their Omnibus Opposition to the SFA MEPPs' and Non-SFA MEPPs' Motions for Partial Summary Judgment ("**Debtors Opp.**") [ECF No. 5381] as if fully set forth herein.

2.      Even if the Court determines that 29 U.S.C. § 1405(e) does not completely resolve the present value discounting issue, the MEPPs still fail to show that the Debtors are not otherwise allowed to do so.

3.      While it is true that principal claims are likely accelerated pursuant to 11 U.S.C. § 502, the MEPPs are wrong that this prevents the Debtors from discounting the MEPPs' withdrawal liability claims—which were yet-to-be-determined *future* streams of payments as of the date the petition was filed—to present value.  The conclusion that there can be no present value discounting once Section 502 applies is contrary to the vast weight of bankruptcy case law and was in fact expressly rejected by the Third Circuit in *In re Oakwood Homes*, 449 F.3d 588 (3d Cir. 2006), the same case the MEPPs attempt to hide behind.

4.      In addition, what was owed as of the date of the petition was a future stream of withdrawal liability payments.  This is a fact the MEPPs do not and cannot contest.  Indeed, they not only fail to point to any evidence in the record showing that they made valid affirmative default or acceleration findings prepetition or as of the date the bankruptcy was filed, they also, in many cases, concede that any such findings were made post-petition (if at all).

5.      Even if the MEPPs could show that their plan had automatic *ipso facto* default and acceleration provisions (they cannot), such clauses violate the Bankruptcy Code's general policy of prohibiting application of such provisions in bankruptcy and the automatic stay.  *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013), is not only inapplicable here (as the clauses in that case are in no way similar to the ones at issue in this litigation), but it is also not binding on this Court and does not stand for the proposition that *ipso facto* provisions are only prohibited in certain contexts, as the MEPPs claim.  Case law from the Third Circuit and several other circuits shows that regardless of the express prohibitions enumerated in the Bankruptcy Code, there is a general policy

to prohibit *ipso facto* clauses because they violate the Code's policy of providing debtors a fresh start in bankruptcy.

6.      Because a future stream of payments was owed as of the petition date, the Debtors are entitled to discount the withdrawal liability claims in this case to present value to account for the time value of money and ensure equality among similarly-situated creditors.  Not one MEPP has shown (or can show) that withdrawal liability payment streams contain bargained-for interest that implicates *Oakwood Homes*, in which the Third Circuit held that bargained-for interest rates reflect a claim's present value, such that present discounting after disallowing unmatured interest would be excessive.

7.      The Debtors are entitled to summary judgment on the other issues raised in their Motion as well.  29 U.S.C. § 1405(b) applies to subordinate the MEPPs' withdrawal liability claims, as a matter of law, if the Debtors are insolvent at the time of liquidation.  This is the fourth and final statutory adjustment applied to an employer's allocable UVBs when determining withdrawal liability, after the allocable UVBs are already adjusted by the 20-year payment cap. The MEPPs cannot get around this clear statutory scheme set forth in ERISA.

8.      Central States and Local 641 also fail to show that they are entitled to include post-2014 contribution rate increases in calculating the Debtors' annual payment.  ERISA is clear that such rate increases are only permissible in limited circumstances—such as where a plan actuary has certified that the rate increases are for additional benefits—and those circumstances are not present here.

9.      Finally, Central States cannot prevail on its $1 billion claim for contributions guarantee, seeking to recover a decade's worth of contribution obligations after the Debtors ceased operations.  The contract provision on which Central States relies is an unenforceable liquidated

4933-6423-4513.1 96859.001

damages clause that bears no relation to Central States' anticipated damages and results in a windfall recovery. The contributions guarantee claims and withdrawal liability claims are also mutually exclusive, and ERISA does not permit MEPPs to double recover in such a fashion.

## **ARGUMENT**

A.    **THE DEBTORS ARE ENTITLED TO DISCOUNT THE MEPPS' WITHDRAWAL LIABILITY CLAIMS TO PRESENT VALUE**

   i.    **29 U.S.C. § 1405(e) Requires Withdrawal Liability Claims to be Discounted to Present Value in Liquidation Proceedings**

10.    The Seven SFA MEPPs and Philadelphia Teamsters continue to argue that the Debtors are not entitled to a discount of the MEPPs' withdrawal liability claims to present value, asserting that ERISA does not require it. *See* Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 4 ("[T]he Funds are . . . seeking to have their withdrawal liability claims, which have been accelerated, not subject to a discount to present value because . . . ERISA makes clear that there should not be a discount."); *id.* ¶ 17 (similar); Philadelphia Teamsters Opp. [ECF No. 5370] ¶ 47 ("By seeking to apply a discount rate to the accelerated amortized payments, Debtors are requesting a reduction that is at odds with ERISA."); *id.* ¶¶ 5, 62 (similar).

11.    As Debtors previously explained, this statement is false because 29 U.S.C. § 1405(e) expressly *requires* discounting withdrawal liability claims to present value where the withdrawn employer is undergoing a liquidation. Debtors Opp. [ECF No. 5381] ¶¶ 7-11. Section 1405(e) provides:

> ***In the case of one or more withdrawals of an employer attributable to the same sale, liquidation, or dissolution, under regulations prescribed by the corporation—***
>
> (1) all such withdrawals shall be treated as a single withdrawal for the purpose of applying this section, and
>
> (2) the withdrawal liability of the employer to each plan shall be an amount which bears the same ratio to the ***present value of the withdrawal liability payments to***

***all plans (after the application of the preceding provisions of this section)*** as the withdrawal liability of the employer to such plan (determined without regard to this section) bears to the withdrawal liability of the employer to all such plans (determined without regard to this section).

29 U.S.C. § 1405(e) (emphases added). In other words, where (as here) an employer has withdrawn from one or more MEPPs as a part of the same liquidation or dissolution (*i.e.*, these bankruptcy proceedings, *see also infra* Section B), all withdrawal liability payments owed after application of the adjustments to the employer's allocable share of UVBs required by 29 U.S.C. § 1381(b)(1)(A)-(D), are to be treated as a single sum that is discounted to present value and distributed to each MEPP on a *pro rata* basis under 29 U.S.C. § 1405(e). *See id.* All the adjustments in 29 U.S.C. § 1405—including the one set forth in subsection (e)—are part and parcel of the withdrawal liability calculation. 29 U.S.C. § 1381(b)(1)(D).

12.    Accordingly, it is not only clear that ERISA expressly allows present value discounting in this case, but ERISA also requires it to be done as part of the MEPPs' final withdrawal liability calculations, as several MEPPs have admitted.[5] *See, e.g.*, Seven SFA MEPPs Mot. [ECF No. 5165] ¶ 6 (citing Section 1405(e) as a provision "in which a present value calculation is to be made with respect to withdrawal liability"); *id.* at ¶ 31 (stating that "***where, as here***, 'one or more withdrawals of an employer [are] attributable to the same sale, liquidation, or dissolution,' 'all such withdrawals shall be treated as a single withdrawal for the purpose of applying this section'") (citing Section 1405(e)(2)) (emphasis added). This is an independent basis for present value discounting, separate from the analysis regarding whether the withdrawal liability

---

[5]    The Debtors are unaware of any PBGC regulation regarding Section 1405(e). However, Section 1405(e)'s reference to "***under regulations prescribed by the corporation***" does not mean that Section 1405(e) is ineffective absent a PBGC regulation. That language merely authorizes such regulations and indeed stands in contrast to language in other sections of ERISA that explicitly require the PBGC to prescribe a regulation to give effect to the section. *E.g.*, 29 U.S.C. § 1388(d)(2) ("An employer to whom section 1383(c) of this title (relating to the entertainment industry) applies shall have no liability for a partial withdrawal except ***under the conditions and to the extent prescribed by the corporation by regulation.***") (emphasis added).

claims were validly accelerated by virtue of 11 U.S.C. § 502(b) or 29 U.S.C. § 1399(c)(5) and whether *Oakwood Homes*' rule against double discounting is implicated.

> ii.     Even if Section 1405(e) Does Not Apply, the MEPPs' Withdrawal Liability Claims Can Be Discounted to Present Value After They Are Accelerated Pursuant to Section 502 of the Bankruptcy Code.

13.     All the MEPPs assert that because acceleration pursuant to 11 U.S.C. § 502 occurs in all bankruptcy proceedings as of the date the petition is filed, this necessarily means that the Debtors are prohibited from seeking present value discounting of the MEPPs' withdrawal liability claims in this case. *See, e.g.*, Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 22–47; Local 705 Opp. [ECF No. 5375] 9–11; Seven SFA MEPPs Opp. [ECF No. 5377] ¶¶ 10–18; Central States Opp. [ECF No. 5376] ¶¶ 4, 21–24; Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶¶ 6–9. This assertion fails for two independent reasons: (1) it goes against the well-settled principle in bankruptcy that, subject to limited exceptions, claims like those at issue here are still discounted to present value even if they are accelerated by virtue of 11 U.S.C. § 502, and (2) the MEPPs cannot get around the fact that what was owed as of the petition date in this case were future streams of payment.

14.     First, the conclusion the MEPPs draw here—*i.e.*, that all claims for future payment accelerated at the time of bankruptcy need not be discounted to present value—is incorrect. Indeed, despite some of the MEPPs' unfounded claims to the contrary (*see, e.g.*, Seven SFA MEPPs Opp. [ECF No. 5377] ¶¶ 12–13), it is the very conclusion that the Third Circuit in *Oakwood Homes* rejected.  *See* Debtors Mot. [ECF No. 5181] ¶¶ 34-37; Debtors Opp. [ECF No. 5381] ¶ 15; *see also In re Oakwood Homes*, 449 F.3d at 602 (finding dissent's theory that "future principal is accelerated" "and becomes presently due debt" upon bankruptcy filing without the need for further discounting to be legally incorrect, noting that such a "special rule" would instead swallow the general rule that claims for future payments should be discounted to present value).

6

The MEPPs have no substantive response to this principle and thus cannot continue to rely on *Oakwood Homes* for their proposition when the Third Circuit said otherwise.

15.    Second, the MEPPs do not and cannot contest that if what is owed as of the date the petition is filed are long-term future streams of payments, then 11 U.S.C. §502(b) still allows those types of claims to be discounted to present value.  *See, e.g.*, *In re Yellow Corp.*, 2024 WL 4194560, at *16 (Bankr. D. Del. Sept. 13, 2024) ("[I]f what the debtors owed on the petition dates was a stream of payments that would be made over time, bankruptcy law would typically provide that the allowed claim would be discounted to its present value"); *In re CF&I Fabricators of Utah, Inc.*, 150 F.3d 1293, 1300 (10th Cir. 1998) ("We turn now to the problem of valuing the claim for liabilities that accrued for plan benefits when PBGC terminated the plan. Inasmuch as those liabilities are for beneficiaries' payments that extend into the future, the amount of the liability must be reduced to present value so the debt can be dealt with under the reorganization plan."); *In re Loewen Grp. Int'l, Inc.*, 274 B.R. 427, 438 (Bankr. D. Del. 2002) ("Although it is true . . . that the commencement of [a] chapter 11 case operates to accelerate all unmatured claims against a debtor, . . . it does not follow that such acceleration negates the requirement that the accelerated principal [debt balances] be discounted to present value pursuant to § 502(b)." (internal citations omitted)); *id.* at 439 (finding that although claimants were allowed to assert claims that equaled the entire unpaid principal balance of the debt owed, § 502(b) requires that those claims must still be discounted to present value).

16.    As explained in detail in the Debtors' opening brief and in its response in opposition to the MEPPs' opening briefs, a future stream of withdrawal liability payments is what was owed in this case as of the date of the petition.  *See* Debtors Mot. [ECF No. 5181] 12–28; Debtors Opp. [ECF No. 5381] ¶¶ 18, 22–45.  These future payments are what is owed because, as of the date the

petition was filed, none of the MEPPs had even calculated their alleged withdrawal liability claims against the Debtors, let alone made any sort of affirmative default or acceleration findings as ERISA and several of the MEPPs' written plan documents require.  Because none of the MEPPs had defaulted Debtors or accelerated their withdrawal liability claims as of the petition date, this means that what was owed as of the petition date were yet-to-be-determined amortized payments that the Debtors would be required to pay over the course of, in most cases, 20 years.[6]  *See* 29 U.S.C. § 1399(b)(1) (requiring MEPPs to provide notice and demand of withdrawal liability payment in accordance with an amortized payment schedule); *id.* at (c)(1) (requiring MEPPs to create amortized withdrawal liability payment schedule unless plan *affirmatively* determines there is a default and *validly* accelerates the obligation pursuant to subsection (c)(5)); *id.* at (c)(2) (noting that employers are only required to pay withdrawal liability pursuant to amortized schedule once notice and demand requirements of subsection (b)(1) have been met); *see also Allied Painting & Decorating, Inc. v. Int'l Painters and Allied Trades Indus. Pens. Fund*, 107 F.4th 190, 198–99 (3rd Cir. 2024) (finding employer was under no obligation to pay a pension plan that failed to furnish a valid notice and demand for payment of withdrawal liability "as soon as practicable"); *see also Chicago Truck Drivers v. El Paso Co.*, 525 F.3d 591, 595 (7th Cir. 2008) ("[T]he withdrawing employer 'owes nothing' until the plan notifies it of its liability and demands payment.") (quoting

---

[6]    The Five SFA and Non-SFA Funds argue that annual withdrawal liability payments are not "future payments" for the purposes of present value discounting.  *See* Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶¶ 6-8.  However, the MEPPs fail to cite any legal support for this contention.  Moreover, this is not supported by the plain text of ERISA.  29 U.S.C. § 1399(b)(1) contemplates that pension plans are required to provide notice to withdrawn employers of their withdrawal liability and a demand for payment in accordance with an amortized annual payment schedule—*i.e.*, a schedule of future annual payments calculated using an interest rate.  This payment schedule is accordingly determined pursuant to the rules set forth in 29 U.S.C. § 1399(c)(1).  Absent any affirmative default or acceleration findings either before or as of the date of the petition, a yet-to-be-determined sum was owed to the MEPPs as of the date of the petition, and that sum was to be paid pursuant to a yet-to-be-determined amortized annual payment schedule as contemplated in 29 U.S.C. §§ 1399(b)(1) and (c)(1).

*Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 423 (1995)).

17.    Several of the MEPPs try to get around this by arguing that it does not matter whether their default findings happened post-petition because their withdrawal liability claims—*i.e.*, their right to file a proof of claim in this bankruptcy action—accrued prepetition.  *See* Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 38–47; Local 705 Opp. [ECF No. 5375] 9–11; Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶¶ 6–9.  This, of course, erroneously assumes that their post-petition default and acceleration findings (if any) somehow relate back to when their initial bankruptcy claim accrued, such that their withdrawal liability claims were validly accelerated when the petition was filed pursuant to 11 U.S.C. § 502.  Not only do the MEPPs fail to provide any legal support for this contention, but, as explained in the Debtors' opening brief, in their opposition brief, and *infra* in Section A.iii., the MEPPs also fail to point to any facts in the record showing they actually defaulted the Debtors and/or validly accelerated the unmatured and unliquidated future streams of withdrawal liability payments at any point before the petition was filed.[7]  *See* Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 48–55; Local 705 Opp. [ECF No. 5375] 9–11; Seven SFA MEPPs Opp. [ECF No. 5377] ¶¶ 19–23; Central States Opp. [ECF No. 5376] ¶¶ 13–14; Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶¶ 6–9.

18.    As the Debtors have established and as the MEPPs continue to ignore, the timing of any alleged default or acceleration findings is thus crucial here.  Indeed, the Delaware Bankruptcy Court has previously addressed this issue and, in *Loewen*, agreed with the Debtors' conclusion.  There, the court analyzed whether claimants' proofs of claim, all filed post-petition,

---

[7]    Indeed, as explained *infra* at Section A.iii., several MEPPs refuse to address whether they validly made insecurity default determinations as ERISA and most of their plan rules require.  *See, e.g.*, Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶ 9.

validly accelerated their prepetition unmatured claims such that those claims were immediately

due and owing as one lump sum as of the date the bankruptcy petition was filed.  *See* 274 B.R. at

430–32, 438.  The claimants argued that either § 502(b) automatically accelerated their claims as

of the date of the petition or that the promissory notes at issue validly did so.  *Id.* at 438.  The court

found neither to be true.  *Id.* at 438–39.  With respect to acceleration pursuant to § 502(b), the court

opined:

> Although it is true, as Claimants argue, that the commencement of Debtors['] chapter 11 case operates to accelerate all unmatured claims against a debtor, . . . it does not follow that such acceleration negates the requirement that the accelerated principal balances under the Promissory Notes be discounted to present value pursuant to § 502(b). As Debtors argue . . . , the concept of acceleration in the context of the commencement of a chapter 11 case is nothing more than a corollary of the principle embodied in [11 U.S.C.] § 101(5)'s definition of "claim" as "any right to payment, whether or not such right is... matured [or] unmatured". A "claim" as defined in § 101(5) differs from an "allowed claim" which must be determined in accordance with [11 U.S.C.] § 502(b). Although § 101(5)'s definition of "claim" permits a creditor to assert a claim against the debtor for all amounts owed to him as of the petition date, even if such amounts are unmatured, § 502(b) provides that such claim will only be allowed to the extent the court determines those amounts "as of the date of the filing of the petition". Therefore, ***although Claimants were permitted to assert claims in an amount equal to the entire unpaid principal balance of the Promissory Notes pursuant to § 101(5), § 502(b) requires that they be discounted to present value as of the Petition Date***.

*Id.* at 438–39 (emphasis added; internal citations omitted).  With respect to acceleration under the

promissory notes at issue, the court specifically determined none of the claimants making this

assertion could establish that they followed the acceleration clauses set forth in the notes.  *Id.* at

438.  Those terms required claimants to affirmatively declare the debtors to be in default, to provide

debtors written notice of that fact, and to provide the debtors an opportunity to cure—none of

which occurred in that case before the debtors filed for bankruptcy.  *See id.*  Because these events

did not and could not occur before the petition, the court determined that claimants did not validly

accelerate their unmatured claims prepetition.  *Id.*

19.     Like the claimants in *Loewen*, the MEPPs want this Court to see past the fact that none of them can point to any prepetition or *ipso facto* default or acceleration findings.  But as *Loewen* makes clear, they cannot avoid this requirement as so many of them attempt to do.[8]  And as *Loewen* further elucidates, the MEPPs' arguments that the Debtors cannot be entitled to present value discounting on their withdrawal liability claims that were entirely unknown and unliquidated as of the petition date by virtue of bankruptcy acceleration are wrong.  Any assertions to the contrary must be rejected.

### iii.    The MEPPs Cannot Establish that They Validly Declared Debtors to be in Default or that They Validly Accelerated Their Claims Pursuant to ERISA Either Prepetition or *Ipso Facto.*

20.     Because the Debtors are allowed to discount the MEPPs' withdrawal liability claims regardless of acceleration under 11 U.S.C. § 502, the MEPPs must therefore point to any evidence in the record establishing that they validly accelerated the Debtors' claims prepetition or *ipso facto*.  As evident from the MEPPs' opposition briefs, each of them fails to do this.[9]

21.     At the outset, several of the MEPPs fail to even address this issue, starting and ending their analysis with the Court's first question regarding automatic acceleration.  *See* Five

---

[8]    The Seven SFA MEPPs argue that the Third Circuit in *Oakwood Homes* overturned the lower court's reasoning in *Loewen*, and that it should be disregarded as a result.  Seven SFA MEPPs Opp. [ECF No. 5377] ¶¶ 12–16. However, the Third Circuit did not, in any way, disturb *Loewen*'s findings relating to acceleration.  Rather, it simply declined to follow the court's approach because it dealt "only with non-interest-bearing instruments" that were not at issue in *Oakwood Homes*.  *See In re Oakwood Homes*, 449 F.3d at 601 ("We reject, as detailed above, the *Loewen* court's baseline conclusion that 11 U.S.C. § 502(b) is clear and unambiguous.  We decline to follow the approach of *Loewen*.").  The Third Circuit went on to specifically point out in footnote 13 that it considered claims very akin to withdrawal liability to be non-interest-bearing.  *Id.* at 599 n.13 (citing *In re CSC Indus., Inc.,* 232 F.3d 505 (6th Cir.2000) (*"non-interest-bearing unfunded benefit liability* of debtor to Pension Benefit Guaranty Corp." (emphasis added)); *In re CF & I Fabricators of Utah, Inc.,* 150 F.3d 1293 (10th Cir.1998) (same)).  Thus, *Loewen* is squarely on-point as it relates to withdrawal liability-like claims, whereas *Oakwood Homes* is not at all applicable.

[9]    Central States asserts that the Debtors waived any challenge to whether a default occurred.  Central States Opp. [ECF No. 5376] ¶ 9 n.3.  As the Debtors previously explained, this argument was already rejected by the Court, and in any event lacks merit because the Debtors had no reason to contest that a default occurred prior to the summary judgment briefing.  Debtors Opp. [ECF No. 5381] ¶ 22 n.8.

4933-6423-4513.1 96859.001

SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶ 9.  These funds—Central Pennsylvania Teamsters, Local 641, Local 710, NETTI, and Virginia Teamsters—accordingly concede that they either had no authority to declare that the Debtors defaulted pursuant to 29 U.S.C. § 1399(c)(5) or that they never affirmatively defaulted Debtors and validly accelerated their claims prepetition or *ipso facto*.  *See* Debtors Mot. [ECF No. 5181] 17–20 (there can be no missed payment default pursuant to 29 U.S.C. § 1399(c)(5)(A)); *id.* at 20–22 (Local 641 has no authority to declare insecurity default pursuant to 29 U.S.C. § 1399(c)(5)(B) as it has not created any plan rules relating to insecurity default processes as required by the statute); *id.* at 22–28 (the remaining MEPPs' plan rules relating to insecurity default and acceleration findings require affirmative decisions by the plans' trustees regarding same).

22.    Even more glaring is the fact that all the remaining MEPPs admit in their opposition briefs that if they did make affirmative default findings pursuant to 29 U.S.C. § 1399(c)(5), those actions were not taken until post-petition.  *See, e.g.*, Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 46, 48–55; Local 705 Opp. [ECF No. 5375] 10–11; Seven SFA MEPPs Opp. [ECF No. 5377] ¶¶ 19–23, n.5; Central States Opp. [ECF No. 5376] ¶ 14.  This fact is fatal to their cause as it means that they admit what was owed as of the petition date were unknown, yet-to-be-determined amortized withdrawal liability payments that were to be spread out over time as contemplated in ERISA.

23.    The MEPPs attempt to distract the Court away from this fact by continuously conflating two distinct concepts: what constitutes a claim for the purposes of filing a claim in a bankruptcy action and the point at which ERISA actually required the Debtors to pay on that obligation.  For example, several of the MEPPs claim that because their right to file a proof of claim in this action was merely triggered by the Debtors' prepetition withdrawal from the funds,

this means that any later (*i.e.*, post-petition) default and acceleration findings are necessarily tied to the prepetition claim accruals such that Section 502 applies and prevents the Debtors from discounting these claims to present value. *See, e.g.*, Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 38–47; Local 705 Opp. [ECF No. 5375] 9–11. This position misses the mark entirely.

24. While it may be true that the MEPPs' withdrawal liability claims were triggered prepetition for the purposes of simply being eligible to file a claim in this bankruptcy action, the MEPPs ignore that ERISA and corresponding case law do not require any withdrawing employers to pay on their withdrawal liability obligations unless and until certain statutory events occur. It is undisputed that the Debtors did not have to pay on any of these obligations—regardless of the bankruptcy filing—unless and until the MEPPs determined that a withdrawal occurred here pursuant to 29 U.S.C. §§ 1383 or 1385, calculated withdrawal liability pursuant to 29 U.S.C. § 1381(b), and then provided the Debtors with a notice and demand for payment in accordance with an amortized payment schedule pursuant to 29 U.S.C. § 1399(b)(1). *See Allied Painting & Decorating, Inc.*, 107 F.4th at 198–99 (finding employer was under no obligation to pay a pension plan that failed to furnish a valid notice and demand for payment of withdrawal liability "'as soon as practicable'"); *see also Chicago Truck Drivers*, 525 F.3d at 595 ("[T]he withdrawing employer 'owes nothing' until the plan notifies it of its liability and demands payment.") (quoting *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 423). As this Court has already found, the MEPPs did not and could not satisfy these requirements until they filed their proofs of claim, which was done more than two to three months after the petition was filed. *In re: Yellow Corp.*, No. 23-11069 (CTG), 2024 WL 1313308, at *6 n.38 (Bankr. D. Del. Mar. 27, 2024) ("This Court, however, believes that the funds satisfied these [29 U.S.C. § 1399 notice] requirements through the filing of their proofs of claim."). The record therefore establishes that the Debtors' withdrawal liability

obligations to the MEPPs under 29 U.S.C. § 1399(c)(2) only arose *after* the MEPPs filed their

proofs of claim.[10]

25.    And despite what some of these MEPPs claim (*see* Seven SFA MEPPs Opp. [ECF

No. 5377] ¶ 29), this Court has already found that as a result of the notice and demand requirements

not being satisfied until well after the petition was filed, there can be no missed payment default

in this case pursuant to 29 U.S.C. § 1399(c)(5)(A).  Any argument to the contrary must be rejected.

26.    This leaves only one other avenue for the MEPPs: they must show that they validly

declared an insecurity default pursuant to 29 U.S.C. § 1399(c)(5)(B) and accordingly accelerated

their claims prepetition or *ipso facto*.  Yet, none of them did that here.

27.    Indeed, five of the MEPPs—Freight Drivers 557, Local 617, Local 641, Local 701,

and the Philadelphia Teamsters—cannot escape the conclusion that they had no authority to

declare insecurity defaults due to the simple fact that none of them have adopted any plan rules to

declare insecurity defaults as ERISA clearly requires.[11]  29 U.S.C. § 1399(c)(5)(B) (plan may only

---

[10]    Contrary to Central States' assertion (*see* Central States Opp. [ECF No. 5376] ¶ 16), it follows that the MEPPs
were likely required to provide notice of any affirmative insecurity default findings before being allowed to
accelerate and seek payment on any outstanding withdrawal liability obligations, particularly where, as here, any
alleged default finding in this case was made before the MEPPs satisfied ERISA's notice and demand
requirements. *Cf.* 29 U.S.C. § 1399(c)(5)(A) (requiring written notice to a withdrawn employer of a missed
payment default finding).

That could not have happened in this case until, at the very least, the date the MEPPs filed their proofs of claim.
Except for three MEPPs here—Local 617, Local 701, and Virginia Teamsters—none of them made any such
finding in their proofs of claim. *See* Central PA Teamsters Proof of Claim No. 17671; Central States Proof of
Claim No. 4320; Freight Drivers 557 Proof of Claim No. 16705; Local 617 Proof of Claim No. 15728; Local 641
Proof of Claim No. 5505; Local 701 Proof of Claim No. 15001; Local 705 Proof of Claim No. 15906; Local 710
Proof of Claim No. 17473; NETTI Proof of Claim No. 18617; New York State Teamsters Proof of Claim No.
4489; Philadelphia Teamsters Proof of Claim No. 13913; Road Carriers 707 Proof of Claim No. 14941; TENJ
Proof of Claim No. 14722; Virginia Teamsters Proof of Claim No. 4461.

[11]    For avoidance of doubt, Local 1730 has not produced any evidence (and the Debtors are unaware of any) that the
fund has plan rules relating to insecurity default findings, despite counsel's assertion to the contrary. *See* Seven
SFA MEPPs Mot. [ECF No. 5165] ¶ 9.  The time for the fund to provide such evidence has passed.  Amended
Scheduling Order [ECF No. 5156] ¶ 1(a)(i).  Accordingly, like the five MEPPs discussed in paragraph 27, Local
1730 had no authority to declare insecurity defaults in Section 1399(c)(5).  Local 1730 claims to have experienced
a mass withdrawal as a result of Debtors' withdrawal from the fund, which would render the 20-year cap
inapplicable to the fund.  *See* Local 1730 Proof of Claim No. 14718 at 4-5.  But even assuming the 20-year cap

14

accelerate withdrawal liability obligation in the event of an insecurity default that must be "defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability"). Tellingly, four of these funds fail to address this issue whatsoever, thus conceding it. *See* Seven SFA MEPPs Opp. [ECF No. 5377] ¶¶ 19–23 (conceding as to Freight Drivers 557, Local 617, and Local 701); Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶ 9 (conceding as to Local 641). And the Philadelphia Teamsters' attempt to get around this fact also necessarily fails.

28.     The Philadelphia Teamsters tries to explain this lack of authority away by arguing that ERISA does not require the plan to adopt rules relating to insecurity defaults and by pointing to a general litigation remedies provision in their withdrawal liability rules. Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 48–55. But this assertion is wrong. 29 U.S.C. § 1399(c)(5) states that in order for a pension plan to accelerate a withdrawal liability obligation, a default event must occur: either a missed payment default under subsection (c)(5)(A) or an insecurity default under subsection (c)(5)(B). Subsection (c)(5)(B) expressly provides that an insecurity default must be "defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." 29 U.S.C. § 1399(c)(5)(B). In other words, a plan must actually have rules relating to insecurity default procedures in order to declare an insecurity default. It is not an automatic finding, as the Philadelphia Teamsters will have this Court believe.

29.     As the Philadelphia Teamsters has already readily admitted, it does not have any such rules. *See* Debtors Mot. [ECF No. 5181] 20–22; *id.* at Ex. 24 (Philadelphia Teamsters Decl.), ¶ 38; *see also* Philadelphia Teamsters Opp. [ECF No. 5370] ¶ 51. Instead, it tries to argue that a

---

doesn't apply, Debtors would still owe a long-term (in this case perpetual) stream of payments that must be discounted to present value for the reasons set forth in Debtors' summary judgment briefing. *See* 29 U.S.C. § 1399(c)(1)(D).

general litigation remedies provision gives it the requisite authority under 29 U.S.C. § 1399(c)(5)(B) to declare such a default in this case. Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 49–50. This provision does not authorize Philadelphia Teamsters to declare an insecurity default under ERISA's default statute. It is merely a blanket remedies provision that provides the fund with the ability to seek any and all remedies under the law in the event it has to litigate a withdrawal liability calculation. The provision does not even mention the phrase "insecurity default" nor does it reference § 1399(c)(5) in any way. Furthermore, if the provision is applied in the way that Philadelphia Teamsters wants, that would lead to an absurd conclusion. Based on a plain reading of the provision, the fund would only be able to declare an insecurity default and seek acceleration under § 1399(c)(5) "[i]n litigation" relating to withdrawal liability disputes and not at any other time. That does not comport with the language of 29 U.S.C. § 1399(c)(5)(B).

30.     While the remaining MEPPs all have insecurity default provisions in their plan documents, none of them can find any relief under 29 U.S.C. § 1399(c)(5)(B) because none of their insecurity default rules are automatic, and all require some sort of affirmative, voluntary default and/or acceleration finding. Local 705 claims that its default provision is automatic as of the filing of the bankruptcy and that this somehow ends the analysis. Local 705 Opp. [ECF No. 5375] 11. However, this ignores the fact that its plan rules require an affirmative acceleration finding based on any event of insecurity default. *See* Debtors Mot. [ECF No. 5181] 22–28. And despite its claim to the contrary, TENJ's default provision is also not automatic as it requires the plan trustees to make a voluntary affirmative default finding. *See id.*; *see also* Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 22 n.5; Seven SFA MEPPs Mot. [ECF No. 5165] at ¶ 9; Sullivan Decl., Ex. C (TENJ Withdrawal Liability Rules), at YELLOW_TENJ 000448–49 (Section 8(j)(b) TENJ's withdrawal liability rules expressly states that an insecurity default is "any other event that

*the Trustees deem* to demonstrate a substantial likelihood that an Employer will be unable to pay its withdrawal liability" (emphasis added)); *Tymon v. Wolitzer*, 240 N.Y.S.2d 888, 896 (N.Y. Sup. Ct.1963) (finding that a provision under which a debt became immediately due and payable was not automatic but "could be brought into being only by an election to accelerate affirmatively exercised by the plaintiff obligees," with such election to be "evidenced by some unequivocal overt act evidencing the election to accelerate or by the institution of a lawsuit on the obligation as accelerated").

31.     Simply put, none of the MEPPs have done anything to establish that their default findings were made prepetition or *ipso facto*.

> **iv.     To the Extent the Plan Provisions at Issue are *Ipso Facto*, They are Unenforceable and Violate the Automatic Stay Requirements.**

32.     Finally, several of the MEPPs spend much of their opposition arguing that any *ipso facto* provisions in this case are enforceable pursuant to Second and Third Circuit case law.[12]  *See* Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 59–61; Local 705 Opp. [ECF No. 5375] 11; Central States Opp. [ECF No. 5376] ¶¶ 9–12; Seven SFA MEPPs Opp. [ECF No. 5377] ¶¶ 24–28. Setting aside the fact that none of the insecurity default and acceleration provisions are entirely, or even partially, automatic and are thus not *ipso facto*, to the extent the Court finds that they are, they would be unenforceable.

33.     Many of the funds argue that *In re AMR Corp.*, 730 F.3d 88 (2d Cir. 2013), is the only applicable authority to consider here.  *See* Local 705 Opp. [ECF No. 5375] 11; Central States Opp. [ECF No. 5376] ¶ 10; Seven SFA MEPPs Opp. [ECF No. 5377] ¶¶ 24–28.  But *AMR Corp.* is not helpful to any of these MEPPs.  First and foremost, the *ipso facto* clauses at issue in *AMR*

---

[12]     The Five SFA and Non-SFA Funds do not address this issue and thus concede the point.  *See* Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶ 9.

*Corp.* were true automatic *ipso facto* provisions in various interest-bearing secured note instruments.  730 F.3d at 94–95 (pointing out that *ipso facto* provision in notes automatically accelerated debt upon the filing of a bankruptcy petition without any need for notice and demand). As explained above, it is undisputed that none of the MEPPs' insecurity default provisions are at all automatic and in no way resemble the provisions in the notes existing in *AMR Corp.*, rendering the Second Circuit's holding meaningless in this context.

34.    Second, even if *AMR Corp.* is applicable here (it is not), there is nothing to support the MEPPs' claims that its holding should be applied narrowly—*i.e.*, *ipso facto* clauses should only be prohibited as to executory contracts and property issues in bankruptcy.  Indeed, several courts in the Third Circuit and elsewhere have recognized that *ipso facto* clauses are generally disfavored, and in some instances are expressly void, under the Bankruptcy Code. *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 152 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013) ("[I]t is well-established that *ipso facto* clauses are unenforceable as a matter of law under the Bankruptcy Code.") (collecting cases); *id.* at 153 ("Courts have interpreted this legislative history [the legislative history of the Bankruptcy Code sections explicitly prohibiting ipso facto clauses] as 'indicat[ing] that ***bankruptcy-default clauses are to be invalid in all types of contracts, without limitation***.... The only congressional statement is clear that in most, if not all, instances, such clauses are not enforceable.... Thus, there is simply no reason to assume that Congress intended to make these clauses enforceable only in non-executory contracts.' As such, the Court agrees with the general trend of the federal courts that the prohibition against ipso facto clauses is not limited to actions based upon §§ 541(c) and 365(e)." (emphasis added)); *In re EBC I, Inc.*, 356 B.R. 631, 640 (Bankr. D. Del. 2006) ("*Ipso facto* clauses (by which a contract is terminated as a result solely of the debtor's insolvency or bankruptcy) are generally disfavored,

if not expressly void, under the Bankruptcy Code."); *In re Hutchins*, 99 B.R. 56, 57 (Bankr. D. Colo. 1989) ("Bankruptcy default clauses are not favored and are generally unenforceable under the Bankruptcy Code."). Just because there are specific provisions in the Bankruptcy Code prohibiting *ipso facto* clauses in certain contexts does not mean that they are *only* prohibited in those contexts—to say otherwise would be to go against the Bankruptcy Code's clear policy giving debtors a fresh start. *See, e.g.*, *In re Railway Reorganization Estate, Inc.,* 133 B.R. 578, 583 (Bankr. D. Del. 1991) ("Today courts continue to read the Code's *ipso facto* sections broadly to effectuate code policy and in recognition that bankruptcy matters are also inherently proceedings in equity.") (internal quotations and citations omitted); *see also Riggs Nat'l Bank of Wash. v. Perry,* 729 F.2d 982, 984–85 (4th Cir. 1984) ("This Court's enforcement of a default-upon-filing clause would clearly intrude upon th[e] policy" of giving debtors a fresh start in bankruptcy premised upon the automatic stay in § 362(d)(1)); *In re Perry,* 29 B.R. 787, 790–91 (D. Md. 1983) (finding that an *ipso facto* clause in an installment contract that was non-executory was nonetheless impermissible); *In re Rose*, 21 B.R. 272, 276–77 (Bankr. D.N.J. 1982) (finding that even though the contract in issue was non-executory, the bankruptcy default clause could still not be enforced because it was contrary to the central purpose of the Bankruptcy Code).

35.     Furthermore, as the Debtors pointed out in their opening brief, at least one Court of Appeals has determined that *ipso facto* provisions in pension plans' rules relating to insecurity defaults would likely be unenforceable in a bankruptcy proceeding due to the generally accepted prohibition on such provisions. *See* Debtors Mot. [ECF No. 5181] 29–30 (analyzing *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 917 (7th Cir. 2001) (expressly noting that pension plan's rules declaring insecurity defaults based on fact of bankruptcy filing are likely unenforceable *ipso facto* clauses)). Almost all of the funds fail to

provide any sort of response to this persuasive authority, which is certainly more on-point than *AMR Corp.*[13]

36.     Central States' explanation of the Seventh Circuit's ruling in *Basic American* misses the mark.  Central States claims that *Basic American* actually held that, although the plan did not make any sort of affirmative declaration, a cessation of operations during a bankruptcy proceeding was an automatic default under 29 U.S.C. § 1399(c)(5)(B).  Central States Opp. [ECF No. 5376] ¶ 12.  However, Central States incorrectly recites the holding and the facts in *Basic American*.  In that case, Central States had made a demand for the accelerated payment for the full amount of withdrawal liability payments in its proof of claim filed against the debtor, who had withdrawn from Central States when its operations ceased.  *Basic American,* 252 F.3d at 917-18.  But the claim at issue in that case was a controlled group claim against a non-debtor member of the controlled group.  *Id.*  And the issue in that case was whether the statute of limitations to collect the accelerated withdrawal liability amount against the non-debtor controlled group member had expired because the claim was accelerated when Central States filed the claim against the non-debtor.  *Id.*  The court found that Central States' claim to recover withdrawal liability against the non-debtor was barred by the statute of limitations because Central States specifically failed to pursue its claim within six years following Central States acceleration against the debtor controlled group member.  *Id.* at 918.  The court otherwise recognized that Central States' insecurity default provision based on the bankruptcy filing was a likely an impermissible *ipso facto* clause.  *Id.* at 917.  This case is wholly irrelevant to Central States' false assertion that its withdrawal liability

---

[13]     Central States points out in its briefing that the clause it relied on in this case to make an insecurity default finding is not based on the bankruptcy filing, but rather it is based the Debtors' alleged failure to make prepetition plan contributions. *See* Central States Opp. [ECF No. 5376] ¶¶ 9, 14.  While it may be true that this is not an *ipso facto* provision, Central States still admits that this default finding was not made until well after the petition was filed. *Id.* at ¶ 14. This is fatal to their case as explained in the Debtors' opening brief and *supra* in sections A.ii-iii.

20

claim against Debtor accelerated without its Trustees taking the required, or any, pre-petition action under its withdrawal liability rules, and Central States makes no legitimate argument to the contrary.

37.     Philadelphia Teamsters turns to *In re Energy Future Holdings Corp.*, 842 F.3d 247 (3d Cir. 2016), for the proposition that *ipso facto* provisions which authorized acceleration are enforceable.  Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 59–61.  However, this argument also fails. First, Philadelphia Teamsters does not have any plan provisions setting forth the procedures for declaring insecurity defaults—this fact is undisputed.  Thus, there are no applicable *ipso facto* clauses to analyze because Philadelphia Teamsters lacks any authority under 29 U.S.C. § 1399(c)(5)(B) to declare an insecurity default.  Second, for the same reasons *AMR Corp.* is inapposite, so too is *Energy Future Holdings.*  Both cases rely on actual automatic provisions that are not at issue in this case, and neither expressly stand for the proposition that *ipso facto* provisions are only prohibited in bankruptcy actions in certain limited contexts.  Indeed, nowhere in *Energy Future Holdings* does the Third Circuit address the general applicability of *ipso facto* provisions in bankruptcy.  Thus, Philadelphia Teamsters' argument should also be disregarded.

>           **v.      Withdrawal Liability Payment Streams Should be Discounted to Present Value**

38.     As the Debtors explained in their Motion, if the Court concludes that Debtors owed MEPPs withdrawal liability payment streams as of the petition date (as based on the record it should), the Court should also discount those payment streams to their present value.  The bankruptcy code and ERISA call for this result: when a debtor owes payments that are spread out over years, these payments must be converted into a lump sum equal to the present value of those payments.  Mem. Op. [ECF No. 4326] at 38 ("[I]f what the debtors owed on the petition date was a stream of payments that would be made over time, bankruptcy law would typically provide that

the allowed claim would be discounted to its present value."); *In re B456 Sys., Inc.*, 2017 WL 6603817, at *22 (Bankr. D. Del. Dec. 22, 2017) ("future damage claims are typically discounted to present value"); 29 U.S.C. § 1405(e)(2) (an employer's withdrawal liability shall be a ratio of the "***present value of the withdrawal liability payments to all plans*** (after the application of [adjustments in § 1381(b)(1)(A)-(D)]") (emphasis added).

39.    *Oakwood Homes* does not say otherwise. *In re Oakwood Homes Corp.*, 449 F.3d at 601 ("We wholeheartedly agree that future liabilities must be reduced in some way to reflect the time value of money."). Nevertheless, these MEPPs present a range of theories for why *Oakwood Homes*' rule should apply to this case and prevent the Court from present valuing their claims. The MEPPs' theories are meritless.

40.    Central States, Philadelphia Teamsters, and the Seven SFA MEPPs all recognize that *Oakwood Homes* concerned bargained-for interest-bearing debt obligations, and that withdrawal liability is not such a debt instrument. Central States Opp. [ECF No. 5376] ¶ 23 & n.6 ("withdrawal liability claims [] are fundamentally unlike commercial loans"; "withdrawal liability is not the product of a negotiated contract" and thus "voluntarily negotiated contractual" cases "are inapposite"); Philadelphia Teamsters Mot. [ECF No. 5162] ¶¶ 53, 55 (acknowledging both that "there is obviously no debt instrument in this case" and that *Oakwood Homes* concerned an "economic deal stuck by the parties"); Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 36. Nevertheless, the MEPPs argue that *Oakwood Homes* should apply because ERISA's 20-year payment cap and other adjustments to Debtors' allocable UVBs already discounted the MEPPs'

claims.  Central States Opp. [ECF No. 5376] ¶ 25; Seven SFA MEPPs Opp. [ECF No. 5377] ¶¶ 32-

35; Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 31-33.[14]

41.    Contrary to the MEPPs' assertion, ERISA's 20-year cap is not a "discount" on

withdrawal liability.  As this Court recognized, the 20-year cap is merely part of the withdrawal

liability calculation process that starts with an employer's allocable share of unfunded vested

benefits, and it makes certain statutorily required adjustments that lead to the employer's

withdrawal liability.  *See* Amended Memorandum Opinion [ECF No. 4770] at 38 ("'withdrawal

liability,' … is best read to mean the amount the employer owes after the application of the 20-

year cap.").  If anything, that the 20-year cap applies only goes to show that the MEPPs' proofs of

claims do seek a future stream of payments, which by definition are not worth their face today and

must be present valued to reflect the time value of money.  *Matter of Penn Central Transp. Co*.,

596 F.2d 1102, 1316 (3d Cir. 1979) (discounting a payment stream to present value accounts for

the fact that "the promise of a dollar payable in several years [up to 20 years in this case] is not

worth 100 cents today").  To put the point more finely, *Oakwood Homes*' double-discounting rule

has no relation to ERISA's 20-year cap.  *Oakwood Homes*' rule is simple: if a creditor files a proof

of claim based on a bargained-for debt instrument, eliminating the bargained-for unmatured

interest under 11 U.S.C. § 502(b)(2) present values the claim and no further present valuation is

necessary.  *Oakwood Homes*, 449 F.3d at 599.  ("A buyer of a note that includes interest surely

knows he is bargaining for a more valuable instrument, as does the seller. … *The point is to*

*recognize what the creditor bargained for, while avoiding a windfall*.")) (emphasis added).

Because the 20-year cap (and withdrawal liability claims generally) does not create unmatured

---

[14]    Philadelphia Teamsters also improperly argues against the law of the case by contending that the 20-year cap does not apply if a Section 1399(c)(5) default triggers the acceleration of the Debtors' withdrawal liability obligations.  Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 56-58.

interest, it does not implicate 11 U.S.C. § 502(b)(2).  The 20-year cap is unrelated to *Oakwood Homes:* it does not discount withdrawal liability, nor does it create unmatured interest subject to 11 U.S.C. § 502(b)(2).

42.    Relatedly, Central States, Philadelphia Teamsters, and Local 705 argue that discounting withdrawal liability claims to present value would be inequitable.  Central States Opp. [ECF No. 5376] ¶ 26 (arguing that because this Court applied ERISA's 20-year cap in calculating Debtors' withdrawal liability, it would be unfair to present value Debtors' withdrawal liability payments); Philadelphia Teamsters Opp. [ECF No. 5370] ¶ 67 (contending that "discounting is not appropriate where, as here, the MEPPs already face a multitude of downward claim reductions pursued by the Debtors as well as low projected distributions to unsecured creditors."); Local 705 Opp. [ECF No. 5375] at 15 f.9 ("Even if the Debtors' plan paid 100% on the dollar, Local 705 Pension Fund will only receive distributions at a future date that will never enjoy investment returns that a distribution on the date of the petition would").  But the fact that unsecured creditors in this case will be subject to pro rata distribution makes it even ***more*** important that the Court treat each class members equally.  *In re B456 Sys., Inc.*, 2017 WL 6603817, at *24 ("The discount rate is applied to the total future damages claim for the purpose of reducing the claim to an amount consistent with the allowed amounts of other prepetition unsecured claims.") (citing *In re Mirant Corp.*, 332 B.R. 139, 158 (Bankr. N.D. Tex. 2005)).  Every dollar the MEPPs receive in excess of their claims' present value is a dollar paid by fellow unsecured creditors – unsecured creditors with claims also subject to pro rata distribution.

43.    Another mutually inconsistent argument the MEPPs advance is that present value discounting is impermissible because withdrawal liability obligations are interest-free and because withdrawal liability payment streams already include a unilaterally-determined interest rate.

24

*Compare* Seven SFA MEPPs Opp. [ECF No. 5377] ¶31 ("The 20-year stream of payments should

be viewed as, in effect, an interest-free loan."); Local 705 Opp. [ECF No. 5375] at 16 ("Local 705

Pension Fund's claim is not an interest-bearing debt.") (emphasis added) *with* Seven SFA MEPPs

Opp. [ECF No. 5377] ¶36 ("the discount rate used to determine an employer's payment schedule

is … the same rate used in the fund's actuarial valuation"); Local 705 Opp. [ECF No. 5375] at 12

("Debtors raised no objections to Local 705 Pension Fund's use of a 6.75% discount rate . . . Local

705 Pension Fund's claim has already been discounted to present value.").  The Debtors will

address these arguments in turn.

44.    For starters, the lone fact that Local 705 and the Seven SFA MEPPs concede that

their withdrawal liability claims are interest-free establishes that *Oakwood Homes* does not apply

and the MEPPs' claims should be present valued.  *See e.g., B456*, 2017 WL 6603817, at *22

("[Creditor's] reliance on *Oakwood Homes* is misplaced. *Oakwood Homes* is limited to claims

based on interest-bearing debt, and [creditor's] underlying claim is not based upon an interest-

bearing instrument and did not include any bargained-for right to interest.").  The Seven SFA

MEPPs incorrectly assert that *Oakwood Homes* does not require present valuation in the absence

of interest.  Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 34.  The *Oakwood Homes* majority

acknowledged that *Loewen* correctly present valued a debt obligation because it was non-interest

bearing.  *Oakwood Homes*, 449 F.3d at 601 n.17 ("*Loewen* understood the crucial economic

distinction, concluding that it was economically appropriate to discount the non-interest-bearing

claims because the parties had bargained to receive less than the face value of the notes by not

building interest into the bargain. Here, in contrast, the parties bargained to receive interest.").[15]

---

[15]    The Seven SFA MEPPs attempt to dismiss *Oakwood Homes*' footnote 17 as mere dicta that this court should
ignore. Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 34 ("Their only citation for their position is a footnote in
which the Third Circuit did not announce a new rule of law, but rather merely noted that its holding is not
inconsistent with the facts of another case.") That is incorrect.  Notwithstanding its location in a footnote, the

45.    In addition, Local 705's assertion that its withdrawal liability claim has already been discounted stems from two misconceptions evident in its opposition.

46.    First, Local 705 confuses (1) the discount rate funds use to determine the present value of nonforfeitable benefits (which is used to determine whether a MEPP has unfunded vested benefits) with (2) the discount rate that would represent the present value of long-term withdrawal liability payment streams (which are determined by allocating the MEPPs' unfunded vested benefits to the employer, and then adjusting the allocable UVBs pursuant to 29 U.S.C. § 1381(b)(1)(A)-(D)).  Local 705 Opp. [ECF No. 5375] at 12-16 (describing Debtors' briefing and expert reports regarding the correct way to price unfunded vested benefits as "numerous admissions that Local 705 Pension Fund got it right").[16]  That is wrong.  If Debtors owed annual withdrawal liability payments as of the petition date that will now be satisfied in a lump sum, the issue is whether to account for the economic reality that a lump sum payment is worth more than annual payments over many years.  Local 705 does not explain how a single calculation that is far upstream of the ultimate withdrawal liability annual payments Debtors now owe changes that picture.  Thus, Local 705's lengthy discussion of UVBs calculation cases and the Debtors' related

---

Third Circuit's analysis of *Loewen* was necessary to its ultimate holding.  *In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000) ("A holding . . . extends beyond a statement of who won or lost a case. A court can choose among different holdings that offer broader or narrower ways of resolving a dispute.").  But even if not strictly required for its decision, the Third Circuit's *Loewen* analysis should be given deference.  *See Cerro Metal Prod. v. Marshall*, 620 F.2d 964, 978 (3d Cir. 1980) (adopting the Supreme Court's interpretation of a statute, even though dicta, because it is "not the sort of passing reference or overly generalized statement that causes courts to assign little, if any, weight to dictum"); *In re Federal-Mogul Glob.*, 402 B.R. 625, 638 (D. Del. 2009) ("Even if the Court were to accept . . . contentions that the relevant passage in *Combustion Eng'g* [a Third Circuit decision] is dicta, which it does not, this Court finds no reason to reject its precepts; dictum from higher courts is entitled to deference by inferior courts and should not be disregarded except for good cause.") (cleaned-up).  Not surprisingly, a Delaware bankruptcy court has already followed the reasoning in *Oakwood Homes*' footnote 17.  *See In re B456 Sys., Inc.*, 2017 WL 6603817, at *22 (Bankr. D. Del. Dec. 22, 2017).

[16]    *See also* Local 705 Opp. [ECF No. 5375] at 1 ("Local 705 Pension Fund's proof of claim in the amount of $17,830,282 represents the present value of Debtors' total future pension obligations . . . Local 705 Pension Fund used a 6.75% discount rate which is the same rate for calculating the fund's minimum required contributions to meet unfunded vested benefits"; *id.* Ex. A (Gitterman Affidavit) ¶ 14 ("The withdrawal liability claim in the amount of $17,830,282 contains [] allocable share of unfunded vested liability equating to $17,830,282. . . ").

arguments is thus irrelevant to whether withdrawal liability claims should be discounted to present value in these proceedings.[17]  Local 705 Opp. [ECF No. 5375] at 16-19.  Those cases concern how to calculate UVBs, not how to present value withdrawal liability payment streams.

47.     Second, the 6.75 percent "interest" that Local 705 superficially attached to its proof of claim, only to be ignored, also does not eliminate the need for present valuation. As the Debtors have explained, unilaterally determined and fund-specific rates contradicts ERISA and the Bankruptcy Code's requirement that each MEPPs' withdrawal liability be present valued using a single, objective rate.  *See* 29 U.S.C. § 1405(e)(2); *In re Value Recreation, Inc*., 228 B.R. 692, 697 (Bankr. D. Minn. 1999) ( explaining that the "[p]resent value of a claim is an objective measure, without regard for who the creditor is, or what particular investment markets and strategies the creditor might make use of to maximize return on investment."); *see also Till v. SCS Credit Corp*., 541 U.S. 465, 474 (2004) (Stevens. J) (plurality) (recognizing the need for present valuation because "[a] debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the

---

[17]  For the same reasons, Local 705's assertion that the Debtors have "waived all challenges to Local 705's discount methodology" lacks merit.  Local 705 Opp. [ECF No. 5375] 12.

Local 705 also states that the Debtors "ignored" their August 23, 2024 motion for summary judgment and did not respond to it until December 14, 2024.  *Id.* 2.  That is not true.  Local 705 agreed (along with the other Non-SFA MEPPs) to several scheduling orders that extended the dispositive motion briefing.  *See* ECF No. 4204 (certification of counsel submitting amended order extending, among other things, the deadline to file any response to dispositive motions to October 22, 2024); ECF No. 4830 (certification of counsel submitting amended order extending, among other things, the deadline to file any response to dispositive motions to November 26, 2024); ECF No. 5146 (certification of counsel submitting amended order extending, among other things, the deadline to file any response to dispositive motions to January 10, 2025).  This is consistent with what Debtors' counsel informed the Court at the November 21, 2024 hearing.  *See* ECF No. 5163, Ex. D (November 21, 2024 Hr'g Tr.) at 10:10-14 ("The Court: Ms. Chan, is your position that [the Debtors' response to Local 705's August 23, 2024 motion] should be folded into the schedule that you have, otherwise, addressed?  Ms. Chan: Yes. Our position is that Local 705 agreed to the various amended scheduling orders that pushed out the dispositive motion deadlines.").

4933-6423-4513.1 96859.001

value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment.").[18]

48.    The Seven SFA MEPPs also contend that *Oakwood Homes*' distinction between bargained-for and not bargained-for rates is insignificant and should be ignored.  Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 36.  Not so.[19]  *Oakwood Homes* and its successor, *In re B456 Sys., Inc.*, emphasize bargaining for good reason.  When a creditor lends a debtor money to be repaid over time, a bargained-for rate captures the value of the debtor's promise to repay the money over the agreed-upon term.  This is the result because a creditor's self-interest ensures it will not offer a debtor a rate that is too low (*i.e.*, a rate below the value of the debtor's promise to repay).  And a debtor's self-interest ensures it will not accept a rate that is too high (*i.e.*, a rate above the value of the debtor's promise to repay).  *Oakwood Homes* simply acknowledges that debtor/creditor negotiations already address present value discounting.  This acknowledgement, combined with 11 U.S.C. § 502(b)(2), provided the *Oakwood Homes* court firm ground for its holding that once

---

[18]  Separately, as the Debtors explained in their Motion, even if this Court were reluctant to eliminate Local 705's bankruptcy premium under Section 502(b), its claims would still be subject to Section 502(b)(2).  Debtors Mot. [ECF No. 5181] ¶ 85 n.12.  Local 705 disagrees, but their response misses the mark.  Local 705 Opp. [ECF No. 5375] 20-21.  The economic substance, not the form, controls the § 502(b)(2) analysis.  *In re Public Service co. of New Hampshire*, 114 B.R. 8800, 803 (Bankr. D. N.H. 1990) (emphasizing that § 502(b)(2) encompasses "what in economic fact is interest").  The make-whole and original issue discount cases that the Debtors cited stand for the following principle: 11 U.S.C. § 502(b)(2) requires discounting when creditors attempt to recover amounts that effectively represent unmatured interest, regardless of their characterization.  *See, e.g.*, *In re Hertz Corp.,* 120 F.4th 1181, 1197 (3d Cir. 2024) ("Self-imposed discounts do not defeat § 502(b)(2)").  Just as make-whole premiums and original issue discount claims attempt to capture excess value through mechanisms other than stated interest, Local 705's unilaterally imposed rate reflects less than the what the market would demand for a similar debt-like obligation.  The fact that Local 705's self-imposed discount appears on the interest side of the ledger rather than the principal, as in the original issue discount cases, does not prevent this Court from applying 11 USC § 502(b)(2) to ensure that other unsecured creditors do not pay for the difference between what Local 705 seeks and their claim's present value.

[19]  The Seven SFA MEPPs also contend that the Debtors cannot meet their burden of proof regarding the appropriate present value discount rate because the Debtors' expert determined the present value of Debtors' withdrawal liability obligation to these MEPPs as of the petition date rather than the date the obligation accrued.  Seven SFA MEPPs Opp. [ECF No. 5377] ¶¶ 39-41.  Setting aside the fact that the Seven Other MEPPs' expert also discounted the Debtors' withdrawal liability obligations as of the petition date, the Seven SFA MEPPs do not dispute that the Debtors' withdrawal liability payment obligations arose as of the petition date.

bargained-for unmatured interest is removed from a claim under Section 502(b)(2), it satisfies the requirement that long-term claims only be allowed for their present value.

49.     Here, not only is there no bargaining dynamic, the MEPPs have explicitly argued that the interest rates they believe to be appropriate are unrelated to the present value of the Debtors' obligation to repay withdrawal liability over years.  *See* Central States Mot. [ECF No. 5169] ¶ 43 (requesting a 4% discount rate for Central States which is the MEPPs' "predicted investment return rate … for 2023"); Seven SFA MEPPs Mot. [ECF No. 5165] ¶ 25 (requesting discount rates that match the assumptions used in the respective MEPP's actuarial valuations); Philadelphia Teamsters Resp. [ECF No. 5162] at ¶ 60 (suggesting "an interest rate assumption between the PBGC's mass withdrawal rate (5.54%) and the interest rate assumption used by the Philadelphia Fund for funding purposes (7.0%) would be reasonable" in light of the "funds' projected investment returns").  The MEPPs seek the exact kind of windfall that the *Oakwood Homes* court was trying to prevent.  *Oakwood Homes*, 449 F.3d at 599.  ("A buyer of a note that includes interest surely knows he is bargaining for a more valuable instrument, as does the seller. … *The point is to recognize what the creditor bargained for, while avoiding a windfall*.")) (emphasis added).

50.     For these reasons, the Court should discount the MEPPs' withdrawal liability claims to present value.

**B.     1405(B) SUBORDINATION SHOULD BE APPLIED TO WITHDRAWAL LIABILITY CLAIMS IF DEBTORS ARE INSOLVENT AT THE BEGINNING OF LIQUIDATION**

### i.     Section 1405(b), if Applicable, Adjusts the Debtors' Allocable UVBs After the 20-Year Cap

51.     The MEPPs do not dispute that the plain language of 29 U.S.C. § 1405(b) operates to limit withdrawal liability claims if, at the time of liquidation, Debtors are "insolvent," as that

term is defined in Section 1405(d).  The MEPPs also do not dispute that under 29 U.S.C.

§ 1381(b)(1), withdrawal liability is calculated to be the employer's allocable UVBs after four

adjustments are applied, with Section 1405 adjustments applied as the fourth and final adjustment

to the allocable UVBs, after the 20-year payment cap is applied.  In their oppositions, the MEPPs

confusingly address arguments that the Debtors did not advance and otherwise ignore the clear

statutory scheme set forth in ERISA that can limit the MEPPs' withdrawal liability claims and

subordinate them to other general unsecured claims in these liquidation proceedings.

52.    *First*, the MEPPs assert that the Debtors' position is that "unfunded vested benefits"

in Section 1405(b) actually means "withdrawal liability."  According to the MEPPs, this position

is contrary to the law of the case because this Court has already ruled that "withdrawal liability"

equals to the amount an employer owes after the application of the 20-year cap, not the employer's

unadjusted allocable unfunded vested benefits.  *See* Central States Opp. [ECF No. 5376] ¶27;

Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 51; Five SFA and Non-SFA MEPPs Opp. [ECF No.

5378] ¶¶ 11-14.  The MEPPs misstate the Debtors' position.  The Debtors' position is that their

***allocable UVBs***—after already being adjusted by the 20-year payment cap if necessary— are

required by section 1381(b)(1) and 1405(b) to be adjusted even further, which is consistent with

the language in Sections 1381(b)(1) and 1405(b).  In fact, both sections provide that the Debtors'

allocable UVBs should be reduced ***after*** applying the 20-year cap adjustment, by as much as an

additional 50 percent:

> The withdrawal liability of an employer to a plan is the amount determined under
> section 1391 of this title to be the ***allocable amount of unfunded vested benefits***,
> ***adjusted***—
>
> (A) first, by any *de minimis* reduction applicable under [29 U.S.C. § 1389],
>
> (B) next, in the case of a partial withdrawal, in accordance with [29 U.S.C.
>      § 1386],

(C) **then, to the extent necessary to reflect the [20-year] limitation on annual payments** under [29 U.S.C. § 1399(c)(1)(B)], and

(D) **finally, in accordance with [29 U.S.C. § 1405].**

29 U.S.C. § 1381(b)(1)(A)-(D) (emphases added).

In the case of an insolvent employer undergoing liquidation or dissolution, the **unfunded vested benefits allocable to that employer** shall not exceed an amount equal to the sum of—

(1) 50 percent of the [UVBs] allocable to the employer (determined without regard to this section), and

(2) that portion of 50 percent of the [UVBs] allocable to the employer (as determined under paragraph (1)) which does not exceed the liquidation or dissolution value of the employer determined—

(A) as of the commencement of liquidation or dissolution, and

(B) after reducing the liquidation or dissolution value of the employer by the amount determined under paragraph (1).

29 U.S.C. § 1405(b) (emphasis added); *see also, e.g.*, Debtors Mot. [ECF No. 5181] ¶ 94 ("1405(b) Subordination reduced an employer's **allocable UVBs** after the allocable UVBs have already been limited by the 20-year cap[.]") (emphasis added).

53.    The Debtors' position regarding Section 1405 is not inconsistent with the Court's prior ruling regarding the 20-year payment cap.  The MEPPs' confusion appears to stem from their failure to recognize that **withdrawal liability** is defined to be an employer's **allocable UVBs after four adjustments**.  29 U.S.C. § 1381(b)(1)(A)-(D).  Because the 20-year payment cap is the third adjustment and the Section 1405 adjustment is the fourth adjustment, the allocable UVBs that Section 1405 is adjusting are necessarily already adjusted by the 20-year cap.[20]  For the same

---

[20]    The Seven SFA MEPPs' assertion that "[t]he 20 year cap does not affect Debtors' allocable share of UVBs, but rather only affects their withdrawal liability" is similarly erroneous.  Seven SFA MEPPs Opp. [ECF No.5377] ¶ 51.  That assertion is also confusing because the same MEPPs concede elsewhere in their brief that the 20-year cap is applied (before any Section 1405 subordination) to allocable UVBs in determining withdrawal liability.  *Id.* ¶¶ 48, 57 (citing 29 U.S.C. § 1381(b)(1)).

reasons, the MEPPs' efforts to distinguish *In re Affiliated Foods*, 249 B.R. 770, 785 (Bankr. W.D. Mo. 2000)—which used the terms withdrawal liability and allocable share of UVBs interchangeably when applying Section 1405(b) subordination—does not alter the applicability of Section 1405(b).  Central States Opp. [ECF No. 5376] ¶ 28; Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶ 14.

54.    *Second*, the MEPPs contend that because the text of Section 1405(b) itself does not refer to allocable UVBs after application of the other adjustments in Section 1381(b)(1), the allocable UVBs that Section 1405(b) adjusts must be the total, unadjusted allocable UVBs.  Central States Opp. [ECF No. 5376] ¶ 29; Seven SFA MEPPs Opp. [ECF No. 5377] ¶¶ 55.  The MEPPs rely on the fact that Section 1405(a) (regarding employers in bona fide sales) refers to "unfunded vested benefits allocable to an employer *(after the application of all sections of this part having a lower number designation than this section)*," but Section 1405(b) (regarding insolvent employers undergoing liquidation) apparently does not have similar language when referencing allocable UVBs.  Central States Opp. [ECF No. 5376] ¶ 29; Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 55.

55.    For each of the below reasons, the MEPPs' superficial reading of Sections 1405(a) and (b) does not pass muster.  Section 1405(b) and other provisions of ERISA do, in fact, require

---

Separately, the Seven SFA MEPPs provided an illustration of how subordination under Section 1405 could be "relevant" if a reduction in UVBs under Section 1405(b) would result in less than 20 years of payment.  Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 49 & n.14.  As explained above, the Debtors disagree with the MEPPs' premise that Section 1405(b) subordination applies only if it would result in less than 20 years of payment.  For avoidance of doubt, regardless of whether the MEPPs' premise is correct, the Debtors still disagree with the MEPPs' illustration of how Section 1405(b) subordination is actually applied.  In the MEPPs' hypothetical, the unadjusted allocable UVBs to the employer is $100 million, the 20-year capped payments total $80 million, and the employer's liquidation value is $20 million.  According to the MEPPs, the application of Section 1405(b) would result in "the 20-year capped payment schedule being further shortened to a schedule of less than 20 years that totals $70 million."  The Debtors submit that the proper amount of withdrawal liability after application of Section 1405(b) in this scenario is $40 million (with further adjustment to reflect present value discounting).

the allocable UVBs that Section 1405(b) adjusts to be the amount that is already adjusted by other

Section 1381(b) adjustments:

(1) The MEPPs' reading ignores the language in Section 1405(b)(1) that refers to "50 percent of the unfunded vested benefits allocable to the employer *(determined without regard to this section [1405])*." (Emphasis added). It does not refer to allocable UVBs "determined without regard to any of the adjustments listed in Section 1381(b)(1)" or similar, as the MEPPs would have it. When read together with Section 1405(b)(2) regarding the other 50 percent of allocable UVBs determined without regard to Section 1405, Section 1405(b) as a whole must be adjusting the allocable UVBs after all non-Section 1405 adjustments are applied.

(2) The MEPPs' reading ignores the language in Section 1405(d)(1) that, in defining the term "insolvent" for purposes of Section 1405, again refers to "withdrawal liability under the plan *(determined without regard to subsection (b))*," not withdrawal liability under the plan "determined without regarding to any of the adjustments listed in Section 1381(b)(1)" or similar.

(3) The MEPPs' reading ignores Section 1381(b)(1)(A)-(D) which directs any Section 1405 adjustment to be the final adjustment to allocable UVBs, after application of other adjustments listed in Section 1381(b)(1).

The Section 1405(b) adjustment, along with the other adjustments to allocable UVBs listed in

Section 1381(b)(1), are mandated by the plain language of ERISA in determining withdrawal

liability. The adjustments are not a "punitive regime," as the Seven SFA MEPPs suggest, but

rather the statutorily-mandated mathematical calculation of a withdrawn employer's withdrawal

liability that starts with an allocation of unfunded vested benefits, and ends, after four statutory

adjustments, with an employer's withdrawal liability. Seven SFA MEPPs Opp. [ECF No. 5377]

¶ 56.

####          ii.      The Debtors Did Not Waive Any Challenge Under Section 1405(b)

56.      Knowing that they will fail in their challenge to Section 1405(b) on the merits, the MEPPs next launch a series of procedural and waiver arguments.  Each of those arguments fail as well.

57.      The MEPPs first maintain that the Debtors have not made an evidentiary showing that Section 1405(b) is applicable here.  Specifically, the MEPPs assert that the Debtors have not established their liquidation value or insolvency, both of which are defined in Section 1405 and are necessary to determine whether Section 1405 applies.  Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶¶ 16-20; Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 45.  However, the Debtors do not contend (at this time) that Section 1405(b) subordination applies as a matter of fact to the MEPPs' withdrawal liability claims.  The Debtors' position, as set forth in their Motion, is *if* the Debtors are insolvent at the time of liquidation, then Section 1405(b) subordination should apply as a matter of law.  Debtors Mot. [ECF No. 5181] ¶¶ 91-99.  As some of the MEPPs recognize, whether the Debtors are insolvent depends on the amount of Debtors' withdrawal liability, which has been and still is the subject of litigation and remains currently unknown.  *See* Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶ 19 (citing 29 U.S.C. § 1405(d)(1)).  The Debtors' liquidation value similarly can only be determined at the time of liquidation.  Nevertheless, the Court can and should decide on summary judgment the legal issue of whether Section 1405(b) subordination applies to the MEPPs' withdrawal liability claims, assuming the Debtors are insolvent at the time of liquidation.  *See In re Murray*, 169 B.R. 263, 267 (Bankr. D. Mass. 1994) ("Once insolvency is determined, [] the debtor may claim the benefit of § 1405.").  This fact is particularly true when the parties agreed to brief all remaining issues appropriate for summary judgment now.  *See* Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 46; Amended Scheduling Order [ECF No. 5156] ¶ 1(a).

34

58.     Relatedly, the MEPPs assert that the Debtors waived any challenge under Section 1405(b) because the Debtors have not met their burden to establish subordination applies through arbitration or the claims objection process.  Seven SFA MEPPs Opp. [ECF No. 5377] ¶ 41; Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶¶ 21-22.  That assertion lacks merit, because this Court already denied the MEPPs' motion to compel arbitration and held that "withdrawal liability claims will be liquidated in this Court through the claims allowance process."  Op. [ECF No. 2765] at 28.  In addition, the Debtors included an objection based on Section 1405(b) in their January 26, 2024 objection to the MEPPs' proofs of claim,[21] and no MEPP meaningfully responded to the Debtors' Section 1405(b) objection until November 2024 in connection with the Debtors' disclosure statement.  Central States Objection to Disclosure Statement [ECF No. 4777] ¶¶ 10-18; MEPPs' Joinder to Central States' Objection to Disclosure Statement [ECF No. 4865] ¶¶ 2-6.  The parties are now appropriately briefing in these cross-motions for partial summary judgment the legal issue of whether 1405(b) subordination applies if the Debtors are insolvent at liquidation, which facts are still unknown, as some MEPPs concede.  *See supra* ¶ 57.  There is no waiver, and the MEPPs' cited authority are inapposite and do not suggest otherwise.  *See* Five SFA and Non-SFA MEPPs Opp. [ECF No. 5378] ¶ 21 (citing *Aiellos v. Zisa*, 2010 WL 421083, at *3 n.6 (D.N.J. Feb. 2, 2010) (finding waiver where plaintiff did not meaningfully respond to defendant's argument); *Conroy v. Leone*, 316 Fed. App'x 140, 144 n.5 (3d Cir. 2009) (argument raised for the first time in appellate brief is waived); *Markert v. PNC Fin. Servs. Grp., Inc.*, 828 F. Supp. 2d 765, 773 (E.D. Pa. 2011) ("Where an issue of fact or law is raised in an opening brief,

---

[21]    *See Debtors' Second Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [ECF No. 1962] ¶ 57 n.65.  The Debtors included similar objections based on Section 1405(b) in their objections to Central States' and the non-SFA MEPPs' proofs of claim.  *See Debtors' Objection to the Proofs of Claim Filed by the Central States Pension Fund* [ECF No. 1322] ¶ 69 n.48; *Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [ECF No. 2595] ¶ 31 n.24.

but it is uncontested in the opposition brief, the issue is considered waived or abandoned by the non-movant in regard to the uncontested issue.")).

59.     Finally, Philadelphia Teamsters repeats its argument that 1405(b) subordination does not apply here because this is a reorganization proceeding under Chapter 11, and Section 1405(b) only applies to insolvent employers undergoing liquidation or dissolution.  Philadelphia Teamsters Opp. [ECF No. 5370] ¶¶ 69-75.  As the Debtors previously responded, this argument rests on the incorrect predicate that this is not a liquidation proceeding under Chapter 11 (it is), and the fund does not dispute that Section 1405(b) applies to Chapter 11 liquidation proceedings. Debtors Opp. [ECF No. 5381] ¶¶ 66-67.

60.     For these reasons, the MEPPs' withdrawal liability claims should be limited by 1405(b) subordination if the Debtors are determined to be insolvent at the beginning of liquidation.

## C.    CENTRAL STATES AND LOCAL 641 MUST EXCLUDE POST-2014 CONTRIBUTION RATE INCREASES FROM ANNUAL PAYMENT CALCULATIONS

61.     In their oppositions, Central States and Local 641 do not dispute that the Debtors' contribution rates increased after 2014.[22]  Nor do Central States or Local 641 dispute that they included these increases in determining the Debtors' annual payments.  Instead, Central States and Local 641 argue that it was proper for them to include such increases because (1) their rehabilitation plans did not impose the increases on the Debtors, and (2) the increases were "benefit

---

[22]    Central States does note that the Debtors' contribution rate decreased since the adoption of the fund's rehabilitation plan in 2008, Central States Opp. [ECF No. 5376] ¶ 31, but that fact is irrelevant.  The question is whether the Debtors' contribution rate increased after 2014 (it did), and whether Central States excluded those post-2014 contribution rate increases in calculating the Debtors' annual payment (it did not).

bearing" or "used to provide an increase in benefits."  *See* Central States Opp. [ECF No. 5376] ¶¶ 31-34; Local 641 Opp. [ECF No. 5378] ¶¶ 24-26.  Neither of these arguments has merit.

62.      The problem for Central States and Local 641 lies in the plain language of ERISA. To begin, Section 1085(g)(3) requires multiemployer plans to "disregard[]" post-2014 contribution rate increases in calculating annual payments if such increases are either "***required*** or ***made*** in order to enable the plan[s] to meet the requirement[s] of . . . [their] rehabilitation plan[s]."  29 U.S.C. § 1085(g)(3)(A) (emphasis added).  Debtors will refer to this as the "**__Rehab Plan Rule__**." It is therefore no defense that Central States' and Local 641's rehabilitation plans did not ***require*** the rate increases on the Debtors, and the funds do not dispute that the rate increases were ***made*** in order to enable them to meet the requirements of their rehabilitation plans.

63.      In any event, Section 1085(g)(3) goes on to create a presumption that any post-2014 rate increases are "deemed" to violate the Rehab Plan Rule, and thus must be excluded, unless one of two exceptions applies.  *Id*. § 1085(g)(3)(B); *see also Royal Ice Cream Co. v. Cent. States, Se. & Sw. Areas Pension Fund*, 732 F. Supp. 3d 888, 891 (N.D. Ill. 2024) ("[A]ll post-2014 increases made pursuant to a rehabilitation plan are excluded from calculating a withdrawal liability, with two exceptions.").  The first exception is where contribution rate increases are "due to increased levels of work, employment, or periods for which compensation is provided."  *Id*.  Central States and Local 641 do not argue that this exception applies.  The second exception is where contribution rate increases "are used to provide an increase in benefits . . . permitted by subsection . . . (f)(1)(B)." *Id*.  This is the exception on which Central States and Local 641 rely.  *See* Central States Opp. [ECF No. 5376] ¶ 34; Local 641 Opp. [ECF No. 5378] ¶ 26.

64.      That reliance is misplaced.  It is not enough for Central States and Local 641 to just ***say*** they used rate increases to fund additional benefits, as they do in their opposition briefing.

Rather, they must show that any benefit increases were "permitted by subsection . . . (f)(1)(B)." 29 U.S.C. § 1085(g)(3)(B). Central States and Local 641 do not even try to make this showing— because they cannot. Section 1085(f)(1)(B) requires an actuarial certification that Central States and Local 641 do not attach as an exhibit, that is not in the record, and that, to the Debtors' knowledge, Central States and Local 641 do not possess. Debtors quote this "**Actuarial Certification Rule**" below in full:

> A plan may not be amended after the date of the adoption of a rehabilitation plan under subsection (e) so as to increase benefits *unless the plan actuary certifies that such increase is paid for out of additional contributions not contemplated by the rehabilitation plan, and, after taking into account the benefit increase, the multiemployer plan is still reasonably expected to emerge from critical status by the end of the rehabilitation period on the schedule contemplated in the rehabilitation plan.*

29 U.S.C. § 1085(f)(1)(B) (emphasis added). Because Central States and Local 641 fail to show they complied with the Actuarial Certification Rule, any post-2014 contribution rate increases for their respective plans necessarily violates the Rehab Plan Rule and must be excluded.

65.     Central States contends that subsection (f)(1)(B) "contains only a narrow prohibition against benefit increases accomplished by rehabilitation plan amendments that lack certification," and that the fund's rate increase here does not fall under that prohibition and is therefore permitted. Central States Opp. [ECF No. 5376] ¶ 34. This is the very argument that Central States has repeatedly raised and that courts and arbitrators have repeatedly rejected because the argument does not accord with the language of subsection (f)(1)(B), which "prohibits not just a 'certain type' of benefit increase. Rather, it prohibits all benefit increases except for the increases it permits, *i.e.*, those certified by an actuary." *Royal Ice Cream Co.*, 732 F. Supp. 3d at 891-92; *see also id.* at 892 ("[Central States'] interpretation of the statute is simply contrary to its plain language. This is confirmed by the great weight of authority. The arbitrator was correct to find that the Fund improperly used post-2014 rate increases in calculating Royal's withdrawal

liability."); *Cent. States, Se. & Sw. Areas Pension Fund v. Event Media, Inc.*, 2024 WL 1363542, at *5 (N.D. Ill. Mar. 29, 2024) ("[Central States] argues that the exception for contribution rate increases 'permitted by' subsection (f)(1)(B) should be interpreted to include any increase 'not prohibited by' this subsection . . . Inverting the use of 'permit' and 'prohibit' in this way departs from the language of the statute. . . Reading the statute's two specific exceptions to allow many more kinds of increases other than those explicitly stated by the statute has no textual support.").

66.     There is simply no getting around the language of Section 1085(f) and (g).[23]  The Court should grant the Debtors summary judgment on this issue.

**D.     CENTRAL STATES' CLAIMS FOR "CONTRIBUTIONS GUARANTEE" ARE NOT ALLOWABLE**

> **i.     The 2014 Guarantee Letter's Liquidated Damages Provision is Unenforceable.**

67.     Central States spends much of its opposition arguing that the 2014 Guarantee Letter, on which Central States relies in claiming almost $1 billion in a contributions guarantee, is an enforceable liquidated damages provision simply because the agreement is between two sophisticated parties.  Central States Opp. [ECF No. 5376] ¶¶ 35, 42-44.  As the Debtors previously explained, that is not true.   Debtors Opp. [ECF No. 5376] ¶ 74.  Contrary to Central States'

---

[23]   Perhaps sensing as much, Local 641 resorts to arguing waiver: Local 641 alleges that "this is the second time the Debtors have moved for summary judgment on this issue," and that Debtors previously "dropp[ed] the argument," such that there has been a waiver.  *See* Local 641 Opp. [ECF No. 5378] ¶ 27.  That is not the case.  In their first motion for partial summary judgment [ECF No. 3825], the Debtors did not move for summary judgment against Local 641.  Instead, the Debtors noted that Local 641 appeared to have improperly calculated Debtors' annual payment, but Local 641 had failed to provide adequate discovery on this issue, despite multiple extensions of the fact discovery deadline.  *See* ECF No. 3825 ¶ 46, n.39. To set the record straight: Local 641 did not provide a declaration on its withdrawal liability calculations until June 7, 2024.  *See* Ex. A, Supplemental Declaration of Shirley Chan, ¶ 3.  On June 11, 2024, the Debtors advised Local 641 that its declaration was insufficient and the Debtors would need to depose Local 641's declarant.  *Id.*.  Because the declarant was traveling and would be unavailable to sit for deposition, the Debtors agreed to permit Local 641 to submit an amended declaration— which Local 641 did not do until five weeks later on July 16, 2024, which was two weeks ***after*** the dispositive motion deadline had passed.  *Id.*.  The Debtors could not have moved (and did not move) for summary judgment under these circumstances.  Instead, the Debtors advised the Court of this issue in a footnote and "reserve[d] the right to seek" "appropriate relief" at a later time, ECF No. 3825 ¶ 46, n.39, which is what the Debtors are doing now.

assertion, "Illinois continues to invalidate damages provisions in contracts . . . even if both parties are economically sophisticated." *Checkers Eight Ltd. P'ship v. Hawkins*, 241 F.3d 558, 563 (7th Cir. 2001) (citations omitted). Indeed, Central States' argument "would prove too much if accepted, because then no damages clause between commercially experienced parties could be considered a penalty, which clearly contradicts actual Illinois law." *Id.* at 563. Accordingly, the requirement that liquidated damages must be reasonable and bear some relation to the damages that might occur still applies in a contract between two sophisticated parties. *GK Dev., Inc. v. Iowa Malls Fin. Corp.*, 3 N.E.3d 804, 816 (Ill. App. Ct. 2013) (listing elements of an enforceable liquidated damages provision).

68.     There is no evidence that the liquidated damages provision in the 2014 Guarantee Letter is reasonable or bears any relation to the damages that Central States might have sustained. While Central States argues that "requiring damages in an amount roughly equivalent to the amount of contributions that would have been paid absent a breach was reasonable," Central States Opp. [ECF No. 5376] ¶ 42, it does not take into account the fact that if the Debtors were to terminate their employees and cease operations, those employees would stop accruing any benefits by virtue of their employment with the Debtors for which Central States would actually be liable and for which continuing contributions would be required. Accordingly, a liquidated damages clause that requires damages to be more or less *100%* of the amount of contributions that would have been paid absent a breach—in this case, almost one billion dollars—does not reasonably bear relation to Central States' anticipated damages, and instead constitutes an improper windfall. While Central States cites statements by Debtor representatives who expressed that the deferral or elimination of contributions received from Debtors is a "sacrifice" for Central States, those statements were given under the premise that the Debtors were still an ongoing business and are

40

therefore inapposite to the reasonableness of the liquidated damages provision here. Central States Opp. [ECF No. 5376] ¶ 43.

69.     Nor can Central States argue that the liquidated damages provision is reasonable because the Debtors chose the contribution guarantee provision at issue over an alternative whereby future withdrawal liability would be assessed using deemed, instead of actual, contribution rates.  According to Central States, had Debtors chosen the deemed-contribution-rate alternative, the total amount of withdrawal liability owed would exceed $5 billion, more than the $1 billion Central States seeks through the contribution guarantee provision, therefore the contribution guarantee provision is reasonable.  *Id.* ¶¶ 35 n.8, 44.  But Central States has also acknowledged that "had Debtors triggered the breach of the contribution guarantee provision earlier (in, say, 2015), the relative cost of the contribution guarantee would have been ***much higher*** compared to the deemed-rate alternative," thus underscoring the arbitrariness of Central States argument.  Central States Mot. [ECF No. 5169] ¶ 59 n.9.

70.     Central States also argues that the Debtors have not met their burden of persuasion. Central States Opp. [ECF No. 5376] ¶ 40.  That assertion is directly contradicted by the Debtors' arguments that there is no evidence in the record supporting the reasonableness of the liquidated damages provision or that the provision bears any relation to the damages that might have occurred at the time of contracting.  *See generally* Debtors Mot. [ECF No. 5181] ¶¶ 111-115; Debtors Opp. [ECF No. 5381] ¶¶ 71-74, *supra* ¶¶ 67-69.  Courts routinely strike liquidated damages clauses as unenforceable in similar circumstances.  *See, e.g.*, *2336 North Clark, LLC v. Hair Fairies, Inc.*, 2022 WL 17249039, at *6 (Ill. App. Ct. Nov. 28, 2022) ("No evidence was presented at trial to indicate that the parties reasonably contemplated it might take up to five years to relet the premises. There was no testimony regarding the rental market in Chicago at the time the lease extension was

executed.  Moreover, as defendants point out, the liquidated damages clause could result in a sizable windfall to plaintiff if it relets the property before the end of the lease term and collects double rent from defendants and its new tenant. Under these facts, the rent acceleration clause [] functions as a penalty for nonperformance, rather than the parties' attempt to estimate the damages resulting from defendants' breach."); *GK Dev.*, 3 N.E.3d at 816 (holding that $4.3 million liquidated damages provision was unenforceable where there was no evidence the parties considered what would be an appropriate damages amount for a minor delay in performance as opposed to the complete failure to perform).

### ii.    Central States' Contributions Guarantee and Withdrawal Liability Claims are Mutually Exclusive

71.    The Debtors explained in their Motion that Central States' contributions guarantee claim and its withdrawal liability claims are mutually exclusive under ERISA, regardless of whether the withdrawal liability claims are based on 29 U.S.C. § 1383(a)(1) (complete withdrawal when employer "permanently ceases to have an obligation to contribute") or § 1383(a)(2) (complete withdrawal when employer "permanently ceases all covered operations under the plan."). Debtors Mot. [ECF No. 5181] ¶¶ 106-109. Central States does not meaningfully respond to these arguments.

72.    With respect to Section 1383(a)(1), Central States asserts that that subsection applies only to obligations imposed by a collective bargaining agreement or by labor law, and not to the Debtors' "separate obligations" under the 2014 Guarantee Letter. Central States Opp. [ECF No. 5376] ¶ 36 (citing 29 U.S.C. § 1392). That assertion is belied by the 2014 Guarantee Letter itself, which provides that the contributions guarantee is to be made pursuant to the Debtors' collective bargaining agreements, and by the language in 1392(a)(1) that includes related agreements, such as the 2014 Guarantee Letter, and not just the collective bargaining agreement.

*See* Debtors Mot. Ex. 42 [ECF No. 5181] (2014 Guarantee Letter), ¶ 1(a) (Debtors "will continue to participate in and pay contributions to the Pension Fund ***pursuant to collective bargaining agreements*** for a period of not less than 10 (ten) full years after all balances [] owed to the Pension Fund under the CDA [] are completely and fully paid and satisfied") (emphasis added); 29 U.S.C. § 1392(a)(1) ("obligation to contribute" means an obligation to contribute arising "***under one or more collective bargaining (or related) agreements***") (emphasis added).  Accordingly, if Central States is to enforce the 2014 Guarantee Letter, the Debtors' obligation to contribute under collective bargaining or related agreements has not ceased, and withdrawal liability cannot be triggered under Section 1383(a)(1).  Debtors Mot. [ECF No. 5181] ¶ 106.

73.    With respect to Section 1383(a)(2), Central States misses the mark as well.  The Debtors' argument is not, as Central States suggests, that they did not cease operations sufficient to trigger a withdrawal under Section 1383(a)(2).  Rather, if the Debtors owed no contributions after their cessation of operations (as the Debtors contend), the Debtors do not dispute that a withdrawal did occur, and withdrawal liability would be owed.  The Debtors' position is, however, that if Central States is able to enforce the 2014 Guarantee Letter and still require contributions to continue for ten years after the cessation of operations, then the mere cessation of the Debtors' operations will not trigger withdrawal liability because a complete withdrawal from a multiemployer pension plan cannot occur while an employer continues to contribute.  The "cessation of operations" provision in Section 1383(a)(2) only applies when an employer is not contributing because no work is performed, even though its collective bargaining agreement may still be in effect.  Moreover, under ERISA, when an employer has a partial withdrawal (because some, but not all, contributions continue), the amount of an employer's withdrawal liability, and withdrawal liability payments, is reduced by the contributions that continue after the year of the

partial withdrawal. *See* 29 U.S.C. §§ 1386(a)(2); 1399(c)(1)(E).  Debtors Mot. [ECF No. 5181] ¶¶ 107-109.    In short, a MEPP cannot receive contributions and withdrawal liability simultaneously without offsetting withdrawal liability by the amount of contributions still being received.  Here, if the Debtors full amount of contributions after its cessation of operations continued for ten years after operations ceased, as Central States claims, there can be no withdrawal liability.  Central States, having no answer, does not engage in this analysis at all.

74.    Central States cannot rely on this Court's prior ruling which upheld the Debtors' agreements with other MEPPs regarding alternative withdrawal liability calculations.  Central States Opp. [ECF No. 5169] ¶ 39.  Those MEPPs' agreements did not involve issues related to either contribution obligations or liquidated damages, and the Court's prior ruling did not address whether contribution obligations and withdrawal liability are mutually exclusive, or whether a contract provision that allows liquidated damages bearing no relation to the anticipated damages is enforceable.

### iii.    The 2014 Guarantee Letter Violates the National Labor Relations Act

75.    Finally, Central States does not dispute that the NLRA provides that "[i]t shall be an unfair labor practice for a labor organization or its agents . . . to cause or attempt to cause an employer to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed."  29 U.S.C. § 158(b)(6).  Nor does Central States dispute that, if it were an agent of International Brotherhood of Teamsters ("**IBT**"), it would violate this provision by having the Debtors pay a liquidated, nine-figure lump sum for future services that the Debtors will never render or for future labor the Debtors' former employees will never provide.

76.    Central States' only response is that it is not an "agent" of IBT.  Central States Opp. [ECF No. 5376] ¶ 45.  But even if that is true, Central States' sole purpose is to provide benefits

to its union members.  29 U.S.C. § 186(c)(5).  And half of Central States' Trustees are appointed by the unions affiliated with IBT, as Central States concedes.  Central States Opp. [ECF No. 5376] ¶ 45.  Because the beneficiaries of the featherbedding provision in the 2014 Guarantee Letter are the same union employees that the NLRA states cannot receive featherbedding (*i.e.*, payment for future work that will not be performed), interpreting the 2014 Guarantee Letter between Yellow and Central States in a way that conflicts with the NLRA's prohibition against featherbedding provisions would allow a union to circumvent the NLRA and have their benefit plans implement featherbedding provisions instead.

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtors respectfully request that the Court enter partial summary judgment in their favor on the SFA MEPPs' and Non-SFA MEPPs' Proofs of Claim for withdrawal liability and Central States' Proofs of Claim for contribution guarantee.

| | |
|---|---|
| Dated:  January 21, 2025<br>Wilmington, Delaware | */s/ Laura Davis Jones* |

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                tcairns@pszjlaw.com
                pkeane@pszjlaw.com
                ecorma@pszjlaw.com

Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Shirley Chan (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 W. Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          pnash@kirkland.com
                dseligman@kirkland.com
                shirley.chan@kirkland.com

-and-

Michael Esser (admitted *pro hac vice*)
John Christian (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:      (415) 439-1400
Facsimile:      (415) 439-1500
Email:          michael.esser@kirkland.com
                john.christian@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*