## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>(Jointly Administered)<br><br>**Hearing Date: February 11, 2025 at 10:00 a.m. (ET)**<br>**Objection Deadline: February 4, 2025 at 4:00 p.m. (ET)** |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER TERMINATING THE DEBTORS' EXCLUSIVE PERIOD TO SOLICIT ACCEPTANCES OF A PLAN OR, IN THE ALTERNATIVE, CONVERTING THE CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors" and such cases, the "Chapter 11 Cases"), by and through its undersigned counsel, hereby files this motion (the "Motion") pursuant to section 1121(d)(1) of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order, substantially in the form attached as **Exhibit A** hereto, terminating the Debtors' exclusive period to solicit acceptances of a plan or, in the alternative, converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. In support of this Motion, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1.        By the Motion, the Committee seeks entry of an order terminating the Debtors' exclusive period to solicit acceptances of a chapter 11 plan or, in the alternative, conversion of

---

[1] A complete list of each of the Debtors in the chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in the chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.  The relief requested by the Motion is necessitated by the fact the Debtors' Plan[2], which is not supported by holders of claims in excess of one third in dollar amount of all Class 5 Claims at each Debtor, cannot be confirmed, and the Committee believes that, given the procedural posture of these cases, the Debtors will not be able to propose and prosecute a plan that has the support of such creditors.  As the Committee has previously advised the Court and all other parties in interest, the existing Plan suffers from at least two primary deficiencies.  First, it fails to provide the Committee, as the fiduciary for all unsecured creditors, with governance rights over the Liquidating Trust.  These governance rights are non-negotiable from the Committee's perspective given that the Liquidating Trust, once formed, and the Liquidating Trustee, once appointed, will take control over all outstanding litigation workstreams, monetization of any remaining assets, reconciliation of claims and ensuring prompt distributions to creditors as contemplated by the Bankruptcy Code and the terms of the plan ultimately confirmed.  The Committee and its constituents that oppose the Plan simply cannot and will not support a plan that leaves these governance matters in the Debtors' control given all that has (and has not) transpired prior to, and over the course of, these Chapter 11 Cases.

2.    On that note, the Committee acknowledges that the Debtors' professionals ran a successful "phase 1" sale process pursuant to which the majority of the Debtors' assets were monetized and the proceeds thereof distributed in satisfaction of all of the Debtors' secured debt obligations.  The Committee further acknowledges that the Debtors are in the midst of selling their remaining assets through a "phase 2" process, a process that the Committee has worked closely

---

[2] Capitalized terms used but not defined shall have the meanings ascribed to them elsewhere in this Motion or in the *Second Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 4974] (as may be amended from time to time, the "Plan"), as applicable.

with the Debtors' professionals on and fully supports.  These sale processes, while integral to the estates' ability to fund eventual distributions to unsecured creditors, have been largely overshadowed in recent months by a multitude of litigation matters that the Debtors have been singularly focused on prosecuting to final conclusion, inclusive of applicable appellate rights.  The Debtors' litigious approach has largely foreclosed the occurrence of productive settlement negotiations in respect of a majority of the Debtors' largest remaining disputed claims, most of which constitute withdrawal liability obligations asserted by multiemployer pension plans.  As a result, the Committee and these creditors have lost faith in the Debtors' ability to propose a confirmable plan.  Indeed, absent the transfer of the myriad litigation matters to fiduciaries selected by the Committee (as is common practice in this and other jurisdictions)—fiduciaries who the Committee will ensure will make every effort to resolve the pending disputes equitably, economically, and otherwise in the best interests of the trust's beneficiaries—it  is unlikely that any plan will be confirmed in these cases.

3.      Second, the Plan contemplates broad releases by the Debtors' estates that are unsupportable in these liquidating cases.  Under the current facts and circumstances, the Committee cannot support a chapter 11 plan that contains estate releases given that potentially valuable claims held by the estates may be pursued to supplement unsecured creditor recoveries in these cases.

4.      In light of the foregoing, the Committee seeks the relief it now requests in this Motion and is prepared to give its recommendation to unsecured creditors with respect to the Plan currently on file, and that recommendation is to ***vote to reject*** the Plan.  The Committee notes, however, that the fate of the Debtors' Plan was sealed long before the filing of this Motion and the Committee's letter urging unsecured creditors to vote to reject the Plan.  The Committee

understands that unsecured creditors that hold no less than 1/3 in dollar amount of the Debtors' unsecured claims—including holders of billions of dollars in asserted multiemployer pension plan withdrawal liability claims at each Debtor—intend to vote to reject the Plan, meaning that the Plan has no impaired accepting class and cannot be confirmed as a matter of law.

5.      Because the Debtors' Plan cannot be confirmed and for the other reasons cited herein, the Committee asks that this Court terminate exclusivity, permit the Committee to file and prosecute its own plan of liquidation, and allow these cases to move, at long last, towards conclusion.  Alternatively, the Committee requests that the Court convert these cases to chapter 7, which, like terminating exclusivity, will allow unsecured creditors to select a new fiduciary to monetize assets, pursue causes of action, reconcile claims, engage in unbiased settlement discussions and make distributions to creditors and would eliminate unjustified releases.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Bankruptcy Code sections 1121(c) and (d).

7.      Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure, the Committee consents to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### I.        The Chapter 11 Cases

8.        On August 6, 2023 and continuing into August 7, 2023 (together, the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing the Chapter 11 Cases.  As set forth in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [ECF No. 14] (the "First Day Declaration"), the Debtors filed for chapter 11 with the objective of effectuating an orderly, value-maximizing winddown of their businesses for the benefit of all parties in interest.[3]

9.        On August 16, 2023, the United States Trustee for the District of Delaware appointed the Committee pursuant to Bankruptcy Code section 1102(a)(1).[4]  An amended notice of appointment was filed on May 20, 2024.[5]  The Committee currently comprises eight members.[6]

### II.        The Prior Exclusivity Extensions

10.        The Debtors have requested and received five extensions of their exclusive periods to date.  On November 8, 2023, the Court approved the Debtors' first request for an extension of their exclusive periods to file (the "Exclusive Filing Period") and solicit votes (the "Exclusive Solicitation Period" and, together with the Exclusive Filing Period, the "Exclusivity Periods") on a chapter 11 plan for an additional 90 days to March 4, 2024 and May 2, 2024, respectively.[7]  On

---

[3] First Day Declaration ¶ 19.

[4] *Notice of Appointment of Committee of Unsecured Creditors* [ECF No. 269].

[5] *First Amended Notice of Appointment of Committee of Unsecured Creditors* [ECF No. 3430].

[6] The Committee comprises the following parties: (i) BNSF Railway; (ii) Central States, Southeast and Southwest Areas Pension Fund; (iii) Daimler Trucks, N.A.; (iv) International Brotherhood of Teamsters; (v) New York State Teamsters Pension and Health Funds; (vi) Pension Benefit Guaranty Corporation; (vii) RFT Logistics LLC; and (viii) Mr. Armando Rivera.

[7] *Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 1065].

February 28, 2024, the Court approved the Debtors' second extension of their Exclusivity Periods for an additional 90 days to June 3, 2024 and July 31, 2024, respectively.[8]

11.     On May 20, 2024, the Debtors filed a motion seeking a third extension of their Exclusivity Periods.[9]  The Committee filed an objection to the third requested extension on May 28, 2024, arguing, among other things, that the Debtors' litigation efforts were being pursued for the benefit of out-of-the-money equity holders rather than for the benefit of unsecured creditors.[10] The Committee also objected on the grounds that the Debtors had not made sufficient progress in negotiating a liquidating plan and that the other relevant factors weighed against granting an extension of exclusivity.  On June 3, 2024, the Court held a contested hearing on the Debtors' motion and overruled the Committee's objection.  On June 4, 2024, the Court entered an order approving the Debtors' third extension of their Exclusivity Periods for an additional 90 days to September 2, 2024 and October 29, 2024, respectively.[11]

12.     On September 2, 2024, the same day that the Debtors filed their Initial Plan (as defined below), the Debtors filed a motion seeking a fourth extension of their Exclusive Solicitation Period.[12]  The Committee did not object to this extension, but on September 9, 2024, the Committee filed its *Statement Regarding Debtors' Fourth Motion for Entry of an Order (I) Extending the Debtors' Exclusive Period to Solicit Acceptances of a Chapter 11 Plan Pursuant to*

---

[8] *Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of The Bankruptcy Code and (II) Granting Related Relief* [ECF No. 2449].

[9] *Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 3433].

[10] *The Official Committee of Unsecured Creditors' Objection to the Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of The Bankruptcy Code and (II) Granting Related Relief* [ECF No. 3511].

[11] *Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 3590].

[12] *Debtors' Fourth Motion for Entry of an Order (I) Extending the Debtors' Exclusive Period to Solicit Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 4252].

*Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [ECF No. 4294] (the "September 9 Statement") in which it previewed its preliminary concerns with the Initial Plan. Specifically, the September 9 Statement described the Initial Plan's failure to provide the Committee with appropriate oversight and consent rights associated with implementation of the Plan and raised issues surrounding the scope of the proposed releases under the Initial Plan.[13] On September 11, 2024, the Court approved a fourth extension of the Debtors' Exclusive Solicitation Period for an additional 60 days to December 30, 2024.[14]

13.     On November 19, 2024, the Court approved a fifth extension of the Debtors' Exclusive Solicitation Period for an additional 60 days to February 28, 2025.[15] After the expiration of the current Exclusive Solicitation Period, the Bankruptcy Code provides that the Court may not extend such period for more than an additional 36 days to April 7, 2025 (*i.e.,* 20 months after the Petition Date).[16]

## III.    The Debtors' Plan Process

14.     On September 2, 2024, after these cases had been pending for nearly thirteen months, the Debtors filed the *Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 4253] (the "Initial Plan"), and the related *Disclosure Statement for the Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 4254]. The Initial Plan was filed on the last day of the Debtors' Exclusive Filing Period, as extended. In the Committee's September 9

---

[13] *Id. ¶* 3.

[14] *Order (I) Extending the Debtors' Exclusive Period to Solicit Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of The Bankruptcy Code and (II) Granting Related Relief* [ECF No. 4306].

[15] *Order (I) Extending the Debtors' Exclusive Period to Solicit Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of The Bankruptcy Code and (II) Granting Related Relief* [ECF No. 4953].

[16] 11 U.S.C. § 1121(d)(2)(B).

Statement, the Committee advised the Court and all other parties in interest that it did not support the Initial Plan.

15.     On October 17, 2024, over six weeks after the Initial Plan was filed, the Debtors filed their *First Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 4580] and *First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 4581] together with the *Motion of Debtors for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [ECF No. 4582].  On November 18, 2024, the Committee filed a statement expressing that it did not support the first amended plan insofar as it deprived unsecured creditors of the right to control the administration of the contemplated Liquidating Trust.[17]  The Committee noted that this issue was of critical importance to the Committee as the fiduciary for all unsecured creditors, who will be the only beneficiaries of the value remaining in these estates after the satisfaction of administrative and priority claims.[18]  On November 20, 2024, prior to the hearing to approve the disclosure statement, the Debtors filed the second amended Plan and the *Second Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [ECF Nos. 4975] (as may be amended from time to time, the "Disclosure Statement"), but no changes were made (or have since been made) to the Liquidating Trust's

---

[17] *See Statement of the Official Committee of Unsecured Creditors Regarding Motion of Debtors for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [ECF No. 4950] ¶ 3. The Committee also continued to have concerns with respect to the scope of the releases proposed under the amended plan, which concerns continue to the date hereof.

[18] *Id.*

proposed governance structure. Although the Committee did not object to approval of the Disclosure Statement, the Committee did include a letter to general unsecured creditors in the relevant solicitation materials explaining that the Committee was not supportive of the current version of the Plan, and advising that negotiations with the Debtors regarding the governance of the Liquidating Trust were ongoing.[19] Given the Committee's concerns, the letter explained that the Committee could not, at the time of the mailing of the solicitation packages, recommend that unsecured creditors vote in favor of the Plan, but noted that the Committee would file a further notice on the docket prior to the Voting Deadline providing its recommendation as to how unsecured creditors should vote on the Plan.[20]

16.    Solicitation of the Plan commenced on or about November 25, 2024. A hearing to consider confirmation of the Plan, which was initially scheduled for February 4, 2025, has been continued to February 24, 2025.

## IV.    General Unsecured Claims

17.    The largest General Unsecured Claims asserted in these cases are the joint and several claims of the multiemployer pension plans ("MEPPs"), virtually all of which remain disputed. The Debtors' liquidation analysis estimates that the joint and several MEPP withdrawal liability claims range from approximately $2 billion at the low end of the assumed range to approximately $4 billion at the high end of the assumed range. By comparison, the Debtors' estimate of "Other General Unsecured Claims" ranges from $197 million at the low end to $543 million at the high end.[21] The Disclosure Statement also provides that the estimated recoveries for holders of General Unsecured Claims range from 0% to 38.3%, depending on the Debtor entity at

---

[19] *Committee Letter* [ECF No. 5024-9].

[20] *Id.*

[21] Disclosure Statement Ex. B (Liquidation Analysis), at 10–11.

which such holders' claims reside and the outcome of the Debtors' pending objections to the MEPP withdrawal liability claims.[22]  Accordingly, under any permutation of the Debtors' own estimates, the MEPPs, which are entitled to assert their claims at every Debtor entity, will hold more than one-third in amount of General Unsecured Claims at each Debtor.

18.    The Debtors only have one impaired, non-insider class of creditors—Class 5 general unsecured creditors—at each Debtor entity under the Plan.  Upon information and belief, the Debtors will not receive votes to accept the Plan from holders of at least two-thirds in dollar amount of Class 5 Claims at each Debtor.

19.    Concurrent with the filing of this Motion, and attached as **Exhibit B** hereto, the Committee filed an updated letter addressed to all holders of Class 5 Claims recommending that such holders vote to reject the Plan for the reasons set forth herein.

## RELIEF REQUESTED

20.    By the Motion, the Committee seeks entry of an order terminating the Debtors' Exclusive Solicitation Period, or, in the alternative, converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

### A.    Legal Standard for Termination of Exclusivity

21.    Bankruptcy Code section 1121 provides that a debtor has the exclusive right to file a plan within the first 120 days after the order for relief and, if such plan is filed, the debtor is given 180 days (running concurrently) in which it has the exclusive right to obtain acceptances of its plan.  11 U.S.C. § 1121(b), (c).  Under Bankruptcy Code section 1121(d), a bankruptcy court may reduce or increase a debtor's exclusivity periods "for cause" upon the request of a party in interest

---

[22] Disclosure Statement at 7.

and after notice and a hearing.  11 U.S.C. § 1121(d)(1).  While a debtor's exclusivity can be terminated at any time, its 120-day exclusive period to file a plan can only be extended up to eighteen months from entry of the order for relief and the 180-day period for exclusive solicitation can only be extended up to twenty months from entry of the order for relief.  11 U.S.C. § 1121(d)(2).  Any "party in interest" may file a plan after both the 120-day exclusive filing period (subject to any extensions) and 180-day exclusive solicitation period (subject to any extensions) have expired.  11 U.S.C. § 1121(c).

22.     The Bankruptcy Code does not define "cause" for modifying the exclusivity periods, leaving the decision to the courts on a case-by-case basis.  *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006).  Bankruptcy Code section 1121(d)(1) provides courts with great latitude in deciding, on a case-specific basis, whether to modify the exclusive periods on a showing of "cause."  *Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A.* (*In re Geriatrics Nursing Home, Inc.*), 187 B.R. 128, 132 (D.N.J. 1995); *see also In re Sharon Steel Corp.*, 78 B.R. 762, 763–64 (Bankr. W.D. Pa. 1987).  Courts typically consider the following nine non-exclusive factors set forth in *Adelphia* when considering whether to modify exclusivity:

(i)     whether the debtor has made progress negotiating with creditors;

(ii)    whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(iii)   the existence of good faith progress toward reorganization;

(iv)    the necessity for sufficient time to negotiate a plan and prepare adequate information;

(v)     the length of time the case has been pending;

(vi)    the size and complexity of the case;

(vii)   whether unresolved contingencies exist;

(viii)  whether the debtor is paying its debts as they become due; and

11

(ix)    whether the debtor is using exclusivity to pressure creditors.

*Adelphia*, 352 B.R. at 587; *see also* Mar. 24, 2022 Hr'g Tr. at 174:7–13, *In re PWM Property Mgmt.*, Case No. 21-11445 (MFW) (Bankr. D. Del.) [ECF No. 566] (considering the *Adelphia* factors in determining whether to extend or reduce the debtor's exclusivity period).

23.    Correct application of the factors includes a broad, global view focused on what is best for the cases.  The primary consideration should be whether terminating exclusivity would facilitate moving the cases forward.  *In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997); *see also Adelphia*, 352 B.R. at 590; Aug. 26, 2011 Hr'g Tr. at 56:14-56:16, *In re Indianapolis Downs, LLC*, Case No. 11-11046 (BLS) (Bankr. D. Del.) [ECF No. 410] (explaining that the analysis comes down to whether or not reasonable progress is being made).

24.    Another important consideration closely related to whether exclusivity facilitates moving the cases forward is the debtor's ability to implement a consensual plan, including whether creditors have lost faith in the debtor's ability to develop and obtain approval of a consensual plan. *See, e.g., In re All Seasons Indus., Inc.*, 121 B.R. 1002, 1006 (N.D. Ind. 1990) ("While the court makes no finding as to whether or not this loss of faith is justified . . . for the purpose of the present motion [regarding exclusivity], it is only necessary to realize that a loss of confidence exists.  This is a factor the court should and must consider in its determination.").  Thus, courts have found that cause did not exist to extend exclusivity, or did exist to terminate exclusivity, when there has been a breakdown in negotiations between the debtor and its significant creditors.  *See, e.g., In re R.G. Pharm., Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) (holding that debtor failed to establish cause to extend exclusivity because of a "breakdown of negotiations between the debtor and the objecting creditors" and debtor failed to show that extension was "likely to significantly improve the progress of the case."); *see also In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 161 (Bankr. D. Me. 1982) (holding that shortening exclusive periods to permit parties in interest to file a plan was

in the "interests of all creditors and the interests of the debtor" and "urg[ing] the parties to put aside their . . . differences and unite in a common effort to successfully reorganize the debtor for the benefit of all creditors.").

25.    For the reasons set forth below, the Committee submits that cause exists to terminate the Debtors' Exclusive Solicitation Period to enable the Committee—as the statutory fiduciary for all unsecured creditors—to propose and prosecute a liquidating plan that it believes will garner sufficient support from the Debtors' unsecured creditor constituencies to be confirmed.

**B.    Application of the *Adelphia* Factors Supports Termination of Exclusivity**

> **(i)    *Adelphia* Factors 1, 2 and 3:  Whether the Debtors Have Made Progress Negotiating with Creditors; Whether the Debtors Have Demonstrated Reasonable Prospects for Filing a Viable Plan; and the Existence of Good Faith Progress Toward Reorganization (all weigh in favor of termination)**

26.    When considering whether a debtor has made progress negotiating with creditors for purposes of continued exclusivity, courts look to the subjective perspective of the creditors and whether creditors have lost confidence in a debtor.  *See, e.g., In re All Seasons Indus., Inc.*, 121 B.R. at 1006 (considering the creditors' view of the situation without considering whether such view was justified); Sept. 27, 2016 Hr'g Tr. at 98:16–99:6, *In re Samson Res. Corp.*, Case No. 15-11934 (BLS) (Bankr. D. Del.) [ECF No. 1418] (denying the debtors' motion for an extension of exclusivity where the debtors failed to engage in negotiations with the creditors' committee); *In re Fountain Powerboat Indus.*, No. 09-07132-8-RDD, 2009 WL 4738202, at *6 (Bankr. E.D.N.C. Dec. 4, 2009) (considering whether a creditor had lost confidence in the debtors' management when deciding a motion to terminate exclusivity); *see also In re New Meatco Provisions, LLC*, No. 2:13-BK-22155-PC, 2014 WL 917335, at *3 (Bankr. C.D. Cal. Mar. 10, 2014) (granting motion to terminate exclusivity when the court found, among other things, that "there is little credible evidence upon which the court can base a finding that [the debtor] will . . . make further

progress in negotiating with creditors[.]"); *In re Crescent Beach Inn, Inc.*, 22 B.R. at 160–61 (terminating exclusivity period given the principal parties' inability to agree on reorganization "at the expense of all creditors of the debtor").

27.    Courts also terminate exclusivity where debtors are not able to demonstrate reasonable prospects for filing a viable plan or the existence of good faith progress toward reorganization. *See, e.g., In re GMG Cap. Partners III, L.P.*, 503 B.R. 596, 602 (Bankr. S.D.N.Y. 2014) (denying debtor's motion to extend exclusivity where, among other things, debtor had no prospect of confirming a plan without creditor's support); *In re New Meatco Provisions, LLC*, 2014 WL 917335, at *3 (granting motion to terminate exclusivity when the court found, among other things, that "there is little credible evidence upon which the court can base a finding that [the debtor] will . . . be able to present a plan of liquidation that has creditor support and a prospect at confirmation within a reasonable period of time"); *In re New Millennium Mgmt., LLC*, No. 13-35719-H3-11, 2014 WL 792115, at *7 (Bankr. S.D. Tex. Feb. 25, 2014) (rejecting debtor's motion to extend exclusivity period where, among other things, debtor had not demonstrated reasonable prospects for filing a viable plan and had made little progress toward reorganization).

28.    To date, the Debtors have not shown that they are able to obtain confirmation of the Plan. Over seventeen months into these Chapter 11 Cases, the Debtors have made little to no meaningful progress in resolving (with finality) the largest disputed claims in these cases, consisting primarily of the MEPP Claims that, given their sheer magnitude at either the low or high end of the Debtors' estimated range, will control whether any plan can be confirmed. While the Debtors have made settlement overtures to the holders of these claims, upon information and belief, those overtures were not viewed constructively and are unlikely to lead to near term resolutions. While many of these claims are capable of being resolved by settlement or through

litigation on a post-effective date basis by a properly motivated liquidating trust, the Committee believes that the Debtors have structured the governance of the Liquidating Trust in bad faith and in a manner designed to unduly pressure creditors.  Moreover, given the Debtors' litigation posture to date and the Liquidating Trust governance structure proposed by the Debtors in the Plan (i.e., one that is completely controlled by designees of the Debtors), the Plan and its post-effective date governance structure will not be accepted by Class 5 at any Debtor.  Indeed, the Committee believes that the only path to settlement and the maximization of value and unsecured creditor recoveries is through a plan construct where the Liquidating Trust is governed by fiduciaries appointed by the only true fiduciary for unsecured creditors—the Committee.  In fact, the Committee has not identified a single case where the debtors controlled a liquidating or litigation trust formed under a chapter 11 plan where the primary, if not sole, beneficiaries of such trust were the debtors' unsecured creditors.  As a result, the Committee no longer has confidence in the Debtors' ability to structure a plan that will be acceptable to (and be in the best interests of) unsecured creditors or, relatedly, to propose a plan that unsecured creditors would support.

29.    In response, the Debtors undoubtedly will tout their innumerable recent and upcoming hearings in front of this Court and their unwavering dedication to the filing and vigorous prosecution of an increasingly-large number of claims objections.  This response, however, is simply not relevant to the Court's inquiry at this stage of the proceedings.  All parties—including the Committee—would readily acknowledge that the Debtors' advisors are well-equipped to mount numerous complex, multi-pronged, novel and expensive litigation battles both in this Court and beyond, but those skills thus far have not translated into the ability to forge consensus around how a liquidating trust should be managed and whose interests should, first and foremost, be taken into account in connection therewith.  Notwithstanding the hundreds of pages of briefing the

Debtors have submitted and the dozens of hours of Court time that these matters have subsumed to date, the time has come to move on from the front lines of the litigation battlefield these cases have become, cease the continued expenditure of millions of dollars a month in professional fees, and work towards one or more settlements that will facilitate the near term distribution of the value held in these estates.  The Committee, as a fiduciary for all unsecured creditors, stands ready and willing to propose a plan that will transfer control over all pending matters and all remaining assets in these estates to fiduciaries without deep-rooted animosity or deal fatigue, who will be best positioned to resolve the pending disputes efficiently and fairly, and ensure that unsecured creditor distributions are maximized (and trust expenditures minimized).

> **(ii)**     ***Adelphia Factors 4 and 5:  Whether the Debtors Have Had Sufficient Time to Negotiate a Plan and the Length of Time the Cases Have Been Pending (both weigh in favor of termination)***

30.     Courts routinely terminate exclusivity in cases where the debtors have failed to negotiate a plan despite sufficient time to do so and in consideration of the amount of time the cases have been pending.  *See, e.g., In re New Meatco Provisions, LLC*, 2014 WL 917335, at *3 (granting motion to terminate exclusivity where, among other things, "there is little credible evidence upon which the court can base a finding that [the debtor] will either make further progress in negotiating with creditors or be able to present a plan of liquidation that has creditor support and a prospect at confirmation within a reasonable period of time."); *In re New Millennium Mgmt., LLC*, 2014 WL 792115, at *7 (rejecting debtor's motion to extend exclusivity period where, among other things, debtor had sufficient time to negotiate a plan, but had not done so); *In re Pub. Serv. Co. of N.H.*, 99 B.R. 155, 175–77 (Bankr. D.N.H. 1989) (denying the motion to extend exclusivity when the court considered that the stalemate between the debtor and a creditor would not promote a consensual plan within a reasonable time frame); *see also In re R.G. Pharmacy*, 374 B.R. at 488

(breakdown of negotiations between debtor and objecting creditors impacted several factors such that continuation of exclusivity was not likely to improve progress toward reorganization).

31.     These cases have been pending for approximately seventeen months and the Debtors are approaching the maximum exclusivity period permitted by the Bankruptcy Code. Under these facts, the Debtors cannot plausibly argue that they have not had ample time to negotiate a consensual plan.   Indeed, the Debtors have had ample time to prepare multiple iterations of the Plan currently on file, each of which is or was unacceptable to the Committee and its constituency for the reasons cited above.   Prolonging the Debtors' unilateral ability to pursue a dead-end plan path will only result in increased professional fee burn to the detriment of all unsecured creditors, a result that the Committee seeks to avoid by asking this Court to terminate exclusivity and permit it to file and prosecute its own liquidating plan.

> **(iii)     *Adelphia Factors 6 and 7:  Whether the Chapter 11 Cases are Complex and Have any Unresolved Contingencies (both weigh in favor of termination)***

32.     Although the size and complexity of a case are relevant considerations, this factor cannot warrant continued exclusivity on its own even if the Court were otherwise inclined to find that the Chapter 11 Cases remain large and complex as of the date hereof.   *See, e.g., In re Pub. Serv. Co. of N.H.*, 99 B.R. at 162 ("[S]ize and complexity must be accompanied by other factors . . . to justify extension of plan exclusivity"); *Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hosp. (In re Henry Mayo Newhall Mem'l Hosp.)*, 282 B.R. 444, 452 (B.A.P. 9th Cir. 2002) (recognizing as "debunked" the view that complex cases require extended exclusivity); *see also, e.g., In re Mid-State Raceway, Inc.*, 323 B.R. 63, 67–68 (Bankr. N.D.N.Y. 2005) ("[T]he Court is mindful that whether or not to grant an extension of exclusivity . . . is a matter of discretion based on all the facts and circumstances.").

33.     The Committee acknowledges that the litigation issues presented in the Chapter 11 Cases are complex, but that complexity should no longer bear on the question of whether the Debtors are entitled to continued exclusivity.  Absent settlement, there is no scenario in which all or a significant portion of the pending litigation matters will be resolved before confirmation of any plan, nor can that plausibly be the goal of the Debtors, the Committee or any other party who may pursue confirmation of a liquidating plan.  The best, and indeed, only path forward at this point in the cases is to recognize the irrefutable truth that all of the pending matters will be transferred to a liquidating trust and will be overseen and controlled by a liquidating trustee.  Similarly, there is no "unresolved contingency" capable of any near-term resolution that would expedite confirmation of a plan here.  Accordingly, these factors similarly support terminating the Debtors' exclusivity period and facilitating the prompt transfer of all pending litigation matters to a liquidating trust pursuant to an unsecured creditor-supported plan.

*(iv)     Adelphia Factor 8:  Whether the Debtors are Paying Their Debts as They Become Due (weighs in favor of termination)*

34.     This factor is given modest weight, if any.  *Adelphia*, 352 B.R. at 590.  Where a debtor is paying its bills as they become due, it means only that this factor does not plainly warrant terminating exclusivity. *Id.*

35.     Although the Debtors may be paying their debts, the majority of the debts coming due are professional fees because the Debtors are (and have always been) non-operating entities. Every dollar spent on professional fees in these cases is a dollar that is not being distributed to unsecured creditors and, thus, represents diminishing recoveries for unsecured creditors.  Given the circumstances of these cases and the Committee's increasing desire to alleviate the excessive fee burn that remains ongoing in these cases, this factor also weighs in favor of termination of exclusivity.

(v)    ***Adelphia Factor 9:  Whether the Debtors are Using Exclusivity to Pressure Creditors (weighs in favor of termination)***

36.    Courts have recognized that a debtor's ability to exert undue pressure on creditors through the extension of exclusivity must be monitored and limited.  *In re Texaco Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) ("An extension should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory." (quoting S. Rep. No. 95-989, 95th Cong. 2d Sess. 118 (1978))); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987) (characterizing Bankruptcy Code section 1121 as "a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise"), *aff'd*, 484 U.S. 365 (1988).

37.    As noted above, the Debtors have been singularly focused on pursuing costly litigation that is depleting estate resources and thus potential recoveries for unsecured creditors. To that end, the Committee believes that the Debtors have purposely structured the governance of the Liquidating Trust to provide for the trust to be overseen and controlled by Debtor-appointees for the express purpose of blindly continuing expensive, animosity-driven litigation and exerting undue pressure on the Debtors' adversaries, who are also their most significant creditors.  These tactics have resulted in little hope of settlement or consensual resolution and, instead, have driven the parties further apart.  Because the votes of these creditors are required to confirm any plan proposed in these cases, the Debtors' tactics have created an impasse that can only be overcome at this point by the termination of exclusivity, which would permit the Committee to propose a plan that gives unsecured creditors the ability to select a fiduciary to handle all go-forward litigation matters.

**C.    Terminating Exclusivity Will Move the Cases Forward for the Benefit of the Estates and Will Not Prejudice the Debtors.**

38.    While the *Adelphia* factors are all significant considerations for the courts, a "primary consideration" in determining whether to terminate exclusivity is whether doing so will "facilitate moving the case forward."  *Dow Corning Corp.,* 208 B.R. at 670; *Adelphia*, 352 B.R. at 590 ("[T]he test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case."); *see also In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. at 452 (holding that "a transcendent consideration is whether adjustment of exclusivity will facilitate moving the case forward toward a fair and equitable resolution").  There can be no doubt that terminating exclusivity is in the interests of moving the Chapter 11 Cases forward.

39.    The Committee is prepared to file a plan immediately that will bring the Chapter 11 Cases to a swift conclusion as it will address the governance issues and release issues that the Committee has raised repeatedly and which are the primary issues preventing the Plan from being acceptable and are issues for which the Debtors have been intransigent.  Given that all of the remaining activity in the Chapter 11 Cases directly impacts unsecured creditor recoveries, the Committee, as the sole fiduciary only for unsecured creditors, is in the best possible position to prosecute a plan of liquidation that will align with the interests of the Debtors' sole voting class. The Committee's proposed plan would be substantially similar to the Plan already on file, with only modest changes needed to address the concerns that have already been expressed to the Court. If the Court were to permit the Committee to file and prosecute such a plan, terminating exclusivity would undoubtedly have the effect of moving these cases forward through the near-term confirmation and implementation of a plan that would represent the interests and have the support

of the Debtors' unsecured creditors.  By contrast, the continued prosecution of the Debtors' Plan will only further dissipate estate assets and add to the over-all timeline of these cases.

40.     Relatedly, the Debtors have been languishing in chapter 11 for over seventeen months.  The Debtors have very nearly exhausted the outside limits of their Exclusivity Periods as dictated by Bankruptcy Code section 1121(d)(2), and thus neither the Debtors nor these estates would be prejudiced by the termination of exclusivity at this late stage.

## ALTERNATIVE REQUESTED RELIEF

41.     If the Court finds that terminating exclusivity is not the best path forward to bring these cases to a conclusion most expeditiously, the Committee respectfully requests that the Chapter 11 Cases be converted to cases under chapter 7 of the Bankruptcy Code.  Bankruptcy Code section 1112(b)(1) provides that on request of a party in interest, and after notice and a hearing, the court shall convert a case under chapter 11 to a case under chapter 7 or dismiss a case under chapter 11, whichever is in the best interests of creditors and the estate, for cause, unless the court determines that the appointment of a trustee or an examiner under section 1104(a) is in the best interests of creditors and the estate.  11 U.S.C. §1112(b)(1).

42.     Bankruptcy Code section 1112(b)(4) provides a non-exhaustive list of sixteen grounds that constitute "cause" for dismissal *or conversion* of a chapter 11 case.  *Nester v. Gateway Access Sol., Inc.* (*In re Gateway Access Sol., Inc.*), 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007) ("Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise.'" (quoting *In re Brown,* 951 F.2d 564, 572 (3d Cir. 1991))).  Among those bases for "cause" is the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).  As discussed herein, the continued accrual of professional fees in these cases represents a "substantial

[and] continuing loss to or diminution of the estate," a loss that will continue to increase, uncapped, over an indefinite period of time as the Debtors' litigation workstreams advance through myriad appellate processes.  Indeed, the Debtors have paid more than $35 million in professional fees since the Initial Plan was filed nearly five months ago and over $185 million since these cases began.  In addition, there is clearly no reasonable likelihood of rehabilitation for these liquidating Debtors. *See, e.g., In re 15375 Mem'l Corp.*, 386 B.R. 548, 552 (Bankr. D. Del. 2008) (stating that "[r]ehabilitation does not include liquidation," but rather it "means to reestablish a business"), *rev'd on other grounds*, 400 B.R. 420 (D. Del. 2009); *see also Loop Corp. v. United States Tr.*, 379 F.3d 511, 516 (8th Cir. 2004) ("Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business.").

43.    Once cause is established, a debtor's case must be converted or dismissed, unless (i) the court finds and specifically identifies unusual circumstances such that conversion or dismissal would not be in the best interests of creditors and the estate, (ii) there is a reasonable likelihood that a plan will be confirmed within a reasonable period of time *and* (iii) the grounds for converting or dismissing the case include an act or omission of the debtor other than Bankruptcy Code section 1112(b)(4)(A) that can be reasonably justified and will be cured within a reasonable period of time.  *See* 11 U.S.C. § 1112(b)(1), (b)(2)(B)(i)–(ii).  The Bankruptcy Code does not define "unusual circumstances"; however, the term contemplates conditions that are not common in chapter 11 cases.  *Mahmood v. Kahtib (In re Mahmood)*, No. CC-16-1210-TaFC, 2017 WL 1032569, *8 (B.A.P. 9th Cir. Mar. 17, 2017) (citing *In re Prod. Int'l Co.,* 395 B.R. 101, 109 (Bankr. D. Ariz. 2008)).  The Committee is aware of no such "unusual circumstances" in these cases.  Moreover, given the Debtors' posture to date in these cases, and for the reasons set forth above at length, there is not a reasonable likelihood that the Debtors will ever be able to obtain

confirmation of their Plan, or confirmation of an alternative plan, within a reasonable period of time.

44.     The Committee respectfully submits that, absent termination of exclusivity requested as the primary form of relief herein, conversion, rather than dismissal, best serves the interests of creditors under these facts and circumstances.  When considering conversion or dismissal, "[the creditors] will be the best judge of their own best interests . . . ."  *In re Mattick*, 496 B.R. 792, 803 (Bankr. W.D.N.C. 2013).  The Committee believes that unless the Committee is provided the opportunity to file a plan devoid of undue Debtor control and unnecessary releases, conversion is in the best interests of the estates and it would cede control over these cases to an independent third party fiduciary, selected by unsecured creditors, who would administer the remaining estates and effectuate distributions to unsecured creditors in an unbiased, expeditious, and ultimately more economical manner than allowing the Debtors to remain in sole control of the trajectory of these cases.  The Committee does not make this request lightly, but feels compelled to do so in order to protect and preserve the estates' remaining assets for the benefit of all unsecured creditors if the Court is not otherwise inclined to terminate exclusivity.

## **RESERVATION OF RIGHTS**

45.     This Motion is submitted without prejudice to, and with a full and express reservation of, the Committee's rights to conduct any and all discovery as may be required or deemed necessary, to supplement or amend this Motion, including based on the results of discovery, and to assert such other grounds for relief as may become apparent.  Nothing herein is intended to be a waiver by the Committee of any right, objection, argument, claim or defense with respect to any matter, all of which are hereby expressly reserved.

## <u>CONCLUSION</u>

**WHEREFORE**, the Committee respectfully requests that the Court enter an order, substantially in the form of the proposed order attached hereto as **<u>Exhibit A</u>**, granting the relief requested herein and granting such other and further relief as is just, proper and equitable.

[*remainder of page intentionally left blank*]

Date:  January 28, 2025
Wilmington, Delaware

**BENESCH, FRIEDLANDER,
          COPLAN & ARONOFF LLP**

*/s/ Jennifer R. Hoover*
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile:  (302) 442-7012
E-mail:   jhoover@beneschlaw.com
          kcapuzzi@beneschlaw.com
          jgentile@beneschlaw.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Philip C. Dublin (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
Kevin Zuzolo (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: pdublin@akingump.com
          mlahaie@akingump.com
          kzuzolo@akingump.com

*Counsel to the Official Committee
of Unsecured Creditors of Yellow Corporation, et al.*