**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' POST-TRIAL WARN BRIEF**

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.  YELLOW WAS NOT REQUIRED TO ISSUE WARN NOTICES TO
    EMPLOYEES LAID OFF ON JULY 30, 2023 ................................................... 2

II. SHOULD THE COURT DETERMINE YELLOW WAS AN "EMPLOYER" AT
    THE TIME OF THE UNIONS' LAYOFFS, ANY PENALTY ASSESSED
    AGAINST THE DEBTORS SHOULD BE REDUCED TO ZERO ON
    ACCOUNT OF THE DEBTORS' GOOD FAITH. .......................................... 8

    A.  The Evidence Shows Yellow had the Requisite Subjective Intent to
        Comply with the WARN Act. ................................................................. 9

    B.  The Evidence Shows Yellow's Application of the Act was Objectively
        Reasonable. ............................................................................................. 12

III. THE UNIONS FAILED TO SHOW HOW THE PERCEIVED INSUFFICIENT
     BRIEF STATEMENT HARMED AFFECTED EMPLOYEES. ..................... 16

CONCLUSION ............................................................................................................. 19

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Alarcon v. Keller Indus., Inc.*
  27 F. 3d 386 (9th Cir. 1994) ...................................................14

*Butler v. Fluor Corp.*,
  511 F. Supp. 3d 688 (D.S.C. 2021)...................................................17, 18

*Carlberg v. Guam Indus. Servs*,
  2017 WL 4381667 (D. Guam Sept. 30, 2017)...................................................13

*Castro v. Chicago Hous. Auth.*,
  360 F.3d 721 (7th Cir. 2004) ...................................................16

*In re Century City Drs. Hosp., LLC*,
  2010 WL 6452903 (B.A.P. 9th Cir. Oct. 29, 2010)...................................................6

*Chaney v. Vt. Bread Co.*,
  2023 WL 5589113 (D. Vt. Aug. 24, 2023) ...................................................15

*In re Decade, S.A.C., LLC*,
  625 B.R. 616 (Bankr. D. Del. 2021) ...................................................7

*In re Dewey & LeBoeuf LLP*,
  487 B.R. 169 (Bankr. S.D.N.Y. 2013)...................................................6

*Easom v. US Well Servs., Inc.*,
  37 F.4th 238 (5th Cir. 2022) ...................................................3

*Easom v. US Well Servs., LLC*,
  2023 WL 6279359 (S.D. Tex. Sept. 26, 2023) ...................................................11

*Frymire v. Ampex Corp.*,
  61 F.3d 757 (10th Cir. 1995) ...................................................10

*Gilmore v. Macy's Retail Holdings*,
  2009 WL 140518 (D.N.J. Jan. 20, 2009) ...................................................7

*Hamilton v. Leavy*,
  322 F.3d 776 (3d Cir. 2003)...................................................7

*Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO & Aeronautical Indus.*
  *Dist. Lodge 776 v. Gen'l Dynamics Corp.*,
  821 F. Supp. 1306 (E.D. Mo. 1993)...................................................17

*Kalwaytis v. Preferred Meal Sys.*,
   Inc., 78 F.3d 117, 121-22 (3d Cir. 1996) ..............................................................13

*Messer v. Bristol Compressors Int'l, LLC*,
   2020 WL 4548125 (W.D. Va. Aug. 6, 2020) ...........................................................16

*Oil, Chem. and Atomic Workers Int'l Union, Local 7-515, AFL-CIO v. Am. Home
   Prods. Corp.*,
   790 F. Supp. 1441 (N.D. Ind. 1992) .......................................................................14

*In re Old Electroalloy Corp.*,
   162 B.R. 121 (Bankr. W.D. Penn. 1993) ...................................................................9

*In re Organogenesis Inc.*,
   316 B.R. 574 (Bankr. D. Mass. 2004) .....................................................................16

*Student Pub. Int. Rsch. Grp. of N.J. Inc. v. Monsanto Co.*,
   1988 WL 156691 (D.N.J. Mar. 24, 1988)..................................................................7

*In re TWL Corp.*,
   712 F.3d 886 (5th Cir. 2013) ....................................................................................3

*United Auto. Aerospace & Agr. Implement Workers of Am., Loc. 1077 v.
   Shadyside Stamping Corp.*,
   1991 WL 230841 (6th Cir. Nov. 8, 1991).........................................................16, 18

*In re United Healthcare Sys.*,
   200 F. 3d 170 (3d Cir. 1999)..................................................................................5, 7

*Williams v. Runyon*,
   130 F.3d 568 (3d Cir. 1997)......................................................................................7

**Statutes**

29 U.S.C. § 2104(a)(1)........................................................................................................5

Cal. Lab. Code § 1405 .......................................................................................................8

N.J. Stat. Ann. § 34:11 – 4:10.b.........................................................................................8

N.Y. Lab. Law § 860-g .....................................................................................................8

## **INTRODUCTION**

Only two triable issues remained after summary judgment: (1) whether under the federal and New York WARN Acts, Yellow was an "employer" at the time of the Unions' layoffs on July 30, 2023, based on the timing of Yellow's last delivery; and, if so, (2) whether damages should be reduced on account of the Debtors' good faith.[2]  In the Debtors' Proposed Pretrial Order and Trial Brief, the Debtors posited that the evidence at trial would show that: (a) Yellow's last delivery was on July 29, 2023, and Yellow was thus a liquidating fiduciary as of July 30, 2023; and (b) Yellow had a subjective intent to comply with the WARN Act and its application of the Act was objectively reasonable.  At trial, the Debtors proffered a significant amount of evidence that delivered on their promise.

Over the course of three days, the Debtors presented testimony and undisputed evidence that demonstrated the real-time chaos and unprecedented circumstances Yellow leadership faced when they realized on July 26, 2023, that the Company would be forced to shutter the doors of its 99-year old business and lay off over 25,000 employees within the next four days.  The evidence established that Yellow was no longer an "employer" when it completed its last delivery at 11:30 p.m. ET on July 29, 2023.  The next day, on July 30, Yellow's last line haul truck—which did not make deliveries—returned to its terminal, and the Company ordered its facilities closed and laid off approximately 22,000 union employees at 12 p.m. ET.  Yellow issued WARN notices to union representatives that same day, and despite having no legal obligation to do so, Yellow also mailed WARN notices to all affected union employees on July 31 in a good faith effort to provide notice

---

[2]    For purposes of this brief, the "<u>Unions</u>" shall mean claimants represented by the International Brotherhood of Teamsters (the "<u>IBT</u>") and the International Association of Machinists and Aerospace Workers (the "<u>IAM</u>"), "<u>Yellow</u>" or the "<u>Company</u>" shall mean Yellow Corporation, "<u>Debtors</u>" shall mean the above-captioned debtors and debtors in possession, and "<u>WARN Act</u>" shall refer to the Worker Adjustment and Retraining Notification Act and its state law equivalents.

to affected employees.  In fact, Yellow's efforts to prioritize the welfare of its employees by keeping them safe and informed permeated the Debtors' case in chief.

Each of the Debtors' witnesses testified to the heightened tensions in the days leading up to the shutdown and the need to maintain a safe working environment.  The record also established the lengths Yellow took to prioritize WARN, including retaining outside financial advisors and labor counsel.  Yellow understood its WARN obligations and had historically issued WARN notices 60 days in advance.  However, here, due to an unexpected shutdown, Yellow did in four days what would have typically been done in months.

The Unions' presentation of evidence paled in comparison.  Rather than proffer any witnesses with personal knowledge relevant to the triable issues, the Unions attempted to relitigate the Court's Motion for Summary Judgment Opinion and Order.  The Unions also conceded that they have the burden of proving Yellow was an "employer" at the time of the Unions' layoffs. Because the Unions failed to establish that Yellow was an "employer" at that time, the Court should find in favor of the Debtors.  Alternatively, because the Unions failed to contradict the substantial evidence put forth by the Debtors, any damages assessed against the Debtors should be reduced to zero on account of the Debtors' good faith efforts to comply with the WARN Act.

## ARGUMENT

### I.    YELLOW WAS NOT REQUIRED TO ISSUE WARN NOTICES TO EMPLOYEES LAID OFF ON JULY 30, 2023.

The evidence presented at trial makes clear that Yellow was no longer an "employer" within the meaning of the WARN Act at the time of the Unions' layoffs.  As established by the Court at summary judgment, the relevant inquiry in determining Yellow's status as a liquidating fiduciary is "[w]hether under the federal and New York WARN Acts, Debtors were an 'employer' on July 30, 2023 when the Union layoffs occurred *based on the timing of the last delivery*."

Summ. J. Order (D.I. 5390) at 4 (emphasis added). The only evidence offered at trial regarding the timing of Yellow's final delivery establishes that the final delivery made by a Yellow driver was on July 29, 2023. Darren Hawkins, Yellow's former CEO, and Dan Olivier, Yellow's CFO, both testified that Yellow made its final delivery of freight to customers on July 29, 2023. Jan. 21, 2025 Trial Tr. (Hawkins) at 127:11-15 ("Q. Sir, was there freight still in the system that Yellow couldn't deliver on July 29th, 2023? A. Yes. Q. Did Yellow, itself, ever deliver that freight? A. No."); *id.* (Olivier) at 169:14-16 ("Q. Do you know the date that Yellow's last shipment was delivered? A. July 29th of 2023."); *see also* Jan. 22, 2025 Trial Tr. (Whittman) at 26:1-3 ("Q. Did Yellow, itself, deliver any of that freight after July 29th? A. No, they did not."). This is corroborated by Yellow's delivery records that were identified and pulled from its historical freight management systems, and then "pressure test[ed]," which unequivocally show Yellow's final delivery consisted of six shipments delivered at approximately 11:30 p.m. ET on July 29, 2023. *See* Jan. 21, 2025 Trial Tr. (Olivier) at 219:3-11 (describing process for analyzing delivery records); *see also* Debtors' Exs. 112-117.

Although the Debtors were the only ones to introduce evidence establishing the timing of Yellow's final delivery, it is the Unions who have the burden of proving Yellow was an "employer" at the time of their layoffs. *See e.g., Easom v. US Well Servs., Inc.,* 37 F.4th 238, 241 (5th Cir. 2022) citing *In re TWL Corp.*, 712 F.3d 886, 897 (5th Cir. 2013) ("To prove a WARN Act claim, a plaintiff must demonstrate that . . . the defendant was 'an employer'[.]"); Jan. 23, 2025 Trial Tr. at 105:8-11 ("The Court: [] So, in the event the evidence on [the liquidating fiduciary point] is a tie, unless you come back later and tell me otherwise, that means you lose? Mr. Ho: I think that's correct."). Thus, given that the Unions did not offer ***any evidence*** to establish the timing of Yellow's final delivery, they failed to meet their burden of proving "the July 30, 2023

3

layoff[s] of the union employees occurred before . . . the last delivery was completed." D.I. 5227 at 48.

Rather than offer any evidence to refute the fact that Yellow's last delivery occurred on July 29, the Unions merely speculated during closing arguments that the driver who made the final delivery "may have" taken "10 hours off" before he returned from the customer's location to his home terminal, and thus that he could have returned after the July 30 layoffs. Jan. 23, 2025 Trial Tr. at 86:11-18. But this speculation is not evidence and cannot satisfy the Unions' burden.[3] And contrary to that speculation, the final delivery driver's payroll records reflect that after the 11:30 p.m. ET delivery on July 29, the driver's destination was his home terminal, which, as the payroll summary also shows, was only 71 miles away from the customer's location. Debtors' Ex. 118. *See also* Jan. 21, 2025 Trial Tr. (Olivier) at 209:24-210:1 ("Q. [A]nd Mr. Stuart's own terminal was 402, correct? A. Correct."); 211:4-6 ("Q. [T]his shows that 402 was supposed to be his destination after finishing his last delivery, correct? A. Yes, yes."). Thus, even if the Yellow driver's return trip to his terminal were part of a "delivery" to a customer, this return drive, too— which would not have taken more than 90 minutes—would have been completed before the Unions' layoffs at 12 p.m. ET on July 30. Debtors' Ex. 124 (July 30, 2023 Yellow Board of Directors Meeting Minutes) at 1 ("[A]s of noon ET, operations formally ceased and terminals are shuttered."); Jan. 21, 2025 Trial Tr. (Hawkins) at 68:6-12 ("Q. Sir, you mentioned the shutdown taking place on Sunday. Was that July 30th? A. Yes. Q. And was that the day union layoffs took

---

[3] The Unions' argument that the final delivery driver could have been the same driver who pulled into a terminal just before noon on July 30, 2023—raising a "gap" of 16-19 hours, *see* D.I. 5361, at 5—is similarly not just unsupported by, but contradictory to, the evidence in the driver's payroll record as well as the testimony of Debtors' witnesses that establishes the July 30 driver was a line haul driver and thus was not completing a delivery. Debtors Ex. 118; Jan. 21, 2025 Trial Tr. (Olivier) at 216:20-22 ("As part of the wind-down towards noon on July 30th, there were line haul drivers still in transit back to their domicile terminals."); *id.* (Hawkins) at 125:1-5 (explaining that a line haul driver merely moves freight between facilities and does not make deliveries); *id.* (Olivier) at 216:8-9 ("Moving freight from one terminal to another Yellow terminal would not be a delivery.").

place as well? A. It is. Noon eastern that day, we had all the facilities closed and the notices posted."); Jan. 21, 2025 Trial Tr. (Olivier) at 230:10-12 ("Q. And what is your understanding of when the layoffs occurred? A. Noon on July 30th.").[4]

To combat the obvious finding that Yellow was a liquidating fiduciary at the time of Unions' layoffs, the Unions attempt to move the goalposts and misdirect the Court.  First, the Unions reject this Court's finding that "Debtors were no longer 'employers' within the meaning of the WARN Act after they had delivered the final shipment."  Unions' Trial Br. (D.I. 5390) at 3. Instead, the Unions argue "[w]hether Yellow was continuing to operate its business, or had become a liquidating fiduciary, . . . should be measured on July 26, 2023,"[5] or "at the latest, the liquidating fiduciary analysis should focus upon the company's activities in the period immediately prior to the layoffs."  D.I. 5405 at 3.  This argument relates to the Unions' interpretation of the word "orders" in the WARN Act.  29 U.S.C. § 2104(a)(1) ("Any employer who orders a plant closing or mass layoff in violation of section 2102 of this title . . . ").  The Unions state that Yellow "ordered" layoffs on July 26 because that is when Yellow's Board of Directors decided to begin the process of liquidation.  Jan. 23, 2025 Trial Tr. at 81:11-21.  This is, however, contrary to the common sense meaning of the term "ordered," as the Court noted.  Jan. 23, 2025 Trial Tr. at 80:8-14 ("[T]he language from the cases that you're pointing to is trying to solve a particular problem,

---

[4]    Employees who were not at Yellow's facilities at noon ET on July 30 were informed of their layoffs even later that day.  *See, e.g.*, W. Coughlen Dep. Tr. at 104:14-105:5 ("Q. How did you learn that you were being terminated? A.  . . . I got – a recorded phone call came to my house at about 4:30 on a Sunday and told me not to report to work for the 2300 shift, or if you are working at seven o'clock on Monday morning, do not report to work . . . Q. And that would have been July 30, 2023? A. Yes, July 30.").

[5]    To be clear, the Debtors believe Yellow was no longer an "employer" within the meaning of the WARN Act as of July 26, 2023, given that Yellow's activities no longer "resemble[d] those of a business operating as a going concern," but rather "those of a business winding up its affairs" at that time.  *In re United Healthcare Sys.*, 200 F. 3d 170, 178 (3d Cir. 1999).  The Debtors reserve the right to argue this issue on appeal, but understand the Court held on summary judgment that Yellow was an "employer" on July 28, 2023.  D.I. 5227 at 48.

but shouldn't override the words of the statute in which ordered has its English meaning."); *see In re Century City Drs. Hosp., LLC*, 2010 WL 6452903, at \*9 (B.A.P. 9th Cir. Oct. 29, 2010) ("[T]he dispositive issue is whether, ***at the time terminations occurred***, the defendant was 'responsible for operating the business as a going concern.'" (emphasis added)); *In re Dewey & LeBoeuf LLP*, 487 B.R. 169, 176 (Bankr. S.D.N.Y. 2013) (describing the relevant inquiry as whether "a debtor was liquidating when the layoffs occurred" (internal citation omitted)).[6]

Nonetheless, the Unions again seek to employ the same standard they have been pushing for months—which was already rejected by this Court—because, under such standard, "it should not matter when Yellow made its last delivery."  Unions' Mot. *in Limine* #3 (D.I. 5361) at 4 n.1. For example, during Mr. Hawkins' cross-examination, the Unions attempted to tie Yellow's fuel surcharges for customers to the "mercantile character" of the trips its drivers took even after Yellow's deliveries were completed.  Jan. 21, 2025 Trial Tr. (Hawkins) at 86:5-12.  During the cross examination of Brian Whittman (Managing Director at Alvarez & Marsal), the Unions similarly suggested the staging of Yellow's freight after Yellow's final delivery "was something Yellow employees always did, even before a shutdown"—a notion Mr. Whittman unequivocally refuted.[7]  Jan. 22, 2025 Trial Tr. (Whittman) at 32:17-22.  But the record is clear that all freight handling conducted after July 29 was done solely to facilitate Yellow's liquidation.  *See id*. at

---

[6]    During closing arguments, the Court raised the question of when the WARN notices were sent to the Unions on July 30.  *See* Jan. 23, 2025 Trial Tr. at 45:24-47:11.  The Debtors acknowledge that the WARN notices were sent to the Unions at approximately 10:14 a.m. on July 30—nearly 12 hours *after* Yellow's final delivery on July 29. *See* Joint Ex. 108.  It should also be noted that individual WARN notices were not sent out to the approximately 22,000 affected union employees until July 31.  Jan. 22, 2025 Trial Tr. (Whittman) at 24:1-6 ("[F]or the union employees, notices were provided to the union representatives on Sunday, the 30th, then mailed to individuals . . . [W]e had 20-some-odd thousand notices to print and get mailed out . . . on the 31st.").  Therefore, there is nothing that occurred before Yellow's final delivery that could be construed as the time that the Unions' layoffs occurred.

[7]    The Unions also appeared to offer generalized testimony from John Murphy on this point.  Given that Mr. Murphy had no personal knowledge of the timing of Yellow's final delivery, Mr. Murphy merely testified to his understanding of the practices for handling customer freight while Yellow was operating normally.  *See e.g.,* Jan. 23, 2025 Trial Tr. (Murphy) at 22:17-25.  Such testimony does not remotely satisfy the Unions' burden.

25:16-25, 61:13-19 (describing that after the company's shutdown, the focus was on "monetize[ing] the company's assets," which included "clear[ing] the terminals of freight," and remaining employees after July 30 were there to "facilitate a liquidation"). After Yellow's final delivery on July 29, the Company focused on "arrangements" that were "being made for customers to retrieve their freight" and Yellow planned to "outsource delivery of remaining freight to customers that cannot or do not retrieve it." Debtors' Ex. 124 at 1 (July 30, 2023 Board Meeting Minutes). These activities do not "resemble those of a business operating as a going concern," but rather "those of a business winding up its affairs," and the Unions have offered no evidence to the contrary. *United Healthcare*, 200 F. 3d at 178.

Even if the evidence presented at trial satisfied the Unions' preferred standard(s) as a substantive matter (and it does not), the Unions' attempt to move the goalposts also suffers from an insurmountable procedural problem – the liquidating fiduciary standard this Court established cannot now be relitigated. *See* D.I. 5227 at 48 ("[T]he [D[ebtors were no longer 'employers' within the meaning of the WARN Act after they had *both* stopped picking up new shipments *and* delivered the final shipment."). "[T]he law of the case doctrine . . . limits relitigation of an issue once it has been decided in an earlier stage of the same litigation[.]" *In re Decade, S.A.C., LLC*, 625 B.R. 616, 626 (Bankr. D. Del. 2021) (quoting *Hamilton v. Leavy*, 322 F.3d 776, 786 (3d Cir. 2003) (cleaned up)). "[Untimely] reconsideration of an issue . . . decided prior to trial, and upon which the case proceeded to trial . . . would be manifestly unfair to the parties." *Student Pub. Int. Rsch. Grp. of N.J. Inc. v. Monsanto Co.*, 1988 WL 156691, at *8 (D.N.J. Mar. 24, 1988).[8]

---

[8]    If the Unions wanted to relitigate this issue of law, they could have filed a motion for reconsideration before trial but failed to do so. Once the parties reach trial, however, each party is barred from raising issues that were decided at summary judgment and attempting to "take a second bite at the apple." *Gilmore v. Macy's Retail Holdings*, 2009 WL 140518, at *7, *9 (D.N.J. Jan. 20, 2009) (granting defendant's motion in limine to preclude plaintiff from introducing evidence "relating to such issues and claims decided" on summary judgment because defendant was "entitled not to have to defend against the same facts"); *see also Williams v. Runyon*, 130 F.3d 568, 573 (3d

Accordingly, the Unions failed to meet their burden of establishing Yellow was an "employer" at the time of the Unions' layoffs, and the Court should find in favor of the Debtors.[9]

## II.    SHOULD THE COURT DETERMINE YELLOW WAS AN "EMPLOYER" AT THE TIME OF THE UNIONS' LAYOFFS, ANY PENALTY ASSESSED AGAINST THE DEBTORS SHOULD BE REDUCED TO ZERO ON ACCOUNT OF THE DEBTORS' GOOD FAITH.

As the Court found on summary judgment, courts may, in their discretion, reduce a company's liability under the WARN Act if the company "present[s] subjective evidence of its intent to comply with the Act and evidence of objective reasonableness in [its] application of the Act."  D.I. 5227 at 59 (internal quotations and citation omitted).  To be clear, as the Court has acknowledged, Yellow's subjective intent and the objective reasonableness of its WARN notices goes to whether the Court has discretion to reduce damages—not just to whether the Court should exercise such discretion.  Jan. 23, 2025 Tr. Transcript at 90:5-8.  The Debtors presented more than enough evidence of this here, and thus any penalty should be reduced to zero.[10]

---

Cir. 1997) (holding district court erred in granting reconsideration after trial on issue from summary judgment, because non-movant party was "clearly prejudiced" by "reliance on the prior ruling" for her trial strategy).

[9]    This same analysis should be applied to the New York WARN Act given that at least one court has held that the liquidating fiduciary exception is also available under New York law.  D.I. 5227 at 66.  Accordingly, the same conclusion—that Yellow was not an "employer" at the time of the Unions' layoffs—should be reached under the New York WARN Act.  The Debtors believe Yellow was no longer an "employer" under the New Jersey WARN Act at the time of the Unions' layoffs as well, and reserve the right to argue that issue on appeal, but understand the Court held at summary judgment that "[t]he New Jersey Act . . . cannot fairly be read to support a liquidating fiduciary exception."  D.I. 5227 at 64.

[10]    Any penalty assessed against the Debtors for violations of state WARN Acts should similarly be reduced on account of the Debtors' good faith.  *See* N.J. Stat. Ann. § 34:11 – 4:10.b ("When determining the amount of the penalty imposed because of a [WARN] violation, the commissioner shall consider factors [including] . . . the seriousness of the violation" and "the good faith of the employer."); N.Y. Lab. Law § 860-g "If an employer proves to the satisfaction of the commissioner that the act or omission that violated this article was in good faith . . . the commissioner may, in his or her discretion, reduce the amount of liability[.]" Cal. Lab. Code § 1405 ("If the court determines that an employer conducted a reasonable investigation in good faith . . . the court may reduce the amount of any penalty imposed against the employer under this chapter.").

### A.   The Evidence Shows Yellow had the Requisite Subjective Intent to Comply with the WARN Act.

The Debtors presented indisputable evidence that Yellow had the requisite subjective intent to comply with the WARN Act at the time of layoffs. As the Court noted at summary judgment, "[t]here is certainly evidence in the record showing that Yellow was concerned with meeting its obligations under the WARN Act," D.I. 5227 at 60, and at trial the Debtors demonstrated the same.

First, Yellow "was aware of the WARN Act and was cautious to not violate its requirements." *In re Old Electroalloy Corp.*, 162 B.R. 121, 126 (Bankr. W.D. Penn. 1993). Several witnesses from the Company attested to Yellow's historical practice and process for meeting its WARN obligations. Jan 21, 2025 Trial Tr. (Hawkins) at 70:20-71:5; *id.* (Statlander) at 135:2-18. Mr. Hawkins explained that in his three decades at Yellow, he could not recall the Company having ever issued a shortened WARN notice because layoffs were always planned more than 60 days in advance. *Id.* (Hawkins) at 71:6-15. And Sarah Statlander, the Vice President of Human Resources and an employee at Yellow for over a decade, testified to the same. *Id.* (Statlander) at 143:17-20.

Unfortunately, the unexpected and unprecedented nature of the July 2023 shutdown forced Yellow to prepare for the mass Unions' layoffs within four days—while it simultaneously also undertook the herculean effort of preparing to file for bankruptcy—when it historically would have had several months to do so. *See id.* (Hawkins) at 71:6-15; *see also* Jan. 22, 2025 Trial Tr. (Whittman) at 15:1-12. Out of an abundance of caution, the Debtors first began discussing their WARN obligations on July 17 after receiving the IBT's strike notice as part of the standard contingency planning process. *See id.* at 13:2-11 ("Q. What topics were discussed at that [July 17] meeting [with the Company], if you recall, just at a high level? A. . . . [I]tems to prepare for filing in terms of… employee issues, including the potential need to issue WARN notices."). Mr.

Whittman painted a clear illustration of how the Company then "devoted a significant amount of time and effort [to drafting and issuing its WARN notices] in a very compressed timeline" after determining mass layoffs were probable on July 26. *Id*. at 64:2-8; *see also* Jan. 21, 2025 Trial Tr. (Hawkins) at 72:3-8 (testifying WARN "frequently" came up on calls relating to the Company's bankruptcy preparations and layoffs between July 26 and July 30). The evidence shows, in addition to Yellow's in-house counsel, Yellow retained labor counsel to assist in these efforts. *See* Jan. 22, 2025 Trial Tr. (Whittman) at 20:6-20; 24:14-25:10; *see also* Jan. 21, 2025 Trial Tr. (Hawkins) at 71:16-22; *id*. (Statlander) at 135:25-136:7.

For the next four days, Yellow worked around the clock to wind down its operations while prioritizing the welfare of its employees, including maintaining a safe work environment as it prepared to lay off over 22,000 union members. *See Frymire v. Ampex Corp.*, 61 F.3d 757, 768 (10th Cir. 1995) (Evidence of an employer's subjective intent to comply with the WARN Act includes "general evidence that the company had its employees' welfare in mind."). Mr. Hawkins testified that there were concerns for physical violence as tensions heightened around the layoffs. Jan. 21, 2025 Trial Tr. (Hawkins) at 128:20-25. Mr. Whittman explained that Yellow intentionally laid off union members on a Sunday to reduce the risk of "negative interactions" between employees. Jan. 22, 2025 Trial Tr. (Whittman) at 19:4-14; *see also id.* at 17:13-18:8 ("[W]e worked with management to determine the . . . best day to let go the union employees [and] how to do that in . . . the most effective and safe way possible."). The Company also prioritized employees' financial welfare by ensuring the Company had sufficient funds to pay wages for the final days those employees worked. Jan. 22, 2025 Trial Tr. (Whittman) at 15:13-16:9 (testifying the Debtors worked "to make sure [they] didn't run out of cash and were able to pay payroll for the final days that the employees were working prior to the filing").

An employer's "subjective intent to comply is also supported by evidence that it tried to keep employees informed of its decisions." *Easom v. US Well Servs., LLC*, 2023 WL 6279359, at *15 (S.D. Tex. Sept. 26, 2023). Yellow always maintained an open and transparent dialogue with its employees to keep them appraised of the state of the Company as circumstances developed. *See* Joint Exs. 41, 44, 48, 55, 75; Debtors' Ex. 41.[11] The record supports the Company's position that Yellow leadership was so concerned about the safety of its workers that it believed it was in the best interest of its employees to avoid further incitement by stating the obvious and pointing the finger at the IBT in talking points and direct communications. Jan. 21, 2025 Trial Tr. (Statlander) at 138:15-19 ("My belief is [] that we didn't want to potentially inflame the situation by citing the actions of the IBT and the Union to the Union employees."); Jan. 22, 2025 Trial Tr. (Whittman) at 45:20-46:4. And on cross-examination the witnesses stated their belief that this same concern was shared by the drafters of Yellow's WARN notice. *Id*. at 46:13-24. Simply put, Yellow believed that the impact of the strike was widely known and widely publicized.

Once the layoffs were safely executed, Yellow had more freedom to communicate its belief that the IBT's strike notice had killed the company. On August 7. 2023, Yellow issued a press release stating as much. *See* Joint Ex. 118 ("IBT leaders announced a strike against Yellow's then-significantly wounded company. Customers fled and business was not recoverable."); *see also* Jan. 22, 2025 Trial Tr. (Whittman) at 23:10-12 (". . . on the petition date, when . . . the communication constraints were removed, there was a more fulsome public release."). And on the same day, Matthew Doheny filed a First Day Declaration on behalf of the Debtors expressing the

---

[11]   It should be noted that union members did not need Yellow email addresses to receive these timely updates about Yellow. The Company had an efficient process in place that made sure terminal managers disseminated communications to union employees in a timely manner. And as soon as those communications were posted, the information would spread like wildfire on "trucking boards," "social media" and "FreightWaves." Jan. 21, 2025 Trial Tr. (Hawkins) at 59:25-60:10. "Any information [Yellow] sent out became public almost immediately." *Id*. at 60:10-12.

same sentiment.  D.I. 14.  Both documents were widely circulated and publicly available.  In light of these communications and the over 25,000 WARN notices Yellow issued to affected employees, the Debtors believed they had conveyed all of the requisite information and did so under extraordinarily challenging circumstances.

> **B.**     **The Evidence Shows Yellow's Application of the Act was Objectively Reasonable.**

At summary judgment, the Court ruled that the Debtors "substantively qualify for the faltering company defense and unforeseeable business circumstances defense," but were precluded from invoking either defense because its WARN notices contained an insufficient brief statement of the basis for reducing the notification period.  D.I. 5390 at 3.  With respect to the faltering company defense, however, the Court noted that the Debtors' WARN notice "certainly comes close to describing the underlying facts that give rise to the faltering company exception."  D.I. 5227 at 32.  And more generally, that "the [D]ebtors' violation of the WARN Act . . . [is] something of a technical one."  *Id*. at 62.  After trial, the objective reasonableness of Yellow's application of the WARN Act is undeniable.

First, the fact that the Court has already reasoned that Yellow's WARN notice *almost* satisfied the requirements of the WARN Act is evidence in and of itself that Yellow's application of the WARN Act was objectively reasonable.  *See id.* at 61 ("even the inadequacy of the notices is a very close question"); *see also* Jan. 23, 2025 Trial Tr. at 101:19-20 ("[I]sn't the question of objective reasonableness, was it close or [did] it miss by a mile?").  In its July 30 WARN notice to union representatives, the Debtors stated, in part:

> The Company was not able to provide earlier notice of the Shut Down as it qualifies under the. . . . 'faltering company,'. . . . exception[] set forth in the WARN Act. . . . The Company had **hoped to complete one or more transactions and secure funds and business** to prevent the closing of these locations but was unable to do so. These circumstances were not reasonably foreseeable at the time notice would have otherwise been required.

Joint Ex. 108 (emphasis added).  A plain reading of this notice provides a general summation of the underlying rationale for Yellow's faltering company defense: due to the IBT's intransigence, the Company was unable to obtain the refinancing it needed (i.e., "complete one or more transactions and secure funds") to save the Company.  The strike notice triggered a "domino effect" of unfortunate events foreclosing any hopes of refinancing Yellow's debt after its shipments plummeted, the ABL collapsed, and Yellow was drained of the remainder its liquidity.  *See* Jan. 21, 2025 Trial Tr. (Hawkins) at 50:8-51:6; 64:25-65:13 (stating the same).

Second, the fact that Yellow did issue WARN notices, along with numerous other communications detailing the looming demise of Yellow if the IBT failed to cooperate, is evidence of the Debtors' objectively reasonable application of the WARN Act.  The law is clear that "defective notice need not be equated with no notice" and "the determination of whether adequate substance has been conveyed [in a WARN notice] requires 'practical and realistic appraisal of the information given to affected employees.'"  *Carlberg v. Guam Indus. Servs*, 2017 WL 4381667, at *4 (D. Guam Sept. 30, 2017) (quoting *Kalwaytis v. Preferred Meal Sys*., Inc., 78 F.3d 117, 121-22 (3d Cir. 1996)).  Practical assessment of a WARN notice, in part, involves the consideration of external communications.  *See id.* ("[A]n employer may, at times, appropriately rely on a combination of written and oral communication, as well as external publicity, to adequately convey the requisite information under the Act to employees.").

Yellow's failed attempt at refinancing was not breaking news to employees at the time of the layoffs.  In fact, ***almost 6 weeks prior to the shutdown***, Yellow informed its employees that due to its "inability to proceed with One Yellow" the Company had been "operating at a loss" and would not be able to "***focus on a comprehensive refinancing of its debt***" until there was a "clearer path forward with the IBT."  Joint Ex. 48 (emphasis added).  Then on July 20, 2023, ten days

13

before Yellow issued its WARN notice, the Company informed employees that "[o]ver the past months" IBT leadership had chosen to "degrade the company" "instead of having direct, productive negotiations that could put Yellow on a better path and save 30,000 jobs."  Joint Ex. 75.  Yellow explained that it remained hopeful and continued to engage in negotiations with the IBT as the "commencement of meaningful negotiations" would allow Yellow to "***reengage in comprehensive refinancing efforts with lenders***" and pave the way for implementation of One Yellow.  *Id.* (emphasis added).

In other words, "***there simply was no secret***" that Yellow desperately needed to refinance but its efforts were blocked by the IBT's intransigence.  *Oil, Chem. and Atomic Workers Int'l Union, Local 7-515, AFL-CIO v. Am. Home Prods. Corp.*, 790 F. Supp. 1441, 1452 (N.D. Ind. 1992) (finding good faith exists where possibility of plant closing was made known to union officials in advance (emphasis added)).  It was objectively reasonable for Yellow to believe that its employees were aware of the "one or more transactions" it "hoped to complete" to "secure funds and business to prevent the closing of these locations" ***because they were***.

Similarly, it was objectively reasonable for Yellow to think it had sufficiently communicated that it had to give shortened notice because of the unforeseeable impact of the strike notice.  For starters, Yellow was not required to specify every reason for its shutdown in its brief statement, and it already referenced its inability to obtain financing.  *See Alarcon v. Keller Indus., Inc.* 27 F. 3d 386, 391 (9th Cir. 1994) ("[i]f an adequate explanation of the circumstances of one cause of the shortened notice period is given [in the WARN notice], the employer is not required to continue on with other explanations.").[12]  And even if Yellow was required to list every basis

---

[12]    The Unions seemed to argue in closing arguments that the Debtors must prove their WARN notices were objectively reasonable under both the faltering company defense and the unforeseeable business circumstances

for reducing the notification period, the Unions failed to point to **any** evidence to suggest that **any** employee was unaware that the strike notice had a devastating impact on the Company.  Rather, the evidence unequivocally demonstrates that employees were certainly aware of the IBT's highly publicized strike threat and its effect on Yellow's business, and thus had the "opportunity to determine whether, on that basis, the absence of prior notice was reasonable." *Chaney v. Vt. Bread Co.*, 2023 WL 5589113, at *11 (D. Vt. Aug. 24, 2023); *see also, e.g.*, V. Torres Dep. Tr. at 86:17-22 (testifying that following the strike notice, he witnessed "all the operations stuff" "declin[e] rapidly within that week"); A. Green Dep. Tr. at 39:8-12 ("[T]he tonnage that we would normally receive kind of decreased throughout the weeks."); W. Coughlen Dep. Tr. at 105:6-15 ("Q. Were you surprised to receive this phone call [about being terminated]? . . . A. No. Q. Why not? A. Because the previous week Yellow had stopped picking up freight.").

As Mr. Whittman testified on cross examination, "[Yellow's] belief was that everyone was certainly aware of . . . the implications of the strike notice. . . .  There was no desire . . .  to poke[] somebody in the eye" with the obvious.  Jan. 21, 2025 Trial Tr. (Whittman) at 45:20-46:4.  And Mr. Hawkins testified that "[e]very employee had a front row seat . . . and saw it, so . . . it was very well known." Jan. 21, 2025 Trial Tr. (Hawkins) at 101:3-10.  The record also shows that IBT leadership was aware that Yellow blamed the strike notice for its financial demise.  *See* Debtors' Ex. 70 ("Yellow has sought to blame the Local Unions' 72-hour strike notice as the cause of its financial problems.").  Accordingly, Yellow believed the sentence reading "[t]hese circumstances were not reasonably foreseeable at the time the notice would have otherwise been required" in its WARN notice was self-explanatory.  *See* Jan. 21, 2025 Trial Tr. (Hawkins) at 73:5-23.  The

---

defense in order to prevail on their good faith defense.  Jan. 23, 2025 Trial Tr. at 92:4-10.  But as the Court correctly noted, "you only need one affirmative defense in order to avoid liability."  *Id*. at 92:11-12.

Debtors therefore satisfy the objective reasonableness prong, particularly considering the tight timeline the Company had to draft and issue the notices, the trove of information available to affected employees regarding the basis for the shortened notice period, and the other extenuating circumstances outlined in Section II(A).[13]

### III.     THE UNIONS FAILED TO SHOW HOW THE PERCEIVED INSUFFICIENT BRIEF STATEMENT HARMED AFFECTED EMPLOYEES.

If there were ever a case where the Court should exercise its discretion to reduce any penalty to zero, this is the case.  In determining whether to impose a penalty for WARN violations, courts have considered the materiality of the technical defect, the extent of harm to plaintiffs, and whether the purpose of the WARN notice was fulfilled.  Where there is no evidence that plaintiffs suffered any harm because of a technical violation and the notice served the purpose of the WARN Act, courts have found no violation of the WARN Act warranting an award of damages.  *See Messer v. Bristol Compressors Int'l, LLC*, 2020 WL 4548125, at *3 (W.D. Va. Aug. 6, 2020) (holding no WARN violation under substantial compliance where there was no evidence that employees "suffered any prejudice" from technical defect and "employees at issue" had "received notice that served the purpose of the WARN Act" despite defects).  An award of damages has similarly been found to be inappropriate where the employer acted in good faith and its employees were informed of the requisite information required under the WARN Act.  *See United Auto. Aerospace & Agr. Implement Workers of Am., Loc. 1077 v. Shadyside Stamping Corp.*, 1991 WL 230841, at *3 (6th Cir. Nov. 8, 1991) (finding even if the employer violated the Act, no damages should be awarded where the employer "knew of the Act, attempted to comply with the Act, and

---

[13]    The Unions failed to present any evidence to the contrary and the case law they rely upon is inapplicable to the facts at hand.  *See e.g. In re Organogenesis Inc.*, 316 B.R. 574, 588 (Bankr. D. Mass. 2004) (no notice at all and the court found there was no evidence establishing that during the relevant period, the Board ever considered the applicability of WARN); *Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 731 (7th Cir. 2004) (no notice at all and court found compliance with WARN was an afterthought).

had reasonable grounds for believing it had complied with the Act," and the notices included "much of the required information"). Finally, courts have also found that damages should not be awarded where, due to unforeseeable business circumstances, the employer issued WARN notices as soon as practicable. *Butler v. Fluor Corp.*, 511 F. Supp. 3d 688, 719 n.33 (D.S.C. 2021) ("Even if [the employer] violated the WARN Act in the process of distributing notice as soon as practicable after the Project's closure, such minor violations would fall squarely within the good faith exception of the WARN Act to avoid an award of damages, particularly given the unique and unprecedented challenges brought about by the shutdown.").

The Unions "are not entitled to any damages on the basis of [Yellow's perceived] technical violation" because they have failed to "identify *any* harm that befell the affected employees as a result of" the inadequate brief statement. *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO & Aeronautical Indus. Dist. Lodge 776 v. Gen'l Dynamics Corp.*, 821 F. Supp. 1306, 1313 (E.D. Mo. 1993) (emphasis added). Given the amount of information affected employees had available to them regarding the cause of Yellow's collapse, there can be no question that they had the opportunity to assess whether Yellow's basis for its shortened notice period was reasonable, and thus the purpose of the brief statement requirement was fulfilled, and the Unions were not harmed by Yellow's WARN notices, despite the Court's finding that they were inadequate. Indeed, even the Court has recognized that "it is by no means obvious that an employee who received a compliant notice would be materially better off than those who received the [D]ebtors' inadequate ones." D.I. 5227 at 61. And, given that the Court has already found "there can be little question that the business circumstances that caused the layoffs were 'unanticipated' within the meaning of the WARN Act's exception," it is clear that the Debtors could not have issued WARN notices any earlier than they did. *Id*. at 3, 61.

Although the Unions may argue that the WARN notices should have been distributed on July 26—the date the layoffs became probable—*or* July 28—the date Yellow issued WARN notices to the non-union employees—the evidence indisputably shows that Yellow issued its WARN notices as soon as practicable given the "magnitude" of the company, the "presence of thousands of workers at the job site," and the "abrupt nature of the shutdown." *Butler*, 511 F. Supp. 3d at 719 (finding no WARN Act violation where notices were issued ***four days after the shutdown*** to hourly employees, and ***ten days after the shutdown*** to salaried employees); *see also* Jan. 21, 2025 Trial Tr. (Statlander) at 140:23-141:6 ("I'm not sure another team could have done what we did in that small amount of time."); *Shadyside Stamping*, 1991 WL 230841, at *3 ("We agree that [employer] acted in good faith . . . During the period in question, [employer's] circumstances were rapidly evolving.  In this situation, the lack of scientific precision in the layoff notices does not vitiate good faith.").  And, even if Yellow had issued notices determined to be sufficient by the Court on July 30, the Unions would still not have received any advanced notice of their layoffs, and therefore suffered no damages as a result of Yellow's perceived technical violation.

However, should the Court determine that some amount of damages should be awarded, any award of damages greater than two or four days of backpay would eviscerate this Court's prior holding that the Debtors substantively qualify for the faltering company and unforeseeable business circumstances exceptions.  D.I. 5227 at 19-28.  Importantly, as this Court found, it was not the July 17 strike notice itself that unforeseeably caused Yellow's demise; it was the resulting loss of customers and the need to shut down operations, *id*. at 28, which the record demonstrates did not become clear until July 26 at the earliest.  *See* Jan. 22, 2025 Trial Tr. (Whittman) at 13:21-14:21.  While the evidence overwhelmingly demonstrates the notices were provided as soon as

possible under the circumstances, July 26 is the earliest possible date on this record that the Court could find notice should have been given due to Yellow's decision to shut down operations. Thus, awarding damages any greater than two or four days of backpay for Yellow's immaterial perceived deficiency would be manifestly unfair to the Debtors.

## **<u>CONCLUSION</u>**

For the reasons set forth herein and evidenced at trial, the Court should find that Yellow was a liquidating fiduciary at the time of the July 30, 2023 layoffs and thus has no WARN liability. Alternatively, the Court should find that any damages assessed against the Debtors should be reduced on account of the Debtors' good faith.

Dated: January 31, 2025
Wilmington, Delaware

*/s/ Peter J. Keane*

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:         ljones@pszjlaw.com
               tcairns@pszjlaw.com
               pkeane@pszjlaw.com
               ecorma@pszjlaw.com

-and-

Patrick J. Nash, P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:          pnash@kirkland.com
               dseligman@kirkland.com

-and-

Michael Esser (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
555 California Street
San Francisco, California 94104
Telephone:     (415) 439-1400
Facsimile:     (415) 439-1500
Email:         michael.esser@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*