## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*, | Case No. 23-11069 (CTG) |
| Debtor. | **Related Docket Nos. 4834, 4835** |

## <u>MEMORANDUM OPINION</u>

Yellow wound down its business operations in July 2023. That constituted a withdrawal from the various multiemployer pension plans in which Yellow had previously participated. In earlier opinions, this Court addressed Yellow's potential liability, under ERISA, to various of those multiemployer pension plans arising out of that withdrawal.[1] Yellow's withdrawal from those multiemployer pension plans and the basic statutory framework governing withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 are both addressed in the prior opinions. In the interest of avoiding repetition and so as not to burden the reader with an unnecessarily long opinion, familiarity with those matters is presumed.

---

[1] *See* Memorandum Opinion dated March 27, 2024, D.I. 2765 (deciding that claims for withdrawal liability are properly decided in the claims allowance process, notwithstanding ERISA's arbitration provisions); Memorandum Opinion dated September 13, 2024, D.I. 4326 (finding that certain regulations promulgated by the PBGC relating to the calculation of withdrawal liability for those pension plans that received federal funding under the American Rescue Plan Act were valid exercises of the agency's regulatory authority, and addressing several disputes regarding the calculation of withdrawal liability); Amended Memorandum Opinion dated November 5, 2024, D.I. 4769 (on motion for reconsideration, amending certain portions of the September 13, 2024 Memorandum Opinion relating to the calculation of withdrawal liability). Debtors Yellow Corporation and its affiliates are referred to collectively as "debtors" or "Yellow." The Employee Retirement Income Security Act of 1974, as amended, is referred to as "ERISA." The Pension Benefit Guaranty Corporation is referred to as the "PBGC." The Amended Memorandum Opinion dated November 5, 2024 is referred to as the "Amended Memorandum Opinion."

The disputes now before the Court arise out of proofs of claim filed by five multiemployer pension plans.[2] These plans filed claims that, in the aggregate, assert approximately $540 million in withdrawal liability.  The debtors objected to the allowance of these claims.[3]  The parties filed cross motions for summary judgment, raising several disputed legal questions that bear on the proper calculation of withdrawal liability.  Three of the issues are now ripe for decision.

*First*, the most significant issue is a dispute over the meaning of 29 U.S.C. § 1393(a)'s command that the plan's actuary, in calculating a plan's withdrawal liability, use assumptions that "in the aggregate, are reasonable" and that take "into account the experience of the plan" to produce a figure that reflects the "actuary's best estimate of anticipated experience under the plan."[4]  On that issue, three courts of appeals have held that the discount rate must at least be in the same ballpark as the discount rate used to calculate the plan's "minimum funding" under 29 U.S.C. § 1084(c), whose statutory language is strikingly similar to that of § 1393(a).  One district court has reached the opposite conclusion.  The Third Circuit

---

[2] The pension plans in question are The Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan (referred to as "Central Pennsylvania Teamsters Pension Fund"), the International Brotherhood of Teamsters Union No. Local 710 Pension Fund (referred to as "Teamsters Local 710 Pension Fund"), the Teamsters Joint Council No. 83 of Virginia Pension Fund (referred to as "Virginia Teamsters Pension Fund"), the New England Teamsters Pension Fund (referred to as "New England Teamsters Pension Fund"), and the Teamsters Pension Trust Fund of Philadelphia & Vicinity (referred to as "Philadelphia Teamsters Pension Fund").  These plans did not receive federal funds under the American Rescue Plan Act, so these claims allowance disputes do not involve the questions regarding the validity of the PBGC regulations addressed in the opinions cited in n.1.

[3] D.I. 2595.

[4] 29 U.S.C. § 1393(a)(1).

has not addressed this question.  As further described below, this Court is persuaded by the statutory analysis set forth in the decisions of the three courts of appeals and will adopt that reasoning.

*Second*, the debtors and the Virginia Teamsters Pension Fund have used different data to calculate the debtors' "contribution base units," which is one of the inputs used to calculate the debtors' annual payment (*i.e.*, what the debtors owe every year to pay off their withdrawal liability).  The Virginia Teamsters Pension Fund argues that its data are more reliable than the debtors' and therefore it should be entitled to summary judgment.  While the Virginia Teamsters Pension Fund makes a fair case for why its data may be more accurate, this is not a question of law that should be decided on summary judgment.  Rather, this issue requires the factfinder to make a credibility determination and must be resolved after trial.

The *third* issue arises out of the fact that Yellow paused its contributions to the New England Teamsters Pension Fund in 2008, when it was experiencing financial turmoil during the financial crisis.   In light of Yellow's financial circumstances at that time, the New England Teamsters Pension Fund, like many other plans at the time, allowed Yellow to pause its contributions without assessing withdrawal liability.  When Yellow rejoined the plan in 2011, its plan contributions were only 25 percent of what they had been when it paused contributions in 2008.  But Yellow's return to the plan was conditioned on its agreement to pay withdrawal liability based on the level of contributions it was making in 2008 if it were to withdraw in the future.  Honoring that agreement would impose withdrawal liability

that exceeds what Yellow would owe if the liability were calculated in accordance with the statutory formula.  Yellow argues that the agreement should be set aside because it is inconsistent with the statute.  This Court addressed a similar question in its Amended Memorandum Opinion and found no reason to invalidate an agreement under which an employer agrees (in exchange for other consideration) to pay withdrawal liability in an amount that exceeds what strict application of the statute would yield.  The Court sees no reason to reach a different conclusion here.[5]

## Jurisdiction

This claims allowance dispute arises under § 502 of the Bankruptcy Code and thus falls within the district court's "arising under" jurisdiction set forth in 28 U.S.C. § 1334(b).  As provided in 28 U.S.C. § 157(a), the district court has referred this matter to this Court under the district court's February 29, 2012 standing order of reference.  This dispute is a core matter under 28 U.S.C. § 157(b)(2)(B).

## Analysis

The current dispute arises on cross motions for summary judgment.  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6]  When conflicting evidence is presented and inferences must be drawn, the court must draw all

---

[5] While the summary judgment briefing also includes other issues, the parties reached various agreements that either resolve those issues or reflect an agreement that they need not be considered at this stage of the litigation.  To the extent appropriate, the form of order submitted by the parties that reflects this ruling should also include the disposition of those other issues.

[6] Fed. R. Civ. P. 56, as made applicable to this contested matter by Fed. R. Bankr. P. 9014(c) and Fed. R. Bankr. P. 7056.

reasonable inferences in the light most favorable to the non-moving party. The court cannot resolve genuinely disputed questions of fact.[7] The judge does not weigh the evidence, but only determines whether the issue, as presented, is definitively resolved.[8]

### I. The assumptions underlying the plans' withdrawal liability calculations must relate to the "anticipated plan experience."

When an employer withdraws from a multiemployer pension plan outside of bankruptcy, ERISA sets out a process for determining the employer's withdrawal liability. The pension plan makes an initial calculation of the withdrawal liability.[9] An employer that seeks to challenge that calculation would do so through arbitration.[10] In that arbitration, the plan's determination "is presumed correct unless a party contesting the determination shows by a preponderance of the evidence that" either "(i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods."[11]

---

[7] *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145, 148 (3d Cir. 1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[8] *Ciarlante*, 143 F.3d at 145, 148; *Anderson*, 477 U.S. at 249.

[9] 29 U.S.C. § 1382(1).

[10] *Id.* § 1401(a)(1).

[11] *Id.* § 1401(a)(3)(B). *See also United Mine Workers of America 1974 Pension Plan v. Energy West Mining Company*, 39 F.4th 730, 735-736 (D.C. Cir. 2022) (describing statutory scheme); *Concrete Pipe & Prod. of Cal. v. Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 615 (1993) (finding that imposing burden of proof on employer to show that the actuary's calculations are unreasonable does not deprive employer of due process).

In this Court's March 2024 Memorandum Opinion, it denied a motion by the plans for relief from stay to have the debtors' withdrawal liability decided through arbitration, instead concluding that this claims allowance question could properly be decided in this Court.[12]  In substance, the plans calculated their withdrawal liability (as ERISA contemplates) in the proofs of claim they filed in this bankruptcy case. This Court's role is substantively identical to the one otherwise played by the arbitrator.  As such, the applicable procedural standard in this claims allowance dispute is the same one that the statute directs the arbitrator to apply when determining whether the assumptions used by the actuary were unreasonable, taking account of the experience of the plan and reasonable expectations.

### A.   *Sofco Erectors* **and the cases that follow it correctly hold that an actuary's assumption must be based on a plans anticipated experience.**

As the Court described in its Amended Memorandum Opinion (particularly at pp. 5-8), multiemployer pension plans present particular regulatory challenges. These plans are subject to ERISA's reticulated statutory and regulatory scheme that is designed to ensure the plans' financial viability.  One aspect of this scheme involves the "minimum funding standards" that such plans must satisfy on an annual basis. ERISA requires that "the employers make contributions to or under the plan for any plan year which, in the aggregate, are sufficient to ensure that the plan does not have an accumulated funding deficiency … as of the end of the plan year."[13]

---

[12] *See* D.I. 2765.

[13] 29 U.S.C. § 1082(a)(2)(C).

An "accumulated funding deficiency" is, in substance, any amount that is "needed to ensure [that the plan] has enough assets to pay for the employees' vested pension benefits when they retire."[14]  Calculating that amount necessarily requires the plan actuary to make certain assumptions, including an assumption about the rate of return the plan is likely to earn on its current assets.  ERISA provides direction regarding the assumptions the actuary should make: "For purposes of this section, all costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of actuarial assumptions and methods — (A) each of which is reasonable (taking into account the experience of the plan and reasonable expectations), and (B) which, in combination, offer the actuary's best estimate of anticipated experience under the plan."[15]

The assumed performance of the fund's investments effectively operates as the discount rate that should be applied to determine the present value of the plan's future obligations.  To use a stylized example, a fund that would owe $1 million in benefits for each of the next ten years would need more than $8.5 million in present assets to pay those benefits if the annual return it would receive on those assets were only three percent.  But at a nine percent annual return, those same benefits would be adequately funded with just over $6.4 million in current assets.  Accordingly, for the purpose of calculating minimum funding, "a higher interest rate-assumption is

---

[14] *United Mine Workers of Am. 1974 Pension Plan*, 39 F.4th at 734.  *See also Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz*, 513 U.S. 414, 416 (1995) (ERISA requires "employers to make contributions that would produce pension plan assets sufficient to meet future vested pension liabilities").

[15] 29 U.S.C. § 1084(c)(3).

more favorable for the fund because it makes it easier to meet minimum-funding standards."[16]

The calculation of withdrawal liability involves a similar exercise. As the Amended Memorandum Opinion (at p. 7) explained, the first step in calculating withdrawal liability is the determination of the plan's "unfunded vested benefits." Not unlike an "accumulated funding deficiency," a plan's unfunded vested benefits are "the value of the nonforfeitable benefits under the plan" less "the value of the assets of the plan."[17] So like with the accumulated funding deficiency, the calculation of unfunded vested benefits requires one to determine the present value of the benefits the plan owes in the future. That present discount calculation similarly requires one to choose a discount rate, which requires one to make an assumption about the likely future performance of the fund's investments.

So, it may come as no surprise that ERISA's statutory direction to the actuary calculating withdrawal liability is quite similar to that provided in the minimum funding context. Here, the statute states that withdrawal liability "shall be determined by each plan on the basis of … actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan."[18] But unlike minimum funding, "[f]or

---

[16] *Sofco Erectors v. Trustees of the Ohio Operating Engineers Pension Fund*, 15 F.4th 407 (6th Cir. 2021).

[17] 29 U.S.C. § 1391(b)(1).

[18] *Id.* § 1393(a)(1).

withdrawal-liability purposes, a lower interest-rate assumption is more favorable" to the plan since a lower rate of return on the plan's investments would *increase* the amount that a withdrawing employer would be required to pay.[19]

For the sake of comparison, the markup below shows the difference in the relevant statutory language between sections 1084(c)(3) (which addresses minimum funding) and 1393(a)(1) (which addresses withdrawal liability). The language of § 1084(c)(3) is shown as the original language and that of § 1393(a)(1) is the revised version. In short, withdrawal liability:

> shall be determined **by each plan** on the basis of — **(1)** actuarial assumptions and methods **which, in the aggregate, are** ~~(A) each of which is~~ reasonable (taking into account the experience of the plan and reasonable expectations) and ~~(B)~~ which, in combination, offer the actuary's best estimate of anticipated experience under the plan.

As the markup reveals, the most significant difference is that in the context of minimum funding, the assumptions must be reasonable *in the aggregate* whereas for purposes of calculating withdrawal liability, *each* of the assumptions must be reasonable. Perhaps that means that there is more flexibility for *individual* assumptions in the minimum funding context so long as the assumptions "in the aggregate" are reasonable, whereas in the withdrawal liability context the reasonableness of "each" assumption is considered in isolation.[20] But to the extent this minor wording difference might conceivably make a difference in some

---

[19] *Sofco Erectors*, 15 F. 4th at 419.

[20] *See United Mine Workers of America 1974 Pension Plan v. Energy West Mining Co.*, 464 F. Supp. 3d 104, 114 (D.D.C. 2020) (suggesting that this language "gives actuaries some room to maneuver"), *rev'd*, *United Mine Workers of Am. 1974 Pension Plan*, 39 F.4th at 730.

circumstance, no party has argued that there is anything about the factual circumstances here that would make this such a case.[21]

The nub of the debtor's challenge to the plans' calculation of their withdrawal liability stems from the fact that the plans used lower rates to present value their future liabilities for the purpose of calculating withdrawal liability than they did to determine their minimum funding obligations. Three of the plans, the Central Pennsylvania Teamsters Pension Fund, the New England Teamsters Pension Fund, and the Virginia Teamsters Pension Fund, used a method referred to as the "Segal Blend" to determine the present value of their future obligations.[22]

The Segal Blend is an actuarial technique used to calculate a plan's withdrawal liability. An actuary applying the Segal Blend will blend the minimum funding rate (calculated under 29 U.S.C. § 1084(c)(3)) and the PBGC's published interest rates on annuities, which is a nearly risk-free rate of return.[23] While rates fluctuate over time, under current rates the use of the Segal Blend typically results in a lower projected investment return. The debtors assert, and the plans do not contest, that the

---

[21] *See also Concrete Pipe*, 508 U.S. at 632-633 ("The use of the same language to describe the actuarial assumptions and methods to be used in these different contexts [of minimum funding and withdrawal liability] tends to check the actuary's discretion in each of them."). Note that at the time of the Supreme Court's decision in *Concrete Pipe*, the language of the two provisions was in fact identical. The history of the various amendments is helpfully described in the district court's opinion in *Manhattan Ford Lincoln v. UAW Local 259 Pension Fund*, 331 F. Supp. 3d 365, 389-390 n.41 (D.N.J. 2018).

[22] D.I. 4834-1, Ex. 1 ¶¶ 24-25 (Central Pennsylvania Teamsters Fund Dec.); *id.*, Ex. 2 ¶¶ 22-23 (New England Teamsters Pension Fund Dec.); *id.*, Ex. 3 at 11 (Culp Dep. Tr.); *id.*, Ex. 4 at 106 (Culp Dep. Tr.).

[23] *Pension, Hospitalization & Benefit Plan of Elec. Indus. v. ConvergeOne Dedicates Servs.*, 730 F. Supp. 3d 41, 43 (S.D.N.Y. 2024).

difference between the Segal Blend rate and the rate they used in calculating minimum funding is nearly four percent.  And none of the so-called "Segal Plans" actually hold annuities.[24]

The differences between the minimum funding rate and the Segal Blend rate are illustrated in the table below, the accuracy of which is not contested.

| Plan | Minimum Funding Rate | Segal Blend Rate |
|---|---|---|
| Central Pennsylvania Teamsters Pension Fund[25] | 7.5% | 3.9% for first 20 years. 3.65% for remainder. |
| New England Teamsters Pension Fund[26] | 8.5% | 4.21% for first 25 years. 4.34% for remainder. |
| Virginia Teamsters Pension Fund[27] | 7.0% | 3.9% for first 20 years. 3.65% for remainder. |

Two other plans used IRS current liability rates, which are essentially interest rates for 30-year U.S. Treasury securities.  These rates also approximate a "risk free" rate of return.

| Plan | Minimum Funding Rate | IRS Rate |
|---|---|---|
| Teamsters Local 710 Pension Fund[28] | 6.5% | 2.57% |
| Philadelphia Teamsters Pension Fund[29] | 7% | 2.53% |

---

[24] *See* D.I. 4834-1, Ex. 5 at 41, 106 (Dixon Dep. Tr.); *Id.* Ex. 1 ¶ 29 (Central Pennsylvania Fund Teamsters Dec.); *Id.* Ex. 4 at 85 (Culp Dep. Tr.).

[25] D.I. 4834-1, Ex. 1 ¶ 24.

[26] *Id.*, Ex. 2 ¶ 22.

[27] *Id.*, Ex. 6 at 1.

[28] *Id.*, Ex. 7 ¶ 23; *id.*, Ex. 8 at 166.

[29] *Id.*, Ex. 9 at 115-116.

The prevailing view, which this Court will follow, is that the similarity of the language ERISA uses to describe the minimum funding rate and the withdrawal liability rate means that a variation between the two that is as substantial the one here is inconsistent with the statute.  The Sixth Circuit's decision on this point in *Sofco Erectors* is persuasive.  The court there emphasized that the relevant statutory language requires the use of assumptions that "offer the actuary's best estimate of anticipated experience under the plan."[30]  And the Segal Blend rate is not the actuary's "best estimate of anticipated experience under the plan."[31]  Instead, the Segal Blend "dilutes the actuary's best estimate with rates on investments that the plan is not required to and might never buy, based on a set formula that is not tailored to the unique characteristics of the plan."[32]

Since the Sixth Circuit's decision in *Sofco Erectors*, two other courts of appeals have adopted its reasoning.  In *United Mine Workers of America 1974 Pension Plan v. Energy West Mining Co.*, upon the employer's withdrawal from the plan, the plan's actuary, rather than relying on the plan's historic investment performance (which was approximately 7.5 percent) used a "risk-free" rate of less than 2.8 percent.[33]  The parties there disputed whether § 1393(a)(1) imposes any substantive limitation on the actuary's selection of a rate, or whether (as the plans argued) the statute merely "requires that the assumptions be developed independently by the actuary but

---

[30] 15 F.4th at 420 (quoting 29 U.S.C. § 1393(a)(1) (emphasis omitted)).

[31] *Id.* at 421.

[32] *Id.* (internal quotations and citation omitted).

[33] *United Mine Workers of Am. 1974 Pension Plan*, 39 F.4th at 736.

otherwise imposes no substantive requirements on the assumptions made."[34]  Relying on the language of the statute and on the *Sofco Erectors* decision, the D.C. Circuit held that when "calculating withdrawal liability, actuaries must select a discount rate based on the plan's actual anticipated investment experience."[35]

The Ninth Circuit decision in *GCIU-Employer Retirement Fund* is to the same effect.[36]  There, the actuary "did not take into consideration the future experience of the GCIU fund or its expected returns on the plan's funds as currently invested," but instead used a risk-free rate of return.[37]  The Ninth Circuit followed the Sixth and D.C. Circuits in concluding that this approach was inconsistent with § 1393(a)(1). "We follow our sister circuits and interpret the statute to require that the actuary's assumptions and methods reflect the plan's characteristics."[38]

It bears note that none of these opinions goes so far as to say that the withdrawal liability rate needs to be precisely *the same* as the minimum funding rate. It is true, as noted above, that there is a slight difference in statutory language.  But as the D.C. Circuit explained, "the assumptions need not be identical but must be

---

[34] *Id.* at 738.

[35] *Id.*

[36] *GCIU-Employer Retirement Fund v. MNG Enterprises, Inc.*, 51 F.4th 1092 (9th Cir. 2022).

[37] *Id.* at 1099 (internal quotation omitted).

[38] *Id.* (citing *United Mine Workers of Am. 1974 Pension Plan*, 39 F.4th at 738; *Sofco Erectors*, 15 F.4th at 422-423).

similar because they both must be 'the actuary's best estimate of anticipated experience under the plan.'"[39]

### B.  None of the plans' arguments for a contrary reading of the statute is persuasive.

The plans respond to these points primarily by relying on a series of older court of appeals decisions that, in their view, hold that the test established by § 1393(a)(1) is purely "procedural" and only requires that a qualified and independent actuary certify that the rate used was the actuary's best estimate of the plan's anticipated experience.[40]  On the strength of these cases, the plans contend that *Sofco Erectors* and the cases that follow it have created a circuit split.[41]

That is incorrect.  The Sixth Circuit explained this point in *Sofco Erectors*.  It is true that § 1393(a)(1) establishes a procedural requirement.  The Sixth Circuit had said as much in *Rhoades*, a case that relied on the same court of appeals cases from which the plans contend that *Sofco Erectors* split.[42]  But *Rhoades*, and the other court of appeals cases on which it relied, is not inconsistent with *Sofco Erectors*.

---

[39] *United Mine Workers of Am. 1974 Pension Plan*, 39 F.4th at 741 (quoting 29 U.S.C. § 1393(a)(1)).  For this reason, nothing in this line of caselaw calls into question the Third Circuit's determination in *Huber v. Casablanca Indus. Inc.*, 916 F.2d 85, 94 (3d Cir. 1990), that ERISA does not *require* an actuary to use the minimum funding rate in calculating withdrawal liability.  *See also* PBGC Opinion Letter 86-24 (stating that "[t]here is no requirement that the actuarial assumptions used to determine withdrawal liability be the same" as those used to the calculate minimum funding rate).

[40] *See Wachtell, Lipton, Rosen & Katz v. Commissioner of Internal Revenue*, 26 F.3d 291, 296 (2d Cir. 1994); *Vinson & Elkins v. Commissioner of Internal Revenue*, 7 F.3d 1235, 1238 (5th Cir. 1993); *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc.,* 698 F.3d 346, 357 (7th Cir. 2012).

[41] D.I. 5042 at 4.

[42] *See Rhoades, McKee, & Boer v. United States*, 43 F.3d 1071 (6th Cir. 1995).

*Rhoades* held that the statutory requirement that the actuary provide a "best estimate" does *not* mean that the estimate must "withstand the scrutiny of 'outside experts' who suggest that a different figure is 'best.'"[43] The point of the "best estimate" requirement is to "ensure that the chosen assumptions actually represent the actuary's own judgment, rather than the dictates of plan administrators or sponsors."[44]

Nothing in those cases, however, permits an actuary to "disregard the statute's requirement that they base their estimates on the 'anticipated experience under the plan.'"[45] That substantive obligation is *in addition to* the procedural requirement that the actuaries be independent and make their best estimate.

It is true that *Rhoades* and the other court of appeals cases on which it relied generally upheld calculations in which actuaries used interest rates that approximated a risk-free rate. But those cases involved circumstances in which a party simply argued that its alternative assumptions were more accurate than those chosen by the actuary. Those courts rejected the challenges. The decisions, however, did not engage (and had no occasion to engage) the question whether the rate used to calculate withdrawal liability violated the statute because it was not in fact based on the actuary's estimate of anticipated experience under the plan. Accordingly, there

---

[43] *Sofco Erectors*, 15 F.4th at 421 (citing *Rhoades*, 43 F.3d at 1074).

[44] *Id.* at 422 (citing *Rhoades*, 43 F.3d at 1075).

[45] *Id.* (quoting 29 U.S.C. § 1393(a)(1)).

is no conflict between the *Sofco Erectors* line of cases and the court of appeals decisions on which the plans rely.

The plans are correct, however, in pointing to a district court opinion that did engage this question and came out their way.  In *Manhattan Ford Lincoln v. UAW Local 259*, the employer withdrew from its multiemployer pension plan and the plan assessed withdrawal liability on the company. [46]  The plan used the Segal Blend to calculate its withdrawal liability.[47]  Manhattan Ford challenged this approach and argued that the plan should have used the minimum funding rate.  The company argued that the plan was required to calculate its withdrawal liability using the minimum funding rate because the plan was not "principally invested in risk-free assets."[48]  The arbitrator found that the plan was permitted to use the Segal Blend and the district court affirmed.  It held that the "best estimate" test was a procedural one and that the purpose of the "best estimate" test was to ensure that the actuary's assumptions were not the result of undue influence from the plan.[49]

The *Manhattan Ford* court noted the similarity of the statutory language used to describe the assumptions that govern minimum funding and those that govern withdrawal liability.[50]  Even so, the court found that the "best estimate" provision "does not embody a substantive standard so much as it commits the issue to the

---

[46] 331 F. Supp. 3d at 372.

[47] *Id.* at 373.

[48] *Id.* at 393-394.

[49] *Id.* at 396.

[50] *Id.* at 387.

judgment of the actuary."[51]   The opinion is a thoughtful one and it makes a fair argument for reading the statute as imposing only a procedural requirement but otherwise establishing a regime of deference to the conclusions of the actuary.   At the end of the day, however, this Court does not believe that the analysis of *Manhattan Ford* provides a sufficient basis to overcome the force of the statutory language, which requires a *court* to decide whether the assumptions used reflect the "actuary's best estimate of anticipated experience under the plan."[52]   On that issue, there is no avoiding the legal conclusion that a rate that has so little grounding in the plan's actual investments is incorrect as a matter of law.

The plans advance several other arguments to support their use of substantially lower rates in their withdrawal liability calculation than those used for minimum funding.   They argue that their blended rates are intended to reflect a conservative growth rate.   This, they contend, is proper because an employer's withdrawal from a multiemployer pension plan creates the risk of an additional financial burden on the remaining employers.

It is certainly true that the use of a higher rate runs the risk that the plan's actual return will be lower, and therefore that the plan will face a funding shortfall. Because withdrawal liability is fixed, if this turns out to be the case, the burden will fall on the remaining plan members to make the plan whole.   So, the plans argue, it

---

[51] *Id.* at 396.

[52] 29 U.S.C. § 1393(a)(1).

is therefore appropriate to use more conservative assumptions to calculate a plan's withdrawal liability.[53]

The *Sofco Erectors* court considered and rejected this very argument. As that court said, while this may well be a fair "policy proposal," there is no "suggestion that Congress intended to give an actuary the discretion to dilute her best estimate of anticipated experience under the plan in order to shift risk onto the departing employer."[54]

The plans also point to a PBGC regulation that requires pension plans that received federal funding under the American Rescue Plan Act to use a risk-free rate of return.[55] That regulation, they contend, supports their use of similar rates here. The regulation, however, does little to advance the plans' position. Section 1393(a) provides that the actuarial assumptions used must be *either* those that reflect the actuary's best estimate of anticipated experience under the plan (under § 1393(a)(1)) *or* those set forth in PBGC regulations (under § 1393(a)(2)). The plans at issue here did not receive American Rescue Plan Act funding and do not contend that any PBGC regulations govern their calculation of withdrawal liability. The fact that a different statutory provision (§ 1393(a)(2)) that applies in different circumstances might permit a different set of actuarial assumptions provides no reason to break from the ordinary meaning of the language in § 1391(a)(1).

---

[53] D.I. 5201 at 3-4.

[54] *Sofco Erectors*, 15 F.4th at 422.

[55] *See* 29 C.F.R. § 4262.16(g).

Finally, the plans correctly point out that while annuity rates today are low by historical standards, there certainly was a time when those rates were higher than the traditional expected return on investment. In those days, using annuity rates to calculate withdrawal liability would have led to lower withdrawal liability than would using the expected return on investment assets.[56] And the plans point out that the same may well be true at some point in the future. But that does not respond at all to the fact that § 1393(a)(1) requires withdrawal liability to be calculated by reference to the anticipated experience of the plan. Whether the words Congress chose lead, at any point in time, to greater or lesser withdrawal liability does not alter the Court's obligation to give effect to the words of the statute as they are written.

Accordingly, while it is true that the district court in *Manhattan Ford* makes a reasoned argument for a contrary reading of the statute, this Court adopts the reasoning articulated in *Sofco Erectors*, *United Mine Workers,* and *GCIU-Employer Retirement Fund*. Under that reasoning, the statutory requirement that the assumptions used in calculating withdrawal liability be based on the actuary's "best estimate of anticipated experience under the plan" precludes the use of discount rates that sharply diverge from those used in calculating minimum funding. That is not to say that the rates need to be identical; some variance may well be permissible, so long as it is grounded in differences that find a home in the statutory language. The Court will accordingly grant partial summary judgment in favor of the debtors on their contention that, in light of the funds' minimum funding rates, the discount rates used

---

[56] *See* D.I. 5201 at 8.

by the plan actuaries to calculate the plans' withdrawal liability are inconsistent with the statutory requirements. The debtors' motion for partial summary judgment on this issue is granted; the plans' motion for partial summary judgment on this point will be denied.[57]

## II.  There is a genuine issue of material fact about which contribution base units should be used to calculate the annual payment owed to the Virginia Teamsters Pension Fund.

The parties dispute whether a discrepancy in the calculation of the Virginia Teamsters Pension Fund's contribution rate requires re-calculation of the debtors' annual payment using the debtors' figures. This is fundamentally a dispute about which side's calculations are more likely to be correct. The Court views this dispute as the type of contest over credibility that is not properly resolved at the summary judgment stage.[58]

ERISA requires multiemployer pension plans to measure plan contributions by "contribution base unit," which is the unit of activity for which an employer has an obligation to contribute to the plan.[59] In this instance, the debtors were obligated

---

[57] The debtors and the plans have also both filed motions *in limine* to exclude the testimony of each other's expert witnesses, contending that the testimony should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Substantial portions of those motions are likely overtaken by the foregoing ruling on summary judgment. To the extent the issues remain live, as the Court noted during the January 13, 2025 argument, the Court will grant the motions to the extent that a witness purports to offer a legal conclusion, with the specific scope of that exclusion to be preserved for trial to the extent a witness purports to offer testimony that is objectionable on this basis. The Court will otherwise deny the motions *in limine*, as the Court is satisfied that the witnesses are qualified to serve as experts and that the testimony is admissible under Rule 702 and *Daubert*. The arguments advanced in the motions *in limine* bear on the weight to be afforded to the testimony rather than its admissibility.

[58] *See In re U.S. Wireless Corp.*, 386 B.R. 556, 559-560 (Bankr. D. Del. 2008).

[59] 29 U.S.C. §§ 1301(a)(11), 1399(c)(1)(C)(i).

to contribute $97.40 a week for "regular employees" and $10 a week for "casual employees" (*i.e.*, part time employees). The annual payments are calculated by multiplying (x) the highest contribution rate in the prior ten years times (y) the highest average number of contribution base units over three consecutive plan years within the 10-year withdrawal liability period. Therefore, an undercounting of the contribution base units will understate the annual payment amount.

Here, the plan seeks summary judgment that its proposed annual payment (calculated using the plan's data) is the correct amount. The debtors do not seek summary judgment on this issue but argue that there is a genuine issue of material fact about whether the data used by the plan to calculate its annual payment were reliable.[60]

In support of this contention, the debtors point to record evidence indicating that the Virginia Teamsters Pension Fund's data were unreliable because (1) the plan's actuary "did not independently verify the accuracy of the plan's records;" (2) a 2022 audit letter cast doubt on the accuracy of the plan's historical data; and (3) the debtors' expert was unable to reconcile his figures with the plan's figures (though the plan asserts that this is of no moment because the debtors' figures are incomplete and would therefore never match).[61]

In response, the Virginia Teamsters Pension Fund makes what appears on first blush to be a fairly persuasive argument that the debtors' data does not include

---

[60] D.I. 5045 at 20-21.

[61] D.I. 5045-5 at 18; D.I. 5045-1 (Ex. 2) at 36; D.I. 5045-5 (Ex. 13); D.I. 4835 at 25-27.

casual employees and therefore understates the number of contribution base units.[62] But even so, this issue ultimately boils down to the question of which party's records are more likely to be the accurate ones. And even if the Court could form an impression of how that credibility determination might ultimately come out, that is not the task on summary judgment, where all reasonable inferences must be drawn in favor of the non-moving party. The Court will therefore deny the Virginia Teamsters Pension Fund's motion for partial summary judgment on this issue.

## III.   The New England Teamsters Pension Fund's withdrawal liability calculation is appropriate.

The final issue is presented in cross motions for summary judgment filed by the New England Teamsters Pension Fund and the debtors. The New England Teamsters Pension Fund calculated the debtors' withdrawal liability in a manner that comports with an agreement reached between the debtors and the New England Teamsters Pension Fund but exceeds the liability that would be imposed by simple application of the statute.

This Court considered similar issues in the Amended Memorandum Opinion and concluded that nothing in ERISA provided a basis for relieving the debtors of their contractual commitment, made upon reentry to certain pension plans, to pay greater withdrawal liability in the event of a subsequent withdrawal than they would otherwise owe under the statute.[63]

---

[62] D.I. 4835 at 25-28; D.I. 5201 at 11-12.

[63] D.I. 4769 at 39-41.

The debtors argue that this circumstance is different because the debtors are not a party to a specific agreement that outlines the terms of their reentry. Rather, the term at issue is set forth in the New England Teamsters Pension Fund's plan documents.[64] The debtors do not dispute, however, that such plan documents may bind an employer in a multiemployer plan. Nor is there any real dispute that the debtors in fact agreed, at the time they reentered the plans, to pay increased withdrawal liability in the event of a subsequent withdrawal.

The debtors further argue that even if the Court's earlier decision was correct in its context, the plan rules at issue here are subject to 29 U.S.C. § 1399(c)(7), which allows plans to "adopt rules for other terms and conditions for the satisfaction of an employer's withdrawal liability" so long as they are "consistent with this chapter."[65] And the debtors argue that these rules, which provide greater liability than ERISA otherwise would impose, are not "consistent with this chapter."

But for the same reasons as those set forth in the Amended Memorandum Opinion, the consensual agreement reached between the New England Teamsters and the debtors is not inconsistent with the statute. The statute certainly provides a methodology for calculating withdrawal liability. And, to be sure, there are some

---

[64] D.I. 4836-2, Ex. B at § 15.06(a)(iv) (New England Teamsters Plan); *See* D.I. 4836-3, Ex. C at Art. 65(b) ("The Employer agrees to and has executed a copy of the New England Teamsters and Trucking Industry Pension Fund Agreement and Declaration of Trust dated April 11, 1958, and accepts such Agreement and Declaration of Trust, as amended....). The debtors do not dispute the notion that they are parties to the New England Teamsters governing pension documents. *See* D.I. 5045 at 21-22 (contesting the New England Teamsters' arguments but not disputing the notion that the debtors are a party to the New England Teamsters' plan documents).

[65] 29 U.S.C. § 1399(c)(7).

statutes that prevent parties from agreeing by contract to terms that change the rules imposed by statute (such as the Bankruptcy Code's prohibition on *ipso facto* clauses).[66] But the parties have pointed to no provision of ERISA that purports to prevent a plan and an employer from reaching an agreement under which an employer would agree to pay more in withdrawal liability, in exchange for some other valid form of consideration (such as the right to reenter the plan, at a lower contribution rate, after having suspended participation). The Court will accordingly grant partial summary judgment in favor of the New England Teamsters Pension Fund and against the debtors on this issue.

## Conclusion

For the foregoing reasons, the summary judgment motions are granted in part and denied in part. The parties are directed to submit a form of order reflecting these rulings.

Dated: February 5, 2025

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

[66] *See* 11 U.S.C. §§ 365(e)(1) and 541(c).