## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>**Related Docket Nos. 2576, 2577, 2578** |

### MEMORANDUM OPINION

In the days leading up to its bankruptcy filing, Yellow Corporation shuttered its business and terminated the vast majority of its employees.[1]  Because the company had not provided the affected employees with 60-days' notice, many thousands of these former employees asserted claims in this bankruptcy case for damages arising out of alleged violations of the WARN Act, which (subject to certain exceptions) requires such notice of any plant closing or mass layoff.[2]

On summary judgment, this Court held that although on the merits the company was entitled to provide less than 60-days' notice (because statutory exceptions to the notice requirement applied), the company *was* obligated to provide a notice that explained the reasons for the shortened notice period.  The Court concluded that the form of notice provided by the company was deficient.  But the Court also found that material factual disputes prevented it from resolving, on summary judgment, the questions (1) whether, at the time Yellow ordered the layoffs

---

[1] Debtors Yellow Corporation and its affiliates are referred to, collectively, as "debtors," "Yellow," or the "company."

[2] The Worker Adjustment and Retraining Notification Act of 1988, codified at 29 U.S.C. § 2101, *et seq.*, is referred to as the "WARN Act."

of its union employees, it was an "employer" (and thus covered by the WARN Act) or merely a "liquidating fiduciary" (in which case the WARN Act's requirements would not apply); and (2) whether the Court should reduce the damages on the ground that "the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter."[3]

The Court held a 3-day trial on those two issues from January 21, 2025 to January 23, 2025.  For the reasons set forth below and based on the evidence presented at trial, the Court finds that Yellow was a liquidating fiduciary, rather than an employer, at the time it ordered the termination of its union employees.  As such, those terminations do not give rise to WARN Act liability.  Alternatively, the Court concludes that if Yellow were an employer subject to the WARN Act at the time it ordered the mass layoffs, the circumstances would justify a reduction in damages, under 29 U.S.C. § 2104(a)(4), from the 60 days of back pay and benefits otherwise provided by statute to 14 days of back pay and benefits.[4]

## Procedural Background

The debtors tumbled into bankruptcy on August 6, 2023.[5]  Several weeks earlier, a well-publicized dispute with the Teamsters Union left many of its customers concerned about the company's viability.  That concern quickly became a self-

---

[3] 29 U.S.C. § 2104(a)(4).

[4] This Memorandum Opinion sets out the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as made applicable to this contested matter under Fed. R. Bankr. P. 9014(c).

[5] D.I. 1.  All docket citations are to the main case unless otherwise noted.

fulfilling prophecy, as Yellow's customers moved their shipments to other carriers. The result was a precipitous decline in new shipments that effectively doomed the company.

Various parties asserted claims against the debtors under the WARN Act. Because the WARN Act authorizes unions to assert claims on behalf of their members, the Teamsters filed approximately 20,000 proofs of claim on behalf of former employees who belonged to the union.[6] Two other groups of former employees (the *Moore* and the *Coughlen* plaintiffs) asserted claims through adversary proceedings.[7] The debtors filed objections to all of the WARN proofs of claim.[8] In April of 2024, the parties in the *Moore* adversary proceeding filed cross motions for summary judgment.[9] The parties in the disputes over union proofs of claim and both adversary proceedings helpfully agreed to present issues common to all of the WARN Act claims in summary judgment motions that would all be heard together.[10] The Court heard argument on the summary judgment motions on October 28, 2024. On December 19, 2024, this Court issued a memorandum opinion providing that the summary judgment motions would be granted in part and denied in part. On January

---

[6] *See* 29 U.S.C. § 2104(a)(4).

[7] *See Moore, et al. v. Yellow Corp., et al.*, Bankr. D. Del. No. 23-50457 (the "*Moore* Adversary"); *Coughlen, et al. v. Yellow Corp., et al.*, Bankr. D. Del. No. 23-50761 (the "*Coughlen* Adversary"). The *Moore* plaintiffs were a class of more than 4,000 non-union employees. The *Coughlen* plaintiffs were individual former employees, some who belonged to the union (but elected not to be represented by the union for the purpose of asserting their claims) and others of whom were not union members (but were not members of the *Moore* class).

[8] D.I. 2576, 2577, 2578.

[9] *Moore* Adversary, D.I. 42.

[10] April 11, 2024 Hr'g Tr. at 23.

13, 2025, this Court issued an order, pursuant to Rule 56(g) of the Federal Rules of Civil Procedure, implementing that ruling, which made certain dispositive findings and deemed other issues resolved for the purposes of trial.[11]  Trial was set to proceed on all issues not resolved on summary judgment on January 21 through January 23, 2025.

Shortly before trial, the *Coughlen* plaintiffs and the *Moore* class both reached tentative settlements with the debtors that resolved their claims.  The parties have represented to the Court that their respective settlements are pending final documentation and are subject to approval by this Court.[12]  The Teamsters proceeded to trial against the debtors on behalf of the members represented by the union.[13]

The key substantive points that remained outstanding after the summary judgment ruling and the two settlements were (1) whether the debtors were a liquidating fiduciary when they laid off substantially all union employees on July 30, 2023 and (2) whether, and to what extent, damages should be reduced pursuant to 29 U.S.C. § 2104(a)(4).[14]

At trial, the debtors presented the live testimony of Darren Hawkins, their former Chief Executive Officer; Daniel Olivier, their Chief Financial Officer; Sarah Statlander, their Vice President for Human Resources; and Brian Whittman, a

---

[11] D.I. 5390; Rule 56(g) of the Federal Rules of Civil Procedure is made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure.

[12] *Coughlen* Adversary, D.I. 184; *Moore* Adversary, D.I. 229.

[13] The International Brotherhood of Teamsters is referred to as either the "Teamsters" or the "union."

[14] D.I. 5227 at 4, 6.

managing director of Alvarez and Marsal, a firm that has served as the debtors' financial advisor.[15]   The Teamsters presented the live testimony of John Murphy, their National Freight Director and co-chair of the Teamsters National Negotiating Committee.[16]   The Court found all the witness testimony to be credible.   The Court has also reviewed and considered the testimony of several witnesses whose designated deposition testimony was admitted, and the various exhibits that have been admitted into evidence.   The parties also submitted post-trial briefs, which this Court found helpful.[17]

This Court's finding of facts and conclusions of law are set forth below.   Readers should note that this Memorandum Opinion largely picks up the story where the Court's December 19, 2024 summary judgment opinion left off.   As such, familiarity with that opinion is presumed.[18]

## Findings of Fact

In the summer of 2023, Yellow was facing financial challenges.[19]   Yellow had acquired various trucking companies that competed in overlapping markets.[20]   The company faced an urgent need to integrate these businesses in order to eliminate

---

[15] Jan. 21, 2025 Hr'g Tr. at 35-37 (Hawkins); Jan. 21, 2025 Hr'g Tr.at 168 (Olivier); Jan. 21, 2025 Hr'g Tr. at133-134 (Statlander); Jan. 22, 2025 Hr'g Tr. at 9 (Whittman).

[16] Jan. 23, 2023 Hr'g Tr. at. 7-8 (Murphy).

[17] *See* D.I. 5591 (debtors); D.I. 5592 (Teamsters).

[18] The Court's December 19, 2024, summary judgment opinion is docketed at D.I. 5227 and can also be found at 2024 WL 5181660 (Bankr. D. Del. Dec. 19, 2024).  It is referred to as the "summary judgment opinion."

[19] Jan. 21, 2023 Hr'g Tr. at 40 (Hawkins).

[20] *Id.* at 38.

redundancy and manage its cost structure.[21]  It dubbed this internal reorganization effort "One Yellow," which it sought to implement in three phases.[22]  It had implemented the first phase in 2022, and in the summer 2023 was seeking to implement the second.[23]

The company viewed One Yellow as the key to its long-term financial stability. At the same that the company was focused on seeking to implement One Yellow, its investment banker, Ducera, was actively focused on its effort to refinance the company's existing debt.[24]  The challenge, as CEO Darren Hawkins put it, was that "the operating plan moving forward … had to go along with that refinancing."[25]  Otherwise put, no lender was going to invest new capital into Yellow – capital that it needed as its liquidity was tightening – unless and until there was a plan in place to integrate the company's separate lines of business and thereby reduce its operational costs.  But implementation of phase two of One Yellow required the consent of the Teamsters union.[26]  And while Teamsters had consented to phase one, negotiations over phase two were becoming protracted and bitter.[27]

As the summer progressed and negotiations with the Teamsters dragged on, the company's cash position continued to weaken.  Yellow thus began looking for

---

[21] *Id.*

[22] *Id.*

[23] *Id.* at 38-40.

[24] *Id.* at 42 (Hawkins).

[25] Jan. 21, 2025 Hr'g Tr.  at 63.

[26] *Id.* at 41.

[27] *Id.* at 38-40.

alternative ways to extend its financial runway.[28]  Among Yellow's most substantial monthly expenses was the $50 million it paid in healthcare and pension benefits to various pension funds.[29]  From June 14 to June 16, Yellow reached out to several of these pension funds, including Central States Pension Fund (which represented the largest share of Yellow's pension obligations), to request a two-month contribution deferral.[30]  Hawkins testified that he believed a two-month deferral could give the company sufficient time to reach an agreement with the Teamsters, finalize its debt refinancing, and then make a "retroactive" payment to the pension funds, such that the employees would maintain their benefits.[31]  The pension funds, however, denied the company's deferral request.[32]

As the situation with the Teamsters became more critical, Yellow began communicating directly with its employees.[33]  Yellow management sent emails to employees updating them on its negotiations with the Teamsters, the steps it was taking to preserve capital (like requesting a deferral from certain pension funds), and the potential consequences of the failure to reach an agreement with the union.[34]  And

---

[28] *Id.* at 47.

[29] *Id.*

[30] Debtors' Exs. 37, 38, 39; Joint Ex. 51.  The various exhibits admitted into evidence at trial are cited as "[party's name]'s Ex(s). ____."

[31] Jan. 21, 2025 Hr'g Tr. at 47.

[32] *Id.* at 47-48.  Joint Ex. 56.  The record shows that the company, when making this request, provided the unions with documents showing the state of the company's financial condition. Jan. 23, 2025 Hr'g Tr. at 32-33 (Murphy).  Nevertheless, when Sean O'Brien, the Teamsters' general president, learned of Yellow's deferral request to the New England Teamsters Pension Fund, he responded by saying "HELL NO." Joint Ex. 53 (all caps original).

[33] Jan. 21, 2025 Hr'g Tr. 43 (Hawkins).

[34] Joint Exs. 41, 48, 50, 55, 75.

while most Yellow employees did not have email accounts, these emails were displayed prominently on bulletin boards throughout Yellow's terminals and often made their way onto industry specific online forums that were frequented by Yellow employees.[35]  Hawkins explained that these communications served two purposes.

The first purpose was "to be transparent."[36]  Hawkins explained that "[m]any of the employees knew me personally, and vice versa. I wanted to make sure that they were informed of the events that were playing out.  There was a tremendous amount of media coverage and other things that were happening, and I wanted to make sure that everyone had accurate information as it involved all of our employees."[37]

The second purpose was more instrumental – to keep the Teamsters at the negotiating table.  Hawkins explained that "Yellow has a long-time, union legacy. From the day I started when I was 21 years old, Yellow was a union company then, and it was a union company on our last day of operation."[38]  He said that he "wanted to make sure that our employees understood where we were at and also that they were communicating with their unions around these subjects because [] the union leadership … [] will listen to me, but they will act upon employee input."[39]

---

[35] Jan. 21, 2025 Hr'g Tr. at 142 (Statlander).  *See also id.* at 60 (Hawkins) ("We would send out a document like this and everyone at the facilities that had e-mails, the terminal manager would print it and post it."); Coughlen Dep. Tr. at 82-83 (former employee testifying that he saw an email from Hawkins posted on a company bulletin board).

[36] Jan. 21, 2025 Hr'g Tr.  at 43 (Hawkins).

[37] *Id.*

[38] *Id.* at 44.

[39] *Id.* at 44-45.

But with no agreement forthcoming and no other obvious way to maintain its business operations, Yellow acted unilaterally, and did not make its July payments to Central States and other pension funds when they came due.[40]  The company's hope and expectation was that the unions would work with the company, and that the parties would focus their attention on an agreement that would permit the company to implement the second phase of One Yellow and then refinance its debt.[41] But that is not how it turned out.

On July 17, Central States sent a memorandum to the Teamsters reporting that Yellow had not made its monthly contributions.  As a result, the memorandum explained, "Yellow's members in the Pension Fund will stop earning pension benefit accruals for work performed on and after July 23, 2023" and "healthcare claims incurred on or after July 23, 2023 will not be paid."[42]

Later that day, Murphy sent a letter to the company on behalf of the union. The letter reported that the union had been informed by the pension funds that the company had failed to make its benefit payments that were due to the pension funds.[43]  The letter went on to say that the union was providing the company with "a seventy-two (72) hour notice that the affected Local Unions … intend to engage in

---

[40] *Id.* at 48. Joint Ex. 62.

[41] Jan. 21, 2025 Hr'g Tr. at 48 (Hawkins).

[42] Joint Ex. 68 at 068.003.  *See also* Jan. 23, 2025 Hr'g Tr. at 15 (Murphy) ("The benefit funds sent us a letter [by] email that said that [Yellow was] not going to … make those payments and they were going to cut off benefits to our members.").

[43] Joint Ex. 68 at 068.002.

lawful strike activity unless and until such delinquency is cured."[44]  The letter stated that "strike activity shall commence any time on or after Monday, July 24, 2023."[45]

The fact of the strike notice was quickly publicized, which triggered a precipitous decline in Yellow's business.[46]  Within the first 24 hours, Yellow's core customers began diverting their business to other trucking companies.[47]  And because there was capacity in the market, competitor freight carriers were able to pick up the excess load quickly.[48]  That, in turn, triggered "a domino effect" which caused new shipments to "evaporate."[49]  Hawkins described the confluence of customers' concerns about Yellow's ability to complete shipments with the existence of excess capacity in the market as a "perfect storm."[50]  The economic conditions allowed Yellow's core customers to divert the majority of their freight to other trucking lines within a matter of days, significantly faster than Yellow's management had thought possible.[51]

The strike notice also kicked off a flurry of activity within the company as it prepared for a potential strike.[52]  Because Yellow operated on a 24/7, 365 basis, its systems were not designed to house all of its equipment at once.[53]  Accordingly, it took

---

[44] *Id.  See also* Jan. 23, 2025 Hr'g Tr. at 15-16 (Murphy) (discussing the notice).

[45] Joint Ex. 68 at 068.002.

[46] Jan. 21, 2025 Hr'g Tr. at 50-51 (Hawkins).

[47] *Id.*

[48] *Id.* at 57.

[49] *Id.* at 51.

[50] *Id.* at 57.

[51] *Id.*

[52] Jan. 21, 2025 Hr'g Tr. at 51.

[53] *Id.* at 60.

some time to prepare to have all of the company's equipment return to its terminals at the same time.[54]  For that reason, in order to prepare for a strike that would commence by Monday, July 24, the company had to cease normal operations by Saturday, July 22.[55]  "[F]rom Saturday evening through Sunday at midnight … the complete focus had to be on having [the] equipment" secured inside a Yellow facility.[56]

The Teamsters called off the strike in the afternoon of Sunday, July 23, just hours before the strike had been scheduled to start (at 12:01 a.m. on Monday).[57]  By then, however, Yellow's systems had been largely shut down.  The result was "gridlock and log jam."[58]  "[W]e had trailers touching each other when we tried to get all our equipment on terminal lots and gates locked."[59]  Hawkins explained that getting the company's operations running again "would be a multiday event."[60]

As a result, it was hardly as if Yellow could start accepting shipments again once the strike was called off.  As Hawkins explained, the company was "trying to get the freight that we already had freed up.  And also at this point, customers [were] insisting on priority delivery and [the company was necessarily focused on] getting that accomplished for those that had the most pressing need."[61]

---

[54] *Id.* at 60-61.

[55] *Id.* at 62.

[56] *Id.*

[57] *Id.* at 64.

[58] Jan. 21, 2025 Hr'g Tr. at 65.

[59] *Id.* at 66.

[60] *Id.* at 64-66.

[61] *Id.* at 66.

Those were not the only challenges flowing from the strike notice. Yellow's lenders also reacted to the news, with the company's asset-based lenders refusing to permit it to access $50 million in credit that would have otherwise been available.[62] And perhaps more fundamentally, the company's management concluded that its core customers would not be returning any time soon and that it would essentially be impossible to refinance the company's debt.[63] On July 26, Yellow's management decided there was no path forward and it would need to liquidate the company.[64]

Once that decision was made, Yellow began working to effectuate an orderly shutdown.[65] Hawkins testified that the company was particularly focused on achieving a safe and efficient winddown that minimized customer disruption and respected the welfare of its employees.[66] The company also devoted substantial resources to its effort to prepare to file for bankruptcy protection, with a view towards being in a position to file the case by July 31.[67] While the company had begun contingency planning as early as July 17, the work at that time was focused largely on identifying the information that would need to be gathered in the event of a filing.[68]

---

[62] *Id.* at 65.

[63] *Id.* at 66; Joint Ex. 91a at 091A.002.

[64] Jan. 21, 2025 Hr'g Tr. at 66-67 (Hawkins) (identifying July 26, 2023 as "the day [] I told union leadership that I would not have the liquidity to pay employees beyond that week [and that] we were going to have to liquidate the company.").

[65] *Id.* at 67.

[66] *Id.*

[67] Jan. 22, 2025 Hr'g Tr. at 14 (Whittman).

[68] *Id.* at 13.

The company's advisors did not begin work in earnest to prepare a bankruptcy filing until July 26.[69]

Over the next five days, Yellow's management, consultants, and lawyers (both in-house and outside counsel) worked to (1) raise and negotiate debtor-in-possession financing; (2) negotiate the use of cash collateral with Yellow's three lender groups; (3) prepare the first-day papers; (4) prepare the debtor-in-possession financing budget; (5) organize the logistics of winding down the company (*i.e.*, crafting a plan to move trucks and remaining freight into Yellow's terminals); (6) identify and address employee issues, including WARN compliance; and (7) develop a cohesive communications strategy.[70]    While Whittman from Alvarez and Marsal (the company's financial advisor) testified that, in light of the size and complexity of the case, he would have preferred to have had three weeks to prepare such a filing, the process of preparing the case for bankruptcy was condensed into a five day period.[71]

On July 26, Yellow began drafting its WARN notices.[72]  This was not the first time Yellow had prepared such notices, as Statlander, the head of human resources, testified that she had been involved in the preparation of such notices in connection with personnel actions in May 2022 and then again in February and March of 2023.[73] She explained that Yellow's usual practice was that counsel would prepare the form

---

[69] *Id.* at 14.

[70] *Id.* at 15-16.

[71] *Id.* at 15; *See also* Kaldenberg Dep. Tr. at 120-121 ("[I]t looks like we sent the [DIP sizing analysis] to Apollo on [July] 26th.").

[72] Jan. 21, 2025 Hr'g Tr. at 135-136 (Statlander).

[73] *Id.* 135.

of notice, which would be shared with Yellow's human resources department.[74]
Statlander testified that the company followed this same process in preparing the
July 2023 WARN notices, though on a compressed timeline.[75]  The notices were sent
to union leadership on July 30, 2023, and then to the approximately 20,000 employees
the next day.[76]  The terminations were also communicated in meetings and phone
calls.[77]

Yellow's employees were generally unsurprised to hear the news.[78]  Broadly
speaking, the company's employees were aware of the impact the strike notice had on
the company.[79]  In communicating with employees about the cause of the company's
failure at the time of the terminations, Yellow took care to avoid pointing fingers at
the Teamsters.  Statlander, for example, testified that the company "didn't want to
potentially inflame the situation by citing the actions of the [Teamsters] to the Union
employees."[80]  Hawkins testified to similar effect.[81]  As he explained on cross

---

[74] *Id.*

[75] *Id.* at 135, 139.

[76] Joint Ex. 104; Jan. 21, 2025 Hr'g Tr. at 158 (Statlander).

[77] Coughlen Dep. Tr. at 104-105; Torres Dep. Tr. at 84-85.  *See also* Jan. 21, 2025 Hr'g Tr. at
140 (Statlander).

[78] Coughlen Dep. Tr. at 104-105 testifying that he was not surprised to receive a call on July
30 indicating that the company was closing because "the previous week Yellow had stopped
picking up freight); Torres Dep. Tr. at 86; Green Dep. Tr. at 38-39.  *See also* Jan. 21, 2025
Hr'g Tr. at 140 (Statlander) ("I don't think anyone was surprised by why they had been called
into that meeting that day.").

[79] *Id.* at 56 (Hawkins) (testifying that the company's employees were "[a]bsolutely" aware of
the effect of the strike notice on the company).

[80] Jan. 21, 2025 Hr'g Tr. at 138 (Statlander).

[81] *Id.* at 105 (Hawkins).

examination, the company had some concern about physical violence at the time of the layoffs, and the company did not wish to "take a very difficult situation and make it worse."[82]

The company's plan was to shut down, and lay off the union employees, by noon eastern standard time on Sunday, July 30.[83]  Because Sundays were the slowest day of the week, with the fewest number of employees on site, the company viewed a daytime closing on July 30 as the "ideal" choice.[84]

By that time, Yellow was no longer working to deliver shipments to its customers.[85]  Instead, the goal in these final days was to "move freight as far as we could."[86]  Sometimes that resulted in a delivery, sometimes freight was simply transported to a terminal and left for the customer to pick up.[87]

Yellow made its final delivery at 11:30 p.m. Eastern Time on July 29, 2023. Daniel Olivier, the company's CFO, testified that he was able to draw that conclusion from his review of various of the company's business records, including payroll records.[88]  The Court credits this testimony and finds that the last shipment was

---

[82] *Id.* at 128.

[83] *Id.* at 68.

[84] *Id.* at 67.

[85] *Id.* at 68.

[86] Jan. 21, 2025 Hr'g Tr. at 68.

[87] *Id.*

[88] *Id.* at 169-180 (Olivier); Debtors' Exs. 112-118.  The Court concluded that some but not all of the documents on which Olivier relied were properly admissible into evidence.  Jan. 21, 2025 Hr'g Tr. at 176-178, 183-185, 188-198, 223-228.  The Court is satisfied that the documents that were admitted into evidence sufficiently establish the point.  Because Olivier's testimony derives entirely from his review of these documents, the Court's finding

delivered at 11:30 p.m. on July 29.  From then until noon on July 30 "the only part of the process left was to ensure all equipment was inside the gates and we had all of our employees back at our facilities before noon so that they could be outside of the gates when the closing occurred at noon Eastern."[89]

## Jurisdiction

The district court has subject-matter jurisdiction over this proceeding under 28 U.S.C. § 1334(b), as a dispute "arising under" § 502 of the Bankruptcy Code.  This case has been referred to this Court under 28 U.S.C. § 157(a) and the district court's

---

is grounded primarily on the underlying documents themselves, informed by Olivier's explanation of the nature of these business records (as to which Olivier did have personal knowledge).

The Court also reserved judgment on a handful of other evidentiary matters pending the Court's review of the trial transcript.  The resolution of those issues is as follows:

(1) The objection to a portion of Hawkins' testimony (on Jan. 21, pp. 69-70) is sustained on the ground that the debtors' conduct after the alleged WARN Act violations to assist in placing affected former employees is not relevant to the resolution of either of the issues before the Court.

(2) The relevance objection to testimony elicited on cross-examination of Hawkins (on Jan. 21, pp. 86-87) is overruled.  The similarity between the work performed after July 30 and the work performed in the ordinary course, while not dispositive, is a relevant consideration.  *See infra* at p. 24.

(3) The objection to the questions of Whittman on cross examination (on Jan. 22, p. 27) on the ground of lack of foundation are overruled.  Subsequent testimony established that the witness had sufficient personal knowledge of the matters addressed for the testimony to be admissible under Rule 602.

(4) The objection to the impeachment (on Jan. 22, p. 38) is overruled.  Whether or not the statement in question is "inconsistent" with the witness' trial testimony within the meaning of Rule 801(d)(1)(A) is a close question, but beside the point in view of the independent admissibility of the deposition testimony under Rule 801(d)(2)(D).

(5) To the extent this Memorandum Opinion relies on designated deposition testimony, this Court has concluded that any objections to the testimony on which it relies are properly overruled.

[89] Jan. 21, 2025 Hr'g Tr. at 69 (Hawkins).

standing order of February 29, 2012.  This claims allowance dispute is a core matter under 28 U.S.C. § 157(b)(2)(B).

**Analysis**

I.      **The debtors became liquidating fiduciaries on July 29, 2023, and were therefore not subject to 29 U.S.C. § 2102's notice requirements when they laid off their union employees on July 30, 2023.**

The summary judgment opinion (at pp. 42-49) provided an overview of the legal principles that mark the line between an "employer" that runs a "business enterprise" and is thus covered by the WARN Act, and a "liquidating fiduciary" that is not.[90]  In short, once an entity that is winding down has stopped running its business but is merely in the process of liquidating, it is no longer an employer, but is instead a liquidating fiduciary.

As the facts of this case demonstrate, in the real world, the task of shutting down a large and complex business is typically a process that takes place over time.  It cannot be accomplished just by flipping a switch.  And that can make the task of drawing the line between when a defendant is a "business enterprise" on the one hand and "liquidating fiduciary" on the other a challenging one.  The guidance from the caselaw is, in large part, that "the more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the

---

[90] *See* summary judgment opinion. *See also In re United Healthcare Sys.*, 200 F.3d 170, 176-177 (3d Cir. 1999). To enforce the WARN Act, the plaintiff must establish that the defendant is an employer under the statute.  Because demonstrating the applicability of the statute is an element of the claim, the Teamsters correctly acknowledged that the plaintiff bears the burden of proving up facts that satisfy the element.  Jan. 23, 2025 Hr'g Tr. at 104-105 (closing argument).

17

WARN Act" and vice versa.[91]   Based on that guidance, the Court concluded on summary judgment that because the debtors were still in the process of making deliveries when they terminated their non-union employees on July 28, they were still "employers" at that time, and thus covered by the WARN Act.   But because the summary judgment record did not reveal whether the final delivery was made before or after the July 30 termination of the union employees, it denied summary judgment on whether the debtors were "employers" when they terminated the union employees.

The Court's summary judgment opinion relied heavily on the Third Circuit's decision in *In re United Healthcare System*.[92]   Because the relevant analysis is necessarily fact dependent, the details of what happened there warrant careful review.   The defendant there was a hospital in New Jersey.[93]   The hospital had been experiencing financial distress since 1993, but its issues did not become critical until 1996.[94]   By then, the hospital was having trouble "maintaining essential supplies (such as blood)."[95]   That year, United Healthcare System engaged in discussions regarding potential transactions with other hospitals.[96]   Though none of these negotiations led to an agreement, the hospital "did not believe financial problems would force it to close."[97]   It adopted a budget for 1997 that showed short term losses

---

[91] *In re United Healthcare Sys.*, 200 F.3d at 178.

[92] 200 F.3d 170 (3d Cir. 1999).

[93] *Id.* at 172.

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

but positive revenues by year end.  And for a time, the hospital conducted business as usual.[98]

In early 1997, however, United Healthcare System began to divert "withholding and other tax payments to meet general operating expenses."[99]  It was then that Primary Healthcare offered to purchase the hospital.[100]  In the midst of those negotiations, United Healthcare System's secured lender, Daiwa, expressed doubts over the viability of the hospital.[101]  Discussions with United Healthcare System about the pending merger did not allay the lender's fears.[102]

On February 13, 1997, Daiwa issued a notice of default and terminated all financing.[103]  As a result, United Healthcare System was unable to continue its daily operations or meet its daily expenses.[104]  On the same day, Blue Cross Blue Shield stopped providing health insurance to United Healthcare System's employees because of non-payment.[105]  Three days later, on February 16, United Healthcare System decided to sell its assets to another hospital system, Saint Barnabas, and close the hospital.[106]

---

[98] *In re United Healthcare Sys.*, 200 F.3d at 172.

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.* at 172-173.

[104] *In re United Healthcare Sys.*, 200 F.3d at 173.

[105] *Id.*

[106] *Id.*

On February 19, United Healthcare System informed the New Jersey Department of Health that "it would close and surrendered its certificates of need."[107] The New Jersey Department of Health revoked the hospital's certificates of need and issued them to Saint Barnabas to facilitate the transfer of United Healthcare System's services.[108]  The same day, United Healthcare System filed a bankruptcy petition and provided WARN notices to its employees.[109]

The WARN notice said that the terminations would be effective on or around April 20 and that the employees should continue reporting to work until that date.[110] By February 21, all of United Healthcare System's patients had been sent home or transferred to a Saint Barnabas affiliate.[111]  As a result, United Healthcare System's "employees were unable to perform their regular duties but instead cleaned, took inventory and prepared the company's assets for sale."[112]  On March 6, the hospital told 1,200 of its 1,300 employees that they should no longer report to work.[113]

The parties agreed that the 1,200 employees were entitled to be paid for the 16 days they worked between the issuance of the February 19 WARN notice and the March 6 termination.  The question was whether those employees had valid WARN Act claims for the additional 44 days of pay to which they would be entitled if the

---

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *In re United Healthcare Sys.*, 200 F.3d at 173.

[111] *Id.*

[112] *Id.*

[113] *Id.*

WARN Act were applicable to the hospital as of the date of their termination.[114]   The bankruptcy and district courts both found that the debtor was an employer through the time of the March 6 terminations.[115]   The Committee appealed to the Third Circuit.

The Third Circuit reversed, holding that the hospital was a liquidating fiduciary.  Importantly for the purpose of this case, the court focused its analysis on whether the defendant was an "employer" "when it terminated its employees on March 6, 1997."[116]   It held that it was not, rejecting the lower courts' conclusion that the mere fact that the hospital's employees were doing work foreclosed application of the liquidating fiduciary exception.[117]   What mattered was the *nature* of the work being done.  "The more closely the activities resemble those of a business winding up its affairs, the more likely it is the entity is not subject to the WARN Act."[118]

The court found that, because United Healthcare System had (1) surrendered its certificates of need (which hospitals in New Jersey must have to provide care) on February 19; (2) filed a voluntary petition that contemplated liquidation the same day; and (3) discharged or transferred all its patients to another hospital by February 21, it had become a liquidating fiduciary by February 21 (at the latest).[119]

---

[114] *Id.* at 173-174.

[115] *Id.* at 174.

[116] *In re United Healthcare Sys.*, 200 F.3d at 175.

[117] *Id.* at 178.

[118] *Id.*

[119] *Id.* at 173 n.1.

Accordingly, the defendant was a liquidating fiduciary well before it terminated its employees on March 6.[120]

Here, applying the same analysis, Yellow was a liquidating fiduciary when it ordered the layoffs of its union employees on July 30, 2023. While every exercise in line drawing is necessarily fraught, based on the trial record, this Court's conclusion is that Yellow crossed the line from being an "employer" to being a "liquidating fiduciary" at 11:30 p.m. on July 29, 2023, when it completed its final delivery.

As set forth above, the evidence presented at trial shows that the last delivery was made on July 29.[121] Indeed, the company's general policy from July 26 onward was to "move freight as far as we could."[122] That is, to get the freight as close to its destination as possible to ensure that Yellow was prepared to cease operations permanently by noon Eastern Time on July 30.[123] In some cases, that meant transporting freight to the nearest terminal and working with the customer to sort out how to retrieve it.[124]

In the summary judgment opinion, the Court rejected Yellow's argument that it became a liquidating fiduciary on July 26, when it made the *decision* to liquidate its business. Rather, the Court concluded that the debtors were running a "business enterprise" so long as they were still making deliveries to customers. The

---

[120] *Id.* at 173.

[121] Jan. 21, 2025 Hr'g Tr. at 169 (Olivier); Debtors' Exs. 112-118.

[122] Jan. 21, 2025 Hr'g Tr. at 68 (Hawkins).

[123] *Id.*

[124] *Id.* at 89.

incremental process of deciding to liquidate and winding down the business here certainly has similarities to the facts described in *United Healthcare System*. And in the summary judgment opinion, this Court pointed to Third Circuit's emphasis on the point at which United Healthcare System had discharged or transferred its last patient in deciding that Yellow was still a business enterprise so long as it was making customer deliveries.

In fairness, the language of *United Healthcare System* did not firmly exclude the possibility that the defendant there might have become a liquidating fiduciary at some time before it had discharged or transferred its last patient. So the debtors' argument on summary judgment that it might have been a liquidating fiduciary at the time of the July 28 non-union layoffs was by no means an unreasonable one for them to have made. Nevertheless, because of the need to draw some discernable line between being an employer and a liquidating fiduciary, this Court believes that the best reading of *United Healthcare System* is the one this Court adopted on summary judgment: in the usual case, a defendant will remain a "business enterprise" so long as it is conducting the revenue-generating activity on which its business was premised. When that work is complete, it becomes a liquidating fiduciary even if there is remaining work for the employees to do in connection with the company's liquidation.

For that reason, the Court rejects the Teamsters' contention that Yellow was a business enterprise on July 30, 2023 because some of its employees continued to do work after that time – even work that bore *some* resemblance to what they did in the

ordinary course.  The record shows that the debtors continued to stage freight for customer pick-up and continued to employ security personnel at the terminals.  That said, once the last delivery was made on July 29, 2023, that activity was no longer in the service of generating future revenues.  Rather, much like United Healthcare System after February 21, 1997, the company's activity was primarily focused on winding down its affairs.[125]  And after the completion of the debtors' final delivery, whatever work occurred in the terminals was done only to prepare the properties for an eventual sale.[126]

The Teamsters argue that because the debtors had employed security personnel, transported equipment between terminals, and staged containers for customer pickup in the ordinary course of business, the debtors were not liquidating fiduciaries.[127]  But as described above and in the summary judgment opinion, that argument is effectively foreclosed by *United Healthcare System*, which makes plain that a defendant that has employees who are still working, but is no longer operating its core business functions, is not an "employer" within the meaning of the WARN Act.[128]

---

[125] Jan. 21, 2025 Hr'g Tr. at 90 (Whittman); Jan. 22, 2025 Hr'g Tr. at 31 (Whittman).

[126] Jan. 22, 2025 Hr'g Tr. at 25 (Whittman).

[127] Jan. 23, 2025 Hr'g Tr. at 85 (closing argument).

[128] *See United Healthcare Sys.* 200 F.3d at 178.  Nothing in the district court's decision in *In re Start Man Furniture, LLC*, 647 B.R. 116 (D. Del. 2022), is to the contrary.  There, the court found that where a business continued to run stores and sell goods notwithstanding a decision to liquidate, the defendant was still an employer and not a liquidating fiduciary.  That conclusion is wholly consistent with the analysis set forth above.  *See id.* at 129 ("a fiduciary that is a liquidating company remains an 'employer' if the methods it uses to benefit creditors includes the continuation of operations in the normal commercial sense.").

At trial and in its post-trial brief, the union made another argument – that the time at which you ask the question whether the debtor is a "business enterprise" or "liquidating fiduciary" is the time at which the employer *makes the decision* to terminate the employees, not the time at which the termination is announced.[129] And here, the Teamsters argue (without contradiction from the debtors) that the record shows that the decision to liquidate the company was made on July 26.[130]

The principal basis for the Teamsters' legal argument flows from one passage in the *United Healthcare System* decision.  That opinion, quoting the Third Circuit's prior decision in *Hotel Employees*, describes how the WARN Act was intended, at least in part, to address the problem of a plant closing being "concealed from the employees."[131]  And *United Healthcare System* goes on, quoting from *Hotel Employees*, to say: "The thrust of WARN is to give fair warning in advance of prospective plant closings.  It would appear, therefore, that if an employer knew of a … closing and failed to notify its employees, the WARN Act would apply."[132]  Following that block quote, the *United Healthcare System* court noted that "[i]n this case, there is no evidence that United Healthcare knew in advance that it would be forced to close but concealed that knowledge from its employees."[133]

---

[129] Jan. 23, 2025 Hr'g Tr. at 77 (closing argument); D.I. 5592 at 4.

[130] *See* Jan. 21, 2025 Hr'g Tr. at 66-67, 76.

[131] *United Healthcare Sys.*, 200 F.3d at 178 (quoting *Hotel Employees and Restaurant Employees Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999)).

[132] *Id.*

[133] *United Healthcare Sys.*, 200 F.3d at 178.

From that, the Teamsters argue that the question whether a defendant was an "employer" under the WARN Act should be viewed as of the time the defendant *decided* to conduct a mass layoff, not as of the time it announced the mass layoff.  The principal problem with that argument, however, is that it cannot be squared with the words of the WARN Act itself.  What the statute says is that an "employer shall not *order* a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order [on the required recipients of the notice]."[134]  The crucial word in that sentence, for this purpose, is "order."  The Teamsters would have the Court re-write the statute so that it provided that an "employer shall not *decide to order*" a plant closing or a mass shutdown without having given the requisite notice.  But that is not what the statute actually says.

The Third Circuit cases on which the Teamsters rely do not provide any basis for disregarding the words of the statute.  The discussion in *Hotel Employees* about an employer concealing its knowledge of a mass layoff immediately follows a discussion of the unanticipated business circumstances defense.[135]  So in context, the point of the reference to an employer's concealment is that the failure to give notice of a layoff does not necessarily give rise to liability.  If the plant closing is the result of unanticipated business circumstances, the employer may have a valid defense.  It is only when the closing is known, but the employer conceals its knowledge, that liability would attach.  But nothing in that passage suggests that the triggering event

---

[134] 29 U.S.C. § 2102(a) (emphasis added).

[135] *Hotel Employees*, 173 F.3d at 181 & n.4.

is the making of the decision, rather than the issuance of the "order," as the language of the statute says.

Nor does the sentence in *United Healthcare System*, following the quotation from *Hotel Employees*, alter this analysis.  That sentence says: "In this case, there is no evidence United Healthcare knew in advance that it would be forced to close but concealed that knowledge from its employees."[136]  That statement was the predicate for the next sentence: that instead, "United Healthcare made repeated and intensive good-faith efforts to remain financially viable and to ensure its employees would keep their jobs."[137]  For what it is worth, all of that is equally true in this case.

Perhaps the reference in *United Healthcare System* to "concealed knowledge" could support an argument for providing a judicial gloss on the statute.  If an employer had decided to conduct a mass layoff and intentionally delayed issuing the "order" until business operations ceased to avoid WARN Act liability, the language in the Third Circuit opinion could support the claim that courts should disregard the defendant's gamesmanship.  But even if that is correct, it would have no application on the facts here, where the delay between the July 26 "decision" and the July 30 "order" was merely a function of the company's effort to conduct an orderly winddown. Absolutely nothing in the trial record suggests that the debtors delayed making the announcement as part of a scheme to conduct an end run around the WARN Act.

---

[136] *United Healthcare Sys.*, 178 F.3d at 178.

[137] *Id.* at 178-179.

Nor do the other cases on which the Teamsters rely in their post-trial brief support their reading.[138]  For example, in *Deveraturda* the Ninth Circuit held that when the federal government took over airport security following the events of September 11, 2001, private security services were not liable under the WARN Act for failing to provide termination notices to their employees, since it was the federal government, rather than the private companies, that made the decision.[139]  Nothing in the opinion speaks at all to the question here, which is whether the term "order" as used in 29 U.S.C. § 2102(a) in fact means the making of the decision to issue such an order.

The Teamsters also rely on *Lichtenstein*.[140]  They contend that the case stands for the proposition that the defendant "ordered" the shutdown a week before the employees were notified when it directed its human resources staff to conduct a mass layoff.  Whether that case actually stands for that proposition is far from clear.  The relevant passage says the following:

> On May 15, 2023, Anuvia informed Mr. Lichtenstein and other workers not to return to work. Anuvia followed up with a form letter terminating all remaining employees on May 23, 2023, when the plant permanently shut down operations.  Mr. Lichtenstein was laid off as part of plant shutdowns or mass layoffs as defined by the WARN Act, for which he is entitled to receive 60 days advance written notice under the WARN Act.[141]

---

[138] *See* D.I. 5592 at 3.

[139] *Deveraturda v. Globe Aviation Security Services*, 454 F.3d 1043, 1045 (9th Cir. 2006).

[140] *Lichtenstein v. Anuvia Plant Nutrients Corp.*, No. 8:23-cv-1423, 2023 WL 7411512, at *2 (M.D. Tenn. Oct. 26, 2023).

[141] *Id.* (internal citation omitted).

Whether or not the court in *Lichtenstein* said so, this Court has no particular quarrel with the proposition that an employer may "order" a shutdown when senior management directs subordinate employees to effectuate that shutdown. Even if that is a correct statement of the law, it does nothing to help the Teamsters on the factual record here. To be sure, the record shows that the company made the decision to liquidate on July 26. But there is nothing to indicate that a decision as to when particular employees would be terminated was made or communicated to anyone on any date prior to the date on which the WARN notices were given. Because this is an issue on which the Teamsters bear the burden of proof, the absence of any evidence of an earlier "order" (even on the broadest understanding of the term "order") is fatal to their contention.[142]

Finally, Judge Walsh's decision in *Cain* recites the plaintiff's contention that the defendant there "not only planned but actually ordered the mass layoffs sometime before it filed for bankruptcy and before it liquidated its business."[143] Nothing in that opinion is remotely inconsistent with the proposition that the relevant question under the WARN Act is when the defendant "ordered" the mass layoff or plant shutdown.

Accordingly, Yellow was a liquidating fiduciary, not a business enterprise, at the time the termination of the company's union employees was "ordered" on July 30, 2023. The union employees' WARN Act claims will therefore be disallowed.

---

[142] *See* Jan. 23, 2025 Hr'g Tr. at 104-105 (closing argument) (counsel for Teamsters acknowledging that they bear the burden of proof on the liquidating fiduciary issue).

[143] *Cain v. Inacom Corp.*, No. ADV 00-1724, 2001 WL 1819997, at *1-*2 (Bankr. D. Del. Sept. 26, 2001).

**II.    In the alternative, the debtors are entitled to damages reduction under 29 U.S.C. § 2104(a)(4).**

Courts have discretion to "reduce the amount of [WARN] liability" if the defendant demonstrates that (1) the violative act or omission was done in good faith and (2) it had reasonable grounds for believing that the act or omission was not a violation of the WARN Act.[144]  To qualify for the good faith defense, an employer must present evidence of its subjective intent to comply with the act and of the objective reasonableness of its compliance efforts.[145]  Damages reductions under § 2104(a)(4) are "intended for circumstances where the employer technically violates the law but shows that it did everything possible to ensure" that its employees received enough advance notice of the layoff.[146]  On the record here, the Court concludes (in the alternative) that if there is a basis for imposing liability under the WARN Act, Yellow's good faith efforts to comply with the statute provide a basis for reducing its liability to 14 days of pay and benefits, rather than the 60 days' to which they would otherwise be entitled.

**A.    The debtors have demonstrated their subjective intent to comply with the WARN Act and the objective reasonableness of their compliance efforts as required under 29 U.S.C. § 2104(a)(4).**

Subjective intent may be established by a showing that the employer "worked with legal counsel to determine whether the company was in compliance with WARN, as well as more general evidence that the company had its employees' welfare in

---

[144] 29 U.S.C. § 2104(a)(4).

[145] *See, e.g., Frymire v. Ampex Corp.*, 61 F.3d 757, 767-768 (10th Cir. 1995).

[146] *Castro v. Chicago Housing Auth.*, 360 F.3d 721, 731 (7th Cir. 2004).

mind."[147]  Courts that have analyzed § 2104(a)(4) have generally looked to the totality of the circumstances when analyzing the subjective element.[148]

In *Frymire v. Ampex Corp.*, the court found that the defendant employer had demonstrated a good faith intent to comply with the act.[149]  The court emphasized the extensive conversations between the company's human resources department and its legal counsel, as well as its "pay in lieu of notice" policy that provided affected employees with three-weeks' notice or pay instead of notice "so that they could more easily seek employment elsewhere."[150]  The court also pointed to the fact that the employees had a sense that layoffs may be coming.[151]

In *Jamesway Corp.*, by contrast, the court rejected the debtor's contention that its WARN liability should be reduced on the basis of good faith.[152]  The court looked to circumstantial evidence of the debtors' subjective belief that they were in compliance with the act and found that, despite the fact that the debtors were aware of their WARN Act obligations, and were able to send notices, they chose not to do so.[153]

Here, the Court is persuaded that the company intended to comply with the WARN Act and that (as least with respect to the union employees whose claims are

---

[147] *Id.*

[148] *See, e.g.*, *Frymire*, 61 F.3d at 767-768; *Castro*, 360 F.3d at 730-731.

[149] 61 F.3d 757 (10th Cir. 1995).

[150] *Id.* at 768-769.

[151] *Id.* at 769.

[152] 235 B.R. 329, 346-347 (Bankr. S.D.N.Y. 1999).

[153] *Id.* at 347.

at issue here) its efforts to do so were objectively reasonable.  To begin, the debtors did in fact send a WARN notice.[154]  And while this Court ruled on summary judgment that the form of the notice fell short of what the statute required, the Court noted (for reasons detailed in its summary judgment opinion) that the question was a close one.[155]  And if the availability of a damages reduction in cases of objective good faith is to mean anything, it must cover a situation in which a defendant fails to comply, but comes close to doing so.

As far as the company's internal processes go, there is evidence that the debtors' human resources department was involved in the review, communication, and circulation of the WARN notice.[156]  Statlander testified that the debtors' human resources team was familiar with the WARN Act's notice requirements and felt comfortable speaking up if something seemed improper.[157]

Given the "gigantic amount of work" being done in the days before the layoffs, the Court is satisfied that the imperfections in the notice itself are not inconsistent with the proposition that the company had engaged in good faith efforts to comply with the statute.[158]  That conclusion is further supported by ample evidence in the record that the company generally sought to keep its employees apprised of the situation.  To be sure, the Court believes that those efforts were motivated at least as

---

[154] Joint Ex. 104.

[155] Summary judgment opinion at 31-37.

[156] Jan. 21, 2025 Hr'g Tr. at 138-139.

[157] *Id.*

[158] *Id.* at 139.

much by the company's desire to have the employees pressure union leadership into taking a more flexible position in the parties' negotiations as it was by a desire to ensure that the employees were fully in the loop.  But even so, these informal efforts to keep the employees aware of the circumstances are broadly consistent with the goals of the WARN Act.

The Teamsters argue that the debtors are not entitled to a reduction of damages based on good faith.  In their view, the fact that the WARN notice did not mention the strike notice means that the debtors could not have reasonably qualified for the unforeseeable business circumstances defense under 29 U.S.C. § 2101(b)(2) and therefore fails the objective prong of § 2104(a)(4).[159]  But the Court previously found that, at least as to the faltering company exception, the "inadequacy of the notices is a very close question."[160]  And because the company would have only needed to prevail on one of its affirmative defenses in order to avoid WARN Act liability, the failure to mention the strike notice is not fatal to its argument that its efforts to comply with the statute were objectively reasonable.  The Court accordingly finds that the debtors' efforts to comply with the WARN Act's notice requirements were objectively reasonable.

## B.    The debtors' WARN Act liability may be reduced, but not eliminated.

The debtors argue that their WARN Act liability should be reduced to zero because the affected union employees did not suffer any harm.  And at some level,

---

[159] Jan. 23, 2025 Hr'g Tr. at 92.

[160] *Id.* at 90-92; summary judgment opinion at 61.

there is a common sense to their position.  Under the Court's summary judgment ruling, had the debtors added a sentence to their notice stating that "the company has been in active negotiations with its lenders and other parties in an effort to refinance its existing indebtedness, and the issuance of WARN Act notices during the pendency of those negotiations would have hindered those efforts," it would have fully complied with its obligations under the WARN Act as applied to its union employees.

Would the inclusion of such a sentence really have made a difference to the employees, particularly in light of the company's extensive communications with them about its status and the widespread publicity of the company's travails? Probably not.  But, in the Court's view, that does not provide a legal basis to eliminate the company's WARN Act liability on good faith grounds.  Congress' objective in providing 60 days' backpay under the WARN Act was not to provide a "make whole" remedy for the harm caused by the failure to provide an adequate notice.[161]  The statute simply provides that affected employees are entitled to a day of backpay for each day the employer violated the statute.[162]  Here, if this Court is incorrect in its conclusion that the debtors were not "employers" at the time they ordered the layoffs in question, then they violated the WARN Act and, to give effect to the purpose of the statute, should bear some liability.

That said, the statute expressly provides for the exercise of discretion in reducing damages in cases in which the defendant acts reasonably and in good faith,

---

[161] *Bledsoe v. Emery Worldwide Airlines*, 635 F.3d 836, 842-843 (6th Cir. 2011); *Roberts v. Genting New York LLC*, 68 F.4th 81, 92 n.11 (2nd Cir. 2023).

[162] 29 U.S.C. § 2104(a)(1).

as the debtors have here.  And when exercising its judicial discretion, a court may consider the totality of the circumstances.[163]  This Court's judgment is that even if the debtors were employers, imposing 60 days of liability for backpay and benefits would be disproportionate in view of the record showing good faith efforts both to comply with the statute and to keep employees apprised of the company's status more generally.  The Court also accepts the company's explanation that the failure to mention the strike notice in the WARN notice was motivated, at least in part, by a desire to avoid exacerbating a potentially volatile (and perhaps even dangerous) situation.[164]  The Court also accepts the notion that Yellow's employees had been made aware of the company's efforts to stabilize its precarious financial situation.[165]

Given the unforeseen and uniquely challenging circumstances in which the WARN notices were drafted, and the company's desire to treat its employees with dignity during the layoffs, the Court finds that to the extent there is any WARN Act liability, it is appropriate to limit the damages to 14 days of backpay and benefits per affected employee.

---

[163] *See, e.g., In re Blinds to go Share Purchase Litig.*, 443 F.3d 1, 8 (1st Cir. 2006); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 770 (1976).

[164] Jan 21, 2025 Hr'g Tr. at 56, 60 (Hawkins); *id.* at 138 (Statlander).  To be sure, the Company went on about a week later to file a rather inflammatory first-day declaration in which it pointedly blamed the Teamsters for the company's failure.  *See* D.I. 14.  But that later filing is not inconsistent with the company's stated desire to avoid inflaming tensions at the time of the shutdown.

[165] Joint Exs. 48, 50, 55, 75.

**Conclusion**

Because the debtors were a liquidating fiduciary as of July 30, 2023 (at the latest) the union members' claims for WARN Act liability shall be disallowed. Alternatively, if there is any WARN Act liability, such liability shall be limited to 14 days of back pay and benefits per affected employee. The parties are directed to settle an appropriate order so providing.

Dated: February 26, 2025

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE