**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | Case No. 23-11069 (CTG) |
| Debtors. | (Jointly Administered) |
|  | **Hearing Date: June 16, 2025 at 10:00 a.m. (ET)** |
|  | **Objection Deadline: May 20, 2025 at 4:00 p.m. (ET)** |

**MOTION OF MFN PARTNERS, LP AND MOBILE STREET HOLDINGS, LLC FOR
ENTRY OF AN ORDER CONVERTING THE DEBTORS' CHAPTER 11 CASES TO
CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

MFN Partners, LP ("MFN") and Mobile Street Holdings, LLC ("Mobile Street" and, with MFN, collectively, "Movants"), by their undersigned counsel, hereby submit to the United States Bankruptcy Court for the District of Delaware (the "Court") this motion (the "Motion") requesting that the Court enter an order, in the form attached hereto as **Exhibit A**, converting the Debtors' chapter 11 cases (the "Chapter 11 Cases") to cases under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"), effective as of June 30, 2025 (the "Conversion Date"), in order for the Debtors to continue to monetize remaining real estate assets and participate in the SFA Ruling appeal currently pending before the Third Circuit.

In support of the Motion, Movants respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.      These cases are nearing their two-year anniversary.  The Debtors ceased operating their prepetition businesses days before filing for bankruptcy and have been liquidating their

---

[1]      A complete list of each of the debtors in these chapter 11 cases (the "Debtors") may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is:  10990 Roe Avenue, Overland Park, Kansas 66211.

assets since the early days of these cases.  The Debtors' exclusivity expired in late February 2025 and no other party has filed a proposed plan.  The Debtors have abandoned the one plan of reorganization for which a disclosure statement was approved – the Second Amended Plan filed back in November 2024 [Dkt. No. 5028] –  reporting to this Court on March 17, 2025 that they did not believe it was confirmable.  *See* Dkt. No. 5907 at 6.

2.      Movants are now convinced that these cases need to convert to chapter 7 for two primary reasons.  First, seven-figure administrative expenses continue to accrue each month, with no end in sight.  This primarily results from the fact that the Debtors and the Official Committee of Unsecured Creditors (the "Committee") each employ multiple sets of advisors, several of whom incur flat fees each month, who continue to incur millions of dollars each month, despite questionable ongoing need.  For example, just in January and February 2025, the Debtors' professionals collectively incurred $10,929,335[2] and the Committee's professionals collectively incurred $3,354,215.[3]  Converting to chapter 7 (effective June 30, 2025) will eliminate all Committee professionals and will greatly streamline needed professionals, while giving the Debtors sufficient time prior to conversion to monetize the vast majority of their remaining real estate assets.

3.      Two, and more importantly, Movants request conversion because it is the only fair and efficient means to ensure fiduciary responsibility to these liquidating estates and their constituents.  Fairness and fiduciary responsibility need to be restored because of the recent, and botched, efforts of the Debtors and the Committee to jam through the *Third Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the*

---

[2]    This includes significant litigation costs in January 2025 that are not likely to be repeated but does not include February 2025 monthly fee statements for Debtors' Delaware counsel and financial advisor.

[3]    This does not include the Committee's financial advisor February 2025 monthly fee statement, which was not filed as of the date of filing this Motion.

*Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors*
(the "Third Amended Plan") [Dkt. No. 5995] – a plan that was premised on an unconscionable "settlement" favoring members of the Committee and a select group of multi-employer pension plans ("MEPPs") whose claims had been objected to by the Debtors and Movants.  This Court's April 7 "preliminary observations" opinion (defined below as the April 7 MEPP Claim Objection Opinion) has effectively rendered that "settlement" even more unconscionable and yet, despite multiple requests by Movants that the Debtors and the Committee withdraw the Third Amended Plan, they have thus far refused to do so and have shown nothing to otherwise move this case forward towards a confirmable plan.[4]

4.      Converting the cases to chapter 7 and appointing an independent trustee ensures fairness in the administration of the Debtors' estates.  It removes the stalemate that has existed for months between the Committee (and its favored members) and the estates concerning control over post-confirmation affairs because there would be no post-confirmation affairs and a chapter 7 trustee as an independent fiduciary can handle matters fairly and transparently.

5.      Movants lament the need to file this Motion.  Since the early days of these cases, MFN has stood side by side with the Debtors on many key issues, providing both economic and significant legal assistance, and never once asked for any benefit that would be unfair to the estates, their creditors, or other shareholders.[5]

6.      When the Committee filed on January 28, 2025 its misguided (and ultimately pointless) motion to terminate exclusivity or, in the alternative, convert these cases to chapter 7

---

[4]    It has been three weeks since the April 7 status conference and issuance of the April 7 MEPP Claim Objection Opinion and not only has the Third Amended Plan not been withdrawn, neither the Debtors nor the Committee have requested a status conference.

[5]    Despite working side by side with the Debtors for nearly two years on the most important matters, and despite trying for three weeks after the issuance of this Court's preliminary observations opinion to give the Debtors a chance to withdraw the Third Amended Plan, Movants will not be surprised if the proponents and "settling" parties to the Third Amended Plan choose to lash out with *ad hominem* attacks.

(the "Committee Exclusivity/Conversion Motion") [Dkt. No. 5564] – because the Committee was adamant it should have sole authority to appoint fiduciaries to settle claim objections and estate claims – Movants objected alongside the Debtors, pointing out that the Committee itself was hopelessly conflicted, favoring its own constituents. *See* Dkt. No. 5614.  But even in that opposition to the Committee Exclusivity/Conversion Motion, Movants recognized that there may come a time when conversion to chapter 7 might make sense, stating "conversion of these cases to chapter 7 may at some point be appropriate if a confirmable plan with proper governance procedures is not put before this Court." *Id.* at ¶ 2.

7.      That time is now.  There is no reasonable prospect for a confirmable plan, the Debtors cannot rehabilitate themselves, and the estate fiduciaries have lost their way.  An independent, non-conflicted, trustee is needed, and there is no longer any point to remaining in chapter 11.

8.      Had the Debtor stayed the course they had followed ever since this Court's SFA Ruling (defined below) – objecting to inflated claims and not surrendering control to favored members of the Committee – there would be less of a need to convert these Chapter 11 Cases pending claim objection resolutions, even with the accrual of administrative expenses.  But on or about March 21, 2025, the Debtors sold out.  They joined forces with the Committee after the Committee and two other groups of MEPP claimants (the "Groom Law Group"[6] and the "Milbank Group")[7] cut deals to "settle" claim objections and give grossly inflated allowed claims to members of these two groups.  The Debtors apparently decided that it was more important to seek

---

[6]     The "Groom Law Group" consists of seven MEPPs: New York Teamsters ("NY Teamsters"); Road Carriers 707 Pension Fund; Teamsters Local 617 Pension Fund; Freight Drivers 557 Fund; Manager Labor 1730 Fund; TENJ Pension Fund; and Auto Mechanics Local 701 Pension.  NY Teamsters also sits on the Committee.

[7]     The "Milbank Group" consists of five MEPPs: New England Teamsters Pension Fund ("New England"); Teamsters Local 641 Pension Fund; Teamsters 710 Pension Fund; Central Pennsylvania Pension Fund ("Central PA"); and Teamsters Joint Council 83 Virginia.

confirmation of a plan – just for the sake of confirming a plan – even at the cost of inappropriately "settling" claims that the Debtors and Movants had objected to and the Debtors **knew** were inflated.

9.      The Debtors and Committee filed on March 28, 2025 their jointly proposed Third Amended Plan and accompanying disclosure statement.  Dkt. Nos. 5995 and 5996.  The Third Amended Plan is premised on a so-called "settlement" of objections to various MEPP claims and the dismissal of the appeal of the SFA Ruling pending before the Third Circuit.  The "settled" claims are listed on Exhibit A to the Plan Supplement.  *See* Dkt. No. 5997.  Two of the claims held by MEPP claimants in the Milbank Group – New England and Central PA – are "settled" for $180 million **more** than what was in the proofs of claim filed by those same MEPP claimants, which was **admitted** in the disclosure statement.  *See* Dkt. No. 5996 at n. 14, n. 17.[8]

10.      The Debtors and the Committee, however, did not file a new motion to approve the disclosure statement and asked for a confirmation hearing on May 19, 2025.  When Movants pointed out in a letter filed with this Court that no new motion had been filed, *see* Dkt. No. 6017 at 2, on April 4, 2025, the Debtors and the Committee filed a "notice" of a supplemental order approving the disclosure statement, with an April 11, 2025 objection deadline.[9]  Dkt. No. 6025.

11.      Moreover, the "settlement" that is the heart of the Third Amended Plan assumed the estates did not prevail on many material legal issues that the Debtors and Movants were actively litigating, including: (a) whether MEPP claims should be discounted to present value; (b) whether all MEPP claims should have 50% of their claims subordinated to non-MEPP general

---

[8]    Movants are not aware of any examples of estate fiduciaries agreeing to settle claim objections by giving the holders of such objected-to claims allowed claims greater than the amounts asserted in the filed proofs of claim.

[9]    Movants immediately requested targeted discovery that would be needed to object by the artificial April 11 deadline.  Following the April 7 status conference, the Debtors requested that Movants agree to defer confirmation and solicitation discovery, which Movants have accommodated.

unsecured claims if the Debtors were insolvent; and (c) whether Central States Pension Fund ("Central States") was entitled to any recovery on account of its contract claim. The "settlement" also gave no credit for the possibility of the Third Circuit reversing the SFA Ruling, which would have the effect of reducing Central States's withdrawal liability claim to less than $50 million.

12.    Indeed, the "settlement" gave Central States (a Committee member) both a $1.038 billion withdrawal liability claim and a $618 million contract claim that the Debtors and Movants had objected to and were on the verge of obtaining a ruling on from this Court. It gave NY Teamsters (a Committee member and member of the Groom Law Group) an allowed claim of $451 million even though rulings by this Court could reduce the claim to less than $250 million. The settlement gave Teamsters 710 Pension Fund (a Milbank Group member) a $117 million claim even though rulings from this Court could reduce it to zero. The settlement also would lock in rulings favoring New England and NY Teamsters that the Debtors and Movants objected to and are now pending before the Third Circuit.

13.    The "settlement" under the Third Amended Plan also ensured that the Debtors' equity security holders were wiped out even though they were not wiped out under the Second Amended Plan and, since the filing of the Second Amended Plan, the estates had only prevailed on material claim objection matters. Yet with all of the existing rulings on claim objections and reasonable prospects at the Third Circuit, there is a meaningful possibility of all general unsecured claims being paid in full if remaining asset sales go well and even before considering any successful prosecution of the IBT Suit (defined below).

14.    Having cut their deal, the Debtors and the Committee argued strenuously against this Court issuing any ruling on all remaining MEPP claim objection issues, requesting that this Court await confirmation and apply the "lowest point of reasonableness" standard, (presumably)

relying on the conventional wisdom that bankruptcy courts will disregard individual party in interest's complaints concerning a plan if there is majority support from all creditors. When this Court indicated it was prepared to rule by April 4, the Debtors and the Committee wrote a letter to this Court on March 27, claiming that this Court could confirm a plan without resolving Movants' claim objections and apply the very lenient Rule 9019 "lowest point of reasonableness" standard.[10]

15.    Even after this Court issued a lengthy letter opinion stating that it was going to issue a ruling by April 7 and that even if the Debtors and Committee sought to confirm the Third Amended Plan with the "settlement," the Court would not apply such a lenient standard, *see* Dkt. No. 5999,[11] still the Debtors and the Committee argued that this Court should not release its opinion and should instead await confirmation.

16.    From March 17, 2025 through April 7, 2025, this Court gave the Debtors and Committee leeway to try to reach a global resolution which would include Movants – but they made no attempt to do so – and then on April 7 issued a 77-page preliminary opinion on key issues relating to MEPPs' withdrawal liability claims (the "April 7 MEPP Objection Opinion") [Dkt. No. 6030]. Though not a final adjudication, this Court's analyses overwhelmingly favored the estates and Movants on the MEPP claim objections, resulting in over $2 billion in claims being subject to disallowance and, equally importantly, 50% of all MEPP claims being

---

[10]    They also tried to have the Court disregard Movants' standing as purportedly mere "joining" parties in the Debtors' claim objections. The Court made short work of this position. *See* Dkt. No. 5999 at 14-16.

[11]    The Court's letter opinion also contained the following observation, which Movants believe is an important principle for *any* chapter 11 case, and not just this one: "At the same time, it is also true that one way to reach consensus among 20 parties is for parties 1 through 19 to agree that they will mug the 20th and divide up that party's fair share among themselves. In such a case, it is the Court's obligation to see through the parties' efforts to cast party 20 as a 'holdout' who is the 'sole obstacle' to a consensual resolution. The Court has certainly not formed any view on merits of the proposed settlement here. Any such judgment will be based solely on the presentation of evidence at the confirmation hearing." Dkt. No. 5999 at 26 n.87.

subordinated to non-MEPP general unsecured claims if the Debtors' estates were determined to be insolvent.

17.    Movants have put together the chart below that shows, just based on existing court rulings, how inflated the claims are of "settling" MEPP claimants in the Third Amended Plan (all figured are rounded):

| Plan | Allowed Settlement Claim | Claims Based on All Rulings (Including April 7 Opinion) | Effect of 50% Subordination[12] | Claim With SFA Included (Third Circuit Reversal)[13] |
|---|---|---|---|---|
| Central States Withdrawal Liability | $1.038 billion | $700 million | $350 million subordinated | $30 million |
| Central States Contract Claim | $618 million | $0 | $0 | $0 |
| New York Teamsters | $546.6 million | $230 million | $115 million subordinated | $230 million |
| New England Teamsters Pension Fund | $451 million | $160 million[14] | $80 million | $160 million |
| Teamsters 710 Pension Fund | $117 million | $0 | $0 | $0 |
| Central PA Pension Fund | $98 million | $30 million | $15 million subordinated | $30 million |
| Management Labor 1730 Fund | $54.2 million | $6 million | $3 million subordinated | $6 million |
| Road Carriers 707 Pension Fund | $51.8 million | $28 million | $14 million subordinated | $28 million |
| Teamsters of Philadelphia | $41 million | $13 million | $6.5 million subordinated | $13 million |
| Teamsters Local 641 Pension Fund | $30.7  million | $17.5 million | $8.75 million subordinated | $17.5 million |
| IAM National Pension Fund | $29 million | $14 million | $7 million subordinated | $14 million |
| Teamsters Joint Council 83 Virginia | $10.2 million | $5.5 million | $2.75 million subordinated | $5.5 million |
| Freight Drivers 557 Fund | $10.1 million | $7 million | $3.5 million subordinated | $7 million |
| Auto Mechanics Local 701 Pension Fund | $8.3 million | $4.75 million | $2.375 million subordinated | $4.75 million |
| Teamsters Local 617 Pension Fund | $4.2 million | $2.75 million | $1.375 million subordinated | $2.75 million |
| TENJ Pension Fund | $3.2 million | $2.25 million | $1.125 million subordinated | $2.25 million |

---

[12]    Amount subordinated to non-MEPP general unsecured claims.

[13]    Before subordination.

[14]    There remains a legal issue relating to calculation of the New England claim that could increase the claim from $160 million to $220 million prior to giving effect to subordination.

| TOTALS | $3.09 billion | $1.22 billion | $610 million subordinated | $550 million (of which $275 million subordinated if Debtor insolvent) |
|---|---|---|---|---|

18.    Had their fiduciary compasses not been broken, the Debtors and the Committee would have been thrilled with the impact of the April 7 MEPP Objection Opinion because all other general unsecured creditors holding allowable claims stood to materially benefit and even have a chance at payment in full.  Movants certainly believed the significant time and effort of the Debtors and the Movants objecting to MEPP claims had been vindicated.

19.    The day after the release of the April 7 MEPP Objection Opinion, Movants asked the Debtors and the Committee to withdraw the Third Amended Plan and repeated this request twice more (on April 14 and April 21).[15]  The estate fiduciaries have refused.  Their fiduciary compasses are broken.  Movants have lost all faith in the Debtors' ability to steward these cases. There is no hope for a confirmable plan and conversion to chapter 7 will eliminate substantial administrative costs, including the fees and costs of the Committee and its professionals.  A chapter 7 trustee will be independent of *both* the Debtors and the Committee members and can proceed without being influenced by trying to obtain a confirmable plan to favor (or curry favor with) selected parties in interest.

20.    Moreover, a chapter 7 trustee can wrap up and close many of the Debtors' chapter 11 cases and request authority to make interim distributions without the need for a plan.  *See In re Bird*, 565 B.R. 382, 400 (Bankr. S.D. Tex. 2017) (Code does not bar a chapter 7 trustee from making interim distributions if it benefits the estate to do so); *In re Energy Co-op, Inc.*, 173 B.R. 363, 372 (N.D. Ill. 1994) (allowing an interim distribution when the trustee proved that it was in the best interests of the estate).

---

[15]    On April 21, 2025, Movants indicated that they wanted confirmation of withdrawal of the Third Amended Plan by April 25 and otherwise would proceed with this Motion.

21.     A debtor may not enjoy the protection of chapter 11 indefinitely.  "[I]t is not the purpose of Chapter 11 to allow a debtor a permanent cloak of protection while the estate's assets continue to diminish and the operational coherence unravels."  *In re Galvin*, 49 B.R. 665, 669 (Bankr. D.N.D. 1985).  "The function of Chapter 11 is rehabilitation—not disintegration."  *Id.*

22.     This Court should convert the Debtors' Chapter 11 Cases to chapter 7 cases because cause for conversion exists and conversion is in the best interest of creditors and the Debtors' estates.

## JURISDICTION AND STATUTORY PREDICATES

23.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2021.

24.      This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware ("Local Rules"), Movants consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

25.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are sections 105(a), 1112(a) and 1112(b) of the Bankruptcy Code and Local Rule 2002-1.

## BACKGROUND

### A.     General Background and Postpetition Liquidation of Assets

26.     On August 6, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have been managing

their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

27.     On August 16, 2023, the United States Trustee for the District of Delaware appointed the Committee [Dkt. No. 269] and twice has filed notices of amendments to the Committee constituents.  At all times, Central States, NY Teamsters, the Pension Benefit Guaranty Corporation ("PBGC"), and the International Brotherhood of Teamsters union ("IBT") have been members of the Committee.

28.     The Debtors were forced to terminate the employment of virtually all of their employees, and ceased operations, immediately prior to the Petition Date.  Since that time, the Debtors have been liquidating their assets, consisting primarily of rolling stock (trucks and trailers) and real estate (both owned and leased).  There is no prepetition business of the Debtors to save.

29.     Moreover, while there are 24 Debtors, only a few have any employees or "operations" during these Chapter 11 Cases.  The vast majority of the Debtors have virtually no assets or creditors (other than the PBGC and MEPP claimants holding joint and several liability claims).

30.     MFN is the largest holder of the publicly traded stock of Yellow Corporation, holding approximately 42.5% of the equity interests in the Debtors.  Mobile Street, an affiliate of MFN, holds several unsecured claims against the Debtors, aggregating to approximately $197 million in asserted claims.  These include claims of two MEPPs: Western Pennsylvania Teamsters & Employers Pension Fund ("Western PA") and International Association of Machinists Motor City Pension Fund.

31.    When these Chapter 11 Cases were filed, the Debtors believed they only had one option for debtor-in-possession ("DIP") financing, provided by their prepetition secured lenders and at great cost.  *See* Dkt. No. 18 at ¶¶ 19, 20.  But MFN provided extremely inexpensive DIP financing (prompting an "auction" to provide such financing) and the end result was financing that saved the estates tens of millions of dollars in fees and interest costs.

32.    MFN also became heavily involved in the Debtors' efforts to monetize their real estate assets, fighting against the Debtors agreeing to a single "stalking horse" bid for all assets without the ability to auction individual assets.  MFN's viewpoint largely prevailed, which led to an auction process that resulted in only approximately two-thirds of the real estate assets being sold for approximately $1.9 billion, which was hundreds of millions of dollars more than the "stalking horse" bid.  Notably, during this phase MFN had virtually no interaction with any Committee professional and is not aware of a single buyer being identified by the Committee.

33.    MFN had far less involvement in phase II of monetization of the Debtors' real estate assets ("Phase II"), which is ongoing.  This is because MFN sought to invest in a real estate investment trust ("REIT") that could be formed through a plan of reorganization and to avoid any possible taint,[16] MFN stood back from the monetization process.

34.    Even after the Debtors abandoned the REIT concept in November 2024 when they proceeded with the First Amended Plan (defined below) and Second Amended Plan, Movants still supported the Debtors' efforts to monetize real estate assets through Phase II.  In Phase II, the Debtors appear to have favored private sales or lease termination resolutions versus a formal auction process.  *See* Dkt. Nos. 6064, 5131 and 5130.  Presumably, the Debtors have thoroughly marketed their assets already and Movants are fine waiting for conversion to occur at the end of

---

[16]    Indeed, MFN (and other equity security holders of the Debtors) put together a term sheet that was attached to the Debtors' initial disclosure statement.  *See* Dkt. No. 4254-3.

June 2025, such that conversion to chapter 7 is not likely to be disruptive (as compared to earlier points in time in these cases).

**B.        The Prepetition IBT Suit and Efforts to Devalue It**

35.        Prior to the Petition Date, on June 27, 2023, the Debtors filed a lawsuit in the United States District Court for the District of Kansas against the IBT and several local unions for alleged breaches of collective bargaining agreements (the "IBT Suit").  In that lawsuit, in addition to injunctive relief, the Debtors sought damages from IBT on the basis of its alleged role in the reduction of the Debtors' enterprise value.

36.        The Debtors have explained in public filings in the IBT Suit how destructive the alleged breaches were to the Debtors.  The Debtors asserted "[a]s alleged in the Complaint, Defendants and IBT General President Sean O'Brien, who orchestrated the breaches, thereby sacrificed 30,000 jobs, including 22,000 union jobs, and a hundred-year-old trucking company so that O'Brien could project an image of 'strength' in the Union's then-pending negotiations with UPS and other companies." *Yellow Corp. v. International Brotherhood of Teamsters*, Case No. 23-01131 (D. Kan. Dkt. No. 65 at 1).  The Debtors further argued that these asserted breaches "caused massive damages to the Company and forced it to file for bankruptcy protection." *Id.*

37.        On March 25, 2024, the court held that the Debtors failed to exhaust the grievance procedure in the parties' collective bargaining agreement and dismissed solely on that procedural basis.  On April 22, 2024, the Debtors asked the court to alter or amend the decision to dismiss the lawsuit and filed a motion to amend the dismissed complaint, both of which the court denied on July 15, 2024.

38.        The Debtors have filed a notice of appeal to the Tenth Circuit.  The Debtors and the IBT have filed appellate briefs.  Regardless of the outcome of such appeal, there will have been no resolution as to the merits of the Debtors' claims in the IBT Suit.  At worst, an adverse

ruling from the Tenth Circuit would require the Debtors to go through the grievance process detailed in the collective bargaining agreements.

39.     Whether the claims are ultimately heard in a district court or through a grievance process, the Debtors' estates have, from the Petition Date, made clear that they believe the claims are real and substantial.  The Debtors' first day declaration provided detailed explanations of the Debtors' (strongly held) views that the actions of the IBT had caused the Debtors substantial damage.  *See* Dkt. No. 14, ¶¶ 2–18, 80–88, 94–100.  Further, the Debtors sought and obtained Court approval of special litigation counsel, which employment application explained the anticipated benefits of pursuing claims against the IBT.  *See* Dkt. No. 418, ¶¶ 8–11.  Special litigation counsel has incurred over $10 million in fees and costs during these Chapter 11 Cases, which is evidence of the significance to the Debtors' estates of the potential value of the claims against the IBT.

40.     The value of the IBT Suit is, of course, speculative.  But the damages sought would be the lost equity value, plus all of the costs of these Chapter 11 Cases, meaning that a successful prosecution may provide a means to pay allowed claims in full and generate a return to prepetition equity security holders.  And clearly the Debtors must have believed it was worth the cost of engaging counsel to pursue, even through the filing and solicitation for the Second Amended Plan.

41.     But despite the Debtors' investment in this litigation and the prospect that a successful litigation could generate substantial value for all stakeholders, the Committee has been critical of the Debtors' potentially massive litigation claim against the IBT (a Committee member) even though if successful it might result in general unsecured claims being paid in full.  *See* Dkt. No. 3511 at ¶ 2.  And there is virtually no discussion in the disclosure statement accompanying

the Third Amended Plan of what would happen to the IBT Suit, but it is reasonable to infer that the deal cut between the Debtors and the Committee would give the Committee control over post-confirmation governance; otherwise, why wipe out equity security holders?

### C.    MEPP and WARN Claim Objections

42.    By far, the biggest litigation matters in these cases – which have forced the Debtors to incur substantial administrative expenses – concern objections to the claims of MEPPs and WARN claimants.  These claims assert billions of dollars of general unsecured claims that were massively overstated or lacked legal merit.  Yet absent objection, they would have overwhelmed any meaningful recovery for other allowed general unsecured claims, much less the Debtors' prepetition equity security holders.

43.    The largest single set of claims was asserted by Central States (another Committee member).  It filed two types of general unsecured claims.  The first was for withdrawal liability and asserted a claim in excess of $4.8 billion.  The second was a claim alleging breach of contract, claiming the Debtors owed Central States approximately $918 million.

44.    In addition to Central States, many other MEPP claimants filed proofs of claim that have been found by this Court to be overstated (albeit no claimant overstated its claim as badly as Central States).  One Committee member (and member of the Groom Law Group), NY Teamsters, filed a proof of claim asserting withdrawal liability of $547 million; based on the rulings by the Court to date that claim has been reduced to $230 million, with $115 million subject to subordination if the Debtors are insolvent.

45.    Two other claimants to specifically mention are New England and Central PA. Both of these claims are part of the Milbank Group that purportedly "settled" their MEPP claims under the Third Amended Plan.  New England filed 24 proofs of claim, each one asserting a

MEPP withdrawal liability claim of $285,022,057.  Central PA likewise filed 24 proofs of claim, each one asserting a MEPP withdrawal liability claim of $81,771,134.

46.     The Debtors did recognize that their fiduciary duties mandated that they object to such claims.  And they welcomed the substantial assistance provided by Movants' counsel, including attorneys with subject matter expertise in ERISA and WARN matters.[17]

### WARN Claims

47.     The Debtors and Movants have been largely successful in prosecution of the claim objections.  On the eve of trial in January 2025, the Debtors announced settlements with two sets of WARN claimants.  This Court approved both settlements, which allow such claims (the "Settled WARN Claims") for less than $13 million. The Debtors then obtained a favorable opinion disallowing all non-settling WARN claims.  *See* Dkt. No. 5807.  The end result is that instead of having to provide for hundreds of millions of dollars of priority unsecured claims (which would have to be paid in full before general unsecured claims would receive any distribution) the current allowed WARN claims are only the Settled WARN Claims.[18]

### MEPP Claim Objections

48.     This Court has also disallowed (or made observations suggesting disallowance of) billions of dollars of MEPP claims after the Debtors and Movants objected and the Court conducted multiple summary judgment hearings.  *See* Dkt. Nos. 4769, 5619.  This includes the detailed April 7 MEPP Objection Opinion, albeit listed as "preliminary," observing, among other things, that Central States's $918 million contract claim is an unenforceable penalty.  *See* Dkt. No. 6030 at 64-67.

---

[17]   Movants estimate that their counsel with subject matter expertise has incurred in excess of $1 million assisting the Debtors.
[18]   This Court's ruling has been appealed to the District Court.

49.    The Debtors and Movants have not prevailed on every MEPP claim issue.  Most significantly, this Court ruled against the Debtors and the Movants, and in favor of the PBGC, Central States, and a few other MEPPs, with respect to whether special financing assistance ("SFA") the United States government provided to certain MEPPs was a "plan asset" that had to count in the calculation of unfunded vested benefits, which is the key input to determining withdrawal liability.  *See* Dkt. Nos. 4769, 4846, 5057 (collectively, the "SFA Ruling").  Both the Debtors and Movants filed notices of appeal.  Though this Court ruled against the Debtors and Movants (including denying Movants' motion for reconsideration), this Court granted a joint motion to certify the SFA Ruling for direct appeal to the Third Circuit, noting the importance of the issue to creditor recoveries.  *See* Dkt. No. 5358.  The Third Circuit accepted the direct certification (sought by both the Debtors and Movants) over objection and directed expedited briefing.  *See In re Yellow Corp.*, Third Cir. Case No. 25-8004 (Feb. 28, 2025), Dkt. No. 25.  As of the date of this Motion, Movants filed an opening brief, which the Debtors joined.  All briefing will be submitted by May 26, 2025, and Movants expect oral argument to occur in June 2025.

50.    Multiple MEPPs opposed the Debtors and Movants with respect to the SFA Ruling issue, but only one MEPP – Central States – stands to materially benefit from this ruling in respect of recovery on account of its withdrawal liability claims against the Debtors.  If the SFA Ruling is reversed on appeal, Central States's withdrawal liability claim would be less than $40 million, but because of the SFA Ruling, Central States's withdrawal liability claim is at least $700 million (after giving effect to this Court's other rulings, and before accounting for subordination).[19]

---

[19]    One bizarre twist to Central States receiving over $38 billion in SFA funds from the United States Treasury is that Central States gave back approximately $126 million following congressional hearings when it was determined that Central States improperly included in its SFA application individual plan beneficiaries who had already passed away.  *See* Mark Williams, *Massive pension bailout must repay millions for including about 3,500 dead people*, Columbus Dispatch (Apr. 10, 2024), https://tinyurl.com/djf683s.  It is not clear whether Central States did the same thing when it filed proofs of claim in these cases.

Movants understand that other MEPPs that received SFA money do not see their claims materially change regardless of the SFA Ruling except that their claims against the Debtors are subject to dilution by the Central States's claim if the SFA Ruling is upheld on appeal.

51.     Further, though the PBGC has vigorously opposed the Debtors and Movants (because it no doubt desires to protect the regulations it issued) its ***unsubordinated*** claim against the Debtors stands to lose out by the dilutive effect of the Central States's withdrawal liability claim.  The PBGC sits on the Committee with a fiduciary obligation to maximize value for general unsecured creditors, and maximizing its claim against the Debtors would help taxpayers, but the PBGC has its own parochial interest to defend its regulations.

52.     In addition to the SFA Ruling, the Debtors objected to three MEPPs' claims – New England, Western PA, and NY Teamsters – on grounds that these MEPPs did not calculate their withdrawal liability in accordance with ERISA and MPPAA but instead based on contracts.  This Court ruled against the Debtors, *see* Dkt. Nos. 4769, 5619.[20]  In connection with the SFA Ruling appeal before the Third Circuit, the Third Circuit authorized the Debtors to file a separate brief in respect of the "contract" ruling by this Court concerning NY Teamsters and Western PA.

**D.      The Committee's Favoritism Towards its Own Members and the Costs of its Professionals**

53.     A troubling aspect of these cases since the early days has been the Committee's lack of public involvement in many key issues, especially when it involved the Committee's own members.  Since its formation, on only seven occasions the Committee has formally joined the Debtors' claim objections or filed statements concerning claim objections brought by the Debtors and Movants.  The Committee has not joined the most important issues against Central States, the PBGC, or NY Teamsters.  The table below lists them:

---

[20]     Movants are aware of a fourth MEPP, Western Conference, which may have similar issues.

| Filing | Docket Number/Date | Debtor Objection | Claims at issue |
|---|---|---|---|
| Joinder (3 pages) | 886 (10/20/23) | Omnibus objections to personal injury claim motions for stay relief | Personal injury claims |
| Statement (5 pages) | 2755 (3/26/24) | Debtor' third, fourth, and fifth claim objections | WARN claims |
| Joinder (5 pages)[21] | 3057 (4/18/24) | Debtors' seventh claim objection | Withdrawal liability (20-year cap, discount rates, other adjustments) |
| Statement (5 pages) | 3998 (7/30/24) | Debtors' motions for summary judgment regarding SFA/20-year cap/discounting to present value | Withdrawal liability |
| Qualified Joinder (3 pages) | 4543 (10/11/24) | Debtors' motion for reconsideration | Withdrawal liability (20-year cap but not SFA Ruling) |
| Joinder (3 pages) | 5326 (1/3/25) | Debtors' 24th claim objection | Environmental Protection Agency claim |
| Joinder (3 pages) | 5451 (1/20/25) | Debtors' 22nd claim objection | CARES Act claims |

54.    Presumably the Committee's silence with respect to other claim objections reveals no nefarious intentions in many respects, but it is odd that the Committee did ***not*** formally object to, or join in the Debtors' objections, concerning SFA (which matters the most to the PBGC and Central States) or Central States's Contract Claim, given the material effect these claims have on general unsecured claim recoveries.  It is fair to say it is highly unusual for a creditors' committee not to actively seek to disallow inflated claims that dilute recoveries to general unsecured

---

[21]    The Committee's joinder indicates that the 20-year cap objections applied to the following MEPPs: (a) Central PA; (b) Teamsters Joint Council #83 of Virginia Pension Fund; and (c) Teamsters Pension Trust Fund of Philadelphia & Vicinity. *See* Dkt. No. 3057 at ¶ 3.  The Committee also noted two others – IAM National Pension Fund and Local 705 IBT Pension Fund – might be subject to objection. *See id.* at n.3.  None of these MEPPs sits on the Committee.  The Committee also asserted that none of the MEPPs properly discounted asserted withdrawal liability payments to present value.  *Id.* at ¶ 5.

creditors, especially when the Debtors are objecting and the Committee did join other claim objections. To this date, the Committee has never explained its positions.[22]

55.     The Committee has also repeatedly voiced concerns regarding administrative expenses (and raised this to, in part, justify (i) objecting to exclusivity[23] and (ii) seeking to terminate exclusivity or convert these cases) but that only supports converting these cases to chapter 7 because, among other benefits, the costs of the Committee sending multiple attorneys to observe hearings or have many attorneys attend weekly meetings would end. *See* Dkt. No. 6024-2 at 13-14; Dkt. No. 6046-2. Further, the Committee has continued to retain both a financial advisor and an investment banker, collectively incurring hundreds of thousands of dollars of fees each month. It is far from clear what benefit the estates now derive from having to pay these monthly fees or what benefit there will be going forward.

56.     Conversion to chapter 7 eliminates all future fees and costs of Committee professionals.

**E.     The Debtors' Efforts to Confirm a Plan of Liquidation and the Committee's Conversion Motion in January 2025**

57.     On September 2, 2024 the Debtors filed the *Disclosure Statement for the Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 4254] and the *Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Initial Plan") [Dkt. No.

---

[22]   In its objection to the Debtors' exclusivity motion filed in May 2024, the Committee complained that the Debtors' "litigation efforts are not being carried out for the benefit of unsecured creditors (creditors who have asserted, in the aggregate, over $11 billion in claims) . . . ." Dkt. No. 3511 at ¶ 2. In retrospect, even the Committee should admit that the "litigation efforts" ***have benefitted*** unsecured creditors because, but for these "litigation efforts," general unsecured creditors would receive pennies on the dollar.

[23]   The Committee apparently believed that would be very unlikely that the Debtors would successfully reduce over $11 billion in general unsecured claims by approximately 90%. Yet 11 months later, the Debtors and Movants are well on their way to doing exactly that. Indeed, if the estates are successful objecting to a $2.13 billion claim of the Environmental Protection Agency and obtain reversals at the Third Circuit on matters being argued on an expedited basis, Movants believe that scenario will occur.

4253]. The Initial Plan had the support of Movants and others because it was premised on reorganizing all remaining real estate into a REIT structure and all allowed general unsecured claims being paid in full with prepetition equity security holders having a meaningful recovery.

58.     Shortly thereafter, this Court issued the SFA Ruling, which made the structure of the Initial Plan unworkable absent reversal on appeal. Though Movants sought reconsideration of the SFA Ruling, the Debtors gave up on the REIT construct and pivoted towards a liquidation of all remaining real estate assets. On October 17, 2024, the Debtors filed the *First Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 4580] (the "First Amended Plan") and a related disclosure statement.

59.     The First Amended Plan eliminated the REIT construct and related conditions precedent concerning disallowance of various claims. *See* Dkt. No. 4581 at 1-2, 49. But the First Amended Plan did not wipe out equity security holders. *See* Dkt. No. 4580 at 20-21. The First Amended Plan did not "settle" any existing claim objections or have the Debtors give up appealing the SFA Ruling, and expressly provided for the possibility that 50% of MEPP withdrawal liability claims would be subordinated to other non-MEPP general unsecured claims. The First Amended Plan did not hand over control of claim objections and estate claims to the Committee.

60.     In support of the First Amended Plan, on November 8, 2024, the Debtors filed a liquidation analysis (the "Liquidation Analysis"). Dkt. No. 4829-1. The liquidation analysis showed, by each debtor, anticipated recoveries under the First Amended Plan as compared to a hypothetical chapter 7 conversion date of February 28, 2025, both with and without the 50% MEPP claim subordination. For many Debtors, there was no difference or the change in

anticipated recoveries in a hypothetical chapter 7 was less than 2%. Indeed, only two Debtors –

Roadway LLC and YRC Inc. – even projected recoveries to general unsecured claim holders in

excess of 10% in the "high" scenario. And the differences between recoveries under the First

Amended Plan and a hypothetical chapter 7 case were relatively small.

61.     The liquidation analysis assumed that a chapter 7 trustee

would be likely to pause any transactions, some market participants may withdraw
from the process, unwilling to fully engage in an auction process with the
uncertainties inherent in a chapter 7 bankruptcy, and the values received for
remaining properties will be negatively impacted from the delay and loss of
continuity. Further, a Trustee may elect to cease any further rent payments on the
Debtors[sic] lease portfolio, jeopardizing the Debtors' ability to assign valuable
leases. Accordingly, the Debtors estimate that the value of the real property may
decrease significantly, to between $285 million and $627 million.

Liquidation Analysis at 8. This created the largest swing in negative value (with a midpoint lost

value of $106.5 million) between the First Amended Plan and the hypothetical chapter 7 as of

February 2025.

62.     The Liquidation Analysis assumed "[i]ncremental professional fees are calculated

at 1.5% to 3.0% of total net proceeds," meaning anticipated chapter 7 professional fees would

total between $16 million and $14 million.[24] It is not clear what is meant by "incremental"

because, among other things, the post-confirmation trust would have its own fees.

63.     The Liquidation Analysis assumed that a chapter 7 trustee would be entitled to 3.0%

of each Debtor's "Gross Liquidation Proceeds available for distribution to creditors," totaling

between $16 million and $27 million. The Liquidation Analysis also assumed that WARN claims

ranged from $0.00 to $207 million. The estates prevailed before this Court and only have allowed

a small amount for the settled WARN claims.

---

[24]    The reference to $14 million as the "high" amount may be a typographical error.

64.    The Liquidation Analysis estimated MEPP claims to range between $2 billion and $4 billion.  As noted above, crediting all of the existing rulings (including the observations contained in the April 7 MEPP Objection Opinion) and assuming the Debtors and Movants do not prevail on appeal in respect of the SFA Ruling or "contract" claims, Movants believe all allowed MEPP claims will not exceed $1.5 billion and even then may have 50% of their claims subordinated to all other general unsecured creditors if the estates are insolvent.  If the estates do prevail in both Third Circuit appeals, such allowed MEPP claims likely would be reduced by at least $700 million.

65.    Movants filed on November 14, 2024 a limited objection to the disclosure statement accompanying the First Amended Plan.  *See* Dkt. No. 4864.  Movants' limited objection pointed out that the disclosure statement did not contain adequate disclosures concerning the IBT Suit and did not adequately address post-confirmation governance, including recusal mechanisms for circumstances where the estate was adverse.  *See id.* at ¶¶ 4-7.  Even then the Movants were concerned that the Debtors might cave to the demands of the Committee's members.

66.    The Debtors sought to address Movants' concerns relating to the First Amended Plan.  On November 22, 2024, the Debtors filed a Second Amended Plan [Dkt. No. 5028] and accompanying disclosure statement, which included language that Movants found acceptable.  The second amended disclosure statement contained a table of projected recoveries for general unsecured claims by debtor and included a column for the 50% MEPP claim subordination.  *See* Dkt. No. 5019-1 at 11-12.  The second amended disclosure statement had detailed disclosures concerning MEPP claim objections, noting MFN's objections, *see id.* at 45 n.24, and included the following statements:

- "With respect to [Central States's] alleged 'contributions guarantee' Claim, the Debtors argued that, among other things, the Claim sought double recovery and reflected an unenforceable liquidated damages provision." *Id.* at 45.

- "The Debtors also believe that the Other SFA MEPPs' proofs of claim are overstated and violate ERISA for a variety of other reasons, described in the Debtors' prior briefs on this subject and expert reports that the Debtors have exchanged with the Other SFA MEPPs." *Id.* at 46.

- The amount of New England's MEPP Claims totaled $285,022,057 in the aggregate. *Id.* at 47 n.31.

- The amount of Central PA's MEPP Claims totaled $81,771,134 in the aggregate. *Id.* at 47 n.28.

67. The Court entered an order approving the disclosure statement accompanying the Second Amended Plan. Dkt. No. 5024. The Debtors then began the solicitation process and arranged for a confirmation hearing on February 24, 2025.

68. But the Debtors did not file any plan supplement revealing who would serve on the liquidating trust board. It was clear to Movants that the Committee, favoring PBGC, Central States, NY Teamsters, and the IBT, would not accept the Debtors nominating a majority of post-confirmation trustees even though the Committee's members were hopelessly conflicted.

69. On January 28, 2025, the Committee filed the Committee Exclusivity/Conversion Motion, setting a February 4 objection deadline and a February 11 hearing date. The Committee sought to terminate exclusivity (though it was slated to terminate in any event within a few weeks if the Second Amended Plan was not confirmed) or, in the alternative, to convert the cases to chapter 7. The primary reason for the Committee's ire was that the Debtors were unwilling to hand over control of a post-confirmation trust to the Committee. *See* Committee Exclusivity/Conversion Motion at ¶¶ 2, 8. It was clear to the Debtors and Movants then that the Committee wanted control, not because the Debtors had been doing a poor job monetizing assets,

but because the Committee wanted to "settle" claim objections against its own members. Both the Debtors and Movants opposed, *see* Dkt. Nos. 5613, 5614, and the Committee Exclusivity/Conversion Motion went nowhere. It was a waste of resources.

**F.    The Week of March 17 and the Third Amended Plan**

70.    The Debtors then kept delaying the hearing on confirmation, including filing a notice that confirmation had been delayed indefinitely. In response, this Court ordered a status conference for March 17, 2025. *See* Dkt. No. 5878. At that status conference, Debtors' counsel explained that the Second Amended Plan was not currently confirmable but that the Debtors had received a proposal from the Committee that would "settle" the claims of Central States and the Groom Law Group. Debtors' counsel added that the Milbank Group and Movants had not seen the proposal and that the Committee was encouraged to share. *See* Dkt. No. 5907 at 6-8.

71.    Movants never saw the Committee proposal. Over the next few days, it appeared that the Debtors, the Milbank Group, and Movants would be aligned to keep on the same path – claim objections would be preserved because their resolution would ultimately benefit all creditors. But somewhere around March 19 or May 20, the ground shifted.[25] Movants learned that the Milbank Group was likely trying to join forces with the Committee, gaining inflated claim allowances, far in excess of what the law permitted and inconsistent with existing rulings by this Court.

72.    Then on March 21, 2025, the Debtors confirmed that they too would join with the Committee and the Milbank Group. The sole reason was to ensure that the Debtors could proceed

---

[25]    At the urging of Debtors' counsel, on March 20, 2025, Movants made a settlement proposal, through the Debtors and to be given to members of the Committee, which would allow for Movants to work on a global resolution. Importantly, this proposal ***did not*** in any way favor the allowed amounts of any claims held by Movants and would not prejudice the estates in any way. To this day, the proposal has not been responded to, other than at the March 26, 2025 status conference, where counsel for the Committee described the proposal as "less [than] constructive" even though it in no way impacted the Debtors' estates. *See* Dkt. No. 5988 at 10.

with a confirmed plan and have a say on the post-confirmation trust board.  Nothing else changed – no rulings from any court and no changes in the monetization of assets.  The Debtors made clear that Movants would be treated as the "holdout" if they opposed the Debtors' and the Committee's efforts to try to confirm the Third Amended Plan.

73.     Key to implementing their strategy, the Debtors, the Committee, Central States, the Groom Law Group, and the Milbank Group needed the block the release of this Court's looming summary judgment decision on remaining issues related to MEPP claim objections, including Central States's contract claim and present valuing; the only rational reason is that if the decision *favored* the estates, then the estates would have to walk away from the Third Amended Plan.  And certainly, Movants (and presumably the Debtors) believed that there was a good chance that the estates would prevail on enough of the issues to mandate such a result.

74.     Movants' counsel told Debtors' counsel that trying to delay a decision that was about to be issued was a mistake and unfair to all other creditors.  The Debtors did not listen.  Late in the afternoon on May 21, 2025, the Debtors privately wrote to this Court, asking for this Court to defer ruling on the last MEPP claim objection issues.  Movants objected, filing a letter on the docket.  *See* Dkt. No. 6017.  After several status conferences and more letters, on April 7, 2025, this Court issued the detailed April 7 MEPP Objection Opinion.  As explained above, applying the effect of the April 7 MEPP Objection Opinion to the Third Amended Plan, it is clear that the "settlement" – already deeply suspect because the settling parties awarded allowed claims to two Milbank Group claimants that are $180 million greater than those claimants' filed proofs of claims – could never satisfy *any* standard of review.

75.     The next day, Movants wrote to the Debtors and the Committee, stating that the Third Amended Plan needed to be withdrawn.  Movants also provided a chart showing the effect

of the Court's April 7 MEPP Objection Opinion on all "settling" MEPP claims – substantially the same chart in this Motion.  Debtors' counsel agreed that all parties should agree on what could be the allowed MEPP claims in light of this Court's rulings, but refused to withdraw the Third Amended Plan, though noting that all confirmation and solicitation deadlines were suspended.

76.    Movants asked again on April 14 and April 21, with the last time stating that absent withdrawal of the Third Amended Plan by April 25, Movants would have no choice but to seek conversion to chapter 7.  The Debtors and the Committee showed no willingness to withdraw the Third Amended Plan – a plan that is premised on wiping out equity security holders and trying to moot out the Third Circuit appeals – but likely sought to keep it in place so that they can attempt another "settlement" of MEPP claim objections and then seek confirmation.

## RELIEF REQUESTED

77.    Movants respectfully request entry of an order, pursuant to Bankruptcy Code sections 105(a),  1112(a) and 1112(b), converting these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code effective as of the Conversion Date and granting related relief.

## BASIS FOR RELIEF

78.    Section 1112(b) of the Bankruptcy Code provides that, on request of a party in interest, and after notice and a hearing, "the Court shall convert a case to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause."  11 U.S.C. § 1112(b)(1).  Under section 1112(b), conversion or dismissal is mandatory upon a finding of "cause."  *See* 11 U.S.C. § 1112(b)(1); *DCNC North Carolina I, LLC v. Wachovia Bank, N.A.*, Case No. 09-3775, 09-3776, 2009 WL 3209728, *6 (E.D. Pa. Oct. 5, 2009); *see also In re The Reserves Resort, Spa & Country Club LLC*, No. 12-13316 (KG), 2013 WL 3523289, *2 (Bankr. D. Del. July 12, 2013) ("The statute thus makes conversion

mandatory once a court finds, as the Court has done here, any of the elements of 'cause.'"). Although "cause" is not defined, section 1112(b)(4) provides a nonexclusive list of 16 "causes" for conversion. 11 U.S.C. § 1112(b)(4)(A)-(P); *In re Am. Capital Equip., LLC*, 688 F.3d 145, 162 n. 10 (3d Cir. 2012) ("the listed examples of cause are not exhaustive"); *In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 386 (E.D. Pa. 1991).

79.     If the movant establishes "cause," the burden then shifts to the debtor to prove it falls within the § 1112(b)(2) "unusual circumstances" exception to § 1112(b)(1)'s mandatory conversion.  However, the Third Circuit instructs that "[c]ourts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization."  *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991)) (citing *In re Canal Place Ltd. Partnership*, 921 F.2d 569, 577 (5th Cir. 1991)); *see also In re Woodbrook Assocs.*, 19 F.3d. 312, 317 (7th Cir. 1994) ("The very purpose of § 1112(b) is to cut short [the] plan and confirmation process where it is pointless.").  If cause to convert or dismiss is present, the Third Circuit has indicated that it then chooses between conversion and dismissal based on "the best interest of creditors and the estate."  *In re Am. Capital Equip.*, LLC, 688 F.3d at 161.

80.     Courts have found conversion best serves the interests of all creditors when conversion is expected to reduce administrative expenses and the chapter 7 trustee would be in a better position to exercise independent judgment concerning the debtor's remaining assets and liabilities.  *In re Nelco Ltd.*, 210 B.R. 707, 709–10 (Bankr. E.D. Va. 1997).  Courts have also converted cases when maintaining the case in chapter 11 would only result in further diminution of the estate.  *In re Bartmann*, 310 B.R. 663 (B.A.P. 10th Cir. 2004).

**G.    Cause Exists Because of Continuing Diminution of the Estates and No Hope for Rehabilitation**

81.    Conversion is warranted where a debtor is "suffering substantial or continuing losses to or diminution of the estate and there is no reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).  The inquiry under 1112(b)(4)(A) is twofold.  *See Gateway Access Solutions, Inc.*, 374 B.R. 556, 563 (Bankr. M.D. Pa. 2007).  "First, the Court must look at the track record of the debtor to determine if it is suffering losses or making gains.  Second, the Court must determine whether rehabilitation is likely given the evidence presented at hearing." *Id.*

82.    With respect to the first prong of the test, "[i]n the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow — including that resulting only from administrative expenses — effectively comes straight from the pockets of the creditors.  This is enough to satisfy the first element of [continuing loss to or diminution of the estate]." *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004); *see also Morreale v. 2011-SIP-1 CRE/CADC Venture, LLC,* 533 B.R. 320, 324 (D. Colo. 2015).  "The losses to the estate need not be large—all that need be found is that the estate is suffering some diminution in value." *In re Sakon*, 617 B.R. 7, 15 (Bankr. D. Conn. 2020).

83.    Here, given that the Debtors have thoroughly marketed their real estate assets and nearly all of the claim objections have been resolved (other than appeals), there is only going to be continuing loss of value if the Debtors remain in chapter 11.  In particular, the Debtors' estates will continue to incur entirely avoidable administrative expenses to pay the numerous Debtor and Committee professionals and United States Trustee fees.  Each dollar of administrative expense incurred comes out of the pocket of general unsecured creditors (and, potentially, equity security holders).

84.     Further, any more attempts to confirm a plan will just generate more avoidable administrative expenses and yet any possible plan at this stage will propose to do nothing more than what a chapter 7 trustee would do – deal with remaining claim objections, address final fee applications, consider estate claims, and make distributions to allowed claim holders.[26]

85.     The Debtors also fail the second prong of the section 1112(b)(4)(A) test because they are not seeking to rehabilitate.  When considering a motion under Bankruptcy Code section 1112(b), "rehabilitation" means an ability to re-establish the debtor-entity on a firm sound financial basis.  *See In re BH S&B Holdings, LLC*, 439 B.R. 342, 347 (Bankr. N.D.N.Y. 2010) ("rehabilitation means to put back in good condition and reestablish on a sound basis.").  An intention to "liquidate (rather than rehabilitate), demonstrates that there is no likelihood of rehabilitation."  *In re BH S&B Holdings, LLC*, 439 B.R. at 347; *see also Loop Corp. v. U.S. Trustee*, 379 F.3d 511 (granting U.S. Trustee's motion after last round of negotiations with lenders failed, and the debtors were cash flow negative, there were mounting costs to the estate, and the plan of liquidation was evidence of a lack of likelihood of rehabilitation).  The *BH S&B* court discussed that though a liquidation plan is permissible, courts have converted or dismissed cases on facts similar to *Loop* and *BH S&B*.  *Id.* at 348 (citing *In re Natrl Plants & Lands Mgmt. Co., Ltd.,* 68 B.R. 394, 395 (Bankr. S.D.N.Y. 1986) (converting chapter 11 case, in part, because the debtor's proposed liquidating plan conceded that the business would be terminated and the debtor was losing $60,000 per month in chapter 11); *see also In re 15375 Mem'l Corp.*, 386 B.R. 548, 552 (Bankr. D. Del. 2008) *rev'd on other grounds BEPCO, L.P. v. 15375 Mem'l Corp. (In re 15375 Mem'l Corp.)*, 400 B.R. 420 (D. Del. 2009) (stating that "[r]ehabilitation does not include liquidation," but rather it "means to reestablish a business.").

---

[26]     As noted above, a chapter 7 trustee can request authority to make interim distributions quickly.

86.     The Debtors have no reasonable prospect of rehabilitation.   The Debtors'
prepetition business ended before the Petition Date.   Though the Debtors did embrace the
possibility of reorganizing around a REIT structure, the Debtors abandoned that effort in their
Second Amended Plan and, given that the Debtors have continued to sell real estate assets, the
REIT concept is dead.   The Debtors will soon complete the orderly sale of their remaining real
estate assets, removing any further need for chapter 11 to maximize value.

87.     Notably, the Committee raised this very argument in the Committee
Exclusivity/Conversion Motion filed on January 28, 2025.   *See* Dkt. No. 5565 at ¶¶ 41-43.   The
circumstances now are even stronger than they were in January 2025 – other than appeals, virtually
all litigation is over and yet the Debtors have no realistic prospects to confirm the Third Amended
Plan or any other plan.[27]

## H.     There is an Inability to Confirm any Plan of Liquidation

88.     Bankruptcy Code section 1112(b)(4)(J) provides that cause exists if there is a
"failure to file a disclosure statement, or to file *or confirm* a plan, within the time fixed by this
title or by order of this court."   11 U.S.C. § 1112(b)(4)(J) (emphasis added).   Here, such
circumstances exist.   Not only has exclusivity expired, there is no path to confirm any plan.   The
Debtors and the Committee teamed up to try to ram through the Third Amended Plan, but it has
failed.   No one has suggested any alternative path, even though Movants have repeatedly requested
*some* evidence of progress.   Indeed, the Debtors and the Committee have refused to withdraw the
Third Amended Plan.

89.     Multiple courts have held that the inability to confirm any plan is cause for
conversion.   *See In re Ghaffari*, 2025 Bankr. LEXIS 666, at *18-24 (Bankr. D.N.M. Mar. 19, 2025)

---

[27]   Presumably the Committee believed it had a good faith basis to seek conversion as alternative relief when it filed
its motion on January 28, 2025, meaning that it should not be opposed now to conversion.

(noting that inability to confirm a chapter 11 plan is cause for conversion or dismissal and explaining why the debtor cannot confirm a chapter 11 plan); *In re Stream TV Networks, Inc.*, 2024 Bankr. LEXIS 25, at *39 (Bankr. E.D. Pa. Jan. 5, 2024) (noting that courts may consider other factors in addition to those listed and that "it is well-settled that a debtor's inability to achieve confirmation of a plan, by itself, provides sufficient cause for dismissal or conversion in a chapter 11 case"); *In re DCNC North Carolina I*, LLC, 407 B.R. 651, 664-65 (Bankr. E.D. Pa. 2009) (holding that while BAPCPA removed "inability to effectuate a plan" as an explicit reason to find cause, an inability to reorganize can still provide cause under section 1112).

I. **The Debtors' and Committee's Decision to Propose the Third Amended Plan and Then Not Withdraw It Is Itself "Cause" for Conversion**

90.     Cause is not limited to the enumerated list in Bankruptcy Code section 1112(b)(4). Cause is also demonstrated here by the abandonment of fiduciary responsibility when both the Debtors and the Committee determined to proceed with the fatally flawed Third Amended Plan and, after its flaws were exposed, still determined not to withdraw it.  This loss of trust can now be restored by an independent fiduciary and, given the state of these Debtors at this stage, chapter 7 is more efficient.

91.     For most of the case there has been the brewing tension between the Debtors (with whom Movants sided) and the Committee over claim objections against Committee members and the IBT Suit, even when the cases otherwise were proceeding in a fashion that benefitted all constituents.  This tension is no doubt why the Committee objected to the Debtors' exclusivity in May 2024, refused to support the Second Amended Plan even though that plan's terms in no way harmed general unsecured creditors, and then filed its own Committee Exclusivity/Conversion Motion in late January 2025.

92.     But around March 21, 2025, the Debtors caved to the Committee, and shortly thereafter these estate fiduciaries jointly proposed the Third Amended Plan even though they were "settling" claim objections by allowing claims directly contrary to this Court's rulings and inconsistent with prior positions taken in this Court.  They made things worse by actively trying to prevent the issuance of further rulings under the guise that this Court's legal rulings would disrupt the settlement – as if that were a bad thing.  And they have now dragged their feet to not make right what did they did wrong after this Court issued its April 7 MEPP Objection Opinion.

93.     Movants have lost faith.  Allowing these Chapter 11 Cases to proceed would not move the cases towards a confirmable plan (unless the Committee members suddenly had a change of heart) and would not restore trust (because the Debtors could simply try again with another variation on the same troubling theme embodied in the Third Amended Plan).

94.     A chapter 7 trustee could do anything that the Debtors or a post-confirmation trust would do but would be entirely independent and conflict free.  The vast majority of litigation is over.  Any remaining assets not sold prior to June 30, 2025 presumably will have been thoroughly marketed such that a chapter 7 trustee could easily pick up where the Debtors left off.  Neither the Debtors nor the Committee could complain about who controls what.  Through a chapter 7 trustee, trust and efficiency could be restored.

## J.     The Court Should Convert These Chapter 11 Cases Rather Than Dismiss Them

95.     After the Court has made the threshold determination that "cause" exists here, the Court must decide whether conversion or dismissal "is in the best interest of creditors and the estate."  11 U.S.C. § 1112(b); *see also Matter of NuGelt, Inc.,* 142 B.R. 661, 669 (Bankr. D. Del. 1992).  The Court's determination is "discretionary, based on the facts of each case."  *NuGelt, Inc.,* 142 B.R. at 669 (citing *In re Winslow,* 123 B.R. 641, 631 (D. Colo. 1991); *In re Sullivan,* 108 B.R. 555, 557 (W.D. Pa. 1989)).  Chapter 7 cases, unlike dismissal, offer a lower-cost avenue to

monetize the Debtors' remaining assets *and* will provide for the disbursement of the liquidated value among creditors in a fair and equitable manner pursuant to the priority scheme of the Bankruptcy Code.  Further, under Chapter 7, an independent trustee will be free to investigate potential claims and causes of action and seek remedies if appropriate.

96.    Conversion of these cases and appointment of a chapter 7 trustee would end the stalemate over control of claim objections, ensure impartiality, and allow these estates to consider any possible estate claims (including any that the Committee apparently has been investigating).[28]

97.    At bottom, while reorganization or controlled liquidation under chapter 11 is always a laudable goal, confirmation of a plan in and of itself is not the end all, be all.  There is no shame that even in cases of this magnitude and complexity there may come a time to convert.  That time is now.

## NOTICE

98.    Movants have provided notice of the hearing on this Motion to the following parties or their respective counsel: (a) the office of the United States Trustee for the District of Delaware; (b) counsel to the Debtors, (c) counsel to the Committee, (d) any party that has requested notice pursuant to Federal Rule of Bankruptcy Procedure 2002, and (e) all creditors of the Debtors pursuant to Federal Rule of Bankruptcy Procedure 2002(a)(4).  Considering the nature of the relief requested, Movants submit that no other or further notice is necessary.

---

[28]    An examiner could do the same thing, and appointment of an examiner would be mandatory, *see In re FTX Trading Ltd.*, 91 F.4th 148 (3d Cir. 2024) (holding that appointment of an examiner is mandatory upon the request of a party in interest if either prong of 11 U.S.C. § 1104(c) is met), but Movants submit that the better course is to simply convert the cases now.

## NO PRIOR REQUEST

99.     Apart     from     the     alternative     relief     requested     in     the     Committee

Exclusivity/Conversion Motion which has not yet been considered by this Court, no prior motion

for the relief requested herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, for the reasons set forth in this Motion, Movants respectfully request that

the Court grant this Motion and order these Chapter 11 Cases converted effective June 30, 2025.

Dated: April 29, 2025                              Respectfully Submitted,
      Wilmington, Delaware

          */s/ L. Katherine Good*
          L. Katherine Good (No. 5101)
          Maria Kotsiras (No. 6840)
          **POTTER ANDERSON & CORROON LLP**
          1313 N. Market Street, 6th Floor
          Wilmington, Delaware 19801
          Telephone: (302) 984-6000
          Facsimile:  (302) 658-1192
          Email: kgood@potteranderson.com
                  mkotsiras@potteranderson.com

          – and –

          **QUINN EMANUEL URQUHART &**
          **SULLIVAN, LLP**
          Eric Winston (*pro hac vice* admitted)
          865 S. Figueroa Street, 10th Floor
          Los Angeles, CA 90017
          Telephone:  (213) 443-3000
          Facsimile:  (213) 443-3100
          Email:  ericwinston@quinnemanuel.com

          *Counsel for MFN Partners, LP and Mobile Street*
          *Holdings, LLC*