## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | Case No. 23-11069 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 6225 & 6355**<br>**Hearing Date: June 17, 2024 at 10:00 a.m. (ET)** |

### THE MFN PARTIES' REPLY IN FURTHER SUPPORT OF THE MOTION OF MFN PARTNERS, LP AND MOBILE STREET HOLDINGS, LLC FOR ENTRY OF AN ORDER CONVERTING THE DEBTORS' CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

MFN Partners, LP ("MFN") and Mobile Street Holdings, LLC ("Mobile Street" and, with MFN, collectively, the "MFN Parties" or "Movants") hereby file this reply to the objection (the "Objection") [Docket No. 6255] of the above captioned debtors and debtors-in-possession (the "Debtors") and the joinder (the "Joinder" and, together with the Objection, the "Objections") [2] [Docket No. 6355] of the Official Committee of Unsecured Creditors (the "Committee") to the *Motion of MFN Partners, LP and Mobile Street Holdings, LLC For Entry of an Order Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* (the "Conversion Motion")[3] [Docket No. 6204], and respectfully state as follows:

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 10990 Roe Avenue, Overland Park, Kansas 66211.

[2] Additionally, several others submitted "objections" that do not appear to actually object to the Conversion Motion or state any basis for their objection. *See* Dkt. Nos. 6360, 6402 & 6411. Peter Levinson, a shareholder of the Debtors, filed a joinder to the Conversion Motion. *See* Dkt. No. 6330. Finally, one individual recently submitted a response that is fairly is read as support for the Conversion Motion. *See* Dkt. No. 6460.

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objection or in the Conversion Motion, as applicable.

## PRELIMINARY STATEMENT

1.      The Debtors and the Committee object to the conversion of these cases to chapter 7 but do not confront the fundamental reasons why conversion makes sense—there is no reasonable path to confirm a plan because there are too many parochial interests seeking to extract value from the estates that they do not deserve, and not enough creditors are willing to vote in favor of a neutral "waterfall" plan of liquidation.  This was true on January 28, 2025, when the Committee sought to terminate exclusivity so that it could propose its own plan or alternatively to convert these cases; it was true on March 17, when Debtors' counsel announced it lacked the votes to confirm the Second Amended Plan, and the Committee announced its intent to prosecute its own plan of liquidation; and it is true today.  Despite the Debtors on May 5 and the Committee on May 20 representing a new plan filing was imminent, no new plan of liquidation has been filed to date.

2.      It has been two months since this Court's April 7 MEPP Objection Opinion made the Third Amended Plan, which sought to settle numerous claim objections and directed the Debtors to dismiss the pending Third Circuit appeal, unconfirmable such that the Debtors abandoned all efforts to proceed with confirmation.  Discovery has revealed that since April 7 the Debtors, the Committee and the "settling" parties have tried to formulate new settlement (albeit without any involvement of the MFN Parties),[4] that too has not produced even a draft plan or actionable term sheet.

---

[4]   For completeness of the record, in the first week of June – after discovery had commenced and the MFN Parties had learned that there were efforts among the same settling parties under the Third Amended Plan to do a new plan – for the first time the MFN Parties were invited to a settlement meeting that did occur on June 10.  The MFN Parties cannot divulge the substance of that meeting but as far as the MFN Parties are aware, no settlement was reached with any creditor that attended.

3.      None of this is surprising to the MFN Parties.  No plan is confirmable because of the competing parochial interests that have bedeviled these cases have proven not to be solvable. The MFN Parties summarize the parties conflicts:[5]

- **The Committee**: the Committee has been on record (both in January and just this week) as not accepting a neutral "waterfall" plan where its members do not control post-confirmation affairs,[6] even though these same members have sought to benefit themselves against the interests of the estates.

- **Central States**: the April 7 MEPP Objection Opinion had the effect of reducing the maximum allowed withdrawal liability claims of Central States by nearly $1.5 billion to approximately $700 million, of which 50% is subordinated.  Central States has lost its leverage to use outsized claims to bend others to its will and now faces having to defend itself before the Third Circuit, with another $700 million of its withdrawal liability claim at risk of disallowance.

- **The Groom Law Group**.  Led by New York Teamsters, a Committee member, they joined the Third Amended Plan because it would avoid massive disallowances of their inflated claims.  The April 7 MEPP Objection Opinion has confirmed how inflated those claims were and there is still more claims to object to.

- **The Milbank Group**: outside of the MFN Parties and the Committee, the Milbank Group claimants were the largest block of active creditors, and thus were critical to the Committee's efforts to confirm a plan before the Third Circuit argument.  So, under the Third Amended Plan they were given nearly $200 million in allowed claims in **excess of what they filed in their proofs of claim** even though the Debtors, the Committee and MFN Parties had all objected to these claims.  These extraordinary gifts turned out to be the linchpin to the Debtors on March 21 agreeing to the Third Amended Plan on March 21.  That has now gone by the

---

[5]  In addition, the PBGC has its own interests in preserving regulations it issued that are external to any interest it has as a general unsecured creditor.

[6]  Indeed, in late January 2025 the Committee *sought to convert these cases precisely for that reason* and has never withdrawn that request, arguing that, among other things "there is clearly no reasonable likelihood of rehabilitation for these liquidating Debtors," and "given the Debtors' posture to date in these cases, and for the reasons set forth above at length, there is not a reasonable likelihood that the Debtors will ever be able to obtain confirmation of their Plan, or confirmation of an alternative plan, within a reasonable period of time."  See Dkt. No. 5564 at ¶¶ 42-43.

Factual allegations in the Committee Exclusivity/Conversion Motion should be considered judicial admissions.  "Judicial admissions are concessions in pleadings or briefs that bind the party who makes them."  *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 211 n.20 (3d Cir. 2006); *see also Fin. Fed. Credit, Inc. v. Callender*, 2003 WL 22858389, at *3 n.3 (E.D. Pa. Dec. 2, 2003) ("Statements by parties in their briefs are treated as binding judicial admissions.").

wayside, and their recoveries are now maximized by a successful appeal before the Third Circuit.

- ***The IBT***: though no documents, or the Third Amended Plan, reveal what was supposed to happen to the estates' claims against the IBT (another Committee member), the Third Amended Plan wiped out prepetition equity security holders, meaning that any value from that lawsuit could never go to stockholders. Moreover, it appears that at least the Debtors anticipated that the IBT would be on the post-confirmation trust board, meaning that it is highly unlikely that the board would authorize any continued litigation against the IBT.

- ***The Debtors***.  The Debtors' parochial interests were to confirm a plan and deliver releases to the Debtors' related parties.  This explains why they were ***not*** on board with the Committee's plan proposal until the Milbank Group got on board.  Once that happened, the Debtors did not care as much as to how claims were allowed.

4.      The end result is that there is no point to the Debtors remaining in chapter 11. Chapter 11 is not the default, even in large cases with sophisticated professionals who are used to only being in chapter 11.  As explained by the *Galvin* court, there is no "permanent cloak of protection" that serves the purpose of chapter 11.  49 B.R. 665, 669 (Bankr. D.N.D. 1985).

5.      The MFN Parties knew that this was the likely outcome based on the preliminary observations in the April 7 MEPP Objection Opinion.  After waiting three weeks to see if anything would change (and it did not), they requested this Court convert these cases to chapter 7, which would result in the appointment of an independent fiduciary to break the logjam.

6.      The Debtors and the Committee (but no other creditors) filed substantive objections to the Conversion Motion but both miss the mark.[7]   Conversion is in the best interest of creditors, equity security holders, and the estates because it both breaks the fiduciary duty logjam that has existed and continues to exist, and it ends continuing and entirely avoidable administrative costs.

---

[7]    None of the other "settling" creditors filed individual objections to the Conversion Motion. Even if one credits individual committee members as derivatively objecting because the Committee did, non-Committee members of the Groom Group, the Milbank MEPPs, and the nearly a dozen other MEPPs did not object.

7.     As further explained below, the MFN parties easily demonstrate "cause" under Bankruptcy Code section 1112(b)(4).  Of course, the Debtors cannot "rehabilitate," which case law confirms is not the same as filing a plan of liquidation.  And there are continuing losses to the estates in the form of professional fees and United States Trustee fees.  Indeed, documents produced in discovery reveal that even after the April 7 MEPP Objection Opinion, the Debtors continue to budget over $9 million each month in professional fees and have no end date.  That alone is cause.

8.     In addition, there is no path to a confirmable plan any time soon.  The MFN Parties firmly believe that it takes "global" peace to have a confirmable plan; less than global peace means no peace.  The MFN Parties also believe the other key constituents should be in agreement.  But there is no reasonable prospect for global peace; if there were, all parties would have sought to have ongoing discussions with all of the relevant parties immediately after April 7.  The Committee has not stated publicly it would support a neutral waterfall plan that does not give it control of post-confirmation affairs.[8]

9.     Converting to chapter 7 also does not lose economic value for stakeholders.  As made clear in the Conversion Motion, the MFN Parties sought conversion as of June 30, 2025, which was the same date as the anticipated effective date of the Third Amended Plan and it was assumed all leased real estate (and the vast majority of owned real estate) would be disposed of.  There would be no loss in value for remaining material assets.  Further, in addition to eliminating significant estate professional fees (by having one chapter 7 trustee rather than a debtor and a committee) and eliminating United States Trustee fees, converting to chapter 7 would generate

---

[8]  As discussed below, why a plan is not confirmable now requires an understanding of how and why we got to a place on June 12 with no new plan on file.  Thus, understanding the Court's commentary at yesterday's discovery hearing regarding the limited relevancy of history, it is not irrelevant when one is seeking to avoid being doomed to repeat it.

additional savings because the MFN Parties have offered to pay out of their own pockets the fees and costs of counsel to prosecute MEPP and WARN claim objections, including appeals, and would offer to the chapter 7 trustee to engage its counsel with subject-matter expertise—the same counsel who has worked closely with the Debtors on both sets of claim objections. And the chapter 7 trustee could start making interim distributions to undisputed priority unsecured creditors.

10.    So, it begs the question: how long must this Court and stakeholders wait? If waiting means until claim objections are judicially resolved, there is no need for chapter 11 at all. When the MFN parties filed this Motion on April 29, they were mindful that it was a drastic change from the norms of large chapter 11 case practice and did so reluctantly. That remains true today. Of course, between today and the hearing on June 17, some combination of the parties who were parties to the flawed settlements in the Third Amended Plan may file a new plan, just to be able to tell this Court that there is a plan on file before the hearing. If that happens—and nothing today suggests it will or that it will reflect global resolution—it very well may be the case of parties looking to avoid facing the hard questions this Court may pose as to why the cases cannot seem to progress. But to be clear, the MFN Parties have always been ready and waiting for a global resolution discussion, and if there was a true effort from all key stakeholders actually participating—*i.e.* the MFN Parties, the Debtors, Central States, the Groom Law Group, the Milbank Group, the PBGC, the IBT, and the Committee—the MFN Parties would be amenable to deferring the Conversion Motion for 30 days.

11.    The MFN Parties note that a few parties did file statements of support, including a handwritten letter by George Campbell filed on the docket on June 6, 2025 (the "Campbell Letter") [Dkt No. 6460]. The Campbell Letter cites no legal authority but speaks plainly to the costs of these cases – both economically and personally. And while acknowledging he does not know how

all of the issues ought to shake out and he has his own opinions on who might be to blame, the

MFN Parties found this passage telling:

> I have talked to lots of employees and the disappointment is across the board. Fees are still being charged, does not seem to be any headway being made. I know you must be tired of this case by now. The changes, the updates, the set backs, even the rule of law. We get the letters of the failed confirmations, the date changes, the terminals still being sold, the fees still being requested and then the news.

12. This statement captures the overarching problem that the Conversion Motion seeks to solve. These cases cannot move forward towards a confirmable plan, so they should not be allowed to languish anymore.

### ADDITIONAL FACTS SUPPORTING CONVERSION

13. Since filing the Conversion Motion, the MFN Parties have served document discovery on the Debtors and Committee, taken depositions of these objecting parties, and obtained informal discovery from counsel representing the Milbank Group. Below are facts obtained through discovery that further support conversion of these cases to chapter 7.

**A.**     ***The Debtors Had No Intention of Accepting What Became the Third Amended Plan but for the Milbank Group First Agreeing with the Committee***

14. Discovery confirmed that what became the Third Amended Plan began with a Committee settlement proposal provided to the Debtors on March 14 that allowed (at inflated amounts) the claims of Central States and the Groom Law Group, gave the Committee control over post-confirmation matters, and was premised on achieving confirmation prior to the Third Circuit argument anticipated to occur in late June. The Debtors did not accept this construct until March 21 and did so solely because the Milbank Group had accepted it. Deposition testimony confirmed that the settlement would not have even been presented to the Debtors' Board but for the fact that the Milbank Group had agreed.

**B.**     ***The Committee Was Desperate to Kill Off the Third Circuit Appeal***

15.     Discovery has revealed that, if the Debtors were not on board, the Committee wanted to have confirmation of its own plan before the Third Circuit argument, which was expected to occur in late June 2025.  In other words, even though the Committee never joined the objections prosecuted by the Debtors and the MFN Parties on the SFA issues argued at the January 28 hearing, nor the objections prosecuted by the Debtors and the MFN Parties regarding the two issues currently pending appeal before the Third Circuit ((i) inclusion of SFA in the calculation of MEPPs' unfunded vested benefits and (ii) certain MEPPs' calculation of allocable unfunded vested benefits and withdrawal liability payments in a manner inconsistent with federal law and unapproved by PBGC), it was eager to kill off the appeal by attempting to confirm a plan that allowed the very claims at issue in the Third Circuit appeal before it could be argued.[9]

16.     Importantly, reversal by the Third Circuit (and assuming that decision became final and nonappeable) would not only benefit virtually all other general unsecured creditors but would materially improve the recovery by the PBGC on account of its claim.  Yet not a single document produced by the Committee reflected this outcome.

**C.**     ***The Milbank Group Claims Were Knowingly Allowed in Amounts More than $198 Million Greater Than Their Filed Proofs of Claim***

17.     Five of the seven Milbank Group claims were collectively allowed, via settlement in the Third Amended Plan, for $198 million more than what was in the proofs of claim these same MEPPs filed.  No other "settling" MEPP received this treatment.  This was the price the estate fiduciaries paid to get Milbank on board.  The table below demonstrates this:

---

[9]   As argued below, absent consent from the MFN Parties, there was no basis to approve a settlement of the claims that are the subject of the pending Third Circuit appeal.

| Milbank Group | Proof of Claim Amount | Plan Settlement Amount |
|---|---|---|
| New England Teamsters | $285,022,057 | $451,716,720 |
| Local 710 | $113,717,722 | $117,003,989 |
| Central Pennsylvania | $81,771,134 | $98,952,700 |
| Philadelphia Teamsters | $36,794,461.38 | $41,080,980 |
| IAM National | $22,820,838.36 | $29,989,281 |
| **TOTAL** | **$540,126,213** | **$738,743,670** |

18.     Each Milbank Group claim was asserted in liquidated amounts.[10]  There were no contingent or unliquidated claims in their proofs of claim.  Each claim was subject to the matters that had been argued on January 28, 2025.  Each had been actively objected to by the Debtors and the MFN Parties, and even the Committee had filed a joinder.  *See* Dkt. No. 5326.  This Court's February 5 *Memorandum Opinion* referred to the asserted amounts of each of these five only in reference to the proof of claim amounts.  *See* Dkt. No. 5619.  The Second Amended Disclosure Statement (and the Third Amended Disclosure Statement) referenced the proof of claim amounts.

19.     On March 21, counsel for the MFN Parties expressly alerted Debtors' counsel that it was wrong to "allow" the New England Teamsters' claim in an amount greater than what was in the proof of claim.  Debtors' counsel forwarded that e-mail to the Committee's lead lawyer. The Debtors and the Committee thus knew they were giving the Milbank Group inflated claim amounts, far in excess of what was set forth in proofs of claim, as "settlements."

20.     Discovery revealed that at least one of the other "settling" creditors after April 7 was concerned that the Milbank Group would "again" hold creditors "hostage," the inference being

---

[10] Except the Teamsters Joint Council No. 83 of Virginia Pension Fund that were filed as partially liquidated.

that parties could not get plan settlement for the Third Amended Plan without giving the Milbank Group unjustifiably inflated claims and, now that the Third Amended Plan claim allowances are indefensible, it will be attempted again.

21.    One of the most inexplicable aspects of how and why we got to today is that the "settled" claim amounts listed on Exhibit A to the Third Amended Plan Supplement do not even match what the Debtors' Board approved on March 23.[11]  As noted above, the Plan Supplement allowed several of the Milbank Claims in amounts far greater than what was in their filed proofs of claims.  Yet there is no evidence the Board was informed of this fact on March 23.  But even more troubling is that the settlement claim amounts for six of the Milbank Group claims presented to the Debtors' Board on March 23 were materially lower than what ended up in the Third Amended Plan.  In other words, what the Board approved on March 23 was far less than what the Debtors gave away in the Plan Supplement filed on March 28:

| Milbank Group | Proof Of Claim Amount | Plan Settlement Amount | March 23 Board Presentation |
|---|---|---|---|
| New England Teamsters | $285,022,057 | $451,716,720 | $450 million |
| Local 710 | $113,717,722 | $117,003,989 | $70 million |
| Central Pennsylvania | $81,771,134 | $98,952,700 | $60 million |
| IAM National | $22,820,838.36 | $29,989,281 | $8 million |
| Virginia Teamsters | $21,400,083 | $10,261,805 | $6 million |
| Philadelphia Teamsters | $36,794,461.38 | $41,080,980 | $12 million |

---

[11]    But these inexplicable differences in allowed claims was not the only problem.  The March 23 presentation purported to present to the Board the "Debtors prevail" litigation scenario as a comparison to the settlement.  Yet in that "Debtors prevail" scenario, Debtors' management and advisors omitted from the presentation the fact that this best case scenario did not include 50% subordination of MEPP claims.  In this scenario, the recoveries of non-MEPP claimants would have doubled from what the presentation described, substantially better than the settlement scenario.

| TOTAL | $561,526,296 | $749,005,475 | $606 million |
|-------|--------------|--------------|--------------|

**D.    *The Committee Had Threatened to Propose a Plan That Did Not Release the Debtors' Directors and Officers, Which Was a Prominent Reason for the Debtors Signing on to the Third Amended Plan***

22.    Though not disclosed in the Third Amended Disclosure Statement, on March 14 the Committee had threatened to file a plan that would provide customary exculpation for estate fiduciaries but not releases for the Debtors' directors and officers.  According to the Debtors, the Committee never articulated the basis for any potential estate claims against directors and officers, despite the potential of such claims being a primary reason for seeking conversion back in January 2025 (*see* Dkt. No. at 5564 ¶ 3), but it was clear from the March 14 proposal that the Committee only intended to provide customary exculpation to estate fiduciaries and professionals.  The implied threat was that the Committee would ensure that any liquidating trust would take a hard look at potential prepetition claims against the Debtors' directors and officers.[12]

23.    Obtaining releases for directors and officers thus was clearly front and center for the Debtors.  In both the minutes of the March 23 Board meeting and the presentation given to the Board members, the benefit of releases was expressly identified and highlighted.

## **REPLY**

24.    The two Objections lack merit in law and fact.  This Court should overrule them.

**A.    *The Debtors Can Never "Rehabilitate"***

25.    Contrary to the assertions in the Objections, in the context of "cause" under section 1112(b)(4)(A) of the Bankruptcy Code, "[r]ehabilitation is not another word for reorganization."

---

[12]    For the avoidance of doubt, the MFN Parties have no idea what could be the potential claims the Committee had hinted at or why it caused the Debtors to make obtaining releases a focal point for the Board's consideration on March 23 and the MFN Parties are not suggesting the cases should be converted for this reason.

7 Collier on Bankruptcy P 1112.04 (16th 2025) (citing *Sante Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 386 B.R. 548, 552 (Bankr. D. Del. 2008), *rev'd on other grounds*, 400 B.R. 420 (D. Del. 2009)).[13] "[T]he standard under section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." 7 Collier on Bankruptcy P 1112.04 (16th 2025); *see also In re Brutsche*, 476 B.R. 298, 302 (Bankr. D.N.M. 2012) (a liquidating plan is not a rehabilitation).

26.     Indeed, the Debtors' own cited cases agree with this analysis. *See* Objection at 5 (citing *In re TMT Procurement Corp.*, 534 B.R. 912, 920 (Bankr. S.D. Tex. 2015)). In *TMT*, the court held that "[r]ehabilitation does not mean reorganization, which could involve liquidation. Instead, rehabilitation signifies something more, with it being described as to put back in good condition; re-establish on a firm, sound basis. … [Movant] has established that there is no reasonable likelihood of rehabilitation and have[sic] established cause to dismiss or convert under § 1112(b)(1)." *Id.* at 920-21.

27.     The cases cited in the Objections do not alter this analysis. The Debtors cite to *In re Smith*, 77 B.R. 496, 502 (Bankr. E.D. Pa. 1987), a forty-year-old case analyzing a prior version of section 1112, dismissing one of the two cases before it for inordinate delay in prosecuting a plan, *see id.* at 503, and denying the motion as to the other debtor because of "the hyprocrisy[sic] of the efforts of [movant] to convert this case to Chapter 7 simply to obtain the appointment of a Trustee and thus blunt the efforts of the opponent's counsel to litigate claims of the Debtor against him." *Id.* None of that is applicable here. Further, the court in *Smith* found that the analysis of

---

[13]   As discussed below, *see infra* at ¶ 27-31, even if confirmation of a plan of liquidation could be deemed "rehabilitation" under section 1112(b)(4)(A), the Debtors cannot satisfy this standard in these cases, as there is no prospect that any party can confirm a plan due to the myriad conflicts and provincial interests at play, as set out herein.

whether there was a reasonable prospect of rehabilitation "is largely a function of how long the debtor has been about trying to formulate a plan without success." *Id.* at 502. Here, as argued in the Conversion Motion and explained further below, there is no reasonable prospect of a confirmable plan being prosecuted in these cases. Inasmuch as an orderly liquidation can be considered a form of "rehabilitation," that orderly liquidation has concluded with the Debtors' completion of the sale of its assets. There is no further possible, or even contemplated, rehabilitation in these cases.

28.    The Committee cites *In re Profundity, LLC*, 2024 WL 4249715 (Bankr. S.D. Fla. Apr, 11, 2024), but that case has little bearing on the facts here. In *Profundity*, the United States Trustee filed an emergency motion to convert because the chapter 11 debtors were not filing monthly operating reports and paying outstanding fees. Another party in interest joined. The debtors resolved the matter with the United States Trustee, which continued the hearing on its motion for 60 days, leaving the joining creditor. That creditor argued that "cause exists to convert the Debtors' cases to Chapter 7 for three reasons: (i) there is a substantial or continuing loss to or diminution of the estates and the absence of a reasonable likelihood of rehabilitation; (ii) the Debtors have failed to timely file their monthly operating reports; and (iii) Eugene Kesselman ('Kesselman'), the Debtors' managing member, has a conflict of interest and cannot execute his fiduciary duties owed to the Debtors." *Id.* at *1.

29.    The court denied the motion. In respect of rehabilitation, the creditor argued that because the debtors were liquidating, there was nothing to rehabilitate. The court held that "the term 'rehabilitation' refers to the debtor's ability to confirm a plan even if it involves a liquidation of assets." *Id.* But even accepting this premise as to the way to construe the word "rehabilitation," the court relied on cases for the proposition that the debtors had a reasonable prospect of

confirming a plan. *Id.* But that is what is missing here – not that the Debtors in theory could file a plan of liquidation, but that they cannot file a *confirmable* one.[14]

30. Moreover, as explained above, there is ample case law, including from this Court, to the contrary, holding that "rehabilitation means to reestablish a business." *In re 15375 Mem'l Corp.*, 386 B.R. at 552 (citing *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 515-516 (8th Cir. 2004) (rehabilitation means the restoration of a business' viability; liquidation is not rehabilitation)).

31. In sum, there is substantial authority supporting Movants' position that rehabilitation in section 1112(b)(4)(A) does not include liquidation. And because the Debtors can only liquidate and cannot revive their businesses, they cannot "rehabilitate."

**B.      *The Debtors Are Suffering Continuing Losses***

32. The Objections assert that the MFN Parties do not satisfy the "continuing loss" standard because accruing professional fees do not count. That is wrong. Case law makes clear that a chapter 11 estate that continues to incur professional fees (and United States Trustee fees) is incurring losses. *See Morreale v. 2011-SIP-1 CRE/CADC Venture LLC (In re Morreale)*, 533 B.R. 320, 324 (D. Colo. 2015) (affirming dismissal where bankruptcy court relied solely on accrual of professional fees in determining that there was diminution to the estate); *Nester v. Gateway Access Sols., Inc. (In re Gateway Access Sols., Inc.)*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007) (including accrual of professional fees in finding loss under section 1112(b)(4)); *Brutsche*, 476 B.R. at 305 ("professional services come at a cost, obviously, which cost needs to be factored in the calculations of gains and losses for the estate."); *In re FRGR Managing Member LLC*, 419

---

[14]  Notably, the court also commented in depth on increased administrative expenses in a chapter 7 of selling a material asset and having the chapter 7 trustee and replacement counsel get up to speed. As set forth in the Conversion Motion and further explained herein, those concerns do not exist in this case.

B.R. 576, 581 (Bankr. S.D.N.Y. 2009) (finding diminution and stating "[the debtor] continues to incur quarterly U.S. Trustee fees as well as legal fees, causing a continuing loss to the estate.").

33.    This is common sense because every dollar spent on a chapter 11 professional or quarterly United States Trustee fee is a lost dollar.  Unlike the "best interests" test in Bankruptcy Code section 1129(a)(7), which does compare recoveries under a plan to what an individual creditor would receive in a hypothetical chapter 7, Bankruptcy Code section 1112(b)(4) focuses asks whether the chapter 11 estates are suffering continuing losses without regard to a comparison to a hypothetical chapter 7.

34.    Here, the answer is yes.  By June 30, the vast majority, if not all, of the Debtors' real estate will have been disposed of.  There is nothing more to do other than resolve claim objections and monitor recoveries of accounts receivable (both of which can happen in chapter 7). But the costs incurring in chapter 11 – at a budgeted clip of $9 million in professional fees each month and quarterly United States Trustee fees – is a loss.  Indeed, both the Debtors and the Committee harped on fee "burn" as a basis for trying to settle claim objections; that "burn" is the administrative expenses of chapter 11.  It is undisputed that converting to chapter 7 eliminates several categories of fees and costs, the largest of which are the fees and costs of the one set of estate professionals.

35.    Further, the MFN Parties have made clear to the Debtors that if the cases are converted, they will offer to pay for the fees and costs the chapter 7 estate would incur prosecuting claim objections (including appeals) associated with MEPP and WARN claims and would offer to free up its subject-matter expert counsel.  The MFN Parties' counsel has already spent considerable time on these issues and worked extensively with the Debtors' counsel in their joint efforts, so there would be effectively no loss in expertise and substantial cost savings.

C.    *There is No Evidence that Any Party Can Confirm a Plan of Reorganization Absent a Global Resolution*

36.    Chapter 11 is not intended to serve as a perpetual stop-gap.  "[T]here must be 'a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376 (1988) (citation omitted).  Congress emphasized this point in 2005 when it changed the statutory language in section 1112 from permissive to mandatory, deliberately circumscribing bankruptcy courts' discretion to refuse to dismiss or convert if, as in this case, the estate's resources continue to be drained with no resolution in sight.  *See In re Gateway Access Sols., Inc.*, 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) ("The amendments to § 1112 limit the Court's discretion to refuse to dismiss or convert a Chapter 11 case upon a finding of cause.").

37.    It is now blatantly obvious that there is no path to a confirmable plan absent global resolution that includes the MFN Parties or judicial resolution of the various claim objections.  As described above, at every turn, parochial interests prevent global resolution.  That is why there has been no new plan proposed in the 65 days since the April 7 MEPP Objection Opinion was issued and more than five weeks since the MFN Parties filed the Conversion Motion.  Documents produced in discovery demonstrate that there has been significant in-fighting amongst the settling parties and that has not even included the MFN Parties in any way.

38.    To show a reasonable likelihood of successful reorganization, the Debtors must do more than proffer vague and unsubstantiated reports of "constructive discussions" regarding a revised plan.  *See First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 572 (3d Cir. 1991) ("'[h]owever honest in its efforts the debtor may be, and however sincere its motives, the District Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation.'") (quoting *Tennessee Publ'g Co. v. Am. Nat'l Bank*, 299 U.S. 18, 22 (1936)); *Canal*

16

*Place Limited Partnership v. Aetna Life Ins. Co. (In re Canal Place Ltd. Partnership),* 921 F.2d 569, 577 (5th Cir.1991) ("Courts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization."). The Debtors offer no details of what such a plan may look like, except the trivial assurance that it will be "consistent with the court's rulings and guidance" (Objection at 7), nor can they provide an estimated timeline. Indeed, both the Debtors and the Committee separately claimed (on May 5 and May 20, respectively) that a new plan filing was imminent. On May 20, 2025, the Committee wrote "the Committee anticipates the filing of a further amended plan in the very near term," Joinder at 3, and the "Debtors and the Committee are in the process of finalizing negotiations on a revised settlement with many of the largest claimants of these estates . . . ." *Id.* at 8. Nothing has been filed.[15]

39.     The cases cited by the Debtors and the Committee only emphasize this point. In each case, the court denied conversion based on the debtor's presentation of clear and plausible avenues towards a confirmable plan, *In re R & S St. Rose Lenders*, LLC, 2016 WL 3536533, at *6 (Bankr. D. Nev. May 18, 2016) (plan on file and all creditors opposed conversion); *In re McTiernan*, 519 B.R. 860, 868 (Bankr. D. Wyo. 2014) ("a reasonable likelihood that a plan involving liquidation can be confirmed within a reasonable time"); *In re Profundity LLC*, 2024 WL 4249715, at *2 (Bankr. S.D. Fla. Apr. 11, 2024) (no evidence that the debtors would be unable to file a workable plan); *In re Imperial Pac. Int'l (CNMI), LLC*, 2024 WL 4528513, at *5 (D. N. Mar. I. Oct. 19, 2024) (case was initiated less than four months prior and that debtor had "worked diligently and collaboratively ... to reevaluate and adjust the case exit strategy"). No similar path exists here.

---

[15]    In yesterday's deposition of the Committee's designee, the Committee took the position that it will not disclose the substance of any current or go-forward plan negotiations even though, of course, it asserted in its Joinder that a plan filing was imminent. Having taken that position, the Committee should be precluded from arguing that there are any current or ongoing plan negotiations that justify denying the Conversion Motion.

40.     And, as outlined above (*supra* ¶ 27) in the single exception, the Debtors cite a case in which the court based its decision to deny conversion on its view that the movant sought only to gain advantage in its pending litigation against the debtors, and the debtors were prosecuting that litigation diligently.  *See In re Smith*, 77 B.R. at 503 ("It is apparent that the Debtor's counsel is not foot-dragging in maintaining litigation against [Movant], but is in fact perceived by [Movant] as doing so too vigorously.").  Again, that reasoning bears no relevance here.  Of course, as the Committee has hinted, the same parties who sought to "settle" under the Third Amended Plan may try something similar – ganging up on the MFN Parties and tarring them as the lone "holdout" or transferring value that should be available to other general unsecured creditors who are not active in these cases.  That too will fail.  Either there is a global settlement for a plan process, or no settlement until claim objections are resolved, which can and should happen in a chapter 7 case.

41.     Importantly, any attempt at this stage to again "compromise" by allowing the claims that are the subject of the Third Circuit appeal is a nonstarter.  Absent a global settlement which includes the MFN Parties (and all other parties to the appeal), [16] this Court lacks jurisdiction to approve any settlement that is the subject of the Third Circuit appeal.  "When a party files a notice of appeal from a final order, that filing 'is an event of jurisdictional significance' because 'it confers jurisdiction on the court of appeals and divests the [trial] court of its control over those aspects of the case involved in the appeal.' While this 'appellate divestiture' rule is not ironclad, exceptions to it are appropriately circumscribed. So '[d]uring the pendency of the appeal the [trial court] retains only the limited authority to take any steps that will assist the Court of Appeals in its determination.'" *In re ESML Holdings Inc.*, 135 F.4th 80, 97 (3d Cir. 2025) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56 (1982), *Sheet Metal Workers' Int'l Ass'n Loc. 19 v.*

---

[16] Through which all parties to the appeal could stipulate to dismissal of the appeal.

*Herre Bros., Inc.*, 198 F.3d 391, 394 (3d Cir. 1999), and *SEC v. Invs. Sec. Corp.*, 560 F.2d 561, 568 (3d Cir. 1977)).

42.    Just as the "granting the relief Heyblom requested—unsealing of the very information sought to be disclosed on appeal—would moot the same issues on appeal and strip [the appellate court] of jurisdiction" in *ESML Holdings*, so too would settling and allowing the MEPP claims before the Third Circuit improperly moot the issues on appeal and strip the Third Circuit of jurisdiction.  *ESML Holdings,* 135 F.4th at 98.

**D.    *The Committee Has No Explanation for Contradicting its Assertions in the Committee Conversion Motion***

43.    One curious aspect of the Committee's Joinder is the lack of discussion of its prior positions.  On January 28, the Committee filed the Committee Exclusivity/Conversion Motion.  It is undisputed that the Committee unambiguously sought to convert these cases if exclusivity did not terminate and, to this day, the Committee has never withdrawn that request to convert nor walked back the contentions it made justifying conversion.  The MFN Parties were not even sure that the Committee would oppose the Conversion Motion, with the Third Amended Plan dead in the water, the Committee's prior position that a neutral "waterfall" plan was unacceptable, and, of course, the Committee's own conversion motion.[17]

44.    The Committee's Joinder pretends that the Committee never made the assertions it made a little over four months ago.  The Committee's Joinder, including the argument that "[t]hese Chapter 11 Cases present precisely the type of circumstances that warrant application of the statutory exception [for unusual circumstances]," directly contradicts the argument made by the Committee on January 28—and nothing has changed since January 28 that the Committee can

---

[17]    This is why the MFN Parties did not serve any discovery on the Committee until after the Committee's Joinder was filed.

point to other than the failed attempt at ramming through the Third Amended Plan.  *See* Dkt. No. 5564 at ¶ 43 ("The Committee is aware of no such "unusual circumstances" in these cases.")

45.    On June 11, 2025, the MFN Parties took a deposition of the Committee's designee and asked questions about the assertions in the Committee Exclusivity/Conversion Motion.  The Committee designee made a remarkable concession: while the Committee's statements were true as of January 28 (justifying conversion) they were no longer true as of March 2025 because the Debtors were no longer engaged in "biased settlement discussions."  But that supposed "shift" from "biased" to "unbiased" positioning by the Debtors was the Debtors agreeing on March 20 or March 21 to the Committee's plan structure (with inflated allowed claims for Central States and the Groom Law Group) solely because the Milbank Group had reached agreement with the Committee first, with the Milbank Group receiving inflated allowed claims.

**E.**    ***Remaining in Chapter 11 Serves No Purpose***

46.    Finally, the MFN Parties argued in their Conversion Motion that the compasses of the fiduciaries in these cases are broken and that constitutes cause to convert.  Nothing in the Objections adequately rebuts these points.  All the Debtors and Committee can say is that they tried to settle protracted claim objection disputes so that a plan could be confirmed.

47.    This is not sufficient.  Even if this Court credits trying to build consensus as a fair exercise by estate fiduciaries, it cannot come at the cost of "mugging" the holdouts.  But that is what was attempted in the Third Amended Plan and it failed.

48.    The MFN Parties, as holders of MEPP claims, non-joint and several general unsecured claims, and equity interests, are entitled to the full protection and advocacy of fiduciaries.  When that does not happen, the right answer is to find a new and independent fiduciary.  This Court should order it now.

## CONCLUSION

**WHEREFORE**, for all the foregoing reasons, the MFN Parties respectfully requests that the Court overrule the Objections, convert the chapter 11 cases to proceedings under chapter 7, and grant such other and further relief as may be just and proper.

Dated: June 12, 2024
    Wilmington, Delaware

Respectfully Submitted,

*/s/ L. Katherine Good*
L. Katherine Good (No. 5101)
Maria Kotsiras (No. 6840)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email: kgood@potteranderson.com
    mkotsiras@potteranderson.com
– and –

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Eric Winston (*pro hac vice* admitted)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100
Email:  ericwinston@quinnemanuel.com

*Counsel for MFN Partners, LP and Mobile Street
Holdings, LLC*