**Exhibit A**

**Redline – Revised Fourth Amended Disclosure Statement**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| | ) | |

**FOURTH AMENDED DISCLOSURE STATEMENT FOR THE FOURTH AMENDED
JOINT CHAPTER 11 PLAN OF YELLOW CORPORATION AND ITS DEBTOR
AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED
BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:            ljones@pszjlaw.com
                    tcairns@pszjlaw.com
                    pkeane@pszjlaw.com
                    ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            patrick.nash@kirkland.com
                    david.seligman@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in*

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

*Possession*

Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP**
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile:  (302) 442-7012
E-mail:   jhoover@beneschlaw.com
          kcapuzzi@beneschlaw.com
          jgentile@beneschlaw.com

Philip C. Dublin (admitted pro hac vice)
Meredith A. Lahaie (admitted pro hac vice)
Kevin Zuzolo (admitted pro hac vice)
**AKIN GUMP STRAUSS HAUER & FELD LLP**

One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email:    pdublin@akingump.com
          mlahaie@akingump.com
          kzuzolo@akingump.com

*Co-Counsel to the Official Committee
of Unsecured Creditors of Yellow Corporation,* et
al.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

---

**THE DEADLINE TO VOTE ON THE PLAN IS**
**October 2~~2~~9, 2025, at 4:00 p.m. (prevailing Eastern Time)**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY**
**EPIQ CORPORATE RESTRUCTURING, LLC ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

YELLOW CORPORATION AND THE ABOVE-CAPTIONED DEBTORS AND DEBTORS IN POSSESSION (EACH, A "<u>DEBTOR</u>" AND, COLLECTIVELY, THE "<u>DEBTORS</u>") AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (THE "<u>COMMITTEE</u>" AND, TOGETHER WITH THE DEBTORS, THE "<u>PLAN PROPONENTS</u>") ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT (THE "<u>DISCLOSURE STATEMENT</u>") TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *FOURTH AMENDED JOINT CHAPTER 11 PLAN OF YELLOW CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE  PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS* (THE "<u>PLAN</u>").  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  PRIOR TO DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, EACH HOLDER ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN PROPONENTS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO <u>ACCEPT</u> THE PLAN.

THE PLAN PROPONENTS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE CHAPTER 11 CASES AND THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH PRIOR OR ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN OR THEREIN

BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.

THIS DISCLOSURE STATEMENT IS BASED ON FACTUAL INFORMATION AND THE FINANCIAL, BUSINESS AND ACCOUNTING DATA PROVIDED BY THE DEBTORS, OR DATA OBTAINED FROM OTHER SOURCES CONSIDERED RELIABLE BY THE PLAN PROPONENTS.  THE PLAN PROPONENTS' PROFESSIONAL ADVISORS HAVE NOT INDEPENDENTLY VERIFIED THE FINANCIAL INFORMATION PROVIDED BY THE DEBTORS CONTAINED IN THIS DISCLOSURE STATEMENT AND MAKE NO REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT.  THUS, THE PLAN PROPONENTS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS COMPLETE AND ACCURATE, ALTHOUGH REASONABLE EFFORT HAS BEEN MADE TO PRESENT COMPLETE AND ACCURATE INFORMATION BASED ON INFORMATION MADE AVAILABLE TO THE PLAN PROPONENTS AND THEIR PROFESSIONAL ADVISORS.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER BY ANY ENTITY.  THE DEBTORS, THE COMMITTEE AND/OR THE LIQUIDATING TRUST MAY, AS APPLICABLE, SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE PLAN PROPONENTS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT BASED ON INFORMATION PROVIDED BY THE DEBTORS OR AS OTHERWISE CONSIDERED RELIABLE BY THE PLAN PROPONENTS AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  ALTHOUGH THE PLAN PROPONENTS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION OR AMENDMENT.  THE PLAN PROPONENTS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE PLAN PROPONENTS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE PLAN PROPONENTS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT, OR ARE NOT ENTITLED TO SUBMIT, BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE X OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO CONSIDER PRIOR TO VOTING," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE PLAN PROPONENTS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE PLAN PROPONENTS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE PLAN PROPONENTS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.   FORWARD-LOOKING STATEMENTS MAY INCLUDE, WITHOUT LIMITATION, STATEMENTS ABOUT THE DEBTORS':

- FINANCIAL CONDITION, REVENUES, CASH FLOWS AND EXPENSES;

- **LEVELS OF INDEBTEDNESS AND LIQUIDITY;**

- **ADVERSE TAX CHANGES;**

- **PENDING AND FUTURE LITIGATION; AND**

- **PLANS, OBJECTIVES AND EXPECTATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' OR THE LIQUIDATING TRUST'S FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ANTICIPATED RECOVERIES TO BE DIFFERENT FROM THOSE THE PLAN PROPONENTS OR THE LIQUIDATING TRUSTEE MAY PROJECT. THESE RISKS, UNCERTAINTIES AND FACTORS MAY INCLUDE THE FOLLOWING, WITHOUT LIMITATION: THE PLAN PROPONENTS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE PLAN PROPONENTS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION OR SERIES OF TRANSACTIONS IF THE PLAN IS NOT CONFIRMED; EXPOSURE TO, AND THE OUTCOMES OF, LITIGATION; THE DEBTORS' AND/OR LIQUIDATING TRUST'S ABILITY TO DIVEST REMAINING OWNED OR LEASED ASSETS; AND ADVERSE TAX CHANGES.**

**THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION BY THE PLAN PROPONENTS FROM TIME TO TIME AND MAY BE AMENDED TO, AMONG OTHER THINGS, PROVIDE SUPPLEMENTAL OR UPDATED INFORMATION REGARDING ANY MATTER SET FORTH IN THIS DISCLOSURE STATEMENT OR THE PLAN (IN EACH CASE INCLUDING ALL ATTACHMENTS, EXHIBITS, AND SUPPLEMENTS THERETO), AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION .............................................................................................................. 1

II.  PRELIMINARY STATEMENT ...................................................................................... 1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN .................................................................................... 2

A.  What is chapter 11? ................................................................................................. 2
B.  Why are the Plan Proponents sending me this Disclosure Statement? ................... 3
C.  Am I entitled to vote on the Plan? .......................................................................... 3
D.  What will I receive from the Debtors if the Plan is consummated? ........................ 4
E.  What does it mean if I have a Convenience Class Claim? ..................................... 10
F.  What happens to my recovery if the Plan is not confirmed or does not go effective? .............. 101
G.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" .............................................................. 101
H.  What are the sources of Cash and other consideration required to fund the Plan? ............ 112
I.  Is there potential litigation related to the Plan? .................................................... 112
J.  Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan? ......................... 112
K.  Will there be releases and exculpation granted to parties in interest as part of the Plan? ............ 123
L.  What is the deadline to vote on the Plan? ............................................................. 134
M.  How do I vote to accept or reject the Plan? .......................................................... 134
N.  Why is the Bankruptcy Court holding a Confirmation Hearing? .......................... 134
O.  When is the Confirmation Hearing set to occur? .................................................. 134
P.  What is the purpose of the Confirmation Hearing? ............................................... 134
Q.  What is the effect of the Plan on the Debtors' Estates? ........................................ 145
R.  Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .................................................................................................... 145
S.  Could subsequent events potentially affect recoveries under the Plan? ............... 145
T.  Do the Plan Proponents recommend voting to accept the Plan? ........................... 145

IV.  OVERVIEW OF THE PLAN ......................................................................................... 156

A.  General Settlement of Claims and Interests .......................................................... 156
B.  Third-Party Sale Transactions and Liquidation Transactions ............................... 156
C.  The Liquidating Trust ............................................................................................ 156
D.  Section 1145 Exemption ....................................................................................... 167
E.  The Liquidating Trustee ........................................................................................ 167
F.  Dissolution of the Debtors ..................................................................................... 167
G.  Causes of Action ................................................................................................... 168
H.  Release, Injunction, Exculpation and Related Provisions ..................................... 168

V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW ................... 202

A.  Yellow's Corporate History and Business Operations .......................................... 202
B.  The Debtors' Prepetition Capital Structure ........................................................... 223

VI.  EVENTS LEADING TO THE CHAPTER 11 FILINGS .............................................. 256

A.  COVID-19 .............................................................................................................. 256
B.  One Yellow ............................................................................................................ 257
C.  Yellow's Inability to Complete Phase 2 Causes Irreparable Damage ................... 268
D.  Yellow's Liquidity Issues ...................................................................................... 279

E.      IBT Threatens to Strike .................................................................... 28 29

F.      Exploration of Strategic Alternatives ............................................ 29 30

VII.    **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** ............................................................................................ **29 30**

A.      First Day Relief ................................................................................. 29 30

B.      Appointment of Official Committee of Unsecured Creditors ........... 29 31

C.      Other Procedural and Administrative Motions .............................. 30 1

D.      Canadian Recognition Proceedings ................................................ 34 5

E.      Retention of Debtor Professionals .................................................. 34 6

F.      Approval of Debtor-in-Possession Financing ................................. 35 6

G.      Bidding Procedures and Marketing Process .................................. 36 8

H.      Litigation Matters ............................................................................ 39 41

I.      The Debtors' Initial Plan and Amendments Thereto ...................... 50 2

J.      MFN's Motion to Convert the Debtors' Chapter 11 Cases to Chapter 7 ....... 52 5

K.      Assumption and Rejection of Executory Contracts and Unexpired Leases ........ 52 6

L.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ........ 54 7

M.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ....... 54 7

VIII.   **CERTAIN RISK FACTORS TO CONSIDER PRIOR TO VOTING** ............ **54 8**

A.      Certain Bankruptcy Law Considerations ........................................ 54 8

B.      Disclosure Statement Disclaimer ..................................................... 57 61

IX.     **SOLICITATION AND VOTING PROCEDURES** ..................................... **59 63**

A.      Holders of Claims Entitled to Vote on the Plan ............................... 60 3

B.      Voting Record Date .......................................................................... 60 4

C.      Voting on the Plan ............................................................................ 60 4

D.      Ballots Not Counted ......................................................................... 61 5

X.      **CONFIRMATION OF THE PLAN** ........................................................... **61 5**

A.      Requirements for Confirmation of the Plan ..................................... 61 5

B.      Best Interests of Creditors/Liquidation Analysis ............................ 62 5

C.      Feasibility ......................................................................................... 63 6

D.      Acceptance by Impaired Classes ..................................................... 63 6

E.      Confirmation Without Acceptance by All Impaired Classes ........... 63 7

XI.     **MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ... **64 8**

A.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ..... 65 9

B.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed General Unsecured Claims ........................................................... 66 70

C.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed General Unsecured Claims ........................................ 68 72

D.      Tax Matters Regarding the Liquidating Trust ................................. 70 4

E.      Information Reporting and Backup Withholding .............................. 72 5

XII.    **RECOMMENDATION** .............................................................................. **73 6**

**EXHIBITS**

**EXHIBIT A**    Chapter 11 Plan

## I.  INTRODUCTION

The Plan Proponents submit this Disclosure Statement (as may be amended, supplemented, and modified from time to time), pursuant to Bankruptcy Code section 1125, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code  Proposed by the Debtors and the Official Committee of Unsecured Creditors* Filed contemporaneously herewith (as may be altered, amended, modified, or supplemented from time to time, the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE PLAN PROPONENTS BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO HOLDERS OF ALLOWED CLAIMS AND ALLOWED INTERESTS, AS APPLICABLE.  AT THIS TIME, THE PLAN PROPONENTS BELIEVE THAT THE PLAN REPRESENTS THE BEST (*I.E.*, MOST VALUE MAXIMIZING) AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE PLAN PROPONENTS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.  PRELIMINARY STATEMENT

On August 6, 2023 and continuing on August 7, 2023 (the "Petition Date"), certain of the Debtors commenced the Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").   The Debtors' discussion of the events leading up to the commencement of the chapter 11 cases is included in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 14] (the "First Day Declaration") Filed on the Petition Date and set forth in Article VI of this Disclosure Statement.  In the First Day Declaration, the Debtors stated that they commenced these Chapter 11 Cases to execute value-maximizing section 363 sales of the Debtors' and their Estates' assets free and clear of all Claims and Interests, and ultimately pursue a chapter 11 plan.  The Debtors successfully sold a majority of their assets and paid off all of their secured debt during the initial phase of these Chapter 11 Cases.

In November 2024, the Bankruptcy Court authorized the Debtors to solicit the Second Amended Plan [Docket No. 5024].  Then-pending litigation among the Debtors and their largest creditors and the apparent lack of support for the Debtors' Second Amended Plan from their largest creditors incentivized hard-fought, good faith, arms' length settlement negotiations between the Debtors, the Committee and the Debtors' largest creditors and key stakeholders to drive consensus around the terms of a plan construct that would enable an orderly and value-maximizing resolution to these Chapter 11 Cases for the benefit of all stakeholders.

After several months of focusing their efforts on the resolution of these outstanding disputes, the Debtors, the Committee, and certain of the Debtors' creditors holding the largest General Unsecured Claims negotiated the terms of a plan structure incorporating a settlement construct for certain significant Claims asserted against the Estates.  Accordingly, on March 28, 2025, the Debtors and the Committee filed the *Third Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant*

---

[1]  Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning given to them in the Plan.

*to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee* (the "Third Amended Plan") [Docket No. 5995] providing for a settlement of certain pending disputes between the Estates and certain MEPP claimants (the "Plan Settlement").  The Third Amended Plan, and the Plan Settlement provided thereby, was intended to resolve significant litigation that would otherwise further delay confirmation of a chapter 11 plan and distributions to unsecured creditors and diminish funds available to pay Allowed Claims.

However, as further described in Article VII.J, K of this Disclosure Statement, events following the Filing of the Third Amended Plan, including the Court's Preliminary MEPP Opinion and the Filing of the Motion to Convert (each as defined herein), forced the Debtors, the Committee, and other key stakeholders to reevaluate the Plan Settlement and reengage in further discussions to determine whether the proposed settlements embodied in the Third Amended Plan were still viable.  The Plan Proponents determined they were not.  Accordingly, and in order to achieve an orderly conclusion to these cases, the Plan Proponents filed the Plan.  Generally, the Plan:

- provides for the vesting of all of the Debtors' and their Estates' assets as of the Effective Date in the Liquidating Trust for the purpose of distributions to Holders of Allowed Claims or Allowed Interests, as applicable;

- provides for the transfer of all pending litigation and disputes to the Liquidating Trust for resolution after the Effective Date in accordance with the Liquidating Trust Agreement;

- provides that the Committee, in consultation with the Debtors, will designate a Liquidating Trustee to wind down the Debtors' remaining affairs, pay, and reconcile Claims, and administer the Plan in an efficient manner; and

- contemplates recoveries to Holders of Administrative Claims, Other Priority Claims, Employee PTO/Commission Full Pay GUC Claims, and Convenience Class Claims that will render unimpaired the Allowed Claims of such Holders.

The Plan Proponents believe that Confirmation of the Plan will expedite and enhance distributions on account of Allowed Claims as quickly and efficiently as is practicable.  Accordingly, the Plan Proponents urge all Holders of Claims entitled to vote to accept the Plan by returning their Ballots so that Epiq Corporate Restructuring, LLC, the Debtors' claims and noticing agent (the "Claims and Noticing Agent"), ***actually receives*** such Ballots by October 2̶29, 2025 at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline").  Assuming the Plan receives the requisite acceptances, the Plan Proponents will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

### III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

#### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly-situated creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code

provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.    Why are the Plan Proponents sending me this Disclosure Statement?**

The Plan Proponents are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, Bankruptcy Code section 1125 requires that the proponent(s) of a plan (here, the Debtors and the Committee) prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of that plan and to share such disclosure statement with all holders of claims or interests whose votes on that plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

**C.    Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to Bankruptcy Code section 1122(a), is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4A | Employee PTO/Commission Full Pay GUC Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4B | Convenience Class Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

| 8 | Interests in Yellow Corporation | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.      What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims and Interests under the Plan.  Any estimates of Allowed Claims in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends on the ability of the Plan Proponents to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Subject to Article VI of the Plan, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below on account of such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Committee or the Liquidating Trustee, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, that is entitled to receive a distribution under the Plan shall receive such distribution on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest, as applicable, or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE PLAN PROPONENTS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS IN THE DEBTORS AND THEIR ESTATES, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Interest** | **Treatment of Claim/Interest** | **Projected Amount of Claims (in $mm)** | **Projected Recovery** |
| 1 | Secured Tax Claims | Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment with the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement, in exchange for such Secured Tax Claim, on the first Distribution Date after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of a Secured Tax Claim shall receive, at the option of the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement: (i) payment in full in Cash of such Holder's Allowed Secured Tax Claim, or (ii) | <$1.0 | 100% |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Amount of Claims (in $mm) | Projected Recovery |
| | | equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the Liquidating Trustee to pay the entire amount of such Allowed Secured Tax Claim during such time period. | | |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment with the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement, in exchange for such Allowed Other Secured Claim, on the first Distribution Date after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement: (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; (ii) the collateral securing such Holder's Allowed Other Secured Claim; or (iii) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | $0.0 — $405.0 | 100% |
| 3 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment with the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement, in exchange for such Allowed Other Priority Claim, on the first Distribution Date after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Other Priority Claim, will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $130.0 — $230.0 | 100% |
| 4A | Employee | Except to the extent that a Holder of an Allowed Employee PTO/Commission Full Pay | $30.0 | 100% |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Interest** | **Treatment of Claim/Interest** | **Projected Amount of Claims (in $mm)** | **Projected Recovery** |
| | PTO/Commission Full Pay GUC Claims | GUC Claim agrees to less favorable treatment with the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement, in exchange for such Allowed Employee PTO/Commission Full Pay GUC Claim, in one or more distributions (in the Liquidating Trustee's reasonable discretion) after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Employee PTO/Commission Full Pay GUC Claim will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | — $40.0 | |
| 4B | Convenience Class Claims | Except to the extent that a Holder of an Allowed Convenience Class Claim by amount or election agrees to less favorable treatment with the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement, in exchange for such Allowed Convenience Class Claim, in one or more distributions (in the Liquidating Trustee's reasonable discretion) after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Allowed Convenience Class Claim, will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided* that to the extent that a Holder of an Allowed Convenience Class Claim holds any joint and several liability claims, guaranty claims or other similar claims against more than one but less than all Debtors arising from or relating to the same obligations or liability as such Allowed Convenience Class Claim, such Holder shall only be entitled to a distribution on one Convenience Class Claim in full and final satisfaction of all such Claims. For the avoidance of doubt, Employee PTO/Commission Class 5 GUC Claims shall not be Convenience Class Claims. | $14.0 — $20.0 | 100% |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Amount of Claims (in $mm) | Projected Recovery |
| 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment with the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement, in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive (i) its Pro Rata share of the GUC Liquidating Trust Interests and as a Beneficiary shall receive, on the applicable Distribution Date, its Pro Rata share of Distributable Proceeds derived from the Liquidating Trust Assets available for distribution on each such Distribution Date as provided under the Plan and Liquidating Trust Agreement, *plus* (ii) if and only to the extent Distributable Proceeds are available after all Allowed General Unsecured Claims are paid in full, in Cash, a Beneficiary shall be entitled to receive Postpetition Interest from the Petition Date through and including the date of satisfaction of such Allowed General Unsecured Claim in full, in Cash; *provided*, a portion of Allowed Withdrawal Liability Claims may be reduced and/or subordinated to all other Allowed General Unsecured Claims in an amount as determined by a Final Order or as otherwise agreed to by the applicable claimant, the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement.2  For the avoidance of doubt, the | $1,250.0-1,70 0.0³ | See table below |

---

[2]    The Debtors previously argued that the Withdrawal Liability Claims will be substantially reduced or subordinated, by as much as 50%, under 29 U.S.C. § 1405(b), given that unsecured creditors will not recover in full.  *See Debtors' Second Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [Docket No. 1962], *fn.* 65; *Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [Docket No. 2595] *fn.* 24.  In the *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan Claims Allowance Disputes* [Docket No. 6030], the Court observed that such Withdrawal Liability Claims are subject to 29 U.S.C. § 1405(b).  On July 18, 2025, the Court issued an interlocutory order giving effect to the Preliminary MEPP Opinion [Docket Nos. 6682, 6683].  To the extent that General Unsecured Claims are paid in full, any Subordinated Withdrawal Liability Claims will be paid in full prior to any distribution on account of Interests in Yellow Corporation.

[3]    Withdrawal Liability Claims within Class 5 are estimated using all rulings that the Bankruptcy Court has issued to date, including the Preliminary MEPP Opinion.  As discussed herein, these Claims are the subject of ongoing appeals or may be subject to further appeals, and may change materially depending on the outcome of those appeals.

| Class | Claim/Interest | Treatment of Claim/Interest | Projected Amount of Claims (in $mm) | Projected Recovery |
|:---:|:---:|:---|:---:|:---:|
| | | **SUMMARY OF EXPECTED RECOVERIES** | | |
| | | Holders of Allowed General Unsecured Claims shall receive the Postpetition Interest set forth in Article III.B.6 of the Plan on a *pari pasu* basis with Allowed Subordinated Withdrawal Liability Claims, if any. | | |
| 6 | Intercompany Claims | Allowed Intercompany Claims, to the extent not assumed pursuant to the terms of the Sale Transaction Documents, shall, at the election of the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement, be (a) set off, settled, distributed, contributed, cancelled or released or (b) otherwise addressed at the option of the Liquidating Trust without any distribution; *provided, however,* that such election shall not adversely affect the treatment provided to Classes 4A, 4B, and 5. | N/A | N/A |
| 7 | Intercompany Interests | Allowed Intercompany Interests shall, at the election of the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement, be (a) set off, settled, addressed, distributed, contributed, merged, cancelled or released or (b) otherwise addressed at the option of the Liquidating Trust without any distribution; *provided, however*, that such election shall not adversely affect the treatment provided to Classes 4A, 4B, and 5. | N/A | N/A |
| 8 | Interests in Yellow Corporation | Except to the extent that a Holder of an Allowed Interest in Yellow Corporation agrees to less favorable treatment with the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement, in exchange for such Allowed Interest in Yellow Corporation, each Holder of an Interest in Yellow Corporation shall receive its Pro Rata share of the Equity Liquidating Trust Interests and as a Beneficiary shall receive, on the applicable Distribution Date, and if and only to the extent Distributable Proceeds are available after all Allowed General Unsecured Claims are paid in full, including Postpetition Interest, its Pro Rata share of Distributable Proceeds derived from | N/A | N/A |

8

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Amount of Claims (in $mm) | Projected Recovery |
| | | the Liquidating Trust Assets available for distribution on each such Distribution Date as provided under the Plan and Liquidating Trust Agreement. | | |
| 9 | Section 510(b) Claims[4] | Section 510(b) Claims, if any, shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims. | N/A | N/A |

| CLASS 5 GENERAL UNSECURED CLAIMS PROJECTED RECOVERY | |
|---|---|
| Debtor | Projected Recovery |
| 1105481 Ontario Inc. | 0.0% - 0.0% |
| Express Lane Service, Inc. | 0.0% - 0.0% |
| New Penn Motor Express LLC | 2.52% - 3.51% |
| Roadway Express International, Inc. | 0.0% - 0.0% |
| Roadway LLC | 54.05% - 10.91% |
| Roadway Next Day Corporation | 0.0% - 0.0% |
| USF Bestway Inc. | 0.0% - 0.0% |
| USF Dugan Inc. | 0.0% - 0.0% |
| USF Holland International Sales Corporation | 0.0% - 0.0% |
| USF Holland LLC | 2.83% - 65.46% |
| USF Reddaway Inc. | 2.32% - 4.01% |
| USF Redstar LLC | 0.0% - 0.0% |
| Yellow Corporation | 0.0% - 0.0% |
| Yellow Freight Corporation | 0.0% - 0.0% |
| Yellow Logistics, Inc. | 0.0% - 0.0% |
| YRC Association Solutions, Inc. | 0.0% - 0.0% |
| YRC Enterprise Services, Inc. | 0.0% - 0.0% |

---

[4]   Although the Plan Proponents are unaware of any Section 510(b) Claims, this Class is included out of an abundance of caution.

| CLASS 5 GENERAL UNSECURED CLAIMS PROJECTED RECOVERY | |
|---|---|
| **Debtor** | **Projected Recovery** |
| YRC Freight Canada Company | 0.0% - 0.0% |
| YRC Inc. | 1~~2~~1.~~7~~0% - 2~~4~~2.~~3~~0% |
| YRC International Investments, Inc. | 0.0% - 0.0% |
| YRC Logistics Inc. | 0.0% - 0.0% |
| YRC Logistics Services, Inc. | 0.0% - 0.0% |
| YRC Mortgages, LLC | 0.0% - 0.0% |
| YRC Regional Transportation, Inc. | 0.3%% - 0.4% |

**E.      What does it mean if I have a Convenience Class Claim?**

If you have an Allowed Convenience Class Claim, that means (a) the total amount of your Allowed General Unsecured Claim is less than $7,500 and is not (i) an Administrative Claim, (ii) a Priority Claim, (iii) a Secured Tax Claim, (iv) an Employee PTO/Commission Full Pay GUC Claim or (v) an Employee PTO/Commission Class 5 GUC Claim; or (b) you elected on your Ballot to treat your Allowed General Unsecured Claim as a Convenience Class Claim, including, if applicable, reducing your Allowed General Unsecured Claim to $7,500; *provided*, *however*, that no Claims asserted by a current or former employee may be a Convenience Class Claim.  You will receive the treatment provided to Holders of Class 4B Convenience Class Claims.  Holders of Allowed Convenience Class Claims are entitled to Cash payment on their Allowed Convenience Class Claims (the "Convenience Class Claim Recovery").  The Convenience Class Claim Recovery may be fulfilled in one or more Distributions.

If you have an Allowed Class 5 General Unsecured Claim above $7,500 you may irrevocably elect on your Ballot to have your Allowed Class 5 General Unsecured Claim reduced to $7,500 and treated as a Class 4B Convenience Class Claim (the "Convenience Claim Election").  To be clear, if you make the Convenience Claim Election, such Allowed Claim will be reduced to $7,500 (as applicable), considered an Allowed Convenience Class Claim, and you *may not* revoke your Convenience Claim Election.

The Convenience Class Claim Recovery is a Cash payment that may be made over one or more Distributions.  Holders of Allowed Convenience Class Claims and Holders of Allowed General Unsecured Claims above $7,500 making the Convenience Claim Election will not be entitled to additional payments other than the Convenience Class Claim Recovery.

**F.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors and their Estates for distribution in accordance with the priorities established by the Bankruptcy Code.  In the alternative, the Chapter 11 Cases may be dismissed.  Conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and such trustee's additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Class.  *See*, *e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2).  The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of

Allowed Claims and thereby reduce creditor recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c). Either alternative will bring additional risks and uncertainties.

      **G.**      **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases approving the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims or Allowed Interests, as applicable, will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter or otherwise as specified in the Plan and/or Liquidating Trust Agreement, as applicable. *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan. "Consummation" means the occurrence of the Effective Date.

      **H.**      **What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors or Liquidating Trustee, as applicable, shall fund the distributions and obligations under the Plan with Cash on hand held by the Debtors or the Liquidating Trust, as applicable, on and after the Effective Date, net Cash proceeds generated by the sale, lease, liquidation, or other disposition of Estate property, including pursuant to the Debtors' and the Estates' Causes of Action, including, but not limited to any Avoidance Actions, Third-Party Sale Transactions, and Cash generated by the use, sale, lease, liquidation or other disposition of the Liquidating Trust Assets. Distributable Proceeds are estimated to be between $600-700 million, assuming an Effective Date on or about November 30, 2025.

      **I.**      **Is there potential litigation related to the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation. Additionally, as described in Article VII.H of this Disclosure Statement, there is currently pending litigation related to various Claims.

In the event that it becomes necessary to seek confirmation of the Plan over the rejection of certain Classes, the Plan Proponents may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes, so long as Class 5 votes to accept the Plan. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies Bankruptcy Code section 1129(b). *See* Article VIII.A.4 of this Disclosure Statement, entitled "Non-Confirmation of the Plan."

      **J.**      **Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?**

The Plan Proponents' estimate of aggregate Allowed General Unsecured Claims ranges from approximately $1,250.0 million to $1,700.0 million.

Although the Plan Proponents' estimate of Allowed General Unsecured Claims is generally the result of the Plan Proponents' and their advisors' analysis of reasonably available information, the projected amount of Allowed General Unsecured Claims set forth herein is subject to material change

(either higher or lower), which difference could materially affect recoveries to the Holders of Allowed Claims in Class 5.  The Debtors have Filed thirty-two omnibus objections to Claims, which have sought to reduce the claims pool by more than $4.67 billion.[5]  The Debtors and, after the Effective Date, the Liquidating Trust, are expected to continue objecting to certain Proofs of Claim, and any such objections could cause the total amount of Allowed General Unsecured Claims to change further.  These changes could affect recoveries to Holders of General Unsecured Claims and such changes could be material.

As of the Petition Date, certain Debtors were also parties to litigation initiated by, among others, Holders of personal injury and property damage Claims.  The Debtors could also become parties to additional litigation in the future.  [The Debtors and the Committee are engaged in an ongoing ADR process that they had previously negotiated at length with the Debtors' insurance carrier and various claimants with respect to certain bodily injury and property damage claims.][6]  As a result, as of June 1, 2025, approximately 1,110 Claims have been settled.  Further, the Debtors and the Committee will continue working through the Claims reconciliation process, and they and/or the Liquidating Trustee may dispute Claims asserted by litigation counterparties.  However, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated herein, the value of recoveries to Holders of Allowed General Unsecured Claims could change, and such changes could be material.

Finally, the Plan contemplates that certain Executory Contracts and Unexpired Leases will be rejected, which may result in parties asserting General Unsecured Claims for rejection damages.

**K.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes.  The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' chapter 11 efforts and were an essential element of the negotiations among the Debtors, the Exculpated Parties, and the Released Parties in obtaining their support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through efforts to negotiate and implement the Plan, which will maximize the value of the Debtors' Estates for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.  Importantly, each of the Releasing Parties will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors and the Released Parties.

The Releasing Parties are each of, and in each case in its capacity as such: (a) the Debtors; (b) the Liquidating Trustee, (c) all Holders of Claims who vote to accept the Plan and who affirmatively opt in to the releases provided by the Plan; (d) all Holders of Claims who vote to reject the Plan and who affirmatively opt in to the releases provided by the Plan; (e) all Holders of Claims who are deemed to reject the Plan and who affirmatively opt in to the releases provided by the Plan; (f) all Holders of Claims who are presumed to accept the Plan and who affirmatively opt in to the releases provided by the Plan;

---

[5]    This figure does not consider (a) the withdrawal of CARES Act claims and (b) additional potential reduction to the claims pool related to pending objections to Claims asserted by the SFA MEPPs, the Non-SFA MEPPs, and the EPA, and under the WARN Act.

[6]    The Debtors, the Committee, and ORIC are in discussions regarding whether the ADR Procedures and process thereunder will continue to be in effect post-Confirmation.

(g) all Holders of Interests who affirmatively opt in to the releases provided by the Plan; (h) the Committee and its current and former members (including any *ex officio* member(s)); (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j) for which such Entity is legally entitled to bind such Affiliate to the releases contained in the Plan under applicable non-bankruptcy law; and (j) each Related Party of each Entity in clause (a) through clause (i) for which such Affiliate or Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law; *provided* that each such Entity that elects not to opt into the releases contained in the Plan, such that it is not a Releasing Party in its capacity as a Holder of a Claim or Interest shall nevertheless be a Releasing Party in each other capacity applicable to such Entity.

The Released Parties are each of, and in each case in its capacity as such: (a) the Debtors; (b) the Liquidating Trustee, (c) all Holders of Claims; (d) all Holders of Interests; (e) the Committee and its current and former members (including any *ex-officio* member(s)); (f) each Releasing Party; (g) the Information Officer; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through clause (i); *provided* that in each case, an Entity shall not be a Released Party if it elects not to opt into the releases described in Article IX of the Plan.

The Exculpated Parties means, collectively, and in each case solely in its capacity as such: (a) each of the Debtors and their current and former directors, managers, and officers that served in such capacity between the Petition Date and Effective Date; (b) the Committee and each of its current and former members (including any *ex-officio* member(s)); (c) the Liquidating Trust, Liquidating Trustee and Liquidating Trust Board of Managers; and (d) with respect to the Entities in clause (a) through (c), each of their respective current and former attorneys, financial advisors, consultants, or other professionals or advisors that served in such capacity between the Petition Date and Effective Date.

The Plan Proponents believe that the releases and exculpations in the Plan are necessary and appropriate, and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit (the "Third Circuit").  Moreover, the Plan Proponents will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions The release, exculpation and injunction provisions that are contained in the Plan are copied in Article IV.I of this Disclosure Statement, entitled "Release, Injunction, Exculpation and Related Provisions."

**L.      What is the deadline to vote on the Plan?**

The Voting Deadline is October 229, 2025, at 4:00 p.m. (prevailing Eastern Time).

**M.      How do I vote to accept or reject the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your Ballot must be properly completed, executed, and delivered as directed, so that your Ballot including your vote is **actually received** by the Claims and Noticing Agent **on or before the Voting Deadline, which is October 229, 2025, at 4:00 p.m. prevailing Eastern Time**.  *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**N.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**O.      When is the Confirmation Hearing set to occur?**

The Confirmation Hearing is scheduled for **November 5~~12~~, 2025, at [●] [a./p.m.]10:00 a.m. (prevailing Eastern Time)**, or such other time as may be scheduled by the Bankruptcy Court.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be Filed and served on the Plan Proponents and certain other parties, by no later than **October 2~~2~~9, 2025, at 4:00 p.m. (prevailing Eastern Time)** in accordance with the notice of Confirmation Hearing.

**P.      What is the purpose of the Confirmation Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan enjoins any creditor from taking any action to collect any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

**Q.      What is the effect of the Plan on the Debtors' Estates?**

The Debtors are liquidating under chapter 11 of the Bankruptcy Code.  If the Plan is confirmed, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article X of the Plan have been satisfied or waived.  On or after the Effective Date, and unless otherwise provided in the Plan, the Liquidating Trustee shall take all actions as may be necessary or appropriate to effectuate the Liquidation Transactions in accordance with the terms of the Plan, the Confirmation Order and the Liquidating Trust Agreement.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**R.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Yellow Corporation, et al., c/o Epiq Ballot Processing, 10300 SW Allen Boulevard, Beaverton, OR 97005
>
> *By electronic mail at:*
> YellowCorporationInfo@epiqglobal.com

*By telephone (toll free) at:*
(866) 641-1076 (Domestic) or +1 (503) 461-4134 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the Claims and Noticing Agent at https://dm.epiq11.com/YellowCorporation (free of charge) or the Bankruptcy Court's website at http://www.deb.uscourts.gov/bankruptcy (for a fee).

**S.      Could subsequent events potentially affect recoveries under the Plan?**

Yes.  Recoveries under the Plan are only guaranteed after the Plan is Confirmed and the Effective Date has occurred.  Any number of subsequent events may interfere with Plan recoveries, including the amount of proceeds generated from the liquidation of Estate assets subsequent to Confirmation and the pursuit of Estate Causes of Action, as well as the litigation outcomes with respect to Claims post-Confirmation.

**T.      Do the Plan Proponents recommend voting to accept the Plan?**

Yes.  The Plan Proponents believe that the Plan provides for a better distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Plan Proponents believe that the Plan is in the best interest of all Holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**IV.    OVERVIEW OF THE PLAN**

As discussed herein, the Plan contemplates liquidating the Debtors' and their Estates' remaining assets under chapter 11 of the Bankruptcy Code and the distribution of the proceeds of the Liquidating Trust Assets for the benefit of Holders of Allowed General Unsecured Claims, other claimants and Holders of Allowed Interests, as applicable.  The Plan contemplates the following key terms, among others described herein and therein:

**A.      General Settlement of Claims and Interests**

As discussed in detail herein and as otherwise provided in the Plan, to the extent provided by the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action and controversies released, settled, compromised or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests and Causes of Action, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

The recoveries to Holders of Claims and Interests are described in Article III.E of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

## B.      Third-Party Sale Transactions and Liquidation Transactions

The Confirmation Order shall constitute full and complete authority for the Plan Proponents and the Liquidating Trustee to take all actions that may be necessary, useful or appropriate to consummate the Plan, the Third-Party Sale Transaction(s) and the Liquidation Transactions without any further judicial or corporate authority, subject to the terms of the Plan and any applicable order approving a Third-Party Sale Transaction. The Third-Party Sale Transactions shall be free and clear of any Liens, Claims, Interests and encumbrances pursuant to Bankruptcy Code sections 363 and 1123 as of the earlier of (i) the Sale Closing Date and (ii) the Effective Date.

Further, on the Effective Date, or as soon as reasonably practicable thereafter, the Liquidating Trustee shall take all actions as may be necessary or appropriate to effectuate the Liquidation Transactions, including the actions enumerated in Article IV.C of the Plan.

## C.      The Liquidating Trust

On the Effective Date, pursuant to the Liquidating Trust Agreement and Article VIII of the Plan, the Debtors, on their own behalf and on behalf of the Beneficiaries, and the Liquidating Trustee shall execute the Liquidating Trust Agreement and take all other steps necessary to establish the Liquidating Trust. Further, on the Effective Date, the Liquidating Trust Board of Managers will be appointed in accordance with the terms of the Plan and the Liquidating Trust Agreement. The rights, responsibilities, and duties of the Liquidating Trustee and the Liquidating Trust Board of Managers are set forth in the Liquidating Trust Agreement.

The Liquidating Trust will be established on behalf of the Beneficiaries pursuant to the Liquidating Trust Agreement, with the Beneficiaries to be treated as the grantors and deemed owners of the Liquidating Trust Assets. On the Effective Date, all Liquidating Trust Assets will vest and be deemed to vest in the Liquidating Trust in accordance with section 1141 of the Bankruptcy Code or as otherwise set forth in the Liquidating Trust Agreement and as further set forth in Article VIII.C of the Plan.

The primary purpose of the Liquidating Trust is to maximize the value of the Liquidating Trust Assets and make distributions in accordance with the Plan, the Confirmation Order and the Liquidating Trust Agreement. Except to the extent reasonably necessary to, and consistent with, its liquidating purpose, the Liquidating Trust will have no objective to continue or engage in the conduct of a trade or business.

As set forth in Article VIII.F of the Plan, the Liquidating Trustee shall be terminated when certain conditions are met, but in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date, unless the Bankruptcy Court determines upon the motion of the Liquidating Trust that a fixed period extension is necessary to facilitate or complete the liquidation, recovery and distribution of the Liquidating Assets.

## D.      Section 1145 Exemption

The Liquidating Trust Interests to be distributed to the Beneficiaries pursuant to the Plan shall not constitute "securities" under applicable law. The Liquidating Trust Interests shall not be transferrable except upon death of the interest holder or by operation of law, subject to the terms of the Liquidating Trust Agreement, and shall not have consent or voting rights or otherwise confer on the Beneficiaries any rights similar to the rights of stockholders of a corporation in respect of actions to be

taken by the Liquidating Trustee in connection with the Liquidating Trust (except as otherwise provided in the Liquidating Trust Agreement). To the extent the Liquidating Trust Interests are considered "securities" under applicable law, the issuance of such interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act and any state or local law requiring registration. To the extent any "offer or sale" of Liquidating Trust Interests may be deemed to have occurred, such offer or sale is under the Plan and in exchange for Claims against or Interests in one or more of the Debtors, or principally in exchange for such Claims or Interests and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code

### E.    The Liquidating Trustee

The powers, authority, responsibilities, and duties of the Liquidating Trust and the Liquidating Trustee are set forth and will be governed by the Liquidating Trust Agreement, the Plan, and the Confirmation Order.

The Liquidating Trustee shall be discharged pursuant to Article VIII.F of the Plan, and the duties, responsibilities, and powers of the Liquidating Trustee will terminate in accordance with the terms of the Liquidating Trust Agreement.

### F.    Dissolution of the Debtors

On, or as soon as reasonably practicable after, the Effective Date and after the transfer of all Liquidating Trust Assets to the Liquidating Trust, pursuant to Article VIII.C of the Plan, the Debtors and their Estates shall be disposed of, dissolved, wound down or liquidated under applicable law without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### G.    Causes of Action

Retained Causes of Action shall immediately vest with the Liquidating Trust as of the Effective Date, provided that, prior to the Effective Date, the Debtors shall not compromise, settle or release any such Retained Causes of Action without the consent of the Committee.

### H.    Release, Injunction, Exculpation and Related Provisions

The Plan contains releases in favor of the Released Parties and exculpation of the Exculpated Parties, as described in Article III.L of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" The release, exculpation, and injunction provisions that are contained in the Plan are copied below.

### 1.    Release of Liens

**Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan and, in the case of a Secured Claim that is Allowed as of the Effective Date, on the Effective Date (or the applicable Sale Closing Date with respect to assets that are transferred by a Debtor under a Third-Party Sale Transaction), all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured**

Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Liquidating Trustee to evidence the release of such Lien and/or security interest, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

If any Holder of a Secured Claim that has been satisfied or settled in full pursuant to the Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Committee or the Liquidating Trustee that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Liquidating Trustee shall be entitled to make any such filings or recordings on such Holder's behalf.

2.      **Releases by the Debtors**

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order and effective as of the Effective Date, to the fullest extent permitted by applicable law, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors, the Liquidating Trust, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Liquidating Trust, or the Estates, that any such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor, the Liquidating Trust, or other Entity, or that any Holder of any Claim against or Interest in a Debtor, the Liquidating Trust, or other Entity could have asserted on behalf of the Debtors or the Liquidating Trust, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Liquidating Trust (including the Debtors' and the Liquidating Trust's capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Liquidating Trust and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Liquidating Trust, intercompany transactions between or among a Debtor, or an affiliate of a Debtor and another Debtor, or the Liquidating Trust, the Chapter 11 Cases, the Canadian Recognition Proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, the Financing Documents and any other Definitive Document or any Liquidation Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, any other Definitive Documents, the Chapter 11 Cases, the Canadian Recognition Proceedings, the filing of the Chapter 11 Cases,

the commencement of the Canadian Recognition Proceedings, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any Avoidance Actions (except for Avoidance Actions against the Debtors' current and former employees); (2) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (3) any matters retained by the Debtors or the Liquidating Trust, as applicable, pursuant to the Schedule of Retained Causes of Action.

3.      Releases by the Releasing Parties

Except as otherwise expressly set forth in the Plan or the Confirmation Order, effective as of the Effective Date, to the fullest extent permitted by applicable law, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released by each Releasing Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Liquidating Trust, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors or the Liquidating Trust (including the Debtors' and the Liquidating Trust's capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Liquidating Trust and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Liquidating Trust, intercompany transactions, the Chapter 11 Cases, the Canadian Recognition Proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, the Financing Documents, and any other Definitive Document or any Liquidation Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, any other Definitive Document, the Chapter 11 Cases, the Canadian Recognition Proceedings, the filing of the Chapter 11 Cases, the commencement of the Canadian Recognition Proceedings, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan or the distribution of property under the Plan, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release (1) any Avoidance Actions (except for Avoidance Actions against the Debtors' current and former employees); (2) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction

contemplated by the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (3) the rights of any Holder of Allowed Claims or Allowed Interests, if applicable, to receive distributions under the Plan.

4.      **Exculpation**

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur any liability for, and each Exculpated Party shall be exculpated from any Cause of Action for any claim related to any act or omission occurring between the Petition Date and the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases or the Canadian Recognition Proceedings prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Liquidating Trust Agreement, the Third-Party Sale Transactions, the Plan, the Plan Supplement, any other Definitive Document, or any Liquidation Transaction, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Third-Party Sale Transactions, any other Definitive Document, the filing of the Chapter 11 Cases, the commencement of the Canadian Recognition Proceedings, the pursuit of Confirmation, the pursuit of the Third-Party Sale Transactions, the pursuit of Consummation, the administration and implementation of the Plan or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or actual fraud.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

5.      **Injunction**

In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors. Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons or Entities who have held, hold, or may hold Claims, Interests, or Causes of Action in the Debtors or the Liquidating Trust, as applicable, shall be precluded and permanently enjoined on and after the Effective Date, from taking any of the following actions against the Debtors, the Liquidating Trust (but solely to the extent such action is brought against the Debtors or the Liquidating Trust to directly or indirectly recover upon any property of the Estates upon the Effective Date), the Exculpated Parties, the Released Parties and any successors, assigns or representatives of such Persons or Entities, solely with respect to any Claims, Interests or Causes of Action that will be or are treated by the Plan: (a) commencing or continuing in any manner any Claim, action, or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order; (c) creating, perfecting or enforcing any encumbrance of any kind; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.  All Persons or Entities who directly or indirectly have held, hold, may hold, or seek to assert Claims or Causes of Action that (x) have been released in the Plan (the "<u>Released Claims</u>") or (y) are subject

to exculpation (the "Exculpated Claims"), shall be enjoined from (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (iii) creating, perfecting, or enforcing any encumbrance of any kind on account of or in connection with or with respect to the Released Claims and Exculpated Claims; (iv) asserting any right of subrogation on account of or in connection with or with respect to the Released Claims and Exculpated Claims, except to the extent that a permissible right of subrogation is asserted with respect to a timely Filed Proof of Claim; or (v) or commencing or continuing in any manner any action or other proceeding on account of or in connection with or with respect to the Released Claims and Exculpated Claims; provided, however, that the foregoing injunction shall have no effect on the liability of any person or Entity that results from any act or omission based on or arising out of gross negligence, fraud or willful misconduct.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the automatic stay pursuant to section 362 of the Bankruptcy Code shall remain in full force and effect with respect to the Debtors and any property dealt with by the Plan until the closing of these Chapter 11 Cases; [provided, however, the foregoing shall not prevent any party from pursuing a claim consistent with the ADR Procedures Order][7].  Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any obligations arising on or after the Effective Date of any Person or Entity under the Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, by accepting, or being eligible to accept, distributions on account of such Claim or Interest, as applicable, pursuant to the Plan shall be deemed to have consented to the injunction provisions set forth in Article IX.E of the Plan.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW

### A.    Yellow's Corporate History and Business Operations

As a storied American icon for approximately 100 years, Yellow was a leading trucking and logistics company, boasting one of the largest LTL networks in North America that enabled Yellow to provide customers with regional, national, and international shipping services of transportation logistics and LTL services.  Entering 2023, Yellow was the largest unionized LTL carrier in the United States, in addition to being the third largest LTL freight carrier and the fifth largest transportation company in North America.

Yellow transported approximately 10% of the nation's LTL freight.  As of July 27, 2023, Yellow employed nearly 30,000 people, approximately two thirds of whom were members of the IBT, who primarily comprised the Company's drivers and dock, maintenance, and clerical workers.  Yellow operated service terminals in 300 communities, with employees in all fifty states.  In 2022, Yellow transported approximately 14.2 million shipments, for approximately 250,000 customers, including the

---

[7]    The Debtors, the Committee, and ORIC are in discussions regarding whether the ADR Procedures and process thereunder will continue to be in effect post-Confirmation.

U.S. Government, generating more than $5.2 billion in operating revenue.  On an average workday, Yellow's approximately 30,000 employees handled approximately 40,000 freight shipments.

As of the Petition Date, Yellow's fleet was comprised of approximately 12,700 tractors, including approximately 11,700 owned tractors and approximately 1,000 leased tractors, and approximately 42,000 trailers, including approximately 34,800 owned trailers and 7,200 leased trailers. Yellow's network included 308 strategically located service facilities, including 169 owned facilities with approximately 10,000 doors and 140 leased facilities with approximately 9,100 doors, in addition to six warehouses managed by Yellow's logistics solution provider, Yellow Logistics.

With its family of trucking brands, including Holland, New Penn, YRC Freight, Reddaway, and Yellow Logistics, Yellow provided transportation services for various categories of goods, which included (among others) apparel, appliances, automotive parts, chemicals, food, furniture, glass, machinery, metal, metal products, non-bulk petroleum products, rubber, textiles, wood, and other manufactured products or components.  Each of Yellow's trucking brands provided different transportation and logistics services to its customers, as summarized in the following chart:

| Brand | Description |
| --- | --- |
| Holland | Offered the most next-day service lanes in its territory and consistently recorded one of the lowest claim ratios in the industry. |
| New Penn | Provided next-day regional LTL shipping services through the northeastern United States, Canada and Puerto Rico. |
| YRC Freight | Transported industrial, commercial and retail goods, specializing in shipping solutions with an expansive network across North America. |
| Reddaway | Offered next-day and two-day service, with a footprint that encompassed all of the Western United States, including Alaska and Hawaii. |
| Yellow Logistics | Coast-to-coast 3PL brokerage combined trucks, technology and talented people to create customized logistics solutions. |

Debtor Yellow Corporation has 23 wholly-owned direct and indirect subsidiaries that are Debtors in these Chapter 11 Cases.

### B.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $1.2 billion in total funded debt obligations.  The table below summarizes the Debtors' prepetition capital structure:

| ($ in millions) | Maturity | Outstanding Principal |
| --- | --- | --- |
| UST Tranche A | September 30, 2024 | $337,042,758 |
| UST Tranche B | September 30, 2024 | $399,999,770 |

| B-2 Term Loan Facility | June 30, 2024 | $485,372,693 |
| ABL Facility | January 9, 2026 | $858,520 |
| **Total Funded Debt** | | $1,223,273,741 |

## 1. The UST Credit Agreements

Beginning in the last two weeks of March 2020, the transportation industry and the economy at large experienced an unexpected and significant decline in economic activity due to the impact of the 2019 coronavirus disease ("COVID-19") and the resulting business shutdown and shelter-in-place orders made across North America by various governmental entities and private enterprises.  As a result, Yellow pursued a loan with the UST pursuant to the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act").

On July 7, 2020, Yellow and certain of its subsidiaries, as guarantors (the "Term Guarantors"), entered into the UST Tranche A Term Loan Credit Agreement (as amended, restated, amended and restated, modified or otherwise supplemented from time to time, the "Tranche A UST Credit Agreement") with The Bank of New York Mellon, as administrative agent and collateral agent and the UST Tranche B Term Loan Credit Agreement (as amended, restated, amended and restated, modified or otherwise supplemented from time to time, the "Tranche B UST Credit Agreement" and, together with the Tranche A UST Credit Agreement, the "UST Credit Agreements") with The Bank of New York Mellon, as administrative agent and collateral agent, pursuant to which the United States Treasury ("UST") committed an aggregate principal amount of $700.0 million to the Company pursuant to the CARES Act. The obligations of the Company under the UST Credit Agreements were guaranteed by the Term Guarantors.

The UST Credit Agreements had maturity dates of September 30, 2024, with a single payment at maturity of the outstanding balance.  The Tranche A UST Credit Agreement consisted of a $300.0 million term loan and bore interest at a rate of the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 3.5% per annum, consisting of 1.50% in cash and the remainder paid-in-kind.  Proceeds from the Tranche A UST Credit Agreement were used to meet Yellow's contractual obligations, maintain working capital and finance technology and infrastructure development.  The Tranche B UST Credit Agreement consisted of a $400.0 million term loan and bore interest at a rate of the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 3.5% per annum, paid in cash.  Proceeds from the Tranche B UST Credit Agreement were used predominantly for the acquisition of tractors and trailers.

Obligations under the UST Credit Agreements were secured by a perfected first-priority security interest in the escrow or controlled account supporting the respective UST Credit Facility, certain tractors and trailers (solely in the case of the Tranche B UST Credit Agreement) and a perfected junior priority security interest (subject in each case to permitted liens) in substantially all other assets of the Company and the Term Guarantors, subject to certain exceptions.

On July 7, 2023, the Company and certain of its subsidiaries entered into a waiver agreement (the "UST Credit Agreement Waiver") under the UST Credit Agreements.  The UST Credit Agreement Waiver provided for a waiver of the minimum Consolidated EBITDA financial covenant of $200.0 million LTM set forth in the UST Credit Agreements for the covenant testing period that ended on June 30, 2023.  LTM Consolidated EBITDA for fourth quarter 2022 was $343.1 million.

As of the Petition Date, approximately $337 million in borrowings remained outstanding under the Tranche A UST Credit Agreement, and approximately $400 million in borrowings remained outstanding under the Tranche B UST Credit Agreement.  As of February 5, 2024, the Debtors paid off all commitments and all obligations of the UST Credit Agreement [Docket No. 2119].

## 2. B-2 Term Loan

On September 11, 2019, Yellow and certain of its subsidiaries, as guarantors (the "B-2 Term Guarantors"), amended and restated the existing credit facilities under the credit agreement dated February 13, 2014 (the "Prior Term Loan Agreement") and entered into a $600.0 million term loan agreement (the "B-2 Term Loan") with funds managed by Apollo Global Management, LLC acting collectively as lead lender ("Apollo"), and Alter Domus, as administrative agent and collateral agent. The obligations of the Company under the governing agreement (the "B-2 Term Loan Agreement") were guaranteed by the B-2 Term Guarantors.

The B-2 Term Loan had a maturity date of June 30, 2024, with a single payment due at maturity of the outstanding balance. The B-2 Term Loan initially bore interest at the Adjusted LIBO rate (subject to a floor of 1.0%) plus a margin of 7.5% per annum, payable at least quarterly in cash, subject to a 1.0% margin step down in the event the Company achieves greater than $400.0 million in trailing-twelve-month Adjusted EBITDA. Obligations under the B-2 Term Loan were secured by a perfected first-priority security interest in (subject to permitted liens) assets of the Company and the B-2 Term Guarantors, including but not limited to all of the Company's wholly owned terminals, tractors, and trailers other than the tractors and trailers funded by the UST Tranche B loan, subject to certain limited exceptions.

On April 7, 2020, the Company and certain of its subsidiaries entered into Amendment No. 1 (the "First Term Loan Amendment") to the B-2 Term Loan as a result of expected future covenant and liquidity tightening due to unprecedented economic deterioration. The First Term Loan Amendment principally provided additional liquidity allowing the Company to defer quarterly interest payments for the quarter ending March 31, 2020 and the quarter ending June 30, 2020 with almost all of such interest to be paid-in-kind. The First Term Loan Amendment also provided for a waiver with respect to the Adjusted EBITDA financial covenant during each fiscal quarter during the fiscal year ending December 31, 2020. The interest rate was retroactively reset to a fixed 14% during the first six months of 2020.

On July 7, 2020, the Company and the B-2 Term Guarantors entered into Amendment No. 2 (the "Second Term Loan Amendment") to the B-2 Term Loan Agreement. The material terms of the Second Term Loan Amendment include, among other things, a consent to the refinancing and conforming changes to the description of collateral set forth in the UST Credit Agreements, permanently capitalizing previously paid-in-kind interest on borrowings under the B-2 Term Loan Agreement, and that all future interest shall accrue at Adjusted LIBO rate plus a margin of 7.5% per annum and 6.5% per annum in the case of alternative base rate borrowings paid in cash. Additionally, the Company was subject to certain financial covenant requirements identical to those of the UST credit agreements.

On July 7, 2023, but effective as of June 30, 2023, the Company and certain of its subsidiaries entered into Amendment No. 3 (the "Third Term Loan Amendment") to the B-2 Term Loan. The Third Term Loan Amendment required, among other things, that the Debtors provide a weekly liquidity report and that the Debtors do not permit liquidity to fall below $35 million at any time. The Third Term Loan Amendment also provided for a change from the Adjusted LIBO rate to the Secured Overnight Financing Rate ("SOFR") plus the ARRC recommended credit spread adjustment.

In July 2023, the Company announced that it closed on the sale of an obsolete terminal property in Compton, California with a third-party purchaser for a sale price of $80 million. In accordance with the terms and conditions of the Third Term Loan Amendment, the net proceeds of the sale, totaling approximately $79.5 million, were applied to the outstanding principal balance of the B-2 Term Loan.

As of the Petition Date, approximately $485.3 million in borrowings remained outstanding under the B-2 Term Loan.  As of December 21, 2023, the Debtors had paid off in full all of their outstanding obligations under the B-2 Term Loan [Docket No. 2119].

### 3.  ABL Facility

On February 13, 2014, Yellow entered into a $450 million asset-based loan facility (the "ABL Facility") from a syndicate of banks arranged by Citizens Business Capital (the "ABL Agent"), Merrill Lynch, Pierce, Fenner & Smith and CIT Finance LLC.  Yellow and its subsidiaries YRC Freight, Reddaway, Holland and New Penn were borrowers under the ABL Facility, and certain of the Company's domestic subsidiaries were guarantors thereunder.  Availability under the ABL Facility was derived by reducing the amount that may be advanced against eligible receivables plus eligible borrowing base cash by certain reserves imposed by the ABL Agent and the Company's outstanding letters of credit and revolving loans.  Eligible borrowing base cash was cash that was deposited from time to time into a segregated restricted account and was included in "Restricted amounts held in escrow" in the accompanying consolidated balance sheet.

At Yellow's option, borrowings under the ABL Facility bore interest at either:  (i) the applicable USD LIBOR rate plus 2.25%, as amended, or (ii) the base rate (as defined in the ABL Facility) plus 1.25%, as amended.  Letter of credit fees equal to the applicable USD LIBOR margin in effect, 2.25% as amended, are charged quarterly in arrears on the average daily stated amount of all letters of credit outstanding during the quarter.  Unused line fees were charged quarterly in arrears (such unused line fee percentage is equal to 0.375% per annum if the average revolver usage is less than 50% or 0.25% per annum if the average revolver usage is greater than 50%).  The ABL Facility was secured by a perfected first-priority security interest (subject to permitted liens) in accounts receivable, cash, deposit accounts, and other assets related to accounts receivable of Yellow and the other loan parties and an additional second-priority security interest (subject to permitted liens) in substantially all remaining assets of the borrowers and the guarantors.

On October 31, 2022, the Company and certain of its subsidiaries entered into Amendment No. 7 (the "ABL Treasury Amendment") in which the maturity date of the ABL Facility was extended to January 9, 2026 and included a springing maturity commencing thirty days prior to the maturity of any of the Term Debt, the UST Tranche A Facility Indebtedness, or the UST Tranche B Facility Indebtedness.  Further, as part of the ABL Treasury Amendment, the approximately $359 million in outstanding and undrawn Letters of Credit fees under the ABL Facility became the applicable margin for SOFR Loans.  The amended facility had an increased capacity of $50 million up to $500 million and an interest rate of SOFR plus 1.75% plus a credit spread adjustment of .10%.

As of the Petition Date, $0.9 million in borrowings remained outstanding under the ABL Facility as well as approximately $359 million of undrawn letters of credit issued and outstanding under the ABL Facility supporting workers compensation insurance, among other obligations.  As of December 21, 2023, the Debtors had repaid in full all of their outstanding obligations under the ABL Credit Agreement other than accrued and accruing ABL Adequate Protection Fees and Expenses pursuant to Section 14(a)(iii) of the Final DIP Order [Docket No. 2119].

As discussed further herein, the Debtors repaid all outstanding secured debt obligations.

# VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS[68]

Yellow operated in a highly competitive environment.  Overall, when Yellow was still operating, the LTL market was increasingly dominated by non-union trucking companies who carried approximately 80% of all LTL freight.  Key competitors included global, integrated freight transportation services providers, global freight forwarders, national freight services providers (including intermodal providers), regional and interregional carriers, third-party logistics providers, and small, intraregional transportation companies.  Yellow also had competitors within several different modes of transportation including:  LTL, truckload, air and ocean cargo, intermodal rail, parcel and package companies, transportation consolidators, reverse logistics firms, and privately-owned fleets.  Ground-based transportation includes private fleets and "for-hire" provider groups.

## A.    COVID-19

During 2019, the freight industry experienced a recession.  This recession appeared to have stabilized in the first quarter of 2020.  However, beginning the last two weeks of March, the freight industry and the economy at large experienced a precipitous and significant decline in economic activity due to the impact of COVID-19.

The COVID-19 pandemic and related economic repercussions created significant uncertainty and resulted in a material decrease in the volume that was expected during 2020 by both Yellow and the industry as a whole.  This market downcycle forced Yellow into a liquidity crunch.  In order to maintain adequate liquidity to fund operations, Yellow took preservation actions in late March and early April 2020, including layoffs, furloughs, further eliminations of short-term incentive compensation and reductions in capital expenditures, and deferment of payments to various parties.

In addition, Yellow benefited from the support afforded to it under the CARES Act, which provided temporary relief related to the payment of employer payroll taxes and delayed the due date for funding minimum required pension contributions.  Specifically, the UST Credit Agreements, which provided Yellow $700 million, were entered into pursuant to the CARES Act.  The CARES Act loan enabled Yellow to stabilize its operations for a period of time.

## B.    One Yellow

In 2019, Yellow announced the "One Yellow" enterprise initiative ("One Yellow").  One Yellow was intended to combine the vast national network of the YRC Freight brand with the speed and consistency of Yellow's regional brands to create one "super-regional carrier."  In addition, One Yellow, once implemented, was set to address operational inefficiencies that hampered the Company's ability to compete in the LTL sector of the trucking market and gain market share.

Prior to the One Yellow initiative, numerous operating companies within Yellow's corporate structure were competing for the same business.  For instance, on any given day, multiple trucks from competing companies that were under Yellow's corporate umbrella could be dispatched to the same location to pick up and deliver shipments of freight, resulting in a massive amount of redundancy, higher costs, and general waste of resources.  Yellow could not reasonably compete with other LTL carriers while its own brands were competing with one another.  One Yellow was therefore a commonsense

---

[68]    Certain of the events concerning the circumstances leading up to the commencement of the Chapter 11 Cases are disputed by the Debtors and the International Brotherhood of Teamsters.  The statements set forth in this Article VI should not be construed as the assent of the Debtors, the Committee or the International Brotherhood of Teamsters to any characterization of the events or otherwise.

integration initiative that would eliminate unnecessary duplication, prevent Yellow's trucking brands from competing with one another for, quite literally, the exact same business, and ultimately transform Yellow from a disparate set of operating companies into a single unified national platform.

If completed, One Yellow would have resulted in the following benefits:  (a) network optimization of all zip codes in pickup and delivery zones, thereby eliminating redundancy where multiple terminals serve the same zip codes; (b) brand enhancement through superior service and customer satisfaction; (c) volume accretion attributable to Yellow's ability to provide a structurally higher level of service and increase its LTL market share, especially its next-day/same-day delivery market share; (d) increased yield; and (e) enhanced pricing abilities, due to greater competitiveness and higher service levels.   The One Yellow process contained three phases, with full implementation expected to be completed by early 2023.   The three phases of the One Yellow initiative can be summarized as follows:

- Phase 1 (20% of network):  to consolidate YRC Freight's operations with Reddaway's operations in the West;

- Phase 2 (70% of network):  to consolidate YRC Freight's operations with Holland's and New Penn's operations in the Northeast, Midwest, and Southeast; and

- Phase 3 (10% of network):  to consolidate YRC Freight's operations with Holland's remaining operations in the Central and Southern regions.

One Yellow was Yellow's most vital strategic initiative, and the very survival of Yellow depended on completing One Yellow as soon as possible.   Yellow anticipated that One Yellow would enable Yellow to dramatically improve its financial performance, including by growing EBITDA to $450 million within one full year of implementation.   Yellow further anticipated that One Yellow would create a financial opportunity to capture upwards of $675 million in additional annual revenue at operating margins of 13.5%.   One Yellow not only made sense financially as a method to improve synergies, but also as a practical matter to position Yellow for long-term success.

When Yellow decided to make a change of operations ("CHOPS") proposal, it would meet with affected local unions and then participate in a CHOPS Committee hearing.  *See* YRCW National Master Freight Agreement ("NMFA") Art. 8 § 6.

In 2022, Yellow proposed CHOPS for Phase 1 of One Yellow, the Teamsters National Freight Industry Negotiating Committee ("TNFINC") approved the Phase 1 CHOPS and Yellow successfully implemented Phase 1.   In September 2022, Phase 1 was launched, with TNFINC support and Union approval of the change of operations Yellow needed to implement Phase 1.   As a result, the linehaul networks of YRC Freight and Reddaway in the Western region were integrated to support both regional and long-haul services.

With the success of the implementation of Phase 1, and Yellow's strong financial position, Yellow continued preparations to implement Phase 2.

C.     **Yellow's Inability to Complete Phase 2 Causes Irreparable Damage**

Even before Yellow's successful implementation of Phase 1, Yellow was preparing for Phase 2 of One Yellow to address operations in the East, Central, and portions of the Southern region—covering 70% of Yellow's network.   In addition to consolidating YRC Freight's operations with Holland's and New Penn's in the East, Central, and portions of the Southern regions, Phase 2 was designed to:  (a) establish one dispatch system across all three operating companies; (b) create 35 new velocity distribution centers; and (c) combine terminals in near proximity with one another in the YRC

Freight-Holland-New Penn network. Yellow planned to implement and complete Phase 2 by the end of 2022 and to begin and complete the final Phase 3 implementation in early 2023. Yellow had every expectation that it would be able to achieve agreement with the TNFINC on implementation of Phases 2 and 3 on a timely basis, leading to its long-term success. Indeed, Yellow had a long history of reaching agreement with TNFINC in challenging circumstances, and it was in both parties' best interests to reach such agreement. Unfortunately, Yellow's efforts never bore fruit, as Phase 2 met with heavy resistance by TNFINC, and the parties could not reach an agreement that would permit Phase 2 to move forward until it was too late.

As described above, One Yellow was designed, among other things, to unify Yellow's disparate operating companies into a single company and brand, modernize Yellow's LTL network, address certain operational inefficiencies, improve Yellow's operating footprint and create a super-regional carrier, enhance the Yellow brand, increase the number of shipments Yellow transports, and expand Yellow's market share. Looking to the future, One Yellow was designed to better position Yellow to take market share from both non-unionized competitors and from the remaining union competitors. Without Phase 2, Yellow could not implement these changes or achieve these improvements for the 80% of Yellow's network that Phase 2 and Phase 3 were intended to address. Reduced to dollars and cents, the inability to proceed with One Yellow cost Yellow the operational savings of approximately $22.85 million per month.

On July 12, 2023, after reports that TNFINC had reached a new collective bargaining agreement with Yellow competitor ABF Freight that included an $11.00/hour wage and benefit increase, Yellow offered to match the $11.00/hour wage and benefit increase subject to certain contingencies. TNFINC rejected Yellow's contingent offer.

Yellow's inability to implement Phase 2 created a liquidity crisis, as a direct result of which Yellow deferred payment of certain contractual contributions in the amount of approximately $22.5 million to both the Central States Health and Welfare Fund and Central States Pension Fund (the "Contributions"). On June 27, 2023, Yellow filed a lawsuit against the IBT, TNFINC, and several local unions for their alleged breaches of the NMFA. On March 25, 2024, the U.S. District Court for the District of Kansas dismissed Yellow's lawsuit. The court found that Yellow failed to exhaust the grievance procedure in the parties' collective bargaining agreement. On April 22, 2024, Yellow asked the court to alter or amend the decision to dismiss the lawsuit and filed a motion to amend the dismissed complaint. However, on July 15, 2024, the court denied the motion to reconsider the March 25, 2024 decision as well as the request to amend Yellow's complaint. Yellow has appealed the dismissal to the Tenth Circuit Court of Appeals.

### D.    Yellow's Liquidity Issues

Yellow anticipated that, as the phases of One Yellow were implemented, operational efficiencies would be achieved, and EBITDA would increase. However, Yellow was not able to realize the projected savings or increased revenues from implementation of Phases 2 or 3. As a result, Yellow had been operating at a loss and exhausting its liquidity.

Furthermore, the overall LTL industry had been experiencing challenging business conditions. In 2022, as the manufacturing sector's strength began to waver, demand for LTL capacity decreased. Subsequently, the first quarter of 2023 was characterized by soft demand, and Yellow did not experience the typical seasonal uplift in demand during the second half of the first quarter of 2023.

This combination of economic headwinds and a liquidity crisis created a perfect storm. Accordingly, Yellow retained the services of Alvarez & Marsal North America, LLC and Kirkland & Ellis LLP to consider potential alternatives to address Yellow's liquidity issues. This liquidity crisis was

sufficiently acute that it necessitated Yellow obtaining waivers of certain covenants under its current credit agreements, including waiver of a minimum EBITDA financial covenant, which it obtained on July 7, 2023. The credit agreement amendment required, among other things, that Yellow provide lenders with a weekly liquidity report and that Yellow's liquidity not fall below $35 million. Further, as part of efforts to pay off the more than $1.2 billion in loans, Yellow sold a terminal in Compton, California, for $80 million.

As of June 30, 2023, Yellow had a $485 million Term Loan that was set to mature in June 2024 and a $737.0 million US Treasury Loan that was set to mature in September 2024. Yellow had to refinance its $1.2 billion in debt before it matured. The financial markets and credit rating agencies took notice.

Yellow's stock price sharply declined over the course of the ten months prior to the Petition Date. At the same time, the credit-rating agencies steadily downgraded Yellow. On February 27, 2023, S&P downgraded Yellow's issuer credit rating from B- to CCC+ and its issue-level rating on Yellow's Term Loan from B- to CCC+ because of uncertainty regarding Yellow's ability to refinance the Term Loan and US Treasury Loan. Further, S&P indicated it could lower Yellow's ratings again if it did not believe Yellow's refinancing plans would address its upcoming maturities before they became current.

On May 15, 2023, Moody's downgraded Yellow's ratings—the corporate family rating, the probability of default rating, the senior secured rating, and the speculative grade liquidity rating—citing delays in implementing Phase 2 and weaker sector fundamentals. On July 6, 2023, S&P further downgraded Yellow's issuer credit rating from CCC+ to CCC- and its issue-level rating on Yellow's Term Loan from CCC+ to CCC-, citing contentious labor contract negotiations and Yellow's need to address looming maturities. On August 1, 2023, in the wake of the IBT strike threat, and in light of the fact that Yellow was forced to take steps to wind-down its operations, S&P once again downgraded Yellow's issuer credit rating from a CCC- to a CC.

### E.    IBT Threatens to Strike

In or about July, 2023, Yellow sought the permission of certain union affiliated health and welfare and defined benefit funds to defer contribution payments in order to preserve liquidity. On July 17, 2023, after Central States Pension Fund denied Yellow's payment deferral request and Yellow did not timely pay, it sent a notice to Yellow and to the IBT and Teamsters National Freight Negotiating Committee that it would suspend benefits for all Yellow employees participating in the fund based on Yellow's failure to remit certain benefits. Also on July 17, 2023, Mr. Murphy, on behalf of the IBT and all local unions, gave a 72-hour notice that the affected local unions were authorized and intended to strike Yellow on or after July 24, 2023, pursuant to Article 8, Section 3(b) of the parties' collective bargaining agreement.

On July 19, 2023, Yellow sought a temporary restraining order and preliminary injunction to, among other things, enjoin the local unions from engaging in a strike work stoppage, slow down, or interruption of work (the "TRO Motion"). On July 20, 2023, IBT and TNFINC opposed Yellow's request for a temporary restraining order and preliminary injunction, and, on July 21, 2023, U.S. District Judge Julie A. Robinson of the District of Kansas denied the TRO Motion on the basis that the court lacked jurisdiction to do so pursuant to the Norris-La Guardia Act, which prohibits federal injunctions of lawful work stoppages. In denying the TRO, Judge Robinson forecasted that the local unions' strike might in fact kill Yellow and that the 22,000 Union members might lose their jobs as a result.

On July 23, 2023, Mr. O'Brien reached out to Yellow's senior management[29]—ten hours before the strike deadline.  As a result of these discussions, and at the TNFINC's direct request, Central States agreed to extend benefits for workers at Yellow operating companies Holland and YRC Freight for thirty days, thus averting a strike that could have begun Monday, July 24.

However, Yellow's customers fled to Yellow's competitors.  In addition, Yellow's banking partners elected to exercise certain protective remedies.  Specifically, on July 19, 2023, Citizens Business Capital ("Citizens") sent Yellow a notice of establishment of availability reserve in the amount of $25 million, which came due July 21, 2023.  On July 25, 2023, Citizens again sent a notice of establishment of availability reserve in the amount of $25 million, exacerbating Yellow's rapidly deteriorating liquidity, which came due on July 27, 2023.

### F.        Exploration of Strategic Alternatives

As described above, the Debtors have been engaged for several years with advisors and stakeholders to address the Debtors' business challenges.  The Debtors worked to explore and execute alternative measures to continue their operations and maximize value for all stakeholders.  Ultimately, however, those efforts could not provide the relief the Debtors needed, and the Debtors determined that it was necessary to pivot to an in-court process.

Specifically, facing a dire liquidity shortfall and the fact that customers had fled to competitors following the Teamster local unions' strike threat, the Debtors' management team and advisors determined that it was appropriate to clear the Debtors' freight network, close their facilities, and commence layoffs of their workforce.  Shortly thereafter, the Debtors Filed these Chapter 11 Cases to pursue an orderly sale process in order to maximize value and minimize the impact of the shutdown for all stakeholders.

## VII.        MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.        First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  On August 9–17, 2023, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis. From September 13–15, 2023, the Bankruptcy Court entered orders approving certain of the First Day Motions on a final basis.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the First Day Declaration.  The First Day Motions, the First Day Declaration, and all orders for relief
granted in the Chapter 11 Cases, can be viewed free of charge at https://dm.epiq11.com/case/yellowcorporation/dockets.

---

[29]    The IBT disputes that Mr. O'Brien initiated his discussion with Yellow's senior management on July 23, 2024.

B.    **Appointment of Official Committee of Unsecured Creditors**

On August 16, 2023, the U.S. Trustee Filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 269], notifying parties in interest that the U.S. Trustee had appointed the Committee in these Chapter 11 Cases.  The Committee was initially comprised of: (i) BNSF Railway; (ii) Central States, Southeast and Southwest Areas Pension Fund; (iii) Daimler Trucks, N.A.; (iv) International Brotherhood of Teamsters; (v) Michelin North America, Inc.; (vi) New York State Teamsters Pension and Health Funds; (vii) Pension Benefit Guaranty Corporation; (viii) RFT Logistics LLC; and (ix) Mr. Armando Rivera.  On May 20, 2024, the *First Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 3430] was Filed to reflect the resignation of Michelin North America, Inc. as of May 8, 2024.  On February 4, 2025, the *Second Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 5615] was Filed to reflect the resignation of Daimler Trucks, N.A. as of February 4, 2025.

On October 4, 2023, the Bankruptcy Court approved the Committee's applications to retain (a) Akin Gump Strauss Hauer & Feld LLP as co-counsel [Docket No. 760], (b) Benesch, Friedlander, Coplan & Aronoff LLP as co-counsel [Docket No. 762], (c) Miller Buckfire as investment banker [Docket No. 764] and (d) Huron Consulting Services LLC as financial advisor to the Committee [Docket No. 761].  The Debtors held a meeting of creditors pursuant to Bankruptcy Code section 341 on September 14, 2023.

C.    **Other Procedural and Administrative Motions**

During these Chapter 11 Cases, the Debtors also Filed several other motions, including:

- De Minimis Asset Sales Motion.  The *Motion of Debtors to Approve Procedures for De Minimis Asset Transactions and Abandonment of De Minimis Assets* [Docket No. 360] (the "De Minimis Asset Sales Motion") was Filed on August 29, 2023, seeking authority to sell certain obsolete, excess, burdensome, or otherwise de minimis assets in individual transactions or a series of transactions with an aggregate sale price equal to or less than $5 million or abandon certain De Minimis Assets with a value of $250,000 or less.  On September 14, 2023, the Debtors Filed a certification of counsel and revised order to the De Minimis Asset Sales Motion resolving certain reservations of rights and other stakeholder inquiries, asking the Bankruptcy Court to enter an order granting the De Minimis Asset Sale Motion [Docket No. 547].  On the same day, the Bankruptcy Court entered an order approving the De Minimis Asset Sale Motion on a final basis [Docket No. 551].

- SOFA Extension Motion.  The *Motion of Debtors Seeking Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief* [Docket No. 361] (the "SOFA Extension Motion") was Filed on August 29, 2023, seeking an extension of the deadlines by which the Debtors must File certain schedules of assets and liabilities and statements of financial affairs for each Debtor (the "Schedules and SOFAs") to and including September 11, 2023.  On September 11, 2023, the Debtors Filed a certification of counsel stating that no objections to the SOFA Extension Motion had been Filed and asking the Bankruptcy Court to enter an order granting the SOFA Extension Motion [Docket No. 443].  On September 12, 2023, the Bankruptcy Court entered an order approving the SOFA Extension Motion on a final basis [Docket No. 493].

The Debtors Filed the Schedules and SOFAs on September 11–12.  *See* Docket Nos. 445–92.

- Ordinary Course Professionals Motion.  The *Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 392] (the "OCP Motion") was Filed on August 31, 2023, seeking authorization for the Debtors to retain and compensate certain professionals utilized in the ordinary course of business.  On September 19, 2023, the Debtors Filed a certificate of counsel with a revised proposed order, asking the Bankruptcy Court to enter an order granting the OCP Motion [Docket No. 604].  On September 20, 2023, the Bankruptcy Court entered an order approving the OCP Motion on a final basis [Docket No. 617].

- Claims Bar Date Motion.  The *Motion of Debtors Seeking Entry an Order (A) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving the Form and Manner of Notice Thereof* [Docket No. 393] (the "Claims Bar Date Motion") was Filed on August 31, 2023, seeking to establish bar dates for Filing Proofs of Claim, amended schedules, and rejection damages, and approving the form and manner for filing Proofs of Claim.  On September 12, 2023, the Debtors Filed a certification of counsel and revised order, asking the Bankruptcy Court to enter an order granting the Claims Bar Date Motion [Docket No. 505].  On September 13, 2023, the Bankruptcy Court entered an order approving the Claims Bar Date Motion on a final basis [Docket No. 194].  On September 15, 2023, the Debtors Filed notice of the bar dates [Docket No. 566].  On September 21, 2023, the Debtors caused notice of the bar dates to be published in *The New York Times* and *The Globe and Mail* [Docket Nos. 643–44].

- Interim Compensation Procedures Motion.  The *Motion of Debtors for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (II) Granting Related Relief* [Docket No. 398] (the "Interim Compensation Procedures Motion") was Filed on June 30, 2023, seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases.  On September 12, 2023, the Debtors Filed a certification of counsel stating that no formal objections to the Interim Compensation Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Interim Compensation Motion [Docket No. 496].  On September 13, 2023, the Bankruptcy Court entered an order approving the Interim Compensation Motion on a final basis [Docket No. 519].

- Agency Agreement Motion.  *See* Article VII.G of this Disclosure Statement for a discussion of the Agency Agreement Motion and related sale processes.

- Local Rule 3007-1(f) Motion.  The *Motion of Debtors for Entry of an Order (I) Modifying the Application of Local Rule 3007-1(f) and (II) Granting Related Relief* [Docket No. 999] (the "Local Rule 3007-1(f) Motion") was Filed on

October 30, 2023, seeking modification of the application of Local Rule 3007-1(f) to allow the Debtors to File up to four substantive omnibus claims objections per calendar month, and allowing each such objection to include up to five hundred claims. On November 8, 2023, the Debtors Filed a certification of counsel stating that no formal objections to the Local Rule 3007-1(f) Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Local Rule 3007-1(f) Motion [Docket No. 1054], and the Bankruptcy Court entered an order approving the Local Rule 3007-1(f) Motion on a final basis [Docket No. 1068].

- Removal Extension Motions. The *Motion of Debtors for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 996] (the "Removal Extension Motion") was Filed on October 30, 2023, seeking an extension of the period within which the Debtors may remove civil actions. The Bankruptcy Court entered an order approving the Removal Extension Motion on a final basis on November 8, 2023 [Docket No. 1056]. The *Debtors' Second Motion for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 2497] (the "Second Removal Extension Motion") was Filed on March 1, 2024, seeking an extension of the period within which the Debtors may remove civil actions. The Bankruptcy Court entered an order approving the Second Removal Extension Motion on a final basis on March 19, 2024 [Docket No. 2654]. The *Debtors' Third Motion for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 3802] (the "Third Removal Extension Motion") was Filed on June 28, 2024, seeking an extension of the period within which the Debtors may remove civil actions. The Bankruptcy Court entered an order approving the Third Removal Extension Motion on a final basis on July 16, 2024 [Docket No. 3908]. The *Debtors' Fourth Motion for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 4546] (the "Fourth Removal Extension Motion") was Filed on October 14, 2024, seeking an extension of the period within which the Debtors may remove civil actions. The Bankruptcy Court entered an order approving the Removal Extension Motion on a final basis on October 24, 2024 [Docket No. 4666]. The *Debtors' Fifth Motion for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 5567] (the "Fifth Removal Extension Motion") was Filed on January 28, 2025, seeking an extension of the period within which the Debtors may remove civil actions. The Bankruptcy Court entered an order approving the Fifth Removal Extension Motion on a final basis on February 6, 2025 [Docket No. 5624]. The *Debtors' Sixth Motion for Entry of an Order (I) Enlarging the Period Within Which the Debtors May Remove Actions and (II) Granting Related Relief* [Docket No. 6594] (the "Sixth Removal Extension Motion") was Filed on June 26, 2025, seeking an extension of the period within which the Debtors may remove civil actions.

- Exclusivity Extension Motions. *The Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 997] (the "Exclusivity Extension

Motion") was Filed on October 30, 2023, seeking an extension of the period within which the Debtors have the exclusive right to File a chapter 11 plan and solicit acceptances thereof.  On November 8, 2023, the Debtors Filed a certification of counsel stating that no formal objections to the Exclusivity Extension Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Exclusivity Extension Motion [Docket No. 1055], and the Bankruptcy Court entered an order approving the Exclusivity Extension Motion on a final basis [Docket No. 1065].  On February 9, 2024, the Debtors Filed the *Second Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 2131] (the "Second Exclusivity Extension Motion").
The Bankruptcy Court entered an order granting the Second Exclusivity Extension Motion on February 28, 2024 [Docket No. 2449].  On May 20, 2024, the Debtors Filed a *third Motion of Debtors for Entry of an Order (I) Extending the Debtors' Exclusive Period to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 3433] (the "Third Exclusivity Extension Motion").
The Committee objected to the Third Exclusivity Extension Motion on May 28, 2024 [Docket No. 3511].  A contested evidentiary hearing was held on June 3, 2024, and the Bankruptcy Court, overruling the Committee's objection, entered an order granting the Third Exclusivity Extension Motion on June 4, 2024 [Docket No. 3590].  On September 2, 2024, the Debtors Filed the *Debtors' Fourth Motion for Entry of an Order (I) Extending the Debtors' Exclusive Period to Solicit Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 4252] (the "Fourth Solicitation Extension Motion"), seeking a further 60-day extension of the period during which the Debtors have the exclusive right to solicit votes on a chapter 11 plan through and including December 30, 2024.  The Bankruptcy Court entered an order granting the Fourth Solicitation Extension Motion on September 11, 2024 [Docket No. 4306].  On November 7, 2024, the Debtors Filed the *Debtors' Fifth Motion for Entry of an Order (I) Extending the Debtors' Exclusive Period to Solicit Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 4778] (the "Fifth Solicitation Extension Motion"), seeking a further 60-day extension of the period during which the Debtors have the exclusive right to solicit votes on a chapter 11 plan through and including February 28, 2025.
The Bankruptcy Court entered an order granting the Fifth Solicitation Extension Motion on November 19, 2024 [Docket No. 4953].  On January 28, 2025, the Committee Filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Terminating the Debtors' Exclusive Period to Solicit Acceptances of a Plan or, in the Alternative, Converting the Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [Docket No. 5564] (the "Exclusivity Termination Motion"), which was adjourned to a date to be determined.  The Debtors' solicitation exclusivity period expired on February 28, 2025 and, as a result, any party in interest may file a chapter 11 plan and solicit acceptances thereof.

- 365(d)(4) Extension Motion.  The *Debtors' Motion for Entry of an Order, Pursuant to Section 365(d)(4) of the Bankruptcy Code, Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket

No. 995] (the "365(d)(4) Extension Motion") was Filed on October 30, 2023, seeking an extension of the period within which the Debtors may assume or reject unexpired leases of nonresidential real property.  On November 9, 2023, the Debtors Filed a certification of counsel stating that no formal objections to the 365(d)(4) Extension Motion had been Filed and asking the Bankruptcy Court to enter an order granting the 365(d)(4) Extension Motion [Docket No. 1115]. On November 13, 2023, the Bankruptcy Court entered an order approving the 365(d)(4) Extension Motion on a final basis [Docket No. 1127].

- Destruction of Documents Motion.  The *Debtors' Motion for Entry of an Order Authorizing the Abandonment and Destruction of Certain Documents and Records* [Docket No. 2000] (the "Destruction of Documents Motion") was Filed January 31, 2024, seeking to abandon or destroy unnecessary documents being stored at Debtors' expense.  On February 14, 2024, the Debtors Filed a certification of counsel stating that no formal objections to the Destruction of Documents Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Destruction of Documents Motion.  On February 15, 2024, the Bankruptcy Court entered an order approving the Destruction of Documents Motion on a final basis [Docket No. 2205].  The Debtors also Filed the *Debtors Motion for Entry of an Order Authorizing the Abandonment and Destruction of Certain Digital Records* [Docket No. 3432] on May 20, 2024, but they withdrew this motion on June 25, 2024 [Docket No. 3770].

- De Minimis Claims Motion.  The Debtors' *Motion of Debtors to Approve Procedures for Settlement of De Minimis Claims Held by or Against the Debtors* [Docket No. 4025] was Filed on August 1, 2024, authorizing and approving the procedures for the Debtors to compromise and settle prepetition and postpetition claims, cross-claims, litigation, and causes of action (the "De Minimis Claims"). On August 12, 2024, the Debtors Filed a certification of counsel proposing a revised form of order incorporating third-party comments.  On August 13, 2024, the Bankruptcy Court entered an order approving the procedures for settlement of De Minimis Claims [Docket No. 4085].

### D.       Canadian Recognition Proceedings

Concurrent with the Filing of the First Day Motions, the Debtors Filed the *Motion for Entry of an Order (I) Authorizing Yellow Corporation to Act as Foreign Representative Pursuant to 11 U.S.C 1505, and (II) Granting Related Relief* [Docket No. 9], by which the Debtors requested that the Court enter an order, among other things, confirming that Yellow Corporation may act as the "foreign representative" on behalf of the Debtors' Estates in connection with a proceeding to be commenced in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") to recognize the Debtors' chapter 11 cases as "foreign main proceedings" under Part IV of the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36, as amended (the "CCAA"), and, on August 9, 2023, the Bankruptcy Court entered such order [Docket No. 172].   On August 29, 2023, the Canadian Court granted the Initial Recognition Order and a Supplemental Order (Foreign Main Proceeding) (collectively, the "Recognition Orders").   The Recognition Orders, among other things, granted a stay of proceedings for the Canadian Debtors and Yellow Corporation pursuant to the CCAA, recognized the Debtors' Chapter 11 Cases as a "foreign main proceeding" in respect of the Canadian Debtors, appointed Alvarez & Marsal Canada Inc. to act as the Information Officer in respect of the Canadian Recognition Proceedings, and recognized and granted full force and effect in Canada to certain of the first day granted by the Court in the Debtors' Chapter 11 Cases.   The Canadian Court has also issued various additional orders in the Canadian Recognition Proceedings that recognized and granted full force and effect in Canada to certain orders subsequently entered by the Court in the Chapter 11 Cases in order to maximize the value of the Debtors' businesses and assets in Canada.   The Recognition Order and other materials and information in respect of the Canadian Recognition Proceedings can be found on the Information Officer's website at https://www.alvarezandmarsal.com/YRCFreightCanada.

As it relates to the Canadian Debtors, the implementation of the Plan and the transactions contemplated thereby is conditional on the granting of an order of the Canadian Court recognizing and giving full force and effect in Canada to the Confirmation Order and the Plan.   The Plan Proponents expect that the Canadian Debtors will seek such order prior to the occurrence of the Effective Date, but reserve the right to waive this condition precedent in their discretion.

### E.       Retention of Debtor Professionals

The Bankruptcy Court entered orders approving the Debtors' applications to retain various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:

- Kirkland & Ellis, LLP, as primary restructuring counsel [Docket No. 639];

- Pachulski Stang Ziehl & Jones LLP, as co-counsel [Docket No. 607];

- Goodmans LLP, as Canadian restructuring counsel [Docket No. 606];

- Ducera Partners LLC, as investment banker [Docket No. 648];

- Alvarez & Marsal North America, LLC, as financial advisor [Docket No. 585];

- Ernst & Young LLP as tax services provider [Docket No. 586];

- Epiq Corporate Restructuring LLC, as claims and noticing agent and administrative advisor [Docket Nos. 170, 604];

- KPMG, as audit service provider [Docket No. 887];

- Kasowitz Benson Torres LLP, as special litigation counsel [Docket No. 1257];

- CBRE, as real estate broker and advisor [Docket No. 4183]; and

- Ritchie Brothers and Nations Capital, as rolling stock agent [Docket No. 981].

The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases.  The postpetition compensation of all of the Debtors' professionals retained pursuant to Bankruptcy Code sections 327 and 328 is subject to the approval of the Bankruptcy Court (unless otherwise indicated in the orders reference above).

## F.    Approval of Debtor-in-Possession Financing

On August 7, 2023, the Debtors Filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Authorizing the Debtors to Use UST Cash Collateral, (V) Granting Adequate Protection, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 16] (the "DIP Motion"), initially requesting that the Bankruptcy Court authorize the Debtors to receive senior secured postpetition financing on a superpriority basis in the form of a senior secured, super priority multiple draw term loan facility in an aggregate principal amount of new money of $142.5 million and to continue using the UST Cash Collateral to provide sufficient liquidity for administration of the Chapter 11 Cases.  The DIP Facility (as defined herein) also featured a roll-up of prepetition debt in the amount of approximately $501 million.  In consideration for the consensual use of UST Cash Collateral, the Debtors agreed to provide the Prepetition Lenders with adequate protection as set forth in the DIP Motion and the accompanying proposed interim order.

After Filing the DIP Motion, the Debtors received other offers to provide DIP financing to the Debtors that proved to be on substantially superior economic terms for the Debtors, their Estates and their stakeholders, and after a series of arms'-length, good faith negotiations, came to a new agreement, which was reflected, along with describing resolution of certain objections, in a certification of counsel the Debtors Filed on September 15, 2023 [Docket No. 563].  Also on September 15, 2023, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 571] (the "Final DIP Order").

The Final DIP Order authorized, among other things, the Debtors to obtain a postpetition credit facility of up to $212.5 million with no roll-up (the "DIP Facility").[10]  The DIP Facility consists of:  (i) a junior secured, superpriority superpriority debtor in possession multi-draw term loan facility (the "Junior DIP Facility"), including (a) new money term loans in the aggregate principal amount of $42.5 million and (b) up to $70 million of additional new money term loans; (ii) an incremental postpetition tranche of the Facility (as defined in the Postpetition B-2 Credit Agreement) constituting a senior secured, superpriority debtor in possession multi-draw term loan facility, with an aggregate principal amount of $100 million, which was drawn in the amount of $50 million.  The Debtors estimate that they saved over $30 million in interest expense and other fees by pursuing and ultimately entering into the DIP Facility, an economically

---

[10] The description of the DIP Facility contained herein is qualified in its entirety by the terms of the Bankruptcy Court's Final DIP Order.

far superior alternative to the proposed DIP facility (to be provided by Apollo) as originally set forth in the DIP Motion.

With sale proceeds from certain of the Real Property Asset Sales, which closed on a rolling basis between December 2023 and March 2024, on December 21, 2023, the Debtors paid off in full the obligations under their B-2 Term Loan Facility and the Prepetition ABL Facility.[911]  These paydowns ended the monthly interest payment of over $17 million accruing under these prepetition facilities and the Debtors' obligations, under the Final DIP Order, to pay the ongoing legal fees of these secured prepetition lenders.  Thereafter, on February 5, 2024, the Debtors repaid in full all of their outstanding obligations under the Prepetition UST Tranche B Credit Agreement and the Prepetition UST Tranche A Credit Agreement.  On February 8, 2024, the Debtors repaid in full all of their outstanding obligations under the Junior DIP Credit Agreement and, upon such payment, the Junior DIP Credit Agreement, all commitments provided thereunder, and all obligations thereunder, and all documents related thereto, in each case, were automatically terminated.  Further, all liens and security interests granted thereunder to secure the obligations under the Junior DIP Credit Agreement were automatically terminated as of February 8, 2024.  See *Notice of (A) Debtors' Repayment of (I) Prepetition Secured Obligations, (II) Prepetition UST Secured Obligations, and (III) DIP Obligations and (B) Termination of (I) Prepetition B-2 Credit Agreement, (II) Prepetition UST Loan Documents, and (III) DIP Loan Documents* [Docket No. 2119] (the "Notice of Debt Repayments").

### G.    Bidding Procedures and Marketing Process[1012]

The Debtors, in consultation with the Committee and MFN, conducted a marketing process for all or substantially all of their assets following the commencement of the Chapter 11 Cases.  The Debtors and their advisors identified and contacted more than 650 parties, including strategic and financial partners, as potential bidders for the Debtors' and their Estates' assets.

On August 7, 2023, the Debtors Filed the Bidding Procedures Motion [Docket No. 22], a motion seeking, among other things, approval of the Bidding Procedures for a sale of all or substantially all of the Debtors' and their Estates' assets pursuant to Bankruptcy Code section 363.  The Bidding Procedures Motion contemplated procedures pursuant to which the Debtors would seek bids for the sales of their assets, which include a significant portfolio of owned real property across numerous states and Canadian provinces as well as thousands of trucks, trailers, and other forms of operational equipment.  After negotiations with their stakeholders, the Debtors were able to reach consensus on the final form of the Bidding Procedures, and, on September 15, 2023, the Bankruptcy Court entered the order approving the Bidding Procedures Motion [Docket No. 575] (the "Bidding Procedures Order").

Under the Bidding Procedures Order, the Bid Deadline for Rolling Stock (as defined in the Bidding Procedures) was October 13, 2023 at 5:00 p.m. and the Bid Deadline for Non-Rolling Stock Assets (as defined in the Bidding Procedures), principally consisting of Real Property Assets, was November 9, 2023 at 5:00 p.m., prevailing Eastern Time.  Qualified Bids were required to satisfy the general Bid Requirements set forth in the Bidding Procedures.  The deadline to object to Rolling Stock sales was October 25, 2023, at 5:00 p.m., prevailing Eastern Time and the sale objection deadline for Non-Rolling Stock Assets was December 8, 2023 at 5:00 p.m., prevailing Eastern Time.  In accordance

---

[911] As provided at fn. 3 of the Notice of Debt Repayments, as of the ABL Repayment Date (as defined therein), the Debtors remained obligated to the Prepetition ABL Secured Parties solely for accrued and accruing ABL Adequate Protection Fees and Expenses pursuant to section 14(a)(iii) of the Final DIP Order.

[1012]    Capitalized terms used but not otherwise defined in this section have the meaning given to them in the documents referenced within this section, as applicable.

with the Bidding Procedures Order, the Debtors Filed notices of potentially assumed executory contracts and unexpired leases on October 12, 2023 and October 26, 2023. *See Amended Notice of Potential Assumption or Assumption and Assignment of Certain Contracts or Leases Associated With the Rolling Stock* [Docket No. 824]; *Notice of Potential Assumption or Assumption and Assignment of Certain Contracts or Leases Associated With the Non-Rolling Stock Assets* [Docket No. 968].

The Debtors engaged in a thorough marketing process for the sales of all or substantially all of the Debtors' and their Estates' assets in accordance with the Bidding Procedures with respect to (a) Rolling Stock Assets (*e.g.*, vehicles, tractors, trucks, trailers, or similar vehicles and trailers, railroad cars, locomotives, stacktrains, and other tolling stock and accessories) and (b) Real Property Assets (*e.g.*, owned real estate, including terminals). The Bidding Procedures Order authorized the Debtors to enter into stalking horse purchase agreements, against which higher or otherwise better offers may be sought.

With respect to Real Property Assets, and in conjunction with the Bidding Procedures, on September 13, 2023, the Debtors Filed a motion [Docket No. 518] seeking, among other things, approval of (a) Estes Express Lines ("Estes") as the Real Estate Stalking Horse Bidder for a sale of all or substantially all of the Debtors' and their Estates' Owned Properties and certain other Assets related to the Debtors' and their Estates' Owned Properties pursuant to Bankruptcy Code section 363, (b) Bid Protections for Estes in connection therewith, and (c) entry into that certain asset purchase agreement dated as of September 11, 2023 by and among Estes Express lines, as purchaser, and Yellow Corporation and its subsidiaries named therein, as sellers (the "Real Property Stalking Horse APA"). *See* Docket No. 624, Exhibit A. The Real Property Stalking Horse APA was part of a market-tested sale process as it set the floor for a competitive bidding process and ensured that the Debtors obtained the highest or otherwise best offer, or combination of offers, for their Real Property Assets. As consideration for the purchase of the Acquired Assets (as defined in the Real Property Stalking Horse APA), the Real Property Stalking Horse APA contemplated, among other consideration, a total cash payment of approximately $1.52 billion. The Bankruptcy Court entered an order approving Estes as the stalking horse for the Debtors' and their Estates' Real Property Assets on September 21, 2023 [Docket No. 624].

On November 28, 2023, the Debtors commenced an auction for one-hundred and twenty-eight (128) owned properties and two (2) leased properties. Following a full, fair, and robust sale and auction process, the Debtors received binding offers pursuant to twenty-one (21) Asset Purchase Agreements (as defined in the Real Property Assets Sale Order (as defined below)) for these properties, totaling approximately $1.88 billion of sale proceeds in the aggregate. The Debtors determined that the Asset Purchase Agreements constituted, in each case as applicable, the highest or otherwise best offer for the applicable Acquired Assets and sought approval of the sale transactions contemplated by the Asset Purchase Agreements. See Notice of Winning Bidders and, if Applicable, Back-Up Bidders with Respect to Certain of the Debtors' and their Estates' Real Property Assets [Docket No. 1268]. A hearing was held on December 12, 2023 before the Bankruptcy Court to consider approval of the Debtors' entry into and performance under the Asset Purchase Agreements (the "Real Property Asset Sale Hearing"). The Bankruptcy Court approved the Debtors' Sale of the one-hundred and twenty-eight Owned Real Properties and two Leased Real Properties for approximately $1.88 billion on December 12, 2023 [Docket No. 1354] (the "Real Property Assets Sale Order").

Additionally, the Bidding Procedures Order authorized the Debtors to conduct a sales process for additional Unexpired Leased Properties. The Debtors conducted auctions for certain of their Leased Properties on December 18, 2023, and December 19, 2023. A hearing was held on January 12, 2024 before the Bankruptcy Court (the "Leased Property Asset Sale Hearing") to consider approval of the Debtors' entry into and performance under the applicable Asset Purchase Agreements (as defined in the Leased Real Property Assets Sale Order (as defined below)). The Bankruptcy Court approved the Debtors' Sale of 23 Leased Properties for approximately $83 million on January 12, 2024. *See Order (I) Approving Certain Asset Purchase Agreements; (II) Authorizing and Approving Sales of Certain Leased*

*Properties of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, in Each Case Pursuant to the Applicable Asset Purchase Agreement; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, in Each Case as Applicable Pursuant to the Applicable Asset Purchase Agreement; and (IV) Granting Related Relief* [Docket No. 1735] (the "<u>Leased Real Property Assets Sale Order</u>").

An additional sale hearing was held on February 26, 2024 to consider the sale of ten leased properties to Knight-Swift Transportation, Inc. for an aggregate purchase price of $2.2 million [Docket No. 2158]. The Bankruptcy Court entered an order approving the sale on February 22, 2024 [Docket No. 2346].

On April 18, 2024, the Debtors prevailed on the merits at a contested hearing as to whether (among other litigated issues) the Debtors were permitted under Bankruptcy Code section 365 to assume approximately 78 unexpired real property leases so that the Debtors could pursue strategic alternatives to maximize the leases' value at a later date. *See Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Certain Unexpired Leases and (II) Granting Related Relief Filed by Yellow Corporation* [Docket No. 2157]. On April 19, 2024, the Bankruptcy Court entered that certain *Order (A) Authorizing the Debtors to Assume Certain Unexpired Leases and (B) Granting Related Relief* [Docket No. 3086]. The Debtors also obtained entry of orders in connection with several stipulations with landlord counterparties memorializing the consensual extension of the deadline to assume or reject certain non-residential real property leases under section 354(d)(4) [Docket Nos. 2427, 2687, 2727, 2750, 2764, 3031, 3032, 3415, 3680, 3688, 3694, 3815, 3878, 4064, 4182, 4213, 4236, 4273, 4285, 4304, 4357, 4366, 4412, 4413, 4468, 4522, 4874, 5054, 5058, 5351, 5455].

On September 25, 2024, the Debtors Filed the *Supplemental Notice of Dates and Deadlines Under Bidding Procedures Order Regarding Debtors' Continued Sale Process* [Docket No. 4425], setting October 18, 2024 as the deadline for parties to submit non-binding written indications of interest for the Debtors' and their Estates' remaining Real Property Assets. On November 18, 2024, the Debtors Filed the *Notice of Further Supplemental Dates and Deadlines Regarding Continued Sale Process for Debtors' Remaining Properties, Including Bid Deadline, Auction, and Sale Hearing* [Docket No. 4952], setting January 6, 2025 as the Bid Deadline, January 13–15, 2025 as the Auction, if necessary, January 17, 2025 as the deadline to File notices of winning bidders and back-up bidders, January 27, 2025 as the Objection Deadline, and January 30, 2025 as the Sale Hearing.[~~11~~13] The Debtors, in consultation with the Committee, have extended the sale process dates pursuant to multiple notices and, most recently, on March 20, 2025, the Debtors Filed the *Notice of Further Supplemental Dates and Deadlines Regarding Continued Sale Process for Debtors' Remaining Properties, Including Bid Deadline, Auction, and Sale Hearing* (the "<u>Sale Process Extension Notice</u>"), which extended the sale process dates and associated deadlines to a date to be determined.[~~12~~14] Since the filing of the Sale Process Extension Notice, the

---

[~~11~~13]    Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the *Notice of Further Supplemental Dates and Deadlines Regarding Continued Sale Process for Debtors' Remaining Properties, Including Bid Deadline, Auction, and Sale Hearing* [Docket No. 4952].

[~~12~~14]    Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the *Notice of Further Supplemental Dates and Deadlines Regarding Continued Sale Process for Debtors' Remaining Properties, Including Bid Deadline, Auction, and Sale Hearing* [Docket No. 5917].

Bankruptcy Court has entered several orders approving additional sales of the Debtors' Real Property Assets,¹³15 including upon the occurrence of the closing of such sale transaction.¹⁴16

With respect to the Debtors' marketing efforts for their Rolling Stock Assets, the Debtors Filed the *Motion of Debtors for Entry of an Order (I) Approving Agency Agreement with Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bros. Auctioneers (Canada) LTD., and IronPlanet Canada Ltd. Effective as of October 16, 2023; (II) Authorizing the Sale of Rolling Stock Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (III) Granting Related Relief* (the "Agency Agreement Motion"). *See* Docket Nos. 852, 986. The Agency Agreement Motion requested (a) approval of the Agency Agreement (as defined in the Agency Agreement Motion), (b) approval of the sales of Rolling Stock Assets free and clear of any liens, claims, interests, and encumbrances pursuant to transactions to be sought by the Agent (as defined in the Agency Agreement Motion), and (c) certain related relief. The Agency Agreement contemplated a process whereby the Agent would ready the Debtors' and their Estates' Rolling Stock Assets for sale and dispose of the Rolling Stock Assets through private treaty, online, webcast, or unreserved public auctions to maximize the value of the Rolling Stock Assets. Under the Agency Agreement, the Agent was to, among other things, over a term of eighteen (18) months from the Effective Date (as defined in the Agency Agreement), (a) market, refurbish, and sell the Rolling Stock Assets in a value maximizing manner and (b) remove the Rolling Stock Assets from the Company Properties no later than six (6) months from entry of the Agency Agreement so that the Debtors' and their Estates' Real Property Assets purchaser(s) could enter and utilize those premises. [Docket Nos. 981, Exhibit 1; 1174, Exhibit A]. The Bankruptcy Court entered an order approving the Agency Agreement Motion on a final basis on October 27, 2023 [Docket No. 981] (together with that certain *Supplemental Order Regarding Agency Agreement with Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bros. Auctioneers (Canada) Ltd. and IronPlanet Canada Ltd Effective as of October 16, 2023; (I) Authorizing and Directing the Reattachment on Rolling Stock Assets Under Certain Circumstances; and (II) Granting Related Relief* [Docket No. 1186] entered by the Bankruptcy Court on November 21, 2023, the "Agency Agreement Order," and together with the Real Property Assets Sale Order, the De Minimis Asset Sales Order, and any other Final Order in the Chapter 11 Cases providing for the Sale or other disposition of any of the Debtors' or their Estates' Assets free and clear of liens, claims, interests, and encumbrances the "Sale Orders"). Since the entry of the Sale Orders, in each case as applicable, the Debtors, the Committee, the purchasers and their respective professionals have been working to consummate the applicable Sale Transactions over the course of these Chapter 11 Cases. To date, the Debtors have sold over 210 properties for over $2.3 billion in proceeds and earned approximately $235 million in proceeds from the sale of Rolling Stock Assets sold pursuant to the Agency Agreement.

---

¹³15 *See Order (I) Approving Certain Asset Purchase Agreements; (II) Authorizing and Approving Sales of Certain Properties of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, In Each Case Pursuant to the Applicable Asset Purchase Agreement; and (III) Granting Related Relief* [Docket No. 6326]; *Order (I) Approving the Sale of the Purchased Assets and Free and Clear, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [Docket No. 6535]; *Order (I) Approving the Asset Purchase Agreement With Saia Motor Freight Line, LLC; (II) Authorizing And Approving Sales of Certain Properties of the Debtors Free and Clear Of Liens, Claims, Interests, and Encumbrances in Each Case Pursuant to the Asset Purchase Agreement; (III) Approving the Assumption and Assignment of Certain Unexpired Leases In Connection Therewith; and (IV) Granting Related Relief* [Docket No. 6546]; *Order (I) Approving Certain Asset Purchase Agreements; (II) Authorizing and Approving Sales of Certain Properties of the Debtors Free and Clear of Liens, Claims, Interests and Encumbrances, in Each Case Pursuant to the Applicable Asset Purchase Agreement; and (III) Granting Related Relief* [Docket No. 6652].

¹⁴16 *See Notice of Occurrence of Closing of Certain Real Property Sales* [Docket No. 6687].

Following the entry of the Agency Court Order, the Debtors and the Agent executed several amendments to the Agency Agreement, each of which were Filed with the Court, as required by the Agency Agreement Order. *See Notice of Amendment to That Certain Agency Agreement with Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bro. Auctioneers (Canada) Ltd. And IronPlanet Canada Ltd Effective as of October 16, 2023* [Docket No. 2489], *Second Notice of Amendment to That Certain Agency Agreement with Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bro. Auctioneers (Canada) Ltd. And IronPlanet Canada Ltd Effective as of October 16, 2023* [Docket No. 5839], *Third Notice of Amendment to That Certain Agency Agreement with Nations Capital, LLC, Ritchie Bros. Auctioneers (America) Inc., IronPlanet, Inc., Ritchie Bro. Auctioneers (Canada) Ltd. And IronPlanet Canada Ltd Effective as of October 16, 2023* [Docket No. 6073] (the "<u>Third Amended Notice of Agency Agreement Amendment</u>"). As per the Third Amended Notice of Agency Agreement Amendment, the Agency Agreement expires on July 31, 2025 (the "<u>Term</u>"). As required by the Agency Agreement Order, the Debtors will File a Final Report (as defined therein) upon the conclusion of the Term identifying (i) the Rolling Stock Assets sold pursuant to the terms set forth in the Agency Agreement, (ii) the sale prices for the Rolling Stock Assets, and (iii) the commission and fees and reimbursement of expenses deducted by the Agent with respect to each transaction (or in the aggregate with respect to expenses if not directly incurred to sell a Rolling Stock Asset). *See* Agency Agreement Order, ¶ 18.

## H.     Litigation Matters

In the ordinary course of business and during the Chapter 11 Cases, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Plan Proponents cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

### 1.     Pension Benefit Guaranty Corporation Termination Claim

Prior to the Petition Date, the Debtors sponsored three single-employer pension plans which were referred to as the Yellow Corporation Pension Plan, the Yellow Retirement Pension Plan (formerly known as the YRC Retirement Pension Plan), and the Roadway LLC Pension Plan (collectively, the "<u>Single Employer Pension Plans</u>"). Following the Petition Date, the Debtors merged their Single Employer Pension Plans into one qualified defined benefit pension plan (the "<u>Surviving Plan</u>").

On March 1, 2024, the Debtors provided notice to the Pension Benefit Guaranty Corporation (the "<u>PBGC</u>") of their intent to terminate the Surviving Plan in a "distress termination" under section 4041(c)(2)(B)(i) of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1341(c)(2)(B)(i), with a proposed termination date of May 1, 2024, because the Debtors had no remaining business operations, were in the process of liquidating, and the Surviving Plan was significantly underfunded on a termination basis. On August 2, 2024, finding the Debtors had satisfied the requirements for distress termination, the PBGC executed the Agreement for Appointment of Trustee and Termination of Plan, reflecting the termination of the Surviving Plan as of May 1, 2024.

In connection with the termination of the Surviving Plan, the PBGC has a General Unsecured Claim against the Estates reflecting the difference between the Surviving Plan's liabilities and its assets as of the termination date. Shortly before the Claims Bar Date and prior to the merger, anticipating the termination of all three Single Employer Pension Plans separately, the PBGC Filed Proofs of Claim asserting joint and several General Unsecured Claims of approximately $206 million. In addition, on December 9, 2024, the PBGC filed a motion seeking allowance and payment of pension insurance premiums in the amount of $1,702,474.67.

### 2. Central States Pension Fund Claims

The Central States Pension Fund ("CSPF") is a multiemployer pension fund that Filed Proofs of Claim against the Estates, for nearly $4.8 billion for withdrawal liability (the "CSPF Withdrawal Liability Claim") and nearly $5.8 billion in total inclusive of Other Priority Claims and General Unsecured Claims. Specifically, prior to the Claims Bar Date, CSPF Filed at least forty-five Proofs of Claim (the "CSPF Proofs of Claim"), generally falling in three categories: (a) twenty-four Proofs of Claim asserting withdrawal liability of $4,827,470,743.87, *see, e.g.*, Proofs of Claim Nos. 4312–35; (b) seventeen Proofs of Claim claiming breach of a "contributions guarantee" and seeking $917,028,151.83, *see, e.g.*, Proofs of Claim No. 4336–52; and (c) assorted other Claims, ranging from $3 million to $77 million on account of obligations relating to, among other things, "vacation pay" or "WARN", *see, e.g.*, Proofs of Claim Nos. 4303–06.

On December 8, 2023, the Debtors Filed an objection to CSPF's Claims [Docket No. 1322] (the "Central States Objection"). The Debtors argued that, among other things, CSPF applied for and received special financial assistance in the amount of $35.8 billion from the U.S. Treasury that eliminated the unfunded vested benefits ("UVBs") that are a prerequisite for any withdrawal liability and that CSPF's Withdrawal Liability Claim otherwise violated ERISA. With respect to CSPF's contributions guarantee Claim, the Debtors argued that, among other things, the Claim sought double recovery and reflected an unenforceable liquidated damages provision. The Debtors also objected to CSPF's remaining Claims on other grounds. Additionally, the Debtors argued in the Central States Objection that even if CSPF were entitled to assess any withdrawal liability against the Debtors or their Estates, some portion would nevertheless have to be subordinated under 29 U.S.C. § 1405(b) and 29 C.F.R. § 4225(b), such that the subordinated amount would only be recoverable if all other creditor claims were satisfied in full (the "CSPF Subordination Argument"). The Debtors' claims objections and briefs in support are available on the Docket as Docket Nos. 1322, 3825, 3917, 3922, 4011, and 4104. CSPF's motions and opposition briefs are available on the Docket as Docket Nos. 3803, 3950, 4010, and 4078.

CSPF Filed a motion to compel arbitration regarding the pension Claims [Docket No. 1665], which the Bankruptcy Court denied. [*See* Docket Nos. 2765, 2766]. At a hearing on February 14, 2024, the Bankruptcy Court set a timeline for discovery on Debtors' Objections to Proofs of Claim Filed by CSPF and the multiemployer pension plans that received special financial assistance (the "SFA MEPPs") and scheduled a trial for August 5, 2024 [Docket No. 2195]. On June 28, 2024, CSPF Filed a partial summary judgment motion regarding the Withdrawal Liability Claims [Docket No. 3803]. The Debtors Filed their own partial summary judgment motion, asking the Bankruptcy Court to enter judgment in their favor. [Docket No. 3825]. On July 12, 2024, PBGC Filed a summary judgment motion for the Central States Objection and the SFA Objection (defined below) [Docket No. 3882]. The parties thereafter agreed to a stipulation where the competing summary judgment motions were briefed and heard by the Bankruptcy Court, and all other activity with respect to the Central States Objection (and related SFA Objection (as defined below)) was stayed until after the Bankruptcy Court resolved the series of threshold legal issues presented by the summary judgment motions. [Docket No. 3862]. Holders of certain General Unsecured Claims and Interests in Yellow Corporation objected to, or otherwise joined in, the Debtors' objections to the CSPF Proofs of Claim.[1517]

---

[1517]    *See Ad Hoc Group of Equity Holders' Joinder to and Statement in Support of Debtors' Motion for Summary Judgment* [Docket No. 4015]; *MFN Partners, LP's Opposition to SFA MEPPS Motions for Summary Judgment* [Docket No. 3918]; *Joinder of Argo Partners in Debtors Motion for Partial Summary Judgment on SFA MEPPs' Withdrawal Liability Claims* [Docket No. 4028].

A hearing was held on the summary judgment motions on August 6, 2024, and on September 13, 2024, the Bankruptcy Court issued that certain *Memorandum Opinion* [Docket No. 4326], providing its reasoning in entering partial summary judgment in favor of CSPF and the Other SFA MEPPs (as defined below) and partial summary judgment in favor of the Debtors. Specifically, the Bankruptcy Court held, among other things, that: (a) the certain regulations issued by PBGC (the "PBGC Regulations") are valid as the regulations were (i) authorized by 29 U.S.C. §§ 1302(b)(3) and 1432(m) and (ii) the regulations are not arbitrary and capricious and in turn, rejected the Debtors' argument that the multiemployer pension plan ("MEPP") Claims (most notably the CSPF Withdrawal Liability Claim) should be fully disallowed on the basis of the pension plans' prior receipt of federal special financial assistance, (b) the Debtors' withdrawal liability is determined with respect to ERISA's 20-year cap on annual payments but the Debtors' argument that the Withdrawal Liability Claims should be discounted to present value is inapplicable based on the assumption the Debtors defaulted on their withdrawal liability obligations, and (c) the New York State Teamsters and the Western Pennsylvania Teamsters (two Other SFA MEPPs as defined below) were entitled to use higher contribution rates when calculating the Debtors' withdrawal liability based on contractual agreements with the Debtors. As described in the following section below, the *Memorandum Opinion* was and may be subject to further argument, briefing and appeals.

CSPF's contributions guarantee Claim was addressed in the Bankruptcy Court's Preliminary MEPP Opinion. Therein, the Bankruptcy Court agreed with the objecting parties that the liquidated damages provision contained in the 2014 letter agreement was an unenforceable penalty under applicable law and previewed its view that the Claim should be disallowed in its entirety. [Docket No. 6030].

The Preliminary MEPP Opinion also addressed other disputed issues relating to various MEPP Claims, including CSPF's Claims. First, with respect to the asserted amount of the CSPF Withdrawal Liability Claims, and whether such amounts are subject to present value discounting, the Bankruptcy Court indicated that the Bankruptcy Code requires claims for unmatured interest to be disallowed and, thus, the CSPF Withdrawal Liability Claim—and all other Withdrawal Liability Claims—should be reduced by an amount equal to the unmatured interest otherwise incorporated into the asserted Claim amounts. Second, the Bankruptcy Court indicated that the mechanic set forth in 29 U.S.C. § 1405(b)—which operates to cap withdrawal liability claims where such claims exceed the liquidation value of the debtor—should properly be applied after reducing UVBs pursuant to ERISA's 20-year cap on payments. Finally, the Bankruptcy Court indicated that CSPF's (and another SFA MEPP, Local 641 (defined below)) use of post-2014 contribution rate increases to calculate withdrawal liability appeared to violate ERISA because the increases were subject to a rehabilitation plan and did not satisfy any statutory exceptions to the rule requiring such increases to be disregarded. [Docket No. 6030]. On July 18, 2025, the Court issued an interlocutory order giving effect to the Preliminary MEPP Opinion [Docket Nos. 6682, 6683].

### 3.   Other SFA MEPP Proofs of Claim

Shortly after Filing the Central States Objection, the Debtors Filed an omnibus objection to Proofs of Claim Filed by ten other multiemployer pension plans (the "Other SFA MEPPs")[16][18] seeking over $1.6 billion in withdrawal liability [Docket No. 1962] (the "SFA Objection").[17][19]   The Debtors

---

[16][18]   The Other SFA MEPPs are, collectively, Freight Drivers and Helpers 557 Pension ("Freight Drivers"); International Association of Motor City Machinists Pension Fund ("IAM"); Management Labor Pension Fund Local 1730 ("Local 1730"); Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund ("Local 701"); New York State Teamsters Conference Pension & Retirement Fund ("New York Teamsters"); Road Carriers Local 707 Pension Fund ("Local 707"); Teamsters Local 617 Pension Plan ("Local 617"); Teamsters Local 641 Pension Plan ("Local 641"); Trucking Employees of North Jersey Pension Fund ("TENJ"); Western Pennsylvania Teamsters and Employers Pension Fund ("Western PA Teamsters").

[17][19]   *See* Docket No. 1962, Exhibit A, which reflects the Debtors' omnibus objection to:  (a) *Freight Drivers Proofs of Claim* asserting *$6,158,876 in the aggregate*, *see* Proof of Claim Nos. 16705, 18597, 18605, 18610, 18616, 18619,

argued that these Proofs of Claim were overstated for many of the same reasons stated in the Central States Objection (and other reasons), as, among other things, the SFA MEPPs received more than $5.32 billion in special financial assistance from the U.S. Treasury as of the Petition Date which the Debtors asserted should negate any withdrawal liability of the Debtors.  The Debtors also contended that the Other SFA MEPPs' proofs of claim were overstated and violate ERISA for a variety of other reasons, as described in the Debtors' prior briefs on this subject and expert reports that the Debtors have exchanged with the Other SFA MEPPs.  *See* Docket Nos. 3825, 3917, 3992, 4011, 4104.  Specifically, the Debtors argued in the SFA Objection that even if the Other SFA MEPPS were entitled to assess any withdrawal liability against the Debtors, some portion would nevertheless have to be subordinated under 29 U.S.C. § 1405(b) and 29 C.F.R. § 4225(b), such that the subordinated amount would only be recoverable if all other creditor claims were satisfied in full (the "Other SFA Subordination Argument").

Like the CSPF Proofs of Claim, the Debtors and the Other SFA MEPPs Filed competing summary judgment motions on a series of threshold legal issues and agreed by stipulation to defer further discovery and trial on all matters until such issues were resolved by the Bankruptcy Court.  [*See* Docket Nos. 3805, 3825; *see also* Docket No. 3862] (stipulation).  As described above, the Bankruptcy Court issued a split summary judgment decision that, notably: (a) rejected the Debtors' arguments regarding the disallowance of the MEPP Claims on the basis of prior receipt of federal special assistance financing; (b) determined the Debtors' withdrawal liability is determined with respect to ERISA's 20-year cap on annual payments, but found that the Debtors' argument that the Withdrawal Liability Claims should be discounted to present value is inapplicable based on the assumption the Debtors defaulted on their withdrawal liability obligations and the liability was accelerated; and (c) held certain Other SFA MEPPs were entitled to use higher contribution rates when calculating the Debtors' withdrawal liability based on contractual agreement.  *See Memorandum Opinion* at [Docket No. 4326].  On September 27, 2024, the Debtors and MFN Partners, LP ("MFN") each Filed motions asking the Bankruptcy Court to reconsider certain aspects of its ruling at [Docket Nos. 4461, 4462], respectively, to which an Ad Hoc Group of Equity Holders joined.  [*See* Docket No. 4463].  Specifically, the Debtors sought reconsideration of the Bankruptcy Court's finding that the Debtors "defaulted" on any withdrawal liability obligations to SFA MEPPs and/or that SFA MEPPs had accelerated claims for such withdrawal liability prior to these Chapter 11 Cases.  [Docket No. 4461].  MFN joined in the Debtors' reconsideration motion and sought the Bankruptcy Court's reconsideration of its findings that the SFA MEPPs can receive the non-recourse

---

*Claim* asserting **$6,158,876 in the aggregate**, *see* Proof of Claim Nos. 16705, 18597, 18605, 18610, 18616, 18619, 1862518625, 18629, 18630, 18634, 18640, 18643, 18647, 18652, 18655, 18659, 18667, 18673, 18679, 18681, 18687, 18690, 18694, 18699; (b) *IAM Proofs of Claim* 16895 and 16905, asserting **$44,064,589** and **$16,514,882**, respectively; (c) *Local 1730 Proof of Claim* 14718 asserting **$65,891,164**; (d) *Local 701 Proofs of Claim* asserting **$48,230,076 in the aggregate**, *see* Proof of Claim Nos. 15001, 15002, 15003, 15004, 15005, 15008, 15009, 15011, 15012, 15013, 15014, 15015, 15016, 15017, 15018, 15019, 15020, 15021, 15023, 15024, 15025, 15026, 15027, 15029; (e) *New York Teamsters Proofs of Claim* asserting **$757,200,000 in the aggregate**, *see* 4489, 4490, 4491, 4492, 4493, 4494, 4495, 4496, 4497, 4498, 4499, 4500, 4501, 4502, 4503, 4504, 4505, 4506, 4507, 4508, 4509, 4510, 4511, 4512; (f) *Local 707 Proofs of Claim* asserting **$245,800,000 in the aggregate**, *see* Proof of Claim Nos. 14941, 19144; (g) *Local 617 Proofs of Claim* asserting **$41,932,295** in the aggregate, *see* Proof of Claim Nos. 15727, 15728, 15730, 15735, 15738, 15740, 15741, 15743, 15745, 15747, 15750, 15751, 15753, 15755, 15757, 15759, 15760, 15761, 15763, 15764, 15765, 15767, 15768, 15770; (h) *Local 641 Proofs of Claim* asserting **$217,160,000** in the aggregate, *see* 5505, 5506, 5507, 5508, 5509, 5510, 5511, 5512, 5513, 5514, 5515, 5516, 5517, 5518, 5519, 5520, 5521, 5522, 5523, 5524, 5525, 5526, 5527, 5528; (i) *TENJ Proof of Claim* 14722 asserting **$14,448,229**; and (j) *Western PA Teamsters Proofs of Claim* asserting **$174,827,536** in the aggregate, *see* Proof of Claim Nos. 18200, 18217, 18230, 18244, 18257, 18267, 18282, 18292, 18307, 18318, 18329, 18339, 18348, 18358, 18369, 18378, 18389, 18397, 18410, 18416, 18422, 18430, 18438, 18442.  In April 2024, *Western PA Teamsters* filed amended proofs of claim to assert **$157,035,213** in the aggregate, *see* Proof of Claim Nos. 19647, 19648, 19649, 19651, 19652, 19653, 19654, 19655, 19656, 19657, 19658, 19659, 19660, 19661, 19662, 19663, 19664, 19665, 19666, 19667, 19668, 19669, 19670, 19671.  In April 2025, *Local 1730* filed amended proofs of claim to assert **$54,210,914** in the aggregate, *see* Proof of Claim Nos. 20132, 20133, 20134, 20135, 20136, 20137, 20138, 20139, 20140, 20141, 20142, 20143, 20144, 20145, 20146, 20147, 20148, 20149, 20150, 20151, 20152, 20153, 20154.

benefit of United States Treasury's funds to pay plan benefits and expenses and yet not count that benefit when Filing a Claim against the Debtors.  [Docket No. 4462].

Oral arguments on the Debtors' and MFN's reconsideration motions proceeded on October 28, 2024.  On November 5, 2024, the Bankruptcy Court granted the Debtors' motion and issued a revised *Amended Memorandum Opinion* reflecting the ruling the same day.  [Docket Nos. 4769, 4771].  In the Bankruptcy Court's order granting the Debtors' reconsideration motion (the "Reconsideration Order"), the Bankruptcy Court also identified additional factual and legal questions that needed to be resolved to liquidate the claims at issue.  On November 12, 2024, the Bankruptcy Court denied MFN's reconsideration motion, and in so doing, reaffirmed the validity of the PBGC Regulations.  [Docket No. 4846].

Following the rulings on the reconsideration motions, the Bankruptcy Court consolidated its rulings on the SFA MEPP disputes, as amended and reconsidered in part, in the Order Relating to SFA MEPP Litigation Motions for Summary Judgment and Motions to Reconsider, dated December 2, 2024. [Docket No. 5057] (the "SFA MEPP Order").  The Debtors and MFN filed a notice of appeal of the SFA MEPP Order, [see Docket Nos. 5170, 5171] and moved jointly for leave to file an interlocutory appeal and for certification of direct appeal for review by the Third Circuit.  [See Docket Nos. 5178, 5179].  On January 9, 2025, the Bankruptcy Court certified a direct appeal of the SFA MEPP Order by the Third Circuit.  [Docket No. 5358].  In light of the Bankruptcy Court's ruling, the United States District Court for the District of Delaware granted a motion from the Debtors, MFN, and Mobile Street, LLC ("Mobile Street") staying the request for an interlocutory appeal pending the outcome of the request for a direct appeal to the Third Circuit.  On February 28, 2025, the Third Circuit granted the petition for direct appeal.  The appeal (the "SFA MEPP Order Appeal") was docketed on March 11, 2025, under case number 25-1421 (the "Appeal Docket").  [Appeal Docket No. 1].

On April 9, 2025, MFN and Mobile Street filed their opening brief concerning the validity of the PBGC Regulations.  [Appeal Docket Nos. 31-33].  The Debtors filed their opening brief the next day on April 10, 2025, joining MFN and Mobile Street's brief and further arguing that the Bankruptcy Court erred when it ruled that ERISA merely sets a withdrawal liability floor and, therefore, certain MEPPs and the Debtors could agree contractually to calculate allocable shares of UVBs and annual withdrawal liability payment amounts in a manner that would increase the Debtors' Withdrawal Liability, by using higher contribution rates or contribution base units (the "Withdrawal Liability Calculation Issue"). [Appeal Docket Nos. 49-50].  CSPF, other SFA MEPPs and the PBGC filed their response briefs on May 12, 2025, and the Debtors, MFN and Mobile Street filed their reply briefs on May 27, 2025.  On June 25, 2025, the Third Circuit held oral argument and instructed further briefing by the PBGC on the Withdrawal Liability Calculation Issue.  PBGC filed its amicus brief on July 8, 2025.  [Appeal Docket No. 97].  On July 18, 2025, the Debtors, MFN, and Mobile Street, as well as the New York State Teamsters Conference Pension and Retirement Fund filed responsive briefs.  [Appeal Docket Nos. 99-100].  To date, the Third Circuit has not issued a ruling on account of the SFA MEPP Order appeal.

The Preliminary MEPP Opinion addressed various additional aspects of the SFA MEPPs' asserted Claims, including that (i) the Other SFA MEPPs' Withdrawal Liability Claims must be discounted to present value and (ii) the mechanic set forth in 29 U.S.C. § 1405(b) should be applied after reducing UVBs pursuant to ERISA's 20-year cap.  On July 18, 2025, the Court issued an interlocutory order giving effect to the Preliminary MEPP Opinion [Docket Nos. 6682, 6683].

### 4. Non-SFA MEPPs

The Debtors are also facing 139 Proofs of Claim Filed by multi-employer pension funds who did not receive the SFA funding from the federal government prior to the Petition Date (the "Non-SFA MEPPs").  Those funds are:  Central Pennsylvania Teamsters Defined Benefit Plan ("Central PA

Teamsters"); [18 20] IBT Local 705 ("Local 705"); [19 21] IAM National Pension Fund ("IAM National"); [20 22] New England Teamsters Pension Plan ("New England Teamsters"); [21 23] Teamsters Joint Council # 83 of Virginia Pension Fund ("Virginia Teamsters"); [22 24] Teamsters Local 710 ("Local 710"); [23 25] and Teamsters Pension Trust Fund of Philadelphia & Vicinity ("Philadelphia Teamsters"). [24 26] These funds collectively Filed 139 Proofs of Claim against the Estates, collectively seeking more than $582 million in withdrawal liability. [25 27]

The Debtors Filed the *Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* (the "Seventh Objection") to these Proofs of Claim [Docket No. 2595], arguing that they are overstated and should be reduced on several grounds.  Further, the Debtors argued in the Seventh Objection that some portion of the asserted Withdrawal Liability Claims should be subordinated under 29 U.S.C. § 1405(b) and 29 C.F.R. § 4225(b), such that the subordinated amount would only be recoverable if all other creditor claims were satisfied in full (the "Seventh Objection Subordination Argument").  The Bankruptcy Court initially entered a separate scheduling order for the Seventh Objection with a trial scheduled for September 23–26 and September 30, 2024 [Docket No. 2961].  However, the Debtors and the Non-SFA MEPPs entered into a stipulation and order extending those deadlines, calling for summary judgment briefing to occur in October 2024 and trial, if necessary, beginning December 16, 2024 [Docket No. 4216].  The Debtors and the Non-SFA MEPPs entered into a further stipulation and order extending those briefing deadlines through November 2024 and trial, if necessary, beginning January 21, 2025.  [Docket No. 4830].

On November 11, 2024, the Debtors, along with Central PA Teamsters, Teamsters Local 710, New England Teamsters Pension Fund and Virginia Teamsters, Filed cross motions for partial summary judgment on several legal questions that bear on the proper calculation of the Withdrawal Liability Claims of the movant Non-SFA MEPPs.  [Docket Nos. 4834, 4835].  Briefing concluded on December 17, 2024, and oral argument on the parties' motions took place on January 13, 2025.  On February 5,

---

[18 20]    *See* Proofs of Claim Nos. 17671, 17676, 17679, 17683, 17686, 17692, 17698, 17710, 17715, 17720, 17728, 17736, 17744, 17752, 17759, 17763, 17767, 17770, 17778, 17783, 17788, 17795, 17799, and 17808 (asserting ***$81,771,134 in the aggregate***).

[19 21]    *See* Proofs of Claim Nos. 15906, 15917, 15943, 15944, 15949, 15951, 15953, 15955, 15957, 15965, 15969, 15971, 15975, 15978, 15979, 15985, 15989, 15995, 15998, 16001, 16005, and 16006 (asserting ***$21,367,019.34 in the aggregate***).

[20 22]    *See* Proof of Claim No. 18620 (asserting ***$22,820,838.36***).

[21 23]    *See* Proofs of Claim Nos. 18617, 18621, 18627, 18631, 18638, 18644, 18649, 18654, 18664, 18671, 18677, 18682, 18688, 18692, 18696, 18703, 18706, 18707, 18709, 18713, 18717, 18720, 18725, and 18729 (asserting ***$285,022,057 in the aggregate***).

[22 24]    *See* Proofs of Claim Nos. 4461, 4462, 4463, 4464, 4465, 4466, 4467, 4468, 4469, 4470, 4471, 4472, 4473, 4474, 4475, 4476, 4477, 4478, 4479, and 4482 (asserting ***$21,400,083 in the aggregate***).

[23 25]    *See* Proofs of Claim Nos. 17473, 17474, 17477, 17478, 17480, 17481, 17482, 17483, 17485, 17486, 17487, 17490, 17492, 17493, 17495, 17496, 17498, 17499, 17501, 17502, 17504, 17506, 17509, and 17510 (asserting ***$113,717,722 in the aggregate***).

[24 26]    *See* Proof of Claim Nos. 13913, 14076, 14079, 14082, 14084, 14109, 14111, 14112, 14116, 14119, 14137, 14211, 14213, 14216, 14235, 14238, 14242, 14259, 14263, 14265, 14315, 14316, 14318, and 14319 (asserting ***$36,794,461.38 in the aggregate***).

[25 27]    *See* Docket No. 2595, Exhibits 1 and 2, which reflects the Debtors' omnibus objection to the above-referenced Proofs of Claim Filed by the Central PA Teamsters, Local 705, IAM National, New England Teamsters, Virginia Teamsters, Local 710, and Philadelphia Teamsters, which collectively asserted approximately $582.9 million.

2025, the Bankruptcy Court issued a memorandum opinion granting in part and denying in part summary judgment.  [Docket No. 5619].  In granting in part the Debtors' motion, the Bankruptcy Court held that the discount rates used by the plan actuaries for certain Non-SFA MEPPs to calculate such plans' withdrawal liability were inconsistent with the statutory requirement of 29 U.S.C. § 1393(a) because they did not "offer the actuary's best estimate of anticipated experience under the plan" as the statute requires. The same decision (i) denied the Virginia Teamsters' request to endorse its contribution rate calculations as a matter of law and held there is a genuine issue of material fact about which contribution base units should be used to calculate the annual payment owed to the Virginia Teamsters, and (ii) determined the New England Teamsters' withdrawal liability calculation was appropriate because there is nothing in ERISA that prevents parties from contracting around the withdrawal liability methodology provided under ERISA.

As with the SFA MEPPs, the Preliminary MEPP Opinion addressed various additional aspects of the Non-SFA MEPPs' asserted Claims, including that (i) the Non-SFA MEPPs' Withdrawal Liability Claims should be discounted to present value and (ii) the mechanic set forth in 29 U.S.C. § 1405(b) should be applied after reducing UVBs pursuant to ERISA's 20-year cap.  On July 18, 2025, the Court issued an interlocutory order giving effect to the Preliminary MEPP Opinion [Docket Nos. 6682, 6683].

### 5. Western Conference

Western Conference of Teamsters Pension Trust Fund ("Western Conference") Filed Proofs of Claim for approximately $257 million, alleging withdrawal liability of approximately $169 million and interest in the amount of approximately $88 million.[28]  The Debtors withdrew from Western Conference in June 2009, and withdrawal liability was not assessed at that time.  Instead, the Debtors entered into several agreements with Western Conference pursuant to which Western Conference agreed to defer, at least for some time period, any assessment of withdrawal liability.  The Debtors were never assessed withdrawal liability by Western Conference prior to the Petition Date (even though applicable law requires a MEPP to assess withdrawal liability as soon as practicable) and did not pay any withdrawal liability to Western Conference.  On May 16, 2025, the Debtors filed *Debtors' Objection to Western Conference of Teamsters' Proofs of Claim for Withdrawal Liability* to these Proofs of Claim [Docket No. 6347] arguing that they should be disallowed in their entirety because, among other things, the Claims are statutorily untimely; Western Conference cannot seek Withdrawal Liability from the Debtors when it has no UVBs; and Western Conference cannot recover more than a decade's worth of interest on unassessed Withdrawal Liability.  On May 19, 2025, MFN and Mobile Street filed the *Joinder of MFN Partners, LP and Mobile Street Holdings, LLC to the Debtors' Objection to Western Conference of Teamsters' Proofs of Claim for Withdrawal Liability* [Docket No. 6351].  On June 27, 2025, the Debtors filed a notice of continued hearing to postpone briefing and argument on the Western Conference claim objection until after the Third Circuit issues its ruling in the SFA MEPP Order Appeal.

### 6. WARN-Related Matters

Shortly after the Petition Date, three separate class action adversary proceeding complaints were Filed against the Debtors alleging "failure to provide its works [sic] with the 60-day advance notice required under the federal Worker Adjustment and Retraining Notification Act (the "WARN Act")[.]" Class Action Adversary Proceeding Complaint by Roger Keef Against Yellow Corporation [Docket No. 47] ("Keef Compl.") ¶ 1; see also Complaint by Elizabeth Brooke Moore, Jeff Moore Against Yellow Freight Corporation, et al.  [Docket No. 25] ("Moore Compl.") ¶ 3; Class Action Adversary Proceeding Complaint for (1) Violation of WARN Act 29 U.S.C. § 2101, et seq.; (2) Violation of New Jersey

---

[28]    *See* Proofs of Claim Nos. 160, 163, 12876.

Millville Dallas Airmotive Plant Job Loss Notification Act; (3) Violation of California Labor Code §§ 1400 et seq.; and (4) Violation of New York WARN Act, NYLL § 860, et seq.  [Docket No. 21] ("Rivera Compl.") ¶ 1.  All three complaints brought claims for relief for violation of 29 U.S.C. § 2101 et seq., individually and on behalf of all other similarly situated former employees.  See Keef Compl. ¶ 31; Moore Compl. at ¶ 26; Rivera Compl. ¶ 70.  Two of the complaints Filed on August 7, 2023 also brought state WARN Act claims.  See Keef Compl. ¶¶ 42–53; Rivera Compl. ¶¶ 81–111.  On November 10, 2023, the plaintiffs from the Moore action ("Moore plaintiffs") amended their complaint, bringing a second claim for relief under the California WARN Act [Moore Adv. Proc. Docket No. 12].

On November 13, 2023, a fourth class action adversary complaint alleging violation of 29 U.S.C. § 2101 et seq. was Filed.  *Class Action Adversary Complaint for (1) Violation of Federal Warn Act 29 U.S.C. § 2101 et seq., (2) Breach of Contract, (3) Unjust Enrichment, (4) Declaratory Relief, (5) Violation of* California Labor Code §1400 et seq., *(6) Violation of California Labor Code § 201 et seq., (7) Violation of North Carolina Wage and Hour Act §§ 95-25.1 et seq., (8) Violation of New York WARN Act, NYLL § 860 et seq.,* and *(9) Violation of New Jersey Millville Dallas Airmotive Plant Job Loss Notification Act* [Docket No. 1126] (the "Coughlen Compl." and the class therein "Coughlen class").  A few days later, on November 17, 2023, the Keef plaintiffs dismissed their complaint without prejudice.  [See Keef Adv. Proc. Docket No. 13].

On December 15, 2023, the Moore plaintiffs sought leave to File a second amended complaint, which was granted on December 26, 2023.  [Moore Adv. Proc. Docket Nos. 19, 23].  The second amended complaint merged the Moore and Rivera matters, leaving only the Moore and Coughlen matters remaining as active adversary proceedings.  [See Moore Adv. Proc. Docket No. 19].  The Bankruptcy Court then certified a class of certain non-union former employees of the Debtors in the Moore lawsuit, see Moore Adv. Proc. Docket No. 69, but declined to certify the Coughlen class.

Separately, more than 1000 WARN-related Proofs of Claim were Filed against the Estates, including, among others, omnibus proofs of claim Filed by the IBT and International Association of Machinists ("IAM") on behalf of all bargaining unit members.  All WARN-related matters in or relating to the Chapter 11 Cases, including the WARN-related Proofs of Claim, the Keef Compl., the Moore Compl., the Rivera Compl, and the Coughlen Compl., are referred to in this Disclosure Statement as the "WARN Claims and Proceedings."

On August 16, 2024, the Debtors and the various WARN claimants Filed a scheduling stipulation for the WARN Claims and Proceedings, see Docket Nos. 4109-1, 4360, Moore Adv. Proc. Docket No. 91-1, and Coughlen Adv. Proc. Docket No. 59-1, which provided for the Filing of any amended, supplemented, or new summary judgment pleadings on or before September 6, 2024, and a hearing on all WARN-related summary judgment matters before the Bankruptcy Court on October 28, 2024.  On September 6, 2024, the Debtors Filed motions for summary judgment [Moore Adv. Proc. Docket Nos. 98, 99; Coughlen Adv. Proc. Docket Nos. 65, 66], as did the Moore plaintiffs [Moore Adv. Proc. Docket No. 100, 102] and the IBT and IAM [Docket No. 3728, 3729].  On September 27, 2024, (i) the Debtors Filed their oppositions to the motions for summary judgment Filed by the Coughlen plaintiffs, the Moore plaintiffs, and the IBT and IAM.  [See Coughlen Adv. Proc. Docket No. 77], [Moore Adv. Proc. Docket No. 114, Docket No. 4452];  (ii) the Moore plaintiffs Filed their opposition to the motion for summary judgment Filed by the Debtors [Moore Adv. Proc. Docket No. 113];  (iii) the Coughlen plaintiffs Filed their opposition to the motion for summary judgment Filed by the Debtors [Coughlen Adv. Proc. Docket No. 75]; and  (iv) the IBT and IAM Filed their opposition to the motion for summary judgment Filed by the Debtors [Docket No. 4440].

Oral arguments on the dispositive WARN motions took place on October 28, 2024.  On December 19, 2024, the Bankruptcy Court issued a memorandum opinion granting and denying summary judgment in part and scheduling a trial on the remaining issues (the "WARN Disputes") between January

21 and January 23, 2025.  [Docket No. 5227].  On January 13, 2025, the Bankruptcy Court entered a Final Order implementing its prior ruling and making specific determinations relating to the Debtors' WARN liability.  [Docket No. 5390].  The Final Order also identified the issues to be decided at trial, including, most pertinently:  (1) whether the Debtors qualified as a liquidating fiduciary when they laid off nearly all union employees on July 30, 2023, and (2) whether, and to what extent, damages should be reduced under 29 U.S.C. § 2104(a)(4).

The Debtors, IBT, IAM and Moore plaintiffs filed pre-trial briefs addressing the remaining WARN Disputes.  [Docket Nos. 5404, 5405, Moore Adv. Proc. Docket No. 204].  Shortly before trial, the Moore class and Coughlen plaintiffs reached tentative settlements with the Debtors.  The Debtors apprised the Bankruptcy Court of the settlements on the first day of the trial, noting that the terms of settlement, while confidential, resolved the Claims of such plaintiffs in full, pending final documentation and court approval.  Consequently, the IBT alone proceeded to trial against the Debtors on behalf of the union's members.

Following the trial, on January 31, 2025, the Debtors, IBT and IAM filed additional briefs at the direction of the Bankruptcy Court.  [Docket Nos. 5591, 5592].  On February 26, 2025, the Bankruptcy Court issued a memorandum opinion resolving the litigated WARN Disputes.  [Docket No. 5807].  Based on the evidence presented at trial, the Bankruptcy Court held that the Debtors have no WARN liability because they were a "liquidating fiduciary" at the time the unionized workforce was terminated, and therefore the WARN Act —which is applicable only to "employers"—did not apply to the Debtors at the time of the layoffs.  The Bankruptcy Court further held that even if the Debtors were not a liquidating fiduciary at the time of the layoffs, the "good faith" defense under 29 U.S.C. § 2104(a)(4) would justify a reduction of damages from 60 days of back pay and benefits to 14 days of back pay and benefits.  The Bankruptcy Court entered the order embodying its decision regarding the WARN Disputes on March 12, 2025.  [Docket No. 5867].  That same day, IBT, TNFINC and IAM appealed the Bankruptcy Court's decision to the United States District Court for the District of Delaware.  [Docket No. 5868].  The appeal is currently pending with the United States District Court for the District of Delaware, which was docketed at case number 25-0307 (the "Union WARN Appeal").  [Docket No. 5868].  On March 26, 2025, the Debtors cross-appealed the Bankruptcy Court's decision, which was docketed at case number 25-0377 (the "Debtors' WARN Cross-Appeal").  [Docket No. 5975].  On April 15, 2025, the Debtors filed a motion to consolidate the bankruptcy appeal and cross-appeal in the United States District Court for the District of Delaware.  [Union WARN Appeal Docket No. 23].[27][29]  The United States District Court for the District of Delaware granted the Debtors' motion to consolidate the appeal and cross-appeal on April 23, 2025 and set a briefing schedule.  [Union WARN Appeal Docket No. 25].  On May 9, 2025, IBT, TNFINC, and IAM filed their opening briefs.  The Debtors filed their opening brief and response on June 20, 2025.  The IBT, TNFINC, and IAM have until July 28, 2025 to file their response and reply.

On February 28, 2025, the parties filed motions to approve the WARN settlements with the Moore and Coughlen parties for $8.75 million and $5.36 million, respectively  [Docket Nos. 5823, 5824, Coughlen Adv. Proc. Docket No. 189].  On March 24, 2025, the Bankruptcy Court approved the WARN settlement with the Coughlen parties on a final basis [Docket No. 5950] and preliminarily approved the WARN settlement with the Moore parties [Docket No. 5951].  The Bankruptcy Court then entered an order granting final approval for the WARN settlement with the Moore parties on June 5, 2025 [Moore Adv. Proc. Docket No. 243].

---

[27][29]    Identical pleadings were filed on the Debtors' WARN Cross-Appeal Docket.

### 7.  Additional IBT-Related Matters

On June 27, 2023, Yellow Corporation and four of its operating subsidiaries (as referenced in this section, together "Yellow") commenced a lawsuit in the U.S. District Court for the District of Kansas against International Brotherhood of Teamsters, Teamsters National Freight Industry Negotiating Committee, and three local Teamsters unions (as referenced in this section, together, the "Union") alleging that, in breach of the operative collective bargaining agreement, the Union blocked Yellow's implementation of Phase 2 of its One Yellow enterprise transformation.  In its complaint, Yellow sought to recover the damages it incurred from delayed implementation of Phase 2 that the Union's breaches allegedly caused.  The Union disputes the Debtors' allegations.  The Union moved to dismiss Yellow's complaint for failure to state a claim.

On March 25, 2024, the district court judge granted the Union's motions to dismiss, dismissed Yellow's complaint, and entered judgment against Yellow, holding that Yellow was required to exhaust grievance procedures in the collective bargaining agreement before it could file suit, and it had not done so and had not alleged an excuse for its failure to exhaust.

On April 22, 2024, Yellow moved for reconsideration.  Specifically, Yellow argued that the trial court erred in determining that the collective bargaining agreement required further grievance, that Yellow had not pled futility as an excuse for failure to exhaust and that the facts and circumstances at hand demonstrated futility of further grievance.  The U.S. District Court for the District of Kansas denied Yellow's motion for reconsideration.

On August 12, 2024, Yellow filed a notice of appeal with the Tenth Circuit Court of Appeals. Yellow filed its appellate brief on October 7, 2024, and the IBT filed its response brief on November 6, 2024.  Yellow filed its reply brief on November 27, 2024 and requested oral argument.  The Tenth Circuit has scheduled oral argument for September 9, 2025.  The IBT has separately filed unfair labor practice charges against Yellow claiming that Yellow's lawsuit is a violation of the National Labor Relations Act, which Yellow disputes.  The National Labor Relations Board Filed proofs of claim against the Debtors based on the IBT's unfair labor practice charges, but has not made a final ruling on the merits.

### 8.  Automatic Stay Matters and ADR Procedures

With certain exceptions, the Filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases may be subject to enjoinment, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be barred and enjoined in connection with the Chapter 11 Cases.

Beginning on August 24, 2023, various claimants Filed motions to lift the automatic stay to proceed with litigation relating to prepetition personal injury, wrongful death, wrongful termination, alleged violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, negligent supervision, defamation, property damage, and other related claims in courts across the country and recover against the Debtors and/or under the Debtors' Motor Carrier's Indemnity Insurance Policy (the "Auto Policy") with Old Republic Insurance Company ("ORIC") or any other potentially applicable insurance policy on account of such Claims.  The Debtors Filed a motion seeking approval of such procedures on December 11, 2023 [Docket No. 1329] (the "ADR Procedures Motion").

After Filing the ADR Procedures Motion, the Debtors continued to work with various stakeholders to resolve a web of issues between and among the Debtors, the claimants, the Committee and ORIC to establish a workable framework for the parties to efficiently resolve these litigation Claims pursuant to the procedures reflected in the Bankruptcy Court's order entered on February 26, 2024 [Docket No. 2389] (the "ADR Procedures Order," and such procedures, the "ADR Procedures"). The ADR Procedures have avoided costly and time-consuming piecemeal litigation across the country, while affording claimants a mechanism to pursue recoveries they might not otherwise be able to obtain for years. As of June 1, 2025, approximately 1,110 of the claims have been settled, including some of claimants which had previously Filed lift-stay motions and/or objected to the ADR Procedures Motion. [The Debtors and the Committee and/or the Liquidating Trustee, as applicable, will continue efforts with the parties to resolve claims against the Debtors and/or ORIC that relate to personal injury, property damage or both, as efficiently as possible.]30

As of the Petition Date, ORIC had approximately $231 million in letters of credit as collateral backing the aforementioned policies, as well as workers' compensation policies that are outside of the scope of the ADR Procedures and the claims resolved thereunder, all of which were drawn after the Petition Date. Between February 24, 2024, the date that the Bankruptcy Court entered the ADR Procedures Order, and July 31, 2025, ORIC has paid approximately $196 million to claimants under the applicable policies and incurred various fees and expenses, all of which have been paid from the collateral and interest thereon. As of July 31, 2025, ORIC held approximately $45 million of remaining collateral.

ORIC has indicated that the remaining claims and required payments under the insurance policies may exceed the value of the collateral it holds, potentially by over $200 million. To the extent there are claims in excess of the collateral, ORIC may be entitled to an unsecured deficiency claim and they assert the contractual right to assert such claim against each Debtor. ORIC has not provided any support behind this assertion, and the Debtors are currently performing an independent review of anticipated exposure. For purposes of the claims estimates contained herein, the Debtors have included a range of $0-$200 million in Class 5 claims on account of the potential deficiency claim at each Debtor.

### 9. EPA Matters

The U.S. Department of Justice ("DOJ") Filed two Proofs of Claim against the Debtors seeking a total of approximately $2.13 billion in past and future costs related to addressing contamination at the Newtown Creek Superfund Site located in New York City.2831 On December 20, 2024, the Debtors Filed an objection the Proofs of Claim alleging that the Debtors have no liability for the alleged environmental claims or, in the alternative, any liability should be reduced by approximately 99.9% to reflect the Debtors' equitable apportionment of the alleged liability. [Docket No. 5237]. On January 10, 2025, the DOJ filed a response alleging that the Debtors are, in fact, jointly and severally liable for the asserted claims [Docket No. 5373]. The hearing on the Debtors' objection has been adjourned to a future date to allow the parties to negotiate a scheduling order.

The Debtors have owned or operated numerous underground and above ground storage tanks and associated systems ("USTs" and "ASTs"). On May 10, 2024, the Debtors Filed the Notice of Abandonment (Unused Fuel) [Docket No. 3353] to effectuate the removal of fuel from and subsequent decommissioning of certain of their tanks by third parties on certain of their owned or leased properties.

---

30  The Debtors, the Committee, and ORIC are in discussions regarding whether the ADR Procedures and process thereunder will continue to be in effect post-Confirmation.

2831  *See* Proof of Claim Nos. 19438, 19439.

Such process remains ongoing. The Debtors own or operate certain other USTs and ASTs that were not subject to the Notice of Abandonment. Some of the Debtors' USTs and ASTs are still in operable status and others have been placed or are in the process of being placed into temporary out-of-service status under applicable regulations. Other USTs and ASTs are in the process of being closed or decommissioned. The Debtors have sold some USTs and ASTs and/or the real property on which they are located. To the extent applicable, the Debtors will coordinate regulated activities with licensed vendors, certified contractors, government agencies, landlords, and property owners, as appropriate, to permanently close or decommission the tanks, extend temporary out-of-service, or place the tanks in operable status in accordance with applicable federal and state law. To the extent that there is a new owner or operator of a UST or AST or landowner of the underlying real property, the Debtors anticipate that certain liabilities relating to the USTs and ASTs will be the responsibility of the new property owners, landlords or tenants, as appropriate under applicable non-bankruptcy law, once the Debtors exit such properties.

The United States on behalf of the EPA and several state environmental agencies (the "Governments") informed the Plan Proponents that it contends that: (1) the Liquidating Trust must comply with all applicable state and federal laws, regulations, and rules for the Debtors' USTs and ASTs, including but not limited to those governing operations, out of service status, decommissioning, closure, and corrective action for releases relating to its USTs and ASTs; (2) the Liquidating Trustee will be liable for residual liabilities, if any, with respect to the USTs and ASTs or releases relating to the USTs and ASTs under applicable non-bankruptcy law; (3) funding in the Liquidating Trust must be made available to address such liabilities; and (4) the Liquidating Trustee may not abandon any USTs and ASTs without conditions in place protecting public health and safety and without providing the Governments reasonable opportunity to object. Nothing in the Disclosure Statement shall prejudice the rights of the Governments to make the above contentions to the Court in an objection to the Plan or the rights of the Plan Proponents, the Liquidating Trustee or any other parties in interest, to disagree with the above contentions.

I.    **The Debtors' Initial Plan and Amendments Thereto**

On September 2, 2024, the Debtors filed the *Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4253] (the "Debtors' Initial Plan"), and the related *Disclosure Statement for the Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4254]. The Committee did not support the Debtors' Initial Plan because, among other things, it provided that the Debtors would select the liquidating trustee and liquidating trust board of managers, each in consultation with the Committee. On September 9, 2024, the Committee advised the Court and all other parties in interest that it did not support the Debtors' Initial Plan in its *Statement Regarding Debtors' Fourth Motion for Entry of an Order (I) Extending the Debtors' Exclusive Period to Solicit Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 4294] (the "September 9 Statement").

On October 17, 2024, the Debtors filed their *First Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4580] and *First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4581] (the "Debtors' First Amended Plan") together with the *Motion of Debtors for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 4582], which also provided that the Debtors would select the liquidating trustee and liquidating trust board of managers, each in consultation with the Committee. On November 18, 2024,

the Committee filed a statement expressing that it did not support the Debtors' First Amended Plan insofar as it continued to deprive unsecured creditors of the right to control the administration of the contemplated liquidating trust and reiterating concerns with respect to the scope of the proposed releases.

On November 20, 2024, prior to the hearing to approve the Debtors' Disclosure Statement, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4974] (the "Debtors' Second Amended Plan") and the Debtors' Disclosure Statement.[2932] On November 22, 2024, the Court entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballot and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 5024] (as may be modified, amended, or supplemented by further Final Order) (the "Disclosure Statement Order").

The Debtors included within the solicitation materials that were distributed to all applicable voting creditors a letter from the Committee addressed to general unsecured creditors in the relevant solicitation materials explaining that the Committee was not supportive of the Debtors' Second Amended Plan, and advising that negotiations with the Debtors regarding the governance of the Liquidating Trust were ongoing. [*See* Docket No. 5024-9]. The letter explained that the Committee could not, at the time of the mailing of the solicitation packages, recommend that unsecured creditors vote in favor of the Debtors' Second Amended Plan, but noted that the Committee would file a further notice on the docket prior to the voting deadline providing its recommendation as to how unsecured creditors should vote on the Debtors' Second Amended Plan.[3033] On January 28, 2025, the Committee filed a *Notice of Filing of Recommendation Letter of Official Committee of Unsecured Creditors with Respect to the Second Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 5565], which included a letter from the Committee providing its recommendation that unsecured creditors should vote to reject the Debtors' Second Amended Plan and not opt in to the third-party releases under the Debtors' Second Amended Plan (the "Committee Recommendation Letter") for two reasons.[3134] First, the Debtors' Second Amended Plan did not provide the Committee with exclusive governance rights over the Liquidating Trust. Second, the Debtors' Second Amended Plan contemplated broad releases by the Debtors' Estates that remained subject to investigation by the Committee.

On January 28, 2025, the Committee filed its Exclusivity Termination Motion seeking to terminate the Debtors' exclusive period for soliciting a chapter 11 plan, or in the alternative, converting the Chapter 11 Cases to chapter 7. On February 4, 2025, the Debtors filed its *Objection of Debtors' to Motion of the Official Committee of Unsecured Creditors for an Order Terminating the Debtors' Exclusive Period to Solicit Acceptances of a Plan or, in the Alternative, Converting the Chapter 11 Cases under Chapter 7 of the Bankruptcy Code* [Docket No. 5613], pursuant to which the Debtors confirmed that the Debtors did not intend to extend their exclusive right to solicit votes on the Second Amended Plan beyond February 28, 2025. The Exclusivity Termination Motion was adjourned to a date to be determined and the Debtors' exclusivity period expired on February 28, 2025.

---

[2932]   On November 22, 2024, the Debtors filed the solicitation versions of the Debtors' Disclosure Statement (the "Debtors' Disclosure Statement") [Docket No. 5027] and Debtors' Second Amended Plan.

[3033]   *Id.*

[3134]   The Committee Recommendation Letter was also filed as an exhibit to the Exclusivity Termination Motion.

The confirmation hearing for the Debtors' Second Amended Plan was originally scheduled to occur on February 4, 2025. On January 10, 2025, the Debtors filed the first notice adjourning the confirmation hearing until February 25, 2025 [Docket No. 5379], and there have been three additional adjournments since that time [Docket Nos. 5644, 5822, 5845]. During this period, the Debtors, the Committee, and certain of the Debtors' creditors holding the largest General Unsecured Claims engaged in several months of hard-fought, good-faith negotiations aimed at resolving the most significant Claims asserted against the Estates and negotiated the terms of a plan structure incorporating a settlement construct for the resolution of same. Accordingly, on March 28, 2025, the Debtors and the Committee filed the Third Amended Plan [Docket No. 5995] incorporating a Plan Settlement substantially reducing the aggregate Claim amounts originally asserted against the Estates while increasing the recoveries for Holders of General Unsecured Claims who do not have the ability to assert such Claims on a joint and several basis against each Debtor. The Third Amended Plan and the Plan Settlement embodied therein was Filed with the support of a substantial majority of Holders of General Unsecured Claims assertable against the Debtors and was intended to resolve objections that have been made to the allowance of the billions of dollars in Claims asserted by the MEPPs on account of obligations associated with the Debtors' withdrawal from the MEPPs. As a result of the Preliminary MEPP Opinion, however, the Plan Proponents determined that the Third Amended Plan was no longer a viable option.

Immediately following the Bankruptcy Court's issuance of the Preliminary MEPP Opinion, the Plan Proponents reengaged with the MEPP claimants who had previously agreed to the terms of the Third Amended Plan in an effort to reach agreement on a revised settlement that would comport with the Preliminary MEPP Opinion, in addition to all other rulings issued in the cases to date. The parties have been unable to reach consensus and therefore have filed the Plan consistent with the Court's commentary at the hearing on the Motion to Convert (defined below). The Plan does not propose to settle any of the Disputed MEPP Claims and, instead, the Plan provides that pending litigation will transfer to the Liquidating Trust. Nonetheless, the Plan Proponents intend to continue settlement discussions with the MEPP claimants and other parties in interest in parallel while prosecuting the Plan.

### J.    MFN's Motion to Convert the Debtors' Chapter 11 Cases to Chapter 7

As discussed in the Introduction to this Disclosure Statement, following the issuance of the Bankruptcy Court's Preliminary MEPP Opinion, the Debtors and the Committee pivoted from the Plan Settlement that was embodied in the jointly proposed Third Amended Plan and began to work on the terms of an alternative plan that conformed to the Court's guidance and observations set forth in the Preliminary MEPP Opinion.

On April 29, 2025, MFN filed the *Motion of MFN Partners, LP and Mobile Street Holdings, LLC for Entry of an Order Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [Docket No. 6204] (the "Motion to Convert"). In the Motion to Convert, MFN alleged that conversion of these Chapter 11 Cases was in the best interest of the Debtors' creditors. Motion to Convert, ¶ 3.

As set forth in the *Objection of Debtors to Motion of MFN Partners, LP and Mobile Street Holdings, LLC for Entry of an Order Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [Docket No. 6225] (the "Debtors' Objection to Conversion"), the Debtors had communicated to MFN that the Debtors would not be prosecuting the Third Amended Plan and would continue to engage with MFN, including by meeting with the Committee and MFN via videoconference on April 23, 2025 to review and seek alignment on what the allowed amount of each MEPP claim should be under the Bankruptcy Court's guidance.  *See* Debtors' Objection to Conversion, ¶ 3.  On May 20, 2025, the Committee filed the *Joinder of the Official Committee of Unsecured Creditors of Yellow Corporation, et al., to Objection of Debtors to Motion of MFN Partners, LP and Mobile Street Holdings, LLC for Entry of an Order Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [Docket No. 6335].

On June 17, 2025, Bankruptcy Court held a hearing on the Motion to Convert.  At that hearing, the Bankruptcy Court denied the Motion to Convert and scheduled a July 8, 2025 status conference to provide the Debtors and their stakeholders with an opportunity to update the Bankruptcy Court with respect to the status of potential settlement discussions (the "July 8 Status Conference").  The following day, the Bankruptcy Court memorialized its ruling in the *Order Regarding the Motion of MFN Partners, LP and Mobile Street Holdings, LLC for Entry of an Order Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [Docket No. 6537].  As reported at the July 8 Status Conference, the Debtors and their stakeholders had not reached a further settlement as of July 8, 2025.

### K.    Assumption and Rejection of Executory Contracts and Unexpired Leases

The Debtors are party to a substantial number of executory contracts.  The Plan Proponents, with the assistance of their advisors, have identified contracts and leases to either assume or reject pursuant to Bankruptcy Code sections 365 or 1123 or otherwise in accordance with the terms of the Plan.  To facilitate this process, the Debtors previously Filed the following motions:

- Rejection Procedures Motion.  The *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 391] (the "Rejection Procedures Motion") on August 31, 2023, seeking approval of procedures for rejecting executory contracts and unexpired leases.  On September 13, 2023, the Debtors Filed a certification of counsel and a revised proposed order resolving certain objections, reservation of rights, and informal inquiries, asking the Bankruptcy Court to enter an order granting the Rejection Procedures Motion [Docket No. 538].  On September 14, 2023, the Bankruptcy Court entered an order approving the Rejection Procedures Motion on a final basis [Docket No. 550].  On October 30, 2023, the Debtors also Filed the *Debtors' Motion for Entry of an Order, Pursuant to Section 365(d)(4) of the Bankruptcy Code, Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 995] and the Bankruptcy Court entered an order approving the 365(d)(4) Extension Motion on a final basis on November 13, 2023 [Docket No. 1127].  On February 12, 2024, the Debtors Filed the *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing the Debtors to Assume Certain Unexpired Leases and (II) Granting Related Relief* [Docket No. 2157] and the Bankruptcy Court entered an order approving the assumption of certain leases and executory contracts on February 26, 2024 [Docket No. 2385].

- Omnibus Rejection Motion.  The *Omnibus Motion of Debtors Seeking Entry of an Order (I) Authorizing (A) Rejection of Certain Executory Contracts and Unexpired Leases Effective as of Dates Specified Herein and (B) Abandonment of Certain Personal Property, If Any, and (II) Granting Related Relief* [Docket No. 394] (the "Omnibus Rejection Motion"), Filed on August 31, 2023, seeking authorization for the Debtors to, among other things, reject certain executory contracts and unexpired leases and abandon certain personal property related to the same.  On September 14, 2023, the Debtors Filed a certification of counsel and revised order, asking the Bankruptcy Court to enter an order granting the Omnibus Rejection Motion [Docket No. 541].  On September 14, 2023, the Bankruptcy Court entered an order approving the Omnibus Rejection Motion on a final basis [Docket No. 548].

On the Effective Date, pursuant to Bankruptcy Code sections 365 and 1123, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected, shall be deemed automatically rejected, unless such Executory Contract or Unexpired Lease shall be categorized pursuant to one of those enumerated categories at Article V.A of the Plan.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases pursuant to the Plan; *provided* that neither the Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under the Third-Party Sale Transaction Documents to assume and assign Executory Contracts and Unexpired Leases pursuant to the Third-Party Sale Transaction Documents.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Liquidating Trustee.  Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Liquidating Trustee in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

## L.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of service of notice of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection or (3) the Effective Date.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan or such other treatment as agreed to by the Holder of such Claim, the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement.

## M.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

As further detailed in Article V.C of the Plan, any monetary defaults under an assumed Executory Contract or Unexpired Lease, shall be satisfied, pursuant to Bankruptcy Code section 365(b)(1), by payment of the Cure Claim in Cash on the Effective Date, subject to the limitations described in Article V.C of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  Pursuant to Article V.C of the Plan, in the event of a dispute the

cure payments required by Bankruptcy Code section 365(b)(1) shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable third parties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served, and actually received by the Plan Proponents at least seven days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object will be deemed to have assented to the assumption or assumption and assignment and cure amount.

## VIII.    CERTAIN RISK FACTORS TO CONSIDER PRIOR TO VOTING

Holders of Claims should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.    Certain Bankruptcy Law Considerations

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims or Allowed Interests, as applicable, under the Plan but will not necessarily affect the validity of the vote of the Impaired Class to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Class.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Bankruptcy Code section 1122 of the provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Plan Proponents believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponents created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article X of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not occur.

#### 3.    The Plan Proponents May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponents intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponents may seek to pursue another strategy to wind down the Estates, such as confirm an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion

to a chapter 7 case, or other strategies. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Allowed Claims or Allowed Interests as those proposed in the Plan.

### 4. Non-Confirmation of the Plan

Even if the Voting Class votes in favor of the Plan, and even if, with respect to any impaired Class deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which is a court of equity, may exercise substantial discretion and may choose not to confirm the Plan. In addition, while the Plan Proponents believe the best interests test for confirmation is satisfied, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 5. The Plan Proponents May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if a debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims or Allowed Interests will receive with respect to their Allowed Claims or Allowed Interests, as applicable. The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Plan Proponents reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, if permissible under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Plan Proponents expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; provided, however, that the Debtors and the Committee shall not amend or modify the Plan in a manner that materially and adversely affects the treatment of any Class of Claims without resoliciting such Class of Holders of Claims.

### 6.   Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).   The Plan Proponents reserve their rights to pursue nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.   The Plan Proponents believe that the Plan satisfies the requirements, but there can be no assurance that the Bankruptcy Court will reach this conclusion.   In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7.   The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.   In such event, a chapter 7 trustee would be appointed or elected to liquidate a debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Plan Proponents believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals. Such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Class. *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2).   The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.   *See* Fed. R. Bankr. P. 1019(2), 3002(c).

### 8.   The Plan Proponents May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Plan Proponents reserve the right to object to the amount or classification of any Claim under the Plan.   The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.   Risk of Non-Occurrence of the Effective Date

Although the Plan Proponents believe that the Effective Date will occur, there can be no assurance as to the timing of the Effective Date or as to whether the Effective Date will, in fact, occur.

### 10.   Contingencies May Affect Votes of the Impaired Voting Class to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims and Allowed Interests, as applicable, under the Plan can be affected by a variety of contingencies, including, without limitation, the outcome of pending claims objections Filed by the Debtors or other parties in interest.   The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims and Allowed Interests, as applicable, under the Plan, will not affect the validity of the vote taken by the

Impaired Voting Class to accept or reject the Plan or require any sort of revote by the Impaired Voting Class.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Plan Proponents cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 11.  Releases, Injunctions and Exculpations Provisions May Not Be Approved

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Liquidating Trustee, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 12.  The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated by the Plan Proponents

With respect to Holders of Allowed General Unsecured Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Plan Proponents have estimated.

### 13.  Subsequent Events May Affect Recoveries Under the Plan

Holders of Allowed Claims and Allowed Interests should carefully review Article III.T of this Disclosure Statement, entitled "Could subsequent events potentially affect recoveries under the Plan?", for a summary of certain potential events that could have the effect of impacting recoveries under the Plan.

### 14.  Certain Tax Implications of the Plan

Holders of Allowed Claims and Allowed Interests should carefully review Article XI of this Disclosure Statement, entitled " MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the post-Effective Date Debtor(s), Liquidating Trust, and Holders of Claims and Interests.

### B.  Disclosure Statement Disclaimer

### 1.  The Financial Information Contained in this Disclosure Statement Has Not Been Audited

In preparing this Disclosure Statement, the Plan Proponents and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the Plan Proponents have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Plan Proponents believe that such financial information fairly reflects the financial condition of the Debtors, the Plan Proponents are unable to warrant that the

financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

### 2.    Information Contained in This Disclosure Statement Is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

### 3.    This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

### 4.    This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Forward-looking statements are neither historical facts nor assurances of future performance.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology.  All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  Any forward-looking statement made herein is based only on information currently available to the Plan Proponents and speaks only as of the date on which it is made.  Except as may be required by applicable law, the Plan Proponents undertake no obligation to publicly update any forward-looking statement whether as a result of new information, future developments, or otherwise.

### 5.    No Legal or Tax Advice Is Provided to You by this Disclosure Statement

***This Disclosure Statement does not constitute legal advice to you.***  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 6.    No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Plan Proponents) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

### 7.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  The Plan Proponents or the

Liquidating Trustee may seek to investigate, File and prosecute Causes of Action and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Causes of Action or objections to such Claims.

### 8.  Your Claim May Be Subject to an Objection

Except as otherwise set forth in the Plan, the vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action or rights of the Plan Proponents or the Liquidating Trustee (or any entity, as the case may be) to object to that Holder's Claim, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### 9.  Information Was Provided by the Debtors and Was Relied Upon by the Plan Proponents' Advisors

The Plan Proponents' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Plan Proponents' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

### 10.  Potential Exists for Inaccuracies, and the Plan Proponents Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Plan Proponents as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Plan Proponents have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Plan Proponents nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Plan Proponents may subsequently update the information in this Disclosure Statement, the Plan Proponents have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11.  No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Committee, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors, counsel to the Committee and the U.S. Trustee.

## IX.  SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, as amended, will be accompanied by a Ballot to be used for voting on the Plan, and is being distributed to the Holders of Claims in the Class that is entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines shall be as set forth in the exhibits annexed to the Disclosure Statement Order (as amended or supplemented).

*The Disclosure Statement Order will be incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.*

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

The Plan Proponents are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 5 (the "Voting Class").  The Holders of Claims in the Voting Class are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan.

Holders of Claims or Interests in Classes 1, 2, 3, 4A, 4B, 6, 7, 8, and 9 are not entitled to vote, and the Plan Proponents are ***not*** soliciting votes from Holders of Claims in such Classes.  Additionally, the Disclosure Statement Order will provide that certain Holders of Claims in the Voting Class, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

**The Voting Record Date is August 26, 2025**.  The Voting Record Date will be the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim in the Voting Class.

### C.    Voting on the Plan

**The Voting Deadline is October 229, 2025, at 4:00 p.m. (prevailing Eastern Time)**.  To be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered as directed, so that your Ballot containing your vote is **actually received** by the Claims and Noticing Agent on or before the Voting Deadline, once determined.

To vote, complete, sign, and date your Ballot and return it (with an original signature) ***promptly*** to one of the below addresses.

> **By regular mail, overnight mail, or hand delivery at:**
>
> **Yellow Corporation, et al., c/o Epiq Ballot Processing,**
> **10300 SW Allen Boulevard, Beaverton, OR 97005**

**OR**

**SUBMIT VIA AN ELECTRONIC BALLOT THROUGH THE CLAIMS AND NOTICING AGENT'S ONLINE ELECTRONIC BALLOT SUBMISSION PORTAL AT https://dm.epiq11.com/YellowCorporation**

**PLEASE SELECT JUST ONE OPTION TO VOTE.**

    **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT TOLL FREE AT (866) 641-1076 (DOMESTIC) or +1 (503) 461-4134 (INTERNATIONAL) OR VIA ELECTRONIC MAIL TO YellowCorporationInfo@epiqglobal.com.**

    **D.**    **Ballots Not Counted**

    **No Ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the Ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no Proof of Claim was Filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Plan Proponents, their agents/representatives (other than the Claims and Noticing Agent), or their financial or legal advisors instead of the Claims and Noticing Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **You should refer to the Disclosure Statement Order, to be subsequently Filed, for additional requirements with respect to voting to accept or reject the Plan.**

    **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

**X.**    **CONFIRMATION OF THE PLAN**

    **A.**    **Requirements for Confirmation of the Plan**

    Among the requirements for Confirmation of the Plan pursuant to Bankruptcy Code section 1129 are that the Plan:  (1) is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) is feasible; and (3) is in the "best interests" of Holders of Claims or Interests.

    At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of Bankruptcy Code section 1129.  The Plan Proponents believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation;

(2) the Plan Proponents have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

[Often called the "best interests" test, Bankruptcy Code section 1129(a)(7) requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Plan Proponents believe that the Plan satisfies the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims and Interests under the Plan will be more timely and similar or better than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses, that each next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

A large majority of the assets of the Debtors' business have been liquidated through the Third-Party Sale Transactions and the Plan effects a wind down of the Debtors' and their Estates' remaining assets not otherwise acquired in the Third-Party Sale Transactions while allowing the remaining litigation claims to be prosecuted to conclusion. Although a chapter 7 liquidation would achieve the same goal, the Plan Proponents believe that the Plan provides a greater recovery to Holders of Allowed Claims and Allowed Interests, as applicable, than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims and Allowed Interests, as applicable, with a better, more timely recovery in part because of the fees and expenses that would be incurred in a chapter 7 liquidation, including the potential added time and expense incurred by the chapter 7 trustee, and any retained professionals, in familiarizing themselves with these Chapter 11 Cases. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses. Therefore, the appointment of a chapter 7 trustee would potentially delay distributions to creditors and reduce the present value of any recovery for Holders. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Plan Proponents during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any subsequent chapter 7 case.

A conversion to chapter 7 would also require entry of a new bar date. *See* Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately Filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Plan Proponents submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions and the prospect of additional Claims that were not asserted in the Chapter 11 Cases.  Accordingly, the Plan Proponents believe that the Plan provides an opportunity to bring the best and most timely return for creditors.]

### C.    Feasibility

Bankruptcy code section 1129(a)(11) requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' and their Estates' assets pursuant to the terms of the Plan, including the Liquidating Trust Agreement.  Accordingly, the Plan Proponents believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Bankruptcy Code section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of the allowed claims in such class that vote on the plan actually cast their Ballots in favor of acceptance.

Bankruptcy Code section 1126(d) defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a class of interests will have voted to accept the plan only if two-thirds in amount of the allowed interests in such class that vote on the plan actually cast their Ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class that contains Claims is eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan Proponents shall request that the Bankruptcy Court deem the Plan accepted by the Holders of such Claims in such Class.

### E.    Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code section 1129(b) allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to Bankruptcy Code section 1129(b), notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and

equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Plan Proponents reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of Bankruptcy Code section 1129(b).  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Plan Proponents may request Confirmation of the Plan, as it may be modified from time to time, under Bankruptcy Code section 1129(b).  The Plan Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of Bankruptcy Code section 1129(b).

### 1.   No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.   Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class.  As to a dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Plan Proponents submit that if there is a "cramdown" of the Plan pursuant to Bankruptcy section 1129(b), the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims in that Class.  The Plan Proponents therefore believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.      MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, Liquidating Trust, and beneficial owners of Claims (each owner, a "Holder").  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Plan Proponents have not requested, nor will they request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not address foreign, state, local, or non-income tax consequences of the Plan (*e.g.*, U.S. federal gift or estate tax or the 3.8% Medicare tax on net investment income), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below. This summary also does not address the U.S. federal income tax consequences to Holders that are not Holders of Allowed General Unsecured Claims.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### A.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

Pursuant to the terms and provisions of the Plan, the Debtors would recognize gain or loss upon the transfer in an amount equal to the difference between the fair market value of assets sold or transferred and the Debtors' tax basis in such assets. To the extent any gains are recognized, such gains may be able to be offset, in whole or in part, by the Debtors' available tax attributes. As of the end of December 31, 2023, the Debtors estimate that they had approximately $727 million of U.S. federal net operating losses (the "<u>NOLs</u>") and approximately $334 million of disallowed business interest carryovers under section 163(j) of the Tax Code (the "<u>163(j) Carryovers</u>"). If the Debtors were to recognize gain in connection with the Plan and such gain could not be entirely offset with available NOLs, 163(j) Carryovers, and other tax attributes, a cash tax liability could arise.

#### 1.    COD Income

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("<u>COD Income</u>") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The amount of any COD Income that will be realized by the Debtors has not been determined and will not be determinable until after the consummation of the Plan.

### B.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed General Unsecured Claims

The following discussion assumes that the transactions contemplated by the Plan will become effective and occur. Holders of Claims are urged to and should consult their tax advisors regarding the tax consequences of the Plan.

#### 1.    U.S. Federal Income Tax Consequences for Holders of Allowed General Unsecured Claims

Pursuant to the Plan, in exchange for full and final satisfaction, settlement and release of the Allowed General Unsecured Claims, each Holder thereof will receive (as provided for and to the extent set forth in the Plan, as applicable) beneficial interests in the Liquidating Trust formed pursuant to Articles IV.D herein and VIII of the Plan (such interests, the "<u>Liquidating Trust Units</u>").

Additionally, as further discussed below in Section D, the Plan Proponents expect (and the Liquidating Trust documents shall provide) that the Liquidating Trustee will treat the Liquidating Trust as a grantor trust of which the applicable Holders of Allowed Claims are the grantors. Each U.S. Holder

of an Allowed Claim receiving Liquidating Trust Units should accordingly be treated as having (a) received its share of the Liquidating Trust Assets from the Debtors and (b) contributed such assets to the Liquidating Trust in exchange for Liquidating Trust Units.

Each such U.S. Holder will be treated as exchanging such Allowed General Unsecured Claim in a taxable exchange under section 1001 of the Tax Code for Liquidating Trust Units. Accordingly, subject to the rules regarding accrued but untaxed interest as discussed below, each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of the Liquidating Trust Assets underlying the Liquidating Trust Units received, as applicable, in exchange for such Allowed General Unsecured Claim, and (2) such Holder's adjusted basis, if any, in such Allowed General Unsecured Claim.

Generally, the gain or loss recognized by a U.S. Holder with respect to an Allowed General Unsecured Claim will be a capital gain or loss unless the Allowed General Unsecured Claim was acquired at a market discount (as discussed below) and depending on whether and the extent to which the Holder previously claimed a bad debt deduction. Any such capital gain or loss generally should be long-term if the U.S. Holder's holding period in the Allowed General Unsecured Claim is more than one (1) year and otherwise should be short-term. Under current U.S. federal income tax law, certain non-corporate U.S. Holders are eligible for preferential rates of U.S. federal income tax on long-term capital gains.

A U.S. Holder of an Allowed General Unsecured Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) and ordinary income to the extent of the lesser of (x) $3,000 ($1,500 for married individuals filing separate returns) or (y) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income in later years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three (3) years preceding the capital loss year or may carry over unused capital losses for the five (5) years following the capital loss year.

A U.S. Holder of such Allowed General Unsecured Claims should obtain a tax basis in its share of each of the Liquidating Trust Assets received (if any) equal to the fair market value of such U.S. Holder's share of each of the Liquidating Trust Assets as of the date such property is treated as having been distributed to the U.S. Holder pursuant to the Plan. The holding period for the beneficial interest in these assets should begin on the day following the Effective Date.

## 2. Accrued but Untaxed Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed General Unsecured Claim is attributable to accrued but untaxed interest on the debt instruments constituting the surrendered Allowed General Unsecured Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of an Allowed General Unsecured Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed General Unsecured Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders

of Allowed General Unsecured Claims will be allocated first to the principal amount of such Allowed General Unsecured Claims, with any excess allocated to unpaid interest that accrued on these Allowed General Unsecured Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Allowed General Unsecured Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNTAXED INTEREST.

### 3.  Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed General Unsecured Claim who exchanges the Allowed General Unsecured Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Allowed General Unsecured Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument immediately after such acquisition is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed General Unsecured Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### 4.  Ownership of Liquidating Trust Units

The U.S. federal income tax obligations of U.S. Holders of Allowed General Unsecured Claims receiving Liquidating Trust Units (as applicable) are not dependent on the Liquidating Trust distributing any Cash or other proceeds.  U.S. Holders of such Claims will be required to report on their U.S. federal income tax returns their share of the Liquidating Trust's items of income, gain, loss, deduction, and credit in the year recognized by the Liquidating Trust.  This requirement may result in such U.S. Holders being subject to tax on their allocable share of the Liquidating Trust's taxable income prior to receiving any cash distributions from the Liquidating Trust (as applicable).  In general, a distribution of Cash by the Liquidating Trust will not be separately taxable to a holder of a beneficial interest in the Liquidating Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust).

### 5.  Delayed Distributions

The Plan provides that certain distributions may be delayed while contingent, unliquidated, or disputed Claims are addressed.  Pending the resolution of such Claims, a portion of the property to be received by Holders of Claims may be deposited into the Liquidating Trust as described in the Plan.  The

property that is subject to delayed distribution will be subject to "disputed ownership fund" treatment under section 1.468B-9 of the Treasury Regulations as further discussed below in Section D.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed General Unsecured Claims**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, local and non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Holder.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

**1.      Gain Recognition**

Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID, if any), any gain realized by a non-U.S. Holder on the exchange of its Allowed General Unsecured Claim pursuant to (and to the extent applicable under) the Plan generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the transactions contemplated by the Plan occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax (and possibly withholding tax) with respect to any gain realized on the exchange if such gain is effectively connected with the non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

**2.      Accrued Interest**

**S**ubject to the discussion of FATCA below, payments to a non-U.S. Holder that are attributable to accrued but untaxed interest with respect to Claims generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W 8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

1.   the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of the applicable Debtor's stock entitled to vote;

2.  the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the applicable Debtor (each, within the meaning of the Tax Code);

3.  the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

4.  such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W 8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  As described above in more detail under the heading "Accrued but Untaxed Interest," the aggregate consideration to be distributed to Holders of Allowed General Unsecured Claims will be allocated first to the principal amount of such Allowed General Unsecured Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

### 3.  FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final Treasury Regulations become effective.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder's exchange of its Claim.

D.        **Tax Matters Regarding the Liquidating Trust**

The Plan provides that assets shall be transferred by the Debtors to a Liquidating Trust in order to facilitate the sale of such assets and the disposition of the proceeds thereof to (as and to the extent applicable) Holders of Claims as provided pursuant to the terms and provisions of the Plan.  As further described in the Plan, such assets may either be subject to:

1.    **Liquidating Trust Treatment**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Plan Proponents expect that the Liquidating Trustee shall treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the Liquidating Trustee will take a position on the Liquidating Trust's tax return accordingly.  For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust.  If the IRS were to challenge successfully the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax).  For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors, the Trustee, and the Holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust.  Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets.  The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (*e.g.*, income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

## 2. Disputed Ownership Fund Treatment

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Plan Proponents intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

## E. Information Reporting and Backup Withholding

The Liquidating Trust will withhold all amounts required by law to be withheld from distributions or payments. The Liquidating Trust will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to (as and to the extent applicable) a Holder of a Claim under the Plan. In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION AND DOES NOT ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS THAT ARE NOT HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS.  ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION

In the opinion of the Plan Proponents, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Plan Proponents recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Date:  ~~July~~September 2~~9~~, 2025
Wilmington, Delaware

Yellow Corporation

*/s/ Matthew Doheny*
Name:  Matthew Doheny
Title:    Chief Restructuring Officer, Yellow Corporation.


The Official Committee of Unsecured Creditors of Yellow Corporation, *et al.*

**BENESCH, FRIEDLANDER,
    COPLAN & ARONOFF LLP**

*/s/ Jennifer Hoover*
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile:  (302) 442-7012
E-mail: jhoover@beneschlaw.com
            kcapuzzi@beneschlaw.com

jgentile@beneschlaw.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Philip C. Dublin (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
Kevin Zuzolo (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email:  pdublin@akingump.com
        mlahaie@akingump.com
        kzuzolo@akingump.com

*Co-Counsel to the Official Committee*
*of Unsecured Creditors of Yellow Corporation,* et al.

## EXHIBIT A

**Chapter 11 Plan**

| Summary report:<br>**Litera Compare for Word 11.11.0.158 Document comparison done on**<br>**9/2/2025 4:54:04 PM** | |
|---|---|
| **Style name:** Color (Kirkland Default) | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://dms.kirkland.com/legal/125185327/22 - Yellow - Fourth Amended Disclosure Statement [PFV].docx | |
| **Modified DMS:** iw://dms.kirkland.com/legal/125185327/29 - Yellow - Fourth Amended Disclosure Statement [KE PFV 9.2.25].docx | |
| **Changes:** | |
| Add | 164 |
| Delete | 148 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 312 |