## EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | Case No. 23-11069 (CTG) |
| Debtors. | (Jointly Administered) |
|  | Re:  Docket Nos. 7619[2] |

**OBJECTION OF MFN PARTNERS, LP AND MOBILE STREET HOLDINGS, LLC TO CONFIRMATION OF THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF YELLOW CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

MFN Partners, LP ("MFN") and Mobile Street Holdings, LLC ("Mobile Street" and, together with MFN, "MFN/Mobile Street"), by their undersigned counsel, hereby submit this objection (the "Objection") to confirmation of the *Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Dkt. No. 6746] (the "Fourth Plan").[3]  In support of this Objection, MFN/Mobile Street respectfully states as follows:

### PRELIMINARY STATEMENT

1.     The Fourth Plan cannot be confirmed for two overarching reasons.  ***First***, at its heart is the material risk that conflicted members of the proposed Liquidating Trust Board of

---

[1]     A complete list of each of the debtors in these chapter 11 cases (the "Debtors") may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is:  10990 Roe Avenue, Overland Park, Kansas 66211.

[2]     By agreement with the Debtors, MFN/Mobile Street's deadline to object has been extended to 11:59 p.m. ET on October 31, 2025.

[3]     Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Fourth Plan.

Managers ("Trust Board") will be empowered to act for their own benefit. It matters not that the Plan Proponents will claim that they have crafted mechanisms in the proposed trust agreement (the "Trust Agreement") to address this risk because, between the history of these cases, the refusal to implement easy and fair solutions, and ongoing conduct highlighting conflicts, there is simply too great a likelihood that this Court will have to review whether decisions made are tainted or not and whether settlements or abandonments are fair and appropriate when all of the risks can be avoided by having a truly independent fiduciary.

2.      MFN/Mobile Street has tried to work with the Plan Proponents to improve the Trust Agreement to alleviate the concerns of conflicts. While progress has been made – the Plan Proponents have signaled they would accept some of MFN/Mobile Street's proposed changes to the Trust Agreement – there remains several material matters that they have refused to accept, without justification.[4] Multiple subsections of Bankruptcy Code section 1129, such as sections (a)(3) and (a)(5) are implicated, mandating denial of confirmation.

3.      *Second*, there is no evidence that the Fourth Plan satisfies section 1129(a)(7)'s "best interest of creditors" test, at least as to YRC, Inc., and the Plan Proponents cannot sustain their burden. The Plan Proponents have not put forward any liquidation analysis. Documents produced by the Plan Proponents do not contain any such analysis. And there is no dispute that under the Fourth Plan, two classes of general unsecured creditors (Classes 4A and 4B) receive 100% of their claims (estimated to be between $44 million and $60 million) but in a hypothetical chapter 7 would share pro rata with Class 5 general unsecured claims. An extra $44 million to $60 million

---

[4]     Attached hereto as Appendix "1" is a redline of the Trust Agreement with MFN/Mobile Street's proposed edits that have not been accepted.

in cash available to pay all general unsecured claims would be materially better for Class 5 – especially creditors of YRC, Inc.

4.      Further, the Fourth Plan estimated the range of allowed Class 5 Claims to be $1.25 billion to $1.7 billion.  This was based on existing rulings on MEPP claims (and accounting for 50% subordination).  The Plan Proponents may again try to settle with the same MEPP claimants that they attempted to settle with under the botched Third Plan that failed, with the risk of giving such claimants more than they deserve, to the detriment of other general unsecured creditors (and potentially equity security holders).  Any such settlement done now – before a plan goes effective and without the independent views of the proposed liquidating trustee – would also violate section 1129(a)(7) because no hypothetical chapter 7 trustee would reasonably be compelled to settle with such MEPP claimants without, at minimum, working closely with MFN/Mobile Street – a co-claim objector who worked extensively on the very objections that resulted in the disallowance of billions of dollars of such claims.  This is particularly true given that ***right now*** MFN/Mobile Street is working with the Debtors on a petition for certiorari relating to the Third Circuit's September 16, 2025 decision and on a reply to the Debtors' and MFN/Mobile Street's objection to New York Teamsters' $77 million liquidated damages claim.

## **RELEVANT FACTUAL BACKGROUND**

5.      This Court is no doubt familiar with the course of these cases and MFN/Mobile Street will seek to illuminate only salient facts.  This includes facts already presented as well as facts recently obtained through discovery.  These facts are important to why the Fourth Plan is not confirmable, at least in its present form.

6.       In 2023 and 2024, the Debtors sought to maximize value for all constituents, not only by engaging in a process to sell their valuable real estate portfolio,[5] but by pursuing a litigation claim against the IBT (including pursuing an appeal to the Tenth Circuit) that the Debtors believed was worth in excess of $1.0 billion (the "IBT Litigation Claim"), and, equally importantly, objecting to asserted claims, including billions of dollars of withdrawal liability claims asserted by MEPPs.

7.       During this period, MFN/Mobile Street worked arm in arm with the Debtors on many key claim objections and vocalized support for the Debtors' real estate marketing efforts and preservation of the potentially massively valuable IBT Litigation Claim.  Even after this Court ruled against the estates and in favor of upholding the PBGC regulations, which ended the possibility of a reorganization around the real estate portfolio and may have dramatically impacted creditor and equity security holder recoveries, MFN/Mobile Street continued to work with the Debtors to obtain direct review by the Third Circuit even though the ruling was interlocutory.   MFN/Mobile Street is currently working with the Debtors on a petition for certiorari.

8.       MFN/Mobile Street further worked with the Debtors on MEPP claim objections, including pursuing the argument that 50% of MEPP withdrawal liability claims had to be subordinated if the Debtors were in fact insolvent.  This issue does nothing to assist equity security holders but directly benefits all general unsecured creditors other than MEPPs.  Even despite friction over the Debtors' positions relating to the Third Plan and MFN/Mobile Street's motion

---

[5]   In the first phase of this selling process in 2023, MFN was heavily involved in working with the Debtors and that process was very successful in generating sale proceeds while preserving a meaningful real estate portfolio that could have been the foundation for a reorganization that could pay all allowed claims in full.  But following this Court's SFA ruling and denial of a reconsideration motion, in November 2024 the Debtors pivoted to a liquidation and MFN stepped away from participating in any sale process.  Since that time, the sales have not gone as well and actual sales appear to have fallen significantly short of estimated sale proceeds.

to convert these cases, MFN/Mobile Street and the Debtors have continued to work on MEPP claim objections, including a recent objection to the New York Teamsters' $77 million liquidated damages claim.

9.    From early on in these cases through the fourth quarter of 2024, the Committee was generally silent to occasionally hostile to the Debtors and to recoveries to prepetition equity security holders.[6]  It, as far as MFN/Mobile Street knows, did not and has not identified any buyers of real estate assets.  Similarly, as far as MFN/Mobile Street knows, the Committee did not identify any litigation claims belonging to the estates that the Debtors did not identify.  The Committee joined a few claim objections the Debtors brought,[7] but noticeably failed to join nearly every claim objection involving a MEPP.  The Committee sat out the SFA dispute, including doing nothing in respect of seeking direct review (which this Court and the Third Circuit granted) and on appeal.  It did not object to Central States' $918 million penalty claim, which this Court has disallowed.  The Committee also did not vocally support the Debtors' pursuit of the IBT Litigation Claim (such as filing an amicus brief or seeking to intervene as creditors' committees often will do when trying to maximize value for their constituents).

10.    As this Court is aware, a majority of the Committee members – Central States, New York Teamsters, the PBGC, and the IBT – all have had interests directly adverse to the estates. Central States and New York Teamsters collectively filed proofs of claim in excess of $130

---

[6]    In 2024, the Committee opposed an extension of exclusivity, which resulted in a lengthy evidentiary hearing on June 3, 2024.

[7]    *See* Dkt. No. 886 (joining objection to personal injury claims); Dkt. No. 2755 (joining objection to WARN claims); Dkt. Nos. 3057, 3998, 4543 (joining objection, briefing, and motion for reconsideration related to 20-year cap issue on MEPP claims; Dkt. No. 5326 (joining objection to Environmental Protection Agency claims); Dkt. No. 5451 (joining objection to CARES Act claims).

billion,[8] including several claims that are unique to each. The PBGC, though it holds a large (and unsubordinated) general unsecured claim and thus should have logically sought to have other inflated claims disallowed in order to maximize its recovery, has only been active in this Court to defend its own regulations[9] even though defense of such regulations has risked recoveries to MEPPs like Western Conference.[10] The IBT, of course, is the target of the Debtors' claim that it was the IBT's prepetition conduct that caused the Debtors to collapse, leading to the termination of over 30,000 workers, the triggering of withdrawal liability, and the tens of millions of dollars in fees and costs incurred in these chapter 11 cases.

11.    In early 2025, the Committee greatly turned up the pressure on the Debtors. In January 2025, the Committee sought to terminate exclusivity (even though it was about to expire in any event) or convert the cases to chapter 7.[11] The sole reason was that the Debtors had filed a "waterfall" plan of liquidation but had refused to hand over post-confirmation control to the Committee. *See* Dkt. No. 5564 at 14–15. The Committee asserted that its own members (plus those aligned with Committee members) had the votes to block confirmation. The Committee's conversion motion noted that it could not support a plan with estate releases "given that potentially valuable claims held by the estates may be pursued to supplement unsecured creditor

---

[8]    Each filed claims against every debtor. The aggregate amount exceeds $130 billion. Even eliminating duplication, the asserted claims were billions of dollars.

[9]    *See* Dkt. No. 2276 & 2500.

[10]    Western Conference historically managed its finances well and thus did not need to take taxpayer money to bail itself out of insolvency. But because it handled its affairs well, it will now receive proportionally lower recoveries than MEPPs who took such funds because of the PBGC regulations.

[11]    *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Terminating the Debtors' Exclusive Period to Solicit Acceptances of a Plan or, in the Alternative, Converting the Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code* [Dkt. No. 5564].

recoveries"[12] (presumably against directors and officers) that the Debtors were not pursuing and would not pursue and thus the Committee needed to wrest control away from the Debtors.[13]

12.     When that conversion motion went nowhere, in March 2025, the Committee threatened to pursue its own plan.  And unlike what occurred in January, this time the Committee cut a deal with certain non-Committee member MEPPs to "settle" all MEPP claim objections. The Debtors, apparently fearing they had no choice if all active participants other than MFN/Mobile Street were on board, agreed.  This resulted in the Third Plan – one that was premised on allowing certain MEPPs' claims in inflated amounts via settlement of objections to claims of favored MEPPs, ensuring that Committee members controlled post-confirmation governance (including the IBT Litigation Claim), and mooting out the SFA appeal then pending at the Third Circuit (and, with it, any petitions for certiorari to the Supreme Court).

13.     It also required this Court to not rule on pending summary judgment motions, with the hope that this Court would apply the lenient "lowest point of reasonableness" standard under Bankruptcy Rule 9019(a).  When MFN/Mobile Street argued that this was not proper or fair, the Committee pointedly sought to claim MFN/Mobile Street lacked standing and that the law required this Court to apply the "lowest point of reasonableness" standard.  *See* Dkt. No. 5982.

14.     This Court rejected the combined efforts of the Debtors and the Committee to block claim objection resolution on the merits and instead issued "preliminary observations" (which later was embodied in an interlocutory summary judgment order) [Dkt. Nos. 6030, 6682].  These preliminary observations overwhelmingly validated the claim objections jointly brought by the

---

[12]     *Id.* at ¶ 3.

[13]     As later learned in discovery conducted in connection with MFN/Mobile Street's own conversion motion [Dkt. No. 6204] (the "Conversion Motion"), this threat of pursuing litigation claims was hollow – there were no such claims even identified by the Committee.

Debtors and MFN/Mobile Street and demonstrated that the "settlements" in the Third Plan were not fair.

15.     Importantly, at the time of the Third Plan and well into June 2025, the Debtors and the Committee estimated distributable value to be in excess of $750 million.  Thus, when the Third Plan estimated that non-settling MEPP and non-MEPP general unsecured creditors would receive no more than 16% (on the high end) on account of their allowed claims, *see* Dkt. No. 5996 at 4, 57, that was based on a distributable value exceeding $750 million.

16.     MFN/Mobile Street then sought conversion to chapter 7 because, with the estate fiduciaries having tried and failed to allow via settlement claims of favored creditors, there was no obvious path to confirm a plan; if the Second Plan, which was actually neutral, was not acceptable, then it was difficult to see any neutral plan being acceptable.  This Court did not grant the Conversion Motion at the hearing on June 17, 2025, but also said it would revisit the issue of conversion if progress was not made towards a confirmable plan.

17.     Two and a half months after the hearing on MFN/Mobile Street's Conversion Motion, the Debtors and the Committee filed the Fourth Plan.  On its face, it is a nominally "neutral" waterfall plan.  It does not by its terms settle any claims.  It does not wipe out equity security holders (since they may recover if the IBT Litigation Claim is successful enough to pay allowed claims in full).  But it did give the Committee the power to select the Liquidating Trustee and four of the five members of the Trust Board.  Thus, it was not neutral like the Second Plan.

18.     According to the disclosure statement accompanying the Fourth Plan [Dkt. No. 7619] (the "Fourth Disclosure Statement"), non-settling MEPP and non-MEPP general unsecured creditors of YRC, Inc. (the one debtor with most of the value and the largest number of general unsecured creditors) do better now under the Fourth Plan than under the Third Plan even though

distributable value is estimated to be no more than $700 million (and may be as low as $600 million) and the Fourth Disclosure Statement reveals that the claims pool could increase by up to $200 million more in non-MEPP general unsecured claims related to potential workers' compensation deficiency claims.  *See* Fourth Disclosure Statement at 54.[14]  Had the actual distributable value of between $600 million to $700 million been known at the time of the Third Plan and an additional $100 million to $200 million been added to the Class 5 claims pool, non-settling MEPP and non-MEPP general unsecured creditors of YRC, Inc. would have had terrible outcomes under the Third Plan.[15]

19.    But the Fourth Plan is still no solution because, at a time when nearly all remaining material issues involve matters adverse to a majority of the Committee's members, the Fourth Plan hands over control of the Debtors' estates to exactly those conflicted Committee members. The Committee picks the Liquidating Trustee[16] and appoints three members of the Trust Board who are in a position to dictate to the Liquidating Trustee what to pursue.  Two of the Committee members nominated to serve on the Trust Board are Central States and New York Teamsters, which are the same two members who filed massively inflated proofs of claim in the billions of dollars that have been largely disallowed.  The third – RFT Logistics LLC – is the holder of a claim against YRC, Inc. that amounts to $1,105,997.00.  Based on minutes of Committee meetings, not once was RFT recorded as raising any concerns with the claims of its fellow

---

[14]    The Fourth Disclosure Statement appears to estimate $100 million for such claims.  The Third Disclosure Statement did not appear to estimate any amount for such claims.

[15]    No matter what, the Fourth Plan is better than the Third Plan precisely because it does settle favored creditors' claims in inflated amounts.

[16]    MFN/Mobile Street has no issues with the qualifications and bona fides of the nominated Liquidating Trustee. Indeed, he would make a fine chapter 7 trustee if the cases were converted.  But in that circumstance, he would not be beholden to a board that had the power to dictate to him what to do or what not to do.

Committee members and there is no evidence that RFT ever voted in a way contrary to the interests of Central States and New York Teamsters.

20.     The Debtors and the Committee have argued (and likely will argue) that the trust agreement has built-in mechanisms to deal with conflicts that are consistent with Delaware corporate law.  Delaware corporate law is not applicable (or should not be the standard) for a trust formed under this plan, particularly when there is a more favorable alternative under chapter 7. This case is unique.  There is no obvious precedent for a circumstance where a debtor's estate is nearly finished liquidating assets and the remaining material matters to be vested in a liquidating trust are litigation matters against the entities that advocated for and control such trust.  The outcome will be that for almost any material matter, there is going to be a conflict that this Court will need to resolve.[17]

21.     There are additional indicia of conflict that should cause this Court to have serious concerns regarding trust governance.  ***One***, as MFN/Mobile Street previously noted, at the eve of the two-year anniversary of these cases, the Debtors filed over 650 preference complaints.  These overwhelmingly appear to be "strike" suits designed to cajole targets into settling even though they have little to no actual liability.[18]  Not surprisingly, since this wave of litigation was commenced, already the Debtors have abandoned 47 such actions[19] without any recovery and settled another 41 (averaging less than 15% of the asserted amount and none involved more than

---

[17]  Consider, for example, the Liquidating Trustee having to decide whether to object to final fee applications, pursue additional claim objections (or equitable subordination) against Central States or the New York Teamsters, pursue the IBT Litigation Claim (which the Committee has not supported but called it a hail mary [Dkt No. 3511, ¶ 48]), or pursue claims of non-exculpated gross negligence against the very parties that appointed him and oversee him. No person in such circumstances can reasonably be expected to take such actions.

[18]  Indeed, discovery revealed the Debtors and the Committee approving a settlement of $5,000 where the Debtors acknowledge that the defendant appears to have complete defenses.

[19]  One abandoned preference action was against EXL Service Holdings, Inc. for over $2 million – which is one of the largest ones filed.  *See* Adv. Case No. 25-51348 (CTG), Dkt. No. 4.  No motion was filed to authorize the abandonment of the preference claim; the Debtors simply filed a notice of dismissal.

$145,000). But despite deciding to pursue highly dubious preference claims against a broad array of parties, not a single Committee member was sued even though several received payments within 90 days. There is no good explanation for this disparate treatment.

22.     **Two**, even after the jointly proposed Fourth Plan was filed, when the Committee had the opportunity to join with the Debtors and MFN/Mobile Street in objecting to New York Teamsters' $77 million liquidated damages claim [Dkt. No. 7603], the Committee did nothing. Notably, one of New York Teamsters' responses [Dkt. No. 7731] is that the objection is too late – an argument that is aimed at estate fiduciaries like the Committee – and yet the Committee has done nothing publicly to protect the estate from this attack.

23.     **Three**, the Committee apparently considered, but rejected, appointing non-Committee members to the Trust Board. If non-Committee members were willing to serve, it begs the question why at least one of them was not appointed.

24.     **Four**, based on minutes produced by the Committee, there is no evidence that the Committee sought to challenge MEPP withdrawal liability claims (including claims of its two members) by pointing out that one MEPP - the Local 705 International Brotherhood of Teamsters Pension Trust Fund (the "Teamsters 705 Fund") - did calculate withdrawal liability correctly in full compliance with ERISA's requirements.[20] In other words, since one MEPP did calculate correctly the Committee could have easily used this fact to convince its own members to do the right thing. There is no evidence that ever happened.

---

[20]     In fact, the Teamsters 705 Fund filed an amended claim lowering its original claim amount because that claim amount was based on an estimate as to the amount of unfunded vested benefits as of December 31, 2022, and when the numbers were finalized, the unfunded vested benefits were determined to be lower than the estimate. The Teamsters 705 Fund filed an original claim for approximately $22 million and then filed an amended claim reducing its claim amount to $17.8 million. Any disputes concern matters such as 50% subordination.

25.     Stated plainly, this Court should not have to go out of its way to rescue a flawed plan and post-confirmation governance when there are better alternatives.

### CONFIRMATION OBJECTION

26.     The Fourth Plan should not be confirmed because it does not satisfy the requirements of Bankruptcy Code sections 1129(a)(1), 1129(a)(3), 1129(a)(5), and 1129(a)(7).

### I.     The Fourth Plan Cannot Satisfy Bankruptcy Code Section 1129(a)(7).

27.     The "best interests of creditors" test provides that a bankruptcy court may confirm a chapter 11 plan only if each holder of an impaired claim "will receive or retain ... property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."  11 U.S.C. § 1129(a)(7)(A)(ii).  To meet this requirement, the Debtor must ensure that creditors are no worse off under the plan than they would be in a chapter 7 liquidation.  *In re Armstrong World Indus.*, Inc., 348 B.R. 136, 165–66 (Bankr. D. Del. 2006).

28.     The Plan Proponents bear the burden of establishing that the Fourth Plan satisfies, for each Debtor's estate, the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.  *See, e.g.*, *In re Glob. Ocean Carriers Ltd.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000) (denying confirmation because the plan proponents failed to establish the plan complied with section 1129(a)(7)).  In addition, the Court has an independent duty to ensure that the Fourth Plan meets the requirements of section 1129(a)(7).  *See In re Crestwood Hosp. LLC*, 2025 WL 1183883, at *29 (Bankr. D. Ariz. Apr. 23, 2025) ("the Court has an affirmative, independent duty to apply the provisions of § 1129"); *In re Union Meeting Partners*, 165 B.R. 553, 574 (Bankr. E.D. Pa. 1994), *subsequently aff'd*, 52 F.3d 317 (3d Cir. 1995) (collecting cases).  In other words, even if MFN/Mobile Street was not raising this issue, the Plan Proponents still have to demonstrate that the Fourth Plan satisfies section 1129(a)(7) for each Debtor's class of applicable creditors.

29.     Courts have recognized the need for intervention where operation of an independent chapter 7 trustee may result in higher recovery for creditors.  *In re Landscaping Servs., Inc.*, 39 B.R. 588, 590 (Bankr. E.D.N.C. 1984); *In re Sierra-Cal*, 210 B.R. 168, 175 (Bankr. E.D. Cal. 1997) ("In a hypothetical liquidation, a competent chapter 7 trustee would be able to recover against SCF").  Thus, as part of determining whether a plan satisfies section 1129(a)(7), this Court can and should take into account reasonable actions of a hypothetical chapter 7 trustee, unburdened with the need to persuade creditors to vote for a plan.

30.     The Plan Proponents fail to meet this burden.  The Fourth Plan merely contains conclusory statements comparing it to a chapter 7 liquidation.  The Plan Proponents state without any support that the estates would incur additional expenses "related to the chapter 7 trustee and additional retained professionals."  *See* Fourth Disclosure Statement at 62.  However, the Plan Proponents have not prepared a liquidation analysis and have not provided any budgets or projections for costs of the Liquidating Trust to allow those to be compared with a chapter 7.

31.     Most obviously, in a hypothetical chapter 7, Class 4B convenience claims or Class 4A claims would not receive 100% as they do under the Fourth Plan but would share pro rata with all other general unsecured claims.  Adding $44 million to $60 million (with a midpoint of $52 million) just to the Class 5 general unsecured claims pool for YRC, Inc. increases distributions to YRC, Inc. general unsecured creditors by more than 3%, which exceeds the highest chapter 7 trustee commission.[21]  That's not insignificant and means Class 5 claimants do worse under the Fourth Plan than they would in a hypothetical chapter 7.  The table below demonstrates this, using

---

[21]   This assumes 100% of the Class 4A and Class 4B claims are YRC, Inc. creditors and 100% of the cash belongs to YRC, Inc.'s estate.  MFN/Mobile Street does not know for sure because the Plan Proponents did not provide this analysis.

midpoint figures from information previously provided by the Plan Proponents and the Fourth Disclosure Statement.

| SUBJECT | CURRENT CLAIMS POOL | AMOUNT OF CLASS 4A/4 CLAIMS | CHAPTER 7 CLAIMS POOL |
|---------|---------------------|------------------------------|------------------------|
| YRC, Inc. Claims | $1.320 billion | $52 million | $1.372 billion |
| Midpoint recovery | 16.50% | $52 million | 19.65% |
| Implied assets | $217.8 million | $52 million | $269.8 million |

32.     The Plan Proponents also rely on the fact that a new bar date would be established upon conversion pursuant to Bankruptcy Rule 1019(b)(1) and that such a new deadline could increase the amount of Allowed Claims and reduce pro rata recoveries.  *See* Fourth Disclosure Statement at 62.  They have not demonstrated that there is any material risk of material new claims that could be filed in a chapter 7 that would reduce recoveries.  These conclusory statements fail to satisfy the Plan Proponents' burden of proof.

33.     At bottom, a chapter 7 trustee could do anything that the Debtors or a post-confirmation trust would do while entirely independent and conflict free, and it is just as likely that trustee could do so at lower overall cost to the estates.  If there are any remaining assets not sold at this time, they have been thoroughly marketed such that a chapter 7 trustee could easily pick up where the Debtors left off.  Neither the Debtors, nor the Committee, nor MFN/Mobile Street could complain about who controls what.  There would thus be minimal, if any, incremental costs in a chapter 7 case.[22]  In fact, costs would likely be lowered because in a hypothetical chapter

---

[22]     The plan's creation of the Liquidating Trust necessarily involves costs (in the form of trustee fees and professional fees) and the plan proponents have not provided any evidence of a cost comparison.

7, needed professionals would be greatly streamlined.  Through a chapter 7 trustee, trust and efficiency would be maximized.

34.     Moreover, a chapter 7 trustee in a hypothetical chapter 7 would not be hampered by the Committee-members-turned-Trust-Board-Managers' allegiances and would likely create additional value for the estate by diligently pursuing all viable, value-maximizing claims, including the IBT Litigation Claim, and objecting to claims without fear.  *See, e.g.*, *In re Sierra-Cal*, 210 B.R. at 174 ("In computing the hypothetical chapter 7 liquidation, the court is entitled to view the entire record of the case and to engage in rational speculation about what would occur in a chapter 7 liquidation.").  There would be no risk of a chapter 7 trustee being directed to do or not do anything by Trust Board members and no risk of having to constantly sort through whether conflicts exist.  That a chapter 7 trustee could act independently without conducting meetings and obtaining approvals from a Trust Board is in and of itself a more efficient process.

35.     Accordingly, the Court should find that the Fourth Plan does not comply with section 1129(a)(7) of the Bankruptcy Code and deny confirmation.

## II.     The Fourth Plan, by Granting the Committee Control Over the Liquidating Trust, Violates Bankruptcy Code Sections 1129(a)(3) and 1129(a)(5).

36.     As noted in the Preliminary Statement, the overarching issue of conflicted control over post-confirmation governance renders the Fourth Plan non-confirmable.  While MFN/Mobile Street acknowledges that the Fourth Plan is, by its terms, a "waterfall" plan (a change from the Third Plan) and does not settle any claims (also a change from the Third Plan), that does not inoculate the Fourth Plan from what the Bankruptcy Code requires.

37.     For avoidance of doubt, if the Plan Proponents agreed to modify the form Trust Agreement as set forth in Appendix "1," this specific confirmation objection would be resolved.  But the Plan Proponents have not agreed to do so.

### *Section 1129(a)(3) Standards*

38.    To be confirmed, a chapter 11 plan must have "been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  In addition to the plan itself, the important inquiry is whether the plan "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *Nat'l Union Fire Ins. of Pittsburgh, PA v. Boy Scouts of Am. (In re Boy Scouts Am.)*, 650 B.R. 87, 175 (D. Del. 2023) (citing *In re Abbotts Dairies*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004), *as amended* (Feb. 23, 2025).

39.    When deciding whether the good faith requirement of section 1129(a)(3) is met, Delaware courts consider whether the plan "(1) fosters a result consistent with the Bankruptcy Code's objectives; (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected and (3) exhibits a fundamental fairness in dealing with the creditors."  *In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 645 (Bankr. D. Del. 2022), *supplemented,* 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), *aff'd,* 650 B.R. 87 (D. Del. 2023), *aff'd in part, rev'd in part, dismissed in part sub nom. In re Boy Scouts of Am.*, 137 F.4th 126 (3d Cir. 2025), and *aff'd,* 650 B.R. 87 (D. Del. 2023) (citing *In re W.R. Grace & Co.*, 475 B.R. 34, 87–88 (D. Del. 2012)); *see also In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001) (quoting *In re Zenith Electronics Corp.*, 241 BR. 92, 107 (Bankr. D. Del. 1999)) ("The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'").

40.    Section 1129(a)(3) "speaks more to the process of plan development than to the content of the plan."  *See In re Quigley Co., Inc.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010) (citing

*In re Bush Indus.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)).  In this context, good faith is viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. *In re W.R. Grace & Co.*, 475 B.R. at 87; *see also In re Quigley Co., Inc.*, 437 B.R. at 125 (collecting cases).  Thus, ***how*** these cases progressed to the Fourth Plan is important to determining whether the Fourth Plan was proposed in good faith.

### *Section 1129(a)(5) Standards*

41.    Section 1129(a)(5) requires that a plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor and that the appointment of such individual be "consistent with the interests of creditors and equity security holders and with public policy."  11 U.S.C. § 1129(a)(5). Thus, the appointments of the Liquidating Trustee, who effectively will be the sole officer, and Trust Board members (who effectively act as directors) must be consistent with public policy and in the interests of creditors and equity security holders in order for the Plan to be confirmed.

42.    While courts have not consistently applied section 1129(a)(5) to members of a trust advisory committee, where there are concerns about the independence of members of such advisory boards or committees, courts have found that there must be protections included to allow a trustee to fulfill their fiduciary duties in the face of conflicts or disagreements with the trust board.  *See In re Boy Scouts of Am.,* 642 B.R. at 640 ("As the *Eagle-Pitcher* court states, members of a trust advisory committee do not fall neatly with the categories enumerated in [sections 1123(a)(7) and 1129(a)(5)].  But, I also agree with the *Eagle-Pitcher* court, that to the extent that a trust advisory committee with veto powers exercises them to prevent a trustee from fulfilling her duties, that trustee must be able to petition the court for appropriate relief."); *In re Beyond.com Corp.*, 289 B. R. 138 (Bankr. N.D. Cal. 2003) (refusing to confirm a plan where there was

insufficient disclosure of the liquidation manager's affiliations, and the liquidation manager was subject to potential conflicts of interest).

43.     Courts have set forth nine factors to consider in assessing "whether the appointment of an individual to serve as a director or officer of a reorganized debtor is 'consistent with public policy.'" *In re Digerati Tech., Inc.*, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014). The factors are: (1) does the proposed plan keep the debtor in existence as an ongoing company; (2) is the debtor a publicly held or privately held company; (3) does continued service of the individual perpetuate incompetence, lack of direction, inexperience, or affiliations with groups inimical to the best interests of the debtor; (4) does the continued service of the individual provide adequate representation of all creditors and equity security owners; (5) does the retention of the individual violate state law in any respect; (6) is the individual a "disinterested person"; (7) is the individual capable and competent to serve in the proposed capacity assigned to him; (8) are the salaries and benefits reasonable; and (9) are there any new independent outside directors being appointed. *Id.* Applying these factors, the Court should find that appointment of the Trust Board is not consistent with public policy because the creditors to not provide adequate representation of all creditors and equity security owners, are not disinterested persons, and have interests that are not aligned with the best interests of all unsecured creditors and equity security owners.

### LaSalle and ConvergeOne

44.     The Supreme Court has recognized that one of the Bankruptcy Code's purposes is to prevent parties with additional leverage, "whether representatives of management or *major creditors*, to use the reorganization process to gain an unfair advantage." *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999) (discussing the advent of the absolute priority rule under § 1129(b)) (cleaned up; emphasis added).

18

45.    More recently, the District Court for the Southern District of Texas recognized the same goal of the Bankruptcy Code in the context of 11 U.S.C. § 1123(a)(4).  *See ConvergeOne Holdings, Inc., v. Ad Hoc Group of Excluded Lenders*, 4:24-cv-02001, dkt. 54 at 9, 13 (S.D. Tex. Sept. 25, 2025) (denying confirmation, comparing the purposes of §§ 1123 and 1129, and finding that "the similarity in text and structure of §§ 1123(a)(4) & 1129(b), as well as the Supreme Court's analysis certainly make the *LaSalle* opinion instructive [on the parameters of § 1123(a)(4)].").

46.    While *LaSalle* and *ConvergeOne* each dealt with different confirmation issues, the policy underlying *LaSalle* and applied by *ConvergeOne* is that a plan should not be a vehicle for favoring some creditors.  That same analysis can and should be considered for sections 1129(a)(3) and 1129(a)(5).

### The Fourth Plan Does Not Satisfy Either Section 1129(a)(3) or Section 1129(a)(5)

47.    Though MFN/Mobile Street have not located a case directly on point with the facts here, the case law developed under sections 1129(a)(3), 1129(a)(5), and *LaSalle* show that the Fourth Plan should fail because it does not "exhibit[] a fundamental fairness in dealing with the creditors" of Yellow, *BSA*, 642 B.R. at 645, nor can it "be effected with results consistent with the objectives and purposes of the Bankruptcy Code," as required by this Court.  *Coram*, 271 B.R. at 234.  The process of getting to this plan, furthered by the choice of only Committee members to serve as a majority of the Trust board, has been plagued by Committee members seeking favorable MEPP claim settlements for themselves and control over post-confirmation governance even to the point of rejecting a neutral waterfall plan, and the result is an unconfirmable construct which vests post-confirmation governance to a conflicted set of Committee members because the Debtors prefer it over conversion.

48.     The Committee and its members blocked confirmation of the Second Plan (itself a "waterfall" plan that was neutral) through their voting power then cajoled the Debtors into being a proponent of the Third Plan.  They only reverted to a "waterfall" plan after failing to proceed with the Third Plan (and its egregiously bad settlements) and arguing against the Conversion Motion, but even then the "waterfall" plan is still subject to the votes and influence of members of the Committee who have been hostile to the estates' interests with regard to open, material issues left to be resolved.  Those same Committee members have not waived their appellate rights or agreed to permit the estates to continue with objections, which would be an entirely neutral outcome.[23]  One of the Committee members – New York Teamsters – has argued that the Debtors (and MFN/Mobile Street) are too late to object to its $77 million liquidated damages claim.  *See* Dkt. No. 7731, ¶¶ 54 – 80.[24]  That contention is a direct attack on the conduct of estate fiduciaries; how can it now serve as such a fiduciary?

49.     The relevant factors under section 1129(a)(5) support denial of confirmation. Factors (3) and (6) are implicated because at least two members (and arguably all three Committee members) are affiliated with groups inimical to the best interests of the debtor and are not disinterested – they hold interests directly adverse to the estates.  Factor (4) is implicated because there is not adequate representation of all creditors – just members of the Committee – and as a majority they are not representative of the interests of equity security holders.  And as for the last

---

[23]    If the Plan Proponents announce a new "settlement" with the same parties to the Third Plan's settlement and if it seeks to allow claims well in excess of what was estimated in the Fourth Disclosure Statement, this Court should ask why – if the Fourth Plan is "neutral" and has an independent trustee – should it not be considered only after the trustee has a chance to review, confer with MFN/Mobile Street as co-objector, and form an independent assessment.

[24]    MFN/Mobile Street and the Debtors are working on a reply that demonstrates this argument of New York Teamsters lacks merit.

factor, the proposed trustee is independent but must answer to the direction of the Trust Board, so his independence is by the terms of the Trust Agreement limited.

50.     The Committee, even once granted the control they insisted upon, could have appointed non-conflicted creditors, or non-Committee members altogether, to the Trust Board (or they could have removed the concept of a Trust Board altogether and selected an independent fiduciary).  They did not do so.  There is no reason the Committee members are any better suited to assume this role than any other similarly situated creditor.  This result is plainly at odds with the objectives of the Bankruptcy Code to prevent major creditors from gaining an unfair advantage in a reorganization, and does not exhibit fundamental fairness in dealing with these other disfavored creditors.  *Coram*, 271 B.R. at 234; *Boy Scouts of Am.*, 642 B.R. at 645.

51.     Moreover, this situation is distinguishable from the average chapter 11 liquidating case where the trust committee is made up of large creditors of the debtors.  In those situations, a liquidating trustee is pursuing claims and causes of action – usually preferences, fraudulent conveyances and director and officer breach of duty claims – and reconciling and objecting to claims.  In such a case, the liquidating trustee might take issues with a trade vendor's invoices or assertions of priority or a landlord's calculation of its rejection damages claim and such creditor can recuse itself while others consider the issue.  While the resolution of these claims will impact percentage recoveries, those amounts are typically not moving the needle significantly and certainly not to the tune of the billions of dollars of claims that the Debtors and MFN/Mobile Street have reduced MEPP claims in this case by through their objections.

52.     Here, however, the major drivers of recovery to trade creditors and equity holders are the amount at which MEPP claims are allowed and the pursuit and success of the IBT Litigation Claims – matters on which at least two of the proposed Managers are conflicted and regarding

which three Managers know that the Committee has taken contrary positions to the estates in the past. This would be akin to allowing a former director of the company who holds a contingent indemnification claim to sit on the board of managers while the trust pursues director and officer liability claims against such manager.

53.     As set forth in Appendix "1", MFN/Mobile Street provided comments to the Trust Agreement to the Plan Proponents that would provide appropriate guardrails and protect parties in interest in these cases from potential conflicts of interest. With one exception, the proposed changes are not mandated by law, but nonetheless are fair and reasonable. There is no articulated reason not to require them.

54.     One proposed change is the default rule under Delaware trust law. Section 37(b) of the Restatement (Third) of Trusts provides that a trustee may be removed for cause. Under Delaware law, "a court will usually remove a trustee if his duties, as such, are in conflict with his individual or other interests." *Rende v. Rende*, 2023 WL 2180572, at *14 (Del. Ch. Feb. 23, 2023) (finding that a co-trustee should be removed where the co-trustee admitted to using trust assets for his own benefit and "has shown that he is unable to put his personal interests aside for the benefit of the Trust and its beneficiaries") (quoting *In re Catell's Est.*, 38 A.2d 466, 469-70 (Del. Ch. 1944)).

55.     MFN/Mobile Street requested that the trust agreement be amended to provide that a Trust Manager can be removed for Cause or Disability by order of the Court on motion brought by any Liquidating Trust Beneficiary. This proposed change has been rejected, without any explanation as to why. Given Delaware law's default rule is to permit a trustee to be removed by a trust beneficiary for cause, that same rule ought to apply to removal of a Trust Manager.

56.     In summary, this case should not establish a precedent that when post-confirmation matters are so dominated by questions of conflict over who runs the post-confirmation affairs, it is ok to cross one's fingers that the conflicts will be caught in time and aired out before this Court when the better, more efficient, and more fair answer is to avoid the conflicts altogether. Accordingly, the Court should find that the Fourth Plan was not proposed in good faith and does not comply with Bankruptcy Code sections 1129(a)(3) and 1129(a)(5), and deny confirmation.

## RESERVATION OF RIGHTS

57.     This Objection is submitted without prejudice to, and with a full and express reservation of, MFN/Mobile Street's rights to supplement or amend this Objection upon review of further discovery production.  Nothing herein is intended to be a waiver by MFN/Mobile Street of any right, objection, argument, claim or defense with respect to any matter, all of which are hereby expressly reserved.

## CONCLUSION

WHEREFORE, for the reasons set forth in this Objection, MFN/Mobile Street respectfully request that the Court deny confirmation of the Fourth Plan.

Dated: October 31, 2025                  Respectfully Submitted,
       Wilmington, Delaware

*/s/ L. Katherine Good*
L. Katherine Good (No. 5101)
Maria Kotsiras (No. 6840)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email: kgood@potteranderson.com
       mkotsiras@potteranderson.com

– and –

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
Eric Winston (*pro hac vice* admitted)
Benjamin Roth (*pro hac vice* admitted)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100
Email:  ericwinston@quinnemanuel.com

*Counsel for MFN Partners, LP and Mobile Street
Holdings, LLC*

24