# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 8144** |

## DECLARATION OF BRIAN WHITTMAN, IN SUPPORT OF CONFIRMATION OF THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF YELLOW CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

I, Brian Whittman, hereby declare under penalty of perjury:[2]

1. I am a Managing Director with Alvarez & Marsal North America, LLC ("A&M"), a restructuring advisory services firm with numerous offices throughout the world.

2. In my capacity as Managing Director of A&M and advisor to the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' sale and wind-down efforts. Accordingly, I am familiar with the terms of the Plan as well as its negotiation and development.

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Plan (as defined herein), the *Debtors' Memorandum of Law in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors (Technical Modifications)* (the "Confirmation Brief"), filed concurrently herewith, or the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Form of Ballot and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 7608] (the "Disclosure Statement Order"), as applicable.

3. Except as otherwise indicated, all matters set forth in this declaration (the "<u>Declaration</u>") are based on (a) my personal knowledge of the Debtors' business operations and finances; (b) my review of relevant information provided to me by other members of the Debtors' management and the Debtors' professional advisors (including A&M employees working under my supervision); (c) my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs; and (d) my review of relevant documents. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## Background and Qualifications

4. I have more than thirty years of experience serving as a financial advisor in distressed situations and providing restructuring and performance improvement services to corporations, various creditor classes, equity owners, and directors of financially distressed companies. For the past thirty years, I have advised companies requiring performance improvement or financial restructuring across a wide range of industries, including automotive, communications, distribution, manufacturing, media, mining, and retail. I have also led complex engagements for companies, secured lenders, and creditors, serving in both interim management and advisory roles. I have prepared numerous liquidation analyses and assessed feasibility in many situations, including providing expert testimony on both topics in other chapter 11 proceedings. I am a Certified Insolvency and Restructuring Advisor and a Certified Public Accountant.

5. I have served as a Managing Director in A&M's Restructuring & Turnaround group since 2008 and as the group's co-head of the Midwest region since 2019. During my tenure at A&M, among other engagements, I have served as interim chief financial officer of Horizon Global in 2018–19, chief restructuring officer of UCI International in 2016, and interim chief financial officer of PSAV, Inc. in 2014. In addition, my recent company-side restructuring

engagements include, among others, Virgin Orbit Holdings, Fast Radius, Boy Scouts of America, Paddock Enterprises, and Casa Systems. Prior to joining A&M in 2002, I spent seven years working as a director in the restructuring practice at a "Big Five" accounting firm.

6. A&M's practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic assistance, typically in distressed business and restructuring settings and situations. A&M serves distressed companies, debtors, secured and unsecured creditors, equity holders, and other parties in both in-court and out-of-court restructuring engagements. A&M has been managing the Debtors' liquidity, forecasting, and budgeting, as well as generally assisting in financial planning and analysis, which includes developing cash flow forecasts, reconciling claims, negotiating the Plan, and preparing related recovery analyses.

## General Background and the Development of the Plan

7. On September 2, 2024, the Debtors filed the *Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4253] and the *Disclosure Statement for the Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4254].

8. On October 17, 2024, the Debtors filed the *First Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4580] and the *First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4581].

9. On November 20, 2024, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4974] and the *Second Amended Disclosure Statement for the Second Amended*

*Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4975].

10. On March 28, 2025, the Debtors filed the *Third Amended Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 5995] and the *Third Amended Disclosure Statement for the Third Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 5596].

11. On July 29, 2025, the Debtors filed the *Fourth Amended Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 6746] (the "Fourth Amended Plan") and the *Fourth Amended Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 6747] (as may be modified, amended, or supplemented, the "Disclosure Statement").

12. On September 15, 2025, the Bankruptcy Court entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures (III) the Form of Ballot and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 7608] (the "Disclosure Statement Order"), approving, among other things, the proposed procedures for solicitation of the Fourth Amended Plan and related notices, forms, and ballots (collectively, the "Solicitation Packages").

13. On September 16, 2025, the Debtors filed a solicitation version of the Disclosure Statement and the Fourth Amended Plan [Docket No. 7619].

14. On September 22, 2025, the Debtors filed the *Notice of Hearing to Consider Confirmation of the Debtors' Fourth Amended Joint Chapter 11 Plan and Related Voting and Objection Deadlines* [Docket No. 7667] (the "Confirmation Hearing Notice").

15. On September 26, 2025, the Debtors caused their claims and noticing agent, Epiq Corporate Restructuring, LLC, to distribute the Solicitation Packages[3] to Holders of Claims entitled to vote on the Plan as of August 26, 2025 —*i.e.*, Class 5 Holders of General Unsecured Claims.[4] On September 26, 2025, the Debtors caused the Confirmation Hearing Notice to be published in the *New York Times* and *The Globe and Mail* [Docket Nos. 7706 and 7707].

16. On October 15, 2025, the Debtors filed with the Bankruptcy Court the *Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 7787] (the "Initial Plan Supplement"), which includes the (a) Schedule of Assumed Executory Contracts and Unexpired Leases, (b) Schedule of Retained Causes of Action, including (i) Claims Related to Insurance Contracts and Policies and (ii) Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, (c) Identities of the Liquidating Trustee and the Liquidating Trust Board of Managers, and the (d) Liquidating Trust Agreement.

17. On October 16, 2025, the Debtors filed with the Bankruptcy Court the *First Amended Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation*

---

[3] Pursuant to the Disclosure Statement Order, the Solicitation Packages included a copy of the Solicitation and Voting Procedures, the form of Ballot, the Debtors' and the Committee's joint Cover Letter, the Confirmation Hearing Notice, the Voting Employee Letters, the Disclosure Statement, and the Disclosure Statement Order, among other documents.

[4] *See Certificate of Service of Solicitation Documents* [Docket No. 7775].

*and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 7798] (the "First Amended Plan Supplement.")

18. On October 22, 2025, the Debtors filed with the Bankruptcy Court the *Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 7860] (the "Second Amended Plan Supplement," and together with the Initial Plan Supplement and the First Amended Plan Supplement, as amended, modified, or supplemented from time to time, the "Plan Supplement"), which included (a) the Schedule of Assumed Executory Contracts and Unexpired Leases and (b) the Schedule of Retained Causes of Action, including (i) Claims Related to Insurance Contracts and Policies, (ii) Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, and (iii) Claims Related to Accounts Relievable.

19. On November 5, 2025, the Debtors filed the *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors*, reflecting that Class 5 (General Unsecured Claims) (the "Voting Class") voted to accept the Plan [Docket No. 8122] (the "Voting Report").

20. Concurrently with the filing of this Declaration, the Debtors also filed the *Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors (Technical Modifications)* [Docket No. 8144] (as modified, amended, or

6

supplemented from time to time, the "Plan") with technical modifications incorporating revisions to resolve comments and informal objections received by the Debtors from various parties in interest.

21.     As discussed herein, I believe prompt Confirmation and Consummation of the Plan is in the best interests of the Debtors, their creditors, and all other parties in interest. Accordingly, I believe that the Bankruptcy Court should confirm the Plan.

### Relevant Provisions of the Plan

22.     I believe that the Plan is the product of extensive, good-faith, arm's-length negotiations among the Debtors, the Committee, and other stakeholders of the Debtors, with all parties working towards a value-maximizing outcome. The Plan is designed to bring these Chapter 11 Cases to an orderly, efficient conclusion in accordance with the distribution priorities set forth in the Plan and consistent with the Bankruptcy Code. I believe that the Plan maximizes stakeholder recoveries and is in the best interests of the Estates. In support of the Confirmation Brief, below I highlight some critical components of the Plan.

**I.    The Plan's Classification of Claims and Interests Is Appropriate.**

23.     The Plan's classification of Claims and Interests places Claims and Interests into nine separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class based on legal or factual criteria or other relevant criteria.

24. Article III.B of the Plan provides for the separate classification of Claims and Interests as follows:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4A | Employee PTO/Commission Full Pay GUC Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4B | Convenience Class Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Interests in Yellow Corporation | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

25. I believe the Claims and Interests assigned to each Class described above are substantially similar to the other Claims and Interests in each such Class. In addition, I believe valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests. Namely, it is my understanding that the Plan separately classifies the Claims because each Holder of such Claims or Interests may hold (or may have held) rights in the Debtors' Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.

26. Further, dissimilar Claims and Interests are not classified together under the Plan. Generally speaking, the classification scheme follows the Debtors' capital structure. Debt and equity are classified separately, and secured debt is classified separately from unsecured debt. I understand that other aspects of the classification scheme reasonably recognize the different legal or factual nature of Claims or Interests.

27. For example, the classification scheme distinguishes Holders of Other Secured Claims (Class 2) from Holders of General Unsecured Claims (Class 5) because of the different

circumstances of each Class, including that the Debtors' obligations with respect to the former are secured by collateral. Other Priority Claims (Class 3) are classified separately due to their required treatment under the Bankruptcy Code. Employee PTO/Commission Full Pay GUC Claims (Class 4A) and Convenience Class Claims (Class 4B) are classified separately for administrative benefit in the interest of cost savings for the Debtors' Estates; the holders of such claims, either by amount or election, will be entitled to satisfaction of their Allowed General Unsecured Claims to ease the Debtors' administrative burden, including the Debtors' potential burden of needing to adjudicate their position on the division of employee-related claims between Priority Claims and non-Priority Claims.

## II. The Plan Is Fair and Equitable.

28. I believe that the Plan is fair and equitable to Holders of Claims and Interests in Classes 6 through 9, which were deemed to reject the Plan. Under the Plan, no holder of any junior Claim or Interest will receive or retain any property under the Plan on account of such junior Claim or Interest. To the extent that Intercompany Interests and Intercompany Claims are reinstated under the Plan, distributions on account of Intercompany Interests and Intercompany Claims are to properly allocate value amongst the Debtors for subsequent distribution to third-party claimants. Thus, the Plan structure is fair and equitable.

## III. The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate.

29. I understand that the Plan includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision. I believe these discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, are supported by the Debtors, the Committee, and the Debtors' key stakeholders, and, as I have been advised, are consistent with applicable precedent. Further, I understand that these provisions were fully and conspicuously disclosed to all parties in interest through the

Confirmation Hearing Notice, the Ballots, and the applicable Notice of Non-Voting Status and Opt-In Forms, which excerpted the full text of the releases, exculpation, and injunction provisions as set forth in the Plan.

### a.     The Debtor Release in the Plan Is Appropriate.

30.     It is my understanding that Article IX.B of the Plan provides for certain releases by each and all of the Debtors, the Liquidating Trust, and their Estates of any and all Claims and Causes of Action, including any derivative claims, that the Debtors, the Liquidating Trust, or their Estates could assert against each of the Released Parties (the "Debtor Release"). I understand that the scope of the Debtor Release is tailored to exclude any Claims arising from or related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence. I understand that the Debtor Release was negotiated as part of the Plan and is an indispensable component to achieve final resolution of potential disputes that would otherwise negatively affect the Debtors' Estates and the recoveries available to creditors under the Plan.

31.     I believe that each Released Party has made a substantial and valuable contribution to the Debtors' Estates. The Released Parties contributed significant time and resources analyzing and negotiating the terms of the Plan, the Third-Party Sale Transactions, and the Liquidation Transactions, all of which will maximize the value of the Debtors' Estates for the benefit of all parties in interest. The Debtors' directors, officers, employees, professionals, and other agents who served in such capacity on or after the Petition Date have been involved in negotiating, formulating, and implementing the Plan, the Third-Party Sale Transactions, and the Liquidation Transactions. I believe these measures, among others, provided the Debtors with access to the liquidity necessary to commence these Chapter 11 Cases, enabled the Debtors to consummate value-maximizing Third-Party Sale Transactions, and have allowed the Debtors to chart a path

toward an orderly and cost-efficient wind-down on the terms set forth in the Plan. Without the contributions of each of the Released Parties, the Plan and the transactions contemplated therein would not have been possible.

32. I believe that the Debtor Release is essential to the success of the Debtors' Plan because it is an integral term of the Plan. Absent the Debtor Release, I believe that the Debtors may not have been able to build the level of consensus with respect to the Plan and the transactions contemplated thereby. I further believe that the Debtor Release is the product of arm's-length and good-faith negotiations between the Debtors and their key stakeholders and is appropriately limited in scope. Based on my review of the Debtors' books and records, familiarity with the Debtors' business and operations, and discussions with the Debtors' advisors, directors, and management, I do not believe that the Debtors have material causes of action against any of the Released Parties that would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan. In addition, despite these Chapter 11 Cases pending for more than two years, I am not aware of any advisors to the Committee identifying any material claims or causes of action that the Debtors should pursue against any Released Party.

33. For these reasons, I believe that the Debtor Release is justified, a sound exercise of the Debtors' business judgment, and in the best interests of creditors and other stakeholders, as it is an integral part of the Plan.

      **b.    The Third-Party Release Is Consensual.**

34. I understand that the Plan also provides for wholly consensual third-party releases by certain Holders of Claims and Interests. Specifically, I understand that Article IX.C of the Plan provides that each Releasing Party shall release any and all Claims and Causes of Action such party could assert against the Released Parties (the "<u>Third-Party Release</u>"), with certain limited

exceptions. I believe the Third-Party Release is consensual and integral to the Plan and should therefore be approved.

35. I understand that the Third-Party Release was and is necessary to secure support for the Plan from the Committee and other stakeholders. I understand that it also brought key stakeholders to the table for negotiations around the Third-Party Sale Transactions and the Plan, each of which contributed to the Debtors' success in these Chapter 11 Cases. Absent these parties' support, I do not believe the Debtors would be able to confirm the Plan or consummate the value-maximizing Liquidation Transactions. Importantly, I understand the Third-Party Release only applies to parties who have (a) actively participated in the chapter 11 or Plan process, including in the formulation and negotiation of the Third-Party Release, or (b) manifested their affirmative consent to the Third-Party Release.

36. For the foregoing reasons, I believe the Third-Party Release should be approved.

### c. The Exculpation Provision Is Appropriate.

37. I understand that Article IX.D of the Plan provides for the exculpation of the Exculpated Parties (the "Exculpation Provision"). I believe the exculpation is fair and appropriate under the facts and circumstances of these Chapter 11 Cases. I believe the Plan's Exculpation Provision is the product of good-faith, arm's-length negotiations, was critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' stakeholders. I believe the Exculpation Provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the exculpation.

38. It is my opinion that the Exculpated Parties participated in good faith in formulating and negotiating the Plan, and I believe they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties. I believe that the Debtors and

12

their officers, directors, and professionals actively negotiated in good faith with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases. Such negotiations were extensive, and the resulting agreements and compromises were implemented in good faith with a high degree of transparency. As a result, the Plan is supported by the Voting Class and the Committee. Furthermore, I understand that the exculpation is limited to claims arising from acts during these Chapter 11 Cases and does not extend beyond such time period. Accordingly, I believe the Bankruptcy Court's findings of good faith vis-à-vis the Chapter 11 Cases should also extend to the Exculpated Parties.

39. In addition, I believe the promise of exculpation played a significant role in facilitating Plan negotiations. I believe that all of the Exculpated Parties played a key role in developing the Plan that paved the way for a successful resolution of these Chapter 11 Cases, and such parties may not have been so inclined to participate in the Plan process without the promise of exculpation. Accordingly, I believe it is appropriate for the Bankruptcy Court to approve the Exculpation Provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.

### d. The Injunction Provision Is Appropriate.

40. I understand that the injunction provision set forth in Article IX.E of the Plan (the "Injunction Provision") implements the Plan's release and exculpation provisions, in part, by permanently enjoining all Entities from commencing or maintaining any action against the Debtors, the Liquidating Trust, the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any Claims or Interests that have been released under the Plan or are subject to exculpation. Thus, I understand that the Injunction Provision is necessary to the Plan because it enforces the release and exculpation provisions that are centrally important to the Plan. Moreover, I understand that the Injunction Provision is narrowly tailored to achieve its

purpose and consensual as to any part that did not specifically object to it. I believe the Injunction Provision is appropriate.

### IV.    The Plan Is in the Best Interests of Creditors and Interest Holders.

41.    It is my understanding that section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accepts the Plan or (b) receives or retains property having a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code under the Plan. I understand that this requirement is known as the "best interests" test. I understand that the best interests test applies to each non-consenting member of an impaired class and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's chapter 11 plan.

42.    The Debtors, the Committee, and their advisors, including A&M, have considered the probable result of a hypothetical chapter 7 liquidation of the Debtors' assets in light of the fact that the Debtors are liquidating their assets and winding down their Estates in chapter 11. On September 24, 2025, MFN Partners, LP ("MFN") and Mobile Street Holdings, LLC ("Mobile," and together "MFN-Mobile") caused to be served upon the Debtors a request for production.[5] In response thereto, the Debtors provided a liquidation analysis (the "Liquidation Analysis") to MFN-Mobile on November 4, 2025. The Liquidation Analysis was prepared with the assistance of A&M and the Debtors' other advisors. The Liquidation Analysis estimates the recoveries that Holders of Allowed Claims or Interests would receive under the priority scheme dictated by the Bankruptcy

---

[5]    *See Notice of First Request for Production of Documents from MFN Partners, LP and Mobile Street Holdings, LLC to the Debtors Regarding Confirmation of the Fourth Amended Joint Chapter 11 Plan* [Docket No. 7695].

Code if these Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. Such recoveries are then compared with the estimated recoveries to Holders of Allowed Claims and Interests under the Plan.

43. I oversaw the preparation of the Liquidation Analysis and worked closely with a team of A&M professionals in its development. The Liquidation Analysis was completed following due diligence performed by the A&M team, which included a review of the Debtors' books and records and discussions with the Debtors' management. The Liquidation Analysis is based on the Debtors' projected cash balance and assets, and incorporates various estimates and assumptions regarding chapter 7 costs including a 3% estimate for the reasonable value of trustee fees, and a 3% estimate for the reasonable value of the chapter 7 trustee's professional fees. Further, the Liquidation Analysis incorporates estimates surrounding additional claims that may be asserted against the chapter 7 estates, made possible from the establishment of a new bar date upon conversion of the cases. I believe that these and the other relevant assumptions are reasonable under the circumstances.

44. Initially, the Liquidation Analysis shows that, assuming all entities convert their Chapter 11 Cases to chapter 7, each Debtor has a recovery in a chapter 7 liquidation that is less than what they would receive under the Plan except for Roadway Express International, Inc., Yellow Logistics, Inc., and YRC Logistics Services Inc. However, because creditors of the other 21 Debtors would receive more under the Plan than they would in a chapter 7 liquidation, I do not believe the Debtors would convert all 24 of the Debtors' cases to chapter 7. Instead, such a scenario would prompt the Debtors to convert only the three Chapter 11 Cases of Roadway Express International, Inc., Yellow Logistics, Inc., and YRC Logistics Services Inc. to chapter 7. Accordingly, the Liquidation Analysis then estimates the results of a chapter 7 conversion at these

three entities individually, with such entities properly burdened by the incremental costs of a chapter 7. The Liquidation Analysis shows that if these three entities, which are anticipated to have only a de minimis amount of value distributable to holders of Claims or Interests ("Distributable Proceeds"), are liquidated through chapter 7 separate from the other Debtor entities, the holders of Class 4A, Class 4B, and Class 5 Claims at the three entities actually receive no recovery under the hypothetical chapter 7 because all Distributable Proceeds would likely be spent on Administrative, Priority, and chapter 7 administration fees and expenses. Furthermore, since each Holder of a Class 5 Claim was given the option under the Plan to elect to have their Claim treated as a Convenience Class Claim, given the size of the non-joint & several claims at the three entities, the Plan provided that all such Holders of Class 5 Claims were able to receive more under the Plan than they would receive in a hypothetical liquidation, subject only to their individual decision as to whether to make such Convenience Claim Election.

45. For the foregoing reasons, I believe, based on the Liquidation Analysis and the recommendations and guidance from the Debtors' other advisors, that the Plan satisfies the best interests test because, among other things, the recoveries expected to be available to Holders of Allowed Claims and Interests under the Plan will be more timely than the recoveries expected to be available in a chapter 7 liquidation, in part because of the potential added time and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with these Chapter 11 Cases. Accordingly, I believe that the appointment of a chapter 7 trustee would almost certainly delay distributions to creditors and reduce the present value of any recovery for Holders. Additionally, I understand that the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors and the Committee during the Chapter 11 Cases (such as compensation for Professionals), which I understand may constitute Allowed Claims in

any subsequent chapter 7 case. I have also been advised that conversion to chapter 7 would require entry of a new bar date. Thus, the amount of Claims ultimately Filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

46. In light of the foregoing, I believe that a chapter 7 liquidation would result in reduced Distributable Proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional Claims that were not asserted in these Chapter 11 Cases. Accordingly, I believe that the Plan provides the best and most timely return for creditors.

## V.    The Plan Is Feasible.

47. I understand that section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation or further reorganization of the debtor or any successor thereto unless such liquidation or reorganization is proposed in the plan. Simply put, section 1129(a)(11) of the Bankruptcy Code requires a plan to be "feasible." I believe the Plan is feasible. I understand that, through the Plan, there will be an orderly liquidation and wind down of the Debtors' Estates and timely distributions to Holders of Allowed Claims in accordance with the Plan, the Bankruptcy Code, and applicable law.

48. Based on my review of the Debtors' financial information and the Plan, I believe the Debtors have sufficient funds to implement and complete the distributions and obligations under the Plan, including on account of Allowed Administrative Claims and Allowed Priority Tax Claims. Specifically, the Debtors shall fund the distributions and obligations with (a) Cash on hand held by the Debtors—which, as of the date hereof, the Debtors have in excess of $600 million, which is considerably higher than the estimated Administrative Claims and Priority Claims and is sufficient for all required payments under the Plan—on and after the Effective Date, (b) net Cash proceeds generated by the sale, lease, liquidation, or disposition of Estate property, including

pursuant to Third-Party Sale Transactions, (c) Cash proceeds generated by the use, sale, lease, liquidation or other disposition of any property belonging to the Liquidating Trust, (d) Cash proceeds generated from the Debtors' and the Estates' accounts receivables, and (e) Cash proceeds from the Debtors' and the Estates' Causes of Action.  Further, I believe the Debtors have sufficient Cash from the Distributable Proceeds to fund the actual and necessary fees and expenses of the Liquidating Trust.  Accordingly, I believe the Debtors have sufficient liquidity to both establish the Liquidating Trust and to make all distributions under the Plan.  Thus, I believe that the Plan is feasible.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 9, 2025

Respectfully submitted,

*/s/ Brian Whittman*
Brian Whittman
Managing Director
Alvarez & Marsal North America, LLC