## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,<br><br>   Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>(Jointly Administered)<br><br>**Related Docket No. 8229** |

### <u>MEMORANDUM OPINION</u>

Yellow Corporation, once among the nation's largest trucking companies, filed for bankruptcy in August 2023. The company had been in contentious negotiations with the Teamsters and found itself perilously low on cash. When the company missed a payment owed to a large pension plan, the union made a public strike threat. That threat caused the company's customers to flee, which in turn led to the shuttering of the debtors' business. Soon thereafter, the debtors filed these bankruptcy cases.

The cases have been litigious and hard fought. Much of the litigation in the case has had to do with the claims of the company's various pension plans for withdrawal liability under the Employee Retirement Income Security Act ("ERISA"), arising out of the company's withdrawal from those pension plans. At the same time, the parties have worked together cooperatively and successfully to sell the company's assets, generating more than $2 billion in proceeds. With those proceeds, the company paid off its secured debt in full and will have hundreds of millions of dollars to distribute to remaining stakeholders.

The debtors have proposed a plan that would create a liquidating trust that would finish the work of resolving the otherwise unliquidated claims against the estate, sell the few assets that remain unsold, and pursue estate causes of action. The trust would then distribute those proceeds to creditors in accordance with their statutory priority. MFN, which (along with its affiliates) is both a shareholder and a creditor of the debtors, objects to confirmation of the plan.[1]

This is, in substance, the debtors' third effort to confirm a plan. The first form of plan was a generic "waterfall" plan. It would have created a trust to be administered by a neutral trustee. That plan failed because several of the pension plans, who are the companies' largest creditors, refused to support it. Those pension plans insisted that they, not a neutral trustee, control the liquidating trust. The plan accordingly did not obtain the necessary creditor vote to achieve confirmation.

The debtors responded to this defeat by (understandably) focusing their efforts on negotiating a plan that could obtain the support of the pension plans. The resulting plan would have given the pension plans control of the liquidating trust. But perhaps more importantly, it would have settled disputes over the allowance of the pension plans' claims on terms that were highly favorable to the pension plans. MFN, however, had exercised its statutory right to object to those claims. After the Court ruled that, in view of MFN's pending objection to the allowance of those claims, it would judge that proposed settlement by a standard that was more exacting than

---

[1] Debtor Yellow Corporation and its various debtor affiliates are referred to as the "debtors" or "Yellow." MFN Partners and its affiliates, which hold both debt and equity of the debtors, are referred to (collectively) as "MFN."

the most deferential form of "business judgment" review, the debtors effectively abandoned that form of plan and returned to the drawing board.

The plan that is now before the Court is, in this Court's view, a reasoned effort to find a middle ground between the first approach that could not garner the support of the largest creditors and the second approach that gave those creditors too much. The Liquidating Trustee is an independent fiduciary who is a well-known restructuring professional.  As is customary, the largest creditors (here, the pension plans) have appointed representatives who will serve on the board of the liquidating trust.  But the trust agreement has standard and appropriate provisions, consistent with Delaware law, that ensure that board members disclose all material relationships with parties who may be affected by the trust's actions and require the board members to recuse themselves from decisions when their participation would create a conflict of interest.

MFN asserts two objections to confirmation of the plan.  *First*, it argues that the trust agreement does not go far enough in ensuring that the trust is fully independent and in guarding against the pension plans' exercise of improper influence.  For these reasons, MFN argues that the plan was not proposed in good faith, as 11 U.S.C. § 1129(a)(3) requires.  But "good faith" is a standard that is based on the totality of the circumstances.  The Court is satisfied that the safeguards included in the trust agreement, when considered as part of a holistic analysis of the plan, are sufficient to meet the good faith standard.

*Second*, MFN argues that creditors would recover more if the case were converted to a chapter 7 liquidation than they will under the plan.  For that reason, they argue that the plan fails the "best interests" test of 11 U.S.C. § 1129(a)(7).  Based on MFN's cross-examination at the confirmation hearing of the debtors' financial advisor who prepared the liquidation analysis, the Court concludes that at least one of the assumptions contained in the debtors' liquidation analysis cannot be supported.  The Court nevertheless does not believe that creditors will do better if these cases are converted to chapter 7 liquidations than they will under the proposed plan.

The principal reason for that is that the plan now before the Court sets the parties on a path towards resolution of the most important disputes.  Whether that proposed resolution (which the parties represent will be presented to the Court in the near term) can be approved is uncertain.  But this Court finds that the introduction of a chapter 7 trustee, who is a total stranger to these proceedings, will substantially set back the efforts towards resolution.  These cases have already been very expensive.  The result of a conversion to chapter 7 will be a longer period of very expensive litigation that will consume substantial value that could otherwise be distributed to creditors.  The underlying math in support of that conclusion is somewhat complex and is set forth in greater detail in Part II of this Memorandum Opinion.  But for those reasons, the Court concludes that the proposed plan satisfies

the best interests test of § 1129(a)(7).  The Court has accordingly entered an order

confirming the plan.[2]

## Factual and Procedural Background

The debtors filed these bankruptcy cases on August 6 and 7, 2023.  The events

that led to the bankruptcy filing, and the various disputes that have arisen along the

way, are described at some length in the Court's several prior opinions in this case.[3]

---

[2] The confirmation order is docketed at D.I. 8229.  On November 17, 2025, the Court issued a bench ruling describing the Court's reasons for overruling MFN's objections.  The Court noted, however, that the bench ruling was intended "primarily for the benefit of the parties who have extensive knowledge of the background of this case," and that "[t]o the extent that a reviewing court may be required to make sense of any of this, I'm likely to put something in writing that I hope will be more accessible to one who doesn't have the same familiarity with the issues or the record that the parties have."  Nov. 17, 2025 Hr'g Tr. at 4.  Following the issuance of the bench ruling, on November 18, 2025, MFN filed a notice of appeal.  D.I. 8220.  The Court then issued the confirmation order on November 19, 2025, and MFN thereafter amended its notice of appeal.  D.I. 8231.  Because the order that is the subject of MFN's appeal is the confirmation order, the notice of appeal is deemed filed on November 19, 2025.  *See* Fed. R. Bankr. P. 8002(a)(2) ("A notice of appeal filed after the bankruptcy court announces a decision or order – but before entry of the judgment, order, or decree – is treated as filed on the date of and after the entry.").  Consistent with this Court's Local Rule 8003-2 and the Court's observations, this Memorandum Opinion is intended to supplement the Court's bench ruling.  *See* Local Rule 8003-2 ("Any bankruptcy Judge whose order is the subject of an appeal may file a written opinion that supports the order being appealed or that supplements any earlier written opinion or recorded oral bench ruling or opinion within 7 days after the filing date of the notice of appeal.").  *See also* D.I. 8229 at 11 (explaining that the reasons supporting the confirmation order "may be further supplemented in a subsequent Memorandum Opinion to be issued within the time permitted by this Court's Local Rule 8003-2").

[3] *See In re Yellow Corp.*, No. 23-11069, 2024 WL 1313308 (Bankr. D. Del. Mar. 27, 2024) (denying motion for relief from stay to refer ERISA withdrawal liability disputes to arbitration); *In re Yellow Corp.*, No. 23-11069, 2024 WL 4194560 (Bankr. D. Del. Sept. 13, 2024) (upholding validity of PBGC regulations regarding pension plans' receipt of funds under the American Rescue Plan Act); *In re Yellow Corp.*, No. 23-11069, 2024 WL 4858795 (Bankr. D. Del. Nov. 5, 2024) (granting partial reconsideration of Sept. 13, 2024 decision); *In re Yellow Corp.*, No. 23-11069, 2024 WL 4925124 (Bankr. D. Del. Nov. 5, 2024) (amended opinion upholding validity of PBGC regulations); *In re Yellow Corp.*, No. 23-11069, 2024 WL 4759426 (Bankr. D. Del. Nov. 12, 2024) (denying further motion for reconsideration of decision upholding PBGC regulations); *In re Yellow Corp.*, No. 23-11069, 2024 WL 5181660 (Bankr. D. Del. Dec. 19, 2024) (summary judgment ruling in WARN Act disputes); *In re*

The description of the procedural history of the case that follows is by no means comprehensive.  A number of significant disputes and case milestones are omitted.  The description below focuses on those aspects of the procedural history that provide necessary context for the dispute now before the Court.

**1.    Events leading to the bankruptcy**

These bankruptcy cases were precipitated by a dispute between the debtors and the International Brotherhood of Teamsters.  The debtors' business traces its roots back almost a century.[4]  By 2023, it was among the nations' largest trucking companies, employing nearly 30,000 people, most of whom belonged to the Teamsters.[5]  But as a roll-up of a variety of separate trucking companies, the debtors faced an urgent need, particularly as they ran into severe liquidity constraints, to restructure and consolidate their operations.  That restructuring, however, required the approval of the unions, and the negotiations over that restructuring were highly contentious.

---

*Yellow Corp.*, No. 23-11069, 2025 WL 419249 (Bankr. D. Del. Feb. 5, 2025) (addressing interest rate to be used in calculating ERISA withdrawal liability); *In re Yellow Corp.*, 668 B.R. 337 (Bankr. D. Del. 2025) (determination, following trial on WARN Act claims, that debtors were a "liquidating fiduciary" rather than an "employer" at the time of the mass layoffs in question); *In re Yellow Corp.*, 670 B.R. 397 (Bankr. D. Del. 2025) (finding that debtors' proposed settlement of ERISA withdrawal liability claims, to which a party-in-interest had objected, would be subject to more exacting scrutiny than most deferential form of "business judgment" review); *In re Yellow Corp.*, 672 B.R. 219 (Bankr. D. Del. 2025) (setting forth "preliminary observations" – later reduced to orders granting partial summary judgment – with respect to various disputes over the calculation of ERISA withdrawal liability); *In re Yellow Corp.*, No. 23-11069, 2025 WL 2639151 (Bankr. D. Del. Sept. 12, 2025) (resolving dispute over language to be included in disclosure statement).

[4] D.I. 14 ¶ 28.

[5] *Id.* ¶ 41.

Finding itself in a perilous cash position, the company failed to make the required July 2023 contributions to the companies' pension funds.  The Teamsters responded to that missed payment by threatening to strike.  The well-publicized strike threat, in turn, caused the company's customers to take their business elsewhere.  Even though the union later said that it was willing to resume negotiations, that offer came too late.  Nearly out of cash and with no real prospect of obtaining financing, the debtors concluded that they had no choice but to shut down their business.  These bankruptcy filings followed soon thereafter.

**2.    The debtors conduct highly successful asset sales.**

In these bankruptcy cases, the debtors and their professionals turned their attention to selling the company's assets – both the extensive real estate portfolio as well as the trucking assets.  Those efforts were highly successful, generating approximately $2 billion in sale proceeds.  The majority of those funds have been used to pay down the debtors' prepetition secured debt and the debtor-in-possession financing.  Even so, hundreds of millions of dollars in value remain in the estate, available for distribution to remaining stakeholders – first unsecured creditors, and in the seemingly unlikely (but still conceivable) event those creditors are paid in full, then equity holders.

**3.    Amid ongoing disputes with the pension plans, the debtors' first proposed plan fails to obtain the creditor support required for confirmation.**

Following the extremely successful asset sales, there appeared to be at least some prospect that the debtors would end up with sufficient cash to pay their unsecured creditors in full, in which case any incremental value would be distributed

to its equity holders.  MFN, the debtors' largest equity holder, thus joined with the debtors in objecting to the allowance of the claims held by the pension plans asserting "withdrawal liability" under ERISA.

One of the key issues that the parties litigated had to do with the treatment of funds that the pension plans received under the American Rescue Plan Act of 2021. A withdrawing employer owes withdrawal liability to a pension plan only for that employer's proportional share of the amount by which the pension plan is underfunded, which essentially means the extent to which the plan's obligations exceed the value of its assets.  But in the American Rescue Plan Act, as part of an effort to prop up the nation's struggling pension system, Congress provided for almost $100 billion in "special financial assistance" to be provided to troubled pension plans. If the amounts received (or to be received) by those pension plans were counted as plan assets, the pension plans would have very little if any "unfunded liability."  The debtors would therefore likely owe quite little in withdrawal liability.  And that, of course, would increase the likelihood that the debtors would be able to pay all valid creditors in full and distribute excess value to equity.

But seeking to avoid a situation in which Congress' provision of special financial assistance to struggling pension plans operated to reduce the liability of withdrawing employers, the PBGC adopted regulations that, in effect, provided that the special financial assistance provided under the American Rescue Plan Act should be excluded for purposes of calculating withdrawal liability.[6]  The debtors and MFN

---

[6] The Pension Benefit Guaranty Corporation is referred to as the "PBGC."

challenged those regulations on the ground that they were inconsistent with the governing statute and were "arbitrary and capricious" within the meaning of the Administrative Procedure Act. This Court rejected those arguments but certified the matter for direct appeal to the Third Circuit, which granted the direct appeal and affirmed.[7]

In the meantime, following the completion of the principal asset sales, in September 2024 the debtors filed a plan and disclosure statement, which were amended first in October 2024 and again in November 2024.[8] In November 2024, the Court approved the disclosure statement.[9] The plan at issue was a plain vanilla "waterfall" plan that provided for the creation of a liquidating trust and the appointment of a neutral trustee. A confirmation hearing was set for February 2025.

At a hearing in January 2025, however, counsel for the Committee (a majority of whose members were multiemployer pension plans) reported that the Committee did not support the plan and that no impaired class of creditors had voted to support it.[10] Statements made by counsel at the various hearings made clear that the key

---

[7] See Yellow, 2024 WL 4925124 (this Court's amended opinion upholding the PBGC regulations); In re Yellow Corporation, 152 F.4th 491, 506 (3d Cir. 2025) (the PBGC regulations "were valid exercises of its delegated authority under ARPA"). On cross-examination by counsel for MFN at the November 12, 2025 confirmation hearing, the debtors' financial advisor generally confirmed that the debtors and MFN are working on a petition for certiorari from the Third Circuit's opinion. See Nov. 12, 2025 Hr'g Tr. at 106 ("Q: And the debtors are literally working with my clients this month on a cert petition, right? A: I don't know the specific[s] of that, but I know we are working on an appeal.").

[8] See D.I. 4253, 4254, 4580, 4581, 4974, 4975.

[9] D.I. 5024.

[10] Jan. 28, 2025 Hr'g Tr. at 132. The Official Committee of Unsecured Creditors appointed in this case is referred to as the "Committee."

issue was governance of the trust, with the pension plans insisting that they be given the right to control trust governance.  At a status conference in March 2025, the debtors reported that they "do not have the votes for the waterfall plan that we filed" because "[c]ertain of our largest unsecured creditors are unwilling to vote for the debtor's plan."[11]

### 4.    In light of the Court's rulings, the debtors' second proposed plan could not be confirmed.

The debtors then turned to working with the pension plans and the Committee on a resolution of the claim disputes that might obviate the pension plans' objections. Later in March, the debtors reported to the Court that they had reached an agreement with the Committee on a settlement with many of the largest pension plans, which the parties intended to include in a proposed plan.  That plan, along with an accompanying disclosure statement, was filed on March 28, 2025.[12]

The challenge this posed was that the pension plan claims that were to be settled under the plan had been objected to not only by the debtors, but also by MFN, exercising the right that every "party in interest" is given under the Bankruptcy Code to object to the allowance of any creditor's asserted claim.[13]  The Court accordingly raised the question of what standard the Court should apply in weighing a settlement that would effectively cut off MFN's right to be heard on a claim objection.  The debtors and the Committee took the view, which does find some support in the

---

[11] Mar. 17, 2025 Hr'g Tr. at 6.

[12] D.I. 5995, 5996.

[13] *See* 11 U.S.C. § 502(a) (a filed claim is "deemed allowed, unless a party in interest ... objects").

caselaw, that the settlement should be viewed under the highly deferential "business judgment" standard under which a court should approve any settlement that falls anywhere within a broad range of "reasonableness." On this view, the Court would be required to approve a settlement that was one dollar above the very lowest rung on the long ladder of what is reasonable, and doing so would eliminate MFN's statutory right to contend that the claim was invalid.[14]

In a March 31, 2025 opinion, the Court rejected that argument.[15] The Court noted that there are cases suggesting that it is impermissible for a court to approve a settlement in a way that would effectively moot out a pending claim objection by a party in interest. According to these cases, if a party in interest objects, a bankruptcy court has a statutory duty to decide on the allowance or disallowance of the claim, and may not approve any settlement that would eliminate that right.[16] The opinion noted, however, that there is also an intermediate position under which it remains possible for a debtor in possession or a trustee to settle a claim to which a party in interest had objected. On this view, in deciding whether to approve the settlement, the court should not be overly deferential to the debtor's judgment. Instead, the court should account for the party's right to object by considering that party's argument in determining the reasonableness of the proposed settlement. While a court need not conduct a full claims allowance hearing to decide whether to approve the settlement,

---

[14] D.I. 5982. *See also In re Kaiser Aluminum*, 339 B.R. 91 (D. Del. 2006).

[15] 670 B.R. 397.

[16] *See In re C.P. Hall Co.*, 513 B.R. 540, 542 (Bankr. N.D. Ill. 2014).

the Court should fairly account for the objecting party's arguments and only approve a settlement if the resolution is at least in the same general range of the court's own assessment of the claim's value in light of those arguments.

The Court left open the question as between the more extreme position set out in *C.P. Hall* and the intermediate one under which settlement may still be possible, but a more exacting standard is applied. The Court made clear, however, that the most deferential standard would not be appropriate in this circumstance.[17]

The reason that mattered was that the Court then had under advisement (and was very close to issuing an opinion resolving) a summary judgment motion that would address a series of contested issues in the claims allowance disputes. Because that analysis would necessarily inform the Court's assessment of the reasonableness of any settlement, the Court concluded that the parties should at least have the benefit of the Court's analysis so that they could determine whether to press forward with the proposed settlement. The Court did so, in the form of "preliminary observations" on the issues raised in the summary judgment motion, in early April.[18]

Because the proposed settlements were vastly higher than the claim amounts as they would be determined after giving effect to the Court's analysis, the parties abandoned the effort to confirm the plan that was premised on these settlements. The Court thereafter issued an order on the summary judgment motions that had been the subject of its April "preliminary observations," granting summary judgment

---

[17] 670 B.R. at 406-411.

[18] 672 B.R. 219.

in part, and denying it in part, for the reasons set forth in the Court's "preliminary observations."[19]

### 5.    The debtors propose a third form of plan.

After further negotiations, the debtors and the Committee jointly proposed a revised form of plan in July 2025.[20]   In September 2025, the Court approved the disclosure statement and solicitation procedures.[21]   Thereafter, the debtors filed various plan supplements and a further amended plan containing technical and clarifying revisions.[22]

This form of plan does not contain settlements of the pension plan claims. Rather, it is a "waterfall" plan in which the liquidating trust will be responsible for claims allowance matters and the pursuit of estate causes of action.  The resolution of any material claims allowance dispute requires this Court's approval.  All proceeds are to be distributed to stakeholders in accordance with their statutory priority.  The liquidating trust is to be governed by the liquidating trustee, who is an independent fiduciary, and a board of managers.

The trust agreement has a detailed set of procedures for addressing potential conflicts of interest.  The key provision reads as follows:

> Prior to the taking of a vote or the taking of any action with respect to any matter or issue, including for the avoidance of doubt, the settling

---

[19] D.I. 6682.

[20] D.I. 6746 (plan); D.I. 6747 (disclosure statement).

[21] D.I. 7608.

[22] *See*, *e.g.*, D.I. 7787 (plan supplement); D.I. 7798 (first amended plan supplement); D.I. 7860 (second amended plan supplement); D.I. 8144 (fourth amended plan); D.I. 8146 (third amended plan supplement); D.I. 8206 (fourth amended plan supplement); D.I. 8226 (further technical amendments to the plan).

and/or allowance of any claim, any Manager of the Liquidating Trust Board of Managers who, with respect to a matter or issue, has or who may have a conflict of interest whereby such Manager's interests are adverse to the interests of the Liquidating Trust, may be deemed a "Conflicted Manager" either (i) by such Manager's own report and full disclosure to the Liquidating Trust Board of Managers of any conflict or potential conflict of interest such Manager has or may have with respect to the matter or issue at hand (including, without limitation, disclosing any and all financial or other pecuniary interests that such Manager may have with respect to or in connection with such matter or issue, other than solely as a holder of Liquidating Trust Interests) or (ii) by the affirmative vote of the majority of the Managers of the Liquidating Trust Board of Managers who are not deemed to be a Conflicted Manager; provided that nothing in this Agreement shall prevent any Manager from seeking emergency relief from the Bankruptcy Court with respect to determining whether a Manager is a Conflicted Manager with respect to any specific matter or issue and to the extent such relief is sought, any Liquidating Trust Beneficiary may appear and be heard in connection with such relief. With respect to an issue or matter as to which one or more Managers(s) is conflicted: (A) a Manager who, with respect to a matter or issue, has been deemed a Conflicted Manager shall not be entitled to participate in any discussion, vote or take part in any action with respect to such matter or issue (provided, however that such Conflicted Manager may make a statement to the other Managers with respect to such matter or issue prior to recusing himself or herself from such discussion, vote or action), (B) the vote or action with respect to such matter or issue shall be undertaken only by Managers of the Liquidating Trust Board of Managers who are not Conflicted Managers; provided however, that such vote or action may only be taken if there are at least two non-Conflicted Managers in attendance at the meeting and (C) the affirmative vote of only a majority of the other Managers of the Liquidating Trust Board of Managers who are not Conflicted Managers shall be required to approve of such matter or issue and the same shall be the act of the Liquidating Trust Board of Managers. In addition, and for the avoidance of doubt, a Conflicted Manager may not be given access to Transferred Privileged Information with respect to a matter or issue in regard to which such Manager is or is deemed to be a Conflicted Manager.[23]

---

[23] D.I. 8146 § 7.4(b).

6.    **The November 12, 2025 confirmation hearing**

MFN objected to confirmation both on the grounds that (1) the conflict-of-interest provisions are inadequate and that the plan was thus proposed in bad faith under § 1129(a)(3) of the Bankruptcy Code; and (2) the plan fails the best-interests test set out in § 1129(a)(7) of the Bankruptcy Code.[24] Various other parties in interest asserted objections that were resolved consensually. The confirmation hearing held on November 12, 2025 was thus focused on the two objections asserted by MFN.

A number of documents and declarations were admitted into evidence without objection.[25] The Court heard direct testimony from one witness, Brian Whittman, who is a managing director of Alvarez & Marsal, the debtors' financial advisor.[26] Whittman was subject to cross-examination by counsel for MFN.[27] Following closing arguments, the Court indicated that it would issue a bench ruling on whether the plan could be confirmed on November 17, 2025. At a hearing on that date, the Court indicated that it would overrule MFN's objections and confirm the plan. The Court delivered a bench ruling summarizing the reasons for its decision. The point of this

---

[24] D.I. 7932. MFN also objected on the ground that the plan did not comply with § 1129(a)(5), which requires the disclosure of "the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of … a successor to the debtor under the plan." 11 U.S.C. § 1129(a)(5)(i). Whether that section applies to a trust advisory committee is unsettled. *See generally In re Boy Scouts of Am. & Delaware BSA*, 642 B.R. 504, 640 (Bankr. D. Del. 2022) (subsequent history omitted). That issue, however, was mooted by the filing of the fourth amended plan supplement that contained the applicable disclosures. *See* D.I. 7798, Ex. C; D.I. 8206.

[25] Nov. 12, 2025 Hr'g Tr. at 19-23.

[26] *Id.* at 30-39.

[27] *Id.* at 40-120.

Memorandum Opinion is to supplement that bench ruling.  On November 19, 2025, the Court entered the confirmation order.[28]

## Jurisdiction

The dispute over whether the debtors' plan should be confirmed arises under § 1129 of the Bankruptcy Code and thus falls within the district court's "arising under" jurisdiction of 28 U.S.C. § 1334(b).  The district court has referred the matter to this Court under 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference.  This plan confirmation dispute is a core matter under 28 U.S.C. § 157(b)(2)(L).

## Analysis

At a hearing on confirmation of a plan, the proponents of that plan (here, the debtors and the Committee) bear the burden of demonstrating by the preponderance of the evidence that the confirmation standards have been satisfied.[29]  The confirmation order makes various specific findings and conclusions with respect to each of the applicable statutory requirements.  The Court is satisfied, based on its review of the evidentiary record, that those findings are supported by the record before the Court.  This Memorandum Opinion does not purport to address each of the specific requirements imposed by the Bankruptcy Code.  Instead, it is intended to set forth the reasons supporting the Court's findings and conclusions with respect to those matters that were contested by the parties.

---

[28] D.I. 8229.

[29] *In re Genesis Health Ventures*, 266 B.R. 591, 598-599 (Bankr. D. Del. 2001).

I.    **The plan was filed in good faith, as § 1129(a)(3) requires; the conflict-of-interest provisions of the trust agreement are standard and customary and provide no reason to call into question the good faith finding.**

Section 1129(a)(3) provides that a plan must be "proposed in good faith and not by any means forbidden by law."[30]  "For purposes of determining good faith under section 1129(a)(3) the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[31]  This analysis "requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal."[32]

When viewed from the perspective of the work done in this bankruptcy case overall, there is no reason at all to question the debtors' good faith in proposing this plan.  They conducted extremely successful asset sales and have been trying for some time to distribute the value generated by those sales to the stakeholders to whom that money belongs.  Their first effort failed because the creditors would not support it.  Then they swung too far to the other extreme, in a way that the Court found unduly prejudicial to MFN.  The Court believes that this effort strives to land somewhere in between.  It is candidly hard to know what else one could reasonably ask of a party in the debtors' position.

MFN's argument that the plan is not proposed in good faith is premised on the trust agreement's governance provisions.  The creation of a post-bankruptcy trust

---

[30] 11 U.S.C. § 1129(a)(3).

[31] *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (quotations, citations, and internal ellipses omitted).

[32] *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012).

under a chapter 11 plan to complete the work that is otherwise assigned by the Bankruptcy Code to the debtor in possession, as trustee, is an omnipresent feature of modern chapter 11 practice. As this Court previously noted in its opinion in *Avon*, a case can be made that the Bankruptcy Code as originally enacted in 1978 did not contemplate this development.[33] But this Court concluded there that the creation of such a post-confirmation trust is permissible under § 1123(b)(6) of the Bankruptcy Code, and MFN makes no suggestion to the contrary.

But because the creation of such a trust was not expressly contemplated by the Code, it is perhaps unsurprising that the Bankruptcy Code has relatively little to say about the appropriate trust governance.[34] In *Boy Scouts*, the court heard expert testimony on corporate governance, and the terms of the trust agreement were amended in response to the witness' concerns about the governance of the trust.[35] Here, MFN rests its argument on the ground that the alleged inadequacy of the trust's governance provisions mean that the plan was not proposed in good faith.

The Court will limit its conclusions to the resolution of the disputes that the parties have presented to it. In light of the relatively limited authority involving post-confirmation trusts, however, the Court does believe it helpful to set out its understanding of the applicable overall legal framework.

---

[33] *See In re AIO US, Inc.*, No. 24-11836, 2025 WL 2426380, at *34 (Bankr. D. Del. Aug. 21, 2025).

[34] While there is little formal authority, some practice guides set out what are described as best practices with respect to the appropriate terms of a post-confirmation trust. *See, e.g.,* Ilan D. Scharf, *Post-confirmation Trusts,* https://plus.lexis.com/api/permalink/a328fa5d-7191-4a76-b4e6-d80df6100fbc/?context=1530671.

[35] *Boy Scouts*, 642 B.R. at 640-644.

*First*, once a plan is confirmed and a trust is created, the respective rights of the various parties are controlled by the plan, the confirmation order, and the trust agreement. That much, the Court believes, follows from the language of § 1141(a) that addresses the binding effect of a confirmed plan on parties in interest and the Supreme Court's *Espinosa* decision, which holds that a confirmed plan is a judgment entitled to preclusive effect on those parties who received appropriate notice.[36]

But that point tells us nothing about what a plan and trust agreement *ought* to say. Those issues are appropriately considered at this stage, when the plan and the trust agreement are before the court at a confirmation hearing. To that end, it bears note that before plan confirmation, the Bankruptcy Code gives parties in interest certain rights *vis-à-vis* the bankruptcy trustee, whether a debtor in possession or an appointed trustee. The trustee may sell estate property out of the ordinary course only when approved by the Court after notice to parties in interest.[37] Creditors are entitled to a judicial determination on the allowance or disallowance of their claims.[38] Creditors may seek the removal of the trustee on a showing of cause.[39]

---

[36] *See* 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan"); *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 269 (2010) ("[t]he Bankruptcy Court's order confirming Espinosa's proposed plan was a final judgment" and "the finality of a Bankruptcy Court's orders following the conclusion of direct review" will typically preclude a challenge to the enforceability of that order).

[37] 11 U.S.C. § 363(b)(1).

[38] *Id.* § 502(b).

[39] *Id.* § 1104.

Once a plan is confirmed that deprives creditors of any or all of these rights, that is what it is. That is the *first* point. But this *second* point is that the Court generally believes that to the extent that a liquidating trust is taking on the responsibilities that the Code assigns to the bankruptcy trustee, such as the right to sell assets free and clear under § 363, the right to assume and assign executory contracts under § 365, or the right to object to claims under § 502, then parties in interest cannot be deprived, over their objection, of the rights afforded to them by the Bankruptcy Code *vis-à-vis* the trustee in bankruptcy.[40]

Importantly, however, this second point is not specifically at issue here. MFN did object to the plan on the ground that the manager of the trust should be removable "for Cause or Disability by order of the Court on motion brought by any Liquidating Trust Beneficiary."[41] During closing argument, however, counsel for the debtors explained that the trust agreement in fact so provides.[42] MFN did not press that point further.

The argument MFN does make, however, raises the *third* point, which is that § 1129(a)(3) requires that a plan be proposed in good faith. This Court agrees with MFN that a plan that permitted a post-confirmation trust to operate in a way that was inconsistent with the fiduciary duties owed by a trustee in bankruptcy –

---

[40] The statutory basis for such a conclusion would likely be § 1129(a)(1), which requires that a plan comport with the requirements of the Bankruptcy Code.

[41] D.I. 7932 at 22.

[42] Nov. 12, 2025 Hr'g Tr. at 139-140; D.I. 8146 § 7.8 ("A Manager may be removed for Cause or Disability by order of the Bankruptcy Court on motion brought by any Liquidating Trust Beneficiary.").

especially if it were proposed for the purpose of circumventing those obligations – would likely violate this good faith requirement.

In 1938, the Chandler Act introduced the concept of the debtor in possession as a feature of federal bankruptcy law.  The notion is that a firm's existing managers may be better positioned than a stranger who is wholly independent to serve in the role of "trustee" to maximize value for the benefit of the company's creditors and other stakeholders.  Ever since that time, however, the question of ensuring that the company's managers, in their capacity as a bankruptcy "trustee," are operating as a proper fiduciary has been a central focus of bankruptcy jurisprudence.[43]

The basic problem is that a firm's managers owe their positions to holders of the company's equity, who may as a matter of corporate law choose the directors.  By virtue of the authority that the Bankruptcy Code gives to the debtor in possession, at least in the first instance, to propose a plan of reorganization, courts have been required to devote careful attention to ensuring (under both the current Bankruptcy Code, and its predecessors) that the debtor not propose a plan that "will simply turn out to be too good a deal for the debtor's owners."[44]

---

[43] The basic problem in fact dates back further – to the equity receiverships under which much of the United States railroad industry was reorganized in the late 19th century.  *See generally* Douglas G. Baird, *The Elements of Bankruptcy* 61-68 (7th ed. 2022).  *See also Louisville Trust Co. v. Louisville, N.A. & C.R. Co.,* 174 U.S. 674 (1899); *Northern Pacific Ry. Co. v. Boyd*, 228 U.S. 482 (1913); *Case v. Los Angeles Lumber Prods.*, 308 U.S. 106 (1939); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988).

[44] *See Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999).

In light of this set of concerns, the current Bankruptcy Code contains a host of protections, express and implicit, designed to ensure that the debtor in possession is serving as a proper fiduciary for the benefit of the company's creditors.  In addition to the principle of absolute priority mentioned above, these protections include creditors' rights to seek conversion or dismissal, the voting provisions that require at least some measure of creditor approval to confirm a plan under which creditors are impaired, and the rights of creditors to obtain standing to pursue estate causes of action when the company improperly declines to pursue them.[45]

MFN's central argument here is that, as applied to the circumstances of this case, the drafters of the Bankruptcy Code may have overachieved.  The typical concern is that a firm's managers might be willing to take imprudent risks – adopt a "hail Mary" strategy that puts the creditors' money at risk in the hopes of generating a return for equity.  Here, the concern is the opposite.  For example, about a month before the filing of the bankruptcy case, the debtors filed a lawsuit against the Teamsters in federal court in Kansas, alleging that the Teamsters had not negotiated in good faith during the parties' labor negotiations, and seeking "$137 million in damages for the Union's obstruction of [the efforts to integrate Yellow's business] as

---

[45] *See* 11 U.S.C. § 1112 (providing for conversion or dismissal); *id.* § 1129(a)(10) (requiring, in a case in which any class of creditors is impaired, the acceptance by an impaired accepting class); *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) (en banc) (finding that the Bankruptcy Code implicitly authorizes a court to grant a creditors' committee standing to pursue a potentially valuable estate cause of action that the debtor elects not to pursue).

well as the loss of Yellow's enterprise value which it estimates at approximately \$1.5 billion."[46]

MFN's concern is that even if the expected value of the pursuit of that claim exceeds the cost of pursuing it (such that an honest fiduciary to the estate as a whole would choose to do so), a liquidating trust dominated by pension plans may elect not to pursue it. This point is not just about the trust being overly conservative in a way that favors creditors over equity holders. MFN contends that in light of the close relationship between the pension plans and the union, a trust governed by pension plans will be conflicted.[47]

Relatedly, MFN argues that the trust may be unwilling to defend the victories that the debtors and MFN obtained in this Court (or challenge the decisions on which it lost in this Court and the Third Circuit) in the disputes over the amount of the withdrawal liability claims. Instead, MFN is concerned that the trust will seek to settle those claims in amounts that it considers to be inflated. Indeed, during the confirmation hearing, MFN elicited testimony on cross examination that the debtors and the pension plans have reached a notional settlement of the pension plan claims,

---

[46] D.I. 14 ¶ 10. The district court dismissed the lawsuit for failure to exhaust the contractual grievance procedures. *Yellow Corp. v. International Brotherhood of Teamsters*, No. 23-1131, 2024 WL 3413967 (D. Kan. July 15, 2024). The Tenth Circuit recently reversed that decision, holding that Yellow was entitled to leave to amend the complaint in order to remedy the deficiency. *Yellow Corp. v. International Brotherhood of Teamsters*, No. 24-3111, 2025 WL 3089412 (10th Cir. Nov. 5, 2025).

[47] Nov. 12, 2025 Hr'g Tr. at 110-111 (cross-examination of debtors' witness contending that the pension plans are hostile to the pursuit of the litigation).

which has been discussed with the debtors' board but for which the debtors have not yet filed a motion seeking this Court's approval.[48]

The Court understands and appreciates MFN's concern. After all, members of the Committee exercised their statutory authority to reject the debtors' initial plan, one that would have appointed a neutral fiduciary as a trustee, because it would not permit the pension plans to control the governance of the trust. On the one hand there is perhaps nothing remarkable about the beneficiaries of a trust wanting some say in the trust governance.[49] On the other, the circumstances do at least give rise to a question why the pension plans would have held up confirmation of the plan (and thus their own distributions) for many months if they did not intend to *use* their role in trust governance to serve their own individual interests.

Whatever concerns one might have about the decision by certain creditors to reject the prior form of plan, nothing in the record would support the conclusion that the current plan was not proposed in good faith. With respect to any potential settlement of pension plan claims, the plan and trust agreement preserve the right of any party in interest, including MFN, to object to the approval of such a settlement. The ultimate decision whether to approve such a settlement remains with this Court.

And as to the pursuit of the Teamsters litigation, the provisions of the liquidating trust agreement are standard and customary. As described above (in the horrific block quote on pp. 13-14 of this Memorandum Opinion from § 7.4(b) of the

---

[48] *Id.* at 91-95.

[49] *AIO US, Inc.*, 2025 WL 2426380, at *27.

trust agreement), the agreement requires the disclosure of any conflict of interest and prohibits managers with a conflict from participating in "any discussion, vote, or [taking] part in any action with respect to such matter or issue."[50]  These provisions are standard and customary and comport with the usual requirements of Delaware corporate law.  In addition, because the trust is created under the terms of the confirmed plan, this Court retains post-confirmation jurisdiction to enforce the terms of the trust agreement itself.[51]

In sum, based on the Court's review of the entire record and the "totality of the circumstances" of this case, the Court finds that the plan was proposed in good faith and thus satisfies the requirements of § 1129(a)(3) of the Bankruptcy Code.

## II.    The plan satisfies § 1129(a)(7)'s requirement that the plan be in the best interests of creditors.

MFN's second objection is that the plan does not satisfy the requirement of § 1129(a)(7) of the Bankruptcy Code that a plan be in the best interests of creditors. That section provides that, in order to be confirmed, a plan must satisfy the following condition:

(7)    With respect to each impaired class of claims or interests —

(A)    each holder of a claim or interest of such class —

(i)    has accepted the plan; or

(ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain

---

[50] D.I. 8146 § 7.4(b).

[51] *In re Resorts Int'l, Inc.*, 372 F.3d 154, 167 (3d Cir. 2004) (the bankruptcy court has post confirmation jurisdiction to "construe and enforce provisions of the Plan to resolve a post-confirmation dispute").

> if the debtor were liquidated under chapter 7 of this
> title on such date[.][52]

Unlike the requirement that a plan satisfy absolute priority, that can be enforced only if the affected class of creditors rejects the plan, the text of the Bankruptcy Code makes plain that the best-interests requirement must be met with respect to "each holder" of a claim that is in a class that is impaired under the plan.[53]

It is customary for a reasonably detailed liquidation analysis, showing the expected recoveries in a chapter 7 case, to be included as part of a disclosure statement that is distributed to creditors, to provide the creditors with sufficient information to make an informed decision on how to vote on the plan. The debtors' disclosure statement with respect to this plan did not contain this type of detailed liquidation analysis. No creditor, however, objected to the approval of the disclosure statement on this basis, and the Court approved the disclosures as adequate.[54]

### A. Whittman's liquidation analysis and associated testimony are admissible.

In order to demonstrate the plan's satisfaction of best interests, the debtors presented Whittman's testimony. In advance of confirmation, Whittman prepared the kind of detailed liquidation analysis commonly included in a disclosure statement. That analysis – a detailed spreadsheet covering six pages with type that is barely legible even when printed on pages that are 11" x 17" – was provided to MFN

---

[52] 11 U.S.C. § 1129(a)(7).

[53] *See In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 46 (Bankr. D. Del. 2000) ("The burden of establishing compliance with section 1129(a)(7) is on the proponent of the plan.").

[54] D.I. 7608.

in discovery.  Whittman did not, however, provide MFN with an expert report containing the kinds of disclosures typically required by Rule 26(a)(2), such as all of the material on which Whittman relied in forming his opinion that the plan satisfies best interests.

MFN moved to exclude Whittman's testimony and the spreadsheet containing the liquidation analysis.  The Court overruled those objections and admitted both the testimony and the spreadsheet.  The confirmation hearing is a "contested matter" within the meaning of the Bankruptcy Rules.  And those rules provide that in a contested matter, "[u]nless the court orders otherwise," Rule 26(a)(2)'s requirement regarding "disclosures about expert testimony" are not applicable.[55]

These rules apply in business and consumer cases alike.  So it is perhaps understandable that the drafters of the rules would not require a complete set of expert disclosures any time a consumer debtor seeks to present expert testimony about the valuation of a vehicle.  In a high stakes and complex matter such as this one, however, the Court would have required the submission of an expert report and other materials in compliance with Rule 26(a)(2) had any party requested it.  But no party did, and so the Court will accordingly apply the rules as they are written.

The Court is satisfied that Whittman is properly qualified as an expert witness who may offer opinion testimony on the subject of liquidation analyses.  He is an experienced financial advisor to companies in financial distress.[56]  He has experience

---

[55] *See* Fed. R. Bankr. P. 9014(c)(2).

[56] Nov. 12, 2025 Hr'g Tr. at 31.

preparing liquidation analyses and has testified in support of liquidation analyses "six or seven" times, including in other high-profile chapter 11 cases.[57]  Applying the analysis under Rule 702 as construed by the Supreme Court in *Kumho Tire* to non-scientific evidence, the Court concludes that Whittman's opinion testimony is sufficiently relevant and reliable to be admissible.[58]

For that reason, the Court will admit his spreadsheet as expert reliance material.  Federal Rule of Evidence 703 permits an expert to rely on hearsay information if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."[59]  Moreover, that information may be considered by the factfinder "if their probative value in helping the [factfinder] evaluate the opinion substantially outweighs their prejudicial effect."[60]  It is certainly customary for an expert on the subject of a liquidation analysis to rely on a spreadsheet such as the one at issue here.  And the Court does not believe that permitting consideration of the spreadsheets introduces any material risk of prejudice.  The Court accordingly denies MFN's motion *in limine* seeking to exclude the expert testimony and the introduction of Whittman's spreadsheets. The testimony and documents are properly admissible into evidence.

---

[57] *Id.*

[58] *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("The objective of [Rule 702] is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

[59] Fed. R. Evid. 703.

[60] *Id.   See also In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 749 (3d Cir. 1994) (addressing application of Rule 703).

**B.     The best-interests analysis must be conducted on a debtor-by-debtor basis; if one were to accept Whittman's assumptions, the plan would satisfy best interests for each of the debtors.**

The starting point to MFN's challenge to Whittman's liquidation analysis must begin with a summary of that analysis itself.  The Court will accordingly seek to summarize the key points of that analysis, beginning with Whittman's projections of what creditors can expect to recover under the debtors' proposed plan, followed by a discussion of his projected recoveries in a chapter 7 case.

**1.     Whittman projects recoveries for general unsecured creditors at 18.7 percent of their allowed claims in his "low case" scenario in chapter 11.**

Whittman's "low case" analysis of what creditors would recover under the plan assumed that the debtors would have $600 million available to distribute to creditors and that the total pool of unsecured claims would be $1.66 billion.  His "high case" (on the second page of his spreadsheet) assumed $700 million of distributable value and a total claims pool of $1.28 billion.

Determining the actual recoveries for unsecured creditors, however, requires a three-step analysis, as the spreadsheet illustrates.  The first step involves various adjustments, to be made on a debtor-by-debtor basis, as a result of various intercompany obligations.  These intercompany obligations include transfers provided for under the plan to cover "convenience class" claims that the plan provides for paying in full, but that certain individual debtors would lack the assets to pay when viewed individually.  These intercompany transfers are demonstrated in the following portion of the spreadsheet, working off of Whittman's "low case" scenario. As the chart below shows, the aggregate distribution of $600 million is the same both

29

before and after these adjustments.  The effect of these intercompany adjustments

simply affects the allocation of that $600 million among the different debtors' estates:

| ($ in 000s) | Net Dist. Value | Admin & Priority Deficiency Transfer | Convenience Deficiency Transfer | Admin IC Recovery | Unsecured IC Recovery | Net Dist. Value incl. I/C, Equity Recov. |
|---|---|---|---|---|---|---|
| 1105481 Ontario Inc. | - | - | - | $ 0 | - | $ 0 |
| Express Lane Service, Inc. | - | - | - | 0 | - | 0 |
| New Penn Motor Express LLC | - | - | - | 42,816 | (3,379) | 39,437 |
| Roadway Express International, Inc. | - | - | 12 | 15 | 0 | 27 |
| Roadway LLC | 4,704 | - | - | (1,048) | 54,666 | 58,321 |
| Roadway Next Day Corporation | - | - | - | - | - | - |
| USF Bestway Inc. | - | 0 | 4 | (0) | - | 4 |
| USF Dugan Inc. | - | - | - | 18 | 0 | 18 |
| USF Holland International Sales Corporation | - | - | - | - | - | - |
| USF Holland LLC | - | - | - | 91,147 | 16 | 91,163 |
| USF Reddaway Inc. | - | - | - | 52,658 | (74) | 52,584 |
| USF Redstar LLC | - | - | - | 254 | (0) | 254 |
| Yellow Corporation | 591,299 | (3,079) | (2,691) | (584,225) | 4,320 | 5,624 |
| Yellow Freight Corporation | - | 72 | 252 | - | - | 324 |
| Yellow Logistics, Inc. | - | 287 | 1,402 | 2,039 | 0 | 3,728 |
| YRC Association Solutions, Inc. | - | - | - | 8 | - | 8 |
| YRC Enterprise Services, Inc. | - | 2,720 | 1,004 | 0 | 2,229 | 5,954 |
| YRC Freight Canada Company | 3,997 | - | - | (1,438) | 2 | 2,561 |
| YRC Inc. | - | - | - | 393,736 | (57,780) | 335,956 |
| YRC International Investments, Inc. | - | - | - | 246 | - | 246 |
| YRC Logistics Inc. | - | - | 17 | (1) | - | 16 |
| YRC Logistics Services, Inc. | - | - | - | 14 | - | 14 |
| YRC Mortgages, LLC | - | - | - | - | - | - |
| YRC Regional Transportation, Inc. | - | - | - | 3,762 | 0 | 3,762 |
| **Total Recovery on a by Entity Basis** | $ 600,000 | - | - | - | - | $ 600,000 |

In a chapter 11 case, however, those recoveries would be reduced in the second

step by two further factors before any value is available for distribution to general

unsecured creditors (which is the "impaired class" to which the best interests test

applies).  *First*, administrative and priority claims need to be paid in full.  *Second*, as

mentioned above, the chapter 11 plan called for the creation of certain "convenience

classes" of employee and trade creditors, whose claims would be paid in full (thus

saving the estate the expense of reconciling the amounts of many relatively small-

dollar claims).  Amounts necessary to satisfy these claims in full must be removed

from the "distributable value" in order to determine the total value that is available

to be distributed to general unsecured creditors.  In Whittman's low-case scenario,

that amount is approximately $311 million (in the aggregate) after the second step.

In other words, approximately $289 million of the $600 million in total distributable value is consumed in this second step of the analysis.

| Admin & Priority | | | | Convenience Class Claims | | | |
|---|---|---|---|---|---|---|---|
| Claims $ | Recovery $ | Recovery % | Remaining Value | Claims $ | Recovery $ | Recovery % | Remaining Value |
| - | - | 0% | - | - | - | 0% | - |
| - | - | 0% | 0 | - | - | 0% | 0 |
| 8,120 | 8,120 | 100% | 31,317 | 2,344 | 2,344 | 100% | 28,973 |
| - | - | 0% | 27 | 27 | 27 | 100% | - |
| - | - | 0% | 58,321 | 40 | 40 | 100% | 58,281 |
| - | - | 0% | - | - | - | 0% | - |
| 1 | 1 | 100% | 3 | 3 | 3 | 100% | - |
| - | - | 0% | 18 | - | - | 0% | 18 |
| - | - | 0% | - | - | - | 0% | - |
| 52,850 | 52,850 | 100% | 38,313 | 7,673 | 7,673 | 100% | 30,640 |
| 19,059 | 19,059 | 100% | 33,525 | 4,340 | 4,340 | 100% | 29,184 |
| - | - | 0% | 254 | - | - | 0% | 254 |
| 3,360 | 3,360 | 100% | 2,264 | 2,264 | 2,264 | 100% | - |
| 6 | 6 | 100% | 318 | 318 | 318 | 100% | - |
| 300 | 300 | 100% | 3,429 | 3,429 | 3,429 | 100% | - |
| - | - | 0% | 8 | - | - | 0% | 8 |
| 4,794 | 4,794 | 100% | 1,159 | 1,159 | 1,159 | 100% | - |
| 1,869 | 1,869 | 100% | 693 | 693 | 693 | 100% | - |
| 153,013 | 153,013 | 100% | 182,943 | 23,175 | 23,175 | 100% | 159,768 |
| - | - | 0% | 246 | - | - | 0% | 246 |
| - | - | 0% | 16 | 16 | 16 | 100% | - |
| - | - | 0% | 14 | 6 | 6 | 100% | 9 |
| - | - | 0% | - | - | - | 0% | - |
| 24 | 24 | 100% | 3,738 | - | - | 0% | 3,738 |
| $ 243,394 | $ 243,394 | 100% | $ 356,606 | $ 45,486 | $ 45,486 | 100% | $ 311,119 |

The third and final set of adjustments deals with the fact that certain claims (most notably, the pension plan withdrawal liability claims) run "jointly and severally" against all of the debtors.   Other claims, however, run only against particular debtor entities.   Those adjustments (reflecting the different recoveries between those creditors who can claim against the assets of every debtor and those who can claim only against the assets of a particular debtor) are shown below:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | **Unsecured Class Claims** | | | | | |
| J&S Claim $ | J&S Recovery $ | J&S Recovery % | Other Claims $ | Other Claims Recovery $ | Other Claim Recovery % | Total Claims | Total Recovery $ | Recovery % | Remaining Value |
| $ 1,288,903 | $ 0 | 0.0% | $ 235 | $ 0 | 0.0% | $ 1,289,138 | $ 0 | 0.0% | - |
| 1,288,903 | 0 | 0.0% | 235 | 0 | 0.0% | 1,289,138 | - | 0.0% | - |
| 1,288,903 | 28,689 | 2.2% | 12,784 | 285 | 2.2% | 1,301,687 | 28,973 | 2.2% | - |
| 1,288,903 | - | 0.0% | 1,582 | - | 0.0% | 1,290,485 | - | 0.0% | - |
| 1,288,903 | 58,263 | 4.5% | 393 | 18 | 4.5% | 1,289,296 | 58,281 | 4.5% | - |
| 1,288,903 | - | 0.0% | 235 | - | 0.0% | 1,289,138 | - | 0.0% | - |
| 1,288,903 | 18 | 0.0% | 235 | 0 | 0.0% | 1,289,138 | 18 | 0.0% | - |
| 1,288,903 | - | 0.0% | 291 | - | 0.0% | 1,289,194 | - | 0.0% | - |
| 1,288,903 | 29,612 | 2.3% | 44,740 | 1,028 | 2.3% | 1,333,642 | 30,640 | 2.3% | - |
| 1,288,903 | 28,701 | 2.2% | 21,711 | 483 | 2.2% | 1,310,614 | 29,184 | 2.2% | - |
| 1,288,903 | 254 | 0.0% | 250 | 0 | 0.0% | 1,289,153 | 254 | 0.0% | - |
| 1,288,903 | - | 0.0% | 69,935 | - | 0.0% | 1,358,838 | - | 0.0% | - |
| 1,288,903 | - | 0.0% | 2,311 | - | 0.0% | 1,291,214 | - | 0.0% | - |
| 1,288,903 | - | 0.0% | 12,164 | - | 0.0% | 1,301,067 | - | 0.0% | - |
| 1,288,903 | 8 | 0.0% | 235 | 0 | 0.0% | 1,289,138 | 8 | 0.0% | - |
| 1,288,903 | - | 0.0% | 28,458 | - | 0.0% | 1,317,361 | - | 0.0% | - |
| 1,288,903 | - | 0.0% | 15,538 | - | 0.0% | 1,304,441 | - | 0.0% | - |
| 1,288,903 | 141,925 | 11.0% | 162,045 | 17,843 | 11.0% | 1,450,948 | 159,768 | 11.0% | - |
| 1,288,903 | 246 | 0.0% | 235 | 0 | 0.0% | 1,289,138 | 246 | 0.0% | - |
| 1,288,903 | - | 0.0% | 242 | - | 0.0% | 1,289,145 | - | 0.0% | - |
| 1,288,903 | 9 | 0.0% | 499 | 0 | 0.0% | 1,289,402 | 9 | 0.0% | - |
| 1,288,903 | - | 0.0% | 235 | - | 0.0% | 1,289,138 | - | 0.0% | - |
| 1,288,903 | 3,737 | 0.3% | 263 | 1 | 0.3% | 1,289,166 | 3,738 | 0.3% | - |
| $ 1,288,903 | $ 291,461 | 22.6% | $ 375,086 | $ 19,658 | 5.2% | $ 1,663,989 | $ 311,119 | 18.7% | - |

The net result is that in the chapter 11 case, in the aggregate (again, using the low-case scenario) a total of $311 million is distributed to creditors whose claims total $1.66 billion, leading unsecured creditors to recover 18.7 percent of the amount of their allowed claims.

> **2.    Whittman projects recoveries for general unsecured creditors at 16.4 percent of their allowed claims in his "low case" scenario in chapter 7.**

These results need to be compared to Whittman's assumptions in the "low case" scenario of what would occur in a chapter 7 case.[61]    There, a few variables are different.    To begin, Whittman assumed that a chapter 7 trustee would obtain its statutory fee of approximately three percent of the total distributable value as provided in § 326(a) of the Bankruptcy Code.    In addition, Whittman assumed that

---

[61] Whittman's analysis of the likely results in the event of a chapter 7 liquidation of the debtors is shown on pages 3 (low case) and 4 (high case) of his spreadsheet.

the trustee would spend three percent of the total distributable value on the incremental costs of administering the chapter 7 estate. As a result, the total distributable value available to creditors is reduced by six percent of $600 million (or $36 million) – yielding $564 million of distributable value.

In addition, in the first step of the intercompany analysis, the transfers required to ensure that all administrative and priority creditors (at every debtor) are paid in full, as is required in chapter 11, are not made. And because there are no convenience class claims, the intercompany transfers necessary to ensure that all convenience class creditors (at every debtor) are paid in full are not made, either. The allocation of the $564 million in value, across the various debtors, following the first step in the analysis is shown in the following portion of the spreadsheet. As in the chapter 11 scenario, this step of the analysis affects only the allocation of the distributable value (here, $564 million) among the various debtors. It does not affect the value in the aggregate available for distribution. That is shown below:

| ($ in 000s) | Net Dist. Value | Admin & Priority Deficiency Transfer | Convenience Deficiency Transfer | Admin IC Recovery | Unsecured IC Recovery | Net Dist. Value incl. I/C, Equity Recov. |
|---|---|---|---|---|---|---|
| 1105481 Ontario Inc. | - | - | - | $ 0 | - | $ 0 |
| Express Lane Service, Inc. | - | - | - | 0 | - | 0 |
| New Penn Motor Express LLC | - | - | - | 41,064 | (3,009) | 38,054 |
| Roadway Express International, Inc. | - | - | - | 15 | (0) | 15 |
| Roadway LLC | 4,421 | - | - | (1,048) | 50,627 | 54,000 |
| Roadway Next Day Corporation | - | - | - | - | - | - |
| USF Bestway Inc. | - | - | - | - | - | - |
| USF Dugan Inc. | - | - | - | 17 | 0 | 17 |
| USF Holland International Sales Corporation | - | - | - | - | - | - |
| USF Holland LLC | - | - | - | 87,171 | 9 | 87,180 |
| USF Reddaway Inc. | - | - | - | 50,674 | (69) | 50,606 |
| USF Redstar LLC | - | - | - | 245 | (0) | 245 |
| Yellow Corporation | 555,621 | - | - | (558,458) | 3,459 | 822 |
| Yellow Freight Corporation | - | - | - | - | - | - |
| Yellow Logistics, Inc. | - | - | - | 1,339 | (1) | 1,337 |
| YRC Association Solutions, Inc. | - | - | - | 7 | - | 7 |
| YRC Enterprise Services, Inc. | - | - | - | (1,468) | 2,054 | 586 |
| YRC Freight Canada Company | 3,758 | - | - | (2,839) | 2 | 921 |
| YRC Inc. | - | - | - | 379,419 | (53,071) | 326,348 |
| YRC International Investments, Inc. | - | - | - | 236 | - | 236 |
| YRC Logistics Inc. | - | - | - | - | - | - |
| YRC Logistics Services, Inc. | - | - | - | 14 | - | 14 |
| YRC Mortgages, LLC | - | - | - | - | - | - |
| YRC Regional Transportation, Inc. | - | - | - | 3,612 | 0 | 3,612 |
| Total Recovery on a by Entity Basis | $ 564,000 | - | - | - | - | $ 564,000 |

In the second step, administrative and priority claims are paid in full, but only to the extent the debtors in question would have the funds to pay them. As described above, the transfers made in chapter 11 to ensure that all such creditors are paid in full would not be made in cases under chapter 7. As the first two columns of the chart below demonstrate, that means that approximately $7.7 million in administrative and priority claims would go unpaid in chapter 7 ($243.4 million - $235.7 million) – yielding that amount of excess value that would become available to general unsecured creditors. In addition, the $45.5 million in value that would be devoted to paying convenience class creditors in chapter 11 would not be spent in a chapter 7 case. The result of this second step, in the chapter 7 scenario, is that approximately $328 million is available to be distributed to unsecured creditors, as can be seen below:

| Admin & Priority | | | | Convenience Class Claims | | | |
|---|---|---|---|---|---|---|---|
| Claims $ | Recovery $ | Recovery % | Remaining Value | Claims $ | Recovery $ | Recovery % | Remaining Value |
| - | - | 0% | - | - | - | 0% | - |
| - | - | 0% | 0 | - | - | 0% | 0 |
| 8,120 | 8,120 | 100% | 29,934 | - | - | 0% | 29,934 |
| - | - | 0% | 15 | - | - | 0% | 15 |
| - | - | 0% | 54,000 | - | - | 0% | 54,000 |
| - | - | 0% | - | - | - | 0% | - |
| 1 | - | 0% | - | - | - | 0% | - |
| - | - | 0% | 17 | - | - | 0% | 17 |
| - | - | 0% | - | - | - | 0% | - |
| 52,850 | 52,850 | 100% | 34,330 | - | - | 0% | 34,330 |
| 19,059 | 19,059 | 100% | 31,547 | - | - | 0% | 31,547 |
| - | - | 0% | 245 | - | - | 0% | 245 |
| 3,360 | 822 | 24% | - | - | - | 0% | - |
| 6 | - | 0% | - | - | - | 0% | - |
| 300 | 300 | 100% | 1,038 | - | - | 0% | 1,038 |
| - | - | 0% | 7 | - | - | 0% | 7 |
| 4,794 | 586 | 12% | - | - | - | 0% | - |
| 1,869 | 921 | 49% | - | - | - | 0% | - |
| 153,013 | 153,013 | 100% | 173,336 | - | - | 0% | 173,336 |
| - | - | 0% | 236 | - | - | 0% | 236 |
| - | - | 0% | - | - | - | 0% | - |
| - | - | 0% | 14 | - | - | 0% | 14 |
| - | - | 0% | - | - | - | 0% | - |
| 24 | 24 | 100% | 3,589 | - | - | 0% | 3,589 |
| $ 243,394 | $ 235,693 | 97% | $ 328,307 | - | - | 0% | $ 328,307 |

The final step is the distribution of that $328 million over the allowed claims. Here, Whittman assumed that the allowed claims in a chapter 7 case would be 20 percent higher than they are in chapter 11. As a result, the final step of his chapter 7 analysis shows $328 million of value being distributed over nearly $2 billion in claims, yielding a total recovery to unsecured creditors of 16.4 percent of the amount of their allowed claims.

| Unsecured Class Claims | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| J&S Claim $ | J&S Recovery $ | J&S Recovery % | Other Claims $ | Other Claim Recovery $ | Other Claim Recovery % | Total Claims | Total Recovery $ | Recovery % | Remaining Value |
| $ 1,491,542 | $ 0 | 0.0% | $ 282 | $ 0 | 0.0% | $ 1,491,824 | $ 0 | 0.0% | - |
| 1,491,542 | 0 | 0.0% | 282 | 0 | 0.0% | 1,491,824 | 0 | 0.0% | - |
| 1,491,542 | 29,574 | 2.0% | 18,153 | 360 | 2.0% | 1,509,695 | 29,934 | 2.0% | - |
| 1,491,542 | 15 | 0.0% | 1,931 | 0 | 0.0% | 1,493,473 | 15 | 0.0% | - |
| 1,491,542 | 53,981 | 3.6% | 520 | 19 | 3.6% | 1,492,062 | 54,000 | 3.6% | - |
| 1,491,542 | - | 0.0% | 282 | - | 0.0% | 1,491,824 | - | 0.0% | - |
| 1,491,542 | - | 0.0% | 282 | - | 0.0% | 1,491,824 | - | 0.0% | - |
| 1,491,542 | 17 | 0.0% | 282 | 0 | 0.0% | 1,491,824 | 17 | 0.0% | - |
| 1,491,542 | - | 0.0% | 349 | - | 0.0% | 1,491,891 | - | 0.0% | - |
| 1,491,542 | 32,941 | 2.2% | 62,895 | 1,389 | 2.2% | 1,554,437 | 34,330 | 2.2% | - |
| 1,491,542 | 30,899 | 2.1% | 31,261 | 648 | 2.1% | 1,522,803 | 31,547 | 2.1% | - |
| 1,491,542 | 245 | 0.0% | 301 | 0 | 0.0% | 1,491,842 | 245 | 0.0% | - |
| 1,491,542 | - | 0.0% | 86,639 | - | 0.0% | 1,578,181 | - | 0.0% | - |
| 1,491,542 | - | 0.0% | 3,155 | - | 0.0% | 1,494,696 | - | 0.0% | - |
| 1,491,542 | 1,025 | 0.1% | 18,712 | 13 | 0.1% | 1,510,253 | 1,038 | 0.1% | - |
| 1,491,542 | 7 | 0.0% | 282 | 0 | 0.0% | 1,491,824 | 7 | 0.0% | - |
| 1,491,542 | - | 0.0% | 35,541 | - | 0.0% | 1,527,083 | - | 0.0% | - |
| 1,491,542 | - | 0.0% | 19,477 | - | 0.0% | 1,511,018 | - | 0.0% | - |
| 1,491,542 | 150,856 | 10.1% | 222,264 | 22,480 | 10.1% | 1,713,806 | 173,336 | 10.1% | - |
| 1,491,542 | 236 | 0.0% | 282 | 0 | 0.0% | 1,491,824 | 236 | 0.0% | - |
| 1,491,542 | - | 0.0% | 310 | - | 0.0% | 1,491,852 | - | 0.0% | - |
| 1,491,542 | 14 | 0.0% | 606 | 0 | 0.0% | 1,492,148 | 14 | 0.0% | - |
| 1,491,542 | - | 0.0% | 282 | - | 0.0% | 1,491,824 | - | 0.0% | - |
| 1,491,542 | 3,588 | 0.2% | 315 | 1 | 0.2% | 1,491,857 | 3,589 | 0.2% | - |
| $ 1,491,542 | $ 303,398 | 20.3% | $ 504,687 | $ 24,909 | 4.9% | $ 1,996,229 | $ 328,307 | 16.4% | - |

> **3.    When the analysis is conducted on a debtor-by-debtor basis (accepting Whittman's assumptions), the best interest test is still satisfied.**

MFN argues, however, that this analysis is not properly conducted in the aggregate but rather must be viewed on a debtor-by-debtor basis. And even accepting all of Whittman's assumptions, the projected recoveries at certain of the debtors – Roadway Express International, Inc., Yellow Logistics, Inc., and YRC Logistics Services, Inc. – are still greater in chapter 7 than chapter 11, thus causing the plan to fail the best interests test with respect to those debtors.

The response to that, however, is that the economies of scale that are obtained when one engages the analysis among the debtors collectively would be lost when the liquidation analysis is viewed on a debtor-by-debtor basis. There is no real dispute that the question of best interests must be viewed from the perspective of each debtor, viewed in isolation. That much follows from the conclusions in *Tribune* and *Avon*

36

that even when a plan is drafted as a single document, in a case in which separate corporate entities are not substantively consolidated, the "plan" must be understood as separate plans for each of the debtors.    Those plans must each satisfy the requirements of confirmation as to each debtor.[62]

To account for that fact, Whittman engaged a separate analysis that assumed that rather than spreading the costs of a chapter 7 case across all of the debtors, those costs were borne by the three debtors for which the plan otherwise failed best interests.    That analysis shows (on page 5 of his chart, in the low-case scenario) that unsecured creditor recoveries for those three debtors (each highlighted in yellow, below) are higher in chapter 11 than in chapter 7:[63]

---

[62] *See In re Tribune Co.,* 464 B.R. 126, 183 (Bankr. D. Del. 2011) (subsequent history, which does not bear on the discussion at issue, omitted); *AIO US, Inc.*, 2025 WL 2426380, at *30 ("As a matter of convenience, [the 20 plans filed by each of the 20 debtors in the case] are contained in a single document that may be described colloquially as 'the plan.'  As a statutory matter, however, they can only be understood as 20 plans, each of which must meet the requirements for confirmation.").

[63] Whittman's "high case" scenario showing the effect of the costs of chapter 7 being borne by the three debtors that failed best interests under his principal analysis is on page 6 of his spreadsheet.

| Unsecured Class Claims | | | | | | | | | |
| J&S Claim $ | J&S Recovery $ | J&S Recovery % | Other Claims $ | Other Claims Recovery $ | Other Claim Recovery % | Total Claims | Total Recovery $ | Recovery % | Remaining Value |
|---|---|---|---|---|---|---|---|---|---|
| $ 1,291,542 | $ 0 | 0.0% | - | - | 0.0% | $ 1,291,542 | $ 0 | 0.0% | - |
| 1,291,542 | 0 | 0.0% | - | - | 0.0% | 1,291,542 | 0 | 0.0% | - |
| 1,291,542 | 34,041 | 2.6% | 6,796 | 179 | 2.6% | 1,296,338 | 34,220 | 2.6% | - |
| 1,291,542 | 15 | 0.0% | 861 | 0 | 0.0% | 1,292,402 | 15 | 0.0% | - |
| 1,291,542 | 97,331 | 7.5% | 111 | 8 | 7.5% | 1,291,652 | 97,340 | 7.5% | - |
| 1,291,542 | - | 0.0% | - | - | 0.0% | 1,291,542 | - | 0.0% | - |
| 1,291,542 | - | 0.0% | - | - | 0.0% | 1,291,542 | - | 0.0% | - |
| 1,291,542 | 17 | 0.0% | - | - | 0.0% | 1,291,542 | 17 | 0.0% | - |
| 1,291,542 | - | 0.0% | 53 | - | 0.0% | 1,291,595 | - | 0.0% | - |
| 1,291,542 | 63,221 | 4.9% | 36,489 | 1,786 | 4.9% | 1,328,031 | 65,007 | 4.9% | - |
| 1,291,542 | 45,726 | 3.5% | 17,149 | 607 | 3.5% | 1,308,691 | 46,333 | 3.5% | - |
| 1,291,542 | 248 | 0.0% | 14 | 0 | 0.0% | 1,291,556 | 248 | 0.0% | - |
| 1,291,542 | - | 0.0% | 38,256 | - | 0.0% | 1,329,798 | - | 0.0% | - |
| 1,291,542 | - | 0.0% | 1,549 | - | 0.0% | 1,293,091 | - | 0.0% | - |
| 1,291,542 | 1,137 | 0.1% | 12,976 | 11 | 0.1% | 1,304,518 | 1,148 | 0.1% | - |
| 1,291,542 | 7 | 0.0% | - | - | 0.0% | 1,291,542 | 7 | 0.0% | - |
| 1,291,542 | - | 0.0% | 13,902 | - | 0.0% | 1,305,444 | - | 0.0% | - |
| 1,291,542 | - | 0.0% | 12,427 | - | 0.0% | 1,303,969 | - | 0.0% | - |
| 1,291,542 | 248,496 | 19.2% | 146,045 | 28,100 | 19.2% | 1,437,587 | 276,598 | 19.2% | - |
| 1,291,542 | 239 | 0.0% | - | - | 0.0% | 1,291,542 | 239 | 0.0% | - |
| 1,291,542 | - | 0.0% | 9 | - | 0.0% | 1,291,551 | - | 0.0% | - |
| 1,291,542 | 14 | 0.0% | 258 | 0 | 0.0% | 1,291,800 | 14 | 0.0% | - |
| 1,291,542 | - | 0.0% | - | - | 0.0% | 1,291,542 | - | 0.0% | - |
| 1,291,542 | 3,655 | 0.3% | 22 | 0 | 0.3% | 1,291,564 | 3,655 | 0.3% | - |
| $ 1,291,542 | $ 494,150 | 38.3% | $ 286,918 | $ 30,692 | 10.7% | $ 1,578,460 | $ 524,842 | 33.3% | - |

For these reasons, the Court finds that if one were to accept Whittman's assumptions, the plan would satisfy the best-interests requirement of § 1129(a)(7).

* * *

In addition, this same insight has led to a further simplifying assumption the Court has made in its own assessment of the record on the question of best interests. For the reasons described above, when Whittman's analysis showed an aggregate recovery of 16.4 percent in the low-case chapter 7 scenario, the best-interest test was satisfied on a debtor-by-debtor basis when compared to his assumed aggregate recovery of 18.7 percent under the low-case scenario of the proposed chapter 11 plan. As will be further described below, the Court accepts Whittman's assumed 18.7 percent recovery rate in the "low case" under the debtors' plan, but believes certain adjustments need to be made to his chapter 7 analysis.

The simplifying assumption is that the Court has not undertaken to engage in a debtor-by-debtor analysis based on the revised assumptions that the Court believes are appropriate.  Rather, so long as the projected *aggregate* recovery in chapter 7 under the assumptions the Court adopts are equal to or lower than the 16.4 percent recovery in Whittman's chapter 7 analysis, the plan will satisfy best interests on a debtor-by-debtor basis for the same reasons set forth above.[64]

### C.    The Court rejects the assumption that the claims pool would be 20 percent larger in a chapter 7 case – a five percent increase is more reasonable.

MFN challenges certain of Whittman's assumptions as unreasonable.  The most important of those assumptions relate to the size of the claims pool.  In the chapter 11 scenario, Whittman's analysis assumes that the pension plan claims will be allowed in the amount reflected in this Court's summary judgment rulings.  MFN contends that the assumptions in the chapter 11 scenario should be increased to account for the settlement that has been discussed between the debtors and the pension plans, but not yet submitted for court approval.  The debtors argue that because there is no final settlement, the amounts reflected in this Court's ruling are proper.

Perhaps more importantly, however, MFN argues that Whittman's assumption that the claims pool would be 20 percent greater in chapter 7 than in

---

[64] The analyses depicted in this Memorandum Opinion are based on Whittman's "low case" scenario.  As noted, he also included a "high case" scenario that assumed $700 million in distributable value and a smaller claims pool.  Because these same assumptions are changed in both the chapter 7 and the chapter 11 scenarios, the analysis set forth in this Memorandum Opinion would not yield a materially different result in the "high case" scenario.

chapter 11 is unsupportable. The Court inclines to agree with MFN's position on this point. It is true that Bankruptcy Rule 1019(b)(1)(B) provides that when a case is converted from chapter 11 to chapter 7, the time for filing a proof of claim is reset. Perhaps in a mass tort case in which the claims pool can be notoriously elastic, there could be reason to believe that a new bar date might attract creditors that did not file proofs of claim in the chapter 11 case. But this is not such a case. Whittman did not dispute the assertion by MFN's counsel on cross-examination that the total late-filed claims in this case come to only $8 million.[65] So while the Court accepts the premise that there may be some number of new claims that are filed in the event of a conversion of the cases to ones under chapter 7, the Court believes that an assumption of a five percent increase is more reasonable than Whittman's assumed 20 percent increase.

Otherwise, however, the Court believes that the claims analysis based on this Court's prior summary judgment decisions is an acceptable assumption. The Court is not forming any judgment one way or the other about whether it will or will not approve a settlement after confirmation. Rather, the point of the Court's analysis is that with respect to the claims that have already been timely filed, there is no reason to conclude that their ultimate allowed amount will be any different in chapter 7 than they would be in chapter 11. Perhaps the Court will ultimately approve a settlement in an amount somewhat greater than its existing rulings contemplate. Perhaps not. But exactly the same would be true if a chapter 7 trustee were appointed. The Court

---

[65] Nov. 12, 2025 Hr'g Tr. at 55.

accordingly sees no reason to use different assumptions in chapter 7 as compared to chapter 11 with respect to the allowed claims that have already been filed.  And as such, the precise amount of the assumed value of allowed claims does not affect the comparative outcome in chapter 7 versus chapter 11.  The only difference the Court sees is the likelihood of some number of new claims being asserted.  To that end, however, the Court will assume the new claims will be five percent of existing timely claims – not 20 percent.[66]

> **D.    As a result of the high cost of the more protracted litigation that would likely occur in chapter 7, creditors would likely recover more under the proposed plan than they would in chapter 7.**

The Court further concludes that an additional assumption should be made about the consequence of converting these cases to chapter 7 and introducing a trustee who has not otherwise been involved in these large and complex cases.  That assumption is that the appointment of a chapter 7 trustee would cause the extensive and expensive litigation that has marked these chapter 11 cases to go on for substantially longer – perhaps as much as 18 to 24 months longer than it would if the Court confirms the plan.

The record in this case demonstrates that the value available to be distributed to creditors has declined sharply as the cases have dragged out.  Whittman testified that the high end of distributable value under the form of plan that was before the Court in November 2024 was $900 million, whereas the high end of distributable

---

[66] Having considered MFN's other challenges to Whittman's assumptions, the Court concludes that Whittman's assumptions that are not addressed expressly in this Memorandum Opinion are otherwise appropriate and are hereby adopted as reasonable.

value is now $700 million.[67]  An analysis conducted in April 2025 (and discussed during the confirmation hearing) projected $790 million in distributable value.[68]  This evaporation of value with the passage of time cannot be ignored.

This is not to say that all of this decline in value is attributable to professional fees and litigation cost.  But some of it certainly is.  This Court's review of the fee applications of the debtors' bankruptcy counsel alone show that these professional fees have been running at a rate of $3.5 million/month over the first 24 months of this bankruptcy case.  The Court is not questioning the reasonableness of any of these fees.  The chapter 11 process is very expensive.  So is the process of resolving other disputes, outside of bankruptcy, with stakes that are as high as they are in this case.  So this point is not by any means intended to cast aspersions on the excellent professionals in this case who have done very good and very hard work.

The point instead is a different one.  It is that high stakes litigation consumes value.  And it is this Court's view, based on its experience having presided in 61 chapter 7 business cases, 15 of which were cases originally filed under chapter 11 but later converted to chapter 7, is that a chapter 7 trustee might well (as MFN would likely prefer) engage in substantial high-stakes litigation with a view towards hitting a home run and returning value for equity.  This Court believes, however, that the end result of that would very likely be the same amount of distributable value as

---

[67] Nov. 12, 2025 Hr'g Tr.  at 81-83.

[68] *Id.* at 84.

would be available under the debtors' proposed plan, over a similar universe of allowed claims, with the only difference being up to two years of further litigation.

That is not to suggest that the chapter 7 trustees in this district are not serious about their fiduciary duties to the estate. They are. Rather, it reflects the reality of human nature that professionals have a way of persuading themselves and their clients that protracted and expensive litigation makes sense even in circumstances when a more sober assessment would counsel otherwise. Accordingly, the Court concludes that in addition to the $18 million in ordinary professional expenses that Whittman projects would be imposed on the estate through the conversion to chapter 7, a further $50 million would likely be spent in additional litigation over the allowance of the pension plan claims and the Teamsters litigation.

The Court appreciates that this finding is a prediction about the future, and one that cannot be proven to be correct or incorrect based on information that is available today. It is often the case, however, that trial courts are called on to make findings of fact that entail predictions about what might occur in the future.[69] In bankruptcy, that is necessarily true of the finding of "feasibility" that a court is required to make to confirm a plan under § 1129(a)(11) of the Bankruptcy Code. And every finding about the value of a business, after all, includes a prediction of the profits that the business will generate in the future. Here, the Court's assessment that the conversion of these cases to ones under chapter 7 would yield 18-24 months

---

[69] *See Huang v. Attorney General of the United States*, 620 F.3d 372, 382 (3d Cir. 2010) (immigration judge's "forecasting of future events constitutes fact-finding").

of further litigation at an aggregate cost to creditors of $50 million is broadly in line with the expense of this case to date, the diminution in value over the course of this case, and the Court's own experience in having presided over dozens of chapter 7 business cases.

The Court has created a chart that seeks to depict the different recoveries in three scenarios: Whittman's chapter 11 analysis (in blue), Whittman's chapter 7 analysis (in green) and the chapter 7 analysis with the revised assumptions that this Court finds to be reasonable (in purple). That analysis shows the following:

| | Ch. 11 total dist value | Admin & priority | Unpaid admin & priority | Conv. Class recovery | 3% trustee fee | 3% incremental prof'l cost of chapter 7 | Additional litigation expense beyond 3% | Remaining value | Total claims (chapter 11) | Incremental claims in chapter 7 | Total claims | Payment percentage | Value consumed by incremental claims |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Whittman chapter 11 (low) | $ 600,000 | $ (243,394) | $ - | $ (45,486) | $ - | | $ - | $ 311,120 | $1,663,989 | | $1,663,989 | 18.7% | $ - |
| | Ch. 7 total dist value | Admin & priority | Unpaid admin & priority | Conv. Class recovery | 3% trustee fee | 3% incremental prof'l cost of chapter 7 | Additional litigation expense beyond 3% | Remaining value | Total claims (chapter 11) | Incremental claims in chapter 7 (20%) | Total claims | Payment percentage | Value consumed by incremental claims |
| Whittman chapter 7 (low) | $ 600,000 | $ (243,394) | $ 7,701 | $ - | $ (18,000) | $ - | $ - | $ 328,307 | $1,663,989 | $ 332,798 | $1,996,787 | 16.4% | $ 54,717.83 |
| | Ch. 7 total dist value | Admin & priority | Unpaid admin & priority | Conv. Class recovery | 3% trustee fee | 3% incremental prof'l cost of chapter 7 | Additional litigation expense beyond 3% | Remaining value | Total claims (chapter 11) | Incremental claims in chapter 7 (5%) | Total claims | Payment percentage | Value consumed by incremental claims |
| Court chapter 7 (low) | $ 600,000 | $ (243,394) | $ 7,701 | $ - | $ (18,000) | $ (18,000) | $ (50,000) | $ 278,307 | $1,663,989 | $ 83,199 | $1,747,188 | 15.9% | $ 13,252.71 |

The result of this analysis is that the total recoveries available to creditors in the chapter 7 scenario, using the assumptions that the Court finds to be reasonable, are lower than those under chapter 11. And for the reasons described above, this conclusion necessarily follows if one were to engage the same debtor-by-debtor analysis that Whittman conducted in the fifth and sixth pages of his spreadsheet. It would also hold if one were to use the "high case" rather than the "low case" scenario. The Court accordingly finds that the debtors' plan satisfies the requirements of § 1129(a)(7) of the Bankruptcy Code.

**Conclusion**

For the foregoing reasons, the Court concluded that the plan is properly confirmable and has accordingly entered the confirmation order docketed at D.I. 8229.

Dated: November 25, 2025

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE