## EXHIBIT A

**Motion**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## MOTION OF THE DEBTORS
## FOR ENTRY OF AN ORDER (I) APPROVING
## THE SETTLEMENT AGREEMENTS BY AND AMONG THE DEBTORS
## AND CERTAIN PENSION FUNDS AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors,") state as follows in support of this motion:[2]

### Preliminary Statement

1.    The Debtors abruptly ceased operating in July 2023, resulting in the Debtors' withdrawal from various multiemployer pension plans (each, a "MEPP") in which they previously participated and to which they contributed.  The Debtors' withdrawal gave rise to what is generally referred to as "withdrawal liability".  Withdrawal liability essentially acts as an exit fee, which requires that the employer—here, the Debtors—pay a share of the shortfall between a MEPP's owed future benefits and the MEPP's assets, or its "unfunded vested benefits," with applicable

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases (as defined herein) may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2]    A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' Chapter 11 Cases, is set forth in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 14].  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Settlement Agreements (as defined herein), as applicable.

adjustments.  On account of pension related liabilities, the MEPPs at issue in these cases filed proofs of claim totaling over $7.4 billion, nearly all of which constitutes withdrawal liability.

2.      As this Court is well aware, in the twenty-seven months these Chapter 11 Cases have been pending, parties extensively briefed and argued disputes arising out of the asserted withdrawal liability claims (among other related liabilities).[3]  Certain disputes were resolved but are subject to appeal and continued litigation risk, while others remain unresolved.

3.      After years of litigation and following months of extensive good-faith, arms'-length, and hard-fought negotiations, the Debtors secured individual settlement agreements (each, a "Settlement Agreement," collectively the "Settlement Agreements" or the "Settlements") with each of fourteen MEPP claimants.  The fourteen MEPP claimants are Central States, Southeast and Southwest Areas Pension Fund (the "Central States Pension Fund"), four MEPPs represented by Groom Law Group[4] (the "Groom Law Funds"), and nine MEPPs represented by Milbank LLP[5] (the "Milbank Funds" and collectively with the Central States Pension Fund and the Groom Law Funds, the "MEPP Settling Parties" and together with the Debtors,  "Settling Parties").

4.      The Settlements resolve significant and material issues still disputed or subject to continued litigation that may result in rulings (and subsequently allowed claim amounts) much less favorable to the Debtors' estates than the Settlements.  This Court rightfully acknowledged

---

[3]    In light of the extensive analysis, briefing, argument, and memorandum opinions to date on these matters, this motion presumes the Court's familiarity with these matters.

[4]    The four multiemployer pension plans are: New York State Teamsters Conference Pension and Retirement Fund, Management Labor Pension Fund Local 1730, Teamsters Local 617 Pension Fund, and Trucking Employees of North Jersey Pension Fund.

[5]    The nine multiemployer pension plans are: New England Teamsters Pension Fund, the Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan, the Teamsters Local 641 Pension Fund, the Teamsters Joint Council No. 83 of Virginia Pension Fund, the International Brotherhood of Teamsters Union No. Local 710 Pension Fund, Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund, Freight Drivers and Helpers 557 Pension Fund, Teamsters Pension Trust Fund of Philadelphia and Vicinity, and IAM National Pension Fund.

that "high-stakes litigation has a way of consuming value, value that would otherwise be available for distribution to creditors."[6]  Absent settlement, it has been represented to the Debtors that parties intend to continue litigating these disputes, including exercising appellate rights, resulting in continued litigation for months, if not years, at significant cost to the estates.  The Debtors estimate such costs would likely be in the tens of millions of dollars, if not more.

5.      Importantly, each Settlement Agreement is an independent agreement; no Settlement Agreement is dependent or conditioned on another Settlement Agreement's approval or effectiveness.  If one Settlement Agreement is not approved or consummated, the other Settlement Agreements survive.

6.      Equally important, the impact of the Settlements on the holders of non-joint and several general unsecured claims will be minimized through a contribution by MEPP Settling Parties.  Because the claims asserted by the MEPPs are joint and several claims against each of the Debtors, the holders of MEPP claims are entitled to distributions from each Debtor to the extent of their allowed claims.  In contrast, substantially all of the other non-MEPP general unsecured claims asserted against the Debtors are not joint and several claims and, therefore, the vast majority of the Debtors' general unsecured creditors are entitled to distributions from only a single Debtor to the extent of their allowed claims (and, as a result, the recovery percentages for MEPP claims on an aggregate basis are substantially higher than the recovery percentages for non-joint and several general unsecured claims).[7]  Accordingly, any increase to the allowed withdrawal liability claims of MEPPs has the effect of adversely and disproportionately impacting the recovery percentage for holders of non-joint and several general unsecured claims.  For this reason, each

---

[6]    Transcript of Hearing on Bench Ruling on Plan Confirmation at 15:5–7, *In re Yellow Corp.*, No. 23-11069 (Bankr. D. Del. Nov. 17, 2025).

[7]    Pension Benefit Guaranty Corporation's ("PBGC") claims against the Debtors are joint and several.

Settlement Agreement provides that the applicable MEPP Settling Party will contribute up to its pro rata share of an approximately $7.4 million contribution[8] for the benefit of non-joint and several general unsecured claimants to ensure such non-joint and several general unsecured claimants are not unduly burdened by the Settlements.

7.      Considering the added risk and cost of litigation—litigation that is a primary gating item before the liquidating trustee can make meaningful distributions to general unsecured claimants, the Settlements clearly benefit the Debtors' estates, providing an efficient path to conclude value-destructive and time-consuming litigation that has already continued for multiple years.

8.      The Debtors believe that the Settlement Agreements are in the best interests of the Debtors and their estates.  Further, the Committee was extensively involved in the negotiations leading to the Settlement Agreements and supports their approval.  Accordingly, the Debtors seek authorization to enter into each Settlement Agreement and to implement the terms thereof.

### Relief Requested

9.      The Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order") (a) approving the Settlement Agreements, each as set forth in its corresponding Settlement Term Sheet (collectively, the "Settlement Term Sheets"), and annexed hereto respectively as Exhibits 1(a)-(n) to **Exhibit A**, by and between the Settling Parties, and (b) granting related relief.  In support of this motion, the Debtors submit the *Declaration of Brian Whittman in Support of Entry of an Order (I) Approving the Settlement Agreements by and Among*

---

[8]     The approximately $7.4 million contribution assumes that the Debtors' cash on hand immediately prior to the Effective Date of the Plan (as defined herein) is between $600-700 million.  To the extent that the Debtors' cash on hand immediately prior to the Effective Date and prior to any distributions contemplated by the Plan is less than $550 million, the aggregate contribution, and each Settling Party's pro rata share, may be adjusted.

*the Debtors and Certain Pension Funds and (II) Granting Related Relief* (the <u>Whittman Declaration</u>), filed substantially contemporaneously herewith.

**Jurisdiction and Venue**

10.    The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.    The statutory bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>") and rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

**Background**

13.    On August 6, 2023 (the "<u>Petition Date</u>") and August 7, 2023, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  These chapter 11 cases (the "<u>Chapter 11 Cases</u>") have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 169].  The Debtors are managing their businesses and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On August 16, 2023, the United States Trustee

for the District of Delaware (the "U.S. Trustee") appointed the Committee of Unsecured Creditors (the "Committee") [Docket No. 269].[9] No trustee or examiner has been appointed in these Chapter 11 Cases.

14.    Prior to the Debtors' operational shutdown, certain of the MEPP Settling Parties— the Central States Pension Fund, the Groom Law Funds, and three of the Milbank Funds—received special financial assistance pursuant to the American Rescue Plan Act of 2021 (the "SFA Pension Funds"). The six other Milbank Funds did not receive such special financial assistance (these six, the "Non-SFA Pension Funds").

15.    The SFA Pension Funds and the Non-SFA Pension Funds each asserted claims against the Debtors' estates (respectively, the "SFA Pension Funds Claims" and the "Non-SFA Pension Funds Claims" and together, the "MEPP Claims"). Specifically, the Central States Pension Fund, the Groom Law Funds, and the Milbank Funds, as collectives, each asserted aggregate claims of approximately $5.7 billion,[10] $867 million,[11] and $833 million,[12] respectively, for withdrawal liability and related claims.

16.    Additionally, certain SFA Pension Funds asserted related pension fund liabilities. Specifically, Central States Pension Fund filed a claim in the amount of approximately $917 million on account of a 2014 contribution guaranty agreement with the Debtors (the "Central States Contribution Guaranty Claim")[13] and the New York State Teamsters Conference Pension and

---

[9]    The Committee was subsequently amended by the *First Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 3430] and the *Second Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 5615].

[10]    *See* Proofs of Claim Nos. 4303–4306 and 4312–4352.

[11]    *See* Docket No. 1962, Exhibit A.

[12]    *See* Docket No. 1962, Exhibit A, and Docket No. 2595, Exhibits 1 and 2.

[13]    *See* Proofs of Claim Nos. 4336–4352.

Retirement Fund (the "NYST Fund") asserted a claim of approximately $76 million for liquidated damages, equal to 10% of the NYST Fund's originally asserted withdrawal liability claim (the "NYST Fund Liquidated Damages Claim").[14]

**A.   The SFA Pension Funds Claims**

17.   On December 8, 2023, the Debtors filed the *Debtors' Objection to the Proofs of Claim Filed by the Central States Pension Fund* [Docket No. 1322] (the "Central States Objection").  The Debtors argued, among other things, that the vast majority (in terms of value) of Central States Pension Fund's withdrawal liability claims were invalid because the claims either (1) were improperly calculated withdrawal liability claims because the fund had received special financial assistance from the U.S. Treasury, (2) violated ERISA,[15] (3) constituted a double recovery, or (4) with respect to the Central States Contribution Guaranty Claim, reflected an unenforceable liquidated damages claim.  Also, the Debtors contended that even if the Central States Pension Fund was entitled to assess any withdrawal liability against the Debtors or their estates, the claim would be at least partially limited, subject to the cap provided under 29 U.S.C. § 1405(b), such that the amount above the cap would only be recoverable if all other creditors recovered in full.

18.   On January 26, 2024, the Debtors filed the *Debtors' Second Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [Docket No. 1962] (the "Second Omnibus Objection").  In the Second Omnibus Objection, the Debtors argued that the claims of the Groom Law Funds, as well as the claims of three pension funds that are included in the Milbank Funds,[16]

---

[14]   *See* Proofs of Claim Nos. 4489–4512.

[15]   "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

[16]   These three pension funds are:  (1) Teamsters Local 641 Pension Fund; (2) Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund; (3) Freight Drivers and Helpers 557 Pension Fund.

were overstated or otherwise invalid based on many of the same arguments as raised in the Central States Objection.

19.     Following a hearing on February 14, 2024, the Court entered an order which set out the discovery timeline and scheduled a trial for August 5, 2024, to hear many of the issues raised in both the Central States Objection and the Second Omnibus Objection [Docket No. 2195]. Following the August 5, 2024 hearing, on September 13, 2024, the Court issued a *Memorandum Opinion* [Docket No. 4326] (the "Memorandum Opinion") holding that certain regulations issued by the PBGC were valid as they were statutorily authorized and neither arbitrary nor capricious, and therefore, the Court rejected the Debtors' argument that the SFA Pension Funds claims should be reduced or fully disallowed on the basis that they had received prior special financial assistance. Additionally, the Court held that the Debtors' withdrawal liability is determined with respect to ERISA's twenty-year cap on annual payments, that certain SFA MEPPs were allowed to calculate the Debtors' withdrawal liability using higher contributions pursuant to agreements with the Debtors, and that the Debtors' argument that their withdrawal liability should be discounted to present value was inapplicable based on the assumption that the Debtors' defaulted on their withdrawal liability obligations prior to the Petition Date.

20.     Following the issuance of the Memorandum Opinion, the Debtors filed the *Debtors' Motion to Reconsider in Part the September 13, 2024 Memorandum Opinion Finding a Withdrawal Liability Default in Advance of a Withdrawal Liability Payment Obligation* [Docket No. 4461] requesting that the Court reconsider certain findings in the Memorandum Opinion. Notably, the Debtors requested that the Court reconsider whether, prior to these Chapter 11 Cases, the Debtors defaulted on any of their withdrawal liability obligations to the SFA Pension Funds and whether the SFA Pension Funds had accelerated claims for such withdrawal liability.

21.     On November 5, 2024, the Court entered the *Amended Memorandum Opinion* [Docket No. 4770] (the "<u>Amended Memorandum Opinion</u>").   The Amended Memorandum Opinion was identical to the Memorandum Opinion, except that it removed any reference to the Debtors effecting a default on their withdrawal liability obligations and instead stated that the issue of whether a default had occurred had not yet been decided.   On December 2, 2024, the Court entered the *Order Relating to SFA MEPP Litigation Motions for Summary Judgment and Motions to Reconsider* [Docket No. 5057] (the "<u>SFA MEPPs Order</u>") which upheld the conclusions of the Amended Memorandum Opinion.   Significantly, the SFA MEPPs Order reaffirmed the Court's prior conclusions that the PBGC's regulations are valid, that the amount of special financial assistance should not be included in the plans' assets for purposes of calculating the Debtors' allocable share of unfunded vested benefits ("<u>UVBs</u>"), that the Debtors' withdrawal liability is determined with respect to ERISA's twenty-year cap on annual payments, and that certain SFA MEPPs were allowed to calculate the Debtors' withdrawal liability using higher contributions pursuant to agreements with the Debtors.

22.     On December 13, 2024, the Debtors filed a *Notice of Appeal* [Docket No. 5170] appealing the SFA MEPPs Order to the United States Court of Appeals for the Third Circuit (the "<u>Third Circuit</u>").

23.     On January 9, 2025, the Court entered the *Order Granting Direct Certification of Debtors' MFN Partners, LP's and Mobile Street Holdings, LLC's Appeal to the United States Court of Appeals for the Third Circuit Pursuant to 28 U.S.C. § 158(d)(2)* [Docket No. 5358] which certified a direct appeal of the SFA MEPPs Order by the Third Circuit.   On February 28, 2025, the Third Circuit granted the petition for direct appeal and the appeal was docketed on March 11,

2025.[17]   On June 25, 2025, the Third Circuit heard oral argument and instructed further briefing,

and on September 16, 2025, the Third Circuit issued an opinion (the "Third Circuit Opinion")

affirming the Court's Memorandum Opinion.[18]

**B.      The Non-SFA Pension Funds Claims**

24.      On March 13, 2024, the Debtors filed the *Debtors' Seventh Omnibus (Substantive)*

*Objection to Proofs of Claim for Withdrawal Liability* [Docket No. 2595] (the "Seventh Omnibus

Objection").   The Debtors argued that the claims of the Milbank Funds, not including the three

pension funds whose claims were objected to in the Second Omnibus Objection,[19] were overstated

and should be reduced on several grounds.   Specifically, in the Seventh Omnibus Objection, the

Debtors' alleged that the claims were inflated, failed to account for liability caps, and/or were not

discounted to present value.   Alternatively, the Debtors contended that even if these claims are not

reduced, some portion of the asserted withdrawal liability should be subject to the limitation

provided for in 29 U.S.C. § 1405(b).

25.      On February 5, 2025, after briefing and oral argument between the parties, the

Court issued a *Memorandum Opinion* [Docket No. 5619] (the "February Opinion") granting in

part and denying in part summary judgment.   In granting in part the Debtors' motion, the Court

held that certain withdrawal liability calculations were inconsistent with statutory requirements.

**C.      Additional Proceedings Related to All MEPP Claims**

26.      Several questions remained unresolved among the Settling Parties.   On December

12, 2024, the Court entered the *Amended Order Scheduling Certain Dates and Deadlines in SFA*

---

[17]   *Order, In re Yellow Corp.*, No. 25-01421 (3d Cir. Mar. 11, 2025), ECF No. 1.

[18]   *Judgment, In re Yellow Corp.*, No. 25-01421 (3d. Cir. Sep. 16, 2025) ECF No. 104.

[19]   The following pension funds claims were objected to in the Second Omnibus Objection:  (1) Teamsters Local 641 Pension Fund, (2) Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund, and (3) Freight Drivers and Helpers 557 Pension Fund.

*MEPP and Non-SFA MEPP Litigation* [Docket No. 5156] which established a briefing schedule and set a January 28, 2025 (the "Summary Judgment Hearing") argument date for summary judgment motions to address further issues related to withdrawal liability claims that were amenable to be resolved on summary judgment.

27. On April 7, 2025, the Court issued the *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan Claims Allowance Disputes* [Docket No. 6030] (the "Preliminary Observations Opinion") pursuant to which the Court decided the issues presented at the Summary Judgment Hearing. The Preliminary Observations Opinion determined, among other things, that (1) the MEPPs' withdrawal liability claims should be discounted to present value, (2) the mechanics set forth in 29 U.S.C. § 1405(b) should be applied after reducing allocable UVBs pursuant to ERISA's twenty-year cap, and (3) with respect to the Central States Contribution Guaranty Claim, the liquidated damages provision was an unenforceable penalty under Illinois law. On July 18, 2025, the Court issued the *Order Relating to Multiemployer Pension Plan Motions for Summary Judgment* [Docket No. 6682] giving effect to the determinations set forth in the Preliminary Observations Opinion.

**D.    MFN Partners, LP/Mobile Street Holdings, LLC**

28. MFN Partners, LP and Mobile Street Holdings, LLC ("MFN/Mobile Street") supported and/or joined certain of the Debtors' objections to the MEPP Claims and related liabilities.[20] MFN/Mobile Street also filed its own motion requesting the Court to reconsider certain findings of the Memorandum Opinion [Docket No. 4462], and, with the Debtors, jointly filed a

---

[20]    *See, e.g.*, *Joinder of MFN Partners, LP to Debtors' Oppositions to Motions of Certain Pension Funds to Compel Arbitration of Withdrawal Liability Disputes* [Docket No. 2440]; *Joinder of MFN Partners, LP and Mobile Street Holdings, LLC to the Debtors' Motions for Partial Summary Judgment on SFA MEPPs' and Non-SFA MEPPs' Claims* [Docket No. 5182]; *Joinder of MFN Partners, LP and Mobile Street Holdings, LLC to the Debtors' Reply in Support of the Motion for Partial Summary Judgment on SFA MEPPs' and the Non-SFA MEPPs' Claims* [Docket No. 5492].

notice of appeal of the SFA MEPPs Order [Docket Nos. 5170, 5171] and moved jointly for leave to file an interlocutory appeal and for certification of direct appeal for review by the Third Circuit [Docket Nos. 5178, 5179].  Upon information and belief, the Debtors understand MFN/Mobile Street is preparing a petition for a writ of certiorari to the United States Supreme Court regarding the Third Circuit Opinion.

29.     On September 12, 2025, MFN/Mobile Street filed an objection to the NYST Fund Liquidated Damages Claim [Docket No. 7603] to which the Debtors joined [Docket No. 7604]. On October 3, 2025, the NYST Fund filed a response to the objection and the Debtors' joinder thereto [Docket No. 7731].  On November 24, 2025, MFN/Mobile Street filed a further reply. [Docket No. 8254].  As of the date of this motion, the objection remains pending.

30.     MFN/Mobile Street also filed a motion seeking conversion of these Chapter 11 Cases to chapter 7 [Docket No. 6204] and objected to the Debtors' *Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors (Technical Modifications)* [Docket No. 8226] (the "Plan").  On November 17, 2025, this Court issued a bench ruling overruling MFN/Mobile Street's Plan objections and, on November 19, 2025, entered an order confirming the Plan [Docket No. 8229] (the "Confirmation Order").  On November 18, 2025, MFN/Mobile Street filed a notice of appeal of the Confirmation Order [Docket No. 8220, as amended by Docket No. 8231], which remains pending.

### Settlement Agreements

31.     As stated above, each Settlement Agreement is its own, independent agreement; the Settlement Agreements do not rise and fall together.  However, given that many unresolved

disputes and issues apply to all MEPP Settling Parties, certain primary terms are consistent across the Settlement Agreements:[21]

a.  **Settlement Effective Date**.  Each Settlement will become effective and binding immediately upon the later of the date this Court enters the Order and, where PBGC approval is required,[22] the date the PBGC approves the Settlement (the "Settlement Effective Date").

b.  **Pending Litigation**.  Each Settling Party agrees to immediately take all actions necessary and reasonable to ensure that all pending appeals and other litigation pursued by the applicable Settling Parties are continued indefinitely.  Upon the Settlement Effective Date, the applicable Settling Parties will take all actions necessary and reasonable to ensure that all pending appeals and other litigation in connection with the claims subject to the applicable Settlement are deemed withdrawn, dismissed, or otherwise settled in full and final satisfaction.

c.  **Releases**.  The releases, injunctions, and exculpation provisions set forth in Article IX of the Plan will apply to the MEPP Settling Party regardless of whether or not such MEPP Settling Party voted to accept the Plan or opt into the third-party releases therein.

d.  **Non-Joint and Several General Unsecured Claims Contribution**.  Each MEPP Settling Party will contribute to an up to approximately $7.4 million distributable value contribution for the benefit of allowed non-joint and several general unsecured claims (the "Non-J&S GUC Contribution").  The Non-J&S GUC Contribution will be on a pro rata basis with each other MEPP claimant with which the Debtors execute a Settlement Agreement.  In the event that the Debtors' cash on hand as of immediately prior to the Effective Date and prior to making any distributions contemplated by the Plan is less than $550 million, each MEPP Settling Party's contribution shall be reduced proportionally by decreasing the Non-J&S GUC Contribution ratably with the percentage difference between the Debtors' cash on hand as of immediately prior to the Effective Date and $550 million.

Thus, either the non–joint and several general unsecured creditors pool receive the approximately $7.4 million Non-J&S GUC Contribution or a decreased Non-J&S GUC Contribution proportionate to the Debtors' cash on hand if such amount immediately prior to the Effective Date and prior to

---

[21]  The following description of the terms of the Settlement Term Sheet in this motion is only a summary thereof. To the extent the summary conflicts with the terms of the Settlement Term Sheet, the terms of the Settlement Term Sheet shall control.

[22]  Under 29 CFR § 4262.16(h), the PBGC must approve settlements of SFA Pension Fund Claims for withdrawal liability over $50 million.

making any distributions contemplated by the Plan is below $550 million. This structure ensures that the costs of implementing the agreements are not shifted onto non–joint and several general unsecured creditors—an outcome that stands in stark contrast to the significant expense and delay that continued litigation would impose directly on such creditors.

e.  **MEPP Calculation Methodology**.  Each proposed allowed claim under each Settlement Agreement was guided by and calculated in good faith by the Debtors and the MEPP Settling Party counterparty in accordance with the rulings and observations of this Court and the Third Circuit, taking into account the cost and risk associated with continued litigation of these claims and the potential appeal of the rulings and observations to date and subject to the specific variances described in more detail below (the "MEPP Calculation Methodology").

f.  **Most Favored Nation**.  If the Debtors propose a settlement of claims asserted by non-Settling Parties on account of withdrawal liability that a Settling Party believes utilizes a calculation methodology materially different from the MEPP Calculation Methodology, the Settling Party shall provide written notice to the Debtors of its position (the "Notice").  The Notice must be provided to the Debtors by the earlier of (a) fourteen days after the Debtors file a motion seeking approval of the non-Settling Party claim settlement and (b) two days prior to the hearing in front of the Bankruptcy Court seeking approval of such settlement.

If a Settling Party provides the Notice and the Debtors obtain approval of a settlement for non-Settling Party claims on account of withdrawal liability that utilizes calculation methodology materially different than the MEPP Calculation Methodology, the Settling Party will be entitled to assert a new claim for the difference between the amount of the Settling Party's claim utilizing the MEPP Calculation Methodology and the amount (if higher) of the Settling Party's claim utilizing said different calculation methodology (the "Delta Claims"), and the Debtors shall utilize best efforts to obtain Court approval to allow the Delta Claims; *provided* that, if the Debtors do not agree that the settlement utilized a methodology materially different than the MEPP Calculation Methodology, the Debtors may object to any Delta Claim.  For the avoidance of doubt, the proposed claims subject to the Settlement Agreements annexed to this motion are consistent with the MEPP Calculation Methodology and do not trigger the right to any Delta Claims.

g.  **Subordination Under Section 1405(b) of ERISA**.  Each MEPP claim subject to a Settlement Agreement is reduced by 25% in settlement of the appropriate application of section 1405(b) of ERISA to these Chapter 11 Cases.

14

A.      **MEPP Calculation Methodology**

32.      ***Withdrawal liability claims***.  Withdrawal liability claims for each MEPP Settling

Party are calculated using a consistent methodology that incorporates the Court's rulings to date

and settles certain open issues not fully resolved by such rulings, and accounts for appellate risk

and litigation expense.    The Preliminary Observations Opinion provided guidance on the

appropriate calculation methodology, which the Settling Parties endeavored to incorporate while

reaching as much stakeholder consensus as feasible.    In accordance with the Preliminary

Observations Opinion and other decisions from the Court in these cases, withdrawal liability

claims for each MEPP Settling Party were calculated by:

a.      Determining the UVBs of each MEPP allocable to the Debtors ("Step 1").
Where there is a dispute between the parties as to the appropriate amount of
UVBs, the amount was determined as set forth below.

b.      Determining the annual payments for each MEPP claim ("Step 2").  Where
there is a dispute between the parties as to the annual payments, the amount
was determined as set forth below.

c.      Limiting the claim to the lesser of the MEPP's UVBs and the first 20 annual
payments ("Step 3").  *See* Preliminary Observations Opinion at 21.

d.      Discounting the annual payments to present value ("Step 4").    *See*
Preliminary Observations Opinion at 22-47.  The rate used to discount the
annual payments to present value, and the potential effect of § 1405(e) on
such calculations, are treated as follows:

i.      For the SFA Pension Funds, each of which were required by
regulation to use a rate set by PBGC (the "PBGC Rate") to set the
amortization schedule for the Debtors' withdrawal liability, the
applicable PBGC Rate was used to discount annual payments to
present value.  This acknowledges the Court's observation that the
applicable rate is used to add interest to each annual payment.  *See*
Preliminary Observations Opinion at 21-22, 43-47.  The SFA
Pension Fund withdrawal liability claims calculated in this manner
were not adjusted as may be required by § 1405(e).

ii.      For the Non-SFA Pension Funds, each of which would otherwise
have used the rate it uses for calculating minimum funding (each
a "Minimum Funding Rate") to set the amortization schedule for the

Debtors' withdrawal liability, a § 1405(e) adjustment was made in a manner consistent with the discussion set forth in the Preliminary Observations Opinion, assuming a uniform rate of 5%. This rate approximates the weighted average of the PBGC Rates and the Non-SFA Pension Funds' Minimum Funding Rates otherwise used to discount annual payments to present value. This acknowledges the Court's discussion regarding the effect § 1405(e) may have on the withdrawal liability owed to MEPPs with higher interest rate assumptions. *See* Preliminary Observations Opinion at 28-30.

e.   In acknowledgement of the § 1405(b) adjustment applicable to "an insolvent employer undergoing liquidation or dissolution," reducing each withdrawal liability claim by 25%, with the unpaid balance of this 25% reduction of the claim to be paid on a pro rata basis with post-petition interest from a Debtor entity or entities only if all general unsecured claims at such Debtor are paid in full ("Step 5"). *See* Preliminary Observations Opinion at 48. This adjustment is discussed further below.

33.   **Step 1: UVB Calculations**. The February Opinion addressed an issue affecting the Non-SFA Pension Funds. It held that the discount rate selected by each of those MEPPs' actuaries to calculate the plan's UVBs should be "similar," although not necessarily identical, to the rate that each MEPP's actuary selected as his or her best estimate of anticipated experience with respect to the plan's investment returns. *See* February Opinion at 12. The February Opinion, however, left open the question of exactly what discount rate would be appropriate to use for each MEPP, leaving the parties and their respective actuaries to determine what rate would be sufficiently 'similar' to the Minimum Funding Rate. *Id.* at 13 ("It bears note that none of these opinions goes so far as to say that the withdrawal liability rate needs to be precisely the same as the minimum funding rate."). In settlement of this open question, these Non-SFA Pension Funds and the Debtors agreed that the UVBs used to determine the withdrawal liability of the Debtors to each MEPP should be between the amount of UVBs asserted by the Debtors (calculated using each MEPP's Minimum Funding Rate) and each MEPP (calculated using each MEPP's actuary's best estimate of anticipated plan experience, as described in those MEPPs' summary judgment briefing).

16

34.    Specifically, the parties determined, for purposes of calculating the Debtors' withdrawal liability to each of these Non-SFA Pension Funds, to set the MEPP's UVBs at an amount reflecting a 60% decrease of the range between the UVBs as originally asserted by each applicable MEPP and the UVBs as would be calculated using each MEPP's Minimum Funding Rate.  This UVB calculation, reflecting a compromise between the amounts previously asserted by the MEPPs and the Debtors, is well within the range of reasonableness and reflects significant compromise by each party.  It also avoids costly and protracted litigation on several questions left open by the February Opinion, including the appropriate discount rate to use to calculate UVBs for each MEPP, whether such a rate is sufficiently "similar" to the Minimum Funding Rate, and whether there are any offsetting actuarial assumptions that justify a different discount rate, as well as any appeals that could be taken of such issues.

35.    **Step 2:  Annual Payments and Appropriate Contribution Rate**.  The Debtors raised challenges with respect to the annual payments used by two MEPPs, Central States Pension Fund and Teamsters Local 641 Pension Fund, related to certain increases in the contribution rates used to calculate annual payments.  In accordance with the Preliminary Observations Opinion, the annual payments of these two MEPPs that used contribution rates automatically increased under rehabilitation plans were adjusted to disregard the post-2014 contribution rate increases.  *See* Preliminary Observations Opinion at 60-63.

36.    **Step 3:  Limit the Claim**.  A MEPP's claim must be reduced to the lesser of the MEPP's UVBs and the first twenty annual payments owed.  *See* Preliminary Observations Opinion at 21.

37.    **Step 4:  Rates Used to Discount Annual Payments to Present Value**.  In the Preliminary Observations Opinion, the Court observed that the rate "used for the most recent

actuarial valuation" for a particular MEPP to set the amortization period may be an appropriate rate to discount the annual payments owed to that MEPP to present value. *See* Preliminary Observations Opinion at 21-22. The Court further observed that such a rate is equal to the Minimum Funding Rate. *Id.* SFA Pension Funds are each required by regulation to use the applicable PBGC Rate as the rate used to set the amortization period, and all of such PBGC Rates are below 5% (some considerably so). Non-SFA Pension Funds use Minimum Funding Rates that approximate expected investment returns, all of which rates are 6.5% or higher. All else being equal, a higher discount rate results in a smaller present value claim.

38. If the SFA Pension Funds' PBGC rate and the non-SFA Pension Funds' Minimum Funding Rates were used to discount annual payments to present value, the SFA Pension Funds would receive proportionately larger claims than the Non-SFA Pension Funds, as their PBGC Rates are relatively lower; the Non-SFA Pension Funds would receive relatively smaller claims, as their Minimum Funding Rates are relatively higher. But the Court also observed in its Preliminary Observations Opinion that in the context of an employer withdrawing from multiple MEPPs, as here, 29 U.S.C. § 1405(e) may operate to smooth the disparity created when discounting withdrawal liability claims using different interest rates: namely, the disparity that "a plan that used a higher interest rate assumption would end up holding a larger claim than it otherwise would have; one that used a lower interest rate assumption would hold a smaller claim." Preliminary Observations Opinion at 29-30. Utilizing § 1405(e) would therefore "allocate the Debtors' liability differently between the pension plans" that use different interest rates, and provide relatively greater claims to MEPPs using higher interest rates in their amortization schedules (in this case, the Non-SFA Pension Funds) than those using lower interest rates in their amortization schedules (in this case, the SFA Pension Funds). *Id.* at 30.

39.     To settle the argument that § 1405(e) should operate to effectively smooth the differences created by the use of different discount rates, the Settling Parties compromised by discounting the annual payments of each SFA Pension Fund at the appropriate PBGC rate with no § 1405(e) adjustment, and discounting the annual payments of each Non-SFA Pension Fund at a rate of 5%, which reflects a § 1405(e) adjustment by using a discount rate that approximates a weighted average of the PBGC Rates used by the SFA Pension Funds and the Minimum Funding Rates used by the Non-SFA Pension Funds.  To the extent this § 1405(e) adjustment results in a claim amount greater than the Non-SFA Pension Fund's allocable UVBs asserted in the fund's proof of claim, the lower amount is used.

40.     The compromise reached on each issue is well within the range of reasonableness, as each gives effect to the Preliminary Observations Opinion and the arguments parties may make regarding the interpretation of § 1405(e).  Furthermore, the Settlements moot further litigation on a complex topic, which is likely to be costly given the lack of other judicial guidance on this subject, (*see* Preliminary Observations Opinion at 24) and the likely need for factual and expert discovery and testimony.

41.     **Step 5:  § 1405(b) Reduction**.  The Preliminary Observations Opinion noted that 29 U.S.C. § 1405(b) provides that an "employer's allocable share of unfunded vested benefits will never be less than half of what it would have otherwise been," but "the employer's share of the unfunded vested benefits is capped at its liquidation value."  Preliminary Observations Opinion at 48.  In other words, the Debtors' liability to each MEPP is at least 50% of the present value of the annual payments owed to that MEPP, and at most 100% of that amount, to the extent the Debtors' "liquidation value" is large enough to satisfy all such claims.

42.     If the Debtors' "liquidation value" is insufficient to satisfy all withdrawal liability claims, a reduction of between 0% and 50% to the withdrawal liability claims would accordingly be appropriate.  However, there are a number of questions that are necessary to address before resolving the appropriate reduction to the withdrawal liability claims, including whether the Debtors were insolvent when they began liquidating (which, notably, would include a final determination of the Debtors' aggregate "withdrawal liability" prior to any adjustment via § 1405(b), which would necessarily require final resolution of all MEPP-related litigation), as of what date the Debtors' "liquidation value" is measured, and if the Debtors' "liquidation value" is measured as of July 2023, what that liquidation value is.  *See* Preliminary Observations Opinion at 50-51; 29 U.S.C. § 1405(b), (d).

43.     These issues are fact-intensive, complex questions likely requiring expert testimony.  Accordingly, in reaching resolution, the Settling Parties determined to reduce the withdrawal liability claims determined in steps 1-4 by 25%.  Additionally, the Plan provides that should the Debtors' estates generate sufficient cash to repay all allowed general unsecured claims at a Debtor or certain Debtors in full, the unpaid balance of this 25% reduction of the withdrawal liability claims would be satisfied out of any additional dollars (pro rata with postpetition interest payments) from each applicable Debtor.[23]  The compromise avoids the need to further litigate the § 1405(b) issues, and, especially so in conjunction with the MEPP Settling Parties' agreement to make a contribution for the benefit of non-joint and several claimants, accords with the purpose of § 1405 by reducing withdrawal liability claims such that they do not "unduly dilute[e] the claims that other legitimate creditors may have against the employer."  Preliminary Observations Opinion

---

[23]     *See* Plan, Art. III.B.6.b.

at 24.  Accordingly, the methodology set forth above and in steps 1-5 provides for an appropriate, efficient, and reasonable resolution of multiple issues in dispute.

44.     ***Other MEPP claims***.  Additionally, certain SFA Pension Funds asserted related pension fund liabilities.  Specifically, Central States Pension Fund asserted the Central States Contribution Guaranty Claim and the NYST Fund asserted the NYST Fund Liquidated Damages Claim.

45.     This Court ruled that the liquidated damages provision at issue in the Central States Contribution Guaranty Claim constituted an unenforceable penalty under Illinois law.  Central States Pension Fund has manifested an intent to appeal this Court's ruling on the Central States Contribution Guaranty Claim.[24]  Central States Pension Fund's Settlement Agreement seeks to resolve the Central States Contribution Guaranty Claim by allowing a general unsecured claim in the amount of $165 million.

46.     The NYST Fund Liquidated Damages Claims is subject MFN/Mobile Street's and the Debtors' pending objection.  The NYST Fund Settlement Agreement seeks to settle all disputed issues with respect to NYST Fund claims, including the objection to the NYST Fund Liquidated Damages Claim in the aggregate amount reflected in Annex 1 to the NYST Fund's Settlement Agreement.

47.     Additionally, certain of the Settlement Agreements also resolve various claims for contributions and related amounts owed to MEPPs and to other multiemployer benefits funds under the terms of the Debtors' collective bargaining agreements.  Following a review of their books and records and the relevant contracts, the Debtors believe that the amounts of allowed

---

[24]     *See Notice of Interlocutory Appeal* [Docket No. 7339].

claims in the Settlement Agreements are reasonable given the amounts of contributions owed to the respective multiemployer funds.

48.     While the Settling Parties have generally applied this Court's and the Third Circuit's rulings to date in negotiating and agreeing to the proposed allowed claim amounts, as set forth above, the Debtors also took into consideration the significant litigation and appeal risk, and associated costs, related to each claim.  Specifically, the Debtors expect that absent settlement, many of the Settling Parties would continue to litigate the disputes at issue, including exercising appellate rights with respect to certain issues previously decided by this Court.  Continued litigation absent settlement is certain, and it is of course possible that the MEPP Settling Parties may prevail on certain issues, potentially resulting in ultimately allowed claims greater than those reflected in the Settlements.  Further, absent the Settlements there would be no Non-J&S GUC Contribution, such that the impact of enhanced recoveries to holders of MEPP claims, in addition to the continued increased litigation expense, is directly borne by non-Settling Party stakeholders. Conversely, under the proposed Settlements, the Settling Parties make a meaningful contribution to offset the adverse impact of increased joint and several claim amounts of non-joint and several general unsecured creditors.

49.     The benefit the Settlement Agreements provide, and the balanced compromises reached therein—each obtained through significant effort in protracted, multiple-round negotiations—inures to the benefit of the Debtors, their estates, and all of their stakeholders, particularly when factoring in the length of time, expense, and uncertainty in continuing to pursue litigation without such agreement.  Accordingly, consummation of the Settlement Agreements is a sound exercise of the Debtors' business judgment and in the best interest of the Debtors' estates. The Debtors respectfully request that the Settlement Agreements be approved, and the Court

authorize the Settling Parties to effectuate the Settlement Agreements and undertake any further actions necessary to perform thereunder.

## Basis for Relief

50.     Bankruptcy Rule 9019(a) provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

51.     Settlements and compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 428 (1968).  It is well settled that in order to "minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993)); *see also Will v. Northwestern Univ. (In re Nutraquest, Inc.*), 434 F.3d 639, 644 (3d Cir. 2006) (finding that "[s]ettlements are favored [in bankruptcy]"); *In re Adelphia Commc'n Corp.*, 361 B.R. 337, 348 (Bankr. D. Del. 2007) (same).  Accordingly, when required, "courts are able to craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, affect the result the [Bankruptcy] Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

52.     Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'" (citation omitted)); *In re Northwestern Corp.*, 2008 WL 2704341,

at *6 (Bankr. D. Del. July 10, 2008) ("[T]he bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interests of the estate.") (citation omitted); *In re Key3Media Grp., Inc.*, 336 B.R. 87, 92 (Bankr D. Del. 2005) ("[T]he bankruptcy court has a duty to make an informed, independent judgment that the compromise is fair and equitable.")

53.    When analyzing settlements, courts in the Third Circuit generally consider the following factors (the "Martin Factors"):

(i) the probability of success in litigation;

(ii) the likely difficulties in collection;

(iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(iv) the paramount interest of the creditors.

*See Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159 (3d Cir. 2002); *In re Martin*, 91 F.3d 389, 392 (3d Cir. 1996).

54.    In addition to these four requirements, the Court must also consider "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).  Importantly, it is well-established that a settlement proponent need not convince the Court that a settlement is the best possible compromise, but only that the settlement falls "within the reasonable range of litigation possibilities somewhere above the lowest point in the range of reasonableness." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008); see also *In re W.R. Grace & Co.,* 475 B.R. 34, 77–78 (Bankr. D. Del. 2012) ("In analyzing the compromise or settlement agreement under the Martin Factors, courts should not have a 'mini trial' on the merits, but rather

should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.").

55.    In its March 31, 2025, letter, *In re Yellow Corp.*, 670 B.R. 397 (Bankr. D. Del. 2025), this Court provided guidance regarding its approach to evaluating settlements under Bankruptcy Rule 9019 in the presence of a third-party objector.    Specifically, this Court contemplated applying a more exacting standard of review to a settlement where a non-settling party objected to a claim resolved by the settlement, yet this objecting party does not join the settlement.    Evaluation of a settlement under Bankruptcy Rule 9019 generally relies on the Martin Factors.    *See In re Managed Storage Int'l, Inc.*, 601 B.R. 261, 265 (Bankr. D. Del. 2019), *aff'd*, 2020 WL 1532390 (D. Del. Mar. 31, 2020) (citing *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996)) (identifying the Martin Factors as the probability of success in litigation, collection difficulties, the complexity, expense, inconvenience, and delay of litigation, and the paramount interests of creditors).    Under *Martin*, bankruptcy courts approve settlements that satisfy the "lowest point of reasonableness." *Id.*  (citing *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014); *In re Exide Tech.*, 303 B.R. 48, 68 (Bankr. D. Del. 2003)); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 77–78 (D. Del. 2012).    However, because MFN/Mobile Street joined as a third-party objector to certain of the underlying claims disputes, and as reflected in its March 31 letter, the Court indicated it may not simply apply the traditional *Martin* analysis.    *See In re Yellow Corp.*, 670 B.R. 397, 407-11 (Bankr. D. Del. 2025).    Instead, the Court stated it would either follow the approach set forth in *In re DVR, LLC*, 582 B.R. 507 (Bankr. D. Colo. 2018)—assessing the settlement proposal under *Martin* while giving less than the usual deference to the debtor's business judgment—or it may decline to consider the settlement at all given the presence of a non-consenting third-party objector.    *In re Yellow Corp.*, 670 B.R. 397 at 410–11.    Although the

Debtors continue to believe that the "lowest point of reasonableness" and the Martin Factors are the appropriate lens through which to evaluate a settlement, even were the Court to apply a more exacting standard in evaluating the Settlements, the plain text of the Bankruptcy Code, together with the principle of harmonization, compels the Court to give effect to both 11 U.S.C. § 502(b) and Rule 9019 by adopting *DVR*'s approach.

56.    The plain text of the Bankruptcy Code and Bankruptcy Rules grant this Court the authority to settle Debtors' and, where applicable, MFN/Mobile Street's claims dispute with the MEPPs via settlement.  Rule 9019 provides a procedural mechanism for the court to approve settlements, while Section 502(b) sets forth the substantive rights regarding claim determination and allowance.  As recognized in *In re DVR, LLC*, 582 B.R. 507, 522 (Bankr. D. Colo. 2018), *aff'd*, 606 B.R. 80 (D. Colo. 2019), the Rule 9019 process fully respects the substantive rights provided by section 502(b).  In other words, section 502(b) and Rule 9019 work together harmoniously—they do not conflict.  And precedent requires the Court to harmonize the provisions in this way rather than read the provisions in a way that would conflict.

57.    No party in interest possesses an implied right to unilaterally block settlement merely because that party holds a pecuniary interest in the distribution of the bankruptcy estate. *See In re DVR, LLC*, 582 B.R. at 522 ("the trustee's settlement power allows him to protect the interests of the overall estate.  To hold otherwise, would permit a creditor to hold the estate hostage to protracted litigation.").  The procedural right to seek approval of a settlement under Rule 9019, after notice and hearing, fully preserves the substantive rights of the parties under section 502(b) and ensures robust participation by all parties in interest.[25]  This approach best serves the objectives of the Bankruptcy Code and should be followed here.

---

[25]    Neither *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024) nor *In re FTX Trading Ltd.*, 91 F.4th 148 (3d Cir. 2024) present a barrier to this Court's approval of the Settlements.  No issue in approving these Settlements is

A.      **The Plain Text of 502(b) Supports the Holding of *DVR***

58.      In approaching provisions like section 502(b) and Rule 9019 that arguably conflict,

the principle of harmonization—not displacement—must govern.    The Supreme Court is

unequivocal: "'[a] new statute will not be read as wholly or even partially amending a prior one

unless there exists a 'positive repugnancy' between the provisions of the new and those of the old

that cannot be reconciled.'" *Cen Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 134

(1974) (quoting *In re Penn Central Transp. Co.*, 384 F. Supp. 895, 943 (Sp.Ct.R.R.R.A. 1974));

*In re: Yellow Corp.*, No. 23-11069 (CTG), 2024 WL 1313308, at* 7 (Bankr. D. Del. Mar. 27,

2024) (quoting *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 510 (2018)) ("The Supreme Court

explained in *Epic Systems* that when 'confronted with two Acts of Congress allegedly touching on

the same topic,' courts are 'not at liberty to pick and choose among congressional enactments and

must instead strive to give effect to both.'").    Said another way, the Court must favor an

interpretation of section 502(b) that avoids a direct conflict with Rule 9019.[26]

---

analogous to the clear statutory language at issue in either *Truck Insurance* or *FTX*.  In *Truck Insurance*, the Court contemplated 11 U.S.C. § 1109 and stressed the plain meaning of statutory language as a safeguard of the bankruptcy process, consistent with the orderly resolution of cases (*see Truck Insurance*, 602 U.S. at 14, holding that a party in interest's right to be heard does not amount to a vote or veto on the bankruptcy process).  In *FTX*, the court confronted language in 11 U.S.C. § 1104(c)(2) that unambiguously called for an examiner under certain conditions.  The court held that the phrasing of the code left it with no discretion to appoint the examiner (*see FTX*, 91 F.4th at 153, holding that the "meaning of the word 'shall' is not ambiguous [and is] a word of command…that normally creates an obligation impervious to judicial discretion.").

[26]  The principle of harmonization between the Bankruptcy Code and the Bankruptcy Rules is more than judicial preference—it is firmly rooted in precedent and the statutory framework governing the relationship between rules and substantive law.  While it is true that the Rules Enabling Act and 28 U.S.C. § 2075 prohibit rules from abridging, enlarging, or modifying substantive rights, the Supreme Court and the Third Circuit have consistently recognized that rules promulgated under the Rules Enabling Act "enjoy presumptive validity" and "have the force and effect of law." *United States v. Smalls*, 2025 WL 2553772, at *4 (3d Cir. Sept. 5, 2025) (citing *Burlington N. R.R. Co. v. Woods*, 480 U.S. 1, 6 (1987); *United States v. Marion*, 404 U.S. 307, 319 (1971)).  Moreover, the Supreme Court has consistently "'rejected every statutory challenge to a Federal Rule that has come before it'", underscoring that any suggestion that section 502(b) *implicitly* limits Rule 9019's procedural right to settlement is, at the outset, presumptively invalid. *Id.* (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 407 (2010)).  The harmonization principle thus requires courts to interpret the Code and Rules to give effect to both, unless there is a "positive repugnancy" that cannot be reconciled.  *Cen Blanchette*, 419 U.S. at 134; *See e.g., In re Four Wells Ltd.*, 2016 WL 1445393, at *9 (B.A.P. 6th Cir. Apr. 12, 2016) (quoting *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Banker. E.D. Mich. 1999)) ("a [bankruptcy] court 'is bound to interpret the Code and Rules harmoniously if it is possible to do so'"); *In re DVR, LLC*, 582 B.R. at 522 (Bankr. D. Colo. 2018) ("Section 502(a) and Rule 9019 do not conflict but

59.     Here, the substantive rights granted by 11 U.S.C. § 502(b) do not infringe on the procedural rights granted by Bankruptcy Rule 9019.  Section 502(b) provides: "if such objection to a claim is made, the court, after notice and a hearing, *shall determine* the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and *shall allow* such claim in such amount."  (emphases added).  While Rule 9019(a) provides, without limitation, "[o]n the trustee's [or debtor's] motion and after notice and a hearing, the court may approve a compromise or settlement," Section 502(b) does not require that determination or allowance occur solely through court-adjudicated litigation; resolution via Rule 9019 settlement complies with section 502(b)'s plain text.  *In re DVR, LLC,* 582 B.R. at 522 ("Section 502(a) and Rule 9019 do not conflict but instead work together harmoniously.").[27]

60.     In *DVR*, the bankruptcy court addressed whether the mandatory language of section 502(b)—requiring the court to "determine" and "allow" claims after an objection—precludes

---

instead work together harmoniously").  This approach is not only consistent with the statutory command that rules not alter substantive rights, but also sound judicial practice: harmonization creates a clear interpretive rule against which Congress can legislate, it "constrain[s] judicial discretion in the interpretation of the laws", *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 109 (1991), avoids unnecessary conflicts, and promotes consistency and predictability.  *Finley v. United States*, 490 U.S. 545, 556 (1989) ("What is of paramount importance is that Congress be able to legislate against a background of clear interpretive rules, so that it may know the effect of the language it adopts."); *Watt v. Alaska*, 451 U.S. 259, 267  (1981) (citing *Morton v. Mancari*, 417 U.S. 535, 551 (1974); *Haggar Co. v. Helvering*, 308 U.S. 389, 394, (1940)) ("We must read the statutes to give effect to each if we can do so while preserving their sense and purpose"); *United States v. Fausto*, 484 U.S. 439, 453 (1988) ("[It] can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change").  Here, Congress has refrained from defining determination and allowance as precluding 9019 settlements via superordinating language like a "notwithstanding" clause.  *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ("[T]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section.").  Relying on brute implication to expand 502(b) such that it swallows Rule 9019 strips Congress of its policymaking power by expanding 502(b) beyond the plain meaning of Congress's prescription.

27    This harmonization of section 502(b) and Rule 9019 is further supported by the flexible interpretation of "notice and a hearing" laid out in 11 U.S.C. § 102(1).  This language does ***not*** require a formal evidentiary hearing in all circumstances; instead, the nature and extent of the hearing must be "appropriate under the particular circumstances." *See e.g., Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 594 (5th Cir. 2003) (citing 11 USC § 102(1); Collier on Bankruptcy, (15th ed.) ¶ 102.02) ("The U.S. Bankruptcy Code defines the phrase 'after notice and a hearing' and similar phrases as requiring such notice and hearings as are appropriate under the particular circumstances.  These terms permit flexibility regarding the occasions in which a full hearing is required, while insuring [sic] that all persons who should have notice receive it."); *In re Harnischfeger Indus., Inc.*, 316 B.R. 616, 620 (D. Del. 2003) (same).

resolution of claim objections through settlement under Rule 9019. *Id.* at 511-16. The court concluded that settlement approval satisfies section 502(b)'s allowance and determination duties, provided the settlement does not compromise the individual rights of non-debtor third parties without their consent. *Id.* at 512. The court reasoned that, when the debtors and a claimant resolve a claim objection by agreeing to a claim amount and the court approves that settlement after applying the Rule 9019 standard, the court has "determined" and "allowed" the claim as required by section 502(b). *Id.* at 512-13 (distinguishing objections concerning independent rights "such as a dispute over competing lien rights" from objections regarding "a creditor's entitlement to a distribution from an estate or its assets" common to all parties in interest). Here, as in *DVR*, there are no non-debtor third-party rights at issue that settlement would compromise; therefore, this Court may fully discharge its section 502(b) duties by approving the Settlements.

61.     The *DVR* approach properly gives effect to both section 502(b) and Rule 9019 by preserving the substantive rights under section 502(b) and the procedural rights under Rule 9019. All parties in interest can participate in the section 502(b) process by objecting to proposed settlements under Rule 9019. And in situations such as this, where the Debtors and a claimant seek to settle a disputed claim in which the Court has already provided certain observations about the amount or validity of the claim, the Court can, consistent with both Rule 9019 and section 502(b) be informed by those prior rulings in passing on the reasonableness of a such a settlement. As *DVR* and its progeny confirm, "If parties settle a claim objection by agreeing that a creditor will have a claim in a certain amount, and the court, after applying the Rule 9019 standard, approves the settlement, then it has 'determined' and 'allowed' the claim." *In re DVR*, 582 B.R. 507, 512 (Bankr. D. Colo. 2018), *aff'd*, 606 B.R. 80 (D. Colo. 2019); *see also In re Fog Cap Retail*

*Investors LLC*, 2024 WL 659559 (applying the *DVR* rule); *In re Roberts*, 667 B.R. 147 (same); *In re 160 Royal Palm, LLC,* 2020 WL 4791955 at *5 (same).

62.      Put differently, section 502(b)'s explicit substantive rights to determination and allowance do not squelch Rule 9019's explicit procedural rights to a court-approved settlement. Thus, on the face of the statutory text and rules, when a court determines and allows a claim under the terms of a Rule 9019 settlement, the court fully discharges its section 502(b) duties. *In re DVR, LLC*, 606 B.R. at 86 ("In interpreting § 502(b), the Bankruptcy Court did not ignore the statute's plain mandatory language but rather applied it in a way that allowed for it to be reasonably reconciled with Rule 9019 and the other provisions in the Bankruptcy Code that give a pivotal role to the trustee."); *In re Roberts*, 667 B.R. 147 (10th Cir. BAP. 2025) (same); *In re Fog Cap Retail Investors LLC*, 2024 WL 659559 (10th Cir. 2024) (same); *In re 160 Royal Palm, LLC,* 2020 WL 4791955 at *5 (Bankr. S.D. Fla. 2020) (citing *In re DVR, LLC*, 582 B.R. at 522) ("Rule 9019(a) of the Federal Rules of Bankruptcy Procedure authorizes the Court to approve settlements in bankruptcy cases.  A trustee or debtor in possession may settle claims against the estate even if other parties in interest objected to those claims").

## B.      Reconciling *DVR*, *CS Mining*, and *C.P. Hall*: Distinguishing Settlements That Affect Individual Rights from Those Involving Only Estate Distributions

63.      In contrast to the approach taken in *DVR*, the Court in its March 31, 2025 letter opinion referenced two cases—*CS Mining* and *C.P. Hall*—that arguably support the proposition that section 502(b) precludes a debtor and a claimant from *ever* settling a claim dispute under Rule 9019 if a third party has objected to that claim. *In re Yellow Corp.*, 670 B.R. at 407–09.  For the reasons explained above, to the extent *CS Mining* and *C.P. Hall* stand for such a proposition, they should be rejected because such a ruling improperly reads Rule 9019 out of existence.  Properly read, *CS Mining* and *C.P. Hall* stand for the uncontroversial proposition that if a settlement would

adversely impact the unique, standalone rights of a third party (rather than merely that third party's interest in collecting from the estate), it may not be approved without such third party's consent. In this way, *CS Mining* and *C.P. Hall* can be reconciled with *DVR*, because the holdings in each case appear to safeguard third-party individual rights—precisely the type of rights that, under *DVR*, a debtor lacks the authority to compromise over a third party's objection.

64.     In *CS Mining*, the settlement at issue would have erased an objecting creditor's contested pre-existing contractual right to priority under an intercreditor agreement.  574 B.R. at 282 ("At the heart of this case are the disputes under the Intercreditor Agreement"); *see In re DVR*, 582 B.R. at 512 ("*In CS Mining,* several secured creditors disputed the terms of their inter-creditor agreement through claim objections and, in particular, whether that agreement required one creditor, WUMI, to convert its loan into equity").

65.     Likewise, in *C.P. Hall*, an individual personal injury creditor (Shipley) objected to a proposed 9019 settlement between other personal injury creditors and the Chapter 7 Trustee.  *In re C.P. Hall*, 513 B.R. at 542.  In the bankruptcy, Shipley, was engaged in a dispute with two groups of personal injury creditors over purported security interests in an insurance policy covering the asbestos claims of the bankrupt tortfeasor.  *In re C.P. Hall*, 513 B.R. at 542-43.  "Since before the bankruptcy case was filed, various personal injury creditors have been fighting over the relative priority of their rights to C.P. Hall's assets." *Id.* at 542.  Within the *C.P. Hall* bankruptcy, Shipley continued his intercreditor dispute by filing an adversary proceeding asserting that other creditors liens were inferior to his.  *Id.*  When Shipley's adversaries reached a settlement with the chapter 7 trustee, the court in that case refused to approve the settlement over Shipley's objection.  *Id.* at 534.  The proposed 9019 settlement had the two consenting classes of personal-injury creditors agreeing to have their claims treated as general unsecured claims, thereby, apparently conceding

priority to Shipley.  *Id.* at 542-43.  Yet Shipley still objected to the competing tort creditors' settlement, suggesting that the settlement nevertheless may have impaired his individual rights. This asserted impairment of rights appears to be the inference drawn by the *DVR* bankruptcy court in explaining the *C.P. Hall* court's holding.  582 B.R. at 512 ("Perhaps the result in *C.P. Hall* can be explained by something in the settlement that attempted to compromise [the objecting third party creditor's] lien rights").

66.    Section 502(b) should not be interpreted to grant a settlement hold-up right to any party who joins a claim objection, as such an interpretation would undermine the efficient administration of bankruptcy estates and frustrate the policy goals of the Bankruptcy Code.  Such an interpretation would create perverse incentives, encouraging parties to object to every claim not on the merits but to gain leverage, resulting in a proliferation of meritless objections and paralyzing settlements in bankruptcy cases.  *In re NovaPro Holdings, LLC*, 2019 WL 1324950, at *4 (D. Del. Mar. 25, 2019), *aff'd*, 815 F. App'x 655 (3d Cir. 2020) (quoting *Martin*, 91 F.3d at 393) ("To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'").  The statutory text and structure of section 502(b) do not support such a right, as the provision merely requires the court to determine and allow claims after notice and a hearing, without granting any party the unilateral power to block settlements.  Expanding section 502(b) in this way would constitute unwarranted judicial policymaking, contrary to its plain meaning and congressional intent.  Settlements are expressly encouraged in bankruptcy to prevent costly litigation and promote efficient resolution, as reflected in both case law and the Federal Rules of Bankruptcy Procedure.

67.    The proper approach harmonizes the Bankruptcy Code and the Bankruptcy Rules, giving effect to both wherever possible.  *See e.g., In re Four Wells Ltd.*, 2016 WL 1445393, at *9

(quoting *In re Dow Corning Corp.*, 237 B.R. at 378) ("a [bankruptcy] court 'is bound to interpret the Code and Rules harmoniously if it is possible to do so'").  Only the *DVR* approach respects both the substantive and procedural frameworks established by Congress and the Supreme Court.

### C.    Application of the Martin Factors.[28]

68.    As previously discussed, *DVR* does not alter the governing *Martin* standard, but rather simply reinforces that a settlement must not unfairly prejudice third parties or operate as an impermissible reallocation of rights.  Indeed, the Settlements readily satisfy each of the Martin Factors precisely because the Settlements are value-maximizing.  The Settlements mitigate litigation costs and risk and represent fair and equitable resolutions well within the range of reasonableness (as expanded upon herein).  The Debtors accordingly exercised sound business judgment in their analysis of the Settlements with reference to the Martin Factors, and the Court should approve the Settlements under Rule 9019.

69.    In the Debtors' business judgment, each Settlement represents a fair compromise considering the circumstances, and it is reasonable and in the best interests of the Debtors, their estates, creditors, and other parties involved in these Chapter 11 Cases.  Each Settlement results from extensive, hard-fought, good-faith, arm's-length negotiations between the Settling Parties, leading to an agreement that falls well within the range of reasonable litigation outcomes.  Each Settlement offers a fair and practical resolution to the disputed issues, which, if continued to be litigated, would reduce the Debtors' distributable value and diminish creditor recoveries.  Each Settlement meets the relevant Martin Factors and, therefore, should be approved.

---

[28]    The second *Martin* factor is not applicable.

70.    *First*, the Settlements resolve myriad legal issues and disputes among the Settling Parties, for which disputes the probability of the Debtors succeeding is highly speculative.[29] The issues in dispute are exceedingly technical, complex, and in many cases lack significant guiding precedent.    Absent the Settlements, the outcome with the highest probability under the circumstances of these cases is mutually-assured destruction that will result in tens of millions of dollars spent litigating various claims and issues, the result of which would put stakeholders in no better place—and indeed, in a much worse place—than the Settlement Agreements afford.[30]  For these reasons and more, the Debtors' business judgment is sound and that the proposed Settlements offer a reasonable and fair resolution of the claims at issue.

71.    As evidenced by the lengthy, hard-fought, and contentious litigation leading up to this point, material risks remain in resolving the billions of dollars of withdrawal liability claims of the MEPP Settling Parties.    Particularly, the Central States Contribution Guaranty Claim remains subject to significant dispute and uncertainty. Further, there is a lack of supporting authority and judicial guidance that address many of the complex disputed issues relating to the claims of the MEPP Settling Parties under these circumstances.  As set forth in further detail above, the Settlements, including the MEPP Claim Methodology incorporated therein, reflect reasonable

---

[29]    The complexity and uncertainty of the litigation surrounding the Settlements is evinced by the numerosity of voluminous filings pertaining to the legal issues among the Settling Parties.  As the Court noted in its Preliminary Observations Opinion, the filings, which ultimately only produced an interlocutory order, were "extensive" and included motions for summary judgment from the Debtors [Docket No 5181] and Teamsters Pension Trust Fund of Philadelphia and Vicinity [Docket No. 5162], NYST Fund, Management Labor Pension Fund Local 1730, Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund, Teamsters Local 617 Pension Fund, Trucking Employees of North Jersey Pension Fund, and Freight Drives and Helpers 557 Pension Fund [Docket No. 5165], Central States [Docket No 5166], Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan, International Brotherhood of Teamsters Union No. Local 710 Pension Fund, New England Teamsters Pension Fund, Teamsters Joint Council No. 83 of Virginia Pension Fund, as well as the holders of the claims originally held by Teamsters Local 641 Pension Plan [Docket No. 5175]. *See* Preliminary Observations Opinion at 6.

[30]    Transcript of Hearing on Bench Ruling on Plan Confirmation at 15:11-16, *In re Yellow Corp.*, No. 23-11069 (Bankr. D. Del. Nov. 17, 2025).

compromises of highly contested disputed issues. For these reasons and more, the Debtors' business judgment is sound, and the Settlements offer a reasonable and fair resolution of the claims at issue.

72. ***Second***, resolving the relevant disputes without the Settlements will require difficult, costly, and time-consuming litigation, likely requiring lengthy evidentiary proceedings before this Court and a multitude of appellate courts. In its analysis related to Bankruptcy Code section 1129(a)(7), this Court concluded that continued litigation—a substantial amount of which is on account of the MEPP Claims—would extend 18 to 24 months and at a cost to the estates in excess of $50 million that would otherwise be available to stakeholders.[31] In contrast, the Settlements allow the Debtors to avoid the time and expense associated with litigating, the effect of which diminishes the assets of the Debtors' estates. Therefore, the Debtors believe that each Settlement provides a certain and timely resolution of the disputes, which is in the best interest of all parties involved.

73. ***Finally***, the paramount interest of creditors (and other parties in interest in these Chapter 11 Cases) will undoubtedly be best served by approving the Settlements. Continued litigation will only increase the administrative costs of the Chapter 11 Cases and, again, diminish recoveries for stakeholders. Additionally, considering the risk of an unfavorable outcome, reaching a final resolution of the MEPP Claims, as outlined in the Settlements, is in the best interests of creditors. Moreover, each Settlement provides a mechanism, through the Non-J&S GUC Contribution, designed to ensure non-joint and several general unsecured claimants are not unduly burdened by the Settlements, in contrast to the continued costs and delay associated with

---

[31] Transcript of Hearing on Bench Ruling on Plan Confirmation at 15:11-16, *In re Yellow Corp.*, No. 23-11069 (Bankr. D. Del. Nov. 17, 2025).

litigation that could significantly reduce recoveries to non-joint and several general unsecured creditors. Therefore, the Debtors' decision to enter into each Settlement should be approved.

74.    For the foregoing reasons, the Debtors respectfully submit that the terms of each Settlement satisfy the criteria for approval under Bankruptcy Rule 9019.

## **Notice**

75.    Notice of this motion, together with a copy of the motion, has been given to the following parties or, in lieu of, to their counsel, if known: (a) the U.S. Trustee, (b) the Committee; (c) the MEPP Settling Parties; (d) PBGC; and (e) all parties required to be given notice under Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

76.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request entry of the Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated:  November 26, 2025
Wilmington, Delaware

*/s/ Laura Davis Jones*

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | **KIRKLAND & ELLIS LLP** |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | 333 W Wolf Point Plaza |
| 919 North Market Street, 17th Floor | Chicago, Illinois 60654 |

919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                tcairns@pszjlaw.com
                pkeane@pszjlaw.com
                ecorma@pszjlaw.com

Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                david.seligman@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*