**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>YELLOW CORPORATION, *et al.*,[1]<br>Debtors. | Chapter 11<br>Case No. 23-11069 (CTG)<br>(Jointly Administered)<br>**Re: Docket Nos. 8296, 8443** |

**STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS IN SUPPORT OF PENSION FUND SETTLEMENT MOTIONS**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this statement (this "Statement") in support of (i) the *Motion of the Debtors for Entry of an Order (I) Approving the Settlement Agreements By and Among the Debtors and Certain Pension Funds and (II) Granting Related Relief* [Docket No. 8296] and (ii) the *Supplemental Motion of the Debtors for Entry of an Order (I) Approving the Settlement Agreements By and Among the Debtors and Certain Pension Funds and (II) Granting Related Relief* [Docket No. 8443] (collectively, the "Motions").[2] In support of this Statement, the Committee respectfully states as follows:

1.  By the Motions, the Debtors seek authority to enter into a series of Settlements with certain MEPP claimants that have, in the aggregate, asserted billions of dollars in claims against the Debtors' estates. As the Court is well aware, the MEPP Claims have been the subject of

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motions.

28092181

extensive, complex and expensive litigation involving a myriad of legal and factual issues. For the reasons set forth herein and in the Motions, the Committee supports approval of the Settlements, and respectfully submits that (i) the Court has the authority to, and should exercise such authority to, approve the Settlements over MFN's objection notwithstanding the fact that MFN itself previously objected to the underlying claims sought to be settled and (ii) the Settlements satisfy the standards for approval under Bankruptcy Rule 9019.

A. **The Court Has Authority to Approve the Settlements Pursuant to Bankruptcy Rule 9019 and Such Authority Does Not Conflict with Bankruptcy Code Section 502(b).**

2.     As the Court observed at the December 5 status conference, consideration of the Motions begins with the question of whether a settlement can be approved over the objection of a party in interest that previously objected to the claim to be settled.[3] The Court indicated at the December 5 status conference that it preliminarily was of the view it could approve a settlement in such a scenario because the underlying claim objection asserted by the party in interest objecting to the settlement would be resolved insofar as approval of the settlement would allow the claim in a determined amount (i.e., adopting the approach set forth in *In re DVR , LLC,* 582 B.R. 507 (Bankr. D. Colo. 2018), *aff'd*, 606 B.R. 80 (D. Colo. 2019)).[4] The Committee agrees that the *DVR* approach, and the Court's inclination at the December 5 status conference, is the correct approach for considering approval of the Settlements. The process for approving a settlement pursuant to Bankruptcy Rule 9019 after notice and a hearing fully preserves the substantive rights of parties under Bankruptcy Code section 502(b) because all parties in interest, including any party that had

---

[3] Hr'g Tr. at 5:13–16 (Bankr. D. Del. Dec. 5, 2025).
[4] *Id.* at 5:16–22 (Bankr. D. Del. Dec. 5, 2025).

previously objected to the subject claim, may be heard in connection with approval of the settlement.[5]

**B.     The Settlements Satisfy Bankruptcy Rule 9019 Standards and Should be Approved.**

3.     When analyzing whether a settlement is fair, reasonable and in the best interests of a debtor's estate, courts in the Third Circuit generally consider the following factors (the "*Martin* Factors"): (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors. *See, e.g., Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 392 (3d Cir. 1996). In addition to the *Martin* Factors, courts must also consider "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)). Importantly, however, courts are "not called upon to decide the merits of the underlying litigation nor determine whether the settlement was the best possible compromise," but rather whether the settlement "could meet the lowest point of reasonableness." *In re Managed Storage Int'l, Inc.*, 601 B.R. 261, 265 (Bankr. D. Del. 2019) (citing *In re Summit Metals, Inc.*, 477 F. App'x 18, 19 (3d Cir. 2012) and *In re Nortel Networks, Inc.*, 522 B.R. 491, 510 (Bankr. D. Del. 2014)), *aff'd*, 2020 WL

---

[5] The approaches taken by the courts in *In re CS Mining, LLC*, 574 B.R. 259 (Bankr. D. Utah 2017) and *In re The C.P. Hall Co.*, 513 B.R. 540 (Bankr. N.D. Ill. 2014), which found that the subject court could not approve settlements over the objection of a previously objecting creditor prior to adjudicating the claim objections, are inapposite and distinguishable from the facts here. Indeed, in *CS Mining* and *C.P. Hall*, the underlying claim objections dealt with contractual and property rights, respectively, belonging to the objecting creditors, not the issue of claim allowance against a debtor. In *CS Mining*, the party objecting to the settlement was asserting a contractual right to priority under an intercreditor agreement. 574 B.R. at 282. In *C.P. Hall*, the party objecting to the settlement was asserting a purported security interest in proceeds of an insurance policy of the debtor. 513 B.R. at 542.

1532390 (D. Del. Mar. 31, 2020); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008) (same).

4. The Settlements satisfy the applicable *Martin* Factors and, thus, meet the legal standards for approval under Bankruptcy Rule 9019.[6] The Settlements satisfy the first *Martin* Factor—probability of success in litigation—because they would, if approved, resolve myriad disputes involving complex, unsettled and, in certain instances, entirely unprecedented legal issues for which the ultimate outcome remains uncertain. Absent resolution of the disputed issues through the Settlements, the Committee believes that all parties involved are likely to exercise all available appellate rights, further depleting the estates' resources beyond the tens of millions of dollars in estate resources already consumed, and delaying distributions to creditors. The Settlements themselves were negotiated within the framework of the Court's rulings to date, and are predicated on the application of a carefully-constructed methodology (the MEPP Calculation Methodology) that takes into account the Court's rulings to date and creates a uniform approach to settling the calculation of withdrawal liability claims allowed in these cases while weighing the costs of continued litigation and appellate risk. Given the risk and expense associated with continued litigation, the Committee believes that the Settlements achieved through application of the MEPP Calculation Methodology represent a reasonable compromise of the various disputed issues in satisfaction of the first *Martin* Factor.

5. The Settlements similarly satisfy the third *Martin* Factor—the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attendant to it. The complexity of the litigation sought to be resolved by the Motions is well known to the Court and all other parties involved at this stage of the cases. Indeed, the disputed issues addressed by the

---

[6] The second *Martin* Factor, the likely difficulties in collection, is not applicable to the proposed Settlements.

Settlements have been the subject of voluminous briefing, multiple summary judgment hearings, three memorandum opinions issued by this Court and a memorandum opinion issued by the United States Court of Appeals for the Third Circuit (the "Third Circuit"). Each memorandum opinion issued by this Court and by the Third Circuit addressed numerous complex factual and legal disputes. Certain of the adjudicated disputes applied to all MEPP claimants and certain of the disputes applied to only one or a limited subset of MEPP claimants, but the proposed Settlements would resolve *all* of the disputes—inclusive of appellate rights—as to all Settling Parties.[7] Moreover, approval of the Settlements would resolve pending claim objections and issues that have not yet been addressed by this Court, conserving additional resources for the ultimate (and accelerated) distribution of value to unsecured creditors. Conversely, further litigation surrounding the disputed issues proposed to be settled would result in the continued expenditure of millions of dollars in professional fees to be borne by the estates—dissipating assets and deferring distributions to creditors likely for years in furtherance of a result that may well be less

---

[7] For example, the Amended Memorandum Opinion issued on November 5, 2024 [Docket No. 4769] addressed at least three significant issues, finding (i) the PBGC regulations were valid and the amount of special financial assistance should not be included in the MEPPs' assets for purposes of calculating the Debtors' allocable share of UVBs, (ii) the Debtors' withdrawal liability is determined with respect to ERISA's twenty-year cap on annual payments and (iii) certain MEPPs were allowed to calculate the Debtors' withdrawal liability using higher contribution rates pursuant to agreements with the Debtors. The Memorandum Opinion issued on February 5, 2025 [Docket No. 5619] addressed at least three additional significant issues, finding (i) certain MEPPs' withdrawal liability calculation must relate to "anticipated plan experience" and the discount rate used by certain MEPPs was inconsistent with statutory requirements, (ii) a genuine issue of material fact existed regarding which contribution base units should be used to calculate the annual payment owed to the Virginia Teamsters Pension Fund and (iii) the New England Teamsters Pension Fund's withdrawal liability should be calculated in accordance with the prepetition agreement entered into between New England Teamsters Pension Fund and the Debtors. The Preliminary Observations Memorandum Opinion issued on April 7, 2025 [Docket No. 6030] and so ordered on July 18, 2025 [Docket No. 6682] addressed at least six additional significant issues, finding (i) the Debtors had not defaulted on their withdrawal liability obligations as of the Petition Date, (ii) the (up to) 20-year stream of withdrawal liability payments was accelerated as a result of the bankruptcy filing, (iii) the MEPPs' withdrawal liability claims should be discounted to present value, (iv) the mechanics set forth in 29 U.S.C. § 1405(b) should be applied after reducing allocable UVBs pursuant to ERISA's 20-year cap, (v) Central States and Teamsters Local 641 Pension Fund used inappropriate contribution rates when they calculated the Debtors' withdrawal liability and (vi) the liquidated damages provision contemplated in the 2014 letter agreement between Central States and the Debtors is an unenforceable penalty under Illinois law. All of the issues implicated by these opinions would be resolved as to the Settling Parties if the Settlements were to be approved.

advantageous to all unsecured creditors than that contemplated by the Settlements. In light of the foregoing, the Committee believes that each Settlement, which proposes to resolve the broad universe of complex disputes relevant to the claim or claims covered by each such Settlement, is in the best interests of the Debtors' estates and their creditors, and satisfies the third *Martin* Factor.

6.   With respect to the fourth *Martin* Factor—the paramount interest of creditors—the Settlements represent a favorable resolution for all stakeholders and thus satisfy this final prong. All creditors will benefit from the Settlements given that implementation of the Settlements will enable the liquidating trust to expedite distributions to creditors instead of pursuing extensive and expensive multi-party litigation.[8] In addition, the Settlements represent a favorable outcome for non-joint and several general unsecured creditors in that the Settlements provide a mechanism through which the MEPP Settling Parties will contribute their *pro rata* share of $7.5 million to non-joint and several general unsecured creditors. This is a significant concession by the MEPP Settling Parties and a key term of the Settlements. Given the size of the MEPP Claims and the MEPP claimants' ability to assert withdrawal liability claims at every Debtor, non-joint and several general unsecured creditors face significant risk from both continued litigation costs and the prospect of rulings that could increase the allowed amount of the MEPP Claims, which would adversely and disproportionately impact holders of non-joint and several general unsecured claims. The $7.5 million Non-J&S GUC Contribution provides a tangible and meaningful benefit to non-joint and several general unsecured creditors that further underscores the favorable outcome of the Settlements as compared to continued litigation. Therefore, the Settlements represent a fair and reasonable compromise when considering the paramount interest of creditors.

---

[8] As this Court has acknowledged, "high-stakes litigation has a way of consuming value . . . that would otherwise be available for distribution to creditors." Hr'g Tr. at 15:5–7 (Bankr. D. Del. Nov. 17, 2025).

7. For the reasons set forth herein and in the Motions, the Committee respectfully submits that the Settlements are fair, reasonable and in the best interests of the Debtors' estates and should be approved.

## RESERVATION OF RIGHTS

8. The Committee expressly reserves the right to amend, modify or supplement this Statement, and to introduce evidence at any hearing on the Motions. This Statement shall not in any way limit any other rights of the Committee to take any further action, on any grounds, as may be appropriate.

## CONCLUSION

9. For the foregoing reasons and those set forth in the Motions, the Committee respectfully requests that the Court: (i) approve the Motions; and (ii) grant such other relief as the Court deems just, proper and equitable.

Dated: January 12, 2026
Wilmington, Delaware

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

 /s/ John C. Gentile
Jennifer R. Hoover (DE No. 5111)
Kevin M. Capuzzi (DE No. 5462)
John C. Gentile (DE No. 6159)
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
E-mail: jhoover@beneschlaw.com
　　　　kcapuzzi@beneschlaw.com
　　　　jgentile@beneschlaw.com

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Philip C. Dublin (admitted *pro hac vice*)
Meredith A. Lahaie (admitted *pro hac vice*)
Kevin Zuzolo (admitted *pro hac vice*)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: pdublin@akingump.com
　　　　mlahaie@akingump.com
　　　　kzuzolo@akingump.com

*Counsel to the Official Committee of Unsecured Creditors*