**<u>EXHIBIT B</u>**

**Lease Documentation**

<div align="center">

NET LEASE
5200 W. 110th Street, Overland Park, Kansas

</div>

In consideration of the rents and covenants hereinafter set forth, Lessor leases to Lessee and Lessee rents from Lessor (this "Lease") the following described Premises upon the following terms and conditions:

1.    **LEASE PROVISIONS.**

      1.1    DATE: November 1, 2014.

      1.2    PARTIES:

          Lessor (collectively):

          Price Property and Investments L.L.C., as tenant in common
          P.O. Box 12067
          Shawnee Mission, KS 66282-2067
          Attention: Barry D. Price

          Green — Blue 1818, L.L.C., as tenant in common
          c/o Scott Asner
          420 Nichols Road
          Suite 205
          Kansas City, Missouri 64112

          and

          Kenneth G. Block
          Block Real Estate Services, LLC
          700 W. 47th Street
          Suite 200
          Kansas City, MO 64112

          Lessee:

          YRC Inc.
          c/o YRC Worldwide Inc.
          10990 Roe Avenue
          Overland Park, Kansas 66211
          Attention: Real Estate and Properties

      1.3    <u>PREMISES</u>: Lessor leases to Lessee and Lessee rents from Lessor the approximately 51,000 square foot building known as the 5200 Building (hereinafter, the "Building"), situated on the land in the City of Overland Park, Johnson County, Kansas located at 5200 W. 110th Street and containing approximately 3.238 acres as more particularly legally

48981119.3

described on <u>Exhibit A</u> attached hereto (the "Land"). The Land and the Building are hereinafter collectively called the "Premises".

1.4    <u>TERM; RENEWAL OPTIONS</u>: The term (as may be extended, the "Term") of this Lease shall be for a period of one hundred thirteen (113) months to commence on November 1, 2014 ("Commencement Date") and ending on March 31, 2024, unless earlier terminated as hereafter provided and unless extended as hereafter provided. Prior to the Commencement Date, Lessee shall submit to Lessor the required certificates of insurance as required under Section 4 herein.

Lessee shall have the option to renew this Lease for two (2) ten-year renewal periods provided that Lessee is not in Default (as hereinafter defined) under this Lease at the time of renewal. Lessee may exercise the renewal options by providing Lessor with two hundred seventy (270) days advance written notice prior to the expiration of the then expiring Term.

1.5    <u>RENT AMOUNT AND PAYMENT</u>: Lessee shall pay to Lessor as rent ("Rent"), in advance, without deduction, set-off, prior notice or demand, except as otherwise specifically set forth in Section 6.3, 6.7,10.1.2, 13, 25 and 26 hereof, the monthly Rent as follows with respect to Rent due beginning November 1, 2014 and thereafter:

| | |
|---|---|
| 11/1/2014 – 9/30/2016 | $39,446.22 |
| 10/1/2016 – 3/31/2019 | $40,629.60 |
| 4/1/2019 – 9/30/2021 | $41,848.49 |
| 10/1/2021 – 3/31/2024 | $43,103.94 |

Rent shall be payable on the first (1st) day of each month in lawful money of the United States of America. The Rent shall be paid at the address of Lessor set out in Paragraph 1.2 or at such other place, and in such manner, as Lessor may from time to time direct upon not less than twenty one (21) days prior notice to Lessee. Monthly Rent for any partial month shall be pro rated on a per diem basis. All installments of Rent not paid when due (each such installment, a "Late Payment") shall bear interest at the then current Commerce Bank of Kansas City, N.A. prime rate ("Prime Rate") plus five percent (5%) with a minimum of twelve percent (12%) (the "Default Rate") until paid. Notwithstanding the foregoing, interest on any Late Payment shall accrue at an annual rate of five percent (5%) until three (3) days after Lessee receives written notice of such Late Payment from Lessor ("Interest Waiver"), after which interest shall accrue at the Default Rate; provided, however, that Lessee shall only receive one (1) Interest Waiver during the first two (2) years of the Term and one (1) Interest Waiver during each successive two-year period of the Term.

The monthly Rent for the first 30 months of any extended Term of this Lease shall be the Rent at the end of the then expiring Term increased by 3% and Rent shall increase by 3% for each 30-month period thereafter until the expiration of the Term.

1.6    <u>ABSOLUTE NET LEASE</u>: Except as otherwise specifically set forth in Sections 3, 6.3, 6.7, 10.1.2,13, 25 and 26 it is the purpose and intent of Lessor and Lessee that Rent and Additional Rent, hereinafter defined, payable hereunder shall be net to Lessor so that this Lease

2

shall yield to Lessor the net Rent and Additional Rent specified, in each month of each year during the Term of this Lease, free from any charges, assessments, or impositions, charged, assessed, or imposed on or against the Premises, and without abatement, deduction or set-off by Lessee, and Lessor shall not be expected or required to pay any such charge, assessment or imposition, or be under any obligation or liability hereunder, and that, except as otherwise expressly set forth herein, all costs, expenses and obligations of any kind relating to the maintenance and operation of the Premises, foreseen or unforeseen, structural or nonstructural, including all alterations, repairs and replacements, which may arise or become due during the Term of this Lease shall be paid by Lessee, and Lessor shall be indemnified and saved harmless by Lessee from and against such costs, expenses and obligations.

1.7   <u>RENT AND ADDITIONAL RENT FOR ANY PARTIAL MONTH AND FIRST FULL MONTH</u>. Rent and Additional Rent for any partial month and first full month shall be paid by Lessee to Lessor prior to commencement of the term hereof.

1.8   <u>SECURITY DEPOSIT</u>: Lessee has delivered and deposited with Lessor a security deposit ("Security Deposit") in the amount of Forty-Four Thousand Two Hundred Seventy-Eight Dollars and Nineteen Cents ($44,278.19). The Security Deposit shall not be commingled with any funds of Lessor or any other party, and shall at all times be deposited in federally-insured accounts; provided, however, that so long as each Guaranty by each respective Guarantor (as such terms are hereinafter defined) shall remain a legal and binding obligation of Guarantors, Lessor shall not have an obligation to segregate the Security Deposit into federally-insured accounts and may commingle it with other of Lessor's funds. Interest on the Security Deposit, whether in federally-insured accounts or held by Lessor, shall accrue for Lessee's benefit at the three (3) year Treasury Bill Rate (adjusted every third year) and shall be added to the Security Deposit. Lessor may use all or any part of the Security Deposit for the payment of Rent, Additional Rent, or any other charges in Default under this Lease which have not been cured as herein provided, or for the payment of any other amount which Lessor has spent or has then become obligated to spend by reason of Lessee's Default pursuant to the terms of this Lease. If any portion of the Security Deposit is so used or applied, Lessee shall, within fifteen (15) days after written demand therefor, provide additional funds to Lessor in an amount sufficient to restore the full original amount of said Security Deposit (or to the full amount subsequently established under this Paragraph 1.8 below). Provided Lessee is not indebted to Lessor pursuant to this Lease, or is not otherwise in Default hereunder beyond any applicable cure period, the Security Deposit or other Lessee funds held by Lessor, together with any other collateral held by Lessor as security for this Lease, shall be returned to Lessee within fifteen (15) days after the expiration or termination of the Term. For purposes of this Lease, the term "Guarantor" shall mean, jointly and severally, each of Scott Asner, Michael Gortenburg, Steve Block, Ken Block. For purposes of this Lease, the term "Guaranty" shall mean one (1) or more guaranty agreement(s) executed by each Guarantor in the form attached hereto as Exhibit E and incorporated herein by reference, a "blue ink" original of which Guaranty shall have been previously delivered to Lessee.

1.9   <u>MANAGEMENT SERVICES</u>: Lessee acknowledges and agrees that Lessor will hire Block Real Estate Services, LLC as its management service company to monitor all of the obligations of Lessee under this Lease. Lessee agrees to pay monthly, in advance, as Additional Rent, a fee (the "Management Fee") equal to one percent (1%) of the then current Rent amount

(not including Additional Rent items) to Lessor for the cost of these management services. These management services are separate and distinct from any maintenance service contract between Lessee and any third party maintenance service provider.

1.10    ADDITIONAL RENT/MONTHLY PAYMENT SUMMARY: Lessee agrees to pay one hundred percent (100%) of (i) taxes payable pursuant to Section 3, and (ii) the Management Fee (collectively, the "Additional Rent"). The amount of the initial monthly Rent, Management Fee and estimated real estate taxes are as follows:

| | | |
|---|---|---|
| (1) | Rent for the first year as set forth in Paragraph 1.5 | $39,446.22 |
| (2) | Management Fee | $349.46 |
| (3) | Estimated Real Estate Tax payment as provided in Section 3 (initial estimate $100,811.16) | $10,352.62 |
| | Monthly Payment Total | $50,193.30 |

Unless Lessor's lender requires estimated real estate taxes to be held by lender or its designee in an escrow account, the monthly payments of estimated real estate taxes shall be held by Lessor in interest bearing federally insured accounts and shall be used by Lessor to promptly pay such taxes and assessments.

1.11    USE: Lessee shall use and occupy the Premises for office use and related uses subject to any restrictive covenants affecting the Premises. Lessee shall not use or permit the Premises or any part thereof to be used for any purpose other than the purpose expressly authorized herein, without the prior written consent of Lessor; provided Lessor will not unreasonably withhold its consent for a use other than office use and related uses as specified above that is (i) permitted by the restrictive covenants and other applicable zoning, occupancy or other laws affecting the Premises, (ii) does not create a hazard to occupants of the Building or adjacent properties, and/or (iii) is not a different use of such character that it will substantially increase the wear and tear on the Premises beyond that created by the use for which the Premises is herein leased.

2.    UTILITIES.

2.1    During the Term of this Lease, Lessee shall pay, prior to delinquency, all utilities, including but not limited, to water, gas heat, electricity, telephone, and sewage, which may be furnished to or used in or about the Premises during the Term of this Lease by Lessee.

3.    REAL ESTATE TAXES AND ASSESSMENTS AND PERSONAL PROPERTY.

3.1    PAYMENT: Lessee shall pay all association fees, estimated real estate taxes and annual installments of special assessments levied against the Premises throughout the Term of this Lease prior to delinquency. Lessee shall pay real estate taxes and special assessments as Additional Rent in monthly installments on the first day of each month and, in the event real property taxes applicable to the then current year are not yet known, the amount payable by Lessee shall be computed on the basis of the amount of the real property taxes for the preceding

48981119.3

taxable year. Each year Lessor shall deliver to Lessee a statement showing the actual real property taxes levied against the Premises. If total payments made by Lessee pursuant to this Paragraph (together with interest thereon) are less than the computation shown in Lessor's statement, such deficiency is payable by Lessee within 30 days of receipt of Lessor's statement. If total payments made by Lessee pursuant to this paragraph exceed the computation shown in Lessor's statement, such overpayment will be credited to Lessee by reducing subsequent monthly installments of Lessee's proportionate share of real property taxes. With regard to special assessments, if payment of such assessments is not payable in installments and the aggregate amount of such special assessments exceeds Fifty Thousand and No/100 Dollars ($50,000), Lessor and Lessee shall agree upon an installment payment plan to spread such payments over a period related to the useful life of the improvements being paid for by the assessment.

3.2    PERSONAL PROPERTY: Lessee shall pay, prior to delinquency all taxes assessed against and levied upon any trade fixtures, furnishings, equipment and all other personal property of Lessee contained in the Premises ("Personal Property"), such Personal Property as more specifically described in Exhibit C hereof, and shall pay all taxes attributable to any leasehold improvements which may be made to the Premises by Lessee. Lessor shall not be responsible for any taxes assessed against and levied upon any Personal Property of Lessee contained in the Premises.

3.3    RIGHT TO CONTEST. Anything herein contained to the contrary notwithstanding, Lessor agrees that Lessee shall have the non-exclusive right to contest the amount or legality of any taxes or special assessments levied against the Premises which it is obligated to pay and the right to make application for the reduction thereof or of any assessments upon which the same may be based, but this shall not be deemed or construed in any way as releasing or discharging Lessee's covenant to pay such taxes and assessments. Lessor shall not be required to join in any such proceedings or application unless it shall be so required by law for the proper prosecution of such proceedings or application and Lessee shall indemnify and hold Lessor harmless against all liabilities, damages, costs and expenses, including reasonable counsel fees, in connection therewith and all such proceedings and applications shall be without any cost or expense or liability to the Lessor.

3.4    PRORATION OF TAXES FOR LAST YEAR OF LEASE TERM: Taxes for the last year of the Lease Term will be prorated.

3.5    RENT TAX: Lessee shall pay when due any tax on rents (not including any income tax) levied by any federal, state or local taxing authority which tax is enacted by law after the date hereof.

4.    INSURANCE.

4.1    PUBLIC LIABILITY: Subject to Paragraph 4.3 below, Lessee shall at all times during the Term hereof, and at Lessee's cost and expense, procure and continue in force commercial general liability insurance covering the Premises, and Lessee's use thereof, against claims for personal injury or death, and property damage occurring upon, in or about the Premises. Such insurance at all times shall be written on an occurrence basis (not a claims made basis), and in an amount of not less than ONE MILLION DOLLARS ($1,000,000) Combined

Single Limit Coverage and general aggregate limits of not less than TWO MILLION DOLLARS ($2,000,000). The aforementioned insurance shall be with companies having a rating of not less than Best's A-VII rating. Certificates of such insurance shall be furnished to Lessor by the insurance companies and shall name Lessor as an additional insured to the extent of the indemnity provided herein.

4.2   OTHER INSURANCE COVERAGES: Lessee shall maintain in effect throughout the Term of this Lease, at Lessee's cost as set forth in Section 1.10, a policy or policies of insurance for property insurance with one hundred percent (100%) of the full insurable replacement value of the Premises (exclusive of Personal Property of Lessee), business income (rent loss) insurance for payment of Rent and Additional Rent hereunder for a period of twelve (12) months, general liability insurance in the amount of $6,000,000 (such limits may be provided in a single policy or in a combination of a primary policy and umbrella or excess liability policies), and all other coverages required by this Lease or any mortgagee of the Premises. Lessee shall name Lessor as an additional insured to the extent of the indemnity provided herein under such policy or policies and shall provide a certificate of insurance to Lessor evidencing Lessor being named as an additional insured to the extent of the indemnity provided herein.

4.3   WAIVER OF RIGHTS: Lessor and Lessee hereby waive any rights each may have against the other on account of any loss or damage occasioned to the Lessor or the Lessee, as the case may be, or to the Premises or its contents, and which may arise from any risk generally covered by property insurance. The parties shall obtain from their respective insurance companies, insuring the Premises a waiver of any right of subrogation which said insurance company may have against the Lessor or the Lessee as the case may be. For purposes of this Paragraph, the definition of the terms Lessor and Lessee as used herein shall include all agents, representatives, successors, insurers, and assigns of either Lessee or Lessor.

4.4   MISCELLANEOUS: It is understood and agreed that the insurance requirements contained in this Section or elsewhere in this Lease are not intended to, and shall not be construed to, limit, mitigate, or reduce any of the indemnity obligations or other obligations of Lessee contained in the Lease except as otherwise specifically set forth.

4.5   MUTUAL INDEMNIFICATION. Except as limited by and subject to Paragraph 4.3 above, Lessee shall defend, indemnify and save the Lessor, its agents, servants, employees and representatives harmless from and against any and all suits, claims, losses, damages and demands, including reasonable attorney's fees arising out of injury, death or damage occurring in, at or about the Premises as a result of the negligent acts or omissions of Lessee, its contractors, agents, servants, employees or visitors. In the event the Lessor is notified of a claim, action or proceeding, or becomes aware of an occurrence, which may result in an indemnification by Lessee of Lessor as provided above, the Lessor shall give prompt notice to Lessee and provide the particulars known by the Lessor. Lessor shall promptly forward to the Lessee every demand, notice, summons or other process received by Lessor or its representatives to which this indemnification applies.

Except as limited by and subject to Paragraph 4.3 above, Lessor shall defend, indemnify and save the Lessee, its agents, servants, employees and representatives harmless from and

against any and all suits, claims, losses, damages and demands, including reasonable attorney's fees arising out of injury, death or damage occurring in, at or about the Premises as a result of the negligent acts or omissions of Lessor, its contractors, agents, servants, employees or visitors. In the event the Lessee is notified of a claim, action or proceeding, or becomes aware of an occurrence, which may result in an indemnification by Lessor of Lessee as provided above, the Lessee shall give prompt notice to Lessor and provide the particulars known by the Lessee. Lessee shall promptly forward to the Lessor every demand, notice, summons or other process received by Lessee or its representatives to which this indemnification applies.

    4.6   <u>LESSEE'S PERSONAL PROPERTY</u>. All of the Lessee's Personal Property at the Premises shall be and remain at Lessee's sole risk, and Lessor shall not be liable for and Lessee hereby releases Lessor from any and all liability or damage thereto except to the extent of Lessor's gross negligence or willful misconduct.

    4.7   <u>DELIVERY OF CERTIFICATES AND NOTICE OF CANCELLATION</u>. Prior to commencement of the Lease term, Lessee shall cause to be delivered to Lessor certificates evidencing insurance coverages as described above. Each such certificate shall contain a provision that any coverage shall not be cancelled or modified except on thirty (30) days' written notice to Lessor at the address for notices stated herein.

5.    DAMAGE OR DESTRUCTION.

    5.1   <u>DUTY TO REPAIR</u>: If the Premises shall be partially or totally destroyed by fire or other casualty, so as to become partially or totally untenantable, the same shall be repaired, rebuilt and restored to the same condition (structural and architectural) existing immediately prior to the casualty, by and at the cost of Lessee. If insurance proceeds are not sufficient to fully repair, rebuild and restore the Premises, Lessee shall fund such additional amounts as are necessary to complete such repair, rebuilding and restoration. Lessor shall reasonably cooperate with Lessee in restoring the Premises, but at no expense to Lessor.

    5.2   <u>DAMAGE DURING LAST THREE YEARS OF TERM</u>: Notwithstanding anything to the contrary herein contained, if the Premises be damaged or destroyed during the last three (3) years of the Term of this Lease to an extent greater than twenty-five percent (25%) of the then replacement value of the improvements on the Premises, either Lessor or Lessee may elect to terminate this Lease, such election to be given by notice to the other within thirty (30) days after the date of damage or destruction. In the event Lessor or Lessee so elects to terminate, then this Lease shall be terminated as of the date of giving of such notice or the date Lessee completes its vacation from the Premises, whichever be the later, and in such event all proceeds of insurance carried in connection with the Premises shall be payable to the Lessor. If the insurance proceeds are not sufficient to pay for all of the repairs, rebuilding and restoration to the same condition (structural and architectural) existing immediately prior to the casualty, Lessee shall pay any deficiency within thirty (30) days after Lessor's demand therefor.

6.    MAINTENANCE AND REPAIRS.

    6.1   <u>CONDITION ON COMMENCEMENT</u>: Lessee has occupied the Premises pursuant to the terms of a Net Lease dated March 31, 2009 between Lessor and Lessee

("Original Lease") By accepting continuing occupancy Lessee shall be deemed to have agreed that the Premises are in a condition suitable for the use authorized under this Lease. Lessee accepts the Premises "AS IS, WHERE IS, WITH ALL FAULTS." The condition of the Premises on March 31, 2009 was mutually agreed upon by Lessor and Lessee as described in Exhibit D hereto.

6.2    LESSOR'S DUTIES: This Lease is intended to be a NET LEASE and except as otherwise specifically set forth in Sections 6 and 13 of this Lease, all repairs, maintenance, replacement, or other functions are to be performed at Lessee's cost. Lessee acknowledges that, except as otherwise specifically set forth in Sections 6 and 13, Lessor will have no duties of repair, maintenance, replacement, or other functions, and any and all cost associated with the Premises will be payable by Lessee.

6.3    LESSEE'S DUTIES: Lessee acknowledges that it shall be responsible for all Lessee obligations set forth in Section 6 hereof, from and after the Commencement Date and Lessee shall continue to be responsible for any such obligations with respect to the Premises which accrued or arose from and after March 31, 2009 up to and including the Commencement Date of this Lease.  The fact that Lessee occupied the Premises pursuant to the terms of the Original Lease up to the Commencement Date, shall in no way diminish Lessee's obligation to comply with its duties under Section 6 which arose prior to the Commencement Date, and Lessee shall continue to be responsible for any such obligations which have not been fulfilled as of the Commencement Date. Lessee at its sole cost and expense shall maintain, and as appropriate repair and replace, in a clean and sanitary condition, and a good state of repair, reasonable wear and tear and damage by condemnation excepted, all portions of the Premises, including but in no way limited to the parking areas, all plumbing, sewage, heating and air conditioning, wiring, glazing, windows, doors, floors, ceilings, interior walls and the interior surface of exterior walls and all fixtures and equipment and all maintenance, repair and replacements of the HVAC systems, roof, footings, foundation, interior load-bearing and exterior walls and structural components of the Premises. Lessee shall maintain adequate heat during the heating season to prevent freezing of plumbing and fire sprinkler systems. The necessity for and adequacy of cleaning, maintenance, repairs and replacement of the Premises shall be measured by the standard which is appropriate for office buildings of comparable class, size and use in the area of the Premises. Except for matters costing $50,000.00 or less, notwithstanding anything in this Lease to the contrary (other than the provisions of Section 5 establishing Lessee's duty to repair damage or destruction from casualty), Lessee shall not have any obligation to perform or pay for any repair, rebuilding or restoration of all or any portion of the Premises in a manner such that the useful life of such repair, rebuilding or restoration would extend beyond the expiration of the then-current Term; provided nothing contained herein shall relieve Lessee of its obligation to make all repairs and replacements necessary to maintain the Premises in a good state of repair until the end of its tenancy. Upon request by Lessee, Lessor and Lessee or their appointed agents shall mutually inspect the roof and other structural and/or mechanical elements of the Premises and determine whether any of them should be replaced. At any point in time after such inspection, if it is mutually determined by Lessor and Lessee that the roof or other structural and/or mechanical elements should be replaced, then Lessor and Lessee shall share the cost of replacement on a fair and equitable basis as follows: (i) Lessee shall initially pay such replacement cost, and (ii) upon the expiration of the Term (including all exercised renewal periods), Lessor shall promptly pay to Lessee the portion of the replacement cost paid by Lessee

8

calculated by multiplying the original replacement cost of the new roof or other such elements times that fraction the numerator of which is the number of months after the expiration or earlier termination of this Lease (not including termination by Lessor as a result of Lessee's default) but during the expected useful life (as mutually agreed by Lessor and Lessee) of the new roof or other such elements at the time it was installed, and the denominator of which shall be the entire expected useful life of the new roof or other such elements at the time it was installed (such payment obligation by Lessor shall survive the expiration or earlier termination of this Lease). With respect to the completion of any such replacements, Lessee shall contract for the work agreed for such replacement and supervise such work. Upon request of the Lessor given at the end of each Lease year, Lessee shall provide Lessor with a list of expenditures which Lessee has made in connection with roof and other such elements maintenance and repair.

6.4   <u>PREVENTATIVE MAINTENANCE PROGRAM - HVAC EQUIPMENT</u>: Lessee at its sole cost and expense shall have maintained in a clean and sanitary condition and in a good state of repair to include replacement of elements thereof, all portions of heating, ventilating, and air conditioning equipment located in the Premises. Lessee shall submit to the Lessor a copy of a preventative maintenance contract with a qualified contractor for the preventative maintenance program required herein. Upon request of the Lessor given at the end of each Lease year, Lessee shall provide Lessor with a list of expenditures which Lessee has made in connection with HVAC maintenance and repair.

6.5   <u>FAILURE TO PERFORM</u>: In the event Lessee fails to maintain the Premises pursuant to this Section, Lessor shall give Lessee notice to do such acts as are reasonably required to so maintain the Premises. In the event Lessee fails to commence such work within thirty (30) days and diligently prosecute it to completion, then Lessor shall have the right to do such acts and expend such funds at the expense of Lessee as are reasonably required to perform such work. Any amount so expended by Lessor shall be paid by Lessee within 30 days after demand. Lessor shall have no liability to Lessee for any damage, inconvenience or interference with the use of the Premises by Lessee as a result of performing any such work except for Lessor's gross negligence or willful misconduct.

6.6   [Intentionally omitted.]

6.7   <u>COMPLIANCE WITH LAWS</u>: Lessee shall do all acts required to comply in all material respects with all applicable laws, ordinances, statutes, regulations and rules of any public authority or organization relating to the maintenance of the Premises, including without limitation, the Americans With Disabilities Act, which are now in force or which may be hereafter in force. Lessor shall have no responsibility to pay for any costs in connection herewith ("Compliance Costs"); provided, however, if Lessee's compliance with this Paragraph shall require the completion of improvements that have a useful life that will extend beyond the end of the Term, and does not arise due to Lessee's voluntary alterations, changes or additions to the Premises pursuant to Paragraph 7.1, then Lessee and Lessor shall share the costs of such improvements on a fair and equitable basis in similar fashion as set forth in Paragraph 6.3 above.

6.8   <u>CONDITION AT END OF TERM</u>: Upon the termination of this Lease or upon the expiration of the Term of this Lease, Lessee shall surrender the Premises in the same condition as received on March 31, 2009 as set forth on Exhibit D, ordinary and reasonable wear

and tear and damage by condemnation, excepted. In particular, subject to ordinary and reasonable wear and tear and damage by condemnation, (i) the mechanical systems servicing the Premises including, without limitation, the HVAC, shall be in good working order, (ii) the parking area shall be in good condition, and (iii) the roofs shall be in good condition.

7.     ALTERATIONS.

    7.1     <u>LESSEE'S RIGHT TO MAKE</u>: Lessee shall not make or permit to be made any alteration or changes in or additions to the Premises without the prior written consent of Lessor, which consent shall not be unreasonably withheld, conditioned or delayed. No such alterations, changes or modifications shall be commenced until Lessor shall have posted proper notices of non-responsibility, if necessary under applicable law to prevent claims against Lessor arising out of such work. Notwithstanding any provision in this Lease, Lessee may make immaterial alterations, additions or improvements to the Premises without the need to obtain Lessor's approval (including, without limitation, hanging pictures and other decorative items which do not affect the structural integrity of the building at the Premises and shall be permitted to use nails, hangers and other such non-destructive customary devices in connection therewith whether or not they penetrate the wall). An immaterial alteration, addition or improvement shall include any alteration, addition or improvement that costs less than $50,000 (excluding any alterations, modifications or additions of personal property of Lessee) and that does not affect the structural integrity of the Building. All repairs, alterations, additions and improvements done by Lessee within the Premises shall be performed in a good and workmanlike manner, in compliance in all material respects with all governmental requirements. Whenever Lessee proposes to do any construction work within the Premises which requires Lessor's approval, Lessee shall first furnish to Lessor plans and specifications covering such work in such detail as Lessor may reasonably request. Such plans and specifications shall comply with such requirements as Lessor may from time to time reasonably prescribe for construction at or about the Premises. In no event shall any non-immaterial construction work be commenced in, at or about the Premises without Lessor's prior written approval of such plans and specifications (if Lessor requests a copy of such plans and specifications). Within ten (10) business days of Lessee's delivery to Lessor of Lessee's proposed plans and specifications for alterations, additions or improvements in or about the Premises and Lessee's request for approval thereof, Lessor shall approve or reject the proposed plans and specifications and Lessor shall otherwise act promptly and in good faith upon written request from Lessee (but without cost or expense to Lessor) to facilitate Lessee's completing alterations, additions or improvements which are approved by Lessor in accordance with the terms of this Lease. In the event Lessee does perform any construction work without the prior written approval of Lessor, Lessor shall, in addition to all other remedies it might have hereunder or at law, have the right to require Lessee to immediately remove any unapproved additions or improvements and restore the Premises to the condition existing prior to such unauthorized construction. Without limiting the generality of the foregoing, Lessee shall under no circumstances make any penetration of the roof or walls (except as permitted above) or floor slab of the Premises without Lessor's consent. In the event Lessor consents to the penetration of the roof or walls or floor slab of the Premises, all such work shall be performed by qualified contractors and shall be monitored by Lessor or its designees and performed under conditions and subject to such conditions and requirements acceptable to Lessor. Except as limited by and subject to Paragraph 4.3 above, Lessee shall and hereby agrees to indemnify and hold Lessor harmless from and against any costs, damages, expenses or liability (including without

limitation, court costs and attorneys' fees), suffered or incurred by Lessor as a result of any penetration of the roof or walls of the Premises, including, without limitation, costs of repair, loss of income, damages to other occupants of the Building to the extent Lessor is liable therefor and damages which result if any warranty on the roof held or maintained by the Lessor is voided or impaired by such penetration. The provisions hereof shall survive the termination of this Lease.

7.2    <u>OWNERSHIP AND REMOVAL</u>: All alterations, changes and additions made to or on the Premises, upon completion, except Personal Property of Lessee, shall become part of the Premises and the property of Lessor and upon termination of this Lease or upon expiration of the Term, shall be surrendered to the Lessor. Notwithstanding the foregoing, upon the termination of this Lease, if Lessor had provided Lessee with written notice at the time Lessor approved such alterations, additions and improvements that Lessor may require removal of such alterations, additions and improvements, Lessor shall have the right to require Lessee, upon not more than one year and not less than ninety (90) days written notice prior to the expiration of the Term, to remove from the Premises at Lessee's sole expense by the termination or expiration of the Term any such alterations, additions and improvements placed or installed on the Premises by Lessee. Any damage caused to the Premises by such removal shall be repaired by and at the expense of Lessee, and the Premises shall be restored to the condition existing prior to the installation of such alterations, additions, and improvements.

8.    LIENS.

8.1    <u>LESSEE'S OBLIGATION</u>: Lessee shall keep the Premises free and clear of any liens arising out of work performed or caused to be performed by Lessee and shall indemnify, hold harmless and defend Lessor from any liens and encumbrances arising out of any work performed or materials furnished by or at the direction of Lessee. In the event any lien is filed, Lessee shall do all acts necessary to discharge or bond over any lien within thirty (30) days of receipt of notice of filing, or if Lessee desires to contest any lien without bonding over such lien, then Lessee shall deposit with Lessor such reasonable security as Lessor may accept to insure the payment of the lien claim. In the event Lessee shall Default (as hereafter defined) in its obligation to pay any lien claim when due, or to bond over such lien or to deposit such security with Lessor as provided in this Paragraph, Lessor shall have the right to expend all sums necessary to discharge the lien claim, and Lessee shall pay promptly after demand all sums expended by Lessor in discharging any lien, including attorneys' fees and costs.

9.    ENTRY.

9.1    <u>RIGHTS OF LESSOR</u>: Lessor and its agents shall have the right at any reasonable time after providing 24 hours notice to Lessee (except in case of emergency) to enter upon the Premises for the purpose of inspection, serving or posting notices, showing to a prospective purchaser or tenant, or for any other lawful purpose. Lessee shall have the right to accompany Lessor while Lessor is on the Premises. At any time within two hundred seventy (270) days prior to the expiration of the Term of this Lease, Lessor may, subject to compliance with any applicable restrictive covenants covering the Premises, place thereon any usual or ordinary "For Lease" or "For Sale" signs.

48981119.3

10.    LESSOR DEFAULT AND REMEDIES.

10.1    If Lessor shall fail to observe or perform any provision of this Lease to be observed or performed by Lessor, where such failure continues for sixty (60) days after written notice thereof by Lessee to Lessor, Lessor shall be in default of this Lease (provided, however, that if the nature of such default is such that the same cannot reasonably be cured within such sixty (60) day period, and Lessor shall commence such cure and thereafter diligently prosecute the same to completion, then no such default shall exist). If Lessor is in default of this Lease and such default continues uncured, then Lessee shall be entitled to the following remedies:

10.1.1 Lessee shall be entitled to all rights and remedies available to Lessee at law or in equity except that Lessee shall not be entitled to terminate this Lease; and

10.1.2 As to monetary defaults by Lessor (e.g., with respect to real estate taxes as set forth in Paragraph 1.10, use of the Security Deposit, use of insurance or condemnation proceeds, and similar matters the resolution of which is monetarily quantifiable in a reasonably objective fashion), Lessee may set off the amount of such monetary obligation of Lessor against Rent, provided that Lessee uses such set off amount to perform the obligation as to which Lessor defaulted.

11.    LESSEE DEFAULT AND REMEDIES.

11.1    EVENTS: The occurrence of any of the following events that is not cured within the time period specified in this Lease (herein referred to as a "Default") shall, at the option of Lessor, constitute a breach of this Lease by Lessee.

11.1.1 Any failure by Lessee to pay the Rent or Additional Rent, or to make any other payment required to be made by Lessee hereunder after ten (10) days from receipt by Lessee of written notice by Lessor of such failure.

11.1.2 Intentionally omitted.

11.1.3 A failure by Lessee to observe or perform any other provision of this Lease to be observed or performed by Lessee, where such failure continues for thirty (30) days after written notice thereof by Lessor to Lessee, provided however, that if the nature of such default is such that the same cannot reasonably be cured within such thirty (30) day period, commence such cure and thereafter diligently prosecute the same to completion.

11.1.4 The making by Lessee of any general assignment for the benefit of creditors; the filing by or against Lessee of a petition to have Lessee adjudged a bankrupt or of a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Lessee, the same is dismissed within ninety (90) days); appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within sixty (60) days or the attachment, execution or other judicial seizure of Lessee's interest in this Lease, where such seizure is not discharged within sixty (60) days.

12

11.2   REMEDIES: Upon the occurrence and continuance of a Default, Lessor shall have the option to pursue any one or more of the following remedies without any further notice or demand whatsoever except as otherwise expressly provided herein:

11.2.1 Lessor, with or without terminating this Lease, may, without prejudice to any other remedy Lessor may have for possession, arrearages in Rent or damages for breach of contract or otherwise, immediately or at any time thereafter, re-enter the Premises and expel or remove therefrom Lessee and all persons and entities claiming by or through Lessee (including, without limitation, any and all sublessees and assigns) and all property belonging to or placed on the Premises by, at the direction of, or with the consent of Lessee or its assignees or sublessees, by summary proceedings, without being liable to prosecution or any claim for damages therefor; and except as limited by and subject to Paragraph 4.3 above, Lessee agrees to indemnify Lessor for all loss and damage which Lessor may suffer by reason of such termination of this Lease or of Lessee's right to possession hereunder, whether through inability to relet the Premises or through decrease in Rent or otherwise. Lessor may, at its option and with or without terminating this Lease, also declare the difference, if any, between (i) the entire amount of the Rent and Additional Rent which would become due and payable during the remainder of the Term of this Lease, discounted to present value using a discount rate equal to the Prime Rate in effect as of the date of such declaration, and (ii) the fair rental value of the Premises during the remainder of the Term of this Lease (taking into account, among other factors, the anticipated duration of the period the Premises will be unoccupied prior to reletting and the anticipated cost of reletting the Premises), also discounted to present value using a discount rate equal to the Prime Rate in effect as of the date of such declaration, to be due and payable immediately, in which event such sum shall be due and payable immediately and Lessee agrees to pay the same at once, together with all Rent, Additional Rent, and other sums theretofore due, it being understood and agreed that such payment shall be and constitute Lessor's liquidated damages, Lessor and Lessee acknowledging and agreeing that it is difficult or impossible to determine the actual damages Lessor would suffer from Lessee's breach hereof and that the agreed upon liquidated damages are not punitive or penalties and are just, fair and reasonable.

11.2.2 In lieu of its right to receive liquidated damages under Paragraph 11.2.1 above, Lessor, with or without terminating this Lease, may immediately or at any time thereafter relet the Premises or any part thereof for such time or times, at such rent or rents, and upon such other terms and conditions as Lessor in its sole discretion may deem advisable, and Lessor may make any reasonable repairs to the Premises which it may deem necessary or proper to facilitate such reletting; and Lessee shall pay all costs of such reletting including, but not limited to, the cost of any such alterations and repairs to the Premises, attorneys' fees and brokerage commissions; and if this Lease shall not have been terminated, Lessee shall continue to pay all Rent, Additional Rent, and all other charges due under this Lease up to and including the date of beginning of payment of rent by any subsequent tenant of part or all of the Premises, and thereafter Lessee shall pay monthly during the remainder of the Term of this Lease the difference, if any, between the Rent, Additional Rent, and other charges collected from any such subsequent tenant or tenants and the Rent, Additional Rent, and other charges reserved in this Lease, but Lessee shall not be entitled to receive any excess of any such rents collected over the Rent and Additional Rent reserved herein.

48981119.3

11.2.3 The remedies provided for in this Lease are in addition to any other remedies available to Lessor at law on in equity, by statute or otherwise. All remedies in this Lease are cumulative and may be exercised alternatively, successively or in any other manner. The exercise by Lessor of any one or more of the rights and remedies provided in this Lease shall not prevent the subsequent exercise by Lessor of any one or more of the other rights or remedies herein provided. Failure of Lessor to declare a Default immediately upon its occurrence, or delay in taking any action in connection with a Default, shall not constitute a waiver of the Default, but Lessor shall have the right to declare the Default at any time while such a Default remains uncured and takes such action as is lawful or authorized under this Lease.

11.3     <u>LESSOR'S RIGHT TO CURE</u>. Except as may be expressly provided in this Lease to the contrary, all agreements and provisions to be performed by Lessee under any of the terms of this Lease shall be at the sole cost and expense of Lessee and without any abatement of Rent or Additional Rent. If Lessee shall fail to pay any sums of money, other than Rent or Additional Rent, required to be paid by it hereunder, or violates any provision of this Lease and such failure or violation shall continue for thirty (30) days after written notice thereof by Lessor (except for failure to provide insurance for which notice but no waiting period is required), Lessor is hereby empowered and Lessor may, but shall not be obligated- so to do, and without waiving or releasing Lessee from any obligations of Lessee or any other right or remedy of Lessor under this Lease or otherwise, make any such payment, perform any such other act or correct any such violation on Lessee's part to be made, performed or observed as in this Lease provided. All sums so paid by Lessor and all such necessary incidental expenses shall accrue simple interest at the Default Rate from demand until payment, and Lessee shall pay to Lessor such accrued interest together with such sums and expenses.

11.4     <u>ATTORNEY'S FEES</u>: In the event any legal matter, dispute, action or proceeding exists or is commenced by or between Lessor or Lessee under this Lease, the prevailing party shall be reimbursed the reasonable attorneys' fees and court costs actually incurred with respect to such matter.

12.     ASSIGNMENT AND SUBLETTING.

12.1     <u>ASSIGNING AND SUBLETTING</u>: Except as otherwise provided herein, Lessee shall not sublet the Premises or any part thereof and Lessee shall not assign, transfer, pledge, mortgage or otherwise encumber this Lease, or any portion thereof, without the previous written consent in each instance of Lessor, which shall not be unreasonably withheld, delayed or conditioned in the case of a sublet, and Lessee shall furnish to Lessor a copy of such proposed instrument. Any assignment or subletting in violation of this Paragraph 12.1 shall be null and void. The acceptance of Rent, Additional Rent or other charges by Lessor from any other person or entity shall not be deemed to be a waiver by Lessor of any provision hereof. Permission is, however, granted Lessee to assign this Lease and also to sublet the Premises or any portion thereof, to any subsidiary of Lessee, or parent or affiliated entities of Lessee, or any purchaser of the assets or ownership interests of Lessee upon giving Lessor written notice of intent to so do. In the event of any assignment or subletting, Lessee shall remain the principal obligor to the Lessor under all covenants of this Lease, and by accepting any assignment or subletting, an assignee or sublessee shall become bound by and shall perform and shall become entitled to the benefit of all of the terms, conditions and covenants by which the Lessee hereunder is bound.

14

12.2    <u>VIOLATION</u>: No consent to any assignment, voluntarily or by operation of law, of this Lease, or any subletting of the Premises shall be deemed to be a consent to any subsequent assignment or subletting except as to the specific instance covered thereby.

13.    EXERCISE OF EMINENT DOMAIN.

13.1    <u>PREMISES TAKEN</u>: If the Premises or any portion thereof are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than twenty (20) percent of the floor area of the Building or more than twenty-five (25) percent of the Land area described on Exhibit A, is taken by condemnation, Lessee may by written notice to Lessor within thirty (30) days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within thirty (30) days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. Lessor shall notify Lessee promptly of receipt by Lessor of notice of condemnation or any threat thereof.

13.2    <u>PREMISES REMAINING</u>: If Lessee does not terminate this Lease in accordance with the foregoing, Lessor shall proceed with due diligence to restore promptly the improvements to an architectural whole substantially to their former condition to the extent feasible, and this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Rent shall be reduced in the proportion that the floor area taken bears to the total floor area of the Premises. Any award for the taking of all or any part of the Premises shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold or for the taking of the fee, or as severance damages; provided however, the Lessee shall be entitled to make a separate claim for moving expense as a result of such condemnation, for loss of Lessee's business and for loss or damage to Lessee's trade fixtures and removable personal property. Lessee shall have no claim against Lessor for the value of any unexpired Term of this Lease or otherwise.

14.    HOLDING OVER.

14.1    <u>TERMS</u>: Any holding over after the expiration of the Term of this Lease by Lessee shall be deemed to be a tenancy from month to month terminable on thirty (30) days written notice, and except for the Term thereof shall be on the same terms and conditions specified herein, except that the monthly rental shall be 125% of the Rent for the last month of the Lease, including any renewals or extensions. If Lessee remains in possession after the expiration of the Term, without Lessor's acquiescence or consent, Lessee shall become a lessee-at-sufferance subject to eviction without notice. This Paragraph 14.1 shall survive the termination of the Lease, by lapse of time or otherwise. Any holding over shall not be deemed a renewal of this Lease by operation of law or otherwise.

15.    SUBORDINATION.

15.1    <u>SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT</u>: This Lease shall be subject and subordinate to any first mortgage or deed of trust placed upon the Premises

15

by any private lender, bank, insurance company, or institutional lender of the like character (herein called an "Mortgage"), all without the necessity of having further instruments executed on the part of Lessee to effectuate such subordination; provided, however, Lessor shall give notice to Lessee promptly of any Mortgage. Notwithstanding the foregoing: (i) except as expressly provided in this Lease by reason of the occurrence and continuance of a Default, as set forth in Paragraph 11.1 of this Lease, by Lessee, Lessee's tenancy and Lessee's rights under this Lease shall not be disturbed, terminated or otherwise adversely affected, nor shall this Lease be affected, by any default under any Mortgage, and in the event of a foreclosure or other enforcement of any Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Lessee for the Term of this Lease, the rights of Lessee under this Lease shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as no Default, as set forth in Paragraph 11.1 of this Lease, by Lessee has occurred and is continuing, provided, however, that any mortgagee or purchaser at a foreclosure sale shall not be (A) liable for any act or omission of any prior Lessor, (B) liable for the consequences of any act or omission of the prior Lessor that occurred prior to the mortgagee's acquisition except to the extent ongoing in nature after such sale, (C) subject to any offsets or defenses which the Lessee might have against the prior Lessor, for acts, omissions, or defaults which occurred prior to the mortgagee's acquisition of the Premises except to the extent ongoing in nature after such sale, (D) bound by any rent or additional rent which the Lessee might have paid in advance for more than one month, (E) bound by any amendment or modification of this Lease made after the date of such mortgage without such mortgagee's prior written consent, or (F) liable for any security deposit, unless actually received by such mortgagee from the prior Lessor, and (ii) no Mortgage shall extend or cover any personal property of Lessee. While this Paragraph 15.1 is self-operative, and no further instrument of subordination shall be necessary, Lessee, Lessor and mortgagee shall, in confirmation of such subordination, upon demand by Lessee or Lessor, at any time or times, execute, acknowledge and deliver a Subordination Non-Disturbance and Attornment Agreement, in customary form, as reasonably requested by Lessee, Lessor or the mortgagee containing the terms herein.

15.2   ESTOPPEL CERTIFICATE: Lessee shall, without charge, at any time and from time to time, within ten (10) business days after request by Lessor, deliver a written instrument to any person, firm or corporation specified by Lessor that has agreed to either purchase the Premises or provide a loan secured by the Premises, duly executed and acknowledged, certifying that this Lease is unmodified and in full force and effect, or if there has been any modification, that the same is in full force and effect as so modified, and identifying any such modifications; whether or not there are then existing any set-offs or defenses in favor of Lessee against the enforcement of any of the terms, covenants and conditions of this Lease by Lessor, and if so, specifying the same, and also whether or not Lessor has observed and performed all of the terms, covenants and conditions on the part of Lessor to be observed and performed, and if not, specifying the same; the dates to which Rent hereunder has been paid; and such other matters as reasonably requested by Lessor or the mortgagee.

15.3   MORTGAGEE PROTECTION: Lessee agrees to give any mortgagees and/or trust deed holders, by certified mail, a copy of any notice of default served upon the Lessor, provided that prior to such notice Lessee has been notified, in writing (by way of Notice of Assignment of Rents and Leases, or otherwise), of the address of such mortgagees and/or trust deed holders. Lessee further agrees that if Lessor shall have failed to cure such default within the

16

time provided for in this Lease, then prior to exercising any right to terminate this Lease, the mortgagees and/or trust deed holders shall have an additional thirty (30) days within which to cure such default or if such default cannot be cured within that time, then such additional time as may be necessary if within such thirty (30) days, any mortgagee and/or trust deed holder has commenced and is diligently pursuing the remedies necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings, if necessary to affect such cure), in which event this Lease shall not be terminated while such remedies are being so diligently pursued.

15.4    <u>ATTORNMENT</u>: Lessee shall, in the event any proceedings are brought for the foreclosure of said Premises, or in the event of exercise of power of sale under any mortgage or deed of trust made by the Lessor covering the Premises, or in the event of a sale by Lessor of its fee or leasehold interest in the Premises or its interest in this Lease attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as Lessor under this Lease.

16.    <u>SIGNS</u>.

16.1    <u>RESTRICTIONS ON LESSEE</u>: Lessee may inscribe, paint, affix or place any signs or advertisements on the exterior, interior or roof the Building without the prior written consent of Lessor, subject to compliance with all governmental regulations. Any signs to be placed by Lessee shall be removed by the Lessee upon demand by the Lessor following the expiration or termination of this Lease, and any damage caused by such removal shall be repaired at the expense of Lessee. The provisions hereof shall survive termination of the Lease.

17.    MAINTENANCE AND USE OF PREMISES AND LAND.

17.1    <u>COST OF NORMAL MAINTENANCE</u>. Lessee shall be responsible for the maintenance, and as appropriate repair and replacement, of the Premises as set forth in Section 6. If Lessee commits a Default in its obligation to properly maintain, repair and replace the Premises as set forth in Section 6, and such Default is continuing, Lessor shall have the right to satisfy the obligation that is in Default. In the event of a Default where Lessor elects to assume any of Lessee's duties under Section 6, Lessee shall reimburse Lessor for any such maintenance, repair, replacement and operation expenses incurred by Lessor.

18.    GENERAL PROVISIONS.

18.1    <u>QUIET ENJOYMENT</u>: Provided no Default of this Lease by Lessee has occurred and is continuing, Lessor covenants that Lessee shall have peaceful and quiet enjoyment of the Premises without hindrance on the part of Lessor, and Lessor will warrant and defend Lessee in the peaceful and quiet enjoyment of the Premises against claims of all persons claiming through or under the Lessor.

18.2    <u>TRANSFER OF LESSOR'S INTEREST IN PREMISES</u>: In the event any sale or exchange of the Premises by Lessor and assignment by Lessor of this Lease, the Lessor shall be entirely freed and relieved of its covenants and obligations contained in, or derived from the Lease arising out of any act, occurrence or omission relating to the Premises or this Lease occurring after the consummation of such sale or exchange and assignment provided that the new owner shall assume and agree to perform all the covenants and obligations of Lessor contained

17

herein and Lessor delivers to such new owner the Security Deposit or other Lessee funds that Lessor is then holding. In the event of such sale or exchange, this Lease shall nevertheless remain unimpaired and in full force and effect and Lessee hereunder agrees to attorn to the then owner of the Premises.

18.3    <u>OBLIGATIONS OF SUCCESSORS</u>: The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate Paragraph hereof, and that all of the provisions hereof shall bind and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

18.4    <u>CAPTIONS</u>: The captions of the Sections and Paragraphs contained in this Lease are for convenience only and shall not be deemed to be relevant in resolving any questions of interpretation or construction of any Section or Paragraph of this Lease.

18.5    <u>NOTICES</u>: Whenever under this Lease provision is made for any demand, notice or declaration of any kind, or where it is deemed desirable or necessary by either party to give or serve any such notice, demand or declaration to the other party, it shall be in writing and served either personally, by overnight delivery service (such as Federal Express) for next business day delivery or sent by certified mail, postage prepaid, addressed at the addresses set forth below. Nonetheless, the time period, if any, in which a response to any notice, demand or declaration must be given shall commence to run from the date of receipt of the notice, demand or declaration by the addressee thereof. Either party may, by like notice at any time and from time to time, designate a different address to which notices shall be sent. Such notices, if mailed, shall be considered sufficiently served or given, for all purposes herein, three (3) days after the time they shall be postmarked by the United States Postal Service, and if delivered by overnight delivery service, one (1) day after the time of delivery to such service. The addresses for notices are:

<div style="margin-left: 2em;">

If to Lessor:   Price Property and Investments L.L.C.
       P.O. Box 12067
       Shawnee Mission, KS 66282-2067
       Attention: Barry D. Price

and to:     Green — Blue 1818, L.L.C.
       Attention: Scott I. Asner
       c/o Scott Asner
       420 Nichols Road
       Suite 205
       Kansas City, Missouri 64112

       and

       Kenneth G. Block
       Block Real Estate Services, LLC
       700 W. 47th Street
       Suite 200

</div>

Kansas City, MO 64112

| With a copy to: | Irwin E. Blond<br>Polsinelli PC<br>900 W. 48th Place, Suite 900<br>Kansas City, MO 64112 |
|---|---|
| With a copy to: | Block Real Estate Services, LLC<br>700 W. 47th Street, Suite 200<br>Kansas City, Missouri 64112<br>Attention: Steve Block |
| If to Lessee: | YRC Inc.<br>c/o YRC Worldwide Inc.<br>10990 Roe Avenue<br>Overland Park, Kansas 66211<br>Attention: Real Estate and Properties |
| With a copy to: | YRC Worldwide Inc.<br>10990 Roe Avenue<br>Overland Park, Kansas 66211<br>Attention: Legal Department |

18.6   **APPLICABLE LAW:** This Lease shall be governed and interpreted solely by the laws of the State of Kansas then in force. Each gender shall be deemed to include all genders.

18.7   **TIME AND JOINT AND SEVERAL LIABILITY:** Time is of the essence of this Lease and each and every provision hereof. All the terms, covenants and conditions contained in this Lease to be performed by either party, if such party shall consist of more than one person or organization, shall be deemed to be joint and several, and all rights and remedies of the parties shall be cumulative and non-exclusive of any other remedy.

19.   ENTIRE AGREEMENT.

19.1   It is agreed between the Lessor and Lessee that there are no oral agreements or representations between the parties hereto affecting this Lease and this Lease supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements, representations and understanding, if any, between the parties hereto or between the parties hereto and any real estate broker who may represent either or both of said parties and none thereof shall be used to interpret or construe this Lease. There are no other representations and this Lease is based solely upon the representations and agreements contained in this Lease.

20.   DISCLOSURE:

LESSEE ACKNOWLEDGES THAT LESSEE HAS BEEN INFORMED THAT PERSON(S) ASSOCIATED WITH BLOCK & COMPANY, INC., REALTORS MAY HAVE OR MAY ACQUIRE AN OWNERSHIP INTEREST IN THE LESSOR, AND LESSEE

19

ACKNOWLEDGES THAT SUCH OWNERSHIP INTEREST SHALL NOT AFFECT THE TERMS, CONDITIONS OR VALIDITY OF THIS LEASE.

21.    HAZARDOUS MATERIALS.

LESSEE COVENANTS AND WARRANTS TO LESSOR THAT LESSEE SHALL NOT INSTALL, STORE, TREAT, TRANSPORT, OR DISPOSE OF, OR PERMIT THE INSTALLATION, STORAGE, USE TREATMENT, TRANSPORTATION OR DISPOSAL OF, ANY "HAZARDOUS MATERIALS" ON, UPON OR BENEATH THE PREMISES EXCEPT FOR THE EXISTING UNDERGROUND STORAGE TANK ASSOCIATED WITH THE EMERGENCY GENERATOR AND EXCEPT FOR PAINTS, SOLVENTS AND CLEANING SOLUTIONS KEPT IN SMALL QUANTITIES AT THE PREMISES. IN THE EVENT OF ANY SUCH INSTALLATION, STORAGE, USE, TREATMENT, TRANSPORTATION OR DISPOSAL, LESSEE SHALL REMOVE ANY SUCH. HAZARDOUS MATERIAL, OR OTHERWISE COMPLY WITH ALL REGULATIONS OR ORDERS OF ANY FEDERAL, STATE, COUNTY, REGIONAL, LOCAL OR OTHER GOVERNMENTAL AGENCY OR AUTHORITY ("GOVERNMENTAL AUTHORITY"), ALL AT THE EXPENSE OF LESSEE. NOTWITHSTANDING THE FOREGOING, LESSEE SHALL NOT BE PROHIBITED FROM USING, STORING, OR DISPOSING OF ANY HAZARDOUS MATERIAL THAT IS NOT PROHIBITED BY ANY GOVERNMENTAL AUTHORITY AND WHICH IS USED, STORED OR DISPOSED OF BY LESSEE IN THE NORMAL COURSE OF LESSEE'S BUSINESS AND IN QUANTITIES WHICH ARE NOT IN EXCESS OF QUANTITIES USED, STORED OR DISPOSED OF BY PRUDENT INDIVIDUALS, FIRMS OR ENTITIES, CONDUCTING BUSINESSES OF THE SAME NATURE AND PURPOSE AS THE LESSEE'S BUSINESS AND WHICH USE, STORAGE AND DISPOSAL OF ANY HAZARDOUS MATERIAL, INCLUDING THE QUANTITIES THEREOF, ARE IN COMPLIANCE WITH ANY AND ALL LAWS, ORDINANCES, RULES, REGULATIONS OR ORDERS OF ANY GOVERNMENTAL AUTHORITY. "HAZARDOUS MATERIALS" AS USED HEREIN SHALL MEAN (A) ASBESTOS IN ANY FORM; (B) UREA FORMALDEHYDE FOAM INSULATION; (C) TRANSFORMERS OR OTHER EQUIPMENT WHICH CONTAIN DYE ELECTRIC FLUID CONTAINING A LEVEL OF POLY-CHLORINATED BIPHENYL IN EXCESS OF 50 PARTS PER MILLION; (D) UNDERGROUND STORAGE TANKS; OR (E) ANY OTHER CHEMICAL, MATERIAL, OR SUBSTANCE WHICH IS REGULATED AS TOXIC OR HAZARDOUS OR EXPOSURE TO WHICH IS PROHIBITED, LIMITED OR REGULATED BY ANY GOVERNMENTAL AUTHORITY.

Lessee shall promptly notify Lessor in writing of any order or pending or threatened action by any regulator, agent or other Governmental Authority, or any claims made by any third party, relating to any Hazardous Materials on, or emanations from, the Premises, and shall promptly furnish Lessor with copies of any correspondence or legal pleadings in connection therewith.

LESSEE HEREBY RELEASES AND AGREES TO INDEMNIFY AND HOLD HARMLESS LESSOR AND LESSOR'S OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, ATTORNEYS AND AGENTS (COLLECTIVELY THE "INDEMNITEES") FROM AND AGAINST ALL LOSS, DAMAGE AND EXPENSE (INCLUDING, WITHOUT

48981119.3

LIMITATION, ATTORNEYS' FEES AND COSTS TO THE EXTENT PERMITTED BY APPLICABLE LAW INCURRED IN THE INVESTIGATION, DEFENSE AND SETTLEMENT OF CLAIMS) THAT INDEMNITEES MAY INCUR AS A RESULT OF OR IN CONNECTION WITH THE ASSERTION AGAINST INDEMNITEES OF ANY CLAIM RELATING IN WHOLE OR IN PART, TO ANY ACTIVITY OF LESSEE, ITS AGENTS, REPRESENTATIVES OR CONTRACTORS, ON OR OFF THE PREMISES OR ANY FAILURE TO ACT, IF SUCH ACTIVITY OR FAILURE TO ACT INVOLVES HAZARDOUS MATERIALS, IN WHOLE OR IN PART, USED, STORED, INSTALLED, TREATED, TRANSPORTED OR DISPOSED OF ON, UPON OR BENEATH THE PREMISES DURING THE TERM OF THE LEASE, OR NONCOMPLIANCE WITH ANY FEDERAL, STATE, OR LOCAL LAWS, ORDINANCES, RULES, REGULATIONS OR ORDERS RELATING THERETO.

22.   RIGHT OF FIRST REFUSAL.

22.1   In the event that Lessor, at any time during the Term of this Lease, desires to offer to transfer, assign or otherwise convey (collectively, "Sell"; any such act, a "Sale") to a third party all or any portion of its interest in the Premises which Lessor intends to accept (the Premises, or the portion thereof which is the subject of the bona fide written offer from such third party, being referred to hereinafter as the "Selected Interest"), then Lessor, prior to accepting such offer, shall deliver to Lessee notice of such intention (the "Landlord Notice"), accompanied by a true and correct copy of the bona fide written offer from such third party, together with evidence satisfactory to Lessee that Lessor intends to accept such offer and identifying the date of closing of the transaction (collectively, the "Stated Terms"). For a period of thirty (30) days after its receipt of the Landlord Notice, accompanied by the Stated Terms (the "Exercise Period"), Lessee shall have the right, by notice (the "Exercise Notice") delivered to Lessor within the Exercise Period, to purchase the Selected Interest subject to the Stated Terms. Lessee shall have the right at any time during the Term of the Lease, to make soil, environmental and other tests on the Premises, repairing all damage caused by such tests.

22.2   In the event that Lessee delivers the Exercise Notice to Lessor within the Exercise Period, Lessor shall sell the Selected Interest subject to such Exercise Notice to Lessee on the terms and conditions set forth in the Stated Terms. In such event, and to the extent the Stated Terms do not provide otherwise, (1) the purchase price of the Selected Interest (the "Purchase Price"), shall be the purchase price set forth in the Stated Terms; (2) the closing of the transaction (the "Closing") shall occur on the date set forth in the Stated Terms, provided that in the event that such date shall occur after the expiration of the Term of this Lease, the Term of this Lease automatically shall be extended upon the same terms and conditions until the Closing shall occur (or until such other date as the parties may agree); (3) at the Closing, as a condition to the Closing, (a) Lessor shall convey fee simple title to the Selected Interest to Lessee by general warranty deed in form satisfactory to Lessee, or shall assign its leasehold interest to Lessee by assignment in form satisfactory to Lessee, as appropriate, free and clear of all exceptions to title other than those exceptions which in Lessee's reasonable opinion will not impair the marketability of the Selected Interest or the ability of Lessee to use the same for its business purpose (the "Permitted Exceptions"); (b) Lessor shall deliver to Lessee an ALTA Form B October 1970 owners or leasehold owners (as applicable) title insurance policy in the amount of the Purchase Price, without those standard exceptions which can be omitted by survey or

21

Lessor's affidavit or indemnity, and subject otherwise only to the Permitted Exceptions, insuring such title or interest to be vested in Lessee; (c) the Selected Interest shall be in such condition as warranted by Lessor in this Lease with respect to the Premises; and (d) all permits, licenses and other approvals which may be required by any federal, state or local governmental authority with competent jurisdiction with respect to (i) the Selected Interest or (ii) the transaction contemplated hereunder shall have been obtained to the satisfaction of Lessee, in its sole judgment; (4) real estate taxes and assessments attributable to the Selected Interest shall be prorated, if applicable, between the parties based on the most recently available tax duplicate; (5) Lessor and Lessee each shall pay fifty percent (50%) of any escrow fees; and (6) all closing costs (including, without limitation, the cost of the title policy and costs of deed or leasehold transfer, but expressly excluding attorney fees) shall be apportioned between the parties in accordance with the local customs of the county and state in which the Premises shall be located. The provisions of this Section and the indemnities set forth in Paragraph 4.5 of this Lease shall survive the Closing.

22.3   In the event that Lessee affirmatively elects not to exercise its right described in Section 22 with respect to the Selected Interest or fails to deliver to Lessor any Exercise Notice within the applicable Exercise Period with respect to the Selected Interest, this Lease shall continue in full force and effect, and Lessor shall have the right to Sell the Selected Interest on terms and conditions not less favorable to Lessor than the Stated Terms. If the terms and conditions on which Lessor is willing to Sell the Selected Interest become less favorable to Lessor than the Stated Terms (and Lessor and Lessee specifically acknowledge and agree, without limiting the generality of the foregoing, that any revision which would decrease the monetary obligations of the prospective purchaser of the Selected Interest or increase the monetary obligations of Lessor would render such terms and conditions less favorable to Lessor for the purposes hereof), then Lessor promptly shall deliver to Lessee notice of such revised terms and conditions, and Lessee may deliver to Lessor, within ten (10) days after Lessor's delivery of such notice to Lessee, an Exercise Notice, evidencing Lessee's election to purchase the Selected Interest, and Lessee and Lessor shall close such transaction pursuant to this Section on such revised terms and conditions. If Lessor shall not close such transaction within one hundred eighty (180) days after the earlier to occur of: (1) Lessee's delivery to Lessor of Lessee's affirmative election not to exercise its right of first refusal or (2) the later to occur of the expiration of the applicable Exercise Period or the above-mentioned ten (10) day period, then Lessee's right of first refusal shall be reinstated and shall continue to apply, and Lessor shall not Sell all or any portion of its interest in the Premises without complying again with the provisions of this Section. If Lessor shall close such transaction within the aforementioned one hundred eighty (180) day period, no such successor Lessor shall Sell all or any portion of its interest in the Premises during the period from the Commencement Date through the fourth anniversary of the Commencement Date, without complying again with the provisions of this Paragraph. Lessor and Lessee acknowledge and agree that a change of ownership of the membership (or other ownership) interests in Lessor or any successor Lessor shall not constitute a Sale.

23.   MEMORANDUM OF LEASE.

23.1   Lessor or Lessee shall have the right at any time to record a memorandum of lease, which may include a reference to the right of first refusal, with the county recorder in and for the county in which the Premises is located, in which case the other party shall promptly

48981119.3

execute and deliver such memorandum to the requesting party. Such memorandum of lease shall not include any financial terms of this Lease. Lessee shall be responsible for the costs of recording such memorandum of lease and at Lease termination shall promptly file a release of such memorandum of lease at Lessee's cost.

24.     WAIVER OF LANDLORD LIENS; LEASEHOLD MORTGAGE.

      24.1     Lessor hereby waives any and all liens, whether statutory, constitutional, or contractual, to which Lessor may otherwise be entitled on any furniture, fixtures, equipment or other property of Lessee located in the Building or on the Premises. In addition, Lessor hereby acknowledges that, so long as lessee is not then in Default under this Lease, Lessee shall have the right to encumber its leasehold interest under this Lease without Lessor's consent, but with reasonable prior notice to Lessor. Lessor agrees to reasonably cooperate with Lessee and any leasehold mortgagee in the execution of any additional documents that may be reasonably required by such mortgagee in connection with such encumbrance, provided that Lessor shall not be required to incur any material costs in connection with such cooperation. Any such leasehold mortgage (a "leasehold mortgage") shall be subject and subordinate to the rights of Lessor under this Lease and any mortgage or other encumbrance now or hereafter encumbering the Premises or Lessor's interest in the Premises. No such leasehold mortgage shall encumber Lessor's fee title. The form of any lessor consent and recognition agreement relating to the leasehold mortgage requested by a holder of the leasehold mortgage (a "leasehold mortgagee") shall be subject to Lessor's prior written approval, which shall not be unreasonably withheld. No leasehold mortgagee shall have the rights or benefits mentioned in this Paragraph, nor shall the provisions of this Paragraph be binding upon Lessor, unless and until the name and address of the leasehold mortgagee shall have been delivered to Lessor in accordance with this Lease, notwithstanding any other form of notice, actual or constructive. Lessee shall not grant more than one leasehold mortgage at one time. Within ten (10) days after the satisfaction of the leasehold mortgage, lessee shall notify Lessor of such satisfaction and Lessee shall cause a release of such leasehold mortgage to be recorded in the appropriate recorder's office. Lessee shall deliver a copy of any such release to Lessor promptly after recording. If required by Lessee's leasehold mortgagee, Lessee shall obtain a mortgagee policy of title insurance insuring the lien of such leasehold mortgage.

25.     LESSOR DEVELOPMENT RIGHTS. Intentionally Deleted.

26.     CREDIT AGAINST RENT FOR INCOME LEASES. Lessee shall be entitled to a credit against Rent otherwise payable hereunder in an amount equal to rent payments received from tenants under the assigned Leases. Lessee shall also have the exclusive right to enter into new leases (e.g. antennae leases) with respect to the existing Building and similarly be entitled to a credit against Rent for the rent payment received under such leases, which leases shall also be assigned to Lessor. Lessee shall receive credit for any such tenant payments the month following receipt by Lessor. Lessor shall have the exclusive right to construct new buildings and structures in accordance with Paragraph 25 above and rents received from any such new buildings or structures constructed will accrue to Lessor without crediting any such amounts to Lessee.

27.     ACKNOWLEDGMENT OF INTENT OF LESSOR AND LESSEE. Lessor and Lessee acknowledge and represent the following circumstances relating to the entry into this Lease: (i) it

48981119.3

was and is the intent of both Lessor and Lessee that the Lease shall be a "true" lease of the Premises, with Lessor, as landlord, and Lessee, as tenant, for the term of the Lease and not as a financing arrangement in any manner whatsoever; (ii) the Lease is not an attempt by Lessor or Lessee to evade operation of any aspect of any applicable law; (iii) in connection with the entry into the Lease, Lessor and Lessee determine that the Lease is fair and that entry into the Lease is in the best interest of both Lessor and Lessee, respectively; (iv) the Lessor and Lessee hereby acknowledge and state that the Lease shall not be construed in any manner to create any relationship other than that of a Landlord/Tenant; (v) the terms of the Lease, including the Rent and other obligations of the Lessee, when taken as a whole, are generally consistent with the industry norms for property similar to the Premises; (vi) the Rent and all other financial obligations of the Lessee under the Lease with respect to the Premises is within a reasonable range of current market rents for similar properties; (vii) the increase in Rent provided under the Lease is within a reasonable range of market parameters; (viii) the structure of the Lease, which is net, is a common lease structure for properties such as the Premises; (ix) Lessee does not have an option to acquire Lessor's interest in the Premises at the expiration of the term or at any other point for a nominal sum; (x) the remedies contained in the Lease available to Lessor upon Lessee's default are traditional landlord remedies for a Lease Agreement rather than a financing arrangement; (xi) there is no provision for (or intention of) prepaid rents under the Lease; and (xii) the Purchase Price paid to Lessee by Lessor for the Premises was not calculated as the amount necessary to finance the transaction, but was paid by Lessor based upon fair market value of the Premises.

[SIGNATURES FOLLOW]

THE PARTIES HERETO affix their Signatures effective as of _November 1_, 2014

PLEASE READ. THIS LEASE CAREFULLY. BLOCK REAL ESTATE SERVICES, LLC, ITS AGENTS OR EMPLOYEES, ARE NOT AUTHORIZED TO GIVE LEGAL, TAX, OR ACCOUNTING ADVICE. IF . YOU DESIRE SUCH ADVICE, CONSULT YOUR ATTORNEY AND/OR ACCOUNTANT BEFORE SIGNING.

**LESSOR:**

**PRICE PROPERTY AND INVESTMENTS L.L.C., as tenant in common**

By: _____
Name: _Scott Asner_
Title: _Manager_

**GREEN – BLUE 1818, L.L.C., as tenant in common**

By: _____
Name: _Kevin G. Brick_
Title: _Manager_

**LESSEE:**

YRC INC.

By: _____
Name: _____
Title: _____

(If Lessor or Lessee shall be a Corporation, the authorized officers must sign on behalf of the Corporation. The Lease must be executed by the President or a Vice President and the Secretary or Assistant Secretary unless the Bylaws or a Resolution of the Board of Directors shall otherwise provide, in which event the Bylaws or a certified copy of the Resolution as the case may be, must be furnished.)

THE PARTIES HERETO affix their Signatures effective as of _November 1st_, 2014

PLEASE READ. THIS LEASE CAREFULLY. BLOCK REAL ESTATE SERVICES, LLC, ITS AGENTS OR EMPLOYEES, ARE NOT AUTHORIZED TO GIVE LEGAL, TAX, OR ACCOUNTING ADVICE. IF . YOU DESIRE SUCH ADVICE, CONSULT YOUR ATTORNEY AND/OR ACCOUNTANT BEFORE SIGNING.

**LESSOR:**

**PRICE PROPERTY AND INVESTMENTS L.L.C., as tenant in common**

By:_____
Name:_____
Title:_____

**GREEN – BLUE 1818, L.L.C., as tenant in common**

By:_____
Name:_____
Title:_____

**LESSEE:**

YRC INC.

By:_____
Name:_____
Title:_____

(If Lessor or Lessee shall be a Corporation, the authorized officers must sign on behalf of the Corporation. The Lease must be executed by the President or a Vice President and the Secretary or Assistant Secretary unless the Bylaws or a Resolution of the Board of Directors shall otherwise provide, in which event the Bylaws or a certified copy of the Resolution as the case may be, must be furnished.)

48981119.3

## EXHIBIT A

TO THAT CERTAIN LEASE
BY AND BETWEEN
PRICE PROPERTY AND INVESTMENTS L.L.C. AND GREEN — BLUE 1818, L.L.C.,
AS TENANTS IN COMMON,
COLLECTIVELY, LESSOR AND
YRC INC., LESSEE
FOR THE PROPERTY LOCATED AT
5200 W. 110th STREET, OVERLAND PARK, KANSAS

## LEGAL DESCRIPTION

Parcel 4:
All that part of the Southwest Quarter of Section 9, Township 13, Range 25, now in the City of Overland Park, Johnson County, Kansas, more particularly described as follows: Commencing at the Southeast corner of the Southwest Quarter of said Section 9; thence North 2 degrees 06 minutes 26 seconds West along the East line of the Southwest Quarter of said Section 9, a distance of 850.23 feet; thence South 87 degrees 53 minutes 34 seconds West, along a line perpendicular to the East line of the Southwest Quarter of said Section 9, a distance of 1422.35 feet, to the point of beginning of subject tract, said point being on the Northwesterly right-of-way line of 110th Street, as now established; thence South 42 degrees 43 minutes 14 seconds West, along the Northwesterly right-of-way line of said 110th Street, a distance of 50 feet; thence North 47 degrees 16 minutes 46 seconds West, a distance of 35 feet; thence North 21 degrees 01 minutes 06 seconds East, a distance of 51.12 feet; thence North 2 degrees 06 minutes 26 seconds West, a distance of 222.49 feet; thence South 87 degrees 53 minutes 34 seconds West, a distance of 225 feet; thence North 2 degrees 06 minutes 26 seconds West, a distance of 377.72 feet, to a point on the Southerly right-of-way line of Interstate Highway No. 435, as now located; thence North 80 degrees 27 minutes 46 seconds East, along the Southerly right-of-way line of said Interstate Highway No. 435, a distance of 267.24 feet; thence South 2 degrees 06 minutes 26 seconds East, along a line 1422.35 feet West of the East line of the Southwest Quarter of said Section 9, a distance of 670.99 feet, to the point of beginning.

Parcel 5:
All that part of the Southwest Quarter of Section 9, Township 13, Range 25, now in the City of Overland Park, Johnson County, Kansas, more particularly described as follows: Commencing at the Southeast corner of the Southwest Quarter of said Section 9; thence North 2 degrees 06 minutes 26 seconds West, along the East line of the Southwest Quarter of said Section 9, a distance of 1108.94 feet; thence South 87 degrees 53 minutes 34 seconds West, along a line perpendicular to the East line of the Southwest Quarter of said Section 9, a distance of 1687.35 feet, to the true point of beginning of subject tract; thence North 2 degrees 06 minutes 26 seconds West, a distance of 377.72 feet, to a point on the Southerly right-of-way line of Interstate Highway No. 435 as now located; thence South 80 degrees 27 minutes 46 seconds West, along the Southerly right-of-way line of said Interstate Highway No. 435, a distance of 70.59 feet; thence South 2 degrees 06 minutes 26 seconds East a distance of 368.59 feet; thence

48981119.3

North 87 degrees 53 minutes 34 seconds East, a distance of 70 feet, to the true point of beginning of subject tract.

Except:

A tract of land in the Southwest Quarter of Section 9, Township 13 South, Range 25 East, in the City of Overland Park, Johnson County, Kansas, described as follows: Commencing at the Southeast corner of said Southwest Quarter, the East line of said Quarter Section having an assumed bearing of North 02 degrees 06 minutes 13 seconds West; thence North 02 degrees 06 minutes 13 seconds West, 1488.10 feet along the East line of said Quarter Section; thence South 87 degrees 53 minutes 47 seconds West, 1671.59 feet to the Southerly right of way line of Interstate 435 highway and the Point of Beginning; thence South 73 degrees 39 minutes 38 seconds West, 64.48 feet; thence South 50 degrees 07 minutes 12 seconds West, 29.47 feet to a point 896.86 feet East of the West line and 1462.39 feet North of the South line of said Quarter Section; thence North 02 degrees 07 minutes 28 seconds West, 22.69 feet to the Southerly right of way line of Interstate 435 highway; thence North 80 degrees 26 minutes 44 seconds East, 86.53 feet along said right of way line to the Point of Beginning.

A-2

## **EXHIBIT B**

Intentionally Deleted.

48981119.3

## EXHIBIT C

TO THAT CERTAIN LEASE
BY AND BETWEEN
PRICE PROPERTY AND INVESTMENTS L.L.C. AND GREEN — BLUE 1818, L.L.C.,
AS TENANTS IN COMMON
COLLECTIVELY, LESSOR AND
YRC INC., LESSEE
FOR THE PROPERTY LOCATED AT
5200 W. 110th STREET, OVERLAND PARK, KANSAS

### PERSONAL PROPERTY

All personal property used at or in connection with the Building. Such personal property shall include, without limitation trade fixtures, furniture, cubicles, phone system, art, wall hangings, plants, IT equipment (servers, etc.), printers, copiers, mail and distribution services equipment, forklifts, vehicles, cafeteria equipment, fitness facility equipment, etc.

C-1

48788093.2
48981119.3

## EXHIBIT D

TO THAT CERTAIN LEASE BY AND BETWEEN
PRICE PROPERTY AND INVESTMENTS. L.L.C. AND GREEN — BLUE 1818, AS
TENANTS IN COMMON, COLLECTIVELY, LESSOR AND
YRC INC., LESSEE
FOR THE PROPERTY LOCATED AT 5200 W. 110th STREET, OVERLAND PARK,
KANSAS

### CONDITION OF PREMISES

The condition of the Premises on March 31, 2009 was substantially as reported in the Property Condition Assessment dated March 24, 2009 prepared by Terracon, as the information in the Property Condition Assessment may be modified or amended by mutual agreement. of Seller and Buyer (the Property Condition Assessment and any such modifications or amendments are collectively referred to as "PCA"). Seller and Buyer agree that Seller's repair obligation in Section 6 of this Net Lease shall not be defined by or interpreted in accordance with any repair or replacement schedules contained in the PCA or any repair or replacement cost estimates contained in the PCA.

D-1

## EXHIBIT E

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT is made by the undersigned individuals whose address for notice hereunder is 420 Nichols Road, Suite 205 Kansas City, Missouri 64112 and 700 W. 47th Street, Suite 200, Kansas City, Missouri 64112(jointly and severally, the "**Guarantor**"), in favor of YRC INC., a Delaware corporation ("**Lessee**"), whose address for notice hereunder is 10990 Roe Avenue, Overland Park, Kansas 66211, Attn: Real Estate and Properties.

W I T N E S S E T H:

WHEREAS, Lessee proposes to enter, or has entered, into that certain Net Lease ("Lease") with Price Property and Investments L.L.C. and Green-Blue 1818, L.L.C., (collectively, "**Lessor**"). Pursuant to the Lease, Lessee has deposited with Lessor cash in the amount of the Security Deposit;

WHEREAS, Lessee has made it a condition precedent to Lessee's entering into the Lease and depositing with Lessor the Security Deposit;

NOW, THEREFORE, (i) to induce Lessee to deposit with Lessor cash in the amount of the Security Deposit, (ii) at the special insistence and request of Lessee, and (iii) for the consideration recited above and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor jointly and severally agrees as follows:

## ARTICLE 1

### The Indebtedness

Section 1.1    The Indebtedness.    As used in this Guaranty Agreement, the "**Indebtedness**" means all of the Security Deposit being held by Lessor pursuant to the Lease, as and when all or a portion of the Security Deposit and other funds are due and payable to Lessee pursuant to the terms of the Lease. Without limiting the generality of the foregoing, the Indebtedness guaranteed under this Guaranty Agreement includes all post-petition interest, expenses and other liabilities of Lessor that would be owed by Lessor to Lessee but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, or similar proceeding involving Lessor.

Section 1.2    Defined Terms. All terms not otherwise defined in this Guaranty Agreement shall have the meanings ascribed to such terms in the Lease.

## ARTICLE 2

### The Guaranty

Section 2.1    Indebtedness Guaranteed. Guarantor unconditionally and irrevocably guarantees the prompt payment when due, whether at the conclusion of the Term or otherwise,

E-1

of all of the Indebtedness. If Guarantor fails to make any payment of any part of the Indebtedness when due, then said failure will constitute a default under this Guaranty Agreement.

Section 2.2    Nature of Guaranty. This is an irrevocable, absolute, completed, and continuing guaranty of payment and not a guaranty of collection, and will not be affected by the release or discharge of Lessor from, or impairment or modification of, Lessor's obligations with respect to any of the Indebtedness in any bankruptcy, receivership, or other insolvency proceeding or otherwise. No notice of modification of the Lease need be given to Guarantor. The fact that the Indebtedness may be rearranged, increased, reduced, and/or modified from time to time, or paid in full without notice to Guarantor will not release, discharge, or reduce the obligation of Guarantor with respect to the Indebtedness, and Guarantor will remain fully bound under this Guaranty Agreement. It is the intention of Lessee and Guarantor that Guarantor's obligations under this Guaranty Agreement will not be discharged at any time prior to the occurrence of both (i) payment in full of the Indebtedness and (ii) expiration of Lessee's obligation to deposit with Lessor the Security Deposit. This Guaranty Agreement may be enforced by Lessee and any subsequent holder of the Indebtedness, and will not be discharged by the assignment or negotiation of all or part of the Indebtedness. This Guaranty Agreement may not be revoked by Guarantor and will continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Indebtedness is rescinded or must otherwise be returned or refunded by Lessee to the payor thereof or to any other person, as a preferential transfer, voidable transfer or otherwise upon any insolvency, bankruptcy, reorganization, receivership, or other debtor relief proceeding involving Lessor or any other payor of such amounts, or after any attempted revocation by Guarantor, all as though such payment had not been made. Guarantor expressly waives presentment, demand, notice of non-payment, protest, notice of protest and dishonor, and any other notice whatsoever on any and all forms of such Indebtedness, and also notice of acceptance of this Guaranty Agreement, acceptance on the part of Lessee being conclusively presumed by its request for this Guaranty Agreement and delivery of the same to Lessee. Guarantor shall be jointly and severally liable with any and all other guarantors of the Indebtedness for the payment to Lessee of the Indebtedness.

Section 2.3    Guarantor's Waivers. Guarantor waives any right to require Lessee to (and it is not necessary for Lessee, in order to enforce such payment by Guarantor to first): (a) proceed against Lessor or any other person liable on the Indebtedness, (b) proceed against or exhaust any security given to secure the Indebtedness, (c) have Lessor joined with Guarantor in any suit arising out of this Guaranty Agreement and/or any of the Indebtedness, (d) enforce Lessee's rights against any other guarantor of the Indebtedness, or (e) pursue or exhaust any other remedy in Lessee's power whatsoever. Lessee is not required to mitigate damages or take any action to reduce, collect or enforce the Indebtedness. Guarantor waives any defense or right arising by reason of any disability, lack of corporate authority or power, lack of good faith under §1.203 of the Uniform Commercial Code or otherwise, or other defense of Lessor or any other guarantor of any of the Indebtedness, and will remain liable on this Guaranty Agreement regardless of whether Lessor or any other guarantor is not liable thereon for any reason.

Section 2.4    Waiver of Subrogation. Guarantor has no right of subrogation until such time as all of the Indebtedness has been paid in full; provided however, that if Guarantor is or becomes an "insider" (as defined from time to time in Section 101 of the U. S. Bankruptcy

E-2

Code) with respect to Lessor, then Guarantor irrevocably and absolutely waives any and all rights of subrogation, contribution, indemnification, reimbursement or similar rights against Lessor with respect to the Indebtedness and this Guaranty Agreement, whether such rights arise under an express or implied contract or by operation of law, it being the intention of Guarantor and Lessee that Guarantor will not be deemed to be a "creditor" (as defined in Section 101 of the U.S. Bankruptcy Code) of Lessor by reason of the existence of this Guaranty Agreement in the event that Lessor becomes a debtor in any proceeding under the U.S. Bankruptcy Code.

Section 2.5    Lessee's Expenses. If Guarantor fails to pay the Indebtedness after notice from Lessee of Lessor's failure to pay any Indebtedness when due, and if Lessee obtains the services of any attorney for collection of amounts owing by Guarantor under this Guaranty Agreement, or if suit is filed to enforce this Guaranty Agreement, or if proceedings are had in any bankruptcy, probate, receivership, or other judicial proceedings for the establishment or collection of any amount owing by Guarantor under this Guaranty Agreement, or if any amount owing by Guarantor under this Guaranty Agreement is collected through such proceedings, then Guarantor must pay to Lessee all court costs and Lessee's reasonable attorneys' fees, together with the amount of any and all expenses, including fees and disbursements of Lessee's attorneys and of any experts or agents retained by Lessee or Lessee's attorneys, which Lessee may incur as a result of Guarantor's failure to pay. Guarantor will also pay any post-judgment interest owing on such amounts as provide by Kansas law.

Section 2.6    Primary Liability. The liability of Guarantor for payment of the Indebtedness is primary and not secondary.

Section 2.7    Events and Circumstances Not Reducing or Discharging Guarantor's Obligations. Guarantor consents and agrees to each of the following, and agrees that Guarantor's obligations under this Guaranty Agreement will not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any rights (including without limitation rights to notice) that Guarantor might otherwise have as a result of or in connection with any of the following:

      a)    Modifications, etc. Any renewal, extension, modification, alteration, acceleration, rearrangement or amendment of or change with respect to all or any part of the Indebtedness, the Lease, or any contract or understanding between Lessor or any other parties and Lessee pertaining to the Indebtedness, including without limitation any sale of all or any part of the Premises, Lessor's interest in the Lease, or any ownership interests in Lessor;

      b)    Adjustment, etc. Any adjustment, waiver, indulgence, forbearance, release, settlement, or compromise that might or might not be granted or given by Lessee to Lessor, Guarantor or any other party;

      c)    Condition of Lessor or Guarantor.    The insolvency, bankruptcy, receivership, arrangement, adjustment, composition, liquidation, disability, dissolution, any other proceeding under any law for protection of debtors, or lack of power of Lessor, Guarantor or any other party at any time liable for payment of all or part of the Indebtedness; any discharge, impairment, modification, release, limitation of liability of,

E-3

or stay of enforcement proceedings against Lessor, Guarantor or any other party or against any properties or the estate of Lessor, Guarantor or any other party in the course of or resulting from any such proceedings; the failure by Lessee to file or enforce a claim in any proceeding described in this subparagraph or to take any other action in any proceeding to which Lessor, Guarantor, or any other person is a party; or any sale, lease or transfer of any or all of the assets of Lessor, Guarantor or any other party, or any changes in the shareholders, members, or other interest owners of Lessor, Guarantor or any other party; or any change of name, identity, structure, reorganization or any change in the business or operations of Lessor, Guarantor or any other party; or

      d)     <u>Preference</u>. Any payment by Lessor to Lessee is held to constitute a preferential or voidable transfer under bankruptcy laws, or for any reason Lessee is required to return or refund such payment or pay such amount to Lessor or any other party;

it being the unambiguous and unequivocal intention of Guarantor that Guarantor is obligated to pay the Indebtedness when due, notwithstanding any occurrence, circumstance, action or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described in this Guaranty Agreement, except for the full and final payment and satisfaction of the Indebtedness.

## ARTICLE 3

### Representations and Warranties

      Section 3.1        <u>By Guarantor</u>. In order to induce Lessee to deposit with Lessor cash in the amount of the Security Deposit, Guarantor represents and warrants to Lessee that:

      a)     <u>Benefit to Guarantor</u>. Guarantor's guaranty pursuant to this Guaranty Agreement reasonably has benefitted or may be expected to benefit, directly or indirectly, Guarantor.

      b)     <u>Familiarity and Reliance</u>. Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of Lessor; however, Guarantor is not relying on such financial condition as an inducement to enter into this Guaranty Agreement.

      c)     <u>No Representation</u>. Neither Lessee nor any other person, corporation, or entity has made any representation, warranty, or statement to Guarantor with regard to Lessor or its financial condition in order to induce Guarantor to execute this Guaranty Agreement.

## ARTICLE 4

### Miscellaneous

<div align="center">E-4</div>

Section 4.1 <u>Successors and Assigns</u>. This Guaranty Agreement is for and inures to the benefit of the successors and assigns of Lessee, and is binding upon the legal representatives, successors, and assigns of Guarantor.

Section 4.2 <u>Notice</u>. All notices provided for or permitted to be given pursuant to this Guaranty Agreement must be in writing and may be given or served by depositing the same in the United States Mail, addressed to the person to be notified, postage prepaid, and registered or certified with return receipt requested, or by Federal Express or other overnight delivery, or by facsimile machine, or by delivering such notice by courier or by hand to such person. Except as otherwise expressly provided in this Guaranty Agreement, notices are effective upon the earlier to occur of (i) receipt by the party to be notified and (ii) three days after deposit in the mail in accordance with this Section. For purposes of this Guaranty Agreement, the parties' addresses for notice are the addresses set forth on the first page of this Guaranty Agreement or any other mailing address in the continental United States of which one party notifies the other in writing.

Section 4.3 <u>Construction</u>. This Guaranty Agreement is a contract made under and is to be construed in accordance with and governed by the laws of the State of Texas.

**THIS GUARANTY AGREEMENT AND THE LEASE REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

THE PARTIES HERETO affix their signatures effective as of October __, 2014.

PLEASE READ THIS LEASE CAREFULLY. BLOCK REAL ESTATE SERVICES, LLC, ITS AGENTS OR EMPLOYEES, ARE NOT AUTHORIZED TO GIVE LEGAL, TAX, OR ACCOUNTING ADVICE. IF YOU DESIRE SUCH ADVISE, CONSULT YOUR ATTORNEY AND/OR ACCOUNTANT BEFORE SIGNING.

_____
Scott Anser


_____
Kenneth G. Block


_____
Michael Gortenburg


_____
Stephen J. Block

E-5

ASSURED QUALITY TITLE CO.

```
JO CO KS        BK:201709      PG:008616
           20170927-0008616
Electronic Recording            9/27/2017
Pages: 9       F: $130.00        2:34 PM
Register of Deeds          T20170057159
```

**COVER PAGE FOR**
**SPECIAL WARRANTY DEED**

ASSURED QUALITY TITLE CO.
KS #0853

**Date of Document:**              September 25, 2017

**Grantor:**                       Green-Blue 1818, L.L.C.,
                                   a Kansas limited liability company and
                                   Price Property and Investments, L.L.C.,
                                   a Kansas limited liability company

**Address of Grantor:**            700 W. 47th Street, Suite 200
                                   Kansas City, Missouri 64112

**Grantee:**                       Glen EG, LLC,
                                   a Missouri limited liability company

**Address of Grantee:**            P.O. Box 882, Smithville, Missouri 64089

**Legal Description:**             See **Exhibit A** attached hereto.

**Prior Document References:**     None

60461320.3

## SPECIAL WARRANTY DEED

THAT, **GREEN-BLUE 1818, L.L.C.**, a Kansas limited liability company and **PRICE PROPERTY AND INVESTMENTS, L.L.C.**, a Kansas limited liability company ("**Grantor**"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration in hand paid to Grantor by **GLEN EG, LLC**, a Missouri limited liability company, its successors or assigns ("**Grantee**"), whose mailing address is P.O.     Box     882, Smithville, Missouri 64089, the receipt and sufficiency of such consideration being hereby acknowledged, has GRANTED, SOLD AND CONVEYED, and by these presents does GRANT, SELL AND CONVEY unto Grantee that certain real property being more particularly described in **Exhibit A**, attached hereto and made a part hereof for all purposes, together with all improvements, structures and fixtures situated thereon (collectively, the "**Property**"); subject, however, to those matters more particularly described in **Exhibit B** attached hereto and made a part hereof for all purposes (collectively, the "**Permitted Exceptions**").

TO HAVE AND TO HOLD the Property, together with all and singular the rights, and appurtenances thereto in anywise belonging, unto Grantee, its successors and assigns forever, subject to the Permitted Exceptions; and Grantor does hereby bind itself and its successors to WARRANT AND FOREVER DEFEND all and singular the Property, subject to the Permitted Exceptions, unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming, or claim the same, or any part thereof, by, through, or under Grantor, but not otherwise.

Grantor also conveys, without warranty all right, title and interest of Grantor in and to any alleys, strips or gores adjoining the Property and any easements, rights of way or other interests in, on, under or to, any land, highway, street, road, right of way, open or proposed, in, on, under, across, in front of, abutting or adjoining the Property.

[Remainder of page intentionally left blank.]

60461320.3

IN WITNESS WHEREOF, this instrument has been executed as of (but not necessarily on) this 25 day of September, 2017.

**GRANTOR:**

**GREEN-BLUE 1818, L.L.C.,**
a Kansas limited liability company

By: _____
      Scott I. Asner, Co-Manager

By: _____
      Kenneth G. Block, Co-Manager

**PRICE PROPERTY AND INVESTMENTS, L.L.C.,**
a Kansas limited liability company

By: _____
      Barry Price, Manager

STATE OF _Missouri_ )
                                      ) ss.
COUNTY OF _Jackson_ )

BE IT REMEMBERED, that on this 25 day of September, 2017, before me, the undersigned, a Notary Public in and for the County and State aforesaid, came Scott I. Asner, Co-Manager of Green-Blue 1818, L.L.C., a Kansas limited liability company, who is personally known to me to be such Co-Manager, and who is personally known to me to be the same person who executed, as such Co-Manager, the within instrument on behalf of such company, and such person duly acknowledged the execution of the same to be the act and deed of such company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year last above written.

SARAH C. ROWE
My Commission Expires
May 25, 2019
Jackson County
Commission #15830861

_____
Notary Public

_____Sarah C. Rowe_____
Print or Type Name

My commission expires:

_May 25, 2019_

[signature page to Special Warranty Deed]

STATE OF _____ )

3

60461320.3

IN WITNESS WHEREOF, this instrument has been executed as of (but not necessarily on) this 2ˢ day of September, 2017.

**GRANTOR:**

**GREEN-BLUE 1818, L.L.C.,**
a Kansas limited liability company

By:_____
    Scott I. Asner, Co-Manager

By: _____
    Kenneth G. Block, Co-Manager

**PRICE PROPERTY AND INVESTMENTS, L.L.C.,**
a Kansas limited liability company

By:_____
    Barry Price, Manager

STATE OF _____ )
                            ) ss.
COUNTY OF _____ )

BE IT REMEMBERED, that on this \_\_\_\_day of September, 2017, before me, the undersigned, a Notary Public in and for the County and State aforesaid, came Scott I. Asner, Co-Manager of Green-Blue 1818, L.L.C., a Kansas limited liability company, who is personally known to me to be such Co-Manager, and who is personally known to me to be the same person who executed, as such Co-Manager, the within instrument on behalf of such company, and such person duly acknowledged the execution of the same to be the act and deed of such company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year last above written.

_____
Notary Public

_____
Print or Type Name

My commission expires:

_____

STATE OF _____ )

[signature page to Special Warranty Deed]

3

60461320.3

COUNTY OF _____  ) ss.
                       )

BE IT REMEMBERED, that on this ____ day of September, 2017, before me, the undersigned, a Notary Public in and for the County and State aforesaid, came Kenneth G. Block, Co-Manager of Green-Blue 1818, L.L.C., a Kansas limited liability company, who is personally known to me to be such Co-Manager, and who is personally known to me to be the same person who executed, as such Co-Manager, the within instrument on behalf of such company, and such person duly acknowledged the execution of the same to be the act and deed of such company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year last above written.

_____
Notary Public

_____
Print or Type Name

My commission expires:

_____


STATE OF  Missouri  )
                    ) ss.
COUNTY OF  Jackson  )

BE IT REMEMBERED, that on this 25th day of September, 2017, before me, the undersigned, a Notary Public in and for the County and State aforesaid, came Barry Price, Manager of Price Property and Investments, L.L.C., a Kansas limited liability company, who is personally known to me to be such Manager, and who is personally known to me to be the same person who executed, as such Manager, the within instrument on behalf of such company, and such person duly acknowledged the execution of the same to be the act and deed of such company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year last above written.

SARAH C. ROWE
My Commission Expires
May 25, 2019
Jackson County
Commission #15830861

_____
Notary Public
Sarah C. Rowe

Print or Type Name

My commission expires:
May 25, 2019

4

60461220.3

State of Missouri.
COUNTY OF Jackson ) ss.

BE IT REMEMBERED, that on this 25th day of September, 2017, before me, the undersigned, a Notary Public in and for the County and State aforesaid, came Kenneth G. Block, Co-Manager of Green-Blue 1818, L.L.C., a Kansas limited liability company, who is personally known to me to be such Co-Manager, and who is personally known to me to be the same person who executed, as such Co-Manager, the within instrument on behalf of such company, and such person duly acknowledged the execution of the same to be the act and deed of such company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year last above written.

Sheri L. Finley
Notary Public

Sheri L. Finley
Print or Type Name

My commission expires:
3-1-2018

STATE OF _____ )
                  ) ss.
COUNTY OF _____ )

SHERI L. FINLEY
Notary Public, Notary Seal
State of Missouri
Clay County
Commission # 14447330
My Commission Expires March 01, 2018

BE IT REMEMBERED, that on this ___ day of September, 2017, before me, the undersigned, a Notary Public in and for the County and State aforesaid, came Barry Price, Manager of Price Property and Investments, L.L.C., a Kansas limited liability company, who is personally known to me to be such Manager, and who is personally known to me to be the same person who executed, as such Manager, the within instrument on behalf of such company, and such person duly acknowledged the execution of the same to be the act and deed of such company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year last above written.

_____
Notary Public

_____
Print or Type Name

My commission expires:
_____

60461320.3

## EXHIBIT A

## LEGAL DESCRIPTION

Tract 1

All that part of the Southwest Quarter of Section 9, Township 13, Range 25, now in The City of Overland Park, Johnson County, Kansas, more particularly described as follows: Commencing at the Southeast corner of the Southwest Quarter of said Section 9; thence North 2 degrees 06 minutes 26 seconds West along the East line of the Southwest Quarter of said Section 9, a distance of 850.23 feet; thence South 87 degrees 53 minutes 34 seconds West, along a line perpendicular to the East line of the Southwest Quarter of said Section 9, a distance of 1422.35 feet, to the point of beginning of subject tract, said point being on the Northwesterly right-of-way line of 110th Street, as now established; thence South 42 degrees 43 minutes 14 seconds West, along the Northwesterly right-of-way line of 110th Street, a distance of 50 feet; thence North 47 degrees, 16 minutes 06 seconds West, a distance of 35 feet; thence North 21 degrees 01 minutes 06 seconds East, a distance of 51.12 feet; thence North 2 degrees 06 minutes 26 seconds West, a distance of 222.49 feet; thence South, 87 degrees 53 minutes 34 seconds West, a distance of 225 feet; thence North 2 degrees 06 minutes 26 seconds West, a distance of 377.72 feet, to a point on the Southerly right-of-way line of Interstate Highway No. 435, as now located; thence North 80 degrees 27 minutes 46 seconds East, along the Southerly right-of-way line of said Interstate Highway No. 435, a distance of 267.24 feet; thence South 2 degrees 06 minutes 26 seconds East, along a line 1422.35 feet West of the East line of the Southwest Quarter of said Section 9, a distance of 670.99 feet, to the point of beginning.

Tract 2

All that part of the Southwest Quarter of Section 9, Township 13, Range 25, now in the City of Overland Park, Johnson County, Kansas, more particularly described as follows: Commencing at the Southeast corner of the Southwest Quarter of said Section 9; thence North 2 degrees 06 minutes 26 seconds West, along the East line of the Southwest Quarter of said Section 9, a distance of 1108.94 feet; thence South 87 degrees 53 minutes 34 seconds West, along a line perpendicular to the East line of the Southwest Quarter of said Section 9, a distance of 1687.35 feet, to the true point of beginning of subject tract; thence North 2 degrees 06 minutes 26 seconds West, a distance of 377.72 feet, to a point on the Southerly right-of-way line of Interstate Highway No. 435 as now located; thence South 80 degrees 27 minutes 46 seconds West along the Southerly right-of-way line of said Interstate Highway No. 435, a distance of 70.59 feet; thence South 2 degrees 06 minutes 26 seconds East a distance of

368.59 feet; thence North 87 degrees 53 minutes 34 seconds East, a
distance of 70 feet, to the point of beginning of subject tract.
Except:

A tract of land in the Southwest Quarter of Section 9, Township 13 South,
Range 25 East, in the City of Overland Park, Johnson County, Kansas,
described as follows: Commencing at the Southeast corner of said
Southwest Quarter, the East line of said Quarter Section having an
assumed bearing of North 02 degrees 06 minutes 13 seconds West; thence
North 02 degrees 06 minutes 13 seconds West, 1488.10 feet along the East
line of said Quarter Section; thence South 87 degrees 53 minutes 47 seconds
West, 1671.59 feet to the Southerly right of way line of Interstate 435
highway and the Point of Beginning; thence South 73 degrees 39 minutes 38
seconds West, 64.48 feet; thence South 50 degrees 07 minutes 12 seconds
West, 29.47 feet to a point 896.86 feet East of the West line and 1462.39 feet
North of the South line of said Quarter Section; thence North 02 degrees 07
minutes 28 seconds West, 22.69 feet to the Southerly right of way line of
Interstate 435 highway; thence North 80 degrees 26 minutes 44 seconds
East, 86.53 feet along said right of way line to the Point of Beginning.

60461320.3

## EXHIBIT B

### PERMITTED EXCEPTIONS

1.    All assessments and taxes for the year 2017 and all subsequent years, none now due and payable.

2.    Storm Sewer easement granted to the City of Overland Park, by the instrument filed September 15, 1975 in Volume 1060 at Page 933.

3.    Easement granted to Kansas City Power and Light Company by the instrument filed April 27, 1976 in Volume 1108 at Page 969, over a portion of the premises in question, as more fully described therein.

4.    Easement granted to the City of Overland Park, by the instrument filed October 21, 1976 in Volume 1159 at Page 156.

5.    Controlled Access Highway to Interstate I-435 from subject property, such right of access having been taken by the State in Condemnation Case No. 26007, Report of Appraiser, Page No. 22, filed in the District Court of Johnson County, Kansas.

6.    Sanitary Sewer Easement and Storm Water Easement filed September 10, 1975 in Volume 1060 at Page 149.

7.    Reservations contained in the Warranty Deed filed September 10, 1975 in Volume 1060 at Page 149.

8.    Complete Access Control to highway granted to the City of Overland Park, as established in deed of Dedication filed December 9, 1994 in Volume 4485 at Page 122.

9.    Fiber Optic Cable Easement established in instrument denominated "Deed of Dedication" filed December 9, 1994 in Volume 4485 at Page 122, over a portion of subject property.

10.    Easement Agreement filed in Book 4934 at Page 20, over a portion of subject property.

11.    Terms and Provisions of Easement Conveyance granted to Kansas City Power and Light Company, a Missouri Corporation, filed in Book 5539 at Page 259, over a portion of subject property.

12.    Memorandum of Agreement filed January 26, 2016 in Book 201601 at Page 005611.

13.    The premises in question lies within the boundaries of OPC STORMDRG, which provides for the levy of assessments.

60461320.3