**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>(Jointly Administered)<br><br>**Related Docket No. 7603, 8296** |

## <u>MEMORANDUM OPINION</u>

**TABLE OF CONTENTS**

Introduction and Summary ................................................................................................ 1

Factual and Procedural Background ................................................................................ 3

   1. The history of the ERISA disputes in these bankruptcy cases
      and the debtors' prior efforts to resolve them ..................................................... 3

      A. The March 2024 decision on arbitration/lift stay issues ............................ 5

      B. The November 2024 decision ......................................................................... 6

         i. Challenge to the PBGC regulations ...................................................... 6

         ii. The application of ERISA's 20-year cap .................................................. 7

         iii. Debtors' contractual undertakings to pay enhanced
            withdrawal liabilities .............................................................................. 9

      C. February 2025 decision on "anticipated plan experience" ......................... 10

      D. Summary judgment argument on remaining withdrawal liability
         issues, debtors' proposed plan settlement with pension plan claimants,
         and the issuance of the April 2025 opinion ............................................... 13

      E. April 2025 opinion on remaining summary judgment issues .................... 19

         i. "Default" and present value ................................................................ 20

         ii. ERISA § 1405(b) ................................................................................... 21

         iii. Contribution rates ................................................................................ 21

         iv. Guaranty claim ..................................................................................... 22

   2. The debtors' abandonment of the prior settlements and
      confirmation of a plan ............................................................................................ 22

   3. The current proposed settlements ....................................................................... 23

Jurisdiction ..............................................................................................29

Analysis...................................................................................................29

   I.  The Court's analysis of the settlements will afford the debtor in
      possession some measure of deference, though the scrutiny will
      be more searching than the most deferential form of "business
      judgment" review. ..............................................................................29

      A.  In a typical circumstance, courts afford a measure of deference to
          a trustee's decision to settle a claims allowance dispute – though
          not the extreme deference that might be suggested by the language
          about the "lowest point in the range of reasonable.".................33

      B.  The *DVR* standard best accommodates this principle with the
          statutory right of a creditor to object to the allowance of a claim. ............35

      C.  The same standard applies to the proposed settlements between the
          debtors and members of the Committee....................................41

  II.  The principal pillars of the settlements satisfy the applicable
      standard. ............................................................................................42

      A.  The settlement's resolution of the interest rate used in determining
          unfunded vested benefits is reasonable....................................44

      B.  The five percent interest rate used to present discount the 20-year
          stream of payments is reasonable............................................46

      C.  The settlement's resolution of the application of § 1405(b) is reasonable. 49

      D.  The settlement's gifting provision is permissible.....................52

  III.The resolution of Central States' guaranty claim is reasonable....................60

  IV.The settlement with Local 710 is reasonable, notwithstanding the
      "fresh start accounting" issue..................................................................62

  V.  The New York Teamsters' settlement is unreasonable and cannot be
      approved. ............................................................................................64

      A.  MFN's objection to the liquidated damages component of the
          New York Teamsters' claim is not procedurally barred............................64

B.  Even affording some deference to the debtors' business judgment, this settlement falls outside the range of reasonable. ............................. 65

C.  MFN's argument that ERISA's requirement that a party seeking liquidated damages must first bring an enforcement action would require a further reduction in the claim for liquidated damages. ............. 66

VI. The settlements with Locals 617 and 1730 are unreasonable and cannot be approved. ...................................................................................... 68

Conclusion ................................................................................................... 74

**Introduction and Summary**

When Yellow Corporation shuttered its business operations immediately before filing these bankruptcy cases, it withdrew from several multiemployer pension plans in which it had been a participant.[1]

One of the central issues in this bankruptcy case has been a series of disputes over the claims asserted by those multiemployer pension plans for withdrawal liability as a result of that withdrawal. The calculation of those claims is complex, and this Court has issued a number of opinions resolving various disputes among the parties over the calculation methodology.

The debtors now propose to settle those disputes. MFN, which is both a creditor and an equity holder of the debtors, objects to those settlements.[2] MFN also filed objections to many of the claims that the debtors now propose to settle. It argues that the proposed settlements overpay the pension plans, which either dilutes MFN's recovery as a creditor or, in the (perhaps unlikely) event that the post-confirmation trust were to recover sufficient funds to allow creditors to be paid in full, reduces the recovery it will obtain on account of its equity holdings.

For the reasons set forth in further detail below, the Court will approve most but not all of the proposed settlements. Engaging in a careful analysis of the reasonableness of the settlements in light of MFN's objections to the underlying claims, though still one that affords some measure of deference to the debtors'

---

[1] Debtor Yellow Corporation and its various debtor affiliates are referred to as the "debtors" or "Yellow."

[2] MFN Partners, LP and Mobile Street Holdings, LLC are referred to collectively as "MFN."

business judgment, the Court concludes that most of the settlements reflect a fair and reasoned resolution of the legitimate disputes among the parties. Certain of the settlements, however, fall outside the range of reasonable and cannot be approved. Specifically, for the reasons described below in Part V, the settlement with the New York Teamsters cannot be approved.[3] For the reasons described in Part VI, the settlements with Locals 617 and 1730 likewise fall outside the range of reasonable and cannot be approved.[4] Each of the other settlements, however, is a reasonable resolution of genuinely disputable questions of law and fact and will be approved.

Unfortunately for the readers of this Memorandum Opinion, understanding the reasons for these conclusions requires one to understand a fair amount of background, both about the calculation of withdrawal liability under ERISA and the disputes that have arisen over the course of this bankruptcy case.[5] This Memorandum Opinion will accordingly begin with a discussion of the procedural history that first covers the underlying ERISA issues that this Court has addressed earlier in this bankruptcy case and then describes the proposed settlements and the rationale offered in support of those settlements.[6]

---

[3] The New York State Teamsters Conference Pension & Retirement Fund is referred to as the "New York Teamsters."

[4] Teamsters Local 617 Pension Fund is referred to as "Local 617." Management Labor Pension Fund Local 1730 is referred to as "Local 1730."

[5] The Employee Retirement Security Act of 1974, as amended, is referred to as "ERISA." References, in this opinion, to sections of the statute point to the provisions as codified in Title 29 of the United States Code.

[6] To facilitate appellate review of the order implementing this decision, the Court has undertaken to summarize its various prior rulings that bear on the issues presented here with the goal of making this Memorandum Opinion comprehensible on a stand-alone basis

In the analysis portion of this opinion, the Court will first (in Part I) describe the standard it concludes is applicable to the approval of the proposed settlements. Part II concludes that the principal pillars of the proposed settlements are permissible. Sub-parts II.A through II.C finds that the five-step methodology used in the principal settlements is a reasonable one. Part II.D concludes that the "gifts" that the settling pension plans are making to non-settling creditors whose claims are not joint-and-several is permissible under existing law in this jurisdiction. Part III concludes that the resolution of the Central States' penalty claim is a reasonable one.[7] Part IV concludes that the settlement with Local 710 is reasonable. Part V concludes that the settlement with the New York Teamsters is unreasonable and cannot be approved. Part VI reaches the same conclusion with respect to the proposed settlements with Locals 617 and 1730.

### Factual and Procedural Background

1. **The history of the ERISA disputes in these bankruptcy cases and the debtors' prior efforts to resolve them**

The debtors once operated one of the nation's largest trucking companies. Back when they were an operating business, the debtors participated in a number of multiemployer pension plans. Under such a plan, several employers contribute, commonly as part of a collective bargaining agreement, to fund employees' pension benefits.

---

to a reader who has not studied those prior opinions. In view of the relative brevity of life, however, those prior opinions are merely summarized rather than replicated in full.

[7] Central States, Southeast and Southwest Areas Pension Fund is referred to as "Central States."

3

These plans, however, are at risk of running into serious financial distress if they find themselves underfunded. When a plan's assets are insufficient to cover its future obligations to pay pension benefits, employers have an incentive to withdraw from the plan to avoid being left to cover the costs of a plan's underfunding. Once one employer withdraws, others have an incentive to do the same, so as not to find themselves holding the bag for an outsized share of the plan's underfunding. It is easy to see how this kind of problem can quickly spiral. Before long, an underfunded pension plan faces the equivalent of a run on the bank that will lead to the plan's collapse.

In response to this problem, Congress in 1980 amended ERISA by enacting the Multiemployer Pension Plan Amendment Act.[8] That statute imposes withdrawal liability on an employer that seeks to withdraw from an underfunded multiemployer pension plan, which (subject to various qualifications and caveats discussed below) requires a withdrawing employer to pay the pension plan the employer's ratable share of the plan's underfunding.

Yellow discontinued its business operations in July 2023 and filed for bankruptcy shortly thereafter. Under ERISA, the cessation of Yellow's business activity constituted a "complete withdrawal" from all of its multiemployer pension plans.[9] Those plans accordingly filed proofs of claim in these bankruptcy cases to

---

[8] *See* 29 U.S.C. §§ 1381-1461.

[9] 29 U.S.C. § 1383(a) ("For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employer … (2) permanently ceases all covered operations under the plan.").

4

recover on account of the "withdrawal liability" that ERISA imposes.[10]   The withdrawal liability claims asserted by these plans came to approximately $7.4 billion.[11]  In addition, Central States asserted a claim of approximately $917 million on account of a 2014 contribution guaranty agreement while the New York Teamsters asserted a liquidated damages claim for $76 million.[12]

Outside of bankruptcy, the process of determining an employer's withdrawal liability begins with the pension plan calculating the amount of that liability and informing the employer of its determination.[13]  In the event of a dispute, either party may initiate an arbitration proceeding.[14]  And the decision of the arbitrator is subject to review in federal district courts.[15]

### A.    The March 2024 decision on arbitration/lift stay issues

Several pension plans took the position that the allowance of their withdrawal liability claims should be resolved through arbitration and filed stay relief motions to permit them to initiate arbitration proceedings.  This Court denied those motions.

---

[10] The claims at issue in the current motion are those asserted by the following pension plans: Central States, Southeast and Southwest Areas Pension Fund; the New York Teamsters; Local 1730; Local 617; Trucking Employees of North Jersey Pension Fund; New England Teamsters Pension Fund; the Central Pennsylvania Teamsters Pension Fund Defined Benefit Plan; the Teamsters Local 641 Pension Fund; the Teamsters Joint Council No. 83 of Virginia Pension Fund; the International Brotherhood of Teamsters Union No. Local 710 Pension Fund; Mid-Jersey Trucking Industry & Teamsters Local 701 Pension and Annuity Fund; Freight Drivers and Helpers 557 Pension Fund; Teamsters Pension Trust Fund of Philadelphia and Vicinity; and IAM National Pension Fund.

[11] *See* Proofs of Claim Nos. 4303-4306, 4312-4352; D.I. 1962 Ex. A; D.I. 2595, Exs. 1 and 2.

[12] *See* Proofs of Claim Nos. 4336-4352; 4489-4512.

[13] 29 U.S.C. § 1399(b).

[14] *Id.* § 1401.

[15] *Id.* § 1401(b).

The Bankruptcy Code provides that any party in interest is entitled to participate in the claims allowance process.  And here, MFN had filed objections to many of the withdrawal liability claims.[16]  Seeking to harmonize the apparently conflicting provisions of the Bankruptcy Code and ERISA, the Court concluded that in view of the centrality of the withdrawal liability claims to this bankruptcy case, the liquidation of the withdrawal liability claims should properly proceed through the bankruptcy claims allowance process.[17]

The Court was thereafter presented with a series of motions that sought partial summary judgment rulings with respect to discrete questions relating to the calculation of withdrawal liability under ERISA.

### B.    The November 2024 decision

#### i.    Challenge to the PBGC regulations

In 2021, in the face of a wave of pension plans that were chronically underfunded, Congress committed billions of dollars to restore the health of those plans and thus prop up the nation's pension system.  The complication this presented was that employers owe withdrawal liability under ERISA only if the plans in which they participate have unfunded vested benefits.  Withdrawing from a plan that is fully funded does not give rise to withdrawal liability.

Congress made clear, however, that the special financial assistance provided under the American Rescue Plan Act of 2021 may only be used to "make benefit

---

[16] 11 U.S.C. § 502(a) (proof of claim is "deemed allowed" unless a "party in interest … objects").

[17] *In re Yellow Corp.*, No. 23-11069, 2024 WL 1313308 (Bankr. D. Del. March 27, 2024).

payments and pay plan expenses."[18]  And if the funds received by the various plans under the American Rescue Plan Act were treated as plan assets, withdrawing employers' liability to those plans would be reduced or eliminated.  To give effect to the statutory directive that the special financial assistance be used only to pay benefits or administrative costs (rather than reduce employers' withdrawal liability), the PBGC promulgated two regulations.[19]  Those regulations effectively provide that funds received (or to be received) by plans under the American Rescue Plan Act would not be counted as plan assets for the purposes of determining whether a plan was underfunded.

Yellow argued, however, that the statutory authority provided to the PBGC under the American Rescue Plan Act was limited to promulgating regulations that imposed "conditions on" the plans that received the funds.  Yellow asserted that regulations at issue could not fairly be described as conditions on the recipients of the funds.  In an opinion first issued in September 2024 and re-issued, as amended, in November 2024, this Court rejected that argument, finding the PBGC regulations to be valid exercises of its delegated regulatory authority.[20]

### ii.      The application of ERISA's 20-year cap

In that same November 2024 opinion, the Court found that ERISA's 20-year cap applied to the calculation of the plans' withdrawal liability claims.  The Court

---

[18] 29 U.S.C. § 1432(l).

[19] The Pension Benefit Guaranty Corporation is referred to as the "PBGC."

[20] *In re Yellow Corp.*, No. 23-11069, 2024 WL 4925124 (Bankr. D. Del. Nov. 5, 2024).

7

explained that ERISA sets out a multi-step process for calculating withdrawal liability:

> *First*, the plan needs to calculate the amount of its unfunded vested benefits, which … is the plan's nonforfeitable benefits minus the value of the plan's assets.  *Second*, the plan must determine what share of those unfunded vested benefits are properly allocated to the withdrawing employer.  ERISA requires the plan to use one of four different allocation methods unless the plan receives authorization from the PBGC to use an alternative method.  The result of this process is the employer's allocable share of the plan's unfunded vested benefits.

> *Third*, § 1399 provides for four adjustments to the amount of withdrawal liability, the only one of which that is applicable here being the 20-year cap.  Withdrawal liability is paid through annual payments.  Those annual payments are determined through a formula derived from the employer's actual contributions over the ten preceding plan years.  Section 1399(c)(1)(B) provides that "[i]n any case in which" the employer's allocable share of the plan's unfunded vested benefits (from step 2) exceeds 20 annual payments (from step 3) "the employer's liability shall be limited to the first 20 annual payments."  This amount is the employer's "withdrawal liability."[21]

Paragraph (5) of § 1399(c), however, provides for the acceleration of the 20-year payment schedule in the event of a "default."  "[In] the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest."[22]

In support of the argument that the 20-year cap should not apply to the calculation of Yellow's withdrawal liability, the plans relied on  § 1399(c)(1)(A), which states that "[e]xcept as provided in ... paragraph[ ] ... 5, an employer shall pay the amount determined ... over the period of years necessary to amortize the amount in

---

[21] *Id.* at \*15 (footnotes omitted).

[22] 29 U.S.C. § 1399(c)(5).

level annual payments."[23]   The plans read this "except" clause to mean that where there is a "default," not only is the liability accelerated (rather than paid over 20 years), but also to eliminate the 20-year cap entirely.   This Court rejected that reasoning, concluding that what is accelerated in the event of default under § 1399(c)(5) is the employer's "withdrawal liability," not the full amount of the employer's share of the plan's unfunded vested benefits.[24]

### iii.    Debtors' contractual undertakings to pay enhanced withdrawal liabilities

In 2013, when the debtors had earlier experienced financial turmoil, they restructured their relationships with various pension plans.   Having previously withdrawn from the New York Teamsters and the Western Pennsylvania Teamsters Fund, Yellow sought to reenter these pension plans.   The parties reached an agreement under which Yellow was permitted to reenter these plans with contributions for its employees at only 25 percent of what it had previously paid.   As part of that agreement, however, Yellow agreed that if it were to withdraw in the future, its withdrawal liability would be based on the higher amounts it had been paying previously.

Yellow argued that because this contractually agreed higher level of withdrawal liability had not been approved by the PBGC, ERISA (particularly, § 1391) prohibited the enforcement of the parties' agreement.   This Court, following a Seventh Circuit opinion that had reached a similar conclusion, rejected that

---

[23] 29 U.S.C. § 1399(c)(1)(B).

[24] *Yellow Corp.,* 2024 WL 4925124, at *16.

argument, finding that the statutory formula is a floor below which the parties cannot agree without the PBGC's approval.  Approval is not required, however, if an employer agrees to pay a greater amount.[25]

## C.    February 2025 decision on "anticipated plan experience"

As described above, the calculation of ERISA withdrawal liability provides (in § 1399) for the employer to pay its allocable share of the plan's unfunded vested benefits over 20 years.  The annual payment is calculated in accordance with a formula.  Under the formula, the annual payment is approximately what the employer had been contributing to the fund before it withdrew.  To the extent the employer's share of unfunded vested benefits exceeds 20 annual payments, the withdrawal liability is capped at that amount.

The determination of the plan's unfunded vested benefits, however, requires the plan to make an assumption about the value today of the benefits it will pay for years into the future.  Such a calculation requires one to choose a discount rate.  For any given stream of future obligations, a lower discount rate means that the present value of those obligations is higher, and vice-versa.  In this context, for a plan

---

[25] *Id.* at *17 (citing *Artistic Carton Co. v. Paper Indus. Union-Management Pension Fund*, 971 F.2d 1346, 1353 (7th Cir. 1992).  In September 2024, this Court issued a Memorandum Opinion that (a) rejected the challenge to the PBGC regulations; (b) held that ERISA's 20-year cap was applicable; and (c) concluded that the debtors' agreement to pay withdrawal liability at the prior (higher) amounts was enforceable.  The opinion went on, however, to conclude that the debtors' withdrawal liability obligations were accelerated as a result of the debtors' default.  That was incorrect.  While the debtors had defaulted prepetition on their obligation to contribute to certain pension plans, they had not defaulted on any obligation to make withdrawal liability payments, which is the type of "default" to which § 1399(c)(5) is referring.  On a motion for reconsideration, the Court amended its September 2024 opinion to remove the references to the debtors having defaulted.  The amended form of opinion is the November 2024 opinion described above.

calculating an employer's withdrawal liability, a lower interest rate, and a higher value of those future obligations, increases the amount of the plan's underfunding. That, in turn, would increase an employer's withdrawal liability, a result that is more favorable for the plan. It is therefore unsurprising that many plan actuaries have used relatively low interest rates – ones that approximate returns on very conservative investments – in determining their unfunded vested benefits.

Significantly, however, ERISA requires plans to make a similar assumption in calculating, on an annual basis, the plan's "accumulated funding deficiency" which in turn helps determine the plan's minimum-funding standards. In this context, however, a higher discount rate is more favorable to the plan, since such an assumption would make it easier to meet minimum-funding standards. Pension plans that received funding under the American Rescue Plan Act were required to use a rather low interest rate for this purpose. Many other plans, however, selected materially higher interest rates when they determined their minimum funding requirements than they did for purposes of calculating their unfunded vested benefits.

The challenge those plans face, however, is that in both situations the statutory language that directs how the interest rate is to be determined is materially the same. Plan actuaries are statutorily required to select a rate that provides "the actuary's best estimate of anticipated experience under the plan."[26]

---

[26] 29 U.S.C. § 1084(c) (addressing minimum funding); *id.* § 1393(a)(1) (addressing withdrawal liability).

11

In an opinion issued in February 2025, the Court addressed cross motions for partial summary judgment with respect to five plans that selected materially higher interest rates for purposes of their calculation of Yellow's withdrawal liability than they did in calculating their accumulated funding deficiencies. This issue had been addressed by three courts of appeals, each of which had held that the rates selected by the plan's actuary for determining withdrawal liability needed to be at least similar to the rate used by the plan for determining its minimum funding.[27] The Third Circuit had not addressed the issue. One district court opinion for the District of New Jersey advanced a reasoned argument that despite the similarity of the statutory language, a plan may use a materially different rate for calculating withdrawal liability than it did in determining its minimum funding.[28] On that court's view, the purpose of the "best estimate" language was purely "procedural," and that read in context, the statute committed the determination of the appropriate rate to the judgment of the actuary.

This Court, however, rejected that reasoning, concluding that the three courts of appeals had the better reading of the relevant statutory language. The Court

---

[27] *See Sofco Erectors, Inc. v. Trustees of Ohio Operating Engineers Pension Fund*, 15 F.4th 407 (6th Cir. 2021); *United Mine Workers of America 1974 Pension Plan v. Energy West Mining Co.*, 39 F. 4th 730 (D.C. Cir. 2022); *GCIU-Employer Retirement Fund v. MNG Enterprises, Inc.*, 51 F.4th 1092 (9th Cir. 2022).

[28] *See Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F. Supp. 3d 365 (D.N.J. 2018).

12

accordingly followed those decisions and granted partial summary judgment in favor of the debtors on this issue.[29]

> **D.    Summary judgment argument on remaining withdrawal liability issues, debtors' proposed plan settlement with pension plan claimants, and the issuance of the April 2025 opinion**

On January 28, 2025, the Court heard argument on what it believes are most of the remaining legal issues that were contested among the parties that affected the calculation of the pension plans' withdrawal liability claims.  Following that hearing, the Court took those matters under advisement and began work on an opinion that addressed those remaining issues.

In early March 2025, counsel for the debtors reached out to chambers to adjourn the March 17, 2025 hearing that had been set on the debtors' proposed plan. At the Court's request, the parties proceeded to a status conference on that date with respect to confirmation issues.  At that hearing, the debtors reported that they cancelled the confirmation hearing on their proposed plan because "the debtors do not have the votes for the waterfall plan that we filed."[30]  Counsel for the debtors added that "[c]ertain of our largest unsecured creditors are unwilling to vote for the debtors' plan.  So, without an impaired accepting class, obviously, we can't have a confirmation hearing."[31]

---

[29] *See In re Yellow Corp.*, No. 23-11069, 2025 WL 419249 (Bankr. D. Del. Feb. 5, 2025).  That opinion also addressed two other withdrawal liability claim issues that do not require discussion here.

[30] March 17, 2025 Hr'g Tr. at 6.

[31] *Id.*

Debtors' counsel added, however, that certain committee members – pension plans holding large withdrawal liability claims – had made a proposal on March 14, 2025 to resolve those plans' claims through a proposed bankruptcy plan. Debtors' counsel reported that the debtors were still reviewing the proposal and noted that several other significant constituencies (other pension plans and MFN) had not yet had the opportunity to review it.[32]

Counsel for the Committee added that while the debtors had just received the proposed settlement terms, the Committee itself intended to file a plan of liquidation reflecting those settlement terms if the debtors did not reach an agreement by the end of the week.[33]

Towards the end of that hearing, the Court commented as follows regarding the then-pending summary judgment opinion on the motion that had been argued on January 28, 2025:

> There is a set of issues on summary judgment on which I am close, but not all the way to issuing a decision. I expect – don't hold me to this, but I expect to get something out sometime next week. No one has asked me – I understand there are ongoing settlement discussions, no one has asked me to not proceed in the ordinary course. So I'm just going to proceed in the ordinary course and get it out as promptly as I can, sort of without regard to whatever I learn[ed] today about where the parties are. So, if someone wants me to do something different, I'll let you ask me, but unless and until someone does, I'm just going to put my head down and do my job.[34]

---

[32] *Id.* at 8.

[33] *Id.* at 11.

[34] *Id.* at 15.

Debtors' counsel suggested that the Court hold a follow-on status conference on March 26, 2025, and the Court agreed to do so.

On March 21, 2025, the Court received an email from counsel for the debtors (copying most of the principal parties) that read as follows:

> We are reaching out to update the Court regarding the [pension plan] summary judgment motions that were argued on January 28, 2025, and are currently under advisement. At the status conference on March 17 this week, the Court indicated it was likely to issue a ruling by next week. We believe we have reached a settlement in principle with the Committee and other [pension plans] (other than MFN Partners). As such, we would respectfully request that the Court hold off on issuing its ruling, and we will provide a more fulsome update at the status conference on March 26.
>
> We have copied relevant counsel for the Committee, the [pension plans], and MFN Partners. Please advise if you have any questions.

On March 25, 2025, counsel for MFN docketed a letter to the Court that disagreed with the debtors' request and argued that the Court should not defer resolution of the summary judgment motions. MFN pointed out that it was a party in interest that had objected to the allowance of the pension plan claims and had participated with the debtors in briefing and arguing summary judgment. "The issues to be resolved either will result in resolution of over a billion dollars in disputed [pension plan] claims and, if the objections are sustained even in part, would meaningfully improve recoveries to all general unsecured creditors holding allowed claims."[35]

---

[35] D.I. 5961 at 1.

At the status conference on March 26, 2025, counsel for the debtors stated that the parties had reached agreement with all parties other than MFN on a global resolution of the withdrawal liability claims, and that the debtors intended to file an amended plan by the end of the week that included the terms of those settlements.

Counsel for the debtors argued that the Court should withhold its decision on the pending summary judgment motions, arguing that "no matter how the Court rules, whether favorable to the debtors or favorable to the plans, the ruling will likely gut our ability to maintain the current level of consensus and [it has] been an extremely hard-fought fight as you are all too well aware, over the 18 months in these cases."[36]  Counsel for MFN, on the other hand, urged the Court to issue its decision.[37] At the end of the hearing, the Court noted that it believed that MFN was likely entitled to a decision on the summary judgment motion it had filed.[38]  Because the debtors asked for additional time to see if a settlement could be reached that included MFN, however, the Court agreed to defer issuing the summary judgment decision until April 4, 2025.

On March 27, 2025, the debtors and the Committee filed a joint letter asking that the Court reconsider its earlier statements and withhold its summary judgment decision.  The letter cited to cases suggesting that so long as the debtors' settlement with a creditor was anywhere within the range of reasonable, a court can and should

---

[36] March 26, 2025 Hr'g Tr. at 5.

[37] *Id.* at 20.

[38] *Id.* at 24.

approve such a settlement even if doing so moots out an objection to the allowance of the claim filed by another party in interest.[39]

The Court responded with a letter opinion on March 31, 2025.[40] That letter opinion noted that the caselaw provided essentially three approaches to the standard to be applied when a debtor-in-possession or trustee sought to settle a claims allowance dispute while another party-in-interest's objection was pending. The first approach, reflected in opinions like the district court's ruling in *Kaiser Aluminum*, essentially applies the same deferential review to the proposed settlement that courts otherwise apply to any other business judgment the debtor in possession or trustee may make.[41]

The second approach is at the opposite extreme. Cases such as *C.P. Hall* and *CS Mining* focus on the language of § 502(b) that states that when a party in interest objects to the allowance of a claim, "the court … shall determine the amount of such claim … as of the date of the filing of the petition, and shall allow such claim in such amount."[42] Finally, the Court noted that one case suggested the possibility of a middle-ground approach. That case sought to reconcile the deference traditionally afforded to the business judgment of a debtor in possession with the command of § 502(b) by giving *some* deference to the debtor in possession's business judgment,

---

[39] D.I. 5982.

[40] *In re Yellow Corp.*, 670 B.R. 397 (Bankr. D. Del. 2025).

[41] *Id.* at 407 (citing *In re Kaiser Aluminum Corp.*, 339 B.R. 91 (D. Del. 2006)).

[42] *See id.* at 408 (citing 11 U.S.C. § 502(b); *In re C.P. Hall Co.*, 513 B.R. 540, 542 (Bankr. N.D. Ill. 2014); *In re CS Mining, LLC*, 574 B.R. 259, 281 (Bankr. D. Utah 2017)).

17

but still applying meaningful scrutiny to an objection to approval of the settlement. This middle-ground standard thereby seeks to accommodate both the deference due to the debtor's judgment and the opposing party's right to object to the allowance of the claim.[43]

The Court concluded that cases like the Supreme Court's decision in *Truck Insurance* and the Third Circuit's decision *In re FTX* effectively eliminated the first approach.[44] The Court reserved judgment as between the second and third approaches. But because in either event the Court was going to give meaningful scrutiny to the plan settlements, applying the standards based on the Court's yet unissued summary judgment ruling, the Court suggested that it ought to issue its opinion so that the parties could proceed to a confirmation hearing with visibility into the target at which they were shooting. But rather than issue that opinion immediately, the Court thought it prudent to set a status conference to give the parties one last opportunity to be heard before doing so.[45]

At that April 6, 2025 status conference, the parties reached something of a consensus that it would be most helpful to the process if the Court would issue its summary judgment decision in the form of "preliminary observations" setting forth the Court's preliminary views on the issues, rather than a ruling formally granting

---

[43] *Id.* at 409 (citing *In re DVR, LLC*, 582 B.R. 507 (Bankr. D. Colo. 2018)).

[44] *Id.* at 411 (citing *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024); *In re FTX Trading Ltd.,* 91 F.4th 148 (3d Cir. 2024)).

[45] *Id.*

18

or denying partial summary judgment.  The Court was persuaded that this was a sensible way to proceed, and on April 7, 2025, the Court issued that opinion.[46]

As further described in the following section, the Court's April 2025 rulings were largely favorable to the debtors' and MFN's positions on a variety of withdrawal liability claim calculation issues.  The result was that the debtors effectively abandoned pursuing confirmation of the then-pending plan, and the parties undertook to negotiate a revised plan, and a revised settlement, that could meet the standards that the Court had set out.

### E.    April 2025 opinion on remaining summary judgment issues

The Court's April 2025 opinion addressed a number of other substantive issues of bankruptcy and ERISA that affect the calculation of the plans' withdrawal liability claims.  The most significant issues were: (1) whether the debtors had defaulted on their obligation to make the 20-year stream of withdrawal liability payments, and if not, how that stream of payments should be present discounted for claims allowance purposes, both under § 502(b)(2) of the Bankruptcy Code and under ERISA; (2) the effect of § 1405(e) of ERISA in contexts when an employer withdraws simultaneously from several multiemployer pension plans; (3) the application of § 1405(b) of ERISA, which generally operates to reduce withdrawal liability claims by 50 percent in circumstances when a withdrawing employer is insolvent; and (4) whether the

---

[46] *In re Yellow Corp.*, 672 B.R. 219 (Bankr. D. Del. 2025).

liquidated damages provision of Central States' 2014 letter agreement with the debtors is an unenforceable penalty clause under applicable state law.

In short, the Court ruled as follows:

### i.     "Default" and present value

To perhaps oversimplify a long and rather complex discussion, the Court concluded that nothing in the summary judgment record suggested that any of the plans had declared an event of default before the petition date.  Accordingly, the debtors' withdrawal liability had not accelerated for any reason other than the bankruptcy filing itself.[47]   The Court concluded, however, that under *Sexton v. Dreyfus*, the bankruptcy filing itself did operate to accelerate all unmatured obligations.  That acceleration is part of the way in which a bankruptcy filing operates to take a "snapshot" of a debtor's financial condition as of the petition date.[48]   The Court went on to conclude, however, that § 502(b)(2) of the Bankruptcy Code disallows any claim for unmatured interest.[49]   Accordingly, to the extent the 20-year stream of payments provided under ERISA contains an interest component, the Court held that any interest that would accrue after the petition date should be disallowed under § 502(b)(2).  In addition, the Court further explained that it appeared that § 1405(e) of ERISA would similarly operate to remove interest from the calculation of

---

[47] *Id.* at 234.

[48] *Id.* at 235.

[49] *Id.* at 242-248.

withdrawal liability when there are multiple withdrawals occasioned by a liquidation.[50]

### ii.        ERISA § 1405(b)

Section 1405(b) of ERISA operates to cap a withdrawal liability claim, "[i]n the case of an insolvent employer undergoing liquidation or dissolution."[51]  In substance, the cap provides that a withdrawal liability claim is never reduced by more than 50 percent (regardless of the value of the employer's assets).  But to the extent the value of the assets exceeds 50 percent of the withdrawal liability, the withdrawal liability claim is capped at the employer's liquidation or dissolution value.[52]   The Court concluded that this cap was potentially applicable (to the extent the debtors were insolvent) and that it applied *after* the application of ERISA's 20-year cap.[53]

### iii.        Contribution rates

As part of 2014 legislation designed to address the financial distress faced by many pension plans, Congress effectively required increased employer contributions to such plans.   At the same time, it made clear that increases in employer contributions that resulted from that legislation should not affect an employer's withdrawal liability.[54]   Two pension plans – Central States and Local 641 – used

---

[50] *Id.* at 238-242.  That section further concluded that § 1405(b) of ERISA operates, in cases involving multiple withdrawals occasioned by a liquidation of an employer, to take the various other reductions required by § 1405(a) – (d) and spread them ratably across all of the affected plans.  *Id.* at 240.

[51] 29 U.S.C. § 1405(b).

[52] *Yellow Corp.,* 672 B.R. at 250-256.

[53] *Id.*

[54] *See* 29 U.S.C. § 1085(g)(3).

21

contribution rates in their calculation of withdrawal liability that reflected Yellow's increased contributions as a result of the 2014 legislation.[55]  The plans argued that the increase fit within a statutory exception for increases in contribution that lead to increased employee accruals.  The problem with that argument, however, was that to fit within the exception, the plans were required to modify their plan documents. Because neither Central States nor Local 641 had done so, the Court found that the exception was inapplicable.[56]

### iv.      Guaranty claim

The debtors entered into a 2014 agreement with Central States relating to Yellow's 2011 deferral of its plan contributions.  The agreement provided that Yellow guaranteed that it would continue to participate in the Central States plan for 10 years after the amounts that it had deferred had been fully paid off.  Yellow completed those payments in January 2023 and withdrew from the Central States plan when it discontinued business operations in July 2023.  Under the letter agreement, that withdrawal entitled Central States to nearly $1 billion in liquidated damages.  The Court found that under Illinois law (which governed that claim) this provision would be treated as a penalty clause and would not be enforceable.

### 2.      The debtors' abandonment of the prior settlements and confirmation of a plan

Following the issuance of the April 2025 decision, the debtors concluded that the plan containing the previously negotiated settlements with the various pension

---

[55] The Teamsters Local 641 Pension Fund is referred to as "Local 641."

[56] *Yellow Corp.,* 672 B.R. at 258.

22

plans could not meet the standard this Court had articulated and thus elected not to pursue confirmation of that plan. Instead, the debtors proposed a plan that did not resolve the pension plan claims but merely established an ordinary "waterfall" distribution of the estate's assets to the holders of allowed claims. This Court confirmed that plan, over MFN's objections, in November 2025.[57] In addition, in September 2025 the Third Circuit (which had granted a direct appeal from this Court's November 2024 order upholding the PBGC regulations and holding that Yellow could be held to its prepetition agreements to pay greater withdrawal liability) affirmed this Court's rulings.[58]

### 3.    The current proposed settlements

During the confirmation hearing, MFN elicited testimony on cross-examination indicating that the debtors had reached agreements in principle to settle the various pension plan claims but had not yet finalized those settlements.[59] Following the entry of the confirmation order, the debtors filed the instant motion to approve those settlements.[60] While the settlements operate through a largely common methodology, the settlements with each of the pension plans with which the debtors seek to settle is a separate agreement. While the plan has been confirmed,

---

[57] *In re Yellow Corp.*, No. 23-11069, 2025 WL 3292607 (Bankr. D. Del. Nov. 25, 2025).

[58] *In re Yellow Corp.*, 152 F.4th 491 (3d Cir. 2025). The debtors and MFN have since filed a petition for certiorari seeking review of that decision. *See MFN Partners, LP, et al. v. New York State Teamsters and Retirement Fund, et al.*, No. 25-986 (U.S. Feb. 13, 2026).

[59] *Yellow Corp.*, 2025 WL 3292607, at *11.

[60] D.I. 8296.

the debtors have chosen to delay going effective on that plan in order to permit the debtor in possession to present these settlements.

The Court conducted an evidentiary hearing on the motion to approve these settlements on January 21, 2026.  At that hearing, certain critical facts were the subject of stipulations by the parties.[61]  In addition, all of the documentary evidence was admitted by agreement of the parties and without objection.[62]  The parties also dispensed with opening statements and began immediately with the evidence.  As a result, a hearing that could easily have taken several court days was completed in a single (long) day.[63]  The Court very much appreciates the parties' cooperation and professionalism, notwithstanding their strong disagreements on the merits.

As the evidence revealed, as to most but not all of the pension plans, the settlement operates through a five-step process:

*First*, the parties determined the unfunded vested benefits of each of the plans that was allocable to the debtors.  As described above, determining that amount requires one to make an assumption about the applicable interest rate.  This Court's February 2025 opinion concluded (following the three courts of appeals to have addressed the issue) that the rate must be similar to the one that the plan uses to calculate minimum funding.  As a compromise of this disputed question, the unfunded vested benefits were set at an amount that was weighted 60 percent to a

---

[61] D.I 8485, 8502, 8551.

[62] *See* Jan. 21, 2026 Hr'g Tr. at 17-25.

[63] *See id.* at 1-351.

24

calculation using the plan's rate for minimum funding and 40 percent to the rate originally selected by the plan's actuary.

*Second*, the parties determined the annual payments each plan would owe, as ERISA provides.  These calculations conformed with this Court's rulings about the effect of the 2014 ERISA amendments, as discussed above in Part 1.E.iii of the factual and procedural background portion of this Memorandum Opinion.

*Third*, the claim was limited to the lesser of the total unfunded vested benefits, or 20 years of annual payments.  That determination also accords with this Court's various rulings, such as discussed in Part 1.B.ii of the factual and procedural background portion of this Memorandum Opinion, that ERISA's 20-year cap was applicable.

The *fourth* step differed between those plans that received special financial assistance under the American Rescue Plan Act and those that did not.  Those pension plans that received special financial assistance were required to use the PBGC's (relatively lower) interest rate for the purpose of calculating minimum funding.  That means that those plans have relatively higher minimum funding obligations.  It also means, however, that they may present value the 20-year stream of payments using a lower discount rate, which operates to increase the present value of their withdrawal liability claim.

On the other hand, those pension plans that did not receive special financial assistance generally used minimum funding rates that approximated their expected

25

investment returns.  Using that (higher) rate to present value the stream of future payments would have operated to generate claims with lower present values.

This Court noted in its April 2025 decision, however, that § 1405(e) of ERISA would operate to reduce the disparities in the withdrawal liability claims held by various pension plans, when an employer withdrew from multiple plans, as a result of the different interests rates they used.[64]  The resolution that the parties reached on this issue was that they agreed that those plans that did not receive special financial assistance would have their claims discounted at five percent – an amount that is greater than the PBGC rate but lower than those plans' minimum funding rates (and is represented to be a weighted average of the applicable rates).

The *fifth* step was a reduction of each claim by 25 percent to account for the requirement of § 1405(b), which (according to this Court's ruling) would require a 50 percent reduction of each claim in the event of the debtors' insolvency.

In addition to the application of these principles to the withdrawal liability claims, the proposed settlements include the resolution of separate claims asserted by Central States and the New York Teamsters.  With respect to Central States, it is resolving its nearly $1 billion claim under the guaranty agreement, that this Court found to be an unenforceable penalty clause, for $165 million.  Central States is also receiving a $12.6 million priority claim.

The New York Teamsters is receiving a total allowed claim of $326.5 million.  Of that claim, the application of the methodology for resolving the plan's withdrawal

---

[64] *See supra* at n. 50.

liability would yield a claim of $250.8 million. That would suggest, as a mathematical matter, that $75.7 million is attributable to the New York Teamsters liquidated damages provision. The New York Teamsters, however, insist that the total settlement is a single, non-severable contract, under which the entire agreement must either be approved or not.

The settlement also has one other feature that bears note. The claims asserted against the pension plans are ones for which each of the debtors is jointly and severally liable, meaning that the pension plans can recover on account of these claims against the assets of each of the debtors. And because the result of these settlements is to increase the claim amounts from the assumptions used in the disclosure statement, the net result is therefore to dilute the recoveries of creditors whose claims run only against an individual debtor. To compensate for this effect, the pension plans are contributing approximately $7.4 million that will be paid under the settlement to the holders of claims for which there is no joint and several liability.

The parties do not materially disagree regarding the claim amounts based on this Court's rulings to date, and how those amounts compare to the proposed settlements. Importantly, however, the amounts listed under the "rulings to date" include certain assumptions about matters that have not been fully resolved. Most significantly, the amounts listed assume that the debtors would prevail in demonstrating their insolvency as of the time of the liquidation, which would therefore provide for the 50 percent reduction of withdrawal liability claims under 29 U.S.C. § 1405(b).

27

Based on the record before the Court, the chart below seeks to set forth, for each of the settling pension plans, (a) the claim amount based on the court's "existing rulings" (which is subject to the caveat described above), (b) the settlement amount based on the application of the five-step methodology described above, and (c) the settlement amount on which the parties have agreed (all subject to rounding):

| Pension Plan | Claim Amount Based on Existing Rulings | Settlement amount applying five-step methodology | Settlement Amount |
|---|---|---|---|
| Central States Withdrawal Liability | $369.6 million | $554.5 million | $554.5 million |
| Central States Penalty Claim | $0 | n/a | $165 million |
| Freight Drivers | $3.6 million | $5.4 million | $5.4 million |
| Local 1730 | $2.5 million | $2.3 million | $7.5 million |
| Local 701 | $2.6 million | $4 million | $3.9 million |
| New York Teamsters | $167.2 (plus liquidated damages claim) | $250.8 million (plus liquidated damages claim) | $326.5 million |
| Local 617 | $0.1 million | $0.1 million | $3.0 million |
| Local 641 | $10.2 million | $15.3 million | $15.3 million |
| Teamsters New Jersey | $1.2 million | $1.7 million | $1.7 million |
| Local 707 | $17.1 million | $25.7 million | $25.7 million |
| Central Pennsylvania | $13.2 million | $42.2 million | $42.2 million |
| IAM National | $5.6 million | $13.2 million | $13.2 million |
| New England Teamsters | $110.4 million | $213.8 million | $213.8 million |
| Virginia Teamsters | $2.9 million | $5.0 million | $5.0 million |
| Local 710 | $0 | $36.1 million | $36.1 million |
| Philadelphia Teamsters | $9.7 million | $19.5 million | $19.5 million |
| TOTAL | $713.3 million (excluding NY Teamsters liquidated damages claim) | $1.1896 billion (excluding NY Teamsters liquidated damages claim and any settlement of Central States penalty claim) | $1.4383 billion |

This chart is a useful tool in guiding the Court's analysis of the proposed settlements. Those cells on the chart that are not shaded in any color represent settlements for which the only issue is the permissibility of the five-step settlement

28

structure described above.  The reasonableness of those settlements is addressed in Part II of this Memorandum Opinion.  Those with shading involve one-off issues that require separate discussion.  The resolution of the Central States penalty clause claim is shaded in red above and is addressed in Part III.  The resolution of the "fresh start" accounting issue involving Local 710 is shaded in orange above and addressed in Part IV.  The resolution of the New York Teamsters' claim (including its liquidated damages claim) is shaded in yellow above and addressed in Part V.  And the proposed settlements with Locals 617 and 1730 are shaded in green above and addressed in Part VI.

### Jurisdiction

As a claims-allowance dispute, this matter arises under § 502 of the Bankruptcy Code and is therefore within the "arising under" jurisdiction of 28 U.S.C. § 1334(b).  It has been referred to this Court pursuant to 28 U.S.C. § 157(a) and the district court's February 29, 2012 standing order of reference.

### Analysis

**I.    The Court's analysis of the settlements will afford the debtor in possession some measure of deference, though the scrutiny will be more searching than the most deferential form of "business judgment" review.**

This Court's March 27, 2025 and April 7, 2025 opinion each spill a fair amount of ink on the standard that the Court ought to apply in considering the motion to approve these settlements.  The Court will not repeat in full the analysis set forth therein.  By the completion of the briefing on the motions, the parties seem broadly

to agree that an intermediate level of scrutiny along the lines suggested by the court in *In re DVR* makes the most sense.[65]  This Court agrees.

The Court's punchline conclusion on the standard that is applicable to the proposed settlement is that the Court is required to review the proposed settlements carefully and to approve them only if the Court is satisfied that the settlements are in fact reasonable.  At the end of the day, however, the Court is not persuaded that the argument over the applicable standard makes much of a practical difference.

It is true that some cases talk about a settlement being just one rung above the very bottom of the ladder of what is reasonable.  And read out of context, that language might suggest an extreme level of deference to the debtors' judgment.  But when one looks more closely at the caselaw from which that language originates, those cases make it clear that a court is still required to review a proposed settlement, hear out the reasons offered in opposition to the approval, and reach a conclusion about the substantive reasonableness of the settlement.  That does not mean, in this or any context, that the role of the Court is to ask whether the judge would choose to enter into such a settlement if the judge were charged in the first instance with running the debtor's business affairs.  That is not the role of the court, and as a result the debtor's business judgment is necessarily entitled to some measure of deference.  But nor does that mean that a bankruptcy judge should come to court wielding a rubber stamp.

---

[65] 582 B.R. 507.

In short, while the Court is not certain there is *any* circumstance in which that is the standard, it is at the very least clear that in the context of a motion to approve the settlement of a claim to which a party in interest has objected, the Court should only approve the settlement if the evidence shows that the settlement is in fact a reasonable one.

It also bears emphasis that the case for deferring to the debtors' "business judgment" necessarily operates differently in different contexts. The paradigmatic articulation of the "business judgment rule" arises when a shareholder seeks to bring a derivative action against a corporate director after some business decision turns out poorly for the corporation, thus reducing the value of the shareholder's investment.[66] In that context, courts are appropriately concerned about discouraging businesses from taking appropriate risks. Unless the decisions made at the time are entitled to some measure of deference, one risks turning corporate directors into insurers of the success of the enterprise. Because no one thinks that would make any sense, the case law is sensibly focused in substantial part on ensuring that the directors appropriately informed themselves of the risks and that the processes followed were standard and appropriate.

The questions presented to a bankruptcy court are different. Even in the context of a motion for authority to use or sell estate property under § 363(b), the question is asked in advance, rather than after things have gone sideways. But there are logical reasons why bankruptcy courts in that context have largely drawn on the

---

[66] *See, e.g., In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006).

"business judgment" principle that comes out of the fiduciary duty caselaw. Bankruptcy judges are, after all, judges, not business executives or financial advisors. A debtor in possession in a chapter 11 case will typically have a management team with the skills and training to make decisions about how to deploy the firm's capital in order to maximize the return for stakeholders. Bankruptcy judges generally do not. So that is further reason why it makes good sense for courts to afford some measure of deference to the trustee or debtor in possession when asked to review a motion seeking approval to use or sell estate property under § 363. Accordingly, it is widely accepted that a bankruptcy court reviews the trustee's business judgments deferentially, asking whether there is a "sound business purpose" or "good business reason" for the decision.[67]

---

[67] *See, e.g.*, *In re ICL Holding Co., Inc.*, 802 F.3d 547, 551 (3d Cir. 2015) (citing *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153-54 (Bankr. D. Del. 1999)); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). A recent article makes the interesting argument that the applicable standard should be supplied by state rather than federal law. *See* Dolan Bortner, *Judging Business Judgment: The Federal Common Law of Bankruptcy Transactions in Chapter 11*, 43 Yale J. on Reg. 253 (2026). Professor Bortner reads cases such as *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979), and *Texas Indus. Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981), to provide that matters unaddressed in a federal statutory scheme should incorporate state law in the absence of a clear federal interest that counsels to the contrary. This Court, however, is not persuaded that these cases point to state corporate law as providing the controlling standard under § 363. *First*, there are important ways in which the concerns of federal bankruptcy law are different from those of state law of fiduciary duties. *Second*, because § 363 applies in chapter 7 cases as well as those under chapter 11, it is far from clear whether the applicable state law would be state corporate law or the law of trusts, which imposes a different form of fiduciary duty that does not include the same form of "business judgment" deference. *See generally Stegemeier v. Magness*, 728 A. 2d 557, 562 (Del. 1999) ("the standards of trust law and corporation law are different"). All of that notwithstanding, even in articulating a federal law governing the court's review of a bankruptcy transaction, this Court finds the guidance provided by the Delaware Court of Chancery and the Delaware Supreme Court on analogous issues of fiduciary duty to be highly instructive and persuasive.

32

**A.** **In a typical circumstance, courts afford a measure of deference to a trustee's decision to settle a claims allowance dispute – though not the extreme deference that might be suggested by the language about the "lowest point in the range of reasonable."**

The approval of a settlement, unless it is a settlement of an estate cause of action that is property of the estate, is not formally governed by § 363. Indeed, nothing in the Code itself expressly addresses the settlement of a claims dispute. And while the subject is addressed by Bankruptcy Rule 9019, that rule does not set forth a substantive standard, stating only that "[o]n the trustee's motion and after notice and a hearing, the court may approve a compromise or settlement."[68]

Rather, in *TMT Trailer Ferry*, a pre-Code case, the Supreme Court explained that settlements that form the basis for a plan of reorganization must be "fair and equitable."[69] The Third Circuit's decision in *In re Martin*, relying on *TMT Trailer Ferry*, found that a bankruptcy court reviewing a trustee's decision to resolve an estate claim should consider "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."[70]

The Third Circuit's articulation of factors to consider is not terribly controversial. Some of the language used by bankruptcy court decisions applying

---

[68] Fed. R. Bankr. P. 9019(a).

[69] *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

[70] *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996). *See also ICL Holding*, 802 F.3d at 551-552 (same).

that test, however, particularly when taken out of context, could be read to suggest that so long as any sober debtor could possibly have agreed to a settlement, a bankruptcy court is duty-bound to rubber stamp it. The language quoted to support this approach derives from Judge Friendly's opinion for the Second Circuit in *Newman v. Stein*, where the Second Circuit approved the settlement of a derivative action brought under the Investment Company Act on the ground that the proposed settlement did not fall "below the lowest point in the zone of reasonableness."[71] But nothing in *Newman* suggests that the court was concluding that a trial court should affix a rubber stamp to a proposed settlement. To the contrary, the Second Circuit in *Newman* relied on the Supreme Court's *TMT* opinion for the proposition that a court must "reach an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated and form an educated estimate of the complexity, expense, and likely duration of such litigation and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."[72]

The language about the "lowest point in the zone of reasonableness" has, in turn, worked its way into a line of subsequent cases.[73] And while the courts in each of these cases in fact engaged a fair and careful analysis of the settlements that were

---

[71] 464 F.2d 689, 698 (2d Cir. 1972).

[72] *Id.* at 692 (internal quotations and ellipses omitted).

[73] *See, e.g., In re Carla Leather, Inc.*, 44 B.R. 457, 465-66 (Bankr. S.D.N.Y. 1984); *In re Grant Broadcasting of Philadelphia*, 71 B.R. 390, 396 (Bankr. E.D. Pa. 1987); *In re Pennsylvania Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992); *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008).

34

presented to them, the language has nevertheless taken on something of a life of its own, and is at times used to suggest some heightened level of extreme deference.

To be sure, the trustee (and in a chapter 11 case, the debtor in possession in its capacity as trustee) – not the bankruptcy judge – is tasked with running the bankruptcy estate in the first instance.  So in determining what course is in the estate's best interest, there is good reason why bankruptcy courts might think long and hard before they substitute their own judgment for that of the trustee.  Indeed, those reasons are closely analogous to those that support the application of the "business judgment" standard to § 363 sales, as discussed above.  But based on this Court's review of the applicable line of authority, when a party in interest challenges a proposed claim settlement on the ground that it is not in the estate's best interest, a bankruptcy court is duty bound to give that party a fair hearing and satisfy itself that the trustee has formed a reasoned judgment about what is best for the estate, in light of the factors the Third Circuit identified in *Martin*.

### B.     The *DVR* standard best accommodates this principle with the statutory right of a creditor to object to the allowance of a claim.

The Court's March 31, 2025 and April 7, 2025 opinions set out the three lines of cases that address a trustee's motion to settle a claims allowance dispute during the pendency of an objection to that claim by another party in interest.  This Court is persuaded that the approach taken by the court in *DVR* best harmonizes the

35

statutory command of § 502(b) with the long history of trustees undertaking to resolve claims allowance disputes as part of their role in managing the bankruptcy estate.[74]

As the *DVR* court noted, § 502(b) states that when a party in interest objects to the allowance of a claim, the court "shall" determine the allowed amount of that claim. That command may not be ignored. But it need not be read to mean that the court is statutorily required to conduct a full claims allowance process before it even considers a motion to settle the claims dispute. Bankruptcy, after all, is largely designed around solving the collective action problem that exists outside of bankruptcy where a single hold-out creditor can block an otherwise sensible and value-maximizing debt restructuring.[75] Reading the statute to permit every and any creditor or party in interest to hold up all progress in the bankruptcy case unless and until it fully litigates a potential objection to every filed claim in the case would be wholly impractical. Such a reading would provide an objector with the very ability to extract holdout value that the Bankruptcy Code is generally designed to avoid. In view of the imperative that federal statutes be read holistically and in a way that is consonant with Congress' overarching objectives, the Court would be disinclined to

---

[74] *See DVR,* 582 B.R. at 515 (discussing historical role of bankruptcy trustees in resolving claims allowance disputes.)

[75] *See Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 220 (pointing to the "the overall purpose of bankruptcy law in solving collective-action problems") (internal brackets and quotations omitted); *Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d Cir. 1995) (bankruptcy seeks "to protect creditors by preventing particular creditors from acting unilaterally in self-interest to obtain payment from a debtor to the detriment of other creditors") (internal quotation omitted).

adopt such a construction unless it were compelled by the statutory text.[76]   Perhaps

for that reason, no party before the Court even argues for such an interpretation.

And such a reading is not, in any event, compelled by the text of § 502(b).  As

the *DVR* court observed, treating the contested matter over whether to approve the

settlement as one to *determine* the allowed amount of the claim respects § 502(b)'s

direction that a party in interest be permitted to object to the allowance of a claim.  If

"parties settle a claim objection by agreeing that a creditor will have a claim in a

certain amount, and the court, after applying the Rule 9019 standard, approves the

settlement, then it has 'determined' and 'allowed' the claim."[77]

This Court agrees with the court in *DVR* that one can reconcile § 502(b)'s right

of a party in interest to object to the allowance of a claim with the trustee's historical

authority to settle claims allowance disputes by giving the objecting party a full and

fair opportunity to be heard in opposition to the motion to approve a settlement.  By

doing so, the court in substance incorporates the objection to claims allowance into

the contested matter over approval of the settlement.

In order for this process to respect the objecting party's statutory rights under

§ 502(b), the court must engage in a searching inquiry into the reasonableness of the

proposed settlement with the full participation of the objecting party.  Only then can

---

[76] *See, e.g., Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003) ("As the Supreme Court has often noted, statutory construction is a holistic endeavor, and this is especially true of the Bankruptcy Code. [Courts] must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (internal citations, brackets, and quotations omitted).

[77] *DVR,* 582 B.R. at 512.

it fairly be said that the decision to approve the settlement is tantamount to a decision to allow the claim in the amount of the settlement.

The court in *Kidde-Fenwal* made a similar point about the standard to be applied when considering a proposed settlement of an estate cause of action (such as for veil piercing or alter ego), the result of which would be to deprive a claimant of a right the claimant would otherwise have outside of bankruptcy to pursue a non-debtor on that claim.  There, the court addressed the general standards courts apply when approving settlements but noted that the standard should perhaps be applied in a "more searching" manner when the result of the court's approval would be to deprive a creditor of a right it would have outside of bankruptcy.[78]  In an observation that makes a point similar to the one this Court sought to make above in rejecting the extreme levels of deference that might be suggested by the "lowest point in the range of reasonable" language, the *Kidde-Fenwal* court added that "the approval of any settlement that just rises above 'the lowest rung in the ladder' seems particularly ill-suited for this situation."[79]

---

[78] *In re Kidde-Fenwal, Inc.*, No. 23-10638 (LSS), 2025 WL 1693173, at *5 (Bankr. D. Del. June 16, 2025).

[79] *Id.*  The Third Circuit similarly suggested in *Whittaker Clark & Daniels* that a more searching review of such a settlement may be appropriate.  There, the court emphasized the bankruptcy court's obligation to "scrutinize proposed settlements under Bankruptcy Rule 9019 to determine what course of action will be in the best interest of the estate."  *In re Whittaker Clark & Daniels, Inc.*, 152 F.4th 432, 452 n.16 (3d Cir. 2025) (internal quotation omitted).  *See also In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) (setting out factors to consider on a motion to approve a settlement involving a release of a company's claims against its insiders).

Further support for the view that a party that objected to a claim is not necessarily entitled to a full hearing on that objection can be found in § 502(c) of the Bankruptcy Code, which expressly permits a court to "estimate" a claim, rather than conduct a full proceeding, when such a proceeding "would unduly delay the administration of the case."[80]  Indeed, one leading scholar describes the process of having a bankruptcy court estimate a claim under § 502(c) as a form of "coerced settlement."

> Outside of bankruptcy, most civil cases are settled.  Every settlement reflects an estimate by both parties of their chances of success on the merits.  Disregarding concerns about reputation and other complications, the settlement value of [a $12,000 claim asserted by a creditor with a one-in-three chance of prevailing in an all-or-nothing circumstance] is about $4,000.  It might make sense for a bankruptcy judge to estimate a claim according to its present probability of success.  Even though this amount will necessarily be different from the outcome of any litigation, it may match the settlement that we would have seen in the absence of bankruptcy.[81]

Section 502(c) would therefore permit a bankruptcy court to estimate a claim, which for this purpose means determine the amount in which the claim should be allowed for all purposes, based on an estimation hearing similar to the one-day proceeding this Court conducted.[82]  The difference, of course, is that in an estimation proceeding the role of the court is to set out its own view, based on the evidence presented, of what would constitute a fair settlement.  In a motion such as the one

---

[80] 11 U.S.C. § 502(c).

[81] Douglas G. Baird, *Elements of Bankruptcy* 81 (7th ed. 2022).

[82] *See In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984) ("In estimating a claim, the bankruptcy court should use whatever method is best suited to the circumstances.") (citation omitted).

now before the Court brought under Bankruptcy Rule 9019, the task is to determine whether the settlement proposed by the trustee is an appropriate one, affording some amount of deference to the trustee's judgment. But the fact that the Code would expressly permit an estimation in these circumstances at least suggests that there is nothing inherently wrong with resolving a claims-allowance dispute following a procedure that, while providing the objecting party a full and fair opportunity to participate, may be more summary than a full contested matter on a claim objection.

In sum, this Court concludes that when the bankruptcy trustee seeks to settle a dispute over the allowance of a claim to which a party in interest has filed an objection under § 502(b), the bankruptcy court *may* approve a settlement between the creditor and the trustee. If the court does approve the settlement, the creditor's claim is allowed in the amount of the settlement, thus satisfying the requirement of § 502(b) that the bankruptcy court determine the allowed amount of the claim. As with any settlement to which a party has objected, the court should give full and fair consideration to the points made by the objector in opposition to the settlement. Even so, however, there remains some room for deference to the trustee's judgment.

Implementing that standard is concededly something that involves at least as much art as science. To try to be concrete about it, imagine a dispute over a claim asserted in the amount of $1 million in which the court concludes, after reviewing the evidence and arguments presented by the parties, that the debtor has a 60% chance of having the claim disallowed. In an estimation proceeding, the court would allow a claim for $400,000.

40

One could certainly see a court, however, concluding that there was room for reasonable disagreement about its assessment of the strength of the debtor's argument, and therefore conclude that in light of the deference it owes to the trustee's judgment, that a settlement that allows the claim in an amount closer to $600,000 was "within the zone" of reasonable. On the other hand, approving a settlement that allowed the claim in the amount of $900,000 would likely not be consistent with the court's obligation to satisfy itself that the settlement was in the best interests of the estate after giving full and fair consideration to the points made by the party who objected to the allowance of the claim and is opposing the settlement. Otherwise put, such a settlement would fall outside the appropriate "zone" of reasonableness. In the (perhaps informal) language this Court used in its April 2025 ruling, such a settlement would not be "in the same Zip Code" as the court's own assessment of the strength of the claim.

### C. The same standard applies to the proposed settlements between the debtors and members of the Committee.

MFN argues that a heightened standard should apply to the Court's consideration of the settlements with Central States and New York Teamsters, both of which are members of the Committee.[83] But MFN points to no case in which any court has ever found the heightened standard of review that applies to transactions between a corporation and an insider to apply to a transaction between a debtor in possession and a member of a creditors' committee. It is true that in its confirmation

---

[83] D.I. 8516 at 25-27. The Official Committee of Unsecured Creditors is referred to as the "Committee."

41

opinion, this Court noted that it understood and appreciated MFN's concerns about the Committee's rejection of the debtors' original plan.[84] The Court is not persuaded, however, that any of that provides a basis for applying a different standard to a motion to approve the proposed settlements between the debtors and Central States or the New York Teamsters.

## II. The principal pillars of the settlements satisfy the applicable standard.

In broad strokes, the Court finds that each of the principal pillars of the debtors' settlement structure falls within the range of reasonable. As described above, this Court resolved a number of disputed issues on partial motions for summary judgment. On many of those issues, the Court found the debtors' position to be the stronger one. Those rulings, however, have not yet been reduced to final judgment so they are not yet appealable. In the absence of a settlement, however, the parties would be free to continue litigating these issues and to appeal from the entry of final judgment. In addition to the expense associated with continued litigation, there is also risk that this Court's decisions could be reversed on appeal.[85]

---

[84] *In re Yellow Corp.*, 2025 WL 3292607, at *11.

[85] The expense of litigation is a factor identified by *Martin* as one that courts may consider in assessing the reasonableness of a settlement. And as this Court's confirmation decision explained, the Court does anticipate that the cost to the estate of continuing to litigate withdrawal liability issues would be very substantial. *See In re Yellow Corp.,* 2025 WL 3292607, at *17-18. That said, so long as both sides' litigation costs would be roughly equal, there is no economic reason why the fact of litigation cost should affect the price at which a dispute would settle. This Court accordingly focuses primarily, in its discussion of the reasonableness of the proposed settlement, on its assessment of the risk associated with litigation, rather than its cost.

This Court has no quarrel at all with the proposition that the debtors would rationally pay something to the pension plans to eliminate the risk associated with the plans' pursuit of appeals from this Court's various claims allowance decisions. The question now before the Court is whether the debtors are effectively overpaying the plans in light of the risks associated with those potential appeals. That exercise necessarily requires this Court to assess the likelihood that an appellate court might conclude that this Court's earlier decisions were wrong.

Judges, who by and large are humans, are of course subject to the natural bias of believing that their own decisions were correct. Why else, after all, would the court have decided the issue as it did if the decision were not correct? But the obvious reality, in addition to the possibility of human error, is the fact that courts regularly resolve disputes on which there is room for reasonable disagreement. The task in assessing this settlement accordingly requires the Court to do its best to control for natural human biases. The question is whether, viewed objectively, the debtors' decision to settle the potential appeals, by paying amounts that are greater than the estate would owe if the decisions were all affirmed, was the exercise of reasoned business judgment. And for the most part, the Court concludes that it was.

In calculating the withdrawal liability claims, the parties generally followed this Court's summary judgment rulings except for three issues on which the settlement methodology reflects a compromise between the approach adopted in this Court's rulings and the positions taken by the plans. *First*, the settlement reflects the use of an interest rate to calculate unfunded vested benefits that is higher than

43

this Court's February 2025 partial summary judgment decision would suggest; *second*, the settlement discounts the future liabilities over the 20-year period at a higher rate than this Court's April 2025 decision would suggest; and *third*, the settlement reduces all withdrawal liabilities at 25 percent, not the 50 percent that this Court held would be required by § 1405(b) if the debtors proved that they were insolvent at the time of the withdrawal. The Court views each of these compromises as being akin to the $1 million claim that the court believes is properly valued at $400,000 but the debtors propose to settle at $600,000. As to each, the settlement gives a greater weight to the likelihood of the plans obtaining a reversal of this Court's decisions on appeal than this Court would ascribe to that possibility. But that is a matter of judgment, and the Court concludes that after affording the debtors the deference to which it has concluded they are entitled, these compromises are reasonable. *Finally*, the Court finds that the settlement's "gifting" provision comports with the consensus reading of applicable Third Circuit authority.

## A. The settlement's resolution of the interest rate used in determining unfunded vested benefits is reasonable.

As the Court described in Part 1.C of the factual and procedural background section of this Memorandum Opinion, the calculation of unfunded vested benefits requires a plan to choose an interest rate for the purpose of determining the cost today of providing pension benefits for decades into the future. Using a low interest rate would increase the present value of those future obligations and thus increase an employer's withdrawal liability. And as described above, certain of the pension plans chose a low, nearly risk-free rate of return for this purpose. Many of these

44

plans, however, used a higher rate for the purpose of calculating the minimum funding requirement, where selecting a higher rate was more advantageous to the plans. The Sixth Circuit in *Sofco,* however, pointed out that the statutory language governing these two calculations is nearly identical.[86] The court thus held that the two interest rates need, at the very least, to be similar. The D.C. and Ninth Circuits have followed *Sofco*.[87] The Third Circuit has not ruled on this issue. As the Court's February 2025 opinion pointed out, however, there is also a well-reasoned opinion from a New Jersey district court (that pre-dates the courts of appeals opinions), *Manhattan Ford*, that comes out the other way. And significantly, since the time of this Court's February 2025 ruling, another district court (in the Northern District of Illinois) has adopted the plans' position.[88]

The debtors propose to settle this issue with the pension plans by having the plans calculate unfunded vested benefits by using an interest rate that is 60 percent weighted towards the minimum funding rate and 40 percent weighted towards the rates that the plans actually selected. Accordingly, the settlement effectively ascribes a 60 percent likelihood to the possibility this Court's ruling will be affirmed and a 40 percent likelihood to the possibility it will be reversed.

This Court's own assessment of the likelihood of reversal on this issue is lower than the settlement assumes (even taking account of the recent decision in *Allied*

---

[86] *Sofco,* 15 F.4th 407.

[87] *United Mine Workers of America 1974 Pension Plan v. Energy West Mining Co.*, 39 F.4th 730 (D.C. Cir. 2022); *GCIU-Employer Retirement Fund*, 51 F.4th 1092 (9th Cir. 2022).

[88] *See Central States, Southeast and Southwest Areas Pension Fund v. Allied Aviation Fueling Co. of St. Louis, LLC*, No. 21-CV-2821, 2025 WL 2524492 (N.D. Ill. Sept. 2, 2025).

45

*Aviation*) – probably more like 33 percent.  But the Court does not believe that the decision to resolve this by ascribing a 40 percent likelihood of success to the pension plans is outside the range of reasonable.

**B.     The five percent interest rate used to present discount the 20-year stream of payments is reasonable.**

Similarly, the decision to present discount the 20-year stream of payments to present value at a five percent discount rate is a compromise that falls within the range of reasonable.  At the outset of the case, both sides effectively sought interest rate arbitrage through the means of present-valuing the 20-year stream of payments.  The debtors took the position that the proper discount rate was their own marginal cost of capital, which they contended could be as much as the 18 percent interest they were paying on their DIP facility.[89]  At the other extreme, the pension plans took the positions that (a) the debtors' default on their prepetition obligation to make pension plan contributions meant that the full amounts (including the interest that would be due) had accelerated before the petition date; (b) the debtors' bankruptcy was itself an event of default that accelerated the obligation to pay interest; and (c) the 20-year cap is not even applicable to the employer's obligation to pay its ratable share of the plan's unfunded vested benefits.[90]

While the Court initially confused the debtors' prepetition default with the kind of default under the 20-year payment stream that would operate to accelerate the 20-year obligation, the Court fixed that error on the debtors' motion for

---

[89] D.I. 5381 at 27.

[90] D.I. 5377.

46

reconsideration.[91]   Thereafter, the Court came to the (perhaps obvious) realization that under *Sexton v. Dreyfus* and *Oakwood Homes*, the right answer to this question is that (a) bankruptcy itself operates as an acceleration event, but (b) any unmatured interest is disallowed, so that the task of "present valuing" the payment streams involves nothing more than adding up the portions of the payment obligations that represent principal rather than interest.[92]

The resolution that the parties reached on this issue was that they agreed that those plans that did not receive special financial assistance would have their claims discounted at five percent – an amount that is greater than the rate used to calculate the interest component of the 20-year payment stream but lower than those plans' minimum funding rates (which many of the plans continue to contend is the proper rate to use for present discounting).

The Court finds this resolution to be within the range of reasonable. On this issue, the Court is actually pretty convinced of the correctness of the conclusion that it (belatedly) came to in its April 2025 decision. Two factors, however, when taken together, lead the Court to conclude that the parties' resolution is within the range of reasonable. *First* is the point noted above. The Court ought to take with a grain of salt its own confidence in the correctness of its prior rulings. And *second* is the fact that the potential swing between the colorable arguments advanced by the parties, from on the one hand discounting the stream of payments at a nearly 18 percent

---

[91] *Yellow Corp.*, 2024 WL 4925124.

[92] *See Sexton v. Dreyfus*, 219 U.S. 339 (1911); *In re Oakwood Homes Corp.*, 449 F.3d 588 (3d Cir. 2006); *Yellow Corp.*, 672 B.R. at 643-646.

47

discount rate to on the other not even applying the 20-year cap, is enormous. While the Court lacks the underlying data (and probably the math skills) to calculate the precise effect on the total allowed amount of the claims that these differences would yield, common sense suggests that the total withdrawal liability claims could vary in the *billions* of dollars based on the resolution of this issue.

In the scheme of things, the effect of the parties' resolution of this issue is relatively modest. MFN argued in its objection, without contradiction from any other party, that the total effect of this resolution was approximately $117 million.[93] And so while the Court would not put a very high likelihood on the prospect of reversal on appeal, in light of the magnitude of the effect, it would only take a rather small chance of reversal to swing the number by the amount reflected in this resolution. This Court adheres to the old-fashioned belief that many legal questions actually have correct answers — or at the very least that one answer is decidedly better than any of the alternatives. But notwithstanding that belief, a lesson that every litigator learns at an early stage is that even when one result appears 100 percent certain to be correct, the likelihood of success is still never higher than 90 percent.[94] For that reason, the

---

[93] D.I. 8516 at 41 (stating that the effect of this resolution was to increase the withdrawal liability claims by approximately $156 million before the 25 percent reduction provided under the resolution of the § 1405(b) issues, meaning that the total effect after the reduction is approximately $117 million).

[94] One exception to that principle applies in the context of seeking Supreme Court review of an appellate court's decision, since the Supreme Court typically grants less than two percent of filed petitions. *See* William J. Aceves, *Ending the Paper Chase at the Supreme Court,* 96 U. Colo. L. Rev. 1083, 1097 (2025) (Supreme Court grants review "in less than 2 percent" of the cases in which certiorari is sought). For this reason, the Court is comfortable ascribing little to no weight to the likelihood that the Supreme Court would grant certiorari to review the Third Circuit's decision upholding the PBGC's regulations. *See supra*, n. 58.

Court concludes that the relatively modest adjustment in the total claims amount, particularly when compared to the possible variation that could have resulted had the matter been fully litigated with each side free to assert its most extreme position, falls within the range of reasonable.

### C. The settlement's resolution of the application of § 1405(b) is reasonable.

The Court similarly concludes that the parties' resolution of the "cap" imposed on withdrawal liability claims under § 1405(b) is reasonable. On this issue, the Court ruled in its April 2025 decision that the 50 percent cap on withdrawal liability claims in the event of the debtors' insolvency applied in this circumstance, and applied *after* the application of ERISA's 20-year cap.[95] The resolution reached by the parties was to reduce all of the withdrawal liability claims by 25 percent – half of the amount by which they would be reduced if the debtors were to prevail on this issue.

The Court is satisfied that this resolution is within the range of reasonable. Here, the Court would not ascribe very much value to the prospect that the Court's resolution of the legal issues might be reversed on appeal. While the pension plans make the argument with energy and vigor, for the reasons it described in its April 2025 opinion, the Court views their claim that § 1405(b) applied *before* ERISA's 20-year cap, and the claim that it does not apply at all, to be rather weak.[96] On the

---

[95] *Yellow Corp.*, 672 B.R. at 252-256.

[96] The plans insist that their argument in this regard is supported by the Eleventh Circuit's opinion in *Perfection Bakeries Inc. v. Retail Wholesale & Dep't Store Int'l Union & Indus. Pension Fund*, 147 F.4th 1314 (11th Cir. 2025). This Court disagrees. *Perfection Bakeries* addressed a particular issue that arises between the intersection of §§ 1381 and 1386 of title 29, which relates to partial withdrawals. Nothing in that decision calls into the question the

49

theory that (as described above) nothing is ever certain, the risk that an appellate court might adopt such an argument could perhaps justify reducing the cap from 50 percent to somewhere between 40 and 45 percent.  The balance of the reduction, however, can be justified based on the possibility that the plans might have prevailed on factual or legal issues that the Court has not yet considered.

As the April 2025 decision explains, § 1405(b) applies in "the case of an insolvent employer undergoing liquidation or dissolution."[97]  The statute by its terms does not address the date as of which the employer's insolvency ought to be assessed. If the question is viewed as of the time the employer's liquidation is completed, it appears likely (although, as the Court's confirmation opinion explains, not yet certain) that Yellow will turn out to have been insolvent.[98]

Simply as a matter of ordinary context, however, the Court thinks it more likely that § 1405(b) requires the Court to make an assessment of the debtors' solvency as of the time the employer withdrew from the plan.  Here, the withdrawal took place in July 2023.  And a conventional assessment of the debtors' solvency as of July 2023 would need to be based on information that was known or knowable as of that time.

What was known about Yellow's solvency as of July 2023?  It would require an evidentiary hearing to answer that question with any measure of certainty.  But

---

conclusion that the 20-year cap (imposed by the third step in § 1381) takes place before the reduction in the event of insolvency (imposed by the fourth step).

[97] 29 U.S.C. § 1405(b).

[98] *In re Yellow Corp.*, 2025 WL 3292607, at *4.

counsel for MFN acknowledged at the hearing on approval of the settlements that equity in the debtors traded for positive value at and after the petition date, and that MFN itself purchased equity in the debtors at and after that time.[99]

Judge Shannon explained in *Samson Resources* that it "is black letter law in this Circuit that the gold standard for determining the value of an asset is to sell it in an open and fair market.  A thing is worth what a willing buyer will pay to a willing seller following a proper marketing process."[100]  He added that the parties "may be right or wrong about what the future may hold, but the value is fixed and conclusively established by the price paid at closing."[101]  And in view of principles of absolute priority (though subject to important caveats about "option value") a positive trading price for a company's equity generally implies a market conclusion that the company is solvent, at least in the balance sheet sense of the term.  The *Iridium* court made essentially the same point, emphasizing that one may properly rely on "market data for purposes of valuing a public company."[102]  Indeed, *Iridium* relied heavily on the Third Circuit's decision in *VFB v. Campbell Soup* for that proposition.[103]

---

[99] Jan. 21, 2026 Hr'g Tr. at 292-293.

[100] *In re Samson Resources Corp.*, No. 15-11934 (BLS), 2023 WL 4003815, *31 (Bankr. D. Del. June 14, 2023).

[101] *Id.*

[102] *In re Iridium Operating LLC*, 373 B.R. 283, 291 (Bankr. S.D.N.Y. 2007).

[103] *See VFB LLC v. Campbell Soup Co.* 482 F.3d 624, 631 (3d Cir. 2007) (explaining that the position that "courts should never measure the value of a business by its market capitalization" was "clearly wrong," because "[e]quity markets allow participants to voluntarily take on or transfer among themselves the risk that their projections will be inaccurate").

This Court has never considered evidence on the issue of the debtors' solvency, let alone issued any decision.  In this respect, the suggestion that the claims based on the Court's rulings to date should include the application of a 50 percent cap, while perhaps an appropriate shorthand way of expressing the notion, is an important (and significant) oversimplification.  And while the Court is not in a position to be more precise about the appropriate level of discount, based on the record before it, the Court is satisfied that the parties' determination to cut the 1405(b) discounting in half, in view of the factual and legal uncertainties associated with that issue, is a resolution that falls within the range of reasonable based on the record before the Court.

### D.   The settlement's gifting provision is permissible.

As described in Part 3 of the Factual and Procedural Background section of this Memorandum Opinion, the settling pension plans have agreed to pay $7.5 million out of their recoveries on their withdrawal liability claims to, in effect, compensate those creditors whose claims run against a single debtor (rather than all of the debtors on a joint-and-several basis) for the dilutive effect of the settlements, which exceed the claims expectations reflected in the debtors' plan and disclosure statement.

MFN challenges this "gifting" provision on the ground that it violates the principle of equal treatment of similarly situated creditors.  As an initial matter, the Court rejects MFN's argument that this provision in the settlement agreement violates the requirement of § 1123(a)(4) that a plan provide the same treatment for creditors in the same class.  That requirement applies to the terms of a *plan*.  Here,

that is exactly what the confirmed plan requires. So in short, whatever problems the "gifting" provision of the settlement may raise, the provisions cannot alter the terms of the plan and thus cannot themselves run afoul of § 1123(a)(4).

That, however, simply raises the question whether this provision of the settlement agreement violates the terms of the confirmed plan, which require that all creditors in a particular class receive the same treatment. Giving this $7.5 million to some but not all general unsecured creditors (all of whom are classified together) at least arguably violates this plan provision in a way that is similar to the way that a "gift" that is provided under a plan can be said to violate the Code.

MFN makes essentially the same point another way, arguing (correctly) that the Supreme Court in *Jevic* held that one cannot achieve through a structured dismissal a result that the Bankruptcy Code's priority scheme would otherwise prohibit.[104] By that same logic, MFN argues that this settlement (whose separation from the plan might be described as an artifice) should not be permitted to achieve a result that the plan cannot. Those points are fair. Because, however, for the reasons described below, the Court concludes that the proposed "gift" would not violate existing law even if it were included in the plan itself, the Court need not address that issue further.

The challenge here on the merits of the "gifting" issue is that the Third Circuit caselaw on gifting, which is of course binding on this Court, is rather nuanced. The

---

[104] *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017).

leading Third Circuit case on the topic is *Armstrong World Industries.*[105]  There, the debtor proposed a plan that would have distributed warrants valued at $35-40 million to the company's equity interest holders (class 12).  The creditors' committee objected to confirmation, arguing that the distribution to equity violated absolute priority in view of the fact that a class of general unsecured creditors (class 6) voted to reject the plan.  Indeed, the parties agreed that if the distribution of the warrants to the prior equity holders were viewed as a distribution of estate property under a plan, the absolute priority rule precluded confirmation of the plan.  That rule, as codified in the current Bankruptcy Code, provides that value cannot be distributed to holders in a junior class, on account of their junior claims or interests, over the objection of a holder in a non-consenting senior class that is not being paid in full.[106]

The debtor's argument in *Armstrong*, however, was that the warrants were not a distribution of estate property.  Instead, it argued that the plan provided that these warrants would be distributed to the holders of class 7 claims (the holders claims arising out of exposure to the debtor's asbestos products), and that those holders were voluntarily agreeing to "gift" the warrants to the debtor's prior equity holders.  In support of that argument, the debtors relied primarily on two cases – *MCorp*

---

[105] *See In re Armstrong World Indus.*, 432 F.3d 507 (3d Cir. 2005).

[106] *See* 11 U.S.C. § 1129(a)(8) (requiring acceptance of all classes to confirm a plan); *id* § 1129(b)(1) (creating exception to requirement of acceptance so long as plan is "fair and equitable"); *id.* § 1129(b)(2)(B)(ii) (defining fair and equitable to provide, in the contest of unsecured creditors, to mean either payment in full or that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property"); *Bank of America National Trust and Savings Ass'n v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 441 (1999) (addressing what it means for a distribution to be "on account of" a junior claim or interest).

*Financial* and *Genesis Health*, both of which involved plans of reorganization in which holders in one class were permitted to "gift" certain value to holders in another class.[107]

The Third Circuit, however, found those cases to be distinguishable. The Third Circuit's treatment of the cases was brief and less than fully elucidating:

> *Genesis Health* involved property subject to the senior creditors' liens that was "carved out" for the junior claimants. In addition, the District Court found *MCorp* distinguishable on its facts because the senior unsecured creditor transferred funds to the FDIC to settle pre-petition litigation.
>
> We adopt the District Court's reading of these cases....[108]

The lore that has since grown up around *Armstrong*, however, is that only a "vertical" gift – one whose recipient is *junior* in priority to the objecting class that is not paid in full – violates absolute priority. For example, the district court in *Nuverra* noted that the *Genesis* case involved a "horizontal" gift, meaning that senior creditors shared some of their own recovery with some junior creditors, but not others who were at the same level of priority as the recipients of the gift.[109] The *Nuverra* court accordingly found that a plan that involved a "horizontal" gift was permissible.

---

[107] *See In re MCorp Financial, Inc.*, 160 B.R. 941, 948 (S.D. Tex. 1993); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001). The debtors in *Armstrong* also pointed to a third case, *In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993). The Third Circuit found that case readily distinguishable in that it was a chapter 7 case to which § 1129 of the Bankruptcy Code did not apply.

[108] *Armstrong*, 432 U.S. at 514 (internal citation omitted).

[109] *In re Nuverra Environmental Solutions, Inc.*, 590 B.R. 75 (D. Del. 2018).

That is certainly a factual distinction between *Armstrong* and *Genesis*. It is not, however, the distinction on which the *Armstrong* court itself relied.[110] Rather, as quoted above, *Armstrong* distinguished *Genesis* on the ground that the "gift" in *Genesis* came from the proceeds of a secured creditor's collateral. And that fact can be equally present in a circumstance in which, say, the secured creditor agrees to skip a class of unsecured creditors to provide a "gift" to the company's equity holder.

The *Armstrong* court's discussion of the *MCorp* case is perhaps even more puzzling. To be sure, the *MCorp* opinion has language suggesting that senior creditors made a "gift" to FDIC on account of its prepetition claim that was alleged to violate the rights of other creditors who did not receive the gift. "The seniors may share their proceeds with creditors junior to the juniors, as long as the juniors continue to receive at least as much as what they would without the sharing."[111] If the language about sharing with creditors who were "junior to the juniors" were taken literally, it would suggest that the case involved a *vertical* gift. And the language the Third Circuit used to distinguish *MCorp* – that the case involved the "settle[ment] of prepetition litigation" – is difficult to square with any theory about what is or is not permissible as a matter of absolute priority.

For what it is worth, this Court is satisfied that *MCorp* is, on its facts, readily distinguishable from the gifting cases at issue. There, the FDIC had claims that ran

---

[110] The bankruptcy court did, however, rely on this distinction in *In re World Health Alternatives, Inc.*, 344 B.R. 291, 297 (Bankr. D. Del. 2006) ("[T]he payout to the general unsecured creditors is a carve out of the secured creditor's lien and not estate property … the Bankruptcy Code does not prohibit this arrangement and reported cases so hold.").

[111] *MCorp.*, 160 B.R. at 960.

against several of the separate debtors in the case. At bottom, the dispute before the court there was about the allocation of value in a court-approved settlement of intercompany claims. In other words, to the extent *MCorp* involved a question of priority, it was primarily an issue of some creditors being *structurally* subordinated to others as a result of the entities against which their claims ran. Because the concept of absolute priority, however, works *within* a single bankruptcy estate, it makes good sense that the Third Circuit concluded that the *MCorp* opinion involved issues that were quite different from the ones it confronted in *Armstrong*.[112]

So what is one to make of these conflicting (and frankly somewhat confusing) strands in the caselaw? From first principles, there are reasoned arguments that can be made on either side of the "gifting" debate. On the one hand, a law review article by leading practitioners argues, in effect, that gifting is exactly the type of "creative thinking" necessary to facilitate a reorganization.[113] Their implicit point is that the distribution to which creditors would be entitled under a plan is *those* creditors' property. To the extent those creditors conclude that it makes sense to use *their own* property to resolve an objection asserted by a class of creditors, so long as other creditors (whether at the same level as seniority as the gift recipient, or senior to

---

[112] *See generally In re AIO US, Inc.*, No. 24-11386, 2025 WL 2426380, at *30 (Bankr. D. Del. Aug. 21, 2025) (explaining that, when considering confirmation of a plan involving a corporate family, the statutory requirements for confirmation must be viewed on a debtor-by-debtor basis).

[113] Harvey R. Miller and Ronit J. Berkovich, *The Implications of the Third Circuit's Armstrong Decision on Creative Corporate Restructuring:  Will Strict Construction of the Absolute Priority Rule Make Chapter 11 Consensus Less Likely?*, 55 Am. U. L. Rev. 1345, 1347 (2006).

57

them) are getting the distribution to which they are otherwise entitled under the Bankruptcy Code, they are not harmed by the "gift."

On the other hand, there is also something to be said for the reasoning set out by the Second Circuit in *DBSD* that any way you package it, a purported "gift" from one class to another is still, in fact, a distribution of estate property on account of a claim that runs afoul of absolute priority.[114] As the Second Circuit put it in *DBSD*, while Congress was aware of criticisms of the absolute priority rule and was aware that the "rule has attracted controversy from its early days," Congress "did not create any exceptions for 'gifts' like the one at issue here."[115]

It is also possible to make a reasoned argument for distinguishing between vertical and horizontal gifts. A vertical gift provides value to a class that is junior to the objecting class and thus runs directly into principles of absolute priority. A gift to a class that is at the same level as the objecting class, however, does not raise issues under § 1129(b)(2)(B)(ii). Rather, the problem with some creditors at a given priority receiving more value than others is that this raises questions under § 1129(b)(1), which requires that a plan "not discriminate unfairly."[116] That standard has been construed to provide somewhat greater flexibility in terms of what kind of discrimination is considered "unfair."[117] While not made express in *Armstrong*, this

---

[114] *In re DBSD North America, Inc.*, 634 F.3d 79, 95 (2d Cir. 2011).

[115] *Id.* at 100. Additionally, if one were to accept the premise that a "gift" were truly "outside" of the plan, such a gift could arguably be viewed as an improper form of vote buying.

[116] 11 U.S.C. § 1129(b)(1).

[117] *See In re Tribune Co.*, 972 F.3d 228, 241-244 (3d Cir. 2020); Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L. J. 227 (1998).

distinction could perhaps form a basis for treating a horizontal gift differently from a vertical gift.

In the end, the Court is persuaded that the most appropriate course is to permit the horizontal gift in this context. *Armstrong* clearly drew a distinction between the question before the court there and the facts of the *Genesis* case. And while the Third Circuit's decision itself did not emphasize the distinction between vertical and horizontal gifts, that is in fact a difference between those cases, and the one on which the district court relied in *Nuverra*. On top of that, the difference in language between § 1129(b)(1) of the Bankruptcy Code and that of § 1129(b)(2)(B)(ii) provides a textual basis for drawing such a distinction. For all of those reasons, the Court will adhere to the rationale of *Nuverra* and read the *Armstrong* opinion to permit horizontal gifting. Based on that reading, the Court is satisfied that the gift at issue here is not inconsistent with the terms of Yellow's confirmed plan.

The Court appreciates MFN's core point that it is being "singled out" by the parties' decision to compensate *other* general unsecured creditors, but not MFN, for the dilutive effect on recoveries caused by the increase in the total claims pool (as against the disclosure statement assumptions) caused by these settlements. But that objection, whatever surface appeal it may have from a fairness perspective, is not categorically different from the complaints made by the objecting parties in *Genesis* and *Nuverra*. So for the reasons described above, the Court is satisfied that this "gifting" aspect of the settlement is permissible under existing law.

59

### III.    The resolution of Central States' guaranty claim is reasonable.

The Court is likewise satisfied that the resolution of Central States' guaranty claim falls within the range of reasonable.  As described in Part 1.E.iv of the Factual and Procedural Background portion of this Memorandum Opinion, the Court's April 2025 opinion held that Central States' guaranty claim under the parties' 2014 letter agreement was an unenforceable penalty clause under Illinois law.[118]

The claim as filed by Central States asserted liquidated damages in the amount of $917 million.  The parties' settlement would grant Central States an allowed claim of $165 million on this guaranty, which is approximately 18 percent of the asserted claim.  While the Court stands behind its decision to grant summary judgment in favor of the debtors on this issue, it is by no means unreasonable to say that there is an 18 percent likelihood that an appellate court might reverse that decision.

As Central States' counsel explained during closing argument on the motion, it takes the view that the purpose of the guaranty claim was not to increase the debtors' withdrawal liability.  Rather, when viewed in context, Yellow was at the time seeking to defer making plan contributions in order to remain afloat.  Central States agreed to permit Yellow to reduce its contribution rate by 75 percent.  The challenge this posed for Central States, however, was that lower contributions would have the effect of decreasing Yellow's withdrawal liability in the event of a withdrawal.  As a result, Central States effectively faced the prospect that, by agreeing to permit the

---

[118] *Yellow Corp.*, 672 B.R. at 259-260.

reduction in the contribution rate, no good deed would go unpunished, and Yellow's potential withdrawal liability would effectively be reduced as a result of Central States agreeing to this accommodation.  By Central States' telling, the point of the guaranty was not to "punish" Yellow in the event of a withdrawal.  Instead, it was only to ensure that the accommodation of Yellow's request to reduce its contribution rate not have the spillover effect of similarly reducing its withdrawal liability.

Is this Court persuaded that this argument would prevail on appeal?  No.  But the Court does believe that there is an 18 percent chance that it could.  Indeed, if the Court were conducting an estimation in which it were asked to assess the probability of success, the Court would likely land somewhere quite close to that figure.  The Court accordingly concludes (even without relying on deference to the debtors' judgment) that the settlement of this claim is within the range of reasonable.[119]

---

[119] The settlement with Central States also includes the resolution of an asserted priority claim.  As originally filed, Central States contended that it held prepetition claims of almost $17.4 million that were entitled to priority under 11 U.S.C. § 507(a)(5).  Under the settlement, Central States is receiving a priority claim of approximately $12.6 million.  The record with respect to calculation of this amount is concededly thin.  *See* Jan. 21, 2026 Hr'g Tr. at 124-125, 162-166 (Whittman testifying about the calculation of this claim).  MFN correctly acknowledges that this issue is "small in the grand scheme of things."  *Id.* at 295.  And the law is clear that prepetition amounts due to "an employee benefit plan … arising from services rendered within 180 days before the … cessation of the debtor's business …. to the extent of …. the number of employees covered by each such plan multiplied by $17,150" minus the priority claim aid to such employees under § 507(a)(4), is in fact entitled to statutory priority.  11 U.S.C. § 507(a)(5).  Based on the relatively limited record, the Court is satisfied that the $12.6 million claim reflects a reasoned effort to estimate the claim that is in fact entitled to § 507(a)(5) priority.

**IV.   The settlement with Local 710 is reasonable, notwithstanding the "fresh start accounting" issue.**

MFN also takes issue with the settlement reached between the debtors and Local 710.   The multi-color chart on page 28 suggests that the debtors propose allowing a claim in excess of $36 million for Local 710 that would be disallowed entirely under the reasoning set out in this Court's earlier rulings.   While there is a superficial sense in which that is true, the Court finds this contention to be more illusory than helpful.

The issue is that Local 710 calculated its unfunded vested benefits using § 1391(b)'s "presumptive method."[120]   Under this presumptive method, rather than allocating unfunded vested benefits based on the employer's share at the end of the plan year before the withdrawal, unfunded vested benefits are allocated on a year-by-year basis.   In substance, the employer receives a credit or debit based on each year's change in the plan's unfunded vested benefits.   When the employer withdraws, its share of the plan's unfunded vested benefited is calculated by totaling these debits and credits over 20 years.[121]

ERISA, however, permits plans that use this method for allocating unfunded vested benefits to provide for a "fresh start" under which, if the plan has a year in which it has no unfunded vested benefits, all debits or credits for prior years would

---

[120] *See* 29 U.S.C. § 1391(b).

[121] *Id.*

be eliminated.[122] MFN argues that Local 710's plan documents include such a rule.[123] If (as this Court held in its February 2025 partial summary judgment ruling) one were to use the minimum funding rate rather than the more conservative rate that most fund actuaries selected, however, then Local 710 would have had no unfunded vested benefits before Yellow's withdrawal. If MFN is correct about the terms of the Local 710 plan documents, that would mean that, under this Court's ruling, Local 710 would not have a withdrawal liability claim against Yellow.

But as counsel for Local 710 pointed out during the argument, using the funding rate that the plan's actuaries actually used, the plan never had a year when its unfunded vested benefits were zero. So the question is whether, had the plan's actuaries known that the plan had no unfunded vested benefits in a given year, whether the plan would have elected to amend the plan's terms so that it was not required to elect the "fresh start."

Because the question is a hypothetical one, the answer to that is unknowable. In the face of that uncertainty, the decision reached by the parties was simply to apply the same methodology that was applied to every other plan to the calculation of Local 710's withdrawal liability claim. An argument could certainly be made that it would have been appropriate to apply some discount to this claim to take account of the possibility that it could have ultimately lost the argument over the fresh start election. In view, however, of the many uncertainties and hypothetical questions

---

[122] *Id.* § 1391(c)(5)(E).

[123] D.I. 8516.

associated with this issue, the Court concludes that the decision to use the same methodology here as elsewhere was a reasonable one.

## V.   The New York Teamsters settlement is unreasonable and cannot be approved.

As described above (and as shaded in yellow in the chart on page 28), the parties agreed to resolve the New York Teamsters' claim by providing it with an allowed claim of $326.5 million.  The application of the general methodology for resolving claims for withdrawal liability would result in the New York Teamsters having a withdrawal liability claim of $250.8 million.  The New York Teamsters insist that its settlement is a single, indivisible settlement that cannot be bifurcated into a "withdrawal liability" portion and a "liquidated damages" portion.  But be that as it may, application of the settlement methodology and ordinary math would suggest that the balance of the New York Teamsters' claim, $75.7 million, can only be attributable to the argument that it is entitled to liquidated damages.  But even if the New York Teamsters is entitled to such liquidated damages, the amount can be no more than 10 percent of the withdrawal liability claim.  For this reason, this settlement is unreasonable and cannot be approved.

### A.   MFN's objection to the liquidated damages component of the New York Teamsters' claim is not procedurally barred.

The New York Teamsters argue that MFN's objection to the liquidated damages component of its claim is procedurally barred under Local Rule 3007-1 because the objection was not expressly included in the Second Omnibus Objection. Local Rule 3007-1 requires that an omnibus objection identify all substantive

64

objections for disallowance of a claim.[124]  The New York Teamsters therefore contend that MFN may not assert the objection now because it was not included earlier.

This rule does not, however, deprive the Court of its ability to consider arguments bearing on the proper amount of a claim.[125]  As previously established, MFN is a party in interest entitled to object to the allowance of claims under § 502 of the Bankruptcy Code.  MFN's objection concerns the proper calculation and allowance of the New York Teamsters' claim.  Moreover, the New York Teamsters had a full and fair opportunity to respond to the issue, and they do not claim that they lacked notice of the objection.  Accordingly, the Court will consider the merits of MFN's objection.

### B.   Even affording some deference to the debtors' business judgment, this settlement falls outside the range of reasonable.

Applying the standard described above, the Court must determine whether the debtors exercised reasonable judgment in agreeing to the settlement in light of the probable outcome of litigation.  Evaluated under this standard, it is evident that the liquidated damages component of this settlement falls outside the range of reasonable.

The New York Teamsters filed a proof of claim that asserted $757.2 million in withdrawal liability and $75.7 million as liquidated damages.  As the New York Teamsters' fund policies provide, the liquidated damages were calculated as 10% of the claimed withdrawal liability amount.

---

[124] Local Rule 3007-1(e)(iv).

[125] *See id.*

There is no dispute, however, that the application of the five-step settlement methodology described above would yield a withdrawal liability claim of $250.8 million. And to the extent the New York Teamsters contend that it is appropriate for their settlement to be measured by some other, unexplained methodology that differs from the five-step process, the Court rejects that contention. The question is therefore whether the parties could have reasonably elected to settle the New York Teamsters' claim for liquidated damages for $75.7 million. The answer to that question is no. The New York Teamsters' own policies set forth liquidated damages as 10 percent of the withdrawal liability amount. So accepting the parties' agreed five-step settlement methodology for calculating the New York Teamsters' withdrawal liability claim (at $250.8 million), the *maximum* claim for liquidated damages could be for no more than $25.1 million.[126] Accordingly, the proposed settlement cannot be justified as reasonable and cannot be approved.

### C. MFN's argument that ERISA's requirement that a party seeking liquidated damages must first bring an enforcement action would require a further reduction in the claim for liquidated damages.

MFN argues that the New York Teamsters cannot recover liquidated damages *at all* because the statutory predicate for such damages was never satisfied. Under 29 U.S.C. § 1451(a), a fiduciary of a multiemployer pension plan may bring a civil action to compel payment of withdrawal liability.[127] In such an action, an employer's

---

[126] The Committee also takes this position in its limited joinder in MFN's objection to the approval of the New York Teamsters' settlement. D.I. 8535 at 2.

[127] 29 U.S.C. § 1451(a)(1).

66

failure to make required withdrawal liability payments is treated in the same manner as a delinquent contribution under § 1145.[128]

MFN argues that ERISA therefore permits the recovery of liquidated damages only when a fiduciary has brought an enforcement action to compel payment. Because the New York Teamsters never brought such an action against the debtors, but instead merely filed a proof of claim in this bankruptcy case, liquidated damages cannot be available here.[129]  The New York Teamsters respond by arguing that their policies provide an independent basis for recovering liquidated damages even without relying on the statute providing for such liquidated damages.  In reply, MFN argues that the New York Teamsters' plan merely codifies, and does not change, the statutory entitlement.

In this Court's view, MFN's argument to this effect is a serious one that must be given some weight in calculating an appropriate range for a reasonable settlement. As this Court sees it, any settlement that did not reduce the liquidated damages claim by at least 20 percent to account for the merits of this argument would be unreasonable.  In view of these conclusions, the parties are welcome to seek a revised settlement that allows the New York Teamsters' withdrawal liability claim at $250.8 million and their liquidated damages claim at $20 million (80 percent of $25.1 million) – for a total allowed claim of $270.8 million.  Alternatively, the parties may meet and confer to propose a scheduling order for the Court (promptly) to resolve the remaining

---

[128] 29 U.S.C § 1451(b).

[129] 11 U.S.C. § 362.

factual and legal issues with respect to this claim.  The Court would then enter final judgment with respect to this claim, upon which the parties would be free to challenge this Court's rulings on appeal.[130]

## VI.   The settlements with Locals 617 and 1730 are unreasonable and cannot be approved.

The settlements with Locals 617 and 1730 likewise depart from the five-step settlement methodology that was otherwise agreed among the parties.  These are the settlements that are shaded in green in the chart on page 28.  As that chart shows, the application of the agreed methodology would have yielded a claim for Local 617 of $0.1 million.  The parties agreed, however, to an allowed claim in the amount of $3 million.  The application of the methodology would have yielded an allowed claim of $2.3 million for Local 1730, but the parties agreed to an allowed claim of $7.5 million.

Brian Whittman, who was one of the debtors' financial advisors and participated directly in the settlement discussions, acknowledged that these settlements – while he resisted the use of the term "outlier" – were "notably less favorable than other settlements."[131]  And when counsel for MFN stated that "neither

---

[130] Because the settlements with each of the pension plans is severable, the parties are welcome to submit a separate proposed order approving those settlements that the Court finds to be reasonable, in order to permit that order to become final and appealable while further proceedings continue with respect to those settlements that the Court is not approving.

[131] Jan. 21, 2026 Hr'g Tr. at 148.

of these two are rooted in the settlement methodology identified in the settlement motion," Whittman responded by saying "[t]hat is correct."[132]

In defense of these settlements, Locals 617 and 1730 primarily attack the five-step settlement methodology for failing to give sufficient weight to their challenges to various prior rulings of this Court. In fairness, Local 1730 does have one argument that it is differently situated from the other plans. It contends that it suffered from a "mass withdrawal." It is common ground that, under 29 U.S.C. § 1399(c)(1)(D)(i), the statute's 20-year cap on withdrawal liability claims does not apply in that circumstance.[133] That fact, however, does little to help Local 1730, as its maximum claim (even before the application of the 20-year cap) was only $5.1 million, whereas its allowed claim is $7.5 million.

Otherwise, the plans' arguments in support of these settlements are little more than an attack on the five-step settlement methodology this Court otherwise approved as reasonable. They contend that greater weight should be given to their arguments that they might prevail on the claim that they are entitled to use a lower discount rate to present value the 20-year payment stream than they used in calculating the interest that would be owed over those 20 years, and thus obtain the benefit of interest-rate arbitrage (notwithstanding § 502(b)(2) of the Bankruptcy

---

[132] *Id.*

[133] 29 U.S.C. § 1399(c)(1)(D)(i) ("In any case in which a multiemployer plan terminates by the withdrawal of every employer from the plan, or in which substantially all the employers withdraw from a plan pursuant to an agreement or arrangement to withdraw from the plan … (i) the liability of each such employer who has withdrawn shall be determined … under this paragraph without regard to subparagraph (B) [which imposes the 20-year cap]").

69

Code, which disallows claims for unmatured interest). And they argue that the Court was wrong to apply the 20-year cap to their claims such that they can recover all of the debtors' allocable share of their unfunded vested benefits.

As described in Part II.B of this Memorandum Opinion, the Court was prepared to ascribe *some* weight to these positions in concluding that parts of the settlement methodology that might otherwise be viewed as overly generous to the plans could be understood to fit within the range of reasonable. The fatal flaw for these settlements is that these plans do not offer *any* methodology that justifies the amounts of their settlements. And because these plans offer no rationale or methodology at all, there is no basis on which the Court can conclude that they are reasonable.

Debtors' counsel candidly acknowledged during closing argument that "there is a fair bit of sausage making with respect to these smaller settlements."[134] Counsel continued: "You know … the reality is that to get to a settlement … we did the best that we could and there were certain settlements that we agreed to that if you look at them in isolation … would be less defensible but in the grand scheme of this overall settlement, these outlier settlements don't move the needle."[135]

The Court is not unsympathetic to this perspective. Indeed, it acknowledges that it does not relish the prospect of presiding over ongoing litigation over rather complex and esoteric issues of ERISA for amounts that, in the scheme of this case,

---

[134] *Id.* at 217.

[135] *Id.*

are little more than rounding errors.  That said, the separate settlements with each of the plans are severable, independent agreements for which the debtors are seeking approval.  MFN objects to the approval of every one of them.  In the face of that reality, the only justification for approving these otherwise unreasonable settlements is the argument that debtors' counsel made – that the cost of litigation just does not justify the trouble.

The response to that point, however, is that the tool of a § 502(c) estimation is readily available to permit the quick and efficient resolution of these claims disputes. Indeed, as the Court noted in Part I of this Memorandum Opinion, the record before the Court on these claims is likely already sufficient to permit the Court to estimate these claims.  Accordingly, if the parties agree to settle these claims at the amounts that five-part settlement methodology would yield, the Court would be happy to enter an order approving such settlements.

Otherwise, the Court would propose that the parties submit a scheduling order that provides for reasonably prompt and simultaneous briefing on a motion to estimate these two claims.  In view of the extensive consideration the Court has given to these issues throughout the nearly three years of this bankruptcy case, including the ten weeks with which it has been wrestling with this Memorandum Opinion, the Court would expect to issue an order allowing these claims in an estimated amount soon thereafter.  Any party that disagrees with the Court's allowance decision would of course then be free to bring an appeal.

\* \* \*

71

MFN has made a handful of other arguments in opposition to the settlements that the Court should address briefly:

- MFN contends that, because the settled claims are nearly twice the amount that would result from applying the Court's prior rulings, the settlements are not even in the same "Zip Code" as the outcome that would result from full litigation of the claims allowance process. The Court concludes that its analysis in Part I of this Memorandum Opinion largely addresses that contention. As explained there, the settlement resolves several issues for which the likelihood of success may be low, but which, if successful on appeal, would substantially increase the allowed amount of the claims, perhaps by as much as an order of magnitude. Accordingly, any comparison between the settlement and a litigated outcome cannot assume a simple linear relationship between the probability of success and the magnitude of potential recovery.

- In addition to its challenges to the settlement methodology (addressed in Part II) and its challenges to settlement that raise one-off issues (addressed in Parts III-VI), MFN also challenges other settlements on the ground that the settlement amount substantially exceeded the amount that it believes was implied by the Court's prior rulings or on the ground that the settlement provided the creditor with nearly all of what the creditor sought in its proof of claim. Each of those settlements, however, was calculated through the application of the uniform

72

methodology that this Court has concluded is reasonable.  *See* Part II. In this Court's view, that is the beginning and end of the analysis.  The fact that some of the pension plans may have been conservative in the filing of proofs of claim while others took far more aggressive positions should not make any difference to how the Court views these settlements.

- MFN takes issue with the debtors' decision to pursue this settlement in this time between the entry of the order confirming the plan and the plan's effective date.  MFN contends that, at the very least, the debtors should have consulted with the individual who will become the liquidating trustee under the post-confirmation trust to solicit his view of the proposed settlements.  The Court is satisfied, however, that the debtors remain as debtors in possession with the powers of a trustee unless and until the debtors' plan becomes effective.  Until then, the post-confirmation trust does not exist, and the post-confirmation trustee has no involvement in running the affairs of the bankruptcy estate.  The Court accordingly does not believe that the debtors were required to consult with the post-confirmation trustee with respect to these settlements.

73

## Conclusion

For the foregoing reasons, the debtors' motion seeking approval of the proposed settlements with the various pension plans other than the New York Teamsters, Local 617, and Local 1730 will be granted. The motion seeking approval of the proposed settlements with the New York Teamsters, Local 617, and Local 1730 will be denied. The parties are directed to settle an appropriate order (or orders) so providing.

Dated: April 2, 2026

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE