# Exhibit B

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>YELLOW CORPORATION, et al.,[1]<br><br>    Debtors. | Chapter 11<br>Bankr. Case No. 23-11069 (CTG)<br><br>(Jointly Administered) |
| RANDOLPH DAVIS, ERIC HERNANDEZ, TIMOTHY O'BRIEN, and JOHN PAYTON, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>YELLOW CORPORATION, YRC INC. (d/b/a YRC FREIGHT), USF HOLLAND, LLC, NEW PENN MOTOR EXPRESS LLC, USF REDDAWAY, INC.,    and DANIEL H. GOLDEN, AS TRUSTEE FOR THE YELLOW LIQUIDATING TRUST<br><br>    Defendants. | Adv. Pro. No. 26-_____(CTG)<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION ADVERSARY PROCEEDING COMPLAINT

RANDOLPH DAVIS, ERIC HERNANDEZ, TIMOTHY O'BRIEN, and JOHN PAYTON (the "Plaintiffs"), on behalf of themselves and a putative class of similarly situated former employees as defined herein, bring this suit against the YELLOW CORPORATION, YRC INC., d/b/a YRC FREIGHT ("YRC Freight), USF HOLLAND, LLC ("USF Holland"), NEW PENN MOTOR EXPRESS LLC ("New Penn"), and USF REDDAWAY, INC. ("Reddaway")

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of Debtors' principal place of business and the Debtors' service address in these chapter 11 cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

(collectively, "Yellow," "Debtors" or "Debtor Defendants"), and DANIEL H. GOLDEN (the "Liquidating Trustee" or "Trustee Defendant" and together with the Debtor Defendants, the "Defendants"), AS TRUSTEE FOR THE YELLOW LIQUIDATING TRUST ("Yellow Liquidating Trust" by way of this Class Action Adversary Proceeding Complaint, and allege as follows:

## NATURE OF THE ACTION

1.      This is a civil action seeking monetary damages and injunctive and declaratory relief from Defendant arising from Debtor Defendants' failure to safeguard certain Personally Identifying Information[2] and Protected Health Information[3] (collectively, "PII") of hundreds of thousands of its employees. Consequently, those employees' PII—including their names, dates of birth, driver's license numbers, state identification card numbers, Social Security numbers, passport numbers, other government issued identification card numbers, financial account numbers, payment card numbers, medical information, and health insurance information—was

---

[2] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, Plaintiff is not asserting that every example of identifying information was compromised in the Data Breach.

[3] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.* ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. A "covered entity" is further defined as, *inter alia*, a health care provider who transmits any health information in electronic form in connection with a transaction covered by HIPAA. *Id. Covered entity*. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa /for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). Specialty Networks is clearly a "covered entity" and the data compromised in the Data Breach that this action arises out of is "protected health information", subject to HIPAA.

permanently compromised.[4] Plaintiffs are some of the victims. They therefore bring this case against Yellow for themselves and a class of all others whose PII was compromised.

2. Over one year ago, on or about March 27, 2025, Yellow discovered that it had lost control over its computer network and the highly sensitive personal information stored on its computer network in a data breach perpetrate by unauthorized third parties ("Data Breach"). According to Yellow, the Data Breach involved hundreds of thousands of records which consisted of historical Yellow employee information, including names and Social Security numbers, going back over twenty years. Upon information and belief, this Data Breach has impacted thousands of former Yellow employees.

3. On or about June 26, 2026—nearly *fifteen* months after the Data Breach first occurred and only a few business days prior to the Effective Date of the Debtors' confirmed Plan (as defined below)—Yellow finally began notifying Class Members about the Data Breach ("Breach Notice"). The Breach Notice is attached as **Exhibit A**.

4. Upon information and belief, Yellow's failure to adequately train its employees on cybersecurity, failure to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the PII of Plaintiffs, and failure to maintain reasonable security safeguards or protocols to protect the Class's PII rendered it an easy target for cybercriminals and allowed them to breach Yellow's systems.

5. Yellow's Breach Notice did not adequately apprise Plaintiffs or the Class of the nature of the breach and the threat it posed. For example, the Breach Notice failed to tell employees how many people were impacted, how the breach happened, or why it took the Yellow

---

[4] An exemplar Data Breach Notice transmitted from Yellow to the California Attorney General is annexed hereto as Plaintiff's Exhibit A, which details the dataset that was compromised.

nearly fifteen months to finally begin notifying victims that cybercriminals had gained access to their highly private information.

6. Yellow's failure to timely report the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

7. Yellow knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

8. In failing to adequately protect its employees' information, adequately notify them about the breach, and obfuscating the nature of the breach, Yellow violated state law and harmed thousands of current and former employees.

9. Plaintiffs and members of the Class are victims of Yellow's negligence and inadequate cyber securities protocols which resulted in the Data Breach. Specifically, Plaintiffs and members of the proposed Class trusted Yellow as their employer to hold their PII safely and securely. However, Yellow betrayed that trust by failing to deploy generally acceptable security measures meant to prevent the Data Breach.

10. The unauthorized exposure of Plaintiffs' PII to cybercriminals is a flown arrow that cannot be called back. Prior to the Data Breach, the PII belonging to Plaintiffs and the Class in the possession of the Yellow was private. No longer. Now, their PII is exposed and unsecure, and Plaintiffs and the Class forever face an amplified risk of fraud and identity theft due to their sensitive PII falling into the hands of cybercriminals.

11. On behalf of themselves and the Nationwide Class preliminarily defined below, Plaintiffs bring causes of action sounding in negligence, *per se* negligence, invasion of privacy,

4

breach of confidence, breach of contract, including breach of the covenant of good faith and fair dealing, trespass to chattels, bailment, unjust enrichment, and conversion. Plaintiffs seek damages and injunctive and declaratory relief arising from Yellow's failure to adequately protect their highly sensitive PII.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1331, 1334, 1367 and 29 U.S.C. § 2104(a)(5); and the Amended Standing Order of Reference of the United States District Court for the District of Delaware Dated February 29, 2012.

13.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O). Pursuant to Fed. R. Bankr. P. 7012(b) and Del. Bankr. L.R. 7012-1, Plaintiffs consent to entry of final orders or judgment by the bankruptcy court.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1409 and 29 U.S.C. § 2104(a)(5).

## PARTIES

15.    Plaintiff Randolph Davis ("Davis") is a citizen of the United States and resident of Texas. Plaintiff was employed by Yellow until it filed for bankruptcy on August 6, 2023.

16.    Plaintiff Eric Hernandez ("Hernandez") is a citizen of the United States and resident of Texas. Plaintiff was employed by Yellow until it filed for bankruptcy on August 6, 2023.

17.    Plaintiff Timothy O'Brien ("O'Brien") is a citizen of the United States and resident of Texas. Plaintiff was employed by Yellow until it filed for bankruptcy on August 6, 2023.

18.    Plaintiff John Payton ("Payton") is a citizen of the United States and resident of Texas. Plaintiff was employed by Yellow until it filed for bankruptcy on August 6, 2023.

19.     Defendant Yellow Corporation is a public corporation formed in the state of Delaware, with its principal place of business at 501 Commerce St., Suite 1120, Nashville, Tennessee, 37203. Yellow Corporation provided transportation services to its customers for their industrial, commercial, and retail goods through its operating subsidiaries. On August 6, 2023, Yellow and certain of its affiliates listed below filed voluntary petitions for relief under Chapter 11 of Title 11 of the U.S. Bankruptcy Code.[5] Yellow Corporation's registered agent for service of process in Delaware is Corporation Trust Company, located at the Corporation Trust Center, 1209 Orange Street, Wilmington DE 19801.

20.     Defendant YRC Inc. (d/b/a YRC Freight) is a public corporation formed in the state of Delaware, with its principal place of business at 501 Commerce St., Suite 1120, Nashville, Tennessee, 37203.  It is a subsidiary of Yellow Corporation.

21.     Defendant USF Holland LLC is a limited liability company formed in the state of Delaware, with its principal place of business at 501 Commerce St., Suite 1120, Nashville, Tennessee, 37203.  It is a subsidiary of Yellow Corporation.

22.     Defendant New Penn Motor Express LLC is a limited liability company formed in the state of Delaware, with its principal place of business at 501 Commerce St., Suite 1120, Nashville, Tennessee, 37203. It is a subsidiary of Yellow Corporation.

23.     Defendant USF Reddaway, Inc. is a public corporation formed in the state of Oregon, with its principal place of business at 501 Commerce St., Suite 1120, Nashville, Tennessee, 37203. It is a subsidiary of Yellow Corporation.

---

[5] On November 19, 2025, the Bankruptcy Court approved and confirmed [Main Case D.I. 8229 (the "Confirmation Order")] the *Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors (Technical Modifications)* (the "Plan"). The confirmed Plan is attached to the Confirmation Order as Exhibit A and is available at Main Case D.I. 8229-3.]

24. Defendant Daniel H. Golden is the duly-appointed Liquidating Trustee for the Yellow Liquidating Trust. [6]

25. Upon the Effective Date, the Debtors and the chapter 11 estates irrevocably transferred and were deemed to have irrevocably transferred to the Liquidating Trust all of their rights title and interest in all of the Liquidating Trust Assets[7] and any other assets remaining with the Debtors or in the Estates. Plan, Art. IV (D) [Main Case D.I. 8229-3.] All Causes of Action[8] and Assigned Insurance Rights[9] of the Debtors or their chapter 11 estates were retained under the

---

[6] On July 1, 2026, the Debtors filed their *Notice of (I) Entry of Confirmation Order, (II) Occurrence of Effective Date, and (III) Related Relief* [Main Case D.I. 9073] (the "Effective Date Notice"). The Effective Date Notice provided that the Effective Date, as defined in the Plan, occurred on July 1, 2026. Pursuant to the Plan, on the Effective Date, the Debtors, on their own behalf and on behalf of the Beneficiaries, and the Liquidating Trustee shall execute the Liquidating Trust Agreement and take all other steps necessary to establish the Liquidating Trust pursuant to the Liquidating Trust Agreement and Article VIII of the Plan. Plan, Art. IV, D. On the Effective Date, the Debtors filed the *Seventh Amended Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed By the Debtors and The Official Committee of Unsecured Creditors* [Main Case D.I. 9071] which included the Liquidating Trust Agreement dated July 1, 2026. The Liquidating Trust Agreement appoints Daniel H. Golden as trustee of the Liquidating Trust.

[7] Defined in the Plan as "all assets of the Debtors and the Estates as of the Effective Date and the proceeds thereof, including, but not limited to, the Distributable Proceeds, the Retained Causes of Action, and the Assigned Insurance Rights."

[8] "Causes of Action" is defined in the Plan as "any actions, Avoidance Actions, claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, proceedings, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, choate or inchoate, directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law or otherwise."

"Retained Causes of Action" is defined in the Plan as "all Causes of Action of the Debtors or their Estates existing as of the Effective Date which shall vest in the Liquidating Trust on the Effective Date, including (i) any pending lawsuits, legal proceedings, collections proceedings, and claims arising from certain multiemployer pension and welfare plan matters and certain WARN Act matters, (ii) any Avoidance Actions (except for Avoidance Actions against the Debtors' current and former employees), and (iii) any claims or causes of action listed on the Schedule of Retained Causes of Action."

[9] "Assigned Insurance Rights" are defined in the Plan as "collectively, any and all rights, titles, privileges, interests, claims, demands or entitlements of the Debtors or their Estates to any and all proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity arising under, or attributable to, any and

Plan and vested in the Liquidating Trust.

## FACTUAL ALLEGATIONS

### A. Plaintiffs and the Class Members entrusted their PII to their employer Yellow

12. Plaintiffs and the members of the Class are individuals formerly employed by Yellow who entrusted their PII to their employer.

13. As a condition of employment, Yellow required Plaintiffs and the Class members to confide and make available to it, its agents, its employees, and its business associates, sensitive and confidential PII, including, but not limited to their names, dates of birth, driver's license numbers, Social Security numbers, payment card information, medical and health insurance information. Yellow used that PII to facilitate its employment of Plaintiffs, including payroll and tax reporting purposes, and required Plaintiffs to provide that PII to obtain employment and payment for that employment.

14. Upon information and belief, Yellow acquired, collected, and stored a massive amount of PII of its employees unencrypted in its computer systems.

15. By obtaining, collecting, using, and deriving a benefit from those individuals' PII, Yellow assumed legal and equitable duties to those individuals and knew or should have known that it was responsible for protecting their PII from unauthorized disclosure using reasonable means according to state and federal law.

---

all Insurance Policies, now existing or hereafter arising, accrued, or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent subject to the terms of the Insurance Policies and applicable law."

"Insurance Policies" are defined in the Plan as "collectively, all of the Debtors' insurance policies, including but not limited to any property and casualty policies, punitive damage policies, commercial general liability policies, *cyber policies*, professional liability policies, D&O Liability Insurance Policies and all agreements, documents or instruments relating thereto, and any of the Debtors' rights under any third parties' insurance policies." (emphasis added).

16. Plaintiffs have taken reasonable steps to maintain the confidentiality of their PII. Plaintiffs relied on Yellow to keep their PII confidential and securely maintained, to use that information for business purposes only, and to make only authorized disclosures of that information.

17. Plaintiffs entrusted their PII to Yellow solely for the purpose of obtaining and maintain their employment with the expectation and implied mutual understanding that Yellow would strictly maintain the confidentiality of that information and safeguard it from theft or misuse. This understanding was based on all the facts and circumstances attendant to their receiving care, and the express, specific, written representations made by Yellow and/or its business associates and their agents.

18. Plaintiffs would not have entrusted Yellow with their highly sensitive PII if they had known that Yellow would not maintain it securely and protect it from unauthorized use or disclosure.

**B.     The security of Yellow's employees' PII was compromised in the Data Breach**

19. Plaintiffs and the Class reasonably relied upon Yellow's representations regarding the security of their PII to their detriment and would not have provided their sensitive PII to Yellow but for their explicit and implicit promises to adequately safeguard that information.

20. Yellow admits that on or about March 27, 2025, it "identified suspicious activity on its computer network," and "with the assistance of third-party cybersecurity specialists, briefly took the systems offline, securely restored them from backups," and "identified that certain files on the computer network were accessed and exfiltrated without permission." According to Yellow, "[a]fter identifying the files that were involved, [it] undertook a comprehensive review of the files to determine what information was contained in them, and to whom the information related," and

9

it determined that "the substantial majority of this information identified is for former Yellow employees."[10]

21.    Despite becoming aware of the Data Breach no later than March 27, 2025, Yellow failed to notify consumers of the Data Breach until *nearly fifteen months later*, on or about June 26, 2026.[11]

22.    Yellow filed a similar notice with the Texas Attorney General that approximately 13,183 Texans were affected by the Data Breach.

23.    Yellow further explained that the unknown actor(s) gained access to PII including names, dates of birth, driver's license numbers, state identification card numbers, Social Security numbers, passport numbers, other government issued identification card numbers, financial account numbers, payment card numbers, medical information, and health insurance information.[12]

24.    As a result of this Data Breach, the PII of thousands of Yellow's former employees was compromised.

25.    The Data Breach was preventable and a direct result of Yellow's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect its employees' PII.

## C.    Plaintiffs' Experience and Injuries

### i.    Plaintiff Davis

26.    Plaintiff Davis was formerly employed by Yellow and is a victim of the Data

---

[10] *See ibid.*

[11] *Ibid.*

[12] *Ibid.*

Breach.

27.     As a condition of employment, Plaintiff Davis provided Yellow with his PII, including at least his social security number. Yellow used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

28.     Plaintiff Davis provided his PII to Yellow and trusted that the company would use reasonable measures to protect it according to state and federal law.

29.     Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

30.     Yellow deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about the Breach for fifteen months.

31.     As a result of its inadequate cybersecurity, Yellow exposed Plaintiff's PII for theft by cybercriminals and sale on the dark web.

32.     Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

33.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Yellow was required to adequately protect.

34.     Plaintiff does not recall ever learning that his PII was compromised in a data breach incident, other than the breach at issue in this case.

35.     As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords,

placing a credit freeze through all the three main credit bureaus, and monitoring Plaintiff's credit information.

36.     For example, Plaintiff has expended time and effort responding to this data breach and he will have to monitor his identity and credit reports periodically, in addition to gathering documentation.

37.     Plaintiff has already spent and will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of his Social Security number, will impact his ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

38.     For example, in an effort to mitigate the heightened risk of identity theft and fraud that he now faces, Plaintiff subscribes to an online credit monitoring service that provides identity theft protection services. While this credit monitoring service will allow Plaintiff to monitor his credit reports to determine whether suspicious activity has occurred, it is powerless to stop identity theft in advance and does not indemnify him from, or insure him against, the harm caused by the Data Breach.

39.     Plaintiff has also been forced, and will continue to be forced, to expend time and effort in order to mitigate the harm she has suffered on account of the Data Breach.

40.     Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This

12

injury was worsened by Yellow's failure to inform Plaintiff about the Data Breach in a timely fashion.

41. Indeed, shortly after the Data Breach, Plaintiff began suffering a significant increase in spam calls. These spam calls suggest that his PII is now in the hands of cybercriminals.

42. Once an individual's PII is for sale and access on the dark web, as Plaintiff's PII is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[13] On information and belief, Plaintiff's phone number was compromised as a result of the Data Breach.

43. Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Yellow's possession, is protected and safeguarded from future breaches.

### ii. Plaintiff Hernandez

44. Plaintiff was formerly employed by Yellow and is a victim of the Data Breach.

45. As a condition of employment, Plaintiff provided Yellow with his PII, including at least his email address and social security number. Yellow used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

46. Plaintiff provided his PII to Yellow and trusted that the company would use reasonable measures to protect it according to state and federal law.

47. Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

---

[13] What do Hackers do with Stolen Information, Aura, https://www.aura.com/learn/what-do-hackers-do-with-stolen_information (last visited January 9, 2024).

48. Yellow deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about the Breach for fifteen months.

49. As a result of its inadequate cybersecurity, Yellow exposed Plaintiff's PII for theft by cybercriminals and sale on the dark web.

50. Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

51. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Yellow was required to adequately protect.

52. Plaintiff does not recall ever learning that his PII was compromised in a data breach incident, other than the breach at issue in this case.

53. As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, placing a credit freeze through all the three main credit bureaus, and monitoring Plaintiff's credit information.

54. For example, Plaintiff has expended time and effort responding to this data breach and he will have to monitor his identity and credit reports periodically, in addition to gathering documentation.

55. Plaintiff has already spent and will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the

Data Breach. Plaintiff is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of his Social Security number, will impact his ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

56.     Plaintiff has also been forced, and will continue to be forced, to expend time and effort in order to mitigate the harm he has suffered on account of the Data Breach.

57.     Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury was worsened by Yellow's failure to inform Plaintiff about the Data Breach in a timely fashion.

58.     Indeed, shortly after the Data Breach, Plaintiff began suffering a significant increase in spam calls. These spam calls suggest that his PII is now in the hands of cybercriminals.

59.     Once an individual's PII is for sale and access on the dark web, as Plaintiff's PII is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[14] On information and belief, Plaintiff's phone number was compromised as a result of the Data Breach.

60.     Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Yellow's possession, is protected and safeguarded from future breaches.

### iii.     Plaintiff O'Brien

61.     Plaintiff was formerly employed by Yellow and is a victim of the Data Breach.

---

[14] What do Hackers do with Stolen Information, Aura, https://www.aura.com/learn/what-do-hackers-do-with-stolen_information (last visited January 9, 2024).

15

62.     As a condition of employment, Plaintiff provided Yellow with his PII, including at least his email address and social security number. Yellow used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

63.     Plaintiff provided his PII to Yellow and trusted that the company would use reasonable measures to protect it according to state and federal law.

64.     Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

65.     Yellow deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about the Breach for fifteen months.

66.     As a result of its inadequate cybersecurity, Yellow exposed Plaintiff's PII for theft by cybercriminals and sale on the dark web.

67.     Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

68.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Yellow was required to adequately protect.

69.     Plaintiff does not recall ever learning that his PII was compromised in a data breach incident, other than the breach at issue in this case.

70.     As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, placing a credit freeze through all the three main credit bureaus, and monitoring Plaintiff's credit

16

information.

71. For example, Plaintiff has expended time and effort responding to this data breach and he will have to monitor his identity and credit reports periodically, in addition to gathering documentation.

72. Plaintiff has already spent and will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of his Social Security number, will impact his ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

73. For example, Plaintiff recently received notice that someone made three unauthorized charges to his Chase credit card. This suggests that his Chase credit card numbers was compromised as a result of the Data Breach.

74. Plaintiff has also been forced, and will continue to be forced, to expend time and effort in order to mitigate the harm he has suffered on account of the Data Breach.

75. Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury was worsened by Yellow's failure to inform Plaintiff about the Data Breach in a timely fashion.

76. Indeed, shortly after the Data Breach, Plaintiff began suffering a significant increase in spam calls. These spam calls suggest that his PII is now in the hands of cybercriminals.

17

77.     Once an individual's PII is for sale and access on the dark web, as Plaintiff's PII is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[15] On information and belief, Plaintiff's phone number was compromised as a result of the Data Breach.

78.     Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Yellow's possession, is protected and safeguarded from future breaches.

### iv.     Plaintiff Payton

79.     Plaintiff was formerly employed by Yellow and is a victim of the Data Breach.

80.     As a condition of employment, Plaintiff provided Yellow with his PII, including at least his email address and social security number. Yellow used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

81.     Plaintiff provided his PII to Yellow and trusted that the company would use reasonable measures to protect it according to state and federal law.

82.     Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

83.     Yellow deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about the Breach for fifteen months.

84.     As a result of its inadequate cybersecurity, Yellow exposed Plaintiff's PII for theft by cybercriminals and sale on the dark web.

---

[15] What do Hackers do with Stolen Information, Aura, https://www.aura.com/learn/what-do-hackers-do-with-stolen_information (last visited January 9, 2024).

85.    Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

86.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Yellow was required to adequately protect.

87.    Plaintiff does not recall ever learning that his PII was compromised in a data breach incident, other than the breach at issue in this case.

88.    As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, placing a credit freeze through all the three main credit bureaus, and monitoring Plaintiff's credit information.

89.    For example, Plaintiff has expended time and effort responding to this data breach and he will have to monitor his identity and credit reports periodically, in addition to gathering documentation.

90.    Plaintiff has already spent and will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff is experiencing anxiety, distress, and fear regarding how this Data Breach, including the exposure and loss of his Social Security number, will impact his ability to do so. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

91.     For example, Plaintiff received notice of possible identity theft approximately three months ago. In an effort to mitigate the heightened risk of identity theft and fraud that he now faces, Plaintiff froze his credit through the three credit reporting agencies.

92.     Plaintiff has also been forced, and will continue to be forced, to expend time and effort in order to mitigate the harm she has suffered on account of the Data Breach.

93.     Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury was worsened by Yellow's failure to inform Plaintiff about the Data Breach in a timely fashion.

94.     Once an individual's PII is for sale and access on the dark web, as Plaintiff's PII is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[16]

95.     Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Yellow's possession, is protected and safeguarded from future breaches.

**D.     Plaintiffs and the Class Members were significantly harmed by the Data Breach**

96.     As discussed above, PII is among the most sensitive, and personally damaging information. The PII stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach.  According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained. Victims affected by those retailer breaches could avoid much of the potential future harm by simply

---

[16] What do Hackers do with Stolen Information, Aura, https://www.aura.com/learn/what-do-hackers-do-with-stolen_information (last visited January 9, 2024).

cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach— names, dates of birth, driver's license numbers, Social Security numbers, bank account information, and health insurance information, etc.—is difficult, if not impossible, to change.

97. This data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information… [is] worth more than 10x on the black market."[17] Likewise, the FBI has warned healthcare organizations that PII data is worth 10 times as much as personal credit card data on the black market.[18]

98. PII data for sale is so valuable because PII is so broad, and it can therefore be used for a wide variety of criminal activity such as creating fake IDs.

99. The value of Plaintiffs' PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course. That is, of course, precisely what the cybercriminal(s) did here.

100. As storehouses of that lucrative information, healthcare providers are also highly targeted by cybercriminals because, "primarily due to budget and resources, [their] security systems are often less sophisticated and decentralized than those in other industries, such as

---

[17] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[18] Stolen personal health credentials, for example, can sell for up to 20 times the value of a U.S. credit card number, according to Don Jackson, director of threat intelligence at PhishLabs, a cyber-crime protection company who obtained his data by monitoring underground exchanges where cyber-criminals sell the information. *See* Humer, Caroline & Finkle, Jim, *Your medical record is worth more to hackers than your credit card*, REUTERS, (Sep. 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924. Dark web monitoring is a commercially available service which, at a minimum, Specialty Networks can and should perform (or hire a third-party expert to perform).

financial services," making them an easier target.[19]

101.    As a result of the Data Breach, Plaintiffs now face, and will continue to face, a heightened risk of identity theft and fraud for the rest of their lives.

102.    One such example of criminals using PII for profit is the development of "Fullz" packages.

103.    Cyber-criminals can cross-reference multiple sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

104.    The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other members of the proposed Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

105.    As a company with a long history of storing its employees' private information on its computer systems, Yellow knew or should have known the importance of safeguarding the PII entrusted to it and of the foreseeable consequences of a breach. Despite this knowledge, however,

---

[19]  Benishti, *supra* note 20.

Yellow failed to take adequate cyber-security measures to prevent the Data Breach from happening.

106.    Yellow has not provided any compensation its former employees victimized in the Data Breach and has not offered to provide any assistance or compensation for the costs and burdens—current and future—associated with the identity theft and fraud resulting from the Data Breach.

107.    Even if Yellow did reimburse Plaintiff for the harm she suffered, it is incorrect to assume that reimbursing a victim of the Data Breach for financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[20]

108.    As a result of Yellow's failure to prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer significant damages. They have suffered or are at increased risk of suffering:

a.    The loss of the opportunity to control how their PII is used;

b.    The diminution in value of their PII;

c.    The compromise, publication and/or theft of their PII;

d.    Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud, including the purchase of identity theft protection insurance and detection services;

e.    Lost opportunity costs and lost wages associated with the time and effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts

---

[20]    *Victims of Identity Theft, 2012*, U.S. DEP'T OF JUSTICE 10, 11 (Jan. 27, 2014), https://www.bjs.gov/content/pub/pdf/vit12.pdf.

spent researching how to prevent, detect, contest and recover from identity theft and fraud;

    f.    Delay in receipt of tax refund monies;

    g.    Unauthorized use of stolen PII;

    h.    The continued risk to their PII, which remains in the possession of Yellow and is subject to further breaches so long as Yellow fails to undertake appropriate measures to protect the PII in its possession; and

    i.    Current and future costs related to the time, effort, and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class members.

**E.    The Data Breach was a Foreseeable Risk of Which Yellow was on Notice**

109.    It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of cybercriminals and other wrongdoers.

110.    In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[21]

111.    In light of recent high profile data breaches, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Yellow knew or should have known that their electronic records would be targeted by cybercriminals.

112.    Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

---

[21] Data breaches break record in 2021, CNET (Jan. 24, 2022), https://www.cnet.com/news/privacy/record-number-of_data-breaches-reported-in-2021-new-report-says/ (last accessed September 4, 2023).

113. Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Yellow failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

114. In the years immediately preceding the Data Breach, Yellow knew or should have known that its computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible via the internet

115. In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[22]

116. In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[23]

117. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted

---

[22] High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations, FBI, available at https://www.ic3.gov/Media/Y2019/PSA191002 (last accessed September 4, 2023).

[23] Ransomware mentioned in 1,000+ SEC filings over the past year, ZDNet, https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last accessed September 4, 2023).

their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[24]

118. This readily available and accessible information confirms that, prior to the Data Breach, Yellow knew or should have known that (i) ransomware actors were targeting entities such as Yellow's, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Yellow, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data. 48. In light of the information readily available and accessible on the internet before the Data Breach, Yellow, having elected to store the unencrypted PII of thousands of its current and former employes in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Yellow's type of business had cause to be particularly on guard against such an attack.

119. Before the Data Breach, Yellow knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Yellow.

120. Prior to the Data Breach, Yellow knew or should have known that it should have encrypted its employees' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

**F. Yellow failed to follow FTC guidelines**

121. According to the Federal Trade Commission ("FTC"), the need for data security

---

[24] Ransomware Guide, U.S. CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last accessed September 4, 2023).

should be factored into all business decision-making.[25] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Yellow, should employ to protect against the unlawful exposure of PII.

122.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[26] The guidelines explain that businesses should:

a.      protect the personal customer information that they keep;

b.      properly dispose of personal information that is no longer needed;

c.      encrypt information stored on computer networks;

d.      understand their network's vulnerabilities; and

e.      implement policies to correct security problems.

The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

123.    The FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[27]

124.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and

---

[25]   *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Sep. 2, 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[26]   *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Sep. 28, 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[27]   *See Start with Security*, *supra* note 25.

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

125. Yellow's failure to employ reasonable and appropriate measures to protect against unauthorized access to its employees' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

## G. Yellow failed to follow industry standards

126. As stated above, the healthcare industry continues to be a high value target among cybercriminals. In 2017, the U.S. healthcare sector experienced over 330 data breaches, a number which continued to grow in 2018 (363 breaches).[28] The costs of healthcare data breaches are among the highest across all industries, topping $380 per stolen record in 2017 as compared to the global average of $141 per record.[29] As a result, both the government and private sector have developed industry best standards to address this growing problem.

127. The United States Department of Health and Human Services' Office for Civil Rights ("DHHS") notes that, "[w]hile all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations as they store large quantities of highly sensitive and valuable data."[30] DHHS highlights "several basic cybersecurity safeguards that can be implemented to improve cyber

---

[28] 2018 End of Year Data Brach Report, ITRC, (Feb. 20, 2019), https://www.idtheftcenter.org/ wp-content/uploads/2019/02/ITRC_2018-End-of-Year Aftermath_FINAL_V2_ combinedWEB.pdf.

[29] *Ibid.*

[30] *Cybersecurity Best Practices for Healthcare Organizations*, HIPAA JOURNAL (Nov. 1, 2018), https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/.

resilience which only require a relatively small financial investment, yet they can have a major impact on an organization's cybersecurity posture."[31] Most notably, organizations must properly encrypt PII in order to mitigate against misuse.

128.     The private sector has similarly identified the healthcare sector as particularly vulnerable to cyber-attacks both because of the of value of the PII that it maintains and because, as an industry, it has been slow to adapt and respond to cybersecurity threats.[32]

129.     Several best practices have been identified that—at a minimum—should be implemented by businesses like Yellow. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and antimalware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

130.     Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Yellow failed to adopt sufficient data security processes. These include minimum standards of the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03,

---

[31]  *Ibid.*

[32]    *10 Cyber Security Best Practices For the Healthcare Industry*, NTIVA (Jun. 19, 2018), https://www.ntiva.com/blog/10-cybersecurity-best-practices-for-the-healthcare-industry.

29

DE.CM-06, DE.CM-09, and RS.CO-04).

131. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Yellow opened the door to the criminals—thereby causing the Data Breach.

132. Yellow also failed to adequately train its employees on even the most basic of cybersecurity protocols, which could have prevented the Data Breach.

133. Yellow's failure to implement these rudimentary measures made it an easy target for the Data Breach that came to pass.

## CLASS ACTION ALLEGATIONS

134. Plaintiffs bring this case on their own behalf for the following proposed class ("the Class"), seeking both damages and equitable/forward-looking relief:

> **All individuals residing in the United States whose PII was compromised in Yellow's Data Breach**.

135. Excluded from the Class are the officers, directors, and legal representatives of Yellow and the judges and court personnel in this case and any members of their immediate families.

136. This action is properly maintainable as a class action under Fed. R. Civ. Proc. 23 which is applicable to this adversary proceeding pursuant to Fed. R. Bankr. Proc. 7023.

137. The Class is so numerous that joinder of all members would be impracticable. Upon information and belief, the Class consists of thousands of members, spread across numerous states.

138. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether and to what extent Yellow had a duty to protect the PII of Plaintiffs and

the Class;

b.  Whether Yellow failed to adopt the practices and procedures necessary to adequately safeguard the information compromised in the Data Breach;

c.  Whether Yellow adequately and accurately informed Class Members that their PII had been compromised;

d.  Whether Class Members are entitled to actual damages, statutory damages, and/or punitive damages as a result of Yellow's wrongful conduct; and

e.  Whether Plaintiffs and the Class are entitled to restitution as a result of Yellow's wrongful conduct.

139.  Plaintiffs' claims are typical of those of other Class members because their PII, like that of every other Class member, was compromised by the Data Breach. Further, Plaintiffs, like all Class members, were injured by Yellow's uniform conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of other Class members arise from the same operative facts and are based on the same legal theories.

140.  Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights Plaintiffs suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.

141.  The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the questions identified in Paragraph 68 above.

142.    A class action would provide substantial benefits over other methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

143.    The litigation of the claims brought herein is manageable. Yellow's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

144.    Adequate notice can be given to Class members directly using information maintained in Yellow's records.

145.    This proposed class action does not present any unique management difficulties.

146.    Class certification is also appropriate under Rule 23(b)(2) because Yellow has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### NEGLIGENCE and/or NEGLIGENCE *Per Se*
### (on behalf of the Nationwide Class)

147. Plaintiffs repeat and incorporate by reference the preceding paragraphs.

148. As a condition of receiving healthcare services, Plaintiffs and Class members were obligated to provide Yellow and/or its business associates their PII.

149. Plaintiffs and the Class members entrusted their PII to Yellow with the understanding that Yellow would safeguard it.

150. Yellow had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and Class members could and would suffer if the PII were wrongfully disclosed.

151. Yellow had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, *inter alia*, designing, maintaining and testing Yellow's security protocols to ensure that Plaintiffs' and Class members' PII in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately trained on cyber security measures regarding employees' PII.

152. Plaintiffs and the Class members were the foreseeable and probable victims of any inadequate security practices and procedures that Yellow employed. Yellow knew of or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance of providing adequate security of that PII, that it had inadequately trained its employees, and that its security protocols were insufficient to secure the PII of Plaintiffs and Class members.

153. Yellow's own conduct created a foreseeable risk of harm to Plaintiffs and Class

33

members. Yellow's misconduct included, but was not limited to, its failure to take the steps to prevent the Data Breach as set forth herein. Yellow's misconduct also included its decision to not comply with industry standards for the safekeeping and authorized disclosure of employees' PII.

154.    Section 5 of the FTC Act prohibits "unfair…practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Yellow, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Yellow's duty in this regard.

155.    Yellow further violated Section 5 of the FTC Act by failing to use reasonable measures to protect employees' PII and not complying with applicable industry standards, as described herein. Yellow's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class members.

156.    Plaintiffs and the Class members had no ability to protect their PII once they entrusted it to Yellow and/or its business associates.

157.    Yellow has admitted that Plaintiffs' and the Class members' PII was wrongfully disclosed to cybercriminals as a result of the Data Breach.

158.    Yellow breached its duty to Plaintiffs and the Class by failing to exercise ordinary and reasonable care in protecting and safeguarding their PII while it was within Yellow's possession or control.

159.    Yellow unlawfully breached its duty to Plaintiffs and Class members by failing to have appropriate procedures in place to detect and prevent unauthorized dissemination of its employees' PII.

160.    Yellow also unlawfully breached its duty to adequately disclose to Plaintiffs and

34

Class members the existence and scope of the Data Breach.

161. But for Yellow's willful and wanton misconduct and/or gross negligence, Plaintiffs' and Class Members' PII would not have been compromised.

162. As a result of Yellow's negligence, Plaintiffs and the Class have suffered and will continue to suffer damages and injury including, but not limited to, out-of-pocket expenses associated with mitigating against the heightened risk of identity theft and fraud caused by the Data Breach; the time and costs associated with remedying identity theft and fraud fairly attributable to the Data Breach; and time spent monitoring, addressing and correcting the current and future consequences of the Data Breach.

163. These harms are directly and proximately caused by the Data Breach.

**SECOND CLAIM FOR RELIEF**
**INVASION OF PRIVACY**
**(on behalf of the Nationwide Class)**

164. Plaintiffs repeat and incorporate by reference the preceding paragraphs.

165. Plaintiffs and Class members took reasonable and appropriate steps to keep their PII confidential from the public.

166. Plaintiffs' and Class members' efforts to safeguard their own PII were successful, as their PII was not known to the general public prior to the Data Breach.

167. Plaintiffs and Class members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

168. Yellow owed a duty to its employees, including Plaintiffs and Class members, to keep their PII confidential.

169. The unauthorized release of PII is highly offensive to a reasonable person.

35

170. Plaintiffs' and Class members' PII is not of legitimate concern to the public.

171. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Yellow as part of their employment, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization. Yellow publicized Plaintiffs' and Class members' PII, by communicating it to cyber criminals who had no legitimate interest in this PII and who had the express purpose of monetizing that information by injecting it into the illicit stream of commerce flowing through the dark web.

172. Indeed, not only is Plaintiffs' and Class members' PII traveling the dark web, but it is being used to commit fraud; it is being disseminated amongst, *inter alia*, merchants, creditors, health care providers and governmental agencies.

173. It is therefore substantially certain that the Plaintiffs' and the Class members' PII is rapidly becoming public knowledge – among the community writ large – due to the nature of the ransomware campaign that procured it, and the identity theft that it is designed for.

174. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

175. Yellow acted with a knowing state of mind when they permitted the Data Breach because they knew their information security practices were inadequate.

176. Yellow acted with a knowing state of mind when they failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

177. Acting with knowledge, Yellow had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

178. As a proximate result of Yellow's acts and omissions, the PII of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

179. Unless and until enjoined and restrained by order of this Court, Yellow's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class because their PII are still maintained by Yellow with its inadequate cybersecurity system and policies.

180. Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Yellow's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Yellow's inability to safeguard the PII of Plaintiffs and the Class.

181. Unless and until enjoined, and restrained by order of this Court, Yellow's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that Yellow's inadequate data security measures will likely result in additional data breaches. Plaintiffs and Class members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiffs' and Class members' privacy by Yellow.

182. In addition to injunctive relief, Plaintiffs, on behalf of himself and the other members of the Class, also seeks compensatory damages for Yellow's invasion of privacy, which includes the value of the privacy interest invaded by Yellow, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**THIRD CLAIM FOR RELIEF**
**BREACH OF CONFIDENCE**
**(on behalf of the Nationwide Class)**

183.    Plaintiffs repeat and incorporate by reference the preceding paragraphs.

184.    Plaintiffs and Class members conveyed confidential and novel information to Yellow, their PII.

185.    Yellow had knowledge that the PII was disclosed to it in confidence.

186.    There was an understanding between Yellow and Plaintiffs and Class members that the confidence of their PII be maintained.

187.    Yellow breached the confidences Plaintiffs and Class members formed with it by disclosing their PII to cybercriminals.

188.    Unless and until enjoined, and restrained by order of this Court, Yellow's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that Yellow's inadequate data security measures will likely result in additional data breaches. Plaintiffs and Class members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further breaches of confidence by Yellow.

**FOURTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT INCLUDING THE IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**(on behalf of the Nationwide Class)**

189.    Plaintiffs repeat and incorporate by reference the preceding paragraphs.

190.    Yellow offered to employ Plaintiffs and members of the Class if, as a condition of that employment, Plaintiffs and members of the Class provided Yellow with their PII..

191.    In turn, Yellow agreed it would not disclose the PII it collected to unauthorized persons.  Yellow also promised to safeguard employees' PII.

38

192. Plaintiffs and the Class accepted Yellow's offer by providing PII to Yellow in exchange for employment with Yellow.

193. Necessarily implicit in the employment arrangement between Yellow and its employees, including Plaintiffs and Class members, was Yellow's obligation to use such PII for business purposes only, to take reasonable steps to secure and safeguard that PII, and not make disclosures of the PII to unauthorized third parties.

194. Further implicit in the agreement, Yellow was obligated to provide Plaintiffs and the Class with prompt and adequate notice of any and all unauthorized access and/or theft of their PII.

195. Plaintiffs and the Class would not have entrusted their PII to Yellow in the absence of such agreement with Yellow.

196. Yellow materially breached the implied contract(s) they had entered with Plaintiffs and Class members by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Yellow further breached the implied contracts with Plaintiffs and Class members by:

    a.    Failing to properly safeguard and protect Plaintiffs' and Class members' PII;

    b.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement;

    c.    Failing to ensure the confidentiality and integrity of electronic PII that Yellow created, received, maintained and transmitted in violation of the FTC Act and HIPAA.

197. The damages sustained by Plaintiffs and Class members as described above were the direct and proximate result of Yellow's material breaches of its agreements.

198.    Plaintiffs and Class members have performed as required under the relevant agreements, or such performance was waived by the conduct of Yellow.

199.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

200.    Yellow failed to promptly advise Plaintiffs and the Class of the Data Breach.

201.    In these and other ways, Yellow violated its duty of good faith and fair dealing.

202.    Plaintiffs and members of the Class have sustained damages as a result of Yellow's breaches of the Contract, including breaches of the Contract through violations of the covenant of good faith and fair dealing.

## FIFTH CLAIM FOR RELIEF
### TRESPASS TO CHATTELS
**(on behalf of the Nationwide Class)**

203.    Plaintiffs repeat and incorporate by reference the preceding paragraphs.

204.    Plaintiffs and the Class entrusted their PII to Yellow and/or its business associates with the understanding that it would keep that information confidential.

205.    Yellow intentionally dispossessed the Plaintiffs and the putative members of the Class of their PII and/or used or intermeddled with the Plaintiffs and the putative members of the Class's possession of their PII, when it allowed cybercriminals to access it, going far beyond the bounds of any consent Plaintiffs and the Class bestowed upon Yellow and/or its business associates.

206.    As explained at length above, Plaintiffs and the Class members were damaged thereby.

40

**SIXTH CLAIM FOR RELIEF**
**BAILMENT**
**(on behalf of the Nationwide Class)**

207. Plaintiffs repeat and incorporate by reference the preceding paragraphs.

208. Plaintiffs, the Class, and Yellow contemplated a mutual benefit bailment when the Plaintiffs and putative members of the Class transmitted their PII to Yellow and/or its business associates solely for treatment and the payment thereof.

209. Plaintiffs' and the Class's PII was transmitted to Yellow and/or its business associates in trust for a specific purpose (treatment), with an implied contract that the trust was to be faithfully executed, and the PII was to be accounted for when the special purpose was accomplished.

210. Yellow was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiffs' and the Class's PII.

211. Plaintiffs' and the Class's PII was used for a different purpose than the Plaintiffs and the Class intended, for a longer time period and/or in a different manner or place than the parties intended.

212. As explained at length above, Plaintiffs and the Class were damaged thereby.

**SEVENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(on behalf of the Nationwide Class)**

213. Plaintiffs repeat and incorporate by reference the preceding paragraphs.

214. In the alternative to the claims alleged above, Plaintiffs allege that they have no adequate remedy at law and bring this unjust enrichment claim on behalf of themselves and the Class Members.

215. Plaintiffs and Class Members conferred a monetary benefit on Yellow in the form

41

of payment for healthcare services. Plaintiffs and Class Members also provided their PII to Yellow.

216. The money that Plaintiffs and Class Members paid, directly or indirectly, to Yellow should have been used by it, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

217. As a result of Yellow's conduct described herein, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between healthcare services associated with the reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and the inadequate healthcare services without reasonable data privacy and security practices and procedures that they received.

218. Under principles of equity and good conscience, Yellow should not be permitted to retain money belonging to Plaintiffs and Class Members because Yellow failed to use that money to implement the reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for and that were otherwise mandated by HIPAA regulations, federal and state law, and industry standards and best practices.

219. Yellow should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by Yellow.

220. A constructive trust should be imposed upon all unlawful or inequitable sums received by Yellow traceable to Plaintiffs and Class Members.

**EIGHTH CLAIM FOR RELIEF**
**CONVERSION**
**(on behalf of the Nationwide Class)**

221. Plaintiffs repeat and incorporate by reference the preceding paragraphs.

222. At all times relevant hereto, Plaintiffs and Class Members had ownership rights to their PII.

223. Yellow engaged in the wrongful act of disposing of the PII by giving cyber criminals access to it.

224. As explained at length above, Plaintiffs and the Class were damaged thereby.

**NINTH CLAIM FOR RELIEF**
**BREACH OF FIDUCIARY DUTY**
**(on behalf of the Nationwide Class)**

225. Plaintiffs repeat and incorporate by reference the preceding paragraphs.

226. Given the relationship between Yellow and Plaintiffs and Class members, where Yellow became guardian of Plaintiffs' and Class members' PII, Yellow became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiffs and Class members, (1) for the safeguarding of Plaintiffs' and Class members' PII; (2) to timely notify Plaintiffs and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Yellow did and does store.

227. Yellow had a fiduciary duty to act for the benefit of Plaintiffs and Class members upon matters within the scope of Yellow's relationship with them—especially to secure their PII.

228. Because of the highly sensitive nature of the PII, Plaintiffs and Class members would not have entrusted Yellow, or anyone in Yellow's position, to retain their PII had they known the reality of Yellow's inadequate data security practices.

229. Yellow breached its fiduciary duties to Plaintiffs and Class members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class members' PII.

230. Yellow also breached its fiduciary duties to Plaintiffs and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

231. As a direct and proximate result of Yellow's breach of its fiduciary duties, Plaintiffs

and Class members have suffered and will continue to suffer numerous injuries (as detailed supra).

**TENTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**(on behalf of the Nationwide Class)**

232.　Plaintiffs repeat and incorporate by reference the preceding paragraphs.

233.　An actual controversy of sufficient immediacy exists between the parties as to warrant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, exists by and among Plaintiffs, the Debtor Defendants, and the Liquidating Trustee.

234.　Given that notice of the Data Breach was provided a mere three (3) business days prior to the Effective Date, it is unconscionable to subject the claims set forth herein to either the automatic stay under 11 U.S.C. §362 or the Plan injunction as set forth in Article IX (E) of the confirmed Plan.

235.　Plaintiffs seek a declaratory judgment establishing that 1) Yellow had a duty to exercise reasonable care in safeguarding, securing, and protecting Plaintiffs' and the Class members' PII from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties, including, *inter alia*, a duty of care in designing, maintaining and testing Yellow's security protocols; 2) Yellow had a duty to ensure that Plaintiffs' and Class members' PII in its possession is adequately secured and protected into the future and that employees tasked with maintaining such information are adequately trained on cyber security measures regarding employees' PII; 3)Yellow had a duty to notify Plaintiffs and the Class members of the Data Breach prior to June 26, 2026, nearly *fifteen* months after the Data Breach on March 27, 2025; and 4) the automatic stay under 11 U.S.C. §362 or the Plan injunction as set forth in Article IX (E) of the confirmed Plan do not apply to the claims asserted herein.

44

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually, on behalf of themselves and all others similarly situated, requests the following relief:

A.      An Order certifying this action as a nationwide class action and appointing Plaintiffs as Class representatives and their counsel as Class counsel;

B.      A mandatory injunction directing Yellow and/or the Liquidating Trustee to safeguard the PII of Plaintiffs and the Class hereinafter adequately by implementing improved security procedures and measures;

C.      A mandatory injunction requiring that Yellow and/or the Liquidating Trustee provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of PII to unauthorized persons;

D.      An award of compensatory, restitutionary, punitive, exemplary, and statutory damages, as permitted by law;

E.      An award of declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class, including a declaratory judgment that the claims asserted herein are not subject to the automatic stay under 11 U.S.C. § 362 or the Plan injunction as set forth in Article IX (E) of the confirmed Plan;

F.      An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law;

G.      An Order granting the Plaintiffs' and the proposed Class an Administrative Expense Claim for 1) all compensatory, restitutionary, punitive, exemplary, and statutory damages, as permitted by law; and 2) pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law; and

H.     Such other and further relief as this court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: July 30, 2026

Respectfully submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ R. Grant Dick IV*
R. Grant Dick IV (No. 5123)
Dean R. Roland (No. 6459)
Kevin Daniel Levitsky (No. 7228)
1000 N. West Street, Suite 1500
Wilmington, DE  19801
Telephone: (302) 984-3867
Facsimile:  (302) 984-3989
Email: gdick@coochtaylor.com
       droland@coochtaylor.com
       klevitsky@coochtaylor.com

*Attorneys for Plaintiffs and Proposed Class*

**OF COUNSEL:**

Joe P. Leniski, Jr.,
**HERZFELD, SUETHOLZ, GASTEL,**
**LENISKI AND WALL PLLC**
1920 Adelicia Street, Suite 300
Nashville, Tennessee 37212
Phone: (615) 800-6225
Email: joey@hsglawgroup.com

*Attorneys for Plaintiffs and Proposed Class*

# EXHIBIT A

**Notice of Data Security Event**

**Date: June 26, 2026**

Yellow Corporation and its affiliated debtors and debtors-in-possession ("Yellow") under their jointly administered chapter 11 cases (Case No. 23-11069 (Bankr. D. Del. (CTG)) ("Yellow") is issuing notice of a recent event that may impact the security of information related to certain individuals. We are providing information about the event, our response, and steps potentially affected individuals may take to help protect their information.

**What Happened?** On or about March 27, 2025, Yellow identified suspicious activity on its computer network. In response, we promptly started an investigation, with the assistance of third-party cybersecurity specialists, briefly took the systems offline, securely restored them from backups, and reviewed this matter further. During our review, we identified that certain files on the computer network were accessed and exfiltrated without permission on March 27, 2025. After identifying the files that were involved, we undertook a comprehensive review of the files to determine what information was contained in them, and to whom the information related. The review was completed and the substantial majority of the information identified is for former Yellow employees.

**What Information Was Involved?** Due to the historical nature of the data involved, Yellow was not able to identify and/or sufficient verify contact information for individuals that were impacted and is therefore issuing this notice. However, Yellow did identify that the affected information may include some of or all of the following: name, Social Security number, date of birth, driver's license or state identification card number, passport number, other government issued identification card numbers, financial account number, payment card number, medical information, and health insurance information.

**What We Are Doing.** We take the confidentiality, privacy, and security of information very seriously. We responded promptly by taking steps to further secure our systems, commencing a comprehensive investigation, and implementing additional technical safeguards to mitigate the reoccurrence of this type of event. Following our review, we are providing this notification to ensure individuals are aware of this matter. Additionally, we are providing free resources and guidance to help protect information.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors. To assist with this process, you may review the *Steps You Can Take To Help Protect Your Information* section below, which has free resources and guidance on how to monitor and protect personal information. We also encourage you to report promptly any suspicious activity to your credit card company, bank, healthcare/insurance provider, or other applicable institution.

**For More Information.** If you have questions about this matter, you may contact our dedicated assistance line at 833-289-4340, Monday through Friday from 9:00 am to 9:00 pm EST (excluding U.S. Holidays).

Individuals may also write to us at Yellow Corporation, 11500 Outlook Street, Suite 400, Overland Park KS 66211.

**Steps You Can Take To Help Protect Your Information**

**Monitor Your Accounts**

Under U.S. law, a consumer is entitled to one free credit report annually from each of the three major credit reporting bureaus, Equifax, Experian, and TransUnion. To order your free credit report, visit www.annualcreditreport.com or call, toll-free, 1-877-322-8228. You may also directly contact the three major credit reporting bureaus listed below to request a free copy of your credit report.

Consumers have the right to place an initial or extended "fraud alert" on a credit file at no cost. An initial fraud alert is a one-year alert that is placed on a consumer's credit file. Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit. If you are a victim of identity theft, you are entitled to an extended fraud alert, which is a fraud alert lasting seven years. Should you wish to place a fraud alert, please contact any one of the three major credit reporting bureaus listed below.

As an alternative to a fraud alert, consumers have the right to place a "credit freeze" on a credit report, which will prohibit a credit bureau from releasing information in the credit report without the consumer's express authorization. The credit freeze is designed to prevent credit, loans, and services from being approved in your name without your consent. However, you should be aware that using a credit freeze to take control over who gets access to the personal and financial information in your credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding a new loan, credit, mortgage, or any other account involving the extension of credit. Pursuant to federal law, you cannot be charged to place or lift a credit freeze on your credit report. To request a credit freeze, you will need to provide the following information:

1. Full name (including middle initial, as well as Jr., Sr., II, III, etc.);
2. Social Security number;
3. Date of birth;
4. Addresses for the prior two to five years;
5. Proof of current address, such as a current utility bill or telephone bill;
6. A legible photocopy of a government-issued identification card (state driver's license or ID card, etc.); and
7. A copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft if you are a victim of identity theft.

Should you wish to place a fraud alert or a credit freeze, please contact the three major credit reporting bureaus listed below:

**Equifax:** www.equifax.com and 1-888-298-0045

**Experian:** www.experian.com and 1-888-397-3742

**TransUnion:** www.transunion.com and 1-833-799-5355

**Additional Information**

You may further educate yourself regarding identity theft, fraud alerts, credit freezes, and the steps you can take to protect your personal information by contacting the consumer reporting bureaus, the Federal Trade Commission, or your state attorney general. The Federal Trade Commission may be reached at: 600 Pennsylvania Avenue NW, Washington, DC 20580; www.identitytheft.gov; 1-877-ID-THEFT (1-877-438-4338); and TTY: 1-866-653-4261. The Federal Trade Commission also encourages those who discover that their information has been misused to file a complaint with them. You can obtain further information on how to file such a complaint by way of the contact information listed above. You have the right to file a police report if you ever experience identity theft or fraud. To file a report with law enforcement for identity theft, you will likely need to provide some proof that you have been a victim. Instances of known or suspected identity theft should also be reported to law enforcement and your state attorney general. This notice has not been delayed by law enforcement.

*For District of Columbia residents*, the District of Columbia Attorney General may be contacted at: 441 4th St. NW #1100 Washington, D.C. 20001; 202-727-3400; and oag.dc.gov.

*For Maryland residents*, the Maryland Attorney General may be contacted at: 200 St. Paul Place, 16th Floor, Baltimore, MD 21202;1-888-743-0023; and www.oag.state.md.us.

*For New Mexico residents*, you have rights pursuant to the Fair Credit Reporting Act, such as the right to be told if information in your credit file has been used against you, the right to know what is in your credit file, the right to ask for your credit score, and the right to dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting bureaus must correct or delete inaccurate, incomplete, or unverifiable information; consumer reporting agencies may not report outdated negative information; access to your file is limited; you must give your consent for credit reports to be provided to employers; you may limit "prescreened" offers of credit and insurance you get based on information in your credit report; and you may seek damages from violator. You may have additional rights under the Fair Credit Reporting Act not summarized here. Identity theft victims and active duty military personnel have specific additional rights pursuant to the Fair Credit Reporting Act. We encourage you to review your rights pursuant to the Fair Credit Reporting Act by visiting www.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf, or by writing Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave. N.W., Washington, D.C. 20580.

*For New York residents,* the New York Attorney General may be contacted at: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; 1-800-771-7755; or https://ag.ny.gov/.

*For North Carolina residents*, the North Carolina Attorney General may be contacted at: 9001 Mail Service Center, Raleigh, NC 27699-9001; 1-877-566-7226 or 1-919-716-6000; and www.ncdoj.gov.

*For Rhode Island residents*, the Rhode Island Attorney General may be reached at: 150 South Main Street, Providence, RI 02903; www.riag.ri.gov; and 1-401-274-4400. Under Rhode Island law, you have the right to obtain any police report filed in regard to this event.