**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
| Debtors. | ) | (Jointly Administered) |

**MOTION OF THE TRUSTEE FOR ENTRY OF AN ORDER (I) APPROVING THE SETTLEMENT AGREEMENTS BY AND AMONG THE LIQUIDATING TRUST AND CERTAIN PENSION FUNDS AND (II) GRANTING RELATED RELIEF**

Daniel H. Golden, as Liquidating Trustee (the "Trustee") of the Liquidating Trust[2] (the "Trust"), as successor in interest to the certain assets of the above captioned debtors (collectively, the "Debtors"), by and through his undersigned counsel, states as follows in support of this motion ("Motion"):

## Preliminary Statement

1. The Liquidation Trust has secured individual settlement agreements (each, a "Settlement Agreement," collectively, the "Settlement Agreements" or the "Settlements") with four multiemployer pension plans (each, a "MEPP") and MFN[3] that will resolve all existing litigation surrounding MEPP claims and the appeals pursued by MFN, save the estates years of continued litigation and allow creditors to receive meaningful distributions in a timely manner.

[1] A complete list of each of the Debtors in these Chapter 11 Cases (as defined in the Motion) may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation. The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

[2] As defined in the *Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* (the "Plan") confirmed by Court order at Docket No. 8229.

[3] MFN Partners, LP and Mobile Street Holdings, LLC are referred to collectively as "MFN."

The four MEPP claimants are (1) three MEPPs represented by Groom Law Group ("Groom") that were previously denied settlement, namely, New York Teamsters, Local 617, and Local 1730[4]; and (2) Western Conference.[5] The settlement with MFN resolves the claims of two MEPPs, Western Pennsylvania Teamsters and IAM Motor City, that are held by MFN (together with New York Teamsters, Local 617, Local 1730 and Western Conference, the "Settling MEPP Parties").[6] The Trustee will also file contemporaneously herewith a statement of no objection to the Local 705 Pension Fund's claim allowance motion, which, together with the Settlement Agreements, will bring the current multi-year long MEPP litigation in these cases to an end. The Trustee has engaged in extensive discussions with the parties that have been involved in the MEPP litigation and does not expect to receive objection to this Motion.

2. The Settlements were principally formulated in accordance with the five-step calculation methodology previously approved by the Court, while also taking into consideration the unique combination of underlying facts and legal positions of each MEPP's claim. As a result, the Settlements include certain MEPP-specific deviations from the prior approved settlements, as explained below.

3. The Trustee respectfully submits that the Settlements are reasonable and satisfy the criteria for approval under Bankruptcy Rule 9019. The Settlements mitigate costs and risk related to litigating the MEPP claims, including such cost and risk associated with the estimation proceeding regarding the claims of New York Teamsters, Local 617, and Local 1730 currently

---

4 New York State Teamsters Conference Pension & Retirement Fund is referred to as "New York Teamsters," Teamsters Local 617 Pension Plan is referred to as "Local 617," and Management Labor Pension Fund Local 1730 is referred to as "Local 1730."

5 Western Conference of Teamsters Pension Trust Fund is referred to as "Western Conference."

6 Western Pennsylvania Teamsters & Employers Pension Fund is referred to as "Western Pennsylvania Teamsters" and International Association of Machinists Motor City Pension Fund is referred to as "IAM Motor City."

scheduled to be heard in October, and any resulting appeal. The Settlements will also resolve all pending objections against MEPP claims and MFN's pending appeals regarding confirmation and certain approved MEPP settlements, thus allowing the Liquidating Trust to begin making meaningful distributions to general unsecured claimants.[7] This Court rightfully acknowledged that "high-stakes litigation has a way of consuming value, value that would otherwise be available for distribution to creditors."[8] Moreover, the Settlements are the result of extensive arms-length and hard fought negotiations. Significantly, the MEPPs that have settlements previously approved by the Court have agreed not to contest this Motion or invoke the most-favored nation provision in their settlements with respect to the Settlements proposed herein. Unlike the prior approved settlements which were objected to and did not encompass all MEPPs that have been involved in the MEPP litigation, the Settlements proposed in this Motion are expected to be unopposed and will end the MEPP litigation once and for all. For these reasons and those set forth more fully below, the Court should approve the Settlements.

**Relief Requested**

4. The Trustee seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order") (a) approving the Settlement Agreements, each as set forth in its corresponding Settlement Term Sheet (collectively, the "Settlement Term Sheets"), and annexed hereto respectively as Exhibits 1(a)-(e) to **Exhibit A**, by and between the settling parties, and (b) granting related relief.

---

7 Nine other MEPPs have outstanding withdrawal liability claims with an aggregate filed claim amount of $26 million. None of these MEPPs have participated in the litigation to date and many have never contacted the estates. The Trustee will work to present resolutions of these claims after the Court rules on this Motion.

8 Transcript of Hearing on Bench Ruling on Plan Confirmation at 15:5-7, *In re Yellow Corp.*, No. 23-11069 (Bankr. D. Del. Nov. 17, 2025).

**Jurisdiction and Venue**

5. The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Trustee confirms his consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

**A. Prior Approved MEPP Settlements**

8. On November 26 and December 22, 2025, the Debtors filed Rule 9019 motions seeking approval of 15 settlement agreements reached with the following MEPPs:

a. Central States Pension Fund;

b. Four MEPPs represented by Groom (New York Teamsters, Local 1730, Local 617, and TENJ);

c. Nine MEPPs represented by Milbank LLP (New England Teamsters, Central Pennsylvania Teamsters, Local 641, Virginia Teamsters, Local

710, Local 701, Freight Drivers, Philadelphia Teamsters, and IAM National); and

d. Local 707.

*See* Docket Nos. 8296 & 8443. MFN objected to the motions and the Court conducted an evidentiary hearing on January 21, 2026. On April 2, 2026, the Court issued a memorandum opinion finding that the five-step methodology used in the principal settlements is a reasonable one and approving the proposed settlements other than those with New York Teamsters, Local 617 and Local 1730. *See Memorandum Opinion* [Docket No. 8799] ("Settlement Opinion").

9. Certain primary terms consistent across the approved settlements are set forth below.

10. **Withdrawal Liability Claim Calculation**. The allowed withdrawal liability claims in the prior approved settlements were guided by and calculated in accordance with the rulings of the Bankruptcy Court and the Third Circuit, while also taking into account the cost and risk associated with continued litigation. The five-step calculation methodology is as follows:

a. Step 1: UVB Calculations. Determine the Debtors' allocable share of unfunded vested benefits for each MEPP. Where there is a dispute between the parties as to the appropriate amount of UVBs, the UVBs is set at an amount reflecting a 60% decrease of the range between the UVBs as originally asserted by each applicable MEPP and the UVBs as would be calculated using each MEPP's minimum funding rate.

b. Step 2: Annual Payments and Appropriate Contribution Rate. Determine the annual payments for each MEPP claim in accordance with the Court's rulings.

c. Step 3: 20-year cap. Apply the 20-year cap on annual payments, in accordance with the Court's rulings, and limit the claim to the lesser of the MEPP's UVBs and the first 20 annual payments.

d. Step 4: Discount the annual payments to present value. The rate used to discount the annual payments to present value, and the potential effect of 29 U.S.C. § 1405(e) on such calculations, are treated as follows:

i. For MEPPs that received special financial assistance, each of which were required by regulation to use a rate set by PBGC (the "PBGC Rate") to set the amortization schedule for the Debtors' withdrawal liability, the applicable PBGC Rate was used to discount annual payments to present value.

ii. For MEPPs that did not receive special financial assistance, each of which would otherwise have used its minimum funding rate (which are higher than PBGC rates), a § 1405(e) adjustment was made in a manner consistent with the discussion set forth in the Court's April 2025 opinion, assuming a uniform rate of 5%.

e. Step 5: 25% reduction of claim. In acknowledgement of the 29 U.S.C. § 1405(b) subordination adjustment applicable to "an insolvent employer undergoing liquidation or dissolution," reducing each withdrawal liability claim by 25%, with the unpaid balance of this 25% reduction of the claim to be paid on a pro rata basis with post-petition interest from a Debtor entity or entities only if all general unsecured claims at such Debtor are paid in full.

11. **Most Favored Nation**. The prior approved settlement agreements contain a most-favored-nation clause regarding the settled claims calculation methodology. Specifically, if the estates propose a new settlement that a MEPP whose settlement has been approved believes utilizes a materially different calculation methodology than its settlement, the MEPP shall provide notice to the estates of the MEPP's position. If notice is provided and the new settlement is approved, the MEPP may assert a new claim for the difference between the calculation methods. However, if the estates disagree that a materially different method is used, the estates may object to the new claim.

12. **Non-Joint and Several General Unsecured Claims Contribution**. The impact of the prior approved settlements on the holders of non-joint and several general unsecured claims is minimized through a contribution by MEPP settling parties. Because the claims asserted by the MEPPs are joint and several claims against each of the Debtors, the holders of MEPP claims are entitled to distributions from each Debtor to the extent of their allowed claims. In contrast, substantially all of the other non-MEPP general unsecured claims asserted against the

Debtors are not joint and several claims and, therefore, the vast majority of the Debtors' general unsecured creditors are entitled to distributions from only a single Debtor to the extent of their allowed claims (and, as a result, the recovery percentages for MEPP claims on an aggregate basis are substantially higher than the recovery percentages for non-joint and several general unsecured claims). Accordingly, any increase to the allowed withdrawal liability claims of MEPPs has the effect of adversely and disproportionately impacting the recovery percentage for holders of non-joint and several general unsecured claims. For this reason, the prior approved settlement agreements provide that the applicable MEPP settling party will contribute its pro rata share of an up-to $7.5 million contribution for the benefit of non-joint and several general unsecured claimants to ensure such non-joint and several general unsecured claimants are not unduly burdened by the settlements. The prior approved settlement agreements further provide that if the estates enter into additional settlements that are approved by the Court, the settling MEPPs' contributions shall be reduced proportionally.

13. Because the Court previously denied the settlements of New York Teamsters, Local 617 and Local 1730, the total contribution to non-joint and several general unsecured creditors that would be provided by MEPPs whose settlements were approved currently sits at $5.7 million.

**B. Relevant Pending Litigation**

14. **<u>MFN's Appeals of MEPP Settlements and Confirmation</u>**. The Court entered orders approving 12 MEPP settlements on April 22-23, 2026. (*See* Dkt. Nos. 8852-8854, 8860-8869). On May 4, MFN appealed nine of the approved settlements to the District Court for the District of Delaware. MFN has also appealed the Court's November 19, 2025 confirmation order approving the Fourth Amended Plan [Dkt. No. 8229] to the District of Delaware. Both appeals are pending.

15. **Estimation Schedule with New York Teamsters, Local 617 and Local 1730**. The Court held status conferences regarding the claims of New York Teamsters, Local 617 and Local 1730 on June 9 and June 15, 2026. On June 15, the Court entered a scheduling order for motions to estimate these MEPPs' withdrawal liability claims concerning the application of § 1405(b) of ERISA and related issues surrounding the Debtors' liquidation value and insolvency (the "Estimation Schedule"). [Dkt. No. 9028]. The Trustee and the MEPPs have since extended the Estimation Schedule by one month pending settlement discussions on the MEPPs' claims, with the estimation hearing now scheduled for October 20, 2026. [Dkt. No. 9091].[9]

16. **Objection to Western Conference Claims**. Western Conference filed proofs of claim for $257 million, alleging withdrawal liability of approximately $169 million and interest of approximately $88 million. The Debtors withdrew from Western Conference in June 2009, and withdrawal liability was not assessed at that time. Instead, the Debtors entered into several agreements with Western Conference pursuant to which Western Conference agreed to defer, at least for some time period, any assessment of withdrawal liability. The Debtors were never assessed withdrawal liability by Western Conference prior to the petition date.

17. On May 16, 2025, the Debtors objected to Western Conference's claims, arguing that they should be disallowed in their entirety because, among other things, the claims are statutorily untimely; Western Conference cannot seek withdrawal liability from the Debtors when it has no UVBs; and Western Conference cannot recover more than a decade's worth of interest on unassessed withdrawal liability. [Dkt. No. 6347]. On May 19, 2025, MFN joined the

---

[9] The Trustee and New York Teamsters, Local 617 and Local 1730 are discussing a further extension of the Estimation Schedule pending the Court's decision on this Motion.

Debtors' objection. [Dkt. No. 6351]. On June 27, 2025, the Debtors filed a notice of continued hearing to postpone briefing and argument on the Western Conference claim objection until after the Third Circuit issued a decision in the appeal captioned *MFN Partners LP, Mobile Street Holdings LLC and Yellow Corporation v. Central States, Southeast and Southwest Areas Pension Fund, et al.*, Case No. 25-1421 (3d Cir.). [Dkt. No. 6597]. On October 3, 2025, after the Third Circuit issued its decision, Western Conference filed a response in support of its claims but withdrew its $88 million claim for interest. [Dkt. No. 7730]. The objection remains pending.

18. **Local 705 Allowance Motion**. On June 30, 2026, Local 705 Pension Fund ("Local 705") filed a *Restated and Renewed Motion to Allow Claim for Distribution Purposes* [Dkt. No. 9068] ("Allowance Motion"), seeking an order allowing its withdrawal liability claim in the as-filed amount of $17,830,282 for distribution purposes. In the Court's April 7, 2025 *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan Claims Allowance Disputes* [Docket No. 6030] (the "Preliminary Observations Opinion"), the Court determined, among other things, that Local 705 properly discounted to present value the stream of payments that would be owed under its withdrawal liability claim, and that the resulting present value is the claim amount asserted by Local 705. [Dkt. No. 6030 at 42-43]. On July 18, 2025, the Court issued the *Order Relating to Multiemployer Pension Plan Motions for Summary Judgment* [Docket No. 6682] giving effect to the determinations set forth in the Preliminary Observations Opinion.

19. In its Allowance Motion, Local 705 argues that the Debtors have waived the argument that ERISA Section 1405(b) applies to its claims and that it has suffered identifiable prejudice. Local 705 asserts that the Debtors are barred under principles of *res judicata* from

raising arguments regarding the subordination of its claim because the Debtors had the opportunity to do so while litigating the Debtors' claim objection against Local 705. As stated above, the Trustee will file contemporaneously herewith a statement of no objection to the Allowance Motion, but the Trustee will also address Local 705's claims in this Motion to the extent necessary to provide context on the settlement landscape.

**The Settlement Agreements**

20. Like the prior settlements, each Settlement Agreement is an independent agreement; no Settlement Agreement is dependent or conditioned on another Settlement Agreement's approval or effectiveness. If one Settlement Agreement is not approved or consummated, the other Settlement Agreements survive.

21. Withdrawal liability claims for each Settling MEPP Party are calculated using the same five-step methodology employed in the previously proposed MEPP settlements and approved by the Court. This includes reducing withdrawal liability claims by 25% to settle the application of § 1405(b) of ERISA and obviate the need for estimation proceeding(s) regarding that issue, including the one currently scheduled to be heard on October 20, and the associated significant fact and expert discovery.

22. The chart below summarizes for each of the Settling MEPP Parties the settlement amount sought in the Settlement Agreements and—for New York Teamsters, Local 617 and Local 1730——the settlement amount that the Court indicated it would approve in the Settlement Opinion (subject to rounding) and the settlement amount previously sought. The remainder of this section explains how the Settlements differ from the previously approved settlements or what additional considerations are at issue.

| MEPP | Settlement Amount | Settlement Amount Court Indicated It Would Approve in Settlement Opinion | Settlement Amount Previously Sought |
|---|---|---|---|
| New York Teamsters (plus liquidated damages claim) | $300,000,000 | $270.8 million / $277.6 million (*see* ¶¶ 23-24) | $326,500,000 |
| Local 617 | $1,150,000 | $0.1 million | $3,000,000 |
| Local 1730 | $4,384,747.5 | $2.3 million / $4.4 million (*see* ¶ 28) | $7,500,000 |
| Western PA Teamsters | $71,253,787.64 | | |
| IAM Motor City | $4,995,244.75 | | |
| Western Conference | $126,374,804 | | |
| **TOTAL** | **$508,158,583.9** | | |
| **TOTAL (with Local 705 allowed at $17,830,282)** | **$525,988,865.9** | | |

23. **New York Teamsters**. New York Teamsters seeks to have an allowed amount of $300 million for its withdrawal liability and liquidated damages claims. New York Teamsters previously sought an allowed claim of $326.5 million, which the Court denied based on the conclusion that it provided a 100% recovery on New York Teamsters' liquidated damages claim. *See* Settlement Opinion at 64-68. The Court explained that a reasonable settlement for the liquidated damages claim would be $20 million calculated by taking 10% of $250.8 million in withdrawal liability (the amount yielded under the five-step methodology) and applying a further 20% discount based on MFN's challenge to the liquidated damages claim that a party seeking liquidated damages must first bring an enforcement action. *Id.* The Court, therefore, indicated that it would approve an allowed claim of $270.8 million ($250.8 million in withdrawal liability, plus $20 million in liquidated damages). *Id.*

24. The Trustee and New York Teamsters agree and respectfully submit that instead of $250.8 million, $334.4 million—the full withdrawal liability amount without 25% reduction—should be used in the liquidated damages calculation, which results in the liquidated damages

claim at $26.8 million ($334.4 million x 10% x 80%). Accordingly, New York Teamsters' total settlement amount under the Court's methodology would be $277.6 million ($250.8 million + $26.8 million), not $270.8 million. In other words, the new settlement of $300 million seeks an additional $22.4 million, not $29.2 million in allowed claim amount. Further, in addition to settling withdrawal liability and liquidated damages claims, the New York Teamsters Settlement also resolves priority claims for prepetition pension contributions at amounts identical to those proposed and unchallenged in the previous settlement.

25. **Local 617**. Local 617 seeks to have an allowed withdrawal liability claim of $1.15 million. Local 617 previously sought an allowed claim of $3 million, which the Court denied but indicated that it would approve an allowed claim of $0.1 million. *See* Settlement Opinion at 68-71.

26. While the settlements of New York Teamsters and Local 617 collectively seek allowed claim amounts $23.5 million higher than what the Court indicated it would approve, the settlements are nevertheless reasonable taking into account the risk that the Court's rulings on present value discounting, the application of the 20-year cap, liquidated damages, and other issues are overturned in the MEPPs' favor. Indeed, it has been represented to the Trustee that absent settlement, these MEPPs intend to exercise appellate rights and continue litigating these issues.

27. In the Settlement Opinion, the Court found that the resolution of discounting the claims of MEPPs that did not receive special financial assistance at five percent—the total effect of which was to increase claims by approximately $117 million—was a reasonable compromise. Settlement Opinion at 48. The Court found that this "relatively modest" adjustment in the total claims amount fell within the range of reasonable, "particularly when compared to the possible

variation that could have resulted had the matter been fully litigated with each side free to assert its most extreme position," "from on the one hand discounting the stream of payments at a nearly 18 percent discount rate to on the other not even applying the 20-year cap," *Id.* at 47-49. The $23.5 million adjustment to New York Teamsters's and Local 617's settlement amount is likewise within the range of reasonable viewed in light of:

a. "[T]he magnitude of the effect" that the 20-year cap, present value discounting and other issues have on the total amount of claims and the fact that "it would only take a rather small chance of reversal to swing the number" by more than $23.5 million, *see id.* at 48. Indeed, the Court noted that Debtors' likelihood of success on appeal was not "higher than 90 percent." *Id.* *See also id.* at 60 (approving the settlement of Central States' liquidated damages claim and explaining that "[w]hile the Court stands behind its decision to grant summary judgment in favor of the debtors on this issue, it is by no means unreasonable to say that there is an 18 percent likelihood that an appellate court might reverse that decision");

b. The approximately $526 million total claims amount contemplated by the Settlements and allowance of Local 705's motion;

c. The lack of objection to the Settlements; and

d. The full conclusion of litigation if the Settlements are approved.

28. **Local 1730**. Local 1730 seeks to have an allowed withdrawal liability claim of $4,384,747.5, which is the amount that the five-step methodology yields—taking into account that it had a "mass withdrawal." Local 1730 previously sought an allowed claim of $7,500,000, which the Court rejected but indicated that it would approve $2.3 million. That $2.3 million

figure includes the application of the 20-year cap. *See* Expert Report: Calculations of Withdrawal Liability for Settlement Purposes By Robert T. Campbell, Dkt. No. 8543-1 at 9 & 25. The Trustee and Local 1730 agree that Local 1730 experienced a "mass withdrawal" when the Debtors withdrew such that the Debtors' withdrawal liability is determined without applying the 20-year cap. 29 U.S.C. § 1399(c)(1)(D)(i) (providing that, in the event of a mass withdrawal, withdrawal liability "shall be determined . . . without regard to" the 20-year cap set forth in 1399(c)(1)(B)). The $4,384,747.5 claim currently sought is calculated using the approved five-step methodology without applying the 20-year cap and is consistent with the Debtors' calculations. *See id.* at 9 (calculating that Local 1730's withdrawal liability claim assuming payments in perpetuity is $5,846,330 before the 25% reduction provided under the resolution of the §1405(b) issues).

29. **MFN**. In addition to settling the withdrawal liability claims of Western Pennsylvania Teamsters and IAM Motor City, MFN will dismiss its pending confirmation and MEPP settlement appeals and waive its right to file a substantial contribution application. IAM Motor City's claims are treated as joint and several obligations, even though IAM Motor City filed proofs of claim against only two of the 24 Debtors,[10] consistent with the treatment presented to the Court and creditors before in the approved disclosure statement accompanying the Plan [Dkt. No. 7619].[11] Finally, MFN's scheduled trade claim transferred from Belk Express is sought to be allowed at the filed amount.

30. **Western Conference**. Given the Third Circuit's ruling upholding the withdrawal liability calculations of certain MEPPs pursuant to contracts with the Debtors, *In re Yellow*

10 *See* Proof of Claim Nos. 16895, 16905, 19785, 19786.

11 The recovery ranges contained in the approved disclosure statement assumed that all withdrawal liability claims, including those of IAM Motor City and Western Conference, were filed jointly and severally.

*Corp.*, 152 F.4th 491, 505-506 (3d Cir. 2025), Western Conference's withdrawal liability claim is calculated assuming that the deferral agreements with the Debtors are valid, notwithstanding ERISA's requirement that withdrawal liability must be assessed and demanded "as soon as practicable" following withdrawal and the other arguments raised in the Debtors' and MFN's claim objection. *See* 29 U.S.C. § 1399(b)(1); Dkt. Nos. 6347 & 6351. And like IAM Motor City, although Western Conference filed proofs of claim against only Yellow Corporation,[12] its claims are treated as joint and several claims in line with what has been shown to the Court and stakeholders previously and in light of Western Conference's contention that its original filed claim filed prior to the entry of the bar date order constituted notice to all Debtors in Yellow Corporation's control group.

31. **Local 705**. The Court determined in the Preliminary Observations Opinion that Local 705 correctly calculated the present value of its withdrawal liability claim, which present value is the claim amount asserted by Local 705. [Dkt. No. 6030 at 42-43]. Local 705 filed the Allowance Motion seeking to have its claim allowed at the as-filed amount and arguing that the Debtors had waived objections based on 29 U.S.C. § 1405(b) as to Local 705. The Trustee does not oppose Local 705's motion, even though doing so effectively allows Local 705's claim without applying the fifth step of the approved calculation methodology of the prior settlements that would reduce the claim by 25% to account for the requirement of § 1405(b), because the Settlement Agreements with the MEPP Settling Parties resolve all other litigation regarding, among other things, the application of § 1405(b) and related waiver issues similar to those asserted by Local 705.

[12] *See* Proof of Claim Nos. 160, 163, 12876.

32. **No Contribution to Non-Joint and Several General Unsecured Creditors**. None of the MEPP Settling Parties (or Local 705) will gift a portion of their recoveries on withdrawal liability claims to non-joint and several general unsecured creditors. This contribution, originally contemplated at $7.5 million total (*see* Settlement Opinion at 52) currently stands at $5.7 million following the Court's denial of three previously proposed settlements (*see* Dkt. Nos. 8852-8854, 8860-8869). And because the previously approved settlements provide for an automatic *pro rata* reduction in contribution amount upon approval of additional MEPP settlements, the Settlements in effect reduce the contribution to non-joint and several general unsecured creditors from $5.7 million to $5.0 million, which amount shall be contributed by the MEPPs whose settlements were previously approved as set forth in the chart below.

| MEPP | Original Contribution Amount | Contribution Amount if All Settlements Proposed Are Approved |
|---|---|---|
| Central States | $3,751,977 | $3,316,186 |
| TENJ | $9,027 | $7,979 |
| Local 707 | $133,773 | $118,235 |
| Local 701 | $20,466 | $18,089 |
| Freight Drivers | $28,226 | $24,947 |
| Local 641 | $79,586 | $70,342 |
| New England Teamsters | $1,114,772 | $985,291 |
| Central Pennsylvania Teamsters | $220,017 | $194,462 |
| Local 710 | $188,240 | $166,376 |
| Virginia Teamsters | $26,106 | $23,074 |
| Philadelphia Teamsters | $101,540 | $89,746 |
| IAM National | $68,889 | $60,888 |
| **TOTAL** | **$5,742,619** | **$5,075,615** |

33. The package of Settlements avoids the risk of a significant increase in withdrawal liability and other liabilities if the remaining issues are litigated further. This benefit far outweighs the contribution reduction resulting from the proposed Settlements.

34. **No Objection From MEPPs Whose Settlements Were Previously Approved**. After protracted, multiple-round negotiations, the MEPPs with previously approved settlements do not object to this Motion and have agreed not to invoke the most favored nation provision in their settlements with respect to the Settlements proposed herein. The Trustee does not expect to receive any objections to this Motion.

35. The benefit the Settlement Agreements provide, and the balanced compromises reached therein—each obtained through significant effort in extensive discussions—inures to the benefit of the Liquidating Trust, the estates, and all of its stakeholders, particularly when factoring in the length of time, expense, and uncertainty in continuing to pursue litigation without such agreement. Accordingly, consummation of the Settlement Agreements is a sound exercise of the Liquidation Trust's business judgment and in the best interest of the bankruptcy estates. The Trustee respectfully requests that the Settlement Agreements be approved, and the Court authorize the MEPP Settling Parties to effectuate the Settlement Agreements and undertake any further actions necessary to perform thereunder.

## Basis for Relief

36. Bankruptcy Rule 9019(a) provides, in relevant part:

> On motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, . . . and indenture trustee as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

37. Settlements and compromises are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 428 (1968). It is well settled that in order to "minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'"

*Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. 1993)); *see also Will v. Northwestern Univ. (In re Nutraquest, Inc.*), 434 F.3d 639, 644 (3d Cir. 2006) (finding that "[s]ettlements are favored [in bankruptcy]"); *In re Adelphia Commc'n Corp.*, 361 B.R. 337, 348 (Bankr. D. Del. 2007) (same). Accordingly, when required, "courts are able to craft flexible remedies that, while not expressly authorized by the [Bankruptcy] Code, affect the result the [Bankruptcy] Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

38. Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'" (citation omitted)); *In re Northwestern Corp.*, 2008 WL 2704341, at *6 (Bankr. D. Del. July 10, 2008) ("[T]he bankruptcy court must determine whether the compromise is fair, reasonable, and in the best interests of the estate.") (citation omitted).

39. When analyzing settlements, courts in the Third Circuit generally consider the following factors (the "Martin Factors"):

(i) the probability of success in litigation;
(ii) the likely difficulties in collection;
(iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
(iv) the paramount interest of the creditors.

*See In re Martin*, 91 F.3d 389, 392 (3d Cir. 1996). As the Court stated in addressing prior motions brought under Rule 9019, "the task is to determine whether the settlement proposed by the trustee is an appropriate one, affording some amount of deference to the trustee's judgment." [Settlement Opinion at 44].

**A. Application of the *Martin* Factors.**[13]

40. The Settlements readily satisfy each of the *Martin* Factors because the Settlements are value-maximizing. The Settlements fully mitigate litigation costs and appellate risk and represent fair and equitable resolutions within the range of reasonable. The Settlements are also expected to be unopposed, unlike the MEPP settlements previously presented to the Court. The Liquidating Trust exercised sound business judgment in its analysis of the Settlements with reference to the *Martin* Factors, and the Court should approve the Settlements under Rule 9019.

41. In the Liquidating Trust's business judgment, each Settlement represents a fair compromise considering the circumstances, and it is reasonable and in the best interests of the estates, creditors, and other parties involved in these Chapter 11 cases. The Settlements, with a few exceptions, are formulated consistent with the settlements already approved by the Court, and the Settlements are the result of hard-fought, good-faith, arms-length negotiations between the Trustee, MFN, the other MEPP Settling Parties, as well as the MEPPs whose settlements were approved previously, leading to an agreement that falls well within the range of reasonable litigation outcomes. Each Settlement offers a fair and practical resolution to the disputed issues, which, if continued to be litigated, would reduce the estates' distributable value and diminish

[13] The second *Martin* factor is not applicable.

creditor recoveries. Each Settlement meets the relevant *Martin* Factors and, therefore, should be approved.

42. ***First***, the Settlements resolve myriad legal issues and disputes among the Settling Parties, for which disputes the probability of the estate succeeding is speculative. The issues in dispute are exceedingly technical, complex, and in many cases lack significant guiding precedent. Absent the Settlements, the outcome with the highest probability under the circumstances of these cases is mutually-assured destruction that will result in tens of millions of dollars spent litigating various claims and issues, the result of which would put stakeholders in no better place—and indeed, in a much worse place—than the Settlement Agreements afford.

43. As evidenced by the lengthy and contentious litigation leading up to this point, including the estimation proceeding with New York Teamsters, Local 617 and Local 1730 that was scheduled after the Court denied the prior proposed settlements of those MEPPs, material risks remain in resolving the billions of dollars of withdrawal liability claims of the MEPP Settling Parties. Further, there is a lack of supporting authority and judicial guidance that address many of the complex disputed issues relating to the claims of the MEPP Settling Parties under these circumstances, including in particular the application of § 1405(b) to withdrawal liability claims and related issues regarding the measurement of the Debtors' liquidation value and insolvency. As set forth in further detail above, the Settlements reflect reasonable compromises of highly contested issues. The Liquidating Trust's business judgment is sound and the Settlements offer a reasonable and fair resolution of the claims at issue.

44. ***Second***, resolving the relevant disputes without the Settlements will require difficult, costly, and time-consuming litigation, requiring evidentiary proceedings before this Court (such as the estimation hearing scheduled for October 20) and a multitude of appellate

courts. In its analysis related to Bankruptcy Code section 1129(a)(7), this Court concluded that continued litigation—a substantial amount of which is on account of the MEPP Claims—would extend 18 to 24 months and at a cost to the estates in excess of $50 million that would otherwise be available to stakeholders. [Dkt. No. 8258 at 41 & 43]. In contrast, the Settlements allow the Liquidating Trust to conclusively avoid the time and expense associated with litigating, the effect of which diminishes the assets of the estates. Therefore, the Liquidating Trust believes that each Settlement provides a certain and timely resolution of the disputes, which is in the best interest of all parties involved.

45. ***Finally***, the paramount interest of creditors (and other parties in interest in these Chapter 11 cases) will undoubtedly be best served by approving the Settlements. While the Settlements effectively reduce the contribution to non-joint and several general unsecured creditors from $5.7 million to $5.0 million, continued litigation absent the Settlements will only increase the administrative costs of the cases and, again, diminish recoveries for stakeholders. Considering the risk of unfavorable litigation outcomes in light of the settlement methodology that the Court previously approved, reaching a final resolution as outlined in the Settlements is in the best interests of creditors.

46. For the foregoing reasons, the Trustee respectfully submits that the terms of each Settlement satisfy the criteria for approval under Bankruptcy Rule 9019.

WHEREFORE, the Trustee requests entry of the Order, substantially in the form attached hereto as **Exhibit A**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

[*Remainder of page intentionally left blank*]

Dated: August 28, 2026
Wilmington, Delaware

*/s/ Peter J. Keane*

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
tcairns@pszjlaw.com
pkeane@pszjlaw.com
ecorma@pszjlaw.com

Alan D. Halperin (admitted *pro hac vice*)
Debra J. Cohen (admitted *pro hac vice*)
**HALPERIN BATTAGLIA BENZIJA, LLP**
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
Email: ahalperin@halperinlaw.net
dcohen@halperinlaw.net

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
Shirley Chan (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 W Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: patrick.nash@kirkland.com
shirley.chan@kirkland.com

*Co-Counsel for the Liquidating Trustee*